

# *WebCivil Supreme - eFiled Documents Detail*

| | |
|---|---|
| Court: | **New York Supreme Court** |
| Index Number: | **158207/2022** |
| Case Name: | **Emigrant Business Credit Corporation vs. Hanratty, John Arthur et al** |
| Case Type: | **Comm-Other** |
| Track: | **Complex** |

## Document List - Click on the document name to view the document

| Document # | Date Received/Filed | Document | Description | Motion # | Filing User |
|---|---|---|---|---|---|
| 1 | 09/25/2022 | SUMMONS + COMPLAINT | --none-- | | ALEXANDER J WILLSCHER |
| 2 | 10/17/2022 | ORDER TO SHOW CAUSE ( PROPOSED ) | --none-- | 001 | ALEXANDER J WILLSCHER |
| 3 | 10/17/2022 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF PROPOSED OSC/EXPARTE APP | Affirmation of Alexander J. Willscher | 001 | ALEXANDER J WILLSCHER |
| 4 | 10/17/2022 | MEMORANDUM OF LAW IN SUPPORT | --none-- | 001 | ALEXANDER J WILLSCHER |
| 5 | 10/17/2022 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF PROPOSED OSC/EXPARTE APP | Affidavit of Scott Weiss | 001 | ALEXANDER J WILLSCHER |
| 6 | 10/17/2022 | EXHIBIT(S) | Credit Agreements | 001 | ALEXANDER J WILLSCHER |
| 7 | 10/17/2022 | EXHIBIT(S) | Promissory Notes | 001 | ALEXANDER J WILLSCHER |
| 8 | 10/17/2022 | EXHIBIT(S) | Guaranties | 001 | ALEXANDER J WILLSCHER |
| 9 | 10/17/2022 | EXHIBIT(S) | Security Agreements | 001 | ALEXANDER J WILLSCHER |
| 10 | 10/17/2022 | EXHIBIT(S) | Custodial and Servicing Agreements | 001 | ALEXANDER J WILLSCHER |
| 11 | 10/17/2022 | EXHIBIT(S) | Validity Guaranties | 001 | ALEXANDER J WILLSCHER |
| 12 | 10/17/2022 | EXHIBIT(S) | Notices of Default | 001 | ALEXANDER J WILLSCHER |
| 13 | 10/17/2022 | EXHIBIT(S) | Independent Auditor's Reports | 001 | ALEXANDER J WILLSCHER |
| 14 | 10/17/2022 | EXHIBIT(S) | McOsker Counterclaim | 001 | ALEXANDER J WILLSCHER |
| 15 | 10/17/2022 | RJI -RE: ORDER TO SHOW CAUSE | --none-- | 001 | ALEXANDER J WILLSCHER |
| 16 | 10/17/2022 | RJI (AMENDED) | RJI Addendum | | ALEXANDER J WILLSCHER |
| 17 | 10/17/2022 | RJI (AMENDED) | Commercial Division Addendum | | ALEXANDER J WILLSCHER |
| 18 | 10/17/2022 | ADDENDUM - COMMERCIAL DIVISION (840C) (POST RJI) | --none-- | | ALEXANDER J WILLSCHER |
| 19 | 10/17/2022 | NOTICE OF APPEARANCE (POST RJI) | Notice of Appearance of Austin P. Mayron | | AUSTIN PHILIP MAYRON |
| 20 | 10/18/2022 | NOTICE OF APPEARANCE (POST RJI) | --none-- | | KARI LIN PARKS |
| 21 | 10/18/2022 | LETTER / CORRESPONDENCE TO JUDGE | --none-- | 001 | KARI LIN PARKS |
| 22 | 10/18/2022 | LETTER / CORRESPONDENCE TO JUDGE | --none-- | 001 | ALEXANDER J WILLSCHER |
| 23 | 10/19/2022 | ORDER TO SHOW CAUSE | --none-- | 001 | John Howard court user |
| 24 | 10/26/2022 | AFFIDAVIT | John Hanratty | 001 | KARI LIN PARKS |
| 25 | 10/26/2022 | AFFIRMATION | Kari Parks | 001 | KARI LIN PARKS |
| 26 | 10/26/2022 | EXHIBIT(S) | October 24, 2022 Emails | 001 | KARI LIN PARKS |
| 27 | 10/26/2022 | MEMORANDUM OF LAW IN OPPOSITION | --none-- | 001 | KARI LIN PARKS |

| 28 | 10/27/2022 | MEMORANDUM OF LAW IN REPLY | --none-- | 001 | ALEXANDER J WILLSCHER |
|----|----|----|----|----|----|
| 29 | 10/27/2022 | AFFIRMATION | --none-- | 001 | ALEXANDER J WILLSCHER |
| 30 | 10/27/2022 | EXHIBIT(S) | October 21, 2022 Emails | 001 | ALEXANDER J WILLSCHER |
| 31 | 11/16/2022 | LETTER / CORRESPONDENCE TO JUDGE | --none-- | 001 | KARI LIN PARKS |
| 32 | 11/16/2022 | EXHIBIT(S) | The Ebury Parties' Memorandum in Support of Motion to Dismiss McOsker Counterclaim and Third-Party Complaint | 001 | KARI LIN PARKS |
| 33 | 11/16/2022 | LETTER / CORRESPONDENCE TO JUDGE | --none-- | 001 | ALEXANDER J WILLSCHER |
| 34 | 11/16/2022 | EXHIBIT(S) | Escrow Correspondence | 001 | ALEXANDER J WILLSCHER |
| 35 | 11/16/2022 | LETTER / CORRESPONDENCE TO JUDGE | Response to EBCC's November 16, 2022 Letter | 001 | KARI LIN PARKS |
| 36 | 11/16/2022 | EXHIBIT(S) | Escrow Correspondence | 001 | KARI LIN PARKS |
| 37 | 11/16/2022 | EXHIBIT(S) | Escrow Correspondence | 001 | KARI LIN PARKS |
| 38 | 11/16/2022 | EXHIBIT(S) | Escrow Correspondence | 001 | KARI LIN PARKS |
| 39 | 11/16/2022 | EXHIBIT(S) | Escrow Correspondence | 001 | KARI LIN PARKS |
| 40 | 11/16/2022 | NOTICE OF APPEARANCE (POST RJI) | --none-- | | DANIEL KUO CRANDALL |
| 41 | 11/16/2022 | NOTICE OF MOTION | --none-- | 002 | DANIEL KUO CRANDALL |
| 42 | 11/16/2022 | MEMORANDUM OF LAW IN SUPPORT | --none-- | 002 | DANIEL KUO CRANDALL |
| 43 | 11/21/2022 | ADJOURNMENT OF MOTION -REQUEST -IN SUBMISSIONS PART -RM 130 | --none-- | 002 | ALEXANDER J WILLSCHER |
| 44 | 11/23/2022 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF MOTION | --none-- | 002 | DANIEL KUO CRANDALL |
| 45 | 11/23/2022 | EXHIBIT(S) | Copy of Complaint | 002 | DANIEL KUO CRANDALL |
| 46 | 11/28/2022 | ORDER - OTHER (NON-MOTION) | --none-- | | John Howard court user |
| 47 | 11/30/2022 | DECISION + ORDER ON MOTION | --none-- | 001 | John Howard court user |
| 48 | 12/02/2022 | MEMORANDUM OF LAW IN OPPOSITION | --none-- | 002 | ALEXANDER J WILLSCHER |
| 49 | 12/06/2022 | STIPULATION - ADJOURNMENT OF MOTION -IN SUBMISSIONS PART -RM 130 | --none-- | 002 | DANIEL KUO CRANDALL |
| 50 | 12/07/2022 | STIPULATION - SO ORDERED | --none-- | | John Howard court user |
| 51 | 12/08/2022 | AFFIRMATION | Certification Pursuant to Commercial Division Rule 10 | | DANIEL KUO CRANDALL |
| 52 | 12/09/2022 | AFFIRMATION | Certification Pursuant to Commercial Division Rule 10 | | ALEXANDER J WILLSCHER |
| 53 | 12/12/2022 | ORDER - STATUS CONFERENCE | --none-- | | John Howard court user |
| 54 | 12/15/2022 | MEMORANDUM OF LAW IN REPLY | --none-- | 002 | DANIEL KUO CRANDALL |
| 55 | 12/19/2022 | BOND/UNDERTAKING | --none-- | | ALEXANDER J WILLSCHER |
| 56 | 12/28/2022 | NOTICE OF APPEAL | --none-- | 001 | DANIEL KUO CRANDALL |
| 57 | 02/22/2023 | STIPULATION - CONFIDENTIALITY ( REQUEST TO SO ORDER ) | Stipulation for the Exchange of Confidential Information | | ALEXANDER J WILLSCHER |
| 58 | 02/22/2023 | EXHIBIT(S) | Letter Regarding Stipulation | | ALEXANDER J WILLSCHER |
| 59 | 03/02/2023 | STIPULATION - SO ORDERED | --none-- | | John Howard court user |
| 60 | 03/29/2023 | STIPULATION - AS DIRECTED BY COURT | Compliance Conference Form | | KARI LIN PARKS |
| 61 | 04/20/2023 | NOTICE OF APPEARANCE (POST RJI) | --none-- | | HEESOO KIM |
| 62 | 05/22/2023 | STIPULATION - AS DIRECTED BY COURT | Compliance Conference Form | | ALEXANDER J WILLSCHER |
| 63 | 05/25/2023 | ORDER - STATUS CONFERENCE | --none-- | | John Howard court user |
| 64 | 07/03/2023 | DECISION + ORDER ON MOTION | --none-- | 002 | John Howard court user |
| 65 | 06/29/2023 | NOTICE OF ENTRY | --none-- | 002 | ALEXANDER J WILLSCHER |
| 66 | 06/30/2023 | NOTICE OF APPEARANCE (POST RJI) | --none-- | | VICTOR ROBERT WANG |
| 67 | 07/07/2023 | STIPULATION - AS DIRECTED BY COURT | Compliance Conference Form | | VICTOR ROBERT WANG |
| 68 | 07/10/2023 | ANSWER WITH COUNTER-CLAIM(S) | --none-- | | KARI LIN PARKS |

| 69 | 07/20/2023 | ANSWER WITH COUNTERCLAIM(S) | Corrected with Verification | | KARI LIN PARKS |
|---|---|---|---|---|---|
| 70 PENDING | 07/27/2023 | NOTICE OF APPEAL | --none-- | 002 | VICTOR ROBERT WANG |
| 71 | 08/09/2023 | NOTICE OF MOTION | --none-- | 003 | ALEXANDER J WILLSCHER |
| 72 | 08/09/2023 | MEMORANDUM OF LAW IN SUPPORT | --none-- | 003 | ALEXANDER J WILLSCHER |
| 73 | 08/09/2023 | AFFIDAVIT | Affidavit of Scott Weiss, dated August 9, 2023 | 003 | ALEXANDER J WILLSCHER |
| 74 | 08/09/2023 | EXHIBIT(S) | Term Sheet | 003 | ALEXANDER J WILLSCHER |
| 75 | 08/09/2023 | AFFIRMATION | Affirmation of Alexander J. Willscher, dated August 9, 2023 | 003 | ALEXANDER J WILLSCHER |
| 76 | 08/09/2023 | EXHIBIT(S) | Copy of Answer and Counterclaim | 003 | ALEXANDER J WILLSCHER |
| 77 | 08/14/2023 | ORDER - STATUS CONFERENCE | --none-- | | John Howard court user |
| 78 | 08/16/2023 | STIPULATION - ADJOURNMENT OF MOTION -IN SUBMISSIONS PART -RM 130 | --none-- | 003 | VICTOR ROBERT WANG |
| 79 | 08/25/2023 | COMPLAINT (AMENDED) | Amended Counterclaim | | KARI LIN PARKS |
| 80 | 08/29/2023 | NOTICE OF MOTION | --none-- | 004 | ALEXANDER J WILLSCHER |
| 81 | 08/29/2023 | MEMORANDUM OF LAW IN SUPPORT | --none-- | 004 | ALEXANDER J WILLSCHER |
| 82 | 08/29/2023 | AFFIRMATION | --none-- | 004 | ALEXANDER J WILLSCHER |
| 83 | 08/29/2023 | EXHIBIT(S) | Copy of Amended Counterclaim | 004 | ALEXANDER J WILLSCHER |
| 84 | 08/29/2023 | EXHIBIT(S) | August 14, 2023 Adjournment Request | 004 | ALEXANDER J WILLSCHER |
| 85 | 09/07/2023 | MEMORANDUM OF LAW IN OPPOSITION | --none-- | 004 | KARI LIN PARKS |
| 86 | 09/13/2023 | MEMORANDUM OF LAW IN REPLY | --none-- | 004 | ALEXANDER J WILLSCHER |
| 87 | 11/21/2023 | ORDER - STATUS CONFERENCE | --none-- | | John Howard court user |
| 88 | 11/30/2023 | DECISION + ORDER ON MOTION | --none-- | 003 | John Howard court user |
| 89 | 11/30/2023 | DECISION + ORDER ON MOTION | --none-- | 004 | John Howard court user |
| 90 | 11/29/2023 | NOTE OF ISSUE:WITHOUT JURY | --none-- | | ALEXANDER J WILLSCHER |
| 91 | 11/30/2023 | NOTICE OF ENTRY | --none-- | 003 | ALEXANDER J WILLSCHER |
| 92 | 11/30/2023 | NOTICE OF ENTRY | --none-- | 004 | ALEXANDER J WILLSCHER |
| 93 | 12/04/2023 | ORDER - ADMINISTRATIVE | --none-- | | Jack Wong court user |
| 94 | 12/20/2023 | NOTICE OF APPEARANCE (POST RJI) | Notice of Appearance of Erin L. Savoie | | ERIN LEAH SAVOIE |
| 95 | 12/28/2023 | LETTER / CORRESPONDENCE TO JUDGE | Letter re Proposed Summary Judgment Briefing Schedule | | ALEXANDER J WILLSCHER |
| 96 PENDING | 12/28/2023 | STIPULATION - OTHER - ( REQUEST TO SO ORDER ) | Stipulation and Proposed Order re Sealing Motions | | ALEXANDER J WILLSCHER |
| 97 PENDING | 01/04/2024 | ORDER TO SHOW CAUSE ( PROPOSED ) | --none-- | 005 | ALEXANDER J WILLSCHER |
| 98 | 01/04/2024 | AFFIDAVIT/AFFIRMATION - REQUEST TO SEAL | Affirmation of Alexander J. Willscher (Sealed) | 005 | ALEXANDER J WILLSCHER |
| 99 | 01/04/2024 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF PROPOSED OSC/EXPARTE APP | Affirmation of Alexander J. Willscher (Redacted) | 005 | ALEXANDER J WILLSCHER |
| 100 | 01/04/2024 | EXHIBIT(S) | Hanratty Criminal Complaint | 005 | ALEXANDER J WILLSCHER |
| 101 | 01/04/2024 | EXHIBIT(S) | Hanratty Appearance Bond | 005 | ALEXANDER J WILLSCHER |
| 102 | 01/04/2024 | EXHIBIT(S) - REQUEST TO SEAL | Excerpts from EBURY_000004 | 005 | ALEXANDER J WILLSCHER |
| 103 | 01/04/2024 | EXHIBIT(S) - REQUEST TO SEAL | Excerpts from EBURY_000160 | 005 | ALEXANDER J WILLSCHER |
| 104 | 01/04/2024 | EXHIBIT(S) - REQUEST TO SEAL | Excerpts from EBURY_000295 | 005 | ALEXANDER J WILLSCHER |
| 105 | 01/04/2024 | EXHIBIT(S) - REQUEST TO SEAL | Excerpts from EBURY_00081206 | 005 | ALEXANDER J WILLSCHER |
| 106 | 01/04/2024 | EXHIBIT(S) - REQUEST TO SEAL | Excerpts from EBURY_00081296 | 005 | ALEXANDER J WILLSCHER |
| 107 | 01/04/2024 | EXHIBIT(S) | Email Correspondence from V. Wang to A. Mayron, dated November 15, 2023 | 005 | ALEXANDER J WILLSCHER |
| 108 | 01/04/2024 | EXHIBIT(S) - REQUEST TO SEAL | Excerpts from Defendants' QuickBooks Journal Report, dated January 3, 2024 | 005 | ALEXANDER J WILLSCHER |
| 109 | 01/04/2024 | MEMORANDUM OF LAW - REQUEST TO SEAL | Memorandum of Law in Support of OSC (Sealed) | 005 | ALEXANDER J WILLSCHER |

| 110 | 01/04/2024 | MEMORANDUM OF LAW IN SUPPORT | Memorandum of Law in Support of OSC (Redacted) | 005 | ALEXANDER J WILLSCHER |
| 111 | 01/08/2024 | STIPULATION - SO ORDERED | --none-- | | John Howard court user |
| 112 | 01/08/2024 | LETTER/CORRESPONDENCE - SO ORDERED | --none-- | | John Howard court user |
| 113 | 01/10/2024 | ORDER TO SHOW CAUSE | --none-- | 005 | John Howard court user |
| 114 PENDING | 01/11/2024 | ORDER TO SHOW CAUSE ( PROPOSED ) | --none-- | 006 | KARI LIN PARKS |
| 115 | 01/11/2024 | MEMORANDUM OF LAW IN SUPPORT | --none-- | 006 | KARI LIN PARKS |
| 116 | 01/11/2024 | AFFIRMATION | --none-- | 006 | KARI LIN PARKS |
| 117 | 01/11/2024 | EXHIBIT(S) | Emails re: Bulk Sale | 006 | KARI LIN PARKS |
| 118 | 01/11/2024 | EXHIBIT(S) | Quickbooks Audit Log | 006 | KARI LIN PARKS |
| 119 | 01/11/2024 | EXHIBIT(S) | Partnership Agreements | 006 | KARI LIN PARKS |
| 120 | 01/12/2024 | NOTICE OF MOTION | --none-- | 009 | ALEXANDER J WILLSCHER |
| 121 | 01/12/2024 | MEMORANDUM OF LAW | --none-- | 009 | ALEXANDER J WILLSCHER |
| 122 | 01/12/2024 | AFFIRMATION | Affirmation of Alexander J. Willscher | 009 | ALEXANDER J WILLSCHER |
| 123 | 01/12/2024 | EXHIBIT(S) | Hanratty Deposition Transcript | 009 | ALEXANDER J WILLSCHER |
| 124 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | July 2021 Text Messages | 009 | ALEXANDER J WILLSCHER |
| 125 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | Grady Deposition Transcript | 009 | ALEXANDER J WILLSCHER |
| 126 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | 2018 Audited Financial Statements | 009 | ALEXANDER J WILLSCHER |
| 127 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | November 9, 2018 Borrowing Base Summary Page | 009 | ALEXANDER J WILLSCHER |
| 128 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | May 17, 2019 Borrowing Base Summary Page | 009 | ALEXANDER J WILLSCHER |
| 129 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | September 13, 2019 Borrowing Base Summary Page | 009 | ALEXANDER J WILLSCHER |
| 130 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | 2019 Fund 1 Audited Financial Statements | 009 | ALEXANDER J WILLSCHER |
| 131 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | 2019 Fund 2 Audited Financial Statements | 009 | ALEXANDER J WILLSCHER |
| 132 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | May 2021 Text Messages | 009 | ALEXANDER J WILLSCHER |
| 133 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | March 2021 Email Correspondence | 009 | ALEXANDER J WILLSCHER |
| 134 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | March 2021 Text Messages | 009 | ALEXANDER J WILLSCHER |
| 135 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | April 21-22, 2021 Email Correspondence | 009 | ALEXANDER J WILLSCHER |
| 136 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | August 2021 Email Correspondence | 009 | ALEXANDER J WILLSCHER |
| 137 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | August 31, 2021 Lien Tape (Ebury) | 009 | ALEXANDER J WILLSCHER |
| 138 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | August 31, 2021 Lien Tape (MTAG) | 009 | ALEXANDER J WILLSCHER |
| 139 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | April 2021 Text Messages | 009 | ALEXANDER J WILLSCHER |
| 140 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | April 7-8, 2021 Email Correspondence | 009 | ALEXANDER J WILLSCHER |
| 141 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | April 12-13, 2021 Email Correspondence | 009 | ALEXANDER J WILLSCHER |
| 142 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | April 24, 2021 Email Correspondence | 009 | ALEXANDER J WILLSCHER |
| 143 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | September 2021 Text Messages | 009 | ALEXANDER J WILLSCHER |
| 144 | 01/12/2024 | EXHIBIT(S) | Mendez Deposition Transcript | 009 | ALEXANDER J WILLSCHER |
| 145 | 01/12/2024 | EXHIBIT(S) | Xie Deposition Transcript | 009 | ALEXANDER J WILLSCHER |
| 146 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | September 20, 2019 Email Correspondence | 009 | ALEXANDER J WILLSCHER |
| 147 | 01/12/2024 | EXHIBIT(S) - REQUEST TO SEAL | Ebury Organizational Charts | 009 | ALEXANDER J WILLSCHER |
| 148 | 01/12/2024 | STATEMENT OF MATERIAL FACTS | --none-- | 009 | ALEXANDER J WILLSCHER |
| 149 PENDING | 01/16/2024 | ORDER TO SHOW CAUSE ( PROPOSED ) | --none-- | 007 | KARI LIN PARKS |
| 150 | 01/16/2024 | MEMORANDUM OF LAW IN SUPPORT | --none-- | 007 | KARI LIN PARKS |

| 151 | 01/16/2024 | AFFIRMATION | --none-- | 007 | KARI LIN PARKS |
|-----|------------|-------------|----------|-----|----------------|
| 152 | 01/16/2024 | EXHIBIT(S) | Criminal Complaint | 007 | KARI LIN PARKS |
| 153 | 01/16/2024 | MEMORANDUM OF LAW IN OPPOSITION | --none-- | 005 | KARI LIN PARKS |
| 154 | 01/16/2024 | AFFIRMATION | --none-- | 005 | KARI LIN PARKS |
| 155 | 01/18/2024 | EXHIBIT(S) | Memorandum Blackline with Corrected Financial Information | 006 | KARI LIN PARKS |
| 156 | 01/23/2024 | MEMORANDUM OF LAW IN OPPOSITION | --none-- | 007 | ALEXANDER J WILLSCHER |
| 157 | 01/23/2024 | AFFIRMATION | --none-- | 007 | ALEXANDER J WILLSCHER |
| 158 | 01/23/2024 | EXHIBIT(S) | November 20, 2023 to December 20, 2023 Email Correspondence | 007 | ALEXANDER J WILLSCHER |
| 159 | 01/23/2024 | EXHIBIT(S) | January 16, 2024 Email Correspondence | 007 | ALEXANDER J WILLSCHER |
| 160 | 01/23/2024 | MEMORANDUM OF LAW IN OPPOSITION | --none-- | 006 | ALEXANDER J WILLSCHER |
| 161 | 01/23/2024 | AFFIRMATION | --none-- | 006 | ALEXANDER J WILLSCHER |
| 162 | 01/23/2024 | EXHIBIT(S) - REQUEST TO SEAL | January 4, 2024 Email Correspondence | 006 | ALEXANDER J WILLSCHER |
| 163 | 01/23/2024 | EXHIBIT(S) | Affirmation of Kari Parks, dated January 11, 2024 | 006 | ALEXANDER J WILLSCHER |
| 164 | 01/23/2024 | EXHIBIT(S) - REQUEST TO SEAL | EBURY_00081329 to EBURY_00081330 | 006 | ALEXANDER J WILLSCHER |
| 165 | 01/26/2024 | DECISION + ORDER ON MOTION | --none-- | 005 | John Howard court user |
| 166 | 01/26/2024 | DECISION + ORDER ON MOTION | --none-- | 006 | John Howard court user |
| 167 | 01/26/2024 | DECISION + ORDER ON MOTION | --none-- | 007 | John Howard court user |
| 168 PENDING | 01/26/2024 | ORDER TO SHOW CAUSE ( PROPOSED ) | --none-- | 008 | ALEXANDER J WILLSCHER |
| 169 | 01/26/2024 | MEMORANDUM OF LAW | --none-- | 008 | ALEXANDER J WILLSCHER |
| 170 | 01/26/2024 | AFFIRMATION | Affirmation of Alexander J. Willscher | 008 | ALEXANDER J WILLSCHER |
| 171 | 01/26/2024 | EXHIBIT(S) | EYZC Default Judgment | 008 | ALEXANDER J WILLSCHER |
| 172 | 01/26/2024 | EXHIBIT(S) | EYZC Notice of Summary Judgment Motion | 008 | ALEXANDER J WILLSCHER |
| 173 | 01/31/2024 | ORDER TO SHOW CAUSE | --none-- | 008 | John Howard court user |
| 174 | 02/07/2024 | LETTER / CORRESPONDENCE TO JUDGE | Status Report | 005 | KARI LIN PARKS |
| 175 | 02/07/2024 | EXHIBIT(S) | Wire Transfer Confirmation | 005 | KARI LIN PARKS |
| 176 | 02/07/2024 | MEMORANDUM OF LAW IN OPPOSITION | --none-- | 008 | KARI LIN PARKS |
| 177 | 02/07/2024 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO MOTION | --none-- | 008 | KARI LIN PARKS |
| 178 | 02/07/2024 | EXHIBIT(S) | Counsel Communications re MSJ Briefing Schedule | 008 | KARI LIN PARKS |
| 179 | 02/07/2024 | EXHIBIT(S) | Feb. 6, 2024 Google Hits for "ebury hanratty" | 008 | KARI LIN PARKS |
| 180 | 02/07/2024 | EXHIBIT(S) | Feb. 7, 2024 Texas Case Docket Sheet | 008 | KARI LIN PARKS |
| 181 | 02/07/2024 | EXHIBIT(S) | Texas Case Post-Judgment Discovery Order | 008 | KARI LIN PARKS |
| 182 | 02/07/2024 | EXHIBIT(S) | Feb. 7, 2024 Collection Action Docket Sheet | 008 | KARI LIN PARKS |
| 183 | 02/14/2024 | DECISION + ORDER ON MOTION | --none-- | 008 | John Howard court user |
| 184 | 02/13/2024 | NOTICE OF ENTRY | --none-- | 007 | VICTOR ROBERT WANG |
| 185 | 02/14/2024 | NOTICE OF ENTRY | --none-- | 008 | VICTOR ROBERT WANG |
| 186 | 02/15/2024 | NOTICE OF MOTION | --none-- | 010 | ALEXANDER J WILLSCHER |
| 187 | 02/15/2024 | MEMORANDUM OF LAW | --none-- | 010 | ALEXANDER J WILLSCHER |
| 188 | 02/22/2024 | MEMORANDUM OF LAW IN OPPOSITION | --none-- | 010 | KARI LIN PARKS |
| 189 | 02/22/2024 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO MOTION | --none-- | 010 | KARI LIN PARKS |
| 190 | 02/29/2024 | NOTICE OF MOTION | --none-- | 011 | ALEXANDER J WILLSCHER |
| 191 | 02/29/2024 | MEMORANDUM OF LAW | --none-- | 011 | ALEXANDER J WILLSCHER |

| 192 | 02/29/2024 | AFFIRMATION | Affirmation of Alexander J. Willscher | 011 | ALEXANDER J WILLSCHER |
|---|---|---|---|---|---|
| 193 | 02/29/2024 | EXHIBIT(S) | Defendants' Monthly Financial Reporting for January 2024 | 011 | ALEXANDER J WILLSCHER |
| 194 | 02/29/2024 | EXHIBIT(S) | Defendants' January 29, 2024 Bulk Sale | 011 | ALEXANDER J WILLSCHER |
| 195 | 02/29/2024 | EXHIBIT(S) | February 16 to February 20, 2024 Email Correspondence | 011 | ALEXANDER J WILLSCHER |
| 196 | 02/29/2024 | EXHIBIT(S) | Defendants' January 31 Real Estate Sale | 011 | ALEXANDER J WILLSCHER |
| 197 | 02/29/2024 | EXHIBIT(S) | February 26, 2024 Email Correspondence | 011 | ALEXANDER J WILLSCHER |
| 198 | 02/29/2024 | EXHIBIT(S) | Hanratty's Motion to Modify Conditions of Release | 011 | ALEXANDER J WILLSCHER |
| 199 | 02/29/2024 | EXHIBIT(S) | Transcript of January 24, 2024 Proceedings | 011 | ALEXANDER J WILLSCHER |
| 200 | 03/11/2024 | NOTICE OF MOTION | --none-- | 012 | KARI LIN PARKS |
| 201 | 03/11/2024 | MEMORANDUM IN OPPOSITION TO MOTION AND IN SUPPORT OF CROSS-MOTION | --none-- | 012 | KARI LIN PARKS |
| 202 | 03/11/2024 | AFFIRMATION | --none-- | 012 | KARI LIN PARKS |
| 203 | 03/11/2024 | EXHIBIT(S) | Dec. 29, 2023 Email | 012 | KARI LIN PARKS |
| 204 | 03/11/2024 | EXHIBIT(S) | Jan. 25-26, 2024 Emails | 012 | KARI LIN PARKS |
| 205 | 03/11/2024 | EXHIBIT(S) | Feb. 8, 2024 Hearing Transcript | 012 | KARI LIN PARKS |
| 206 | 03/11/2024 | EXHIBIT(S) | Scott Weiss Deposition Transcript Excerpt | 012 | KARI LIN PARKS |
| 207 | 03/11/2024 | EXHIBIT(S) | Jan. 24, 2024 Hearing Transcript | 012 | KARI LIN PARKS |
| 208 | 03/15/2024 | MEMORANDUM OF LAW IN REPLY | --none-- | 011 | ALEXANDER J WILLSCHER |
| 209 | 03/15/2024 | AFFIRMATION | --none-- | 011 | ALEXANDER J WILLSCHER |
| 210 | 03/15/2024 | EXHIBIT(S) | January 16, 2024 Letter from A. Willscher to S. Williams | 011 | ALEXANDER J WILLSCHER |
| 211 | 03/20/2024 | MEMORANDUM OF LAW IN OPPOSITION | --none-- | 012 | ALEXANDER J WILLSCHER |
| 212 | 03/20/2024 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO CROSS-MOTION | Affirmation of Alexander J. Willscher | 012 | ALEXANDER J WILLSCHER |
| 213 | 03/20/2024 | EXHIBIT(S) | SWIFT MT-199 | 012 | ALEXANDER J WILLSCHER |
| 214 | 03/20/2024 | EXHIBIT(S) | SJ Global Investments Default Judgment | 012 | ALEXANDER J WILLSCHER |
| 215 | 03/20/2024 | EXHIBIT(S) | Eastern Daily Press Article | 012 | ALEXANDER J WILLSCHER |
| 216 | 03/20/2024 | EXHIBIT(S) | Letter of Attestation | 012 | ALEXANDER J WILLSCHER |
| 217 | 03/20/2024 | EXHIBIT(S) | JD Euroway Bank Confirmation Letters | 012 | ALEXANDER J WILLSCHER |
| 218 | 03/20/2024 | EXHIBIT(S) | Medium Article | 012 | ALEXANDER J WILLSCHER |
| 219 | 03/20/2024 | EXHIBIT(S) | King NewsWire Article | 012 | ALEXANDER J WILLSCHER |
| 220 | 03/20/2024 | EXHIBIT(S) | Queendom of Sheba Press Release | 012 | ALEXANDER J WILLSCHER |
| 221 | 03/20/2024 | EXHIBIT(S) | Canadian Office of the Superintendent of Financial Institutions Search Results | 012 | ALEXANDER J WILLSCHER |
| 222 | 03/20/2024 | EXHIBIT(S) | 2024-01-16 Letter from A. Willscher to S. Williams | 012 | ALEXANDER J WILLSCHER |
| 223 | 03/26/2024 | MEMORANDUM OF LAW IN REPLY | --none-- | 012 | KARI LIN PARKS |
| 224 | 07/22/2024 | LETTER / CORRESPONDENCE TO JUDGE | --none-- | | ALEXANDER J WILLSCHER |
| 225 | 07/22/2024 | LETTER/CORRESPONDENCE - SO ORDERED | --none-- | | John Howard court user |

Close

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                     Plaintiff,

       v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

                    Defendants.

---------------------------------------------------------- x

Index No. _____

**SUMMONS**

**TO THE ABOVE-NAMED DEFENDANTS:**

You are hereby summoned and required to serve upon the attorneys for Plaintiff Emigrant Business Credit Corporation ("EBCC"), at the address stated below, a copy of your Answer to the Complaint in this action within twenty (20) days after the service of this Summons, exclusive of the day of service, or within thirty (30) days after service if this Summons is not personally delivered to you within the State of New York; and, in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

The basis of venue is CPLR 501 because EBCC is a resident in the County of New York, with headquarters and principal place of business located at 6 East 43rd Street, 20th Floor, New York, NY 10017; and CPLR 503 because the parties agreed to waive any objection to venue in any action initiated in this Court with respect to the agreements at issue in the Complaint.

Dated:   September 25, 2022
      New York, New York

Respectfully submitted,

_/s/ Alexander J. Willscher_

Alexander J. Willscher
Austin P. Mayron
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business Credit Corporation*

2

FILED: NEW YORK COUNTY CLERK 09/25/2022 06:55 PM
NYSCEF DOC. NO. 1

INDEX NO. 158207/2022

RECEIVED NYSCEF: 09/25/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 9 of 688

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                         Plaintiff,

        v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

                     Defendants.

---------------------------------------------------------- x

Index No. _____

**COMPLAINT**

Plaintiff Emigrant Business Credit Corporation ("**EBCC**"), by and through its undersigned attorneys, hereby alleges the following in support of its Complaint against John Arthur Hanratty ("**Hanratty**") and Ebury Street Capital, LLC ("**ESC**"), as well as Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1, LLC; Ebury RE LLC; and XYZ Corps. 1-10 (the "**Ebury Companies**"):

## NATURE OF THE ACTION

1.        This is an action for fraudulent inducement, fraudulent transfer, and breach of contract that stems from Defendants' fraudulent conversion of tens of millions of dollars' worth of EBCC's collateral.  Defendants brazenly violated the terms of the agreements (the "**Credit Agreements**") governing two credit facilities that EBCC extended to Defendants beginning in 2017 (the "**Credit Facilities**"), and later fraudulently induced EBCC to amend the Credit Agreements, including to obtain increases to Defendants' lines of credit.  Defendants misappropriated advances under the Credit Facilities as well as EBCC's collateral to pay tens of millions of dollars in distributions to company insiders—including Defendant John Hanratty—as well as other investors.  Defendants' actions violated strict contractual limitations in the Credit Agreements that required them to maintain the loan proceeds as EBCC's collateral.  To facilitate the scheme, Defendants regularly falsified borrowing base certificates and other documents that they submitted to EBCC as the basis for receiving advances under the Credit Facilities.  Defendants further used a web of sham corporate transactions—among companies controlled by Hanratty—to

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 11 of 688

loot EBCC's collateral and the loan proceeds. Indeed, according to a federal counterclaim filed

by one of his former business partners, Hanratty openly bragged about the fact that he was

defrauding EBCC.

2.      On November 10, 2021, the notes underlying the Credit Facilities came due and

Defendants failed to repay EBCC, including over $18 million in outstanding principal and interest.

The Credit Agreements provided that EBCC was to be fully secured by collateral owned by the

Borrowers and Guarantors to the Credit Agreements. Under the terms of those agreements,

Defendants were permitted to use the loan proceeds only to finance Defendants' purchase of tax

liens; the purchased tax liens (as well as any and all proceeds thereof) were EBCC's collateral;

and a third-party custodian was supposed to control the collateral at all times. Throughout 2020

and 2021, Hanratty continually represented to EBCC that it was "overcollateralized"—meaning

that the value of EBCC's collateral exceeded the then-existing amounts owed under the Credit

Facilities. At one point in 2021, Defendants provided to EBCC a lien tape—purportedly from the

independent third-party custodian—that falsely showed that the Credit Facilities were secured by

over $27 million in tax lien collateral.

3.      When EBCC approached the third-party custodian after the default to foreclose on

the collateral, it discovered that about 90% of its supposed collateral—worth almost $26 million—

was "missing." Moreover, EBCC learned that the lien tape that Hanratty had provided from the

third-party custodian was fake. EBCC not only was not overcollateralized by the Borrowers and

Guarantors to the Credit Agreements, but Defendants had been lying for years about the collateral,

their use of funds advanced under the Credit Facilities, and Defendants' compliance with the Credit

Agreements.

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 12 of 688

4.     Since the default, EBCC has discovered that Defendants impermissibly paid out over $22 million in distributions to their investors in 2018 and 2019—without EBCC's knowledge and in violation of the Credit Agreements—while at the same time withdrawing over $27 million in funding from the Credit Facilities.  EBCC also has discovered that Defendants repeatedly made false statements about the collateral to induce EBCC to enter into modifications to the Credit Agreements between 2018 and 2021, and to extend additional funds thereunder.  Finally, EBCC has discovered that Defendants fraudulently transferred millions of dollars' worth of EBCC's collateral to Ebury RE LLC and XYZ Corps. 1-10, to prevent EBCC from receiving sale proceeds from sales of the collateral and from foreclosing on the collateral in the event of a default.

5.     This is not the first time Defendants have been accused of running a fraudulent scheme.  In 2019, a group of investors sued certain of Defendants and alleged that Defendants had been "robbing Peter to pay Paul."  Instead of notifying EBCC of that lawsuit (as required by the Credit Agreements), Hanratty impermissibly used funds advanced under the Credit Facilities to fully redeem and settle with those investors.  More recently, Defendants were sued by a former business partner named Thomas McOsker ("**McOsker**"), who alleged that certain of Defendants have been engaged in a "Ponzi-like scheme."  According to McOsker, Hanratty admitted in a 2018 text message that he was "leapfrogging"—*i.e.*, using money from one fund or transaction to pay off another fund or transaction.  McOsker, who shared offices with Hanratty in 2018 and 2019, also alleged that Hanratty routinely provided false information to EBCC as part of a fraudulent scheme.  The McOsker lawsuit, which Defendants also failed to disclose to EBCC, additionally involves a dispute over the proceeds from Defendants' sale of $3.5 million of EBCC's collateral, which should have been paid to EBCC, as explained below.

-4-

6.      In the ten months since Defendants defaulted, they have failed to repay EBCC the amounts due under the Credit Agreements or to return the fraudulently transferred collateral. Accordingly, EBCC seeks a judgment:

     i.  awarding damages for breach of contract, in an amount to be ascertained at trial but not less than $21,813,177.46, plus accrued interest, reasonable attorneys' fees, court costs, and legal expenses;

     ii.  awarding damages for Defendants' fraudulent inducement, in an amount to be ascertained at trial;

     iii.  awarding damages for Defendants' fraudulent transfers, in an amount to be ascertained at trial;

     iv.  imposing punitive damages against Defendants for their willful and wanton misconduct; and

     v.  imposing joint and several liability on Hanratty, ESC, and the Ebury Companies.

## THE PARTIES

7.      EBCC is a New York-based specialty finance company organized under the laws of Delaware.  Its headquarters and principal place of business are located at 6 East 43rd Street, 20th Floor, New York, NY 10017.  It is a wholly-owned subsidiary of Emigrant Bank, the largest family-owned bank in the United States.

8.      John Hanratty is the manager of ESC.  On information and belief, he resides at 1152 Ave Magdalena, San Juan, Puerto Rico 00907.  In 2017, when the parties executed the Credit Agreements, Hanratty lived in Rye, NY.  On information and belief, he moved to Puerto Rico in 2018.

9.      ESC is a New York limited liability company.  It is the manager or general partner of the Ebury Companies.  On information and belief, the principal place of business of ESC and of each of the Ebury Companies is 644 Avenida Fernadez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

-5-

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 14 of 688

### A. The Funds

10.     The Ebury Companies are organized into two funds (the "**Funds**"):

    a.   Ebury Fund 1, LP ("**Fund 1**") is a Delaware limited partnership managed by ESC.

    b.   Ebury Fund 2, LP ("**Fund 2**") is a Delaware limited partnership managed by ESC.

### B. The Borrowers

11.     EBCC extended the Credit Facilities to wholly-owned subsidiaries of the Funds, which were created to facilitate the Credit Agreements (the "**Borrowers**"):

    a.   Ebury 1EMI LLC is a New York limited liability company. It is a wholly-owned subsidiary of Fund 1, and is managed by ESC.

    b.   Ebury 2EMI LLC is a New York limited liability company. It is a wholly-owned subsidiary of Fund 2, and is managed by ESC.

12.     The Borrowers' names contain the initials "EMI"—short for "Emigrant"—to denote that their assets are EBCC's collateral.

### C. The Guarantors

13.     Each Borrower owns special purpose entities (the "**Ebury SPEs**") that purchase, own, and sell tax lien certificates or real estate in various states:

    a.   EB 1EMIALA LLC is an Alabama limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

    b.   EB 2EMIALA LLC is an Alabama limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

    c.   EB 1EMIFL, LLC is a Florida limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

    d.   EB 2EMIFL, LLC is a Florida limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

    e.   EB 1EMIIN, LLC is an Indiana limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

FILED: NEW YORK COUNTY CLERK 09/25/2022 06:55 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 1

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State

RECEIVED NYSCEF: 09/25/2022

Court Records    Pg 15 of 688

f.  EB 2EMIIN, LLC is an Indiana limited liability company.  It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

g.  EB 1EMIMD, LLC is a Maryland limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

h.  EB 2EMIMD, LLC is a Maryland limited liability company.  It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

i.  EB 1EMINJ, LLC is a New Jersey limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

j.  EB 2EMINJ, LLC is a New Jersey limited liability company.  It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

k.  EB 1EMINY, LLC is a New York limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

l.  EB 2EMINY, LLC is a New York limited liability company.  It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

m.  EB 1EMISC, LLC is a South Carolina limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

n.  EB 2EMISC, LLC is a South Carolina limited liability company.  It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

o.  RE 1EMI LLC is a New York limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

p.  RE 2EMI LLC is a New York limited liability company.  It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

q.  EB 1EMIDC, LLC is a District of Columbia limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

r.  Arque Tax Receivable Fund (Maryland), LLC is a Maryland limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

s.  Ebury Fund 1FL, LLC is a Florida limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

t.  Ebury Fund 2FL, LLC is a Florida limited liability company.  It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

u.  Ebury Fund 1NJ, LLC is a New Jersey limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

-7-

v.   Ebury Fund 2NJ, LLC is a New Jersey limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

14.   Red Clover 1, LLC is a Delaware limited liability company. It is a wholly-owned subsidiary of Ebury Fund 2, LP, and is managed by ESC.

15.   The Ebury SPEs, along with ESC and Red Clover 1, LLC, are guarantors to the Credit Agreements (the "**Guarantors**").

**D.   Additional Affiliate or Subsidiary Entities**

16.   Ebury RE LLC is a New Jersey limited liability company. It is a subsidiary of Fund 1 and Fund 2, and is managed by ESC.

17.   XYZ Corps. 1-10 are additional affiliate or subsidiary corporate entities of the Ebury Companies, the identities of which are presently unknown, to which Defendants have transferred EBCC's collateral or proceeds from EBCC's collateral. The specific identifies of XYZ Corps. 1-10 are unknown to EBCC because Defendants have concealed their fraudulent transfers from EBCC, including by submitting falsified borrowing base certificates and other documents to EBCC. EBCC has named XYZ Corps. 1-10 as unknown parties in accordance with CPLR 1024.

**E.   Alter Ego Allegations**

18.   ESC and each of the Ebury Companies is an alter ego of Hanratty and of one another with respect to the transactions described in this Complaint. ESC and each of the Ebury Companies:

a.   Disregard corporate formalities;

b.   Intermingle funds;

c.   Have common ownership, officers, directors, and personnel;

d.   Share a common office space, address, telephone number, and email addresses;

e.   Are completely dominated by Hanratty;

f.   Have no independence in their business operations;

g.  Are not treated as independent profit centers;

h.  Engage in conflicted, interested transactions; and

i.  Primarily transact Hanratty's business rather than their own.

## JURISDICTION AND VENUE

19.    Jurisdiction in this Court is proper pursuant to CPLR 301 and 302, including because: (i) the Borrowers and Guarantors agreed to "the jurisdiction of the courts of the state of New York located in the borough of Manhattan" as to any claim with respect to the Credit Agreements; (ii) Hanratty agreed to "the jurisdiction of the state courts of New York" as to any claim brought to enforce the Validity Guaranties (discussed below); (iii) ESC, the Borrowers, EB 1EMINY, LLC, EB 2EMINY, LLC, RE 1EMI LLC, and RE 2EMI LLC, are domestic corporations; (iv) ESC and the Ebury Companies are alter egos of Hanratty and of each other, and their contacts with the State of New York can be imputed to one another; and (v) Defendants made false statements directed to EBCC in New York and engaged in fraudulent transfers that harmed EBCC in New York, derive substantial revenue from interstate commerce, and reasonably should have expected their false statements and fraudulent transfers to have consequences for EBCC in New York.

20.    Venue in this Court is proper pursuant to CPLR 501 and 503 because EBCC is a resident in the County of New York and because the parties agreed to waive any objection to venue in any action initiated in this Court with respect to the Credit Agreements.

21.    This action is properly brought in the Commercial Division of the Supreme Court pursuant to Section 202.70 of the Uniform Civil Rules for the Supreme Court and the County Court because its principal claims involve breach of contract and business transactions involving dealings with commercial banks that exceed the monetary threshold of $500,000.

## FACTUAL BACKGROUND

### A.    Overview of Tax Liens.

22.    If a property owner does not pay their municipal taxes (*e.g.*, property taxes, sewer and water bills, etc.), the municipality can place a tax lien on their property for the amount of delinquent taxes owed.  A tax lien is senior to most other types of interests in real property, meaning that a property with a tax lien cannot be sold or refinanced until the tax lien is paid.

23.    Municipalities auction off tax liens to third parties in the form of tax lien certificates.  The rules for these sales vary from state to state.  In general, the owner of a tax lien certificate is entitled to the face value of the lien (the amount of delinquent taxes), plus any subsequent interest or fees.  The interest rates charged on tax lien certificates are favorable for investors and can range from 10% to 36% annually.

24.    If a property owner fails to pay off a tax lien on their property within a pre-determined period of time, the owner of the tax lien certificate can foreclose on the property and obtain ownership of it as a "real estate owned" property ("**REO**").

25.    Investors purchase tax liens for two reasons: (i) to profit from the interest rate charged by the municipality on the outstanding tax lien; or (ii) to obtain ownership of the underlying real estate through foreclosure.  Thus, there are several ways to value a tax lien certificate, including:

- **Face Value (FV):**  The original amount of delinquent taxes secured by the tax lien certificate;

- **Redemptive Value (RV):**  The face value of the tax lien certificate plus interest, fees, and subsequent tax payments made by the certificate owner; and

- **Assessed Value:**  The fair market value of the underlying real estate (the expected value of the REO upon foreclosure).

-10-

26.     If the owner of a tax lien certificate fails to make subsequent tax payments on the property, another investor may be able to purchase a subsequent, more senior tax lien certificate and "prime" them.

**B.     Asset-Based Lending ("ABL").**

27.     An ABL is a credit facility that allows a borrower to draw down on a revolving line of credit at a pre-determined "**Advance Rate**" against the value of a pool of eligible assets, which serves as collateral for the credit facility.  An ABL can be structured around any type of asset, including accounts receivable, inventory, equipment, or real estate.

28.     The total amount that a borrower can draw down is called the "**Borrowing Base**," which is calculated by multiplying the amount of eligible collateral by the Advance Rate.  For example, if a Borrower has $10 million in eligible collateral and the advance rate is 80%, the Borrowing Base is $8 million (*i.e.*, the amount up to which the borrower can withdraw).  The "**Availability**" of the ABL is the Borrowing Base minus any amounts that already have been drawn down on the credit facility.

29.     The key feature of an ABL is that the lender ***always*** is secured by collateral worth more than the outstanding principal of the ABL.  To illustrate, in the previous example, even if the borrower draws down the full $8 million in availability, the lender still is secured by $10 million in collateral.  If the borrower defaults, the lender can make good on the loan by foreclosing on the collateral.

30.     To request a funding draw under an ABL, a borrower must be in compliance with the loan documents, have no events of default, and have sufficient eligible assets against which the lender can advance.  The accuracy and trustworthiness of the borrowing base is key to a lender's decision to advance funds under an ABL.

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 20 of 688

31.    In addition, a borrower is obligated to keep the borrowing base up-to-date by removing ineligible assets (such as aged or charged-off assets) and to make mandatory prepayments if the amount of outstanding funding draws exceeds the availability of the ABL (called an "**Overadvance**").  To illustrate using the same example as before, if the borrower draws down $8 million in availability but then sells the $10 million in collateral (reducing the Borrowing Base to zero), the borrower must pay back an $8 million Overadvance.

C.    **The Credit Agreements.**

32.    In 2016, Hanratty approached EBCC seeking a $15 million credit facility to finance the purchase of new tax lien certificates by the Ebury Companies.  At the time, Defendants had established credit facilities with Capital One, N.A., to finance their purchases of tax liens.

33.    On March 9, 2017, EBCC agreed to extend a $10 million credit facility to Ebury 1EMI LLC, and a $5 million credit facility to Ebury 2EMI LLC.  EBCC agreed to increase the Ebury 1EMI LLC facility to $13.5 million on October 29, 2018, and to $15 million on September 24, 2019.  Through the October 2018 refinancing, Defendants paid off the Capital One facilities and began using EBCC as their exclusive lender.

34.    Under the Credit Agreements, the Credit Facilities were structured as ABLs.  The Borrowing Base for each credit facility was comprised of the tax lien certificates that Defendants were to purchase with the funds that EBCC advanced under the Credit Facilities.  The applicable advance rate varied from 70% to 85%, depending on the state in which the tax lien was purchased.  Any tax lien that Defendants purchased using the Credit Facilities, and its proceeds, was EBCC's collateral (the "**Collateral**").  Defendants were not allowed to transfer any of the Collateral, with limited exceptions.

35.    The Credit Agreements were structured so that EBCC would be fully secured at all times.  EBCC was to lend money to the Borrowers to finance their purchases of tax liens and then

be secured by those tax liens and their proceeds. The tax liens themselves would be secured by the value of the underlying real estate, which would provide EBCC with an additional layer of protection. For example, Defendants purchased a tax lien certificate on a property at 4520 Agualinda Boulevard, Cape Coral, FL 33914, with a face value of $28,509.98, using funds advanced under the Credit Facilities. Under the Credit Agreements, Defendants were entitled to request a funding draw of up to $24,233.48 (85% of the face value of the lien) to fund the purchase of this tax lien certificate. In exchange, EBCC was to be secured by the full value of the certificate, including any interest, fees, or subsequent tax payments. Further, if the property owner failed to pay off the tax lien, Defendants would be entitled to foreclose on the property, which had an assessed value of $247,450. Thus, for this example, EBCC agreed to loan Defendants up to $24,233.48, which would be secured by a tax lien certificate with face value of $28,509.98, and up to $247,450 in underlying real estate value.

36.   The notes underlying the Credit Agreements provided that the Borrowers would "repay all principal, interest, costs and expenses outstanding hereunder on March 9, 2021."

    a.   On March 18, 2021, the parties agreed to extend the maturity date of the notes to May 8, 2021.

    b.   On May 18, 2021, the parties agreed to extend the maturity date of the notes again, to August 10, 2021.

    c.   On August 13, 2021, the parties agreed to a final maturity extension, which set the maturity date of the notes as November 10, 2021.

37.   Each of the Guarantors also executed a guaranty that "absolutely, unconditionally and irrevocably" guaranteed to EBCC "the due, prompt and punctual payment and satisfaction of the Indebtedness (whether at the stated maturity, by acceleration or otherwise)."

38.   On November 10, 2021, the Borrowers and the Guarantors were required to repay EBCC, including over $18 million in outstanding principal and interest. They failed to do so. On

November 29, 2021, EBCC sent the Borrowers and Guarantors notices of default and demands for

payment.  Defendants since have failed to repay EBCC the amounts owed under the Credit

Agreements, which now exceed $21,813,177.46, plus accrued interest, reasonable attorneys' fees,

court costs, and legal expenses.

> **D.     Hanratty personally guaranteed the accuracy of Defendants' representations to EBCC and agreed to repay EBCC for any damages caused by any misrepresentations.**

39.     The Credit Agreements required that Hanratty execute validity guaranty

agreements in favor of EBCC (the "**Validity Guaranties**").  These agreements provide that

Hanratty is personally liable for any resulting damages if Defendants made any misrepresentations

to EBCC about the Collateral.  Hanratty executed the Validity Guaranties on May 9, 2017.

40.     Specifically, Hanratty guaranteed that "all Information from time to time delivered

to Lender will be true and correct in all material respects as of the Calculation Date applicable to

such Information."  The Validity Guaranties define "Information" to include "all written

information relating to the eligibility of Collateral . . . including, without limitation, all Borrowing

Base Certificates and any schedules of Collateral."

41.     The Validity Guaranties provide that, if the Information is not "true and correct, in

all material respects as of a Calculation Date," Hanratty personally must "pay the aggregate

amount of all Damages incurred by Lender."  Hanratty's obligation to pay damages under the

Validity Guaranties is "on a 'solidary' and 'joint and several' basis."

42.     As discussed below, Hanratty repeatedly delivered false information to EBCC

relating to the eligibility of Collateral, including in Borrowing Base Certificates and schedules of

Collateral.  He thus is personally liable for EBCC's damages.

### E. EBCC relied on Hanratty's false statements about the Collateral in agreeing to amend the Credit Agreements between 2018 and 2021.

43.     Hanratty consistently claimed that EBCC was "overcollateralized," meaning that EBCC was secured by collateral worth more than the amounts outstanding under the Credit Facilities.

44.     For example, on January 13, 2021, Hanratty wrote to EBCC that it was secured by $26.5 million redemptive value in tax lien collateral, which was itself collateralized by underlying real estate with an assessed value of $275 million.

45.     EBCC relied on that statement, and other similar valuations that Hanratty provided regarding the Collateral, in agreeing to amend the Credit Agreements between 2018 and 2021, including:

   a.   The Sixth Amendment to Loan Documents for Ebury 1EMI LLC, executed on October 29, 2018, which increased the credit facility to $13,500,000;

   b.   The Seventh Amendment to Loan Documents for Ebury 1EMI LLC, executed on September 24, 2019, which increased the credit facility to $15,000,000;

   c.   The Eighth Amendment to Loan Documents for Ebury 1EMI LLC, executed on March 18, 2021, which extended the maturity date of the underlying note to May 8, 2021;

   d.   The Ninth Amendment to Loan Documents for Ebury 1EMI LLC, executed on May 18, 2021, which extended the maturity date of the underlying note to August 10, 2021;

   e.   The Tenth Amendment to Loan Documents for Ebury 1EMI LLC, executed on August 12, 2021, which extended the maturity date of the underlying note to November 10, 2021;

   f.   The Waiver and Sixth Amendment to Loan Documents for Ebury 2EMI LLC, executed on March 18, 2021, which extended the maturity date of the underlying note to May 8, 2021; and

   g.   The Eighth Amendment to Loan Documents for Ebury 2EMI LLC, executed on August 13, 2021, which extended the maturity date of the underlying note to November 10, 2021.

-15-

46.    On May 5, 2021, an EBCC employee named Jack Grady texted Hanratty that he
was going to be "representing to our committee meeting that we are secured by 30 mm [$30
million] in lien collateral . . . which is my understanding of where the portfolio is right now."
Hanratty falsely responded, "It is."

47.    On July 21, 2021, Grady texted Hanratty with concerns based on the 2019 audits
of Fund 1 and Fund 2, which valued the Funds' investments in tax liens at around $17.2 million—
less than the approximately $18 million outstanding balance under the Credit Facilities.  Hanratty
falsely responded that EBCC actually was secured by $32 million in tax lien collateral, plus an
additional $10 million in REO collateral.

48.    According to McOsker, Hanratty at one point bragged about his ability to mislead
Grady, and stated that Grady "won't notice" that he was submitting falsified documents to EBCC.

49.    These claims of "overcollateralization" were intentionally false and were intended
to lull EBCC into forgoing its rights under the Credit Agreements to declare an event of default
and demand repayment.

### F.    The Credit Agreements required the use of a third-party Custodian and Servicer.

50.    The Credit Agreements required the Borrowers to deliver any tax lien certificates
that they purchased to a designated third-party Custodian.

 a.    Under Section 5.10 of the Credit Agreements, the Borrowers and the
Guarantors represented and warranted as of the date of each Advance that
they had delivered to the Custodian "all required Tax Lien Documents."

 b.    Likewise, under Section 1.1(y) of the Credit Agreements, "[a]ny Tax Lien
whose Basic Tax Lien Documents are not delivered to Lender, or to the
Custodian, by no later than the effective date of the most recent Borrowing
Base Certificate furnished to the Lender," was not eligible to be included in
the Borrowing Bases.

51.     This requirement was essential to the parties' agreements. EBCC relied on the involvement of an independent third-party to ensure the safekeeping of the Collateral. Defendants were *not* allowed to retain custody of the tax liens or to service the tax liens themselves (called "**self-servicing**").

52.     Further, under Section 8.2 of the Credit Agreements, the Borrowers were prohibited from "chang[ing] the Servicer or the Custodian without the prior written consent of Lender." The Credit Agreements originally designated Tower Fund Services, LLC as the Servicer and Custodian. On November 8, 2017, EBCC consented in writing to changing the Servicer and Custodian to MTAG Services, LLC ("**MTAG**").

53.     EBCC never consented to changing the Custodian or Servicer to any of Defendants or allowing Defendants to keep custody of the Collateral or self-service.

54.     According to McOsker, "[o]n several occasions in 2019," Hanratty coached him on responses to inquiries from MTAG to aid Hanratty in misleading MTAG.

**G.     As the scheme begins to unravel, Hanratty engages in damage control and makes multiple misrepresentations to EBCC.**

55.     In March 2021, as part of a field examination of the Borrowers, EBCC discovered that certain of the Collateral was not in MTAG's custody. Over the next eight months, Hanratty repeatedly misled EBCC about the custodial status of the Collateral. Throughout March 2021, Hanratty would state that the Collateral was not in MTAG's custody due to "timing" or "uploading" problems, but that those problems would be resolved in just a few days.

56.     On September 21, 2021, after promising to update EBCC about the custody of the Collateral for months, Hanratty sent EBCC an email with the subject line "Custody," and attached a spreadsheet called "MTAG Active Lien Detail." On its face, the spreadsheet purported to be from MTAG: it contained a header with the MTAG logo and the caption "Active Lien Detail

Period Ending: Tuesday August 31, 2021." The spreadsheet, in fact, was not from MTAG—on information and belief, Hanratty fabricated it in order to deceive EBCC and obscure the fact that he was self-servicing the Collateral.

57. According to the spreadsheet, MTAG had custody of 6,782 tax lien certificates, worth $27.8 million RV. MTAG has since confirmed to EBCC that, as of that date, it had custody of only 518 tax lien certificates, worth $1.3 million RV.

58. After EBCC sent Ebury notices of default in November 2021, Hanratty admitted that he had custody of, and was self-servicing, almost 90% of the Collateral, using a platform called Speedboat.

59. By self-servicing the Collateral, Hanratty violated the Credit Agreements and evaded third-party scrutiny of Defendants' financial dealings. In addition, any tax lien that Defendants were self-servicing was not eligible to be included in the Borrowing Bases under Section 1.1(y) of the Credit Agreements.

**H.    After Defendants defaulted on the Credit Agreements, Hanratty continued to misrepresent the status of the Collateral to EBCC.**

60. On December 15, 2021, Defendants sent EBCC another lien tape, purporting to identify EBCC's collateral as of December 1, 2021. According to this second lien tape, MTAG had custody of only 497 liens worth $1.3 million RV, and Defendants admitted to self-servicing 1,047 liens, purportedly worth $17.8 million RV.

61. The December 15, 2021 lien tape did not contain over 5,000 tax liens (worth over $14 million RV) that were included in the purported MTAG lien tape.

62. In addition, 153 Maryland tax liens that appeared in both lien tapes purportedly increased in value by $4.3 million RV over the three months between the two lien tapes.

-18-

63.     On information and belief, Hanratty inflated the value of these Maryland liens by improperly including the "bid amount" in his valuations.  The "bid amount" is the price that a tax lien certificate owner must pay to obtain the deed to a property upon foreclosure in Maryland. Under Maryland Code § 14-818, the "bid amount" is not a component of the redemptive value of the lien and Hanratty improperly included it in his valuation of these Maryland liens.

64.     Defendants still have not delivered custody of any of the self-serviced Collateral to MTAG.

**I.     Hanratty routinely submitted to EBCC Borrowing Bases Certificates that concealed the fact that Hanratty was impermissibly self-servicing the Collateral.**

65.     Under the Credit Agreements, the Borrowers could use advances under the Credit Facilities only to purchase eligible tax liens and for ordinary and necessary expenses of business operations incurred in the ordinary course of business:

a.    Section 2.1 of the Credit Agreements provides that "Advances shall be used solely for the purposes of acquiring Eligible Tax Liens (including Subsequent Tax Liens)."

b.    Section 6.26 of the Credit Agreements states that "Unless specifically consented to the contrary by the Lender in writing, the Borrower shall use Advances solely to fund the acquisition of Eligible Tax liens in the ordinary course of the business of the Ebury Companies and to finance ordinary and necessary expenses of the business operations of the Ebury Companies incurred in the ordinary course of the business."  EBCC has not consented in writing or otherwise to any other uses of advances under the Credit Agreements.

c.    Section 9.1 of the Credit Agreements provides that it was an event of default if "any Ebury Company diverts or uses any portion of any amount received on account of the collateral while any of the indebtedness remains outstanding."

66.     Prior to each request for an advance, Hanratty, as managing director of the Borrowers, was required to provide EBCC with a signed, certified Borrowing Base Certificate. The Borrowers requested more than a dozen advances and Hanratty provided a signed, certified

Borrowing Base Certificate for each request. Each Borrowing Base Certificate contained a statement that: "Pursuant to the Credit and Security Agreements dated March 9 2017. The undersigned does hereby certify that the above is a true and correct account of all accounts receivable assigned to you which remain unpaid. You are asked to rely upon the truthfulness of the foregoing representations made herein, in order to advance or lend money to the undersigned, and the undersigned also represents that the above described accounts are free and clear of any and all liens or claims whatsoever except the one in your favor."

67.     Hanratty also provided signed notices of borrowing on behalf of the Borrowers in connection with each advance, which contained additional certifications that: (i) "all representations and warranties of the Borrower contained in the Credit Agreement are true and correct on the date hereof," (ii) "no Event of Default has occurred and is continuing beyond any applicable notice and grade periods, or would result from the Proposed Borrowing," (iii) "there has been no material adverse change or disclosure regarding the financial or business condition of the Borrower since the Closing Date," and (iv) "there has been no material adverse change in the Borrowing Base since the most recent Borrowing Base Certificate or in the business operations, properties, prospects or condition (financial or otherwise) of any Borrower since the Closing Date."

68.     On information and belief, these statements were false because Defendants were self-servicing the Collateral, and because of additional misrepresentations described below. In addition, according to McOsker, Hanratty would alter the "origination dates for hundreds of certificates" on the Borrowing Base Certificates, to cover up his fraud.

**J.    EBCC discovers Hanratty's historical lies for the purpose of inducing EBCC to release funds to him.**

69.    Defendants made additional misrepresentations for at least four advances under the Credit Facilities.

i.    _November 9, 2018 Advance_

70.    On November 9, 2018, EBCC advanced Ebury 1EMI LLC $220,000 to finance the purported purchase of $236,433 in tax lien certificates.

71.    According to financial records that Hanratty provided to EBCC, Defendants did not use these funds to purchase new tax liens. Instead, they used the funds to pay a $288,810.67 distribution to an investor in the Funds named Tiffanie Eagan, in violation of the Credit Agreements.

ii.    _May 17, 2019 Advance_

72.    On May 17, 2019, EBCC advanced Ebury 1EMI LLC $860,000 to finance the purported purchase of $3,492,881 in tax lien certificates.

73.    According to financial records that Hanratty provided to EBCC, Defendants did not use these funds to purchase new tax liens. Instead, they used the funds to pay $1,208,772 to various investors, including the Brinker-Cohen Family Trust, Horseshoe Investments LLC, the Elizabeth R. Walsh 2016 Irrevocable Trust, and Ice Holdings, LLC, to settle a lawsuit, in violation of the Credit Agreements.

74.    In addition, the May 17, 2019 Borrowing Base Certificate fraudulently included liens against which Defendants already had received advances from EBCC. Specifically, Defendants requested an advance against more than 300 New Jersey tax lien certificates ($1.6 million in purported eligibility) that they already had received an advance against in March 2019.

75.     Defendants violated the Credit Agreements and misled EBCC by including these duplicate tax liens in the Borrowing Bases.  Without the duplicate tax liens, there would have been less availability under the Credit Facilities.

> iii.     *June 12, 2019 Advance*

76.     On June 12, 2019, EBCC advanced Ebury 1EMI LLC $2,400,000 to finance the purported purchase of $3,320,765 in tax lien certificates.

77.     According to financial records that Hanratty provided to EBCC, Defendants purchased only $2.1 million in tax lien certificates.

78.     As part of the $2.1 million in tax lien certificate purchases, Defendants purchased a portfolio of liens called the FWDSL portfolio.  On information and belief, the original face value of the FWDSL portfolio was $2,534,751, but Defendants were able to purchase it for approximately $900,000 because the liens had diminished in value (by approximately $1.6 million).

79.     Under Section 1.1(a) of the Credit Agreements, Defendants were required to use the purchase price of the FWDSL portfolio in the Borrowing Base, and were not entitled to advances based on the original face value of the liens.  Nevertheless, on information and belief, Defendants improperly claimed part of the original face value of the FWDSL portfolio in the Borrowing Bases.

> iv.     *September 13, 2019 Advance*

80.     On September 13, 2019, EBCC advanced Ebury 2EMI LLC $850,000 to finance the purported purchase of $1,228,529 in tax lien certificates.

81.     According to financial records that Hanratty provided to EBCC, Defendants did not use these funds to purchase new tax liens.  Instead, they used the funds to pay $750,000 in

-22-

distributions to two investors, Ira Leventhal and Beth Leventhal, in violation of the Credit

Agreements.

82.     In addition, the September 13, 2019 Borrowing Base Certificate contained

duplicate liens.  Specifically, Defendants requested an advance against 64 Maryland tax lien

certificates ($428,061.47 in purported eligibility) that they already had requested an advance

against in a June 12, 2019 Borrowing Base Certificate for Ebury 1EMI LLC.

83.     Further, Defendants requested the advance based on inflated valuations of three

Maryland liens, which Ebury 1EMI LLC already had borrowed against in June 2019:

| Parcel ID | June 12, 2019 Borrowing Base Certificate (Ebury 1EMI LLC) | September 13, 2019 Borrowing Base Certificate (Ebury 2EMI LLC) |
|---|---|---|
| 15-1739044 | $ 24,950.02 | $ 266,912.02 |
| 01-0031195 | $ 43,905.13 | $ 217,224.07 |
| 05-0376756 | $ 30,044.86 | $ 316,331.51 |

84.     In total, Defendants inflated the value of these three Maryland liens by over

$700,000.

85.     As explained above, Defendants improperly included the "bid amount"—an

amount that Defendants would be required to pay to obtain the deeds to the properties—in the

Borrowing Bases.

**K.     Other historical lies by Hanratty for the purpose of inducing EBCC to release
funds to him.**

86.     In addition, on September 7, 2018, Ebury 2EMI requested a $3.8 million advance,

purportedly to fund its assignment to EBCC of $5.2 million in tax liens that it previously had

pledged to Capital One.

87.     According to financial records that Hanratty provided to EBCC, however,

Defendants did not use the advance to pay Capital One.  Instead, Defendants used the funds to pay

a $3.3 million distribution to an investor.

88.    Defendants had paid Capital One $2 million on or around August 10, 2018 as part of a loan payoff to release collateral that they had pledged to Capital One.  On information and belief, Defendants obtained the funds to make that payment by selling $1.47 million worth of New Jersey tax liens (called the NJ0530 and NJ0530B liens), in transactions between July 20, 2018 and August 9, 2018.

89.    On information and belief, even though Defendants had sold the NJ0530 and NJ0530B liens by August 9, 2018, they still included those liens on a September 7, 2018 Borrowing Base Certificate.  Based on the Borrowing Bases' Availability on that date, Defendants caused EBCC to advance $836,731 to which Defendants were not entitled.

**L.    Defendants misappropriated EBCC's Collateral to repay disgruntled investors.**

90.    On at least two occasions, Defendants impermissibly sold EBCC's Collateral to pay off investors in the Funds.  Under Section 8.5 of the Credit Agreements, Defendants were allowed to sell tax liens in certain situations, but were required to deposit all proceeds from the sales into EBCC's lockbox account "within one (1) Business Day after receipt."

91.    <u>Example 1:</u>  On or around December 14, 2018, Defendants sold $1,350,000 in tax lien certificates that were EBCC's collateral.  That same day, according to financial records that Hanratty provided to EBCC, Defendants paid over $1.1 million in distributions to investors.

    a.    Under the Credit Agreements, Defendants should have removed the sold tax liens from the Borrowing Bases.  Doing so would have reduced the Borrowing Bases' Availability by $1.2 million and triggered a $1 million Overadvance.  Defendants did not remove the tax liens from the Borrowing Bases and did not pay EBCC any Overadvance.

    b.    In addition, under Section 8.5 of the Credit Agreements, Defendants were required to deposit proceeds from any such sales into the EBCC lockbox account. Defendants did not do so for these sales.

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 33 of 688

92.    <u>Example 2</u>:  On or around May 15, 2019, Defendants sold $858,344.50 in tax lien

certificates that were EBCC's collateral.   Defendants did not reduce the Borrowing Bases'

Availability or deposit the proceeds from the sales into the EBCC lockbox account.  Instead,

according to financial records that Hanratty provided to EBCC, Defendants transferred $350,000

in sale proceeds from Ebury 1EMI LLC to Ebury 2EMI LLC and then used those proceeds (along

with the $860,000 advance that Defendants obtained using duplicate liens, discussed in paragraphs

72-75), to pay $1,208,772 to various investors to settle a lawsuit.

93.    In total, Defendants paid investors in the Funds approximately $22 million in

distributions in 2018 and 2019.  On information and belief, these distributions were paid using

funds advanced under the Credit Facilities or using proceeds from the sale of EBCC's Collateral.

The distributions also were made in violation of Section 8.8 of the Credit Agreements, which

barred the Ebury Companies from making distributions, including if "an event has occurred that,

with notice, the lapse of time or otherwise, could constitute an Event of Default."

**M.    Hanratty secretly sells portions of EBCC's collateral, but continues to represent the contrary to EBCC.**

94.    In 2018, ESC sold four tranches of tax lien certificates through a brokerage owned

by McOsker called BloxTrade, LLC.   The sales yielded approximately $3.5 million in total

proceeds:

a.  On June 27, 2018, ESC sold 41 Alabama tax lien certificates owned by EB 1EMIALA LLC and EB 2EMIALA LLC for $413,635.99;

b.  On September 28, 2018, ESC sold 242 Alabama tax liens certificates owned by EB 1EMIALA LLC and EB 2EMIALA LLC for $834,291.64;

c.  On November 21, 2018, ESC sold 18 New Jersey tax lien certificates owned by Ebury Fund 1 NJ, LLC for $450,384.95; and

d.  On December 6, 2018, ESC sold 666 New Jersey tax lien certificates owned by Ebury Fund 1 NJ, LLC and Ebury Fund 2 NJ, LLC for $1,828,267.72.

-25-

95.     On information and belief, the tax lien certificates that ESC sold were EBCC's Collateral. Thus, under Section 8.5 of the Credit Agreements, Defendants were required to deposit all proceeds from these sales into the EBCC lockbox account "within one (1) Business Day after receipt." Defendants have not paid EBCC the proceeds of these sales.

96.     In addition, at least for the November 21, 2018 sale, Hanratty continued to represent to EBCC that he owned the liens and that they were increasing in value. On information and belief, Hanratty falsely included these liens in Borrowing Base Certificates until at least May 2020.

### N.     Fraudulent Transfers of REOs.

97.     Under Section 3.1 of the Credit Agreements, the proceeds of EBCC's tax lien collateral were also EBCC's collateral. Thus, any REO that resulted from a foreclosure on a tax lien that was EBCC's collateral is also EBCC's collateral. Hanratty repeatedly has acknowledged to EBCC that the REOs that resulted from foreclosures on tax liens that were EBCC's collateral are EBCC's collateral.

98.     Further, under Section 8.1 of the Credit Agreements, the Borrowers and Guarantors agreed that "prior to completion of any . . . foreclosure or other such proceeding, the Tax Lien will be assigned to an Ebury Company or an assignee of an Ebury Company." Defendants created RE 1EMI LLC and RE 2EMI LLC for the purpose of owning the REOs that resulted from foreclosures on tax liens that were EBCC's collateral.

99.     On information and belief, since 2017, Defendants have been transferring REOs that are the proceeds of EBCC's collateral to entities other than the Borrowers and Guarantors, including Ebury RE LLC and XYZ Corps. 1-10, including to prevent EBCC from receiving sale proceeds from the sale of the REOs, as well as from foreclosing on the REOs in the event of a default.

-26-

FILED: NEW YORK COUNTY CLERK 09/25/2022 06:55 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 09/25/2022
24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 35 of 688

100.    On information and belief, the Borrowers and Guarantors have not received fair consideration for these transfers and these transfers were not arms-length transactions.

101.    The REOs are EBCC's collateral and should not have been transferred to entities that are not parties to the Credit Agreements.

## COUNT ONE
### (Breach of Contract)

102.    EBCC repeats the allegations in paragraphs 1 to 101 as if fully set forth herein.

103.    Under the Credit Agreements, the Borrowers and Guarantors were required to "repay all principal, interest, costs and expenses outstanding . . . on November 10, 2021." They did not do so.

104.    On November 29, 2021, EBCC sent the Borrowers and Guarantors notices of default and demands for payment. The Borrowers have failed to repay the amounts outstanding under the Credit Agreements and now owe more than $21,813,177.46.

105.    EBCC is entitled to repayment of the amounts outstanding under the terms of the Credit Agreements.

106.    The Borrowers' failure to repay the amounts outstanding under the Credit Agreements constitutes an Event of Default. Accordingly, in addition to the amounts outstanding under the Credit Agreements, EBCC demands and is entitled to payment of its reasonable attorneys' fees, court costs, and legal expenses under Section 11.7 of the Credit Agreements.

107.    Each of the Guarantors guaranteed to EBCC "the due, prompt and punctual payment and satisfaction of the Indebtedness" and is liable for these amounts on a "solidary" or "joint and several" basis, along with the Borrowers.

108.    Hanratty also is liable for these amounts on a "solidary" or "joint and several" basis because he provided EBCC false information relating to the eligibility of Collateral, in violation of the Validity Guaranties, and EBCC incurred damages, costs, and losses as a result.

109.    Hanratty, ESC, and the Ebury Companies also are liable for these amounts because each entity is an alter ego of the Borrowers and Guarantors.

<div align="center">

**COUNT TWO**
**(Fraudulent Inducement)**

</div>

110.    EBCC repeats the allegations in paragraphs 1 to 109 as if fully set forth herein.

111.    Hanratty, the Borrowers, and the Guarantors made false statements of then-existing material facts about the eligibility of various tax lien collateral at the time they induced EBCC to execute the following agreements:

a.    The Sixth Amendment to Loan Documents for Ebury 1EMI LLC, executed on October 29, 2018, which increased the credit facility to $13,500,000;

b.    The Seventh Amendment to Loan Documents for Ebury 1EMI LLC, executed on September 24, 2019, which increased the credit facility to $15,000,000;

c.    The Eighth Amendment to Loan Documents for Ebury 1EMI LLC, executed on March 18, 2021, which extended the maturity date of the underlying note to May 8, 2021;

d.    The Ninth Amendment to Loan Documents for Ebury 1EMI LLC, executed on May 18, 2021, which extended the maturity date of the underlying note to August 10, 2021;

e.    The Tenth Amendment to Loan Documents for Ebury 1EMI LLC, executed on August 12, 2021, which extended the maturity date of the underlying note to November 10, 2021;

f.    The Waiver and Sixth Amendment to Loan Documents for Ebury 2EMI LLC, executed on March 18, 2021, which extended the maturity date of the underlying note to May 8, 2021; and

g.    The Eighth Amendment to Loan Documents for Ebury 2EMI LLC, executed on August 13, 2021, which extended the maturity date of the underlying note to November 10, 2021.

112.    Defendants' false statements of fact were material to EBCC. Had EBCC known that Defendants were self-servicing the Collateral, had sold the Collateral without paying EBCC the proceeds of the sales, were using advances to pay investors rather than purchase tax liens, or were double-counting or inflating the value of tax liens, it would not have agreed to these amendments.

113.    EBCC justifiably relied upon Defendants' signed Borrowing Base Certificates and was harmed by Defendants' actions.

114.    Hanratty, the Borrowers, and the Guarantors knew that their statements were false because they knew they were self-servicing the Collateral, they had sold the Collateral without paying EBCC the proceeds of the sales, they were using advances to pay investors rather than purchase tax liens, and they were double-counting or inflating the value of tax liens.

115.    The Borrowers' conduct was gross, wanton, willful, and morally culpable to a degree sufficient to justify an award of punitive damages.

116.    Hanratty, ESC, and the Ebury Companies each are liable for the fraudulent inducement because each entity is an alter ego of the Borrowers and Guarantors.

## COUNT THREE
### (Fraudulent Transfer – DCL §§ 272-274, 276)

117.    EBCC repeats the allegations in paragraphs 1 to 116 as if fully set forth herein.

118.    On information and belief, Defendants have transferred REOs that are EBCC's Collateral under the Credit Agreements to entities that are not parties to the Credit Agreements, including Ebury RE LLC and XYZ Corps. 1-10.

119.    On information and belief, these transfers were not arms-length transactions and Ebury RE LLC and XYZ Corps. 1-10 did not give fair consideration for the REOs.

-29-

120.    On information and belief, Defendants acted with actual intent to hinder, delay or defraud EBCC by transferring these REOs to Ebury RE LLC and XYZ Corps. 1-10.

121.    On information and belief, Defendants were insolvent or were rendered insolvent by the transfers.  In addition, on information and belief, Defendants were left with unreasonably small capital after the transfers.

122.    Defendants' conduct was gross, wanton, willful, and morally culpable to a degree sufficient to justify an award of punitive damages.

123.    In addition, EBCC is entitled to reasonable attorneys' fees because Defendants acted with actual intent to hinder, delay or defraud EBCC.

124.    Hanratty, ESC, and the Ebury Companies are each liable for the fraudulent transfers because each entity is an alter ego of the Borrowers and Guarantors.

## PRAYER FOR RELIEF

EBCC respectfully requests that this Court:

i.     Award damages for breach of contract, in an amount to be ascertained at trial but not less than $21,813,177.46, plus accrued interest, reasonable attorneys' fees, court costs, and legal expenses;

ii.    Award damages for Defendants' fraudulent inducement, in an amount to be ascertained at trial;

iii.   Award damages for Defendants' fraudulent transfers, in an amount to be ascertained at trial;

iv.    Award punitive damages for Defendants' willful and wanton misconduct;

v.     Impose joint and several liability on Hanratty, ESC, and the Ebury Companies; and

vi.    Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

EBCC demands trial by jury of all issues so triable.

-30-

Dated:  September 25, 2022
        New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*

Alexander J. Willscher
Austin P. Mayron
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business
Credit Corporation*

-31-

At an Individual Assignment Part, Part ___, of the Supreme Court of the State of New York, held in and for the County of New York, at the Courthouse located at 60 Centre Street, New York, NY, on the ___ day of _____, 2022

PRESENT:

      Hon. _____
                J.S.C.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| _____ x | |
| EMIGRANT BUSINESS CREDIT CORPORATION, | |
| : | Index No. 158207/2022 |
| Plaintiff, | |
| v. | |
| JOHN ARTHUR HANRATTY, | **[PROPOSED] ORDER TO SHOW CAUSE** |
| EBURY STREET CAPITAL, LLC, | |
| EBURY FUND 1, LP, | |
| EBURY FUND 2, LP, | |
| EBURY 1EMI LLC, | |
| EBURY 2EMI LLC, | |
| EB 1EMIALA LLC, | |
| EB 2EMIALA LLC, | |
| EB 1EMIFL, LLC, | |
| EB 2EMIFL, LLC, | |
| EB 1EMIIN, LLC, | |
| EB 2EMIIN, LLC, | |
| EB 1EMIMD, LLC, | |
| EB 2EMIMD, LLC, | |
| EB 1EMINJ, LLC, | |
| EB 2EMINJ, LLC, | |
| EB 1EMINY, LLC, | |
| EB 2EMINY, LLC, | |
| EB 1EMISC, LLC, | |
| EB 2EMISC, LLC, | |
| RE 1EMI LLC, | |
| RE 2EMI LLC, | |
| EB 1EMIDC, LLC, | |
| ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, | |

EBURY FUND 1FL, LLC,                    :
EBURY FUND 2FL, LLC,                    :
EBURY FUND 1NJ, LLC,                    :
EBURY FUND 2NJ, LLC,                    :
RED CLOVER 1, LLC,                      :
EBURY RE LLC, and                       :
XYZ CORPS. 1-10,                        :
                                        :
                      Defendants.       :
_____ x

**UPON READING** the annexed Memorandum of Law; the Affidavit of Scott Weiss, and the exhibits annexed thereto; the Affirmation of Alexander J. Willscher; and all other papers and pleadings filed herein; it is

**ORDERED** that Defendants John Arthur Hanratty; Ebury Street Capital, LLC; Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1, LLC; and Ebury RE LLC appear before this Court, located at 60 Centre Street, New York, NY, on the ___ day of _____ 2022, at ____ o'clock a.m./p.m., or as soon thereafter as counsel can be heard, and show cause why an Order should not be issued:

     a.    Enjoining and restraining Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, or permitting the transfer of any of their assets during the pendency of the above-captioned action (the "**Action**"), aside from ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses or living expenses;

b.      Ordering Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, to the extent that any tax lien certificate or real estate property resulting from the foreclosure on a tax lien certificate is or has been sold, to deposit any proceeds from such sale, aside from ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses, into an escrow account, to be established by the Parties;

c.      Ordering Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, to notify EBCC at least twenty-four (24) hours in advance of transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, or permitting the transfer of any assets in an amount exceeding $50,000;

d.      Granting Plaintiff such other and further relief as the Court deems just and proper.

Sufficient reason having been alleged, and pending a hearing and further Order of this Court, it is

**ORDERED**, that Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, are temporarily restrained and enjoined from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, permitting the transfer of any of their assets, aside from ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses or living expenses;

**ORDERED**, that Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, to the extent that any tax lien certificate or real estate property resulting from the foreclosure on a tax lien certificate is or has been sold, are temporarily restrained and enjoined to deposit any proceeds from such sale, aside from ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses, into an escrow account, to be established by the Parties;

**ORDERED**, that Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, must notify

EBCC at least twenty-four (24) hours in advance of transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, or permitting the transfer of any assets in an amount exceeding $50,000;

**ORDERED**, that service of a copy of this Order, together with a copy of the papers in support thereof, made upon Defendants by email to their counsel Gusrae Kaplan Nusbaum PLLC, by Kari Parks, Esq. at kparks@gusraekaplan.com, on or before the ___ day of _____, 2022, be deemed good and sufficient service; and it is

**ORDERED**, that any opposition to this motion be served by _____, 2022; and any reply be served by _____, 2022.


ENTER:

_____
J.S.C.


-4-

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 44 of 688

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | x<br>:<br>: |
| | : |
| Plaintiff, | : Index No. 158207/2022 |
| | : |
| v. | : |
| | : |
| JOHN ARTHUR HANRATTY, | : **AFFIRMATION OF** |
| EBURY STREET CAPITAL, LLC, | : **ALEXANDER J. WILLSCHER** |
| EBURY FUND 1, LP, | : |
| EBURY FUND 2, LP, | : |
| EBURY 1EMI LLC, | : |
| EBURY 2EMI LLC, | : |
| EB 1EMIALA LLC, | : |
| EB 2EMIALA LLC, | : |
| EB 1EMIFL, LLC, | : |
| EB 2EMIFL, LLC, | : |
| EB 1EMIIN, LLC, | : |
| EB 2EMIIN, LLC, | : |
| EB 1EMIMD, LLC, | : |
| EB 2EMIMD, LLC, | : |
| EB 1EMINJ, LLC, | : |
| EB 2EMINJ, LLC, | : |
| EB 1EMINY, LLC, | : |
| EB 2EMINY, LLC, | : |
| EB 1EMISC, LLC, | : |
| EB 2EMISC, LLC, | : |
| RE 1EMI LLC, | : |
| RE 2EMI LLC, | : |
| EB 1EMIDC, LLC, | : |
| ARQUE TAX RECEIVABLE FUND | : |
| (MARYLAND), LLC, | : |
| EBURY FUND 1FL, LLC, | : |
| EBURY FUND 2FL, LLC, | : |
| EBURY FUND 1NJ, LLC, | : |
| EBURY FUND 2NJ, LLC, | : |
| RED CLOVER 1, LLC, | : |
| EBURY RE LLC, and | : |
| XYZ CORPS. 1-10, | : |
| | : |
| Defendants. | : |
| | x |

**ALEXANDER J. WILLSCHER**, an attorney duly admitted to practice law in the Courts of the State of New York, affirms the truth of the following statements, under the penalties of perjury:

1.      I am a partner at the firm of Sullivan & Cromwell LLP, counsel for Plaintiff Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned matter.  I am familiar with the matters set forth below.

2.      I make this affirmation of emergency circumstances to request entry of EBCC's accompanying motion by order to show cause, requesting a temporary restraining order and injunctive relief related to Defendants' fraudulent transfers of EBCC's collateral.

3.      EBCC is proceeding by order to show cause, rather than by notice of motion, because this is an urgent matter requiring an expedited return date.  As set forth in the annexed materials, Defendants owe EBCC a substantial, unpaid debt, in an amount of over $21,951,600.67, plus accrued interest, reasonable attorneys' fees, court costs, and legal expenses, secured by liens on certain of Defendants' assets.

4.      Based on Defendants' prior dissipation of assets and the likelihood that Defendants will continue to dissipate assets to hinder, delay, and defraud EBCC, there is a real and imminent risk that EBCC will lose the ability to collect on its security interests or any judgment in this action. There is particular emergency here given the significant history of Defendants' fraudulent transfers of assets to hinder, delay, and defraud EBCC, and Defendants' representations that they presently intend to sell certain of EBCC's collateral.

5.      As set forth in detail in the Affidavit of Scott Weiss and the annexed Memorandum of Law, Defendants already have sold millions of dollars' worth of EBCC's collateral and

transferred the proceeds to alter-ego entities, to evade EBCC's perfected security interests as well as Defendants' obligations under the Credit Agreements.

6.    Absent the requested temporary restraining order and injunctive relief, there will be nothing to prevent Defendants from further transferring or otherwise dissipating EBCC's collateral in violation of EBCC's rights and New York law, and causing irreparable harm to EBCC by rendering EBCC's security interests and any judgment in this action meaningless and unenforceable.

7.    In compliance with Commercial Division Rule 202.7(f), on October 16, 2022, I notified Defendants of the date, time, and place of this application by sending the letter annexed hereto via email to Defendants' counsel, with copies to each Defendant, via email.

8.    No prior application has been made for the relief sought by this order to show cause.

Dated:    October 17, 2022                  /s/ Alexander J. Willscher
          New York, New York               **ALEXANDER J. WILLSCHER**

-3-

## CERTIFICATE OF COMPLIANCE

I hereby certify that this affirmation complies with the word count limit of N.Y.C.R.R.

202.8-b for documents prepared by use of a computer because it contains 413 words.

Dated:    October 17, 2022                    _/s/ Alexander J. Willscher_
          New York, New York                 Alexander J. Willscher

-4-

**Mayron, Austin P.**

| | |
|---|---|
| **From:** | Mayron, Austin P. |
| **Sent:** | Sunday, October 16, 2022 1:30 PM |
| **To:** | 'swilliams@rumberger.com' |
| **Cc:** | 'jh@eburycap.com'; 'jhanratty@me.com'; 'jhanratty@gmail.com'; Willscher, Alexander J. |
| **Subject:** | Re: Emigrant Business Credit Corp. v. John Hanratty, et al., Index No. 158207/2022, New York Supreme Court |
| **Attachments:** | 2022-10-16 Letter from A. Willscher to S. Williams.pdf |

Counsel—

We represent Emigrant Business Credit Corporation ("EBCC") in connection with the above-captioned matter.  As explained in the attached letter, EBCC intends to move by order to show cause for a temporary restraining order and other injunctive relief tomorrow, October 17, 2022, at approximately 1:30 PM.

Please let us know if you will accept service by e-mail of the Summons & Complaint, as well as the Order to Show Cause and supporting documents annexed thereto.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP | 125 Broad Street |
    New York, NY  10004-2498
T: (212) 558-3733 | F: (212) 558-3588
mayrona@sullcrom.com | http://www.sullcrom.com

1

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

October 16, 2022

Via E-mail

R. Scott Williams, Esq.
    Rumberger, Kirk & Caldwell, P.A.
        2001 Park Place North,
            Suite 1300
                Birmingham, AL  35203.

        Re:    *Emigrant Business Credit Corp.* v. *John Hanratty, et al.*, Index
               No. 158207/2022, New York Supreme Court, New York County

Dear Mr. Williams:

            Pursuant to N.Y.C.R.R. 202.7(f), we hereby notify you that EBCC will be
moving by order to show cause for a temporary restraining order and other injunctive relief
against Defendants in the above-captioned action on October 17, 2022, at approximately
1:30 PM, or at the soonest time thereafter when the application can be heard, in 60 Centre
Street, New York, NY, Room 119A.

                                        Sincerely,

                                        */s/ Alexander J. Willscher*

                                        Alexander J. Willscher

cc:  John Arthur Hanratty
1152 Ave Magdalena
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

Ebury Street Capital, LLC
644 Avenida Fernandez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 50 of 688

R. Scott Williams, Esq.                                                    -2-

Ebury Fund 1, LP
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 1EMIFL, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

Ebury Fund 2, LP
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 2EMIFL, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

Ebury 1EMI LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 1EMIIN, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

Ebury 2EMI LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 2EMIIN, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 1EMIALA LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 1EMIMD, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 2EMIALA LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 2EMIMD, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

R. Scott Williams, Esq.                                                    -3-

EB 1EMINJ, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

RE 1EMI LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 2EMINJ, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

RE 2EMI LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 1EMINY, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 1EMIDC, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 2EMINY, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

Arque Tax Receivable Fund (Maryland),
LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 1EMISC, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

Ebury Fund 1FL, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

EB 2EMISC, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

Ebury Fund 2FL, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 52 of 688

R. Scott Williams, Esq.                                              -4-

Ebury Fund 1NJ, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

Ebury Fund 2NJ, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

Red Clover 1, LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

Ebury RE LLC
644 Avenida Fernadez Juncos
District View Office Center, Suite 203
San Juan, Puerto Rico  00907
jh@eburycap.com
(via e-mail)

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| ─────────────────────── x | |
| EMIGRANT BUSINESS CREDIT | : |
| CORPORATION, | : |
| | : Index No. 158207/2022 |
| Plaintiff, | : |
| v. | : |
| | : |
| JOHN ARTHUR HANRATTY, | : **MEMORANDUM OF LAW** |
| EBURY STREET CAPITAL, LLC, | : **IN SUPPORT OF** |
| EBURY FUND 1, LP, | : **ORDER TO SHOW CAUSE** |
| EBURY FUND 2, LP, | : |

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

                              Defendants.

─────────────────────── x

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State

Court Records    Pg 54 of 688

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ 1

**STATEMENT OF FACTS** ................................................................................... 2

    A.  Defendants' Obligations Under the Loan Documents ......................................... 2

    B.  Defendants' Fraudulent Scheme ........................................................................ 4

**ARGUMENT** ........................................................................................................ 6

    A.  EBCC Can Demonstrate a Likelihood of Success on the Merits......................... 6

    B.  EBCC Will Suffer Irreparable Harm Absent Injunctive Relief ........................ 12

    C.  The Balance of the Equities Favors EBCC ...................................................... 15

**CONCLUSION** ................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*159 Smith, LLC* v. *Boreum Hill Prop. Holdings, LLC*,
191 A.D.3d 741 (2d Dep't 2021) .................................................................6

*1650 Realty Assocs., LLC* v. *Golden Touch Mgmt., Inc.*,
101 A.D.3d 1016 (2d Dep't 2012) ..............................................................14

*Am. Med. & Life Ins. Co.* v. *Crosssummit Enters., Inc.*,
No. 18059/2008, 2009 WL 1574129 (Sup. Ct. N.Y. Cnty. May 18, 2009).............................12

*AQ Asset Mgmt. LLC* v. *Levine*,
111 A.D.3d 245 (1st Dep't 2013) ..............................................................14

*Arcamone-Makinano* v. *Britton Prop., Inc.*,
83 A.D.3d 623 (2d Dep't 2011) ..................................................................6

*Bank of Am., N.A.* v. *Won Sam Yi*,
294 F. Supp. 3d 62 (W.D.N.Y. 2018) ...........................................................14

*Brenntag Int'l Chems., Inc.* v. *Bank of India*,
175 F.3d 245 (2d Cir. 1999)......................................................................12

*Care Envt'l Corp.* v. *M2 Techs., Inc.*,
2006 WL 148913 (E.D.N.Y. Jan. 18, 2006) ...................................................10

*Cortlandt St. Recovery Corp.* v. *Bonderman*,
31 N.Y.3d 30 (2018) ..............................................................................11

*De Walle* v. *De Walle*,
68 Misc. 3d 1224(A) (Sup. Ct. Nassau Cnty. 2020) ........................................9

*Deckert* v. *Indep. Shares Corp.*,
311 U.S. 282 (1940)................................................................................12

*Dempster* v. *Overview Equities, Inc.*,
4 A.D.3d 495 (2d Dep't 2004)...................................................................10

*Deutsch* v. *Grunwald*,
165 A.D.3d 1035 (2d Dep't 2018) ..............................................................15

*Doe* v. *Axelrod*,
73 N.Y.2d 748 (1988) .....................................................................6, 12, 15

-ii-

*Felix* v. *Brand Serv. Grp. LLC*,
101 A.D.3d 1724 (1st Dep't 2012) ....................................................15

*First Bank of Ams.* v. *Motor Car Funding, Inc.*,
257 A.D.2d 287 (1st Dep't 1999) .......................................................8

*Goodstein* v. *Enbar*,
2017 WL 1032545 (Sup. Ct. N.Y. Cnty. Mar. 17, 2017) .......................................12

*Gosmile, Inc.* v. *Levine*,
81 A.D.3d 77 (1st Dep't 2010) ..........................................................8

*IS Chrystie Mgmt. LLC* v. *ADP, LLC*,
205 A.D.3d 418 (1st Dep't 2022) ........................................................8

*JSC VTB Bank* v. *Mavlyanov*,
2017 WL 2494806 (Sup. Ct. N.Y. Cnty. June 9, 2017).............................12, 14, 15

*Klein, Wagner & Morris* v. *Lawrence A. Klein, P.C.*,
186 A.D.2d 631 (2d Dep't 1992) ........................................................12

*Laco X-Ray Sys., Inc.* v. *Fingerhut*,
88 A.D.2d 425 (2d Dep't 1982) ..........................................................9

*Loreley Fin. (Jersey) No. 4 Ltd.* v. *UBS Ltd.*,
40 Misc. 3d 323 (Sup. Ct. N.Y. Cnty. 2013) .............................................9

*McLaughlin, Piven, Vogel, Inc.* v. *W.J. Nolan & Co.*,
114 A.D.2d 165 (2d Dep't 1986) .....................................................12, 15

*Mega Pers. Lines, Inc.* v. *Halton*,
9 A.D.3d 553 (3d Dep't 2004) ..........................................................9

*Music Mix Mobile LLC* v. *Newman (In re Stage Presence, Inc.)*,
592 B.R. 292 (Bankr. S.D.N.Y. 2018) ...................................................11

*Nesis* v. *Paris Int'l Lighting, Inc.*,
184 A.D.2d 485 (1st Dep't 1992) .......................................................15

*New York Univ.* v. *Cont'l Ins. Co.*,
87 N.Y.2d 308 (1995) ...................................................................8

*Palmerone* v. *Staples*,
195 A.D.3d 736 (2d Dep't 2021) ........................................................11

*Pimentel* v. *Aminov*,
23 Misc. 3d 1112(A) (Sup. Ct. Queens Cnty. 2009)......................................15

-iii-

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 57 of 688

*Polonetsky* v. *Better Homes Depot, Inc.*,
    97 N.Y.2d 46 (2001) .................................................................10

*Ruiz* v. *Meloney*,
    26 A.D.3d 485 (2d Dep't 2006) ...................................................6

*Sau Thi Ma* v. *Xuan T. Lien*,
    198 A.D.2d 186 (1st Dep't 1993) ............................................6, 14

*Shisgal* v. *Brown*,
    21 A.D.3d 845 (1st Dep't 2005) .................................................11

*Steinberg* v. *Levine*,
    6 A.D.3d 620 (2d Dep't 2004) ...................................................10

*Sylmark Holdings Ltd.* v. *Silicone Zone Int'l Ltd.*,
    5 Misc. 3d 285 (Sup. Ct. N.Y. Cnty. 2004) ................................7

*Tap Holdings, LLC* v. *Orix Fin. Corp.*,
    109 A.D.3d 167 (1st Dep't 2013) ..............................................11

*Tucker* v. *Toia*,
    54 A.D.2d 322 (4th Dep't 1976) .................................................6

*Wall St. Assocs.* v. *Brodsky*,
    257 A.D.2d 526 (1st Dep't 1999) ..............................................10

*Winchester Glob. Tr. Co.* v. *Donovan*,
    22 Misc. 3d 1119(A) (Sup. Ct. 2009) ........................................11

*Winchester Glob. Tr. Co.* v. *Donovan*,
    58 A.D.3d 833 (2d Dep't 2009) .................................................13

*Witham* v. *VFinance Invs., Inc.*,
    52 A.D.3d 403 (1st Dep't 2008) .................................................8

**Statutes and Rules**

N.Y. Bus. Corp. Law § 102(a)(8) ...............................................13

N.Y. Debt. & Cred. Law § 271 ...................................................13

N.Y. Debt. & Cred. Law § 273 (effective until April 3, 2020)...................9

N.Y. Debt. & Cred. Law § 273(a)(1) .............................................9

N.Y. Debt. & Cred. Law § 273(a)(2) .............................................9

N.Y. Debt. & Cred. Law § 274 ...................................................9

-iv-

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 58 of 688

N.Y. Debt. & Cred. Law § 276 (effective until April 3, 2020)........................................................9

CPLR 6301.................................................................................................................6, 16

CPLR 6312(b)......................................................................................................................16

CPLR 6313............................................................................................................................6

**Other Authorities**

Peter B. Oh, *Veil-Piercing*, 89 Tex. L. Rev. 81 (2010) .................................................................11

Restatement (Second) of Torts § 944 cmt. i (Am. L. Inst. 1979) .................................................13

# INTRODUCTION

In 2017, Plaintiff Emigrant Business Credit Corporation ("**EBCC**") extended lines of credit to companies controlled by Defendant John Hanratty ("**Hanratty**"), backed by guarantees from over a dozen other Hanratty-controlled companies, as well as from Hanratty himself. Four years later, the promissory notes underlying the lines of credit (the "**Credit Facilities**") came due, at which point Defendants failed to repay EBCC over $18 million in outstanding principal and interest.

Since EBCC issued notices of the default for non-payment, Defendants have failed to repay EBCC and now owe more than $21,951,600.67 in outstanding principal, interest, costs and expenses. But that is not the end of the story. EBCC has discovered that Defendants misappropriated advances under the Credit Facilities, as well as EBCC's collateral, in order to distribute tens of millions of dollars to Hanratty, investors, and other company insiders. EBCC also has discovered that Defendants, in an effort to increase the amounts available under the Credit Facilities, repeatedly deceived EBCC in an effort to induce EBCC to amend the agreements governing the Credit Facilities (the "**Credit Agreements**").

In addition, EBCC has discovered that Defendants fraudulently transferred EBCC's collateral to other Hanratty-controlled companies to circumvent EBCC's liens and to prevent EBCC from recovering the amounts that it is owed. According to records provided by Hanratty, Defendants have sold around 90 properties (worth more than $4 million) in 2022 alone that were EBCC's collateral, without remitting any of the sale proceeds to EBCC. In addition, Defendants have listed for sale another 88 properties that are EBCC's collateral (for approximately $4.8 million total), but have not agreed to remit any sale proceeds to EBCC. EBCC respectfully requests, therefore, that, pending the resolution of this action, the Court enter a preliminary

injunction to maintain the status quo and to prevent Defendants from continuing to dissipate EBCC's collateral.

<div align="center">**STATEMENT OF FACTS**</div>

Defendant John Hanratty approached EBCC in 2016 seeking a $15 million credit facility to finance Defendants' purchases of tax lien certificates. (Weiss Aff. ¶ 3.) To facilitate the lending relationship, Defendants created Ebury 1EMI LLC and Ebury 2EMI LLC (the "**Borrowers**") to maintain ownership of the tax lien certificates that were to be purchased using the Credit Facilities. (*Id*. ¶ 4.) The Borrowers' names contain the initials "EMI"—short for "Emigrant"—to denote that EBCC holds liens on their assets. (*Id*.) On March 9, 2017, EBCC agreed to extend a $10 million credit facility to Ebury 1EMI LLC and a $5 million credit facility to Ebury 2EMI LLC, subject to the conditions set out in the various loan documents. (*Id*.)

**A.    Defendants' Obligations Under the Loan Documents**

The Credit Facilities are governed by several agreements, including the Credit Agreements, the Security Agreements, the Custodial Agreements, and the Guaranties. (*Id*. ¶ 5.)

The Credit Agreements.  Under the Credit Agreements, EBCC agreed to advance funds to Defendants to finance their purchases of tax liens. (Weiss Aff. ¶¶ 6-7.) Defendants were allowed to use advances only to purchase eligible tax liens and for ordinary and necessary business expenses.[1] (*Id*. ¶ 7.) The purchased tax liens, and any resulting proceeds, were to be EBCC's collateral, which Defendants were not allowed to transfer without EBCC's consent (with limited exceptions). (*Id*. ¶ 10.) Per the terms of the promissory notes underlying the Credit Facilities, Defendants were required to repay EBCC all outstanding principal, interest, costs, and expenses

---

[1]  The structure of the Credit Facilities is described in more detail in the Complaint. (*See* Compl. ¶¶ 22-31, 34-35.)

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 61 of 688

at the maturity date.  (*Id.* ¶ 8.)  The maturity date was originally set as March 9, 2021; after several

extensions, the final maturity date was set as November 10, 2021.  (*Id.*)

<u>Security Agreements</u>.  Defendants granted EBCC liens on and security interests in "all

present and future assets and rights" of the Borrowers and Guarantors (*id.* ¶ 11), including the

collateral and any proceeds of the collateral (*id.*).

<u>Custodial and Servicing Agreements</u>.  The Custodial and Servicing Agreements required

Defendants to designate a third-party custodian and servicer to take possession of, hold, and

administer the tax liens that were to be purchased using the Credit Facilities.  (Weiss Aff. ¶ 12.)

The Credit Agreements originally designated Tower Fund Services, LLC as the Custodian and

Servicer; on November 8, 2017, the parties agreed to designate MTAG Services, LLC ("**MTAG**")

as the Custodian and Servicer.  (*Id.*)  Defendants were prohibited from changing the custodian or

servicer without EBCC's prior written consent.  (*Id.*)

<u>Guaranties</u>.  The Credit Agreements required certain of the Defendants (the "**Guarantors**")

to provide guaranties for the indebtedness,[2] and Hanratty to execute "validity guaranty"

agreements in favor of EBCC.  (Weiss Aff. ¶¶ 10, 13.)  The validity guaranties provide that

Hanratty is personally liable for all damages incurred by EBCC that result from false information

provided by Defendants "relating to the eligibility of Collateral."  (*Id.* ¶ 13.)

---

[2]  The Guarantors include Defendants Ebury Street Capital, LLC; Ebury Fund 1, LP; Ebury Fund
2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC; EB 2EMIALA LLC;
EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC;
EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY,
LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC;
Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC;
Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; and Red Clover 1, LLC.

-3-

## B.    Defendants' Fraudulent Scheme

On November 10, 2021, Defendants were required—but failed—to repay EBCC the amounts outstanding under the Credit Facilities. (*Id.* ¶ 14.) When EBCC approached MTAG after the default to foreclose on the collateral, it discovered that about 90% of its supposed collateral—worth almost $18 million—was "missing." EBCC's subsequent investigation has discovered brazen violations of the Credit Agreements and fraudulent transfers of EBCC's collateral by Defendants. (*Id.* ¶ 16.)

<u>Self-Servicing</u>.    The Credit Agreements required Defendants to deliver any tax lien certificates that they purchased using the Credit Facilities to MTAG, the designated third-party custodian and servicer. (*Id.* ¶ 12.) Defendants were not allowed to retain custody of or service the tax liens themselves (called "**self-servicing**"), because the involvement of an independent third-party was essential to ensure the collateral's safekeeping. (*Id.*) In a December 2021 lien tape Defendants submitted to EBCC, Defendants admitted that they had been self-servicing almost 90% of EBCC's purported collateral. (*Id.* ¶ 16.) Given that Defendants were not allowed to request advances against self-serviced tax liens, Defendants misrepresented the eligibility of the collateral by requesting advances against these liens. (*Id.* ¶ 17.)

<u>Borrowing Base Misrepresentations</u>.    On several occasions, Defendants inflated the value of EBCC's tax lien collateral or double-counted collateral. For example, in a December 2021 lien tape, Defendants inflated the value of three Maryland tax liens by over $700,000, by improperly including future ***payments*** that Defendants were required to make as part of the ***value*** of the liens. (Weiss Aff. ¶ 19.) As another example, on September 7, 2018, Defendants requested an advance against New Jersey tax liens that they already had sold to pay off another lender and fund distributions to investors and other insiders. (*Id.* ¶ 18.) Finally, on May 17, 2019 and September

-4-

13, 2019, Defendants requested advances against tax liens against which they already had received advances. (*Id.*)

 Misuse of Advances and Collateral. EBCC also has discovered that Defendants misused advances and sold EBCC's collateral to pay off investors and other lenders. For example, Defendants used advances from September 2018, November 2018, May 2019, and September 2019, to pay distributions to investors. (Weiss Aff. ¶ 20.) Further, on at least two occasions, Defendants impermissibly sold EBCC's collateral to pay distributions to investors. (*Id.*) In December 2018, Defendants sold $1.35 million in tax lien certificates that were EBCC's collateral to fund over $1.1 million in distributions to investors. (*Id.*) Similarly, in May 2019, Defendants sold $858,344.50 in tax liens that were EBCC's collateral to fund additional distributions to investors. (*Id.*)

 Fraudulent Inducement. EBCC has determined that it was fraudulently induced by Defendants to enter into certain amendments to the Credit Agreements: specifically, the Sixth, Seventh, Eighth, Ninth, and Tenth Amendments to Loan Documents for Ebury 1EMI LLC, and the Sixth and Eighth Amendment to Loan Documents for Ebury 2EMI LLC. (Weiss Aff. ¶¶ 21-22.) Among other things, these amendments extended the original maturity date of March 9, 2021, and increased the amount of the Ebury 1EMI LLC credit facility from $10 million to $15 million. (*Id.*) If EBCC had known that Defendants were self-servicing the Collateral, sold certain of the Collateral without paying EBCC the sale proceeds, were using advances to pay investors rather than purchase tax liens, or were double-counting or inflating the value of tax liens or otherwise misrepresenting the Borrowing Bases, EBCC would not have agreed to amend the Credit Agreements and would have stopped advancing funds to Defendants and demanded repayment. (*Id.*)

# ARGUMENT

To obtain a preliminary injunction, a party must establish: (i) a likelihood of success on the merits, (ii) irreparable harm absent injunctive relief, and (iii) a balancing of the equities in its favor. *Doe* v. *Axelrod*, 73 N.Y.2d 748, 750 (1988); *see* CPLR 6301 (preliminary injunction and temporary restraining order), 6313 (temporary restraining order). The entry of injunctive relief is particularly appropriate where it is necessary "to hold the parties in *status quo* while the legal issues are determined in a deliberate and judicious manner," *Tucker* v. *Toia*, 54 A.D.2d 322, 326 (4th Dep't 1976), or to "prevent the dissipation of property that could render a judgment ineffectual," *Ruiz* v. *Meloney*, 26 A.D.3d 485, 486 (2d Dep't 2006). The decision whether to grant injunctive relief is committed to the sound discretion of the trial court. *159 Smith, LLC* v. *Boreum Hill Prop. Holdings, LLC*, 191 A.D.3d 741, 742 (2d Dep't 2021).

## A.    EBCC Can Demonstrate a Likelihood of Success on the Merits

The first requirement to obtain a preliminary injunction is to establish a likelihood of success on the merits. *Doe*, 73 N.Y.2d at 750. EBCC can make a prima facie showing of its right to relief as to each Count in the Complaint; any one of which is sufficient to establish a likelihood of success on the merits. *Tucker*, 54 A.D.2d at 326.[3]

<u>Breach of Contract (Count One)</u>. EBCC is likely to succeed on the merits of its breach of contract claims. "To establish a breach of contract claim, the plaintiff must allege the specific terms of the agreement, the consideration, the plaintiffs' performance, and the defendants' breach

---

[3] *See generally Sau Thi Ma* v. *Xuan T. Lien*, 198 A.D.2d 186, 187 (1st Dep't 1993) ("Where denial of injunctive relief would render the final judgment ineffectual, the degree of proof required to establish the element of likelihood of success on the merits should be accordingly reduced." (quotation omitted)); *Arcamone-Makinano* v. *Britton Prop., Inc.*, 83 A.D.3d 623, 625 (2d Dep't 2011) ("The mere existence of an issue of fact will not itself be grounds for the denial of the motion.").

-6-

of the agreement." *Sylmark Holdings Ltd.* v. *Silicone Zone Int'l Ltd.*, 5 Misc. 3d 285, 295 (Sup. Ct. N.Y. Cnty. 2004). Under the Credit Agreements, EBCC agreed to finance the Borrowers' purchases of tax liens. (Ex. A to Weiss Aff. at 3, 80.) In return, the Borrowers promised to repay EBCC "all principal, interest, costs and expenses outstanding" at the agreed-upon maturity date (as extended)—November 10, 2021. (Ex. B to Weiss Aff. at 4, 16.) At the maturity date, however, the Borrowers failed to repay EBCC more than $18 million in outstanding principal and interest, despite EBCC having fully performed under the Credit Agreements. (Weiss Aff. ¶ 14.) As its right to repayment is beyond dispute, EBCC is likely to prevail on these claims.

EBCC also is likely to prevail in demonstrating that Hanratty and the Guarantors are liable for the amounts owed under the Credit Facilities. Each of the Guarantors promised to EBCC "the due, prompt and punctual payment and satisfaction of the Indebtedness" and assumed liability for such indebtedness on a "solidary" or "joint and several" basis. (Ex. C to Weiss Aff. at 4, 6, 13, 15, 22, 24, 31, 33.). Similarly, Hanratty, through the Validity Guaranties, guaranteed that "all written information relating to the eligibility of Collateral" that Defendants provided to EBCC would be "true and correct in all material respects." (Ex. F to Weiss Aff. at 4, 12.) By repeatedly delivering false information to EBCC relating to the eligibility of the collateral (Weiss Aff. ¶¶ 18-20), Hanratty is liable for the "aggregate amount of all Damages incurred by" EBCC on a "solidary" or "joint and several" basis (Ex. F to Weiss Aff. at 4, 12).[4]

<u>Fraudulent Inducement (Count Two)</u>. EBCC also is likely to succeed on the merits with respect to its fraudulent inducement claims. "To state a claim for fraudulent inducement, there

---

[4] Had EBCC known that Defendants were self-servicing the Collateral, had sold the Collateral without paying EBCC the sale proceeds, were using advances to pay investors rather than purchase tax liens, or were double-counting or inflating the value of tax liens, it would have stopped advancing funds to Defendants and demanded repayment. (Weiss Aff. ¶ 22.)

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 66 of 688

must be a knowing misrepresentation of material present fact, which is intended to deceive another

party and induce that party to act on it, resulting in injury." *Gosmile, Inc.* v. *Levine*, 81 A.D.3d

77, 81 (1st Dep't 2010). The misrepresentation must concern "present facts . . . collateral to the

contract (though it may have induced the plaintiff to sign the contract)." *First Bank of Ams.* v.

*Motor Car Funding, Inc.*, 257 A.D.2d 287, 292 (1st Dep't 1999); *see IS Chrystie Mgmt. LLC* v.

*ADP, LLC*, 205 A.D.3d 418, 418 (1st Dep't 2022).[5]

As explained above, Defendants made knowing misrepresentations of fact to induce EBCC

to execute the Sixth, Seventh, Eighth, Ninth, and Tenth Amendments to Loan Documents for

Ebury 1EMI LLC, and the Sixth and Eighth Amendment to Loan Documents for Ebury 2EMI

LLC. (Weiss Aff. ¶ 21.) The misrepresentations were about issues collateral to the Credit

Agreements—including the custody, existence, and value of EBCC's collateral, as well as

Defendants' use of the collateral and advances under the Credit Facilities—and were material to

EBCC's decisions to amend the Credit Agreements. (*Id.* ¶¶ 18-20.) EBCC justifiably relied on

Defendants' misrepresentations and was injured because, had it known that Defendants were

self-servicing the collateral, had sold the collateral without paying EBCC the sale proceeds, were

using advances to pay investors rather than purchase tax liens, or were double-counting or inflating

the value of tax liens, it would have stopped advancing funds to Defendants and demanded

repayment. (*Id.* ¶ 21.) Accordingly, EBCC is likely to prevail on its fraudulent inducement claims.

*See Witham* v. *VFinance Invs., Inc.*, 52 A.D.3d 403, 403 (1st Dep't 2008) (affirming a preliminary

injunction based on "a claim of fraud based on alleged misrepresentation of facts beyond mere

intention not to perform on a contract").

---

[5] *See generally New York Univ.* v. *Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (1995) ("[D]efendant may
be liable in tort . . . when it has engaged in tortious conduct separate and apart from its failure to
fulfill its contractual obligations.").

-8-

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO. 4

INDEX NO. 158207/2022

RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 67 of 688

<u>Fraudulent Transfer (Count Three)</u>.  EBCC is likely to succeed on the merits of its fraudulent transfer claims as well.  To state a claim for actual fraudulent transfers, the plaintiff must show that the defendant made the transfers with "actual intent . . . to hinder, delay, or defraud either present or future creditors."  N.Y. Debt. & Cred. Law § 276 (effective until April 3, 2020); *see also* N.Y. Debt. & Cred. Law § 273(a)(1).[6]  To state a claim for constructively fraudulent transfers, "the plaintiff must establish that the defendant (1) made a conveyance; (2) without fair consideration; (3) by a person who is insolvent or who becomes insolvent as a consequence of the transfer." *Loreley Fin. (Jersey) No. 4 Ltd.* v. *UBS Ltd.*, 40 Misc. 3d 323, 337 (Sup. Ct. N.Y. Cnty. 2013).[7]  EBCC's fraudulent transfer claims relate to Defendants' transfers of EBCC's tax lien and REO collateral to entities that are not parties to the Credit Agreements, including Ebury RE LLC and other unknown entities.  (Compl. ¶ 118.)

EBCC is likely to prevail on its claims for constructive fraud because the entities that originally owned the tax liens did not receive fair consideration for transferring them to Ebury RE LLC, *see Mega Pers. Lines, Inc.* v. *Halton*, 9 A.D.3d 553, 555 (3d Dep't 2004) (holding that transfers "directly to the insider or to an entity controlled by the insider" raised inference of a lack of fair consideration); *Laco X-Ray Sys., Inc.* v. *Fingerhut*, 88 A.D.2d 425, 432-33 (2d Dep't 1982), and Defendants were insolvent at the time of the transfers (*see* Part B, *infra*).  In addition, EBCC is likely to prevail on its claims for actual fraud because Defendants acted with the requisite intent.

---

[6] The Debtor and Creditor Law was amended in 2019; the amended provisions apply only to transfers occurring on or after April 4, 2020.  *See De Walle* v. *De Walle*, 68 Misc. 3d 1224(A) (Sup. Ct. Nassau Cnty. 2020).

[7] *See also* N.Y. Debt. & Cred. Law § 273(a)(2); N.Y. Debt. & Cred. Law § 274; N.Y. Debt. & Cred. Law § 273 (effective until April 3, 2020); N.Y. Debt. & Cred. Law § 274 (effective until April 3, 2020).

First, according to Defendants' former business partner, Hanratty would instruct his employees "to obtain title over a property in the benefit of a different entity than the original investor, thereby defrauding some investors to the benefit of others, while inflating asset value to obtain bank loans and/or mortgages." (Ex. I to Weiss Aff. at 65.) Defendants also would "take redemptions from . . . assets and instead of paying [EBCC] . . . put the money in another fund to cover shortfalls." (*Id*. at 71.) Hanratty even openly bragged about the fact that he was defrauding EBCC. (*Id*. at 75.) Second, Defendants' transfers bear the "badges of fraud," which also can be used to prove the requisite intent. *See Steinberg* v. *Levine*, 6 A.D.3d 620, 621 (2d Dep't 2004) (holding that fraudulent intent "may be inferred from the circumstances surrounding the allegedly fraudulent transfer"); *see also Wall St. Assocs.* v. *Brodsky*, 257 A.D.2d 526, 529 (1st Dep't 1999) (listing the badges of fraud). The transfers were made between Hanratty-controlled companies (Weiss Aff. ¶ 25), violated the Credit and Security Agreements and thus were not in the usual course of business, were not made for adequate consideration, and were made with full knowledge of Defendants' financial condition and EBCC's interest in the collateral. As a result, EBCC is likely to prevail on its actual fraud claims as well.[8]

<u>Alter Ego Liability (All Counts)</u>. Finally, EBCC is likely to establish that each Defendant is an alter ego of one another with respect to EBCC's claims.[9] New York courts impose alter ego

---

[8] *See also Dempster* v. *Overview Equities, Inc.*, 4 A.D.3d 495, 498 (2d Dep't 2004) (finding that transfer to a corporation operating "out of the same address as the defendant's other business," among other badges of fraud, established prima facie showing of actual fraud); *Care Envt'l Corp.* v. *M2 Techs., Inc.*, 2006 WL 148913, at *10 (E.D.N.Y. Jan. 18, 2006) (finding that transfers between corporations with "identical management, facilities and ownership" supported prima facie showing of actual fraud).

[9] "In actions for fraud, corporate officers and directors may be held individually liable if they participated in or had knowledge of the fraud," even absent a showing of alter ego liability. *See Polonetsky* v. *Better Homes Depot, Inc.*, 97 N.Y.2d 46, 55 (2001).

liability "whenever necessary 'to prevent fraud or achieve equity.'" *Winchester Glob. Tr. Co.* v. *Donovan*, 22 Misc. 3d 1119(A) (Sup. Ct. 2009) (unpublished table disposition) (quoting *Walkovszky* v. *Carlton*, 18 N.Y.2d 414, 417 (1966)).[10] Given EBCC's clear right to repayment under the Credit Agreements, along with Defendants' fraudulent transfers of EBCC's collateral, the imposition of alter ego liability here is necessary to redress the harm caused by Defendants' fraud and to achieve equity. *See Cortlandt St. Recovery Corp.* v. *Bonderman*, 31 N.Y.3d 30, 47-48 (2018); *Palmerone* v. *Staples*, 195 A.D.3d 736, 739 (2d Dep't 2021).

In deciding whether to impose alter ego liability, the Court may consider: (1) the disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the amount of business discretion displayed by the related entities; (7) whether the related entities deal with one another at arm's length; (8) whether the entities are treated as independent profit centers; (9) the payment or guarantee of debts by the related entities; and (10) whether the entities used one another's properties as if the properties were their own. *Shisgal* v. *Brown*, 21 A.D.3d 845, 848 (1st Dep't 2005); *see Tap Holdings, LLC* v. *Orix Fin. Corp.*, 109 A.D.3d 167, 174 (1st Dep't 2013).

Each of these factors supports a finding of alter ego liability here. In particular, Defendants are: inadequately capitalized (Weiss Aff. ¶ 27); intermingle funds (*id*.); have an overlap in ownership, officers, directors, and personnel (*id*.); share a common office space, address, telephone numbers, and email addresses (*id*.); do not display independent business discretion (*id*.);

---

[10] *See generally Music Mix Mobile LLC* v. *Newman (In re Stage Presence, Inc.)*, 592 B.R. 292, 298 (Bankr. S.D.N.Y. 2018) ("[U]nder New York law, the concepts of alter ego liability and veil-piercing liability 'are indistinguishable, do not lead to different results, and should be treated as interchangeable.'" (quotation omitted)); Peter B. Oh, *Veil-Piercing*, 89 Tex. L. Rev. 81, 120 (2010) (noting that New York courts impose alter ego liability 42.76% of the time when requested).

do not deal with one another at arm's length (*id.*); are not treated as independent profit centers (*id.*); pay and guarantee each other's debts (*id.*); and use one another's properties as if the properties were their own (*id.*). There is overwhelming evidence that each Defendant is an alter ego of one another with respect to EBCC's claims and the Court thus should grant the requested relief against all Defendants. *See JSC VTB Bank* v. *Mavlyanov*, No. 652516/2016, 2017 WL 2494806, at *15 (Sup. Ct. N.Y. Cnty. June 9, 2017) (granting a preliminary injunction based on alter ego liability where the defendant used "LLCs as instrumentalities with which to . . . shelter [assets] from the reach of his creditors").

### B.    EBCC Will Suffer Irreparable Harm Absent Injunctive Relief

The second requirement to obtain a preliminary injunction is to establish irreparable harm absent injunctive relief. *Doe*, 73 N.Y.2d at 750. Courts routinely find irreparable harm where insolvent debtors hinder, delay, or otherwise defraud creditors. EBCC faces immediate and irreparable harm here because: (i) Defendants are insolvent, and (ii) EBCC holds security interests in specific assets that Defendants intend to sell, encumber, or otherwise transfer. *See generally Klein, Wagner & Morris* v. *Lawrence A. Klein, P.C.*, 186 A.D.2d 631, 633 (2d Dep't 1992) (holding that irreparable harm includes "any injury for which money damages are insufficient"); *McLaughlin, Piven, Vogel, Inc.* v. *W.J. Nolan & Co.*, 114 A.D.2d 165, 174 (2d Dep't 1986) (same).

Insolvency. It is well settled that money damages against an insolvent debtor are an insufficient remedy to preclude injunctive relief. *See Goodstein* v. *Enbar*, No. 654114/2016, 2017 WL 1032545, at *5 (Sup. Ct. N.Y. Cnty. Mar. 17, 2017); *Am. Med. & Life Ins. Co.* v. *Crosssummit Enters., Inc.*, No. 18059/2008, 2009 WL 1574129 (Sup. Ct. N.Y. Cnty. May 18, 2009).[11]

---

[11] *See also Deckert* v. *Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (holding that a preliminary injunction was proper where "there were allegations that [the defendant] was insolvent"); *Brenntag Int'l Chems., Inc.* v. *Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999).

-12-

Defendants owe EBCC a substantial, unpaid debt, which now exceeds $21,951,600.67, plus

interest, fees, and costs. (Weiss Aff. ¶ 15.) This debt has been outstanding for over eleven months

and Defendants' failure to repay EBCC (even partially) confirms their insolvency. N.Y. Debt. &

Cred. Law § 271 ("A debtor that is generally not paying the debtor's debts as they become due . . .

is presumed to be insolvent."); N.Y. Bus. Corp. Law § 102(a)(8) (defining "insolvency" to mean

that a debtor is "unable to pay debts as they become due in the usual course of the debtor's

business.").[12]

Defendants' financial statements also confirm their insolvency, including as of 2019. In

2021, Defendants' independent auditor expressed "substantial doubts about [Defendants'] ability

to continue as a going concern," given the amounts outstanding under the Credit Facilities in

2019.[13] (Ex. H to Weiss Aff. at 4, 6.) Since 2019, the amounts due under the Credit Facilities

have only grown, while EBCC has continued to discover facts that call into question the existence

and value of Defendants' purported assets.[14] (*E.g.*, Weiss Aff. ¶¶ 18-19.)

The insufficiency of money damages is amplified by Defendants' history of fraudulently

transferring assets to place them beyond EBCC's reach. *See Winchester Glob. Tr. Co.* v. *Donovan*,

---

[12] *See generally* Restatement (Second) of Torts § 944 cmt. i (Am. L. Inst. 1979) ("To the extent that the damages awarded cannot be realized upon execution, the damage remedy is proportionately inadequate.")

[13] Defendants have refused to provide EBCC with more recent audited financial statements, likely because such statements would provide further evidence of their insolvency. (*See* Weiss Aff. at ¶ 23.) Defendants have failed to provide EBCC with completed 2020 audited financial statements, and only recently provided EBCC with drafts of those financial statements. (*Id*. ¶ 24.)

[14] The independent auditor also emphasized that it used valuations of Defendants' investments in tax liens that were "estimate[s]" provided by ***Defendants*** "in the absence of readily ascertainable market values." (Ex. H to Weiss Aff. at 4, 6 (emphasis added).) Given Defendants' history of inflating the value of their assets (Weiss Aff. at ¶ 19), these estimates likely overstated the value of Defendants' assets.

-13-

58 A.D.3d 833, 834 (2d Dep't 2009) (granting injunctive relief where "the uncontrolled sale and disposition by the [defendants] of their assets would threaten to render ineffectual any judgment which the plaintiff might obtain herein."); *Sau Thi Ma*, 198 A.D.2d at 186 ("[I]f the requested relief is not granted, a substantial amount of money may be dissipated or otherwise unavailable for recovery."); *see also 1650 Realty Assocs., LLC* v. *Golden Touch Mgmt., Inc.*, 101 A.D.3d 1016, 1018 (2d Dep't 2012). Defendants have admitted to selling around 90 properties (worth more than $4 million) in 2022 that were EBCC's collateral, without remitting the sale proceeds to EBCC. (Weiss Aff. ¶ 25.) Defendants also have listed for sale another 88 properties that are EBCC's collateral (for approximately $4.8 million total), but have not agreed to remit any sale proceeds to EBCC. (*Id.*) If Defendants are allowed to divert the proceeds of these sales, their insolvency will only deepen, further demonstrating the inadequacy of money damages here. *See JSC VTB Bank*, 2017 WL 2494806, at *16.

        EBCC's Security Interests. Injunctive relief is appropriate here for a second, independent reason—"the monies at issue are identifiable proceeds that are supposed to be held for [EBCC]." *AQ Asset Mgmt. LLC* v. *Levine*, 111 A.D.3d 245, 259 (1st Dep't 2013). The Credit and Security Agreements provide that the tax lien certificates that Defendants purchased using EBCC's funds, along with any proceeds thereof (including REO properties), are EBCC's collateral. (Ex. A to Weiss Aff. at 17, 94; Ex. D to Weiss Aff. at 5, 20.) In *Bank of America, N.A.* v. *Won Sam Yi*, 294 F. Supp. 3d 62, 79 (W.D.N.Y. 2018), the Court held that "a secured creditor who holds a security interest over the Collateral, as granted by Defendants through the Security Agreement" can demonstrate irreparable harm from the potential dissipation of that collateral where "there is a 'strong nexus' between the Collateral and any future money judgment." As in *Bank of America*, there is a strong nexus here between EBCC's interest in the collateral and any future judgment—

-14-

the collateral is the security for the funds that EBCC advanced to Defendants, which Defendants have failed to repay. The Court should grant the requested relief to protect EBCC's security interests in its collateral.

### C.      The Balance of the Equities Favors EBCC

The final requirement to obtain a preliminary injunction is to establish a balance of the equities that favors an injunction. *Doe*, 73 N.Y.2d at 750. As demonstrated above, EBCC faces irreparable harm because Defendants are insolvent and continue to dissipate EBCC's collateral. The balance of the equities decidedly favors the entry of injunctive relief here because EBCC faces irreparable harm that exceeds the harm Defendants face from the imposition of an injunction. *See McLaughlin*, 114 A.D.2d at 174. Absent injunctive relief, there is a substantial likelihood that EBCC will not be able to collect on its security interests or recover in this proceeding. *Felix* v. *Brand Serv. Grp. LLC*, 101 A.D.3d 1724, 1726 (1st Dep't 2012) (finding that the balance of the equities favored entry of an injunction because "while defendants may be delayed in paying off debt or using the escrow money for other purposes, plaintiffs may never be able to recover the money, if disbursed, even if plaintiffs ultimately prevail in the underlying action"); *JSC VTB Bank*, 2017 WL 2494806, at *16. The entry of injunctive relief, on the other hand, will not harm Defendants; it simply will "maintain the status quo" during the pendency of the proceedings. *Deutsch* v. *Grunwald*, 165 A.D.3d 1035, 1037 (2d Dep't 2018).[15] The balance of the equities also favors the entry of injunctive relief here because Defendants have fraudulently transferred, and will continue to fraudulently transfer, EBCC's collateral, absent injunctive relief. *Nesis* v. *Paris Int'l Lighting, Inc.*, 184 A.D.2d 485, 486 (1st Dep't 1992) (finding the balance of the equities

---

[15] *See also Pimentel* v. *Aminov*, 23 Misc. 3d 1112(A) (Sup. Ct. Queens Cnty. 2009) (unpublished table disposition).

favored plaintiff upon "the demonstration of a fraudulent transfer of assets"). Given the minimal

harm to Defendants from an injunction, and the irreparable harm to EBCC absent an injunction,

the balance of equities strongly favors the entry of injunctive relief.

## CONCLUSION

EBCC has established the prerequisites for the entry of a preliminary injunction: (i) a

likelihood of success on the merits of its breach of contract, fraudulent inducement, and fraudulent

transfer claims; (ii) imminent and irreparable harm from the insufficiency of money damages

against Defendants, who are insolvent, and Defendants' ongoing misappropriation of identifiable

proceeds of EBCC's collateral; and (iii) a balancing of the equities favoring an injunction. *See*

CPLR 6301. For the foregoing reasons, EBCC respectfully requests the Court enter an order[16]:

a.  Enjoining and restraining Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, or permitting the transfer of any of their assets during the pendency of the above-captioned action; aside from ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses or living expenses;

b.  Ordering Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, to the extent that any tax lien certificate or real estate property resulting from the foreclosure on a tax lien certificate is or has been sold, to deposit any proceeds from such sale, aside from ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses, into an escrow account, to be established by the Parties;

c.  Ordering Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, to notify EBCC at least twenty-four (24) hours in advance of transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending,

---

[16] EBCC agrees to give an undertaking in an amount to be fixed by the court, as required by CPLR 6312(b). Given EBCC's clear and indisputable right to repayment under the Credit Agreements and Defendants' demonstrated insolvency, EBCC respectfully submits that the undertaking should be set at $0 because Defendants will not be harmed by the requested injunctive relief.

-16-

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 75 of 688

withdrawing, disposing of, assigning, or permitting the transfer of any assets in an amount exceeding $50,000;

d.    Imposing temporary restraints against Defendants regarding the relief requested herein pending a hearing and further Order of this Court;

e.    Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated:   October 17, 2022          Respectfully submitted,
         New York, New York

                                   */s/ Alexander J. Willscher*

                                   Alexander J. Willscher
                                   Austin P. Mayron
                                   SULLIVAN & CROMWELL LLP
                                   125 Broad Street
                                   New York, New York  10004
                                   Telephone: (212) 558-4000
                                   Fax: (212) 558-3588

                                   *Attorneys for Plaintiff Emigrant Business
                                   Credit Corporation*

-17-

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with the word count limit of

N.Y.C.R.R. 202.8-b for documents prepared by use of a computer because it contains 5,416 words.

Dated:   October 17, 2022                        */s/ Alexander J. Willscher*
        New York, New York                     Alexander J. Willscher

-18-

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | x : : : |
| Plaintiff, | : : |
| v. | : : |
| JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1-10, | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : |
| Defendants. | : : x |

Index No. 158207/2022

**AFFIDAVIT OF SCOTT WEISS**

STATE OF NEW YORK     )
                          ) ss.:
COUNTY OF NEW YORK    )

**SCOTT WEISS**, being duly sworn, deposes and says under the penalties of perjury:

1. I am Senior Vice President of Plaintiff Emigrant Business Credit Corporation ("**EBCC**") and am duly authorized to make this affidavit on behalf of EBCC in support of EBCC's Order to Show Cause.

2. EBCC is a specialty finance company focused on providing creative financing solutions to middle and lower-middle market companies nationwide. In my capacity as Senior Vice President of EBCC, I am familiar with the facts and circumstances set forth herein. Except where otherwise indicated, the facts set forth herein are based upon my personal knowledge obtained through my involvement with the matters herein described and my review of EBCC's books and records, which are made and kept in the ordinary course of business, and publicly available information. As to facts stated upon information and belief, I believe them to be true.

### A. Defendants' Obligations Under the Loan Documents

3. In 2016, Defendant John Hanratty approached EBCC to establish a $15 million credit facility to fund the purchase of tax lien certificates by Ebury Fund 1, L.P., Ebury Fund 2, L.P., and their subsidiaries and affiliates.

4. On March 9, 2017, EBCC agreed to extend a $10 million credit facility to Ebury 1EMI LLC and a $5 million credit facility to Ebury 2EMI LLC (the "**Credit Facilities**"). Defendants created Ebury 1EMI LLC and Ebury 2EMI LLC (the "**Borrowers**") specifically to facilitate the lending relationship with EBCC; the Borrowers' names contain the initials "EMI"— short for "Emigrant"—to signify that EBCC holds liens on their assets.

-2-

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 10/17/2022
24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 79 of 688

5.      The Credit Facilities were structured as asset-based revolving lines of credit and are governed by the conditions set out in various loan documents, including the Credit Agreements, Security Agreements, Custodial Agreements, and various Guaranties.

6.      Under the loan documents, the Borrowers were allowed to draw down on the Credit Facilities in total amounts called the Borrowing Base, calculated by multiplying the amount of eligible collateral owned by the Borrowers by a predetermined advance rate.  At any given time, the Borrowers were entitled to withdraw the Availability, which was the Borrowing Base minus any amounts that Defendants already had drawn down.

7.      The Credit Agreements restricted the Borrowers' use of advances under the Credit Facilities to the purchase of tax liens and ordinary and necessary business expenses.  Section 2.1 of the Credit Agreements provides that advances "shall be used solely for the purposes of acquiring Eligible Tax Liens."  Section 6.26 of the Credit Agreements provides that "Borrower[s] shall use Advances solely to fund the acquisition of Eligible Tax Liens in the ordinary course of business of the Ebury Companies and to finance ordinary and necessary expenses of business operations of the Ebury Companies incurred in the ordinary course of business."  And Section 9.1 of the Credit Agreements made it an event of default if "any Ebury Company diverts or uses any portion of any amount received on account of the collateral while any of the Indebtedness remains outstanding."  True and correct copies of the Credit Agreements, and certain amendments thereto, are attached as Exhibit A.

8.      The Borrowers were required to repay the Promissory Notes underlying the Credit Facilities, including "all principal, interests, costs and expenses outstanding," by the maturity date of the notes.  The original maturity date of the notes was March 9, 2021; the parties later amended

-3-

the notes to set the maturity dates as November 10, 2021. True and correct copies of the Promissory Notes, and certain amendments thereto, are attached as Exhibit B.

9.    Section 6.21 of the Credit Agreements required additional Hanratty-controlled companies to execute guaranties for the indebtedness "on a solidary and joint and several basis" with the Borrowers.[*] The Guarantors executed these guaranties and "absolutely, unconditionally and irrevocably" promised to EBCC the "due, prompt and punctual payment of the Indebtedness." True and correct copies of the Guaranties are attached as Exhibit C.

10.    As consideration for the Credit Agreements, the Borrowers and the Guarantors pledged all of their tax lien assets and investment properties (among other assets), as well as any proceeds from those assets, as collateral security. Defendants granted EBCC liens on the collateral, as reflected in Sections 3.1, 4.4, and 5.11 of the Credit Agreements. Under Section 8.5 of the Credit Agreements, Defendants were barred from selling, transferring or otherwise alienating any of EBCC's collateral (with limited exceptions).

11.    Defendants also executed Security Agreements pledging all of the Borrowers' and Guarantors' present and future assets as security for the Credit Facilities, including the collateral and any proceeds of the collateral. True and correct copies of the Security Agreements are attached as Exhibit D.

12.    Defendants were required to deliver custody of any tax liens they purchased using advances under the Credit Facilities to an independent third-party custodian and servicer.

---

[*] The Guarantors include Defendants Ebury Street Capital, LLC; Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; and Red Clover 1, LLC.

-4-

Originally, Tower Fund Services, LLC ("**Tower**") was the designated custodian and servicer; the parties agreed on November 8, 2017 to replace Tower with MTAG Services, LLC ("**MTAG**"). The use of a third-party custodian and servicer was essential to the parties' agreement in order to ensure the collateral's safekeeping. True and correct copies of the Custodial and Servicing Agreements are attached as Exhibit E.

13.    As additional security, Hanratty was required under Section 6.22 of the Credit Agreements to execute the Validity Guaranties. The Validity Guaranties provide that Hanratty is liable personally for all damages incurred by EBCC that result from false information provided by Defendants "relating to the eligibility of Collateral . . . including, without limitation, all Borrowing Base Certificates and any schedules of Collateral." True and correct copies of the Validity Guaranties are attached as Exhibit F.

**B.    Defendants' Fraudulent Scheme**

14.    At the maturity of the Promissory Notes, Defendants were required, but failed to repay EBCC over $18 million in outstanding principal and interest under the Credit Facilities. On November 29, 2021, EBCC sent Defendants Notices of Default demanding payment of the amounts due and owing. True and correct copies of the Notices of Default are attached as Exhibit G.

15.    Since the maturity date, Defendants have failed to repay EBCC and now owe more than $21,951,600.67 in outstanding principal, interest, costs and expenses. EBCC also has demanded and is entitled to payment of its reasonable attorneys' fees, court costs, and legal expenses, including associated with this action, under Section 11.7 of the Credit Agreements.

16.    When EBCC approached MTAG to verify MTAG's custody and the value of the collateral, it discovered that MTAG had custody of only approximately 500 tax liens, worth approximately $1.3 million in redemptive value. Hanratty previously had represented to EBCC

that it was secured by $26.5 million redemptive value in tax lien collateral (January 13, 2021), $30 million in tax lien collateral (May 5, 2021), and $32 million in tax lien collateral (July 21, 2021). According to a lien tape provided to EBCC by Hanratty's counsel on December 15, 2021, Defendants were self-servicing 1,047 tax lien certificates, worth $17.8 million in redemptive value—almost 90% of EBCC's purported collateral on this lien tape—as of December 1, 2021.

17.    Defendants violated various provisions of the loan documents by maintaining custody of and self-servicing EBCC's collateral. In particular, under Section 1.1(y) of the Credit Agreements, self-serviced tax liens were not eligible to be included in the Borrowing Bases and Defendants thus could not request advances based on the value of such liens.

18.    After reviewing various documents which Defendants submitted to EBCC, EBCC has discovered that Defendants repeatedly "double-counted" collateral on Borrowing Bases to request advances to which they were not entitled. For example, in a September 13, 2019 Borrowing Base Certificate, Defendants requested an advance against 64 Maryland tax lien certificates ($428,061.74 in purported eligibility) which they already had requested an advance against in a June 12, 2019 Borrowing Base Certificate. Similarly, on September 7, 2018, Defendants requested a $3.8 million advance based on two tranches of New Jersey tax liens (called the NJ0530 and NJ0530B liens) which Defendants already had sold. Finally, on May 17, 2019, Defendants requested an $860,000 advance against more than 300 New Jersey tax liens ($1.6 million in purported eligibility) that they already had received an advance against in March 2019.

19.    EBCC also has discovered that Defendants inflated the value of the collateral which they included in the Borrowing Bases. For example, in a September 13, 2019 Borrowing Base Certificate, Defendants requested an advance based on inflated valuations of three Maryland liens, which they already had borrowed against in June 2019.

-6-

| Parcel ID | June 12, 2019 Borrowing Base Certificate (Ebury 1EMI LLC) | September 13, 2019 Borrowing Base Certificate (Ebury 2EMI LLC) |
|---|---|---|
| 15-1739044 | $ 24,950.02 | $ 266,912.02 |
| 01-0031195 | $ 43,905.13 | $ 217,224.07 |
| 05-0376756 | $ 30,044.86 | $ 316,331.51 |

The valuations of these tax lien certificates in the September 13, 2019 Borrowing Base were inflated because they improperly included the "bid amount"—an amount which Defendants would be required to pay to obtain the deed to the underlying properties; not a component of the value of the tax lien certificate.

20.    According to financial records that Hanratty provided to EBCC, Defendants impermissibly used advances under the Credit Facilities and sold EBCC's collateral to pay off investors and other lenders:

- On September 7, 2018, EBCC advanced Defendants $3.8 million purportedly to fund their assignment to EBCC of $5.2 million in tax lien collateral, which instead they used to pay a $3.3 million distribution to an investor;

- On November 9, 2018, EBCC advanced Defendants $220,000 to finance the purported purchase of $236,433 in tax lien certificates, which instead they used to pay a $288,810.67 distribution to an investor;

- On May 17, 2019, EBCC advanced Defendants $860,000 to finance the purported purchase of $3,492,881 in tax lien certificates, which instead they used to pay $1,208,772 to various investors;

- On June 12, 2019, EBCC advanced Defendants $2,400,000 to finance the purported purchase of $3,320,765 in tax lien certificates, which instead they used to pay a $288,810.67 distribution to an investor;

- On September 13, 2019, EBCC advanced Defendants $850,000 to finance the purported purchase of $1,228,529 in tax lien certificates, which instead they used to pay $750,000 in distributions to investors;

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 5    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 84 of 688

21.    EBCC relied on the truth of Defendants' Borrowing Base Certificates, lien reports, and other representations about the custody and value of the collateral, in agreeing to execute amendments to the Credit Agreements, including:

- The Sixth Amendment to Loan Documents for Ebury 1EMI LLC, executed on October 29, 2018, which increased the credit facility to $13,500,000;

- The Seventh Amendment to Loan Documents for Ebury 1EMI LLC, executed on September 24, 2019, which increased the credit facility to $15,000,000;

- The Eighth Amendment to Loan Documents for Ebury 1EMI LLC, executed on March 18, 2021, which extended the maturity date of the underlying note to May 8, 2021;

- The Ninth Amendment to Loan Documents for Ebury 1EMI LLC, executed on May 18, 2021, which extended the maturity date of the underlying note to August 10, 2021;

- The Tenth Amendment to Loan Documents for Ebury 1EMI LLC, executed on August 12, 2021, which extended the maturity date of the underlying note to November 10, 2021;

- The Waiver and Sixth Amendment to Loan Documents for Ebury 2EMI LLC, executed on March 18, 2021, which extended the maturity date of the underlying note to May 8, 2021; and

- The Eighth Amendment to Loan Documents for Ebury 2EMI LLC, executed on August 13, 2021, which extended the maturity date of the underlying note to November 10, 2021.

22.    Had EBCC known that Defendants were self-servicing the collateral, had sold the collateral without paying EBCC the sale proceeds, were using advances to pay investors rather than purchase tax liens, or were double-counting or inflating the value of tax liens, it would have stopped advancing funds to Defendants and demanded repayment.

23.    The most recent audited financial statements that Defendants have provided EBCC are from 2019. In those documents, Defendants' independent auditor expressed "substantial doubts about [Defendants'] ability to continue as a going concern," based on Defendants' apparent

-8-

inability to "repay all amounts outstanding under the [EBCC] Line[s] of Credit." True and correct copies of the Independent Auditor's Reports are attached as Exhibit H.

24.    Defendants have refused to provide EBCC with more recent audited financial statements. On August 24, 2022, Defendants' counsel sent EBCC "draft" 2020 unaudited financial statements but warned that "some of the documents is wrong" because "these numbers undervalue the lien book of business" and "[t]his results in a reflection of the business that is not accurate."

25.    On information and belief, Defendants have transferred ownership of REO properties resulting from foreclosures on EBCC's tax lien collateral to Ebury RE LLC, and other unknown Hanratty-controlled companies. Since the default, Defendants have continued to sell these REO properties. EBCC has determined, based on a list of sales provided by Hanratty, that Defendants have sold at least 90 properties (for a total of $4,102,431.20) so far in 2022 that purportedly were EBCC's collateral and were included on a December 30, 2021 Borrowing Base Certificate. In addition, based on EBCC's review of listings on Defendants' website (http://www.eburyre.com/), Defendants have listed for sale another 88 properties that are EBCC's collateral (for approximately $4.8 million total) that were included on the December 30, 2021 Borrowing Base Certificate and purportedly were EBCC's collateral as well. Defendants have not agreed to remit any sale proceeds to EBCC.

26.    Allegations from Defendants' former business partner, Thomas McOsker, provide further evidence of Defendants' fraudulent scheme. On September 1, 2022, McOsker filed a counterclaim against certain of Defendants for violations of the federal RICO statute, conversion, and breach of contract. According to the counterclaim, Hanratty engaged in a "Ponzi like scheme" that involved "falsify[ing] borrowing bases, mislead[ing] auditors, and commit[ing] fraud against his bank and investors." In particular, McOsker alleged that Hanratty would "alter[] data on excel

-9-

documents sent to his banks, including Emigrant Bank, regarding the borrowing base for Ebury Fund certificates, specifically origination dates for hundreds of certificates, and other relevant financial data." Further, Hanratty would "conceal sale proceeds from his lending institutions" by "send[ing] funds from Ebury Fund sales proceeds directly to investors, or other parties to cover his tracks" and by "obtain[ing] title over a property in the benefit of a different entity than the original investor entity, thereby defrauding some investors to the benefit of others." "On several occasions in 2019," Hanratty coached McOsker on responses to inquiries from MTAG to aid him in misleading MTAG. And in 2018, "Hanratty falsified the borrowing bases submitted to his bank Emigrant Bank" and bragged that EBCC "won't notice." A true and correct copy of the McOsker counterclaim is attached as Exhibit 1.

C.    **Alter-Ego Allegations**

27.    Defendant John Hanratty dominates each of the Defendant corporations. He is the manager of Defendant Ebury Street Capital, LLC, which in turn manages each of the other Defendants. EBCC negotiated and executed the parties' various agreements exclusively with Hanratty and Defendants do not display any independent business discretion in their dealings with EBCC. Defendants share officers, directors and personnel, as well as a common office space and address. Based on Defendants' 2019 audited financial statements and their inability to repay EBCC in the past eleven months, and on information and belief, Defendants are inadequately capitalized. Further, based on financial records provided to EBCC by Defendants, Defendants use one another's properties as if the properties were their own, pay and guarantee each other's debts, do not deal with one another at arm's length, and are not treated as independent profit centers.

Sworn to before me this
17th day of October 2022

_Linda Young_
Notary Public

LINDA YOUNG
Notary Public, State of New York
No. 01YO5067926
Qualified in Nassau County
Commission Expires October 26, 2022

_Scott Weiss (signature)_

**SCOTT WEISS**

This remote notarial act involved the use
-10-    of communication technology.
Linda Young, Nassau County

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this affidavit complies with the word count limit of N.Y.C.R.R.

202.8-b for documents prepared by use of a computer because it contains 2,680 words.

Dated:  October 17, 2022                    */s/ Alexander J. Willscher*
        New York, New York                    Alexander J. Willscher

-11-

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 88 of 688

# EXHIBIT A

## TABLE OF CONTENTS

Ebury 1EMI LLC

    Credit Agreement ..................................................................................... 3

    Sixth Amendment to the Credit Agreement..................................................... 55

    Seventh Amendment to the Credit Agreement ................................................ 60

    Eighth Amendment to the Credit Agreement .................................................. 64

    Ninth Amendment to the Credit Agreement.................................................... 70

    Tenth Amendment to the Credit Agreement.................................................... 74

Ebury 2EMI LLC

    Credit Agreement ..................................................................................... 80

    Sixth Amendment to the Credit Agreement.................................................... 132

    Eighth Amendment to the Credit Agreement .................................................. 136

## CREDIT AGREEMENT

**THIS CREDIT AGREEMENT**, dated as of March 9, 2017, is by and between **EBURY 1EMI LLC**, a New York limited liability company, as borrower (the "**Borrower**"), and **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation, as lender (the "**Lender**" and together, with the Borrower, the "**Parties**").

The Borrower has requested and the Lender has agreed to make available to the Borrower a secured revolving line of credit facility in the amount of $10,000,000.00 to finance the purchase of Tax Liens on the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.1   <u>Defined Terms</u>. The following words and phrases shall have the following meanings when used in this Agreement.

(a)   "**Acquisition Price**" means: (i) if the lien is acquired from a Person other than a Taxing Authority, the amount paid to acquire the Tax Lien; and (ii) if the lien is acquired from a Taxing Authority, the amount paid to that Taxing Authority to acquire the Tax Lien and secured by the Tax Lien, including, without limitation, amounts paid with respect to any Subsequent Tax Liens, and all taxes, assessments, costs, refundable premiums and any other amounts secured by the Tax Lien and paid to that Taxing Authority.

(b)   "**Advance**" means a disbursement of funds by the Lender under the Line of Credit to, at the direction of, or on behalf of the Borrower, subject to the terms and conditions of this Agreement.

(c)   "**Affiliate**" means, as to any Person, any other Person: (i) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person; (ii) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting securities or equities of such Person; or (iii) ten percent (10%) or more of the voting securities or equities of which is directly or indirectly beneficially owned or held by the Person in question. The term "control" as used in this definition means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities or equities, by control, or otherwise.

(d)   "**Agreement**" means this Credit Agreement and all exhibits and schedules thereto, as the same may be amended, modified, restated, replaced or supplemented from time to time in accordance with the provisions hereof.

(e)   "**Alabama Purchased Liens**" means Tax Liens to be purchased by EB 2EMIAL LLC from Ebury Fund 2, LP.

(f)   "**Applicable Law**" means all laws of any Governmental Authority applicable to the matter, including any ordinances, judgments, decrees, injunctions, writs, orders and other legally binding actions of any Governmental Authority, and common law and rules and regulations of any federal, regional, state, county, municipal or other Governmental Authority.

(g)   "**Applicable Statute**" with respect to any Tax Lien and any Eligible Jurisdiction, means the Applicable Law set forth on Schedule 1.1(f) hereto, as may be amended, supplemented, modified, replaced, restated and otherwise in effect from time to time.

(h)   "**Assigned Tax Lien**" means any Tax Lien that: (i) was acquired by the Borrower from any Person other than the Taxing Authority that issued such Tax Lien; or (ii) with respect to the Rochester NY

1

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 6    24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State   RECEIVED NYSCEF: 10/17/2022
Court Records   Pg 91 of 688

Liens or the Alabama Purchased Liens, was originated by any Person other than the Borrower.

(i)    **"Authorized Individual"** means any officer, employee or representative of the Borrower whom the Borrower designates in a notice delivered to the Lender as authorized to request Advances.

(j)    **"Bankruptcy Code"** means Title 11 of the United Sates Code, as amended.

(k)    **"Basic Tax Lien Documents"** means and shall consist of the Tax Lien Documents and each of the other documents required to be delivered or otherwise provided by the Borrower to the Lender or the Custodian, as applicable, including any Tax Certificate receipt and other documents evidencing the transfer of such Tax Lien to an Ebury Company, setting forth the following information with respect to such Tax Lien (as applicable for the related jurisdiction), and such other information as Lender may require:

(i)    the number by which a Tax Lien is identified on the books and records of the Servicer;

(ii)    the identification number assigned to such Tax Lien by the Taxing Authority issuing such Tax Lien;

(iii)    the street address of the related Property on the books and records of the related Taxing Authority;

(iv)    the tax block and lot designation (or similar identification designation) of the related Property;

(v)    the type of related Property;

(vi)    the name and mailing address of the Tax Debtor on the books and records of the related Taxing Authority;

(vii)    the Principal Balance of such Tax Lien, with each component of such Principal Balance separately stated;

(viii)    the Tax Lien Value of such Tax Lien, with each component of such Tax Lien Value separately stated;

(ix)    the market value, assessed value and the equalization ratio (to the extent available) of the related Property, as of the proposed Funding Date related to such Tax Lien;

(x)    the then existing loan to value related to such Tax Lien;

(xi)    the date of creation of such Tax Lien, the date the related Taxing Authority sold such Tax Lien and the date the Ebury Company acquired or expects to acquire such Tax Lien;

(xii)    all accrued interest, costs and expenses owed by the Tax Debtor with respect to such Tax Lien;

(xiii)    the date on which foreclosure proceedings may first be commenced and, if readily applicable, the date on which any such Tax Lien and the related Property;

(xiv)    the annualized interest rate (or penalty, if such penalty is recurring) at which such Tax Lien accrues interest (or penalty, as applicable) on the Principal Balance of such Tax Lien, excluding any one-time penalties, premiums, overbids, fees or subsequent liens bid rate for such Tax Lien;

(xv)    whether such Tax Lien is an Assigned Tax Lien, and if so, the names and contact information of the original owner; and

(xvi)    if such Tax Lien is a Rochester NY Lien or an Alabama Purchased Lien, copies of all loan agreements, notices, certificates and other forms related to the origination of such Rochester NY Lien or Alabama Purchased Lien and the transfer of the

related lien from the Taxing Authority to the Ebury Company.

The Basic Tax Lien Documents may be in the form of one or more documents, collectively setting forth all of the information required, and may be in the form of an excel file, a computer disk or other electronic files.

(l)     "**Bill of Sale**" means the bill of sale relating to a transfer of a Tax Lien to an Ebury Company, dated as of the date of such sale, executed by the related transferor.

(m)     "**Borrowing Base**" means, as determined by the Lender from time to time, the sum of:

(i)     80% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of Alabama; plus

(ii)     85% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of Florida; plus

(iii)     75% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of Indiana; plus

(iv)     85% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of Maryland; plus

(v)     85% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of New Jersey; plus

(vi)     70% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of New York (Rochester NY Liens only); plus

(vii)     80% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchase in the State of South Carolina; less

(viii)     From the date of this Agreement until March 8, 2018, a liquidity reserve in the amount of $667,000.00.

Notwithstanding the foregoing, as it applies to the Line of Credit, the Lender shall have the exclusive right, in its sole discretion, to reduce the overall Borrowing Base percentage, but in any event, not to reduce it to less than to fifty (50%) percent of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens, if and for only so long as the average percentage of all Ebury Company Eligible Tax Liens in foreclosure exceeds 30%, or the average Acquisition Price of the Ebury Company Eligible Tax Liens exceeds $25,000.00.

For the purpose of calculating the weighted average age, multiple Eligible Tax Liens with multiple acquisition dates affecting a single Property shall be aggregated and aged using the date of the oldest Eligible Tax Lien. For the purposes of calculating the average Acquisition Price, the total Unpaid Acquisition Price of all Eligible Tax Liens is divided by the total number of Eligible Properties.

The foregoing average thresholds shall be calculated and tested for compliance at such times as requested by the Lender in its sole discretion, but in any event not more frequently than once per calendar month.

As of the date of this Agreement only Eligible Tax Liens secured by Property in Alabama, Florida, Indiana, Maryland, New Jersey, New York (Rochester NY Liens only) and South Carolina may be included in the Borrowing Base.

(n)     "**Borrowing Base Certificate**" has the meaning set forth in Section 6.14(a) below.

(o)     "**Business Day**" means any day other than a Saturday or a Sunday on which banks in the State of New York are not authorized or obligated by law or executive order to be closed.

(p)     "**Change of Control**" means:  (i) the failure of Ebury Fund 1, LP to directly or indirectly

119304637_13

own and control all of the Equity Interests of the Borrower; or (ii) the failure of the Borrower to directly own and control, subject to the pledge to the Lender under the other Transaction Documents, all of the Equity Interests of each other Ebury Company.

      (q)    "**Collateral**" means and includes individually, collectively, interchangeably and without limitation all property and assets granted as collateral security for the Indebtedness, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise, including all accessions, additions, replacements, and substitutions and all related accounts, inventory, and general intangibles. Collateral includes without limitation all the Equity Interests in each Ebury Company (other than the Borrower), all funds in the Lockbox Account and any and all rights and interests in or to each Tax Lien in which any Ebury Company has an interest, whether now owned or hereafter created or acquired, pledged from time to time as security for the Indebtedness, which shall specifically include, without limitation, all of the following:

      (i)      all now owned or existing and hereafter acquired, created, or arising Tax Liens;

      (ii)     all Collections of such Tax Liens;

      (iii)    each Bill of Sale;

      (iv)    all Servicing Rights related to such Tax Liens;

      (v)    all Servicing Files and all documents comprising such Servicing Files;

      (vi)    all Tax Lien Files related to such Tax Liens and all documents comprising such Tax Lien Files;

      (vii)    amounts and property from time to time on deposit in the Lockbox Account;

      (viii)    all deposit, collection, escrow, reserve, collateral or lock-box accounts and all amounts and property from time to time on deposit therein related to the Tax Liens;

      (ix)    all Related Rights;

      (x)    all rights of any Ebury Company under the Servicing Agreement;

      (xi)    all accessions, additions, attachments, improvements, substitutions and replacements thereto;

      (xii)    all now owned and hereafter acquired, created or arising general intaugibles of every nature, kind and description, without limitation, customer lists, choses in action, claims, books, records, goodwill, patents and patent applications, copyrights, trademarks, trade names, service marks, trade styles, trademark applications, trade secrets, contracts, contract rights, royalties, licenses, franchises, deposits, license, franchise and royalty agreements, formulae, tax and any other types of refunds, returned and unearned insurance premiums, rights and claims under insurance policies including without limitation, credit insurance and key man life insurance policies, and computer information, software, records and data;

      (xiii)    all now owned and hereafter acquired equipment wherever located, and all replacements, parts, accessions, substitutions and additions thereto;

      (xiv)    all now owned or hereafter acquired fixtures, wherever located;

      (xv)    all now owned and hereafter acquired, created or arising chattel paper (including electronic chattel paper), instruments and documents (including bills of lading, warehouse receipts and other documents of title) of every nature, kind and description;

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 94 of 688

(xvi)    all now owned and hereafter acquired, created or arising supporting obligations and letter-of-credit rights of every nature, kind and description;

(xvii)   all now existing and hereafter acquired or arising deposit accounts reserves and credit balances of every nature, wherever located, and all documents and records associated therewith;

(xviii)  all property (personal or otherwise), now or hereafter in the possession of the Lender;

(xix)    all now owned or hereafter acquired investment property of every kind; and

(xx)     the accessions to, and substitutions for and all replacements, products and proceeds (including, without limitation, insurance proceeds and insurance premiums), whether cash or noncash, of all of the foregoing property and interests in property.

As used herein, each of the terms and phrases "general intangibles", "equipment", "fixtures", "chattel paper", "electronic chattel paper", "instruments", "documents", "supporting obligations", "letter-of credit rights", "investment property" and "proceeds" shall have the respective meaning assigned thereto in Articles 8 and 9 of the UCC.

Collateral also includes all other property and rights subject to the Security Interests granted, or that may later be granted, to the Lender by any Grantor as security for any of the Indebtedness under this Agreement or any other Transaction Document.

(r)   "**Collections**" with respect to any Tax Lien, means all of the following: (i) all Redemption Payments; (ii) all premiums; and (iii) all other collections, income, distributions, receipts, payments, collections, prepayments, recoveries, proceeds (including insurance and condemnation proceeds) and other payments or amounts of any kind paid, received, collected, recovered or distributed on, in connection with or in respect of such Tax Lien, including principal payments, interest payments, statutory legal fees, prepayment fees, extension fees, exit fees, defeasance fees, transfer fees, make whole fees, late charges, late fees and all other fees or charges of any kind or nature, yield maintenance charges, penalties, default interest, net sale, foreclosure, liquidation, securitization or other disposition proceeds, settlements and proceeds.

(s)   "**Concentration Limit**" means, for each property type listed in the table below, the amount determined by applying the percentage assigned to the property type/use classification in the table below to the aggregate Unpaid Acquisition Prices of all of the Tax Liens:

| % Limit | Property Type/Use |
|---|---|
| No less than 75% | Residential |
| No more than 20% | Commercial Properties |
| No more than 10% | Mobile Homes |
| No more than 5% | Industrial Properties |
| No more than 10% | Vacant (unimproved) |

(t)   "**Custodial Agreement**" means and includes each agreement with an Ebury Company, the Custodian and the Lender, in a form satisfactory to the Lender, pursuant to which the Tax Certificates and the other Tax Lien Documents will be delivered to the Custodian and held and administered in accordance with the terms of such agreement.

(u)   "**Custodian**" means and includes each Person (including the Lender) approved by the Lender to take possession of, hold and administer the Tax Certificates and other Tax Lien Documents.

5

(v)    **"Ebury Companies"** means and includes the Borrower, EB 1EMIALA LLC, an Alabama limited liability company, EB 1EMIFL, LLC, a Florida limited liability company, EB 1EMIIN, LLC, an Indiana limited liability company, EB 1EMIMD, LLC, a Maryland limited liability company, EB 1EMINJ LLC, a New Jersey limited liability company, EB 1EMINY, LLC, a New York limited liability company, EB 1EMISC LLC, a South Carolina limited liability company, RE 1EMI LLC, a New York limited liability company, and all other Persons that may become a party to this Agreement as an Ebury Company by any modification, amendment, supplement or joinder to this Agreement. Each Ebury Company other than the Borrower shall be a wholly owned Subsidiary of the Borrower.

(w)    **"Eligible Jurisdictions"** means and includes Alabama, Florida, Indiana, Maryland, New Jersey, New York (with respect to the Rochester NY Liens only) and South Carolina; provided that the Lender may approve, in writing, additional jurisdictions as Eligible Jurisdictions.

(x)    **"Eligible Property"** means and includes all types of real (immovable) property, except for the following (unless otherwise agreed to by the Lender, in writing):

| | |
|---|---|
| (i) | Cooperatives |
| (ii) | Retirement Homes |
| (iii) | Service Stations |
| (iv) | Automobile related properties (e.g. Sales, Repair/Body Shops, Rental Lots, etc.) |
| (v) | Vacant Institutional Churches |
| (vi) | Private Schools and Colleges |
| (vii) | Homes for the Aged |
| (viii) | Orphanages, Other Non-Profits or Charitable Service Organizations |
| (ix) | Mortuaries, Cemeteries and Crematoriums |
| (x) | Clubs, Lodges, and Union Halls |
| (xi) | Sanitariums,  and Convalescent and Rest Homes |
| (xii) | Cultural Organizations and Facilities |
| (xiii) | Military Properties |
| (xiv) | Forests, Parks and Recreational Areas |
| (xv) | Public Schools |
| (xvi) | Public Colleges |
| (xvii) | Public Hospitals |
| (xviii) | County Properties |
| (xix) | State Properties |
| (xx) | Federal Properties |
| (xxi) | Municipal Properties |
| (xxii) | Leasehold Interests |
| (xxiii) | Utilities (e.g., Gas, Electric, Telephone, Water, Sewage, Railroads, Pipelines, Canals, Radio and TV) |
| (xxiv) | Mining Lands, Petroleum Lands, or Gas Lands |
| (xxv) | Subsurface Rights |
| (xxvi) | Rights-of-Way, Streets, Roads, Irrigation Channels and Ditches |
| (xxvii) | Rivers, Lakes, or Other Submerged Lands |
| (xxviii) | Sewage Disposal, Solid Waste Disposal, Borrow Pits, Drainage Reservoirs, Waste Lands, Marshes, Sand Dunes and Swamps |
| (xxix) | Outdoor Recreational or Parklands |
| (xxx) | Centrally Assessed Industrial Properties (Light & Heavy) |

(y)    **"Eligible Tax Lien"** means and includes all Tax Liens secured by Eligible Property, except for the following (unless otherwise agreed to by the Lender, in writing):

119304637_13

(i)    Any Tax Lien owned by an Ebury Company that is not owned by a Special Purpose Entity in a State for which a Special Purpose Entity is required under Section 3.6.

(ii)    Any Tax Lien imposed by a Taxing Authority in any State or jurisdiction other than what is permitted under this Agreement.

(iii)    Any Tax Lien that is not encumbered by a Security Interest in favor of the Lender, and by no later than the date of the Borrowing Base Certificate delivered to the Lender, is not registered in a manner and with an address acceptable to the Lender.

(iv)    Any Tax Lien whose Basic Tax Lien Documents are not delivered to the Lender, or to the Custodian, by no later than the effective date of the most recent Borrowing Base Certificate furnished to the Lender, in which event such Tax Lien will be excluded until its Basic Tax Lien Documents are delivered to the Lender or the Custodian. If no paper certificate or other tangible evidence of the existence and assignment of the Tax Lien is issued by the Taxing Authority, the Lender agrees that the Basic Tax Lien Documents may be transmitted electronically to the Lender, or to the Custodian.

(v)    Any Tax Lien that, by no later than the effective date of the most recent Borrowing Base Certificate, is not registered in accordance with the State Registration Requirements for that State; provided, however, that this provision shall not apply to Tax Liens acquired prior to the date of this Agreement as long as a request for assignment to, or re-registration in, the required name is submitted to the Taxing Authority within sixty (60) days after the date of this Agreement in a form acceptable to the Lender.

(vi)    Any Tax Lien that is not free and clear of all security interests, liens, encumbrances, and claims of third parties, except for Permitted Liens.

(vii)    Any Tax Lien with respect to which the Tax Debtor is a shareholder, director, partner, member, manager, officer, employee or agent of any Ebury Company or any of their respective Subsidiaries or Affiliates.

(viii)    Any Tax Lien with respect to which the obligations of the Tax Debtor may be conditional.

(ix)    Any Tax Lien with respect to which the Tax Debtor is a Subsidiary or Affiliate of any Ebury Company, any of their respective Subsidiaries or Affiliates, or any shareholder, director, partner, member, manager or officer, of any Ebury Company or any of their respective Subsidiaries or Affiliates.

(x)    Any Tax Lien whose validity has been challenged in any legal or administrative proceeding and such proceeding is not resolved in favor of validity of the Tax Lien within six (6) months after the date the validity of such Tax Lien is challenged in writing.

(xi)    Any Tax Lien secured by Property where the aggregate of all amounts due under all Tax Liens included in the Collateral secured by that Property exceeds $500,000.00.

(xii)    Any Tax Lien secured by any Property that is encumbered by a federal tax lien filed against any owner of the Property.

(xiii)    Any Tax Lien secured by Property owned in whole or in part by any Person who is a debtor in a case commenced under the Bankruptcy Code at the time the Tax Lien is purchased, or anytime thereafter once the Borrower becomes aware that such a case has been commenced, where the aggregate of all Tax Liens secured by property owned in whole or in part by any Person who is a debtor in a case

119304637_13

commenced under the Bankruptcy Code at the time the Tax Lien is purchased exceeds one percent (1%) of the aggregate of all amounts due under all Tax Liens included in the Collateral.

(xiv)    Any Tax Lien secured by Property for which a federal or State environmental lien or other notice of environmental issues has been filed in the real property records of the county where the Property is located.

(xv)    Any Tax Lien that the Lender, in its sole discretion, deems to be ineligible for any reason.

(xvi)    The amount of the aggregate of the Unpaid Acquisition Prices of Tax Liens secured by property types listed in the definition of Concentration Limits in excess of (other than for residential property) the Concentration Limit for that property type.

(xvii)    Any Tax Lien in which any Ebury Company has been issued a tax deed.

(xviii)    Any other Tax Lien excluded from the definition of Eligible Tax Lien for a State defined as an Eligible Jurisdiction herein as set forth on Schedule 1.1(x) hereto.

(xix)    Any non-recoverable or non-refundable premium or overbid.

(xx)    Any Tax Lien to the extent its acquisition would cause the then aggregate Acquisition Prices for all Tax Liens secured by Properties to exceed twenty percent (20%) of the aggregate assessed values for such Properties; and for this purpose "assessed value" equals the fair market value equivalent assigned to the Property by the Taxing Authority in calculating the property taxes assessed against the Property.

(z)    **"Environmental Laws"** means any and all federal, state, and local laws, regulations, judicial decisions, orders, decrees, plans, rules, permits, licenses, and other governmental restrictions and requirements pertaining to health, safety, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, *et seq.*, the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. § 651, *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, and the Toxic Substances Control Act, 15 U.S.C. § 2601, *et seq.*, as the same may be amended or supplemented from time to time.

(aa)    **"Equity Interest"** with respect to any Person, means:  (i) any share, interest, participation and other equivalent (however denominated) of capital stock of (or other ownership, equity or profit interests in) such Person; (ii) any warrant, option or other right for the purchase or other acquisition from such Person of any of the foregoing; (iii) any security convertible into or exchangeable for any of the foregoing; and (iv) any other ownership or profit interest in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such share, warrant, option, right or other interest is authorized or otherwise existing on any date.

(bb)    **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

(cc)    **"Event of Default"** means individually, collectively, and interchangeably any of the Events of Default set forth in Article IX below.

(dd)    **"Expiration Date"** means the earlier of:  (i) in the event an Event of Default occurs, the date the Lender demands repayment, in full, of the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid; or (ii) the latest stated maturity date of the Note and any renewals and extensions of the Note (provided, however, that the Lender has made no commitment to, and is not obligated to, renew the Note or extend the maturity date of the Note).

119304637_13

(ee)    "**GAAP**" means generally accepted accounting principles, applied on a consistent basis, as set forth in opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants or in statements of the Financial Accounting Standards Board or their respective successors and that are applicable in the circumstances as of the date in question. Accounting principles are applied on a "consistent basis" where the accounting principles applied in a current period are comparable in all material respects to those accounting principles applied in a preceding period.

(ff)    "**Governing Documents**" with respect to any Person, means its articles or certificate of incorporation or formation, by laws, memorandum and articles of association, partnership agreement, limited liability company agreement, operating or trust agreement, limited liability company certificate, trust certificate or other organizational, charter or governing documents.

(gg)    "**Governmental Authority**" means any: (i) nation or government; (ii) state or local or other political subdivision thereof; (iii) central bank or similar monetary or regulatory authority; (iv) Person, agency, authority, instrumentality, court, regulatory body, central bank or other body or entity exercising executive, legislative, judicial, taxing, quasi-judicial, quasi-legislative, regulatory or administrative functions or powers of or pertaining to government; (v) court or arbitrator having jurisdiction over such Person or its assets or properties; (vi) stock exchange on which shares of stock of such Person are listed or admitted for trading; or (vii) supra-national body such as the European Union or the European Central Bank.

(hh)    "**Grantor**" means and includes individually, collectively, interchangeably and without limitation, the Ebury Companies and each and all of the Persons granting a Security Interest in any Collateral for the Indebtedness.

(ii)    "**Guarantor**" means and includes each Ebury Company (other than the Borrower) and EBURY STREET CAPITAL, LLC, and all other Persons that may become a party to this Agreement as a Guarantor by any modification amendment or supplement to this Agreement.

(jj)    "**Hazardous Material**" means any substance, product, waste, pollutant, material, chemical, contaminant, constituent, or other material which is or becomes listed, regulated, or addressed under any Environmental Law, including, without limitation, asbestos, petroleum, and polychlorinated biphenyls.

(kk)    "**Indebtedness**" means each and every draft, liability, obligation and indemnity obligation of every type and description that the Borrower may now or at any time owe to the Lender (whether such debt, liability, indemnity obligation or obligation now exists or is hereafter created or incurred, whether it arises in a transaction involving the Lender alone or in a transaction involving other creditors of the Borrower and whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several), including all indebtedness of the Borrower to the Lender under this Agreement, the Note and the other Transaction Documents, together with interest, costs, expenses, reasonable attorneys' fees and other reasonable fees and charges as more fully set forth herein, whether or not any such indebtedness may be barred under any statute of limitations or may be otherwise unenforceable or voidable for any reason.

(ll)    "**Indemnified Amount**" has the meaning set forth in Section 10.1.

(mm)    "**Indemnified Person**" has the meaning set forth in Section 10.1.

(nn)    "**Insolvency Event**" with respect to any Person, means: (i) the filing of a decree or order for relief by a court having jurisdiction in the premises with respect to such Person or any substantial part of its assets or property in an involuntary case under any applicable Insolvency Law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its assets or property, or ordering the winding up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of thirty (30) days; (ii) the commencement by such Person of a voluntary case under any applicable Insolvency Law now or hereafter in effect; (iii) the consent by such Person to the entry of an order for relief in an involuntary case under any Insolvency Law, (iv) the consent by

such Person to the appointment of or taking possession by a receiver, liquidator, assignee; custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its assets or property; (v) the making by such Person of any general assignment for the benefit of creditors; (vi) the admission in writing in a legal proceeding of the inability of such Person to pay its debts generally as they become due; or (vii) the failure by such Person generally to pay its debts as they become due.

(oo)    **"Insolvency Laws"** means and includes the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments and similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

(pp)    **"Insolvency Proceeding"** means any case, action or proceeding before any court or other Governmental Authority relating to any Insolvency Event.

(qq)    **"Investment Company Act"** means the Investment Company Act of 1940.

(rr)    **"Lender POA"** means the duly executed written power of attorney to be delivered by the Borrower to the Lender on the closing date of the Line of Credit.

(ss)    **"Lien"** means any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever, including without limitation any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security.

(tt)    **"Line of Credit"** means the $10,000,000.00 revolving line of credit facility described in Article II below.

(uu)    **"Lockbox Account"** has the meaning set forth in Section 3.7 below.

(vv)    **"Material Adverse Effect"** means a material adverse effect on or material adverse change in or to: (i) the property, assets, business, operations, financial condition or credit quality of any Ebury Company, Guarantors, a Validity Guarantor or the Servicer, including any loss as a result of a violation of any Environmental Laws that impairs the ability of each of the Ebury Companies, the Guarantors and the Validity Guarantors to pay and perform their obligations under the Transaction Documents to which they are party; (ii) the ability of each of the Ebury Companies, the Guarantors and the Validity Guarantors to pay and perform their respective obligations under the Transaction Documents to which they are party; (iii) the validity, legality, binding effect or enforceability of any Transaction Document, the Eligible Tax Liens or the Security Interests granted hereunder or thereunder; (iv) the rights and remedies of the Lender or any Indemnified Person under any Transaction Document; or (v) the perfection or priority of any Lien granted under any Transaction Document.

(ww)    **"Municipal Lien"** means all real estate tax liens and all other municipal liens upon or arising in connection with any Property related to a Tax Lien, including, but not limited to, sewer service charges, water service charges and assessments for improvements upon such Property.

(xx)    **"Note"** means the promissory note evidencing the Borrower's obligations to repay Advances made under the Line of Credit, as well as any substitute, replacement or refinancing note or notes therefor or other promissory notes pursuant to the terms of this Agreement. The Note initially evidencing the Borrower's obligations to repay the Advances made under the Line of Credit shall be drawn payable to the Lender for the maximum amount of the Advances allowed under the Line of Credit in the amount of $10,000,000.00. The Note shall provide for interest at the rate established for the Line of Credit and for payment, in full, of all principal, interest and other charges by no later than the Expiration Date, and shall contain such other provisions (including, without limitation, provisions relating to calculation of interest, late charges, acceleration, default interest, cross-defaults, rights upon default, payment application, and attorneys' fees) customarily incorporated in commercial loan notes. Although the term "Note" includes refinancings, the Lender is under no obligation to renew or extend the maturity date of the Note or any substitute, replacement or refinancing note or notes therefor.

119304637_13

(yy)    **"Original Owner"** with respect to any Assigned Tax Lien, means the Person from whom the Ebury Company acquired such Assigned Tax Lien.

(zz)    **"Overadvance"** has the meaning set forth in Section 2.2 below.

(aaa)    **"Payment Date"** means the first day of each calendar month or, if any such day is not a Business Day, the next succeeding Business Day. The initial Payment Date shall be April 1, 2017.

(bbb)    **"Permitted Liens"** means any of the following as to which no enforcement, collection, execution, levy or foreclosure proceedings has been commenced:  (i) Liens granted by the Security Interests, pursuant to the Transaction Documents or other liens in favor of the Lender; (ii) Liens for state, municipal, local or other local taxes, assessments or other charges that are not delinquent and not yet due and payable; (iii) Liens imposed by Applicable Law, such as materialmen's, mechanics', carriers', workmen's, repairmen's and similar Liens, arising in the ordinary course of business securing obligations that are not overdue for more than thirty (30) days; and (iv) other Municipal Liens.

(ccc)    **"Person"** means any individual, corporation, limited liability company, limited partnership, general partnership, joint venture, association, joint stock company, trust, bank, unincorporated organization, business trust or other organization, whether or not a legal entity, and United States federal and state governments and agencies, or regulatory authorities or political subdivisions thereof, or any other form of entity.

(ddd)    **"Property"** means the underlying real (immovable) property and related improvements, including fixtures, encumbered by a Tax Lien.

(eee)    **"Related Rights"** for any Tax Lien, means all rights of the owner thereof, including without limitation, all rights to foreclose on the associated Property.

(fff)    **"Release"** means any release, use, generation, manufacture, storage, treatment, disposal, spill, emissions, leaking, pumping, injection, or migration of Hazardous Materials on, about, under or within all or any portion of any property.

(ggg)    **"Remedial Action"** means all actions required to:  (i) clean up, remove, treat, or otherwise address Hazardous Materials in the indoor or outdoor environment; (ii) prevent the Release or threat of Release or minimize the further Release of Hazardous Materials so that they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care deposit, disposal, disbursement, leaching, or migration of Hazardous Materials.

(hhh)    **"REO Property"** means a Property relating to a Tax Lien the title to which has been acquired through foreclosure or otherwise (including a tax deed).

(iii)    **"Requirements of Law"** with respect to any Person or the Person's assets or property and as of any date means all of the following applicable thereto as of such date:  all governing documents and existing and future laws, statutes, rules, regulations, treaties, codes, ordinances, permits, certificates, orders and licenses of and interpretations by any Governmental Authority (including Environmental Laws, ERISA, securities laws, regulations of the Board of Governors of the Federal Reserve System, and laws, rules and regulations relating to usury, licensing, truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices and privacy), judgments, decrees, injunctions, writs, awards or orders of any court, arbitrator or other Governmental Authority.

(jjj)    **"Retained Interests"** with respect to any Tax Lien, means all obligations and liabilities of the Borrower, the Servicer or any third party to the owner of the Property.

(kkk)    **"Rochester NY Liens"** means and includes 763 Tax Liens to be purchased by EB 1EMINY LLC from American Tax Funding having an aggregate redemptive value of $8,347,102.56.

(lll)   "**Security Agreement**" means and includes individually, collectively, interchangeably and without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

(mmm) "**Security Interest**" means and includes individually, collectively, interchangeably and without limitation any and all present and future mortgages, pledges, liens, security interests, crop pledges, assignments and other security agreements directly or indirectly securing the repayment of the Indebtedness, whether created by law, contract, or otherwise.

(nnn)   "**Servicer**" means and includes each Person (including the Lender) approved by the Lender to service and administer Tax Liens of any Ebury Company pursuant to a Servicing Agreement.

(ooo)   "**Servicing Agreement**" means and includes each agreement with an Ebury Company, a Servicer and the Lender, in a form satisfactory to the Lender, pursuant to which Tax Liens will be serviced and administered in accordance with the terms of such agreement, which terms shall specifically include the right of the Lender, upon an Event of Default, at its option to terminate the Servicing Agreement and take over the servicing function, or designate a third-party of its choice to act as Servicer.

(ppp)   "**Special Purpose Entity**" has the meaning set forth in Section 3.6 below.

(qqq)   "**Special Purpose Entity Covenants**" means the covenants of the Borrower set forth in Schedule 1.1(ppp) attached hereto.

(rrr)   "**State**" means a State of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insula possession subject to the jurisdiction of the United States.

(sss)   "**State Registration Requirement**" means and includes each of the Tax Lien registration requirements for each State set forth on the applicable portion of Schedule 1.1(x) attached hereto.

(ttt)   "**Subsequent Tax Lien**" with respect to a Property subject to Tax Lien means Municipal Liens upon such Property, including interest and penalties accruing thereon for periods subsequent to the period covered by the Municipal Liens evidenced by such initial Tax Lien that are: (i) paid by the owner of such Tax Lien to the applicable Taxing Authority; (ii) are not themselves evidenced by a certificate or instrument separate from such initial Tax Lien; and (iii) include all other rights, remedies and interest attributable to or incident to the payment or ownership of subsequent taxes and assessments on such Property.

(uuu)   "**Subsidiary**" means, with respect to any Person: (i) any business entity of which more than fifty (50%) percent of the total voting power of voting securities and equities thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof; and (ii) any partnership in which such Person or any of its subsidiaries is a general partner.

(vvv)   "**Tax**" or "**Taxes**" means any present or future taxes, levies, imposts, duties, charges, assessments or fees of any nature (including interest, penalties and additions thereto) that are imposed by any Government Authority.

(www)   "**Tax Certificate**" means the certificate or other evidence of purchase or payment that evidences the sale or transfer of a Tax Lien pursuant to applicable State laws and regulations.

(xxx)   "**Tax Debtor**" means individually, collectively and interchangeably each Person who has an ownership interest in Property that secures a Tax Lien and any other Person that may be obligated to pay a Tax Lien.

(yyy)   "**Taxing Authority**" means the Governmental Authority assessing, levying and collecting taxes.

119304637_13

(zzz)    "**Tax Lien**" means the lien or other rights imposed upon real (immovable) property to secure the payment of taxes, assessments and other charges due and owing with respect to such real (immovable) property, including, without limitation, the right to collect, receive and otherwise administer the collection of payments associated with such lien or other rights, whether evidenced by a physical or electronic certificate or instrument issued by the related Taxing Authority.  For purposes of this Agreement, "Tax Lien" is deemed to include "Subsequent Tax Liens."

(aaaa)    "**Tax Lien Documents**" means and includes, with respect to any Tax Lien, all documents prepared, executed or filed in connection with a Tax Lien, including, without limitation, the Tax Certificate and all documents or instruments evidencing, governing, securing, guaranteeing or otherwise pertaining to such Tax Lien and any other instruments that may be required to be presented to the applicable taxing authority as a condition of receiving a redemption payment, as the same may be modified, amended, renewed, extended, rearranged, restated or replaced from time to time.

(bbbb)    "**Termination Date**" means the earlier of:  (i) the Expiration Date; and (ii) the date on which all Indebtedness shall become due and payable pursuant to Section 9.2(a).

(cccc)    "**Transaction Documents**" means and includes individually, collectively, interchangeably and without limitation, this Agreement, the Note, the Servicing Agreement, the Custodial Agreement, Guaranty Agreements from each Guarantor, each of the Security Agreements, the Lender POA, all UCC financing statements, amendments and continuation statements filed pursuant to any document comprising Transaction Documents and all other promissory notes, credit agreements, loan agreements, guaranties, security agreements, mortgages, collateral mortgages, deeds of trust, subordination agreements and other instruments, agreements, and documents, whether now or hereafter existing, executed in connection with, or related to, any of the Indebtedness, all as may be amended, modified or restated from time to time in accordance with this Agreement.

(dddd)    "**UCC**" means the Uniform Commercial Code in effect in the State of New York from time to time.

(eeee)    "**Unpaid Acquisition Price**" means, for a Tax Lien, that portion of the Acquisition Price of the Tax Lien that has not been repaid to the Borrower by the Taxing Authority or the Tax Debtor though redemptions or other means.

(ffff)    "**Vacant (unimproved)**" shall mean and include collectively, vacant residential, vacant commercial and vacant industrial properties.  Property types as used in this provision shall be mutually exclusive (i.e., vacant commercial shall not be included in Commercial Properties).

(gggg)    "**Validity Guarantor**" means JOHN HANRATTY, a New York resident, and all other Persons that may become a party to this Agreement as a Validity Guarantor by any modification amendment or supplement to this Agreement.

1.2    <u>Accounting Matters</u>.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing any audited financial statements required herein, except as otherwise specifically prescribed herein.  Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, the Indebtedness of the Borrower shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 on financial liabilities shall be disregarded.

(b)    If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth herein, and either Borrower or the Lender shall so request, the Borrower and the Lender shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such

13

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 6    24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State   RECEIVED NYSCEF: 10/17/2022
Court Records    Pg 103 of 688

change in GAAP (subject to the approval of the Lender; provided that, until so amended: (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein; and (ii) the Borrower shall provide to the Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

1.3    <u>Other Definitional Provisions</u>. All definitions contained in this Agreement are equally applicable to the singular and plural forms of the terms defined. The words "hereof", "herein", and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all references in a Transaction Document to Sections, Articles, Exhibits and Schedules shall be construed to refer to Sections and Articles of, and Exhibits and Schedules to, the Transaction Document in which such references appear. Terms used herein that are defined in the UCC, unless otherwise defined herein, shall have the meanings specified in the UCC. Any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document). Any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time. Words denoting gender shall be construed to include the masculine, feminine and neuter, when such construction is appropriate; and specific enumeration shall not exclude the general but shall be constructed as cumulative; the word "or" is not exclusive; the word "including" (in its various forms) means "including, without limitation"; in the computation of periods of time, the word " from" means "from and including" and the words "to" and "until" mean " to but excluding "; and all references to money refer to the legal currency of the United States of America.

<div align="center">

**ARTICLE II**
**LINE OF CREDIT**

</div>

2.1    <u>Line of Credit</u>. Subject to and upon the terms and conditions contained in this Agreement, and relying on the representations and warranties contained in this Agreement, the Lender agrees to make Advances to the Borrower on a revolving line of credit basis, provided that the aggregate amount of such Advances outstanding does not exceed the lesser of: (i) the maximum dollar amount of the Note (initially, $10,000,000.00); and (ii) the Borrowing Base. Within the foregoing limits, the Borrower may borrow, partially or wholly prepay, and re-borrow under the Line of Credit in accordance with the following provisions. Advances shall be used solely for the purposes of acquiring Eligible Tax Liens (including Subsequent Tax Liens).

(a)    Authorized Individuals may request Advances under the Line of Credit, as well as directions for payment from the accounts of the Borrower, in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of the Borrower: (i) when credited to any deposit account of the Borrower or any other Ebury Company maintained with the Lender; or (ii) when advanced in accordance with the instructions of an Authorized Individual. The Lender, at the option of the Lender, may set a cutoff time, which as of the date of this Agreement shall be deemed to be 1:00 p.m., after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

(b)    The Borrower hereby authorizes the Lender to make Advances under the Line of Credit in amounts necessary to pay any fee or charge provided for under this Agreement or any other Transaction Document, including, without limitation, to pay any accrued interest due under the Note. Any such Advance may, at the option of the Lender, be funded directly to the Lender or deposited into a deposit account of the Borrower or any other Ebury Company maintained with the Lender, which account may then be debited by the Lender for the amount of such Advances. The Lender shall be under no obligation to make any such Advance after an Event of Default occurs.

(c)    The outstanding and unpaid principal balance under the Note shall bear interest at the rate stated in the Note. The Borrower shall make payments of unpaid interest accrued on the outstanding and unpaid

<div align="center">14</div>

119304637_13

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 104 of 688

principal balance under the Note as provided for in the Note. All unpaid and accrued interest not due and payable earlier, shall be due and payable on the Expiration Date.

2.2    <u>Overadvances</u>. In the event the unpaid principal amount of the outstanding Advances under the Line of Credit ever exceeds the Borrowing Base, the excess amount (an "**Overadvance**") shall be paid by the Borrower within three (3) Business Days after written notice from the Lender. Overadvances shall bear interest at the rate stated in the Note. The Borrower acknowledges and agrees that the Lender is not obligated to the Borrower to fund any Advance that would create an Overadvance.

2.3    <u>Annual Audit Fees</u>. Under the terms of this Agreement, the Lender has the right to conduct periodic reviews, inspections and audits of the Collateral and the books and records of the Ebury Companies at the expense of the Borrower.

2.4    <u>Unused Fee</u>. In addition to interest, beginning April 1, 2017 through the date the Borrower notifies the Lender that it irrevocably waives and relinquishes the right to any future Advance under the Line of Credit, the Borrower agrees to pay to the Lender an unused facility fee on the unused portion of the Line of Credit (the "unused portion" being the amount by which the maximum dollar amount of the Note exceeds the outstanding principal balance of the Note) from the date of this Agreement through the Expiration Date, at the rate of 0.25% per annum, accrued daily and payable for each three (3) calendar month period (each calendar quarter), in arrears, fifteen (15) days after last day of each calendar quarter. The amount of the unused facility fee shall be calculated each day during the period for which the fee is due using an assumed 360 day year.

2.5    <u>Loan Account</u>. The Lender shall maintain on its books a record of account in which the Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the Line of Credit. The Lender shall provide the Borrower with periodic statements of account of the Borrower, which statements shall be considered to be correct and conclusively binding on the Borrower, absent manifest error unless the Borrower notifies the Lender to the contrary within thirty (30) days after receipt by the Borrower of any such statement that the Borrower deems to be incorrect.

<div align="center">

**ARTICLE III**
**COLLATERAL**

</div>

3.1    <u>Collateral</u>.

(a)    The Parties intend that this Agreement and any other Transaction Document constitute a security agreement and the transactions effected hereby constitute secured loans by the Lender to the Borrower under Applicable Law. As collateral security for the prompt, complete and indefeasible payment and performance in full when due, whether by lapse of time, acceleration or otherwise, of the Indebtedness, each Ebury Company hereby grants to the Lender a lien on and Security Interest in all of such Ebury Company's right, title and interest in, to and under the Collateral, whether now existing or owned or hereafter arising or acquired by such Ebury Company.

(b)    The grant under this Article neither constitutes nor is intended to result in a creation or an assumption by the Lender of any obligation of any Ebury Company or any other Person in connection with any or all of the Collateral or under any agreement or instrument relating thereto. Anything herein to the contrary notwithstanding: (i) each Ebury Company shall remain responsible to perform all of its duties and obligations in respect of the Retained Interests to the same extent as if this Agreement had not been executed; (ii) the exercise by the Lender of any of its rights in the Collateral shall not release any Ebury Company from any of its duties or obligations under the Collateral; and (iii) the Lender shall neither have any obligations or liability under the Collateral by reason of this Agreement nor be obligated to perform any of the obligations or duties of the Ebury Companies any thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(c)    The Security Interests in the Collateral shall be continuing Liens and shall include the rents, proceeds and products of the Collateral, including without limitation the proceeds of any insurance. Each Ebury Company agrees not to transfer or encumber any of the Collateral, and agrees not to allow any other Grantor

<div align="center">15</div>

to transfer or encumber any of the Collateral, except as may be otherwise permitted under in this Agreement or with the written consent of the Lender.

3.2      Collateral Representations and Warranties.  In addition to the agreements, representations and warranties included in any Security Agreement, with respect to Tax Liens included in the Collateral, each Ebury Company agrees and represents and warrants to the Lender that:  (a) all present Tax Liens represent, and all future Tax Liens will represent, Tax Liens acquired by an Ebury Company in the ordinary course of its business and will comply with all Applicable Law, except where failure to so comply would not cause or have a Material Adverse Effect; (b) each Tax Lien represented to be an Eligible Tax Lien included in the Borrowing Base conforms to the requirements of the definition of Eligible Tax Liens included in the Borrowing Base; and (c) all Tax Lien Documents and information listed on schedules delivered to the Lender in accordance with the terms of this Agreement and other Transaction Documents will be true and correct in all material respects.  So long as no Event of Default has occurred and is continuing, any inspection, examination, review or audit of the records of any Ebury Company allowed under this Agreement shall be conducted at the offices of the Borrower or the third-party possessor during normal business hours after at least twenty-four (24) hours' prior notice.  During the existence of an Event of Default, any such inspection, examination, review or audit shall be conducted at such time and place as may reasonably be requested by the Lender.

3.3      Protection of Security Interest; Lender as Attorney-in-Fact.  Each Ebury Company agrees that from time to time, at its expense, it will promptly execute and deliver all instruments and documents, and take all actions, that may reasonably be necessary, or, at the Lender's request, that the Lender may deem necessary or desirable, to perfect, protect or more fully evidence the security interest granted to the Lender in the Collateral, or to enable the Lender to exercise and enforce its rights and remedies hereunder and thereunder.  If any Ebury Company fails to perform any of its obligations under this Section 3.3 after five (5) Business Days' notice from the Lender, the Lender may (but shall not be required to) perform, or cause performance of, such obligation; and the Lender's costs and expenses incurred in connection therewith shall be payable by the Ebury Companies upon demand.  Each Ebury Company hereby irrevocably authorizes the Lender at any time and from time to time to file in any UCC jurisdiction financing statements (including amendments and continuations thereto) that indicate the Collateral as all assets of the Ebury Companies or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State or such jurisdiction.

3.4      Waiver of Certain Laws.  Each Ebury Company agrees, to the full extent that it may lawfully so agree, that neither it nor anyone claiming through or under it will set up, claim or seek to take advantage of any appraisement, valuation, stay, extension or redemption law now or hereafter in force in any locality where any part of the Collateral may be situated in order to prevent, hinder or delay the enforcement or foreclosure of this Agreement, or the absolute sale of any of the Collateral or any part thereof, or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereof, and such Person for itself and all who may at any time claim through or under it, hereby waives, to the full extent that it may be lawful so to do, the benefit of all such laws, and any and all right to have any of the properties or assets constituting the Collateral marshaled upon any such sale, and agrees that the Lender or any court having jurisdiction to foreclosure the security interests granted in this Agreement may sell the Collateral as an entirety or in such parcels as the Lender or such court may determine.

3.5      Servicing Agreement.  To the extent required by this Agreement, the Borrower has entered into a Servicing Agreement approved as to form by the Lender, with a Servicer acceptable to the Lender, and a fully executed copy of which has been provided to the Lender.

3.6      Special Purpose Entities.  Tax Liens secured by property in a State must be owned by a special purpose entity organized and existing under the laws of that State (a "**Special Purpose Entity**") with organizational documents that:  (a) restrict its activities to Tax Lien ownership and activities related thereto; (b) prohibit acts that can be taken without the consent of the Lender; and (c) include such other organizational terms as are set forth in the Special Purpose Entity Requirements.

3.7      Lockbox Account.  All Collections (including electronic payments) must be deposited each

Business Day, daily and in kind, by the Borrower, into a lockbox account established and maintained with a financial institution acceptable to Lender, and for which Lender has entered into a control agreement (the "**Lockbox Account**"). Collections received by any Ebury Company shall be deposited into the Lockbox Account, in kind, no later than one (1) Business Day after receipt. Collections received by the Custodian or a Servicer shall be transferred to the Lockbox Account in accordance with the terms of the Custodial Agreement or the Servicing Agreement. Each Business Day the collected balance in the Lockbox shall be transferred to Lender and applied to repayment of the Indebtedness. Except for Tax Liens collected by the Custodian or a Servicer, each Ebury Company agrees to instruct, in writing, all Persons responsible for making payments of amounts secured by Tax Liens and other amounts due to any Ebury Company to make all payments to Ebury Fund 1 LP, P.O. Box 829686, Philadelphia, PA 19182-9686 (or such other address selected by the Lender). After an Event of Default occurs and during the continuance thereof, the Lender shall have the independent right, but not a duty, to notify Persons responsible for making payments of amounts secured by Tax Liens or other amounts due to any Ebury Company to make all payments to the address selected by the Lender. All payments received by the Lender and all payments received by any Ebury Company or any Custodian or any Servicer or any agent acting for any Ebury Company will be applied to repayment of the Indebtedness.

## ARTICLE IV
## CONDITIONS PRECEDENT TO EACH ADVANCE

The obligation of the Lender to make the initial Advance under the Line of Credit and each subsequent Advance under the Line of Credit shall be subject to the fulfillment of all of the conditions set forth in this Agreement and in the Transaction Documents to the satisfaction of the Lender.

4.1     _Transaction Documents_. Each Transaction Document shall have been duly executed by, and delivered to the Parties hereto and thereto and the Lender shall have received such other documents, instruments, agreements and legal opinions reasonably required by the Lender or counsel for the Lender in connection with the transactions contemplated by this Agreement, each in form and substance satisfactory to the Lender.

4.2     _Approvals_. The Lender shall have received: (a) satisfactory evidence in the form of a legal opinion or officer's certificate that the Borrower, the other Ebury Companies, the Guarantors, the Servicer and the Custodian have obtained all required consents and approvals of all Persons, including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement and the other Transaction Documents to which each is a party and the consummation of the transactions contemplated hereby or thereby; or (b) an officer's certificate from each of the Borrower, the other Ebury Companies, the Guarantors, the Servicer and the Custodian in form and substance satisfactory to the Lender affirming that no such consents or approvals are required; it being understood that the acceptance of such evidence or officer's certificate shall in no way limit the recourse of the Lender against the Borrower for a breach or the Borrower's representations or warranties that all such consents and approvals have, in fact, been obtained.

4.3     _Authorizations_. The Lender shall have received from each Ebury Company, in form and substance satisfactory to the Lender, evidence that the execution and delivery of this Agreement, the Note and the other Transaction Documents has been duly authorized, together with such other authorizations and other documents and instruments as the Lender or counsel for the Lender may reasonably require to evidence such authorization. All consents, authorizations, permits and approvals of any Governmental Authority or other Person necessary or advisable in connection with the execution and delivery of the Transaction Documents and the transactions contemplated thereby shall have been obtained and be in full force and effect.

4.4     _Security Interest Creation_. The Security Interests shall have been duly authorized and created (subject only to Permitted Liens) and shall be in full force and effect and the Lender shall have received evidence, acceptable to the Lender, of the priority of the Security Interests in the Collateral as contemplated by this Agreement.

4.5     _Opinions_. The Lender shall have received originally executed copies of the favorable written opinions of counsel for the Borrower as to such matters as the Lender may reasonably request and in form and substance reasonably satisfactory to the Lender.

119304637_13

4.6    Special Purpose Entity Classification. Each Ebury Company other than the Borrower shall have provided to the Lender its executed Governing Documents, in form and substance satisfactory to the Lender, which provides that such Ebury Company is a special purpose entity with at least one (1) independent director or independent manager, if such entity is a limited liability company, or that requires the affirmative consent of the trust certificate holder and trustee to take an Insolvency Action, if such entity is a statutory trust. The Servicer shall have provided to the Lender its executed Governing Documents. Each Guarantor shall have provided to the Lender its executed Governing Documents, in form and substance satisfactory to the Lender.

4.7    Payment of Fees and Expenses. The Borrower shall have paid all fees, charges, and other expenses that are then due and payable as specified in this Agreement or any other Transaction Document including the commitment fee in the amount of $100,000 due at Closing.

4.8    Other Conditions. There has been no Material Adverse Effect or Event of Default and the Borrower and the other Ebury Companies shall each be in compliance in all material respects with all Applicable Law.

4.9    Representations and Warranties. The representations and warranties set forth in this Agreement, in the Transaction Documents, and in any document or certificate delivered to the Lender under this Agreement are true and correct in all material respects.

4.10    Cessation of Advances. Without limiting any other rights and remedies provided in this Agreement, the other Transaction Documents or available at law, in equity, or otherwise, the Lender shall have no obligation to make any Advance if: (a) any Event of Default has occurred and is continuing; (b) an event has occurred and is continuing that, with notice, the lapse of time or otherwise, could constitute an Event of Default; (c) any condition precedent for the obligation of the Lender to make such Advance is not satisfied; (d) any Ebury Company becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (e) there occurs a material adverse change in the financial condition of any Ebury Company or any Validity Guarantor, or in the value of the Collateral taken as a whole; (f) any Ebury Company or any Validity Guarantor or any other Grantor seeks, claims or otherwise attempts to limit, modify or revoke any Security Interest granted to the Lender; (g) any Validity Guarantor seeks, claims or otherwise attempts to limit, modify or revoke the validity guaranty executed by such Validity Guarantor, or (h) at least thirty (30) days prior to the date a requested Advance is to be made, the Lender has notified the Borrower that the Lender in good faith deems itself insecure even though no Event of Default shall have occurred.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Ebury Company jointly and separately represents and warrants to the Lender that as of the date of this Agreement and as of the date of each Advance, the following shall be true and correct and shall be deemed to have certified that, after giving effect to the proposed Advance and pledge of Tax Liens:

5.1    Organization. The Borrower is a New York limited liability company, and each other Ebury Company is a limited liability company organized under the laws of the State where property securing its Tax Liens is located. Each Ebury Company is duly organized, validly existing and is in good standing under the laws of the jurisdiction of its organization, is duly qualified to do business in and is in good standing in every jurisdiction where the failure to so qualify could have or cause a Material Adverse Effect, and has all powers and all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted except where the failure to obtain such licenses, authorizations, consents and approvals could not reasonably be expected to result in a Material Adverse Effect.

5.2    Authorization. The execution, delivery and performance of this Agreement by each Ebury Company has been duly authorized, and does not conflict with, and will not result in a violation of, or constitute or give rise to an event of default under any Governing Documents of any Ebury Company, any agreement or other instrument that may be binding upon any Ebury Company or any Applicable Law applicable to any Ebury Company or the assets of any Ebury Company except to the extent such conflict could not reasonably be expected

to result in a Material Adverse Effect. Each Ebury Company has the power and authority to enter into this Agreement and each Grantor has the power and authority to grant collateral security for the Indebtedness. Each Ebury Company has the further power and authority to own and to hold all of its assets and properties, and to carry on its business as now conducted.

5.3    Financial Information - Ebury Companies.  As of the date hereof, the financial statements of each Ebury Company furnished to the Lender are complete and correct in all material respects, the financial statements of each Ebury Company were prepared in accordance with GAAP, and the financial statements of each Ebury Company fairly represent the financial condition and solvency of each Ebury Company as of the date thereof. To the best of their knowledge, no Ebury Company has any contingent obligations or liabilities that were not disclosed or reserved against in the financial statements of any Ebury Company or in the notes thereto. Since the dates of such financial statements, there has been no material adverse change in the financial condition or business of any Ebury Company that has not been disclosed to the Lender in writing.

5.4    Financial Information -- Validity Guarantor.  As of the date hereof, the financial statements of Validity Guarantor furnished to Lender prior to the date of this Agreement is complete and correct in all material respects and fairly represent the financial condition of each Validity Guarantor for whom financial statements were provided as of the date thereof. To the best of the knowledge of each Ebury Company: (a) no Validity Guarantor has any contingent obligations or liabilities that were not disclosed or reserved against in the financial statements of any Validity Guarantor or in the notes thereto; and (b) since the dates of such financial statements, there has been no material adverse change in the financial condition or business of any Validity Guarantor that have not been disclosed to Lender in writing.

5.5    Other Debt.  No Ebury Company has any indebtedness or other monetary obligation to others (direct or contingent) other than:  (a) trade debt incurred in the normal course of business; (b) other general liabilities incurred in the ordinary course of business; and (c) indebtedness to the Lender.

5.6    Properties.  Except for Permitted Liens, each Ebury Company owns and has good title to all of its respective properties free and clear of all security interests, and no Ebury Company has executed any security documents or authorized the filing of any financing statements relating to such properties. All of the property of each Ebury Company is titled in its respective name, except as otherwise required or permitted under this Agreement.

5.7    Hazardous Substances.

(a)    Except as disclosed to and acknowledged by the Lender in writing, each Ebury Company agrees, represents and warrants that: (i) during the period of ownership by any Ebury Company, there has been and will be no unlawful Release or threatened Release of any Hazardous Substances by any Person on, under, or about any of the properties owned by any Ebury Company; (ii) no Ebury Company has any knowledge of, or reason to believe that there has been any unlawful Release or threatened Release of any Hazardous Substances by any prior owners or occupants of any of the properties of any Ebury Company, or any actual or threatened litigation or claims of any kind by any Person relating to such matters; and (iii) neither any Ebury Company nor any tenant, contractor, agent or other authorized user of any of the properties of any Ebury Company shall Release any Hazardous Substances on, under, or about any of the properties other than in full compliance with all Applicable Laws, including without limitation the Environmental Laws; provided, however, that to the extent any Ebury Company discovers any unlawful Release or threatened Release of any Hazardous Substances by any prior owners or occupants of any property and such Ebury Company promptly notifies the Lender and formulizes a plan, acceptable to the Lender in its reasonable discretion, to pursue a Remedial Action and the Ebury Companies continue to implement such Remedial Action, no Event of Default shall be deemed to have occurred.

(b)    Each Ebury Company authorizes the Lender and its agents to enter upon the Properties, subject to the rights of tenants, if the Lender has a reasonable basis to suspect non-compliance of one or more such Properties, to make such inspections and tests as the Lender may deem appropriate to determine compliance of the Properties with this Section 5.6. Any inspections or tests made by the Lender shall be at the expense of the Ebury Companies and for the purposes of the Lender only and shall not be construed to create any responsibility or

119304637_13

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 109 of 688

liability on the part of the Lender to any Ebury Company or to any other Person. The representations and warranties contained herein are based on due diligence by the Ebury Companies in investigating such properties for Hazardous Substances as the Ebury Companies determine necessary or advisable based on an evaluation of each property acquired by any Ebury Company.

(c)    Each Ebury Company hereby: (i) releases and waives any future claims against the Lender for indemnity or contribution in the event any Ebury Company becomes liable for cleanup or other costs under any Applicable Law including the Environmental Laws; and (ii) as set forth in Article X below, agrees to indemnify and hold harmless the Lender against any and all claims, losses, liabilities, damages, penalties, and expenses that the Lender may directly or indirectly sustain or suffer resulting from a breach of this Section or as a consequence of any Release or threatened Release occurring prior to the ownership of any interest in the Properties by any Ebury Company and prior to the Lender's or any Subsidiary's or Affiliate's ownership, whether or not the same was or should have been known to any Ebury Company. The indemnification provided by this Section and Article X below shall survive the payment of the Indebtedness and the termination or expiration of this Agreement and shall not be affected by the acquisition by the Lender of any interest in any of the Properties, except to the extent the actions or omissions giving rise to any claim occurred subsequent to the date the Lender acquired an interest in the subject property. For the avoidance of doubt, any reference to the property of any Ebury Company in this Section 5.6 does not refer to and shall not be interpreted to refer to any Property securing the Tax Liens.

5.8    <u>Litigation</u>. As of the date hereof, there are no suits, investigations or proceedings pending, or to the knowledge of any Ebury Company, threatened against or adversely affecting any Ebury Company or the assets of any Ebury Company, before any court or by any Governmental Authority.

5.9    <u>Taxes</u>. All tax returns and reports of the Ebury Companies that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full.

5.10    <u>Tax Liens</u>. Each Ebury Company has complied in all respects with its obligations under the Custodial Agreement with respect to each Tax Lien, including delivery to Custodian of all required Tax Lien Documents. No Tax Lien Documents relating to any Tax Lien has any marks or notations indicating that such Tax Lien has been sold, assigned, pledged, encumbered or otherwise conveyed by such Ebury Company to any Person other than the Lender. The assignment and pledge of each Tax Lien to the Lender does not violate any of the Tax Lien Documents or any agreement to which any Ebury Company is a party or by which any Ebury Company is bound. On or prior to the applicable Advance date, such Ebury Company or the Servicer shall have instructed all Taxing Authorities (and any other applicable Person) to make all payments in respect of the related Tax Liens to the Lender.

5.11    <u>Security Interests and Lien Priority</u>. Each Ebury Company has good and valid ownership of the Collateral, free and clear of all Liens other than Permitted Liens. The Transaction Documents constitute a valid and effective grant of a security interest, free and clear of any Liens (other than Permitted Liens) to the Lender of all right, title and interest (other than Retained Interests) of each Ebury Company in, to and under all of the Collateral, which security interest is of first priority. To the extent that the UCC applies and such security interest can be perfected by either the filing of a financing statement or the taking of possession by the Lender or its agent, such security interest is perfected. No Ebury Company has sold, assigned, pledged, encumbered or otherwise conveyed any of the Collateral to any Person other than pursuant to the Transaction Documents nor authorized the filing of any UCC financing statements naming it as debtor, other than any financing statement that has been filed pursuant to this Agreement.

5.12    <u>Separateness</u>. Each Ebury Company is in compliance with the Special Purpose Entity Covenants.

5.13    <u>REO Properties</u>. The Borrower and the other Ebury Companies other than RE 1EMI LLC do not own any REO Properties.

5.14    <u>Binding Effect</u>. This Agreement and the other Transaction Documents executed by any Ebury Company are binding upon the executing Parties, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms, subject to the effect of any Insolvency Laws

119304637_13

affecting the rights and remedies of creditors generally general principles of equity.

5.15    Employee Benefit Plans.  Each employee benefit plan as to which any Ebury Company may have any liability complies in all material respects with all applicable requirements of law and regulations, and:  (a) no Reportable Event nor Prohibited Transaction (as defined in ERISA) has occurred with respect to any such plan; (b) no Ebury Company has withdrawn from any such plan or initiated steps to do so; and (c) no steps have been taken to terminate any such plan.

5.16    Investment Company.  No Ebury Company is an "Investment Company" as that term is defined under the Investment Company Act of 1940.

5.17    Compliance with Applicable Law.  In connection with the transactions contemplated by the Transaction Documents, each Ebury Company has complied in all respects with all applicable Requirements of Law except to the extent that any failure to so comply would not have a Material Adverse Effect.  No Ebury Company:  (a) is or is controlled by a Person required to register as an "investment company" as defined in the Investment Company Act of 19409; (b) is a "broker" or "dealer" as defined in, or could be subject to a liquidation proceeding under, the Securities Investor Protection Act of 1970; or (c) is subject to regulation by any Governmental Authority limiting its ability of the Borrower to incur the Indebtedness.

5.18    Location of Records.  Each Ebury Company keeps records concerning the Collateral at the offices of the Custodian: 56 Locust Avenue, 2nd Floor, Rye, NY 10580.

5.19    Tax Identification Numbers.  The Federal Employer Tax Identification Number for each Ebury Company is set forth on Schedule 5 attached hereto.

5.20    Organizational Identification Numbers.  The organizational identification number assigned to each Ebury Company by the agency of that jurisdiction where its organizational documents is set forth on Schedule 5 attached hereto.

5.21    Information.  All information heretofore or contemporaneously herewith furnished by each Ebury Company and each Validity Guarantor to the Lender for the purposes of or in connection with the Transaction Documents or any transaction contemplated thereby is, and all information hereafter furnished by or on behalf of each Ebury Company and each Validity Guarantor to the Lender will be, true and accurate in every material respect on the date as of which such information is dated or certified; and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading.

5.22    Survival of Representation and Warranties.  Each Ebury Company understands and agrees that the Lender is relying upon the above representations and warranties in extending the Line of Credit and making Advances.  Each Ebury Company further understands and agrees that the foregoing representations and warranties shall be continuing in nature and shall remain in full force and effect until such time as the Indebtedness shall be paid in full and this Agreement has been terminated by the Parties and the Lender, or until the Expiration Date, whichever is the last to occur.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

Each Ebury Company covenants and agrees with the Lender that, so long as this Agreement remains in effect, it shall comply with the following affirmative covenants:

6.1    Material Adverse Changes and Litigation.  Each Ebury Company shall promptly inform the Lender in writing of:  (a) any and all adverse changes causing a Material Adverse Effect on an Ebury Company's or any Validity Guarantor's financial condition; and (b) all litigation, investigations and claims and all threatened litigation and claims affecting an Ebury Company or a Validity Guarantor that could reasonably be expected to result in a Material Adverse Effect.

6.2    _Financial Records_. Each Ebury Company shall maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit the Lender, and its employees and agents, at Borrower's expense, to inspect, examine, review or audit such Ebury Company's books and records (including, without limitation, reviews and audits of all Tax Lien records). So long as no Event of Default has occurred and is continuing, any inspection, examination, review or audit of the records of any Ebury Company allowed under this Agreement shall be conducted at the offices of the Borrower or the third-party possessor during normal business hours after at least twenty-four (24) hours' prior notice. After an Event of Default has occurred and is continuing, any such inspection, examination, review or audit shall be conducted at such time and place as may reasonably be requested by the Lender.

6.3    _Financial Reports_. All financial statements, schedules and reports required to be provided under this Agreement and the Transaction Documents shall be in a form consistent with the historical statements provided to the Lender, and each statement and report provided by the Ebury Companies shall be prepared in accordance with GAAP, applied on a consistent basis and certified as being true and correct to the best knowledge and belief by the chief financial representatives of the Ebury Companies or other Person acceptable to the Lender.

6.4    _Loss Reserve_. The Ebury Companies shall establish and maintain on their books and records, at all times, a loss reserve acceptable to the Lender. As of the date of this Agreement, no loss reserve is required by the Lender, but the Lender reserves the right to establish, from time to time, a reasonable loss reserve requirement acceptable to the Lender based on financial information provided for the Ebury Companies.

6.5    _Revenue Recognition Method_. Each Ebury Company shall utilize a revenue recognition method consistent with GAAP, applied on a consistent basis.

6.6    _Annual Financial Statements_. Each Ebury Company and Ebury Fund 1, LP shall, without demand or request by the Lender and not later than ninety (90) days after the end of each fiscal year, furnish the Lender with fiscal year-end consolidated financial statements for the prior year, including balance sheet and income statement and a statement of cash flows, audited by a certified public accountant acceptable to the Lender and accompanied by the unqualified opinion of the certified public accountant, with footnotes and consolidating schedules.

6.7    _Monthly and Quarterly Financial Statements_. Each Ebury Company and Ebury Fund 1, LP shall, beginning with the quarter ending June 30, 2017, without demand or request by the Lender and not later than forty-five (45) days after the end of each fiscal quarter, furnish the Lender with consolidated quarter-end financial statements (including balance sheet, income statement and statement of cash flows) for the prior quarter, and if the Lender should so request, prepared and certified as correct to the best knowledge and belief by the chief financial representatives of such Ebury Company or Ebury Fund 1, LP or other Person acceptable to the Lender. Each Ebury Company and Ebury Fund 1, LP shall, beginning with the month ending March 31, 2017, without demand or request by the Lender and not later than thirty (30) days after the end of each month, furnish the Lender with consolidated month-end financial statements (including balance sheet, income statement and statement of cash flows) for the prior month, and if the Lender should so request, prepared and certified as correct to the best knowledge and belief by the chief financial representatives of such Ebury Company or Ebury Fund 1, LP or other Person acceptable to the Lender. The financial statements referred to in this Section 6.7 shall be provided in a form and format reasonably acceptable to the Lender.

6.8    _Personal Financial Statements – Validity Guarantor_. The Ebury Companies shall, without demand or request by Lender, furnish Lender with a personal financial statement for the Validity Guarantor, originally signed and dated, in a form and content reasonably acceptable to Lender, with information including information no older than thirteen (13) months from the date furnished.

6.9    _Personal Tax Returns – Validity Guarantor_. The Ebury Companies shall, without demand or request by Lender and not later than fifteen (15) days after filing, but no later than October 31st of the then current fiscal year, furnish Lender with copies of the federal income tax returns for the prior year (and any extensions) filed by the Validity Guarantor, with all schedules and supporting documentation.

6.10    _Compliance Certificate_. Upon delivery of the financial statements described in Sections 6.6 and

119304637_13

6.7 above, the Ebury Companies shall furnish the Lender with a certificate executed by the chief financial representatives of the Ebury Companies or other Person acceptable to the Lender: (a) showing the calculation details and result for each of the financial covenants in Article VII; (b) certifying that all of the representations and warranties in this Agreement and the other Transaction Documents are true and correct in all material respects, except as noted in the certificate; (c) certifying that no Event of Default has occurred under this Agreement, except as noted in the certificate; and (d) certifying that no event has occurred which, with notice, the lapse of time or otherwise, could constitute an Event of Default under this Agreement, except as noted in the certificate.

6.11    <u>Projections</u>. The Borrower will deliver to the Lender, within thirty (30) days before the beginning of each fiscal year, projections for Borrower on a month by month basis, prepared by Borrower's management.

6.12    <u>Company Tax Returns - Ebury Fund 1, LP, Ebury Fund 2, LP and Ebury Street Capital, LLC</u>. The Ebury Companies shall, without demand or request by the Lender and not later than fifteen (15) days after filing, but no later than September 30th of the then current fiscal year, furnish the Lender with copies of the federal income tax returns for the prior year (and any extensions) filed by Ebury Fund 1, LP, Ebury Fund 2, LP, and Ebury Street Capital, LLC with all schedules and supporting documentation.

6.13    <u>Borrowing Base Certificates</u>.

(a)    Prior to each request for an Advance the Ebury Companies shall furnish the Lender with a certificate identifying the calculation of the combined Borrowing Base for the Ebury Companies (which shall be furnished in the form of a combined certificate for all Ebury Companies for all States and a combined certificate for all Ebury Companies for each State) utilizing balance and eligibility information current as of the date the Borrowing Base Certificate is furnished to the Lender, in reasonable detail and in form and content reasonably acceptable to the Lender, prepared by the Ebury Companies and certified as correct to the best knowledge and belief the chief financial representative of the Ebury Companies or other Person acceptable to the Lender (a "**Borrowing Base Certificate**").

(b)    At such time as the Advances outstanding, together with all advances outstanding under the Credit Agreement by and between the Lender and Ebury 2 EMI LLC dated as of the date hereof, are collectively in excess of $2,000,000.00, Borrowing Base Certificates shall be furnished, without demand or request by the Lender, no later than fifteen (15) days after the end of each month, with information for the month just ended.

(c)    Each Borrowing Base Certificate shall certify that the Ebury Companies are in compliance with all terms and conditions of this Agreement and the Transaction Documents, including statements that: (i) all of the representations and warranties in this Agreement are true and correct in all material respects; (ii) no Event of Default has occurred under this Agreement; and (iii) no event has occurred that, with notice, the lapse of time or otherwise, could constitute an Event of Default under this Agreement. The amount of gross Tax Lien receivables of the Ebury Companies shown on month-end Borrowing Base Certificates must not be materially different than the amount of gross Tax Lien receivables shown on the quarterly financial statements for the Ebury Companies including the same month-end unless the Ebury Companies provide the Lender with a reconciliation acceptable to the Lender with the quarterly financial statements.

6.14    <u>Monthly Tax Lien Reports</u>.

(a)    Each month-end Borrowing Base Certificate shall be accompanied by reports, for the month ended, providing the following supporting information for the month-end Borrowing Base Certificate (which shall be furnished in the form of a combined report for all Ebury Companies for all States and a combined certificate for all Ebury Companies for each State):

(i)    A listing of all new purchases of Tax Liens and redemption of Tax Liens;

(ii)    a listing of all collections received (separately identifying Acquisition Prices, interest and other amounts received);

119304637_13

| | |
|---|---|
| (iii) | a listing of all charge-offs; |
| (iv) | an update of Unpaid Acquisition Price information for the Tax Liens; |
| (v) | the Unpaid Acquisition Prices of the Tax Liens by property type or use code; |
| (vi) | portfolio compositions and redemptions by property type/use, state and county; |
| (vii) | a summary of all Tax Liens excluded from the Borrowing Base listed by the applicable Eligible Tax Lien exclusion; and |
| (viii) | such other information and in such detail as the Lender may reasonably request. |

(b)　　The monthly Tax Lien report shall be in reasonable detail and in written and electronic media form and format reasonably acceptable to the Lender and certified as correct to the best knowledge and belief of the chief financial representative of the Ebury Companies or other Person acceptable to the Lender.

6.15　　Inspection Reports.  The Ebury Companies shall, upon reasonable request of the Lender, furnish the Lender with copies of all inspection reports issued by all supervisory Governmental Authority agencies for the Ebury Companies, if any.

6.16　　Tax Lien Requirements.

(a)　　If the a Taxing Authority issues certificates evidencing Tax Liens on a delayed basis, the affected Ebury Company shall:  (i) promptly comply with all requirements of such Taxing Authority and each Applicable Statute to promptly secure ownership of each Tax Lien; and (ii) promptly upon receipt of notice that such certificates are available for delivery, request from the Custodian, if required, the original receipt or other evidence received from such Taxing Authority with respect to such Tax Lien and promptly deliver such receipt and any other documents necessary to obtain such certificates from such Taxing Authority immediately upon the availability of such certificates and, upon receipt of such certificates, deliver such certificates to the Custodian.

(b)　　The affected Ebury Company shall timely and fully:  (i) comply with all provisions of all Applicable Statutes necessary or desirable to fully preserve all of the rights of a holder of a Tax Lien to receive all amounts in redemption of such Tax Lien, to foreclose on such Tax Lien, to acquire ownership of the related Property and to preserve and exercise any and all rights, duties and obligations of the holder of such Tax Lien under the Applicable Statutes; and (ii) promptly and fully perform all duties and obligations of a holder of a Tax Lien under each Applicable Statute.  In furtherance of the foregoing and not in limitation thereof, such Ebury Company shall deliver all notices required by or provided for in each Applicable Statute to each Person entitled to receive such notices; each such notice shall be delivered in the form and by the means required, specified or otherwise permitted by the Applicable Statutes and within the timeframes provided for or required by the Applicable Statutes.

(c)　　Upon receipt of notice that a Tax Lien has been redeemed, if the related certificate evidencing such Tax Lien is required to be surrendered to the related Taxing Authority in order for the redemption to be paid to the holder of such Tax Lien, the affected Ebury Company shall, upon receipt of such certificate from the Custodian pursuant to the Custodial Agreement, deliver such certificate to the applicable Taxing Authority, together with appropriate instructions to cause the redemption payment to be deposited in the Lockbox Account.

(d)　　With respect to any Tax Lien that is an Assigned Tax Lien, the affected Ebury Company shall: (i) periodically request from the Original Owner information regarding the redemption or other status of such Assigned Tax Lien; and (ii) timely file all UCC continuation statements related to the original UCC filings.  Upon receipt of notice that an Assigned Tax Lien has been redeemed, if the related certificate evidencing such Assigned Tax Lien is required to be surrendered to the related Taxing Authority in order for the redemption to be paid to the holder of such Assigned Tax Lien, such Ebury Company shall request that the Custodian deliver to such Ebury Company or the Servicer the related certificate for the purpose of receiving such redemption amount and, upon receipt of such certificate from the Custodian, deliver such certificate to the applicable Taxing Authority, together with appropriate instructions to cause the redemption payment to be deposited into the Lockbox Account.

119304637_13

6.17    Tax Lien Responsibility. Notwithstanding anything herein to the contrary, each Ebury Company shall perform (or shall cause the Servicer to perform) all of its obligations with respect to the Tax Liens to the same extent as if a Security Interest in such Tax Liens had not been granted hereunder, and the exercise by the Lender of its rights hereunder shall not relieve any Ebury Company from such obligations. The Lender shall not have any obligation or liability with respect to any Tax Lien, and shall not be obligated to perform any of the obligations of the Ebury Companies thereunder.

6.18    Regulatory Inspection Reports. The Ebury Companies shall, upon reasonable request of Lender, furnish Lender with copies of all inspection reports issued by all supervisory regulatory agencies for the Ebury Companies, if any.

6.19    Additional Information. The Ebury Companies shall furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, tax returns, and other reports with respect to the financial condition and business operations of the Ebury Companies and Validity Guarantors as the Lender may reasonably request from time to time.

6.20    Additional Information - Regulatory Requirements. Each Ebury Company acknowledges that the Lender is, or may be, subject to Applicable Law requiring the Lender to obtain, verify, and record information that identifies their customers, including all loan parties. The Ebury Companies agree to provide the Lender with any information the Lender reasonably deems necessary to comply with all such Applicable Laws.

6.21    Guaranties. Prior to the initial Advance, the Ebury Companies (other than Borrower) and the Guarantor shall furnish an executed guaranty of all of the Indebtedness in favor of Lender, on a solidary and joint and several basis with Borrower and each other Ebury Company and Guarantor, on a form approved by Lender.

6.22    Validity Guaranties. Prior to the initial Advance, the Borrower shall furnish executed a validity guaranty from Validity Guarantor in favor of Lender, on forms approved by Lender.

6.23    Custodial Agreements. Prior to any Advance including Eligible Tax Certificates issued by Taxing Authorities in a State where Tax Certificates and other Basic Tax Lien Documents are required by the Lender to be delivered to the Custodian and held and administered in accordance with the terms of the Custodian Agreement as shown on the schedule for a State (identified by its postal abbreviation) attached to this Agreement (or by amendment or supplement to this Agreement), the Ebury Companies shall furnish executed Custodial Agreements to the Lender on forms approved by the Lender.

6.24    Servicing Agreements. Prior to any Advance including Eligible Tax Certificates issued by Taxing Authorities in a State where Tax Certificates and other Basic Tax Lien Documents are required by the Lender to be delivered to serviced and administered in accordance with the terms of a Servicing Agreement as shown on the schedule for a State (identified by its postal abbreviation) attached to this Agreement (or by amendment or supplement to this Agreement), the Ebury Companies shall furnish executed Servicing Agreements to the Lender on forms approved by the Lender.

6.25    Other Agreements. Each Ebury Company shall comply with all terms and conditions of all other agreements, whether now or hereafter existing, between it and any other Person and shall notify the Lender immediately in writing of any default (beyond the applicable cure period, if any) in connection with any other such agreements that could have a Material Adverse Effect.

6.26    Use of Proceeds. Unless specifically consented to the contrary by the Lender in writing, the Borrower shall use Advances solely to fund the acquisition of Eligible Tax Liens in the ordinary course of the business of the Ebury Companies and to finance ordinary and necessary expenses of the business operations of the Ebury Companies incurred in the ordinary course of the business (including, without limitation, expenses for the enforcement of Tax Liens and the acquisition at foreclosure, by deed in lieu of foreclosure, or tax deed sales, of properties securing Tax Liens). The Borrower agrees not to use the proceeds of any Advance to acquire or carry margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System).

119304637_13

6.27    Taxes, Charges and Liens. Each Ebury Company shall pay and discharge, before they become delinquent, all of their respective indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon the Ebury Companies or their respective properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of the properties, income, or profits of any Ebury Company; provided, however, that no Ebury Company will be required to pay property taxes or other taxes on Property securing a Tax Lien unless such payments would accrue interest in favor of such Ebury Company, or until such time as the failure to pay such taxes would result in such Ebury Company's Tax Lien failing to be a first priority lien on the Property securing the Tax Lien, except to the extent that regardless of such outcome, such Ebury Company, in its commercially reasonable business judgment, determines it is not in the best interest financially to make such payment; and provided, further, no Ebury Company will be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as: (a) the legality of the same shall be contested in good faith by appropriate proceedings; and (b) appropriate and adequate reserves shall have been established with respect to such contested assessment, tax, charge, levy, lien, or claim. The Ebury Companies, upon demand of the Lender, will furnish to the Lender evidence of payment of the assessments, taxes, charges, levies, liens and claims and will authorize the appropriate governmental official to deliver to the Lender at any time a written statement of any assessments, taxes, charges, levies, liens and claims against their respective properties, income, or profits.

6.28    Performance. The Ebury Companies shall, in all material respects, perform and comply with all terms, conditions and provisions set forth in this Agreement and in all other instruments and agreements of the Ebury Companies with or in favor of the Lender in a timely manner.

6.29    Management and Operations. The Ebury Companies shall conduct their respective business affairs in a reasonable and prudent manner and in compliance with all applicable laws, ordinances, rules and regulations respecting its properties, charters, businesses and operations, including, without limitation, compliance with the Americans With Disabilities Act and with all minimum funding standards and other requirements of ERISA and other laws applicable to employee benefit plans of any Ebury Company, except where failure to so comply would not have a Material Adverse Effect.

6.30    Inspection. The Ebury Companies shall permit employees or agent of the Lender to inspect any and all Collateral and any other properties of the Ebury Companies and to examine, review or audit the books, accounts, ledger sheets, and records of the Ebury Companies and to make copies and memoranda of the books, accounts, ledger sheets, and records of the Ebury Companies. If any Ebury Company now or at any time hereafter maintains any records (including without limitation computer generated records and computer programs for the generation of such records) in the possession of a third party, the Ebury Companies, upon request of the Lender, shall notify such party to permit the Lender free access to such records and to provide the Lender with copies of any records it may request, all at the expense of the Ebury Companies; provided however that to the extent the Lender requests access to any computers of the Ebury Companies in order to access computer generated records or programs, a representative of the Ebury Companies shall be present at all times and access such records or reports on behalf of the Lender. So long as no Event of Default has occurred and is continuing, any inspection, examination, review or audit of the records of the Borrower allowed under this Agreement shall be conducted at the offices of the Ebury Companies or the third-party possessor during normal business hours after at least twenty-four (24) hours' prior notice. An Event of Default and is continuing, any such inspection, examination, review or audit shall be conducted at such time and place as may reasonably be requested by the Lender.

6.31    Change of Location. The Ebury Companies shall immediately notify the Lender in writing of any additions to or changes in their respective business locations or chief executive office locations.

6.32    Title to Assets and Property. The Ebury Companies shall maintain good and marketable title to all of the Collateral, subject to Permitted Liens.

6.33    Notice of Default and ERISA Matters. The Ebury Companies, forthwith upon learning of the occurrence of any of the following, provide the Lender with written notice thereof, describing the same and the steps being taken with respect thereto: (a) the occurrence of any Event of Default; (b) the occurrence of any event

119304637_13

that, with the passage of time, would constitute an Event of Default; or (c) the occurrence of a "Reportable Event" or a "Prohibited Transaction" (as defined in ERISA) under, or the institution of steps by any Ebury Company to withdraw from, or the institution of any steps to terminate, any employee benefit plan as to which any Ebury Company may have any liability.

6.34    Employee Benefit Plans. The Ebury Companies shall maintain each of the employee benefit plans to which it may have any liability, in compliance with all applicable requirements of law and regulations.

6.35    Environmental Compliance and Reports. Each Company shall comply in all respects with all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on the part of such Ebury Company or any third party, on property owned or occupied by such Ebury Company, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate Governmental Authority; shall furnish to the Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any Governmental Authority concerning any intentional or unintentional action or omission on the part of such Ebury Company in connection with any environmental activity whether or not there is damage to the environment or other natural resources.

6.36    Other Information. The Ebury Companies shall, from time to time, provide the Lender with such other information regarding the Ebury Companies and their businesses and assets as the Lender may reasonably request.

6.37    Additional Assurances. Each Ebury Company shall make, execute and deliver to the Lender such promissory notes, security agreements, financing statements, instruments, documents and other agreements as the Lender or its attorneys may reasonably request to evidence and secure the Indebtedness.

## ARTICLE VII
## FINANCIAL COVENANTS

Each Ebury Company covenants and agrees with the Lender that, as long as this Agreement remains in effect, it shall comply with the following financial covenants:

7.1    Definitions. For purposes of testing compliance with these financial covenants, the following terms shall have the following meanings. Except as otherwise provided by these defined terms, all computations made to determine compliance with these financial covenants shall be made in accordance with GAAP, applied on a consistent basis and shall exclude the effect of all inter-company transactions between and among the Ebury Companies.

(a)    "**Derivative Contract**" means a financial contract, arranged through a dealer (including, without limitation, the Lender) deriving its value by reference to an underlying asset, interest rate, exchange rate or index and includes, without limitation, interest rate swaps, interest rate cap, interest rate collar, interest rate floor, interest rate exchange or other similar interest rate hedging contracts.

(b)    "**Due from Related Parties**" during the period of determination, means the sum of: (i) all amounts due from any Person that is an Affiliate or Subsidiary of any Ebury Company; (ii) all amounts due from any Person that is a shareholder, director, partner, member, manager, officer, employee or agent of any Ebury Company or any Affiliate or Subsidiary of any Ebury Company; and (iii) all amounts due from any Person that is an Affiliate or Subsidiary of any shareholder, director, shareholder, director, partner, member, manager, partner or officer of any Ebury Company or any Affiliate or Subsidiary of any Ebury Company.

(c)    "**EBIT**" during the period of determination, means the amount of earnings of the Ebury Companies before deduction of Interest Expense and income taxes.

(d)    "**Excluded Assets**" as of the end of the period of determination, means the sum of: (i) Intangibles; (ii) Due from Related Parties; and (iii) all amounts included in assets secured by any Tax Lien other

than Rochester Tax liens that is more than thirty-six (36) months old, where aging begins from the date the Tax Lien was sold by the Taxing Authority, unless the foreclosure process on the Property securing the Tax Lien has been initiated; however there shall be no Excluded Assets under this clause (iii) for Rochester Tax Liens.

(e)    "**Intangibles**" as of the end of the period of determination, means the aggregate of all goodwill, purchase premiums, trademarks, patents, copyrights, organizational expenses, and similar intangible assets of the Ebury Companies.

(f)    "**Interest Expense**" during the period of determination, means the sum of all interest expense incurred by the Ebury Companies.

(g)    "**Total Assets**" as of the end of the period of determination, means the total book value (including, without limitation, all accrued interest on Tax Liens) of all assets of the Ebury Companies (less contra-assets).

(h)    "**Total Liabilities**" as of the end of the period of determination, means the sum of all liabilities of the Ebury Companies.

(i)    "**Total Net Worth**" as of the end of the period of determination, means Total Assets, less Total Liabilities.

7.2    <u>Minimum Interest Coverage</u>.  The Ebury Companies, on a consolidated basis, shall maintain Interest Coverage of no less than 1.50 where "**Interest Coverage**" is calculated as (a) EBIT; <u>divided by</u> (b) Interest Expense.  Ebury Fund 1, LP, on a consolidated basis, shall maintain Interest Coverage of no less than 1.50.

7.3    <u>Maximum Leverage Position - Consolidated</u>.  The Ebury Companies, on a consolidated basis, shall maintain Leverage Position of no more than 4.00 where "**Leverage Position**" is calculated as:  (a) Total Liabilities; <u>divided by</u> (b) Total Net Worth <u>less</u> Excluded Assets.  Ebury Fund 1, LP, on a consolidated basis, shall maintain Leverage Position of no more than 4.00.

7.4    <u>Testing - Effect of Derivative Contracts</u>.  Testing for compliance with these financial covenants shall be made without giving effect to any non-cash mark-to-market adjustments for outstanding Derivative Contracts that would otherwise be required under GAAP.

7.5    <u>Financial Covenant Testing Frequency</u>.  The Ebury Companies shall be tested, on a consolidated basis, for compliance with these financial covenants, initially as of June 30, 2017, and thereafter as of the end of each fiscal quarter after receipt of the quarterly financial statements of the Ebury Companies for the end of the testing period.  Compliance with the Interest Coverage requirement shall be tested using quarterly financial statements for the Ebury Companies on a rolling 4-quarters basis.  Compliance with all financial covenant requirements shall also be tested using the annual audited financial statements for the Ebury Companies upon receipt.

<div align="center">

**ARTICLE VIII**
**NEGATIVE COVENANTS**

</div>

Each Ebury Company covenants and agrees with the Lender that, as long as this Agreement remains in effect, without the prior written consent of the Lender, which consent shall not be unreasonably withheld, it shall comply with the following negative covenants:

8.1    <u>Tax Lien Sales and Foreclosures</u>.  No Ebury Company shall take title to any Property in any name that includes the Lender's name, any abbreviated version of the Lender's name, the Lender's full or abbreviated name listed in any capacity or any other name that could indicate that the Lender has any ownership interest in the Property upon completion of a Tax Lien sale, tax deed sale, foreclosure or other proceeding divesting the Tax Debtor of ownership rights.  It is expected that, prior to completion of any Tax Lien sale, tax deed sale, foreclosure or other such proceeding, the Tax Lien will be assigned to an Ebury Company or an assignee of an Ebury Company

(for which the Lender may require payment of a release price). The first sentence of this negative covenant shall survive repayment of the Indebtedness and termination of this Agreement and the Transaction Documents.

8.2    Custodian and Servicing Agreements. The Ebury Companies have entered into agreement(s) with Tower Fund Services, LLC, as Servicer and Custodian hereunder. The Ebury Companies will not change the Servicer or the Custodian without the prior written consent of Lender, and the Ebury Companies will not enter into, amend, modify or terminate any Custodian Agreement or Servicing Agreement without the prior written consent of Lender.

8.3    Equity Interests. The Ebury Companies shall not, except as otherwise provided in the Transaction Documents: (a) issue, sell or otherwise transfer any of their respective Equity Interests, or the rights, warrants or options to purchase or acquire any of their respective Equity Interests; redeem, retire or repurchase any of their respective Equity Interests; or (b) register any transfer of their respective Equity Interests.

8.4    Indebtedness and Liens. The Ebury Companies shall not: (a) create, incur or assume indebtedness or other monetary obligation (direct or contingent) other than: (i) trade debt incurred in the normal course of business; (ii) other general liabilities incurred in the ordinary course of business; and (iii) indebtedness to the Lender; or (b) except as allowed as a Permitted Lien, create or allow any other Person to create any lien affecting, or otherwise encumbering, any of the Collateral.

8.5    Transfers. The Ebury Companies shall not: (a) sell, transfer or otherwise alienate any of the Collateral; or (b) other than in the ordinary course of business, sell, transfer or otherwise alienate any of their respective assets. The foregoing notwithstanding, the Lender agrees that this provision does not prohibit any transfers of Property acquired by an Ebury Company and that, without prior written consent of the Lender, until an Event of Default occurs, the Ebury Companies can sell Tax Liens provided that the amount realized from such sales is no less than ninety percent (90%) of the Unpaid Acquisition Prices of the Tax Liens sold and further provided that all proceeds of any such sales are deposited into the Lockbox Account within one (1) Business Day after receipt.

8.6    Continuity of Operations. No Ebury Company shall: (a) engage in any business activities substantially different than those in which the Ebury Companies are presently engaged or other similar finance and credit services businesses; (b) operate under any trade name other than trade names, if any, identified in this Agreement; or (c) cease operations, liquidate, merge or consolidate with any other entity, change ownership or ownership structure (except as permitted by this Agreement), or dissolve.

8.7    Other Agreements. No Ebury Company shall enter into any agreement containing any provision that would be violated or breached by the performance of its obligations under this Agreement and the other Transaction Documents.

8.8    Distributions. The Ebury Companies shall not make any distributions if: (a) an Event of Default has occurred; (b) an event has occurred that, with notice, the lapse of time or otherwise, could constitute an Event of Default; or (c) the distribution made or to be made will cause the Borrower to violate, or fail to comply fully with, any of the terms and conditions of, or to default under this Agreement or any other Transaction Document (including, without limitation, the financial covenants in Article VII). In addition to the limitations set forth in the first sentence of this Section 8.8, the Borrower shall not make any distributions in excess of $5,000,000 in any calendar year. For purposes of this Section, the term "distribution" includes all cash distributions paid to the holders of Equity Interests in any Ebury Company, and the value of all non-cash distributions made to the holders of Equity Interests in any Ebury Company.

8.9    Loans, Acquisitions and Guaranties. The Ebury Companies shall not, without the prior written consent of the Lender: (a) loan, invest in or advance money or assets other than: (i) in the ordinary course of business (including the acquisition of Tax Liens, except as limited by Section 8.10); or (ii) loans or advances made by any Ebury Company to any other Ebury Company; (b) purchase, create or acquire any interest in any other enterprise or entity (except for the interests in Subsidiaries used only for bidding on Tax Liens); (c) purchase, create or acquire all or substantially all of the assets of any other enterprise or entity, other than acquisition of Tax Liens

29

in the ordinary course of business; or (d) incur any obligation as surety or guarantor other than in the ordinary course of business.

8.10     Rochester NY Tax Liens. The Ebury Companies shall not acquire any existing Tax Lien (i.e., Tax Liens previously acquired from a Taxing Authority by a Person other than an Ebury Company); provided, however, the Ebury Companies shall be allowed to acquire existing Tax Liens without the prior written consent of the Lender, subject to the following restrictions: (a) the existing Tax Liens are Rochester NY Liens, and Borrower contributes at least twenty-five percent (25%) of the purchase price to the purchase of such Rochester NY Liens from funds that are not borrowed, and Alabama Purchased Liens; and (b) the acquisitions and all re-registration requirements must occur within sixty (60) days of the execution of this Agreement. The Ebury Companies acknowledge and agree that the aging of existing Tax Liens will be based on the date the Tax Lien was originally acquired from the Taxing Authority. The Ebury Companies acknowledge and agree that in order for any Tax Liens purchased pursuant to this Article to be included in the Borrowing Base calculation, all such Tax Liens must comply with all Eligible Tax Lien requirements for inclusion in the Borrowing Base, including the name registration and lockbox requirements, if any. Notwithstanding the foregoing, once the Lender is provided with written evidence satisfactory to the Lender of the initiation of the name re-registration process and change of the address of the payments to the Ebury Companies' lockbox, and all other Eligible Tax Lien requirements for inclusion in the Borrowing Base are met, then those Tax Liens may be included in the Borrowing Base calculation even though the name re-registration is not yet complete.

8.11     Concentration Limits. The amount of the aggregate of the Unpaid Acquisition Prices of Tax Liens secured by residential property shall not at any time be less than seventy-five percent (75%) of the Unpaid Acquisition Prices of all Tax Liens.

## ARTICLE IX
## EVENTS OF DEFAULT

9.1     Events of Default. Each of following events shall be an "**Event of Default**":

(a)     any Ebury Company fails to: (i) make any principal or interest under the Indebtedness, whether by acceleration or otherwise, within three (3) Business Days of the date due; (ii) cure any Borrowing Base deficiency when due; or (iii) make a payment of any other amount required under the Transaction Documents within five (5) Business Days of the date due (unless otherwise specified in this Section 9.1), in each case in accordance with the Transaction Documents;

(b)     any Ebury Company diverts or uses any portion of any amount received on account of the Collateral while any of the Indebtedness remains outstanding, other than for repayment of the Indebtedness or deposit into the Lockbox Account;

(c)     any Ebury Company violates, or fails to comply fully with, any of the terms and conditions of this Agreement other than those specifically described in this Section 9.1, and such violation or failure continues unremedied for fifteen (15) days after the earlier of receipt by the Borrower of notice of such failure from the Lender or an Ebury Company's knowledge of such failure; provided, however, that no such notice or grace or cure period shall be applicable with respect to a negative covenant, a financial reporting covenant or a financial covenant;

(d)     any event of default occurs or exists (after expiration of any applicable grace or cure periods) under any Transaction Document;

(e)     any Ebury Company defaults (after expiration of any applicable grace or cure periods) under any other loan, extension of credit, security agreement, or obligation in favor of the Lender;

(f)     any Ebury Company, Ebury Fund 1, LP or Ebury Fund 2, LP defaults (after expiration of any applicable grace or cure periods) under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or Person if the effect of such default is to cause

119304637_13

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 120 of 688

or permit the acceleration of such debt;

(g)     any Ebury Company suspends its business operations for fifteen (15) consecutive Business Days, or the insolvency, however evidenced, of any Ebury Company occurs or exists; provided however that the Borrower shall be permitted to, upon sixty (60) days' written notice to the Lender, cease operations of any Ebury Company and liquidate its assets so long as the proceeds thereof are applied in accordance with the terms of this Agreement;

(h)     an Insolvency Event occurs with respect to any Ebury Company;

(i)     a Change of Control occurs, unless the Lender has consented in writing;

(j)     any proceedings for the dissolution or appointment of a liquidator of any Ebury Company is commenced and such proceedings are not dismissed within sixty (60) days after commencement, or if a liquidator is appointed for all or any part of the property of any Ebury Company;

(k)     any representation or warranty of any Ebury Company or any Validity Guarantor made in connection with the Indebtedness or in this Agreement or any of the other Transaction Documents proves to be incorrect or misleading in any material respect;

(l)     the Lender ceases for any reason to have:  (i) a valid and perfected first priority security interest in the Equity Interests in any Ebury Company; (ii) a valid first priority security interest in any portion of or all of the Collateral; or (iii) a valid and perfected first priority security interest in any portion of the Collateral to the extent that the UCC applies and such security interest can be perfected by either the filing of a financing statement or the taking of possession of such Collateral by the Lender or its agent; in each case, subject to Permitted Liens, and in each case, such default continues unremedied for one (1) Business Day after the earlier of receipt by the Borrower of notice thereof from Lender or the discovery of such default by the Borrower; provided, that solely with respect to clauses (ii) or (iii), if such default is caused by a change in Applicable Law, the Borrower has notified the Lender of such default, the Borrower, in good faith, is taking action to cure such default, and there are no other Liens on the Collateral other than Permitted Liens, then the Borrower shall have ten (10) Business Days to cure such default;

(m)     any Ebury Company or any Validity Guarantor seeks, claims or otherwise attempts to limit, modify or revoke the guaranty granted by the Ebury Company or the Validity Guarantor to the Lender;

(n)     any material right or remedy of the Lender or any material obligation, covenant, or agreement of any Ebury Company under the Transaction Documents, or any Lien granted by any Ebury Company under the Transaction Documents or with respect to Tax Liens, terminates, is declared null and void, ceases to be valid and effective, ceases to be the legal, valid, binding and enforceable obligation of any Ebury Company, or the validity, effectiveness, binding nature or enforceability thereof is contested, challenged, denied or repudiated in writing by any Ebury Company or any of its Affiliates;

(o)     a Material Adverse Effect occurs as to the financial condition of any Ebury Company, or in the value of the Collateral taken as a whole; provided, however, a Material Adverse Effect in the value of the Collateral may not be derived from market trades, a decline in real estate values, or adverse rulings, judgments, court orders, or legislation that do not directly affect the Collateral;

(p)     any a final judgment or judgments for the payment of money in excess of $100,000 in the aggregate that is not insured against is entered against any or all of the Ebury Companies, and the same is not satisfied, discharged (or provision has not been made for such discharge) or bonded, or a stay of execution thereof has not been procured, within thirty (30) days from the date of entry thereof;

(q)     any Ebury Company fails to deposit (or cause to be deposited) into the Lockbox Account any Collections received by it within one (1) Business Day of the date required hereunder; and

31

(r)     any Servicer or Custodian agreement is terminated without being simultaneously replaced with a Servicer or Custodian, as applicable, agreement reasonably acceptable to the Lender.

9.2     Effect of an Event of Default.

(a)     Upon the occurrence of an Event of Default, any and all commitments and obligations of the Lender under this Agreement or any of the other Transaction Documents or any other agreement immediately will terminate (including any obligation to make further Advances or disbursements), and, at the option of the Lender, the Indebtedness and all interest accrued thereon shall immediately become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, and the Lender may exercise any and all rights and remedies otherwise available to the Lender, including rights available hereunder and all of the rights and remedies of a secured party upon default under the UCC (such rights and remedies to be cumulative and nonexclusive), and, in addition, may take the following remedial actions:

(i)     the Lender may accelerate payment of the Note in full, in principal, interest, costs, expenses, attorneys' fees, and other fees and charges, as well as to accelerate the maturity of any and all other loans and obligations that any Ebury Company may then owe to the Lender, whether direct or indirect, or by way of assignment or purchase of a participation interest, and whether absolute or contingent, liquidated or unliquidated, voluntary or involuntary, determined or undetermined, due or to become due, and whether now existing or hereafter arising, and whether any Ebury Company is obligated alone or with others on a "solidary" or "joint and several" basis, as a principal obligor or as a surety, of every nature and kind whatsoever, whether any such indebtedness may be barred under any statute of limitations or otherwise may be unenforceable or voidable for any reason whatsoever;

(ii)     without notice except as provided by law, file an appropriate collection action against the Ebury Companies (or any one of them) and, at the Lender's option, to proceed or exercise any rights against any Collateral then securing repayment of the Indebtedness;

(iii)     without notice except as provided by law and at any time or from time to time, charge, set-off and otherwise apply all or any part of the Indebtedness, any interest accrued thereon and or any other amount due and owing to Lender against amounts payable to the Borrower;

(iv)     reduce the maximum dollar amount of the Line of Credit and also to reduce the percentage of Eligible Tax Liens included in the Borrowing Base; and

(v)     take any action and pursue any rights and remedies provided in the Lender POA and the other Transaction Documents or available at law, in equity, or otherwise.

(b)     In addition to the remedial actions set forth in Section 9.2(a) and consistent with the rights and remedies of a secured party under the UCC (and except as otherwise required by the UCC), the Lender, upon the occurrence of an Event of Default, may also without notice except as specified below, solicit and accept bids for and sell the Collateral or any part of the Collateral in one (1) or more parcels at public or private sale, at any exchange, broker's board or at the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable, and the Lender shall apply the proceeds from the sale of the Collateral to any amounts payable by the Borrower with respect to the Indebtedness in accordance with the priorities required by the Transaction Documents.

(c)     The Borrower agrees that, to the extent notice of sale shall be required by law, at least ten (10) Business Days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed for such sale, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Every such sale shall operate to divest all right, title, interest, claim and demand whatsoever of any Ebury Company in and to the Collateral so sold, and shall be a perpetual bar, both at law and in equity, against the Ebury Companies or any Person claiming the Collateral sold

through the Ebury Companies and their respective successors or assigns.

9.3    Exercise of Remedies.  Except as may be prohibited by Applicable Law, all of the rights and remedies of the Lender expressly provided in this Agreement are cumulative, may be exercised singularly or concurrently and not exclusive of any rights or remedies that the Lender would otherwise hold under Applicable Law or in equity.  Election by the Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of any Ebury Company shall not affect the right of the Lender to declare a default and to exercise its rights and remedies.  Neither the failure or delay on the part of the Lender to exercise any right, power or privilege under this Agreement, or any course of dealing between the Borrower, on the one hand, and the Lender, on the other hand, shall operate as a waiver of such right, power or privilege, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

9.4    Waiver of Certain Laws.  Each Ebury Company agrees, to the fullest extent that it may lawfully so agree, that neither it nor anyone claiming through or under it will set up, claim or seek to take advantage of any appraisal, valuation, stay, extension or redemption law now or hereafter in force in any locality where any Collateral may be situated in order to prevent, hinder or delay the enforcement or foreclosure of this Agreement, or the absolute sale of any of the Collateral or any part thereof, or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereof, and such Borrower, for itself and all who may at any time claim through or under it, hereby waives, to the full extent that it may be lawful so to do, the benefit of all such laws, and any and all right to have any of the properties or assets constituting the Collateral marshaled upon any such sale, and agrees that the Lender or any court having jurisdiction to foreclose the security interests granted in this Agreement may sell the Collateral as an entirety or such parcels as the Lender or such court may determine.

9.5    Power of Attorney.  The Borrower hereby irrevocably appoints the Lender its true and lawful attorney (with full power of substitution) in its name, place and stead and at its expense, in connection with the enforcement of the rights and remedies provided for in this Section 9.5, including to:  (a) give any necessary receipts or acquittance for amounts collected or received hereunder; (b) make all necessary transfers of the Collateral in connection with any sale or other disposition made pursuant hereto; (c) execute and deliver for value all necessary or appropriate Bills of Sale, assignments and other instruments in connection with any such sale or other disposition, the Borrower thereby ratifying and confirming all that such attorney (or any substitute) shall lawfully do hereunder and pursuant hereto; and (d) sign any agreements, orders or other documents in connection with or pursuant to any Transaction Document; which power of attorney shall be evidenced by the delivery to the Lender on or before closing a written power of attorney, duly executed by the Borrower and appropriately notarized (the "**Lender POA**") in the form of Exhibit 9.5 attached hereto; provided, that the Lender shall not exercise any right under the Lender POA prior to the occurrence of an Event of Default.  Nevertheless, if so requested by the Lender or a purchaser of any of the Collateral, the Borrower shall ratify and confirm any such sale or other disposition by executing and delivering to the Lender or such purchaser all proper Bills of Sale, assignments, releases and other instruments as may be designated in any such request.

## ARTICLE X
## INDEMNIFICATION AND INCREASED COSTS

10.1    Indemnities by the Borrower.  Without limiting any other rights which the Lender or its Affiliates may have hereunder or under Applicable Law, each Ebury Company shall release, defend, indemnify and hold harmless the Lender, its Affiliates and their respective officers, directors, shareholders, partners, members, owners, employees, agents, attorneys, Affiliates and advisors (each an "**Indemnified Person**" and collectively the "**Indemnified Persons**"), on a net after-tax basis, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, taxes, fees, costs, expenses (including reasonable legal fees and expenses), penalties or fines of any kind that may be imposed on, incurred by or asserted against such Indemnified Person (collectively, the "**Indemnified Amounts**") in any way relating to, arising out of or resulting from or in connection with:  (a) the Transaction Documents, the Tax Liens, any other Collateral, the Advances, any Property or related property, or any action taken or omitted to be taken by any Ebury Company, the Servicer, any

119304637_13

Indemnified Person or any of their respective employees, managers, officers, directors or agents in connection with or under any of the foregoing, or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of any Transaction Document, any Advance or any Collateral; (b) any claims, actions or damages by a Tax Debtor or lessee with respect to a Tax Lien or the related Property; (c) any violation or alleged violation of, non-compliance with or liability under any Requirements of Law; (d) ownership of, Liens on, security interests in or the exercise of rights or remedies under any of the items referred to in the preceding clause (a); (e) any accident, injury to or death of any person or loss of or damage to property occurring in, on or about any Property or on the adjoining sidewalks, curbs, parking areas, streets or ways; (f) any use, nonuse or condition in, on or about, or possession, alteration, repair, operation, maintenance or management of, any Property or on the adjoining sidewalks, curbs, parking areas, streets or ways; (g) any failure by any Ebury Company or the Servicer or any of their respective employees, managers, officers, directors or agents to perform or comply with any Transaction Document, Tax Lien, Requirements of Law or Applicable Statute; (h) performance of any labor or services or the furnishing of any materials or other property in respect of any Property; (i) any claim by brokers, finders or similar Persons claiming to be entitled to a commission in connection with any lease or other transaction involving any Transaction Document or Property; (j) any Taxes attributable to the execution, delivery, filing or recording of any Transaction Document or any memorandum of any of the foregoing; (k) any Lien or claim arising on or against any item of Collateral or any Property or any liability asserted against the Lender or any Indemnified Person with respect thereto; (l) (i) a past, present or future violation or alleged violation of any Environmental Laws in connection with any property or Property by any Person or other source, whether related or unrelated to the Ebury Companies, the Servicer or any Tax Debtor; (ii) any presence of any Hazardous Substances in, on, within, above, under, near, affecting or emanating from any Property; (iii) the failure to timely perform any Remedial Action or other remedial work of any kind or nature in accordance with applicable Environmental Laws; (iv) any past, present or future activity by any Person or other source, whether related or unrelated to the Ebury Companies, the Servicer or any Tax Debtor in connection with any actual or threatened Release any Hazardous Substances in connection with any Property; (v) any past, present or future Release of Hazardous Substances (whether intentional or unintentional, direct or indirect, foreseeable or unforeseeable) to, from, on, within, in, under, near or affecting any Property by any Person or other source, whether related or unrelated to the Ebury Companies, the Servicer or any Tax Debtor; (vi) the imposition, recording or filing or the threatened imposition, recording or filing of any Lien on any Property with regard to, or as a result of, any Hazardous Substances pursuant to any Environmental Law; or (vii) any misrepresentation or failure to perform any obligations pursuant to any Transaction Document or Basic Tax Lien Document to environmental matters in any way; and (m) any Ebury Company's or the Servicer's conduct, activities, actions or inactions in connection with, relating to or arising out of any of the foregoing clauses of this Section 10.1, that, in each case, results from anything whatsoever other than any Indemnified Person's gross negligence or intentional misconduct, as determined by a court of competent jurisdiction pursuant to a final, non-appealable judgment. In any suit, proceeding or action brought by any Person in connection with any Tax Lien or other item of Collateral, each Ebury Company shall defend, indemnify and hold each Indemnified Person harmless from and against all expense, loss or damage suffered by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever in respect thereof or in connection therewith. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.1 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Ebury Company, an Indemnified Person or any other Person or any Indemnified Person is otherwise a party thereto and whether or not any transaction is consummated.

    10.2   <u>Increased Costs; Capital Adequacy; Illegality.</u>

        (a)    If either: (i) the introduction of or any change (including any change by way of imposition or increase of reserve requirements) in or in the interpretation of any Requirements of Law; or (ii) the compliance by the Lender or its Affiliates with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), shall: (x) subject the Lender or its Affiliates to any Tax with respect to any Advance hereunder, or any right or obligation to make Advances hereunder, or on any payment made hereunder; (y) impose, modify or deem applicable any reserve requirement, special deposit or similar requirement against assets of, deposits with or for the amount of, or credit extended by, the Lender, or (z) impose any other condition affecting any Advance or the Lender's rights hereunder or under any other Transaction Document, the result of which is to increase the cost to the Lender or to reduce the amount of any sum received or receivable by

119304637_13

the Lender under this Agreement, under any other Transaction Document, then on the next Payment Date in the calendar month following the calendar month during which the Lender demands payment (which demand shall be accompanied by a statement setting forth the basis for such demand and a reasonably estimated calculation of such demand), the Borrower shall pay directly to the Lender such additional amount or amounts as will compensate the Lender or its Affiliates for such additional or increased cost incurred or such reduction suffered.

(b)     If either:   (i) the introduction of or any change in or in the interpretation of any Requirements of Law, guideline, rule, regulation, directive or request; or (ii) compliance by the Lender or its Affiliates with any law, guideline, rule, regulation, directive or request from any central bank or other Governmental Authority (whether or not having the force of law), including compliance by the Lender or its Affiliates with any request or directive regarding capital adequacy (including the transition to and implementation of the Basel III capital adequacy guidelines), but, in each case, excluding Taxes, has or would have the effect of reducing the rate of return on the capital of the Lender as a consequence of its obligations hereunder or arising in connection herewith to a level below that which the Lender could have achieved but for such introduction, change or compliance (taking into consideration the policies of the Lender or its Affiliates with respect to capital adequacy) by an amount deemed by the Lender to be material, then from time to time, on the Payment Date in the calendar month following the calendar month during which the Lender demands payment (which demand shall be accompanied by a statement setting forth the basis for such demand and a reasonably estimated calculation of such demand), the Borrower shall pay directly to the Lender such additional amount or amounts as will compensate the Lender or its Affiliates for such reduction.  For the avoidance of doubt, if the issuance of any amendment or supplement to Statement of Financial Accounting Standards Nos. 166 or 167 by the Financial Accounting Standards Board or any other change in accounting standards or the issuance of any other pronouncement, release or interpretation, causes or requires the consolidation of all or a portion of the assets and liabilities of the Ebury Companies with the assets and liabilities of the Lender or its Affiliates or shall otherwise impose any loss, cost, expense, reduction of return on capital or other loss, such event shall constitute a circumstance on which the Lender may base a claim for reimbursement under this Section 10.2.

**ARTICLE XI**
**MISCELLANEOUS PROVISIONS**

The following miscellaneous provisions are a part of this Agreement:

11.1     Amendments.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

11.2     Governing Law; Consent to Jurisdiction.  This Agreement and any claim with respect hereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).  Each of the Parties: (a) agrees to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the Borough of Manhattan; and (b) waives any objection based on *forum non conveniens*, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

11.3     Waivers.

(a)     To the extent permitted under Applicable Law, each Ebury Company hereby knowingly, voluntarily and intentionally waives any right to assert a counterclaim, other than a compulsory counter claim in any action or proceeding brought against it by the Lender or any Indemnified Person.

(b)     **THE LENDER AND EACH EBURY COMPANY HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE BETWEEN THEM, WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE, CONNECTED WITH, ARISING OUT OF OR IN ANY WAY RELATED OR PERTAINING TO THIS AGREEMENT, ANY OTHER TRANSACTION**

119304637_13

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 125 of 688

DOCUMENT, THE COLLATERAL OR ANY DEALINGS, COURSE OF CONDUCT BETWEEN THEM OR ACTIONS OR STATEMENTS OF EITHER PARTY. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT. THE LENDER AND EACH EBURY COMPANY HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY THEM TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

(c)      To the extent permitted under Applicable Law, each Ebury Company hereby knowingly, voluntarily and intentionally waives any right to claim or recover in any litigation whatsoever involving either of the Parties or an Indemnified Person, any special, exemplary, punitive, indirect, incidental or consequential damages of any kind or nature whatsoever or any damages other than, or in addition to, actual damages, whether such waived damages are based on contract, statute, tort or common law or any other legal theory.

(d)      Each Ebury Company certifies that no representative, agent or attorney of the Lender or an Indemnified Person has represented, expressly or otherwise, that the Lender or an Indemnified Person would not seek to enforce any of the waivers in this Section 11.3 in the event of litigation or other circumstances.

(e)      The Lender and each Ebury Company further represents that it has been represented in the signing of this Agreement and the making of these waivers by independent legal counsel, selected of its own free will, and had the opportunity to discuss these waivers with counsel.

(f)      The provisions of this Section 11.3 shall survive termination of this Agreement and the payment in full of the Indebtedness.

11.4      Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

11.5      Consent to Loan Participation. The Ebury Companies agree and consent to the sale or transfer by the Lender, whether now or later, of one or more participation interests in the Indebtedness to one or more purchasers, whether related or unrelated to the Lender; provided, however, that to the extent no Event of Default exists, such sale or transfer shall not be consummated without the consent of the Borrower not to be unreasonably withheld, conditioned or delayed. The Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge the Lender may have about any Ebury Company or any Validity Guarantor or about any other matter relating to the Indebtedness, and the Ebury Companies hereby waive any rights to privacy that they may have with respect to such matters. The Ebury Companies additionally waive any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. The Ebury Companies also agree that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Indebtedness and will have all the rights granted under this Agreement and under the participation agreement or agreements governing the sale of such participation interests. A merger affecting the Lender shall not be considered a sale, assignment, conveyance or other disposition that is subject to any consent requirement of this provision.

11.6      Controlling Terms. The Transaction Documents shall contain such terms and provisions as the parties thereto shall agree (including provisions for repayment, interest and security) and the terms and conditions of each of the other Transaction Documents shall be cumulative and in addition to the terms and provisions of this Agreement, which shall apply to all Transaction Documents. This Agreement and all of the Transaction Documents shall be construed in such a manner as to give full force and effect to all provisions of this Agreement and the other Transaction Documents; however, in the event of any irreconcilable conflict between the terms and provisions contained in this Agreement and in any of the other Transaction Documents, the terms and provisions of this Agreement shall control.

11.7      Costs and Expenses. Each Ebury Company agrees to pay, upon demand, all of the reasonable out-of-pocket expenses of the Lender in connection with: (a) the preparation and execution of this Agreement and the

Transaction Documents, including reasonable attorneys' fees; (b) amendments, consents, waivers, and terminations made or requested in connection with this Agreement and the other Transaction Documents; and (c) the enforcement, protection, defense and collection of this Agreement and the other Transaction Documents. If an Event of Default occurs, the Lender may pay someone else to help collect the Indebtedness and to enforce this Agreement, and the Ebury Companies will, subject to any limits under Applicable Law, pay the Lender all of the Lender's reasonable attorneys' fees, court costs and legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees related to bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.

11.8    Calculation of Time Periods. Whenever this Agreement provides for or contemplates a period of time for the performance of any term, provision or condition of this Agreement, all of the days in such period shall be counted consecutively including Saturdays, Sundays and other non-Business Days except in instances where this Agreement expressly provides that only Business Days shall be counted; provided, however, if the last day of any such time period falls on a Saturday, Sunday or other non-Business Day, the last day shall be extended to the next succeeding Business Day immediately thereafter occurring.

11.9    Entire Agreement. This Agreement, the Note and the other Transaction Documents, embody the final, entire agreement of the Parties and supersede any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the Parties. There are no oral agreements between the Parties.

11.10    Maximum Interest Rate. No provision of this Agreement, the Note, or any other Transaction Document shall require the payment or permit the collection of interest in excess of the maximum permitted by applicable law (the "**Maximum Rate**"). If interest in excess of the Maximum Rate is provided for-in this Agreement, in any other Transaction Document, or otherwise in connection with the Indebtedness, or is adjudicated to be so provided, the provisions of this Section shall govern and prevail and neither any Ebury Company nor any Grantor, shall be obligated to pay the excess amount of such interest or any other excess sum paid for the use, forbearance, or detention of Advances made under this Agreement. In the event the Lender ever receives, collects or applies, as interest due and payable under the Note, any sum in excess of the Maximum Rate, the amount of the excess shall be applied as a payment and reduction of the principal of the indebtedness represented by that Note or any other Note; and if the principal of the indebtedness represented by the Note has been fully paid, any remaining excess shall forthwith be paid to the Borrower. In determining whether or not interest paid or payable under the Note exceeds the Maximum Rate, the Ebury Companies and the Lender shall, to the extent permitted by Applicable Law: (a) characterize any non-principal payment as an expense, fee or premium rather than as interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread, in equal or unequal parts, the total amount of interest throughout the entire contemplated term of the indebtedness represented by the Note so that interest for the entire term of the Note does not exceed the Maximum Rate.

11.11    Notices. Any notice or demand which, by provision of this Agreement, is required or permitted to be given or served by a Party on another Party must be in writing and shall be deemed to have been sufficiently given and served for all purposes: (a) if mailed, three (3) Business Days after being deposited, postage prepaid, in the United States mail, registered or certified mail; (b) if delivered by nationally recognized overnight delivery service, one (1) Business Day after being delivered to such service; or (c) if delivered in person, the day of delivery; in each case addressed (until another address or addresses are given in writing in accordance with this Agreement as follows:

If to Borrower or any Ebury Company:        EBURY 1EMI LLC
                                            56 Locust Avenue, 2nd Floor
                                            Rye, NY 10580
                                            Attention: John Hanratty

If to Lender:                               EMIGRANT BUSINESS CREDIT CORPORATION
                                            6 East 43rd Street, 20th Floor

119304637_13

New York, New York 10017
Attention: Karen Wold

With a copy to:

Dilworth Paxson LLP
457 Haddonfield Road, Suite 700
Cherry Hill, NJ 08002
Attn: Scott J. Freedman, Esq.

11.12    Severability.  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any Person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other Persons or circumstances.  If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

11.13    Sole Discretion of the Lender.  Unless otherwise provided in this Agreement, whenever the consent or approval of the Lender is required under this Agreement, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of the Lender and the decision of the Lender shall be final and conclusive; provided, however, that the Lender will act reasonably and in good faith in exercising its discretion.

11.14    Successors and Assigns.  All covenants and agreements contained herein by or on behalf of the Ebury Companies shall bind their respective successors and assigns and shall inure to the benefit of the Lender, its successors and assigns.  No Ebury Company shall have the right to assign its rights under this Agreement or any interest therein without the prior written consent of the Lender.

11.15    Survival.  All warranties, representations, and covenants made by the Ebury Companies in this Agreement or in any certificate or other instrument delivered by any Ebury Company or any Validity Guarantor to the Lender under this Agreement shall be considered to have been relied upon by the Lender and will survive the making of Advances and delivery to the Lender of the Transaction Documents, regardless of any investigation made by, or on behalf of, the Lender.

11.16    Waiver by the Lender.  The Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by the Lender.  No delay or omission on the part of the Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by the Lender of a provision of this Agreement shall not prejudice or constitute a waiver of the right of the Lender otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by the Lender, or any course of dealing between the Lender and any Ebury Company or any Validity Guarantor, or between the Lender and any Grantor, shall constitute a waiver of any of the rights of the Lender or of any obligations of any Ebury Company, any Validity Guarantor or any Grantor as to any future transactions.  Whenever the consent of the Lender is required under this Agreement, the granting of such consent by the Lender in any instance shall not constitute continuing consent in subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of the Lender.

11.17    Counterparts.  This Agreement may be signed in any number of counterpart copies and by the Parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement electronically or by facsimile transmission shall be effective as delivery of a manually executed counterpart.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

119304637_13

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives, under seal, the day and year first above written.

WITNESS/ATTEST:

By: _Stephen J. Rogers_

Print Name: _Stephen J. Rogers_

Title: _Notary Public_

EBURY IEMI LLC

By: EBURY STREET CAPITAL, LLC, Manager

    By: _____

    John Hanratty, Manager

EMIGRANT BUSINESS CREDIT CORPORATION

By: _____(SEAL)

Karen Wold, Managing Director

[Signature Page to Credit Agreement]

119304637_13

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives, under seal, the day and year first above written.

WITNESS/ATTEST:                          EBURY 1EMI LLC

By:_____              By:  EBURY STREET CAPITAL, LLC, Manager
Print Name:_____                   By:_____
Title:_____                    John Hanratty, Manager


                                         EMIGRANT BUSINESS CREDIT CORPORATION

                                         By: _____(SEAL)
                                         Karen Wold, Managing Director


[Signature Page to Credit Agreement]

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO: 6

INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 130 of 688

## SCHEDULE 1.1(f)
## APPLICABLE TAX LIEN STATUTES

| Eligible Jurisdiction | Tax Lien Statutes |
|---|---|
| Alabama | Ala. Code §§ 40-10-180 - 198 |
| Florida | Flo. Statutes §§ 197.102 – 602 |
| Indiana | Ind. Code §§ 6-1.1-1 - 1-45.5-9 |
| Maryland | Md. Code Ann. §§ 14-808 - 854 |
| New Jersey | N.J. Rev. Stat. §§ 54:5-1- 137 |
| New York* | N.Y. Real Prop. Tax Law §§ 100 – 2016 |
| South Carolina | S.C. Code Ann. §§ 12-49-10 -- 12-49-1290 |

*Under New York law, sales of tax liens are allowed only to entities other than the New York Municipal Bond Bank Agency (the "Bond Bank") for those counties, cities or towns that are not subject to the provisions of N.Y. Real Prop. Tax Law § 1104, which allows the sale of tax liens to entities other than the Bond Bank by counties, cities or towns having preexisting tax lien collection laws as of January 1, 1993, or that adopted such a collection law by July 1, 1994 allowing such counties, cities or towns to sell tax liens as a means of collection.

## SCHEDULE 1.1(x)
## ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS

### ALABAMA

Additional Eligible Property Exclusions. The following properties with respect to the Eligible Jurisdiction of Alabama are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

Additional Eligible Tax Lien Exclusions. The following Tax Liens with respect to the Eligible Jurisdiction of Alabama are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

(a)    Any Tax Lien with respect to which more than thirty-six (36) months have elapsed since such Tax Lien was sold by the Taxing Authority; and

(b)    Any redeemed Tax Lien; *provided, however,* that the portion of the Acquisition Price of a redeemed Tax Lien held by a tax collector in a tax sale surplus fund, if any, shall not be deemed an ineligible Tax Lien hereunder.

State Registration Requirements. To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in Alabama must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

(a)    The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

(b)    The registered address of the holder of the Tax Lien shall be the lock box address provided for in this Credit Agreement, the address of the Custodian, or another address acceptable to the Lender;

(c)    The registered account for remittance of electronic payments from Taxing Authorities shall be the Lockbox Account; and

(d)    The Tax Lien must be held by the Custodian pursuant to the terms of a Custodial Agreement and serviced in accordance with the terms of a Servicing Agreement.

119304637_13

<div align="center">

**SCHEDULE 1.1(x)**
**ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS**
**(CONTINUED)**

</div>

**FLORIDA**

_Additional Eligible Property Exclusions._  The following properties with respect to the Eligible Jurisdiction of Florida are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents:  N/A

_Additional Eligible Tax Lien Exclusions._  The following Tax Liens with respect to the Eligible Jurisdiction of Florida are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

       (a)        Any Tax Lien with a stated annual interest rate of less than one quarter of one percent (0.25%);

       (b)        Any Tax Lien with respect to which more than thirty-six (36) months have elapsed since such Tax Lien was sold by the Taxing Authority; and

       (c)        Any Tax Lien secured by a property where a [Tax Deed Application] has been filed.

_State Registration Requirements._  To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in Florida must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

       (a)        The registered name of the holder of the Tax Lien shall be "Emigrant Business Credit Corporation, as Collateral Assignee for [an Ebury Company (other than Borrower)]", "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" or another name acceptable to the Lender;

       (b)        The registered address of the holder of the Tax Lien shall be the lock box address provided for in this Credit Agreement, the address of the Custodian, or another address acceptable to the Lender; and

       (c)        The registered account for remittance of electronic payments from Taxing Authorities shall be shall be the Lockbox Account controlled by the Lender.

119304637_13

## SCHEDULE 1.1(x)
## ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS
### (CONTINUED)

__INDIANA__

      __Additional Eligible Property Exclusions.__ The following properties with respect to the Eligible Jurisdiction of Indiana are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

      __Additional Eligible Tax Lien Exclusions.__ The following Tax Liens with respect to the Eligible Jurisdiction of Indiana are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

      (a)      Any Tax Lien with respect to which more than eighteen (18) months have elapsed since such Tax Lien was sold by the Taxing Authority; and

      (b)      Any redeemed Tax Lien; *provided, however,* that the portion of the Acquisition Price of a redeemed Tax Lien held by a tax collector in a tax sale surplus fund, if any, shall not be deemed an ineligible Tax Lien hereunder.

      __State Registration Requirements.__ To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in Indiana must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

      (a)      The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

      (b)      The registered address of the holder of the Tax Lien shall be the Custodian's address (or another address acceptable to the Lender);

      (c)      The registered account for remittance of electronic payments from Taxing Authorities shall be the Lockbox Account; and

      (d)      The Tax Lien must be held by the Custodian pursuant to the terms of a Custodial Agreement and serviced in accordance with the terms of a Servicing Agreement.

119304637_13

## SCHEDULE 1.1(x)
## ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS
### (CONTINUED)

### MARYLAND

Additional Eligible Property Exclusions. The following properties with respect to the Eligible Jurisdiction of Maryland are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

Additional Eligible Tax Lien Exclusions. The following Tax Liens with respect to the Eligible Jurisdiction of Maryland are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

(a)      Any Tax Lien with respect to which more than thirty-six (36) months have elapsed since such Tax Lien was sold by the Taxing Authority; and

(b)      Any redeemed Tax Lien; *provided, however*, that the portion of the Acquisition Price of a redeemed Tax Lien held by a tax collector in a tax sale surplus fund, if any, shall not be deemed an ineligible Tax Lien hereunder.

State Registration Requirements. To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in Maryland must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

(a)      The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

(b)      The registered address of the holder of the Tax Lien shall be the Custodian's address (or another address acceptable to the Lender);

(c)      The registered account for remittance of electronic payments from Taxing Authorities shall be the Lockbox Account; and

(d)      The Tax Lien must be held by the Custodian pursuant to the terms of a Custodial Agreement and serviced in accordance with the terms of a Servicing Agreement.

119304637_13

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 6
24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
RECEIVED NYSCEF: 10/17/2022
Court Records    Pg 135 of 688

## SCHEDULE 1.1(x)
## ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS
### (CONTINUED)

**NEW JERSEY**

Additional Eligible Property Exclusions. The following properties with respect to the Eligible Jurisdiction of New Jersey are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

Additional Eligible Tax Lien Exclusions. The following Tax Liens with respect to the Eligible Jurisdiction of New Jersey are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

(a)    Any Tax Lien not recorded in the real property records of the county where the Property securing the Tax Lien is located within three (3) months of the date such Tax Lien was sold;

(b)    Any Tax Lien for which a redemption notice has been received, the [Tax Certificate] has been submitted for payment and payment was not received within ninety (90) days of receipt of the original redemption notice;

(c)    Any Tax Lien secured by Property for which an Ebury Company has received notice of the commencement of an action to foreclose a Subsequent Tax Lien secured by the Property sold to a Person other than an Ebury Company unless and until such Ebury Company purchases the Subsequent Tax Lien being foreclosed and provides the Lender with evidence of such purchase or such Subsequent Tax Lien is otherwise satisfied prior to completion of the foreclosure;

(d)    The aggregate amount of all Tax Liens included in the Collateral secured by a Property where, with respect to at least one Tax Lien secured by the Property, more than thirty-six (36) months has elapsed since such Tax Lien was sold unless a foreclosure process has been initiated against such Property before the 36-motnh period elapses;

(e)    Any Tax Lien not redeemed within four (4) years after it was initially sold; provided, however, that only any premium paid for such Tax Lien shall be deemed an ineligible Tax Lien; and

(f)    The aggregate amount of all Tax Liens included in the Collateral secured by a Property to which more than twenty-four (24) months after a foreclosure process has been initiated no later than thirty-six (36) after such Tax Lien was sold.

State Registration Requirements. To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in New Jersey must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

(a)    The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

(b)    The registered address of the holder of the Tax Lien shall be the lock box address provided for in this Credit Agreement, the address of the Custodian, or another address acceptable to the Lender;

(c)    The registered account for remittance of electronic Tax Lien payments from Taxing Authorities shall be an account approved by the Lender and controlled by only the Custodian or the Lender; and

(d)    The Tax Lien must be held by the Custodian pursuant to the terms of a Custodial Agreement and serviced in accordance with the terms of a Servicing Agreement.

119304637_13

### SCHEDULE 1.1(x)
### ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS
### (CONTINUED)

<u>NEW YORK</u>

<u>Additional Eligible Property Exclusions</u>.  The following properties with respect to the Eligible Jurisdiction of New York are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

<u>Additional Eligible Tax Lien Exclusions</u>. The following Tax Liens with respect to the Eligible Jurisdiction of New York are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

(a)     Any Tax Lien with respect to which more than ninety-six (96) months have elapsed since such Tax Lien was sold by the Taxing Authority; *provided, however,* that, from and after the date that is six months after the Closing Date, seventy percent (70%) of Tax Liens with respect to which more than sixty (60) months but less than ninety-six (96) months ("5 to 8 Year Tax Liens") have elapsed since such Tax Lien was sold by the Taxing Authority and that are not subject to a payment plan for repayment shall not be Eligible Tax Liens; *provided further, however,* that, from and after the date that is one year after the Closing Date, one-hundred (100%) percent of 5 to 8 Year Tax Liens not subject to a payment plan for repayment shall not be Eligible Tax Liens; and

(b)     Any redeemed Tax Lien; *provided, however,* that the portion of the Acquisition Price of a redeemed Tax Lien held by a tax collector in a tax sale surplus fund, if any, shall not be deemed an ineligible Tax Lien hereunder.

<u>State Registration Requirements</u>.  To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in New York must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

(a)     The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

(b)     The registered address of the holder of the Tax Lien shall be the Custodian's address (or another address acceptable to the Lender);

(c)     The registered account for remittance of electronic payments from Taxing Authorities shall be the Lockbox Account; and

(d)     The Tax Lien must be held by the Custodian pursuant to the terms of a Custodial Agreement and serviced in accordance with the terms of a Servicing Agreement.

119304637_13

SCHEDULE 1.1(x)
**ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS**
(CONTINUED)

**SOUTH CAROLINA**

Additional Eligible Property Exclusions. The following properties with respect to the Eligible Jurisdiction of South Carolina are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

Additional Eligible Tax Lien Exclusions. The following Tax Liens with respect to the Eligible Jurisdiction of South Carolina are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

(a)      Any Tax Lien with respect to which more than eighteen (18) months have elapsed since such Tax Lien was sold by the Taxing Authority; and

(b)      Any Tax Lien where a tax deed has been issued on the underlying Property.

State Registration Requirements.   To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in South Carolina must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

(a)      The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

(b)      The registered address of the holder of the Tax Lien shall be the Custodian's address (or another address acceptable to the Lender);

(c)      The registered account for remittance of electronic Tax Lien payments from Taxing Authorities shall be an account approved by the Lender and controlled by only the Custodian or the Lender; and

(d)      For Tax Liens secured by Property in South Carolina, a Custodial Agreement and a Servicing Agreement with an approved Servicer is required.

119304637_13

SCHEDULE 1.1(ppp)
SPECIAL PURPOSE ENTITY COVENANTS

Until the Termination Date occurs, the Borrower and each other Ebury Company agrees to:  (a) not own any assets or engage in any business other than the assets and business specifically contemplated by, or incur any indebtedness or other material obligation, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than as permitted under this Agreement or any other Transaction Document; (b) not make any loans or advances to any Affiliate or third party or acquire obligations or securities of its Affiliates, except that the Borrower may own the other Ebury Companies; (c) pay its debts and liabilities only from its own assets; (d) comply with the provisions of its Governing Documents; (e) do all things necessary or desirable to observe all organizational formalities and preserve its existence, and not amend, modify, waive provisions of or otherwise change in any material respect its Governing Documents; (f) maintain all of its books, records, financial statements and bank accounts separate from those of the other Ebury Companies and its Affiliates (except that such financial statements may be consolidated to the extent consolidation is required under GAAP; provided, that (i) appropriate notation shall be made on such financial statements to indicate the separateness of such Person from such Affiliate and to indicate that such Person's assets and credit are not available to satisfy the debts and other obligations of such Affiliate or any other Person and (ii) such assets shall also be listed on such Person's own separate balance sheet and except that the Borrower and the other Ebury Companies may share bank accounts as provided in the Transaction Documents) and file its own tax returns (except to the extent consolidation is required or permitted under Applicable Law or it is a disregarded entity for tax purposes); (g) be, and at all times hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate), correct any known misunderstanding regarding its status as a separate entity, conduct business in its own name, and not identify itself or any of its Affiliates as a division of the other (except to the extent it is treated as a division of any Affiliate for tax purposes); (h) maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations and shall remain solvent (provided that this provision shall not require any Person to make contributions of equity capital to such Person), (i) not engage in any Change of Control, dissolution, winding up, liquidation, consolidation or merger in whole or in part or convey or transfer all or substantially all of its properties and assets to any Person (except as permitted under this Agreement and any other Transaction Document); (j) not commingle its funds or other assets with those of any Affiliate or any other Person, except that the Borrower and the other Ebury Companies may share bank accounts as provided in the Transaction Documents; (k) maintain its properties, funds, accounts and assets separate and segregated from those of any other Person, except that the Borrower and the other Ebury Companies may share bank accounts as provided in the Transaction Documents; (l) not hold itself out to be responsible for the debts or obligations of any other Person (other than pursuant to the Transaction Documents); (m) not, without the prior unanimous written consent of all of its independent directors or independent managers, take any Insolvency Action; (n) have at least one independent director or independent manager and provide the Lender with at least two (2) Business Days prior notice of the removal by its member of any independent directors or independent managers, together with the name and contact information of the replacement independent directors or independent managers and evidence of the replacement's satisfaction of the definition of independent directors or independent managers; (o) except as set forth in the Transaction Documents, not enter into any transaction with an Affiliate of such Person except on commercially reasonable terms similar to those available to unaffiliated parties in an arm's length transaction; (p) use separate stationery, invoices and checks bearing its own name; (q) allocate fairly and reasonably any overhead for shared office space and for services performed by any employee of an Affiliate; (r) not pledge its assets to any Person, other than as contemplated by the Transaction Documents; (s) not form, acquire or hold any Subsidiary or own any Equity Interest in any other entity, other than as contemplated by the Transaction Documents (including, without limitation, the Borrower forming and owning the other Ebury Companies; and (t) ensure that its Governing Documents provide that: (i) upon the resignation or dissolution of the last remaining member of such Person, the independent director or independent manager or special member be automatically admitted as a member of such Person; and (ii) any such Person admitted pursuant to such provision of the limited liability company agreement of such Person described in clause (i) above shall not:  (x) own any economic interest in such Person; (y) have any obligation to make any capital contribution to such Person; or (z) receive any Equity Interest in such Person.

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO: 6

INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 139 of 688

## SCHEDULE 5
## TAX IDENTIFICATION NUMBERS AND ORGANIZATIONAL IDENTIFICATION NUMBERS

Tax Identification Numbers

| | |
|---|---|
| EBURY 1EMI LLC | ███████ |
| EB 1EMIALA LLC | |
| EB 1EMIFL, LLC | |
| EB 1EMIIN, LLC | |
| EB 1EMIMD, LLC | |
| EB 1EMINJ LLC | |
| EB 1EMINY, LLC | |
| EB 1EMISC LLC | |
| RE 1EMI LLC | |

Organizational Identification Numbers

| | |
|---|---|
| EBURY 1EMI LLC | ██████ |
| EB 1EMIALA LLC | |
| EB 1EMIFL, LLC | █████████ |
| EB 1EMIIN, LLC | ██████████ |
| EB 1EMIMD, LLC | |
| EB 1EMINJ LLC | ███████ |
| EB 1EMINY, LLC | ████████ |
| EB 1EMISC LLC | |
| RE 1EMI LLC | ██████ |

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 140 of 688

**EXHIBIT 9.5**
**FORM POWER OF ATTORNEY**

THIS POWER OF ATTORNEY is executed and delivered by EBURY 1EMI LLC, a New York limited liability company (the "Grantor" or the "Borrower") in favor of EMIGRANT BUSINESS CREDIT CORPORATION, a Delaware corporation (the "Lender" or the "Attorney"), pursuant to the Credit Agreement dated as of the date hereof (as may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and between the Borrower and the Lender and the other Transaction Documents. Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

No person to whom this Power of Attorney is presented, as authority for the Attorney to take any action or actions contemplated hereby, shall inquire into or seek confirmation from the Grantor as to the authority of the Attorney to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to the Attorney unconditionally the authority to take and perform the actions contemplated herein, and the Grantor irrevocably waives any right to commence any suit or action, in law or equity, against any person or entity that acts in reliance upon or acknowledges the authority granted under this Power of Attorney. The power of attorney granted hereby is coupled with an interest and may not be revoked or canceled by the Grantor until all of the Indebtedness has been indefeasibly paid in full and the Attorney has provided its written consent thereto.

The Grantor hereby irrevocably constitutes and appoints the Attorney (and all officers, employees and agents designated by the Attorney), with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in its place and stead and in its name or in the Attorney's own name, from time to time in the Attorney's discretion, to take any and all appropriate action and to execute and deliver any and all documents and instruments that may be necessary or desirable to accomplish the purposes of the Credit Agreement and the other Transaction Documents and, without limiting the generality of the foregoing, hereby grants to the Attorney the power and right, on its behalf, without notice to or assent by it, upon the occurrence and during the continuance of any Event of Default, to do the following: (a) exercise all rights and privileges of the Grantor under the Transaction Documents; (b) pay or discharge any taxes, Liens or other encumbrances levied or placed on or threatened against the Grantor or the Grantor's property; (c) defend any suit, action or proceeding brought against the Grantor if the Grantor does not defend such suit, action or proceeding or if the Attorney believes that the Grantor is not pursuing such defense in a manner that will maximize the recovery to the Attorney, and settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, give such discharges or releases as the Attorney may deem appropriate; (d) file or prosecute any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitrator, or take any other action otherwise deemed appropriate by the Attorney for the purpose of collecting any and all such moneys due to the Grantor whenever payable and to enforce any other right in respect of the Grantor's property; and (e) sell, transfer, pledge, make any agreement with respect to or otherwise deal with, any of the Grantor's property, and execute, in connection with such sale or action, any endorsements, assignments or other instruments of conveyance or transfer in connection therewith; all as though the Attorney were the absolute owner of the Grantor's property for all purposes, and to do, at the Attorney's option and the Grantor's expense, at any time or from time to time, all acts and other things that the Attorney reasonably deems necessary to perfect, preserve, or realize upon its property or assets and the Security Interests of the Lender, all as fully and effectively as it might do; provided, that the Attorney shall not exercise any of the foregoing powers and rights hereunder prior to the occurrence of an Event of Default. The Grantor hereby ratifies, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof.

This Power of Attorney is given as security for the Indebtedness and, upon the occurrence and during the continuance of an Event of Default, the authority hereby conferred is, and shall be irrevocable, and shall remain in full force and effect until renounced by the Lender.

IN WITNESS WHEREOF, this Power of Attorney is executed by the Grantor as of this ____ day of March, 2017.

WITNESS/ATTEST:

By:_____
Print Name:_____
Title:_____

EBURY 1EMI LLC
By:  EBURY STREET CAPITAL, LLC, Manager

By:_____
John Hanratty, Manager

Exhibit 9.5 Page 1

119304637_13

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO. 6

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State.
Court Records   Pg 141 of 688

INDEX NO. 158207/2022

RECEIVED NYSCEF: 10/17/2022

STATE OF _____ )

                                                  )      ss:

COUNTY OF _____ )

On this, the ___ day of March, 2017, before me, a Notary Public, the undersigned officer, personally appeared John Hanratty, who acknowledged himself to be the Manager of Ebury Street Capital, LLC, a New York limited liability company and the manager of EBURY 1EM1 LLC, a New York limited liability company, and that he, in such capacity, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing on behalf of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                          _____
                                          Notary Public

My commission expires:

Exhibit 9.5 Page 2

119304637_13

## SIXTH AMENDMENT TO LOAN DOCUMENTS
### EBURY 1
### October 29, 2018

**THIS SIXTH AMENDMENT TO LOAN DOCUMENTS** (this "**Amendment**") is made as of October 29, 2018, between and among **EBURY 1EMI LLC**, a New York limited liability company (the "**Borrower**"), **EB 1EMIALA LLC**, an Alabama limited liability company, **EB 1EMIFL, LLC**, a Florida limited liability company, **EB 1EMIIN, LLC**, an Indiana limited liability company, **EB 1EMIMD, LLC**, a Maryland limited liability company, **EB 1EMINJ LLC**, a New Jersey limited liability company, **EB 1EMINY, LLC**, a New York limited liability company, **EB 1EMISC LLC**, a South Carolina limited liability company, **RE 1EMI LLC**, a New York limited liability company, **EB 1EMIDC LLC**, a District of Columbia limited liability company, **ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC**, a Maryland limited liability company, **EBURY FUND 1FL LLC**, a Florida limited liability company, and **EBURY FUND 1NJ LLC**, a New Jersey limited liability company (collectively, the "**Guarantors**"), and **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

### WITNESSETH:

A.    The Borrower and the Guarantors have executed and delivered to the Lender the following (collectively, as amended from time to time, the "**Loan Documents**"), which evidence or secure some or all of the Borrower's and Guarantors' obligations to the Lender (the "**Obligations**"), all of which are dated March 9, 2017 except as set forth below to the contrary:

I.      Credit Agreement between Borrower and Lender (as amended, the "**Credit Agreement**")

II.     Joinder and Amendment to Loan Documents dated July 20, 2017 (1st Amendment)

III.    Amendment to Loan Documents dated May 1, 2018 (the "**2nd Amendment**")

IV.     Amendment to Loan Documents dated May 23, 2018 (3rd Amendment)

V.      Amendment to Loan Documents dated May 31, 2018 (4th Amendment)

VI.     Joinder and Amendment to Loan Documents dated October 23, 2018 (5th Amendment)

VII.    $10,000,000 Revolving Promissory Note (as amended, the "**Existing Note**")

VIII.   Security Agreement (All Assets – Ebury 1EMI LLC and SPEs) (as amended, the "**Security Agreement - All Assets**")

IX.     Security Agreement (SPE Membership Interests) (as amended, the "**Security Agreement - SPE Membership Interests**")

X.      Security Agreement (Membership Interests in Ebury 1EMI LLC)

XI.     Guaranty (By SPEs for Obligations of Ebury 1EMI LLC) (as amended, the "**Guaranty by SPEs**")

XII.    Guaranty (by Ebury Street Capital, LLC for Obligations of Ebury 1EMI LLC)

XIII.   Validity Guaranty Agreement executed by John Hanratty

XIV.    Custodial Agreement dated November 8, 2017 (MTAG Services, LLC)

XV.     Servicing Agreement dated August 1, 2017 (MTAG Services, LLC)

XVI.    Addendum to Servicing Agreement dated November 8, 2017

XVII.   First Amendment to Addendum to Servicing Agreement dated September 6, 2018

XVIII.  Pledge and Security Agreement

XIX.    Deposit Account Control Agreement with PNC Bank, National Association dated February 16, 2017

XX.     All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

B.    The Borrower, the Guarantors and the Lender desire to amend the Loan Documents as provided for in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

120488190_1

1.  <u>Amendments</u>.  Certain of the Loan Documents are amended as follows:

    a.  Concurrently with the execution and delivery of this Amendment, the Borrower shall execute and deliver to the Lender an Amended and Restated Revolving Promissory Note (the "**Restated Note**") evidencing the Line of Credit in the original principal amount of $13,500,000.00, in form and substance satisfactory to the Lender. Upon receipt by the Lender of the Restated Note, the Existing Note shall be canceled and the loan evidenced by the Existing Note (the "**Existing Loan**") and all accrued and unpaid interest on the Existing Note shall thereafter be evidenced by the Restated Note; and all references to the promissory note evidencing the Existing Loan in any documents relating thereto, howsoever named, shall thereafter be deemed to refer to the Restated Note. Without duplication, the Restated Note shall not constitute a novation and shall in no way extinguish the Borrower's unconditional obligation to repay all indebtedness, including accrued and unpaid interest, evidenced by the Existing Note.

    b.  Section 1.1(m)(v) of the Credit Agreement is hereby deleted and replaced with the following:

    **"(v)   New Jersey.**

    **(A)    90% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of New Jersey, where no foreclosure process has been initiated, and where no more than thirty-six (36) months has elapsed since such Tax Lien was sold; plus**

    **(B)    85% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of New Jersey, where no more than twenty-four (24) months has elapsed since a foreclosure process was initiated, but only if the foreclosure process was initiated no later than thirty-six (36) months after such Tax Lien was sold; plus"**

    c.  Section 1.1(tt) of the Credit Agreement is hereby deleted and replaced with the following:

    **"(tt)   "Line of Credit" means the $13,500,000.00 revolving line of credit facility described in Article II below."**

    d.  Borrower may prepay all of the principal and interest outstanding under the Termed Out Portion (as defined in the 2nd Amendment).  If and only if Borrower prepays all principal outstanding under the Termed Out Portion (the "**Prepayment**"), and all interest outstanding, then effective upon receipt by Lender of such payments the Lender and the Borrower shall take such actions as are deemed necessary by Lender, including but not limited to execution of additional documents and instruments, to increase the maximum amount of the Line of Credit by the amount of the Prepayment.

2.  <u>General</u>.  Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment.  This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents.  To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

3.  <u>Certification</u>.  The Borrower and each Guarantor hereby certifies that:  (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment:  (i) true and correct as of the date of this Amendment; (ii) ratified and confirmed without condition as if made anew; and (iii) incorporated into this Amendment by reference; (b) no Event of Default or event which,

120488190_1

with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document; (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained; and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower and the Guarantors, enforceable in accordance with its terms. The Borrower and each Guarantor confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

4.      <u>Collateral</u>.  The Borrower and each Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests and pledges granted by the Borrower or the Guarantors shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's and the Guarantors' existing and future Obligations to the Lender, as modified by this Amendment.

5.      <u>Fees</u>.  Upon execution of this Amendment, and thereafter as incurred, the Borrower shall pay all costs and expenses of the Lender, including the reasonable fees and expenses of legal counsel for the Lender, incurred in connection with the preparation, negotiation and enforcement of this Amendment and the Loan Documents.

6.      <u>Release</u>.  In consideration of the Lender's agreement to consent to the modifications set forth herein, the Borrower and each Guarantor waives and releases and forever discharges the Lender and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that they may have against the Lender or any of them arising out of or relating to the Obligations.  The Borrower and each Guarantor further agrees to indemnify and hold the Lender and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Lender or any of them on account of any claims arising out of or relating to the Obligations.  **The Borrower and the Guarantors further state that they have carefully read the foregoing release and indemnity, know the contents thereof and grant the same as their own free act and deed.**

7.      <u>Miscellaneous</u>.

    a.      This Amendment will be binding upon and inure to the benefit of the Borrower, the Guarantors and the Lender and their respective successors and assigns.

    b.      This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument.   Delivery of an executed counterpart of a signature page to this Amendment by electronic or facsimile transmission shall be effective as delivery of a manually executed counterpart.

    c.      This Agreement and any claim with respect hereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).

    d.      Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed.  Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Lender's rights and remedies (all of which are hereby reserved).  **The Borrower and the Guarantors expressly ratify and confirm the waiver of jury trial provisions contained in the Loan Documents, which are incorporated herein by reference.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

120488190_1

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

<div style="margin-left: 3em">

BORROWER:
EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC
EBURY FUND 1FL LLC
EBURY FUND 1NJ LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By:_____
Karen Wold, Managing Director

</div>

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC
EBURY FUND 1FL LLC
EBURY FUND 1NJ LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____
Karen Wold, Managing Director

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 147 of 688

## SEVENTH AMENDMENT TO LOAN DOCUMENTS
## EBURY 1
## SEPTEMBER 24, 2019

THIS **SEVENTH AMENDMENT TO LOAN DOCUMENTS** (this "**Amendment**") is made as of September 24, 2019, between and among **EBURY 1EMI LLC**, a New York limited liability company (the "**Borrower**"), **EB 1EMIALA LLC**, an Alabama limited liability company, **EB 1EMIFL, LLC**, a Florida limited liability company, **EB 1EMIIN, LLC**, an Indiana limited liability company, **EB 1EMIMD, LLC**, a Maryland limited liability company, **EB 1EMINJ LLC**, a New Jersey limited liability company, **EB 1EMINY, LLC**, a New York limited liability company, **EB 1EMISC LLC**, a South Carolina limited liability company, **RE 1EMI LLC**, a New York limited liability company, **EB 1EMIDC LLC**, a District of Columbia limited liability company, **ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC**, a Maryland limited liability company, **EBURY FUND 1FL LLC**, a Florida limited liability company, and **EBURY FUND 1NJ LLC**, a New Jersey limited liability company (collectively, the "**Guarantors**"), and **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

WITNESSETH:

A.     The Borrower and the Guarantors have executed and delivered to the Lender the following (collectively, as amended from time to time, the "**Loan Documents**"), which evidence or secure some or all of the Borrower's and Guarantors' obligations to the Lender (the "**Obligations**"), all of which are dated March 9, 2017 except as set forth below to the contrary:

I.      Credit Agreement between Borrower and Lender (as amended, the "**Credit Agreement**")
II.     Joinder and Amendment to Loan Documents dated July 20, 2017 (1st Amendment)
III.    Amendment to Loan Documents dated May 1, 2018 (2nd Amendment) (the "**2nd Amendment**")
IV.     Amendment to Loan Documents dated May 23, 2018 (3rd Amendment)
V.      Amendment to Loan Documents dated May 31, 2018 (4th Amendment)
VI.     Joinder and Amendment to Loan Documents dated October 23, 2018 (5th Amendment)
VII.    Amendment to Loan Documents dated October 29, 2018 (6th Amendment)
VIII.   $13,500,000,000 Amended and Restated Revolving Promissory Note (as amended, the "**Existing Note**")
IX.     Security Agreement (All Assets – Ebury 1EMI LLC and SPEs)
X.      Security Agreement (SPE Membership Interests)
XI.     Security Agreement (Membership Interests in Ebury 1EMI LLC)
XII.    Guaranty (By SPEs for Obligations of Ebury 1EMI LLC)
XIII.   Guaranty (by Ebury Street Capital, LLC for Obligations of Ebury 1EMI LLC)
XIV.    Validity Guaranty Agreement executed by John Hanratty
XV.     Custodial Agreement dated November 8, 2017 (MTAG Services, LLC)
XVI.    Servicing Agreement dated August 1, 2017 (MTAG Services, LLC)
XVII.   Addendum to Servicing Agreement dated November 8, 2017
XVIII.  First Amendment to Addendum to Servicing Agreement dated September 6, 2018
XIX.    Pledge and Security Agreement
XX.     Deposit Account Control Agreement with PNC Bank, National Association dated February 16, 2017
XXI.    All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

B.     The Borrower, the Guarantors and the Lender desire to amend the Loan Documents as provided for in this Amendment.

1

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    <u>Amendments</u>.  Certain of the Loan Documents are amended as follows:

    a.    Upon execution of this Amendment Borrower shall repay in full all principal and interest outstanding under the Termed Out Portion, as such term is defined in the 2nd Amendment.

    b.    Concurrently with the execution and delivery of this Amendment, the Borrower shall execute and deliver to the Lender an Amended and Restated Revolving Promissory Note (the "**Restated Note**") evidencing the Line of Credit in the original principal amount of $15,000,000.00, in form and substance satisfactory to the Lender. Upon receipt by the Lender of the Restated Note, the Existing Note shall be canceled and the loan evidenced by the Existing Note (the "**Existing Loan**") and all accrued and unpaid interest on the Existing Note shall thereafter be evidenced by the Restated Note; and all references to the promissory note evidencing the Existing Loan in any documents relating thereto, howsoever named, shall thereafter be deemed to refer to the Restated Note. Without duplication, the Restated Note shall not constitute a novation and shall in no way extinguish the Borrower's unconditional obligation to repay all indebtedness, including accrued and unpaid interest, evidenced by the Existing Note.

    c.    Section 1.1(tt) of the Credit Agreement is hereby deleted and replaced with the following:

        "**(tt)    "Line of Credit" means the $15,000,000.00 revolving line of credit facility described in Article II below.**"

    d.    Section 6.12 of the Loan Agreement is hereby deleted and replaced with: "*Reserved*".

2.    <u>General</u>.  Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment.  This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents.  To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

3.    <u>Certification</u>.  The Borrower and each Guarantor hereby certifies that:  (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment:  (i) true and correct as of the date of this Amendment; (ii) ratified and confirmed without condition as if made anew; and (iii) incorporated into this Amendment by reference; (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document; (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained; and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower and the Guarantors, enforceable in accordance with its terms. The Borrower and each Guarantor confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

4.    <u>Collateral</u>.  The Borrower and each Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests and pledges granted by the Borrower or the Guarantors shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's and the Guarantors' existing and future Obligations to the Lender, as modified by this Amendment.

121103987_1

5.      Fees. Upon execution of this Amendment, and thereafter as incurred, the Borrower shall pay all costs and expenses of the Lender, including the reasonable fees and expenses of legal counsel for the Lender, incurred in connection with the preparation, negotiation and enforcement of this Amendment and the Loan Documents.

6.      Release. In consideration of the Lender's agreement to consent to the modifications set forth herein, the Borrower and each Guarantor waives and releases and forever discharges the Lender and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that they may have against the Lender or any of them arising out of or relating to the Obligations. The Borrower and each Guarantor further agrees to indemnify and hold the Lender and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Lender or any of them on account of any claims arising out of or relating to the Obligations. **The Borrower and the Guarantors further state that they have carefully read the foregoing release and indemnity, know the contents thereof and grant the same as their own free act and deed.**

7.      Miscellaneous.

   a.      This Amendment will be binding upon and inure to the benefit of the Borrower, the Guarantors and the Lender and their respective successors and assigns.

   b.      This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by electronic or facsimile transmission shall be effective as delivery of a manually executed counterpart.

   c.      This Agreement and any claim with respect hereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).

   d.      Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed. Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Lender's rights and remedies (all of which are hereby reserved). **The Borrower and the Guarantors expressly ratify and confirm the waiver of jury trial provisions contained in the Loan Documents, which are incorporated herein by reference.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

121103987_1

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Manfutty, Manager

GUARANTORS:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC
EBURY FUND 1FL LLC
EBURY FUND 1NJ LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Manfutty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____
Karen Wold, Managing Director

**FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM**
INDEX NO. 158207/2022

NYSCEF DOC. NO. 6     24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
RECEIVED NYSCEF: 10/17/2022

Court Records     Pg 151 of 688

## WAIVER AND EIGHTH AMENDMENT TO LOAN DOCUMENTS
## EBURY 1
## MARCH ⅃⅃, 2021

THIS **WAIVER AND EIGHTH AMENDMENT TO LOAN DOCUMENTS** (this "**Amendment**") is made as of March ⅃⅃, 2021, between and among **EBURY 1EMI LLC**, a New York limited liability company (the "**Borrower**"), **EB 1EMIALA LLC**, an Alabama limited liability company, **EB 1EMIFL, LLC**, a Florida limited liability company, **EB 1EMIIN, LLC**, an Indiana limited liability company, **EB 1EMIMD, LLC**, a Maryland limited liability company, **EB 1EMINJ LLC**, a New Jersey limited liability company, **EB 1EMINY, LLC**, a New York limited liability company, **EB 1EMISC LLC**, a South Carolina limited liability company, **RE 1EMI LLC**, a New York limited liability company, **EB 1EMIDC LLC**, a District of Columbia limited liability company, **ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC**, a Maryland limited liability company, **EBURY FUND 1FL LLC**, a Florida limited liability company, and **EBURY FUND 1NJ LLC**, a New Jersey limited liability company (collectively, the "**Guarantors**"), and **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

### WITNESSETH:

A.     The Borrower and the Guarantors have executed and delivered to the Lender the following (collectively, as amended from time to time, the "**Loan Documents**"), which evidence or secure some or all of the Borrower's and Guarantors' obligations to the Lender (the "**Obligations**"), all of which are dated March 9, 2017 except as set forth below to the contrary:

| | |
|---|---|
| I. | Credit Agreement between Borrower and Lender (as amended, the "**Credit Agreement**") |
| II. | Joinder and Amendment to Loan Documents dated July 20, 2017 (1st Amendment) |
| III. | Amendment to Loan Documents dated May 1, 2018 (2nd Amendment) |
| IV. | Amendment to Loan Documents dated May 23, 2018 (3rd Amendment) |
| V. | Amendment to Loan Documents dated May 31, 2018 (4th Amendment) |
| VI. | Joinder and Amendment to Loan Documents dated October 23, 2018 (5th Amendment) |
| VII. | Amendment to Loan Documents dated October 29, 2018 (6th Amendment) |
| VIII. | Seventh Amendment to Loan Documents dated September 24, 2019 |
| IX. | $15,000,000 Amended and Restated Revolving Promissory Note dated September 24, 2019 (as amended, the "**Note**") |
| X. | Security Agreement (All Assets – Ebury 1EMI LLC and SPEs) |
| XI. | Security Agreement (SPE Membership Interests) |
| XII. | Security Agreement (Membership Interests in Ebury 1EMI LLC) |
| XIII. | Guaranty (By SPEs for Obligations of Ebury 1EMI LLC) |
| XIV. | Guaranty (by Ebury Street Capital, LLC for Obligations of Ebury 1EMI LLC) |
| XV. | Validity Guaranty Agreement executed by John Hanratty |
| XVI. | Custodial Agreement dated November 8, 2017 (MTAG Services, LLC) |
| XVII. | Servicing Agreement dated August 1, 2017 (MTAG Services, LLC) |
| XVIII. | Addendum to Servicing Agreement dated November 8, 2017 |
| XIX. | First Amendment to Addendum to Servicing Agreement dated September 6, 2018 |
| XX. | Pledge and Security Agreement |
| XXI. | Deposit Account Control Agreement with PNC Bank, National Association dated February 16, 2017 |
| XXII. | All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A. |



B.    The Borrower, the Guarantors and the Lender desire to amend the Loan Documents as provided for in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    Waiver. The Borrower has acknowledged and agreed with the Lender that each Ebury Company and Ebury Fund 1, LP failed to comply with the covenant set forth in Section 6.6 of the Credit Agreement (failure to timely provide annual Financial Statements) for the fiscal year ending December 31, 2019. The failure by each Ebury Company and Ebury Fund 1, LP to comply with the foregoing covenant constitutes an Event of Default under the Loan Documents. Borrower has requested that the Lender waive the Event of Default resulting from such non-compliance. In reliance upon the Borrower's representations and warranties and subject to the terms and conditions set forth herein, the Lender agrees to grant a waiver of non-compliance with the foregoing covenant and of the Event of Default resulting from such violation solely for the above-referenced period. The Borrower agrees that Each Ebury Company and Ebury Fund 1, LP will hereafter comply fully with this covenant and all other provisions of the Loan Documents, which remain in full force and effect. Except as expressly described in this Amendment, this waiver shall not constitute: (a) a modification or an alteration of the terms, conditions or covenants of the Loan Documents or (b) a waiver, release or limitation upon the Lender's exercise of any of its rights and remedies thereunder, which are hereby expressly reserved. This waiver shall not relieve or release the Borrower in any way from any of its respective duties, obligations, covenants or agreements under the Loan Documents or from the consequences of any Event of Default thereunder, except as expressly described above. This waiver shall not obligate the Lender, or be construed to require the Lender, to waive any other Events of Default or defaults, whether now existing or which may occur after the date of this waiver.

2.    Amendments. Certain of the Loan Documents are amended as follows:

a.    Effective March 10, 2021 the second sentence of the PAYMENTS Section of the Note is hereby deleted and replaced with the following:

**"The Borrower will repay all principal, interest, costs and expenses outstanding hereunder on May 8, 2021."**

b.    Borrower hereby agrees that it will comply with the provisions of Section 6.6 of the Credit Agreement (annual Financial Statements of each Ebury Company and Ebury Fund 1, LP) for the fiscal year ending December 31, 2019 on or before April 5, 2021.

3.    General. Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment. This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents. To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

4.    Certification. The Borrower and each Guarantor hereby certifies that: (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment: (i) true and correct as of the date of this Amendment; (ii) ratified and confirmed without condition as if made anew; and (iii) incorporated into this Amendment by reference; (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document; (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained; and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower and the Guarantors, enforceable in accordance with its terms. The Borrower and each Guarantor confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.



122173374_1

2

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 153 of 688

5.    Collateral.  The Borrower and each Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests and pledges granted by the Borrower or the Guarantors shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's and the Guarantors' existing and future Obligations to the Lender, as modified by this Amendment.

6.    Fees.  Upon execution of this Amendment, and thereafter as incurred, the Borrower shall pay all costs and expenses of the Lender, including the reasonable fees and expenses of legal counsel for the Lender, incurred in connection with the preparation, negotiation and enforcement of this Amendment and the Loan Documents.

7.    Release.  In consideration of the Lender's agreement to consent to the modifications set forth herein, the Borrower and each Guarantor waives and releases and forever discharges the Lender and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that they may have against the Lender or any of them arising out of or relating to the Obligations.  The Borrower and each Guarantor further agrees to indemnify and hold the Lender and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Lender or any of them on account of any claims arising out of or relating to the Obligations.  **The Borrower and the Guarantors further state that they have carefully read the foregoing release and indemnity, know the contents thereof and grant the same as their own free act and deed.**

8.    Miscellaneous.

    a.    This Amendment will be binding upon and inure to the benefit of the Borrower, the Guarantors and the Lender and their respective successors and assigns.

    b.    This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Amendment by electronic or facsimile transmission shall be effective as delivery of a manually executed counterpart.

    c.    This Agreement and any claim with respect hereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).

    d.    Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed. Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Lender's rights and remedies (all of which are hereby reserved).  **The Borrower and the Guarantors expressly ratify and confirm the waiver of jury trial provisions contained in the Loan Documents, which are incorporated herein by reference.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]



122173374_1

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC
EBURY FUND 1FL LLC
EBURY FUND 1NJ LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By Karen Wold
Karen Wold, President

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC
EBURY FUND 1FL LLC
EBURY FUND 1NJ LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____
Karen Wold, President



IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC
EBURY FUND 1FL LLC
EBURY FUND 1NJ LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____
Karen Wold, President

122173374_1



# NINTH AMENDMENT TO LOAN DOCUMENTS
## EBURY 1
## MAY 18, 2021

THIS **NINTH AMENDMENT TO LOAN DOCUMENTS** (this "**Amendment**") is made as of May 18, 2021, between and among **EBURY 1EMI LLC**, a New York limited liability company (the "**Borrower**"), **EB 1EMIALA LLC**, an Alabama limited liability company, **EB 1EMIFL, LLC**, a Florida limited liability company, **EB 1EMIIN, LLC**, an Indiana limited liability company, **EB 1EMIMD, LLC**, a Maryland limited liability company, **EB 1EMINJ LLC**, a New Jersey limited liability company, **EB 1EMINY, LLC**, a New York limited liability company, **EB 1EMISC LLC**, a South Carolina limited liability company, **RE 1EMI LLC**, a New York limited liability company, **EB 1EMIDC LLC**, a District of Columbia limited liability company, **ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC**, a Maryland limited liability company, **EBURY FUND 1FL LLC**, a Florida limited liability company, and **EBURY FUND 1NJ LLC**, a New Jersey limited liability company (collectively, the "**Guarantors**"), and **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

WITNESSETH:

A.    The Borrower and the Guarantors have executed and delivered to the Lender the following (collectively, as amended from time to time, the "**Loan Documents**"), which evidence or secure some or all of the Borrower's and Guarantors' obligations to the Lender (the "**Obligations**"), all of which are dated March 9, 2017 except as set forth below to the contrary:

I.     Credit Agreement between Borrower and Lender (as amended, the "**Credit Agreement**")

II.    Joinder and Amendment to Loan Documents dated July 20, 2017 (1st Amendment)

III.   Amendment to Loan Documents dated May 1, 2018 (2nd Amendment)

IV.    Amendment to Loan Documents dated May 23, 2018 (3rd Amendment)

V.     Amendment to Loan Documents dated May 31, 2018 (4th Amendment)

VI.    Joinder and Amendment to Loan Documents dated October 23, 2018 (5th Amendment)

VII.   Amendment to Loan Documents dated October 29, 2018 (6th Amendment)

VIII.  Seventh Amendment to Loan Documents dated September 24, 2019 (7th Amendment)

IX.    Waiver and Eighth Amendment to Loan Documents dated March 18, 2021 (8th Amendment)

X.     $15,000,000 Amended and Restated Revolving Promissory Note dated September 24, 2019 (as amended, the "**Note**")

XI.    Security Agreement (All Assets – Ebury 1EMI LLC and SPEs)

XII.   Security Agreement (SPE Membership Interests)

XIII.  Security Agreement (Membership Interests in Ebury 1EMI LLC)

XIV.   Guaranty (By SPEs for Obligations of Ebury 1EMI LLC)

XV.    Guaranty (by Ebury Street Capital, LLC for Obligations of Ebury 1EMI LLC)

XVI.   Validity Guaranty Agreement executed by John Hanratty

XVII.  Custodial Agreement dated November 8, 2017 (MTAG Services, LLC)

XVIII. Servicing Agreement dated August 1, 2017 (MTAG Services, LLC)

XIX.   Addendum to Servicing Agreement dated November 8, 2017

XX.    First Amendment to Addendum to Servicing Agreement dated September 6, 2018

XXI.   Pledge and Security Agreement

XXII.  Deposit Account Control Agreement with PNC Bank, National Association dated February 16, 2017

XXIII. All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

122265431_1

B.    The Borrower, the Guarantors and the Lender desire to amend the Loan Documents as provided for in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    <u>Amendments</u>.  Certain of the Loan Documents are amended as follows:

a.    The Borrower acknowledges that the Lender will not make any further advances under the line of credit evidenced by the Note.  Any principal repaid may not be reborrowed.

b.    Effective May 10, 2021 the following clause in the VARIABLE INTEREST RATE Section of the Note:

**"interest will be assessed on the unpaid principal balance of this Note at the Index Rate effective as of that day plus four and one-quarter percent (4.25%), and will be fixed at that rate until the first Business Day of the next calendar month (each, an "Interest Period")."**

is hereby deleted and replaced with:

**"interest will be assessed on the unpaid principal balance of this Note at the Index Rate effective as of that day plus six and one-quarter percent (6.25%), and will be fixed at that rate until the first Business Day of the next calendar month (each, an "Interest Period")."**

c.    Effective May 9, 2021 the second sentence of the PAYMENTS Section of the Note is hereby deleted and replaced with the following:

**"The Borrower will repay all principal, interest, costs and expenses outstanding hereunder on August 10, 2021."**

2.    <u>General</u>.  Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment.  This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents.  To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

3.    <u>Certification</u>.  The Borrower and each Guarantor hereby certifies that:  (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment:  (i) true and correct as of the date of this Amendment; (ii) ratified and confirmed without condition as if made anew; and (iii) incorporated into this Amendment by reference; (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document; (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained; and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower and the Guarantors, enforceable in accordance with its terms. The Borrower and each Guarantor confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

4.    <u>Collateral</u>.  The Borrower and each Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests and pledges granted by the Borrower or the Guarantors shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's and the Guarantors' existing and future Obligations to the Lender, as modified by this Amendment.

122265431_1

5.      Fees.  Upon execution of this Amendment, and thereafter as incurred, the Borrower shall pay all costs and expenses of the Lender, including the reasonable fees and expenses of legal counsel for the Lender, incurred in connection with the preparation, negotiation and enforcement of this Amendment and the Loan Documents.

6.      Release.  In consideration of the Lender's agreement to consent to the modifications set forth herein, the Borrower and each Guarantor waives and releases and forever discharges the Lender and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that they may have against the Lender or any of them arising out of or relating to the Obligations.  The Borrower and each Guarantor further agrees to indemnify and hold the Lender and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Lender or any of them on account of any claims arising out of or relating to the Obligations.  **The Borrower and the Guarantors further state that they have carefully read the foregoing release and indemnity, know the contents thereof and grant the same as their own free act and deed.**

7.      Miscellaneous.

    a.      This Amendment will be binding upon and inure to the benefit of the Borrower, the Guarantors and the Lender and their respective successors and assigns.

    b.      This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument.    Delivery of an executed counterpart of a signature page to this Amendment by electronic or facsimile transmission shall be effective as delivery of a manually executed counterpart.

    c.      This Agreement and any claim with respect hereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).

    d.      Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed.  Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Lender's rights and remedies (all of which are hereby reserved).  **The Borrower and the Guarantors expressly ratify and confirm the waiver of jury trial provisions contained in the Loan Documents, which are incorporated herein by reference.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

122265431_1

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM

NYSCEF DOC. NO. 6

INDEX NO. 158207/2022

RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 160 of 688

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC
EBURY FUND 1FL LLC
EBURY FUND 1NJ LLC

By:  EBURY 1EMI LLC, Sole Member

By:  EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____
Karen Wold, President

122265431_1

# TENTH AMENDMENT TO LOAN DOCUMENTS
## EBURY 1
### AUGUST 12, 2021

**THIS TENTH AMENDMENT TO LOAN DOCUMENTS** (this "**Amendment**") is made as of August 12, 2021, between and among **EBURY 1EMI LLC**, a New York limited liability company (the "**Borrower**"), **EB 1EMIALA LLC**, an Alabama limited liability company, **EB 1EMIFL, LLC**, a Florida limited liability company, **EB 1EMIIN, LLC**, an Indiana limited liability company, **EB 1EMIMD, LLC**, a Maryland limited liability company, **EB 1EMINJ LLC**, a New Jersey limited liability company, **EB 1EMINY, LLC**, a New York limited liability company, **EB 1EMISC LLC**, a South Carolina limited liability company, **RE 1EMI LLC**, a New York limited liability company, **EB 1EMIDC LLC**, a District of Columbia limited liability company, **ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC**, a Maryland limited liability company, **EBURY FUND 1FL LLC**, a Florida limited liability company, and **EBURY FUND 1NJ LLC**, a New Jersey limited liability company (collectively, the "**Guarantors**"), and **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

WITNESSETH:

A.      The Borrower and the Guarantors have executed and delivered to the Lender the following (collectively, as amended from time to time, the "**Loan Documents**"), which evidence or secure some or all of the Borrower's and Guarantors' obligations to the Lender (the "**Obligations**"), all of which are dated March 9, 2017 except as set forth below to the contrary:

I.       Credit Agreement between Borrower and Lender (as amended, the "**Credit Agreement**")

II.      Joinder and Amendment to Loan Documents dated July 20, 2017 (1st Amendment)

III.     Amendment to Loan Documents dated May 1, 2018 (2nd Amendment)

IV.      Amendment to Loan Documents dated May 23, 2018 (3rd Amendment)

V.       Amendment to Loan Documents dated May 31, 2018 (4th Amendment)

VI.      Joinder and Amendment to Loan Documents dated October 23, 2018 (5th Amendment)

VII.     Amendment to Loan Documents dated October 29, 2018 (6th Amendment)

VIII.    Seventh Amendment to Loan Documents dated September 24, 2019 (7th Amendment)

IX.      Waiver and Eighth Amendment to Loan Documents dated March 18, 2021 (the "**8th Amendment**")

X.       Ninth Amendment to Loan Documents dated May 18, 2021 (the "**9th Amendment**")

XI.      $15,000,000 Amended and Restated Revolving Promissory Note dated September 24, 2019, as amended by the 8th Amendment and the 9th Amendment (as amended, the "**Note**")

XII.     Security Agreement (All Assets – Ebury 1EMI LLC and SPEs)

XIII.    Security Agreement (SPE Membership Interests)

XIV.     Security Agreement (Membership Interests in Ebury 1EMI LLC)

XV.      Guaranty (By SPEs for Obligations of Ebury 1EMI LLC)

XVI.     Guaranty (by Ebury Street Capital, LLC for Obligations of Ebury 1EMI LLC)

XVII.    Validity Guaranty Agreement executed by John Hanratty

XVIII.   Custodial Agreement dated November 8, 2017 (MTAG Services, LLC)

XIX.     Servicing Agreement dated August 1, 2017 (MTAG Services, LLC)

XX.      Addendum to Servicing Agreement dated November 8, 2017

XXI.     First Amendment to Addendum to Servicing Agreement dated September 6, 2018

XXII.    Pledge and Security Agreement

XXIII.   Deposit Account Control Agreement with PNC Bank, National Association dated February 16, 2017

122433027_1

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO. 6

INDEX NO. 158207/2022

RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 162 of 688

XXIV. All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

B.      The Borrower, the Guarantors and the Lender desire to amend the Loan Documents as provided for in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      <u>Reservation of Rights</u>.  The Borrower's failure to comply with the following constitute Events of Default (the "Events of Default") under the Credit Agreement and the other Loan Documents:

a.  <u>Section 6.6 of the Credit Agreement</u> - Failure by each Ebury Company and Ebury Fund 1, LP to furnish the Lender with fiscal year-end consolidated financial statements for the fiscal year ended December 31, 2019 by April 5, 2021, and failure by each Ebury Company and Ebury Fund 1, LP to furnish the Lender with fiscal year-end unqualified audited consolidated financial statements for the fiscal year ended December 31, 2020 by April 30, 2021.

b.  <u>Section 6.7 of the Credit Agreement</u> – Failure by each Ebury Company and Ebury Fund 1, LP to furnish the Lender with consolidated month-end financial statements (including balance sheet, income statement and statement of cash flows) for the prior month no later than thirty (30) days after the end of each month, for the months of October, 2020 through June, 2021.

c.  <u>Section 6.10 of the Credit Agreement</u>. Failure by the Ebury Companies to timely furnish the Lender with a covenant compliance certificate for the quarters ended December 31, 2019 and December 31, 2020.

d.  <u>Section 6.12 of the Credit Agreement</u>.  Failure by Ebury Fund 1, LP, Ebury Fund 2, LP and Ebury Street Capital, LLC to deliver to Lender, not later than fifteen (15) days after filing, but no later than September 30, 2020, copies of the federal income tax returns for 2019.

e.  <u>Section 6.13 of the Credit Agreement</u>. Failure by the Ebury Companies to deliver to Lender Borrowing Base Certificates for the months of January through July, 2020 and September, 2020 through June, 2021.

f.  <u>Section 6.14 of the Credit Agreement</u>.  Failure by the Ebury Companies to deliver to Lender Tax Lien reports for the months of January through July, 2020 and September, 2020 through June, 2021.

g.  <u>Schedule 1.1(x) to the Credit Agreement</u>.  Failure to have the Tax Liens held by the Custodian under the Custodial Agreement and serviced by the Servicer pursuant to the Servicing Agreement.

As a result of the Events of Default, the Lender reserves the right to:  (i) declare the Indebtedness to be immediately due and payable in full as a result thereof; and/or (ii) exercise the Lender's other rights and remedies under the Loan Documents, or otherwise, as a result thereof, all without further notice to the Borrower.  The determination of the Lender not to have exercised its other rights and remedies at this time as a result of the Events of Default and/or the acceptance of any payments from, or on behalf of, the Borrowers by the Lender shall not be deemed to constitute:  (i) a cure or waiver of the Events of Default or any other Default or Event of Default which may exist under the Credit Agreement and the other Loan Documents; (ii) the agreement of the Lender to forbear from exercising its rights and remedies under the Loan Documents, or otherwise, or (iii) a waiver or modification of any of the terms and conditions of the Loan Documents, all of which remain in full force and effect.  Lender expressly reserves all of its rights with respect to the Credit Agreement and the other Loan

122433027_1

Case 24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 163 of 688

Documents, including, without limitation, the Lender's right to take such action at such times as the Lender, in its sole discretion, deems necessary or appropriate without further notice to the Borrower, and nothing contained herein shall be deemed to be a waiver of any of the same.

2.        <u>Amendments</u>.  Certain of the Loan Documents are amended as follows:

a.        The Borrower acknowledges that the Lender will not make any further advances under the line of credit evidenced by the Note.  Any principal repaid may not be reborrowed.

b.        Effective August 11, 2021 the following clause in the VARIABLE INTEREST RATE Section of the Note:

**"interest will be assessed on the unpaid principal balance of this Note at the Index Rate effective as of that day plus six and one-quarter percent (6.25%), and will be fixed at that rate until the first Business Day of the next calendar month (each, an "Interest Period")."**

is hereby deleted and replaced with:

**"interest will be assessed on the unpaid principal balance of this Note at the Index Rate effective as of that day plus eight and one-quarter percent (8.25%), and will be fixed at that rate until the first Business Day of the next calendar month (each, an "Interest Period")."**

c.        Effective August 11, 2021 the second sentence of the PAYMENTS Section of the Note is hereby deleted and replaced with the following:

**"The Borrower will repay all principal, interest, costs and expenses outstanding hereunder on November 10, 2021."**

3.        <u>General</u>.  Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment.  This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents.  To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

4.        <u>Certification</u>.  The Borrower and each Guarantor hereby certifies that:  (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment:  (i) true and correct as of the date of this Amendment; (ii) ratified and confirmed without condition as if made anew; and (iii) incorporated into this Amendment by reference; (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document; (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained; and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower and the Guarantors, enforceable in accordance with its terms. The Borrower and each Guarantor confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

5.        <u>Collateral</u>.  The Borrower and each Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests and pledges granted by the Borrower or the Guarantors shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's and the Guarantors' existing and future Obligations to the Lender, as modified by this Amendment.

6.      Fees.  Upon execution of this Amendment, and thereafter as incurred, the Borrower shall pay all costs and expenses of the Lender, including the reasonable fees and expenses of legal counsel for the Lender, incurred in connection with the preparation, negotiation and enforcement of this Amendment and the Loan Documents.

7.      Release.  In consideration of the Lender's agreement to consent to the modifications set forth herein, the Borrower and each Guarantor waives and releases and forever discharges the Lender and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that they may have against the Lender or any of them arising out of or relating to the Obligations.  The Borrower and each Guarantor further agrees to indemnify and hold the Lender and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Lender or any of them on account of any claims arising out of or relating to the Obligations.  **The Borrower and the Guarantors further state that they have carefully read the foregoing release and indemnity, know the contents thereof and grant the same as their own free act and deed.**

8.      Miscellaneous.

   a.      This Amendment will be binding upon and inure to the benefit of the Borrower, the Guarantors and the Lender and their respective successors and assigns.

   b.      This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument.   Delivery of an executed counterpart of a signature page to this Amendment by electronic or facsimile transmission shall be effective as delivery of a manually executed counterpart.

   c.      This Agreement and any claim with respect hereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).

   d.      Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed.  Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Lender's rights and remedies (all of which are hereby reserved).  **The Borrower and the Guarantors expressly ratify and confirm the waiver of jury trial provisions contained in the Loan Documents, which are incorporated herein by reference.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

122433027_1

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC
EBURY FUND 1FL LLC
EBURY FUND 1NJ LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager
By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____
Karen Wold, President

5

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC
EBURY FUND 1FL LLC
EBURY FUND 1NJ LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

*Karen Wold*

By: _____
Karen Wold, President

## CREDIT AGREEMENT

**THIS CREDIT AGREEMENT**, dated as of March ___, 2017, is by and between **EBURY 2 EMI LLC**, a New York limited liability company, as borrower (the "**Borrower**"), and **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation, as lender (the "**Lender**" and together, with the Borrower, the "**Parties**").

The Borrower has requested and the Lender has agreed to make available to the Borrower a secured revolving line of credit facility in the amount of $5,000,000.00 to finance the purchase of Tax Liens on the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Defined Terms. The following words and phrases shall have the following meanings when used in this Agreement.

(a)    "**Acquisition Price**" means: (i) if the lien is acquired from a Person other than a Taxing Authority, the amount paid to acquire the Tax Lien; and (ii) if the lien is acquired from a Taxing Authority, the amount paid to that Taxing Authority to acquire the Tax Lien and secured by the Tax Lien, including, without limitation, amounts paid with respect to any Subsequent Tax Liens, and all taxes, assessments, costs, refundable premiums and any other amounts secured by the Tax Lien and paid to that Taxing Authority.

(b)    "**Advance**" means a disbursement of funds by the Lender under the Line of Credit to, at the direction of, or on behalf of the Borrower, subject to the terms and conditions of this Agreement.

(c)    "**Affiliate**" means, as to any Person, any other Person: (i) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person; (ii) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting securities or equities of such Person; or (iii) ten percent (10%) or more of the voting securities or equities of which is directly or indirectly beneficially owned or held by the Person in question. The term "control" as used in this definition means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities or equities, by control, or otherwise.

(d)    "**Agreement**" means this Credit Agreement and all exhibits and schedules thereto, as the same may be amended, modified, restated, replaced or supplemented from time to time in accordance with the provisions hereof.

(e)    "**Alabama Purchased Liens**" means Tax Liens to be purchased by EB 2EMIAL LLC from Ebury Fund 1, LP.

(f)    "**Applicable Law**" means all laws of any Governmental Authority applicable to the matter, including any ordinances, judgments, decrees, injunctions, writs, orders and other legally binding actions of any Governmental Authority, and common law and rules and regulations of any federal, regional, state, county, municipal or other Governmental Authority.

(g)    "**Applicable Statute**" with respect to any Tax Lien and any Eligible Jurisdiction, means the Applicable Law set forth on Schedule 1.1(f) hereto, as may be amended, supplemented, modified, replaced, restated and otherwise in effect from time to time.

(h)    "**Assigned Tax Lien**" means any Tax Lien that: (i) was acquired by the Borrower from any Person other than the Taxing Authority that issued such Tax Lien; or (ii) with respect to the Rochester NY

Liens or the Alabama Purchased Liens, was originated by any Person other than the Borrower.

(i)     **"Authorized Individual"** means any officer, employee or representative of the Borrower whom the Borrower designates in a notice delivered to the Lender as authorized to request Advances.

(j)     **"Bankruptcy Code"** means Title 11 of the United Sates Code, as amended.

(k)     **"Basic Tax Lien Documents"** means and shall consist of the Tax Lien Documents and each of the other documents required to be delivered or otherwise provided by the Borrower to the Lender or the Custodian, as applicable, including any Tax Certificate receipt and other documents evidencing the transfer of such Tax Lien to an Ebury Company, setting forth the following information with respect to such Tax Lien (as applicable for the related jurisdiction), and such other information as Lender may require:

(i)     the number by which a Tax Lien is identified on the books and records of the Servicer;

(ii)     the identification number assigned to such Tax Lien by the Taxing Authority issuing such Tax Lien;

(iii)     the street address of the related Property on the books and records of the related Taxing Authority;

(iv)     the tax block and lot designation (or similar identification designation) of the related Property;

(v)     the type of related Property;

(vi)     the name and mailing address of the Tax Debtor on the books and records of the related Taxing Authority;

(vii)     the Principal Balance of such Tax Lien, with each component of such Principal Balance separately stated;

(viii)     the Tax Lien Value of such Tax Lien, with each component of such Tax Lien Value separately stated;

(ix)     the market value, assessed value and the equalization ratio (to the extent available) of the related Property, as of the proposed Funding Date related to such Tax Lien;

(x)     the then existing loan to value related to such Tax Lien;

(xi)     the date of creation of such Tax Lien, the date the related Taxing Authority sold such Tax Lien and the date the Ebury Company acquired or expects to acquire such Tax Lien;

(xii)     all accrued interest, costs and expenses owed by the Tax Debtor with respect to such Tax Lien;

(xiii)     the date on which foreclosure proceedings may first be commenced and, if readily applicable, the date on which any such Tax Lien and the related Property;

(xiv)     the annualized interest rate (or penalty, if such penalty is recurring) at which such Tax Lien accrues interest (or penalty, as applicable) on the Principal Balance of such Tax Lien, excluding any one-time penalties, premiums, overbids, fees or subsequent liens bid rate for such Tax Lien;

(xv)     whether such Tax Lien is an Assigned Tax Lien, and if so, the names and contact information of the original owner; and

(xvi)     if such Tax Lien is a Rochester NY Lien or an Alabama Purchased Lien, copies of all loan agreements, notices, certificates and other forms related to the origination of such Rochester NY Lien or Alabama Purchased Lien and the transfer of the

2

related lien from the Taxing Authority to the Ebury Company.

The Basic Tax Lien Documents may be in the form of one or more documents, collectively setting forth all of the information required, and may be in the form of an excel file, a computer disk or other electronic files.

(l)    "**Bill of Sale**" means the bill of sale relating to a transfer of a Tax Lien to an Ebury Company, dated as of the date of such sale, executed by the related transferor.

(m)    "**Borrowing Base**" means, as determined by the Lender from time to time, the sum of:

(i)    80% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of Alabama; plus

(ii)    85% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of Florida; plus

(iii)    75% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of Indiana; plus

(iv)    85% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of Maryland; plus

(v)    85% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of New Jersey; plus

(vi)    70% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchased in the State of New York (Rochester NY Liens only); plus

(vii)    80% of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens purchase in the State of South Carolina; less

(viii)    From the date of this Agreement until March 8, 2018, a liquidity reserve in the amount of $333,000.00.

Notwithstanding the foregoing, as it applies to the Line of Credit, the Lender shall have the exclusive right, in its sole discretion, to reduce the overall Borrowing Base percentage, but in any event, not to reduce it to less than to fifty (50%) percent of the aggregate amount of the Unpaid Acquisition Prices of all Eligible Tax Liens, if and for only so long as the average percentage of all Ebury Company Eligible Tax Liens in foreclosure exceeds 30%, or the average Acquisition Price of the Ebury Company Eligible Tax Liens exceeds $25,000.00.

For the purpose of calculating the weighted average age, multiple Eligible Tax Liens with multiple acquisition dates affecting a single Property shall be aggregated and aged using the date of the oldest Eligible Tax Lien. For the purposes of calculating the average Acquisition Price, the total Unpaid Acquisition Price of all Eligible Tax Liens is divided by the total number of Eligible Properties.

The foregoing average thresholds shall be calculated and tested for compliance at such times as requested by the Lender in its sole discretion, but in any event not more frequently than once per calendar month.

As of the date of this Agreement only Eligible Tax Liens secured by Property in Alabama, Florida, Indiana, Maryland, New Jersey, New York (Rochester NY Liens only) and South Carolina may be included in the Borrowing Base.

(n)    "**Borrowing Base Certificate**" has the meaning set forth in Section 6.14(a) below.

(o)    "**Business Day**" means any day other than a Saturday or a Sunday on which banks in the State of New York are not authorized or obligated by law or executive order to be closed.

(p)    "**Change of Control**" means: (i) the failure of Ebury Fund 2, LP to directly or indirectly

119449465_6

own and control all of the Equity Interests of the Borrower; or (ii) the failure of the Borrower to directly own and control, subject to the pledge to the Lender under the other Transaction Documents, all of the Equity Interests of each other Ebury Company.

(q)    "**Collateral**" means and includes individually, collectively, interchangeably and without limitation all property and assets granted as collateral security for the Indebtedness, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise, including all accessions, additions, replacements, and substitutions and all related accounts, inventory, and general intangibles. Collateral includes without limitation all the Equity Interests in each Ebury Company (other than the Borrower), all funds in the Lockbox Account and any and all rights and interests in or to each Tax Lien in which any Ebury Company has an interest, whether now owned or hereafter created or acquired, pledged from time to time as security for the Indebtedness, which shall specifically include, without limitation, all of the following:

(i)    all now owned or existing and hereafter acquired, created, or arising Tax Liens;

(ii)    all Collections of such Tax Liens;

(iii)    each Bill of Sale;

(iv)    all Servicing Rights related to such Tax Liens;

(v)    all Servicing Files and all documents comprising such Servicing Files;

(vi)    all Tax Lien Files related to such Tax Liens and all documents comprising such Tax Lien Files;

(vii)    amounts and property from time to time on deposit in the Lockbox Account;

(viii)    all deposit, collection, escrow, reserve, collateral or lock-box accounts and all amounts and property from time to time on deposit therein related to the Tax Liens;

(ix)    all Related Rights;

(x)    all rights of any Ebury Company under the Servicing Agreement;

(xi)    all accessions, additions, attachments, improvements, substitutions and replacements thereto;

(xii)    all now owned and hereafter acquired, created or arising general intangibles of every nature, kind and description, without limitation, customer lists, choses in action, claims, books, records, goodwill, patents and patent applications, copyrights, trademarks, trade names, service marks, trade styles, trademark applications, trade secrets, contracts, contract rights, royalties, licenses, franchises, deposits, license, franchise and royalty agreements, formulae, tax and any other types of refunds, returned and unearned insurance premiums, rights and claims under insurance policies including without limitation, credit insurance and key man life insurance policies, and computer information, software, records and data;

(xiii)    all now owned and hereafter acquired equipment wherever located, and all replacements, parts, accessions, substitutions and additions thereto;

(xiv)    all now owned or hereafter acquired fixtures, wherever located;

(xv)    all now owned and hereafter acquired, created or arising chattel paper (including electronic chattel paper), instruments and documents (including bills of lading, warehouse receipts and other documents of title) of every nature, kind and description;

4

(xvi)     all now owned and hereafter acquired, created or arising supporting obligations and letter-of-credit rights of every nature, kind and description;

(xvii)    all now existing and hereafter acquired or arising deposit accounts reserves and credit balances of every nature, wherever located, and all documents and records associated therewith;

(xviii)   all property (personal or otherwise), now or hereafter in the possession of the Lender;

(xix)     all now owned or hereafter acquired investment property of every kind; and

(xx)      the accessions to, and substitutions for and all replacements, products and proceeds (including, without limitation, insurance proceeds and insurance premiums), whether cash or noncash, of all of the foregoing property and interests in property.

As used herein, each of the terms and phrases "general intangibles", "equipment", "fixtures", "chattel paper", "electronic chattel paper", "instruments", "documents", "supporting obligations", "letter-of credit rights", "investment property" and "proceeds" shall have the respective meaning assigned thereto in Articles 8 and 9 of the UCC.

Collateral also includes all other property and rights subject to the Security Interests granted, or that may later be granted, to the Lender by any Grantor as security for any of the Indebtedness under this Agreement or any other Transaction Document.

(r)       "Collections" with respect to any Tax Lien, means all of the following: (i) all Redemption Payments; (ii) all premiums; and (iii) all other collections, income, distributions, receipts, payments, collections, prepayments, recoveries, proceeds (including insurance and condemnation proceeds) and other payments or amounts of any kind paid, received, collected, recovered or distributed on, in connection with or in respect of such Tax Lien, including principal payments, interest payments, statutory legal fees, prepayment fees, extension fees, exit fees, defeasance fees, transfer fees, make whole fees, late charges, late fees and all other fees or charges of any kind or nature, yield maintenance charges, penalties, default interest, net sale, foreclosure, liquidation, securitization or other disposition proceeds, settlements and proceeds.

(s)       "Concentration Limit" means, for each property type listed in the table below, the amount determined by applying the percentage assigned to the property type/use classification in the table below to the aggregate Unpaid Acquisition Prices of all of the Tax Liens:

| % Limit | Property Type/Use |
|---|---|
| No less than 75% | Residential |
| No more than 20% | Commercial Properties |
| No more than 10% | Mobile Homes |
| No more than 5% | Industrial Properties |
| No more than 10% | Vacant (unimproved) |

(t)       "Custodial Agreement" means and includes each agreement with an Ebury Company, the Custodian and the Lender, in a form satisfactory to the Lender, pursuant to which the Tax Certificates and the other Tax Lien Documents will be delivered to the Custodian and held and administered in accordance with the terms of such agreement.

(u)       "Custodian" means and includes each Person (including the Lender) approved by the Lender to take possession of, hold and administer the Tax Certificates and other Tax Lien Documents.

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 6    24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State    RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 172 of 688

   (v)  "**Ebury Companies**" means and includes the Borrower, EB 2EMIALA LLC, an Alabama limited liability company, EB 2EMIFL, LLC, a Florida limited liability company, EB 2EMIIN, LLC, an Indiana limited liability company, EB 2EMIMD, LLC, a Maryland limited liability company, EB 2EMINJ LLC, a New Jersey limited liability company, EB 2EMINY, LLC, a New York limited liability company, EB 2EMISC LLC, a South Carolina limited liability company, RE 2EMI LLC, a New York limited liability company, and all other Persons that may become a party to this Agreement as an Ebury Company by any modification, amendment, supplement or joinder to this Agreement. Each Ebury Company other than the Borrower shall be a wholly owned Subsidiary of the Borrower.

   (w)  "**Eligible Jurisdictions**" means and includes Alabama, Florida, Indiana, Maryland, New Jersey, New York (with respect to the Rochester NY Liens only) and South Carolina; provided that the Lender may approve, in writing, additional jurisdictions as Eligible Jurisdictions.

   (x)  "**Eligible Property**" means and includes all types of real (immovable) property, except for the following (unless otherwise agreed to by the Lender, in writing):

    (i)   Cooperatives
    (ii)   Retirement Homes
    (iii)   Service Stations
    (iv)   Automobile related properties (e.g. Sales, Repair/Body Shops, Rental Lots, etc.)
    (v)   Vacant Institutional Churches
    (vi)   Private Schools and Colleges
    (vii)   Homes for the Aged
    (viii)   Orphanages, Other Non-Profits or Charitable Service Organizations
    (ix)   Mortuaries, Cemeteries and Crematoriums
    (x)   Clubs, Lodges, and Union Halls
    (xi)   Sanitariums, and Convalescent and Rest Homes
    (xii)   Cultural Organizations and Facilities
    (xiii)   Military Properties
    (xiv)   Forests, Parks and Recreational Areas
    (xv)   Public Schools
    (xvi)   Public Colleges
    (xvii)   Public Hospitals
    (xviii)   County Properties
    (xix)   State Properties
    (xx)   Federal Properties
    (xxi)   Municipal Properties
    (xxii)   Leasehold Interests
    (xxiii)   Utilities (e.g., Gas, Electric, Telephone, Water, Sewage, Railroads, Pipelines, Canals, Radio and TV)
    (xxiv)   Mining Lands, Petroleum Lands, or Gas Lands
    (xxv)   Subsurface Rights
    (xxvi)   Rights-of-Way, Streets, Roads, Irrigation Channels and Ditches
    (xxvii)   Rivers, Lakes, or Other Submerged Lands
    (xxviii)   Sewage Disposal, Solid Waste Disposal, Borrow Pits, Drainage Reservoirs, Waste Lands, Marshes, Sand Dunes and Swamps
    (xxix)   Outdoor Recreational or Parklands
    (xxx)   Centrally Assessed Industrial Properties (Light & Heavy)

   (y)  "**Eligible Tax Lien**" means and includes all Tax Liens secured by Eligible Property, except for the following (unless otherwise agreed to by the Lender, in writing):

6

119449465_6

(i)    Any Tax Lien owned by an Ebury Company that is not owned by a Special Purpose Entity in a State for which a Special Purpose Entity is required under Section 3.6.

(ii)    Any Tax Lien imposed by a Taxing Authority in any State or jurisdiction other than what is permitted under this Agreement.

(iii)    Any Tax Lien that is not encumbered by a Security Interest in favor of the Lender, and by no later than the date of the Borrowing Base Certificate delivered to the Lender, is not registered in a manner and with an address acceptable to the Lender.

(iv)    Any Tax Lien whose Basic Tax Lien Documents are not delivered to the Lender, or to the Custodian, by no later than the effective date of the most recent Borrowing Base Certificate furnished to the Lender, in which event such Tax Lien will be excluded until its Basic Tax Lien Documents are delivered to the Lender or the Custodian. If no paper certificate or other tangible evidence of the existence and assignment of the Tax Lien is issued by the Taxing Authority, the Lender agrees that the Basic Tax Lien Documents may be transmitted electronically to the Lender, or to the Custodian.

(v)    Any Tax Lien that, by no later than the effective date of the most recent Borrowing Base Certificate, is not registered in accordance with the State Registration Requirements for that State; provided, however, that this provision shall not apply to Tax Liens acquired prior to the date of this Agreement as long as a request for assignment to, or re-registration in, the required name is submitted to the Taxing Authority within sixty (60) days after the date of this Agreement in a form acceptable to the Lender.

(vi)    Any Tax Lien that is not free and clear of all security interests, liens, encumbrances, and claims of third parties, except for Permitted Liens.

(vii)    Any Tax Lien with respect to which the Tax Debtor is a shareholder, director, partner, member, manager, officer, employee or agent of any Ebury Company or any of their respective Subsidiaries or Affiliates.

(viii)    Any Tax Lien with respect to which the obligations of the Tax Debtor may be conditional.

(ix)    Any Tax Lien with respect to which the Tax Debtor is a Subsidiary or Affiliate of any Ebury Company, any of their respective Subsidiaries or Affiliates, or any shareholder, director, partner, member, manager or officer, of any Ebury Company or any of their respective Subsidiaries or Affiliates.

(x)    Any Tax Lien whose validity has been challenged in any legal or administrative proceeding and such proceeding is not resolved in favor of validity of the Tax Lien within six (6) months after the date the validity of such Tax Lien is challenged in writing.

(xi)    Any Tax Lien secured by Property where the aggregate of all amounts due under all Tax Liens included in the Collateral secured by that Property exceeds $500,000.00.

(xii)    Any Tax Lien secured by any Property that is encumbered by a federal tax lien filed against any owner of the Property.

(xiii)    Any Tax Lien secured by Property owned in whole or in part by any Person who is a debtor in a case commenced under the Bankruptcy Code at the time the Tax Lien is purchased, or anytime thereafter once the Borrower becomes aware that such a case has been commenced, where the aggregate of all Tax Liens secured by property owned in whole or in part by any Person who is a debtor in a case

commenced under the Bankruptcy Code at the time the Tax Lien is purchased exceeds one percent (1%) of the aggregate of all amounts due under all Tax Liens included in the Collateral.

(xiv)   Any Tax Lien secured by Property for which a federal or State environmental lien or other notice of environmental issues has been filed in the real property records of the county where the Property is located.

(xv)   Any Tax Lien that the Lender, in its sole discretion, deems to be ineligible for any reason.

(xvi)   The amount of the aggregate of the Unpaid Acquisition Prices of Tax Liens secured by property types listed in the definition of Concentration Limits in excess of (other than for residential property) the Concentration Limit for that property type.

(xvii)   Any Tax Lien in which any Ebury Company has been issued a tax deed.

(xviii)   Any other Tax Lien excluded from the definition of Eligible Tax Lien for a State defined as an Eligible Jurisdiction herein as set forth on Schedule 1.1(x) hereto.

(xix)   Any non-recoverable or non-refundable premium or overbid.

(xx)   Any Tax Lien to the extent its acquisition would cause the then aggregate Acquisition Prices for all Tax Liens secured by Properties to exceed twenty percent (20%) of the aggregate assessed values for such Properties; and for this purpose "assessed value" equals the fair market value equivalent assigned to the Property by the Taxing Authority in calculating the property taxes assessed against the Property.

(z)   **"Environmental Laws"** means any and all federal, state, and local laws, regulations, judicial decisions, orders, decrees, plans, rules, permits, licenses, and other governmental restrictions and requirements pertaining to health, safety, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, *et seq.*, the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. § 651, *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, and the Toxic Substances Control Act, 15 U.S.C. § 2601, *et seq.*, as the same may be amended or supplemented from time to time.

(aa)   **"Equity Interest"** with respect to any Person, means: (i) any share, interest, participation and other equivalent (however denominated) of capital stock of (or other ownership, equity or profit interests in) such Person; (ii) any warrant, option or other right for the purchase or other acquisition from such Person of any of the foregoing; (iii) any security convertible into or exchangeable for any of the foregoing; and (iv) any other ownership or profit interest in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such share, warrant, option, right or other interest is authorized or otherwise existing on any date.

(bb)   **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

(cc)   **"Event of Default"** means individually, collectively, and interchangeably any of the Events of Default set forth in Article IX below.

(dd)   **"Expiration Date"** means the earlier of: (i) in the event an Event of Default occurs, the date the Lender demands repayment, in full, of the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid; or (ii) the latest stated maturity date of the Note and any renewals and extensions of the Note (provided, however, that the Lender has made no commitment to, and is not obligated to, renew the Note or extend the maturity date of the Note).

(ee)    "**GAAP**" means generally accepted accounting principles, applied on a consistent basis, as set forth in opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants or in statements of the Financial Accounting Standards Board or their respective successors and that are applicable in the circumstances as of the date in question. Accounting principles are applied on a "consistent basis" where the accounting principles applied in a current period are comparable in all material respects to those accounting principles applied in a preceding period.

(ff)    "**Governing Documents**" with respect to any Person, means its articles or certificate of incorporation or formation, by laws, memorandum and articles of association, partnership agreement, limited liability company agreement, operating or trust agreement, limited liability company certificate, trust certificate or other organizational, charter or governing documents.

(gg)    "**Governmental Authority**" means any: (i) nation or government; (ii) state or local or other political subdivision thereof; (iii) central bank or similar monetary or regulatory authority; (iv) Person, agency, authority, instrumentality, court, regulatory body, central bank or other body or entity exercising executive, legislative, judicial, taxing, quasi-judicial, quasi-legislative, regulatory or administrative functions or powers of or pertaining to government; (v) court or arbitrator having jurisdiction over such Person or its assets or properties; (vi) stock exchange on which shares of stock of such Person are listed or admitted for trading; or (vii) supra-national body such as the European Union or the European Central Bank.

(hh)    "**Grantor**" means and includes individually, collectively, interchangeably and without limitation, the Ebury Companies and each and all of the Persons granting a Security Interest in any Collateral for the Indebtedness.

(ii)    "**Guarantor**" means and includes each Ebury Company (other than the Borrower) and EBURY STREET CAPITAL, LLC, and all other Persons that may become a party to this Agreement as a Guarantor by any modification amendment or supplement to this Agreement.

(jj)    "**Hazardous Material**" means any substance, product, waste, pollutant, material, chemical, contaminant, constituent, or other material which is or becomes listed, regulated, or addressed under any Environmental Law, including, without limitation, asbestos, petroleum, and polychlorinated biphenyls.

(kk)    "**Indebtedness**" means each and every draft, liability, obligation and indemnity obligation of every type and description that the Borrower may now or at any time owe to the Lender (whether such debt, liability, indemnity obligation or obligation now exists or is hereafter created or incurred, whether it arises in a transaction involving the Lender alone or in a transaction involving other creditors of the Borrower and whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several), including all indebtedness of the Borrower to the Lender under this Agreement, the Note and the other Transaction Documents, together with interest, costs, expenses, reasonable attorneys' fees and other reasonable fees and charges as more fully set forth herein, whether or not any such indebtedness may be barred under any statute of limitations or may be otherwise unenforceable or voidable for any reason.

(ll)    "**Indemnified Amount**" has the meaning set forth in Section 10.1.

(mm)    "**Indemnified Person**" has the meaning set forth in Section 10.1.

(nn)    "**Insolvency Event**" with respect to any Person, means: (i) the filing of a decree or order for relief by a court having jurisdiction in the premises with respect to such Person or any substantial part of its assets or property in an involuntary case under any applicable Insolvency Law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its assets or property, or ordering the winding up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of thirty (30) days; (ii) the commencement by such Person of a voluntary case under any applicable Insolvency Law now or hereafter in effect; (iii) the consent by such Person to the entry of an order for relief in an involuntary case under any Insolvency Law, (iv) the consent by

such Person to the appointment of or taking possession by a receiver, liquidator, assignee; custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its assets or property; (v) the making by such Person of any general assignment for the benefit of creditors; (vi) the admission in writing in a legal proceeding of the inability of such Person to pay its debts generally as they become due; or (vii) the failure by such Person generally to pay its debts as they become due.

(oo)    "**Insolvency Laws**" means and includes the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments and similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

(pp)    "**Insolvency Proceeding**" means any case, action or proceeding before any court or other Governmental Authority relating to any Insolvency Event.

(qq)    "**Investment Company Act**" means the Investment Company Act of 1940.

(rr)    "**Lender POA**" means the duly executed written power of attorney to be delivered by the Borrower to the Lender on the closing date of the Line of Credit.

(ss)    "**Lien**" means any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever, including without limitation any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security.

(tt)    "**Line of Credit**" means the $5,000,000.00 revolving line of credit facility described in Article II below.

(uu)    "**Lockbox Account**" has the meaning set forth in Section 3.7 below.

(vv)    "**Material Adverse Effect**" means a material adverse effect on or material adverse change in or to: (i) the property, assets, business, operations, financial condition or credit quality of any Ebury Company, Guarantors, a Validity Guarantor or the Servicer, including any loss as a result of a violation of any Environmental Laws that impairs the ability of each of the Ebury Companies, the Guarantors and the Validity Guarantors to pay and perform their obligations under the Transaction Documents to which they are party; (ii) the ability of each of the Ebury Companies, the Guarantors and the Validity Guarantors to pay and perform their respective obligations under the Transaction Documents to which they are party; (iii) the validity, legality, binding effect or enforceability of any Transaction Document, the Eligible Tax Liens or the Security Interests granted hereunder or thereunder; (iv) the rights and remedies of the Lender or any Indemnified Person under any Transaction Document; or (v) the perfection or priority of any Lien granted under any Transaction Document.

(ww)    "**Municipal Lien**" means all real estate tax liens and all other municipal liens upon or arising in connection with any Property related to a Tax Lien, including, but not limited to, sewer service charges, water service charges and assessments for improvements upon such Property.

(xx)    "**Note**" means the promissory note evidencing the Borrower's obligations to repay Advances made under the Line of Credit, as well as any substitute, replacement or refinancing note or notes therefor or other promissory notes pursuant to the terms of this Agreement. The Note initially evidencing the Borrower's obligations to repay the Advances made under the Line of Credit shall be drawn payable to the Lender for the maximum amount of the Advances allowed under the Line of Credit in the amount of $5,000,000.00. The Note shall provide for interest at the rate established for the Line of Credit and for payment, in full, of all principal, interest and other charges by no later than the Expiration Date, and shall contain such other provisions (including, without limitation, provisions relating to calculation of interest, late charges, acceleration, default interest, cross-defaults, rights upon default, payment application, and attorneys' fees) customarily incorporated in commercial loan notes. Although the term "Note" includes refinancings, the Lender is under no obligation to renew or extend the maturity date of the Note or any substitute, replacement or refinancing note or notes therefor.

10

119449465_6

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 177 of 688

(yy)   **"Original Owner"** with respect to any Assigned Tax Lien, means the Person from whom the Ebury Company acquired such Assigned Tax Lien.

(zz)   **"Overadvance"** has the meaning set forth in Section 2.2 below.

(aaa)   **"Payment Date"** means the first day of each calendar month or, if any such day is not a Business Day, the next succeeding Business Day. The initial Payment Date shall be April 1, 2017.

(bbb)   **"Permitted Liens"** means any of the following as to which no enforcement, collection, execution, levy or foreclosure proceedings has been commenced: (i) Liens granted by the Security Interests, pursuant to the Transaction Documents or other liens in favor of the Lender; (ii) Liens for state, municipal, local or other local taxes, assessments or other charges that are not delinquent and not yet due and payable; (iii) Liens imposed by Applicable Law, such as materialmen's, mechanics', carriers', workmen's, repairmen's and similar Liens, arising in the ordinary course of business securing obligations that are not overdue for more than thirty (30) days; and (iv) other Municipal Liens.

(ccc)   **"Person"** means any individual, corporation, limited liability company, limited partnership, general partnership, joint venture, association, joint stock company, trust, bank, unincorporated organization, business trust or other organization, whether or not a legal entity, and United States federal and state governments and agencies, or regulatory authorities or political subdivisions thereof, or any other form of entity.

(ddd)   **"Property"** means the underlying real (immovable) property and related improvements, including fixtures, encumbered by a Tax Lien.

(eee)   **"Related Rights"** for any Tax Lien, means all rights of the owner thereof, including without limitation, all rights to foreclose on the associated Property.

(fff)   **"Release"** means any release, use, generation, manufacture, storage, treatment, disposal, spill, emissions, leaking, pumping, injection, or migration of Hazardous Materials on, about, under or within all or any portion of any property.

(ggg)   **"Remedial Action"** means all actions required to: (i) clean up, remove, treat, or otherwise address Hazardous Materials in the indoor or outdoor environment; (ii) prevent the Release or threat of Release or minimize the further Release of Hazardous Materials so that they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care deposit, disposal, disbursement, leaching, or migration of Hazardous Materials.

(hhh)   **"REO Property"** means a Property relating to a Tax Lien the title to which has been acquired through foreclosure or otherwise (including a tax deed).

(iii)   **"Requirements of Law"** with respect to any Person or the Person's assets or property and as of any date means all of the following applicable thereto as of such date: all governing documents and existing and future laws, statutes, rules, regulations, treaties, codes, ordinances, permits, certificates, orders and licenses of and interpretations by any Governmental Authority (including Environmental Laws, ERISA, securities laws, regulations of the Board of Governors of the Federal Reserve System, and laws, rules and regulations relating to usury, licensing, truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices and privacy), judgments, decrees, injunctions, writs, awards or orders of any court, arbitrator or other Governmental Authority.

(jjj)   **"Retained Interests"** with respect to any Tax Lien, means all obligations and liabilities of the Borrower, the Servicer or any third party to the owner of the Property.

(kkk)   **"Rochester NY Liens"** means and includes 297 Tax Liens to be purchased by EB 2EMINY LLC from American Tax Funding having an aggregate redemptive value of $3,568,818.00.

11

119449465_7

(lll)   "**Security Agreement**" means and includes individually, collectively, interchangeably and without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

(mmm) "**Security Interest**" means and includes individually, collectively, interchangeably and without limitation any and all present and future mortgages, pledges, liens, security interests, crop pledges, assignments and other security agreements directly or indirectly securing the repayment of the Indebtedness, whether created by law, contract, or otherwise.

(nnn)   "**Servicer**" means and includes each Person (including the Lender) approved by the Lender to service and administer Tax Liens of any Ebury Company pursuant to a Servicing Agreement.

(ooo)   "**Servicing Agreement**" means and includes each agreement with an Ebury Company, a Servicer and the Lender, in a form satisfactory to the Lender, pursuant to which Tax Liens will be serviced and administered in accordance with the terms of such agreement, which terms shall specifically include the right of the Lender, upon an Event of Default, at its option to terminate the Servicing Agreement and take over the servicing function, or designate a third-party of its choice to act as Servicer.

(ppp)   "**Special Purpose Entity**" has the meaning set forth in Section 3.6 below.

(qqq)   "**Special Purpose Entity Covenants**" means the covenants of the Borrower set forth in Schedule 1.1(ppp) attached hereto.

(rrr)   "**State**" means a State of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insula possession subject to the jurisdiction of the United States.

(sss)   "**State Registration Requirement**" means and includes each of the Tax Lien registration requirements for each State set forth on the applicable portion of Schedule 1.1(x) attached hereto.

(ttt)   "**Subsequent Tax Lien**" with respect to a Property subject to Tax Lien means Municipal Liens upon such Property, including interest and penalties accruing thereon for periods subsequent to the period covered by the Municipal Liens evidenced by such initial Tax Lien that are: (i) paid by the owner of such Tax Lien to the applicable Taxing Authority; (ii) are not themselves evidenced by a certificate or instrument separate from such initial Tax Lien; and (iii) include all other rights, remedies and interest attributable to or incident to the payment or ownership of subsequent taxes and assessments on such Property.

(uuu)   "**Subsidiary**" means, with respect to any Person: (i) any business entity of which more than fifty (50%) percent of the total voting power of voting securities and equities thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof; and (ii) any partnership in which such Person or any of its subsidiaries is a general partner.

(vvv)   "**Tax**" or "**Taxes**" means any present or future taxes, levies, imposts, duties, charges, assessments or fees of any nature (including interest, penalties and additions thereto) that are imposed by any Government Authority.

(www) "**Tax Certificate**" means the certificate or other evidence of purchase or payment that evidences the sale or transfer of a Tax Lien pursuant to applicable State laws and regulations.

(xxx)   "**Tax Debtor**" means individually, collectively and interchangeably each Person who has an ownership interest in Property that secures a Tax Lien and any other Person that may be obligated to pay a Tax Lien.

(yyy)   "**Taxing Authority**" means the Governmental Authority assessing, levying and collecting taxes.

119449465_6

(zzz) **"Tax Lien"** means the lien or other rights imposed upon real (immovable) property to secure the payment of taxes, assessments and other charges due and owing with respect to such real (immovable) property, including, without limitation, the right to collect, receive and otherwise administer the collection of payments associated with such lien or other rights, whether evidenced by a physical or electronic certificate or instrument issued by the related Taxing Authority. For purposes of this Agreement, "Tax Lien" is deemed to include "Subsequent Tax Liens."

(aaaa) **"Tax Lien Documents"** means and includes, with respect to any Tax Lien, all documents prepared, executed or filed in connection with a Tax Lien, including, without limitation, the Tax Certificate and all documents or instruments evidencing, governing, securing, guaranteeing or otherwise pertaining to such Tax Lien and any other instruments that may be required to be presented to the applicable taxing authority as a condition of receiving a redemption payment, as the same may be modified, amended, renewed, extended, rearranged, restated or replaced from time to time.

(bbbb) **"Termination Date"** means the earlier of: (i) the Expiration Date; and (ii) the date on which all Indebtedness shall become due and payable pursuant to Section 9.2(a).

(cccc) **"Transaction Documents"** means and includes individually, collectively, interchangeably and without limitation, this Agreement, the Note, the Servicing Agreement, the Custodial Agreement, Guaranty Agreements from each Guarantor, each of the Security Agreements, the Lender POA, all UCC financing statements, amendments and continuation statements filed pursuant to any document comprising Transaction Documents and all other promissory notes, credit agreements, loan agreements, guaranties, security agreements, mortgages, collateral mortgages, deeds of trust, subordination agreements and other instruments, agreements, and documents, whether now or hereafter existing, executed in connection with, or related to, any of the Indebtedness, all as may be amended, modified or restated from time to time in accordance with this Agreement.

(dddd) **"UCC"** means the Uniform Commercial Code in effect in the State of New York from time to time.

(eeee) **"Unpaid Acquisition Price"** means, for a Tax Lien, that portion of the Acquisition Price of the Tax Lien that has not been repaid to the Borrower by the Taxing Authority or the Tax Debtor though redemptions or other means.

(ffff) **"Vacant (unimproved)"** shall mean and include collectively, vacant residential, vacant commercial and vacant industrial properties. Property types as used in this provision shall be mutually exclusive (i.e., vacant commercial shall not be included in Commercial Properties).

(gggg) **"Validity Guarantor"** means JOHN HANRATTY, a New York resident, and all other Persons that may become a party to this Agreement as a Validity Guarantor by any modification amendment or supplement to this Agreement.

1.2    Accounting Matters.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing any audited financial statements required herein, except as otherwise specifically prescribed herein. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, the Indebtedness of the Borrower shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 on financial liabilities shall be disregarded.

(b)    If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth herein, and either Borrower or the Lender shall so request, the Borrower and the Lender shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such

13

119449465_6

change in GAAP (subject to the approval of the Lender; provided that, until so amended: (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein; and (ii) the Borrower shall provide to the Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

     1.3    Other Definitional Provisions. All definitions contained in this Agreement are equally applicable to the singular and plural forms of the terms defined. The words "hereof", "herein", and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all references in a Transaction Document to Sections, Articles, Exhibits and Schedules shall be construed to refer to Sections and Articles of, and Exhibits and Schedules to, the Transaction Document in which such references appear. Terms used herein that are defined in the UCC, unless otherwise defined herein, shall have the meanings specified in the UCC. Any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document). Any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time. Words denoting gender shall be construed to include the masculine, feminine and neuter, when such construction is appropriate; and specific enumeration shall not exclude the general but shall be constructed as cumulative; the word "or " is not exclusive; the word "including" (in its various forms) means "including, without limitation"; in the computation of periods of time, the word " from" means "from and including" and the words "to" and "until" mean " to but excluding "; and all references to money refer to the legal currency of the United States of America.

## ARTICLE II
## LINE OF CREDIT

     2.1    Line of Credit. Subject to and upon the terms and conditions contained in this Agreement, and relying on the representations and warranties contained in this Agreement, the Lender agrees to make Advances to the Borrower on a revolving line of credit basis, provided that the aggregate amount of such Advances outstanding does not exceed the lesser of: (i) the maximum dollar amount of the Note (initially, $5,000,000.00); and (ii) the Borrowing Base. Within the foregoing limits, the Borrower may borrow, partially or wholly prepay, and re-borrow under the Line of Credit in accordance with the following provisions. Advances shall be used solely for the purposes of acquiring Eligible Tax Liens (including Subsequent Tax Liens).

     (a)    Authorized Individuals may request Advances under the Line of Credit, as well as directions for payment from the accounts of the Borrower, in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of the Borrower: (i) when credited to any deposit account of the Borrower or any other Ebury Company maintained with the Lender; or (ii) when advanced in accordance with the instructions of an Authorized Individual. The Lender, at the option of the Lender, may set a cutoff time, which as of the date of this Agreement shall be deemed to be 1:00 p.m., after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

     (b)    The Borrower hereby authorizes the Lender to make Advances under the Line of Credit in amounts necessary to pay any fee or charge provided for under this Agreement or any other Transaction Document, including, without limitation, to pay any accrued interest due under the Note. Any such Advance may, at the option of the Lender, be funded directly to the Lender or deposited into a deposit account of the Borrower or any other Ebury Company maintained with the Lender, which account may then be debited by the Lender for the amount of such Advances. The Lender shall be under no obligation to make any such Advance after an Event of Default occurs.

     (c)    The outstanding and unpaid principal balance under the Note shall bear interest at the rate stated in the Note. The Borrower shall make payments of unpaid interest accrued on the outstanding and unpaid

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 181 of 688

principal balance under the Note as provided for in the Note. All unpaid and accrued interest not due and payable earlier, shall be due and payable on the Expiration Date.

2.2     Overadvances. In the event the unpaid principal amount of the outstanding Advances under the Line of Credit ever exceeds the Borrowing Base, the excess amount (an "**Overadvance**") shall be paid by the Borrower within three (3) Business Days after written notice from the Lender. Overadvances shall bear interest at the rate stated in the Note. The Borrower acknowledges and agrees that the Lender is not obligated to the Borrower to fund any Advance that would create an Overadvance.

2.3     Annual Audit Fees. Under the terms of this Agreement, the Lender has the right to conduct periodic reviews, inspections and audits of the Collateral and the books and records of the Ebury Companies at the expense of the Borrower.

2.4     Unused Fee. In addition to interest, beginning April 1, 2017 through the date the Borrower notifies the Lender that it irrevocably waives and relinquishes the right to any future Advance under the Line of Credit, the Borrower agrees to pay to the Lender an unused facility fee on the unused portion of the Line of Credit (the "unused portion" being the amount by which the maximum dollar amount of the Note exceeds the outstanding principal balance of the Note) from the date of this Agreement through the Expiration Date, at the rate of 0.25% per annum, accrued daily and payable for each three (3) calendar month period (each calendar quarter), in arrears, fifteen (15) days after last day of each calendar quarter. The amount of the unused facility fee shall be calculated each day during the period for which the fee is due using an assumed 360 day year.

2.5     Loan Account. The Lender shall maintain on its books a record of account in which the Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the Line of Credit. The Lender shall provide the Borrower with periodic statements of account of the Borrower, which statements shall be considered to be correct and conclusively binding on the Borrower, absent manifest error unless the Borrower notifies the Lender to the contrary within thirty (30) days after receipt by the Borrower of any such statement that the Borrower deems to be incorrect.

## ARTICLE III
## COLLATERAL

3.1     Collateral.

(a)     The Parties intend that this Agreement and any other Transaction Document constitute a security agreement and the transactions effected hereby constitute secured loans by the Lender to the Borrower under Applicable Law. As collateral security for the prompt, complete and indefeasible payment and performance in full when due, whether by lapse of time, acceleration or otherwise, of the Indebtedness, each Ebury Company hereby grants to the Lender a lien on and Security Interest in all of such Ebury Company's right, title and interest in, to and under the Collateral, whether now existing or owned or hereafter arising or acquired by such Ebury Company.

(b)     The grant under this Article neither constitutes nor is intended to result in a creation or an assumption by the Lender of any obligation of any Ebury Company or any other Person in connection with any or all of the Collateral or under any agreement or instrument relating thereto. Anything herein to the contrary notwithstanding: (i) each Ebury Company shall remain responsible to perform all of its duties and obligations in respect of the Retained Interests to the same extent as if this Agreement had not been executed; (ii) the exercise by the Lender of any of its rights in the Collateral shall not release any Ebury Company from any of its duties or obligations under the Collateral; and (iii) the Lender shall neither have any obligations or liability under the Collateral by reason of this Agreement nor be obligated to perform any of the obligations or duties of the Ebury Companies any thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(c)     The Security Interests in the Collateral shall be continuing Liens and shall include the rents, proceeds and products of the Collateral, including without limitation the proceeds of any insurance. Each Ebury Company agrees not to transfer or encumber any of the Collateral, and agrees not to allow any other Grantor

15

to transfer or encumber any of the Collateral, except as may be otherwise permitted under in this Agreement or with the written consent of the Lender.

3.2    Collateral Representations and Warranties. In addition to the agreements, representations and warranties included in any Security Agreement, with respect to Tax Liens included in the Collateral, each Ebury Company agrees and represents and warrants to the Lender that: (a) all present Tax Liens represent, and all future Tax Liens will represent, Tax Liens acquired by an Ebury Company in the ordinary course of its business and will comply with all Applicable Law, except where failure to so comply would not cause or have a Material Adverse Effect; (b) each Tax Lien represented to be an Eligible Tax Lien included in the Borrowing Base conforms to the requirements of the definition of Eligible Tax Liens included in the Borrowing Base; and (c) all Tax Lien Documents and information listed on schedules delivered to the Lender in accordance with the terms of this Agreement and other Transaction Documents will be true and correct in all material respects. So long as no Event of Default has occurred and is continuing, any inspection, examination, review or audit of the records of any Ebury Company allowed under this Agreement shall be conducted at the offices of the Borrower or the third-party possessor during normal business hours after at least twenty-four (24) hours' prior notice. During the existence of an Event of Default, any such inspection, examination, review or audit shall be conducted at such time and place as may reasonably be requested by the Lender.

3.3    Protection of Security Interest; Lender as Attorney-in-Fact. Each Ebury Company agrees that from time to time, at its expense, it will promptly execute and deliver all instruments and documents, and take all actions, that may reasonably be necessary, or, at the Lender's request, that the Lender may deem necessary or desirable, to perfect, protect or more fully evidence the security interest granted to the Lender in the Collateral, or to enable the Lender to exercise and enforce its rights and remedies hereunder and thereunder. If any Ebury Company fails to perform any of its obligations under this Section 3.3 after five (5) Business Days' notice from the Lender, the Lender may (but shall not be required to) perform, or cause performance of, such obligation; and the Lender's costs and expenses incurred in connection therewith shall be payable by the Ebury Companies upon demand. Each Ebury Company hereby irrevocably authorizes the Lender at any time and from time to time to file in any UCC jurisdiction financing statements (including amendments and continuations thereto) that indicate the Collateral as all assets of the Ebury Companies or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State or such jurisdiction.

3.4    Waiver of Certain Laws. Each Ebury Company agrees, to the full extent that it may lawfully so agree, that neither it nor anyone claiming through or under it will set up, claim or seek to take advantage of any appraisement, valuation, stay, extension or redemption law now or hereafter in force in any locality where any part of the Collateral may be situated in order to prevent, hinder or delay the enforcement or foreclosure of this Agreement, or the absolute sale of any of the Collateral or any part thereof, or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereof, and such Person for itself and all who may at any time claim through or under it, hereby waives, to the full extent that it may be lawful so to do, the benefit of all such laws, and any and all right to have any of the properties or assets constituting the Collateral marshaled upon any such sale, and agrees that the Lender or any court having jurisdiction to foreclosure the security interests granted in this Agreement may sell the Collateral as an entirety or in such parcels as the Lender or such court may determine.

3.5    Servicing Agreement. To the extent required by this Agreement, the Borrower has entered into a Servicing Agreement approved as to form by the Lender, with a Servicer acceptable to the Lender, and a fully executed copy of which has been provided to the Lender.

3.6    Special Purpose Entities. Tax Liens secured by property in a State must be owned by a special purpose entity organized and existing under the laws of that State (a "**Special Purpose Entity**") with organizational documents that: (a) restrict its activities to Tax Lien ownership and activities related thereto; (b) prohibit acts that can be taken without the consent of the Lender; and (c) include such other organizational terms as are set forth in the Special Purpose Entity Requirements.

3.7    Lockbox Account. All Collections (including electronic payments) must be deposited each

Business Day, daily and in kind, by the Borrower, into a lockbox account established and maintained with a financial institution acceptable to Lender, and for which Lender has entered into a control agreement (the "**Lockbox Account**"). Collections received by any Ebury Company shall be deposited into the Lockbox Account, in kind, no later than one (1) Business Day after receipt. Collections received by the Custodian or a Servicer shall be transferred to the Lockbox Account in accordance with the terms of the Custodial Agreement or the Servicing Agreement. Each Business Day the collected balance in the Lockbox shall be transferred to Lender and applied to repayment of the Indebtedness. Except for Tax Liens collected by the Custodian or a Servicer, each Ebury Company agrees to instruct, in writing, all Persons responsible for making payments of amounts secured by Tax Liens and other amounts due to any Ebury Company to make all payments to Ebury Fund 2 LP, P.O. Box 829686, Philadelphia, PA 19182-9686 (or such other address selected by the Lender). After an Event of Default occurs and during the continuance thereof, the Lender shall have the independent right, but not a duty, to notify Persons responsible for making payments of amounts secured by Tax Liens or other amounts due to any Ebury Company to make all payments to the address selected by the Lender. All payments received by the Lender and all payments received by any Ebury Company or any Custodian or any Servicer or any agent acting for any Ebury Company will be applied to repayment of the Indebtedness.

## ARTICLE IV
## CONDITIONS PRECEDENT TO EACH ADVANCE

The obligation of the Lender to make the initial Advance under the Line of Credit and each subsequent Advance under the Line of Credit shall be subject to the fulfillment of all of the conditions set forth in this Agreement and in the Transaction Documents to the satisfaction of the Lender.

4.1     Transaction Documents. Each Transaction Document shall have been duly executed by, and delivered to the Parties hereto and thereto and the Lender shall have received such other documents, instruments, agreements and legal opinions reasonably required by the Lender or counsel for the Lender in connection with the transactions contemplated by this Agreement, each in form and substance satisfactory to the Lender.

4.2     Approvals. The Lender shall have received: (a) satisfactory evidence in the form of a legal opinion or officer's certificate that the Borrower, the other Ebury Companies, the Guarantors, the Servicer and the Custodian have obtained all required consents and approvals of all Persons, including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement and the other Transaction Documents to which each is a party and the consummation of the transactions contemplated hereby or thereby; or (b) an officer's certificate from each of the Borrower, the other Ebury Companies, the Guarantors, the Servicer and the Custodian in form and substance satisfactory to the Lender affirming that no such consents or approvals are required; it being understood that the acceptance of such evidence or officer's certificate shall in no way limit the recourse of the Lender against the Borrower for a breach or the Borrower's representations or warranties that all such consents and approvals have, in fact, been obtained.

4.3     Authorizations. The Lender shall have received from each Ebury Company, in form and substance satisfactory to the Lender, evidence that the execution and delivery of this Agreement, the Note and the other Transaction Documents has been duly authorized, together with such other authorizations and other documents and instruments as the Lender or counsel for the Lender may reasonably require to evidence such authorization. All consents, authorizations, permits and approvals of any Governmental Authority or other Person necessary or advisable in connection with the execution and delivery of the Transaction Documents and the transactions contemplated thereby shall have been obtained and be in full force and effect.

4.4     Security Interest Creation. The Security Interests shall have been duly authorized and created (subject only to Permitted Liens) and shall be in full force and effect and the Lender shall have received evidence, acceptable to the Lender, of the priority of the Security Interests in the Collateral as contemplated by this Agreement.

4.5     Opinions. The Lender shall have received originally executed copies of the favorable written opinions of counsel for the Borrower as to such matters as the Lender may reasonably request and in form and substance reasonably satisfactory to the Lender.

17

4.6     Special Purpose Entity Classification.  Each Ebury Company other than the Borrower shall have provided to the Lender its executed Governing Documents, in form and substance satisfactory to the Lender, which provides that such Ebury Company is a special purpose entity with at least one (1) independent director or independent manager, if such entity is a limited liability company, or that requires the affirmative consent of the trust certificate holder and trustee to take an Insolvency Action, if such entity is a statutory trust. The Servicer shall have provided to the Lender its executed Governing Documents. Each Guarantor shall have provided to the Lender its executed Governing Documents, in form and substance satisfactory to the Lender.

4.7     Payment of Fees and Expenses.  The Borrower shall have paid all fees, charges, and other expenses that are then due and payable as specified in this Agreement or any other Transaction Document including the commitment fee in the amount of $50,000 due at Closing.

4.8     Other Conditions.  There has been no Material Adverse Effect or Event of Default and the Borrower and the other Ebury Companies shall each be in compliance in all material respects with all Applicable Law.

4.9     Representations and Warranties.  The representations and warranties set forth in this Agreement, in the Transaction Documents, and in any document or certificate delivered to the Lender under this Agreement are true and correct in all material respects.

4.10    Cessation of Advances.  Without limiting any other rights and remedies provided in this Agreement, the other Transaction Documents or available at law, in equity, or otherwise, the Lender shall have no obligation to make any Advance if:  (a) any Event of Default has occurred and is continuing; (b) an event has occurred and is continuing that, with notice, the lapse of time or otherwise, could constitute an Event of Default; (c) any condition precedent for the obligation of the Lender to make such Advance is not satisfied; (d) any Ebury Company becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (e) there occurs a material adverse change in the financial condition of any Ebury Company or any Validity Guarantor, or in the value of the Collateral taken as a whole; (f) any Ebury Company or any Validity Guarantor or any other Grantor seeks, claims or otherwise attempts to limit, modify or revoke any Security Interest granted to the Lender; (g) any Validity Guarantor seeks, claims or otherwise attempts to limit, modify or revoke the validity guaranty executed by such Validity Guarantor, or (h) at least thirty (30) days prior to the date a requested Advance is to be made, the Lender has notified the Borrower that the Lender in good faith deems itself insecure even though no Event of Default shall have occurred.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Ebury Company jointly and separately represents and warrants to the Lender that as of the date of this Agreement and as of the date of each Advance, the following shall be true and correct and shall be deemed to have certified that, after giving effect to the proposed Advance and pledge of Tax Liens:

5.1     Organization.  The Borrower is a New York limited liability company, and each other Ebury Company is a limited liability company organized under the laws of the State where property securing its Tax Liens is located.  Each Ebury Company is duly organized, validly existing and is in good standing under the laws of the jurisdiction of its organization, is duly qualified to do business in and is in good standing in every jurisdiction where the failure to so qualify could have or cause a Material Adverse Effect, and has all powers and all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted except where the failure to obtain such licenses, authorizations, consents and approvals could not reasonably be expected to result in a Material Adverse Effect.

5.2     Authorization.  The execution, delivery and performance of this Agreement by each Ebury Company has been duly authorized, and does not conflict with, and will not result in a violation of, or constitute or give rise to an event of default under any Governing Documents of any Ebury Company, any agreement or other instrument that may be binding upon any Ebury Company or any Applicable Law applicable to any Ebury Company or the assets of any Ebury Company except to the extent such conflict could not reasonably be expected

18

to result in a Material Adverse Effect. Each Ebury Company has the power and authority to enter into this Agreement and each Grantor has the power and authority to grant collateral security for the Indebtedness. Each Ebury Company has the further power and authority to own and to hold all of its assets and properties, and to carry on its business as now conducted.

5.3     Financial Information - Ebury Companies. As of the date hereof, the financial statements of each Ebury Company furnished to the Lender are complete and correct in all material respects, the financial statements of each Ebury Company were prepared in accordance with GAAP, and the financial statements of each Ebury Company fairly represent the financial condition and solvency of each Ebury Company as of the date thereof. To the best of their knowledge, no Ebury Company has any contingent obligations or liabilities that were not disclosed or reserved against in the financial statements of any Ebury Company or in the notes thereto. Since the dates of such financial statements, there has been no material adverse change in the financial condition or business of any Ebury Company that has not been disclosed to the Lender in writing.

5.4     Financial Information – Validity Guarantor. As of the date hereof, the financial statements of Validity Guarantor furnished to Lender prior to the date of this Agreement is complete and correct in all material respects and fairly represent the financial condition of each Validity Guarantor for whom financial statements were provided as of the date thereof. To the best of the knowledge of each Ebury Company: (a) no Validity Guarantor has any contingent obligations or liabilities that were not disclosed or reserved against in the financial statements of any Validity Guarantor or in the notes thereto; and (b) since the dates of such financial statements, there has been no material adverse change in the financial condition or business of any Validity Guarantor that have not been disclosed to Lender in writing.

5.5     Other Debt. No Ebury Company has any indebtedness or other monetary obligation to others (direct or contingent) other than:  (a) trade debt incurred in the normal course of business; (b) other general liabilities incurred in the ordinary course of business; and (c) indebtedness to the Lender.

5.6     Properties. Except for Permitted Liens, each Ebury Company owns and has good title to all of its respective properties free and clear of all security interests, and no Ebury Company has executed any security documents or authorized the filing of any financing statements relating to such properties. All of the property of each Ebury Company is titled in its respective name, except as otherwise required or permitted under this Agreement.

5.7     Hazardous Substances.

(a)     Except as disclosed to and acknowledged by the Lender in writing, each Ebury Company agrees, represents and warrants that:  (i) during the period of ownership by any Ebury Company, there has been and will be no unlawful Release or threatened Release of any Hazardous Substances by any Person on, under, or about any of the properties owned by any Ebury Company; (ii) no Ebury Company has any knowledge of, or reason to believe that there has been any unlawful Release or threatened Release of any Hazardous Substances by any prior owners or occupants of any of the properties of any Ebury Company, or any actual or threatened litigation or claims of any kind by any Person relating to such matters; and (iii) neither any Ebury Company nor any tenant, contractor, agent or other authorized user of any of the properties of any Ebury Company shall Release any Hazardous Substances on, under, or about any of the properties other than in full compliance with all Applicable Laws, including without limitation the Environmental Laws; provided, however, that to the extent any Ebury Company discovers any unlawful Release or threatened Release of any Hazardous Substances by any prior owners or occupants of any property and such Ebury Company promptly notifies the Lender and formulizes a plan, acceptable to the Lender in its reasonable discretion, to pursue a Remedial Action and the Ebury Companies continue to implement such Remedial Action, no Event of Default shall be deemed to have occurred.

(b)     Each Ebury Company authorizes the Lender and its agents to enter upon the Properties, subject to the rights of tenants, if the Lender has a reasonable basis to suspect non-compliance of one or more such Properties, to make such inspections and tests as the Lender may deem appropriate to determine compliance of the Properties with this Section 5.6. Any inspections or tests made by the Lender shall be at the expense of the Ebury Companies and for the purposes of the Lender only and shall not be construed to create any responsibility or

119449465_6

liability on the part of the Lender to any Ebury Company or to any other Person. The representations and warranties contained herein are based on due diligence by the Ebury Companies in investigating such properties for Hazardous Substances as the Ebury Companies determine necessary or advisable based on an evaluation of each property acquired by any Ebury Company.

(c)  Each Ebury Company hereby: (i) releases and waives any future claims against the Lender for indemnity or contribution in the event any Ebury Company becomes liable for cleanup or other costs under any Applicable Law including the Environmental Laws; and (ii) as set forth in Article X below, agrees to indemnify and hold harmless the Lender against any and all claims, losses, liabilities, damages, penalties, and expenses that the Lender may directly or indirectly sustain or suffer resulting from a breach of this Section or as a consequence of any Release or threatened Release occurring prior to the ownership of any interest in the Properties by any Ebury Company and prior to the Lender's or any Subsidiary's or Affiliate's ownership, whether or not the same was or should have been known to any Ebury Company. The indemnification provided by this Section and Article X below shall survive the payment of the Indebtedness and the termination or expiration of this Agreement and shall not be affected by the acquisition by the Lender of any interest in any of the Properties, except to the extent the actions or omissions giving rise to any claim occurred subsequent to the date the Lender acquired an interest in the subject property. For the avoidance of doubt, any reference to the property of any Ebury Company in this Section 5.6 does not refer to and shall not be interpreted to refer to any Property securing the Tax Liens.

5.8   Litigation. As of the date hereof, there are no suits, investigations or proceedings pending, or to the knowledge of any Ebury Company, threatened against or adversely affecting any Ebury Company or the assets of any Ebury Company, before any court or by any Governmental Authority.

5.9   Taxes. All tax returns and reports of the Ebury Companies that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full.

5.10   Tax Liens. Each Ebury Company has complied in all respects with its obligations under the Custodial Agreement with respect to each Tax Lien, including delivery to Custodian of all required Tax Lien Documents. No Tax Lien Documents relating to any Tax Lien has any marks or notations indicating that such Tax Lien has been sold, assigned, pledged, encumbered or otherwise conveyed by such Ebury Company to any Person other than the Lender. The assignment and pledge of each Tax Lien to the Lender does not violate any of the Tax Lien Documents or any agreement to which any Ebury Company is a party or by which any Ebury Company is bound. On or prior to the applicable Advance date, such Ebury Company or the Servicer shall have instructed all Taxing Authorities (and any other applicable Person) to make all payments in respect of the related Tax Liens to the Lender.

5.11   Security Interests and Lien Priority. Each Ebury Company has good and valid ownership of the Collateral, free and clear of all Liens other than Permitted Liens. The Transaction Documents constitute a valid and effective grant of a security interest, free and clear of any Liens (other than Permitted Liens) to the Lender of all right, title and interest (other than Retained Interests) of each Ebury Company in, to and under all of the Collateral, which security interest is of first priority. To the extent that the UCC applies and such security interest can be perfected by either the filing of a financing statement or the taking of possession by the Lender or its agent, such security interest is perfected. No Ebury Company has sold, assigned, pledged, encumbered or otherwise conveyed any of the Collateral to any Person other than pursuant to the Transaction Documents nor authorized the filing of any UCC financing statements naming it as debtor, other than any financing statement that has been filed pursuant to this Agreement.

5.12   Separateness. Each Ebury Company is in compliance with the Special Purpose Entity Covenants.

5.13   REO Properties. The Borrower and the other Ebury Companies other than RE 2EMI LLC do not own any REO Properties.

5.14   Binding Effect. This Agreement and the other Transaction Documents executed by any Ebury Company are binding upon the executing Parties, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms, subject to the effect of any Insolvency Laws

119449465_6

affecting the rights and remedies of creditors generally general principles of equity.

5.15    Employee Benefit Plans. Each employee benefit plan as to which any Ebury Company may have any liability complies in all material respects with all applicable requirements of law and regulations, and: (a) no Reportable Event nor Prohibited Transaction (as defined in ERISA) has occurred with respect to any such plan; (b) no Ebury Company has withdrawn from any such plan or initiated steps to do so; and (c) no steps have been taken to terminate any such plan.

5.16    Investment Company. No Ebury Company is an "Investment Company" as that term is defined under the Investment Company Act of 1940.

5.17    Compliance with Applicable Law. In connection with the transactions contemplated by the Transaction Documents, each Ebury Company has complied in all respects with all applicable Requirements of Law except to the extent that any failure to so comply would not have a Material Adverse Effect. No Ebury Company: (a) is or is controlled by a Person required to register as an "investment company" as defined in the Investment Company Act of 19409; (b) is a "broker" or "dealer" as defined in, or could be subject to a liquidation proceeding under, the Securities Investor Protection Act of 1970; or (c) is subject to regulation by any Governmental Authority limiting its ability of the Borrower to incur the Indebtedness.

5.18    Location of Records. Each Ebury Company keeps records concerning the Collateral at the offices of the Custodian: 56 Locust Avenue, 2nd Floor, Rye, NY 10580.

5.19    Tax Identification Numbers. The Federal Employer Tax Identification Number for each Ebury Company is set forth on Schedule 5 attached hereto.

5.20    Organizational Identification Numbers. The organizational identification number assigned to each Ebury Company by the agency of that jurisdiction where its organizational documents is set forth on Schedule 5 attached hereto.

5.21    Information. All information heretofore or contemporaneously herewith furnished by each Ebury Company and each Validity Guarantor to the Lender for the purposes of or in connection with the Transaction Documents or any transaction contemplated thereby is, and all information hereafter furnished by or on behalf of each Ebury Company and each Validity Guarantor to the Lender will be, true and accurate in every material respect on the date as of which such information is dated or certified; and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading.

5.22    Survival of Representation and Warranties. Each Ebury Company understands and agrees that the Lender is relying upon the above representations and warranties in extending the Line of Credit and making Advances. Each Ebury Company further understands and agrees that the foregoing representations and warranties shall be continuing in nature and shall remain in full force and effect until such time as the Indebtedness shall be paid in full and this Agreement has been terminated by the Parties and the Lender, or until the Expiration Date, whichever is the last to occur.

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

Each Ebury Company covenants and agrees with the Lender that, so long as this Agreement remains in effect, it shall comply with the following affirmative covenants:

6.1    Material Adverse Changes and Litigation. Each Ebury Company shall promptly inform the Lender in writing of: (a) any and all adverse changes causing a Material Adverse Effect on an Ebury Company's or any Validity Guarantor's financial condition; and (b) all litigation, investigations and claims and all threatened litigation and claims affecting an Ebury Company or a Validity Guarantor that could reasonably be expected to result in a Material Adverse Effect.

6.2    Financial Records. Each Ebury Company shall maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit the Lender, and its employees and agents, at Borrower's expense, to inspect, examine, review or audit such Ebury Company's books and records (including, without limitation, reviews and audits of all Tax Lien records). So long as no Event of Default has occurred and is continuing, any inspection, examination, review or audit of the records of any Ebury Company allowed under this Agreement shall be conducted at the offices of the Borrower or the third-party possessor during normal business hours after at least twenty-four (24) hours' prior notice. After an Event of Default has occurred and is continuing, any such inspection, examination, review or audit shall be conducted at such time and place as may reasonably be requested by the Lender.

6.3    Financial Reports. All financial statements, schedules and reports required to be provided under this Agreement and the Transaction Documents shall be in a form consistent with the historical statements provided to the Lender, and each statement and report provided by the Ebury Companies shall be prepared in accordance with GAAP, applied on a consistent basis and certified as being true and correct to the best knowledge and belief by the chief financial representatives of the Ebury Companies or other Person acceptable to the Lender.

6.4    Loss Reserve. The Ebury Companies shall establish and maintain on their books and records, at all times, a loss reserve acceptable to the Lender. As of the date of this Agreement, no loss reserve is required by the Lender, but the Lender reserves the right to establish, from time to time, a reasonable loss reserve requirement acceptable to the Lender based on financial information provided for the Ebury Companies.

6.5    Revenue Recognition Method. Each Ebury Company shall utilize a revenue recognition method consistent with GAAP, applied on a consistent basis.

6.6    Annual Financial Statements. Each Ebury Company and Ebury Fund 2, LP shall, without demand or request by the Lender and not later than ninety (90) days after the end of each fiscal year, furnish the Lender with fiscal year-end consolidated financial statements for the prior year, including balance sheet and income statement and a statement of cash flows, audited by a certified public accountant acceptable to the Lender and accompanied by the unqualified opinion of the certified public accountant, with footnotes and consolidating schedules.

6.7    Monthly and Quarterly Financial Statements. Each Ebury Company and Ebury Fund 2, LP shall, beginning with the quarter ending June 30, 2017, without demand or request by the Lender and not later than forty-five (45) days after the end of each fiscal quarter, furnish the Lender with consolidated quarter-end financial statements (including balance sheet, income statement and statement of cash flows) for the prior quarter, and if the Lender should so request, prepared and certified as correct to the best knowledge and belief by the chief financial representatives of such Ebury Company or Ebury Fund 2, LP or other Person acceptable to the Lender. Each Ebury Company and Ebury Fund 2, LP shall, beginning with the month ending March 31, 2017, without demand or request by the Lender and not later than thirty (30) days after the end of each month, furnish the Lender with consolidated month-end financial statements (including balance sheet, income statement and statement of cash flows) for the prior month, and if the Lender should so request, prepared and certified as correct to the best knowledge and belief by the chief financial representatives of such Ebury Company or Ebury Fund 2, LP or other Person acceptable to the Lender. The financial statements referred to in this Section 6.7 shall be provided in a form and format reasonably acceptable to the Lender.

6.8    Personal Financial Statements – Validity Guarantor. The Ebury Companies shall, without demand or request by Lender, furnish Lender with a personal financial statement for the Validity Guarantor, originally signed and dated, in a form and content reasonably acceptable to Lender, with information including information no older than thirteen (13) months from the date furnished.

6.9    Personal Tax Returns – Validity Guarantor. The Ebury Companies shall, without demand or request by Lender and not later than fifteen (15) days after filing, but no later than October 31st of the then current fiscal year, furnish Lender with copies of the federal income tax returns for the prior year (and any extensions) filed by the Validity Guarantor, with all schedules and supporting documentation.

6.10    Compliance Certificate. Upon delivery of the financial statements described in Sections 6.6 and

119449465_6

6.7 above, the Ebury Companies shall furnish the Lender with a certificate executed by the chief financial representatives of the Ebury Companies or other Person acceptable to the Lender: (a) showing the calculation details and result for each of the financial covenants in Article VII; (b) certifying that all of the representations and warranties in this Agreement and the other Transaction Documents are true and correct in all material respects, except as noted in the certificate; (c) certifying that no Event of Default has occurred under this Agreement, except as noted in the certificate; and (d) certifying that no event has occurred which, with notice, the lapse of time or otherwise, could constitute an Event of Default under this Agreement, except as noted in the certificate.

6.11    Projections.    The Borrower will deliver to the Lender, within thirty (30) days before the beginning of each fiscal year, projections for Borrower on a month by month basis, prepared by Borrower's management.

6.12    Company Tax Returns - Ebury Fund 1, LP, Ebury Fund 2, LP and Ebury Street Capital, LLC.    The Ebury Companies shall, without demand or request by the Lender and not later than fifteen (15) days after filing, but no later than September 30th of the then current fiscal year, furnish the Lender with copies of the federal income tax returns for the prior year (and any extensions) filed by Ebury Fund 1, LP, Ebury Fund 2, LP, and Ebury Street Capital, LLC with all schedules and supporting documentation.

6.13    Borrowing Base Certificates.

(a)    Prior to each request for an Advance the Ebury Companies shall furnish the Lender with a certificate identifying the calculation of the combined Borrowing Base for the Ebury Companies (which shall be furnished in the form of a combined certificate for all Ebury Companies for all States and a combined certificate for all Ebury Companies for each State) utilizing balance and eligibility information current as of the date the Borrowing Base Certificate is furnished to the Lender, in reasonable detail and in form and content reasonably acceptable to the Lender, prepared by the Ebury Companies and certified as correct to the best knowledge and belief the chief financial representative of the Ebury Companies or other Person acceptable to the Lender (a "**Borrowing Base Certificate**").

(b)    At such time as the Advances outstanding, together with all advances outstanding under the Credit Agreement by and between the Lender and Ebury 1EMI LLC dated as of the date hereof, are collectively in excess of $2,000,000.00, Borrowing Base Certificates shall be furnished, without demand or request by the Lender, no later than fifteen (15) days after the end of each month, with information for the month just ended.

(c)    Each Borrowing Base Certificate shall certify that the Ebury Companies are in compliance with all terms and conditions of this Agreement and the Transaction Documents, including statements that: (i) all of the representations and warranties in this Agreement are true and correct in all material respects; (ii) no Event of Default has occurred under this Agreement; and (iii) no event has occurred that, with notice, the lapse of time or otherwise, could constitute an Event of Default under this Agreement. The amount of gross Tax Lien receivables of the Ebury Companies shown on month-end Borrowing Base Certificates must not be materially different than the amount of gross Tax Lien receivables shown on the quarterly financial statements for the Ebury Companies including the same month-end unless the Ebury Companies provide the Lender with a reconciliation acceptable to the Lender with the quarterly financial statements.

6.14    Monthly Tax Lien Reports.

(a)    Each month-end Borrowing Base Certificate shall be accompanied by reports, for the month ended, providing the following supporting information for the month-end Borrowing Base Certificate (which shall be furnished in the form of a combined report for all Ebury Companies for all States and a combined certificate for all Ebury Companies for each State):

(i)    A listing of all new purchases of Tax Liens and redemption of Tax Liens;

(ii)    a listing of all collections received (separately identifying Acquisition Prices, interest and other amounts received);

(iii)     a listing of all charge-offs;

(iv)     an update of Unpaid Acquisition Price information for the Tax Liens;

(v)     the Unpaid Acquisition Prices of the Tax Liens by property type or use code;

(vi)     portfolio compositions and redemptions by property type/use, state and county;

(vii)     a summary of all Tax Liens excluded from the Borrowing Base listed by the applicable Eligible Tax Lien exclusion; and

(viii)     such other information and in such detail as the Lender may reasonably request.

(b)     The monthly Tax Lien report shall be in reasonable detail and in written and electronic media form and format reasonably acceptable to the Lender and certified as correct to the best knowledge and belief of the chief financial representative of the Ebury Companies or other Person acceptable to the Lender.

6.15     Inspection Reports. The Ebury Companies shall, upon reasonable request of the Lender, furnish the Lender with copies of all inspection reports issued by all supervisory Governmental Authority agencies for the Ebury Companies, if any.

6.16     Tax Lien Requirements.

(a)     If the a Taxing Authority issues certificates evidencing Tax Liens on a delayed basis, the affected Ebury Company shall: (i) promptly comply with all requirements of such Taxing Authority and each Applicable Statute to promptly secure ownership of each Tax Lien; and (ii) promptly upon receipt of notice that such certificates are available for delivery, request from the Custodian, if required, the original receipt or other evidence received from such Taxing Authority with respect to such Tax Lien and promptly deliver such receipt and any other documents necessary to obtain such certificates from such Taxing Authority immediately upon the availability of such certificates and, upon receipt of such certificates, deliver such certificates to the Custodian.

(b)     The affected Ebury Company shall timely and fully: (i) comply with all provisions of all Applicable Statutes necessary or desirable to fully preserve all of the rights of a holder of a Tax Lien to receive all amounts in redemption of such Tax Lien, to foreclose on such Tax Lien, to acquire ownership of the related Property and to preserve and exercise any and all rights, duties and obligations of the holder of such Tax Lien under the Applicable Statutes; and (ii) promptly and fully perform all duties and obligations of a holder of a Tax Lien under each Applicable Statute. In furtherance of the foregoing and not in limitation thereof, such Ebury Company shall deliver all notices required by or provided for in each Applicable Statute to each Person entitled to receive such notices; each such notice shall be delivered in the form and by the means required, specified or otherwise permitted by the Applicable Statutes and within the timeframes provided for or required by the Applicable Statutes.

(c)     Upon receipt of notice that a Tax Lien has been redeemed, if the related certificate evidencing such Tax Lien is required to be surrendered to the related Taxing Authority in order for the redemption to be paid to the holder of such Tax Lien, the affected Ebury Company shall, upon receipt of such certificate from the Custodian pursuant to the Custodial Agreement, deliver such certificate to the applicable Taxing Authority, together with appropriate instructions to cause the redemption payment to be deposited in the Lockbox Account.

(d)     With respect to any Tax Lien that is an Assigned Tax Lien, the affected Ebury Company shall: (i) periodically request from the Original Owner information regarding the redemption or other status of such Assigned Tax Lien; and (ii) timely file all UCC continuation statements related to the original UCC filings. Upon receipt of notice that an Assigned Tax Lien has been redeemed, if the related certificate evidencing such Assigned Tax Lien is required to be surrendered to the related Taxing Authority in order for the redemption to be paid to the holder of such Assigned Tax Lien, such Ebury Company shall request that the Custodian deliver to such Ebury Company or the Servicer the related certificate for the purpose of receiving such redemption amount and, upon receipt of such certificate from the Custodian, deliver such certificate to the applicable Taxing Authority, together with appropriate instructions to cause the redemption payment to be deposited into the Lockbox Account.

24

6.17     Tax Lien Responsibility. Notwithstanding anything herein to the contrary, each Ebury Company shall perform (or shall cause the Servicer to perform) all of its obligations with respect to the Tax Liens to the same extent as if a Security Interest in such Tax Liens had not been granted hereunder, and the exercise by the Lender of its rights hereunder shall not relieve any Ebury Company from such obligations. The Lender shall not have any obligation or liability with respect to any Tax Lien, and shall not be obligated to perform any of the obligations of the Ebury Companies thereunder.

6.18     Regulatory Inspection Reports. The Ebury Companies shall, upon reasonable request of Lender, furnish Lender with copies of all inspection reports issued by all supervisory regulatory agencies for the Ebury Companies, if any.

6.19     Additional Information. The Ebury Companies shall furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, tax returns, and other reports with respect to the financial condition and business operations of the Ebury Companies and Validity Guarantors as the Lender may reasonably request from time to time.

6.20     Additional Information - Regulatory Requirements. Each Ebury Company acknowledges that the Lender is, or may be, subject to Applicable Law requiring the Lender to obtain, verify, and record information that identifies their customers, including all loan parties. The Ebury Companies agree to provide the Lender with any information the Lender reasonably deems necessary to comply with all such Applicable Laws.

6.21     Guaranties. Prior to the initial Advance, the Ebury Companies (other than Borrower) and the Guarantor shall furnish an executed guaranty of all of the Indebtedness in favor of Lender, on a solidary and joint and several basis with Borrower and each other Ebury Company and Guarantor, on a form approved by Lender.

6.22     Validity Guaranties. Prior to the initial Advance, the Borrower shall furnish executed a validity guaranty from Validity Guarantor in favor of Lender, on forms approved by Lender.

6.23     Custodial Agreements. Prior to any Advance including Eligible Tax Certificates issued by Taxing Authorities in a State where Tax Certificates and other Basic Tax Lien Documents are required by the Lender to be delivered to the Custodian and held and administered in accordance with the terms of the Custodian Agreement as shown on the schedule for a State (identified by its postal abbreviation) attached to this Agreement (or by amendment or supplement to this Agreement), the Ebury Companies shall furnish executed Custodial Agreements to the Lender on forms approved by the Lender.

6.24     Servicing Agreements. Prior to any Advance including Eligible Tax Certificates issued by Taxing Authorities in a State where Tax Certificates and other Basic Tax Lien Documents are required by the Lender to be delivered to serviced and administered in accordance with the terms of a Servicing Agreement as shown on the schedule for a State (identified by its postal abbreviation) attached to this Agreement (or by amendment or supplement to this Agreement), the Ebury Companies shall furnish executed Servicing Agreements to the Lender on forms approved by the Lender.

6.25     Other Agreements. Each Ebury Company shall comply with all terms and conditions of all other agreements, whether now or hereafter existing, between it and any other Person and shall notify the Lender immediately in writing of any default (beyond the applicable cure period, if any) in connection with any other such agreements that could have a Material Adverse Effect.

6.26     Use of Proceeds. Unless specifically consented to the contrary by the Lender in writing, the Borrower shall use Advances solely to fund the acquisition of Eligible Tax Liens in the ordinary course of the business of the Ebury Companies and to finance ordinary and necessary expenses of the business operations of the Ebury Companies incurred in the ordinary course of the business (including, without limitation, expenses for the enforcement of Tax Liens and the acquisition at foreclosure, by deed in lieu of foreclosure, or tax deed sales, of properties securing Tax Liens). The Borrower agrees not to use the proceeds of any Advance to acquire or carry margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System).

119449465_6

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO. 6

INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 192 of 688

6.27    Taxes, Charges and Liens. Each Ebury Company shall pay and discharge, before they become delinquent, all of their respective indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon the Ebury Companies or their respective properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of the properties, income, or profits of any Ebury Company; provided, however, that no Ebury Company will be required to pay property taxes or other taxes on Property securing a Tax Lien unless such payments would accrue interest in favor of such Ebury Company, or until such time as the failure to pay such taxes would result in such Ebury Company's Tax Lien failing to be a first priority lien on the Property securing the Tax Lien, except to the extent that regardless of such outcome, such Ebury Company, in its commercially reasonable business judgment, determines it is not in the best interest financially to make such payment; and provided, further, no Ebury Company will be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as: (a) the legality of the same shall be contested in good faith by appropriate proceedings; and (b) appropriate and adequate reserves shall have been established with respect to such contested assessment, tax, charge, levy, lien, or claim. The Ebury Companies, upon demand of the Lender, will furnish to the Lender evidence of payment of the assessments, taxes, charges, levies, liens and claims and will authorize the appropriate governmental official to deliver to the Lender at any time a written statement of any assessments, taxes, charges, levies, liens and claims against their respective properties, income, or profits.

6.28    Performance. The Ebury Companies shall, in all material respects, perform and comply with all terms, conditions and provisions set forth in this Agreement and in all other instruments and agreements of the Ebury Companies with or in favor of the Lender in a timely manner.

6.29    Management and Operations. The Ebury Companies shall conduct their respective business affairs in a reasonable and prudent manner and in compliance with all applicable laws, ordinances, rules and regulations respecting its properties, charters, businesses and operations, including, without limitation, compliance with the Americans With Disabilities Act and with all minimum funding standards and other requirements of ERISA and other laws applicable to employee benefit plans of any Ebury Company, except where failure to so comply would not have a Material Adverse Effect.

6.30    Inspection. The Ebury Companies shall permit employees or agent of the Lender to inspect any and all Collateral and any other properties of the Ebury Companies and to examine, review or audit the books, accounts, ledger sheets, and records of the Ebury Companies and to make copies and memoranda of the books, accounts, ledger sheets, and records of the Ebury Companies. If any Ebury Company now or at any time hereafter maintains any records (including without limitation computer generated records and computer programs for the generation of such records) in the possession of a third party, the Ebury Companies, upon request of the Lender, shall notify such party to permit the Lender free access to such records and to provide the Lender with copies of any records it may request, all at the expense of the Ebury Companies; provided however that to the extent the Lender requests access to any computers of the Ebury Companies in order to access computer generated records or programs, a representative of the Ebury Companies shall be present at all times and access such records or reports on behalf of the Lender. So long as no Event of Default has occurred and is continuing, any inspection, examination, review or audit of the records of the Borrower allowed under this Agreement shall be conducted at the offices of the Ebury Companies or the third-party possessor during normal business hours after at least twenty-four (24) hours' prior notice. An Event of Default and is continuing, any such inspection, examination, review or audit shall be conducted at such time and place as may reasonably be requested by the Lender.

6.31    Change of Location. The Ebury Companies shall immediately notify the Lender in writing of any additions to or changes in their respective business locations or chief executive office locations.

6.32    Title to Assets and Property. The Ebury Companies shall maintain good and marketable title to all of the Collateral, subject to Permitted Liens.

6.33    Notice of Default and ERISA Matters. The Ebury Companies, forthwith upon learning of the occurrence of any of the following, provide the Lender with written notice thereof, describing the same and the steps being taken with respect thereto: (a) the occurrence of any Event of Default; (b) the occurrence of any event

that, with the passage of time, would constitute an Event of Default; or (c) the occurrence of a "Reportable Event" or a "Prohibited Transaction" (as defined in ERISA) under, or the institution of steps by any Ebury Company to withdraw from, or the institution of any steps to terminate, any employee benefit plan as to which any Ebury Company may have any liability.

6.34    Employee Benefit Plans. The Ebury Companies shall maintain each of the employee benefit plans to which it may have any liability, in compliance with all applicable requirements of law and regulations.

6.35    Environmental Compliance and Reports. Each Company shall comply in all respects with all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on the part of such Ebury Company or any third party, on property owned or occupied by such Ebury Company, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate Governmental Authority; shall furnish to the Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any Governmental Authority concerning any intentional or unintentional action or omission on the part of such Ebury Company in connection with any environmental activity whether or not there is damage to the environment or other natural resources.

6.36    Other Information. The Ebury Companies shall, from time to time, provide the Lender with such other information regarding the Ebury Companies and their businesses and assets as the Lender may reasonably request.

6.37    Additional Assurances. Each Ebury Company shall make, execute and deliver to the Lender such promissory notes, security agreements, financing statements, instruments, documents and other agreements as the Lender or its attorneys may reasonably request to evidence and secure the Indebtedness.

## ARTICLE VII
## FINANCIAL COVENANTS

Each Ebury Company covenants and agrees with the Lender that, as long as this Agreement remains in effect, it shall comply with the following financial covenants:

7.1    Definitions. For purposes of testing compliance with these financial covenants, the following terms shall have the following meanings. Except as otherwise provided by these defined terms, all computations made to determine compliance with these financial covenants shall be made in accordance with GAAP, applied on a consistent basis and shall exclude the effect of all inter-company transactions between and among the Ebury Companies.

(a)    **"Derivative Contract"** means a financial contract, arranged through a dealer (including, without limitation, the Lender) deriving its value by reference to an underlying asset, interest rate, exchange rate or index and includes, without limitation, interest rate swaps, interest rate cap, interest rate collar, interest rate floor, interest rate exchange or other similar interest rate hedging contracts.

(b)    **"Due from Related Parties"** during the period of determination, means the sum of: (i) all amounts due from any Person that is an Affiliate or Subsidiary of any Ebury Company; (ii) all amounts due from any Person that is a shareholder, director, partner, member, manager, officer, employee or agent of any Ebury Company or any Affiliate or Subsidiary of any Ebury Company; and (iii) all amounts due from any Person that is an Affiliate or Subsidiary of any shareholder, director, shareholder, director, partner, member, manager, partner or officer of any Ebury Company or any Affiliate or Subsidiary of any Ebury Company.

(c)    **"EBIT"** during the period of determination, means the amount of earnings of the Ebury Companies before deduction of Interest Expense and income taxes.

(d)    **"Excluded Assets"** as of the end of the period of determination, means the sum of: (i) Intangibles; (ii) Due from Related Parties; and (iii) all amounts included in assets secured by any Tax Lien other

27

119449465_6

**FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM**
INDEX NO. 158207/2022

NYSCEF DOC. NO.: 6
24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 194 of 688

than Rochester Tax liens that is more than thirty-six (36) months old, where aging begins from the date the Tax Lien was sold by the Taxing Authority, unless the foreclosure process on the Property securing the Tax Lien has been initiated; however there shall be no Excluded Assets under this clause (iii) for Rochester Tax Liens.

(e) "**Intangibles**" as of the end of the period of determination, means the aggregate of all goodwill, purchase premiums, trademarks, patents, copyrights, organizational expenses, and similar intangible assets of the Ebury Companies.

(f) "**Interest Expense**" during the period of determination, means the sum of all interest expense incurred by the Ebury Companies.

(g) "**Total Assets**" as of the end of the period of determination, means the total book value (including, without limitation, all accrued interest on Tax Liens) of all assets of the Ebury Companies (less contra-assets).

(h) "**Total Liabilities**" as of the end of the period of determination, means the sum of all liabilities of the Ebury Companies.

(i) "**Total Net Worth**" as of the end of the period of determination, means Total Assets, less Total Liabilities.

7.2    <u>Minimum Interest Coverage</u>.    The Ebury Companies, on a consolidated basis, shall maintain Interest Coverage of no less than 1.50 where "**Interest Coverage**" is calculated as (a) EBIT; <u>divided by</u> (b) Interest Expense. Ebury Fund 2, LP, on a consolidated basis, shall maintain Interest Coverage of no less than 1.50.

7.3    <u>Maximum Leverage Position - Consolidated</u>.    The Ebury Companies, on a consolidated basis, shall maintain Leverage Position of no more than 4.00 where "**Leverage Position**" is calculated as: (a) Total Liabilities; <u>divided by</u> (b) Total Net Worth <u>less</u> Excluded Assets. Ebury Fund 2, LP, on a consolidated basis, shall maintain Leverage Position of no more than 4.00.

7.4    <u>Testing - Effect of Derivative Contracts</u>.    Testing for compliance with these financial covenants shall be made without giving effect to any non-cash mark-to-market adjustments for outstanding Derivative Contracts that would otherwise be required under GAAP.

7.5    <u>Financial Covenant Testing Frequency</u>.    The Ebury Companies shall be tested, on a consolidated basis, for compliance with these financial covenants, initially as of June 30, 2017, and thereafter as of the end of each fiscal quarter after receipt of the quarterly financial statements of the Ebury Companies for the end of the testing period. Compliance with the Interest Coverage requirement shall be tested using quarterly financial statements for the Ebury Companies on a rolling 4-quarters basis. Compliance with all financial covenant requirements shall also be tested using the annual audited financial statements for the Ebury Companies upon receipt.

## ARTICLE VIII
## NEGATIVE COVENANTS

Each Ebury Company covenants and agrees with the Lender that, as long as this Agreement remains in effect, without the prior written consent of the Lender, which consent shall not be unreasonably withheld, it shall comply with the following negative covenants:

8.1    <u>Tax Lien Sales and Foreclosures</u>.    No Ebury Company shall take title to any Property in any name that includes the Lender's name, any abbreviated version of the Lender's name, the Lender's full or abbreviated name listed in any capacity or any other name that could indicate that the Lender has any ownership interest in the Property upon completion of a Tax Lien sale, tax deed sale, foreclosure or other proceeding divesting the Tax Debtor of ownership rights. It is expected that, prior to completion of any Tax Lien sale, tax deed sale, foreclosure or other such proceeding, the Tax Lien will be assigned to an Ebury Company or an assignee of an Ebury Company

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 6     Case 24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State   RECEIVED NYSCEF: 10/17/2022

Court Records     Pg 195 of 688

(for which the Lender may require payment of a release price). The first sentence of this negative covenant shall survive repayment of the Indebtedness and termination of this Agreement and the Transaction Documents.

8.2     Custodian and Servicing Agreements. The Ebury Companies have entered into agreement(s) with Tower Fund Services, LLC, as Servicer and Custodian hereunder. The Ebury Companies will not change the Servicer or the Custodian without the prior written consent of Lender, and the Ebury Companies will not enter into, amend, modify or terminate any Custodian Agreement or Servicing Agreement without the prior written consent of Lender.

8.3     Equity Interests. The Ebury Companies shall not, except as otherwise provided in the Transaction Documents: (a) issue, sell or otherwise transfer any of their respective Equity Interests, or the rights, warrants or options to purchase or acquire any of their respective Equity Interests; redeem, retire or repurchase any of their respective Equity Interests; or (b) register any transfer of their respective Equity Interests.

8.4     Indebtedness and Liens. The Ebury Companies shall not: (a) create, incur or assume indebtedness or other monetary obligation (direct or contingent) other than: (i) trade debt incurred in the normal course of business; (ii) other general liabilities incurred in the ordinary course of business; and (iii) indebtedness to the Lender; or (b) except as allowed as a Permitted Lien, create or allow any other Person to create any lien affecting, or otherwise encumbering, any of the Collateral.

8.5     Transfers. The Ebury Companies shall not: (a) sell, transfer or otherwise alienate any of the Collateral; or (b) other than in the ordinary course of business, sell, transfer or otherwise alienate any of their respective assets. The foregoing notwithstanding, the Lender agrees that this provision does not prohibit any transfers of Property acquired by an Ebury Company and that, without prior written consent of the Lender, until an Event of Default occurs, the Ebury Companies can sell Tax Liens provided that the amount realized from such sales is no less than ninety percent (90%) of the Unpaid Acquisition Prices of the Tax Liens sold and further provided that all proceeds of any such sales are deposited into the Lockbox Account within one (1) Business Day after receipt.

8.6     Continuity of Operations. No Ebury Company shall: (a) engage in any business activities substantially different than those in which the Ebury Companies are presently engaged or other similar finance and credit services businesses; (b) operate under any trade name other than trade names, if any, identified in this Agreement; or (c) cease operations, liquidate, merge or consolidate with any other entity, change ownership or ownership structure (except as permitted by this Agreement), or dissolve.

8.7     Other Agreements. No Ebury Company shall enter into any agreement containing any provision that would be violated or breached by the performance of its obligations under this Agreement and the other Transaction Documents.

8.8     Distributions. The Ebury Companies shall not make any distributions if: (a) an Event of Default has occurred; (b) an event has occurred that, with notice, the lapse of time or otherwise, could constitute an Event of Default; or (c) the distribution made or to be made will cause the Borrower to violate, or fail to comply fully with, any of the terms and conditions of, or to default under this Agreement or any other Transaction Document (including, without limitation, the financial covenants in Article VII). In addition to the limitations set forth in the first sentence of this Section 8.8, the Borrower shall not make any distributions in excess of $5,000,000 in any calendar year. For purposes of this Section, the term "distribution" includes all cash distributions paid to the holders of Equity Interests in any Ebury Company, and the value of all non-cash distributions made to the holders of Equity Interests in any Ebury Company.

8.9     Loans, Acquisitions and Guaranties. The Ebury Companies shall not, without the prior written consent of the Lender: (a) loan, invest in or advance money or assets other than: (i) in the ordinary course of business (including the acquisition of Tax Liens, except as limited by Section 8.10); or (ii) loans or advances made by any Ebury Company to any other Ebury Company; (b) purchase, create or acquire any interest in any other enterprise or entity (except for the interests in Subsidiaries used only for bidding on Tax Liens); (c) purchase, create or acquire all or substantially all of the assets of any other enterprise or entity, other than acquisition of Tax Liens

119449465_6

in the ordinary course of business; or (d) incur any obligation as surety or guarantor other than in the ordinary course of business.

8.10     Rochester NY Tax Liens. The Ebury Companies shall not acquire any existing Tax Lien (i.e., Tax Liens previously acquired from a Taxing Authority by a Person other than an Ebury Company); provided, however, the Ebury Companies shall be allowed to acquire existing Tax Liens without the prior written consent of the Lender, subject to the following restrictions: (a) the existing Tax Liens are Rochester NY Liens, and Borrower contributes at least twenty-five percent (25%) of the purchase price to the purchase of such Rochester NY Liens from funds that are not borrowed, and Alabama Purchased Liens; and (b) the acquisitions and all re-registration requirements must occur within sixty (60) days of the execution of this Agreement. The Ebury Companies acknowledge and agree that the aging of existing Tax Liens will be based on the date the Tax Lien was originally acquired from the Taxing Authority. The Ebury Companies acknowledge and agree that in order for any Tax Liens purchased pursuant to this Article to be included in the Borrowing Base calculation, all such Tax Liens must comply with all Eligible Tax Lien requirements for inclusion in the Borrowing Base, including the name registration and lockbox requirements, if any. Notwithstanding the foregoing, once the Lender is provided with written evidence satisfactory to the Lender of the initiation of the name re-registration process and change of the address of the payments to the Ebury Companies' lockbox, and all other Eligible Tax Lien requirements for inclusion in the Borrowing Base are met, then those Tax Liens may be included in the Borrowing Base calculation even though the name re-registration is not yet complete.

8.11     Concentration Limits. The amount of the aggregate of the Unpaid Acquisition Prices of Tax Liens secured by residential property shall not at any time be less than seventy-five percent (75%) of the Unpaid Acquisition Prices of all Tax Liens.

## ARTICLE IX
## EVENTS OF DEFAULT

9.1     Events of Default. Each of following events shall be an "**Event of Default**":

(a)     any Ebury Company fails to: (i) make any principal or interest under the Indebtedness, whether by acceleration or otherwise, within three (3) Business Days of the date due; (ii) cure any Borrowing Base deficiency when due; or (iii) make a payment of any other amount required under the Transaction Documents within five (5) Business Days of the date due (unless otherwise specified in this Section 9.1), in each case in accordance with the Transaction Documents;

(b)     any Ebury Company diverts or uses any portion of any amount received on account of the Collateral while any of the Indebtedness remains outstanding, other than for repayment of the Indebtedness or deposit into the Lockbox Account;

(c)     any Ebury Company violates, or fails to comply fully with, any of the terms and conditions of this Agreement other than those specifically described in this Section 9.1, and such violation or failure continues unremedied for fifteen (15) days after the earlier of receipt by the Borrower of notice of such failure from the Lender or an Ebury Company's knowledge of such failure; provided, however, that no such notice or grace or cure period shall be applicable with respect to a negative covenant, a financial reporting covenant or a financial covenant;

(d)     any event of default occurs or exists (after expiration of any applicable grace or cure periods) under any Transaction Document;

(e)     any Ebury Company defaults (after expiration of any applicable grace or cure periods) under any other loan, extension of credit, security agreement, or obligation in favor of the Lender;

(f)     any Ebury Company, Ebury Fund 1, LP or Ebury Fund 2, LP defaults (after expiration of any applicable grace or cure periods) under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or Person if the effect of such default is to cause

119449465_6

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 6    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 197 of 688

or permit the acceleration of such debt;

(g)    any Ebury Company suspends its business operations for fifteen (15) consecutive Business Days, or the insolvency, however evidenced, of any Ebury Company occurs or exists; provided however that the Borrower shall be permitted to, upon sixty (60) days' written notice to the Lender, cease operations of any Ebury Company and liquidate its assets so long as the proceeds thereof are applied in accordance with the terms of this Agreement;

(h)    an Insolvency Event occurs with respect to any Ebury Company;

(i)    a Change of Control occurs, unless the Lender has consented in writing;

(j)    any proceedings for the dissolution or appointment of a liquidator of any Ebury Company is commenced and such proceedings are not dismissed within sixty (60) days after commencement, or if a liquidator is appointed for all or any part of the property of any Ebury Company;

(k)    any representation or warranty of any Ebury Company or any Validity Guarantor made in connection with the Indebtedness or in this Agreement or any of the other Transaction Documents proves to be incorrect or misleading in any material respect;

(l)    the Lender ceases for any reason to have: (i) a valid and perfected first priority security interest in the Equity Interests in any Ebury Company; (ii) a valid first priority security interest in any portion of or all of the Collateral; or (iii) a valid and perfected first priority security interest in any portion of the Collateral to the extent that the UCC applies and such security interest can be perfected by either the filing of a financing statement or the taking of possession of such Collateral by the Lender or its agent; in each case, subject to Permitted Liens, and in each case, such default continues unremedied for one (1) Business Day after the earlier of receipt by the Borrower of notice thereof from Lender or the discovery of such default by the Borrower; provided, that solely with respect to clauses (ii) or (iii), if such default is caused by a change in Applicable Law, the Borrower has notified the Lender of such default, the Borrower, in good faith, is taking action to cure such default, and there are no other Liens on the Collateral other than Permitted Liens, then the Borrower shall have ten (10) Business Days to cure such default;

(m)    any Ebury Company or any Validity Guarantor seeks, claims or otherwise attempts to limit, modify or revoke the guaranty granted by the Ebury Company or the Validity Guarantor to the Lender;

(n)    any material right or remedy of the Lender or any material obligation, covenant, or agreement of any Ebury Company under the Transaction Documents, or any Lien granted by any Ebury Company under the Transaction Documents or with respect to Tax Liens, terminates, is declared null and void, ceases to be valid and effective, ceases to be the legal, valid, binding and enforceable obligation of any Ebury Company, or the validity, effectiveness, binding nature or enforceability thereof is contested, challenged, denied or repudiated in writing by any Ebury Company or any of its Affiliates;

(o)    a Material Adverse Effect occurs as to the financial condition of any Ebury Company, or in the value of the Collateral taken as a whole; provided, however, a Material Adverse Effect in the value of the Collateral may not be derived from market trades, a decline in real estate values, or adverse rulings, judgments, court orders, or legislation that do not directly affect the Collateral;

(p)    any a final judgment or judgments for the payment of money in excess of $100,000 in the aggregate that is not insured against is entered against any or all of the Ebury Companies, and the same is not satisfied, discharged (or provision has not been made for such discharge) or bonded, or a stay of execution thereof has not been procured, within thirty (30) days from the date of entry thereof;

(q)    any Ebury Company fails to deposit (or cause to be deposited) into the Lockbox Account any Collections received by it within one (1) Business Day of the date required hereunder; and

119449465_6

(r) any Servicer or Custodian agreement is terminated without being simultaneously replaced with a Servicer or Custodian, as applicable, agreement reasonably acceptable to the Lender.

9.2    Effect of an Event of Default.

(a)    Upon the occurrence of an Event of Default, any and all commitments and obligations of the Lender under this Agreement or any of the other Transaction Documents or any other agreement immediately will terminate (including any obligation to make further Advances or disbursements), and, at the option of the Lender, the Indebtedness and all interest accrued thereon shall immediately become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, and the Lender may exercise any and all rights and remedies otherwise available to the Lender, including rights available hereunder and all of the rights and remedies of a secured party upon default under the UCC (such rights and remedies to be cumulative and nonexclusive), and, in addition, may take the following remedial actions:

(i)    the Lender may accelerate payment of the Note in full, in principal, interest, costs, expenses, attorneys' fees, and other fees and charges, as well as to accelerate the maturity of any and all other loans and obligations that any Ebury Company may then owe to the Lender, whether direct or indirect, or by way of assignment or purchase of a participation interest, and whether absolute or contingent, liquidated or unliquidated, voluntary or involuntary, determined or undetermined, due or to become due, and whether now existing or hereafter arising, and whether any Ebury Company is obligated alone or with others on a "solidary" or "joint and several" basis, as a principal obligor or as a surety, of every nature and kind whatsoever, whether any such indebtedness may be barred under any statute of limitations or otherwise may be unenforceable or voidable for any reason whatsoever;

(ii)    without notice except as provided by law, file an appropriate collection action against the Ebury Companies (or any one of them) and, at the Lender's option, to proceed or exercise any rights against any Collateral then securing repayment of the Indebtedness;

(iii)    without notice except as provided by law and at any time or from time to time, charge, set-off and otherwise apply all or any part of the Indebtedness, any interest accrued thereon and or any other amount due and owing to Lender against amounts payable to the Borrower;

(iv)    reduce the maximum dollar amount of the Line of Credit and also to reduce the percentage of Eligible Tax Liens included in the Borrowing Base; and

(v)    take any action and pursue any rights and remedies provided in the Lender POA and the other Transaction Documents or available at law, in equity, or otherwise.

(b)    In addition to the remedial actions set forth in Section 9.2(a) and consistent with the rights and remedies of a secured party under the UCC (and except as otherwise required by the UCC), the Lender, upon the occurrence of an Event of Default, may also without notice except as specified below, solicit and accept bids for and sell the Collateral or any part of the Collateral in one (1) or more parcels at public or private sale, at any exchange, broker's board or at the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable, and the Lender shall apply the proceeds from the sale of the Collateral to any amounts payable by the Borrower with respect to the Indebtedness in accordance with the priorities required by the Transaction Documents.

(c)    The Borrower agrees that, to the extent notice of sale shall be required by law, at least ten (10) Business Days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed for such sale, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Every such sale shall operate to divest all right, title, interest, claim and demand whatsoever of any Ebury Company in and to the Collateral so sold, and shall be a perpetual bar, both at law and in equity, against the Ebury Companies or any Person claiming the Collateral sold

32

through the Ebury Companies and their respective successors or assigns.

9.3     Exercise of Remedies.  Except as may be prohibited by Applicable Law, all of the rights and remedies of the Lender expressly provided in this Agreement are cumulative, may be exercised singularly or concurrently and not exclusive of any rights or remedies that the Lender would otherwise hold under Applicable Law or in equity.  Election by the Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of any Ebury Company shall not affect the right of the Lender to declare a default and to exercise its rights and remedies.  Neither the failure or delay on the part of the Lender to exercise any right, power or privilege under this Agreement, or any course of dealing between the Borrower, on the one hand, and the Lender, on the other hand, shall operate as a waiver of such right, power or privilege, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

9.4     Waiver of Certain Laws.  Each Ebury Company agrees, to the fullest extent that it may lawfully so agree, that neither it nor anyone claiming through or under it will set up, claim or seek to take advantage of any appraisal, valuation, stay, extension or redemption law now or hereafter in force in any locality where any Collateral may be situated in order to prevent, hinder or delay the enforcement or foreclosure of this Agreement, or the absolute sale of any of the Collateral or any part thereof, or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereof, and such Borrower, for itself and all who may at any time claim through or under it, hereby waives, to the full extent that it may be lawful so to do, the benefit of all such laws, and any and all right to have any of the properties or assets constituting the Collateral marshaled upon any such sale, and agrees that the Lender or any court having jurisdiction to foreclose the security interests granted in this Agreement may sell the Collateral as an entirety or such parcels as the Lender or such court may determine.

9.5     Power of Attorney.  The Borrower hereby irrevocably appoints the Lender its true and lawful attorney (with full power of substitution) in its name, place and stead and at its expense, in connection with the enforcement of the rights and remedies provided for in this Section 9.5, including to:  (a) give any necessary receipts or acquittance for amounts collected or received hereunder; (b) make all necessary transfers of the Collateral in connection with any sale or other disposition made pursuant hereto; (c) execute and deliver for value all necessary or appropriate Bills of Sale, assignments and other instruments in connection with any such sale or other disposition, the Borrower thereby ratifying and confirming all that such attorney (or any substitute) shall lawfully do hereunder and pursuant hereto; and (d) sign any agreements, orders or other documents in connection with or pursuant to any Transaction Document; which power of attorney shall be evidenced by the delivery to the Lender on or before closing a written power of attorney, duly executed by the Borrower and appropriately notarized (the "**Lender POA**") in the form of Exhibit 9.5 attached hereto; provided, that the Lender shall not exercise any right under the Lender POA prior to the occurrence of an Event of Default.  Nevertheless, if so requested by the Lender or a purchaser of any of the Collateral, the Borrower shall ratify and confirm any such sale or other disposition by executing and delivering to the Lender or such purchaser all proper Bills of Sale, assignments, releases and other instruments as may be designated in any such request.

## ARTICLE X
## INDEMNIFICATION AND INCREASED COSTS

10.1     Indemnities by the Borrower.  Without limiting any other rights which the Lender or its Affiliates may have hereunder or under Applicable Law, each Ebury Company shall release, defend, indemnify and hold harmless the Lender, its Affiliates and their respective officers, directors, shareholders, partners, members, owners, employees, agents, attorneys, Affiliates and advisors (each an "**Indemnified Person**" and collectively the "**Indemnified Persons**"), on a net after-tax basis, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, taxes, fees, costs, expenses (including reasonable legal fees and expenses), penalties or fines of any kind that may be imposed on, incurred by or asserted against such Indemnified Person (collectively, the "**Indemnified Amounts**") in any way relating to, arising out of or resulting from or in connection with:  (a) the Transaction Documents, the Tax Liens, any other Collateral, the Advances, any Property or related property, or any action taken or omitted to be taken by any Ebury Company, the Servicer, any

33

119449465_6

Indemnified Person or any of their respective employees, managers, officers, directors or agents in connection with or under any of the foregoing, or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of any Transaction Document, any Advance or any Collateral; (b) any claims, actions or damages by a Tax Debtor or lessee with respect to a Tax Lien or the related Property; (c) any violation or alleged violation of, non-compliance with or liability under any Requirements of Law; (d) ownership of, Liens on, security interests in or the exercise of rights or remedies under any of the items referred to in the preceding clause (a); (e) any accident, injury to or death of any person or loss of or damage to property occurring in, on or about any Property or on the adjoining sidewalks, curbs, parking areas, streets or ways; (f) any use, nonuse or condition in, on or about, or possession, alteration, repair, operation, maintenance or management of, any Property or on the adjoining sidewalks, curbs, parking areas, streets or ways; (g) any failure by any Ebury Company or the Servicer or any of their respective employees, managers, officers, directors or agents to perform or comply with any Transaction Document, Tax Lien, Requirements of Law or Applicable Statute; (h) performance of any labor or services or the furnishing of any materials or other property in respect of any Property; (i) any claim by brokers, finders or similar Persons claiming to be entitled to a commission in connection with any lease or other transaction involving any Transaction Document or Property; (j) any Taxes attributable to the execution, delivery, filing or recording of any Transaction Document or any memorandum of any of the foregoing; (k) any Lien or claim arising on or against any item of Collateral or any Property or any liability asserted against the Lender or any Indemnified Person with respect thereto; (l) (i) a past, present or future violation or alleged violation of any Environmental Laws in connection with any property or Property by any Person or other source, whether related or unrelated to the Ebury Companies, the Servicer or any Tax Debtor; (ii) any presence of any Hazardous Substances in, on, within, above, under, near, affecting or emanating from any Property; (iii) the failure to timely perform any Remedial Action or other remedial work of any kind or nature in accordance with applicable Environmental Laws; (iv) any past, present or future activity by any Person or other source, whether related or unrelated to the Ebury Companies, the Servicer or any Tax Debtor in connection with any actual or threatened Release any Hazardous Substances in connection with any Property; (v) any past, present or future Release of Hazardous Substances (whether intentional or unintentional, direct or indirect, foreseeable or unforeseeable) to, from, on, within, in, under, near or affecting any Property by any Person or other source, whether related or unrelated to the Ebury Companies, the Servicer or any Tax Debtor; (vi) the imposition, recording or filing or the threatened imposition, recording or filing of any Lien on any Property with regard to, or as a result of, any Hazardous Substances pursuant to any Environmental Law; or (vii) any misrepresentation or failure to perform any obligations pursuant to any Transaction Document or Basic Tax Lien Document to environmental matters in any way; and (m) any Ebury Company's or the Servicer's conduct, activities, actions or inactions in connection with, relating to or arising out of any of the foregoing clauses of this Section 10.1, that, in each case, results from anything whatsoever other than any Indemnified Person's gross negligence or intentional misconduct, as determined by a court of competent jurisdiction pursuant to a final, non-appealable judgment. In any suit, proceeding or action brought by any Person in connection with any Tax Lien or other item of Collateral, each Ebury Company shall defend, indemnify and hold each Indemnified Person harmless from and against all expense, loss or damage suffered by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever in respect thereof or in connection therewith. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.1 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Ebury Company, an Indemnified Person or any other Person or any Indemnified Person is otherwise a party thereto and whether or not any transaction is consummated.

    10.2    Increased Costs; Capital Adequacy; Illegality.

    (a)    If either: (i) the introduction of or any change (including any change by way of imposition or increase of reserve requirements) in or in the interpretation of any Requirements of Law; or (ii) the compliance by the Lender or its Affiliates with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), shall: (x) subject the Lender or its Affiliates to any Tax with respect to any Advance hereunder, or any right or obligation to make Advances hereunder, or on any payment made hereunder; (y) impose, modify or deem applicable any reserve requirement, special deposit or similar requirement against assets of, deposits with or for the amount of, or credit extended by, the Lender, or (z) impose any other condition affecting any Advance or the Lender's rights hereunder or under any other Transaction Document, the result of which is to increase the cost to the Lender or to reduce the amount of any sum received or receivable by

119449465_6

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 6    24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State   RECEIVED NYSCEF: 10/17/2022
Court Records    Pg 201 of 688

the Lender under this Agreement, under any other Transaction Document, then on the next Payment Date in the calendar month following the calendar month during which the Lender demands payment (which demand shall be accompanied by a statement setting forth the basis for such demand and a reasonably estimated calculation of such demand), the Borrower shall pay directly to the Lender such additional amount or amounts as will compensate the Lender or its Affiliates for such additional or increased cost incurred or such reduction suffered.

(b)  If either: (i) the introduction of or any change in or in the interpretation of any Requirements of Law, guideline, rule, regulation, directive or request; or (ii) compliance by the Lender or its Affiliates with any law, guideline, rule, regulation, directive or request from any central bank or other Governmental Authority (whether or not having the force of law), including compliance by the Lender or its Affiliates with any request or directive regarding capital adequacy (including the transition to and implementation of the Basel III capital adequacy guidelines), but, in each case, excluding Taxes, has or would have the effect of reducing the rate of return on the capital of the Lender as a consequence of its obligations hereunder or arising in connection herewith to a level below that which the Lender could have achieved but for such introduction, change or compliance (taking into consideration the policies of the Lender or its Affiliates with respect to capital adequacy) by an amount deemed by the Lender to be material, then from time to time, on the Payment Date in the calendar month following the calendar month during which the Lender demands payment (which demand shall be accompanied by a statement setting forth the basis for such demand and a reasonably estimated calculation of such demand), the Borrower shall pay directly to the Lender such additional amount or amounts as will compensate the Lender or its Affiliates for such reduction. For the avoidance of doubt, if the issuance of any amendment or supplement to Statement of Financial Accounting Standards Nos. 166 or 167 by the Financial Accounting Standards Board or any other change in accounting standards or the issuance of any other pronouncement, release or interpretation, causes or requires the consolidation of all or a portion of the assets and liabilities of the Ebury Companies with the assets and liabilities of the Lender or its Affiliates or shall otherwise impose any loss, cost, expense, reduction of return on capital or other loss, such event shall constitute a circumstance on which the Lender may base a claim for reimbursement under this Section 10.2.

### ARTICLE XI
### MISCELLANEOUS PROVISIONS

The following miscellaneous provisions are a part of this Agreement:

11.1    Amendments. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

11.2    Governing Law; Consent to Jurisdiction. This Agreement and any claim with respect hereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)). Each of the Parties: (a) agrees to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the Borough of Manhattan; and (b) waives any objection based on *forum non conveniens*, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

11.3    Waivers.

(a)    To the extent permitted under Applicable Law, each Ebury Company hereby knowingly, voluntarily and intentionally waives any right to assert a counterclaim, other than a compulsory counter claim in any action or proceeding brought against it by the Lender or any Indemnified Person.

(b)    **THE LENDER AND EACH EBURY COMPANY HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE BETWEEN THEM, WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE, CONNECTED WITH, ARISING OUT OF OR IN ANY WAY RELATED OR PERTAINING TO THIS AGREEMENT, ANY OTHER TRANSACTION**

119449465_6

DOCUMENT, THE COLLATERAL OR ANY DEALINGS, COURSE OF CONDUCT BETWEEN THEM OR ACTIONS OR STATEMENTS OF EITHER PARTY. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT. THE LENDER AND EACH EBURY COMPANY HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY THEM TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

(c)    To the extent permitted under Applicable Law, each Ebury Company hereby knowingly, voluntarily and intentionally waives any right to claim or recover in any litigation whatsoever involving either of the Parties or an Indemnified Person, any special, exemplary, punitive, indirect, incidental or consequential damages of any kind or nature whatsoever or any damages other than, or in addition to, actual damages, whether such waived damages are based on contract, statute, tort or common law or any other legal theory.

(d)    Each Ebury Company certifies that no representative, agent or attorney of the Lender or an Indemnified Person has represented, expressly or otherwise, that the Lender or an Indemnified Person would not seek to enforce any of the waivers in this Section 11.3 in the event of litigation or other circumstances.

(e)    The Lender and each Ebury Company further represents that it has been represented in the signing of this Agreement and the making of these waivers by independent legal counsel, selected of its own free will, and had the opportunity to discuss these waivers with counsel.

(f)    The provisions of this Section 11.3 shall survive termination of this Agreement and the payment in full of the Indebtedness.

11.4    Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

11.5    Consent to Loan Participation. The Ebury Companies agree and consent to the sale or transfer by the Lender, whether now or later, of one or more participation interests in the Indebtedness to one or more purchasers, whether related or unrelated to the Lender; provided, however, that to the extent no Event of Default exists, such sale or transfer shall not be consummated without the consent of the Borrower not to be unreasonably withheld, conditioned or delayed. The Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge the Lender may have about any Ebury Company or any Validity Guarantor or about any other matter relating to the Indebtedness, and the Ebury Companies hereby waive any rights to privacy that they may have with respect to such matters. The Ebury Companies additionally waive any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. The Ebury Companies also agree that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Indebtedness and will have all the rights granted under this Agreement and under the participation agreement or agreements governing the sale of such participation interests. A merger affecting the Lender shall not be considered a sale, assignment, conveyance or other disposition that is subject to any consent requirement of this provision.

11.6    Controlling Terms. The Transaction Documents shall contain such terms and provisions as the parties thereto shall agree (including provisions for repayment, interest and security) and the terms and conditions of each of the other Transaction Documents shall be cumulative and in addition to the terms and provisions of this Agreement, which shall apply to all Transaction Documents. This Agreement and all of the Transaction Documents shall be construed in such a manner as to give full force and effect to all provisions of this Agreement and the other Transaction Documents; however, in the event of any irreconcilable conflict between the terms and provisions contained in this Agreement and in any of the other Transaction Documents, the terms and provisions of this Agreement shall control.

11.7    Costs and Expenses. Each Ebury Company agrees to pay, upon demand, all of the reasonable out-of-pocket expenses of the Lender in connection with: (a) the preparation and execution of this Agreement and the

119449465_6

Transaction Documents, including reasonable attorneys' fees; (b) amendments, consents, waivers, and terminations made or requested in connection with this Agreement and the other Transaction Documents; and (c) the enforcement, protection, defense and collection of this Agreement and the other Transaction Documents. If an Event of Default occurs, the Lender may pay someone else to help collect the Indebtedness and to enforce this Agreement, and the Ebury Companies will, subject to any limits under Applicable Law, pay the Lender all of the Lender's reasonable attorneys' fees, court costs and legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees related to bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.

11.8    Calculation of Time Periods. Whenever this Agreement provides for or contemplates a period of time for the performance of any term, provision or condition of this Agreement, all of the days in such period shall be counted consecutively including Saturdays, Sundays and other non-Business Days except in instances where this Agreement expressly provides that only Business Days shall be counted; provided, however, if the last day of any such time period falls on a Saturday, Sunday or other non-Business Day, the last day shall be extended to the next succeeding Business Day immediately thereafter occurring.

11.9    Entire Agreement. This Agreement, the Note and the other Transaction Documents, embody the final, entire agreement of the Parties and supersede any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the Parties. There are no oral agreements between the Parties.

11.10    Maximum Interest Rate. No provision of this Agreement, the Note, or any other Transaction Document shall require the payment or permit the collection of interest in excess of the maximum permitted by applicable law (the "**Maximum Rate**"). If interest in excess of the Maximum Rate is provided for-in this Agreement, in any other Transaction Document, or otherwise in connection with the Indebtedness, or is adjudicated to be so provided, the provisions of this Section shall govern and prevail and neither any Ebury Company nor any Grantor, shall be obligated to pay the excess amount of such interest or any other excess sum paid for the use, forbearance, or detention of Advances made under this Agreement. In the event the Lender ever receives, collects or applies, as interest due and payable under the Note, any sum in excess of the Maximum Rate, the amount of the excess shall be applied as a payment and reduction of the principal of the indebtedness represented by that Note or any other Note; and if the principal of the indebtedness represented by the Note has been fully paid, any remaining excess shall forthwith be paid to the Borrower. In determining whether or not interest paid or payable under the Note exceeds the Maximum Rate, the Ebury Companies and the Lender shall, to the extent permitted by Applicable Law: (a) characterize any non-principal payment as an expense, fee or premium rather than as interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread, in equal or unequal parts, the total amount of interest throughout the entire contemplated term of the indebtedness represented by the Note so that interest for the entire term of the Note does not exceed the Maximum Rate.

11.11    Notices. Any notice or demand which, by provision of this Agreement, is required or permitted to be given or served by a Party on another Party must be in writing and shall be deemed to have been sufficiently given and served for all purposes: (a) if mailed, three (3) Business Days after being deposited, postage prepaid, in the United States mail, registered or certified mail; (b) if delivered by nationally recognized overnight delivery service, one (1) Business Day after being delivered to such service; or (c) if delivered in person, the day of delivery; in each case addressed (until another address or addresses are given in writing in accordance with this Agreement as follows:

If to Borrower or any Ebury Company:    EBURY 2 EMI LLC
                                        56 Locust Avenue, 2nd Floor
                                        Rye, NY 10580
                                        Attention: John Hanratty

If to Lender:    EMIGRANT BUSINESS CREDIT CORPORATION
                 6 East 43rd Street, 20th Floor

119449465_6

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO. 6
INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 204 of 688

New York, New York 10017
Attention: Karen Wold

With a copy to:

Dilworth Paxson LLP
457 Haddonfield Road, Suite 700
Cherry Hill, NJ 08002
Attn: Scott J. Freedman, Esq.

11.12    Severability. If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any Person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other Persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

11.13    Sole Discretion of the Lender. Unless otherwise provided in this Agreement, whenever the consent or approval of the Lender is required under this Agreement, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of the Lender and the decision of the Lender shall be final and conclusive; provided, however, that the Lender will act reasonably and in good faith in exercising its discretion.

11.14    Successors and Assigns. All covenants and agreements contained herein by or on behalf of the Ebury Companies shall bind their respective successors and assigns and shall inure to the benefit of the Lender, its successors and assigns. No Ebury Company shall have the right to assign its rights under this Agreement or any interest therein without the prior written consent of the Lender.

11.15    Survival. All warranties, representations, and covenants made by the Ebury Companies in this Agreement or in any certificate or other instrument delivered by any Ebury Company or any Validity Guarantor to the Lender under this Agreement shall be considered to have been relied upon by the Lender and will survive the making of Advances and delivery to the Lender of the Transaction Documents, regardless of any investigation made by, or on behalf of, the Lender.

11.16    Waiver by the Lender. The Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by the Lender. No delay or omission on the part of the Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by the Lender of a provision of this Agreement shall not prejudice or constitute a waiver of the right of the Lender otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by the Lender, or any course of dealing between the Lender and any Ebury Company or any Validity Guarantor, or between the Lender and any Grantor, shall constitute a waiver of any of the rights of the Lender or of any obligations of any Ebury Company, any Validity Guarantor or any Grantor as to any future transactions. Whenever the consent of the Lender is required under this Agreement, the granting of such consent by the Lender in any instance shall not constitute continuing consent in subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of the Lender.

11.17    Counterparts. This Agreement may be signed in any number of counterpart copies and by the Parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement electronically or by facsimile transmission shall be effective as delivery of a manually executed counterpart.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

119449465_6

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO: 6

RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 205 of 688

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives, under seal, the day and year first above written.

WITNESS/ATTEST:

By: _Stephen A. Rogers_

Print Name: _Stephen A. Rogers_

Title: _Notary Public_

EBURY 2 EMI, LLC

By:  EBURY STREET CAPITAL, LLC, Manager

By:_____

John Hanratty, Manager

EMIGRANT BUSINESS CREDIT CORPORATION

By:_____(SEAL)

Karen Wold, Managing Director

[Signature Page to Credit Agreement]

119449465_6

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO: 6
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 206 of 688

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives, under seal, the day and year first above written.

WITNESS/ATTEST:                          EBURY 2 EMI LLC

By:_____             By:  EBURY STREET CAPITAL, LLC, Manager
Print Name:_____                  By:_____
Title:_____                       John Hanratty, Manager


                                         EMIGRANT BUSINESS CREDIT CORPORATION

                                         By: _____(SEAL)
                                             Karen Wold, Managing Director


[Signature Page to Credit Agreement]


119449465_6

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 207 of 688

## SCHEDULE 1.1(f)
## APPLICABLE TAX LIEN STATUTES

| Eligible Jurisdiction | Tax Lien Statutes |
|---|---|
| Alabama | Ala. Code §§ 40-10-180 - 198 |
| Florida | Flo. Statutes §§ 197.102 – 602 |
| Indiana | Ind. Code §§ 6-1.1-1 - 1-45.5-9 |
| Maryland | Md. Code Ann. §§ 14-808 - 854 |
| New Jersey | N.J. Rev. Stat. §§ 54:5-1- 137 |
| New York* | N.Y. Real Prop. Tax Law §§ 100 – 2016 |
| South Carolina | S.C. Code Ann. §§ 12-49-10 – 12-49-1290 |

*Under New York law, sales of tax liens are allowed only to entities other than the New York Municipal Bond Bank Agency (the "Bond Bank") for those counties, cities or towns that are not subject to the provisions of N.Y. Real Prop. Tax Law § 1104, which allows the sale of tax liens to entities other than the Bond Bank by counties, cities or towns having preexisting tax lien collection laws as of January 1, 1993, or that adopted such a collection law by July 1, 1994 allowing such counties, cities or towns to sell tax liens as a means of collection.

## SCHEDULE 1.1(x)
## ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS

**ALABAMA**

_Additional Eligible Property Exclusions._  The following properties with respect to the Eligible Jurisdiction of Alabama are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

_Additional Eligible Tax Lien Exclusions._  The following Tax Liens with respect to the Eligible Jurisdiction of Alabama are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

(a)     Any Tax Lien with respect to which more than thirty-six (36) months have elapsed since such Tax Lien was sold by the Taxing Authority; and

(b)     Any redeemed Tax Lien; _provided_, _however_, that the portion of the Acquisition Price of a redeemed Tax Lien held by a tax collector in a tax sale surplus fund, if any, shall not be deemed an ineligible Tax Lien hereunder.

_State Registration Requirements._  To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in Alabama must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

(a)     The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

(b)     The registered address of the holder of the Tax Lien shall be the lock box address provided for in this Credit Agreement, the address of the Custodian, or another address acceptable to the Lender;

(c)     The registered account for remittance of electronic payments from Taxing Authorities shall be the Lockbox Account; and

(d)     The Tax Lien must be held by the Custodian pursuant to the terms of a Custodial Agreement and serviced in accordance with the terms of a Servicing Agreement.

119449465_6

## SCHEDULE 1.1(x)
## ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS
## (CONTINUED)

**FLORIDA**

Additional Eligible Property Exclusions. The following properties with respect to the Eligible Jurisdiction of Florida are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

Additional Eligible Tax Lien Exclusions. The following Tax Liens with respect to the Eligible Jurisdiction of Florida are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

(a)     Any Tax Lien with a stated annual interest rate of less than one quarter of one percent (0.25%);

(b)     Any Tax Lien with respect to which more than thirty-six (36) months have elapsed since such Tax Lien was sold by the Taxing Authority; and

(c)     Any Tax Lien secured by a property where a [Tax Deed Application] has been filed.

State Registration Requirements. To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in Florida must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

(a)     The registered name of the holder of the Tax Lien shall be "Emigrant Business Credit Corporation, as Collateral Assignee for [an Ebury Company (other than Borrower)]", "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" or another name acceptable to the Lender;

(b)     The registered address of the holder of the Tax Lien shall be the lock box address provided for in this Credit Agreement, the address of the Custodian, or another address acceptable to the Lender; and

(c)     The registered account for remittance of electronic payments from Taxing Authorities shall be shall be the Lockbox Account controlled by the Lender.

## SCHEDULE 1.1(x)
## ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS
### (CONTINUED)

**INDIANA**

    <u>Additional Eligible Property Exclusions</u>. The following properties with respect to the Eligible Jurisdiction of Indiana are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

    <u>Additional Eligible Tax Lien Exclusions</u>. The following Tax Liens with respect to the Eligible Jurisdiction of Indiana are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

    (a)    Any Tax Lien with respect to which more than eighteen (18) months have elapsed since such Tax Lien was sold by the Taxing Authority; and

    (b)    Any redeemed Tax Lien; *provided, however*, that the portion of the Acquisition Price of a redeemed Tax Lien held by a tax collector in a tax sale surplus fund, if any, shall not be deemed an ineligible Tax Lien hereunder.

    <u>State Registration Requirements</u>. To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in Indiana must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

    (a)    The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

    (b)    The registered address of the holder of the Tax Lien shall be the Custodian's address (or another address acceptable to the Lender);

    (c)    The registered account for remittance of electronic payments from Taxing Authorities shall be the Lockbox Account; and

    (d)    The Tax Lien must be held by the Custodian pursuant to the terms of a Custodial Agreement and serviced in accordance with the terms of a Servicing Agreement.

119449465_6

SCHEDULE 1.1(x)
ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS
(CONTINUED)

**MARYLAND**

Additional Eligible Property Exclusions. The following properties with respect to the Eligible Jurisdiction of Maryland are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

Additional Eligible Tax Lien Exclusions. The following Tax Liens with respect to the Eligible Jurisdiction of Maryland are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

(a)    Any Tax Lien with respect to which more than thirty-six (36) months have elapsed since such Tax Lien was sold by the Taxing Authority; and

(b)    Any redeemed Tax Lien; *provided, however,* that the portion of the Acquisition Price of a redeemed Tax Lien held by a tax collector in a tax sale surplus fund, if any, shall not be deemed an ineligible Tax Lien hereunder.

State Registration Requirements. To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in Maryland must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

(a)    The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

(b)    The registered address of the holder of the Tax Lien shall be the Custodian's address (or another address acceptable to the Lender);

(c)    The registered account for remittance of electronic payments from Taxing Authorities shall be the Lockbox Account; and

(d)    The Tax Lien must be held by the Custodian pursuant to the terms of a Custodial Agreement and serviced in accordance with the terms of a Servicing Agreement.

119449465_6

## SCHEDULE 1.1(x)
## ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS
### (CONTINUED)

**NEW JERSEY**

Additional Eligible Property Exclusions.  The following properties with respect to the Eligible Jurisdiction of New Jersey are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents:  N/A

Additional Eligible Tax Lien Exclusions. The following Tax Liens with respect to the Eligible Jurisdiction of New Jersey are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

(a)    Any Tax Lien not recorded in the real property records of the county where the Property securing the Tax Lien is located within three (3) months of the date such Tax Lien was sold;

(b)    Any Tax Lien for which a redemption notice has been received, the [Tax Certificate] has been submitted for payment and payment was not received within ninety (90) days of receipt of the original redemption notice;

(c)    Any Tax Lien secured by Property for which an Ebury Company has received notice of the commencement of an action to foreclose a Subsequent Tax Lien secured by the Property sold to a Person other than an Ebury Company unless and until such Ebury Company purchases the Subsequent Tax Lien being foreclosed and provides the Lender with evidence of such purchase or such Subsequent Tax Lien is otherwise satisfied prior to completion of the foreclosure;

(d)    The aggregate amount of all Tax Liens included in the Collateral secured by a Property where, with respect to at least one Tax Lien secured by the Property, more than thirty-six (36) months has elapsed since such Tax Lien was sold unless a foreclosure process has been initiated against such Property before the 36-motnh period elapses;

(e)    Any Tax Lien not redeemed within four (4) years after it was initially sold; provided, however, that only any premium paid for such Tax Lien shall be deemed an ineligible Tax Lien; and

(f)    The aggregate amount of all Tax Liens included in the Collateral secured by a Property to which more than twenty-four (24) months after a foreclosure process has been initiated no later than thirty-six (36) after such Tax Lien was sold.

State Registration Requirements.  To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in New Jersey must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

(a)    The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

(b)    The registered address of the holder of the Tax Lien shall be the lock box address provided for in this Credit Agreement, the address of the Custodian, or another address acceptable to the Lender;

(c)    The registered account for remittance of electronic Tax Lien payments from Taxing Authorities shall be an account approved by the Lender and controlled by only the Custodian or the Lender; and

(d)    The Tax Lien must be held by the Custodian pursuant to the terms of a Custodial Agreement and serviced in accordance with the terms of a Servicing Agreement.

119449465_6

<div align="center">

**SCHEDULE 1.1(x)**
**ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS**
**(CONTINUED)**

</div>

**NEW YORK**

     _Additional Eligible Property Exclusions._ The following properties with respect to the Eligible Jurisdiction of New York are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents: N/A

     _Additional Eligible Tax Lien Exclusions._ The following Tax Liens with respect to the Eligible Jurisdiction of New York are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

     (a)     Any Tax Lien with respect to which more than ninety-six (96) months have elapsed since such Tax Lien was sold by the Taxing Authority; _provided, however,_ that, from and after the date that is six months after the Closing Date, seventy percent (70%) of Tax Liens with respect to which more than sixty (60) months but less than ninety-six (96) months ("5 to 8 Year Tax Liens") have elapsed since such Tax Lien was sold by the Taxing Authority and that are not subject to a payment plan for repayment shall not be Eligible Tax Liens; _provided further, however,_ that, from and after the date that is one year after the Closing Date, one-hundred (100%) percent of 5 to 8 Year Tax Liens not subject to a payment plan for repayment shall not be Eligible Tax Liens; and

     (b)     Any redeemed Tax Lien; _provided, however,_ that the portion of the Acquisition Price of a redeemed Tax Lien held by a tax collector in a tax sale surplus fund, if any, shall not be deemed an ineligible Tax Lien hereunder.

     _State Registration Requirements._ To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in New York must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

     (a)     The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

     (b)     The registered address of the holder of the Tax Lien shall be the Custodian's address (or another address acceptable to the Lender);

     (c)     The registered account for remittance of electronic payments from Taxing Authorities shall be the Lockbox Account; and

     (d)     The Tax Lien must be held by the Custodian pursuant to the terms of a Custodial Agreement and serviced in accordance with the terms of a Servicing Agreement.

119449465_6

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO. 6
24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State.
Court Records    Pg 214 of 688
INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/17/2022

## SCHEDULE 1.1(x)
### ELIGIBLE PROPERTY AND TAX LIEN EXCLUSIONS
#### (CONTINUED)

**SOUTH CAROLINA**

_Additional Eligible Property Exclusions._ The following properties with respect to the Eligible Jurisdiction of South Carolina are hereby included in the itemized exclusions set forth in in the definition of "Eligible Property" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Property for purposes of the Transaction Documents:  N/A

_Additional Eligible Tax Lien Exclusions._ The following Tax Liens with respect to the Eligible Jurisdiction of South Carolina are hereby included in the itemized exclusions set forth in in the definition of "Eligible Tax Liens" of Section 1.1 of the Credit Agreement and shall not constitute Eligible Tax Liens secured by Eligible Property for purposes of the Transaction Documents:

(a)    Any Tax Lien with respect to which more than eighteen (18) months have elapsed since such Tax Lien was sold by the Taxing Authority; and

(b)    Any Tax Lien where a tax deed has been issued on the underlying Property.

_State Registration Requirements._ To qualify as an Eligible Tax Lien for purposes of the Transaction Documents, a Tax Lien secured by Property located in South Carolina must be registered with the Taxing Authority issuing the Tax Lien with information and subject to the conditions as follows:

(a)    The registered name of the holder of the Tax Lien shall be "[Trust Fund Services], as Custodian for [an Ebury Company (other than Borrower)]" (or another name acceptable to the Lender);

(b)    The registered address of the holder of the Tax Lien shall be the Custodian's address (or another address acceptable to the Lender);

(c)    The registered account for remittance of electronic Tax Lien payments from Taxing Authorities shall be an account approved by the Lender and controlled by only the Custodian or the Lender; and

(d)    For Tax Liens secured by Property in South Carolina, a Custodial Agreement and a Servicing Agreement with an approved Servicer is required.

119449465_6

## SCHEDULE 1.1(ppp)
## SPECIAL PURPOSE ENTITY COVENANTS

Until the Termination Date occurs, the Borrower and each other Ebury Company agrees to: (a) not own any assets or engage in any business other than the assets and business specifically contemplated by, or incur any indebtedness or other material obligation, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than as permitted under, this Agreement or any other Transaction Document; (b) not make any loans or advances to any Affiliate or third party or acquire obligations or securities of its Affiliates, except that the Borrower may own the other Ebury Companies; (c) pay its debts and liabilities only from its own assets; (d) comply with the provisions of its Governing Documents; (e) do all things necessary or desirable to observe all organizational formalities and preserve its existence, and not amend, modify, waive provisions of or otherwise change in any material respect its Governing Documents; (f) maintain all of its books, records, financial statements and bank accounts separate from those of the other Ebury Companies and its Affiliates (except that such financial statements may be consolidated to the extent consolidation is required under GAAP; provided, that (i) appropriate notation shall be made on such financial statements to indicate the separateness of such Person from such Affiliate and to indicate that such Person's assets and credit are not available to satisfy the debts and other obligations of such Affiliate or any other Person and (ii) such assets shall also be listed on such Person's own separate balance sheet and except that the Borrower and the other Ebury Companies may share bank accounts as provided in the Transaction Documents) and file its own tax returns (except to the extent consolidation is required or permitted under Applicable Law or it is a disregarded entity for tax purposes); (g) be, and at all times hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate), correct any known misunderstanding regarding its status as a separate entity, conduct business in its own name, and not identify itself or any of its Affiliates as a division of the other (except to the extent it is treated as a division of any Affiliate for tax purposes); (h) maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations and shall remain solvent (provided that this provision shall not require any Person to make contributions of equity capital to such Person), (i) not engage in any Change of Control, dissolution, winding up, liquidation, consolidation or merger in whole or in part or convey or transfer all or substantially all of its properties and assets to any Person (except as permitted under this Agreement and any other Transaction Document); (j) not commingle its funds or other assets with those of any Affiliate or any other Person, except that the Borrower and the other Ebury Companies may share bank accounts as provided in the Transaction Documents; (k) maintain its properties, funds, accounts and assets separate and segregated from those of any other Person, except that the Borrower and the other Ebury Companies may share bank accounts as provided in the Transaction Documents; (l) not hold itself out to be responsible for the debts or obligations of any other Person (other than pursuant to the Transaction Documents); (m) not, without the prior unanimous written consent of all of its independent directors or independent managers, take any Insolvency Action; (n) have at least one independent director or independent manager and provide the Lender with at least two (2) Business Days prior notice of the removal by its member of any independent directors or independent managers, together with the name and contact information of the replacement independent directors or independent managers and evidence of the replacement's satisfaction of the definition of independent directors or independent managers; (o) except as set forth in the Transaction Documents, not enter into any transaction with an Affiliate of such Person except on commercially reasonable terms similar to those available to unaffiliated parties in an arm's length transaction; (p) use separate stationery, invoices and checks bearing its own name; (q) allocate fairly and reasonably any overhead for shared office space and for services performed by any employee of an Affiliate; (r) not pledge its assets to any Person, other than as contemplated by the Transaction Documents; (s) not form, acquire or hold any Subsidiary or own any Equity Interest in any other entity, other than as contemplated by the Transaction Documents (including, without limitation, the Borrower forming and owning the other Ebury Companies; and (t) ensure that its Governing Documents provide that: (i) upon the resignation or dissolution of the last remaining member of such Person, the independent director or independent manager or special member be automatically admitted as a member of such Person; and (ii) any such Person admitted pursuant to such provision of the limited liability company agreement of such Person described in clause (i) above shall not: (x) own any economic interest in such Person; (y) have any obligation to make any capital contribution to such Person; or (z) receive any Equity Interest in such Person.

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 6    24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State   RECEIVED NYSCEF: 10/17/2022
Court Records    Pg 216 of 688

**SCHEDULE 5**
**TAX IDENTIFICATION NUMBERS AND ORGANIZATIONAL IDENTIFICATION NUMBERS**

<u>Tax Identification Numbers</u>

EBURY 2 EMI LLC
EB 2EMIALA LLC
EB 2EMIFL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC

<u>Organizational Identification Numbers</u>

EBURY 2 EMI LLC
EB 2EMIALA LLC
EB 2EMIFL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC

Schedule 1.1(ppp)

119449465_6

## EXHIBIT 9.5
## FORM POWER OF ATTORNEY

THIS POWER OF ATTORNEY is executed and delivered by EBURY 2 EMI LLC, a New York limited liability company (the "Grantor" or the "Borrower") in favor of EMIGRANT BUSINESS CREDIT CORPORATION, a Delaware corporation (the "Lender" or the "Attorney"), pursuant to the Credit Agreement dated as of the date hereof (as may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and between the Borrower and the Lender and the other Transaction Documents. Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

No person to whom this Power of Attorney is presented, as authority for the Attorney to take any action or actions contemplated hereby, shall inquire into or seek confirmation from the Grantor as to the authority of the Attorney to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to the Attorney unconditionally the authority to take and perform the actions contemplated herein, and the Grantor irrevocably waives any right to commence any suit or action, in law or equity, against any person or entity that acts in reliance upon or acknowledges the authority granted under this Power of Attorney. The power of attorney granted hereby is coupled with an interest and may not be revoked or canceled by the Grantor until all of the Indebtedness has been indefeasibly paid in full and the Attorney has provided its written consent thereto.

The Grantor hereby irrevocably constitutes and appoints the Attorney (and all officers, employees and agents designated by the Attorney), with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in its place and stead and in its name or in the Attorney's own name, from time to time in the Attorney's discretion, to take any and all appropriate action and to execute and deliver any and all documents and instruments that may be necessary or desirable to accomplish the purposes of the Credit Agreement and the other Transaction Documents and, without limiting the generality of the foregoing, hereby grants to the Attorney the power and right, on its behalf, without notice to or assent by it, upon the occurrence and during the continuance of any Event of Default, to do the following:  (a) exercise all rights and privileges of the Grantor under the Transaction Documents; (b) pay or discharge any taxes, Liens or other encumbrances levied or placed on or threatened against the Grantor or the Grantor's property; (c) defend any suit, action or proceeding brought against the Grantor if the Grantor does not defend such suit, action or proceeding or if the Attorney believes that the Grantor is not pursuing such defense in a manner that will maximize the recovery to the Attorney, and settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, give such discharges or releases as the Attorney may deem appropriate; (d) file or prosecute any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitrator, or take any other action otherwise deemed appropriate by the Attorney for the purpose of collecting any and all such moneys due to the Grantor whenever payable and to enforce any other right in respect of the Grantor's property; and (e) sell, transfer, pledge, make any agreement with respect to or otherwise deal with, any of the Grantor's property, and execute, in connection with such sale or action, any endorsements, assignments or other instruments of conveyance or transfer in connection therewith; all as though the Attorney were the absolute owner of the Grantor's property for all purposes, and to do, at the Attorney's option and the Grantor's expense, at any time or from time to time, all acts and other things that the Attorney reasonably deems necessary to perfect, preserve, or realize upon its property or assets and the Security Interests of the Lender, all as fully and effectively as it might do; provided, that the Attorney shall not exercise any of the foregoing powers and rights hereunder prior to the occurrence of an Event of Default. The Grantor hereby ratifies, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof.

This Power of Attorney is given as security for the Indebtedness and, upon the occurrence and during the continuance of an Event of Default, the authority hereby conferred is, and shall be irrevocable, and shall remain in full force and effect until renounced by the Lender.

IN WITNESS WHEREOF, this Power of Attorney is executed by the Grantor as of this ___ day of March, 2017.

WITNESS/ATTEST:                          EBURY 2 EMI LLC
                                         By:  EBURY STREET CAPITAL, LLC, Manager

By:_____       By:_____
Print Name:_____       John Hanratty, Manager
Title:_____

Exhibit 9.5 Page 1

I19449465_6

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO. 6

INDEX NO. 158207/2022

RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State.
Court Records    Pg 218 of 688

STATE OF _____        )

                                        )        ss:

COUNTY OF _____          )

On this, the ____ day of March, 2017, before me, a Notary Public, the undersigned officer, personally appeared John Hanratty, who acknowledged himself to be the Manager of Ebury Street Capital, LLC, a New York limited liability company and the manager of EBURY 2 EMI LLC, a New York limited liability company, and that he, in such capacity, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing on behalf of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

Notary Public

My commission expires:

Exhibit 9.5 Page 2

119449465_6

## WAIVER AND SIXTH AMENDMENT TO LOAN DOCUMENTS
## EBURY 2
## MARCH , 2021

   **THIS WAIVER AND SIXTH AMENDMENT TO LOAN DOCUMENTS** (this "**Amendment**") is made as of March , 2021, between and among **EBURY 2 EMI LLC**, a New York limited liability company (the "**Borrower**"), **EB 2EMIALA LLC**, an Alabama limited liability company, **EB 2EMIFL, LLC**, a Florida limited liability company, **EB 2EMIIN, LLC**, an Indiana limited liability company, **EB 2EMIMD, LLC**, a Maryland limited liability company, **EB 2EMINJ LLC**, a New Jersey limited liability company, **EB 2EMINY, LLC**, a New York limited liability company, **EB 2EMISC LLC**, a South Carolina limited liability company, **RE 2EMI LLC**, a New York limited liability company, **EBURY FUND 2 NJ LLC,** a New Jersey limited liability company, **EBURY FUND 2 FL LLC**, a Florida limited liability company (collectively, the "**Guarantors**"), and **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

### WITNESSETH:

A.   The Borrower and the Guarantors have executed and delivered to the Lender the following (collectively, as amended from time to time, the "**Loan Documents**"), which evidence or secure some or all of the Borrower's and Guarantors' obligations to the Lender (the "**Obligations**"), all of which are dated March 9, 2017 except as set forth below to the contrary:

   I.   Credit Agreement between Borrower and Lender (as amended, the "**Credit Agreement**")

   II.   Amendment to Loan Documents dated May 1, 2018 (1st Amendment)

   III.   Amendment to Loan Documents dated May 23, 2018 (2nd Amendment)

   IV.   Amendment to Loan Documents dated May 23, 2018 (3rd Amendment)

   V.   Joinder and Amendment to Loan Documents dated September 6, 2018 (4th Amendment)

   VI.   Fifth Amendment to Loan Documents dated October 29, 2018 (5th Amendment)

   VII.   $5,000,000 Revolving Promissory Note (as amended, the "**Note**")

   VIII.   Security Agreement (All Assets – Ebury 2 EMI LLC and SPEs)

   IX.   Security Agreement (SPE Membership Interests)

   X.   Security Agreement (Membership Interests in Ebury 2 EMI LLC)

   XI.   Guaranty (By SPEs for Obligations of Ebury 2 EMI LLC)

   XII.   Guaranty (by Ebury Street Capital, LLC for Obligations of Ebury 2 EMI LLC)

   XIII.   Validity Guaranty Agreement executed by John Hanratty

   XIV.   Custodial Agreement dated November 8, 2017 (MTAG Services, LLC)

   XV.   Servicing Agreement dated August 1, 2017 (MTAG Services, LLC)

   XVI.   Addendum to Servicing Agreement dated November 8, 2017

   XVII.   First Amendment to Addendum to Servicing Agreement dated September 6, 2018

   XVIII.   Pledge and Security Agreement

   XIX.   Deposit Account Control Agreement with PNC Bank, National Association dated February 16, 2017

   XX.   All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

B.   The Borrower, the Guarantors and the Lender desire to amend the Loan Documents as provided for in this Amendment.

   NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1

122173431_1



1.    Waiver. The Borrower has acknowledged and agreed with the Lender that each Ebury Company and Ebury Fund 2, LP failed to comply with the covenant set forth in Section 6.6 of the Credit Agreement (failure to timely provide annual Financial Statements) for the fiscal year ending December 31, 2019. The failure by each Ebury Company and Ebury Fund 2, LP to comply with the foregoing covenant constitutes an Event of Default under the Loan Documents. Borrower has requested that the Lender waive the Event of Default resulting from such non-compliance. In reliance upon the Borrower's representations and warranties and subject to the terms and conditions set forth herein, the Lender agrees to grant a waiver of non-compliance with the foregoing covenant and of the Event of Default resulting from such violation solely for the above-referenced period. The Borrower agrees that Each Ebury Company and Ebury Fund 2, LP will hereafter comply fully with this covenant and all other provisions of the Loan Documents, which remain in full force and effect. Except as expressly described in this Amendment, this waiver shall not constitute: (a) a modification or an alteration of the terms, conditions or covenants of the Loan Documents or (b) a waiver, release or limitation upon the Lender's exercise of any of its rights and remedies thereunder, which are hereby expressly reserved. This waiver shall not relieve or release the Borrower in any way from any of its respective duties, obligations, covenants or agreements under the Loan Documents or from the consequences of any Event of Default thereunder, except as expressly described above. This waiver shall not obligate the Lender, or be construed to require the Lender, to waive any other Events of Default or defaults, whether now existing or which may occur after the date of this waiver.

2.    Amendments. Certain of the Loan Documents are amended as follows:

a.    Effective March 10, 2021 the second sentence of the PAYMENTS Section of the Note is hereby deleted and replaced with the following:

**"The Borrower will repay all principal, interest, costs and expenses outstanding hereunder on May 8, 2021."**

b.    Borrower hereby agrees that it will comply with the provisions of Section 6.6 of the Credit Agreement (annual Financial Statements of each Ebury Company and Ebury Fund 2, LP) for the fiscal year ending December 31, 2019 on or before April 5, 2021.

3.    General. Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment. This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents. To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

4.    Certification. The Borrower and each Guarantor hereby certifies that: (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment: (i) true and correct as of the date of this Amendment; (ii) ratified and confirmed without condition as if made anew; and (iii) incorporated into this Amendment by reference; (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document; (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained; and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower and the Guarantors, enforceable in accordance with its terms. The Borrower and each Guarantor confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

5.    Collateral. The Borrower and each Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests and pledges granted by the Borrower or the Guarantors shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's and the Guarantors' existing and future Obligations to the Lender, as modified by this Amendment.



**FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM** INDEX NO. 158207/2022
NYSCEF DOC. NO. 6 RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 221 of 688

6.   Fees. Upon execution of this Amendment, and thereafter as incurred, the Borrower shall pay all costs and expenses of the Lender, including the reasonable fees and expenses of legal counsel for the Lender, incurred in connection with the preparation, negotiation and enforcement of this Amendment and the Loan Documents.

7.   Release. In consideration of the Lender's agreement to consent to the modifications set forth herein, the Borrower and each Guarantor waives and releases and forever discharges the Lender and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that they may have against the Lender or any of them arising out of or relating to the Obligations. The Borrower and each Guarantor further agrees to indemnify and hold the Lender and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Lender or any of them on account of any claims arising out of or relating to the Obligations. **The Borrower and the Guarantors further state that they have carefully read the foregoing release and indemnity, know the contents thereof and grant the same as their own free act and deed.**

8.   Miscellaneous.

   a.   This Amendment will be binding upon and inure to the benefit of the Borrower, the Guarantors and the Lender and their respective successors and assigns.

   b.   This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by electronic or facsimile transmission shall be effective as delivery of a manually executed counterpart.

   c.   This Agreement and any claim with respect hereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).

   d.   Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed. Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Lender's rights and remedies (all of which are hereby reserved). **The Borrower and the Guarantors expressly ratify and confirm the waiver of jury trial provisions contained in the Loan Documents, which are incorporated herein by reference.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**



IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 2 EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC
EBURY FUND 2 NJ LLC
EBURY FUND 2 FL LLC

By: EBURY 2 EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _Karen Wold_____

Karen Wold, President

122173431_1

**EIGHTH AMENDMENT TO LOAN DOCUMENTS**
**EBURY 2**
**AUGUST __13__ , 2021**

      **THIS EIGHTH AMENDMENT TO LOAN DOCUMENTS** (this "**Amendment**") is made as of August __13__ , 2021, between and among **EBURY 2 EMI LLC**, a New York limited liability company (the "**Borrower**"), **EB 2EMIALA LLC**, an Alabama limited liability company, **EB 2EMIFL, LLC**, a Florida limited liability company, **EB 2EMIIN, LLC**, an Indiana limited liability company, **EB 2EMIMD, LLC**, a Maryland limited liability company, **EB 2EMINJ LLC**, a New Jersey limited liability company, **EB 2EMINY, LLC**, a New York limited liability company, **EB 2EMISC LLC**, a South Carolina limited liability company, **RE 2EMI LLC**, a New York limited liability company, **EBURY FUND 2 NJ LLC**, a New Jersey limited liability company, **EBURY FUND 2 FL LLC**, a Florida limited liability company, and **RED CLOVER 1 LLC**, a Delaware limited liability company (collectively, the "**Guarantors**") and **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

WITNESSETH:

A.    The Borrower and the Guarantors have executed and delivered to the Lender the following (collectively, as amended from time to time, the "**Loan Documents**"), which evidence or secure some or all of the Borrower's and Guarantors' obligations to the Lender (the "**Obligations**"), all of which are dated March 9, 2017 except as set forth below to the contrary:

I.      Credit Agreement between Borrower and Lender (as amended, the "**Credit Agreement**")

II.    Amendment to Loan Documents dated May 1, 2018 (1st Amendment)

III.    Amendment to Loan Documents dated May 23, 2018 (2nd Amendment)

IV.    Amendment to Loan Documents dated May 23, 2018 (3rd Amendment)

V.    Joinder and Amendment to Loan Documents dated September 6, 2018 (4th Amendment)

VI.    Fifth Amendment to Loan Documents dated October 29, 2018 (5th Amendment)

VII.    Waiver and Sixth Amendment to Loan Documents dated March 18, 2021 (6th Amendment)

VIII.    Joinder and Seventh Amendment to Loan Documents dated May 18, 2021 (the "**7th Amendment**")

IX.    $5,000,000 Revolving Promissory Note (as amended, the "**Note**")

X.    Security Agreement (All Assets – Ebury 2 EMI LLC and SPEs), as amended

XI.    Security Agreement (SPE Membership Interests), as amended

XII.    Security Agreement (Membership Interests in Ebury 2 EMI LLC)

XIII.    Guaranty (By SPEs for Obligations of Ebury 2 EMI LLC), as amended

XIV.    Guaranty (by Ebury Street Capital, LLC for Obligations of Ebury 2 EMI LLC)

XV.    Validity Guaranty Agreement executed by John Hanratty

XVI.    Custodial Agreement dated November 8, 2017 (MTAG Services, LLC)

XVII.    Servicing Agreement dated August 1, 2017 (MTAG Services, LLC)

XVIII.    Addendum to Servicing Agreement dated November 8, 2017

XIX.    First Amendment to Addendum to Servicing Agreement dated September 6, 2018

XX.    Pledge and Security Agreement

XXI.    Deposit Account Control Agreement with PNC Bank, National Association dated February 16, 2017

XXII.    All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

B.    The Borrower, the Guarantors and the Lender desire to amend the Loan Documents as provided for in this Amendment.

1

24-04020-dsj     Doc 1-1     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #2 State
Court Records     Pg 224 of 688

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     Reservation of Rights.  The Borrower's failure to comply with the following constitute Events of Default (the "Events of Default") under the Credit Agreement and the other Loan Documents:

   a.     Section 6.6 of the Credit Agreement - Failure by each Ebury Company and Ebury Fund 2, LP to furnish the Lender with fiscal year-end consolidated financial statements for the fiscal year ended December 31, 2019 by April 5, 2021, and failure by each Ebury Company and Ebury Fund 2, LP to furnish the Lender with fiscal year-end unqualified audited consolidated financial statements for the fiscal year ended December 31, 2020 by April 30, 2021.

   b.     Section 6.7 of the Credit Agreement – Failure by each Ebury Company and Ebury Fund 2, LP to furnish the Lender with consolidated month-end financial statements (including balance sheet, income statement and statement of cash flows) for the prior month no later than thirty (30) days after the end of each month, for the months of October, 2020 through June, 2021.

   c.     Section 6.10 of the Credit Agreement. Failure by the Ebury Companies to timely furnish the Lender with a covenant compliance certificate for the quarters ended December 31, 2019 and December 31, 2020.

   d.     Section 6.12 of the Credit Agreement.  Failure by Ebury Fund 1, LP, Ebury Fund 2, LP and Ebury Street Capital, LLC to deliver to Lender, not later than fifteen (15) days after filing, but no later than September 30, 2020, copies of the federal income tax returns for 2019.

   e.     Section 6.13 of the Credit Agreement. Failure by the Ebury Companies to deliver to Lender Borrowing Base Certificates for the months of January through July, 2020 and September, 2020 through June, 2021.

   f.     Section 6.14 of the Credit Agreement.  Failure by the Ebury Companies to deliver to Lender Tax Lien reports for the months of January through July, 2020 and September, 2020 through June, 2021.

   g.     Schedule 1.1(x) to the Credit Agreement.  Failure to have the Tax Liens held by the Custodian under the Custodial Agreement and serviced by the Servicer pursuant to the Servicing Agreement.

As a result of the Events of Default, the Lender reserves the right to:  (i) declare the Indebtedness to be immediately due and payable in full as a result thereof; and/or (ii) exercise the Lender's other rights and remedies under the Loan Documents, or otherwise, as a result thereof, all without further notice to the Borrower.  The determination of the Lender not to have exercised its other rights and remedies at this time as a result of the Events of Default and/or the acceptance of any payments from, or on behalf of, the Borrowers by the Lender shall not be deemed to constitute: (i) a cure or waiver of the Events of Default or any other Default or Event of Default which may exist under the Credit Agreement and the other Loan Documents; (ii) the agreement of the Lender to forbear from exercising its rights and remedies under the Loan Documents, or otherwise, or (iii) a waiver or modification of any of the terms and conditions of the Loan Documents, all of which remain in full force and effect.  Lender expressly reserves all of its rights with respect to the Credit Agreement and the other Loan Documents, including, without limitation, the Lender's right to take such action at such times as the Lender, in its sole discretion, deems necessary or appropriate without further notice to the Borrower, and nothing contained herein shall be deemed to be a waiver of any of the same.

2.     Amendments.  Certain of the Loan Documents are amended as follows:

122433025_1

a.    The Borrower acknowledges that the Lender will not make any further advances under the line of credit evidenced by the Note. Any principal repaid may not be reborrowed.

b.    Effective August 11, 2021 the following clause in the VARIABLE INTEREST RATE Section of the Note:

**"interest will be assessed on the unpaid principal balance of this Note at the Index Rate effective as of that day plus six and one-quarter percent (6.25%), and will be fixed at that rate until the first Business Day of the next calendar month (each, an "Interest Period")."**

is hereby deleted and replaced with:

**"interest will be assessed on the unpaid principal balance of this Note at the Index Rate effective as of that day plus eight and one-quarter percent (8.25%), and will be fixed at that rate until the first Business Day of the next calendar month (each, an "Interest Period")."**

c.    Effective August 11, 2021 the second sentence of the PAYMENTS Section of the Note is hereby deleted and replaced with the following:

**"The Borrower will repay all principal, interest, costs and expenses outstanding hereunder on November 10, 2021."**

2.    <u>General</u>. Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment. This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents. To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

3.    <u>Certification</u>. The Borrower and each Guarantor hereby certifies that: (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment: (i) true and correct as of the date of this Amendment; (ii) ratified and confirmed without condition as if made anew; and (iii) incorporated into this Amendment by reference; (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document; (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained; and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower and the Guarantors, enforceable in accordance with its terms. The Borrower and each Guarantor confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

4.    <u>Collateral</u>. The Borrower and each Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests and pledges granted by the Borrower or the Guarantors shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's and the Guarantors' existing and future Obligations to the Lender, as modified by this Amendment.

5.    <u>Fees</u>. Upon execution of this Amendment, and thereafter as incurred, the Borrower shall pay all costs and expenses of the Lender, including the reasonable fees and expenses of legal counsel for the Lender, incurred in connection with the preparation, negotiation and enforcement of this Amendment and the Loan Documents.

6.    <u>Release</u>. In consideration of the Lender's agreement to consent to the modifications set forth herein, the Borrower and each Guarantor waives and releases and forever discharges the Lender and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that they may have against the Lender or any of them arising out of or relating to the Obligations. The Borrower and each

Guarantor further agrees to indemnify and hold the Lender and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Lender or any of them on account of any claims arising out of or relating to the Obligations. **The Borrower and the Guarantors further state that they have carefully read the foregoing release and indemnity, know the contents thereof and grant the same as their own free act and deed.**

7.    <u>Miscellaneous</u>.

a.    This Amendment will be binding upon and inure to the benefit of the Borrower, the Guarantors and the Lender and their respective successors and assigns.

b.    This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by electronic or facsimile transmission shall be effective as delivery of a manually executed counterpart.

c.    This Agreement and any claim with respect hereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).

d.    Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed. Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Lender's rights and remedies (all of which are hereby reserved). **The Borrower and the Guarantors expressly ratify and confirm the waiver of jury trial provisions contained in the Loan Documents, which are incorporated herein by reference.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

122433025_1

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 2 EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC
EBURY FUND 2 NJ LLC
EBURY FUND 2 FL LLC
RED CLOVER 1 LLC

By: EBURY 2 EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____
Karen Wold, President

5

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives, under seal, the day and year first set forth above.

BORROWER:
EBURY 2 EMI LLC
By:  EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC
EBURY FUND 2 NJ LLC
EBURY FUND 2 FL LLC
RED CLOVER 1 LLC

By:  EBURY 2 EMI LLC, Sole Member

By:  EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: *Karen Wold* _____
Karen Wold, President

# EXHIBIT B

# TABLE OF CONTENTS

Ebury 1EMI LLC

Promissory Note.................................................................................................... 3

First Amended Promissory Note............................................................................ 7

Second Amended Promissory Note ................................................................... 11

Ebury 2EMI LLC

Promissory Note.................................................................................................. 15

$10,000,000.00                                                   March 9, 2017

**PROMISE TO PAY. EBURY 1EMI LLC**, a New York limited liability company (the "**Borrower**"), promises to pay to the order of **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**"), in lawful money of the United States of America the sum of **TEN MILLION AND NO/100 DOLLARS** (U.S.$10,000,000.00), together with simple interest at the rate per annum equal to 4.50 percentage points over the Index Rate provided below, as the Index Rate under this Note may be adjusted from time to time, one or more times, with interest being assessed on the unpaid principal balance of this Note as outstanding from time to time, commencing on the date of this Note and continuing until this Note is paid in full, or until default under this Note with interest thereafter being subject to the default interest rate provisions set forth herein.

**CREDIT AGREEMENT.** This Note represents and evidences a certain revolving line of credit loan (the "**Revolving Loan**") available to the Borrower, and all advances by the Lender pursuant to the Revolving Loan are governed by, and secured in the manner set forth in, that certain Credit Agreement by and between the Borrower and the Lender dated as of the date hereof (as may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"). Reference is made to the Credit Agreement for provisions for the acceleration of the maturity hereof on the occurrence of certain events specified therein, the definition of capitalized terms not otherwise defined herein, and for all other pertinent purposes.

**LINE OF CREDIT.** This Note evidences the Revolving Loan and Advances under this Note may be requested by an Authorized Individual in writing. The Borrower agrees to be liable for all sums advanced in accordance with the instructions of an Authorized Individual. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by the Lender's internal records, including computer printouts. The Lender will have no obligation to advance funds under this Note if: (a) the Borrower is in default under the terms of this Note, the other Transaction Documents or any other agreement that the Borrower or any Guarantor has with the Lender; (b) the Borrower or any Guarantor ceases doing business or is insolvent; (c) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guarantee of this Note or any other loan with the Lender; or (d) the Borrower has applied funds provided pursuant to this Note for purposes other than those permitted by the Credit Agreement or otherwise acceptable to the Lender.

**VARIABLE INTEREST RATE.** The rate used to assess interest under this Note is subject to change, as provided in this Note, based on changes in the Index Rate (as defined below). As of the date of this Note and as of the first Business Day of each month after the date of this Note, interest will be assessed on the unpaid principal balance of this Note at the Index Rate effective as of that day *plus* 4.50 percentage points, and will be fixed at that rate until the first Business Day of the next calendar month (each, an "**Interest Period**"). The forgoing notwithstanding, once an Event of Default occurs under this Note, the Lender shall have the right to prospectively increase the interest rate in accordance with the default interest rate provisions of this Note. Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INDEX RATE.** The "**Index Rate**" under this Note effective as of the first day of an Interest Period is the greater of: (a) 0.50% per annum; and (b) the rate (expressed as a percentage per annum) paid on deposits of United States Dollars with a 1-month maturity as reported on the Reuters Screen LIBOR01 Page at or about 11:00 a.m. (London time) on the second London Business Day before the first day of an Interest Period, or if not so reported, then as determined by the Lender from another recognized source or interbank quotation ("**LIBOR**"). A "**London Business Day**," as used in this Note, is any day on which commercial banks in London, England are open for general business (including dealings in foreign exchange and foreign currency deposits). The Borrower understands that the Index Rate is not necessarily the lowest rate charged by the Lender on its loans and the Lender may make loans based on other index rates as well. If LIBOR becomes unavailable during the term of this Note, the Lender may designate a substantially similar index rate substitute for LIBOR, after notice to the Borrower, until LIBOR becomes available.

119310542_6

**INTEREST CALCULATION.** Interest on this Note is computed on a 365/360 simple interest basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

**OTHER FEES AND CHARGES.** In addition to the principal, interest and other fees and charges provided for in this Note, the Borrower agrees to also pay all other amounts, fees and charges, if any, provided for in the Credit Agreement.

**PAYMENTS.** The Borrower will pay regular monthly payments of accrued unpaid interest under this Note beginning April 1, 2017, continuing on the first day of each month thereafter until this Note is paid in full. The Borrower will repay all principal, interest, costs and expenses outstanding hereunder on March 1, 2020. All payments under this Note shall be made to the Lender at 6 East 43rd Street, 20th Floor, New York, New York 10017, or at such other place as the Lender may designate in writing. Unless otherwise agreed or required by Applicable Law, the Credit Agreement or the Other Transaction Documents, payments will be applied first to any unpaid collection costs and late charges, then to accrued unpaid interest, with any remaining amount applied to repay principal.

**EVENTS OF DEFAULT.** "Events of Default" shall have the meaning set forth in the Credit Agreement.

**INTEREST AFTER DEFAULT.** Upon the occurrence, and during the continuance, of any Event of Default, whether or not the Lender has elected to accelerate the Indebtedness evidenced by this Note, this Note shall bear interest, payable on demand, at the rate of two percentage points in excess of the per annum interest rate then in effect under this Note (the "**Default Rate**"), but in no event shall the Default Rate be more than the highest rate permitted by the applicable usury law in respect of the Borrower, until the unpaid principal balance of the Loan, interest and any charges shall have been paid in full.

**LATE CHARGE.** If any payment due under this Note is not paid in full within ten (10) calendar days of when due, the Borrower shall pay the Lender a late payment fee in an amount equal to 10% of the payment amount due. Late charges will not be assessed following the declaration of an Event of Default and the acceleration of maturity of this Note.

**PREPAYMENT.** The Borrower may prepay this Note in full at any time by paying the then existing balance of the Indebtedness, including all unpaid principal balance of this Note, plus accrued simple interest and any unpaid late charges, as of the date of prepayment, without any prepayment penalty or premium. Prepayment of the amounts due under this Note shall not constitute termination of any of the Transaction Documents, including, without limitation, the Credit Agreement. If the Borrower prepays this Note in full, or if the Lender accelerates payment, the Borrower understands that, unless otherwise required under Applicable Law, any prepaid fees or charges will not be subject to rebate and will be earned by the Lender at the time this Note is signed.

**ATTORNEYS' FEES.** If the Lender refers this Note to an attorney for collection, or files suit against the Borrower to collect the Indebtedness, or if the Borrower files an Insolvency Proceeding, the Borrower agrees to pay the reasonable attorneys' fees incurred by the Lender.

**NSF CHECK CHARGES.** In the event that any payment under this Note is made by check and the check is returned to the Lender unpaid due to nonsufficient funds, the Borrower agrees to pay the Lender an additional NSF check charge equal to $29.00.

**DEPOSIT ACCOUNTS.** As collateral security for repayment of this Note, the Indebtedness, and all renewals and extensions, as well as to secure any and all other loans, notes, indebtedness and obligations that the Borrower may now and in the future owe to the Lender or incur in favor of the Lender, whether direct or indirect, absolute or contingent, due or to become due, of any nature and kind whatsoever, the Borrower is granting the Lender a continuing security interest in any and all funds that the Borrower may now and in the future have on deposit with the Lender or in certificates of deposit or other deposit accounts as to which the Borrower is an account holder. The Borrower further agrees that the Lender may, following the occurrence and during the continuance of an Event of Default, apply any funds that the Borrower may have on deposit with the Lender in

Case 2:24-cv-04020-dsj  Doc 1-1  Filed 08/14/24  Entered 08/14/24 09:45:23  Doc #2 State
Court Records  Pg 233 of 688

certificates of deposit or other deposit accounts in which the Borrower is an account holder against the unpaid balance of the Indebtedness and any and all other present and future indebtedness and obligations that the Borrower may then owe to the Lender, in principal, interest, fees, costs, expenses, and attorneys' fees.

**GOVERNING LAW; JURISDICTION.** This Note and any claim with respect thereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)). The Borrower and the Lender each (a) agrees to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the borough of Manhattan, and (b) waives any objection based on *forum non conveniens*, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

**WAIVERS.**

(a) **JURY TRIAL WAIVER. THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE BETWEEN BORROWER AND LENDER, WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE, CONNECTED WITH, ARISING OUT OF OR IN ANY WAY RELATED OR PERTAINING TO THIS NOTE OR ANY DEALINGS, COURSE OF CONDUCT BETWEEN BORROWER AND LENDER OR ACTIONS OR STATEMENTS OF EITHER BORROWER OR LENDER. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT. THE BORROWER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY LENDER TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.**

(b) No right or remedy conferred upon or reserved to the Lender under any of the Transaction Documents, or with respect to any Collateral, or now or hereafter existing at law or in equity, by statute, or other legislative enactment, is intended to be exclusive of any other right or remedy, and each and every such right or remedy shall be cumulative and concurrent, and shall be in addition to every other such right or remedy, and may be pursued singly, concurrently, successively or otherwise, at the sole discretion of the Lender, and shall not be exhausted by any one exercise thereof but may be exercised as often as occasion therefor shall occur. No act of the Lender shall be deemed or construed as an election to proceed under any one such right or remedy to the exclusion of any other such right or remedy; furthermore, each such right or remedy of the Lender shall be separate, distinct, and cumulative and none shall be given effect to the exclusion of any other. The failure to exercise or delay in exercising any such right or remedy, or the failure to insist upon strict performance of any term of any of the Transaction Documents, shall not be construed as a waiver or release of the same, or of any Event of Default thereunder, or of any obligation or liability of the Borrower thereunder.

(c) The recovery of any judgment by the Lender shall not affect in any manner any rights, remedies, or powers of the Lender under any of the Transaction Documents but such rights, remedies and power of the Lender shall continue unimpaired as before. Further, the exercise by the Lender of its rights and remedies and the entry of any judgment by the Lender shall not affect in any way the interest rate payable hereunder or under any of the other Transaction Documents on any amounts due to the Lender, but interest shall continue to accrue on such amounts at the Default Rate.

(d) Except as to notices that are specifically provided for herein or in any of the other Transaction Documents, the Borrower hereby waives: (i) presentment, demand, notice of nonpayment, protest, notice of protest, any other notice of dishonor, notice of intent to accelerate and notice of acceleration; (ii) all other notices in connection with the delivery, acceptance, performance, default or enforcement of payment of this Note; (iii) diligence of collection of this Note; (iv) all errors, defects, imperfections and rights of appeal in any proceedings instituted by Lender under the terms of this Note, and the Borrower hereby releases the same; (v) all

benefit that might accrue to the Borrower from any present or future exemption laws, including, without limitation, laws exempting any property, real, personal or mixed, or any part of the proceeds arising from any sale of such property, from attachment, levy or sale under execution; (vi) all benefit that might accrue to the Borrower by virtue of any present or future laws providing for valuation or appraisement, stay of execution, exemption from civil process, or extension of time for payment; (vii) any right to require marshalling of assets; (viii) the right of inquisition on any real estate levied on, and the Borrower voluntarily condemns the same and authorizes the clerk to enter upon the writ of execution this voluntary condemnation; (ix) the right to interpose any counterclaim in any action brought by the Lender on this Note; and (x) the right to have any suit, action or proceeding brought by the Lender on this Note consolidated with any suit, action or proceeding brought by the Borrower.

        (e)    The Borrower agrees that the Lender may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Transaction Documents (and the Borrower hereby waives any notice of any of the foregoing), and that the Transaction Documents may be amended, supplemented or modified by the Lender and other signatory parties, and any action taken by the Lender pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of the Lender, or of any Event of Default, or of any liability or obligation of the Borrower, under any of the Transaction Documents.

**SUCCESSORS AND ASSIGNS LIABLE.** The obligations and agreements of the Borrower under this Note shall be binding upon the Borrower's successors and assigns. The rights and remedies granted to the Lender under this Note shall inure to the benefit of the Lender's successors and assigns, as well as to any subsequent holder or holders of this Note.

**CAPTION HEADINGS.** Caption headings of the sections of this Note are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Note, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

**SEVERABILITY.** If any provision of this Note is held to be invalid, illegal or unenforceable by any court, that provision shall be deleted from this Note and the balance of this Note shall be interpreted as if the deleted provision never existed.

**PRIOR TO SIGNING THIS NOTE, THE BORROWER READ AND UNDERSTOOD ALL OF ITS PROVISIONS.**

        BORROWER:

        EBURY 1EMI LLC
        By: EBURY STREET CAPITAL, LLC, Manager

        By: _____
        John Hanratty, Manager

## AMENDED AND RESTATED REVOLVING PROMISSORY NOTE

$13,500,000.00                                                              October 29, 2018

**PROMISE TO PAY.  EBURY 1EMI LLC**, a New York limited liability company (the "**Borrower**"), promises to pay to the order of **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**"), in lawful money of the United States of America the sum of **THIRTEEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS** (U.S.$13,500,000.00), together with simple interest at the rate per annum equal to four and one-quarter percent (4.25%) over the Index Rate provided below, as the Index Rate under this Note may be adjusted from time to time, one or more times, with interest being assessed on the unpaid principal balance of this Note as outstanding from time to time, commencing on the date of this Note and continuing until this Note is paid in full, or until default under this Note with interest thereafter being subject to the default interest rate provisions set forth herein.

**CREDIT AGREEMENT.**  This Note represents and evidences a certain revolving line of credit loan (the "**Revolving Loan**") available to the Borrower, and all advances by the Lender pursuant to the Revolving Loan are governed by, and secured in the manner set forth in, that certain Credit Agreement by and between the Borrower and the Lender dated March 9, 2017, as amended (as may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**").  Reference is made to the Credit Agreement for provisions for the acceleration of the maturity hereof on the occurrence of certain events specified therein, the definition of capitalized terms not otherwise defined herein, and for all other pertinent purposes.

**LINE OF CREDIT.**  This Note evidences the Revolving Loan and Advances under this Note may be requested by an Authorized Individual in writing.  The Borrower agrees to be liable for all sums advanced in accordance with the instructions of an Authorized Individual.  The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by the Lender's internal records, including computer printouts.  The Lender will have no obligation to advance funds under this Note if:  (a) the Borrower is in default under the terms of this Note, the other Transaction Documents or any other agreement that the Borrower or any Guarantor has with the Lender; (b) the Borrower or any Guarantor ceases doing business or is insolvent; (c) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guarantee of this Note or any other loan with the Lender; or (d) the Borrower has applied funds provided pursuant to this Note for purposes other than those permitted by the Credit Agreement or otherwise acceptable to the Lender.

**VARIABLE INTEREST RATE.**  The rate used to assess interest under this Note is subject to change, as provided in this Note, based on changes in the Index Rate (as defined below).  As of the date of this Note and as of the first Business Day of each month after the date of this Note, interest will be assessed on the unpaid principal balance of this Note at the Index Rate effective as of that day *plus* four and one-quarter percent (4.25%), and will be fixed at that rate until the first Business Day of the next calendar month (each, an "**Interest Period**").  The forgoing notwithstanding, once an Event of Default occurs under this Note, the Lender shall have the right to prospectively increase the interest rate in accordance with the default interest rate provisions of this Note.  Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INDEX RATE.**  The "**Index Rate**" under this Note effective as of the first day of an Interest Period is the greater of:  (a) 0.50% per annum; and (b) the rate (expressed as a percentage per annum) paid on deposits of United States Dollars with a 1-month maturity as reported on the Reuters Screen LIBOR01 Page at or about 11:00 a.m. (London time) on the second London Business Day before the first day of an Interest Period, or if not so reported, then as determined by the Lender from another recognized source or interbank quotation ("**LIBOR**").  A "**London Business Day**," as used in this Note, is any day on which commercial banks in London, England are open for general business (including dealings in foreign exchange and foreign currency deposits).  The Borrower understands that the Index Rate is not necessarily the lowest rate charged by the Lender on its loans and the Lender may make loans based on other index rates as well.  If LIBOR becomes unavailable during the term of this Note, the Lender may designate a substantially similar index rate substitute for LIBOR, after notice to the Borrower, until LIBOR becomes available.

120488192_1

**INTEREST CALCULATION.** Interest on this Note is computed on a 365/360 simple interest basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

**OTHER FEES AND CHARGES.** In addition to the principal, interest and other fees and charges provided for in this Note, the Borrower agrees to also pay all other amounts, fees and charges, if any, provided for in the Credit Agreement.

**PAYMENTS.** The Borrower will pay regular monthly payments of accrued unpaid interest under this Note beginning December 1, 2018, continuing on the first day of each month thereafter until this Note is paid in full. The Borrower will repay all principal, interest, costs and expenses outstanding hereunder on March 9, 2021. All payments under this Note shall be made to the Lender at 6 East 43rd Street, 20th Floor, New York, New York 10017, or at such other place as the Lender may designate in writing. Unless otherwise agreed or required by Applicable Law, the Credit Agreement or the Other Transaction Documents, payments will be applied first to any unpaid collection costs and late charges, then to accrued unpaid interest, with any remaining amount applied to repay principal.

**EVENTS OF DEFAULT.** "Events of Default" shall have the meaning set forth in the Credit Agreement.

**INTEREST AFTER DEFAULT.** Upon the occurrence, and during the continuance, of any Event of Default, whether or not the Lender has elected to accelerate the Indebtedness evidenced by this Note, this Note shall bear interest, payable on demand, at the rate of two percentage points in excess of the per annum interest rate then in effect under this Note (the "**Default Rate**"), but in no event shall the Default Rate be more than the highest rate permitted by the applicable usury law in respect of the Borrower, until the unpaid principal balance of the Loan, interest and any charges shall have been paid in full.

**LATE CHARGE.** If any payment due under this Note is not paid in full within ten (10) calendar days of when due, the Borrower shall pay the Lender a late payment fee in an amount equal to 10% of the payment amount due. Late charges will not be assessed following the declaration of an Event of Default and the acceleration of maturity of this Note.

**PREPAYMENT.** The Borrower may prepay this Note in full at any time by paying the then existing balance of the Indebtedness, including all unpaid principal balance of this Note, plus accrued simple interest and any unpaid late charges, as of the date of prepayment, without any prepayment penalty or premium. Prepayment of the amounts due under this Note shall not constitute termination of any of the Transaction Documents, including, without limitation, the Credit Agreement. If the Borrower prepays this Note in full, or if the Lender accelerates payment, the Borrower understands that, unless otherwise required under Applicable Law, any prepaid fees or charges will not be subject to rebate and will be earned by the Lender at the time this Note is signed.

**ATTORNEYS' FEES.** If the Lender refers this Note to an attorney for collection, or files suit against the Borrower to collect the Indebtedness, or if the Borrower files an Insolvency Proceeding, the Borrower agrees to pay the reasonable attorneys' fees incurred by the Lender.

**NSF CHECK CHARGES.** In the event that any payment under this Note is made by check and the check is returned to the Lender unpaid due to nonsufficient funds, the Borrower agrees to pay the Lender an additional NSF check charge equal to $29.00.

**DEPOSIT ACCOUNTS.** As collateral security for repayment of this Note, the Indebtedness, and all renewals and extensions, as well as to secure any and all other loans, notes, indebtedness and obligations that the Borrower may now and in the future owe to the Lender or incur in favor of the Lender, whether direct or indirect, absolute or contingent, due or to become due, of any nature and kind whatsoever, the Borrower is granting the Lender a continuing security interest in any and all funds that the Borrower may now and in the future have on deposit with the Lender or in certificates of deposit or other deposit accounts as to which the Borrower is an account holder. The Borrower further agrees that the Lender may, following the occurrence and during the continuance of an Event of Default, apply any funds that the Borrower may have on deposit with the Lender in

certificates of deposit or other deposit accounts as to which the Borrower is an account holder against the unpaid balance of the Indebtedness and any and all other present and future indebtedness and obligations that the Borrower may then owe to the Lender, in principal, interest, fees, costs, expenses, and attorneys' fees.

**GOVERNING LAW; JURISDICTION.**  This Note and any claim with respect thereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).  The Borrower and the Lender each (a) agrees to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the borough of Manhattan, and (b) waives any objection based on *forum non conveniens*, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

**WAIVERS.**

(a)     **JURY TRIAL WAIVER.     THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE BETWEEN BORROWER AND LENDER, WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE, CONNECTED WITH, ARISING OUT OF OR IN ANY WAY RELATED TO OR PERTAINING TO THIS NOTE OR ANY DEALINGS, COURSE OF CONDUCT BETWEEN BORROWER AND LENDER OR ACTIONS OR STATEMENTS OF EITHER BORROWER OR LENDER.  IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT.  THE BORROWER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY LENDER TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.**

(b)     No right or remedy conferred upon or reserved to the Lender under any of the Transaction Documents, or with respect to any Collateral, or now or hereafter existing at law or in equity, by statute, or other legislative enactment, is intended to be exclusive of any other right or remedy, and each and every such right or remedy shall be cumulative and concurrent, and shall be in addition to every other such right or remedy, and may be pursued singly, concurrently, successively or otherwise, at the sole discretion of the Lender, and shall not be exhausted by any one exercise thereof but may be exercised as often as occasion therefor shall occur.  No act of the Lender shall be deemed or construed as an election to proceed under any one such right or remedy to the exclusion of any other such right or remedy; furthermore, each such right or remedy of the Lender shall be separate, distinct, and cumulative and none shall be given effect to the exclusion of any other.  The failure to exercise or delay in exercising any such right or remedy, or the failure to insist upon strict performance of any term of any of the Transaction Documents, shall not be construed as a waiver or release of the same, or of any Event of Default thereunder, or of any obligation or liability of the Borrower thereunder.

(c)     The recovery of any judgment by the Lender shall not affect in any manner any rights, remedies, or powers of the Lender under any of the Transaction Documents but such rights, remedies and power of the Lender shall continue unimpaired as before.  Further, the exercise by the Lender of its rights and remedies and the entry of any judgment by the Lender shall not affect in any way the interest rate payable hereunder or under any of the other Transaction Documents on any amounts due to the Lender, but interest shall continue to accrue on such amounts at the Default Rate.

(d)     Except as to notices that are specifically provided for herein or in any of the other Transaction Documents, the Borrower hereby waives:  (i) presentment, demand, notice of nonpayment, protest, notice of protest, any other notice of dishonor, notice of intent to accelerate and notice of acceleration; (ii) all other notices in connection with the delivery, acceptance, performance, default or enforcement of payment of this Note; (iii) diligence of collection of this Note; (iv) all errors, defects, imperfections and rights of appeal in any proceedings instituted by Lender under the terms of this Note, and the Borrower hereby releases the same; (v) all

benefit that might accrue to the Borrower by virtue of any present or future exemption laws, including, without limitation, laws exempting any property, real, personal or mixed, or any part of the proceeds arising from any sale of such property, from attachment, levy or sale under execution; (vi) all benefit that might accrue to the Borrower by virtue of any present or future laws providing for valuation or appraisement, stay of execution, exemption from civil process, or extension of time for payment; (vii) any right to require marshalling of assets; (viii) the right of inquisition on any real estate levied on, and the Borrower voluntarily condemns the same and authorizes the clerk to enter upon the writ of execution this voluntary condemnation; (ix) the right to interpose any counterclaim in any action brought by the Lender on this Note; and (x) the right to have any suit, action or proceeding brought by the Lender on this Note consolidated with any suit, action or proceeding brought by the Borrower.

(e)    The Borrower agrees that the Lender may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Transaction Documents (and the Borrower hereby waives any notice of any of the foregoing), and that the Transaction Documents may be amended, supplemented or modified by the Lender and other signatory parties, and any action taken by the Lender pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of the Lender, or of any Event of Default, or of any liability or obligation of the Borrower, under any of the Transaction Documents.

**SUCCESSORS AND ASSIGNS LIABLE.** The obligations and agreements of the Borrower under this Note shall be binding upon the Borrower's successors and assigns. The rights and remedies granted to the Lender under this Note shall inure to the benefit of the Lender's successors and assigns, as well as to any subsequent holder or holders of this Note.

**CAPTION HEADINGS.** Caption headings of the sections of this Note are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Note, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

**SEVERABILITY.** If any provision of this Note is held to be invalid, illegal or unenforceable by any court, that provision shall be deleted from this Note and the balance of this Note shall be interpreted as if the deleted provision never existed.

**AMENDMENT AND RESTATEMENT.** This Note amends and restates, and is in substitution for, that certain Revolving Promissory Note in the original principal amount of $10,000,000 payable to the order of the Lender and dated March 9, 2017 (the "**Existing Note**"). However, without duplication, this Note shall in no way extinguish, cancel or satisfy Borrower's unconditional obligation to repay all indebtedness evidenced by the Existing Note or constitute a novation of the Existing Note. Nothing herein is intended to extinguish, cancel or impair the lien priority or effect of any security agreement, pledge agreement or mortgage with respect to the Borrower's obligations hereunder and under any other document relating hereto.

**PRIOR TO SIGNING THIS NOTE, THE BORROWER READ AND UNDERSTOOD ALL OF ITS PROVISIONS.**

BORROWER:

EBURY 1EM7LLC
By: EBURY STREET CAPITAL, LLC, Manager

By:
John Hanratty, Manager

## AMENDED AND RESTATED REVOLVING PROMISSORY NOTE

$15,000,000.00                                                September 24, 2019

**PROMISE TO PAY. EBURY 1EMI LLC**, a New York limited liability company (the "**Borrower**"), promises to pay to the order of **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**"), in lawful money of the United States of America the sum of **FIFTEEN MILLION AND NO/100 DOLLARS** (U.S.$15,000,000.00), together with simple interest at the rate per annum equal to four and one-quarter percent (4.25%) over the Index Rate provided below, as the Index Rate under this Note may be adjusted from time to time, one or more times, with interest being assessed on the unpaid principal balance of this Note as outstanding from time to time, commencing on the date of this Note and continuing until this Note is paid in full, or until default under this Note with interest thereafter being subject to the default interest rate provisions set forth herein.

**CREDIT AGREEMENT.** This Note represents and evidences a certain revolving line of credit loan (the "**Revolving Loan**") available to the Borrower, and all advances by the Lender pursuant to the Revolving Loan are governed by, and secured in the manner set forth in, that certain Credit Agreement by and between the Borrower and the Lender dated March 9, 2017, as amended (as may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"). Reference is made to the Credit Agreement for provisions for the acceleration of the maturity hereof on the occurrence of certain events specified therein, the definition of capitalized terms not otherwise defined herein, and for all other pertinent purposes.

**LINE OF CREDIT.** This Note evidences the Revolving Loan and Advances under this Note may be requested by an Authorized Individual in writing. The Borrower agrees to be liable for all sums advanced in accordance with the instructions of an Authorized Individual. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by the Lender's internal records, including computer printouts. The Lender will have no obligation to advance funds under this Note if: (a) the Borrower is in default under the terms of this Note, the other Transaction Documents or any other agreement that the Borrower or any Guarantor has with the Lender; (b) the Borrower or any Guarantor ceases doing business or is insolvent; (c) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guarantee of this Note or any other loan with the Lender; or (d) the Borrower has applied funds provided pursuant to this Note for purposes other than those permitted by the Credit Agreement or otherwise acceptable to the Lender.

**VARIABLE INTEREST RATE.** The rate used to assess interest under this Note is subject to change, as provided in this Note, based on changes in the Index Rate (as defined below). As of the date of this Note and as of the first Business Day of each month after the date of this Note, interest will be assessed on the unpaid principal balance of this Note at the Index Rate effective as of that day *plus* four and one-quarter percent (4.25%), and will be fixed at that rate until the first Business Day of the next calendar month (each, an "**Interest Period**"). The forgoing notwithstanding, once an Event of Default occurs under this Note, the Lender shall have the right to prospectively increase the interest rate in accordance with the default interest rate provisions of this Note. Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INDEX RATE.** The "**Index Rate**" under this Note effective as of the first day of an Interest Period is the greater of: (a) 0.50% per annum; and (b) the rate (expressed as a percentage per annum) paid on deposits of United States Dollars with a 1-month maturity as reported on the Reuters Screen LIBOR01 Page at or about 11:00 a.m. (London time) on the second London Business Day before the first day of an Interest Period, or if not so reported, then as determined by the Lender from another recognized source or interbank quotation ("**LIBOR**"). A "**London Business Day**," as used in this Note, is any day on which commercial banks in London, England are open for general business (including dealings in foreign exchange and foreign currency deposits). The Borrower understands that the Index Rate is not necessarily the lowest rate charged by the Lender on its loans and the Lender may make loans based on other index rates as well. If LIBOR becomes unavailable during the term of this Note, the Lender may designate a substantially similar index rate substitute for LIBOR, after notice to the Borrower, until LIBOR becomes available.

**INTEREST CALCULATION.** Interest on this Note is computed on a 365/360 simple interest basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

**OTHER FEES AND CHARGES.** In addition to the principal, interest and other fees and charges provided for in this Note, the Borrower agrees to also pay all other amounts, fees and charges, if any, provided for in the Credit Agreement.

**PAYMENTS.** The Borrower will pay regular monthly payments of accrued unpaid interest under this Note beginning October 1, 2019, and continuing on the first day of each month thereafter until this Note is paid in full. The Borrower will repay all principal, interest, costs and expenses outstanding hereunder on March 9, 2021. All payments under this Note shall be made to the Lender at 6 East 43rd Street, 20th Floor, New York, New York 10017, or at such other place as the Lender may designate in writing. Unless otherwise agreed or required by Applicable Law, the Credit Agreement or the Other Transaction Documents, payments will be applied first to any unpaid collection costs and late charges, then to accrued unpaid interest, with any remaining amount applied to repay principal.

**EVENTS OF DEFAULT.** "Events of Default" shall have the meaning set forth in the Credit Agreement.

**INTEREST AFTER DEFAULT.** Upon the occurrence, and during the continuance, of any Event of Default, whether or not the Lender has elected to accelerate the Indebtedness evidenced by this Note, this Note shall bear interest, payable on demand, at the rate of two percentage points in excess of the per annum interest rate then in effect under this Note (the "**Default Rate**"), but in no event shall the Default Rate be more than the highest rate permitted by the applicable usury law in respect of the Borrower, until the unpaid principal balance of the Loan, interest and any charges shall have been paid in full.

**LATE CHARGE.** If any payment due under this Note is not paid in full within ten (10) calendar days of when due, the Borrower shall pay the Lender a late payment fee in an amount equal to 10% of the payment amount due. Late charges will not be assessed following the declaration of an Event of Default and the acceleration of maturity of this Note.

**PREPAYMENT.** The Borrower may prepay this Note in full at any time by paying the then existing balance of the Indebtedness, including all unpaid principal balance of this Note, plus accrued simple interest and any unpaid late charges, as of the date of prepayment, without any prepayment penalty or premium. Prepayment of the amounts due under this Note shall not constitute termination of any of the Transaction Documents, including, without limitation, the Credit Agreement. If the Borrower prepays this Note in full, or if the Lender accelerates payment, the Borrower understands that, unless otherwise required under Applicable Law, any prepaid fees or charges will not be subject to rebate and will be earned by the Lender at the time this Note is signed.

**ATTORNEYS' FEES.** If the Lender refers this Note to an attorney for collection, or files suit against the Borrower to collect the Indebtedness, or if the Borrower files an Insolvency Proceeding, the Borrower agrees to pay the reasonable attorneys' fees incurred by the Lender.

**NSF CHECK CHARGES.** In the event that any payment under this Note is made by check and the check is returned to the Lender unpaid due to nonsufficient funds, the Borrower agrees to pay the Lender an additional NSF check charge equal to $29.00.

**DEPOSIT ACCOUNTS.** As collateral security for repayment of this Note, the Indebtedness, and all renewals and extensions, as well as to secure any and all other loans, notes, indebtedness and obligations that the Borrower may now and in the future owe to the Lender or incur in favor of the Lender, whether direct or indirect, absolute or contingent, due or to become due, of any nature and kind whatsoever, the Borrower is granting the Lender a continuing security interest in any and all funds that the Borrower may now and in the future have on deposit with the Lender or in certificates of deposit or other deposit accounts as to which the Borrower is an account holder. The Borrower further agrees that the Lender may, following the occurrence and during the continuance of an Event of Default, apply any funds that the Borrower may have on deposit with the Lender in

24-04020-dsj     Doc 1-1     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #2 State
                             Court Records     Pg 241 of 688

certificates of deposit or other deposit accounts as to which the Borrower is an account holder against the unpaid balance of the Indebtedness and any and all other present and future indebtedness and obligations that the Borrower may then owe to the Lender, in principal, interest, fees, costs, expenses, and attorneys' fees.

**GOVERNING LAW; JURISDICTION.** This Note and any claim with respect thereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)). The Borrower and the Lender each (a) agrees to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the borough of Manhattan, and (b) waives any objection based on *forum non conveniens*, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

**WAIVERS.**

(a) **JURY TRIAL WAIVER. THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE BETWEEN BORROWER AND LENDER, WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE, CONNECTED WITH, ARISING OUT OF OR IN ANY WAY RELATED TO OR PERTAINING TO THIS NOTE OR ANY DEALINGS, COURSE OF CONDUCT BETWEEN BORROWER AND LENDER OR ACTIONS OR STATEMENTS OF EITHER BORROWER OR LENDER. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT. THE BORROWER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY LENDER TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.**

(b) No right or remedy conferred upon or reserved to the Lender under any of the Transaction Documents, or with respect to any Collateral, or now or hereafter existing at law or in equity, by statute, or other legislative enactment, is intended to be exclusive of any other right or remedy, and each and every such right or remedy shall be cumulative and concurrent, and shall be in addition to every other such right or remedy, and may be pursued singly, concurrently, successively or otherwise, at the sole discretion of the Lender, and shall not be exhausted by any one exercise thereof but may be exercised as often as occasion therefor shall occur. No act of the Lender shall be deemed or construed as an election to proceed under any one such right or remedy to the exclusion of any other such right or remedy; furthermore, each such right or remedy of the Lender shall be separate, distinct, and cumulative and none shall be given effect to the exclusion of any other. The failure to exercise or delay in exercising any such right or remedy, or the failure to insist upon strict performance of any term of any of the Transaction Documents, shall not be construed as a waiver or release of the same, or of any Event of Default thereunder, or of any obligation or liability of the Borrower thereunder.

(c) The recovery of any judgment by the Lender shall not affect in any manner any rights, remedies, or powers of the Lender under any of the Transaction Documents but such rights, remedies and power of the Lender shall continue unimpaired as before. Further, the exercise by the Lender of its rights and remedies and the entry of any judgment by the Lender shall not affect in any way the interest rate payable hereunder or under any of the other Transaction Documents on any amounts due to the Lender, but interest shall continue to accrue on such amounts at the Default Rate.

(d) Except as to notices that are specifically provided for herein or in any of the other Transaction Documents, the Borrower hereby waives: (i) presentment, demand, notice of nonpayment, protest, notice of protest, any other notice of dishonor, notice of intent to accelerate and notice of acceleration; (ii) all other notices in connection with the delivery, acceptance, performance, default or enforcement of payment of this Note; (iii) diligence of collection of this Note; (iv) all errors, defects, imperfections and rights of appeal in any proceedings instituted by Lender under the terms of this Note, and the Borrower hereby releases the same; (v) all

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 242 of 688

benefit that might accrue to the Borrower by virtue of any present or future exemption laws, including, without limitation, laws exempting any property, real, personal or mixed, or any part of the proceeds arising from any sale of such property, from attachment, levy or sale under execution; (vi) all benefit that might accrue to the Borrower by virtue of any present or future laws providing for valuation or appraisement, stay of execution, exemption from civil process, or extension of time for payment; (vii) any right to require marshalling of assets; (viii) the right of inquisition on any real estate levied on, and the Borrower voluntarily condemns the same and authorizes the clerk to enter upon the writ of execution this voluntary condemnation; (ix) the right to interpose any counterclaim in any action brought by the Lender on this Note; and (x) the right to have any suit, action or proceeding brought by the Lender on this Note consolidated with any suit, action or proceeding brought by the Borrower.

(e)    The Borrower agrees that the Lender may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Transaction Documents (and the Borrower hereby waives any notice of any of the foregoing), and that the Transaction Documents may be amended, supplemented or modified by the Lender and other signatory parties, and any action taken by the Lender pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of the Lender, or of any Event of Default, or of any liability or obligation of the Borrower, under any of the Transaction Documents.

**SUCCESSORS AND ASSIGNS LIABLE.** The obligations and agreements of the Borrower under this Note shall be binding upon the Borrower's successors and assigns. The rights and remedies granted to the Lender under this Note shall inure to the benefit of the Lender's successors and assigns, as well as to any subsequent holder or holders of this Note.

**CAPTION HEADINGS.** Caption headings of the sections of this Note are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Note, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

**SEVERABILITY.** If any provision of this Note is held to be invalid, illegal or unenforceable by any court, that provision shall be deleted from this Note and the balance of this Note shall be interpreted as if the deleted provision never existed.

**AMENDMENT AND RESTATEMENT.** This Note amends and restates, and is in substitution for, that certain Amended and Restated Revolving Promissory Note in the original principal amount of $13,500,000 payable to the order of the Lender and dated October 29, 2018 (the "**Existing Note**"). However, without duplication, this Note shall in no way extinguish, cancel or satisfy Borrower's unconditional obligation to repay all indebtedness evidenced by the Existing Note or constitute a novation of the Existing Note. Nothing herein is intended to extinguish, cancel or impair the lien priority or effect of any security agreement, pledge agreement or mortgage with respect to the Borrower's obligations hereunder and under any other document relating hereto.

**PRIOR TO SIGNING THIS NOTE, THE BORROWER READ AND UNDERSTOOD ALL OF ITS PROVISIONS.**

BORROWER:

EBURY 1EM LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Heffratty, Manager

# REVOLVING PROMISSORY NOTE

$5,000,000.00                                                                          March 9, 2017

**PROMISE TO PAY. EBURY 2 EMI LLC**, a New York limited liability company (the "**Borrower**"), promises to pay to the order of **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**"), in lawful money of the United States of America the sum of **FIVE MILLION AND NO/100 DOLLARS** (U.S.$5,000,000.00), together with simple interest at the rate per annum equal to 4.50 percentage points over the Index Rate provided below, as the Index Rate under this Note may be adjusted from time to time, one or more times, with interest being assessed on the unpaid principal balance of this Note as outstanding from time to time, commencing on the date of this Note and continuing until this Note is paid in full, or until default under this Note with interest thereafter being subject to the default interest rate provisions set forth herein.

**CREDIT AGREEMENT.** This Note represents and evidences a certain revolving line of credit loan (the "**Revolving Loan**") available to the Borrower, and all advances by the Lender pursuant to the Revolving Loan are governed by, and secured in the manner set forth in, that certain Credit Agreement by and between the Borrower and the Lender dated as of the date hereof (as may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"). Reference is made to the Credit Agreement for provisions for the acceleration of the maturity hereof on the occurrence of certain events specified therein, the definition of capitalized terms not otherwise defined herein, and for all other pertinent purposes.

**LINE OF CREDIT.** This Note evidences the Revolving Loan and Advances under this Note may be requested by an Authorized Individual in writing. The Borrower agrees to be liable for all sums advanced in accordance with the instructions of an Authorized Individual. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by the Lender's internal records, including computer printouts. The Lender will have no obligation to advance funds under this Note if: (a) the Borrower is in default under the terms of this Note, the other Transaction Documents or any other agreement that the Borrower or any Guarantor has with the Lender; (b) the Borrower or any Guarantor ceases doing business or is insolvent; (c) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guarantee of this Note or any other loan with the Lender; or (d) the Borrower has applied funds provided pursuant to this Note for purposes other than those permitted by the Credit Agreement or otherwise acceptable to the Lender.

**VARIABLE INTEREST RATE.** The rate used to assess interest under this Note is subject to change, as provided in this Note, based on changes in the Index Rate (as defined below). As of the date of this Note and as of the first Business Day of each month after the date of this Note, interest will be assessed on the unpaid principal balance of this Note at the Index Rate effective as of that day *plus* 4.50 percentage points, and will be fixed at that rate until the first Business Day of the next calendar month (each, an "**Interest Period**"). The forgoing notwithstanding, once an Event of Default occurs under this Note, the Lender shall have the right to prospectively increase the interest rate in accordance with the default interest rate provisions of this Note. Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INDEX RATE.** The "**Index Rate**" under this Note effective as of the first day of an Interest Period is the greater of: (a) 0.50% per annum; and (b) the rate (expressed as a percentage per annum) paid on deposits of United States Dollars with a 1-month maturity as reported on the Reuters Screen LIBOR01 Page at or about 11:00 a.m. (London time) on the second London Business Day before the first day of an Interest Period, or if not so reported, then as determined by the Lender from another recognized source or interbank quotation ("**LIBOR**"). A "**London Business Day**," as used in this Note, is any day on which commercial banks in London, England are open for general business (including dealings in foreign exchange and foreign currency deposits). The Borrower understands that the Index Rate is not necessarily the lowest rate charged by the Lender on its loans and the Lender may make loans based on other index rates as well. If LIBOR becomes unavailable during the term of this Note, the Lender may designate a substantially similar index rate substitute for LIBOR, after notice to the Borrower, until LIBOR becomes available.

119449574_1

**INTEREST CALCULATION.** Interest on this Note is computed on a 365/360 simple interest basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

**OTHER FEES AND CHARGES.** In addition to the principal, interest and other fees and charges provided for in this Note, the Borrower agrees to also pay all other amounts, fees and charges, if any, provided for in the Credit Agreement.

**PAYMENTS.** The Borrower will pay regular monthly payments of accrued unpaid interest under this Note beginning April 1, 2017, continuing on the first day of each month thereafter until this Note is paid in full. The Borrower will repay all principal, interest, costs and expenses outstanding hereunder on March 1, 2020. All payments under this Note shall be made to the Lender at 6 East 43rd Street, 20th Floor, New York, New York 10017, or at such other place as the Lender may designate in writing. Unless otherwise agreed or required by Applicable Law, the Credit Agreement or the Other Transaction Documents, payments will be applied first to any unpaid collection costs and late charges, then to accrued unpaid interest, with any remaining amount applied to repay principal.

**EVENTS OF DEFAULT.** "Events of Default" shall have the meaning set forth in the Credit Agreement.

**INTEREST AFTER DEFAULT.** Upon the occurrence, and during the continuance, of any Event of Default, whether or not the Lender has elected to accelerate the Indebtedness evidenced by this Note, this Note shall bear interest, payable on demand, at the rate of two percentage points in excess of the per annum interest rate then in effect under this Note (the "**Default Rate**"), but in no event shall the Default Rate be more than the highest rate permitted by the applicable usury law in respect of the Borrower, until the unpaid principal balance of the Loan, interest and any charges shall have been paid in full.

**LATE CHARGE.** If any payment due under this Note is not paid in full within ten (10) calendar days of when due, the Borrower shall pay the Lender a late payment fee in an amount equal to 10% of the payment amount due. Late charges will not be assessed following the declaration of an Event of Default and the acceleration of maturity of this Note.

**PREPAYMENT.** The Borrower may prepay this Note in full at any time by paying the then existing balance of the Indebtedness, including all unpaid principal balance of this Note, plus accrued simple interest and any unpaid late charges, as of the date of prepayment, without any prepayment penalty or premium. Prepayment of the amounts due under this Note shall not constitute termination of any of the Transaction Documents, including, without limitation, the Credit Agreement. If the Borrower prepays this Note in full, or if the Lender accelerates payment, the Borrower understands that, unless otherwise required under Applicable Law, any prepaid fees or charges will not be subject to rebate and will be earned by the Lender at the time this Note is signed.

**ATTORNEYS' FEES.** If the Lender refers this Note to an attorney for collection, or files suit against the Borrower to collect the Indebtedness, or if the Borrower files an Insolvency Proceeding, the Borrower agrees to pay the reasonable attorneys' fees incurred by the Lender.

**NSF CHECK CHARGES.** In the event that any payment under this Note is made by check and the check is returned to the Lender unpaid due to nonsufficient funds, the Borrower agrees to pay the Lender an additional NSF check charge equal to $29.00.

**DEPOSIT ACCOUNTS.** As collateral security for repayment of this Note, the Indebtedness, and all renewals and extensions, as well as to secure any and all other loans, notes, indebtedness and obligations that the Borrower may now and in the future owe to the Lender or incur in favor of the Lender, whether direct or indirect, absolute or contingent, due or to become due, of any nature and kind whatsoever, the Borrower is granting the Lender a continuing security interest in any and all funds that the Borrower may now and in the future have on deposit with the Lender or in certificates of deposit or other deposit accounts as to which the Borrower is an account holder. The Borrower further agrees that the Lender may, following the occurrence and during the continuance of an Event of Default, apply any funds that the Borrower may have on deposit with the Lender in

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 7    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 245 of 688

certificates of deposit or other deposit accounts as to which the Borrower is an account holder against the unpaid balance of the Indebtedness and any and all other present and future indebtedness and obligations that the Borrower may then owe to the Lender, in principal, interest, fees, costs, expenses, and attorneys' fees.

**GOVERNING LAW; JURISDICTION.** This Note and any claim with respect thereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)). The Borrower and the Lender each (a) agrees to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the borough of Manhattan, and (b) waives any objection based on *forum non conveniens*, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

**WAIVERS.**

(a)    **JURY TRIAL WAIVER.    THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE BETWEEN BORROWER AND LENDER, WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE, CONNECTED WITH, ARISING OUT OF OR IN ANY WAY RELATED OR PERTAINING TO THIS NOTE OR ANY DEALINGS, COURSE OF CONDUCT BETWEEN BORROWER AND LENDER OR ACTIONS OR STATEMENTS OF EITHER BORROWER OR LENDER. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT. THE BORROWER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY LENDER TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.**

(b)    No right or remedy conferred upon or reserved to the Lender under any of the Transaction Documents, or with respect to any Collateral, or now or hereafter existing at law or in equity, by statute, or other legislative enactment, is intended to be exclusive of any other right or remedy, and each and every such right or remedy shall be cumulative and concurrent, and shall be in addition to every other such right or remedy, and may be pursued singly, concurrently, successively or otherwise, at the sole discretion of the Lender, and shall not be exhausted by any one exercise thereof but may be exercised as often as occasion therefor shall occur. No act of the Lender shall be deemed or construed as an election to proceed under any one such right or remedy to the exclusion of any other such right or remedy; furthermore, each such right or remedy of the Lender shall be separate, distinct, and cumulative and none shall be given effect to the exclusion of any other. The failure to exercise or delay in exercising any such right or remedy, or the failure to insist upon strict performance of any term of any of the Transaction Documents, shall not be construed as a waiver or release of the same, or of any Event of Default thereunder, or of any obligation or liability of the Borrower thereunder.

(c)    The recovery of any judgment by the Lender shall not affect in any manner any rights, remedies, or powers of the Lender under any of the Transaction Documents but such rights, remedies and power of the Lender shall continue unimpaired as before. Further, the exercise by the Lender of its rights and remedies and the entry of any judgment by the Lender shall not affect in any way the interest rate payable hereunder or under any of the other Transaction Documents on any amounts due to the Lender, but interest shall continue to accrue on such amounts at the Default Rate.

(d)    Except as to notices that are specifically provided for herein or in any of the other Transaction Documents, the Borrower hereby waives: (i) presentment, demand, notice of nonpayment, protest, notice of protest, any other notice of dishonor, notice of intent to accelerate and notice of acceleration; (ii) all other notices in connection with the delivery, acceptance, performance, default or enforcement of payment of this Note; (iii) diligence of collection of this Note; (iv) all errors, defects, imperfections and rights of appeal in any proceedings instituted by Lender under the terms of this Note, and the Borrower hereby releases the same; (v) all

benefit that might accrue to the Borrower by virtue of any present or future exemption laws, including, without limitation, laws exempting any property, real, personal or mixed, or any part of the proceeds arising from any sale of such property, from attachment, levy or sale under execution; (vi) all benefit that might accrue to the Borrower by virtue of any present or future laws providing for valuation or appraisement, stay of execution, exemption from civil process, or extension of time for payment; (vii) any right to require marshalling of assets; (viii) the right of inquisition on any real estate levied on, and the Borrower voluntarily condemns the same and authorizes the clerk to enter upon the writ of execution this voluntary condemnation; (ix) the right to interpose any counterclaim in any action brought by the Lender on this Note; and (x) the right to have any suit, action or proceeding brought by the Lender on this Note consolidated with any suit, action or proceeding brought by the Borrower.

(e)    The Borrower agrees that the Lender may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Transaction Documents (and the Borrower hereby waives any notice of any of the foregoing), and that the Transaction Documents may be amended, supplemented or modified by the Lender and other signatory parties, and any action taken by the Lender pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of the Lender, or of any Event of Default, or of any liability or obligation of the Borrower, under any of the Transaction Documents.

**SUCCESSORS AND ASSIGNS LIABLE.** The obligations and agreements of the Borrower under this Note shall be binding upon the Borrower's successors and assigns. The rights and remedies granted to the Lender under this Note shall inure to the benefit of the Lender's successors and assigns, as well as to any subsequent holder or holders of this Note.

**CAPTION HEADINGS.** Caption headings of the sections of this Note are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Note, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

**SEVERABILITY.** If any provision of this Note is held to be invalid, illegal or unenforceable by any court, that provision shall be deleted from this Note and the balance of this Note shall be interpreted as if the deleted provision never existed.

**PRIOR TO SIGNING THIS NOTE, THE BORROWER READ AND UNDERSTOOD ALL OF ITS PROVISIONS.**

BORROWER:

EBURY 2 EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

# EXHIBIT C

# TABLE OF CONTENTS

Ebury 1EMI LLC

ESC Guaranty ................................................................................................... 3

SPE Guaranty ................................................................................................. 12

Ebury 2EMI LLC

ESC Guaranty ................................................................................................. 21

SPE Guaranty ................................................................................................. 30

## GUARANTY

(By Ebury Street Capital, LLC for Obligations of Ebury IEMI LLC)

**THIS GUARANTY** dated as of March 9, 2017 (as may be amended, modified or supplemented from time to time, the "**Guaranty**") is made by **EBURY STREET CAPITAL, LLC,** a New York limited liability company (the "**Guarantor**") in favor of **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

## WITNESSETH:

**WHEREAS, EBURY 1EMI LLC**, as borrower (the "**Borrower**"), and the Lender are entering into a Credit Agreement, dated as of the date hereof (as may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"), pursuant to which the Lender has agreed to advance funds to the Borrower from time to time secured by the Collateral described in the Credit Agreement;

**WHEREAS**, the Guarantor is, and will be, the owner of the Tax Liens and certain other Collateral and is, and will be, receiving a direct or indirect benefit from the Borrower entering into the Credit Agreement; and

**WHEREAS**, the execution and delivery of this Guaranty by the Guarantor are conditions precedent to the effectiveness of the Credit Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and to induce the Lender to enter into the Credit Agreement and the other Transactions Documents, and make Advances thereunder, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby agrees as follows:

1.      Definitions.      Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Credit Agreement:

(a)      "**Bank Products**" means and includes any type of service or facility (other than direct loans) extended to the Borrower by the Lender or a Subsidiary or Affiliate of the Lender in reliance on the Lender's agreement to indemnify such Subsidiary or Affiliate, including, without limitation, (i) letters of credit, (ii) electronic item processing, including automated clearinghouse transactions, (iii) credit cards, (iv) deposit accounts, and (v) Swap Agreements (including any option with respect to any Swap Agreements) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

(b)      "**Indebtedness**" means and includes: (i) all present and future amounts, liabilities and obligations of the Borrower to the Lender due or owing under or in connection with the Credit Agreement, any other Transaction Document and all other loans, extensions of credit, Bank Products, obligations, debts and liabilities, plus interest thereon, of the Borrower that may now and in the future be owed to or incurred in favor of the Lender, as well as all claims by the Lender against the Borrower, whether existing now or later; whether they are voluntary or involuntary, whether related or unrelated, whether committed or purely discretionary, due or to become due, direct or indirect or by way of assignment, determined or undetermined, absolute or contingent, liquidated or unliquidated; whether the Borrower may be liable individually or jointly with others, of every nature and kind whatsoever, in principal, interest, costs, expenses and attorneys' fees and all other fees and charges; whether the Borrower may be obligated as guarantor, surety, accommodation party or otherwise; whether recovery upon such obligations may be or hereafter may become barred by any statute of limitations; whether such indebtedness may be or hereafter may become void or otherwise unenforceable from time to time hereafter; (ii) all costs, expenses, obligations, liabilities, damages and other losses incurred by the Lender (and costs of enforcement and collection) in connection with, arising out of or related to (a) the failure of the Guarantor to comply with the Special Purpose Entity Covenants in any material respect, and (b) the failure of the Borrower to deliver or cause to be delivered any Collections or proceeds from Tax Liens as required by the Transaction Documents; and (iii) all of the Indebtedness, including without limitation all present and future amounts, now or at any time or from time to time hereafter due or owing under or in connection with the Credit Agreement or any other Transaction Document

1

119435789_1

upon any Ebury Company initiating or consenting to the filing of a voluntary petition by any Ebury Company under any chapter of the Bankruptcy Code, or seeking relief for any Ebury Company under any Insolvency Laws or the appointment of a trustee, receiver, conservator or liquidator for all or any part of any Ebury Company's properties or assets.

(c)      "**Swap Agreements**" means and includes any agreement between the Borrower and any Person with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or combination of these transactions.

2.      Guarantee of the Indebtedness. The Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Lender the due, prompt and punctual payment and satisfaction of the Indebtedness (whether at the stated maturity, by acceleration or otherwise). The Guarantor shall make payment of the Indebtedness and other amounts payable by the Guarantor hereunder promptly upon written demand therefor (and in any event within five (5) Business Days), in compliance with this Guaranty. The Lender shall not be required to seek payment or performance from the Borrower or any other person or entity or to seek recourse to any collateral at any time securing any of the Indebtedness, prior to demanding payment of the Indebtedness from the Guarantor. Notwithstanding anything to the contrary herein, if the Guarantor does not qualify as an Eligible Contract Participant (as defined in the Commodity Exchange Act, as amended) at the time any Swap Agreement between the Borrower and the Lender or its Affiliates is entered into, the Guarantor shall neither guarantee nor be a party to such Swap Agreement. This exclusion shall have no effect on any other obligations of the Guarantor under this Guaranty.

3.      Continuing Guaranty. This Guaranty is a continuing guarantee of the Indebtedness for the duration of the term of the Credit Agreement and any renewals or extensions thereof. The obligations and liability of the Guarantor under this Guaranty shall be open and continuous in effect. The Guarantor intends to and does hereby guarantee at all times the prompt and punctual payment, performance and satisfaction of all of the present and future Indebtedness in favor of the Lender and any payments made on the Indebtedness by the Guarantor, the Borrower or others will not discharge or diminish the obligations and liability of the Guarantor hereunder for any remaining and succeeding Indebtedness. Payments to be made by the Guarantor hereunder may be required by the Lender on any number of occasions as provided in this Guaranty. Payment by the Guarantor shall be made to the Lender on written demand as Indebtedness become due.

4.      Costs of Enforcement. The Guarantor shall pay to the Lender forthwith upon demand all reasonable and documented costs and expenses (including court costs and attorneys' fees) incurred or expended by the Lender in enforcing its rights under this Guaranty, with interest at the rate provided under the Note from the date of each such expenditure until the Lender is repaid in full.

5.      Subordination of Rights.

(a)      (i) In the event that the Guarantor should for any reason (a) advance or lend monies to the Borrower, whether or not such funds are used by the Borrower to make payment(s) under the Indebtedness, (b) make any payment(s) to the Lender or others for and on behalf of the Borrower under the Indebtedness, or (c) make any payment to the Lender in total or partial satisfaction of the obligations and liabilities of the Guarantor under this Guaranty, or (ii) if any of the property of the Guarantor is used to pay or satisfy any of the Indebtedness, the Guarantor hereby agrees that any and all rights that the Guarantor may have or acquire to collect from or to be reimbursed by the Borrower (or from or by any other guarantor, endorser or surety of the Indebtedness), whether the rights of collection or reimbursement of the Guarantor arise by way of subrogation to the rights of the Lender or otherwise, shall in all respects, whether or not the Borrower is presently or subsequently becomes insolvent, be subordinate, inferior and junior to the rights of the Lender to collect and enforce payment, performance and satisfaction of the then remaining Indebtedness, until such time as the Indebtedness are fully paid and satisfied.

(b)      In the event of the insolvency or consequent liquidation of the assets of the Borrower, through Insolvency Laws, by voluntary liquidation, or otherwise, the assets of the Borrower applicable to the

2

payment of claims of the Lender shall be paid to the Lender and shall be first applied by the Lender to the then remaining Indebtedness. The Guarantor hereby assigns to the Lender all claims that the Guarantor may have or acquire against the Borrower or any assignee or trustee of the Borrower in bankruptcy; provided that, such assignment shall be effective only for the purpose of and to the extent of assuring to the Lender full payment of the Indebtedness guaranteed under this Guaranty, and no further.

(c)     The Guarantor hereby agrees to refrain from attempting to collect or enforce any of the collection or reimbursement rights against the Borrower (or against any other guarantor, surety or endorser of the Indebtedness), arising by way of subrogation or otherwise, until such time as all of the then remaining Indebtedness in favor of the Lender is fully paid and satisfied. Should the Guarantor for any reason whatsoever receive any payment(s) from the Borrower (or any other guarantor, surety or endorser of the Indebtedness) that the Borrower (or such a third party) may owe to the Guarantor for any of the reasons stated above, the receiving Guarantor agrees to accept such payment(s) in trust for and on behalf of the Lender, advising such other Guarantor or the Borrower (or the third party payee) of such fact.

(d)     The Guarantor further unconditionally agrees to immediately deliver such funds to the Lender, with such funds being held by the Guarantor over any interim period, in trust for the Lender. In the event that the Guarantor should for any reason whatsoever receive any such funds from the Borrower (or any third party), and deposit such funds in one or more deposit accounts, no matter where located, the Lender shall have the right to attach any and all of the deposit accounts in which such funds were deposited, whether or not such funds were commingled with other monies, and whether or not such funds then remain on deposit in such an account or accounts.

6.     Setoff Rights.

(a)     Subject to the limitations set forth in Section 2 of this Guaranty, and in addition to any rights now or hereafter granted under the Transaction Documents, Applicable Law or otherwise, the Guarantor hereby grants to the Lender and each Indemnified Person a right of setoff upon any and all deposits (general, specified, special, time, demand, provisional or final) and credits, claims or indebtedness of the Guarantor at any time existing, and any obligation owed by the Lender or any Affiliate of the Lender to the Guarantor and to set off against any Indebtedness or indebtedness owed by the Guarantor and any indebtedness owed by the Lender or any Affiliate of the Lender to the Guarantor, in each case whether direct or indirect, absolute or contingent, matured or unmatured, whether or not arising under the Transaction Documents and irrespective of the currency, place of payment or booking office of the amount or obligation and in each case at any time held or owing by the Lender, any Affiliate of the Lender or any Indemnified Person to or for the credit of the Guarantor, without prejudice to the Lender's right to recover any deficiency.

(b)     The Lender, its Affiliates and each Indemnified Person are hereby authorized upon any amount becoming due and payable by the Guarantor to the Lender or any Indemnified Person under the Indebtedness, without notice to the Guarantor, any such notice being expressly waived by the Guarantor to the extent permitted under Applicable Law, to set off, appropriate, apply and enforce such right of set off against any and all items hereinabove referred to against any amounts owing to the Lender or any Indemnified Person by the Guarantor under the Indebtedness, irrespective of whether the Lender, its Affiliates or any Indemnified Person shall have made any demand under the Transaction Documents and regardless of any other collateral securing such amounts, and in all cases without waiver or prejudice of the Lender's rights to recover a deficiency.

(c)     ANY AND ALL RIGHTS TO REQUIRE THE LENDER OR OTHER INDEMNIFIED PERSONS TO EXERCISE THEIR RIGHTS OR REMEDIES WITH RESPECT TO THE TAX LIENS OR OTHER INDEMNIFIED PERSONS UNDER THE TRANSACTION DOCUMENTS, PRIOR TO EXERCISING THE FOREGOING RIGHT OF SETOFF, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED BY THE GUARANTOR.

(d)     The Lender or any Indemnified Person shall promptly notify the Guarantor after any such set off and application made by the Lender or such Indemnified Person, provided that the failure to give such notice shall not affect the validity of such setoff and application. If an amount or obligation is unascertained, the Lender

3

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 8 RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State.
Court Records   Pg 252 of 688

may in a commercially reasonable manner acting in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant Person accounting to the other Person when the amount or obligation is ascertained. This Section 6 shall be without prejudice and in addition to any right of setoff, combination of accounts, Lien or other rights to which any Person is at any time otherwise entitled.

7.     Joint, Several and Solidary Liability.   The obligations and liability of the Guarantor under this Guaranty shall be on a "solidary" or "joint and several" basis along with the Borrower to the same degree and extent as if the Guarantor had been or will be a co- borrower, co-principal obligor or co-maker of the Indebtedness. The obligations and liability of the Guarantor hereunder shall further be on a "solidary" or "joint and several" basis among the Guarantor and any other guarantor, endorser or surety of the Indebtedness.

8.     Duration.   This Guaranty and the obligations and liability of the Guarantor hereunder shall remain in full force and effect until such time as the Indebtedness is paid in full.

9.     Events of Default; Remedies.

(a)     The Guarantor's failure to observe or perform any covenant under this Guaranty that continues unremedied for five (5) Business Days after the earlier of: (i) receipt by the Guarantor of notice of such failure or breach from the Lender; or Guarantor's knowledge of such failure or breach; shall constitute an Event of Default under the Credit Agreement.

(b)     Upon the occurrence of an Event of Default under the Credit Agreement, the Lender shall be entitled to enforce its rights and remedies against the Guarantor as provided in this Guaranty.

10.     Waivers.

(a)     The Guarantor hereby assents, to the extent permitted under Applicable Law, to all the terms and conditions of the Indebtedness and waives:

(i)     notice of acceptance of this Guaranty and the creation, extension or accrual of any Indebtedness by the Lender;

(ii)     presentment, demand for payment, notice of dishonor and nonpayment, notice of intention to accelerate, notice of acceleration, protest and notice of protest, collection or institution of any suit or other action by the Lender in collection thereof, including any notice of default in payment thereof, or other notice to, or demand for payment thereof, on any party;

(iii)     any requirement of diligence or promptness on the part of the Lender in the enforcement of any of its rights under the provisions of any of the Transaction Documents;

(iv)     any requirement to notify the Guarantor of any nonpayment relating to any collateral directly or indirectly securing the Indebtedness, or notice of any action or non-action on the part of the Borrower, the Lender, or any other guarantor, surety or endorser of the Indebtedness, or notice of the creation of any new or additional Indebtedness subject to this Guaranty;

(v)     notice of any other nature whatsoever;

(vi)     any rights to demand or require collateral security from the Borrower, or any other person as provided under Applicable Law or otherwise;

(vii)     any requirement on the part of the Lender to notify the Guarantor of the terms, time and place of any public or private sale of any collateral directly or indirectly securing the Indebtedness;

(viii)     any "one action" or "anti-deficiency" law or any other law that may prevent the Lender from bringing any action, including a claim for deficiency, against the Guarantor, before or after the commencement or completion of any foreclosure action by the Lender, or any action in lieu of foreclosure by the Lender;

4

119435789_1

(ix)      any election of remedies by the Lender that may destroy or impair the subrogation rights of the Guarantor or the right of the Guarantor to proceed for reimbursement against the Borrower or any other guarantor, surety or endorser of the Indebtedness, including without limitation, any loss of rights the Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness;

(x)      any disability or other defense of the Borrower or any other guarantor, surety or endorser, or any other person, or by reason of the cessation from any cause whatsoever, other than payment in full of the Indebtedness;

(xi)      any requirement that the Lender take any action whatsoever against the Borrower or any other party or file any claim in the event of the bankruptcy of the Borrower; or

(xii)      the failure of the Lender to protect, preserve or resort to any Collateral.

(b)      The Guarantor warrants and agrees that each of the waivers set forth in this Section 10 is made with the full knowledge of the Guarantor as to its significance and consequences, and that, under the circumstances, such waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any Applicable Law or public policy, such waiver shall be effective only to the extent permitted by law. The waivers set forth in this Section 10 shall be effective notwithstanding the fact that the Borrower ceases to exist by reason of its liquidation, merger, consolidation or otherwise.

11.     Consent.

(a)      The Guarantor hereby consents that, from time to time, and without further notice to or consent of the Guarantor, the Lender may take any or all of the following actions without affecting the liability of the Guarantor: (i) extend, renew, modify, compromise, settle or release the Indebtedness; (ii) release or compromise any liability of any party or parties with respect to the Indebtedness; (iii) subordinate or agree to subordinate the payment of all or any part of the Indebtedness; (iv) subordinate or agree to subordinate its Security Interests in the Collateral or exchange, surrender or otherwise deal with the Collateral as the Lender may determine; (v) apply any payments or proceeds to any of the Indebtedness in such priority or with such preferences as the Lender may determine in its sole discretion, regardless of which of the Indebtedness then remains unpaid; (vi) take or accept any other collateral security or guaranty for any or all of the Indebtedness; (vii) enter into, deliver, modify, amend, or waive compliance with, any instrument or arrangement evidencing, securing or otherwise affecting, all or any part of the Indebtedness; (viii) discharge, release or agree not to sue any party (including, but not limited to, the Borrower or any other guarantor, surety, or endorser of the Indebtedness), who is or may be liable to the Lender for any of the Indebtedness; or (ix) exercise or refrain from exercising any right or remedy of the Lender.

(b)      In addition, neither the course of dealing between the Lender and the Guarantor or the Borrower (or any other guarantor, surety or endorser of the Indebtedness), nor any failure or delay on the part of the Lender to exercise any of the rights and remedies of the Lender under this Guaranty or any other agreement or agreements by and between the Lender and the Guarantor or the Borrower (or any other guarantor, surety or endorser), shall have the effect of impairing or releasing the obligations and liabilities of the Guarantor to the Lender, or of waiving any of the rights and remedies of the Lender under this Guaranty or otherwise.

(c)      Any partial exercise of any rights and remedies granted to the Lender shall furthermore not constitute a waiver of any of the other rights and remedies of the Lender; it being the intent and agreement of the Guarantor that the rights and remedies of the Lender shall be cumulative in nature. The Guarantor further agrees that, should the Borrower default under any Indebtedness, any waiver or forbearance on the part of the Lender to pursue the available rights and remedies of the Lender shall be binding upon the Lender only to the extent that the Lender specifically agrees to such waiver or forbearance in writing. A waiver or forbearance on the part of the Lender as to one event of default shall not constitute a waiver or forbearance as to any other default.

12.     Deposit Accounts. As collateral security for repayment of the Indebtedness, the Guarantor hereby grants the Lender a continuing security interest in any and all funds that the Guarantor may now and in the future have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the

119435789_1

Lender or its Affiliates as to which the Guarantor is an account holder. The Guarantor further agrees that the Lender may, if an Event of Default under the Credit Agreement has occurred and is continuing, apply any funds that the Guarantor may have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the Lender or its Affiliates as to which the Guarantor is an account holder against the unpaid balance of any and all other present and Indebtedness.

13.    Obligations of the Guarantor are Unconditional. The obligations of the Guarantor under this Guaranty shall be absolute and unconditional, irrespective of the validity, regularity or enforceability of the Indebtedness or any instrument or agreement evidencing the same or relating thereto or any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Guarantor. The obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances and shall not be discharged except by complete payment or performance of the Indebtedness and the liabilities of the Guarantor hereunder and shall be joint and several with the obligations of any other guarantor, endorser or surety of the Indebtedness given to the Lender on behalf of the Borrower. This Guaranty and the obligations of the Guarantor hereunder shall terminate on the Termination Date; *provided, however*, that this Guaranty shall be reinstated if any such payment or performance is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by the Lender for any reason, including without limitation by reason of the insolvency, bankruptcy or reorganization of the Borrower, the Servicer, the Guarantor or any other Person. It is the intention of the Lender and the Guarantor that the obligations and liabilities of the Guarantor hereunder shall not be discharged except by the full and complete performance and satisfaction of such obligations and liabilities; and then only to the extent of such performance.

14.    Representations and Warranties. The Guarantor represents and warrants that:

(a)    the guaranty of the Indebtedness by the Guarantor and the execution, delivery and performance of this Guaranty by the Guarantor neither are in violation of any Applicable Law nor will in a default under any contract, agreement, or instrument to which the Guarantor is a party, or by which the Guarantor or the property of the Guarantor may be bound;

(b)    it will receive or has received a direct or indirect material benefit from the transactions contemplated herein or arising out of the Indebtedness;

(c)    this Guaranty, when executed and delivered to the Lender, will constitute a valid, legal and binding obligation of the Guarantor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency or similar laws affecting generally the enforcement of creditor's rights;

(d)    it has established adequate means of obtaining information from the Borrower on a continuing basis regarding the financial condition of the Borrower; and

(e)    the Lender has not made any representations to it as to the creditworthiness of the Borrower.

15.    Affirmative Covenants. The Guarantor covenants and agrees with the Lender that, so long as this Guaranty remains in effect, the Guarantor shall:

(a)    promptly inform the Lender in writing of (i) all material adverse changes in the financial condition of the Guarantor or the Borrower, and (ii) all litigation and claims and all threatened litigation and claims affecting the Guarantor or the Borrower that would reasonably be expected to materially and adversely affect the financial condition of the Guarantor or the financial condition of the Borrower;

(b)    without demand or request by the Lender, furnish the Lender with the financial statements for Guarantor required under the Credit Agreement;

(c)    furnish such information, statements and reports with respect to the financial condition and business operations of Guarantor as the Lender may reasonably request from time to time; and

6

119435789_1

(d)    keep adequately informed of any facts, events or circumstances that might in any way affect the risks of the Guarantor under this Guaranty recognizing that the Lender shall have no obligation to disclose to the Guarantor any information or material relating to the Borrower.

16.    Negative Covenant. The Guarantor covenants and agrees with the Lender that, as long as this Guaranty remains in effect, the Guarantor shall not, without the prior written consent of the Lender, sell, lease, assign, pledge, hypothecate, encumber, transfer, or otherwise dispose of all or substantially all of its assets except in accordance with the Credit Agreement.

17.    Remedies. Upon the failure in the payment or performance of any of the Indebtedness when due (whether by acceleration or otherwise) and continuance thereof beyond any applicable cure or grace period, the Lender may institute a judicial proceeding for the collection of the sums or the performance of the Indebtedness so due and unpaid or unperformed, and may prosecute such proceeding to judgment for final decree, and may enforce the same against the Guarantor or any other guarantor, surety or endorser of the Indebtedness and collect the monies adjudged or decreed to be payable in the manner provided by law out of the property of the Guarantor or any other guarantor, surety or endorser of the Indebtedness, wherever situated. In the event of such a failure, the Lender shall have the right to proceed first and directly against the Guarantor or any other guarantor, surety or endorser of the Indebtedness without proceeding against the Borrower or any other person (including other the Guarantor or obligors), without exhausting any other remedies that it may have and without resorting to any other security held by the Lender.

18.    Transfer of Indebtedness. This Guaranty is for the benefit of the Lender and for such other person or persons as may from time to time become or be the holders of all or any part of the Indebtedness. This Guaranty shall be transferable and negotiable with the same force and effect and to the same extent as the Indebtedness may be transferable; it being understood and agreed to by the Guarantor that, upon any transfer or assignment of all or any part of the Indebtedness, the holder of such Indebtedness shall have all of the rights and remedies granted to the Lender under this Guaranty. The Guarantor further agrees that, upon any transfer of all or any portion of the Indebtedness, the Lender may transfer and deliver any and all collateral securing repayment of such Indebtedness (including, but not limited to, any collateral provided by the Guarantor) to the transferee of such Indebtedness, and such collateral shall secure any and all of the Indebtedness in favor of such a transferee. The Guarantor additionally agrees that, after any such transfer or assignment has taken place, the transferring the Lender shall be fully discharged from any and all liability and responsibility to the Guarantor with respect to such collateral, and the transferee thereafter shall be vested with all the powers and rights with respect to such collateral.

19.    Consent to Participation. The Guarantor recognizes and agrees that the Lender may, from time to time, one or more times, transfer all or any part of the Indebtedness through sales of participation interests in such Indebtedness to one or more third party lenders. The Guarantor specifically agrees and consents to all such transfers and assignments and waives any subsequent notice of such transfers and assignments as may be provided under any Applicable Law. The Guarantor additionally agrees that the purchaser of a participation interest in the Indebtedness will be considered as the absolute owner of a percentage interest of such Indebtedness and that such a purchaser will have all of the rights granted under any participation agreement governing the sale of such a participation interest. The Guarantor waives any rights of offset that the Guarantor may have against any transferring the Lender or any purchaser of such a participation interest, and the Guarantor unconditionally agrees that the Lender or such a purchaser may enforce the obligations and liabilities of the Guarantor under this Guaranty, irrespective of the failure or insolvency of any such transferring the Lender or any such purchaser.

20.    Notices. Any notice or demand which, by provision of this Guaranty, is required or permitted to be given or served to or on the Guarantor or the Lender shall be deemed to have been sufficiently given and served for all purposes (if mailed) three calendar days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses is given in writing by the Guarantor or Lender, as applicable) as follows:

119435789_1

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM

NYSCEF DOC. NO. 8

INDEX NO. 156207/2022

RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State

Court Records   Pg 256 of 688

EBURY STREET CAPITAL, LLC
56 Locust Avenue, 2nd Floor
Rye, NY 10580
Attention: John Hanratty

EMIGRANT BUSINESS CREDIT CORPORATION
6 East 43rd Street, 20th Floor
New York, New York 10017
Attention: Karen Wold

21.     Additional Guaranties. The Guarantor recognizes and agrees that the Guarantor (or any one or more of them) may have previously granted, and may in the future grant, one or more additional guaranties of the Indebtedness in favor of the Lender. Should this occur, the execution of this Guaranty and any additional guaranties on the part of the Guarantor will not be construed as a cancellation of this Guaranty or any of the additional guaranties of the Guarantor; it being the full intent and agreement of the Guarantor that all such guaranties of the Indebtedness in favor of the Lender shall remain in full force and effect and shall be cumulative in nature and effect.

22.     Miscellaneous Provisions. The following miscellaneous provisions are a part of this Guaranty:

(a)     No amendment, modification, consent or waiver of any provision of this Guaranty, and no consent to any departure by the Guarantor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of the Lender, and then shall be effective only as to the specific instance and for the specific purpose for which given.

(b)     Caption headings of the sections of this Guaranty are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Guaranty, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

(c)     This Guaranty embodies the final, entire agreement of the parties hereto and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. There are no oral agreements between the parties to this Guaranty.

(d)     This Guaranty and any claim with respect thereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)). The Lender and the Guarantor both (i) agree to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the borough of Manhattan, and (ii) waive any objection based on *forum non conveniens*, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

(e)     If any provision of this Guaranty is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable. This Guaranty shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Guaranty, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.

(f)     The obligations and liabilities of the Guarantor under this Guaranty shall be binding upon their respective successors and assigns.

8

119435789_1

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO. 8

INDEX NO. 158267/2022
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 257 of 688

(g)    The Guarantor hereby waives the right to any jury trial in any action, proceeding, or counterclaim brought by the Guarantor or the Lender arising out of this Guaranty.

**THE GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT AND AGREES TO ITS TERMS.  THIS AGREEMENT IS DATED AS OF THE DATE STATED ABOVE.**

GUARANTOR:

EBURY STREET CAPITAL, LLC

By: _____
John Hanratty, Manager

119435789_1

(By SPEs for Obligations of Ebury 1EMI LLC)

**THIS GUARANTY** dated as of March $\underline{9}$, 2017 (as may be amended, modified or supplemented from time to time, the "**Guaranty**") is made by **EB 1EMIALA LLC**, an Alabama limited liability company, **EB 1EMIFL, LLC**, a Florida limited liability company, **EB 1EMIIN, LLC**, an Indiana limited liability company, **EB 1EMIMD, LLC**, a Maryland limited liability company, **EB 1EMINJ LLC**, a New Jersey limited liability company, **EB 1EMINY, LLC**, a New York limited liability company, **EB 1EMISC LLC**, a South Carolina limited liability company and **RE 1EMI LLC**, a New York limited liability company (jointly and severally, individually and collectively, the "**Guarantor**") in favor of **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

WITNESSETH:

**WHEREAS**, **EBURY 1EMI LLC**, as borrower (the "**Borrower**"), and the Lender are entering into a Credit Agreement, dated as of the date hereof (as may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"), pursuant to which the Lender has agreed to advance funds to the Borrower from time to time secured by the Collateral described in the Credit Agreement;

**WHEREAS**, the Guarantor is, and will be, the owner of the Tax Liens and certain other Collateral and is, and will be, receiving a direct or indirect benefit from the Borrower entering into the Credit Agreement; and

**WHEREAS**, the execution and delivery of this Guaranty by the Guarantor are conditions precedent to the effectiveness of the Credit Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and to induce the Lender to enter into the Credit Agreement and the other Transactions Documents, and make Advances thereunder, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby agrees as follows:

1.      Definitions.   Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Credit Agreement:

        (a)      "**Bank Products**" means and includes any type of service or facility (other than direct loans) extended to the Borrower by the Lender or a Subsidiary or Affiliate of the Lender in reliance on the Lender's agreement to indemnify such Subsidiary or Affiliate, including, without limitation, (i) letters of credit, (ii) electronic item processing, including automated clearinghouse transactions, (iii) credit cards, (iv) deposit accounts, and (v) Swap Agreements (including any option with respect to any Swap Agreements) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

        (b)      "**Indebtedness**" means and includes: (i) all present and future amounts, liabilities and obligations of the Borrower to the Lender due or owing under or in connection with the Credit Agreement, any other Transaction Document and all other loans, extensions of credit, Bank Products, obligations, debts and liabilities, plus interest thereon, of the Borrower that may now and in the future be owed to or incurred in favor of the Lender, as well as all claims by the Lender against the Borrower, whether existing now or later; whether they are voluntary or involuntary, whether related or unrelated, whether committed or purely discretionary, due or to become due, direct or indirect or by way of assignment, determined or undetermined, absolute or contingent, liquidated or unliquidated; whether the Borrower may be liable individually or jointly with others, of every nature and kind whatsoever, in principal, interest, costs, expenses and attorneys' fees and all other fees and charges; whether the Borrower may be obligated as guarantor, surety, accommodation party or otherwise; whether recovery upon such obligations may be or hereafter may become barred by any statute of limitations; whether such indebtedness may be or hereafter may become void or otherwise unenforceable from time to time hereafter; (ii) all costs, expenses, obligations, liabilities, damages and other losses incurred by the Lender (and costs of enforcement and collection) in connection with, arising out of or related to (a) the failure of the Guarantor to comply with the

1

Special Purpose Entity Covenants in any material respect, and (b) the failure of the Borrower to deliver or cause to be delivered any Collections or proceeds from Tax Liens as required by the Transaction Documents; and (iii) all of the Indebtedness, including without limitation all present and future amounts, now or at any time or from time to time hereafter due or owing under or in connection with the Credit Agreement or any other Transaction Document upon any Ebury Company initiating or consenting to the filing of a voluntary petition by any Ebury Company under any chapter of the Bankruptcy Code, or seeking relief for any Ebury Company under any Insolvency Laws or the appointment of a trustee, receiver, conservator or liquidator for all or any part of any Ebury Company's properties or assets.

(c)     "**Swap Agreements**" means and includes any agreement between the Borrower and any Person with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or combination of these transactions.

2.     Guarantee of the Indebtedness. The Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Lender the due, prompt and punctual payment and satisfaction of the Indebtedness (whether at the stated maturity, by acceleration or otherwise). The Guarantor shall make payment of the Indebtedness and other amounts payable by the Guarantor hereunder promptly upon written demand therefor (and in any event within five (5) Business Days), in compliance with this Guaranty. The Lender shall not be required to seek payment or performance from the Borrower or any other person or entity or to seek recourse to any collateral at any time securing any of the Indebtedness, prior to demanding payment of the Indebtedness from the Guarantor. Notwithstanding anything to the contrary herein, if the Guarantor does not qualify as an Eligible Contract Participant (as defined in the Commodity Exchange Act, as amended) at the time any Swap Agreement between the Borrower and the Lender or its Affiliates is entered into, the Guarantor shall neither guarantee nor be a party to such Swap Agreement. This exclusion shall have no effect on any other obligations of the Guarantor under this Guaranty.

3.     Continuing Guaranty. This Guaranty is a continuing guarantee of the Indebtedness for the duration of the term of the Credit Agreement and any renewals or extensions thereof. The obligations and liability of the Guarantor under this Guaranty shall be open and continuous in effect. The Guarantor intends to and does hereby guarantee at all times the prompt and punctual payment, performance and satisfaction of all of the present and future Indebtedness in favor of the Lender and any payments made on the Indebtedness by the Guarantor, the Borrower or others will not discharge or diminish the obligations and liability of the Guarantor hereunder for any remaining and succeeding Indebtedness. Payments to be made by the Guarantor hereunder may be required by the Lender on any number of occasions as provided in this Guaranty. Payment by the Guarantor shall be made to the Lender on written demand as Indebtedness become due.

4.     Costs of Enforcement. The Guarantor shall pay to the Lender forthwith upon demand all reasonable and documented costs and expenses (including court costs and attorneys' fees) incurred or expended by the Lender in enforcing its rights under this Guaranty, with interest at the rate provided under the Note from the date of each such expenditure until the Lender is repaid in full.

5.     Subordination of Rights.

(a)     (i) In the event that the Guarantor should for any reason (a) advance or lend monies to the Borrower, whether or not such funds are used by the Borrower to make payment(s) under the Indebtedness, (b) make any payment(s) to the Lender or others for and on behalf of the Borrower under the Indebtedness, or (c) make any payment to the Lender in total or partial satisfaction of the obligations and liabilities of the Guarantor under this Guaranty, or (ii) if any of the property of the Guarantor is used to pay or satisfy any of the Indebtedness, the Guarantor hereby agrees that any and all rights that the Guarantor may have or acquire to collect from or to be reimbursed by the Borrower (or from or by any other guarantor, endorser or surety of the Indebtedness), whether the rights of collection or reimbursement of the Guarantor arise by way of subrogation to the rights of the Lender or otherwise, shall in all respects, whether or not the Borrower is presently or subsequently becomes insolvent, be

2

subordinate, inferior and junior to the rights of the Lender to collect and enforce payment, performance and satisfaction of the then remaining Indebtedness, until such time as the Indebtedness are fully paid and satisfied.

(b)       In the event of the insolvency or consequent liquidation of the assets of the Borrower, through Insolvency Laws, by voluntary liquidation, or otherwise, the assets of the Borrower applicable to the payment of claims of the Lender shall be paid to the Lender and shall be first applied by the Lender to the then remaining Indebtedness. The Guarantor hereby assigns to the Lender all claims that the Guarantor may have or acquire against the Borrower or any assignee or trustee of the Borrower in bankruptcy; provided that, such assignment shall be effective only for the purpose of and to the extent of assuring to the Lender full payment of the Indebtedness guaranteed under this Guaranty, and no further.

(c)       The Guarantor hereby agrees to refrain from attempting to collect or enforce any of the collection or reimbursement rights against the Borrower (or against any other guarantor, surety or endorser of the Indebtedness), arising by way of subrogation or otherwise, until such time as all of the then remaining Indebtedness in favor of the Lender is fully paid and satisfied. Should the Guarantor for any reason whatsoever receive any payment(s) from the Borrower (or any other guarantor, surety or endorser of the Indebtedness) that the Borrower (or such a third party) may owe to the Guarantor for any of the reasons stated above, the receiving Guarantor agrees to accept such payment(s) in trust for and on behalf of the Lender, advising such other Guarantor or the Borrower (or the third party payee) of such fact.

(d)       The Guarantor further unconditionally agrees to immediately deliver such funds to the Lender, with such funds being held by the Guarantor over any interim period, in trust for the Lender. In the event that the Guarantor should for any reason whatsoever receive any such funds from the Borrower (or any third party), and deposit such funds in one or more deposit accounts, no matter where located, the Lender shall have the right to attach any and all of the deposit accounts in which such funds were deposited, whether or not such funds were commingled with other monies, and whether or not such funds then remain on deposit in such an account or accounts.

6.       Setoff Rights.

(a)       Subject to the limitations set forth in Section 2 of this Guaranty, and in addition to any rights now or hereafter granted under the Transaction Documents, Applicable Law or otherwise, the Guarantor hereby grants to the Lender and each Indemnified Person a right of setoff upon any and all deposits (general, specified, special, time, demand, provisional or final) and credits, claims or indebtedness of the Guarantor at any time existing, and any obligation owed by the Lender or any Affiliate of the Lender to the Guarantor and to set off against any Indebtedness or indebtedness owed by the Guarantor and any indebtedness owed by the Lender or any Affiliate of the Lender to the Guarantor, in each case whether direct or indirect, absolute or contingent, matured or unmatured, whether or not arising under the Transaction Documents and irrespective of the currency, place of payment or booking office of the amount or obligation and in each case at any time held or owing by the Lender, any Affiliate of the Lender or any Indemnified Person to or for the credit of the Guarantor, without prejudice to the Lender's right to recover any deficiency.

(b)       The Lender, its Affiliates and each Indemnified Person are hereby authorized upon any amount becoming due and payable by the Guarantor to the Lender or any Indemnified Person under the Indebtedness, without notice to the Guarantor, any such notice being expressly waived by the Guarantor to the extent permitted under Applicable Law, to set off, appropriate, apply and enforce such right of set off against any and all items hereinabove referred to against any amounts owing to the Lender or any Indemnified Person by the Guarantor under the Indebtedness, irrespective of whether the Lender, its Affiliates or any Indemnified Person shall have made any demand under the Transaction Documents and regardless of any other collateral securing such amounts, and in all cases without waiver or prejudice of the Lender's rights to recover a deficiency.

(c)       ANY AND ALL RIGHTS TO REQUIRE THE LENDER OR OTHER INDEMNIFIED PERSONS TO EXERCISE THEIR RIGHTS OR REMEDIES WITH RESPECT TO THE TAX LIENS OR OTHER INDEMNIFIED PERSONS UNDER THE TRANSACTION DOCUMENTS, PRIOR TO EXERCISING

3

119375035_3

THE FOREGOING RIGHT OF GUARANTEE IS KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED BY THE GUARANTOR.

(d)     The Lender or any Indemnified Person shall promptly notify the Guarantor after any such set off and application made by the Lender or such Indemnified Person, provided that the failure to give such notice shall not affect the validity of such setoff and application. If an amount or obligation is unascertained, the Lender may in a commercially reasonable manner acting in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant Person accounting to the other Person when the amount or obligation is ascertained. This Section 6 shall be without prejudice and in addition to any right of setoff, combination of accounts, Lien or other rights to which any Person is at any time otherwise entitled.

7.     Joint, Several and Solidary Liability. The obligations and liability of the Guarantor under this Guaranty shall be on a "solidary" or "joint and several" basis along with the Borrower to the same degree and extent as if the Guarantor had been or will be a co- borrower, co-principal obligor or co-maker of the Indebtedness. The obligations and liability of the Guarantor hereunder shall further be on a "solidary" or "joint and several" basis among the Guarantor and any other guarantor, endorser or surety of the Indebtedness.

8.     Duration. This Guaranty and the obligations and liability of the Guarantor hereunder shall remain in full force and effect until such time as the Indebtedness is paid in full.

9.     Events of Default; Remedies.

(a)     The Guarantor's failure to observe or perform any covenant under this Guaranty that continues unremedied for five (5) Business Days after the earlier of: (i) receipt by the Guarantor of notice of such failure or breach from the Lender; or Guarantor's knowledge of such failure or breach; shall constitute an Event of Default under the Credit Agreement.

(b)     Upon the occurrence of an Event of Default under the Credit Agreement, the Lender shall be entitled to enforce its rights and remedies against the Guarantor as provided in this Guaranty.

10.     Waivers.

(a)     The Guarantor hereby assents, to the extent permitted under Applicable Law, to all the terms and conditions of the Indebtedness and waives:

(i)     notice of acceptance of this Guaranty and the creation, extension or accrual of any Indebtedness by the Lender;

(ii)     presentment, demand for payment, notice of dishonor and nonpayment, notice of intention to accelerate, notice of acceleration, protest and notice of protest, collection or institution of any suit or other action by the Lender in collection thereof, including any notice of default in payment thereof, or other notice to, or demand for payment thereof, on any party;

(iii)     any requirement of diligence or promptness on the part of the Lender in the enforcement of any of its rights under the provisions of any of the Transaction Documents;

(iv)     any requirement to notify the Guarantor of any nonpayment relating to any collateral directly or indirectly securing the Indebtedness, or notice of any action or non-action on the part of the Borrower, the Lender, or any other guarantor, surety or endorser of the Indebtedness, or notice of the creation of any new or additional Indebtedness subject to this Guaranty;

(v)     notice of any other nature whatsoever;

(vi)     any rights to demand or require collateral security from the Borrower, or any other person as provided under Applicable Law or otherwise;

4

Case 24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 262 of 688

(vii)     any requirement that the Lender to notify the Guarantor of the terms, time and place of any public or private sale of any collateral directly or indirectly securing the Indebtedness;

(viii)    any "one action" or "anti-deficiency" law or any other law that may prevent the Lender from bringing any action, including a claim for deficiency, against the Guarantor, before or after the commencement or completion of any foreclosure action by the Lender, or any action in lieu of foreclosure by the Lender;

(ix)      any election of remedies by the Lender that may destroy or impair the subrogation rights of the Guarantor or the right of the Guarantor to proceed for reimbursement against the Borrower or any other guarantor, surety or endorser of the Indebtedness, including without limitation, any loss of rights the Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness;

(x)       any disability or other defense of the Borrower or any other guarantor, surety or endorser, or any other person, or by reason of the cessation from any cause whatsoever, other than payment in full of the Indebtedness;

(xi)      any requirement that the Lender take any action whatsoever against the Borrower or any other party or file any claim in the event of the bankruptcy of the Borrower; or

(xii)     the failure of the Lender to protect, preserve or resort to any Collateral.

(b)      The Guarantor warrants and agrees that each of the waivers set forth in this Section 10 is made with the full knowledge of the Guarantor as to its significance and consequences, and that, under the circumstances, such waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any Applicable Law or public policy, such waiver shall be effective only to the extent permitted by law. The waivers set forth in this Section 10 shall be effective notwithstanding the fact that the Borrower ceases to exist by reason of its liquidation, merger, consolidation or otherwise.

11.    Consent.

(a)      The Guarantor hereby consents that, from time to time, and without further notice to or consent of the Guarantor, the Lender may take any or all of the following actions without affecting the liability of the Guarantor: (i) extend, renew, modify, compromise, settle or release the Indebtedness; (ii) release or compromise any liability of any party or parties with respect to the Indebtedness; (iii) subordinate or agree to subordinate the payment of all or any part of the Indebtedness; (iv) subordinate or agree to subordinate its Security Interests in the Collateral or exchange, surrender or otherwise deal with the Collateral as the Lender may determine; (v) apply any payments or proceeds to any of the Indebtedness in such priority or with such preferences as the Lender may determine in its sole discretion, regardless of which of the Indebtedness then remains unpaid; (vi) take or accept any other collateral security or guaranty for any or all of the Indebtedness; (vii) enter into, deliver, modify, amend, or waive compliance with, any instrument or arrangement evidencing, securing or otherwise affecting, all or any part of the Indebtedness; (viii) discharge, release or agree not to sue any party (including, but not limited to, the Borrower or any other guarantor, surety, or endorser of the Indebtedness), who is or may be liable to the Lender for any of the Indebtedness; or (ix) exercise or refrain from exercising any right or remedy of the Lender.

(b)      In addition, neither the course of dealing between the Lender and the Guarantor or the Borrower (or any other guarantor, surety or endorser of the Indebtedness), nor any failure or delay on the part of the Lender to exercise any of the rights and remedies of the Lender under this Guaranty or any other agreement or agreements by and between the Lender and the Guarantor or the Borrower (or any other guarantor, surety or endorser), shall have the effect of impairing or releasing the obligations and liabilities of the Guarantor to the Lender, or of waiving any of the rights and remedies of the Lender under this Guaranty or otherwise.

(c)      Any partial exercise of any rights and remedies granted to the Lender shall furthermore not constitute a waiver of any of the other rights and remedies of the Lender; it being the intent and agreement of the Guarantor that the rights and remedies of the Lender shall be cumulative in nature. The Guarantor further agrees

5

119375035_3

Case 24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records Pg 263 of 688

that, should the Borrower default under the Credit Agreement, a forbearance on the part of the Lender to pursue the available rights and remedies of the Lender shall be binding upon the Lender only to the extent that the Lender specifically agrees to such waiver or forbearance in writing. A waiver or forbearance on the part of the Lender as to one event of default shall not constitute a waiver or forbearance as to any other default.

12.  <u>Deposit Accounts</u>. As collateral security for repayment of the Indebtedness, the Guarantor hereby grants the Lender a continuing security interest in any and all funds that the Guarantor may now and in the future have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the Lender or its Affiliates as to which the Guarantor is an account holder. The Guarantor further agrees that the Lender may, if an Event of Default under the Credit Agreement has occurred and is continuing, apply any funds that the Guarantor may have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the Lender or its Affiliates as to which the Guarantor is an account holder against the unpaid balance of any and all other present and Indebtedness.

13.  <u>Obligations of the Guarantor are Unconditional</u>. The obligations of the Guarantor under this Guaranty shall be absolute and unconditional, irrespective of the validity, regularity or enforceability of the Indebtedness or any instrument or agreement evidencing the same or relating thereto or any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Guarantor. The obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances and shall not be discharged except by complete payment or performance of the Indebtedness and the liabilities of the Guarantor hereunder and shall be joint and several with the obligations of any other guarantor, endorser or surety of the Indebtedness given to the Lender on behalf of the Borrower. This Guaranty and the obligations of the Guarantor hereunder shall terminate on the Termination Date; *provided, however*, that this Guaranty shall be reinstated if any such payment or performance is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by the Lender for any reason, including without limitation by reason of the insolvency, bankruptcy or reorganization of the Borrower, the Servicer, the Guarantor or any other Person. It is the intention of the Lender and the Guarantor that the obligations and liabilities of the Guarantor hereunder shall not be discharged except by the full and complete performance and satisfaction of such obligations and liabilities; and then only to the extent of such performance.

14.  <u>Representations and Warranties</u>. The Guarantor represents and warrants that:

(a)  the guaranty of the Indebtedness by the Guarantor and the execution, delivery and performance of this Guaranty by the Guarantor neither are in violation of any Applicable Law nor will in a default under any contract, agreement, or instrument to which the Guarantor is a party, or by which the Guarantor or the property of the Guarantor may be bound;

(b)  it will receive or has received a direct or indirect material benefit from the transactions contemplated herein or arising out of the Indebtedness;

(c)  this Guaranty, when executed and delivered to the Lender, will constitute a valid, legal and binding obligation of the Guarantor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency or similar laws affecting generally the enforcement of creditor's rights;

(d)  it has established adequate means of obtaining information from the Borrower on a continuing basis regarding the financial condition of the Borrower; and

(e)  the Lender has not made any representations to it as to the creditworthiness of the Borrower.

15.  <u>Affirmative Covenants</u>. The Guarantor covenants and agrees with the Lender that, so long as this Guaranty remains in effect, the Guarantor shall:

(a)  promptly inform the Lender in writing of (i) all material adverse changes in the financial condition of the Guarantor or the Borrower, and (ii) all litigation and claims and all threatened litigation and claims

6

affecting the Guarantor or the Borrower that could reasonably be expected to materially and adversely affect the financial condition of the Guarantor or the financial condition of the Borrower;

> (b)        without demand or request by the Lender, furnish the Lender with the financial statements for Guarantor required under the Credit Agreement;

> (c)        furnish such information, statements and reports with respect to the financial condition and business operations of Guarantor as the Lender may reasonably request from time to time; and

> (d)        keep adequately informed of any facts, events or circumstances that might in any way affect the risks of the Guarantor under this Guaranty recognizing that the Lender shall have no obligation to disclose to the Guarantor any information or material relating to the Borrower.

16.        <u>Negative Covenant</u>.  The Guarantor covenants and agrees with the Lender that, as long as this Guaranty remains in effect, the Guarantor shall not, without the prior written consent of the Lender, sell, lease, assign, pledge, hypothecate, encumber, transfer, or otherwise dispose of all or substantially all of its assets except in accordance with the Credit Agreement.

17.        <u>Remedies</u>.  Upon the failure in the payment or performance of any of the Indebtedness when due (whether by acceleration or otherwise) and continuance thereof beyond any applicable cure or grace period, the Lender may institute a judicial proceeding for the collection of the sums or the performance of the Indebtedness so due and unpaid or unperformed, and may prosecute such proceeding to judgment for final decree, and may enforce the same against the Guarantor or any other guarantor, surety or endorser of the Indebtedness and collect the monies adjudged or decreed to be payable in the manner provided by law out of the property of the Guarantor or any other guarantor, surety or endorser of the Indebtedness, wherever situated.  In the event of such a failure, the Lender shall have the right to proceed first and directly against the Guarantor or any other guarantor, surety or endorser of the Indebtedness without proceeding against the Borrower or any other person (including other the Guarantor or obligors), without exhausting any other remedies that it may have and without resorting to any other security held by the Lender.

18.        <u>Transfer of Indebtedness</u>.  This Guaranty is for the benefit of the Lender and for such other person or persons as may from time to time become or be the holders of all or any part of the Indebtedness.  This Guaranty shall be transferable and negotiable with the same force and effect and to the same extent as the Indebtedness may be transferable; it being understood and agreed to by the Guarantor that, upon any transfer or assignment of all or any part of the Indebtedness, the holder of such Indebtedness shall have all of the rights and remedies granted to the Lender under this Guaranty.  The Guarantor further agrees that, upon any transfer of all or any portion of the Indebtedness, the Lender may transfer and deliver any and all collateral securing repayment of such Indebtedness (including, but not limited to, any collateral provided by the Guarantor) to the transferee of such Indebtedness, and such collateral shall secure any and all of the Indebtedness in favor of such a transferee.  The Guarantor additionally agrees that, after any such transfer or assignment has taken place, the transferring the Lender shall be fully discharged from any and all liability and responsibility to the Guarantor with respect to such collateral, and the transferee thereafter shall be vested with all the powers and rights with respect to such collateral.

19.        <u>Consent to Participation</u>.  The Guarantor recognizes and agrees that the Lender may, from time to time, one or more times, transfer all or any part of the Indebtedness through sales of participation interests in such Indebtedness to one or more third party lenders.  The Guarantor specifically agrees and consents to all such transfers and assignments and waives any subsequent notice of such transfers and assignments as may be provided under any Applicable Law.  The Guarantor additionally agrees that the purchaser of a participation interest in the Indebtedness will be considered as the absolute owner of a percentage interest of such Indebtedness and that such a purchaser will have all of the rights granted under any participation agreement governing the sale of such a participation interest.  The Guarantor waives any rights of offset that the Guarantor may have against any transferring the Lender or any purchaser of such a participation interest, and the Guarantor unconditionally agrees that the Lender or such a purchaser may enforce the obligations and liabilities of the Guarantor under this Guaranty, irrespective of the failure or insolvency of any such transferring the Lender or any such purchaser.

<div align="center">7</div>

20.     _Notices_.  Any notice under, in connection with, or related to this Guaranty, is required or permitted to be given or served to or on the Guarantor or the Lender shall be deemed to have been sufficiently given and served for all purposes (if mailed) three calendar days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses is given in writing by the Guarantor or Lender, as applicable) as follows:

> EB 1EMIALA LLC
> EB 1EMI FL, LLC
> EB 1EMIIN, LLC
> EB 1EMIMD, LLC
> EB 1EMINJ LLC
> EB 1EMINY, LLC
> EB 1EMISC LLC
> RE 1EMI LLC
> 56 Locust Avenue, 2nd Floor
> Rye, NY 10580
> Attention: John Hanratty
>
> EMIGRANT BUSINESS CREDIT CORPORATION
> 6 East 43rd Street, 20th Floor
> New York, New York 10017
> Attention: Karen Wold

21.     _Additional Guaranties_.  The Guarantor recognizes and agrees that the Guarantor (or any one or more of them) may have previously granted, and may in the future grant, one or more additional guaranties of the Indebtedness in favor of the Lender.  Should this occur, the execution of this Guaranty and any additional guaranties on the part of the Guarantor will not be construed as a cancellation of this Guaranty or any of the additional guaranties of the Guarantor; it being the full intent and agreement of the Guarantor that all such guaranties of the Indebtedness in favor of the Lender shall remain in full force and effect and shall be cumulative in nature and effect.

22.     _Miscellaneous Provisions_.  The following miscellaneous provisions are a part of this Guaranty:

(a)     No amendment, modification, consent or waiver of any provision of this Guaranty, and no consent to any departure by the Guarantor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of the Lender, and then shall be effective only as to the specific instance and for the specific purpose for which given.

(b)     Caption headings of the sections of this Guaranty are for convenience purposes only and are not to be used to interpret or to define their provisions.  In this Guaranty, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

(c)     This Guaranty embodies the final, entire agreement of the parties hereto and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto.  There are no oral agreements between the parties to this Guaranty.

(d)     This Guaranty and any claim with respect thereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).  The Lender and the Guarantor both (i) agree to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the borough of Manhattan, and (ii) waive any objection based on _forum non_

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records Pg 266 of 688

*conveniens*, and any objection of venue of any such submission of any action in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

(e)     If any provision of this Guaranty is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable. This Guaranty shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Guaranty, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.

(f)     The obligations and liabilities of the Guarantor under this Guaranty shall be binding upon their respective successors and assigns.

(g)     The Guarantor hereby waives the right to any jury trial in any action, proceeding, or counterclaim brought by the Guarantor or the Lender arising out of this Guaranty.

**THE GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED AS OF THE DATE STATED ABOVE.**

GUARANTOR:

EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC

By: EBURY 1EMI LLC, Sole Member

    By: EBURY STREET CAPITAL, LLC, Manager

        By: _____
        John Hanratty, Manager

119375035_3

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 267 of 688

## GUARANTY

### (By Ebury Street Capital, LLC for Obligations of Ebury 2 EMI LLC)

**THIS GUARANTY** dated as of March 9, 2017 (as may be amended, modified or supplemented from time to time, the "**Guaranty**") is made by **EBURY STREET CAPITAL, LLC**, a New York limited liability company (the "**Guarantor**") in favor of **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

WITNESSETH:

**WHEREAS**, **EBURY 2 EMI LLC**, as borrower (the "**Borrower**"), and the Lender are entering into a Credit Agreement, dated as of the date hereof (as may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"), pursuant to which the Lender has agreed to advance funds to the Borrower from time to time secured by the Collateral described in the Credit Agreement;

**WHEREAS**, the Guarantor is, and will be, the owner of the Tax Liens and certain other Collateral and is, and will be, receiving a direct or indirect benefit from the Borrower entering into the Credit Agreement; and

**WHEREAS**, the execution and delivery of this Guaranty by the Guarantor are conditions precedent to the effectiveness of the Credit Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and to induce the Lender to enter into the Credit Agreement and the other Transactions Documents, and make Advances thereunder, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby agrees as follows:

1.    <u>Definitions</u>.    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Credit Agreement:

(a)    "**Bank Products**" means and includes any type of service or facility (other than direct loans) extended to the Borrower by the Lender or a Subsidiary or Affiliate of the Lender in reliance on the Lender's agreement to indemnify such Subsidiary or Affiliate, including, without limitation, (i) letters of credit, (ii) electronic item processing, including automated clearinghouse transactions, (iii) credit cards, (iv) deposit accounts, and (v) Swap Agreements (including any option with respect to any Swap Agreements) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

(b)    "**Indebtedness**" means and includes:  (i) all present and future amounts, liabilities and obligations of the Borrower to the Lender due or owing under or in connection with the Credit Agreement, any other Transaction Document and all other loans, extensions of credit, Bank Products, obligations, debts and liabilities, plus interest thereon, of the Borrower that may now and in the future be owed to or incurred in favor of the Lender, as well as all claims by the Lender against the Borrower, whether existing now or later; whether they are voluntary or involuntary, whether related or unrelated, whether committed or purely discretionary, due or to become due, direct or indirect or by way of assignment, determined or undetermined, absolute or contingent, liquidated or unliquidated; whether the Borrower may be liable individually or jointly with others, of every nature and kind whatsoever, in principal, interest, costs, expenses and attorneys' fees and all other fees and charges; whether the Borrower may be obligated as guarantor, surety, accommodation party or otherwise; whether recovery upon such obligations may be or hereafter may become barred by any statute of limitations; whether such indebtedness may be or hereafter may become void or otherwise unenforceable from time to time hereafter; (ii) all costs, expenses, obligations, liabilities, damages and other losses incurred by the Lender (and costs of enforcement and collection) in connection with, arising out of or related to (a) the failure of the Guarantor to comply with the Special Purpose Entity Covenants in any material respect, and (b) the failure of the Borrower to deliver or cause to be delivered any Collections or proceeds from Tax Liens as required by the Transaction Documents; and (iii) all of the Indebtedness, including without limitation all present and future amounts, now or at any time or from time to time hereafter due or owing under or in connection with the Credit Agreement or any other Transaction Document

1

upon any Ebury Company initiating or consenting to the filing of a voluntary petition by any Ebury Company under any chapter of the Bankruptcy Code, or seeking relief for any Ebury Company under any Insolvency Laws or the appointment of a trustee, receiver, conservator or liquidator for all or any part of any Ebury Company's properties or assets.

(c)    "**Swap Agreements**" means and includes any agreement between the Borrower and any Person with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or combination of these transactions.

2.    Guarantee of the Indebtedness.    The Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Lender the due, prompt and punctual payment and satisfaction of the Indebtedness (whether at the stated maturity, by acceleration or otherwise).   The Guarantor shall make payment of the Indebtedness and other amounts payable by the Guarantor hereunder promptly upon written demand therefor (and in any event within five (5) Business Days), in compliance with this Guaranty.   The Lender shall not be required to seek payment or performance from the Borrower or any other person or entity or to seek recourse to any collateral at any time securing any of the Indebtedness, prior to demanding payment of the Indebtedness from the Guarantor. Notwithstanding anything to the contrary herein, if the Guarantor does not qualify as an Eligible Contract Participant (as defined in the Commodity Exchange Act, as amended) at the time any Swap Agreement between the Borrower and the Lender or its Affiliates is entered into, the Guarantor shall neither guarantee nor be a party to such Swap Agreement.   This exclusion shall have no effect on any other obligations of the Guarantor under this Guaranty.

3.    Continuing Guaranty.   This Guaranty is a continuing guarantee of the Indebtedness for the duration of the term of the Credit Agreement and any renewals or extensions thereof.   The obligations and liability of the Guarantor under this Guaranty shall be open and continuous in effect.   The Guarantor intends to and does hereby guarantee at all times the prompt and punctual payment, performance and satisfaction of all of the present and future Indebtedness in favor of the Lender and any payments made on the Indebtedness by the Guarantor, the Borrower or others will not discharge or diminish the obligations and liability of the Guarantor hereunder for any remaining and succeeding Indebtedness.   Payments to be made by the Guarantor hereunder may be required by the Lender on any number of occasions as provided in this Guaranty.   Payment by the Guarantor shall be made to the Lender on written demand as Indebtedness become due.

4.    Costs of Enforcement.    The Guarantor shall pay to the Lender forthwith upon demand all reasonable and documented costs and expenses (including court costs and attorneys' fees) incurred or expended by the Lender in enforcing its rights under this Guaranty, with interest at the rate provided under the Note from the date of each such expenditure until the Lender is repaid in full.

5.    Subordination of Rights.

(a)    (i) In the event that the Guarantor should for any reason (a) advance or lend monies to the Borrower, whether or not such funds are used by the Borrower to make payment(s) under the Indebtedness, (b) make any payment(s) to the Lender or others for and on behalf of the Borrower under the Indebtedness, or (c) make any payment to the Lender in total or partial satisfaction of the obligations and liabilities of the Guarantor under this Guaranty, or (ii) if any of the property of the Guarantor is used to pay or satisfy any of the Indebtedness, the Guarantor hereby agrees that any and all rights that the Guarantor may have or acquire to collect from or to be reimbursed by the Borrower (or from or by any other guarantor, endorser or surety of the Indebtedness), whether the rights of collection or reimbursement of the Guarantor arise by way of subrogation to the rights of the Lender or otherwise, shall in all respects, whether or not the Borrower is presently or subsequently becomes insolvent, be subordinate, inferior and junior to the rights of the Lender to collect and enforce payment, performance and satisfaction of the then remaining Indebtedness, until such time as the Indebtedness are fully paid and satisfied.

(b)    In the event of the insolvency or consequent liquidation of the assets of the Borrower, through Insolvency Laws, by voluntary liquidation, or otherwise, the assets of the Borrower applicable to the

119449530_1

payment of claims of the Lender shall be paid to the Lender and shall be first applied by the Lender to the then remaining Indebtedness. The Guarantor hereby assigns to the Lender all claims that the Guarantor may have or acquire against the Borrower or any assignee or trustee of the Borrower in bankruptcy; provided that, such assignment shall be effective only for the purpose of and to the extent of assuring to the Lender full payment of the Indebtedness guaranteed under this Guaranty, and no further.

(c)     The Guarantor hereby agrees to refrain from attempting to collect or enforce any of the collection or reimbursement rights against the Borrower (or against any other guarantor, surety or endorser of the Indebtedness), arising by way of subrogation or otherwise, until such time as all of the then remaining Indebtedness in favor of the Lender is fully paid and satisfied. Should the Guarantor for any reason whatsoever receive any payment(s) from the Borrower (or any other guarantor, surety or endorser of the Indebtedness) that the Borrower (or such a third party) may owe to the Guarantor for any of the reasons stated above, the receiving Guarantor agrees to accept such payment(s) in trust for and on behalf of the Lender, advising such other Guarantor or the Borrower (or the third party payee) of such fact.

(d)     The Guarantor further unconditionally agrees to immediately deliver such funds to the Lender, with such funds being held by the Guarantor over any interim period, in trust for the Lender. In the event that the Guarantor should for any reason whatsoever receive any such funds from the Borrower (or any third party), and deposit such funds in one or more deposit accounts, no matter where located, the Lender shall have the right to attach any and all of the deposit accounts in which such funds were deposited, whether or not such funds were commingled with other monies, and whether or not such funds then remain on deposit in such an account or accounts.

6.     <u>Setoff Rights</u>.

(a)     Subject to the limitations set forth in Section 2 of this Guaranty, and in addition to any rights now or hereafter granted under the Transaction Documents, Applicable Law or otherwise, the Guarantor hereby grants to the Lender and each Indemnified Person a right of setoff upon any and all deposits (general, specified, special, time, demand, provisional or final) and credits, claims or indebtedness of the Guarantor at any time existing, and any obligation owed by the Lender or any Affiliate of the Lender to the Guarantor and to set off against any Indebtedness or indebtedness owed by the Guarantor and any indebtedness owed by the Lender or any Affiliate of the Lender to the Guarantor, in each case whether direct or indirect, absolute or contingent, matured or unmatured, whether or not arising under the Transaction Documents and irrespective of the currency, place of payment or booking office of the amount or obligation and in each case at any time held or owing by the Lender, any Affiliate of the Lender or any Indemnified Person to or for the credit of the Guarantor, without prejudice to the Lender's right to recover any deficiency.

(b)     The Lender, its Affiliates and each Indemnified Person are hereby authorized upon any amount becoming due and payable by the Guarantor to the Lender or any Indemnified Person under the Indebtedness, without notice to the Guarantor, any such notice being expressly waived by the Guarantor to the extent permitted under Applicable Law, to set off, appropriate, apply and enforce such right of set off against any and all items hereinabove referred to against any amounts owing to the Lender or any Indemnified Person by the Guarantor under the Indebtedness, irrespective of whether the Lender, its Affiliates or any Indemnified Person shall have made any demand under the Transaction Documents and regardless of any other collateral securing such amounts, and in all cases without waiver or prejudice of the Lender's rights to recover a deficiency.

(c)     ANY AND ALL RIGHTS TO REQUIRE THE LENDER OR OTHER INDEMNIFIED PERSONS TO EXERCISE THEIR RIGHTS OR REMEDIES WITH RESPECT TO THE TAX LIENS OR OTHER INDEMNIFIED PERSONS UNDER THE TRANSACTION DOCUMENTS, PRIOR TO EXERCISING THE FOREGOING RIGHT OF SETOFF, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED BY THE GUARANTOR.

(d)     The Lender or any Indemnified Person shall promptly notify the Guarantor after any such set off and application made by the Lender or such Indemnified Person, provided that the failure to give such notice shall not affect the validity of such setoff and application. If an amount or obligation is unascertained, the Lender

3

may in a commercially reasonable manner acting in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant Person accounting to the other Person when the amount or obligation is ascertained. This Section 6 shall be without prejudice and in addition to any right of setoff, combination of accounts, Lien or other rights to which any Person is at any time otherwise entitled.

7.    Joint, Several and Solidary Liability.  The obligations and liability of the Guarantor under this Guaranty shall be on a "solidary" or "joint and several" basis along with the Borrower to the same degree and extent as if the Guarantor had been or will be a co- borrower, co-principal obligor or co-maker of the Indebtedness. The obligations and liability of the Guarantor hereunder shall further be on a "solidary" or "joint and several" basis among the Guarantor and any other guarantor, endorser or surety of the Indebtedness.

8.    Duration.  This Guaranty and the obligations and liability of the Guarantor hereunder shall remain in full force and effect until such time as the Indebtedness is paid in full.

9.    Events of Default; Remedies.

(a)    The Guarantor's failure to observe or perform any covenant under this Guaranty that continues unremedied for five (5) Business Days after the earlier of:  (i) receipt by the Guarantor of notice of such failure or breach from the Lender; or Guarantor's knowledge of such failure or breach; shall constitute an Event of Default under the Credit Agreement.

(b)    Upon the occurrence of an Event of Default under the Credit Agreement, the Lender shall be entitled to enforce its rights and remedies against the Guarantor as provided in this Guaranty.

10.    Waivers.

(a)    The Guarantor hereby assents, to the extent permitted under Applicable Law, to all the terms and conditions of the Indebtedness and waives:

(i)    notice of acceptance of this Guaranty and the creation, extension or accrual of any Indebtedness by the Lender;

(ii)    presentment, demand for payment, notice of dishonor and nonpayment, notice of intention to accelerate, notice of acceleration, protest and notice of protest, collection or institution of any suit or other action by the Lender in collection thereof, including any notice of default in payment thereof, or other notice to, or demand for payment thereof, on any party;

(iii)    any requirement of diligence or promptness on the part of the Lender in the enforcement of any of its rights under the provisions of any of the Transaction Documents;

(iv)    any requirement to notify the Guarantor of any nonpayment relating to any collateral directly or indirectly securing the Indebtedness, or notice of any action or non-action on the part of the Borrower, the Lender, or any other guarantor, surety or endorser of the Indebtedness, or notice of the creation of any new or additional Indebtedness subject to this Guaranty;

(v)    notice of any other nature whatsoever;

(vi)    any rights to demand or require collateral security from the Borrower, or any other person as provided under Applicable Law or otherwise;

(vii)    any requirement on the part of the Lender to notify the Guarantor of the terms, time and place of any public or private sale of any collateral directly or indirectly securing the Indebtedness;

(viii)    any "one action" or "anti-deficiency" law or any other law that may prevent the Lender from bringing any action, including a claim for deficiency, against the Guarantor, before or after the commencement or completion of any foreclosure action by the Lender, or any action in lieu of foreclosure by the Lender;

4

(ix)     any election of remedies by the Lender that may destroy or impair the subrogation rights of the Guarantor or the right of the Guarantor to proceed for reimbursement against the Borrower or any other guarantor, surety or endorser of the Indebtedness, including without limitation, any loss of rights the Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness;

(x)     any disability or other defense of the Borrower or any other guarantor, surety or endorser, or any other person, or by reason of the cessation from any cause whatsoever, other than payment in full of the Indebtedness;

(xi)     any requirement that the Lender take any action whatsoever against the Borrower or any other party or file any claim in the event of the bankruptcy of the Borrower; or

(xii)     the failure of the Lender to protect, preserve or resort to any Collateral.

(b)     The Guarantor warrants and agrees that each of the waivers set forth in this Section 10 is made with the full knowledge of the Guarantor as to its significance and consequences, and that, under the circumstances, such waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any Applicable Law or public policy, such waiver shall be effective only to the extent permitted by law. The waivers set forth in this Section 10 shall be effective notwithstanding the fact that the Borrower ceases to exist by reason of its liquidation, merger, consolidation or otherwise.

11.     Consent.

(a)     The Guarantor hereby consents that, from time to time, and without further notice to or consent of the Guarantor, the Lender may take any or all of the following actions without affecting the liability of the Guarantor: (i) extend, renew, modify, compromise, settle or release the Indebtedness; (ii) release or compromise any liability of any party or parties with respect to the Indebtedness; (iii) subordinate or agree to subordinate the payment of all or any part of the Indebtedness; (iv) subordinate or agree to subordinate its Security Interests in the Collateral or exchange, surrender or otherwise deal with the Collateral as the Lender may determine; (v) apply any payments or proceeds to any of the Indebtedness in such priority or with such preferences as the Lender may determine in its sole discretion, regardless of which of the Indebtedness then remains unpaid; (vi) take or accept any other collateral security or guaranty for any or all of the Indebtedness; (vii) enter into, deliver, modify, amend, or waive compliance with, any instrument or arrangement evidencing, securing or otherwise affecting, all or any part of the Indebtedness; (viii) discharge, release or agree not to sue any party (including, but not limited to, the Borrower or any other guarantor, surety, or endorser of the Indebtedness), who is or may be liable to the Lender for any of the Indebtedness; or (ix) exercise or refrain from exercising any right or remedy of the Lender.

(b)     In addition, neither the course of dealing between the Lender and the Guarantor or the Borrower (or any other guarantor, surety or endorser of the Indebtedness), nor any failure or delay on the part of the Lender to exercise any of the rights and remedies of the Lender under this Guaranty or any other agreement or agreements by and between the Lender and the Guarantor or the Borrower (or any other guarantor, surety or endorser), shall have the effect of impairing or releasing the obligations and liabilities of the Guarantor to the Lender, or of waiving any of the rights and remedies of the Lender under this Guaranty or otherwise.

(c)     Any partial exercise of any rights and remedies granted to the Lender shall furthermore not constitute a waiver of any of the other rights and remedies of the Lender; it being the intent and agreement of the Guarantor that the rights and remedies of the Lender shall be cumulative in nature. The Guarantor further agrees that, should the Borrower default under any Indebtedness, any waiver or forbearance on the part of the Lender to pursue the available rights and remedies of the Lender shall be binding upon the Lender only to the extent that the Lender specifically agrees to such waiver or forbearance in writing. A waiver or forbearance on the part of the Lender as to one event of default shall not constitute a waiver or forbearance as to any other default.

12.     Deposit Accounts. As collateral security for repayment of the Indebtedness, the Guarantor hereby grants the Lender a continuing security interest in any and all funds that the Guarantor may now and in the future have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the

5

119449530_1

Lender or its Affiliates as to which the Guarantor is an account holder. The Guarantor further agrees that the Lender may, if an Event of Default under the Credit Agreement has occurred and is continuing, apply any funds that the Guarantor may have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the Lender or its Affiliates as to which the Guarantor is an account holder against the unpaid balance of any and all other present and Indebtedness.

13.    <u>Obligations of the Guarantor are Unconditional</u>. The obligations of the Guarantor under this Guaranty shall be absolute and unconditional, irrespective of the validity, regularity or enforceability of the Indebtedness or any instrument or agreement evidencing the same or relating thereto or any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Guarantor. The obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances and shall not be discharged except by complete payment or performance of the Indebtedness and the liabilities of the Guarantor hereunder and shall be joint and several with the obligations of any other guarantor, endorser or surety of the Indebtedness given to the Lender on behalf of the Borrower. This Guaranty and the obligations of the Guarantor hereunder shall terminate on the Termination Date; *provided, however*, that this Guaranty shall be reinstated if any such payment or performance is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by the Lender for any reason, including without limitation by reason of the insolvency, bankruptcy or reorganization of the Borrower, the Servicer, the Guarantor or any other Person. It is the intention of the Lender and the Guarantor that the obligations and liabilities of the Guarantor hereunder shall not be discharged except by the full and complete performance and satisfaction of such obligations and liabilities; and then only to the extent of such performance.

14.    <u>Representations and Warranties</u>. The Guarantor represents and warrants that:

(a)    the guaranty of the Indebtedness by the Guarantor and the execution, delivery and performance of this Guaranty by the Guarantor neither are in violation of any Applicable Law nor will in a default under any contract, agreement, or instrument to which the Guarantor is a party, or by which the Guarantor or the property of the Guarantor may be bound;

(b)    it will receive or has received a direct or indirect material benefit from the transactions contemplated herein or arising out of the Indebtedness;

(c)    this Guaranty, when executed and delivered to the Lender, will constitute a valid, legal and binding obligation of the Guarantor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency or similar laws affecting generally the enforcement of creditor's rights;

(d)    it has established adequate means of obtaining information from the Borrower on a continuing basis regarding the financial condition of the Borrower; and

(e)    the Lender has not made any representations to it as to the creditworthiness of the Borrower.

15.    <u>Affirmative Covenants</u>. The Guarantor covenants and agrees with the Lender that, so long as this Guaranty remains in effect, the Guarantor shall:

(a)    promptly inform the Lender in writing of (i) all material adverse changes in the financial condition of the Guarantor or the Borrower, and (ii) all litigation and claims and all threatened litigation and claims affecting the Guarantor or the Borrower that would reasonably be expected to materially and adversely affect the financial condition of the Guarantor or the financial condition of the Borrower;

(b)    without demand or request by the Lender, furnish the Lender with the financial statements for Guarantor required under the Credit Agreement;

(c)    furnish such information, statements and reports with respect to the financial condition and business operations of Guarantor as the Lender may reasonably request from time to time; and

119449530_1

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 273 of 688

(d)    keep adequately informed of any facts, events or circumstances that might in any way affect the risks of the Guarantor under this Guaranty recognizing that the Lender shall have no obligation to disclose to the Guarantor any information or material relating to the Borrower.

16.    Negative Covenant. The Guarantor covenants and agrees with the Lender that, as long as this Guaranty remains in effect, the Guarantor shall not, without the prior written consent of the Lender, sell, lease, assign, pledge, hypothecate, encumber, transfer, or otherwise dispose of all or substantially all of its assets except in accordance with the Credit Agreement.

17.    Remedies. Upon the failure in the payment or performance of any of the Indebtedness when due (whether by acceleration or otherwise) and continuance thereof beyond any applicable cure or grace period, the Lender may institute a judicial proceeding for the collection of the sums or the performance of the Indebtedness so due and unpaid or unperformed, and may prosecute such proceeding to judgment for final decree, and may enforce the same against the Guarantor or any other guarantor, surety or endorser of the Indebtedness and collect the monies adjudged or decreed to be payable in the manner provided by law out of the property of the Guarantor or any other guarantor, surety or endorser of the Indebtedness, wherever situated. In the event of such a failure, the Lender shall have the right to proceed first and directly against the Guarantor or any other guarantor, surety or endorser of the Indebtedness without proceeding against the Borrower or any other person (including other the Guarantor or obligors), without exhausting any other remedies that it may have and without resorting to any other security held by the Lender.

18.    Transfer of Indebtedness. This Guaranty is for the benefit of the Lender and for such other person or persons as may from time to time become or be the holders of all or any part of the Indebtedness. This Guaranty shall be transferable and negotiable with the same force and effect and to the same extent as the Indebtedness may be transferable; it being understood and agreed to by the Guarantor that, upon any transfer or assignment of all or any part of the Indebtedness, the holder of such Indebtedness shall have all of the rights and remedies granted to the Lender under this Guaranty. The Guarantor further agrees that, upon any transfer of all or any portion of the Indebtedness, the Lender may transfer and deliver any and all collateral securing repayment of such Indebtedness (including, but not limited to, any collateral provided by the Guarantor) to the transferee of such Indebtedness, and such collateral shall secure any and all of the Indebtedness in favor of such a transferee. The Guarantor additionally agrees that, after any such transfer or assignment has taken place, the transferring the Lender shall be fully discharged from any and all liability and responsibility to the Guarantor with respect to such collateral, and the transferee thereafter shall be vested with all the powers and rights with respect to such collateral.

19.    Consent to Participation. The Guarantor recognizes and agrees that the Lender may, from time to time, one or more times, transfer all or any part of the Indebtedness through sales of participation interests in such Indebtedness to one or more third party lenders. The Guarantor specifically agrees and consents to all such transfers and assignments and waives any subsequent notice of such transfers and assignments as may be provided under any Applicable Law. The Guarantor additionally agrees that the purchaser of a participation interest in the Indebtedness will be considered as the absolute owner of a percentage interest of such Indebtedness and that such a purchaser will have all of the rights granted under any participation agreement governing the sale of such a participation interest. The Guarantor waives any rights of offset that the Guarantor may have against any transferring the Lender or any purchaser of such a participation interest, and the Guarantor unconditionally agrees that the Lender or such a purchaser may enforce the obligations and liabilities of the Guarantor under this Guaranty, irrespective of the failure or insolvency of any such transferring the Lender or any such purchaser.

20.    Notices. Any notice or demand which, by provision of this Guaranty, is required or permitted to be given or served to or on the Guarantor or the Lender shall be deemed to have been sufficiently given and served for all purposes (if mailed) three calendar days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses is given in writing by the Guarantor or Lender, as applicable) as follows:

EBURY STREET CAPITAL, LLC
56 Locust Avenue, 2nd Floor
Rye, NY 10580
Attention: John Hanratty

EMIGRANT BUSINESS CREDIT CORPORATION
6 East 43rd Street, 20th Floor
New York, New York 10017
Attention: Karen Wold

21.    _Additional Guaranties_.  The Guarantor recognizes and agrees that the Guarantor (or any one or more of them) may have previously granted, and may in the future grant, one or more additional guaranties of the Indebtedness in favor of the Lender.  Should this occur, the execution of this Guaranty and any additional guaranties on the part of the Guarantor will not be construed as a cancellation of this Guaranty or any of the additional guaranties of the Guarantor; it being the full intent and agreement of the Guarantor that all such guaranties of the Indebtedness in favor of the Lender shall remain in full force and effect and shall be cumulative in nature and effect.

22.    _Miscellaneous Provisions_.  The following miscellaneous provisions are a part of this Guaranty:

(a)    No amendment, modification, consent or waiver of any provision of this Guaranty, and no consent to any departure by the Guarantor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of the Lender, and then shall be effective only as to the specific instance and for the specific purpose for which given.

(b)    Caption headings of the sections of this Guaranty are for convenience purposes only and are not to be used to interpret or to define their provisions.  In this Guaranty, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

(c)    This Guaranty embodies the final, entire agreement of the parties hereto and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto.  There are no oral agreements between the parties to this Guaranty.

(d)    This Guaranty and any claim with respect thereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).  The Lender and the Guarantor both (i) agree to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the borough of Manhattan, and (ii) waive any objection based on _forum non conveniens_, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

(e)    If any provision of this Guaranty is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable.  This Guaranty shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Guaranty, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.

(f)    The obligations and liabilities of the Guarantor under this Guaranty shall be binding upon their respective successors and assigns.

8

(g)    The Guarantor hereby waives the right to any jury trial in any action, proceeding, or counterclaim brought by the Guarantor or the Lender arising out of this Guaranty.

**THE GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT AND AGREES TO ITS TERMS.  THIS AGREEMENT IS DATED AS OF THE DATE STATED ABOVE.**

GUARANTOR:

EBURY STREET CAPITAL, LLC

By: _____
John Hanratty, Manager

## GUARANTY
### (By SPEs for Obligations of Ebury 2 EMI LLC)

**THIS GUARANTY** dated as of March 9, 2017 (as may be amended, modified or supplemented from time to time, the "**Guaranty**") is made by **EB 2EMIALA LLC**, an Alabama limited liability company, **EB 2EMIFL, LLC**, a Florida limited liability company, **EB 2EMIIN, LLC**, an Indiana limited liability company, **EB 2EMIMD, LLC**, a Maryland limited liability company, **EB 2EMINJ LLC**, a New Jersey limited liability company, **EB 2EMINY, LLC**, a New York limited liability company, **EB 2EMISC LLC**, a South Carolina limited liability company and **RE 2EMI LLC**, a New York limited liability company (jointly and severally, individually and collectively, the "**Guarantor**") in favor of **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

### WITNESSETH:

**WHEREAS, EBURY 2 EMI LLC**, as borrower (the "**Borrower**"), and the Lender are entering into a Credit Agreement, dated as of the date hereof (as may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"), pursuant to which the Lender has agreed to advance funds to the Borrower from time to time secured by the Collateral described in the Credit Agreement;

**WHEREAS**, the Guarantor is, and will be, the owner of the Tax Liens and certain other Collateral and is, and will be, receiving a direct or indirect benefit from the Borrower entering into the Credit Agreement; and

**WHEREAS**, the execution and delivery of this Guaranty by the Guarantor are conditions precedent to the effectiveness of the Credit Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and to induce the Lender to enter into the Credit Agreement and the other Transactions Documents, and make Advances thereunder, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby agrees as follows:

1.    <u>Definitions</u>.  Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Credit Agreement:

    (a)    "**Bank Products**" means and includes any type of service or facility (other than direct loans) extended to the Borrower by the Lender or a Subsidiary or Affiliate of the Lender in reliance on the Lender's agreement to indemnify such Subsidiary or Affiliate, including, without limitation, (i) letters of credit, (ii) electronic item processing, including automated clearinghouse transactions, (iii) credit cards, (iv) deposit accounts, and (v) Swap Agreements (including any option with respect to any Swap Agreements) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

    (b)    "**Indebtedness**" means and includes: (i) all present and future amounts, liabilities and obligations of the Borrower to the Lender due or owing under or in connection with the Credit Agreement, any other Transaction Document and all other loans, extensions of credit, Bank Products, obligations, debts and liabilities, plus interest thereon, of the Borrower that may now and in the future be owed to or incurred in favor of the Lender, as well as all claims by the Lender against the Borrower, whether existing now or later; whether they are voluntary or involuntary, whether related or unrelated, whether committed or purely discretionary, due or to become due, direct or indirect or by way of assignment, determined or undetermined, absolute or contingent, liquidated or unliquidated; whether the Borrower may be liable individually or jointly with others, of every nature and kind whatsoever, in principal, interest, costs, expenses and attorneys' fees and all other fees and charges; whether the Borrower may be obligated as guarantor, surety, accommodation party or otherwise; whether recovery upon such obligations may be or hereafter may become barred by any statute of limitations; whether such indebtedness may be or hereafter may become void or otherwise unenforceable from time to time hereafter; (ii) all costs, expenses, obligations, liabilities, damages and other losses incurred by the Lender (and costs of enforcement and collection) in connection with, arising out of or related to (a) the failure of the Guarantor to comply with the

119449524_1

Special Purpose Entity Covenants in any material respect, and (b) the failure of the Borrower to deliver or cause to be delivered any Collections or proceeds from Tax Liens as required by the Transaction Documents; and (iii) all of the Indebtedness, including without limitation all present and future amounts, now or at any time or from time to time hereafter due or owing under or in connection with the Credit Agreement or any other Transaction Document upon any Ebury Company initiating or consenting to the filing of a voluntary petition by any Ebury Company under any chapter of the Bankruptcy Code, or seeking relief for any Ebury Company under any Insolvency Laws or the appointment of a trustee, receiver, conservator or liquidator for all or any part of any Ebury Company's properties or assets.

(c)   **"Swap Agreements"** means and includes any agreement between the Borrower and any Person with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or combination of these transactions.

2.   <u>Guarantee of the Indebtedness</u>.  The Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Lender the due, prompt and punctual payment and satisfaction of the Indebtedness (whether at the stated maturity, by acceleration or otherwise).  The Guarantor shall make payment of the Indebtedness and other amounts payable by the Guarantor hereunder promptly upon written demand therefor (and in any event within five (5) Business Days), in compliance with this Guaranty.  The Lender shall not be required to seek payment or performance from the Borrower or any other person or entity or to seek recourse to any collateral at any time securing any of the Indebtedness, prior to demanding payment of the Indebtedness from the Guarantor.  Notwithstanding anything to the contrary herein, if the Guarantor does not qualify as an Eligible Contract Participant (as defined in the Commodity Exchange Act, as amended) at the time any Swap Agreement between the Borrower and the Lender or its Affiliates is entered into, the Guarantor shall neither guarantee nor be a party to such Swap Agreement.  This exclusion shall have no effect on any other obligations of the Guarantor under this Guaranty.

3.   <u>Continuing Guaranty</u>.  This Guaranty is a continuing guarantee of the Indebtedness for the duration of the term of the Credit Agreement and any renewals or extensions thereof.  The obligations and liability of the Guarantor under this Guaranty shall be open and continuous in effect.  The Guarantor intends to and does hereby guarantee at all times the prompt and punctual payment, performance and satisfaction of all of the present and future Indebtedness in favor of the Lender and any payments made on the Indebtedness by the Guarantor, the Borrower or others will not discharge or diminish the obligations and liability of the Guarantor hereunder for any remaining and succeeding Indebtedness.  Payments to be made by the Guarantor hereunder may be required by the Lender on any number of occasions as provided in this Guaranty.  Payment by the Guarantor shall be made to the Lender on written demand as Indebtedness become due.

4.   <u>Costs of Enforcement</u>.  The Guarantor shall pay to the Lender forthwith upon demand all reasonable and documented costs and expenses (including court costs and attorneys' fees) incurred or expended by the Lender in enforcing its rights under this Guaranty, with interest at the rate provided under the Note from the date of each such expenditure until the Lender is repaid in full.

5.   <u>Subordination of Rights</u>.

(a)   (i) In the event that the Guarantor should for any reason (a) advance or lend monies to the Borrower, whether or not such funds are used by the Borrower to make payment(s) under the Indebtedness, (b) make any payment(s) to the Lender or others for and on behalf of the Borrower under the Indebtedness, or (c) make any payment to the Lender in total or partial satisfaction of the obligations and liabilities of the Guarantor under this Guaranty, or (ii) if any of the property of the Guarantor is used to pay or satisfy any of the Indebtedness, the Guarantor hereby agrees that any and all rights that the Guarantor may have or acquire to collect from or to be reimbursed by the Borrower (or from or by any other guarantor, endorser or surety of the Indebtedness), whether the rights of collection or reimbursement of the Guarantor arise by way of subrogation to the rights of the Lender or otherwise, shall in all respects, whether or not the Borrower is presently or subsequently becomes insolvent, be

2

subordinate, inferior and junior to the rights of the Lender to collect and enforce payment, performance and satisfaction of the then remaining Indebtedness, until such time as the Indebtedness are fully paid and satisfied.

(b)       In the event of the insolvency or consequent liquidation of the assets of the Borrower, through Insolvency Laws, by voluntary liquidation, or otherwise, the assets of the Borrower applicable to the payment of claims of the Lender shall be paid to the Lender and shall be first applied by the Lender to the then remaining Indebtedness. The Guarantor hereby assigns to the Lender all claims that the Guarantor may have or acquire against the Borrower or any assignee or trustee of the Borrower in bankruptcy; provided that, such assignment shall be effective only for the purpose of and to the extent of assuring to the Lender full payment of the Indebtedness guaranteed under this Guaranty, and no further.

(c)       The Guarantor hereby agrees to refrain from attempting to collect or enforce any of the collection or reimbursement rights against the Borrower (or against any other guarantor, surety or endorser of the Indebtedness), arising by way of subrogation or otherwise, until such time as all of the then remaining Indebtedness in favor of the Lender is fully paid and satisfied. Should the Guarantor for any reason whatsoever receive any payment(s) from the Borrower (or any other guarantor, surety or endorser of the Indebtedness) that the Borrower (or such a third party) may owe to the Guarantor for any of the reasons stated above, the receiving Guarantor agrees to accept such payment(s) in trust for and on behalf of the Lender, advising such other Guarantor or the Borrower (or the third party payee) of such fact.

(d)       The Guarantor further unconditionally agrees to immediately deliver such funds to the Lender, with such funds being held by the Guarantor over any interim period, in trust for the Lender. In the event that the Guarantor should for any reason whatsoever receive any such funds from the Borrower (or any third party), and deposit such funds in one or more deposit accounts, no matter where located, the Lender shall have the right to attach any and all of the deposit accounts in which such funds were deposited, whether or not such funds were commingled with other monies, and whether or not such funds then remain on deposit in such an account or accounts.

6.       Setoff Rights.

(a)       Subject to the limitations set forth in Section 2 of this Guaranty, and in addition to any rights now or hereafter granted under the Transaction Documents, Applicable Law or otherwise, the Guarantor hereby grants to the Lender and each Indemnified Person a right of setoff upon any and all deposits (general, specified, special, time, demand, provisional or final) and credits, claims or indebtedness of the Guarantor at any time existing, and any obligation owed by the Lender or any Affiliate of the Lender to the Guarantor and to set off against any Indebtedness or indebtedness owed by the Guarantor and any indebtedness owed by the Lender or any Affiliate of the Lender to the Guarantor, in each case whether direct or indirect, absolute or contingent, matured or unmatured, whether or not arising under the Transaction Documents and irrespective of the currency, place of payment or booking office of the amount or obligation and in each case at any time held or owing by the Lender, any Affiliate of the Lender or any Indemnified Person to or for the credit of the Guarantor, without prejudice to the Lender's right to recover any deficiency.

(b)       The Lender, its Affiliates and each Indemnified Person are hereby authorized upon any amount becoming due and payable by the Guarantor to the Lender or any Indemnified Person under the Indebtedness, without notice to the Guarantor, any such notice being expressly waived by the Guarantor to the extent permitted under Applicable Law, to set off, appropriate, apply and enforce such right of set off against any and all items hereinabove referred to against any amounts owing to the Lender or any Indemnified Person by the Guarantor under the Indebtedness, irrespective of whether the Lender, its Affiliates or any Indemnified Person shall have made any demand under the Transaction Documents and regardless of any other collateral securing such amounts, and in all cases without waiver or prejudice of the Lender's rights to recover a deficiency.

(c)       ANY AND ALL RIGHTS TO REQUIRE THE LENDER OR OTHER INDEMNIFIED PERSONS TO EXERCISE THEIR RIGHTS OR REMEDIES WITH RESPECT TO THE TAX LIENS OR OTHER INDEMNIFIED PERSONS UNDER THE TRANSACTION DOCUMENTS, PRIOR TO EXERCISING

3

THE FOREGOING RIGHT OF SETOFF, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED BY THE GUARANTOR.

(d)     The Lender or any Indemnified Person shall promptly notify the Guarantor after any such set off and application made by the Lender or such Indemnified Person, provided that the failure to give such notice shall not affect the validity of such setoff and application.  If an amount or obligation is unascertained, the Lender may in a commercially reasonable manner acting in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant Person accounting to the other Person when the amount or obligation is ascertained. This Section6 shall be without prejudice and in addition to any right of setoff, combination of accounts, Lien or other rights to which any Person is at any time otherwise entitled.

7.     Joint, Several and Solidary Liability.  The obligations and liability of the Guarantor under this Guaranty shall be on a "solidary" or "joint and several" basis along with the Borrower to the same degree and extent as if the Guarantor had been or will be a co- borrower, co-principal obligor or co-maker of the Indebtedness. The obligations and liability of the Guarantor hereunder shall further be on a "solidary" or "joint and several" basis among the Guarantor and any other guarantor, endorser or surety of the Indebtedness.

8.     Duration.  This Guaranty and the obligations and liability of the Guarantor hereunder shall remain in full force and effect until such time as the Indebtedness is paid in full.

9.     Events of Default; Remedies.

(a)     The Guarantor's failure to observe or perform any covenant under this Guaranty that continues unremedied for five (5) Business Days after the earlier of:  (i) receipt by the Guarantor of notice of such failure or breach from the Lender; or Guarantor's knowledge of such failure or breach; shall constitute an Event of Default under the Credit Agreement.

(b)     Upon the occurrence of an Event of Default under the Credit Agreement, the Lender shall be entitled to enforce its rights and remedies against the Guarantor as provided in this Guaranty.

10.     Waivers.

(a)     The Guarantor hereby assents, to the extent permitted under Applicable Law, to all the terms and conditions of the Indebtedness and waives:

(i)     notice of acceptance of this Guaranty and the creation, extension or accrual of any Indebtedness by the Lender;

(ii)     presentment, demand for payment, notice of dishonor and nonpayment, notice of intention to accelerate, notice of acceleration, protest and notice of protest, collection or institution of any suit or other action by the Lender in collection thereof, including any notice of default in payment thereof, or other notice to, or demand for payment thereof, on any party;

(iii)     any requirement of diligence or promptness on the part of the Lender in the enforcement of any of its rights under the provisions of any of the Transaction Documents;

(iv)     any requirement to notify the Guarantor of any nonpayment relating to any collateral directly or indirectly securing the Indebtedness, or notice of any action or non-action on the part of the Borrower, the Lender, or any other guarantor, surety or endorser of the Indebtedness, or notice of the creation of any new or additional Indebtedness subject to this Guaranty;

(v)     notice of any other nature whatsoever;

(vi)     any rights to demand or require collateral security from the Borrower, or any other person as provided under Applicable Law or otherwise;

4

119449524_1

(vii)      any requirement on the part of the Lender to notify the Guarantor of the terms, time and place of any public or private sale of any collateral directly or indirectly securing the Indebtedness;

(viii)      any "one action" or "anti-deficiency" law or any other law that may prevent the Lender from bringing any action, including a claim for deficiency, against the Guarantor, before or after the commencement or completion of any foreclosure action by the Lender, or any action in lieu of foreclosure by the Lender;

(ix)      any election of remedies by the Lender that may destroy or impair the subrogation rights of the Guarantor or the right of the Guarantor to proceed for reimbursement against the Borrower or any other guarantor, surety or endorser of the Indebtedness, including without limitation, any loss of rights the Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness;

(x)      any disability or other defense of the Borrower or any other guarantor, surety or endorser, or any other person, or by reason of the cessation from any cause whatsoever, other than payment in full of the Indebtedness;

(xi)      any requirement that the Lender take any action whatsoever against the Borrower or any other party or file any claim in the event of the bankruptcy of the Borrower; or

(xii)      the failure of the Lender to protect, preserve or resort to any Collateral.

(b)      The Guarantor warrants and agrees that each of the waivers set forth in this Section 10 is made with the full knowledge of the Guarantor as to its significance and consequences, and that, under the circumstances, such waivers are reasonable and not contrary to public policy or law.  If any such waiver is determined to be contrary to any Applicable Law or public policy, such waiver shall be effective only to the extent permitted by law.  The waivers set forth in this Section 10 shall be effective notwithstanding the fact that the Borrower ceases to exist by reason of its liquidation, merger, consolidation or otherwise.

11.    Consent.

(a)      The Guarantor hereby consents that, from time to time, and without further notice to or consent of the Guarantor, the Lender may take any or all of the following actions without affecting the liability of the Guarantor:   (i) extend, renew, modify, compromise, settle or release the Indebtedness; (ii) release or compromise any liability of any party or parties with respect to the Indebtedness; (iii) subordinate or agree to subordinate the payment of all or any part of the Indebtedness; (iv) subordinate or agree to subordinate its Security Interests in the Collateral or exchange, surrender or otherwise deal with the Collateral as the Lender may determine; (v) apply any payments or proceeds to any of the Indebtedness in such priority or with such preferences as the Lender may determine in its sole discretion, regardless of which of the Indebtedness then remains unpaid; (vi) take or accept any other collateral security or guaranty for any or all of the Indebtedness; (vii) enter into, deliver, modify, amend, or waive compliance with, any instrument or arrangement evidencing, securing or otherwise affecting, all or any part of the Indebtedness; (viii) discharge, release or agree not to sue any party (including, but not limited to, the Borrower or any other guarantor, surety, or endorser of the Indebtedness), who is or may be liable to the Lender for any of the Indebtedness; or (ix) exercise or refrain from exercising any right or remedy of the Lender.

(b)      In addition, neither the course of dealing between the Lender and the Guarantor or the Borrower (or any other guarantor, surety or endorser of the Indebtedness), nor any failure or delay on the part of the Lender to exercise any of the rights and remedies of the Lender under this Guaranty or any other agreement or agreements by and between the Lender and the Guarantor or the Borrower (or any other guarantor, surety or endorser), shall have the effect of impairing or releasing the obligations and liabilities of the Guarantor to the Lender, or of waiving any of the rights and remedies of the Lender under this Guaranty or otherwise.

(c)      Any partial exercise of any rights and remedies granted to the Lender shall furthermore not constitute a waiver of any of the other rights and remedies of the Lender; it being the intent and agreement of the Guarantor that the rights and remedies of the Lender shall be cumulative in nature.  The Guarantor further agrees

119449524_1

that, should the Borrower default under any Indebtedness, any waiver or forbearance on the part of the Lender to pursue the available rights and remedies of the Lender shall be binding upon the Lender only to the extent that the Lender specifically agrees to such waiver or forbearance in writing. A waiver or forbearance on the part of the Lender as to one event of default shall not constitute a waiver or forbearance as to any other default.

12.   Deposit Accounts. As collateral security for repayment of the Indebtedness, the Guarantor hereby grants the Lender a continuing security interest in any and all funds that the Guarantor may now and in the future have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the Lender or its Affiliates as to which the Guarantor is an account holder. The Guarantor further agrees that the Lender may, if an Event of Default under the Credit Agreement has occurred and is continuing, apply any funds that the Guarantor may have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the Lender or its Affiliates as to which the Guarantor is an account holder against the unpaid balance of any and all other present and Indebtedness.

13.   Obligations of the Guarantor are Unconditional. The obligations of the Guarantor under this Guaranty shall be absolute and unconditional, irrespective of the validity, regularity or enforceability of the Indebtedness or any instrument or agreement evidencing the same or relating thereto or any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Guarantor. The obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances and shall not be discharged except by complete payment or performance of the Indebtedness and the liabilities of the Guarantor hereunder and shall be joint and several with the obligations of any other guarantor, endorser or surety of the Indebtedness given to the Lender on behalf of the Borrower. This Guaranty and the obligations of the Guarantor hereunder shall terminate on the Termination Date; *provided, however*, that this Guaranty shall be reinstated if any such payment or performance is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by the Lender for any reason, including without limitation by reason of the insolvency, bankruptcy or reorganization of the Borrower, the Servicer, the Guarantor or any other Person. It is the intention of the Lender and the Guarantor that the obligations and liabilities of the Guarantor hereunder shall not be discharged except by the full and complete performance and satisfaction of such obligations and liabilities; and then only to the extent of such performance.

14.   Representations and Warranties. The Guarantor represents and warrants that:

(a)   the guaranty of the Indebtedness by the Guarantor and the execution, delivery and performance of this Guaranty by the Guarantor neither are in violation of any Applicable Law nor will in a default under any contract, agreement, or instrument to which the Guarantor is a party, or by which the Guarantor or the property of the Guarantor may be bound;

(b)   it will receive or has received a direct or indirect material benefit from the transactions contemplated herein or arising out of the Indebtedness;

(c)   this Guaranty, when executed and delivered to the Lender, will constitute a valid, legal and binding obligation of the Guarantor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency or similar laws affecting generally the enforcement of creditor's rights;

(d)   it has established adequate means of obtaining information from the Borrower on a continuing basis regarding the financial condition of the Borrower; and

(e)   the Lender has not made any representations to it as to the creditworthiness of the Borrower.

15.   Affirmative Covenants. The Guarantor covenants and agrees with the Lender that, so long as this Guaranty remains in effect, the Guarantor shall:

(a)   promptly inform the Lender in writing of (i) all material adverse changes in the financial condition of the Guarantor or the Borrower, and (ii) all litigation and claims and all threatened litigation and claims

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 282 of 688

affecting the Guarantor or the Borrower that would reasonably be expected to materially and adversely affect the financial condition of the Guarantor or the financial condition of the Borrower;

(b)    without demand or request by the Lender, furnish the Lender with the financial statements for Guarantor required under the Credit Agreement;

(c)    furnish such information, statements and reports with respect to the financial condition and business operations of Guarantor as the Lender may reasonably request from time to time; and

(d)    keep adequately informed of any facts, events or circumstances that might in any way affect the risks of the Guarantor under this Guaranty recognizing that the Lender shall have no obligation to disclose to the Guarantor any information or material relating to the Borrower.

16.    <u>Negative Covenant</u>.  The Guarantor covenants and agrees with the Lender that, as long as this Guaranty remains in effect, the Guarantor shall not, without the prior written consent of the Lender, sell, lease, assign, pledge, hypothecate, encumber, transfer, or otherwise dispose of all or substantially all of its assets except in accordance with the Credit Agreement.

17.    <u>Remedies</u>.  Upon the failure in the payment or performance of any of the Indebtedness when due (whether by acceleration or otherwise) and continuance thereof beyond any applicable cure or grace period, the Lender may institute a judicial proceeding for the collection of the sums or the performance of the Indebtedness so due and unpaid or unperformed, and may prosecute such proceeding to judgment for final decree, and may enforce the same against the Guarantor or any other guarantor, surety or endorser of the Indebtedness and collect the monies adjudged or decreed to be payable in the manner provided by law out of the property of the Guarantor or any other guarantor, surety or endorser of the Indebtedness, wherever situated.  In the event of such a failure, the Lender shall have the right to proceed first and directly against the Guarantor or any other guarantor, surety or endorser of the Indebtedness without proceeding against the Borrower or any other person (including other the Guarantor or obligors), without exhausting any other remedies that it may have and without resorting to any other security held by the Lender.

18.    <u>Transfer of Indebtedness</u>.  This Guaranty is for the benefit of the Lender and for such other person or persons as may from time to time become or be the holders of all or any part of the Indebtedness.  This Guaranty shall be transferable and negotiable with the same force and effect and to the same extent as the Indebtedness may be transferable; it being understood and agreed to by the Guarantor that, upon any transfer or assignment of all or any part of the Indebtedness, the holder of such Indebtedness shall have all of the rights and remedies granted to the Lender under this Guaranty.  The Guarantor further agrees that, upon any transfer of all or any portion of the Indebtedness, the Lender may transfer and deliver any and all collateral securing repayment of such Indebtedness (including, but not limited to, any collateral provided by the Guarantor) to the transferee of such Indebtedness, and such collateral shall secure any and all of the Indebtedness in favor of such a transferee.  The Guarantor additionally agrees that, after any such transfer or assignment has taken place, the transferring the Lender shall be fully discharged from any and all liability and responsibility to the Guarantor with respect to such collateral, and the transferee thereafter shall be vested with all the powers and rights with respect to such collateral.

19.    <u>Consent to Participation</u>.  The Guarantor recognizes and agrees that the Lender may, from time to time, one or more times, transfer all or any part of the Indebtedness through sales of participation interests in such Indebtedness to one or more third party lenders.  The Guarantor specifically agrees and consents to all such transfers and assignments and waives any subsequent notice of such transfers and assignments as may be provided under any Applicable Law.  The Guarantor additionally agrees that the purchaser of a participation interest in the Indebtedness will be considered as the absolute owner of a percentage interest of such Indebtedness and that such a purchaser will have all of the rights granted under any participation agreement governing the sale of such a participation interest.  The Guarantor waives any rights of offset that the Guarantor may have against any transferring the Lender or any purchaser of such a participation interest, and the Guarantor unconditionally agrees that the Lender or such a purchaser may enforce the obligations and liabilities of the Guarantor under this Guaranty, irrespective of the failure or insolvency of any such transferring the Lender or any such purchaser.

7

20.    Notices. Any notice or demand which, by provision of this Guaranty, is required or permitted to be given or served to or on the Guarantor or the Lender shall be deemed to have been sufficiently given and served for all purposes (if mailed) three calendar days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses is given in writing by the Guarantor or Lender, as applicable) as follows:

EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC
56 Locust Avenue, 2nd Floor
Rye, NY 10580
Attention: John Hanratty

EMIGRANT BUSINESS CREDIT CORPORATION
6 East 43rd Street, 20th Floor
New York, New York 10017
Attention: Karen Wold

21.    Additional Guaranties. The Guarantor recognizes and agrees that the Guarantor (or any one or more of them) may have previously granted, and may in the future grant, one or more additional guaranties of the Indebtedness in favor of the Lender. Should this occur, the execution of this Guaranty and any additional guaranties on the part of the Guarantor will not be construed as a cancellation of this Guaranty or any of the additional guaranties of the Guarantor; it being the full intent and agreement of the Guarantor that all such guaranties of the Indebtedness in favor of the Lender shall remain in full force and effect and shall be cumulative in nature and effect.

22.    Miscellaneous Provisions. The following miscellaneous provisions are a part of this Guaranty:

(a)    No amendment, modification, consent or waiver of any provision of this Guaranty, and no consent to any departure by the Guarantor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of the Lender, and then shall be effective only as to the specific instance and for the specific purpose for which given.

(b)    Caption headings of the sections of this Guaranty are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Guaranty, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

(c)    This Guaranty embodies the final, entire agreement of the parties hereto and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. There are no oral agreements between the parties to this Guaranty.

(d)    This Guaranty and any claim with respect thereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)). The Lender and the Guarantor both (i) agree to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the borough of Manhattan, and (ii) waive any objection based on *forum non*

*conveniens*, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

(e)    If any provision of this Guaranty is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable. This Guaranty shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Guaranty, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.

(f)    The obligations and liabilities of the Guarantor under this Guaranty shall be binding upon their respective successors and assigns.

(g)    The Guarantor hereby waives the right to any jury trial in any action, proceeding, or counterclaim brought by the Guarantor or the Lender arising out of this Guaranty.

**THE GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED AS OF THE DATE STATED ABOVE.**

GUARANTOR:

EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC

By: EBURY 2 EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

9

119449524_1

# EXHIBIT D

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 286 of 688

# TABLE OF CONTENTS

Ebury 1EMI LLC

    Security Agreement ........................................................................................................... 3

Ebury 2EMI LLC

    Security Agreement ......................................................................................................... 18

24-04020-dsj     Doc 1-1     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #2 State
Court Records Appendix Pg 287 of 688

(All Assets - EBURY 1EMI LLC and SPEs)

**THIS SECURITY AGREEMENT** dated as of March 1, 2017 (as may be amended, modified or supplemented from time to time, the "**Security Agreement**") is made by **EBURY 1EMI LLC**, a New York limited liability company (the "**Borrower**"), and **EB 1EMIALA LLC**, an Alabama limited liability company, **EB 1EMIFL, LLC**, a Florida limited liability company, **EB 1EMIIN, LLC**, an Indiana limited liability company, **EB 1EMIMD, LLC**, a Maryland limited liability company, **EB 1EMINJ LLC**, a New Jersey limited liability company and **EB 1EMINY, LLC**, a New York limited liability company, **EB 1EMISC LLC**, a South Carolina limited liability company and **RE 1EMI LLC**, a New York limited liability company (collectively, the "**SPEs**" and together, with the Borrower, the "**Grantors**"), in favor of **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

<div align="center">WITNESSETH:</div>

**WHEREAS**, the Borrower and the Lender have entered into a Credit Agreement, dated as of the date hereof (as may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"), pursuant to which the Lender has agreed to advance funds to the Borrower from time to time secured by, among other things, the Grantors' pledge of certain Collateral;

**WHEREAS**, the Grantors are, and will be, the owner of the Tax Liens and certain other Collateral and are, and will be, receiving a direct or indirect benefit from the Borrower entering into the Credit Agreement; and

**WHEREAS**, the execution and delivery of this Guaranty by the Grantors are conditions precedent to the effectiveness of the Credit Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and to induce the Lender to enter into the Credit Agreement and the other Transactions Documents, and make Advances thereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantors hereby agree as follows:

<div align="center">

**ARTICLE I**
**DEFINITIONS**

</div>

1.1     Certain Definitions. Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Credit Agreement:

(a)     "**Bank Products**" means and includes any type of service or facility (other than direct loans) extended to any Grantor by the Lender or a subsidiary or affiliate of the Lender in reliance on the Lender's agreement to indemnify such subsidiary or affiliate, including, without limitation, (i) letters of credit, (ii) electronic item processing, including automated clearinghouse transactions, (iii) credit cards, (iv) deposit accounts, and (v) Swap Agreements (including any option with respect to any Swap Agreements) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

(b)     "**Collateral**" has the meaning set forth in Section 2.1 of this Security Agreement.

(c)     "**Indebtedness**" means (i) all present and future amounts, liabilities and obligations of any Grantor to the Lender due or owing under or in connection with the Credit Agreement, any other Transaction Document and all other loans, extensions of credit, Bank Products, obligations, debts and liabilities, plus interest thereon, of any Grantor that may now or in the future be owed to or incurred in favor of the Lender, as well as all claims by the Lender against any Grantor, whether existing now or later; whether they are voluntary or involuntary, whether related or unrelated, whether committed or purely discretionary, due or to become due, direct or indirect or by way of assignment, determined or undetermined, absolute or contingent, liquidated or unliquidated; whether any Grantor may be liable individually or jointly with others, of every nature and kind whatsoever, in principal, interest,

<div align="center">1</div>

costs, expenses and attorneys' fees and other costs and for whatever any Grantor may be obligated as guarantor, surety, accommodation party or otherwise; whether recovery upon such obligations may be or hereafter may become barred by any statute of limitations; whether such indebtedness may be or hereafter may become void or otherwise unenforceable from time to time hereafter; (ii) all costs, expenses, obligations, liabilities, damages and other losses incurred by the Lender (and costs of enforcement and collection) in connection with, arising out of or related to (a) the failure of any SPE to comply with the Special Purpose Entity Covenants in any material respect, and (b) the failure of any Grantor to deliver or cause to be delivered any Collections or proceeds from Tax Liens as required by the Credit Agreement; and (iii) all of the Indebtedness, including without limitation all present and future amounts, now or at any time or from time to time hereafter due or owing under or in connection with the Credit Agreement or any other Transaction Document upon any Grantor initiating or consenting to the filing of a voluntary petition by any Grantor under any chapter of the Bankruptcy Code, or seeking relief for any Grantor under any Insolvency Laws or the appointment of a trustee, receiver, conservator or liquidator for all or any part of any Grantor's properties or assets.

(d) "**Lien**" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on jurisprudence, statute or contract, and including but not limited to the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes; and shall include reservations, exceptions, encroachments, easements, servitudes, usufructs, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting property. For the purposes of this Security Agreement, each Grantor shall be deemed to be the owner of any property that it either has accrued or holds subject to a conditional sale agreement, financing lease or other arrangement pursuant to which title to the property has been retained by or vested in some other Person for security purposes.

(e) "**Security Interests**" means and includes individually, collectively, interchangeably and without limitation, the security interests in, and pledges and assignments of, the Collateral granted under this Security Agreement securing the Indebtedness.

(f) "**Swap Agreement**" means and includes means any agreement between each Grantor and any Person with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or combination of these transactions.

(g) "**UCC**" means the Uniform Commercial Code as adopted in the applicable Eligible Jurisdictions.

1.2 Other Definitional Provisions. All definitions contained in this Security Agreement are equally applicable to the singular and plural forms of the terms defined. The words "hereof", "herein", and "hereunder" and words of similar import referring to this Security Agreement refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement. Unless otherwise specified, all references in a Transaction Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Transaction Document in which such references appear. Terms used herein that are defined in the UCC, unless otherwise defined herein, shall have the meanings specified in the UCC. Any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Transaction Document). Any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time. Words denoting gender shall be construed to include the masculine, feminine and neuter, when such construction is appropriate; and specific enumeration shall not exclude the general but shall be construed as cumulative; the word "or" is not exclusive; the word "including" (in its various forms) means "including, without limitation"; in the computation of periods of time, the word "from" means "from and including" and the words "to"

119311259_4

and "until" mean "to but excluding"; and "Dollars" or "$" mean the legal currency of the United States of America.

## ARTICLE II
## PLEDGE; GRANT AND PERFECTION OF SECURITY INTERESTS

2.1     The Security Interests.  As collateral security for the complete, prompt and indefeasible payment and performance in full when due, whether by lapse of time, acceleration or otherwise, of the Indebtedness, each Grantor hereby pledges and grants a lien on and security interest in all of such Grantor's right, title and interest in, to and under all present and future assets and rights of such Grantor, including, without limitation, all Tax Certificates, Tax Liens, accounts, chattel paper (whether tangible or electronic), instruments (including promissory notes), inventory, documents, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles), including without limitation all account ledgers, books, records, files, computer disks and software and all rights thereto, but excluding interests in Swap Agreements, if any, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise, including all accessions, additions, replacements, and substitutions and all related accounts, inventory, and general intangibles (collectively, the "**Collateral**").

2.2     Deposit Accounts.  As collateral security for the full and prompt payment of the Indebtedness in accordance with the Credit Agreement and the other Transaction Documents, each Grantor hereby grants the Lender a continuing security interest in any and all funds that any Grantor may now and in the future have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the Lender or its Affiliates as to which Grantor is an account holder.  Each Grantor further agrees that the Lender may, if an Event of Default has occurred and is continuing, apply any funds that Grantor may have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the Lender or its Affiliates as to which any Grantor is an account holder, against the unpaid balance of any and all Indebtedness.

2.3     No Liability.  The pledge of and the grant of the Security Interests in the Collateral hereunder are intended as collateral security only and shall not subject the Lender to, or transfer or in any way affect or modify, any obligation or liability of any Grantor with respect to any of the Collateral or any transaction in connection therewith.

## ARTICLE III
## COLLATERAL ACTIONS

3.1     Authorization to File Financing Statements.  Each Grantor hereby irrevocably authorizes the Lender at any time and from time to time to file, in any UCC jurisdiction, any initial financing statements and amendments thereto that the Lender reasonably deems necessary or advisable to perfect any and all Security Interests.  Each Grantor acknowledges and agrees that, in addition to the names of the debtor and the secured party and a description of the property covered by the Security Interest to be perfected, such financing statements and amendments thereto may contain any information required by the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether Grantor is an organization, the type of organization and any organization identification number issued to Grantor.  Each Grantor agrees to furnish any such information to the Lender promptly upon request.  Each Grantor acknowledges and agrees that financing statements and amendments thereto may include statements providing notice that any alienation or encumbrance of any of the Collateral, in violation of the Credit Agreement, will violate the rights of the Lender under this Security Agreement.  Each Grantor also ratifies its authorization for the Lender to have filed in any UCC jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.  Each Grantor agrees that it will not, and does not have the right to, terminate any financing statement naming the Lender as a secured party unless and

3

119311259_4

until the Indebtedness is paid in full or agrees for a Grantor, in writing, to file termination statements. Once the Indebtedness is paid in full and all other obligations to Lender (including contingent obligations) are fully satisfied, upon request Lender will terminate all financing statements naming any Grantor ad debtor and Lender as a secured party or authorize Grantors or some other Person to terminate such financing statements.

3.2    <u>Tax Lien Priority</u>. The Grantors shall timely cause all actions to be taken that are required under Applicable Law to establish and maintain the priority of the Tax Liens, including, without limitation, providing required notices and making required filings.

3.3    <u>Possession of Collateral - Tax Lien Documents</u>. Each Grantor will deliver the Basic Tax Lien Documents to the Lender, or the Custodian, in accordance with the Credit Agreement. With respect to each Grantor, the Lender and the Custodian shall be deemed to have exercised reasonable care in the custody and preservation of all Tax Lien Documents in the possession of the Lender or the Custodian if the party in possession takes such action for that purpose as any Grantor shall request or as the Lender or the Custodian shall deem appropriate under the circumstances, but failure to honor any request by any Grantor shall not of itself be deemed to be a failure to exercise reasonable care. The Lender and the Custodian shall not be required to take any steps necessary to preserve any rights in any Tax Lien Documents against obligors thereunder, nor to protect, preserve or maintain any security interest given to secure any Tax Lien Documents, except as may be provided by separate written agreement.

3.4    <u>Possession of Collateral - Other Promissory Notes and Tangible Chattel Paper</u>. Each Grantor shall forthwith deliver, to the Lender, or the Custodian, upon request, all other instruments and tangible chattel paper included in the Collateral.

3.5    <u>Release and Return of Possessory Collateral</u>. Upon notice from a Grantor or a Taxing Authority that a Tax Debtor intends to redeem, or the Grantor intends to settle or compromise in the ordinary course of business, any Tax Lien or other instrument or tangible chattel paper included in the Collateral, and receipt of a fully completed and signed Lender-approved request form, the Lender or the Custodian shall promptly deliver to such Grantor or the appropriate Taxing Authority the related Basic Tax Lien Documents and other instruments or chattel paper in the possession of the Lender or the Custodian; provided that all proceeds of such redemption, settlement or compromise shall be applied to the Indebtedness in accordance with the Credit Agreement. Additionally, from time to time and as appropriate for the repossession, foreclosure or collection under or other servicing of any of the Collateral, receipt of a fully completed and signed Lender-approved request form, the Lender or the Custodian shall promptly deliver related instruments and documents in the possession of the Lender or the Custodian; provided, however, all such instruments and documents delivered shall be held in trust for the benefit of the Lender by the Person to whom the instruments and documents are delivered.

3.6    <u>Electronic Chattel Paper and Transferable Records</u>. If any Grantor at any time holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, such Grantor shall promptly notify the Lender thereof and, at the request and option of the Lender, shall take such action as the Lender may reasonably request to vest in the Lender control, under Section 9-105 of the UCC, of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.

3.7    <u>Collateral in the Possession of a Bailee</u>. If any Collateral is at any time in the possession of a bailee, the Grantors shall promptly notify the Lender thereof and, if requested by the Lender, shall promptly obtain an acknowledgement from the bailee, in form and substance reasonably satisfactory to the Lender, that the bailee holds such Collateral subject to the Security Interests and, after an Event of Default occurs, shall act upon the instructions of the Lender, without the further consent of the Grantors.

3.8    <u>Other Actions as to any and all Collateral</u>. Each Grantor further agrees to take any other action reasonably requested by the Lender to insure the attachment, perfection and first priority of, and the ability of the

119311259_4

Lender to enforce, the Security Interests in such Collateral, (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC, to the extent, if any, that the signature of any Grantor thereon is required therefor, (b) executing, delivering and filing such real estate record filings as the Lender deems appropriate, to the extent, if any, that the signature of any Grantor thereon is required therefor, (c) causing the name of the Lender to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the Security Interests in such Collateral, (d) complying with Applicable Law or State Registration Requirements as to any Collateral if compliance is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the Security Interests in such Collateral, (e) obtaining Governmental Authority and other third party consents and approvals, including without limitation any consent of any licensor, lessor or other person obligated on the Collateral, (f) obtaining waivers from mortgagees and landlords in form and substance satisfactory to the Lender, landlords and mortgagees, and (g) taking all actions required under the UCC, State Registration Requirements or Applicable Law in any Eligible Jurisdiction, or by other law as applicable in any foreign jurisdiction. Each Grantor also hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing and filing any documents necessary to perfect or to continue any Security Interest.

3.9     Expenses. The Grantors will reimburse the Lender for all reasonable expenses incurred by the Lender in connection with the perfection, termination, and the continuation of the perfection of any Security Interest in the Collateral.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Grantor represents, warrants and covenants, in favor of the Lender, as follows:

4.1     Organization. Each Grantor is a limited liability company duly organized, validly existing and in good standing under the jurisdiction of its organization, and is duly qualified to do business in and is in good standing in every jurisdiction where the failure to so qualify could have or cause a Material Adverse Effect on the Collateral or Grantor's ability to comply with any of its obligations under this Security Agreement. Each Grantor has all powers and all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted, where failure to have such powers licenses, authorizations, consents and approvals could have or cause a Material Adverse Effect on the Collateral or Grantor's ability to comply with any of its obligations under this Security Agreement.

4.2     *Reserved*.

4.3     Authorization and No Violation. The execution, delivery and performance of this Security Agreement by each Grantor have been duly authorized, and do not conflict with, and will not result in a violation of, or constitute or give rise to an event of default under any Grantor's Governing Documents or any other agreements or instruments that may be binding upon any Grantor, or under Applicable Law or court decree or order applicable to a Grantor or its properties. Each Grantor has the power and authority to enter into this Security Agreement, grant collateral security for the Indebtedness, own and hold all of its assets and properties, and carry on its business as now conducted.

4.4     Changes. Each Grantor covenants with the Lender that it will not change its: (a) name or organizational identification number without providing at least thirty (30) days' prior written notice to the Lender; or (b) type of organization or jurisdiction of organization.

4.5     No Liens. Other than financing statements or other similar or equivalent documents or instruments with respect to the Security Interests and Permitted Liens, no financing statement, mortgage, security agreement or similar or equivalent document or instrument covering all or any part of the Collateral is on file or of record in any jurisdiction in which such filing or recording would be effective to perfect a Lien on such Collateral. No Collateral is in the possession of any Person (other than the Borrower) asserting any claim thereto or security interest therein, except the Lender.

119311259_4

4.6    Transactions Involving Court Records. Page 292 of 688l, offer to sell, or otherwise transfer or dispose of the Collateral.

4.7    Insurance. Each Grantor will maintain with financially sound and reputable insurers, insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Such insurance shall be in such minimum amounts that no Grantor will be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Lender. Upon request of the Lender, each Grantor shall deliver to the Lender certificates of insurance and policies evidencing compliance with this Section 4.7. As of the date of this Security Agreement, a single commercial general liability policy with annual coverages of $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate covering the Grantors will satisfy this requirement; provided, however, the Lender shall have the right to require additional policies and coverages in the event the Lender learns of activities or properties of any Grantor that would reasonably support a requirement for additional policies and coverages.

4.8    Collateral Records. The Grantors do now, and at all times hereafter, whether directly or through the Servicer or the Custodian approved by the Lender, shall, keep correct and accurate records of the Collateral and all payment and balance information, all of which records shall be available for inspection and copying at any reasonable time upon the Lender's or its representatives' demand. With respect to all payment obligations included in the Collateral of each Grantor (including, without limitation, accounts, instruments, chattel paper and Tax Liens), each Grantor agrees to keep and maintain such balance and payment history records as the Lender may reasonably require, including, without limitation, delinquency information. Where this information is stored, created, and processed at a Servicer or Custodian, the Grantors shall coordinate with these vendors, at the Grantors' sole cost, for the above requests.

4.9    Possessory Collateral. With respect to the Grantors, the Lender and the Custodian shall be deemed to have exercised reasonable care in the custody and preservation of all Collateral in the possession of the Lender or the Custodian if the Lender or the Custodian takes such action for that purpose as the Grantors shall request or as the Lender or the Custodian, in their reasonable discretion, shall deem appropriate under the circumstances, but failure to honor any request by any Grantor shall not of itself be deemed to be a failure to exercise reasonable care. The Lender and the Custodian shall not be required to take any steps necessary to preserve any rights in any Collateral or protect, preserve or maintain any security interest included in any Collateral. In the event any Collateral is held by a Custodian, each Grantor shall execute a Custodial Agreement pursuant to which the Custodian is appointed to hold in such Collateral for the benefit of the Lender.

4.10    Tax Lien Documents. Neither the Lender nor the Custodian shall be required to take any steps necessary to preserve any rights in any Tax Lien or any Tax Lien Documents, apply for any excess funds held by a tax collector, apply for any tax deed, or otherwise protect, preserve or maintain the Tax Lien of any Tax Lien Document.

4.11    Indemnification. Each Grantor agrees to indemnify, to defend and to save and hold the Lender harmless from and against any and all claims, suits, obligations, damages, losses, costs, expenses (including without limitation, the reasonable attorneys' fees of the Lender), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by the Lender arising out of or in any manner occasioned by this Security Agreement or the rights and remedies granted to the Lender hereunder. This indemnity requirement shall survive the cancellation of this Security Agreement as to all matters arising or accruing prior to such cancellation, and the foregoing indemnity provision shall further survive in the event that the Lender elects to exercise any of the remedies as provided under this Security Agreement following any Event of Default hereunder.

4.12    Transactional Taxes. Each Grantor agrees to indemnify, to defend and to save and hold the Lender harmless from and against all claims, suits, obligations, damages, losses, costs, expenses (including without limitation, the reasonable attorneys' fees of the Lender), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by the Lender for Taxes imposed by

6

Governmental Authorities including the Court Records in connection with the execution or delivery of the Note, this Security Agreement or any other Transaction Document (including UCC filings). This indemnity shall survive the cancellation of this Security Agreement and satisfaction of the Indebtedness and the termination of the other Transaction Documents, including any mortgage or any other instrument securing the Indebtedness.

4.13    Claims of Others. Grantors will be fully responsible for any losses that the Lender may suffer as a result of anyone other than the Lender or holders of Permitted Liens asserting any rights or interest in or to the Collateral. Each Grantor agrees to appear in and to defend all actions or proceedings purporting to affect the rights and Security Interests granted to the Lender under this Security Agreement. In the event that the Lender elects to defend any such action or proceeding, each Grantor agrees to reimburse the Lender for the reasonable costs associated therewith, including without limitation, the reasonable attorneys' fees of the Lender, which costs will be payable upon demand.

4.14    Enforceability of Collateral. To the extent the Collateral consists of payment obligations (including, without limitation, accounts, instruments, chattel paper and Tax Liens), the Collateral is genuine and enforceable in accordance with its terms, and fully complies with Applicable Law concerning form, content, manner of preparation and execution, and all Persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral, free of any offset, compensation, deduction or counterclaim. So long as this Security Agreement remains in effect, no Grantor shall, without the prior written consent of the Lender compromise, settle, adjust, or extend payment under or with regard to any such payment obligations, except in the ordinary course of business.

4.15    Location of Collateral. To the extent not required to deliver possession of the Collateral to the Lender, each Grantor shall keep the Collateral (or to the extent the Collateral consists of intangible property, the records concerning the Collateral) at the offices of the Custodian or any Servicer, other office locations of such Grantors, or such other location or locations as are reasonably acceptable to the Lender.

4.16    Transactions Involving Collateral. Except for Collections on the Collateral made in the ordinary course of business (and the delivery of redeemed Tax Certificates in connection with such Collections) or as permitted by the Credit Agreement, the Grantors shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, other than in the ordinary course of business. The Grantors shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any Lien or charge, other than Permitted Liens and the Security Interests provided for in this Security Agreement, without the prior written consent of the Lender, except as permitted in the Credit Agreement. This includes but is not limited to security interests junior in right and priority to the Security Interests granted under this Security Agreement. All proceeds from any disposition of the Collateral (for whatever reason) shall be applied in accordance with the terms of the Credit Agreement.

4.17    Verifications. Each Grantor agrees that the Lender, or its agents, may (a) periodically contact Taxing Authorities to determine tax collections and balances remaining due under Tax Liens and inquire as to such other matters which the Lender may require, and (b) periodically contact other Persons to verify the amounts then owing under other Collateral payment obligations, to determine whether such Persons have any setoff or counterclaims against the Collateral or any Grantor, and to inquire as to such other matters which the Lender may require.

4.18    Accounts and Lock Box. As required under the Credit Agreement, each Grantor agrees to (a) establish and maintain accounts with banks deemed acceptable to the Lender, for the deposit of Collections, and (b) instruct, in writing, all Persons responsible for making payments of amounts secured by Tax Liens or due to any Grantor to make all payments to an address selected by the Lender. After an Event of Default occurs, the Lender shall have the independent right, but not duty, to notify Persons responsible for making any such payments to make all payments to an address selected by the Lender. As required under the Credit Agreement and the other Transaction Documents, all payments received by any Grantor or the Custodian or any agent acting for any Grantor will be deposited, daily, into the accounts established with banks deemed acceptable to the Lender.

4.19    Amounts Collected by the Lender. The actual amount of the cash received by the Lender as a result of the exercise of its collection rights under this Security Agreement, less all reasonable costs and expenses of

7

119311259_4

the Lender including, without limitation, legal, warehouse, storage, processing, transportation and safe expenses, shall be applied as a credit against the Indebtedness. If there is a surplus remaining after the Indebtedness is paid in full, the Lender shall remit such surplus to the Borrower or any other Grantor.

4.20    Right of Inspection and Information. Each Grantor will permit any officer, employee or agent of the Lender to visit and inspect any of the Collateral in accordance with the terms of the Credit Agreement.

4.21    Taxes. The Grantors will, except as otherwise allowed under the Credit Agreement, pay as and when due and payable all Taxes, levies, license fees, assessments, and other impositions levied on the Collateral or any part thereof before its use and operation.

4.22    Future Liens. No Grantor shall, without the prior written consent of the Lender grant any Lien that may affect the Collateral other than Permitted Liens or as set forth in the Credit Agreement, or any part or parts thereof, nor shall any Grantor permit or consent to any Lien attaching to or being filed against any of the Collateral in favor of anyone other than the Lender and the holders of Permitted Liens.

4.23    Notice of Liens. Grantors shall immediately notify the Lender in writing upon (a) the filing of any attachment, lien, judicial process, claim, or other Lien on such Grantor or any of the Collateral, or (b) the occurrence of any default, or event that, with the passage of time, the failure to cure or giving of notice, might result in a default under any of Grantor's obligations that may be secured by any Lien or that might result in a Lien affecting the Collateral, or should any of the Collateral be seized or attached or levied upon, or threatened by seizure or attachment or levy, by any person other than the Lender.

4.24    Further Assurances. On request of the Lender, each Grantor will promptly: (a) correct any defect, error or omission that may be discovered in the contents of this Security Agreement or any financing statement relating thereto or in the execution or acknowledgment of this Security Agreement or any financing statement; (b) execute, acknowledge, deliver and record such further instruments (including, without limitation, further security agreements, financing statements, continuation statements and assignments of accounts, contract rights, general intangibles and proceeds) and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Security Agreement and to more fully identify and subject to the Security Interest hereof any property intended to be covered hereby, including without limitation any renewals, additions, substitutions, replacements or accessions to the Collateral; (c) execute, acknowledge, deliver and record any document or instrument (including specifically any financing statement) necessary, desirable or proper to protect the Liens and Security Interests hereunder against the rights or interests of third persons, if any, that the signature of any Grantor thereon is required therefor, and (d) execute, deliver and file such real estate record filings as the Lender deems appropriate, to the extent, if any, that the signature of any Grantor thereon is required therefor. The Grantors shall pay all reasonable costs connected with any of the foregoing.

4.25    Collateral Indemnity. If the validity or priority of this Security Agreement or any rights, Security Interests or other interests created or evidenced hereby shall be challenged in writing or in legal proceedings, the Grantors will give prompt written notice thereof to the Lender and, at the reasonable cost and expense of the Grantors, will diligently endeavor to cure any defect that may be developed or claimed, and take all necessary and proper steps for the defense of such legal proceedings, and the Lender (whether or not named as a party to legal proceedings with respect thereto) is hereby authorized and empowered to take such additional steps as in its reasonable judgment and discretion may be necessary or proper for the defense of any such legal proceedings or the protection of the validity or priority of this Security Agreement and the rights, security interests and other interests created or evidenced hereby, and all reasonable expenses so incurred of every kind and character shall be paid promptly on demand and shall be a part of the Indebtedness.

4.26    Expenditures. Each Grantor recognizes and agrees that the Lender may incur certain expenses in connection with the exercise of Lender's rights under this Security Agreement. If not discharged or paid when due, the Lender may (but shall not be obligated to) discharge or pay any amounts required to be discharged or paid by any Grantor under this Security Agreement, including without limitation all Taxes (but only to the extent required to be paid under the terms the Credit Agreement), Liens and other claims, at any time levied or placed on the Collateral. The Lender also may (but shall not be obligated to) pay all costs for insuring, maintaining and

8

preserving the Collateral, including without limitation insurance protecting only the interests of the Lender in the Collateral. The Lender may further take such other action or actions and incur such additional expenditures as the Lender may deem to be necessary and proper to cure or rectify any actions or inactions on any Grantor's part as may be required under this Security Agreement. Nothing under this Security Agreement or otherwise shall obligate the Lender to take any such actions or to incur any such additional expenditures on any Grantor's behalf, or result in the Lender being in any way responsible or liable for any losses, damages, or injuries to the Collateral, to any Grantor, or to any other person or persons, resulting from the Lender forgoing such actions or incurring such additional expenses. The Lender's election to take any such actions or incur such additional expenditures shall not constitute a waiver or forbearance by the Lender of any Event of Default. All such expenditures incurred or paid by the Lender for such purposes will then bear interest at the default rate in the Note from the date incurred or paid to the date of repayment, become a part of the Indebtedness and, at the option of the Lender and be payable on demand. This Security Agreement also secures payment of any such amounts. Such rights shall be in addition to all other rights and remedies to which the Lender may be entitled under this Security Agreement upon the occurrence of an Event of Default.

4.27    Compliance with Applicable Laws. Each Grantor will observe and comply with all Applicable Law, Requirements of Law and State Registration Requirements as to the Collateral and otherwise; provided, however, that each Grantor shall have the right to contest alleged violations in good faith by appropriate proceedings diligently conducted if such contest will not have a material adverse effect on such Grantor, the business of such Grantor or any of the Collateral or the Security Interests.

4.28    Borrower Information. Each Grantor represents, warrants and agrees that: (a) it will receive or has received a direct or indirect material benefit from the transactions contemplated herein or arising out of the Indebtedness; (b) it has established adequate means of obtaining information from the Borrower on a continuing basis with regard to the financial condition of the Borrower; and (c) the Lender has not made any representations to any Grantor as to the creditworthiness of the Borrower. Each Grantor agrees to keep adequately informed of any facts, events or circumstances that might in any way affect any Grantor's risks with regard to the Indebtedness. Each Grantor further agrees that the Lender shall not have any obligation to disclose to any Grantor any information or material relating to any of the Indebtedness or the Borrower.

## ARTICLE V
## DEFAULT AND DEFAULT RIGHTS

5.1    Events of Default. Any Grantor's failure to observe or perform any covenant under this Security Agreement that continues unremedied for five (5) Business Days after the earlier of: (a) receipt by such Grantor of notice of such failure or such breach from the Lender; (b) or any Grantor's knowledge of such failure or breach; shall constitute an Event of Default under the Credit Agreement.

5.2    Effect of an Event of Default. Upon the occurrence of an Event of Default under the Credit Agreement, the Lender may exercise any and all rights and remedies otherwise available to it, including rights available hereunder and all of the rights and remedies of a secured party upon default under the UCC (such rights and remedies to be cumulative and nonexclusive), and, in addition, may take the following remedial actions:

(a)    Consistent with the rights and remedies of a secured party under the UCC (and except as otherwise required by the UCC), the Lender, upon the occurrence of an Event of Default, may also without notice except as specified below, solicit and accept bids for and sell the Collateral or any part of the Collateral in one (1) or more parcels at public or private sale, at any exchange, broker's board or at the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable, and the Lender shall apply the proceeds from the sale of the Collateral to any amounts payable by each Grantor with respect to the Indebtedness in accordance with the priorities required by the Transaction Documents. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) Business Days' notice to each Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by

announcement at the time and place fixed for the sale or any adjournment thereof, without further notice, be made at the time and place to which it was so adjourned. Every such sale shall operate to divest all right, title, interest, claim and demand whatsoever of each Grantor in and to the Collateral so sold, and shall be a perpetual bar, both at law and in equity, against each Grantor or any Person claiming the Collateral sold through each Grantor and their respective successors or assigns.

(i)     Upon the completion of any sale under Section 5.2(a), each Grantor will deliver or cause to be delivered all of the Collateral sold to the purchaser or purchasers at such sale on the date of sale, or within a reasonable time thereafter if it shall be impractical to make immediate delivery, but in any event full title and right of possession to such property shall pass to such purchaser or purchasers forthwith upon the completion of such sale. Nevertheless, if so requested by the Lender or by any purchaser, each Grantor shall confirm any such sale or transfer by executing and delivering to such purchaser all proper instruments of conveyance and transfer and release as may be designated in any such request.

(ii)    At any sale under Section 5.2(a), the Lender may bid for and purchase the property offered for sale and, upon compliance with the terms of sale, may hold, retain and dispose of such property without further accountability therefor. When purchasing property at a sale under Section 5.2(a), the Lender may set off the purchase price of such property against amounts owing to the Lender in payment of such purchase price up to the full amount owing to the Lender.

(b)     The Lender, instead of exercising the power of sale conferred upon it under Section 5.2(a), may proceed by a suit or suits at law or in equity to foreclose or enforce the Security Interests and sell the Collateral, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

(c)     The Lender may, in its sole discretion, commence an appropriate action or actions against each Grantor seeking specific performance of any covenant contained herein, or in aid of the execution or enforcement of any power herein granted.

(d)     The Lender may exercise at the Grantors' sole expense any and all rights and remedies of the Grantors under or in connection with the Collateral.

(e)     The Lender shall have and may exercise any or all other rights and remedies available at law, in equity, or otherwise.

(f)     Following the occurrence of any Event of Default, the Lender may exercise any rights and all under the Lender POA.

(g)     The Lender shall have the right to appoint a receiver for one or more the Grantors and with respect to which (i) the receiver may be an employee of the Lender and may serve without bond, and (ii) all fees of the receiver and the receiver's professionals shall become part of the Indebtedness secured by this Security Agreement and be payable on demand, with interest at the default rate in the Notes (not to exceed the highest rate allowed by Applicable Law) from the date incurred or paid to the date of repayment.

(h)     The Lender shall not be required to marshal any present or future collateral security (including but not limited to this Security Agreement and the Collateral) for, or other assurances of payment, of any of the Indebtedness or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, each Grantor hereby agrees that each Grantor will not invoke any law relating to the marshaling of collateral that might cause delay in or impede the enforcement of the rights of the Lender under this Security Agreement or under any other instrument creating or evidencing any of the Indebtedness or under which any of the Indebtedness is outstanding or by which any of the Indebtedness is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

(i)     Beyond the exercise of reasonable care in the custody thereof, the Lender shall have no

10

Case 7:24-cv-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 297 of 688

duty as to any Collateral in its possession or under its possession or control of any agent or bailee or any income thereon. The Lender shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and shall not be liable or responsible for any loss or damage to any of the Collateral, except for gross negligence or willful misconduct of the Lender, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Lender in good faith.

(j)    At any time or times, in order to comply with Applicable Law, the Lender may appoint a bank or trust company or one or more other Persons with such power and authority as may be necessary for the effectual operation of the provisions hereof as may be specified in the instrument of appointment.

5.3    <u>Cumulative Remedies</u>. All of the rights and remedies of the Lender, whether evidenced by this Security Agreement, the other Transaction Documents or any other writing, are cumulative and may be exercised singularly or concurrently. Election by the Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of any Grantor under this Security Agreement, after failure to perform, shall not affect the right of the Lender to declare a default and exercise remedies available to the Lender under this Security Agreement. Nothing under this Security Agreement or otherwise shall be construed so as to limit or restrict the rights and remedies available to the Lender under this Security Agreement following an Event of Default, or in any way to limit or restrict the rights and ability of the Lender to proceed directly against any Grantor or to proceed against any other collateral directly or indirectly securing the Indebtedness. Nothing under this Security Agreement or otherwise shall be construed so as to require the Lender to proceed against or resort to any collateral directly or indirectly securing the Indebtedness at any time.

5.4    <u>Waivers</u>.

(a)    Each Grantor hereby waives (i) demand, presentment for payment, protest, notice of protest, notice of nonpayment, notice of acceleration and notice of intent to accelerate under all of the Indebtedness secured by this Security Agreement, and (ii) all pleas of division and discussion, and all similar rights with regard to the Indebtedness.

(b)    Each Grantor hereby agrees that: (i) it shall remain liable, together with each Grantor and any and all guarantors of the Indebtedness, on a "solidary" or "joint and several" basis; (ii) the discharge or release of any party who is, may, or will be liable to the Lender under any of the Indebtedness, or the release of the Collateral or any other collateral directly or indirectly securing repayment of the same, shall not have the effect of releasing or otherwise diminishing or reducing the actual or potential liability of any Grantor or any other party or parties guaranteeing payment of the Indebtedness, who shall remain liable to the Lender, and remain liable to the Lender, or of releasing any Collateral or other collateral that is not expressly released by the Lender; and (iii) the acceptance of payments by the Lender other than in accordance with the terms of the Transaction Documents, or the subsequent agreement of the Lender to extend or modify such repayment terms, shall likewise not have the effect of releasing any Grantor or any other party or parties guaranteeing payment of the Indebtedness, from their respective obligations to the Lender under this Security Agreement and to the Lender under the Indebtedness, or of releasing any of the Collateral or other collateral directly or indirectly securing repayment of the Indebtedness.

(c)    Neither the course of dealing between any Grantor and the Lender nor the Lender's failure or delay to exercise any, or partial exercise of, its rights and remedies under this Security Agreement or any other Transaction Document shall have the effect of waiving any of the Lender's rights and remedies, it being each Grantor's intent and agreement that the rights and remedies of the Lender shall be cumulative in nature.

(d)    Each Grantor further agrees that, upon the occurrence of any Event of Default, any waiver or forbearance on the part of the Lender to pursue the rights and remedies available to the Lender under this Security Agreement shall be binding upon the Lender only to the extent that the Lender specifically agrees to any such waiver or forbearance in writing. A waiver or forbearance as to one Event of Default shall not constitute a waiver or forbearance as to any other Event of Default. None of the warranties, conditions, provisions and terms contained in this Security Agreement or any other Related Document, shall be deemed to have been waived by any act or knowledge of the Lender or the agents, officers or employees of the Lender; but only by an instrument in

11

writing specifying such waiver, signed by the authorized representative of the Lender and delivered to the Grantors.

## ARTICLE VI
## MISCELLANEOUS PROVISIONS

6.1     Notices.  Any notice or demand that, by provision of this Security Agreement, is required or permitted to be given or served must be in writing and shall be deemed to have been sufficiently given and served for all purposes (if mailed) three (3) days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one (1) Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses are given in writing) as follows:

> EBURY 1EMI LLC
> EB 1EMIALA LLC
> EB 1EMI FL, LLC
> EB 1EMIIN, LLC
> EB 1EMIMD, LLC
> EB 1EMI NJ LLC
> EB 1EMINY, LLC
> EB 1EMISC LLC
> RE 1EMI LLC
> 56 Locust Avenue, 2nd Floor
> Rye, New York 10580
> Attention: John Hanratty

> EMIGRANT BUSINESS CREDIT CORPORATION
> 6 East 43rd Street, 20th Floor
> New York, New York 10017
> Attention: Karen Wold

6.2     Amendment.  Neither this Security Agreement nor any provisions thereof may be changed, waived, discharged or terminated orally or in any manner other than by an instrument in writing signed by the Lender and the Grantors.

6.3     Governing Law; Consent to Jurisdiction.  This Security Agreement and any claim with respect thereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).  The Lender and each Grantor (a) agrees to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the borough of Manhattan, and (b) waives any objection based on *forum non conveniens*, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

6.4     Waivers.

(a)     To the extent permitted under Applicable Law, each Grantor hereby knowingly, voluntarily and intentionally waives any right to assert a counterclaim, other than a compulsory counter claim in any action or proceeding brought against it by the Lender or any Indemnified Person.

**(b)     To the extent permitted under Applicable Law, the Lender and each Grantor hereby knowingly, voluntarily and intentionally waives any right to have a jury participate in resolving any dispute between them, whether sounding in tort, contract or otherwise, connected with, arising out of or in any way related or pertaining to this Security Agreement, any other Transaction Document, the Collateral or any dealings, course of conduct between them or actions or statements of either Party.  It is agreed and understood that this waiver constitutes a waiver of trial by jury of all claims against all parties to such**

12

2-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records Pg 299 of 688

actions or proceedings, including claims against parties to this Security Agreement. The Lender and each Grantor hereby represents that no representations of fact or opinion have been made by them to induce this waiver of trial by jury or to in any way modify or nullify its effect.

(c)     To the extent permitted under Applicable Law, each Grantor hereby knowingly, voluntarily and intentionally waives any right to claim or recover in any litigation whatsoever involving the Lender, any Grantor or an Indemnified Person, any special, exemplary, punitive, indirect, incidental or consequential damages of any kind or nature whatsoever or any damages other than, or in addition to, actual damages, whether such waived damages are based on contract, statute, tort or common law or any other legal theory.

(d)     Each Grantor certifies that no representative, agent or attorney of the Lender or an Indemnified Person has represented, expressly or otherwise, that the Lender or an Indemnified Person would not seek to enforce any of the waivers in this Section in the event of litigation or other circumstances.

(e)     The Lender and each Grantor further represents that they have been represented in the signing of this Security Agreement and the making of these waivers by independent legal counsel, selected of its own free will, and had the opportunity to discuss these waivers with counsel.

(f)     The provisions of this Section 6.4 shall survive termination of this Security Agreement and the payment in full of the Indebtedness.

6.5     Costs and Expenses. Each Grantor agrees to pay, upon demand, all of the reasonable out-of-pocket expenses of the Lender in connection with (a) the preparation and execution of this Security Agreement and the Transaction Documents, including reasonable attorneys' fees; (b) amendments, consents, waivers, and terminations made or requested in connection this Security Agreement and the other Transaction Documents; and (c) the enforcement, protection, defense and collection of this Security Agreement and the other Transaction Documents. If an Event of Default occurs, the Lender may pay someone else to help collect the Indebtedness and to enforce this Security Agreement, and the Grantors will, subject to any limits under Applicable Law, pay the Lender all of the Lender's reasonable attorneys' fees, court costs and legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees related to bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.

6.6     Cumulative Rights. The rights and remedies of the Lender under this Security Agreement and the other Transaction Documents shall be cumulative, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

6.7     Other Provisions.

(a)     Caption headings of the Articles of this Security Agreement are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Security Agreement, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

(b)     This Security Agreement embodies the final, entire agreement of the parties hereto and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. There are no oral agreements between the parties to this Security Agreement.

(c)     If any provision of this Security Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable. This Security Agreement shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Security Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. In lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Security Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible

13

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
and legal, valid and enforceable.      Court Records   Pg 300 of 688

6.8     Sole Discretion.  Unless otherwise specifically provided in this Security Agreement, whenever the consent or approval of the Lender is required under this Security Agreement, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of the Lender, and the decision of the Lender shall be final and conclusive.

6.9     Successors and Assigns.

(a)     All covenants and agreements made by or on behalf of each Grantor in this Security Agreement shall bind its successors and assigns and shall inure to the benefit of the Lender and its respective successors and assigns.

(b)     This Security Agreement is for the benefit of the Lender and for such other Person or Persons as may from time to time become or be the holders of any of the Indebtedness, and this Security Agreement shall be transferable and negotiable, with the same force and effect and to the same extent as the Indebtedness may be transferable, it being understood that, upon the transfer or assignment by the Lender of any of the Indebtedness, the legal holder of such Indebtedness shall have all of the rights granted to the Lender under this Security Agreement.

(c)     Each Grantor hereby recognizes and agrees that the Lender may assign all or any portion of the Indebtedness to one or more third party creditors.  Such transfers may include, but are not limited to, sales of participation interests in the Indebtedness.  Each Grantor specifically agrees and consents, subject to the terms of the Credit Agreement, to all such transfers and assignments and further waives any subsequent notice of such transfers or assignments as may be provided under applicable law.  Each Grantor further agrees that once the Lender transfers all of its interests in the Indebtedness the Lender will be fully released from any and all of obligations and responsibilities to each Grantor under this Security Agreement.

6.10     Termination.  Upon the full payment of the Indebtedness, the full satisfaction of all other obligations to the Lender (including contingent obligations) and the occurrence of the Termination Date, this Security Agreement shall terminate.  After termination of this Security Agreement, upon request of any Grantor, the Lender shall authorize the filing, at the expense of such Grantor, of termination statements for financing statements naming such Grantor as debtor and the Lender as a secured party and return any certificates evidencing the Collateral in its possession to such Grantor.

6.11     Counterparts.  This Security Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Security Agreement electronically or by facsimile transmission shall be effective as delivery of a manually executed counterpart.

[SIGNATURE PAGES TO FOLLOW]

119311259_4

EACH GRANTOR ACKNOWLEDGES HAVING READ THE PROVISIONS OF THIS SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS SECURITY AGREEMENT IS DATED AS OF THE DATE STATED ABOVE.

**GRANTORS:**

EBURY 1EMI LLC
   By: EBURY STREET CAPITAL, LLC, Manager

      By: _____
      John Hanratty, Manager

EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMI NJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
   By: EBURY 1EMI LLC, Sole Member
      By: EBURY STREET CAPITAL, LLC, Manager

      By: _____
      John Hanratty, Manager

15

119311259_4

## SECURITY AGREEMENT
### (All Assets - EBURY 2 EMI LLC and SPEs)

**THIS SECURITY AGREEMENT** dated as of March 9, 2017 (as may be amended, modified or supplemented from time to time, the "**Security Agreement**") is made by **EBURY 2 EMI LLC**, a New York limited liability company (the "**Borrower**"), and **EB 2EMIALA LLC**, an Alabama limited liability company, **EB 2EMIFL, LLC**, a Florida limited liability company, **EB 2EMIIN, LLC**, an Indiana limited liability company, **EB 2EMIMD, LLC**, a Maryland limited liability company, **EB 2EMINJ LLC**, a New Jersey limited liability company and **EB 2EMINY, LLC**, a New York limited liability company, **EB 2EMISC LLC**, a South Carolina limited liability company and **RE 2EMI LLC**, a New York limited liability company (collectively, the "**SPEs**" and together, with the Borrower, the "**Grantors**"), in favor of **EMIGRANT BUSINESS CREDIT CORPORATION**, a Delaware corporation (the "**Lender**").

### WITNESSETH:

**WHEREAS,** the Borrower and the Lender have entered into a Credit Agreement, dated as of the date hereof (as may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"), pursuant to which the Lender has agreed to advance funds to the Borrower from time to time secured by, among other things, the Grantors' pledge of certain Collateral;

**WHEREAS,** the Grantors are, and will be, the owner of the Tax Liens and certain other Collateral and are, and will be, receiving a direct or indirect benefit from the Borrower entering into the Credit Agreement; and

**WHEREAS,** the execution and delivery of this Guaranty by the Grantors are conditions precedent to the effectiveness of the Credit Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and to induce the Lender to enter into the Credit Agreement and the other Transactions Documents, and make Advances thereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantors hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Certain Definitions.    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Credit Agreement:

(a)    "**Bank Products**" means and includes any type of service or facility (other than direct loans) extended to any Grantor by the Lender or a subsidiary or affiliate of the Lender in reliance on the Lender's agreement to indemnify such subsidiary or affiliate, including, without limitation, (i) letters of credit, (ii) electronic item processing, including automated clearinghouse transactions, (iii) credit cards, (iv) deposit accounts, and (v) Swap Agreements (including any option with respect to any Swap Agreements) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

(b)    "**Collateral**" has the meaning set forth in Section 2.1 of this Security Agreement.

(c)    "**Indebtedness**" means (i) all present and future amounts, liabilities and obligations of any Grantor to the Lender due or owing under or in connection with the Credit Agreement, any other Transaction Document and all other loans, extensions of credit, Bank Products, obligations, debts and liabilities, plus interest thereon, of any Grantor that may now or in the future be owed to or incurred in favor of the Lender, as well as all claims by the Lender against any Grantor, whether existing now or later; whether they are voluntary or involuntary, whether related or unrelated, whether committed or purely discretionary, due or to become due, direct or indirect or by way of assignment, determined or undetermined, absolute or contingent, liquidated or unliquidated; whether any Grantor may be liable individually or jointly with others, of every nature and kind whatsoever, in principal, interest,

costs, expenses and attorneys' fees and all other fees and charges; whether any Grantor may be obligated as guarantor, surety, accommodation party or otherwise; whether recovery upon such obligations may be or hereafter may become barred by any statute of limitations; whether such indebtedness may be or hereafter may become void or otherwise unenforceable from time to time hereafter; (ii) all costs, expenses, obligations, liabilities, damages and other losses incurred by the Lender (and costs of enforcement and collection) in connection with, arising out of or related to (a) the failure of any SPE to comply with the Special Purpose Entity Covenants in any material respect, and (b) the failure of any Grantor to deliver or cause to be delivered any Collections or proceeds from Tax Liens as required by the Credit Agreement; and (iii) all of the Indebtedness, including without limitation all present and future amounts, now or at any time or from time to time hereafter due or owing under or in connection with the Credit Agreement or any other Transaction Document upon any Grantor initiating or consenting to the filing of a voluntary petition by any Grantor under any chapter of the Bankruptcy Code, or seeking relief for any Grantor under any Insolvency Laws or the appointment of a trustee, receiver, conservator or liquidator for all or any part of any Grantor's properties or assets.

(d)    "**Lien**" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on jurisprudence, statute or contract, and including but not limited to the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes; and shall include reservations, exceptions, encroachments, easements, servitudes, usufructs, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting property. For the purposes of this Security Agreement, each Grantor shall be deemed to be the owner of any property that it either has accrued or holds subject to a conditional sale agreement, financing lease or other arrangement pursuant to which title to the property has been retained by or vested in some other Person for security purposes.

(e)    "**Security Interests**" means and includes individually, collectively, interchangeably and without limitation, the security interests in, and pledges and assignments of, the Collateral granted under this Security Agreement securing the Indebtedness.

(f)    "**Swap Agreement**" means and includes means any agreement between each Grantor and any Person with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or combination of these transactions.

(g)    "**UCC**" means the Uniform Commercial Code as adopted in the applicable Eligible Jurisdictions.

1.2    Other Definitional Provisions. All definitions contained in this Security Agreement are equally applicable to the singular and plural forms of the terms defined. The words "hereof", "herein", and "hereunder" and words of similar import referring to this Security Agreement refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement. Unless otherwise specified, all references in a Transaction Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Transaction Document in which such references appear. Terms used herein that are defined in the UCC, unless otherwise defined herein, shall have the meanings specified in the UCC. Any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Transaction Document). Any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time. Words denoting gender shall be construed to include the masculine, feminine and neuter, when such construction is appropriate; and specific enumeration shall not exclude the general but shall be constructed as cumulative; the word "or" is not exclusive; the word "including" (in its various forms) means "including, without limitation"; in the computation of periods of time, the word "from" means "from and including" and the words "to"

and "until" mean "to but excluding"; and all references to money refer to the legal currency of the United States of America.

## ARTICLE II
## PLEDGE; GRANT AND PERFECTION OF SECURITY INTERESTS

2.1     The Security Interests.  As collateral security for the complete, prompt and indefeasible payment and performance in full when due, whether by lapse of time, acceleration or otherwise, of the Indebtedness, each Grantor hereby pledges and grants a lien on and security interest in all of such Grantor's right, title and interest in, to and under all present and future assets and rights of such Grantor, including, without limitation, all Tax Certificates, Tax Liens, accounts, chattel paper (whether tangible or electronic), instruments (including promissory notes), inventory, documents, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles), including without limitation all account ledgers, books, records, files, computer disks and software and all rights thereto, but excluding interests in Swap Agreements, if any, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise, including all accessions, additions, replacements, and substitutions and all related accounts, inventory, and general intangibles (collectively, the "**Collateral**").

2.2     Deposit Accounts.  As collateral security for the full and prompt payment of the Indebtedness in accordance with the Credit Agreement and the other Transaction Documents, each Grantor hereby grants the Lender a continuing security interest in any and all funds that any Grantor may now and in the future have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the Lender or its Affiliates as to which Grantor is an account holder. Each Grantor further agrees that the Lender may, if an Event of Default has occurred and is continuing, apply any funds that Grantor may have on deposit with the Lender or its Affiliates or in certificates of deposit or other deposit accounts with the Lender or its Affiliates as to which any Grantor is an account holder, against the unpaid balance of any and all Indebtedness.

2.3     No Liability.  The pledge of and the grant of the Security Interests in the Collateral hereunder are intended as collateral security only and shall not subject the Lender to, or transfer or in any way affect or modify, any obligation or liability of any Grantor with respect to any of the Collateral or any transaction in connection therewith.

## ARTICLE III
## COLLATERAL ACTIONS

3.1     Authorization to File Financing Statements.  Each Grantor hereby irrevocably authorizes the Lender at any time and from time to time to file, in any UCC jurisdiction, any initial financing statements and amendments thereto that the Lender reasonably deems necessary or advisable to perfect any and all Security Interests. Each Grantor acknowledges and agrees that, in addition to the names of the debtor and the secured party and a description of the property covered by the Security Interest to be perfected, such financing statements and amendments thereto may contain any information required by the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether Grantor is an organization, the type of organization and any organization identification number issued to Grantor. Each Grantor agrees to furnish any such information to the Lender promptly upon request. Each Grantor acknowledges and agrees that financing statements and amendments thereto may include statements providing notice that any alienation or encumbrance of any of the Collateral, in violation of the Credit Agreement, will violate the rights of the Lender under this Security Agreement. Each Grantor also ratifies its authorization for the Lender to have filed in any UCC jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof. Each Grantor agrees that it will not, and does not have the right to, terminate any financing statement naming the Lender as a secured party unless and

3

until the Indebtedness is paid in full and the Lender authorizes each Grantor, in writing, to file termination statements. Once the Indebtedness is paid in full and all other obligations to Lender (including contingent obligations) are fully satisfied, upon request Lender will terminate all financing statements naming any Grantor ad debtor and Lender as a secured party or authorize Grantors or some other Person to terminate such financing statements.

3.2     Tax Lien Priority. The Grantors shall timely cause all actions to be taken that are required under Applicable Law to establish and maintain the priority of the Tax Liens, including, without limitation, providing required notices and making required filings.

3.3     Possession of Collateral - Tax Lien Documents. Each Grantor will deliver the Basic Tax Lien Documents to the Lender, or the Custodian, in accordance with the Credit Agreement. With respect to each Grantor, the Lender and the Custodian shall be deemed to have exercised reasonable care in the custody and preservation of all Tax Lien Documents in the possession of the Lender or the Custodian if the party in possession takes such action for that purpose as any Grantor shall request or as the Lender or the Custodian shall deem appropriate under the circumstances, but failure to honor any request by any Grantor shall not of itself be deemed to be a failure to exercise reasonable care. The Lender and the Custodian shall not be required to take any steps necessary to preserve any rights in any Tax Lien Documents against obligors thereunder, nor to protect, preserve or maintain any security interest given to secure any Tax Lien Documents, except as may be provided by separate written agreement.

3.4     Possession of Collateral - Other Promissory Notes and Tangible Chattel Paper. Each Grantor shall forthwith deliver, to the Lender, or the Custodian, upon request, all other instruments and tangible chattel paper included in the Collateral.

3.5     Release and Return of Possessory Collateral. Upon notice from a Grantor or a Taxing Authority that a Tax Debtor intends to redeem, or the Grantor intends to settle or compromise in the ordinary course of business, any Tax Lien or other instrument or tangible chattel paper included in the Collateral, and receipt of a fully completed and signed Lender-approved request form, the Lender or the Custodian shall promptly deliver to such Grantor or the appropriate Taxing Authority the related Basic Tax Lien Documents and other instruments and chattel paper in the possession of the Lender or the Custodian; provided that all proceeds of such redemption, settlement or compromise shall be applied to the Indebtedness in accordance with the Credit Agreement. Additionally, from time to time and as appropriate for the repossession, foreclosure or collection under or other servicing of any of the Collateral, receipt of a fully completed and signed Lender-approved request form, the Lender or the Custodian shall promptly deliver related instruments and documents in the possession of the Lender or the Custodian; provided, however, all such instruments and documents delivered shall be held in trust for the benefit of the Lender by the Person to whom the instruments and documents are delivered.

3.6     Electronic Chattel Paper and Transferable Records. If any Grantor at any time holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, such Grantor shall promptly notify the Lender thereof and, at the request and option of the Lender, shall take such action as the Lender may reasonably request to vest in the Lender control, under Section 9-105 of the UCC, of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.

3.7     Collateral in the Possession of a Bailee. If any Collateral is at any time in the possession of a bailee, the Grantors shall promptly notify the Lender thereof and, if requested by the Lender, shall promptly obtain an acknowledgement from the bailee, in form and substance reasonably satisfactory to the Lender, that the bailee holds such Collateral subject to the Security Interests and, after an Event of Default occurs, shall act upon the instructions of the Lender, without the further consent of the Grantors.

3.8     Other Actions as to any and all Collateral. Each Grantor further agrees to take any other action reasonably requested by the Lender to insure the attachment, perfection and first priority of, and the ability of the

4

Lender to enforce, the Security Interests including, without limitation, (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC, to the extent, if any, that the signature of any Grantor thereon is required therefor, (b) executing, delivering and filing such real estate record filings as the Lender deems appropriate, to the extent, if any, that the signature of any Grantor thereon is required therefor, (c) causing the name of the Lender to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the Security Interests in such Collateral, (d) complying with Applicable Law or State Registration Requirements as to any Collateral if compliance is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the Security Interests in such Collateral, (e) obtaining Governmental Authority and other third party consents and approvals, including without limitation any consent of any licensor, lessor or other person obligated on the Collateral, (f) obtaining waivers from mortgagees and landlords in form and substance satisfactory to the Lender, landlords and mortgagees, and (g) taking all actions required under the UCC, State Registration Requirements or Applicable Law in any Eligible Jurisdiction, or by other law as applicable in any foreign jurisdiction. Each Grantor also hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing and filing any documents necessary to perfect or to continue any Security Interest.

3.9    Expenses. The Grantors will reimburse the Lender for all reasonable expenses incurred by the Lender in connection with the perfection, termination, and the continuation of the perfection of any Security Interest in the Collateral.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Grantor represents, warrants and covenants, in favor of the Lender, as follows:

4.1    Organization. Each Grantor is a limited liability company duly organized, validly existing and in good standing under the jurisdiction of its organization, and is duly qualified to do business in and is in good standing in every jurisdiction where the failure to so qualify could have or cause a Material Adverse Effect on the Collateral or Grantor's ability to comply with any of its obligations under this Security Agreement. Each Grantor has all powers and all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted, where failure to have such powers licenses, authorizations, consents and approvals could have or cause a Material Adverse Effect on the Collateral or Grantor's ability to comply with any of its obligations under this Security Agreement.

4.2    *Reserved*.

4.3    Authorization and No Violation. The execution, delivery and performance of this Security Agreement by each Grantor have been duly authorized, and do not conflict with, and will not result in a violation of, or constitute or give rise to an event of default under any Grantor's Governing Documents or any other agreements or instruments that may be binding upon any Grantor, or under Applicable Law or court decree or order applicable to any Grantor or its properties. Each Grantor has the power and authority to enter into this Security Agreement, grant collateral security for the Indebtedness, own and hold all of its assets and properties, and carry on its business as now conducted.

4.4    Changes. Each Grantor covenants with the Lender that it will not change its: (a) name or organizational identification number without providing at least thirty (30) days' prior written notice to the Lender; or (b) type of organization or jurisdiction of organization.

4.5    No Liens. Other than financing statements or other similar or equivalent documents or instruments with respect to the Security Interests and Permitted Liens, no financing statement, mortgage, security agreement or similar or equivalent document or instrument covering all or any part of the Collateral is on file or of record in any jurisdiction in which such filing or recording would be effective to perfect a Lien on such Collateral. No Collateral is in the possession of any Person (other than the Borrower) asserting any claim thereto or security interest therein, except the Lender.

5

4.6 _Transactions Involving Collateral_. No Grantor shall sell, offer to sell, or otherwise transfer or dispose of the Collateral.

4.7 _Insurance_. Each Grantor will maintain with financially sound and reputable insurers, insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Such insurance shall be in such minimum amounts that no Grantor will be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Lender. Upon request of the Lender, each Grantor shall deliver to the Lender certificates of insurance and policies evidencing compliance with this Section 4.7. As of the date of this Security Agreement, a single commercial general liability policy with annual coverages of $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate covering the Grantors will satisfy this requirement; provided, however, the Lender shall have the right to require additional policies and coverages in the event the Lender learns of activities or properties of any Grantor that would reasonably support a requirement for additional policies and coverages.

4.8 _Collateral Records_. The Grantors do now, and at all times hereafter, whether directly or through the Servicer or the Custodian approved by the Lender, shall, keep correct and accurate records of the Collateral and all payment and balance information, all of which records shall be available for inspection and copying at any reasonable time upon the Lender's or its representatives' demand. With respect to all payment obligations included in the Collateral of each Grantor (including, without limitation, accounts, instruments, chattel paper and Tax Liens), each Grantor agrees to keep and maintain such balance and payment history records as the Lender may reasonably require, including, without limitation, delinquency information. Where this information is stored, created, and processed at a Servicer or Custodian, the Grantors shall coordinate with these vendors, at the Grantors' sole cost, for the above requests.

4.9 _Possessory Collateral_. With respect to the Grantors, the Lender and the Custodian shall be deemed to have exercised reasonable care in the custody and preservation of all Collateral in the possession of the Lender or the Custodian if the Lender or the Custodian takes such action for that purpose as the Grantors shall request or as the Lender or the Custodian, in their reasonable discretion, shall deem appropriate under the circumstances, but failure to honor any request by any Grantor shall not of itself be deemed to be a failure to exercise reasonable care. The Lender and the Custodian shall not be required to take any steps necessary to preserve any rights in any Collateral or protect, preserve or maintain any security interest included in any Collateral. In the event any Collateral is held by a Custodian, each Grantor shall execute a Custodial Agreement pursuant to which the Custodian is appointed to hold in such Collateral for the benefit of the Lender.

4.10 _Tax Lien Documents_. Neither the Lender nor the Custodian shall be required to take any steps necessary to preserve any rights in any Tax Lien or any Tax Lien Documents, apply for any excess funds held by a tax collector, apply for any tax deed, or otherwise protect, preserve or maintain the Tax Lien of any Tax Lien Document.

4.11 _Indemnification_. Each Grantor agrees to indemnify, to defend and to save and hold the Lender harmless from and against any and all claims, suits, obligations, damages, losses, costs, expenses (including without limitation, the reasonable attorneys' fees of the Lender), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by the Lender arising out of or in any manner occasioned by this Security Agreement or the rights and remedies granted to the Lender hereunder. This indemnity requirement shall survive the cancellation of this Security Agreement as to all matters arising or accruing prior to such cancellation, and the foregoing indemnity provision shall further survive in the event that the Lender elects to exercise any of the remedies as provided under this Security Agreement following any Event of Default hereunder.

4.12 _Transactional Taxes_. Each Grantor agrees to indemnify, to defend and to save and hold the Lender harmless from and against and all claims, suits, obligations, damages, losses, costs, expenses (including without limitation, the reasonable attorneys' fees of the Lender), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by the Lender for Taxes imposed by

6

Governmental Authorities including those due and owing in connection with the execution or delivery of the Note, this Security Agreement or any other Transaction Document (including UCC filings). This indemnity shall survive the cancellation of this Security Agreement and satisfaction of the Indebtedness and the termination of the other Transaction Documents, including any mortgage or other instrument securing the Indebtedness.

4.13    Claims of Others. Grantors will be fully responsible for any losses that the Lender may suffer as a result of anyone other than the Lender or holders of Permitted Liens asserting any rights or interest in or to the Collateral. Each Grantor agrees to appear in and to defend all actions or proceedings purporting to affect the rights and Security Interests granted to the Lender under this Security Agreement. In the event that the Lender elects to defend any such action or proceeding, each Grantor agrees to reimburse the Lender for the reasonable costs associated therewith, including without limitation, the reasonable attorneys' fees of the Lender, which costs will be payable upon demand.

4.14    Enforceability of Collateral. To the extent the Collateral consists of payment obligations (including, without limitation, accounts, instruments, chattel paper and Tax Liens), the Collateral is genuine and enforceable in accordance with its terms, and fully complies with Applicable Law concerning form, content, manner of preparation and execution, and all Persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral, free of any offset, compensation, deduction or counterclaim. So long as this Security Agreement remains in effect, no Grantor shall, without the prior written consent of the Lender compromise, settle, adjust, or extend payment under or with regard to any such payment obligations, except in the ordinary course of business.

4.15    Location of Collateral. To the extent not required to deliver possession of the Collateral to the Lender, each Grantor shall keep the Collateral (or to the extent the Collateral consists of intangible property, the records concerning the Collateral) at the offices of the Custodian or any Servicer, other office locations of such Grantors, or such other location or locations as are reasonably acceptable to the Lender.

4.16    Transactions Involving Collateral. Except for Collections on the Collateral made in the ordinary course of business (and the delivery of redeemed Tax Certificates in connection with such Collections) or as permitted by the Credit Agreement, the Grantors shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, other than in the ordinary course of business. The Grantors shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any Lien or charge, other than Permitted Liens and the Security Interests provided for in this Security Agreement, without the prior written consent of the Lender, except as permitted in the Credit Agreement. This includes but is not limited to security interests junior in right and priority to the Security Interests granted under this Security Agreement. All proceeds from any disposition of the Collateral (for whatever reason) shall be applied in accordance with the terms of the Credit Agreement.

4.17    Verifications. Each Grantor agrees that the Lender, or its agents, may (a) periodically contact Taxing Authorities to determine tax collections and balances remaining due under Tax Liens and inquire as to such other matters which the Lender may require, and (b) periodically contact other Persons to verify the amounts then owing under other Collateral payment obligations, to determine whether such Persons have any setoff or counterclaims against the Collateral or any Grantor, and to inquire as to such other matters which the Lender may require.

4.18    Accounts and Lock Box. As required under the Credit Agreement, each Grantor agrees to (a) establish and maintain accounts with banks deemed acceptable to the Lender, for the deposit of Collections, and (b) instruct, in writing, all Persons responsible for making payments of amounts secured by Tax Liens or due to any Grantor to make all payments to an address selected by the Lender. After an Event of Default occurs, the Lender shall have the independent right, but not duty, to notify Persons responsible for making any such payments to make all payments to an address selected by the Lender. As required under the Credit Agreement and the other Transaction Documents, all payments received by any Grantor or the Custodian or any agent acting for any Grantor will be deposited, daily, into the accounts established with banks deemed acceptable to the Lender.

4.19    Amounts Collected by the Lender. The actual amount of the cash received by the Lender as a result of the exercise of its collection rights under this Security Agreement, less all reasonable costs and expenses of

7

the Lender including, without limitation, collection and legal expenses, storage, processing, transportation and sale expenses, shall be applied as a credit against the Indebtedness. If there is a surplus remaining after the Indebtedness is paid in full, the Lender shall remit such surplus to the Borrower or any other Grantor.

4.20    Right of Inspection and Information. Each Grantor will permit any officer, employee or agent of the Lender to visit and inspect any of the Collateral in accordance with the terms of the Credit Agreement.

4.21    Taxes. The Grantors will, except as otherwise allowed under the Credit Agreement, pay as and when due and payable all Taxes, levies, license fees, assessments, and other impositions levied on the Collateral or any part thereof before its use and operation.

4.22    Future Liens. No Grantor shall, without the prior written consent of the Lender grant any Lien that may affect the Collateral other than Permitted Liens or as set forth in the Credit Agreement, or any part or parts thereof, nor shall any Grantor permit or consent to any Lien attaching to or being filed against any of the Collateral in favor of anyone other than the Lender and the holders of Permitted Liens.

4.23    Notice of Liens. Grantors shall immediately notify the Lender in writing upon (a) the filing of any attachment, lien, judicial process, claim, or other Lien on such Grantor or any of the Collateral, or (b) the occurrence of any default, or event that, with the passage of time, the failure to cure or giving of notice, might result in a default under any of Grantor's obligations that may be secured by any Lien or that might result in a Lien affecting the Collateral, or should any of the Collateral be seized or attached or levied upon, or threatened by seizure or attachment or levy, by any person other than the Lender.

4.24    Further Assurances. On request of the Lender, each Grantor will promptly: (a) correct any defect, error or omission that may be discovered in the contents of this Security Agreement or any financing statement relating thereto or in the execution or acknowledgment of this Security Agreement or any financing statement; (b) execute, acknowledge, deliver and record such further instruments (including, without limitation, further security agreements, financing statements, continuation statements and assignments of accounts, contract rights, general intangibles and proceeds) and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Security Agreement and to more fully identify and subject to the Security Interest hereof any property intended to be covered hereby, including without limitation any renewals, additions, substitutions, replacements or accessions to the Collateral; (c) execute, acknowledge, deliver and record any document or instrument (including specifically any financing statement) necessary, desirable or proper to protect the Liens and Security Interests hereunder against the rights or interests of third persons, if any, that the signature of any Grantor thereon is required therefor, and (d) execute, deliver and file such real estate record filings as the Lender deems appropriate, to the extent, if any, that the signature of any Grantor thereon is required therefor. The Grantors shall pay all reasonable costs connected with any of the foregoing.

4.25    Collateral Indemnity. If the validity or priority of this Security Agreement or any rights, Security Interests or other interests created or evidenced hereby shall be challenged in writing or in legal proceedings, the Grantors will give prompt written notice thereof to the Lender and, at the reasonable cost and expense of the Grantors, will diligently endeavor to cure any defect that may be developed or claimed, and take all necessary and proper steps for the defense of such legal proceedings, and the Lender (whether or not named as a party to legal proceedings with respect thereto) is hereby authorized and empowered to take such additional steps as in its reasonable judgment and discretion may be necessary or proper for the defense of any such legal proceedings or the protection of the validity or priority of this Security Agreement and the rights, security interests and other interests created or evidenced hereby, and all reasonable expenses so incurred of every kind and character shall be paid promptly on demand and shall be a part of the Indebtedness.

4.26    Expenditures. Each Grantor recognizes and agrees that the Lender may incur certain expenses in connection with the exercise of Lender's rights under this Security Agreement. If not discharged or paid when due, the Lender may (but shall not be obligated to) discharge or pay any amounts required to be discharged or paid by any Grantor under this Security Agreement, including without limitation all Taxes (but only to the extent required to be paid under the terms the Credit Agreement), Liens and other claims, at any time levied or placed on the Collateral. The Lender also may (but shall not be obligated to) pay all costs for insuring, maintaining and

8

preserving the Collateral, including without limitation, the purchase of insurance protecting only the interests of the Lender in the Collateral. The Lender may further take such other action or actions and incur such additional expenditures as the Lender may deem to be necessary and proper to cure or rectify any actions or inactions on any Grantor's part as may be required under this Security Agreement. Nothing under this Security Agreement or otherwise shall obligate the Lender to take any such actions or to incur any such additional expenditures on any Grantor's behalf, or result in the Lender being in any way responsible or liable for any losses, damages, or injuries to the Collateral, to any Grantor, or to any other person or persons, resulting from the Lender forgoing such actions or incurring such additional expenses. The Lender's election to take any such actions or incur such additional expenditures shall not constitute a waiver or forbearance by the Lender of any Event of Default. All such expenditures incurred or paid by the Lender for such purposes will then bear interest at the default rate in the Note from the date incurred or paid to the date of repayment, become a part of the Indebtedness and, at the option of the Lender and be payable on demand. This Security Agreement also secures payment of any such amounts. Such rights shall be in addition to all other rights and remedies to which the Lender may be entitled under this Security Agreement upon the occurrence of an Event of Default.

4.27    Compliance with Applicable Laws. Each Grantor will observe and comply with all Applicable Law, Requirements of Law and State Registration Requirements as to the Collateral and otherwise; provided, however, that each Grantor shall have the right to contest alleged violations in good faith by appropriate proceedings diligently conducted if such contest will not have a material adverse effect on such Grantor, the business of such Grantor or any of the Collateral or the Security Interests.

4.28    Borrower Information. Each Grantor represents, warrants and agrees that: (a) it will receive or has received a direct or indirect material benefit from the transactions contemplated herein or arising out of the Indebtedness; (b) it has established adequate means of obtaining information from the Borrower on a continuing basis with regard to the financial condition of the Borrower; and (c) the Lender has not made any representations to any Grantor as to the creditworthiness of the Borrower. Each Grantor agrees to keep adequately informed of any facts, events or circumstances that might in any way affect any Grantor's risks with regard to the Indebtedness. Each Grantor further agrees that the Lender shall not have any obligation to disclose to any Grantor any information or material relating to any of the Indebtedness or the Borrower.

## ARTICLE V
## DEFAULT AND DEFAULT RIGHTS

5.1    Events of Default. Any Grantor's failure to observe or perform any covenant under this Security Agreement that continues unremedied for five (5) Business Days after the earlier of: (a) receipt by such Grantor of notice of such failure or such breach from the Lender; (b) or any Grantor's knowledge of such failure or breach; shall constitute an Event of Default under the Credit Agreement.

5.2    Effect of an Event of Default. Upon the occurrence of an Event of Default under the Credit Agreement, the Lender may exercise any and all rights and remedies otherwise available to it, including rights available hereunder and all of the rights and remedies of a secured party upon default under the UCC (such rights and remedies to be cumulative and nonexclusive), and, in addition, may take the following remedial actions:

(a)    Consistent with the rights and remedies of a secured party under the UCC (and except as otherwise required by the UCC), the Lender, upon the occurrence of an Event of Default, may also without notice except as specified below, solicit and accept bids for and sell the Collateral or any part of the Collateral in one (1) or more parcels at public or private sale, at any exchange, broker's board or at the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable, and the Lender shall apply the proceeds from the sale of the Collateral to any amounts payable by each Grantor with respect to the Indebtedness in accordance with the priorities required by the Transaction Documents. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) Business Days' notice to each Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by

119454360_1

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 9    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 311 of 688

announcement at the time and place fixed for such sale, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Every such sale shall operate to divest all right, title, interest, claim and demand whatsoever of each Grantor in and to the Collateral so sold, and shall be a perpetual bar, both at law and in equity, against each Grantor or any Person claiming the Collateral sold through each Grantor and their respective successors or assigns.

(i)    Upon the completion of any sale under Section 5.2(a), each Grantor will deliver or cause to be delivered all of the Collateral sold to the purchaser or purchasers at such sale on the date of sale, or within a reasonable time thereafter if it shall be impractical to make immediate delivery, but in any event full title and right of possession to such property shall pass to such purchaser or purchasers forthwith upon the completion of such sale. Nevertheless, if so requested by the Lender or by any purchaser, each Grantor shall confirm any such sale or transfer by executing and delivering to such purchaser all proper instruments of conveyance and transfer and release as may be designated in any such request.

(ii)    At any sale under Section 5.2(a), the Lender may bid for and purchase the property offered for sale and, upon compliance with the terms of sale, may hold, retain and dispose of such property without further accountability therefor. When purchasing property at a sale under Section 5.2(a), the Lender may set off the purchase price of such property against amounts owing to the Lender in payment of such purchase price up to the full amount owing to the Lender.

(b)    The Lender, instead of exercising the power of sale conferred upon it under Section 5.2(a), may proceed by a suit or suits at law or in equity to foreclose or enforce the Security Interests and sell the Collateral, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

(c)    The Lender may, in its sole discretion, commence an appropriate action or actions against each Grantor seeking specific performance of any covenant contained herein, or in aid of the execution or enforcement of any power herein granted.

(d)    The Lender may exercise at the Grantors' sole expense any and all rights and remedies of the Grantors under or in connection with the Collateral.

(e)    The Lender shall have and may exercise any or all other rights and remedies available at law, in equity, or otherwise.

(f)    Following the occurrence of any Event of Default, the Lender may exercise any rights and all under the Lender POA.

(g)    The Lender shall have the right to appoint a receiver for one or more the Grantors and with respect to which (i) the receiver may be an employee of the Lender and may serve without bond, and (ii) all fees of the receiver and the receiver's professionals shall become part of the Indebtedness secured by this Security Agreement and be payable on demand, with interest at the default rate in the Notes (not to exceed the highest rate allowed by Applicable Law) from the date incurred or paid to the date of repayment.

(h)    The Lender shall not be required to marshal any present or future collateral security (including but not limited to this Security Agreement and the Collateral) for, or other assurances of payment of, any of the Indebtedness or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, each Grantor hereby agrees that each Grantor will not invoke any law relating to the marshaling of collateral that might cause delay in or impede the enforcement of the rights of the Lender under this Security Agreement or under any other instrument creating or evidencing any of the Indebtedness or under which any of the Indebtedness is outstanding or by which any of the Indebtedness is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

(i)    Beyond the exercise of reasonable care in the custody thereof, the Lender shall have no

10

duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon. The Lender shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and shall not be liable or responsible for any loss or damage to any of the Collateral, except for gross negligence or willful misconduct of the Lender, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Lender in good faith.

(j) At any time or times, in order to comply with Applicable Law, the Lender may appoint a bank or trust company or one or more other Persons with such power and authority as may be necessary for the effectual operation of the provisions hereof as may be specified in the instrument of appointment.

5.3    Cumulative Remedies.  All of the rights and remedies of the Lender, whether evidenced by this Security Agreement, the other Transaction Documents or any other writing, are cumulative and may be exercised singularly or concurrently.  Election by the Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of any Grantor under this Security Agreement, after failure to perform, shall not affect the right of the Lender to declare a default and exercise remedies available to the Lender under this Security Agreement.  Nothing under this Security Agreement or otherwise shall be construed so as to limit or restrict the rights and remedies available to the Lender under this Security Agreement following an Event of Default, or in any way to limit or restrict the rights and ability of the Lender to proceed directly against any Grantor or to proceed against any other collateral directly or indirectly securing the Indebtedness.  Nothing under this Security Agreement or otherwise shall be construed so as to require the Lender to proceed against or resort to any collateral directly or indirectly securing the Indebtedness at any time.

5.4    Waivers.

(a) Each Grantor hereby waives (i) demand, presentment for payment, protest, notice of protest, notice of nonpayment, notice of acceleration and notice of intent to accelerate under all of the Indebtedness secured by this Security Agreement, and (ii) all pleas of division and discussion, and all similar rights with regard to the Indebtedness.

(b) Each Grantor hereby agrees that:  (i) it shall remain liable, together with each Grantor and any and all guarantors of the Indebtedness, on a "solidary" or "joint and several" basis; (ii) the discharge or release of any party who is, may, or will be liable to the Lender under any of the Indebtedness, or the release of the Collateral or any other collateral directly or indirectly securing repayment of the same, shall not have the effect of releasing or otherwise diminishing or reducing the actual or potential liability of any Grantor or any other party or parties guaranteeing payment of the Indebtedness, who shall remain liable to the Lender, and remain liable to the Lender, or of releasing any Collateral or other collateral that is not expressly released by the Lender; and (iii) the acceptance of payments by the Lender other than in accordance with the terms of the Transaction Documents, or the subsequent agreement of the Lender to extend or modify such repayment terms, shall likewise not have the effect of releasing any Grantor or any other party or parties guaranteeing payment of the Indebtedness, from their respective obligations to the Lender under this Security Agreement and to the Lender under the Indebtedness, or of releasing any of the Collateral or other collateral directly or indirectly securing repayment of the Indebtedness.

(c) Neither the course of dealing between any Grantor and the Lender nor the Lender's failure or delay to exercise any, or partial exercise of, its rights and remedies under this Security Agreement or any other Transaction Document shall have the effect of waiving any of the Lender's rights and remedies, it being each Grantor's intent and agreement that the rights and remedies of the Lender shall be cumulative in nature.

(d) Each Grantor further agrees that, upon the occurrence of any Event of Default, any waiver or forbearance on the part of the Lender to pursue the rights and remedies available to the Lender under this Security Agreement shall be binding upon the Lender only to the extent that the Lender specifically agrees to any such waiver or forbearance in writing.  A waiver or forbearance as to one Event of Default shall not constitute a waiver or forbearance as to any other Event of Default.  None of the warranties, conditions, provisions and terms contained in this Security Agreement or any other Related Document, shall be deemed to have been waived by any act or knowledge of the Lender or the agents, officers or employees of the Lender; but only by an instrument in

11

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM

NYSCEF DOC. NO. 9

INDEX NO. 158207/2022

RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 313 of 688

writing specifying such waiver, signed by a duly authorized officer of the Lender and delivered to the Grantors.

## ARTICLE VI
## MISCELLANEOUS PROVISIONS

6.1    Notices.    Any notice or demand that, by provision of this Security Agreement, is required or permitted to be given or served must be in writing and shall be deemed to have been sufficiently given and served for all purposes (if mailed) three (3) days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one (1) Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses are given in writing) as follows:

> EBURY 2 EMI LLC
> EB 2EMIALA LLC
> EB 2EMI FL, LLC
> EB 2EMIIN, LLC
> EB 2EMIMD, LLC
> EB 2EMI NJ LLC
> EB 2EMINY, LLC
> EB 2EMISC LLC
> RE 2EMI LLC
> 56 Locust Avenue, 2nd Floor
> Rye, New York 10580
> Attention: John Hanratty

> EMIGRANT BUSINESS CREDIT CORPORATION
> 6 East 43rd Street, 20th Floor
> New York, New York 10017
> Attention: Karen Wold

6.2    Amendment.    Neither this Security Agreement nor any provisions thereof may be changed, waived, discharged or terminated orally or in any manner other than by an instrument in writing signed by the Lender and the Grantors.

6.3    Governing Law; Consent to Jurisdiction.    This Security Agreement and any claim with respect thereto shall be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provision (other than §§ 5-1401 and 5-1402 of the New York General Obligation Law)).  The Lender and each Grantor (a) agrees to the jurisdiction of the courts of the state of New York located in the borough of Manhattan and the federal courts located within the state of New York in the borough of Manhattan, and (b) waives any objection based on *forum non conveniens*, and any objection of venue of any action initiated hereunder in any of the aforementioned courts and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

6.4    Waivers.

(a)    To the extent permitted under Applicable Law, each Grantor hereby knowingly, voluntarily and intentionally waives any right to assert a counterclaim, other than a compulsory counter claim in any action or proceeding brought against it by the Lender or any Indemnified Person.

(b)    **To the extent permitted under Applicable Law, the Lender and each Grantor hereby knowingly, voluntarily and intentionally waives any right to have a jury participate in resolving any dispute between them, whether sounding in tort, contract or otherwise, connected with, arising out of or in any way related or pertaining to this Security Agreement, any other Transaction Document, the Collateral or any dealings, course of conduct between them or actions or statements of either Party.  It is agreed and understood that this waiver constitutes a waiver of trial by jury of all claims against all parties to such**

12

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 9
RECEIVED NYSCEF: 10/17/2022
24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 314 of 688

actions or proceedings, including claims against parties who are not parties to this Security Agreement. The Lender and each Grantor hereby represents that no representations of fact or opinion have been made by them to induce this waiver of trial by jury or to in any way modify or nullify its effect.

(c)     To the extent permitted under Applicable Law, each Grantor hereby knowingly, voluntarily and intentionally waives any right to claim or recover in any litigation whatsoever involving the Lender, any Grantor or an Indemnified Person, any special, exemplary, punitive, indirect, incidental or consequential damages of any kind or nature whatsoever or any damages other than, or in addition to, actual damages, whether such waived damages are based on contract, statute, tort or common law or any other legal theory.

(d)     Each Grantor certifies that no representative, agent or attorney of the Lender or an Indemnified Person has represented, expressly or otherwise, that the Lender or an Indemnified Person would not seek to enforce any of the waivers in this Section in the event of litigation or other circumstances.

(e)     The Lender and each Grantor further represents that they have been represented in the signing of this Security Agreement and the making of these waivers by independent legal counsel, selected of its own free will, and had the opportunity to discuss these waivers with counsel.

(f)     The provisions of this Section 6.4 shall survive termination of this Security Agreement and the payment in full of the Indebtedness.

6.5     Costs and Expenses. Each Grantor agrees to pay, upon demand, all of the reasonable out-of-pocket expenses of the Lender in connection with (a) the preparation and execution of this Security Agreement and the Transaction Documents, including reasonable attorneys' fees; (b) amendments, consents, waivers, and terminations made or requested in connection this Security Agreement and the other Transaction Documents; and (c) the enforcement, protection, defense and collection of this Security Agreement and the other Transaction Documents. If an Event of Default occurs, the Lender may pay someone else to help collect the Indebtedness and to enforce this Security Agreement, and the Grantors will, subject to any limits under Applicable Law, pay the Lender all of the Lender's reasonable attorneys' fees, court costs and legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees related to bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.

6.6     Cumulative Rights. The rights and remedies of the Lender under this Security Agreement and the other Transaction Documents shall be cumulative, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

6.7     Other Provisions.

(a)     Caption headings of the Articles of this Security Agreement are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Security Agreement, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

(b)     This Security Agreement embodies the final, entire agreement of the parties hereto and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. There are no oral agreements between the parties to this Security Agreement.

(c)     If any provision of this Security Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable. This Security Agreement shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Security Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. In lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Security Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible

13

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 315 of 688

and legal, valid and enforceable.

6.8      Sole Discretion. Unless otherwise specifically provided in this Security Agreement, whenever the consent or approval of the Lender is required under this Security Agreement, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of the Lender, and the decision of the Lender shall be final and conclusive.

6.9      Successors and Assigns.

(a)      All covenants and agreements made by or on behalf of each Grantor in this Security Agreement shall bind its successors and assigns and shall inure to the benefit of the Lender and its respective successors and assigns.

(b)      This Security Agreement is for the benefit of the Lender and for such other Person or Persons as may from time to time become or be the holders of any of the Indebtedness, and this Security Agreement shall be transferable and negotiable, with the same force and effect and to the same extent as the Indebtedness may be transferable, it being understood that, upon the transfer or assignment by the Lender of any of the Indebtedness, the legal holder of such Indebtedness shall have all of the rights granted to the Lender under this Security Agreement.

(c)      Each Grantor hereby recognizes and agrees that the Lender may assign all or any portion of the Indebtedness to one or more third party creditors. Such transfers may include, but are not limited to, sales of participation interests in the Indebtedness. Each Grantor specifically agrees and consents, subject to the terms of the Credit Agreement, to all such transfers and assignments and further waives any subsequent notice of such transfers or assignments as may be provided under applicable law. Each Grantor further agrees that once the Lender transfers all of its interests in the Indebtedness the Lender will be fully released from any and all of obligations and responsibilities to each Grantor under this Security Agreement.

6.10      Termination. Upon the full payment of the Indebtedness, the full satisfaction of all other obligations to the Lender (including contingent obligations) and the occurrence of the Termination Date, this Security Agreement shall terminate. After termination of this Security Agreement, upon request of any Grantor, the Lender shall authorize the filing, at the expense of such Grantor, of termination statements for financing statements naming such Grantor as debtor and the Lender as a secured party and return any certificates evidencing the Collateral in its possession to such Grantor.

6.11      Counterparts. This Security Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Security Agreement electronically or by facsimile transmission shall be effective as delivery of a manually executed counterpart.

[SIGNATURE PAGES TO FOLLOW]

14

EACH GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS SECURITY AGREEMENT IS DATED AS OF THE DATE STATED ABOVE.

**GRANTORS:**

EBURY 2 EMI LLC
    By: EBURY STREET CAPITAL, LLC, Manager

        By: _____
        John Hanratty, Manager

EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMI NJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC
    By: EBURY 2 EMI LLC, Sole Member
        By:   EBURY STREET CAPITAL, LLC, Manager

        By: _____
        John Hanratty, Manager

119454360_1

# EXHIBIT E

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 10    24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State    RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 318 of 688

# TABLE OF CONTENTS

Ebury 1EMI LLC

    Custodial Agreement ........................................................................................ 3

Ebury 2EMI LLC

    Custodial Agreement ...................................................................................... 14

Servicing Agreement ............................................................................................ 25

    Addendum to Servicing Agreement.............................................................. 71

## CUSTODIAL AGREEMENT
(EBURY 1EMI LLC)

**THIS CUSTODIAL AGREEMENT** is entered into as of _____, 2017 by Grantors, Custodian and Lender. Lender has extended a line of credit to Borrower pursuant to the Credit Agreement secured, *inter alia*, by assets of Grantors in which Grantors have granted Lender a security interest, which are being held and administered by Custodian for Grantors pursuant to a separate Servicing Agreement. Grantors have agreed to put in place Collateral control measures with Custodian acceptable to Lender to protect the interests of Lender in, and control over, the Collateral, and Grantors and Custodian have agreed to enter into this Agreement to provide the Collateral protection and control required by Lender. Capitalized terms used in this paragraph are defined below.

**NOW, THEREFORE,** for good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
DEFINITIONS

Section 1.1    Certain Definitions. As used in this Agreement, the following terms shall have the meanings indicated, unless the context otherwise requires:

"*Acquisition Date*" means any date upon which any Grantor acquires a Tax Lien that secures the Indebtedness.

"*Agreement*" means this Custodial Agreement, as this Custodial Agreement may be amended or modified from time to time.

"*Borrower*" means EBURY 1EMI LLC, a New York limited liability company.

"*Business Day*" means a day other than a Saturday, Sunday or legal holiday for commercial banks in New York, New York.

"*Claim*" has the meaning set forth in Section 4.5.

"*Collateral*" has the meaning set forth in Section 2.1.

"*Credit*" means and includes funds or other credit extended by Lender to Borrower or any Grantor for the purpose of acquiring Tax Liens.

"*Credit Agreement*" means and includes, the Credit Agreement entered into between and among Grantors and Lender dated as of March 9, 2017, any amendments and supplements to thereto, and any replacement credit agreements entered into by any Grantor with Lender.

"*Credit Default*" means and includes an Event of Default as defined in the Credit Agreement.

"*Custodian*" means MTAG SERVICES, LLC, a Virginia limited liability company, or any other Person selected by Borrower and approved by Lender in its reasonable discretion.

"*Deposit Account*" has the meaning set forth in Section 2.7.

"*Grantor*" means and includes Borrower, EB 1EMIALA LLC, an Alabama limited liability company, EB 1EMIFL, LLC, a Florida limited liability company, EB 1EMIIN, LLC, an Indiana limited liability company, EB 1EMIMD, LLC, a Maryland limited liability company, EB 1EMINJ LLC, a New Jersey limited liability company and EB 1EMINY, LLC, a New York limited liability company, EB 1EMISC LLC, a South Carolina limited liability company, RE 1EMI LLC, a New York limited liability company, and EB 1EMIDC LLC, a District of Columbia limited liability company, and all other Persons that may

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO. 10                                                        RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State.
Court Records    Pg 320 of 688

become a party to this Agreement as a Grantor by any modification, amendment, supplement or joinder to this Agreement.

"*Indebtedness*" has the meaning set forth in the Security Agreement.

"*Lender*" means EMIGRANT BUSINESS CREDIT CORPORATION, a Delaware corporation, its successors and assigns.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other form of entity.

"*Related Documents*" means and includes individually, collectively, interchangeably and without limitation, the Credit Agreement and all written promissory notes, credit agreements, and loan agreements, and all environmental agreements, guaranties, security agreements, mortgages, collateral mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

"*Security Agreement*" means and includes, the Security Agreement (All Assets - EBURY 1EMI LLC AND SPEs) entered into between and among Grantors and Lender dated as of March 9, 2017, any amendments and supplements to thereto, and any subsequent security agreements entered into by any Grantor with Lender, directly or indirectly securing the repayment of the Indebtedness, whether created by law, contract, or otherwise.

"*Security Interests*" means and includes the security interests in, and pledges and assignments of, the Collateral granted under the Security Agreement securing the Indebtedness and all liens created thereby.

"*Servicing Agreement*" means each separate agreement (excluding this Agreement) between Custodian and any Grantor (or any other subsidiary or affiliate of any Grantor) by which Custodian has agreed to service Tax Certificates.

"*Subsequent Tax Lien*" means, with respect to a Tax Lien acquired by a Grantor, a Tax Lien secured by the same property that secures an existing Grantor's Tax Lien and that is sold on or after the date the Grantor's existing Tax Lien was sold by the taxing authority.

"*Tax Certificate*" means the certificate or other evidence of purchase or payment (whether in paper or electronic form) that evidences the sale or transfer of a Tax Lien pursuant to applicable state laws and regulations.

"*Tax Debtor*" means individually, collectively and interchangeably each Person who has an ownership interest in property that secures a Tax Lien and any other Person that may be obligated to pay a Tax Lien.

"*Tax Lien*" means the lien or other rights imposed upon real (immovable) property by a taxing authority to secure the payment of taxes, water or sewer charges, assessments and other charges due and owing with respect to such real (immovable) property, including, without limitation, the right to collect, receive and otherwise administer the collection of payments associated with such lien or other rights, including any Subsequent Tax Liens.

"*Tax Lien Documents*" means and includes, with respect to any Tax Lien, all documents prepared, executed or filed in connection with a Tax Lien, including, without limitation, the Tax Certificate and all documents or instruments evidencing, governing, securing, guaranteeing or otherwise pertaining to such Tax Lien and any other instruments that would be required to be presented to the applicable taxing authority as a condition of receiving a redemption payment, as the same may be modified, amended, renewed, extended, rearranged, restated or replaced from time to time.

2

"*UCC*" means the Uniform Commercial Code as adopted in the applicable jurisdiction or jurisdictions.

Section 1.2    Other Terms. Capitalized terms not otherwise defined in this Agreement shall have the meanings defined in the Credit Agreement or the other documents executed in connection therewith.

Section 1.3    Money. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

## ARTICLE II
## SECURITY INTERESTS AND ACTIONS WITH RESPECT TO THE COLLATERAL

Section 2.1    Security Interests and Collateral. Each Grantor hereby represents and warrants that it has the power and authority to grant, and has granted, Security Interests to Lender in and to its assets, including, without limitation, the following (the "Collateral"):

> All present and future Tax Liens, Tax Certificates of each Grantor and proceeds thereof, together with all related accounts, chattel paper (whether tangible or electronic), instruments (including promissory notes), inventory, documents, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and general intangibles (including payment intangibles), and all related account ledgers, books, records, files, computer disks and software and all rights thereto, account ledgers, books, records, files, computer disks and software and other rights.

The description of the Collateral in this Agreement shall not limit or otherwise affect the Security Interests granted to Lender in any Security Agreement.

Section 2.2    Appointment; Name Registration.

(a)    Each Grantor hereby appoints the Custodian as custodian of the Tax Liens, the Tax Certificates and the Tax Lien Documents pursuant to the terms of this Custodial Agreement.

(b)    The Custodian hereby agrees to (i) accept such appointment, and (ii) the Tax Liens, the Tax Certificates and the Tax Lien Documents delivered to it, and to hold, release and transfer all of the same, pursuant to the terms of this Custodian Agreement.

(c)    As long as this Agreement remain in effect, each Grantor shall register, and hereby instructs Custodian to register, all Tax Liens acquired by or for any Grantor in the following designated name (or a substantially similar name):

> MTAG SERVICES as custodian for [a Grantor (other than Borrower)]

Grantors, Custodian and Lender acknowledge that substantially similar names may include typographical errors, abbreviations and compressions of the designated name and other deviations provided that the substantially similar name is sufficient to allow Custodian to identify the Tax Lien as being subject to this Agreement.

(d)    There shall be, and hereby is, established by each Grantor (other than the Borrower) with the Custodian a non-interest bearing account that will be designated the EBURY 1EMI CUSTODIAL ACCOUNT (the "Custodial Account") and into which the Tax Liens, the Tax Certificates and the other Tax Lien Documents shall be held and that will be governed by and subject to this Custodial Agreement.

Section 2.3    Initial Acquisition Information. Within five (5) Business Days of each Acquisition Date, Grantors shall deliver or cause to be delivered to Custodian and Lender a copy (in tangible or electronic form) of any receipt, document, notice, form or other item evidencing ownership of each Tax Lien, with all material information concerning the purchase of such Tax Lien and information about the property securing the Tax Lien and each Tax

3

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 10
24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State.
RECEIVED NYSCEF: 10/17/2022
Court Records   Pg 322 of 688

Debtor, including, without limitation (a) the date the Tax Lien was sold by the taxing authority, (b) the price paid to the taxing authority to purchase the Tax Lien, (c) the interest rate with respect to the Tax Lien, (d) the tax block and lot number, or other identifying number used by the taxing authority, of the parcel securing the Tax Lien, (e) the electronic file containing the tax lien acquisition information in a format reasonably acceptable to Custodian, and (f) such other information as may be reasonably requested by Custodian or Lender.

Section 2.4   Subsequent Information. Within five (5) Business Days of receipt of such Tax Lien information, Custodian will upload the information to its online information system and Custodian will provide Grantors and Lender with unlimited online access to such Tax Lien information. Within five (5) Business Days of adding this information to its online information system, Custodian shall export and deliver to Grantors and Lender, via email, information to reflecting and confirming the respective added Tax Liens in an excel spreadsheet format (or other format acceptable to all parties). Custodian shall enter additional information concerning any Tax Lien received by Custodian into its online information system within ten (10) Business Days following receipt of the applicable Tax Certificate, provided such information, to the extent provided by Grantors or otherwise obtained by Custodian, is in a format acceptable to Custodian. The information entered shall include, but not be limited to, the date such Tax Certificate was sold by the applicable taxing authority and such other information which may be reasonably requested by Lender, provided there is a field for such additional information in Custodian's online information system and available to Custodian. Custodian shall thereafter compare the information shown on each Tax Certificate with the information furnished by Grantors or otherwise obtained by Custodian with respect to such Tax Certificate and, if the information set forth in the Tax Certificate is different from the information previously provided to Custodian, Custodian shall promptly notify Grantors and Lender of any material discrepancies, and Grantors shall correct the respective Tax Lien information.

Section 2.5   Tax Lien Possession. Custodian shall receive and hold (a) Tax Certificates issued for Tax Liens acquired by or for Grantors in its vaults (to the extent in tangible form), or (b) with respect to Tax Liens in non-certificated form, with the issuer thereof. Custodian shall hold such Tax Certificates until directed otherwise in writing by the Borrower or, following a Credit Default, Lender. Custodian shall provide Grantors and Lender with online access to copies of any and all notices or other documents received regarding any Tax Lien, promptly upon receipt and in any case no later than five (5) Business Days after receipt.

Section 2.6   Redemption Notices. Upon receipt of any written redemption notice relating to any Tax Lien, Custodian shall notify Grantors and Lender of the redemption notice. Upon approval from Grantors or, after a Credit Default, Lender that such payment is correct, Custodian shall mail the original Tax Certificate to the applicable taxing authority or, if such redemption payment is not correct or if no redemption payment is specified, it shall await further instructions from Grantors (or, following Custodian's receipt of notice of the occurrence and continuance of any Credit Default, Lender). If no further instructions are received within five (5) Business Days, Custodian will remove the redemption notice from its online information system.

Section 2.7   Redemption Payments. Custodian shall cause each redemption payment to be deposited into an account designated by Lender (the "Deposit Account") within five (5) Business Days after receipt. Lender shall have the right to change the Deposit Account by giving notice to Custodian and Grantors. If any action shall be required in connection with collection of such redemption payment, Custodian shall notify Grantors and Lender of such requirement and shall follow instructions of Lender in connection therewith. Custodian shall have no obligation to determine the sufficiency of the redemption payment or the redemptive value of the Tax Lien, however, for payments received valued less than the computerized calculation of the anticipated redemptive value notice shall be sent to Grantors for instructions on processing.

Section 2.8   Redemption Information. Custodian shall enter all information received concerning each redemption payment into its online information system, including, without limitation: (a) the date of receipt of the redemption notice given by the applicable Governmental Authority, (b) after receipt thereof, the amount of the redemption payment, and (c) the date such redemption payment check was deposited in the Deposit Account.

Section 2.9   Redeemed Tax Certificates. Custodian shall use commercially reasonable efforts to send redeemed Tax Certificates to the appropriate taxing authority in bulk on a periodic basis, so as to minimize Grantors' expense

119834128_2
Custodial Agreement I

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 323 of 688

relating to the delivery of redeemed Tax Certificates. At any Grantor's request, Custodian shall deliver redeemed Tax Certificates in bulk to Grantors for further delivery by Grantors to the appropriate taxing authority. In the event that redeemed Tax Certificates are sent by Custodian to Grantors at any Grantor's instruction, and such redeemed Tax Certificates are not received by Grantor for any reason whatsoever, or are never subsequently received by the appropriate taxing authority from Grantors for any reason whatsoever, Custodian shall not be responsible for seeking, nor shall it be liable for the cost associated with, the issuance of an affidavit of non-receipt or lost certificate affidavit from the taxing authority.

Section 2.10   Collection of Other Payments. Irrespective of the occurrence of a Credit Default, Custodian shall be entitled to receive, in addition to redemptions, all other payments from all sources now or hereafter due on, under or in respect to each Tax Lien and Grantors shall take all actions necessary to enable Custodian to receive all such payments. If at any time Custodian or any Grantor shall receive any payment on, or in respect of, any Tax Lien (in addition to redemptions), Custodian and Grantors shall cause each such payment to be deposited in the Deposit Account and Custodian shall reflect the amount of such payment in its online information system. Each Grantor hereby irrevocably designates Custodian as its agent and attorney-in-fact with full power to endorse and deliver such payment in the name and on its behalf for deposit in the Deposit Account.

Section 2.11   Servicing Agreement. So long as no Credit Default has occurred, Custodian is authorized to sign on behalf of Lender to release Tax Documents via execution of release/assignment documents or endorsements as is necessary and proper to manage Tax Liens in accordance with the applicable Servicing Agreement. Upon any notice of a Credit Default to Custodian from Lender or any Grantor, Custodian shall obtain Lender's prior written consent to Custodian's execution of any such release or obtain Lender's signature upon any such release.

## ARTICLE III
## REPRESENTATIONS AND COVENANTS

Custodian hereby represents and warrants, acknowledges and agrees, as follows:

Section 3.1   Lender Instructions. At all times during the term of this Agreement following Custodian's receipt of notice of the occurrence and continuance of any Credit Default, Custodian will comply with all orders and instructions originated by Lender in respect of the Collateral.

Section 3.2   Other Security Interests. As of the date hereof, Custodian has no knowledge of and has received no notice of any other security interest in respect of the Collateral (except for the interest of Lender granted in the Security Agreement) and it will advise Lender in writing promptly following obtaining any knowledge of or receipt of notice of any such other security interest. Additionally, Custodian shall not obtain a lien on any of the Collateral for its own benefit.

Section 3.3   Collateral Releases. Except as otherwise required or permitted by this Agreement (including, without limitation, sending redeemed Tax Certificates to the appropriate taxing authority in accordance with Section 2.9), Custodian shall not enter into, agree to enter into or comply with any release, transfer, payment, or redemption instruction, or any other order or instruction, in each case concerning any of the Collateral, from any Person other than Lender.

Section 3.4   Fees and Expenses of Custodian. Custodian shall notify Grantors of all fees, expenses and charges of Custodian arising out of Custodian's performance of its duties and obligations under this Agreement, and Grantors agree to pay all such fees, expenses and charges promptly or, if already paid by Custodian, Grantors shall promptly reimburse Custodian therefor. The foregoing notwithstanding, Grantors and Lender acknowledge and agree that Custodian has no obligation to advance funds to pay others for fees or expenses (including recording fees) and that payments to others by Custodian are expected to be paid only from advanced (or otherwise made available to Custodian) by Grantors, Lender or some other Person (not Custodian).

Section 3.5   Removal or Resignation of Custodian. Grantors, with the written approval of Lender (exercising reasonable discretion), may at any time, effective upon sixty (60) days' written notice to Custodian, remove and replace the Person serving as Custodian under this Agreement. At any time a Credit Default exists, Lender may

119834128_2
Custodial Agreement 1

remove and replace the Person serving as Custodian under this Agreement. Custodian may, at any time, effective upon ninety (90) days' written notice to Grantors and Lender, resign and terminate its agreement to act as Custodian hereunder. Removal or resignation of a Custodian under this Agreement shall constitute a termination of each Servicing Agreement between the Custodian and Grantors (or any one or more of them) to the extent it affects the Collateral. Prior to the effective date of such removal or resignation, Custodian shall deliver the Collateral then held by it, to a replacement Custodian selected by Grantors and approved by Lender (exercising reasonable discretion) or, after the occurrence and continuance of any Credit Default, a replacement Custodian selected by Lender (which be Lender). Notwithstanding any such removal, resignation or replacement, a Custodian shall continue to hold the Collateral for the benefit of Grantors and Lender and shall continue to be bound by its obligations and duties under this Agreement until all of the Collateral held by Custodian has been delivered by the Custodian to the replacement Custodian as provided herein.

Section 3.6    Inspection. Custodian agrees that Lender and its agents, accountants, attorneys and auditors will be permitted during normal business hours at any time and from time to time upon reasonable notice to Custodian (provided no notice shall be required following the occurrence of a Credit Default) to examine the files, documents, records and other papers in the possession or under the control of Custodian relating to any or all of the Collateral and to make copies thereof.

## ARTICLE IV
### MISCELLANEOUS

Section 4.1    Remedies Cumulative; Waiver. The rights, powers and remedies of Custodian, Grantor and Lender under this Agreement shall be in addition to all rights, powers and remedies given to Custodian, Grantors and Lender by virtue of any statute or rule of law, the Credit Agreement or any other agreement, all of which rights, powers and remedies shall be cumulative and may be exercised from time to time. No failure on the part of Custodian, Grantors, or Lender to exercise, and no delay in exercising, any right, power or remedy shall operate as a waiver thereof nor shall any single or partial exercise by Custodian, Grantors or Lender of any right, power or remedy preclude any other or future exercise of thereof or the exercise of any other right, power or remedy.

Section 4.2    Binding Upon Successors. All rights of Custodian, Grantors and Lender under this Agreement shall inure to the benefit of Custodian and Lender and their respective successors and assigns.

Section 4.3    Entire Agreement; Severability. This Agreement contains the entire custodial agreement between Custodian and Lender with respect to the Collateral. If any of the provisions of this Agreement shall be held invalid or unenforceable, this Agreement shall be construed as if not containing such provisions, and the rights and obligations of the parties hereto shall be construed and enforced accordingly.

Section 4.4    Choice of Law. This Agreement shall be governed and construed in accordance with the substantive laws of the State of New York (without regard to any principles of law that would require the application of the laws of another state).

Section 4.5    Claims Resolution. This Section concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to this Agreement (including any renewals, extensions or modifications) (each, a "Claim"). For the purposes of this provision only, the term "parties" shall include any respective parent corporation, subsidiary or affiliate of any Grantor, Custodian or Lender involved in the servicing, management or administration of any obligation described or evidenced by this Agreement.

(a)    At the request of any party to this Agreement, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, U.S. Code) (the "Act"). The Act will apply even though this Agreement provides that it is governed by the law of a specified state. The arbitration will take place on an individual basis without resort to any form of class action.

(b)    Arbitration proceedings will be determined in accordance with the Act, the then-current rules and procedures for the arbitration of financial services disputes of the American Arbitration Association or any

successor thereof ("AAA"), and the terms of this paragraph. In the event of any inconsistency, the terms of this paragraph shall control. If AAA is unwilling or unable to (i) serve as the provider of arbitration or (ii) enforce any provision of this arbitration clause. Lender may designate another arbitration organization with similar procedures to serve as the provider of arbitration.

(c)     The arbitration shall be administered by AAA and conducted, unless otherwise required by law, in any U.S. state where real or tangible personal property collateral for this credit is located or if there is no such collateral, in the state specified in the governing law section of this Agreement. All Claims shall be determined by one arbitrator; however, if Claims exceed Five Million Dollars ($5,000,000.00), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed, judgment entered and enforced.

(d)     The arbitrator(s) will give effect to statutes of limitation in determining any Claim and may dismiss the arbitration on the basis that the Claim is barred. For purposes of the application of the statute of limitations, the service on AAA under applicable AAA rules of a notice of Claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s). The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this Agreement.

(e)     This Section does not limit the right of any party to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(f)     The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of the Claim to arbitration.

(g)     By agreeing to binding arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim. Furthermore, without intending in any way to limit this Agreement to arbitrate, to the extent any Claim is not arbitrated, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim. This provision is a material inducement for the parties entering into this Agreement.

Section 4.6     Amendment. Neither this Agreement nor any provision hereof may be changed, waived, discharged, modified or terminated except pursuant to a written instrument signed by Grantors, Custodian and Lender (except as otherwise provided in this Agreement).

Section 4.7     Notices. Any notice or demand which, by provision of this Agreement, is required or permitted to be given or served to or on Grantors shall be deemed to have been sufficiently given and served for all purposes (if mailed) three (3) Business Days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses is given in writing by Grantors to Custodian and Lender) as follows:

> EBURY IEMI LLC
> EB IEMIALA LLC
> EB IEMI FL, LLC
> EB IEMIIN, LLC

EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
16 School Street, Suite 100
Rye, NY 10580
Attention: John Hanratty

Any notice or demand which, by provision of this Agreement, is required or permitted to be given or served to or on Custodian shall be deemed to have been sufficiently given and served for all purposes (if mailed) three (3) Business Days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses is given in writing by Custodian to Grantors and Lender) as follows:

MTAG SERVICES, LLC
111 Coleman Blvd., Suite 400
Mount Pleasant, SC 29464.
Attention: James P. Meeks, President and CEO

Any notice or demand which, by any provision of this Agreement, is required or permitted to be given or served by to or on Lender shall be deemed to have been sufficiently given and served for all purposes (if mailed) three (3) Business Days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses are given in writing by Lender to Grantor and Custodian) as follows:

EMIGRANT BUSINESS CREDIT CORPORATION
6 East 43rd Street, 20th Floor
New York, New York 10017
Attention: Karen Wold
Email: woldi@emigrant.com

Section 4.8     Counterparts. This Agreement may be executed in two or more counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. Any signature page to this Agreement may be witnessed by a telecopy or other facsimile of any original signature page or any counterpart hereof may be appended to any other counterpart hereof to form a completely executed counterpart hereof.

Section 4.9     Indemnity – Grantors. Grantors agree to indemnify and hold Custodian harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly (a) out of this Agreement or any document required hereunder, (b) by reason of actions taken by Custodian in accordance with instructions given Lender regarding the Collateral, and (c) from any litigation or proceeding related to or arising out of this Agreement. This indemnity includes, but is not limited to, reasonable attorneys' fees actually incurred by Custodian. This indemnity will survive repayment of the Indebtedness and the termination of this Agreement.

Section 4.10     Lender Expenses. All advances, charges, costs and expenses, including reasonable attorneys' fees, incurred or paid Lender in exercising any right, power or remedy conferred by this Agreement or in the enforcement thereof, including, without limitation, reimbursing Lender should it choose, in its sole discretion, to pay any fees, costs and/or expenses owing by any Grantor hereunder, shall become a part of the Indebtedness and

8

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM                    INDEX NO. 158207/2022

NYSCEF DOC. NO. 10    24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23    Doc #2 State.
                                    Court Records    Pg 327 of 688          RECEIVED NYSCEF: 10/17/2022

shall be paid to Lender by Grantor immediately and without demand, with interest thereon at an annual rate equal to the highest rate of interest of any of the Indebtedness.

[SIGNATURES ON FOLLOWING PAGE]

119834128_2
Custodial Agreement |

IN WITNESS WHEREOF, THE UNDERSIGNED HAVE CAUSED THEIR DULY AUTHORIZED
REPRESENTATIVES TO EXECUTE THIS AGREEMENT, AS OF THE DATE STATED ABOVE.

GRANTORS:

EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

SPEs:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

CUSTODIAN:

MTAG SERVICES, LLC

By: _____
James P. Meeks, Manager

LENDER:

EMIGRANT BUSINESS CREDIT CORPORATION

By: _____ (SEAL)
Karen Wold, Managing Director

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 10    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 329 of 688

IN WITNESS WHEREOF, THE UNDERSIGNED HAVE CAUSED THEIR DULY AUTHORIZED REPRESENTATIVES TO EXECUTE THIS AGREEMENT, AS OF THE DATE STATED ABOVE.

**GRANTORS**:

EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

**SPEs**:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

**CUSTODIAN**:

MTAG SERVICES, LLC

By: _____
James P. Meeks, Manager

**LENDER**:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____ (SEAL)
Karen Wold, Managing Director

## CUSTODIAL AGREEMENT
(EBURY 2EMI LLC)

**THIS CUSTODIAL AGREEMENT** is entered into as of _____, 2017 by Grantors, Custodian and Lender. Lender has extended a line of credit to Borrower pursuant to the Credit Agreement secured, *inter alia*, by assets of Grantors in which Grantors have granted Lender a security interest, which are being held and administered by Custodian for Grantors pursuant to a separate Servicing Agreement. Grantors have agreed to put in place Collateral control measures with Custodian acceptable to Lender to protect the interests of Lender in, and control over, the Collateral, and Grantors and Custodian have agreed to enter into this Agreement to provide the Collateral protection and control required by Lender. Capitalized terms used in this paragraph are defined below.

**NOW, THEREFORE**, for good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
DEFINITIONS

Section 1.1     Certain Definitions. As used in this Agreement, the following terms shall have the meanings indicated, unless the context otherwise requires:

"*Acquisition Date*" means any date upon which any Grantor acquires a Tax Lien that secures the Indebtedness.

"*Agreement*" means this Custodial Agreement, as this Custodial Agreement may be amended or modified from time to time.

"*Borrower*" means EBURY 2EMI LLC, a New York limited liability company.

"*Business Day*" means a day other than a Saturday, Sunday or legal holiday for commercial banks in New York, New York.

"*Claim*" has the meaning set forth in Section 4.5.

"*Collateral*" has the meaning set forth in Section 2.1.

"*Credit*" means and includes funds or other credit extended by Lender to Borrower or any Grantor for the purpose of acquiring Tax Liens.

"*Credit Agreement*" means and includes, the Credit Agreement entered into between and among Grantors and Lender dated as of March 9, 2017, any amendments and supplements to thereto, and any replacement credit agreements entered into by any Grantor with Lender.

"*Credit Default*" means and includes an Event of Default as defined in the Credit Agreement.

"*Custodian*" means MTAG SERVICES, LLC, a Virginia limited liability company, or any other Person selected by Borrower and approved by Lender in its reasonable discretion.

"*Deposit Account*" has the meaning set forth in Section 2.7.

"*Grantor*" means and includes Borrower, EB 2EMIALA LLC, an Alabama limited liability company, EB 2EMIFL, LLC, a Florida limited liability company, EB 2EMIIN, LLC, an Indiana limited liability company, EB 2EMIMD, LLC, a Maryland limited liability company, EB 2EMINJ LLC, a New Jersey limited liability company and EB 2EMINY, LLC, a New York limited liability company, EB 2EMISC LLC, a South Carolina limited liability company, and RE 2EMI LLC, a New York limited liability

1

company, and all other Persons that may become a party to this Agreement as a Grantor by any modification, amendment, supplement or joinder to this Agreement.

"*Indebtedness*" has the meaning set forth in the Security Agreement.

"*Lender*" means EMIGRANT BUSINESS CREDIT CORPORATION, a Delaware corporation, its successors and assigns.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other form of entity.

"*Related Documents*" means and includes individually, collectively, interchangeably and without limitation, the Credit Agreement and all written promissory notes, credit agreements, and loan agreements, and all environmental agreements, guaranties, security agreements, mortgages, collateral mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

"*Security Agreement*" means and includes, the Security Agreement (All Assets - EBURY 2EMI LLC AND SPEs) entered into between and among Grantors and Lender dated as of March 9, 2017, any amendments and supplements to thereto, and any subsequent security agreements entered into by any Grantor with Lender, directly or indirectly securing the repayment of the Indebtedness, whether created by law, contract, or otherwise.

"*Security Interests*" means and includes the security interests in, and pledges and assignments of, the Collateral granted under the Security Agreement securing the Indebtedness and all liens created thereby.

"*Servicing Agreement*" means each separate agreement (excluding this Agreement) between Custodian and any Grantor (or any other subsidiary or affiliate of any Grantor) by which Custodian has agreed to service Tax Certificates.

"*Subsequent Tax Lien*" means, with respect to a Tax Lien acquired by a Grantor, a Tax Lien secured by the same property that secures an existing Grantor's Tax Lien and that is sold on or after the date the Grantor's existing Tax Lien was sold by the taxing authority.

"*Tax Certificate*" means the certificate or other evidence of purchase or payment (whether in paper or electronic form) that evidences the sale or transfer of a Tax Lien pursuant to applicable state laws and regulations.

"*Tax Debtor*" means individually, collectively and interchangeably each Person who has an ownership interest in property that secures a Tax Lien and any other Person that may be obligated to pay a Tax Lien.

"*Tax Lien*" means the lien or other rights imposed upon real (immovable) property by a taxing authority to secure the payment of taxes, water or sewer charges, assessments and other charges due and owing with respect to such real (immovable) property, including, without limitation, the right to collect, receive and otherwise administer the collection of payments associated with such lien or other rights, including any Subsequent Tax Liens.

"*Tax Lien Documents*" means and includes, with respect to any Tax Lien, all documents prepared, executed or filed in connection with a Tax Lien, including, without limitation, the Tax Certificate and all documents or instruments evidencing, governing, securing, guaranteeing or otherwise pertaining to such Tax Lien and any other instruments that would be required to be presented to the applicable taxing authority as a condition of receiving a redemption payment, as the same may be modified, amended, renewed, extended, rearranged, restated or replaced from time to time.

2

"*UCC*" means the Uniform Commercial Code as adopted in the applicable jurisdiction or jurisdictions.

Section 1.2      Other Terms. Capitalized terms not otherwise defined in this Agreement shall have the meanings defined in the Credit Agreement or the other documents executed in connection therewith.

Section 1.3      Money. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

## ARTICLE II
### SECURITY INTERESTS AND ACTIONS WITH RESPECT TO THE COLLATERAL

Section 2.1      Security Interests and Collateral. Each Grantor hereby represents and warrants that it has the power and authority to grant, and has granted, Security Interests to Lender in and to its assets, including, without limitation, the following (the "Collateral"):

> All present and future Tax Liens, Tax Certificates of each Grantor and proceeds thereof, together with all related accounts, chattel paper (whether tangible or electronic), instruments (including promissory notes), inventory, documents, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and general intangibles (including payment intangibles), and all related account ledgers, books, records, files, computer disks and software and all rights thereto, account ledgers, books, records, files, computer disks and software and other rights.

The description of the Collateral in this Agreement shall not limit or otherwise affect the Security Interests granted to Lender in any Security Agreement.

Section 2.2      Appointment; Name Registration.

(a)      Each Grantor hereby appoints the Custodian as custodian of the Tax Liens, the Tax Certificates and the Tax Lien Documents pursuant to the terms of this Custodial Agreement.

(b)      The Custodian hereby agrees to (i) accept such appointment, and (ii) the Tax Liens, the Tax Certificates and the Tax Lien Documents delivered to it, and to hold, release and transfer all of the same, pursuant to the terms of this Custodian Agreement.

(c)      As long as this Agreement remain in effect, each Grantor shall register, and hereby instructs Custodian to register, all Tax Liens acquired by or for any Grantor in the following designated name (or a substantially similar name):

MTAG SERVICES as custodian for [a Grantor (other than Borrower)]

Grantors, Custodian and Lender acknowledge that substantially similar names may include typographical errors, abbreviations and compressions of the designated name and other deviations provided that the substantially similar name is sufficient to allow Custodian to identify the Tax Lien as being subject to this Agreement.

(d)      There shall be, and hereby is, established by each Grantor (other than the Borrower) with the Custodian a non-interest bearing account that will be designated the EBURY 2EMI CUSTODIAL ACCOUNT (the "Custodial Account") and into which the Tax Liens, the Tax Certificates and the other Tax Lien Documents shall be held and that will be governed by and subject to this Custodial Agreement.

Section 2.3      Initial Acquisition Information. Within five (5) Business Days of each Acquisition Date, Grantors shall deliver or cause to be delivered to Custodian and Lender a copy (in tangible or electronic form) of any receipt, document, notice, form or other item evidencing ownership of each Tax Lien, with all material information concerning the purchase of such Tax Lien and information about the property securing the Tax Lien and each Tax

Debtor, including, without limitation (a) the date the Tax Lien was sold by the taxing authority, (b) the price paid to the taxing authority to purchase the Tax Lien, (c) the interest rate with respect to the Tax Lien, (d) the tax block and lot number, or other identifying number used by the taxing authority, of the parcel securing the Tax Lien, (e) the electronic file containing the tax lien acquisition information in a format reasonably acceptable to Custodian, and (f) such other information as may be reasonably requested by Custodian or Lender.

Section 2.4    Subsequent Information. Within five (5) Business Days of receipt of such Tax Lien information, Custodian will upload the information to its online information system and Custodian will provide Grantors and Lender with unlimited online access to such Tax Lien information. Within five (5) Business Days of adding this information to its online information system, Custodian shall export and deliver to Grantors and Lender, via email, information to reflecting and confirming the respective added Tax Liens in an excel spreadsheet format (or other format acceptable to all parties). Custodian shall enter additional information concerning any Tax Lien received by Custodian into its online information system within ten (10) Business Days following receipt of the applicable Tax Certificate, provided such information, to the extent provided by Grantors or otherwise obtained by Custodian, is in a format acceptable to Custodian. The information entered shall include, but not be limited to, the date such Tax Certificate was sold by the applicable taxing authority and such other information which may be reasonably requested by Lender, provided there is a field for such additional information in Custodian's online information system and available to Custodian. Custodian shall thereafter compare the information shown on each Tax Certificate with the information furnished by Grantors or otherwise obtained by Custodian with respect to such Tax Certificate and, if the information set forth in the Tax Certificate is different from the information previously provided to Custodian, Custodian shall promptly notify Grantors and Lender of any material discrepancies, and Grantors shall correct the respective Tax Lien information.

Section 2.5    Tax Lien Possession. Custodian shall receive and hold (a) Tax Certificates issued for Tax Liens acquired by or for Grantors in its vaults (to the extent in tangible form), or (b) with respect to Tax Liens in non-certificated form, with the issuer thereof. Custodian shall hold such Tax Certificates until directed otherwise in writing by the Borrower or, following a Credit Default, Lender. Custodian shall provide Grantors and Lender with online access to copies of any and all notices or other documents received regarding any Tax Lien, promptly upon receipt and in any case no later than five (5) Business Days after receipt.

Section 2.6    Redemption Notices. Upon receipt of any written redemption notice relating to any Tax Lien, Custodian shall notify Grantors and Lender of the redemption notice. Upon approval from Grantors or, after a Credit Default, Lender that such payment is correct, Custodian shall mail the original Tax Certificate to the applicable taxing authority or, if such redemption payment is not correct or if no redemption payment is specified, it shall await further instructions from Grantors (or, following Custodian's receipt of notice of the occurrence and continuance of any Credit Default, Lender). If no further instructions are received within five (5) Business Days, Custodian will remove the redemption notice from its online information system.

Section 2.7    Redemption Payments. Custodian shall cause each redemption payment to be deposited into an account designated by Lender (the "Deposit Account") within five (5) Business Days after receipt. Lender shall have the right to change the Deposit Account by giving notice to Custodian and Grantors. If any action shall be required in connection with collection of such redemption payment, Custodian shall notify Grantors and Lender of such requirement and shall follow instructions of Lender in connection therewith. Custodian shall have no obligation to determine the sufficiency of the redemption payment or the redemptive value of the Tax Lien, however, for payments received valued less than the computerized calculation of the anticipated redemptive value notice shall be sent to Grantors for instructions on processing.

Section 2.8    Redemption Information. Custodian shall enter all information received concerning each redemption payment into its online information system, including, without limitation: (a) the date of receipt of the redemption notice given by the applicable Governmental Authority, (b) after receipt thereof, the amount of the redemption payment, and (c) the date such redemption payment check was deposited in the Deposit Account.

Section 2.9    Redeemed Tax Certificates. Custodian shall use commercially reasonable efforts to send redeemed Tax Certificates to the appropriate taxing authority in bulk on a periodic basis, so as to minimize Grantors' expense

4

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 16
24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
RECEIVED NYSCEF: 10/17/2022
Court Records    Pg 334 of 688

relating to the delivery of redeemed Tax Certificates. At any Grantor's request, Custodian shall deliver redeemed Tax Certificates in bulk to Grantors for further delivery by Grantors to the appropriate taxing authority. In the event that redeemed Tax Certificates are sent by Custodian to Grantors at any Grantor's instruction, and such redeemed Tax Certificates are not received by Grantor for any reason whatsoever, or are never subsequently received by the appropriate taxing authority from Grantors for any reason whatsoever, Custodian shall not be responsible for seeking, nor shall it be liable for the cost associated with, the issuance of an affidavit of non-receipt or lost certificate affidavit from the taxing authority.

Section 2.10    Collection of Other Payments. Irrespective of the occurrence of a Credit Default, Custodian shall be entitled to receive, in additional to redemptions, all other payments from all sources now or hereafter due on, under or in respect to each Tax Lien and Grantors shall take all actions necessary to enable Custodian to receive all such payments. If at any time Custodian or any Grantor shall receive any payment on, or in respect of, any Tax Lien (in addition to redemptions), Custodian and Grantors shall cause each such payment to be deposited in the Deposit Account and Custodian shall reflect the amount of such payment in its online information system. Each Grantor hereby irrevocably designates Custodian as its agent and attorney-in-fact with full power to endorse and deliver such payment in the name and on its behalf for deposit in the Deposit Account.

Section 2.11    Servicing Agreement. So long as no Credit Default has occurred, Custodian is authorized to sign on behalf of Lender to release Tax Documents via execution of release/assignment documents or endorsements as is necessary and proper to manage Tax Liens in accordance with the applicable Servicing Agreement. Upon any notice of a Credit Default to Custodian from Lender or any Grantor, Custodian shall obtain Lender's prior written consent to Custodian's execution of any such release or obtain Lender's signature upon any such release.

## ARTICLE III
## REPRESENTATIONS AND COVENANTS

Custodian hereby represents and warrants, acknowledges and agrees, as follows:

Section 3.1    Lender Instructions. At all times during the term of this Agreement following Custodian's receipt of notice of the occurrence and continuance of any Credit Default, Custodian will comply with all orders and instructions originated by Lender in respect of the Collateral.

Section 3.2    Other Security Interests. As of the date hereof, Custodian has no knowledge of and has received no notice of any other security interest in respect of the Collateral (except for the interest of Lender granted in the Security Agreement) and it will advise Lender in writing promptly following obtaining any knowledge of or receipt of notice of any such other security interest. Additionally, Custodian shall not obtain a lien on any of the Collateral for its own benefit.

Section 3.3    Collateral Releases. Except as otherwise required or permitted by this Agreement (including, without limitation, sending redeemed Tax Certificates to the appropriate taxing authority in accordance with Section 2.9), Custodian shall not enter into, agree to enter into or comply with any release, transfer, payment, or redemption instruction, or any other order or instruction, in each case concerning any of the Collateral; from any Person other than Lender.

Section 3.4    Fees and Expenses of Custodian. Custodian shall notify Grantors of all fees, expenses and charges of Custodian arising out of Custodian's performance of its duties and obligations under this Agreement, and Grantors agree to pay all such fees, expenses and charges promptly or, if already paid by Custodian, Grantors shall promptly reimburse Custodian therefor. The foregoing notwithstanding, Grantors and Lender acknowledge and agree that Custodian has no obligation to advance funds to pay others for fees or expenses (including recording fees) and that payments to others by Custodian are expected to be paid only from advanced (or otherwise made available to Custodian) by Grantors, Lender or some other Person (not Custodian).

Section 3.5    Removal or Resignation of Custodian. Grantors, with the written approval of Lender (exercising reasonable discretion), may at any time, effective upon sixty (60) days' written notice to Custodian, remove and replace the Person serving as Custodian under this Agreement. At any time a Credit Default exists, Lender may

remove and replace the Person serving as Custodian under this Agreement. Custodian may, at any time, effective upon ninety (90) days' written notice to Grantors and Lender, resign and terminate its agreement to act as Custodian hereunder. Removal or resignation of a Custodian under this Agreement shall constitute a termination of each Servicing Agreement between the Custodian and Grantors (or any one or more of them) to the extent it affects the Collateral. Prior to the effective date of such removal or resignation, Custodian shall deliver the Collateral then held by it, to a replacement Custodian selected by Grantors and approved by Lender (exercising reasonable discretion) or, after the occurrence and continuance of any Credit Default, a replacement Custodian selected by Lender (which be Lender). Notwithstanding any such removal, resignation or replacement, a Custodian shall continue to hold the Collateral for the benefit of Grantors and Lender and shall continue to be bound by its obligations and duties under this Agreement until all of the Collateral held by Custodian has been delivered by the Custodian to the replacement Custodian as provided herein.

Section 3.6    Inspection. Custodian agrees that Lender and its agents, accountants, attorneys and auditors will be permitted during normal business hours at any time and from time to time upon reasonable notice to Custodian (provided no notice shall be required following the occurrence of a Credit Default) to examine the files, documents, records and other papers in the possession or under the control of Custodian relating to any or all of the Collateral and to make copies thereof.

<div align="center">

**ARTICLE IV**
MISCELLANEOUS

</div>

Section 4.1    Remedies Cumulative; Waiver. The rights, powers and remedies of Custodian, Grantor and Lender under this Agreement shall be in addition to all rights, powers and remedies given to Custodian, Grantors and Lender by virtue of any statute or rule of law, the Credit Agreement or any other agreement, all of which rights, powers and remedies shall be cumulative and may be exercised from time to time. No failure on the part of Custodian, Grantors, or Lender to exercise, and no delay in exercising, any right, power or remedy shall operate as a waiver thereof nor shall any single or partial exercise by Custodian, Grantors or Lender of any right, power or remedy preclude any other or future exercise of thereof or the exercise of any other right, power or remedy.

Section 4.2    Binding Upon Successors. All rights of Custodian, Grantors and Lender under this Agreement shall inure to the benefit of Custodian and Lender and their respective successors and assigns.

Section 4.3    Entire Agreement; Severability. This Agreement contains the entire custodial agreement between Custodian and Lender with respect to the Collateral. If any of the provisions of this Agreement shall be held invalid or unenforceable, this Agreement shall be construed as if not containing such provisions, and the rights and obligations of the parties hereto shall be construed and enforced accordingly.

Section 4.4    Choice of Law. This Agreement shall be governed and construed in accordance with the substantive laws of the State of New York (without regard to any principles of law that would require the application of the laws of another state).

Section 4.5    Claims Resolution. This Section concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to this Agreement (including any renewals, extensions or modifications) (each, a "Claim"). For the purposes of this provision only, the term "parties" shall include any respective parent corporation, subsidiary or affiliate of any Grantor, Custodian or Lender involved in the servicing, management or administration of any obligation described or evidenced by this Agreement.

(a)    At the request of any party to this Agreement, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, U.S. Code) (the "Act"). The Act will apply even though this Agreement provides that it is governed by the law of a specified state. The arbitration will take place on an individual basis without resort to any form of class action.

(b)    Arbitration proceedings will be determined in accordance with the Act, the then-current rules and procedures for the arbitration of financial services disputes of the American Arbitration Association or any

<div align="center">6</div>

successor thereof ("AAA"), and the terms of this paragraph. In the event of any inconsistency, the terms of this paragraph shall control. If AAA is unwilling or unable to (i) serve as the provider of arbitration or (ii) enforce any provision of this arbitration clause, Lender may designate another arbitration organization with similar procedures to serve as the provider of arbitration.

(c)    The arbitration shall be administered by AAA and conducted, unless otherwise required by law, in any U.S. state where real or tangible personal property collateral for this credit is located or if there is no such collateral, in the state specified in the governing law section of this Agreement. All Claims shall be determined by one arbitrator; however, if Claims exceed Five Million Dollars ($5,000,000.00), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed, judgment entered and enforced.

(d)    The arbitrator(s) will give effect to statutes of limitation in determining any Claim and may dismiss the arbitration on the basis that the Claim is barred. For purposes of the application of the statute of limitations, the service on AAA under applicable AAA rules of a notice of Claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s). The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this Agreement.

(e)    This Section does not limit the right of any party to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(f)    The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of the Claim to arbitration.

(g)    By agreeing to binding arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim. Furthermore, without intending in any way to limit this Agreement to arbitrate, to the extent any Claim is not arbitrated, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim. This provision is a material inducement for the parties entering into this Agreement.

Section 4.6    Amendment. Neither this Agreement nor any provision hereof may be changed, waived, discharged, modified or terminated except pursuant to a written instrument signed by Grantors, Custodian and Lender (except as otherwise provided in this Agreement).

Section 4.7    Notices. Any notice or demand which, by provision of this Agreement, is required or permitted to be given or served to or on Grantors shall be deemed to have been sufficiently given and served for all purposes (if mailed) three (3) Business Days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses is given in writing by Grantors to Custodian and Lender) as follows:

EBURY 2EMI LLC
EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC

7

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 337 of 688

EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC
16 School Street, Suite 100
Rye, NY 10580
Attention: John Hanratty

Any notice or demand which, by provision of this Agreement, is required or permitted to be given or served to or on Custodian shall be deemed to have been sufficiently given and served for all purposes (if mailed) three (3) Business Days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses is given in writing by Custodian to Grantors and Lender) as follows:

MTAG SERVICES, LLC
111 Coleman Blvd., Suite 400
Mount Pleasant, SC 29464,
Attention: James P. Meeks, President and CEO

Any notice or demand which, by any provision of this Agreement, is required or permitted to be given or served by to or on Lender shall be deemed to have been sufficiently given and served for all purposes (if mailed) three (3) Business Days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses are given in writing by Lender to Grantor and Custodian) as follows:

EMIGRANT BUSINESS CREDIT CORPORATION
6 East 43rd Street, 20th Floor
New York, New York 10017
Attention: Karen Wold
Email: woldi@emigrant.com

Section 4.8    Counterparts. This Agreement may be executed in two or more counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. Any signature page to this Agreement may be witnessed by a telecopy or other facsimile of any original signature page or any counterpart hereof may be appended to any other counterpart hereof to form a completely executed counterpart hereof.

Section 4.9    Indemnity – Grantors. Grantors agree to indemnify and hold Custodian harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly (a) out of this Agreement or any document required hereunder, (b) by reason of actions taken by Custodian in accordance with instructions given Lender regarding the Collateral, and (c) from any litigation or proceeding related to or arising out of this Agreement. This indemnity includes, but is not limited to, reasonable attorneys' fees actually incurred by Custodian. This indemnity will survive repayment of the Indebtedness and the termination of this Agreement.

Section 4.10    Lender Expenses. All advances, charges, costs and expenses, including reasonable attorneys' fees, incurred or paid Lender in exercising any right, power or remedy conferred by this Agreement or in the enforcement thereof, including, without limitation, reimbursing Lender should it choose, in its sole discretion, to pay any fees, costs and/or expenses owing by any Grantor hereunder, shall become a part of the Indebtedness and shall be paid to Lender by Grantor immediately and without demand, with interest thereon at an annual rate equal to the highest rate of interest of any of the Indebtedness.

8

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO: 10    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 338 of 688

[SIGNATURES ON FOLLOWING PAGE]

119834191_2
Custodial Agreement 2

IN WITNESS WHEREOF, THE UNDERSIGNED HAVE CAUSED THEIR DULY AUTHORIZED
REPRESENTATIVES TO EXECUTE THIS AGREEMENT, AS OF THE DATE STATED ABOVE.

**GRANTORS**:

EBURY 2EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

**SPEs**:
EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC

By: EBURY 2EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

**CUSTODIAN**:

MTAG SERVICES, LLC

By: _____
James P. Meeks, Manager

**LENDER**:

EMIGRANT BUSINESS CREDIT CORPORATION

By: _____ (SEAL)
Karen Wold, Managing Director

10

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 340 of 688

IN WITNESS WHEREOF, THE UNDERSIGNED HAVE CAUSED THEIR DULY AUTHORIZED REPRESENTATIVES TO EXECUTE THIS AGREEMENT, AS OF THE DATE STATED ABOVE.

**GRANTORS**:

EBURY 2EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

SPEs:
EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC

By: EBURY 2EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

**CUSTODIAN**:

MTAG SERVICES, LLC

By _____
James P. Meeks, Manager

**LENDER**:

EMIGRANT BUSINESS CREDIT CORPORATION

By: _____(SEAL)
Karen Wold, Managing Director

10

119834191_2
Custodial Agreement 2

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 341 of 688

# SERVICING AGREEMENT

between

Ebury Fund 1 LP and Ebury Fund 2 LP and their affiliates,

Owner,

MTAG SERVICES, LLC,
Servicer

Dated as of August 1, 2017

# TABLE OF CONTENTS

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

SECTION 1.01 Definitions ................................................................................................ 1
SECTION 1.02 Certain Calculations ................................................................................. 8
SECTION 1.03 Other Definitional Provisions ................................................................. .9

## ARTICLE II
## GENERAL OBLIGATIONS OF SERVICER

SECTION 2.01 Duties and Responsibilities as to Servicing ........................................... 10
SECTION 2.02 Asset Administration ............................................................................... 13
SECTION 2.03 Employee Dishonesty Policy and Errors and Omissions Insurance ................. 14
SECTION 2.04 Maintenance and Release of Tax Lien Documentation ..................................... 14
SECTION 2.05 Annual Certification by Officer .............................................................. 16
SECTION 2.06 Permitted Charge Offs ............................................................................. 17

## ARTICLE III
## TERM

SECTION 3.01 Term of Servicing Agreement .................................................................. 17

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

SECTION 4.01 Servicer's Representations and Warranties ............................................. 17
SECTION 4.02 Owner's Representations and Warranties ............................................... 19
SECTION 4.03 Notice of Incorrect Representations or Warranties ................................ 20

## ARTICLE V
## COMPENSATION, SERVICING FEES AND OTHER CHARGES

SECTION 5.01 Servicing Fees .......................................................................................... 20
SECTION 5.02 No Other Servicing Fees .......................................................................... 21
SECTION 5.03 Right to Amend Servicing Fees                                             21
SECTION 5.04 No Violation of Laws or Regulations ...................................................... 21
SECTION 5.05 Payment of Lien Administration Expenses ............................................ 21
SECTION 5.06 Netting ...................................................................................................... 21

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 343 of 688

## ARTICLE VI
## COLLECTION OF PAYMENTS

SECTION 6.01  General ........................................................................................... 21
SECTION 6.02  Forbearance Agreements................................................................... 22
SECTION 6.03  Servicer to Prepare and Deliver Servicer Reporting Statements ...................... 22

## ARTICLE VII
## PROTECTION OF SECURITY

SECTION 7.01  Properties with respect to which Foreclosure is Permitted and Has Begun...... 23
SECTION 7.02  Notice of Liens and Other Actions ...................................................... 23
SECTION 7.03  Actions with to respect to Bankruptcy Tax Liens........................................... 24

## ARTICLE VIII
## REALIZATION AND FORECLOSURE

SECTION 8.01  Realization upon Tax Liens ............................................................... 25
SECTION 8.02  Responsibilities on Foreclosure or Other Realization........................................ 26
SECTION 8.03  Conveyance Documents.................................................................... 26

## ARTICLE IX

Place Holder

## ARTICLE X
## ACCOUNTING SYSTEM

SECTION 10.01  General ........................................................................................... 30

## ARTICLE XI
## TERMINATION

SECTION 11.01  Termination...................................................................................... 31
SECTION 11.02  Servicer's Duties Upon Termination .................................................... 32
SECTION 11.03  Payment of Servicing Fees Upon Termination............................................ 32
SECTION 11.04  Successor Servicer .......................................................................... 33

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

SECTION 12.01  Assignment and Delegation of Duties by Servicer ......................................... 33

SECTION 12.02  Independent Contractor ................................................................ 34
SECTION 12.03  All Funds and Records to be Held for Benefit of the Owner ........................... 35
SECTION 12.04  Assignment by the Owner ............................................................... 35
SECTION 12.05  Indemnification ....................................................................... 35
SECTION 12.06  Notice of Significant Changes ......................................................... 36
SECTION 12.07  Controlling Law; Choice of Forum ..................................................... 36
SECTION 12.08  Indulgences Not Waivers ............................................................... 36
SECTION 12.09  Notices ............................................................................... 36
SECTION 12.10  Titles Not to Affect Interpretation .................................................. 37
SECTION 12.11  Attorneys' Fees ....................................................................... 37
SECTION 12.12  Electronic Reporting .................................................................. 38
SECTION 12.13  Provisions Separable .................................................................. 38
SECTION 12.14  Entire Servicing Agreement; Amendment ................................................. 38
SECTION 12.15  Counterparts .......................................................................... 38
SECTION 12.16  No Recourse ........................................................................... 38
SECTION 12.17  Cooperation of Servicer with a Securitization. ....................................... 39

SCHEDULES

SCHEDULE A          Servicing Price Matrix

EXHIBITS

EXHIBIT A      Tax Lien Schedule
EXHIBIT B      MTAG Services, LLC Servicing Policies and Procedures
EXHIBIT C      {reserved}
EXHIBIT D      Form of Monthly Reporting Package
EXHIBIT E      {reserved}
EXHIBIT F      List of Selling Municipalities

This Servicing Agreement, dated as of August 1, 2017 (this "Servicing Agreement"), by and between Ebury Fund 1 LP and Ebury Fund 2 LP and their affiliates}, DE limited partnerships (the "Owner")_and MTAG Services, LLC, a Virginia limited liability company ("MTAG Services" or the "Servicer"), recites and provides as follows. Capitalized terms used herein shall have the meanings ascribed to such terms in Article I hereof.

WHEREAS, the Owner desires that the Servicer provide the services set forth in this Servicing Agreement; and

WHEREAS, the Owner and the Servicer have agreed upon a fee arrangement for such services, as more particularly set forth below in this Servicing Agreement.

NOW, THEREFORE, based upon the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

ARTICLE I.

DEFINITIONS

Section 1.01. Definitions.

"Acquisition Date": The date of acquisition of a Tax Lien by Owner from a Selling Municipality or previous owner of the Tax Lien.

"Adjusted Redemptive Value": With respect to any Tax Lien and any date of calculation, (i) the amount required to redeem such Tax Lien in full on such date plus, to the extent not otherwise included in the foregoing, all recoverable Lien Administration Expenses as of such date, or (ii) in the case of a Tax Lien that has been the subject of a judicial modification in a Bankruptcy Proceeding, the amount fixed by the applicable bankruptcy court, plus, to the extent not otherwise included in the foregoing, all recoverable Lien Administration Expenses as of such date.

"Affiliate": With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Bankrupt": A Person (i) which has filed a voluntary petition for relief under the Bankruptcy Code, or (ii) which has had instituted against it an involuntary proceeding under the Bankruptcy Code (collectively, a "Bankruptcy Proceeding") which shall have resulted in an order for relief having been issued or which remains undismissed for a period of 30 days and, in either case, which Person remains subject to such Bankruptcy Proceeding as of the applicable date of determination.

"Bankruptcy Code": The United States Bankruptcy Code, 11 U.S.C. Section 101 (*et seq.*).

"Bankruptcy Tax Liens": As of any given date of determination, Tax Liens with respect to which the related Property Owners are Bankrupt.

"Base Servicing Fee": As defined in Section 5.01(a) hereof.

"Base Servicing Fee Percentage": As set forth on Schedule A hereto.

"Business Day": Any day that is not a Saturday, Sunday or other day on which commercial banking institutions in the City of New York, New York are authorized or obligated by Law to be closed.

"Calculation Period": As defined in Section 5.01(a) hereof.

"Certificate Exception Report": As provided in Section 6.03(a) hereof, in substantially the form of Exhibit I hereto.

"Collections": With respect to a Tax Lien, the amount actually collected with respect to such Tax Lien, whether through redemption proceeds, proceeds of foreclosure, proceeds of the sale of the Tax Lien or otherwise.

"Conveyance": A transfer of fee title, or the creation of a leasehold estate in real property, or the creation of any right to the use or occupancy of real property, or right to the collection or enjoyment of rents or issues in real property, or the assignment of any such right or interest.

"Employee Dishonesty Policy": An employee dishonesty policy issued by a Qualified Insurer under which such insurer (a) agrees to indemnify the Servicer for all loss sustained as a result of any theft, embezzlement, fraud or other dishonest act on the part of the Servicer's directors, officers or employees, (b) provides for aggregate limits of liability for directors, officers or employees of the lesser of $1 million or the amount of coverage that would be required by Fannie Mae with respect to the Servicer if the Servicer were servicing and administering mortgage loans for Fannie Mae in addition to other mortgage loans being serviced and administered by the Servicer and (c) names the Servicer and the Owner as joint payees under such Employee Dishonesty Policy as their interests may appear.

"Event of Default": As defined in Section 11.01 hereof.

"Flood Insurance Policy": Any policy of insurance issued in accordance with the Flood Disaster Protection Act of 1973, as amended from time to time, or, if repealed or amended, any superseding legislation governing similar insurance coverage, or any other policy providing similar coverage against loss sustained by floods.

"Foreclosure Amount": The amount necessary to commence and complete the foreclosure process relating to a Tax Lien.

"Foreclosure Notice":  A notice from the Servicer to the Owner which sets forth any required Foreclosure Amount and the date(s) on which such funds are required.

"Independent":  When used with respect to any specified Person, any such Person who (i) does not have any direct financial interest, or any material indirect financial interest, in any of the Owner, the Servicer or any Affiliate thereof and (ii) is not connected with the Owner, the Servicer or any Affiliate thereof as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions.

"Initial Tax Lien Principal Balance":  With respect to any Tax Lien, the total amount of the Tax Lien due as of the related Acquisition Date, including interest, penalties, fees and charges, at the respective rates and as calculated and applied thereto under applicable Law.

"Insolvency Event":  (a) The making by a Person of a general assignment for the benefit of creditors or any admission by a Person in writing of its inability to pay its debts as they become due, or the institution of any proceeding by a Person seeking relief on its behalf as debtor, or to adjudicate it a bankrupt or insolvent, or seeking liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any Law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property, a Person consenting by answer or otherwise to the institution of any such proceeding against it or the taking by a Person of any action in furtherance or contemplation of any of the foregoing; or (b) the institution of any proceeding against a Person seeking to have an order for relief entered against such Person as debtor or to adjudicate it a bankrupt or insolvent, or seeking liquidation, reorganization, arrangement, adjustment or composition of such Person or its debts under any Law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property, which either (i) results in any such entry of an order of relief, adjudication of bankruptcy or insolvency, appointment, or issuance or entry of any other order having a similar effect or (ii) remains undismissed for a period of 30 days.

"Instruments of Release":  As defined in Section 2.04(c) hereof.

"Insurance Policy":  Any Hazard Insurance Policy, Flood Insurance Policy, Public Liability Insurance Policy, Errors and Omissions Insurance Policy or Employee Dishonesty Policy, including all riders and endorsements thereto or any other insurance policies procured with respect to the Properties.

"Laws":  All statutes (including all Tax Lien Statutes), rules, regulations, ordinances, orders, or decrees of any federal or state government or political subdivision, agency or public official thereof, including all applicable debtor and consumer protection laws.

"Legal Challenge":  As defined in Section 2.01(c) hereof.

"Lien Administration Expenses":  All customary and reasonable out-of-pocket expenses (exclusive of Overhead Expenses) determined by the Servicer to be necessary or desirable in connection with the performance of its duties under this Servicing Agreement, the pursuit of any Collections or the foreclosure of, or other realization upon (such realization to

include, but not be limited to, Tax Lien redemptions), the Tax Liens, and the protection of the interests and enforcement of the rights of the Owner in any matter relating to its duties hereunder (including, for the avoidance of doubt, all of the duties and obligations pursuant to Articles VII, VIII and IX of this Servicing Agreement), including without limitation (i) all fees and expenses related to the foreclosure process generally and to specific foreclosure proceedings such as recording, filing and other court related fees; (ii) the cost of all bankruptcy, lien and title searches; (iii) the cost of title, hazard, flood and public liability insurance policies and any other asset specific insurance policy required or deemed appropriate, as well as the cost of any deductible relating thereto; (iv) the reasonable fees and disbursements of all counsel and trustees retained in connection with such foreclosure proceedings, both individually and collectively; (v) all expenses relating to required appraisals and property valuations; (vi) mortgage recording taxes; and (vii) all expenses incurred in the review and purchase of Subsequent Tax Liens.

"Lockbox": One or more post office boxes with the United States Post Office, each of which has been or shall be established by or assigned to and under the exclusive jurisdiction of the Owner, and which is to be used exclusively for Tax Liens serviced under this Agreement..

"Lockbox Account": One or more image lockbox accounts established by or assigned to and maintained in the name of the Owner for the deposit of all payments made with respect to the Tax Liens, each subject to control agreements for the benefit of and satisfactory in form and substance to the Owner. The Owner shall grant Servicer image access to review the daily transactions of said Lockbox Account.

"MTAG Services": MTAG Services, LLC, a Virginia limited liability company.

"Notices": As defined in Section 12.09 hereof.

"Officer": With respect to the designated entity, an officer or employee duly authorized to act on behalf of the designated entity for the referenced purpose.

"Officer's Certificate": A certificate signed by an Officer of, as the case may be, the Owner or the Servicer, as may be delivering such certificate, and delivered to the appropriate addressee thereof. The signatory of any Officer's Certificate must be a person whose name and specimen signature appears on a list of officers or employees of the Person delivering such certificate furnished to all other Persons whose names are set forth herein on the Acquisition Date, as such list may be amended from time to time.

"Overhead Expenses": Any expenses relating to the general business operations of the Servicer, including but not limited to rental payments with respect to Servicer's office space; expenses relating to electricity, heating and air conditioning with respect to Servicer's office space; staff salaries, telephone, ordinary photocopying and telecopying expenses; expenses relating to benefits provided to the Servicer's employees; taxes paid by the Servicer on its own behalf; and any other expenses relating to the general operation of its offices.

"Owner": Ebury Fund 1 LP and Ebury Fund 2 LP and their affiliates, Delaware limited partnerships, or any successor thereto hereunder and its affiliates.

"Partial Payment": As defined in Section 6.01(c) hereof.

"Person": Any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Property": The underlying real property encumbered by a Tax Lien.

"Property Owner": As to each Property, the owner of record thereof; provided, however, that where the context makes reference to redemption of a Tax Lien related to a Property, the term "Property Owner" shall also include any Person that has a statutory right to redeem such Tax Lien.

"Public Liability Insurance Policy": A policy of public liability insurance issued by a Qualified Insurer.

"Qualified Insurer": An insurance company or security or bonding company qualified to write the related insurance policy in the relevant jurisdiction which shall have a General Policyholder Rating of "A+," "A," "A-" or "B+" and a Financial Rating of Class VI, Class VII and Class X, respectively, as indicated in the Best's Insurance Reports as of the date the related policy is issued.

"Realized Loss": With respect to any Tax Lien, an amount equal to the amount, if any, by which the Tax Lien Principal Balance of such Tax Lien has been charged off pursuant to Section 2.07 hereof.

"Redemptive Value": With respect to any Tax Lien and any date of calculation, (i) the amount required to redeem such Tax Lien in full on such date excluding, for the avoidance of doubt, any Lien Administration Expenses, or (ii) in the case of a Tax Lien that has been the subject of a judicial modification in a Bankruptcy Proceeding, the amount fixed by the applicable bankruptcy court, excluding, for the avoidance of doubt, any Lien Administration Expenses.

"Selling Municipality": Any of the Selling Municipalities identified on Exhibit F.

"Servicer": MTAG Services, or any successor thereto hereunder.

"Servicer Monthly Reporting Statement": As defined in Section 6.03(b) hereof.

"Servicer Reporting Statements": Collectively, the Servicer Weekly Reporting Statement and the Servicer Monthly Reporting Statement.

"Servicer's Tax Lien File": The file containing the items set forth in Section 2.04(a) hereof, which the Servicer retains for the purposes of servicing the Tax Liens.

"Servicing Agreement": This Servicing Agreement and all exhibits, schedules and appendices hereto.

"Servicing Fees": Each of the Base Servicing Fee, and Subsequent Tax Liens Purchasing Fee, as set forth in Section 5.01 hereof.

"Servicing Officer":  Any officer or employee of the Servicer involved in, or responsible for, the administration and servicing of the Tax Liens whose name and specimen signature appears on a list of servicing officers or employees of the Servicer furnished by the Servicer to the Owner on the Acquisition Date, as such list may be amended by the Servicer from time to time.

"Servicing Policies":  The MTAG Services, LLC Servicing Policies and Procedures, as set forth on Exhibit B attached hereto and as may be amended from time to time.

"Subsequent Taxes and Assessments":  In respect of a Tax Lien encumbering a given Property, any and all amounts falling due after the date of such Tax Lien which amounts, if not paid, either have resulted or will result in the creation of a further tax lien on such Property.

"Subsequent Tax Lien":  Any tax certificate, tax deed or any other instrument that represents an obligation with respect to tax delinquencies (as governed by the related Tax Lien Statute) subsequently assessed on Property relating to Tax Liens owned by the Owner after the acquisition of such Tax Liens by the Owner.

"Subsequent Tax Lien Purchasing Fee":  As defined in Section 5.01(d) hereof.

"Tax Lien":  With respect to each Selling Municipality, the tax certificates, tax deeds or any other instruments that represent an obligation with respect to tax delinquencies as governed by the related Tax Lien Statute, which shall include each action, filing, claim, tax deed application or other litigation or proceeding (including any foreclosure proceeding) that is pending in connection with such Tax Lien.  For the avoidance of doubt, the definition of "Tax Lien" hereunder shall include the Acquired Assets, the Existing Portfolio Tax Liens, and Future Tax Liens and all Subsequent Tax Liens.

"Tax Lien Principal Balance":  With respect to any Tax Lien as of a particular date, the Initial Tax Lien Principal Balance thereof *less* (i) all Collections thereon allocated to principal pursuant to Section 1.02 hereof through such date and (ii) all Realized Losses thereon through such date.

"Tax Lien Securitization":  As defined in Section 12.17 hereof.

"Tax Lien Statute":  The statute or law identified by the Servicer as currently in effect and governing the disposition of Tax Liens in a Selling Municipality.

"Termination Date":  The earlier of (i) the date the aggregate outstanding Tax Lien Principal Balance for all Tax Liens has been reduced to zero or (ii) a termination of this Servicing Agreement in accordance with Article XI hereof.

"Transaction Documents":  This Servicing Agreement and any other agreement, instrument or document executed and delivered in connection with the transactions contemplated by such agreements.

"Uniform Commercial Code":  The Uniform Commercial Code of the State of New York, as amended and in effect from time to time.

Section 1.02.   Certain Calculations.   Unless otherwise specified herein, the following provisions shall apply:

(a)   All calculations of interest provided for herein shall be made on the basis of a 360-day year consisting of twelve 30-day months.

(b)   Collections received with respect to any Tax Lien shall be deemed to be applied (i) first, to reduce the portion of the Tax Lien Principal Balance thereof representing principal, (ii) second, to reduce the portion of the Adjusted Redemptive Value thereof representing recoverable Lien Administration Expenses relating to such Tax Lien and (iii) third, to reduce the portion of the Adjusted Redemptive Value thereof representing interest accrued thereon (other than any such interest included as part of the Initial Tax Lien Principal Balance).

(c)   In the event that a payment is received by the Servicer from a Property Owner or Selling Municipality whose Property is subject to Tax Liens in respect of more than one tax year, the Servicer shall apply such payment in accordance with the applicable Tax Lien Statute.

(d)   In the case of (i) one or more Tax Liens which encumber a given Property and which have been purchased from a Selling Municipality (the "Relevant Selling Municipality") and are being serviced by the Servicer hereunder, (ii) such Property is also subject to one or more tax liens held by a Person or Persons other than a Selling Municipality, and (iii) the Relevant Selling Municipality has advised the Servicer in writing that an agreement exists between the Relevant Selling Municipality and such Person or Persons as to the allocation of collections in respect of tax liens on such Property, then in such case the Servicer shall apply Collections in respect of such Tax Liens in accordance with the written instructions of such Relevant Selling Municipality that are not inconsistent with the other provisions of this Servicing Agreement.

Section 1.03.   Other Definitional Provisions.   Unless otherwise specified herein, the following provisions shall apply:

(a)   All terms defined in this Servicing Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(b)   As used in this Servicing Agreement and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Servicing Agreement or in any such certificate or other document, and accounting terms partly defined in this Servicing Agreement or in any such certificate or other document to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles.  To the extent that the definitions of accounting terms in this Servicing Agreement or in any such certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained in this Servicing Agreement or in any such certificate or other document shall control.

(c)   The words "hereof", "herein", "hereunder" and words of similar import when used in this Servicing Agreement shall refer to this Servicing Agreement as a whole and not

to any particular provision of this Servicing Agreement; Article, Section, Schedule and Exhibit references contained in this Servicing Agreement are references to Articles, Sections, Schedules and Exhibits in or to this Servicing Agreement unless otherwise specified; the term "including" shall mean "including without limitation"; the term "to" a given date shall mean "to but not including" such date; and the term "through" a given date shall mean "through and including" such date.

(d)    The definitions contained in this Servicing Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

(e)    Any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented in accordance with its terms and includes (i) in the case of agreements or instruments, references to all attachments thereto and instruments incorporated therein and (ii) in the case of statutes, any successor statutes; references to a Person are also to its permitted successors and assigns.

## ARTICLE II.

## GENERAL OBLIGATIONS OF SERVICER

Section 2.01.  <u>Duties and Responsibilities as to Servicing</u>.

(a)    The Servicer shall service and administer the Tax Liens listed on <u>Exhibit A</u>[1] attached hereto and made a part hereof, in accordance with the terms of this Servicing Agreement, the Servicing Policies and the provisions of all applicable Laws and, unless expressly provided to the contrary herein, giving due consideration to customary and usual standards of practice of prudent institutional residential and commercial loan servicers and asset managers servicing or managing, as the case may be, comparable assets for their own account, and taking into account its other obligations hereunder, but without regard to:

(i)    any relationship that the Servicer or any Affiliate of the Servicer may have with the related Property Owner or Selling Municipality;

(ii)    the Servicer's right to receive compensation for its services hereunder or with respect to any particular transaction;

---

[1]    It is understood by the parties hereto, that such <u>Exhibit A</u> shall initially be delivered by Owner following the initial acquisition of Tax Liens and shall include all Tax Liens, including, in all cases, any Subsequent Tax Liens acquired in connection therewith. It shall be updated by the Servicer on a timely basis after receipt of each acquisition file from Owner, which shall be sent to Servicer, electronically, on a timely basis by Owner after the completion of each acquisition from a Selling Municipality.  Such <u>Exhibit A</u> shall also be promptly updated from time to time to reflect any foreclosed properties.  The Servicer shall at all times maintain a complete and accurate copy of <u>Exhibit A</u> in its files, and shall provide the Owner with a copy promptly upon the Owner's request.

(iii)    any ownership interest that the Servicer or any Affiliate of the Servicer has in any Tax Lien;

(iv)    the ownership, or servicing or management for others by the Servicer or any Affiliate of the Servicer of any other assets similar to the Tax Liens; or

(v)    the fact that the best interest of the Servicer and the best interest of the Owner or the Selling Municipalities may not be the same.

In the event the Servicer discovers that its servicing activities on behalf of any other Person conflict or may conflict with the Servicer's obligations under this Servicing Agreement, then the Servicer shall give written notice to the Owner of such conflict within five days of discovering such conflict, and the Servicer shall resolve such conflict within thirty days of giving such notice to, and in consultation with, the Owner. Without intending to limit the rights of the Servicer under Section 12.01 hereof, in the event that the Servicer believes that it is unable to comply with the requirements of this Section 2.01 with respect to any particular Tax Lien Property as a result of one or more of the factors described in the foregoing clauses (i) through (v) or is unable to comply as a matter of law, it may arrange for a Person acceptable to the Owner to perform its duties with respect to such Tax Lien. In such event, the Servicer shall be deemed to be in compliance herewith. The Servicer shall provide notice to the Owner upon any amendment of the Servicing Policies and shall not materially amend the Servicing Policies without the prior written consent of the Owner.

(b)    Subject to any express limitations set forth in this Servicing Agreement, the Servicer shall seek to recover on a timely basis the largest amount possible with respect to each Tax Lien; provided, however, that nothing herein contained shall be construed as an express or implied guarantee by the Servicer of the collectability of the Tax Liens or of its ability to effect the timely or complete recovery thereof. Subject only to the above-described servicing standards and the terms of this Servicing Agreement and of the respective Tax Liens, the Servicer shall have full power and authority to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable; provided, however, that under no circumstances (other than during a period when a Property Owner is Bankrupt) shall the Servicer agree with any Property Owner or Selling Municipality to compromise, modify or reduce the Redemptive Value of any Tax Lien without the prior written consent of the Owner. Without limiting the generality of the foregoing, the Servicer shall, and is hereby authorized and empowered by the Owner to, with respect to each Tax Lien it is obligated to service pursuant to this Servicing Agreement, prepare, execute and deliver, on behalf of the Owner, any and all documents or other instruments necessary to maintain the lien of or enforce the Tax Liens on each Property if, in its reasonable judgment, such action is in accordance with, or is required by, this Servicing Agreement. Without limiting the generality of the power and authority granted herein, the Servicer shall also have full power and authority to prepare, execute, acknowledge and deliver, in connection with any foreclosure action brought pursuant to Section 8.01 hereof, on behalf of the applicable parties to this Servicing Agreement, the following documents: (i) affidavit of verification of debt, (ii) affidavit in support of default judgment, (iii) affidavit in support of motion for summary judgment, (iv) affidavit regarding testimony before referee, (v) computation of amount due oath, (vi) combined verification, oath and designation regarding the appointment of

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 10    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 354 of 688

an administrator with the surrogates court and (vii) such other oaths, affidavits and/or documents as may be necessary for the prosecution of the foreclosure action.

(c)    The Servicer shall at all times maintain accurate records and books of account, an adequate system of audit and internal controls and otherwise service the Tax Liens in a responsible, business-like manner and in accordance with good and accepted commercial practice. The Servicer shall provide the Owner, or its duly authorized representatives and designees, reasonable access during the Servicer's customary business hours, to any and all non-confidential information requested by the Owner with respect to the Tax Liens, the servicing of the Tax Liens, the Servicer's servicing and business operations (including with respect to any litigation involving the Servicer (whether or not in connection with the foreclosure or disposition of a Tax Lien)) and any other information deemed necessary by the Owner to ensure compliance by the Servicer with this Servicing Agreement or the compliance with any other regulatory requirement of the Owner or one of its Affiliates. The Servicer shall promptly notify the Owner in writing of any event, circumstance or occurrence (including the enactment of any Federal, state or local legislation) of which it has actual knowledge which could, in the reasonable judgment of the Servicer, materially adversely affect: (i) the terms or enforceability of any Tax Lien, including (A) any legal challenges filed in any judicial or administrative proceeding (whether in a foreclosure or Bankruptcy Proceeding or otherwise) to the amount, the enforceability or the lien priority thereof, or (B) any foreclosure or similar action against any Property underlying a Tax Lien or other action to enforce a tax lien against any Property (any such challenge or action, a "Legal Challenge"), (ii) the Property related to such Tax Lien, or (iii) the ability of the Servicer to service any Tax Lien or to otherwise perform and carry out its duties, responsibilities and obligations under this Servicing Agreement. If so instructed by the Owner, the Servicer shall turn over the defense of any Legal Challenge to the Owner or to such Person or Persons (including the applicable Selling Municipality) as the Owner may direct. In connection therewith the Servicer shall, at the request of the Owner, provide the Owner or such Person or Persons, as applicable, with copies of any papers served or filed in connection with such a Legal Challenge. The Servicer acknowledges that, in defending any such Legal Challenge, the Owner, or the applicable Selling Municipality with the written consent of the Owner, may authorize a compromise or reduction of the Redemptive Value of the Tax Lien which is the subject of such Legal Challenge. If at any time in connection with a Legal Challenge the Owner shall receive any discovery request, including a request to produce documents, the Owner shall promptly notify the Servicer of such request and the Servicer shall respond to such request within the applicable time frame. If at any time in connection with a Legal Challenge the Owner receives a request to provide a deposition, the Owner shall promptly notify the Servicer of such request and the Servicer shall respond to such request within the applicable time frame. In the event that it is necessary for the Owner to provide a deposition, the Servicer shall appear at such deposition on behalf of the Owner. The Servicer shall have the sole obligation to file any and all proofs of claim relating to any Tax Lien where the Property Owner and/or the Property is or becomes the subject of a Bankruptcy Proceeding, and shall, at the Owner's request, provide the Owner with copies thereof. The Servicer, on behalf of the Owner, shall file a notice of appearance and request for notice in accordance with Rule 2002 of the Federal Rules of Bankruptcy Procedure in any and all Bankruptcy Proceedings relating to the Tax Liens. The Servicer, on behalf of the Owner, shall comply with Rule 3001(e) of the Federal Rules of Bankruptcy Procedure with respect to the Bankruptcy Tax Liens.

(d)    The Servicer shall keep confidential all communications, whether written, oral, or otherwise, between the Servicer and the Owner and any other Persons with respect to Legal Challenges, as that term is defined in subsection (c) above, and with respect to any compromises or reductions of the Redemptive Value of one or more Tax Liens as a result of any Legal Challenges; provided, however, that the Servicer may disclose such information to (i) its professional consultants, (ii) to any other person to which such disclosure may be required (1) in compliance with any Law applicable to it or (2) in response to any subpoena or other legal process or (iii) otherwise in accordance with this Servicing Agreement.

(f)    Upon written request of a Servicing Officer, the Owner shall provide the Servicer with a power of attorney authorizing the execution by the Servicer of various agreements and instruments on behalf of the Owner in connection with the performance of its duties hereunder in the ordinary course of business, and thereafter such powers of attorney as the Servicer may reasonably request from time to time to for such purpose, provided (i) no such power of attorney shall be provided with respect to any matter as to which the prior consent of the Owner is expressly required pursuant to this Servicing Agreement until such time as such consent has been obtained, and (ii) the Servicer shall not use any such power of attorney to take any action not permitted by this Servicing Agreement.

Section 2.02.  Asset Administration.

(a)    Servicer Staffing. The Servicer shall maintain (and hire if necessary) a sufficient number of employees to enable the Servicer to perform its responsibilities under this Servicing Agreement. All such servicing personnel shall have sufficient qualifications, experience and administrative support to timely, efficiently, competently and professionally perform the servicing obligations hereunder in the manner contemplated by this Servicing Agreement. The Servicer shall promptly notify the Owner of any changes in senior management personnel involved with the Tax Liens.

(b)    Inquiries and Complaints. The Servicer shall be responsible for the process of resolving inquiries and complaints concerning the Tax Liens from the Property Owners, the Selling Municipalities, the general public, financial institutions and other third parties. The Servicer shall promptly coordinate investigations and respond to inquiries and complaints received, shall monitor the resolution of pending complaints and shall keep a record detailing all complaints received and corrective actions taken, which shall be available for review by the Owner at the Owner's request. The Servicer shall also provide a Monthly Litigation Status Report to the Owner in substantially the form set forth in Exhibit D hereto which will include information about all material written complaints and litigation involving the Tax Liens or the Servicer, including the facts surrounding such action, the parties involved in such actions and actions taken by the Servicer to address such complaints and litigation. At the request of the Owner, the Servicer shall provide any additional information and documentation with respect to any complaints and litigation identified in a Monthly Litigation Status Report.

(c)    Computer Systems.

(i)      The Servicer acknowledges that efficient and timely reporting and exchange of information regarding the Tax Liens between the Servicer and the Owner is critical to the efficient servicing and management of the Tax Liens by the Servicer. Accordingly, the Servicer shall, if requested and at its expense, cause its computer technicians and consultants to consult with those of the Owner to facilitate the Servicer's efficient exchange of servicing data in electronic format with the Owner. If requested, the Servicer shall provide access to the servicing data maintained for the Tax Liens (including the information used to compile the servicer reports) in a format reasonably acceptable to the receiving party. The Servicer will perform such other functions as may be reasonably necessary or desirable from time to time hereunder to perform the servicing obligations hereunder in a timely and efficient manner. In no event will the Servicer be required to replace or substantially alter its existing computer system or incur any expenses relating to the alteration of the computer systems of the Owner.

(ii)      In consultation with and on behalf of the Owner, the Servicer shall, at its expense and for its use, maintain accounting and collection systems which will coordinate all accounting and other information developed by the Servicer regarding the Tax Liens, including without limitation, all information relating to or necessary for (A) the monitoring of servicing activities, (B) the preparation of servicing reports and tax reports, (C) the calculation and monitoring of servicing fees, trial balances and cash flow, and (D) the overall management of the Tax Liens.

(iii)      The Servicer represents and warrants that it has an existing "disaster recovery" feature in place with respect to its computer system which is designed to recover all computer stored information relating to the Tax Liens in the event of a power outage or other disruptive event, and agrees that it shall maintain such feature throughout the term of this Servicing Agreement.

Section 2.03.  <u>Employee Dishonesty Policy and Errors and Omissions Insurance</u>. The Servicer, at its expense, shall maintain in effect during the term of this Servicing Agreement (i) an Employee Dishonesty Policy and (ii) an errors and omissions insurance policy, in each case with such coverage as shall then be available on commercially reasonable terms. The Employee Dishonesty Policy shall protect and insure against losses, including forgery, theft, embezzlement and fraud of the directors, officers and employees of the Servicer, and shall contain an endorsement listing the Owner as loss payee. The Servicer shall be deemed to have complied with the terms of this provision with respect to an Employee Dishonesty Policy if one of its Affiliates has such employee dishonesty coverage, and by the terms of such employee dishonesty coverage, the coverage thereunder extends to the Servicer and complies with the terms of the immediately preceding sentence. The errors and omissions insurance policy shall insure against loss arising from errors, omissions or negligent acts of the Servicer with respect to its services hereunder, shall have a policy limit of not less than $1 million, and name the Owner as an additional insured, but solely with respect to their vicarious liability, if any, for work performed by the Servicer, affording coverage for all directors, officers and employees of the Servicer. No provision of this Section 2.03 requiring such Employee Dishonesty Policy and errors and omissions insurance (nor the provision of such insurance) shall diminish or relieve the Servicer from its duties and obligations as set forth in this Servicing Agreement. The Servicer shall promptly report any changes of which it is actually aware that may occur in the Employee

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 10    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 357 of 688

Dishonesty Policy or errors and omissions insurance policy, including any information that the provider thereof has ceased to be a Qualified Insurer, and shall furnish to the Owner on request, copies of all binders and policies or certificates evidencing that such bonds and insurance policies are in full force and effect. The Servicer shall promptly report to the Owner all cases of embezzlement or fraud, or irregularities of operation, suspected or otherwise, whether or not such events involve funds relating to the Tax Liens. The total losses, regardless of whether claims are filed with the applicable insurer or surety, shall be disclosed in such reports together with the amount of such losses covered by insurance. If a bond or insurance claim report is filed with any of the Servicer's bonding companies or insurers, a copy of such report shall promptly be furnished to the Owner.

Section 2.04. <u>Maintenance and Release of Tax Lien Documentation</u>.

(a)    <u>Maintenance, Custody and Ownership of Servicer's Tax Lien Files and Records</u>.

Within five (5) Business Days after each Acquisition Date, the Owner shall electronically deliver to the Servicer information on all new Tax Lien purchases by completing the required information fields in the electronic form attached hereto as [Ex. "X"]; and also deliver or cause to be delivered to the Servicer a copy of any receipt, document, notice, form or other item evidencing ownership of each Tax Lien. The Servicer shall be responsible for the following in connection with the custody of the Servicer's Tax Lien Files:

(i)    The Servicer shall verify that all documentation evidencing ownership of the Tax Liens and any other documents which are required to be delivered by the applicable Selling Municipality are in its possession, and will review the documents to ensure that they appear regular and accurate on their face;

(ii)    The Servicer shall segregate and maintain continuous custody of all Tax Lien files received by it in secure and resistant facilities, in accordance with customary standards for such custody;

(iii)    If the Servicer receives notice of a redemption in full of a Tax Lien for which it is custodian, the Servicer shall surrender the physical Tax Lien (if applicable) promptly upon confirmation of such redemption; and

(iv)    The Servicer will track the redemption of each Tax Lien to assure that proceeds are received in a timely manner.

The Servicer shall also maintain, as a part of the Servicer's Tax Lien File for each Tax Lien (x) copies of any instruments or documents that modify or supplement the terms or conditions of the applicable Tax Lien, and (y) all other papers and documents generated by or coming into the possession of the Servicer (including but not limited to, tax receipts, insurance premium receipts, ledger sheets, payment records, property inspections, insurance claim files and correspondence, foreclosure files and correspondence, current and historical computerized data files, whether developed or originated by the Servicer or others) that are required to document or service such Tax Lien. The Servicer's Tax Lien Files shall remain the property of the Owner at all times, subject however, to the right of the Servicer to retain copies of the Servicer's Tax Lien

Files for its own purposes, and all such records, documents and instruments in the possession and custody of the Servicer constituting a part of the Servicer's Tax Lien File relating to any Tax Lien, shall be held by the Servicer as the agent and bailee of the Owner for purposes of perfecting the Owner's security interest in the Tax Liens, in the event it is determined that such perfection is achieved through possession by the secured party or its agent and bailee as may be contemplated by the Uniform Commercial Code or other applicable Law. On written request of the Owner, the Servicer shall immediately deliver all or any of such records and documents in its possession or custody to the Owner or a third party designated by the Owner in writing, together with a list identifying each Tax Lien to which such records pertain. The Servicer, at its option, may microfilm, microfiche or otherwise condense any records or documents constituting a part of, or relating to, any Tax Lien or the Servicer's Tax Lien File except for the Hazard Insurance Policy or any Flood Insurance Policy, provided that the Servicer will, upon written request by the Owner, promptly reproduce in their entirety any or all such records or documents, the cost of such reproduction to be considered a Lien Administration Expense.

(b)    <u>Tax Lien Record</u>. The Servicer shall maintain an appropriate account record for each Tax Lien being serviced hereunder. The account record for each Tax Lien shall include the tax block, lot designation, tax class (if any) and building code of the related Property. The account record shall also include the date of acquisition, face value and bid rate on each Tax Lien. Any system utilized for the Tax Lien account records shall be capable of producing, at any time for any Tax Lien, an account transcript itemizing in chronological order the date, amount, and distribution (with respect to principal and/or interest) of each amount paid by the Property Owner and/or Selling Municipality with respect to amounts due and owing with respect to the Tax Lien, and the accrual of statutory interest on the Tax Lien.

(c)    <u>Release of Servicer's Tax Lien File Upon Tax Lien Redemption or Other Liquidation</u>.

(i) Upon any liquidation of a Tax Lien, the Servicer shall direct the deposit of the related Collections in the related Lockbox Account and, in the case of a redemption, if necessary under applicable Law, prepare an instrument or instruments necessary to release the lien of the Tax Lien (all such instruments collectively, the "<u>Instruments of Release</u>"), and shall also, in the case of a redemption, if necessary under applicable Law, deliver such Instruments of Release, in recordable form, to or for the benefit of the Property Owner, and deposit any remaining documents into the Servicer's Tax Lien File.

(ii) Upon the receipt of all condemnation proceeds awarded in an eminent domain proceeding relating to a Tax Lien, the Servicer shall prepare and deliver, as required under applicable Law, Instruments of Release, in recordable form, to release the Property from the lien of the Tax Lien, and deposit any remaining documents into the Servicer's Tax Lien File.

Section 2.05. <u>Annual Certification by Officer</u>. On or before January 30 in each calendar year, commencing in 2018, the Servicer shall deliver to the Owner an Officer's Certificate to the effect that:

(a) The officer signing such certificate has reviewed the activities and performance of the Servicer during the preceding fiscal year (or portion thereof) under this Servicing Agreement and, to the best of such officer's knowledge, the Servicer has fulfilled, in all material respects, all of its duties, responsibilities or obligations under this Servicing Agreement throughout such year (or portion thereof), or, if there has been a default or failure of the Servicer to perform any of such duties, responsibilities or obligations, a description of each default or failure and the nature and status thereof and the actions that the Servicer proposes to take to cure the same.

(b) {reserved}

(c) Such officer has confirmed that the insurance required by Section 2.03 of this Servicing Agreement is in full force and effect, and that the relevant insurer(s) is/are still Qualified Insurer(s) as of the date of the certification.

(d) {reserved}

The Servicer shall also furnish and certify such other information as to its organization, activities and personnel as the Owner may reasonably request from time to time.

Section 2.06. <u>Permitted Charge Offs</u>. The Servicer shall be permitted to charge off amounts from the aggregate Tax Lien Principal Balance in accordance with this Section.

(a) The Servicer shall identify the Tax Liens with respect to which estimates of the related Lien Administration Expenses exceed the anticipated Collections with respect to such Tax Liens. At any time following the Acquisition Date, the Servicer may deliver to the Owner notice of the Tax Liens so identified, which shall include a list of such Tax Liens and materials in support of the Servicer's determination that such Tax Liens are not collectible or should not be collected. Within fifteen (15) days from the receipt of such notice, the Owner shall deliver to the Servicer written acceptance of any items contained in the list of Tax Liens described in the notice from the Servicer.

(b) The Servicer shall charge off any Tax Lien with respect to which the Servicer has received less than the Redemptive Value of such Tax Lien through (i) the sale or disposition of the underlying Property or (ii) judicial determination. The Servicer shall effect such charge off within 30 days from the date on which the Servicer has received such reduced amount.

(c) The Tax Lien Principal Balance of any such charged off Tax Lien shall be reduced to zero.

ARTICLE III.

TERM

Section 3.01.  Term of Servicing Agreement.  This Servicing Agreement shall be effective as of the date hereof and shall terminate on the Termination Date.  The provisions of Article V and Section 12.05 shall survive the termination of this Servicing Agreement.

ARTICLE IV.

REPRESENTATIONS AND WARRANTIES

Section 4.01.  Servicer's Representations and Warranties.  The Servicer represents and warrants to the Owner, and at all times during the term of this Servicing Agreement shall be deemed to represent and warrant, as follows:

(a)    It is a limited liability company duly organized, validly existing and in good standing under the laws of the Commonwealth of Virginia and is or will be in compliance with all applicable Laws to the extent such compliance is necessary to enforce each Tax Lien in accordance with the terms of this Servicing Agreement;

(b)    The execution and delivery of this Servicing Agreement by it and its performance and compliance with the terms of this Servicing Agreement will not violate its organizational documents or bylaws or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any contract, agreement or other instrument to which it is a party or which may be applicable to it or any of its assets, which default or breach would materially and adversely affect its condition (financial or other) or operations or its properties or might have consequences that would materially affect the performance of its duties hereunder;

(c)    This Servicing Agreement, assuming due authorization, execution and delivery by each of the other parties hereto, constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Servicing Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other laws relating to or affecting the rights of creditors generally, and by general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law);

(d)    It is not in violation of, and the execution and delivery of this Servicing Agreement by it and its performance and compliance with the terms of this Servicing Agreement will not constitute a violation with respect to, any order or decree of

any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction, which violation would have consequences that would materially and adversely affect its condition (financial or other) or operations or its properties or might have consequences that would materially affect the performance of its duties hereunder;

(e)     No litigation is pending or, to the best of its knowledge, threatened against it which would have an adverse effect on its entering into or performing its obligations under this Servicing Agreement or which could have a material adverse effect on its financial condition;

(f)     It does not believe, nor does it have any reason or cause to believe, that as of the date hereof it cannot perform each and every covenant and obligation on its part hereunder to be performed in accordance with the terms hereof in all material respects;

(g)     No consent, approval, authorization or order of any court, governmental agency or governmental body is required for the execution, delivery and performance by it of, or compliance by it with, this Servicing Agreement, or the consummation by it of the transactions contemplated by this Servicing Agreement;

(h)     It possesses all licenses necessary for the conduct of its business in the Tax Lien States or is otherwise exempt or not required under applicable Law to effect such qualification or license and no demand for such qualification or license has been made upon the Servicer by such state, and in any event the Servicer is in compliance with the Laws of the Tax Lien States to the extent necessary to ensure the enforceability of each Tax Lien and the servicing of the Tax Liens in accordance with the terms of this Servicing Agreement; and

(i)     To the best of its knowledge, neither any factual information provided by, or any statements made in this Servicing Agreement by, it nor any statement, report or other document furnished or to be furnished by it pursuant to this Servicing Agreement or in connection with the transactions contemplated herein contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

It is understood and agreed that the representations and warranties set forth in this Section 4.01 shall survive until the termination of this Servicing Agreement, and shall inure to the benefit of the Owner and its successors or assigns.

Section 4.02. <u>Owner's Representations and Warranties</u>. The Owner represents and warrants to the Servicer, and at all times during the term of this Servicing Agreement shall be deemed to represent and warrant, as follows:

(a)     It is duly organized, validly existing and in good standing under the laws of the State of Delaware;

(b)     This Servicing Agreement, assuming due authorization, execution and delivery by each of the other parties hereto, constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Servicing Agreement, except as such

enforcement may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other laws relating to or affecting the rights of creditors generally, and by general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law);

(c)     The execution and delivery of this Servicing Agreement by it and its performance and compliance with the terms of this Servicing Agreement will not violate its organizational documents or bylaws or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any contract, agreement or other instrument to which it is a party or which may be applicable to it or any of its assets, which default or breach would materially and adversely affect its condition (financial or other) or operations or its properties or might have consequences that would materially affect the performance of its duties hereunder;

(d)     It is not in violation of, and the execution and delivery of this Servicing Agreement by it and its performance and compliance with the terms of this Servicing Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction, which violation would have consequences that would materially and adversely affect its condition (financial or other) or operations or its properties or might have consequences that would materially affect the performance of its duties hereunder;

(e)     No litigation is pending or, to the best of its knowledge, threatened against it which would have an adverse effect on its entering into or performing its obligations under this Servicing Agreement or which could have a material adverse effect on its financial condition; and

(f)     No consent, approval, authorization or order of any court, governmental agency or governmental body is required for the execution, delivery and performance by it of, or compliance by it with, this Servicing Agreement, or the consummation by it of the transactions contemplated by this Servicing Agreement.

(g)     The Owner warrants that it will provide complete and accurate information to the Servicer concerning the acquired Tax Liens so that Servicer can perform its obligations to the Owner as set forth in this Servicing Agreement.

It is understood and agreed that the representations and warranties set forth in this Section 4.02 shall survive until the termination of this Servicing Agreement, and shall inure to the benefit of the Servicer.

Section 4.03.  Notice of Incorrect Representations or Warranties.  If any party hereto during the term of this Servicing Agreement discovers that any of the representations or warranties contained in this Article IV are false, incorrect or misleading, or if any party hereto obtains knowledge of any event or circumstance that would reasonably cause it to believe that any of its representations or warranties are false, incorrect or misleading, it shall promptly deliver to the other parties hereto an Officer's Certificate (i) certifying as to the event or circumstance that caused, or may have caused, the representation or warranty to be false, incorrect or misleading and (ii) summarizing the action, if any, that it intends to take (or has taken) to cause or assure that its representation or warranty is true, correct and not misleading.

## ARTICLE V.

## COMPENSATION, SERVICING FEES AND OTHER CHARGES

Section 5.01. <u>Servicing Fees</u>.

(a)    As compensation for the services provided by the Servicer under this Servicing Agreement with respect to the Tax Liens, the Servicer shall be entitled to receive certain fees with respect to the servicing of Tax Liens in each Tax Lien State. Such Servicing Fees shall be determined on a monthly basis (the "<u>Calculation Period</u>") and shall be comprised of (i) the Base Servicing Fee determined with respect to each Tax Lien based on the product of the following: (A) the Base Servicing Fee Percentage applicable to such Tax Lien on such date (as set forth on Schedule A hereto), (B) the Tax Lien Principal Balance which corresponds to such Tax Lien on the first day of the month, and (C) a fraction, the numerator of which is one and the denominator of which is 12 (as calculated by the Servicer in consultation with the Owner) (the "<u>Base Servicing Fee</u>")

(b)    Any Servicing Fees due and owing to the Servicer shall be paid to the Servicer on or about the twentieth Business Day of each month during the term of this Servicing Agreement.

(c)    With respect to any Subsequent Tax Liens acquired by the Servicer on behalf of the Owner as set forth in Section 8.01(b) hereto, Owner agrees to pay Servicer a fee equal to the aggregate Initial Tax Lien Principal Balance of such Subsequent Tax Liens in the related Tax Lien State multiplied by the Subsequent Tax Lien Purchasing Percentage (as set forth on Schedule A) "<u>Subsequent Tax Liens Purchasing Fee</u>".

Section 5.02. <u>No Other Servicing Fees</u>. The Servicing Fees referred to in Section 5.01 hereof are the only Servicing Fees that shall be paid to the Servicer in connection with the performance of the obligations of the Servicer set forth under this Servicing Agreement, and the Servicer shall not be entitled to any compensation or remuneration hereunder other than the Servicing Fee. The Servicer shall be required to pay all expenses incurred by it in connection with the performance of its obligations under this Servicing Agreement and shall not be entitled to reimbursement therefor except to the extent set forth in Section 5.05 hereof.

Section 5.03    <u>Right to Amend Servicing Fees</u>. The Servicer shall have the right to amend any of its Servicing Fees set forth in Section 5.01 hereof not more than once a year after the first year anniversary of the Effective Date of this Servicing Agreement. The Servicer may effectuate any amendment to its Servicing Fees by providing the Owner 30 days prior notice of the effective date of the amendment. Unless Owner objects to the amended Servicing Fees prior to the effective date of the amendment by providing a notice to terminate this Servicing Agreement pursuant to Section 11.01(ii) hereof, the Owner will be deemed to have agreed to the amended Servicing Fees under this Servcing Agreement.

Section 5.04. <u>No Violation of Laws or Regulations</u>. Notwithstanding any other provisions of this Servicing Agreement, the Servicer shall not charge or impose on any Property

Owner and/or any Selling Municipality, nor seek to charge or impose, or assert a right to receive, any fee, charge, premium or penalty that if charged or collected would violate or contravene any Law, including usury laws.

Section 5.05.  <u>Payment of Lien Administration Expenses</u>.  The Owner shall be responsible for providing all funds throughout the term of this Servicing Agreement to pay all Lien Administration Expenses in advance of any such payment being due and, to the extent such payment is not made to the recipient directly by the Owner, in sufficient time to permit timely payment to the third party recipient.  If the Owner makes funds available to the Servicer for the payment of any Lien Administration Expense, then the Servicer shall be responsible for payment of such Lien Administration Expense to the party to whom payment should be made.

Section 5.06.  <u>Netting</u>.  The Servicer shall have the right to deduct from, offset and apply any Collections and other amounts received and payable to the Owner against any Servicing Fees and Lien Administration Expenses payable by the Owner pursuant to this Servicing Ageeement which are more than 30 days past due (after any required notice has been given to the Owner in accordance herewith).  The Owner shall be responsible for providing all funds throughout the term of this Servicing Agreement to pay all Lien Administration Expenses in advance of any such payment being due and, to the extent such payment is not made to the recipient directly by the Owner, in sufficient time to permit timely payment to the third party recipient.  If the Owner makes funds available to the Servicer for the payment of any Lien Administration Expense, then the Servicer shall be responsible for payment of such Lien Administration Expense to the party to whom payment should be made.


## ARTICLE VI.

## COLLECTION OF PAYMENTS

Section 6.01.  <u>General</u>.

(a)     The Servicer shall direct all Collections received with respect to a Tax Lien to be paid by the related selling municipality directly into the related Lockbox Account.

(b)     The Servicer shall transfer all Collections received by the Servicer in respect of each Tax Lien or related Property acquired under this Servicing Agreement on or after the applicable Acquisition Date into the applicable Lockbox Account on a daily basis, and in no event later than one (1) Business Day after the Servicer's receipt.  The Servicer agrees that it has no right, title or interest in, or ownership claim to, any amounts held in any Lockbox Account.

(c)     The Servicer may, in accordance with the Laws of the applicable jurisdiction and with the consent of the Owner, to the extent permitted, accept payments for less than the full Redemptive Value of a Tax Lien (a "<u>Partial Payment</u>").  A Partial Payment shall not discharge the related Tax Lien unless consented to by the Owner, but shall be applied against the Redemptive Value thereof in accordance with Section 1.02 hereof.

Section 6.02. <u>Forbearance Agreements</u>. With the written consent of the Owner, the Servicer is hereby authorized to forbear in connection with its enforcement of Tax Liens provided that the subject Property Owners or Selling Municipalities comply with the individual terms and conditions of forbearance established by the Servicer. The details of such forbearance shall be determined by consultation with the Owner and shall be maintained in the Servicer's collection system. The Servicer shall further provide to the Owner reasonable access to such information during the Servicer's customary business hours, at the Owner's request. Any reasonable expenses incurred by the Servicer in negotiating and monitoring the terms and conditions of forbearance shall be considered Lien Administration Expenses.

Section 6.03. <u>Servicer to Prepare and Deliver Servicer Reporting Statements</u>.

Not later than 5:00 p.m. Eastern Time as in effect in the City of New York on the fifteenth calendar day after the end of each month (or the next Business Day if such day is not a Business Day), the Servicer shall prepare and deliver to the Owner, a statement in form and substance reasonably acceptable to the Owner (a "<u>Servicer Monthly Reporting Statement</u>") with respect to the Tax Liens setting forth:

(i)     Asset Activity Summary

(ii)    Asset Collections Summary and Details

(iii)   Redemptions

(iv)    Bankruptcy Status

(v)     State Foreclosure Summary and Detail

(vi)    Mature Liens

(vii)   Prior and Other Adjustments

(viii)  Purchases

(ix)    Income

(x)     Active Lien Detail

The Servicer will provide any other information regarding the Tax Liens serviced by it hereunder (i) as Owner may, from time to time, reasonably request and (ii) needed to satisfy Owner's books and records requirements for general accounting principles, tax and any other regulatory requirements.

# ARTICLE VII.

## PROTECTION OF SECURITY

Section 7.01. <u>Properties with respect to which Foreclosure is Permitted and Has Begun</u>. The Servicer shall visit and inspect any Property and prepare and place in the Servicer's Tax Lien File a Property Inspection Report at the request of the Owner. Notwithstanding the foregoing, the Servicer shall consult with the Owner as to when the Servicer believes such visits and inspections would be advisable pursuant to the Servicing Policies. Subject to the ability of the Servicer to gain access to or control of the Property, the Servicer shall also perform any and all other acts as may be consistent with accepted commercial practice for inspection and protection of properties secured by delinquent mortgage loans or as required by the Owner. All Property Inspection Reports shall be delivered to the Owner, upon request.

Section 7.02. <u>Notice of Liens and Other Actions</u>. The Servicer shall take such steps as are customary to monitor the status of liens or other encumbrances that could be superior or ranked *pari passu* in lien priority to the lien of the Tax Liens, but shall have no obligation hereunder to take any action, as the Servicer may deem appropriate, to protect the Owner against any such superior liens until the time, if any, of the actual foreclosure of such superior lien, and such actions shall be subject to the availability of funds provided by the Owner for such purpose. The Servicer will use its best efforts to make the Owner aware of any superior or *pari passu* liens or encumbrances of which the Servicer is notified or otherwise has actual knowledge.

The Servicer shall promptly notify the Owner in writing of the existence of any lien or judicial levy upon or writ of attachment against a Property as to which the Servicer is notified or otherwise has actual knowledge, that is, or may be, superior or ranked *pari passu* to the lien of the Tax Lien including, for example, certain federal liens. In addition, within five (5) Business Days of discovery, and on an ongoing basis thereafter with respect to any specific action, including regular updates, the Servicer shall notify the Owner in writing (and provide related documentation as requested by the Owner) of any subpoenas, regulatory actions, orders, penalties or fines received with respect to the Tax Liens or the Servicer, as well as any pending arbitration, mediation or litigation involving more than $100,000 in controversy involving the same. Similarly, notice shall promptly be given by the Servicer to the Owner in the event the Servicer is notified or otherwise has actual knowledge that a Property Owner is Bankrupt or that any condemnation of a Property is pending or threatened.

Section 7.03. <u>Actions with respect to Bankruptcy Tax Liens</u>. The Servicer shall not take any steps in violation of applicable bankruptcy laws regarding any Tax Lien as to which the related Property Owner is Bankrupt. To this end but without limiting the generality of the foregoing, the Servicer shall, with respect to the Bankruptcy Tax Liens, unless authorized by the applicable bankruptcy court, refrain from any acts of collection during the time that the related Property Owner and/or the Property is the subject of a Bankruptcy Proceeding and any act to enforce or collect the Bankruptcy Tax Liens by act of foreclosure or other legal means (including but not limited to the sending of letters other than those required by statute) without first obtaining appropriate judicial relief; <u>provided, however</u>, that the Servicer may, in accordance with the Laws of the applicable jurisdiction, send each Property Owner a so-called "hello letter" in which the Servicer identifies itself as the servicer of the Tax Liens.

ARTICLE VIII.

REALIZATION AND FORECLOSURE

Section 8.01. <u>Realization upon Tax Liens</u>.

(a)    The Servicer shall review any prior and available due diligence on the Properties and recommend to the Owner whether the foreclosure process should be commenced for any outstanding Tax Lien. The foreclosure process shall only be initiated by the Servicer at the direction of the Owner. With the written consent of the Owner and subject to any requirements of the Owner, the Servicer shall initiate the process to foreclose on a Tax Lien and shall provide the Owner with a Foreclosure Notice in connection therewith to the extent applicable. The Owner shall direct the Servicer as to whether to proceed with the foreclosure process in the name of the Owner or the name of the Servicer or its designee. The Owner shall pay the Foreclosure Amount set forth in the Foreclosure Notice as prescribed in such notice. Any reasonable out-of-pocket expenses incurred by the Servicer in the foreclosure process shall be considered Lien Administration Expenses. The Servicer shall not be required to pursue any deficiency judgments or to bring any collection actions against any assets of the Property Owners and/or any Selling Municipalities other than the Properties encumbered by Tax Liens (unless as otherwise set forth in the applicable Tax Lien Statute).

(b)    The Servicer shall review any prior and available due diligence on the Properties and recommend to the Owner whether Subsequent Tax Liens available for purchase on a Property should be acquired by the Owner. Prior to any purchase, the Servicer shall notify the Owner of the amount required and steps necessary to complete such purchase. With the approval of the Owner and subject to any requirements of the Owner, the Servicer shall purchase such Subsequent Tax Liens on behalf of the Owner. The Owner agrees to take all necessary steps reasonably requested by the Servicer to facilitate and complete the acquisition of Subsequent Tax Liens. The purchase price for all Subsequent Tax Liens shall be a cost and expense of the Owner and the Servicer shall have no liability for such purchase price. Any reasonable out-of-pocket expenses incurred by the Servicer in the review and purchase of Subsequent Tax Liens shall be considered Lien Administration Expenses. The Servicer shall have no liability for Subsequent Tax Liens not purchased on behalf of the Owner.

(c)    Actions to foreclose upon Properties encumbered by Tax Liens shall be commenced pursuant to the applicable Laws of the jurisdiction. In any Tax Lien foreclosure action, the Servicer shall, with the written consent of the Owner and in accordance with the applicable Laws of the jurisdiction, make a bid on behalf of the Owner for the related Property in an amount that shall maximize proceeds to the Owner. The Property shall be sold only to the Person offering the highest economic value therefor, taking into account all of the terms and conditions of the offer, as determined by the Servicer in accordance with its servicing standard and after consultation with the Owner.

(d)    Prior to any foreclosure of the Tax Lien related to any Property, the Servicer may in its discretion, after taking into account the servicing standard set forth in Section 2.01(a) hereof and with the written consent of the Owner, obtain an appraisal thereof conducted by an

Independent appraiser familiar with the area in which such Property is located in order to determine the fair market value of such Property. .

(e)     The Servicer shall not be liable in the event that any estimates made by an expert pursuant to subsection (d) of this Section 8.01 are different from actual figures, provided that prior to retaining such expert the Servicer has reasonably determined that such expert was qualified and duly licensed. The Servicer shall also not be liable with respect to a hazardous environmental condition or with respect to a Property that is not in substantial compliance with applicable environmental laws as long as the Servicer has followed the procedures set forth in this Section.

Section 8.02. {reserved}

Section 8.03. <u>Conveyance Documents</u>. Any Conveyance to any purchaser of an REO Property shall be made by quitclaim deed, bargain and sale deed without covenants, or special limited or general warranty deed, as determined to be commercially reasonable by the Servicer. The Servicer shall use all commercially reasonable efforts to prepare the necessary documents not later than two weeks prior to the expected date of sale or confirmation of sale, if applicable. The Owner shall execute such documents or grant a power of attorney to the Servicer or its agent for the purpose of executing such documents.

## ARTICLE IX.

## ARTICLE X.

## ACCOUNTING SYSTEM

Section 10.01. <u>General</u>. All accounting and Tax Lien servicing records pertaining to each Tax Lien shall be maintained in such manner (including in electronic format) as will permit the Owner, or its duly authorized representatives and designees, to examine and audit and make legible reproduction of records at any time, including by electronic delivery, at the Owner's request. Following the termination of this Servicing Agreement, the Servicer shall box and index all records compiled in connection with this Servicing Agreement and the Tax Liens serviced hereunder, and shall deliver said records upon the direction of the Owner.

## ARTICLE XI.

## TERMINATION

Section 11.01. <u>Termination</u>.

(i)     The Owner may, upon thirty (30) Business Days' prior notice, terminate the rights and obligations (but not the liabilities) of the Servicer under this Servicing Agreement upon written notice to the Servicer upon the happening of any of the following events (an "<u>Event of Default</u>"):

(a)    If the Servicer fails to remit or transfer any funds received that the Servicer is required to remit or transfer pursuant to this Servicing Agreement, and such failure is not cured within two (2) Business Days after the earlier of (i) the Servicer's having knowledge of such failure and (ii) the giving by the Owner to the Servicer of written notice of such failure;

(b)    If any representation or warranty made by the Servicer in this Servicing Agreement is false, incorrect or misleading in any material respect, or if any representation or warranty made by the Servicer in any report, document, certificate or other papers delivered by the Servicer to the Owner from time to time is false, incorrect or misleading in any material respect, and such breach has not been cured by the Servicer within 30 days of the Servicer's receipt of written notice of such breach by an Officer of the Owner;

(c)    If the Servicer breaches or fails to perform or observe any obligation or condition (other than those referred to in subparagraphs (a) and (b) of this Section 11.01), to be performed or observed by it under this Servicing Agreement and such breach or default is not cured within 30 days (or such later period as agreed to in writing by the Owner) after the earlier of (i) the Servicer's having knowledge of such breach or default and (ii) the giving by the Owner to the Servicer of written notice demanding that such breach or default be cured; or, if the Owner has not given such written notice to the Servicer, the Owner has made a good faith determination that such default cannot be cured within 30 days;

(d)    If an Insolvency Event shall have occurred in respect of the Servicer or any Person holding all or substantially all of the issued and outstanding shares of capital stock representing ordinary voting rights of the Servicer;

(e)    If a material event of default has occurred, or an event has occurred which, with the giving of notice or the passage of time or both, would constitute a material event of default, under any agreement of the Servicer or any of its subsidiaries in connection with any indebtedness of $50,000 or more.

(ii)    The Owner may, after receiving notice of an amendment of the Servicing Fees pursuant to Section 5.03 hereof, terminate this Servicing Agreement by providing notice to the Servicer at any time before the effective date of the amended Servicing Fees. The effective date of any such termination is set forth in Section 11.04 hereof, and the unamended Servicing Fees that were previously in place will remain in effect until the effective date of termination.

(iii)    The Servicer may, upon 90 days prior notice (which period shall include any cure period set forth below), terminate this Servicing Agreement upon written notice to the Owner upon the happening of any of the following events:

(a)    If any representation or warranty made by the Owner in this Servicing Agreement is false, incorrect or misleading in any material respect, and such breach has not been cured by the Owner within 30 days of the Servicer's receipt of written notice of such breach by an Officer of the Servicer;

(b)    If the Owner fails to pay any fees required to be paid under Section 5.01 of this Servicing Agreement and such default is not cured within 30 days after the giving by the Servicer to the Owner of written notice demanding that such default be cured; or

(c)    If an Insolvency Event shall have occurred in respect of the Owner or any Person holding all or substantially all of the issued and outstanding shares of capital stock representing ordinary voting rights of the Owner.

Section 11.02. <u>Servicer's Duties Upon Termination</u>.  Upon any termination of the rights and obligations of the Servicer under this Servicing Agreement pursuant to 11.01 hereof, the Servicer, at its expense if terminated pursuant to Section 11.01(i) hereof (and such expenses shall be Lien Administration Expenses in the event of any other termination), shall promptly deliver to any Person designated by the Owner the Servicer's Tax Lien Files together with all other reports, documents, data and information in the possession, custody or control of the Servicer that relate to the Tax Liens and shall otherwise exercise its best efforts to effect and carry out an orderly and efficient transfer of the duties, responsibilities and obligations of the Servicer to a new Servicer designated by the Owner.  In the event that the rights and obligations of the Servicer under this Servicing Agreement are terminated pursuant to Section 11.01(i) or (iii), in addition to any other claim, right or remedy that the terminating party may have against the defaulting party, the defaulting party shall reimburse the terminating party, on demand, for any loss, damage or expense including court costs and reasonable attorneys' fees, incidental to the termination of this Servicing Agreement and, if termination is by reason of a default by the Servicer, the Servicer shall be responsible for all costs of the transfer of the servicing of the Tax Liens to the successor Servicer.  Termination of this Servicing Agreement shall not release the Servicer or the Owner from any liability or obligation that shall have arisen or may thereafter arise as a result of acts or omissions by the Servicer or the Owner, as applicable, prior to such termination.

Section 11.03. <u>Payment of Servicing Fees Upon Termination</u>.  Any termination or assignment of the rights and obligations of the Servicer under this Servicing Agreement by the Owner as to all or any Tax Liens, shall not extinguish the Servicer's right, if any, to payment of Servicing Fees that the Servicer was entitled to be paid prior to the date of termination; except, however, that in the case of a termination by the Owner by reason of an Event of Default, the Owner shall be entitled to deduct from and offset against any amounts due to the Servicer the amount of any loss, liability, damage, cost or expense for which the Servicer is liable or obligated to pay the Owner as a result of such Event of Default.

Section 11.04. <u>Successor Servicer</u>.  Any termination pursuant to Section 11.01 hereunder shall not be effective until the appointment of a successor Servicer, provided that in no event shall the termination of this Servicing Agreement pending appointment of a successor Servicer exceed sixty (60) days from the otherwise applicable termination date.  Any successor Servicer hereunder shall be (A) reasonably satisfactory to the Owner and (B) an organization experienced in the management and disposition of tax liens, distressed real estate and nonperforming income property.  Such successor Servicer shall execute and deliver an agreement,

in form and substance reasonably satisfactory to the Owner, which contains an assumption by such Person of the due and punctual performance of each covenant and condition to be performed or observed by the Servicer under this Servicing Agreement from and after the date of such agreement.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

Section 12.01. <u>Assignment and Delegation of Duties by Servicer</u>.

(a)     Except as otherwise provided by subsection (b) hereof, the Servicer shall not assign or transfer any of its rights, benefits or privileges under this Servicing Agreement to any other Person, nor delegate to or subcontract with, nor authorize or appoint, any other Person to perform any of the duties, covenants or obligations to be performed by the Servicer hereunder without the prior written consent of the Owner, such consent to be withheld in its sole discretion. Any agreement, instrument or act purporting to effect any such assignment, transfer, subcontract, delegation or appointment without such consent shall be void.

(b)     In performing and carrying out its duties, responsibilities and obligations under this Servicing Agreement in accordance with the Servicing Policies, the Servicer may, without the prior written consent of the Owner, hire, retain or subcontract with the following types of Persons, the cost of which shall be considered Lien Administration Expenses; <u>provided</u>, <u>however</u>, that neither such Person nor any Affiliate, equityholder, officer or employee of, or Person deriving direct economic benefit from, such Person or any Affiliate thereof, is also an Affiliate, equityholder, officer or employee of the Servicer, or of any Affiliate thereof:

(i)     {reserved}

(ii)     Professional property inspection companies to conduct routine inspections of, and provide written inspection reports on, Properties as required by this Servicing Agreement;

(iii)     Real estate tax service companies to provide periodic reports as to the amount of Subsequent Taxes and Assessments due on any Property and the amount due on any tax lien that ranks *pari passu* with any Tax Lien and the due date or dates of each installment;

(iv)     Construction companies, contractors and laborers to provide labor, materials and supplies necessary to protect, preserve, repair and perform capital improvements with respect to any specific Property as provided by this Servicing Agreement;

(v)     Professional property management companies, auctioneers, real estate brokers, appraisers, architects, engineers, surveyors, title searchers, rent receivers and tax preparers;

(vi)     Skiptracing and asset search companies or contractors to assist in the location of Property Owners or interested parties;

(vii)     Mass mailing or similar service companies to assist in the production and distribution of collection letters and marketing of specific; and

(viii)     Media broker companies to assist in the marketing and placement of advertisements regarding specific Properties.

The Servicer shall require that each Person that is retained to provide any of the foregoing services holds all required governmental franchises, certificates, licenses and permits necessary to provide the services for and conduct the business in which it is engaged by the Servicer and that such Person is reputable, knowledgeable, skilled and experienced and has the necessary personnel, facilities and equipment required to provide the services for which such Person is retained. In selecting such Persons, the Servicer shall, all other factors being equal, give strong preference to Persons based in the applicable Tax Lien State. Any such Person shall not be deemed to be a partner or member of the Owner.

Section 12.02. <u>Independent Contractor</u>. The Servicer undertakes to service the Tax Liens and to otherwise perform and carry out the duties, responsibilities and obligations to be performed and carried out by it under this Servicing Agreement as an independent contractor. It is the intent of the parties that the Servicing Agreement will not create a partnership, joint venture or similar arrangement for U.S. federal, state and local tax or other purposes and, to the extent permitted by applicable law, the parties agree to treat the Servicing Agreement consistent with such intent.

Section 12.03. <u>All Funds and Records to be Held for Benefit of the Owner</u>. All of the Servicer's Tax Lien Files and all Collections held by the Servicer for the benefit of the Owner in respect of any Tax Liens shall be held by the Servicer for and on behalf of the Owner, and shall be and remain the sole and exclusive property of the Owner. The Servicer also agrees that it shall not create, incur or subject any Servicer's Tax Lien File or any funds which otherwise are or may become due or payable to the Owner, to any claim, lien, security interest, judgment, levy, writ or attachment or other encumbrance, nor assert by legal action or any claim or right of set-off against any Servicer's Tax Lien File or any funds collected on, or in connection with, a Tax Lien except as expressly permitted by this Servicing Agreement. The Servicer hereby acknowledges that concurrently with the execution of this Servicing Agreement, the Owner has acquired and holds a security interest in the Servicer's Tax Lien Files (and in all Tax Liens represented by such Servicer's Tax Lien Files) and in all Collections now or hereafter held by, or under the control of, the Servicer that are collected by the Servicer in connection with the Tax Liens, and in all proceeds of the foregoing and proceeds of proceeds.

Section 12.04. <u>Assignment by the Owner</u>. The Servicer agrees that the Owner may at any time and without the consent of the Servicer, assign and transfer its right, title and interest

under this Servicing Agreement to any other Person financially capable of performing the Owner's obligations hereunder (and Owner shall provide evidence of the same to the Servicer at least 30 Business Days prior to such assignment); provided that such Person expressly assumes the obligations of the Owner under this Servicing Agreement.  Upon any such assignment and transfer, whether by sale at foreclosure or otherwise, the Servicer shall thereafter render to the assignee the services that are to be performed by it under this Servicing Agreement, and unless otherwise expressly agreed in writing, the Owner shall not have any further obligation or liability to the Servicer following such assignment and transfer, except, however, that the Servicer shall be entitled to receive the Servicing Fee and any other amounts due to the Servicer that shall have accrued to the Servicer prior to such assignment and transfer pursuant to the terms of this Servicing Agreement.

Section 12.05.  <u>Indemnification</u>.

(a)    The Servicer shall indemnify, defend and hold harmless the Owner from and against any loss, liability or expense (including the reasonable fees and expenses of counsel and the other costs and expenses of defending itself against any claims or other matters) arising out of any breach of this Servicing Agreement or the servicing standards under this Servicing Agreement without negligence or bad faith on the part of such indemnified party.

(b)    The Owner shall indemnify, defend and hold harmless the Servicer from and against any loss, liability or expense (including the reasonable fees and expenses of counsel and the other costs and expenses of defending itself against any claims or other matters) arising out of a breach of the Owner's obligations under this Servicing Agreement,  or for any acts of negligence, fraud, or other wrongdoing of the Owenr.

(c)    The obligations of the Servicer and the Owner under this Section 12.05 shall survive the termination of this Servicing Agreement.

(d)    At the option of the Owner and absent any conflict of interest, any indemnified party shall be represented by counsel selected by the Owner with respect to any litigation brought by or against such indemnified party or its officers, directors or employees with respect to any claims, damages, judgments, liabilities or causes of action to which such persons may be subject and to which they are entitled to be indemnified hereunder.  Without limiting its rights to indemnification hereunder, any indemnified party may also, at its own expense, retain co-counsel chosen by it.

Section 12.06.  <u>Notice of Significant Changes</u>.  The Servicer shall promptly notify the Owner in the event of (a) a reorganization, merger or consolidation of the Servicer, (b) a change of its trade name or business address, (c) the closing of any office utilized in providing services under this Servicing Agreement (d) the occurrence of a significant negative change in its financial position, or (e) upon the Servicer's becoming aware of the occurrence of an Event of Default.

Section 12.07.  <u>Controlling Law; Choice of Forum</u>.  This Servicing Agreement and all questions relating to its validity, interpretation, performance and enforcement, shall be governed by and construed, interpreted and enforced in accordance with the Laws of the State of

New York, notwithstanding any New York or other choice-of-law rules to the contrary. This Servicing Agreement shall be deemed to be executed in the City of New York, New York, regardless of the domicile of the Servicer.

The parties hereto agree that any and all claims arising under this Servicing Agreement or related thereto shall be exclusively heard and determined either in the courts of the United States located in New York or in the courts of the State of New York located in the City of New York. THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW ALL RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR IN CONNECTION WITH THIS SERVICING AGREEMENT AS WELL AS, ANY OBJECTION WHICH EITHER MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 12.08. Indulgences Not Waivers. Neither the failure nor any delay on the part of a party to exercise any right, remedy, power or privilege under this Servicing Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege under this Servicing Agreement operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

Section 12.09. Notices.

(a) All notices, requests, demands, consents, approvals, reports and other communications (collectively, "Notices") required or permitted under this Servicing Agreement shall be in writing and shall be deemed to have been duly given, made and received when (i) delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, (ii) delivered against receipt or upon actual receipt of delivery from a nationally recognized overnight courier, (iii) given by facsimile and evidenced by confirmed receipt or (iv) by email and evidenced by confirmed receipt:

    (i)    If to the Owner:

    Ebury Fund 1 LP and Ebury Fund 2 LP and their affiliates
    41 Purdy Ave P.O. Box 281,
    Rye, NY 10580
    Attention: John Hanratty
    Telephone: 212.634.9097
    Email: jh@eburycap.com

    (ii)    If to the Servicer:

MTAG Services
111 Coleman Avenue, Suite 400
Mt. Pleasant, SC, 29464
Attention: James P. Meeks
Telephone: 703-917-0283
Email: jmeeks@mtagservices.com

Any party may alter the party, address, facsimile number and/or email address to which communications or copies are to be sent as set forth above by giving notice of such change of address in conformity with the provisions of this Subsection for the giving of notice.

Section 12.10.  Titles Not to Affect Interpretation.  The titles or paragraphs and subparagraphs contained in this Servicing Agreement are for convenience only, and they neither form a part of this Servicing Agreement nor are they to be used in the construction or interpretation hereof.

Section 12.11.  Attorneys' Fees.  If any party hereto shall bring suit against any other party as a result of any alleged breach or failure by such other party to fulfill or perform any covenants or obligations under this Servicing Agreement or in any deed, instrument or other document delivered hereunder, or to seek declaratory relief as to the rights or obligations of either party hereto, then in such event, the prevailing party in such action shall, in addition to any other relief granted or awarded by the court, be entitled to judgment or award for reasonable attorneys' fees incurred by reason of such action and all costs of suit and those incurred in preparation thereof, at both trial and appellate levels.

Section 12.12.  Electronic Reporting.  All reports to be made by the Servicer to the Owner (or such reports as may be specified by the Servicer) may be transmitted electronically in lieu of written reporting in accordance with this Servicing Agreement.  Regardless of the method of submission, reporting shall be complete, accurate and timely.

Section 12.13.  Provisions Separable.  The provisions of this Servicing Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason other or others of them may be invalid or unenforceable in whole or in part.

Section 12.14.  Entire Servicing Agreement; Amendment.  This Servicing Agreement together with the remaining Transaction Documents contain the entire agreement and understanding between the parties hereto with respect to the subject matter thereof and supersedes all prior and contemporaneous servicing agreements, understandings, inducements and conditions, expressed or implied, oral or written, of any nature whatsoever with respect to the subject matter thereof.  The express terms hereof and the other Transaction Documents control and supersede any course of performance and/or usage of the trade inconsistent with any of the

terms hereof. This Servicing Agreement may not be modified or amended, or the provisions hereof waived, other than by an agreement in writing signed by the parties hereto.

Section 12.15. <u>Counterparts</u>. This Servicing Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were on the same instrument.

Section 12.16. <u>No Recourse</u>. No recourse may be taken, directly or indirectly, with respect to the obligations of the Owner under this Servicing Agreement or any certificate or other writing delivered in connection herewith, against:

(i)     the owner of a beneficial interest in the Owner; or

(ii)    any partner, owner, beneficiary, agent, officer, director, employee or agent of the Owner, any holder of a beneficial interest in the Owner or of any successor or assign of any such holder, except as any such person may have expressly agreed (it being understood that no such holder of a beneficial interest in the Owner has any such obligations in its individual capacity) and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable Law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.

It is not the intent of this Section to expand the Servicer's obligations under this Servicing Agreement. Except as otherwise provided in this Section 12.16, nothing in this Servicing Agreement, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Servicing Agreement.

Section 12.17. <u>Cooperation of Servicer with a Securitization</u>. The Servicer and the Owner acknowledge that the Owner may effect a sale of some or all of the Tax Liens to one or more third party purchasers or one or more trusts or other entities in connection with a securitization of such Tax Liens (a "<u>Tax Lien Securitization</u>").

(a)     With respect to any Tax Lien Securitization, the Servicer agrees, at the expense of the Owner as a Lien Administration Expense (1) to cooperate fully with the Owner and any prospective purchaser with respect to all reasonable requests and due diligence procedures; (2) to provide certain material information with respect to the Servicer and the servicing of the Tax Liens for disclosure purposes as reasonably requested by the Owner to effectuate such Tax Lien Securitization and provide customary and reasonable indemnity as to the material accuracy and completeness of any information so provided; (3) to execute, deliver and perform any agreements reasonably required or necessary to effectuate such Tax Lien Securitization and (4) to restate the representations and warranties as to the Servicer set forth in this Servicing Agreement as of the settlement or closing date in connection with such Tax Lien Securitization.

(b)     With respect to any Tax Lien Securitization, the Owner agrees to engage the Servicer as servicer thereunder. The parties hereto agree that (i) any Tax Liens hereunder which are included in a Tax Lien Securitization will be serviced in accordance with the provisions

of the servicing agreement entered into in connection therewith and will no longer be serviced pursuant to this Servicing Agreement; (ii) such Tax Liens included in a Tax Lien Securitization shall not be included in the calculation of Servicing Fees under this Servicing Agreement; and (iii) all servicing fees of the servicer to be paid under such Tax Lien Securitization shall be negotiated in good faith by the Owner and the Servicer based on prevailing market rates for servicers of a Tax Lien Securitization.

[INTENTIONALLY LEFT BLANK]

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 10
24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 378 of 688
RECEIVED NYSCEF: 10/17/2022

IN WITNESS WHEREOF, the Owner and the Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized all as of the day and year first above written.

Ebury Fund 1 LP and Ebury Fund 2 LP and their affiliates, as Owner

By: _____
    Name:
    Title:

MTAG SERVICES, LLC, as Servicer

By: _____
    Name: James Meeks
    Title: President and CEO

Schedule A

**Servicing Price Matrix**

**Base Servicing Fee Percentages by State**

Step-up Fee applies when Owner designates Servicer as the responsible party for all Asset Management and Foreclosure Management activities, and the lien's age since original acquisition from the municipality is past the Months to Redemption as stated in the Servicing Price Matrix per state.

States MTAG Currently Services

| Servicing Fees: | Servicing Fee | Step-Up Fee | Months to Redemption/ Step Up | Sub Purchasing Fee |
|---|---|---|---|---|
| Alabama | 0.900% | 0.600% | 36 | 0.250% |
| Arizona | 0.750% | 0.600% | 36 | 0.250% |
| Colorado | 0.900% | 0.600% | 36 | 0.250% |
| Connecticut | 0.950% | 0.600% | 12 | 0.250% |
| Florida | 0.750% | 0.600% | 22 | 0.250% |
| Illinois | 0.900% | 0.600% | 24 | 0.250%/0.500* |
| Indiana | 0.900% | 0.600% | 12 | |
| Kentucky | 1.100% | 0.600% | 12 | |
| Maryland | 0.900% | 0.600% | 12 | 0.250% |
| Mississippi | 0.900% | 0.600% | 24 | 0.250% |
| Montana | 0.000% | 0.600% | 36 | 0.250% |
| New York | 0.900% | 0.600% | 24 | 0.250% |
| New Jersey | 0.900% | 0.600% | 24 | 1.000% |
| Ohio | 1.100% | 0.600% | 18 | 0.250% |
| South Carolina | 0.750% | 0.600% | 12 | |
| Texas | 1.000% | 0.600% | 36 | |

*Cook County purchases subs twice a year (0.50 basis points), all other counties once a year (0.25 basis points)

States MTAG Currently Does Not Have a Presence

| Servicing Fees: | Servicing Fee | Step-Up Fee | Months to Redemption | Sub Purchasing Fee |
|---|---|---|---|---|
| Georgia** | 1.000% | 0.600% | 36 | 0.250% |
| Louisiana | 0.900% | 0.600% | 36 | 0.250% |

**Plus Costs for office and ground resource setup

Subsequent Liens

*Subsequent Tax Liens are added to the original Tax Lien Principal Balance and considered the
same age as the original Tax Lien when calculating Base Servicing fees.*

Incentive Pricing*

*Term : Total portfolio principal balance will be calculated the first business day of each month.
If the trailing 3-month average is at or above the strike, a discount will be applied to that
month's servicing fee. The discount will only be applied to the aggregate principal balance of
ori/sub stacks above the floor*

| | |
|---|---|
| Strike: | $100,000,000 |
| Discount: | 0.10% |
| Floor: | $2,000 |
| Reset: | Monthly |
| Look-back: | 3 months |

*\*Only available with Full Servicing*

Initial: _____    Date: _____
Ebury Fund 1 LP and Ebury Fund 2 LP and their affiliates

Initial: _____    Date: __8/1/17____
MTAG Services, LLC

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 381 of 688

EXHIBIT A

<u>Tax Lien Schedule</u>

Initial Tax Lien Schedule to be provided by Owner

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 382 of 688

EXHIBIT B

MTAG Services, LLC Servicing Policies

On File with Servicer/Owner

EXHIBIT C

<u>Reserved</u>

On File with Servicer/Owner

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO: 10    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 10/17/2022
Court Records    Pg 384 of 688

EXHIBIT D

Form of Monthly Reporting Package

On File with Servicer/Owner

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State.
Court Records    Pg 385 of 688

## EXHIBIT E

### Reserved

**On File with Servicer/Owner**

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 10
24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 386 of 688

**EXHIBIT F**

<u>List of Selling Municipalities</u>

On File with Servicer/Owner

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO.: 10

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 387 of 688

INDEX NO. 156207/2022
RECEIVED NYSCEF: 10/17/2022

## ADDENDUM TO SERVICING AGREEMENT

**THIS ADDENDUM TO SERVICING AGREEMENT** (this "Addendum") is entered into as of November 8, 2017, by EBURY FUND 1, LP and EBURY FUND 2, LP, both Delaware limited partnerships, (collectively, the "Owners"), MTAG SERVICES, LLC, a Virginia limited liability company (the "Servicer"), EMIGRANT BUSINESS CREDIT CORPORATION, a Delaware corporation (the "Lender"), EBURY 1EMI LLC and EBURY 2 EMI LLC, both New York limited liability companies (collectively, the "Borrowers"), and the wholly owned subsidiaries of the Borrowers that are parties to this Addendum, including those added to this Addendum by any modification, amendment, supplement or joinder to this Addendum (collectively, the "SPEs").

The Owners and the Servicer are the parties to a Servicing Agreement dated as of August 1, 2017, (the "Servicing Agreement") pursuant to which the Servicer has agreed to service and administer Tax Liens (as defined in the Servicing Agreement). The Owners, the Borrowers, the SPEs, the Lender and others are parties to those two certain Credit Agreements (collectively, the "Credit Agreements") and related documents dated as of March 9, 2017 (collectively, with the Credit Agreements, as amended, the "Credit Documents") pursuant to which the Lender has extended lines of credit and other financial accommodations to the Borrowers secured by, *inter a ia*, certain Tax Liens held by or on behalf of the Borrowers and the SPEs.

The Owners, Borrowers, the SPEs, the Lender and the Servicer have agreed to enter into this Addendum to include the Tax Liens of the SPEs as Tax Liens serviced and administered under the Servicing Agreement, to recognize the security interest of the Lender in the Tax Liens serviced and administered under the Servicing Agreement and proceeds thereof and to provide for related matters.

**NOW, THEREFORE,** for good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.    Definitions. Capitalized terms not otherwise defined in this Addendum shall have the meanings defined in the Servicing Agreement.

Section 2.    Purchasing Lender's Tax Liens. By virtue of this Addendum, Servicer, the Owners, Borrowers, and the SPEs agree that the Emigrant Tax Liens purchased by Servicer for the benefit of Borrowers or any of the SPEs will be registered in the in the following designated name (or a substantially similar name):

Servicer as Custodian for [an Ebury 1EMI SPE or an Ebury 2EMI SPE (other than Borrowers)]

and will use the following address for the owner of the Tax Liens:

Ebury Fund 1, LP
P.O. Box 829686
Philadelphia, PA 19182-9686

The Fund, the Borrower, the SPEs, Tower, and the Lender acknowledge that substantially similar names may include typographical errors, abbreviations and compressions of the designated name and other deviations provided that the substantially similar name is sufficient to allow Tower to identify the Tax Lien as being subject to the Servicing Agreement.

Section 3.    Servicing Agreement Tax Liens. By virtue of this Addendum, the Servicer, the Owners, the Borrowers, and the SPEs agree that the Tax Liens serviced and administered by the Servicer under the terms of the Servicing Agreement will include Tax Liens held by or on behalf of the SPEs in addition to the Tax Liens held by or on behalf of the Owners, and the definitions of "Subsequent Tax Lien" and "Tax Lien" in the Servicing Agreement include Tax Liens held by or on behalf of the Owners, Borrowers, and the SPEs. The Owners agree to pay all servicing fees for the servicing and administration of Tax Liens (including those held by

or on behalf of the Borrowers and SPEs).

Section 4.    Recognition of Security Interest. The Owners, the Borrowers, the SPEs and the Servicer acknowledge, agree and recognize that the Borrowers and the SPEs have granted the Lender a security interest in the Tax Liens and proceeds thereof for the benefit of the Lender.

Section 5.    Other Security Interests. As of the date hereof, the Servicer has no knowledge of and has received no notice of any other security interest in respect any of the Tax Liens (except for security interests granted to the Lender) and Servicer will advise the Lender in writing promptly following obtaining any knowledge of or receipt of notice of any such other security interest. Additionally, the Servicer shall not obtain a lien on any of the Collateral for Servicer's own benefit.

Section 6.    Collections. In the event the Servicer receives payment of any amount owed to the Owners, Borrowers, or any SPE from whatever source, the Servicer shall cause each such payment to be sent to the applicable Lockbox or deposited into the applicable Lockbox Account within five (5) Business Days after receipt. Lender shall have the right to change the Lockbox Account by giving notice to Servicer, Borrowers, and the SPEs. If any action shall be required in connection with collection of such payment, Servicer shall notify the Borrowers, the SPEs, and Lender of such requirement and shall follow instructions of Lender in connection therewith. Servicer shall have no obligation to determine the sufficiency of the Tax Lien payment or the redemptive value of the Tax Lien, however, for payments received valued less than the computerized calculation of the anticipated redemptive value notice shall be sent to the Borrowers and the SPEs for instructions on processing. Servicer agrees that any change in the Lockbox Account must be approved in writing by Lender prior to the change.

Section 7.    Inspection. The Servicer agrees that the Lender and its agents, accountants, attorneys and auditors will be permitted, after at least twenty-four (24) hours' prior notice, during normal business hours at any time and from time to time, to examine the files, documents, records and other papers in the possession or under the control of the Servicer relating to any or all of the Tax Liens and to make copies thereof.

Section 8.    Lender Instructions. Any other provision of the Servicing Agreement or this Addendum notwithstanding, after the Lender provides the Borrowers and the Servicer a written notice that an Event of Default (as defined in either or both of the Credit Agreements) has occurred and is continuing (a "Credit Agreement Default Notice"), and thereafter until the Lender, in writing, gives notice to the Servicer that the Lender revokes the Credit Agreement Default Notice, the Servicer will comply with all orders and instructions originated by the Lender in respect of the Tax Liens without any further notice to, or the vote, consent or approval of, any other Person (including the Owners, Borrowers, and the SPEs).

Section 9.    Replacement of Servicer. Any other provision of the Servicing Agreement or this Addendum notwithstanding, after a Credit Agreement Default Notice is given and until revoked, the Lender shall have the right, at its option (including, without limitation, without the vote, consent or approval of any other Person), to remove any Servicer and appoint a replacement for any Servicer (the "Replacement Servicer") under the Servicing Agreement by giving written notice to the Owners and the Servicer that the Lender is exercising its removal and replacement rights (which notice may be combined with a Credit Agreement Default Notice), which notice shall also designate the name and address of the Replacement Servicer appointed by the Lender and the effective date of the replacement (a "Replacement Notice"), with a copy to the Replacement Servicer prior to the effective date of the replacement. The Lender agrees to promptly deliver a written revocation of Credit Agreement Default Notice to the Owners, Borrowers, and the Servicer upon cure or waiver of the applicable Event of Default. The Servicer and the Replacement Servicer may rely on, and shall be protected in relying on, a Replacement Notice without further inquiry or investigation. The Owners, the SPEs, and the Servicer agree to cooperate with the Lender and any Replacement Servicer to effect an orderly transfer of the Servicer's duties under the Servicing Agreement. The Servicer shall promptly deliver to the Replacement Servicer the Servicer's Tax Lien files together with all other reports, documents, data and information in the possession, custody or control of the Servicer that relate to the Tax Liens and shall otherwise exercise commercially reasonable efforts to effect and carry out an orderly and efficient transfer of the duties, responsibilities and obligations of the

2

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM

NYSCEF DOC. NO. 10

INDEX NO. 190107/2019

RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State

Court Records   Pg 389 of 688

Servicer to the Replacement Servicer. The Owners, Borrowers, and the SPEs agree to execute powers of attorney in favor of any Replacement Servicer substantially identical to such powers of attorney that the Owners are obligated to execute in accordance with the terms of the Servicing Agreement.

Section 10.    Termination of Servicing Agreement. Any other provision of the Servicing Agreement or this Addendum notwithstanding, at any time after a Credit Agreement Default Notice is given and until revoked, the Lender shall have the right, at its option (including, without limitation, without the vote, consent or approval of any other Person), to terminate the Servicing Agreement upon thirty (30) Business Days' written notice to the Owners and the Servicer (which notice may be combined with a Credit Agreement Default Notice). Upon termination by Lender, the Servicer shall promptly deliver to the Lender (or its designee) the Servicer's Tax Lien files together with all other reports, documents, data and information in the possession, custody or control of the Servicer that relate to the Tax Liens and shall otherwise exercise commercially reasonable efforts to effect and carry out an orderly and efficient transfer of the Servicer's Tax Lien files and related information.

Section 11.    Servicing. Until a Credit Agreement Default Notice is given to the Servicer and after such a notice is revoked, the Servicer is authorized to sign on behalf of the Lender as necessary to release Tax Documents via execution of release/assignment documents or endorsements as is necessary and proper to manage Tax Liens in accordance with the Servicing Agreement. After a Credit Agreement Default Notice is given to the Servicer and until such a notice is revoked, the Servicer shall obtain Lender's prior written consent to the Servicer's execution of any such release or obtain the Lender's signature upon any such release.

Section 12.    Binding Upon Successors. All rights of the Servicer, the Owners, Borrowers, the SPEs, the Lender under the Servicing Agreement and this Addendum shall inure to the benefit of the Servicer, the Owners, Borrowers, the SPEs, the Lender and their respective successors and assigns.

Section 13.    Entire Agreement; Severability. The Servicing Agreement and this Addendum contain the entire agreement of the Servicer, the Owners, the Borrowers, the SPEs, the Lender with respect to the Servicing Agreement. If any of the provisions of this Addendum shall be held invalid or unenforceable, this Addendum shall be construed as if not containing such provisions, and the rights and obligations of the parties hereto shall be construed and enforced accordingly.

Section 14.    Choice of Law. The Servicing Agreement and this Addendum shall be governed and construed in accordance with the substantive laws of the State of New York (without regard to any principles of law that would require the application of the laws of another state).

Section 15.    Addendum Term. This Addendum and the relative rights and obligations of parties hereunder shall terminate upon the termination of the Credit Agreements pursuant to its terms (in which case termination of this Addendum shall be automatic without any written cancellation required, but the Lender agrees to provide written confirmation at the request of any party).

Section 16.    Amendment. Neither the Servicing Agreement, this Addendum nor any provision hereof may be changed, waived, discharged, modified or terminated except pursuant to a written instrument signed by the Owners, the SPEs, the Servicer, and the Lender (except as otherwise provided in this Addendum).

Section 17.    Notices. Notices to the Owners, Borrowers, and the Servicer will be given, made and received as provided for in the Servicing Agreement. Notices to the Borrowers and SPEs will be given to the Owners as provided for in the Servicing Agreement. Notices to the Lender will be given to the following address:

> EMIGRANT BUSINESS CREDIT CORPORATION
> 6 East 43rd Street, 20th Floor
> New York, New York 10017
> Attention: Karen Wold
> Email:  woldi@emigrant.com

3

Any party may alter the party, address, facsimile number and/or email address to which communications or copies are to be sent as set forth in the Servicing Agreement and this Addendum by giving notice of such change of address in conformity with the provisions of the Servicing Agreement and this Addendum for the giving of notice.

Section 18.    Counterparts. This Addendum may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were on the same instrument.

Section 19.    Conflict with Credit Documents. In the event of any inconsistency between the provisions of the Servicing Agreement as modified by this Addendum, and the other Credit Documents entered into in connection therewith, each of the parties hereto acknowledge and agree that the Servicing Agreement, as modified by this Addendum, shall prevail and the performance of any such obligation or exercise of any right in accordance with the Servicing Agreement, as modified by this Addendum, shall not result in any breach of a corresponding provision in the other Credit Documents.

[SIGNATURES ON FOLLOWING PAGES]

4

IN WITNESS WHEREOF, THE UNDERSIGNED HAVE CAUSED THEIR DULY AUTHORIZED REPRESENTATIVES TO EXECUTE THIS ADDENDUM, AS OF THE DATE STATED ABOVE.

**OWNERS:**
EBURY FUND 1, LP
EBURY FUND 2, LP

By: Ebury Street Capital, LLC, General Partner

By: _____
John Hanratty, Manager

**BORROWERS AND SPEs:**

EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

SPEs:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

EBURY 2EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

SPEs:
EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC

By: EBURY 2EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

**SERVICER**:
MTAG SERVICES, LLC

By: _____
James P. Meeks, Manager

**LENDER**:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____ (SEAL)
Karen Wold, Managing Director

EBURY 2EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

SPEs:
EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC

By: EBURY 2EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

SERVICER:
MTAG SERVICES, LLC

By: _____
James P. Meeks, Manager

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____ (SEAL)
Karen Wold, Managing Director

6

119833191_1
Addendum to Servicing Agreement 1 and 2

NYSCEF DOC. NO. 10    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 394 of 688

EBURY 2EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

SPEs:
EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2FMISC LLC
RE 2EMI LLC

By: EBURY 2EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

**SERVICER**:
MTAG SERVICES, LLC

By: _____
James P. Meeks, Manager

**LENDER**:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____ (SEAL)
Karen Wold, Managing Director

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM

NYSCEF DOC. NO. 11

INDEX NO. 158207/2022

RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 395 of 688

# EXHIBIT F

# TABLE OF CONTENTS

Ebury 1EMI LLC

    Validity Guaranty.................................................................................................................. 3

Ebury 2EMI LLC

    Validity Guaranty................................................................................................................ 11

VALIDITY GUARANTY AGREEMENT

(JOHN HANRATTY)

THIS VALIDITY GUARANTY AGREEMENT (the "Agreement") dated as of March 7, 2017, is made by JOHN HANRATTY (the "Validity Guarantor") in favor of EMIGRANT BUSINESS CREDIT CORPORATION, a Delaware corporation (the "Lender").

WHEREAS, Lender has extended or may extend a line of credit or other financial accommodations to EBURY 1EMI, LLC, a New York limited liability company (the "Borrower"). In order to induce Lender to extend the line of credit or other financial accommodations to Borrower, Validity Guarantor has agreed to execute and deliver this Agreement in order to guaranty the validity of Information provided to Lender by or for Borrower. Capitalized terms used in this paragraph are defined below.

NOW, THEREFORE, in consideration of the premises, Validity Guarantor agrees as follows:

1.      Definitions. The following terms shall have the following meanings when used in this Agreement. Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Credit Agreement referred to below or under New York law. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

"Agreement" means this Validity Guaranty Agreement, as this Validity Guaranty Agreement may be amended, modified, or restated from time to time.

"Calculation Date" means: (a) with respect to any Borrowing Base Certificate, the date of such Borrowing Base Certificate, as set forth thereon; and (b) with respect to any financial statement, the date of such financial statement, as set forth therein.

"Collateral" means individually, collectively, interchangeably and without limitation any and all property in which Lender has been granted a security interest as security for any of the Indebtedness.

"Credit Agreement" means individually, collectively and interchangeably, the Credit Agreement entered into by Borrower and Lender dated as of March 7, 2017, and any amendments and supplements to the Credit Agreement.

"Damages" means individually, collectively, interchangeably and without limitation any and all damages, costs or losses incurred by Lender as the result, in whole or in part, of any Information not being true and correct, in all material respects as of a Calculation Date, including, without limitation, related reasonable attorneys' fees and expenses, other related reasonable expenses and the amount of any overadvance made in reliance on a Borrowing Base Certificate. In no event will the term "Damages" include any claim for lost opportunity costs.

"Indebtedness" means the indebtedness of Borrower to Lender under the Credit Agreement, the Note and the other Related Documents, together with interest, reasonable costs, reasonable expenses, reasonable attorneys' fees and other fees and charges as provided for in the Credit Agreement, whether or not any such indebtedness may be barred under any statute of limitations or may be otherwise unenforceable or voidable for any reason.

"Information" means, individually, collectively, interchangeably and without limitation any and all financial statements and all written information relating to the eligibility of Collateral from time to time delivered to Lender by Borrower or by third parties at the direction of Borrower (including, without limitation, all Borrowing Base Certificates and any schedules of Collateral.

"Lender" means EMIGRANT BUSINESS CREDIT CORPORATION, its successors and assigns.

1

"Validity Guarantor" means John Hanratty, a New York resident.

2.     Validity Guaranty. Validity Guarantor hereby guarantees that, to the knowledge of Validity Guarantor, all Information from time to time delivered to Lender will be true and correct in all material respects as of the Calculation Date applicable to such Information. Validity Guarantor hereby further agrees to pay the aggregate amount of all Damages incurred by Lender.

3.     Joint, Several and Solidary Liability. The obligation of Validity Guarantor to pay Damages under this Agreement shall be on a "solidary" and "joint and several" basis along with others responsible to pay Lender for Damages.

4.     Duration of Guaranty and Effect of Cancellation. This Agreement and the obligations of Validity Guarantor hereunder shall remain in full force and effect until such time as this Agreement may be canceled or otherwise terminated by Lender under a written cancellation instrument in favor of Validity Guarantor. Unless otherwise indicated under such a written cancellation instrument, the agreement of Lender to terminate or otherwise cancel this Agreement shall affect only, and shall be expressly limited to, the future obligations of Validity Guarantor under this Agreement after the date of such a written cancellation instrument; with Validity Guarantor remaining fully obligated and liable under this Agreement for any and all obligations arising from Information provided prior to the date of such a written cancellation instrument. Nothing under this Agreement or under any other agreement or understanding by and between Validity Guarantor and Lender shall in any way obligate, or be construed to obligate, Lender to agree to the subsequent termination or cancellation of the obligations of Validity Guarantor hereunder; it being fully understood and agreed to by Validity Guarantor that Lender has and intends to continue to rely on the obligations of Validity Guarantor under this Agreement in extending credit and other Indebtedness to and in favor of Borrower, and that to release Validity Guarantor from the continuing obligations of Validity Guarantor under this Agreement would so prejudice Lender that Lender may, within its sole and uncontrolled discretion and judgment, refuse to release Validity Guarantor from any of the continuing obligations of Validity Guarantor under this Agreement for any reason whatsoever as long as any of the Indebtedness remains unpaid and outstanding and the Credit Agreement is not terminated, Lender is obligated or agrees to make any advances to Borrower, or otherwise.

5.     Waivers. Validity Guarantor agrees as follows:

(a)     Validity Guarantor waives notice of acceptance of this Agreement by Lender.

(b)     Validity Guarantor waives notice, and Validity Guarantor consents to, any agreements or arrangements between Lender and Borrower or anyone else including, without limitation, agreements and arrangements for payment, extension, subordination, composition, arrangement, compromise, discharge, or release of the whole or any part of the Indebtedness

(c)     Validity Guarantor waives notice of any change in the financial condition of Borrower or the change or surrender of any and all Collateral.

(d)     Validity Guarantor waives any right to require Lender to notify Validity Guarantor of any action or non-action on the part of Borrower, Lender, or any other guarantor, surety or endorser, or notice of the creation of any new or additional Indebtedness subject to this Agreement.

(e)     Validity Guarantor waives any right to demand or require collateral security from Borrower, or any other person.

(f)     Validity Guarantor waives any right to require Lender to notify Validity Guarantor of the terms, time and place of any public or private sale of any Collateral.

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM        INDEX NO. 158207/2022
NYSCEF DOC. NO. 11        Court Records        Pg 399 of 688        RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State

(g)    Validity Guarantor waives any rights arising from any action or inaction of remedies by Lender that may destroy or impair the subrogation rights of Validity Guarantor or the right of Validity Guarantor to proceed for reimbursement against Borrower or any other guarantor, surety or endorser, including without limitation, any loss of rights Validity Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness.

(h)    Validity Guarantor waives the right to renounce any disposition or transfer of assets whether created under a will, trust agreement, or intestacy statute, with respect to any devise, bequest, distributive share, trust account, life insurance or annuity contract, employee benefit plan (including, without limitation, any pension, retirement, death benefit, stock bonus or profit sharing plan, system, or trust), or any other disposition or transfer created by any testamentary or non-testamentary instrument or by operation of law, and any of the foregoing created or increased by reason of a renunciation made by another person.

(i)    Validity Guarantor waives any disability or other defense of Validity Guarantor, Borrower or any other guarantor, surety or endorser, or any other person, or by reason of the cessation from any cause whatsoever, other than payment in full of the Indebtedness and termination of the Credit Agreement.

Validity Guarantor warrants and agrees that each of the waivers set forth above is made with the full knowledge of Validity Guarantor of its significance and consequences, and that, under the circumstances, such waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law.

6.    Subordination of Rights. In the event that Validity Guarantor should for any reason: (a) advance or lend monies to Borrower, whether or not such funds are used by Borrower to make any payment under the Indebtedness; (b) make any payment to Lender or others for and on behalf Borrower under the Indebtedness; (c) make any payment to Lender in total or partial satisfaction of the obligations and liabilities of Validity Guarantor under this Agreement; or (d) if any of the property of Validity Guarantor is used to pay or satisfy any of the Indebtedness, Validity Guarantor hereby agrees that any and all rights that Validity Guarantor may have or acquire to collect from or to be reimbursed by Borrower (or from or by any other guarantor, endorser or surety), whether the rights of collection or reimbursement of Validity Guarantor arise by way of subrogation to the rights of Lender or otherwise, shall in all respects, whether or not Validity Guarantor or Borrower is presently or subsequently becomes insolvent, be subordinate, inferior and junior to the rights of Lender to collect and enforce payment, performance and satisfaction of the then remaining Indebtedness, until such time as the Indebtedness is fully paid and satisfied and the Credit Agreement is terminated. In the event of the insolvency or consequent liquidation of the assets of Validity Guarantor or Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Validity Guarantor or Borrower applicable to the payment of claims of Lender and Validity Guarantor shall be paid to Lender and shall be first applied by Lender to repayment of the then remaining Indebtedness. Validity Guarantor hereby assigns to Lender all claims that Validity Guarantor may have or acquire against Borrower or any assignee or trustee of Borrower in bankruptcy; provided that, such assignment shall be effective only for the purpose of and to the extent of assuring to Lender full satisfaction of the obligations of Validity Guarantor under this Agreement, and no further.

7.    Receipt of Payments. Validity Guarantor further agrees to refrain from attempting to collect or enforce any of the collection or reimbursement rights against Borrower (or against any other guarantor, surety or endorser), arising by way of subrogation or otherwise, until such time as all of the then remaining Indebtedness in favor of Lender is fully paid and satisfied, provided, however, nothing herein shall prevent Validity Guarantor from receiving distributions, dividends and management or other fees from Borrower or its affiliates that are permitted by the Credit Agreement. In the event that Validity Guarantor should receive any payment from Borrower (or any other guarantor, surety or endorser) that Borrower (or such a third party) may owe to Validity Guarantor for any reason (other than distributions, dividends and management or other fees that are permitted by the Credit Agreement), Validity Guarantor agrees to accept each such payment in trust for and on behalf of Lender, advising Borrower (or the third party payee) of such fact. Validity Guarantor further unconditionally agrees to immediately deliver such funds to Lender with such funds being held by Validity Guarantor over any interim period, in trust for Lender.

119434082_1

8.      Deposit Accounts. As collateral security for repayment of the obligations of Validity Guarantor hereunder, Validity Guarantor hereby grants Lender a continuing security interest in any and all funds that Validity Guarantor may now and in the future have on deposit with Lender or in certificates of deposit or other deposit accounts with Lender as to which Validity Guarantor is an account holder.

9.      Covenants Relating to the Indebtedness. Validity Guarantor agrees that Lender may, at its sole option, at any time, and from time to time, without the consent of or notice to Validity Guarantor or to any other party, and without incurring any responsibility to Validity Guarantor or to any other party, and without impairing or releasing any of the obligations or liabilities of Validity Guarantor under this Agreement:

(a)      Make additional secured or unsecured loans to Borrower.

(b)      Discharge, release or agree not to sue any party (including, but not limited to, Borrower or any other guarantor, surety, or endorser), who is or may be liable to Lender for any of the Indebtedness.

(c)      Sell, exchange, release, surrender, realize upon, or otherwise deal with, in any manner and in any order, any collateral directly or indirectly securing repayment of any of the Indebtedness.

(d)      Alter, renew, extend, accelerate, or otherwise change the manner, place, terms or times of payment or other terms of the Indebtedness, or any part thereof, including any increase or decrease in the rate or rates of interest on any of the Indebtedness.

(e)      Settle or compromise any of the Indebtedness.

(f)      Subordinate or agree to subordinate the payment of all or any part of the Indebtedness, or the security rights of Lender in any collateral directly or indirectly securing any such Indebtedness, to the payment or security rights of any other present or future creditors.

(g)      Apply any payments or proceeds to any of the Indebtedness in such priority or with such preferences as Lender may determine in its sole discretion, regardless of which of the Indebtedness then remains unpaid.

(h)      Take or accept any other collateral security or guaranty for any or all of the Indebtedness.

(i)      Enter into, deliver, modify, amend, or waive compliance with, any instrument or arrangement evidencing, securing or otherwise affecting, all or any part of the Indebtedness.

In addition, no course of dealing between Lender and Borrower (or any other guarantor, surety or endorser), nor any failure or delay on the part of Lender to exercise any of the rights and remedies of Lender under this Agreement or any other agreement or agreements by and between Lender and Borrower (or any other guarantor, surety or endorser), shall have the effect of impairing or releasing the obligations and liabilities of Validity Guarantor to Lender, or of waiving any of the rights and remedies of Lender under this Agreement or otherwise. Any partial exercise of any rights and remedies granted to Lender shall furthermore not constitute a waiver of any of the other rights and remedies of Lender; it being the intent and agreement of Validity Guarantor that the rights and remedies of Lender shall be cumulative in nature.

10.      No Release of Validity Guarantor. The obligations and liabilities of Validity Guarantor under this Agreement shall not be released, impaired, reduced, or otherwise affected by, and shall continue in full force and effect notwithstanding the occurrence of any event, including without limitation any one or more of the following events:

4

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 11    Court Records Pg. 401 of 688    RECEIVED NYSCEF: 10/17/2022

2:24-cv-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State

(a)       The insolvency, bankruptcy, assignment, composition, liquidation, disability, dissolution, or lack of authority (whether corporate, partnership or trust) of Borrower (or any person acting on behalf of Borrower), or of any other guarantor, surety or endorser.

(b)       Any payment by Validity Guarantor, Borrower, or any other party, to Lender that is held to constitute a preferential transfer or a fraudulent conveyance under any applicable law, or any such amounts or payment which, for any reason, Lender is required to refund or repay to Borrower or to any other person.

(c)       Any dissolution of Borrower, or any sale, lease or transfer of all or any part of any assets of Borrower.

In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership, or any other debt relief granted to Borrower or to any other party, Lender must rescind or restore any payment received in total or partial satisfaction of the Indebtedness, any prior release or discharge from the terms of this Agreement given to Validity Guarantor shall be without effect, and this Agreement and the obligations and liabilities of Validity Guarantor hereunder shall automatically and retroactively be renewed and/or reinstated and shall remain in full force and effect to the same degree and extent as if such a release or discharge had never been granted. It is the intention of Lender and Validity Guarantor that the obligations and liabilities of Validity Guarantor hereunder shall not be discharged except by the full and complete performance and satisfaction by Validity Guarantor of such obligations and liabilities; and then only to the extent of such performance.

11.     <u>Representations and Warranties</u>. Validity Guarantor represents and warrants that:

(a)       Any and all financial statements of Validity Guarantor furnished to Lender were complete and correct in all material respects, and fairly represent the financial condition and solvency of Validity Guarantor as of the date thereof. To the knowledge of Validity Guarantor, Validity Guarantor does not have any contingent obligations or liabilities that were not disclosed or reserved against in the financial statements of Validity Guarantor or in the notes thereto. Since the dates of such financial statements, there has been no material adverse change in the financial condition or business of Validity Guarantor that has not been disclosed to Lender in writing.

(b)       The execution, delivery and performance of this Agreement by Validity Guarantor are not in violation of any laws and will not result in a default under any contract, agreement, or instrument to which Validity Guarantor is a party, or by which Validity Guarantor or the property of Validity Guarantor may be bound.

(c)       Validity Guarantor will receive and/or has received a direct or indirect material benefit from the transactions contemplated herein and/or arising out of the Indebtedness.

(d)       This Agreement, when executed and delivered to Lender, will constitute a valid, legal and binding obligation of Validity Guarantor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency or similar laws affecting generally the enforcement of creditor's rights.

(e)       Validity Guarantor has established adequate means of obtaining information from Borrower on a continuing basis regarding the financial condition of Borrower and information relating to the eligibility of Collateral.

(f)       Lender has not made any representations to Validity Guarantor as to the creditworthiness of Borrower.

12.     <u>Affirmative Covenants</u>. Validity Guarantor covenants and agrees in favor of Lender that, so long as this Agreement remains in effect,

(a) Validity Guarantor will keep adequately informed of any facts, events or circumstances that might in any way affect the risks of Validity Guarantor under this Agreement. Validity Guarantor further agrees that Lender shall not have any obligation to disclose to Validity Guarantor any information or material relating to Borrower, any other party responsible for payment of all or any part of the Indebtedness Guarantor or any other Validity Guarantor.

(b) Validity Guarantor will furnish such additional information and statements with respect to the financial condition of Validity Guarantors as Lender may reasonably request from time to time.

13. Remedies. Upon the failure in the payment or performance of any of the obligations of Validity Guarantor under this Agreement, Lender may institute a judicial proceeding for the collection of the sums or the performance of any of the obligations of Validity Guarantor under this Agreement and unpaid or unperformed, and may prosecute such proceeding to judgment for final decree, and may enforce the same against Validity Guarantor and/or one or more other guarantors and collect the monies adjudged or decreed to be payable in the manner provided by law out of the property of Validity Guarantor and/or one or more other guarantors, wherever situated.

14. Enforcement Expenses. Validity Guarantor agrees to pay all reasonable costs and expenses, including reasonable attorneys' fees actually incurred and disbursements and any other reasonable fees and disbursements, that may be incurred by or on behalf of Lender in enforcing any of the obligations and liabilities of Validity Guarantor hereunder.

15. Transfer of Indebtedness. This Agreement is for the benefit of Lender and for such other person or persons as may from time to time become or be the holders of all or any part of the Indebtedness. This Agreement shall be transferable and negotiable with the same force and effect and to the same extent as the Indebtedness may be transferable; it being understood and agreed to by Validity Guarantor that, upon any transfer or assignment of all or any part of the Indebtedness, the holder of such Indebtedness shall have all of the rights and remedies granted to Lender under this Agreement. Validity Guarantor further agrees that, upon any transfer of all or any portion of the Indebtedness, Lender may transfer and deliver any and all collateral securing repayment of such Indebtedness (including, but not limited to, any collateral provided by Validity Guarantor) to the transferee of such Indebtedness, and such collateral shall secure any and all of the Indebtedness in favor of such a transferee. Validity Guarantor additionally agrees that, after any such transfer or assignment has taken place, the transferring Lender shall be fully discharged from any and all liability and responsibility to Validity Guarantor with respect to such collateral, and the transferee thereafter shall be vested with all the powers and rights with respect to such collateral.

16. Consent to Participation. Validity Guarantor recognizes and agrees that Lender may, from time to time, one or more times, transfer all or any part of the Indebtedness through sales of participation interests in such Indebtedness to one or more third party lenders. Validity Guarantor specifically agrees and consents to all such transfers and assignments, and Validity Guarantor further waives any subsequent notice of such transfers and assignments as may be provided under New York law. Validity Guarantor additionally agrees that the purchaser of a participation interest in the Indebtedness will be considered as the absolute owner of a percentage interest of such Indebtedness and that such a purchaser will have all of the rights granted under any participation agreement governing the sale of such a participation interest. Validity Guarantor waives any rights of offset that Validity Guarantor may have against any transferring Lender and/or any purchaser of such a participation interest, and Validity Guarantor unconditionally agrees that either such a transferring Lender or such a purchaser may enforce the obligations and liabilities of Validity Guarantor under this Agreement, irrespective of the failure or insolvency of any such transferring Lender or any such purchaser.

17. Notices. Any notice or demand which, by provision of this Agreement, is required or permitted to be given or served to or on Validity Guarantor shall be deemed to have been sufficiently given and served for all purposes (if mailed) three calendar days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses is given in writing by Validity Guarantor) as follows:

6

56 Locust Avenue, 2nd Floor
Rye, NY 10580

Any notice or demand which, by any provision of this Agreement, is required or permitted to be given or served by to or on Lender shall be deemed to have been sufficiently given and served for all purposes (if mailed) three calendar days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses are given in writing by Lender) as follows:

> EMIGRANT BUSINESS CREDIT CORPORATION
> 6 East 43rd Street, 20th Floor
> New York, New York 10017
> Attention: Karen Wold

18.  Miscellaneous Provisions. The following miscellaneous provisions are a part of this Agreement:

(a)  Amendment. No amendment, modification, consent or waiver of any provision of this Agreement, and no consent to any departure by Validity Guarantor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of Lender, and then shall be effective only as to the specific instance and for the specific purpose for which given.

(b)  Caption Headings. Caption headings of the sections of this Agreement are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Agreement, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

(c)  Entire Agreement. This Agreement embodies the final, entire agreement of the parties hereto and supersede any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. There are no oral agreements between the parties to this Agreement.

(d)  Governing Law and Jurisdiction. This Agreement shall be governed and construed in accordance with the substantive laws of the State of New York (without regard to any principles of law that would require the application of the laws of another state). Validity Guarantor and Lender hereby irrevocably consent to the jurisdiction of the state courts of New York and the federal courts in New York, and agree that any action or proceeding arising out of or brought to enforce the provisions of this Agreement may be brought in any court having subject matter jurisdiction.

(e)  Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable. This Agreement shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.

(f)  Successors and Assigns Bound. The obligations and liabilities of Validity Guarantor under this Agreement shall be binding upon the successors, devisees, administrators, executors and assigns of Validity Guarantor.

119434082_1

24-04020-dsj Doc 1-1 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #2 State
Court Records Pg 404 of 688

(g) **WAIVER OF JURY.** VALIDITY GUARANTOR OR LENDER HEREBY WAIVES THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY VALIDITY GUARANTOR OR LENDER AGAINST THE OTHER.

VALIDITY GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT AND AGREES TO ITS TERMS. IN ADDITION, VALIDITY GUARANTOR UNDERSTANDS THAT THIS AGREEMENT WILL CONTINUE UNTIL TERMINATED. NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS AGREEMENT EFFECTIVE. THIS AGREEMENT IS EFFECTIVE AS OF THE DATE STATED ABOVE.

VALIDITY GUARANTOR:

JOHN HANRATTY

119434082_1

VALIDITY GUARANTY AGREEMENT

(JOHN HANRATTY)

THIS VALIDITY GUARANTY AGREEMENT (the "Agreement") dated as of March 9, 2017, is made by JOHN HANRATTY (the "Validity Guarantor") in favor of EMIGRANT BUSINESS CREDIT CORPORATION, a Delaware corporation (the "Lender").

WHEREAS, Lender has extended or may extend a line of credit or other financial accommodations to EBURY 2 EMI, LLC, a New York limited liability company (the "Borrower"). In order to induce Lender to extend the line of credit or other financial accommodations to Borrower, Validity Guarantor has agreed to execute and deliver this Agreement in order to guaranty the validity of Information provided to Lender by or for Borrower. Capitalized terms used in this paragraph are defined below.

NOW, THEREFORE, in consideration of the premises, Validity Guarantor agrees as follows:

1.      Definitions. The following terms shall have the following meanings when used in this Agreement. Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Credit Agreement referred to below or under New York law. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

"Agreement" means this Validity Guaranty Agreement, as this Validity Guaranty Agreement may be amended, modified, or restated from time to time.

"Calculation Date" means: (a) with respect to any Borrowing Base Certificate, the date of such Borrowing Base Certificate, as set forth thereon; and (b) with respect to any financial statement, the date of such financial statement, as set forth therein.

"Collateral" means individually, collectively, interchangeably and without limitation any and all property in which Lender has been granted a security interest as security for any of the Indebtedness.

"Credit Agreement" means individually, collectively and interchangeably, the Credit Agreement entered into by Borrower and Lender dated as of March 1, 2017, and any amendments and supplements to the Credit Agreement.

"Damages" means individually, collectively, interchangeably and without limitation any and all damages, costs or losses incurred by Lender as the result, in whole or in part, of any Information not being true and correct, in all material respects as of a Calculation Date, including, without limitation, related reasonable attorneys' fees and expenses, other related reasonable expenses and the amount of any overadvance made in reliance on a Borrowing Base Certificate. In no event will the term "Damages" include any claim for lost opportunity costs.

"Indebtedness" means the indebtedness of Borrower to Lender under the Credit Agreement, the Note and the other Related Documents, together with interest, reasonable costs, reasonable expenses, reasonable attorneys' fees and other fees and charges as provided for in the Credit Agreement, whether or not any such indebtedness may be barred under any statute of limitations or may be otherwise unenforceable or voidable for any reason.

"Information" means, individually, collectively, interchangeably and without limitation any and all financial statements and all written information relating to the eligibility of Collateral from time to time delivered to Lender by Borrower or by third parties at the direction of Borrower (including, without limitation, all Borrowing Base Certificates and any schedules of Collateral.

"Lender" means EMIGRANT BUSINESS CREDIT CORPORATION, its successors and assigns.

1

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 406 of 688

"Validity Guarantor" means John Hanratty, a New York resident.

2.    <u>Validity Guaranty</u>. Validity Guarantor hereby guarantees that, to the knowledge of Validity Guarantor, all Information from time to time delivered to Lender will be true and correct in all material respects as of the Calculation Date applicable to such Information. Validity Guarantor hereby further agrees to pay the aggregate amount of all Damages incurred by Lender.

3.    <u>Joint, Several and Solidary Liability</u>. The obligation of Validity Guarantor to pay Damages under this Agreement shall be on a "solidary" and "joint and several" basis along with others responsible to pay Lender for Damages.

4.    <u>Duration of Guaranty and Effect of Cancellation</u>. This Agreement and the obligations of Validity Guarantor hereunder shall remain in full force and effect until such time as this Agreement may be canceled or otherwise terminated by Lender under a written cancellation instrument in favor of Validity Guarantor. Unless otherwise indicated under such a written cancellation instrument, the agreement of Lender to terminate or otherwise cancel this Agreement shall affect only, and shall be expressly limited to, the future obligations of Validity Guarantor under this Agreement after the date of such a written cancellation instrument; with Validity Guarantor remaining fully obligated and liable under this Agreement for any and all obligations arising from Information provided prior to the date of such a written cancellation instrument. Nothing under this Agreement or under any other agreement or understanding by and between Validity Guarantor and Lender shall in any way obligate, or be construed to obligate, Lender to agree to the subsequent termination or cancellation of the obligations of Validity Guarantor hereunder; it being fully understood and agreed to by Validity Guarantor that Lender has and intends to continue to rely on the obligations of Validity Guarantor under this Agreement in extending credit and other Indebtedness to and in favor of Borrower, and that to release Validity Guarantor from the continuing obligations of Validity Guarantor under this Agreement would so prejudice Lender that Lender may, within its sole and uncontrolled discretion and judgment, refuse to release Validity Guarantor from any of the continuing obligations of Validity Guarantor under this Agreement for any reason whatsoever as long as any of the Indebtedness remains unpaid and outstanding and the Credit Agreement is not terminated, Lender is obligated or agrees to make any advances to Borrower, or otherwise.

5.    <u>Waivers</u>. Validity Guarantor agrees as follows:

(a)    Validity Guarantor waives notice of acceptance of this Agreement by Lender.

(b)    Validity Guarantor waives notice, and Validity Guarantor consents to, any agreements or arrangements between Lender and Borrower or anyone else including, without limitation, agreements and arrangements for payment, extension, subordination, composition, arrangement, compromise, discharge, or release of the whole or any part of the Indebtedness

(c)    Validity Guarantor waives notice of any change in the financial condition of Borrower or the change or surrender of any and all Collateral.

(d)    Validity Guarantor waives any right to require Lender to notify Validity Guarantor of any action or non-action on the part of Borrower, Lender, or any other guarantor, surety or endorser, or notice of the creation of any new or additional Indebtedness subject to this Agreement.

(e)    Validity Guarantor waives any right to demand or require collateral security from Borrower, or any other person.

(f)    Validity Guarantor waives any right to require Lender to notify Validity Guarantor of the terms, time and place of any public or private sale of any Collateral.

2

(g)     Validity Guarantor waives any right arising from any election of remedies by Lender that may destroy or impair the subrogation rights of Validity Guarantor or the right of Validity Guarantor to proceed for reimbursement against Borrower or any other guarantor, surety or endorser, including without limitation, any loss of rights Validity Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness.

(h)     Validity Guarantor waives the right to renounce any disposition or transfer of assets whether created under a will, trust agreement, or intestacy statute, with respect to any devise, bequest, distributive share, trust account, life insurance or annuity contract, employee benefit plan (including, without limitation, any pension, retirement, death benefit, stock bonus or profit sharing plan, system, or trust), or any other disposition or transfer created by any testamentary or non-testamentary instrument or by operation of law, and any of the foregoing created or increased by reason of a renunciation made by another person.

(i)     Validity Guarantor waives any disability or other defense of Validity Guarantor, Borrower or any other guarantor, surety or endorser, or any other person, or by reason of the cessation from any cause whatsoever, other than payment in full of the Indebtedness and termination of the Credit Agreement.

Validity Guarantor warrants and agrees that each of the waivers set forth above is made with the full knowledge of Validity Guarantor of its significance and consequences, and that, under the circumstances, such waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law.

6.     <u>Subordination of Rights</u>. In the event that Validity Guarantor should for any reason: (a) advance or lend monies to Borrower, whether or not such funds are used by Borrower to make any payment under the Indebtedness; (b) make any payment to Lender or others for and on behalf Borrower under the Indebtedness; (c) make any payment to Lender in total or partial satisfaction of the obligations and liabilities of Validity Guarantor under this Agreement; or (d) if any of the property of Validity Guarantor is used to pay or satisfy any of the Indebtedness, Validity Guarantor hereby agrees that any and all rights that Validity Guarantor may have or acquire to collect from or to be reimbursed by Borrower (or from or by any other guarantor, endorser or surety), whether the rights of collection or reimbursement of Validity Guarantor arise by way of subrogation to the rights of Lender or otherwise, shall in all respects, whether or not Validity Guarantor or Borrower is presently or subsequently becomes insolvent, be subordinate, inferior and junior to the rights of Lender to collect and enforce payment, performance and satisfaction of the then remaining Indebtedness, until such time as the Indebtedness is fully paid and satisfied and the Credit Agreement is terminated. In the event of the insolvency or consequent liquidation of the assets of Validity Guarantor or Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Validity Guarantor or Borrower applicable to the payment of claims of Lender and Validity Guarantor shall be paid to Lender and shall be first applied by Lender to repayment of the then remaining Indebtedness. Validity Guarantor hereby assigns to Lender all claims that Validity Guarantor may have or acquire against Borrower or any assignee or trustee of Borrower in bankruptcy; provided that, such assignment shall be effective only for the purpose of and to the extent of assuring to Lender full satisfaction of the obligations of Validity Guarantor under this Agreement, and no further.

7.     <u>Receipt of Payments</u>. Validity Guarantor further agrees to refrain from attempting to collect or enforce any of the collection or reimbursement rights against Borrower (or against any other guarantor, surety or endorser), arising by way of subrogation or otherwise, until such time as all of the then remaining Indebtedness in favor of Lender is fully paid and satisfied, provided, however, nothing herein shall prevent Validity Guarantor from receiving distributions, dividends and management or other fees from Borrower or its affiliates that are permitted by the Credit Agreement. In the event that Validity Guarantor should receive any payment from Borrower (or any other guarantor, surety or endorser) that Borrower (or such a third party) may owe to Validity Guarantor for any reason (other than distributions, dividends and management or other fees that are permitted by the Credit Agreement), Validity Guarantor agrees to accept each such payment in trust for and on behalf of Lender, advising Borrower (or the third party payee) of such fact. Validity Guarantor further unconditionally agrees to immediately deliver such funds to Lender with such funds being held by Validity Guarantor over any interim period, in trust for Lender.

119434082_1

8.    <u>Deposit Accounts</u>. As collateral security for repayment of the obligations of Validity Guarantor hereunder, Validity Guarantor hereby grants Lender a continuing security interest in any and all funds that Validity Guarantor may now and in the future have on deposit with Lender or in certificates of deposit or other deposit accounts with Lender as to which Validity Guarantor is an account holder.

9.    <u>Covenants Relating to the Indebtedness</u>. Validity Guarantor agrees that Lender may, at its sole option, at any time, and from time to time, without the consent of or notice to Validity Guarantor or to any other party, and without incurring any responsibility to Validity Guarantor or to any other party, and without impairing or releasing any of the obligations or liabilities of Validity Guarantor under this Agreement:

(a)    Make additional secured or unsecured loans to Borrower.

(b)    Discharge, release or agree not to sue any party (including, but not limited to, Borrower or any other guarantor, surety, or endorser), who is or may be liable to Lender for any of the Indebtedness.

(c)    Sell, exchange, release, surrender, realize upon, or otherwise deal with, in any manner and in any order, any collateral directly or indirectly securing repayment of any of the Indebtedness.

(d)    Alter, renew, extend, accelerate, or otherwise change the manner, place, terms or times of payment or other terms of the Indebtedness, or any part thereof, including any increase or decrease in the rate or rates of interest on any of the Indebtedness.

(e)    Settle or compromise any of the Indebtedness.

(f)    Subordinate or agree to subordinate the payment of all or any part of the Indebtedness, or the security rights of Lender in any collateral directly or indirectly securing any such Indebtedness, to the payment or security rights of any other present or future creditors.

(g)    Apply any payments or proceeds to any of the Indebtedness in such priority or with such preferences as Lender may determine in its sole discretion, regardless of which of the Indebtedness then remains unpaid.

(h)    Take or accept any other collateral security or guaranty for any or all of the Indebtedness.

(i)    Enter into, deliver, modify, amend, or waive compliance with, any instrument or arrangement evidencing, securing or otherwise affecting, all or any part of the Indebtedness.

In addition, no course of dealing between Lender and Borrower (or any other guarantor, surety or endorser), nor any failure or delay on the part of Lender to exercise any of the rights and remedies of Lender under this Agreement or any other agreement or agreements by and between Lender and Borrower (or any other guarantor, surety or endorser), shall have the effect of impairing or releasing the obligations and liabilities of Validity Guarantor to Lender, or of waiving any of the rights and remedies of Lender under this Agreement or otherwise. Any partial exercise of any rights and remedies granted to Lender shall furthermore not constitute a waiver of any of the other rights and remedies of Lender; it being the intent and agreement of Validity Guarantor that the rights and remedies of Lender shall be cumulative in nature.

10.    <u>No Release of Validity Guarantor</u>. The obligations and liabilities of Validity Guarantor under this Agreement shall not be released, impaired, reduced, or otherwise affected by, and shall continue in full force and effect notwithstanding the occurrence of any event, including without limitation any one or more of the following events:

4

119434082_1

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 409 of 688

(a)    The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution, or lack of authority (whether corporate, partnership or trust) of Borrower (or any person acting on behalf of Borrower), or of any other guarantor, surety or endorser.

(b)    Any payment by Validity Guarantor, Borrower, or any other party, to Lender that is held to constitute a preferential transfer or a fraudulent conveyance under any applicable law, or any such amounts or payment which, for any reason, Lender is required to refund or repay to Borrower or to any other person.

(c)    Any dissolution of Borrower, or any sale, lease or transfer of all or any part of any assets of Borrower.

In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership, or any other debt relief granted to Borrower or to any other party, Lender must rescind or restore any payment received in total or partial satisfaction of the Indebtedness, any prior release or discharge from the terms of this Agreement given to Validity Guarantor shall be without effect, and this Agreement and the obligations and liabilities of Validity Guarantor hereunder shall automatically and retroactively be renewed and/or reinstated and shall remain in full force and effect to the same degree and extent as if such a release or discharge had never been granted. It is the intention of Lender and Validity Guarantor that the obligations and liabilities of Validity Guarantor hereunder shall not be discharged except by the full and complete performance and satisfaction by Validity Guarantor of such obligations and liabilities; and then only to the extent of such performance.

11.    Representations and Warranties. Validity Guarantor represents and warrants that:

(a)    Any and all financial statements of Validity Guarantor furnished to Lender were complete and correct in all material respects, and fairly represent the financial condition and solvency of Validity Guarantor as of the date thereof. To the knowledge of Validity Guarantor, Validity Guarantor does not have any contingent obligations or liabilities that were not disclosed or reserved against in the financial statements of Validity Guarantor or in the notes thereto. Since the dates of such financial statements, there has been no material adverse change in the financial condition or business of Validity Guarantor that has not been disclosed to Lender in writing.

(b)    The execution, delivery and performance of this Agreement by Validity Guarantor are not in violation of any laws and will not result in a default under any contract, agreement, or instrument to which Validity Guarantor is a party, or by which Validity Guarantor or the property of Validity Guarantor may be bound.

(c)    Validity Guarantor will receive and/or has received a direct or indirect material benefit from the transactions contemplated herein and/or arising out of the Indebtedness.

(d)    This Agreement, when executed and delivered to Lender, will constitute a valid, legal and binding obligation of Validity Guarantor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency or similar laws affecting generally the enforcement of creditor's rights.

(e)    Validity Guarantor has established adequate means of obtaining information from Borrower on a continuing basis regarding the financial condition of Borrower and information relating to the eligibility of Collateral.

(f)    Lender has not made any representations to Validity Guarantor as to the creditworthiness of Borrower.

12.    Affirmative Covenants. Validity Guarantor covenants and agrees in favor of Lender that, so long as this Agreement remains in effect,

119434082_1

(a)    Validity Guarantor will keep adequately informed of any facts, events or circumstances that might in any way affect the risks of Validity Guarantor under this Agreement. Validity Guarantor further agrees that Lender shall not have any obligation to disclose to Validity Guarantor any information or material relating to Borrower, any other party responsible for payment of all or any part of the Indebtedness Guarantor or any other Validity Guarantor.

(b)    Validity Guarantor will furnish such additional information and statements with respect to the financial condition of Validity Guarantors as Lender may reasonably request from time to time.

13.    Remedies. Upon the failure in the payment or performance of any of the obligations of Validity Guarantor under this Agreement, Lender may institute a judicial proceeding for the collection of the sums or the performance of any of the obligations of Validity Guarantor under this Agreement and unpaid or unperformed, and may prosecute such proceeding to judgment for final decree, and may enforce the same against Validity Guarantor and/or one or more other guarantors and collect the monies adjudged or decreed to be payable in the manner provided by law out of the property of Validity Guarantor and/or one or more other guarantors, wherever situated.

14.    Enforcement Expenses. Validity Guarantor agrees to pay all reasonable costs and expenses, including reasonable attorneys' fees actually incurred and disbursements and any other reasonable fees and disbursements, that may be incurred by or on behalf of Lender in enforcing any of the obligations and liabilities of Validity Guarantor hereunder.

15.    Transfer of Indebtedness. This Agreement is for the benefit of Lender and for such other person or persons as may from time to time become or be the holders of all or any part of the Indebtedness. This Agreement shall be transferable and negotiable with the same force and effect and to the same extent as the Indebtedness may be transferable; it being understood and agreed to by Validity Guarantor that, upon any transfer or assignment of all or any part of the Indebtedness, the holder of such Indebtedness shall have all of the rights and remedies granted to Lender under this Agreement. Validity Guarantor further agrees that, upon any transfer of all or any portion of the Indebtedness, Lender may transfer and deliver any and all collateral securing repayment of such Indebtedness (including, but not limited to, any collateral provided by Validity Guarantor) to the transferee of such Indebtedness, and such collateral shall secure any and all of the Indebtedness in favor of such a transferee. Validity Guarantor additionally agrees that, after any such transfer or assignment has taken place, the transferring Lender shall be fully discharged from any and all liability and responsibility to Validity Guarantor with respect to such collateral, and the transferee thereafter shall be vested with all the powers and rights with respect to such collateral.

16.    Consent to Participation. Validity Guarantor recognizes and agrees that Lender may, from time to time, one or more times, transfer all or any part of the Indebtedness through sales of participation interests in such Indebtedness to one or more third party lenders. Validity Guarantor specifically agrees and consents to all such transfers and assignments, and Validity Guarantor further waives any subsequent notice of such transfers and assignments as may be provided under New York law. Validity Guarantor additionally agrees that the purchaser of a participation interest in the Indebtedness will be considered as the absolute owner of a percentage interest of such Indebtedness and that such a purchaser will have all of the rights granted under any participation agreement governing the sale of such a participation interest. Validity Guarantor waives any rights of offset that Validity Guarantor may have against any transferring Lender and/or any purchaser of such a participation interest, and Validity Guarantor unconditionally agrees that either such a transferring Lender or such a purchaser may enforce the obligations and liabilities of Validity Guarantor under this Agreement, irrespective of the failure or insolvency of any such transferring Lender or any such purchaser.

17.    Notices. Any notice or demand which, by provision of this Agreement, is required or permitted to be given or served to or on Validity Guarantor shall be deemed to have been sufficiently given and served for all purposes (if mailed) three calendar days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses is given in writing by Validity Guarantor) as follows:

6

119434082_1

JOHN HANRATTY
56 Locust Avenue, 2nd Floor
Rye, NY 10580

Any notice or demand which, by any provision of this Agreement, is required or permitted to be given or served by to or on Lender shall be deemed to have been sufficiently given and served for all purposes (if mailed) three calendar days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one Business Day after being delivered to such courier, or (if delivered in person) the same day as delivery, in each case addressed (until another address or addresses are given in writing by Lender) as follows:

EMIGRANT BUSINESS CREDIT CORPORATION
6 East 43rd Street, 20th Floor
New York, New York 10017
Attention: Karen Wold

18.    Miscellaneous Provisions. The following miscellaneous provisions are a part of this Agreement:

(a)    Amendment. No amendment, modification, consent or waiver of any provision of this Agreement, and no consent to any departure by Validity Guarantor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of Lender, and then shall be effective only as to the specific instance and for the specific purpose for which given.

(b)    Caption Headings. Caption headings of the sections of this Agreement are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Agreement, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

(c)    Entire Agreement. This Agreement embodies the final, entire agreement of the parties hereto and supersede any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. There are no oral agreements between the parties to this Agreement.

(d)    Governing Law and Jurisdiction. This Agreement shall be governed and construed in accordance with the substantive laws of the State of New York (without regard to any principles of law that would require the application of the laws of another state). Validity Guarantor and Lender hereby irrevocably consent to the jurisdiction of the state courts of New York and the federal courts in New York, and agree that any action or proceeding arising out of or brought to enforce the provisions of this Agreement may be brought in any court having subject matter jurisdiction.

(e)    Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable. This Agreement shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.

(f)    Successors and Assigns Bound. The obligations and liabilities of Validity Guarantor under this Agreement shall be binding upon the successors, devisees, administrators, executors and assigns of Validity Guarantor.

7

119434082_1

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 11
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 412 of 688

(g)  **WAIVER OF JURY TRIAL.** VALIDITY GUARANTOR HEREBY WAIVES THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY VALIDITY GUARANTOR OR LENDER AGAINST THE OTHER.

VALIDITY GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT AND AGREES TO ITS TERMS. IN ADDITION, VALIDITY GUARANTOR UNDERSTANDS THAT THIS AGREEMENT WILL CONTINUE UNTIL TERMINATED. NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS AGREEMENT EFFECTIVE. THIS AGREEMENT IS EFFECTIVE AS OF THE DATE STATED ABOVE.

VALIDITY GUARANTOR:

JOHN HANRATTY

8

119434082_1

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 12
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 413 of 688

# EXHIBIT G

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 12
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 414 of 688

# TABLE OF CONTENTS

Ebury 1EMI LLC

     Notice of Default.................................................................................................................... 3

Ebury 2EMI LLC

     Notice of Default.................................................................................................................... 5



**DP**

Dilworth
Paxson LLP

Mark Schiavo
New Jersey Managing Partner

DIRECT DIAL NUMBER:
(856) 675-1962

Scott J. Freedman
sfreedman@dilworthlaw.com

November 29, 2021

VIA REGULAR MAIL AND EMAIL

EBURY 1EMI LLC
41 Purdy Avenue
#278
Rye, New York 10580
Attention:  John Hanratty

VIA OVERNIGHT MAIL

EBURY 1EMI LLC
1357 Ashford Avenue
Suite 2-137
San Juan, Puerto Rico 00907
Attention:  John Hanratty

RE:   Event of Default under Credit Agreement dated as of March 9, 2017 (as amended, the "Agreement") between EBURY 1EMI LLC (the "Borrower") and EMIGRANT BUSINESS CREDIT CORPORATION (the "Bank")

Dear Mr. Hanratty:

We represent Emigrant Business Credit Corporation.  There is currently an Event of Default under the Agreement due to, among other reasons, the Borrower's failure to pay all obligations outstanding under the Agreement in full, by November 10, 2021.  Pursuant to the terms of the Agreement and the documents executed in connection therewith (collectively, the "Loan Documents"), all principal, interest, costs, expenses and other obligations of the Borrower to the Bank are due and payable in full.  The amount owed under the Loan Documents as of November 29, 2021 is as follows:

| Principal | $13,706,199.01 |
|---|---|
| Interest | $93,302.81 |
| Attorneys' Fees | ** |
| **TOTAL** | **$13,799,501.82** |

** In addition, attorneys' fees and costs that are unpaid must be paid in full, whether incurred before or after the date of this letter.

A Limited Liability Partnership Formed in Pennsylvania
LibertyView  •  457 Haddonfield Road  •  Suite 700  •  Cherry Hill, NJ 08002  •  856-675-1900  •  fax:  856-249-5098
www.dilworthlaw.com • Exton, PA • Philadelphia, PA • Princeton, NJ • Harrisburg, PA • Wilmington, DE • New York, NY

122577156_1

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 416 of 688

Dilworth Paxson LLP                                                           Page 2
To:  EBURY 1EMI LLC

Demand is hereby made upon the Borrower pursuant to the terms of the Loan Documents to make payment to the Bank of the amounts set forth above.  If the Bank does not receive payment in full of the amounts above and per diem interest through the date the payment is made on or before December 9, 2021, the Bank will, without further notice to the Borrower, take all appropriate action and institute all appropriate legal proceedings the Bank deems necessary to ensure the full collection of the amount due under the Loan Documents, including but not limited to filing Civil Actions against the Borrower and the guarantors for the obligations of Borrower to Bank.  The Borrower will also be responsible for legal fees incurred before or after the date of this letter by the Bank in connection with the obligations of the Borrower to the Bank.

Payment should be made in immediately available funds by overnight delivery as follows:

Emigrant Bank for the Account of Emigrant Business Credit Corp.
Account No.:  9251657904
ABA/Routing No.:  226070403
Reference:  Ebury 1EMI, LLC

By delivering this letter, the Bank is in no way waiving any rights, powers or privileges granted to the Bank by the Loan Documents.  The Bank hereby expressly reserves all of its rights with respect to enforcing any and all such rights, powers or privileges at any time in the future.  In no event shall the Bank's delay in exercising, or its failure to exercise, any or all of the Bank's rights, powers, privileges or remedies, nor the Bank's partial exercise of the same, constitute a waiver or release of any of the Bank's rights, powers, privileges or remedies.

Very truly yours,

Scott J. Freedman

cc:      EB 1EMIALA LLC, Guarantor (via email)
         EB 1EMI FL, LLC, Guarantor (via email)
         EB 1EMIIN, LLC, Guarantor (via email)
         EB 1EMIMD, LLC, Guarantor (via email)
         EB 1EMINJ LLC, Guarantor (via email)
         EB 1EMINY LLC, Guarantor (via email)
         EB 1EMISC LLC, Guarantor (via email)
         RE 1EMI LLC, Guarantor (via email)
         EB 1EMIDC LLC, Guarantor (via email)
         ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, Guarantor (via email)
         EBURY FUND 1FL LLC, Guarantor (via email)
         EBURY FUND 1NJ LLC, Guarantor (via email)
         Karen Wold, Emigrant Business Credit Corp. (via email)

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO. 12
INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/17/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 417 of 688



Mark Schiavo
New Jersey Managing Partner

DIRECT DIAL NUMBER:
(856) 675-1962

Scott J. Freedman
sfreedman@dilworthlaw.com

November 29, 2021

VIA REGULAR MAIL AND EMAIL

EBURY 2 EMI LLC
41 Purdy Avenue
#278
Rye, New York 10580
Attention: John Hanratty

VIA OVERNIGHT MAIL

EBURY 2 EMI LLC
1357 Ashford Avenue
Suite 2-137
San Juan, Puerto Rico 00907
Attention: John Hanratty

RE:   Event of Default under Credit Agreement dated as of March 9, 2017 (as amended, the "Agreement") between EBURY 2 EMI LLC (the "Borrower") and EMIGRANT BUSINESS CREDIT CORPORATION (the "Bank")

Dear Mr. Hanratty:

We represent Emigrant Business Credit Corporation. There is currently an Event of Default under the Agreement due to, among other reasons, the Borrower's failure to pay all obligations outstanding under the Agreement in full, by November 10, 2021. Pursuant to the terms of the Agreement and the documents executed in connection therewith (collectively, the "Loan Documents"), all principal, interest, costs, expenses and other obligations of the Borrower to the Bank are due and payable in full. The amount owed under the Loan Documents as of November 29, 2021 is as follows:

| | |
|---|---|
| Principal | $4,545,448.02 |
| Interest | $30,934.30 |
| Attorneys' Fees | ** |
| **TOTAL** | **$4,576,382.32** |

** In addition, attorneys' fees and costs that are unpaid must be paid in full, whether incurred before or after the date of this letter.

A Limited Liability Partnership Formed in Pennsylvania
LibertyView • 457 Haddonfield Road • Suite 700 • Cherry Hill, NJ 08002 • 856-675-1900 • fax: 856-249-5098
www.dilworthlaw.com • Exton, PA • Philadelphia, PA • Princeton, NJ • Harrisburg, PA • Wilmington, DE • New York, NY

122577237_1

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 418 of 688

Dilworth Paxson LLP                                                    Page 2
To:  EBURY 2 EMI LLC

Demand is hereby made upon the Borrower pursuant to the terms of the Loan Documents to make payment to the Bank of the amounts set forth above.  If the Bank does not receive payment in full of the amounts above and per diem interest through the date the payment is made on or before December 9, 2021, the Bank will, without further notice to the Borrower, take all appropriate action and institute all appropriate legal proceedings the Bank deems necessary to ensure the full collection of the amount due under the Loan Documents, including but not limited to filing Civil Actions against the Borrower and the guarantors for the obligations of Borrower to Bank.   The Borrower will also be responsible for legal fees incurred before or after the date of this letter by the Bank in connection with the obligations of the Borrower to the Bank.

Payment should be made in immediately available funds by overnight delivery as follows:

Emigrant Bank for the Account of Emigrant Business Credit Corp.
Account No.:  9251657904
ABA/Routing No.:  226070403
Reference:  Ebury 2 EMI, LLC

By delivering this letter, the Bank is in no way waiving any rights, powers or privileges granted to the Bank by the Loan Documents.  The Bank hereby expressly reserves all of its rights with respect to enforcing any and all such rights, powers or privileges at any time in the future.  In no event shall the Bank's delay in exercising, or its failure to exercise, any or all of the Bank's rights, powers, privileges or remedies, nor the Bank's partial exercise of the same, constitute a waiver or release of any of the Bank's rights, powers, privileges or remedies.

Very truly yours,

Scott J. Freedman

cc:     EB 2EMIALA LLC, Guarantor (via email)
        EB 2EMI FL, LLC, Guarantor (via email)
        EB 2EMIIN, LLC, Guarantor (via email)
        EB 2EMIMD, LLC, Guarantor (via email)
        EB 2EMINJ LLC, Guarantor (via email)
        EB 2EMINY LLC, Guarantor (via email)
        EB 2EMISC LLC, Guarantor (via email)
        RE 2EMI LLC, Guarantor (via email)
        EBURY FUND 2 FL LLC, Guarantor (via email)
        EBURY FUND 2 NJ LLC, Guarantor (via email)
        RED CLOVER 1 LLC, Guarantor (via email)
        Karen Wold, Emigrant Business Credit Corp. (via email)

# EXHIBIT H

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 420 of 688

# TABLE OF CONTENTS

Ebury 1EMI LLC

     Independent Auditor's Report.............................................................................................. 3

Ebury 2EMI LLC

     Independent Auditor's Report.............................................................................................. 5

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 421 of 688
i



### INDEPENDENT AUDITOR'S REPORT

To the Partners of
Ebury Fund 1, L.P. and Subsidiaries

We have audited the accompanying consolidated financial statements of Ebury Fund 1, L.P. and Subsidiaries (the Partnership), which comprise the consolidated statement of assets, liabilities and partners' capital including the consolidated condensed schedule of investments as of December 31, 2019, and the related consolidated statement of operations, consolidated statement of changes in partners' capital, and consolidated statement of cash flows for the year then ended, and the related notes to the consolidated financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Basis for Qualified Opinion**

As discussed in Note 9 of the consolidated financial statements, the Partnership together with other related parties are involved in two separate complaints filed in the Puerto Rico Court of First Instance and United States District Court for the District of Delaware against an escrow agent and various of its related parties for collection of moneys owed in connection with the sale of certain tax liens. As of December 31, 2019, the Partnership had recorded $3,014,168 in amounts held by the escrow agent. It is uncertain whether the Partnership will be able to recover any amounts owed by the escrow agent in the near future.


Phone: 787+724+3400
Fax: 787+724+3300
Address: 1519 Ponce de León Avenue
Suite 601, Stop 23
San Juan, Puerto Rico, 00909
www.ccl-cpafirm.com



*A member of*

Independent legal & accounting firms

**CC&L**
Colón Cuebas & Laguna, PSC
Certified Public Accountants and Business Advisors

**Qualified Opinion**

In our opinion, except for the possible effects of the matters discussed in the Basis for Qualified Opinion paragraph, the consolidated financial statements referred to in the first paragraph present fairly, in all material respects, the financial position of Ebury Fund 1, L.P. and Subsidiaries as of December 31, 2019, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

**Substantial Doubt about the Partnership's Ability to Continue as a Going Concern**

The accompanying consolidated financial statements have been prepared assuming that the Partnership will continue as a going concern. As discussed in Note 7 to the consolidated financial statements, as of December 31, 2019, the Partnership had a revolving line of credit with Emigrant Business Credit Corporation Bank (Emigrant) amounting to $15,000,000, of which $14,649,639 were outstanding and will be due for payment on August 10, 2021. It is uncertain whether the Partnership will be able to repay all amounts outstanding under the Line of Credit on this date. This condition raises substantial doubt about the Partnership's ability to continue as a going concern. Management's evaluation of the events and conditions and management's plans regarding these matters are described in Note 10 to the consolidated financial statements. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to that matter.

**Emphasis of Other Matters**

As discussed in Notes 1 and 2, the consolidated financial statements include investments in tax lien receivables and Ebury RE, LLC valued at $6,466,903 and $6,430,361, respectively whose fair values have been estimated by the General Partner of the Partnership in the absence of readily ascertainable market values. However, because of the inherent uncertainty of valuation, the estimated values determined by the General Partner may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material.

San Juan, Puerto Rico
May 27, 2021.

*Colón Cuebas & Laguna, CPA, PSC*

CERTIFIED PUBLIC ACCOUNTANTS
Stamp No. E428259 of the Puerto Rico Society of
Certified Public Accountants was affixed to
the original of this report.

Phone: 787+724+3400
Fax: 787+724+3300
Address: 1519 Ponce de León Avenue
Suite 601, Stop 23
San Juan, Puerto Rico, 00909
www.ccl-cpafirm.com

A member of



MSI Global Alliance

Independent legal & accounting firms

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
NYSCEF DOC. NO. 13
INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/17/2022



**Colón Cuebas & Laguna, PSC**
Certified Public Accountants and Business Advisors

# INDEPENDENT AUDITOR'S REPORT

To the Partners of
Ebury Fund 2, L.P. and Subsidiaries

We have audited the accompanying consolidated financial statements of Ebury Fund 2, L.P. and Subsidiaries (the Partnership), which comprise the consolidated statement of assets, liabilities and partners' capital including the consolidated condensed schedule of investments as of December 31, 2019, and the related consolidated statement of operations, consolidated statement of changes in partners' capital, and consolidated statement of cash flows for the year then ended, and the related notes to the consolidated financial statements.

## Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

## Auditor's Responsibility

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

## Basis for Qualified Opinion

As discussed in Note 9 to the consolidated financial statements, the Partnership together with other related parties are involved in two separate complaints filed in the Puerto Rico Court of First Instance and United States District Court for the District of Delaware against an escrow agent and various of its related parties for collection of moneys owed in connection with the sale of certain tax liens. As of December 31, 2019, the Partnership had recorded $372,657 in amounts held by the escrow agent. It is uncertain whether the Partnership will be able to recover any amounts owed by the escrow agent in the near future.



Phone: 787+724+3400
Fax: 787+721+3300
Address: 1519 Ponce de León Avenue
Suite 601, Stop 23
San Juan, Puerto Rico, 00909
www.ccl-cpafirm.com



*A member of*

**msi** Global Alliance

*Independent legal & accounting firms*



**Qualified Opinion**

In our opinion, except for the possible effects of the matters discussed in the Basis for Qualified Opinion paragraph, the consolidated financial statements referred to in the first paragraph present fairly, in all material respects, the financial position of Ebury Fund 2, L.P. and Subsidiaries as of December 31, 2019, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

**Substantial Doubt about the Partnership's Ability to Continue as a Going Concern**

The accompanying consolidated financial statements have been prepared assuming that the Partnership will continue as a going concern. As discussed in Note 7 to the consolidated financial statements, as of December 31, 2019, the Partnership had a revolving line of credit with Emigrant Business Credit Corporation Bank (Emigrant) amounting to $5,000,000, of which $4,719,889 were outstanding and will be due for payment on August 10, 2021. It is uncertain whether the Partnership will be able to repay all amounts outstanding under the Line of Credit on this date. This condition raises substantial doubts about the Partnership's ability to continue as a going concern. Management's evaluation of the events and conditions and management's plans regarding these matters are described in Note 10 of the consolidated financial statements. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to that matter.

**Emphasis of Other Matter**

As discussed in Notes 1 and 2, the consolidated financial statements include investments in tax lien receivables and Ebury RE, LLC valued at $10,770,836 and $3,231,939, respectively whose fair values have been estimated by the General Partner of the Partnership in the absence of readily ascertainable market values. However, because of the inherent uncertainty of valuation, the estimated values determined by the General Partner may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material.

San Juan, Puerto Rico
May 27, 2021.

CERTIFIED PUBLIC ACCOUNTANTS
Stamp No. E428260 of the Puerto Rico Society of
Certified Public Accountants was affixed to
the original of this report.


Phone: 787+724+3400
Fax: 787+724+3300
Address:1519 Ponce de León Avenue
Suite 601, Stop 23
San Juan, Puerto Rico, 00909
www.ccl-cpafirm.com


A member of
Independent legal & accounting firms

# EXHIBIT I

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 14
RECEIVED NYSCEF: 10/17/2022

Case 1:21-cv-00203-MN Document 14 Filed 08/14/21 Page 1 of 200 PageID #: 1708

Court Records    Pg 426 of 688

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EBURY STREET CAPITAL, LLC, EB
1EMIALA, LLC, EB 2EMIALA, LLC,
EBURY FUND 1 NJ LLC, and EBURY FUND
2 NJ, LLC,

        Plaintiffs/Counterclaim
        Defendants,

  v.

THOMAS R. MCOSKER, ANDREW
KERNAN, BADEL HERNANDEZ,
LIENCLEAR – 0001, LLC, LIENCLEAR –
0002, LLC, LIENCLEAR, LLC,
BLOXTRADE, LLC, BCMG SERVICES,
LLC, BCMG INTERNATIONAL, LLC, and
SITONA VENTURES LLC,

        Defendants/Counterclaimants/
        Third-Party Plaintiffs.

  v.

JOHN HANRATTY, PING XIE, SARAH
WELLS, DENNISSE MENDEZ, SHIRLEY
VEGA, JOHN BRONZO, PATRICK
SEYMOUR, EB LEVRE I, LLC, EBURY
FUND I, LP, EBURY FUND 2, LP, EB
1EMIDC, LLC, RED CLOVER 1, LLC,
WHITE CLOVER 1, LLC, BLACK CLOVER
I, LLC, EBURY FUND IC1, LLC, EBURY
FUND 2CI, LLC, and EBURY RE, LLC,

        Third-Party Defendants.

Civil Action No. 1:21-cv-00203-RTD

## DEFENDANTS/COUNTERCLAIMANTS/THIRD-PARTY PLAINTIFFS'
## ANSWER TO THE AMENDED COMPLAINT, AFFIRMATIVE DEFENSES,
## COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT

Defendants/Counterclaimants/Third-Party Plaintiffs Thomas R. McOsker, Andrew

Kernan, Badel Hernandez, Lienclear – 0001, LLC, Lienclear – 0002, LLC, Lienclear, LLC,

BloxTrade, LLC, BCMG Services, LLC, BCMG International, LLC, and Sitona Ventures LLC ("Defendants"), by counsel, respond to Plaintiff/Counter-Defendant's ("Plaintiff") Amended Complaint (the "Complaint") and allege in the Counterclaims as follows.  For the Court's convenience, Plaintiff's allegations are set forth verbatim with Defendants' responses immediately following.

Except as expressly admitted herein, Defendants deny all allegations in the Complaint, including legal conclusions (which are for the Court to determine) and any allegations in headings and/or footnotes. To the extent Defendants answer allegations containing terms defined in the Complaint, such answer is not an acknowledgement, admission, or adoption of any fact or characterization made by Plaintiff.  In addition, to the extent Defendants refer the Court to a document referenced in the Consolidated Complaint for the complete contents thereof, they deny any allegations in the Complaint that are inconsistent with the contents of such documents.

### NATURE OF ACTION

1.      This action is brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et. seq.* and Delaware state law for treble, actual and punitive damages and for the recovery of attorneys' fees and costs incurred in this action.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

2.      Plaintiffs are in the tax lien investment business.

**RESPONSE: Denied.**

3.      Plaintiff ESC is the managing member of Plaintiffs EF 1 and EF 2, which own New Jersey tax lien certificates, and Plaintiffs EB 1 and EB 2, which own Alabama tax lien certificates.

**RESPONSE: Defendants**

4.      Defendants LC Purchaser, LC Escrow, LC Servicer, and BloxTrade (collectively, the "**Tax Lien Defendants**") advertise themselves as market-makers in and brokers of tax lien certificates ("**Certificates**").

**RESPONSE: Denied.**

Case 1:20-cv-00268-LAK Document 111-14 Filed 08/14/24 Page 430 of 725
Court Records    Pg 428 of 688

5.      The Tax Lien Defendants purport to facilitate transactions by (1) purchasing Certificates and then selling the Certificates at a mark-up (2) after providing escrow, clearing, and transfer services to Certificates' sellers and buyers.

**RESPONSE: Denied.**

6.      Defendant Thomas R. McOsker ("**McOsker**") owns and manages a panoply of Delaware and Puerto Rico LLCs that purport to engage in legitimate financial services, including the Tax Lien Defendants and Defendants BCMG Services, BCMG International, and Sitona (collectively, the "**Corporate Defendants**").

**RESPONSE: Denied.**

7.      Defendants Andrew Kernan, and Badel Hernandez (with McOsker, the "**Individual Defendants**") help McOsker manage the Tax Lien Defendants and the Corporate Defendants.

**RESPONSE: Denied.**

8.       Defendants comprise the "**McOsker Enterprise**," an association-in-fact which defrauds the Tax Lien Defendants' clients into depositing escrow funds with Defendant LC Escrow, which Defendants then steal and use for their own purposes.

**RESPONSE: Denied.**

9.      Defendants work in tandem to "offer" unsuspecting clients an efficient, closed-loop tax lien brokerage service.

**RESPONSE: Denied.**

10.     In reality, Defendants defraud the public and their own clients by presenting the Corporate Defendants as legitimate financial services companies, then spending their clients' money to line their own pockets.

**RESPONSE: Denied.**

11.     In several separate transactions throughout 2018, ESC and the Tax Lien Defendants executed a series of contracts (the "**Transaction Agreements**") to facilitate Plaintiffs' sale of nearly one thousand Certificates to Defendant LC Purchaser.

**RESPONSE: Denied.**

12.     Plaintiffs assigned to, and the Tax Lien Defendants gained title of, all Certificates promised in the Transaction Agreements.

**RESPONSE: Denied.**

13.     In exchange for Plaintiffs' Certificates, the Tax Lien Defendants promised to lawfully perform all transaction services and pay Plaintiffs over $3.5 million in supposedly escrowed funds.

**RESPONSE: Denied.**

14.     But unbeknownst to Plaintiffs, the Tax Lien Defendants did not even maintain a proper escrow account.

**RESPONSE: Denied.**

15.     Instead, the Tax Lien Defendants simply deposited the funds into a JPMorgan Chase checking account held by LC Escrow in New York (the "**Chase Account**").

**RESPONSE: Denied.**

16.     Furthermore, instead of disbursing Plaintiffs' money as required by the Transaction Agreements, and as repeatedly requested by Plaintiffs, Defendants McOsker, Kernan, and Hernandez repeatedly transferred cash from the New York Chase Account into Puerto Rico bank accounts held by Defendants BCMG Services and LC Servicer (the "**Puerto Rico Accounts**").

**RESPONSE: Denied.**

17.     Once the Individual Defendants moved Plaintiffs' millions into the Puerto Rico Accounts, the McOsker Enterprise misappropriated the money, lining their own pockets and otherwise using Plaintiffs' $3.5 million for anything other than what they had promised Plaintiffs.

**RESPONSE: Denied.**

18.     The McOsker Enterprise misappropriated Plaintiffs' money for a variety of unlawful purposes that comprise violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et. seq.,* (RICO) through their predicate acts of wire fraud, violations of the National Stolen Property Act, and money laundering.

**RESPONSE: Denied.**

19.     Defendants' conduct also violates Delaware common law, including breaches of contract, fraud, unjust enrichment, and conversion.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required but to the extent that any allegation, accusation or insinuation is being made regarding Defendant's behavior, conduct or actions then it is denied in its entirety.**

20.     For example, Defendants perpetrated what amounted be essentially a Ponzi Scheme by using new clients' money to pay off the Tax Lien Defendants' existing clients.

**RESPONSE: Denied.**

21.     Defendants also used Plaintiffs' $3.5 million of supposedly escrowed funds to (1) finance Defendants BCMG Services's fraudulent scheme to qualify for tax credits issued by the Commonwealth of Puerto Rico; (2) fund Defendant BCMG Services's routine business expenses; (3) bankroll Defendant McOsker's personal whims, including buying a volleyball team and coffee farm; and (4) pay off Defendants Kernan and Hernandez for their help in committing these crimes.

**RESPONSE: Denied.**

22.     As Plaintiffs became aware that Defendants stole the money, Plaintiffs learned that Defendants had perpetrated similar frauds on other clients of the Tax Lien Defendants since at least 2016.

**RESPONSE: Denied.**

23.     Plaintiffs believe that the McOsker Enterprise is using the Tax Lien Defendants to lure other innocent victims to this day.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied. By way of further answer, Defendants deny that they compromise the McOsker Enterprise and that they have "lured" any person or entity.**

24.     Plaintiffs seek to recover damages caused by the McOsker Enterprise and Defendants to the fullest extent permitted under the law, including treble, actual, and/or punitive damages, together with interest, costs and fees; and all other relief this Court deems just and proper.

**RESPONSE: Denied that Plaintiffs are entitled to any relief.**

### THE PARTIES

25.     Plaintiff ESC is a New York limited liability company and the managing member of the other Plaintiffs.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

26.     Plaintiff EB 1EMIALA, LLC is an Alabama limited liability company that purchases, owns, and sells Alabama tax lien certificates.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

27.     Plaintiff EB 2EMIALA, LLC is an Alabama limited liability company that purchases, owns, and sells Alabama tax lien certificates.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

28.     Plaintiff Ebury Fund 1 NJ, LLC is a New Jersey limited liability company that purchases, owns, and sells New Jersey tax lien certificates.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

29.     Plaintiff Ebury Fund 2 NJ, LLC is a New Jersey limited liability company that purchases, owns, and sells New Jersey tax lien certificates.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

30.     Each Plaintiff's principal place of business is 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

31.     Defendant Thomas R. McOsker is a resident of Puerto Rico. McOsker owns all of the Corporate Defendants and manages the other Individual Defendants.

**RESPONSE: Denied.**

32.     Defendant LienClear, LLC (defined above as "**LC Servicer**") is a Puerto Rico limited liability company. Defendant McOsker owns LC Servicer.

**RESPONSE: Denied.**

33.     Defendant LienClear – 0001, LLC (defined above as "**LC Purchaser**") is a Delaware limited liability company. Defendant McOsker owns LC Purchaser.

**RESPONSE: Admitted.**

34.     Defendant LienClear 0002, LLC (defined above as "**LC Escrow**") is a Delaware limited liability company. Defendant McOsker owns LC Escrow.

**RESPONSE: Admitted.**

35.     Defendant BloxTrade, LLC ("**BloxTrade**") is a Puerto Rico limited liability company. Defendant McOsker owns BloxTrade, which purports to be a tax lien broker.

**RESPONSE: Denied.**

36.      Defendant BCMG Services, LLC (defined above as "**BCMG Services**") is a Puerto Rico limited liability company. Defendant McOsker owns BCMG Services.

**RESPONSE: Denied.**

37.     Defendant BCMG International, LLC (defined above as "**BCMG International**") is a Puerto Rico limited liability company wholly owned by BCMG Services. The Tax Lien Defendants, BCMG Services, and BCMG International all have the same principal place of business: 53 Palmeras Street, Suite 901 San Juan, Puerto Rico 00901.

**RESPONSE: Denied.**

38.     Defendant Sitona Ventures, LLC (defined above as "**Sitona**") is a Delaware limited liability company whose principal place of business is 401 Park Avenue South, 10th Floor, New York, NY 10016. Defendant McOsker owns Sitona.

**RESPONSE: Denied.**

39.     The application for authority of Sitona filed with the New York State Department of State, Division of Corporations dated July 29, 2015 is signed by McOsker, as "member" with an address of 401 Park Avenue South, 10th Floor, New York, NY 10016.

**RESPONSE: Admitted.**

40.     Non-party Cactus Ventures LLC ("**Cactus**") was a Delaware limited liability company whose principal place of business was 401 Park Avenue South, 10th Floor, New York, NY 10016. Defendant McOsker owned Cactus.

**RESPONSE: Denied.**

41.     The application for authority of Cactus filed with the New York State Department of State, Division of Corporations dated November 7, 2014 and is signed by McOsker, as "member" with an address of 401 Park Avenue South, 10th Floor, New York, NY 10016.

**RESPONSE: Admitted.**

42.     Cactus identified its principal place of business at 1 Little West 12th Street, New York, New York, 10014, which is the same business address as Defendants LC Purchaser and LC Escrow.

**RESPONSE: Denied.**

43.     Plaintiffs do not sue Cactus because its limited liability company certificate was canceled in 2018.

**RESPONSE: Admitted that Cactus was dissolved in 2018.**

44.     Defendant Andrew Kernan is a resident of New York and personally profited at least $85,000 from the McOsker Enterprise's wrongdoing against Plaintiffs.

**RESPONSE: Denied.**

45.     Defendant Kernan is an independent contractor and Chief Financial Officer ("**CFO**") of Defendant BCMG Services and the Tax Lien Defendants.

**RESPONSE: Denied.**

46.     Defendant Badel Hernandez is a resident of Puerto Rico and personally profited at least $62,000 from McOsker Enterprise's wrongdoing against Plaintiffs.

**RESPONSE: Denied.**

47.     Defendant Hernandez is the in-house counsel and business manager of Defendants LC Servicer, BloxTrade, and BCMG Services.

**RESPONSE: Denied.**

48.     Each Tax Lien Defendant is undercapitalized and lacks corporate formalities.

**RESPONSE: Denied.**

49.     The Tax Lien Defendants did not engage in arm's-length transactions with each other, but instead freely exchanged assets that they had stolen from their clients.

**RESPONSE: Denied.**

50.     The McOsker Enterprise used the Tax Lien Defendants to commit federal felonies, from which the Individual Defendants personally profited.

**RESPONSE: Denied.**

51.     The Individual Defendants planned, organized, and directed the wrongful events alleged herein primarily through the Corporate Defendants, including by wrongfully converting the supposedly-escrowed funds due to Plaintiffs for the Corporate Defendants' own business expenses and the Individual Defendants' personal profits.

**RESPONSE: Denied.**

52.     For example, the McOsker Enterprise used the Tax Lien Defendants to gain control of, and steal, Escrow Funds belonging to Plaintiffs.

**RESPONSE: Denied.**

53.     There is substantial overlap in ownership, officers, directors and personnel among Defendants.

**RESPONSE: Denied.**

54.     For example, the Individual and Tax Lien Defendants share common office spaces, addresses, and phone numbers in Puerto Rico.

**RESPONSE: Denied.**

55.     As part of the sale of Plaintiffs' tax liens, the Tax Lien Defendants did not act at arm's-length with each other, despite contractual obligations to do so, but rather engaged in conflicted, interested transactions with one another.

**RESPONSE: Denied.**

## JURISDICTION AND VENUE

56.     Pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction because Plaintiffs allege RICO violations in violation of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. §1964(c).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

57.     Pursuant to 28 U.S.C. § 1367, the Court may exercise supplemental jurisdiction over Plaintiffs' state law claims.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

58.     This Court has personal jurisdiction over Defendants LC Purchaser, LC Escrow, and Sitona, each of which is a Delaware limited liability company and may be served by serving its registered agent in Delaware.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

59.     The Court has personal jurisdiction over the Tax Lien Defendants because each entered into agreements with Plaintiff in which they consented to the jurisdiction of Delaware Courts.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

60.     The Court has personal jurisdiction over the Individual Defendants because they are citizens of the United States, reside in Puerto Rico and New York, and upon information and belief, manage Delaware limited liability companies LC Purchaser, LC Escrow, and Sitona thus have consented to personal jurisdiction in Delaware pursuant to 6 *Del. C.* § 18-109(a).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

61.     The Court has personal jurisdiction over all of the Defendants pursuant to 18 U.S.C. § 1965 because this action may be brought in this jurisdiction against Defendants LC Purchaser, LC Escrow, and Sitona.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

62.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Defendants LC Purchaser, LC Escrow, and Sitona are Delaware entities and the Tax Lien Defendants executed agreements with Plaintiff ESC in which the parties consented to Delaware as the venue for any and all disputes that arise out of the agreements.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

63.     Moreover, in a related Puerto Rico proceeding, Defendants moved to dismiss on the basis of, inter alia, forum non conveniens, claiming that Delaware court was the proper jurisdiction for this dispute.

**RESPONSE: Admitted that Defendants moved to dismiss the ongoing Puerto Rico proceeding on the basis of *forum non* conveniens. Denied that "this dispute" is the same dispute in the ongoing Puerto Rico proceeding.**

## FACTUAL BACKGROUND

**Tax Lien Investments**

64.     Plaintiffs invest in tax lien Certificates, which are certificates of claims against properties that have liens against them due to unpaid property taxes.

**RESPONSE: Admitted.**

65.     Investors like Plaintiffs can buy Certificates in jurisdictions that levy property taxes, which typically are counties and municipalities.

**RESPONSE: Admitted.**

66.     The investor pays the property's outstanding taxes to the municipality.

**RESPONSE: Admitted.**

67.     In exchange, the municipality issues the Certificate to the investor, which gives the investor the right to collect the unpaid taxes and interest from the property owner.

**RESPONSE: Admitted.**

68.     Certificates can be valuable investments because they not only provide stable cash flow, but also have superiority to the vast majority of other liens that can be imposed upon real property.

**RESPONSE: Admitted.**

69.     Because there is no central exchange for the secondary trading of Certificates, when investors like Plaintiffs want to sell their Certificates, they often engage the services of brokers and market-makers.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

70.     The Tax Lien Defendants purport to offer such brokerage and market-making services for Certificates.

**RESPONSE: Denied.**

**The Transactions**

71.     Between 2015 and 2017, Plaintiffs acquired approximately one thousand Certificates on properties located across the United States.

11

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

72. In 2018, Plaintiffs began working with Defendant BloxTrade to sell Plaintiffs' Certificates.

**RESPONSE: Admitted in-part. "Plaintiffs' Certificates" and the proceeds from the sale thereof were to be used, in-part, to fund activities related to the CRIM Proposal.**

73. In 2018, Plaintiffs sold thousands of Certificates in eight separate transactions with Defendant BloxTrade, understanding that BloxTrade would, in turn, sell the Certificates to third parties unaffiliated with Plaintiffs or Defendants (the "**Transactions**").

**RESPONSE: Denied.**

74. Defendant BloxTrade and the Tax Lien Defendants purported to structure the transactions so that Plaintiffs would sell the Certificates directly to Defendant LC Purchaser, while Defendant LC Escrow would act as a "third-party escrow agent" and Defendant LC Servicer would perform the transfer and assignment of the Certificates in connection with each Transaction.

**RESPONSE: Admitted that LC Purchaser purchased the Certificates. Admitted that LC Escrow acts as an escrow agent. Admitted that LC Servicer performs the transfer and assignment of the Certificates. The remainder of the allegations of this Paragraph are denied.**

75. The Tax Lien Defendants told Plaintiffs that as the Transactions were pending, the money that Defendant LC Purchaser was providing to purchase Plaintiffs' Certificates would be held in an escrow account maintained by Defendant LC Escrow.

**RESPONSE: Denied.**

76. The Tax Lien Defendants claimed that LC Escrow would release the purchase money to Plaintiffs once the third-party sellers purchased the Certificates from Defendant LC Purchaser via Defendant BloxTrade.

**RESPONSE: Denied.**

77. A functionally-identical set of three contracts governed each Transaction: (1) a Tax Lien Purchase and Sale Agreement, (2) an Escrow Agreement, and (3) a Service Agreement, which each have Delaware choice-of-law and venue provisions (together, the "**Transaction Agreements**").

**RESPONSE: Admitted in part. The Transactions Agreements do not contain the entire agreement of the parties.**

78.     The Tax Lien Purchase and Sale Agreements ("**P/S Agreements**") memorialize the terms on which Defendant LC Purchaser bought the Certificates from Plaintiffs.

**RESPONSE: Denied.**

79.     The Transaction Agreements established the terms on and process with which Defendant LC Escrow would conduct escrow services for Plaintiffs and the ultimate third-party purchasers.

**RESPONSE: Denied.**

80.     The Service Agreements require Defendant LC Servicer to perform all acts necessary to effect each Transaction, including delivering the Certificates from Plaintiffs to Defendant LC Purchaser, certifying those deliveries, and sending the relevant county clerk Plaintiffs' assignments of the Certificates.

**RESPONSE: Denied.**

81.     Each Transaction Agreement was executed by Plaintiff ESC, on the one hand, and one or more of the Tax Lien Defendants, on the other hand.

**RESPONSE: Admitted.**

82.     Plaintiff ESC executed each Transaction Agreement as the Managing Member of the Plaintiffs selling their respective Certificates.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

83.     Annexed to this Complaint as Exhibit 1 are true and correct copies of the Transaction Agreements for the October 1, 2018 Transaction and related transaction documents, including the Certificate of Servicer Evidencing Transfer of Tax Liens executed by Defendant LC Servicer.

**RESPONSE: Denied.**

84.     To induce Plaintiffs to engage in the Transactions and execute the Transaction Agreements, the Tax Lien Defendants represented that they would ensure that Plaintiffs received the ultimate purchasers' money in exchange for Plaintiffs' Certificates.

**RESPONSE: Denied.**

85.     In every single one of the eight Transactions, Plaintiffs delivered all relevant Certificates to the Tax Lien Defendants.

**RESPONSE: Denied.**

86.     The Tax Lien Defendants, meanwhile, were supposed to make two payments to Plaintiffs per Transaction: (a) 60% of the Transaction price when Plaintiffs provided satisfactory assignment forms, and (b) the remaining 40% once LC Servicer actually transferred and assigned the Certificates.

**RESPONSE: Denied.**

87.     The Tax Lien Defendants repeatedly acknowledged that Plaintiffs had fulfilled all of their contractual duties for each Transaction.

**RESPONSE: Denied.**

88.     The Tax Lien Defendants, however, did not fulfill their own—and, as discussed below, planned to steal Plaintiffs' money before the parties ever executed the Transaction or P/S Agreements.

**RESPONSE: Denied.**

89.     In four of the eight Transactions, the Tax Lien Defendants dragged their feet for weeks and months after re-selling Plaintiffs' Certificates, continually manufacturing new excuses for their failure to pay Plaintiffs money that Defendants supposedly had escrowed.

**RESPONSE: Denied.**

90.     In the remaining four Transactions, the Tax Lien Defendants never paid Plaintiffs at all (the "**Unpaid Transactions**").

**RESPONSE: Denied.**

91.     In June 2018, Plaintiffs EB 1 and EB 2 sought to sell 41 Certificates on Alabama properties.

**RESPONSE: Admitted.**

92.     On June 27, 2018, Plaintiff ESC contracted with Defendant BloxTrade to sell EB 1's and EB 2's 41 Alabama Certificates to LC Purchaser for $413,635.99 (the "**June 2018 Transaction**").

**RESPONSE: Denied.**

93.    Defendant LC Purchaser was not the ultimate buyer of the June 2018 Transaction's 41 Certificates, but instead a pass-through entity that conveyed the titles to the ultimate buyer.

**RESPONSE: Denied.**

94.    Defendant BloxTrade confirmed that the June 2018 Transaction became effective on June 28, 2018.

**RESPONSE: Denied.**

95.    On June 27, 2018, Defendant McOsker confirmed that LC Purchaser had re-sold the 41 Certificates. See Exhibit 2, the trade confirmation for the June 2018 Transaction.

**RESPONSE: Denied.**

96.    In other words, on June 27, 2018, Defendant McOsker certified that Plaintiffs should receive all of the supposedly-escrowed funds for these 41 Certificates.

**RESPONSE: Denied.**

97.    But Defendants never paid, and Plaintiffs never received, the $431,635.99 due from the June 2018 Transaction.

**RESPONSE: Denied.**

98.    In late September 2018, EB1 and EB2 decided to sell 242 more Certificates on Alabama properties.

**RESPONSE: Admitted.**

99.    On October 1, 2018, ESC agreed to sell the 242 Certificates to LC Purchaser for $834,291.64 (the "**October 2018 Transaction**").

**RESPONSE: Admitted.**

100.    LC Purchaser sold the tax liens for more than the $834,291.64 it had contracted to pay Plaintiffs.

**RESPONSE: Denied.**

101.    LC Servicer certified that all conditions necessary to pay Plaintiffs pursuant to the October 2018 Transaction had been met. See Exhibit 3, the trade confirmation for the October 2018 Transaction.

**RESPONSE: Denied.**

102.    As they had in June, the Tax Lien Defendants again claimed that they had escrowed Plaintiffs' $834,291.64, yet refused to disburse the proceeds to Plaintiffs.

**RESPONSE: Denied.**

103.    In November 2018, ESC, sought to sell 18 New Jersey Certificates owned by Plaintiff EF 1.

**RESPONSE: Denied.**

104.    On November 21, 2018, ESC agreed to sell EF 1's 18 Certificates to LC Purchaser for $450,384.95 (the "**November 2018 Transaction**").

**RESPONSE: Admitted.**

105.    Again, LC Purchaser claimed that the Tax Lien Defendants had escrowed Plaintiffs' proceeds and that LC Purchaser had re-sold the Certificates for more than Plaintiffs' price.

**RESPONSE: Denied.**

106.    Again, the Tax Lien Defendants confirmed that all conditions precedent had been met to release Plaintiffs' proceeds from escrow to Plaintiffs. See Exhibit 4, the trade confirmation for the November 2018 Transaction.

**RESPONSE: Denied.**

107.    And again, the Tax Lien Defendants never conveyed, and Plaintiffs have never received, the $450,384.95 that the Tax Lien Defendants supposedly had held in escrow for Plaintiffs.

**RESPONSE: Denied.**

108.    The last Unpaid Transaction occurred in December 2018, when ESC agreed to sell 666 New Jersey Certificates owned by EF 1 and EF 2 to LC Purchaser for $1,828,267.72 (the "**December 2018 Transaction**").

**RESPONSE: Admitted.**

109.    LC Purchaser again sold those Certificates at a profit, after which the Tax Lien Defendants certified that all conditions precedent had been met to release the "escrowed" proceeds to Plaintiffs. See Exhibit 5, the trade confirmation for the December 2018 Transaction.

**RESPONSE: Denied.**

110.    Despite acknowledging that Plaintiffs met all conditions precedent to receiving their December 2018 Transaction fees, the Tax Lien Defendants refused to pay the $1,828,267.72 that they had supposedly been holding in escrow for Plaintiffs.

**RESPONSE: Denied.**

111.    The four Unpaid Transactions should have resulted in the Tax Lien Defendants' release of approximately $3,500,229 in escrowed funds to Plaintiffs (the "**Escrowed Funds**").

**RESPONSE: Denied.**

112.    To this day, the Tax Lien Defendants continue to owe Plaintiffs the Escrowed Funds.

**RESPONSE: Denied.**

113.    Yet the Tax Lien Defendants still refuse payment, providing no lawful excuse or justification.

**RESPONSE: Denied.**

**In a Ponzi-Like Scheme, Defendants Stole Over $3.5 Million of Supposedly-"Escrowed" Funds from Plaintiffs**

114.    After the Transactions, Plaintiffs learned the McOsker Enterprise has a practice and pattern of diverting "escrow" funds from clients like Plaintiffs.

**RESPONSE: Denied.**

115.    In fact, the Tax Lien Defendants never really "escrow" client funds at all.

**RESPONSE: Denied.**

116.    Instead, the Individual Defendants move the client money from account to account, jurisdiction to jurisdiction, in order to steal the client money for the McOsker Enterprise's own unlawful purposes.

**RESPONSE: Denied.**

117.    First, instead of placing the client money into a segregated escrow accounts, the Tax Lien Defendants simply deposit their clients' "escrow" funds into the Chase Account: a New York checking account held by Defendant LC Escrow.

**RESPONSE: Denied.**

118.     The Chase Account is not a true, segregated escrow account; the McOsker Enterprise uses the Chase Account as a piggy bank.

**RESPONSE: Denied.**

119.     The McOsker Enterprise opened and uses the Chase Account to trick its clients and law enforcement into thinking that the Tax Lien Defendants are legitimate, lawful entities that actually segregate client money.

**RESPONSE: Denied.**

120.     However, once client money hits the Chase Account, the Individual Defendants transfer the client money to the Puerto Rico Accounts held by Defendants BCMG Services and LC Servicer.

**RESPONSE: Denied.**

121.     After the client money clears in the Puerto Rico Accounts, the McOsker Enterprise allows Defendants to withdraw the money at will to suit their own whims.

**RESPONSE: Denied.**

122.     For example, the McOsker Enterprise uses existing clients' money to induce new, unsuspecting clients to give the Tax Lien Defendants even more money, in what amounts to a simple Ponzi scheme.

**RESPONSE: Denied.**

123.     The McOsker Enterprise uses misappropriated client funds to partly repay existing clients with new clients' supposedly-escrowed funds, as it did with four of Plaintiffs' Transactions.

124.     For example, in or about March 2018, the Tax Lien Defendants began diverting Plaintiffs' funds from the alleged Escrow Account.

**RESPONSE: Denied.**

125.     On four of the Parties' eight Transactions, the Tax Lien Defendants only paid Plaintiffs after an extreme delay and constant inquiry and concern from Plaintiffs.

**RESPONSE: Denied.**

126.     Upon information and belief, the Tax Lien Defendants chose to pay Plaintiffs for four of the Transactions in an attempt to string Plaintiffs along as long as possible, in order to steal hundreds more valuable Certificates, which the Tax Lien Defendants liquidated for millions of dollars.

**RESPONSE: Denied.**

127.    Eventually, the Tax Lien Defendants no longer bothered trying to placate their existing clients and stopped paying them altogether, moving on to new victims.

**RESPONSE: Denied.**

128.    As described below, the methods with which the McOsker Enterprise perpetrates this Ponzi-like scheme comprise wire fraud, violations of the NSPA, and money laundering.

**RESPONSE: Denied.**

129.    At all relevant times, Defendant LC Escrow told Plaintiffs that it was a legitimate escrow agent that would act independently of the other Defendants.

**RESPONSE: Admitted.**

130.    This was a lie.

**RESPONSE: Denied.**

131.    Defendant LC Escrow did not hold the Escrow Funds in any escrow account, but rather the Chase Account, which was a mere checking account at a JP Morgan Chase branch in New York.

**RESPONSE: Denied.**

132.    Defendants McOsker and Kernan controlled the Chase and Puerto Rico Accounts.

**RESPONSE: Denied.**

133.    Contrary to Defendants McOsker's and LC Escrow's representations, on at least four separate occasions, Defendant McOsker directed Defendant Kernan to wire the Escrowed Funds from LC Escrow's Chase Account to BCMG Services's and LC Servicer's Puerto Rico Accounts.

**RESPONSE: Denied.**

134.    Contrary to Defendants McOsker and LC Escrow's representations, without Plaintiffs' knowledge or permission, and without fulfillment of any of the conditions specified in the Transaction Agreements for the release of Escrow Funds and in violation of the Wire Fraud Act and the National Stolen Property Act ("**NSPA**"), McOsker directed the Tax Lien Defendants to knowingly and falsely represent in the Transaction Agreements that the Escrow Funds would only be released in the manner agreed to in the schedules of the Transaction Agreements.

**RESPONSE: Denied.**

135.    The Tax Lien Defendants made these false representations to induce Plaintiffs into agreeing to allow LC Escrow to act as the escrow agent for the Escrow Funds.

**RESPONSE: Denied.**

136.    At the time they induced Plaintiffs into the Transactions and providing their Certificates, McOsker and the Tax Lien Defendants knew that they would convert Plaintiffs' Certificates and the Escrowed Funds for McOsker and the McOsker Enterprise's benefit.

**RESPONSE: Denied.**

**Defendants Repeatedly Lied About Their Failures to Pay Plaintiffs**

137.    Plaintiffs made several requests to Defendants, including all three Individual Defendants, to close out the transactions and distribute the Escrow Funds due to Plaintiffs.

**RESPONSE: Denied.**

138.    In response, Defendants repeatedly lied about why the Escrowed Funds were late.

**RESPONSE: Denied.**

139.    For example, in connection with the December 2018 Transaction, in an email dated March 21, 2019, Defendant McOsker informed Plaintiffs' representative, John Hanratty, and others that:

[Third-party Buyer A] deposited $1,835,767.72 ($1,828,267.72 plus $7,500 in fees) for NJ_0584_B with Ebury. Due to the overfunding error that has been previously discussed with the parties, [Buyer A] was refunded $379,000 of that purchase price on Feb. 15. As to Process, yes we can confirm that Ebury/MTAG first releases physical certs on or before tomorrow (Fri.) TLOAX processes assignments, John signs and then the funds are netted and released.

**RESPONSE: Plaintiffs purport to quote from and characterize an email.  Defendants respectfully refer the court to the parties' full correspondence (to be produced in discovery) for a full and accurate statement of their contents.**

140.    Defendant McOsker's representations were false: despite satisfaction of the preconditions needed to release the $1,828,767.72 of Escrow Funds to Plaintiffs, Defendants never released the December 2018 Transaction Escrowed Funds to Plaintiffs.

**RESPONSE: Denied.**

141.    On August 30, 2018, Plaintiffs' representative requested from the Tax Lien Defendants an updated proof of the Escrow Funds from the June 2018 Transaction.

**RESPONSE: Denied.**

142.    In response, on August 30, 2018, a representative of the Tax Lien Defendants, identified various entities, including BCMG International (a wholly owned subsidiary of BCMG Services) as entities allegedly holding the Escrow Funds.

**RESPONSE: Denied.**

143.    To prove that BCMG International held some of Plaintiffs' Escrowed Funds, the LC Escrow representative emailed Plaintiffs a purported screenshot of a Scotia Bank account that held approximately $300,000 (the "**Scotia Screenshot**").

**RESPONSE: Denied.**

144.    Defendant McOsker informed John Hanratty that a portion of the Escrow Funds was transferred into the BCMG International bank account because the bank had net capital requirements that required a minimum balance of $1 million and upon the approval of BCMG International as an International Financial Entity or upon receipt of a Puerto Rico Industrial Development Laws Act 73 of May 28, 2008 ("**Act 73**") Tax Credit from the government of Puerto Rico, the Escrow Funds would be transferred to Plaintiffs.

**RESPONSE: Denied.**

145.    Defendant McOsker's excuse was irrelevant: Plaintiffs never allowed Defendants to divert the Escrowed Funds away from the Escrow Account for any reason, let alone to BCMG International, another LLC owned by Defendant McOsker.

**RESPONSE: Denied.**

146.    BCMG International's supposed net capital requirements simply could never have justified Defendants' unilateral diversion of Plaintiffs' Escrowed Funds.

**RESPONSE: Denied.**

147.    Nor could a Puerto Rico Tax Credit for BCMG justified the McOsker Enterprise's theft of the Escrowed Funds from Plaintiffs.

**RESPONSE: Denied.**

148.    Moreover, Defendant McOsker's excuse was also a lie: Defendants never did transfer these supposed Scotia Bank funds to Plaintiffs.

**RESPONSE: Denied.**

149.    In fact, the Scotia Screenshot did not even represent an actual bank balance: as described below, it was just an image file that the McOsker Enterprise used to repeatedly trick its various clients.

**RESPONSE: Denied.**

**Defendants Have Perpetrated the Same Racketeering Scheme Against Other Victims**

150.    In addition to the four separate Unpaid Transactions, the McOsker Enterprise has routinely converted escrow funds from the Tax Lien Defendants' other clients for the McOsker Enterprise's own wrongful ends, including paying previous clients, funding its Tax Fraud Scheme, bankrolling Defendant McOsker's personal projects, paying off Defendants Kernan and Hernandez, and laundering funds.

**RESPONSE: Denied.**

151.    From 2016 through at least 2019, the McOsker Enterprise repeatedly converted funds from clients' escrow accounts in transactions, including funds of Tax Lien Defendant clients Tang Capital Management LLC, INA Group LLC, Millennium Trust Company, LLC, HGM Holdings LLC, Kite Capital Partners, LLC, and Laveer Capital Management, LLC.

**RESPONSE: Denied.**

152.    The McOsker Enterprise stole those clients' money in the same manner and for the same reasons that it stole Plaintiffs' money: by pretending that the Tax Lien Defendants would properly escrow proceeds from the sale of clients' Certificates, but instead transferring clients' revenues across jurisdictions and bank accounts so Defendants could profit from those thefts.

**RESPONSE: Denied.**

153.    In 2017, the McOsker Enterprise routinely breached other clients' Transaction Agreements, diverting at least, $790,000 from client escrow accounts established and managed by the Tax Lien Defendants.

**RESPONSE: Denied.**

154.    As Defendants did with Plaintiffs' assets, the McOsker Enterprise diverted some of these client assets to cover the shortfalls in the escrow accounts of other clients of the Tax Lien Defendants.

**RESPONSE: Denied.**

155.    In May 2019, BloxTrade brokered a transaction in which non-party HGM sold real estate located in Indiana to non-party Laveer Capital Management, LLC ("**Laveer**").

**RESPONSE: Admitted.**

156.    Laveer deposited funds for the purchase with LC Escrow (the "**Laveer Transaction**").

**RESPONSE: Denied.**

157.    Defendant McOsker directed the Tax Lien Defendants to convert the escrow funds deposited by Laveer and instructed Defendant Hernandez to create fictitious reasons to delay the closing of the Laveer Transaction in order to conceal the conversion of the escrow funds deposited by Laveer.

**RESPONSE: Denied.**

158.    On or about June 11, 2019, HGM informed Defendants Hernandez and McOsker that due to the delays in the closing, the Laveer Transaction was cancelled.

**RESPONSE: Denied.**

159.    Throughout June and July 2019, Laveer repeatedly demanded that the Tax Lien Defendants refund Laveer's money, which LC Escrow purported to be holding in an escrow account.

**RESPONSE: Denied.**

160.    On July 8, 2019, Defendant Kernan, at the instruction of Defendant McOsker and in order to conceal the misuse of the escrow funds, sent Laveer's representative the exact same Scotia Screenshot that Defendants had sent to Plaintiffs in August 2018, now claiming that it showed Laveer's own escrowed funds. *See* ¶ 141 *supra.*

**RESPONSE: Denied.**

161.    Defendant Kernan knew that this representation to Laveer was false: he knew that it was the same Scotia Screenshot the Tax Lien Defendants had used almost a full year earlier to play the same trick on Plaintiffs.

**RESPONSE: Denied.**

162.    Upon information and belief, the Individual Defendants repeatedly used that exact Scotia Screenshot to defraud multiple clients, assuming that their clients would never communicate with each other and learn the truth.

**RESPONSE: Denied.**

**Defendants Used Plaintiffs' Escrowed Funds to Commit Tax Fraud Against Puerto Rico**

163.    Under Act 73, certain corporate expenses, including capital expenditures to acquire intellectual property, are eligible for a 50% tax credit.

**RESPONSE: Admitted.**

164.    From 2017 through 2019, the McOsker Enterprise converted Plaintiffs' and other clients' escrow funds to further a tax fraud scheme where BCMG Services would seemingly purchase millions of dollars of intellectual property in order to obtain millions of dollars of freely transferable tax credits under Act 73.

**RESPONSE: Denied.**

165.    BCMG Services—another Puerto Rican entity owned by McOsker—engaged in sham transactions designed to look like eligible intellectual property expenditures entitled to Article 73 tax credits.

**RESPONSE: Denied.**

166.    In reality, these transactions were simply circular payments made at vastly inflated prices among Defendants BCMG Services, Sitona, and non-party Cactus—all of which were owned by Defendant McOsker and operated by all three Individual Defendants.

**RESPONSE: Denied.**

167.    To further the tax fraud, Defendant McOsker directed Defendant Kernan to divert LC Escrow client funds, including Plaintiffs' assets, to BCMG Services's Puerto Rico Accounts.

**RESPONSE: Denied.**

168.    Defendant McOsker would then direct BCMG Services to wire the client funds back to New York to reflect BCMG Services's purported "purchases" of the intellectual property from Cactus and Sitona—again, two entities under common control with BCMG Services.

**RESPONSE: Denied.**

**Cactus Purchases LienLog Intellectual Property for $160,000 and Purports to Sell it to BCMG Services for Over $2,000,000**

169.    Defendant McOsker owned Cactus, which he operated with Defendants Kernan and Hernandez.

**RESPONSE: Denied.**

170.    According to United States Patent and Trademark Office ("**USPTO**"), in November 2014, Cactus purchased the trademarks "Lienlog.com" and "Lienlog" from non-parties LienLog LLC and LienMarket LLC (the "**LienLog IP**").
**RESPONSE: Admitted.**

171.    Cactus paid $160,000 for the Lienlog IP.

**RESPONSE: Admitted.**

172.    USPTO records identify the Lienlog IP as goods and services providing an Internet webpage for the management and technical support of various tax lien portfolios.

**RESPONSE: Admitted.**

173.    In 2016, Defendants McOsker and Kernan cooked up a fraudulent valuation of the Lienlog IP to be used in connection with Defendant BCMG Services' purported purchase of the Lienlog IP from Cactus for the purpose of acquiring intellectual property that could be used to obtain an Act 73 Tax Credit.

**RESPONSE: Denied.**

174.    Pursuant to Defendant Kernan's supposedly-independent valuation, BCMG Services purchased from Cactus Lienlog IP for $2,044,250—almost 13 times what Cactus had paid in the arm's-length transaction just three years earlier.

**RESPONSE: Denied.**

175.    The $2,044,250 purchase price was to be paid in installments in 2016 and 2017 from BCMG Services to Cactus.

**RESPONSE: Admitted.**

176.    Despite the fact that Defendants, themselves, came up with this purchase price, BCMG Services did not even have $2,044,250 to make the installment payments to Cactus.

**RESPONSE: Denied.**

177.    Defendant BCMG Services could not obtain the Article 73 Tax Credit unless it showed that it had actually paid Cactus the $2,044,250 purchase price.

**RESPONSE: Admitted.**

178.    To close the fictitious installment sale acquisition of the Lienlog IP, the Individual Defendants diverted Tax Lien Defendants' escrowed client funds to BCMG Services.

**RESPONSE: Denied.**

179.    The McOsker Enterprise then used these converted client assets to create a fictitious arm's-length transaction for BCMG Services to purchase the LienLog IP from Cactus.
**RESPONSE: Denied.**

180.    In 2017 and 2018, non-party law firm Pietrantoni Mendez & Alvarez LLC submitted tax credit applications that represented to the Puerto Rican tax authorities that $2,044,250 was paid by BCMG Services for the LienLog IP.

**RESPONSE: Admitted.**

181.    Defendants McOsker and Kernan intentionally grossly overvalued the acquisition value and cost of LienLog IP and converted client escrow funds so that they could create fraudulent Article 73 tax refund applications to submit to the Puerto Rician tax authorities.

**RESPONSE: Denied.**

182.    Defendants knew that there was no conceivable justification for the LienLog IP's 1300% increase: by September 30, 2017, Lienlog.com was not even an active website.

**RESPONSE: Denied.**

183.    USPTO records reflect that the LienLog trademarks were cancelled in March 2019.

**RESPONSE: Admitted.**

184.    In other words, the McOsker Enterprise structured its purchase and sale of the LienLog IP to create an economically circular transactions, using money diverted from the Tax Lien Defendants' clients, to defraud the Commonwealth of Puerto Rico.

**RESPONSE: Denied.**

185.    To make matters worse, even after stealing $1 million from Puerto Rico, the Individual Defendants did not deposit money back into the Chase Account to cover the escrow funds they had stolen from their clients.

**RESPONSE: Denied.**

186.    By the end of 2017, the client escrow accounts had deficits of over $790,000.

**RESPONSE: Denied.**

**The McOsker Enterprise Rebrands the LienLog IP as LienCloud IP and Purports to Resell it to BCMG Services for Over $13 million**

187.    Defendant McOsker also owned Defendant Sitona.

**RESPONSE: Admitted.**

188.    In 2018, Defendant BCMG Services purchased purported intellectual property called "Liencloud" for $13,189,500 from Sitona (the "**LienCloud IP**").

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 14    Case 1:20-cv-02043-MKV   Document 121   Filed 08/14/24   Entered 08/14/24 09:24:12   Exhibit 13800 Pg 12   RECEIVED NYSCEF: 10/17/2022

Court Records    Pg 452 of 688

**RESPONSE: Admitted that BCMG Services purchased intellectual property called "Liencloud" from Sitona.**

189.    Defendant BCMG Services asserts that the LienCloud IP is a web-based portfolio management system for the tax lien industry.

**RESPONSE: Denied.**

190.    In fact, LienCloud IP is merely a rebranding by the McOsker Enterprise of the purported LienLog IP purchased by Cactus in 2014 for $160,000 and resold to BCMG Services via installments in 2016 and 2017 for $2,044,250.

**RESPONSE: Denied.**

191.    The McOsker Enterprise rebranded LienLog IP into LienCloud IP in furtherance of a scheme to obtain on behalf of BCMG Services an additional Act 73 tax credit in the amount of $6,594,750—for the very same IP on which BCMG Services fraudulently obtained tax credits in 2017 and 2018.

**RESPONSE: Denied.**

192.    Defendant BCMG Services made two payments to Defendant Sitona in connection with this purported purchase: $7 million in 2018, and another $6.189 million in 2019.

**RESPONSE: Denied.**

193.    In order to obtain the Act 73 Tax Credit for the purchase of LienCloud IP, BCMG Services was required to demonstrate to the Puerto Rican tax authorities that it paid Sitona $7 million in 2018.

**RESPONSE: Denied.**

194.    On March 26, 2019, Pietrantoni Mendez & Alvarez LLC, on behalf of BCMG Services, represented to the Puerto Rican tax authorities that Defendant BCMG Services paid $7 million for the LienCloud IP in 2018 and it would pay the remaining $6,189,500 in 2019.

**RESPONSE: Admitted.**

195.    Defendant BCMG Services again lacked the funds to pay for the IP, and did not have the $7 million it purportedly owed Sitona.

**RESPONSE: Denied.**

196.    The Individual Defendants again stole Tax Lien Defendant clients' funds from the Chase Account, depositing them into BCMG Services's Puerto Rico Accounts.

**RESPONSE: Denied.**

197.    The Individual Defendants then directed Defendant BCMG Services to divert the same funds to back to New York, into Sitona's bank account, to pay Sitona for the "LienCloud" IP.

**RESPONSE: Denied.**

198.    The McOsker Enterprise converted client escrow funds, including escrow funds due and owing Plaintiffs to allow BCMG Services to receive an Act 73 Tax Credit in excess of $6.5 million.

**RESPONSE: Denied.**

199.    At this time, Plaintiffs are not aware whether BCMG Services actually received that Act 73 Tax Credit of over $6.5 million from Puerto Rico.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

**The McOsker Enterprise's Frauds, Thefts, and Money Laundering Comprise Racketeering Activity in Violation of 18 U.S.C. § 1962**

**The McOsker Enterprise**

200.    Defendants are a group of persons and entities associated together in fact as the McOsker Enterprise for the common purpose of carrying out an ongoing enterprise, as described in the foregoing paragraphs of this Amended Complaint.

**RESPONSE: Denied.**

201.    Through the years of individual acts of theft and fraud to coverup that theft, Defendants stole money from Plaintiffs and the Tax Lien Defendants' other clients, as well as the Commonwealth of Puerto Rico.

**RESPONSE: Denied.**

202.    As described above, the McOsker Enterprise is an organization that has existed for several years and functions as a continuing unit with an informal command structure that uses seemingly-legitimate business and investment entities to conduct illegal activity.

**RESPONSE: Denied.**

203.    At all times relevant to this Amended Complaint, the Individual Defendants engaged in the operation or management of the McOsker Enterprise.

**RESPONSE: Denied.**

204.    While Defendant McOsker acted as the head of the McOsker Enterprise, Defendants Hernandez and Kernan acted closely with him, knowing that they were engaging in illegal conduct and stealing from others.

**RESPONSE: Denied.**

205.    The predicate acts described herein constitute a pattern of racketeering activities and are part of a common scheme to enrich the McOsker Enterprise at the expense of Plaintiffs through acts constituting: (i) wire fraud, in violation of 18 U.S.C. § 1343; (ii) violations of the NSPA, 18 U.S.C. §§ 2314-15; and (iii) money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

**RESPONSE: Denied.**

206.    The McOsker Enterprise's violations of § 1962(c) injured Plaintiffs.

**RESPONSE: Denied.**

207.    Under the provisions of 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing this suit, prejudgment interest and attorneys' fees.

**RESPONSE: Denied that Plaintiffs are entitled to any relief.**

**The McOsker Enterprise Committed Wire Fraud in Violation of 18 U.S.C. § 1343**

208.    By the acts described herein, the members of the McOsker Enterprise knowingly executed and/or intentionally participated in a scheme that defrauded, and that was intended to defraud, the Plaintiffs, and in furtherance of this scheme, Defendants transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures and/or sounds, but not limited to the following predicate acts:

(i) numerous email and telephone communications between Plaintiffs' representatives, including, John Hanratty, the Individual Defendants, and other representatives of the McOsker Enterprise between March 2018 and April 2019 in furtherance of the scheme to fraudulently induce Plaintiffs to enter into agreements and proceed with the transactions set forth herein above so that the McOsker Enterprise could divert the Escrow Funds for its own purposes;

(ii) numerous emails and telephone calls throughout all of 2018 between Plaintiffs' representatives, including John Hanratty, and the Individual Defendants and other representatives of the McOsker Enterprise in which the McOsker Enterprise, through Defendants LC Purchaser and LC Escrow, in furtherance of a scheme to fraudulently induce Plaintiffs to execute the Transaction Agreements, repeatedly and falsely represented to Plaintiffs that the proceeds from the sales of Plaintiffs' tax liens would be held in an escrow account and only distributed to Plaintiffs upon the occurrence of certain events;

(iii) numerous emails and telephone communications between Plaintiffs' representatives, including, John Hanratty and the Individual Defendants and other representatives of the McOsker Enterprise between June 2018 and April 2019 that contained numerous false representations and omissions concerning the location and use of the Escrow Funds; and (iv) Defendant McOsker's instructions to Defendants Kernan and Hernandez throughout 2018 to transfer the Escrow Funds from the Chase Account to the Puerto Rico Accounts are instances of wire communications in furtherance of the McOsker Enterprise that constitute violations of 18 U.S.C. 1343.

**RESPONSE: Denied.**

209.     The repeated diversions of the Escrow Funds reflect and constitute instances of wire communications in furtherance of the McOsker Enterprise that constitute violations of 18 U.S.C. §1343 occurred on, or shortly after Plaintiffs received trade confirmations from BloxTrade in June 2018, October 2018, November 2018, and December 2018.

**RESPONSE: Denied.**

210.     All transfers of the Escrow Funds are alleged to have been made by, or at the direction of, Defendant McOsker.

**RESPONSE: Denied.**

211.     The specific details of the monetary transactions in which LC Escrow wired Plaintiffs' Escrow Funds to BCMG Services and LC Services are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

**RESPONSE: Denied.**

**The McOsker Enterprise Committed Theft in Violation of The National Stolen Property Act, 18 U.S.C. §§ 2314–2315**

212.     By the acts described herein, the members of the McOsker Enterprise transmitted, transferred, and received money with a value of more than $5,000, knowing that the money had been converted and/or taken by fraud.

**RESPONSE: Denied.**

213.     The money was transmitted or transferred in interstate commerce among bank accounts in New York and Puerto Rico.

**RESPONSE: Denied.**

214.     By the acts described herein, the members of the McOsker Enterprise devised or intended to devise a scheme or artifice to defraud, or for obtaining money with a value of $5,000 or more by means of false or fraudulent pretenses, representations, or promises, transported or

caused to be transported in interstate or foreign commerce in the execution or concealment of the scheme or artifice to defraud.

**RESPONSE: Denied.**

215. The acts include but are not limited to the unauthorized transfers of Escrow Funds from the LC Escrow account(s) in New York to accounts held by BCMG Services and LC Services in Puerto Rico, and from those accounts, to various other accounts controlled by the McOsker Enterprise, as well as the Puerto Rico Tax Credit fraud described above.

**RESPONSE: Denied.**

216. The transfers reflecting and constituting instances of violations of 18 U.S.C. 2314-2135, are set forth in paragraphs 13, 117-125, 208(iv), 209 and 215, which occurred on, or shortly after Plaintiffs received trade confirmations from BloxTrade, and are believed to have occurred on or about June 27, 2018, October 1, 2018, November 21, 2018, and December 6, 2018.

**RESPONSE: Denied.**

217. All transfers of the Escrow Funds are alleged to have been made at the direction of Defendant McOsker to Defendant Kernan.

**RESPONSE: Denied.**

218. The specific details of the monetary transactions in which LC Escrow wired Plaintiffs' Escrow Funds to BCMG Services and LC Servicer are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

**RESPONSE: Denied.**

**Money Laundering in Violation of 18 U.S.C. §§ 2314–2315**

219. Defendant McOsker committed, and aided and abetted, acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 in connection with a scheme in which he used the McOsker Enterprise to divert escrow funds from Plaintiffs to BCMG Services, for various reasons, including to purchase LienLog IP and LienCloud IP while concealing the true relationships among BCMG Services and Cactus and Sitona.

**RESPONSE: Denied.**

220. Defendant McOsker's violations of the other predicate acts (Wire Fraud and the NSPA) are specified unlawful activity within the meaning of 18 U.S.C. §§ 1956 and 1957

**RESPONSE: Denied.**

221.    Defendant McOsker concealed the source of the funding for, and his ownership of, entities involved in the racketeering scheme. For example:

(i) in 2016 and 2017, McOsker concealed that BCMG Services' purported purchase of the LienLog IP was from Cactus, an entity wholly owned by McOsker;

(ii) in 2017, McOsker concealed that LC Escrow was diverting clients' escrow funds from an LC Escrow account located in New York to a BCMG Services' account in Puerto Rico and then wired to back to New York for the purported arms'-length purchase of LienLog IP from Cactus (an entity McOsker owns);

(iii) in 2018, McOsker concealed that BCMG's purported purchase of the LienCloud IP was from an entity (Sitona) that was wholly owned by McOsker; and

(iv) in 2018, McOsker concealed that Plaintiffs' Escrow Funds were diverted from an LC Escrow account located in New York to a BCMG Services' account in Puerto Rico and then wire back to New York for the purported arms'-length purchase of LienCloud IP from Sitona (an entity that McOsker owns).

**RESPONSE: Denied.**

222.    McOsker directing the aforementioned wiring of the Escrow Funds between LC Escrow, BCMG Services, and their subsequent transfers of such monies constituted violations of (i) 18 U.S.C. § 1956 in that McOsker knew that the aforementioned financial transactions were intended to promote further predicate offenses, avoid tax reporting requirements, or otherwise conceal laundering funds; and (ii) 18 U.S.C. § 1957 in that McOsker knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity.

**RESPONSE: Denied.**

223.    Further evidence in support of this Court, including whether McOsker and the McOsker Enterprise is continuing one or more of the predicate acts set forth above, is peculiarly within the knowledge and control of McOsker and other Defendants.

**RESPONSE: Denied.**

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF

### RICO 18 U.S.C. § 1962(c)
### (AGAINST TOM MCOSKER)

224.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

**RESPONSE: Defendants incorporate and reallege the previous responses as though fully set forth herein.**

225.    At all relevant times, Plaintiffs were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required.**

226.    At all relevant times, all Defendants were/are/remain "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required.**

227.    At all relevant times, the McOsker Enterprise (i) has been an ongoing association-in- fact with a decision-making framework or mechanism for controlling the association; and (ii) has had associated members with a common purpose that function as a continuing unit, including all Defendants.

**RESPONSE: Denied.**

228.    At all relevant times, the McOsker Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required.**

229.    At all relevant times, Defendants were employed by, or associated with, the McOsker Enterprise and conducted and participated in the conduct of the McOsker Enterprise through a pattern of racketeering activity described in this Complaint.

**RESPONSE: Denied.**

230.    Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused Plaintiffs' injuries.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required.**

231.    Pursuant to 18 U.S.C. § 1964(c), the Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest, and attorneys' fees.

**RESPONSE: Denied that Plaintiffs are entitled to any relief.**

<div align="center">

**SECOND CLAIM FOR RELIEF**
**RICO 18 U.S.C. § 1962(d)**
**(AGAINST ALL DEFENDANTS)**

</div>

232.    Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

**RESPONSE: Defendants incorporate and reallege the previous responses as though fully set forth herein.**

233.     At all relevant times, Plaintiffs were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

234.     At all relevant times, each of the Defendants was a "person" within the meeting of 18 U.S.C. §§ 1961(3) and 1962(d).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

235.     At all relevant times, the McOsker Enterprise (i) was and is an ongoing association in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that function as a continuing unit.

**RESPONSE: Denied.**

236.     The Defendants entered into a series of agreements between and among each other to knowingly and willfully engage in a conspiracy to violate 18 U.S.C. 1962(c). Each Defendant entered into at least one agreement with at least one other Defendant to join the conspiracy, took acts in furtherance of that conspiracy, and knowingly participated in that conspiracy.

**RESPONSE: Denied.**

237.     The Defendants agreed and conspired to violate 18 U.S.C. 1962(c) by participating, directly or indirectly, in the conduct of the affairs of the McOsker Enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

**RESPONSE: Denied.**

238.     Each Defendant agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. §1962(c), as demonstrated by, among other things the following facts:

(a) Kernan, as chief financial officer of the Tax Lien Defendants and BCMG Services, actively and knowingly participated in multiple predicate acts to further the scheme, including, but not limited to, working with McOsker to divert client escrow funds belonging to Plaintiffs and other clients of LC Escrow from accounts in New York to BCMG Services' and LC Servicer's accounts in Puerto Rico; and preparing an appraisal of the LienLog IP at a vastly inflated amount in order to further McOsker's scheme to obtain an Act 73 Tax Credit;

(b) Hernandez, as in-house counsel and business manager for the Tax Lien Defendants and BCMG Services, actively and knowingly participated in multiple predicate acts to further the scheme, including, but not limited to, working with McOsker to knowingly misrepresent to Plaintiffs and other clients the reasons why their escrow funds were not paid despite knowing that the McOsker Enterprise had stolen and was holding the escrow in the Puerto Rico Accounts and was using the client funds for impermissible purposes, including, but not limited to, furthering the McOsker Enterprise's Act 73 tax scheme;

(c) As described above, LC Purchaser, LC Escrow, LC Services, BloxTrade, BCMG Services, BCMG International, and Sitona were the principal co-conspirators and directly participated in multiple predicate acts to further the scheme.

**RESPONSE: Denied.**

239.    Further evidence of an agreement among Defendants is peculiarly within the knowledge and control of Defendants.

**RESPONSE: Denied.**

240.    Each Defendant is a member of the McOsker Enterprise and as co-conspirators, Defendants are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the Plaintiffs that were caused by any members of the conspiracy, regardless of whether Defendants themselves were directly involved in a particular aspect of the McOsker Enterprise.

**RESPONSE: Denied.**

241.    As a direct and proximate result of the violations set forth above, the Plaintiffs have been injured. Defendants' violations of 1962(d) are the proximate cause of this injury. Under the provisions of 18 U.S.C. § 1964(c), the Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest and attorneys' fees.

**RESPONSE: Denied.  Further denied that Plaintiffs are entitled to any relief.**

### THIRD CLAIM FOR RELIEF
### FRAUDULENT INDUCEMENT TO CONTRACT
### (AGAINST TOM MCOSKER, LC PURCHASER AND LC ESCROW)

242.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

**RESPONSE: Claim dismissed.  No response required.**

243.    As described herein, McOsker caused LC Purchaser and LC Escrow to make numerous misrepresentations in the P/S Agreements and Transaction Agreements that Plaintiffs

would receive the Escrow Funds, *i.e.,* the proceeds from Plaintiffs' sales of the Certificates to LC Purchaser.

**RESPONSE: Claim dismissed.  No response required.**

244.    McOsker also personally lied to Plaintiffs in order to get them to execute the Agreements and give up their Certificates.

**RESPONSE: Claim dismissed.  No response required.**

245.    McOsker, LC Purchaser, and LC Escrow were aware at the time the P/S Agreements and Transaction Agreements were executed that contrary to the representations they made in the agreements that the Escrow Funds would not be held in an escrow account, that that the Escrow Funds would be diverted from the escrow account without Plaintiffs' knowledge or consent, that the Escrow Funds would be used for the benefit of Defendants, and that Plaintiffs would not receive some or all of the Escrow Funds

**RESPONSE: Claim dismissed.  No response required.**

246.    McOsker, LC Purchaser, and LC Escrow made these false representations in the P/S Agreements and Transaction Agreements to induce Plaintiffs to sell their Certificates to LC Purchaser, to induce Plaintiffs to agree to use LC Escrow as the escrow agent, and thereby, to be able to divert the Escrow Funds for the benefit of Defendants.

**RESPONSE: Claim dismissed.  No response required.**

247.    At the time McOsker made or caused LC Purchaser and LC Escrow to make these numerous misrepresentations and omissions, McOsker, LC Purchaser, and LC Escrow knew they had no intention of honoring their commitments, rather they intended to divert Plaintiffs' Escrow Funds.

**RESPONSE: Claim dismissed.  No response required.**

248.    Plaintiffs justifiably relied on McOsker, LC Purchaser, and LC Escrow's false representations in the P/S Agreements and the Transaction Agreements, and thereby, sold the Certificates to LC Purchaser.

**RESPONSE: Claim dismissed.  No response required.**

249.    As a result of Plaintiffs' reliance, they were injured in an amount to be determined at trial, but not less than $3,500,229.

**RESPONSE: Claim dismissed.  No response required.**

## FOURTH CLAIM FOR RELIEF
## BREACH OF CONTRACT
## (AGAINST LIENCLEAR 002, LLC)

250.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

**RESPONSE: Defendants incorporate and reallege the previous responses as though fully set forth herein.**

251.    Plaintiffs' forth claim for breach of contract is plead in the alternative to Plaintiffs' third claim for fraudulent inducement to contract.

**RESPONSE: The paragraph states a conclusion of law to which no response is required.**

252.    The Transaction Agreements were valid and binding contracts between Plaintiff and LC Escrow.

**RESPONSE: Admitted in part. The Transaction Agreements do not contain the entire agreement of the parties.**

253.    Under the Transaction Agreements, LC Escrow was required to hold the Escrow Funds in an escrow account unless and until a condition for disbursement under the Transaction Agreements occurred – *e.g.*, (i) an instruction from the Servicer; (ii) an event on the agreed upon schedule; or, (iii) a joint written direction from the representatives of both LC Purchaser and Plaintiffs.

**RESPONSE: Denied.**

254.    Events on the agreed upon schedule for disbursement of funds set forth in the Transaction Agreements occurred – namely, titles to the tax lien Certificates at issue were successfully transferred to LC Purchaser.

**RESPONSE: Denied.**

255.    Nevertheless, LC Escrow willfully failed and refused to disburse the Escrow Funds to Plaintiffs, despite the formal transfer of title for all tax liens to LC Purchaser, in breach of the Transaction Agreements.

**RESPONSE: Denied.**

256.    As a result, Plaintiffs have been damaged in an amount to be determined at trial.

**RESPONSE: Denied.**

## FIFTH CLAIM FOR RELIEF
## CONVERSION
## (AGAINST ALL DEFENDANTS)

257.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

**RESPONSE: Claim dismissed.  No response required.**

258.    At all relevant times, Plaintiffs had an immediate and superior right of possession to the Escrow Funds.

**RESPONSE: Claim dismissed.  No response required.**

259.    By the wrongful actions described herein, Defendants intentionally stole and converted the Escrow Funds to the exclusion and detriment of the Plaintiffs' rights.

**RESPONSE: Claim dismissed.  No response required.**

260.    As a direct and proximate result of Defendants' actions, the Plaintiffs have been damaged and are entitled to compensatory damages in an amount to be determined at trial.

**RESPONSE: Claim dismissed.  No response required.**

## SIXTH CLAIM FOR RELIEF
## CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)

261.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

**RESPONSE: Defendants incorporate and reallege the previous responses as though fully set forth herein.**

262.    Defendants are a combination of two or more persons.

**RESPONSE: Denied.**

263.    As set forth herein, each Defendant engaged in at least one unlawful act in furtherance of a conspiracy against Plaintiffs.

**RESPONSE: Denied.**

264.    Defendants' conspiracy is the direct and proximate cause of the damage to Plaintiffs in an amount to be determined at trial.

RESPONSE: Denied.

265.    Each Defendant is jointly and severally liable for the acts of its co-conspirators committed in furtherance of the conspiracy.

RESPONSE: Denied.

## EIGHTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

266.    Plaintiffs incorporate and reallege the previously paragraphs as though fully set forth herein.

RESPONSE: Claim dismissed.  Not response required.

267.    Plaintiffs plead the eighth claim in the alternative to its fourth claim for breach of contract claim as to those Defendants.

RESPONSE: Claim dismissed.  Not response required.

268.    By their wrongful conduct as described herein, Defendants have been unjustly enriched at the Plaintiffs' expense.

RESPONSE: Claim dismissed.  Not response required.

269.    It is against equity and good conscience to permit the Defendants to retain the benefits of their wrongful conduct.

RESPONSE: Claim dismissed.  Not response required.

270.    Defendants' wrongful conduct was the direct and proximate cause of damage to the Plaintiffs in an amount to be determined at trial.

RESPONSE: Claim dismissed.  Not response required.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for entry of a judgment in favor of Plaintiffs against

Defendants, jointly and severally, in an amount to be proven at trial, including an award of:

1. actual, compensatory, and consequential damages;
2. trebled actual damages;
3. restitution and a constructive trust over Defendants' assets;

4. costs and expenses of this action, including reasonable attorneys' fees;
5. Punitive damages;
6. Pre- and post-judgment interest at the maximum legal rate; and
7. Other and further relief as the Court deems just and proper.

**RESPONSE: Denied that Plaintiffs are entitled to any relief.**

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' Complaint fails to state a claim against Defendants upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred, in whole or in part, because Plaintiffs/Counterclaim Defendants has not suffered any damages.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims and requests for relief are barred, in whole or in part, by Plaintiffs/Counterclaim Defendants' improper conduct, unclean hands, and breaches of the agreements.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred, in whole or in part, due to Plaintiffs/Counterclaim Defendants' failure to join necessary and/or indispensable parties.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred, in whole or in part, because Plaintiffs/Counterclaim Defendants assumed the risk.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred, in whole or in part, because any injuries suffered by Plaintiffs/Counterclaim Defendants were caused by an intervening and/or superseding cause(s).

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred, in whole or in part, because none of the alleged acts or omissions of the Defendants/Counterclaimants/Third-Party Plaintiffs were the proximate cause of the alleged damages sustained by Plaintiffs/Counterclaim Defendants.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred by the applicable statute of limitations.

### NINTH AFFIRMATIVE DEFENSE

Defendants/Counterclaimants/Third-Party Plaintiffs reserve the right to supplement these affirmative defenses as additional information is discovered.

# COUNTERCLAIMS

## THE PARTIES

1.      Plaintiff/Counterclaim Defendant ESC is a New York limited liability company and the managing member of the other Plaintiffs.

2.      Plaintiff/Counterclaim Defendant EB 1EMIALA, LLC is an Alabama limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

3.      Plaintiff/Counterclaim Defendant EB 2EMIALA, LLC is an Alabama limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

4.      Plaintiff/Counterclaim Defendant Ebury Fund 1 NJ, LLC is a New Jersey limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

5.      Plaintiff/Counterclaim Defendant Ebury Fund 2 NJ, LLC is a New Jersey limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

6.      Defendant/Counterclaimant/Third-Party Plaintiff Thomas McOsker is a resident of Puerto Rico.

7.      Defendant/Counterclaimant/Third-Party Plaintiff Badel Hernandez is a resident of Puerto Rico.

8.      Defendant/Counterclaimant/Third-Party Plaintiff Andrew Kernan is a resident of the State of New York.

9.      Defendant/Counterclaimant/Third-Party Plaintiff LienClear, LLC is a Puerto Rico limited liability company.

10.     Defendant/Counterclaimant/Third-Party Plaintiff LienClear 0001, LLC is a Delaware limited liability company.

11.     Defendant/Counterclaimant/Third-Party Plaintiff LienClear 0002, LLC is a Delaware limited liability company.

12.     Defendant/Counterclaimant/Third-Party Plaintiff BloxTrade, LLC is a Puerto Rico limited liability company.

13.     Defendant/Counterclaimant/Third-Party Plaintiff BCMG Services, LLC is a Puerto Rico limited liability company.

14.     Defendant/Counterclaimant/Third-Party Plaintiff BCMG International, LLC is a Puerto Rico limited liability company.

15.     Defendant/Counterclaimant/Third-Party Plaintiff Sitona Ventures LLC is a Delaware limited liability company.

## JURISDICTION AND VENUE

16.     Pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction because Defendants allege RICO violations in violation of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1964(c).

17.     Pursuant to 28 U.S.C. § 1367, the Court may exercise supplemental jurisdiction over Defendants/Counterclaimants/Third-Party Plaintiffs' state law claims.

18.     The Court has personal jurisdiction over Ebury Street Capital, LLC because it entered into agreements with Defendants in which it consented to the jurisdiction of Delaware Courts.

19.     The Court has personal jurisdiction over all the Plaintiffs pursuant to 18 U.S.C.§ 1965 because this action may be brought in this jurisdiction against Third-Party Defendants EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC.

20.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Third-Party Defendants EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC are Delaware entities and Ebury Street Capital, LLC executed agreements with Defendants/Counterclaimants/Third-Party Plaintiffs in which the parties consented to Delaware as the venue for any and all disputes that arise out of the agreements.

## FACTUAL BACKGROUND

**McOsker and Hanratty Meet**

21.     On or around 2011, Thomas R. McOsker, a native of the State of Maine, met John Hanratty, an attorney by education, in the city of New York.

22.     At that time, McOsker worked as Head of Tax Receivables Brokerage Division at GFI Group.

23.     Specifically, McOsker originally joined GFI Group to open a new division focused on creating a secondary market for property tax encumbrances, commonly known as "Tax Liens".

24.     The Tax Lien industry consists of the purchase and sale of encumbrances that governmental entities have over tax debts, which are trafficked in a secondary market.

25.     In 2011, Hanratty worked as the Chief Compliance Officer of OTA Advisors, LLC, a brokerage firm for option contracts. In addition to his work at OTA, Hanratty also started an investment fund in tax encumbrances.

Case 1:20-cv-02012-MN   Document 14   Filed 08/14/24   Entered 08/14/24 09:45:23   Page 2 of 37
Court Records     Pg 470 of 688

26.     The investment fund of  Hanratty, today known as Ebury Street Capital, LLC, ("Ebury St.") conducted a series of transactions with the firm GFI Group where McOsker worked and there, they both met.

27.     Subsequently, McOsker left GFI Group to commence his own tax encumbrance brokerage firm, BloxTrade, LLC.  Hanratty ultimately left his employment with OTA Advisors to fully engage in his investment fund, Ebury Street Capital, LLC.

**McOsker and Hanratty Enter into the CRIM Proposal**

28.     In 2014, McOsker permanently moved from New York City to San Juan, Puerto Rico.

29.     McOsker is the holder of a decree under Law No. 22 of January 27, 2012, which grants preferential tax rates over the passive income for specific individuals that become bona fide residents of Puerto Rico in accordance with the Internal Revenue Code.

30.     In Puerto Rico, McOsker continued offering, through his companies, the same services that they offered in the United States, namely brokerage and clearing services for Tax Liens. All of the companies are separate entities and offer different business services.

31.     Due to the specialized knowledge of  McOsker, he identified a business opportunity in the portfolio of tax encumbrances of the Center for the Collection of Municipal Taxes ("CRIM"), whose low levels of raising capital created a liquidity problem to CRIM and, subsequently, to the municipal governments.

32.     Through his specialty in the market of tax encumbrances, one of his corporate entities could purchase the portfolio of tax encumbrances of the CRIM through Law 21 of June 26, 1997, known as the 'Law of Sale of Tax Debts", thus granting an instant liquidity to the municipalities, and then proceed to sell the tax liens in the secondary market and/or foreclose them.

In the alternative, if the CRIM had no interest in selling its portfolio of encumbrances, the intention of McOsker was to increase the raising of capital of the CRIM through a public-private alliance, using the technology developed by his companies to obtain hundreds of millions for the CRIM through the payment of delinquent debtors (the "CRIM Proposal").

33.     In preparing to begin the CRIM Proposal McOsker contributed all the necessary investment capital to pursue the purchase of the encumbrances of the CRIM – investing approximately $7 million through his companies through the end of 2017. This was done without requesting external capital or incurring debt.

34.     During this time, McOsker and Hanratty remained in contact, in-part because Hanratty was interested in moving to Puerto Rico. Hanratty, who at that time resided in Rye, NY, believed that the fiscal crisis of the government of Puerto Rico and its instrumentalities created interesting opportunities that he wanted to exploit.

35.     In mid-2017, McOsker and Hanratty met in New York to discuss several matters, including the CRIM Proposal and the benefits of Hanratty moving to Puerto Rico (the "2017 Meeting").

36.     At the 2017 Meeting, Hanratty and McOsker began to form an understanding that they desired to become partners in the CRIM Proposal.

37.     McOsker did not require from Hanratty that he make an initial capital contribution under the Initial Agreement, even though McOsker had already invested millions of dollars in the CRIM Proposal, nor did he request what is known as a shared services allocation, which is an item commonly required between subsidiaries and partner relations.

38.     On the contrary, the Agreement between the parties at that time was that Hanratty would be a capital partner and his financing obligations would be for the future obligations

incurred by the common venture. As discussed below, the parties' obligations related to the CRIM Proposal were clarified and further memorialized through various subsequent writings including various documents circulated in 2017 and 2018, emails in 2017, 2018 and 2019, and instant messages through various messaging services throughout 2017-2019.

39. In September 2017, Hurricane Maria struck Puerto Rico causing catastrophic damage. Maria left McOsker with a difficult decision to make: to stop pursuing the CRIM Proposal, to incur a loan to continue operations, or to expand the relationship with Hanratty to include a credit line that would finance the joint enterprise.

40. In late September 2017, Hanratty represented to McOsker that he was in a very liquid financial position and that he had the ability to provide the financing contemplated by the parties. This would later prove to be false.

41. Moving forward, in late 2017, Hanratty and McOsker agreed that each one would cover 50% of the expenses related to the CRIM Proposal onward, with Hanratty paying the expenses up-front and the partners netting out the amounts once the deal was finalized or the Provisional Credit Line was closed. Similarly, they agreed that they would equally share the net profits originating from the CRIM Proposal. Hanratty would have no claim to any other portion of McOsker's various other companies, including BCMG and Defendants. At no time was Hanratty entitled to any assets of the BCMG companies, including but not limited to the Act 73 tax credits. Importantly, Hanratty was required to procure a formal credit line, in a significant amount (the "Formal Credit Line"), that would allow the partners to make the necessary capital investments so that the CRIM Proposal would be successful. Another capital requirement was the development of a certain intellectual property that would allow McOsker and Hanratty to process and administer the tax encumbrances in a more efficient manner and to locate the defaulting

properties with greater precision. The final, and most significant, requirement, was for Ebury to lead the equity syndicate for the purchase or loan amount necessary to procure the CRIM Portfolio, initially for $400million and later for $800million, as well as to raise from third party financing partners through debt and equity any amount of this total purchase price that Ebury was unable to cover to successfully purchase the portfolio(the "Agreement").

42.     Among other things, McOsker contributed to the partnership under licensing terms certain use of the intellectual property he had purchased and financed the development of, namely Map Plus Prime and its underlying databases which were of great interest to the CRIM and importance for the CRIM Proposal. Hanratty and McOsker agreed that these terms would continue until such a time as the CRIM deal had been signed and funded, and which point Hanratty and McOsker's partnership interests would move to a new subsidiary of BCMG Services called BCMG Capital, LLC.

43.     In or around September 2018, they would formalize the Agreement through the BCMG Capital, LLC operating agreement, which was signed by both parties on February 19, 2019. Due to the fraud, misstatements, negligence, and actions of the Hanratty Enterprise (defined herein), the CRIM Proposal never closed, thus BCMG Partners, although formed in structure and approved to commence business, never started operations.

44.     In anticipation of the CRIM Deal closing, the BCMG Capital, LLC operating agreement provided that Lesser Flamingo, LLC, a Puerto Rico limited liability company wholly owned by Hanratty in his personal capacity, is a 49% partner-owner of BCMG Capital LLC and BCMG Services, LLC, wholly owned by BCMG LLC, is a 51% partner-owner of BCMG Capital LLC.

**Hanratty and Ebury St. Fail to Meet Their Obligations Under the CRIM Proposal**

45.    Hanratty and Ebury St. were unable to provide their own funds to finance the day-to-day operations of the CRIM Proposal.  As a result, Hanratty and Ebury St. employed alternate means to attempt to obtain the necessary financing.

46.    For example, on more than one occasion in 2017, Hanratty, through Ebury St., purchased tax encumbrances directly from Carry Trade, LLC, then owned by McOsker, with the intention that the capital originating from the transaction would be used to inject liquidity into the operations of BCMG, LLC and the CRIM Proposal.

47.    Similarly, Hanratty was unable to procure the Formal Credit line. Initially, Hanratty attempted to obtain credit and financing facilities through Ebury St. and its affiliated companies, since they had purportedly generated goodwill in the markets thanks to Hanratty's alleged good credit history.

**The Provisional Credit Line**

48.    In the interim, and as part of his relationship with McOsker and his companies, Hanratty, through Ebury St. and his other companies, entered into more than 10 transactions with Bloxtrade, LLC, Lienclear, LLC, Lienclear –0001, LLC and Lienclear – 0002, LLC. For this he executed structurally identical groups of contracts for transactions of tax encumbrances that consisted of: a Purchase and Sale Agreement, an Escrow Agreement, and a Services Agreement (the "Contract").

49.    It is necessary to clarify that prior to Hanratty and McOsker becoming partners, it was not a common practice in the companies of McOsker to serve as an escrow agent. For years previously, the companies used US Bank as a third-party escrow agent for transactions.  It was only at the suggestion of Hanratty that LienClear 0002, LLC began serving as an escrow agent,

and on several occasions throughout 2018 and 2019 Hanratty specifically told ultimate third-party purchasers of tax liens owned by Ebury that if they did not escrow their purchase funds with LienClear - 0002 , he would not sign the deal.

50.      Pursuant to the Escrow Agreement, the funds originating from the sale of the four groups of tax encumbrances would be given to Ebury St. when the transaction had finalized.

51.      However, since up until that moment Hanratty and Ebury St. had not successfully procured the Formal Credit Line, the parties agreed that the escrowed funds would act as a bridge loan, which would be repaid when the Formal Credit Line was obtained to make the necessary capital contributions (the "Provisional Credit Line").

52.      Operating under the belief that he would obtain the Formal Credit Line, Hanratty and Ebury St. used the sole provisional financing that they had available – the capital of Ebury St. deposited in the escrow accounts.  Hanratty, in his capacity as Managing Partner of Ebury St., authorized the use of the funds for the Provisional Credit Line. Over the course of 2017-2019 Hanratty repeatedly via phone, text, other electronic communication, and in person assured McOsker that he had sufficient "carried interest" in Ebury Fund 1 and Fund 2 to cover a Provisional Line of Credit in excess of $3million, that his Ebury Fund 2 investors would be liquidated shortly and therefore he essentially owned all of the Ebury Fund 2 assets outright personally and thus could convey the 50% Ebury Fund 2 ownership to McOsker, and that Hanratty's capacity as Manager and fiduciary for the Ebury Funds gave him authority to authorize the use of the Provisional Credit Line for the benefit of the partnership. Since Hanratty was the Managing Member of each entity in writing, had signatory authority, and refused to allow McOsker or his team to speak with Ebury CFO Ping Xie, McOsker took his partner Hanratty at his word.  The parties had agreed that, given that it was a bridge loan, the Provisional Credit Line would not be

payable until they obtained a formal financing line. This is documented in e-mails and text message communications between McOsker and Hanratty from 2017-2019, the last of which in early 2019 demonstrate a desperate attempt by Hanratty to document his meritless version of the Provisional Credit Line story.

**The Search for Financing and The Assets Involved**

53.      Hanratty and McOsker had agreed that the Formal Credit Line that they would request would be one collateralized with assets, to wit, with tax encumbrances.

54.      Searching for a financing line, Hanratty, acting as Director of Ebury St., approached several entities, including, but not limited to known financial entities such as Emigrant Bank ("Emigrant"), Blue Clover Financial, LLC ("Blue Clover"), AloStar Bank, which in turn is a subdivision of Cadence Bank ("Alostar"), and Hunt Financial Group for this purpose.

55.      For the sole purpose of allowing Hanratty to negotiate a financing line to capitalize the CRIM Proposal, McOsker assigned his 100% interest in several companies, including Carry Trade, LLC and BFNH, LLC, to BCLF Rev I, LLC, where Hanratty and McOsker were equal partners.

56.      Subsequently, Carry Trade, LLC and BFNH, LLC were assigned to Ebury Fund 2, LP, because, as Hanratty alleged, procuring a financing line under the name and the alleged goodwill of Ebury St. would be easier, and also that he wanted to collateralize the temporary Provisional Credit Line as it was taking Hanratty longer than he had promised to secure the financing. Defendants/Counterclaimants/Third-Party Plaintiffs would later learn that Hanratty neglected to inform his Ebury Fund 2 investors of this agreement, Provisional Line of Credit, and assets pledged into the Fund. On information and belief, Hanratty, Ping, and Mendez marked these

$5.3 million in assets on the books of the fund without paying for them, and it is unclear what cost basis they falsified to this effect.

57.     These transfers were documented through a series of loans. One loan in 2018 for approximately $1.8 Million was uncollateralized and was repaid in full the same year; a second loan in 2018 was structured as a collateralized revolving line of credit for up to $3 Million, which was drawn down to meet the ongoing partnership needs including draws for Ebury St at Hanratty's request. This loan was repaid in full, then partially drawn down and stood partially outstanding at the time Ebury fled the BCMG office and filed their meritless lawsuit in Puerto Rico in a desperate attempt to cover up the fraudulent actions of the Hanratty Enterprise. This net outstanding amount between the parties was presented in a reconciliation, discussed infra.

58.     In exchange for the assignments made, Hanratty also agreed to grant McOsker a proprietary interest in Ebury Fund 2, LP, of fifty percent (50%), the issuance of which never occurred despite repeated promises for close to a year that it would be "soon". In this way, Hanratty induced McOsker to transfer the above referenced assets and ownership interests in exchange for the promise of the 50% ownership interest in Ebury Fund 2, LP.

59.     These companies had portfolios of Tax Liens that were to be used as collateral for the Formal Credit Line. Hanratty recommended transferring the limited liability companies and not the tax encumbrances that had these assets since it helped to reduce the transactional costs.

60.     Carry Trade, LLC and BFNH, LLC, had tax encumbrance assets whose redemption value was estimated to be approximately $5,325,290.85 at the time of the transfer. (The redemption value is the estimated measure of the appraisal of the value of the tax encumbrance).

61.     Similarly, for the sole purpose of allowing Hanratty to negotiate a financing line to capitalize the CRIM Proposal under the name of Ebury St., Hanratty and McOsker decided to

jointly reinvest $750,000 originating from the Provisional Credit Line to purchase additional joint assets that would serve as additional collateral for the Formal Credit Line.

62.    Hanratty and McOsker referred to this investment as the "Leper Line." With the investment of $750,000 originating from the Provisional Credit Line, Hanratty and McOsker were able to purchase tax liens whose redemption value exceeded $14 million due to McOsker's position in the marketplace.

63.    Despite the fact that Hanratty signed each of the Contracts and personally authorized the wires for the purchase amounts in writing, he somehow attempts to include this $750,000 draw from the Provisional Line of Credit as part of his baseless claims in this lawsuit. As indicated in writing between the partners, the purchase contracts, and the transfer documentation, the $750,000 was used to buy assets that, to Defendants' knowledge, are still being held by entities controlled by Hanratty or have since been sold or converted to the sole benefit of Hanratty and his entities. Discovery will show whether these assets have suffered the same fate as the other Ebury Fund 1 and Fund 2 assets at the hands of Hanratty; that is whether they have been wrongfully converted and comingled or transferred between funds and fund investors to perpetuate the Ponzi like scheme, or to falsify borrowing bases, mislead auditors, and commit fraud against his banks and investors.

64.    Said assets were purchased by BCLF Rev. I, LLC, where Hanratty and McOsker were partners, and subsequently BCLF Rev. I LLC and/or its assets were transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. The assignment was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that Hanratty would grant to McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

65.     Nevertheless, notwithstanding the efforts of McOsker to help Hanratty and Ebury St. to obtain a financing facility, Hanratty never procured the Formal Credit Line.

66.     On the contrary, Hanratty continuously created expectations and representations that there was only a short time left to achieve a permanent financing facility, when this was not the case.

67.     During the time in which Hanratty was supposed to be working to obtain the Formal Credit Line, he instead proceeded to use BCMG's and resources to attempt to solicit various municipal governments in Puerto Rico to extend them high interest loans which would solely benefit Hanratty and Ebury St.

68.     Thus, for example, Hanratty notified Kernan, Vazquez, McOsker, and several companies of McOsker, that there was only one week left to achieve the financing facility and that they make the corresponding preparations. Hanratty knew these statements were false when made.

69.     During this time, Hanratty moved his cousin, attorney Patrick Seymour, to the BCMG office to document and craft a legal case against McOsker and other individuals and entities while rifling through secure documents and assets under the cover of night.  Some of the documents and assets were stolen from the BCMG offices by Hanratty, Vega, and Seymour over a weekend when they vacated the office. It is unclear what other confidential documentation or assets of which they are in possession.

70.     Several initial attempts by Hanratty at procuring the Formal Credit Line failed. In the end, the last financing facility that Hanratty pursued, known as the Alostar line, never materialized. The understanding of McOsker and his employees, even mere weeks before the filing

of the complaint of Hanratty in the Federal Forum in June 2019, was that Hanratty continued to seek the financing facility with Alostar.

71.    Hanratty pursued the credit line with Alostar acting in his capacity as "Founder and Principal" of Ebury St., as evidenced in the Proposal Letter of Alostar dated October 22, 2019 ("Alostar Proposal"). The Alostar Proposal was signed by Hanratty in his capacity as Managing Partner of Ebury St., an entity which, in turn, represented three funds as their General and Managerial Partner, Ebury Fund I, LP; Ebury Fund 2, LP; and Ebury RE, LLC.

72.    Also, in an attempt to secure funding from Alostar, Hanratty represented himself to be the managing partner of BCMG and carried business cards to this effect that he distributed freely to private sector individuals, local government officials in Puerto Rico, and federal government officials in Washington DC. On at least one occasion in person and in writing, and without McOsker's prior knowledge or permission, Hanratty lied to banks, holding himself out at the CEO of BCMG Services, LLC, which he never held any interest in, nor was he ever promised any interest in.

**The Efforts to Formalize the Relationship and Reconcile Accounts**

73.    At the beginning of 2019, knowing his own difficulties to procure a financing facility, Hanratty requested that the Provisional Credit Line of the funds originating from the escrow accounts for which Ebury Fund 2 held collateral be formalized (in his words, that they be "*papered*").

74.    Hanratty also sought that the Provisional Loan be formalized due to the fact that he had made the decision to liquidate his Ebury St. fund and he told his investors that they would receive their capital within 90 days. When they were not delivered their capital on time, some of

them, including an investor named Michael Salerno, sued Hanratty and filed a complaint with the New York police.

75.     McOsker and his team welcomed this request from Hanratty, since McOsker and his companies had been seeking documentation from Hanratty for months and had incurred a number of expenses in the name of Hanratty and his companies in 2018 and continued to do so in 2019, wherefore it would be necessary to make a reconciliation of expenses to determine how much each one owed of the loan in net terms.

76.     Said reconciliation was prepared and presented for the first time on October 22, 2018, by Kernan to Hanratty during a strategy and planning meeting of expenses.

77.     To wit, the following are only some of the expenses which McOsker and his companies incurred for Hanratty and for which McOsker and his companies should receive a credit in the financial reconciliation between the parties:

> a. Payment of the recruitment and salary expenses of two employees nominally under the payroll of BCMG, Dennisse Méndez and Shirley Vega, but who worked solely and exclusively for Hanratty in matters of Ebury St. and its subsidiaries and affiliates. Their monthly salaries amounted, with benefits to $9,581 and $3,953, respectively;
> b. Greater than $900,000 in capital investment directly and exclusively for BCMG for the CRIM Proposal;
> c. Office space for Hanratty and his employees of Ebury St., Dennisse Méndez and Shirley Vega;
> d. A payment of $170,990.58 on May 15, 2019, to finalize a transaction of Ebury St. with an entity called Avenue Capital; and
> e. A loan of $100,000 requested on October 5, 2018, to cover a deficiency of liquidity of Ebury St., which was never returned.

78.     All of the above is limited to the expenses incurred by McOsker and his companies for the exclusive benefit of Hanratty. This does not include the expenses that were made to advance the CRIM Proposal, wherefore Hanratty and McOsker were severally responsible for 50%, which includes, but which is not limited to:

a. The equipment of Map Plus, LLC, who during 2018 worked on compiling a set if data that allowed the most efficient location of delinquent properties of the CRIM;
b. The contracting of the following firms:

    i. O'Neill & Borges, LLC;
    ii. Estudios Técnicos; and
    iii. PKMG.

79.    Even though during the months from February 2019 to June 2019 repeated proposals of reconciliation were sent for his approval, Hanratty was barely responsive to the same.

80.    When he responded, he sought to dispute certain expenses such as for example, the expense of human resources of Map Plus, LLC, which was dedicated in 2018 to working on the CRIM Proposal, which is duly documented by the billing system Harvest.  Now, it appears that these disputes were manufactured for the purpose of buying time to retain counsel, steal information, and craft a meritless lawsuit so that he would have sufficient time to cover his fraudulent actions in both Ebury Fund 1 and Ebury Fund 2.

81.    During all this time in which McOsker and his companies incurred in expenses for what was supposed to be a common venture, Hanratty continued to assure McOsker and his employees that he would promptly secure the Formal Credit Line. This never materialized and Hanratty and his companies filed a complaint in Puerto Rico without having agreed on a reconciliation to finally pay for those expenses which McOsker and his companies incurred for his benefit. Having little success in Puerto Rico, Hanratty and his companies filed this complaint in DE to further delay and allow time to perpetuate his Ponzi like scheme.

**Hanratty Realizes His Failures, Tucks Tail and Runs, and Files Meritless Slanderous Lawsuits against McOsker**

82.    Suddenly, Hanratty decided to leave the BCMG offices.  Hanratty's departure was in fact so unexpected that, after Hanratty mentioned to McOsker for the first time that he would seek new office space on a Thursday, by the following Monday, Hanratty had already left the

office with Shirley Vega and Dennisse Mendez and all their respective belongings. The very next day (three business days after Hanratty initially indicated that he was moving offices) McOsker was served with a complaint filed by Hanratty and his companies against McOsker and his companies in the US Federal Court for the District of Puerto Rico, which was later voluntarily dismissed. This would begin a string of meritless and slanderous lawsuits filed by Hanratty and his companies against McOsker and his companies.

83.     Among the things that Hanratty, Vega, and Seymour stole from the BCMG offices were certain certificates of tax encumbrances over the property of the State of Ohio belonging to Carry Trade and other affiliated entities. It is unclear what other items Hanratty, Vega, and Seymour stole, or took digital copies of, over the weekend between when Hanratty informed McOsker that he was moving offices and the first complaint was filed, or any time beforehand for that matter.

84.     The complaint filed by Hanratty against McOsker, twice in Puerto Rico and now here in the Federal District Court for the District of Delaware falsely represented the relationship between the parties as one of separate and independent parties when Hanratty well knew, and there are hundreds of documents that confirm, Hanratty and McOsker were partners.

85.     Not only did Hanratty file the scandalous and deceitful complaints in Puerto Rico and the Federal District Court for the District of Delaware, he also dedicated himself to spread this false information among relevant persons in the market of tax encumbrances of the United States, which caused damages to the reputation of McOsker and to the goodwill of BCMG, LLC and affiliated entities and subsidiaries.

86.     Hanratty's false and slanderous statements include, but are not limited to:

   a.   Falsely reporting to the Puerto Rican government that McOsker was defrauding the Puerto Rican Government related to tax credits;

17

b. Falsely reporting to the Puerto Rican Office of Industrial Tax Exemption that BCMG International was engaged in fraudulent acts;

c. Falsely reporting to the Puerto Rican Department of Economic Development that McOsker was defrauding the Puerto Rican Government related to tax credits;

d. Falsely reporting to the Puerto Rican Industrial Development Company that McOsker was defrauding the Puerto Rican Government related to tax credits;

e. Falsely reporting to the Puerto Rican Treasury Department (Hacienda) that McOsker was defrauding the Puerto Rican Government related to tax credits;

f. Falsely reporting to certain banking institutions in Puerto Rico that McOsker was defrauding the Puerto Rican Government related to tax credits;

g. In 2019 falsifying statements and directing Dudley at Lavaleer Capital via text message to create a false paper trail he would later attempt to use to have OITE cancel the decree of BCMG International

h. In 2019 falsely accusing McOsker of stealing from his friend and colleague Robert Sanchez in a building partnership; and

i. In 2019, approaching former members of the MapPlus team in order to falsely accuse McOsker of some of the allegations in this Amended Complaint.

j. Falsely informing multiple fund managers in the tax lien industry over the course of 2019-2021, and possibly ongoing, that McOsker stole his funds related to the four trades at issue.

87.     Similarly, Hanratty attempted to use the dispute between the parties and the filing of his complaint to prevent BCMG Technologies and BCMG Services to be granted a tax credit to which they were creditors pursuant to Law 73-2008. This caused that the delivery of said tax credit to BCMG Services and BCMG Technologies be delayed, which caused these parties damages that are included but are not limited to accrued interests and legal expenses for payments owed.

88.     Had the CRIM Proposal been successful, it was a business opportunity that would inject the necessary capital to the municipal governments of Puerto Rico and contribute to the fiscal sustainability of the government and its instrumentalities. The value of the asset purchase portion of the CRIM Proposal for the municipalities was initially $400 million in immediate liquidity in 2017, which later increased to a proposal of $800 million in immediate liquidity in 2018. The value of the servicing portion of the portfolio was 10% of collected assets, estimated to be roughly $1billion per year, for a proposed 15-year contract term. For McOsker and Hanratty, it was potentially worth hundreds of millions of dollars.

**Plaintiffs/Counterclaim Defendants/Third-Party Defendants Fraudulently Concealed Their Wrongful Activities**

89.     Plaintiffs/Counterclaim Defendants/Third-Party Defendants engaged in affirmative acts of concealment to put Defendants/Counterclaimants/Third-Party Plaintiffs off the trial of injury to prevent Defendants/Counterclaimants/Third-Party Plaintiffs from gaining knowledge of the facts to support their causes of action.

90.     Plaintiffs/Counterclaim Defendants/Third-Party Defendants acts of concealment include, but are not limited to:

a.  In attempt to conceal his action from his own CFO, lenders, investors, and custodians, including McOsker, during several in-person meetings over the course of 2018 and early 2019 between McOsker and Hanratty, Hanratty insisted that McOsker and his team not speak with Ebury CFO Ping Xie.

b.  In attempt to conceal his action from his own CFO, lenders, investors, and custodians, including McOsker, in at least two in person meetings over the course of 2018 between Hernandez and Hanratty, Hanratty insisted that Hernandez not speak with Ebury CFO Ping Xie.

c.  In attempt to conceal his action from his own CFO, lenders, investors, and custodians, including McOsker, in at least one phone conversation in 2018 between Kernan and Hanratty, Hanratty insisted that Kernan not speak with Ebury CFO Ping Xie.

d.  In order to cover his cash and redemption shortfalls caused by his own mismanagement and fraud, Hanratty, over the course of 2018 and it is believed in 2019 and to this day, altered data on excel documents sent to his banks, including Emigrant Bank, regarding the borrowing base for Ebury Fund certificates, specifically origination dates for hundreds of certificates, and other relevant financial data.

e.  Hanratty directed Ping on financial information provided to their banks, current investors, potential investors, current and potential lenders to recognize the value to the pledged Carry Trade, BFNH, and Leper Line assets at 100% of redemptive value, while not disclosing to those parties that he didn't pay McOsker for the pledged Carry Trade, BFNH, and Leper Line assets.

f.  In order to conceal sale proceeds from his lending institutions and other investors Hanratty would routinely instruct, in some cases verbally and others in writing, Kernan and Vazquez to send funds from Ebury Fund sales proceeds directly to investors, or other parties to cover his tracks. In one instance in August 2018, Hanratty approached Vazquez and Kernan with a request to wire approximately $2million owed to the two Ebury Funds directly to one investor Ira Levinthol, who was an investor in Ebury Fund 2 but not Ebury Fund 1. When questioned as to why this money would go directly to an investor instead of to

the fund to pay the bank first, then follow the normal fund procedure via his custodian, Hanratty became irate. Per Hanratty's instruction on August 15, 2018, BCMG wired from LienClear-0002 to National Fin. - Ira Leventhal IRA - (for Ebury Fund) - $800,000.00, and on the same day to National Fin. - Ira Leventhal IRA - (for Ebury Fund) - $1,289,504.77.

g.  Over the course of 2017-2019, Hanratty continuously insisted to McOsker that conversations regarding the Provisional Credit Line and his interest in Ebury Fund 2 be had in person or via telephone. In fact, on several occasions via telephone, text and electronic communication in 2018 Hanratty berated McOsker for sending written communication instead of verbal.

h.  Over the course of 2018, and especially in 2019, Hanratty deliberately would use intimidating and verbally abusive behavior to bully BCMG, Ebury, and other employees and contractors into getting his way, thus using this intimidation to dissuade individuals form questioning his requests and behavior, concealing his true actions and intent. On several occasions in 2018 McOsker was approached by members of the team who were concerned about the erratic, loud, and violent tendencies of Hanratty in the office. Mendez helped Hanratty with management of the Ebury St. employees, as well as the Philippine team that Ebury paid for services and paid healthcare for. Mendez often had to repair verbal and email damage done by Hanratty to that team, and over the course of 2018 and early 2019, several of the team members resigned citing similar issues. In fact, in late 2018, Mendez had to talk the office manager of the Philippines team Ana Yang, who later resigned.

i.  In early 2018, Hanratty deliberately hid from his Ebury Fund 1 and Ebury Fund 2 investors, including McOsker, that he had moved to Puerto Rico, often flying back to New York in order to pacify contentious financial and redemption issues with Fund Investors.

j.  Over the course of 2018, 2019, and believed today, Hanratty would conceal his location and via telephone instruct his employees and contractors in New York and the Philippines to sign documents on his behalf, notarize documents with his signature without him present, and perform any number of other tasks required for him to be in person.

k.  It is believed that, despite Delaware forum selection clauses in all relevant trade documents, Hanratty purposefully brought his meritless suit against McOsker and his companies in Puerto Rico in Puerto Rico due to the fact that it had a lower chance of being discovered by his investors versus bringing it in Delaware. This bought Hanratty over 2 years of time to conceal actions, liquidate liens, fraudulently transfer assets, procure hard money credit lines, and in his words "clean up" his Fund 1 and Fund 2 mismanagement. In fact, on an unsolicited phone call in 2020, certain Ebury Fund 1 investors, whom McOsker had never spoken with before nor had he ever met, contacted McOsker asking him if he would liquidate their fund assets because Hanratty was mismanaging them. When McOsker stated that he was confused as to why they would reach out to him, considering they were currently on opposite sides of a Puerto Rico state civil suit, the investors claimed to not know of the suit. Either Hanratty used the investors to deliberately try to gain information form McOsker during

the lawsuit, or he intentionally concealed the existence of the lawsuit form the very investors being sued.

l. Hanratty forwarded an email in mid-2019 to Mendez where he mischaracterized the nature of the Provisional Line of Credit, and the ongoing relationship with McOsker, specifically in attempt to solicit her to work for him at Ebury and poison her against McOsker, and presumably to justify some of the actions that he directed her to take against BCMG.

m. In 2018, Hanratty verbally and forcibly instructed Hernandez to prepare and sign the Carry Trade and BFNH operating agreements immediately so that he could have McOsker sign the same day.

n. On several occasions in 2019, Hanratty would burst into McOsker's office with printed documents and instruct him to "just sign them" so that he could purportedly close the Provisional Line of credit. He routinely used disorganization, rushed tactics, pressure, and intimidation to force signatures and quick decisions to conceal his actions in all aspects of his business.

o. On several occasions in 2019, Hanratty verbally walked McOsker through what he expected McOsker's response via email to be to his custodians MTAG, presumably so that it matched whatever story Hanratty had told them.

p. On one occasion in 2018 Hanratty approached McOsker in person to "coordinate" McOsker's response to Tower Fund Services, his custodian, on several issues that the servicer was having with Hanratty. Again, trying to document his side of the story for this third party.

q. At least weekly, via misleading, fraudulent, or deceptive statements in in-person comments, text messages, emails, phone calls, Hanratty concealed from McOsker, from the first meeting regarding the CRIM portfolio in 2017 all the way through the in-person meeting in 2019 where Hanratty finally admitted that he was not going to satisfy his requirement to procure the Formal Credit Line, that he would not be able to satisfy his duties under the partnership agreement.

r. On several occasions in 2018 and early 2019, Hanratty misrepresented to McOsker that the syndicate of investors he was responsible for procuring were firmly committed to financing the CRIM portfolio, concealing the fact that they were not committed them to be.

s. Hanratty concealed his illiquid personal and Fund level position from late 2017 through 2019.

t. Under the guise of "helping with the CRIM portfolio", Hanratty concealed his cousin Seymour's actions, undertaken in BCMG offices day and night.

u. On an ongoing basis throughout 2017 to 2019, Hanratty verbally assured McOsker that his fund investors were appraised of their partnership and agreements, and that his conflict of interest vis-à-vis Ebury was disclosed and waived, thus concealing potential risk for the partnership.

v. Initially, Hanratty concealed from McOsker the police report and criminal lawsuit filed against him by his investors in 2018.

w. From August 2018 through June 2019, but especially during the first half of 2019, Hanratty concealed from McOsker his conversations with and private instructions for Mendez which were directly in conflict with her employment

agreement with BCMG Services, as well as the interest of the Hanratty/McOsker partnership and McOsker personally.

x. Over the course of 2018 and early 2019, Hanratty concealed from McOsker his private instructions and direction of Andrew Adler, a former Ebury employee that Hanratty suggested that BCMG hire as a broker to gain inside knowledge about BCMG trades, all while Adler was an employee of BCMG Services.

y. Hanratty concealed from McOsker the fact that his Ebury funds were over-leveraged, that he was falsifying borrowing bases to avoid capital call requirements, and that McOsker's assets and promised equity positions were in jeopardy.

z. From Fall 2018 to Winter 2019 Hanratty played a "wait and see" game. Hanratty continually and consistently advised McOsker, Kernan, and Vazquez that the Formal Line of Credit was in final stages - only a week or two away from being finalized, when in reality he had no commitment from anyone to finance the Formal Line of Credit.

aa. From Winter 2018 to Spring 2019, Hanratty refused to confirm detailed reconciliation of financial matters - after repeated in--person and email requests via Kernan, to conceal his actions to try and document, after-the-fact, his side of the story before filing litigation in multiple forums.

**The Hanratty Enterprise**

91.    Plaintiffs are a group of persons and entities associated together in fact as the Hanratty Enterprise for the common purpose of carrying out an ongoing enterprise.

92.    John Hanratty acted as the head of the Hanratty Enterprise, directing his employees and contractors to inappropriately transfer investor assets, mismanage investor funds, falsify notarized documents, defraud investors, and outright steal from his partner, McOsker.

93.    Sarah Wells is Hanratty's personal assistant and functioned as the office manager for Ebury St.'s New York office.  From at least the formation of the partnership in 2017 to the present, at Hanratty's instruction, Wells would notarize documents on Hanratty's behalf while Hanratty was neither present nor in the same state when said notarizations occurred.  Further, at the direction of Hanratty, Wells assisted in improperly transferring assets among the Entity Members (defined herein) in order to hide the assets from clients and partners in order to enrich the Individual Members (defined herein).  Wells also acted as HR manager for Hanratty's various

companies and dealt with his frequent and explosive hiring and firing of his undocumented Philippine team, who had insecure access to financial information for Ebury Funds, investors, credit lines, and other financial information, as well as working with Dennisse Mendez to pay their compensation and health insurance via offshore shell companies.

94.     Dennisse Mendez is Ebury's Director of Operations, and at Hanratty's request and instruction, manages Ebury St.'s tax lien and real estate asset portfolios.  As set forth herein, at the direction of Hanratty, Mendez assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members. Further, Mendez worked with Wells to assist in paying the undocumented Philippine team' compensation and health insurance via offshore shell companies.  While a documented employee with BCMG, including the accompanying confidentiality, non-solicitation, and noncompetition, she facilitated the fraud with Hanratty pre and post exit.

95.     Shirley Vega is an employee working for Ebury. As set forth herein, Vega assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019.  Further, at the direction of Hanratty, Vega assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

96.     John Bronzo was an attorney working for Ebury St. who was eventually promoted to the position of Ebury St.'s General Counsel.  At Hanratty's instruction, Bronzo would initiate foreclosure procedures on certain tax lien certificates and process the necessary paperwork to obtain title to these acquired properties. There were several instances where Hanratty would instruct Bronzo to obtain title over a property in the benefit of a different entity than the original investor entity, thereby defrauding some investors to the benefit of others, while inflating asset

value to obtain bank loans and/or mortgages.  Further, at the direction of Hanratty, Bronzo assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

97.     Patrick  Seymour was Ebury's General Counsel who replaced Bronzo in this role. Seymour assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019.  Further, at the direction of Hanratty,  Seymour assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members

98.     Ping Xie is Ebury St.'s Chief Financial Officer and assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members, assisted in improperly moving assets into foreign entities located in the British Virgin Islands in order to hide the assets from clients, partners, and the United States Internal Revenue Service to enrich the Individual Members and defraud the United States Government. Xie knowingly falsified borrowing bases and redemption reports to present to Ebury St.'s servicers, lenders, potential lenders, investors, potential investors, and auditors.

99.     Hanratty, Wells, Mendez, Vega, Bronzo, Xie and  Seymour comprise the ("Individual Members").

100.     Ebury Street Capital, LLC is a fund controlled by Hanratty and acts as the General and Managerial Partner of Ebury Fund I, LP; Ebury Fund 2, LP; and Ebury RE, LLC.  The Hanratty Enterprise uses the seemingly legitimate company to lure investors and take their money.  For example, Hanratty made the decision to liquidate his Ebury St. fund and told his investors that they would receive their capital within 90 days. When they were not delivered their capital on time,

some of them, including an investor named Michael Salerno, sued Hanratty and filed a complaint with the New York police.

101.    EB LEVRE I, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to hold real estate assets and assist in the improper transfer of assets between entities.

102.    Ebury Fund I, LP, is a Delaware limited partnership that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.  For example, Ebury St. distributed $3,793,679 to Ebury Fund 1, LP ("Fund 1") investors between July 1, 2018 and February 19, 2019, despite Fund 1 current assets being listed at $1,918,787.49 as of December 31, 2018.

103.    Ebury Fund II, LP, is a Delaware limited partnership that the Hanratty Enterprise uses to comingle and find funds from investors and partners.  For example, McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners.  Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. The assignment was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that  Hanratty would grant to  McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

104.    EB 1EMIDC, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.

105.    Red Clover 1, LLC,  is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.  For example,  McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners.  Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to

be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. Hanratty then assigned or transferred said assets to Red Clover 1, LLC to hide said assets from McOsker and affiliated entities as well as his own investors. The pledge was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that Hanratty would grant to McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

106. White Clover 1, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.

107. Black Clover I, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.

108. Ebury Fund IC1, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.

109. Ebury RE, LLC is a New Jersey limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.

110. Ebury Fund 2CI, LLC is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners (collectively, Ebury Street Capital, LLC, with EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund II, LP, EB 1EMIDC, LLC, Red Clover 1, LLC White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury RE, LLC, and Ebury Fund 2CI, LLC (the "Entity Members").

111. The Individual Members and the Entity Members comprise the "Hanratty Enterprise" an association-in-fact that purports to manage and operate various investment funds.

FILED: NEW YORK COUNTY CLERK 10/17/2022 03:31 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO. 14                                                  RECEIVED NYSCEF: 10/17/2022

Case 1:20-cv-02765-RA   Document 11   Filed 08/14/24   Entered 08/14/24 09:45:28   Main Document   Pg 493 of 688
Court Records      Pg 493 of 688

112.    The Hanratty Enterprise is an organization that has existed for several years and functions as a continuing unit with an informal command structure that uses seemingly legitimate business and investment entities to conduct illegal activity.

113.    In reality, the Hanratty Enterprise preys on unsuspecting clients to take their money, which they then misappropriate and commingle funds across various entities to line their own pockets.  Further, the Hanratty Enterprise engages in outright theft of assets, including tax lien certificates, from its partners.  These activities are done to enrich the Hanratty Enterprise and its members.

114.    Through the years of individual acts of theft, misappropriation of money and other assets, and fraud to cover up that theft and misappropriation, the Hanratty Enterprise and its members stole money from Defendants/Counterclaimants/Third-Party Plaintiffs and other third parties.

115.    At all times relevant to these Counterclaims, the Individual Members engaged in the operation or management of the Hanratty Enterprise.

116.    While Hanratty acted as the head of the Hanratty Enterprise, Dennisse Méndez, Shirley Vega, Sarah Wells, John Bronzo, Patrick Seymour, and Ping Xie acted closely with him, knowing that they were engaging in illegal conduct and stealing from others.

117.    The Individual Members used the Entities Members to steal, transfer, and conceal assets, including client funds, partner money, and partner tax lien certificates in order to enrich themselves to the detriment of their clients and partners.

118.    At all relevant times, the Hanratty Enterprise's engaged in conduct affecting interstate commerce, including but not limited to, transmitting, assigning, or otherwise transferring

money and other assets among bank accounts in jurisdictions including but not limited to Puerto Rico, the British Virgin Islands, Delaware, New York, New Jersey, and/or Alabama.

119.    At all relevant times, the members of the Hanratty Enterprise acted with the common purpose of enriching themselves to the detriment of their clients and partners.

120.    At all relevant times, the members of the Hanratty Enterprise were employed or associated with the Hanratty Enterprise and participated in the conduct and affairs of the Hanratty Enterprise through a pattern of racketeering activity as described herein.

121.    The predicate acts described herein are related and pose a threat of continued activity as the Hanratty Enterprise has and continues to improperly steal, transfer, or otherwise dispose of its clients' and partners' money and other assets.

122.    The predicate acts described herein constitute a pattern of racketeering activities and are part of a common scheme to enrich the Hanratty Enterprise at the expense of Defendants/Counterclaimants/Third-Party Plaintiffs through acts constituting: (i) wire fraud, in violation of 18 U.S.C. § 1343; (ii) violations of the NSPA, 18 U.S.C. §§ 2314-15; and (iii) money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

123.    The    Hanratty    Enterprise's    violations    of    §    1962(c)    injured Defendants/Counterclaimants/Third-Party Plaintiffs.

124.    Under the provisions of 18 U.S.C. § 1964(c), Defendants/Counterclaimants/Third-Party Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing this suit, prejudgment interest and attorneys' fees.

**Through a Ponzi-Like Scheme, The Hanratty Enterprise Defrauded and Stole Funds from Defendants/Counterclaimants/Third-Party Plaintiffs and Investors to Pay Off Previous Investors and Debts and to Procure New Investors**

125.     The Hanratty Enterprise had a practice of stealing, comingling, or otherwise misusing investor and partner funds and assets to pay off previously disgruntled investors and lure new unsuspecting investors.

126.     The Hanratty Enterprise would accept investor money into one fund or entity, use that money to produce leverage via a lender, then purchase assets in that fund. The Hanratty Enterprise would then take the redemptions from those assets and instead of paying that lender and investor, put the money in another fund to cover shortfalls. The Hanratty Enterprise did this hundreds of times, beginning in at least 2017 and is ongoing.

127.     By way of specific example, Hanratty made the decision to liquidate his Ebury St. fund and told his investors that they would receive their capital within 90 days. When they were not delivered their capital on time, because of shortfalls due to comingling and other improper transfers, some of them, including an investor named Michael Salerno, sued Hanratty and filed a complaint with the New York police.

128.     Hanratty then stole, comingled, or otherwise misused current investor and partner funds and assets to pay Mr. Salerno and other investors.

129.     The Hanratty Enterprise would routinely make improper transfers among the various entities and funds to pay off current debts, investors, and partners.

130.     Hanratty would also ask McOsker if he could "tap" $50,000.00 from funds as least partially owned by Defendants/Counterclaimants/Third-Party Plaintiffs in order to pay off current debts, investors, and partners.  Hanratty never repaid the $50,000 "tap."

**The Hanratty Enterprise's Frauds, Thefts, and Money Laundering Comprise Racketeering Activity in Violation of 18 U.S.C. § 1962**

**The Hanratty Enterprise Committed Wire Fraud in Violation of 18 U.S.C. § 1343**

131.    By the acts described herein, the members of the Hanratty Enterprise knowingly executed and/or intentionally participated in a scheme that defrauded, and that was intended to defraud, the Defendants/Counterclaimants/Third-Party Plaintiffs and other investors, and in furtherance of this scheme, the members of the Hanratty Enterprise transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures and/or sounds, but not limited to the following predicate acts:

    i.   numerous email and telephone communications between the parties and other investors beginning in 2017 and continuing through 2019 in furtherance of the scheme to fraudulently induce Defendants/Counterclaimants/Third-Party Plaintiffs and other investors to enter into agreements and remain in agreements so that the Hanratty Enterprise and its members could profit from their schemes;

    ii.  numerous emails and telephone calls throughout 2018 and 2019 between the parties regarding Hanratty and his funds' ability to obtain financing for the CRIM Proposal;

    iii. numerous emails and telephone calls throughout 2018 and 2019 between the parties regarding the location and the purpose of Defendants/Counterclaimants/Third-Party Plaintiffs' money and other assets;

    iv.  Numerous fraudulent mailings of tax lien certificates over state lines regarding the Lepper Line Transactions, the Carry Trade Portfolio, and the Woods Cove Portfolio;

    v.   Hanratty's instruction via email and telephone communications for Wells to improperly notarize documents for Hanratty outside his presence when he was in a different territory;

    vi.  Hanratty's instruction to the Individual Members to improperly divert, comingle, steal, or otherwise improperly use Defendants/Counterclaimants/Third-Party Plaintiffs' and other investors money and assets are instances of wire communications in furtherance of the McOsker Enterprise that constitute violations of 18 U.S.C. 1343.

132.    The specific details of the Individual Members acts in improperly diverting, comingling, stealing, or otherwise improperly using Defendants/Counterclaimants/Third-Party

Plaintiffs' and other investors money and assets are exclusively within the knowledge and control of the members of the Hanratty Enterprise and will be identified in discovery and proven at trial.

**The Hanratty Enterprise Committed Theft in Violation of The National Stolen Property Act, 18 U.S.C. §§ 2314–2315**

133.    By the acts described herein, the members of the Hanratty Enterprise transmitted, transferred, stole, and received money or assets with a value of more than $5,000, knowing that the money or assets had been converted and/or taken by fraud.

134.    The money was transmitted or transferred in interstate commerce among bank accounts in New York, Puerto Rico, and other states and territories.

135.    By the acts described herein, the members of the Hanratty Enterprise devised or intended to devise a scheme or artifice to defraud, or for obtaining money or assets with a value of $5,000 or more by means of false or fraudulent pretenses, representations, or promises, transported or caused to be transported in interstate or foreign commerce in the execution or concealment of the scheme or artifice to defraud.

136.    On or about June 2019, Hanratty, Vega, Bronzo, and Seymour entered the BCMG offices over the weekend and took tax certificates belonging to companies controlled by McOsker, including certificates related to the Lepper Line Transactions, the Carry Trade Portfolio, and the Woods Cove Portfolio.

137.    The theft and transfers were made at the direction of Hanratty.

138.    The specific details of the Individual Members acts in stealing, Defendants/Counterclaimants/Third-Party Plaintiffs' and other investors money and assets are exclusively within the knowledge and control of the members of the Hanratty Enterprise and will be identified in discovery and proven at trial.

**The Hanratty Enterprise Committed Money Laundering in Violation of 18 U.S.C. §§ 2314–2315**

139.     The members of the Hanratty Enterprise committed, and aided and abetted, acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 in connection with a scheme in which the members used the Hanratty Enterprise to divert, comingle, or otherwise improperly transfer Defendants/Counterclaimants/Third-Party Plaintiffs' and other investors money and assets for various reasons, including to enrich the members of the Hanratty Enterprise.

140.     The members of the Hanratty Enterprise violations of the other predicate acts (Wire Fraud and the NSPA) are specified unlawful activity within the meaning of 18 U.S.C. §§ 1956 and 1957.

141.     Through 2017 and continuing through the present, the members of the Hanratty Enterprise, through the Hanratty Enterprise routinely stole, comingled, or otherwise illegally transferred money and other assets from Defendants/Counterclaimants/Third-Party Plaintiffs' and other investors into other funds owned and controlled by Hanratty.

142.     The members of the Hanratty Enterprise would then use these seemingly legitimate funds to secure loans to pay off other outstanding debts and obligations incurred as a result of fraud and other unlawful acts.

143.     Hanratty directing the aforementioned wiring and transfers of the money and other assets stolen, comingled, or otherwise illegally transferred from Defendants/Counterclaimants/Third-Party Plaintiffs' and other investors constituted violations of (i) 18 U.S.C. § 1956 in that the Hanratty Enterprise members knew that the aforementioned financial transactions were intended to promote further predicate offenses, avoid tax reporting requirements, or otherwise conceal laundering funds; and (ii) 18 U.S.C. § 1957 in that the Hanratty Enterprise

members knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity.

144.     Further evidence in support, including whether Hanratty and the Hanratty Enterprise is continuing one or more of the predicate acts set forth above, is peculiarly within the knowledge and control of Plaintiffs/Counterclaim Defendants/Third-Party Defendants.

**The Hanratty Enterprise Committed Fraud**

145.     Ebury Fund 1 and Fund 2 had separate lenders to whom the Ebury enterprise owed certain contractual, fiduciary, and moral duties, which they routinely breached and hid from Hanratty's investors. In 2018, and believed to be continuing until present, Hanratty falsified the borrowing base submitted to his bank Emigrant Bank stating "Jack Grady has no idea what he's doing, and won't notice." Hanratty did this so that certain assets that were no longer eligible for financing purposes would not expire, so that he could gain more time to put additional assets on the borrowing base to cover these shortfalls, including those stolen form McOsker and those purchased together using the Leper Line.

146.     On multiple occasions over the course of 2018 and 2019 Hanratty, Ping, and Mendez represented to their current and prospective lenders and investors, that Ebury Fund 1 and Fund 2 owned the Carry Trade, BFNH, and Lepper Line assets, free and clear of all incumbrances, and represented that they were worth 100% of redemptive value.  This is despite never paying McOsker for the $5.3million in Carry Trade assets, and despite the fact that a portion of the Provisional Credit Line had been used to procure the $14 million in Lepper Line assets that Ebury Fund and Fund 2 purported to own and seek financing on.

147.     In a  Ponzi-like scheme he moved money from one fund to another to cover loses, falsified the borrowing bases, wired money directly to Ira Levinthol and other individual investors

without following his own fund documents and defrauding McOsker and the other fund investors in the process.

148.    In a text message from Hanratty to McOsker in 2018, Hanratty assured McOsker not to worry about his actions, because his investors were aware that he was "leapfrogging" i.e. that he was using money from one fund or transaction to pay off another fund or transaction.

149.    Hanratty received sales proceeds from sales brokered by BloxTrade, as well as redemptions received from MTAG and other servicers, and allocated them to inappropriate funds on many occasions throughout 2017, 2018, 2019, and believed to be continuing until the present.

150.    Hanratty stablished a real estate fund and transferred tax lien assets there under purported low bases, knowing that they were worth significantly more, and then sold, or worked with hard money lenders and other questionable third-parties to secure formal and informal financing on these assets, some of which he deposited in Ebury Fund 1 and Fund 2 accounts to cover the shortfalls that he created through his theft, gross mismanagement, and fraud.

151.    Further evidence in support, including whether Hanratty and the Hanratty Enterprise is continuing one or more of the predicate acts set forth above, is peculiarly within the knowledge and control of Plaintiffs/Counterclaim Defendants/Third-Party Defendants.

**The Hanratty Enterprise Committed Extortion in Violation of 18 U.S.C. §§ 871 et. seq.**

152.    In the Second Quarter of 2019, Hanratty emailed McOsker in relation to tax credits that Defendants/Counterclaimants/Third-Party Plaintiffs were to receive from the Puerto Rican Government.

153.    Hanratty stated, "either you have a tax credit problem or an IP [ownership] problem," implying that unless McOsker paid him a ransom, Hanratty would continue his baseless allegations to the Puerto Rican Government that McOsker and his affiliated entities were

committing tax fraud against Puerto Rico. If McOsker paid Hanratty, Hanratty would drop his baseless allegations.

154.    Further evidence in support, including whether Hanratty and the Hanratty Enterprise is continuing one or more of the predicate acts set forth above, is peculiarly within the knowledge and control of Plaintiffs/Counterclaim Defendants/Third-Party Defendants.

## COUNT I – RICO UNDER 1962(d)
### Against Ebury St.

155.    Defendants/Counterclaimants/Third-Party Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

156.    At all relevant times, Ebury St. was a "person" within the meaning of 18 U.S.C. §§1961(3) and 1962(d).

157.    At all relevant times, each of the Defendants/Counterclaimants/Third-Party Plaintiffs was a "person" within the meeting of 18 U.S.C. §§ 1961(3) and 1962(d).

158.    At all relevant times, the Hanratty Enterprise (i) was and is an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that function as a continuing unit.

159.    Ebury St. and the Third-Party Defendants entered into a series of agreements between and among each other to knowingly and willfully engage in a conspiracy to violate 18 U.S.C. 1962(c). Ebury St. and the Third-Party Defendants entered into at least one agreement with at least Ebury St. and/or one of the Third-Party Defendants to join the conspiracy, took acts in furtherance of that conspiracy, and knowingly participated in that conspiracy.

160.    Ebury St. and the Third-Party Defendants agreed and conspired to violate 18 U.S.C. 1962(c) by participating, directly or indirectly, in the conduct of the affairs of the Hanratty Enterprise through a pattern of racketeering activity, including an agreement that the conspirators,

or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

161.    Ebury St. and the Third-Party Defendants agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. §1962(c), as demonstrated by, among other things the following facts:

    a.  John Hanratty acted as the head of the Hanratty Enterprise, directing his employees to inappropriately transfer investor assets, mismanage investor funds, falsifying notarized documents, defraud investors, and outright steal from his partner, McOsker.

    b.  Sarah Wells is Hanratty' personal assistant and functioned as the office manager for Ebury St.'s New York office. At Hanratty's instruction, Wells would notarize documents on Hanratty's behalf while Hanratty was neither present nor in the same state when said notarizations occurred. Further, at the direction of Hanratty, Wells assisting in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners in order to enrich the Individual Members (defined herein).

    c.  Dennisse Mendez is Ebury's Director of Operations, and at Hanratty's request and instruction, manages Ebury St.'s tax lien and real estate asset portfolios. As set forth herein, at the direction of Hanratty, Mendez assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

    d.  Shirley Vega is an accountant working for Ebury St. As set forth herein, Vega assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019. Further, at the direction of Hanratty, Vega assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

    e.  John Bronzo was an attorney working for Ebury St. who was eventually promoted to the position of Ebury St.'s General Counsel. At Hanratty's instruction, Bronzo would initiate foreclosure procedures on certain tax lien certificates and process the necessary paperwork to obtain title to these acquired properties. There were several instances where Hanratty would instruct Bronzo to obtain title over a property in the benefit of a different entity than the original investor entity, thereby defrauding some investors while inflating asset value to obtain bank loans and/or mortgages. Further, at the direction of Hanratty, Bronzo assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

f. Patrick Seymour was Ebury's General Counsel who replaced Bronzo in this role. Seymour assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019. Further, at the direction of Hanratty, Seymour assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

g. Ping Xie is Ebury's Chief Financial Officer and, at the direction of Hanratty, assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members, assisted in improperly moving assets into foreign entities located in the British Virgin islands in order to hide the assets from clients, partners, and the United States Internal Revenue Service in order to enrich the Individual Members and defraud the United States Government.

h. Ebury Street Capital, LLC is a fund controlled by Hanratty and acts as the General and Managerial Partner of Ebury Fund I, LP; Ebury Fund 2, LP; and Ebury RE, LLC. Hanratty uses the seemingly legitimate company to lure investors and take their money. For example, Hanratty made the decision to liquidate his Ebury St. fund and told his investors that they would receive their capital within 90 days. When they were not delivered their capital on time, some of them, including an investor named Michael Salerno, sued Hanratty and filed a complaint with the New York police.

i. EB LEVRE I, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

j. Ebury Fund I, LP, is a Delaware limited partnership that Hanratty uses to comingle and hide funds from investors and partners. For example, Ebury St. distributed $3,793,679 to Ebury Fund 1, LP ("Fund 1") investors between July 1, 2018 and February 19, 2019, despite Fund 1 current assets being listed at $1,918,787.49 as of December 31, 2018

k. Ebury Fund II, LP, is a Delaware limited partnership that Hanratty uses to comingle and hide funds from investors and partners. For example, McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners. Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. The assignment was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that Hanratty would grant to McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

l. EB 1EMIDC, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

m. Red Clover 1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners. For example, McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners. Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. Hanratty then assigned or transferred said assets to Red Clover 1, LLC to hide

said assets from McOsker and affiliated entities. The pledge was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that Hanratty would grant to McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

n.  White Clover 1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

o.  Black Clover I, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

p.  Ebury Fund IC1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

q.  Ebury Fund 2CI, LLC is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners. (Collectively, Ebury Street Capital, LLC, with EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund II, LP, EB 1EMIDC, LLC, Red Clover 1, LLC White Clover 1, LLC, Black Clover I, LLC, and Ebury Fund IC1, LLC, (the "Entity Members").

162.  As described above, the Individual Members were the principal co-conspirators and directly participated in multiple predicate acts to further the scheme.

163.  Further evidence of an agreement among Ebury St. and the Third-Party Defendants is peculiarly within the knowledge and control of Ebury St. and the Third-Party Defendants.

164.  Ebury St. and the Third-Party Defendants are each a member of the Hanratty Enterprise and as co-conspirators, Ebury St. and the Third-Party Defendants are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the Defendants/Counterclaimants/Third-Party Plaintiffs that were caused by any members of the conspiracy, regardless of whether Ebury St. and the Third-Party Defendants themselves were directly involved in a particular aspect of the Hanratty Enterprise.

165.  As a direct and proximate result of the violations set forth above, Defendants/Counterclaimants have been injured. Ebury St. and the Third-Party Defendants' violations of 1962(d) are the proximate cause of this injury. Under the provisions of 18 U.S.C. § 1964(c), the Defendants/Counterclaimants/Third-Party Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest and attorneys' fees.

## COUNT II – CONVERSION
### Against All Plaintiffs/Counterclaim Defendants

166.     Defendants/Counterclaimants/Third-Party Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

167.     At all relevant times, Defendants/Counterclaimants/Third-Party Plaintiffs had an immediate and superior right of possession to the Tax Liens held by Carry Trade, LLC and BFNH, LLC as well as ownership of said companies.

168.     McOsker pledged the aforementioned assets and ownership rights of said companies, at the suggestion of Hanratty, to companies jointly owned and controlled by McOsker and Hanratty for the limited and sole purpose of Hanratty obtaining the Formal Credit Line, and, alternatively, as a back up to secure the Provisional Credit Line.

169.     Defendants/Counterclaimants/Third-Party Plaintiffs held a property interest in the aforementioned assets and ownership rights with an immediate right to possession.

170.     Plaintiffs/Counterclaim Defendants/Third-Party Defendants then transferred the aforementioned assets and ownership rights without the consent or knowledge of McOsker.

171.     By the wrongful actions described herein, Plaintiffs/Counterclaim Defendants/Third-Party Defendants intentionally stole and converted the aforementioned assets and ownership rights to the exclusion and detriment of the Defendants/Counterclaimants/Third-Party Plaintiffs' rights.

172.     As a direct and proximate result of Plaintiffs/Counterclaim Defendants/Third-Party Defendants' actions, the Defendants/Counterclaimants/Third-Party Plaintiffs have been damaged and are entitled to compensatory damages in an amount to be determined at trial.

## COUNT III – BREACH OF CONTRACT
### Against Ebury St.

173.    Defendants/Counterclaimants/Third-Party Plaintiffs repeat and reallege each and every allegation if set forth herein.

174.    On or about September 2018 Messrs. Hanratty and McOsker entered into the Agreement related to the CRIM Proposal. The Agreement contained sufficiently definite terms and the parties manifested a mutual intention to be bound by the terms.

175.    Under the Agreement, and as more fully set forth herein, Hanratty and McOsker decided that for the CRIM Proposal to be successful, it was the obligation of Hanratty, first, to inject his own capital and that of his companies to cover 50% of the future obligations of the CRIM Proposal and, second, to procure the Formal Credit Line to make the necessary capital investments so that the CRIM Proposal would be successful.

176.    McOsker's obligations included, among the already $7 Million in capital investments he made: to cover 50% of the future obligations of the CRIM Proposal and, second, to supply the necessary intellectual property that would allow McOsker and Hanratty to process and administer the tax encumbrances in a more efficient manner and to locate the defaulting properties with greater precision.

177.    Hanratty and his companies did not comply with their obligations of injecting their own capital, because they had no capital of their own whatsoever. Further, they did not comply with their obligation to obtain the Formal Credit Line, since his promises with regard to the financing facilities never materialized. Nor did they comply with their obligation to successfully finance or build the syndicate to finance the $400 million nor the $800 million CRIM proposal.

178.    Defendants/Counterclaimants/Third-Party Plaintiffs relied on Hanratty's assurances that he would obtain financing and inject capital contributions to cover 50% of the future obligations of the CRIM Proposal to their detriment.

179.    Hanratty and his companies' breaches cost the joint venture, and McOsker personally, lost profits, because even if the CRIM Proposal had not been successfully obtained, McOsker and his companies allowed business opportunities to pass based on the expectation that Hanratty would obtain financing and make capital contributions.

180.    Had he had another more diligent partner, or had he done it on his own, McOsker would have been able to obtain the necessary financing to continue pursuing the CRIM Proposal. In the alternative, McOsker would have invested the capital that he invested into the CRIM Proposal in a different manner had he known that the line of financing was not going to materialize.

181.    Defendants/Counterclaimants/Third-Party Plaintiffs have performed all conditions, covenants, and promises required by them in accordance with the terms and conditions of the contract except insofar as performance thereof has been excused by the failure of Ebury St. to perform and their breaches thereof.

182.    The lost profit by McOsker as a result of Hanratty's breaches is in excess of, at a minimum, $150 million. The CRIM Proposal had an initial objective to purchase the portfolio of tax encumbrances of the CRIM, valued at $400 million in 2017 and $800 million in 2018, for purchase of $2.4 billion in assets, as well as a 15-year servicing contract for 10% of net collected revenue, expected to be $2 billion a year, or $20 million per year for 15 years.

WHEREFORE, Defendants/Counterclaimants/Third-Party Plaintiffs pray for entry of a judgment in favor of Defendants/Counterclaimants/Third-Party Plaintiffs against Ebury St., in an amount to be proven at trial, including an award of:

A.  actual, compensatory, and consequential damages;

B.  trebled actual damages;

C.  restitution and a constructive trust over Ebury St.'s assets;

D.  costs and expenses of this action, including reasonable attorneys' fees;

E.  Punitive damages;

F.  Pre- and post-judgment interest at the maximum legal rate; and

G.  Other and further relief as the Court deems just and proper.

## THIRD- PARTY COMPLAINT

### THE PARTIES

1.  Defendant/Counterclaimant/Third-Party Plaintiff Thomas McOsker is a resident of Puerto Rico.

2.  Defendant/Counterclaimant/Third-Party Plaintiff Badel Hernandez is a resident of Puerto Rico.

3.  Defendant/Counterclaimant/Third-Party Plaintiff Andrew Kernan is a resident of the State of New York.

4.  Defendant/Counterclaimant/Third-Party Plaintiff LienClear, LLC is a Puerto Rico limited liability company.

5.  Defendant/Counterclaimant/Third-Party Plaintiff LienClear 0001, LLC is a Delaware limited liability company.

6.  Defendant/Counterclaimant/Third-Party Plaintiff LienClear 0002, LLC is a Delaware limited liability company.

7.  Defendant/Counterclaimant/Third-Party Plaintiff BloxTrade, LLC is a Puerto Rico limited liability company.

8.  Defendant/Counterclaimant/Third-Party Plaintiff BCMG Services, LLC is a Puerto Rico limited liability company.

9.  Defendant/Counterclaimant/Third-Party Plaintiff BCMG International, LLC is a Puerto Rico limited liability company.

10. Defendant/Counterclaimant/Third-Party Plaintiff Sitona Ventures LLC is a Delaware limited liability company.

11. Third-Party Defendant John Hanratty  is a resident of Puerto Rico.

12. Third-Party Defendant Dennisse Méndez is a resident of Puerto Rico.

13. Third-Party Defendant Shirley Vega is a resident of Puerto Rico.

14. Third-Party Defendant Sarah Wells is a resident of New York.

15. Third-Party Defendant John Bronzo is a resident of New York.

16. Third-Party Defendant Ping Xie is a resident of New York.

17. Third-Party Defendant Patrick Seymour is a resident of Pennsylvania.

18. Third-Party Defendant Ebury Fund I, LP, is a limited partnership of Delaware whose principal place of business is at 41 Purdy Ave., #278, Rye, NY, 10580.

19. Third-Party Defendant Ebury Fund 2, LP is a limited partnership of Delaware whose principal place of business is at 41 Purdy Ave. #278, Rye, NY, 10580.

20. Third-Party Defendant EB 1EMIDC, LLC is a limited liability company of Delaware whose principal place of business is at 41 Purdy Ave. #278, Rye, NY, 10580.

21. Third-Party Defendant Red Clover 1, LLC, is a limited liability company of Delaware whose principal place of business is at 1357 Ashford Ave., Ste. 2, PMB 451, San Juan, PR 00927.

22. Third-Party Defendant White Clover 1, LLC, is a limited liability company of Delaware whose principal place of business is at 1357 Ashford Ave., Ste. 2, PMB 451, San Juan, PR 00927.

23. Third-Party Defendant Black Clover I, LLC, is a limited liability company of Delaware whose principal place of business is at 1357 Ashford Ave., Ste. 2, PMB 451, San Juan, PR 00927.

24. Third-Party Defendant Ebury Fund IC1, LLC is a limited liability company of Delaware whose principal place of business is at 41 Purdy Ave. #278, Rye, NY, 10580.

25.     Third-Party Defendant Ebury Fund 2CI, LLC is a limited liability company of Delaware whose principal place of business is at 41 Purdy Ave. #278, Rye, NY, 10580.

26.     Third-Party Defendant Ebury RE, LLC is a limited liability company of New Jersey whose principal place of business is 644 Fernandez Juncos Ave., San Juan, PR, 00907.

## JURISDICTION AND VENUE

27.     Pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction because Defendant/Counterclaimant/Third-Party Plaintiffs allege RICO violations in violation of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1964(c).

28.     Pursuant to 28 U.S.C. § 1367, the Court may exercise supplemental jurisdiction over Defendant/Counterclaimant/Third-Party Plaintiffs' state law claims.

29.     This Court has personal jurisdiction over Third-Party Defendants EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC each of which is a Delaware entity and may be served by serving its registered agent in Delaware.

30.     The Court has personal jurisdiction over Ebury Street Capital, LLC because it entered into agreements with Defendant/Counterclaimant/Third-Party Plaintiffs in which it consented to the jurisdiction of Delaware Courts.

31.     The Court has personal jurisdiction over the Individual Members because they are citizens of the United States, reside in Puerto Rico and New York, and upon information and belief, manage Delaware entities EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC,

Ebury Fund 2CI, LLC and thus have consented to personal jurisdiction in Delaware pursuant to 6 *Del. C.* § 18-109(a); 6 *Del. C.* § 15-114.

32.     The Court has personal jurisdiction over all of the Plaintiffs/Counterclaim Defendants/Third-Party Plaintiffs pursuant to 18 U.S.C.§ 1965 because this action may be brought in this jurisdiction against parties EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC.

33.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Plaintiffs EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC are Delaware entities and Ebury Street Capital, LLC executed agreements with Defendant/Counterclaimant/Third-Party Plaintiffs in which the parties consented to Delaware as the venue for any and all disputes that arise out of the agreements.

## FACTUAL BACKGROUND

34.     Defendants/Counterclaimants/Third-Party Plaintiffs incorporate and reallege Paragraphs 21 through 182 of the Counterclaims as though fully set forth herein.

### COUNT I – RICO UNDER 1962(c)
### Against John Hanratty

35.     Defendants/Counterclaimants/Third-Party Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

36.     At all relevant times, Defendants/Counterclaimants/Third-Party Plaintiffs were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

37.     At all relevant times, all Third-Party Defendants and Ebury St. were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

38.     At all relevant times, the Hanratty Enterprise (i) has been an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) has had associated members with a common purpose that function as a continuing unit, including all Plaintiffs.

39.     At all relevant times, the Hanratty Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

40.     At all relevant times, all Third-Party Defendants and Ebury St. were employed by, or associated with, the Hanratty Enterprise and conducted and participated in the conduct of the Hanratty Enterprise through a pattern of racketeering activity described in this Complaint.

41.     The Third-Party Defendants' and Ebury St.'s violations of 18 U.S.C. § 1962(c) have directly and proximately caused Defendants/Counterclaimants/Third-Party Plaintiffs' injuries. Pursuant to 18 U.S.C. § 1964(c), the Defendants/Counterclaimants/Third-Party Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest, and attorneys' fees.

## COUNT II – RICO UNDER 1962(d)
### Against all Third-Party Defendants

42.     Defendants/Counterclaimants/Third-Party Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

43.     At all relevant times, Defendants/Counterclaimants/Third-Party Plaintiffs were "persons" within the meaning of 18 U.S.C. §§1961(3) and 1962(d).

44.     At all relevant times, each of the Third-Party Defendants and Ebury St. were "persons" within the meeting of 18 U.S.C. §§ 1961(3) and 1962(d).

45.     At all relevant times, the Hanratty Enterprise (i) was and is an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that function as a continuing unit.

46.     The Third-Party Defendants and Ebury St. entered into a series of agreements between and among each other to knowingly and willfully engage in a conspiracy to violate 18 U.S.C. 1962(c). Each Third-Party Defendant and Ebury St. entered into at least one agreement with at least one other Third-Party Defendant and Ebury St. to join the conspiracy, took acts in furtherance of that conspiracy, and knowingly participated in that conspiracy.

47.     The Third-Party Defendants and Ebury St. agreed and conspired to violate 18 U.S.C. 1962(c) by participating, directly or indirectly, in the conduct of the affairs of the Hanratty Enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

48.     Each Third-Party Defendant and Ebury St. agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. §1962(c), as demonstrated by, among other things the following facts:

    a. John Hanratty, as more fully alleged herein, acted as the head of the Hanratty Enterprise, directing his employees to inappropriately transfer investor assets, mismanage investor funds, falsifying notarized documents, defraud investors, and outright steal from his partner, McOsker.

    b. Sarah Wells is Hanratty' personal assistant and functioned as the office manager for Ebury St.'s New York office. At Hanratty's instruction, Wells would notarize documents on Hanratty's behalf while Hanratty was neither present nor in the same state when said notarizations occurred. Further, at the direction of Hanratty, Wells assisting in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners in order to enrich the Individual Members (defined herein).

c.  Dennisse Mendez is Ebury's Director of Operations, and at Hanratty's request and instruction, manages Ebury St.'s tax lien and real estate asset portfolios. As set forth herein, at the direction of Hanratty, Mendez assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

d.  Shirley Vega is an accountant working for Ebury St. As set forth herein, Vega assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019.  Further, at the direction of Hanratty, Vega assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

e.  John Bronzo was an attorney working for Ebury St. who was eventually promoted to the position of Ebury St.'s General Counsel.  At Hanratty's instruction, Bronzo would initiate foreclosure procedures on certain tax lien certificates and process the necessary paperwork to obtain title to these acquired properties. There were several instances where Hanratty would instruct Bronzo to obtain title over a property in the benefit of a different entity than the original investor entity, thereby defrauding some investors while inflating asset value to obtain bank loans and/or mortgages.  Further, at the direction of Hanratty, Bronzo assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

f.  Patrick  Seymour was Ebury's General Counsel who replaced Bronzo in this role.  Seymour assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019.  Further, at the direction of Hanratty,  Seymour assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members

g.  Ping Xie is Ebury's Chief Financial Officer and, at the direction of Hanratty, assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members, assisted in improperly moving assets into foreign entities located in the British Virgin islands in order to hide the assets from clients, partners, and the United States Internal Revenue Service in order to enrich the Individual Members and defraud the United States Government.

h.  Hanratty, Wells, Mendez, Vega, Bronzo, Xie and  Seymour comprise the ("Individual Members").

i.  Ebury Street Capital, LLC is a fund controlled by Hanratty and acts as the General and Managerial Partner of Ebury Fund I, LP; Ebury Fund 2, LP; and Ebury RE, LLC.  Hanratty uses the seemingly legitimate company to lure investors and take their money.  For example, Hanratty made the decision to liquidate his Ebury St. fund and told his investors that they would receive their capital within 90 days. When they were not delivered their capital on time, some of them, including an investor named Michael Salerno, sued Hanratty and filed a complaint with the New York police.

    j.   EB LEVRE I, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

    k.   EB 1EMIDC, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

    l.   Ebury Fund I, LP, is a Delaware limited partnership that Hanratty uses to comingle and hide funds from investors and partners. For example, Ebury St. distributed $3,793,679 to Ebury Fund 1, LP ("Fund 1") investors between July 1, 2018 and February 19, 2019, despite Fund 1 current assets being listed at $1,918,787.49 as of December 31, 2018

    m.   Ebury Fund II, LP, is a Delaware limited partnership that Hanratty uses to comingle and hide funds from investors and partners. For example, McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners. Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. The assignment was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that Hanratty would grant to McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

    n.   Red Clover 1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners. For example, McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners. Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. Hanratty then assigned or transferred said assets to Red Clover 1, LLC to hide said assets from McOsker and affiliated entities. The pledge was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that Hanratty would grant to McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

    o.   White Clover 1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

    p.   Black Clover I, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

    q.   Ebury Fund IC1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

    r.   Ebury RE, LLC is a New Jersey limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

    s.   Ebury Fund 2CI, LLC is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

49.    As described above, Individual Members and the Entity Members were the principal co-conspirators and directly participated in multiple predicate acts to further the scheme.

50.     Further evidence of an agreement among Third-Party Defendants and Ebury St. is peculiarly within the knowledge and control of Third-Party Defendants and Ebury St.

51.     Each Third-Party Defendant and Ebury St. is a member of the Hanratty Enterprise and as co-conspirators, the Third-Party Defendant and Ebury St. are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the Defendants/Counterclaimants/Third-Party Plaintiffs that were caused by any members of the conspiracy, regardless of whether the Third-Party Defendants and Ebury St. themselves were directly involved in a particular aspect of the Hanratty Enterprise.

52.     As a direct and proximate result of the violations set forth above, Defendants/Counterclaimants/Third-Party Plaintiffs have been injured.  the Third-Party Defendants and Ebury St.'s violations of 1962(d) are the proximate cause of this injury. Under the provisions of 18 U.S.C. § 1964(c), the Defendants/Counterclaimants/Third-Party Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest and attorneys' fees.

### COUNT III– FRAUD/FRAUDULENT INDUCEMENT
### Against John Hanratty

53.     Defendants/Counterclaimants/Third-Party Plaintiffs repeat and reallege each and every allegation if set forth herein.

54.     Hanratty made numerous materially false statements and representations as described herein including, but not limited to, the following:

    a.  Falsely representing to McOsker that Hanratty and Ebury St. were in a liquid financial position and able to fulfill their obligations under the CRIM Proposal; and

    b.  Falsely representing to McOsker that Hanratty and Ebury St. that were very close to obtaining the necessary financing.

55.     Hanratty knew the statements were false when made.

56.     Hanratty made the statements identified in paragraphs 70 to induce McOsker to enter into the CRIM Proposal and remain partners with Hanratty related to the CRIM Proposal.

57.     McOsker acted in justifiable reliance on Hanratty's false statements and remained partners with Hanratty related to the CRIM Proposal to his detriment.

58.     As outlined above, Defendants/Counterclaimants/Third-Party Plaintiffs have been damaged by Hanratty's false statements.  Had Hanratty not impermissibly induced McOsker to remain partners related to the CRIM Proposal, McOsker and his companies could have successfully maintained the CRIM Proposal through other means, or McOsker and his companies would have engagement in other business opportunities that they let pass by because of Hanratty's assurances that financing would be obtained and Hanratty's and McOsker's efforts under the CRIM Proposal could continue.

## COUNT IV – TORTIOUS INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE/BUSINESS RELATIONS
### Against John Hanratty

59.     Defendants/Counterclaimants/Third-Party Plaintiffs repeat and reallege each and every allegation if set forth herein.

60.     Defendants/Counterclaimants/Third-Party Plaintiffs had a reasonable probability of a business opportunity.  Specifically, BCMG Technologies and BCMG Services had a contract with the Puerto Rican Industrial Development Company ("PRIDCO") to be granted a tax credit in excess of $4 million to which they were creditors pursuant to Law 73-2008.

61.     Defendants complied with all their obligations under the contract with PRIDCO to receive the tax credits.

62.     Hanratty intentionally interfered with McOsker and his companies' tax credit by, among other things as set forth herein, falsely reporting to the PRIDCO authorities, Department

of Economic Development and Commerce ("DDEC")authorities, and Hacienda that McOsker and his companies were defrauding the Puerto Rican government through the Law 73-20088 tax credits.

63.     Hanratty's false reports were without justification as its only motive and purpose was to disrupt McOsker and his companies' business activities and cost them money through various costs and expense and the potential loss of the Law 73-20088 tax credits.

64.     Hanratty's false reports has caused McOsker and his companies to go through detailed laborious audits.  The audits have cost Defendants considerable time, money, and resources to comply with and have disrupted business activities. **To date the audits have disproven all Hanratty's false accusations.** Defendants are confident that will remain through the audits' completion.

65.     As a result of Hanratty's false accusations, Defendants have been damaged through the loss of time, resources, money, and legal expenses to comply with the audits, a disruption to business activity, harm to business reputation, and the unrealized $4 million plus tax credit.

### COUNT V – TORTIOUS INTERFERENCE  WITH CONTRACTUAL RELATIONS
### Against John Hanratty

66.     Defendants repeat and reallege each and every allegation if set forth herein.

67.     BCMG Technologies and BCMG Services had a contract with the Puerto Rican Industrial Development Company ("PRIDCO") to be granted a tax credit in excess of $4 million to which they were creditors pursuant to Law 73-20088.

68.     Hanratty was aware that BCMG Technologies and BCMG Services had a contract with PRIDCO for Law 73-20088 tax credits.

69.     Hanratty intentionally interfered with McOsker and his companies' tax credit by falsely reporting to the PRIDCO authorities, DDEC authorities, and Hacienda that McOsker and his companies were defrauding the Puerto Rican government through the Law 73-20088 tax credits.

70.     Hanratty's false report was without justification as its only motive and purpose was to disrupt McOsker and his companies' business activities and cost them money through various costs and expense and the potential loss of the Law 73-20088 tax credits.

71.     Hanratty's false report has caused McOsker and his companies to go through detailed laborious audits.  The audits have cost Defendants considerable time, money, and resources to comply with and have disrupted business activities. **To date the audits have disproven all Hanratty's false accusations.**  Defendants are confident that will remain through the audits' completion.

72.     As a result of Hanratty's false accusations, Defendants have been damaged through the loss of time, resources, money, and legal expenses to comply with the audits, a disruption to business activity, harm to business reputation, and the unrealized $4 million plus tax credit.

### COUNT VI – CONVERSION
### Against All Third-Party Defendants

73.     Defendants incorporate and reallege the previous paragraphs as though fully set forth herein.

74.     At all relevant times, Defendants had an immediate and superior right of possession to the Tax Liens held by Carry Trade, LLC and BFNH, LLC as well as ownership of said companies.

75.     McOsker pledged the aforementioned assets and ownership rights of said companies, at the suggestion of Hanratty, to companies jointly owned and controlled by McOsker

and Hanratty for the limited and sole purpose of Hanratty obtaining the Formal Credit Line, and, alternatively, as a back up to secure the Provisional Credit Line.

76.     Defendants held a property interest in the aforementioned assets and ownership rights with an immediate right to possession.

77.     Hanratty then transferred the aforementioned assets and ownership rights without the consent or knowledge of McOsker.

78.     By the wrongful actions described herein, Plaintiffs intentionally stole and converted the aforementioned assets and ownership rights to the exclusion and detriment of the Defendants' rights.

79.     As a direct and proximate result of Plaintiffs' actions, the Defendants have been damaged and are entitled to compensatory damages in an amount to be determined at trial.

## COUNT VII – CIVIL CONSPIRACY
### Against All Third-Party Defendants

80.     Defendants incorporate and reallege the previous paragraphs as though fully set forth herein.

81.     Plaintiffs are a combination of two or more persons.

82.     As set forth herein, each Plaintiff engaged in at least one unlawful act in furtherance of a conspiracy against Plaintiffs.

83.     Plaintiffs' conspiracy is the direct and proximate cause of the damage to Defendants in an amount to be determined at trial.

84.     Each Plaintiff is jointly and severally liable for the acts of its co-conspirators committed in furtherance of the conspiracy.

## COUNT VIII - UNJUST ENRICHMENT
### Against All Third-Party Defendants

85.     Defendants incorporate and reallege the previous paragraphs as though fully set forth herein.

86.     Defendants plead the eighth claim in the alternative to its claim for breach of contract and conversion as to those Plaintiffs.

87.     By their wrongful conduct as described herein, Plaintiffs have been unjustly enriched at Defendants' expense.

88.     It is against equity and good conscience to permit Plaintiffs to retain the benefits of their wrongful conduct.

89.     Plaintiffs' wrongful conduct was the direct and proximate cause of damage to the Defendants in an amount to be determined at trial.


## COUNT IX – DEFAMATION (Slander/Slander per se)
### Against John Hanratty

90.     Defendants incorporate and reallege the previous paragraphs as though fully set forth herein.

91.     From 2019 through present Hanratty disseminated false accusations and claims that McOsker had committed criminal acts, as well as statements directly maligning to McOsker in his trade, business, and profession. Hanratty made these oral statements to various Puerto Rican government officials and individuals in the tax lien industry

92.     Hanratty made false and defamatory statements of fact concerning McOsker, including but not limited to:

a.   Falsely reporting to the Puerto Rican government that McOsker was defrauding the Puerto Rican Government related to tax credits;

14

b.  Falsely reporting to the Puerto Rican Office of Industrial Tax Exemption that BCMG International was engaged in fraudulent acts;

c.  Falsely reporting to the Puerto Rican Department of Economic Development that McOsker was defrauding the Puerto Rican Government related to tax credits;

d.  Falsely reporting to the Puerto Rican Industrial Development Company that McOsker was defrauding the Puerto Rican Government related to tax credits;

e.  Falsely reporting to the Puerto Rican Treasury Department (Hacienda) that McOsker was defrauding the Puerto Rican Government related to tax credits;

f.  Falsely reporting to certain banking institutions in Puerto Rico that McOsker was defrauding the Puerto Rican Government related to tax credits;

g.  In 2019 accusing McOsker of stealing from his friend and colleague Robert Sanchez in a building partnership;

h.  In 2019, approaching former members of the MapPlus team in order to falsely accuse McOsker of some of the allegations in this complaint; and

i.  Falsely informing multiple fund managers in the tax lien industry over the course of 2019-2021, and possibly ongoing, that McOsker stole his funds related to the four trades at issue.

93.    Hanratty made the false and defamatory statements to third parties in an unprivileged publication.

94.    Hanratty's defamatory statements are slander per se because the statements were made to malign McOsker in his trade, business, or profession.

95.    As a direct and proximate result of Hanratty's defamatory statements McOsker has suffered harm, including but not limited to, economic damages and harm to McOsker's reputation and goodwill in an amount to be determined at trial.

## COUNT X – DEFAMATION (Libel)
### Against John Hanratty

96.    Defendants incorporate and reallege the previous paragraphs as though fully set forth herein.

97.    From 2019 to the present, Hanratty disseminated false accusations and claims that McOsker had committed criminal acts, as well as statements directly maligning to McOsker in his

trade, business and profession. Hanratty made these written statements to the Puerto Rican government and individuals in the tax lien industry.

98.    Hanratty made false and defamatory statements of fact concerning McOsker, including but not limited to:

> a. Falsely reporting to the Puerto Rican government that McOsker was defrauding the Puerto Rican Government related to tax credits;
> b. Falsely reporting to the Puerto Rican Office of Industrial Tax Exemption that BCMG International was engaged in fraudulent acts;
> c. Falsely reporting to the Puerto Rican Department of Economic Development that McOsker was defrauding the Puerto Rican Government related to tax credits;
> d. Falsely reporting to the Puerto Rican Industrial Development Company that McOsker was defrauding the Puerto Rican Government related to tax credits;
> e. Falsely reporting to the Puerto Rican Treasury Department (Hacienda) that McOsker was defrauding the Puerto Rican Government related to tax credits;
> f. Falsely reporting to certain banking institutions in Puerto Rico that McOsker was defrauding the Puerto Rican Government related to tax credits;
> g. In 2019 directing Dudley at Lavaleer Capital via text message as to how to attempt to bully BCMG employees via email to create a false paper trail he would later attempt to use to have OITE cancel the decree of BCMG International;
> h. In 2019 accusing McOsker of stealing from his friend and colleague Robert Sanchez in a building partnership;
> i. In 2019, approaching former members of the MapPlus team in order to falsely accuse McOsker of some of the allegations in this complaint; and
> j. Falsely informing multiple fund managers in the tax lien industry over the course of 2019-2021, and possibly ongoing, that McOsker stole his funds related to the four trades at issue.

99.    Hanratty made the false and defamatory statements to third parties in an unprivileged publication.

100.    Hanratty's defamatory statements are slander per se because the statements were made to malign McOsker in his trade, business, or profession.

101.    As a direct and proximate result of Hanratty's defamatory statements McOsker has suffered harm, including but not limited to, economic damages and harm to McOsker's reputation and goodwill in an amount to be determined at trial.

WHEREFORE, Defendants/Counterclaimants/Third-Party Plaintiffs pray for entry of a judgment in favor of Defendants/Counterclaimants/Third-Party Plaintiffs against Plaintiffs/Counterclaimants/Third-Party Defendants, jointly and severally, in an amount to be proven at trial, including an award of:

A.  actual, compensatory, and consequential damages;

B.  trebled actual damages;

C.  restitution and a constructive trust over Plaintiffs/Counterclaimants/Third-Party Defendants' assets;

D.  costs and expenses of this action, including reasonable attorneys' fees;

E.  Punitive damages;

F.  Pre- and post-judgment interest at the maximum legal rate; and

G.  Other and further relief as the Court deems just and proper.


**COOCH AND TAYLOR, P.A.**

/s/ *Dean R. Roland*
Blake A. Bennett (#5133)
Dean R. Roland (#6459)
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE 19801
(302) 984-3800

*Attorneys for Defendants/
Counterclaimants/Third-Party
Plaintiffs*

INDEX NO. 158207/2022

UCS-840
(rev. 02/01/2022)

# REQUEST FOR JUDICIAL INTERVENTION

**SUPREME** COURT, COUNTY OF **NEW YORK**

Index No. ___158207/2022___ Date Index Issued: ___09/26/2022___

| | For Court Use Only: |
|---|---|
| | IAS Entry Date |
| | Judge Assigned |
| | RJI Filed Date |

**CAPTION**   Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

Emigrant Business Credit Corporation

Plaintiff(s)/Petitioner(s)

-against-

John Arthur Hanratty; Ebury Street Capital, LLC; Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC; EB 1EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1, LLC; Ebury RE LLC; and XYZ Corps. 1-10

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING**   Check only one box and specify where indicated.

**COMMERCIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ○ Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ◉ Other Commercial (*specify*): Breach of Contract, Fraudulent Inducement, Fraudulent Transfer
  - *NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**TORTS**
- ○ Asbestos
- ○ Child Victims Act
- ○ Environmental (*specify*): _____
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (*specify*): _____
- ○ Other Negligence (*specify*): _____
- ○ Other Professional Malpractice (specify): _____
- ○ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ○ Child-Parent Security Act (*specify*): ○ Assisted Reproduction ○ Surrogacy Agreement
- ○ CPLR Article 75 – Arbitration   [see *NOTE* in **COMMERCIAL** section]
- ○ CPLR Article 78 – Proceeding against a Body or Officer
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 – Kendra's Law
- ○ MHL Article 10 – Sex Offender Confinement (*specify*): ○ Initial ○ Review
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (*specify*): _____
- ○ Other Special Proceeding (*specify*): _____

**MATRIMONIAL**
- ○ Contested
  - *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI ADDENDUM (UCS-840M).*
  - *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

**REAL PROPERTY**   Specify how many properties the application includes: _____
- ○ Condemnation
- ○ Mortgage Foreclosure (*specify*): ○ Residential ○ Commercial
  - Property Address: _____
  - *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*
- ○ Partition
  - *NOTE: Complete and attach the PARTITION RJI ADDENDUM (UCS-840P).*
- ○ Tax Certiorari (*specify*): Section:_____ Block:_____ Lot:_____
- ○ Tax Foreclosure
- ○ Other Real Property (*specify*): _____

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution   [see *NOTE* in **COMMERCIAL** section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change/Sex Designation Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (*specify*): _____

**STATUS OF ACTION OR PROCEEDING**   Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ◉ | ○ | If yes, date filed: ___09/25/2022___ |
| Has a summons and complaint or summons with notice been served? | ◉ | ○ | If yes, date served: ___10/17/2022___ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**   Check one box only and enter additional information where indicated.

- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice   Date Issue Joined: _____
- ○ Notice of Motion   Relief Requested: _____ Return Date: _____
- ○ Notice of Petition   Relief Requested: _____ Return Date: _____
- ◉ Order to Show Cause   Relief Requested: ___Preliminary Injunction___ Return Date: _____
- ○ Other Ex Parte Application   Relief Requested: _____
- ○ Partition Settlement Conference
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other (specify): _____

1 of 2

**RELATED CASES** No. List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases. If none, leave blank.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES** For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Un-Rep | Parties<br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br>For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined<br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br>For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: Emigrant Business Credit Corporation<br>Role(s): Plaintiff | Alexander J. Willscher; Sullivan & Cromwell LLP; 125 Broad Street, New York, NY 10004; (212) 558-4000; willschera@sullcrom.com | ◉ YES ○ NO | |
| ☐ | Name: John Arthur Hanratty<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: Ebury Street Capital, LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: Ebury Fund 1, LP<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: Ebury Fund 2, LP<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: Ebury 1EMI LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: Ebury 2EMI LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: EB 1EMIALA LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: EB 2EMIALA LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: EB 1EMIFL, LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: EB 2EMIFL, LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: EB 1EMIIN, LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: EB 2EMIIN, LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: EB 1EMIMD, LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |
| ☐ | Name: EB 2EMIMD, LLC<br>Role(s): Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ○ YES ◉ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: _____**10/17/2022**_____

/s/ Alexander J. Willscher
_____
Signature

____**4860755**____   **Alexander J. Willscher**
Attorney Registration Number   Print Name

**Request for Judicial Intervention Addendum**

| Supreme Court | | |
|---|---|---|
| **COURT, COUNTY OF** New York | | **Index No:** 158207/2022 |

**For use when additional space is needed to provide party or related case information.**

**PARTIES:** For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties:<br><br>List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants:<br><br>Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | **Name:** EB 1EMINJ, LLC<br>**Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES<br>☒ NO | |
| ☐ | **Name:** EB 2EMINJ, LLC<br>**Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES<br>☒ NO | |
| ☐ | **Name:** EB 1EMINY, LLC<br>**Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES<br>☒ NO | |
| ☐ | **Name:** EB 2EMINY, LLC<br>**Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES<br>☒ NO | |
| ☐ | **Name:** EB 1EMISC, LLC<br>**Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES<br>☒ NO | |
| ☐ | **Name:** EB 2EMISC, LLC<br>**Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES<br>☒ NO | |
| ☐ | **Name:** RE 1EMI LLC<br>**Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES<br>☒ NO | |
| ☐ | **Name:** RE 2EMI LLC<br>**Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES<br>☒ NO | |

## RELATED CASES:
List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

24-0404 sds, Doc 1-1, Filed 08/14/24, Entered 08/14/24 09:45:23, Doc #2 State
Court Records Pg 529 of 688

## Request for Judicial Intervention Addendum

| Supreme Court | **COURT, COUNTY OF** New York | **Index No:** 158207/2022 |

**For use when additional space is needed to provide party or related case information.**

**PARTIES:**   For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | **Name:** EB 1EMIDC, LLC  **Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES  ☒ NO | |
| ☐ | **Name:** Arque Tax Receivable Fund (Maryland), LLC  **Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES  ☒ NO | |
| ☐ | **Name:** Ebury Fund 1FL, LLC  **Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES  ☒ NO | |
| ☐ | **Name:** Ebury Fund 2FL, LLC  **Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES  ☒ NO | |
| ☐ | **Name:** Ebury Fund 1NJ, LLC  **Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES  ☒ NO | |
| ☐ | **Name:** Ebury Fund 2NJ, LLC  **Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES  ☒ NO | |
| ☐ | **Name:** Red Clover 1, LLC  **Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES  ☒ NO | |
| ☐ | **Name:** Ebury RE LLC  **Role(s):** Defendant | Kari Parks; Gusrae Kaplan Nusbaum PLLC; 120 Wall Street, New York, NY 10005; (212) 269-1400; kparks@gusraekaplan.com | ☐ YES  ☒ NO | |

**RELATED CASES:**   List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

2 of 2

24-04020-dsj Doc 1-1 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #2 State
Court Records Pg 530 of 688

UCS-840C
3/2011

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF **New York**
_____ x

Emigrant Business Credit Corporation

Plaintiff(s)/Petitioner(s)

-against-

John Hanratty, et al.

Defendant(s)/Respondent(s)
_____ x

Index No. **158207/2022**

RJI No. (if any) **N/A**

**COMMERCIAL DIVISION**
**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☒ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ Damages in excess of $21,951,600.67 _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

N/A

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

N/A

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: **10/17/2022** _____

/s/ Alexander J. Willscher
_____
**SIGNATURE**

Alexander J. Willscher
_____
**PRINT OR TYPE NAME**

1 of 1

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 531 of 688

UCS-840C
3/2011

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF **New York**
_____ x

Emigrant Business Credit Corporation

Plaintiff(s)/Petitioner(s)

-against-
John Hanratty, et al.

Defendant(s)/Respondent(s)
_____ x

Index No. **158207/2022**_____

RJI No. (if any) **N/A**_____

## COMMERCIAL DIVISION
### Request for Judicial Intervention Addendum

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

[X] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

[ ] Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

[ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

[ ] Shareholder derivative actions — without consideration of the monetary threshold

[ ] Commercial class actions — without consideration of the monetary threshold

[X] Business transactions involving or arising out of dealings with commercial banks and other financial institutions

[ ] Internal affairs of business organizations

[ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

[ ] Environmental insurance coverage

[ ] Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

[ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

[ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ Damages in excess of $21,951,600.67_____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

N/A

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

N/A

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: **10/17/2022**_____

*/s/ Alexander J. Willscher*
_____
**SIGNATURE**

Alexander J. Willscher
_____
**PRINT OR TYPE NAME**

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 532 of 688

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------- x
                                                   :
EMIGRANT BUSINESS CREDIT                            :
CORPORATION,                                        :
                                                   :     Index No. 158207/2022
                    Plaintiff,                     :
                                                   :
            v.                                      :
                                                   :
JOHN ARTHUR HANRATTY,                               :     **NOTICE OF APPEARANCE**
EBURY STREET CAPITAL, LLC,                          :
EBURY FUND 1, LP,                                   :
EBURY FUND 2, LP,                                   :
EBURY 1EMI LLC,                                     :
EBURY 2EMI LLC,                                     :
EB 1EMIALA LLC,                                     :
EB 2EMIALA LLC,                                     :
EB 1EMIFL, LLC,                                     :
EB 2EMIFL, LLC,                                     :
EB 1EMIIN, LLC,                                     :
EB 2EMIIN, LLC,                                     :
EB 1EMIMD, LLC,                                     :
EB 2EMIMD, LLC,                                     :
EB 1EMINJ, LLC,                                     :
EB 2EMINJ, LLC,                                     :
EB 1EMINY, LLC,                                     :
EB 2EMINY, LLC,                                     :
EB 1EMISC, LLC,                                     :
EB 2EMISC, LLC,                                     :
RE 1EMI LLC,                                        :
RE 2EMI LLC,                                        :
EB 1EMIDC, LLC,                                     :
ARQUE TAX RECEIVABLE FUND                           :
(MARYLAND), LLC,                                    :
EBURY FUND 1FL, LLC,                                :
EBURY FUND 2FL, LLC,                                :
EBURY FUND 1NJ, LLC,                                :
EBURY FUND 2NJ, LLC,                                :
RED CLOVER 1, LLC,                                  :
EBURY RE LLC, and                                   :
XYZ CORPS. 1-10,                                    :
                                                   :
                    Defendants.                    :
                                                   :
-------------------------------------------------- x

PLEASE TAKE NOTICE that the undersigned is appearing on behalf of Plaintiff Emigrant

Business Credit Corporation in the above-captioned action and requests that all papers in

connection with this action be served upon him at the address listed below.

Dated:  October 17, 2022           Respectfully submitted,
        New York, New York

                                   */s/ Austin P. Mayron*

                                   Austin P. Mayron
                                   SULLIVAN & CROMWELL LLP
                                   125 Broad Street
                                   New York, New York  10004
                                   Telephone: (212) 558-4000
                                   Fax: (212) 558-3588

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 534 of 688

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

                        Plaintiff,

        v.                                          Index No. 158207/2022

JOHN ARTHUR HANRATTY,                               NOTICE OF APPEARANCE
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1 EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 1EMINJ, LLC,
EB 1EMINY, LLC,
EB 2MINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1–10,

                        Defendants.

---

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 535 of 688

**PLEASE TAKE NOTICE** that the undersigned enters my appearance as counsel in the above-captioned action for "Named Defendants" John Arthur Hanratty, Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB1 EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, Arque Tax Receiable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and Ebury RE LLC. I am admitted to practice in this Court.

Dated: October 18, 2022
      New York, New York

                        Respectfully submitted,

                        /s/Kari Parks
                        **Kari Parks**
                        **Gusrae Kaplan Nusbaum PLLC**
                        **120 Wall Street, 25th Floor**
                        **New York, New York 10005**
                        **Tel: (212) 269-1400**
                        **Fax: (212) 809-4147**
                        **kparks@gusraekaplan.com**

                        Counsel for Named Defendants

# GUSRAE KAPLAN NUSBAUM PLLC

### ATTORNEYS AT LAW

120 WALL STREET-25ᵀᴴ FLOOR

NEW YORK, NEW YORK 10005

——

TEL (212) 269-1400

FAX (212) 809-4147

——

www.gusraekaplan.com

OF COUNSEL

ROBERT L. BLESSEY

SCOTT H. GOLDSTEIN

MARTIN H. KAPLAN

LAWRENCE G. NUSBAUM

October 18, 2022

**VIA NYSCEF**

Justice to be Assigned

Supreme Court, New York County

Commercial Division

60 Centre Street

New York, New York 10007

RE: <u>Emigrant Business Credit Corporation v. John Arthur Hanratty et al.</u>, No. 158207/2022

Dear Justice to be Assigned:

I represent the "**Named Defendants**" in the above-captioned "**Action**" and write to request that the Court deny, without further briefing, Plaintiff Emigrant Business Credit Corporation's ("**EBCC**") request for a temporary restraining order ("**TRO**") and preliminary injunction ("**PI**") via Order to Show Cause ("**Injunctive Relief Request**"); or, at least, to deny EBCC the opportunity to file a reply brief in further support of its Injunctive Relief Request. <u>See</u> Dkt. 2, Proposed Order to Show Cause (Oct. 17, 2022).

EBCC filed its summons and complaint on September 25, 2022, alleging that the Named Defendants breached Credit Agreements in November 2021; fraudulently induced EBCC to execute various contracts between October 2018 and August 2021; and, "on information and belief," "since 2017," Named Defendants "have transferred" property that allegedly belongs to EBCC, in violation of New York's fraudulent transfer statutes. <u>See</u> Dkt. 1 ¶¶ 99, 102–24 (Sep. 25, 2022).

On Sunday, October 16, 2022—three weeks after initiating this Action, eleven months after Named Defendants allegedly breached the Credit Agreements, one to four years after Named Defendants allegedly fraudulently-induced EBCC into executed contracts, and **five years** since, "on information and belief," Named Defendants allegedly began transferring EBCC's supposed property—EBCC emailed Defendant John Hanratty and a lawyer who had been representing him in ongoing negotiations with EBCC, instructing them of EBCC's "inten[tion] to move by order to show cause for a temporary

GUSRAE KAPLAN NUSBAUM PLLC

Justice to be Assigned
Supreme Court, New York County
Commercial Division
October 18, 2022
Page 2

restraining order and other injunctive relief tomorrow," and asking them to "accept service by e-mail of the Summons & Complaint, as well as the Order to Show Cause and supporting documents." Dkt. 3, Declaration of Alexander J. Willscher at 5 (Oct. 17, 2022). That email did not include the Summons and Complaint, nor did it include the "Order to Show Cause and supporting papers." See id. On Monday, October 17, 2022, undersigned counsel agreed to accept service, and EBCC's counsel delivered them via email.

As a threshold matter, the Court should deny EBCC's Injunctive Relief Request without requiring Named Defendants to expend the effort and expenses necessary to prepare full opposition papers. Imminent, irreparable harm is "the single most important prerequisite" of a TRO or preliminary injunction. Citibank, N.A. v. Citytrust, 756 F.2d 273, 2753 (2d Cir. 1985) (quoting Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp., 719 F.2d 42, 45 (2d Cir. 1983)); see also, e.g., Golden v. Steam Heat, Inc., 216 A.D.2d 440, 442 (2d Dep't 1995) ("the irreparable harm must be shown by the moving party to be **imminent**, not remote or speculative") (emphasis added); U.S. Re Cos. v. Scheerer, 41 A.D.3d 152, 155 (1st Dep't 2007) (denying injunction where "money damages equal to the value of the transactions lost" were a "quantifiable remedy" for defendant's alleged breach); Sterling Fifth Assoc. v. Carpentille Corp., 5 A.D.3d 328, 329 (1st Dep't 2004) ("Lost profits and tax benefits, however difficult to compute they may be, are clearly compensable with money damages").

Here, EBCC's own delay in asserting its purported rights is dispositive prove that EBCC cannot establish the imminent harm that justifies the "drastic remedy" of a TRO or preliminary injunction: EBCC did not sue Named Defendants until eleven months after they allegedly breached the contracts, and five years after Named Defendants—"on information and belief," no less—supposedly began fraudulently transferring EBCC's property. Dkt. 1 ¶¶ 99, 102–24 (Sep. 25, 2022); accord Citibank, 756 F.2d at 276 (citations omitted) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").

What's more, EBCC did not immediately serve the Summons and Complaint, and in fact apparently did not even bother to engage a process server to do so; instead, **three weeks** after initiating this Action, EBCC threatened to seek an *ex parte* TRO and preliminary injunction, and accompanied that threat with a request that Named Defendants accept service by email. See Dkt. 3, Declaration of Alexander J. Willscher at 5 (Oct. 17, 2022). Given the weeks (if not years) that EBCC has slept on its own purported rights, the Court should deny its Injunctive Relief Request without forcing Named

GUSRAE KAPLAN NUSBAUM PLLC

Justice to be Assigned
Supreme Court, New York County
Commercial Division
October 18, 2022
Page 3

Defendants to waste their own precious (and, according to EBCC, dwindling) resources on EBCC's fire drill. Accord, e.g., NYCRR 202.8-d ("Motions shall be brought on by order to show cause **only where there is genuine urgency** (e.g., applications for provisional relief) [ . . . ]") (emphasis added); Commercial Division Rule 19 ("Motions shall be brought on by order to show cause **only when there is genuine urgency** (e.g., applications for provisional relief) [ . . . ]") (emphasis added).

However, if the Court does authorize EBCC's proposed order to show cause, Named Defendants respectfully request that the Court strike EBCC's request to file a reply brief. See Dkt. 2, Proposed Order to Show Cause at 4 (Oct. 17, 2022). Both Supreme Court and Commercial Division Rules strongly disfavor reply papers in support of orders to show cause. See NYCRR 202.8-d ("Absent advance permission of the court, reply papers shall not be submitted on orders to show cause."); Commercial Division Rule 19 ("Absent advance permission, reply papers shall not be submitted on orders to show cause.).

Simply put, EBCC has had more than enough time to marshal all the facts and law that support its emergency request for "drastic relief." If EBCC's concerns are so urgent that they justify emergency relief, the Court should make a decision as soon as it allows Named Defendants to be fully heard. Accord Commercial Division Rule 20 ("Temporary Restraining Orders. [ . . . ] The applicant must give notice, including copies of all supporting papers, to the opposing parties sufficient to permit them an opportunity to appear and contest the application.).

Therefore, Named Defendants respectfully request that the Court (1) deny EBCC's Injunctive Relief Request without requiring Named Defendants to file full opposing papers or (2) deny EBCC the opportunity to file reply papers.

Respectfully submitted,

/s/ Kari Parks
Kari Parks

CC: All counsel of record (via NYSCEF)

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

October 18, 2022

By NYSCEF

Justice to be Assigned,
    Supreme Court, New York County,
        Commercial Division,
            60 Centre Street,
                New York, New York  100007.

Re:    Emigrant Business Credit Corporation v. John Arthur Hanratty et
       al., No. 158207/2022

Dear Justice to be Assigned:

I represent Plaintiff Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned action.  I respectfully oppose Defendants' October 18, 2022 request that the Court deny EBCC's motion by order to show cause for injunctive relief to prevent Defendants from dissipating EBCC's collateral during the pendency of this action.  (Dkt. 2.)

Defendants do not dispute that EBCC faces irreparable harm absent injunctive relief.  Defendants owe EBCC more than $21 million in outstanding principal, interest, costs and expenses.  EBCC has demonstrated that Defendants are insolvent and will be unable to satisfy an award for money damages.  (Dkt. 4 at 18-20.)  EBCC also has demonstrated that Defendants improperly have been selling, encumbering, or otherwise transferring specific assets in which EBCC holds security interests.  (*Id*. at 20-21.)  In particular, EBCC has shown that—in 2022 alone—Defendants have sold around 90 properties (worth more than $4 million) that were EBCC's collateral, without remitting any sale proceeds to EBCC.  (*Id*. at 20.)  EBCC further has shown that Defendants have listed for sale another 88 properties that are EBCC's collateral (for approximately $4.8 million total), but have not agreed to remit any sale proceeds to EBCC.  (*Id*.)  Injunctive relief is necessary here to prevent the undisputed irreparable harm faced by EBCC.

The sole basis for Defendants' opposition is that EBCC somehow "delayed" in moving for injunctive relief by filing five weeks after it discovered, on September 16,

Justice to be Assigned                                                                    -2-

2022, new evidence of Defendants' fraudulent scheme, including allegations contained in a counterclaim filed in federal court in Delaware that:

- Defendant John Hanratty bragged to a business partner that EBCC had "no idea" what Defendants were doing and "w[ould]n't notice" his submission of falsified documents to support draws on the EBCC credit facilities (Dkt. 14 at 75);

- Defendants "knowingly falsified borrowing bases and redemption reports to present to" EBCC in order to "hide . . . assets" from EBCC (*id*. at 66); and

- In furtherance of Defendants' fraudulent scheme, Defendant John Hanratty coached his business partner to lie to the independent third-party custodian of EBCC's collateral (*id*. at 63).

EBCC had been engaged in attempts to resolve this dispute on a voluntary basis since Defendants' defaults for non-payment in November 2021.[1]  It was only after EBCC discovered the egregious facts alleged by Defendants' business partner, which provided undeniable confirmation of Defendants' fraudulent scheme, that EBCC filed the instant action.

In any event, it is well-established that "[m]ere delay, without the necessary elements creating an equitable estoppel, does not preclude the grant of an injunction." *N.Y. Real Est. Inst., Inc.* v. *Edelman*, 42 A.D.3d 321, 322 (1st Dep't 2007); *see id*. (delay of sixteen months); *Tom Doherty Assocs., Inc.* v. *Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) (delay of seven months); *Trustco Bank, Nat'l Ass'n* v. *Glens Falls Nat'l Bank & Tr. Co.*, 903 F. Supp. 335, 339 (N.D.N.Y. 1995) (delay of six months); *Second on Second Café, Inc.* v. *Hing Sing Trading, Inc.*, 66 A.D.3d 255, 273 n.6 (1st Dep't 2009) (delay of five months).  Defendants do not allege (nor could they) that they have suffered harm from the five weeks that have passed since EBCC first learned of the new evidence—Defendants are insolvent with a significant outstanding debt to EBCC in an amount exceeding $21 million.[2]

---

[1]    During those negotiations, the lawyer who had been representing Defendants repeatedly indicated that Defendants were contemplating a bankruptcy filing.  Such a filing at least would have had the virtue of freezing Defendants' assets and preventing Defendants from further dissipating EBCC's collateral.

[2]    Defendants appear to concede that the purported "delay" here should be measured in "weeks."  (Dkt. 21 at 2.)  Although Defendants complain that it has been "one to four

Justice to be Assigned                                                              -3-

Similarly, the passage of time attributable to "good faith efforts to investigate," *Tom Doherty Assocs.*, 60 F.3d at 39, and "attempt[s] to resolve the problem . . . on a voluntary basis," *Second on Second Café*, 66 A.D.3d at 273 n.6, does not preclude the grant of an injunction.  As EBCC explained in its already-filed pleadings and papers, Defendants engaged in an elaborate scheme involving sham corporate transactions among dozens of corporate entities, while also submitting to EBCC falsified documents in order to mislead EBCC.  (*E.g.* Dkt. 5 ¶¶ 18-20.)  EBCC expended an appropriate amount of time to investigate the new allegations about Defendants' fraudulent scheme, and to gather evidence that demonstrates that Defendants have been dissipating EBCC's collateral, before filing this action and seeking injunctive relief.

Defendants request that the Court strike the proposed order to show cause to the extent it provides the Court with an opportunity to request reply papers.  Given the complexity of Defendants' fraudulent scheme, EBCC respectfully submits that reply papers are likely to assist the Court in making its decision.  Should the Court allow for reply papers, EBCC can serve them within 24 hours of the deadline for Defendants to serve opposition papers.

The need for injunctive relief here is acute—before EBCC filed the Complaint in this action, Hanratty thought EBCC had "no idea" what he was doing.  Now that he knows that his fraud has been revealed, there is an imminent risk that he will dissipate EBCC's collateral.  EBCC respectfully requests that the Court grant the proposed order to show cause.

Sincerely,

*/s/ Alexander J. Willscher*

Alexander J. Willscher

cc:      All counsel of record (via NYSCEF)

---

years" since they fraudulently induced EBCC into executing amendments to the Credit Agreements and "five years" since they began fraudulently transferring EBCC's collateral (*id*. at 1), Defendants should not be allowed to reframe time during which they successfully hid their fraudulent scheme from EBCC as EBCC's own "delay."

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 542 of 688

At an Individual Assignment Part, Part 49,
of the Supreme Court of the State of
New York, held in and for the County of
New York, at the Courthouse located at
60 Centre Street, New York, NY, on the 19 th
day of October , 2022

PRESENT:

Hon. _Margaret Chan_
     J.S.C.

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| EMIGRANT BUSINESS CREDIT CORPORATION, | : | |
| | : | Index No. 158207/2022 |
| Plaintiff, | : | |
| v. | : | |
| | : | ~~PROPOSED~~ ORDER TO SHOW |
| JOHN ARTHUR HANRATTY, | : | CAUSE |
| EBURY STREET CAPITAL, LLC, | : | MO#001 |
| EBURY FUND 1, LP, | : | |
| EBURY FUND 2, LP, | : | |
| EBURY 1EMI LLC, | : | |
| EBURY 2EMI LLC, | : | |
| EB 1EMIALA LLC, | : | |
| EB 2EMIALA LLC, | : | |
| EB 1EMIFL, LLC, | : | |
| EB 2EMIFL, LLC, | : | |
| EB 1EMIIN, LLC, | : | |
| EB 2EMIIN, LLC, | : | |
| EB 1EMIMD, LLC, | : | |
| EB 2EMIMD, LLC, | : | |
| EB 1EMINJ, LLC, | : | |
| EB 2EMINJ, LLC, | : | |
| EB 1EMINY, LLC, | : | |
| EB 2EMINY, LLC, | : | |
| EB 1EMISC, LLC, | : | |
| EB 2EMISC, LLC, | : | |
| RE 1EMI LLC, | : | |
| RE 2EMI LLC, | : | |
| EB 1EMIDC, LLC, | : | |
| ARQUE TAX RECEIVABLE FUND | : | |
| (MARYLAND), LLC, | : | |

```
EBURY FUND 1FL, LLC,               :
EBURY FUND 2FL, LLC,               :
EBURY FUND 1NJ, LLC,               :
EBURY FUND 2NJ, LLC,               :
RED CLOVER 1, LLC,                 :
EBURY RE LLC, and                  :
XYZ CORPS. 1-10,                   :
                                   :
              Defendants.          :
                                   :
─────────────────────────────────  x
```

**UPON READING** the annexed Memorandum of Law; the Affidavit of Scott Weiss, and the exhibits annexed thereto; the Affirmation of Alexander J. Willscher; and all other papers and pleadings filed herein; it is

**ORDERED** that Defendants John Arthur Hanratty; Ebury Street Capital, LLC; Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1, LLC; and Ebury RE LLC ~~appear before this Court, located at 60 Centre Street, New York, NY, on the~~ 28TH DAY OF OCTOBER 2022 ~~o'clock a.m./p.m., or as soon thereafter as counsel can~~ —On submission only be heard and show cause why an Order should not be issued:

    a.    Enjoining and restraining Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, or permitting the transfer of any of their assets during the pendency of the above-captioned action (the "**Action**"), aside from ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses or living expenses;

FILED: NEW YORK COUNTY CLERK 10/19/2022 04:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 23 24-04020-dsj Doc 1-1 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #2 State RECEIVED NYSCEF: 10/19/2022

Court Records Pg 544 of 688

b. Ordering Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, to the extent that any tax lien certificate or real estate property resulting from the foreclosure on a tax lien certificate is or has been sold, to deposit any proceeds from such sale, aside from ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses, into an escrow account, to be established by the Parties;

c. Ordering Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, to notify EBCC at least twenty-four (24) hours in advance of transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, or permitting the transfer of any assets in an amount exceeding $50,000;

d. Granting Plaintiff such other and further relief as the Court deems just and proper.

Sufficient reason having been alleged, and pending a hearing and further Order of this Court, it is

ORDERED, that Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, are temporarily restrained and enjoined from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, permitting the transfer of any of their assets, aside from ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses or living expenses;

ORDERED, that Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, to the extent that any tax lien certificate or real estate property resulting from the foreclosure on a tax lien certificate is or has been sold, are temporarily restrained and enjoined to deposit any proceeds from such sale, aside from ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses, into an escrow account, to be established by the Parties;

ORDERED, that Defendants, and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them, must notify

-3-

EBCC at least twenty-four (24) hours in advance of transferring, mortgaging, selling, converting,

concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, or permitting

the transfer of any assets in an amount exceeding \$50,000;

**ORDERED**, that service of a copy of this Order, together with a copy of the papers in

support thereof, made upon Defendants by ~~email to their counsel Gusrae Kaplan Nusbaum PLLC,~~ NYSCEF

~~by Kari Parks, Esq. at kparks@gusraekaplan.com~~, on or before the _20_th day of _October_,

2022, be deemed good and sufficient service; and it is

**ORDERED**, that any opposition to this motion be served by _October 26_, 2022; and

any reply be served by _October 27_, 2022.

ENTER:

_____
J.S.C.

**MARGARET A. CHAN**
**J.S.C.**

-4-

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 546 of 688

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

EMIGRANT BUSINESS CREDIT
CORPORATION,

                         Plaintiff,


            v.                                    Index No. 158207/2022

JOHN ARTHUR HANRATTY, EBURY                       Mot. #001
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,
                         Defendants.


## AFFIDAVIT OF JOHN HANRATTY

COMMONWEALTH OF PUERTO RICO        )
                                  ) ss.:
MUNICPALITY OF SAN JUAN            )

        John Hanratty, being duly sworn, deposes and says under the penalties of

perjury:

1.      I am a defendant in the above-captioned case; the founder and managing

partner of the "**Ebury Entities**;" and am authorized to make this affidavit on behalf of

myself and the Ebury Entities (together, the "**Ebury Parties**").

2.      From 2017 until the Covid-19 Pandemic, the Ebury Entities experienced

significant growth, but also constant change.

3.      While it is entirely possible—indeed likely—that there have occasionally

been inaccuracies in documents that I, the Ebury Entities, and EBCC all relied upon,

none of the Ebury Parties has ever attempted to lie to or otherwise intentionally deceive

EBCC.

4.      Former EBCC President Karen Wold, former Senior Vice President Jack

Grady, and current Vice President Sahil Arora had real-time insight into the Ebury

Entities' struggles and successes, and agreed with the Ebury Parties' desire to combine

the multiple entities in order to streamline recordkeeping and operations.

5.      The Ebury Entities have essentially three types of assets: tax liens, real

estate, and seller-financed loans.

6.      The tax liens are against properties with unpaid property taxes. Tax liens

can provide stable cash flow, the ability to foreclose on the property, and seniority to

most other real property liens

7.      I met EBCC around 2016, when the then-existing Ebury Entities were

based in Rye, New York, and wanted to pursue higher-yield liens.

8.      EBCC expressed interest in lending money, and formalized its interest by issuing a term sheet, suggesting that the Credit Lines would close after a 90-day due diligence period.

9.      After the relevant Ebury Entities agreed to basic terms, EBCC began due diligence, in which it reviewed and approved the Ebury Entities' assets, including our Collateral.

10.      EBCC's diligence period lasted ten months, during which EBCC worked with me and the Ebury Parties' then-servicer and custodian, "**Tower**" Fund Services, LLC, to review our historical data, current data, future financial projects, and other information.

11.      Shortly before the Credit Lines closed in March 2017, the Ebury Entities hired "**Controller 1.**"

12.      From approximately 2013 through 2017, Tower provided both financial and lien services to the Ebury Parties.

13.      When the Ebury Entities first began working with Tower, the Ebury Parties' assets comprised approximately $10 million; by spring 2018, our assets had grown to approximately $70 million, and had begun to outgrow Tower's servicing abilities.

14.      After the Credit Lines closed, and with EBCC's knowledge and consent, the Ebury Parties kept Tower to provide financial services, but hired MTAG be their lien custodian.

FILED: NEW YORK COUNTY CLERK 10/26/2022 09:22 PM
NYSCEF DOC. NO. 24

INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/26/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 549 of 688

15.     At the time, the Ebury Parties' medium-term goal was to buy out their equity holders, retire all their bank loans, and securitize their portfolio.

16.     To do so, the Ebury Entities need a rated servicer—and MTAG was, for all practical purposes, the only rated servicer that could do the job.

17.     However, attempting to work with Tower and MTAG simultaneously was a "disaster."

18.     The two companies' reports and systems did not integrate well, and Tower was unhappy that it had lost the Ebury Parties' custodian and servicer business.

19.     Around late 2017, Tower quit, leaving the Ebury Parties' financials in a shambles.

20.     Controller 1 appeared to get the Ebury Entities' financials in shape and work well with MTAG, but the Entities had to retain the services of Opus Fund Services for fund administration.

21.     Around 2018, I moved to Puerto Rico, while the Ebury Entities remained in Rye; eventually, the Ebury Entities opened a Puerto Rico office, and ran both offices until early 2020, after the Puerto Rico bookkeepers discovered that Controller 1 had not been keeping proper books, financials, or accounting records, and Controller 1 resigned.

22.     Before I moved to Puerto Rico, several Ebury Entities and I began working with non-party Thomas R. McOsker, who purported to engage in legitimate tax lien brokerage services.

23.     Additionally, I formed a joint venture with McOsker for the sole purpose of purchasing Tax Liens in Puerto Rico.

24. When I first moved to Puerto Rico, the Ebury Entities briefly shared office space and some back-office support personnel with Mr. McOsker's companies.

25. In 2018, several Ebury Entities continued working with Mr. McOsker to sell thousands of their tax lien certificates.

26. Eventually, the Ebury Parties realized that Mr. McOsker was stealing escrowed funds from the lien sales in order to support his personal life and other businesses. In addition, I became aware this had been a pattern of Mr. McOsker dating back to 2016, and that Mr. McOsker had also been stealing from his other clients.

27. In June 2019, the Ebury Parties moved out of their shared office space, and sued Mr. McOsker in the federal district court for the District of Puerto Rico.

28. After Mr. McOsker argued that the federal Puerto Rico court lacked jurisdiction, I re-filed my claims in the Puerto Rico Court of First Instance.

29. In Puerto Rico, Mr. McOsker filed counterclaims and argued that the dispute truly belonged in Delaware.

30. Moreover, the Covid-19 Pandemic significantly interfered with the Puerto Rico court's operations, slowing down an already-slow process.

31. Accordingly, in February 2021, I sued Mr. McOsker, his chief associates, and his relevant entities in the federal district court for the District of Delaware, alleging, inter alia, that the "**McOsker Defendants**" were engaging in a continuing federal racketeering conspiracy in violation of 18 U.S.C. §§ 1962(c), (d).

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 551 of 688

32.     In August 2021, the McOsker Defendants moved to dismiss that case; in July 2022, the Court largely denied that motion, holding that the relevant Ebury Entities had adequately pleaded their RICO claims.

33.     After receiving an extension, the McOsker Defendants filed an answer and counterclaim on September 1, 2022, accusing the various Ebury Parties of the same misconduct that they have been litigating in Puerto Rico since 2019.

34.     While the relevant Ebury Parties' motion to dismiss those Delaware counterclaims had been due this coming Friday, October 28, the Ebury Parties sought and received a two-week extension for that filing so they could focus on opposing EBCC's preliminary injunction motion.

35.     Discovery has begun in both the Puerto Rico and Delaware cases.

36.     Besides delaying justice in Puerto Rico, the Pandemic also attacked the Ebury Entities' business model.

37.     The Ebury Entities' tax liens provide essentially two types of revenue: a steady collection of tax payments from the property owner, or, if the property owner fails to pay her taxes, through foreclosure on the property.

38.     Typically, the property owner must pay those taxes through certified physical check, either by mail or in person with their local municipality. Foreclosure proceedings, meanwhile, must wind their way through local courts. And once the Ebury Entities finally do take title of a property, they often must invest significant time and resources in rehabilitating the property so they can receive a return on their investments by renting or selling the property.

39.     The Pandemic caused many local government offices to close, thwarting taxpayers' ability to draw and submit certified checks. Many relevant jurisdictions also imposed foreclosure and eviction freezes, and closed their local courts.

40.     The Pandemic and associated government closures slowed the Ebury Entities' revenue to a trickle, provided only by those property owners who were sufficiently lucky and sophisticated to be able to continue to pay their debts.

41.     In short, the Pandemic froze the Ebury Entities, whose average monthly revenue fell from $1,129,307 in 2019 to $663,992 in 2020, to $330,382 in 2021. Now that local authorities' operations are nearly back to "normal," the Ebury Entities have gotten back on track: in 2022, the Ebury Entities' average monthly revenue has risen to $753,096—leaving the Ebury Entities in their best cash position since the Pandemic began.

42.     Over the years, the Ebury Entities have used the Credit Lines of multiple lenders to purchase over 32,000 liens, worth approximately $175 million.

43.     Today, the Ebury Entities are solvent.

44.     Currently, the Ebury Entities hold assets of approximately $28.1 million.

45.     EBCC has filed UCC-1 Statements perfecting its security interests in the Ebury Entities' liens, but cannot secure UCC protection on the Ebury Entities' real estate.

46.     Between the Maturity Date and September 14, 2022, EBCC and the Ebury Parties actively negotiated how to pay off the Credit Lines.

47.     For months, EBCC and the Ebury Parties had nearly-daily calls, reviewed collateral, and discussed the Ebury Entities' ongoing refinancing efforts.

48.     To facilitate the process, in January 2022 the Ebury Parties gave EBCC full access to all of their financial and operational records.

49.     The Ebury Parties use Quickbooks for financials of the Ebury Entities, Appfolio for the Financials of its real estate owned property ("**REO**"), ZOHO for managing the sales process and property oversight, and Speedboat for servicing the lien portfolios; the Ebury Entities track their seller-financed loan portfolio internally.

50.     For the last ten months, EBCC has had the login credentials to directly access these systems and acquire all information related to the Ebury Parties assets.

51.     However, the software's audit trails shows that EBCC did not bother to view the Ebury Entities' (1) Quickbooks account between June 2022 and October 24, 2022; (2) Appfolio between March 2022 and October 24, 2022; (3) Speedboat since August 16, 2022; and (4) ZOHO since June 2022 to October 24, 2022.

52.     While EBCC's fact affiant, Scott Weiss, has his own credentials to log into all four of these systems, he has not logged in to Speedboat since May 2022, Appfolio since January 2022, Zoho in the last 90 days while never generating a report in over 11 months of access and did not log in to Quickbooks between May 7 and October 24, 2022.

53.     On October 24, 2022, the Ebury Parties' counsel reminded EBCC's counsel that EBCC "continues to have full access to all of [the Ebury Parties'] financials, including their Quickbooks and other accounting software."

54.     After the Credit Lines matured, the Ebury Parties offered to pay at least interest EBCC, while at the instruction of EBCC the Ebury Parties looked for investors to buy EBCC out; EBCC refused the payments.

55.     By June 2022, the Ebury Parties had proposed a payment plan that would liquidate the business and provide a repayment of the loan. The offer did not get a response until August 2022

56.     At EBCC's request, the Ebury Parties also an obtained outside investor proposals to buy out EBCC. Multiple attempts by outside investors to interact with EBCC employees was delayed, or did not occur at all.

57.     On September 13, 2022, EBCC agreed to the negotiated version of the Ebury Parties' original repayment offer, and demanded that the Ebury Parties finalize their agreement by signing a term sheet by "the end of business" on September 15, 2022.

58.     The Ebury Parties returned their signed term sheet on September 15, and was prepared to pay EBCC and comply as contemplated by that term sheet.

59.     EBCC did not respond to the Ebury Parties' acceptance.

60.     EBCC has always been aware of the three McOsker lawsuits, including Mr. McOsker's various counterclaims and defenses, which have not materially changed over the past three years of litigation.

61.     EBCC also has been aware that I voluntarily spoken on multiple occasions with federal and Puerto Rico law enforcement agencies regarding Mr. McOsker's frauds, and that one of Mr. McOsker's former lieutenants verified that Mr. McOsker

24-04020-dsj     Doc 1-1     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #2 State
                                    Court Records     Pg 555 of 688

had, indeed, been stealing from his clients, including the Ebury Entities while
defrauding the government of Puerto Rico.

62.     Despite EBCC's alleged concerns and existing knowledge, the Bank has
never asked any Ebury Party about Mr. McOsker's September 2022 allegations.

63.     The Ebury Parties are concerned that EBCC's requested preliminary relief
would cause significant disruption to the business, and if abused, cause the Ebury
Entities' insolvency.

64.     The Ebury Entities must spend money to make money: they are in the
process of selling both liens and real estate, and while the foreclosure process tends to
be significantly more profitable, it also involves litigation, property rehabilitation, and
rental and sale costs.

65.     Frictionless, rapid investment decisions are essential to the Ebury Parties'
ongoing business and profitability; continually moving assets slows down that process.

66.     Given EBCC's decision to sue just two weeks after the Ebury Parties
Executed the Term Sheet negotiated for over 10 months—and its attempt to use the
TRO to gain premature discovery from the Ebury Parties—the Ebury Parties are
significantly concerned that EBCC will abuse the proposed OSC's terms, including the
24-hour notice window and interpretation of ordinary and necessary disbursements,
and unnecessarily complicate this already-expensive litigation, eventually resulting in
Ebury's insolvency.

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 556 of 688

_____

John Arthur Hanratty

Affidavit No. _-fsr-_

Sworn to and subscribed before me by John Arthur Hanratty, of legal age, married, executive and resident of San Juan, Puerto Rico, personally known to me.

In San Juan, Puerto Rico, this 26th day of October 2022



NOTARY PUBLIC

## CERTIFICATE OF COMPLIANCE

I certify that this affidavit complies with the word count limit of N.Y.C.R.R. 202.8-b for documents prepared via computer. Mr. Hanratty's affidavit contains 2,084 words.

Dated:   October 26, 2022
         New York, New York

                                        /s/ Kari Parks
                                        Kari Parks

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 558 of 688

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

EMIGRANT BUSINESS CREDIT
CORPORATION,

                Plaintiff,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

                Defendants.

Index No. 158207/2022

Mot. #001

## **AFFIRMATION OF KARI PARKS**

Under the penalties of perjury, I, Kari Parks, affirm as follows:

1.      I am an associate of the law firm Gusrae Kaplan Nusbaum PLLC, counsel

for the "**Ebury Parties**" in the above-captioned matter.

2.      I submit this affirmation in opposition to Plaintiff Emigrant Business

Credit Corporation's ("**EBCC**") order to show cause, Mot. #001.

3.      A true and correct copy of October 24, 2022 emails between me and

EBCC's counsel is annexed as Exhibit A to this Affirmation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 26, 2022
     New York, New York

Respectfully submitted,

/s/ Kari Parks

2

FILED: NEW YORK COUNTY CLERK 10/26/2022 09:22 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 26
RECEIVED NYSCEF: 10/26/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 560 of 688

# EXHIBIT A

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 561 of 688

| | |
|---|---|
| **From:** | Mayron, Austin P. |
| **To:** | Kari Parks |
| **Cc:** | Willscher, Alexander J.; Victor Wang |
| **Subject:** | RE: Introduction |
| **Date:** | Monday, October 24, 2022 16:45:38 |

Hi Kari,

The clear contractual bar on Defendants transferring any of the Collateral precludes any argument that these purported tax lien purchases were "ordinary" disbursements (no less that they were "necessary" in light of the defaults for non-payment). Putting that issue aside, we are concerned that it has been five days since the Court entered the TRO and you still have not provided us with the amount of proceeds remaining from these sales and are speculating that it is "unlikely" they still are available. To the extent your client contends that he purchased tax liens using these proceeds, he should provide proof of these purchases. EBCC has a clear entitlement to this information under both Sections 6.2 and 6.30 of the Credit Agreements; further, we believe this information is necessary to demonstrate your client's compliance with the TRO.

Finally, as we understand it, your client did not provide EBCC with access to the financials for many of the Defendants, including Ebury RE LLC (the party that made many of these sales). If you disagree, please let us know.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Monday, October 24, 2022 1:04 PM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; Victor Wang <vwang@gusraekaplan.com>
**Subject:** [EXTERNAL] Re: Introduction

Hi Austin,

I think we're conflating two issues here: the contracts and the TRO.

The TRO (which I assume your firm wrote) requires my clients to do no more and no less than (1) "deposit any proceeds from such sale, aside from ordinary and necessary disbursements," and (2) "to notify EBCC at least 24 hours before…" The TRO of course binds our client, and we are working to comply with it.

To the extent you invoke the Credit Agreement's terms and argue what my clients were or were not allowed to do in the past (e.g., "Defendants were barred," "your client was not permitted"), those are substantive liability issues, not urgent issues regarding my clients' current / post-TRO-issuance behavior that requires a court conference this week.

For the same reasons, your request for receipts certainly is relevant to the general case, but is a discovery request that you can pursue in the usual course, not information you need immediately in order for the parties to fulfill the TRO's mandate.

That said, as a practical matter, I understand that your client continues to have full access to all of my clients' financials, including their Quickbooks and other accounting software. We certainly are doing what we can to comply with the TRO, but conferencing with the Court about what my clients should or shouldn't have done before October 19 is irrelevant to whether we're currently working to comply with the TRO.

Best,
Kari


**Kari Parks, Associate** | **Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.


On Oct 24, 2022, at 12:41, Mayron, Austin P. <mayrona@sullcrom.com> wrote:


Hi Kari,

Thank you for that confirmation, but I still am concerned that we are not on the same page. Based on your client's representations in a December 30, 2021 Borrowing Base Certificate, at least $4.1 million of these sale proceeds were EBCC's collateral. (Dkt. 5

¶ 25.)  Under Section 8.5 of the Credit Agreements, Defendants were barred from "sell[ing], transfer[ing] or otherwise alienat[ing] *any of the Collateral*."  (Dkt. 6 at 31 (emphasis added).)  Thus, your client was not permitted to transfer at least $4.1 million of these sales proceeds—not to mention that your client received the notices of default for non-payment on November 29, 2021.  (Dkt. 12.)

To the extent you contend that your client has used the $4.5 million in sales proceeds to purchase new tax liens (which are EBCC's collateral as well), please provide proof of these purchases.  In addition, please provide the current account balances for each of Defendants' bank accounts so that we may confirm.  (*See generally* Dkt. 6 at 24, 28.)  Finally, please provide your availability between 2:30 pm and 4:30 pm tomorrow for a joint phone call with Justice Chan's law clerks, should we be unable to resolve this issue.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Monday, October 24, 2022 11:22 AM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; Victor Wang <vwang@gusraekaplan.com>
**Subject:** [EXTERNAL] Re: Introduction

Hi Austin - yes, I think we're on the same page here. We are working on identifying the depositing entity / entities and calculating the relevant "proceeds," but it's unlikely that the current available cash proceeds are $4.5+mm, since our clients' usual course is to reinvest proceeds into purchasing new liens, and then repeating the process.

**Kari Parks, Associate** | **Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 564 of 688

of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

On Oct 24, 2022, at 10:57, Mayron, Austin P. <mayrona@sullcrom.com> wrote:

Hi Kari, Victor,

Thank you for your response. Your client has been ordered "to the extent that any tax lien certificate or real estate property resulting from the foreclosure on a tax lien certificate is **or has been** sold, to deposit any proceeds from such sale . . . into an escrow account." (Dkt. 23 at 3.) On July 28, 2022, your client represented to EBCC that he has sold over $4.5 million in REOs in 2022 alone.

Please confirm by close of business today that your client intends to comply with the Order to Show Cause and to deposit these proceeds, along with all other proceeds from his sales of tax lien certificates or real estate properties resulting from the foreclosure on a tax lien certificate, into the parties' escrow account. If you cannot do so, please provide your availability between 2:30 pm and 4:30 pm tomorrow for a joint phone call with Justice Chan's law clerks.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Monday, October 24, 2022 6:02 AM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>

**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; Victor Wang <vwang@gusraekaplan.com>

**Subject:** [EXTERNAL] Introduction

Hi Austin,

Please meet Victor, our law clerk who's been working on the Ebury matters. He was on vacation last week but moving forward, will be your point person for logistics like the escrow details.

We're still trying to get clarity on the exact number and entity that will be transferring in. My client did tell me that he anticipates about $50k of tax lien sales to close this week, and that they do accounts payable once a week. Please reach out to Victor with any questions or ideas on the escrow issues.

Best,
Kari

**Kari Parks, Associate | Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication.  Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in

any way from its use.

---

**This is an external message from: kparks@gusraekaplan.com **

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

EMIGRANT BUSINESS CREDIT
CORPORATION,

<div style="text-align:center">Plaintiff,</div>

<div style="text-align:center">v.</div>

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

<div style="text-align:center">Defendants.</div>

Index No. 158207/2022

Mot. #001

<div style="text-align:center">

**THE EBURY PARTIES' OPPOSITION TO ORDER TO SHOW CAUSE**

</div>

GUSRAE KAPLAN NUSBAUM PLLC
Kari Parks
Victor Wang (Admission Pending)
120 Wall Street
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com
vwang@gusraekaplan.com

*Counsel for The Ebury Parties*

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 568 of 688

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                                    i

TABLE OF AUTHORITIES                                                               iii

PRELIMINARY STATEMENT                                                                1

BACKGROUND                                                                           2

I.    EBCC Claims that the Ebury Parties Failed to Repay Two Credit Lines           2

II.   Invoking Hearsay and "Information and Belief," EBCC Attempts to Allege
Fraudulent Inducement and Fraudulent Transfer                                       3

III.   The Ebury Parties Have Never Tried to Trick EBCC                             5

  A.    From 2017 through 2020, the Ebury Parties Experienced Significant Financial
  and Operational Turnover                                                          5

  B.    The Ebury Parties and Non-Party McOsker have been Suing Each Other since
  2019                                                                              7

  C.    After Significant Pandemic Setbacks, the Ebury Entities Finally are Profitable
  Again                                                                             8

  D.    EBCC has had Full Access to the Ebury Entities' Financial and Operational
  Records for Ten Months                                                            9

IV.    EBCC Admitted that Mr. McOsker's Hearsay is Its Primary Reason for Suing the
Ebury Parties                                                                      10

V.    The Ebury Parties Worry that EBCC Will the Preliminary Injunction to Drive Them
Into Insolvency and Grab Their Assets                                              12

LEGAL STANDARD                                                                     13

ARGUMENT                                                                           14

I.    This Court Must Disregard EBCC's Conclusory, Hearsay, and "Information and
Belief" Allegations                                                               14

II.    EBCC Fails to Even State Its Fraudulent Inducement or Fraudulent Claims, Let
Alone "Clearly Establish" Its Likely "Success on the Merits"                       16

i

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 569 of 688

III.    Because the Parties' Contractual Duties are "Open to Doubt and Uncertainty,"
EBCC Cannot Clearly Prove It Will Win Its Contract Claim                    18

IV.    By Demanding Nothing But Money Damages, EBCC Admits It Cannot Clearly
Prove "Irreparable Injury"                                                  20

    A.    When Money Can Fix the Problem, Irreparable Injury Does Not Exist    20

    B.    Our Highest Courts Have Rejected EBCC's "Well-Settled" Exception    21

    C.    A Supposed "Strong Nexus" Between Collateral and Money Damages Does
Not Excuse EBCC's Failure to Clearly Prove Irreparable Harm                 24

V.    EBCC Cannot Clearly Prove that the Equities Favor Preliminary Relief: The Bank
Demands the "Most Powerful Weapon of Oppression" to Pursue Money Damages that
Total Just 0.00388% of Its Parent's Assets—But 78% of the Ebury Entities' Assets    26

VI.    EBCC Must Post a $30 Million Bond to Secure Its Desired Injunction         27

CONCLUSION                                                                   28

WORD COUNT CERTIFICATION                                                     29

## TABLE OF AUTHORITIES

**Cases**

Am. Med & Life Ins. Co. v. Crossummit Enters., Inc., No. 18059/2008, 2009 WL 1574129

    (Sup Ct. N.Y. Cnty. May 18, 2009)         20

Anderson v. Malley, 191 A.D. 573 (1st Dep't 1920)         17

AQ Asset Mgmt. LLC v. Levine, 111 A.D.3d 245 (1st Dep't 2013)     24

Bank of America, N.A. v. Yi, 294 F. Supp. 3d 62 (W.D.N.Y. 2018)     24

Campbell v. Ernest, 19 N.Y.S. 123 (2d Dep't 1892)         25

Cook v. New Amsterdam Real-Est. Ass'n, 32 N.Y.S. 888 (2d Dep't 1895)     15

Cosmos Forms, Ltd. v. Furst, 172 A.D.2d 403 (1st Dep't 1991)     14

Credit Agricole Indosuez v. Rossiyskiy Kredit Bank, 94 N.Y.2d 541 (2000)     13, 21, 24

Destiny USA Holdings, LLC v. Citigroup Glob. Markets Realty Corp., 69 A.D.3d 212

    (4th Dep't 2009)         27

Dinner Club Corp. v. Hamlet on Olde Oyster Bay Homeowners Ass'n, 21 A.D.3d 777

    (1st Dep't 2005)         21

DLJ Morg. Cap, Inc. v. Kontogiannis, 594 F. Supp. 2d 308 (E.D.N.Y. 2009)     16

Dolan v. Conlon, 114 A.D. 570 (1st Dep't 1906)         17

Eagle Eye Collection Corp. v. Shariff, 190 A.D.3d 600 (1st Dep't 2021)     17

Elmrock Opportunity Master Fund I, L.P. v. Citicorp N. Am., Inc., 155 A.D.3d 411 (1st

    Dep't 2017)         15

Encore Credit Corp. v. LaMattina, No. CV-05-5442 (CPS), 2006 WL 148909 (E.D.N.Y. Jan.

    18, 2006)         15

Gerald Modell Inc. v. Morgenthau, 196 Misc. 2d 354 (Sup. Ct. 2003) (Gans, J.)     15

Goodstein v. Enbar, No. 654114/2016, 2017 WL 1032545 (Sup. Ct. Mar. 17, 2017)     20

Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc., 527 U.S. 308 (1999)     passim

La Magica LLC v. 145 Atl. LLC, 154 A.D.3d 515 (1st Dep't 2017)     14

Laco X-Ray Sys. v. Fingerhut, 88 A.D.2d 425 (2d Dep't 1982)     21

Leo v. Levi, 304 A.D.2d 621 (2d Dep't 2003)     25

Louie v. David & Chiu Place Rest., Inc., 261 A.D.2d 150 (1st Dep't 1999)     27

Margolies v. Encounter, Inc., 42 N.Y.2d 475 (1977)                                27

Marine Midland Bank v. Murkoff, 120 A.D.2d 122 (2d Dep't 1986)                   16

Nat'l Westminister Bank USA v. Weksel, 124 A.D.2d 144 (1st Dep't 1987)           16

New York University v. Continental Ins. Co., 87 N.Y.2d 308 (1995)               16

O'Hara v. Corp. Audit Co., 161 A.D.2d 309 (1st Dep't 1990)                    14, 28

Orix Credit All., Inc. v. R.E. Hable Co., 256 A.D.2d 114 (1st Dep't 1998)        14

Rosenthal v. Rochester Button Co., 148 A.D.3d 375 (2d Dep't 1989)                23

Second on Second Café, Inc. v. Hing Sing Trading, Inc., 66 A.D.3d 255 (1st Dep't 2009) 13

Shapiro v. Shorenstein, 157 A.D.2d 833 (2d Dep't 1990)                          20

Spectrum Stanford, LLC v. 400 Atl. Title, LLC, 162 A.D.3d 615 (1st Dep't 2018)   1, 13, 19

SportsChannel Am. Assocs. v. Nat'l Hockey League, 186 A.D.2d 417 (1st Dep't 1992) 18,
    19

Swartz v. Swartz, 145 A.D.3d 818 (2d Dep't 2016)                                17

U.S. Re Cos., Inc. v. Scheerer, 41 A.D.3d 152 (1st Dep't 2007)                   20

Visual Equities Inc. v. Sotheby's, Inc., 199 A.D.2d 59 (1st Dep't 1993) (citations omitted)
                                                                              27

Wellbilt Equip. Corp. v. Red Eye Grill, L.P. 308 A.D.2d 411 (1st Dep't 2003)    14

Winter v. Nat'l Resources Def. Council, Inc., 555 U.S. 7 (2008)                 13

Xerox Corp. v. Neises, 31 A.D.2d 195 (1st Dep't 1968)                           18

Zodkevitch v. Feibush, 49 A.D.3d 424 (1st Dep't 2008)                         19, 24, 25

**Rules**

CPLR 6201 (McKinney 2022)                                                       23

CPLR 6301 (McKinney 2022)                                                       21

CPLR 6312(b) (McKinney 2022)                                                    27

**Treatises**

Wait, Fraudulent Conveyances § 73                                              21

The "**Ebury Parties**"[1] respectfully submit this opposition to Plaintiff Emigrant

Business Credit Corp.'s ("**EBCC**" or the "**Bank**") "**Motion**" for preliminary injunction.

See [Dkt. 2](#), Proposed Order to Show Cause (Oct. 17, 2022).

## PRELIMINARY STATEMENT

EBCC claims that the Ebury Parties owe $21+ million on an unpaid loan. In other

words, this case is about money. Nothing but money. A plain vanilla, breach-of-contract-

for-money case.

Because this suit involves no "extraordinary circumstances" that warrant gifting

EBCC the most "powerful weapon of oppression" to "interfere with [the Ebury Parties']

affairs" long before final judgment, the Ebury Parties respectfully request that the Court

deny EBCC's Motion. Accord, e.g., Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund,

Inc., 527 U.S. 308, 330 (1999) ("The requirement that the creditor obtain a prior judgment

is a fundamental protection in debtor–creditor law."); Spectrum Stanford, LLC v. 400 Atl.

Title, LLC, 162 A.D.3d 615, 617 (1st Dep't 2018) (preliminary injunction unwarranted

where movant proved that defendant had defaulted on $235 million loan, but failed to

show "imperative, urgent, or grave necessity" warranting requested relief).

---

[1] Defendants Ebury Street Capital, LLC, Ebury "**Fund 1**," LP, Ebury "**Fund 2**," LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, "**Ebury RE**" LLC (together, the "**Ebury Entities**") and John Hanratty (with the Ebury Entities, the "**Ebury Parties**").

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 573 of 688

## BACKGROUND

### I.    EBCC Claims that the Ebury Parties Failed to Repay Two Credit Lines

EBCC is a "specialty finance company" owned by "Emigrant Bank, the largest family-owned bank in the United States." Dkt. 1, Summons + Complaint ¶ 7 (Sep. 25, 2022) ("**Compl.**"). Last quarter, 172-year-old Emigrant Bank reported total assets of $5.61 billion, including $4.14 billion in "net loans and leases." See FDIC, Emigrant Bank Financial & Regulatory Reporting – FDIC Cert #12054 (June 30, 2022); FDIC, Emigrant Bank Institution Details (Oct. 21, 2022).

Pursuant to March 2017 "**Credit Agreements**," EBCC extended "**Credit Lines**" to Defendant Ebury 1EMI LLC ("**1EMI**") and Defendant Ebury 2EMI LLC ("**2EMI**" and with 1EMI, the "**Borrowers**"), which originally were to mature in March 2021. Compl. ¶¶ 33, 36. After three extensions, the Credit Lines became due in November 2021 (the "**Maturity Date**"). Id. ¶¶ 36, 38.

On November 29, 2021, EBCC sent notices of default and demands for payment of approximately $18 million. Id. ¶ 104. EBCC's September 2022 Complaint claims the Borrowers "now owe more than $21,813,177.46." Id.

Besides the Ebury Parties' alleged failure to repay the Credit Lines, EBCC also flags several other alleged contractual breaches. See id. ¶¶ 39, 50, 52, 65, 90–93. The Complaint does not identify how, if at all, this panoply of breaches harmed EBCC. See generally id. But the Complaint does allege that EBCC's damages for all of the alleged contractual breaches is "not less than $21,813,177.46:" the Credit Lines' alleged outstanding balance. Compare id. ¶ 6 and id. ¶ 104.

2

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 574 of 688

## II. Invoking Hearsay and "Information and Belief," EBCC Attempts to Allege Fraudulent Inducement and Fraudulent Transfer

EBCC also sues for fraudulent inducement, claiming that (1) "between 2018 and 2021," the Ebury Parties "[r]epeatedly made false statements about the collateral to induce EBCC to enter into modifications to the Credit Agreements;" (2) "[t]hroughout 2020 and 2021," Mr. Hanratty "consistently claimed that EBCC was 'overcollateralized,'" and (3) Mr. Hanratty "routinely submitted to EBCC Borrowing Base Certificates that concealed the fact that [Mr.] Hanratty was impermissibly self-servicing the Collateral." Id. ¶¶ 2, 3, 4, 43, 49, 65–69, 112.

To "support" its speculations, EBCC pleads 20 "information and belief" allegations, including:

- "[O]n information and belief, [Mr.] Hanratty fabricated [a spreadsheet] in order to deceive EBCC and obscure the fact that he was self-servicing the Collateral,"
- "On information and belief, [Mr.] Hanratty inflated the value of these Maryland tax liens by improperly including the 'bid amount' in his valuations,"
- "On information and belief, the tax lien certificates that ESC sold were EBCC's Collateral," and
- "On information and belief, [Mr.] Hanratty falsely included these liens in the Borrowing Base Certificates until at least May 2020."

Id. ¶¶ 56, 63, 95, 96.

Attempting to plead fraud, EBCC also repeatedly invokes the September 2022 Counterclaim of Thomas McOsker—which Mr. McOsker filed after the federal District of Delaware refused to dismiss certain Ebury Entities' RICO complaint against him. See id. ¶¶ 5, 48, 54.

3

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 575 of 688

EBCC even uses both "information and belief" **and** Mr. McOsker's hearsay in a single fraud allegation. Compl. ¶ 68 ("On information and belief, these statements were false [ . . . ] according to [Mr.] McOsker, [Mr.] Hanratty would alter 'the original dates for hundreds of certificates' [ . . . ]").

Finally, EBCC offers only "information and belief" allegations to try to plead fraudulent transfer, including:

- "On information and belief, since 2017, Defendants have been transferring [real estate owned property ("**REOs**")] that are the proceeds of EBCC's collateral to entities other than the Borrowers and Guarantors, including Ebury RE LLE and XYZ Corps. 1-10, including to prevent EBCC from receiving sale proceeds from the sale of the REOs, as well as from foreclosing on the REOs in the event of a default," id. ¶ 99;
- "On information and belief, the Borrowers and Guarantors have not received fair consideration for these transfers and these transfers were not arms-length transactions," id. ¶ 100;
- "On information and belief, these transfers were not arms-length transactions and Ebury RE LLC and XYZ Corps. 1-10 did not give fair consideration for the REOs," id. ¶ 119;

Id. ¶¶ 99–100, 118–121.

EBCC does not explain what facts support its "information and belief" (1) that the Ebury Parties are trying to "prevent EBCC" from receiving any sums to which it is entitled, (2) that there was not "fair consideration" for the transfers, (3) that the transfers were not "arms-length transactions," (4) why—particularly given Mr. Hanratty's personal Validity Guaranties—transferring assets to Ebury RE might be problematic, or (5) how or why "XYZ Corps. 1–10," whatever they are, might possibly be involved. See generally id. ¶¶ 99–100, 118–121.

### III.   The Ebury Parties Have Never Tried to Trick EBCC

#### A. From 2017 through 2020, the Ebury Parties Experienced Significant Financial and Operational Turnover

Over the years, the Ebury Entities have used credit lines provided by several lenders to purchase over 32,000 liens, worth approximately $175 million. Affidavit of John Hanratty ¶ 42 (Oct. 26, 2022) ("**Hanratty Aff.**").

From 2017 until the Covid-19 Pandemic, the Ebury Entities experienced significant growth, but also constant change. Id. ¶ 2. While Mr. Hanratty acknowledges that it is entirely possible—indeed likely—that there have been occasional inaccuracies in documents that he, the Ebury Entities, and EBCC all relied upon, none of the Ebury Parties has ever intended to deceive EBCC; indeed, former EBCC President Karen Wold, former Senior Vice President Jack Grady, and current Vice President Sahil Arora had real-time insight into the Ebury Entities' struggles and successes, and agreed with the Ebury Parties' desire to combine the Entities to streamline recordkeeping and operations. Id. ¶¶ 3–4.

Mr. Hanratty met EBCC around 2016, when the then-existing Ebury Entities were based in Rye, New York. Id. ¶ 7. EBCC issued the Ebury Entities a term sheet, and closed the Credit Agreements and Lines after ten months of due diligence, during which EBCC worked with Mr. Hanratty and the Ebury Parties' then-servicer and custodian, "**Tower**" Fund Services, LLC,  to review the Ebury Parties' historical data, current data, future financial projects, and other information. Id. ¶¶ 8–10.

FILED: NEW YORK COUNTY CLERK 10/26/2022 09:22 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 27
24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
RECEIVED NYSCEF: 10/26/2022
Court Records   Pg 577 of 688

Shortly before the Credit Lines closed in March 2017, the Ebury Entities hired "**Controller 1**." Id. ¶ 11. After closing, and with EBCC's knowledge and consent, the Ebury Parties kept using Tower to provide financial services, and also hired MTAG be their lien custodian. Id. ¶ 14. At the time, the Ebury Parties' medium-term goal was to buy out their equity holders, retire all their bank loans, and securitize their portfolio. Id. ¶ 15. To do so, the Ebury Entities need a rated servicer—and MTAG was, for all practical purposes, the only rated servicer that could do the job. Id. ¶ 16.

However, attempting to work with Tower and MTAG simultaneously was a "disaster." Id. ¶ 17. The two companies' reports and systems did not integrate well, and Tower was unhappy that it had lost the Ebury Parties' custodian and servicer business. Id. ¶ 18. In late 2017, Tower quit, leaving the Ebury Parties' financials in a shambles. Id. ¶ 19.

In 2018, Mr. Hanratty moved to Puerto Rico, while the Ebury Entities remained in Rye; eventually, the Ebury Entities opened a Puerto Rico office, and ran both offices until early 2020, after the Puerto Rico bookkeepers discovered that Controller 1 had not been keeping proper financial records, and Controller 1 resigned. Id. ¶ 21/

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 578 of 688

**B. The Ebury Parties and Non-Party McOsker have been Suing Each Other since 2019**

Before Mr. Hanratty moved to Puerto Rico, he and several Ebury Entities began working with non-party Thomas R. McOsker, who purported to engage in legitimate tax lien services. Id. ¶22. When Mr. Hanratty first moved to Puerto Rico, the Ebury Entities shared office space and some back-office support personnel with Mr. McOsker's companies. Id. ¶ 24.

Eventually, the Ebury Parties realized that Mr. McOsker was stealing from his clients, including several Ebury Entities. Id. ¶ 26. In June 2019, the Ebury Parties moved out of their shared office space and sued Mr. McOsker in the federal district court for the District of Puerto Rico. Id. ¶ 27. After Mr. McOsker argued that the federal Puerto Rico court lacked jurisdiction, Mr. Hanratty re-filed his claims in the Puerto Rico Court of First Instance. Id. ¶ 28. In 2019, Mr. McOsker counterclaimed, arguing that the dispute truly belonged in Delaware. Id. ¶ 29. Then, the Covid-19 Pandemic significantly interfered with the Puerto Rico court's operations, exacerbating an already-slow process. Id. ¶ 30.

Therefore, in February 2021, Mr. Hanratty sued in the federal district court for the District of Delaware, accusing Mr. McOsker and his cronies (the "**McOsker Defendants**") of engaging in a federal racketeering conspiracy. Id. ¶ 31. In July 2022, the Court denied the McOsker Defendants' motion to dismiss the Delaware case. Id. ¶¶ 32–33. On September 1, 2022, the McOsker Defendants filed their Delaware answer and counterclaim, accusing the various Ebury Parties of the same misconduct that they have been litigating in Puerto Rico since 2019. Id. ¶ 33. While the relevant Ebury Parties'

24-04020-dsj     Doc 1-1     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #2 State
Court Records        Pg 579 of 688

motion to dismiss those Delaware counterclaims had been due this coming Friday,

October 28, the Ebury Parties sought and received a two-week extension for that filing so

they could focus on opposing EBCC's Motion in this case. Id. 34.

### C.  After Significant Pandemic Setbacks, the Ebury Entities Finally are Profitable Again

Besides delaying the Puerto Rico litigation, the Pandemic also attacked the Ebury

Entities' business model. Id. ¶ 36.

The Ebury Entities' tax liens provide essentially two types of revenue: a steady

collection of tax payments from the property owner, or, if the property owner fails to pay

her taxes, through foreclosure on the property. Id. ¶ 37. Typically, the property owner

must pay those taxes through certified physical check, either by mail or in person with

their local municipality. Id. ¶ 38 Foreclosure proceedings, meanwhile, must wind their

way through local courts. Id. And once the Ebury Entities finally do take title of a

property, they often must invest significant time and resources in rehabilitating the

property so they can receive a return on their investments by renting or selling the

property. Id.

But the Pandemic caused many local government offices to close, thwarting

taxpayers' ability to draw and submit certified checks. Id. ¶ 39. Many jurisdictions also

imposed foreclosure and eviction freezes and closed their local courts. Id. In short, the

Pandemic froze the Ebury Entities, whose average monthly revenue fell from $1,129,307

in 2019 to $663,992 in 2020, to $330,382 in 2021. Id. ¶ 41.

Now that government operations are nearly back to "normal," the Ebury Entities

are back on track: in 2022, the Ebury Entities' average monthly revenue has risen to

$753,096—leaving the Ebury Entities in their best cash position since the Pandemic began

Id. Today, the Ebury Entities are solvent: they own assets totaling approximately $28.1

million. Id. ¶ 44.

### D. EBCC has had Full Access to the Ebury Entities' Financial and Operational Records for Ten Months

Between the Maturity Date and September 14, 2022, EBCC and the Ebury Parties

actively negotiated how to pay off the Credit Lines, with nearly-daily calls on which the

Parties reviewed the Collateral and discussed the Ebury Entities' ongoing refinancing

efforts. Id. ¶ 47. In January 2022, the Ebury Parties gave EBCC full access to all of the

Entities' financial and operational records: Quickbooks for the Ebury Entities (including

Ebury RE), Appfolio for the REOs, Zoho for managing sales and overseeing properties,

and Speedboat for servicing the lien portfolios. Id. ¶ 48.

On October 24, 2022, EBCC logged in to the Ebury Entities' Quickbooks, Zoho, and

Appfolio accounts for the first time since June, June, and March 2022, respectively. Id. ¶

51. EBCC's fact affiant, Scott Weiss, has his own credentials to log into all four of these

systems; however, he has not logged in to Speedboat since May 2022, and did not log in

to Quickbooks between May 7 and October 24, 2022. Id. ¶ 52. Just 53 minutes before Mr.

Weiss logged in to Quickbooks, the Ebury Parties' counsel had reminded EBCC's counsel

that EBCC "continues to have full access to all of [the Ebury Parties'] financials, including

their Quickbooks and other accounting software." Affirmation of Kari Parks Exhibit A

(Oct. 26, 2022) ("**Parks Aff**").

After the Credit Lines matured, the Ebury Parties offered to pay EBCC at least

interest; EBCC refused to accept payment. Id. ¶ 54.

By June 2022, the Ebury Parties had proposed a payment plan that would liquidate

the Entities and provide cash to repay the Credit Lines. Id. ¶ 55. At EBCC's request, the

Ebury Parties also obtained outside investor proposals to buy out EBCC—proposals that

EBCC did not follow up on. Id. ¶ 56.

On September 13, 2022, EBCC agreed to a negotiated version of Ebury Parties'

original repayment offer, and demanded that the Ebury Parties agree by "the end of

business" on September 15, 2022. Id. ¶ 57. The Ebury Parties returned their signature on

September 15, and prepared to pay EBCC in accordance with the term sheet. Id. ¶ 58.

EBCC did not respond to the Ebury Parties' acceptance. Id. ¶ 59.

## IV. EBCC Admitted that Mr. McOsker's Hearsay is Its Primary Reason for Suing the Ebury Parties

Ten days later, EBCC filed this lawsuit. See Dkt. 1 (Sep. 25, 2022). Three weeks

after that—on a Sunday afternoon—EBCC's litigation counsel emailed Mr. Hanratty and

his transactional counsel, asking them to accept service of its complaint and order to show

cause. See Dkt. 21 (Oct. 18, 2022). The next day, EBCC filed this Motion via order to show

cause. See Dkt. 2 (Oct. 17, 2022).

10

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 582 of 688

The Ebury Parties asked the Court to deny the OSC without further briefing, arguing that "EBCC's own delay in asserting its purported rights is dispositive pro[of] that EBCC cannot establish the imminent harm that justifies the 'drastic remedy' of a TRO or preliminary injunction: EBCC did not sue [the Ebury Parties] until eleven months after they allegedly breached the contracts, and five years after the [Ebury Parties]—'on information and belief, no less'—supposedly began fraudulently transferring EBCC's property." Dkt. 21.

In response, EBCC admitted that its only "new evidence" supporting emergency relief was "allegations contained in a counterclaim"—the Delaware counterclaim filed by Mr. McOsker. Dkt. 22 (Oct. 18, 2022).

Despite EBCC's supposed concerns about McOsker's September 2022 counterclaim, the Bank has never asked any Ebury Party about McOsker's new allegations. Hanratty Aff. ¶ 62.

In fact, EBCC has always been aware of the three McOsker lawsuits; moreover, Mr. McOsker's allegations have not materially changed over the past three years of litigation. Id. ¶ 60. EBCC also knew that Mr. Hanratty has voluntarily spoken with federal and Puerto Rico law enforcement agencies regarding McOsker's frauds—as a witness, not a target—and that one of McOsker's former lieutenants verified that McOsker had, indeed, been stealing from both the government of Puerto Rico and his own clients, including the Ebury Entities. Id. ¶ 61.

11

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 583 of 688

## V.       The Ebury Parties Worry that EBCC Will the Preliminary Injunction to Drive Them Into Insolvency and Grab Their Assets

The Ebury Parties are concerned that EBCC's requested injunction would cause significant disruption to their businesses, and possibly cause their insolvency. Id. ¶ 63.

The Ebury Parties must spend money to make money: they purchase and sell both liens and real estate, and while the foreclosure process tends to be significantly more profitable, it also involves litigation, property rehabilitation, and rental and sale costs. Id. ¶ 64. Frictionless, rapid investment decisions are essential to the Ebury Parties' business and profitability; continually moving assets slows down that process. Id. 65.

And given EBCC's decision to sue just two weeks after the Ebury Parties accepted the Term Sheet—and its attempt to leverage the TRO and demand an unnecessary court conference to pressure the Ebury Parties into premature, one-sided discovery, see Parks Decl. Exhibit A—the Ebury Parties are concerned that EBCC will abuse the proposed OSC's terms, including the 24-hour notice window and interpretation of "ordinary and necessary disbursements," and unnecessarily complicate this already-expensive litigation. Hanratty Aff. ¶66 . While EBCC has perfected its security interests in the Ebury Entities' tax liens, it cannot file UCC-1 statements for the Entities' other most significant assets: their real estate. Id. ¶ 45.

FILED: NEW YORK COUNTY CLERK 10/26/2022 09:22 PM  INDEX NO. 158207/2022

NYSCEF DOC. NO. 27          24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 10/26/2022

Court Records    Pg 584 of 688

## LEGAL STANDARD

The preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"—never on a mere "possibility of irreparable harm." Winter v. Nat'l Resources Def. Council, Inc., 555 U.S. 7, 22 (2008) (citation omitted).

When a movant seeks the classic preliminary injunction, which commands that the respondent **refrain** from changing its behavior, the movant must prove "a probability of success on the merits, danger of irreparable injury in the absence of an injunction[,] and a balance of equities in its favor." Second on Second Café, Inc. v. Hing Sing Trading, Inc., 66 A.D.3d 255, 264 (1st Dep't 2009) (citations omitted).

But the movant's burden increases when it seeks a "mandatory preliminary injunction" that "mandat[es] specific conduct:" then, it must also prove (1) its own "**clear** right to mandatory injunctive relief," and (2) that the proposed injunction "is **essential** to maintain the *status quo* pending trial." Id. at 264–65 (citations omitted) (emphasis added).

Therefore, only if "imperative, urgent, or grave necessity" exists—and if "the undisputed facts are such that without an injunction order a trial will be futile"—and if the movant presents the "clearest evidence" showing all three conjunctive elements, including that the movant seeks something **other** than "a money judgment"—then, and only then, may the Court, "acting with 'great caution,'" issue a preliminary injunction. Spectrum, 162 A.D.3d at 615 (citations omitted); accord Credit Agricole Indosuez v. Rossiyskiy Kredit Bank, 94 N.Y.2d 541, 548 (2000) (preliminary injunction inappropriate where plaintiff's cause of action for permanent injunction was "incidental to and purely

13

for the purposes of enforcement of the primarily relief sought here, a money judgment."). Disputed fact issues, "standing alone," are enough reason to deny a preliminary injunction. O'Hara v. Corp. Audit Co., 161 A.D.2d 309, 310 (1st Dep't 1990) (citation omitted).

## ARGUMENT

### I.   This Court Must Disregard EBCC's Conclusory, Hearsay, and "Information and Belief" Allegations

Conclusory allegations fail to state any claim, let alone prove up a plaintiff's much higher burden to secure a preliminary injunction. See, e.g., Wellbilt Equip. Corp. v. Red Eye Grill, L.P. 308 A.D.2d 411, 412 (1st Dep't 2003) (reversing grant of preliminary injunction in class action suit filed by undocumented immigrants against DMV; "bald, conclusory assertions are inadequate to meet the burden imposed on the proponent of preliminary injunctive relief to demonstrate a probability of ultimate success on the merits, irreparable injury in the event that injunctive relief is denied, and a balance of equities in its favor."); Cosmos Forms, Ltd. v. Furst, 172 A.D.2d 403, 403 (1st Dep't 1991) (conclusory allegations failed to prove likelihood of success on the merits).

Hearsay allegations also cannot state a claim or support a preliminary injunction. See, e.g., La Magica LLC v. 145 Atl. LLC, 154 A.D.3d 515, 516 (1st Dep't 2017) (affirming denial of preliminary injunction, observing that court could not consider hearsay in deciding the motion); Orix Credit All., Inc. v. R.E. Hable Co., 256 A.D.2d 114, 116 (1st Dep't 1998) (holding that allegations failed to plead fraud with particularity where they offered "general second-hand or third-hand rumors of Orix's misconduct"); Gerald

14

Modell Inc. v. Morgenthau, 196 Misc. 2d 354, 360 (Sup. Ct. 2003) (Gans, J.) (inter alia,

denying order to show cause seeking preliminary injunction where supporting "facts"

were "hearsay and double hearsay and [therefore] insufficient"); Encore Credit Corp. v.

LaMattina, No. CV-05-5442 (CPS), 2006 WL 148909, at *3–4 (E.D.N.Y. Jan. 18, 2006)

(refusing to grant preliminary injunction or attachment where allegations "relie[d] almost

exclusively on a Felony Complaint", but did not plead specific explaining mechanics of

alleged fraudulent transfer).

   "Information and belief" allegations similarly fail to state a claim or support a

preliminary injunction. See, e.g., Elmrock Opportunity Master Fund I, L.P. v. Citicorp N.

Am., Inc., 155 A.D.3d 411, 412 (1st Dep't 2017) (affirming dismissal of fraudulent

inducement claim whose "key allegation" was "pleaded on information and belief," and

therefore "insufficient to state the claim"). Indeed, as early as 1895, the Second

Department refused to consider an attorney's affidavit that offered various allegations

without explaining that the affiant had "personal knowledge" of the facts, and without

identifying "the source of the information." Cook v. New Amsterdam Real-Est. Ass'n, 32

N.Y.S. 888, 888–89 (2d Dep't 1895).

15

## II.      EBCC Fails to Even State Its Fraudulent Inducement or Fraudulent Claims, Let Alone "Clearly Establish" Its Likely "Success on the Merits"

Yet here, EBCC relies on conclusory, hearsay, **and** "information and belief" allegations to try to state its fraudulent inducement and transfer claims—failing its most basic CPLR 3211 and 3016(b) standards, let alone clearly prove success on the merits. Compare supra at 3–4 and, e.g., New York University v. Continental Ins. Co., 87 N.Y.2d 308, 319 (1995) (holding, inter alia, that NYU failed to state fraudulent inducement or punitive damages claims where it claimed that defendant insurer "fraudulently induced the University (and others) to purchase insurance, and to maintain such insurance, by falsely representing that it would evaluate claims in good faith and in compliance with the law and by concealing that it is and has long been engaged in a scheme and practice of refusing to indemnify its policyholders and then vindictively and improperly terminating their insurance coverage.").

To win its fraudulent inducement or transfer claims, EBCC must prove, by "clear and convincing" evidence, the Ebury Parties' *scienter*: their "actual intent to defraud." Marine Midland Bank v. Murkoff, 120 A.D.2d 122, 127 (2d Dep't 1986). New York courts must dismiss complaints that rely on "naked allegation[s]" of "badges of fraud," such as the transferor's imminent insolvency. See DLJ Mortg. Cap, Inc. v. Kontogiannis, 594 F. Supp. 2d 308, 330 (E.D.N.Y. 2009); accord Nat'l Westminister Bank USA v. Weksel, 124 A.D.2d 144, 149 (1st Dep't 1987) (citation omitted) (plaintiffs cannot plead scienter with "summar[y] allega[tions]" that lack "supporting factual detail.").

For example, as early as 1906, the First Department reversed a temporary receivership because the plaintiff had pleaded "[n]o facts" "explaining the basis for her belief" that the transfer at issue "lacked consideration" was intended to thwart collection. Dolan v. Conlon, 114 A.D. 570, 571 (1st Dep't 1906). Two decades later, the First Department rejected a fraudulent transfer claim based on "hearsay" that the plaintiff had failed to substantiate with further facts—and which was directly contradicted by defendants, who affirmed that they had "fully disclose[d] their [transfers'] purpose," "and that they are solvent and able to meet all their obligations." Anderson v. Malley, 191 A.D. 573, 574–75 (1st Dep't 1920).

More recently, the Second Department held that a complaint failed to plead fraudulent transfer where it "merely alleged in a conclusory manner that [defendant] was rendered insolvent as a result of the transfers that he made," without alleging facts that showed he "was insolvent or that he intended or believed that he would incur debts beyond his ability to pay as a result of the transfers." Swartz v. Swartz, 145 A.D.3d 818, 828 (2d Dep't 2016) (dismissing fraudulent transfer claim).

And just last year, the First Department affirmed pleadings dismissal of a fraudulent transfer claim, observing that "[s]peculative and conclusory allegations do not state a claim for constructive fraud under the Debtor and Creditor Law." Eagle Eye Collection Corp. v. Shariff, 190 A.D.3d 600, 600 (1st Dep't 2021) (citations omitted).

As in Dolan, Anderson, Swartz, and Eagle Eye, EBCC provides no facts at all to support its "information and belief" that the Ebury Parties have sold EBCC's supposed

collateral without fair consideration, or that they are using Ebury RE to hide EBCC's assets. See supra at 3–5.

On the contrary: EBCC has full access to all of the Ebury Entities' financial records—including Ebury RE's—and as in Anderson, the Ebury Parties have testified that they have never tried to deceive EBCC, and that their transactions are proper. Id. Neither of EBCC's fraud claims can justify a preliminary injunction.

### III. Because the Parties' Contractual Duties are "Open to Doubt and Uncertainty," EBCC Cannot Clearly Prove It Will Win Its Contract Claim

While the Ebury Parties do not anticipate moving for CPLR 3211 dismissal of EBCC's contract claim, the Credit Agreements' many ambiguities render EBCC unable to clearly prove success on the merits. Accord SportsChannel Am. Assocs. v. Nat'l Hockey League, 186 A.D.2d 417, 418 (1st Dep't 1992) (citation omitted) ("Injunctive relief is inappropriate when sought upon contractual language that leaves the rights of the parties open to doubt and uncertainty."); Xerox Corp. v. Neises, 31 A.D.2d 195, 198 (1st Dep't 1968) (refusing to grant preliminary injunction because contractual cause was "too imprecise and ambiguous" for court to decide that plaintiff was "likely to succeed on the merits").

The Ebury Parties' occasional financial misstatements, investor redemptions, and supposed disclosure failures do not "clearly" breach the Credit Agreements. See, e.g., CA § 5.3 (representing that the Ebury entities' financials are "correct in all **material** respects") (emphasis added); id. § 6.1 ("Each Ebury Company shall promptly inform the Lender [ . . . of] litigation, investigations and claims and all threatened litigation and claims

18

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 590 of 688

affecting an Ebury Company or Validity Guarantor that could **reasonably** be expected to result in a **Material** Adverse Effect") (emphasis added); id. § 6.26 (allowing the Ebury Entities to use the Advances "to finance ordinary and necessary business expenses").

It also is not clear that the Ebury Parties' outstanding Credit Line balance breaches the contracts: between the Maturity Date and September 2022, the Ebury Parties and EBCC were actively negotiating repayment; and just ten days before suing, the Ebury Parties accepted EBCC's repayment terms. See Hanratty Aff. ¶¶ 46–59.

EBCC filed 419 pages of contracts to support its Motion. See generally Dkts. 6, 7, 8, 9, 10, 11, 12 (Oct. 17, 2022). Because those contracts "leave[] the rights of the parties to doubt and uncertainty," EBCC falls far short of its burden to provide the "clearest evidence" supporting its requested injunction. See SportsChannel, 186 A.2d at 418; Spectrum, 162 A.D3d at 615.

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 591 of 688

**IV.    By Demanding Nothing But Money Damages, EBCC Admits It Cannot Clearly Prove "Irreparable Injury"**

**A.    When Money Can Fix the Problem, Irreparable Injury Does Not Exist**

It is black-letter law that irreparable injury does not exist, and preliminary injunctions cannot issue, if money damages can redress the plaintiff's harm. Compare Dkt. 4, Memorandum of Law in Support of OSC at 12–15 (Oct. 17, 2022) ("**OSC Br.**"). (acknowledging that "irreparable harm includes 'any injury for which money damages are insufficient,'" but ignoring that EBCC seeks nothing but money damages) and, e.g., Zodkevitch v. Feibush, 49 A.D.3d 424, 425 (1st Dep't 2008) (citations omitted) (reversing preliminary injunction directing defendants to escrow allegedly-misappropriated funds because plaintiffs "failed to make a clear showing that they would suffer irreparable injury unless that relief were granted [ . . . ] Specifically, plaintiffs failed to demonstrate that an award of monetary damages would not adequately compensate them."); U.S. Re Cos., Inc. v. Scheerer, 41 A.D.3d 152, 155 (1st Dep't 2007) (citation omitted) (reversing preliminary injunction because the "quantifiable remedy" of "money damages" "precludes a finding of irreparable harm"); Shapiro v. Shorenstein, 157 A.D.2d 833, 834–35 (2d Dep't 1990) (citation omitted) (holding that fraudulent transfer plaintiff failed to prove necessity of preliminary injunction for several independent reasons, including that "any breach on the part of the defendants may be fully redressed by money damages").

The Complaint seeks nothing but money damages: $21+ million for breach of contract and to-be-determined cash "damages" for fraudulent inducement and transfer. See Compl. at 30. The inquiry should end there.

20

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 592 of 688

## B. Our Highest Courts Have Rejected EBCC's "Well-Settled" Exception

Instead of facing this precedent head-on, EBCC just plain misrepresents the law. See generally OSC Br. at 12–15.

First, EBCC offers just two, unpublished, trial court opinions to argue that "[i]t is well settled that money damages against an insolvent debtor are an insufficient remedy to preclude injunctive relief." See id. at 12 (citing Goodstein v. Enbar, No. 654114/2016, 2017 WL 1032545, at *5 (Sup. Ct. Mar. 17, 2017); Am. Med & Life Ins. Co. v. Crossummit Enters., Inc., No. 18059/2008, 2009 WL 1574129 (Sup Ct. N.Y. Cnty. May 18, 2009)).

But CPLR 6301—the statute that governs this motion—only authorizes preliminary injunctions if the plaintiff clearly proves that the defendant (1) has engaged or imminently will be engaging (2) in **fraudulent or otherwise wrongful** behavior, (3) in order to **cause** its own insolvency. See CPLR 6301 (McKinney 2022); cf. Laco X-Ray Sys. v. Fingerhut, 88 A.D.2d 425, 429 (2d Dep't 1982) (citation omitted) ("The mere removal or assignment or other disposition of property is not grounds for attachment. Fraud cannot be inferred; it must be proved.").

Even "[t]he mere danger of asset-stripping [does not] make an exception to the general rule" that money judgment actions do not warrant preliminary relief. Credit Agricole, 94 N.Y.2d at 548–49; see also Dinner Club Corp. v. Hamlet on Olde Oyster Bay Homeowners Ass'n, 21 A.D.3d 777, 778–79 (1st Dep't 2005) (citations omitted) ("[T]he debtor's disposing of assets, even rendering the anticipated judgment uncollectible [ . . . ] will not support a temporary injunction.").

21

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 593 of 688

Indeed, our common law roundly rejects the notion that a creditor can "interfere" just because a debtor is insolvent:

> A rule of procedure which allowed any prowling creditor, before his claim was definitively established by judgment, and without reference to the character of his demand, to file a bill to discover assets, or to impeach transfers, or interfere with the business affairs of the alleged debtor, would manifestly be susceptible of the grossest abuse. A more powerful weapon of oppression could not be placed at the disposal of unscrupulous litigants.

Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc., 527 U.S. 308, 330 (1999) (quoting Wait, Fraudulent Conveyances § 73 at 110–111).

For example, in Grupo Mexicano, the Supreme Court reversed the Southern District of New York's grant, and Second Circuit's affirmance, of a preliminary injunction preventing a debtor from "dissipating, transferring, conveying, or otherwise encumbering" the creditors' right to "receive or benefit" from the debtors' "most significant asset," where the lower courts had reasoned, inter alia, that the debtors were "at risk of insolvency if not already insolvent:"

> Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available? More importantly, by adding, through judicial fiat, a new and powerful weapon to the creditor's arsenal, the new rule could radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws—including those relating to bankruptcy, fraudulent conveyances, and preferences. Because any rational creditor would want to protect his investment, such a remedy might induce creditors to engage in a "race to the courthouse" in cases involving insolvent or near-insolvent debtors, which might prove financially fatal to the struggling debtor.

527 U.S. at 330–31.

22

Similarly, the Second Department reversed preliminary relief where plaintiffs "solely [sought] money damages," but argued that "defendants are suffering or may suffer financial reverses pendente lite, and therefore may be unable to satisfy a subsequent judgment." Rosenthal v. Rochester Button Co., 148 A.D.3d 375, 376–77 (2d Dep't 1989). The Court rejected the notion that defendants' possible insolvency "satisfies the irreparable injury requirement:"

> [W]e see no reason why plaintiffs, under the circumstances herein, should receive a preference over any other unsecured creditor of Alpine. If such injunctive relief is granted on a simple showing that a defendant may at some future date be unable to pay a judgment, it would amount to a de facto judicial amendment of the requirements set forth in CPLR 6201 for attachment of assets.

Id. at 377; see also CPLR 6201 (McKinney 2022).

In an alternate universe where EBCC's "well settled law" is the law—it's not— EBCC still musters no facts to suggest that the Ebury Parties are insolvent. See generally Compl. The Ebury Parties, meanwhile, testify that their current assets **exceed** EBCC's maximum possible relief by approximately $4 million; and that EBCC's abuse of any injunctive relief is the **only** force that might cause their insolvency. See supra at 12–13. Even if this "exception" existed, it would not apply to this case.

23

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 595 of 688

### C.  A Supposed "Strong Nexus" Between Collateral and Money Damages Does Not Excuse EBCC's Failure to Clearly Prove Irreparable Harm

EBCC cites another two cases to claim that a "strong nexus[] between EBCC's interest between the Collateral and any future money judgment" warrants preliminary relief. OSC Br. at 14–15 (quoting AQ Asset Mgmt. LLC v. Levine, 111 A.D.3d 245, 259 (1st Dep't 2013) and analyzing Bank of America, N.A. v. Yi, 294 F. Supp. 3d 62, 79 (W.D.N.Y. 2018)). Neither case is relevant: in AQ, the First Department granted a preliminary injunction simultaneously with summary judgment for the same parties, and in Yi, the debtors agreed that they were liable for the contested debt. See AQ, 111 A.D.3d at 260–61; Yi, 294 F. Supp. 3d at 72.

Despite raising its "strong nexus" argument, EBCC does not discuss CPLR 6301's "subject of the action" provision—perhaps because it only grants relief if (1) that "subject" is a concrete, specific, identifiable res, **and** (2) EBCC still clearly proves the customary, mandatory three elements: success on the merits, irreparable harm, and balance of the equities. See, e.g., Zodkevitch, 49 A.D.3d at 425.

In Credit Agricole, the Court of Appeals explained exactly why "subject of [EBCC's] action" is the cash that the Ebury Parties allegedly owe pursuant to the Credit Agreements—not the collateral that backs the cash loan:

> In no proper or legal sense can a defendant do or permit any act in violation of the plaintiff's rights respecting the subject of the action, **in an action on contract for the recovery of money only**. The plaintiff in such an action **has no rights as against the property of the defendant** until he obtains a judgment, and **until then he has no legal right to interfere with the defendant in the use and sale of the same**.

94 N.Y.2d at 545–46 (quoting Campbell v. Ernest, 19 N.Y.S. 123, 125 (2d Dep't 1892))

(emphasis in Credit Agricole); see also Compl. at 30 (seeking only money damages).

But even if the collateral were the "subject of the action," EBCC would still have

to "clearly" prove irreparable injury. See, e.g. Zodkevitch, 49 A.D.3d at 425; Leo v. Levi,

304 A.D.2d 621, 622–23 (2d Dep't 2003). The Zodkevitch trial court had issued a

preliminary injunction directing the defendant–appellant to escrow identifiable funds

that he allegedly had misappropriated from the plaintiffs. 49 A.D.3d at 425. Even though

those funds were identifiable and specific, the First Department reversed: "irreparable

injury" remained "a necessary element on a motion for preliminary injunction," and

plaintiffs failed to "clear[ly] show[]" "that an award of monetary damages would not

compensate them." Zodkevitch, 49 A.D.3d at 425.

Likewise, in Leo v. Levi, the Second Department reversed the Supreme Court's

grant of preliminary injunction that restrained one defendant from paying another out of

the collateral on a loan issued by plaintiff. 304 A.D.2d at 622–23. Because the bank was

suing to collect on the loan itself—not to foreclose on collateral—the assets were "not

specific funds which c[ould] rightly be regarded as 'the subject of the action.'" Id.

(citations omitted). Again, the Second Department applied the usual test: "since the

plaintiffs could be adequately compensated by damages or could pursue relief under

CPLR 6201(3) for a provision order of attachment, [plaintiffs failed] to demonstrate

irreparable injury." Id. (citations omitted).

**V.** **EBCC Cannot Clearly Prove that the Equities Favor Preliminary Relief: The Bank Demands the "Most Powerful Weapon of Oppression" to Pursue Money Damages that Total Just 0.00388% of Its Parent's Assets—But 78% of the Ebury Entities' Assets**

Even the equities don't favor EBCC: if the Ebury Parties filed for bankruptcy tomorrow, EBCC would still recover significant sums, since the Bank has filed UCC-1 Statements perfecting its security interests in the liens. See Hanratty Aff. ¶ 45.

And even if, somehow, EBCC collected $0 from those liens, EBCC remains part of a 172-year-old bank with total assets of $5.61 billion, including $4.14 billion in "net loans and leases." FDIC, Emigrant Bank Financial & Regulatory Reporting – FDIC Cert #12054 (June 30, 2022); FDIC, Emigrant Bank Institution Details (Oct. 21, 2022). Meanwhile, the Ebury Entities are young, and just finally beginning to recover from the Pandemic's two-year attack on their cash flow. Hanratty Aff. ¶ 41.

Finally, while EBCC's Complaint pleads money damages that total **78%** of the Ebury Entities' assets, that same final judgment is worth just **0.00388%** of Emigrant Bank's net assets, or **0.00526%** of Emigrant Bank's "net loans and leases. Compare Compl. at 30 and FDIC, Emigrant Bank Financial & Regulatory Reporting – FDIC Cert #12054 (June 30, 2022).

At the end of the day, EBCC would be just fine if the Court refuses to issue a preliminary injunction. But there is no guarantee that the Ebury Entities will survive EBCC's "interfere[nce]." Accord Grupo Mexicano, 527 U.S. at 330.

26

FILED: NEW YORK COUNTY CLERK 10/26/2022 09:22 PM
NYSCEF DOC. NO. 27

INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/26/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 598 of 688

## VI.    EBCC Must Post a $30 Million Bond to Secure Its Desired Injunction

If the Court does decide to issue a preliminary injunction, it must also require EBCC to post an undertaking of no less than $30 million. See CPLR 6312(b) (McKinney 2022).

This Court must price CPLR 6312(b)'s undertaking to reflect the Ebury Parties' "possible damages" caused by an injunction wrongfully issued. See Visual Equities Inc. v. Sotheby's, Inc., 199 A.D.2d 59, 59 (1st Dep't 1993) (citations omitted); see also Margolies v. Encounter, Inc., 42 N.Y.2d 475, 479 (1977) (movant must post bond that "afford[s] reasonable protection to the defendant against an erroneous or improper grant of this special provisional remedy"). The "possible damages" encompass a wide range of resulting harms, including lost interest on restrained funds, as well as attorneys' fees incurred in vacating the injunction. Louie v. David & Chiu Place Rest., Inc., 261 A.D.2d 150, 152 (1st Dep't 1999).

For example, the Appellate Division approved a $15 million bond to reflect damages that Citigroup would incur if one of its borrowers did not, in fact, have the right to continue to draw on an advancing term loan, and a $278,5000 bond to reflect damages that Sotheby's would incur in being restrained from delivering an original print of the Declaration of Independence. See Destiny USA Holdings, LLC v. Citigroup Glob. Markets Realty Corp., 69 A.D.3d 212, 224 (4th Dep't 2009); Sotheby's, 199 A.D.2d at 59.

Here, EBCC argues (without proof) that the Ebury Parties are insolvent; the Ebury Parties, meanwhile, testify that EBCC's ability to interfere with their business may jeopardize the Entities' very ability to survive. See supra at 12–13.

27

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records        Pg 599 of 688

Therefore, $30 million is a reasonable approximation the Ebury Parties' possible damages: the total loss of their assets, plus interest and attorneys' fees. Cf. Grupo Mexicano, 527 U.S. at 331 (warning that "[b]ecause any rational creditor would want to protect his investment," allowing preliminary injunctions solely because a debtor might be insolvent could "induce creditors to engage in a 'race to the courthouse'," perhaps "prov[ing] financially fatal to the struggling debtor.").

## CONCLUSION

Between this Motion's "sharp issues of [disputed] fact," EBCC's demand for nothing but money damages, and its proposed injunction's disruption to the *status quo* and the Ebury Entities' fundamental operations, EBCC has "failed completely" to "clear[ly] show[]" that its preliminary injunction is "necess[ary] or justifi[able]." Accord O'Hara, 161 A.D.3d at 309–10.

The Ebury Parties respectfully request that the Court deny EBCC's Motion.


Dated: October 26, 2022
       New York, New York


                                    Respectfully submitted,

                                    /s/ Kari Parks
                                    Kari Parks
                                    Victor Wang (Admission Pending)
                                    GUSRAE KAPLAN NUSBAUM PLLC
                                    120 Wall Street
                                    New York, New York 10005
                                    (212) 269-1400
                                    kparks@gusraekaplan.com
                                    vwang@gusraekaplan.com

                                    *Counsel for The Ebury Parties*


28

## WORD COUNT CERTIFICATION

I certify that this memorandum of law complies with the word count limit of N.Y.C.R.R. 202.8-b for documents prepared by computer. Microsoft Word's word count tool represents that this memorandum, excluding the caption, table of contents, table of authorities, and signature block, totals 6,937 words.

Dated: October 26, 2022
 New York, New York

/s/ Kari Parks
Kari Parks

29

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 601 of 688

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

|  |  |  |
|---|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | x : : : | |
|  | : | Index No. 158207/2022 |
| Plaintiff, | : | |
| v. | : : | |
| JOHN ARTHUR HANRATTY, | : | **MOTION SEQUENCE NO. 001** |
| EBURY STREET CAPITAL, LLC, | : | |
| EBURY FUND 1, LP, | : | |
| EBURY FUND 2, LP, | : | **REPLY MEMORANDUM OF** |
| EBURY 1EMI LLC, | : | **LAW IN SUPPORT OF** |
| EBURY 2EMI LLC, | : | **ORDER TO SHOW CAUSE** |
| EB 1EMIALA LLC, | : | |
| EB 2EMIALA LLC, | : | |
| EB 1EMIFL, LLC, | : | |
| EB 2EMIFL, LLC, | : | |
| EB 1EMIIN, LLC, | : | |
| EB 2EMIIN, LLC, | : | |
| EB 1EMIMD, LLC, | : | |
| EB 2EMIMD, LLC, | : | |
| EB 1EMINJ, LLC, | : | |
| EB 2EMINJ, LLC, | : | |
| EB 1EMINY, LLC, | : | |
| EB 2EMINY, LLC, | : | |
| EB 1EMISC, LLC, | : | |
| EB 2EMISC, LLC, | : | |
| RE 1EMI LLC, | : | |
| RE 2EMI LLC, | : | |
| EB 1EMIDC, LLC, | : | |
| ARQUE TAX RECEIVABLE FUND | : | |
| (MARYLAND), LLC, | : | |
| EBURY FUND 1FL, LLC, | : | |
| EBURY FUND 2FL, LLC, | : | |
| EBURY FUND 1NJ, LLC, | : | |
| EBURY FUND 2NJ, LLC, | : | |
| RED CLOVER 1, LLC, | : | |
| EBURY RE LLC, and | : | |
| XYZ CORPS. 1-10, | : | |
|  | : | |
| Defendants. | : | |
|  | x | |

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................... 1

**ARGUMENT** ................................................................................................................... 1

   A. EBCC Is Highly Likely to Succeed on the Merits ............................................. 1

      1. Defendants essentially concede EBCC's key factual allegations ................................. 1

      2. EBCC has demonstrated that it will succeed on its breach of contract claim .............. 2

      3. EBCC has demonstrated that it is likely to succeed on its fraud claims ...................... 3

   B. Insolvency Is a Well-Established Ground for Irreparable Injury ......................... 4

   C. An Injunction Is Necessary to Maintain the Status Quo ..................................... 9

   D. The Court Should Impose Only a Nominal Undertaking ................................. 10

   E. The Court Should Impose Strict Deadlines for Defendants to Comply with the
      Preliminary Injunction ........................................................................................ 12

**CONCLUSION** ............................................................................................................. 13

FILED: NEW YORK COUNTY CLERK 10/27/2022 11:15 PM
NYSCEF DOC. NO. 28
INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/27/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 603 of 688

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*7th Sense, Inc.* v. *Liu*,
220 A.D.2d 215 (1st Dep't 1995) ...........................................................10

*AQ Asset Mgmt. LLC* v. *Levine*,
111 A.D.3d 245 (1st Dep't 2013) .............................................................7

*Assaf Imports, Ltd., Inc.* v. *20 W. 38th St. Assocs.*,
97 A.D.2d 702 (1st Dep't 1983) ............................................................10

*Auguston* v. *Spry*,
282 A.D.2d 489 (2d Dep't 2001) ..............................................................4

*Ayro Commc'ns, Inc.* v. *Jaymer Commc'ns Corp.*,
6 Misc. 3d 1022(A) (Sup. Ct. Kings Cnty. 2005) ...................................2

*Bank of Am., N.A.* v. *Won Sam Yi*,
294 F. Supp. 3d 62 (W.D.N.Y. 2018) ...................................................5, 7

*Barbes Rest. Inc.* v. *ASRR Suzer 218, LLC*,
140 A.D.3d 430 (1st Dep't 2016) .............................................................2

*Bernheim* v. *Matthew Bender & Co.*,
244 A.D.2d 161 (1st Dep't 1997) ...........................................................10

*Bonded Concrete, Inc.* v. *Town of Saugerties*,
42 A.D.3d 852 (3d Dep't 2007) ................................................................9

*Brenntag Int'l Chems., Inc.* v. *Bank of India*,
175 F.3d 245 (2d Cir. 1999).....................................................................5

*Computer World Sol., Inc.* v. *Apple Fund, L.P. (In re Computer World Sol., Inc.)*,
427 B.R. 680 (Bankr. N.D. Ill. 2010) ....................................................11

*DeCarlo* v. *Sanese*,
65 A.D.2d 945 (4th Dep't 1978)...............................................................2

*Deckert* v. *Indep. Shares Corp.*,
311 U.S. 282 (1940)..................................................................................4

*First Fed. of Mich.* v. *Barrow*,
878 F.2d 912 (6th Cir. 1989) ............................................................10, 11

FILED: NEW YORK COUNTY CLERK 10/27/2022 11:15 PM
NYSCEF DOC. NO. 28

INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/27/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 604 of 688

*Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999)......................................................5, 6

*Ithilien Realty Corp.* v. *180 Ludlow Dev. LLC*,
    80 A.D.3d 455 (1st Dep't 2011) ..................................................10

*Karr Graphics Corp.* v. *Spar Knitwear Corp.*,
    192 A.D.3d 673 (2d Dep't 2021) ..................................................10

*Laco X-Ray Systems* v. *Fingerhut*,
    88 A.D.2d 425 (2d Dep't 1982) ....................................................6

*Lanzi* v. *Brooks*,
    43 N.Y.2d 778 (1977) ..................................................................4

*Leo* v. *Levi*,
    304 A.D.2d 621 (2d Dep't 2003) ................................................8, 9

*Luis* v. *United States*,
    578 U.S. 5 (2016)..........................................................................5

*Nesis* v. *Paris Int'l Lighting, Inc.*,
    184 A.D.2d 485 (1st Dep't 1992) ..................................................9

*Petry* v. *Gillon*,
    199 A.D.3d 1277 (3d Dep't 2021) ................................................2

*Philip Morris USA Inc.* v. *Scott*,
    561 U.S. 1301 (2010) (Scalia, J., in chambers) ...........................5

*Pludeman* v. *N. Leasing Sys., Inc.*,
    10 N.Y.3d 486 (2008) ..................................................................4

*Quantum Corp. Funding, Ltd.* v. *Assist You Home Health Care Servs. of Va.*,
    144 F. Supp. 2d 241 (S.D.N.Y. 2001)..........................................5

*Ruiz* v. *Meloney*,
    26 A.D.3d 485 (2d Dep't 2006) ....................................................2

*Sardino* v. *Scholet Fam. Tr.*,
    192 A.D.3d 1433 (3d Dep't 2021) ..............................................10

*Sargiss* v. *Magarelli*,
    12 N.Y.3d 527 (2009) ..................................................................4

*Spectrum Stanford, LLC* v. *400 Atl. Title, LLC*,
    162 A.D.3d 615 (1st Dep't 2018) ..................................................6

FILED: NEW YORK COUNTY CLERK 10/27/2022 11:15 PM
NYSCEF DOC. NO. 28

INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/27/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 605 of 688

*Strecher-Traung Lithograph Corp.* v. *Lithographers & Photoengravers Int'l Union, Loc. 11L, AFL-CIO,*
46 Misc. 2d 925 (Sup. Ct. Monroe Cnty. 1965) ...................................................2

*Sylmark Holdings Ltd.* v. *Silicone Zone Int'l Ltd.,*
5 Misc. 3d 285 (Sup. Ct. N.Y. Cnty. 2004) .......................................................3

*Visual Equities Inc.* v. *Sotheby's, Inc.,*
199 A.D.2d 59 (1st Dep't 1993) .................................................................10, 11

*Weiss* v. *Herlihy,*
23 A.D. 608 (1st Dep't 1897) ....................................................................9

*Wright* v. *Lewis,*
21 Misc. 3d 1120(A) (Sup. Ct. Kings Cnty. 2008) ..............................................10

*Zodkevitch* v. *Feibush,*
49 A.D.3d 424 (1st Dep't 2008) ...............................................................8

## Statutes and Rules

CPLR 3016(b)..........................................................................................3, 4

CPLR 3211...............................................................................................4

CPLR 6301...............................................................................................6, 8

CPLR 6312(b)............................................................................................9, 10

CPLR 6312(c).............................................................................................2

## Other Authorities

11A Charles A. Wright et al., Federal Practice and Procedure § 2948.1 (3d ed. Apr. 2022 update) ....................................................................................5

1 Dan B. Dobbs, Law of Remedies § 2.5(2) (1993) ...................................................5

5 John N. Pomeroy, A Treatise on Equity Jurisprudence, § 1911 (4th ed. 1919) ...........................5

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 606 of 688

## INTRODUCTION

Defendants fail to controvert EBCC's detailed showing of its entitlement to a preliminary injunction. Instead, Defendants request that the Court decline to enter a preliminary injunction because Defendants' "financial misstatements" have been only "occasional." (Dkt. 27 at 23.) Defendants' failure to dispute the key facts of this case is fatal to their opposition and EBCC respectfully requests that the Court enter a preliminary injunction.

## ARGUMENT

**A.    EBCC Is Highly Likely to Succeed on the Merits.**

1.    Defendants essentially concede EBCC's key factual allegations.

In their opposition papers, Defendants do not dispute that:

- they failed to repay EBCC at the maturity date, in violation of the promissory notes (Dkt. 7 at 12, 16);

- they owe EBCC over $21 million in outstanding principal and interest (Dkt. 4 at 10);

- they have been self-servicing almost 90% of EBCC's purported collateral and have misrepresented the eligibility of collateral by requesting advances against self-serviced liens (*id.*);

- they inflated the value of EBCC's collateral in a December 2021 lien tape and misleadingly double-counted collateral when requesting advances in 2018 and 2019 (*id.* at 10-11);

- they misused advances and sold EBCC's collateral to pay off investors and other lenders (*id.* at 11);

- they have sold around 90 properties (worth more than $4 million) in 2022 that were EBCC's collateral, without remitting the sale proceeds to EBCC;

- they have listed for sale another 88 properties that are EBCC's collateral (for approximately $4.8 million total), without agreeing to remit any sale proceeds to EBCC (Dkt. 4 at 20).[1]

---

[1]    Defendants also do not dispute that each Defendant is an alter ego of one another with respect to EBCC's claims (Dkt. 4 at 16-18), or that Defendant John Hanratty is personally liable

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 607 of 688

Instead, Defendants attempt to brush off these facts as "occasional inaccuracies" or "occasional financial misstatements." (Dkt. 27 at 10, 23.)  Defendants' failure to dispute these factual allegations constitutes admissions for the purposes of this motion.  *Strecher-Traung Lithograph Corp.* v. *Lithographers & Photoengravers Int'l Union, Loc. 11L, AFL-CIO*, 46 Misc. 2d 925, 926 (Sup. Ct. Monroe Cnty. 1965) (finding, on a motion for a preliminary injunction, that the defendants admitted facts alleged by the plaintiff "by fail[ing] to deny" them); *DeCarlo* v. *Sanese*, 65 A.D.2d 945, 945 (4th Dep't 1978).

In any event, "the presentation by the defendant of evidence sufficient to raise an issue of fact . . . shall not in itself be grounds for denial of [a motion for a preliminary injunction]." CPLR 6312(c); *see Barbes Rest. Inc.* v. *ASRR Suzer 218, LLC*, 140 A.D.3d 430, 431 (1st Dep't 2016) ("A likelihood of success on the merits may be sufficiently established even where the facts are in dispute and the evidence need not be conclusive."); *Ruiz* v. *Meloney*, 26 A.D.3d 485, 486-87 (2d Dep't 2006); *see also Ayro Commc'ns, Inc.* v. *Jaymer Commc'ns Corp.*, 6 Misc. 3d 1022(A) (Sup. Ct. Kings Cnty. 2005) (unpublished table disposition) (finding a preliminary injunction proper "to maintain the status quo, even [where] the movant's success on the merits cannot be determined at the time that the application for a preliminary injunction is brought").  Defendants have failed to raise an issue of fact sufficient to warrant the denial of injunctive relief here.

2.    <u>EBCC has demonstrated that it will succeed on its breach of contract claim.</u>

EBCC has established a high likelihood of success on the merits of its breach of contract claim (Dkt. 4 at 12-13), which *alone* is sufficient to establish EBCC's entitlement to an injunction.  *See Petry* v. *Gillon*, 199 A.D.3d 1277, 1279 (3d Dep't 2021) (noting that "to obtain a

---

for all damages incurred by EBCC as a result of Defendants providing EBCC with false information about the eligibility of collateral (*id.* at 13).

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 608 of 688

preliminary injunction" a plaintiff need only demonstrate a likelihood of success on the merits of

"one of their claims"). Defendants do not dispute that, under the promissory notes, they were

required to repay EBCC all outstanding principal, interest, costs, and expenses at the maturity date.

(Dkt. 7 at 12, 16.) Nor do they dispute that they failed to repay EBCC or that EBCC has been

harmed by their failure to repay the debts. Thus, EBCC is likely to prevail on its breach of contract

claim. *See Sylmark Holdings Ltd.* v. *Silicone Zone Int'l Ltd.*, 5 Misc. 3d 285, 295 (Sup. Ct. N.Y.

Cnty. 2004).

Rather than address these clear contractual breaches, Defendants volunteer *other*

provisions of the Credit Agreements that they also have breached. (Dkt. 27 at 23-24.) While

EBCC appreciates Defendants' suggestions, EBCC's claim focuses on its clear right to repayment

under the promissory notes. (Dkt. 4 at 13.) Notwithstanding Defendants' baseless assertions that

the relevant contractual language has "many ambiguities" and "leaves the rights of the parties open

to doubt and uncertainty" (Dkt. 27 at 23 (quotation omitted)), the Court should find that EBCC has

established a likelihood of success on the merits of its breach of contract claim for non-payment

based on the unambiguous and undisputed language of the promissory notes.

3.    <u>EBCC has demonstrated that it is likely to succeed on its fraud claims.</u>

EBCC also has established a likelihood of success on the merits of its fraudulent

inducement and fraudulent transfer claims. (Dkt. 4 at 13-16.) EBCC has shown that Defendants

misrepresented material facts related to the custody of EBCC's collateral prior to EBCC executing

various amendments to the Credit Agreements, and that Defendants have sold and actively

continue to sell real estate properties that are EBCC's collateral, including real estate properties

that resulted from foreclosures on tax lien certificates that were EBCC's collateral. (*Id.*) To refute

that showing, Defendants assert that EBCC's use of "information and belief" allegations in the

Complaint is fatal to any showing of a likelihood of success on the merits of these claims. (Dkt. 27

at 1920.) But Defendants misstate the law (and fail even to quote the governing standard). Under CPLR 3016(b), EBCC was required only to state "the circumstances constituting the wrong . . . in detail." *See Lanzi* v. *Brooks*, 43 N.Y.2d 778, 780 (1977) ("This provision requires only that the misconduct complained of be set forth in sufficient detail to clearly inform a defendant with respect to the incidents complained of . . . ."); *Pludeman* v. *N. Leasing Sys., Inc.*, 10 N.Y.3d 486, 492 (2008) ("[S]ection 3016(b) may be met when the facts are sufficient to permit a reasonable inference of the alleged conduct."). EBCC has provided Defendants with detailed allegations identifying the precise circumstances of the alleged wrongs.

Further, the CPLR 3016(b) standard "is not construed so strictly so as to prevent an otherwise valid cause of action where it would be impossible for the plaintiff to state in detail all of the circumstances of the fraud because the knowledge of those details is in the exclusive possession of the defendants." *See Auguston* v. *Spry*, 282 A.D.2d 489, 490 (2d Dep't 2001); *Pludeman*, 10 N.Y.3d at 491-92 ("[W]here concrete facts 'are peculiarly within the knowledge of the party' charged with the fraud . . . it would work a potentially unnecessary injustice to dismiss a case at an early stage where any pleading deficiency might be cured later in the proceedings.").[2] Here, although EBCC has presented evidence of Defendants' fraudulent scheme, the intricate details of the scheme's means and methods are in Defendants' exclusive possession (until discovery commences).

### B.    Insolvency Is a Well-Established Ground for Irreparable Injury.

EBCC faces irreparable injury because Defendants are insolvent and are actively dissipating EBCC's remaining collateral. Money damages therefore are an inadequate remedy.

---

[2]    *See generally Sargiss* v. *Magarelli*, 12 N.Y.3d 527, 531 (2009) ("On a CPLR 3211 motion to dismiss, a court may consider affidavits to remedy pleading problems.").

([Dkt. 4](#) at 18-21.)  That principle has been recognized by the U.S. Supreme Court, *see Deckert* v.

*Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (holding that a preliminary injunction was proper

where "there were allegations that [the defendant] was insolvent");[3] the Second Circuit, *see*

*Brenntag Int'l Chems., Inc.* v. *Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999); and learned

treatises, *see* 5 John N. Pomeroy, A Treatise on Equity Jurisprudence, § 1911, p. 4340 (4th ed.

1919) (noting "the general recognition by the courts of the glaring insufficiency of a judgment for

damages against an insolvent").[4]

       Defendants rely on *Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund,*

*Inc.*, 527 U.S. 308, 330 (1999), to argue that the Court may not grant EBCC a preliminary

injunction.  (*See* [Dkt. 27](#) at 27.)  But *Grupo Mexicano* is inapplicable.  By its own terms, *Grupo*

*Mexicano* applies only to the case of "a general creditor . . . [who] ha[s] no cognizable interest

either at law or in equity, in the property of his debtor."  *Id.* at 319-20; *see Bank of Am., N.A.* v.

*Won Sam Yi*, 294 F. Supp. 3d 62, 77 (W.D.N.Y. 2018) ("Notably, the *Grupo Mexicano* decision

distinguished the situation attendant to general unsecured creditors from that involving a creditor

asserting some interest in or on the property. . . .  Indeed, several courts have distinguished *Grupo*

---

[3]    *See also Philip Morris USA Inc.* v. *Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in
chambers) ("Normally the mere payment of money is not considered irreparable, but . . . [i]f
expenditures cannot be recouped, the resulting loss may be irreparable." (internal citations
omitted)).  Justice Scalia was the author of *Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond*
*Fund, Inc.*, 527 U.S. 308, 330 (1999)—the main case upon which Defendants rely (*see* [Dkt. 27](#) at
27).

[4]    *See also* 1 Dan B. Dobbs, Law of Remedies § 2.5(2), pp. 130–31 (1993) (noting that "[t]he
legal remedy is usually inadequate" where money damages are "available but not collectible"); *see*
*also* 11A Charles A. Wright et al., Federal Practice and Procedure § 2948.1 (3d ed. Apr. 2022
update) ("[E]xtraordinary circumstances, such as a risk that the defendant will become insolvent
before a judgment can be collected, may give rise to the irreparable harm necessary for a
preliminary injunction." (footnotes omitted)).

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 611 of 688

*Mexicano* on this ground.").[5]  Here, it is undisputed that EBCC has liens on Defendants' assets

and is a secured creditor.  Accordingly, EBCC has demonstrated that it faces irreparable injury due

to Defendants' insolvency.

Defendants' reliance on *Spectrum Stanford, LLC* v. *400 Atlantic Title, LLC*, 162

A.D.3d 615 (1st Dep't 2018), is similarly misplaced.  (*See* Dkt. 27 at 28.)  In *Spectrum Stanford*,

the plaintiff sought "to enforce a contractual right under a loan agreement to replace the current

property manager with a property manager of its choosing."  *Id*. at 615-16.  Contrary to

Defendants' characterization—that the case was about a "default on [a] $235 million loan" (Dkt.

27 at 28)—*Spectrum Stanford* stands for the reasonable proposition that having a property

"managed by an agent that [a plaintiff] does not desire" is not an irreparable harm.  That case does

not hold that there is no "imperative, urgent, or grave necessity" to enjoin an insolvent party who

has defaulted on a multi-million-dollar loan and continues to dissipate a secured creditor's

collateral.

Finally, Defendants invoke CPLR 6301 to argue that EBCC is not entitled to a

preliminary injunction.  (Dkt. 27 at 26.)  According to Defendants, CPLR 6301 "only authorizes

preliminary injunctions if the plaintiff clearly proves that the defendant (1) has engaged or

imminently will be engaging (2) in fraudulent or otherwise wrongful behavior, (3) in order to cause

its own insolvency."  (*Id*. (emphasis omitted).)  Not only is this construction wrong, but also

Defendants create it out of whole cloth.  Neither CPLR 6301 nor *Laco X-Ray Systems* v. *Fingerhut*,

---

[5]    *See, e.g., Luis* v. *United States*, 578 U.S. 5, 17 (2016) (confirming that *Grupo Mexicano*
applies only to unsecured creditors); *Quantum Corp. Funding, Ltd.* v. *Assist You Home Health
Care Servs. of Va.*, 144 F. Supp. 2d 241, 249 (S.D.N.Y. 2001).  *Grupo Mexicano* also addressed
the equitable powers of the federal courts under the Judiciary Act of 1789, not the powers of this
Court.  *See* 527 U.S. at 318.

88 A.D.2d 425, 429 (2d Dep't 1982), contains Defendants' language, and the Court should decline to adopt Defendants' rewrite of the statute.

Defendants alternatively contend that EBCC "musters no facts to suggest that the Ebury Parties are insolvent." (Dkt. 27 at 28.) That argument ignores the detailed factual showing EBCC made in support of its order to show cause. EBCC demonstrated that Defendants have failed to repay an outstanding debt of more than $21 million that has been pending for almost a year. (Dkt. 4 at 19 (providing definitions of "insolvency," including a failure "to pay debts as they become due"); Dkt. 5 ¶ 15.) In addition, Defendants' own independent auditor has expressed "substantial doubts about [Defendants'] ability to continue as a going concern," given the amounts outstanding under the Credit Facilities in 2019. (Dkt. 5 ¶ 23; Dkt. 13 at 4, 6.)

Against all of that evidence—which Defendants do not dispute—Defendants baldly contend that "their current assets exceed EBCC's maximum possible relief by approximately $4 million." (Dkt. 27 at 14, 28; Dkt. 24 ¶ 44.) Putting aside the self-serving and conclusory nature of that assertion, the lack of any documentary or evidentiary corroboration, and Defendants' well-established and undisputed history of inflating the value of their assets (see Dkt. 5 ¶ 19), Defendants themselves *admit* that their purported assets are illiquid and are not available to satisfy a money judgment. They concede that "once the Ebury Entities finally do take title of a property, they often *must invest significant* time and *resources* in rehabilitating the property so they can receive a return on their investment by renting or selling the property." (Dkt. 24 ¶ 38 (emphasis added); *id*. ¶ 64 ("The Ebury Entities *must spend money to make money* . . . [and] the foreclosure process . . . involves litigation, property rehabilitation, and rental and sale costs." (emphasis added)).). Defendants are insolvent and should be barred from further dissipating EBCC's collateral.

Defendants also fail to distinguish *AQ Asset Management LLC* v. *Levine*, 111 A.D.3d 245, 259 (1st Dep't 2013), and *Bank of America*, 294 F. Supp. 3d at 79. (Dkt. 4 at 20-21.) Defendants first contend that the cash proceeds of Emigrant's collateral cannot be the "subject of the action" under CPLR 6301 because the subject must be "a concrete, specific, identifiable res." (Dkt. 27 at 29.) But the cash proceeds of Emigrant's collateral *are* the subject of this action—the proceeds themselves are Emigrant's collateral. (Dkt. 5 ¶¶ 10-11; Dkt. 6 at 7 (defining EBCC's collateral to include "all replacements, products and proceeds . . . whether cash or noncash"), 84 (same); *id.* at 17 (stating that EBCC's security interests "shall include the rents, proceeds and products of the Collateral"), 94 (same); Dkt. 9 at 5, 20.)

Second, Defendants argue that *Zodkevitch* v. *Feibush*, 49 A.D.3d 424 (1st Dep't 2008) and *Leo* v. *Levi*, 304 A.D.2d 621 (2d Dep't 2003) establish a heightened evidentiary burden to establish irreparable injury. (Dkt. 27 at 30.) But the cases do no such thing. *Zodkevitch* merely denied injunctive relief where the "plaintiffs failed to demonstrate that an award of monetary damages would not adequately compensate them." 49 A.D.3d at 425. Here, EBCC has demonstrated that an award of money damages is inadequate due to Defendants' insolvency and their threatened actions in violation of EBCC's rights in its collateral. Similarly, *Leo* reversed the grant of a preliminary injunction to prevent the plaintiffs' former law partner from being paid legal fees during the pendency of their suit against him, which sought "contribution" for payments on a joint loan. 304 A.D.2d at 622-23. Although the legal fees had been collateral for the loan—which "had been repaid in full"—the plaintiffs did not have a security interest in the legal fees targeted by the injunction.[6] *Id.* Here, unlike the plaintiffs in *Leo*, EBCC has a security interest in the

---

[6] Defendants mischaracterize *Leo* to the extent they claim that it involved "one defendant . . . paying another out of the collateral on a loan issued by plaintiff" and "the bank . . . suing to

targeted assets. (Dkt. 5 ¶¶ 10-11; Dkt. 6 at 7, 17, 84, 94; Dkt. 9 at 5, 20.) Thus, EBCC can demonstrate that it faces irreparable harm absent injunctive relief.

### C.    An Injunction Is Necessary to Maintain the Status Quo.

In its opening memorandum of law, EBCC demonstrated that the balance of the equities favors granting injunctive relief. (Dkt. 4 at 21-22.) Not only is there a substantial likelihood that EBCC will not be able to collect on its security interests or recover in this proceeding absent injunctive relief, but also the requested injunction is necessary to "maintain the status quo" during the pendency of the proceedings. (*Id.*) EBCC also has identified fraudulent transfers of assets, among other fraudulent misconduct, which strongly tilts the balance of the equities in its favor. *Nesis* v. *Paris Int'l Lighting, Inc.*, 184 A.D.2d 485, 486 (1st Dep't 1992) (finding the balance of the equities favored plaintiff upon "the demonstration of a fraudulent transfer of assets").

Defendants' only response is to argue that they should be allowed to dissipate EBCC's collateral because EBCC has other assets. (Dkt. 27 at 7, 31-32.) But that is not how the balance of the equities works. *See Weiss* v. *Herlihy*, 23 A.D. 608, 614 (1st Dep't 1897) ("[H]e who comes into equity must come with clean hands."). The fact that EBCC has other assets does not justify Defendants' failure to honor their contractual commitments to repay EBCC, nor does it excuse Defendants' fraudulent misconduct. Defendants' attempt to distract from their own wrongful acts should be rejected.

---

collect on the loan itself." (Dkt. 27 at 30.) The bank was not even a party to the case, let alone a plaintiff.

D.    **The Court Should Impose Only a Nominal Undertaking.**

Under CPLR 6312(b), an undertaking must be limited to only "damages and costs which may be sustained by reason of the injunction."  CPLR 6312(b); *see Bonded Concrete, Inc.* v. *Town of Saugerties*, 42 A.D.3d 852, 854-55 (3d Dep't 2007) (noting that although "[t]he amount of the undertaking is discretionary . . . it should be rationally related to the potential damages recoverable if it is ultimately determined that the injunction was unwarranted").    EBCC respectfully submits that the Court should set a nominal undertaking in the amount of $1 because Defendants have failed to demonstrate that they will suffer any damages or costs by reason of the injunction.  *See Wright* v. *Lewis*, 21 Misc. 3d 1120(A) (Sup. Ct. Kings Cnty. 2008) (unpublished table disposition) ("Courts, in exercising their discretion, have set nominal undertakings in cases in which the defendant's potential damages, if the defendant prevails, are minimal."); *see also Sardino* v. *Scholet Fam. Tr.*, 192 A.D.3d 1433, 1434-35 (3d Dep't 2021) (affirming the imposition of a $1 undertaking).[7]

Defendants speculate that they face "possible damages" of $30 million based on "the total loss of their assets."  (Dkt. 27 at 33.)  Defendants offer no support for this contention and merely caution that "EBCC's requested preliminary relief . . . *if abused*, [could] cause the Ebury Entities' insolvency" (Dkt. 24 ¶ 63) (emphasis added), and state that "the Ebury Parties are significantly concerned that EBCC will abuse the proposed OSC's terms . . . eventually resulting

---

[7]        In no event should the undertaking exceed $10,000.  *See Ithilien Realty Corp.* v. *180 Ludlow Dev. LLC*, 80 A.D.3d 455 (1st Dep't 2011) ("The undertaking in the nominal amount of $10,000 was 'rationally related' to the potential damages that defendants would incur if the preliminary injunction proves to be unwarranted."); *Bernheim* v. *Matthew Bender & Co.*, 244 A.D.2d 161, 161 (1st Dep't 1997); *Assaf Imports, Ltd., Inc.* v. *20 W. 38th St. Assocs.*, 97 A.D.2d 702, 703 (1st Dep't 1983).

-10-

in Ebury's insolvency" (*id*. ¶ 66). These allegations plainly are insufficient to establish damages under CPLR 6312(b).

      *First*, a defendant may not establish possible damages through "unsubstantiated and speculative claims," *Karr Graphics Corp.* v. *Spar Knitwear Corp.,* 192 A.D.3d 673, 676 (2d Dep't 2021), or "conclusory and unsupported testimony," *7th Sense, Inc.* v. *Liu*, 220 A.D.2d 215, 217 (1st Dep't 1995). The key case on which Defendants rely—*Visual Equities Inc.* v. *Sotheby's, Inc.*, 199 A.D.2d 59 (1st Dep't 1993) (*see* Dkt. 27 at 32)—confirms that an undertaking may not account for "speculative" damages where "no showing [has been] made of any damages," 199 A.D.2d at 59.[8] Defendants' assertion that the requested injunction will "cause the Ebury Entities' insolvency" is speculative, which precludes consideration of such damages in fixing the amount of the undertaking.[9]

      *Second*, the requested injunction will not cause "the total loss of [Defendants'] assets." (*Id*.) Instead, it would authorize Defendants to make "ordinary and necessary disbursements related to Defendants' tax lien or real estate businesses or living expenses."[10] (Dkt. 23 at 2.) Defendants do not explain how an injunction with a carve-out for ordinary and necessary disbursements could "jeopardize the Entities' very ability to survive." (Dkt. 27 at 27.)

---

[8]    Defendants misrepresent the holding of *Visual Equities*. The Appellate Division did not "approve[] . . . a $278,500[] bond to reflect damages that Sotheby's would incur in being restrained from delivering an original print of the Declaration of Independence." (*Contra* Dkt. 27 at 32.) Instead, it held that the trial court's "consideration of [the third party's] possible damages . . . was speculative" and ordered the undertaking "reduced." *Visual Equities*, 199 A.D.2d at 59.

[9]    Defendants also qualify their allegations, arguing that the requested injunction could cause harm only "*if abused*." (Dkt. 24 ¶¶ 63, 66 (emphasis added).)

[10]    *See generally Computer World Sol., Inc.* v. *Apple Fund, L.P. (In re Computer World Sol., Inc.)*, 427 B.R. 680, 690 (Bankr. N.D. Ill. 2010) ("A debt cannot be incurred in the ordinary course of business where the debtor engaged in fraudulent conduct."); *First Fed. of Mich.* v. *Barrow*, 878 F.2d 912, 918 (6th Cir. 1989) ("[F]raudulent business manipulations . . . do not comport with ordinary course of business practices commonly pursued by properly conducted [companies].").

-11-

Similarly, the requested injunction bars Defendants from transferring assets during the pendency of this litigation and requires them to deposit certain proceeds into an escrow account. (Dkt. 23 at 2-3.) Defendants fail to show how an injunction freezing their assets would cause "the total loss of their assets." (Dkt. 27 at 28.) *Finally*, Defendants have conceded that they owe EBCC $21 million and that they have granted EBCC liens over their assets. *See* pp. 1-2, *supra*. Thus, the main loss Defendants face is not "by reason of the injunction"; rather, it is by reason of a final judgment of this Court holding Defendants to their commitments under the Credit Agreements.

### E. The Court Should Impose Strict Deadlines for Defendants to Comply with the Preliminary Injunction.

On October 19, this Court entered a temporary restraining order directing Defendants "to deposit any proceeds" from the sales of certain assets into an escrow account. (Dkt. 23 at 3.) Rather than comply, Defendants have flouted the Court's order. (*See* Dkt. 26.) Since the TRO was entered more than one week ago, Defendants have failed to respond to requests about the amount of proceeds remaining in their possession or even *which Defendant* has possession of the proceeds. (*Id*. at 6.) Defendants also have failed to complete the necessary forms to establish an escrow account (Ex. A to Willscher Reply Affirm.), and now speculate that "it's unlikely" that the cash proceeds from past sales are still available, given their "usual course . . . to reinvest proceeds into purchasing new liens." (*Compare* Dkt. 26 at 4, *with* Dkt. 24 ¶ 41 (claiming that "the Ebury Entities [are] in their best cash position since the Pandemic began").) When asked for proof of these supposed lien purchases, Defendants refused. (Dkt. 26 at 1-4.)

In the order to show cause, EBCC requested "such other and further relief as the Court deems just and proper." (Dkt. 23 at 3.) To prevent the Court from being burdened with ongoing disputes about Defendants' noncompliance with the preliminary injunction, EBCC respectfully requests that the Court impose a reasonable deadline for Defendants to comply with

-12-

the escrow requirement of the preliminary injunction (five business days), as well as to comply

with any reasonable request from EBCC for information to verify Defendants' compliance with

the injunction (two business days).[11]

## **CONCLUSION**

EBCC respectfully requests that the Court grant the requested injunctive relief.

Dated:   October 27, 2022
      New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*

Alexander J. Willscher
Austin P. Mayron
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business
Credit Corporation*

---

[11]     EBCC has a clear right to this information independent of the current litigation.  (Dkt. 6 at 24 (Section 6.2) (providing that EBCC may "inspect, examine, review or audit such Ebury Company's books and records . . . at such time and place as may reasonably be requested by" EBCC, following an event of default); *id*. at 28 (Section 6.30) (same).)  In the interest of fairness, the Court may further order that, to the extent Defendants object to a request for information from EBCC, they must raise it with the Court by a joint phone call to the Court's law clerks, per the Court's individual practices, within two business days.

-13-

FILED: NEW YORK COUNTY CLERK 10/27/2022 11:15 PM
NYSCEF DOC. NO. 28
INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/27/2022

24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 619 of 688

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with the word count limit of

N.Y.C.R.R. 202.8-b for documents prepared by use of a computer because it contains 4,167 words.

Dated:   October 27, 2022                          /s/ Alexander J. Willscher
        New York, New York                          Alexander J. Willscher

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 620 of 688

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| EMIGRANT BUSINESS CREDIT CORPORATION, | : | |
| | : | |
| | : | Index No. 158207/2022 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN ARTHUR HANRATTY, | : | **MOTION SEQUENCE NO. 001** |
| EBURY STREET CAPITAL, LLC, | : | |
| EBURY FUND 1, LP, | : | |
| EBURY FUND 2, LP, | : | **REPLY AFFIRMATION OF** |
| EBURY 1EMI LLC, | : | **ALEXANDER J. WILLSCHER** |
| EBURY 2EMI LLC, | : | |

EMIGRANT BUSINESS CREDIT
CORPORATION,

                    Plaintiff,

        v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

                    Defendants.

Index No. 158207/2022

**MOTION SEQUENCE NO. 001**

**REPLY AFFIRMATION OF
ALEXANDER J. WILLSCHER**

**ALEXANDER J. WILLSCHER**, an attorney duly admitted to practice law in the Courts of the State of New York, affirms the truth of the following statements, under the penalties of perjury:

1.      I am a partner at the firm of Sullivan & Cromwell LLP, counsel for Plaintiff Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned matter.  I am familiar with the matters set forth below.

2.      I submit this reply affirmation in support of EBCC's Order to Show Cause.

3.      True and correct copies of emails between EBCC's counsel and Defendants' counsel are attached as Exhibit A.  I have redacted the contact information of third parties that appears in the email chains.

Dated:   October 27, 2022               */s/ Alexander J. Willscher*
             New York, New York               **ALEXANDER J. WILLSCHER**

FILED: NEW YORK COUNTY CLERK 10/27/2022 11:15 PM
NYSCEF DOC. NO. 29
INDEX NO. 158207/2022
RECEIVED NYSCEF: 10/27/2022
24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State
Court Records   Pg 622 of 688

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this affirmation complies with the word count limit of N.Y.C.R.R.

202.8-b for documents prepared by use of a computer because it contains 112 words.

Dated:   October 27, 2022                          _/s/ Alexander J. Willscher_
         New York, New York                       Alexander J. Willscher

-3-

24-04020-dsj     Doc 1-1     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #2 State
Court Records     Pg 623 of 688

## Mayron, Austin P.

| | |
|---|---|
| **From:** | Mayron, Austin P. |
| **Sent:** | Friday, October 21, 2022 1:20 PM |
| **To:** | 'Kari Parks' |
| **Cc:** | Willscher, Alexander J. |
| **Subject:** | RE: NYSCEF Alert: New York - Commercial - Other - Commercial Division - Entry of Order/Judgment 158207/2022 (Emigrant Business Credit Corporation v. John Arthur Hanratty et al) |

Hi Kari,

The vendor told us that they are waiving the escrow agent fees; should that change, we can discuss costs.  The vendor also has requested KYC materials from each party; I will send a separate email introducing you and including their requests for KYC materials.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Friday, October 21, 2022 5:32 AM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** [EXTERNAL] Re: NYSCEF Alert: New York - Commercial - Other - Commercial Division - Entry of Order/Judgment 158207/2022 (Emigrant Business Credit Corporation v. John Arthur Hanratty et al)

Hi Austin,

We should be fine with your vendor, assuming your client is covering the cost.

I'll ask John about the paying entity and amount and get back to you later today.

Best,
Kari

**Kari Parks, Associate | Gusrae Kaplan Nusbaum PLLC |** 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to

another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

On Oct 20, 2022, at 12:33, Mayron, Austin P. <mayrona@sullcrom.com> wrote:

Hi Kari,

For the escrow agreement, could you please let us know which of the Defendants will be depositing proceeds from past or future sales of tax lien certificates or REOs into the escrow account (in addition to an approximate amount they intend to deposit upon account opening)? I have attached our vendor's template form, which we hope to work from.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Mayron, Austin P.
**Sent:** Wednesday, October 19, 2022 7:26 PM
**To:** 'Kari Parks' <kparks@gusraekaplan.com>; Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: NYSCEF Alert: New York - Commercial - Other - Commercial Division - Entry of Order/Judgment 158207/2022 (Emigrant Business Credit Corporation v. John Arthur Hanratty et al)

Hi Kari,

Thank you for reaching out. We would prefer to use a dedicated escrow account for this litigation and are speaking with a vendor. We expect to have additional details for you tomorrow, but please let us know if you object to this plan. In addition, the vendor has asked us how much you expect to deposit in order to price their offer. Could you please provide us with an estimate of how much Defendants intend to deposit to account for proceeds from past sales of tax lien certificates and REO properties that they have not already remitted to Emigrant?

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Wednesday, October 19, 2022 4:54 PM
**To:** Willscher, Alexander J. <willschera@sullcrom.com>; Mayron, Austin P. <mayrona@sullcrom.com>

Subject: [EXTERNAL] FW: NYSCEF Alert: New York - Commercial - Other - Commercial Division - Entry of Order/Judgment 158207/2022 (Emigrant Business Credit Corporation v. John Arthur Hanratty et al)

Hi Alexander and Austin,

Hope you're having a good day. Per Justice Chan's OSC, we propose using our firm's IOLA account as the "escrow account" for TRO Section B. Please let me know what you think. Thanks!

Best,
Kari

---

**From:** efile@nycourts.gov <efile@nycourts.gov>
**Sent:** Wednesday, October 19, 2022 16:52
**To:** pellerm@sullcrom.com; Kari Parks <kparks@gusraekaplan.com>; efile@nycourts.gov; willschera@sullcrom.com; scmanagingclerk@sullcrom.com; mayrona@sullcrom.com
**Subject:** NYSCEF Alert: New York - Commercial - Other - Commercial Division - Entry of Order/Judgment 158207/2022 (Emigrant Business Credit Corporation v. John Arthur Hanratty et al)

## New York County Supreme Court
## NOTIFICATION OF ENTRY OF ORDER/JUDGMENT
## 10/19/2022

**Document: 23 - ORDER TO SHOW CAUSE**

Please note that the above referenced order/judgment has been entered in the office of the County Clerk. The date and time of entry are indicated by the file stamp affixed to the document and displayed on the document detail page.

Unless otherwise directed by the court, receipt of this notification does not constitute service of the referenced order/judgment upon any party. See e-filing rules regarding service of an order/judgment with notice of entry. 202.5-b(h)(2).

### Case Information

Index #: **158207/2022**
Caption: **Emigrant Business Credit Corporation v. John Arthur Hanratty et al**
eFiling Status: **Partial Participation Recorded**
Assigned Case Judge: **Margaret Pui Yee Chan**

### E-mail Service Notifications Sent

| Name | Email Address |
|---|---|
| ALEXANDER WILLSCHER | willschera@sullcrom.com |

FILED: NEW YORK COUNTY CLERK 10/27/2022 11:15 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 30    24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 10/27/2022

Court Records    Pg 626 of 688

| KARI PARKS | kparks@gusraekaplan.com |
| AUSTIN MAYRON | mayrona@sullcrom.com |

## E-mail Service Notifications NOT Sent

Court rules require hard copy service upon non-participating parties and attorneys who have opted-out or declined consent

| Party | Attorney |
|-------|----------|
| XYZ Corps., Defendant/Respondent | No Representation Recorded |

*NOTICE:* This e-mail is intended only for the named recipient and for the purposes of the New York State Courts E-Filing System. If you are neither the intended recipient nor a person designated to receive messages on behalf of the intended recipient, notify the sender immediately.

*If you are unsure of the contents or origin of this email, it is advised to NOT click on any links provided. Instead, log into your NYSCEF account to access the documents referred to in this email. Thank you.*

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**

**Phone:** 646-386-5956

**Website:** http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml [nycourts.gov]

---

**\*\*This is an external message from:** kparks@gusraekaplan.com **\*\***

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

## Mayron, Austin P.

| | |
|---|---|
| **From:** | Mayron, Austin P. |
| **Sent:** | Friday, October 21, 2022 1:23 PM |
| **To:** | 'Kari Parks' |
| **Cc:** | 'Tendler, David '; Choi, Jin ; Demarco, Debra ; Willscher, Alexander J. |
| **Subject:** | FW: Escrow Account for Litigation |
| **Attachments:** | Incubency Exhibit.docx; Sample Ownership Letter - Escrow.doc.docx; 2021 FinCEN Form.pdf; W9.pdf |

Kari,

Please see below request for KYC materials for the escrow account.  Defendants would be the Depositor/Party A.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Tendler, David Redacted
**Sent:** Friday, October 21, 2022 11:48 AM
**To:** Choi, Jin Redacted ; Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; Demarco, Debra Redacted
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation

Hello Austin,

I have included our KYC outline below, which needs to be completed before the closing. As a reminder, we can now accept third party, self-initiated e-signatures for the Agreement and Incumbency Exhibit. Please let me know if you have any questions.

**Depositor/Party A:**
1. **Certificates of Formation and Good Standing**
2. **W-9** (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (Preferred)*. Please note that the entity's address listed on the W-9 should **MATCH** the entity's address that is listed on the FinCEN Certification of Beneficial Ownership Form (see below).
    - Please also provide a copy of the EIN Confirmation Letter provided by the IRS at the time of EIN/TIN issuance, that reflects the EIN/TIN listed on the W-9, for verification purposes.
3. **Ownership Letter** (sample attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (Preferred)*.
    - Please also provide, **prior to closing**, an organizational chart that lists all beneficial owners who have, directly or indirectly, a 10% or greater ownership interest in the Purchaser/Depositor (including their ownership percentages).
4. *FinCEN Certification of Beneficial Ownership Form* (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (Preferred)*.
    - Control Person of the Purchaser/Depositor – The name on the form **MUST** match the government-issued photo ID provided.
    - Government-issued photo ID is required for the Control Person/Beneficial Owner(s). Please note that non-U.S.-issued IDs must be notarized.

- If a passport is provided, the residential address of the individual must be provided as well.
5. **Executed Incumbency** (Exhibit of Escrow Agreement) —Need to be provided at least 5 days before closing. DOESN'T need to be Citi-bank initiated
    - Government-issued photo ID is required for any/all individuals listed -- if a passport is provided, the residential address of the individual must be provided as well.

**Party B:**

1. **W-9** (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (Preferred)*.
2. **Executed Incumbency** (Exhibit of Escrow Agreement) -- Need to be provided at least 5 days before closing, DOESN'T need to be Citi-bank initiated
    - Government-issued photo ID is required for any/all individuals listed -- if a passport is provided, the residential address of the individual must be provided as well

**David Tendler**
Escrow Business Development

Citi Private Bank, Law Firm Group
153 E. 53rd Street, 23rd Floor
New York, NY
Mobile: Redacted

Important Disclosures [privatebank.citibank.com]

# GUSRAE KAPLAN NUSBAUM PLLC

### ATTORNEYS AT LAW

120 WALL STREET-25ᵀᴴ FLOOR
NEW YORK, NEW YORK 10005

OF COUNSEL
ROBERT L. BLESSEY

SCOTT H. GOLDSTEIN
MARTIN H. KAPLAN
LAWRENCE G. NUSBAUM

TEL (212) 269-1400
FAX (212) 809-4147

www.gusraekaplan.com

**November 16, 2022**

**VIA NYSCEF**
**The Honorable Margaret Pui Yee Chan**
**Justice of the Supreme Court, New York County**
**Commercial Division**
**60 Centre Street, Room 659**
**New York, New York 10007**

　　　　RE: Emigrant Business Credit Corporation v. John Arthur Hanratty et al., No.
158207/2022

**Dear Justice Chan:**

　　　　I represent the "Ebury Parties" in the above-captioned "Action" and write to provide one supplementary exhibit in further opposition to Plaintiff Emigrant Business Credit Corporation's ("EBCC") motion for temporary restraining order ("TRO") and preliminary injunction ("PI") via Order to Show Cause ("OSC"). See Dkt. 27, Named Defendants' Memorandum of Law in Opposition to OSC (Oct. 26, 2022) ("Opposition Brief"). The Ebury Parties have respectfully requested that the Court deny EBCC's motion for preliminary injunction, lift the TRO, and allow this breach-of-loan-contract case to proceed in the usual course. See generally id.

　　　　EBCC filed its summons and complaint on September 25, 2022, alleging that the Named Defendants breached Credit Agreements in November 2021; fraudulently induced EBCC to execute various contracts between October 2018 and August 2021; and, "on information and belief," "since 2017," the Ebury Parties "have transferred" property that allegedly belongs to EBCC, in violation of New York's fraudulent transfer statutes. See Dkt. 1 ƒƒ 99, 102–24 (Sep. 25, 2022).

GUSRAE KAPLAN NUSBAUM PLLC

The Honorable Margaret Pui Yee Chan
Supreme Court, New York County
Commercial Division
November 16, 2022
Page 2

On October 18, 2022, undersigned counsel filed a letter requesting that Your Honor deny the OSC without further briefing or deny EBCC the ability to file a reply brief, emphasizing that there was no urgency here: EBCC was suing to enforce contracts allegedly breached ten months prior, and did not even attempt to serve their "Complaint" until Sunday, October 16, 2022, when they threatened, via email to Defendant John Hanratty and his transactional counsel, to move for a TRO and PI.  See Dkt. 21 (Oct. 18, 2022); see also id. at 2 (citing Citibank, N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").

EBCC filed an opposing letter, in which it admitted that the only reason why it filed this suit and sought preliminary relief was "new" September 2022 "allegations contained in a counterclaim filed in federal court in Delaware" by non-party Thomas R. McOsker, who claims to be Mr. Hanratty's "former business partner." See Dkt. 22 at 1–2 (Oct. 18, 2022).

Accordingly, among other issues, the Ebury Parties' Opposition emphasized that EBCC had been aware of the Ebury Parties' disputes for years, and that the "new" accusations against the Ebury Parties were not new at all:

Eventually, the Ebury Parties realized that Mr. McOsker was stealing from his clients, including several Ebury Entities. In June 2019, the Ebury Parties moved out of their shared office space and sued Mr. McOsker in the federal district court for the District of Puerto Rico. After Mr. McOsker argued that the federal Puerto Rico court lacked jurisdiction, Mr. Hanratty re-filed his claims in the Puerto Rico Court of First Instance. In 2019, Mr. McOsker counterclaimed, arguing that the dispute truly belonged in Delaware. Then, the Covid-19 Pandemic significantly interfered with the Puerto Rico court's operations, exacerbating an already-slow process.

GUSRAE KAPLAN NUSBAUM PLLC

The Honorable Margaret Pui Yee Chan
Supreme Court, New York County
Commercial Division
November 16, 2022
Page 3

> Therefore, in February 2021, Mr. Hanratty sued in the federal district court for the District of Delaware, accusing Mr. McOsker and his cronies (the "McOsker Defendants") of engaging in a federal racketeering conspiracy. In July 2022, the Court denied the McOsker Defendants' motion to dismiss the Delaware case. On September 1, 2022, the McOsker Defendants filed their Delaware answer and counterclaim, accusing the various Ebury Parties of the same misconduct that they have been litigating in Puerto Rico since 2019. While the relevant Ebury Parties' motion to dismiss those Delaware counterclaims had been due this coming Friday, October 28, the Ebury Parties sought and received a two-week extension for that filing so they could focus on opposing EBCC's Motion in this case.

**Opposition Brief** at 7–8.

The relevant Ebury Parties filed that Delaware motion to dismiss on Monday, November 14, 2022. Therefore, please find annexed the memorandum in support of their motion to dismiss the McOsker Defendants' Counterclaim pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), for failing to plead any of its claims or the District of Delaware's personal jurisdiction over the third-party defendants. See Exhibit B.

Respectfully submitted,

/s/ Kari Parks
Kari Parks

CC: All counsel of record (via NYSCEF)

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EBURY STREET CAPITAL, LLC, EB 1EMIALA, LLC, EB 2EMIALA, LLC, EBURY FUND 1 NJ LLC, and EBURY FUND 2 NJ, LLC,<br><br>              Plaintiffs–Counterclaim Plaintiffs,<br><br>    v.<br><br>THOMAS R. MCOSKER, ANDREW KERNAN, BADEL HERNANDEZ, LIENCLEAR – 0001, LLC, LIENCLEAR – 0002, LLC, LIENCLEAR, LLC, BLOXTRADE, LLC, BCMG SERVICES, LLC, BCMG INTERNATIONAL, LLC, and SITONA VENTURES LLC,<br><br>              Defendants–Counterclaim Plaintiffs–Third-Party Plaintiffs,<br><br>    v.<br><br>JOHN HANRATTY, PING XIE, SARAH WELLS, DENNISSE MÉNDEZ, SHIRLEY VEGA, JOHN BRONZO, PATRICK SEYMOUR, EB LEVRE I, LLC, EBURY FUND I, LP, EBURY FUND 2, LP, EB 1EMIDC, LLC, RED CLOVER 1, LLC, WHITE CLOVER 1, LLC, BLACK CLOVER I, LLC, EBURY FUND IC1, LLC, EBURY FUND 2CI, LLC, and EBURY RE, LLC,<br><br>              Third-Party Defendants. | C.A. No. 21-cv-00203-MN |

## THE EBURY PARTIES' OPENING BRIEF IN SUPPORT OF
## MOTION TO DISMISS COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

GUSRAE KAPLAN NUSBAUM PLLC
Kari Parks (*pro hac vice*)
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com

SMITH KATZENSTEIN & JENKINS LLP
Kathleen M. Miller (No. 2898)
Julie M. O'Dell (No. 6191)
1000 N. West Street, Suite 1501
Wilmington Delaware 19801
(302) 652-8400
kmiller@skjlaw.com
jodell@skjlaw.com

*Attorneys for The Ebury Parties*

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iv

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND ............................................................................................................ 2

    I.  Plaintiffs Allege that the McOsker Parties Have Run a Multi-Year Ponzi Scheme to Trick Their Clients—Including Plaintiffs—Into Giving Up Millions of Dollars' Worth of Tax Lien Certificates ...................................................................................................... 2

    II.  In July 2022, Judge Dawson Denied the McOsker Parties' Motion to Dismiss the Ebury Plaintiffs' RICO and Civil Conspiracy Claims .................................................. 5

    III.  In September 2022, the McOsker Parties Filed 13 Counter- and Third-Party Claims, Adding 17 Ebury Entities and Employees as Third-Party Defendants .................................... 6

        A.  The McOsker Parties Claim that Mr. McOsker—With Zero Help or Funding—Created the CRIM Proposal Sometime Between 2014 and 2017 ...................................... 6

        B.  The McOsker Parties Claim that They Contracted with Unidentified Ebury Parties Sometime Between 2017 and 2019 ................................................................. 7

    IV.  Defendant BCMG Services and Non-Party Lesser Flaming LLC Executed the BCMG Capital Contract ..................................................................................................... 8

    V.  The McOsker Parties Allege that Mr. Hanratty Did Not Finance the CRIM Proposal, and Attempt to Defend Against Plaintiffs' Amended Complaint ................................... 8

    VI.  The McOsker Parties Claim that Mr. Hanratty Did Not Give Them Full Access to the Ebury Parties, and "Slandered" Them When He Sued .......................................... 10

    VII.  The McOsker Parties Allege Nearly No Facts About the Ebury Employees' or Entities' Conduct ................................................................................................................ 12

        A.  The Ebury Employees ....................................................................................... 12

        1.  Sarah Wells ....................................................................................... 12

        2.  Dennisse Méndez ............................................................................... 13

        3.  Shirley Vega ...................................................................................... 13

        4.  John Bronzo ....................................................................................... 14

        5.  Patrick Seymour ................................................................................ 14

        6.  Ping Xie ............................................................................................. 15

B.    The Ebury Entities .................................................................................. 15

1.    Ebury Street Capital, LLC .......................................................... 16

2.    EB 1EMIALA, LLC .................................................................... 16

3.    EB 2EMIALA, LLC .................................................................... 16

4.    Ebury Fund 1 NJ LLC ................................................................ 16

5.    Ebury Fund 2 NJ, LLC ............................................................... 17

6.    EB Levre I, LLC ........................................................................ 17

7.    Ebury Fund I, LP ....................................................................... 17

8.    Ebury Fund 2, LP ...................................................................... 18

9.    EB 1EMIDC, LLC ...................................................................... 18

10.   Red Clover 1, LLC ..................................................................... 18

11.   White Clover 1, LLC .................................................................. 19

12.   Black Clover I, LLC ................................................................... 19

13.   Ebury Fund IC1, LLC ................................................................ 19

14.   Ebury Fund 2CI, LLC ................................................................ 19

15.   Ebury RE, LLC .......................................................................... 19

LEGAL STANDARD ............................................................................................ 20

ARGUMENT .......................................................................................................... 21

I.  Puerto Rico Law Governs the McOsker Parties' Common Law Claims ............................. 21

A.    The BCMG Capital Contract Includes Two Puerto Rico "Governing Law" Clauses..22

B.    The McOsker Parties' Tort Claims Arise out of Puerto Rico Contacts Between Puerto Rico Residents ............................................. 23

II.  The McOsker Parties Fail to Plead the Existence of Any Contract Enforceable Against Any Ebury Parties, Let Alone Breach-of-Contract's Other Elements............................................. 24

A.    The McOsker Parties Do Not Explain Who Should Defend Themselves Against the Breach-of-Contract Claim.............................................. 24

B.    The McOsker Parties Cannot Enforce the BCMG Operating Agreement Against Any Ebury Party ............................................. 25

III.  The McOsker Parties' Torts are Time-Barred ................................................. 25

IV.  Tardiness Aside, the McOsker Parties Fail to Plead Their Torts' Elements ..................... 26

A.    Conversion........................................................................... 26

B.   Tortious Interference ................................................................... 27

C.   Defamation ................................................................................... 28

D.   Unjust Enrichment....................................................................... 29

V. The McOsker Parties Fail to Plead the Existence of Any RICO Enterprise, Let Alone Racketeering Activity that Injured them.................................................. 30

VI.  The McOsker Parties Fail to Plead RICO or Civil Conspiracy ......................................... 33

VII.  The Court Cannot Exercise Personal Jurisdiction Over the Third-Party Defendants ...... 34

CONCLUSION.................................................................................... 35

Court Records    Pg 637 of 688

# TABLE OF AUTHORITIES

Page(s)

Cases

A.M. Capen's Co. v. Am. Trading & Prod. Corp.,
  200 F. Supp. 2d 34 (D.P.R. 2002)...........................................................27

Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,
  660 F. Supp. 1362 (D. Conn. 1987).........................................................34

Annulli v. Panikkar,
  200 F.3d 189 (3d Cir. 1999).................................................................31

Ashcroft v. Iqbal,
  556 U.S. 662 (2009)...................................................................20, 24

Associated Gen. Contractors of Cal., Inc. v. Cal. State Council,
  459 U.S. 519 (1983).........................................................................21

A-Valey Engineers, Inc. v. Bd. of Chosen Freeholders,
  106 F. Supp. 2d 711 (D.N.J. 2000).........................................................34

Barreto Peat, Inc. v. Luis A. Ayala Colon Sucrs., Inc.,
  709 F. Supp. 321 (D.P.R. 1989).............................................................26

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007)...................................................................20, 24

Berg Chilling Sys., Inc. v. Hull Corp.,
  435 F.3d 455 (3d Cir. 2006).................................................................21

Black & Yates, Inc. v. Mahogany Ass'n, Inc.,
  129 F.2d 227 (3d Cir.)......................................................................33

Blount Fin. Serv. Inc. v. Walter E. Heller & Co.,
  819 F.2d 151 (6th Cir. 1987) ...............................................................31

Certain Underwriters at Lloyds, London v. Chemtura Corp.,
  160 A.3d 457 (Del. 2017) ...................................................................22

iv

Chin v. Chrysler LLC,
    538 F.3d 272 (3d Cir. 2008) ............................................................... 21

Colon v. Bladés,
    914 F. Supp. 23  (D.P.R. 2012) ........................................................... 28

Fed. Ins. Co. v. Banco de Ponce,
    582 F. Supp. 1388 (D.P.R. 1984) ....................................................... 26

Flip Mortgage Corp. v. McElhone,
    841 F.2d 531 (4th Cir. 1988) .............................................................. 31

Flovac, Inc. v. Airvac, Inc.,
    84 F. Supp. 3d 95 (D.P.R. 2015) ........................................................ 25

Fowler v. UPMC Shadyside,
    578 F.3d 203 (3d Cir. 2009) .......................................................... 20, 35

Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc.,
    115 P.R. Dec. 553, 1984 WL 270915 (P.R. 1984) ............................ 27

General Office,
    115 P.R. Offic. Trans. ......................................................................... 27

Gierbolini Rosa v. Banco Popular de Puerto Rico,
    930 F. Supp. 712 (D.P.R. 1996) ......................................................... 28

Gov't of Puerto Rico v. Carpenter Co.,
    442 F. Supp. 3d 4647 (D.P.R. 2020 .................................................... 29

H.J. Inc. v. Northwestern Bell Tel. Co.,
    492 U.S. 229 (1989) ...................................................................... 30, 31

Harris v. Goderick,
    No. 05-22039-CIV, 2012 WL 12542429 (S.D. Fla. Oct. 5, 2012) ......... 20

Heirs of Sorbá v. Viñas,
    49 P.R.R. 31 (1935) ........................................................................... 26

Hughes v. Consol-Penn. Coal Co.,
    945 F.2d 594 (3d Cir. 2011) .............................................................. 30

Hull Dobbs Co. v. Superior Court,
    81 P.R.R. 214 (P.R. 1959) ................................................................. 26

In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,
    578 F. Supp. 3d 2676 (D.P.R. 2021 ........................................................ 29

In re Garrido Jimenez,
    455 B.R. 51 (D.P.R. 2011) .................................................................... 25

In re OSC 1 Liquidating Corp.,
    529 B.R. 825 (Bankr. D. Del. 2015) ....................................................... 22

Island Airlines, LLC v. Bohlke,
    No. SX-2016-CV-00404, 2022 WL 474132 n.7 (D.V.I. Feb. 14, 2022) .................. 21

Jane Voe #2 v. Archdiocese of Milwaukee,
    700 F. Supp. 2d 653 (D. Del. 2010) ....................................................... 34

Kolar v. Preferred Real Est. Invs., Inc.,
    361 F. App'x 354 (3d Cir. 2010) ................................................... 30, 31, 32

Lum v. Bank of Am.,
    361 F.3d 217 (3d Cir. 2004) ........................................................... 30, 32

Marshall-Silver Constr. Co. v. Mendel,
    894 F.2d 593 (3d Cir. 1990) ................................................................ 31

Martinez Colon v. Santander Nat'l Bank,
    4 F. Supp. 2d 53 (D.P.R. 1998) ............................................................ 25

Menasco, Inc. v. Wasserman,
    886 F.2d 681 (4th Cir. 1989) ............................................................... 31

MirTech v. AgroFresh Inc.,
    561 F. Supp. 3d 447 (D. Del. 2021) ........................................................ 26

Montalban v. Centro Com. Plaza Carolina,
    132 D.P.R. 785 (1993) ..................................................................... 27

New Comm. Wireless Servs., Inc. v. SprintCom, Inc.,
    287 F.3d 1 (1st Cir. 2002) ................................................................. 27

Ocaso, S.A. Compañia de Seguros y Reaseguros v. Puerto Rico Maritime Shipping Authority,
    915 F. Supp. 1244 (D.P.R. 1996) .......................................................... 25

Odesser v. Continental Bank,
    676 F. Supp. 1305 (E.D. Pa. 1987) ........................................................ 33

Penn. Emp. Benefit Tr. Fund v. Zeneca, Inc.,
    710 F .Supp.2d 458 (D. Del. 2010) ......................................................... 23

Phillips v. Cnty. of Allegheny,
    515 F.3d 224 (3d Cir. 2008) ........................................................... 20, 35

R.R. Isla Verde Hotel Corp. v. Howard Johnson Int'l, Inc.,
    121 Fed. App'x. 870 (1st Cir. 2005) ........................................................ 27

Rolon v. Rafael Rosario & Assocs., Inc.,
    450 F. Supp. 2d 153 (D.P.R. 2006) ........................................................ 33

Rose v. Bartle,
    871 F.2d 331 (3d Cir. 1989) ................................................................ 33

Shoemaker v. McConnell,
    556 F. Supp. 2d 351 (D. Del. 2008) ....................................................... 35

Swierkiewicz v. Sorema N.A.,
    534 U.S. 506 (2002) ....................................................................... 24

Time Share Vacation Club v. Atlantic Resorts, Ltd.,
    735 F.2d 61 (3d Cir. 1984) ........................................................... 34, 35

Travelers Indem. Co. v. Lake,
    594 A.2d 38 (Del. 1991) ................................................................... 22

Triangle Cayman Asset Co. v. LG & AC, Corp.,
    Civ. No. 16-2863 (FAB), 2018 WL 10581534 (D.P.R. Aug. 3, 2018) ................... 28

United States v. Falcone,
    311 U.S. 205 (1940) ....................................................................... 33

United States v. Kreimer,
    609 F.2d 126 (5th Cir. 1980) ......................................................... 31, 32

United States v. Viola,
    35 F.3d 37 (2d Cir. 1994) ................................................................. 33

Western Assocs. Ltd v. Market Square Assocs.,
    235 F.3d 629 (D.C. Cir. 2001) ............................................................. 30

Westernbank Puerto Rico v. Kachkar,
    Civ. No. 07-1606 (ADC/BJM), 2009 WL 6337949 (D.P.R. Dec. 10, 2009) ............. 29

Whitwell v. Archmere Acad., Inc.,
  463 F. Supp. 2d 482 (D. Del. 2006) ........................................................................ 21

Statutes

10 Del. C. § 3104 ................................................................................................. 35
18 U.S.C. §§ 1341, 1343 ..................................................................................... 30
31 L.P.R.A. § 3374 .............................................................................................. 25
31 L.P.R.A. § 5298 .............................................................................................. 26


Rules

Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) ........................................... 1

Other Authorities

Restatement (Second) of Conflicts § 6 ................................................................. 22
Restatement (Second) of Conflicts § 145 ............................................................. 23
Restatement (Second) of Conflicts § 148 ............................................................. 23
Restatement (Second) of Conflicts § 188 ............................................................. 22

This is the "**Ebury Parties**"[1] Opening Brief in support of their Motion to Dismiss Defendants–Counterclaim Plaintiffs–Third-Party Plaintiffs' (together, the "**McOsker Parties**[2]") Counterclaims and Third-Party Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). See Counterclaims and Third-Party Complaint (Sep. 1, 2022) [D.I. 39].

## PRELIMINARY STATEMENT

In 2019, the Ebury Parties learned that they were victims of the McOsker Parties' multi-year Ponzi Scheme, moved out of the Puerto Rico office that they shared with the McOsker Parties, and sued in the federal district court for the District of Puerto Rico. Because the McOsker Parties argued that their dispute belonged in local Puerto Rico court, the Ebury Parties voluntarily dismissed their first federal case and refiled in the local court—where the McOsker Parties argued that this dispute actually belonged here in Delaware.

At the McOsker Parties' urging, and as the Puerto Rico case continued, the Ebury Plaintiffs sued in this Court in February 2021, alleging that the McOsker Parties perpetrated a racketeering conspiracy and breached numerous contracts governed by Delaware law. In July 2021, Judge Dawson rejected the McOsker Parties' motion to dismiss the Amended Complaint, preserving the Ebury Plaintiffs' RICO and contract claims.

---

[1] The "**Ebury Parties**" are Plaintiffs–Counterclaim Defendants (together, the "**Ebury Plaintiffs**") Ebury Street Capital, LLC ("**ESC**"), EB 1EMIALA, LLC, EB 2EMIALA, LLC, Ebury Fund 1 NJ LLC, and Ebury Fund 2 NJ, LLC and "**Third-Party Defendants**" John Hanratty, Ping Xie, Sarah Wells, Dennisse Méndez, Shirley Vega, John Bronzo, Patrick Seymour, EB Levre I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC, and Ebury RE, LLC.

[2] The "**McOsker Parties**" are Defendants–Counterclaim Plaintiffs–Third-Party Plaintiffs Thomas R. McOsker, Andrew Kernan, Badel Hernandez, Lienclear – 0001 ("**LC Purchaser**"), LLC, Lienclear – 0002, LLC ("**LC Escrow**"), Lienclear, LLC ("**LC Servicer**"), "**Bloxtrade**," LLC, "**BCMG Services**," LLC, "**BCMG International**," LLC, and "**Sitona**" Ventures LLC.

Now, the McOsker Parties have filed their Counterclaim and Third-Party Complaint (the "**Counterclaim**") accusing the Ebury Parties of mirror-image racketeering and contract misconduct, plus more torts for good measure. But in plagiarizing the Ebury Plaintiffs' solid RICO structure, the McOsker Parties fail to actually plead RICO facts; instead of mirroring Plaintiffs' well-pleaded Amended Complaint, the McOsker Parties offer a house of mirrors filled with nothing but adjectives, adverbs, innuendo, and legal conclusions.

Because the McOsker Parties' melodrama fails to plead facts alleging that a single one of the 22 Ebury Parties is liable for even one of the 13 Counter- or Third-Party Claims—or that even one of the Third-Party Ebury Defendants has a single contact with Delaware—the Ebury Parties respectfully request that the Court grant this Motion.

## BACKGROUND

I. **Plaintiffs Allege that the McOsker Parties Have Run a Multi-Year Ponzi Scheme to Trick Their Clients—Including Plaintiffs—Into Giving Up Millions of Dollars' Worth of Tax Lien Certificates**

Defendant Thomas R. McOsker owns and manages a panoply of Delaware and Puerto Rico LLCs, including Defendants LC Purchaser, LC Escrow, LC Servicer, BCMG Services, BCMG International, and Sitona. Amended Complaint ¶¶ 6, 31–37 (June 25, 2021) ("**Am. Compl.**" or "**Amended Complaint**") [D.I. 16]. Mr. McOsker also owned non-party "**Cactus**" Ventures LLC, which was a Delaware LLC established in 2014 and canceled in 2018. Id. ¶¶ 40–43. Defendant Andrew Kernan is the Chief Financial Officer of LC Purchaser, LC Escrow, LC Servicer (together, the "**Tax Lien Defendants**") and BCMG Services, while Defendant Badel Hernandez is in-house counsel and business manager of Defendants LC Servicer, BloxTrade, and BCMG Services. Id. ¶¶ 45–46.

Plaintiffs, meanwhile, are investors in tax lien certificates, which give their holders the right to collect unpaid taxes and interest from property owners. Id. ¶¶ 2, 64–68. Because there is no exchange or other centralized mechanism for secondary trading, investors like Plaintiffs often engage brokers and market-makers when it comes time to sell their certificates. Id. ¶ 70. The Tax Lien Defendants purport to be such brokers, advertising that they (1) purchase Certificates and then sell them at a mark-up (2) after providing escrow, clearing, and transfer services. Id. ¶¶ 4, 5.

Plaintiffs eventually hired the Tax Lien Defendants to facilitate eight separate "**Transactions**" governed by a functionally-identical set of three contracts, which required the Tax Lien Defendants to make to make two payments to Plaintiffs per Transaction: (1) 60% of the Transaction price when Plaintiffs provided satisfactory assignment forms, and (2) the remaining 40% one LC Servicer transferred the Certificates to third-party purchasers. Am. Compl. ¶¶ 72–73, 77, 86, 91–111.

But in four of the eight Transactions, the Tax Lien Defendants dragged their feet for months after selling Plaintiffs' Certificates, continually manufacturing new excuses for their failure to pay Plaintiffs. Id. ¶ 89. And in the last four Transactions—in which Plaintiffs transferred title to 932 Certificates, for which Defendants promised they would pay Plaintiffs $3.5 million—the Tax Lien Defendants never paid Plaintiffs at all (the "**Unpaid Transactions**"). Id. ¶¶ 90–111.

After the Tax Lien Defendants failed to pay Plaintiffs for their Certificates, Plaintiffs learned, inter alia, that (1) LC Escrow repeatedly used the exact same "**Scotia Bank Screenshot**" to trick Plaintiffs and other clients, including non-party Laveer Management, LLC ("**Laveer**"), into believing that the Tax Lien Defendants would pay for their Certificates; (2) the Tax Lien Defendants never really escrow client funds at all, but instead deposit client money into a New York checking account held by LC Escrow, then transfer the funds to Puerto Rico accounts held

by BCMG Services and LC Servicer; and (3) used client money to attempt to defraud Puerto Rican taxpayers of over $6.5 million, engaging in a three-year scheme in which BCMG Services purported to purchase millions of dollars of intellectual property in arm's-length transactions—but actually just arranged and executed circular payments among BCMG Services, Sitona, and Cactus, all owned by Mr. McOsker and operated by Messrs. McOsker, Kernan, and Hernandez, purchasing the "**LienLog IP**" for $160,000 in 2014, sold it to BCMG Services for $2,044,250 in 2017, and sold it again to Sitona for $13,189,500 in 2018, despite the fact that LienLog's website no longer existed and its trademarks had been canceled. Id. ¶¶ 115, 149, 160–62, 164–99.

Plaintiffs also learned that from 2016 through at least 2019, the "**McOsker Enterprise**" had defrauded other Tax Lien Defendant clients—including non-parties Tang Capital Management LLC, INA Group LLC, Millennium Trust Company, LLC, HGM Holdings LLC, Kite Capital Partners, and Laveer—in the exact same manner and for the exact same reasons that the Enterprise stole Plaintiffs' money and Certificates, including by using the exact same Scotia Bank Screenshot. Id. ¶¶ 151, 153, 162.

Plaintiffs first sought justice in Puerto Rico, suing Mr. McOsker, BCMG Services, BCMG International, and several other McOsker entities in the federal District of Puerto Rico. See generally Declaration of McOsker Counsel Blake A. Bennett ("**Bennett Decl.**") Exs. 1, 4, 5 (Aug. 27, 2021) [D.I. 22-1, 22-4, 22-5]. After Mr. McOsker, BCMG Services, and BCMG International claimed that diversity jurisdiction did not exist, Plaintiffs refiled their claims in Puerto Rico state court—where Mr. McOsker, BCMG Services, and BCMG International argued that the dispute really belonged in Delaware. See id. at 1 (arguing that the Ebury Parties "are contractually impeded from objecting to the jurisdiction of the Delaware courts."); id. at 15 ("[T]his factor alone tilts the scale unequivocally in favor of a transfer to the U.S. District Court for the District of Delaware.").

## II.    In July 2022, Judge Dawson Denied the McOsker Parties' Motion to Dismiss the Ebury Plaintiffs' RICO and Civil Conspiracy Claims

Accordingly, on February 12, 2021, Plaintiffs initiated this "**Delaware Litigation**" against the McOsker Parties. See Order Partially Granting and Partially Denying McOsker Parties' Motion to Dismiss at 1 (July 7, 2022) [D.I. 28] (the "**Order**") (citations omitted). After the McOsker Parties moved to dismiss, Plaintiffs filed an Amended Complaint, alleging one RICO § 1962(c) Control claim against Mr. McOsker; one RICO § 1962(d) Conspiracy claim against all of the McOsker Parties; Fraudulent Inducement against Mr. McOsker, LC Purchaser, and LC Escrow; Breach of Contract against Lienclear 002, LLC; and, in the alternative, Conversion, Civil Conspiracy, and Unjust Enrichment against all of the McOsker Parties. Id.; see also Am. Compl. ¶¶ 224–70.

The McOsker Parties moved to dismiss yet again, arguing that Plaintiffs had failed to state any claim but breach of contract; the federal Court should also dismiss the state-law contract claim; the Court could not exercise personal jurisdiction over Messrs. Kernan or Hernandez; and, alternatively, the Court should stay this Delaware litigation pursuant to Colorado River. See generally Memorandum in Support of Motion to Dismiss or Stay (Aug. 27, 2021) [D.I. 23]. Plaintiffs opposed the McOsker Parties' dismissal motion, and the McOsker Parties countered with a reply brief. See Plaintiffs' Opposition (Oct. 12, 2021) [D.I. 24]; McOsker Parties' Reply (Nov. 12, 2021) [D.I. 27].

On July 7, 2022, Judge Dawson issued an order preserving the Ebury Plaintiffs' RICO, breach of contract, and civil conspiracy claims, dismissing their fraudulent inducement, conversion, and unjust enrichment claims as duplicative. Order at 4–9.

Judge Dawson rejected the McOsker Parties' RICO § 1962(c) arguments, holding that the Ebury Plaintiffs had properly alleged (1) enterprise, by pleading facts explaining that "the common

purpose of the [McOsker E]nterprise was to expand its clients in order to get them to convey title

of their Certificates to Defendants," (2) pattern, by pleading facts explaining "the time period of

the [allegedly-fraudulent] communications, the fraudulent misconduct that Plaintiffs accuse [the

McOsker Parties] of, and even between whom the communications occurred," and (3) open-ended

racketeering continuity, by pleading facts showing how the McOsker Parties had perpetrated the

same racketeering acts against other third parties, specifically named by Plaintiffs, "even after the

four transactions at issue in this case occurred." Id. at 4–8 (citations omitted).

### III. In September 2022, the McOsker Parties Filed 13 Counter- and Third-Party Claims, Adding 17 Ebury Entities and Employees as Third-Party Defendants

#### A. The McOsker Parties Claim that Mr. McOsker—With Zero Help or Funding—Created the CRIM Proposal Sometime Between 2014 and 2017

The September 2022 Counterclaim alleges that sometime before 2011, Mr. McOsker began

working at non-party GFI Group "to open a new division focused on creating a secondary market

for property tax encumbrances, commonly known as 'Tax Liens,'" and that in 2011, he was its

"Head of Tax Receivables Brokerage Division. Countercl. ¶¶ 21–23. At some point, Mr. McOsker

"left GFI Group to commence his own tax encumbrance brokerage firm, [Defendant] BloxTrade."

Id. ¶ 27. In 2014, Mr. McOsker moved from New York City to San Juan to take advantage of

"preferential tax rates" for "bona fide residents of Puerto Rico." Id. ¶¶ 28–29.

Once in Puerto Rico, Mr. McOsker's "specialized knowledge" allowed him to "identif[y]

a business opportunity in the portfolio of tax encumbrances of the Center for the Collection of

Municipal Taxes ('**CRIM**')." Id. ¶¶ 31–33.

FILED: NEW YORK COUNTY CLERK 11/16/2022 10:17 AM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 32
RECEIVED NYSCEF: 11/16/2022

Case 1-23-01118-jmp Doc 8-11 Filed 08/14/24 Entered 08/14/24 09:45:14 Page 2 of 50
Court Records    Pg 648 of 688

**B. The McOsker Parties Claim that They Contracted with Unidentified Ebury Parties Sometime Between 2017 and 2019**

The Counterclaim alleges that "[i]n mid-2017," Messrs. McOsker and Hanratty "met in New York to discuss several matters," and "began to form an understanding that they desired to become partners in the CRIM Proposal." Id. ¶ 37. However, "[Mr.] McOsker did not require" Mr. Hanratty to "make an initial capital contribution under the Initial Agreement," nor did Mr. McOsker "request what is known as a shared services allocation." Id. ¶ 37. While the Counterclaim capitalizes the phrase "Initial Agreement," that phrase is not defined anywhere in the pleading; indeed, this is the only time that phrase appears in the entire document. See generally id.

The McOsker Parties go on to claim:

> [T]he Agreement between the parties at that time was that [Mr.] Hanratty would be a capital partner and his financing obligations would be for future obligations incurred by the common venture. As discussed below, the parties' obligations related to the CRIM Proposal were clarified and further memorialized through various subsequent writings including various documents circulated in 2017 and 2018, emails in 2017, 2018, and 2019, and instant messages through various messaging services throughout 2017–2019.

Id. ¶¶ 37–38. The Counterclaim does not identify or annex the "various subsequent writings" that "clarified and further memorialized" "the parties' obligations," nor does it identify who "the parties" are. See generally id.

While this paragraph again capitalizes "Agreement," the Counterclaim does not define that term for another five paragraphs, when it alleges that "they"—whose antecedent is unclear— "formalize[d] the Agreement through the "**BCMG Capital**," LLC operating agreement, which was signed by both parties on February 19, 2019" (the "**BCMG Capital Contract**"). Id. ¶ 43. The BCMG Contract "provided that Lesser Flamingo, LLC, a Puerto Rico limited liability company wholly owned by [Mr.] Hanratty" would be "a 49% partner–owner" of BCMG Capital, while Defendant BCMG Services, owned by Mr. McOsker, would be "a 51% partner–owner." See id.

## IV. Defendant BCMG Services and Non-Party Lesser Flaming LLC Executed the BCMG Capital Contract

Because the Counterclaim neither annexes nor quotes the BCMG Contract, the Ebury Parties attach it to this Opening Brief as an exhibit. Compare generally id. and Declaration of Kari Parks Exhibit A, BCMG Capital Contract. The only parties to the BCMG Capital Contract are Defendant BCMG Services and non-party Lesser "**Flamingo**" LLC. See id. at 1, 4, 30.

The Contract has two "Governing Law" clauses, which both invoke Puerto Rico law. Id. at 1–2, 5, 28. The Contract states that BCMG Capital's "principal place of business and registered office" shall be in San Juan, Puerto Rico. Id. at 5. The Contract also includes an arbitration clause, which requires all dispute between the Members to be resolved by arbitration, in Spanish, in San Juan, Puerto Rico. Id. at 25–26. Finally, the Contract includes "Integration" and "No Third Party Beneficiary Clauses." Id. at 28.

## V. The McOsker Parties Allege that Mr. Hanratty Did Not Finance the CRIM Proposal, and Attempt to Defend Against Plaintiffs' Amended Complaint

The Counterclaim devotes several dozen paragraphs to claim that (1) "[Mr.] Hanratty and [ESC] were unable to provide their own funds to finance the day-to-day operations of the CRIM Proposal" and therefore "employed alternate means to attempt to obtain the necessary financing," purporting to give examples of Mr. Hanratty's attempts to find "a financing line" and the "alternate means," including a bridge loan; and (2) push back against Plaintiffs' well-pleaded RICO, breach of contract, and conspiracy allegations. Id. ¶¶ 45–81; see also generally Order.

For example, the Counterclaim alleges that "[Mr.] Hanratty notified [Messrs.] Kernan, Vasquez, McOsker, and several companies of McOsker, that there was only one week left to achieve the financing facility and that they make the corresponding preparations," and that "[Mr.]

Hanratty knew these statements were false when made," but does not explain what harm Mr. Hanratty's urgency caused. Id. ¶ 68.

Similarly, the Counterclaim alleges that [Mr.] Hanratty moved his cousin, attorney [and Third-Party Defendant] Patrick Seymour, to the [shared] BCMG office to document and craft a legal case against [Mr.] McOsker and other individuals and entities while rifling through secure documents and assets under the cover of night." Id. ¶ 69. However, it does not explain why Messrs. Hanratty and Seymour could not look through their own files, in their own office, after dark—let alone explain how that activity, lawful or not, hurt the McOsker Parties, other than claiming that "[Mr.] Hanratty and his companies" eventually filed "a string of meritless and slanderous lawsuits" against the McOsker Parties. Compare generally id. and id. ¶ 83; but see Order at 10 (refusing to dismiss Plaintiffs' RICO, breach of contract, or conspiracy claims against the McOsker Parties); Parks Decl. ¶ 3 (discovery has begun in the Puerto Rico case).

Then, "[s]uddenly, [Mr.] Hanratty decided to leave the BCMG offices." Id. ¶ 82. Again, the McOsker Parties neither specify the time frame, nor explain what was "sudden" or why this "suddenness" matters, though they do claim that Mr. Hanratty and his employees, Mr. Seymour and Ms. Vega, "stole[] or took digital copies" "certain certificates of tax encumbrances" that belong to "Carry Trade"—an entity in which Messrs. Hanratty and McOsker were "equal partners." Id. ¶¶ 82–83. The McOsker Parties further claim that Messrs. Hanratty and Seymour and Ms. Vega "stole[] or took digital copies" of "other items," yet admit that they have no idea whether this is true. Id. ¶ 83 ("It is unclear what other items [Mr.] Hanratty, [Ms.] Vega, and [Mr.] Seymour stole, or took digital copies of [ . . . ]").

## VI. The McOsker Parties Claim that Mr. Hanratty Did Not Give Them Full Access to the Ebury Parties, and "Slandered" Them When He Sued

"The very next day," "[Mr.] McOsker was served with" a copy of Plaintiffs' first federal

complaint, filed in the District of Puerto Rico, "begin[ning] a string of meritless and scandalous

lawsuits filed by [Mr.] Hanratty and his companies against [Mr.] McOsker and his companies:"

> Not only did [Mr.] Hanratty file the scandalous and deceitful complaints in Puerto Rico and the Federal District Court for the District of Delaware, he also dedicated himself to spread this false information among relevant persons in the market of tax encumbrances of the United States, which caused damages to the reputation of [Mr.] McOsker and to the goodwill of BCMG, LLC and affiliated entities of subsidiaries. [Mr.] Hanratty's false and slanderous statements include, but are not limited to:
>
> a. Falsely reporting to the Puerto Rican government that [Mr.] McOsker was defrauding the Puerto Rican Government related to tax credits;
> b. Falsely reporting to the Puerto Rican Office of Industrial Tax Exemption that BCMG International was engaged in fraudulent acts;
> c. Falsely reporting to the Puerto Rican Department of Economic Development that [Mr.] McOsker was defrauding the Puerto Rican Government related to tax credits;
> d. Falsely reporting to the Puerto Rican Industrial Development Company that McOsker was defrauding the Puerto Rican Government related to tax credits;
> e. Falsely reporting to the Puerto Rican Treasury Department (Hacienda) that McOsker was defrauding the Puerto Rican Government related to tax credits;
> f. Falsely reporting to certain banking institutions in Puerto Rico that [Mr.] McOsker was defrauding the Puerto Rican Government related to tax credits;
> g. In 2019[,] falsifying statements and directing Dudley at Laveer Capital to create a false paper trail he would later attempt to use to have OITE cancel the decree of BCMG International;
> h. In 2019[,] falsely accusing [Mr.] McOsker of stealing from his friend and colleague Robert Sanchez in a building partnership;[]
> i. In 2019, approaching former members of the MapPlus team in order to falsely accuse [Mr.] McOsker of some of the allegations in this Amended Complaint[; and]
> j. Falsely informing multiple fund managers in the tax lien industry over the course of 2019–2021, and possibly ongoing, that [Mr.] McOsker stole his funds related to the four trades at issue.

Id. ¶¶ 84–86. To support their Libel claim, the McOsker Parties also claim that "[i]n 2019," Mr. Hanratty "direct[ed] Dudley at [Laveer] Capital via text message as to how to attempt to bully BCMG employees via email." Id. ¶ 98(g).

The McOsker Parties provide no further detail regarding these "false and statements" statements—no identification of when Mr. Hanratty made these statements, no explanation of what, exactly, Mr. Hanratty actually said, and no explanation of why any of these statements were "false report[s]." See generally id.

The McOsker Parties also claim that Mr. Hanratty "attempted to use the dispute between the parties and the filing of his complaint to prevent BCMG Technologies and BCMG Services to be granted a tax credit," which "delay[ed] the tax credit." Id. ¶ 87. Again, the McOsker Parties do not identify when, exactly, Mr. Hanratty "attempted to use the dispute;" why they believe that he did so in order "to prevent BCMG Technologies and BCMG Services" from being granted tax credits; or what, exactly, Mr. Hanratty actually did. See generally id.

Finally, the McOsker Parties claim that "Plaintiffs / Counterclaim Defendants / Third-Party Defendants" engaged in various "acts of concealment," such as "insist[ing]" that the McOsker Parties not speak directly with Mr. Xie, "insist[ing]" that Messrs. Hanratty and McOsker speak verbally instead of in writing," "bull[ied]" and "used intimidated to dissuade individuals from questioning his requests and behavior," "concealed" and "refused to confirm" assorted financial information of the Ebury Entities, and "[f]rom fall 2018 to Winter 2019," "played a 'wait and see' game." See Countercl. ¶ 90.

The McOsker Parties claim that Mr. Hanratty is liable for violating RICO §§ 1962(c) and (d), and also sue him for "Fraud / Fraudulent Inducement," "Tortious Interference with Prospective Economic Advantage / Business Relations," "Tortious Interference with Contractual Relations,"

Conversion, Civil Conspiracy, Unjust Enrichment, "Defamation (Slander / Slander per se)," and "Defamation (Libel)." See generally id.

## VII. The McOsker Parties Allege Nearly No Facts About the Ebury Employees' or Entities' Conduct

Besides their 10 claims against Mr. Hanratty, the McOsker Parties also sue the Ebury employees and entities for Unjust Enrichment, Conversion, Civil Conspiracy, and RICO § 1962(d) conspiracy. See generally id.

### A. The Ebury Employees

The McOsker Parties claim that the employees "acted closely with [Mr. Hanratty], knowing that they were engaging in illegal conduct and stealing from others," including "to steal, transfer, and conceal assets, including client funds, partner money, and partner tax lien certificates in order to enrich themselves to the detriment of their clients and partners." Countercl. ¶¶ 116–17. The McOsker Parties' allegations against each individual employee begin and end with:

#### 1. Sarah Wells

Sarah Wells is Hanratty's personal assistant and functioned as the office manager for Ebury St.'s New York office. From at least the formation of the partnership in 2017 to the present, at Hanratty's instruction, Wells would notarize documents on Hanratty's behalf while Hanratty was neither present nor in the same state when said notarizations occurred. Further, at the direction of Hanratty, Wells assisted in improperly transferring assets among the Entity Members (defined herein) in order to hide the assets from clients and partners in order to enrich the Individual Members (defined herein). Wells also acted as HR manager for Hanratty's various companies and dealt with his frequent and explosive hiring and firing of his undocumented Philippine team, who had insecure access to financial information for Ebury Funds, investors, credit lines, and other financial information, as well as working with Dennisse Méndez to pay their compensation and health insurance via offshore shell companies.

Countercl. ¶ 93; see also id. ¶ 131(v) (alleging that Ms. Wells "improperly notarize[d] documents"); id. ¶ 161(a) (repeating most of ¶ 93 verbatim); 3PC ¶ 48(b) (same).

Case 1:24-cv-00268-LJL   Document 1524   Filed 08/14/24   Page 2 of 36
Court Records        Pg 654 of 688

### 2.  Dennisse Méndez

Dennisse Méndez is Ebury's Director of Operations, and at Hanratty's request and instruction, manages Ebury St.'s tax lien and real estate asset portfolios. As set forth herein, at the direction of Hanratty, Méndez assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members. Further, Méndez worked with Wells to assist in paying the undocumented Philippine team' compensation and health insurance via offshore shell companies. While a documented employee with BCMG, including the accompanying confidentiality, non-solicitation, and noncompetition, she facilitated the fraud with Hanratty pre and post exit.

Countercl. ¶ 94; see also id. ¶ 161(c) (repeating much of id. ¶ 94 verbatim, with no additional

information); id. ¶ 90 3PC ¶ 48(c) (same); Countercl. ¶ 56 ("On information and belief," Ms.

Méndez "marked these $5.3 million in assets on the books of the fund without paying for them,

and it is unclear what cost basis they falsified to this effect"); id. ¶ 82 (alleging that Ms. Méndez

helped manage ESC employees and independent contractors and "had to talk to the office manager

of the Philippines team[], who later resigned").

### 3.  Shirley Vega

Shirley Vega is an employee working for Ebury. As set forth herein, Vega assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019. Further, at the direction of Hanratty, Vega assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

Countercl. ¶ 95; accord id. ¶ 161(d) (repeating ¶ 95 verbatim); 3PC ¶ 48(d) (same).

The McOsker Parties further allege that "[o]n or about June 2019," "over a weekend," Ms.

Vega and Messrs. Hanratty and Seymour "stole, or took digital copies of" "documents and assets"

"over a weekend when they vacated the office." Countercl. ¶¶ 69, 82–83, 136; but see ¶ 83 ("It is

unclear what other items [Mr.] Hanratty, [Ms.] Vega, and [Mr.] Seymour stole, or took digital

copies of, over the weekend between when [Mr.] Hanratty informed [Mr.] McOsker that he was

moving offices and the first complaint was filed, or any time beforehand for that matter.").

4. **John Bronzo**

John Bronzo was an attorney working for Ebury St. who was eventually promoted to the position of Ebury St.'s General Counsel. At Hanratty's instruction, Bronzo would initiate foreclosure procedures on certain tax lien certificates and process the necessary paperwork to obtain title to these acquired properties. There were several instances where Hanratty would instruct Bronzo to obtain title over a property in the benefit of a different entity than the original investor entity, thereby defrauding some investors to the benefit of others, while inflating asset value to obtain bank loans and/or mortgages. Further, at the direction of Hanratty, Bronzo assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

Countercl. ¶ 96; <u>accord</u> <u>id.</u> ¶ 161(e) (repeating ¶ 96 verbatim); 3PC ¶ 48(e) (same). The McOsker

Parties also accuse Mr. Bronzo of the same "theft" that occurred "[o]n or about June 2019." <u>Id.</u> ¶¶

136–37.

5. **Patrick Seymour**

Patrick Seymour was Ebury's General Counsel who replaced Bronzo in this role. Seymour assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019. Further, at the direction of Hanratty, Seymour assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

Countercl. ¶ 97; <u>accord</u> <u>id.</u> ¶ 161(f) (repeating ¶ 97 verbatim); Third-Party Complaint ("**TPC**") ¶

48(f) (same). The McOsker Parties claim that Mr. Seymour worked out of the BCMG office "to

document and craft a legal case against [Mr.] McOsker and other individuals and entities while

rifling through secure documents and assets under the cover of night." <u>Id.</u> ¶ 69; <u>see also</u> <u>id.</u> ¶ 90(t)

("Under the guise of 'helping with the CRIM portfolio,' [Mr.] Hanratty concealed his cousin

Seymour's actions, undertaken in BCMG offices day and night"). They also accuse Mr. Seymour

of the "theft" that occurred "[o]n or about June 2019." <u>Id.</u> ¶¶ 69, 83, 136–37.

**6.  Ping Xie**

Ping Xie is Ebury St.'s Chief Financial Officer and assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members, assisted in improperly moving assets into foreign entities located in the British Virgin Islands in order to hide the assets from clients, partners, and the United States Internal Revenue Service to enrich the Individual Members and defraud the United States Government. Xie knowingly falsified borrowing bases and redemption reports to present to Ebury St.'s servicers, lenders, potential lenders, investors, potential investors, and auditors.

Countercl. ¶ 98; accord id. ¶ 161(g) (repeating most of ¶ 98 verbatim, without adding additional information); TPC ¶ 48(g) (same). "On multiple occasions over the course of 2018 and 2019 Hanratty, Ping, and Méndez [falsely] represented to their current and prospective lenders and investors that Ebury Fund 1 and Fund 2 owned the Carry Trade, BFNH, and Lepper Line assets, free and clear of all incumbrances, and represented that they were worth 100% of redemptive value." Countercl. ¶ 146.

The McOsker Parties also allege, "[o]n information and belief," that Messrs. Hanratty, Xie, and Ms. Méndez "marked[] $5.3 million in assets on the books of the fund without paying for them, and it is unclear what cost basis they falsified to this effect." Id. ¶ 56. The McOsker Parties do not provide any facts explaining this "information and belief." See generally Countercl.; TPC.

**B.  The Ebury Entities**

The McOsker Parties again plead legal conclusions that the Court may exercise personal jurisdiction over the Ebury Entities and that this District is an appropriate venue for this dispute. See Countercl. ¶ 19 (personal jurisdiction); id. ¶ 20 (venue); TPC ¶ 29 (personal jurisdiction); id. ¶ 32 (personal jurisdiction); id. ¶ 33 (venue).

1.      **Ebury Street Capital, LLC**

The only facts that the McOsker Parties plead regarding ESC's alleged acts or omissions are that ESC (1) "is a fund controlled by [Mr.] Hanratty and acts as the General and Managerial Partner of Ebury Fund I, LP; Ebury Fund 2, LP; and Ebury RE, LLC," (2) "conducted a series of transactions with the firm GFI Group where [Mr.] McOsker worked" and met Mr. Hanratty, (3) "distributed $3,793,679 to Ebury Fund I, LP ("**Fund 1**") investors between July 1, 2018 and February 19, 2018, despite [sic] Fund 1 current assets being listed at $1,918,787.49 as of December 31, 2018," and (4) "were unable to provide [its] own funds to finance the day-to-day operations of the CRIM Proposal" and "employed alternate means to obtain the necessary financing." Countercl. ¶¶ 26, 45, 51–52, 100; TPC ¶ 48(l).

2.      **EB 1EMIALA, LLC**

The McOsker Parties' only factual allegation regarding this Entity is: "EB 1EMIALA, LLC is an Alabama limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907." Countercl. ¶ 2.

3.      **EB 2EMIALA, LLC**

The McOsker Parties' only factual allegation regarding this Entity is: "EB 2EMIALA, LLC is an Alabama limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907." Countercl. ¶ 3.

4.      **Ebury Fund 1 NJ LLC**

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury Fund 1 NJ, LLC is a New Jersey limited liability company with a principal place of business at 644 Avenida

Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907." Countercl. ¶ 4.

### 5. Ebury Fund 2 NJ, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury Fund 2 NJ, LLC is a New Jersey limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907." Countercl. ¶ 5.

### 6. EB Levre I, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "EB LVERE I, LLC is a Delaware limited liability company that the Hanratty Enterprise uses to hold real estate assets and assist in the improper transfer of assets between entities." Countercl. ¶ 101; accord id. ¶ 161(i) ("EB LEVRE I, LLC is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners."); TPC ¶ 48(j) (repeating ¶ 161(i) verbatim).

### 7. Ebury Fund I, LP

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury Fund I, LP, is a Delaware limited partnership that the Hanratty Enterprise uses to comingle and hide funds from investors and partners. For example, [ESC] distributed $3,793,679 to Ebury Fund 1, LP ("Fund 1") investors between July 1, 2018 and February 19, 2019, despite [sic] Fund 1 current assets being listed at $1,918,787.49 as of December 31, 2018." Countercl. ¶ 102; accord id. ¶ 161(j) (repeating ¶ 102 verbatim); TPC ¶ 48(l) (same). It is not clear whether the McOsker Parties are alleging that "Ebury Fund I, LP" and "Ebury Fund 1, LP" are the same Entity. See generally Countercl.

### 8.  Ebury Fund 2, LP

The McOsker Parties' only factual allegation regarding this Entity is:

> Ebury Fund II, LP, is a Delaware limited partnership that the Hanratty Enterprise
> uses to comingle and find funds from investors and partners. For example, McOsker
> pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC,
> where Hanratty and McOsker were partners. Hanratty subsequently caused BCLF
> Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned
> by Hanratty and/or his affiliated companies.

Countercl. ¶ 103; accord id. ¶ 161(k) (repeating ¶ 103 verbatim); id. ¶ 48(m) (same). It is not clear

whether the McOsker Parties are alleging that "Ebury Fund 2, LP" and "Ebury Fund II, LP" are

the same Entity. See generally Countercl.

### 9.  EB 1EMIDC, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "EB 1EMIDC, LLC,

is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide

funds from investors and partners." Countercl. ¶ 104; accord id. ¶ 161(l) (repeating ¶ 104

verbatim); TPC ¶ 48(k) (same).

### 10.  Red Clover 1, LLC

The McOsker Parties' only factual allegation regarding this Entity is:

> Red Clover 1, LLC, is a Delaware limited liability company that the Hanratty
> Enterprise uses to comingle and hide funds from investors and partners. For
> example, McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to
> BCLF Rev. I, LLC, where Hanratty and McOsker were partners. Hanratty
> subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury
> Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. Hanratty
> then assigned or transferred said assets to Red Clover 1, LLC to hide said assets
> from McOsker and affiliated entities as well as his own investors.

Countercl. ¶ 105; accord id. ¶ 161(m) (repeating ¶ 105 verbatim); TPC ¶ 48(n) (same).

### 11.    White Clover 1, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "White Clover 1, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners." Countercl. ¶ 106; accord id. ¶ 161(n) (repeating ¶ 106 verbatim); TPC ¶ 48(o) (same).

### 12.    Black Clover I, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "Black Clover I, LLC is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners." Countercl. ¶ 107; accord id. ¶ 161(o) (repeating ¶ 107 verbatim); TPC ¶ 48(p) (same).

### 13.    Ebury Fund IC1, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury Fund IC1, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners." Countercl. ¶ 108; accord ¶ 161(p) (repeating ¶ 108 verbatim); TPC ¶ 48(q) (same).

### 14.    Ebury Fund 2CI, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury Fund 2CI, LLC is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners." Countercl. ¶ 161(q); accord TPC ¶ 48(s) (repeating id. verbatim).

### 15.    Ebury RE, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury RE, LLC is a New Jersey limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners." Countercl. ¶ 109; TPC ¶ 48(r) (repeating id. verbatim).

## LEGAL STANDARD

"A plaintiff cannot convert a fact-free, inadequate claim into a viable cause of action by merely adding meaningless adjectives or adverbs." Harris v. Goderick, No. 05-22039-CIV, 2012 WL 12542429, at *6 (S.D. Fla. Oct. 5, 2012), R&R adopted sub nom., No. 05-22039-CIV, 2013 WL 11319432 (S.D. Fla. May 6, 2015), aff'd sub nom., 608 F. App'x 760 (11th Cir. 2015) (citations omitted) ("Regardless of whether Plaintiff uses words like 'clearly,' 'obviously,' or 'indisputably,' the [Court's] focus is on the substance of the factual allegations, not the adverbs or adjectives a litigant uses.").

"[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (citation omitted). If "the factual detail in a complaint is so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8," the Court must dismiss the pleading. Id. at 232.

Therefore, to survive this Motion, the McOsker Parties' Counterclaim must plead "facts to state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). While the Court should "assume the[] veracity" of the Counterclaim's "well-pleaded factual allegations," its conclusory allegations "are not entitled to [this] assumption." Ashcroft v. Iqbal, 556 U.S. 662, 680 (2009); see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (citing Phillips, 515 F.3d at 232–33) (Iqbal "provides the final nail-in-the-coffin for [Conley v. Gibson's] 'no set of facts' standard").

While the Court must assume that the McOsker Parties "can prove the **facts**" they allege, it cannot assume that they "can prove facts that [they have] not alleged," or that the Ebury Parties

"have violated the [] laws in ways that [the McOsker Parties] have not[] alleged." <u>Associated Gen. Contractors of Cal., Inc. v. Cal. State Council</u>, 459 U.S. 519, 526 (1983) (emphasis added). Accordingly, "[w]here a pleading party elects to inundate other litigants with copious factual and legal allegations," it should "provide reference in each count as to which factual allegations it alleges support that count." <u>Island Airlines, LLC v. Bohlke</u>, No. SX-2016-CV-00404, 2022 WL 474132, at *10 n.7 (D.V.I. Feb. 14, 2022).

## ARGUMENT

### I.     Puerto Rico Law Governs the McOsker Parties' Common Law Claims

The McOsker Parties invoke this Court's supplemental jurisdiction to hear their common law claims Countercl. ¶¶ 155–82 (RICO § 1962(d), Conversion, Breach of Contract); TPC ¶¶ 35–101 (RICO § 1962(c), RICO § 1962(d), "Fraud / Fraudulent Inducement," "Tortious Interference with Prospective Business Advantage / Business Relations," "Tortious Interference with Contractual Relations," Conversion, Civil Conspiracy, Unjust Enrichment, "Defamation (Slander / Slander per se)," "Defamation (Libel")). While they do not specify which jurisdiction's law controls any of these claims, they do allege that all of this wrongful conduct occurred when Messrs. Hanratty and McOsker both lived and worked in San Juan, Puerto Rico, including when they shared office space. <u>See generally</u> <u>id.</u>

Where, as here, more than one state's law could apply, this Court must apply Delaware's choice-of-law standards to determine which law controls. <u>See</u> <u>Chin v. Chrysler LLC</u>, 538 F.3d 272, 278 (3d Cir. 2008) (federal court applies choice-of-law principles of forum state). The Court must decide choice of law on an issue-by-issue basis, <u>i.e.</u> apply dépeçage. <u>Whitwell v. Archmere Acad., Inc.</u>, 463 F. Supp. 2d 482, 485 (D. Del. 2006) (citing <u>Berg Chilling Sys., Inc. v. Hull Corp.</u>, 435 F.3d 455, 462 (3d Cir. 2006)).

Since 1991, Delaware has resolved choice of law questions pursuant to a "most significant relationship" test derived from the Restatement (Second) of Conflict of Laws (the "**Second Restatement**"). Certain Underwriters at Lloyds, London v. Chemtura Corp., 160 A.3d 457, 464–65 (Del. 2017) (citing Travelers Indem. Co. v. Lake, 594 A.2d 38, 46–47 (Del. 1991)).

Seven considerations are generally applicable to all "most significant relationship" questions: (1) interstate and international systems' needs, (2) the forum's relevant policies, (3) other interested states' relevant policies, as well as those other states' relative interests in determining the issue; (4) protecting the parties' justified expectations, (5) that field of law's basic underlying policies, (6) certain, predictable, and uniform results, and (7) the ease of determining and applying the applicable law. Lake, 594 A.2d at 47 (quoting Restatement (Second) of Conflicts § 6).

### A. The BCMG Capital Contract Includes Two Puerto Rico "Governing Law" Clauses

If a written contract includes a choice-of-law clause, the Court must apply the specified law so long as it has a "material relationship to the transaction." In re OSC 1 Liquidating Corp., 529 B.R. 825, 831–32 (Bankr. D. Del. 2015) (citation omitted). If a contract is oral or otherwise lacks a choice-of-law clause, the Court considers Second Restatement § 188's five factors to determine which state has the "most significant relationship:" (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties. Chemtura, 160 A.3d at 465 (citing Restatement (Second) of Conflicts § 188).

Here, the only pleaded agreement—the BCMG Capital Contract—includes not one, but two "Governing Law" clauses, which both state that Puerto Rico law governs the Contract. See BCMG Capital Contract §§ 2.1, 13.12. Accordingly, Puerto Rico law governs the Contract Claim.

### B. The McOsker Parties' Tort Claims Arise out of Puerto Rico Contacts Between Puerto Rico Residents

To determine which law controls a tort claim, Delaware considers (a) "the place where the injury occurred," (b) "the place where the conduct causing the injury occurred," (c) "the domicil, residence, nationality, place of incorporation and place of business for the parties," and (d) "the place where the relationship, if any, between the parties is centered." Penn. Emp. Benefit Tr. Fund v. Zeneca, Inc., 710 F .Supp. 2d 458, 468 (D. Del. 2010) (citing Restatement (Second) of Conflicts § 145). Delaware applies a "more specific" version of this test "where fraud or misrepresentation is at issue:" if "the plaintiff's action in reliance occurred in the same state where the false representation was made, that state's law controls." Id. (citing Restatement (Second) of Conflicts § 148).

Therefore, Puerto Rico law governs the tort claims: all of the allegedly-tortious activity (1) occurred in Puerto Rico, (2) by Ebury Parties living and working in Puerto Rico, (3) against McOsker Parties living and working in Puerto Rico. See generally Countercl.; TPC.

FILED: NEW YORK COUNTY CLERK 11/16/2022 10:17 AM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 32
RECEIVED NYSCEF: 11/16/2022

Case 1:20-cv-00268-VM   Document 43-4   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #: 2 Stat
Court Records      Pg 665 of 688

## II. The McOsker Parties Fail to Plead the Existence of Any Contract Enforceable Against Any Ebury Parties, Let Alone Breach-of-Contract's Other Elements

### A. The McOsker Parties Do Not Explain Who Should Defend Themselves Against the Breach-of-Contract Claim

As a threshold matter, Counterclaim Count III's failure to identify who, exactly, was a party to—let alone breached—a contract with any McOsker Party is reason enough for this Court to dismiss the contract claim. Accord Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (citation omitted) (a complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.").

While the Counterclaim titles the cause of action as "Against Ebury St.," its explanatory allegations suggest that the McOsker Parties might be trying to allege breach of contract against Mr. Hanratty personally, or perhaps Mr. Hanratty and specified entities. See Countercl. ¶ 174 ("On or about September 2018 Messrs. Hanratty and McOsker entered into the Agreement related to the CRIM Proposal [ . . . ]"); id. ¶ 177 ("Hanratty and his companies did not comply with **their** obligations [ . . . ]") (emphasis added); id. ¶ 179 ("Hanratty and his companies' breaches [ . . . ]"); id. ¶ 182 ("Hanratty's breaches [ . . . ]").

Because the claim's nine explanatory paragraphs do not even decide which "defendant is liable for the misconduct alleged," the Court should dismiss Count III. Accord Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570) (the facts alleged must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

## B. The McOsker Parties Cannot Enforce the BCMG Operating Agreement Against Any Ebury Party

The BCMG Capital Contract is the only agreement that the McOsker Parties attempt to enforce against any Ebury Party. See Countercl. ¶ 43. However, no Ebury Party is a party to the BCMG Capital Contract: its only parties are (1) Defendant BCMG Capital, LLC and (2) non-party Flamingo. See BCMG Capital Contract at 1, 4, 30.

Moreover, the Counterclaim does not even attempt to plead facts explaining why any Ebury Party could be bound by Flamingo's promises; it mentions Flamingo just once, pleading that it is a "Puerto Rico limited liability company wholly owned by [Mr.] Hanratty in his personal capacity [and] is a 49% partner–owner of BCMG Capital LLC." Id. ¶ 44. That single allegation falls far short of pleading any theory that could justify holding any Ebury Party to Flamingo's promises. Accord In re Garrido Jimenez, 455 B.R. 51, 57 (D.P.R. 2011) (citing 31 L.P.R.A. § 3374) (Under Puerto Rico law, a "contract shall only be valid between the parties who execute them and their heirs").

Finally, not a single one of the Ebury Parties' allegedly-wrongful acts breaches any BCMG Capital Contract term. Compare generally BCMG Capital Contract and Countercl. The McOsker Parties fail to plead their Contract Claim.

## III. The McOsker Parties' Torts are Time-Barred

Puerto Rico's one-year statute of limitations bars all of the McOsker Parties' tort claims. See, e.g., Flovac, Inc. v. Airvac, Inc., 84 F. Supp. 3d 95, 105–06 (D.P.R. 2015) (tortious interference); Martinez Colon v. Santander Nat'l Bank, 4 F. Supp. 2d 53, 57 (D.P.R. 1998) (defamation and libel); Ocaso, S.A. Compañia de Seguros y Reaseguros v. Puerto Rico Maritime Shipping Authority, 915 F. Supp. 1244, 1261 (D.P.R. 1996) (fraud, fraudulent misrepresentation,

and civil conspiracy); <u>Barreto Peat, Inc. v. Luis A. Ayala Colon Sucrs., Inc.</u>, 709 F. Supp. 321, 323

(D.P.R. 1989) (citing 31 L.P.R.A. § 5298) (conversion).

To the extent that the Counterclaim gives the reader any temporal context, it appears that

the McOsker Parties' conversion, unjust enrichment, fraud, and civil conspiracy claims arise out

of commercial activity that occurred no later than 2019, when the McOsker and Ebury Parties

stopped working together. <u>See generally</u> Countercl. The Counterclaim provides no temporal

information at all to explain when Mr. Hanratty allegedly defamed the McOsker Parties. <u>See</u>

<u>generally</u> <u>id.</u>

Because not one of the McOsker Parties' tort claims remained viable on February 12,

2021—when Plaintiffs initiated this Delaware Litigation—the Court must dismiss all of them as

time-barred. <u>Cf.</u> <u>MirTech v. AgroFresh Inc.</u>, 561 F. Supp. 3d 447, 458 (D. Del. 2021) (citation

omitted) (observing that the filing of a complaint tolls the statute of limitations governing a

compulsory counterclaim, but does not toll the time to file an affirmative counterclaim).

## IV. Tardiness Aside, the McOsker Parties Fail to Plead Their Torts' Elements

### A. Conversion

In Puerto Rico, conversion is not just "the simple acquisition of another's property," but

instead "the malicious and wrongful privation of the ownership rights, the illegal exercise, or the

assumption of authority over another's property, use and enjoyment." <u>Fed. Ins. Co. v. Banco de</u>

<u>Ponce</u>, 582 F. Supp. 1388, 1393 (D.P.R. 1984), <u>aff'd</u>, 751 F.2d 38 (1st Cir. 1984) (citing <u>Hull</u>

<u>Dobbs Co. v. Superior Court</u>, 81 P.R.R. 214, 222 (P.R. 1959); <u>Heirs of Sorbá v. Viñas</u>, 49 P.R.R.

31 (1935)). Accordingly, the McOsker Parties must plead that (1) each defendant's "malicious and

wrongful privation" of (2) the McOsker Parties' ownership rights (2) actually and proximately

caused (3) the McOsker Parties' damages. <u>Montalban v. Centro Com. Plaza Carolina</u>, 132 D.P.R.

785, 795–96 (1993); <u>Banco de Ponce</u>, 751 F.2d at 42.

Because the McOsker Parties fail to plead facts showing each and every Party "maliciously" and "wrongfully privat[ed]" the McOsker Parties' "ownership rights," the Court should dismiss the conversion claims—Counterclaim Count II and Third-Party Complaint Count VI. <u>See generally</u> Countercl.

### B. Tortious Interference

As a threshold matter, there is no such thing as a "tortious interference with prospective economic advantage / business relations" claim in Puerto Rico. <u>A.M. Capen's Co. v. Am. Trading & Prod. Corp.</u>, 200 F. Supp. 2d 34, 48–49 (D.P.R. 2002); <u>see also</u> <u>Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc.</u>, 115 P.R. Dec. 553, 558–59, 1984 WL 270915 (P.R. 1984) (holding that because a fixed-term contract is "indispensable," there is no tortious interference claim "[i]f what is affected is [ . . . ] a profitable financial relationship where there is no contract").

Instead, Puerto Rico only recognizes tortious interference with contract, and only if the claimant pleads (1) the existence of a contract (2) that has a fixed length of time, (3) the defendant had prior knowledge of that contract, (3) the defendant maliciously caused (4) the third party to break the contract, and (5) the plaintiff suffered resulting damages. <u>See, e.g.</u>, <u>New Comm. Wireless Servs., Inc. v. SprintCom, Inc.</u>, 287 F.3d 1, 9–10 (1st Cir. 2002) (citing <u>General Office</u>, 115 P.R. Offic. Trans. at 734); <u>R.R. Isla Verde Hotel Corp. v. Howard Johnson Int'l, Inc.</u>, 121 Fed. App'x. 870, 871 (1st Cir. 2005).

By failing to allege the relevant facts, including (1) the PRIDCO contract had a fixed time, (2) the PRIDCO contract's terms, (3) the PRIDCO contract's counterparty breached the contract, or (4) Mr. Hanratty caused the counterparty to breach the contract, the McOsker Parties fail to

plead tortious interference. Accord Triangle Cayman Asset Co. v. LG & AC, Corp., Civ. No. 16-2863 (FAB), 2018 WL 10581534, at *1 (D.P.R. Aug. 3, 2018), aff'd, 52 F.4th 24 (1st Cir. 2022) (dismissing tortious interference claim where, inter alia, claimant failed to cite to contract's fixed terms). Accordingly, the Court should dismiss Third-Party Complaint Counts IV and V.

### C. Defamation

"Puerto Rico has codified the basic features of the Anglo-Saxon common law governing defamation" and recognizes "the traditional defense of privilege," including "the absolute privilege to report judicial proceedings." Gierbolini Rosa v. Banco Popular de Puerto Rico, 930 F. Supp. 712, 716–17 (D.P.R. 1996), aff'd, 121 F.3d 695 (1st Cir. 1997); see also, e.g., Colon v. Bladés, 914 F. Supp. 23 193, 197–98 (D.P.R. 2012) (Puerto Rico defamation's elements are (1) negligently false statement of fact (2) about the plaintiff (3) published to a third party; "merely hyperbolic" statements "are not defamatory").

Therefore, a communication is privileged per se if, inter alia, it is made "[i]n a fair and true report of a judicial legislative, official or other proceedings, or of anything said in the course thereof," or to a Puerto Rico "official upon probable cause with the intention of serving the public interest or of securing the redress of a private wrong." Gierbolini, 930 F. Supp. at 717 n.1 (quoting 32 L.P.R.A. § 3144).

All ten allegedly-wrongful statements are so vague that it is highly questionable whether they meet Rule 8's low notice pleading standard. See TPC ¶¶ 92, 98.

Regardless, six of Mr. Hanratty's alleged ten "false and defamatory statements of fact" were per se privileged: "false[] report[s] to the Puerto Rican government" of the McOsker Parties' unlawful activity. Id. ¶¶ 92(a)–(f); id. ¶¶ 98(a)–(f). The remaining four all are "report[s]" of the Ebury Parties' various litigations against the McOsker Parties. See id. ¶¶ 92(g)–(i); id. ¶¶ 98(g)–

(j). And at least two could never have been defamatory at all: "directing Dudley at Laveer Capital" is not a "false statement of fact," and "accusing McOsker of stealing" is not a publication to a third party. <u>See</u> <u>id.</u> ¶ 92(g); <u>id.</u> ¶¶ 98(g)–(h). Therefore, the Court should dismiss Third-Party Complaint Counts IX and X.

### D.  Unjust Enrichment

In Puerto Rico, plaintiffs can **only** invoke unjust enrichment if the allegedly-wrongful behavior is not prohibited by any other law. <u>Gov't of Puerto Rico v. Carpenter Co.</u>, 442 F. Supp. 3d 464, 476–77 (D.P.R. 2020). The claim is "unavailable if the plaintiff may seek other forms of relief," even if the plaintiff "fail[s] to sufficiently allege that claim." <u>In re Fin. Oversight & Mgmt. Bd. for Puerto Rico</u>, 578 F. Supp. 3d 267, 296 (D.P.R. 2021).

In claiming that the Ebury Parties' allegedly-wrongful behavior is prohibited by a panoply of other laws, the McOsker Parties plead themselves out of any unjust enrichment claim. <u>Accord, e.g.</u>, <u>Westernbank Puerto Rico v. Kachkar</u>, Civ. No. 07-1606 (ADC/BJM), 2009 WL 6337949, at *29 (D.P.R. Dec. 10, 2009), <u>report and recommendation adopted</u>, 2010 WL 14165421, at *1 (D.P.R. Mar. 31, 2010) (<u>inter alia</u>, dismissing unjust enrichment claim; "That the defendants have failed to plead [their breach of contract, fraudulent inducement, and conversion] claims adequately to survive the motion to dismiss, or that [plaintiff's] affirmative defenses have defeated them, does not render the underlying tort and contract laws inapplicable to the situation."). The Court should dismiss Third-Party Complaint Count VIII.

## V. The McOsker Parties Fail to Plead the Existence of Any RICO Enterprise, Let Alone Racketeering Activity that Injured them

To plead a RICO § 1962(c) "Control" violation, the McOsker Parties must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, i.e. two predicate acts defined by statute, including indictable offenses under the mail and wire fraud statutes. Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004); 18 U.S.C. §§ 1341, 1343.

RICO claims rooted in fraud must be "pleaded with particularity" sufficient to satisfy Rule 9(b). Kolar v. Preferred Real Est. Invs., Inc., 361 F. App'x 354, 363 (3d Cir. 2010) (citing Lum, 361 F.3d at 224). Indeed, such claims "must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." Kolar, 361 F. App'x at 363 (quoting Western Assocs. Ltd v. Market Square Assocs., 235 F.3d 629, 637 (D.C. Cir. 2001)).

To plead a racketeering "pattern," the Counterclaim must allege that the racketeering acts are related and continuous—that they "amount to or pose a threat of criminal activity." Kolar, 361 F. App'x at 362–63 (citing H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)). To plead continuity, a claimant must allege "a closed period of repeated conduct" that lasted "a substantial period of time," or "past conduct that by its nature projects into the future with a threat of repetition;" in other words, that the enterprise is a "long-term association that exists **for** criminal purposes." H.J. Inc., 492 U.S. at 241–42. While two predicate acts across ten years may state a RICO claim, predicate acts that occurred over a twelve-month period do not. Hughes v. Consol-Penn. Coal Co., 945 F.2d 594, 610–11 (3d Cir. 2011).

An isolated allegedly-fraudulent transaction "cannot by itself underpin a pattern of racketeering activity." Kolar, 361 F. App'x at 365 (citations omitted). Similarly, unlawful schemes that target just one or one class of victims do not "pose [a] future threat," and therefore also cannot

trigger RICO liability. Marshall-Silver Constr. Co. v. Mendel, 894 F.2d 593, 596–98 (3d Cir. 1990); see also id. at 598 (quoting H.J. Inc., 492 U.S. at 239) ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy the continuity requirement: Congress was concerned in RICO with long-term criminal conduct."). Moreover, "if the pattern requirement has any force whatsoever, it is to prevent [ . . . ] ordinary commercial fraud from being transformed into a federal RICO claim." Kolar, 361 F. App'x at 365 (quoting Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989)).

Therefore, federal courts often dismiss RICO claims that arise out of disputed contractual obligations. See, e.g., Annulli v. Panikkar, 200 F.3d 189, 200 (3d Cir. 1999) ("[T]heft by deception, like a simple breach of contract or intentional interference with contract, is not a predicate act of racketeering activity enumerated in § 1961(1) [ . . . ] We will not read language into § 1962 to federalize every state tort, contract, and criminal law action."); Flip Mortgage Corp. v. McElhone, 841 F.2d 531, 538 (4th Cir. 1988) ("[T]his circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims"); Blount Fin. Serv. Inc. v. Walter E. Heller & Co., 819 F.2d 151, 152 (6th Cir. 1987) (dismissing RICO claim in part because "[t]he fact that the parties take different positions under the contract [ . . . and defendant] thereby concealed or refused to disclose what the plaintiff considers the true prime rate called for under the contract, does not give a valid rise to a claim for fraud."); United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980) ("[T]he mail fraud act does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract.").

For example, in Kolar, the Third Circuit held that a plaintiff failed to plead its § 1962(c) claim where "the balance of the complaint" alleged very little "activity containing any 'deceptive elements,'" aside from one supposedly-fraudulent transaction. 361 F. Appp'x at 363. Instead, the

"essence" of the complaint was that the defendants had "'diverted and / or misappropriated monies due and payable' to him under purported claims of contractual right." Id. While the plaintiff tried to "characterize these contract-based claims of right as 'false' and 'fraudulent,'" "defendants' alleged conduct—even if wrongful as a matter of contract or other state law—was not fraudulent." Id.

And in Lum, the Third Circuit rejected a § 1962(c) claim rooted in allegations that "[e]ach month during the Class Period, Defendants mailed thousands of bank statements, advertisements for credit cards, contracts and promotional materials containing the fraudulent stated and artificially inflated interest rates to Plaintiffs and the Class in furtherance of their fraudulent scheme," and made "interstate phone calls and / or facsimile transmissions" promoting their alleged frauds. 361 F.3d at 224. By failing to "indicate the date, time, or place of any misrepresentation" or "provide an alternative means of injecting precision and some measure of substantiation into the fraud allegations," the plaintiffs fell short of Rule 9(b)'s particularity requirements. Id. at 225.

As in Lum, the McOsker Parties fail to plead any § 1962(c) violation "because their general allegations of fraud do not comply with Rule 9(b) and their specific allegations regarding particular transactions do not amount to fraud." Lum, 361 F.3d at 224. And as in Kolar, the "essence" of the McOsker Parties' allegations is that the Ebury Parties failed to live up to their contractual promises. See Kolar, 361 F. App'x at 363. Because the McOsker Parties' only alleged damages flow out of non-fraudulent, but failed, business endeavors, they state no RICO claim; and for the same reasons, the McOsker Parties' "Fraud / Fraudulent Inducement" claim fails; the Court should dismiss Counterclaim Count I and Third-Party Complaint Counts I, II, and III.

## VI. The McOsker Parties Fail to Plead RICO or Civil Conspiracy

Conspiracy's threshold element is affirmative agreement; therefore, a person cannot be convicted of agreeing to participate in a conspiracy if she does not know that the conspiracy even exists. United States v. Falcone, 311 U.S. 205, 210–11 (1940). Courts require proof of the defendant's actual knowledge in order to prevent liability based on merely tenuous or incidental connections with the enterprise. United States v. Viola, 35 F.3d 37, 45 (2d Cir. 1994) (citations omitted).

Therefore, to plead RICO § 1962(d) conspiracy, the Counterclaim must allege that each defendant (1) "agree[d] to commit the predicate acts" and (2) "[knew] that those acts were part of a pattern of racketeering activity conducted in such a way as to violate Section 1962(a), (b), or (c)." Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989) (quoting Odesser v. Continental Bank, 676 F. Supp. 1305, 1312 (E.D. Pa. 1987)).

Similarly, to plead civil conspiracy, the Counterclaim must allege specific "facts showing particularly what a defendant[] did to carry the conspiracy into effect, whether such acts within the framework of the conspiracy alleged,[] whether such acts, in the ordinary course of events, would proximately cause injury to the plaintiff," and that the defendant affirmatively agreed to perform those acts "in furtherance of the objects of the conspiracy." Rolon v. Rafael Rosario & Assocs., Inc., 450 F. Supp. 2d 153, 160–61 (D.P.R. 2006) (citation omitted).

Here, the Counterclaim pleads zero facts demonstrating any Ebury Entity or Employees' knowledge of the alleged RICO enterprise—let alone facts showing that any of those Ebury Parties affirmatively agreed to facilitate the conspiracy, or performed any acts that, "in the ordinary course of events, would proximately cause injury to the plaintiff." See Rolon, 450 F. Supp. 2d at 161; accord Rose, 871 F.2d at 336 (citing Black & Yates, Inc. v. Mahogany Ass'n, Inc., 129 F.2d 227,

231–32 (3d Cir.), <u>cert. denied</u>, 317 U.S. 672 (1942)) ("A conspiracy claim must[] contain supportive **factual** allegations") (emphasis added).

Because the Counterclaim fails to plead facts showing each and every Ebury Entity's or Employee's own knowledge of, role in, or agreement to violate RICO or commit any alleged tort against the McOsker Parties, the Court should dismiss both the RICO Conspiracy and Civil Conspiracy claims: Third-Party Complaint Counts II and VII. <u>Accord, e.g.</u>, <u>A-Valey Engineers, Inc. v. Bd. of Chosen Freeholders</u>, 106 F. Supp. 2d 711, 715 (D.N.J. 2000) (alterations omitted) (plaintiffs failed to state a claim against "'defendant corporations' [who] supplied the misrepresentations in issue;" "Pleadings containing collectivized allegations against 'defendants' do not satisfy Rule 9(b)."); <u>Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg</u>, 660 F. Supp. 1362, 1369 (D. Conn. 1987) (dismissing RICO complaint that "[did] not specify which defendants used mail or wire services, what was transmitted, or to whom it was sent").

## VII. The Court Cannot Exercise Personal Jurisdiction Over the Third-Party Defendants

Finally, by failing to state any claim against any Third-Party Defendant, the Counterclaim also fails to allege this Court's jurisdiction over all of those Parties.

To survive this 12(b)(2) Motion, the McOsker Parties bear the burden of proving, by a preponderance of the evidence, that (1) there is a statutory basis for jurisdiction and (2) exercising jurisdiction comports with due process. <u>Jane Voe #2 v. Archdiocese of Milwaukee</u>, 700 F. Supp. 2d 653, 655 (D. Del. 2010) (citations omitted). To prove the defendant's minimum contacts, the McOsker Parties must produce "sworn affidavits or other competent evidence." <u>Id.</u> (quoting <u>Time Share Vacation Club v. Atlantic Resorts, Ltd.</u>, 735 F.2d 61, 67 n.9 (3d Cir. 1984)).

While the RICO statute authorizes federal service of process, the Counterclaim fails to plead the Third-Party Defendants' knowing agreement to and participation in any RICO

conspiracy. See id. And assuming that this Court would exercise supplemental jurisdiction even if

the RICO claims failed, it could not exercise personal jurisdiction over the Third-Party Defendants

because the Counterclaim fails to plead facts suggesting that even one of those Ebury Parties has

a single contact with Delaware, let alone the minimum contacts necessary to satisfy due process.

Accord Shoemaker v. McConnell, 556 F. Supp. 2d 351, 354–55 (D. Del. 2008) (citing 10 Del. C.

§ 3104)) (granting 12(b)(2) dismissal where Delaware resident sued Ohio residents for car crash

that occurred in Ohio).

## CONCLUSION

The Counterclaim's failure to prove their "entitlement" to relief "with its facts" dooms

each and every one of the McOsker Parties' claims. See Fowler, 578 F.3d at 211 (citing Phillips,

515 F.3d at 234–35). The Ebury Parties respectfully request that the Court dismiss the

Counterclaim and Third-Party Complaint with prejudice.

Dated: November 14, 2022

SMITH KATZENSTEIN & JENKINS LLP

Of Counsel:                                     /s/ Kathleen M. Miller
                                                Kathleen M. Miller (No. 2898)
GUSRAE KAPLAN NUSBAUM PLLC                      Julie M. O'Dell (No. 6191)
                                                Brandywine Building
Kari Parks (pro hac vice)                       1000 N. West Street, Suite 1591
120 Wall Street, 25th Floor                     Wilmington, Delaware 19801
New York, New York 10005                        (302) 652-8400
(212) 269-1400                                  kmiller@skjlaw.com
kparks@gusraekaplan.com                         jodell@skjlaw.com

                                                Attorneys for The Ebury Parties

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

November 16, 2022

By NYSCEF

The Honorable Margaret Chan,
    Supreme Court, New York County,
      Commercial Division,
        60 Centre Street, Room 659
          New York, New York 100007.

        Re:    Emigrant Business Credit Corporation v. John Arthur Hanratty et al., No. 158207/2022

Dear Justice Chan:

        I represent Plaintiff Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned action and write in response to Defendants' letter from earlier today. While EBCC objects to Defendants' attempt to file an unauthorized and untimely sur-reply to the pending order to show cause (Dkt. 23), EBCC respectfully notes that neither Defendants' letter, nor the attached exhibit, has any bearing on EBCC's right to the requested relief.

        Defendants use their letter to question the wisdom of EBCC's decision to bring this action; which EBCC brought after it discovered, among other things, that Defendant John Hanratty had bragged to a business partner about defrauding EBCC. (Dkt. 22 at 2 (identifying new allegations).) Defendants claim that the specific allegations that EBCC highlighted "[are] not new" (Dkt. 31 at 2), but fail to identify any earlier disclosure of these egregious facts.

        More importantly, Defendants still fail to dispute ***any*** of the undisputed facts set out in EBCC's motion papers, including that:

- they failed to repay EBCC at the maturity date, in violation of the promissory notes;

- they owe EBCC over $21 million in outstanding principal and interest;

The Honorable Margaret Chan                                                    -2-

- they have been self-servicing almost 90% of EBCC's purported collateral and have misrepresented the eligibility of collateral by requesting advances against self-serviced liens;

- they inflated the value of EBCC's collateral in a December 2021 lien tape and misleadingly double-counted collateral when requesting advances in 2018 and 2019;

- they misused advances and sold EBCC's collateral to pay off investors and other lenders;

- they have sold around 90 properties (worth more than $4 million) in 2022 that were EBCC's collateral, without remitting the sale proceeds to EBCC;

- they have listed for sale another 88 properties that are EBCC's collateral (for approximately $4.8 million total), without agreeing to remit any sale proceeds to EBCC.

(Dkt. 28 at 6 (citations omitted).)  Instead, Defendants use their unauthorized sur-reply to rehash their argument that EBCC somehow "delayed" in requesting relief such that Defendants should be allowed to continue dissipating EBCC's collateral.  (Dkt. 31 at 2.) For the reasons set out in EBCC's motion papers, EBCC respectfully requests that the Court grant the requested relief.  (*See also* Dkt. 22 at 1-3.)

EBCC also would like to alert the Court to Defendants' continued defiance of the Court's order to show cause.  Four weeks ago, the Court ordered Defendants to deposit the proceeds from the sales of certain assets into an escrow account, to be established by the parties.  (Dkt. 23 at 3.)  Despite this clear and unequivocal command, Defendants refused to provide EBCC with necessary information to establish the escrow account (the escrow amount) until yesterday at 9:03 AM.  (*See* Ex. A at 7.)

Defendants now claim that they intend to deposit into the escrow account only $20,000 in proceeds (*id.*); an amount that simply is not credible in light of Defendants' sworn testimony in this case.  Specifically, Defendants have testified that they earned average monthly revenues of $753,096 over the past year and that they are "in their best cash position since the Pandemic began."  (Dkt. 24 ¶ 41.)  It strains credulity to believe that Defendants have only $20,000 in available proceeds to deposit into the escrow account and Defendants have refused thus far to provide corroboration for their claim to have spent the remainder of the proceeds prior to the entry of the order to show cause.  (Ex. A at 6.)

In light of Defendants' month-long effort to wait out the clock on the order to show cause, EBCC respectfully requests the Court grant the supplemental relief

The Honorable Margaret Chan                                                    -3-

identified in EBCC's reply memorandum of law (Dkt. 28 at 17-18), at the earliest possible opportunity.

Sincerely,

*/s/ Alexander J. Willscher*

Alexander J. Willscher

cc:      All counsel of record (via NYSCEF)

| | |
|---|---|
| **From:** | Victor Wang <vwang@gusraekaplan.com> |
| **Sent:** | Tuesday, November 15, 2022 11:08 AM |
| **To:** | Mayron, Austin P.; Kari Parks |
| **Cc:** | Willscher, Alexander J. |
| **Subject:** | [EXTERNAL] RE: Escrow Account for Litigation |

Hi Austin,

I just gave you a call to figure out the KYC documents. Please give me a call back when you get a chance. Thank you.

Best,
Victor

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Monday, November 14, 2022 8:19 PM
**To:** Victor Wang <vwang@gusraekaplan.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

Hi Victor,

It has now been almost a month since the Court entered the TRO in this case, and three days since you represented that you would provide us with the escrow amount. As such, we intend to call Justice Chan's chambers tomorrow at 2:30 p.m. to raise the issue of Defendants' noncompliance with the TRO. Please confirm your availability to join that call, or provide an alternative time between 2:30 p.m. and 4:30 p.m. tomorrow for us to speak with the Court.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Victor Wang <vwang@gusraekaplan.com>
**Sent:** Thursday, November 10, 2022 5:27 PM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation

Hi Austin,

Our client will provide to us on Friday the escrow amount so I will send it to you tomorrow. Thank you.

Best,
Victor

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Wednesday, November 9, 2022 5:47 PM

1

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 681 of 688

**To:** Victor Wang <vwang@gusraekaplan.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

Thank you, Victor.  We will finalize the escrow agreement and send you a revised version for comment and execution.  Citi has asked for the dollar amount of the initial deposit that Defendants intend to make upon execution of the escrow agreement (potentially Friday).  Could you please let us know that escrow amount?

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Victor Wang <vwang@gusraekaplan.com>
**Sent:** Wednesday, November 9, 2022 2:50 PM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation

Hi Austin,

Please see the attached Escrow documents sent over by our client. Please let me know if the escrow agreement is finalized or if you would need other documents from our client. Thank you.

Best,
Victor

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Tuesday, November 8, 2022 3:25 PM
**To:** Kari Parks <kparks@gusraekaplan.com>; Victor Wang <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

Hi Victor,

Thank you for your call, and we are sorry to hear that Mr. Hanratty has been in the hospital.  Now that he has been released, we look forward to finalizing the escrow agreement.  Please do not hesitate to reach out if there is anything we can to do help move things along.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Mayron, Austin P.
**Sent:** Tuesday, November 8, 2022 3:19 PM
**To:** 'Kari Parks' <kparks@gusraekaplan.com>; 'Victor Wang' <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 682 of 688

Counsel—

The Court directed Defendants to deposit proceeds from past or future sales of tax lien certificates or REO properties into an escrow account. The TRO was entered on October 19, 2022—almost three weeks ago—and you since have refused to cooperate in establishing the escrow account, or even to identify which Defendants will be depositing funds into the account or the approximate amount of proceeds to be deposited. On October 24, 2022, you represented that "we're on the same page here" and that you were "working on identifying the depositing entity/ entities and calculating the relevant 'proceeds.'" You also indicated that you "anticipate[d] about $50k of tax lien sales to close this week"—*i.e.*, the week of October 24—but have not escrowed any sale proceeds. Please provide an update on these outstanding matters.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Mayron, Austin P.
**Sent:** Tuesday, November 1, 2022 8:53 PM
**To:** 'Victor Wang' <vwang@gusraekaplan.com>
**Cc:** Kari Parks <kparks@gusraekaplan.com>; Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** FW: Escrow Account for Litigation

Hi Victor,

Please see below request for KYC materials for the escrow account. Defendants would be the Depositor/Party A. Also attached is Citi's template escrow agreement, for which you will have to identify which Defendants will be depositing funds into the escrow account.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Mayron, Austin P.
**Sent:** Friday, October 21, 2022 1:23 PM
**To:** 'Kari Parks' <kparks@gusraekaplan.com>
**Cc:** 'Tendler, David ' <​███████████>; Choi, Jin <​███████████>; Demarco, Debra <​███████████>; Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** FW: Escrow Account for Litigation

Kari,

Please see below request for KYC materials for the escrow account. Defendants would be the Depositor/Party A.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

**From:** Tendler, David <█████████████████>
**Sent:** Friday, October 21, 2022 11:48 AM
**To:** Choi, Jin <████████████>; Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; Demarco, Debra <█████████████>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation

Hello Austin,

I have included our KYC outline below, which needs to be completed before the closing. As a reminder, we can now accept third party, self-initiated e-signatures for the Agreement and Incumbency Exhibit. Please let me know if you have any questions.

**Depositor/Party A:**

1. **Certificates of Formation and Good Standing**
2. **W-9** (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (Preferred)*. Please note that the entity's address listed on the W-9 should **MATCH** the entity's address that is listed on the FinCEN Certification of Beneficial Ownership Form (see below).
   - Please also provide a copy of the EIN Confirmation Letter provided by the IRS at the time of EIN/TIN issuance, that reflects the EIN/TIN listed on the W-9, for verification purposes.
3. **Ownership Letter** (sample attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (Preferred)*.
   - Please also provide, **prior to closing,** an organizational chart that lists all beneficial owners who have, directly or indirectly, a 10% or greater ownership interest in the Purchaser/Depositor (including their ownership percentages).
4. *FinCEN Certification of Beneficial Ownership Form* (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (Preferred)*.
   - Control Person of the Purchaser/Depositor – The name on the form **MUST** match the government-issued photo ID provided.
   - Government-issued photo ID is required for the Control Person/Beneficial Owner(s). Please note that non-U.S.-issued IDs must be notarized.
   - If a passport is provided, the residential address of the individual must be provided as well.
5. **Executed Incumbency** (Exhibit of Escrow Agreement) –Need to be provided at least 5 days before closing. DOESN'T need to be Citi-bank initiated
   - Government-issued photo ID is required for any/all individuals listed -- if a passport is provided, the residential address of the individual must be provided as well.

**Party B:**

1. **W-9** (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (Preferred)*.
2. **Executed Incumbency** (Exhibit of Escrow Agreement) -- Need to be provided at least 5 days before closing, DOESN'T need to be Citi-bank initiated
   - Government-issued photo ID is required for any/all individuals listed -- if a passport is provided, the residential address of the individual must be provided as well

**David Tendler**
Escrow Business Development

Citi Private Bank, Law Firm Group
153 E. 53rd Street, 23rd Floor
New York, NY
Mobile: █████████

Important Disclosures [privatebank.citibank.com]

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

---

**\*\*This is an external message from:** vwang@gusraekaplan.com **\*\***

FILED: NEW YORK COUNTY CLERK 11/16/2022 03:00 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 34
RECEIVED NYSCEF: 11/16/2022

24-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State
Court Records    Pg 685 of 688

| | |
|---|---|
| **From:** | Kari Parks <kparks@gusraekaplan.com> |
| **Sent:** | Wednesday, November 16, 2022 8:27 AM |
| **To:** | Mayron, Austin P. |
| **Cc:** | Willscher, Alexander J.; Victor Wang |
| **Subject:** | Re: [EXTERNAL] RE: Escrow Account for Litigation EBCC Ebury |
| **Attachments:** | annual_budget_comparative-20221101.pdf; Ebury Fund 1_ProfitandLoss_YTD 2022.pdf; Ebury Fund 2_ProfitandLoss_YTD 2022.pdf |

Hi Austin - thanks for following up. I'll discuss with my client and get back to you. Thanks.

**Kari Parks, Associate | Gusrae Kaplan Nusbaum PLLC |** 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

On Nov 16, 2022, at 08:05, Mayron, Austin P. <mayrona@sullcrom.com> wrote:

Hi Kari,

We have reviewed AppFolio and QuickBooks and have confirmed that these platforms do not contain the requested financial records. According to the attached summary statements from AppFolio and QuickBooks, the Ebury Companies had a total income of $539,670.73 in the entirety of 2022—nowhere near the $753,096 in monthly revenues that your client has claimed to have earned in 2022. Nor do the other financial records that your client has provided substantiate your client's claim to have reinvested the at-issue sales proceeds into new tax liens. As we discussed on our call, please confirm whether you intend to provide us with the requested proof that the Ebury Companies have incurred more than $7 million in ordinary and necessary business expenses in 2022 (putting aside our position that your client should not have been investing millions of dollars into new, illiquid assets while in default of his obligation to repay EBCC more than $21 million in outstanding debt). Given that we first requested this

information on October 24, 2022, we believe this issue is ripe for presentation to the Court and again request your availability for a joint call, either today or tomorrow.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Willscher, Alexander J. <willschera@sullcrom.com>
**Sent:** Tuesday, November 15, 2022 3:09 PM
**To:** Kari Parks <kparks@gusraekaplan.com>; Victor Wang <vwang@gusraekaplan.com>; Mayron, Austin P. <mayrona@sullcrom.com>
**Subject:** RE: [EXTERNAL] RE: Escrow Account for Litigation EBCC Ebury

Thank you. We will check.

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Date:** Tuesday, Nov 15, 2022 at 2:34 PM
**To:** Victor Wang <vwang@gusraekaplan.com>, Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation EBCC Ebury

Hi,

Just talked to Austin. On our call earlier, I told you that I believed Ebury RE's books were subsumed within Fund 2's in Quickbooks, but wanted to double-check. I looked back at our records and I was mistaken; Ebury RE's books are in Appfolio, not Quickbooks. I understand that EBCC has full access to Ebury RE's Appfolio and has accessed that platform as recently as last week. I believe that Appfolio has the details Alex identified (Ebury RE's inventory sold / inflows, outflow / expenses, bank accounts).

Best,
Kari

---

**From:** Victor Wang <vwang@gusraekaplan.com>
**Sent:** Tuesday, November 15, 2022 9:03
**To:** Mayron, Austin P. <mayrona@sullcrom.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; Cortes, Diana <████████████████>; Tendler, David <████████████████>; Demarco, Debra <████████████████>; Choi, Jin <████████████>
**Subject:** RE: Escrow Account for Litigation EBCC Ebury

Good morning Austin,

Mr. Hanratty is expected to deposit $20K upon execution of the escrow agreement and I am getting the other documents together. Thank you.

Best,
Victor

FILED: NEW YORK COUNTY CLERK 11/16/2022 03:00 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 34    22-04020-dsj    Doc 1-1    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #2 State    RECEIVED NYSCEF: 11/16/2022

Court Records    Pg 687 of 688

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Monday, November 14, 2022 1:27 PM
**To:** Victor Wang <vwang@gusraekaplan.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; Cortes, Diana <diana.cortes@citi.com>; Tendler, David <david.tendler@citi.com>; Demarco, Debra <debra.demarco@citi.com>; Choi, Jin <jin.choi@citi.com>
**Subject:** RE: Escrow Account for Litigation EBCC Ebury

Hi Victor, Kari,

Could you please provide Citi with the below information for the Ebury parties? In addition, could you please provide us with the amount you expect to deposit upon execution of the escrow agreement?

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Tendler, David <███████████████>
**Sent:** Monday, November 14, 2022 12:20 PM
**To:** Demarco, Debra <███████████████>; Mayron, Austin P. <mayrona@sullcrom.com>; Choi, Jin <███████████████>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; Cortes, Diana <███████████████>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation EBCC Ebury

Hello Austin,

Thank you for sending the KYC documents. Below are a few KYC updated will need.

Ebury RE LLC

1. **W9**- please fill in line 1

1. **FinCen** – Please have the address on the W9 and address on page 1 and 2 of the FinCen match.

1. **Ownership Letter** – please add the ownership percentages to the Exhibit of the Ownership Letter.

1. **Missing**: Formation and Good Standing certificate, John Hanratty's ID that matches the ID used on the FinCen, EIN verification.


Ebury Fund 2 LP – Is this an SEC register fund? If so, we will need the attached Money Manager Letter filled out. Please note, any edits to the attached documents will cause delays.

1. **W9**- please fill in line 1

1. **Missing** – Formation, Good Standing, and EIN verification


Emigrant Business Credit Corporation

1. We will need the Exhibit A-3 of the agreement signed.

FILED: NEW YORK COUNTY CLERK 11/16/2022 03:00 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO. 34          24-04020-dsj   Doc 1-1   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #2 State   RECEIVED NYSCEF: 11/16/2022

Court Records     Pg 688 of 688

Let me know if you have any questions, or would like to jump on a quick call.

Thank you,

**David Tendler**, Assistant Vice President
Business Development, Law Firm Group
Citi Global Wealth at Work
153 E. 53rd Street, New York, NY 10022
T █████████

Important disclosures [privatebank.citibank.com]

**THE NATIONAL LAW JOURNAL | BEST OF 2022 FOR:**

Business Bank
Attorney Escrow Services

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

---

**\*\*This is an external message from:** kparks@gusraekaplan.com **\*\***