# GUSRAE KAPLAN NUSBAUM PLLC

### ATTORNEYS AT LAW

120 WALL STREET-25TH FLOOR
NEW YORK, NEW YORK 10005

OF COUNSEL
ROBERT L. BLESSEY

SCOTT H. GOLDSTEIN
MARTIN H. KAPLAN
LAWRENCE G. NUSBAUM

TEL (212) 269-1400
FAX (212) 809-4147

www.gusraekaplan.com

**November 16, 2022**

VIA NYSCEF
**The Honorable Margaret Chan**
**Justice of the Supreme Court, New York County**
**Commercial Division**
**60 Centre Street, Room 659**
**New York, New York 10007**

RE: Emigrant Business Credit Corporation v. John Arthur Hanratty et al., No. 158207/2022

Dear Justice Chan:

I represent the "Ebury Parties" in the above-captioned "Action" and write in response to the letter filed this afternoon by Plaintiff Emigrant Business Credit Corporation ("EBCC"), which purports to "respond" to the Ebury Parties' filing of a new, supplemental exhibit in opposition to EBCC's pending motion for preliminary injunction by characterizing the new exhibit as an "unauthorized sur-reply" and accusing the Ebury Parties of "def[ying]" the temporary restraining order that the Court issued on October 19, 2022 (the "TRO"). Compare Dkt. 31, Ebury Parties' Letter / Correspondence to Judge (Nov. 16, 2022); Dkt. 32, The Ebury Parties' Memorandum in Support of Motion to Dismiss McOsker Counterclaim and Third-Party Complaint ("[P]lease find annexed the memorandum in support of [certain Ebury Parties'] motion to dismiss the McOsker Defendants' Counterclaim," filed in the federal district court for the District of Delaware on Monday, November 14) and Dkt. 33, EBCC's Letter / Correspondence to Judge (Nov. 16, 2022) ("EBCC Letter").

The TRO orders the Ebury Parties to deposit certain income, excluding "ordinary and necessary disbursements related to Defendants' tax lien or real estate business," into "an escrow account[] to be established by the Parties," and to give EBCC 24 hours' notice before transferring, spending, etc. "any assets in an amount exceeding $50,000." Dkt. 23, Order to Show Cause at 3–4 (Oct. 19, 2022) ("OSC").

GUSRAE KAPLAN NUSBAUM PLLC

**The Honorable Margaret Chan**
**November 16, 2022**
**Page 2**

Two minutes after Your Honor entered the TRO, I emailed EBCC's counsel:

Hope you're having a good day. Per Justice Chan's OSC, we propose using our firm's IOLA account as the "escrow account" for TRO Section B. Please let me know what you think. Thanks!

Exhibit A at 3. EBCC declined my offer, expressing its "prefer[ence] to use a dedicated escrow account" and asking "how much [the Ebury Parties] expect to deposit in order to price [the unidentified vendor's] offer." Id. at 2. While the Ebury Parties tentatively agreed to using a third-party vendor if EBCC would cover the vendor cost, EBCC never responded to that concern. See id. at 1.

Regardless, since late October, the Ebury Parties have attempted to comply with the many document and information requests demanded by EBCC, purportedly required by Citi Private Bank, the third-party vendor chosen by EBCC. Because EBCC chose to hire Citi Private Bank to open a brand-new escrow account instead of just using either law firm's preexisting IOLA account at no cost to any client, EBCC has transmitted numerous information and document requests, including for certificates of formation and good standing, Forms W-9, ownership letters, organizational charts, FinCEN and IRS documents, and other know-your-customer ("KYC") materials. Exhibit B at 4–5. EBCC also has repeatedly claimed that "Citi has asked for the dollar amount of the initial deposit." See, e.g., id. at 1 (emphasis added). After numerous back-and-forth and delays, including those caused by the hospitalization of the Ebury Parties' principal, the Parties had finally come close to finalizing the many, many escrow documents. See generally id.

Two days ago, EBCC's counsel forwarded additional information requests from Citi, and asked for "the amount [the Ebury Parties] expect to deposit upon execution of the escrow agreement." Exhibit C at 3. Seven hours later, EBCC "threatened" to "call Justice Chan's chambers tomorrow at 2:30p.m. to raise the issue of Defendants' noncompliance with the TRO." Exhibit D at 1. The next morning, the Ebury Parties' counsel informed EBCC that they expect to deposit "$20K upon the execution of the escrow agreement and [are] getting the other documents together," and called and emailed EBCC's counsel "to figure out the KYC documents." Id.; Exhibit D at 1.

Then, EBCC's counsel called me; during that 21-minute phone call, the parties discussed their different expectations of the "initial" escrow amount and "ordinary and necessary disbursements related to Defendants' tax lien or real estate business," and EBCC demanded a summary document representing every single financial transaction in which the Ebury Parties have participated in 2022. I reminded opposing counsel that EBCC continues to have full access to the Ebury Parties' Quickbooks and Appfolio accounts, allowing EBCC to view the Ebury Parties' transactions in real time. See Exhibit

GUSRAE KAPLAN NUSBAUM PLLC

The Honorable Margaret Chan
November 16, 2022
Page 3

C at 3. I also observed that EBCC repeatedly had "threatened" to "call the judge" immediately before the Ebury Parties' deadlines to file papers in this and the Delaware action, and expressed my hope that the timing was merely coincidental. EBCC's counsel assured me that EBCC's escalations have not been driven by the Ebury Parties' filing deadlines, and offered to "give" the Ebury Parties until Thursday or "a couple more days" to prepare the detailed financials that EBCC had demanded. This morning, EBCC expressed concerns with the information available on Quickbooks and Appfolio; 22 minutes later, I responded that I would "discuss with my client and get back to you." Id. at 1.

But EBCC responded to the filing of the McOsker MTD by expressing its "inten[tion] to file a brief response this afternoon, and will also be raising the issue of [the Ebury Parties'] noncompliance with the TRO" unless the Ebury Parties created and provided a single document detailing all of their 2022 financial transactions "in advance of [EBCC's] filing" this afternoon. Id. at 1. So here we are.

The fact of the matter is, EBCC's demands are the only reason why the Ebury Parties have yet to fund any escrow account. Two minutes after the Court issued the TRO, the Ebury Parties tried to comply with their obligations by identifying an escrow account into which they could immediately deposit their proceeds, less "ordinary and necessary disbursements." But EBCC chose a more laborious, less private, more expensive option, and after weeks of back-and-forth—including new information requests as recently as Monday—has yet to establish any escrow account.

Moreover, EBCC has abused the TRO in exactly the manner condemned by the United States Supreme Court. In Grupo Mexicano, the Court reversed a preliminary injunction that prevented a debtor from "dissipating, transferring, conveying, or otherwise encumbering the creditors' right to 'receive or benefit' from the debtors 'most significant asset,'" despite the lower courts' reasoning that the debtors were "at risk of insolvency if not already insolvent." See Dkt. 27 at 21–22 (Oct. 26, 2022) (quoting Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc., 527 U.S. 308, 330 (1999)).

G U S R A E   K A P L A N   N U S B A U M   PLLC

**The Honorable Margaret Chan**
**November 16, 2022**
**Page 4**

In doing so, the Court warned:

A rule of procedure which allowed any prowling creditor, before his claim
was definitively established by judgment, and without reference to the
character of his demand, to file a bill to discover assets, or to impeach
transfers, or to interfere with the business affairs of the alleged debtor,
would manifestly be susceptible of the grossest abuse. A more powerful
weapon of oppression could not be placed at the disposal of unscrupulous
litigants.

**Id.**

Our Court of Appeals also has explained exactly why New York law prohibits
banks from obtaining preliminary injunctions in breach-of-loan-contract cases:

[I]n an action on contract for the recovery of money only[, t]he plaintiff [ .
. . ] has no rights as against the property of the defendant **until he obtains
a judgment, and until then has no legal right to interfere with defendant
in the use and sale of same.**

**Id.** at 24 (citing **Credit Agricole Indosuez v. Rossiyskiy Kredit Bank**, 94 N.Y.2d 541, 545–
46) (2000) (emphasis in **Credit Agricole**).

While EBCC's continual attempts to privately bully the Ebury Parties are
annoying, EBCC's decision to publicly misrepresent the Ebury Parties' TRO compliance,
and to ignore EBCC's responsibility for the escrow account's continued non-existence, is
inexcusable. EBCC is exactly the "prowling creditor" that our highest courts reject.

Because a bank's money damages complaint never justifies injunctive relief—and
EBCC has "no legal right to interfere" with the Ebury Parties' "use and sale" of their
assets—the Ebury Parties respectfully request that the Court lift the TRO and deny
EBCC's motion for preliminary injunction.

Respectfully submitted,

/s/ Kari Parks
**Kari Parks**

**CC: All counsel of record (via NYSCEF)**

**Enclosures**

# Exhibit A

| | |
|---|---|
| **From:** | Kari Parks |
| **To:** | Mayron, Austin P. |
| **Cc:** | Willscher, Alexander J. |
| **Bcc:** | Kari Parks |
| **Subject:** | Re: NYSCEF Alert: New York - Commercial - Other - Commercial Division - Entry of Order/Judgment 158207/2022 (Emigrant Business Credit Corporation v. John Arthur Hanratty et al) |
| **Date:** | Friday, October 21, 2022 5:31:53 |
| **Attachments:** | Citi Private Bank Escrow Agreement Template.doc |

Hi Austin,

We should be fine with your vendor, assuming your client is covering the cost.

I'll ask John about the paying entity and amount and get back to you later today.

Best,
Kari

**Kari Parks, Associate | Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 |
T: (212) 269-1400 | www.gusraekaplan.com

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

On Oct 20, 2022, at 12:33, Mayron, Austin P. <mayrona@sullcrom.com> wrote:

<!--[if mso 9]--> <!--[endif]-->
Hi Kari,

For the escrow agreement, could you please let us know which of the Defendants

FILED: NEW YORK COUNTY CLERK 11/16/2022 08:15 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 36    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 11/16/2022

Court Records    Pg 7 of 2230

will be depositing proceeds from past or future sales of tax lien certificates or REOs into the escrow account (in addition to an approximate amount they intend to deposit upon account opening)? I have attached our vendor's template form, which we hope to work from.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Mayron, Austin P.
**Sent:** Wednesday, October 19, 2022 7:26 PM
**To:** 'Kari Parks' <kparks@gusraekaplan.com>; Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: NYSCEF Alert: New York - Commercial - Other - Commercial Division - Entry of Order/Judgment 158207/2022 (Emigrant Business Credit Corporation v. John Arthur Hanratty et al)

Hi Kari,

Thank you for reaching out. We would prefer to use a dedicated escrow account for this litigation and are speaking with a vendor. We expect to have additional details for you tomorrow, but please let us know if you object to this plan. In addition, the vendor has asked us how much you expect to deposit in order to price their offer. Could you please provide us with an estimate of how much Defendants intend to deposit to account for proceeds from past sales of tax lien certificates and REO properties that they have not already remitted to Emigrant?

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Wednesday, October 19, 2022 4:54 PM
**To:** Willscher, Alexander J. <willschera@sullcrom.com>; Mayron, Austin P. <mayrona@sullcrom.com>
**Subject:** [EXTERNAL] FW: NYSCEF Alert: New York - Commercial - Other - Commercial Division - Entry of Order/Judgment 158207/2022 (Emigrant Business Credit Corporation v. John Arthur Hanratty et al)

Hi Alexander and Austin,

Hope you're having a good day. Per Justice Chan's OSC, we propose using our firm's IOLA account as the "escrow account" for TRO Section B. Please let me know what you think. Thanks!

Best,
Kari

---

**From:** efile@nycourts.gov <efile@nycourts.gov>
**Sent:** Wednesday, October 19, 2022 16:52
**To:** pellerm@sullcrom.com; Kari Parks <kparks@gusraekaplan.com>;
efile@nycourts.gov; willschera@sullcrom.com; scmanagingclerk@sullcrom.com;
mayrona@sullcrom.com
**Subject:** NYSCEF Alert: New York - Commercial - Other - Commercial Division - Entry of Order/Judgment 158207/2022 (Emigrant Business Credit Corporation v. John Arthur Hanratty et al)

## New York County Supreme Court
### NOTIFICATION OF ENTRY OF ORDER/JUDGMENT
### 10/19/2022

**Document: 23 - ORDER TO SHOW CAUSE**

Please note that the above referenced order/judgment has been entered in the office of the County Clerk. The date and time of entry are indicated by the file stamp affixed to the document and displayed on the document detail page.

Unless otherwise directed by the court, receipt of this notification does not constitute service of the referenced order/judgment upon any party. See e-filing rules regarding service of an order/judgment with notice of entry. 202.5-b(h)(2).

### Case Information

Index #: **158207/2022**
Caption: **Emigrant Business Credit Corporation v. John Arthur Hanratty et al**
eFiling Status: **Partial Participation Recorded**
Assigned Case Judge: **Margaret Pui Yee Chan**

### E-mail Service Notifications Sent

FILED: NEW YORK COUNTY CLERK 11/16/2022 08:15 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 36
RECEIVED NYSCEF: 11/16/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 9 of 2230

| Name | Email Address |
|------|---------------|
| ALEXANDER WILLSCHER | willschera@sullcrom.com |
| KARI PARKS | kparks@gusraekaplan.com |
| AUSTIN MAYRON | mayrona@sullcrom.com |

## E-mail Service Notifications NOT Sent

Court rules require hard copy service upon non-participating parties and attorneys who have opted-out or declined consent

| Party | Attorney |
|-------|----------|
| XYZ Corps., Defendant/Respondent | No Representation Recorded |

*NOTICE: This e-mail is intended only for the named recipient and for the purposes of the New York State Courts E-Filing System. If you are neither the intended recipient nor a person designated to receive messages on behalf of the intended recipient, notify the sender immediately.*

*If you are unsure of the contents or origin of this email, it is advised to NOT click on any links provided. Instead, log into your NYSCEF account to access the documents referred to in this email. Thank you.*

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**

**Phone:** 646-386-5956

**Website:** http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml [nycourts.gov]

**\*\*This is an external message from:** kparks@gusraekaplan.com **\*\***

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

# Exhibit B

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 11 of 2230

| From: | Victor Wang |
|---|---|
| To: | Mayron, Austin P.; Kari Parks |
| Cc: | Willscher, Alexander J. |
| Subject: | RE: Escrow Account for Litigation |
| Date: | Thursday, November 10, 2022 17:26:43 |

Hi Austin,

Our client will provide to us on Friday the escrow amount so I will send it to you tomorrow. Thank you.

Best,
Victor

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Wednesday, November 9, 2022 5:47 PM
**To:** Victor Wang <vwang@gusraekaplan.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

Thank you, Victor. We will finalize the escrow agreement and send you a revised version for comment and execution. Citi has asked for the dollar amount of the initial deposit that Defendants intend to make upon execution of the escrow agreement (potentially Friday). Could you please let us know that escrow amount?

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Victor Wang <vwang@gusraekaplan.com>
**Sent:** Wednesday, November 9, 2022 2:50 PM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation

Hi Austin,

Please see the attached Escrow documents sent over by our client. Please let me know if the escrow agreement is finalized or if you would need other documents from our client. Thank you.

Best,
Victor

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Tuesday, November 8, 2022 3:25 PM
**To:** Kari Parks <kparks@gusraekaplan.com>; Victor Wang <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

Hi Victor,

Thank you for your call, and we are sorry to hear that Mr. Hanratty has been in the hospital. Now
that he has been released, we look forward to finalizing the escrow agreement. Please do not
hesitate to reach out if there is anything we can to do help move things along.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Mayron, Austin P.
**Sent:** Tuesday, November 8, 2022 3:19 PM
**To:** 'Kari Parks' <kparks@gusraekaplan.com>; 'Victor Wang' <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

Counsel—

The Court directed Defendants to deposit proceeds from past or future sales of tax lien certificates
or REO properties into an escrow account. The TRO was entered on October 19, 2022—almost
three weeks ago—and you since have refused to cooperate in establishing the escrow account, or
even to identify which Defendants will be depositing funds into the account or the approximate
amount of proceeds to be deposited. On October 24, 2022, you represented that "we're on the
same page here" and that you were "working on identifying the depositing entity/ entities and
calculating the relevant 'proceeds.'" You also indicated that you "anticipate[d] about $50k of tax lien
sales to close this week"—*i.e.*, the week of October 24—but have not escrowed any sale proceeds.
Please provide an update on these outstanding matters.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Mayron, Austin P.
**Sent:** Tuesday, November 1, 2022 8:53 PM
**To:** 'Victor Wang' <vwang@gusraekaplan.com>

**Cc:** Kari Parks <kparks@gusraekaplan.com>; Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** FW: Escrow Account for Litigation

Hi Victor,

Please see below request for KYC materials for the escrow account.  Defendants would be the
Depositor/Party A.  Also attached is Citi's template escrow agreement, for which you will have to
identify which Defendants will be depositing funds into the escrow account.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Mayron, Austin P.
**Sent:** Friday, October 21, 2022 1:23 PM
**To:** 'Kari Parks' <kparks@gusraekaplan.com>
**Cc:** [redacted]@citi.com>; [redacted]@citi.com>; [redacted]@citi.com>; Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** FW: Escrow Account for Litigation

Kari,

Please see below request for KYC materials for the escrow account.  Defendants would be the
Depositor/Party A.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** [redacted]@citi.com>
**Sent:** Friday, October 21, 2022 11:48 AM
**To:** [redacted]@citi.com>; Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; [redacted]@citi.com>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation

Hello Austin,

I have included our KYC outline below, which needs to be completed before the closing. As a
reminder, we can now accept third party, self-initiated e-signatures for the Agreement and
Incumbency Exhibit. Please let me know if you have any questions.

-

## Depositor/Party A:

1. **Certificates of Formation and Good Standing**
2. **W-9** (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (**Preferred**).* Please note that the entity's address listed on the W-9 should **MATCH** the entity's address that is listed on the FinCEN Certification of Beneficial Ownership Form (see below).
    - Please also provide a copy of the EIN Confirmation Letter provided by the IRS at the time of EIN/TIN issuance, that reflects the EIN/TIN listed on the W-9, for verification purposes.
3. **Ownership Letter** (sample attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (**Preferred**).*
    - Please also provide, **prior to closing**, an organizational chart that lists all beneficial owners who have, directly or indirectly, a 10% or greater ownership interest in the Purchaser/Depositor (including their ownership percentages).
4. **FinCEN Certification of Beneficial Ownership Form** (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (**Preferred**).*
    - Control Person of the Purchaser/Depositor – The name on the form **MUST** match the government-issued photo ID provided.
    - Government-issued photo ID is required for the Control Person/Beneficial Owner(s). Please note that non-U.S.-issued IDs must be notarized.
    - If a passport is provided, the residential address of the individual must be provided as well.
5. **Executed Incumbency** (Exhibit of Escrow Agreement) –Need to be provided at least 5 days before closing. DOESN'T need to be Citi-bank initiated
    - Government-issued photo ID is required for any/all individuals listed -- if a passport is provided, the residential address of the individual must be provided as well.

## Party B:

1. **W-9** (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (**Preferred**).*
2. **Executed Incumbency** (Exhibit of Escrow Agreement) -- Need to be provided at least 5 days before closing, DOESN'T need to be Citi-bank initiated
    - Government-issued photo ID is required for any/all individuals listed -- if a passport is provided, the residential address of the individual must be provided as well

David █████
Escrow Business Development

Citi Private Bank, Law Firm Group
153 E. 53rd Street, 23rd Floor
New York, NY
Mobile: +█
████████ ██@citi.com

Important Disclosures [privatebank.citibank.com]

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                                Court Records    Pg 15 of 2230

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If
you are not the intended recipient, please delete the e-mail and notify us immediately.

**This is an external message from:** ywang@gusraekaplan.com **

# Exhibit C

| | |
|---|---|
| **From:** | Mayron, Austin P. |
| **To:** | Kari Parks; Victor Wang |
| **Cc:** | Willscher, Alexander J. |
| **Subject:** | RE: [EXTERNAL] RE: Escrow Account for Litigation EBCC Ebury |
| **Date:** | Wednesday, November 16, 2022 13:44:03 |

Counsel—

We acknowledge receipt of your sur-reply in opposition to EBCC's order to show cause.  We intend to file a brief response this afternoon, and will also be raising the issue of Defendants' noncompliance with the TRO.  Please let us know whether you expect to provide the requested corroboration in advance of our filing.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Wednesday, November 16, 2022 8:27 AM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; Victor Wang <vwang@gusraekaplan.com>
**Subject:** Re: [EXTERNAL] RE: Escrow Account for Litigation EBCC Ebury

Hi Austin - thanks for following up. I'll discuss with my client and get back to you. Thanks.

**Kari Parks, Associate** | Gusrae Kaplan Nusbaum PLLC | 120 Wall Street | New York, NY 10005 |
T: (212) 269-1400 | www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication.  Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission.  Although this transmission and any attachments are believed to

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 18 of 2230

be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

On Nov 16, 2022, at 08:05, Mayron, Austin P. <mayrona@sullcrom.com> wrote:

Hi Kari,

We have reviewed AppFolio and QuickBooks and have confirmed that these platforms do not contain the requested financial records. According to the attached summary statements from AppFolio and QuickBooks, the Ebury Companies had a total income of $539,670.73 in the entirety of 2022—nowhere near the $753,096 in monthly revenues that your client has claimed to have earned in 2022. Nor do the other financial records that your client has provided substantiate your client's claim to have reinvested the at-issue sales proceeds into new tax liens. As we discussed on our call, please confirm whether you intend to provide us with the requested proof that the Ebury Companies have incurred more than $7 million in ordinary and necessary business expenses in 2022 (putting aside our position that your client should not have been investing millions of dollars into new, illiquid assets while in default of his obligation to repay EBCC more than $21 million in outstanding debt). Given that we first requested this information on October 24, 2022, we believe this issue is ripe for presentation to the Court and again request your availability for a joint call, either today or tomorrow.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Willscher, Alexander J. <willschera@sullcrom.com>
**Sent:** Tuesday, November 15, 2022 3:09 PM
**To:** Kari Parks <kparks@gusraekaplan.com>; Victor Wang <vwang@gusraekaplan.com>; Mayron, Austin P. <mayrona@sullcrom.com>
**Subject:** RE: [EXTERNAL] RE: Escrow Account for Litigation EBCC Ebury

Thank you. We will check.

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Date:** Tuesday, Nov 15, 2022 at 2:34 PM
**To:** Victor Wang <vwang@gusraekaplan.com>, Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>

FILED: NEW YORK COUNTY CLERK 11/16/2022 08:15 PM
NYSCEF DOC. NO. 38

INDEX NO. 158207/2022
RECEIVED NYSCEF: 11/16/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 19 of 2230

Subject: [EXTERNAL] RE: Escrow Account for Litigation EBCC Ebury

Hi,

Just talked to Austin. On our call earlier, I told you that I believed Ebury RE's books were subsumed within Fund 2's in Quickbooks, but wanted to double-check. I looked back at our records and I was mistaken; Ebury RE's books are in Appfolio, not Quickbooks. I understand that EBCC has full access to Ebury RE's Appfolio and has accessed that platform as recently as last week. I believe that Appfolio has the details Alex identified (Ebury RE's inventory sold / inflows, outflow / expenses, bank accounts).

Best,
Kari

---

**From:** Victor Wang <vwang@gusraekaplan.com>
**Sent:** Tuesday, November 15, 2022 9:03
**To:** Mayron, Austin P. <mayrona@sullcrom.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; ▮▮▮▮▮▮ @citi.com>; ▮▮▮▮▮▮▮▮▮ @citi.com>; ▮▮▮▮▮▮▮▮ @citi.com>; ▮▮▮▮▮▮▮ @citi.com>
**Subject:** RE: Escrow Account for Litigation EBCC Ebury

Good morning Austin,

Mr. Hanratty is expected to deposit $20K upon execution of the escrow agreement and I am getting the other documents together. Thank you.

Best,
Victor

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Monday, November 14, 2022 1:27 PM
**To:** Victor Wang <vwang@gusraekaplan.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; ▮▮▮▮▮▮ .com>; ▮▮▮▮▮▮▮▮▮ @citi.com>; ▮▮▮▮▮▮▮ @citi.com>; ▮▮▮▮▮▮ @citi.com>
**Subject:** RE: Escrow Account for Litigation EBCC Ebury

Hi Victor, Kari,

Could you please provide Citi with the below information for the Ebury parties?  In addition, could you please provide us with the amount you expect to deposit upon execution of the escrow agreement?

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

**From:** ███████████ citi.com>
**Sent:** Monday, November 14, 2022 12:20 PM
**To:** ███████ @citi.com>; Mayron, Austin P.
<mayrona@sullcrom.com>; ███████ @citi.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; ███████
███████ @citi.com>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation EBCC Ebury

Hello Austin,

Thank you for sending the KYC documents. Below are a few KYC updated will need.

Ebury RE LLC
1. **W9**- please fill in line 1

1. **FinCen** – Please have the address on the W9 and address on page 1 and 2 of the
   FinCen match.

1. **Ownership Letter** – please add the ownership percentages to the Exhibit of the
   Ownership Letter.

1. **Missing**: Formation and Good Standing certificate, John Hanratty's ID that
   matches the ID used on the FinCen, EIN verification.

Ebury Fund 2 LP – Is this an SEC register fund? If so, we will need the attached Money
Manager Letter filled out. Please note, any edits to the attached documents will cause
delays.
1. **W9**- please fill in line 1

1. **Missing** – Formation, Good Standing, and EIN verification

Emigrant Business Credit Corporation
1. We will need the Exhibit A-3 of the agreement signed.

Let me know if you have any questions, or would like to jump on a quick call.

Thank you,

██████, Assistant Vice President
Business Development, Law Firm Group
Citi Global Wealth at Work
153 E. 53rd Street, New York, NY 10022
T 212 ████
███████ @citi.com

Important disclosures [privatebank.citibank.com]

**THE NATIONAL LAW JOURNAL | BEST OF 2022 FOR:**

Business Bank
Attorney Escrow Services

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

---

**This is an external message from:** kparks@gusraekaplan.com **

# Exhibit D

| | |
|---|---|
| **From:** | Victor Wang |
| **To:** | Mayron, Austin P.; Kari Parks |
| **Cc:** | Willscher, Alexander J. |
| **Subject:** | RE: Escrow Account for Litigation |
| **Date:** | Tuesday, November 15, 2022 11:07:42 |

Hi Austin,

I just gave you a call to figure out the KYC documents. Please give me a call back when you get a chance. Thank you.

Best,
Victor

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Monday, November 14, 2022 8:19 PM
**To:** Victor Wang <vwang@gusraekaplan.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

Hi Victor,

It has now been almost a month since the Court entered the TRO in this case, and three days since you represented that you would provide us with the escrow amount. As such, we intend to call Justice Chan's chambers tomorrow at 2:30 p.m. to raise the issue of Defendants' noncompliance with the TRO. Please confirm your availability to join that call, or provide an alternative time between 2:30 p.m. and 4:30 p.m. tomorrow for us to speak with the Court.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Victor Wang <vwang@gusraekaplan.com>
**Sent:** Thursday, November 10, 2022 5:27 PM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation

Hi Austin,

Our client will provide to us on Friday the escrow amount so I will send it to you tomorrow. Thank you.

Best,

Victor

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Wednesday, November 9, 2022 5:47 PM
**To:** Victor Wang <vwang@gusraekaplan.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

Thank you, Victor.  We will finalize the escrow agreement and send you a revised version for comment and execution.  Citi has asked for the dollar amount of the initial deposit that Defendants intend to make upon execution of the escrow agreement (potentially Friday).  Could you please let us know that escrow amount?

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Victor Wang <vwang@gusraekaplan.com>
**Sent:** Wednesday, November 9, 2022 2:50 PM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>; Kari Parks <kparks@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation

Hi Austin,

Please see the attached Escrow documents sent over by our client. Please let me know if the escrow agreement is finalized or if you would need other documents from our client. Thank you.

Best,
Victor

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Tuesday, November 8, 2022 3:25 PM
**To:** Kari Parks <kparks@gusraekaplan.com>; Victor Wang <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

Hi Victor,

Thank you for your call, and we are sorry to hear that Mr. Hanratty has been in the hospital.  Now that he has been released, we look forward to finalizing the escrow agreement.  Please do not hesitate to reach out if there is anything we can to do help move things along.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Mayron, Austin P.
**Sent:** Tuesday, November 8, 2022 3:19 PM
**To:** 'Kari Parks' <kparks@gusraekaplan.com>; 'Victor Wang' <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Escrow Account for Litigation

Counsel—

The Court directed Defendants to deposit proceeds from past or future sales of tax lien certificates or REO properties into an escrow account. The TRO was entered on October 19, 2022—almost three weeks ago—and you since have refused to cooperate in establishing the escrow account, or even to identify which Defendants will be depositing funds into the account or the approximate amount of proceeds to be deposited. On October 24, 2022, you represented that "we're on the same page here" and that you were "working on identifying the depositing entity/ entities and calculating the relevant 'proceeds.'" You also indicated that you "anticipate[d] about $50k of tax lien sales to close this week"—*i.e.*, the week of October 24—but have not escrowed any sale proceeds. Please provide an update on these outstanding matters.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

---

**From:** Mayron, Austin P.
**Sent:** Tuesday, November 1, 2022 8:53 PM
**To:** 'Victor Wang' <vwang@gusraekaplan.com>
**Cc:** Kari Parks <kparks@gusraekaplan.com>; Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** FW: Escrow Account for Litigation

Hi Victor,

Please see below request for KYC materials for the escrow account. Defendants would be the Depositor/Party A. Also attached is Citi's template escrow agreement, for which you will have to identify which Defendants will be depositing funds into the escrow account.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

**From:** Mayron, Austin P.
**Sent:** Friday, October 21, 2022 1:23 PM
**To:** 'Kari Parks' <kparks@gusraekaplan.com>
**Cc:** ███████████████ @citi.com>; █████████████ @citi.com>; ███████████████
███████████ @citi.com>; Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** FW: Escrow Account for Litigation

Kari,

Please see below request for KYC materials for the escrow account.  Defendants would be the
Depositor/Party A.

Best,

Austin P. Mayron
Sullivan & Cromwell LLP
P: (212) 558-3733

**From:** ███████████████ @citi.com>
**Sent:** Friday, October 21, 2022 11:48 AM
**To:** ███████████ @citi.com>; Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; ███████████████████ @citi.com>
**Subject:** [EXTERNAL] RE: Escrow Account for Litigation

Hello Austin,

I have included our KYC outline below, which needs to be completed before the closing. As a
reminder, we can now accept third party, self-initiated e-signatures for the Agreement and
Incumbency Exhibit. Please let me know if you have any questions.
-
**Depositor/Party A:**
  1. **Certificates of Formation and Good Standing**
  2. **W-9** (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies
     of wet ink originals (**Preferred**)*. Please note that the entity's address listed on the W-9 should
     **MATCH** the entity's address that is listed on the FinCEN Certification of Beneficial Ownership
     Form (see below).
       • Please also provide a copy of the EIN Confirmation Letter provided by the IRS at the
         time of EIN/TIN issuance, that reflects the EIN/TIN listed on the W-9, for verification
         purposes.
  3. **Ownership Letter** (sample attached) -- We can only accept *Citibank-initiated DocuSign or PDF
     copies of wet ink originals (**Preferred**)*.

- Please also provide, **prior to closing**, an organizational chart that lists all beneficial owners who have, directly or indirectly, a 10% or greater ownership interest in the Purchaser/Depositor (including their ownership percentages).

4. **FinCEN Certification of Beneficial Ownership Form** (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (**Preferred**)*.

  - Control Person of the Purchaser/Depositor – The name on the form **MUST** match the government-issued photo ID provided.
  - Government-issued photo ID is required for the Control Person/Beneficial Owner(s). Please note that non-U.S.-issued IDs must be notarized.
  - If a passport is provided, the residential address of the individual must be provided as well.

5. **Executed Incumbency** (Exhibit of Escrow Agreement) –Need to be provided at least 5 days before closing. DOESN'T need to be Citi-bank initiated

  - Government-issued photo ID is required for any/all individuals listed -- if a passport is provided, the residential address of the individual must be provided as well.

**Party B:**

1. **W-9** (current form attached) -- We can only accept *Citibank-initiated DocuSign or PDF copies of wet ink originals (**Preferred**)*.

2. **Executed Incumbency** (Exhibit of Escrow Agreement) -- Need to be provided at least 5 days before closing, DOESN'T need to be Citi-bank initiated

  - Government-issued photo ID is required for any/all individuals listed -- if a passport is provided, the residential address of the individual must be provided as well

██████████

Escrow Business Development

Citi Private Bank, Law Firm Group

153 E. 53rd Street, 23rd Floor
New York, NY
Mobile: +1 (732) ████
████████ @citi.com

Important Disclosures [privatebank.citibank.com]

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

**This is an external message from:** vwang@gusraekaplan.com **

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

                              Plaintiff,

          v.                                             Index No. 158207/2022

JOHN ARTHUR HANRATTY, EBURY              **NOTICE OF APPEARANCE**
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 2NJ, LLC, RED
CLOVER 1, LLC, EBURY RE LLC, and
XYZ CORPS. 1–10,

                              Defendants.

PLEASE TAKE NOTICE that the undersigned enters my appearance as counsel in

the above–captioned action for John Arthur Hanratty, Ebury Street Capital, LLC, Ebury

Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC,

EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN,

LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB1 EMINJ, LLC, EB 2EMINJ, LLC, EB

1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE

2EMI LLC, Arque Tax Receieable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury

Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and

Ebury RE LLC (the "**Named Defendants,**" or the "**Ebury Parties**"). I am admitted to

practice in this Court.

Dated: November 16, 2022
　　　　New York, New York

　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　/s/ Daniel Crandall
　　　　　　　　　　　　　Kari Parks
　　　　　　　　　　　　　Daniel Crandall
　　　　　　　　　　　　　Victor Wang (Admission Pending)
　　　　　　　　　　　　　GUSRAE KAPLAN NUSBAUM PLLC
　　　　　　　　　　　　　120 Wall Street, 25th Floor
　　　　　　　　　　　　　New York, New York 10005
　　　　　　　　　　　　　(212) 269-1400
　　　　　　　　　　　　　kparks@gusraekaplan.com
　　　　　　　　　　　　　dcrandall@gusraekaplan.com
　　　　　　　　　　　　　vwang@gusraekaplan.com

　　　　　　　　　　　　　*Counsel for the Ebury Parties*

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 30 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

|  | Plaintiff, |
| --- | --- |

v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 2NJ, LLC, RED
CLOVER 1, LLC, EBURY RE LLC, and
XYZ CORPS. 1–10,

Defendants.

Index No. 158207/2022

Mot. #002

## THE EBURY PARTIES' NOTICE OF MOTION TO DISMISS

PLEASE TAKE NOTICE that upon the accompanying Memorandum of Law dated

November 16, 2022, the "**Ebury Parties**,"[1] through undersigned counsel, shall move the

---

[1] Defendants Ebury Street Capital, LLC ("**ESC**"), Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, Ebury RE LLC

Court located at 60 Centre Street, New York, New York 10007, on December 2, 2022 at

9:30am or as soon thereafter as counsel may be heard, for an Order granting the Ebury

Parties' motion to dismiss Plaintiff's fraudulent inducement and fraudulent transfer

claims, and Plaintiff's breach of contract claim against ESC and Ebury RE, pursuant to

CPLR 3211(a)(1) and / or CPLR 3211(a)(7), and for such further relief that this Court

deems just and proper.

PLEASE TAKE FURTHER NOTICE that pursuant to CPLR 2214(b), Plaintiff

Emigrant Business Credit Corporation must serve any answering papers on the

undersigned at least seven days before this motion's return date.

Dated: November 16, 2022
          New York, New York

GUSRAE KAPLAN NUSBAUM PLLC

/s/ Daniel Crandall
Kari Parks
Daniel Crandall
Victor Wang (Admission Pending)
GUSRAE KAPLAN NUSBAUM PLLC
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com
dcrandall@gusraekaplan.com
vwang@gusraekaplan.com

*Counsel for the Ebury Parties*

---

("**Ebury RE**") (together, the "**Ebury Entities**") and John Hanratty (with the Ebury
Entities, the "**Ebury Parties**").

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**COMMERCIAL DIVISION**

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

                      Plaintiff,

        v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

                      Defendants.

Index No. 158207/2022

Mot. #002

---

## THE EBURY PARTIES' BRIEF IN SUPPORT OF MOTION TO DISMISS

GUSRAE KAPLAN NUSBAUM PLLC
Kari Parks
Daniel Crandall
Victor Wang (Admission Pending)
120 Wall Street
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com
dcrandall@gusraekaplan.com
vwang@gusraekaplan.com

*Counsel for The Ebury Parties*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................ii

PRELIMINARY STATEMENT ............................................................ 1

BACKGROUND.................................................................................... 2

I.   EBCC Claims That The Ebury Parties Failed to Repay Two Credit Lines ............. 2

II.  Invoking Hearsay and "Information and Belief," EBCC Attempts to Allege Fraudulent Inducement ..........................................................................3

III. All Six Fraudulent Transfer Allegations are "On Information and Belief" .......... 4

IV.  Five Weeks After Securing the TRO, EBCC Has Not Established the Escrow Account......................................................................................... 5

LEGAL STANDARD ........................................................................... 6

ARGUMENT........................................................................................ 7

I.   ESC, Ebury RE, and John Hanratty Are Not Parties to the Credit Agreements..... 7

   A.   EBCC Does Not Allege Alter Ego Facts.................................................. 8

   B.   The Complaint Does Not Plead Facts Showing That ESC, Ebury RE, or Mr. Hanratty Abused the Corporate Form to Defraud EBCC........................................... 10

II.  EBCC Pleads No Fraudulent Inducement Facts ....................................... 11

   A.   By Offering Nothing But Legal Conclusions, "Information and Belief," and Hearsay Allegations, EBCC Fails to Plead Scienter ...................................... 12

   B.   Even if EBCC's Unexplained Speculation Did Plead "Facts," Its Fraudulent Inducement Claim Merely Duplicates Its Contract Claim........................................... 16

III. EBCC Pleads No Fraudulent Transfer Facts ......................................... 18

   A.   The First Department Has Repeatedly Reversed Fraudulent Transfer Claims Rooted in "Information and Belief" Allegations ........................................... 19

   B.   "Information and Belief" Aside, EBCC's Fraudulent Transfer "Facts" Are Mere Legal Conclusions ......................................................................... 19

CONCLUSION ................................................................................. 21

WORD COUNT CERTIFICATION ....................................................... 22

i

## TABLE OF AUTHORITIES

**Cases**

501 Fifth Ave. Co. LLC v. Alvona LLC, 110 A.D.3d 494 (1st Dep't 2013)    6

Albstein v. Elany Contracting Corp., 30 A.D.3d 210 (1st Dep't 2006)    9, 10

Alexander Condo. v. E. 49th St. Dev. II, LLC, 60 Misc. 3d 1232(A) (Sup. Ct. N.Y. Cnty. 2018) (Reed, J.)    7

Bd. of Managers of Gansevoort Condo. v. 325 W. 13th, LLC, 121 A.D.3d 554 (1st Dep't 2014)    9, 10

Carlyle, LLC v. Quik Park 1633 Garage LLC, 160 A.D.3d 476 (1st Dep't 2018)    18, 19

CIBC Bank & Trust Co. (Cayman) Ltd. v. Credit Lyonnais, 270 A.D.2d 138 (1st Dep't 2000)    6

Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382 (1987)    17

Connaughton v. Chipotle Mexican Grill, Inc., 29 N.Y.3d 137 (2017)    7

Cortlandt St. Recovery Corp. v. Bonderman, 73 Misc. 3d 1217(A) (Sup. Ct. N.Y. Cnty. 2021) (Reed, J.), reargument denied, 75 Misc. 3d 469 (Sup. Ct. N.Y. Cnty. 2022)    8

De Vera v. 243 Suydam, LLC, 60 Misc. 3d 1224(A) (Sup. Ct. Kings Cnty. 2018)    14

Dember Constr. Corp. v. Staten Isl. Mall, 56 A.D.2d 768 (1st Dep't 1977)    7

Elmrock Opportunity Master Fund I, L.P. v. Citicorp N. Am., Inc., 155 A.D.3d 411 (1st Dep't 2017)    15

Etex Apparel, Inc. v. Tractor Int'l Corp., 83 A.D.3d 587 (1st Dep't 2011)    7

Facebook, Inc. v. DLA Piper LLP (US), 134 A.D.3d 610 (1st Dep't 2015)    15

Giant Grp., Ltd. v. Arthur Andersen, LLP, 2 A.D.3d 189 (1st Dep't 2003)    12

Goshen v. Mutual Life Ins. Co., 98 N.Y.2d 314 (2002)    6

J.E. Morgan Knitting Mills, Inc. v. Reeves Brothers, Inc. 243 A.D.2d 422 (1st Dep't 1997)    17, 18

J.G. Jewelry Pte. Ltd. v. TJC Jewelry, Inc., No. 651469/2018, 2021 WL 2688507 (Sup. Ct. N.Y. Cnty. June 30, 2021) (Cohen, J.)    19, 20

Kanbar v. Aronow, 260 A.D.2d 182 (1st Dep't 1999)    15

L&M 353 Franklyn Ave. LLC v. Steinman, 202 A.D.3d 440 (1st Dep't 2022)    19

ii

FILED: NEW YORK COUNTY CLERK 11/16/2022 10:12 PM
NYSCEF DOC. NO. 42
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 35 of 2230
INDEX NO. 158207/2022
RECEIVED NYSCEF: 11/16/2022

Marine Midland Bank v. Grant Thornton LLP, 260 A.D.2d 318 (1st Dep't 1999)    13

Michael Davis Constr., Inc. v. 129 Parsonage Lane, LLC, 194 A.D.3d 805 (2d Dep't 2021)

                                                                                16

Milan Music, Inc. v. Emmel Commc'ns Booking, Inc., 7 Misc. 3d 1008(A) (Sup. Ct. N.Y.

    Cnty. 2004) (Freedman, J.)                                                   7

Modell's N.Y. Inc. v. Noodle Kidoodle, Inc., 242 A.D.2d 248 (1st Dep't 1997)     13

Morris v. New York State Dep't of Tax'n & Fin., 82 N.Y.2d 135 (1993)          8, 10

New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308 (1995)                          12

Nurnberg v. Hobo Corp., 30 A.D.3d 359 (1st Dep't 2006)                        11, 12

Orix Credit All., Inc. v. R.E. Hable Co., 256 A.D.2d 114 (1st Dep't 1998)      6, 14

P & HR Sols., LLC v. Ram Cap. Funding, LLC, 195 A.D.3d 473 (1st Dep't 2021)    9, 10

Pacnet Network Ltd. v. KDDI Corp., 78 A.D.3d 478 (1st Dep't 2010)                13

Platinum Partners Value Arbitrage Fund LP v. Kroll Assocs., Inc., 102 A.D.3d 483 (1st

    Dep't 2013)                                                                  12

Project Cricket Acquisition, Inc. v. Fla. Cap. Partners, Inc., 180 A.D.3d 627 (1st Dep't

    2020)                                                                        16

Quatrochi v. Citibank, N.A., 210 A.D.2d 53 (1st Dep't 1994)                       6

Riback v. Margulis, 43 A.D.3d 1023 (2d Dep't 2007)                                20

Shisgal v. Brown, 21 A.D.3d 845 (1st Dep't 2005)                                  9

Siwek v. Mahoney, 39 N.Y.2d 159 (1976)                                           6

Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC, 146 A.D.3d 1 (1st Dep't

    2016), aff'd, 31 N.Y.3d 1002 (2018)                                         8, 9

Sonkin v. Sonkin, 157 A.D.3d 414 (1st Dep't 2018)                                12

Sound Communications Inc. v. Rack and Roll, Inc., 88 A.D.3d 523 (1st Dep't 2011)  10, 11

Varo, Inc. v. Alvis PLC, 261 A.D.2d 262 (1st Dep't 1999)                          17

Vitamin Realty Assocs. LLC v. Time Rec. Storage, LLC, 148 N.Y.S.3d 8 (1st Dep't 2021)  9

iii

**Statutes**

CPLR 3016(b) (McKinney 2022)     12, 14

CPLR 3016(d) (McKinney 2022)     12

CPLR 3211(a)(1) (McKinney 2022)     1, 6

CPLR 3211(a)(7) (McKinney 2022)     1, 6

N.Y. Debt. & Cred. Law § 273(a)(1) (McKinney 2022)     18

N.Y. Debt. & Cred. Law § 273(a)(2) (McKinney 2022)     18, 20

iv

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 37 of 2230

Pursuant to Civil Practice Law & Rules ("**CPLR**") 3211(a)(1) and (7), the "**Ebury Parties**"[1] respectfully submit this memorandum in support of their motion to dismiss Plaintiff Emigrant Business Credit Corp.'s ("**EBCC**" or the "**Bank**") "**Complaint**," which fails to state fraudulent inducement and fraudulent transfer claims against any of the Ebury Parties, and fails to plead breach of contract against ESC and Ebury RE.

## PRELIMINARY STATEMENT

EBCC initiated this lawsuit because Borrowers 1EMI and 2EMI have not repaid $18 million of credit lines that matured in 2021.

Not content with its straightforward contract claim, EBCC also sues all 29 Ebury Parties for fraudulent inducement and fraudulent transfer—yet fails to provide a single factual allegation supporting either fraud claim—simply to "justify" its attempt to transmogrify its money damages demand into a (dead on arrival) injunctive relief claim.

The Court should cut EBCC's Complaint back down to size, focusing the Parties on the real dispute here: whether the Borrowers and Guarantors breached the Credit Agreements.

---

[1] Defendants Ebury Street Capital, LLC ("**ESC**"), Ebury "**Fund 1**," LP, Ebury "**Fund 2**," LP, Ebury "**1EMI**" LLC, Ebury "**2EMI**" LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, "**Ebury RE**" LLC (together, the "**Ebury Entities**") and John Hanratty (with the Ebury Entities, the "**Ebury Parties**").

## BACKGROUND

**I.**      **EBCC Claims That The Ebury Parties Failed to Repay Two Credit Lines**

EBCC is a "specialty finance company" owned by "Emigrant Bank, the largest family-owned bank in the United States." Compl., Dkt. 1 ¶ 7 (Sep. 25, 2022). Last quarter, 172-year-old Emigrant Bank reported total assets of $5.61 billion, including $4.14 billion in "net loans and leases." See FDIC, Emigrant Bank Financial & Regulatory Reporting – FDIC Cert #12054 (June 30, 2022); FDIC, Emigrant Bank Institution Details (Nov. 11, 2022).

Pursuant to March 9, 2017 "**Credit Agreements**," EBCC extended "**Credit Lines**" to 1 EMI and 2EMI (together, the "**Borrowers**"). Compl., Dkt. 1 ¶ 33. After three extensions, those Credit Lines matured in November 2021. Id. ¶¶ 33, 36, 38. Aside from the Borrowers, several of the Ebury Parties are Guarantors of the Credit Agreements. Id. ¶¶ 11–15, 37, 103.

However, ESC, Ebury RE, and Mr. Hanratty are neither Guarantors of nor parties to the Credit Agreements. Accord generally Compl., Dkt. 1 Mr. Hanratty did sign two "**Validity Guaranties**" attesting that certain information provided to EBCC about the "**Collateral**" for the Credit Lines would be accurate. Id. ¶¶ 39–42, 108; see also Validity Guaranties, Dkt. 11 (filed by EBCC Oct. 17, 2022).

On November 29, 2021, EBCC sent notices of default and demands for payment of approximately $18 million under the Credit Agreements. Id. ¶ 104. EBCC's September 2022 Complaint claims the Borrowers "now owe more than $21,813,177.46." Id.

## II. Invoking Hearsay and "Information and Belief," EBCC Attempts to Allege Fraudulent Inducement

Besides the Borrowers' failure to repay the Credit Lines, EBCC also now claims that (1) the Ebury Parties "fraudulently induced" EBCC to "enter into modifications to the Credit Agreements between 2018 and 2021"; (2) Mr. Hanratty "consistently claimed that EBCC was 'overcollateralized," and (3) Mr. Hanratty "routinely submitted to EBCC Borrowing Base Certificates that concealed the fact that [Mr.] Hanratty was impermissibly self–servicing the Collateral." Id. ¶¶ 4, 43, 45, 65–69, 111.

To "support" its speculations, EBCC pleads 20 "information and belief" allegations, including that "on information and belief," Mr. Hanratty "fabricated" a spreadsheet to "obscure" his alleged "self-servicing" of the Collateral, and "[o]n information and belief," Mr. Hanratty "improperly included the 'bid amount'" in valuing Maryland tax liens. See id. ¶¶ 8–9, 56, 63, 68, 78–79, 88-89, 93, 95–96, 99–100, 118–21.

In its attempt to plead fraudulent inducement, EBCC also repeatedly invokes the September 2022 "**Counterclaim**" of Thomas McOsker—which Mr. McOsker filed after the federal District of Delaware refused to dismiss certain Ebury Entities' RICO complaint against him. See id. ¶¶ 5, 48, 54. On November 14, 2022, the relevant Ebury Parties moved to dismiss the Delaware Counterclaim. See Dkt. 32, The Ebury Parties' Opening Brief in Support of Motion to Dismiss Counterclaims and Third-Party Complaint (Nov. 16, 2022).

EBCC even uses both "information and belief" **and** Mr. McOsker's hearsay in a single fraud allegation. Compl., Dkt. 1 ¶ 68 ("On information and belief, these statements

were false . . . . [A]ccording to [Mr.] McOsker, [Mr.] Hanratty would alter 'the original dates for hundreds of certificates.'").

### III.    All Six Fraudulent Transfer Allegations are "On Information and Belief"

Finally, EBCC offers only "information and belief" allegations to try to plead fraudulent transfer, including:

- "On information and belief, since 2017, Defendants have been transferring [real estate owned property ("**REOs**")] that are the proceeds of EBCC's collateral to entities other than the Borrowers and Guarantors, including Ebury RE LLE and XYZ Corps. 1–10, including to prevent EBCC from receiving sale proceeds from the sale of the REOs, as well as from foreclosing on the REOs in the event of a default," id. ¶ 99;
- "On information and belief, the Borrowers and Guarantors have not received fair consideration for these transfers and these transfers were not arms-length transactions," id. ¶ 100;
- "On information and belief, these transfers were not arms-length transactions and Ebury RE LLC and XYZ Corps. 1-10 did not give fair consideration for the REOs," id. ¶ 119.

See also id. ¶¶ 99–100, 118–21.

However, EBCC does not explain what facts support its "information and belief" (1) that the Ebury Parties are trying to "prevent EBCC" from receiving any sums to which it is entitled, (2) that there was not "fair consideration" for the transfers, (3) that the transfers were not "arms-length transactions," (4) why—particularly given Mr. Hanratty's personal Validity Guaranties—transferring assets to Ebury RE might be problematic, or (5) how or why "XYZ Corps. 1–10," whatever they are, might possibly be involved. See generally id. ¶¶ 99–100, 118–21.

## IV.    Five Weeks After Securing the TRO, EBCC Has Not Established the Escrow Account

Three weeks after EBCC filed this lawsuit, it emailed the Ebury Parties' principal and transactional lawyer, requesting that they accept service of the Complaint and an Order to Show Cause moving for temporary restraining order and preliminary injunction (the "**OSC**"). See Dkt. 21, Ebury Parties' Letter to Judge (Oct. 18, 2022). In entering the OSC, this Court granted in part and denied in part EBCC's motion, and entered a temporary restraining order ("**TRO**") requiring (1) the parties to establish an escrow account into which the Ebury Parties must deposit certain income, excluding "ordinary and necessary disbursements related to Defendants' tax lien or real estate business" and (2) the Ebury Parties to give EBCC 24 hours' before transferring, spending, etc. "any assets in an amount exceeding $50,000." See Dkt. 23, OSC at 3–4 (Oct. 19, 2022).

Two minutes after the Court entered the OSC and TRO, the Ebury Parties offered their counsel's IOLA account as an escrow account. See Dkt. 35, The Ebury Parties' Response to EBCC's Letter / Correspondence to Judge at 2 (Nov. 16, 2022). EBCC declined, insisting on opening a new escrow account with a third-party vendor; despite weeks of communications and attempts to satisfy EBCC's paperwork demands, EBCC has not yet established that escrow account. See id. at 2–3.

**LEGAL STANDARD**

The Ebury Parties move for partial dismissal because EBCC fails to plead its fraud claims against any of the 29 Ebury Parties, and fails to plead breach of the Credit Agreements against ESC, Ebury RE, and Mr. Hanratty.

CPLR 3211(a)(1) dismissal is appropriate "where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law." Goshen v. Mutual Life Ins. Co., 98 N.Y.2d 314, 326 (2002). Documents whose contents are "essentially undeniable," such as contracts and court filings, "clearly qualify as documentary evidence." Siwek v. Mahoney, 39 N.Y.2d 159, 163 n.2 (1976); see also CPLR 3211(a)(1) (McKinney 2022).

On a 3211(a)(7) motion, meanwhile, the Court must presume the Complaint's factual allegations to be true; however, the Complaint's "bare legal conclusions" and "factual" allegations "contradicted by documentary evidence" cannot support its claims. CIBC Bank & Trust Co. (Cayman) Ltd. v. Credit Lyonnais, 270 A.D.2d 138, 138 (1st Dep't 2000) (citing Quatrochi v. Citibank, N.A., 210 A.D.2d 53, 53 (1st Dep't 1994)); see also CPLR 3211(a)(7) (McKinney 2022).

Moreover, this Court must reject allegations that "are wholly conclusory and consist of no more than a recitation of the elements of [a] claim, 'upon information and belief.'" 501 Fifth Ave. Co. LLC v. Alvona LLC, 110 A.D.3d 494, 494 (1st Dep't 2013). Hearsay also cannot state a claim. See Orix Credit All., Inc. v. R.E. Hable Co., 256 A.D.2d 114, 116 (1st Dep't 1998) (holding that allegations failed to plead fraud where they offered "second-hand or third-hand rumors of [defendant's] misconduct").

6

If the Complaint "fails to assert facts in support of an element of the claim[s]," or its "factual allegations and inferences to be drawn from them" provide no right to recovery, the Court must dismiss the Complaint. <u>Connaughton v. Chipotle Mexican Grill, Inc.</u>, 29 N.Y.3d 137, 142 (2017).

## ARGUMENT

### I.     ESC, Ebury RE, and John Hanratty Are Not Parties to the Credit Agreements

EBCC does not allege that ESC, Ebury RE, or Mr. Hanratty is a party to either Credit Agreement—yet sues all three for breaching those contracts, claiming, without supporting facts, that "each entity is an alter ego of the Borrowers and Guarantors." <u>See</u> Compl., Dkt. 1 ¶ 109; <u>but see</u> <u>Milan Music, Inc. v. Emmel Commc'ns Booking, Inc.</u>, 7 Misc. 3d 1008(A), *3 (Sup. Ct. N.Y. Cnty. 2004) (Freedman, J.) (citing <u>Dember Constr. Corp. v. Staten Isl. Mall</u>, 56 A.D.2d 768, 769 (1st Dep't 1977)) (dismissing breach of contract claim against defendant that "signed the Contract only in his disclosed capacity as the agent for [a party to the contract]"; "A non-party to a contract cannot be liable for its breach").

In doing so, EBCC fails to fulfill its "heavy burden" to pierce the veil and plead alter ego liability. <u>Etex Apparel, Inc. v. Tractor Int'l Corp.</u>, 83 A.D.3d 587, 587 (1st Dep't 2011) (holding that plaintiffs had not established alter ego relationship between defendants); <u>see also, e.g.,</u> <u>Alexander Condo. v. E. 49th St. Dev. II, LLC</u>, 60 Misc. 3d 1232(A) (Sup. Ct. N.Y. Cnty. 2018) (Reed, J.) (granting motion to dismiss on the pleadings where plaintiff "failed to meet its heavy burden" as was necessary to impose alter ego liability on defendants).

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 44 of 2230

Contractual alter ego liability only exists for non-parties who (1) "exercised complete domination [ . . . ] in respect to the transaction attacked" of an alter ego that was a party to the contract, **and** (2) exercised that domination in order "to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC, 146 A.D.3d 1, 12 (1st Dep't 2016), aff'd, 31 N.Y.3d 1002 (2018).

In other words, "[d]omination, standing alone," is not enough to plead alter ego liability; the Complaint must plead facts explaining how the non-party **used** that domination **in order to** defraud the plaintiff. Morris v. New York State Dep't of Tax'n & Fin., 82 N.Y.2d 135, 141, 144 (1993) (reversing order imposing alter ego liability on an individual owner of a corporation because the owner had not "perverted the protective benefits of the corporate privilege to commit a wrong").

### A. EBCC Does Not Allege Alter Ego Facts

In support of EBCC's alter ego theory of liability, the Complaint alleges that the Ebury Parties are all alter egos of one another because they "[d]isregard corporate formalities," "[h]ave common ownership, officers, directors, and personnel," "[h]ave no independence in their business operations," "[a]re not treated as independent profit centers," and so on. Compl., Dkt. 1 ¶ 18. But this is simply a list of factors that courts consider when determining whether parties are alter egos—EBCC provides no facts supporting these conclusory allegations, or any other facts supporting its alter ego theory. Compare generally id. with, e.g., Cortlandt St. Recovery Corp. v. Bonderman, 73 Misc. 3d 1217(A) (Sup. Ct. N.Y. Cnty. 2021) (Reed, J.), reargument denied, 75 Misc. 3d 469 (Sup.

8

Ct. N.Y. Cnty. 2022) (quoting <u>Shisgal v. Brown</u>, 21 A.D.3d 845, 848 (1st Dep't 2005)) (Alter

ego indicia include (1) absence of corporate formalities, (2) "keeping of corporate

records," (3) "overlap in ownership, officers, directors, and personnel," (4) independent

"business discretion", and (4) whether the business entities "are treated as independent

profit centers.").

Where, as here, the plaintiff "set[s] forth conclusory allegations merely reciting

typical veil–piercing factors," without supporting facts, the plaintiff's alter ego

allegations are insufficient to state a cause of action. <u>P & HR Sols., LLC v. Ram Cap.</u>

<u>Funding, LLC</u>, 195 A.D.3d 473, 474 (1st Dep't 2021) (quoting <u>Skanska</u>, 146 A.D.3d at 12).

<u>See also</u> <u>Vitamin Realty Assocs. LLC v. Time Rec. Storage, LLC</u>, 148 N.Y.S.3d 8, 10 (1st

Dep't 2021) ("conclusory allegations of 'domination'" were "insufficient to allege alter

ego liability"); <u>Bd. of Managers of Gansevoort Condo. v. 325 W. 13th, LLC</u>, 121 A.D.3d

554, 554 (1st Dep't 2014) (allegations that a business entity "was undercapitalized,

dominated by defendant and intermingled its assets with defendant's," were "conclusory

and devoid of facts," and could not support alter ego liability); <u>Albstein v. Elany</u>

<u>Contracting Corp.</u>, 30 A.D.3d 210, 210 (1st Dep't 2006) (plaintiff's allegations that

"corporation was 'undercapitalized' and functioned as [defendant]'s 'alter ego'" were

insufficient because the plaintiff "failed to plead any facts to substantiate such conclusory

claims").

For example, in <u>P & HR Solutions</u>, the plaintiffs sued the owner of several limited

liability companies for breach of contract and fraud, based on the companies' alleged

breach of a contract. 195 A.D.3d at 473. The owner of the companies was not himself a

party to the contracts; therefore, the plaintiffs relied on a theory that the limited liability companies were alter egos of the owner. Id. at 473–74. But because the plaintiffs' only factual support for this alter ego theory amounted to a "recit[ation]" of the "typical veil–piercing factors," the claims against the owner of the companies were dismissed. Id. at 474.

As in P & HR, EBCC has alleged no facts supporting its theory that the Ebury Parties are alter egos of one another other than the recitation of the "typical veil–piercing factors" in paragraph 18 of the Complaint, so all claims relying on the alter ego theory of liability should be dismissed. See generally Compl., Dkt. 1.

### B. The Complaint Does Not Plead Facts Showing That ESC, Ebury RE, or Mr. Hanratty Abused the Corporate Form to Defraud EBCC

EBCC also fails to plead facts showing that ESC, Ebury RE, or Mr. Hanratty "perverted the protective benefits" of the corporate form in order to use the corporations as "instrument[s] of wrongdoing" or defraud EBCC. Compare generally Compl., Dkt. 1 with Morris, 82 N.Y.2d at 144; Gansevoort Condo., 121 A.D.3d at 554; Albstein, 30 A.D.3d at 210.

The First Department's decision in Sound Communications Inc. v. Rack and Roll, Inc. is instructive. 88 A.D.3d 523 (1st Dep't 2011). In that case, the complaint sued for breach of an agreement with a limited liability company defendant, and also sought to impose liability on individual defendants who allegedly used the limited liability company as their alter ego. Id. at 523–24. However, the mere fact that the company was functioning as the individual defendants' alter ego was insufficient to impose alter ego

10

liability. Id. at 524. Because the plaintiff had not alleged facts showing that the individual defendants used the company defendant's "status as a limited liability company" in order "to commit a fraud," the First Department reversed the lower court's denial of the individual defendants' motion to dismiss, and dismissed all claims against them. Id. at 523–24.

Here, like in Sound Communications, EBCC does not plead any facts showing that ESC, Ebury RE, or Mr. Hanratty used the corporate status of any of the other Ebury Parties in order to defraud EBCC. See generally Compl., Dkt. 1

In fact, EBCC itself admits that Mr. Hanratty executed Validity Guaranties that make him personally liable for damages incurred as a result of the Ebury Entities' alleged breach of the Credit Agreements. Id. ¶¶ 39–42. Accordingly, even if the Complaint had sufficiently alleged that the Ebury Parties were alter egos of one another, EBCC has alleged no basis to impose alter ego liability on ESC, Ebury RE, or Mr. Hanratty.

Therefore, because ESC and Ebury RE are not parties to the Credit Agreements, the breach of contract claim against those Parties should be dismissed. Similarly, because Mr. Hanratty is not a party to the Credit Agreements, the breach of contract claim against him should only be allowed to proceed with respect to the Validity Guaranties.

## II.    EBCC Pleads No Fraudulent Inducement Facts

EBCC fails to plead facts alleging fraudulent inducement with the particularity necessary to state all fraud–based claims. See Nurnberg v. Hobo Corp., 30 A.D.3d 359, 360 (1st Dep't 2006) (elements are (1) a material representation (2) that the speaker knows to be false (3) spoken in order to induce reliance, causing (4) plaintiff's actual reliance and

(5) damages); <u>Sonkin v. Sonkin</u>, 157 A.D.3d 414, 415 (1st Dep't 2018) (citing CPLR 3016(d) (McKinney 2022)) (affirming order granting motion to dismiss fraud claims because fraud claims were not pleaded with particularity required by CPLR 3016(d)).

Scienter—the intent to trick, deceive, or defraud—is an "essential element" of any cause of action sounding in fraud. <u>New York Univ. v. Cont'l Ins. Co.</u>, 87 N.Y.2d 308, 318 (1995). Therefore, inadvertent errors cannot state a fraud claim. <u>Platinum Partners Value Arbitrage Fund LP v. Kroll Assocs., Inc.</u>, 102 A.D.3d 483, 483 (1st Dep't 2013) (holding that plaintiff had failed to state cause of action for fraud, where plaintiff's allegations "indicate[d], at the most, errors or simple oversight on defendant's part").

## A. By Offering Nothing But Legal Conclusions, "Information and Belief," and Hearsay Allegations, EBCC Fails to Plead Scienter

In attempting to substitute conclusory, hearsay, and "information and belief" allegations for actual facts, EBCC fails to plead scienter with particularity. <u>Accord Giant Grp., Ltd. v. Arthur Andersen, LLP</u>, 2 A.D.3d 189, 190 (1st Dep't 2003) (dismissing fraud claim because "[p]laintiff allege[d] [] that defendants knew or recklessly failed to discover certain improprieties in [] financial statements," but "fail[ed] to set forth facts from which scienter may be inferred").

### 1. EBCC Pleads No Facts to Buttress Its Legal Conclusions

Because EBCC's allegations that the Ebury Parties made "intentionally false" statements about the Collateral are unsupported by facts, they are purely conclusory. Compl., <u>Dkt. 1</u> ¶¶ 49, 114. Conclusory allegations of intent cannot support a cause of action for fraud, particularly given the CPLR 3016(b)'s heightened pleading standards for

claims based on fraud. <u>Pacnet Network Ltd. v. KDDI Corp.</u>, 78 A.D.3d 478, 479 (1st Dep't 2010) (affirming dismissal of fraudulent inducement claim, where plaintiff made only conclusory allegations that defendant knew its alleged misrepresentation was false); <u>Marine Midland Bank v. Grant Thornton LLP</u>, 260 A.D.2d 318, 319 (1st Dep't 1999) (affirming dismissal of lender's fraud claim based on alleged misrepresentation in borrower's financial statements, where the only allegation that the misrepresentation was deliberate was a "conclusory assertion of recklessness and intent"); <u>Modell's N.Y. Inc. v. Noodle Kidoodle, Inc.</u>, 242 A.D.2d 248, 250 (1st Dep't 1997) ("conclusory allegation of 'intentional misrepresentations' . . . fail[ed] to support [plaintiff's] fraud claim").

In <u>Pacnet Network</u>, the plaintiff hired the defendant to construct a fiber optic network. 78 A.D.3d at 479. The defendant represented that minimal system failures would occur during the network's "25-year design life," but after an earthquake, the network was out of service for about 500 days. <u>Id.</u> The plaintiff alleged that the defendant knew at the time that its performance prediction was false, but could allege no facts supporting the inference that the defendant had this knowledge. <u>Id.</u> Accordingly, the court held that the plaintiff's allegations of intent to deceive were "conclusory," and the plaintiff therefore had not stated a claim for fraudulent inducement. <u>Id.</u>

EBCC alleges that the Ebury Parties knew that their representations to EBCC regarding the Collateral were false, but like the <u>Pacnet</u> plaintiff, EBCC has failed to state a claim for fraudulent inducement because it alleges no facts supporting the inference the Ebury Parties had this knowledge. Compl., <u>Dkt. 1</u> ¶¶ 49, 114.

13

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 50 of 2230

**2.  A Disgruntled Business Associate's Hearsay Cannot State EBCC's Fraud Claims**

To plead fraudulent inducement, EBCC relies on Mr. McOsker's Counterclaim. Compl., Dkt. 1 ¶¶ 5, 48, 54, 68.

But hearsay cannot plead fraud with particularity. Orix, 256 A.D.2d at 116 (holding that allegations failed to plead fraud with particularity where they offered "general second–hand or third-hand rumors of Orix's misconduct"); De Vera v. 243 Suydam, LLC, 60 Misc. 3d 1224(A) (Sup. Ct. Kings Cnty. 2018) ("hearsay allegations" were "insufficient to establish that plaintiffs were induced to enter into [a contract] by fraud," in light of "particularity requirements of" CPLR 3016(b)).

In Orix Credit Alliance, the plaintiff was "a large commercial lender" and the defendants were "corporate borrowers." 256 A.D.2d at 114. The borrowers asserted a counterclaim for fraud, alleging that the lender had deceived them regarding the terms of their loan agreements, and thereby fraudulently overcharged the borrowers for the loans. Id. at 115–16. However, the borrowers' only facts in support of the alleged deception came from discussions between former employees of the lender that the borrowers had become privy to. Id. at 116. The borrowers alleged no direct knowledge of "the amount of the [lender's] overcharges" or "the manner in which [the lender] cheated them." Id. Therefore, the First Department dismissed the borrowers' fraud counterclaim on the pleadings, reversing an order of the court below that had allowed the counterclaim to proceed. Id. at 114.

14

EBCC, like the borrowers in <u>Orix Credit Alliance</u>, alleges fraud based not on first-hand knowledge, but rather on Mr. McOsker's Counterclaim allegations regarding conversations that he says he had with Mr. Hanratty. Compl., <u>Dkt. 1</u> ¶¶ 5, 48, 54, 68. This hearsay cannot support EBCC's fraudulent inducement claim, just as hearsay could not support the fraud counterclaim in <u>Orix Credit Alliance</u>.

### 3. EBCC Pleads No Facts to Explain Its "Information and Belief" Allegations

The only other fact that EBCC sets forth in support of its allegation that the Ebury Parties intentionally misled them is alleged on information and belief: EBCC alleges that, "on information and belief, [Mr.] Hanratty fabricated" a spreadsheet with the logo of a third-party lien servicer "in order to deceive EBCC and obscure the fact that he was self-servicing the Collateral." Compl., <u>Dkt. 1</u> ¶ 56. "Information and belief" allegations, like hearsay allegations, cannot state a claim for fraudulent inducement. <u>See, e.g.</u>, <u>Elmrock Opportunity Master Fund I, L.P. v. Citicorp N. Am., Inc.</u>, 155 A.D.3d 411, 412 (1st Dep't 2017) (affirming dismissal of fraudulent inducement claim whose "key allegation" was "pleaded on information and belief," and therefore "insufficient to state the claim"); <u>Facebook, Inc. v. DLA Piper LLP (US)</u>, 134 A.D.3d 610, 615 (1st Dep't 2015) ("Statements made in pleadings upon information and belief are not sufficient to establish the necessary quantum of proof to sustain allegations of fraud."); <u>Kanbar v. Aronow</u>, 260 A.D.2d 182 (1st Dep't 1999) (dismissing fraud claim where essential allegations were "all asserted on information and belief, without disclosure of the sources of information that form the basis of the belief").

## B. Even if EBCC's Unexplained Speculation Did Plead "Facts," Its Fraudulent Inducement Claim Merely Duplicates Its Contract Claim

In attempting to plead fraudulent inducement, EBCC claims that the Ebury Parties lied to EBCC about the Collateral. See Compl., Dkt. 1 ¶ 111.

However, EBCC's breach of contract claim against Mr. Hanratty is based on an alleged breach of a provision in the Validity Guaranties, whereby Mr. Hanratty represented that information provided to EBCC about the Collateral pursuant to the Creditor Agreements would be accurate. Id. ¶¶ 40–41, 108. Mr. Hanratty allegedly breached the Validity Guaranties when he "delivered false information to EBCC" regarding the Collateral. Id. ¶ 42, 108.

Thus, the breach of contract claim against Mr. Hanratty and the fraudulent inducement claim are based on identical facts—alleged misrepresentations regarding the Collateral—and are therefore duplicative.

Fraudulent inducement claims should be dismissed as duplicative of breach of contract when both are based on alleged breaches of representations or warranties in the agreement at issue. Project Cricket Acquisition, Inc. v. Fla. Cap. Partners, Inc., 180 A.D.3d 627, 627 (1st Dep't 2020) (denying leave to amend to add new allegations of fraud in the inducement based on alleged breach of representations and warranties in stock purchase agreement, because the fraudulent inducement claim would be duplicative of contract claims); see also Michael Davis Constr., Inc. v. 129 Parsonage Lane, LLC, 194 A.D.3d 805, 807 (2d Dep't 2021) ("Where the fraud claim is premised upon an alleged breach of contractual duties and does not concern representations which are . . . extraneous to the

terms of the contract between the parties, a fraud claim does not lie."). This is a specific

application of the "well–established principle that a simple breach of contract is not to be

considered a tort unless a legal duty independent of the contract itself has been violated."

Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389 (1987).

The First Department's decision in Varo, Inc. v. Alvis PLC is illustrative. Varo, Inc.

v. Alvis PLC, 261 A.D.2d 262 (1st Dep't 1999). In Varo, the plaintiff company had

purchased assets from the defendants, including a warehouse. Id. at 262–64. The

purchase agreement included a warranty that the warehouse was free of environmental

hazards, but after the agreement was finalized, the plaintiff incurred $560,000 in damages

in connection with the removal and cleanup of hazardous materials at the warehouse. Id.

at 263–64. The plaintiff sued for breach of contract, based on the warranty. Id. at 264.

However, the plaintiff also sued for fraud, alleging that the defendants made the

warranty "with knowledge that it was false." Id. at 265. The First Department held that

because the fraud claim was "based on the same facts as underlie[d] the contract claim"

the fraud claim was duplicative of the contract claim. Id. at 266.

The First Department decided a similar case in J.E. Morgan Knitting Mills, Inc. v.

Reeves Brothers, Inc. 243 A.D.2d 422 (1st Dep't 1997). The J.E. Morgan plaintiff had

purchased property from the defendant, and in the contract of sale, the defendant had

warranted that there were no undisclosed liabilities burdening the property. Id. at 423.

When the plaintiff discovered that there were, in fact, undisclosed liabilities, it sued for

both breach of contract and fraud. Id. But because both claims were based on the same

underlying misrepresentation, the court held that they were duplicative, and affirmed dismissal of the fraud claim. Id.

Because EBCC's fraud theory is just as duplicative as those in Varo and J.E. Morgan, the Court should dismiss EBCC's fraudulent inducement claim.

### III.    EBCC Pleads No Fraudulent Transfer Facts

New York's Debtor and Creditor Law prohibits two types of fraudulent transfer: "actual" and "constructive." See N.Y. Debt. & Cred. Law § 273(a)(1) (McKinney 2022). To plead actual fraudulent transfer, the creditor must plead, with particularity, that the debtor made a transfer "with actual intent to hinder, delay or defraud" the creditor. N.Y. Debt. & Cred. Law § 273(a)(1) (McKinney 2022); Carlyle, LLC v. Quik Park 1633 Garage LLC, 160 A.D.3d 476, 477 (1st Dep't 2018) (dismissing actual fraudulent transfer claims that were not pleaded with particularity). To plead constructive fraudulent transfer, the creditor must allege that the debtor made a transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation," likely leaving the debtor insolvent or with "unreasonably small" capital. N.Y. Debt. & Cred. Law § 273(a)(2) (McKinney 2022).

Here, it appears that EBCC is attempting to sue for both actual and constructive fraudulent transfer. See Compl., Dkt. 1 ¶¶ 118–19 ("On information and belief, these transfers were not arms–length transactions [ . . . ]. On information and belief, Defendants acted with actual intent to hinder, delay, or defraud EBCC").

18

### A. The First Department Has Repeatedly Reversed Fraudulent Transfer Claims Rooted in "Information and Belief" Allegations

However, EBCC offers no facts at all to support either theory. Compl., Dkt. 1, ¶¶ 99–100, 118–21. Instead, the Bank pleads each and every one of its fraudulent transfer allegations "on information and belief." See id.

In Carlyle, the First Department reversed and dismissed actual and constructive fraudulent transfer claims because all of their "relevant allegations were made upon information and belief." 160 A.D.3d at 477. This past February, the First Department again reversed and ordered dismissal of a constructive fraudulent transfer claim that relied on "information and belief" allegations. See L&M 353 Franklyn Ave. LLC v. Steinman, 202 A.D.3d 440, 440 (1st Dep't 2022).

As in The Carlyle and L&M, EBCC's reliance on "information and belief" allegations dooms its fraudulent transfer claim. See Compl., Dkt. 1 ¶¶ 99–100, 118–121.

### B. "Information and Belief" Aside, EBCC's Fraudulent Transfer "Facts" Are Mere Legal Conclusions

Even if EBCC's allegations regarding fraudulent transfer were not pleaded on information and belief, EBCC's fraudulent transfer claims still would not survive a motion to dismiss. In J.G. Jewelry, the Commercial Division dismissed a constructive fraudulent transfer claim that pleaded functionally identical allegations to those made by EBCC—except did not bother with pleading the phrase "information and belief." See J.G. Jewelry Pte. Ltd. v. TJC Jewelry, Inc., No. 651469/2018, 2021 WL 2688507, at *5 (Sup. Ct. N.Y. Cnty. June 30, 2021) (Cohen, J.). Exactly as EBCC has done here, J.G. Jewelry's fraudulent transfer allegations tracked the statute's language, pleading that the plaintiffs

19

made transactions that "rendered [them] insolvent" and left them with "unreasonably small capital." <u>Compare</u> <u>id.</u> <u>with</u> Compl., <u>Dkt. 1</u> ¶¶ 99–100, 118–21; <u>see also</u> N.Y. Debt. & Cred. Law § 273(a)(2). Because "speculative and conclusory allegations fail to state a cause of action for constructive fraudulent conveyance," Justice Cohen dismissed the counterclaim. <u>J.G. Jewelry</u>, 2021 WL 2688507 at *5 (quoting <u>Riback v. Margulis</u>, 43 A.D.3d 1023, 1023 (2d Dep't 2007)) (quotation and alteration marks omitted).

As in <u>J.G. Jewelry</u>, EBCC's fraudulent transfer allegations do not but quote the statute and speculate about the Ebury Parties' scienter. The Court should dismiss the fraudulent transfer claim.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 57 of 2230

## CONCLUSION

EBCC provides no reason why this Court should bind ESC, Ebury RE, and Mr. Hanratty to contracts that they have not executed. Moreover, EBCC provides no facts to support their "information and belief," conclusory, and hearsay allegations regarding the Ebury Parties' fraudulent intent or transfer.

Therefore, the Ebury Parties respectfully request that the Court (1) dismiss the contract claim against ESC and Ebury RE, as well as against Mr. Hanratty to the extent it relies on the Credit Agreements, and (2) dismiss the fraudulent inducement and fraudulent transfer claims in their entirety.

Dated: November 16, 2022
        New York, New York

                        Respectfully submitted,

                        /s/Daniel Crandall
                        Kari Parks
                        Daniel Crandall
                        Victor Wang (Admission Pending)
                        GUSRAE KAPLAN NUSBAUM PLLC
                        120 Wall Street
                        New York, New York 10005
                        (212) 269-1400
                        kparks@gusraekaplan.com
                        dcrandall@gusraekaplan.com
                        vwang@gusraekaplan.com

                        *Counsel for the Ebury Parties*

## WORD COUNT CERTIFICATION

I certify that this memorandum of law complies with the word count limit of N.Y.C.R.R. 202.8-b for documents prepared by computer. Microsoft Word's word count tool represents that this memorandum, excluding the caption, table of contents, table of authorities, and signature block, totals 6,383 words.

Dated: November 16, 2022
      New York, New York

                                 /s/ Daniel Crandall
                                 Daniel Crandall

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 59 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

|  |  |  |
|---|---|---|
| | x | |
| EMIGRANT BUSINESS CREDIT CORPORATION, | : | |
| | : | |
| | : | Index No. 158207/2022 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN ARTHUR HANRATTY, | : | **MOTION SEQUENCE NO. 002** |
| EBURY STREET CAPITAL, LLC, | : | |
| EBURY FUND 1, LP, | : | |
| EBURY FUND 2, LP, | : | **REQUEST FOR AN** |
| EBURY 1EMI LLC, | : | **ADJOURNMENT** |
| EBURY 2EMI LLC, | : | |
| EB 1EMIALA LLC, | : | |
| EB 2EMIALA LLC, | : | |
| EB 1EMIFL, LLC, | : | |
| EB 2EMIFL, LLC, | : | |
| EB 1EMIIN, LLC, | : | |
| EB 2EMIIN, LLC, | : | |
| EB 1EMIMD, LLC, | : | |
| EB 2EMIMD, LLC, | : | |
| EB 1EMINJ, LLC, | : | |
| EB 2EMINJ, LLC, | : | |
| EB 1EMINY, LLC, | : | |
| EB 2EMINY, LLC, | : | |
| EB 1EMISC, LLC, | : | |
| EB 2EMISC, LLC, | : | |
| RE 1EMI LLC, | : | |
| RE 2EMI LLC, | : | |
| EB 1EMIDC, LLC, | : | |
| ARQUE TAX RECEIVABLE FUND | : | |
| (MARYLAND), LLC, | : | |
| EBURY FUND 1FL, LLC, | : | |
| EBURY FUND 2FL, LLC, | : | |
| EBURY FUND 1NJ, LLC, | : | |
| EBURY FUND 2NJ, LLC, | : | |
| RED CLOVER 1, LLC, | : | |
| EBURY RE LLC, and | : | |
| XYZ CORPS. 1-10, | : | |
| | : | |
| Defendants. | : | |
| | x | |

---

Pursuant to Rule 16(c) of the Rules of the Commercial Division of the Supreme Court, N.Y.C.R.R. 202.70(g), Plaintiff Emigrant Business Credit Corporation ("EBCC") respectfully requests that the Court adjourn the return date of Defendants' Motion to Dismiss (Dkt. 41) by one week, until December 9, 2022, in light of the upcoming Thanksgiving holiday. The adjournment would extend the deadline for EBCC to serve answering papers from November 25, 2022, to December 2, 2022. EBCC has conferred with Defendants, who have indicated that they are willing to consent to such an adjournment.

Dated:   November 21, 2022                    Respectfully submitted,
         New York, New York

                                              */s/ Alexander J. Willscher*
                                              _____

                                              Alexander J. Willscher
                                              Austin P. Mayron
                                              SULLIVAN & CROMWELL LLP
                                              125 Broad Street
                                              New York, New York 10004
                                              Telephone: (212) 558-4000
                                              Fax: (212) 558-3588

                                              *Attorneys for Plaintiff Emigrant Business*
                                              *Credit Corporation*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

|  |  |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION,<br><br>                                          Plaintiff,<br><br>                    v.<br><br>JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1 EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 1EMINJ, LLC, EB 1EMINY, LLC, EB 2MINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1–10,<br><br>                                          Defendants. | Index No. 158207/2022<br><br>**Mot. #002** |

## AFFIRMATION OF DANIEL CRANDALL
## IN SUPPORT OF MOTION TO DISMISS

Under the penalties of perjury, I, Daniel Crandall, an attorney admitted to practice

before the courts of the State of New York, and not a party to this action, affirm as follows:

1

1.      I am an associate attorney of the law firm Gusrae Kaplan Nusbaum PLLC, counsel for the "**Ebury Parties**"[1] in the above–captioned action.

2.      I submit this affirmation in support of the Ebury Parties' November 16, 2022 "**Motion to Dismiss**." Dkt. 41.

3.      A true and correct copy of Plaintiff Emigrant Business Credit Corp.'s ("**EBCC**" or the "**Bank**") "**Complaint**" is annexed hereto as Exhibit A.

4.      The Ebury Parties' memorandum in support of their Motion to Dismiss sets forth the relevant facts from the Complaint, and the legal arguments upon which the Motion is based. See generally Dkt. 42 (Nov. 16, 2022).

5.      The Ebury Parties' Motion to Dismiss seeks an Order dismissing EBCC's fraudulent inducement and fraudulent transfer claims, as well as EBCC's breach of contract claim against ESC and Ebury RE, pursuant to CPLR 3211(a)(1) and / or CPLR 3211(a)(7), and granting such further relief that this Court deems just and proper.

6.      The Ebury Parties have not previously asked this Court for the relief sought by their Motion to Dismiss.

---

[1] Defendants Ebury Street Capital, LLC ("**ESC**"), Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, Ebury RE LLC ("**Ebury RE**") and John Hanratty (the "**Ebury Parties**").

Dated: November 23, 2022
    New York, New York

                         Respectfully submitted,

                         /s/ Daniel Crandall
                         Daniel Crandall

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 64 of 2230

## WORD COUNT CERTIFICATION

I certify that this affirmation complies with the word count limit of N.Y.C.R.R. 202.8-b for documents prepared by computer. Microsoft Word's word count tool represents that this affirmation, excluding the caption, table of contents, table of authorities, and signature block, totals 314 words.

Dated: November 23, 2022
New York, New York

/s/ Daniel Crandall
Daniel Crandall

# Exhibit A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| ──────────────────────── x | | |
| EMIGRANT BUSINESS CREDIT | : | |
| CORPORATION, | : | |
| | : | Index No. _____ |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| JOHN ARTHUR HANRATTY, | : | **COMPLAINT** |
| EBURY STREET CAPITAL, LLC, | : | |
| EBURY FUND 1, LP, | : | |
| EBURY FUND 2, LP, | : | |
| EBURY 1EMI LLC, | : | |
| EBURY 2EMI LLC, | : | |
| EB 1EMIALA LLC, | : | |
| EB 2EMIALA LLC, | : | |
| EB 1EMIFL, LLC, | : | |
| EB 2EMIFL, LLC, | : | |
| EB 1EMIIN, LLC, | : | |
| EB 2EMIIN, LLC, | : | |
| EB 1EMIMD, LLC, | : | |
| EB 2EMIMD, LLC, | : | |
| EB 1EMINJ, LLC, | : | |
| EB 2EMINJ, LLC, | : | |
| EB 1EMINY, LLC, | : | |
| EB 2EMINY, LLC, | : | |
| EB 1EMISC, LLC, | : | |
| EB 2EMISC, LLC, | : | |
| RE 1EMI LLC, | : | |
| RE 2EMI LLC, | : | |
| EB 1EMIDC, LLC, | : | |
| ARQUE TAX RECEIVABLE FUND | : | |
| (MARYLAND), LLC, | : | |
| EBURY FUND 1FL, LLC, | : | |
| EBURY FUND 2FL, LLC, | : | |
| EBURY FUND 1NJ, LLC, | : | |
| EBURY FUND 2NJ, LLC, | : | |
| RED CLOVER 1, LLC, | : | |
| EBURY RE LLC, and | : | |
| XYZ CORPS. 1-10, | : | |
| | : | |
| Defendants. | : | |
| ──────────────────────── x | | |

FILED: NEW YORK COUNTY CLERK 09/23/2022 05:08 PM

NYSCEF DOC. NO. 15

INDEX NO. 158207/2022

RECEIVED NYSCEF: 09/23/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 67 of 2230

Plaintiff Emigrant Business Credit Corporation ("**EBCC**"), by and through its undersigned attorneys, hereby alleges the following in support of its Complaint against John Arthur Hanratty ("**Hanratty**") and Ebury Street Capital, LLC ("**ESC**"), as well as Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1, LLC; Ebury RE LLC; and XYZ Corps. 1-10 (the "**Ebury Companies**"):

### NATURE OF THE ACTION

1.      This is an action for fraudulent inducement, fraudulent transfer, and breach of contract that stems from Defendants' fraudulent conversion of tens of millions of dollars' worth of EBCC's collateral. Defendants brazenly violated the terms of the agreements (the "**Credit Agreements**") governing two credit facilities that EBCC extended to Defendants beginning in 2017 (the "**Credit Facilities**"), and later fraudulently induced EBCC to amend the Credit Agreements, including to obtain increases to Defendants' lines of credit. Defendants misappropriated advances under the Credit Facilities as well as EBCC's collateral to pay tens of millions of dollars in distributions to company insiders—including Defendant John Hanratty—as well as other investors. Defendants' actions violated strict contractual limitations in the Credit Agreements that required them to maintain the loan proceeds as EBCC's collateral. To facilitate the scheme, Defendants regularly falsified borrowing base certificates and other documents that they submitted to EBCC as the basis for receiving advances under the Credit Facilities. Defendants further used a web of sham corporate transactions—among companies controlled by Hanratty—to

-2-

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 68 of 2230

loot EBCC's collateral and the loan proceeds. Indeed, according to a federal counterclaim filed

by one of his former business partners, Hanratty openly bragged about the fact that he was

defrauding EBCC.

2.      On November 10, 2021, the notes underlying the Credit Facilities came due and

Defendants failed to repay EBCC, including over $18 million in outstanding principal and interest.

The Credit Agreements provided that EBCC was to be fully secured by collateral owned by the

Borrowers and Guarantors to the Credit Agreements. Under the terms of those agreements,

Defendants were permitted to use the loan proceeds only to finance Defendants' purchase of tax

liens; the purchased tax liens (as well as any and all proceeds thereof) were EBCC's collateral;

and a third-party custodian was supposed to control the collateral at all times. Throughout 2020

and 2021, Hanratty continually represented to EBCC that it was "overcollateralized"—meaning

that the value of EBCC's collateral exceeded the then-existing amounts owed under the Credit

Facilities. At one point in 2021, Defendants provided to EBCC a lien tape—purportedly from the

independent third-party custodian—that falsely showed that the Credit Facilities were secured by

over $27 million in tax lien collateral.

3.      When EBCC approached the third-party custodian after the default to foreclose on

the collateral, it discovered that about 90% of its supposed collateral—worth almost $26 million—

was "missing." Moreover, EBCC learned that the lien tape that Hanratty had provided from the

third-party custodian was fake. EBCC not only was not overcollateralized by the Borrowers and

Guarantors to the Credit Agreements, but Defendants had been lying for years about the collateral,

their use of funds advanced under the Credit Facilities, and Defendants' compliance with the Credit

Agreements.

FILED: NEW YORK COUNTY CLERK 09/23/2022 05:58 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 15
RECEIVED NYSCEF: 09/23/2022
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 69 of 2230

4.      Since the default, EBCC has discovered that Defendants impermissibly paid out over $22 million in distributions to their investors in 2018 and 2019—without EBCC's knowledge and in violation of the Credit Agreements—while at the same time withdrawing over $27 million in funding from the Credit Facilities. EBCC also has discovered that Defendants repeatedly made false statements about the collateral to induce EBCC to enter into modifications to the Credit Agreements between 2018 and 2021, and to extend additional funds thereunder. Finally, EBCC has discovered that Defendants fraudulently transferred millions of dollars' worth of EBCC's collateral to Ebury RE LLC and XYZ Corps. 1-10, to prevent EBCC from receiving sale proceeds from sales of the collateral and from foreclosing on the collateral in the event of a default.

5.      This is not the first time Defendants have been accused of running a fraudulent scheme. In 2019, a group of investors sued certain of Defendants and alleged that Defendants had been "robbing Peter to pay Paul." Instead of notifying EBCC of that lawsuit (as required by the Credit Agreements), Hanratty impermissibly used funds advanced under the Credit Facilities to fully redeem and settle with those investors. More recently, Defendants were sued by a former business partner named Thomas McOsker ("**McOsker**"), who alleged that certain of Defendants have been engaged in a "Ponzi-like scheme." According to McOsker, Hanratty admitted in a 2018 text message that he was "leapfrogging"—*i.e.*, using money from one fund or transaction to pay off another fund or transaction. McOsker, who shared offices with Hanratty in 2018 and 2019, also alleged that Hanratty routinely provided false information to EBCC as part of a fraudulent scheme. The McOsker lawsuit, which Defendants also failed to disclose to EBCC, additionally involves a dispute over the proceeds from Defendants' sale of $3.5 million of EBCC's collateral, which should have been paid to EBCC, as explained below.

-4-

6.     In the ten months since Defendants defaulted, they have failed to repay EBCC the amounts due under the Credit Agreements or to return the fraudulently transferred collateral. Accordingly, EBCC seeks a judgment:

  i.   awarding damages for breach of contract, in an amount to be ascertained at trial but not less than $21,813,177.46, plus accrued interest, reasonable attorneys' fees, court costs, and legal expenses;

  ii.  awarding damages for Defendants' fraudulent inducement, in an amount to be ascertained at trial;

  iii. awarding damages for Defendants' fraudulent transfers, in an amount to be ascertained at trial;

  iv.  imposing punitive damages against Defendants for their willful and wanton misconduct; and

  v.   imposing joint and several liability on Hanratty, ESC, and the Ebury Companies.

## THE PARTIES

7.     EBCC is a New York-based specialty finance company organized under the laws of Delaware.  Its headquarters and principal place of business are located at 6 East 43rd Street, 20th Floor, New York, NY 10017.  It is a wholly-owned subsidiary of Emigrant Bank, the largest family-owned bank in the United States.

8.     John Hanratty is the manager of ESC.  On information and belief, he resides at 1152 Ave Magdalena, San Juan, Puerto Rico 00907.  In 2017, when the parties executed the Credit Agreements, Hanratty lived in Rye, NY.  On information and belief, he moved to Puerto Rico in 2018.

9.     ESC is a New York limited liability company.  It is the manager or general partner of the Ebury Companies.  On information and belief, the principal place of business of ESC and of each of the Ebury Companies is 644 Avenida Fernadez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

FILED: NEW YORK COUNTY CLERK 09/25/2022 05:08 PM
NYSCEF DOC. NO. 15
INDEX NO. 158207/2022
RECEIVED NYSCEF: 09/25/2022
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 71 of 2230

**A.      The Funds**

10.      The Ebury Companies are organized into two funds (the "**Funds**"):

     a. Ebury Fund 1, LP ("**Fund 1**") is a Delaware limited partnership managed by ESC.

     b. Ebury Fund 2, LP ("**Fund 2**") is a Delaware limited partnership managed by ESC.

**B.      The Borrowers**

11.      EBCC extended the Credit Facilities to wholly-owned subsidiaries of the Funds, which were created to facilitate the Credit Agreements (the "**Borrowers**"):

     a. Ebury 1EMI LLC is a New York limited liability company.  It is a wholly-owned subsidiary of Fund 1, and is managed by ESC.

     b. Ebury 2EMI LLC is a New York limited liability company.  It is a wholly-owned subsidiary of Fund 2, and is managed by ESC.

12.      The Borrowers' names contain the initials "EMI"—short for "Emigrant"—to denote that their assets are EBCC's collateral.

**C.      The Guarantors**

13.      Each Borrower owns special purpose entities (the "**Ebury SPEs**") that purchase, own, and sell tax lien certificates or real estate in various states:

     a. EB 1EMIALA LLC is an Alabama limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

     b. EB 2EMIALA LLC is an Alabama limited liability company.  It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

     c. EB 1EMIFL, LLC is a Florida limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

     d. EB 2EMIFL, LLC is a Florida limited liability company.  It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

     e. EB 1EMIIN, LLC is an Indiana limited liability company.  It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

FILED: NEW YORK COUNTY CLERK 09/23/2022 05:66 PM

NYSCEF DOC. NO. 15

INDEX NO. 158207/2022

RECEIVED NYSCEF: 09/23/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 72 of 2230

f.   EB 2EMIIN, LLC is an Indiana limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

g.   EB 1EMIMD, LLC is a Maryland limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

h.   EB 2EMIMD, LLC is a Maryland limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

i.   EB 1EMINJ, LLC is a New Jersey limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

j.   EB 2EMINJ, LLC is a New Jersey limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

k.   EB 1EMINY, LLC is a New York limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

l.   EB 2EMINY, LLC is a New York limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

m.   EB 1EMISC, LLC is a South Carolina limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

n.   EB 2EMISC, LLC is a South Carolina limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

o.   RE 1EMI LLC is a New York limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

p.   RE 2EMI LLC is a New York limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

q.   EB 1EMIDC, LLC is a District of Columbia limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

r.   Arque Tax Receivable Fund (Maryland), LLC is a Maryland limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

s.   Ebury Fund 1FL, LLC is a Florida limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

t.   Ebury Fund 2FL, LLC is a Florida limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

u.   Ebury Fund 1NJ, LLC is a New Jersey limited liability company. It is a wholly-owned subsidiary of Ebury 1EMI LLC, and is managed by ESC.

-7-

FILED: NEW YORK COUNTY CLERK 09/23/2022 05:00 PM

NYSCEF DOC. NO. 15

INDEX NO. 158207/2022

RECEIVED NYSCEF: 09/23/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 73 of 2230

     v.  Ebury Fund 2NJ, LLC is a New Jersey limited liability company. It is a wholly-owned subsidiary of Ebury 2EMI LLC, and is managed by ESC.

14.    Red Clover 1, LLC is a Delaware limited liability company. It is a wholly-owned subsidiary of Ebury Fund 2, LP, and is managed by ESC.

15.    The Ebury SPEs, along with ESC and Red Clover 1, LLC, are guarantors to the Credit Agreements (the "**Guarantors**").

### D.    Additional Affiliate or Subsidiary Entities

16.    Ebury RE LLC is a New Jersey limited liability company. It is a subsidiary of Fund 1 and Fund 2, and is managed by ESC.

17.    XYZ Corps. 1-10 are additional affiliate or subsidiary corporate entities of the Ebury Companies, the identities of which are presently unknown, to which Defendants have transferred EBCC's collateral or proceeds from EBCC's collateral. The specific identifies of XYZ Corps. 1-10 are unknown to EBCC because Defendants have concealed their fraudulent transfers from EBCC, including by submitting falsified borrowing base certificates and other documents to EBCC. EBCC has named XYZ Corps. 1-10 as unknown parties in accordance with CPLR 1024.

### E.    Alter Ego Allegations

18.    ESC and each of the Ebury Companies is an alter ego of Hanratty and of one another with respect to the transactions described in this Complaint. ESC and each of the Ebury Companies:

    a.  Disregard corporate formalities;

    b.  Intermingle funds;

    c.  Have common ownership, officers, directors, and personnel;

    d.  Share a common office space, address, telephone number, and email addresses;

    e.  Are completely dominated by Hanratty;

    f.  Have no independence in their business operations;

    g.   Are not treated as independent profit centers;

    h.   Engage in conflicted, interested transactions; and

    i.   Primarily transact Hanratty's business rather than their own.

## JURISDICTION AND VENUE

19.     Jurisdiction in this Court is proper pursuant to CPLR 301 and 302, including because: (i) the Borrowers and Guarantors agreed to "the jurisdiction of the courts of the state of New York located in the borough of Manhattan" as to any claim with respect to the Credit Agreements; (ii) Hanratty agreed to "the jurisdiction of the state courts of New York" as to any claim brought to enforce the Validity Guaranties (discussed below); (iii) ESC, the Borrowers, EB 1EMINY, LLC, EB 2EMINY, LLC, RE 1EMI LLC, and RE 2EMI LLC, are domestic corporations; (iv) ESC and the Ebury Companies are alter egos of Hanratty and of each other, and their contacts with the State of New York can be imputed to one another; and (v) Defendants made false statements directed to EBCC in New York and engaged in fraudulent transfers that harmed EBCC in New York, derive substantial revenue from interstate commerce, and reasonably should have expected their false statements and fraudulent transfers to have consequences for EBCC in New York.

20.     Venue in this Court is proper pursuant to CPLR 501 and 503 because EBCC is a resident in the County of New York and because the parties agreed to waive any objection to venue in any action initiated in this Court with respect to the Credit Agreements.

21.     This action is properly brought in the Commercial Division of the Supreme Court pursuant to Section 202.70 of the Uniform Civil Rules for the Supreme Court and the County Court because its principal claims involve breach of contract and business transactions involving dealings with commercial banks that exceed the monetary threshold of $500,000.

-9-

## FACTUAL BACKGROUND

### A.  Overview of Tax Liens.

22.  If a property owner does not pay their municipal taxes (*e.g.*, property taxes, sewer and water bills, etc.), the municipality can place a tax lien on their property for the amount of delinquent taxes owed.  A tax lien is senior to most other types of interests in real property, meaning that a property with a tax lien cannot be sold or refinanced until the tax lien is paid.

23.  Municipalities auction off tax liens to third parties in the form of tax lien certificates.  The rules for these sales vary from state to state.  In general, the owner of a tax lien certificate is entitled to the face value of the lien (the amount of delinquent taxes), plus any subsequent interest or fees.  The interest rates charged on tax lien certificates are favorable for investors and can range from 10% to 36% annually.

24.  If a property owner fails to pay off a tax lien on their property within a pre-determined period of time, the owner of the tax lien certificate can foreclose on the property and obtain ownership of it as a "real estate owned" property ("**REO**").

25.  Investors purchase tax liens for two reasons: (i) to profit from the interest rate charged by the municipality on the outstanding tax lien; or (ii) to obtain ownership of the underlying real estate through foreclosure.  Thus, there are several ways to value a tax lien certificate, including:

- **Face Value (FV):**  The original amount of delinquent taxes secured by the tax lien certificate;

- **Redemptive Value (RV):**  The face value of the tax lien certificate plus interest, fees, and subsequent tax payments made by the certificate owner; and

- **Assessed Value:**  The fair market value of the underlying real estate (the expected value of the REO upon foreclosure).

26.    If the owner of a tax lien certificate fails to make subsequent tax payments on the property, another investor may be able to purchase a subsequent, more senior tax lien certificate and "prime" them.

**B.    Asset-Based Lending ("ABL").**

27.    An ABL is a credit facility that allows a borrower to draw down on a revolving line of credit at a pre-determined "**Advance Rate**" against the value of a pool of eligible assets, which serves as collateral for the credit facility.  An ABL can be structured around any type of asset, including accounts receivable, inventory, equipment, or real estate.

28.    The total amount that a borrower can draw down is called the "**Borrowing Base**," which is calculated by multiplying the amount of eligible collateral by the Advance Rate.  For example, if a Borrower has $10 million in eligible collateral and the advance rate is 80%, the Borrowing Base is $8 million (*i.e.*, the amount up to which the borrower can withdraw).  The "**Availability**" of the ABL is the Borrowing Base minus any amounts that already have been drawn down on the credit facility.

29.    The key feature of an ABL is that the lender *always* is secured by collateral worth more than the outstanding principal of the ABL.  To illustrate, in the previous example, even if the borrower draws down the full $8 million in availability, the lender still is secured by $10 million in collateral.  If the borrower defaults, the lender can make good on the loan by foreclosing on the collateral.

30.    To request a funding draw under an ABL, a borrower must be in compliance with the loan documents, have no events of default, and have sufficient eligible assets against which the lender can advance.  The accuracy and trustworthiness of the borrowing base is key to a lender's decision to advance funds under an ABL.

31.      In addition, a borrower is obligated to keep the borrowing base up-to-date by removing ineligible assets (such as aged or charged-off assets) and to make mandatory prepayments if the amount of outstanding funding draws exceeds the availability of the ABL (called an "**Overadvance**"). To illustrate using the same example as before, if the borrower draws down $8 million in availability but then sells the $10 million in collateral (reducing the Borrowing Base to zero), the borrower must pay back an $8 million Overadvance.

### C.      The Credit Agreements.

32.      In 2016, Hanratty approached EBCC seeking a $15 million credit facility to finance the purchase of new tax lien certificates by the Ebury Companies. At the time, Defendants had established credit facilities with Capital One, N.A., to finance their purchases of tax liens.

33.      On March 9, 2017, EBCC agreed to extend a $10 million credit facility to Ebury 1EMI LLC, and a $5 million credit facility to Ebury 2EMI LLC. EBCC agreed to increase the Ebury 1EMI LLC facility to $13.5 million on October 29, 2018, and to $15 million on September 24, 2019. Through the October 2018 refinancing, Defendants paid off the Capital One facilities and began using EBCC as their exclusive lender.

34.      Under the Credit Agreements, the Credit Facilities were structured as ABLs. The Borrowing Base for each credit facility was comprised of the tax lien certificates that Defendants were to purchase with the funds that EBCC advanced under the Credit Facilities. The applicable advance rate varied from 70% to 85%, depending on the state in which the tax lien was purchased. Any tax lien that Defendants purchased using the Credit Facilities, and its proceeds, was EBCC's collateral (the "**Collateral**"). Defendants were not allowed to transfer any of the Collateral, with limited exceptions.

35.      The Credit Agreements were structured so that EBCC would be fully secured at all times. EBCC was to lend money to the Borrowers to finance their purchases of tax liens and then

-12-

be secured by those tax liens and their proceeds.  The tax liens themselves would be secured by the value of the underlying real estate, which would provide EBCC with an additional layer of protection.  For example, Defendants purchased a tax lien certificate on a property at 4520 Agualinda Boulevard, Cape Coral, FL 33914, with a face value of $28,509.98, using funds advanced under the Credit Facilities.  Under the Credit Agreements, Defendants were entitled to request a funding draw of up to $24,233.48 (85% of the face value of the lien) to fund the purchase of this tax lien certificate.  In exchange, EBCC was to be secured by the full value of the certificate, including any interest, fees, or subsequent tax payments.  Further, if the property owner failed to pay off the tax lien, Defendants would be entitled to foreclose on the property, which had an assessed value of $247,450.  Thus, for this example, EBCC agreed to loan Defendants up to $24,233.48, which would be secured by a tax lien certificate with face value of $28,509.98, and up to $247,450 in underlying real estate value.

36.    The notes underlying the Credit Agreements provided that the Borrowers would "repay all principal, interest, costs and expenses outstanding hereunder on March 9, 2021."

  a.  On March 18, 2021, the parties agreed to extend the maturity date of the notes to May 8, 2021.

  b.  On May 18, 2021, the parties agreed to extend the maturity date of the notes again, to August 10, 2021.

  c.  On August 13, 2021, the parties agreed to a final maturity extension, which set the maturity date of the notes as November 10, 2021.

37.    Each of the Guarantors also executed a guaranty that "absolutely, unconditionally and irrevocably" guaranteed to EBCC "the due, prompt and punctual payment and satisfaction of the Indebtedness (whether at the stated maturity, by acceleration or otherwise)."

38.    On November 10, 2021, the Borrowers and the Guarantors were required to repay EBCC, including over $18 million in outstanding principal and interest.  They failed to do so.  On

-13-

November 29, 2021, EBCC sent the Borrowers and Guarantors notices of default and demands for

payment. Defendants since have failed to repay EBCC the amounts owed under the Credit

Agreements, which now exceed $21,813,177.46, plus accrued interest, reasonable attorneys' fees,

court costs, and legal expenses.

> **D.    Hanratty personally guaranteed the accuracy of Defendants' representations to EBCC and agreed to repay EBCC for any damages caused by any misrepresentations.**

39.    The Credit Agreements required that Hanratty execute validity guaranty

agreements in favor of EBCC (the "**Validity Guaranties**"). These agreements provide that

Hanratty is personally liable for any resulting damages if Defendants made any misrepresentations

to EBCC about the Collateral. Hanratty executed the Validity Guaranties on May 9, 2017.

40.    Specifically, Hanratty guaranteed that "all Information from time to time delivered

to Lender will be true and correct in all material respects as of the Calculation Date applicable to

such Information." The Validity Guaranties define "Information" to include "all written

information relating to the eligibility of Collateral . . . including, without limitation, all Borrowing

Base Certificates and any schedules of Collateral."

41.    The Validity Guaranties provide that, if the Information is not "true and correct, in

all material respects as of a Calculation Date," Hanratty personally must "pay the aggregate

amount of all Damages incurred by Lender." Hanratty's obligation to pay damages under the

Validity Guaranties is "on a 'solidary' and 'joint and several' basis."

42.    As discussed below, Hanratty repeatedly delivered false information to EBCC

relating to the eligibility of Collateral, including in Borrowing Base Certificates and schedules of

Collateral. He thus is personally liable for EBCC's damages.

FILED: NEW YORK COUNTY CLERK 09/25/2022 05:08 PM
NYSCEF DOC. NO. 15

INDEX NO. 158207/2022
RECEIVED NYSCEF: 09/25/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 80 of 2230

**E.    EBCC relied on Hanratty's false statements about the Collateral in agreeing to amend the Credit Agreements between 2018 and 2021.**

43.    Hanratty consistently claimed that EBCC was "overcollateralized," meaning that EBCC was secured by collateral worth more than the amounts outstanding under the Credit Facilities.

44.    For example, on January 13, 2021, Hanratty wrote to EBCC that it was secured by $26.5 million redemptive value in tax lien collateral, which was itself collateralized by underlying real estate with an assessed value of $275 million.

45.    EBCC relied on that statement, and other similar valuations that Hanratty provided regarding the Collateral, in agreeing to amend the Credit Agreements between 2018 and 2021, including:

    a.    The Sixth Amendment to Loan Documents for Ebury 1EMI LLC, executed on October 29, 2018, which increased the credit facility to $13,500,000;

    b.    The Seventh Amendment to Loan Documents for Ebury 1EMI LLC, executed on September 24, 2019, which increased the credit facility to $15,000,000;

    c.    The Eighth Amendment to Loan Documents for Ebury 1EMI LLC, executed on March 18, 2021, which extended the maturity date of the underlying note to May 8, 2021;

    d.    The Ninth Amendment to Loan Documents for Ebury 1EMI LLC, executed on May 18, 2021, which extended the maturity date of the underlying note to August 10, 2021;

    e.    The Tenth Amendment to Loan Documents for Ebury 1EMI LLC, executed on August 12, 2021, which extended the maturity date of the underlying note to November 10, 2021;

    f.    The Waiver and Sixth Amendment to Loan Documents for Ebury 2EMI LLC, executed on March 18, 2021, which extended the maturity date of the underlying note to May 8, 2021; and

    g.    The Eighth Amendment to Loan Documents for Ebury 2EMI LLC, executed on August 13, 2021, which extended the maturity date of the underlying note to November 10, 2021.

-15-

46.     On May 5, 2021, an EBCC employee named Jack Grady texted Hanratty that he was going to be "representing to our committee meeting that we are secured by 30 mm [$30 million] in lien collateral . . . which is my understanding of where the portfolio is right now." Hanratty falsely responded, "It is."

47.     On July 21, 2021, Grady texted Hanratty with concerns based on the 2019 audits of Fund 1 and Fund 2, which valued the Funds' investments in tax liens at around $17.2 million—less than the approximately $18 million outstanding balance under the Credit Facilities.  Hanratty falsely responded that EBCC actually was secured by $32 million in tax lien collateral, plus an additional $10 million in REO collateral.

48.     According to McOsker, Hanratty at one point bragged about his ability to mislead Grady, and stated that Grady "won't notice" that he was submitting falsified documents to EBCC.

49.     These claims of "overcollateralization" were intentionally false and were intended to lull EBCC into forgoing its rights under the Credit Agreements to declare an event of default and demand repayment.

**F.     The Credit Agreements required the use of a third-party Custodian and Servicer.**

50.     The Credit Agreements required the Borrowers to deliver any tax lien certificates that they purchased to a designated third-party Custodian.

    a.  Under Section 5.10 of the Credit Agreements, the Borrowers and the Guarantors represented and warranted as of the date of each Advance that they had delivered to the Custodian "all required Tax Lien Documents."

    b.  Likewise, under Section 1.1(y) of the Credit Agreements, "[a]ny Tax Lien whose Basic Tax Lien Documents are not delivered to Lender, or to the Custodian, by no later than the effective date of the most recent Borrowing Base Certificate furnished to the Lender," was not eligible to be included in the Borrowing Bases.

51.     This requirement was essential to the parties' agreements.  EBCC relied on the

involvement of an independent third-party to ensure the safekeeping of the Collateral.  Defendants

were *not* allowed to retain custody of the tax liens or to service the tax liens themselves (called

"**self-servicing**").

52.     Further, under Section 8.2 of the Credit Agreements, the Borrowers were prohibited

from "chang[ing] the Servicer or the Custodian without the prior written consent of Lender."  The

Credit Agreements originally designated Tower Fund Services, LLC as the Servicer and

Custodian.  On November 8, 2017, EBCC consented in writing to changing the Servicer and

Custodian to MTAG Services, LLC ("**MTAG**").

53.     EBCC never consented to changing the Custodian or Servicer to any of Defendants

or allowing Defendants to keep custody of the Collateral or self-service.

54.     According to McOsker, "[o]n several occasions in 2019," Hanratty coached him on

responses to inquiries from MTAG to aid Hanratty in misleading MTAG.

**G.     As the scheme begins to unravel, Hanratty engages in damage control and
         makes multiple misrepresentations to EBCC.**

55.     In March 2021, as part of a field examination of the Borrowers, EBCC discovered

that certain of the Collateral was not in MTAG's custody.  Over the next eight months, Hanratty

repeatedly misled EBCC about the custodial status of the Collateral.  Throughout March 2021,

Hanratty would state that the Collateral was not in MTAG's custody due to "timing" or

"uploading" problems, but that those problems would be resolved in just a few days.

56.     On September 21, 2021, after promising to update EBCC about the custody of the

Collateral for months, Hanratty sent EBCC an email with the subject line "Custody," and attached

a spreadsheet called "MTAG Active Lien Detail."  On its face, the spreadsheet purported to be

from MTAG:  it contained a header with the MTAG logo and the caption "Active Lien Detail

FILED: NEW YORK COUNTY CLERK 09/25/2022 05:66 PM

NYSCEF DOC. NO. 45

INDEX NO. 158207/2022

RECEIVED NYSCEF: 09/25/2022

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State

Court Records   Pg 83 of 2230

Period Ending: Tuesday August 31, 2021." The spreadsheet, in fact, was not from MTAG—on information and belief, Hanratty fabricated it in order to deceive EBCC and obscure the fact that he was self-servicing the Collateral.

57.     According to the spreadsheet, MTAG had custody of 6,782 tax lien certificates, worth $27.8 million RV.  MTAG has since confirmed to EBCC that, as of that date, it had custody of only 518 tax lien certificates, worth $1.3 million RV.

58.     After EBCC sent Ebury notices of default in November 2021, Hanratty admitted that he had custody of, and was self-servicing, almost 90% of the Collateral, using a platform called Speedboat.

59.     By self-servicing the Collateral, Hanratty violated the Credit Agreements and evaded third-party scrutiny of Defendants' financial dealings.  In addition, any tax lien that Defendants were self-servicing was not eligible to be included in the Borrowing Bases under Section 1.1(y) of the Credit Agreements.

**H.     After Defendants defaulted on the Credit Agreements, Hanratty continued to misrepresent the status of the Collateral to EBCC.**

60.     On December 15, 2021, Defendants sent EBCC another lien tape, purporting to identify EBCC's collateral as of December 1, 2021.  According to this second lien tape, MTAG had custody of only 497 liens worth $1.3 million RV, and Defendants admitted to self-servicing 1,047 liens, purportedly worth $17.8 million RV.

61.     The December 15, 2021 lien tape did not contain over 5,000 tax liens (worth over $14 million RV) that were included in the purported MTAG lien tape.

62.     In addition, 153 Maryland tax liens that appeared in both lien tapes purportedly increased in value by $4.3 million RV over the three months between the two lien tapes.

63.     On information and belief, Hanratty inflated the value of these Maryland liens by improperly including the "bid amount" in his valuations.  The "bid amount" is the price that a tax lien certificate owner must pay to obtain the deed to a property upon foreclosure in Maryland. Under Maryland Code § 14-818, the "bid amount" is not a component of the redemptive value of the lien and Hanratty improperly included it in his valuation of these Maryland liens.

64.     Defendants still have not delivered custody of any of the self-serviced Collateral to MTAG.

**I.     Hanratty routinely submitted to EBCC Borrowing Bases Certificates that concealed the fact that Hanratty was impermissibly self-servicing the Collateral.**

65.     Under the Credit Agreements, the Borrowers could use advances under the Credit Facilities only to purchase eligible tax liens and for ordinary and necessary expenses of business operations incurred in the ordinary course of business:

a.  Section 2.1 of the Credit Agreements provides that "Advances shall be used solely for the purposes of acquiring Eligible Tax Liens (including Subsequent Tax Liens)."

b.  Section 6.26 of the Credit Agreements states that "Unless specifically consented to the contrary by the Lender in writing, the Borrower shall use Advances solely to fund the acquisition of Eligible Tax liens in the ordinary course of the business of the Ebury Companies and to finance ordinary and necessary expenses of the business operations of the Ebury Companies incurred in the ordinary course of the business."  EBCC has not consented in writing or otherwise to any other uses of advances under the Credit Agreements.

c.  Section 9.1 of the Credit Agreements provides that it was an event of default if "any Ebury Company diverts or uses any portion of any amount received on account of the collateral while any of the indebtedness remains outstanding."

66.     Prior to each request for an advance, Hanratty, as managing director of the Borrowers, was required to provide EBCC with a signed, certified Borrowing Base Certificate. The Borrowers requested more than a dozen advances and Hanratty provided a signed, certified

Borrowing Base Certificate for each request. Each Borrowing Base Certificate contained a statement that: "Pursuant to the Credit and Security Agreements dated March 9 2017. The undersigned does hereby certify that the above is a true and correct account of all accounts receivable assigned to you which remain unpaid. You are asked to rely upon the truthfulness of the foregoing representations made herein, in order to advance or lend money to the undersigned, and the undersigned also represents that the above described accounts are free and clear of any and all liens or claims whatsoever except the one in your favor."

67.     Hanratty also provided signed notices of borrowing on behalf of the Borrowers in connection with each advance, which contained additional certifications that: (i) "all representations and warranties of the Borrower contained in the Credit Agreement are true and correct on the date hereof," (ii) "no Event of Default has occurred and is continuing beyond any applicable notice and grade periods, or would result from the Proposed Borrowing," (iii) "there has been no material adverse change or disclosure regarding the financial or business condition of the Borrower since the Closing Date," and (iv) "there has been no material adverse change in the Borrowing Base since the most recent Borrowing Base Certificate or in the business operations, properties, prospects or condition (financial or otherwise) of any Borrower since the Closing Date."

68.     On information and belief, these statements were false because Defendants were self-servicing the Collateral, and because of additional misrepresentations described below. In addition, according to McOsker, Hanratty would alter the "origination dates for hundreds of certificates" on the Borrowing Base Certificates, to cover up his fraud.

**J.    EBCC discovers Hanratty's historical lies for the purpose of inducing EBCC to release funds to him.**

69.    Defendants made additional misrepresentations for at least four advances under the Credit Facilities.

    *i.    November 9, 2018 Advance*

70.    On November 9, 2018, EBCC advanced Ebury 1EMI LLC $220,000 to finance the purported purchase of $236,433 in tax lien certificates.

71.    According to financial records that Hanratty provided to EBCC, Defendants did not use these funds to purchase new tax liens. Instead, they used the funds to pay a $288,810.67 distribution to an investor in the Funds named Tiffanie Eagan, in violation of the Credit Agreements.

    *ii.    May 17, 2019 Advance*

72.    On May 17, 2019, EBCC advanced Ebury 1EMI LLC $860,000 to finance the purported purchase of $3,492,881 in tax lien certificates.

73.    According to financial records that Hanratty provided to EBCC, Defendants did not use these funds to purchase new tax liens. Instead, they used the funds to pay $1,208,772 to various investors, including the Brinker-Cohen Family Trust, Horseshoe Investments LLC, the Elizabeth R. Walsh 2016 Irrevocable Trust, and Ice Holdings, LLC, to settle a lawsuit, in violation of the Credit Agreements.

74.    In addition, the May 17, 2019 Borrowing Base Certificate fraudulently included liens against which Defendants already had received advances from EBCC. Specifically, Defendants requested an advance against more than 300 New Jersey tax lien certificates ($1.6 million in purported eligibility) that they already had received an advance against in March 2019.

75. Defendants violated the Credit Agreements and misled EBCC by including these duplicate tax liens in the Borrowing Bases. Without the duplicate tax liens, there would have been less availability under the Credit Facilities.

<i>iii.    June 12, 2019 Advance</i>

76. On June 12, 2019, EBCC advanced Ebury 1EMI LLC $2,400,000 to finance the purported purchase of $3,320,765 in tax lien certificates.

77. According to financial records that Hanratty provided to EBCC, Defendants purchased only $2.1 million in tax lien certificates.

78. As part of the $2.1 million in tax lien certificate purchases, Defendants purchased a portfolio of liens called the FWDSL portfolio. On information and belief, the original face value of the FWDSL portfolio was $2,534,751, but Defendants were able to purchase it for approximately $900,000 because the liens had diminished in value (by approximately $1.6 million).

79. Under Section 1.1(a) of the Credit Agreements, Defendants were required to use the purchase price of the FWDSL portfolio in the Borrowing Base, and were not entitled to advances based on the original face value of the liens. Nevertheless, on information and belief, Defendants improperly claimed part of the original face value of the FWDSL portfolio in the Borrowing Bases.

<i>iv.    September 13, 2019 Advance</i>

80. On September 13, 2019, EBCC advanced Ebury 2EMI LLC $850,000 to finance the purported purchase of $1,228,529 in tax lien certificates.

81. According to financial records that Hanratty provided to EBCC, Defendants did not use these funds to purchase new tax liens. Instead, they used the funds to pay $750,000 in

distributions to two investors, Ira Leventhal and Beth Leventhal, in violation of the Credit

Agreements.

82.     In addition, the September 13, 2019 Borrowing Base Certificate contained

duplicate liens.  Specifically, Defendants requested an advance against 64 Maryland tax lien

certificates ($428,061.47 in purported eligibility) that they already had requested an advance

against in a June 12, 2019 Borrowing Base Certificate for Ebury 1EMI LLC.

83.     Further, Defendants requested the advance based on inflated valuations of three

Maryland liens, which Ebury 1EMI LLC already had borrowed against in June 2019:

| Parcel ID | June 12, 2019 Borrowing Base Certificate (Ebury 1EMI LLC) | September 13, 2019 Borrowing Base Certificate (Ebury 2EMI LLC) |
|---|---|---|
| 15-1739044 | $ 24,950.02 | $ 266,912.02 |
| 01-0031195 | $ 43,905.13 | $ 217,224.07 |
| 05-0376756 | $ 30,044.86 | $ 316,331.51 |

84.     In total, Defendants inflated the value of these three Maryland liens by over

$700,000.

85.     As explained above, Defendants improperly included the "bid amount"—an

amount that Defendants would be required to pay to obtain the deeds to the properties—in the

Borrowing Bases.

**K.     Other historical lies by Hanratty for the purpose of inducing EBCC to release
        funds to him.**

86.     In addition, on September 7, 2018, Ebury 2EMI requested a $3.8 million advance,

purportedly to fund its assignment to EBCC of $5.2 million in tax liens that it previously had

pledged to Capital One.

87.     According to financial records that Hanratty provided to EBCC, however,

Defendants did not use the advance to pay Capital One.  Instead, Defendants used the funds to pay

a $3.3 million distribution to an investor.

-23-

88.     Defendants had paid Capital One $2 million on or around August 10, 2018 as part of a loan payoff to release collateral that they had pledged to Capital One.  On information and belief, Defendants obtained the funds to make that payment by selling $1.47 million worth of New Jersey tax liens (called the NJ0530 and NJ0530B liens), in transactions between July 20, 2018 and August 9, 2018.

89.     On information and belief, even though Defendants had sold the NJ0530 and NJ0530B liens by August 9, 2018, they still included those liens on a September 7, 2018 Borrowing Base Certificate.  Based on the Borrowing Bases' Availability on that date, Defendants caused EBCC to advance $836,731 to which Defendants were not entitled.

**L.     Defendants misappropriated EBCC's Collateral to repay disgruntled investors.**

90.     On at least two occasions, Defendants impermissibly sold EBCC's Collateral to pay off investors in the Funds.  Under Section 8.5 of the Credit Agreements, Defendants were allowed to sell tax liens in certain situations, but were required to deposit all proceeds from the sales into EBCC's lockbox account "within one (1) Business Day after receipt."

91.     <u>Example 1:</u>  On or around December 14, 2018, Defendants sold $1,350,000 in tax lien certificates that were EBCC's collateral.  That same day, according to financial records that Hanratty provided to EBCC, Defendants paid over $1.1 million in distributions to investors.

    a.     Under the Credit Agreements, Defendants should have removed the sold tax liens from the Borrowing Bases.  Doing so would have reduced the Borrowing Bases' Availability by $1.2 million and triggered a $1 million Overadvance.  Defendants did not remove the tax liens from the Borrowing Bases and did not pay EBCC any Overadvance.

    b.     In addition, under Section 8.5 of the Credit Agreements, Defendants were required to deposit proceeds from any such sales into the EBCC lockbox account.  Defendants did not do so for these sales.

92.  <u>Example 2</u>:  On or around May 15, 2019, Defendants sold $858,344.50 in tax lien

certificates that were EBCC's collateral.  Defendants did not reduce the Borrowing Bases'

Availability or deposit the proceeds from the sales into the EBCC lockbox account.  Instead,

according to financial records that Hanratty provided to EBCC, Defendants transferred $350,000

in sale proceeds from Ebury 1EMI LLC to Ebury 2EMI LLC and then used those proceeds (along

with the $860,000 advance that Defendants obtained using duplicate liens, discussed in paragraphs

72-75), to pay $1,208,772 to various investors to settle a lawsuit.

93.  In total, Defendants paid investors in the Funds approximately $22 million in

distributions in 2018 and 2019.  On information and belief, these distributions were paid using

funds advanced under the Credit Facilities or using proceeds from the sale of EBCC's Collateral.

The distributions also were made in violation of Section 8.8 of the Credit Agreements, which

barred the Ebury Companies from making distributions, including if "an event has occurred that,

with notice, the lapse of time or otherwise, could constitute an Event of Default."

**M.  Hanratty secretly sells portions of EBCC's collateral, but continues to represent the contrary to EBCC.**

94.  In 2018, ESC sold four tranches of tax lien certificates through a brokerage owned

by McOsker called BloxTrade, LLC.  The sales yielded approximately $3.5 million in total

proceeds:

a.  On June 27, 2018, ESC sold 41 Alabama tax lien certificates owned by EB 1EMIALA LLC and EB 2EMIALA LLC for $413,635.99;

b.  On September 28, 2018, ESC sold 242 Alabama tax liens certificates owned by EB 1EMIALA LLC and EB 2EMIALA LLC for $834,291.64;

c.  On November 21, 2018, ESC sold 18 New Jersey tax lien certificates owned by Ebury Fund 1 NJ, LLC for $450,384.95; and

d.  On December 6, 2018, ESC sold 666 New Jersey tax lien certificates owned by Ebury Fund 1 NJ, LLC and Ebury Fund 2 NJ, LLC for $1,828,267.72.

-25-

FILED: NEW YORK COUNTY CLERK 09/23/2022 05:00 PM
NYSCEF DOC. NO. 15

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 91 of 2230

INDEX NO. 158207/2022
RECEIVED NYSCEF: 09/23/2022

95.     On information and belief, the tax lien certificates that ESC sold were EBCC's Collateral.  Thus, under Section 8.5 of the Credit Agreements, Defendants were required to deposit all proceeds from these sales into the EBCC lockbox account "within one (1) Business Day after receipt."  Defendants have not paid EBCC the proceeds of these sales.

96.     In addition, at least for the November 21, 2018 sale, Hanratty continued to represent to EBCC that he owned the liens and that they were increasing in value.  On information and belief, Hanratty falsely included these liens in Borrowing Base Certificates until at least May 2020.

### N.     Fraudulent Transfers of REOs.

97.     Under Section 3.1 of the Credit Agreements, the proceeds of EBCC's tax lien collateral were also EBCC's collateral.  Thus, any REO that resulted from a foreclosure on a tax lien that was EBCC's collateral is also EBCC's collateral.  Hanratty repeatedly has acknowledged to EBCC that the REOs that resulted from foreclosures on tax liens that were EBCC's collateral are EBCC's collateral.

98.     Further, under Section 8.1 of the Credit Agreements, the Borrowers and Guarantors agreed that "prior to completion of any . . . foreclosure or other such proceeding, the Tax Lien will be assigned to an Ebury Company or an assignee of an Ebury Company."  Defendants created RE 1EMI LLC and RE 2EMI LLC for the purpose of owning the REOs that resulted from foreclosures on tax liens that were EBCC's collateral.

99.     On information and belief, since 2017, Defendants have been transferring REOs that are the proceeds of EBCC's collateral to entities other than the Borrowers and Guarantors, including Ebury RE LLC and XYZ Corps. 1-10, including to prevent EBCC from receiving sale proceeds from the sale of the REOs, as well as from foreclosing on the REOs in the event of a default.

-26-

100.    On information and belief, the Borrowers and Guarantors have not received fair
consideration for these transfers and these transfers were not arms-length transactions.

101.    The REOs are EBCC's collateral and should not have been transferred to entities
that are not parties to the Credit Agreements.

**COUNT ONE**
**(Breach of Contract)**

102.    EBCC repeats the allegations in paragraphs 1 to 101 as if fully set forth herein.

103.    Under the Credit Agreements, the Borrowers and Guarantors were required to
"repay all principal, interest, costs and expenses outstanding . . . on November 10, 2021." They
did not do so.

104.    On November 29, 2021, EBCC sent the Borrowers and Guarantors notices of
default and demands for payment.  The Borrowers have failed to repay the amounts outstanding
under the Credit Agreements and now owe more than $21,813,177.46.

105.    EBCC is entitled to repayment of the amounts outstanding under the terms of the
Credit Agreements.

106.    The Borrowers' failure to repay the amounts outstanding under the Credit
Agreements constitutes an Event of Default.  Accordingly, in addition to the amounts outstanding
under the Credit Agreements, EBCC demands and is entitled to payment of its reasonable
attorneys' fees, court costs, and legal expenses under Section 11.7 of the Credit Agreements.

107.    Each of the Guarantors guaranteed to EBCC "the due, prompt and punctual
payment and satisfaction of the Indebtedness" and is liable for these amounts on a "solidary" or
"joint and several" basis, along with the Borrowers.

108.    Hanratty also is liable for these amounts on a "solidary" or "joint and several" basis because he provided EBCC false information relating to the eligibility of Collateral, in violation of the Validity Guaranties, and EBCC incurred damages, costs, and losses as a result.

109.    Hanratty, ESC, and the Ebury Companies also are liable for these amounts because each entity is an alter ego of the Borrowers and Guarantors.

## COUNT TWO
### (Fraudulent Inducement)

110.    EBCC repeats the allegations in paragraphs 1 to 109 as if fully set forth herein.

111.    Hanratty, the Borrowers, and the Guarantors made false statements of then-existing material facts about the eligibility of various tax lien collateral at the time they induced EBCC to execute the following agreements:

a.    The Sixth Amendment to Loan Documents for Ebury 1EMI LLC, executed on October 29, 2018, which increased the credit facility to $13,500,000;

b.    The Seventh Amendment to Loan Documents for Ebury 1EMI LLC, executed on September 24, 2019, which increased the credit facility to $15,000,000;

c.    The Eighth Amendment to Loan Documents for Ebury 1EMI LLC, executed on March 18, 2021, which extended the maturity date of the underlying note to May 8, 2021;

d.    The Ninth Amendment to Loan Documents for Ebury 1EMI LLC, executed on May 18, 2021, which extended the maturity date of the underlying note to August 10, 2021;

e.    The Tenth Amendment to Loan Documents for Ebury 1EMI LLC, executed on August 12, 2021, which extended the maturity date of the underlying note to November 10, 2021;

f.    The Waiver and Sixth Amendment to Loan Documents for Ebury 2EMI LLC, executed on March 18, 2021, which extended the maturity date of the underlying note to May 8, 2021; and

g.    The Eighth Amendment to Loan Documents for Ebury 2EMI LLC, executed on August 13, 2021, which extended the maturity date of the underlying note to November 10, 2021.

112.    Defendants' false statements of fact were material to EBCC.  Had EBCC known that Defendants were self-servicing the Collateral, had sold the Collateral without paying EBCC the proceeds of the sales, were using advances to pay investors rather than purchase tax liens, or were double-counting or inflating the value of tax liens, it would not have agreed to these amendments.

113.    EBCC justifiably relied upon Defendants' signed Borrowing Base Certificates and was harmed by Defendants' actions.

114.    Hanratty, the Borrowers, and the Guarantors knew that their statements were false because they knew they were self-servicing the Collateral, they had sold the Collateral without paying EBCC the proceeds of the sales, they were using advances to pay investors rather than purchase tax liens, and they were double-counting or inflating the value of tax liens.

115.    The Borrowers' conduct was gross, wanton, willful, and morally culpable to a degree sufficient to justify an award of punitive damages.

116.    Hanratty, ESC, and the Ebury Companies each are liable for the fraudulent inducement because each entity is an alter ego of the Borrowers and Guarantors.

## COUNT THREE
### (Fraudulent Transfer – DCL §§ 272-274, 276)

117.    EBCC repeats the allegations in paragraphs 1 to 116 as if fully set forth herein.

118.    On information and belief, Defendants have transferred REOs that are EBCC's Collateral under the Credit Agreements to entities that are not parties to the Credit Agreements, including Ebury RE LLC and XYZ Corps. 1-10.

119.    On information and belief, these transfers were not arms-length transactions and Ebury RE LLC and XYZ Corps. 1-10 did not give fair consideration for the REOs.

FILED: NEW YORK COUNTY CLERK 03/25/2022 05:08 PM
NYSCEF DOC. NO. 15
INDEX NO. 158207/2022
RECEIVED NYSCEF: 03/25/2022
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 95 of 2230

120.     On information and belief, Defendants acted with actual intent to hinder, delay or defraud EBCC by transferring these REOs to Ebury RE LLC and XYZ Corps. 1-10.

121.     On information and belief, Defendants were insolvent or were rendered insolvent by the transfers.  In addition, on information and belief, Defendants were left with unreasonably small capital after the transfers.

122.     Defendants' conduct was gross, wanton, willful, and morally culpable to a degree sufficient to justify an award of punitive damages.

123.     In addition, EBCC is entitled to reasonable attorneys' fees because Defendants acted with actual intent to hinder, delay or defraud EBCC.

124.     Hanratty, ESC, and the Ebury Companies are each liable for the fraudulent transfers because each entity is an alter ego of the Borrowers and Guarantors.

## PRAYER FOR RELIEF

EBCC respectfully requests that this Court:

i.     Award damages for breach of contract, in an amount to be ascertained at trial but not less than $21,813,177.46, plus accrued interest, reasonable attorneys' fees, court costs, and legal expenses;

ii.     Award damages for Defendants' fraudulent inducement, in an amount to be ascertained at trial;

iii.     Award damages for Defendants' fraudulent transfers, in an amount to be ascertained at trial;

iv.     Award punitive damages for Defendants' willful and wanton misconduct;

v.     Impose joint and several liability on Hanratty, ESC, and the Ebury Companies; and

vi.     Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

EBCC demands trial by jury of all issues so triable.

FILED: NEW YORK COUNTY CLERK 09/25/2022 05:58 PM
NYSCEF DOC. NO. 15

INDEX NO. 158207/2022
RECEIVED NYSCEF: 09/25/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 96 of 2230

Dated:   September 25, 2022
       New York, New York

Respectfully submitted,

/s/ Alexander J. Willscher

Alexander J. Willscher
Austin P. Mayron
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business
Credit Corporation*

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:  **HON. MARGARET A. CHAN**       PART     49M

_Justice_

------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,      **INDEX NO.**     158207/2022

Plaintiff,

- v -

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL,
LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY
FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ CORPS.

Defendants.

------------------------------------------------------------------X

There being no opposition from defendants, the court hereby grants plaintiff's
request (NYSCEF # 43) to adjourn the return date of defendants' motion to dismiss
(NYSCEF # 41). The return date shall be December 9, 2022, and plaintiff's deadline
to serve answering papers shall be December 2, 2022.

DATE: **11/28/2022**                             **MARGARET A. CHAN, JSC**

**Check One:**      [ ] **Case Disposed**     [x] **Non-Final Disposition**

**Check if Appropriate:**    [ ] **Other (Specify** _____ )

# OTHER ORDER – NON-MOTION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

-----------------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,

|  |  |
|---|---|
| **INDEX NO.** | 158207/2022 |

             Plaintiff,

|  |  |
|---|---|
| **MOTION DATE** | 10/18/2022 |

- v -

|  |  |
|---|---|
| **MOTION SEQ. NO.** | 001 |

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL,
LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED
CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS.

**DECISION + ORDER ON
MOTION**

             Defendants.

-----------------------------------------------------------------------------X

HON. MARGARET A. CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 001) 1, 2, 3, 4, 5, 6, 7,
8, 9, 10, 11, 12, 13, 14, 15, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31

were read on this motion to/for             PREL INJUNCTION/TEMP REST ORDR        .

      In this action, plaintiff lender Emigrant Business Credit Corporation alleges
causes of action for breach of contract, fraudulent inducement, and fraudulent
transfer against defendants. In its attempt to recover the amounts it loaned to
defendants Ebury 1EMI LLC and Ebury 2EMI LLC (respectively, 1EMI and 2EMI
and, together, the Borrowers), plaintiff seeks an order, which, in short, would enjoin
defendants from (1) transferring their general assets (with an ordinary and
necessary business expense carveout), (2) depositing certain proceeds into escrow,
and (3) requiring defendants to give plaintiff twenty-four hours' notice prior to
defendants' transfer of assets exceeding $50,000.[1] Defendants oppose the motion.

---

[1] The court granted a temporary restraining order as to the latter two items by order filed
on October 19, 2022 (NYSCEF # 23).

**158207/2022   EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR
ET AL
Motion No. 001**

**Page 1 of 9**

1 of 9

## BACKGROUND

### Plaintiff Extends Financing to Defendants

Plaintiff is a New York-based specialty finance company (NYSCEF # 1 – Complaint, ¶ 5). Defendant John Hanratty is the manager of defendant Ebury Street Capital, LLC (ESC), the manager or general partner of all the other corporate defendants (collectively with ESC, the Ebury Entities) (id., ¶'s 8-9). Plaintiff claims that "ESC and each of the Ebury Companies is an alter ego of Hanratty and of one another with respect to the transactions with respect to the transactions described in this Complaint." (id., ¶ 18).

On March 9, 2017, plaintiff extended credit facilities to Borrowers 1EMI and 2EMI in amounts totaling $10,000,000 and $5,000,000, respectively, with 1EMI's facility later increased to $15,000,000 (id., ¶ 33). Hanratty and various Ebury Entities issued guaranties in connection with the credit facilities (id., ¶'s 15, 37, 39).

The funds were to be used to finance the purchase of tax lien certificates that municipalities place on properties when an owner fails to pay municipal taxes (id., ¶'s 32; 22). Certain investors purchase tax lien certificates from municipalities to profit from the interest rate chargeable on the certificate and to enable ownership of the underlying real estate through foreclosure (id., ¶ 25).

Plaintiff explains that the credit facilities were structured to allow the Borrowers to draw down revolving lines of credit against the value of a pool of eligible assets serving as collateral (id., ¶'s 27; 34). The total amount the Borrowers could draw down equals the advance rate, which ranged from 70% to 85%, multiplied by the amount of eligible collateral (id., ¶'s 28; 34). Any tax lien certificate that defendants purchased using the credit facilities, and its proceeds, served as the collateral (id., ¶ 34).

Plaintiff alleges that "[d]efendants misappropriated advances to the credit facilities as well as EBCC's collateral to pay tens of millions of dollars in distributions to company insiders – including Defendant John Hanrraty – as well as other investors" (id. ¶ 1). Also, the Borrowers failed to repay the principal and interest for the credit facilities when they came due on November 10, 2021, which default has continued even after plaintiff sent a default notice on November 29, 2021 (id., ¶ 38). Plaintiff alleges that the outstanding amounts exceed $21.8 million (id., ¶ 38).

### Allegations of Fraud

For its fraud claim, plaintiff alleges as follows: Hanratty consistently claimed that plaintiff was secured by collateral worth more than the outstanding amounts (id., ¶ 43). For example, one of plaintiff's employees conveyed concerns to Hanratty about the 2019 financial audits, which valued the tax lien investments at around $17.2 million, being less than the approximately $18 million outstanding balance owed at the time (id., ¶ 47). Hanratty responded that plaintiff was actually secured by $32 million in tax lien collateral, plus additional collateral amounts (id., ¶ 47).

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 2 of 9
ET AL
Motion No. 001

2 of 9

Hanratty's claims of overcollateralization were intentionally false, and Hanratty even bragged about his ability to mislead plaintiff's employee (*id.*, ¶'s 47-49).

The credit facilities required the Borrowers to deliver the tax lien certificates they purchased to a designated third-party custodian, which the parties agreed would be MTAG Services, LLC (the Custodian) (*id.*, ¶'s 50; 52). In March of 2021, plaintiff discovered that certain of the collateral was not held by the Custodian (*id.*, ¶ 55). Plaintiff alleges that Hanratty subsequently misled plaintiff about the custodial status of the collateral. To wit, defendant shared a spreadsheet purporting to be from the Custodian and indicated that as of August 31, 2021, the Custodian had 6,782 tax lien certificates (*id.*, ¶ 55-57). The Custodian has since confirmed to plaintiff that as of that date, it only had custody of 518 tax lien certificates worth a fraction of the amount the spreadsheet had indicated (*id.*, ¶ 57). Hanratty admitted he was self-servicing almost 90% of the collateral (*id.*, ¶ 58).

Additional allegations of fraud include that Hanratty improperly inflated the value of certain liens, altered origination dates for hundreds of certificates, and misrepresented that certain advances would be used to finance purchases of tax lien certificates when they were instead used for investor distributions and settlements (*id.*, ¶'s 63; 68; 69-81). Further, defendants were required to deposit proceeds from sales of tax lien certificates into plaintiff's lockbox account, but not only did defendants fail to do so, Hanratty also falsely represented that he owned the liens and that they were increasing in value (*id.*, ¶'s 94-96). And, because proceeds of tax lien certificates are treated as collateral, this means any owned real property that resulted from a foreclosure on a tax lien should also have been included as collateral. But defendants have been effecting transfers without receipt of fair consideration, so to prevent plaintiff from receiving sale proceeds (*id.*, ¶'s 97-100).

## DISCUSSION

"The provisional remedy of a preliminary injunction in New York civil actions is governed by CPLR 6301" (*Credit Agricole Indosuez v Rossiyskiy Kredit Bank*, 94 NY2d 541, 544 [2000]), which provides in relevant parts:

> A preliminary injunction may be granted in any action where it appears that the defendant threatens or is about to do, or is doing or procuring or suffering to be done, an act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual, or in any action where the plaintiff has demanded and would be entitled to a judgment restraining the defendant from the commission or continuance of an act, which, if committed or continued during the pendency of the action, would produce injury to the plaintiff. . . .

(CPLR 6301).

The "remedy of granting a preliminary injunction is a drastic one which should be used sparingly" (*McLaughlin, Piven, Vogel, Inc. v W.J. Nolan & Co.*, 114 AD2d 165, 172 [2d Dept 1986]). "A preliminary injunction substantially limits a

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 3 of 9
ET AL
Motion No. 001

3 of 9

NYSCEF DOC. 26-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 101 of 2230

defendant's rights and is thus an extraordinary provisional remedy requiring a special showing .... [It] will only be granted when the party seeking such relief demonstrates a likelihood of ultimate success on the merits, irreparable injury if the preliminary injunction is withheld, and a balance of equities tipping in favor of the moving party" (*1234 Broadway LLC v West Side SRO Law Project*, 86 AD3d 18, 23 [1st Dept 2011], citing *Doe v Axelrod*, 73 NY2d 748 [1988]).

Whether to grant a preliminary injunction is "committed to the sound discretion of the motion court" (*Harris v Patients Med., P.C.*, 169 AD3d 433, 434 [1st Dept 2019]). The existence of triable issues of fact does not require the denial of a preliminary injunction when the movant meets its burden of establishing that the three prerequisites for injunctive relief have been met (*Bell & Co, P.C. v Rosen*, 114 AD3d 411, 411 [1st Dept 2014]; CPLR 6312 [c]). "The purpose of a preliminary injunction is to maintain the status quo and prevent the dissipation of property that could render a judgment ineffectual" (*1650 Realty Assocs., LLC v Golden Touch Mgmt., Inc.*, 101 AD3d 1016, 1018 [2d Dept 2012]).

### Likelihood of Ultimate Success on the Merits

Plaintiff argues that it is likely to succeed on the merits (NYSCEF # 4 – MOL at 6-12; NYSCEF # 28 – Reply at 1-4). The first basis plaintiff puts forward is its claim for breach of contract. "To establish a breach of contract claim, the plaintiffs must allege the specific terms of the agreement, the consideration, the plaintiffs' performance, and the defendants' breach of the agreement" (*Sylmark Holdings Ltd. v Silicone Zone Int'l Ltd.*, 5 Misc 3d 285, 295 [Sup Ct, NY County 2004]). Plaintiff argues that this has been met because the Borrowers promised to repay all principal and interest outstanding at the maturity date – November 10, 2021 – but failed to do so (NYSCEF # 4 at 7). Plaintiff adds that Hanratty and other defendants are liable for the amounts the Borrowers owe on account of the guaranties (*id.* at 7).

Defendants argue that it is "not clear" that the outstanding credit line balance breaches the contracts as the parties were actively negotiating repayment between the maturity date and September 2022 and that defendants accepted plaintiff's repayment terms just prior to commencing this action (NYSCEF # 27 – Opp at 19; # 24 – Hanratty aff, ¶ 57). However, defendants' representation here is unsupported and insufficient for a denial of a preliminary injunction (*Bell*, 114 AD3d at 411).

Defendants argue that because plaintiff relies on "Conclusory, Hearsay, and 'Information and Belief' Allegations" to support its breach of contract claim, plaintiffs cannot show that it has a likelihood of success. Defendants' argument is unavailing as plaintiff's allegations and supporting affidavit (NYSCEF # 5) is sufficient to establish likelihood of success on the merits for the present purposes. As such, the court need not, and does not, reach the parties' arguments as to the sufficiency of plaintiff's other causes of action (*see e.g. Petry v Gillon*, 199 AD3d 1277, 1279 [3d Dept 2021] ["to obtain a preliminary injunction, plaintiffs needed to

Court Records    Pg 102 of 2230

demonstrate a likelihood of success on the merits on at least one of their claims"]).
In sum, plaintiff has presented a prima facie case supporting the likelihood of
success on the merits, which defendants have failed to rebut for this motion.

### Irreparable Injury

Plaintiff asserts that it has established irreparable injury on two independent
bases: defendants' insolvency and the monies at issue being identifiable proceeds of
plaintiff's collateral. The court considers the insolvency issue first.[2]

A "general creditor has no legally recognized interest in or right to interfere
with the use of the unencumbered property of a debtor prior to obtaining judgment.
. . Therefore, . . . the acts of the debtor in disposing of assets will not have
'produce[d] [cognizable] injury to the plaintiff' and thus will not support a
temporary injunction" (*Credit Agricole*, 94 NY2d at 549 [quoting CPLR 6301]). In a
money action, a plaintiff "often fears that [the defendant] will secrete property
during the action's pendency and thus make a money judgment uncollectable.
[Plaintiff's] remedy there, if [plaintiff] can establish such conduct by [defendant]
convincingly, is an order of attachment under CPLR 6201 [3], not an injunction
under Article 63." (*Id.* at 548 quoting Siegel, NY Prac § 327 at 498 [3d ed]).

Nonetheless, a secured creditor does have a legally recognized interest in
preventing dissipation of encumbered property prior to obtaining judgment (*see e.g.
Winchester Glob. Tr. Co. v Donovan*, 58 AD3d 833, 834 [2d Dept 2009] [holding that
injunctive relief was properly granted as the uncontrolled disposition of assets
"would threaten to render ineffectual any judgment which the plaintiff might
obtain" in an action by a secured party to set aside allegedly fraudulent conveyances
made "in derogation of the plaintiff's perfected security interest"]; *Goldman Sachs
Bank USA v Schreiber*, 2022 WL 60650 at *3 [Sup Ct, NY County 2022] [granting
preliminary injunction enjoining the transfer of assets where plaintiff, a secured
creditor, sought to prevent a dissipation of collateral, and the sale of such assets in
direct contravention of agreements would cause irreparable harm by taking away
the value of the collateral]).

Here, in his affidavit, plaintiff's Senior Vice President, Scott Weiss, states
that defendants "executed Security Agreements pledging all of the Borrowers' and
Guarantors' present and future assets as security for the Credit Facilities"
(NYSCEF #'s 5 – Weiss Aff, ¶ 11; 9 – the Security Agreements). Weiss avers that
defendants have sold at least 90 properties and have listed another 88 properties
that were purportedly part of plaintiff's collateral, for a total of approximately,
respectively, $4.1 and $4.8 million (NYSCEF # 5, ¶ 25). Plaintiff argues this

---

[2] As a threshold matter, the court is not convinced by defendants' argument that plaintiff's
"own delay in asserting its purported rights" vitiates against finding imminent, irreparable
harm (NYSCEF # 21 at 2). Even if, *arguendo*, plaintiff did cause delay in seeking the
present relief, "[m]ere delay, without the necessary elements creating an equitable estoppel,
does not preclude the grant of an injunction" (*New York Real Est. Inst., Inc. v Edelman*, 42
AD3d 321, 322 [1st Dept 2007]).

**158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR        Page 5 of 9
ET AL
Motion No. 001**

5 of 9

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 103 of 2230

supports its allegation that defendants have a history of fraudulently transferring assets to place them beyond plaintiff's reach (NYSCEF # 4 at 14). Hanratty confirms that plaintiff has "filed UCC-1 Statements perfecting its security interests in the Ebury Entities' liens" (NYSCEF # 24 – Hanratty Aff, ¶ 45).

As for evidence of defendants' insolvency, plaintiff identifies that defendants have failed to repay the outstanding debt of more than $21 million which has been pending for almost a year, and that defendants' own independent auditor expressed substantial doubts about defendants' ability to continue as a going concern (NYSCEF # 28 at 7). Without addressing either of plaintiff's contentions, defendants assert that plaintiff "musters no facts to suggest that [defendants] are insolvent," referring generally to the complaint (NYSCEF # 27 at 23). In their memorandum of law, defendants note that defendants have testified that their current assets exceed plaintiff's "maximum possible relief by approximately $4 million" (*id.* at 23). Defendants do not indicate where such testimony may be found.

The court finds that plaintiff has sufficiently established for the present purposes that plaintiff is a secured creditor whose collateral risks further dissipation by insolvent defendants. Under New York law, this finding is sufficient to warrant issuing the preliminary injunction plaintiff seeks (*Winchester*, 58 AD3d 833; *see also Goodstein v Enbar*, 2017 WL 1032545 at *5 [Sup Ct, NY County 2017] [noting that "it is self-evident that if a party renders itself insolvent for the purpose of evading judgment, the plaintiff will not be fully compensated by a monetary award"]).

Defendants' reliance on *Credit Agricole* is inapposite as it involves claims of a general, unsecured creditor. Defendants' reliance on *Dinner Club Corp. v Hamlet on Olde Oyster Bay Homeowners Ass'n, Inc.* is similarly unavailing (21 AD3d 777 [1st Dept 2005]) [noting that "a *general creditor* has no cognizable interest in or right to interfere with the use of the unencumbered property of a debtor until the creditor obtains a judgment"] [emphasis added]).[3] Defendants' reliance on *Zodkevitch v Feibush* and related cases for the idea that irreparable injury does not exist if money damages can redress plaintiff's harm is without merit here given the insolvency exception plaintiff identifies (49 AD3d 424, 425 [1st Dept 2008]).

Citing *Laco X-Ray Sys., Inc. v Fingerhut*, 88 AD2d 425 [2d Dept 1982]) defendants wrongly assert that CPLR 6301 only authorizes a preliminary injunction if plaintiff "clearly proves that the defendant (1) has engaged or imminently will be engaging (2) in fraudulent or otherwise wrongful behavior, (3) in order to cause its own insolvency" (NYSCEF # 27 at 21). CPLR 6301 does not mention fraudulent or

---

[3] Defendants also cite the United States Supreme Court case *Grupo Mexicano de Desarrollo S.A. v All. Bond Fund, Inc.*, 527 US 308 [1999]). Defendants fail to explain the applicability of this federal court case, which, even if it were, for argument's sake, applicable, would also be unavailing. *Grupo Mexicano* "distinguished the situation attendant to general unsecured creditors from that involving a creditor asserting some interest in or on the property" (*Bank of Am., N.A. v Won Sam Yi*, 294 F Supp 3d 62, 77 [WD NY 2018]).

FILED: NEW YORK COUNTY CLERK 11/30/2022 11:30 AM INDEX NO. 158207/2022
NYSCEF DOC. NO. 47
Court Records    Pg 104 of 2230
RECEIVED NYSCEF: 11/29/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

wrongful behavior, and *Laco*, analyzing the appropriateness of an attachment under Article 62 of the CPLR, does not once mention CPLR 6301.

Finally, defendants posit that insolvency is an insufficient basis to satisfy the irreparable injury requirement (citing *Rosenthal v Rochester Button Co.*, 148 AD2d 375 [1st Dept 1989]). *Rosenthal* is inapposite, however, as the *Rosenthal* court was not persuaded that the defendant was "in financial distress and likely to be unable to pay any judgment in the future" (*id.* at 377).

### Balance of Equities

The court next considers the third part of the showing plaintiff must make to support a preliminary injunction. "To obtain an injunction, the plaintiff [must] show that the irreparable injury to be sustained is more burdensome to [such plaintiff] than the harm that would be caused to the defendant through the imposition of the injunction" (*Lombard v Station Square Inn Apartments Corp.*, 94 AD3d 717, 721-22 [2d Dept 2012]). Plaintiff argues that "[a]bsent injunctive relief, there is a substantial likelihood that [plaintiff] will not be able to collect on its security interests or recover in this proceeding" whereas there would be "minimal harm to Defendants from an injunction" (NYSCEF # 4 at 15-16).

Defendants respond that plaintiff "would be just fine" if the court denies the injunction as plaintiff could still recover significant sums if defendants file for bankruptcy because of plaintiff's perfected security interests (NYSCEF # 27 at 26). Defendants continue that even if plaintiff collected nothing, plaintiff "remains part of a 172-year old bank with total assets of $5.61 billion" such that the money judgment plaintiff seeks is worth just 0.00388% of plaintiff's net assets.

Defendants' argument falls flat, and the court finds that the balance of equities favors plaintiff (*see e.g. Felix v Brand Serv. Grp. LLC*, 101 AD3d 1724, 1726 [4th Dept 2012] [finding balance of equities supported applicant where even if defendants may be delayed in using the restrained funds, nonetheless without the injunction "plaintiffs may never be able to recover the money, if disbursed"]; *Goldman Sachs Bank USA*, 2022 WL 60650 at *2 [finding balance of equities favored lender where there were loan defaults by the debtor]).

### Undertaking

Defendants assert that if the injunction issues, the court should order plaintiff to post a $30 million undertaking to reflect defendants' "possible damages" including the "possible . . . total loss of [defendants'] assets" (NYSCEF 27 at 27-28). Plaintiff requests that the court "set a nominal undertaking in the amount of $1 or in no event greater than $10,000 because Defendants have failed to demonstrate that they will suffer any damages or costs by reason of the injunction" (NYSCEF # 28 at 10).

CPLR 6312 [b] provides that "prior to the granting of a preliminary injunction, the plaintiff shall give an undertaking in an amount to be fixed by the court, that the plaintiff, if it is finally determined that he or she was not entitled to

**158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR**    **Page 7 of 9**
**ET AL**
**Motion No. 001**

7 of 9

an injunction, will pay to the defendant all damages and costs which may be
sustained by reason of the injunction. . . ." The amount must be "rationally related
to defendants' potential damages if the preliminary injunction later proves to have
been unwarranted" (*Madison/Fifth Assocs. LLC v 1841-1843 Ocean Parkway, LLC*,
50 AD3d 533, 534 [1st Dept 2008]). Speculative damages are not considered (*Visual
Equities Inc. v Sotheby's*, Inc., 199 AD2d 59, 59 [1st Dept 1993]).

The court finds that an undertaking of $2.1 million is rationally related to
defendants' potential damages (*see e.g. Zonghetti v Jeromack*, 150 AD2d 561, 563
[2d Dept 1989] [in granting injunction prohibiting the defendants from transferring
or dissipating any of their assets, where $740,000 was allegedly converted,
undertaking properly set at $100,000]).

## CONCLUSION

In view of the above, it is

ORDERED that the motion of plaintiff Emigrant Business Credit
Corporation (Emigrant) for a preliminary injunction against the above-captioned
defendants is granted; and it is further

ORDERED that defendants and their successors, assigns, agents, employees,
officers, attorneys, and all other persons acting in concert or participation with any
of them (Related Persons), are temporarily restrained and enjoined from
transferring, mortgaging, selling, converting, concealing, dissipating, disbursing,
spending, withdrawing, disposing of, assigning, permitting the transfer of any of
their assets, aside from ordinary and necessary disbursements related to the
defendants' tax lien or real estate businesses or living expenses; and it is further

ORDERED that defendants and their Related Persons, to the extent that any
tax lien certificate or real estate property resulting from the foreclosure on a tax
lien certificate is or has been sold on or after October 19, 2022, are temporarily
restrained and enjoined to deposit any proceeds from such sale, aside from ordinary
and necessary disbursements related to the defendants' tax lien or real estate
businesses, into an escrow account, to be established by the parties; and it is further

ORDERED, that defendants and their Related Persons must notify Emigrant
at least twenty-four (24) hours in advance of transferring, mortgaging, selling,
converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of,

FILED: NEW YORK COUNTY CLERK 11/30/2022 11:30 AM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 47
RECEIVED NYSCEF: 11/29/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 106 of 2230

assigning, or permitting the transfer of any assets in an amount exceeding $50,000; and it is further

ORDERED that pursuant to CPLR 6312 (b) Emigrant shall post an undertaking in the sum of $2,100,000 by December 19, 2022; and it is further

ORDERED that a preliminary conference shall be held on December 5, 2022, at 2:30 p.m. or at such other time that the parties shall set with the court's law clerk; and it is further

ORDERED that defendants shall share with plaintiff in advance of the conference documentary evidence supporting its calculations as to the amounts subject to escrow.

| 11/29/2022 | | | | MARGARET CHAN, J.S.C. |
| DATE | | | | |

| CHECK ONE: | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
| | | GRANTED | DENIED | X | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 9 of 9
ET AL
Motion No. 001

9 of 9

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| ――――――――――――――――― x | | |
| EMIGRANT BUSINESS CREDIT | : | |
| CORPORATION, | : | |
| | : | Index No. 158207/2022 |
| Plaintiff, | : | |
| | : | (Hon. Margaret Chan) |
| v. | : | |
| | : | **MOTION SEQUENCE NO. 002** |
| JOHN ARTHUR HANRATTY, | : | |
| EBURY STREET CAPITAL, LLC, | : | **MEMORANDUM OF LAW IN** |
| EBURY FUND 1, LP, | : | **OPPOSITION TO DEFENDANTS'** |
| EBURY FUND 2, LP, | : | **MOTION TO DISMISS** |
| EBURY 1EMI LLC, | : | |
| EBURY 2EMI LLC, | : | **ORAL ARGUMENT REQUESTED** |
| EB 1EMIALA LLC, | : | |
| EB 2EMIALA LLC, | : | |
| EB 1EMIFL, LLC, | : | |
| EB 2EMIFL, LLC, | : | |
| EB 1EMIIN, LLC, | : | |
| EB 2EMIIN, LLC, | : | |
| EB 1EMIMD, LLC, | : | |
| EB 2EMIMD, LLC, | : | |
| EB 1EMINJ, LLC, | : | |
| EB 2EMINJ, LLC, | : | |
| EB 1EMINY, LLC, | : | |
| EB 2EMINY, LLC, | : | |
| EB 1EMISC, LLC, | : | |
| EB 2EMISC, LLC, | : | |
| RE 1EMI LLC, | : | |
| RE 2EMI LLC, | : | |
| EB 1EMIDC, LLC, | : | |
| ARQUE TAX RECEIVABLE FUND | : | |
| (MARYLAND), LLC, | : | |
| EBURY FUND 1FL, LLC, | : | |
| EBURY FUND 2FL, LLC, | : | |
| EBURY FUND 1NJ, LLC, | : | |
| EBURY FUND 2NJ, LLC, | : | |
| RED CLOVER 1, LLC, | : | |
| EBURY RE LLC, and | : | |
| XYZ CORPS. 1-10, | : | |
| | : | |
| Defendants. | : | |
| ――――――――――――――――― x | | |

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM  INDEX NO. 158207/2022

NYSCEF DOC. NO. 46  24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State  RECEIVED NYSCEF: 12/02/2022
Court Records   Pg 108 of 2230

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................ 1

**BACKGROUND** ......................................................................................................... 2

**LEGAL STANDARDS** ............................................................................................... 5

**ARGUMENT** .............................................................................................................. 6

   I.  EBCC adequately pleaded both liability for Defendants ESC, Ebury RE, and John Hanratty and that Defendants are alter egos of one another. ............................................. 6

     A.  Defendant ESC is a guarantor to the Credit Agreements. ........................................... 6

     B.  Defendant John Hanratty is a validity guarantor to the Credit Agreements. ............... 7

     C.  Each Defendant is an alter ego of the other Defendants. ............................................. 8

  II.  EBCC adequately pleaded its fraudulent inducement and fraudulent transfer claims...... 11

     A.  EBCC pleaded sufficient facts to establish its fraud claims. ...................................... 12

     B.  EBCC adequately pleaded fraudulent inducement and its fraudulent inducement claims are not duplicative of its breach of contract claims. .............................................. 14

     C.  EBCC sufficiently pleaded fraudulent transfers. ....................................................... 18

**CONCLUSION** .......................................................................................................... 20

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 48
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 12/02/2022
Court Records   Pg 109 of 2230

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.N. Frieda Diamonds, Inc.* v. *Kaminski,*
  122 A.D.3d 517 (1st Dep't 2014) ...................................................................12

*Allenby, LLC* v. *Credit Suisse, AG,*
  134 A.D.3d 577 (1st Dep't 2015) ...............................................................18, 19

*Am. Media, Inc.* v. *Bainbridge & Knight Lab'ys, LLC,*
  135 A.D.3d 477 (1st Dep't 2016) ...................................................................16

*Aozora Bank, Ltd.* v. *J.P. Morgan Sec. LLC,*
  144 A.D.3d 440 (1st Dep't 2016) ...................................................................14

*Auguston* v. *Spry,*
  282 A.D.2d 489 (2d Dep't 2001) .....................................................................5

*Bank of Tokyo-Mitsubishi, Ltd.* v. *Kvaerner a.s.,*
  243 A.D.2d 1 (1st Dep't 1998) ......................................................................16

*Barker* v. *Time Warner Cable, Inc.,*
  24 Misc. 3d 1213(A) (Sup. Ct. Nassau Cnty. 2009) ...........................................16, 17

*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund* v. *Allure Metal Works, Inc.,*
  209 A.D.3d 712 (2d Dep't 2022) ....................................................................10

*Belco Petroleum Corp.* v. *AIG Oil Rig, Inc.,*
  164 A.D.2d 583 (1st Dep't 1991) ...................................................................20

*Citi Mgmt. Grp., Ltd.* v. *Highbridge House Ogden, LLC,*
  45 A.D.3d 487 (1st Dep't 2007) ....................................................................18

*Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.,*
  70 N.Y.2d 382 (1987) ................................................................................17

*Colasacco* v. *Robert E. Lawrence Real Est.,*
  68 A.D.3d 706 (2d Dep't 2009) .....................................................................19

*Cortlandt St. Recovery Corp.* v. *Bonderman,*
  31 N.Y.3d 30 (2018) ...............................................................................8, 10

*Deerfield Commc'ns Corp.* v. *Chesebrough-Ponds, Inc.,*
  68 N.Y.2d 954 (1986) ................................................................................18

-ii-

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM
NYSCEF DOC. NO. 48

INDEX NO. 158207/2022

RECEIVED NYSCEF: 12/02/2022

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
Court Records     Pg 110 of 2230

*EBC I, Inc.* v. *Goldman, Sachs & Co.*,
    5 N.Y.3d 11 (2005) ....................................................................................5

*Epiphany Cmty. Nursery Sch.* v. *Levey*,
    171 A.D.3d 1 (1st Dep't 2019) ................................................................19

*Etex Apparel, Inc.* v. *Tractor Int'l Corp.*,
    83 A.D.3d 587 (1st Dep't 2011) ..............................................................11

*First Bank of Ams.* v. *Motor Car Funding, Inc.*,
    257 A.D.2d 287 (1st Dep't 1999) .............................................1, 14, 15, 16

*Gosmile, Inc.* v. *Levine*,
    81 A.D.3d 77 (1st Dep't 2010) .................................................................14

*Greenberg* v. *Meyreles*,
    155 A.D.3d 1001 (1st Dep't 2017) ...........................................................15

*Hicks* v. *Santiago*,
    104 A.D.2d 471 (2d Dep't 1984) ..............................................................12

*Int'l Bus. Machs. Corp.* v. *GlobalFoundries U.S. Inc.*,
    204 A.D.3d 441 (1st Dep't 2022) .............................................................18

*IS Chrystie Mgmt. LLC* v. *ADP, LLC*,
    205 A.D.3d 418 (1st Dep't 2022) .............................................................14

*J.E. Morgan Knitting Mills, Inc.* v. *Reeves Bros., Inc.*,
    243 A.D.2d 422 (1st Dep't 1997) .............................................................17

*Kelley* v. *Galina-Bouquet, Inc.*,
    155 A.D.2d 96 (1st Dep't 1990) ..........................................................17, 18

*Kocak* v. *Dargin*,
    199 A.D.3d 456 (1st Dep't 2021) .............................................................18

*Laco X-Ray Sys., Inc.* v. *Fingerhut*,
    88 A.D.2d 425 (2d Dep't 1982) ...............................................................20

*Lanzi* v. *Brooks*,
    43 N.Y.2d 778 (1977) ...............................................................................5

*Leon* v. *Martinez*,
    84 N.Y.2d 83 (1994) .................................................................................5

*Lincoln Bldg. Servs. Inc.* v. *Dellwood Dev., Ltd.*,
    54 Misc. 3d 1220(A) (Sup. Ct. Queens Cnty. 2017)................................10

-iii-

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 48

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State

Court Records   Pg 111 of 2230

RECEIVED NYSCEF: 12/02/2022

*Loreley Fin. (Jersey) No. 4 Ltd.* v. *UBS Ltd.*,
40 Misc. 3d 323 (Sup. Ct. N.Y. Cnty. 2013) ....................................................19

*Lucia* v. *Goldman*,
68 A.D.3d 1064 (2d Dep't 2009) ......................................................................5

*Man Advisors, Inc.* v. *Selkoe*,
174 A.D.3d 435 (1st Dep't 2019) ...................................................................18

*MBIA Ins. Corp.* v. *Countrywide Home Loans, Inc.*,
87 A.D.3d 287 (1st Dep't 2011) .....................................................................15

*Mega Pers. Lines, Inc.* v. *Halton*,
9 A.D.3d 553 (3d Dep't 2004) .........................................................................20

*Michael Davis Constr., Inc.* v. *129 Parsonage Lane, LLC*,
194 A.D.3d 805 (2d Dep't 2021) ....................................................................17

*Milan Music, Inc.* v. *Emmel Commc'ns Booking, Inc.*,
7 Misc. 3d 1008(A) (Sup. Ct. N.Y. Cnty. 2004) ..............................................7

*Oster* v. *Kirschner*,
77 A.D.3d 51 (1st Dep't 2010) ...............................................................12, 20

*Pacnet Network Ltd.* v. *KDDI Corp.*,
78 A.D.3d 478 (1st Dep't 2010) .....................................................................13

*Perez* v. *Long Island Concrete Inc.*,
203 A.D.3d 552 (1st Dep't 2022) ...................................................................10

*Peterec-Tolino* v. *Harap*,
68 A.D.3d 1083 (2d Dep't 2009) ......................................................................5

*Platinum Partners Value Arbitrage Fund LP* v. *Kroll Assocs., Inc.*,
102 A.D.3d 483 (1st Dep't 2013) ...................................................................12

*Pludeman* v. *N. Leasing Sys., Inc.*,
10 N.Y.3d 486 (2008) ...........................................................................5, 6, 12

*Project Cricket Acquisition, Inc.* v. *Fla. Cap. Partners, Inc.*,
180 A.D.3d 627 (1st Dep't 2020) ...................................................................17

*Richbell Info. Servs., Inc.* v. *Jupiter Partners, L.P.*,
309 A.D.2d 288 (1st Dep't 2003) ...................................................................17

*Ridinger* v. *W. Chelsea Dev. Partners LLC*,
150 A.D.3d 559 (1st Dep't 2017) ...................................................................19

-iv-

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 12/02/2022
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 112 of 2230

*Sargiss* v. *Magarelli*,
12 N.Y.3d 527 (2009) ..................................................................................6

*Shah* v. *Ortiz*,
2014 WL 110241 (Sup. Ct. N.Y. Cnty. Jan. 9, 2014) ...............................16

*Shisgal* v. *Brown*,
21 A.D.3d 845 (1st Dep't 2005) ..................................................................9

*Sound Commc'ns, Inc.* v. *Rack & Roll, Inc.*,
88 A.D.3d 523 (1st Dep't 2011) ................................................................10

*Tap Holdings, LLC* v. *Orix Fin. Corp.*,
109 A.D.3d 167 (1st Dep't 2013) ................................................................9

*Thomson* v. *New World Bible Translation Comm.*,
127 A.D.3d 731 (2d Dep't 2015) .................................................................5

*UBS Sec. LLC* v. *Highland Cap. Mgmt., L.P.*,
93 A.D.3d 489 (1st Dep't 2012) ................................................................10

*Universal Inv. Advisory SA* v. *Bakrie Telecom Pte., Ltd.*,
154 A.D.3d 171 (1st Dep't 2017) ..............................................................16

*Varo, Inc.* v. *Alvis PLC*,
261 A.D.2d 262 (1st Dep't 1999) ..............................................................17

*Winchester Glob. Tr. Co.* v. *Donovan*,
22 Misc. 3d 1119(A) (Sup. Ct. Nassau Cnty. 2009) ..................................8

**Statutes and Rules**

N.Y. Debt. & Cred. Law § 273(a)(1) ....................................................................19

N.Y. Debt. & Cred. Law § 276 (effective until April 3, 2020) ...........................19

CPLR 3014 ...........................................................................................................18

CPLR 3016 ...........................................................................................................19

CPLR 3016(b) .....................................................................................................5, 6

CPLR 3211(a)(1) ....................................................................................................5

CPLR 3211(a)(7) ....................................................................................................5

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM
NYSCEF DOC. NO. 46

INDEX NO. 158207/2022
RECEIVED NYSCEF: 12/02/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records        Pg 113 of 2230

Plaintiff Emigrant Business Credit Corporation ("**EBCC**") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss.  (Dkt. Nos. 41, 42 ("**Mot.**").)

## INTRODUCTION

In its 30-page Complaint, EBCC methodically describes the fraudulent scheme by which Defendants have illegally converted more than \$21 million from EBCC.  (Dkt. No. 1 ("**Compl.**") ¶¶ 1-4.)  The Complaint's allegations are so detailed and so specific that Defendants now admit to having made "financial misstatements" and having submitted to EBCC documents that were riddled with "inaccuracies."  (Dkt. No. 27 at 10, 23.)  Despite Defendants' attempts to downplay their misconduct (Mot. at 6), this is no "straightforward" breach of contract case.  It is a fraud case.  One that involves Defendants' years of fraudulent misrepresentations and their misuse of tens of millions of dollars of EBCC's collateral and loan proceeds—all culminating in Defendants' having converted more than \$21 million from EBCC.

Defendants attack the sufficiency of the Complaint on two main grounds, arguing that:  (i) EBCC inadequately pleads liability for Defendants ESC, Ebury RE, and John Hanratty and that Defendants are alter egos of one another (Mot. at 12-16); and (ii) EBCC inadequately pleads its fraudulent inducement and fraudulent transfer claims (*id.* at 16-25).  Both arguments are meritless, particularly given the applicable standard of review on a motion to dismiss.

*First*, Defendants seek to absolve ESC, Ebury RE, and John Hanratty of liability for EBCC's claims—likely because these entities hold the proceeds of Defendants' illicit scheme—on the grounds that EBCC did not plead sufficient facts to establish their liability.  That argument must fail in light of the guaranty agreements already in the record (Dkt. No. 8 at 3, 12 (ESC Guaranties); Dkt. No. 11 at 3, 11 (Hanratty Guaranties)), and EBCC's detailed allegations supporting alter ego liability (*e.g.*, Compl. ¶¶ 8-17, 37, 92; Dkt. No. 5 ¶¶ 9, 20, 25, 27; Dkt. No. 8).

*Second*, Defendants contend that EBCC fails adequately to plead its fraudulent inducement and fraudulent transfer claims. The Complaint, however, comprehensively documents Defendants' fraudulent scheme, alleging that Defendants "misappropriated advances under the Credit Facilities as well as EBCC's collateral to pay tens of millions of dollars in distributions to company insiders—including Defendant John Hanratty—as well as other investors." The Complaint further provides specific details of Defendants' fraudulent misrepresentations and transfers. (*E.g.*, Compl. ¶¶ 1-4, 43-49, 55-101.) To the extent the Complaint occasionally relies on "information and belief" allegations, it does so permissibly and only to the extent necessary where the specific means and methods of Defendants' fraudulent scheme are within Defendants' exclusive possession.

The evidence of Defendants' fraud is overwhelming (and certainly more than enough to survive a motion to dismiss). In July 2021, Defendant John Hanratty represented to EBCC that its loans were secured by over $42 million in assets. (Compl. ¶ 47.) Fifteen months later, he conceded that Defendants' assets are worth, at most, only $28.1 million.[1] (Dkt. No. 24 ¶ 44.) Not only is fraud *a* reasonable inference under the circumstances, it is *the only* reasonable inference: more than $14 million in assets do not vanish without fraudulent misconduct. Moreover, EBCC has provided detailed factual allegations supporting every element of its claims. EBCC respectfully requests that the Court deny Defendants' motion to dismiss.

## BACKGROUND

In November 2021, Defendant John Hanratty and his various corporate alter egos (the "Ebury Companies") defaulted on their obligation to repay EBCC more than $21 million in

---

[1] Defendants' failure to repay EBCC any portion of the more than $21 million in outstanding debt under the Credit Agreements—more than a year past due—suggests that Defendants' self-serving and unsupported valuation of their assets is false, or at least significantly inflated.

outstanding principal and interest under two credit facilities, which EBCC had extended to the
Ebury Companies in 2017.  (Compl. ¶ 1.)  When EBCC approached the parties' designated
third-party custodian in order to foreclose on the underlying collateral, EBCC "discovered that
about 90% of its supposed collateral—worth almost $26 million—was missing."  (*Id.* ¶ 3.)  Upon
further investigation, EBCC discovered that Defendants had been lying "for years about the
collateral, their use of the funds advanced under the Credit Facilities, and their compliance with
the Credit Agreements."  (*Id.* ¶ 3.)  EBCC endeavored for several months to resolve this dispute
on a voluntary basis.  (Dkt. No. 22 at 2.)  In September 2022, however, EBCC discovered that
Hanratty had bragged publicly about *defrauding EBCC* and *providing EBCC with fraudulent
financial documents* (Compl. ¶¶ 48, 68).  Upon learning that information, EBCC ceased
negotiations with Hanratty and filed this action.

    The Complaint includes claims for breach of contract, fraudulent inducement, and
fraudulent transfers (Compl. ¶¶ 102-24), and lays out the facts that EBCC has discovered about
Defendants' fraudulent scheme, including that Defendants:

- falsely claimed to EBCC that it was collateralized by more than $30 million in tax lien collateral (*id.* ¶¶ 43-49);

- were self-servicing almost 90% of EBCC's collateral despite their explicit contractual obligations to deliver the collateral to a third-party custodian (*id.* ¶¶ 55-59);

- provided EBCC with false financial documents to support numerous draws on the Credit Facilities, including draws on November 9, 2018; May 17, 2019; June 12, 2019; and September 13, 2019 (*id.* ¶¶ 69-81);

- double-counted and inflated the value of the collateral in financial submissions to EBCC (*id.* ¶¶ 82-85); and

- impermissibly sold EBCC's collateral, including to repay other disgruntled investors (*id.* ¶¶ 90-96).

EBCC also has discovered that Defendants transferred real estate properties ("REOs"), which had resulted from foreclosures on EBCC's collateral, to unauthorized entities—including Ebury RE, LLC—in order "to prevent EBCC from receiving sale proceeds from the sale of the REOs." (*Id.* ¶¶ 97-101; Dkt. No. 5 ¶ 25.)

Given Defendants' submission of false financial documents to EBCC and the complicated "web of sham corporate transactions" that Defendants used "to loot EBCC's collateral and the loan proceeds" (Compl. ¶¶ 1, 56, 68), EBCC's complaint includes a handful of "information and belief" allegations. That is done solely to deal with situations where the specific means and methods of Defendants' scheme are within Defendants' exclusive knowledge and control. Those facts include:

- *the circumstances of Defendants' moves to Puerto Rico in 2018* (*id.* ¶¶ 8 (Hanratty's Puerto Rico address and the date of his move), 9 (the Ebury Companies' address in Puerto Rico));[2]

- *Defendants' mental states in taking various actions* (*id.* ¶¶ 56 (Hanratty's purpose in fabricating a fake lien tape), 120 (Defendants' intent in making certain transfers)); and

- *the specific accounting tricks Defendants used to cover up their fraudulent misconduct* (*id.* ¶¶ 63, 78-89 (exactly how Defendants inflated the values of certain assets); *id.* ¶¶ 93, 95-96 (which assets Defendants fraudulently transferred to third parties); *id.* ¶¶ 99-100, 118-121 (which assets Defendants fraudulently transferred among themselves)).

Nevertheless, even where EBCC asserts information and belief allegations, it has provided detailed factual allegations setting out the circumstances of Defendants' various fraudulent actions.

---

[2]    Notably, Defendant Hanratty already has confirmed the accuracy of EBCC's information and belief allegations on this point. (Hanratty Aff., Dkt. No. 24 ¶ 21 ("Around 2018, I moved to Puerto Rico, while the Ebury Entities remained in Rye; eventually, the Ebury Entities opened a Puerto Rico office, and ran both offices until early 2020.").)

## LEGAL STANDARDS

A motion to dismiss under CPLR 3211(a)(7) must be denied unless "the facts as alleged do not fit within any cognizable legal theory." *Peterec-Tolino* v. *Harap*, 68 A.D.3d 1083, 1084 (2d Dep't 2009). "In considering such a motion, the court must accept the facts as alleged in the complaint as true [and] accord the plaintiff the benefit of every possible favorable inference." *Thomson* v. *New World Bible Translation Comm.*, 127 A.D.3d 731, 732 (2d Dep't 2015); *see EBC I, Inc.* v. *Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19 (2005) ("Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss."). The court also "may freely consider affidavits submitted by the plaintiff to remedy any defects in the complaint." *Leon* v. *Martinez*, 84 N.Y.2d 83, 88 (1994). Similarly, a motion to dismiss under CPLR 3211(a)(1) "may appropriately be granted 'only where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law.'" *Lucia* v. *Goldman*, 68 A.D.3d 1064, 1065 (2d Dep't 2009) (quoting *Goshen* v. *Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 326 (2002)).

Where a complaint alleges fraud, the plaintiff need only state "the circumstances constituting the wrong . . . in detail." CPLR 3016(b). This standard "requires only that the misconduct complained of be set forth in sufficient detail to clearly inform a defendant with respect to the incidents complained of." *Lanzi* v. *Brooks*, 43 N.Y.2d 778, 780 (1977); *Pludeman* v. *N. Leasing Sys., Inc.*, 10 N.Y.3d 486, 492 (2008) ("[S]ection 3016(b) may be met when the facts are sufficient to permit a reasonable inference of the alleged conduct.").

Further, CPLR 3016(b) must not be "construed so strictly so as to prevent an otherwise valid cause of action where it would be impossible for the plaintiff to state in detail all of the circumstances of the fraud *because the knowledge of those details is in the exclusive possession of the defendants*." *See Auguston* v. *Spry*, 282 A.D.2d 489, 490 (2d Dep't 2001)

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
Court Records     Pg 118 of 2230

(emphasis added). "[W]here concrete facts 'are peculiarly within the knowledge of the party'

charged with the fraud . . . it would work a potentially unnecessary injustice to dismiss a case at

an early stage where any pleading deficiency might be cured later in the proceedings." *Pludeman*,

10 N.Y.3d at 491-92. And, as with other asserted pleading defects, "[the] court may consider

affidavits to remedy pleading problems" under CPLR 3016(b). *Sargiss* v. *Magarelli*, 12 N.Y.3d

527, 531 (2009).

## ARGUMENT

I.     **EBCC adequately pleaded both liability for Defendants ESC, Ebury RE, and John
       Hanratty and that Defendants are alter egos of one another.**

   In the Complaint, EBCC pleaded not only that most of the Defendants are parties

to the relevant contractual agreements but also that each Defendant is an alter ego of the other

Defendants with respect to EBCC's claims. (*E.g.*, Compl. ¶¶ 8-17, 37, 92.) Despite these detailed

allegations, Defendants seek to absolve Defendants ESC, Ebury RE, and John Hanratty of liability

for EBCC's claims—likely because they are the only Defendants that are not judgment-proof.[3]

(Mot. at 12-16.) Defendants' arguments must fail, however, because ESC is a Guarantor to the

Credit Agreements, Hanratty is a Validity Guarantor to the Credit Agreements, and each Defendant

is an alter ego of the other Defendants with respect to EBCC's claims.

  **A.**  **Defendant ESC is a guarantor to the Credit Agreements.**

   In their motion, Defendants repeatedly assert that ESC is not a party to the Credit

Agreements. (Mot. at 7, 12, 16.) That is demonstrably false. EBCC clearly alleged that ESC is a

Guarantor to the Credit Agreements in its Complaint. (Compl. ¶ 15 ("The Ebury SPEs, *along with*

*ESC . . . are guarantors* to the Credit Agreements . . . .") (emphasis added).) In addition, EBCC

---

[3]  Notably, Defendants have refused to provide EBCC with current financial statements for
these entities.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 119 of 2230

provided the Court with copies of those guaranties.  (Dkt. No. 8 at 3 ("THIS GUARANTY dated

as of March 9, 2017 . . . is made *by EBURY STREET CAPITAL, LLC* . . . .") (emphasis added); *id.*

at 12 (same).)  EBCC also provided copies of certain amendments to the Credit Agreements that

reference the guaranties (Dkt. No. 6 at 55, 60, 64, 70, 74, 132, 136).  Accordingly, EBCC

sufficiently has pleaded that ESC is liable for Defendants' breaches of the Credit Agreements.[4]

### B.  Defendant John Hanratty is a validity guarantor to the Credit Agreements.

Defendants concede, as they must, that EBCC's breach of contract claims against

Defendant John Hanratty must "be allowed to proceed with respect to the Validity Guaranties."

(Mot. at 16.)  That is so because Hanratty indisputably executed validity guaranty agreements that

imposed "solidary" and "joint and several" liability on him for "any and all damages, costs or

losses incurred by Lender as the result, in whole or in part, of any [information related to the

collateral] not being true and correct, in all material respects."  (Dkt. No. 11 at 3, 11.)

Nevertheless, Defendants argue that Hanratty is not liable for their breaches of the

Credit Agreements because he is not a party to those agreements.  (Mot. at 16.)  Defendants'

argument is based on a misreading of the Complaint.  EBCC does not assert that Hanratty is liable

for Defendants' breaches of the Credit Agreement as a party to those agreements.  Instead, it

alleges that Hanratty "is liable for these amounts . . . because he provided EBCC false information

relating to the eligibility of Collateral, in violation of the Validity Guaranties."  (Compl. ¶ 108.)

Specifically, Hanratty provided EBCC false information about the eligibility of Collateral, in

---

[4]     Defendants (at 12) cite *Milan Music, Inc.* v. *Emmel Communications Booking, Inc.*, 7 Misc.
3d 1008(A) (Sup. Ct. N.Y. Cnty. 2004) (unpublished table disposition) for the proposition that a non-
party to a contract cannot be liable for its breach.  But that case, which concerned those "with
no connection to the Contract whatsoever," *id.* at *3, is irrelevant here, where EBCC has adequately pled
that all Defendants have a clear "connection" to the Credit Agreements, since ESC and Hanratty
executed guaranties and all Defendants are alter egos of one another.

-7-

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 12/02/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 120 of 2230

violation of the Validity Guaranties, from Defendants' earliest funding draws on the Credit Facilities. (*Id.* ¶¶ 86-89.) Had EBCC known about Defendants' false statements, "it would have stopped advancing funds to Defendants and demanded repayment." (Dkt. No. 5 ¶ 22; Compl. ¶ 112.) EBCC's damages from Defendants' breaches of the Credit Agreements thus resulted from Hanratty's false statements and he is liable for those damages on a "solidary" and "joint and several" basis.

### C. Each Defendant is an alter ego of the other Defendants.

Putting the guaranties aside, each Defendant—including ESC, Ebury RE, and John Hanratty—is liable for EBCC's claims on the independent ground that each Defendant is an alter ego of the other Defendants. (Compl. ¶¶ 109, 116, 124.) Defendants argue that EBCC failed to plead alter ego liability because its allegations are "conclusory" (Mot. at 13-15), and because it failed to plead that Defendants engaged in fraud (*id.* at 15-16). Defendants are wrong on both counts.[5]

New York courts impose alter ego liability "whenever necessary 'to prevent fraud or achieve equity.'" *Winchester Glob. Tr. Co.* v. *Donovan*, 22 Misc. 3d 1119(A) (Sup. Ct. Nassau Cnty. 2009) (unpublished table disposition) (quoting *Walkovszky* v. *Carlton*, 18 N.Y.2d 414, 417 (1966). In deciding whether to impose alter ego liability, the Court may consider: (i) the disregard of corporate formalities; (ii) inadequate capitalization; (iii) intermingling of funds; (vi) overlap in ownership, officers, directors, and personnel; (v) common office space, address and telephone numbers of corporate entities; (vi) the amount of business discretion displayed by the related entities; (vii) whether the related entities deal with one another at arm's length; (viii) whether the

---

[5]    *See generally Cortlandt St. Recovery Corp.* v. *Bonderman*, 31 N.Y.3d 30, 47 (2018) ("[A] fact-laden claim to pierce the corporate veil is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss.").

entities are treated as independent profit centers; (ix) the payment or guarantee of debts by the related entities; and (x) whether the entities used one another's properties as if the properties were their own. *Shisgal* v. *Brown*, 21 A.D.3d 845, 848 (1st Dep't 2005); *see Tap Holdings, LLC* v. *Orix Fin. Corp.*, 109 A.D.3d 167, 174 (1st Dep't 2013).

EBCC pleaded sufficient facts to establish Defendants' alter ego liability. It has established that Defendants:

- *are inadequately capitalized* (Compl. ¶ 38 ("Defendants since have failed to repay EBCC the amounts owed under the Credit Agreements[.]"));

- *intermingle funds* (*id.* ¶ 92 ("Defendants transferred $350,000 in sales proceeds from Ebury 1EMI LLC to Ebury 2EMI LLC[.]"); Dkt. No. 5 ¶ 25);

- *have common ownership, officers, directors and personnel* (Compl. ¶¶ 8 (Hanratty "is the manager of ESC"), 9 (ESC "is the manager or general partner of the Ebury Companies"), 10-17 (the Ebury Companies are all subsidiaries or affiliates of Ebury Fund 1, LP and Ebury Fund 2, LP));

- *share a common office space and address* (*id.* ¶ 9 (Defendants' address in Puerto Rico); Dkt. No. 15 at 7 (admitting that certain Defendants share that address in Puerto Rico); Dkt. No. 6 at 39, 116 (Defendants' former shared address in New York));

- *are completely dominated by Defendant John Hanratty* (Compl. ¶ 32; Dkt. No. 5 ¶ 27 (EBCC "negotiated . . . exclusively with Hanratty[.]"); Dkt. No. 24 (Hanratty Aff.) ¶ 1 ("I am . . . the founder and managing partner of the 'Ebury Entities[.]'"));

- *do not deal with one another at arm's length and are not treated as independent profit centers* (Compl. ¶ 92);

- *pay and guarantee each other's debts* (Compl. ¶¶ 37 ("Each of the Guarantors also executed a guaranty[.]"), 39 ("Hanratty executed the Validity Guaranties[.]"); Dkt. Nos. 8, 9); and

- *use one another's properties as if the properties were their own* (Compl. ¶ 92; Dkt. No. 5 ¶ 25).

"Those facts are sufficient, at the pleading stage," to impose alter ego liability. *Cortlandt St. Recovery Corp.*, 31 N.Y.3d at 49-50 (defendants were "corporate shells" used to distribute loan proceeds "with the known and intended result that [the shells] would be rendered insolvent"); *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund* v. *Allure Metal Works, Inc.*, 209 A.D.3d 712, 714 (2d Dep't 2022) (defendants shared personnel, office space, and equipment, and engaged in the same business); *Perez* v. *Long Island Concrete Inc.*, 203 A.D.3d 552, 554 (1st Dep't 2022) (defendants shared personnel, equipment, and payroll); *UBS Sec. LLC* v. *Highland Cap. Mgmt., L.P.*, 93 A.D.3d 489, 490 (1st Dep't 2012) (defendants were operated "as a single economic entity"). Notably, Defendant John Hanratty signed each of the Credit Agreements (Dkt. No. 6), the Promissory Notes (Dkt. No. 7); the Guaranties (Dkt. No. 8), the Security Agreements (Dkt. No. 9), the Custodial and Servicing Agreements (Dkt. No. 10), and the Validity Guaranties (Dkt. No. 11). There can be no dispute that EBCC has established that Defendants are alter egos of one another—dominated by Hanratty—in light of these detailed allegations.[6]

Although Defendants go to great lengths in their formal submissions to maintain the illusion that they are independent entities, their counsel effectively has admitted that Defendants are alter egos. To begin with, these twenty-nine purportedly independent entities are represented by one law firm. Moreover, in correspondence with EBCC, Defendants' counsel has

---

[6]    *Sound Communications, Inc.* v. *Rack & Roll, Inc.*, 88 A.D.3d 523 (1st Dep't 2011), upon which Defendants rely (at 15-16), is not to the contrary. It stands merely for the proposition that veil piercing is inappropriate where a plaintiff fails to plead that the defendant used the corporate form to perpetrate a fraud or wrong against the plaintiff. EBCC has clearly done so here. *E.g.*, Compl. ¶ 1 ("Defendants . . . used a web of sham corporate transactions—among companies controlled by Hanratty—to loot EBCC's collateral and the loan proceeds."). New York courts have found almost identical allegations sufficient to allege an abuse of the corporate form. *E.g.*, *Lincoln Bldg. Servs. Inc.* v. *Dellwood Dev., Ltd.*, 54 Misc. 3d 1220(A) (Sup. Ct. Queens Cnty. 2017) (unpublished table disposition) (defendant who "diverted corporate monies," and was therefore unable to return its lender's collateral, served as a "poignant example of abuse of the corporate form").

repeatedly referred to the 29 Defendants as a collective, single entity—"[m]y client" or "[o]ur client" (Dkt. No. 26 at 6; Dkt. No. 34 at 1, 2)—and indicated that Hanratty dominates each of the corporate Defendants (Dkt. No. 30 at 1 ("I'll ask John about the paying entity and amount and get back to you later today.")).  Although EBCC has provided sufficient facts to establish alter ego liability, Defendants' counsel's own statements speak volumes about the reality of Defendants' lack of independence.[7]

Given the clear proof that Defendants are alter egos of one another, all EBCC is required to plead in order to establish Defendants' alter ego liability is that Defendants defrauded EBCC. (*See* Mot. at 15.)  As explained in the next section, EBCC adequately pleaded its fraudulent inducement and fraudulent transfer claims, providing the last element to establish Defendants' alter ego liability.

**II.      <u>EBCC adequately pleaded its fraudulent inducement and fraudulent transfer claims.</u>**

In the Complaint, EBCC alleged that: (i) Defendants made false statements of present fact to induce it to execute amendments to the Credit Agreements, and (ii)  Defendants have fraudulently transferred EBCC's collateral to Ebury RE LLC and other affiliates of the Ebury Companies.  (Compl. ¶ 1, 4, 43-49, 97-101, 110-124; Dkt. No. 5 ¶ 25.)  Defendants argue these allegations are defective because EBCC has pled certain allegations on the basis of "information

---

[7]      In each of the cases Defendants cite in support of their argument that Defendants are not alter egos of one another, the court declined to impose alter ego liability for reasons that have no relevance here.  For example, in *Etex Apparel, Inc.* v. *Tractor International Corp.*, 83 A.D.3d 587, 588 (1st Dep't 2011), the court found against imposing alter ego liability only because the record was "replete with indicia that defendants-appellants" had "maintained their separate corporate or individual identities" and the record was "devoid of evidence that defendants-appellants completely dominated and controlled" the other defendant.  This holding is inapposite here, where EBCC has provided substantial evidence that the Defendants had a single identity and that Hanratty ran and completely dominated each of the other Defendants.

and belief," and because Defendants contend the fraudulent inducement claims are "duplicative" of EBCC's breach of contract claims. (Mot. at 16-25.) Defendants' arguments should be rejected. EBCC's allegations provide Defendants sufficient facts to apprise them of the alleged wrongs, and Defendants' attack on EBCC's fraudulent inducement claims are incorrect as a matter of law.

> **A.    EBCC pleaded sufficient facts to establish its fraud claims.**

Defendants contend that EBCC failed adequately to plead its fraud claims because EBCC purportedly failed to plead scienter—that Defendants acted with the intent to defraud EBCC. (Mot. at 16-20.) As New York courts have recognized, however, "[p]articipants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud." *Oster*, 77 A.D.3d at 55-56. Thus, "actual knowledge need only be pleaded generally" and "an intent to commit fraud [may] be divined from surrounding circumstances." *Id.*

Here, EBCC pleaded sufficient facts to establish an inference of fraudulent intent. *See Pludeman*, 10 N.Y.3d at 493. Specifically, EBCC pleaded that Defendants "knew that they were self-servicing the Collateral, they had sold the Collateral without paying EBCC the proceeds of the sales, they were using advances to pay investors rather than purchase tax liens, and they were double-counting or inflating the value of tax liens." (Compl. ¶ 114.) These allegations are more than sufficient to establish "a reasonable inference of fraudulent intent." *A.N. Frieda Diamonds, Inc.* v. *Kaminski*, 122 A.D.3d 517, 517 (1st Dep't 2014); *see Hicks* v. *Santiago*, 104 A.D.2d 471, 472 (2d Dep't 1984) ("Whether to draw such an inference of fraudulent intent based on proof of a substantial irregularity is a question of fact.").[8]

---

[8]    Defendants' citation (at 17) to *Platinum Partners Value Arbitrage Fund LP* v. *Kroll Associates, Inc.*, 102 A.D.3d 483, 483 (1st Dep't 2013), is unavailing. In *Platinum Partners*, the Defendant was alleged to have omitted "three articles published nine or more years earlier . . . that disclosed material negative information" from a "single-spaced 76-page report." *Id.* Plainly, leaving a few details out of a 76-page report is not at all comparable to lying to a bank about the

In any event, Defendants exaggerate the extent of EBCC's "information and belief"
allegations. For example, Defendants focus on EBCC's allegations that Defendant John Hanratty
created and submitted to EBCC a fake lien tape. (Mot. at 20.) As reflected in the Complaint,
EBCC alleged that, after months of inquiries from EBCC, Hanratty sent EBCC an email attaching
a lien tape that purported to be from MTAG and bore the MTAG logo. (Compl. ¶ 56.) In fact, the
lien tape was not from MTAG and falsely included more than 6,000 tax lien certificates
(purportedly worth more than $26 million) that were not in MTAG's custody as of the date of the
lien tape. (Id. at ¶¶ 56-57.) Defendants later admitted that MTAG did not have custody of over
90% of the liens identified in the lien tape and that their tax lien portfolio was worth at least $10
million less than what the lien tape had claimed. (Id. at ¶¶ 58, 60.) None of those detailed
allegations were pled on the basis of information and belief. In addition to all of those allegations,
the Complaint further alleged, on the basis of information and belief, that Hanratty "fabricated [the
lien tape] in order to deceive EBCC and obscure the fact that he was self-servicing the Collateral."
(Id. at ¶ 56.) Defendants assert that the single information and belief allegation at the end of
EBCC's detailed factual showing is sufficient to invalidate EBCC's claims and warrant dismissal.
(Mot. at 20.)

---

existence, custodial status, and value of collateral for $20 million credit facilities.

The same is true with Defendants' citation (at 18) to *Pacnet Network Ltd.* v. *KDDI Corp.*,
78 A.D.3d 478 (1st Dep't 2010). The court there held that an allegation that a defendant
misrepresented facts was conclusory because the plaintiff alleged "no intentional
misrepresentation of any material existing facts." *Id.* at 479. However, the court explained that
such representations would be actionable where they were "contradicted by a concrete, existing
fact that defendant either intentionally failed to disclose or negligently failed to discover." *Id.*
Here, EBCC has adequately pled that Defendants' representations were clearly contradicted by
concrete, then-existing facts that Defendants failed to disclose to EBCC, such as the inflated value
of the collateral or the fact that it was being self-serviced.

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 46    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 12/02/2022

Court Records    Pg 126 of 2230

Defendants are wrong.  EBCC's inability to know Defendants' mental state and subjective intentions—here, the exact reason why Hanratty fabricated the lien tape—does not defeat its detailed fraud allegations.  Instead, EBCC's detailed factual allegations fully support a reasonable inference of fraud and scienter.  "The complaint, while in part pleaded on information and belief, had sufficient facts to support the reasonable inference of fraud and scienter." *Aozora Bank, Ltd.* v. *J.P. Morgan Sec. LLC*, 144 A.D.3d 440, 441 (1st Dep't 2016).

**B.    EBCC adequately pleaded fraudulent inducement and its fraudulent inducement claims are not duplicative of its breach of contract claims.**

Defendants wrongly assert that EBCC failed to adequately plead its fraudulent inducement claims.  (Mot. at 19-23.)  "To state a claim for fraudulent inducement," EBCC is required to plead "a knowing misrepresentation of material present fact, which is intended to deceive another party and induce that party to act on it, resulting in injury."  *Gosmile, Inc.* v. *Levine*, 81 A.D.3d 77, 81 (1st Dep't 2010).  The misrepresentation must concern "present facts . . . collateral to the contract (though it may have induced the plaintiff to sign the contract)."  *First Bank of Ams.* v. *Motor Car Funding, Inc.*, 257 A.D.2d 287, 292 (1st Dep't 1999); *see IS Chrystie Mgmt. LLC* v. *ADP, LLC*, 205 A.D.3d 418, 418 (1st Dep't 2022).

EBCC pleaded that Defendants "made false statements of then-existing material facts about the eligibility of various tax lien collateral at the time they induced EBCC to execute" seven different amendments to the Credit Agreements.  (Compl. ¶ 111)  The false statements included providing EBCC with false Borrowing Base Certificates and false Notices of Borrowing that concealed the fact that "Defendants were self-servicing the Collateral, had sold the Collateral without paying EBCC the proceeds of the sales, were using advances to pay investors rather than purchase tax liens, [and] were double-counting or inflating the value of tax liens."  (*Id.* ¶ 112.)  EBCC provided the specific circumstances for each of these false statements, including specific

-14-

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 12/02/2022
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 127 of 2230

dates, amounts, documents, transferors, and transferees.  (*Id.* ¶¶ 50-96).  *See MBIA Ins. Corp.* v. *Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 295 (1st Dep't 2011) ("The amended complaint sufficiently identifies Countrywide's misrepresentations and describes when and how they were made to MBIA, including through false and misleading loan tapes and prospectuses.").

Defendants ignore these allegations and instead assert incorrectly that EBCC's fraudulent inducement claims rest solely upon:  (i) the McOsker Counterclaim (Mot. at 19-20), and (ii) "information and belief" allegations related to a doctored spreadsheet that Defendants submitted to EBCC (*id.* at 20).  That is incorrect.  To take one example, EBCC pleaded that Defendants impermissibly have been self-servicing the Collateral (*id.* ¶¶ 57-60), which Defendants concealed from EBCC to induce EBCC to execute amendments to the Credit Agreements (*id.* ¶¶ 45, 59).  As another example, EBCC pleaded that Defendants misused advances under the Credit Facilities on at least four separate occasions (*id.* ¶¶ 69-85), and then failed to disclose the resulting events of default to EBCC before inducing EBCC to execute amendments to the Credit Agreements (*id.* ¶¶ 65, 67).  EBCC thus pleaded sufficient facts to establish its fraudulent inducement claims.

As a fallback, Defendants argue that EBCC's fraudulent inducement claims must be dismissed as duplicative of its claims against Hanratty for breaching the Validity Guaranties.  (Mot. at 21-23.)  That argument fails for at least four independent reasons.

*First*, the fraud and breach claims are collateral to one another.  It is well settled that a fraudulent inducement claim is not duplicative of a breach of contract claim where, as here, the fraud claim alleges misrepresentations of present fact that are collateral to the contract.  *See, e.g.*, *Greenberg* v. *Meyreles*, 155 A.D.3d 1001, 1003 (1st Dep't 2017); *First Bank of Ams.* v. *Motor Car Funding*, 257 A.D.2d 287, 292 (1st Dept. 1999).  New York courts routinely hold that

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 48    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 12/02/2022

Court Records    Pg 128 of 2230

fraudulent inducement claims alleging the exact type of misrepresentation at issue here—namely, false statements concerning collateral for a loan agreement—are not duplicative of breaches of the underlying loan agreements. *See First Bank* v. *Motor Car Funding*, 257 A.D.2d 287, 291-92 (1st Dep't 1999) (holding that "misrepresentations of present fact" regarding the "quality of collateral" underlying a loan agreement are "collateral to the contract" and may be pursued "notwithstanding the existence of a breach of contract claim"); *Am. Media, Inc.* v. *Bainbridge & Knight Lab'ys, LLC*, 135 A.D.3d 477, 477-78 (1st Dep't 2016) (same).

Here, the Complaint properly alleges that Defendants made misrepresentations of present fact to induce EBCC to amend the Credit Agreements. (Compl. ¶¶ 50-96.) These misrepresentations are distinct from, and collateral to, the promise of future performance that Hanratty made, and later breached, in the Validity Guaranties; namely, that he would ensure that Defendants delivered true and correct information to EBCC and he would be responsible for any damages resulting from any false information. (*Id.* ¶ 39.) The Validity Guaranties thus are distinct from the amendments to the Credit Agreements and are therefore collateral to those contracts. *See Universal Inv. Advisory SA* v. *Bakrie Telecom Pte., Ltd.*, 154 A.D.3d 171, 181 (1st Dep't 2017) (holding that a cause of action for fraudulent inducement of a note was "not duplicative" of a claim for breach of the borrower's personal guaranty on that note); *see also Bank of Tokyo-Mitsubishi, Ltd.* v. *Kvaerner a.s.,* 243 A.D.2d 1, 6 (1st Dep't 1998) ("Ordinarily, a guaranty, even if contemporaneously executed, is considered a distinct obligation.").

*Second*, the fraud and breach claims concern different documents. As a matter of law, two causes of action that "involv[e] two entirely different contract agreements" cannot duplicate one another. *Barker* v. *Time Warner Cable, Inc.*, 24 Misc. 3d 1213(A) (Sup. Ct. Nassau Cnty. 2009) (unpublished table disposition); *Shah* v. *Ortiz*, 2014 WL 110241, at *2 (Sup. Ct. N.Y.

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM
NYSCEF DOC. NO. 46

INDEX NO. 158207/2022

RECEIVED NYSCEF: 12/02/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 129 of 2230

Cnty. Jan. 9, 2014). Here, the fraudulent inducement claims relate to seven amendments to the Credit Agreements, executed in 2018, 2019, and 2021 (Compl. ¶ 111), while the breach of contract claims against Hanratty concern the Validity Guaranties that he executed in 2017 (*id.* ¶ 108). The fraud and breach claims thus arise from different agreements entered into at different times, and are not duplicative.

Rather than grapple with the weight of controlling authority on this point, Defendants ignore it entirely, citing instead to wholly inapposite cases in which the breach and fraud claims *concerned the same document. See Michael Davis Constr., Inc.* v. *129 Parsonage Lane, LLC*, 194 A.D.3d 805, 807 (2d Dep't 2021) (same construction contract); *Project Cricket Acquisition, Inc.* v. *Fla. Cap. Partners, Inc.*, 180 A.D.3d 627, 627 (1st Dep't 2020) (same stock purchase agreement); *Varo, Inc.* v. *Alvis PLC*, 261 A.D.2d 262 (1st Dep't 1999) (same stock purchase agreement); *J.E. Morgan Knitting Mills, Inc.* v. *Reeves Bros., Inc.*, 243 A.D.2d 422 (1st Dep't 1997) (same contract of sale); *Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987) (same construction contract). These cases say nothing about the claims at issue here, which involve "entirely different contract agreements." *Barker*, 24 Misc. 3d 1213(A).

*Third*, the fraud and breach claims concern different parties. Just as two claims cannot duplicate one another when they concern different documents, they likewise are not duplicative when they concern different parties. *See Richbell Info. Servs., Inc.* v. *Jupiter Partners, L.P.*, 309 A.D.2d 288, 305 (1st Dep't 2003). Here, only Hanratty (but not the Ebury Companies) is a party to the Validity Guaranties, and only the Ebury Companies (but not Hanratty) are parties to the amendments to the Credit Agreements. EBCC's claims for Hanratty's breaches of the Validity Guaranties therefore cannot be duplicative of its fraud claims concerning the amendments to the Credit Agreements. *See Kelley* v. *Galina-Bouquet, Inc.*, 155 A.D.2d 96, 99 (1st Dep't 1990)

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 130 of 2230

(causes of action are "not duplicative of one another, since the actions are against different parties").

*Finally*, the fraud and breach claims seek different relief.  Claims cannot duplicate one another where a plaintiff pursues distinct recoveries for each claim.  *See Int'l Bus. Machs. Corp.* v. *GlobalFoundries U.S. Inc.*, 204 A.D.3d 441, 442 (1st Dep't 2022); *Kocak* v. *Dargin*, 199 A.D.3d 456, 457 (1st Dep't 2021); *Kelley*, 155 A.D.2d at 99.  Here, the breach claims against Hanratty seek the payments he promised to EBCC under the terms of the Validity Guaranties, while the fraudulent inducement claims seek to hold Defendants accountable for the fraud they have perpetrated.  *Cf. Deerfield Commc'ns Corp.* v. *Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986) (fraudulent inducement claim not duplicative of breach of contract because "[t]he measure of damages recoverable for being fraudulently induced to enter into a contract which otherwise would not have been made is 'indemnity for [the] loss suffered through that inducement'" (quoting *Sager* v. *Friedman*, 270 N.Y. 472, 481 (1936))).  Because EBCC "seeks different relief" for each claim, *Kocak*, 199 A.D.3d at 457; *Kelley*, 155 A.D.2d at 99, the fraud and breach claims are not duplicative.[9]

## C.    EBCC sufficiently pleaded fraudulent transfers.

Defendants also incorrectly assert that EBCC failed adequately to plead its fraudulent transfer claims.  (Mot. at 23-25.)  To state a claim for actual fraudulent transfers, EBCC was required to plead that the transfers were made with "actual intent . . . to hinder, delay, or

---

[9]    Finally, even if the fraud and breach claims were somehow duplicative, EBCC still would be entitled to plead theories of liability in the alternative.  *See Man Advisors, Inc.* v. *Selkoe*, 174 A.D.3d 435, 435 (1st Dep't 2019) (denying motion to dismiss duplicative fraud claim); *Allenby, LLC* v. *Credit Suisse, AG*, 134 A.D.3d 577, 581 (1st Dep't 2015) (same); *Citi Mgmt. Grp., Ltd.* v. *Highbridge House Ogden, LLC*, 45 A.D.3d 487, 487 (1st Dep't 2007) (same).  *See generally* CPLR 3014.

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 48
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 131 of 2230
RECEIVED NYSCEF: 12/02/2022

defraud either present or future creditors." N.Y. Debt. & Cred. Law § 276 (effective until April 3, 2020); *see also* N.Y. Debt. & Cred. Law § 273(a)(1). To state a claim for constructively fraudulent transfers, EBCC was required to establish that Defendants "(1) made a conveyance; (2) without fair consideration; (3) by a person who is insolvent or who becomes insolvent as a consequence of the transfer."[10] *Loreley Fin. (Jersey) No. 4 Ltd.* v. *UBS Ltd.*, 40 Misc. 3d 323, 337 (Sup. Ct. N.Y. Cnty. 2013). Here, EBCC alleged, on information and belief, that Defendants "have been transferring REOs that are the proceeds of EBCC's collateral to entities other than the Borrowers and Guarantors," "have not received fair consideration for these transfers," and that the "transfers were not arms-length transactions." (Compl. ¶¶ 97-101.)

While Defendants complain that EBCC relied on "information and belief" allegations (Mot. at 23-25), "[t]he specificity requirements are relaxed where it is alleged that the particular circumstances of the alleged fraud are peculiarly within the defendants' knowledge." *Colasacco* v. *Robert E. Lawrence Real Est.*, 68 A.D.3d 706, 708 (2d Dep't 2009); *see Allenby, LLC* v. *Credit Suisse, AG*, 134 A.D.3d 577, 580 (1st Dep't 2015) ("Although the allegations of fraud are based on information and belief, plaintiffs 'set forth sufficient information to apprise defendants of the alleged wrongs'" (citation omitted)). Here, the particular circumstances of these transfers—including exactly which Defendants were involved and how much consideration was paid—are exclusively within Defendants' possession. EBCC thus was required only "to inform Defendants . . . of the acts that [it] is complaining about," *Epiphany Cmty. Nursery Sch.* v. *Levey*, 171 A.D.3d 1, 9 (1st Dep't 2019), which it has done.

---

[10]    EBCC's claims for constructive fraud "are not subject to the particularity requirement of CPLR 3016." *Ridinger* v. *W. Chelsea Dev. Partners LLC*, 150 A.D.3d 559, 560 (1st Dep't 2017).

In any event, EBCC has provided substantial allegations that do not rely on "information and belief." It has alleged that the transactions were between entities controlled by Hanratty (Compl. ¶ 4), which raises an inference of a lack of fair consideration, *see Mega Pers. Lines, Inc.* v. *Halton*, 9 A.D.3d 553, 555 (3d Dep't 2004); *Laco X-Ray Sys., Inc.* v. *Fingerhut*, 88 A.D.2d 425, 432-33 (2d Dep't 1982). It also has alleged that Defendant Ebury RE has listed for sale on its website 88 properties that are EBCC's collateral (Dkt. No. 5 ¶ 25), which it could do only if the properties were transferred to it by one of the Borrowers or Guarantors. Finally, the circumstances of the alleged transfers—which were made between insiders and moved assets away from the Defendants that are in contractual privity with EBCC—are more than enough to create an inference of fraudulent intent. *Oster* v. *Kirschner*, 77 A.D.3d 51, 55-56 (1st Dep't 2010) ("[I]ntent to commit fraud is to be divined from the surrounding circumstances."). In light of the circumstances, where the specific means of Defendants' fraudulent scheme are within their exclusive knowledge; and EBCC's non-information-and-belief allegations, which demonstrate that Defendants have transferred at least 88 properties to Ebury RE, EBCC has adequately pleaded its fraudulent transfer claims.[11]

## CONCLUSION

EBCC respectfully requests that the Court deny Defendants' motion to dismiss.

Dated:  December 2, 2022                     Respectfully submitted,
        New York, New York

                                            */s/ Alexander J. Willscher*
                                            _____

                                            Alexander J. Willscher
                                            Austin P. Mayron

---

[11]    Should the Court determine that EBCC has failed adequately to plead its fraud claims, EBCC respectfully requests that it be granted leave to serve an amended complaint. *See Belco Petroleum Corp.* v. *AIG Oil Rig, Inc.*, 164 A.D.2d 583, 599 (1st Dep't 1991).

FILED: NEW YORK COUNTY CLERK 12/02/2022 04:56 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 12/02/2022

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 133 of 2230

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business
Credit Corporation*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this memorandum of law complies with the word count limit of

N.Y.C.R.R. § 202.70(g), Rule 17, for documents prepared by use of a computer because it contains

6,519 words.

Dated:   December 2, 2022                    */s/ Alexander J. Willscher*
        New York, New York                    Alexander J. Willscher

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

                          Plaintiff,

          v.                                    Index No. 158207/2022

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND          **STIPULATION AND [PROPOSED]**
1, LP, EBURY FUND 2, LP, EBURY 1EMI              **ORDER**
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

                          Defendants.

        **IT IS HEREBY STIPULATED AND AGREED**, by and between Plaintiff Emigrant

Business Credit Corporation and Defendants the "**Ebury Parties**,"[1] that:

---

[1] Defendants Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI
LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB
2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC,
EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC,
LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax
Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC, Ebury
Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, Ebury RE LLC (together, the
"**Ebury Entities**") and John Hanratty (with the Ebury Entities, the "**Ebury Parties**").

1

1.      The return date of the Ebury Parties' Motion to Dismiss (Dkt. 41), which

was previously extended from December 2, 2022 to December 9, 2022 at Plaintiff's

unopposed request (Dkt. No. 46), shall be again extended to December 16, 2022.

2.      This adjournment would extend the deadline for the Ebury Parties to file

their reply papers in further support of their Motion to Dismiss from December 8, 2022

to December 15, 2022.

Dated: December 6, 2022
        New York, New York

**GUSRAE KAPLAN NUSBAUM PLLC**

/s/ Daniel Crandall
Daniel Crandall
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
dcrandall@gusraekaplan.com

*Attorneys for the Ebury Parties*

**SULLIVAN & CROMWELL LLP**

/s/ Alexander J. Willscher
Alexander J. Willscher
Austin P. Mayron
125 Broad Street
New York, New York 10004
(212) 558-4000
willschera@sullcrom.com
mayrona@sullcrom.com

*Attorneys for Plaintiff Emigrant
Business Credit Corporation*

**SO ORDERED.**

_____
**Hon. Margaret A. Chan, J.S.C.**

2

FILED: NEW YORK COUNTY CLERK 12/06/2022 05:15 PM
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 137 of 2230
RECEIVED NYSCEF: 12/06/2022

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**COMMERCIAL DIVISION**

| | |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1 EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 1EMINJ, LLC, EB 1EMINY, LLC, EB 2MINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1–10,<br><br>Defendants. | Index No. 158207/2022<br><br>**STIPULATION AND ~~[PROPOSED]~~ ORDER** |

**IT IS HEREBY STIPULATED AND AGREED**, by and between Plaintiff Emigrant

Business Credit Corporation and Defendants the "**Ebury Parties**,"[1] that:

---

[1] Defendants Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, Ebury RE LLC (together, the "**Ebury Entities**") and John Hanratty (with the Ebury Entities, the "**Ebury Parties**").

1

1.      The return date of the Ebury Parties' Motion to Dismiss (Dkt. 41), which

was previously extended from December 2, 2022 to December 9, 2022 at Plaintiff's

unopposed request (Dkt. No. 46), shall be again extended to December 16, 2022.

2.      This adjournment would extend the deadline for the Ebury Parties to file

their reply papers in further support of their Motion to Dismiss from December 8, 2022

to December 15, 2022.

Dated: December 6, 2022
       New York, New York

**GUSRAE KAPLAN NUSBAUM PLLC**

/s/ Daniel Crandall
Daniel Crandall
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
dcrandall@gusraekaplan.com

*Attorneys for the Ebury Parties*

**SULLIVAN & CROMWELL LLP**

/s/ Alexander J. Willscher
Alexander J. Willscher
Austin P. Mayron
125 Broad Street
New York, New York 10004
(212) 558-4000
willschera@sullcrom.com
mayrona@sullcrom.com

*Attorneys for Plaintiff Emigrant
Business Credit Corporation*

**SO ORDERED.**

_____
**Hon. Margaret A. Chan, J.S.C.**

MARGARE... J.S.C.

2

FILED: NEW YORK COUNTY CLERK 12/08/2022 09:49 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 51    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 12/08/2022

Court Records    Pg 139 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

Plaintiff,

v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

Defendants.

---

Index No. 158207/2022

## **ALTERNATIVE DISPUTE RESOLUTION ATTORNEY CERTIFICATION**

Pursuant to Rule 10 of the Commercial Division Rules, I certify that I have

discussed with my clients the "**Ebury Parties**"[1] any Alternative Dispute Resolution

---

[1] Defendants Ebury Street Capital, LLC ("**ESC**"), Ebury "**Fund 1**," LP, Ebury "**Fund 2**,"
LP, Ebury "**1EMI**" LLC, Ebury "**2EMI**" LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB
1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC,
EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC EB 1EMINY, LLC, EB 2EMINY,
LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund
2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, "**Ebury RE**"

options available through the Commercial Division and those offered by private entities.

My clients:

> (x) presently wish to jointly engage a mediator at an appropriate time to aid settlement.

> ( ) do not presently wish to jointly engage a mediator at an appropriate time to aid settlement.

> This case involves the following (check all that are applicable):

> ☒ an ongoing business or personal relationship among the parties

> ☐ an employment agreement

> ☒ a business transaction involving a commercial bank or other financial institution

> ☐ commercial insurance coverage or environmental insurance coverage

> ☐ construction litigation

> ☐ the amount in issue is less than double the jurisdictional threshold amount for the Commercial Division in this County or Judicial District

> ☐ issues that appear to require creative or flexible solutions

---

LLC (together, the "**Ebury Entities**") and John Hanratty (with the Ebury Entities, the "**Ebury Parties**").

Dated: December 8, 2022
      New York, New York

Respectfully submitted,

**GUSRAE KAPLAN NUSBAUM PLLC**

/s/Daniel Crandall
Kari Parks
Daniel Crandall
Victor R. Wang (Admission Pending)
120 Wall Street, 25th Floor
New York, New York 10005
Tel: (212) 269-1400
Fax: (212) 809-4147
kparks@gusraekaplan.com
dcrandall@gusraekaplan.com
vwang@gusraekaplan.com

*Attorneys for the Ebury Parties*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                        Plaintiff,

        v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

                    Defendants.

---------------------------------------------------------- x

Index No. 158207/2022

(Hon. Margaret Chan)

**ALTERNATIVE DISPUTE
RESOLUTION ("ADR") ATTORNEY
CERTIFICATION**

Pursuant to Rule 10 of the Commercial Division Rules, I certify that I have discussed with my client any Alternative Dispute Resolution options available through the Commercial Division and those offered by private entities.  My client:

☐ presently wishes to jointly engage an ADR provider at an appropriate time to aid settlement.

☒ do not presently wish to jointly engage an ADR provider at an appropriate time to aid settlement for the following reasons:

This action involves substantial allegations of fraudulent misconduct for which settlement does not appear to be a reasonable possibility.

This case involves the following (check all that are applicable):

☒ an ongoing business or personal relationship among the parties

☐ an employment agreement

☒ a business transaction involving a commercial bank or other financial institution

☐ commercial insurance coverage or environmental insurance coverage

☐ construction litigation

☐ the amount in issue is less than double the jurisdictional threshold amount for the Commercial Division in this County or Judicial District

☐ issues that appear to require creative or flexible solutions.

Dated:   December 9, 2022
      New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*

Alexander J. Willscher
Austin P. Mayron
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588
willschera@sullcrom.com
mayrona@sullcrom.com

*Attorneys for Plaintiff Emigrant Business Credit Corporation*

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 144 of 2230

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:    **HON. MARGARET A. CHAN**                    PART        49
                                                    *Justice*
-----------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,                INDEX NO.        158207/2022

                              Plaintiff,

                              - v -

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL,
LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY
FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ CORPS.,

                              Defendant.

-----------------------------------------------------------------------X

        The parties appeared via Microsoft Teams for a preliminary conference on
December 9, 2022 at 2:30 p.m. Pursuant to the conference, it is hereby ORDERED:

1) By December 23, 2022, defendants shall provide to plaintiff documentation
   showing the source of any proceeds in excess of $5,000 and any
   disbursements from the defendants in excess of $10,000, both on or after
   October 19, 2023. Defendants to continue as an ongoing obligation to share
   such documentation with plaintiff two weeks after the first of each month
   respecting the previous month.
2) Respecting the escrow funding obligation, defendants shall not include as an
   ordinary and necessary disbursement carveout any disbursements relating to
   new tax liens. The parties shall meet and confer to further define this
   carveout; if the parties are unable to stipulate to such carveout by December
   19, 2022, the parties shall email the court's law clerk to set up a conference.
3) Disclosure shall proceed pursuant to the Rules of the Commercial Division
   (CD) and the Rules of Commercial Division Part 49.
4) Demand for a bill of particulars and/or interrogatories (see CPLR 3130 (1)
   and CD Rule 11-a) shall be served by all parties on or before January 9, 2023.

## OTHER ORDER – NON-MOTION

FILED: NEW YORK COUNTY CLERK 12/12/2022 02:05 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 53
RECEIVED NYSCEF: 12/12/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 145 of 2230

5) A responsive bill of particulars and/or answers to interrogatories shall be served by all parties on or before January 23, 2023 with any production with privilege logs, on a rolling basis, completed no later than February 6, 2023.

6) Demand for discovery and inspection (see CD Rule 11-e) shall be served by all parties on or before February 6, 2023.

7) Responses to demands shall be served by all parties on or before February 20, 2023 with any production with privilege logs, on a rolling basis, completed no later than March 13, 2023.

8) The parties will execute a stipulation reflecting their agreement as to exchanging electronically-stored information (ESI) (see CD Rule 11-c) by January 23, 2023 or if there is no agreement or only partial agreement, the parties shall notify the court and the matter will be addressed at the compliance conference.

9) EBTs of all parties to be noticed or agreed to by stipulation on or before February 6, 2023. EBTs to be held for all parties and non-parties (if any) on or before April 28, 2023.

10) Expert discovery to be completed by May 31, 2023.

11) Impleader shall be completed on or before February 6, 2023.

12) End date for all disclosure: May 31, 2023.

13) If any dispute over discovery arises, the parties shall immediately consult and comply with the court's Part Rules.

14) Any dispositive motion(s) shall be made within sixty days of the deadline to file the note of issue and/or as directed by the Part Rules or further order of this court.

15) The note of issue/certificate of readiness shall be filed by June 2, 2023 with a copy of this order.

Next Compliance Conference Date: April 5, 2023 at 2:30 p.m. via Microsoft Teams (unless otherwise instructed by the court).
NOI Date: June 2, 2023.

DATE: **12/09/2022**

MARGARET A. CHAN, JSC

**Check One:**  ☐ **Case Disposed**  ☒ **Non-Final Disposition**

**Check if Appropriate:**  ☐ **Other (Specify** _____ )

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

Plaintiff,

v.                                                    Index No. 158207/2022

JOHN ARTHUR HANRATTY, EBURY                           Mot. #002
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

Defendants.

## THE EBURY PARTIES' REPLY IN SUPPORT OF MOTION TO DISMISS

**GUSRAE KAPLAN NUSBAUM PLLC**

Kari Parks
Daniel Crandall
Victor Wang (Admission Pending)
120 Wall Street
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com
dcrandall@gusraekaplan.com
vwang@gusraekaplan.com

*Counsel for The Ebury Parties*

FILED: NEW YORK COUNTY CLERK 12/15/2022 08:28 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 54
RECEIVED NYSCEF: 12/15/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 147 of 2230

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

ARGUMENT .......................................................................................................... 1

    I.    EBCC Pleads No Facts Justifying Alter Ego Liability Over Mr. Hanratty or Ebury RE ............................................................................................................................. 1

        A.    Merely Reciting Alter Ego Factors Fails to Plead Alter Ego Liability ............... 1

        B.    EBCC Pleads No Facts Explaining Why Unspecified Transactions Among Unspecified Parties were a "Sham" or Otherwise Show that Mr. Hanratty or Ebury RE Abused the Corporate Form ...................................................................................... 4

    II.    The Complaint's Failure to Plead Scienter Facts is Fatal to EBCC's Fraudulent Inducement Claim ...................................................................................................... 6

    III.    The Court Should Dismiss EBCC's Fraudulent Inducement Claim as Duplicative of Its Breach-of-Contract Claim ...................................................................................... 10

    IV.    EBCC Pleads No Fraudulent Transfer Facts ........................................................ 14

CONCLUSION ...................................................................................................... 16

WORD COUNT CERTIFICATION ........................................................................ 17

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 148 of 2230

# TABLE OF AUTHORITIES

**Cases**

<u>Am. Media, Inc. v. Bainbridge & Knight Lab'ys, LLC</u>, 135 A.D.3d 477 (1st Dep't 2016)  11

<u>Barker v. Time Warner Cable, Inc.</u>, 24 Misc. 3d 1213(A) (Sup. Ct. Nassau Cnty. 2009) .. 12

<u>Bd. of Managers of Gansevoort Condo. v. 325 W. 13th, LLC</u>, 121 A.D.3d 554 (1st Dep't 2014) ................................................................................................................................. 2

<u>Beijing Zhong Xian Wei Ye Stainless Decoration Center v. Guo</u>, No. 653176/2017, 2020 WL 2404938 (Sup. Ct. N.Y. Cnty. May 7, 2020) (Bannon, J.) ........................................... 14

<u>Brainstorms Internet Mktg., Inc. v. USA Networks, Inc.</u>, 6 A.D.3d 318 (1st Dep't 2004) .. 2

<u>Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.</u>, 655 F. Supp. 2d 177 (E.D.N.Y. 2009) ............................................................................................................................................. 4

<u>Carling v. Peters</u>, 170 A.D.3d 482 (1st Dep't 2019) .......................................................... 13, 14

<u>Cortlandt St. Recovery Corp. v. Bonderman</u>, 31 N.Y.3d 30 (2018) ................................... 2, 3

<u>ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC</u>, 50 A.D.3d 397 (1st Dep't 2008) ................................................................................................................................. 13, 14

<u>First Bank of Americas v. Motor Car Funding, Inc.</u>, 257 A.D.2d 287 (1st Dep't 1999) ..... 11

<u>Fromowitz v. W. Park Assocs., Inc.</u>, 106 A.D.3d 950 (2d Dep't 2013) ......................... 11, 14

<u>Giant Grp., Ltd. v. Arthur Andersen</u>, 2 A.D.3d 189 (1st Dep't 2003) ................................. 10

<u>Kelley v. Galina-Bouquet, Inc.</u>, 155 A.D.2d 96 (1st Dep't 1990) ................................... 12, 13

<u>LaSalle Nat. Bank v. Ernst & Young LLP</u>, 285 A.D.2d 101 (1st Dep't 2001) ..................... 10

<u>Lincoln Bldg. Servs. Inc. v. Dellwood Dev., Ltd.</u>, 54 Misc. 3d 1220(A) (Sup. Ct. Queens Cnty. 2017) ........................................................................................................................... 4

<u>Man Advisors, Inc. v. Selkoe</u>, 174 A.D.3d 435 (1st Dep't 2019) .......................................... 14

<u>Metro. Transp. Auth. V. Triumph Advert. Prods., Inc.</u>, 116 A.D.2d 526 (1st Dep't 1986) ... ............................................................................................................................................ 5, 12

ii

Monaco v. New York Univ. Med. Ctr., 213 A.D.2d 167 (1st Dep't 1995) ............................ 6

New York City Waterfront Dev. Fund II, LLC v. Pier A Battery Park Assocs., LLC, 206
    A.D.3d 565 (1st Dep't 2022) ......................................................................................... 6

Oster v. Kirschner, 77 A.D.3d 51 (1st Dep't 2010) ............................................................ 7, 8

P & HR Sols., LLC v. Ram Cap. Funding, LLC, 195 A.D.3d 473 (1st Dep't 2021) .............. 2

Platinum Partners Value Arbitrage Fund LP v. Kroll Assocs., Inc., 102 A.D.3d 483 (1st
    Dep't 2013) ................................................................................................................ 8, 9

Pludeman v. N. Leasing Sys., Inc., 10 N.Y.3d 486 (2008) ...................................................... 7

Shah v. Ortiz, No. 651500/2011, 2014 WL 110241 (Sup. Ct. N.Y. Cnty. Jan. 09, 2014)
    (Marber, J.) ................................................................................................................ 12

Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC, 146 A.D.3d 1 (1st Dep't
    2016), aff'd, 31 N.Y.3d 1002 (2018) ....................................................................... 2, 6

Varo, Inc. v. Alvis PLC, 261 A.D.2d 262 (1st Dep't 1999) .............................................. 10, 14

## Statutes

CPLR 3016(b) .................................................................................................................... 7

N.Y. Debt. & Cred. Law § 273(a) (McKinney 2022) ............................................................ 14

## Other Authorities

Def.–Resp't's Br., Platinum Partners Value Arbitrage Fund LP v. Kroll Assocs., Inc.,
    2012 WL 13035580 (1st Dep't 2012) ........................................................................ 9

iii

The "**Ebury Parties**" respectfully submit this reply memorandum in further support of their "**Motion to Dismiss**" Plaintiff Emigrant Business Credit Corporation's ("**EBCC**") "**Complaint**," which fails to plead fraudulent inducement or fraudulent transfer facts, and further fails to show how it can hold non-parties John Hanratty and "**Ebury RE**" LLC liable for breaching the "**Credit Agreements**."

## ARGUMENT

### I. EBCC Pleads No Facts Justifying Alter Ego Liability Over Mr. Hanratty or Ebury RE

EBCC's Opposition clarifies that Ebury Street Capital, LLC ("**ESC**") is a party to the Credit Agreements; therefore, the Ebury Parties no longer move for dismissal of the breach-of-Credit Agreement claim against ESC. See Opp., Dkt. 48 at 6–7 (Dec. 2, 2022).

But while Mr. Hanratty is a party to the "**Validity Guaranties**," EBCC still fails to identify any facts suggesting that he is a party to the Credit Agreements, or that Ebury RE is a party to either the Validity Guaranties or the Credit Agreements. Compl., Dkt. 1 (Sept. 25, 2022) ¶¶ 39, 108. EBCC also fails to identify any other facts that could bind Mr. Hanratty or Ebury RE to the Credit Agreements, whether via alter ego liability or otherwise. See generally id.

#### A. Merely Reciting Alter Ego Factors Fails to Plead Alter Ego Liability

EBCC argues that the "**Borrowers**"and "**Guarantors**" are Mr. Hanratty and Ebury RE's alter egos. Opp., Dkt. 48 at 6–8. However, the Opposition elides a discussion of the elements required to impose contractual alter ego liability on non–parties to a contract, which are (1) that the non–parties "exercised complete domination [ . . . ] in respect to the

1

transaction attacked" of an alter ego that was a party to the contract, **and** (2) exercised

that domination in order "to commit a fraud or wrong against the plaintiff which resulted

in plaintiff's injury." Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC, 146 A.D.3d 1,

12 (1st Dep't 2016), aff'd, 31 N.Y.3d 1002 (2018).  The Complaint does not allege facts

establishing that Mr. Hanratty or Ebury RE used the corporate form of any of any of the

Borrowers or Guarantors of the Credit Agreements "as an instrument of wrongdoing,"

which is "fatal" to alter ego liability. Bd. of Managers of Gansevoort Condo. v. 325 W.

13th, LLC, 121 A.D.3d 554, 555 (1st Dep't 2014).

Instead of identifying any abuses of the corporate form, EBCC simply incants

typical alter ego factors. Compl., Dkt. 1 ¶ 18 (reciting legal factors without pleading

relevant facts); Opp. Dkt. 48 at 9–10 (asserting that "EBCC has pleaded sufficient facts to

establish Defendants' alter ego liability," followed by bulleted list of factors). Without

pleading facts that prove up these factors, EBCC fails to plead alter ego liability. See, e.g.,

P & HR Sols., LLC v. Ram Cap. Funding, LLC, 195 A.D.3d 473, 474 (1st Dep't 2021) (mere

recitation of veil–piercing factors insufficient to state a cause of action based on alter ego

liability) (citing Skanska, 146 A.D.3d at 12); Brainstorms Internet Mktg., Inc. v. USA

Networks, Inc., 6 A.D.3d 318, 318 (1st Dep't 2004) (same).

EBCC's Opposition cites cases in purported support of the notion that alleging the

veil–piercing factors is sufficient to impose alter ego liability at the pleading stage,

without regard to whether there was an abuse of the corporate form—but the cases do

not in fact support this proposition. Opp., Dkt. 48 at 10 (citing e.g., Cortlandt St. Recovery

Corp. v. Bonderman, 31 N.Y.3d 30 (2018)).

2

In <u>Cortland</u>, for instance, the plaintiffs sued private equity investment funds to collect on debts that non–party debtors had defaulted on. 31 N.Y.3d at 34–37. The private equity defendants had previously created a group of shell companies that had acquired the debtors. <u>Id.</u> at 35. The plaintiffs' complaint set forth facts detailing how the defendants employed the shell companies in a "borrowing scheme" whereby the shells "acquire[d] long–term debt which dwarfed shareholder equity, all the while distributing . . . loan proceeds and certificate redemptions to the private equity defendants." 31 N.Y.3d at 48. The shell companies allegedly enabled the defendants "to conceal the true nature" of the borrowing scheme, which left the shell companies insolvent, thereby enriching the defendants at the expense of creditors. <u>Id.</u> at 48–49. The plaintiffs' allegations "describe[d] the precarious financial status of the [shells] when the private equity defendants took the corporate assets for themselves, setting forth how and when the business acquired debt, and how that debt continued to grow despite the shareholders' disproportionately low equity at the time." <u>Id.</u> at 49. The complaint included specifics such as "the dates and amounts" of the alleged fraudulent distributions to the defendants. <u>Id.</u> Thus, unlike EBCC's Complaint, which alleges no facts indicating that the Ebury Parties abused the corporate form to EBCC's detriment, the <u>Cortlandt</u> plaintiffs alleged how the private equity defendants in that case "misused the corporate form" of shell company alter egos as part of a scheme that injured the plaintiffs. <u>Id.</u>

**B. EBCC Pleads No Facts Explaining Why Unspecified Transactions Among Unspecified Parties were a "Sham" or Otherwise Show that Mr. Hanratty or Ebury RE Abused the Corporate Form**

EBCC's Opposition makes only a nominal effort, in a footnote, to address its failure to identify an abuse of the corporate form. Opp., Dkt. 48 at 10 n.6. That footnote cites a Queens County Supreme Court decision which found alter ego liability because the plaintiff had established how the defendant had abused the corporate form, and the specific fruits of that fraud: the defendant diverted corporate assets "for his and his family members' personal use, which included purchases from local stores, casino debts, as well as investments in automobiles and racing cars." See id.; Lincoln Bldg. Servs. Inc. v. Dellwood Dev., Ltd., 54 Misc. 3d 1220(A) (Sup. Ct. Queens Cnty. 2017).

Even if an unpublished Queens County Supreme Court case bound this Court, Lincoln Building is factually inapposite here, where the only "abuse" identified by EBCC is a vague allegation that Defendants "used sham corporate transactions" between the Ebury Entities "to loot EBCC's collateral and loan proceeds." Compare Opp., Dkt. 48 at 10 n.6 (citing Compl., Dkt. 1 ¶ 1) with, e.g., Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc., 655 F. Supp. 2d 177, 196–97 (E.D.N.Y. 2009) (where plaintiffs alleged that individual defendants "distributed to themselves funds held by [alleged alter ego] corporate defendants for the purpose of avoiding attachment of the funds by plaintiffs," but did not "specify . . . which individual defendant took funds from which corporation," this was "too vague and conclusory to allege alter ego liability") (internal quotation marks omitted) (applying New York law).

4

As the First Department has held, "[m]ere conclusory allegations that the corporate structure is a sham are insufficient to warrant piercing the corporate veil." <u>Metro. Transp. Auth. V. Triumph Advert. Prods., Inc.</u>, 116 A.D.2d 526, 528 (1st Dep't 1986). EBCC's allegations of unspecified "sham" transactions are thus insufficient to establish abuse of the corporate form.

The few other facts that EBCC musters fail to save its alter ego liability. <u>See</u> Opp. <u>Dkt. 48</u> at 9. For instance, the Opposition cites EBCC's allegation in paragraph 92 of the Complaint that "Defendants transferred $350,000 in sale proceeds from Ebury 1EMI LLC to Ebury 2EMI LLC" in support of its allegation in paragraph 18 that the Ebury Parties "intermingle[d] funds." <u>Id.</u> But the Opposition does not explain how the transfer of funds from Ebury "**1EMI**" LLC to Ebury "**2EMI**" LLC could possibly interfere with EBCC's ability to collect the amounts that are allegedly due under the Credit Agreements or otherwise injure EBCC: in fact, both 1EMI and 2EMI are directly liable to EBCC as parties to the Credit Agreements. Compl., <u>Dkt 1</u> ¶ 11.

The Opposition also adds a bullet point to its list of typical veil–piercing factors, asserting that Defendants "are inadequately capitalized." Opp., <u>Dkt. 48</u> at 9. However, this assertion was not included in the Complaint, and is not supported by any of the Complaint's allegations. Compl., <u>Dkt. 1</u> ¶ 18. EBCC follows its assertion that Defendants are inadequately capitalized with a citation to the Complaint's allegation that the Ebury Parties have "failed to repay EBCC the amounts owed under the Credit Agreements." Opp., <u>Dkt. 48</u> at 9 (quoting Compl., <u>Dkt. 1</u> ¶ 38). But this makes no sense — if the mere fact that a borrower has defaulted under a credit agreement is sufficient to allege that the

borrower is inadequately capitalized, then this veil–piercing factor would militate in favor of piercing the corporate veil against any borrower that is sued for non–payment.

In reality, "a simple breach of contract, without more," in not a reason to impose alter ego liability. Skanska, 146 A.D.3d at 12; see also New York City Waterfront Dev. Fund II, LLC v. Pier A Battery Park Assocs., LLC, 206 A.D.3d 565, 567 (1st Dep't 2022) (holding that, where plaintiff creditor's allegations showed only that defendants used their domination and control over the borrower "to cause [the] [b]orrower to breach its contractual obligations," this was "insufficient to pierce the corporate veil").

## II. The Complaint's Failure to Plead Scienter Facts is Fatal to EBCC's Fraudulent Inducement Claim

EBCC's Opposition concedes that scienter is an essential element of a claim for fraudulent inducement, and cannot dispute that the Complaint's only direct allegations of fraudulent intent are insufficient because they are either stated "on information and belief," or are hearsay drawn from the McOsker Counterclaim. Opp., Dkt. 48 at 12–14.

Instead, the Opposition spends two pages establishing that EBCC's Complaint alleges the elements of fraudulent inducement **other** than scienter, without relying on information and belief for those elements. Id. at 14–15.

But, of course, the Complaint must plead every element of every claim—and our law is clear that EBCC's pleading burden is even higher for fraud and its distinguishing element—scienter—than it is for most other types of claims. Monaco v. New York Univ. Med. Ctr., 213 A.D.2d 167, 169 (1st Dep't 1995) (holding that each of the elements of fraud,

6

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 156 of 2230

including scienter, "must be supported by factual allegations sufficient to satisfy" CPLR

3016(b)'s requirement that fraud claims be pleaded with "particularity").

In an attempt to save its fraudulent inducement claim, EBCC cites cases for the

proposition that, under certain circumstances, fraudulent intent "need only be pleaded

generally." Opp., Dkt. 48 at 12 (citing e.g., Pludeman v. N. Leasing Sys., Inc., 10 N.Y.3d

486 (2008); Oster v. Kirschner, 77 A.D.3d 51 (1st Dep't 2010)). But this misstates the law,

as is clear from a review of EBCC's cases.

In Pludeman, the plaintiffs sued both a corporation and its "top management" for

fraud. 10 N.Y.3d at 489. The plaintiffs had sufficiently alleged fraudulent intent on the

part of sales representatives of the corporation, but the defendants moved to dismiss the

fraud claim against the corporation's management because the plaintiffs had not made

allegations regarding the individual managers' intent. Id. at 489–91. The court held that

the corporation's fraudulent intent could be imputed to its managers, given their "key

positions" within the company. Id. at 493. Pludeman is inapposite here because EBCC

has alleged no underlying fraudulent intent that could be imputed to the Ebury Parties.

See generally Compl., Dkt. 1.

The Oster plaintiffs asserted a cause of action for aiding and abetting fraud against

a law firm that had prepared a private placement memorandum ("**PPM**") for an

investment that turned out to be a Ponzi scheme. 77 A.D.3d at 55. While the complaint

contained only general allegations that the law firm knew the investment was a Ponzi

scheme, discovery in a parallel SEC proceeding showed that the law firm knew the

investment was run by securities felons, one of whom had been banned from the

7

securities industry. Id. The law firm did not initially disclose this criminal history in the PPM. Id. at 54. After the FBI raided the Ponzi scheme's offices, the law firm provided a revised PPM that mentioned the securities felons' criminal history, but the revised PPM was backdated to appear that it had been provided before the FBI raid. Id. at 55. Based on these facts, including that the underlying fraud of the Ponzi scheme had been established, the court allowed the aiding and abetting claim to proceed. Id. at 55–56. Here, EBCC's claim is not aiding and abetting, but rather that the Ebury Parties themselves committed fraud; no underlying fraud is alleged. Compl., Dkt. 1 ¶¶ 110–16. And unlike in Oster, EBCC has made no allegations—except for information and belief and hearsay—that the Ebury parties knowingly provided any false information to EBCC. See generally id.

EBCC's Opposition identifies one set of non–"information and belief" allegations that it asserts support its argument that it has sufficiently pleaded scienter: Mr. Hanratty allegedly sent EBCC a spreadsheet that bore the logo of a third–party lien servicer, but that was not actually prepared by that lien servicer. Opp., Dkt. 48 at 13 (citing Compl., Dkt. 1 ¶ 56). The spreadsheet also allegedly reported inaccurate numbers pertaining to the "**Collateral**." Id. (citing Compl., Dkt. 1 ¶¶ 56–58, 60). However, EBCC does not dispute that where, as here, the plaintiff's allegations "indicate, at the most, errors or simple oversight on defendant's part," they "do not give rise to an inference of fraudulent intent." Compare Mot., Dkt. 42 at 12 (Nov. 16, 2022) (citing Platinum Partners Value Arbitrage Fund LP v. Kroll Assocs., Inc., 102 A.D.3d 483, 483 (1st Dep't 2013)), with generally Opp., Dkt. 48. The Complaint does not plead any facts suggesting that merely

sending a spreadsheet with a logo demonstrates that Mr. Hanratty intended to deceive EBCC—the fundamental scienter question of all fraud-based claims.

In <u>Platinum Partners</u>, the plaintiff commissioned the defendant, a private investigative firm, to produce reports on individuals associated with a company that the plaintiff was considering investing $20 million in. 102 A.D.3d at 483. The defendant produced the reports, but failed to disclose a civil theft action against one of the individuals, along with two criminal convictions against a related entity and individual. <u>Id.</u>; Def.–Resp't's Br., <u>Platinum Partners Value Arbitrage Fund LP v. Kroll Assocs., Inc.</u>, 2012 WL 13035580, at *2 (1st Dep't 2012). The plaintiff sued for fraud, but because it had not alleged facts supporting a finding that the failure to disclose this information was deliberate, the First Department affirmed dismissal of the fraud claim on the pleadings. 102 A.D.3d at 483.

EBCC's Opposition argues that <u>Platinum Partners</u> is distinguishable because "lying to a bank" about collateral is "[p]lainly" worse than the conduct of the defendant in that case. Opp., Dkt. 48 at 12 n.8. But this argument assumes its own conclusion by positing that the Ebury Parties "l[ied] to a bank." <u>Id.</u> There is no basis in the Complaint to conclude that the Ebury Parties lied to EBCC because, outside of hearsay and information and belief, there are no allegations that the Ebury Parties knew any information they provided to EBCC about the Collateral was false. <u>See generally</u> Compl, Dkt. 1. Furthermore, the question is not whether the Ebury Parties' alleged behavior was "bad," "good," or "worse"; the question is whether the Complaint pleads facts showing that Mr. Hanratty intended to trick, and did trick, EBCC.

EBCC's Opposition also does not address <u>Giant Grp., Ltd. v. Arthur Andersen, LLP</u>, another case cited in the Motion to Dismiss that is similar to <u>Platinum Partners</u>. Mot., <u>Dkt. 42</u> at 12 (citing 2 A.D.3d 189, 190 (1st Dep't 2003)); <u>see generally</u> Opp., <u>Dkt. 48</u>. In <u>Giant Group</u>, the plaintiff asserted a fraud claim based on allegations that the defendants "knew or recklessly failed to discover certain improprieties in the financial statements of [a] corporate entity which defendants were purportedly to review on plaintiff's behalf." 2 A.D.3d at 190. However, aside from the financial statements' alleged inaccuracy, the plaintiff alleged no "facts from which scienter may be inferred," so the First Department dismissed the fraud claim. <u>Id.</u>; <u>see also</u> <u>LaSalle Nat. Bank v. Ernst & Young LLP</u>, 285 A.D.2d 101, 109–10 (1st Dep't 2001) (conclusory allegations that accounting firm knew its financial reports were inaccurate could not support fraud claim, where "most of" the specific factual allegations "amount[ed] to negligence rather than the intent to mislead the complaining party").

Here, as in <u>Platinum Partners</u>, <u>Giant Group</u>, and <u>LaSalle</u>, EBCC's failure to allege sufficient facts to support an inference of fraudulent intent dooms its fraudulent inducement claim.

## III. The Court Should Dismiss EBCC's Fraudulent Inducement Claim as Duplicative of Its Breach-of-Contract Claim

Even if EBCC has stated a claim for fraudulent inducement, it should be dismissed as duplicative of its claim for breach of the Validity Guaranties because they are both based on allegations that the Ebury Parties "delivered false information to EBCC" regarding the Collateral. Compl., <u>Dkt. 1</u> ¶¶ 40–42, 108, 111; <u>Varo, Inc. v. Alvis PLC</u>, 261

A.D.2d 262, 266 (1st Dep't 1999) (where fraud claim was "based on the same facts as underlie[d] the contract claim," fraud claim was duplicative of contract claim); Fromowitz v. W. Park Assocs., Inc., 106 A.D.3d 950, 951 (2d Dep't 2013) ("[A] cause of action premised upon fraud cannot lie where it is based on the same allegations as the breach of contract claim.").

EBCC argues that "false statements concerning collateral for a loan agreement . . . are not duplicative of breaches of the underlying loan agreements." Opp., Dkt. 48 at 16. But this misses the point: the Ebury Parties do not argue that EBCC's fraudulent inducement claim is duplicative of its claim for breach of the underlying Credit Agreements, only that it is duplicative of the claim for breach of the Validity Guaranties. Mot., Dkt. 42 at 16–18.

EBCC cites cases where the court allowed both fraud and contract claims to proceed, because the fraud claim was premised on misrepresentations regarding collateral, and the contract claim was based on something else. Opp., Dkt. 48 at 16 (citing First Bank of Americas v. Motor Car Funding, Inc., 257 A.D.2d 287, 290 (1st Dep't 1999) (contract claim was based on defendant's refusal to (1) deliver title and lien documents and (2) buy certain loan contracts pursuant to sale and purchase agreement); Am. Media, Inc. v. Bainbridge & Knight Lab'ys, LLC, 135 A.D.3d 477, 477 (1st Dep't 2016) (breach of contract claim was based on failure to pay $1.3 million owed for advertising services)). Here, however, the fraudulent inducement claim and the claim for breach of the Validity Guaranties are duplicative because they are **both** based on alleged misrepresentations regarding the Collateral. Compl., Dkt. 1 ¶¶ 42, 108, 111; cf. Fromowitz, 106 A.D.3d at 951–

FILED: NEW YORK COUNTY CLERK 12/15/2022 08:28 PM
NYSCEF DOC. NO. 54

INDEX NO. 158207/2022
RECEIVED NYSCEF: 12/15/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 161 of 2230

52 (holding that fraud claim based on misrepresentation regarding the quality of roof shingles duplicated contract claim for breach of agreement to install specific roof shingles, and reversing order that had allowed both claims to proceed).

EBCC also argues that the fraud and contract claims are not duplicative because the fraud claim is based on allegations that the Ebury Parties fraudulently induced EBCC to enter into the Credit Agreements, while the contract claim relates to the Validity Guaranties, and the two claims thus "concern different documents." Opp., Dkt. 48 at 16–17. But this is not the law, and the two decisions EBCC cites do not support this proposition. In Shah v. Ortiz, the court held that claims for breach of fiduciary duty and breach of the covenant of good faith were not duplicative not only because they "ar[o]se from different agreements," but also because, unlike here, "the claims assert[ed] different factual bases for recovery." No. 651500/2011, 2014 WL 110241, at *2 (Sup. Ct. N.Y. Cnty. Jan. 09, 2014) (Marber, J.). And in Barker v. Time Warner Cable, Inc., the court noted in dicta that claims involving "two entirely different contract agreements" may not be duplicative, but dismissed claims for breach of contract and breach of the covenant of good faith because in that case, both claims actually did arise from the same contract. 24 Misc. 3d 1213(A) (Sup. Ct. Nassau Cnty. 2009).

EBCC additionally argues that the fraud and contract claims are not duplicative because they both concern different parties. Opp., Dkt. 48 at 17–18. But this, again, is not the law. Metro. Transp. Auth., 116 A.D.2d at 527–28 (fraud cause of action against president dismissed as redundant in light of breach of contract cause of action against corporate defendant, where same allegations gave rise to both claims). EBCC cites Kelley

12

v. Galina-Bouquet, Inc., which held that a divorce action and a separate breach of

employment contract litigation between a woman and her estranged husband's

corporation were not duplicative, "since the actions [we]re against different parties, and

the plaintiff s[ought] different relief in each action." 155 A.D.2d 96, 99 (1st Dep't 1990).

However, the issue of whether two actions are duplicative of each other is different from

the issue here, which is whether two claims in the same action are duplicative. Thus,

Kelley is inapposite.

EBCC next argues that the fraud and contract claims are not duplicative because

they seek different relief. Opp., Dkt. 48 at 17–18. This is not true. EBCC fails to plead any

specific fraudulent inducement damages. Compl., Dkt. 1 at 30 (requesting that the Court

"[a]ward damages for Defendants' fraudulent inducement, in an amount to be

ascertained at trial"). But the Complaint does allege that, under the Validity Guaranties,

Mr. Hanratty "is personally liable for any [] damages" resulting from the Ebury Parties'

alleged "misrepresentations to EBCC about the Collateral." Id. ¶ 39. Thus, EBCC's own

Complaint makes clear that, to the extent it was damaged by the Ebury Parties' alleged

fraudulent misrepresentations regarding the Collateral, EBCC seeks identical damages

under the Validity Guaranties. Furthermore, even if the fraud and contract claims sought

different relief, they might still be duplicative. Carling v. Peters, 170 A.D.3d 482, 483 (1st

Dep't 2019) (conclusory request for punitive damages based on fraud claim did "not mask

that [the] fraud claim [wa]s, at its core, no different from, and duplicative of, [the]

contract–based claims"); ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC, 50

A.D.3d 397, 398 (1st Dep't 2008) (dismissing fraud claim as duplicative of contract claims,

and holding that the fact that plaintiffs "s[ought] different remedies for the breaches of contract d[id] not alter the nature of the underlying cause of action").

Finally, EBCC asserts that it is entitled to plead duplicative fraud and contract claims in the alternative. Opp., Dkt. 48 at 18 n.9. EBCC cites Man Advisors, Inc. v. Selkoe, and claims that the decision denied a motion to dismiss a duplicative fraud claim. Id. (citing 174 A.D.3d 435 (1st Dep't 2019)). But EBCC misreads the case—in fact, the First Department only allowed the Man Advisors plaintiff's fraud claim to proceed because it was **not** duplicative of the plaintiff's breach claim. 174 A.D.3d at 435. New York courts regularly dismiss duplicative fraud claims, and should do so here. See, e.g., Carling, 170 A.D.3d at 483 (dismissing duplicative fraud claim); ESBE Holdings, 50 A.D.3d at 398 (same); Varo, 261 A.D.2d at 266 (same); Fromowitz, 106 A.D.3d at 951 (same).

### IV.    EBCC Pleads No Fraudulent Transfer Facts

The Complaint alleges no facts in support of its fraudulent transfer claims, other than several paragraphs that contain "information and belief" allegations tracking the language of New York's fraudulent transfer statutes. See Compl., Dkt. 1 ¶¶ 99–100, 118–121; N.Y. Debt. & Cred. Law § 273(a)(1)–(2) (McKinney 2022). This is insufficient to state a claim for fraudulent transfer. Beijing Zhong Xian Wei Ye Stainless Decoration Center v. Guo, No. 653176/2017, 2020 WL 2404938, at *2 (Sup. Ct. N.Y. Cnty. May 7, 2020) (Bannon, J.) (allegations of fraudulent conveyance that "simply parrot[ed] the statutory elements" did not state a claim).

EBCC's Opposition tries to supplement the Complaint's deficient allegations with a citation to an affidavit of one of EBBC's employees. Opp., Dkt. 48 at 20 (citing Aff. of

Scott Weiss, Dkt. 5 ¶ 25 (Oct. 17, 2022)). That affidavit alleges that the Ebury Parties website, which has the address http://eburyre.com/, lists 88 properties for sale. Aff. of Scott Weiss, Dkt. 5 ¶ 25. The Opposition argues that because the website appears to belong to Ebury RE, which is not a Borrower or Guarantor under the Credit Agreements, the Ebury Parties must be fraudulently transferring assets from the Borrowers and Guarantors to Ebury RE to escape liability under the Credit Agreements. Opp., Dkt. 48 at 20. But this does not follow—among other reasons, the "**Ebury Entities**" can list properties on Ebury RE's website without transferring ownership of those properties, just as one can list property for sale in classified ads without transferring ownership of the property to the newspaper.

EBCC thus has still failed to identify fraudulent transfer facts, and its fraudulent transfer claim must be dismissed.

15

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 165 of 2230

## CONCLUSION

The Ebury Parties respectfully request that the Court (1) dismiss the contract claim against Ebury RE, as well as against Mr. Hanratty to the extent it relies on the Credit Agreements, and (2) dismiss the fraudulent inducement and fraudulent transfer claims in their entirety.

Dated: December 15, 2022
     New York, New York

          Respectfully submitted,

          **GUSRAE KAPLAN NUSBAUM PLLC**

          /s/Daniel Crandall
          Kari Parks
          Daniel Crandall
          Victor R. Wang (Admission Pending)
          120 Wall Street
          New York, New York 10005
          (212) 269-1400
          kparks@gusraekaplan.com
          dcrandall@gusraekaplan.com
          vwang@gusraekaplan.com

          *Counsel for The Ebury Parties*

16

FILED: NEW YORK COUNTY CLERK 12/15/2022 08:28 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 54
RECEIVED NYSCEF: 12/15/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 166 of 2230

## WORD COUNT CERTIFICATION

I certify that this memorandum of law complies with the word count limit of N.Y.C.R.R. 202.8-b for documents prepared by computer. Microsoft Word's word count tool represents that this memorandum, excluding the caption, table of contents, table of authorities, and signature block, totals 4,190 words.

Dated: December 15, 2022
        New York, New York

/s/ Daniel Crandall
Daniel Crandall

17

Bond No. **800138431**

# UNDERTAKING ON PRELIMINARY INJUNCTION

SUPREME COURT STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,

Plaintiff.

-v-

Index No. 158207/2022

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL,
LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1EMIFL, LLC EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC EB
1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC. LLC EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC RED
CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS,

Defendants.

-------------------------------------------------------------------------X

**WHEREAS,** on the 29th day of November 2022, the above-named Plaintiff, was granted a preliminary injunction, upon the posting of a bond in the amount of TWO MILLION ONE HUNDRED THOUSAND AND XX/100 ($2,100,000.00) Dollars, in the above-entitled action, enjoining the Defendants, from doing certain things as more fully set forth in the order by the Hon. Margaret Chan, J.S.C.

**NOW, THEREFORE,** the Atlantic Specialty Insurance Company having an office and principal place of business for the state of New York at 77 Water Street, 17th Floor, New York, NY, 10005, as Surety, does hereby, pursuant to the Statute in such case made and provided, undertake that the Plaintiff will pay to the Defendants, so enjoined, such damages and costs not exceeding the sum of TWO MILLION ONE HUNDRED THOUSAND AND XX/100 ($2,100,000.00) Dollars as it may sustain by reason of the preliminary injunction if the Court shall finally decide that the Plaintiff was not entitled thereto; such damages and costs to be ascertained by a reference, or otherwise as the Court shall direct.

DATED: December 19, 2022

**ATLANTIC SPECIALTY
INSURANCE COMPANY**

By:

D. Nicholas Blaikie, *Attorney-in-fact*

form#

## ACKNOWLEDGEMENT OF SURETY

### STATE OF NEW YORK
### COUNTY OF NEW YORK

On the 19th day of December in the year 2022, before me personally came D. Nicholas Blaikie to me known, who being by me duly sworn, did depose and say that he resides at One State Street Plaza, 31st Floor, New York, NY 10004, that he is the Attorney-in-Fact of Atlantic Specialty Insurance Company, the corporation described in and which executed the above instrument; that he knows the corporate seal of said corporation, that the seal affixed to such instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and, that he signed his name thereto by like order; and that said corporation is duly authorized to transact business in the State of New York in pursuance of the statutes of such case made and provided, that the Superintendent of insurance of the State of New York, has pursuant to Chapter 28 of the Consolidated Laws of the State of New York, known as the Insurance Law, issued to Atlantic Specialty Insurance Company, A Certificate of Solvency and qualification to become surety or guarantor on all bonds, undertakings, recognizances, guaranties and other obligations required or permitted by law and that such certificate has not been revoked.

COLETTE M. BLAIKIE
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 1BL4989857
Qualified in NEW YORK County
Commission Expires MAY 6 2026

Notary Public



# Power of Attorney

KNOW ALL MEN BY THESE PRESENTS, that ATLANTIC SPECIALTY INSURANCE COMPANY, a New York corporation with its principal office in Plymouth, Minnesota, does hereby constitute and appoint: D. Nicholas Blaikie, Colette M. Blaikie, Fayth Vasseur, each individually if there be more than one named, its true and lawful Attorney-in-Fact, to make, execute, seal and deliver, for and on its behalf as surety, any and all bonds, recognizances, contracts of indemnity, and all other writings obligatory in the nature thereof; provided that no bond or undertaking executed under this authority shall exceed in amount the sum of: unlimited and the execution of such bonds, recognizances, contracts of indemnity, and all other writings obligatory in the nature thereof in pursuance of these presents, shall be as binding upon said Company as if they had been fully signed by an authorized officer of the Company and sealed with the Company seal. This Power of Attorney is made and executed by authority of the following resolutions adopted by the Board of Directors of ATLANTIC SPECIALTY INSURANCE COMPANY on the twenty-fifth day of September, 2012:

Resolved: That the President, any Senior Vice President or Vice President (each an "Authorized Officer") may execute for and in behalf of the Company any and all bonds, recognizances, contracts of indemnity, and all other writings obligatory in the nature thereof, and affix the seal of the Company thereto; and that the Authorized Officer may appoint and authorize an Attorney-in-Fact to execute on behalf of the Company any and all such instruments and to affix the Company seal thereto; and that the Authorized Officer may at any time remove any such Attorney-in-Fact and revoke all power and authority given to any such Attorney-in-Fact.

Resolved: That the Attorney-in-Fact may be given full power and authority to execute for and in the name and on behalf of the Company any and all bonds, recognizances, contracts of indemnity, and all other writings obligatory in the nature thereof, and any such instrument executed by any such Attorney-in-Fact shall be as binding upon the Company as if signed and sealed by an Authorized Officer and, further, the Attorney-in-Fact is hereby authorized to verify any affidavit required to be attached to bonds, recognizances, contracts of indemnity, and all other writings obligatory in the nature thereof

This power of attorney is signed and sealed by facsimile under the authority of the following Resolution adopted by the Board of Directors of ATLANTIC SPECIALTY INSURANCE COMPANY on the twenty-fifth day of September, 2012:

Resolved: That the signature of an Authorized Officer, the signature of the Secretary or the Assistant Secretary, and the Company seal may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing an Attorney-in-Fact for purposes only of executing and sealing any bond, undertaking, recognizance or other written obligation in the nature thereof, and any such signature and seal where so used, being hereby adopted by the Company as the original signature of such officer and the original seal of the Company, to be valid and binding upon the Company with the same force and effect as though manually affixed.

IN WITNESS WHEREOF, ATLANTIC SPECIALTY INSURANCE COMPANY has caused these presents to be signed by an Authorized Officer and the seal of the Company to be affixed this twenty-seventh day of April, 2020.

STATE OF MINNESOTA
HENNEPIN COUNTY

By _____
Paul J. Brehm, Senior Vice President

On this twenty-seventh day of April, 2020, before me personally came Paul J. Brehm, Senior Vice President of ATLANTIC SPECIALTY INSURANCE COMPANY, to me personally known to be the individual and officer described in and who executed the preceding instrument, and he acknowledged the execution of the same, and being by me duly sworn, that he is the said officer of the Company aforesaid, and that the seal affixed to the preceding instrument is the seal of said Company and that the said seal and the signature as such officer was duly affixed and subscribed to the said instrument by the authority and at the direction of the Company.

ALISON DWAN NASH-TROUT
NOTARY PUBLIC - MINNESOTA
My Commission Expires
January 31, 2025

_____
Notary Public

I, the undersigned, Secretary of ATLANTIC SPECIALTY INSURANCE COMPANY, a New York Corporation, do hereby certify that the foregoing power of attorney is in full force and has not been revoked, and the resolutions set forth above are now in force.

Signed and sealed. Dated    19th    day of December    2022.

This Power of Attorney expires
January 30, 2025

_____
Kara Barrow, Secretary

Please direct bond verifications to surety.@onebeaconbest.com

 specialty solutions

**Atlantic Specialty Insurance Company**
Period Ended 12/31/2021

Dollars displayed in thousands

| Admitted Assets | | Liabilities and Surplus | |
|---|---|---|---|
| Investments | | Liabilities | |
| Bonds | $ 1,827,267 | Loss Reserves | $ 1,012,842 |
| Preferred Stocks | | Loss Adjustment Expense Reserves | 307,406 |
| Common Stocks | 907,728 | Total Loss & LAE Reserves | 1,320,248 |
| Mortgage Loans | | | |
| Real Estate | - | Unearned Premium Reserve | 655,960 |
| Contract Loans | - | Total Reinsurance Liabilities | 24,180 |
| Derivatives | - | Commissions, Other Expenses, and Taxes due | 63,705 |
| Cash, Cash Equivalents & Short Term Investments | 174,284 | Derivatives | - |
| Other Investments | 20,131 | Payable to Parent, Subs or Affiliates | - |
| Total Cash & Investments | 2,929,367 | All Other Liabilities | 442,340 |
| Premiums and Considerations Due | 388,964 | Total Liabilities | 2,506,925 |
| Reinsurance Recoverable | 24,105 | | |
| Receivable from Parent, Subsidiary or Affiliates | 36,353 | Capital and Surplus | |
| All Other Admitted Assets | 29,690 | Common Capital Stock | 5,001 |
| | | Preferred Capital Stock | - |
| Total Admitted Assets | 3,390,479 | Surplus Notes | - |
| | | Unassigned Surplus | 305,606 |
| | | Other Including Gross Contributed | 577,367 |
| | | Capital & Surplus | 851,954 |
| | | Total Liabilities and C&S | 3,358,479 |

State of Minnesota
County of Hennepin

I, Kara Barrow, Secretary of Atlantic Specialty Insurance Company do hereby certify that the foregoing statement is a correct exhibit of the assets and liabilities of the said Company, on the 31st day of December, 2021, according to the best of my information, knowledge and belief.

*Kara M Barrow*
Secretary

Subscribed and sworn to, before me, a Notary Public of the State of Minnesota on this 14th day of March, 2022.

*Kerri Riechers*
Notary Public

KERRI RIECHERS
Notary Public
Minnesota
My Commission Expires January 31, 2025

My Commission Expires January 31, 2025

# STATE OF NEW YORK
## DEPARTMENT OF FINANCIAL SERVICES

### CERTIFICATE OF SOLVENCY UNDER SECTION 1111 OF THE NEW YORK INSURANCE LAW

It is hereby certified that

### Atlantic Specialty Insurance Company
### of New York, New York

a corporation organized under the laws of New York and duly authorized to transact the business of insurance in this State, is qualified to become surety or guarantor on all bonds, undertakings, recognizances, guaranties, and other obligations required or permitted by law; and that the said corporation is possessed of a capital and surplus including gross paid-in and contributed surplus and unassigned funds (surplus) aggregating the sum of $820,615,432. (Capital $9,000,546), as is shown by its sworn financial statement for the quarter ending, March 31, 2021, on file in this Department, prior to audit.

The said corporation cannot lawfully expose itself to loss on any one risk or hazard to an amount exceeding 10% of its surplus to policyholders, unless it shall be protected in excess of that amount in the manner provided in Section 4118 of the Insurance Law of this State.



In Witness Whereof, I have hereunto set my hand and affixed the official seal of this Department at the City of Albany, this 2nd day of June, 2021.

Linda A. Lacewell
Superintendent

By

Colleen M. Draper
Special Deputy Superintendent

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 172 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

                                Plaintiff,

                v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

                                Defendants.

Index No. 158207/2022

Hon. Margaret A. Chan

<u>**NOTICE OF APPEAL**</u>

PLEASE TAKE NOTICE that the "**Ebury Parties**"[1] hereby appeal to the

Appellate Division of the Supreme Court of the State of New York, First Department,

---

[1] Defendants Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC,

from each and every aspect of the annexed Decision and Order of the Honorable

Margaret A. Chan of the Supreme Court, New York County, dated November 29, 2022,

and duly entered in the Office of the New York County Clerk on November 30, 2022,

which granted the motion for a preliminary injunction of Plaintiff Emigrant Business

Credit Corporation (Motion Sequence 1).

Dated: December 28, 2022
New York, New York

Respectfully submitted,

**GUSRAE KAPLAN NUSBAUM PLLC**

/s/Daniel Crandall
Kari Parks
Daniel Crandall
Victor R. Wang (Admission Pending)
120 Wall Street
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com
dcrandall@gusraekaplan.com
vwang@gusraekaplan.com

*Counsel for The Ebury Parties*

Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, Ebury RE LLC and
John Hanratty (together, the "**Ebury Parties**").

FILED: NEW YORK COUNTY CLERK 12/28/2022 04:06 PM

INDEX NO. 158207/2022

NYSCEF DOC. NO. 56

RECEIVED NYSCEF: 12/28/2022

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records    Pg 174 of 2230

# Exhibit A

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 175 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

--------------------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,

                    Plaintiff,

          - v -

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL,
LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED
CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS.

                    Defendants.

--------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 158207/2022 |
| **MOTION DATE** | 10/18/2022 |
| **MOTION SEQ. NO.** | 001 |

**DECISION + ORDER ON
MOTION**

HON. MARGARET A. CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 001) 1, 2, 3, 4, 5, 6, 7,
8, 9, 10, 11, 12, 13, 14, 15, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31

were read on this motion to/for         PREL INJUNCTION/TEMP REST ORDR        .

      In this action, plaintiff lender Emigrant Business Credit Corporation alleges
causes of action for breach of contract, fraudulent inducement, and fraudulent
transfer against defendants. In its attempt to recover the amounts it loaned to
defendants Ebury 1EMI LLC and Ebury 2EMI LLC (respectively, 1EMI and 2EMI
and, together, the Borrowers), plaintiff seeks an order, which, in short, would enjoin
defendants from (1) transferring their general assets (with an ordinary and
necessary business expense carveout), (2) depositing certain proceeds into escrow,
and (3) requiring defendants to give plaintiff twenty-four hours' notice prior to
defendants' transfer of assets exceeding $50,000.[1] Defendants oppose the motion.

---

[1] The court granted a temporary restraining order as to the latter two items by order filed
on October 19, 2022 (NYSCEF # 23).

**158207/2022   EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR
ET AL
Motion No. 001**

**Page 1 of 9**

# BACKGROUND

*Plaintiff Extends Financing to Defendants*

Plaintiff is a New York-based specialty finance company (NYSCEF # 1 – Complaint, ¶ 5). Defendant John Hanratty is the manager of defendant Ebury Street Capital, LLC (ESC), the manager or general partner of all the other corporate defendants (collectively with ESC, the Ebury Entities) (*id.*, ¶'s 8-9). Plaintiff claims that "ESC and each of the Ebury Companies is an alter ego of Hanratty and of one another with respect to the transactions with respect to the transactions described in this Complaint." (*id.*, ¶ 18).

On March 9, 2017, plaintiff extended credit facilities to Borrowers 1EMI and 2EMI in amounts totaling $10,000,000 and $5,000,000, respectively, with 1EMI's facility later increased to $15,000,000 (*id.*, ¶ 33). Hanratty and various Ebury Entities issued guaranties in connection with the credit facilities (*id.*, ¶'s 15, 37, 39).

The funds were to be used to finance the purchase of tax lien certificates that municipalities place on properties when an owner fails to pay municipal taxes (*id.*, ¶'s 32; 22). Certain investors purchase tax lien certificates from municipalities to profit from the interest rate chargeable on the certificate and to enable ownership of the underlying real estate through foreclosure (*id.*, ¶ 25).

Plaintiff explains that the credit facilities were structured to allow the Borrowers to draw down revolving lines of credit against the value of a pool of eligible assets serving as collateral (*id.*, ¶'s 27; 34). The total amount the Borrowers could draw down equals the advance rate, which ranged from 70% to 85%, multiplied by the amount of eligible collateral (*id.*, ¶'s 28; 34). Any tax lien certificate that defendants purchased using the credit facilities, and its proceeds, served as the collateral (*id.*, ¶ 34).

Plaintiff alleges that "[d]efendants misappropriated advances to the credit facilities as well as EBCC's collateral to pay tens of millions of dollars in distributions to company insiders – including Defendant John Hanrraty – as well as other investors" (*id.* ¶ 1). Also, the Borrowers failed to repay the principal and interest for the credit facilities when they came due on November 10, 2021, which default has continued even after plaintiff sent a default notice on November 29, 2021 (*id.*, ¶ 38). Plaintiff alleges that the outstanding amounts exceed $21.8 million (*id.*, ¶ 38).

*Allegations of Fraud*

For its fraud claim, plaintiff alleges as follows: Hanratty consistently claimed that plaintiff was secured by collateral worth more than the outstanding amounts (*id.*, ¶ 43). For example, one of plaintiff's employees conveyed concerns to Hanratty about the 2019 financial audits, which valued the tax lien investments at around $17.2 million, being less than the approximately $18 million outstanding balance owed at the time (*id.*, ¶ 47). Hanratty responded that plaintiff was actually secured by $32 million in tax lien collateral, plus additional collateral amounts (*id.*, ¶ 47).

FILED: NEW YORK COUNTY CLERK 12/28/2022 04:06 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 56
RECEIVED NYSCEF: 12/28/2022

Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 177 of 2230

Hanratty's claims of overcollateralization were intentionally false, and Hanratty even bragged about his ability to mislead plaintiff's employee (*id.*, ¶'s 47-49).

The credit facilities required the Borrowers to deliver the tax lien certificates they purchased to a designated third-party custodian, which the parties agreed would be MTAG Services, LLC (the Custodian) (*id.*, ¶'s 50; 52). In March of 2021, plaintiff discovered that certain of the collateral was not held by the Custodian (*id.*, ¶ 55). Plaintiff alleges that Hanratty subsequently misled plaintiff about the custodial status of the collateral. To wit, defendant shared a spreadsheet purporting to be from the Custodian and indicated that as of August 31, 2021, the Custodian had 6,782 tax lien certificates (*id.*, ¶ 55-57). The Custodian has since confirmed to plaintiff that as of that date, it only had custody of 518 tax lien certificates worth a fraction of the amount the spreadsheet had indicated (*id.*, ¶ 57). Hanratty admitted he was self-servicing almost 90% of the collateral (*id.*, ¶ 58).

Additional allegations of fraud include that Hanratty improperly inflated the value of certain liens, altered origination dates for hundreds of certificates, and misrepresented that certain advances would be used to finance purchases of tax lien certificates when they were instead used for investor distributions and settlements (*id.*, ¶'s 63; 68; 69-81). Further, defendants were required to deposit proceeds from sales of tax lien certificates into plaintiff's lockbox account, but not only did defendants fail to do so, Hanratty also falsely represented that he owned the liens and that they were increasing in value (*id.*, ¶'s 94-96). And, because proceeds of tax lien certificates are treated as collateral, this means any owned real property that resulted from a foreclosure on a tax lien should also have been included as collateral. But defendants have been effecting transfers without receipt of fair consideration, so to prevent plaintiff from receiving sale proceeds (*id.*, ¶'s 97-100).

## DISCUSSION

"The provisional remedy of a preliminary injunction in New York civil actions is governed by CPLR 6301" (*Credit Agricole Indosuez v Rossiyskiy Kredit Bank*, 94 NY2d 541, 544 [2000]), which provides in relevant parts:

A preliminary injunction may be granted in any action where it appears that the defendant threatens or is about to do, or is doing or procuring or suffering to be done, an act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual, or in any action where the plaintiff has demanded and would be entitled to a judgment restraining the defendant from the commission or continuance of an act, which, if committed or continued during the pendency of the action, would produce injury to the plaintiff. . . .

(CPLR 6301).

The "remedy of granting a preliminary injunction is a drastic one which should be used sparingly" (*McLaughlin, Piven, Vogel, Inc. v W.J. Nolan & Co.*, 114 AD2d 165, 172 [2d Dept 1986]). "A preliminary injunction substantially limits a

defendant's rights and is thus an extraordinary provisional remedy requiring a special showing …. [It] will only be granted when the party seeking such relief demonstrates a likelihood of ultimate success on the merits, irreparable injury if the preliminary injunction is withheld, and a balance of equities tipping in favor of the moving party" (*1234 Broadway LLC v West Side SRO Law Project*, 86 AD3d 18, 23 [1st Dept 2011], citing *Doe v Axelrod*, 73 NY2d 748 [1988]).

Whether to grant a preliminary injunction is "committed to the sound discretion of the motion court" (*Harris v Patients Med., P.C.*, 169 AD3d 433, 434 [1st Dept 2019]). The existence of triable issues of fact does not require the denial of a preliminary injunction when the movant meets its burden of establishing that the three prerequisites for injunctive relief have been met (*Bell & Co, P.C. v Rosen*, 114 AD3d 411, 411 [1st Dept 2014]; CPLR 6312 [c]). "The purpose of a preliminary injunction is to maintain the status quo and prevent the dissipation of property that could render a judgment ineffectual" (*1650 Realty Assocs., LLC v Golden Touch Mgmt., Inc.*, 101 AD3d 1016, 1018 [2d Dept 2012]).

### Likelihood of Ultimate Success on the Merits

Plaintiff argues that it is likely to succeed on the merits (NYSCEF # 4 – MOL at 6-12; NYSCEF # 28 – Reply at 1-4). The first basis plaintiff puts forward is its claim for breach of contract. "To establish a breach of contract claim, the plaintiffs must allege the specific terms of the agreement, the consideration, the plaintiffs' performance, and the defendants' breach of the agreement" (*Sylmark Holdings Ltd. v Silicone Zone Int'l Ltd.*, 5 Misc 3d 285, 295 [Sup Ct, NY County 2004]). Plaintiff argues that this has been met because the Borrowers promised to repay all principal and interest outstanding at the maturity date – November 10, 2021 – but failed to do so (NYSCEF # 4 at 7). Plaintiff adds that Hanratty and other defendants are liable for the amounts the Borrowers owe on account of the guaranties (*id.* at 7).

Defendants argue that it is "not clear" that the outstanding credit line balance breaches the contracts as the parties were actively negotiating repayment between the maturity date and September 2022 and that defendants accepted plaintiff's repayment terms just prior to commencing this action (NYSCEF # 27 – Opp at 19; # 24 – Hanratty aff, ¶ 57). However, defendants' representation here is unsupported and insufficient for a denial of a preliminary injunction (*Bell*, 114 AD3d at 411).

Defendants argue that because plaintiff relies on "Conclusory, Hearsay, and 'Information and Belief' Allegations" to support its breach of contract claim, plaintiffs cannot show that it has a likelihood of success. Defendants' argument is unavailing as plaintiff's allegations and supporting affidavit (NYSCEF # 5) is sufficient to establish likelihood of success on the merits for the present purposes. As such, the court need not, and does not, reach the parties' arguments as to the sufficiency of plaintiff's other causes of action (*see e.g. Petry v Gillon*, 199 AD3d 1277, 1279 [3d Dept 2021] ["to obtain a preliminary injunction, plaintiffs needed to

demonstrate a likelihood of success on the merits on at least one of their claims"]). In sum, plaintiff has presented a prima facie case supporting the likelihood of success on the merits, which defendants have failed to rebut for this motion.

### Irreparable Injury

Plaintiff asserts that it has established irreparable injury on two independent bases: defendants' insolvency and the monies at issue being identifiable proceeds of plaintiff's collateral. The court considers the insolvency issue first.[2]

A "general creditor has no legally recognized interest in or right to interfere with the use of the unencumbered property of a debtor prior to obtaining judgment. . . Therefore, . . . the acts of the debtor in disposing of assets will not have 'produce[d] [cognizable] injury to the plaintiff' and thus will not support a temporary injunction" (*Credit Agricole*, 94 NY2d at 549 [quoting CPLR 6301]). In a money action, a plaintiff "often fears that [the defendant] will secrete property during the action's pendency and thus make a money judgment uncollectable. [Plaintiff's] remedy there, if [plaintiff] can establish such conduct by [defendant] convincingly, is an order of attachment under CPLR 6201 [3], not an injunction under Article 63." (*Id.* at 548 quoting Siegel, NY Prac § 327 at 498 [3d ed]).

Nonetheless, a secured creditor does have a legally recognized interest in preventing dissipation of encumbered property prior to obtaining judgment (*see e.g. Winchester Glob. Tr. Co. v Donovan*, 58 AD3d 833, 834 [2d Dept 2009] [holding that injunctive relief was properly granted as the uncontrolled disposition of assets "would threaten to render ineffectual any judgment which the plaintiff might obtain" in an action by a secured party to set aside allegedly fraudulent conveyances made "in derogation of the plaintiff's perfected security interest"]; *Goldman Sachs Bank USA v Schreiber*, 2022 WL 60650 at *3 [Sup Ct, NY County 2022] [granting preliminary injunction enjoining the transfer of assets where plaintiff, a secured creditor, sought to prevent a dissipation of collateral, and the sale of such assets in direct contravention of agreements would cause irreparable harm by taking away the value of the collateral]).

Here, in his affidavit, plaintiff's Senior Vice President, Scott Weiss, states that defendants "executed Security Agreements pledging all of the Borrowers' and Guarantors' present and future assets as security for the Credit Facilities" (NYSCEF #'s 5 – Weiss Aff, ¶ 11; 9 – the Security Agreements). Weiss avers that defendants have sold at least 90 properties and have listed another 88 properties that were purportedly part of plaintiff's collateral, for a total of approximately, respectively, $4.1 and $4.8 million (NYSCEF # 5, ¶ 25). Plaintiff argues this

---

[2] As a threshold matter, the court is not convinced by defendants' argument that plaintiff's "own delay in asserting its purported rights" vitiates against finding imminent, irreparable harm (NYSCEF # 21 at 2). Even if, *arguendo*, plaintiff did cause delay in seeking the present relief, "[m]ere delay, without the necessary elements creating an equitable estoppel, does not preclude the grant of an injunction" (*New York Real Est. Inst., Inc. v Edelman*, 42 AD3d 321, 322 [1st Dept 2007]).

**158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR          Page 5 of 9**
**ET AL**
**Motion No. 001**

85 of 198

supports its allegation that defendants have a history of fraudulently transferring assets to place them beyond plaintiff's reach (NYSCEF # 4 at 14). Hanratty confirms that plaintiff has "filed UCC-1 Statements perfecting its security interests in the Ebury Entities' liens" (NYSCEF # 24 – Hanratty Aff, ¶ 45).

As for evidence of defendants' insolvency, plaintiff identifies that defendants have failed to repay the outstanding debt of more than $21 million which has been pending for almost a year, and that defendants' own independent auditor expressed substantial doubts about defendants' ability to continue as a going concern (NYSCEF # 28 at 7). Without addressing either of plaintiff's contentions, defendants assert that plaintiff "musters no facts to suggest that [defendants] are insolvent," referring generally to the complaint (NYSCEF # 27 at 23). In their memorandum of law, defendants note that defendants have testified that their current assets exceed plaintiff's "maximum possible relief by approximately $4 million" (*id.* at 23). Defendants do not indicate where such testimony may be found.

The court finds that plaintiff has sufficiently established for the present purposes that plaintiff is a secured creditor whose collateral risks further dissipation by insolvent defendants. Under New York law, this finding is sufficient to warrant issuing the preliminary injunction plaintiff seeks (*Winchester*, 58 AD3d 833; *see also Goodstein v Enbar*, 2017 WL 1032545 at *5 [Sup Ct, NY County 2017] [noting that "it is self-evident that if a party renders itself insolvent for the purpose of evading judgment, the plaintiff will not be fully compensated by a monetary award"]).

Defendants' reliance on *Credit Agricole* is inapposite as it involves claims of a general, unsecured creditor. Defendants' reliance on *Dinner Club Corp. v Hamlet on Olde Oyster Bay Homeowners Ass'n, Inc.* is similarly unavailing (21 AD3d 777 [1st Dept 2005]) [noting that "a *general creditor* has no cognizable interest in or right to interfere with the use of the unencumbered property of a debtor until the creditor obtains a judgment"] [emphasis added]).[3] Defendants' reliance on *Zodkevitch v Feibush* and related cases for the idea that irreparable injury does not exist if money damages can redress plaintiff's harm is without merit here given the insolvency exception plaintiff identifies (49 AD3d 424, 425 [1st Dept 2008]).

Citing *Laco X-Ray Sys., Inc. v Fingerhut*, 88 AD2d 425 [2d Dept 1982]) defendants wrongly assert that CPLR 6301 only authorizes a preliminary injunction if plaintiff "clearly proves that the defendant (1) has engaged or imminently will be engaging (2) in fraudulent or otherwise wrongful behavior, (3) in order to cause its own insolvency" (NYSCEF # 27 at 21). CPLR 6301 does not mention fraudulent or

---

[3] Defendants also cite the United States Supreme Court case *Grupo Mexicano de Desarrollo S.A. v All. Bond Fund, Inc.*, 527 US 308 [1999]). Defendants fail to explain the applicability of this federal court case, which, even if it were, for argument's sake, applicable, would also be unavailing. *Grupo Mexicano* "distinguished the situation attendant to general unsecured creditors from that involving a creditor asserting some interest in or on the property" (*Bank of Am., N.A. v Won Sam Yi*, 294 F Supp 3d 62, 77 [WD NY 2018]).

wrongful behavior, and *Laco*, analyzing the appropriateness of an attachment under Article 62 of the CPLR, does not once mention CPLR 6301.

Finally, defendants posit that insolvency is an insufficient basis to satisfy the irreparable injury requirement (citing *Rosenthal v Rochester Button Co.*, 148 AD2d 375 [1st Dept 1989]). *Rosenthal* is inapposite, however, as the *Rosenthal* court was not persuaded that the defendant was "in financial distress and likely to be unable to pay any judgment in the future" (*id.* at 377).

### Balance of Equities

The court next considers the third part of the showing plaintiff must make to support a preliminary injunction. "To obtain an injunction, the plaintiff [must] show that the irreparable injury to be sustained is more burdensome to [such plaintiff] than the harm that would be caused to the defendant through the imposition of the injunction" (*Lombard v Station Square Inn Apartments Corp.*, 94 AD3d 717, 721-22 [2d Dept 2012]). Plaintiff argues that "[a]bsent injunctive relief, there is a substantial likelihood that [plaintiff] will not be able to collect on its security interests or recover in this proceeding" whereas there would be "minimal harm to Defendants from an injunction" (NYSCEF # 4 at 15-16).

Defendants respond that plaintiff "would be just fine" if the court denies the injunction as plaintiff could still recover significant sums if defendants file for bankruptcy because of plaintiff's perfected security interests (NYSCEF # 27 at 26). Defendants continue that even if plaintiff collected nothing, plaintiff "remains part of a 172-year old bank with total assets of $5.61 billion" such that the money judgment plaintiff seeks is worth just 0.00388% of plaintiff's net assets.

Defendants' argument falls flat, and the court finds that the balance of equities favors plaintiff (*see e.g. Felix v Brand Serv. Grp. LLC*, 101 AD3d 1724, 1726 [4th Dept 2012] [finding balance of equities supported applicant where even if defendants may be delayed in using the restrained funds, nonetheless without the injunction "plaintiffs may never be able to recover the money, if disbursed"]; *Goldman Sachs Bank USA*, 2022 WL 60650 at *2 [finding balance of equities favored lender where there were loan defaults by the debtor]).

### Undertaking

Defendants assert that if the injunction issues, the court should order plaintiff to post a $30 million undertaking to reflect defendants' "possible damages" including the "possible . . . total loss of [defendants'] assets" (NYSCEF 27 at 27-28). Plaintiff requests that the court "set a nominal undertaking in the amount of $1 or in no event greater than $10,000 because Defendants have failed to demonstrate that they will suffer any damages or costs by reason of the injunction" (NYSCEF # 28 at 10).

CPLR 6312 [b] provides that "prior to the granting of a preliminary injunction, the plaintiff shall give an undertaking in an amount to be fixed by the court, that the plaintiff, if it is finally determined that he or she was not entitled to

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR   Page 7 of 9
ET AL
Motion No. 001

10 of 98

an injunction, will pay to the defendant all damages and costs which may be sustained by reason of the injunction. . . ." The amount must be "rationally related to defendants' potential damages if the preliminary injunction later proves to have been unwarranted" (*Madison/Fifth Assocs. LLC v 1841-1843 Ocean Parkway, LLC*, 50 AD3d 533, 534 [1st Dept 2008]). Speculative damages are not considered (*Visual Equities Inc. v Sotheby's*, Inc., 199 AD2d 59, 59 [1st Dept 1993]).

The court finds that an undertaking of $2.1 million is rationally related to defendants' potential damages (*see e.g. Zonghetti v Jeromack*, 150 AD2d 561, 563 [2d Dept 1989] [in granting injunction prohibiting the defendants from transferring or dissipating any of their assets, where $740,000 was allegedly converted, undertaking properly set at $100,000]).

## CONCLUSION

In view of the above, it is

ORDERED that the motion of plaintiff Emigrant Business Credit Corporation (Emigrant) for a preliminary injunction against the above-captioned defendants is granted; and it is further

ORDERED that defendants and their successors, assigns, agents, employees, officers, attorneys, and all other persons acting in concert or participation with any of them (Related Persons), are temporarily restrained and enjoined from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, permitting the transfer of any of their assets, aside from ordinary and necessary disbursements related to the defendants' tax lien or real estate businesses or living expenses; and it is further

ORDERED that defendants and their Related Persons, to the extent that any tax lien certificate or real estate property resulting from the foreclosure on a tax lien certificate is or has been sold on or after October 19, 2022, are temporarily restrained and enjoined to deposit any proceeds from such sale, aside from ordinary and necessary disbursements related to the defendants' tax lien or real estate businesses, into an escrow account, to be established by the parties; and it is further

ORDERED, that defendants and their Related Persons must notify Emigrant at least twenty-four (24) hours in advance of transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of,

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 8 of 9
ET AL
Motion No. 001

18 of 98

FILED: NEW YORK COUNTY CLERK 12/28/2022 04:06 PM

INDEX NO. 158207/2022

NYSCEF DOC. NO. 90

Case 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State

RECEIVED NYSCEF: 12/28/2022

Court Records    Pg 183 of 2230

assigning, or permitting the transfer of any assets in an amount exceeding $50,000; and it is further

ORDERED that pursuant to CPLR 6312 (b) Emigrant shall post an undertaking in the sum of $2,100,000 by December 19, 2022; and it is further

ORDERED that a preliminary conference shall be held on December 5, 2022, at 2:30 p.m. or at such other time that the parties shall set with the court's law clerk; and it is further

ORDERED that defendants shall share with plaintiff in advance of the conference documentary evidence supporting its calculations as to the amounts subject to escrow.

| 11/29/2022 | | | | | |
|---|---|---|---|---|---|
| DATE | | | | MARGARET CHAN, J.S.C. | |

| CHECK ONE: | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|---|
| | | GRANTED | DENIED | X | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR ET AL
Motion No. 001

Page 9 of 9

12 of 98

# Exhibit B

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 185 of 2230

# Supreme Court of the State of New York

# Appellate Division: First    Judicial Department

Informational Statement (Pursuant to 22 NYCRR 1250.3 [a]) - Civil

| Case Title: Set forth the title of the case as it appears on the summons, notice of petition or order to show cause by which the matter was or is to be commenced, or as amended. | For Court of Original Instance |
|---|---|
| **EMIGRANT BUSINESS CREDIT CORPORATION**<br><br>- against -<br><br>JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1 EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMO, LLC, EB 1EMINJ, LLC, EB 1EMINY, LLC, EB 1EMISC, LLC, EB 2MINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1–10 | Date Notice of Appeal Filed |
| | **For Appellate Division** |

| Case Type | | Filing Type | |
|---|---|---|---|
| ■ Civil Action | ☐ CPLR article 78 Proceeding | ■ Appeal | ☐ Transferred Proceeding |
| ☐ CPLR article 75 Arbitration | ☐ Special Proceeding Other | ☐ Original Proceedings | ☐ CPLR Article 78 ☐ |
| | ☐ Habeas Corpus Proceeding | ☐ CPLR Article 78 | Executive Law § 298 |
| | | ☐ Eminent Domain | ☐ CPLR 5704 Review |
| | | ☐ Labor Law 220 or 220-b | |
| | | ☐ Public Officers Law § 36 | |
| | | ☐ Real Property Tax Law § 1278 | |

**Nature of Suit:** Check up to three of the following categories which best reflect the nature of the case.

| | | | |
|---|---|---|---|
| ☐ Administrative Review | ■ Business | ■ Commercial | ■ Contracts |
| ☐ Declaratory Judgment | Relationships ☐ | ☐ Election Law | ☐ Estate Matters |
| ☐ Family Court | Domestic Relations ☐ | ☐ Miscellaneous | ☐ Prisoner Discipline & Parole |
| ☐ Real Property (other than foreclosure) | Mortgage Foreclosure ☐ Statutory | ☐ Taxation | ☐ Torts |

Informational Statement - Civil

FILED: NEW YORK COUNTY CLERK 12/28/2022 04:06 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 56    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 12/28/2022

Court Records    Pg 186 of 2230

| Appeal | |
|---|---|
| Paper Appealed From (Check one only): | If an appeal has been taken from more than one order or judgment by the filing of this notice of appeal, please indicate the below information for each such order or judgment appealed from on a separate sheet of paper. |

| | | | |
|---|---|---|---|
| ☐ Amended Decree | ☐ Determination | ☐ Order | ☐ Resettled Order |
| ☐ Amended Judgement | ☐ Finding | ☐ Order & Judgment | ☐ Ruling |
| ☐ Amended Order | ☐ Interlocutory Decree | ☐ Partial Decree | ☐ Other (specify): |
| ■ Decision | ☐ Interlocutory Judgment | ☐ Resettled Decree | |
| ☐ Decree | ☐ Judgment | ☐ Resettled Judgment | |

| | | | |
|---|---|---|---|
| Court: | Supreme Court | County: | New York |
| Dated: | 11/29/2022 | Entered: 11/30/2022 | |
| Judge (name in full): | Margaret A. Chan | Index No.: 158207/2022 | |
| Stage:  ■ Interlocutory  ☐ Final  ☐ Post-Final | | Trial:  ☐ Yes  ■ No   If Yes:  ☐ Jury  ☐ Non-Jury | |

| Prior Unperfected Appeal and Related Case Information |
|---|

Are any appeals arising in the same action or proceeding currently pending in the court?    ☐ Yes  ■ No

If Yes, please set forth the Appellate Division Case Number assigned to each such appeal.

Where appropriate, indicate whether there is any related action or proceeding now in any court of this or any other jurisdiction, and if so, the status of the case:

n/a

| Original Proceeding |
|---|

| | |
|---|---|
| Commenced by:  ☐ Order to Show Cause  ☐ Notice of Petition  ☐ Writ of Habeas Corpus | Date Filed: |
| Statute authorizing commencement of proceeding in the Appellate Division: | |

| Proceeding Transferred Pursuant to CPLR 7804(g) |
|---|

| | | |
|---|---|---|
| Court: | Choose Court | County:    Choose County |
| Judge (name in full): | | Order of Transfer Date: |

| CPLR 5704 Review of Ex Parte Order: |
|---|

| | | |
|---|---|---|
| Court: | Choose Court | County:    Choose County |
| Judge (name in full): | | Dated: |

| Description of Appeal, Proceeding or Application and Statement of Issues |
|---|

Description: If an appeal, briefly describe the paper appealed from. If the appeal is from an order, specify the relief requested and whether the motion was granted or denied. If an original proceeding commenced in this court or transferred pursuant to CPLR 7804(g), briefly describe the object of proceeding. If an application under CPLR 5704, briefly describe the nature of the ex parte order to be reviewed.

Defendants appeal from each and every part of the Decision and Order of the Honorable Margaret A. Chan dated November 29, 2022, which granted the motion for a preliminary injunction of Plaintiff Emigrant Business Credit Corporation.

Informational Statement - Civil

Issues: Specify the issues proposed to be raised on the appeal, proceeding, or application for CPLR 5704 review, the grounds for reversal, or modification to be advanced and the specific relief sought on appeal.

1. Did the Honorable Margaret A. Chan err in granting Plaintiff's motion for a preliminary injunction? Yes.

## Party Information

Instructions: Fill in the name of each party to the action or proceeding, one name per line. If this form is to be filed for an appeal, indicate the status of the party in the court of original instance and his, her, or its status in this court, if any. If this form is to be filed for a proceeding commenced in this court, fill in only the party's name and his, her, or its status in this court.

| No. | Party Name | Original Status | Appellate Division Status |
|-----|------------|-----------------|---------------------------|
| 1 | Emigrant Business Credit Corporation | Plaintiff | Respondent |
| 2 | John Arthur Hanratty | Defendant | Appellant |
| 3 | Ebury Street Capital, LLC | Defendant | Appellant |
| 4 | Ebury Fund 1, LP | Defendant | Appellant |
| 5 | Ebury Fund 2, LP | Defendant | Appellant |
| 6 | Ebury 1EMI LLC | Defendant | Appellant |
| 7 | Ebury 2EMI LLC | Defendant | Appellant |
| 8 | EB 1EMIALA LLC | Defendant | Appellant |
| 9 | EB 2EMIALA LLC | Defendant | Appellant |
| 10 | EB 1EMIFL, LLC | Defendant | Appellant |
| 11 | EB 2EMIFL, LLC | Defendant | Appellant |
| 12 | EB 1EMIIN, LLC | Defendant | Appellant |
| 13 | EB 2EMIIN, LLC | Defendant | Appellant |
| 14 | EB 1EMIMD, LLC | Defendant | Appellant |
| 15 | EB 2EMIMD, LLC | Defendant | Appellant |
| 16 | EB 1EMINJ, LLC | Defendant | Appellant |
| 17 | EB 2EMINJ, LLC | Defendant | Appellant |
| 18 | EB 1EMINY, LLC | Defendant | Appellant |
| 19 | EB 2EMINY, LLC | Defendant | Appellant |
| 20 | See Annex A for additional parties. | | |

Informational Statement - Civil

FILED: NEW YORK COUNTY CLERK 12/28/2022 04:06 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 56    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 12/28/2022

Court Records    Pg 188 of 2230

| Attorney Information |
|---|

Instructions: Fill in the names of the attorneys or firms for the respective parties. If this form is to be filed with the notice of petition or order to show cause by which a special proceeding is to be commenced in the Appellate Division, only the name of the attorney for the petitioner need be provided. In the event that a litigant represents herself or himself, the box marked "Pro Se" must be checked and the appropriate information for that litigant must be supplied in the spaces provided.

| Attorney/Firm Name: Sullivan & Cromwell LLP | | | |
|---|---|---|---|
| Address: 125 Broad Street | | | |
| City: New York | State: NY | Zip: 10004 | Telephone No: (212) 558-4000 |
| E-mail Address: willschera@sullcrom.com; mayrona@sullcrom.com | | | |
| Attorney Type: ■ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): 1 | | | |

| Attorney/Firm Name: Gusrae Kaplan Nusbaum PLLC | | | |
|---|---|---|---|
| Address: 120 Wall Street | | | |
| City: New York | State: NY | Zip: 10005 | Telephone No: (212) 269-1400 |
| E-mail Address: kparks@gusraekaplan.com; dcrandall@gusraekaplan.com; vwang@gusraekaplan.com | | | |
| Attorney Type: ■ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): 2-32 | | | |

| Attorney/Firm Name: | | | |
|---|---|---|---|
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

| Attorney/Firm Name: | | | |
|---|---|---|---|
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

| Attorney/Firm Name: | | | |
|---|---|---|---|
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

| Attorney/Firm Name: | | | |
|---|---|---|---|
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

Informational Statement - Civil

FILED: NEW YORK COUNTY CLERK 12/28/2022 04:06 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 56

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records    Pg 189 of 2230

RECEIVED NYSCEF: 12/28/2022

Annex A to Informational Statement

| 20 | EB 1EMISC, LLC | Defendant | Appellant |
|----|----------------|-----------|-----------|
| 21 | EB 2EMISC, LLC | Defendant | Appellant |
| 22 | EB 2EMISC, LLC | Defendant | Appellant |
| 23 | RE 1EMI LLC | Defendant | Appellant |
| 24 | RE 2EMI LLC | Defendant | Appellant |
| 25 | EB 1EMIDC, LLC | Defendant | Appellant |
| 26 | Arque Tax Receivable Fund (Maryland), LLC | Defendant | Appellant |
| 27 | Ebury Fund 1FL, LLC | Defendant | Appellant |
| 28 | Ebury Fund 2FL, LLC | Defendant | Appellant |
| 29 | Ebury Fund 1NJ, LLC | Defendant | Appellant |
| 30 | Ebury Fund 2NJ, LLC | Defendant | Appellant |
| 31 | Red Clover 1, LLC | Defendant | Appellant |
| 32 | Ebury RE LLC | Defendant | Appellant |
| 33 | XYZ Corps. 1-10 | Defendant | None |

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK: COMMERCIAL DIVISION**

---------------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                  Plaintiff,

     v.

JOHN ARTHUR HANRATTY, et al.,

                Defendants.

---------------------------------------------------------------- x

Index No. 158207/2022

(Hon. Margaret Chan)

**STIPULATION FOR THE
EXCHANGE OF CONFIDENTIAL
INFORMATION**

      This matter having come before the Court by stipulation of plaintiff, Emigrant Business

Credit Corporation ("EBCC"), and defendants John Arthur Hanratty, Ebury Street Capital, LLC,

Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA

LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB

2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC;

EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC;

RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund

1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1,

LLC; and Ebury RE LLC (together, the "Ebury Parties"), for the entry of a protective order

pursuant to CPLR 3103(a), limiting the review, copying, dissemination and filing of confidential

and/or proprietary documents and information to be produced by either party and their respective

counsel or by any non-party in the course of discovery in this matter to the extent set forth below;

and the parties, by, between and among their respective counsel, having stipulated and agreed to

the terms set forth herein, and good cause having been shown;

      IT IS hereby ORDERED that:

1.  This Stipulation is being entered into to facilitate the production, exchange and discovery of documents and information that the parties agree merit confidential treatment (hereinafter the "Documents" or "Testimony").

2.  Either party may designate Documents produced, or Testimony given, in connection with this action as "confidential," either by notation on the document, statement on the record of the deposition, written advice to the respective undersigned counsel for the parties hereto, or by other appropriate means.

3.  As used herein:

(a)  "Confidential Information" shall mean all Documents and Testimony, and all information contained therein, and other information designated as confidential, if such Documents or Testimony contain trade secrets, proprietary business information, competitively sensitive information, or other information the disclosure of which would, in the good faith judgment of the party designating the material as confidential, be detrimental to the conduct of that party's business or the business of any of that party's customers or clients.

(b)  "Producing party" shall mean the parties to this action and any third-parties producing "Confidential Information" in connection with depositions, document production or otherwise, or the party asserting the confidentiality privilege, as the case may be.

(c)  "Receiving party" shall mean the party to this action and/or any non-party receiving "Confidential Information" in connection with depositions, document production or otherwise.

4.  The Receiving party may, at any time, notify the Producing party that the Receiving party does not concur in the designation of a document or other material as Confidential Information. If the Producing party does not agree to declassify such document or material, the Receiving party may move before the Court for an order declassifying those documents or materials. If no such

motion is filed, such documents or materials shall continue to be treated as Confidential Information. If such motion is filed, the documents or other materials shall be deemed Confidential Information unless and until the Court rules otherwise.

5.   Except with the prior written consent of the Producing party or by Order of the Court, Confidential Information shall not be furnished, shown or disclosed to any person or entity except to:

(a)  personnel of plaintiff or defendant actually engaged in assisting in the preparation of this action for trial or other proceeding herein and who have been advised of their obligations hereunder;

(b)  counsel for the parties to this action and their associated attorneys, paralegals and other professional personnel (including support staff) who are directly assisting such counsel in the preparation of this action for trial or other proceeding herein, are under the supervision or control of such counsel, and who have been advised by such counsel of their obligations hereunder;

(c)  expert witnesses or consultants retained by the parties or their counsel to furnish technical or expert services in connection with this action or to give testimony with respect to the subject matter of this action at the trial of this action or other proceeding herein; provided, however, that such Confidential Information is furnished, shown or disclosed in accordance with paragraph 7 hereof;

(d)  the Court and court personnel, if filed in accordance with paragraph 12 hereof;

(e)  an officer before whom a deposition is taken, including stenographic reporters and any necessary secretarial, clerical or other personnel of such officer, if furnished, shown or disclosed in accordance with paragraph 10 hereof;

(f)  trial and deposition witnesses, if furnished, shown or disclosed in accordance with paragraphs 9 and 10, respectively, hereof; and

(g)  any other person agreed to by the parties.

6.   Confidential Information shall be utilized by the Receiving party and its counsel only for purposes of this litigation and for no other purposes.

7.   Before any disclosure of Confidential Information is made to an expert witness or consultant pursuant to paragraph 5(c) hereof, counsel for the Receiving party shall provide the expert's written agreement, in the form of Exhibit A attached hereto, to comply with and be bound by its terms. Counsel for the party obtaining the certificate shall supply a copy to counsel for the other party at the time of the disclosure of the information required to be disclosed by CPLR 3101(d), except that any certificate signed by an expert or consultant who is not expected to be called as a witness at trial is not required to be supplied.

8.   All depositions shall presumptively be treated as Confidential Information and subject to this Stipulation during the deposition and for a period of fifteen (15) days after a transcript of said deposition is received by counsel for each of the parties. At or before the end of such fifteen day period, the deposition shall be classified appropriately.

9.   Should the need arise for any of the parties to disclose Confidential Information during any hearing or trial before the Court, including through argument or the presentation of evidence, such party shall notify all other parties and only upon a showing of good cause, will the information be deemed confidential. Such a showing may be made by application to the court by motion or order to show cause.

10. This Stipulation shall not preclude counsel for the parties from using during any deposition in this action any documents or information which have been designated as "Confidential

Information" under the terms hereof. Any court reporter and deposition witness who is given access to Confidential Information shall, prior thereto, be provided with a copy of this Stipulation and shall execute the certificate annexed hereto. Counsel for the party obtaining the certificate shall supply a copy to counsel for the other party.

11. A party may designate as Confidential Information subject to this Stipulation any document, information, or deposition testimony produced or given by any non-party to this case, or any portion thereof. In the case of Documents, designation shall be made by notifying all counsel in writing of those documents which are to be stamped and treated as such at any time up to fifteen (15) days after actual receipt of copies of those documents by counsel for the party asserting the confidentiality privilege. In the case of deposition Testimony, designation shall be made by notifying all counsel in writing of those portions which are to be stamped or otherwise treated as such at any time up to fifteen (15) days after the transcript is received by counsel for the party asserting the confidentiality privilege. Prior to the expiration of such fifteen (15) day period (or until a designation is made by counsel, if such a designation is made in a shorter period of time), all such documents shall be treated as Confidential Information.

12. A Receiving Party who seeks to file with the Court any deposition transcripts, exhibits, answers to interrogatories, and other documents which have previously been designated as comprising or containing Confidential Information, and any pleading, brief or memorandum which reproduces, paraphrases or discloses Confidential Information, shall provide all other parties with seven (7) days' written notice of its intent to file such material with the Court, so that the Producing Party may file by Order to Show Cause a motion to seal such Confidential Information asserting good cause for such sealing. The Confidential Information shall not be filed until the Court renders a decision on the motion to seal. In the event the motion to seal is

granted, all documents which are the subject of the order to seal, shall be filed in sealed

envelopes or other appropriate sealed container on which shall be endorsed the caption of this

litigation, the words "CONFIDENTIAL MATERIAL- SUBJECT TO STIPULATION FOR THE

PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION" as an indication of

the nature of the contents, and a statement in substantially the following form: "This envelope,

containing documents which are filed in this case by (name of party), is not to be opened nor are

the contents thereof to be displayed or revealed other than to the Court, the parties and their

counsel of record, except by order of the Court or consent of all the parties. Violation hereof may

be regarded as contempt of the Court." All pleadings, briefs or memoranda which reproduce,

paraphrase or disclose any documents which have previously been designated by a party as

comprising or containing Confidential Information, shall identify such documents by the

production number ascribed to them at the time of production.

13. Any person receiving Confidential Information shall not reveal or discuss such information to

or with any person not entitled to receive such information under the terms hereof.

14. Any document or information that may contain Confidential Information that has been

inadvertently produced without identification as to its "confidential" nature as provided in

paragraphs 2 and/or 11 of this Stipulation, may be so designated by the party asserting the

confidentiality privilege by written notice to the undersigned counsel for the Receiving party

identifying the document or information as "confidential" within a reasonable time following the

discovery that the document or information has been produced without such designation.

15. Extracts and summaries of Confidential Information shall also be treated as confidential in

accordance with the provisions of this Stipulation.

16. The production or disclosure of Confidential Information shall in no way constitute a waiver of each party's right to object to the production or disclosure of other information in this action or in any other action.

17. This Stipulation is entered into without prejudice to the right of either party to seek relief from, or modification of, this Stipulation or any provisions thereof by properly noticed motion to the Court or to challenge any designation of confidentiality as inappropriate under the Civil Practice Law and Rules or other applicable law.

18. The provisions of this Stipulation shall, absent prior written consent of both parties, continue to be binding after the conclusion of this action, except:

    (a) that there shall be no restriction on documents that are used in Court (unless such exhibits are permitted by court order to be filed under seal or redacted); and

    (b) that a party may seek the written permission of the Producing party or further order of the Court with respect to dissolution or modification of the Stipulation.

19. Nothing herein shall be deemed to waive any privilege recognized by law, or shall be deemed an admission as to the admissibility in evidence of any facts or documents revealed in the course of disclosure.

20. Within sixty (60) days after the final termination of this litigation by settlement or exhaustion of all appeals, all Confidential Information produced or designated and all reproductions thereof, shall be returned to the Producing Party or shall be destroyed, at the option of the Producing Party. In the event that any party chooses to destroy physical objects and documents, such party shall certify in writing within sixty (60) days of the final termination of this litigation that it has undertaken its best efforts to destroy such physical objects and documents, and that such physical objects and documents have been destroyed to the best of its knowledge. Notwithstanding

anything to the contrary, counsel of record for the parties may retain one copy of documents constituting work product, a copy of pleadings, motion papers, discovery responses, deposition transcripts and deposition and trial exhibits. This Stipulation shall not be interpreted in a manner that would violate any applicable cannons of ethics or codes of professional responsibility.

Nothing in this Stipulation shall prohibit or interfere with the ability of counsel for any party, or of experts specially retained for this case, to represent any individual, corporation, or other entity adverse to any party or its affiliate(s) in connection with any other matters.

21. This Stipulation may be changed by further order of this Court, and is without prejudice to the rights of a party to move for relief from any of its provisions, or to seek or agree to different or additional protection for any particular material or information.

| Attorneys for Plaintiff | Attorneys for Defendants |
|---|---|
| */s/ Alexander J. Willscher* | */s/ Daniel Crandall* |
| Alexander J. Willscher | Kari Parks |
| Austin P. Mayron | Daniel Crandall |
| SULLIVAN & CROMWELL LLP | Victor R. Wang (admission pending) |
| 125 Broad Street | GUSRAE KAPLAN NUSBAUM PLLC |
| New York, New York 10004 | 120 Wall Street, 25th Floor |
| Telephone: (212) 558-4000 | New York, New York 10005 |
| | Telephone: (212) 269-1400 |
| Date: February 22, 2023 | Date: February 22, 2023 |

SO ORDERED:

_____

J.S.C.

EXHIBIT "A"

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK: COMMERCIAL DIVISION**

```
_____  x
                                   :
EMIGRANT BUSINESS CREDIT           :
CORPORATION,                       :
                                   :     Index No. 158207/2022
               Plaintiff,          :
                                   :     (Hon. Margaret Chan)
         v.                        :
                                   :     **AGREEMENT WITH RESPECT**
JOHN ARTHUR HANRATTY, et al.,      :     **TO CONFIDENTIAL MATERIAL**
                                   :
               Defendants.         :
                                   :
                                   :
_____  x
```

I,_____, state that:

1.  My address Is_____.

2.  My present employer is

_____.

3.  My present occupation or job description is

_____.

4.  I have received a copy of the Stipulation for the Production and Exchange of

CONFIDENTIAL INFORMATION (the "Stipulation") entered in the above-entitled action on

_____.

5.  I have carefully read and understand the provisions of the Stipulation.

6.  I will comply with all of the provisions of the Stipulation.

7.  I will hold in confidence, will not disclose to anyone not qualified under the Stipulation, and

will use only for purposes of this action, any Confidential Information that is disclosed to me.

8.  I will return all Confidential Information that comes into my possession, and documents or

things that I have prepared relating thereto, to counsel for the party by whom I am employed or

retained, or to counsel from whom I received the Confidential Information.

9.   I hereby submit to the jurisdiction of this court for the purpose of enforcement of the

Stipulation in this action.

Dated:

_____

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

BRUSSELS • FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

February 22, 2023

<u>Via NYSCEF</u>

The Honorable Margaret Chan,
    Supreme Court, New York County,
      Commercial Division,
        60 Centre Street, Room 659
          New York, New York  100007.

        Re:    *Emigrant Business Credit Corporation v. John Arthur Hanratty et al.*, No. 158207/2022

Dear Justice Chan:

        I write on behalf of the parties in the above-referenced action to respectfully request that the Court enter the Stipulation for the Exchange of Confidential Information (the "Stipulation") filed contemporaneously herewith.  The Stipulation adheres to the model Stipulation and Order for the Production and Exchange of Confidential Information posted under the Court's rules.

        Sincerely,

        */s/ Alexander J. Willscher*

        Alexander J. Willscher

cc:    *All Counsel of Record* (via NYSCEF)

FILED: NEW YORK COUNTY CLERK 03/02/2023 04:47 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 59    24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 03/02/2023
Court Records    Pg 201 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK: COMMERCIAL DIVISION**

---------------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT     :
CORPORATION,     :
    :
    :    Index No. 158207/2022
      Plaintiff,     :
    :    (Hon. Margaret Chan)
      v.     :
    :
JOHN ARTHUR HANRATTY, et al.,     :    **STIPULATION FOR THE**
    :    **EXCHANGE OF CONFIDENTIAL**
      Defendants.     :    **INFORMATION**
    :
    :
---------------------------------------------------------------- x

       This matter having come before the Court by stipulation of plaintiff, Emigrant Business

Credit Corporation ("EBCC"), and defendants John Arthur Hanratty, Ebury Street Capital, LLC,

Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA

LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB

2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC;

EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC;

RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund

1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1,

LLC; and Ebury RE LLC (together, the "Ebury Parties"), for the entry of a protective order

pursuant to CPLR 3103(a), limiting the review, copying, dissemination and filing of confidential

and/or proprietary documents and information to be produced by either party and their respective

counsel or by any non-party in the course of discovery in this matter to the extent set forth below;

and the parties, by, between and among their respective counsel, having stipulated and agreed to

the terms set forth herein, and good cause having been shown;

       IT IS hereby ORDERED that:

1. This Stipulation is being entered into to facilitate the production, exchange and discovery of documents and information that the parties agree merit confidential treatment (hereinafter the "Documents" or "Testimony").

2. Either party may designate Documents produced, or Testimony given, in connection with this action as "confidential," either by notation on the document, statement on the record of the deposition, written advice to the respective undersigned counsel for the parties hereto, or by other appropriate means.

3. As used herein:

(a) "Confidential Information" shall mean all Documents and Testimony, and all information contained therein, and other information designated as confidential, if such Documents or Testimony contain trade secrets, proprietary business information, competitively sensitive information, or other information the disclosure of which would, in the good faith judgment of the party designating the material as confidential, be detrimental to the conduct of that party's business or the business of any of that party's customers or clients.

(b) "Producing party" shall mean the parties to this action and any third-parties producing "Confidential Information" in connection with depositions, document production or otherwise, or the party asserting the confidentiality privilege, as the case may be.

(c) "Receiving party" shall mean the party to this action and/or any non-party receiving "Confidential Information" in connection with depositions, document production or otherwise.

4. The Receiving party may, at any time, notify the Producing party that the Receiving party does not concur in the designation of a document or other material as Confidential Information. If the Producing party does not agree to declassify such document or material, the Receiving party may move before the Court for an order declassifying those documents or materials. If no such

motion is filed, such documents or materials shall continue to be treated as Confidential

Information. If such motion is filed, the documents or other materials shall be deemed

Confidential Information unless and until the Court rules otherwise.

5. Except with the prior written consent of the Producing party or by Order of the Court,

Confidential Information shall not be furnished, shown or disclosed to any person or entity except

to:

(a) personnel of plaintiff or defendant actually engaged in assisting in the preparation of

this action for trial or other proceeding herein and who have been advised of their obligations

hereunder;

(b) counsel for the parties to this action and their associated attorneys, paralegals and

other professional personnel (including support staff) who are directly assisting such counsel in

the preparation of this action for trial or other proceeding herein, are under the supervision or

control of such counsel, and who have been advised by such counsel of their obligations

hereunder;

(c) expert witnesses or consultants retained by the parties or their counsel to furnish

technical or expert services in connection with this action or to give testimony with respect to the

subject matter of this action at the trial of this action or other proceeding herein; provided,

however, that such Confidential Information is furnished, shown or disclosed in accordance with

paragraph 7 hereof;

(d) the Court and court personnel, if filed in accordance with paragraph 12 hereof;

(e) an officer before whom a deposition is taken, including stenographic reporters and any

necessary secretarial, clerical or other personnel of such officer, if furnished, shown or disclosed

in accordance with paragraph 10 hereof;

FILED: NEW YORK COUNTY CLERK 03/02/2023 04:47 PM
NYSCEF DOC. NO. 59

INDEX NO. 158207/2022
RECEIVED NYSCEF: 03/02/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 204 of 2230

(f) trial and deposition witnesses, if furnished, shown or disclosed in accordance with paragraphs 9 and 10, respectively, hereof; and

(g) any other person agreed to by the parties.

6. Confidential Information shall be utilized by the Receiving party and its counsel only for purposes of this litigation and for no other purposes.

7. Before any disclosure of Confidential Information is made to an expert witness or consultant pursuant to paragraph 5(c) hereof, counsel for the Receiving party shall provide the expert's written agreement, in the form of Exhibit A attached hereto, to comply with and be bound by its terms. Counsel for the party obtaining the certificate shall supply a copy to counsel for the other party at the time of the disclosure of the information required to be disclosed by CPLR 3101(d), except that any certificate signed by an expert or consultant who is not expected to be called as a witness at trial is not required to be supplied.

8. All depositions shall presumptively be treated as Confidential Information and subject to this Stipulation during the deposition and for a period of fifteen (15) days after a transcript of said deposition is received by counsel for each of the parties. At or before the end of such fifteen day period, the deposition shall be classified appropriately.

9. Should the need arise for any of the parties to disclose Confidential Information during any hearing or trial before the Court, including through argument or the presentation of evidence, such party shall notify all other parties and only upon a showing of good cause, will the information be deemed confidential. Such a showing may be made by application to the court by motion or order to show cause.

10. This Stipulation shall not preclude counsel for the parties from using during any deposition in this action any documents or information which have been designated as "Confidential

Information" under the terms hereof. Any court reporter and deposition witness who is given

access to Confidential Information shall, prior thereto, be provided with a copy of this

Stipulation and shall execute the certificate annexed hereto. Counsel for the party obtaining the

certificate shall supply a copy to counsel for the other party.

11. A party may designate as Confidential Information subject to this Stipulation any document,

information, or deposition testimony produced or given by any non-party to this case, or any

portion thereof. In the case of Documents, designation shall be made by notifying all counsel in

writing of those documents which are to be stamped and treated as such at any time up to fifteen

(15) days after actual receipt of copies of those documents by counsel for the party asserting the

confidentiality privilege. In the case of deposition Testimony, designation shall be made by

notifying all counsel in writing of those portions which are to be stamped or otherwise treated as

such at any time up to fifteen (15) days after the transcript is received by counsel for the party

asserting the confidentiality privilege. Prior to the expiration of such fifteen (15) day period (or

until a designation is made by counsel, if such a designation is made in a shorter period of time),

all such documents shall be treated as Confidential Information.

12. A Receiving Party who seeks to file with the Court any deposition transcripts, exhibits,

answers to interrogatories, and other documents which have previously been designated as

comprising or containing Confidential Information, and any pleading, brief or memorandum

which reproduces, paraphrases or discloses Confidential Information, shall provide all other

parties with seven (7) days' written notice of its intent to file such material with the Court, so that

the Producing Party may file by Order to Show Cause a motion to seal such Confidential

Information asserting good cause for such sealing. The Confidential Information shall not be

filed until the Court renders a decision on the motion to seal. In the event the motion to seal is

granted, all documents which are the subject of the order to seal, shall be filed in sealed

envelopes or other appropriate sealed container on which shall be endorsed the caption of this

litigation, the words "CONFIDENTIAL MATERIAL- SUBJECT TO STIPULATION FOR THE

PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION" as an indication of

the nature of the contents, and a statement in substantially the following form: "This envelope,

containing documents which are filed in this case by (name of party), is not to be opened nor are

the contents thereof to be displayed or revealed other than to the Court, the parties and their

counsel of record, except by order of the Court or consent of all the parties. Violation hereof may

be regarded as contempt of the Court." All pleadings, briefs or memoranda which reproduce,

paraphrase or disclose any documents which have previously been designated by a party as

comprising or containing Confidential Information, shall identify such documents by the

production number ascribed to them at the time of production.

13. Any person receiving Confidential Information shall not reveal or discuss such information to

or with any person not entitled to receive such information under the terms hereof.

14. Any document or information that may contain Confidential Information that has been

inadvertently produced without identification as to its "confidential" nature as provided in

paragraphs 2 and/or 11 of this Stipulation, may be so designated by the party asserting the

confidentiality privilege by written notice to the undersigned counsel for the Receiving party

identifying the document or information as "confidential" within a reasonable time following the

discovery that the document or information has been produced without such designation.

15. Extracts and summaries of Confidential Information shall also be treated as confidential in

accordance with the provisions of this Stipulation.

FILED: NEW YORK COUNTY CLERK 03/02/2023 04:47 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 59    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    RECEIVED NYSCEF: 03/02/2023
Court Records    Pg 207 of 2230

16. The production or disclosure of Confidential Information shall in no way constitute a waiver of each party's right to object to the production or disclosure of other information in this action or in any other action.

17. This Stipulation is entered into without prejudice to the right of either party to seek relief from, or modification of, this Stipulation or any provisions thereof by properly noticed motion to the Court or to challenge any designation of confidentiality as inappropriate under the Civil Practice Law and Rules or other applicable law.

18. The provisions of this Stipulation shall, absent prior written consent of both parties, continue to be binding after the conclusion of this action, except:

     (a) that there shall be no restriction on documents that are used in Court (unless such exhibits are permitted by court order to be filed under seal or redacted); and

     (b) that a party may seek the written permission of the Producing party or further order of the Court with respect to dissolution or modification of the Stipulation.

19. Nothing herein shall be deemed to waive any privilege recognized by law, or shall be deemed an admission as to the admissibility in evidence of any facts or documents revealed in the course of disclosure.

20. Within sixty (60) days after the final termination of this litigation by settlement or exhaustion of all appeals, all Confidential Information produced or designated and all reproductions thereof, shall be returned to the Producing Party or shall be destroyed, at the option of the Producing Party. In the event that any party chooses to destroy physical objects and documents, such party shall certify in writing within sixty (60) days of the final termination of this litigation that it has undertaken its best efforts to destroy such physical objects and documents, and that such physical objects and documents have been destroyed to the best of its knowledge. Notwithstanding

anything to the contrary, counsel of record for the parties may retain one copy of documents

constituting work product, a copy of pleadings, motion papers, discovery responses, deposition

transcripts and deposition and trial exhibits. This Stipulation shall not be interpreted in a manner

that would violate any applicable cannons of ethics or codes of professional responsibility.

Nothing in this Stipulation shall prohibit or interfere with the ability of counsel for any party, or

of experts specially retained for this case, to represent any individual, corporation, or other entity

adverse to any party or its affiliate(s) in connection with any other matters.

21. This Stipulation may be changed by further order of this Court, and is without prejudice to

the rights of a party to move for relief from any of its provisions, or to seek or agree to different

or additional protection for any particular material or information.

Attorneys for Plaintiff                            Attorneys for Defendants

*/s/ Alexander J. Willscher*                        */s/ Daniel Crandall*

Alexander J. Willscher                             Kari Parks
Austin P. Mayron                                   Daniel Crandall
SULLIVAN & CROMWELL LLP                            Victor R. Wang (admission pending)
125 Broad Street                                   GUSRAE KAPLAN NUSBAUM PLLC
New York, New York 10004                           120 Wall Street, 25th Floor
Telephone: (212) 558-4000                          New York, New York 10005
                                                   Telephone: (212) 269-1400

Date: February 22, 2023                            Date: February 22, 2023


                                        SO ORDERED:


                                        _____

                                        J.S.C.
                                        **MARGARET A. CHAN**
                                        **J.S.C.**

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 209 of 2230

EXHIBIT "A"

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK: COMMERCIAL DIVISION**

```
——————————————————————————  x
                                :
EMIGRANT BUSINESS CREDIT        :
CORPORATION,                    :
                                :    Index No. 158207/2022
                Plaintiff,      :
                                :    (Hon. Margaret Chan)
        v.                      :
                                :    AGREEMENT WITH RESPECT
JOHN ARTHUR HANRATTY, et al.,   :    TO CONFIDENTIAL MATERIAL
                                :
                Defendants.     :
                                :
                                :
——————————————————————————  x
```

I,_____, state that:

1. My address Is_____.

2. My present employer is _____

_____.

3. My present occupation or job description is _____

_____.

4. I have received a copy of the Stipulation for the Production and Exchange of

CONFIDENTIAL INFORMATION (the "Stipulation") entered in the above-entitled action on

_____.

5. I have carefully read and understand the provisions of the Stipulation.

6. I will comply with all of the provisions of the Stipulation.

7. I will hold in confidence, will not disclose to anyone not qualified under the Stipulation, and

will use only for purposes of this action, any Confidential Information that is disclosed to me.

8. I will return all Confidential Information that comes into my possession, and documents or

things that I have prepared relating thereto, to counsel for the party by whom I am employed or

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 210 of 2230

retained, or to counsel from whom I received the Confidential Information.

9.  I hereby submit to the jurisdiction of this court for the purpose of enforcement of the

Stipulation in this action.

Dated:

_____

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**COMMERCIAL DIVISION**

EMIGRANT BUSINESS CREDIT
CORPORATION,

                              Plaintiff,

                    v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI LLC,
EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1 EMIFL, LLC, EB
2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB 2MINY,
LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE
1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC, EBURY FUND 1FL,
LLC, EBURY FUND 2FL, LLC, EBURY
FUND 2NJ, LLC, RED CLOVER 1, LLC,
EBURY RE LLC, and XYZ CORPS. 1–10,

                              Defendants.

Index No. 158207/2022

**Discovery Conference Form**

**Compliance Conference**

## Appearances

**Counsel for Plaintiff**
Alexander J. Willscher
Austin P. Mayron
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
willschera@sullcrom.com
mayrona@sullcrom.com

(212) 558-4000

**Counsel for Named Defendants**
Kari Parks
Heesoo Kim
Victor Wang (Admission Pending)
Gusrae Kaplan Nusbaum PLLC
120 Wall Street, 25th Floor
New York, NY 10005
kparks@gusraekaplan.com
hkim@gusraekaplan.com
vwang@gusraekaplan.com

(212) 269-1400

## Status of Discovery

The parties have timely exchanged interrogatories, answers to interrogatories, requests for production, and responses to requests for production. The parties have produced tens of thousands of documents.

Named Defendants' document production is complete, and Plaintiff expects to complete its document production on Monday, April 3, 2023.

The parties have served notices of deposition and have agreed to discuss deposition scheduling next week.

## Significant Disputes

There are not significant disputes between the parties at this time.

Plaintiff has requested amended responses to its Interrogatories 5–9 and Defendants expect to serve those amended responses by the end of April 2023.

## Non-Compliance with Prior Order

There has been no non-compliance with the Court's prior orders.

## Proposed Revisions to the Schedule and Reasons for Revisions

Currently, the deposition deadline is April 28; the expert / all discovery deadline is May 31; and the Note of Issue deadline is June 2. However, because the parties' respective productions have been voluminous, and because the parties do not anticipate any need for expert discovery, the parties have agreed to set June 1 as the deadline for all discovery (including both fact and expert), allowing June 2 to remain the Note of Issue deadline. The parties will respectfully request that the Court so-order this revision.

**Outstanding Motions or Appeals**

Defendants have filed a Notice of Appeal of the Court's order on Motion Sequence 1, but has not yet perfected their appeal. The parties have been participating in the First Department's mandatory mediation program before Defendants perfect their appeal.

Defendants have moved to partially dismiss Plaintiff's complaint. <u>See</u> Mot. Seq. 2. The parties completed briefing on that motion on December 15, 2022. The Court has not yet issued a ruling on Motion Sequence 2.

**Settlement Efforts**

The parties are engaged in settlement discussions both via the First Department's mandatory mediation program and privately.

**SO ORDERED:**

**Date: _____**                    **Enter: _____**
                                           **Hon. Margaret Chan, J.S.C.**

**In view of the above, it is ORDERED that:**

**Date: _____**
**ENTER: _____**
**Hon. Margaret Chan, J.S.C.**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**COMMERCIAL DIVISION**

EMIGRANT BUSINESS CREDIT
CORPORATION,

<div align="center">Plaintiff,</div>

<div align="center">v.</div>

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

<div align="center">Defendants.</div>

Index No. 158207/2022

**NOTICE OF APPEARANCE**

PLEASE TAKE NOTICE that the undersigned enters my appearance as counsel in

the above–captioned action for John Arthur Hanratty, Ebury Street Capital, LLC, Ebury

Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC,

EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN,

LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB1 EMINJ, LLC, EB 2EMINJ, LLC, EB

1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE

2EMI LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury

<div align="center">1</div>

Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and

Ebury RE LLC (the "**Ebury Parties**"). I am admitted to practice in this Court.

Dated: April 20, 2023
New York, New York

Respectfully submitted,

/s/Heesoo Kim
Heesoo Kim
GUSRAE KAPLAN NUSBAUM PLLC
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
hkim@gusraekaplan.com

*Counsel for the Ebury Parties*

2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| ───────────────────── x | |
| EMIGRANT BUSINESS CREDIT<br>CORPORATION, | Index No. 158207/2022 |
| Plaintiff, | Hon. Margaret Chan |
| v. | **DISCOVERY CONFERENCE FORM** |
| JOHN ARTHUR HANRATTY, et al., | |
| Defendants. | |
| ───────────────────── x | |

<div align="center">

**APPEARANCES**

</div>

| **Counsel for Plaintiff** | **Counsel for Named Defendants** |
|---|---|
| Alexander J. Willscher | Kari Parks |
| Austin P. Mayron | Victor Wang (*admission pending*) |
| SULLIVAN & CROMWELL LLP | GUSRAE KAPLAN NUSBAUM PLLC |
| 125 Broad Street | 120 Wall Street, 25th Floor |
| New York, New York  10004 | New York, New York  10005 |
| Telephone: (212) 558-4000 | Telephone: (212) 269-1400 |
| Fax: (212) 558-3588 | Fax: (212) 809-4147 |

<div align="center">

**STATUS OF DISCOVERY**

</div>

The parties have exchanged interrogatories, answers to interrogatories, requests for production, and responses to requests for production. The parties have produced tens of thousands of documents. Defendants completed their document production on March 21, 2023. Plaintiff completed its document production on April 5, 2023.

<div align="center">

**SIGNIFICANT DISPUTES**

</div>

Plaintiff objected to Defendants' responses to its Interrogatories 5-9 and requested that Defendants serve supplemental responses. As reflected in the parties' March 29, 2023 discovery conference form (Dkt. No. 60), Defendants agreed to serve supplemental responses and expected to serve those responses by the end of April 2023. Defendants have not yet served those responses, but expect to do so before this Wednesday's compliance conference.

Further, in the preliminary injunction order (Dkt. No. 47), the Court ordered Defendants to deposit the proceeds from the sale of any tax lien certificate or real estate property resulting from the foreclosure on a tax lien—aside from ordinary and necessary business expenses—into an escrow account.  Defendants have deposited only $65,000 into the escrow account to date, and the financial documentation submitted by Defendants pursuant to the Court's status conference order (Dkt. No. 53), suggests that, since December, Defendants' proceeds have exceeded their expenditures by more than $1 million.  Plaintiff requested additional documentation—including a record of Defendants' transactions since November (which Defendants agreed to produce on May 9), as well as an identification of the upcoming lien obligations Defendants intend to pay with any cash on hand—to understand this discrepancy.    Defendants expect to produce this documentation by May 30.

## NON-COMPLIANCE WITH PRIOR ORDERS

There has been no non-compliance with the Court's prior orders.

## PROPOSED REVISIONS TO THE SCHEDULE AND REASONS FOR REVISIONS

Due to witness availability, the parties were not able to schedule all of the depositions before June 1.  As such, the parties have agreed to set July 6 as the deadline for all discovery and July 7 as the deadline for the Note of Issue.  The parties have scheduled 7 of the 8 depositions requested by Defendants and 4 of the 6 depositions requested by Plaintiff, all to occur before the July 7 revised deadline.  The parties respectfully request that the Court so-order these revisions to the schedule.

**OUTSTANDING MOTIONS OR APPEALS**

Defendants filed a noticed of appeal of the Court's order on Motion Sequence 1, but have not yet perfected their appeal. The parties have been participating in the First Department's mandatory mediation program before Defendants perfect their appeal.

Defendants have moved to partially dismiss Plaintiff's complaint (Motion Sequence 2). The parties completed briefing on that motion on December 15, 2022, and oral argument on that motion is scheduled for June 1, 2023.

**SETTLEMENT EFFORTS**

The parties are engaged in settlement discussions both via the First Department's mandatory mediation program and privately.

**SO ORDERED:**

**Date: _____**                                    **ENTER: _____**
                                                          **Hon. Margaret Chan, J.S.C.**

**In view of the above, it is ORDERED that:**

**Date: _____**
**ENTER: _____**
**Hon. Margaret Chan, J.S.C.**

FILED: NEW YORK COUNTY CLERK 05/25/2023 04:59 PM
NYSCEF DOC. NO. 63

INDEX NO. 158207/2022
RECEIVED NYSCEF: 05/25/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 219 of 2230

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:    **HON. MARGARET A. CHAN**               **PART**        49
                                              *Justice*

-----------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,                **INDEX NO.**        158207/2022
                          Plaintiff,

               - v -

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL,
LLC, EBURY STREET FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY
FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ CORPS.,
                          Defendants.

-----------------------------------------------------------------------X

        The parties appeared via Microsoft Teams for a compliance conference on
May 24, 2023 at 2:30 p.m. Pursuant to the conference, it is hereby ORDERED:

1. In light of witness availability, the deadline to complete depositions is
   extended to July 6, 2023.
2. Defendants shall provide additional supplemental responses to
   interrogatories by May 30, 2023.
3. Respecting financial reporting obligations of defendants, including as
   directed by the court's prior order (NYSCEF # 53), given plaintiff's concerns
   over the amount of funds deposited into escrow (see NYSCEF # 62),
   defendants shall, by May 30, 2023, provide a record of all transactions since
   November 1, 2022 and identification of upcoming lien obligations defendants
   intend to pay.

Next Compliance Conference Date: July 12, 2023 at 3:30 p.m. via Microsoft Teams.
Deadline to file the note of issue: July 13, 2023

DATE: 05/24/2023                                        MARGARET A. CHAN, JSC

**Check One:**          ☐ Case Disposed          ☒ Non-Final Disposition

**Check if Appropriate:**    ☐ Other (Specify _____ )

# OTHER ORDER – NON-MOTION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

-------------------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,

                            Plaintiff,

                  - v -

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL,
LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED
CLOVER 1, LLC, EBURY RE LLC, XYZ CORPS 1-10.

                         Defendants.

-------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 158207/2022 |
| **MOTION DATE** | 11/16/2022 |
| **MOTION SEQ. NO.** | 002 |

**DECISION + ORDER ON
MOTION**

HON. MARGARET CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 002) 41, 42, 43, 44, 45, 48, 49, 54

were read on this motion to/for _____ DISMISS _____.

       In this action involving credit facilities and related guaranties, plaintiff Emigrant Business Credit Corporation alleges three causes of action for breach of contract, fraudulent inducement, and fraudulent transfer. Defendants move pursuant to CPLR 3211 (a) (1) and (7) for an order dismissing the first cause of action regarding Ebury Street Capital, LLC (ESC) and Ebury RE LLC (Ebury RE) and dismissing the second and third causes of action regarding all defendants. Plaintiff opposes the motion.

### Background

       Plaintiff is a New York-based specialty finance company (NYSCEF # 1 – Complaint, ¶ 7). Hanratty is the manager of ESC, and ESC is the manager or general partner of all the other defendants (collectively with ESC, the Ebury Entities) (*id.*, ¶'s 8-9). On March 9, 2017, plaintiff extended credit facilities to defendants 1EMI LLC and Ebury 2EMI LLC (respectively, 1EMI and 2EMI and, together, the Borrowers) in amounts totaling $10,000,000 and $5,000,000, respectively, with 1EMI's facility later increasing to $13,500,000 on October 29,

**158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR
ET AL
Motion No. 002**
       **Page 1 of 8**

1 of 8

2018 and to $15,000,000 on September 24, 2019 (*id.*, ¶ 33). Hanratty and various
Ebury Entities issued guaranties connected to the facilities (*id.*, ¶'s 15, 37, 39).

The funds were to be used to finance the purchase of tax lien certificates that
municipalities place on properties when an owner fails to pay municipal taxes (*id.*,
¶'s 32; 22). Investors purchase tax lien certificates from municipalities to profit from
the interest rate chargeable on the certificate and to enable ownership of the
underlying real estate through foreclosure (*id.*, ¶ 25).

Each Borrower owns special purpose entities (Ebury SPEs) that purchase,
own, and sell tax lien certificates or real estate in various states (*id.*, ¶ 13). Plaintiff
explains that the credit facilities were structured to allow the Borrowers to draw
down revolving lines of credit against the value of a pool of eligible assets serving as
collateral (*id.*, ¶'s 27; 34). The total amount the Borrowers could draw down was
calculated by multiplying the amount of eligible collateral by the advance rate,
which ranged from 70% to 85% (*id.*, ¶'s 28; 34). Any tax lien certificate that
defendants purchased using the Credit Facilities, and its proceeds, served as the
collateral and were to be delivered to a designated third-party custodian (*id.*, ¶'s 34,
50). Following the initial appointment of a custodian, on November 8, 2017, plaintiff
consented to changing the custodian to be MTAG Services, LLC (MTAG) (*id.*, ¶ 52).
Defendants were not allowed to retain custody of the tax liens or to service the tax
liens themselves and all proceeds from the selling of a tax lien were to be deposited
into plaintiff's lockbox account (*id.*, ¶'s 51, 91 [b]).

Plaintiff alleges that "[d]efendants misappropriated advances to the credit
facilities as well as [plaintiff's] collateral to pay tens of millions of dollars in
distributions to company insiders—including Defendant John Hanratty—as well as
other investors" (*id.* ¶ 1). Also, plaintiff charges the Borrowers with failing to repay
the principal and interest for the credit facilities when they came due on November
10, 2021, which default has continued even after plaintiff sent a default notice on
November 29, 2021 (*id.*, ¶ 38). Plaintiff alleges that the outstanding amounts exceed
$21.8 million (*id.*, ¶ 38).

For its fraud claim, plaintiff alleges as follows: Hanratty consistently claimed
that plaintiff was secured by collateral worth more than the outstanding amounts
(*id.*, ¶ 43). For example, one of plaintiff's employees conveyed concerns to Hanratty
about the 2019 financial audits, which valued the tax lien investments at around
$17.2 million, being less than the approximately $18 million outstanding balance
owed at the time (*id.*, ¶ 47). Hanratty responded that plaintiff was actually secured
by $32 million in tax lien collateral, plus additional collateral amounts (*id.*, ¶ 47).
Hanratty's claims of overcollateralization were intentionally false, and Hanratty
even bragged about his ability to mislead plaintiff's employee (*id.*, ¶'s 47-49).

In March of 2021, plaintiff discovered that certain of the collateral was not
held by the custodian (*id.*, ¶ 55). Plaintiff alleges that Hanratty subsequently misled
plaintiff about the custodial status of the collateral. To wit, defendant shared a
spreadsheet purporting to be from the custodian and indicated that as of August 31,

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR     Page 2 of 8
ET AL
Motion No. 002

2 of 8

2021, the custodian had 6,782 tax lien certificates (*id.*, ¶'s 55-57). The custodian has since confirmed to plaintiff that as of that date, it only had custody of 518 tax lien certificates worth a fraction of the amount the spreadsheet had indicated (*id.*, ¶ 57). Hanratty admitted he was self-servicing almost 90% of the collateral (*id.*, ¶ 58).

Additional allegations of fraud include that Hanratty improperly inflated the value of certain liens, altered origination dates for hundreds of certificates, and misrepresented that certain advances would be used to finance purchases of tax lien certificates when they were instead used for investor distributions and settlements (*id.*, ¶'s 63; 68; 69-81). Further, defendants were required to deposit proceeds from sales of certificates into plaintiff's lockbox, but not only did defendants fail to do so, Hanratty also falsely represented that he owned the liens and that they were increasing in value (*id.*, ¶'s 94-96). And, because proceeds of tax lien certificates are treated as collateral, this means any owned real property that resulted from a foreclosure on a tax lien should also have been included as collateral. Defendants have been effecting transfers without receipt of fair consideration, however, preventing plaintiff from receiving sale proceeds (*id.*, ¶'s 97-100).

Hanratty and various Ebury Entities issued guaranties in connection with the credit facilities (*id.*, ¶'s 15, 37, 39). Plaintiff asserts that Hanratty is personally liable in accordance with validity guaranties he executed (*id.*, ¶ 42; NYSCEF # 11 – Validity Guaranties). Plaintiff also asserts liability by virtue of the Ebury Entities being alter egos of Hanratty and of one another (NYSCEF # 1, ¶'s 18, 109, 116, 124).

Shortly after plaintiff initiated this action, it moved by order to show cause (MS001) for injunctive relief to enjoin, *inter alia*, the transfer of defendants' assets, which this court granted by Decision and Order of November 29, 2022 (NYSCEF # 47). Since then, the parties have been proceeding with discovery while briefing the present motion, for which oral argument was held on June 1, 2023.

## Discussion

On a motion to dismiss pursuant to CPLR 3211 (a) (7), the court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference," and "determine only whether the facts as alleged fit into any cognizable legal theory" (*Siegmund Strauss, Inc. v E. 149th Realty Corp.*, 104 AD3d 401, 403 [1st Dept 2013]). Significantly, "whether a plaintiff . . . can ultimately establish its allegations is not taken into consideration in determining a motion to dismiss" (*Phillips S. Beach LLC v ZC Specialty Ins. Co.*, 55 AD3d 493, 497 [1st Dept 2008], *lv denied* 12 NY3d 713 [2009]). At the same time, "[i]n those circumstances where the legal conclusions and factual allegations are flatly contradicted by documentary evidence they are not presumed to be true or accorded every favorable inference' " (*Morgenthow & Latham v Bank of New York Company, Inc.*, 305 AD2d 74, 78 [1st Dept 2003] [internal citation and quotation omitted]).

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR   Page 3 of 8
ET AL
Motion No. 002

3 of 8

FILED: NEW YORK COUNTY CLERK 07/03/2023 12:02 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 64    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 06/29/2023

Court Records    Pg 223 of 2230

*Breach of Contract: Alter Ego Allegations*

"To plead a breach of contract, the proponent must allege the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages" (*Second Source Funding, LLC v Yellowstone Cap., LLC*, 144 AD3d 445, 445-46 [1st Dept 2016]).

Defendants initially argue in support of their motion to dismiss the breach of contract claim that ESC, Ebury RE, and Hanratty are not party to either of the Credit Agreements. In opposition, plaintiff raises that ESC is a guarantor, and Hanratty is a validity guarantor, to the Credit Agreements (NYSCEF # 48, at 6-8 citing NYSCEF #'s 8 and 11). In reply, defendants acknowledge ESC's guaranty and state that they "no longer move for dismissal of the breach-of-Credit Agreement claim against ESC" (NYSCEF # 54 at 1). Also recognizing Hanratty's Validity Guaranties, defendants nonetheless reiterate that plaintiff "still fails to identify any facts suggesting that he is a party to the Credit Agreements" (*id.*). This is unavailing to sustain a motion to dismiss a breach of contract claim that plaintiff premises on Hanratty's Validity Guaranties (NYSCEF # 1, ¶ 108).[1] It is undisputed that the guaranties do not reach Ebury RE, however, to which plaintiff's breach of contract claim depends on alter ego allegations that the court now addresses.

Defendants contend that plaintiff has failed to plead alter ego theory facts or the requisite showing that defendants abused the corporate form to defraud plaintiff (NYSCEF # 42 at 8-11). Providing a list of typical veil–piercing factors without supporting facts, defendants argue, is insufficient (*id.*, at 9-10). Plaintiff counters that it pled sufficient facts to establish defendants' alter ego liability, including inadequate capitalization of defendants, the intermingling of funds, and common ownership, officers, directors, and personnel, among others (NYSCEF # 48 at 9). In reply, defendants echo their rejection of the sufficiency of plaintiff's allegations (NYSCEF # 54 at 1-6).

An alter ego theory of liability to pierce the corporate veil generally "requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. While complete domination of the corporation is the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required" (*Shisgal v Brown*, 21 AD3d 845, 848 [1st Dept 2005] [quotation marks omitted] [rejecting motion to dismiss claim based on veil-piercing and listing various "indicia of a situation warranting veil-piercing" such as absence of corporate formalities, inadequate capitalization, use of funds for personal purposes, and more]).

---

[1] Defendants accept as much, stating that "the breach of contract claim against [Hanratty] should only be allowed to proceed with respect to the Validity Guaranties" (NYSCEF # 42 at 11).

158207/2022    EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 4 of 8
ET AL
Motion No. 002

4 of 8

Plaintiff sufficiently states a prima facie case for piercing the corporate veil. Defendants' argument that plaintiff has not connected the indicia of a situation warranting veil-piercing with facts showing defendants' abuse of the corporate form to harm plaintiff is unavailing given plaintiff's well-pled complaint and the standards applicable at this stage (see *Cortlandt St. Recovery Corp. v Bonderman*, 96 NE3d 191, 47 [2018] ["a fact-laden claim to pierce the corporate veil is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss"]; see also *Baby Phat Holding Co., LLC v Kellwood Co.*, 123 AD3d 405, 407 [1st Dept 2014] [finding that wrongdoing in the veil piercing context "does not necessarily require allegations of actual fraud. While fraud certainly satisfies the wrongdoing requirement, other claims of inequity or malfeasance will also suffice"]).

Defendants' reliance on *Sound Commc'ns, Inc. v Rack & Roll, Inc.* is inapposite (88 AD3d 523 [1st Dept 2011]). There, where the complaint merely alleged that the entity defendant "functioned as the moving defendants' alter ego," the court found the plaintiff did "not sufficiently allege[] that [defendant's] status as a limited liability company was used to commit a fraud against plaintiff" (*id.* at 524). Here, plaintiff points out that its complaint alleges that defendants "used a web of sham corporate transactions—among companies controlled by Hanratty—to loot [plaintiff's] collateral and the loan proceeds" (NYSCEF # 48 at 10, n 6 citing NYSCEF # 1, ¶ 1). Overall, plaintiff's complaint includes the necessary allegations, as well as sufficient detail, to survive at this stage (see e.g. *2406-12 Amsterdam Assoc. LLC v Alianza LLC*, 136 AD3d 512, 512 [1st Dept 2016] [sustaining pleading of veil piercing, negating the necessity of particularized allegations]).

### Fraudulent Inducement

Next, defendants assert that plaintiff pleads no fraudulent inducement facts, contending that allegations supported by hearsay and information and belief are insufficient (NYSCEF # 42 at 11-15). And the fraudulent inducement count is allegedly duplicative of the breach of contract claim (*id.* at 16-18). In opposition, plaintiff argues that it has sufficiently pled the claim, with only limited and appropriate use of information and belief allegations (NYSCEF # 48 at 14-15). Plaintiff asserts that defendants' duplication argument is mistaken because, among other things, the fraud claim alleges "misrepresentations of present fact that are collateral to the contract" (*id.* at 15-16). In reply, defendants echo their initial arguments and clarify that they "do not argue that [plaintiff's] fraudulent inducement claim is duplicative of its claim for breach of the underlying Credit Agreements, only that it is duplicative of the claim for breach of the Validity Guaranties" (NYSCEF # 54 at 11).

"To state a cause of action for fraudulent inducement, it is sufficient that the claim alleges a material representation, known to be false, made with the intention of inducing reliance, upon which the victim actually relies, consequentially sustaining a detriment" (*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp., LLC*, 19 AD3d 273, 275 [1st Dept 2005]). There are limits on when a fraud cause of action will be sustained if such allegations touch on a separate cause of

158207/2022   EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR          Page 5 of 8
ET AL
Motion No. 002

5 of 8

action for breach of contract to the extent of impermissible duplication (*see e.g. Varo, Inc. v Alvis PLC*, 261 AD2d 262 [1st Dept 1999]; *Project Cricket Acquisition, Inc. v Fla. Cap. Partners, Inc.* (180 AD3d 627 [1st Dept 2020]). Nevertheless, a "fraud claim will be upheld when a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, even though the same circumstances also give rise to the plaintiff's breach of contract claim. . . . Unlike a misrepresentation of future intent to perform, a misrepresentation of present facts is collateral to the contract . . . and therefore involves a separate breach of duty" (*MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 87 AD3d 287, 293 [1st Dept 2011])

Defendants' motion to dismiss the fraudulent inducement claim is denied. Plaintiff's complaint sufficiently pleads the elements necessary to sustain the claim, even with the heightened pleading standard and even without regard to those certain allegations defendants argue are hearsay (NYSCEF # 1, ¶'s 55-96 [including allegations of: fabricating a spreadsheet to inflate the amount of collateral held by the contractually agreed third-party custodian; inflating values of collateral; periodically misrepresenting the status of certain amounts in signed certifications separate from the underlying credit agreements and validity guaranties; and duplicating liens in requests for advances]). That CPLR 3016 (b) requires particularized pleading, and that plaintiff relies on selective and limited use of information and belief allegations, does not mandate dismissal here given the well-pled and detailed complaint (*see e.g. MBIA Ins.*, 87 AD3d at 295 ["unassailable proof of fraud" not necessary; fraud claim sustained where complaint "sufficiently identifies . . . misrepresentations and describes when and how they were made . . . including through false and misleading loan tapes and prospectuses"]).

Nor are defendants correct that the fraudulent inducement count must be dismissed as duplicative of the breach of contract claim (relying on, *inter alia, Varo* and *Project Cricket*) because, as plaintiff asserts and as described above, the fraud claim is supported by assertions of misrepresentations of then-present fact that are collateral to the relevant contracts (*see e.g. Am. Media, Inc. v Bainbridge & Knight Labs., LLC*, 135 AD3d 477, 478 [1st Dept 2016] [complaint adequately stated fraud against owner of corporate counterparty "based on alleged misrepresentations of present fact concerning the capitalization of [the company] and the existence of [purported] account receivable from non-party"]). In that defendants limit their argument here to the Validity Guaranties (NYSCEF # 54 at 11), the allegations of fraud still extend beyond Hanratty's guaranty misrepresentations and, accordingly, are sustainable as being collateral to such agreements; in any event, to the extent certain allegations of fraud may also be contained in allegedly false representations, that is "of no consequence" (*MBIA Ins.*, 87 AD3d at 294).

### *Fraudulent Transfer*

Defendants assert that plaintiff pleads no fraudulent transfer facts, but instead merely, on "information and belief," recants legal conclusions (NSYCEF # 42 at 19-20). Plaintiff responds by asserting that its allegations are sufficient at this

158207/2022    EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 6 of 8
ET AL
Motion No. 002

6 of 8

stage, including where it has pled substantial allegations that do not rely on information and belief to sustain this claim (NYSCEF # 48 at 20).[2]

Plaintiff adds that "the circumstances of the alleged transfers—which were made between insiders and moved assets away from the Defendants that are in contractual privity with [plaintiff]—are more than enough to create an inference of fraudulent intent" (NYSCEF # 48 at 20). And plaintiff points to Ebury RE's website listing of properties of certain of the other defendants (*id.*). In reply, defendant repeats the alleged insufficiency of the allegations, as to both actual and constructive fraudulent transfer, and rejects the import plaintiff would draw from Ebury RE's listing (NYSCEF # 54 at 14-15).

"To state a cause of action for constructive fraudulent conveyance under Debtor and Creditor Law §§ 273, 274, and 275, the complaint must allege that the transferor transferred assets without receiving fair consideration in exchange" (*McCormack Family Charitable Found. v Fid. Brokerage Services, LLC*, 195 AD3d 420, 421-22 [1st Dept 2021], *lv to appeal denied*, 37 NY3d 912 [2021]). Such claims "are not subject to the particularity requirement of CPLR 3016, because they are based on constructive fraud" (*Ridinger v W. Chelsea Dev. Partners LLC*, 150 AD3d 559, 560 [1st Dept 2017]).

"Under DCL § 276, '[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors' .... Claims under DCL § 276 require proof of 'actual fraud' rather than simply 'constructive fraud'" (*214 Knickerbocker LLC v Pan*, 2022 NY Slip Op 33579[U] at 7 [Sup Ct, NY County 2022], *affd*, 2023 NY Slip Op 02959 [1st Dept 2023] [quotation marks and citations omitted]). CPLR 3016 (b) requires a fraud claim to state in detail the circumstances constituting the wrong:

> The purpose of section 3016(b)'s pleading requirement is to inform a defendant with respect to the incidents complained of. We have cautioned that section 3016(b) should not be so strictly interpreted as to prevent an otherwise valid cause of action in situations where it may be impossible to state in detail the circumstances constituting a fraud. . . . Thus, where concrete facts are peculiarly within the knowledge of the party charged with the fraud, it would work a potentially unnecessary injustice to dismiss a case at an early stage where any

---

[2] Plaintiff points to paragraph 4 of the complaint (NYSCEF # 1), which states:
Since the default, [plaintiff] has discovered that Defendants impermissibly paid out over $22 million in distributions to their investors in 2018 and 2019—without [plaintiff's] knowledge and in violation of the Credit Agreements—while at the same time withdrawing over $27 million in funding from the Credit Facilities. . . . Finally, [plaintiff] has discovered that Defendants fraudulently transferred millions of dollars' worth of [plaintiff's] collateral to Ebury RE LLC . . . to prevent [plaintiff] from receiving sale proceeds from sales of the collateral and from foreclosing on the collateral. . . .

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR
ET AL
Motion No. 002

Page 7 of 8

7 of 8

pleading deficiency might be cured later in the
proceedings.

(*Pludeman v N. Leasing Sys., Inc.*, 10 NY3d 486, 491–92 [2008]
[citations and quotation marks omitted]).

Defendants' motion to dismiss is denied. That defendants identify cases
where courts have found, on different facts, complaints insufficiently alleging
fraudulent transfer is unavailing to support dismissal of this well-pled complaint
(NYSCEF # 42 at 19, citing, *inter alia, Carlyle, LLC v Quik Park 1633 Garage LLC*
(160 AD3d 476, 477 [1st Dept 2018]). Read with favorable inferences, given the
allegations of distributions which rendered defendants uncollateralized and unable
to pay plaintiff the amounts owed, plaintiff's actual and constructive fraudulent
transfer claims survive (*see e.g. Epiphany Community Nursery School v Levey*, 171
AD3d 1, 9 [1st Dept 2019] [sustaining fraud claims on motion to dismiss, including
where the "allegations in the complaint are not bare legal conclusions. Nor are they
inherently incredible"]; *see also Pludeman* at 491–92).

### Conclusion

In light of the foregoing, it is hereby

ORDERED that defendants' motion to dismiss (MS 002) is denied in the
entirety; and it is further

ORDERED that counsel for plaintiff shall serve a copy of this decision, along
with notice of entry, on all parties within ten days of entry.

| 06/29/2023 | | | | MARGARET CHAN, J.S.C. | |
|---|---|---|---|---|---|
| **DATE** | | | | | |
| **CHECK ONE:** | | CASE DISPOSED | [x] | NON-FINAL DISPOSITION | |
| | | GRANTED | [x] DENIED | GRANTED IN PART | [ ] OTHER |
| **APPLICATION:** | | SETTLE ORDER | | SUBMIT ORDER | |
| **CHECK IF APPROPRIATE:** | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | [ ] REFERENCE |

158207/2022   EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR     Page 8 of 8
ET AL
Motion No. 002

8 of 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————— x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                   Plaintiff,

      v.

JOHN ARTHUR HANRATTY, et al.,

                 Defendants.

———————————————————— x

Index No. 158207/2022

Hon. Margaret Chan

**NOTICE OF ENTRY**

**PLEASE TAKE NOTICE** that attached hereto is a true and correct copy of the Decision + Order on Motion of the Hon. Margaret Chan, J.S.C., dated June 29, 2023, and duly entered in the above-captioned action in the office of the County Clerk, New York County, on the 29th day of June, 2023

Dated:  June 29, 2023
        New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*

Alexander J. Willscher
Austin P. Mayron
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business Credit Corporation*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

-----------------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,

|  |  |
|---|---|
| **INDEX NO.** | 158207/2022 |

                                    Plaintiff,

|  |  |
|---|---|
| **MOTION DATE** | 11/16/2022 |

                    - v -

|  |  |
|---|---|
| **MOTION SEQ. NO.** | 002 |

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL,
LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB ·
2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED
CLOVER 1, LLC, EBURY RE LLC, XYZ CORPS 1-10.

**DECISION + ORDER ON
MOTION**

                                    Defendants.

-----------------------------------------------------------------------------X

HON. MARGARET CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 002) 41, 42, 43, 44, 45,
48, 49, 54

were read on this motion to/for _____ DISMISS _____ .

   In this action involving credit facilities and related guaranties, plaintiff
Emigrant Business Credit Corporation alleges three causes of action for breach of
contract, fraudulent inducement, and fraudulent transfer. Defendants move
pursuant to CPLR 3211 (a) (1) and (7) for an order dismissing the first cause of
action regarding Ebury Street Capital, LLC (ESC) and Ebury RE LLC (Ebury RE)
and dismissing the second and third causes of action regarding all defendants.
Plaintiff opposes the motion.

### Background

   Plaintiff is a New York-based specialty finance company (NYSCEF # 1 –
Complaint, ¶ 7). Hanratty is the manager of ESC, and ESC is the manager or
general partner of all the other defendants (collectively with ESC, the Ebury
Entities) (*id.,* ¶'s 8-9). On March 9, 2017, plaintiff extended credit facilities to
defendants 1EMI LLC and Ebury 2EMI LLC (respectively, 1EMI and 2EMI and,
together, the Borrowers) in amounts totaling $10,000,000 and $5,000,000,
respectively, with 1EMI's facility later increasing to $13,500,000 on October 29,

2018 and to $15,000,000 on September 24, 2019 (*id.,* ¶ 33). Hanratty and various Ebury Entities issued guaranties connected to the facilities (*id.,* ¶'s 15, 37, 39).

The funds were to be used to finance the purchase of tax lien certificates that municipalities place on properties when an owner fails to pay municipal taxes (*id.,* ¶'s 32; 22). Investors purchase tax lien certificates from municipalities to profit from the interest rate chargeable on the certificate and to enable ownership of the underlying real estate through foreclosure (*id.,* ¶ 25).

Each Borrower owns special purpose entities (Ebury SPEs) that purchase, own, and sell tax lien certificates or real estate in various states (*id.,* ¶ 13). Plaintiff explains that the credit facilities were structured to allow the Borrowers to draw down revolving lines of credit against the value of a pool of eligible assets serving as collateral (*id.,* ¶'s 27; 34). The total amount the Borrowers could draw down was calculated by multiplying the amount of eligible collateral by the advance rate, which ranged from 70% to 85% (*id.,* ¶'s 28; 34). Any tax lien certificate that defendants purchased using the Credit Facilities, and its proceeds, served as the collateral and were to be delivered to a designated third-party custodian (*id.,* ¶'s 34, 50). Following the initial appointment of a custodian, on November 8, 2017, plaintiff consented to changing the custodian to be MTAG Services, LLC (MTAG) (*id.,* ¶ 52). Defendants were not allowed to retain custody of the tax liens or to service the tax liens themselves and all proceeds from the selling of a tax lien were to be deposited into plaintiff's lockbox account (*id.,* ¶'s 51, 91 [b]).

Plaintiff alleges that "[d]efendants misappropriated advances to the credit facilities as well as [plaintiff's] collateral to pay tens of millions of dollars in distributions to company insiders—including Defendant John Hanratty—as well as other investors" (*id.* ¶ 1). Also, plaintiff charges the Borrowers with failing to repay the principal and interest for the credit facilities when they came due on November 10, 2021, which default has continued even after plaintiff sent a default notice on November 29, 2021 (*id.,* ¶ 38). Plaintiff alleges that the outstanding amounts exceed $21.8 million (*id.,* ¶ 38).

For its fraud claim, plaintiff alleges as follows: Hanratty consistently claimed that plaintiff was secured by collateral worth more than the outstanding amounts (*id.,* ¶ 43). For example, one of plaintiff's employees conveyed concerns to Hanratty about the 2019 financial audits, which valued the tax lien investments at around $17.2 million, being less than the approximately $18 million outstanding balance owed at the time (*id.,* ¶ 47). Hanratty responded that plaintiff was actually secured by $32 million in tax lien collateral, plus additional collateral amounts (*id.,* ¶ 47). Hanratty's claims of overcollateralization were intentionally false, and Hanratty even bragged about his ability to mislead plaintiff's employee (*id.,* ¶'s 47-49).

In March of 2021, plaintiff discovered that certain of the collateral was not held by the custodian (*id.,* ¶ 55). Plaintiff alleges that Hanratty subsequently misled plaintiff about the custodial status of the collateral. To wit, defendant shared a spreadsheet purporting to be from the custodian and indicated that as of August 31,

FILED: NEW YORK COUNTY CLERK 06/29/2023 05:03 PM | INDEX NO. 158207/2022
NYSCEF DOC. NO. 65 | RECEIVED NYSCEF: 06/29/2023

NYSCEF DOC. NO. 64-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 231 of 2230

2021, the custodian had 6,782 tax lien certificates (*id.*, ¶'s 55-57). The custodian has since confirmed to plaintiff that as of that date, it only had custody of 518 tax lien certificates worth a fraction of the amount the spreadsheet had indicated (*id.*, ¶ 57). Hanratty admitted he was self-servicing almost 90% of the collateral (*id.*, ¶ 58).

Additional allegations of fraud include that Hanratty improperly inflated the value of certain liens, altered origination dates for hundreds of certificates, and misrepresented that certain advances would be used to finance purchases of tax lien certificates when they were instead used for investor distributions and settlements (*id.*, ¶'s 63; 68; 69-81). Further, defendants were required to deposit proceeds from sales of certificates into plaintiff's lockbox, but not only did defendants fail to do so, Hanratty also falsely represented that he owned the liens and that they were increasing in value (*id.*, ¶'s 94-96). And, because proceeds of tax lien certificates are treated as collateral, this means any owned real property that resulted from a foreclosure on a tax lien should also have been included as collateral. Defendants have been effecting transfers without receipt of fair consideration, however, preventing plaintiff from receiving sale proceeds (*id.*, ¶'s 97-100).

Hanratty and various Ebury Entities issued guaranties in connection with the credit facilities (*id.*, ¶'s 15, 37, 39). Plaintiff asserts that Hanratty is personally liable in accordance with validity guaranties he executed (*id.*, ¶ 42; NYSCEF # 11 – Validity Guaranties). Plaintiff also asserts liability by virtue of the Ebury Entities being alter egos of Hanratty and of one another (NYSCEF # 1, ¶'s 18, 109, 116, 124).

Shortly after plaintiff initiated this action, it moved by order to show cause (MS001) for injunctive relief to enjoin, *inter alia*, the transfer of defendants' assets, which this court granted by Decision and Order of November 29, 2022 (NYSCEF # 47). Since then, the parties have been proceeding with discovery while briefing the present motion, for which oral argument was held on June 1, 2023.

## Discussion

On a motion to dismiss pursuant to CPLR 3211 (a) (7), the court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference," and "determine only whether the facts as alleged fit into any cognizable legal theory" (*Siegmund Strauss, Inc. v E. 149th Realty Corp.*, 104 AD3d 401, 403 [1st Dept 2013]). Significantly, "whether a plaintiff . . . can ultimately establish its allegations is not taken into consideration in determining a motion to dismiss" (*Phillips S. Beach LLC v ZC Specialty Ins. Co.*, 55 AD3d 493, 497 [1st Dept 2008], *lv denied* 12 NY3d 713 [2009]). At the same time, "[i]n those circumstances where the legal conclusions and factual allegations are flatly contradicted by documentary evidence they are not presumed to be true or accorded every favorable inference' " (*Morgenthow & Latham v Bank of New York Company, Inc.*, 305 AD2d 74, 78 [1st Dept 2003] [internal citation and quotation omitted]).

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 3 of 8
ET AL
Motion No. 002

3 of 9

## *Breach of Contract; Alter Ego Allegations*

"To plead a breach of contract, the proponent must allege the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages" (*Second Source Funding, LLC v Yellowstone Cap., LLC*, 144 AD3d 445, 445-46 [1st Dept 2016]).

Defendants initially argue in support of their motion to dismiss the breach of contract claim that ESC, Ebury RE, and Hanratty are not party to either of the Credit Agreements. In opposition, plaintiff raises that ESC is a guarantor, and Hanratty is a validity guarantor, to the Credit Agreements (NYSCEF # 48, at 6-8 citing NYSCEF #'s 8 and 11). In reply, defendants acknowledge ESC's guaranty and state that they "no longer move for dismissal of the breach-of-Credit Agreement claim against ESC" (NYSCEF # 54 at 1). Also recognizing Hanratty's Validity Guaranties, defendants nonetheless reiterate that plaintiff "still fails to identify any facts suggesting that he is a party to the Credit Agreements" (*id.*). This is unavailing to sustain a motion to dismiss a breach of contract claim that plaintiff premises on Hanratty's Validity Guaranties (NYSCEF # 1, ¶ 108).[1] It is undisputed that the guaranties do not reach Ebury RE, however, to which plaintiff's breach of contract claim depends on alter ego allegations that the court now addresses.

Defendants contend that plaintiff has failed to plead alter ego theory facts or the requisite showing that defendants abused the corporate form to defraud plaintiff (NYSCEF # 42 at 8-11). Providing a list of typical veil–piercing factors without supporting facts, defendants argue, is insufficient (*id.*, at 9-10). Plaintiff counters that it pled sufficient facts to establish defendants' alter ego liability, including inadequate capitalization of defendants, the intermingling of funds, and common ownership, officers, directors, and personnel, among others (NYSCEF # 48 at 9). In reply, defendants echo their rejection of the sufficiency of plaintiff's allegations (NYSCEF # 54 at 1-6).

An alter ego theory of liability to pierce the corporate veil generally "requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. While complete domination of the corporation is the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required" (*Shisgal v Brown*, 21 AD3d 845, 848 [1st Dept 2005] [quotation marks omitted] [rejecting motion to dismiss claim based on veil-piercing and listing various "indicia of a situation warranting veil-piercing" such as absence of corporate formalities, inadequate capitalization, use of funds for personal purposes, and more]).

---

[1] Defendants accept as much, stating that "the breach of contract claim against [Hanratty] should only be allowed to proceed with respect to the Validity Guaranties" (NYSCEF # 42 at 11).

Plaintiff sufficiently states a prima facie case for piercing the corporate veil. Defendants' argument that plaintiff has not connected the indicia of a situation warranting veil-piercing with facts showing defendants' abuse of the corporate form to harm plaintiff is unavailing given plaintiff's well-pled complaint and the standards applicable at this stage (*see Cortlandt St. Recovery Corp. v Bonderman*, 96 NE3d 191, 47 [2018] ["a fact-laden claim to pierce the corporate veil is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss"]; *see also Baby Phat Holding Co., LLC v Kellwood Co.*, 123 AD3d 405, 407 [1st Dept 2014] [finding that wrongdoing in the veil piercing context "does not necessarily require allegations of actual fraud. While fraud certainly satisfies the wrongdoing requirement, other claims of inequity or malfeasance will also suffice"]).

Defendants' reliance on *Sound Commc'ns, Inc. v Rack & Roll, Inc.* is inapposite (88 AD3d 523 [1st Dept 2011]). There, where the complaint merely alleged that the entity defendant "functioned as the moving defendants' alter ego," the court found the plaintiff did "not sufficiently allege[] that [defendant's] status as a limited liability company was used to commit a fraud against plaintiff" (*id.* at 524). Here, plaintiff points out that its complaint alleges that defendants "used a web of sham corporate transactions—among companies controlled by Hanratty—to loot [plaintiff's] collateral and the loan proceeds" (NYSCEF # 48 at 10, n 6 citing NYSCEF # 1, ¶ 1). Overall, plaintiff's complaint includes the necessary allegations, as well as sufficient detail, to survive at this stage (*see e.g. 2406-12 Amsterdam Assoc. LLC v Alianza LLC*, 136 AD3d 512, 512 [1st Dept 2016] [sustaining pleading of veil piercing, negating the necessity of particularized allegations]).

## *Fraudulent Inducement*

Next, defendants assert that plaintiff pleads no fraudulent inducement facts, contending that allegations supported by hearsay and information and belief are insufficient (NYSCEF # 42 at 11-15). And the fraudulent inducement count is allegedly duplicative of the breach of contract claim (*id.* at 16-18). In opposition, plaintiff argues that it has sufficiently pled the claim, with only limited and appropriate use of information and belief allegations (NYSCEF # 48 at 14-15). Plaintiff asserts that defendants' duplication argument is mistaken because, among other things, the fraud claim alleges "misrepresentations of present fact that are collateral to the contract" (*id.* at 15-16). In reply, defendants echo their initial arguments and clarify that they "do not argue that [plaintiff's] fraudulent inducement claim is duplicative of its claim for breach of the underlying Credit Agreements, only that it is duplicative of the claim for breach of the Validity Guaranties" (NYSCEF # 54 at 11).

"To state a cause of action for fraudulent inducement, it is sufficient that the claim alleges a material representation, known to be false, made with the intention of inducing reliance, upon which the victim actually relies, consequentially sustaining a detriment" (*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp., LLC*, 19 AD3d 273, 275 [1st Dept 2005]). There are limits on when a fraud cause of action will be sustained if such allegations touch on a separate cause of

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR          Page 5 of 8
ET AL
Motion No. 002

5 of 9

action for breach of contract to the extent of impermissible duplication (*see e.g. Varo, Inc. v Alvis PLC*, 261 AD2d 262 [1st Dept 1999]; *Project Cricket Acquisition, Inc. v Fla. Cap. Partners, Inc.* (180 AD3d 627 [1st Dept 2020]). Nevertheless, a "fraud claim will be upheld when a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, even though the same circumstances also give rise to the plaintiff's breach of contract claim. . . . Unlike a misrepresentation of future intent to perform, a misrepresentation of present facts is collateral to the contract . . . and therefore involves a separate breach of duty" (*MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 87 AD3d 287, 293 [1st Dept 2011])

Defendants' motion to dismiss the fraudulent inducement claim is denied. Plaintiff's complaint sufficiently pleads the elements necessary to sustain the claim, even with the heightened pleading standard and even without regard to those certain allegations defendants argue are hearsay (NYSCEF # 1, ¶'s 55-96 [including allegations of: fabricating a spreadsheet to inflate the amount of collateral held by the contractually agreed third-party custodian; inflating values of collateral; periodically misrepresenting the status of certain amounts in signed certifications separate from the underlying credit agreements and validity guaranties; and duplicating liens in requests for advances]). That CPLR 3016 (b) requires particularized pleading, and that plaintiff relies on selective and limited use of information and belief allegations, does not mandate dismissal here given the well-pled and detailed complaint (*see e.g. MBIA Ins.*, 87 AD3d at 295 ["unassailable proof of fraud" not necessary; fraud claim sustained where complaint "sufficiently identifies . . . misrepresentations and describes when and how they were made . . . including through false and misleading loan tapes and prospectuses"]).

Nor are defendants correct that the fraudulent inducement count must be dismissed as duplicative of the breach of contract claim (relying on, *inter alia, Varo* and *Project Cricket*) because, as plaintiff asserts and as described above, the fraud claim is supported by assertions of misrepresentations of then-present fact that are collateral to the relevant contracts (*see e.g. Am. Media, Inc. v Bainbridge & Knight Labs., LLC*, 135 AD3d 477, 478 [1st Dept 2016] [complaint adequately stated fraud against owner of corporate counterparty "based on alleged misrepresentations of present fact concerning the capitalization of [the company] and the existence of [purported] account receivable from non-party"]). In that defendants limit their argument here to the Validity Guaranties (NYSCEF # 54 at 11), the allegations of fraud still extend beyond Hanratty's guaranty misrepresentations and, accordingly, are sustainable as being collateral to such agreements; in any event, to the extent certain allegations of fraud may also be contained in allegedly false representations, that is "of no consequence" (*MBIA Ins.*, 87 AD3d at 294).

### Fraudulent Transfer

Defendants assert that plaintiff pleads no fraudulent transfer facts, but instead merely, on "information and belief," recants legal conclusions (NSYCEF # 42 at 19-20). Plaintiff responds by asserting that its allegations are sufficient at this

stage, including where it has pled substantial allegations that do not rely on information and belief to sustain this claim (NYSCEF # 48 at 20).[2]

Plaintiff adds that "the circumstances of the alleged transfers—which were made between insiders and moved assets away from the Defendants that are in contractual privity with [plaintiff]—are more than enough to create an inference of fraudulent intent" (NYSCEF # 48 at 20). And plaintiff points to Ebury RE's website listing of properties of certain of the other defendants (*id.*). In reply, defendant repeats the alleged insufficiency of the allegations, as to both actual and constructive fraudulent transfer, and rejects the import plaintiff would draw from Ebury RE's listing (NYSCEF # 54 at 14-15).

"To state a cause of action for constructive fraudulent conveyance under Debtor and Creditor Law §§ 273, 274, and 275, the complaint must allege that the transferor transferred assets without receiving fair consideration in exchange" (*McCormack Family Charitable Found. v Fid. Brokerage Services, LLC*, 195 AD3d 420, 421-22 [1st Dept 2021], *lv to appeal denied*, 37 NY3d 912 [2021]). Such claims "are not subject to the particularity requirement of CPLR 3016, because they are based on constructive fraud" (*Ridinger v W. Chelsea Dev. Partners LLC*, 150 AD3d 559, 560 [1st Dept 2017]).

"Under DCL § 276, '[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors' . . . . Claims under DCL § 276 require proof of 'actual fraud' rather than simply 'constructive fraud' " (*214 Knickerbocker LLC v Pan*, 2022 NY Slip Op 33579[U] at 7 [Sup Ct, NY County 2022], *affd*, 2023 NY Slip Op 02959 [1st Dept 2023] [quotation marks and citations omitted]). CPLR 3016 (b) requires a fraud claim to state in detail the circumstances constituting the wrong:

> The purpose of section 3016(b)'s pleading requirement is to inform a defendant with respect to the incidents complained of. We have cautioned that section 3016(b) should not be so strictly interpreted as to prevent an otherwise valid cause of action in situations where it may be impossible to state in detail the circumstances constituting a fraud. . . . Thus, where concrete facts are peculiarly within the knowledge of the party charged with the fraud, it would work a potentially unnecessary injustice to dismiss a case at an early stage where any

---

[2] Plaintiff points to paragraph 4 of the complaint (NYSCEF # 1), which states:
Since the default, [plaintiff] has discovered that Defendants impermissibly paid out over $22 million in distributions to their investors in 2018 and 2019—without [plaintiff's] knowledge and in violation of the Credit Agreements—while at the same time withdrawing over $27 million in funding from the Credit Facilities. . . . Finally, [plaintiff] has discovered that Defendants fraudulently transferred millions of dollars' worth of [plaintiff's] collateral to Ebury RE LLC . . . to prevent [plaintiff] from receiving sale proceeds from sales of the collateral and from foreclosing on the collateral. . . .

158207/2022   EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 7 of 8
ET AL
Motion No. 002

8 of 9

Case 24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 236 of 2230

pleading deficiency might be cured later in the
proceedings.

(*Pludeman v N. Leasing Sys., Inc.*, 10 NY3d 486, 491–92 [2008]
[citations and quotation marks omitted]).

Defendants' motion to dismiss is denied. That defendants identify cases
where courts have found, on different facts, complaints insufficiently alleging
fraudulent transfer is unavailing to support dismissal of this well-pled complaint
(NYSCEF # 42 at 19, citing, *inter alia, Carlyle, LLC v Quik Park 1633 Garage LLC*
(160 AD3d 476, 477 [1st Dept 2018]). Read with favorable inferences, given the
allegations of distributions which rendered defendants uncollateralized and unable
to pay plaintiff the amounts owed, plaintiff's actual and constructive fraudulent
transfer claims survive (*see e.g. Epiphany Community Nursery School v Levey*, 171
AD3d 1, 9 [1st Dept 2019] [sustaining fraud claims on motion to dismiss, including
where the "allegations in the complaint are not bare legal conclusions. Nor are they
inherently incredible"]; *see also Pludeman* at 491–92).

## Conclusion

In light of the foregoing, it is hereby

ORDERED that defendants' motion to dismiss (MS 002) is denied in the
entirety; and it is further

ORDERED that counsel for plaintiff shall serve a copy of this decision, along
with notice of entry, on all parties within ten days of entry.

| 06/29/2023 | | | | |
|---|---|---|---|---|
| **DATE** | | | **MARGARET CHAN, J.S.C.** | |
| CHECK ONE: | [ ] CASE DISPOSED | [x] NON-FINAL DISPOSITION | | |
| | [ ] GRANTED [x] DENIED | [ ] GRANTED IN PART | [ ] OTHER | |
| APPLICATION: | [ ] SETTLE ORDER | [ ] SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | [ ] INCLUDES TRANSFER/REASSIGN | [ ] FIDUCIARY APPOINTMENT | [ ] REFERENCE | |

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 8 of 8
ET AL
Motion No. 002

9 of 9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

> Plaintiff,

v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 2NJ, LLC, RED
CLOVER 1, LLC, EBURY RE LLC, and
XYZ CORPS. 1–10,

> Defendants.

Index No. 158207/2022

**NOTICE OF APPEARANCE**

PLEASE TAKE NOTICE that the undersigned enters my appearance as counsel in

the above–captioned action for John Arthur Hanratty, Ebury Street Capital, LLC, Ebury

Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC,

EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN,

LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB1 EMINJ, LLC, EB 2EMINJ, LLC, EB

1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE

2EMI LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury

Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and

1

Ebury RE LLC (the "**Named Defendants**", or the "**Ebury Parties**"). I am admitted to

practice in this Court.

Dated: June 30, 2023
      New York, New York

                Respectfully submitted,

                /s/ Victor Wang
                Victor Wang
                Gusrae Kaplan Nusbaum PLLC
                120 Wall Street, 25th Floor
                New York, New York 10005
                (212) 269-1400
                vwang@gusraekaplan.com

                *Counsel for the Ebury Parties*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**COMMERCIAL DIVISION**

EMIGRANT BUSINESS CREDIT
CORPORATION,

                          Plaintiff,

          v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI LLC,
EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1 EMIFL, LLC, EB
2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB 2MINY,
LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE
1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC, EBURY FUND 1FL,
LLC, EBURY FUND 2FL, LLC, EBURY
FUND 2NJ, LLC, RED CLOVER 1, LLC,
EBURY RE LLC, and XYZ CORPS. 1–10,
                          Defendants.

Index No. 158207/2022

**Discovery Conference Form**

**Compliance Conference**

## Appearances

**Counsel for Plaintiff**
Alexander J. Willscher
Austin P. Mayron
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
willschera@sullcrom.com
mayrona@sullcrom.com
(212) 558-4000

**Counsel for Named Defendants**
Kari Parks
Victor Wang
Gusrae Kaplan Nusbaum PLLC
120 Wall Street, 25th Floor
New York, NY 10005
kparks@gusraekaplan.com
vwang@gusraekaplan.com
(212) 269-1400

**Status of Discovery**

The parties have timely exchanged interrogatories, answers to interrogatories, requests for production, and responses to requests for production. The parties have produced tens of thousands of documents.

Named Defendants completed their document production on Mach 21, 2023, and Plaintiff completed its document production on April 5, 2023.

**Significant Disputes**

Plaintiff objected to Defendants' responses to its Interrogatories 5–9 and requested that Defendants serve amended responses. Defendants have served their first amended responses on May 23, 2023 and second amended responses on June 5, 2023.

**Non-Compliance with Prior Order**

There has been no non-compliance with the Court's prior orders.

**Proposed Revisions to the Schedule and Reasons for Revisions**

The parties have previously requested a schedule change on May 22, 2023 because the parties were unable to schedule all of the depositions before June 1. Currently, all discovery deadline is July 6 and the Note of Issue deadline is July 7. However, due to the unavailability and scheduling of non-party witnesses, who do not work for the parties anymore, not all witnesses have not been deposed yet. Defendants have agreed to accept Plaintiff's subpoenas and to work with the non-party witnesses and to depose Plaintiff's party and non-party witnesses after Plaintiff deposes Defendants' non-party witnesses. The parties have agreed to set July 26 as the deadline for all discovery and July 27 as the deadline for the Note of Issue. The parties have

finished 4 of the 6 depositions requested by Plaintiff and 2 of the 7 depositions requested by Defendants. The parties have scheduled the remaining 2 of the depositions requested by Plaintiff and the remaining 5 of the 7 depositions requested by Defendants, all to occur before the July 26 revised deadline. The parties respectfully request that the Court so-order these revisions to the schedule.

### Outstanding Motions or Appeals

Defendants have filed a Notice of Appeal of the Court's order on Motion Sequence 1, but have not yet perfected their appeal. The parties have been participating in the First Department's mandatory mediation program before Defendants perfect their appeal.

### Settlement Efforts

The parties are engaged in settlement discussions both via the First Department's mandatory mediation program and privately.

**SO ORDERED:**

**Date: _____**

**Enter: _____**
Hon. Margaret Chan, J.S.C.

**In view of the above, it is ORDERED that:**

**Date: _____**
**ENTER: _____**
**Hon. Margaret Chan, J.S.C.**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**COMMERCIAL DIVISION**

---

**EMIGRANT BUSINESS CREDIT CORPORATION,**

       **Plaintiff–Counterclaim Defendant,**

    **v.**

**JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, and EBURY RE LLC,**

       **Defendants–Counterclaim Plaintiffs,**

    **v.**

**XYZ CORPS. 1-10,**

       **Defendants.**

---

**Index No. 158207/2022**



**THE EBURY PARTIES'
ANSWER AND
COUNTERCLAIM**

1

Defendant–Counterclaim Plaintiffs John Arthur Hanratty, Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2 EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, Eb 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury Fund 2 FL, LLC,  Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and Ebury RE, LLC (together, the "Ebury Parties") answer the complaint of and files their own "Counterclaim" against Plaintiff–Counterclaim Defendant Emigrant Business Credit Corporation ("Emigrant"):

## NATURE OF THE ACTION

1.      Paragraph 1 asserts legal conclusions that require no response. To the extent Paragraph 1 requires a response, the Ebury Parties deny Paragraph 1.

2.      Paragraph 2 asserts legal conclusions and purports to represent documents that speak for themselves, and therefore requires no response. To the extent Paragraph 2 requires a response, the Ebury Parties admit that the Credit Facilities matured in November 2021, that the Ebury Parties have not fully repaid the Credit Facilities, and that Mr. Hanratty occasionally told Emigrant "that it was 'overcollateralized,'" and denies Paragraph 2's remaining assertions, and specifically denies that the Ebury Parties ever knowingly communicated false material information to Emigrant.

3.      Paragraph 3 asserts legal conclusions that require no response, as well as factual allegations regarding which the Ebury Parties lack knowledge or information

2

FILED: NEW YORK COUNTY CLERK 07/10/2023 10:40 PM       INDEX NO. 158207/2022

NYSCEF DOC. NO: 68     24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 07/10/2023

Court Records       Pg 245 of 2230

sufficient to form a belief regarding their truth. To the extent Paragraph 3 requires a response, the Ebury Parties deny Paragraph 3's allegations.

4.        Paragraph 4 asserts legal conclusions that require no response, as well as factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth. To the extent Paragraph 4 requires a response, the Ebury Parties deny its allegations.

5.        Paragraph 5 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 5 requires a response, the Ebury Parties deny its allegations.

6.        Paragraph 6 asserts legal conclusions that requires no response. To the extent Paragraph 6 requires a response, the Ebury Parties deny its allegations. The Ebury Parties further observe that between November 2021 and September 2022, the Ebury Parties negotiated in good faith with Emigrant to work out a payment plan of the Credit Facilities and executed a September 14, 2022 Settlement Term Sheet ("Settlement Contract") offered by Emigrant. Eleven days after the Ebury Parties returned that executed Term Sheet to Emigrant, Emigrant initiated the above-captioned "Action" and sued the Ebury Parties to collect on the very same Credit Facilities whose repayment had been resolved with the Settlement Contract.

## THE PARTIES

7.      The Ebury Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 7.

8.      The Ebury Parties deny that Mr. Hanratty "resides at 1152 Ave Magdalena, San Juan, Puerto Rico 00907" and otherwise admit the allegations of Paragraph 8.

9.      The Ebury Parties admit Paragraph 9.

10.     The Ebury Parties admit Paragraph 10.

11.     The Ebury Parties admit Paragraph 11.

12.     Paragraph 12 asserts legal conclusions that require no response. To the extent Paragraph 12 requires a response, the Ebury Parties deny its allegations.

13.     Paragraph 13 asserts legal conclusions that require no response. To the extent Paragraph 13 requires a response, the Ebury Parties deny its allegations.

14.     The Ebury Parties deny Paragraph 14.

15.     Paragraph 15 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 15 requires a response, the Ebury Parties deny its allegations.

16.     The Ebury Parties admit Paragraph 16.

17.     Paragraph 17 asserts legal conclusions that require no response, as well as factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth. To the extent Paragraph 17 requires a response, the Ebury Parties deny its allegations.

4

18.     Paragraph 18 asserts legal conclusions that require no response. To the extent Paragraph 18 requires a response, the Ebury Parties deny its allegations.

## JURISDICTION AND VENUE

19.     Paragraph 19 asserts legal conclusions that require no response. To the extent Paragraph 19 requires a response, the Ebury Parties deny its allegations.

20.     Paragraph 20 asserts legal conclusions and purports to represent documents that speak for themselves, and therefore requires no response. To the extent Paragraph 20 requires a response, the Ebury Parties admit that venue is proper in this court, and otherwise deny its allegations.

21.     Paragraph 21 asserts legal conclusions and requires no response. To the extent Paragraph 21 requires a response, the Ebury Parties admit that this action is appropriate for the Commercial Division and otherwise deny its allegations.

## FACTUAL BACKGROUND

22.     Paragraph 22 asserts legal conclusions and generalities and requires no response.

23.     Paragraph 23 asserts legal conclusions and generalities and requires no response.

24.     Paragraph 24 asserts legal conclusions and generalities and requires no response.

25.     Paragraph 25 asserts legal conclusions and generalities and requires no response.

5

26.     Paragraph 26 asserts legal conclusions and generalities and requires no response.

27.     Paragraph 27 asserts legal conclusions and generalities and requires no response.

28.     Paragraph 28 asserts legal conclusions and generalities and requires no response.

29.     Paragraph 29 asserts legal conclusions and generalities and requires no response.

30.     Paragraph 30 asserts legal conclusions and generalities and requires no response.

31.     Paragraph 31 asserts legal conclusions, opinions, and generalities and requires no response.

32.     Paragraph 32 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 32 requires a response, the Ebury Parties admit that they communicated with EBCC in 2016 regarding obtaining a new credit facility, and at the time, had established credit facilities with Capital One, N.A., and otherwise deny its allegations.

33.     Paragraph 33 asserts legal conclusions that require no response. To the extent that Paragraph 33 requires a response, the Ebury Parties agree that the credit facilities were increased multiple times and that the Ebury Parties repaid the Capital One facilities, and otherwise deny its allegations.

**6**

34.     Paragraph 34 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 34 requires a response, the Ebury Parties deny its allegations.

35.     Paragraph 35 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 35 requires a response, the Ebury Parties deny its allegations.

36.     Paragraph 36 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 36 requires a response, the Ebury Parties deny its allegations.

37.     Paragraph 37 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 37 requires a response, the Ebury Parties deny its allegations.

38.     Paragraph 38 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 38 requires a response, the Ebury Parties deny its allegations.

39.     Paragraph 39 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 39 requires a response, the Ebury Parties deny its allegations.

40.     Paragraph 40 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 40 requires a response, the Ebury Parties deny its allegations.

41.     Paragraph 41 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 41 requires a response, the Ebury Parties deny its allegations.

42.     Paragraph 42 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 42 requires a response, the Ebury Parties deny its allegations.

43.     Paragraph 43 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 43 requires a response, the Ebury Parties admit that Mr. Hanratty occasionally claimed that EBCC was "overcollateralized," that Mr. Hanratty believed those statements to be true on all occasions that he said so, and otherwise deny its allegations.

44.     Paragraph 44 purports to represent a document that speaks for itself and requires no response. To the extent Paragraph 44 requires a response, the Ebury Parties deny its allegations.

45.     Paragraph 45 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 45 requires a response, the Ebury Parties deny its allegations.

46.     Paragraph 46 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 46 requires a response, the Ebury Parties deny its allegations.

47. Paragraph 47 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 47 requires a response, the Ebury Parties deny its allegations.

48. Paragraph 48 purports to represent hearsay in a document that speaks for itself and requires no response. To the extent Paragraph 48 requires a response, the Ebury Parties deny its allegations.

49. Paragraph 49 asserts legal conclusions that require no response. To the extent Paragraph 49 requires a response, the Ebury Parties deny its allegations.

50. Paragraph 50 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 50 requires a response, the Ebury Parties deny its allegations.

51. Paragraph 51 asserts legal conclusions and factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth and requires no response. To the extent Paragraph 51 requires a response, the Ebury Parties deny its allegations.

52. Paragraph 52 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 52 requires a response, the Ebury Parties admit that EBCC was aware that MTAG was one of the Ebury Parties' servicers, and otherwise deny its allegations.

53. Paragraph 53 asserts legal conclusions and requires no response. To the extent Paragraph 53 requires a response, the Ebury Parties deny its allegations.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 252 of 2230

54.     Paragraph 54 purports to represent hearsay in a document that speaks for itself and requires no response. To the extent Paragraph 54 requires a response, the Ebury Parties deny its allegations.

55.     Paragraph 55 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 55 requires a response, the Ebury Parties admit that they understood MTAG's records to suffer from timing and uploading problems, and otherwise deny Paragraph 55's allegations.

56.     Paragraph 56 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 56 requires a response, the Ebury Parties deny its allegations.

57.     Paragraph 57 purports to represent documents that speak for themselves and assert factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth and requires no response. To the extent Paragraph 57 requires a response, the Ebury Parties deny its allegations.

58.     Paragraph 58 asserts legal conclusions and purports to represent documents that speak for themselves. To the extent Paragraph 58 requires a response, the Ebury Parties admit that they self-serviced some of EBCC's collateral using the Speedboat platform, and that EBCC was well aware of this self-servicing before November 2021; otherwise deny Paragraph 58's allegations; and further deny the implication that they hid or otherwise concealed this information from EBCC before November 2021.

**10**

59.     Paragraph 59 asserts legal conclusions and purports to represent documents that speak for themselves. To the extent Paragraph 59 requires a response, the Ebury Parties deny its allegations.

60.     Paragraph 60 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 60 requires a response, the Ebury Parties deny its allegations.

61.     Paragraph 61 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 61 requires a response, the Ebury Parties deny its allegations.

62.     Paragraph 62 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 62 requires a response, the Ebury Parties deny its allegations.

63.     Paragraph 63 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response.

64.     Paragraph 64 asserts legal conclusions and requires no response. To the extent Paragraph 64 requires a response, the Ebury Parties admit its allegations.

65.     Paragraph 65 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 65 requires a response, the Ebury Parties deny its allegations.

66.     Paragraph 66 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 66 requires a response, the Ebury Parties deny its allegations.

67.     Paragraph 67 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 67 requires a response, the Ebury Parties deny its allegations.

68.     Paragraph 68 asserts legal conclusions, purports to represent hearsay in documents that speak for themselves, and requires no response. To the extent Paragraph 68 requires a response, the Ebury Parties deny its allegations.

69.     Paragraph 69 asserts legal conclusions and requires no response. To the extent Paragraph 69 requires a response, the Ebury Parties deny its allegations.

70.     The Ebury Parties admit that EBCC provided approximately $220,000 to EB 1EMI LLC on or Around November 9, 2018 and otherwise deny Paragraph 70.

71.     Paragraph 71 asserts legal conclusions that require no response. To the extent Paragraph 71 requires a response, the Ebury Parties deny its allegations.

72.      The Ebury Parties admit that EBCC provided approximately $860,000 to Ebury 1 EMI LLC on or around May 17, 2019 and otherwise deny Paragraph 72.

73.     Paragraph 73 asserts legal conclusions that require no response. To the extent Paragraph 71 requires a response, the Ebury Parties deny its allegations.

74.     Paragraph 74 asserts legal conclusions that require no response. To the extent Paragraph 72 requires a response, the Ebury Parties deny its allegations.

75.     Paragraph 75 asserts legal conclusions that require no response. To the extent Paragraph 75 requires a response, the Ebury Parties deny its allegations.

76.     The Ebury Parties admit that EBCC provided approximately $2.4 million in or around June 12, 2019 and otherwise deny Paragraph 76.

77. The Ebury Parties deny Paragraph 77.

78. The Ebury Parties deny Paragraph 78.

79. Paragraph 79 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 79 requires a response, the Ebury Parties deny its allegations.

80. The Ebury Parties admit that EBCC provided approximately $850,000 on or around September 13, 2019 and otherwise deny Paragraph 80.

81. Paragraph 81 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 81 requires a response, the Ebury Parties deny its allegations.

82. Paragraph 82 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 82 requires a response, the Ebury Parties deny its allegations.

83. Paragraph 83 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 83 requires a response, the Ebury Parties deny its allegations.

84. Paragraph 84 asserts opinions and legal conclusions that require no response. To the extent Paragraph 84 requires a response, the Ebury Parties deny its allegations.

85. Paragraph 85 asserts opinions and legal conclusions that require no response. To the extent Paragraph 85 requires a response, the Ebury Parties deny its allegations.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 256 of 2230

86.    Paragraph 86 purports to represent documents that speak for themselves and requires no response.

87.    Paragraph 87 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 87 requires a response, the Ebury Parties deny its allegations.

88.    Paragraph 88 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 88 requires a response, the Ebury Parties deny its allegations.

89.    Paragraph 89 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 89 requires a response, the Ebury Parties deny its allegations.

90.    Paragraph 90 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 90 requires a response, the Ebury Parties deny its allegations.

91.    Paragraph 91 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 91 requires a response, the Ebury Parties deny its allegations.

92.    Paragraph 92 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 92 requires a response, the Ebury Parties deny its allegations.

93.      Paragraph 93 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 93 requires a response, the Ebury Parties deny its allegations.

94.      The Ebury Parties admit Paragraph 94.

95.      Paragraph 95 asserts opinions and legal conclusions and requires no response. To the extent Paragraph 95 requires a response, Ebury Parties admit that they have not paid EBCC the proceeds of the sales detailed in Paragraph 94, because, as EBCC is well aware, the Ebury Parties have not received those proceeds; and otherwise deny Paragraph 95.

96.      Paragraph 96 asserts opinions and legal conclusions that require no response. To the extent Paragraph 96 requires a response, the Ebury Parties deny its allegations.

97.      Paragraph 97 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response.

98.      Paragraph 98 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 98.

99.      Paragraph 99 asserts opinions and legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 99.

100.     Paragraph 100 asserts opinions and legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 100.

15

FILED: NEW YORK COUNTY CLERK 07/10/2023 10:40 PM
NYSCEF DOC. NO. 68
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 258 of 2230

INDEX NO. 158207/2022

RECEIVED NYSCEF: 07/10/2023

101.    Paragraph 101 asserts opinions and legal conclusions and requires no response.

## COUNT ONE
### (Breach of Contract)

102.    In response to Paragraph 102, the Ebury Parties incorporate their foregoing allegations.

103.    Paragraph 103 asserts legal conclusions and requires no response. To the extent Paragraph 103 requires a response, the Ebury Parties admit that the Credit Facilities have not been fully repaid, and otherwise deny its allegations.

104.    Paragraph 104 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 104 requires a response, the Ebury Parties admit that the Credit Facilities have not been fully repaid and otherwise deny Paragraph 104's allegations.

105.    Paragraph 105 asserts legal conclusions and requires no response.

106.    Paragraph 106 asserts legal conclusions and requires no response.

107.    Paragraph 107 asserts legal conclusions and requires no response.

108.    Paragraph 108 asserts legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 108.

109.    Paragraph 109 asserts legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 109.

16

## COUNT TWO
### (Fraudulent Inducement)

110.    In response to Paragraph 110, the Ebury Parties incorporate their foregoing allegations.

111.    Paragraph 111 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 111.

112.    Paragraph 112 asserts opinions and legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 112.

113.    Paragraph 113 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 113.

114.    Paragraph 114 asserts opinions and legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 114.

115.    Paragraph 115 asserts opinions and legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 115.

116.    Paragraph 116 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 116.

17

## COUNT THREE
### (Fraudulent Transfer – DCL // 272-274, 276)

117.     In response to Paragraph 117, the Ebury Parties incorporate their foregoing allegations.

118.     Paragraph 118 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 118.

119.     Paragraph 119 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 119.

120.     Paragraph 120 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 120.

121.     Paragraph 121 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 121.

122.     Paragraph 122 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 122.

123.     Paragraph 123 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 123.

124.     Paragraph 124 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 124.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

EBCC's Complaint fails to state a claim.

### Second Affirmative Defense

EBCC's claims are barred by the doctrines of waiver, estoppel, unclean hands, and unconscionability.

### Third Affirmative Defense

The complaint's claims are barred because EBCC has violated the implied covenant of good faith and fair dealing.

### Fourth Affirmative Defense

EBCC's fraud claims are barred because the Ebury Parties did not make any material misrepresentations or omissions to EBCC.

### Fifth Affirmative Defense

EBCC's fraud claims are barred because any reliance EBCC had on the Ebury Parties' supposedly-false statements was not reasonable.

### Sixth Affirmative Defense

EBCC's fraud claims are barred because they are duplicative.

### Seventh Affirmative Defense

EBCC's damages and other remedies are limited by EBCC's bad-faith abandonment of the Parties' post-default workout negotiations.

## COUNTERCLAIMS

As and for their counterclaims against EBCC, the Ebury Parties respectfully allege:

1.      Before the Ebury Parties began working with EBCC, they had a $45 million revolving credit facility with Capital One, N.A.

2.      In 2016 and 2017, EBCC wooed the Ebury Parties to open lines of credit with EBCC and, eventually, abandon their relationships with Capital One entirely.

3.      From 2017 through 2020, EBCC loaned--and the Ebury Parties repaid--millions upon millions of dollars through the Credit Facilities.

4.      But in 2020, the Covid-19 pandemic froze the Ebury Parties' business.

5.      The Ebury Parties' business is heavily invested in distressed real estate and therefore is at the mercy of foreclosures, evictions, and smooth, efficient state and local governments and court systems.

6.      In response to Covid-19, state and federal governments closed municipal and county offices, paused judicial proceedings, and froze foreclosure and eviction proceedings.

7.      Overnight, the Ebury Parties lost their primary tools for collecting revenue from their investments.

8.      In spring 2021—when the Credit Facilities originally were to mature—the Ebury Parties' businesses still were suffering from the pandemic's closures and slowdowns.

9.      In May 2021, EBCC agreed to extend the Credit Facilities' maturity date by three months.

**20**

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 263 of 2230

10.    In exchange, EBCC extracted the Ebury Parties' agreement to raise the
Credit Facilities interest rate by 200 basis points; discontinue further draws under the
revolving Credit Facilities; and contribute two new tax lien portfolios to the Ebury Party
that had contracted with EBCC.

11.    After, as EBCC characterized it, "administrative-related delays in closing"
the new tax lien portfolios' purchases,  EBCC agreed to another three-month extension of
the Credit Facilities, setting their new maturity date as November 10, 2021.

12.    EBCC again did not make those concessions out benevolence.

13.    Instead, the Bank further increased the Credit Facilities' pricing by another
200 basis points, to L+825.

14.    As late as August 2021, EBCC's bankers told others at the Bank, including
the Bank's credit team, that "[f]rom 2017 [through] 2019, Ebury exhibited stellar operating
performance" that was "equivalent to 40% of annual amortization on EBC[C]'s loan."

15.     But EBCC also recognized that "[t]he pandemic has negatively impacted
Ebury's results from a timing perspective, as government-mandated moratoriums took
the pressure off of mortgage lenders and individual homeowners to settle tax liens."

16.    And at the same time, EBCC observed that "the slowdown in Ebury's core
tax lien business in 2020 and early 2021 was offset by outperformance in its REO
business" and that "the underlying 'credit' of the tax liens will actually improve once the
foreclosure moratoriums are lifted as these liens will continue to accrue interest (as high
as 18%) and ultimate provide higher cash flows to the [Ebury Parties] and EBC[C]."

21

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 264 of 2230

17.    Yet in November 2021, EBCC decided to call the Credit Facilities instead of again extending their maturity dates.

18.    From November 2021 through September 2022, EBCC and the Ebury Parties worked together to negotiate a resolution of the Credit Facilities.

19.    For example, even before the Credit Facilities matured in November 2021, EBCC and Mr. Hanratty had contacted multiple third-party lenders to gauge their interest in purchasing the debt.

20.    EBCC and the Ebury Parties also routinely discussed and negotiated potential payment plans that would fully discharge the Ebury Parties' debts.

21.    At EBCC's request, the Ebury Parties directly connected the Bank with those third parties on multiple occasions, so that the Bank and the third parties could independently discuss and negotiate the sale of the Ebury Parties' debts.

22.    However, EBCC continually dropped the ball on those negotiations, from stringing third-party investors along to failing to respond to them at all.

23.    In spring 2022, the Ebury Parties offered EBCC a multi-year payment plan, which contemplated that the Ebury Parties would fully repay their debt by 2025.

24.    Besides offering concrete solutions, the Ebury Parties also freely shared all their material financial, legal, and other relevant information with EBCC.

25.    By December 2021, the Ebury Parties had sent their lien servicing software's access credentials to EBCC, including for the Ebury Parties' and Speedboat accounts.

26.     By March 2022, the Ebury Parties had sent their Quickbooks accounting software access credentials to EBCC, so that EBCC could independently review and verify the Ebury Parties' financial records.

27.     The Ebury Parties even coordinated with the software providers to provide usage tutorials to EBCC's personnel.

28.     The Ebury Parties also participated in multiple conference calls per week with numerous EBCC personnel to attempt to work out the debts.

29.     Initially, the Ebury Parties' primary EBCC contact, Jack Grady, participated on those phone calls, along with his direct supervisor, EBCC's President.

30.     In early 2022, however, Mr. Grady disappeared from those conferences.

31.     In summer 2023, the Ebury Parties learned that Mr. Grady had disappeared from those conferences because EBCC placed him on administrative leave while EBCC conducted an internal investigation into Mr. Grady's conduct.

32.     EBCC eventually separated Mr. Grady from employment and paid him a significant severance payment.

33.     Even after Mr. Grady left, EBCC's President continued to participate in the conferences.

34.     However, she soon disappeared from the conferences, as well.

35.     Other EBCC personnel and EBCC's outside counsel continued to purport to negotiate with the Ebury Parties.

36.     In August 2022, EBCC sent the Ebury Parties a settlement term sheet that detailed a multi-year plan via which the Ebury Parties would discharge their debt to EBCC.

37.     After several rounds of conversations and negotiations, EBCC sent the Ebury Parties the final "Settlement Term Sheet," dated September 14, 2022.

38.     That Settlement Term Sheet memorialized all of the material terms on which EBCC and the Ebury Parties agreed to resolve the outstanding Credit Facilities.

39.     Just one day after transmitting the Settlement Term Sheet, EBCC's outside counsel emphasized that the bank "need this executed by the end of business today."

40.     EBCC's outside counsel also emphasized that the Bank "needed" the Ebury Parties to execute the Settlement Term Sheet on September 15, 2022 so that the Parties could close the Settlement by Friday, September 23, 2022.

41.     Relying on the Parties' lengthy negotiations, EBCC's demand that the Ebury Parties execute the Settlement Term Sheet "today," and EBCC's promise that executing "today" would mean the Settlement closed by the following Friday, the Ebury Parties executed and returned the Settlement Term Sheet to EBCC on September 15, 2022.

42.     But EBCC went dark after the Ebury Parties returned the executed Settlement Term Sheet.

43.     And on Sunday, September 25, 2022—without warning to the Ebury Parties, and even without warning to the EBCC outside counsel who had negotiated the Settlement Term Sheet—EBCC initiated this Action, suing the Ebury Parties for the very

24

same alleged conduct that the Parties had purportedly attempted to resolve via the Settlement Term Sheet.

44.      The only "new" "misconduct" alleged in EBCC's Complaint was copy-pasted hearsay from a counterclaim filed against certain Ebury Parties by a disgruntled business partner in a Delaware federal litigation (the "McOsker Allegations").

45.      But Ebury entities are the plaintiffs in all litigations against that former business partner, Thomas McOsker.

46.      The Ebury entities filed that first suit against Mr. McOsker and his entities and affiliates in Puerto Rico July 2019.

47.      After Mr. McOsker insisted that the dispute belonged in Delaware, the Ebury entities sued in the federal district court for the District of Delaware in February 2021.

48.      The Ebury Parties consistently made EBCC contemporaneously aware of those McOsker litigations.

49.      In Delaware, Mr. McOsker filed successive motions to dismiss the relevant Ebury entities' RICO and supplemental common-law contract and tort claims.

50.      After losing all of those motions, Mr. McOsker filed an answer and counterclaim asserting, inter alia, the McOsker Allegations.

51.      While the Ebury Parties did not immediately send that pleading to EBCC, the Ebury Parties had made the Bank well aware of the ongoing, multiple litigations between Ebury entities and Mr. McOsker.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 268 of 2230

52.     Moreover, EBCC sent the Settlement Term Sheet on September 14, 2022 and

demanding that the Ebury Parties execute the contract on September 15, 2022.

53.     EBCC induced the Ebury Parties' signature by claiming that the Parties

would close the Settlement by September 23, 2022.

54.     But after ten months of putting the Ebury Parties through every possible

test—from sharing software access to toying with third-party investors to blowing off

refinancing arrangements to purporting to negotiate repayment plans to demanding

next-day execution of the Settlement Term Sheet—EBCC disappeared, only to sue the

Ebury Parties on the Sunday after the Settlement was supposed to have closed.

55.     Consequently, the Ebury Parties counterclaim against EBCC.

## COUNT I
### Breach of Contract

56.     The Ebury Parties incorporate their foregoing allegations.

57.     The Settlement Term Sheet memorialized a contract to settle the

outstanding Credit Facilities.

58.     Relying on EBCC's promises that the Settlement would close by

September 23, 2022, the Ebury Parties executed and returned the Settlement Term Sheet

to EBCC on September 15, 2022.

59.     Instead of continuing to negotiate and close the Settlement in good faith,

EBCC sued the Ebury Parties.

60.     In doing so, EBCC breached the Settlement Term Sheet and damaged the

Ebury Parties in an amount to be determined during discovery and proven at trial,

currently estimated to be no less than $500,000 in out-of-pocket expenses.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

61.    The Ebury Parties incorporate their foregoing allegations.

62.    EBCC had the duty to negotiate the Settlement in good faith.

63.    Instead of continuing to negotiate and close the Settlement in good faith, EBCC sued the Ebury Parties.

64.    In doing so, EBCC breached the implied covenant of good faith and fair dealing and damaged the Ebury Parties in an amount to be determined during discovery and proven at trial, currently estimated to total no less than $500,000 in out-of-pocket expenses.

## COUNT III
### Negligent Misrepresentation

65.    The Ebury Parties incorporate their foregoing allegations.

66.    From at least November 2021 through September 2022, EBCC repeatedly, continually represented to the Ebury Parties that EBCC desired to settle and refinance the outstanding Credit Facilities and would work to do so in good faith.

67.    Trusting in EBCC's professionalism and economic motivations, the Ebury Parties reasonably relied on EBCC's representations that it would work in good faith to accept reasonable workout and / or refinancing terms.

68.    EBCC's representations were false.

69.    It was foreseeable to EBCC that the Ebury Parties would reasonably rely on EBCC's false representations.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 270 of 2230

70.     EBCC had a duty to truthfully communicate with the Ebury Parties in good faith.

71.     In negligently misrepresenting its intentions to refinance, renegotiate, and / or settle the outstanding Credit Facilities, EBCC has damaged the Ebury Parties in an amount to be revealed during discovery and proven at trial.

## COUNT IV
### Promissory Estoppel

72.     The Ebury Parties incorporate their foregoing allegations.

73.     Via the Settlement Term Sheet and other communications, EBCC promised that it would work in good faith to resolve the outstanding Credit Facilities with the Ebury Parties.

74.     EBCC should have expected and did expect that the Ebury Parties reasonably relied on its promises and representations that it was truly interested in resolving the Ebury Parties' debts.

75.     The Ebury Parties relied on EBCC's promises to their detriment by, <u>inter alia</u>, wasting ten months attempting to negotiate a resolution with EBCC.

76.     The Ebury Parties spent hundreds of thousands of dollars trying to find and close a resolution that EBCC would accept.

77.     In the meantime, the Credit Facilities accumulated thousands of dollars of interest per day.

78.     The doctrine of promissory estoppel entitles the Ebury Parties to damages in an amount to be revealed during discovery and proven at trial.

**28**

## RELIEF REQUESTED

On the foregoing allegations, the Ebury Parties request relief and judgment,

including:

    (a) Monetary relief in an amount to be determined at trial;
    (b) Costs and expenses incurred in this action, including attorneys' fees;
    (c) Pre- and post-judgment interest; and
    (d) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Ebury Parties demand a jury trial.

Dated: July 10, 2023
    New York, New York

GUSRAE KAPLAN NUSBAUM PLLC

/s/ Kari Parks
Kari Parks
Victor Wang
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com
vwang@gusraekaplan.com

Attorneys for the Ebury Parties

29

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

| | |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION,<br><br>    Plaintiff–Counterclaim Defendant,<br><br>    v.<br><br>JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, and EBURY RE LLC,<br><br>    Defendants–Counterclaim Plaintiffs,<br><br>    v.<br><br>XYZ CORPS. 1-10,<br><br>    Defendants. | Index No. 158207/2022<br><br><br>**THE EBURY PARTIES'<br>ANSWER AND<br>COUNTERCLAIM** |

Defendant–Counterclaim Plaintiffs John Arthur Hanratty, Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2 EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, Eb 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury Fund 2 FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and Ebury RE, LLC (together, the "**Ebury Parties**") answer the complaint of and files their own "**Counterclaim**" against Plaintiff–Counterclaim Defendant Emigrant Business Credit Corporation ("**Emigrant**"):

## NATURE OF THE ACTION

1.      Paragraph 1 asserts legal conclusions that require no response. To the extent Paragraph 1 requires a response, the Ebury Parties deny Paragraph 1.

2.      Paragraph 2 asserts legal conclusions and purports to represent documents that speak for themselves, and therefore requires no response. To the extent Paragraph 2 requires a response, the Ebury Parties admit that the Credit Facilities matured in November 2021, that the Ebury Parties have not fully repaid the Credit Facilities, and that Mr. Hanratty occasionally told Emigrant "that it was 'overcollateralized,'" and denies Paragraph 2's remaining assertions, and specifically denies that the Ebury Parties ever knowingly communicated false material information to Emigrant.

3.      Paragraph 3 asserts legal conclusions that require no response, as well as factual allegations regarding which the Ebury Parties lack knowledge or information

sufficient to form a belief regarding their truth. To the extent Paragraph 3 requires a response, the Ebury Parties deny Paragraph 3's allegations.

4.      Paragraph 4 asserts legal conclusions that require no response, as well as factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth. To the extent Paragraph 4 requires a response, the Ebury Parties deny its allegations.

5.      Paragraph 5 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 5 requires a response, the Ebury Parties deny its allegations.

6.      Paragraph 6 asserts legal conclusions that requires no response. To the extent Paragraph 6 requires a response, the Ebury Parties deny its allegations. The Ebury Parties further observe that between November 2021 and September 2022, the Ebury Parties negotiated in good faith with Emigrant to work out a payment plan of the Credit Facilities and executed a September 14, 2022 Settlement Term Sheet ("**Settlement Contract**") offered by Emigrant. Eleven days after the Ebury Parties returned that executed Term Sheet to Emigrant, Emigrant initiated the above-captioned "**Action**" and sued the Ebury Parties to collect on the very same Credit Facilities whose repayment had been resolved with the Settlement Contract.

## THE PARTIES

7.        The Ebury Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 7.

8.        The Ebury Parties deny that Mr. Hanratty "resides at 1152 Ave Magdalena, San Juan, Puerto Rico 00907" and otherwise admit the allegations of Paragraph 8.

9.        The Ebury Parties admit Paragraph 9.

10.        The Ebury Parties admit Paragraph 10.

11.        The Ebury Parties admit Paragraph 11.

12.        Paragraph 12 asserts legal conclusions that require no response. To the extent Paragraph 12 requires a response, the Ebury Parties deny its allegations.

13.        Paragraph 13 asserts legal conclusions that require no response. To the extent Paragraph 13 requires a response, the Ebury Parties deny its allegations.

14.        The Ebury Parties deny Paragraph 14.

15.        Paragraph 15 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 15 requires a response, the Ebury Parties deny its allegations.

16.        The Ebury Parties admit Paragraph 16.

17.        Paragraph 17 asserts legal conclusions that require no response, as well as factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth. To the extent Paragraph 17 requires a response, the Ebury Parties deny its allegations.

18.     Paragraph 18 asserts legal conclusions that require no response. To the extent Paragraph 18 requires a response, the Ebury Parties deny its allegations.

## JURISDICTION AND VENUE

19.     Paragraph 19 asserts legal conclusions that require no response. To the extent Paragraph 19 requires a response, the Ebury Parties deny its allegations.

20.     Paragraph 20 asserts legal conclusions and purports to represent documents that speak for themselves, and therefore requires no response. To the extent Paragraph 20 requires a response, the Ebury Parties admit that venue is proper in this court, and otherwise deny its allegations.

21.     Paragraph 21 asserts legal conclusions and requires no response. To the extent Paragraph 21 requires a response, the Ebury Parties admit that this action is appropriate for the Commercial Division and otherwise deny its allegations.

## FACTUAL BACKGROUND

22.     Paragraph 22 asserts legal conclusions and generalities and requires no response.

23.     Paragraph 23 asserts legal conclusions and generalities and requires no response.

24.     Paragraph 24 asserts legal conclusions and generalities and requires no response.

25.     Paragraph 25 asserts legal conclusions and generalities and requires no response.

26.     Paragraph 26 asserts legal conclusions and generalities and requires no response.

27.     Paragraph 27 asserts legal conclusions and generalities and requires no response.

28.     Paragraph 28 asserts legal conclusions and generalities and requires no response.

29.     Paragraph 29 asserts legal conclusions and generalities and requires no response.

30.     Paragraph 30 asserts legal conclusions and generalities and requires no response.

31.     Paragraph 31 asserts legal conclusions, opinions, and generalities and requires no response.

32.     Paragraph 32 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 32 requires a response, the Ebury Parties admit that they communicated with EBCC in 2016 regarding obtaining a new credit facility, and at the time, had established credit facilities with Capital One, N.A., and otherwise deny its allegations.

33.     Paragraph 33 asserts legal conclusions that require no response. To the extent that Paragraph 33 requires a response, the Ebury Parties agree that the credit facilities were increased multiple times and that the Ebury Parties repaid the Capital One facilities, and otherwise deny its allegations.

34.     Paragraph 34 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 34 requires a response, the Ebury Parties deny its allegations.

35.     Paragraph 35 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 35 requires a response, the Ebury Parties deny its allegations.

36.     Paragraph 36 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 36 requires a response, the Ebury Parties deny its allegations.

37.     Paragraph 37 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 37 requires a response, the Ebury Parties deny its allegations.

38.     Paragraph 38 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 38 requires a response, the Ebury Parties deny its allegations.

39.     Paragraph 39 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 39 requires a response, the Ebury Parties deny its allegations.

40.     Paragraph 40 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 40 requires a response, the Ebury Parties deny its allegations.

41.    Paragraph 41 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 41 requires a response, the Ebury Parties deny its allegations.

42.    Paragraph 42 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 42 requires a response, the Ebury Parties deny its allegations.

43.    Paragraph 43 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 43 requires a response, the Ebury Parties admit that Mr. Hanratty occasionally claimed that EBCC was "overcollateralized," that Mr. Hanratty believed those statements to be true on all occasions that he said so, and otherwise deny its allegations.

44.    Paragraph 44 purports to represent a document that speaks for itself and requires no response. To the extent Paragraph 44 requires a response, the Ebury Parties deny its allegations.

45.    Paragraph 45 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 45 requires a response, the Ebury Parties deny its allegations.

46.    Paragraph 46 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 46 requires a response, the Ebury Parties deny its allegations.

47.      Paragraph 47 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 47 requires a response, the Ebury Parties deny its allegations.

48.      Paragraph 48 purports to represent hearsay in a document that speaks for itself and requires no response. To the extent Paragraph 48 requires a response, the Ebury Parties deny its allegations.

49.      Paragraph 49 asserts legal conclusions that require no response. To the extent Paragraph 49 requires a response, the Ebury Parties deny its allegations.

50.      Paragraph 50 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 50 requires a response, the Ebury Parties deny its allegations.

51.      Paragraph 51 asserts legal conclusions and factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth and requires no response. To the extent Paragraph 51 requires a response, the Ebury Parties deny its allegations.

52.      Paragraph 52 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 52 requires a response, the Ebury Parties admit that EBCC was aware that MTAG was one of the Ebury Parties' servicers, and otherwise deny its allegations.

53.      Paragraph 53 asserts legal conclusions and requires no response. To the extent Paragraph 53 requires a response, the Ebury Parties deny its allegations.

54.     Paragraph 54 purports to represent hearsay in a document that speaks for itself and requires no response. To the extent Paragraph 54 requires a response, the Ebury Parties deny its allegations.

55.     Paragraph 55 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 55 requires a response, the Ebury Parties admit that they understood MTAG's records to suffer from timing and uploading problems, and otherwise deny Paragraph 55's allegations.

56.     Paragraph 56 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 56 requires a response, the Ebury Parties deny its allegations.

57.     Paragraph 57 purports to represent documents that speak for themselves and assert factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth and requires no response. To the extent Paragraph 57 requires a response, the Ebury Parties deny its allegations.

58.     Paragraph 58 asserts legal conclusions and purports to represent documents that speak for themselves. To the extent Paragraph 58 requires a response, the Ebury Parties admit that they self-serviced some of EBCC's collateral using the Speedboat platform, and that EBCC was well aware of this self-servicing before November 2021; otherwise deny Paragraph 58's allegations; and further deny the implication that they hid or otherwise concealed this information from EBCC before November 2021.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

Court Records    Pg 282 of 2230

59.     Paragraph 59 asserts legal conclusions and purports to represent documents that speak for themselves. To the extent Paragraph 59 requires a response, the Ebury Parties deny its allegations.

60.     Paragraph 60 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 60 requires a response, the Ebury Parties deny its allegations.

61.     Paragraph 61 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 61 requires a response, the Ebury Parties deny its allegations.

62.     Paragraph 62 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 62 requires a response, the Ebury Parties deny its allegations.

63.     Paragraph 63 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response.

64.     Paragraph 64 asserts legal conclusions and requires no response. To the extent Paragraph 64 requires a response, the Ebury Parties admit its allegations.

65.     Paragraph 65 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 65 requires a response, the Ebury Parties deny its allegations.

66.     Paragraph 66 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 66 requires a response, the Ebury Parties deny its allegations.

67.     Paragraph 67 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 67 requires a response, the Ebury Parties deny its allegations.

68.     Paragraph 68 asserts legal conclusions, purports to represent hearsay in documents that speak for themselves, and requires no response. To the extent Paragraph 68 requires a response, the Ebury Parties deny its allegations.

69.     Paragraph 69 asserts legal conclusions and requires no response. To the extent Paragraph 69 requires a response, the Ebury Parties deny its allegations.

70.     The Ebury Parties admit that EBCC provided approximately $220,000 to EB 1EMI LLC on or Around November 9, 2018 and otherwise deny Paragraph 70.

71.     Paragraph 71 asserts legal conclusions that require no response. To the extent Paragraph 71 requires a response, the Ebury Parties deny its allegations.

72.      The Ebury Parties admit that EBCC provided approximately $860,000 to Ebury 1 EMI LLC on or around May 17, 2019 and otherwise deny Paragraph 72.

73.     Paragraph 73 asserts legal conclusions that require no response. To the extent Paragraph 71 requires a response, the Ebury Parties deny its allegations.

74.     Paragraph 74 asserts legal conclusions that require no response. To the extent Paragraph 72 requires a response, the Ebury Parties deny its allegations.

75.     Paragraph 75 asserts legal conclusions that require no response. To the extent Paragraph 75 requires a response, the Ebury Parties deny its allegations.

76.     The Ebury Parties admit that EBCC provided approximately $2.4 million in or around June 12, 2019 and otherwise deny Paragraph 76.

77.    The Ebury Parties deny Paragraph 77.

78.    The Ebury Parties deny Paragraph 78.

79.    Paragraph 79 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 79 requires a response, the Ebury Parties deny its allegations.

80.    The Ebury Parties admit that EBCC provided approximately $850,000 on or around September 13, 2019 and otherwise deny Paragraph 80.

81.    Paragraph 81 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 81 requires a response, the Ebury Parties deny its allegations.

82.    Paragraph 82 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 82 requires a response, the Ebury Parties deny its allegations.

83.    Paragraph 83 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 83 requires a response, the Ebury Parties deny its allegations.

84.    Paragraph 84 asserts opinions and legal conclusions that require no response. To the extent Paragraph 84 requires a response, the Ebury Parties deny its allegations.

85.    Paragraph 85 asserts opinions and legal conclusions that require no response. To the extent Paragraph 85 requires a response, the Ebury Parties deny its allegations.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 285 of 2230

86.     Paragraph 86 purports to represent documents that speak for themselves and requires no response.

87.     Paragraph 87 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 87 requires a response, the Ebury Parties deny its allegations.

88.     Paragraph 88 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 88 requires a response, the Ebury Parties deny its allegations.

89.     Paragraph 89 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 89 requires a response, the Ebury Parties deny its allegations.

90.     Paragraph 90 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 90 requires a response, the Ebury Parties deny its allegations.

91.     Paragraph 91 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 91 requires a response, the Ebury Parties deny its allegations.

92.     Paragraph 92 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 92 requires a response, the Ebury Parties deny its allegations.

93.     Paragraph 93 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 93 requires a response, the Ebury Parties deny its allegations.

94.     The Ebury Parties admit Paragraph 94.

95.     Paragraph 95 asserts opinions and legal conclusions and requires no response. To the extent Paragraph 95 requires a response, Ebury Parties admit that they have not paid EBCC the proceeds of the sales detailed in Paragraph 94, because, as EBCC is well aware, the Ebury Parties have not received those proceeds; and otherwise deny Paragraph 95.

96.     Paragraph 96 asserts opinions and legal conclusions that require no response. To the extent Paragraph 96 requires a response, the Ebury Parties deny its allegations.

97.     Paragraph 97 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response.

98.     Paragraph 98 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 98.

99.     Paragraph 99 asserts opinions and legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 99.

100.    Paragraph 100 asserts opinions and legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 100.

101.     Paragraph 101 asserts opinions and legal conclusions and requires no response.

## COUNT ONE
### (Breach of Contract)

102.     In response to Paragraph 102, the Ebury Parties incorporate their foregoing allegations.

103.     Paragraph 103 asserts legal conclusions and requires no response. To the extent Paragraph 103 requires a response, the Ebury Parties admit that the Credit Facilities have not been fully repaid, and otherwise deny its allegations.

104.     Paragraph 104 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 104 requires a response, the Ebury Parties admit that the Credit Facilities have not been fully repaid and otherwise deny Paragraph 104's allegations.

105.     Paragraph 105 asserts legal conclusions and requires no response.

106.     Paragraph 106 asserts legal conclusions and requires no response.

107.     Paragraph 107 asserts legal conclusions and requires no response.

108.     Paragraph 108 asserts legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 108.

109.     Paragraph 109 asserts legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 109.

## COUNT TWO
### (Fraudulent Inducement)

110.     In response to Paragraph 110, the Ebury Parties incorporate their

foregoing allegations.

111.     Paragraph 111 asserts legal conclusions that require no response. To the

extent it requires a response, the Ebury Parties deny Paragraph 111.

112.     Paragraph 112 asserts opinions and legal conclusions that require no

response. To the extent it requires a response, the Ebury Parties deny Paragraph 112.

113.     Paragraph 113 asserts legal conclusions that require no response. To the

extent it requires a response, the Ebury Parties deny Paragraph 113.

114.     Paragraph 114 asserts opinions and legal conclusions that require no

response. To the extent it requires a response, the Ebury Parties deny Paragraph 114.

115.     Paragraph 115 asserts opinions and legal conclusions that require no

response. To the extent it requires a response, the Ebury Parties deny Paragraph 115.

116.     Paragraph 116 asserts legal conclusions that require no response. To the

extent it requires a response, the Ebury Parties deny Paragraph 116.

## COUNT THREE
### (Fraudulent Transfer – DCL §§ 272-274, 276)

117.    In response to Paragraph 117, the Ebury Parties incorporate their

foregoing allegations.

118.    Paragraph 118 asserts legal conclusions that require no response. To the

extent it requires a response, the Ebury Parties deny Paragraph 118.

119.    Paragraph 119 asserts legal conclusions that require no response. To the

extent it requires a response, the Ebury Parties deny Paragraph 119.

120.    Paragraph 120 asserts legal conclusions that require no response. To the

extent it requires a response, the Ebury Parties deny Paragraph 120.

121.    Paragraph 121 asserts legal conclusions that require no response. To the

extent it requires a response, the Ebury Parties deny Paragraph 121.

122.    Paragraph 122 asserts legal conclusions that require no response. To the

extent it requires a response, the Ebury Parties deny Paragraph 122.

123.    Paragraph 123 asserts legal conclusions that require no response. To the

extent it requires a response, the Ebury Parties deny Paragraph 123.

124.    Paragraph 124 asserts legal conclusions that require no response. To the

extent it requires a response, the Ebury Parties deny Paragraph 124.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

EBCC's Complaint fails to state a claim.

### Second Affirmative Defense

EBCC's claims are barred by the doctrines of waiver, estoppel, unclean hands, and unconscionability.

### Third Affirmative Defense

The complaint's claims are barred because EBCC has violated the implied covenant of good faith and fair dealing.

### Fourth Affirmative Defense

EBCC's fraud claims are barred because the Ebury Parties did not make any material misrepresentations or omissions to EBCC.

### Fifth Affirmative Defense

EBCC's fraud claims are barred because any reliance EBCC had on the Ebury Parties' supposedly-false statements was not reasonable.

### Sixth Affirmative Defense

EBCC's fraud claims are barred because they are duplicative.

### Seventh Affirmative Defense

EBCC's damages and other remedies are limited by EBCC's bad-faith abandonment of the Parties' post-default workout negotiations.

## COUNTERCLAIMS

As and for their counterclaims against EBCC, the Ebury Parties respectfully allege:

1.       Before the Ebury Parties began working with EBCC, they had a $45 million revolving credit facility with Capital One, N.A.

2.       In 2016 and 2017, EBCC wooed the Ebury Parties to open lines of credit with EBCC and, eventually, abandon their relationships with Capital One entirely.

3.       From 2017 through 2020, EBCC loaned--and the Ebury Parties repaid--millions upon millions of dollars through the Credit Facilities.

4.       But in 2020, the Covid-19 pandemic froze the Ebury Parties' business.

5.       The Ebury Parties' business is heavily invested in distressed real estate and therefore is at the mercy of foreclosures, evictions, and smooth, efficient state and local governments and court systems.

6.       In response to Covid-19, state and federal governments closed municipal and county offices, paused judicial proceedings, and froze foreclosure and eviction proceedings.

7.       Overnight, the Ebury Parties lost their primary tools for collecting revenue from their investments.

8.       In spring 2021—when the Credit Facilities originally were to mature—the Ebury Parties' businesses still were suffering from the pandemic's closures and slowdowns.

9.       In May 2021, EBCC agreed to extend the Credit Facilities' maturity date by three months.

10.     In exchange, EBCC extracted the Ebury Parties' agreement to raise the Credit Facilities interest rate by 200 basis points; discontinue further draws under the revolving Credit Facilities; and contribute two new tax lien portfolios to the Ebury Party that had contracted with EBCC.

11.     After, as EBCC characterized it, "administrative-related delays in closing" the new tax lien portfolios' purchases, EBCC agreed to another three-month extension of the Credit Facilities, setting their new maturity date as November 10, 2021.

12.     EBCC again did not make those concessions out benevolence.

13.     Instead, the Bank further increased the Credit Facilities' pricing by another 200 basis points, to L+825.

14.     As late as August 2021, EBCC's bankers told others at the Bank, including the Bank's credit team, that "[f]rom 2017 [through] 2019, Ebury exhibited stellar operating performance" that was "equivalent to 40% of annual amortization on EBC[C]'s loan."

15.     But EBCC also recognized that "[t]he pandemic has negatively impacted Ebury's results from a timing perspective, as government-mandated moratoriums took the pressure off of mortgage lenders and individual homeowners to settle tax liens."

16.     And at the same time, EBCC observed that "the slowdown in Ebury's core tax lien business in 2020 and early 2021 was offset by outperformance in its REO business" and that "the underlying 'credit' of the tax liens will actually improve once the foreclosure moratoriums are lifted as these liens will continue to accrue interest (as high as 18%) and ultimate provide higher cash flows to the [Ebury Parties] and EBC[C]."

17.     Yet in November 2021, EBCC decided to call the Credit Facilities instead of again extending their maturity dates.

18.     From November 2021 through September 2022, EBCC and the Ebury Parties worked together to negotiate a resolution of the Credit Facilities.

19.     For example, even before the Credit Facilities matured in November 2021, EBCC and Mr. Hanratty had contacted multiple third-party lenders to gauge their interest in purchasing the debt.

20.     EBCC and the Ebury Parties also routinely discussed and negotiated potential payment plans that would fully discharge the Ebury Parties' debts.

21.     At EBCC's request, the Ebury Parties directly connected the Bank with those third parties on multiple occasions, so that the Bank and the third parties could independently discuss and negotiate the sale of the Ebury Parties' debts.

22.     However, EBCC continually dropped the ball on those negotiations, from stringing third-party investors along to failing to respond to them at all.

23.     In spring 2022, the Ebury Parties offered EBCC a multi-year payment plan, which contemplated that the Ebury Parties would fully repay their debt by 2025.

24.     Besides offering concrete solutions, the Ebury Parties also freely shared all their material financial, legal, and other relevant information with EBCC.

25.     By December 2021, the Ebury Parties had sent their lien servicing software's access credentials to EBCC, including for the Ebury Parties' and Speedboat accounts.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                        Court Records    Pg 294 of 2230

26.     By March 2022, the Ebury Parties had sent their Quickbooks accounting software access credentials to EBCC, so that EBCC could independently review and verify the Ebury Parties' financial records.

27.     The Ebury Parties even coordinated with the software providers to provide usage tutorials to EBCC's personnel.

28.     The Ebury Parties also participated in multiple conference calls per week with numerous EBCC personnel to attempt to work out the debts.

29.     Initially, the Ebury Parties' primary EBCC contact, Jack Grady, participated on those phone calls, along with his direct supervisor, EBCC's President.

30.     In early 2022, however, Mr. Grady disappeared from those conferences.

31.     In summer 2023, the Ebury Parties learned that Mr. Grady had disappeared from those conferences because EBCC placed him on administrative leave while EBCC conducted an internal investigation into Mr. Grady's conduct.

32.     EBCC eventually separated Mr. Grady from employment and paid him a significant severance payment.

33.     Even after Mr. Grady left, EBCC's President continued to participate in the conferences.

34.     However, she soon disappeared from the conferences, as well.

35.     Other EBCC personnel and EBCC's outside counsel continued to purport to negotiate with the Ebury Parties.

FILED: NEW YORK COUNTY CLERK 07/20/2023 12:40 PM
NYSCEF DOC. NO. 69
INDEX NO. 158207/2022
RECEIVED NYSCEF: 07/20/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 295 of 2230

36.     In August 2022, EBCC sent the Ebury Parties a settlement term sheet that detailed a multi-year plan via which the Ebury Parties would discharge their debt to EBCC.

37.     After several rounds of conversations and negotiations, EBCC sent the Ebury Parties the final "**Settlement Term Sheet**," dated September 14, 2022.

38.     That Settlement Term Sheet memorialized all of the material terms on which EBCC and the Ebury Parties agreed to resolve the outstanding Credit Facilities.

39.     Just one day after transmitting the Settlement Term Sheet, EBCC's outside counsel emphasized that the bank "need this executed by the end of business today."

40.     EBCC's outside counsel also emphasized that the Bank "needed" the Ebury Parties to execute the Settlement Term Sheet on September 15, 2022 so that the Parties could close the Settlement by Friday, September 23, 2022.

41.     Relying on the Parties' lengthy negotiations, EBCC's demand that the Ebury Parties execute the Settlement Term Sheet "today," and EBCC's promise that executing "today" would mean the Settlement closed by the following Friday, the Ebury Parties executed and returned the Settlement Term Sheet to EBCC on September 15, 2022.

42.     But EBCC went dark after the Ebury Parties returned the executed Settlement Term Sheet.

43.     And on Sunday, September 25, 2022—without warning to the Ebury Parties, and even without warning to the EBCC outside counsel who had negotiated the Settlement Term Sheet—EBCC initiated this Action, suing the Ebury Parties for the very

same alleged conduct that the Parties had purportedly attempted to resolve via the Settlement Term Sheet.

44.    The only "new" "misconduct" alleged in EBCC's Complaint was copy-pasted hearsay from a counterclaim filed against certain Ebury Parties by a disgruntled business partner in a Delaware federal litigation (the "**McOsker Allegations**").

45.    But Ebury entities are the plaintiffs in all litigations against that former business partner, Thomas McOsker.

46.    The Ebury entities filed that first suit against Mr. McOsker and his entities and affiliates in Puerto Rico July 2019.

47.    After Mr. McOsker insisted that the dispute belonged in Delaware, the Ebury entities sued in the federal district court for the District of Delaware in February 2021.

48.    The Ebury Parties consistently made EBCC contemporaneously aware of those McOsker litigations.

49.    In Delaware, Mr. McOsker filed successive motions to dismiss the relevant Ebury entities' RICO and supplemental common-law contract and tort claims.

50.    After losing all of those motions, Mr. McOsker filed an answer and counterclaim asserting, inter alia, the McOsker Allegations.

51.    While the Ebury Parties did not immediately send that pleading to EBCC, the Ebury Parties had made the Bank well aware of the ongoing, multiple litigations between Ebury entities and Mr. McOsker.

52.    Moreover, EBCC sent the Settlement Term Sheet on September 14, 2022 and

demanding that the Ebury Parties execute the contract on September 15, 2022.

53.    EBCC induced the Ebury Parties' signature by claiming that the Parties

would close the Settlement by September 23, 2022.

54.    But after ten months of putting the Ebury Parties through every possible

test—from sharing software access to toying with third-party investors to blowing off

refinancing arrangements to purporting to negotiate repayment plans to demanding

next-day execution of the Settlement Term Sheet—EBCC disappeared, only to sue the

Ebury Parties on the Sunday after the Settlement was supposed to have closed.

55.    Consequently, the Ebury Parties counterclaim against EBCC.

### COUNT I
### Breach of Contract

56.    The Ebury Parties incorporate their foregoing allegations.

57.    The Settlement Term Sheet memorialized a contract to settle the

outstanding Credit Facilities.

58.    Relying on EBCC's promises that the Settlement would close by

September 23, 2022, the Ebury Parties executed and returned the Settlement Term Sheet

to EBCC on September 15, 2022.

59.    Instead of continuing to negotiate and close the Settlement in good faith,

EBCC sued the Ebury Parties.

60.    In doing so, EBCC breached the Settlement Term Sheet and damaged the

Ebury Parties in an amount to be determined during discovery and proven at trial,

currently estimated to be no less than $500,000 in out-of-pocket expenses.

FILED: NEW YORK COUNTY CLERK 07/20/2023 12:40 PM

NYSCEF DOC. NO.: 65

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

Court Records    Pg 298 of 2230

INDEX NO. 158207/2022

RECEIVED NYSCEF: 07/20/2023

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

61.    The Ebury Parties incorporate their foregoing allegations.

62.    EBCC had the duty to negotiate the Settlement in good faith.

63.    Instead of continuing to negotiate and close the Settlement in good faith, EBCC sued the Ebury Parties.

64.    In doing so, EBCC breached the implied covenant of good faith and fair dealing and damaged the Ebury Parties in an amount to be determined during discovery and proven at trial, currently estimated to total no less than $500,000 in out-of-pocket expenses.

## COUNT III
### Negligent Misrepresentation

65.    The Ebury Parties incorporate their foregoing allegations.

66.    From at least November 2021 through September 2022, EBCC repeatedly, continually represented to the Ebury Parties that EBCC desired to settle and refinance the outstanding Credit Facilities and would work to do so in good faith.

67.    Trusting in EBCC's professionalism and economic motivations, the Ebury Parties reasonably relied on EBCC's representations that it would work in good faith to accept reasonable workout and / or refinancing terms.

68.    EBCC's representations were false.

69.    It was foreseeable to EBCC that the Ebury Parties would reasonably rely on EBCC's false representations.

70.     EBCC had a duty to truthfully communicate with the Ebury Parties in good faith.

71.     In negligently misrepresenting its intentions to refinance, renegotiate, and / or settle the outstanding Credit Facilities, EBCC has damaged the Ebury Parties in an amount to be revealed during discovery and proven at trial.

## COUNT IV
### Promissory Estoppel

72.     The Ebury Parties incorporate their foregoing allegations.

73.     Via the Settlement Term Sheet and other communications, EBCC promised that it would work in good faith to resolve the outstanding Credit Facilities with the Ebury Parties.

74.     EBCC should have expected and did expect that the Ebury Parties reasonably relied on its promises and representations that it was truly interested in resolving the Ebury Parties' debts.

75.     The Ebury Parties relied on EBCC's promises to their detriment by, inter alia, wasting ten months attempting to negotiate a resolution with EBCC.

76.     The Ebury Parties spent hundreds of thousands of dollars trying to find and close a resolution that EBCC would accept.

77.     In the meantime, the Credit Facilities accumulated thousands of dollars of interest per day.

78.     The doctrine of promissory estoppel entitles the Ebury Parties to damages in an amount to be revealed during discovery and proven at trial.

FILED: NEW YORK COUNTY CLERK 07/20/2023 12:41 PM
NYSCEF DOC. NO. 69
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 300 of 2230

INDEX NO. 158207/2022
RECEIVED NYSCEF: 07/20/2023

## RELIEF REQUESTED

On the foregoing allegations, the Ebury Parties request relief and judgment,

including:

(a) Monetary relief in an amount to be determined at trial;
(b) Costs and expenses incurred in this action, including attorneys' fees;
(c) Pre- and post-judgment interest; and
(d) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Ebury Parties demand a jury trial.

Dated: July 10, 2023
       New York, New York

**GUSRAE KAPLAN NUSBAUM PLLC**

/s/ Kari Parks
Kari Parks
Victor Wang
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com
vwang@gusraekaplan.com

*Attorneys for the Ebury Parties*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

                    Plaintiff,

          v.                                        Index No. 158207/2022

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

                    Defendants.

---

## VERIFICATION OF JOHN HANRATTY

John Hanratty, being duly sworn, deposes and says:

1.    I am a defendant–counterclaim plaintiff in the above-captioned action.

2.    I am authorized to verify the Ebury Parties' Answer and Counterclaim on behalf of named defendants–counterclaim plaintiffs.

3.    I have the read the foregoing Answer and Counterclaim and know its contents are true to my knowledge, except those matters alleged on information and belief, which I believe to be true.

Sworn to before me this _19_ day of July, 2023.

_____
Notary Public

_____
John Hanratty

STACEY A. PINEAU
Notary Public
Massachusetts
My Commission Expires
Oct 19, 2029

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

                Plaintiff,

    v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

                Defendants.

Index No. 158207/2022

Hon. Margaret A. Chan

---

## NOTICE OF APPEAL

    PLEASE TAKE NOTICE that the **"Ebury Parties"**[1] hereby appeal to the

Appellate Division of the Supreme Court of the State of New York, First Department,

---

[1] Defendants Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury
1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD,
LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB
1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque
Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC,

1

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 304 of 2230

from each and every aspect of the annexed Decision and Order of the Honorable

Margaret A. Chan of the Supreme Court, New York County, dated June 29, 2023, and

duly entered in the Office of the New York County Clerk on June 29, 2023, which

denied Defendant Ebury Parties' Motion to Dismiss (Motion Sequence 2).


Dated: July 27, 2023
      New York, New York

                    Respectfully submitted,

                    **GUSRAE KAPLAN NUSBAUM PLLC**

                    /s/ Victor Wang
                    Kari Parks
                    Victor R. Wang
                    120 Wall Street
                    New York, New York 10005
                    (212) 269-1400
                    kparks@gusraekaplan.com
                    vwang@gusraekaplan.com

                    *Counsel for The Ebury Parties*

---

Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, Ebury RE LLC and
John Hanratty (together, the "**Ebury Parties**").

2

FILED: NEW YORK COUNTY CLERK 07/27/2023 05:22 PM

INDEX NO. 158207/2022

NYSCEF DOC. NO. 70

RECEIVED NYSCEF: 07/27/2023

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records    Pg 305 of 2230

# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------- x

EMIGRANT BUSINESS CREDIT        :    Index No. 158207/2022
CORPORATION,        :
        :    Hon. Margaret Chan
        Plaintiff,    :
    v.        :    **NOTICE OF ENTRY**
        :
JOHN ARTHUR HANRATTY, et al.,    :
        :
        Defendants.    :
        :

---------------------------------------------------- x

      **PLEASE TAKE NOTICE** that attached hereto is a true and correct copy of the

Decision + Order on Motion of the Hon. Margaret Chan, J.S.C., dated June 29, 2023, and duly

entered in the above-captioned action in the office of the County Clerk, New York County, on the

29th day of June, 2023

Dated:   June 29, 2023           Respectfully submitted,
       New York, New York

                           */s/ Alexander J. Willscher*

                           Alexander J. Willscher
                           Austin P. Mayron
                           SULLIVAN & CROMWELL LLP
                           125 Broad Street
                           New York, New York  10004
                           Telephone: (212) 558-4000
                           Fax: (212) 558-3588

                           *Attorneys for Plaintiff Emigrant Business*
                         *Credit Corporation*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

-------------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,

                        Plaintiff,

             - v -

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL,
LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED
CLOVER 1, LLC, EBURY RE LLC, XYZ CORPS 1-10.

                        Defendants.

-------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 158207/2022 |
| **MOTION DATE** | 11/16/2022 |
| **MOTION SEQ. NO.** | 002 |

**DECISION + ORDER ON MOTION**

HON. MARGARET CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 002) 41, 42, 43, 44, 45, 48, 49, 54

were read on this motion to/for                   **DISMISS**

      In this action involving credit facilities and related guaranties, plaintiff Emigrant Business Credit Corporation alleges three causes of action for breach of contract, fraudulent inducement, and fraudulent transfer. Defendants move pursuant to CPLR 3211 (a) (1) and (7) for an order dismissing the first cause of action regarding Ebury Street Capital, LLC (ESC) and Ebury RE LLC (Ebury RE) and dismissing the second and third causes of action regarding all defendants. Plaintiff opposes the motion.

### Background

      Plaintiff is a New York-based specialty finance company (NYSCEF # 1 – Complaint, ¶ 7). Hanratty is the manager of ESC, and ESC is the manager or general partner of all the other defendants (collectively with ESC, the Ebury Entities) (*id.*, ¶'s 8-9). On March 9, 2017, plaintiff extended credit facilities to defendants 1EMI LLC and Ebury 2EMI LLC (respectively, 1EMI and 2EMI and, together, the Borrowers) in amounts totaling $10,000,000 and $5,000,000, respectively, with 1EMI's facility later increasing to $13,500,000 on October 29,

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR ET AL
Motion No. 002

Page 1 of 8

51 off 188

2018 and to $15,000,000 on September 24, 2019 (*id.*, ¶ 33). Hanratty and various Ebury Entities issued guaranties connected to the facilities (*id.*, ¶'s 15, 37, 39).

The funds were to be used to finance the purchase of tax lien certificates that municipalities place on properties when an owner fails to pay municipal taxes (*id.*, ¶'s 32; 22). Investors purchase tax lien certificates from municipalities to profit from the interest rate chargeable on the certificate and to enable ownership of the underlying real estate through foreclosure (*id.*, ¶ 25).

Each Borrower owns special purpose entities (Ebury SPEs) that purchase, own, and sell tax lien certificates or real estate in various states (*id.*, ¶ 13). Plaintiff explains that the credit facilities were structured to allow the Borrowers to draw down revolving lines of credit against the value of a pool of eligible assets serving as collateral (*id.*, ¶'s 27; 34). The total amount the Borrowers could draw down was calculated by multiplying the amount of eligible collateral by the advance rate, which ranged from 70% to 85% (*id.*, ¶'s 28; 34). Any tax lien certificate that defendants purchased using the Credit Facilities, and its proceeds, served as the collateral and were to be delivered to a designated third-party custodian (*id.*, ¶'s 34, 50). Following the initial appointment of a custodian, on November 8, 2017, plaintiff consented to changing the custodian to be MTAG Services, LLC (MTAG) (*id.*, ¶ 52). Defendants were not allowed to retain custody of the tax liens or to service the tax liens themselves and all proceeds from the selling of a tax lien were to be deposited into plaintiff's lockbox account (*id.*, ¶'s 51, 91 [b]).

Plaintiff alleges that "[d]efendants misappropriated advances to the credit facilities as well as [plaintiff's] collateral to pay tens of millions of dollars in distributions to company insiders—including Defendant John Hanratty—as well as other investors" (*id.* ¶ 1). Also, plaintiff charges the Borrowers with failing to repay the principal and interest for the credit facilities when they came due on November 10, 2021, which default has continued even after plaintiff sent a default notice on November 29, 2021 (*id.*, ¶ 38). Plaintiff alleges that the outstanding amounts exceed $21.8 million (*id.*, ¶ 38).

For its fraud claim, plaintiff alleges as follows: Hanratty consistently claimed that plaintiff was secured by collateral worth more than the outstanding amounts (*id.*, ¶ 43). For example, one of plaintiff's employees conveyed concerns to Hanratty about the 2019 financial audits, which valued the tax lien investments at around $17.2 million, being less than the approximately $18 million outstanding balance owed at the time (*id.*, ¶ 47). Hanratty responded that plaintiff was actually secured by $32 million in tax lien collateral, plus additional collateral amounts (*id.*, ¶ 47). Hanratty's claims of overcollateralization were intentionally false, and Hanratty even bragged about his ability to mislead plaintiff's employee (*id.*, ¶'s 47-49).

In March of 2021, plaintiff discovered that certain of the collateral was not held by the custodian (*id.*, ¶ 55). Plaintiff alleges that Hanratty subsequently misled plaintiff about the custodial status of the collateral. To wit, defendant shared a spreadsheet purporting to be from the custodian and indicated that as of August 31,

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 2 of 8
ET AL
Motion No. 002

62 of 188

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 309 of 2230

2021, the custodian had 6,782 tax lien certificates (*id.*, ¶'s 55-57). The custodian has since confirmed to plaintiff that as of that date, it only had custody of 518 tax lien certificates worth a fraction of the amount the spreadsheet had indicated (*id.*, ¶ 57). Hanratty admitted he was self-servicing almost 90% of the collateral (*id.*, ¶ 58).

Additional allegations of fraud include that Hanratty improperly inflated the value of certain liens, altered origination dates for hundreds of certificates, and misrepresented that certain advances would be used to finance purchases of tax lien certificates when they were instead used for investor distributions and settlements (*id.*, ¶'s 63; 68; 69-81). Further, defendants were required to deposit proceeds from sales of certificates into plaintiff's lockbox, but not only did defendants fail to do so, Hanratty also falsely represented that he owned the liens and that they were increasing in value (*id.*, ¶'s 94-96). And, because proceeds of tax lien certificates are treated as collateral, this means any owned real property that resulted from a foreclosure on a tax lien should also have been included as collateral. Defendants have been effecting transfers without receipt of fair consideration, however, preventing plaintiff from receiving sale proceeds (*id.*, ¶'s 97-100).

Hanratty and various Ebury Entities issued guaranties in connection with the credit facilities (*id.*, ¶'s 15, 37, 39). Plaintiff asserts that Hanratty is personally liable in accordance with validity guaranties he executed (*id.*, ¶ 42; NYSCEF # 11 – Validity Guaranties). Plaintiff also asserts liability by virtue of the Ebury Entities being alter egos of Hanratty and of one another (NYSCEF # 1, ¶'s 18, 109, 116, 124).

Shortly after plaintiff initiated this action, it moved by order to show cause (MS001) for injunctive relief to enjoin, *inter alia*, the transfer of defendants' assets, which this court granted by Decision and Order of November 29, 2022 (NYSCEF # 47). Since then, the parties have been proceeding with discovery while briefing the present motion, for which oral argument was held on June 1, 2023.

## Discussion

On a motion to dismiss pursuant to CPLR 3211 (a) (7), the court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference," and "determine only whether the facts as alleged fit into any cognizable legal theory" (*Siegmund Strauss, Inc. v E. 149th Realty Corp.*, 104 AD3d 401, 403 [1st Dept 2013]). Significantly, "whether a plaintiff . . . can ultimately establish its allegations is not taken into consideration in determining a motion to dismiss" (*Phillips S. Beach LLC v ZC Specialty Ins. Co.*, 55 AD3d 493, 497 [1st Dept 2008], *lv denied* 12 NY3d 713 [2009]). At the same time, "[i]n those circumstances where the legal conclusions and factual allegations are flatly contradicted by documentary evidence they are not presumed to be true or accorded every favorable inference' " (*Morgenthow & Latham v Bank of New York Company, Inc.*, 305 AD2d 74, 78 [1st Dept 2003] [internal citation and quotation omitted]).

### *Breach of Contract; Alter Ego Allegations*

"To plead a breach of contract, the proponent must allege the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages" (*Second Source Funding, LLC v Yellowstone Cap., LLC*, 144 AD3d 445, 445-46 [1st Dept 2016]).

Defendants initially argue in support of their motion to dismiss the breach of contract claim that ESC, Ebury RE, and Hanratty are not party to either of the Credit Agreements. In opposition, plaintiff raises that ESC is a guarantor, and Hanratty is a validity guarantor, to the Credit Agreements (NYSCEF # 48, at 6-8 citing NYSCEF #'s 8 and 11). In reply, defendants acknowledge ESC's guaranty and state that they "no longer move for dismissal of the breach-of-Credit Agreement claim against ESC" (NYSCEF # 54 at 1). Also recognizing Hanratty's Validity Guaranties, defendants nonetheless reiterate that plaintiff "still fails to identify any facts suggesting that he is a party to the Credit Agreements" (*id.*). This is unavailing to sustain a motion to dismiss a breach of contract claim that plaintiff premises on Hanratty's Validity Guaranties (NYSCEF # 1, ¶ 108).[1] It is undisputed that the guaranties do not reach Ebury RE, however, to which plaintiff's breach of contract claim depends on alter ego allegations that the court now addresses.

Defendants contend that plaintiff has failed to plead alter ego theory facts or the requisite showing that defendants abused the corporate form to defraud plaintiff (NYSCEF # 42 at 8-11). Providing a list of typical veil–piercing factors without supporting facts, defendants argue, is insufficient (*id.*, at 9-10). Plaintiff counters that it pled sufficient facts to establish defendants' alter ego liability, including inadequate capitalization of defendants, the intermingling of funds, and common ownership, officers, directors, and personnel, among others (NYSCEF # 48 at 9). In reply, defendants echo their rejection of the sufficiency of plaintiff's allegations (NYSCEF # 54 at 1-6).

An alter ego theory of liability to pierce the corporate veil generally "requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. While complete domination of the corporation is the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required" (*Shisgal v Brown*, 21 AD3d 845, 848 [1st Dept 2005] [quotation marks omitted] [rejecting motion to dismiss claim based on veil-piercing and listing various "indicia of a situation warranting veil-piercing" such as absence of corporate formalities, inadequate capitalization, use of funds for personal purposes, and more]).

---

[1] Defendants accept as much, stating that "the breach of contract claim against [Hanratty] should only be allowed to proceed with respect to the Validity Guaranties" (NYSCEF # 42 at 11).

Plaintiff sufficiently states a prima facie case for piercing the corporate veil. Defendants' argument that plaintiff has not connected the indicia of a situation warranting veil-piercing with facts showing defendants' abuse of the corporate form to harm plaintiff is unavailing given plaintiff's well-pled complaint and the standards applicable at this stage (*see Cortlandt St. Recovery Corp. v Bonderman*, 96 NE3d 191, 47 [2018] ["a fact-laden claim to pierce the corporate veil is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss"]; *see also Baby Phat Holding Co., LLC v Kellwood Co.*, 123 AD3d 405, 407 [1st Dept 2014] [finding that wrongdoing in the veil piercing context "does not necessarily require allegations of actual fraud. While fraud certainly satisfies the wrongdoing requirement, other claims of inequity or malfeasance will also suffice"]).

Defendants' reliance on *Sound Commc'ns, Inc. v Rack & Roll, Inc.* is inapposite (88 AD3d 523 [1st Dept 2011]). There, where the complaint merely alleged that the entity defendant "functioned as the moving defendants' alter ego," the court found the plaintiff did "not sufficiently allege[] that [defendant's] status as a limited liability company was used to commit a fraud against plaintiff" (*id.* at 524). Here, plaintiff points out that its complaint alleges that defendants "used a web of sham corporate transactions—among companies controlled by Hanratty—to loot [plaintiff's] collateral and the loan proceeds" (NYSCEF # 48 at 10, n 6 citing NYSCEF # 1, ¶ 1). Overall, plaintiff's complaint includes the necessary allegations, as well as sufficient detail, to survive at this stage (*see e.g. 2406-12 Amsterdam Assoc. LLC v Alianza LLC*, 136 AD3d 512, 512 [1st Dept 2016] [sustaining pleading of veil piercing, negating the necessity of particularized allegations]).

*Fraudulent Inducement*

Next, defendants assert that plaintiff pleads no fraudulent inducement facts, contending that allegations supported by hearsay and information and belief are insufficient (NYSCEF # 42 at 11-15). And the fraudulent inducement count is allegedly duplicative of the breach of contract claim (*id.* at 16-18). In opposition, plaintiff argues that it has sufficiently pled the claim, with only limited and appropriate use of information and belief allegations (NYSCEF # 48 at 14-15). Plaintiff asserts that defendants' duplication argument is mistaken because, among other things, the fraud claim alleges "misrepresentations of present fact that are collateral to the contract" (*id.* at 15-16). In reply, defendants echo their initial arguments and clarify that they "do not argue that [plaintiff's] fraudulent inducement claim is duplicative of its claim for breach of the underlying Credit Agreements, only that it is duplicative of the claim for breach of the Validity Guaranties" (NYSCEF # 54 at 11).

"To state a cause of action for fraudulent inducement, it is sufficient that the claim alleges a material representation, known to be false, made with the intention of inducing reliance, upon which the victim actually relies, consequentially sustaining a detriment" (*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp., LLC*, 19 AD3d 273, 275 [1st Dept 2005]). There are limits on when a fraud cause of action will be sustained if such allegations touch on a separate cause of

action for breach of contract to the extent of impermissible duplication (*see e.g. Varo, Inc. v Alvis PLC*, 261 AD2d 262 [1st Dept 1999]; *Project Cricket Acquisition, Inc. v Fla. Cap. Partners, Inc.* (180 AD3d 627 [1st Dept 2020]). Nevertheless, a "fraud claim will be upheld when a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, even though the same circumstances also give rise to the plaintiff's breach of contract claim. . . . Unlike a misrepresentation of future intent to perform, a misrepresentation of present facts is collateral to the contract . . . and therefore involves a separate breach of duty" (*MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 87 AD3d 287, 293 [1st Dept 2011])

Defendants' motion to dismiss the fraudulent inducement claim is denied. Plaintiff's complaint sufficiently pleads the elements necessary to sustain the claim, even with the heightened pleading standard and even without regard to those certain allegations defendants argue are hearsay (NYSCEF # 1, ¶'s 55-96 [including allegations of: fabricating a spreadsheet to inflate the amount of collateral held by the contractually agreed third-party custodian; inflating values of collateral; periodically misrepresenting the status of certain amounts in signed certifications separate from the underlying credit agreements and validity guaranties; and duplicating liens in requests for advances]). That CPLR 3016 (b) requires particularized pleading, and that plaintiff relies on selective and limited use of information and belief allegations, does not mandate dismissal here given the well-pled and detailed complaint (*see e.g. MBIA Ins.*, 87 AD3d at 295 ["unassailable proof of fraud" not necessary; fraud claim sustained where complaint "sufficiently identifies . . . misrepresentations and describes when and how they were made . . . including through false and misleading loan tapes and prospectuses"]).

Nor are defendants correct that the fraudulent inducement count must be dismissed as duplicative of the breach of contract claim (relying on, *inter alia*, *Varo* and *Project Cricket*) because, as plaintiff asserts and as described above, the fraud claim is supported by assertions of misrepresentations of then-present fact that are collateral to the relevant contracts (*see e.g. Am. Media, Inc. v Bainbridge & Knight Labs., LLC*, 135 AD3d 477, 478 [1st Dept 2016] [complaint adequately stated fraud against owner of corporate counterparty "based on alleged misrepresentations of present fact concerning the capitalization of [the company] and the existence of [purported] account receivable from non-party"]). In that defendants limit their argument here to the Validity Guaranties (NYSCEF # 54 at 11), the allegations of fraud still extend beyond Hanratty's guaranty misrepresentations and, accordingly, are sustainable as being collateral to such agreements; in any event, to the extent certain allegations of fraud may also be contained in allegedly false representations, that is "of no consequence" (*MBIA Ins.*, 87 AD3d at 294).

*Fraudulent Transfer*

Defendants assert that plaintiff pleads no fraudulent transfer facts, but instead merely, on "information and belief," recants legal conclusions (NSYCEF # 42 at 19-20). Plaintiff responds by asserting that its allegations are sufficient at this

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 6 of 8
ET AL
Motion No. 002

16 of 88

stage, including where it has pled substantial allegations that do not rely on information and belief to sustain this claim (NYSCEF # 48 at 20).[2]

Plaintiff adds that "the circumstances of the alleged transfers—which were made between insiders and moved assets away from the Defendants that are in contractual privity with [plaintiff—are more than enough to create an inference of fraudulent intent" (NYSCEF # 48 at 20). And plaintiff points to Ebury RE's website listing of properties of certain of the other defendants (*id.*). In reply, defendant repeats the alleged insufficiency of the allegations, as to both actual and constructive fraudulent transfer, and rejects the import plaintiff would draw from Ebury RE's listing (NYSCEF # 54 at 14-15).

"To state a cause of action for constructive fraudulent conveyance under Debtor and Creditor Law §§ 273, 274, and 275, the complaint must allege that the transferor transferred assets without receiving fair consideration in exchange" (*McCormack Family Charitable Found. v Fid. Brokerage Services, LLC*, 195 AD3d 420, 421-22 [1st Dept 2021], *lv to appeal denied*, 37 NY3d 912 [2021]). Such claims "are not subject to the particularity requirement of CPLR 3016, because they are based on constructive fraud" (*Ridinger v W. Chelsea Dev. Partners LLC*, 150 AD3d 559, 560 [1st Dept 2017]).

"Under DCL § 276, '[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors' . . . . Claims under DCL § 276 require proof of 'actual fraud' rather than simply 'constructive fraud'" (*214 Knickerbocker LLC v Pan*, 2022 NY Slip Op 33579[U] at 7 [Sup Ct, NY County 2022], *affd*, 2023 NY Slip Op 02959 [1st Dept 2023] [quotation marks and citations omitted]). CPLR 3016 (b) requires a fraud claim to state in detail the circumstances constituting the wrong:

> The purpose of section 3016(b)'s pleading requirement is to inform a defendant with respect to the incidents complained of. We have cautioned that section 3016(b) should not be so strictly interpreted as to prevent an otherwise valid cause of action in situations where it may be impossible to state in detail the circumstances constituting a fraud. . . . Thus, where concrete facts are peculiarly within the knowledge of the party charged with the fraud, it would work a potentially unnecessary injustice to dismiss a case at an early stage where any

---

[2] Plaintiff points to paragraph 4 of the complaint (NYSCEF # 1), which states:
Since the default, [plaintiff] has discovered that Defendants impermissibly paid out over $22 million in distributions to their investors in 2018 and 2019—without [plaintiff's] knowledge and in violation of the Credit Agreements—while at the same time withdrawing over $27 million in funding from the Credit Facilities. . . . Finally, [plaintiff] has discovered that Defendants fraudulently transferred millions of dollars' worth of [plaintiff's] collateral to Ebury RE LLC . . . to prevent [plaintiff] from receiving sale proceeds from sales of the collateral and from foreclosing on the collateral. . . .

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR   Page 7 of 8
ET AL
Motion No. 002

17 of 88

pleading deficiency might be cured later in the proceedings.

(*Pludeman v N. Leasing Sys., Inc.*, 10 NY3d 486, 491–92 [2008] [citations and quotation marks omitted]).

Defendants' motion to dismiss is denied. That defendants identify cases where courts have found, on different facts, complaints insufficiently alleging fraudulent transfer is unavailing to support dismissal of this well-pled complaint (NYSCEF # 42 at 19, citing, *inter alia, Carlyle, LLC v Quik Park 1633 Garage LLC* (160 AD3d 476, 477 [1st Dept 2018]). Read with favorable inferences, given the allegations of distributions which rendered defendants uncollateralized and unable to pay plaintiff the amounts owed, plaintiff's actual and constructive fraudulent transfer claims survive (*see e.g. Epiphany Community Nursery School v Levey*, 171 AD3d 1, 9 [1st Dept 2019] [sustaining fraud claims on motion to dismiss, including where the "allegations in the complaint are not bare legal conclusions. Nor are they inherently incredible"]; *see also Pludeman* at 491–92).

## Conclusion

In light of the foregoing, it is hereby

ORDERED that defendants' motion to dismiss (MS 002) is denied in the entirety; and it is further

ORDERED that counsel for plaintiff shall serve a copy of this decision, along with notice of entry, on all parties within ten days of entry.

| 06/29/2023 | | | | |
|---|---|---|---|---|
| **DATE** | | | **MARGARET CHAN, J.S.C.** | |
| CHECK ONE: | [ ] CASE DISPOSED | [x] NON-FINAL DISPOSITION | | |
| | [ ] GRANTED [x] DENIED | [ ] GRANTED IN PART | [ ] OTHER | |
| APPLICATION: | [ ] SETTLE ORDER | [ ] SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | [ ] INCLUDES TRANSFER/REASSIGN | [ ] FIDUCIARY APPOINTMENT | [ ] REFERENCE | |

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY, JOHN ARTHUR    Page 8 of 8
ET AL
Motion No. 002

18 of 88

# EXHIBIT B

# Supreme Court of the State of New York
# Appellate Division: First    Judicial Department

Informational Statement (Pursuant to 22 NYCRR 1250.3 [a]) - Civil

| Case Title: Set forth the title of the case as it appears on the summons, notice of petition or order to show cause by which the matter was or is to be commenced, or as amended. | For Court of Original Instance |
|---|---|
| **EMIGRANT BUSINESS CREDIT CORPORATION**<br><br>- against -<br><br>JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI, LLC, EB 1EMIALA, LLC, EB 2EMIALA, LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1 EMIN, LLC, EB 2EMIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1-10 | Date Notice of Appeal Filed<br><br>For Appellate Division |

| Case Type | | Filing Type | |
|---|---|---|---|
| ■ Civil Action | ☐ CPLR article 78 Proceeding | ■ Appeal | ☐ Transferred Proceeding |
| ☐ CPLR article 75 Arbitration | ☐ Special Proceeding Other | ☐ Original Proceedings | ☐ CPLR Article 78 |
| | ☐ Habeas Corpus Proceeding | ☐ CPLR Article 78 | ☐ Executive Law § 298 |
| | | ☐ Eminent Domain | ☐ CPLR 5704 Review |
| | | ☐ Labor Law 220 or 220-b | |
| | | ☐ Public Officers Law § 36 | |
| | | ☐ Real Property Tax Law § 1278 | |

**Nature of Suit:** Check up to three of the following categories which best reflect the nature of the case.

| | | | |
|---|---|---|---|
| ☐ Administrative Review | ■ Business Relationships | ■ Commercial | ■ Contracts |
| ☐ Declaratory Judgment | ☐ Domestic Relations | ☐ Election Law | ☐ Estate Matters |
| ☐ Family Court | ☐ Mortgage Foreclosure | ☐ Miscellaneous | ☐ Prisoner Discipline & Parole |
| ☐ Real Property (other than foreclosure) | ☐ Statutory | ☐ Taxation | ☐ Torts |

Informational Statement - Civil

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 317 of 2230

| Appeal | |
|---|---|
| Paper Appealed From (Check one only): | If an appeal has been taken from more than one order or judgment by the filing of this notice of appeal, please indicate the below information for each such order or judgment appealed from on a separate sheet of paper. |

| | | | |
|---|---|---|---|
| ☐ Amended Decree | ☐ Determination | ☐ Order | ☐ Resettled Order |
| ☐ Amended Judgement | ☐ Finding | ☐ Order & Judgment | ☐ Ruling |
| ☐ Amended Order | ☐ Interlocutory Decree | ☐ Partial Decree | ☐ Other (specify): |
| ■ Decision | ☐ Interlocutory Judgment | ☐ Resettled Decree | |
| ☐ Decree | ☐ Judgment | ☐ Resettled Judgment | |

| Court: | Supreme Court | County: | New York |
|---|---|---|---|
| Dated: | 06/29/2023 | Entered: 06/29/2023 | |
| Judge (name in full): Margaret A. Chan | | Index No.: 158207/2022 | |
| Stage: ■ Interlocutory ☐ Final ☐ Post-Final | | Trial: ☐ Yes ■ No    If Yes: ☐ Jury ☐ Non-Jury | |

| Prior Unperfected Appeal and Related Case Information |
|---|

Are any appeals arising in the same action or proceeding currently pending in the court?    ☐ Yes ■ No
If Yes, please set forth the Appellate Division Case Number assigned to each such appeal.

Where appropriate, indicate whether there is any related action or proceeding now in any court of this or any other jurisdiction, and if so, the status of the case:
N/A

| Original Proceeding |
|---|

| Commenced by: ☐ Order to Show Cause ☐ Notice of Petition ☐ Writ of Habeas Corpus | Date Filed: |
|---|---|
| Statute authorizing commencement of proceeding in the Appellate Division: | |

| Proceeding Transferred Pursuant to CPLR 7804(g) |
|---|

| Court: | Choose Court | County: | Choose County |
|---|---|---|---|
| Judge (name in full): | | Order of Transfer Date: | |

| CPLR 5704 Review of Ex Parte Order: |
|---|

| Court: | Choose Court | County: | Choose County |
|---|---|---|---|
| Judge (name in full): | | Dated: | |

| Description of Appeal, Proceeding or Application and Statement of Issues |
|---|

Description: If an appeal, briefly describe the paper appealed from. If the appeal is from an order, specify the relief requested and whether the motion was granted or denied. If an original proceeding commenced in this court or transferred pursuant to CPLR 7804(g), briefly describe the object of proceeding. If an application under CPLR 5704, briefly describe the nature of the ex parte order to be reviewed.

Informational Statement - Civil

FILED: NEW YORK COUNTY CLERK 07/27/2023 05:22 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 70    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 07/27/2023
Court Records    Pg 318 of 2230

Issues: Specify the issues proposed to be raised on the appeal, proceeding, or application for CPLR 5704 review, the grounds for reversal, or modification to be advanced and the specific relief sought on appeal.

1. Did the Honorable Margaret A. Chan err in denying in its entirety Defendants' motion to dismiss? Yes.

## Party Information

Instructions: Fill in the name of each party to the action or proceeding, one name per line. If this form is to be filed for an appeal, indicate the status of the party in the court of original instance and his, her, or its status in this court, if any. If this form is to be filed for a proceeding commenced in this court, fill in only the party's name and his, her, or its status in this court.

| No. | Party Name | Original Status | Appellate Division Status |
|-----|------------|-----------------|---------------------------|
| 1 | Emigrant Business Credit Corporation | Plaintiff | Respondent |
| 2 | John Arthur Hanratty | Defendant | Appellant |
| 3 | Ebury Street Capital, LLC | Defendant | Appellant |
| 4 | Ebury Fund 1, LP | Defendant | Appellant |
| 5 | Ebury Fund 2, LP | Defendant | Appellant |
| 6 | Ebury 1EMI LLC | Defendant | Appellant |
| 7 | Ebury 2EMI LLC | Defendant | Appellant |
| 8 | EB 1EMIALA LLC | Defendant | Appellant |
| 9 | EB 2EMIALA LLC | Defendant | Appellant |
| 10 | EB 1EMIFL LLC | Defendant | Appellant |
| 11 | EB 2EMIFL LLC | Defendant | Appellant |
| 12 | EB 1EMIIN LLC | Defendant | Appellant |
| 13 | EB 2EMIIN LLC | Defendant | Appellant |
| 14 | EB 1EMIMD LLC | Defendant | Appellant |
| 15 | EB 2EMIMD LLC | Defendant | Appellant |
| 16 | EB 1EMINJ LLC | Defendant | Appellant |
| 17 | EB 2EMINJ LLC | Defendant | Appellant |
| 18 | EB 1EMINY LLC | Defendant | Appellant |
| 19 | EB 2EMINY LLC | Defendant | Appellant |
| 20 | See Annex A for additional parties | | |

Informational Statement - Civil

| Attorney Information |
|---|

**Instructions:** Fill in the names of the attorneys or firms for the respective parties. If this form is to be filed with the notice of petition or order to show cause by which a special proceeding is to be commenced in the Appellate Division, only the name of the attorney for the petitioner need be provided. In the event that a litigant represents herself or himself, the box marked "Pro Se" must be checked and the appropriate information for that litigant must be supplied in the spaces provided.

| Attorney/Firm Name: Alexander J. Willscher, Austin P. Mayron / Sullivan & Cromwell LLP |
|---|

| Address: 125 Broad Street |
|---|

| City: New York | State: NY | Zip: 10004 | Telephone No: (212) 558-4000 |
|---|---|---|---|

| E-mail Address: willschera@sullcrom.com; mayrona@sullcrom.com |
|---|

| Attorney Type: ■ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice |
|---|

| Party or Parties Represented (set forth party number(s) from table above): *1* |
|---|

| Attorney/Firm Name: Kari Parks, Victor R. Wang / Gusrae Kaplan Nusbaum PLLC |
|---|

| Address: 120 Wall Street |
|---|

| City: New York | State: NY | Zip: 10005 | Telephone No: (212) 269-1400 |
|---|---|---|---|

| E-mail Address: kparks@gusraekaplan.com; vwang@gusraekaplan.com |
|---|

| Attorney Type: ■ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice |
|---|

| Party or Parties Represented (set forth party number(s) from table above): *2-31* |
|---|

| Attorney/Firm Name: |
|---|

| Address: |
|---|

| City: | State: | Zip: | Telephone No: |
|---|---|---|---|

| E-mail Address: |
|---|

| Attorney Type: ☐ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice |
|---|

| Party or Parties Represented (set forth party number(s) from table above): |
|---|

| Attorney/Firm Name: |
|---|

| Address: |
|---|

| City: | State: | Zip: | Telephone No: |
|---|---|---|---|

| E-mail Address: |
|---|

| Attorney Type: ☐ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice |
|---|

| Party or Parties Represented (set forth party number(s) from table above): |
|---|

| Attorney/Firm Name: |
|---|

| Address: |
|---|

| City: | State: | Zip: | Telephone No: |
|---|---|---|---|

| E-mail Address: |
|---|

| Attorney Type: ☐ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice |
|---|

| Party or Parties Represented (set forth party number(s) from table above): |
|---|

| Attorney/Firm Name: |
|---|

| Address: |
|---|

| City: | State: | Zip: | Telephone No: |
|---|---|---|---|

| E-mail Address: |
|---|

| Attorney Type: ☐ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice |
|---|

| Party or Parties Represented (set forth party number(s) from table above): |
|---|

Informational Statement - Civil

Annex A to Informational Statement

| 20 | EB 1EMISC, LLC | Defendant | Appellant |
|----|----------------|-----------|-----------|
| 21 | EB 2EMISC, LLC | Defendant | Appellant |
| 22 | RE 1EMI LLC | Defendant | Appellant |
| 23 | RE 2EMI LLC | Defendant | Appellant |
| 24 | EB 1EMIDC, LLC | Defendant | Appellant |
| 25 | Arque Tax Receivable Fund (Maryland), LLC | Defendant | Appellant |
| 26 | Ebury Fund 1FL, LLC | Defendant | Appellant |
| 27 | Ebury Fund 2FL, LLC | Defendant | Appellant |
| 28 | Ebury Fund 1NJ, LLC | Defendant | Appellant |
| 29 | Ebury Fund 2NJ, LLC | Defendant | Appellant |
| 30 | Red Clover 1, LLC | Defendant | Appellant |
| 31 | Ebury RE LLC | Defendant | Appellant |
| 32 | XYZ Corps. 1-10 | Defendant | None |

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
Court Records     Pg 321 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

                Plaintiff,

      v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

                Defendants.

---

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 003**

**NOTICE OF EBCC'S MOTION TO
DISMISS DEFENDANTS'
COUNTERCLAIM**

**PLEASE TAKE NOTICE** that, upon the annexed Memorandum of Law; the Affidavit of Scott Weiss, sworn to on August 9, 2023, and the exhibits annexed thereto; the Affirmation of Alexander J. Willscher, dated August 9, 2023, and the exhibits annexed thereto; and all other papers and pleadings filed herein, Plaintiff Emigrant Business Credit Corporation will move this Court, located at 60 Centre Street, New York, New York 10007, on August 25, 2023, at 9:30 a.m. or as soon thereafter as counsel can be heard, for an order pursuant to CPLR 3211(a)(1) and/or (7) dismissing Defendants' Counterclaim (Dkt. No. 69) and granting such other and further relief as the Court may deem just and proper.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR 2214(b), any answering papers or cross-motions are required to be served upon the undersigned at least seven days before the date set forth above for the submission of this motion.

Dated:   August 9, 2023
      New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*
_____

Alexander J. Willscher
Austin P. Mayron
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business
Credit Corporation*

-2-

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| ———————————————— | x |  |
| EMIGRANT BUSINESS CREDIT CORPORATION, | : | Index No. 158207/2022 |
| Plaintiff, | : | (Hon. Margaret Chan) |
| v. | : | **MOTION SEQUENCE NO. 003** |
| JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1-10, | : | **MEMORANDUM OF LAW IN SUPPORT OF EBCC'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM** |
| Defendants. | : |  |
| ———————————————— | x |  |

# TABLE OF CONTENTS

*Page*

**INTRODUCTION** ........................................................................................................ 1

**BACKGROUND** ......................................................................................................... 2

**LEGAL STANDARDS** ............................................................................................... 5

**ARGUMENT** ............................................................................................................... 6

I.     DEFENDANTS' BREACH OF CONTRACT AND IMPLIED COVENANT CLAIMS
     ARE DEFECTIVE .............................................................................................. 6

    A.    EBCC Did Not Breach a Contractual Obligation by Filing This Lawsuit ............. 6

    B.    EBCC Did Not Breach the Implied Covenant of Good Faith and Fair Dealing
       by Filing This Lawsuit ........................................................................................ 9

II.    DEFENDANTS FAIL TO PLEAD ANY NEGLIGENT
     MISREPRESENTATION ................................................................................... 11

    A.    The Parties' Settlement Negotiations Did Not Create a Special Relationship ..... 11

    B.    EBCC Did Not Provide Defendants With Incorrect Information ......................... 13

III.   DEFENDANTS' PROMISSORY ESTOPPEL CLAIM FAILS AS A MATTER
     OF LAW ............................................................................................................ 14

    A.    Defendants Do Not Identify a Clear and Unambiguous Promise ........................ 15

    B.    Defendants Also Cannot Establish Detrimental Reliance .................................... 16

**CONCLUSION** .......................................................................................................... 18

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*320 W. 115 Realty LLC* v. *All Bldg. Constr. Corp.*,
194 A.D.3d 511 (1st Dep't 2021) ...........................................................10

*4720 Third Ave. Hous. LLC* v. *CA Ventures LLC*,
211 A.D.3d 417 (1st Dep't 2022) .............................................................5

*Affordable Hous. Assocs., Inc.* v. *Town of Brookhaven*,
49 Misc. 3d 570 (Sup. Ct. Suffolk Cnty. 2015) ......................................6

*AG Cap. Funding Partners, L.P.* v. *State St. Bank & Tr. Co.*,
5 N.Y.3d 582 (2005) ...............................................................................12

*AHA Sales, Inc.* v. *Creative Bath Prod., Inc.*,
58 A.D.3d 6 (2d Dep't 2008) .................................................................17

*Azimut-Benetti S.p.A.* v. *Magnum Marine Corp.*,
55 A.D.3d 483 (1st Dep't 2008) .............................................................15

*Bath & Twenty, LLC* v. *Fed. Sav. Bank*,
198 A.D.3d 855 (2d Dep't 2021) .............................................................5

*Bitter* v. *Renzo*,
39 Misc. 3d 1208(A) (Sup. Ct. N.Y. Cnty. 2012) ..................................14

*Brown* v. *Cerberus Cap. Mgmt., L.P.*,
173 A.D.3d 513 (1st Dep't 2019) .............................................................9

*Carvel Corp.* v. *Nicolini*,
144 A.D.2d 611 (2d Dep't 1988) ...........................................................17

*Castellotti* v. *Free*,
138 A.D.3d 198 (1st Dep't 2016) ...........................................................14

*Celauro* v. *4C Foods Corp.*,
187 A.D.3d 836 (2d Dep't 2020) .............................................................9

*Cobble Hill Nursing Home, Inc.* v. *Henry & Warren Corp.*,
74 N.Y.2d 475 (1989) ..............................................................................8

*Colasacco* v. *Robert E. Lawrence Real Estate*,
68 A.D.3d 706 (2d Dep't 2009) .........................................................5, 11

FILED: NEW YORK COUNTY CLERK 08/09/2023 09:48 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 72
RECEIVED NYSCEF: 08/09/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 326 of 2230

*Core Dev. Grp.* v. *Spaho*,
   199 A.D.3d 447 (1st Dep't 2021) ............................................................... 9

*Country-Wide Leasing Corp.* v. *Subaru of Am., Inc.*,
   133 A.D.2d 735 (2d Dep't 1987) ............................................................... 17

*Delmaestro v. Marlin*,
   168 A.D.3d 813 (2d Dep't 2019) ............................................................... 15

*Dembeck* v. *220 Cent. Park S., LLC*,
   33 A.D.3d 491 (1st Dep't 2006) ............................................................... 12

*Dobroshi* v. *Bank of America*,
   65 A.D.3d 882 (1st Dep't 2009) ............................................................... 12

*Feldman* v. *Byrne*,
   210 A.D.3d 646 (2d Dep't 2022) ............................................................... 12

*Fesseha* v. *TD Waterhouse Inv. Servs., Inc.*,
   305 A.D.2d 268 (1st Dep't 2003) ............................................................... 9

*Gary Powell, Inc.* v. *Mendel/Borg Grp.*,
   237 A.D.2d 407 (2d Dep't 1997) ............................................................... 16

*High Tides, LLC* v. *DeMichele*,
   88 A.D.3d 954 (2d Dep't 2011) ............................................................... 12

*Hollinger Digital, Inc.* v. *Looksmart, Ltd.*,
   267 A.D.2d 77 (1st Dep't 1999) ............................................................... 7

*Izhaky* v. *Izhaky*,
   215 A.D.3d 588 (1st Dep't 2023) ............................................................... 18

*J.A.O. Acquisition Corp.* v. *Stavitsky*,
   8 N.Y.3d 144 (2007) ............................................................... 11

*Jordan Panel Sys., Corp.* v. *Turner Constr. Co.*,
   45 A.D.3d 165 (1st Dep't 2007) ............................................................... 9

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
   87 A.D.3d 287 (1st Dep't 2011) ............................................................... 11

*NGR, LLC* v. *Gen. Elec. Co.*,
   24 A.D.3d 425 (2d Dep't 2005) ............................................................... 17

*Pacnet Network Ltd.* v. *KDDI Corp.*,
   78 A.D.3d 478 (1st Dep't 2010) ............................................................... 11, 13

-iii-

*Pentagon Fed. Credit Union* v. *Popovic*,
   217 A.D.3d 480 (1st Dep't 2023) .................................................6, 15

*Piroozian* v. *Homapour*,
   210 A.D.3d 709 (2d Dep't 2022) ...........................................................5

*Prestige Foods, Inc.* v. *Whale Sec. Co.*,
   243 A.D.2d 281 (1st Dep't 1997) ..........................................................7

*Prospect St. Ventures I, LLC* v. *Eclipsys Sols. Corp.*,
   23 A.D.3d 213 (1st Dep't 2005) ..........................................................17

*Pullman Grp.* v. *Prudential Ins. Co., of Am.*,
   288 A.D.2d 2 (1st Dep't 2001) ..............................................................9

*Remora Cap. S.A.* v. *Dukan*,
   175 A.D.3d 1219 (1st Dep't 2019) ......................................................10

*Richbell Info. Servs., Inc.* v. *Jupiter Partners, L.P.*,
   309 A.D.2d 288 (1st Dep't 2003) ........................................................15

*Richter's Est.* v. *Novo Corp.*,
   43 A.D.2d 1 (1st Dep't 1973) ..............................................................18

*River Glen Assocs., Ltd.* v. *Merrill Lynch Credit Corp.*,
   295 A.D.2d 274 (1st Dep't 2002) ........................................................17

*Rowe* v. *Great Atl. & Pac. Tea Co.*,
   46 N.Y.2d 62 (1978) ...........................................................................10

*Schroeder* v. *Pinterest, Inc.*,
   133 A.D.3d 12 (1st Dep't 2015) ..........................................................17

*Schutty* v. *Speiser Krause P.C.*,
   86 A.D.3d 484 (1st Dep't 2011) ..........................................................16

*Schwartz* v. *Miltz*,
   77 A.D.3d 723 (2d Dep't 2010) ...........................................................16

*Shah* v. *Mitra*,
   171 A.D.3d 971 (2d Dep't 2019) ...........................................................5

*Sheth* v. *N.Y. Life Ins. Co.*,
   273 A.D.2d 72 (1st Dep't 2000) ..........................................................14

*Simkin* v. *Blank*,
   19 N.Y.3d 46 (2012) .............................................................................5

-iv-

FILED: NEW YORK COUNTY CLERK 08/09/2023 09:48 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 72
RECEIVED NYSCEF: 08/09/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 328 of 2230

*Singh* v. *City of New York*,
  2023 WL 3098734 (N.Y. Apr. 27, 2023) ............................................................. 10

*Stacey O.* v. *Donald P.*,
  137 A.D.2d 965 (3d Dep't 1988) ........................................................................ 18

*StarVest Partners II, L.P.* v. *Emportal, Inc.*,
  101 A.D.3d 610 (1st Dep't 2012) ...................................................................... 14

*Steele* v. *Delverde S.R.L.*,
  242 A.D.2d 414 (1st Dep't 1997) ...................................................................... 15

*StoreRunner Network, Inc.* v. *CBS Corp.*,
  8 A.D.3d 127 (1st Dep't 2004) .......................................................................... 15

*Stratigos* v. *Brio Bar Corp.*,
  2020 WL 2557884 (Sup. Ct. N.Y. Cnty. Apr. 2, 2020) ....................................... 5

*Sylmark Holdings Ltd.* v. *Silicone Zone Int'l Ltd.*,
  5 Misc. 3d 285 (Sup. Ct. N.Y. Cnty. 2004) ..................................................... 6, 8

*Thome* v. *Alexander & Louisa Calder Found.*,
  70 A.D.3d 88 (1st Dep't 2009) .......................................................................... 16

*Trib. Printing Co.* v. *263 Ninth Ave. Realty, Inc.*,
  88 A.D.2d 877 (1st Dep't 1982) ........................................................................ 14

*U.S. Express Leasing, Inc.* v. *Elite Tech. (N.Y.), Inc.*,
  87 A.D.3d 494 (1st Dep't 2011) ........................................................................ 12

**STATUTES AND RULES**

22 NYCRR § 130-1.1 .............................................................................................. 7

CPLR 3016(b) ............................................................................................. 5, 11, 13

CPLR 3211(a)(1) ...................................................................................................... 5

CPLR 3211(a)(7) ................................................................................................. 5, 14

Plaintiff Emigrant Business Credit Corporation ("**EBCC**") respectfully submits this memorandum of law in support of its motion to dismiss Defendants' Counterclaim.  ([Dkt. No. 69](#) ("**Countercl.**").)

## INTRODUCTION

After Defendants defaulted on their obligation to repay EBCC over $18 million in outstanding principal and interest under two Credit Facilities, EBCC spent almost a year trying to negotiate a voluntary settlement.  During those negotiations, EBCC discovered that Defendants had misappropriated advances under the Credit Facilities as well as EBCC's collateral to pay tens of millions of dollars of distributions to company insiders—including Defendant John Hanratty ("**Hanratty**")—as well as other investors.  EBCC also discovered that Defendants regularly falsified borrowing base certificates and other documents that they submitted to EBCC as the basis for receiving advances under the Credit Facilities.  Moreover, EBCC discovered that Hanratty had openly bragged to a former business partner about defrauding EBCC.

After discovering Defendants' fraud, EBCC ceased settlement negotiations and filed this lawsuit.  Defendants now assert that EBCC's decision to end negotiations and file this lawsuit was improper and grounds for Defendants to assert four counterclaims:  breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and promissory estoppel.  ([Countercl.](#) ¶¶ 56-78.)  Defendants seek damages exceeding $1 million, "in an amount to be determined during discovery and proven at trial."  (*[Id.](#)*)

The basis for Defendants' counterclaim is a non-binding term sheet—signed by Defendants but never executed by EBCC—that set out terms and conditions for a potential amendment to the agreements governing the Credit Facilities.  According to Defendants, the term sheet was "a contract to settle the . . . Credit Facilities" that EBCC allegedly breached by suing Defendants after EBCC discovered Defendants' fraud.  ([Countercl.](#) ¶¶ 57.)  Despite referencing

the term sheet eighteen times in their counterclaim, Defendants never once mention that the term sheet explicitly provides that it was non-binding and "for discussion purposes only." Nor do they mention that, by signing the term sheet, they agreed and acknowledged *twice* that the term sheet does not impose any binding contractual obligations on EBCC. Defendants also do not explicitly mention that EBCC never executed the term sheet. Defendants' counterclaims—all of which assert that EBCC somehow agreed to settle the Credit Facilities and not bring any lawsuits, even if it discovered that Defendants had committed fraud—are entirely meritless. Accordingly, EBCC respectfully requests the Court dismiss all four counts of Defendants' Counterclaim.

## BACKGROUND[1]

Between 2017 and 2021, EBCC lent Defendants tens of millions of dollars to finance their purchases of tax liens. (Countercl. ¶¶ 2-3, 17.) Any tax liens that Defendants purchased using the Credit Facilities, as well as any proceeds, were EBCC's collateral and Defendants were not allowed to transfer any of the collateral, with limited exceptions. (Dkt. No. 6 at 6, 17-18; Dkt. No. 69 ("**Answer**") ¶ 36 (referring to the contents of the Credit Agreements).) After the Credit Facilities came due in March 2021, EBCC agreed to three maturity date extensions, to provide more time for Defendants to repay their obligations. (Dkt. No. 6 at 65, 71, 86; Answer ¶ 36.) But, at final maturity in November 2021, Defendants failed to repay EBCC over $18 million in outstanding principal and interest and EBCC issued notices of default. (Answer ¶ 2; Dkt. No. 12 at 3, 5.) Defendants still have not repaid the amounts outstanding under the Credit Facilities and now owe more than $24 million. (Answer ¶ 2.)

---

[1]    For the purposes of this motion only, EBCC accepts the non-conclusory allegations in the counterclaim as true.

Throughout the parties' multi-year relationship, Hanratty repeatedly represented to EBCC that EBCC was "overcollateralized"—meaning that EBCC's loans were secured by collateral worth more than the outstanding loan amounts. (Answer ¶ 2.) With that understanding, the parties tried to "work[] together" after the defaults—from November 2021 through September 2022—"to negotiate a resolution of the Credit Facilities." (Countercl. ¶ 18.) Ultimately, however, EBCC discovered that Hanratty had defrauded EBCC and had even bragged about doing so to a former business partner. (Id. ¶ 44; Dkt. No. 14 at 75.) After learning that information, EBCC filed this action, asserting causes of action for breach of contract, fraudulent inducement, and fraudulent transfer. (Countercl. ¶ 43; Dkt. No. 1.)

Defendants' Counterclaim focuses on settlement negotiations that took place in August and September 2022, more than eight months after Defendants defaulted under the Credit Facilities, and almost eighteen months after the original maturity date. (Countercl. ¶ 36.) According to Defendants, EBCC sent them a "settlement term sheet" in August 2022 "that detailed a multi-year plan via which [Defendants] would discharge their debt to EBCC." (Id. ¶ 36.) "After several rounds of conversations and negotiations," on September 14, 2022, EBCC sent Defendants the "final" draft of the term sheet. (Id. ¶ 37.) And, while Defendants executed and returned the term sheet the next day, EBCC "went dark" and did not countersign and return the document. (Id. ¶¶ 41-42.) Instead, EBCC filed this action one week later. (Id. ¶ 43.)

Although Defendants did not provide the Court with a copy of the term sheet, they assert that it "memorialized all of the material terms on which [the parties] agreed to resolve the outstanding Facilities." (Id. ¶¶ 38, 57.) In Defendants' telling, those terms include that "the Settlement would close by September 23, 2022" and that EBCC would "continu[e] to negotiate and close the Settlement in good faith." (Id. ¶¶ 58-59.) Defendants also allege that EBCC made

representations "that it would work in good faith to accept reasonable workout and / or refinancing terms" and "that it was truly interested in resolving the Ebury Parties' debt," but provide no specifics—such as who made the representations, to whom, when, how, or the exact language used. (*Id.* ¶¶ 66-67, 71, 73-74.)

EBCC has provided a copy of the term sheet for the Court's review in connection with this motion. (Ex. A to the Aff. of Scott Weiss, sworn to on Aug. 9, 2023 ("**Term Sheet**").) By its own terms, the document is a non-binding "summary of the principal terms and conditions under which Lender *may* agree to address Existing Events of Default, including an amendment to the Loan Documents."[2] (*Id.* at 1 (emphasis added); *see id.* at 7 ("This Term Sheet represents only a summary of the proposed Amendment.").) By signing the term sheet, Defendants acknowledged and agreed:

> that the proposed terms and conditions set forth herein are provided for discussion purposes only and do not constitute an offer, agreement, or commitment to lend and are subject to satisfactory completion of due diligence, credit approval, satisfactory review and execution of documentation, and such other terms and conditions as may be determined by Lender and its counsel.

(*Id.* at 1.) Defendants also acknowledged and agreed "that this Term Sheet is for discussion purposes only and creates no binding obligations on the part of the Lender." (*Id.* at 8.)

The term sheet included ten conditions precedent to taking effect, including "execution of . . . the Term Sheet by no later than 5:00 p.m. EST on September 14, 2022" and delivery of "all of the Tax Lien Certificates and other Tax Lien Documents to the Custodian and

---

[2] Under the amendment contemplated by the term sheet, Defendants would have agreed to pay EBCC "no less than $3,000,000" by December 31, 2022, and then make quarterly payments of "no less than $1,500,000." (Term Sheet at 3.) Had the parties entered into such an amendment, Defendants would have been obligated to pay EBCC $6,000,000 by June 30, 2023. To date, Defendants have managed to escrow only $65,000.

-4-

the Servicer"—neither of which occurred.  (*Id*. at 6-7.)  The term sheet also states that it was a termination event if the "Borrower and/or any of the Guarantors shall make any omissions or misrepresentations to the Lender at any time." (*Id*. at 6.)  EBCC did not countersign and return the term sheet.  (Countercl. ¶¶ 41-42.)

## LEGAL STANDARDS

EBCC moves for dismissal of Defendants' Counterclaim under CPLR 3211(a)(1) and (7).  Under CPLR 3211(a)(1), the Court may dismiss a claim with prejudice where it is "utterly refute[d]" by documentary evidence.  *See, e.g.*, *Stratigos* v. *Brio Bar Corp.*, 2020 WL 2557884, at *3 (Sup. Ct. N.Y. Cnty. Apr. 2, 2020).   "Judicial records, as well as documents reflecting out-of-court transactions such as mortgages, deeds, contracts, and any other papers, the contents of which are essentially undeniable" may qualify as documentary evidence.  *Bath & Twenty, LLC* v. *Fed. Sav. Bank*, 198 A.D.3d 855 (2d Dep't 2021).  Term sheets also may qualify as documentary evidence.  *See, e.g.*, *Piroozian* v. *Homapour*, 210 A.D.3d 709, 712 (2d Dep't 2022); *4720 Third Ave. Hous. LLC* v. *CA Ventures LLC*, 211 A.D.3d 417, 418 (1st Dep't 2022).

Under CPLR 3211(a)(7), dismissal of a counterclaim "is warranted if the counterclaimant fails to assert facts in support of an element of the [counterclaim], or if the factual allegations and inferences to be drawn from them do not allow for an enforceable right of recovery."  *Shah* v. *Mitra*, 171 A.D.3d 971, 973 (2d Dep't 2019) (alterations adopted and citation omitted).  Although a counterclaim "is to be given a liberal construction, the allegations contained within it are assumed to be true[,] and the [counterclaimant] is to be afforded every possible inference, . . . 'allegations consisting of bare legal conclusions as well as factual claims flatly contradicted by documentary evidence are not entitled to any such consideration.'"  *Simkin* v. *Blank*, 19 N.Y.3d 46, 52 (2012) (citation omitted).

-5-

Finally, Defendants' claim for negligent misrepresentation is subject to the heightened pleading standard of CPLR 3016(b). *Colasacco* v. *Robert E. Lawrence Real Estate*, 68 A.D.3d 706, 708 (2d Dep't 2009). Under CPLR 3016(b), Defendants must allege facts such as "when, how, [and] by whom" the purported misrepresentations were made. *Pentagon Fed. Credit Union* v. *Popovic*, 217 A.D.3d 480, 482 (1st Dep't 2023); CPLR 3016(b) ("Where a cause of action or defense is based upon misrepresentation . . . the circumstances constituting the wrong shall be stated in detail.").

## ARGUMENT

## I. DEFENDANTS' BREACH OF CONTRACT AND IMPLIED COVENANT CLAIMS ARE DEFECTIVE

"To establish a breach of contract claim," Defendants must allege "the specific terms of the agreement, the consideration, [Defendants'] performance, and [EBCC's] breach." *Sylmark Holdings Ltd.* v. *Silicone Zone Int'l Ltd.*, 5 Misc. 3d 285, 295 (Sup. Ct. N.Y. Cnty. 2004). For an implied covenant claim, Defendants "must allege facts which tend to show that [EBCC] sought to prevent performance of the contract or to withhold its benefits from [Defendants]." *Affordable Hous. Assocs., Inc.* v. *Town of Brookhaven*, 49 Misc. 3d 570, 574 (Sup. Ct. Suffolk Cnty. 2015). Defendants fail to allege either breach of contract or breach of the implied covenant of good faith and fair dealing, because they fail to establish the existence or breach of a contract or that EBCC violated the implied covenant of good faith and fair dealing.

### A. EBCC Did Not Breach a Contractual Obligation By Filing This Lawsuit

Defendants' breach of contract claim is based entirely on a non-binding term sheet that EBCC never executed. (*Compare* Countercl. ¶ 57 ("The Settlement Term Sheet memorialized a contract to settle the outstanding Credit Facilities."), *with id.* ¶ 42 (admitting that EBCC "went dark" and never returned a countersigned term sheet).) Defendants did not provide the Court with

a copy of the term sheet, likely because it utterly refutes their breach of contract claim. The term sheet provides:

> The Parties acknowledge and agree that the proposed terms and conditions set forth herein are provided **_for discussion purposes only_** and **_do not constitute an offer, agreement or commitment to lend_** and are subject to satisfactory completion of due diligence, credit approval, satisfactory review and execution of documentation, and such other terms and conditions as may be determined by Lender and its counsel.

(Term Sheet at 1 (emphasis added).) It goes on to list ten conditions precedent to the execution of any new agreement by the parties, most of which never occurred.[3] (*Id*. at 6-7.) The term sheet concludes by re-affirming that "[t]his Term Sheet represents only a summary" of a proposed new agreement and that Defendants "each hereby acknowledge[] that this Term Sheet is **_for discussion purposes only_** and **_creates no binding obligations_** on the part of [EBCC]." (*Id*. at 8 (emphasis added).) The term sheet also includes an empty EBCC signature block, as it required the signature of an authorized representative of EBCC but the document was never countersigned and returned. (*Id*. at 8.) Defendants' breach of contract claim—premised on this non-binding term sheet, that EBCC never executed, and that contains an explicit acknowledgment by Defendants that it does not impose any binding obligations on EBCC—is "flatly contradicted" by the documentary evidence and should be dismissed.[4] *Hollinger Digital, Inc.* v. *Looksmart, Ltd.*, 267 A.D.2d 77, 77 (1st Dep't 1999) ("Plaintiff's causes of action for breach of contract, promissory estoppel and equitable estoppel were all properly dismissed as 'flatly contradicted' by the letter agreement between the parties, which expressly stated their intention not to be bound until a stock purchase

---

[3]     The first condition precedent was "[t]he Parties['] execution of . . . the Term Sheet by no later than 5:00 p.m. EST on September 14, 2022" (Term Sheet at 6), which Defendants admit they failed to satisfy (Countercl. ¶ 41).

[4]     Plaintiff reserves the right to seek appropriate sanctions under 22 NYCRR § 130-1.1 related to Defendants' filing of the Counterclaim.

agreement was executed and all requisite consents were delivered."); *Prestige Foods, Inc.* v. *Whale Sec. Co.*, 243 A.D.2d 281, 281-82 (1st Dep't 1997) ("Plaintiffs' causes of action for breach of contract, breach of the implied duty of good faith and fair dealing, and promissory estoppel were all properly dismissed as 'flatly contradicted' by the letter agreements in issue, which expressly stated that neither party had any legal obligations to the other until both had executed and delivered an underwriting agreement.").

Even if the term sheet imposed contractual obligations on EBCC—and it does not—Defendants' claim for breach still must fail. Defendants allege that "EBCC breached the Settlement Term Sheet" by bringing this lawsuit "[i]nstead of continuing to negotiate and close the Settlement in good faith." (Countercl. ¶¶ 59-60.) But Defendants fail to explain how EBCC's conduct violated any specific term of the parties' supposed contract. *Sylmark Holdings Ltd.*, 5 Misc. 3d at 295 (requiring claimant to allege "the specific terms of the agreement").[5] Defendants do not point to any provision of the term sheet that prohibits EBCC from bringing this lawsuit; nor could they because the term sheet does not contain such a provision. To the contrary, the term sheet states:

> Borrower remains in default of the existing terms of its lending relationship with the Lender. Until and unless the Lender and the Borrower have agreed to the terms of any Amendment, and until such Amendment has been agreed to in writing among the Parties, the ***Lender continues to reserve all of its rights and remedies under the lending relationship***.

(Term Sheet at 8 (emphasis added); *see also id*. at 6 (providing that it is a termination event if the "Borrower and/or any of the Guarantors shall make any omissions or misrepresentations to the

---

[5]    *See generally Cobble Hill Nursing Home, Inc.* v. *Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989) ("[U]nless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy.").

Lender at any time").)  Given that the term sheet explicitly reserved to EBCC the right to file this

lawsuit, Defendants fail to state a claim for breach of contract.

### B.  EBCC Did Not Breach the Implied Covenant of Good Faith and Fair Dealing by Filing this Lawsuit

Defendants' failure to establish the existence of a contract is fatal to their claim for

breach of the implied covenant of good faith and fair dealing.  As discussed *supra*, EBCC did not

countersign and return the term sheet, *Brown* v. *Cerberus Cap. Mgmt., L.P.*, 173 A.D.3d 513, 513

(1st Dep't 2019) (document "not a binding contract" where counterparty did not sign); Defendants

also do not allege that EBCC otherwise manifested acceptance (Countercl. ¶ 42 ("EBCC went dark

after the Ebury Parties returned the executed Settlement Term Sheet")).  "The implied covenant of

good faith and fair dealing cause of action fails in the absence of an enforceable contract in which

the covenant would be implied."  *Core Dev. Grp.* v. *Spaho*, 199 A.D.3d 447, 449 (1st Dep't 2021);

*Jordan Panel Sys., Corp.* v. *Turner Constr. Co.*, 45 A.D.3d 165, 180 (1st Dep't 2007) (affirming

the dismissal of claims for breach of contract and breach of the implied covenant where

non-binding "term sheet establishe[d] that, as a matter of law, the facts alleged . . . did not give

rise to any contract between the parties").  As a result, Defendants fail to establish that EBCC

violated the implied covenant by filing this lawsuit.

Defendants' claim for breach of the implied covenant fails for the independent

reason that "[n]o obligation may be implied that would be inconsistent with other terms of the

contractual relationship."  *Celauro* v. *4C Foods Corp.*, 187 A.D.3d 836, 838 (2d Dep't 2020).

Here, the term sheet included an express provision reserving to EBCC its rights under the parties'

other contracts—which include the right to file this lawsuit.  *Pullman Grp.* v. *Prudential Ins. Co.,*

*of Am.*, 288 A.D.2d 2, 4 (1st Dep't 2001) ("The claim against Prudential for breach of a duty to

negotiate in good faith is inconsistent with the terms of the preliminary letter agreement Prudential

had signed, which makes manifest that Prudential did not intend to be bound until the deal was

finalized."); *Fesseha* v. *TD Waterhouse Inv. Servs., Inc.*, 305 A.D.2d 268, 268 (1st Dep't 2003)

("While the covenant of good faith and fair dealing is implicit in every contract, it cannot be

construed so broadly as effectively to nullify other express terms of a contract, or to create

independent contractual rights."). Further, even if the term sheet did not expressly reserve EBCC's

right to bring this lawsuit, implying a new term prohibiting EBCC from doing so would still be

inconsistent with other provisions of the term sheet—for example, the provision that the term sheet

"creates no binding obligations on the part of [EBCC]." *See Singh* v. *City of New York*, 2023 WL

3098734, at *2 (N.Y. Apr. 27, 2023) (the implied covenant "encompasses only those 'promises

which a reasonable person in the position of the promisee would be justified in understanding were

included'" (citation omitted)).[6]

      Finally, Defendants' claim for breach of the implied covenant fails because it is

duplicative of Defendants' breach of contract claim. A claim for breach of the implied covenant

of good faith and fair dealing must be dismissed if it is "redundant of . . . [a] breach of contract

claim[]." *Remora Cap. S.A.* v. *Dukan*, 175 A.D.3d 1219, 1221 (1st Dep't 2019). Here, Defendants

"rel[y] on the same facts that form the basis for the breach of contract claim and seek the exact

same damages." *320 W. 115 Realty LLC* v. *All Bldg. Constr. Corp.*, 194 A.D.3d 511, 512 (1st

Dep't 2021). Both of Defendants' contractual claims are based on the same alleged duty to

"negotiate and close the Settlement in good faith" and both assert the same damages of "no less

---

[6]    *See generally Rowe* v. *Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978) ("[A] party
who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the
function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it
exists. Thus, a party making such a claim must prove not merely that it would have been better or
more sensible to include such a covenant, but rather that the particular unexpressed promise sought
to be enforced is in fact implicit in the agreement viewed as a whole.").

-10-

than \$500,000 in out-of-pocket expenses." (*Compare* Countercl. ¶¶ 56-60, *with id.* ¶¶ 61-64.)  As such, Defendants' claim for breach of the implied covenant is redundant and impermissibly duplicative of their breach of contract claim.

## II.    DEFENDANTS FAIL TO PLEAD ANY NEGLIGENT MISREPRESENTATION

"A claim for negligent misrepresentation requires . . . (1) the existence of a special or privity-like relationship imposing a duty . . . to impart correct information . . . ; (2) that the information was incorrect; and (3) reasonable reliance on the information." *J.A.O. Acquisition Corp.* v. *Stavitsky*, 8 N.Y.3d 144, 148 (2007).  Further, a claim for negligent misrepresentation must be pleaded in accordance with the specificity requirements of CPLR 3016(b).  *Colasacco*, 68 A.D.3d at 708; *Pacnet Network Ltd.* v. *KDDI Corp.*, 78 A.D.3d 478, 479 (1st Dep't 2010) (negligent misrepresentation claim must be tied to "concrete" facts and not be "indefinite and conclusory").  Defendants' negligent misrepresentation claim should be dismissed because Defendants fail to plead the existence of a special relationship or that EBCC provided Defendants with incorrect information.

### A.    The Parties' Settlement Negotiations Did Not Create a Special Relationship

To state a claim for negligent misrepresentation, Defendants must establish "a special relationship of trust or confidence between the parties which creates a duty for one party to impart correct information to another." *MBIA Ins. Corp.* v. *Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 296 (1st Dep't 2011).  Here, Defendants' claim fails from the outset because Defendants fail to allege, much less establish, that the parties' settlement negotiations created a special relationship.  To the contrary, Defendants assert that "EBCC had a duty to truthfully communicate with the Ebury Parties in good faith," without any allegation that this "duty" arose from a special relationship between EBCC and Defendants.  (Countercl. ¶ 70.)  These vague allegations fail to satisfy CPLR 3016(b)'s requirement that "the circumstances constituting the

-11-

wrong shall be stated in detail." *Colasacco*, 68 A.D.3d at 709 (dismissing negligent misrepresentation claim where the complaint "fail[ed] to allege [a duty] to impart correct information arising out of a special relationship").

Regardless, the settlement negotiations did not create a special relationship. A special relationship exists only where a party "possess[es] unique or specialized expertise, or . . . [is] in a special position of confidence and trust with the injured party." *High Tides, LLC* v. *DeMichele*, 88 A.D.3d 954, 959-60 (2d Dep't 2011) (citation omitted). New York courts "repeatedly [have] held that an arm's length borrower-lender relationship is not of a confidential or fiduciary nature and therefore does not support a cause of action for negligent misrepresentation." *Dobroshi* v. *Bank of America*, 65 A.D.3d 882, 884 (1st Dep't 2009); *Dembeck* v. *220 Cent. Park S., LLC*, 33 A.D.3d 491, 492 (1st Dep't 2006) ("A fiduciary relationship does not exist between parties engaged in an arm's-length business transaction"). Consequently, Defendants "must make a showing of 'special circumstances' that could have transformed the parties' business relationship to a fiduciary one, such as control by one party of the other for the good of the other." *Feldman* v. *Byrne*, 210 A.D.3d 646, 650 (2d Dep't 2022) (citation omitted). Defendants make no such showing here; nor could they. There are no "special circumstances" here that "transformed the parties' business relationship to a fiduciary one." *Id*. For example, EBCC did not "possess[] any specialized knowledge or expertise," as compared to Defendants, that would place it in a special position of trust. *U.S. Express Leasing, Inc.* v. *Elite Tech. (N.Y.), Inc.*, 87 A.D.3d 494, 497 (1st Dep't 2011). "Where the relationship of the parties fails to reveal actual privity or a relationship that otherwise closely resembles privity, no cause of action exists for negligent misrepresentation." *AG Cap. Funding Partners* v. *State St. Bank & Tr. Co.*, 5 N.Y.3d 582, 595 (2005).

### B.    EBCC Did Not Provide Defendants With Incorrect Information

Defendants also fail to allege with particularity that EBCC provided them with any incorrect information.  The extent of Defendants' allegations is that EBCC represented that it "desired to settle and refinance the outstanding Credit Facilities and would work in good faith" and "that it would work in good faith to accept reasonable workout and / or refinancing terms." (Countercl. ¶¶ 66-67.)  These vague allegations are insufficient to carry Defendants' burden because they lack the requisite specificity—Defendants do not identify who made the alleged statements, to whom the statements were made, when the statements were made, or even what exactly was said.  *See* CPLR 3016(b) (requiring "the circumstances constituting the wrong" to be "stated in detail").

In addition, allegations of false "statements of prediction or expectation" satisfy the particularity requirement of CPLR 3016(b) only if they are accompanied by an allegation "that the prediction was contradicted by a concrete, existing fact that [the party] either intentionally failed to disclose or negligently failed to discover." *Pacnet Network*, 78 A.D.3d at 479.  In *Pacnet Network*, the First Department addressed alleged misrepresentations related to the reliability of laser diode components of a fiber optic cable system.  *Id*. at 478.  The Court held that the defendant's representation that "minimal [laser diode] failures would occur . . . and the laser diodes would stop failing over the course of the system's 25-year design life" could not support a claim for negligent misrepresentation without allegations "that the prediction was contradicted by a concrete, existing fact." *Id*. at 479.  Here, Defendants' vague and conclusory allegation that EBCC falsely "represented . . . [a] desire[] to settle and refinance the outstanding Credit Facilities" is even less specific than the "statement of prediction" that was found to be insufficiently detailed in *Pacnet Network*.

FILED: NEW YORK COUNTY CLERK 08/09/2023 09:48 PM
NYSCEF DOC. NO. 72

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 342 of 2230

INDEX NO. 158207/2022
RECEIVED NYSCEF: 08/09/2023

In fact, the purported false information here appears to be statements of future intention, which are not actionable as negligent misrepresentations. *Bitter* v. *Renzo*, 39 Misc. 3d 1208(A) (Sup. Ct. N.Y. Cnty. 2012) ("A negligent misrepresentation claim may not be based on opinions or statements of future intention."); *see Sheth* v. *N.Y. Life Ins. Co.*, 273 A.D.2d 72, 74 (1st Dep't 2000) ("The purported misrepresentations relied upon by plaintiffs may not form the basis of a claim for fraudulent and/or negligent misrepresentation since they are conclusory and/or constitute mere puffery, opinions of value or future expectations."). Accordingly, Defendants have failed to establish that EBCC provided them with false information, defeating their claim for negligent misrepresentation.[7]

## III. DEFENDANTS' PROMISSORY ESTOPPEL CLAIM FAILS AS A MATTER OF LAW

To plead a viable promissory estoppel claim, Defendants must adequately allege "(i) a sufficiently clear and unambiguous promise; (ii) reasonable reliance on the promise; and (iii) injury caused by the reliance." *Castellotti* v. *Free*, 138 A.D.3d 198, 204 (1st Dep't 2016); *cf. Trib. Printing Co.* v. *263 Ninth Ave. Realty, Inc.*, 88 A.D.2d 877, 879 (1st Dep't 1982) (doctrine of promissory estoppel is "reserved for a limited class of cases based on unusual circumstances"). Defendants fail to state such a cause of action here and their claim for promissory estoppel is due to be dismissed under CPLR 3211(a)(1) and (7).

---

[7]    *See also StarVest Partners II* v. *Emportal, Inc.*, 101 A.D.3d 610, 613 (1st Dep't 2012) ("Where a term sheet or other preliminary agreement explicitly requires the execution of a further written agreement before any party is contractually bound, it is unreasonable as a matter of law for a party to rely upon the other party's promises to proceed with the transaction in the absence of that further written agreement.").

FILED: NEW YORK COUNTY CLERK 08/09/2023 09:48 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 72    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 08/09/2023

Court Records    Pg 343 of 2230

A.    **Defendants Do Not Identify a Clear and Unambiguous Promise**

As with the other counterclaims, Defendants fail to identify a specific promise to support their claim for promissory estoppel.  The only "promise" identified by Defendants is that "[v]ia the Settlement Term Sheet and other communications, EBCC promised that it would work in good faith to resolve the outstanding Credit Facilities with the Ebury Parties."  (Countercl. ¶ 73.) These allegations are insufficient to carry Defendants' burden to establish a "clear and unambiguous promise." *Richbell Info. Servs., Inc.* v. *Jupiter Partners*, 309 A.D.2d 288, 304 (1st Dep't 2003).

The non-binding term sheet itself is not a "clear and unambiguous promise" because the term sheet states that it "is for discussion purposes only and creates no binding obligations on the part of the Lender."  (Term Sheet at 1, 9.)  "There can be no valid claim of implied contract or promissory estoppel where the purported contract indicates a lack of intent to be bound." *Azimut-Benetti S.p.A.* v. *Magnum Marine Corp.*, 55 A.D.3d 483, 484 (1st Dep't 2008). Similarly, the unspecified "other communications" on which Defendants rely cannot constitute clear and unambiguous promises, *StoreRunner Network, Inc.* v. *CBS Corp.*, 8 A.D.3d 127, 128 (1st Dep't 2004) (granting summary judgment where "the oral promises upon which the cause [was] premised were not clear and unambiguous and could not have been reasonably relied upon by plaintiff to its detriment"),[8] particularly because Defendants fail to allege "when, how, or by whom" those communications were made.  *Pentagon Fed. Credit Union*, 217 A.D.3d at 482.  More fundamentally, entering into settlement negotiations does not constitute a promise not to bring a lawsuit for breach of contract, fraudulent inducement, and fraudulent transfer upon the discovery

---

[8]    *Cf. Steele* v. *Delverde S.R.L.*, 242 A.D.2d 414, 415 (1st Dep't 1997) ("[A]s a general matter, an oral promise will not be enforced on this ground unless it would be unconscionable to deny it.").

FILED: NEW YORK COUNTY CLERK 08/09/2023 09:48 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 72    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 08/09/2023

Court Records    Pg 344 of 2230

of fraudulent misconduct. *Delmaestro* v. *Marlin*, 168 A.D.3d 813, 816 (2d Dep't 2019) ("[A]lthough the parties were negotiating, there was no clear and unambiguous promise that the contemplated transaction would be consummated or that the plaintiff would be able to move into the property in the absence of an executed agreement."). As neither the term sheet nor any "other communication[]" constitutes a clear and unambiguous promise, Defendants fail to plead a claim for promissory estoppel. *Schutty* v. *Speiser Krause P.C.*, 86 A.D.3d 484, 485 (1st Dep't 2011) ("The documentary evidence of the parties' lengthy and fruitless negotiations establishes as a matter of law that there was no clear and unambiguous promise on which plaintiff reasonably could have relied.").

### B.    Defendants Also Cannot Establish Detrimental Reliance

Defendants also fail to adequately allege detrimental reliance. *Thome* v. *Alexander & Louisa Calder Found.*, 70 A.D.3d 88, 105 (1st Dep't 2009). The extent of Defendants' claimed injury is that they "wast[ed] ten months" negotiating with EBCC and "spent hundreds of thousands of dollars trying to find and close a resolution." (Countercl. ¶¶ 75-78.) But the "ten months" and "hundreds of thousands of dollars" Defendants allegedly spent after defaulting on their obligations under the Credit Facilities cannot be attributed to any promise by EBCC. Instead, those expenditures "were attributable to the nature of [Defendants'] ongoing relationship" with EBCC under the Credit Facilities. *Schwartz* v. *Miltz*, 77 A.D.3d 723, 725 (2d Dep't 2010); *Gary Powell, Inc.* v. *Mendel/Borg Grp.*, 237 A.D.2d 407, 408 (2d Dep't 1997) (doctrine of promissory estoppel is unavailable where "the injury stems only from [Defendants'] continued performance of its contractual obligations").

Further, to the extent the term sheet is the "promise" on which Defendants relied, their injures could have arisen only during a one-week period—Defendants executed the Term Sheet on September 15, 2022, EBCC "went dark," and then, one week later, EBCC initiated this

action.  (Countercl. ¶¶ 41-43.)  To the extent Defendants suffered "ten months" and "hundreds of thousands of dollars" of injuries, they have failed to show how those alleged injuries are attributable to the one week period between September 15, 2022 and September 25, 2022.[9]  *See Schroeder* v. *Pinterest, Inc.*, 133 A.D.3d 12, 32 (1st Dep't 2015) (dismissing promissory estoppel claim where plaintiffs failed to plead "facts . . . showing that [they] did something, or refrained from doing something, in reliance" on the alleged promise).

Finally, "the doctrine of promissory estoppel is limited to cases where the promisee suffered an 'unconscionable injury.'"  *AHA Sales, Inc.* v. *Creative Bath Prod., Inc.*, 58 A.D.3d 6, 21 (2d Dep't 2008).  Here, Defendants' only alleged injury is "[t]he expenditure of time and [money]" to negotiate a resolution of their defaults under the Credit Facilities.  *Prospect St. Ventures I, LLC* v. *Eclipsys Sols. Corp.*, 23 A.D.3d 213, 214 (1st Dep't 2005).  Defendants' injuries are "not detrimental reliance under the circumstances."  *Id.*; *see NGR, LLC* v. *Gen. Elec. Co.*, 24 A.D.3d 425, 425-26 (2d Dep't 2005) ("The failure of the parties' complex business negotiations did not, under the circumstances herein, give rise to a claim for damage."); *River Glen Assocs., Ltd.* v. *Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 274 (1st Dep't 2002).[10]  As Defendants failed to adequately plead detrimental reliance, their promissory estoppel claim fails as a matter of law.

---

[9]      It also is inconsistent with the parties' contractual relationship to impose liability on EBCC for Defendants' post-default legal expenses, given that Defendants have agreed to pay EBCC's post-default legal expenses.  (Dkt. No. 6 at 39 ("Each Ebury Company agrees to pay . . . all of the reasonable out-of-pocket expenses of the Lender in connection with . . . amendments, consents, waivers, and terminations made or requested in connection with this Agreement . . . [and] the enforcement, protection, defense and collection of this Agreement."); *cf.* Term Sheet at 7 ("Borrower shall reimburse Lender all legal expenses incurred by Lender in connection with the preparation, negotiation and closing of the Amendment, whether or not it is consummated, and the administration and enforcement of the Loan Documents.")).

[10]     *Cf. Carvel Corp.* v. *Nicolini*, 144 A.D.2d 611, 612 (2d Dep't 1988) ("Even if all allegations made by the defendants were to be taken as true, we would not find the circumstances to be so egregious as to warrant the application of the doctrine of promissory estoppel."); *Country-Wide Leasing Corp.* v. *Subaru of Am., Inc.*, 133 A.D.2d 735, 736 (2d Dep't 1987) ("[T]he mere failure

-17-

## CONCLUSION

EBCC respectfully requests that the Court dismiss Defendants' counterclaim with

prejudice.[11]

Dated:    August 9, 2023              Respectfully submitted,
          New York, New York

                                      */s/ Alexander J. Willscher*

                                      Alexander J. Willscher
                                      Austin P. Mayron
                                      SULLIVAN & CROMWELL LLP
                                      125 Broad Street
                                      New York, New York  10004
                                      Telephone: (212) 558-4000
                                      Fax: (212) 558-3588

                                      *Attorneys for Plaintiff Emigrant Business
                                      Credit Corporation*

---

to obtain an uncertain prospective benefit does not rise to a sufficient level of unconscionability to warrant the application of the doctrine of promissory estoppel.").

[11]    The Court may dismiss a complaint with prejudice where "any leave to replead would . . . be[] futile," *Izhaky* v. *Izhaky*, 215 A.D.3d 588, 589 (1st Dep't 2023), or where "exceptional circumstances . . . merit[] this extreme sanction," *Stacey O.* v. *Donald P.*, 137 A.D.2d 965, 966 (3d Dep't 1988). Dismissal with prejudice is appropriate here, given the extent to which Defendants' claims are refuted by the term sheet. Alternatively, Plaintiff respectfully requests that the Court dismiss Defendants' counterclaim and "deny leave to amend." *Richter's Est.* v. *Novo Corp.*, 43 A.D.2d 1, 3 (1st Dep't 1973).

-18-

FILED: NEW YORK COUNTY CLERK 08/09/2023 09:48 PM
NYSCEF DOC. NO. 72

INDEX NO. 158207/2022
RECEIVED NYSCEF: 08/09/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 347 of 2230

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with the word count limit of Commercial Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because it contains 5,733 words.

Dated:   August 9, 2023
         New York, New York

*/s/ Alexander J. Willscher*
Alexander J. Willscher

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 348 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | : | Index No. 158207/2022 |
| Plaintiff, | : | (Hon. Margaret Chan) |
| v. | : | **MOTION SEQUENCE NO. 003** |
| JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1-10, | : | **AFFIDAVIT OF SCOTT WEISS** |
| Defendants. | : | |

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

      **SCOTT WEISS**, being duly sworn, deposes and says under the penalties of perjury:

      1.     I am Senior Vice President of Plaintiff Emigrant Business Credit Corporation

("**EBCC**") and am duly authorized to make this affidavit on behalf of EBCC in support of EBCC's

Motion to Dismiss Defendants' Counterclaim.

      2.     Attached as Exhibit A is a true and correct copy of the term sheet EBCC received

from Defendant John Arthur Hanratty on September 15, 2022.

Sworn to before me this
9th day of August 2023

_____
Notary Public

                                  _____
                                  **SCOTT WEISS**

David M. Condori
Notary Public
My Commission Expires
03/31/2026
State of Connecticut

-2-

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this affidavit complies with the word count limit of Commercial

Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because

it contains 73 words.

Dated:   August 9, 2023                       */s/ Alexander J. Willscher*
       New York, New York               Alexander J. Willscher

-3-

# EXHIBIT A

2:24-cv-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records          Pg 352 of 2230



September 14, 2022

EBURY 1EMI LLC and EBURY 2EMI LLC
Attention: John Hanratty

<div align="center">Term Sheet</div>

Reference is made to those certain Credit Agreements dated as of March 9, 2017 (as amended, collectively, the "Credit Agreement") and any and all other agreements and documents that have been or may be executed in connection thereof (collectively, with the Credit Agreement, the "Loan Documents") by and among EMIGRANT BUSINESS CREDIT CORPORATION, as Lender (the "Lender"), EBURY 1EMI LLC, for one Credit Agreement, and EBURY 2EMI LLC, for the other Credit Agreement, as Borrower (jointly and severally, individually and collectively, the "Borrower"), and multiple subsidiary or affiliate SPEs, as Guarantors (collectively, the "Existing Guarantors" and, with Lender, the "Parties"). All capitalized terms used in this Term Sheet and not otherwise defined herein shall have the meaning ascribed to such terms in the Credit Agreement.

Pursuant to the terms of the Loan Documents and as set forth below, various Events of Default (the "Existing Events of Default") under the Loan Documents have occurred and are ongoing. What follows is a summary of the principal terms and conditions under which Lender may agree to address Existing Events of Default, including an amendment to the Loan Documents.

The Parties acknowledge and agree that the proposed terms and conditions set forth herein are provided for discussion purposes only and do not constitute an offer, agreement or commitment to lend and are subject to satisfactory completion of due diligence, credit approval, satisfactory review and execution of documentation, and such other terms and conditions as may be determined by Lender and its counsel.

| | |
|---|---|
| Existing Events of Default: | Borrower and Lender each acknowledges that there are various known Existing Events of Default under the Loan Documents including, *inter alia*, the failure to pay all outstanding principal, interest and other obligations owed under the Loan Documents when due on November 10, 2021.<br><br>The Parties will execute an amendment to the Loan Documents (the "Amendment") memorializing the terms of this Term Sheet as part of the consideration for Lender refraining from exercising any of its rights and remedies under the Loan Documents solely with respect to the Existing Events of Default and solely until the earlier to occur of (i) November 1, 2025 (the "Termination Date"), or (ii) any of the Termination Events (specified below).<br><br>From the date of the Amendment until the Termination Date Lender shall not exercise rights and remedies against the Borrower and/or the Guarantors (as defined below) solely with respect to the Existing Events of Default; provided, however, that nothing in the Loan Documents or the Amendment shall prevent Lender from: (i) refusing to extend any new or additional extensions of credit under the Loan Documents; (ii) imposing a default rate of interest to the extent permitted by the Loan Documents; or (iii) sending any notices or taking any other action necessary or appropriate to protect |

and preserve Lender's rights and interests with respect to the Borrower, the Guarantors or the Collateral relative to the rights and interests of any other Person.

| | |
|---|---|
| Existing Obligation: | The Parties acknowledge and agree that, after crediting all previously made payments, as of August 9, 2022, the aggregate amount of unpaid principal, accrued interest and late fees owed under the Loan Documents is $21,525,251.71 and shall increase by an additional $6,398.35 each day until the execution of the Amendment (collectively, with unpaid fees and costs, the "Existing Obligation"). |

The Borrower and the Existing Guarantors each acknowledges and agrees that the Existing Obligation constitutes the legal, valid, binding and enforceable obligation of the Borrower and the Existing Guarantors to the Lender that is not subject to any credit, offset, defense, cause of action, setoff, counterclaim or adjustment of any kind, and is secured by the liens and security interests created and granted in or pursuant to the Loan Documents, which liens and security interests are legal, valid, binding and enforceable security interests in the Collateral, in each case fully perfected and prior and superior in right to any other person, and that this Term Sheet in no manner impairs or adversely affects such liens and security interests.

| | |
|---|---|
| Interest Rate: | LIBOR to SOFR; Commencing on the date of the Amendment the principal amount of the Existing Obligation shall accrue interest at a rate per annum equal to SOFR + 10.36% basis points. During the existence of an Event of Default other than an Existing Event of Default, the applicable margin shall increase by two percent (2.00%) per annum over the rate otherwise applicable. |
| Payment Terms: | Borrower agrees to pay Lender the sum of $18,247,480.55 as follows: |

    (i)    Commencing on September 30, 2022, and continuing on the last of each month thereafter through and including the Termination Date, Borrower shall pay Lender the sum of $350,000 (each, a "Monthly Payment"). Each Monthly Payment will be applied first to accrued unpaid interest and then against the Existing Obligation.

    (ii)    Remaining Monthly Gross Receipts (as will be further defined in the Amendment) during any calendar month, after payment of the Monthly Payment (each, the "Remaining Monthly Receipts") shall be paid to Lender (each, an "Additional Payment" and collectively, with each Monthly Payment and any and all other payments due under the Amendment, the "Payments") on or before the 10th day of each month; provided, however, that Borrower can retain a portion of the Remaining Monthly Receipts to cover certain operating expenses (collectively, the "Operating Expenses") and capital expenditures associated with the Collateral (collectively, the "Capital Expenditures") in the aggregate amount of no more $450,000 per month (each, the "Monthly Operations Cap"); provided, however, that the Monthly Operations Cap shall be subject to a budget (the "Monthly Budget") agreed to by the Parties on a monthly basis and may be modified upon further and consistent with the Monthly Budget.

(a) The Operating Expenses shall: (1) include salaries and wages of employees other than the Validity Guarantor, utilities, and other general administrative expenses and amounts owed by and between any of the Guarantors; (2) be subject to the Monthly Operations Cap and the Monthly Budget; and (3) not exceed $75,000 per month and may be modified upon further agreement by the Parties.

(b) The Capital Expenditures shall: (1) include legal, custodial and servicing fees and costs with respect to the Tax Liens, legal, management and property protection fees and costs, and real estate taxes related to the REO Properties (as defined below), other costs and expenditures related to preserving and protecting the Tax Liens and/or improving, developing and renovating the REO Properties, and other capital expenditures, including the monthly fee charged by the Custodian and the Servicer of approximately $11,000; (2) be subject to the Monthly Operations Cap and the Monthly Budget; and (3) not exceed $375,000 per month and may be modified upon further agreement by the Parties.

(c) Notwithstanding any other provision of this subparagraph, Borrower shall have the right to retain up to an aggregate of $100,000 as a retained balance for Operating Expenses, provided Borrower has satisfied its obligations set forth in subsections (i) through (iv) of this Payment Terms section.

(iii) By no later than December 31, 2022, Borrower shall make Payments to Lender no less than $3,000,000 in the aggregate, which shall include the Monthly Payments due on or before September 30, 2022, October 31, 2022, November 30, 2022 and December 31, 2022 and the Additional Payments to be made during such three-month period.

(iv) During the three-month period commencing on January 1, 2023 and ending March 31, 2023, and continuing each three-month period thereafter through and including the three-month period ending on the Termination Date, Borrower shall pay Lender no less than $1,500,000 in the aggregate, which shall include the Monthly Payments and the Additional Payments to be made during such three-month period); provided, however, if the Borrower has paid in excess of $1,500,000 during a previous three month period this provision is further modified regarding a minimum payment to the extent of any overage previously accrued in an amount not to exceed the lesser of (a) 50% of any such overage or (b) $250,000.

(v) Borrower's failure to make any of the Payments when due shall constitute an Event of Default under the Amendment and the Loan Documents.

(vi) Upon the occurrence of an Event of Default, the Existing Obligation (less any of the Payments made by Borrower), together with all costs, accrued interest and reasonable attorneys' fees, shall be reinstated and immediately due and payable.

| | |
|---|---|
| Existing Collateral: | Borrower and the Existing Guarantors each acknowledges and reaffirms all existing Collateral (the "Existing Collateral") including without limitation that the REO Properties were each acquired through, and are proceeds and products of, the Tax Liens, and constitute Existing Collateral. |
| Additional Collateral: | To the extent not included in and not in lieu of the Existing Collateral, Lender shall be provided additional collateral (collectively, the "Additional Collateral" and together, with the Existing Collateral, the "Collateral") including, *inter alia*:  first priority liens on and security interests and assignments and pledges of 100% of the equity interests in, and assets of, any and all Affiliates of any of the Ebury Companies, the Validity Guarantor, Ebury Fund 1, LP, Ebury Fund 2, LP and/or Ebury Street Capital, LLC that are neither the Borrower nor an Existing Guarantor (collectively, the "Additional Guarantors" and, with the Existing Guarantors, the "Guarantors") including but not limited to:  Ebury RE, LLC; EB TVRC, LLC; EB TRVC LLC; Ebury Akron RE LLC; White Clover I, LLC; and EYZC, LLC.

The Borrower and each of the Guarantors shall guarantee, collateralize and be otherwise liable for the Existing Obligation and any and all other Indebtedness' owed under the Loan Documents, and the Amendment shall include appropriate provisions to ensure such treatment.

To the extent not included in and not in lieu of the Existing Collateral, Additional Collateral will encompass and include:  (i) any and all real property acquired by the Borrower or any of the Guarantors by foreclosure, acceptance of a deed-in-lieu of foreclosure, abandonment, reclamation from bankruptcy, or otherwise in connection with a partial or total satisfaction of a Tax Lien or otherwise and, as the context so requires; (ii) equity interests in any Person owning property of the type described in the foregoing, together with all buildings, fixtures and improvements thereon and all other rights, benefits and proceeds arising from and in connection with such property, together with the related records, the related servicing rights, any related takeout commitment, and all instruments, chattel paper and general intangibles comprising or relating to any or all of the foregoing (collectively, "REO Properties"); and (iii) each bank account of the Borrower and any and all of the Guarantors including without limitation the Primary Accounts.

Collateral as it pertains to REO Properties will include:  the recorded deed, owner's title insurance policy, evidence of adequate property insurance coverage and other related documents and records, documents evidencing that payment of property taxes is current and fair market value, and other documents for each of the REO Properties (all of which shall be held by the Custodian as the exclusive bailee and agent of Lender); and all rights of Borrower, each of the Guarantors and/or the asset manager in the applicable servicing records and under leases, the Primary Accounts (as defined below) and the pledged equity interests.

Borrower shall, and cause each of the Additional Guarantors to, assign, pledge and grant a first priority security interest in and lien on the Collateral including each of the REO Properties to Lender. |

Control Accounts:

Borrower and the Guarantors shall establish and maintain at such financial institutions as may be acceptable to Lender, in Lender's reasonable discretion, the Borrower's and the Guarantors' depository accounts (collectively, the "Primary Accounts"). All funds received by Borrower and Guarantors with respect to the Tax Liens, the REO Properties, the other Collateral and/or business operations otherwise shall be deposited into the Primary Accounts. Borrower and Guarantors may make withdrawals from the Primary Accounts solely to cover the Operating Expenses and the Capital Expenditures, for the purposes of and subject to the limitations set forth in subsections (ii) and (iii) of the Payment Terms section above. Borrower, Guarantors, Lender and the institutions where the Primary Accounts are held shall enter into deposit account control agreements in connection with the Primary Accounts, in form and substance reasonably satisfactory to Lender.

REO Properties Matters:

The Amendment will set forth various defined terms and provisions relating to the REO Properties including:

(i)     Retention of an Ebury Affiliate as "Asset Manager" and delineating its obligations regarding servicing, managing, liquidating and distributing resulting proceeds from sales of the REO Properties subject to additional appropriate documentation;

(ii)    Establishment of the Primary Accounts for the collection and disbursement of REO Properties proceeds;

(iii)   Defining and establishing parameters for Permitted Encumbrances, and permitted Operating Expenses and Capital Expenditures as thy pertain to the REO Properties;

(iv)    Additional covenants such as: (a) requiring proper asset management, maintenance, and insurance; (b) prohibiting assignment and/or the sale of any of the pledged equity interests without Lender consent or any distributions by Borrower and/or any of the Guarantors; and (c) requiring all sales and transfers to be at arm's length and to disinterested parties unless Lender consents; and

(v)     Establishing additional Events of Default and remedies upon the occurrence of such Events of Default related to the REO Properties including Lender's right to sell, liquidate or transfer the pledged equity interests and the REO Properties.

Additional Financial Reporting
Requirements and Covenants:

Borrower and the Guarantors shall:

(i)     Not incur or commit to operating expenses (absolute dollar amount and percentage of revenue) except as allowed by the Monthly Budgets or with Lender's consent;

(ii)    Provide to Lender, on a monthly basis no later than six (6) business days from the end of the month or some other time as Lender may request, a complete and true schedule (the "Collateral Schedule") of the Tax Liens, the REO Properties and the other Collateral that shall include value and other information as required by Lender and an affirmation by the Validity Guarantor as to its accuracy;

5

(iii)    Within six (6) business days of the acquisition date of any future Tax Lien, Borrower shall deliver the related Tax Lien Documents to the Custodian;

(iv)    Borrower shall deliver to Lender the audited financial statements for the fiscal years ended on December 31, 2020 and December 31, 2021 within five (5) days of being received by Borrower, but no later than December 31, 2022;

(v)    On or before the 10th of each month, provide copies of all monthly statements for all bank accounts held by Borrower and any and all of the Guarantors for the preceding month, as well as copies of all monthly credit card or related statements;

(vi)    Provide monthly cash flow reports, including an affirmation by the Validity Guarantor as to their accuracy.

(vii)    Provide monthly operating reports showing variances from the Monthly Budget, with a comparison of actual to forecasted results for the previous week, and a narrative on any material variance on a line item basis, including an affirmation by the Validity Guarantor as to their accuracy;

(viii)    Provide bi-monthly reports detailing acquisitions, redemptions, foreclosures, and/or dispositions of the Tax Liens, the REO Properties and the other Collateral, including an affirmation by the Validity Guarantor as to their accuracy, on or before the 5th and 20th of each month;

(ix)    Provide such other reports and information regarding any aspect of the Borrower's and the Guarantors' businesses as Lender may reasonably request; and

(x)    Participate in calls with Lender regarding operations, the Collateral and financial matters on a bi-monthly basis or such other less frequency as may be determined by Lender from time to time in its sole discretion.

**Termination Events:**    The following shall constitute "Termination Events" under the Loan Documents:

(i)    Occurrence of an Event of Default (other than an Existing Event of Default) under any of the Loan Documents;

(ii)    Breach of any representation or warranty, covenant, or other term or condition set forth in the Amendment;

(iii)    Occurrence of a material adverse effect;

(iv)    Borrower and/or any of the Guarantors shall make any omissions or misrepresentations to the Lender at any time; and/or

(v)    Borrower shall have paid all amounts due under the Amendment in full.

**Conditions Precedent:**    The following are conditions precedent:

(i)    The Parties execution of (a) the Term Sheet by no later than 5:00 p.m. EST on September 14, 2022, and (b) the Amendment by no

        later than 5:00 p.m. EST on September 23, 2022 (the "Amendment Deadline");

(ii)  Borrower shall have acknowledged the occurrence of the Existing Defaults, and other customary matters related to acknowledgements concerning the amount of the Existing Obligation and secured position, without defense, setoff or counterclaim;

(iii)  Borrower shall have delivered to Lender the initial Collateral Schedule no later than five (5) days prior to the Amendment Deadline;

(iv)  Borrower shall have delivered the first Monthly Budget, including projected inflows and outflows, in reasonable detail and substance satisfactory to Lender;

(v)  Borrower shall have delivered a budget through the Termination Date broken out on a monthly basis, in reasonable detail and substance satisfactory to Lender;

(vi)  The Amendment and all related documentation respecting the Amendment shall be in form and substance satisfactory to Lender, and all fees and expenses incurred by Lender in connection with the negotiation and preparation of the Amendment shall have been paid by Borrower;

(vii)  Borrower and/or the Guarantors and Lender shall have executed the Amendment and any related documentation required by the Lender;

(viii)  Borrower shall have delivered all of the Tax Lien Certificates and all other Tax Lien Documents to the Custodian and the Servicer[1]; Borrower shall have provided the most updated draft of the audited financial statements for the fiscal year ended December 31, 2020;

(ix)  Borrower shall have complied with all requests for information regarding the identity and status of the REO Properties and the other Collateral; and

(x)  No Event of Default or Termination Event (or any event or condition that with the giving of notice or passage of time or both would constitute an Event of Default or Termination Event) shall have occurred.

Negotiations Period:  From on and after the date this Term Sheet is delivered through the execution of the Amendment, Borrower and Guarantors shall not sell, transfer, distribute or otherwise dissipate the Collateral outside the ordinary course of business.

Indemnification Expense:  Borrower shall reimburse Lender all legal expenses incurred by Lender in connection with the preparation, negotiation and closing of the Amendment, whether or not it is consummated, and the administration and enforcement of the Loan Documents.

---

[1] MTAG Services, LLC ("MTAG"), the current Custodian and Servicer needs only the Tax Lien Certificates and other Tax Lien Documents to perform its obligations under the Custodial Agreements and the Servicing Agreements. Replacing MTAG as the Custodian and the Servicer can be considered after execution of the Amendment and shall be subject to Lender's approval. N.B. Lender would generally be supportive of another reputable vendor that provided comparable services at a lower cost.

Governing Law: State of New York

This Term Sheet represents only a summary of the proposed Amendment. As a result, any Amendment, if agreed to by the Lender, shall contain other terms and conditions that are customary in a transaction of this nature, including but not limited to reaffirmation of the Existing Obligation and the Collateral.

Borrower remains in default of the existing terms of its lending relationship with the Lender. Until and unless the Lender and the Borrower have agreed to the terms of any Amendment, and until such Amendment has been agreed to in writing among the Parties, the Lender continues to reserve all of its rights and remedies under the lending relationship.

The undersigned Borrower and Guarantors each hereby acknowledges that this Term Sheet is for discussion purposes only and creates no binding obligations on the part of the Lender.

LENDER:
EMIGRANT BUSINESS CREDIT CORPORATION

By: _____
William Staudt,
Chairman and CEO

BORROWER:
EBURY 1EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

EBURY 2 EMI LLC
By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

GUARANTORS:
EB 1EMIALA LLC
EB 1EMI FL, LLC
EB 1EMIIN, LLC
EB 1EMIMD, LLC
EB 1EMINJ LLC
EB 1EMINY, LLC
EB 1EMISC LLC
RE 1EMI LLC
EB 1EMIDC LLC
ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC
EBURY FUND 1FL LLC
EBURY FUND 1NJ LLC

By: EBURY 1EMI LLC, Sole Member

By: EBURY STREET CAPITAL, LLC, Manager

By: _____
John Hanratty, Manager

8

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 360 of 2230

EB 2EMIALA LLC
EB 2EMI FL, LLC
EB 2EMIIN, LLC
EB 2EMIMD, LLC
EB 2EMINJ LLC
EB 2EMINY, LLC
EB 2EMISC LLC
RE 2EMI LLC
EBURY FUND 2 NJ LLC
EBURY FUND 2 FL LLC
RED CLOVER 1 LLC

By:  EBURY 2 EMI LLC, Sole Member

    By:  EBURY STREET CAPITAL, LLC, Manager

       By: _____
       John Hanratty, Manager

9

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| EMIGRANT BUSINESS CREDIT CORPORATION, | : | |
| | : | Index No. 158207/2022 |
| Plaintiff, | : | |
| v. | : | (Hon. Margaret Chan) |
| | : | **MOTION SEQUENCE NO. 003** |
| JOHN ARTHUR HANRATTY, | : | |
| EBURY STREET CAPITAL, LLC, | : | **AFFIRMATION OF** |
| EBURY FUND 1, LP, | : | **ALEXANDER J. WILLSCHER** |
| EBURY FUND 2, LP, | : | |

EMIGRANT BUSINESS CREDIT
CORPORATION,

     Plaintiff,

   v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

     Defendants.

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 003**

**AFFIRMATION OF
ALEXANDER J. WILLSCHER**

**ALEXANDER J. WILLSCHER**, an attorney duly admitted to practice law in the Courts of the State of New York, affirms the truth of the following statements, under the penalties of perjury:

1.      I am a partner at the firm of Sullivan & Cromwell LLP, counsel for Plaintiff Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned matter.  I am familiar with the matters set forth below.

2.      I submit this affirmation in support of EBCC's motion to dismiss Defendants' Counterclaim.

3.      Attached as Exhibit A is a true and correct copy of Defendants' Answer and Counterclaim.  (Dkt. No. 69.)

4.      EBCC's motion to dismiss seeks an order pursuant to CPLR 3211 (a)(1) and/or (7) dismissing Defendants' Counterclaim and granting such other and further relief as the Court may deem just and proper.

5.      EBCC has not previously asked the Court for the relief sought by its motion to dismiss.

Dated:  August 9, 2023                          _/s/ Alexander J. Willscher_
         New York, New York                    **ALEXANDER J. WILLSCHER**

## CERTIFICATE OF COMPLIANCE

I hereby certify that this affirmation complies with the word count limit of Commercial

Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because

it contains 149 words.


Dated:   August 9, 2023                    */s/ Alexander J. Willscher*
         New York, New York                Alexander J. Willscher


-3-

# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**COMMERCIAL DIVISION**

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

      Plaintiff–Counterclaim Defendant,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC,
RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE
TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, and EBURY RE LLC,

      Defendants–Counterclaim Plaintiffs,

      v.

XYZ CORPS. 1-10,

      Defendants.

Index No. 158207/2022

THE EBURY PARTIES'
ANSWER AND
COUNTERCLAIM

---

1

Defendant–Counterclaim Plaintiffs John Arthur Hanratty, Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2 EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, Eb 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury Fund 2 FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and Ebury RE, LLC (together, the "Ebury Parties") answer the complaint of and files their own "Counterclaim" against Plaintiff–Counterclaim Defendant Emigrant Business Credit Corporation ("Emigrant"):

## NATURE OF THE ACTION

1.      Paragraph 1 asserts legal conclusions that require no response. To the extent Paragraph 1 requires a response, the Ebury Parties deny Paragraph 1.

2.      Paragraph 2 asserts legal conclusions and purports to represent documents that speak for themselves, and therefore requires no response. To the extent Paragraph 2 requires a response, the Ebury Parties admit that the Credit Facilities matured in November 2021, that the Ebury Parties have not fully repaid the Credit Facilities, and that Mr. Hanratty occasionally told Emigrant "that it was 'overcollateralized,'" and denies Paragraph 2's remaining assertions, and specifically denies that the Ebury Parties ever knowingly communicated false material information to Emigrant.

3.      Paragraph 3 asserts legal conclusions that require no response, as well as factual allegations regarding which the Ebury Parties lack knowledge or information

sufficient to form a belief regarding their truth. To the extent Paragraph 3 requires a response, the Ebury Parties deny Paragraph 3's allegations.

4.      Paragraph 4 asserts legal conclusions that require no response, as well as factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth. To the extent Paragraph 4 requires a response, the Ebury Parties deny its allegations.

5.      Paragraph 5 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 5 requires a response, the Ebury Parties deny its allegations.

6.      Paragraph 6 asserts legal conclusions that requires no response. To the extent Paragraph 6 requires a response, the Ebury Parties deny its allegations. The Ebury Parties further observe that between November 2021 and September 2022, the Ebury Parties negotiated in good faith with Emigrant to work out a payment plan of the Credit Facilities and executed a September 14, 2022 Settlement Term Sheet ("Settlement Contract") offered by Emigrant. Eleven days after the Ebury Parties returned that executed Term Sheet to Emigrant, Emigrant initiated the above-captioned "Action" and sued the Ebury Parties to collect on the very same Credit Facilities whose repayment had been resolved with the Settlement Contract.

3

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 368 of 2230

## THE PARTIES

7.      The Ebury Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 7.

8.      The Ebury Parties deny that Mr. Hanratty "resides at 1152 Ave Magdalena, San Juan, Puerto Rico 00907" and otherwise admit the allegations of Paragraph 8.

9.      The Ebury Parties admit Paragraph 9.

10.     The Ebury Parties admit Paragraph 10.

11.     The Ebury Parties admit Paragraph 11.

12.     Paragraph 12 asserts legal conclusions that require no response. To the extent Paragraph 12 requires a response, the Ebury Parties deny its allegations.

13.     Paragraph 13 asserts legal conclusions that require no response. To the extent Paragraph 13 requires a response, the Ebury Parties deny its allegations.

14.     The Ebury Parties deny Paragraph 14.

15.     Paragraph 15 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 15 requires a response, the Ebury Parties deny its allegations.

16.     The Ebury Parties admit Paragraph 16.

17.     Paragraph 17 asserts legal conclusions that require no response, as well as factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth. To the extent Paragraph 17 requires a response, the Ebury Parties deny its allegations.

4

18.     Paragraph 18 asserts legal conclusions that require no response. To the extent Paragraph 18 requires a response, the Ebury Parties deny its allegations.

## JURISDICTION AND VENUE

19.     Paragraph 19 asserts legal conclusions that require no response. To the extent Paragraph 19 requires a response, the Ebury Parties deny its allegations.

20.     Paragraph 20 asserts legal conclusions and purports to represent documents that speak for themselves, and therefore requires no response. To the extent Paragraph 20 requires a response, the Ebury Parties admit that venue is proper in this court, and otherwise deny its allegations.

21.     Paragraph 21 asserts legal conclusions and requires no response. To the extent Paragraph 21 requires a response, the Ebury Parties admit that this action is appropriate for the Commercial Division and otherwise deny its allegations.

## FACTUAL BACKGROUND

22.     Paragraph 22 asserts legal conclusions and generalities and requires no response.

23.     Paragraph 23 asserts legal conclusions and generalities and requires no response.

24.     Paragraph 24 asserts legal conclusions and generalities and requires no response.

25.     Paragraph 25 asserts legal conclusions and generalities and requires no response.

5

26.     Paragraph 26 asserts legal conclusions and generalities and requires no response.

27.     Paragraph 27 asserts legal conclusions and generalities and requires no response.

28.     Paragraph 28 asserts legal conclusions and generalities and requires no response.

29.     Paragraph 29 asserts legal conclusions and generalities and requires no response.

30.     Paragraph 30 asserts legal conclusions and generalities and requires no response.

31.     Paragraph 31 asserts legal conclusions, opinions, and generalities and requires no response.

32.     Paragraph 32 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 32 requires a response, the Ebury Parties admit that they communicated with EBCC in 2016 regarding obtaining a new credit facility, and at the time, had established credit facilities with Capital One, N.A., and otherwise deny its allegations.

33.     Paragraph 33 asserts legal conclusions that require no response. To the extent that Paragraph 33 requires a response, the Ebury Parties agree that the credit facilities were increased multiple times and that the Ebury Parties repaid the Capital One facilities, and otherwise deny its allegations.

**6**

34.     Paragraph 34 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 34 requires a response, the Ebury Parties deny its allegations.

35.     Paragraph 35 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 35 requires a response, the Ebury Parties deny its allegations.

36.     Paragraph 36 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 36 requires a response, the Ebury Parties deny its allegations.

37.     Paragraph 37 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 37 requires a response, the Ebury Parties deny its allegations.

38.     Paragraph 38 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 38 requires a response, the Ebury Parties deny its allegations.

39.     Paragraph 39 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 39 requires a response, the Ebury Parties deny its allegations.

40.     Paragraph 40 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 40 requires a response, the Ebury Parties deny its allegations.

7

41.     Paragraph 41 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 41 requires a response, the Ebury Parties deny its allegations.

42.     Paragraph 42 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 42 requires a response, the Ebury Parties deny its allegations.

43.     Paragraph 43 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 43 requires a response, the Ebury Parties admit that Mr. Hanratty occasionally claimed that EBCC was "overcollateralized," that Mr. Hanratty believed those statements to be true on all occasions that he said so, and otherwise deny its allegations.

44.     Paragraph 44 purports to represent a document that speaks for itself and requires no response. To the extent Paragraph 44 requires a response, the Ebury Parties deny its allegations.

45.     Paragraph 45 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 45 requires a response, the Ebury Parties deny its allegations.

46.     Paragraph 46 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 46 requires a response, the Ebury Parties deny its allegations.

**8**

47.    Paragraph 47 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 47 requires a response, the Ebury Parties deny its allegations.

48.    Paragraph 48 purports to represent hearsay in a document that speaks for itself and requires no response. To the extent Paragraph 48 requires a response, the Ebury Parties deny its allegations.

49.    Paragraph 49 asserts legal conclusions that require no response. To the extent Paragraph 49 requires a response, the Ebury Parties deny its allegations.

50.    Paragraph 50 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 50 requires a response, the Ebury Parties deny its allegations.

51.    Paragraph 51 asserts legal conclusions and factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth and requires no response. To the extent Paragraph 51 requires a response, the Ebury Parties deny its allegations.

52.    Paragraph 52 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 52 requires a response, the Ebury Parties admit that EBCC was aware that MTAG was one of the Ebury Parties' servicers, and otherwise deny its allegations.

53.    Paragraph 53 asserts legal conclusions and requires no response. To the extent Paragraph 53 requires a response, the Ebury Parties deny its allegations.

9

54.     Paragraph 54 purports to represent hearsay in a document that speaks for itself and requires no response. To the extent Paragraph 54 requires a response, the Ebury Parties deny its allegations.

55.     Paragraph 55 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 55 requires a response, the Ebury Parties admit that they understood MTAG's records to suffer from timing and uploading problems, and otherwise deny Paragraph 55's allegations.

56.     Paragraph 56 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 56 requires a response, the Ebury Parties deny its allegations.

57.     Paragraph 57 purports to represent documents that speak for themselves and assert factual allegations regarding which the Ebury Parties lack knowledge or information sufficient to form a belief regarding their truth and requires no response. To the extent Paragraph 57 requires a response, the Ebury Parties deny its allegations.

58.     Paragraph 58 asserts legal conclusions and purports to represent documents that speak for themselves. To the extent Paragraph 58 requires a response, the Ebury Parties admit that they self-serviced some of EBCC's collateral using the Speedboat platform, and that EBCC was well aware of this self-servicing before November 2021; otherwise deny Paragraph 58's allegations; and further deny the implication that they hid or otherwise concealed this information from EBCC before November 2021.

10

59.    Paragraph 59 asserts legal conclusions and purports to represent documents that speak for themselves. To the extent Paragraph 59 requires a response, the Ebury Parties deny its allegations.

60.    Paragraph 60 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 60 requires a response, the Ebury Parties deny its allegations.

61.    Paragraph 61 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 61 requires a response, the Ebury Parties deny its allegations.

62.    Paragraph 62 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 62 requires a response, the Ebury Parties deny its allegations.

63.    Paragraph 63 asserts legal conclusions and purports to represent documents that speak for themselves and requires no response.

64.    Paragraph 64 asserts legal conclusions and requires no response. To the extent Paragraph 64 requires a response, the Ebury Parties admit its allegations.

65.    Paragraph 65 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 65 requires a response, the Ebury Parties deny its allegations.

66.    Paragraph 66 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 66 requires a response, the Ebury Parties deny its allegations.

67.    Paragraph 67 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 67 requires a response, the Ebury Parties deny its allegations.

68.    Paragraph 68 asserts legal conclusions, purports to represent hearsay in documents that speak for themselves, and requires no response. To the extent Paragraph 68 requires a response, the Ebury Parties deny its allegations.

69.    Paragraph 69 asserts legal conclusions and requires no response. To the extent Paragraph 69 requires a response, the Ebury Parties deny its allegations.

70.    The Ebury Parties admit that EBCC provided approximately $220,000 to EB 1EMI LLC on or Around November 9, 2018 and otherwise deny Paragraph 70.

71.    Paragraph 71 asserts legal conclusions that require no response. To the extent Paragraph 71 requires a response, the Ebury Parties deny its allegations.

72.    The Ebury Parties admit that EBCC provided approximately $860,000 to Ebury 1 EMI LLC on or around May 17, 2019 and otherwise deny Paragraph 72.

73.    Paragraph 73 asserts legal conclusions that require no response. To the extent Paragraph 71 requires a response, the Ebury Parties deny its allegations.

74.    Paragraph 74 asserts legal conclusions that require no response. To the extent Paragraph 72 requires a response, the Ebury Parties deny its allegations.

75.    Paragraph 75 asserts legal conclusions that require no response. To the extent Paragraph 75 requires a response, the Ebury Parties deny its allegations.

76.    The Ebury Parties admit that EBCC provided approximately $2.4 million in or around June 12, 2019 and otherwise deny Paragraph 76.

77.     The Ebury Parties deny Paragraph 77.

78.     The Ebury Parties deny Paragraph 78.

79.     Paragraph 79 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 79 requires a response, the Ebury Parties deny its allegations.

80.     The Ebury Parties admit that EBCC provided approximately $850,000 on or around September 13, 2019 and otherwise deny Paragraph 80.

81.     Paragraph 81 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 81 requires a response, the Ebury Parties deny its allegations.

82.     Paragraph 82 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 82 requires a response, the Ebury Parties deny its allegations.

83.     Paragraph 83 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 83 requires a response, the Ebury Parties deny its allegations.

84.     Paragraph 84 asserts opinions and legal conclusions that require no response. To the extent Paragraph 84 requires a response, the Ebury Parties deny its allegations.

85.     Paragraph 85 asserts opinions and legal conclusions that require no response. To the extent Paragraph 85 requires a response, the Ebury Parties deny its allegations.

13

86.     Paragraph 86 purports to represent documents that speak for themselves and requires no response.

87.     Paragraph 87 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 87 requires a response, the Ebury Parties deny its allegations.

88.     Paragraph 88 purports to represent documents that speak for themselves and requires no response. To the extent Paragraph 88 requires a response, the Ebury Parties deny its allegations.

89.     Paragraph 89 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 89 requires a response, the Ebury Parties deny its allegations.

90.     Paragraph 90 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 90 requires a response, the Ebury Parties deny its allegations.

91.     Paragraph 91 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 91 requires a response, the Ebury Parties deny its allegations.

92.     Paragraph 92 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 92 requires a response, the Ebury Parties deny its allegations.

14

93.     Paragraph 93 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 93 requires a response, the Ebury Parties deny its allegations.

94.     The Ebury Parties admit Paragraph 94.

95.     Paragraph 95 asserts opinions and legal conclusions and requires no response. To the extent Paragraph 95 requires a response, Ebury Parties admit that they have not paid EBCC the proceeds of the sales detailed in Paragraph 94, because, as EBCC is well aware, the Ebury Parties have not received those proceeds; and otherwise deny Paragraph 95.

96.     Paragraph 96 asserts opinions and legal conclusions that require no response. To the extent Paragraph 96 requires a response, the Ebury Parties deny its allegations.

97.     Paragraph 97 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response.

98.     Paragraph 98 asserts opinions and legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 98.

99.     Paragraph 99 asserts opinions and legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 99.

100.     Paragraph 100 asserts opinions and legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 100.

15

101.     Paragraph 101 asserts opinions and legal conclusions and requires no response.

## COUNT ONE
### (Breach of Contract)

102.     In response to Paragraph 102, the Ebury Parties incorporate their foregoing allegations.

103.     Paragraph 103 asserts legal conclusions and requires no response. To the extent Paragraph 103 requires a response, the Ebury Parties admit that the Credit Facilities have not been fully repaid, and otherwise deny its allegations.

104.     Paragraph 104 asserts legal conclusions, purports to represent documents that speak for themselves, and requires no response. To the extent Paragraph 104 requires a response, the Ebury Parties admit that the Credit Facilities have not been fully repaid and otherwise deny Paragraph 104's allegations.

105.     Paragraph 105 asserts legal conclusions and requires no response.

106.     Paragraph 106 asserts legal conclusions and requires no response.

107.     Paragraph 107 asserts legal conclusions and requires no response.

108.     Paragraph 108 asserts legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 108.

109.     Paragraph 109 asserts legal conclusions and requires no response. To the extent it requires a response, the Ebury Parties deny Paragraph 109.

## COUNT TWO
### (Fraudulent Inducement)

110.    In response to Paragraph 110, the Ebury Parties incorporate their foregoing allegations.

111.    Paragraph 111 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 111.

112.    Paragraph 112 asserts opinions and legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 112.

113.    Paragraph 113 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 113.

114.    Paragraph 114 asserts opinions and legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 114.

115.    Paragraph 115 asserts opinions and legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 115.

116.    Paragraph 116 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 116.

17

## COUNT THREE
### (Fraudulent Transfer – DCL // 272-274, 276)

117.    In response to Paragraph 117, the Ebury Parties incorporate their foregoing allegations.

118.    Paragraph 118 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 118.

119.    Paragraph 119 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 119.

120.    Paragraph 120 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 120.

121.    Paragraph 121 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 121.

122.    Paragraph 122 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 122.

123.    Paragraph 123 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 123.

124.    Paragraph 124 asserts legal conclusions that require no response. To the extent it requires a response, the Ebury Parties deny Paragraph 124.

18

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

EBCC's Complaint fails to state a claim.

### Second Affirmative Defense

EBCC's claims are barred by the doctrines of waiver, estoppel, unclean hands, and unconscionability.

### Third Affirmative Defense

The complaint's claims are barred because EBCC has violated the implied covenant of good faith and fair dealing.

### Fourth Affirmative Defense

EBCC's fraud claims are barred because the Ebury Parties did not make any material misrepresentations or omissions to EBCC.

### Fifth Affirmative Defense

EBCC's fraud claims are barred because any reliance EBCC had on the Ebury Parties' supposedly-false statements was not reasonable.

### Sixth Affirmative Defense

EBCC's fraud claims are barred because they are duplicative.

### Seventh Affirmative Defense

EBCC's damages and other remedies are limited by EBCC's bad-faith abandonment of the Parties' post-default workout negotiations.

**19**

## COUNTERCLAIMS

As and for their counterclaims against EBCC, the Ebury Parties respectfully allege:

1.      Before the Ebury Parties began working with EBCC, they had a $45 million revolving credit facility with Capital One, N.A.

2.      In 2016 and 2017, EBCC wooed the Ebury Parties to open lines of credit with EBCC and, eventually, abandon their relationships with Capital One entirely.

3.      From 2017 through 2020, EBCC loaned--and the Ebury Parties repaid--millions upon millions of dollars through the Credit Facilities.

4.      But in 2020, the Covid-19 pandemic froze the Ebury Parties' business.

5.      The Ebury Parties' business is heavily invested in distressed real estate and therefore is at the mercy of foreclosures, evictions, and smooth, efficient state and local governments and court systems.

6.      In response to Covid-19, state and federal governments closed municipal and county offices, paused judicial proceedings, and froze foreclosure and eviction proceedings.

7.      Overnight, the Ebury Parties lost their primary tools for collecting revenue from their investments.

8.      In spring 2021—when the Credit Facilities originally were to mature—the Ebury Parties' businesses still were suffering from the pandemic's closures and slowdowns.

9.      In May 2021, EBCC agreed to extend the Credit Facilities' maturity date by three months.

**20**

10.     In exchange, EBCC extracted the Ebury Parties' agreement to raise the Credit Facilities interest rate by 200 basis points; discontinue further draws under the revolving Credit Facilities; and contribute two new tax lien portfolios to the Ebury Party that had contracted with EBCC.

11.     After, as EBCC characterized it, "administrative-related delays in closing" the new tax lien portfolios' purchases, EBCC agreed to another three-month extension of the Credit Facilities, setting their new maturity date as November 10, 2021.

12.     EBCC again did not make those concessions out benevolence.

13.     Instead, the Bank further increased the Credit Facilities' pricing by another 200 basis points, to L+825.

14.     As late as August 2021, EBCC's bankers told others at the Bank, including the Bank's credit team, that "[f]rom 2017 [through] 2019, Ebury exhibited stellar operating performance" that was "equivalent to 40% of annual amortization on EBC[C]'s loan."

15.     But EBCC also recognized that "[t]he pandemic has negatively impacted Ebury's results from a timing perspective, as government-mandated moratoriums took the pressure off of mortgage lenders and individual homeowners to settle tax liens."

16.     And at the same time, EBCC observed that "the slowdown in Ebury's core tax lien business in 2020 and early 2021 was offset by outperformance in its REO business" and that "the underlying 'credit' of the tax liens will actually improve once the foreclosure moratoriums are lifted as these liens will continue to accrue interest (as high as 18%) and ultimate provide higher cash flows to the [Ebury Parties] and EBC[C]."

21

17.     Yet in November 2021, EBCC decided to call the Credit Facilities instead of again extending their maturity dates.

18.     From November 2021 through September 2022, EBCC and the Ebury Parties worked together to negotiate a resolution of the Credit Facilities.

19.     For example, even before the Credit Facilities matured in November 2021, EBCC and Mr. Hanratty had contacted multiple third-party lenders to gauge their interest in purchasing the debt.

20.     EBCC and the Ebury Parties also routinely discussed and negotiated potential payment plans that would fully discharge the Ebury Parties' debts.

21.     At EBCC's request, the Ebury Parties directly connected the Bank with those third parties on multiple occasions, so that the Bank and the third parties could independently discuss and negotiate the sale of the Ebury Parties' debts.

22.     However, EBCC continually dropped the ball on those negotiations, from stringing third-party investors along to failing to respond to them at all.

23.     In spring 2022, the Ebury Parties offered EBCC a multi-year payment plan, which contemplated that the Ebury Parties would fully repay their debt by 2025.

24.     Besides offering concrete solutions, the Ebury Parties also freely shared all their material financial, legal, and other relevant information with EBCC.

25.     By December 2021, the Ebury Parties had sent their lien servicing software's access credentials to EBCC, including for the Ebury Parties' and Speedboat accounts.

22

26.     By March 2022, the Ebury Parties had sent their Quickbooks accounting software access credentials to EBCC, so that EBCC could independently review and verify the Ebury Parties' financial records.

27.     The Ebury Parties even coordinated with the software providers to provide usage tutorials to EBCC's personnel.

28.     The Ebury Parties also participated in multiple conference calls per week with numerous EBCC personnel to attempt to work out the debts.

29.     Initially, the Ebury Parties' primary EBCC contact, Jack Grady, participated on those phone calls, along with his direct supervisor, EBCC's President.

30.     In early 2022, however, Mr. Grady disappeared from those conferences.

31.     In summer 2023, the Ebury Parties learned that Mr. Grady had disappeared from those conferences because EBCC placed him on administrative leave while EBCC conducted an internal investigation into Mr. Grady's conduct.

32.     EBCC eventually separated Mr. Grady from employment and paid him a significant severance payment.

33.     Even after Mr. Grady left, EBCC's President continued to participate in the conferences.

34.     However, she soon disappeared from the conferences, as well.

35.     Other EBCC personnel and EBCC's outside counsel continued to purport to negotiate with the Ebury Parties.

36.    In August 2022, EBCC sent the Ebury Parties a settlement term sheet that detailed a multi-year plan via which the Ebury Parties would discharge their debt to EBCC.

37.    After several rounds of conversations and negotiations, EBCC sent the Ebury Parties the final "Settlement Term Sheet," dated September 14, 2022.

38.    That Settlement Term Sheet memorialized all of the material terms on which EBCC and the Ebury Parties agreed to resolve the outstanding Credit Facilities.

39.    Just one day after transmitting the Settlement Term Sheet, EBCC's outside counsel emphasized that the bank "need this executed by the end of business today."

40.    EBCC's outside counsel also emphasized that the Bank "needed" the Ebury Parties to execute the Settlement Term Sheet on September 15, 2022 so that the Parties could close the Settlement by Friday, September 23, 2022.

41.    Relying on the Parties' lengthy negotiations, EBCC's demand that the Ebury Parties execute the Settlement Term Sheet "today," and EBCC's promise that executing "today" would mean the Settlement closed by the following Friday, the Ebury Parties executed and returned the Settlement Term Sheet to EBCC on September 15, 2022.

42.    But EBCC went dark after the Ebury Parties returned the executed Settlement Term Sheet.

43.    And on Sunday, September 25, 2022—without warning to the Ebury Parties, and even without warning to the EBCC outside counsel who had negotiated the Settlement Term Sheet—EBCC initiated this Action, suing the Ebury Parties for the very

same alleged conduct that the Parties had purportedly attempted to resolve via the Settlement Term Sheet.

44.    The only "new" "misconduct" alleged in EBCC's Complaint was copy-pasted hearsay from a counterclaim filed against certain Ebury Parties by a disgruntled business partner in a Delaware federal litigation (the "McOsker Allegations").

45.    But Ebury entities are the plaintiffs in all litigations against that former business partner, Thomas McOsker.

46.    The Ebury entities filed that first suit against Mr. McOsker and his entities and affiliates in Puerto Rico July 2019.

47.    After Mr. McOsker insisted that the dispute belonged in Delaware, the Ebury entities sued in the federal district court for the District of Delaware in February 2021.

48.    The Ebury Parties consistently made EBCC contemporaneously aware of those McOsker litigations.

49.    In Delaware, Mr. McOsker filed successive motions to dismiss the relevant Ebury entities' RICO and supplemental common-law contract and tort claims.

50.    After losing all of those motions, Mr. McOsker filed an answer and counterclaim asserting, inter alia, the McOsker Allegations.

51.    While the Ebury Parties did not immediately send that pleading to EBCC, the Ebury Parties had made the Bank well aware of the ongoing, multiple litigations between Ebury entities and Mr. McOsker.

52.     Moreover, EBCC sent the Settlement Term Sheet on September 14, 2022 and

demanding that the Ebury Parties execute the contract on September 15, 2022.

53.     EBCC induced the Ebury Parties' signature by claiming that the Parties

would close the Settlement by September 23, 2022.

54.     But after ten months of putting the Ebury Parties through every possible

test—from sharing software access to toying with third-party investors to blowing off

refinancing arrangements to purporting to negotiate repayment plans to demanding

next-day execution of the Settlement Term Sheet—EBCC disappeared, only to sue the

Ebury Parties on the Sunday after the Settlement was supposed to have closed.

55.     Consequently, the Ebury Parties counterclaim against EBCC.

## COUNT I
## Breach of Contract

56.     The Ebury Parties incorporate their foregoing allegations.

57.     The Settlement Term Sheet memorialized a contract to settle the

outstanding Credit Facilities.

58.     Relying on EBCC's promises that the Settlement would close by

September 23, 2022, the Ebury Parties executed and returned the Settlement Term Sheet

to EBCC on September 15, 2022.

59.     Instead of continuing to negotiate and close the Settlement in good faith,

EBCC sued the Ebury Parties.

60.     In doing so, EBCC breached the Settlement Term Sheet and damaged the

Ebury Parties in an amount to be determined during discovery and proven at trial,

currently estimated to be no less than $500,000 in out-of-pocket expenses.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

61.    The Ebury Parties incorporate their foregoing allegations.

62.    EBCC had the duty to negotiate the Settlement in good faith.

63.    Instead of continuing to negotiate and close the Settlement in good faith, EBCC sued the Ebury Parties.

64.    In doing so, EBCC breached the implied covenant of good faith and fair dealing and damaged the Ebury Parties in an amount to be determined during discovery and proven at trial, currently estimated to total no less than $500,000 in out-of-pocket expenses.

## COUNT III
### Negligent Misrepresentation

65.    The Ebury Parties incorporate their foregoing allegations.

66.    From at least November 2021 through September 2022, EBCC repeatedly, continually represented to the Ebury Parties that EBCC desired to settle and refinance the outstanding Credit Facilities and would work to do so in good faith.

67.    Trusting in EBCC's professionalism and economic motivations, the Ebury Parties reasonably relied on EBCC's representations that it would work in good faith to accept reasonable workout and ∕ or refinancing terms.

68.    EBCC's representations were false.

69.    It was foreseeable to EBCC that the Ebury Parties would reasonably rely on EBCC's false representations.

27

70.     EBCC had a duty to truthfully communicate with the Ebury Parties in good faith.

71.     In negligently misrepresenting its intentions to refinance, renegotiate, and / or settle the outstanding Credit Facilities, EBCC has damaged the Ebury Parties in an amount to be revealed during discovery and proven at trial.

### COUNT IV
### Promissory Estoppel

72.     The Ebury Parties incorporate their foregoing allegations.

73.     Via the Settlement Term Sheet and other communications, EBCC promised that it would work in good faith to resolve the outstanding Credit Facilities with the Ebury Parties.

74.     EBCC should have expected and did expect that the Ebury Parties reasonably relied on its promises and representations that it was truly interested in resolving the Ebury Parties' debts.

75.     The Ebury Parties relied on EBCC's promises to their detriment by, _inter alia_, wasting ten months attempting to negotiate a resolution with EBCC.

76.     The Ebury Parties spent hundreds of thousands of dollars trying to find and close a resolution that EBCC would accept.

77.     In the meantime, the Credit Facilities accumulated thousands of dollars of interest per day.

78.     The doctrine of promissory estoppel entitles the Ebury Parties to damages in an amount to be revealed during discovery and proven at trial.

28

## RELIEF REQUESTED

On the foregoing allegations, the Ebury Parties request relief and judgment,

including:

    (a) Monetary relief in an amount to be determined at trial;
    (b) Costs and expenses incurred in this action, including attorneys' fees;
    (c) Pre- and post-judgment interest; and
    (d) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Ebury Parties demand a jury trial.

Dated: July 10, 2023
    New York, New York

GUSRAE KAPLAN NUSBAUM PLLC

/s/ Kari Parks
Kari Parks
Victor Wang
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com
vwang@gusraekaplan.com

Attorneys for the Ebury Parties

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

**PRESENT:**    **HON. MARGARET A. CHAN**                    **PART**        49

*Justice*
-------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,                **INDEX NO.**        158207/2022

                              Plaintiff,

                              - v -

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL,
LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB
2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY
FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ CORPS.,

                              Defendants.

-------------------------------------------------------------------X

         The parties appeared via Microsoft Teams for a status conference on August
9, 2023 at 2:30 p.m. Pursuant to the conference, it is hereby ORDERED:

1.  The parties shall meet and confer as to defendants' pending discovery
    demands and document demands plaintiff's counsel indicates would be timely
    and may be forthcoming.

Next Conference Date: November 15, 2023 at 2:30 p.m. via Microsoft Teams.
Deadline to file the note of issue: November 17, 2023

DATE: 08/09/2023                                    _____
                                                    MARGARET A. CHAN, JSC

**Check One:**        [ ] Case Disposed        [X] Non-Final Disposition

**Check if Appropriate:**   [ ] Other (Specify _____ )

# OTHER ORDER – NON-MOTION
1 of 1

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 395 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

Plaintiff,

v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

Defendants.

Index No. 158207/2022

STIPULATION AND [PROPOSED]
ORDER

Motion #3

**IT IS HEREBY STIPULATED AND AGREED**, by and between Plaintiff

Emigrant Business Credit Corporation ("**EBCC**") and Defendants the "**Ebury Parties**,"[1]

that:

---

[1] Defendants Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, Ebury RE LLC (together, the "**Ebury Entities**") and John Hanratty (with the Ebury Entities, the "**Ebury Parties**").

1

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 396 of 2230

1.      The return date of EBCC's Motion to Dismiss (Dkt. 71) previously was August

25, 2023.

2.      Plaintiff has consented to the Ebury Parties' request to adjourn the Motion

Return date to September 1, 2023.[2]

3.      All deadlines corresponding to the Motion Return date and other

corresponding deadlines are adjourned by one week.


Dated: August 16, 2022
        New York, New York

**SULLIVAN & CROMWELL LLP**                    **GUSRAE KAPLAN NUSBAUM
                                                PLLC**

/s/ Alexander J. Willscher                      /s/ Victor Wang
Alexander J. Willscher                          Kari Parks
Austin P. Mayron                                Victor Wang
125 Broad Street                                120 Wall Street, 25th Floor
New York, New York 10004                        New York, New York 10005
(212) 558-4000                                  (212) 269-1400
willschera@sullcrom.com                         kparks@gusraekaplan.com
mayrona@sullcrom.com                            vwang@gusraekaplan.com

*Attorneys for Plaintiff Emigrant*              *Attorneys for the Ebury Parties*
*Business Credit Corporation*


**SO ORDERED.**


_____
**Hon. Margaret A. Chan, J.S.C.**


_____

[2] EBCC consents to Defendants' request for a one-week extension as a professional courtesy, without prejudice
to its right to argue that Defendants' filing of the Counterclaim (Dkt. No. 69), was "undertaken primarily to
delay or prolong the resolution of the litigation." 22 NYCRR § 130-1.1(c)(2). EBCC will not point to this
one-week extension as grounds to make such an argument.

2

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 397 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**COMMERCIAL DIVISION**

EMIGRANT BUSINESS CREDIT CORPORATION,

        **Plaintiff–Counterclaim Defendant,**

        **v.**

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, and EBURY RE LLC,

        **Defendants–Counterclaim Plaintiffs,**

        **v.**

XYZ CORPS. 1-10,

        **Defendants.**

**Index No. 158207/2022**

**THE EBURY PARTIES'**
**<u>AMENDED COUNTERCLAIM</u>**

As and for their "Amended Counterclaim" against Emigrant Business Credit Corporation ("EBCC" or the "Bank"), Defendants–Counterclaim Plaintiffs John Arthur Hanratty, Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2 EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, Eb 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury Fund 2 FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and Ebury RE, LLC (together, the "Ebury Parties") respectfully allege:

1.    The Ebury Parties' primary business is investing in tax lien certificates, which give their owners the ability to collect overdue property taxes and, if the taxes remain unpaid, foreclose on the underlying real estate.

**The Covid-19 Pandemic Rendered Tax Lien Certificates Illiquid**

2.    Investing in tax lien certificates requires expertise, connections, and capital.

3.    There is no central, unified market for tax lien certificates.

4.    Instead, investors purchase them either from the initial taxing entity, e.g. a municipality or county, or from other tax lien investors.

5.    The taxing entity typically sells the certificates at public auctions, while tax lien investors generally are only able to sell the certificates to others who work in the tax lien industry.

2

6.      Accordingly, investing in tax lien certificates requires not just capital, but also expertise.

7.      However, under normal market conditions. tax lien certificates can be an attractive investment.

8.      Tax lien certificates typically throw off predictable, steady cash flow.

9.      Historically, property owners usually quickly get back on track with their tax payments: whatever relatively small amount of unpaid taxes pales in comparison to the value of their homes or other real estate.

10.     And when property owners fail to repay their taxes, the certificate holder can foreclose on the property, which usually is worth many times the certificate's face value.

11.     While foreclosure tends to be more profitable than merely collecting overdue property taxes, foreclosure also is a slower and more expensive process.

12.     For example, in foreclosure, the certificate owner—here, the Ebury Parties—must rehabilitate the property, retain realtors, and take care of all of the other headaches associated with selling real estate.

13.     Regardless of whether a tax lien investor derives its primary revenue from collecting taxes or foreclosing on real property, tax lien investing typically requires cash investment.

14.     Accordingly, over the past decade—particularly when interest rates were lower than they are today—tax lien investors often obtained revolving credit lines to finance the investments.

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 400 of 2230

15.     However, the Covid-19 pandemic temporarily froze the tax lien investment business.

16.     During the pandemic, federal, state, and local authorities imposed numerous restrictions that neutered tax lien certificate holders' ability to persuade property owners to become current on their taxes.

17.     For example, many governments imposed foreclosure freezes.

18.     Foreclosures have "spiked" and "surged" since foreclosure freezes began thawing in 2022.

19.     Similarly, throughout 2020 and 2021, municipalities across the country shuttered their doors.

20.     Many of those municipalities required tax lien certificates and their attendant paperwork to be done only with wet signatures, notaries, and in hard copy.

21.     Accordingly, the municipalities' closures halted the tax lien business.

22.     Similarly, local housing courts across the country paused operations for months, and even over a year.

23.     Therefore,, tax lien certificate holders like the Ebury Parties could no longer seek judicial intervention to enforce collections or foreclosures.

24.     In short, numerous Covid-19 policies functionally froze the tax lien certificate market, temporarily destroying the liquidity of tax lien investments.

25.     The Ebury Parties' relationship with EBCC suffered accordingly.

4

**Desperate to Break In to the Tax Lien Business, EBCC Convinced The Ebury Parties to Abandon Their Other Lending Relationships**

26.    in the mid-2010s, EBCC was eager to work in the tax lien industry.

27.    In 2016, a board member of EBCC's parent entity introduced EBCC to the Ebury Parties.

28.    At the time, the Ebury Parties had a $45 million revolving credit facility with "Capital One," N.A.

29.    A revolving credit facility operates essentially as a corporate credit card.

30.    For example, pursuant to the $45 million revolving credit facility, the Ebury Parties could borrow up to $45 million from Capital One at a time, but needed to pay down that revolving credit facility's balance in order to borrow again.

31.    In 2016 and 2017, EBCC wooed the Ebury Parties to open credit lines with EBCC and, eventually, abandon their relationships with Capital One entirely.

**Despite Covid-19's Impacts on Tax Lien Liquidity, EBCC Continued to Claim that the Ebury Parties were "Stellar" Clients**

32.      Between 2017 and 2020, EBCC advanced the Ebury Parties approximately $35 million in connection with the Credit Facilities.

33.      However, the Credit Facilities' maximum balance was never allowed to be more than approximately $15 million.

34.      Accordingly, the Ebury Parties only were able to borrow $35 million over the years because they continually, timely paid down their balances.

35.      For example, in the four months of 2017 that the Credit Facilities were available, the Ebury Parties paid EBCC approximately $3.7 million in principal and $220,000 in interest.

36.      In 2018, meanwhile, the Ebury Parties paid EBCC approximately $6.4 million.

37.      But in 2020, the Ebury Parties paid EBCC only approximately $1.8 million.

38.      The pandemic had essentially frozen the Ebury Parties' business and investments.

39.      In response to Covid-19, state and federal governments closed municipal and county offices, paused judicial proceedings, and froze foreclosure and eviction proceedings.

40.      But the Ebury Parties' business is heavily invested in distressed real estate and therefore is at the mercy of foreclosures, evictions, and smooth, efficient state and local governments and court systems.

6

41.     Overnight, the Ebury Parties lost their primary tools for collecting revenue from their investments.

42.     In spring 2021—when the Credit Facilities originally were to mature—the Ebury Parties' businesses still were suffering from the pandemic's closures and slowdowns.

43.     EBCC understood that the pandemic had frozen the Ebury Parties' investments—yet believed, and continued to report, that the Ebury Parties' fundamental business model was strong and that their liquidity problem did not cast any doubt on the Ebury Parties' value, assets, or eventual repayment ability.

44.     In May 2021, recognizing Covid-19's continuing impact on the Ebury Parties, EBCC agreed to extend the Credit Facilities' maturity date by three months.

45.     In exchange, EBCC extracted the Ebury Parties' agreement to raise the Credit Facilities interest rate by 200 basis points; discontinue further draws under the revolving Credit Facilities; and contribute two new tax lien portfolios to the Ebury Party that had contracted with EBCC.

46.     After, as EBCC characterized it, "administrative-related delays in closing" the new tax lien portfolios' purchases,  EBCC agreed to another three-month extension of the Credit Facilities, setting their new maturity date as November 10, 2021.

47.     EBCC again did not make those concessions out of pure benevolence.

48.     Instead, the Bank further increased the Credit Facilities' pricing by another 200 basis points, to L+825.

FILED: NEW YORK COUNTY CLERK 08/25/2023 09:36 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 79    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 08/25/2023

Court Records    Pg 404 of 2230

49.     Even then, EBCC continued to tell its supervisors, credit team, and parent company leadership that the Ebury Parties were "stellar" clients.

50.     As late as August 2021, EBCC's bankers reported that "[f]rom 2017 [through] 2019, Ebury exhibited stellar operating performance" that was "equivalent to 40% of annual amortization on EBC[C]'s loan."

51.     In doing so, EBCC also recognized that "[t]he pandemic has negatively impacted Ebury's results from a timing perspective, as government-mandated moratoriums took the pressure off of mortgage lenders and individual homeowners to settle tax liens."

52.     But at the same time, EBCC observed that "the slowdown in Ebury's core tax lien business in 2020 and early 2021 was offset by outperformance in its REO business" and that "the underlying 'credit' of the tax liens will actually improve once the foreclosure moratoriums are lifted as these liens will continue to accrue interest (as high as 18%) and ultimate provide higher cash flows to the [Ebury Parties] and EBC[C]."

53.     Yet in November 2021, EBCC decided to call the Credit Facilities instead of again extending their maturity dates.

54.     Soon thereafter, EBCC suspended—and eventually fired—the Ebury Parties' primary banker, who managed EBCC's relationship with the Ebury Parties.

8

**EBCC Dragged out the Workout Process Only to Abandon Ship and Charge The
Ebury Parties Millions More in Default Interest**

55.     From November 2021 through September 2022, EBCC and the Ebury
Parties worked together to resolve the Credit Facilities.

56.     For example, even before the Credit Facilities matured in November 2021,
EBCC and Mr. Hanratty had contacted multiple third-party lenders to gauge their
interest in purchasing the debt.

57.     EBCC and the Ebury Parties also routinely discussed and negotiated
potential payment plans that would fully discharge the Ebury Parties' debts.

58.     Besides offering concrete solutions, the Ebury Parties also freely shared all
their material financial, legal, and other relevant information with EBCC.

59.     By December 2021, the Ebury Parties had sent their lien servicing
software's access credentials to EBCC, including for the Ebury Parties' and Speedboat
accounts.

60.     By March 2022, the Ebury Parties had sent their Quickbooks accounting
software access credentials to EBCC, so that EBCC could independently review and
verify the Ebury Parties' financial records.

61.     The Ebury Parties even coordinated with the software providers to
provide usage tutorials to EBCC's personnel.

62.     The Ebury Parties also participated in multiple conference calls per week
with numerous EBCC personnel to attempt to work out the debts.

9

63.    At EBCC's request, the Ebury Parties directly connected the Bank with those third parties on multiple occasions, so that the Bank and the third parties could independently discuss and negotiate the sale of the Ebury Parties' debts.

64.    However, EBCC continually dropped the ball on those negotiations, from stringing third-party investors along to failing to respond to them at all.

65.    On June 17, 2022, the Ebury Parties sent EBCC a specific repayment plan that contemplated that (1) EBCC would accept $18 million as full repayment of the Credit Lines; (2) the Ebury Parties would pay EBCC no less than $350,000 per month; (3) EBCC would allow the Ebury Parties to maintain $400,000 of operating capital at all times; (4) the Ebury Parties would pay EBCC 100% of all monthly cash that exceeded $750,000; and (5) EBCC's continued ability to review and oversee the Ebury Parties' day-to-day financials.

66.    EBCC did not respond to that proposal in June 2022.

67.    EBCC did not respond to that proposal in July 2022, either.

68.    Finally, on August 10, 2022, EBCC countered to the Ebury Parties' "proposal made via email on June 17, 2022," attaching a document that EBCC characterized as "a term sheet setting forth the terms of an amendment through which the existing obligations owed to EBC[C] can be repaid" and requesting that the Ebury Parties' lawyer call "as soon as possible to discuss."

69.    Over the next month, EBCC and the Ebury Parties' respective counsel hammered out the settlement details.

FILED: NEW YORK COUNTY CLERK 08/25/2023 09:36 PM

INDEX NO. 158207/2022

NYSCEF DOC. NO. 79

RECEIVED NYSCEF: 08/25/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

Court Records    Pg 407 of 2230

70.     After several rounds of conversations and negotiations, EBCC sent the Ebury Parties the final "Settlement Term Sheet," dated September 14, 2022.

71.     That Settlement Term Sheet memorialized all of the material terms on which EBCC and the Ebury Parties agreed to resolve the outstanding Credit Facilities.

72.     Just one day after transmitting the Settlement Term Sheet, EBCC's outside counsel emphasized that the bank "need this executed by the end of business today."

73.     EBCC's outside counsel also emphasized that the Bank "needed" the Ebury Parties to execute the Settlement Term Sheet on September 15, 2022 so that the Parties could close the Settlement by Friday, September 23, 2022.

74.     Relying on the Parties' lengthy negotiations, EBCC's demand that the Ebury Parties execute the Settlement Term Sheet "today," and EBCC's promise that executing "today" would mean the Settlement closed by the following Friday, the Ebury Parties executed and returned the Settlement Term Sheet to EBCC on September 15, 2022.

75.     But EBCC went dark after the Ebury Parties returned the executed Settlement Term Sheet.

11

## EBCC Had No Good-Faith Reason to Abandon the Settlement

76.     On Sunday, September 25, 2022—without warning to the Ebury Parties, and even without warning to the EBCC outside counsel who had negotiated the Settlement Term Sheet—EBCC initiated this Action, suing the Ebury Parties for the very same alleged conduct that the Parties had purportedly attempted to resolve via the Settlement Term Sheet.

77.     The only post-default "misconduct" alleged in EBCC's Complaint was copy-pasted hearsay from a counterclaim filed against certain Ebury Parties by a disgruntled business partner, Thomas R. McOsker, in a Delaware federal litigation (the "McOsker Allegations").

78.     In discovery, EBCC's witnesses confirmed that the McOsker Allegations were the only new "facts" that caused EBCC to abandon the settlement and sue the Ebury Parties.

79.     However, EBCC knew or should have known that the McOsker Allegations were baseless.

80.     The Ebury Parties had introduced Mr. McOsker to EBCC years prior, in connection with a transaction that the Ebury Parties abandoned once it became clear that Mr. McOsker was cheating them.

81.     In June 2019, the Ebury Parties moved out of the Puerto Rico office they shared with Mr. McOsker and his controlled companies (the "McOsker Entities").

82.     The very next business day, the Ebury Parties sued the McOsker Entities in the federal district court for the District of Puerto Rico.

12

FILED: NEW YORK COUNTY CLERK 08/25/2023 09:36 PM
NYSCEF DOC. NO.: 79
INDEX NO. 158207/2022
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 409 of 2230
RECEIVED NYSCEF: 08/25/2023

83.     Because the McOsker Entities argued that the Puerto Rico federal court could not exercise diversity jurisdiction, the Ebury Parties voluntarily dismissed that federal litigation and refiled their claims in Puerto Rico's local court.

84.     That litigation still is proceeding in Puerto Rico.

85.     As early as summer 2019, the Ebury Parties told EBCC what had happened with Mr. McOsker and shared all material litigation information with EBCC.

86.     In the Puerto Rico litigation, Delaware-incorporated McOsker Entities argued that their part of the dispute belonged in Delaware court.

87.     Accordingly, the Ebury Parties dismissed those McOsker Entities and claims from the Puerto Rico litigation, and in February 2021, filed a new litigation against those entities and related principals in the federal district court for the District of Delaware (the "Delaware Litigation").

88.     In the Delaware Litigation, the relevant Ebury Parties allege that the McOsker Parties violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, specifically by stealing tax lien certificates from numerous investment funds, including the Ebury Parties, and claiming no less than $3.5 million in damages.

89.     Again, EBCC was well aware of that Delaware Litigation from its inception.

90.     Indeed, EBCC repeatedly referenced the $3+ million that the Ebury Parties expected to someday recover in the Delaware Litigation.

91.     The McOsker Parties tried, and failed, to get the Delaware Litigation dismissed.

13

92.     After 18 months of stalling and motion practice, the McOsker Parties finally filed their Answer and Counterclaim in September 2022.

93.     That initial Counterclaim copy-pasted the Ebury Parties' legal allegations verbatim in an attempt to build reciprocal RICO claims against the Ebury Parties.

94.     Those hall-of-mirrors McOsker Allegations are the very same ones on which EBCC supposedly relied to abandon its settlement negotiations and sue the Ebury Parties.

95.     In response to the Ebury Parties' pleadings dismissal motion, the McOsker Parties filed amended claims that attempted to preserve their claims.

96.     Because those amended pleadings failed to cure the original deficiencies, the Ebury Parties moved to dismiss the amended pleadings in February 2023.

97.     Magistrate Judge Jennifer L. Hall held oral argument on that motion on August 18, 2023, and has not yet ruled on the motion.

98.     Regardless, from at least 2019 through 2023, EBCC knew that Mr. McOsker was untrustworthy and had victimized the Ebury Parties.

99.     Ebury entities are the plaintiffs in all litigations against Mr. McOsker.

100.    Ebury entities initiated all three of the litigations against Mr. MCOsker and his entities.

101.    The Ebury Parties consistently made EBCC contemporaneously aware of the McOsker litigations.

14

FILED: NEW YORK COUNTY CLERK 08/25/2023 09:36 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 79    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 08/25/2023

Court Records    Pg 411 of 2230

102.    In September 2022, EBCC was well aware that Ebury Parties were continuing to pursue Mr. McOsker and his entities in two separate litigations, including for $3.5 million of tax lien certificates that are EBCC's collateral.

103.    In September 2022, EBCC also was well aware that Mr. McOsker and his entities had yet again failed to win a dismissal motion, and would soon be required to answer the Ebury Parties' claims.

104.    EBCC was unbothered by that ongoing litigation: it adopted and papered up the Ebury Parties' June 2022 proposal in early September 2022, sent the Settlement Term on September 14, 2022, and demanded that the Ebury Parties execute the contract no later than September 15, 2022.

105.    EBCC induced the Ebury Parties' signature by claiming that the Parties would close the Settlement by September 23, 2022.

106.    But after ten months of putting the Ebury Parties through every possible test—from sharing software access to toying with third-party investors to blowing off refinancing arrangements to purporting to negotiate repayment plans to demanding next-day execution of the Settlement Term Sheet—EBCC disappeared, only to sue the Ebury Parties on the Sunday after the Settlement was supposed to have closed.

107.    By waiting to sue the Ebury Parties until nearly a year after the default, EBCC claimed that the Ebury Parties owed millions more in interest than at the time of default, and even more than contemplated in the parties' negotiated settlement.

15

108.    Moreover, by dragging out the workout process for over ten months, EBCC forced the Ebury Parties to spend hundreds of thousands of dollars on legal and other professional services fees.

109.    Consequently, the Ebury Parties counterclaim against EBCC.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract

110.    The Ebury Parties incorporate their foregoing allegations.

111.    The Settlement Term Sheet memorialized a contract to settle the outstanding Credit Facilities.

112.    Relying on EBCC's promises that the Settlement would close by September 23, 2022, the Ebury Parties executed and returned the Settlement Term Sheet to EBCC on September 15, 2022.

113.    Instead of continuing to negotiate and close the Settlement in good faith, EBCC sued the Ebury Parties.

114.    In doing so, EBCC breached the Settlement Term Sheet and damaged the Ebury Parties in an amount to be determined during discovery and proven at trial, currently estimated to be no less than $500,000 in out-of-pocket expenses.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

115.    The Ebury Parties incorporate their foregoing allegations.

116.    EBCC had the duty to negotiate the Settlement in good faith.

117.    Instead of continuing to negotiate and close the Settlement in good faith, EBCC sued the Ebury Parties.

118.    In doing so, EBCC breached the implied covenant of good faith and fair dealing and damaged the Ebury Parties in an amount to be determined during discovery and proven at trial, currently estimated to total no less than $500,000 in out-of-pocket expenses.

119.    EBCC had a duty to truthfully communicate with the Ebury Parties in good faith.

120.    In negligently misrepresenting its intentions to refinance, renegotiate, and / or settle the outstanding Credit Facilities, EBCC has damaged the Ebury Parties in an amount to be revealed during discovery and proven at trial.

## COUNT III
### Promissory Estoppel

121.    The Ebury Parties incorporate their foregoing allegations.

122.    Via the Settlement Term Sheet and other communications, EBCC promised that it would work in good faith to resolve the outstanding Credit Facilities with the Ebury Parties.

123.    EBCC should have expected and did expect that the Ebury Parties reasonably relied on its promises and representations that it was truly interested in resolving the Ebury Parties' debts.

124.    The Ebury Parties relied on EBCC's promises to their detriment by, <u>inter alia</u>, wasting ten months attempting to negotiate a resolution with EBCC.

125.    The Ebury Parties spent hundreds of thousands of dollars trying to find and close a resolution that EBCC would accept.

126.    In the meantime, the Credit Facilities accumulated thousands of dollars of interest per day.

127.    The doctrine of promissory estoppel entitles the Ebury Parties to damages in an amount to be revealed during discovery and proven at trial.

18

## RELIEF REQUESTED

On the foregoing allegations, the Ebury Parties request relief and judgment,

including:

(a) Monetary relief in an amount to be determined at trial;
(b) Costs and expenses incurred in this action, including attorneys' fees;
(c) Pre- and post-judgment interest; and
(d) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Ebury Parties demand a jury trial.

Dated: August 25, 2023
      New York, New York

GUSRAE KAPLAN NUSBAUM PLLC

/s/ Kari Parks
Kari Parks
Victor Wang
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com
vwang@gusraekaplan.com

Attorneys for The Ebury Parties

19

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION,<br><br>              Plaintiff,<br><br>      v.<br><br>JOHN ARTHUR HANRATTY,<br>EBURY STREET CAPITAL, LLC,<br>EBURY FUND 1, LP,<br>EBURY FUND 2, LP,<br>EBURY 1EMI LLC,<br>EBURY 2EMI LLC,<br>EB 1EMIALA LLC,<br>EB 2EMIALA LLC,<br>EB 1EMIFL, LLC,<br>EB 2EMIFL, LLC,<br>EB 1EMIIN, LLC,<br>EB 2EMIIN, LLC,<br>EB 1EMIMD, LLC,<br>EB 2EMIMD, LLC,<br>EB 1EMINJ, LLC,<br>EB 2EMINJ, LLC,<br>EB 1EMINY, LLC,<br>EB 2EMINY, LLC,<br>EB 1EMISC, LLC,<br>EB 2EMISC, LLC,<br>RE 1EMI LLC,<br>RE 2EMI LLC,<br>EB 1EMIDC, LLC,<br>ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC,<br>EBURY FUND 1FL, LLC,<br>EBURY FUND 2FL, LLC,<br>EBURY FUND 1NJ, LLC,<br>EBURY FUND 2NJ, LLC,<br>RED CLOVER 1, LLC,<br>EBURY RE LLC, and<br>XYZ CORPS. 1-10,<br><br>             Defendants. | Index No. 158207/2022<br><br>(Hon. Margaret Chan)<br><br>**MOTION SEQUENCE NO. 004**<br><br>**NOTICE OF EBCC'S MOTION TO DISMISS DEFENDANTS' AMENDED COUNTERCLAIM** |

**PLEASE TAKE NOTICE** that, upon the annexed Memorandum of Law; the Affirmation of Alexander J. Willscher, dated August 29, 2023, and the exhibits annexed thereto; and all other papers and pleadings filed herein, Plaintiff Emigrant Business Credit Corporation will move this Court, located at 60 Centre Street, New York, New York 10007, on September 14, 2023, at 9:30 a.m. or as soon thereafter as counsel can be heard, for an order pursuant to CPLR 3211(a)(1) and/or (7) dismissing Defendants' Amended Counterclaim (Dkt. No. 79) and granting such other and further relief as the Court may deem just and proper.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR 2214(b), any answering papers or cross-motions are required to be served upon the undersigned at least seven days before the date set forth above for the submission of this motion.

Dated:   August 29, 2023                    Respectfully submitted,
         New York, New York

                                            */s/ Alexander J. Willscher*
                                            _____

                                            Alexander J. Willscher
                                            Austin P. Mayron
                                            SULLIVAN & CROMWELL LLP
                                            125 Broad Street
                                            New York, New York 10004
                                            Telephone: (212) 558-4000
                                            Fax: (212) 558-3588

                                            *Attorneys for Plaintiff Emigrant Business
                                            Credit Corporation*

-2-

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

———————————————————— x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                    Plaintiff,

        v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

                  Defendants.

———————————————————— x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 004**

**MEMORANDUM OF LAW IN
SUPPORT OF EBCC'S
MOTION TO DISMISS
DEFENDANTS' AMENDED
COUNTERCLAIM**

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO: 81
RECEIVED NYSCEF: 08/29/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 419 of 2230

# TABLE OF CONTENTS

*Page*

**INTRODUCTION** ................................................................................................ 1

**BACKGROUND** ................................................................................................. 2

**LEGAL STANDARDS** ...................................................................................... 5

**ARGUMENT** ...................................................................................................... 6

**I.**     **Defendants' breach of contract and implied covenant claims are defective** ............... 6

       A.     EBCC did not breach a contractual obligation by filing this lawsuit ..................... 6

       B.     EBCC did not breach the implied covenant of good faith and fair dealing by filing this lawsuit ................................................................................................ 8

**II.**     **Defendants' promissory estoppel claim fails as a matter of law** ................................ 10

       A.     Defendants do not identify a clear and unambiguous promise ............................ 11

       B.     Defendants also cannot establish detrimental reliance ......................................... 12

**III.**    **Defendants' Amended Counterclaim should be dismissed with prejudice** ............... 14

**CONCLUSION** ................................................................................................... 15

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.: 81
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 420 of 2230
RECEIVED NYSCEF: 08/29/2023

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*320 W. 115 Realty LLC* v. *All Bldg. Constr. Corp.*,
 194 A.D.3d 511 (1st Dep't 2021) ............................................................10

*4720 Third Ave. Hous. LLC* v. *CA Ventures LLC*,
 211 A.D.3d 417 (1st Dep't 2022) ..............................................................5

*Affordable Hous. Assocs., Inc.* v. *Town of Brookhaven*,
 49 Misc. 3d 570 (Sup. Ct. Suffolk Cnty. 2015) .........................................6

*AHA Sales, Inc.* v. *Creative Bath Prod., Inc.*,
 58 A.D.3d 6 (2d Dep't 2008) ...................................................................13

*Azimut-Benetti S.p.A.* v. *Magnum Marine Corp.*,
 55 A.D.3d 483 (1st Dep't 2008) ..............................................................11

*Bath & Twenty, LLC* v. *Fed. Sav. Bank*,
 198 A.D.3d 855 (2d Dep't 2021) ...............................................................5

*Brown* v. *Cerberus Cap. Mgmt., L.P.*,
 173 A.D.3d 513 (1st Dep't 2019) ...............................................................8

*Carvel Corp.* v. *Nicolini*,
 144 A.D.2d 611 (2d Dep't 1988) ..............................................................14

*Castellotti* v. *Free*,
 138 A.D.3d 198 (1st Dep't 2016) ..............................................................11

*Celauro* v. *4C Foods Corp.*,
 187 A.D.3d 836 (2d Dep't 2020) ................................................................9

*Cobble Hill Nursing Home, Inc.* v. *Henry & Warren Corp.*,
 74 N.Y.2d 475 (1989) ................................................................................8

*Core Dev. Grp.* v. *Spaho*,
 199 A.D.3d 447 (1st Dep't 2021) ...............................................................9

*Country-Wide Leasing Corp.* v. *Subaru of Am., Inc.*,
 133 A.D.2d 735 (2d Dep't 1987) ..............................................................14

*Delmaestro* v. *Marlin*,
 168 A.D.3d 813 (2d Dep't 2019) ..............................................................12

-ii-

*Fesseha* v. *TD Waterhouse Inv. Servs., Inc.*,
    305 A.D.2d 268 (1st Dep't 2003) .......................................................9

*Gary Powell, Inc.* v. *Mendel/Borg Grp.*,
    237 A.D.2d 407 (2d Dep't 1997) ........................................................13

*Hollinger Digital, Inc.* v. *Looksmart, Ltd.*,
    267 A.D.2d 77 (1st Dep't 1999) .........................................................7

*Izhaky* v. *Izhaky*,
    215 A.D.3d 588 (1st Dep't 2023) .......................................................14

*Jordan Panel Sys., Corp.* v. *Turner Constr. Co.*,
    45 A.D.3d 165 (1st Dep't 2007) .........................................................9

*NGR, LLC* v. *Gen. Elec. Co.*,
    24 A.D.3d 425 (2d Dep't 2005) .........................................................14

*Pentagon Fed. Credit Union* v. *Popovic*,
    217 A.D.3d 480 (1st Dep't 2023) .......................................................12

*Piroozian* v. *Homapour*,
    210 A.D.3d 709 (2d Dep't 2022) .........................................................5

*Prestige Foods, Inc.* v. *Whale Sec. Co.*,
    243 A.D.2d 281 (1st Dep't 1997) ........................................................7

*Prospect St. Ventures I, LLC* v. *Eclipsys Sols. Corp.*,
    23 A.D.3d 213 (1st Dep't 2005) .....................................................13, 14

*Pullman Grp.* v. *Prudential Ins. Co., of Am.*,
    288 A.D.2d 2 (1st Dep't 2001) ..........................................................9

*Remora Cap. S.A.* v. *Dukan*,
    175 A.D.3d 1219 (1st Dep't 2019) ......................................................10

*Richbell Info. Servs., Inc.* v. *Jupiter Partners*,
    309 A.D.2d 288 (1st Dep't 2003) .......................................................11

*Richter's Est.* v. *Novo Corp.*,
    43 A.D.2d 1 (1st Dep't 1973) ..........................................................14

*River Glen Assocs., Ltd.* v. *Merrill Lynch Credit Corp.*,
    295 A.D.2d 274 (1st Dep't 2002) .......................................................14

*Rowe* v. *Great Atl. & Pac. Tea Co.*,
    46 N.Y.2d 62 (1978) ...................................................................10

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 81
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 08/29/2023
Court Records    Pg 422 of 2230

*Schroeder* v. *Pinterest, Inc.*,
    133 A.D.3d 12 (1st Dep't 2015) ...............................................................13

*Schutty* v. *Speiser Krause P.C.*,
    86 A.D.3d 484 (1st Dep't 2011) ................................................................12

*Schwartz* v. *Miltz*,
    77 A.D.3d 723 (2d Dep't 2010) ................................................................13

*Shah* v. *Mitra*,
    171 A.D.3d 971 (2d Dep't 2019) ................................................................5

*Simkin* v. *Blank*,
    19 N.Y.3d 46 (2012) ...................................................................................5

*Singh* v. *City of New York*,
    2023 WL 3098734 (N.Y. Apr. 27, 2023)...................................................10

*Stacey O.* v. *Donald P.*,
    137 A.D.2d 965 (3d Dep't 1988) ..............................................................14

*Steele* v. *Delverde S.R.L.*,
    242 A.D.2d 414 (1st Dep't 1997) ..............................................................12

*StoreRunner Network, Inc.* v. *CBS Corp.*,
    8 A.D.3d 127 (1st Dep't 2004) ..................................................................11

*Stratigos* v. *Brio Bar Corp.*,
    2020 WL 2557884 (Sup. Ct. N.Y. Cnty. Apr. 2, 2020) ............................5

*Sylmark Holdings Ltd.* v. *Silicone Zone Int'l Ltd.*,
    5 Misc. 3d 285 (Sup. Ct. N.Y. Cnty. 2004) ...........................................6, 8

*Thome* v. *Alexander & Louisa Calder Found.*,
    70 A.D.3d 88 (1st Dep't 2009) ..................................................................12

*Trib. Printing Co.* v. *263 Ninth Ave. Realty, Inc.*,
    88 A.D.2d 877 (1st Dep't 1982) ................................................................11

**STATUTES AND RULES**

22 NYCRR § 130-1.1 .........................................................................................15

CPLR 3211(a)(1) ..........................................................................................5, 11

CPLR 3211(a)(7) ..........................................................................................5, 11

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 423 of 2230

Plaintiff Emigrant Business Credit Corporation ("**EBCC**") respectfully submits this memorandum of law in support of its motion to dismiss Defendants' Amended Counterclaim. (Dkt. No. 79 ("**Am. Countercl.**").)

## INTRODUCTION

After Defendants defaulted on their obligation to repay EBCC over $18 million in outstanding principal and interest under two Credit Facilities, EBCC spent almost a year trying to negotiate a voluntary settlement.  During those negotiations, EBCC discovered that Defendants had misappropriated advances under the Credit Facilities, as well as EBCC's collateral, to pay tens of millions of dollars of distributions to company insiders—including Defendant John Hanratty ("**Hanratty**")—and other investors.  EBCC also discovered that Defendants regularly falsified borrowing base certificates and other documents that they submitted to EBCC as the basis for receiving advances under the Credit Facilities.  Moreover, EBCC discovered that Hanratty had openly bragged to a former business partner about defrauding EBCC.

After discovering Defendants' fraud, EBCC ceased settlement negotiations and filed this lawsuit.  Defendants now assert that EBCC's decision to end negotiations and file this lawsuit was improper and grounds for Defendants to assert three counterclaims:  (i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; and (iii) promissory estoppel.  (Am. Countercl. ¶¶ 110-127.)  Defendants seek damages exceeding $1 million, "in an amount to be determined during discovery and proven at trial."  (*Id.*)

The basis for Defendants' Amended Counterclaim is a non-binding term sheet— signed by Defendants, but never executed by EBCC—that set out terms and conditions for a potential amendment to the agreements governing the Credit Facilities.  According to Defendants, the term sheet was "a contract to settle the . . . Credit Facilities" that EBCC allegedly breached by suing Defendants after EBCC discovered Defendants' fraud.  (Am. Countercl. ¶ 111.)  Despite

referencing the term sheet fourteen times in their Amended Counterclaim, Defendants **never once** mention that the term sheet explicitly provides that it was non-binding and "for discussion purposes only." Nor do they mention that, by signing the term sheet, they agreed and acknowledged *twice* that the term sheet does not impose any binding contractual obligations on EBCC. Defendants also do not explicitly mention that EBCC never executed the term sheet. Defendants' counterclaims—all of which assert that EBCC somehow agreed to settle the Credit Facilities and not bring any lawsuits, even if it discovered that Defendants had committed fraud— are entirely meritless. Accordingly, EBCC respectfully requests the Court dismiss all three counts of Defendants' Amended Counterclaim.

### BACKGROUND[1]

Between 2017 and 2021, EBCC lent Defendants tens of millions of dollars to finance their purchases of tax liens. (Am. Countercl. ¶¶ 1, 32.) Any tax liens that Defendants purchased using the Credit Facilities, as well as any proceeds, were EBCC's collateral and Defendants were not allowed to transfer any of the collateral, with limited exceptions. (Dkt. No. 6 at 6, 17-18; Dkt. No. 69 ("**Answer**") ¶ 36 (referring to the contents of the Credit Agreements).) After the Credit Facilities came due in March 2021, EBCC agreed to three maturity date extensions, to provide more time for Defendants to repay their obligations. (Dkt. No. 6 at 65, 71, 86; Answer ¶ 36.) But, at final maturity in November 2021, Defendants failed to repay EBCC over $18 million in outstanding principal and interest, and EBCC issued notices of default. (Answer ¶ 2; Dkt. No. 12 at 3, 5.) Defendants still have not repaid the amounts outstanding under the Credit Facilities and now owe EBCC more than $24 million. (Answer ¶ 2.)

---

[1]     For the purposes of this motion only, EBCC accepts the non-conclusory allegations in the counterclaim as true.

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 81
RECEIVED NYSCEF: 08/29/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 425 of 2230

Throughout the parties' multi-year relationship, Hanratty repeatedly represented to EBCC that EBCC was "overcollateralized"—meaning that EBCC's loans were secured by collateral worth more than the outstanding loan amounts. (Answer ¶ 2.) With that understanding, the parties tried to "work[] together" after the defaults—from November 2021 through September 2022—"to resolve the Credit Facilities." (Am. Countercl. ¶ 55.) Ultimately, however, EBCC discovered that Hanratty had defrauded EBCC, and had even bragged about doing so to a former business partner. (Id. ¶ 77; Dkt. No. 14 at 75.) After learning that information, EBCC filed this action, asserting claims for breach of contract, fraudulent inducement, and fraudulent transfer. (Am. Countercl. ¶ 76; Dkt. No. 1.)

Defendants' Amended Counterclaim focuses on settlement negotiations that took place in August and September 2022, more than eight months after Defendants defaulted under the Credit Facilities, and almost eighteen months after the original maturity date. (Am. Countercl. ¶ 69.) According to Defendants, EBCC sent them a "settlement term sheet" in August 2022 that "memorialized all of the material terms on which EBCC and the Ebury Parties agreed to resolve the outstanding Credit Facilities." (Id. ¶¶ 68-71.) "After several rounds of conversations and negotiations," on September 14, 2022, EBCC sent Defendants the "final" draft of the term sheet. (Id. ¶ 70.) And, while Defendants executed and returned the term sheet the next day, EBCC "went dark" and did not countersign and return the document. (Id. ¶¶ 74-75.) Instead, EBCC filed this action one week later. (Id. ¶ 76.)

Although Defendants did not provide the Court with a copy of the term sheet, they assert that it "memorialized all of the material terms on which [the parties] agreed to resolve the outstanding Facilities." (Id. ¶¶ 71, 111.) In Defendants' telling, those terms include that "the Settlement would close by September 23, 2022" and that EBCC would "continu[e] to negotiate

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
NYSCEF DOC. NO. 81

INDEX NO. 158207/2022

RECEIVED NYSCEF: 08/29/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 426 of 2230

and close the Settlement in good faith." (*Id.* ¶¶ 112-113.)  Defendants also allege that EBCC made representations "that it would work in good faith to accept reasonable workout and / or refinancing terms" and "that it was truly interested in resolving the Ebury Parties' debt," but provide no specifics—such as who made the representations, to whom, when, how, or the exact language used.  (*Id.* ¶¶ 122-123.)

EBCC provided a copy of the term sheet for the Court's review in connection with its prior motion to dismiss.  (Dkt. No. 74 ("**Term Sheet**").)  By its own terms, the document is a non-binding "summary of the principal terms and conditions under which Lender ***may*** agree to address Existing Events of Default, including an amendment to the Loan Documents."[2]  (*Id.* at 1 (emphasis added); *see id.* at 7 ("This Term Sheet represents only a summary of the proposed Amendment.").)  By signing the term sheet, Defendants acknowledged and agreed:

> that the proposed terms and conditions set forth herein are provided for discussion purposes only and do not constitute an offer, agreement, or commitment to lend and are subject to satisfactory completion of due diligence, credit approval, satisfactory review and execution of documentation, and such other terms and conditions as may be determined by Lender and its counsel.

(*Id.* at 1.)  Defendants also acknowledged and agreed "that this Term Sheet is for discussion purposes only and creates no binding obligations on the part of the Lender."  (*Id.* at 8.)

The term sheet included ten conditions precedent to taking effect, including "execution of . . . the Term Sheet by no later than 5:00 p.m. EST on September 14, 2022" and delivery of "all of the Tax Lien Certificates and other Tax Lien Documents to the Custodian and

---

[2]    Under the amendment contemplated by the term sheet, Defendants would have agreed to pay EBCC "no less than $3,000,000" by December 31, 2022, and then make quarterly payments of "no less than $1,500,000."  (Term Sheet at 3; Am. Countercl. ¶ 65.)  Had the parties entered into such an amendment, Defendants would have been obligated to pay EBCC $6,000,000 by June 30, 2023.  To date, Defendants have managed to escrow only $65,000.

the Servicer"—neither of which occurred. (*Id.* at 6-7.)  The term sheet also states that it was a termination event if the "Borrower and/or any of the Guarantors shall make any omissions or misrepresentations to the Lender at any time." (*Id.* at 6.)  EBCC did not countersign and return the term sheet. (*See* Am. Countercl. ¶¶ 74-75.)

## LEGAL STANDARDS

EBCC moves for dismissal of Defendants' Amended Counterclaim under CPLR 3211(a)(1) and (7).  Under CPLR 3211(a)(1), the Court may dismiss a claim with prejudice where it is "utterly refute[d]" by documentary evidence.  *See, e.g.*, *Stratigos* v. *Brio Bar Corp.*, 2020 WL 2557884, at *3 (Sup. Ct. N.Y. Cnty. Apr. 2, 2020).  "Judicial records, as well as documents reflecting out-of-court transactions such as mortgages, deeds, contracts, and any other papers, the contents of which are essentially undeniable" may qualify as documentary evidence. *Bath & Twenty, LLC* v. *Fed. Sav. Bank*, 198 A.D.3d 855 (2d Dep't 2021).  Term sheets also may qualify as documentary evidence.  *See, e.g.*, *Piroozian* v. *Homapour*, 210 A.D.3d 709, 712 (2d Dep't 2022); *4720 Third Ave. Hous. LLC* v. *CA Ventures LLC*, 211 A.D.3d 417, 418 (1st Dep't 2022).

Under CPLR 3211(a)(7), dismissal of a counterclaim "is warranted if the counterclaimant fails to assert facts in support of an element of the [counterclaim], or if the factual allegations and inferences to be drawn from them do not allow for an enforceable right of recovery." *Shah* v. *Mitra*, 171 A.D.3d 971, 973 (2d Dep't 2019) (alterations adopted and citation omitted).  Although a counterclaim "is to be given a liberal construction, the allegations contained within it are assumed to be true[,] and the [counterclaimant] is to be afforded every possible inference, . . . 'allegations consisting of bare legal conclusions as well as factual claims flatly contradicted by documentary evidence are not entitled to any such consideration.'" *Simkin* v. *Blank*, 19 N.Y.3d 46, 52 (2012) (citation omitted).

-5-

## ARGUMENT

**I.**    **Defendants' breach of contract and implied covenant claims are defective.**

"To establish a breach of contract claim," Defendants must allege "the specific terms of the agreement, the consideration, [Defendants'] performance, and [EBCC's] breach." *Sylmark Holdings Ltd.* v. *Silicone Zone Int'l Ltd.*, 5 Misc. 3d 285, 295 (Sup. Ct. N.Y. Cnty. 2004). For an implied covenant claim, Defendants "must allege facts which tend to show that [EBCC] sought to prevent performance of the contract or to withhold its benefits from [Defendants]." *Affordable Hous. Assocs., Inc.* v. *Town of Brookhaven*, 49 Misc. 3d 570, 574 (Sup. Ct. Suffolk Cnty. 2015). Defendants fail to allege either breach of contract or breach of the implied covenant of good faith and fair dealing, because they fail to establish the existence or breach of a contract or that EBCC violated the implied covenant of good faith and fair dealing.

**A.**    **EBCC did not breach a contractual obligation by filing this lawsuit.**

Defendants' breach of contract claim is based entirely on a non-binding term sheet that EBCC never executed. (*Compare* Am. Countercl. ¶ 111 ("The Settlement Term Sheet memorialized a contract to settle the outstanding Credit Facilities."), *with id.* ¶ 75 (admitting that EBCC "went dark" and never returned a countersigned term sheet).) Defendants did not provide the Court with a copy of the term sheet, likely because it unambiguously refutes their breach of contract claim. The term sheet provides:

> The Parties acknowledge and agree that the proposed terms and conditions set forth herein are provided ***for discussion purposes only*** and ***do not constitute an offer, agreement or commitment to lend*** and are subject to satisfactory completion of due diligence, credit approval, satisfactory review and execution of documentation, and such other terms and conditions as may be determined by Lender and its counsel.

-6-

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
NYSCEF DOC. NO. 81

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 429 of 2230

INDEX NO. 158207/2022
RECEIVED NYSCEF: 08/29/2023

(Term Sheet at 1 (emphasis added).) The term sheet lists ten conditions precedent to the execution of any new agreement by the parties, most of which never occurred.[3] (*Id.* at 6-7.) The term sheet concludes by re-affirming that "[t]his Term Sheet represents only a summary" of a proposed new agreement and that Defendants "each hereby acknowledge[] that this Term Sheet is ***for discussion purposes only*** and ***creates no binding obligations*** on the part of [EBCC]." (*Id.* at 8 (emphasis added).) The term sheet also includes an empty EBCC signature block, as it required the signature of an authorized representative of EBCC, but the document was never countersigned and returned. (*Id.* at 8.) Defendants' breach of contract claim—premised on this non-binding term sheet, that EBCC never executed, and that contains an explicit acknowledgment by Defendants that it does not impose any binding obligations on EBCC—is "flatly contradicted" by the documentary evidence and should be dismissed. *Hollinger Digital, Inc.* v. *Looksmart, Ltd.*, 267 A.D.2d 77, 77 (1st Dep't 1999) ("Plaintiff's causes of action for breach of contract, promissory estoppel and equitable estoppel were all properly dismissed as 'flatly contradicted' by the letter agreement between the parties, which expressly stated their intention not to be bound until a stock purchase agreement was executed and all requisite consents were delivered."); *Prestige Foods, Inc.* v. *Whale Sec. Co.*, 243 A.D.2d 281, 281-82 (1st Dep't 1997) ("Plaintiffs' causes of action for breach of contract, breach of the implied duty of good faith and fair dealing, and promissory estoppel were all properly dismissed as 'flatly contradicted' by the letter agreements in issue, which expressly stated that neither party had any legal obligations to the other until both had executed and delivered an underwriting agreement.").

---

[3]      The first condition precedent was "[t]he Parties['] execution of . . . the Term Sheet by no later than 5:00 p.m. EST on September 14, 2022" (Term Sheet at 6), which Defendants admit they failed to satisfy (Am. Countercl. ¶ 74).

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
NYSCEF DOC. NO.: 81

INDEX NO. 158207/2022

RECEIVED NYSCEF: 08/29/2023

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records     Pg 430 of 2230

Even if the term sheet imposed contractual obligations on EBCC—and it does not—Defendants' claim for breach still must fail. Defendants allege that "EBCC breached the Settlement Term Sheet" by bringing this lawsuit "[i]nstead of continuing to negotiate and close the Settlement in good faith." (Am. Countercl. ¶¶ 113-114.) But Defendants fail to explain how EBCC's conduct violated any specific term of the parties' supposed contract. *Sylmark Holdings Ltd.*, 5 Misc. 3d at 295 (requiring claimant to allege "the specific terms of the agreement").[4] Defendants do not point to any provision of the term sheet that prohibits EBCC from bringing this lawsuit; nor could they because the term sheet does not contain such a provision. To the contrary, the term sheet states:

> Borrower remains in default of the existing terms of its lending relationship with the Lender. Until and unless the Lender and the Borrower have agreed to the terms of any Amendment, and until such Amendment has been agreed to in writing among the Parties, the *Lender continues to reserve all of its rights and remedies under the lending relationship*.

(Term Sheet at 8 (emphasis added); *see also id.* at 6 (providing that it is a termination event if the "Borrower and/or any of the Guarantors shall make any omissions or misrepresentations to the Lender at any time").) Given that the term sheet explicitly reserved to EBCC the right to file this lawsuit, Defendants fail to state a claim for breach of contract.

**B.    EBCC did not breach the implied covenant of good faith and fair dealing by filing this lawsuit.**

Defendants' failure to establish the existence of a contract is fatal to their claim for breach of the implied covenant of good faith and fair dealing. As discussed *supra*, EBCC did not countersign and return the term sheet, *Brown* v. *Cerberus Cap. Mgmt., L.P.*, 173 A.D.3d 513, 513

---

[4]    *See generally Cobble Hill Nursing Home, Inc.* v. *Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989) ("[U]nless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy.").

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM	INDEX NO. 158207/2022

NYSCEF DOC. NO.: 81	24-04020-dsj	Doc 1-2	Filed 08/14/24	Entered 08/14/24 09:45:23	Doc #3 State	RECEIVED NYSCEF: 08/29/2023

Court Records	Pg 431 of 2230

(1st Dep't 2019) (document "not a binding contract" where counterparty did not sign); Defendants also do not allege that EBCC otherwise manifested acceptance (Am. Countercl. ¶ 75 ("EBCC went dark after the Ebury Parties returned the executed Settlement Term Sheet")). "The implied covenant of good faith and fair dealing cause of action fails in the absence of an enforceable contract in which the covenant would be implied." *Core Dev. Grp.* v. *Spaho*, 199 A.D.3d 447, 449 (1st Dep't 2021); *Jordan Panel Sys., Corp.* v. *Turner Constr. Co.*, 45 A.D.3d 165, 180 (1st Dep't 2007) (affirming the dismissal of claims for breach of contract and breach of the implied covenant where non-binding "term sheet establishe[d] that, as a matter of law, the facts alleged . . . did not give rise to any contract between the parties"). As a result, Defendants fail to establish that EBCC violated the implied covenant by filing this lawsuit.

Defendants' claim for breach of the implied covenant fails for the independent reason that "[n]o obligation may be implied that would be inconsistent with other terms of the contractual relationship." *Celauro* v. *4C Foods Corp.*, 187 A.D.3d 836, 838 (2d Dep't 2020). Here, the term sheet included an express provision reserving to EBCC its rights under the parties' other contracts—which include the right to file this lawsuit. *Pullman Grp.* v. *Prudential Ins. Co., of Am.*, 288 A.D.2d 2, 4 (1st Dep't 2001) ("The claim against Prudential for breach of a duty to negotiate in good faith is inconsistent with the terms of the preliminary letter agreement Prudential had signed, which makes manifest that Prudential did not intend to be bound until the deal was finalized."); *Fesseha* v. *TD Waterhouse Inv. Servs., Inc.*, 305 A.D.2d 268, 268 (1st Dep't 2003) ("While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights."). Further, even if the term sheet did not expressly reserve EBCC's right to bring this lawsuit, implying a new term prohibiting EBCC from doing so would still be

-9-

inconsistent with other provisions of the term sheet—for example, the provision that the term sheet "creates no binding obligations on the part of [EBCC]." *See Singh* v. *City of New York*, 2023 WL 3098734, at *2 (N.Y. Apr. 27, 2023) (the implied covenant "encompasses only those 'promises which a reasonable person in the position of the promisee would be justified in understanding were included'" (citation omitted)).[5]

Finally, Defendants' claim for breach of the implied covenant fails because it is duplicative of Defendants' breach of contract claim. A claim for breach of the implied covenant of good faith and fair dealing must be dismissed if it is "redundant of . . . [a] breach of contract claim[]." *Remora Cap. S.A.* v. *Dukan*, 175 A.D.3d 1219, 1221 (1st Dep't 2019). Here, Defendants "rel[y] on the same facts that form the basis for the breach of contract claim and seek the exact same damages." *320 W. 115 Realty LLC* v. *All Bldg. Constr. Corp.*, 194 A.D.3d 511, 512 (1st Dep't 2021). Both of Defendants' contractual claims are based on the same alleged duty to "negotiate and close the Settlement in good faith" and both assert the same damages of "no less than $500,000 in out-of-pocket expenses." (*Compare* Am. Countercl. ¶¶ 110-114, *with id.* ¶¶ 115-118.) As such, Defendants' claim for breach of the implied covenant is redundant and impermissibly duplicative of their breach of contract claim.

## II.   Defendants' promissory estoppel claim fails as a matter of law.

To plead a viable promissory estoppel claim, Defendants must adequately allege "(i) a sufficiently clear and unambiguous promise; (ii) reasonable reliance on the promise; and

---

[5]      *See generally Rowe* v. *Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978) ("[A] party who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists. Thus, a party making such a claim must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole.").

(iii) injury caused by the reliance." *Castellotti* v. *Free*, 138 A.D.3d 198, 204 (1st Dep't 2016); *cf.*

*Trib. Printing Co.* v. *263 Ninth Ave. Realty, Inc.*, 88 A.D.2d 877, 879 (1st Dep't 1982) (doctrine

of promissory estoppel is "reserved for a limited class of cases based on unusual circumstances").

Defendants fail to state such a cause of action here and their claim for promissory estoppel is due

to be dismissed under CPLR 3211(a)(1) and (7).

### A.    Defendants do not identify a clear and unambiguous promise.

As with the other counterclaims, Defendants fail to identify a specific promise to

support their claim for promissory estoppel.  The only "promise" identified by Defendants is that

"[v]ia the Settlement Term Sheet and other communications, EBCC promised that it would work

in good faith to resolve the outstanding Credit Facilities with the Ebury Parties."  (Am. Countercl.

¶ 112.)  These allegations are insufficient to carry Defendants' burden to establish a "clear and

unambiguous promise." *Richbell Info. Servs., Inc.* v. *Jupiter Partners*, 309 A.D.2d 288, 304 (1st

Dep't 2003).

The non-binding term sheet itself is not a "clear and unambiguous promise"

because the term sheet states that it "is for discussion purposes only and creates no binding

obligations on the part of the Lender."  (Term Sheet at 1, 9.)  "There can be no valid claim of

implied contract or promissory estoppel where the purported contract indicates a lack of intent to

be bound." *Azimut-Benetti S.p.A.* v. *Magnum Marine Corp.*, 55 A.D.3d 483, 484 (1st Dep't 2008).

Similarly, the unspecified "other communications" on which Defendants rely cannot constitute

clear and unambiguous promises, *StoreRunner Network, Inc.* v. *CBS Corp.*, 8 A.D.3d 127, 128

(1st Dep't 2004) (granting summary judgment where "the oral promises upon which the cause

[was] premised were not clear and unambiguous and could not have been reasonably relied upon

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
Court Records     Pg 434 of 2230

by plaintiff to its detriment"),[6] particularly because Defendants fail to allege "when, how, or by

whom" those communications were made. *Pentagon Fed. Credit Union* v. *Popovic*, 217 A.D.3d

480, 482 (1st Dep't 2023). More fundamentally, entering into settlement negotiations does not

constitute a promise not to bring a lawsuit for breach of contract, fraudulent inducement, and

fraudulent transfer upon the discovery of fraudulent misconduct. *Delmaestro* v. *Marlin*, 168

A.D.3d 813, 816 (2d Dep't 2019) ("[A]lthough the parties were negotiating, there was no clear

and unambiguous promise that the contemplated transaction would be consummated or that the

plaintiff would be able to move into the property in the absence of an executed agreement."). As

neither the term sheet nor any "other communication[]" constitutes a clear and unambiguous

promise, Defendants fail to plead a claim for promissory estoppel. *Schutty* v. *Speiser Krause P.C.*,

86 A.D.3d 484, 485 (1st Dep't 2011) ("The documentary evidence of the parties' lengthy and

fruitless negotiations establishes as a matter of law that there was no clear and unambiguous

promise on which plaintiff reasonably could have relied.").

## B. Defendants also cannot establish detrimental reliance.

Defendants also fail to adequately allege detrimental reliance. *Thome* v. *Alexander

& Louisa Calder Found.*, 70 A.D.3d 88, 105 (1st Dep't 2009). The extent of Defendants' claimed

injury is that they "wast[ed] ten months" negotiating with EBCC and "spent hundreds of thousands

of dollars trying to find and close a resolution." (Am. Countercl. ¶¶ 124-127.) But the "ten

months" and "hundreds of thousands of dollars" Defendants allegedly spent after defaulting on

their obligations under the Credit Facilities cannot be attributed to any promise by EBCC. Instead,

those expenditures "were attributable to the nature of [Defendants'] ongoing relationship" with

---

[6]     *Cf. Steele* v. *Delverde S.R.L.*, 242 A.D.2d 414, 415 (1st Dep't 1997) ("[A]s a general matter, an oral promise will not be enforced on this ground unless it would be unconscionable to deny it.").

EBCC under the Credit Facilities. *Schwartz* v. *Miltz*, 77 A.D.3d 723, 725 (2d Dep't 2010); *Gary*

*Powell, Inc.* v. *Mendel/Borg Grp.*, 237 A.D.2d 407, 408 (2d Dep't 1997) (doctrine of promissory

estoppel is unavailable where "the injury stems only from [Defendants'] continued performance

of its contractual obligations").

        Further, to the extent the term sheet is the "promise" on which Defendants relied,

their injuries could have arisen only during a one-week period—Defendants executed the Term

Sheet on September 15, 2022, EBCC "went dark," and then, one week later, EBCC initiated this

action. ([Am. Countercl.]() ¶¶ 74-76.) To the extent Defendants suffered "ten months" and "hundreds

of thousands of dollars" of injuries, they have failed to show how those alleged injuries are

attributable to the one week period between September 15, 2022 and September 25, 2022.[7] *See*

*Schroeder* v. *Pinterest, Inc.*, 133 A.D.3d 12, 32 (1st Dep't 2015) (dismissing promissory estoppel

claim where plaintiffs failed to plead "facts . . . showing that [they] did something, or refrained

from doing something, in reliance" on the alleged promise).

        Finally, "the doctrine of promissory estoppel is limited to cases where the promisee

suffered an 'unconscionable injury.'" *AHA Sales, Inc.* v. *Creative Bath Prod., Inc.*, 58 A.D.3d 6,

21 (2d Dep't 2008). Here, Defendants' only alleged injury is "[t]he expenditure of time and

[money]" to negotiate a resolution of their defaults under the Credit Facilities. *Prospect St.*

---

[7]    It also is inconsistent with the parties' contractual relationship to impose liability on EBCC for Defendants' post-default legal expenses, given that Defendants have agreed to pay EBCC's post-default legal expenses. ([Dkt. No. 6]() at 39 ("Each Ebury Company agrees to pay . . . all of the reasonable out-of-pocket expenses of the Lender in connection with . . . amendments, consents, waivers, and terminations made or requested in connection with this Agreement . . . [and] the enforcement, protection, defense and collection of this Agreement."). Even the non-binding Term Sheet specifies the same. ([Term Sheet]() at 7 ("Borrower shall reimburse Lender all legal expenses incurred by Lender in connection with the preparation, negotiation and closing of the Amendment, whether or not it is consummated, and the administration and enforcement of the Loan Documents.")).

*Ventures I, LLC* v. *Eclipsys Sols. Corp.*, 23 A.D.3d 213, 214 (1st Dep't 2005).  Defendants' injuries are "not detrimental reliance under the circumstances." *Id.*; *see NGR, LLC* v. *Gen. Elec. Co.*, 24 A.D.3d 425, 425-26 (2d Dep't 2005) ("The failure of the parties' complex business negotiations did not, under the circumstances herein, give rise to a claim for damage."); *River Glen Assocs., Ltd.* v. *Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 274 (1st Dep't 2002).[8]  As Defendants failed to adequately plead detrimental reliance, their promissory estoppel claim fails as a matter of law.

### III.    Defendants' Amended Counterclaim should be dismissed with prejudice.

The Court may dismiss a counterclaim with prejudice where "any leave to replead would . . . be[] futile," *Izhaky* v. *Izhaky*, 215 A.D.3d 588, 589 (1st Dep't 2023), or where "exceptional circumstances . . . merit[] this extreme sanction," *Stacey O.* v. *Donald P.*, 137 A.D.2d 965, 966 (3d Dep't 1988).  Dismissal with prejudice is appropriate here, given the extent to which Defendants' claims are refuted by the term sheet and Defendants' amendments to their Counterclaim after seeing EBCC's first motion to dismiss.[9]

Defendants previously filed another counterclaim.  (Dkt. No. 69 ("Countercl.").)  Apart from thirty paragraphs of background on tax lien investing (Am. Countercl. ¶¶ 1-31) and the removal of their counterclaim for negligent misrepresentation (Countercl. ¶¶ 65-69),[10] the original

---

[8]    *Cf. Carvel Corp.* v. *Nicolini*, 144 A.D.2d 611, 612 (2d Dep't 1988) ("Even if all allegations made by the defendants were to be taken as true, we would not find the circumstances to be so egregious as to warrant the application of the doctrine of promissory estoppel."); *Country-Wide Leasing Corp.* v. *Subaru of Am., Inc.*, 133 A.D.2d 735, 736 (2d Dep't 1987) ("[T]he mere failure to obtain an uncertain prospective benefit does not rise to a sufficient level of unconscionability to warrant the application of the doctrine of promissory estoppel.").

[9]    Alternatively, EBCC respectfully requests that the Court dismiss Defendants' counterclaim and "deny leave to amend."  *Richter's Est.* v. *Novo Corp.*, 43 A.D.2d 1, 3 (1st Dep't 1973).

[10]    Although Defendants removed their counterclaim for negligent misrepresentation, they failed to remove two paragraphs related to that counterclaim.  (Am. Countercl. ¶¶ 119-120 ("In negligently misrepresenting its intentions to refinance, negotiate, and /or settle the outstanding Credit Facilities, EBCC has damaged the Ebury Parties in an amount to be revealed during discovery and proven at trial.").)  Defendants' abandonment of their counterclaim for negligent

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
NYSCEF DOC. NO. 81

INDEX NO. 158207/2022

RECEIVED NYSCEF: 08/29/2023

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 437 of 2230

Counterclaim and the Amended Counterclaim are virtually identical. That is so despite Defendants having seen EBCC's first motion to dismiss, which laid out the *exact same* deficiencies with the original Counterclaim. (*See* Dkt. No. 72.) Defendants' inability to cure the glaring defects in their counterclaims confirms that any further amendment would be futile and that dismissal with prejudice is warranted.

EBCC reserves the right to seek appropriate sanctions under 22 NYCRR § 130-1.1 related to Defendants' filing of the Amended Counterclaim. Notably, EBCC "brought to [Defendants'] attention" that the Counterclaim lacked a "legal or factual basis" via its first motion to dismiss; yet Defendants proceeded with filing the Amended Counterclaim without remedying any of those serious deficiencies; apart from withdrawing Defendants' meritless counterclaim for negligent misrepresentation. *See* 22 NYCRR § 1301-1.(c).

### CONCLUSION

EBCC respectfully requests that the Court dismiss Defendants' Amended Counterclaim with prejudice.


Dated:   August 29, 2023
        New York, New York

                              Respectfully submitted,

                              */s/ Alexander J. Willscher*

                              Alexander J. Willscher
                              Austin P. Mayron
                              SULLIVAN & CROMWELL LLP
                              125 Broad Street
                              New York, New York  10004
                              Telephone: (212) 558-4000
                              Fax: (212) 558-3588

                              *Attorneys for Plaintiff Emigrant Business*
                              *Credit Corporation*

---

misrepresentation confirms that the counterclaim was frivolous.

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 81
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 08/29/2023

Court Records    Pg 438 of 2230

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with the word count limit of Commercial Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because it contains 4,835 words.

Dated:    August 29, 2023                    */s/ Alexander J. Willscher*
          New York, New York                Alexander J. Willscher

-16-

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                Plaintiff,

      v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

                Defendants.

---------------------------------------------------------------x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 004**

**AFFIRMATION OF
ALEXANDER J. WILLSCHER**

**ALEXANDER J. WILLSCHER**, an attorney duly admitted to practice law in the Courts of the State of New York, affirms the truth of the following statements, under the penalties of perjury:

1.      I am a partner at the firm of Sullivan & Cromwell LLP, counsel for Plaintiff Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned matter.  I am familiar with the matters set forth below.

2.      I submit this affirmation in support of EBCC's motion to dismiss Defendants' Amended Counterclaim.

3.      Attached as Exhibit A is a true and correct copy of Defendants' Amended Counterclaim.  (Dkt. No. 79.)

4.      EBCC's motion to dismiss seeks an order pursuant to CPLR 3211 (a)(1) and/or (7) dismissing Defendants' Amended Counterclaim and granting such other and further relief as the Court may deem just and proper.

5.      EBCC previously filed a motion to dismiss Defendants' Answer and Counterclaim (Dkt. No. 69), with a return date of August 25, 2023.  (*See* Mot. Seq. No. 3; Dkt. Nos. 71-76.)

6.      On August 14, 2023, Defendants requested a one week adjournment of EBCC's motion to dismiss.  Attached as Exhibit B is a true and correct copy of Defendants' request for an adjournment.

7.      EBCC consented to the adjournment request as a professional courtesy. (Dkt. No. 78.)   Defendants provided no indication that they intended to file an Amended Counterclaim; rather than the opposing papers they referenced in their request for an adjournment.

8.      On August 25, 2023, Defendants filed their Amended Counterclaim.  For the reasons set out in the accompanying memorandum of law, Defendants' Amended Counterclaim is

-2-

without merit and fails to remedy the serious deficiencies EBCC identified in its original motion to dismiss; apart from withdrawing Defendants' meritless counterclaim for negligent misrepresentation.  (Dkt. No. 72.)

9.    EBCC has not previously asked the Court for the relief sought by its motion to dismiss.

Dated:   August 29, 2023                    */s/ Alexander J. Willscher*
         New York, New York                **ALEXANDER J. WILLSCHER**

-3-

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 442 of 2230

## CERTIFICATE OF COMPLIANCE

I hereby certify that this affirmation complies with the word count limit of Commercial

Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because

it contains 304 words.


Dated:    August 29, 2023                    */s/ Alexander J. Willscher*
       New York, New York                    Alexander J. Willscher

-4-

# EXHIBIT A

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 444 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

      Plaintiff–Counterclaim Defendant,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMISC, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC,
RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE
TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, and EBURY RE LLC,

      Defendants–Counterclaim Plaintiffs,

      v.

XYZ CORPS. 1-10,

      Defendants.

Index No. 158207/2022

THE EBURY PARTIES'
AMENDED COUNTERCLAIM

As and for their "Amended Counterclaim" against Emigrant Business Credit Corporation ("EBCC" or the "Bank"), Defendants–Counterclaim Plaintiffs John Arthur Hanratty, Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2 EMI LLC, EB 1EMIALA LLC,  EB 2EMIALA LLC, Eb 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury Fund 2 FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and Ebury RE, LLC (together, the "Ebury Parties") respectfully allege:

1.    The Ebury Parties' primary business is investing in tax lien certificates, which give their owners the ability to collect overdue property taxes and, if the taxes remain unpaid, foreclose on the underlying real estate.

### The Covid-19 Pandemic Rendered Tax Lien Certificates Illiquid

2.    Investing in tax lien certificates requires expertise, connections, and capital.

3.    There is no central, unified market for tax lien certificates.

4.    Instead, investors purchase them either from the initial taxing entity, e.g. a municipality or county, or from other tax lien investors.

5.    The taxing entity typically sells the certificates at public auctions, while tax lien investors generally are only able to sell the certificates to others who work in the tax lien industry.

2

6.      Accordingly, investing in tax lien certificates requires not just capital, but also expertise.

7.      However, under normal market conditions. tax lien certificates can be an attractive investment.

8.      Tax lien certificates typically throw off predictable, steady cash flow.

9.      Historically, property owners usually quickly get back on track with their tax payments: whatever relatively small amount of unpaid taxes pales in comparison to the value of their homes or other real estate.

10.     And when property owners fail to repay their taxes, the certificate holder can foreclose on the property, which usually is worth many times the certificate's face value.

11.     While foreclosure tends to be more profitable than merely collecting overdue property taxes, foreclosure also is a slower and more expensive process.

12.     For example, in foreclosure, the certificate owner—here, the Ebury Parties—must rehabilitate the property, retain realtors, and take care of all of the other headaches associated with selling real estate.

13.     Regardless of whether a tax lien investor derives its primary revenue from collecting taxes or foreclosing on real property, tax lien investing typically requires cash investment.

14.     Accordingly, over the past decade—particularly when interest rates were lower than they are today—tax lien investors often obtained revolving credit lines to finance the investments.

3

15.    However, the Covid-19 pandemic temporarily froze the tax lien investment business.

16.    During the pandemic, federal, state, and local authorities imposed numerous restrictions that neutered tax lien certificate holders' ability to persuade property owners to become current on their taxes.

17.    For example, many governments imposed foreclosure freezes.

18.    Foreclosures have "spiked" and "surged" since foreclosure freezes began thawing in 2022.

19.    Similarly, throughout 2020 and 2021, municipalities across the country shuttered their doors.

20.    Many of those municipalities required tax lien certificates and their attendant paperwork to be done only with wet signatures, notaries, and in hard copy.

21.    Accordingly, the municipalities' closures halted the tax lien business.

22.    Similarly, local housing courts across the country paused operations for months, and even over a year.

23.    Therefore,, tax lien certificate holders like the Ebury Parties could no longer seek judicial intervention to enforce collections or foreclosures.

24.    In short, numerous Covid-19 policies functionally froze the tax lien certificate market, temporarily destroying the liquidity of tax lien investments.

25.    The Ebury Parties' relationship with EBCC suffered accordingly.

**Desperate to Break In to the Tax Lien Business, EBCC Convinced The Ebury Parties
to Abandon Their Other Lending Relationships**

26.    in the mid-2010s, EBCC was eager to work in the tax lien industry.

27.    In 2016, a board member of EBCC's parent entity introduced EBCC to the
Ebury Parties.

28.    At the time, the Ebury Parties had a $45 million revolving credit facility
with "Capital One," N.A.

29.    A revolving credit facility operates essentially as a corporate credit card.

30.    For example, pursuant to the $45 million revolving credit facility, the
Ebury Parties could borrow up to $45 million from Capital One at a time, but needed to
pay down that revolving credit facility's balance in order to borrow again.

31.    In 2016 and 2017, EBCC wooed the Ebury Parties to open credit lines with
EBCC and, eventually, abandon their relationships with Capital One entirely.

5

### Despite Covid-19's Impacts on Tax Lien Liquidity, EBCC Continued to Claim that the Ebury Parties were "Stellar" Clients

32.     Between 2017 and 2020, EBCC advanced the Ebury Parties approximately $35 million in connection with the Credit Facilities.

33.     However, the Credit Facilities' maximum balance was never allowed to be more than approximately $15 million.

34.     Accordingly, the Ebury Parties only were able to borrow $35 million over the years because they continually, timely paid down their balances.

35.     For example, in the four months of 2017 that the Credit Facilities were available, the Ebury Parties paid EBCC approximately $3.7 million in principal and $220,000 in interest.

36.     In 2018, meanwhile, the Ebury Parties paid EBCC approximately $6.4 million.

37.     But in 2020, the Ebury Parties paid EBCC only approximately $1.8 million.

38.     The pandemic had essentially frozen the Ebury Parties' business and investments.

39.     In response to Covid-19, state and federal governments closed municipal and county offices, paused judicial proceedings, and froze foreclosure and eviction proceedings.

40.     But the Ebury Parties' business is heavily invested in distressed real estate and therefore is at the mercy of foreclosures, evictions, and smooth, efficient state and local governments and court systems.

6

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 450 of 2230

41.     Overnight, the Ebury Parties lost their primary tools for collecting revenue from their investments.

42.     In spring 2021—when the Credit Facilities originally were to mature—the Ebury Parties' businesses still were suffering from the pandemic's closures and slowdowns.

43.     EBCC understood that the pandemic had frozen the Ebury Parties' investments—yet believed, and continued to report, that the Ebury Parties' fundamental business model was strong and that their liquidity problem did not cast any doubt on the Ebury Parties' value, assets, or eventual repayment ability.

44.     In May 2021, recognizing Covid-19's continuing impact on the Ebury Parties, EBCC agreed to extend the Credit Facilities' maturity date by three months.

45.     In exchange, EBCC extracted the Ebury Parties' agreement to raise the Credit Facilities interest rate by 200 basis points; discontinue further draws under the revolving Credit Facilities; and contribute two new tax lien portfolios to the Ebury Party that had contracted with EBCC.

46.     After, as EBCC characterized it, "administrative-related delays in closing" the new tax lien portfolios' purchases,  EBCC agreed to another three-month extension of the Credit Facilities, setting their new maturity date as November 10, 2021.

47.     EBCC again did not make those concessions out of pure benevolence.

48.     Instead, the Bank further increased the Credit Facilities' pricing by another 200 basis points, to L+825.

7

49.     Even then, EBCC continued to tell its supervisors, credit team, and parent company leadership that the Ebury Parties were "stellar" clients.

50.     As late as August 2021, EBCC's bankers reported that "[f]rom 2017 [through] 2019, Ebury exhibited stellar operating performance" that was "equivalent to 40% of annual amortization on EBC[C]'s loan."

51.     In doing so, EBCC also recognized that "[t]he pandemic has negatively impacted Ebury's results from a timing perspective, as government-mandated moratoriums took the pressure off of mortgage lenders and individual homeowners to settle tax liens."

52.     But at the same time, EBCC observed that "the slowdown in Ebury's core tax lien business in 2020 and early 2021 was offset by outperformance in its REO business" and that "the underlying 'credit' of the tax liens will actually improve once the foreclosure moratoriums are lifted as these liens will continue to accrue interest (as high as 18%) and ultimate provide higher cash flows to the [Ebury Parties] and EBC[C]."

53.     Yet in November 2021, EBCC decided to call the Credit Facilities instead of again extending their maturity dates.

54.     Soon thereafter, EBCC suspended—and eventually fired—the Ebury Parties' primary banker, who managed EBCC's relationship with the Ebury Parties.

8

**EBCC Dragged out the Workout Process Only to Abandon Ship and Charge The Ebury Parties Millions More in Default Interest**

55.    From November 2021 through September 2022, EBCC and the Ebury Parties worked together to resolve the Credit Facilities.

56.    For example, even before the Credit Facilities matured in November 2021, EBCC and Mr. Hanratty had contacted multiple third-party lenders to gauge their interest in purchasing the debt.

57.    EBCC and the Ebury Parties also routinely discussed and negotiated potential payment plans that would fully discharge the Ebury Parties' debts.

58.    Besides offering concrete solutions, the Ebury Parties also freely shared all their material financial, legal, and other relevant information with EBCC.

59.    By December 2021, the Ebury Parties had sent their lien servicing software's access credentials to EBCC, including for the Ebury Parties' and Speedboat accounts.

60.    By March 2022, the Ebury Parties had sent their Quickbooks accounting software access credentials to EBCC, so that EBCC could independently review and verify the Ebury Parties' financial records.

61.    The Ebury Parties even coordinated with the software providers to provide usage tutorials to EBCC's personnel.

62.    The Ebury Parties also participated in multiple conference calls per week with numerous EBCC personnel to attempt to work out the debts.

9

63.     At EBCC's request, the Ebury Parties directly connected the Bank with those third parties on multiple occasions, so that the Bank and the third parties could independently discuss and negotiate the sale of the Ebury Parties' debts.

64.     However, EBCC continually dropped the ball on those negotiations, from stringing third-party investors along to failing to respond to them at all.

65.     On June 17, 2022, the Ebury Parties sent EBCC a specific repayment plan that contemplated that (1) EBCC would accept $18 million as full repayment of the Credit Lines; (2) the Ebury Parties would pay EBCC no less than $350,000 per month; (3) EBCC would allow the Ebury Parties to maintain $400,000 of operating capital at all times; (4) the Ebury Parties would pay EBCC 100% of all monthly cash that exceeded $750,000; and (5) EBCC's continued ability to review and oversee the Ebury Parties' day-to-day financials.

66.     EBCC did not respond to that proposal in June 2022.

67.     EBCC did not respond to that proposal in July 2022, either.

68.     Finally, on August 10, 2022, EBCC countered to the Ebury Parties' "proposal made via email on June 17, 2022," attaching a document that EBCC characterized as "a term sheet setting forth the terms of an amendment through which the existing obligations owed to EBC[C] can be repaid" and requesting that the Ebury Parties' lawyer call "as soon as possible to discuss."

69.     Over the next month, EBCC and the Ebury Parties' respective counsel hammered out the settlement details.

10

70.    After several rounds of conversations and negotiations, EBCC sent the Ebury Parties the final "Settlement Term Sheet," dated September 14, 2022.

71.    That Settlement Term Sheet memorialized all of the material terms on which EBCC and the Ebury Parties agreed to resolve the outstanding Credit Facilities.

72.    Just one day after transmitting the Settlement Term Sheet, EBCC's outside counsel emphasized that the bank "need this executed by the end of business today."

73.    EBCC's outside counsel also emphasized that the Bank "needed" the Ebury Parties to execute the Settlement Term Sheet on September 15, 2022 so that the Parties could close the Settlement by Friday, September 23, 2022.

74.    Relying on the Parties' lengthy negotiations, EBCC's demand that the Ebury Parties execute the Settlement Term Sheet "today," and EBCC's promise that executing "today" would mean the Settlement closed by the following Friday, the Ebury Parties executed and returned the Settlement Term Sheet to EBCC on September 15, 2022.

75.    But EBCC went dark after the Ebury Parties returned the executed Settlement Term Sheet.

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
NYSCEF DOC. NO.: 93
INDEX NO. 158207/2022
RECEIVED NYSCEF: 08/29/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 455 of 2230

**EBCC Had No Good-Faith Reason to Abandon the Settlement**

76.      On Sunday, September 25, 2022—without warning to the Ebury Parties, and even without warning to the EBCC outside counsel who had negotiated the Settlement Term Sheet—EBCC initiated this Action, suing the Ebury Parties for the very same alleged conduct that the Parties had purportedly attempted to resolve via the Settlement Term Sheet.

77.      The only post-default "misconduct" alleged in EBCC's Complaint was copy-pasted hearsay from a counterclaim filed against certain Ebury Parties by a disgruntled business partner, Thomas R. McOsker, in a Delaware federal litigation (the "McOsker Allegations").

78.      In discovery, EBCC's witnesses confirmed that the McOsker Allegations were the only new "facts" that caused EBCC to abandon the settlement and sue the Ebury Parties.

79.      However, EBCC knew or should have known that the McOsker Allegations were baseless.

80.      The Ebury Parties had introduced Mr. McOsker to EBCC years prior, in connection with a transaction that the Ebury Parties abandoned once it became clear that Mr. McOsker was cheating them.

81.      In June 2019, the Ebury Parties moved out of the Puerto Rico office they shared with Mr. McOsker and his controlled companies (the "McOsker Entities").

82.      The very next business day, the Ebury Parties sued the McOsker Entities in the federal district court for the District of Puerto Rico.

12

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
NYSCEF DOC. NO. 85
INDEX NO. 158207/2022
RECEIVED NYSCEF: 08/29/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 456 of 2230

83.    Because the McOsker Entities argued that the Puerto Rico federal court could not exercise diversity jurisdiction, the Ebury Parties voluntarily dismissed that federal litigation and refiled their claims in Puerto Rico's local court.

84.    That litigation still is proceeding in Puerto Rico.

85.    As early as summer 2019, the Ebury Parties told EBCC what had happened with Mr. McOsker and shared all material litigation information with EBCC.

86.    In the Puerto Rico litigation, Delaware-incorporated McOsker Entities argued that their part of the dispute belonged in Delaware court.

87.    Accordingly, the Ebury Parties dismissed those McOsker Entities and claims from the Puerto Rico litigation, and in February 2021, filed a new litigation against those entities and related principals in the federal district court for the District of Delaware (the "Delaware Litigation").

88.    In the Delaware Litigation, the relevant Ebury Parties allege that the McOsker Parties violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, specifically by stealing tax lien certificates from numerous investment funds, including the Ebury Parties, and claiming no less than $3.5 million in damages.

89.    Again, EBCC was well aware of that Delaware Litigation from its inception.

90.    Indeed, EBCC repeatedly referenced the $3+ million that the Ebury Parties expected to someday recover in the Delaware Litigation.

91.    The McOsker Parties tried, and failed, to get the Delaware Litigation dismissed.

13

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 93
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 08/29/2023
Court Records    Pg 457 of 2230

92.    After 18 months of stalling and motion practice, the McOsker Parties finally filed their Answer and Counterclaim in September 2022.

93.    That initial Counterclaim copy-pasted the Ebury Parties' legal allegations verbatim in an attempt to build reciprocal RICO claims against the Ebury Parties.

94.    Those hall-of-mirrors McOsker Allegations are the very same ones on which EBCC supposedly relied to abandon its settlement negotiations and sue the Ebury Parties.

95.    In response to the Ebury Parties' pleadings dismissal motion, the McOsker Parties filed amended claims that attempted to preserve their claims.

96.    Because those amended pleadings failed to cure the original deficiencies, the Ebury Parties moved to dismiss the amended pleadings in February 2023.

97.    Magistrate Judge Jennifer L. Hall held oral argument on that motion on August 18, 2023, and has not yet ruled on the motion.

98.    Regardless, from at least 2019 through 2023, EBCC knew that Mr. McOsker was untrustworthy and had victimized the Ebury Parties.

99.    Ebury entities are the plaintiffs in all litigations against Mr. McOsker.

100.    Ebury entities initiated all three of the litigations against Mr. MCOsker and his entities.

101.    The Ebury Parties consistently made EBCC contemporaneously aware of the McOsker litigations.

102.   In September 2022, EBCC was well aware that Ebury Parties were continuing to pursue Mr. McOsker and his entities in two separate litigations, including for $3.5 million of tax lien certificates that are EBCC's collateral.

103.   In September 2022, EBCC also was well aware that Mr. McOsker and his entities had yet again failed to win a dismissal motion, and would soon be required to answer the Ebury Parties' claims.

104.   EBCC was unbothered by that ongoing litigation: it adopted and papered up the Ebury Parties' June 2022 proposal in early September 2022, sent the Settlement Term on September 14, 2022, and demanded that the Ebury Parties execute the contract no later than September 15, 2022.

105.   EBCC induced the Ebury Parties' signature by claiming that the Parties would close the Settlement by September 23, 2022.

106.   But after ten months of putting the Ebury Parties through every possible test—from sharing software access to toying with third-party investors to blowing off refinancing arrangements to purporting to negotiate repayment plans to demanding next-day execution of the Settlement Term Sheet—EBCC disappeared, only to sue the Ebury Parties on the Sunday after the Settlement was supposed to have closed.

107.   By waiting to sue the Ebury Parties until nearly a year after the default, EBCC claimed that the Ebury Parties owed millions more in interest than at the time of default, and even more than contemplated in the parties' negotiated settlement.

15

108.    Moreover, by dragging out the workout process for over ten months, EBCC forced the Ebury Parties to spend hundreds of thousands of dollars on legal and other professional services fees.

109.    Consequently, the Ebury Parties counterclaim against EBCC.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract

110.    The Ebury Parties incorporate their foregoing allegations.

111.    The Settlement Term Sheet memorialized a contract to settle the outstanding Credit Facilities.

112.    Relying on EBCC's promises that the Settlement would close by September 23, 2022, the Ebury Parties executed and returned the Settlement Term Sheet to EBCC on September 15, 2022.

113.    Instead of continuing to negotiate and close the Settlement in good faith, EBCC sued the Ebury Parties.

114.    In doing so, EBCC breached the Settlement Term Sheet and damaged the Ebury Parties in an amount to be determined during discovery and proven at trial, currently estimated to be no less than $500,000 in out-of-pocket expenses.

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 83
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 460 of 2230
RECEIVED NYSCEF: 08/29/2023

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

115.    The Ebury Parties incorporate their foregoing allegations.

116.    EBCC had the duty to negotiate the Settlement in good faith.

117.    Instead of continuing to negotiate and close the Settlement in good faith, EBCC sued the Ebury Parties.

118.    In doing so, EBCC breached the implied covenant of good faith and fair dealing and damaged the Ebury Parties in an amount to be determined during discovery and proven at trial, currently estimated to total no less than $500,000 in out-of-pocket expenses.

119.    EBCC had a duty to truthfully communicate with the Ebury Parties in good faith.

120.    In negligently misrepresenting its intentions to refinance, renegotiate, and / or settle the outstanding Credit Facilities, EBCC has damaged the Ebury Parties in an amount to be revealed during discovery and proven at trial.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 461 of 2230

## COUNT III
### Promissory Estoppel

121.    The Ebury Parties incorporate their foregoing allegations.

122.    Via the Settlement Term Sheet and other communications, EBCC promised that it would work in good faith to resolve the outstanding Credit Facilities with the Ebury Parties.

123.    EBCC should have expected and did expect that the Ebury Parties reasonably relied on its promises and representations that it was truly interested in resolving the Ebury Parties' debts.

124.    The Ebury Parties relied on EBCC's promises to their detriment by, <u>inter alia</u>, wasting ten months attempting to negotiate a resolution with EBCC.

125.    The Ebury Parties spent hundreds of thousands of dollars trying to find and close a resolution that EBCC would accept.

126.    In the meantime, the Credit Facilities accumulated thousands of dollars of interest per day.

127.    The doctrine of promissory estoppel entitles the Ebury Parties to damages in an amount to be revealed during discovery and proven at trial.

18

# RELIEF REQUESTED

On the foregoing allegations, the Ebury Parties request relief and judgment,

including:

(a) Monetary relief in an amount to be determined at trial;
(b) Costs and expenses incurred in this action, including attorneys' fees;
(c) Pre- and post-judgment interest; and
(d) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Ebury Parties demand a jury trial.


Dated: August 25, 2023
          New York, New York

<div style="text-align:right">

GUSRAE KAPLAN NUSBAUM PLLC

/s/ Kari Parks
Kari Parks
Victor Wang
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com
vwang@gusraekaplan.com

Attorneys for The Ebury Parties

</div>

19

# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 08/29/2023 05:13 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 84    24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 08/29/2023

Court Records    Pg 464 of 2230

| | |
|---|---|
| **From:** | Kari Parks <kparks@gusraekaplan.com> |
| **Sent:** | Monday, August 14, 2023 11:46 AM |
| **To:** | Mayron, Austin P. |
| **Cc:** | Willscher, Alexander J.; Victor Wang |
| **Subject:** | [EXTERNAL] CPLR 3211 Motion Timing |

Hi Austin,

Hope you had a great weekend. Your clients' Motion (#3) set a return date of August 25, 2023, with my clients' opposing papers due this Friday, August 18. Would you all consent to a one-week adjournment? I'm tied up with a number of matters this week, including heading down to Delaware for a hearing in my other Ebury case (v. McOsker). Thanks in advance for your courtesies.

Best,
Kari

**Kari Parks, Senior Associate | Gusrae Kaplan Nusbaum PLLC |** 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

**\*\*This is an external message from: kparks@gusraekaplan.com \*\***

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 465 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

      **Plaintiff–Counterclaim Defendant,**

      **v.**

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC,
RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE
TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, and EBURY RE LLC,

      **Defendants–Counterclaim Plaintiffs,**

      **v.**

XYZ CORPS. 1-10,

      **Defendants.**

---

Index No. 158207/2022
Mot. Seq. 4

Hon. Margaret A. Chan

# THE EBURY PARTIES'
## OPPOSITION TO MOTION TO DISMISS AMENDED COUNTERCLAIM

1

FILED: NEW YORK COUNTY CLERK 09/07/2023 09:02 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.: 85
RECEIVED NYSCEF: 09/07/2023

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
Court Records     Pg 466 of 2230

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................... 2

TABLE OF AUTHORITIES ..................................................... 3

PRELIMINARY STATEMENT ................................................... 4

BACKGROUND .................................................................... 5

    I.    The Pandemic Froze the Ebury Parties' Cash Flow ........... 5

    II.   EBCC Considered The Ebury Parties to be "Stellar" Borrowers Even as They Struggled to Repay the Credit Facilities ........... 6

    III.  The Parties' Eleven-Month Negotiation Resulted in the Nine-Page Settlement Term Sheet Drafted and Offered by EBCC ........... 9

    IV.  The McOsker Allegations Are EBCC's Only Reason for Abandoning the Settlement Term Sheet ........... 12

ARGUMENT ........................................................................ 16

    I.    EBCC Abandoned the Settlement Negotiations in Bad Faith ........... 16

        A.   The Settlement Term Sheet Memorializes the Parties' Duties to Negotiate in Good Faith ........... 19

        B.   The McOsker Allegations Do Not Justify EBCC's Abandonment of the Parties' Settlement Negotiations ........... 21

    II.   If the Court Preserves the Breach-of-Contract Counterclaim, It May Dismiss the Others as Duplicative ........... 22

CONCLUSION ..................................................................... 24

WORD COUNT CERTIFICATION ........................................... 25

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 467 of 2230

# TABLE OF AUTHORITIES

**Cases**

<u>Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.</u>, 145 F.3d 543 (2d Cir. 1998)    16

<u>Bennett v. Itochu Int'l</u>, 682 F. Supp. 2d 469 (E.D. Pa. 2010)    18

<u>Betty, Inc. v. PepsiCo., Inc.</u>, No. 16 CV 4215 (VB), 2018 WL 2561028 (S.D.N.Y. June 4, 2018)    18

<u>BNP Paribas Mortgage Corp. v. Bank of Am., N.A.</u>, 949 F.Supp.2d 486 (S.D.N.Y.2013)    22

<u>Brown v. Cara</u>, 420 F.3d 148 (2d Cir. 2005)    17, 18

<u>Cambridge Cap. LLC v. Ruby Has LLC</u>, 565 F. Supp. 3d 440 (S.D.N.Y. 2021)    18, 19, 20, 21

<u>Cambridge Cap. LLC v. Ruby Has LLC</u>, No. 20-CV-11118 (LJL), 2023 WL 3956868 (S.D.N.Y. June 2, 2023)    16, 18

<u>Credit Suisse First Boston v. Utrecht-Am. Fin. Co.</u>, 80 A.D.3d 485 (1st Dep't 2011)    23

<u>Cross & Cross Properties Ltd. v. Everett Allied Co.</u>, 886 F.2d 497 (2d Cir. 1989)    22

<u>Dalton v. Educ. Testing Serv.</u>, 87 N.Y.2d 384 (1995)    21, 22

<u>EQT Infrastructure Ltd. v. Smith</u>, 861 F. Supp. 2d 220 (S.D.N.Y. 2012)    19

<u>FCOF UB Sec. LLC v. MarEquity, Inc.</u>, 663 F. Supp. 2d 224 (S.D.N.Y. 2009)    19

<u>Gas Nat., Inc. v. Iberdrola, S.A.</u>, 33 F. Supp. 3d 373 (S.D.N.Y. 2014)    19, 22, 23

<u>IDT Corp. v. Tyco Grp.</u>, 13 N.Y.3d 209 (2009)    16, 17

<u>IDT Corp. v. Tyco Grp., S.A.R.L.</u>, 23 N.Y.3d 497 (2014)    17

<u>Kaye v. Grossman</u>, 202 F.3d 611, (2d Cir. 2000)    21

<u>L-7 Designs, Inc. v. Old Navy, LLC</u>, 964 F. Supp. 2d 299 (S.D.N.Y. 2013)    21

<u>Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.</u>, 765 F. Supp. 2d 403 (S.D.N.Y. 2011)    19, 20

<u>Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.</u>, 383 F. Supp. 2d 428 (S.D.N.Y. 2003)    20

<u>Teachers Ins. & Annuity Ass'n v. Tribune Co.</u>, 670 F. Supp. 491 (S.D.N.Y. 1987)    16, 17, 23

<u>Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.</u>, 487 F.3d 89 (2d Cir. 2007)    22

**Other Authorities**

E. Allan Farnsworth, <u>Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations</u>, 87 Colum. L. Rev. 217, 251 (1987)    16

**Treatises**

Farnsworth on Contracts ⁄ 7.17 (2d ed. 2001)    22

3

The Ebury Parties[1] respectfully submit this memorandum in opposition to Plaintiff–Counterclaim Defendant Emigrant Business Credit Corporation's ("**EBCC**" or the "**Bank**" and with the Ebury Parties, the "**Parties**") "**Motion**" to dismiss the Ebury Parties' amended "**Counterclaim**."

## PRELIMINARY STATEMENT

EBCC's rote recitations of 1L contract law ignore its Motion's dispositive issue: Does the Counterclaim allege sufficient facts to show that EBCC breached its duty to negotiate in good faith to resolve the Ebury Parties' debt?

After months of negotiations, EBCC memorialized the Ebury Parties' material terms in and demanded that the Ebury Parties sign the "**Settlement Term Sheet**," which provided a comprehensive framework via which the Ebury Parties would resolve their debt to the Bank. Days later, EBCC sued the Ebury Parties instead of finalizing the Settlement's terms—not because the Ebury Parties failed to fulfill any of the Settlement Term Sheet's conditions precedent or other obligations, but simply because a third party filed new allegations in a years-long litigation of which the Bank had been well aware.

Whether styled as a breach-of-contract, implied covenant of good faith and fair dealing, or promissory estoppel claim, EBCC's about-face breached the good-faith

---

[1] Defendants–Counterclaim Plaintiffs John Arthur Hanratty, Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2 EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, Eb 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury Fund 2 FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and Ebury RE, LLC.

**4**

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 469 of 2230

negotiation duties inherent in all preliminary contracts. Therefore, the Ebury Parties respectfully request that the Court deny EBCC's Motion.

## BACKGROUND

The Ebury Parties' primary business is investing in tax lien certificates, which give their owners the ability to collect overdue property taxes and, if the taxes remain unpaid, foreclose on the underlying real estate. Amended Counterclaim, Dkt. 79 ƒ 1 (Aug. 25, 2023) ("**Am. Countercl.**"). The Ebury Parties' business is heavily invested in distressed real estate and therefore is at the mercy of foreclosures, evictions, and smooth, efficient state and local governments and court systems. Id. ƒ 40.

### I.    The Pandemic Froze the Ebury Parties' Cash Flow

Under normal market conditions, tax lien certificates can be an attractive investment. Id. ƒ 7. Property owners usually quickly get back on track with their tax payments: whatever relatively small amount of unpaid taxes pales in comparison to the value of their homes or other real estate. Id. ƒ 9. When property owners fail to repay their taxes, the certificate holder can foreclose on the property, which usually is worth many times the certificate's face value. Id. ƒ 10.

Regardless of whether a tax lien investor derives its primary revenue from collecting taxes or foreclosing on real property, tax lien investing typically requires cash investment. Id. ƒ 13. Accordingly, over the past decade—particularly when interest rates were lower than they are today—tax lien investors often obtained revolving credit lines to finance the investments. Id. ƒ 14.

However, the Covid-19 pandemic temporarily froze the tax lien investment business. Id. ƒ 15. During the pandemic, federal, state, and local authorities imposed numerous restrictions that neutered tax lien certificate holders' ability to persuade property owners to become current on their taxes, including by freezing eviction and foreclosure and closing state and local courts and offices. Id. ƒ 16. In short, numerous Covid-19 policies functionally froze the tax lien certificate market, temporarily destroying the liquidity of tax lien investments. Id. ƒ 24.

## II.    EBCC Considered The Ebury Parties to be "Stellar" Borrowers Even as They Struggled to Repay the Credit Facilities

In the mid-2010s, EBCC was eager to work in the tax lien industry. Id. ƒ 26. In 2016 and 2017, EBCC wooed the Ebury Parties to open credit lines with EBCC and, eventually, abandon their relationships with Capital One entirely. Id. ƒ 31. Between 2017 and 2020, EBCC advanced the Ebury Parties approximately $35 million in connection with the Credit Facilities. Id. ƒ 32. The Credit Facilities' maximum balance was never allowed to be more than approximately $15 million. Id. ƒ 33.

Accordingly, the Ebury Parties only were able to borrow $35 million over the years because they continually, timely paid down their balances. Id. ƒ 34. For example, in the four months of 2017 that the Credit Facilities were available, the Ebury Parties paid EBCC approximately $3.7 million in principal and $220,000 in interest. Id. ƒ 35. In 2018, meanwhile, the Ebury Parties paid EBCC approximately $6.4 million. Id. ƒ 36. But in response to Covid-19, state and federal governments closed municipal and county offices, paused judicial proceedings, and froze foreclosure and eviction proceedings. Id. ƒ 39. In doing so, the Pandemic essentially froze the Ebury Parties' business, which is heavily

**6**

invested in distressed real estate and therefore is at the mercy of foreclosures, evictions, and smooth, efficient state and local governments and court systems. <u>Id.</u> ƒ 40.

The Ebury Parties' relationship with EBCC suffered accordingly. <u>Id.</u> ƒ 25. In 2020, the Ebury Parties paid EBCC only approximately $1.8 million. <u>Id.</u> ƒ 37. In spring 2021— when the Credit Facilities originally were to mature—the Ebury Parties' businesses still were suffering from the pandemic's closures and slowdowns. <u>Id.</u> ƒ 42.

EBCC understood that the pandemic had frozen the Ebury Parties' investments— yet believed, and continued to report, that the Ebury Parties' fundamental business model was strong and that their liquidity problem did not cast any doubt on the Ebury Parties' value, assets, or eventual repayment ability. <u>Id.</u> ƒ 43.

In May 2021, recognizing Covid-19's continuing impact on the Ebury Parties, EBCC agreed to extend the Credit Facilities' maturity date by three months. <u>Id.</u> ƒ 44. In exchange, EBCC extracted the Ebury Parties' agreement to raise the Credit Facilities interest rate by 200 basis points; discontinue further draws under the revolving Credit Facilities; and contribute two new tax lien portfolios to the Ebury Party that had contracted with EBCC. <u>Id.</u> ƒ 45.

After, as EBCC characterized it, "administrative-related delays in closing" the new tax lien portfolios' purchases, EBCC agreed to another three-month extension of the Credit Facilities, setting their new maturity date as November 10, 2021. <u>Id.</u> ƒ 46. EBCC again did not make those concessions out of pure benevolence. <u>Id.</u> ƒ 47. Instead, the Bank further increased the Credit Facilities' pricing by another 200 basis points, to L+825. <u>Id.</u> ƒ 48.

7

Even then, EBCC continued to tell its supervisors, credit team, and parent company leadership that the Ebury Parties were "stellar" clients. Id. ƒ 49. As late as August 2021, EBCC's bankers reported that "[f]rom 2017 [through] 2019, Ebury exhibited stellar operating performance" that was "equivalent to 40% of annual amortization on EBC[C]'s loan." Id. ƒ 50.

In doing so, EBCC also recognized that "[t]he pandemic has negatively impacted Ebury's results from a timing perspective, as government-mandated moratoriums took the pressure off of mortgage lenders and individual homeowners to settle tax liens." Id. ƒ 51. At the same time, EBCC observed that "the slowdown in Ebury's core tax lien business in 2020 and early 2021 was offset by outperformance in its REO business" and that "the underlying 'credit' of the tax liens will actually improve once the foreclosure moratoriums are lifted as these liens will continue to accrue interest (as high as 18%) and ultimate provide higher cash flows to the [Ebury Parties] and EBC[C]." Id. ƒ 52.

Yet in November 2021, EBCC decided to call the Credit Facilities instead of again extending their maturity dates. Id. ƒ 53. Soon thereafter, EBCC suspended—and eventually fired—the Ebury Parties' primary banker, who had managed EBCC's relationship with the Ebury Parties. Id. ƒ 54.

**8**

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 473 of 2230

### III. The Parties' Eleven-Month Negotiation Resulted in the Nine-Page Settlement Term Sheet Drafted and Offered by EBCC

From November 2021 through September 2022, EBCC and the Ebury Parties worked together to resolve the Credit Facilities, including via dozens of conference calls, often numbering several in one week. Id. ƒƒ 55, 62. Besides offering concrete solutions, the Ebury Parties freely shared all their material financial, legal, and other relevant information with EBCC. Id. ƒ 58. By December 2021, the Ebury Parties had given EBCC access to all software necessary for EBCC to independently verify the Ebury Parties' assets, including for their accounting and tax lien servicing providers. Id. ƒƒ 58–61.

On June 17, 2022, the Ebury Parties sent EBCC a specific repayment plan that contemplated that (1) EBCC would accept $18 million as full repayment of the Credit Lines; (2) the Ebury Parties would pay EBCC no less than $350,000 per month; (3) EBCC would allow the Ebury Parties to maintain $400,000 of operating capital at all times; (4) the Ebury Parties would pay EBCC 100% of all monthly cash that exceeded $750,000; and (5) EBCC's continued ability to review and oversee the Ebury Parties' day-to-day financials. Id. ƒ 65.

On August 10, 2022, EBCC countered to the Ebury Parties' "proposal made via email on June 17, 2022," attaching a document that EBCC characterized as "a term sheet setting forth the terms of an amendment through which the existing obligations owed to EBC[C] can be repaid" and requesting that the Ebury Parties' lawyer call "as soon as possible to discuss." Id ƒ 68.

Over the next month, EBCC and the Ebury Parties' respective counsel hammered out the settlement details. Id. ƒ 69. After several rounds of conversations and

9

negotiations, EBCC sent the Ebury Parties the final "**Settlement Term Sheet**," dated September 14, 2022. Id. ¶ 70.

While the Settlement Term Sheet, drafted by EBCC, characterized itself as "for discussion purposes only," "not constitut[ing] an offer, agreement or commitment to lend" and was "subject to satisfactory completion of due diligence, credit approval, satisfactory review and execution of documentation, and such other terms and conditions as may be determined by Lender and its counsel," the nine-page document also outlined all of the material terms that would be incorporated into the Parties' final Settlement, including that:

1. "The Parties will execute an amended to the Loan Documents,"
2. That Amendment would extend the Ebury Parties' deadline to repay the Credit Facilities to "the earlier to occur of (i) November 1, 2025" or "any of the Termination Events (specified below);"
3. EBCC would "refrain[] from exercising any of its rights and remedies under the Loan Documents," but could "refus[e] to extend any new or additional extensions of credit," "impos[e] a default rate of interest," or "send[] any notices or tak[e] any other action necessary or appropriate to protect and preserve [its] rights and interests;"
4. "The Parties acknowledge and agree that [ . . . ] the aggregate amount [ . . . ] owed under the Loan Documents is $21,525.251.71 and shall increase by an additional $6,398.35 each day until the execution of the Amendment" (the "**Existing Obligation**");
5. The Ebury Parties "acknowledge[] and agree[] that the Existing Obligation constitutes the[ir] legal, valid, binding, and enforceable obligation" and "is not subject to any credit, offset, defense, cause of action, setoff, counterclaim or adjustment of any time, and is secured by [specified] liens and security interests;"
6. Interest "shall accrue" at SOFT + 10.36% basis points;
7. The Ebury Parties "agree[] to pay [EBCC] the sum of $18,247.480.55;"
8. The Ebury Parties agree to pay that sum pursuant to a specified schedule, including no less than $350,000 per month, plus "Remaining Monthly Gross Receipts" calculated pursuant to a four-paragraph formula outlined in the Settlement Term Sheet;
9. "By no later than December 31, 2022, [the Ebury Parties] shall make Payments to [EBCC] no less than $3,000,000;"

**10**

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 475 of 2230

10. In each quarter of 2023, the Ebury Parties "shall pay [EBCC] no less than $1,500,000," subject to specific offsets explained in the Settlement Term Sheet;

11. The Ebury Parties "acknowledge[] and reaffirm[] all existing Collateral (the "Existing Collateral") including without limitation that the REO Properties were each acquired through, and are proceeds and products of, the Tax Liens, and constitute Existing Collateral;"

12. The Ebury Parties agree to new "Additional Collateral" that and "Additional Guarantors" who would cross-collateralize the Credit Facilities;

13. The Ebury Parties will run all transactions through new, supervised financial accounts created at EBCC's behest;

14. Ten paragraphs of "Additional Financial Reporting Requirements and Covenants;"

15. Ten "Conditions Precedent," including execution of the Term Sheet by September 14, 2022 and the Amendment by September 23, 2022; and

16. The Ebury Parties' agreement that "[f]rom on and after the date this [Settlement] Term Sheet is delivered through the execution of the Amendment, [they] shall not sell, transfer, distribute or otherwise dissipate the Collateral outside the ordinary course of business."

Settlement Term Sheet, Dkt. 74 (Aug. 9, 2022).

Just one day after transmitting the Settlement Term Sheet, EBCC's outside counsel emphasized that the bank "need this executed by the end of business today." Id. ƒ 72. EBCC's outside counsel also emphasized that the Bank "needed" the Ebury Parties to execute the Settlement Term Sheet on September 15, 2022 so that the Parties could close the Settlement by Friday, September 23, 2022. Id. ƒ 73.

Relying on the Parties' lengthy negotiations, EBCC's demand that the Ebury Parties execute the Settlement Term Sheet "today," and EBCC's promise that executing "today" would mean the Settlement closed by the following Friday, the Ebury Parties executed and returned the Settlement Term Sheet to EBCC on September 15, 2022. Id. ƒ 74. Despite months of oral negotiations, weeks of exchanging EBCC-created drafts, and

11

pressuring the Ebury Parties to sign "today," EBCC went dark after the Ebury Parties

returned the executed Settlement Term Sheet. <u>Id.</u> ƒ 75.

### IV.    The McOsker Allegations Are EBCC's Only Reason for Abandoning the Settlement Term Sheet

On Sunday, September 25, 2022—without warning to the Ebury Parties, and even

without warning to the EBCC outside counsel who had negotiated the Settlement Term

Sheet—EBCC initiated this Action, suing the Ebury Parties for the very same alleged

conduct that the Parties had purportedly attempted to resolve via the Settlement Term

Sheet. <u>Id.</u> ƒ 76.

The only post-default "misconduct" alleged in EBCC's Complaint was copy-

pasted hearsay from a counterclaim filed against certain Ebury Parties by a disgruntled

business partner, Thomas R. McOsker, in a Delaware federal litigation (the "**McOsker**

**Allegations**"). <u>Id.</u> ƒ 77. In discovery, EBCC's witnesses confirmed that the McOsker

Allegations were the **only** new "facts" that caused EBCC to abandon the settlement and

sue the Ebury Parties. <u>Id.</u> ƒ 78.

However, EBCC knew or should have known that the McOsker Allegations were

baseless. <u>Id.</u> ƒ 79. As early as summer 2019, the Ebury Parties told EBCC what had

happened with Mr. McOsker and shared all material litigation information with EBCC.

<u>Id.</u> ƒ 85. Indeed, EBCC repeatedly referenced the $3+ million that the Ebury Parties

expected to someday recover in the Delaware Litigation. <u>Id.</u> ƒ 90.

The Ebury Parties had introduced Mr. McOsker to EBCC years prior, in connection

with a transaction that the Ebury Parties abandoned once it became clear that Mr.

McOsker was cheating them. <u>Id.</u> ƒ 80. In June 2019, the Ebury Parties moved out of the

Puerto Rico office they shared with Mr. McOsker and his controlled companies (the "**McOsker Entities**"). Id. ∫ 81. The very next business day, the Ebury Parties sued the McOsker Entities in the federal district court for the District of Puerto Rico. Id. ∫ 82.

Because the McOsker Entities argued that the Puerto Rico federal court could not exercise diversity jurisdiction, the Ebury Parties voluntarily dismissed that federal litigation and refiled their claims in Puerto Rico's local court. Id. ∫ 83. That litigation still is proceeding in Puerto Rico. Id. ∫ 84.

In the Puerto Rico litigation, Delaware-incorporated McOsker Entities argued that their part of the dispute belonged in Delaware court. Id. ∫ 87. Accordingly, the Ebury Parties dismissed those McOsker Entities and claims from the Puerto Rico litigation, and in February 2021, filed a new litigation against those entities and related principals in the federal district court for the District of Delaware (the "**Delaware Litigation**"). Id. ∫ 88. In the Delaware Litigation, the relevant Ebury Parties allege that the McOsker Parties violated the Racketeer Influenced and Corrupt Organizations ("**RICO**") Act, specifically by stealing tax lien certificates from numerous investment funds, including the Ebury Parties, and claiming no less than $3.5 million in damages. Id. ∫ 89.

The McOsker Parties tried, and failed, to get the Delaware Litigation dismissed. Id. ∫ 91. After 18 months of stalling and motion practice, the McOsker Parties finally filed their Answer and Counterclaim in September 2022. Id. ∫ 92. That initial Counterclaim copy-pasted the Ebury Parties' legal allegations verbatim in an attempt to build reciprocal RICO claims against the Ebury Parties. Id. ∫ 93. Those hall-of-mirrors McOsker

Allegations are the very same ones on which EBCC supposedly relied to abandon its settlement negotiations and sue the Ebury Parties. <u>Id.</u> ƒ 94.

In response to the Ebury Parties' pleadings dismissal motion, the McOsker Parties filed amended claims that attempted to preserve their claims. <u>Id.</u> ƒ 95. Because those amended pleadings failed to cure the original deficiencies, the Ebury Parties moved to dismiss the amended pleadings in February 2023. <u>Id.</u> ƒ 96. Magistrate Judge Jennifer L. Hall held oral argument on that motion on August 18, 2023, and has not yet ruled on the motion. <u>Id.</u> ƒ 97.

From at least 2019, EBCC knew that Mr. McOsker was untrustworthy and had victimized the Ebury Parties. <u>Id.</u> ƒ 98. Ebury entities initiated all three of the litigations against Mr. McOsker and his entities. ƒ 100. The Ebury Parties consistently made EBCC contemporaneously aware of the McOsker litigations. <u>Id.</u> ƒ 101.

In September 2022, EBCC was well aware that Ebury Parties were continuing to pursue Mr. McOsker and his entities in two separate litigations, including for $3.5 million of tax lien certificates that are EBCC's collateral. <u>Id.</u> ƒ 102. In September 2022, EBCC also was well aware that Mr. McOsker and his entities had yet again failed to win a dismissal motion, and would soon be required to answer the Ebury Parties' claims. <u>Id.</u> ƒ 103. EBCC was unbothered by that ongoing litigation: it adopted and papered up the Ebury Parties' June 2022 proposal in early September 2022, sent the Settlement Term on September 14, 2022, and demanded that the Ebury Parties execute the contract no later than September 15, 2022. <u>Id.</u> ƒ 104.

<div align="center">14</div>

EBCC induced the Ebury Parties' signature by claiming that the Parties would close the Settlement by September 23, 2022. Id. ∫ 105. But after ten months of putting the Ebury Parties through every possible test—from sharing software access to toying with third-party investors to blowing off refinancing arrangements to purporting to negotiate repayment plans to demanding next-day execution of the Settlement Term Sheet—EBCC disappeared, only to sue the Ebury Parties on the Sunday after the Settlement was supposed to have closed. Id. ∫ 106.

By waiting to sue the Ebury Parties until nearly a year after the default—and by relying solely on the McOsker Allegations to turn a routine, straightforward, uncontested failure to repay a loan into a wide-ranging fraud case—EBCC claimed that the Ebury Parties owed millions more in interest than at the time of default, and even more than contemplated in the parties' negotiated settlement. Id. ∫ 107. Moreover, by dragging out the workout process for over ten months, EBCC forced the Ebury Parties to spend hundreds of thousands of dollars on legal and other professional services fees. Id. ∫ 108. Consequently, the Ebury Parties counterclaim against EBCC for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. Id. ∫∫ 109–27.

## ARGUMENT

While EBCC's Motion fairly characterizes basic contract, implied covenant, and promissory estoppel principles, it ignores the New York law that governs this Motion: parties to a "preliminary agreement" have the duty to negotiate in good faith, even if they do not have the duty to ultimately fulfill the contemplated contract's final, binding terms. Accord IDT Corp. v. Tyco Grp., 13 N.Y.3d 209, 213 (2009) (holding that non-final settlement agreement with numerous open terms was sufficiently definite to impose the duty to negotiate in good faith). By abandoning the Parties' settlement negotiations simply because Mr. McOsker filed new Allegations in the Delaware Litigation, EBCC violated its obligations to negotiate with the Ebury Parties in good faith.

### I.    EBCC Abandoned the Settlement Negotiations in Bad Faith

New York law recognizes two types of binding preliminary contracts: a "Type I Agreement," in which "the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document," and a "Type II Agreement," which "expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." Cambridge Cap. LLC v. Ruby Has LLC, No. 20-CV-11118 (LJL), 2023 WL 3956868, at *27 (S.D.N.Y. June 2, 2023) ("**Cambridge II**") (citing Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998); Teachers Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987)); see also, e.g., E. Allan Farnsworth, Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations, 87 Colum. L. Rev. 217, 251 (1987) (describing "precontractual

16

FILED: NEW YORK COUNTY CLERK 09/07/2023 09:02 PM
NYSCEF DOC. NO. 85

INDEX NO. 158207/2022
RECEIVED NYSCEF: 09/07/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records        Pg 481 of 2230

liability" as an agreement to negotiate in which the parties "set out specific substantive terms of the deal, but do not agree to be bound as to those terms," and observing that such agreements are commonly found in the "field of mergers and acquisitions" in which a "letter of intent amounts to an agreement to negotiate.") (cleaned up); cf. IDT Corp., 13 N.Y.3d at 215 n.2 (observing that while the Court of Appeals "does not disagree with the reasoning in federal cases" distinguishing between "Type I" and "Type II" agreements, it "do[es] not find the rigid classifications into 'Types' useful.").

Type II agreements "do not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework." Brown v. Cara, 420 F.3d 148, 153 (2d Cir. 2005) (cleaned up). Accordingly, a party cannot "renounc[e] the deal, abandon[] the negotiations, or insist[] on conditions that do not conform to the preliminary agreement." Tribune, 670 F. Supp. at 498.

As the Court of Appeals has explained:

[P]arties may enter into a binding contract under which the obligations of the parties are conditioned on the negotiation of future agreements. In such a case, the parties are obliged to negotiate in good faith. But that obligation can come to an end without a breach by either party. There is such a thing as a good faith impasse; not every good faith negotiation bears fruit.

IDT Corp. v. Tyco Grp., S.A.R.L., 23 N.Y.3d 497, 502–03 (2014).

To determine whether such an agreement exists, New York courts consider (1) "whether the intent to be bound is revealed by the language of the agreement," (2) "the context of the negotiations," (3) "the existence of open terms," (4) "partial performance," and (5) "the necessity of putting the agreement in final form, as indicated by the

17

FILED: NEW YORK COUNTY CLERK 09/07/2023 09:02 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 85    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 09/07/2023

Court Records    Pg 482 of 2230

customary form of such transactions." <u>Brown</u>, 420 F.3d at 157 ("the question posed is whether the parties have agreed to proceed with an open framework toward a contractual goal, leaving necessary terms for later negotiation.").

However, whether a Type II agreement exists and has been breached "cannot be reduced to a simple formula that applies across all forms of Type II agreements and all factual settings." <u>Cambridge II</u>, 2023 WL 3956868, at *29; <u>see also</u> <u>Brown</u>, 420 F.3d at 157 ("[I[f the question posed is whether the parties have agreed to proceed within an open framework toward a contractual goal, leaving necessary terms for later negotiation, rather than whether the parties have agreed to achieve the ultimate contractual goal, then the language of the agreement, its contents and omissions, and the context in which it was negotiated and signed, may lead to different conclusions."). Courts have even allowed Type II claims to proceed to discovery where the plain language, negotiations context, and open terms weigh against the claimant. <u>Betty, Inc. v. PepsiCo., Inc.</u>, No. 16 CV 4215 (VB), 2018 WL 2561028, at *4–5 (S.D.N.Y. June 4, 2018).

FILED: NEW YORK COUNTY CLERK 09/07/2023 09:02 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 85
RECEIVED NYSCEF: 09/07/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 483 of 2230

## A. The Settlement Term Sheet Memorializes the Parties' Duties to Negotiate in Good Faith

EBCC's laser focus on the "non-binding agreement" language misses the forest for the trees: New York's most basic contract principles require reading documents in their entirety, not cherry-picking favorable clauses:

> [I]t is a fundamental precept of contract law that agreements must be read in their entirety and that no provision of a contract draws the entirety of its meaning from examining its language in isolation. "In determining whether a letter of intent is sufficient to give rise to a duty to negotiate in good faith, the Court must examine the entire document and the relevant circumstances surrounding its adoption."

Cambridge Cap. LLC v. Ruby Has LLC, 565 F. Supp. 3d 440, 443 (S.D.N.Y. 2021) ("**Cambridge I**") (quoting Bennett v. Itochu Int'l, 682 F. Supp. 2d 469, 482 (E.D. Pa. 2010)); see also id. at 446 (citing FCOF UB Sec. LLC v. MarEquity, Inc., 663 F. Supp. 2d 224, 229 (S.D.N.Y. 2009)) ("For the Type II inquiry, courts place more emphasis on the context of the negotiations and less on the existence of unresolved terms.").

That language is particularly irrelevant to this preliminary agreement analysis **because** such agreements do not bind the parties to their unfinalized substantive terms, but instead only to the duty to negotiate in good faith. See, e.g., Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc., 765 F. Supp. 2d 403, 415 (S.D.N.Y. 2011) ("[T]he first factor, the language of the document, favors the finding of a Type II preliminary agreement. First, the phrase 'this Memorandum is not a binding legal obligation' is not dispositive here because Type II preliminary agreements are not binding legal obligations."); Gas Nat., Inc. v. Iberdrola, S.A., 33 F. Supp. 3d 373, 381

**19**

(S.D.N.Y. 2014) ("The parties' description of the LOI as a 'non-binding letter of intent,' while relevant, is not determinative.").

The "negotiations context," "open terms," and "partial performance" factors further compel the conclusion that EBCC was bound to negotiate in good faith. The Parties "had dealings for years," the Settlement Term Sheet was "the culmination of several months of discussions and negotiations," and "the Parties' history of past business relationships and extended business discussions prior to the [Settlement Term Sheet] implies that future discussions to reach the ultimate contractual goals were contemplated." <u>Learning Annex</u>, 765 F. Supp. 2d at 415; <u>see also, e.g.</u>, <u>Cambridge I</u>, 565 F. Supp. 3d at 446 (that the parties "engaged in in-person meetings and deep discussions over the past year" weighed in favor of binding Type II agreement); <u>EQT Infrastructure Ltd. v. Smith</u>, 861 F. Supp. 2d 220, 229 (S.D.N.Y. 2012) (finding that a "lengthy negotiations period" of "nine months of negotiations and several rounds of offers and counteroffers" prior to execution of an LOI supports conclusion that parties intended to keep negotiating and thus were bound "to do so in good faith"); <u>Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.</u>, 383 F. Supp. 2d 428, 446 (S.D.N.Y. 2003) (finding that "at least two meetings and several conversations regarding the deal" weighed slightly in favor of enforceable agreement).

As in <u>Cambridge I</u>, the nine-page Settlement Term Sheet is "striking in the detail it provides: [I]t contains the parties' agreement on many major terms;" "even includes governance provisions;" uses "concrete terms" "[i]n words that are mandatory and not merely aspirational," and by including specific term sheet and closing deadlines,

expresses the parties' "'intent [] to move forward to a **closing** as quickly as possible,' not just to negotiation and consummation of final transaction documents." <u>Cambridge I</u>, 565 F. Supp. 3d at 444 (emphasis in original).

### B. The McOsker Allegations Do Not Justify EBCC's Abandonment of the Parties' Settlement Negotiations

EBCC breached that duty because it "unreasonably insisted on conditions that did not conform to the preliminary writing:" nothing in the Settlement Term Sheet conditioned the Parties' future relationship on theoretical, unsubstantiated allegations made in litigation that had been known by and disclosed to EBCC for years. <u>See</u> <u>Learning Annex</u>, 765 F. Supp. 2d at 417.

Not a single one of the Settlement Term Sheet's ten "Conditions Precedent" could be construed to include the McOsker Allegations, and EBCC's decision to initiate this litigation instead of continuing to negotiate with the Ebury Parties—or even ask the Ebury Parties about or give them the opportunity to explain the Allegations—breached EBCC's good-faith negotiation duties by "preventing adequate collaboration" between the Parties. <u>See, e.g.</u>, <u>L-7 Designs, Inc. v. Old Navy, LLC</u>, 964 F. Supp. 2d 299, 314 (S.D.N.Y. 2013) (refusing to grant summary judgment; "It is possible that a reasonable juror could find that L-7's filing of the complaint constituted a breach of the [contract] by preventing adequate collaboration between Oldham and the Old Navy executives with whom he has to work. It is likewise possible, however, that a reasonable juror could find that L-7's lawsuit was merely an attempt to clarify the meaning of the [contract]."); <u>Cambridge I</u>, 565 F. Supp. 3d at 452 (refusing to grant pleadings dismissal because complaint alleged

<div align="center">21</div>

that defendant "demand[ed] new economic terms inconsistent with the provisions previously agreed-to in the LOI and abandoning negotiations in December 2020.").

## II.    If the Court Preserves the Breach-of-Contract Counterclaim, It May Dismiss the Others as Duplicative

By pleading facts explaining exactly why the McOsker Allegations are no good-faith basis for EBCC's withdrawal from the Settlement Term Sheet, and exactly how the Ebury Parties detrimentally relied on EBCC's promises to negotiate and settle their debts, the Counterclaim pleads its implied covenant and promissory estoppel claims. See, e.g., Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) (implied covenant prohibits parties from "do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"); Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000) (promissory estoppel requires pleading "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance."); Farnsworth on Contracts ∕ 7.17 (2d ed. 2001) (implied covenant can require parties to undertake "affirmative steps to cooperate in achieving" the contract's objectives).

However, the implied covenant and promissory estoppel analyses significantly overlap with New York's breach-of-preliminary-agreement analysis, to an even greater extent than they do with traditional contract analyses. As in the "preliminary agreement" analysis, to determine whether EBCC breached the implied covenant, New York Courts "must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." Dalton, 87 N.Y.2d at 389.

FILED: NEW YORK COUNTY CLERK 09/07/2023 09:02 PM  INDEX NO. 158207/2022

NYSCEF DOC. NO. 85    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 09/07/2023

Court Records    Pg 487 of 2230

Accordingly, whether particular conduct violates the implied covenant "necessarily depends on the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007). Moreover, what "good faith" requires "varies on a case-by-case basis: 'the boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." Gas Nat., 33 F. Supp. 3d at 383 (quoting Cross & Cross Properties Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989)).

Similarly, "[p]romissory estoppel is a narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement—for example, the Statute of Frauds or a failure of consideration." BNP Paribas Mortgage Corp. v. Bank of Am., N.A., 949 F.Supp.2d 486, 516 (S.D.N.Y.2013).

While each of the Ebury Parties' counterclaims requires a slightly different legal analysis, all three rest on the same factual allegations and request the same relief. Therefore, if the Court determines that the Counterclaim pleads its breach-of-contract claim, it may dismiss the other two as duplicative. Accord Credit Suisse First Boston v. Utrecht-Am. Fin. Co., 80 A.D.3d 485, 487–88 (1st Dep't 2011) (quoting Tribune, 670 F. Supp. at 498) (cleaned up) (observing that preliminary agreement's "obligation to negotiate in good faith 'bars a party from insisting on conditions that do not conform to the preliminary agreement'" and dismissing implied covenant claim as duplicative); Gas Nat., 33 F. Supp. 3d at 385–86 (dismissing promissory estoppel claim as duplicative where

court concluded that the parties "enter[ed] into a binding obligation to negotiate in good faith.").

## CONCLUSION

The McOsker Allegations are no legitimate reason for EBCC to have abandoned the Parties' Settlement Term Sheet. Therefore, the Ebury Parties respectfully request that the Court either deny the Motion in its entirety or grant the Motion only to the extent it seeks dismissal of duplicative implied covenant and promissory estoppel claims.


Dated: September 7, 2023
     New York, New York


Respectfully submitted,

**GUSRAE KAPLAN NUSBAUM PLLC**

**/s/ Kari Parks**
**Kari Parks**
**120 Wall Street, 25th Floor**
**New York, New York 10005**
**(212) 269-1400**
kparks@gusraekaplan.com

Attorneys for the Ebury Parties

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 489 of 2230

## WORD COUNT CERTIFICATION

I certify that this memorandum of law complies with the word count limit established in Commercial Division Rule 17, NYCRR∕202.70(g), because it contains 5,548 words.


Dated: September 7, 2023
     New York, New York


                                  /s/ Kari Parks
                                  Kari Parks

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 490 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                Plaintiff,

      v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

             Defendants.

---------------------------------------------------------------- x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 004**

**REPLY MEMORANDUM OF LAW IN
SUPPORT OF EBCC'S
MOTION TO DISMISS
DEFENDANTS' AMENDED
COUNTERCLAIM**

# TABLE OF CONTENTS

*Page*

**INTRODUCTION** ................................................................. 1

**ARGUMENT** ...................................................................... 1

**I.    Defendants' breach of contract claim fails as a matter of law** ........................ 1

    A.    The Term Sheet is not a preliminary agreement .................................... 2

    B.    The Term Sheet does not impose any duties on EBCC ......................... 3

    C.    EBCC did not violate any duty to Defendants ....................................... 6

    D.    Defendants' damages allegations are inconsistent with their counterclaims .......... 7

**II.   Defendants' implied covenant and promissory estoppel claims are deficient and impermissibly duplicative** ......................................................... 8

**CONCLUSION** ................................................................... 8

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Aksman* v. *Xiongwei Ju,*
   21 A.D.3d 260 (1st Dep't 2005) ..............................................................5

*All. Network, LLC* v. *Sidley Austin LLP,*
   43 Misc. 3d 848 (Sup. Ct. N.Y. Cnty. 2014) ............................................8

*Amcan Holdings, Inc.* v. *Can. Imperial Bank of Com.,*
   70 A.D.3d 423 (1st Dep't 2010) ..............................................................5

*Antonucci* v. *Stevens Dodge, Inc.,*
   73 Misc. 2d 173 (Civ. Ct. Queens Cnty. 1973) ........................................2

*Betty, Inc.* v. *PepsiCo, Inc.,*
   2018 WL 2561028 (S.D.N.Y. June 4, 2018) ............................................5

*Brown* v. *Cara,*
   420 F.3d 148 (2d Cir. 2005) ....................................................................5

*BW Hvac Operations, LLC* v. *Lambro Indus., Inc.,*
   2014 WL 2738049 (Sup. Ct. N.Y. Cnty. June 12, 2014) ................2, 5, 6

*Cambridge Cap. LLC* v. *Ruby Has LLC,*
   2023 WL 3956868 (S.D.N.Y. June 2, 2023) ............................................5

*Deutsche Bank Nat'l Tr. Co.* v. *Husband,*
   47 Misc. 3d 1206(A) (Sup. Ct. N.Y. Cnty. 2015) ....................................6

*EQT Infrastructure Ltd.* v. *Smith,*
   861 F. Supp. 2d 220 (S.D.N.Y. 2012) ......................................................6

*Express Indus. & Terminal Corp.* v. *N.Y.S. Dep't of Transp.,*
   93 N.Y.2d 584 (1999) ..............................................................................2

*FCOF UB Sec. LLC* v. *MorEquity, Inc.,*
   663 F. Supp. 2d 224 (S.D.N.Y. 2009) ......................................................5

*Gas Nat., Inc.* v. *Iberdrola, S.A.,*
   33 F. Supp. 3d 373 (S.D.N.Y. 2014) ........................................................5

*Guggenheim Corp. Funding, LLC* v. *Access.1 Commc'ns Corp.-NY,*
   26 Misc. 3d 1210(A) (Sup. Ct. 2009) ..................................................1, 4

-ii-

FILED: NEW YORK COUNTY CLERK 09/13/2023 10:39 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 86
RECEIVED NYSCEF: 09/13/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 493 of 2230

*HP Hotel Sponsor, LLC* v. *Strategic Cap. Sols., LLC*,
   29 Misc. 3d 1204(A) (Sup. Ct. N.Y. Cnty. 2010)................................................5

*IDT Corp.* v. *Tyco Grp.*,
   13 N.Y.3d 209 (2009) ........................................................................................5

*IDT Corp.* v. *Tyco Grp., S.A.R.L.*,
   23 N.Y.3d 497 (2014) ........................................................................................2

*iGo Mktg. & Ent., LLC* v. *Hartbeat Prods., LLC*,
   217 A.D.3d 753 (2d Dep't 2023) ........................................................................7

*Jordan Panel Sys., Corp.* v. *Turner Constr. Co.*,
   45 A.D.3d 165 (1st Dep't 2007) .........................................................................3

*Kowalchuk* v. *Stroup*,
   61 A.D.3d 118 (1st Dep't 2009) .......................................................................2, 3

*Lazard Freres & Co.* v. *First Nat'l Bank of Md.*,
   268 A.D.2d 294 (1st Dep't 2000) .......................................................................2

*Learning Annex Holdings, LLC* v. *Whitney Educ. Grp.*,
   765 F. Supp. 2d 403 (S.D.N.Y. 2011) ................................................................5

*In re Lipper Holdings, LLC*,
   1 A.D.3d 170 (1st Dep't 2003) ...........................................................................6

*NRP Holdings LLC* v. *City of Buffalo*,
   2012 WL 2873899 (W.D.N.Y. July 12, 2012).....................................................4

*Oppenheimer & Co.* v. *Oppenheim, Appel, Dixon & Co.*,
   86 N.Y.2d 685 (1995) ........................................................................................3

*Simon* v. *Kyrejko*,
   2017 WL 2362195 (Sup. Ct. N.Y. Cnty. May 30, 2017).....................................4

*Solus Alternative Asset Mgmt. LP* v. *Perry Corp.*,
   2015 WL 4240999 (Sup. Ct. N.Y. Cnty. July 13, 2015) .....................................1

*Spencer Trask Software & Info. Servs. LLC* v. *RPost Int'l Ltd.*,
   383 F. Supp. 2d 428 (S.D.N.Y. 2003).................................................................6

*Stonehill Cap. Mgmt., LLC* v. *Bank of the West*,
   28 N.Y.3d 439 (2016) ......................................................................................3, 5

*Tchrs. Ins. & Annuity Ass'n of Am.* v. *Trib. Co.*,
   670 F. Supp. 491 (S.D.N.Y. 1987) .................................................................2, 4, 5

-iii-

FILED: NEW YORK COUNTY CLERK 09/13/2023 10:39 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.: 86
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 494 of 2230
RECEIVED NYSCEF: 09/13/2023

*U.S. Bank Nat'l Ass'n* v. *Kahn Prop. Owner, LLC*,
   64 Misc. 3d 1236(A) (Sup. Ct. N.Y. Cnty. 2019) .......................................................4

*UrbanAmerica, L.P. II* v. *Carl Williams Grp.*,
   95 A.D.3d 642 (1st Dep't 2012) ................................................................................5

*Vacold LLC* v. *Cerami*,
   545 F.3d 114 (2d Cir. 2008).......................................................................................4

*Williamson, Picket, Gross, Inc.* v. *LVMH, Inc.*,
   20 Misc. 3d 1141(A) (Sup. Ct. N.Y. Cnty. 2008) .......................................................4

**STATUTES AND RULES**

22 NYCRR § 103-1.1(c)..................................................................................................8

## INTRODUCTION

The core of Defendants' Amended Counterclaim is that a draft Term Sheet[1]—that contains an explicit provision that it "creates no binding obligations on the part of" EBCC and that EBCC never signed—is a binding preliminary agreement that imposes duties on EBCC. That is absurd. Defendant's position is frivolous and the Amended Counterclaim should be dismissed in its entirety and with prejudice.

## ARGUMENT

### I.    Defendants' breach of contract claim fails as a matter of law.

Defendants assert that the Term Sheet required EBCC to negotiate a settlement and that EBCC breached a contractual duty by ceasing negotiations and filing this action after EBCC discovered evidence confirming its belief that Defendants had committed fraud. (Dkt. No. 85 at 16.) But EBCC had no duty to negotiate with Defendants absent "an underlying binding agreement requiring them to do so." *Solus Alternative Asset Mgmt. LP* v. *Perry Corp.*, 2015 WL 4240999, at *10 (Sup. Ct. N.Y. Cnty. July 13, 2015). Defendants base their breach of contract claim on the Term Sheet, which cannot be the "underlying binding agreement" because EBCC never executed or agreed to it. Further, even if EBCC had done so, EBCC still would not owe any duties to Defendants because the Term Sheet is expressly non-binding. Defendants fail as a matter of law to identify a binding agreement that required EBCC to negotiate a settlement, and their breach of contract claim must be dismissed. *See Guggenheim Corp. Funding, LLC* v. *Access.1 Commc'ns Corp.-NY*, 26 Misc. 3d 1210(A), at *10 (Sup. Ct. 2009) ("Under New York law, whether a binding agreement exists is a legal issue, not a factual one.").

---

[1]    (*See* Dkt. 74 ("**Term Sheet**").)

### A.    The Term Sheet is not a preliminary agreement.

EBCC is not bound by the Term Sheet because EBCC never agreed to it. "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp.* v. *N.Y.S. Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999); *see Kowalchuk* v. *Stroup*, 61 A.D.3d 118, 121 (1st Dep't 2009). EBCC never agreed to the Term Sheet and Defendants do not plausibly allege otherwise. The most that Defendants allege is that, "[a]fter months of negotiations," EBCC "sent the . . . Term [Sheet] on September 14, 2022," and then "disappeared." (Dkt. No. 85 at 4, 14-15.)

"It is fundamental . . . that mere participation in negotiations and discussions does not create binding obligation, even if agreement is reached on all disputed terms." *Tchrs. Ins. & Annuity Ass'n of Am.* v. *Trib. Co.*, 670 F. Supp. 491, 497 (S.D.N.Y. 1987). In addition, "[w]here the agreement takes the form of a written instrument," an agreement is "effective only when the document has been signed and delivered." *Antonucci* v. *Stevens Dodge, Inc.*, 73 Misc. 2d 173, 175 (Civ. Ct. Queens Cnty. 1973); *see Lazard Freres & Co.* v. *First Nat'l Bank of Md.*, 268 A.D.2d 294, 295 (1st Dep't 2000) (finding no enforceable agreement where the defendant "never signed and returned" the proposed agreement). EBCC never signed and returned the Term Sheet, so Defendants cannot use it as the basis for their breach of contract claim. (*See* Dkt. No. 74 at 8 (empty EBCC signature block on the Term Sheet).)

The law of preliminary agreements does not disturb these bedrock principles of contract law. Preliminary agreements are "***binding contract[s]*** under which the obligations of the parties are conditioned on the negotiation of future agreements." *IDT Corp.* v. *Tyco Grp., S.A.R.L.*, 23 N.Y.3d 497, 502 (2014) (emphasis added). "Without an agreement," there can be no "preliminary agreement." *BW Hvac Operations, LLC* v. *Lambro Indus., Inc.*, 2014 WL 2738049,

at *6 (Sup. Ct. N.Y. Cnty. June 12, 2014). The parties never formed an agreement because they never executed "an Amendment . . . in writing among the parties," as contemplated by the Term Sheet. (<u>Dkt. No. 74</u> at 8.)

Defendants characterize the Term Sheet's contemplation of a future written agreement as a condition precedent that does not defeat the existence of a preliminary agreement. (<u>Dkt. No. 85</u> at 21.) But the execution of an Amendment in writing was a condition "prefatory to the formation of a binding agreement," not merely a "condition[] precedent to performance." *Stonehill Cap. Mgmt., LLC* v. *Bank of the West*, 28 N.Y.3d 439, 452 (2016). A condition precedent to performance is an "act[] or event[] which must occur before a party is obliged to perform a promise made pursuant to an existing contract." *Oppenheimer & Co.* v. *Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995). By contrast, a condition precedent to the formation or existence of a contract provides that "no contract arises 'unless and until the condition occurs.'" *Id.* (citation omitted). Here, the execution of a written Amendment indisputably was a condition precedent to the formation of a binding agreement because the Term Sheet, if executed, still "reserve[d] all of [EBCC's] rights and remedies under the lending relationship" until the execution of a written Amendment. (<u>Dkt. No. 74</u> at 8.) Defendants' discursion through the law of preliminary agreements is thus completely unnecessary, as they have failed to establish that the Term Sheet is an agreement at all.

## B. The Term Sheet does not impose any duties on EBCC.

Even if the Term Sheet were a preliminary agreement, it still would not impose any duties on EBCC. "Under New York law, 'when a party gives forthright, reasonable signals that it means to be bound only by a written agreement,' that intent is honored." *Kowalchuk*, 61 A.D.3d at 123 (citation omitted); *Jordan Panel Sys., Corp.* v. *Turner Constr. Co.*, 45 A.D.3d 165, 169 (1st Dep't 2007) (same). "[N]o amount of negotiation or oral agreement to specific terms" will

change that outcome or "result in the formation of a binding contract." *Simon* v. *Kyrejko*, 2017

WL 2362195, at *8 (Sup. Ct. N.Y. Cnty. May 30, 2017) (citation omitted).

      The "primary inquiry" to determine whether a preliminary agreement imposes any

duties is "whether the agreement expressly provides that the parties will not be bound in the

absence of a formal, executed writing." *Guggenheim Corp. Funding, LLC*, 26 Misc. 3d 1210(A),

at *11; *U.S. Bank Nat'l Ass'n* v. *Kahn Prop. Owner, LLC*, 64 Misc. 3d 1236(A), at *6 (Sup. Ct.

N.Y. Cnty. 2019) (same); *see also Vacold LLC* v. *Cerami*, 545 F.3d 114, 125 (2d Cir. 2008) ("In

particular, we ask whether the agreement expressly states that the parties will not be bound in the

absence of a further, definitive written instrument.").

      If the agreement "is clear that the parties do not intend to be bound, the Court need

look no further." *NRP Holdings LLC* v. *City of Buffalo*, 2012 WL 2873899, at *6 (W.D.N.Y. July

12, 2012) (citation omitted). That is so because "[a] party cannot be contractually bound to an

agreement when the agreement clearly states that it is not binding until a formal agreement has

been executed." *Williamson, Picket, Gross, Inc*. v. *LVMH, Inc.*, 20 Misc. 3d 1141(A), at *2 (Sup.

Ct. N.Y. Cnty. 2008). "A primary concern for courts in such disputes is to avoid trapping parties

in surprise contractual obligations that they never intended." *Tchrs. Ins. & Annuity Ass'n of Am.*,

670 F. Supp. at 497.

      The Term Sheet explicitly provides that it is non-binding. (*See* <u>Dkt. No. 74</u>.) The

document is only a "summary of the principal terms and conditions under which Lender ***may*** agree

to address Existing Events of Default, including an amendment to the Loan Documents." (*Id*. at 1

(emphasis added); *see id.* at 7 (same)). In the Term Sheet, Defendants acknowledged and agreed

that the Term Sheet was "for discussion purposes only," "d[id] not constitute an offer, agreement,

or commitment to lend," and "create[d] no binding obligations on the part of the Lender." (*Id*. at

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 499 of 2230

1, 8.) "These statements are unambiguous: they clearly provide that the [Term Sheet] do[es] not create a binding agreement between the parties" and instead was merely "a non-binding negotiation preliminary to a binding contract." *BW Hvac Operations, LLC*, 2014 WL 2738049, at *5. Thus, the plain language of the Term Sheet "conclusively negates" Defendant's breach of contract claim. *Aksman* v. *Xiongwei Ju*, 21 A.D.3d 260, 261 (1st Dep't 2005).[2]

Defendants assert otherwise, citing a litany of cases analyzing preliminary agreements.[3] (Dkt. No. 85 at 16-22.) But this case is distinguishable from ***every one of those cases***, each of which involved an actual agreement between the parties. *IDT Corp.* v. *Tyco Grp.*, 13 N.Y.3d 209, 211 (2009) ("written settlement agreement"); *Cambridge Cap. LLC* v. *Ruby Has LLC*, 2023 WL 3956868, at *3 (S.D.N.Y. June 2, 2023) ("signed . . . LOI"); *Tchrs. Ins. & Annuity Ass'n of Am.*, 670 F. Supp. at 499 (signed letter of acceptance); *Brown* v. *Cara*, 420 F.3d 148, 151 (2d Cir. 2005) (signed memorandum of understanding); *Betty, Inc.* v. *PepsiCo, Inc.*, 2018 WL 2561028, at *1 (S.D.N.Y. June 4, 2018) ("Creative Agency Services Agreement"); *FCOF UB Sec. LLC* v. *MorEquity, Inc.*, 663 F. Supp. 2d 224, 226 (S.D.N.Y. 2009) ("executed . . . purchase agreement"); *Learning Annex Holdings, LLC* v. *Whitney Educ. Grp.*, 765 F. Supp. 2d 403, 408 (S.D.N.Y. 2011) ("Memorandum of Understanding . . . signed by both [parties]"); *Gas Nat., Inc.*

---

[2]    *See UrbanAmerica, L.P. II* v. *Carl Williams Grp.*, 95 A.D.3d 642, 644 (1st Dep't 2012) ("The court properly dismissed defendants' counterclaims. The letter of intent (LOI) specifically states that it is not binding . . . ."); *HP Hotel Sponsor, LLC* v. *Strategic Cap. Sols., LLC*, 29 Misc. 3d 1204(A), at *4 (Sup. Ct. N.Y. Cnty. 2010) ("The court holds that the Letter is not a Type II binding preliminary commitment. It expressly provides that the parties will not be bound in the absence of a formal, executed writing.").

[3]    While Defendants discuss Type I and Type II preliminary agreements (Dkt. No. 85 at 16-21), the Court of Appeals has "rejected . . . Type I/Type II classifications" and instead asks "whether the agreement contemplated the negotiation of later agreements and if the consummation of those agreements was a precondition to a party's performance." *Amcan Holdings, Inc.* v. *Can. Imperial Bank of Com.*, 70 A.D.3d 423, 427 (1st Dep't 2010) (citation omitted). Regardless of the classification system used, a preliminary agreement still requires an agreement. *See Stonehill Cap. Mgmt.*, 28 N.Y.3d at 452.

v. *Iberdrola, S.A.*, 33 F. Supp. 3d 373, 375 (S.D.N.Y. 2014) ("sign[ed] . . . Letter of Intent"); *EQT Infrastructure Ltd.* v. *Smith*, 861 F. Supp. 2d 220, 224 (S.D.N.Y. 2012) ("signed . . . LOI"); *Spencer Trask Software & Info. Servs. LLC* v. *RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 436 (S.D.N.Y. 2003) (handshake between the parties).

      For the reasons discussed in Part I.A, *supra*, the Term Sheet is not an agreement between the parties. Further, the unambiguous language of the Term Sheet cannot reasonably be interpreted as imposing obligations on EBCC. *See In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." (internal citations omitted)). As such, Defendants fail to state a claim against EBCC for breach of contract based on the Term Sheet.

### C.     EBCC did not violate any duty to Defendants.

      "[T]here is no basis for [imposing] a duty to act in good faith" on EBCC here because the parties did not form a preliminary agreement. *BW Hvac Operations*, 2014 WL 2738049, at *6. But even if the parties had formed a preliminary agreement and EBCC had been obligated to negotiate a settlement with Defendants, it still did not violate any duty by filing this action. EBCC has plausibly alleged serious fraudulent misconduct by Defendants, including "fraudulent conversion of tens of millions of dollars' worth of EBCC's collateral" and submission of "falsified borrowing base certificates and other documents . . . as the basis for receiving advances under the Credit Facilities." (<u>Dkt. No. 1</u> ¶ 1; *see* <u>Dkt. No. 64</u>.) The duty to negotiate in good faith under a preliminary agreement does not require EBCC to continue negotiating a settlement with entities it believes have committed fraud. *Cf. Deutsche Bank Nat'l Tr. Co.* v.

*Husband*, 47 Misc. 3d 1206(A), at *9 (Sup. Ct. N.Y. Cnty. 2015) (duty to negotiate in good faith does not "compel either party to consent to the other's position").[4]

### D.    Defendants' damages allegations are inconsistent with their counterclaims.

Defendants' breach of contract claim also fails because Defendants have not plausibly alleged any damages from EBCC's actions.  Defendants assert that they have suffered damages in the form of owing "millions more in interest than at the time of default" and "hundreds of thousands of dollars on legal and other professional services" because of EBCC's decision to file this action "nearly a year after the default" and "drag[] out the workout process for over ten months."  (Dkt. No. 85 at 15.)  But Defendants' counterclaims are based entirely on the Term Sheet, which EBCC provided to Defendants only about a week before it filed this action.  Any interest under the Credit Facilities or professional expenses that Defendants accrued during the workout process simply cannot be attributed to a Term Sheet that Defendants had not yet or only just received.  Defendants' failure to plausibly allege that they suffered any damages during the one-week period between September 15, 2022 (when Defendants signed the Term Sheet) and September 25, 2022 (when EBCC allegedly breached the Term Sheet by filing this Action) is fatal to their breach of contract counterclaim.  *iGo Mktg. & Ent., LLC* v. *Hartbeat Prods., LLC*, 217 A.D.3d 753, 754 (2d Dep't 2023) ("Proof of damages is an essential element of a claim for breach of contract under New York law.").

---

[4]    While EBCC accepts the non-conclusory allegations in the counterclaim as true for purposes of this motion, Defendants misstate the record, including when they state that "EBCC's witnesses confirmed that the McOsker Allegations were the only new 'facts' that caused EBCC to abandon the settlement and sue the Ebury Parties." (Dkt. No. 85 at 12.)  The serious allegations of fraud set out in EBCC's Complaint speaks for themselves (*see* Dkt. No. 1), and EBCC will address Defendants' incorrect factual assertions at an appropriate time.

## II.     Defendants' implied covenant and promissory estoppel claims are deficient and impermissibly duplicative.

Defendants concede that their claims for breach of the implied covenant of good faith and fair dealing and promissory estoppel are impermissibly duplicative of their breach of contract claim.[5]  (Dkt. No. 85 at 22-24.)  Defendants nevertheless request that the Court dismiss these claims *only if* the Court preserves their breach of contract claim.  (*Id.* at 23.)  The Court should dismiss both claims regardless, as Defendants failed to address any of the other serious legal deficiencies identified by EBCC in its opening memorandum of law that independently justify dismissal.  *See All. Network, LLC* v. *Sidley Austin LLP*, 43 Misc. 3d 848, 864 n.4 (Sup. Ct. N.Y. Cnty. 2014) ("[F]ailure to oppose arguments raised by motion to dismiss results in waiver.").

Defendants do not dispute that their implied covenant claim seeks to impose on EBCC an obligation that is inconsistent with the parties' contracts; they also do not dispute that they failed to identify a clear and unambiguous promise or establish detrimental reliance, as required under the doctrine of promissory estoppel.  (Dkt. No. 81 at 14-19.)  As such—and regardless of the Court's ruling on the breach of contract claim—Defendants' claims for breach of the implied covenant of good faith and fair dealing and promissory estoppel fail as a matter of law and should be dismissed.

## CONCLUSION

EBCC respectfully requests that the Court dismiss Defendants' Amended Counterclaim in its entirety and with prejudice.[6]

---

[5]     Defendants' abandonment of these counterclaims supports a finding that the counterclaims were "completely without merit in law." 22 NYCRR § 103-1.1(c).  Notably, Defendants chose to re-assert these meritless counterclaims in their Amended Counterclaim after receiving notice that the counterclaims lacked a legal or factual basis. (*See* Dkt. No. 72 at 15-17, 20-23.)

[6]     Dismissal with prejudice is warranted for the reasons stated in EBCC's opening memorandum of law.  (Dkt. No. 81 at 19-20.)  Defendants do not dispute that leave to amend

-8-

Dated:   September 13, 2023
         New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*

Alexander J. Willscher
Austin P. Mayron
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business
Credit Corporation*

---

would be futile and that exceptional circumstances justify dismissal with prejudice.  *See All.
Network*, 43 Misc. 3d at 864 n.4.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with the word-count limit of Commercial Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because it contains 2,727 words.

Dated:   September 13, 2023          /s/ Alexander J. Willscher
         New York, New York          Alexander J. Willscher

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | |
|---|---|
| PRESENT: **HON. MARGARET A. CHAN** | **PART** 49 |
| *Justice* | |

-----------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,

               Plaintiff,

      - v -

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS.,

               Defendants.

**INDEX NO.**    158207/2022

-----------------------------------------------------------------X

The parties appeared via Microsoft Teams for a status conference on November 21, 2023 at 1:30 PM. Based on the discussions held during the conference, it is hereby

ORDERED that the deadline to file the Note of Issue is extended to December 29, 2023.

DATE: **11/21/2023**

**MARGARET A. CHAN, JSC**

**Check One:** ☐ **Case Disposed**    ☒ **Non-Final Disposition**

**Check if Appropriate:** ☐ **Other (Specify** _____ )

# OTHER ORDER – NON-MOTION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

--------------------------------------------------------------------------------X

| | |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | **INDEX NO.** 158207/2022 |
| Plaintiff, | **MOTION DATE** 08/09/2023, 08/29/2023 |
| - v - | |
| JOHN HANRATTY, EBURY STREET CAPITAL, LLC,EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC,EBURY 2EMI LLC,EB 1EMIALA LLC,EB 2EMIALA LLC,EB 1EMIFL, LLC,EB 2EMIFL, LLC,EB 1EMIIN, LLC,EB 2EMIIN, LLC,EB 1EMIMD, LLC,EB 2EMIMD, LLC,EB 1EMINJ, LLC,EB 2EMINJ, LLC,EB 1EMINY, LLC,EB 2EMINY, LLC,EB 1EMISC, LLC,EB 2EMISC, LLC,RE 1EMI LLC,RE 2EMI LLC,EB 1EMIDC, LLC,ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC,EBURY FUND 1FL, LLC,EBURY FUND 2FL, LLC,EBURY FUND 1NJ, LLC,EBURY FUND 2NJ, LLC,RED CLOVER 1, LLC,EBURY RE LLC, and XYZ CORPS. | **MOTION SEQ. NO.** 003 004 **DECISION + ORDER ON MOTION** |
| Defendants. | |

--------------------------------------------------------------------------------X

HON. MARGARET CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 003) 71, 72, 73, 74, 75, 76, 78

were read on this motion to/for _____ DISMISS _____ .

The following e-filed documents, listed by NYSCEF document number (Motion 004) 80, 81, 82, 83, 84, 85, 86

were read on this motion to/for _____ DISMISS _____ .

Defendants-counterclaim plaintiffs John Arthur Hanratty, Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2 EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, Eb 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury Fund 2 FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and Ebury RE, LLC have filed counterclaims, as amended on August 25, 2023, against plaintiff-counterclaim defendant Emigrant Business Credit Corporation (EBCC), alleging causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel (NYSCEF # 79).

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL    Page 1 of 2
Motion No. 003. 004

1 of 2

Presently before the court is EBCC's motion pursuant to CPLR 3211(a)(1) and (7) for an order dismissing the amended counterclaims (NYSCCEF # 80).[1] The court held in-person oral arguments on EBCC's motion on November 27, 2023.

For the reasons stated by the court on the record during oral arguments, it is hereby

ORDERED that EBCC's motion to dismiss (MS004) is granted; and it is further

ORDERED that EBCC's original motion to dismiss (MS003) is denied as moot; and it is further

ORDERED that the parties are directed to contact the court reporter, Monica Hahn (monicahahnscr@gmail.com), for a copy of the oral-argument transcript and to file a copy of the transcript on NYSCEF as soon as available.

| 11/27/2023 | | | | |
|---|---|---|---|---|
| **DATE** | | | MARGARET A. CHAN, J.S.C. | |

| CHECK ONE: | | CASE DISPOSED | | X NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | X | GRANTED | DENIED | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

---

[1] The Amended Counterclaims were filed in response to EBCC's original motion to dismiss. As a result, EBCC's original motion (MS003) is denied as moot.

**158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL**
**Motion No. 003. 004**                                                **Page 2 of 2**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

-------------------------------------------------------------------------------X

| | |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | **INDEX NO.** _158207/2022_ |

Plaintiff,

**MOTION DATE** 08/09/2023, 08/29/2023

- v -

JOHN HANRATTY, EBURY STREET CAPITAL,
LLC,EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC,EBURY 2EMI LLC,EB 1EMIALA LLC,EB
2EMIALA LLC,EB 1EMIFL, LLC,EB 2EMIFL, LLC,EB
1EMIIN, LLC,EB 2EMIIN, LLC,EB 1EMIMD, LLC,EB
2EMIMD, LLC,EB 1EMINJ, LLC,EB 2EMINJ, LLC,EB
1EMINY, LLC,EB 2EMINY, LLC,EB 1EMISC, LLC,EB
2EMISC, LLC,RE 1EMI LLC,RE 2EMI LLC,EB 1EMIDC,
LLC,ARQUE TAX RECEIVABLE FUND (MARYLAND),
LLC,EBURY FUND 1FL, LLC,EBURY FUND 2FL,
LLC,EBURY FUND 1NJ, LLC,EBURY FUND 2NJ,
LLC,RED CLOVER 1, LLC,EBURY RE LLC, and XYZ
CORPS.

**MOTION SEQ. NO.** ___003 004___

**DECISION + ORDER ON
MOTION**

Defendants.

-------------------------------------------------------------------------------X

HON. MARGARET CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 003) 71, 72, 73, 74, 75,
76, 78

were read on this motion to/for _____DISMISS_____.

The following e-filed documents, listed by NYSCEF document number (Motion 004) 80, 81, 82, 83, 84,
85, 86

were read on this motion to/for _____DISMISS_____.

     Defendants-counterclaim plaintiffs John Arthur Hanratty, Ebury Street
Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2
EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, Eb 1EMIFL, LLC, EB 2EMIFL,
LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC,
EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB
1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury
Fund 2 FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC,
and Ebury RE, LLC have filed counterclaims, as amended on August 25, 2023,
against plaintiff-counterclaim defendant Emigrant Business Credit Corporation
(EBCC), alleging causes of action for breach of contract, breach of the implied
covenant of good faith and fair dealing, and promissory estoppel (NYSCEF # 79).

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL
Motion No. 003. 004

Page 1 of 2

1 of 2

Presently before the court is EBCC's motion pursuant to CPLR 3211(a)(1) and (7) for an order dismissing the amended counterclaims (NYSCCEF # 80).[1] The court held in-person oral arguments on EBCC's motion on November 27, 2023.

For the reasons stated by the court on the record during oral arguments, it is hereby

ORDERED that EBCC's motion to dismiss (MS004) is granted; and it is further

ORDERED that EBCC's original motion to dismiss (MS003) is denied as moot; and it is further

ORDERED that the parties are directed to contact the court reporter, Monica Hahn (monicahahnscr@gmail.com), for a copy of the oral-argument transcript and to file a copy of the transcript on NYSCEF as soon as available.

| 11/27/2023 | | | | | | |
|---|---|---|---|---|---|---|
| **DATE** | | | | | **MARGARET A. CHAN, J.S.C.** | |
| **CHECK ONE:** | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
| | X | GRANTED | DENIED | | GRANTED IN PART | OTHER |
| **APPLICATION:** | | SETTLE ORDER | | | SUBMIT ORDER | |
| **CHECK IF APPROPRIATE:** | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

[1] The Amended Counterclaims were filed in response to EBCC's original motion to dismiss. As a result, EBCC's original motion (MS003) is denied as moot.

**158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL**   Page 2 of 2
**Motion No.  003. 004**

# NOTE OF ISSUE

Calendar No. (if any)_____

Index No.____158207/2022_____

| Supreme | Court, | New York | | County, N.Y. |

_____ Court, _____ County, N.Y.

*For use of Clerk*

Justice Margaret A. Chan

Name of Justice Assigned

Emigrant Business Credit Corporation

**NOTICE FOR TRIAL**

*Plaintiff/Petitioner*

___Trial by jury demanded
    ___Of all issues
    ___Of issues specified below
    ___Or attached hereto
_X_Trial without Jury

Filed by __Plaintiff_____
Date summons served__ 09/25/2022_____
Date service completed _10/17/2022_____
Date Issue joined___07/20/2023_____

-against-

John Arthur Hanratty, et al.

**NATURE OF ACTION OR PROCEEDING**

_X__Tort     ___Motor Vehicle Negligence
        ___Medical Malpractice
        ___Other Tort
_X__Contract
___Contested Matrimonial
___Uncontested Matrimonial
___Tax Certiorari
___Condemnation
___Other (not itemized above) specify:_____
_____

*Defendant/Respondent*

___This action is brought as a class action

Amount Demanded $_damages in an amount to be determined at trial_
Other Relief_____

Special Preference claimed under
_____
_____

Insurance carrier(s), if known:_____
_____
_____

on the ground that
_____
_____

_____
_____
_____

Attorney for Plaintiff/Plaintiff Pro Se: _Alexander J. Willscher, Austin P. Mayron_
Address: __Sullivan & Cromwell LLP_____
_125 Broad Street, New York, NY 10004_
Phone Number __(212) 558-4000_____

Attorney for Defendant/Defendant Pro Se: _Kari Parks, Victor Wang_
Address: __Gusrae Kaplan Nusbaum PLLC_____
_120 Wall Street, 25th Floor, New York, NY 10005_
Phone Number __(212) 269-1400_____

# CERTIFICATE OF READINESS FOR TRIAL

## (Items 1-7 must be checked)

|  | Completed | Waived | Not Required |
|---|---|---|---|
| 1. All pleadings served................................................ | X | | |
| 2. Bill of particulars served......................................... | | | X |
| 3. Physical examinations completed........................... | | | X |
| 4. Medical reports exchanged..................................... | | | X |
| 5. Appraisal reports exchanged ................................. | | | X |
| 6. Compliance with rules in matrimonial actions......... | | | X |
| 7. Discovery now know to be necessary completed... | X | | |

8. There are no outstanding requests for discovery.

9. There has been a reasonable opportunity to complete the foregoing proceedings.

10. There has been compliance with any order issued to Precalendar Rules (22 NYCRR 202.12)

11. If a medical malpractice action, there has been compliance with any order pursuant to 22 NYCRR 202.56

12. The case is ready for trial.

Dated:    November 28, 2023

Signature    *Austin Mayron*

Print Name    Austin Mayron

Attorney for/Party Pro Se    Plaintiff

Address    Sullivan & Cromwell LLP

125 Broad Street, New York, NY 10004

Phone Number    (212) 558-4000

---

State of New York County of _____ss:

_____
being duly sworn deposes and says: that deponent is not a party to the action, is over 18 years of age and resides at _____that on the ___ day of _____, 20____ deponent served the within Note of Issue and Certificate of Readiness on

_____attorney(s)
for _____herein at their office located at_____
_____during their absence from said office

(a) by then and there leaving a true copy of the same with

_____

the clerk; partner; person having charge of said office.

(b) and said office being closed by depositing a true copy of same enclosed in a sealed wrapper directed to said attorney(s), in the office letter drop or box

Sworn before me on the ___ day of _____, 20___

_____
Notary Public

---

State of New York County of _____ss:

_____
being duly sworn deposes and says: that deponent is not a party to the action, is over 18 years of age and resides at _____that on the ___ day of _____, 20___ deponent served the within Note of Issue and Certificate of Readiness on

_____attorney(s)
for _____
at_____

the address designated by said attorney(s) for that purpose by depositing a true copy of same enclosed in a postpaid properly address wrapper, in -a post office- official depository under the exclusive care and custody of the United States Postal Service within New York State.

Sworn before me on the ___ day of _____, 20___

_____
Notary Public

---

Admission of Service

Due service of a note of issue and certificate of readiness of which the within is a copy is admitted this ___ day of_____, 20_____

_____    _____
Attorney(s) for_____

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 512 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| ⸺⸺⸺⸺⸺⸺⸺⸺  x | |
| EMIGRANT BUSINESS CREDIT : CORPORATION, : | Index No. 158207/2022 |
| : | Hon. Margaret Chan |
| Plaintiff, : | |
| v. : | **NOTICE OF ENTRY** |
| : | |
| JOHN ARTHUR HANRATTY, et al., : | |
| : | |
| Defendants. : | |
| ⸺⸺⸺⸺⸺⸺⸺⸺  x | |

**PLEASE TAKE NOTICE** that attached hereto is a true and correct copy of the

Decision + Order on Motion #003 of the Hon. Margaret Chan, J.S.C., dated November 27, 2023,

and duly entered in the above-captioned action in the office of the County Clerk, New York

County, on the 30th day of November, 2023

Dated:    November 30, 2023
          New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*

Alexander J. Willscher
Austin P. Mayron
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business*
*Credit Corporation*

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 513 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

-----------------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,

                    Plaintiff,

             - v -

JOHN HANRATTY, EBURY STREET CAPITAL,
LLC,EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC,EBURY 2EMI LLC,EB 1EMIALA LLC,EB
2EMIALA LLC,EB 1EMIFL, LLC,EB 2EMIFL, LLC,EB
1EMIIN, LLC,EB 2EMIIN, LLC,EB 1EMIMD, LLC,EB
2EMIMD, LLC,EB 1EMINJ, LLC,EB 2EMINJ, LLC,EB
1EMINY, LLC,EB 2EMINY, LLC,EB 1EMISC, LLC,EB
2EMISC, LLC,RE 1EMI LLC,RE 2EMI LLC,EB 1EMIDC,
LLC,ARQUE TAX RECEIVABLE FUND (MARYLAND),
LLC,EBURY FUND 1FL, LLC,EBURY FUND 2FL,
LLC,EBURY FUND 1NJ, LLC,EBURY FUND 2NJ,
LLC,RED CLOVER 1, LLC,EBURY RE LLC, and XYZ
CORPS.

                    Defendants.

-----------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 158207/2022 |
| **MOTION DATE** | 08/09/2023, 08/29/2023 |
| **MOTION SEQ. NO.** | 003 004 |

**DECISION + ORDER ON MOTION**

HON. MARGARET CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 003) 71, 72, 73, 74, 75, 76, 78

were read on this motion to/for                 DISMISS              .

The following e-filed documents, listed by NYSCEF document number (Motion 004) 80, 81, 82, 83, 84, 85, 86

were read on this motion to/for                 DISMISS              .

       Defendants-counterclaim plaintiffs John Arthur Hanratty, Ebury Street
Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2
EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, Eb 1EMIFL, LLC, EB 2EMIFL,
LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC,
EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB
1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury
Fund 2 FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC,
and Ebury RE, LLC have filed counterclaims, as amended on August 25, 2023,
against plaintiff-counterclaim defendant Emigrant Business Credit Corporation
(EBCC), alleging causes of action for breach of contract, breach of the implied
covenant of good faith and fair dealing, and promissory estoppel (NYSCEF # 79).

Presently before the court is EBCC's motion pursuant to CPLR 3211(a)(1) and (7) for an order dismissing the amended counterclaims (NYSCCEF # 80).[1] The court held in-person oral arguments on EBCC's motion on November 27, 2023.

For the reasons stated by the court on the record during oral arguments, it is hereby

ORDERED that EBCC's motion to dismiss (MS004) is granted; and it is further

ORDERED that EBCC's original motion to dismiss (MS003) is denied as moot; and it is further

ORDERED that the parties are directed to contact the court reporter, Monica Hahn (monicahahnscr@gmail.com), for a copy of the oral-argument transcript and to file a copy of the transcript on NYSCEF as soon as available.

| | | |
|---|---|---|
| **11/27/2023** | | |
| **DATE** | | MARGARET A. CHAN, J.S.C. |

| CHECK ONE: | | CASE DISPOSED | | | **X** | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | **X** | GRANTED | | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

---

[1] The Amended Counterclaims were filed in response to EBCC's original motion to dismiss. As a result, EBCC's original motion (MS003) is denied as moot.

**158207/2022   EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL**   Page 2 of 2
**Motion No.  003. 004**

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 515 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| ———————————————————— x | |
| EMIGRANT BUSINESS CREDIT CORPORATION, | Index No. 158207/2022 |
| Plaintiff, | Hon. Margaret Chan |
| v. | **NOTICE OF ENTRY** |
| JOHN ARTHUR HANRATTY, et al., | |
| Defendants. | |
| ———————————————————— x | |

**PLEASE TAKE NOTICE** that attached hereto is a true and correct copy of the Decision + Order on Motion #004 of the Hon. Margaret Chan, J.S.C., dated November 27, 2023, and duly entered in the above-captioned action in the office of the County Clerk, New York County, on the 30th day of November, 2023

Dated:    November 30, 2023
         New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*
————————————————————

Alexander J. Willscher
Austin P. Mayron
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business*
*Credit Corporation*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 49M

-------------------------------------------------------------------------------X

| | |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | **INDEX NO.** 158207/2022 |
| Plaintiff, | **MOTION DATE** 08/09/2023, 08/29/2023 |
| - v - | |
| JOHN HANRATTY, EBURY STREET CAPITAL, LLC,EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC,EBURY 2EMI LLC,EB 1EMIALA LLC,EB 2EMIALA LLC,EB 1EMIFL, LLC,EB 2EMIFL, LLC,EB 1EMIIN, LLC,EB 2EMIIN, LLC,EB 1EMIMD, LLC,EB 2EMIMD, LLC,EB 1EMINJ, LLC,EB 2EMINJ, LLC,EB 1EMINY, LLC,EB 2EMINY, LLC,EB 1EMISC, LLC,EB 2EMISC, LLC,RE 1EMI LLC,RE 2EMI LLC,EB 1EMIDC, LLC,ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC,EBURY FUND 1FL, LLC,EBURY FUND 2FL, LLC,EBURY FUND 1NJ, LLC,EBURY FUND 2NJ, LLC,RED CLOVER 1, LLC,EBURY RE LLC, and XYZ CORPS. | **MOTION SEQ. NO.** 003 004  **DECISION + ORDER ON MOTION** |
| Defendants. | |

-------------------------------------------------------------------------------X

HON. MARGARET CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 003) 71, 72, 73, 74, 75, 76, 78

were read on this motion to/for _____ DISMISS _____ .

The following e-filed documents, listed by NYSCEF document number (Motion 004) 80, 81, 82, 83, 84, 85, 86

were read on this motion to/for _____ DISMISS _____ .

Defendants-counterclaim plaintiffs John Arthur Hanratty, Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2 EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, Eb 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury Fund 2 FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, and Ebury RE, LLC have filed counterclaims, as amended on August 25, 2023, against plaintiff-counterclaim defendant Emigrant Business Credit Corporation (EBCC), alleging causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel (NYSCEF # 79).

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL                     Page 1 of 2
Motion No. 003. 004

2 of 3

Presently before the court is EBCC's motion pursuant to CPLR 3211(a)(1) and (7) for an order dismissing the amended counterclaims (NYSCCEF # 80).[1] The court held in-person oral arguments on EBCC's motion on November 27, 2023.

For the reasons stated by the court on the record during oral arguments, it is hereby

ORDERED that EBCC's motion to dismiss (MS004) is granted; and it is further

ORDERED that EBCC's original motion to dismiss (MS003) is denied as moot; and it is further

ORDERED that the parties are directed to contact the court reporter, Monica Hahn (monicahahnscr@gmail.com), for a copy of the oral-argument transcript and to file a copy of the transcript on NYSCEF as soon as available.

| | | | |
|---|---|---|---|
| **11/27/2023** | | | |
| DATE | | MARGARET A. CHAN, J.S.C. | |

| CHECK ONE: | | CASE DISPOSED | X | NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | X | GRANTED | DENIED | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

---

[1] The Amended Counterclaims were filed in response to EBCC's original motion to dismiss. As a result, EBCC's original motion (MS003) is denied as moot.

158207/2022  EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL
Motion No. 003. 004                                                Page 2 of 2

FILED: NEW YORK COUNTY CLERK 12/04/2023 03:41 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 93
RECEIVED NYSCEF: 12/04/2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 518 of 2230

ADMINISTRATIVE ORDER OF THE
CHIEF ADMINISTRATIVE JUDGE OF THE COURTS

Pursuant to the authority vested in me, and with the advice and consent of the Administrative Board of the Courts, I hereby amend Rule 30 of section 202.70(g) of the Uniform Rules for the Supreme and County Courts (Rules of Practice for the Commercial Division), effective immediately, to read as follows (additions underlined, deletions in strikethrough):

Rule 30. Settlement and Pretrial Conferences.

* * *

(b) Mandatory Settlement Conference. Unless exempted as set forth herein, the parties in every case pending in the Commercial Division must participate in a court-ordered mandatory settlement conference (MSC) following the filing of a Note of Issue.

(1) Referral to MSC. Following the filing of a Note of Issue, the parties must confer and file a request to proceed to a MSC pursuant to one of the following four tracks. If all parties have agreed upon the settlement conference track that they prefer, they may file a joint request with a statement of preferred procedure for MSC. If the parties do not agree, they must file separate requests with statements as to their preference for a MSC track. ~~The parties' preferences would ordinarily be given presumptive weight.~~ The court will select the settlement conference track after considering the parties' preferences, the available judicial and other resources, and any other factors the court deems appropriate. The four possible settlement conference tracks are as follows: . . .

_____
Acting Chief Administrative Judge of the Courts

Date: April 20, 2023

AO/134/23

ADMINISTRATIVE ORDER OF THE
CHIEF ADMINISTRATIVE JUDGE OF THE COURTS

Pursuant to the authority vested in me, and with the advice and consent of the Administrative Board of the Courts, I hereby amend Rule 30 of section 202.70(g) of the Uniform Rules for the Supreme and County Courts (Rules of Practice for the Commercial Division), effective February 1, 2022, to read as follows (new material underlined, deletions in strikethrough):

Rule 30. Settlement and Pretrial Conferences

* * *

(b) Mandatory Settlement Conference. Unless exempted as set forth herein, the parties in every case pending in the Commercial Division must participate in a court-ordered mandatory settlement conference (MSC) following the filing of a Note of Issue.

(1) Referral to MSC. Following the filing of a Note of Issue, the parties must confer and file a request to proceed to a MSC pursuant to one of the following four tracks. If all parties have agreed upon the settlement conference track that they prefer, they may file a joint request with a statement of preferred procedure for MSC. If the parties do not agree, they must file separate requests with statements as to their preference for a MSC track. The parties' preferences would ordinarily be given presumptive weight. The four possible settlement conference tracks are as follows:

(A) The parties may agree to have a settlement conference before the assigned justice or another judge pursuant to Commercial Division Rule 3(b).

(B) The court may refer the case to the Judicial Hearing Officer/Special Referee office for assignment of a Judicial Hearing Officer or Special Referee to conduct the MSC.

(C) The court may refer the case to the ADR coordinator or other designated court official in the judicial district where the case is pending for assignment, at no charge to the parties, of a neutral selected from the roster of neutrals or mediators under Part 146 of the Rules of the Chief Administrative Judge. If the parties wish to continue talks with the neutral beyond the initial conference, an arrangement will have to be made to retain such neutral at terms agreed to by the neutral and the parties.

(D) The parties may agree to engage a private neutral.

(2) Attendance at MSC. The MSC shall be attended by a person with knowledge of the case and authority to settle the case.

(3) Submissions to the neutral conducting the MSC. The neutral shall determine whether a submission should be provided to the neutral and the service thereof.

(4) Exemptions from MSC. MSC is mandatory for all cases in the Commercial Division unless the assigned justice to the case, for good cause shown, exempts the case from MSC under this Rule.

(5) Confidentiality. All attendees of the MSC, including the assigned neutral, shall treat as confidential information any settlement submission created expressly for use in the MSC, anything that happened or was said during the course of or pursuant to the MSC, and any positions taken or offers made during the MSC. Such material cannot be disclosed to anyone not involved in the litigation or to the court, and may not be used in any fashion in the litigation of the case.

(6) Report. Following the MSC, the parties will advise the assigned justice whether a settlement was reached, and if a settlement was reached, a date by which the parties expect to complete documentation of the settlement. The parties shall not discuss any reasons why a settlement was not reached.

(7) Scheduling and Procedures. Any scheduling and procedural issues shall be determined by the justice assigned to the case. If it is determined that the MSC is to be held before a neutral other than the assigned justice, scheduling and procedural issues with respect to the MSC shall be determined by the neutral.

(8) Non-exclusive. Nothing in the Rule shall preclude or replace any settlement practices used by the court, by any individual justice, or as agreed to by the parties and the assigned justice shall retain ultimate authority with respect to each aspect of the MSC.

(b) (c) Pre-trial Conference. Prior to the pretrial conference, counsel shall confer in a good faith effort to identify matters not in contention, resolve disputed questions without need for court intervention and further discuss settlement of the case. At the pre-trial conference, counsel shall be prepared to discuss all matters as to which there is disagreement between the parties, including those identified in Rules 27-29, and settlement of the matter. At or before the pre-trial conference, the court may require the parties to prepare a written stipulation of undisputed facts.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 521 of 2230

(e) (d) Consultation Regarding Expert Testimony. The court may direct that prior to the pre-trial conference, counsel for the parties consult in good faith to identify those aspects of their respective experts' anticipated testimony that are not in dispute. The court may further direct that any agreements reached in this regard shall be reduced to a written stipulation.

_____
Chief Administrative Judge of the Courts

Date: January 7, 2022

AO/10/22

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | : | Index No. 158207/2022 |
| Plaintiff, | : | (Hon. Margaret Chan) |
| v. | : | |
| JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1-10, | : | **NOTICE OF APPEARANCE** |
| Defendants. | : | |

PLEASE TAKE NOTICE that the undersigned is appearing on behalf of Plaintiff Emigrant Business Credit Corporation in the above-captioned action and requests that all papers in connection with this action be served upon her at the address listed below.

Dated:    December 20, 2023                    Respectfully submitted,
          New York, New York

                                               */s/ Erin L. Savoie*
                                               _____

                                               Erin L. Savoie
                                               SULLIVAN & CROMWELL LLP
                                               125 Broad Street
                                               New York, New York  10004
                                               Telephone: (212) 558-4000
                                               Fax: (212) 558-3588

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

December 28, 2023

<u>Via NYSCEF and E-mail</u>

The Honorable Margaret Chan,
   Supreme Court, New York County,
     Commercial Division,
      60 Centre Street, Room 659,
       New York, New York  10007.

        Re:   Emigrant Business Credit Corporation v. John Arthur Hanratty, et
al., No. 158207/2022

Dear Justice Chan:

      I represent Plaintiff Emigrant Business Credit Corporation ("EBCC") in connection with the above-captioned action and write to respectfully request the Court so-order the below briefing schedule for dispositive motions, which has been agreed to by the parties.

      The parties believe the proposed schedule—which would reduce the total number of briefs filed from six to four—will streamline the Court's review and consideration of their dispositive motions.

| Brief | Deadline | Word Limit |
|---|---|---|
| Emigrant's Motion for Summary Judgment | January 12 | 7,000 words |
| Ebury's Combined Cross-Motion for Summary Judgment and Opposition | February 2 | 14,000 words |
| Emigrant's Combined Opposition and Reply | February 23 | 11,200 words |
| Ebury's Reply | March 8 | 4,200 words |

      In addition, to further conserve resources, the parties also propose that—rather than filing a sealing motion in connection with each brief—each party file a single omnibus sealing motion after briefing is complete.  Thank you for your attention to these matters.

         Sincerely,

         */s/ Alexander J. Willscher*

The Honorable Margaret Chan                                                    -2-


                                               Alexander J. Willscher


cc:        *All Counsel of Record* (via NYSCEF)

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

|  |  |  |
|---|---|---|
| | x | |
| EMIGRANT BUSINESS CREDIT CORPORATION, | : : : | |
| | : | Index No. 158207/2022 |
| Plaintiff, | : | |
| v. | : : | |
| JOHN ARTHUR HANRATTY, | : | **STIPULATION AND [PROPOSED]** |
| EBURY STREET CAPITAL, LLC, | : | **ORDER** |

EMIGRANT BUSINESS CREDIT
CORPORATION,

          Plaintiff,

    v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

          Defendants.

**STIPULATION AND [PROPOSED]
ORDER**

---

**WHEREAS**, on December 28, 2023, Plaintiff Emigrant Business Credit Corporation and Defendants the "Ebury Parties"[1] submitted a proposed summary judgment briefing schedule that contemplates each side submitting two summary judgment briefs;

**WHEREAS**, the parties expect that their summary judgment briefing and supporting papers will contain information designated as Confidential Information under the Stipulation for the Exchange of Confidential Information (Dkt. 59) (the "Protective Order");

**WHEREAS**, under Paragraph 12 of the Protective Order, Producing Parties, as defined therein, have seven days from the date of filing of any Confidential Information to move for an Order sealing such materials;

**WHEREAS**, the parties seek to adjourn the seven-day deadline under the Protective Order in connection with any summary judgment filings; and instead each to file a single sealing motion within ten (10) days of the latest return date of the parties' motions for summary judgment;

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED** by and between the undersigned counsel, subject to the approval of the Court, that the seven-day deadline to file a motion to seal under Paragraph 12 of the Protective Order in connection with any summary judgment filings is adjourned; and that each party may file a single sealing motion within ten (10) days of the latest return date of the parties' motions for summary judgment.

---

[1] Defendants Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, Ebury RE LLC (together, the "Ebury Entities") and John Hanratty (with the Ebury Entities, the "Ebury Parties").

Attorneys for Plaintiff

/s/ Alexander J. Willscher

Alexander J. Willscher
Austin P. Mayron
Erin L. Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000

Date:  December 28, 2023

Attorneys for Defendants

/s/ Kari Parks

Kari Parks
Victor R. Wang
GUSRAE KAPLAN NUSBAUM PLLC
120 Wall Street, 25th Floor
New York, New York  10005
Telephone: (212) 269-1400

Date:  December 28, 2023

SO ORDERED:

_____

J.S.C.

**WARNING:**

**YOUR FAILURE TO APPEAR IN COURT MAY RESULT IN YOUR IMMEDIATE ARREST AND IMPRISONMENT FOR CONTEMPT OF COURT**

**NOTICE:**

**THE PURPOSE OF THE HEARING UPON THE FOLLOWING APPLICATION IS TO PUNISH THE ACCUSED FOR A CONTEMPT OF COURT, AND THAT SUCH PUNISHMENT MAY CONSIST OF FINE OR IMPRISONMENT, OR BOTH, ACCORDING TO LAW**

At Commercial Division Part 49, of the Supreme Court of the State of New York, held in and for the County of New York, at the Courthouse located at 60 Centre Street, New York, NY, on the ___ day of _____, 2024.

PRESENT:
Hon. Margaret Chan, J.S.C.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| _____ x | | |
| EMIGRANT BUSINESS CREDIT CORPORATION, | : : : | |
|  | : | Index No. 158207/2022 |
| Plaintiff, | : : | |
| v. | : | (Hon. Margaret Chan) |
|  | : : | **MOTION SEQUENCE NO. 005** |
| JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND | : : : : : : : : : : : : : : : | **[PROPOSED] ORDER TO SHOW CAUSE** |

2FL, LLC, EBURY FUND 1NJ, LLC,                    :
EBURY FUND 2NJ, LLC, RED CLOVER 1,  :
LLC, EBURY RE LLC, and XYZ                         :
CORPS. 1-10,                                              :
                                                              :
                Defendants.          :
_____    :
                                             x

        **UPON READING** the annexed Memorandum of Law; the Affirmation of Alexander J. Willscher and the exhibits annexed thereto; and all other papers and pleadings filed herein; it is

        **ORDERED** that Defendants John Arthur Hanratty; Ebury Street Capital, LLC; Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1, LLC; and Ebury RE LLC appear before this Court, located at 60 Centre Street, New York, NY, on the ___ day of _____ 2024, at ____ o'clock a.m./p.m., or as soon thereafter as counsel can be heard, and show cause why an Order should not be issued:

    a.      Pursuant to Judiciary Law §§ 753, 773, and 774, adjudging Defendants in **CIVIL CONTEMPT** of Court and imposing upon them a civil fine of $306,946.30, for Defendants' failure to comply with the terms of the Decision + Order on Motion of the Hon. Margaret Chan, filed November 30, 2022 (Dkt. 47), restraining and enjoining Defendants and their Related Persons (i) from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, permitting the transfer of any of their assets, aside from ordinary and necessary disbursements related to the Defendants' tax lien or real estate businesses or living expenses; (ii) to deposit any proceeds from such sale, aside from ordinary and necessary disbursements related to the Defendants' tax lien or real estate businesses, into the parties' escrow account; and (iii) to notify Plaintiff at least twenty-four (24) hours in advance of transferring, mortgaging, selling, converting, concealing, dissipating, spending, withdrawing, disposing of, assigning, or permitting the transfer of any assets in an amount exceeding $50,000; and the Preliminary Conference Order, filed December 12, 2022 (Dkt. 53),

-2-

requiring that Defendants provide documentation showing the source of any proceeds in excess of $5,000 two weeks after the first of each month respecting the previous month;

b. Pursuant to Judiciary Law §§ 750(3) and 751(1), adjudging Defendant John Arthur Hanratty in **CRIMINAL CONTEMPT** of Court and imposing upon him a criminal fine of up to $1,000 for each of his four acts of contempt, for his willful failure to comply with the terms of the Decision + Order on Motion of the Hon. Margaret Chan, filed November 30, 2022 (Dkt. 47), restraining and enjoining Defendants and their Related Persons (i) from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, permitting the transfer of any of their assets, aside from ordinary and necessary disbursements related to the Defendants' tax lien or real estate businesses or living expenses; (ii) to deposit any proceeds from such sale, aside from ordinary and necessary disbursements related to the Defendants' tax lien or real estate businesses, into the parties' escrow account; and (iii) to notify Plaintiff at least twenty-four (24) hours in advance of transferring, mortgaging, selling, converting, concealing, dissipating, spending, withdrawing, disposing of, assigning, or permitting the transfer of any assets in an amount exceeding $50,000; and the Preliminary Conference Order, filed December 12, 2022 (Dkt. 53), requiring that Defendants provide documentation showing the source of any proceeds in excess of $5,000 two weeks after the first of each month respecting the previous month;

c. Pursuant to CPLR § 2222, authorizing Plaintiff to docket as a money judgment any order issued by the Court on this motion fixing the amount of money owed by Defendants, including restitution, fines, and motion costs; and

d. Granting Plaintiff its costs and disbursements, and such other and further relief as the Court deems just and proper.

Sufficient reason having been alleged, and pending a hearing and further Order of this Court, it is

**ORDERED** that Defendants must deposit $306,946.30 into the Parties' joint escrow account no later than the _____ day of _____, 2024;

**ORDERED** that, pursuant to 22 NYCRR 202.5-b(k)(2) and Paragraph 12 of the so-ordered Stipulation for the Exchange of Confidential Information (Dkt. 59), the Clerk shall restrict the sealed documents filed by Plaintiff in support of this Order for seven (7) days after the filing of the Order to all except the Parties' counsel and court personnel;

**ORDERED** that service of a copy of this Order, together with a copy of the papers in support thereof, made upon Defendants by _____, on or before the ____ day of _____, 2024, be deemed good and sufficient service; and it is

**ORDERED**, that any opposition to this motion be served by _____, 2024; and any reply be served by _____, 2024.

ENTER:

_____
Hon. Margaret Chan, J.S.C.

# FILED: NEW YORK COUNTY CLERK

## NYSCEF DOC. NO. 098

## AFFIDAVIT/AFFIRMATION - REQUEST TO SEAL
Affirmation of Alexander J. Willscher (Sealed)

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | : : : : | |
|  | Plaintiff, | Index No. 158207/2022 |
| v. | : : | (Hon. Margaret Chan) |
| JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1-10, | : : : : : : : : : : : : : : : : : : : | **MOTION SEQUENCE NO. 005** **AFFIRMATION OF ALEXANDER J. WILLSCHER** |
|  | Defendants. | : : |

**ALEXANDER J. WILLSCHER**, an attorney duly admitted to practice law in the Courts of the State of New York, affirms the truth of the following statements, under the penalties of perjury:

1.      I am a partner at the law firm of Sullivan & Cromwell LLP, counsel for Plaintiff Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned matter.  I am familiar with the matters set forth below.

2.      I make this affirmation of emergency circumstances to request entry of EBCC's accompanying motion by order to show cause, respectfully requesting that Defendants be held in

civil and criminal contempt for their repeated and willful violations of this Court's
Decision + Order on Motion, filed November 30, 2022 (Dkt. 47) (the "Preliminary Injunction
Order"), and Preliminary Conference Order, filed December 12, 2022 (Dkt. 53).

3.      EBCC is proceeding by order to show cause, rather than by notice of motion,
because this is an urgent matter requiring an expedited return date.  As set forth in the annexed
materials, Defendants repeatedly—including as recently as December 20, 2023—have violated the
Preliminary Injunction Order and Preliminary Conference Order, including the restrictions on
Defendants' ability to transfer assets and the requirement that Defendants notify EBCC before
transferring assets in excess of $50,000.

4.      In particular, EBCC has discovered that on December 20, 2018, just two days after
Defendant John Arthur Hanratty ("Hanratty") was arrested in Puerto Rico on federal criminal
charges related to his scheme to defraud EBCC, he transferred ███ to himself without
providing notice to EBCC.  Upon information and belief, I believe that Hanratty intends to use that
███ (and other proceeds of EBCC's collateral that are at issue in this litigation) to fund his
bail package and the costs of his defense in the federal criminal case.

5.      EBCC also has discovered that, a few weeks earlier on December 11, 2023,
Hanratty sold ███ of EBCC's tax lien collateral for only ███ without providing
any notice to EBCC, or escrowing the proceeds as required by the Court's Orders.  The fact that
Hanratty is selling EBCC's collateral at an amount almost ███ less than he had valued it in
Defendants' own books and records, indicates that he is actively destroying the value of Emigrant's
remaining collateral.  Moreover, based on upon information and belief, it was only that fire sale of
Emigrant's collateral that provided Hanratty with sufficient liquidity to impermissibly wire himself
███ on December 20, 2023.

-2-

FILED: NEW YORK COUNTY CLERK 01/04/2024 04:23 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO. 99          24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/04/2024

Court Records    Pg 536 of 2230

6.      Before submitting this motion, EBCC contacted Defendants' counsel this morning in an effort to understand the above-listed transactions and why notice had not been provided as required by the Preliminary Injunction Order.  EBCC requested a response by 3:00 p.m. today, and as of the time of filing, has not received an answer.

7.      There is a real and imminent risk that Defendants will continue to violate the Preliminary Injunction Order, particularly given that Hanratty was arrested two weeks ago and today must post a $2,000,000 bond, secured by $400,000 in cash or other assets to be deposited with the Court.  Any further depletion of EBCC's collateral—be it through sales at uneconomic prices or through unauthorized wires to Hanratty—will cause EBCC immediate and irreparable harm.

8.      Attached hereto as Exhibit A is a true and correct copy of the unsealed criminal complaint in *United States of America* v. *John Arthur Hanratty*, No. 1:23-mj-07566 (filed Dec. 15, 2023), ECF No. 1.

9.      Attached hereto as Exhibit B is a true and correct copy of the appearance bond in *United States of America* v. *John Arthur Hanratty*, No. 1:23-mj-07566 (filed Dec. 21, 2023), ECF No. 5.

10.     Attached hereto as Exhibit C is a true and correct copy of excerpts from a spreadsheet produced by Defendants in this action, bearing Bates number EBURY_000004 and purportedly listing transactions from Defendants' bank accounts, including transactions from November 10, 2022 through November 29, 2022.

11.     According to Exhibit C, Defendants made a withdrawal of ▇▇▇▇ on November 16, 2022; and a withdrawal of ▇▇▇▇ on November 17, 2022.  Defendants, in

-3-

violation of the Court's Preliminary Injunction Order, did not provide EBCC advance notice of these transactions.

12.    Attached hereto as Exhibit D is a true and correct copy of excerpts from a spreadsheet produced by Defendants in this action, bearing Bates number EBURY_000160 and purportedly listing transactions from Defendants' bank accounts, including transactions from November 30, 2022 through December 13, 2022.

13.    According to Exhibit D, Defendants made withdrawals of ██████ and ██████ on December 1, 2022; a withdrawal of ██████ on December 6, 2022; and a transfer of ██████ on December 7, 2022.   Defendants, in violation of the Court's Preliminary Injunction Order, did not provide EBCC advance notice of these transactions.

14.    Attached hereto as Exhibit E is a true and correct copy of excerpts from a spreadsheet produced by Defendants in this action, bearing Bates number EBURY_000295 and purportedly listing transactions from Defendants' bank accounts, including transactions from December 16, 2022 through January 11, 2023.

15.    According to Exhibit E, Defendants made a withdrawal of ██████ on December 19, 2022.  Defendants, in violation of the Court's Preliminary Injunction Order, did not provide EBCC advance notice of this transaction.

16.    Attached hereto as Exhibit F is a true and correct copy of excerpts from a spreadsheet produced by Defendants in this action, bearing Bates number EBURY_00081206 and purportedly listing transactions from Defendants' bank accounts, including transactions from August 10, 2023 through September 6, 2023.

-4-

17.    According to Exhibit F, Defendants made a bulk sale of liens for ███████ on August 17, 2023. Defendants, in violation of the Court's Preliminary Injunction Order, did not provide EBCC advance notice of this transaction or escrow the sale proceeds.

18.    Attached hereto as Exhibit G is a true and correct copy of excerpts from a spreadsheet produced by Defendants in this action, bearing Bates number EBURY_00081296 and purportedly listing transactions from Defendants' bank accounts, including transactions from October 10, 2023 through November 8, 2023.

19.    Attached hereto as Exhibit H is a true and correct copy of email correspondence from Victor Wang, counsel for Defendants, to Austin Mayron, counsel for Plaintiff, dated November 15, 2023, linking to a production of documents that included the document bearing Bates number EBURY_00081296.

20.    Attached hereto as Exhibit I is a true and correct copy of excerpts from a journal report exported from Defendants' QuickBooks accounting software on January 3, 2024, including transactions from Defendants' bank accounts from October 12, 2023 through December 20, 2023.

21.    According to Exhibit I, Defendants made a bulk sale of tax liens worth ███████ for only ███████ on December 11, 2023; and transferred ███████ directly to Hanratty on December 20, 2023. Defendants, in violation of the Court's Preliminary Injunction Order, did not provide EBCC advance notice of these transactions or escrow the sale proceeds.

22.    In addition, according to Exhibit I, Defendants sold a tax lien worth ███████ for ███████ on October 13, 2023. Defendants, in violation of the Court's Preliminary Injunction Order and Preliminary Conference Order, did not provide EBCC advance notice of this transaction, escrow the sale proceeds, or disclose this transaction in Defendants' monthly financial reporting.

-5-

23.      Finally, according to Exhibit I, Defendants have made ███████ in "transfer[s]

to John Hanratty" since October 12, 2023.

24.      No prior application has been made for the relief sought by this order to show cause.


Dated:   January 4, 2024                    /s/ Alexander J. Willscher
         New York, New York                 **ALEXANDER J. WILLSCHER**

-6-

## CERTIFICATE OF COMPLIANCE

I hereby certify that this affirmation complies with the word-count limit of Commercial

Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because

it contains 1,224 words.

Dated:    January 4, 2024                          */s/ Alexander J. Willscher*
      New York, New York                          Alexander J. Willscher

-7-

# EXHIBIT A

Case 1:23-mj-07566-UA Document 1 Filed 12/14/23 Page 1 of 3 State
Court Records      Pg 542 of 2230

AUSAs: Andrew K. Chan and Nicholas Chiuchiolo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |
|---|
| UNITED STATES OF AMERICA |
| v. |
| JOHN ARTHUR HANRATTY, |
| Defendant. |

# 23 MAG 7566

## SEALED COMPLAINT

Violations of 18 U.S.C. §§ 1343, 1344

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

LAUREN COLLINS, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Wire Fraud)

1.      From at least in or about 2017 through at least in or about 2021, in the Southern District of New York and elsewhere, JOHN ARTHUR HANRATTY, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, HANRATTY engaged in scheme to make false statements to a bank ("Victim Bank-1") insured by the Federal Deposit Insurance Corporation (the "FDIC") in order to fraudulently obtain money from HANRATTY's line of credit with Victim Bank-1, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
### (Bank Fraud)

2.      From at least in or about 2017 through at least in or about 2021, in the Southern District of New York and elsewhere, JOHN ARTHUR HANRATTY, the defendant, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to

wit, HANRATTY engaged in scheme to make false statements to Victim Bank-1 in order to obtain money from HANRATTY's line of credit with Victim Bank-1.

(Title 18, United States Code, Sections 1344 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.      I am a Special Agent with the FBI and am currently assigned to a squad that primarily investigates securities fraud and other complex white-collar frauds. I have received training and have participated in investigations of financial crimes, including crimes involving financial institutions. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## OVERVIEW

4.      As detailed below, JOHN ARTHUR HANRATTY, the defendant, was the Founder and Managing Director of Ebury Street Capital, LLC ("Ebury Street Capital"), an investment firm with a portfolio primarily comprised of municipal tax liens. Between in or around 2017 and in or around 2021, HANRATTY participated in a fraudulent scheme to steal money from Victim Bank-1 by drawing down on approximately $20 million in commercial lines of credit that had been extended to Ebury Street Capital. Specifically, as further detailed below, HANRATTY made materially false statements on spreadsheets (known as "borrowing base certificates") submitted by email to Victim Bank-1 summarizing the value of the municipal tax liens that Ebury Street Capital was offering as collateral for its commercial line of credit. As a result of these false statements on Ebury Street Capital's borrowing base certificates, Victim Bank-1 paid Ebury Street Capital large sums of money to which it was not entitled. The false statements on Ebury Street Capital's borrowing base certificates included, among other things: (1) listing large quantities of municipal tax liens on the borrowing base certificates that Ebury Street Capital did not own; and (2) double-counting municipal tax liens by listing the same liens on multiple borrowing base certificates. Additionally, although Ebury Street Capital was contractually required to use money from Victim Bank-1 either to purchase municipal tax liens or for ordinary business expenses, HANRATTY actually used portions of the money obtained from Victim Bank-1 to pay off Ebury Street Capital's investors—who themselves were threatening to sue and who, in fact, sued Ebury Street Capital and HANRATTY after Ebury Street Capital was unable to pay investors who were seeking to pull out their investments from the fund. Ebury Street Capital's commercial line of credit has now been completely exhausted, and Ebury Street Capital owes over $20 million in principal and interest to Victim Bank-1.

## BACKGROUND ON EBURY STREET CAPITAL

5.      Based on my training and experience, my conversations with representatives of Victim Bank-1, my review of publicly available information regarding Ebury Street Capital, and

my personal involvement in this investigation, I have learned the following, in substance and in part, regarding Ebury Street Capital and its commercial line of credit with Victim Bank-1:

    a.    Ebury Street Capital is an investment firm that was founded by JOHN ARTHUR HANRATTY, the defendant, in or around 2010.  At all relevant times, HANRATTY served as the Managing Director and Principal for Ebury Street Capital, which manages two different funds known as Ebury Fund 1 and Ebury Fund 2.  HANRATTY has been an attorney licensed to practice law in the State of New York since in or around 2002 and has previously held legal and compliance positions at well-known investment firms and financial institutions, including serving as the Chief Compliance Officer and General Counsel for a trading broker dealer.  HANRATTY resided in Rye, New York until in or around 2019, when he relocated to San Juan, Puerto Rico.

    b.    Ebury Street Capital primarily invests in municipal tax liens, which are liens placed on real property by municipal governments for delinquent property taxes and other fees owed by property owners.  Municipal governments typically sell municipal tax lien certificates to the highest bidder at public auctions.  Investors frequently purchase tax lien certificates because: (1) municipal tax liens earn a high rate of interest (frequently between 10% to 36% annually) until the underlying taxes are repaid (and the lien is "redeemed" by the property owner; and (2) municipal tax liens frequently provide a path for investors to foreclose on the underlying property and potentially gain ownership of the underlying real estate.  Within the municipal tax lien investment industry, municipal tax liens are typically valued by: (a) the amount of outstanding taxes or fees owed to the municipality (known as the "face value"); (b) the amount of taxes and fees owed plus all accrued interest required to redeem a property and satisfy the lien (known as the "redemptive value"); or (c) the fair market value of the underlying real estate.

    c.    Victim Bank-1 is headquartered in Manhattan and operates a commercial lending business through which it provides loans to various businesses, including investment firms.  In or around 2016, HANRATTY approached Victim Bank-1 to apply for a commercial line of credit for Ebury Street Capital.  HANRATTY represented to representatives of Victim Bank-1 that the purpose of Ebury Street Capital's commercial line of credit would be for HANRATTY to invest in municipal tax liens earning a high rate of interest—an interest rate that would exceed the interest charged by Victim Bank-1 on the line of credit.  HANRATTY claimed to have significant experience in purchasing municipal tax liens and to have been investing in tax liens since 2009.

    d.    In or around March 2017, Victim Bank-1 agreed to extend a $10 million commercial line of credit to Ebury Fund 1 and a $5 million commercial line of credit to Ebury Fund 2.  In or around October 2018, Victim Bank-1 agreed to expand these commercial lines of credit by an additional $3.5 million.  In or around September 2019, Victim Bank-1 agreed to expand these commercial lines of credit by an additional $1.5 million, for a total of $20 million.  To memorialize these commercial lines of credit, HANRATTY signed credit agreements on behalf of Ebury Fund 1 and Ebury Fund 2.  The credit agreements restricted Ebury Street Capital's use of the funds from the line of credit to the purchase of tax liens and ordinary and necessary business expenses.  Prior to obtaining any money from Victim Bank-1, Ebury Street Capital was required to submit a spreadsheet known as a "borrowing base certificate" that summarized the unencumbered municipal tax liens being offered as collateral for the line of credit.  The borrowing bases used a formula allowing Ebury Street Capital to borrow a certain percentage (typically between 80% to 90%, depending on the municipality) of the redemptive value of the municipal tax lien.  So, for example, if Ebury Street Capital placed new municipal tax liens into a borrowing

3

base certificate, their potential borrowing ability increased. Similarly, if batches of municipal tax liens were redeemed or sold, then Ebury Street Capital's borrowing base decreased. Because of the importance of the accuracy and truthfulness of these borrowing base spreadsheets, HANRATTY was required to sign each borrowing base certificate and certify as to its accuracy.

e. The total loan balance on Ebury Fund 1's and Ebury Fund 2's lines of credit with Victim Bank-1 generally hovered below approximately $5 million until in or around the Summer of 2018, when Ebury Street Capital began to borrow heavily from the lines of credit with Victim Bank-1. By in or around September 2018, Ebury Street Capital had borrowed approximately $15 million from its lines of credit, and by in or around December 2019, Ebury Street Capital had nearly exhausted the $20 million available through its lines of credit with Victim Bank-1.

f. In or around March 2021, Ebury Street Capital failed to pay off its outstanding loan to Victim Bank-1 by the original maturity date, which was then extended several additional times until in or around November 2021, by which time Ebury Street Capital owed over $18 million in outstanding principal and interest. Since in or around October 2021, Ebury Street Capital has failed to make any principal or interest payments to Victim Bank-1.

### FALSE STATEMENTS IN EBURY STREET CAPITAL'S BORROWING BASE CERTIFICATES

6. As further discussed below, the FBI has identified numerous false statements in Ebury Street Capital's borrowing base certificates that were submitted by JOHN ARTHUR HANRATTY, the defendant, to Victim Bank-1 to obtain additional funds to which Ebury Street Capital was not entitled. These false statements include (1) listing large quantities of municipal tax liens on borrowing base certificates that Ebury Street Capital did not actually own; and (2) double-counting municipal tax liens by listing the same liens on multiple borrowing base certificates. Some examples of these false statements are described below.

7. Based on my review of records from Victim Bank-1, my conversations with representatives of Victim Bank-1, my conversations with the CEO and owner of a brokerage firm for municipal tax liens that did business with Ebury Street Capital ("Broker-1"),[1] and my review of bank records, records obtained from Broker-1, and other records obtained during the course of the investigation, I have learned the following, in substance and in part:

*Ebury Fund 2 - October 15, 2018 Borrowing Base Certificate and*
*January 9, 2020 Borrowing Base Certificate*

a. On or about October 15, 2018, an Ebury Street Capital employee located outside of the United States submitted by email to Victim Bank-1, located in Manhattan, a borrowing base certificate signed by JOHN ARTHUR HANRATTY, the defendant, containing a spreadsheet titled "NJ Additions" with a purported value of approximately $85,000. The spreadsheet contained

---

[1] Based on my review of publicly available court records, I know that in or around February 2021, Ebury Street Capital filed a lawsuit against Broker-1 in the United States District Court for the District of Delaware alleging, among other things, violations of the racketeering laws, fraudulent inducement to contract, breach of contract, and unjust enrichment. Broker-1 has filed counterclaims in the litigation alleging similar claims against Ebury Street Capital.

information regarding approximately 44 tax liens from various municipalities in New Jersey. The "NJ Additions" sheet in the borrowing base certificate contains the name of Broker-1 and contained information typically held by Broker-1 for each of the liens, including a unique identification number for each lien used by Broker-1. Based on my conversations with the CEO of Broker-1, HANRATTY inquired with Broker-1 about purchasing the book of liens described in the "NJ Additions" spreadsheet on behalf of Ebury Street Capital, but the transaction did not occur. Based on this information from Broker-1 and my review of Ebury Street Capital's bank records and internal accounting records, I believe that HANRATTY falsely represented to Victim Bank-1 that Ebury Street Capital owned the tax liens in the "NJ Additions" spreadsheet and offered the liens as collateral.

b.   As a result of the inclusion of the "NJ Additions" spreadsheet in the borrowing base certificate, HANRATTY falsely certified to Victim Bank-1 that the value of Ebury Fund 2's collateral was approximately $4.65 million. Based on this collateral valuation and the previous loan balance of approximately $4.56 million, HANRATTY falsely certified that Ebury Street Capital was entitled to borrow an additional $85,500 from Ebury Fund 2's line of credit.

c.   Based on my review of bank records, I know that on or about October 15, 2018, Victim Bank-1 transferred approximately $75,000 to Ebury Fund 2 in reliance on the false borrowing base certificate. The money was then transferred from Ebury Fund 2 to Ebury Fund 1, shortly after Ebury Fund 1 had disbursed on or about October 11, 2018 approximately $340,000 to two individuals that, based on the names of the individuals and publicly available information, appear to be investors in Ebury Street Capital.

d.   On or about January 9, 2020, Ebury Street Capital submitted to Victim Bank-1 a borrowing base certificate signed by HANRATTY containing a spreadsheet titled "NJ Additions" that contained approximately 44 tax liens from various municipalities in New Jersey. The "NJ Additions" spreadsheet in the borrowing base certificate contains the name of Broker-1 and appears to be nearly identical in all material respects to the "NJ Additions" spreadsheet in the October 15, 2018 borrowing base certificate. In connection with the submission of this borrowing base certificate, HANRATTY wrote in the subject line of the email sent to Victim Bank-1: "Fund 2 – we bought some subs." Based on my training, experience, and participation in this investigation, I believe that "subs" frequently refer to subsequent tax liens that are placed on a particular property for additional years where taxes are owed by a property owner to a municipality. As a result, in this borrowing base certificate, I believe that HANRATTY was representing that Ebury Fund 2 had purchased tax liens for additional years on the same liens that were listed in the "NJ Additions" sheet in the October 15, 2018 borrowing base certificate—a batch of tax liens and subsequent tax liens that Ebury Street Capital did not actually own.

e.   As a result of the inclusion of the "NJ Additions" spreadsheet in the January 9, 2020 borrowing base certificate, HANRATTY falsely certified to Victim Bank-1 that the value of Ebury Fund 2's collateral was approximately $4.85 million. Based on this collateral valuation and the previous loan balance of approximately $4.73 million, HANRATTY falsely certified that Ebury Street Capital was entitled to borrow an additional approximately $132,000 from Ebury Fund 2's line of credit.

f.   Based on my review of bank records, I know that on or about January 10, 2020, Victim Bank-1 transferred approximately $125,000 to Ebury Fund 2 in reliance on the false

5

borrowing base certificate. Those funds, in turn, were distributed to various Ebury bank accounts, including $10,000 that was quickly transferred through multiple Ebury accounts and then to HANRATTY's American Express account.

*Ebury Fund 1 – November 9, 2018 Borrowing Base Certificate and*
*February 8, 2019 Borrowing Base Certificate*

g.  On or about November 9, 2018, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY containing a spreadsheet titled "FL Additions" that contained approximately 60 tax liens from various municipalities in Florida.  The "FL Additions" spreadsheet in the borrowing base certificate did not contain the name of Broker-1, but contained information typically held by Broker-1 for each of the liens, including, for example, a unique identification number for each lien used by Broker-1.  Based on my conversations with the CEO of Broker-1, HANRATTY inquired about purchasing the book of liens described in the "FL Additions" spreadsheet on behalf of Ebury Street Capital in or around October 2018, but the transaction did not occur.

h.  Based on my personal involvement in this investigation, I know that an external contractor was hired to conduct an analysis on a random sample of approximately 15 percent of the 60 tax liens listed in the "FL Additions" spreadsheet.  Based on this analysis of the publicly-available records for these randomly-selected tax liens, it did not appear that Ebury Street Capital ever became the registered owner of the tax liens in the "FL Additions" spreadsheet.

i.  As a result of the inclusion of the "FL Additions" spreadsheet in the November 9, 2018 borrowing base certificate, HANRATTY falsely certified to Victim Bank-1 that the value of Ebury Fund 1's collateral was approximately $9.55 million.  Based on this collateral valuation and the previous loan balance of approximately $9.33 million, HANRATTY falsely certified that Ebury Street Capital was entitled to borrow an additional approximately $220,000 from Ebury Fund 1's line of credit.

j.  Based on my review of bank records, I know that on or about November 9, 2018, Victim Bank-1 transferred approximately $220,000 to Ebury Fund 1 in reliance on the false borrowing base certificate.  Later that day, Ebury Fund 1 disbursed approximately $288,000 to an individual who, according to Victim Bank-1 and publicly available information, was a representative of an investor in Ebury Street Capital.

k.  Approximately three months later, on or about February 8, 2019, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY attaching a spreadsheet titled "FL Additions," which appeared to be identical in all material respects to the false "FL Additions" spreadsheet included in the November 9, 2018 borrowing base certificate described above in paragraph 7(g).  In other words, HANRATTY on two separate occasions fraudulently offered the same batch of tax liens as collateral to Victim Bank-1.  Based on my conversations with the CEO of Broker-1, the analysis by the external contractor described above, and my review of Ebury Street Capital's bank records and internal accounting records, I believe that HANRATTY falsely represented to Victim Bank-1 that Ebury Street Capital owned the batch of liens listed in the "FL Additions" spreadsheet at the time when they were listed in the November 9, 2018 and February 8, 2019 borrowing base certificates.

l. As a result of the inclusion of the "FL Additions" spreadsheet in the February 8, 2019 borrowing base certificate, HANRATTY falsely certified to Victim Bank-1 that the value of Ebury Fund 1's collateral was approximately $9 million. Based on this collateral valuation and the previous loan balance of approximately $8.52 million, HANRATTY falsely certified that Ebury Street Capital was entitled to borrow an additional $482,000 from Ebury Fund 1's line of credit.

m. Based on my review of bank records, I know that on or about February 8, 2019, Victim Bank-1 transferred approximately $460,000 to Ebury Fund 1 in reliance on the false borrowing base certificate.

*Ebury Fund 1 – March 21, 2019 Borrowing Base Certificate and*
*May 17, 2019 Borrowing Base Certificate*

n. On or about March 21, 2019, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY containing a spreadsheet titled "NJ Additions #2" that contained approximately 385 tax liens from various municipalities in New Jersey. As a result of the inclusion of this sheet, HANRATTY falsely certified to Victim Bank-1 that there was approximately $2.1 million of available money to be borrowed under Ebury Fund 1's line of credit. Based on my review of bank records, I know that on or about March 22, 2019, Victim Bank-1 transferred approximately $1.675 million to Ebury Fund 1 on or about March 22, 2019.

o. On or about May 17, 2019, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY containing a spreadsheet titled "NJ Additions #3" that contained approximately 344 tax liens from various municipalities in New Jersey. As a result of the inclusion of this sheet, HANRATTY falsely certified to Victim Bank-1 that there was approximately $860,000 of available money to be borrowed under Ebury Fund 1's line of credit. Based on my review of bank records, I know that on or about May 17, 2019: (1) approximately $860,000 was transferred from Victim Bank-1 to Ebury Fund 1; (2) approximately $350,000 was transferred from Ebury Fund 2 to Ebury Fund 1; and (3) approximately $1.2 million was transferred from Ebury Fund 1 to a business entity that, based on publicly available information and according to Victim Bank-1, was an investor in Ebury Street Capital. Based on my review of Ebury Street Capital's internal accounting records, I know that the $1.2 million payment was described in Ebury Street Capital's records as a "Settlement with the investor."

p. Based on my comparison of the "NJ Additions #2" spreadsheet in the March 21, 2019 borrowing base certificate and the "NJ Additions #3" spreadsheet in the May 17, 2019 borrowing base certificate, it appears that approximately 70 percent of the liens in the "NJ Additions #2" spreadsheet reappeared on the "NJ Additions #3" spreadsheet. In other words, it appears that HANRATTY fraudulently obtained money from Victim Bank-1 by double-counting over 200 municipal tax liens.

## **MISAPPROPRIATION OF FUNDS FROM VICTIM BANK-1 TO PAY INVESTORS**

8. Based on my review of publicly available court records, I know that in or around January 2019, Ebury Street Capital was sued by a group of investors (the "Plaintiff Investors") in Westchester County Supreme Court, who alleged, in substance and in part, that in or around June

2018, the Plaintiff Investors notified Ebury Street Capital of their intent to withdraw their investments in the company. However, as of the time the lawsuit was filed, Ebury Street Capital had not been able to pay the Plaintiff Investors. *See Brinker-Cohen Family Trust et al. v. Ebury Fund I, LP et al.*, No. 50611/2019 (Sup. Ct. Westchester Cnty. Jan. 9. 2019). Based on my conversations with a representative of Victim Bank-1, I know that JOHN ARTHUR HANRATTY, the defendant, did not inform Victim Bank-1 of this lawsuit, in violation of the credit agreements signed by HANRATTY. As further described below, on various dates that Ebury Street Capital submitted borrowing base certificates requesting funds from Victim Bank-1 to purchase municipal tax liens, it appears that Ebury Street Capital instead used the funds to pay investor distributions—in violation of the credit agreements signed by JOHN ARTHUR HANRATTY, the defendant. Based on my review of bank records, Ebury Street Capital's accounting records, and records from Victim Bank-1, I have learned the following, among other things:

a. On or about November 9, 2018, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY, which resulted in Victim Bank-1 providing approximately $220,000 to Ebury Fund 1 for the purpose of purchasing municipal tax liens and ordinary business expenses. Ebury Street Capital's accounting records do not record any purchases of liens on or about that day; however, the records indicate a transfer of approximately $280,000 as an "Investor withdrew." The records additionally indicate the name of an attorney who serves as a representative for one of the Plaintiff Investors. As a result, it appears that HANRATTY misappropriated funds provided by Victim Bank-1 to pay one of the Plaintiff Investors.

b. On or about May 17, 2019, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY, which resulted in Victim Bank-1 providing approximately $860,000 to Ebury Fund 1 for the purpose of purchasing municipal tax liens, as described above in ¶ 7(o). Ebury Street Capital's internal accounting records do not include records of any purchases of liens on or about that day; however, the records indicate a transfer of approximately $1.2 million as a "Settlement with the investor." Based on my review of bank records, it appears that this transfer was sent to one of the Plaintiff Investors.

c. On or about September 13, 2019, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY, which resulted in Victim Bank-1 providing approximately $850,000 to Ebury Fund 2 for the purpose of purchasing municipal tax liens. Ebury Street Capital's accounting records do not record any purchases of liens on or about that day; however, the records indicate two transfers totaling approximately $750,000 to two individuals ("Investor-1" and "Investor-2"). Based on my conversations with Investor-1, I know that Investor-1 had been seeking to withdraw Investor-1's investments in Ebury Street Capital around the time of this transfer.

9.     Based on my conversations with representatives of Victim Bank-1, Ebury Street Capital and JOHN ARTHUR HANRATTY, the defendant, have not made any principal or interest payments on its commercial lines of credit since in or around October 2021. Ebury Street Capital currently owes Victim Bank-1 over $20 million in outstanding principal and interest.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of JOHN ARTHUR HANRATTY, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.


s/ Lauren Collins /otw
Lauren Collins
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 15th day of December, 2023.

THE HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York

9

# EXHIBIT B

SDNY (Rev. 12/21)
AO 98 (Rev. 12/11) Appearance Bond

# UNITED STATES DISTRICT COURT
for the

Southern District of New York

|  |  |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
|  | ) | Case No.  23 MAG 7566 |
| John Arthur Hanratty | ) | |
| *Defendant* | ) | |

## APPEARANCE BOND

### Defendant's Agreement

I, _____John Arthur Hanratty_____ *(defendant)*, agree to follow every order of this court, or any court that considers this case, and I further agree that this bond may be forfeited if I fail:

( X )    to appear for court proceedings;
( X )    if convicted, to surrender to serve a sentence that the court may impose; or
( X )    to comply with all conditions set forth in the Order Setting Conditions of Release.

### Type of Bond

( X ) (1)  This is a personal recognizance bond.

(    ) (2)  This is an unsecured bond of _____ .  (    ) Cosigned by _____ FRP.

( X ) (3)  This is a secured bond of  $ 2,000,000.00 , secured by:

( X ) (a)  $ 400,000.00 _____ , in cash deposited with the court.

(    ) (b)  the agreement of the defendant and each surety to forfeit the following cash or other property *(describe the cash or other property, including claims on it — such as a lien, mortgage, or loan — and attach proof of ownership and value)*:

If this bond is secured by real property, documents to protect the secured interest may be filed of record.

(    ) (c)  a bail bond with a solvent surety *(attach a copy of the bail bond, or describe it and identify the surety)*:

( X ) (d) Cosigned by __2__ FRP.

### Forfeiture or Release of the Bond

*Forfeiture of the Bond.* This appearance bond may be forfeited if the defendant does not comply with the above agreement. The court may immediately order the amount of the bond surrendered to the United States, including the security for the bond, if the defendant does not comply with the agreement. At the request of the United States, the court may order a judgment of forfeiture against the defendant and each surety for the entire amount of the bond, including interest and costs.

24-04020 Case 1:05-cr-27566-008/1402 Document Entered 08/14/24 09:45:23 Doc #3 State
Court Records      Pg 553 of 2230

AO 98 (Rev. 12/11) Appearance Bond

23 MAG 7566

*Release of the Bond.* The court may order this appearance bond ended at any time. This bond will be satisfied and the security will be released when either: (1) the defendant is found not guilty on all charges, or (2) the defendant reports to serve a sentence.

## Declarations

*Ownership of the Property.* I, the defendant – and each surety – declare under penalty of perjury that:

(1)     all owners of the property securing this appearance bond are included on the bond;
(2)     the property is not subject to claims, except as described above; and
(3)     I will not sell the property, allow further claims to be made against it, or do anything to reduce its value while this appearance bond is in effect.

*Acceptance.* I, the defendant – and each surety – have read this appearance bond and have either read all the conditions of release set by the court or had them explained to me. I agree to this Appearance Bond.

I, the defendant – and each surety – declare under penalty of perjury that this information is true. (See 28 U.S.C. § 1746.)

Date: ___12/21/2023___

Defendant's Signature John Arthur Hanratty

Interpreter's Initials

_____
Surety/property owner - printed name

_____
Surety/property owner - signature and date

Deputy Clerk's Initials

Interpreter's Initials

_____
Surety/property owner - printed name

_____
Surety/property owner - signature and date

Deputy Clerk's Initials

Interpreter's Initials

_____
Surety/property owner - printed name

_____
Surety/property owner - signature and date

Deputy Clerk's Initials

Interpreter's Initials

CLERK OF COURT

Date: ___12/21/2023___

Signature of Deputy Clerk

Approved.

Date: _____

AUSA's Signature Nicholas Chiuchiolo

AO 199A (Rev. 06/19)  Order Setting Conditions of Release

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

|  |  |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| **John Arthur Hanratty** | ) | Case No.   23 MAG 7566 |
| *Defendant* | ) | |

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

(1)  The defendant must not violate federal, state, or local law while on release.

(2)  The defendant must cooperate in the collection of a DNA sample if it is authorized by 34 U.S.C. § 40702.

(3)  The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

(4)  The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

The defendant must appear at: _____

*Place*

_____

on  _____

*Date and Time*

If blank, defendant will be notified of next appearance.

(5)  The defendant must sign an Appearance Bond, if ordered.

FILED: NEW YORK COUNTY CLERK 01/04/2024 04:23 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 101    24-04020, Case 1:20-cr-12756, Document 1402, Entered 03/14/24/09:45:23, Doc #3 State    RECEIVED NYSCEF: 01/04/2024

Court Records    Pg 555 of 2230

AO 199B (Rev. 12/20)  Additional Conditions of Release                                      John Arthur Hanratty          23 MAG 7566

# ADDITIONAL CONDITIONS OF RELEASE

Pursuant to 18 U.S.C. § 3142(c)(1)(B), the court may impose the following least restrictive condition(s) only as necessary to reasonably assure the appearance of the person as required and the safety of any other person and the community.

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

( [ ] )  (6)  The defendant is placed in the custody of:
Person or organization _____
Address *(only if above is an organization)* _____
City and state _____  Tel. No. _____

who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: _____    _____
                            *Custodian*                                *Date*

( [✓] )  (7)  The defendant must:
( [✓] )  (a)  submit to supervision by and report for supervision to the    PRETRIAL SERVICES FOR [ ] Regular; [ ] Strict; [✓] As Directed
telephone number _____, no later than _____ .
( [ ] )  (b)  continue or actively seek employment.
( [ ] )  (c)  continue or start an education program.
( [✓] )  (d)  surrender any passport to:    PRETRIAL SERVICES
( [✓] )  (e)  not obtain a passport or other international travel document.
( [✓] )  (f)  abide by the following restrictions on personal association, residence, or travel:    SDNY/EDNY/DPR/DNJ/DMA
with prior notice and approval from PTS
( [✓] )  (g)  avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution,
including:  No contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution unless in the presence of counsel.

( [ ] )  (h)  get medical or psychiatric treatment: _____

( [ ] )  (i)  return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling,
or the following purposes: _____

( [ ] )  (j)  maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers
necessary.
( [ ] )  (k)  not possess a firearm, destructive device, or other weapon.
( [ ] )  (l)  not use alcohol ( [ ] ) at all ( [ ] ) excessively.
( [ ] )  (m)  not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed
medical practitioner.
( [ ] )  (n)  submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with
random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of
prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy
of prohibited substance screening or testing.
( [ ] )  (o)  participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or
supervising officer.
( [ ] )  (p)  participate in one of the following location restriction programs and comply with its requirements as directed.
( [ ] ) (i)  **Curfew.** You are restricted to your residence every day ( [ ] ) from _____ to _____ , or ( [ ] ) as
directed by the pretrial services office or supervising officer; or
( [ ] ) (ii)  **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services;
medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other
activities approved in advance by the pretrial services office or supervising officer; or
( [ ] ) (iii)  **Home Incarceration.** You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and
court appearances or other activities specifically approved by the court; or
( [ ] ) (iv)  **Stand Alone Monitoring.** You have no residential curfew, home detention, or home incarceration restrictions. However,
you must comply with the location or travel restrictions as imposed by the court.
**Note:** Stand Alone Monitoring should be used in conjunction with global positioning system (GPS) technology.

AO 199B (Rev. 12/20)  Additional Conditions of Release                                    John Arthur Hanratty          23 MAG 7566

## ADDITIONAL CONDITIONS OF RELEASE

( ☐ ) (q)  submit to the following location monitoring technology and comply with its requirements as directed:
    ( ☐ ) (i)    Location monitoring technology as directed by the pretrial services or supervising officer; or
    ( ☐ ) (ii)   Voice Recognition; or
    ( ☐ ) (iii)  Radio Frequency; or
    ( ☐ ) (iv)   GPS.

( ☐ ) (r)  pay all or part of the cost of location monitoring based upon your ability to pay as determined by the pretrial services or supervising officer.

( ☐ ) (s)  report as soon as possible, to the pretrial services or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

( ☑ ) (t)  _____
              _____

Agreed conditions of release:
$2,000,000 personal recognizance bond;  Secured by $400,000 cash/property; To be co-signed by two financially responsible persons; Travel restricted to SDNY/EDNY/DPR/DNJ/DMA with prior notice and approval from pretrial services; Surrender travel documents and no new applications; Pretrial supervision as directed by pretrial services; No contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution unless in the presence of counsel; Def. to be released on own signature; Remaining conditions to be my by: 1/4/2024. ***Preliminary Hearing Date: 1/22/2024 on defendants consent.

Defense Counsel Name: Anna Kovalevska

Defense Counsel Telephone Number: 212-269-1400

Defense Counsel Email Address: akovalevska@gusraekaplan.com

AO 199C  (Rev. 09/08)  Advice of Penalties

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT:  John Arthur Hanratty                    Case No.  23 MAG 7566

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year.  This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court.  The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed.  If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive.  In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release.  I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed.  I am aware of the penalties and sanctions set forth above.

Date:  12/21/2023

Defendant's Signature  John Arthur Hanratty

[ ] **DEFENDANT RELEASED**

City and State

### Directions to the United States Marshal

(  ) The defendant is ORDERED released after processing.

(  ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release.  If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date:

Judicial Officer's Signature

AUSA's Signature  Nicholas Chiuchiolo

DISTRIBUTION:   COURT    DEFENDANT    PRETRIAL SERVICE    U.S. ATTORNEY    U.S. MARSHAL

FILED: NEW YORK COUNTY CLERK 01/04/2024 04:23 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 101
RECEIVED NYSCEF: 01/04/2024

AO 199C  (Rev. 09/08)  Advice of Penalties



Southern District of New York

The Bronx
Manhattan
Westchester
Rockland
Dutchess
Orange
Putnam
Sullivan

Eastern District of New York

Brooklyn (Kings County)
Queens (Queens County)
Staten Island (Richmond County)
Long Island (Nassau & Suffolk)

FILED: NEW YORK COUNTY CLERK 01/04/2024 04:23 PM
NYSCEF DOC. NO. 101

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/04/2024

Case 1:... Document... Filed 12/... 09:45:23 8 Doc #3 State
Court Records    Pg 559 of 2230

DOCKET No. 23MJ7566

DEFENDANT John Arthur Hanratty

AUSA Nicholas Chiuchiolo

DEF.'S COUNSEL Anna Kovalevska
☒ RETAINED ☐ FEDERAL DEFENDERS ☐ CJA ☐ PRESENTMENT ONLY

☐ _____ INTERPRETER NEEDED

☐ DEFENDANT WAIVES PRETRIAL REPORT
12/18/2023 in DPR
DATE OF ARREST 12/21/2023    ☒ VOL. SURR.
TIME OF ARREST AM    ☐ ON WRIT
TIME OF PRESENTMENT 2:05 pm

☒ Rule 5 ☐ Rule 9 ☐ Rule 5(c)(3) ☐ Detention Hrg.

☐ Other: _____

## BAIL DISPOSITION

☐ SEE SEP. ORDER
☐ DETENTION ON CONSENT W/O PREJUDICE    ☐ DETENTION: RISK OF FLIGHT/DANGER    ☐ SEE TRANSCRIPT
☐ DETENTION HEARING SCHEDULED FOR: _____
☒ AGREED CONDITIONS OF RELEASE
☒ DEF. RELEASED ON OWN RECOGNIZANCE
☒ $ 2 million BOND    ☒ 2 FRP
☒ SECURED BY $ 400,000    CASH/PROPERTY: _____
☒ TRAVEL RESTRICTED TO SDNY/EDNY/ DPR + DCNT + D MAVI with prior notice + approval
☐ TEMPORARY ADDITIONAL TRAVEL UPON CONSENT OF AUSA & APPROVAL OF PRETRIAL SERVICES    of PTS
☒ SURRENDER TRAVEL DOCUMENTS (& NO NEW APPLICATIONS)

☒ PRETRIAL SUPERVISION: ☐ REGULAR ☐ STRICT ☒ AS DIRECTED BY PRETRIAL SERVICES
☐ DRUG TESTING/TREATMT AS DIRECTED BY PTS ☐ MENTAL HEALTH EVAL/TREATMT AS DIRECTED BY PTS
☐ DEF. TO SUBMIT TO URINALYSIS; IF POSITIVE, ADD CONDITION OF DRUG TESTING/TREATMENT
☐ HOME INCARCERATION ☐ HOME DETENTION ☐ CURFEW ☐ STAND ALONE MONITORING
☐ LOCATION MONITORING TECHNOLOGY AS DIRECTED BY PTS ☐ GPS
☐ DEF. TO PAY ALL OF PART OF COST OF LOCATION MONITORING, AS DETERMINED BY PRETRIAL SERVICES

☐ DEF. TO CONTINUE OR SEEK EMPLOYMENT [OR] ☐ DEF. TO CONTINUE OR START EDUCATION PROGRAM
☐ DEF. NOT TO POSSESS FIREARM/DESTRUCTIVE DEVICE/OTHER WEAPON

☐ DEF. TO BE DETAINED UNTIL ALL CONDITIONS ARE MET
☒ DEF. TO BE RELEASED ON OWN SIGNATURE, PLUS THE FOLLOWING CONDITIONS: _____
_____ ; REMAINING CONDITIONS TO BE MET BY: 1/7/2024

## ADDITIONAL CONDITIONS/ADDITIONAL PROCEEDINGS/COMMENTS:

No contact, directly or indirectly, with any person who
is or may be a victim or witness in the investigation
or prosecution unless in the presence of
counsel.

☐ DEF. ARRAIGNED; PLEADS NOT GUILTY    ☐ CONFERENCE BEFORE D.J. ON _____
☐ DEF. WAIVES INDICTMENT
☐ SPEEDY TRIAL TIME EXCLUDED UNDER 18 U.S.C. § 3161(h)(7) UNTIL _____

For Rule 5(c)(3) Cases:
☐ IDENTITY HEARING WAIVED    ☐ DEFENDANT TO BE REMOVED
☐ PRELIMINARY HEARING IN SDNY WAIVED    ☐ CONTROL DATE FOR REMOVAL: _____

PRELIMINARY HEARING DATE: 1/22/2024    ☒ ON DEFENDANT'S CONSENT

DATE: 12/21/2023

_____
UNITED STATES MAGISTRATE JUDGE, S.D.N.Y.

# FILED: NEW YORK COUNTY CLERK

## NYSCEF DOC. NO. 102

## EXHIBIT(S) - REQUEST TO SEAL
Excerpts from EBURY_000004

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 103

EXHIBIT(S) - REQUEST TO SEAL
Excerpts from EBURY_000160

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 104

EXHIBIT(S) - REQUEST TO SEAL
Excerpts from EBURY_000295

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 105

EXHIBIT(S) - REQUEST TO SEAL
Excerpts from EBURY_00081206

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 106

EXHIBIT(S) - REQUEST TO SEAL
Excerpts from EBURY_00081296

# EXHIBIT H

**From:**              Victor Wang <vwang@gusraekaplan.com>
**Sent:**               Wednesday, November 15, 2023 1:14 PM
**To:**                Mayron, Austin P.
**Cc:**                Kari Parks; Willscher, Alexander J.
**Subject:**          [EXTERNAL] EBCC v. Hanratty - Monthly Transaction

Good afternoon Austin,

In compliance with paragraph 1 of the Court's December 12, 2022 Preliminary Conference Order, please find the below-linked production of documents stamped EBURY_00081296 - EBURY_00081321.

https://gusraekaplan.sharefile.com/i/i5a5f2eba3234bb7a [gusraekaplan.sharefile.com]

Thank you.

Best,
Victor

**Victor Wang, Associate | Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 | www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

**This is an external message from: vwang@gusraekaplan.com **

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 108

EXHIBIT(S) - REQUEST TO SEAL

Excerpts from Defendants' QuickBooks
Journal Report, dated January 3, 2024

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 109

MEMORANDUM OF LAW - REQUEST
TO SEAL

Memorandum of Law in Support of OSC
(Sealed)

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records            Pg 569 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

——————————————————————— x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                    Plaintiff,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ
CORPS. 1-10,

                    Defendants.

——————————————————————— x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 005**

**MEMORANDUM OF LAW IN
SUPPORT OF ORDER TO SHOW
CAUSE**

## INTRODUCTION

On December 18, 2023, Defendant John Arthur Hanratty ("**Hanratty**") was arrested in Puerto Rico and charged by the U.S. Attorney's Office for the Southern District of New York with bank and wire fraud in connection with his scheme to defraud Plaintiff Emigrant Business Credit Corporation ("**EBCC**"). (*See* Ex. A to Willscher Affirm.) Today is the deadline in Hanratty's criminal case for him, pursuant to his bail package, to post a $2 million appearance bond, secured by $400,000 in cash or other assets. (Ex. B to Willscher Affirm. at 5.) Upon learning this week of that bond condition, EBCC became concerned that Hanratty would misappropriate

proceeds from the sale of EBCC's collateral in order to post his bond, in violation of this Court's Preliminary Injunction Order. (*See* Dkt. 47.) After further investigation, EBCC has discovered that its fears were well placed; Hanratty has engaged in repeated, flagrant, and willful violations of the Court's preliminary injunction that warrant findings of civil and criminal contempt.

The Preliminary Injunction Order, filed on November 29, 2022, contains three relevant provisions. *First*, Hanratty and the Ebury Defendants may not transfer or withdraw any assets "aside from ordinary and necessary disbursements related to the defendants' tax lien or real estate businesses or living expenses." (Dkt. 47 at 8.) *Second*, Hanratty and the Ebury Defendants must deposit the proceeds from the sale of any tax lien certificates or real estate property into the parties' joint escrow account. (*Id.*) *Third*, Hanratty and the Ebury Defendants must provide EBCC at least twenty-four hours' advance notice before "the transfer of any assets in an amount exceeding $50,000." (*Id.*)

EBCC has discovered that, on December 11, 2023, Hanratty made a bulk sale of EBCC's tax lien collateral—listed in the books and records of the Ebury Defendants by Hanratty as having a book value of ████████—for only ████████, without providing any notice to EBCC or escrowing the proceeds. (Willscher Affirm. ¶ 5.) Then, on December 20, 2023—two days after his arrest—Hanratty transferred ██████ to himself, again without providing any notice to EBCC. (*Id.*) These are serious violations of the Preliminary Injunction Order. Hanratty and the Ebury Defendants must immediately return the ██████ he wrongfully took and escrow the ████████ in sale proceeds.

Beyond those clear violations, EBCC's preliminary review has discovered additional violations by Defendants of the preliminary injunction. For example, on October 13, 2023, Hanratty sold a tax lien certificate worth ████████ for ██████, without providing any

notice to EBCC or escrowing the proceeds. (*See id.* ¶¶ 21-22.) Moreover, Defendants concealed

this transaction from EBCC by providing EBCC with a purported report of Defendants'

transactions "[i]n compliance with paragraph 1 of the Court's December 12, 2022 Preliminary

Conference Order" that entirely omitted the October 13, 2023 transaction. (*See id*. ¶¶ 18-19.)

These are not one-off mistakes. Hanratty has a long history of disobeying this

Court's preliminary injunction (and the temporary restraining order that preceded it), including on

November 16, 2022; November 17, 2022; twice on December 1, 2022; December 6, 2022;

December 19, 2022; and August 17, 2023. (*See id.* ¶¶ 10-17.)

Accordingly, and as set forth more fully below, EBCC respectfully requests that

the Court: (i) issue findings of civil and criminal contempt against Defendants; (ii) impose a civil

fine of $306,946.30 against Defendants and a criminal fine of up to $1,000 against Hanratty per

act of contempt; and (iii) order Defendants to escrow $306,946.30 pending a hearing and further

Order of this Court. EBCC also respectfully requests that the Court admonish Defendants to

escrow the proceeds from the sale of any tax lien certificate or real estate property "aside from

ordinary and necessary disbursements related to defendants' tax lien or real estate businesses," and

clarify that expenses related to Hanratty's criminal proceedings are not "ordinary and necessary

disbursements." (*See* <u>Dkt. 47.</u>)

## **BACKGROUND**

Shortly after EBCC filed this action in September 2022, it moved, by order to show

cause, for a temporary restraining order and preliminary injunction to prevent Defendants from

continuing to dissipate EBCC's collateral. (*See* <u>Dkt. 2.</u>) As EBCC explained at the time,

Defendants have a "history of fraudulently transferring assets to place them beyond EBCC's

reach" and EBCC "face[d] irreparable harm because Defendants are insolvent and continue to

dissipate EBCC's collateral." (<u>Dkt. 4</u> at 19, 21.) Accordingly, EBCC sought relief that would

ensure it was adequately protected from further dissipation of its collateral. Specifically, EBCC

sought a robust preliminary injunction containing the following provisions:

- <u>Transfer Restriction</u>: Enjoining Defendants "from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, [or] permitting the transfer of any of their assets, aside from ordinary and necessary disbursements related to the defendants' tax lien or real estate businesses or living expenses";

- <u>Escrow Requirement</u>: Ordering Defendants to "deposit any proceeds" from the sale of "any tax lien certificate or real estate property resulting from the foreclosure on a tax lien certificate . . . into an escrow account, to be established by the parties"; and

- <u>Notice Requirement</u>: Ordering Defendants to provide EBCC with notice "at least twenty-four (24) hours [before] transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, or permitting the transfer of any of their assets in an amount exceeding $50,000."

(<u>Dkt. 2</u> at 2-3.)

On October 19, 2022, the Court issued a temporary restraining order that imposed

the escrow and notice requirements. (<u>Dkt. 23</u> at 3-4.) Then, on November 30, 2022, the Court

entered a preliminary injunction that imposed all three requirements. (<u>Dkt. 47</u> at 8-9.)[1]

After the preliminary injunction issued, EBCC discovered that Defendants had

repeatedly violated the temporary restraining order. Specifically, Defendants had made

withdrawals of ███ on November 16, 2022, and of ███ on November 17, 2022, without

providing advance notice to EBCC. (*See* Willscher Affirm. ¶¶ 10-11.) As such, during the

Preliminary Conference on December 9, 2022, EBCC requested additional mechanisms to verify

---

[1]    On December 28, 2022, Defendants filed a notice of appeal challenging the Court's preliminary injunction. (*See* <u>Dkt. 56</u>.) Ultimately, Defendants chose not to perfect their appeal and accepted the requirements of the Preliminary Injunction Order and Preliminary Conference Order.

-4-

Defendants' compliance with the Preliminary Injunction Order.  EBCC requested, and the Court

ordered, that "defendants shall provide to plaintiff documentation showing the source of any

proceeds in excess of $5,000 and any disbursements from the defendants in excess of $10,000 . . .

as an ongoing obligation" each month.  (<u>Dkt. 53</u> at 1.)

Defendants' first monthly reporting—on December 23, 2022—revealed yet more

violations of the Preliminary Injunction Order.  On December 1, 2022, Defendants made

withdrawals of ██████ and █████; on December 6, 2022, Defendants made a withdrawal

of ██████; and on December 7, 2022, Defendants made a transfer of ██████, all without

providing advance notice to EBCC.  (*See* Willscher Affirm. ¶¶ 12-13.)

Subsequent monthly reporting revealed further violations of the Preliminary

Injunction Order.  On December 19, 2022, Defendants made a withdrawal of ████████, again

without providing advance notice to EBCC.  (*See id.* ¶¶ 14-15.).  On August 17, 2023, Defendants

made a bulk sale of liens for █████ without providing advance notice to EBCC or escrowing the

proceeds.  (*Id.* ¶¶ 16-17.).  While EBCC had serious concerns about Defendants' repeated

violations of the Preliminary Injunction Order, Defendants appeared to have come into compliance

with the Court's order by the beginning of 2023 (with the one exception listed above), so EBCC

did not pursue the issue further with the Court.

That belief was shattered yesterday when EBCC discovered new and very serious

violations of the Preliminary Injunction Order, dating back to October 2023.  As previously

mentioned, Hanratty was arrested in Puerto Rico on December 18, 2023.  He was charged, by the

U.S. Attorney's Office for the Southern District of New York, with bank and wire fraud in

connection with his scheme to defraud EBCC.  (*See* Ex. A to Willscher Affirm.)  As a condition

of his release, Hanratty has agreed to post, by January 4, 2024, a $2 million appearance bond,

-5-

secured by $400,000 in cash or other assets by January 4, 2024.  (Ex. B to Willscher Affirm. at 4.)

Upon learning of that condition, EBCC began investigating Defendants' financial records to ensure

that Hanratty was not using proceeds from the sale of EBCC's collateral to post his bond.  Through

that investigation, EBCC discovered further violations of the preliminary injunction.

Of greatest concern, EBCC discovered that Hanratty, just **two days** after his arrest,

transferred ██████ to himself, without providing any notice to EBCC.  (Willscher Affirm.

¶¶ 20-21.)  Further, it appears that Hanratty generated the liquidity to make that ██████payment

earlier in December through a bulk sale of over ██████████ of EBCC's tax lien collateral, for

which he received only ██████████.  (*Id.*)  In violation of the Court's order, Hanratty did not

provide EBCC with any notice of the sale, preventing EBCC from evaluating the sale's fairness

before it took place or taking any action to block it.  (*Id.*)  Nor did Hanratty escrow the proceeds

of the bulk sale as was required by the Order.  EBCC still is investigating the circumstances of this

sale, including the purported basis for the apparent ████ sale discount on these liens.

In addition, EBCC discovered that, on October 13, 2023, Hanratty sold a tax lien

worth ██████ for ██████, without providing any notice to EBCC or escrowing the proceeds.

(*Id.* ¶ 22)  Moreover, Hanratty did not disclose that sale in Defendants' November financial

reporting (*see* Ex. H to Willscher Affirm.), in violation of the Preliminary Conference Order's

requirement that "defendants shall provide documentation showing the source of any proceeds in

excess of $5,000" (Dkt. 53 at 1).

Finally, EBCC discovered that Defendants have made ██████ in "transfer[s] to

John Hanratty" since October 12, 2023.  (Ex. H to Willscher Affirm.)  In addition, Defendants

transferred ██████ to an individual named "██████████████" on December 14, 2023.  (*Id.*)  Based

on the now-complete discovery in this case, EBCC does not believe that ██████████ is

-6-

employed by any of the Defendants, and thus any payments to him are presumptively prohibited by the Preliminary Injunction Order because they are not business related.

Based on these facts, it is apparent that Hanratty is in clear violation of the Court's orders. Moreover, based on Hanratty's actions in the past month—including selling a substantial portion of Emigrant's collateral at an apparent loss of ▮▮▮ and wiring funds to himself following his arrest on federal criminal charges—there is both a clear risk that Hanratty is actively depleting EBCC's collateral and an immediate risk of further, irreparable harm to EBCC.

Before submitting this motion, EBCC contacted Defendants' counsel this morning in an effort to understand the above-listed transactions and why Defendants had not provided notice as required by the Preliminary Injunction Order. EBCC requested a response by 3:00 p.m. today, and, as of the time of filing, has not received a substantive justification for the apparent violation of this Court's orders.

## LEGAL STANDARDS

To establish a finding of civil contempt, the movant must show, by clear and convincing evidence, that: (i) "a lawful order of the court, clearly expressing an unequivocal mandate, was in effect"; (ii) "the order has been disobeyed"; (iii) "the party to be held in contempt . . . had knowledge of the court's order"; and (iv) "prejudice." *El-Dehdan* v. *El-Dehdan*, 26 N.Y.3d 19, 29 (2015); *see* Judiciary Law § 753. "To satisfy the prejudice requirement, it is sufficient to allege and prove that the contemnor's actions were 'calculated to . . . defeat, impair, impede or prejudice the rights or remedies of a party.'" *Orange Cnty.-Poughkeepsie Ltd. P'ship* v. *Bonte*, 37 A.D.3d 684, 686 (2d Dep't 2007); *see Bd. of Directors of Windsor Owners Corp.* v. *Platt*, 148 A.D.3d 645, 646 (1st Dep't 2017) ("Judiciary Law § 753 does not require a showing of . . . monetary harm as a precondition to a finding of civil contempt.").

-7-

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 576 of 2230

Civil contempt is punished by "a fine, sufficient to indemnify the aggrieved party" for any loss or injury caused by the disobedient party. Judiciary Law § 773. Until such a fine is paid, the Court may imprison the disobedient party for up to "three months if the fine is less than five hundred dollars" and up to "six months if the fine is five hundred dollars or more." Judiciary Law § 774(1).

Criminal contempt has similar elements, but requires an additional showing of "willfulness with which the conduct is carried out," *McCormick* v. *Axelrod*, 59 N.Y.2d 574, 583 (1983); *see* Judiciary Law § 750(A)(3), and must be proven "beyond a reasonable doubt," *N.Y.C. Coalition to End Lead Poisoning* v. *Giuliani*, 245 A.D.2d 49, 50 (1st Dep't 1997). Willfulness in this context is a very low bar, meaning only "an awareness of the act that is other than 'unwitting conduct.'" *El-Dehdan*, 26 N.Y.3d at 35 (citation omitted). Further, criminal contempt does not require a showing of prejudice. *C.B-C.* v. *W.C.*, 178 N.Y.S.3d 386, 397 (Sup. Ct. Nassau Cnty. 2022) ("The element of prejudice to a party's rights is essential to civil contempt, which aims to vindicate the rights of a private party to litigation, but not criminal contempt, which aims to vindicate the authority of the court.").

Each act of criminal contempt may be punished "by fine, not exceeding one thousand dollars, or by imprisonment, not exceeding thirty days, . . . or both." Judiciary Law § 751(1); *see Town of Southampton* v. *R.K.B. Realty, LLC*, 91 A.D.3d 628, 630-31 (2d Dep't 2012) (holding that "separate fines may be imposed" for "multiple acts of disobedience"). Notably, "the same act may be punishable as both a civil and a criminal contempt." *McCormick*, 59 N.Y.2d at 583.

-8-

# <u>ARGUMENT</u>

Hanratty has willfully and repeatedly disobeyed this Court's Preliminary Injunction Order (Dkt. 47) and Preliminary Conference Order (Dkt. 53), including by: (i) selling ████ of EBCC's tax lien collateral on December 11, 2023, without providing advance notice to EBCC or escrowing the proceeds; (ii) transferring ████ to himself on December 20, 2023, without providing advance notice to EBCC; (iii) transferring tax lien collateral worth ████ on October 13, 2023, without providing advance notice to EBCC or escrowing the proceeds; and (iv) concealing the transfer of that tax lien from Defendants' November financial reporting.

Each element of civil contempt is easily met here. The Preliminary Injunction Order and Preliminary Conference Order are "lawful order[s] of the court, clearly expressing . . . unequivocal mandate[s]," *El-Dehdan*, 26 N.Y.3d at 29, that Defendants must provide twenty-four hours' advance notice to EBCC before transferring assets in an amount exceeding $50,000, escrow the proceeds from any such sale "aside from ordinary and necessary disbursements," and provide documentation each month for any proceeds in excess of $5,000.

Defendants ignored the Court's orders by failing to comply with each of those requirements. Hanratty was aware of the Court's orders because he submitted an affidavit in opposition to EBCC's motion for a preliminary injunction (*see* Dkt. 24), instructed his counsel both in an appeal from the Court's Preliminary Injunction Order and in "multiple mediation conferences . . . in [an] attempt to resolve the Appeal" (*see* Dkt. 56; Letter Request for Extension, *Emigrant Bus. Credit Corp.* v. *Hanratty*, 1st Dep't No. 2022-05825 (filed June 26, 2023), NYSCEF No. 3), and has been responsible for submitting monthly financial reporting to EBCC pursuant to the Preliminary Conference Order for over a year.

-9-

Finally, EBCC has been prejudiced, including because Defendants' failure to comply with this Court's orders has deprived EBCC of the advanced ability to review the propriety and fairness of the at-issue transactions and has prejudiced EBCC's ability to recover the transferred assets. *See Ficus Invs., Inc.* v. *Priv. Cap. Mgmt., L.L.C.*, 66 A.D.3d 557, 558 (1st Dep't 2009) (finding prejudice where the defendant impermissibly "negotiat[ed] the conveyance of certain mortgages without providing notice to plaintiffs"). As such, EBCC respectfully requests that the Court find Defendants in civil contempt of the Preliminary Injunction Order and Preliminary Conference Order. *See Richardson* v. *Gray*, 272 A.D.2d 142, 142 (1st Dep't 2000) (affirming finding of civil contempt where defendant transferred funds other than "in the ordinary course of business"); *see also Kassab* v. *Kasab*, 137 A.D.3d 1141, 1142 (2d Dep't 2016) (affirming finding of civil contempt against party who used corporate funds "to pay his legal fees in this . . . action" because "legal fees incurred by a shareholder in defending a dissolution proceeding are not payable with corporate funds as expenses incurred in the ordinary course of business").

As a remedy for Defendant's civil contempt, EBCC respectfully requests the imposition of a civil fine of $306,946.30, ███████████████████████████ ████████████████████████████████████████████████████. *See* Judiciary Law § 773. This is an appropriate amount under the circumstances. *See Pac. All. Asia Opportunity Fund L.P.* v. *Wan*, 199 A.D.3d 423, 423 (1st Dep't 2021) (affirming a civil contempt fine "of $500,000 for every day . . . in which a $27 million yacht remains outside the court's jurisdiction in violation of prior orders").

For the same reasons, EBCC also respectfully requests that the Court find Hanratty in criminal contempt of the Preliminary Injunction Order and Preliminary Conference Order. A finding of criminal contempt is appropriate against a party who "intentionally disobeyed a clear

-10-

and lawful order." _Motta_ v. _Motta_, 192 A.D.3d 481, 482 (1st Dep't 2021). For example, in

_Pensmore Invs., LLC_ v. _Gruppo, Levey & Co._, 184 A.D.3d 468, 469 (1st Dep't 2020), the First

Department affirmed a finding of criminal contempt against a party that sold assets "in violation

of an attachment order"—a provisional remedy akin to a preliminary injunction. Similarly, in

_Zodkevitch_ v. _Feibush_, 17 Misc. 3d 1106(A), at *8 (Sup. Ct. N.Y. Cnty. 2007), the court found the

defendant to be in civil and criminal contempt for continuing the "dissipation of . . . funds" in

violation of a preliminary injunction. _See also Town of Copake_ v. _13 Lackawanna Props., LLC_,

73 A.D.3d 1308, 1310 (3d Dep't 2010) (affirming findings of civil and criminal contempt for

intentional violations of a temporary restraining order).

There can be no dispute that Hanratty's conduct here has been willful. As

previously demonstrated, Hanratty was well aware of the Court's orders. Where, as here, a

defendant ignores "the clear and unequivocal mandate of the court, of which [he] was aware" and

"continue[s] to operate [his] business as if the injunction did not exist[, his] actions can be

interpreted in no other way than as willful and thus support the finding of criminal contempt." _All._

v. _World Farm Inc._, 300 A.D.2d 22, 22 (1st Dep't 2002); _see Town of Southampton_, 91 A.D.3d at

630 (affirming findings of civil and criminal contempt where defendants were "aware of the clear

and unequivocal provisions set forth in the [so-ordered] stipulations, and violated these

provisions"); _Casavecchia_ v. _Mizrahi_, 57 A.D.3d 702, 704 (2d Dep't 2008) (affirming findings of

civil and criminal contempt where "[d]espite the clear and unequivocal mandates of the court

[against distributing certain funds], of which [the defendant] was aware, he nonetheless continued

to violate them, as if the court's orders did not exist."). As a punishment for Defendant's criminal

contempt, EBCC respectfully requests the imposition of a fine of up to $1,000 for each of the four

acts of contempt listed above, pursuant to Judiciary Law § 751(1).

## **CONCLUSION**

For the foregoing reasons, EBCC respectfully requests the Court enter the proposed

order to show cause:

a. Adjudging Defendants in civil contempt of Court, imposing upon them a civil fine of $306,946.30, for Defendants' failure to comply with the terms of the Court's Preliminary Injunction Order and Preliminary Conference Order;

b. Adjudging Defendant John Arthur Hanratty in criminal contempt of Court, imposing upon him a criminal fine of up to $1,000 for each of the four identified acts of contempt,[2] for his willful failure to comply with the terms of the Court's Preliminary Injunction Order and Preliminary Conference Order;

c. Authorizing Plaintiff to docket as a money judgment any order issued by the Court on this motion fixing the amount of money owed by Defendants, including restitution, fines, and motion costs;

d. Requiring that Defendants deposit $306,946.30 into the Parties' joint escrow account pending a hearing and further Order of this Court; and

e. Granting Plaintiff its costs and disbursements, and such other and further relief as the Court deems just and proper.

Dated:   January 4, 2024
          New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*

Alexander J. Willscher
Austin P. Mayron
Erin L. Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business
Credit Corporation*

---

[2]    Criminal contempt fines are to be paid "to the treasurer of the county." Judiciary Law § 791.

-12-

FILED: NEW YORK COUNTY CLERK 01/04/2024 04:23 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 110
RECEIVED NYSCEF: 01/04/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 581 of 2230

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with the word-count limit of Commercial Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because it contains 3,410 words.

Dated:   January 4, 2024                    */s/ Alexander J. Willscher*
        New York, New York                    Alexander J. Willscher

-13-

FILED: NEW YORK COUNTY CLERK 01/08/2024 02:52 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 111
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 582 of 2230
RECEIVED NYSCEF: 01/08/2024

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

———————————————————— x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                Plaintiff,

        v.

JOHN ARTHUR HANRATTY,
EBURY STREET CAPITAL, LLC,
EBURY FUND 1, LP,
EBURY FUND 2, LP,
EBURY 1EMI LLC,
EBURY 2EMI LLC,
EB 1EMIALA LLC,
EB 2EMIALA LLC,
EB 1EMIFL, LLC,
EB 2EMIFL, LLC,
EB 1EMIIN, LLC,
EB 2EMIIN, LLC,
EB 1EMIMD, LLC,
EB 2EMIMD, LLC,
EB 1EMINJ, LLC,
EB 2EMINJ, LLC,
EB 1EMINY, LLC,
EB 2EMINY, LLC,
EB 1EMISC, LLC,
EB 2EMISC, LLC,
RE 1EMI LLC,
RE 2EMI LLC,
EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC,
EBURY FUND 1FL, LLC,
EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC,
EBURY RE LLC, and
XYZ CORPS. 1-10,

                Defendants.

———————————————————— x

Index No. 158207/2022

**STIPULATION AND ~~PROPOSED~~
ORDER**

**WHEREAS**, on December 28, 2023, Plaintiff Emigrant Business Credit Corporation and Defendants the "Ebury Parties"[1] submitted a proposed summary judgment briefing schedule that contemplates each side submitting two summary judgment briefs;

**WHEREAS**, the parties expect that their summary judgment briefing and supporting papers will contain information designated as Confidential Information under the Stipulation for the Exchange of Confidential Information (Dkt. 59) (the "Protective Order");

**WHEREAS**, under Paragraph 12 of the Protective Order, Producing Parties, as defined therein, have seven days from the date of filing of any Confidential Information to move for an Order sealing such materials;

**WHEREAS**, the parties seek to adjourn the seven-day deadline under the Protective Order in connection with any summary judgment filings; and instead each to file a single sealing motion within ten (10) days of the latest return date of the parties' motions for summary judgment;

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED** by and between the undersigned counsel, subject to the approval of the Court, that the seven-day deadline to file a motion to seal under Paragraph 12 of the Protective Order in connection with any summary judgment filings is adjourned; and that each party may file a single sealing motion within ten (10) days of the latest return date of the parties' motions for summary judgment.

---

[1] Defendants Ebury Street Capital, LLC, Ebury Fund 1, LP, Ebury Fund 2, LP, Ebury 1EMI LLC, Ebury 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1FL, LLC, Ebury Fund 2FL, LLC, Ebury Fund 1NJ, LLC, Ebury Fund 2NJ, LLC, Red Clover 1, LLC, Ebury RE LLC (together, the "Ebury Entities") and John Hanratty (with the Ebury Entities, the "Ebury Parties").

FILED: NEW YORK COUNTY CLERK 01/08/2024 02:52 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 111

RECEIVED NYSCEF: 01/08/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 584 of 2230

Attorneys for Plaintiff

*/s/ Alexander J. Willscher*

Alexander J. Willscher
Austin P. Mayron
Erin L. Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000

Date:  December 28, 2023

Attorneys for Defendants

*/s/ Kari Parks*

Kari Parks
Victor R. Wang
GUSRAE KAPLAN NUSBAUM PLLC
120 Wall Street, 25th Floor
New York, New York  10005
Telephone: (212) 269-1400

Date:  December 28, 2023

SO ORDERED:

MARGARET A. CHAN
J.S.C.

Dated:  January 8, 2024

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*

*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

December 28, 2023

Via NYSCEF and E-mail

The Honorable Margaret Chan,
 Supreme Court, New York County,
  Commercial Division,
   60 Centre Street, Room 659,
    New York, New York 10007.

   Re: Emigrant Business Credit Corporation v. John Arthur Hanratty, et
     al., No. 158207/2022

Dear Justice Chan:

   I represent Plaintiff Emigrant Business Credit Corporation ("EBCC") in connection with the above-captioned action and write to respectfully request the Court so-order the below briefing schedule for dispositive motions, which has been agreed to by the parties.

   The parties believe the proposed schedule—which would reduce the total number of briefs filed from six to four—will streamline the Court's review and consideration of their dispositive motions.

| Brief | Deadline | Word Limit |
|---|---|---|
| Emigrant's Motion for Summary Judgment | January 12 | 7,000 words |
| Ebury's Combined Cross-Motion for Summary Judgment and Opposition | February 2 | 14,000 words |
| Emigrant's Combined Opposition and Reply | February 23 | 11,200 words |
| Ebury's Reply | March 8 | 4,200 words |

   In addition, to further conserve resources, the parties also propose that—rather than filing a sealing motion in connection with each brief—each party file a single omnibus sealing motion after briefing is complete. Thank you for your attention to these matters.

         Sincerely,

         */s/ Alexander J. Willscher*

The Honorable Margaret Chan                                    -2-

                                        Alexander J. Willscher

    cc:    *All Counsel of Record* (via NYSCEF)

Application is granted.

SO ORDERED:

Hon. Margaret A. Chan, J.S.C.

DATED: January 8, 2024

(INDEX No. 158207/2022)

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 587 of 2230

## WARNING:

### YOUR FAILURE TO APPEAR IN COURT MAY RESULT IN YOUR IMMEDIATE ARREST AND IMPRISONMENT FOR CONTEMPT OF COURT

### NOTICE:

### THE PURPOSE OF THE HEARING UPON THE FOLLOWING APPLICATION IS TO PUNISH THE ACCUSED FOR A CONTEMPT OF COURT, AND THAT SUCH PUNISHMENT MAY CONSIST OF FINE OR IMPRISONMENT, OR BOTH, ACCORDING TO LAW

At Commercial Division Part 49, of the Supreme Court of the State of New York, held in and for the County of New York, at the Courthouse located at 60 Centre Street, New York, NY, on the 9th day of January, 2024.

PRESENT:
Hon. Margaret Chan, J.S.C.

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

———————————————————————— x
:
EMIGRANT BUSINESS CREDIT
CORPORATION,
:
            Index No. 158207/2022
       Plaintiff,
:
       v.          (Hon. Margaret Chan)
:
JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1, : **MOTION SEQUENCE NO. 005**
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA : [PROPOSED] **ORDER TO SHOW**
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, : **CAUSE**
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB :
2EMIIN, LLC, EB 1EMIMD, LLC, EB :
2EMIMD, LLC, EB 1EMINJ, LLC, EB :
2EMINJ, LLC, EB 1EMINY, LLC, EB :
2EMINY, LLC, EB 1EMISC, LLC, EB :
2EMISC, LLC, RE 1EMI LLC, RE 2EMI :
LLC, EB 1EMIDC, LLC, ARQUE TAX :
RECEIVABLE FUND (MARYLAND), LLC, :
EBURY FUND 1FL, LLC, EBURY FUND :

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 588 of 2230

2FL, LLC, EBURY FUND 1NJ, LLC,              :
EBURY FUND 2NJ, LLC, RED CLOVER 1,         :
LLC, EBURY RE LLC, and XYZ                 :
CORPS. 1-10,                               :
                                           :
                    Defendants.            :
                                           :
—————————————————————————    x

**UPON READING** the annexed Memorandum of Law; the Affirmation of Alexander J.

Willscher and the exhibits annexed thereto; and all other papers and pleadings filed herein; it is

*LET* ~~ORDERED that~~ Defendants John Arthur Hanratty; Ebury Street Capital, LLC;

Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC;

EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN,

LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC;

EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC;

RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund

1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1,

LLC; and Ebury RE LLC appear before this Court, located at 60 Centre Street, New York, NY, on

the 19th day of January 2024, at 2:30 P.M. o'clock a.m./p.m., or as soon thereafter as counsel can

be heard, and show cause why an Order should not be issued:

a.    Pursuant to Judiciary Law §§ 753, 773, and 774, adjudging Defendants in **CIVIL
      CONTEMPT** of Court and imposing upon them a civil fine of $306,946.30, for
      Defendants' failure to comply with the terms of the Decision + Order on Motion of
      the Hon. Margaret Chan, filed November 30, 2022 (Dkt. 47), restraining and
      enjoining Defendants and their Related Persons (i) from transferring, mortgaging,
      selling, converting, concealing, dissipating, disbursing, spending, withdrawing,
      disposing of, assigning, permitting the transfer of any of their assets, aside from
      ordinary and necessary disbursements related to the Defendants' tax lien or real
      estate businesses or living expenses; (ii) to deposit any proceeds from such sale,
      aside from ordinary and necessary disbursements related to the Defendants' tax lien
      or real estate businesses, into the parties' escrow account; and (iii) to notify Plaintiff
      at least twenty-four (24) hours in advance of transferring, mortgaging, selling,
      converting, concealing, dissipating, spending, withdrawing, disposing of,
      assigning, or permitting the transfer of any assets in an amount exceeding $50,000;
      and the Preliminary Conference Order, filed December 12, 2022 (Dkt. 53),

-2-

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 589 of 2230

requiring that Defendants provide documentation showing the source of any proceeds in excess of $5,000 two weeks after the first of each month respecting the previous month;

b.  Pursuant to Judiciary Law §§ 750(3) and 751(1), adjudging Defendant John Arthur Hanratty in **CRIMINAL CONTEMPT** of Court and imposing upon him a criminal fine of up to $1,000 for each of his four acts of contempt, for his willful failure to comply with the terms of the Decision + Order on Motion of the Hon. Margaret Chan, filed November 30, 2022 (Dkt. 47), restraining and enjoining Defendants and their Related Persons (i) from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, permitting the transfer of any of their assets, aside from ordinary and necessary disbursements related to the Defendants' tax lien or real estate businesses or living expenses; (ii) to deposit any proceeds from such sale, aside from ordinary and necessary disbursements related to the Defendants' tax lien or real estate businesses, into the parties' escrow account; and (iii) to notify Plaintiff at least twenty-four (24) hours in advance of transferring, mortgaging, selling, converting, concealing, dissipating, spending, withdrawing, disposing of, assigning, or permitting the transfer of any assets in an amount exceeding $50,000; and the Preliminary Conference Order, filed December 12, 2022 (Dkt. 53), requiring that Defendants provide documentation showing the source of any proceeds in excess of $5,000 two weeks after the first of each month respecting the previous month;

c.  Pursuant to CPLR § 2222, authorizing Plaintiff to docket as a money judgment any order issued by the Court on this motion fixing the amount of money owed by Defendants, including restitution, fines, and motion costs; and

d.  Granting Plaintiff its costs and disbursements, and such other and further relief as the Court deems just and proper.

Sufficient reason having been alleged, and pending a hearing and further Order of this Court, it is

**ORDERED** that Defendants must deposit $306,946.30 into the Parties' joint escrow account no later than the ⎯11th⎯ day of ⎯January⎯, 2024;

**ORDERED** that, pursuant to 22 NYCRR 202.5-b(k)(2) and Paragraph 12 of the so-ordered Stipulation for the Exchange of Confidential Information (Dkt. 59), the Clerk shall restrict the sealed documents filed by Plaintiff in support of this Order for seven (7) days after the filing of the Order to all except the Parties' counsel and court personnel;

-3-

**ORDERED** that service of a copy of this Order, together with a copy of the papers in support thereof, made upon Defendants by *NYSCEF*, on or before the 10th day of January , 2024, be deemed good and sufficient service; and it is

**ORDERED**, that any opposition to this motion be served by January 16 , 2024 and any reply be served by 2024.

ENTER:

Hon. Margaret Chan, J.S.C.

-4-

At Commercial Division Part 49, of the
Supreme Court of the State of New York, held
in and for the County of New York, at the
Courthouse located at 60 Centre Street, New
York, NY, on the ____ day of
_____, 2024.

PRESENT:
Hon. Margaret Chan, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

**EMIGRANT BUSINESS CREDIT
CORPORATION,**

  **Plaintiff,**

   **v.**

**JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC,
RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE
TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, and EBURY RE LLC,**

  **Defendants,**

   **v.**

**XYZ CORPS. 1-10,**

  **Defendants.**

---

**Index No. 158207/2022**

**The Honorable Margaret A. Chan**

**Mot. Seq. 6**

**[PROPOSED]**
<u>**ORDER TO SHOW CAUSE**</u>

**UPON READING** the annexed Memorandum of Law; the Affirmation of Kari Parks and the exhibits annexed thereto; and all other papers and pleadings filed herein; it is

**ORDERED** that Plaintiff Emigrant Business Credit Corporation appear before this Court, located at 60 Centre Street, New York, NY, on the ___ day of _2024, at ____o'clock a.m./p.m., or as soon thereafter as counsel can be heard, and show cause why an Order should not be issued:

    a.    Pursuant to CPLR § 5015 and / or CPLR § 2221, vacating and / or modifying that portion of the Court's January 9, 2024 order requiring Defendants to deposit $306,946.30 into the Parties' joint escrow account no later than the 11th day of January, 2024;" and

    b.    Granting Defendants its costs and disbursements, and such other and further relief as the Court deems just and proper.

Sufficient reason having been alleged, and pending a hearing and further Order of this Court, it is

**ORDERED** that the portion of the Court's January 9, 2024 Order that ordered the Defendants to "deposit $306,946.30 into the Parties' joint escrow account no later than the 11th day of January, 2024" be (1) vacated in its entirety; (2) modified to a lesser amount; and/or (3) extended to a the _____ day of _____, 2024;

**ORDERED** that service of a copy of this Order, together with a copy of the papers in support thereof, made upon Plaintiff by _____, on or before the ____ day of _____, 2024, be deemed good and sufficient service; and it is

**ORDERED**, that any opposition to this motion be served by _____, 2024; and any reply be served by _____, 2024.

ENTER:

_____

Hon. Margaret Chan, J.S.C.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 593 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

       **Plaintiff,**

          **v.**

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2 LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC,
RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE
TAX RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, and EBURY RE LLC,

       **Defendants,**

          **v.**

XYZ CORPS. 1-10,

       **Defendants.**

---

Index No. 158207/2022

The Honorable Margaret A. Chan

Mot. Seq. 6

**MEMORANDUM OF LAW IN
SUPPORT OF
<u>ORDER TO SHOW CAUSE</u>**

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 594 of 2230

Defendants respectfully submit this memorandum in support of Order to Show Cause ("**OSC**"), which moves the Court to vacate or allow reargument on and modify the portion of its January 9, 2024 "**Order**" that ordered the Ebury Parties[1] to "deposit $306,946.30 into the Parties' joint escrow account no later than the 11th day of January, 2024." See Dkt. 113 at 3 (Jan. 10, 2024).

## BACKGROUND

In September 2022, Plaintiff Emigrant Business Credit Corporation ("**EBCC**" and with the Ebury Parties, the "**Parties**") initiated the above-captioned "**Action**," suing the Ebury Parties for breach of contract, fraudulent inducement, and fraudulent transfer. See generally Dkt. 1 (Sep. 25, 2022). Three weeks later, EBCC filed an order to show cause seeking temporary injunctive relief while this Action is pending. Dkt. 2 (Oct. 17, 2022). Over the Ebury Parties' opposition, this Court granted EBCC's injunctive relief motion. Dkt. 47 (Nov. 29, 2022) (the "**Preliminary Injunction**").

Among other terms, the Preliminary Injunction "temporarily restrain[s] and enjoin[s]" the Ebury Parties, (1) prohibiting them from transferring "any of their assets, aside from ordinary and necessary disbursements related to [the Ebury Parties'] tax lien or real estate business or living expenses;" (2) requiring them to escrow tax lien certificate

---

[1] Defendants Ebury Street Capital ("**ESC**"), LLC, "**Ebury Fund 1**," LP, "**Ebury Fund 2**," LP, Ebury 1EMI LLC, Ebury 2 EMI LLC, "**EB 1EMIALA**" LLC, "**EB 2EMIALA**" LLC, Eb 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury Fund 2 FL, LLC, "**Ebury Fund 1NJ**," LLC, "**Ebury Fund 2NJ**," LLC, Red Clover 1, LLC, and "**Ebury RE**," LLC (together, the "**Ebury Entities**") and John Hanratty (with the Ebury Entities, the "**Ebury Parties**").

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 115
RECEIVED NYSCEF: 01/11/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 595 of 2230

or resulting real estate property proceeds, if those proceeds are not intended for "ordinary and necessary disbursements related to the [Ebury Parties'] tax lien or real state businesses," and (3) requiring them to notify EBCC at least 24 hours before transferring any assets "exceeding $50,000." Dkt. 47 at 8–9.

In the year since the Court issued the Preliminary Injunction, the Parties have cooperated fully in litigating this Action, from motion practice to exchanging hundreds of thousands of pages of documents to weeks of depositions, including EBCC's two-day, in-person deposition of Defendant John Hanratty, who is the Ebury Entities' managing member. Indeed, before last week, the only motions filed by the Parties were dispositive motions or stipulated briefing schedules; the Parties never once sought the Court's intervention or assistance to ensure that discovery moved forward. See generally Dkt.

Moreover, EBCC has never challenged the Ebury Parties' retention of or payments to undersigned counsel in connection with litigating this Action or certain Ebury Parties' pre-existing Delaware federal litigation, which Defendants ESC, EB 1EMIALA, EB 2EMIALA, Ebury Fund 1 NJ, and Ebury Fund 2 NJ initiated in February 2021, and to which Mr. Hanratty, Ebury Fund 1, Ebury Fund 2, EB 1EMIDC, Red Clover 1, and Ebury RE have been parties since September 2023.  See generally id.

However, Mr. Hanratty was arrested, and a federal "**Criminal Complaint**" against him was unsealed, on January 18, 2024. See generally Dkt. 100 (Jan. 4, 2024). As EBCC's counsel has affirmed, that Criminal Complaint's allegations are nearly identical to those pursued by EBCC in this civil Action, and accuse Mr. Hanratty of fraudulently inducing EBCC's extension of credit to the Ebury Entities. See Affirmation of Alexander J.

Willscher ƒ 4, Dkt. 99 (Jan. 4, 2024) ("**Willscher Aff.**"); <u>see generally</u> <u>id.</u> Exhibit A. The Criminal Complaint, which takes the form of a sworn affidavit from a Federal Bureau of Investigations ("**FBI**") agent, is largely based on records provided by and conversations with EBCC. <u>See, e.g.</u>, <u>id.</u> ƒƒ 5, 7, 8(a), 9. Mr. Hanratty's conditions of release require, <u>inter alia</u>, a $2 million bond secured by $400,000 in assets. <u>Id.</u> Ex. B.

Approximately two weeks later, EBCC filed the proposed OSC. Dkt. 97 (Jan. 4, 2024). EBCC argued that without prior notice to EBCC, (a) on December 11, 2023, Mr. Hanratty personally "made a bulk sale" of collateral with a "book value of $1.1 million" for $256,946.30," and (b) on December 20, 2023, Mr. Hanratty "transferred $75,000 to himself." Dkt. 109 at 2 (Jan. 4, 2024).

To support its motion, EBCC annexes excerpts that it extracted from the Ebury Entities' Quickbooks software. Willscher Aff. ƒ 20. Those Quickbooks excerpts show that the "bulk sale" was actually 27 separate transactions, whose proceeds ranged from $2,500 to $167,132.75. Willscher Exhibit I at 1–2. And on at least one occasion, EBCC inquired about certain transactions disclosed by the Ebury Parties in their monthly report; received the answer that those transactions were part of a "bulk sale;" and raised no objection or complaint to those transactions. Affirmation of Kari Parks Exhibit A (Jan. 11, 2024) ("**Parks Aff.**").

EBCC has had continuous, open access to the Ebury Entities' live accounting records, including Quickbooks, since at least early 2022. <u>Id.</u> ƒ 3. However—and despite the Preliminary Injunction's terms—in 2023, EBCC has only bothered to look at the Ebury Entities' records on 13 dates: February 3, March 22, June 1, August 16, August 17, October

**4**

19, December 7, December 8, December 13, December 14, January 3, January 4, and January 5. Id. Exhibit B. The most recent transaction in EBCC's Quickbooks extract—which EBCC created on January 3, 2024—is a $75,000 transfer to Mr. Hanratty. Willscher Aff. Exhibit I at 4.

To further support EBCC's motion, its counsel avers that he "believe[s] that [Mr.] Hanratty intends to use that $75,000 [ . . . ] to fund his bail package and the costs of his defense." Id. The limited partnership agreements of both Ebury Fund 1 and Ebury Fund 2 provide that the entities "shall, in the sole discretion of the General Partner [Mr. Hanratty], advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of" "any acts, omissions or alleged acts or omissions arising out of or in connection with the Partnership, this Agreement or any investment made or held by the Partnership [ . . . if] such acts, omissions or alleged acts or omission [ . . . ] are not found by a court of competent jurisdiction **upon entry of a final non-appealable judgment** to have been made in bad faith or to constitute fraud, willful misconduct, or gross negligence." Parks Aff. Exhibit C at 19, 58 (emphasis added).

The Court's ensuing OSC orders the Ebury Parties to serve any opposition papers by January 16, but to deposit $306,946.30—the total amount of fine demanded by EBCC—into the escrow account "no later than" January 11, 2024. OSC at 3. Since the Court's order, the Ebury Parties have transferred at least $169,074.49 to the Parties' escrow account. Parks Aff. ∫ 4.

## LEGAL STANDARD

The Court may vacate an order on the grounds of, <u>inter alia</u>, "newly-discovered evidence" or "misrepresentation[] or other misconduct of an adverse party." CPLR ⁄ 5015(a). The Court may grant leave to reargue and vacate a prior order if it finds that "matters of fact or law allegedly overlooked or misapprehended" should change its decision. CPLR ⁄ 2221.

While not binding on this Commercial Division Court, Second Circuit federal courts apply a "heightened 'substantial likelihood' standard" when a "requested injunction (a) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." <u>Citigroup Glob. Mkts. V. VCG Special Opp. Master Fund Ltd.</u>, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (citations omitted). New York federal courts apply this standard if "the issuance of an injunction will render a trial on the merits largely or partly meaningless, either because of temporal concerns, say, a case involving the live televising of an event scheduled for the day on which preliminary relief is granted, or because of the nature of the subject of the litigation, say, a case involving the disclosure of confidential information." <u>Id.</u> at 35.

Second Circuit courts apply this heightened standard if a plaintiff seeks a "mandatory" preliminary injunction—<u>i.e.</u>, one that "command[s] some positive act," as opposed to a "prohibitory" injunction that merely asks the party to refrain from acting. <u>Id.</u> at 35 n.4.

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 115
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 599 of 2230

RECEIVED NYSCEF: 01/11/2024

## ARGUMENT

The Ebury Parties respectfully request that the Court either (a) vacate the OSC's order that the Ebury Parties deposit $306,946.30 into the escrow account no later than January 11, 2024 or (b) modify the order by adjourning the deadline by no less than one week and / or lessening the amount that the Ebury Parties must escrow.

As a threshold matter, it simply is not clear that EBCC must succeed on its contempt motion. The Ebury Parties will brief the issue more comprehensively when they file their January 16 opposition. But historically, EBCC has neither objected to nor demanded advance notice of bulk sales. See, e.g., Parks Aff. Exhibit A. EBCC has never complained about the six figures in legal fees that the Ebury Parties have paid to undersigned counsel's law firm in connection with this Action or the Delaware litigation, despite the fact that both EBCC and the Delaware adverse party have accused Mr. Hanratty of fraud. See generally Dkt. Any advancement of criminal defense costs is an "ordinary" and "necessary" business expense, certainly a necessary "living expense[]," and is explicitly contemplated in Ebury Fund 1 and Ebury Fund 2's partnership agreements. Compare Preliminary Injunction with, e.g., Sierra Rutile Ltd. v. Katz, No. 90 Civ. 4913, 1997 WL 43119, at *1–2 (S.D.N.Y. July 31, 1997) ("[T]he Court may order [a] corporation to advance litigation expenses, notwithstanding the corporation's allegations that the director or officer engaged in wrongdoing against the corporation."); Blackmer v. Comm'r of Internal Revenue, 70 F.2d 255, 256 (2d Cir. 1934) ("Expenses incurred in the defense of a criminal charge growing out the business of the taxpayer are 'ordinary' expenses"). And despite EBCC's purported concern that Mr. Hanratty would use

company funds to post bond, and EBCC's years of continuous, live access to the Ebury

Parties' accounting records, EBCC does not complain of any transfers made after the

December 20, 2023 $75,000 transfer. See generally Dkt. 110, Memorandum in Support of

Proposed OSC (Jan. 4, 2024).

Moreover, as a practical matter—and assuming the truth of EBCC's claims that the

Ebury Entities are highly illiquid—it is no small feat for the Ebury Parties to conjure up

$306,946.30 cash on 36 hours' notice. While the Ebury Parties have been able to identify

and deposit $169,047.49, it is unrealistic and unjust to require—and punish—them if they

fail to find and deposit the **entirety** of the fine that EBCC seeks, let alone to do so five

days before the Ebury Parties even are required to serve their opposition papers, and an

unknown period of time before the Court rules on the motion's merits.

**8**

## CONCLUSION

The OSC's order that the Ebury Parties deposit the entire fine sought by EBCC, on two days' notice, is unwarranted and unjust. The Ebury Parties respectfully request that the Court vacate this portion of the OSC in its entirety or modify it to allow the Ebury Parties to fulfill the Court's order on a longer timeline and / or with less money.

Dated: January 11, 2024
     New York, New York

                Respectfully submitted,

                **GUSRAE KAPLAN NUSBAUM PLLC**

                /s/ Kari Parks
                **Kari Parks**
                **Victor Wang**
                **120 Wall Street, 25th Floor**
                **New York, New York 10005**
                **(212) 269-1400**
                kparks@gusraekaplan.com
                vwang@gusraekaplan.com

                Counsel for the Ebury Parties

9

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 602 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

                    Plaintiff,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

                    Defendants.

Index No. 158207/2022
The Honorable Margaret A. Chan

Mot. Seq. 6

## AFFIDAVIT OF KARI PARKS PURSUANT TO CPLR 2217(b)

STATE OF NEW YORK        )
                             ) ss.:
COUNTY OF NEW YORK     )

      Kari Parks, being duly sworn, deposes and says under the penalties of perjury:

      1.      I am a partner of the law firm Gusrae Kaplan Nusbaum PLLC, counsel for

the **"Ebury Parties"** in the above-captioned matter and I submit this affidavit to replace

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 603 of 2230

the affirmation in support of the Ebury Parties' proposed order to show cause, Motion Sequence 6, that I filed on January 11, 2024.

2.      The Ebury Parties have moved, pursuant to Civil Practice Law and Rules §2221, for an order (the "**Motion**") requiring EBCC to show cause why the Court should not vacate its previous order that the Ebury Parties deposit $306,946.30 into the Parties' joint escrow account no later than the January 11, 2024. (Dkt. 113).

3.      Pursuant to CPLR 2217(b), the Ebury Parties have not previously moved for the relief sought by this Motion, brought by order to show cause.

4.      The above-entitled action was brought against the Ebury Parties for fraudulent inducement, fraudulent transfer, and breach of contract.

5.      The above-entitled action was commenced by service of the summons and complaint upon the Ebury Parties on the 25th day of September, 2022.

6.      In my previously-filed affirmation, I wrote that "I understand that on January 11, 2024, the Ebury Parties transferred at least $169,074.49 to the Parties' escrow account."

7.      However, I was mistaken: that $169,074.49 represents what the Ebury Parties paid EBCC in 2023.

8.      EBCC has had continuous, open access to the Ebury Entities' live accounting records, including Quickbooks, since at least early 2022.

9.      A true and correct copy of the September 15, 2023 emails between our law firm and Plaintiff's counsel is annexed as Exhibit A.

2

10.     A true and correct copy of Quickbooks login time stamps is annexed as Exhibit B.

11.     True and correct copies of Ebury Fund 1, LP and Ebury Fund 2, LP's Limited Partnership Agreements are annexed as Exhibit C.

12.     A true and correct copy of a blackline of a new version of the memorandum that strips out the incorrect information described <u>supra</u> ¶¶ 3–4 is annexed as Exhibit D.

WHEREFORE, the Ebury Parties respectfully request for an order, pursuant to Civil Practice Law and Rules § 2221, requiring EBCC to show cause why the Court should not vacate the previous order for the Ebury Parties to deposit $306,946.30 into the Parties' joint escrow account no later than the January 11, 2024. (<u>Dkt</u>. 113).

Dated: January 19, 2024
       New York, New York

                            Respectfully submitted,

                            _____
                            Kari Parks

3

**STATE OF NEW YORK**            )
                                 ) ss.:
**COUNTY OF NEW YORK**           )

On this day, before me personally appeared Kari Parks, to me known, who, being by me duly sworn, personally known to me or proved to me on the basis of satisfactory evidence to be the individual who in my presence executed the foregoing, in her individual capacity, and in my presence duly acknowledged to me that he executed the same.

_____
Notary Public

WENDY RABINER
NOTARY PUBLIC, STATE OF NEW YORK
REGISTRATION NO. 01RA6311420
QUALIFIED IN RICHMOND COUNTY
COMMISSION EXPIRES_____

4

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM
NYSCEF DOC. NO. 117
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/11/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 607 of 2230

| | |
|---|---|
| **From:** | Victor Wang |
| **To:** | Mayron, Austin P. |
| **Cc:** | Kari Parks; Willscher, Alexander J. |
| **Subject:** | Re: EBCC v. Hanratty - Monthly Transaction |
| **Date:** | Friday, September 15, 2023 5:27:50 PM |

Hi Austin,

Yes. The two transactions were related to the same bulk sale and are aged NJ liens.

Thank you.

Best,
Victor

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Friday, September 15, 2023 3:31:40 PM
**To:** Victor Wang <vwang@gusraekaplan.com>
**Cc:** Kari Parks <kparks@gusraekaplan.com>; Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: EBCC v. Hanratty - Monthly Transaction

Hi Victor,

Thank you for sharing this information.  Could you please provide more detail about the transactions reflected in EBURY_00081212, and whether these two transactions were related to the same bulk sale?

Best,

**Austin P. Mayron**
+1 212 558 3733 (T) | +1 518 577 1643 (M)

**From:** Victor Wang <vwang@gusraekaplan.com>
**Sent:** Friday, September 15, 2023 3:08 PM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>
**Cc:** Kari Parks <kparks@gusraekaplan.com>; Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** [EXTERNAL] EBCC v. Hanratty - Monthly Transaction

Good afternoon Austin,

In compliance with paragraph 1 of the Court's December 12, 2022 Preliminary Conference Order, please find the below-linked production of documents stamped EBURY_00081206 - EBURY_00081253.

https://gusraekaplan.sharefile.com/i/i333baad00874ed4a [gusraekaplan.sharefile.com]

Thank you.

Best,

Victor

**Victor Wang, Associate** | **Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication.  Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission.  Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

**\*\*This is an external message from:** vwang@gusraekaplan.com **\*\***

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

# EXHIBIT B

| Date Changed | User | Event |
|---|---|---|
| Jan 5, 2024 at 11:43 am Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 4, 2024 at 7:22 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 4, 2024 at 1:53 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 4, 2024 at 1:12 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 4, 2024 at 12:43 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 4, 2024 at 12:41 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 4, 2024 at 12:11 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 3, 2024 at 8:38 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 3, 2024 at 8:25 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 3, 2024 at 12:42 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Dec 14, 2023 at 12:57 am Atlantic Standard Time | Scott Weiss | Signed Out. |
| Dec 13, 2023 at 10:48 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Dec 13, 2023 at 10:48 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Dec 13, 2023 at 10:06 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Dec 13, 2023 at 6:46 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Dec 8, 2023 at 11:58 am Atlantic Standard Time | Scott Weiss | Signed Out. |
| Dec 8, 2023 at 10:53 am Atlantic Standard Time | Scott Weiss | Signed In. |
| Dec 7, 2023 at 5:45 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Oct 19, 2023 at 1:05 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Aug 16, 2023 at 9:20 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Aug 16, 2023 at 9:12 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jun 1, 2023 at 5:50 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Mar 23, 2023 at 11:02 am Atlantic Standard Time | Scott Weiss | Signed Out. |
| Mar 23, 2023 at 9:26 am Atlantic Standard Time | Scott Weiss | Signed In. |
| Mar 22, 2023 at 3:25 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Mar 22, 2023 at 3:17 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Mar 22, 2023 at 1:28 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Mar 22, 2023 at 12:22 pm Atlantic Standard Time | Scott Weiss | Signed In. |

| Date Changed | User | Event |
|---|---|---|
| Jan 5, 2024 at 11:43 am Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 4, 2024 at 7:22 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 4, 2024 at 1:12 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 4, 2024 at 12:10 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 4, 2024 at 12:07 am Atlantic Standard Time | Scott Weiss | Signed Out. |
| Jan 3, 2024 at 11:01 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 3, 2024 at 10:28 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 3, 2024 at 10:09 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Jan 3, 2024 at 8:38 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 3, 2024 at 8:22 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 3, 2024 at 1:32 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jan 3, 2024 at 12:44 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Dec 8, 2023 at 1:57 am Atlantic Standard Time | Scott Weiss | Signed Out. |
| Dec 7, 2023 at 11:33 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Dec 7, 2023 at 11:21 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Dec 7, 2023 at 10:16 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Dec 7, 2023 at 7:15 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Dec 7, 2023 at 7:15 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Dec 7, 2023 at 6:45 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Oct 19, 2023 at 11:30 am Atlantic Standard Time | Scott Weiss | Signed In. |
| Aug 17, 2023 at 4:19 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Aug 17, 2023 at 4:04 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Aug 17, 2023 at 2:15 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Aug 16, 2023 at 10:28 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Aug 16, 2023 at 9:22 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Aug 16, 2023 at 9:15 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Jun 1, 2023 at 7:02 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Jun 1, 2023 at 5:57 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Mar 22, 2023 at 4:31 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Mar 22, 2023 at 3:25 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Mar 22, 2023 at 3:17 pm Atlantic Standard Time | Scott Weiss | Signed Out. |
| Mar 22, 2023 at 3:00 pm Atlantic Standard Time | Scott Weiss | Signed In. |
| Feb 3, 2023 at 2:19 pm Atlantic Standard Time | Scott Weiss | Signed In. |

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 119
RECEIVED NYSCEF: 01/11/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 612 of 2230

# EXHIBIT C

---

## EXHIBIT A – LIMITED PARTNERSHIP AGREEMENT

---

**LIMITED PARTNERSHIP AGREEMENT**

**OF**

**EBURY FUND 1, LP**

Dated as of January 15, 2015

## TABLE OF CONTENTS

Page

ARTICLE I – FORMATION AND PURPOSE ...................................................................1

ARTICLE II – ADMISSION OF PARTNERS; CAPITALIZATION ...........................................2

ARTICLE III – CAPITAL ACCOUNTS; PROFITS AND LOSSES .........................................4

ARTICLE IV – DISTRIBUTIONS OF CASH FLOWS; WITHDRAWALS ...............................8

ARTICLE V – POWERS, DUTIES AND RIGHTS OF GENERAL PARTNER .......................13

ARTICLE VI – POWERS, RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS ..........20

ARTICLE VII – ACCOUNTING, BOOKS AND RECORDS; REPORTS TO PARTNERS .....21

ARTICLE VIII –TRANSFER AND ASSIGNMENT OF PARTNERSHIP INTERESTS...........22

ARTICLE IX – DISSOLUTION OF PARTNERSHIP .........................................................23

ARTICLE X – POWER OF ATTORNEY .........................................................................26

ARTICLE XI – MISCELLANEOUS ...............................................................................27

APPENDIX A – DEFINITIONS ....................................................................................

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 615 of 2230

This LIMITED PARTNERSHIP AGREEMENT (the "*Agreement*") of Ebury Fund 1, LP, a Delaware limited partnership (the "*Partnership*"), is made and entered into as of this 1st day of January, 2015, by and among Ebury Street Capital, LLC, a New York limited liability company, as the General Partner, and the Limited Partners.

## WITNESSETH

**WHEREAS**, the parties hereto desire to form a limited partnership for the purposes hereinafter provided.

**NOW, THEREFORE**, for and in consideration of the foregoing premises, the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

## ARTICLE I – FORMATION AND PURPOSE

1.01    <u>Formation</u>.  The parties hereby form a limited partnership and agree to conduct the Partnership as a limited partnership pursuant to the terms hereof.  The General Partner has executed the Certificate of Limited Partnership and caused it to be filed as required by the Act, and shall from time to time execute and file elsewhere a similar certificate when required by applicable law or permitted by applicable law and advisable for the Partnership to do so.

1.02    <u>Name</u>.  The name of the Partnership shall be Ebury Fund 1, LP, and the business of the Partnership shall be conducted under such name.

1.03    <u>Offices</u>.  The registered office of the Partnership is at 3500 S. Dupont Hwy, Dover DE 19901. The Partnership's initial registered agent for service of process at such address shall be Interstate Agent Services, LLC.  The business office of the Partnership is at 56 Locust Ave, 2nd Floor, Rye, New York 10580. The Partnership may have such additional offices at such other places as the General Partner shall deem advisable.

1.04    <u>Term</u>. The Partnership shall continue until the earlier of (i) the termination, bankruptcy, insolvency or dissolution of the General Partner, (ii) the complete withdrawal of the General Partner from the Partnership, unless a successor general partner is appointed pursuant to *Section 4.02(b)* hereof, (iii) entry of a decree of judicial dissolution under Section 17-802 of the Act, (iv) either (a) the death of the Principal or (b) an adjudication in a final non-appealable decision on the merits of a court of competent jurisdiction that the Principal is physically or mentally incapable of making investment decisions on behalf of the General Partner (either such event, a "*Key Man Event*"), unless the Limited Partners elect to continue the Partnership pursuant to *Section 4.02* hereof, or (v) a determination by the General Partner that the Partnership should be dissolved.

1.05    Purpose of Partnership.

(a)    The Partnership is organized for the purpose of investing in Tax Liens and Securities and engaging in all activities and transactions as the General Partner may deem necessary or advisable in connection therewith and doing such other lawful acts as the General Partner may deem necessary or advisable in connection with the maintenance and administration of the Partnership.

(b)    The Partnership may engage in other activities and businesses incidental to the purpose of the Partnership as may be necessary or desirable, in the opinion of the General Partner, to promote and carry out the principal purposes of the Partnership, as set forth above; *provided, however*, that, without the written consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time, (i) the purpose of the Partnership shall not be changed, and (ii) the Partnership shall not engage in any substantial business endeavor other than those consistent with the purpose of the Partnership, or incidental thereto.

1.06    Investment Management Techniques Proprietary.    The investment management systems, techniques and methods employed by the General Partner in the management of the Partnership's investments shall be the sole property of the General Partner, and neither the Partnership nor any Limited Partner shall have any interest in or right or claim with respect to such investment management systems, techniques or methods or in any of the research products or recommendations generated through their use.

1.07    Definitions.    Capitalized terms used and not defined herein shall have the meaning attributed to such terms in the definitions set forth in Appendix A hereto, or in the relevant section of this Agreement listed on Appendix A.

1.08    Offshore Fund. Substantially all of the assets of Ebury Fund 1, Ltd., a British Virgin Islands business company (the "Offshore Fund") will place all or substantially all of its assets in, and conduct its trading activities primarily through, the Partnership, utilizing a "Mini-Master-Feeder" structure.  The establishment of the Offshore Fund was sponsored by the General Partner.  The General Partner will serve as the investment manager to the Offshore Fund and the Partnership and will conduct the investment activities of the Partnership, managing its day-to-day activities.  The Offshore Fund will participate on a *pro rata* basis in the profits and losses of the Partnership and bear a *pro rata* portion of all expenses of the Partnership based on the net asset value of its respective interests in the Partnership.

## ARTICLE II – ADMISSION OF PARTNERS; CAPITALIZATION

2.01    Admission of Partners.  The General Partner may admit one or more new Partners to one of the classes (each, a "***Class***") at such times and on such terms as the General Partner deems appropriate, subject only to the conditions that:

(a)    Each new Partner shall execute a Subscription Agreement pursuant to which it agrees to be bound by the terms and provisions hereof;

2

(b)    In the case of admission of a general partner other than the General Partner, such new general partner controls, is controlled by, or is under common control with the General Partner;

(c)    The total number of Limited Partners may not at any time exceed 100 (as interpreted under Section 3 of the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder, *provided however*, that the General Partner may further limit the number of Limited Partners such that the combined number of Limited Partners and beneficial owners of any feeder fund investing in the Partnership who are U.S. persons (as determined by the General Partner) shall not exceed 100; and

(d)    The General Partner reasonably believes that any new Partner satisfies the minimum investor suitability standards established by the General Partner.

2.02    Capital Contributions of Limited Partners. Upon admission to the Partnership, each Limited Partner shall contribute Cash in the amount set forth in such Partner's Subscription Agreement.  The minimum initial capital contribution to the Partnership by a Limited Partner is generally $100,000, subject to the General Partner's sole discretion to accept subscriptions for lesser amounts or, upon giving notice to the Limited Partners, to require a higher minimum. Limited Partners may be admitted on the first business day of any calendar month, or at any other time the General Partner chooses to accept initial capital contributions.  The General Partner may, in its sole discretion, reject any initial subscription request.

2.03    Additional Capital Contributions.  A Partner may make additional contributions in Cash to the Partnership in amounts of not less than $25,000, with the consent of the General Partner and subject to its sole and absolute discretion to accept lesser amounts. Additional capital contributions may be accepted from existing Limited Partners on the first business day of any calendar month, or at any other time the General Partner chooses to accept such additional capital contributions.  The General Partner may, in its sole discretion, reject any additional subscription request.

2.04    No Interest on Contributions.  No Partner shall be entitled to receive interest on its capital contributions.

2.05    No Right to Return of Capital Contribution.  No Partner shall have the right to withdraw from the Partnership or to demand a return of all or any part of his capital contribution during the term of the Partnership except as provided in *Article IV* hereof.

2.06    Liability of Limited Partners.  Notwithstanding any other term or provision of this Agreement to the contrary, in no event shall any Limited Partner be liable for (i) any debts, obligations, liabilities or indemnifications of the Partnership in an amount that exceeds the capital contribution of such Limited Partner or for (ii) any debts, obligations, liabilities or indemnifications of any other Partner, nor shall the Limited Partners have any personal liability for contributing any capital to the Partnership.

2.07  <u>Classes</u>.  Initially the Partnership has two Classes of Interests: Class A Interests and Class B Interests.  The General Partner has the authority to issue additional classes at its discretion.

## ARTICLE III – CAPITAL ACCOUNTS; PROFITS AND LOSSES

3.01  <u>Capital Accounts</u>.

(a)  One or more Capital Accounts shall be established and maintained on the books of the Partnership for each Partner, with multiple such accounts being maintained for a single Partner solely for the purpose of tracking the Lock-Up Period applicable to each capital contribution made by such Partner.  The amount of each Partner's initial capital contribution shall be credited to its Capital Account at the beginning of the Accounting Period in which such capital contribution is accepted.  At the end of such Accounting Period (and each Accounting Period thereafter), the Capital Account of each Partner shall be (i) increased or decreased by the amount credited or debited to the Capital Account of such Partner pursuant to *Section 3.02(a) through (c)*.  At the beginning of each Accounting Period thereafter, the Capital Account of each Partner shall be increased by the amount of any additional capital contributions made by such Partner on the first day of such Accounting Period, and decreased by (i) the amount of any withdrawals made by such Partner pursuant to *Article IV* as of the end of the immediately preceding Accounting Period.  At the end of each Accounting Period, each Limited Partner's Capital Account shall be decreased by the amount of the Management Fee then due pursuant to *Section 5.06(a)*.

(b)  Capital Account balances and the value of any capital contributed to the Partnership shall be determined by application of the capital accounting rules in Regulations Section 1.704-1(b)(2)(iv).

3.02  <u>Interests in Profits and Losses; Performance Allocation</u>.

(a)  The Net Profit or Net Loss as to each Class for each Accounting Period shall be tentatively allocated as of the last day of such Accounting Period to each Partner's respective Capital Account in proportion to the Partner's Allocation Percentage for such Accounting Period, subject only to reduction pursuant to *Section 3.02(b) and (c)*.  For purposes of calculating Net Profit or Net Loss, the Partnership will include both realized and unrealized gains and losses on its investments.  In the case of the General Partner, the entire amount initially allocated to its Capital Account pursuant to the first sentence of this *Section 3.02(a)* shall be finally allocated to its Capital Account at the close of the Accounting Period.

(b)  Subject to the limitations set forth in *Section 3.03 through 3.07*, at the end of each Fiscal Year, the aggregate Net Profit as to each Class, if any, allocated to each Limited Partner for such Fiscal Year shall be finally allocated as follows:

(i)    <u>High Water Mark</u>.  First, to such Limited Partner until such time as the balance, if any, in such Limited Partner's Cumulative Loss

Account has been eliminated (but in no event more than the balance existing in such account); and

(ii)    85/15 Split.  Thereafter, 85% to such Limited Partner and 15% to the General Partner (such amount allocated to the General Partner, will hereafter be referred to as the "*Performance Allocation*").

The final allocations set forth in this *Section 3.02(b)* (and *3.02(c)* below) may be computed at the end of an Accounting Period, in the sole discretion of the General Partner, for a Limited Partner who effects a partial or complete withdrawal from its Capital Account at the end of such Accounting Period as if the applicable Withdrawal Date were the last day of a Performance Allocation Period, by multiplying (i) the portion of the Net Profits allocable to the withdrawing Limited Partner pursuant to this *Section 3.02* in excess of the balance, if any, existing in such Limited Partner's Cumulative Loss Account, by (ii) the ratio obtained by dividing the amount being withdrawn by the balance in such Limited Partner's Capital Account immediately prior to the withdrawal. If such Limited Partner is making a partial withdrawal of its Capital Account, the allocations set forth in this *Section 3.02* for the remainder of the Performance Allocation Period in which such Accounting Period occurs shall be based on such Limited Partner's Allocation Percentage and Cumulative Loss Account immediately following such withdrawal.  The General Partner may, in its sole discretion, enter into arrangements with Limited Partners under which the Performance Allocation is reduced, waived or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make a substantial investment or otherwise are determined by the General Partner in its sole discretion to represent a strategic relationship.

(c)    Subject to the limitations set forth in *Section 3.03 through 3.07*, at the end of each Fiscal Year, the aggregate Net Loss, if any, allocated to each Limited Partner for such Fiscal Year shall be finally allocated to such Limited Partner (and such Limited Partner's Cumulative Loss Account shall be adjusted accordingly).

3.03    Limitation on Allocations.  Any Net Losses or items of loss or deduction allocated to a Limited Partner pursuant to this *Article III* shall not exceed the maximum amount of such items that can be allocated without causing the Partner to have a negative Capital Account balance, after giving effect to the following adjustments:  (a) debit to such Capital Account balance the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6), and (b) credit to such Capital Account balance the sum of (i) the amount that the Partner is obligated to restore to the capital of the Partnership, and (ii) the amount that the Partner is deemed to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(c)(1) and (2).  The Partnership shall allocate all Net Losses or items of loss or deduction in excess of the limitations set forth in this *Section 3.03* first to any Limited Partners to whom the limitation in the preceding sentence does not apply, in proportion to their respective Allocation Percentages.  Any Net Losses that the Partnership

5

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 119
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/11/2024
Court Records    Pg 620 of 2230

cannot allocate to any Limited Partner as a result of the limitation set forth in the first sentence of this *Section 3.03* shall be allocated to the General Partner.

3.04    Qualified Income Offset.  In the event that any Partner unexpectedly receives any adjustments, allocations or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that cause a deficit balance in such Partner's Capital Account, the Partnership shall allocate items of Partnership income and gain to that Partner in an amount and manner sufficient to eliminate the deficit balance as quickly as possible, *provided that* the Partnership shall make an allocation pursuant to this *Section 3.04* only if and to the extent that a Partner would have a deficit Capital Account balance after the Partnership makes all other allocations provided for in this *Article III* as if this *Section 3.04* were not in the Agreement.  For purposes of any allocation pursuant to the preceding sentence, in determining any deficit balance in a Partner's Capital Account, the Partnership shall (a) reduce the Partner's Capital Account by expected adjustments, allocations or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), and (b) increase the Partner's Capital Account by any amount that the Partner must restore to the deficit balance of his Capital Account or that Regulations Section 1.704-1(b)(2)(ii)(c) deems the Partner to restore to the deficit balance of his Capital Account.

3.05    Gross Income.  In the event that any Partner has a deficit balance in its Capital Account as of the end of any Fiscal Year in excess of the sum of the amount such Partner is obligated to restore to the capital of the Partnership pursuant to any provision of this Agreement, or that such Partner is deemed to be obligated to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(c)(1) and (2), then the Partnership shall allocate to each such Partner items of income and gain for such Fiscal Year and subsequent Fiscal Years, if necessary, in an amount and manner sufficient to eliminate as quickly as possible such Capital Account deficit.  The Partnership shall make an allocation pursuant to this *Section 3.05* if and only to the extent that such Partner would have such an excess deficit balance in its Capital Account after the Partnership tentatively has made all other allocations pursuant to this *Article III* as if *Section 3.04* and this *Section 3.05* were not in this Agreement.

3.06    Section 754 Adjustments.  To the extent that the Partnership makes an election pursuant to Code Section 754 and *Section 7.06* hereof, the amount of any adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or 743(b) that is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and the gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Regulations section.

3.07    Curative Allocations.  The Partnership intends that any allocations made pursuant to the last sentence of *Section 3.03* or pursuant to *Section 3.04, Section 3.05 or Section 3.06* (collectively, "**Regulatory Allocations**") comply with certain requirements of the Regulations. The Partnership also intends that, to the extent possible, the Partnership offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations pursuant to this *Section 3.07*.  Therefore, notwithstanding any other provisions of this *Article III* (other than the Regulatory Allocations), the Partnership shall make such offsetting special allocations in

whatever manner it determines appropriate so that, after it makes the offsetting allocations, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance the Partner would have had if the Regulatory Allocations were not part of the Agreement and the Partnership allocated all items pursuant to the remaining Sections of this *Article III*.

3.08    <u>Priority of Allocations</u>.  The Partnership shall make the allocations pursuant to *Section 3.02* through *Section 3.07* in the following order and priority: (a) first, the Partnership shall make the Regulatory Allocations in the order and priority in which they appear in this Agreement; and (b) next, the Partnership shall make the allocations pursuant to *Section 3.02*.

3.09    <u>Contributed and Revalued Property</u>.  For Federal income tax purposes, any income, gain, loss or deduction with respect to property contributed by a Partner to the Partnership that has a fair market value different from its adjusted basis for Federal income tax purposes shall be allocated among the Partners in accordance with Code Section 704(c) and the Regulations Section 1.704-3, using any method prescribed in Regulations Section 1.704-3 determined by the General Partner.  With respect to any Partnership asset that is revalued pursuant to the terms hereof, subsequent allocations of income, gain, loss and deduction with respect to the asset shall take into account any variation between the adjusted basis of such asset for Federal income tax purposes and its fair market value at the time of revaluation in the same manner as under Code Section 704(c) and Regulations Section 1.704-3, using any method prescribed therein as determined by the General Partner.

3.10    <u>Varying Interest</u>.  In the event of the transfer of an Interest during a Fiscal Year, or in the event that a Partner's percentage interest changes during a Fiscal Year, the Net Profits, Net Losses or items of income, gain, loss or deduction allocated for the Fiscal Year during which the transfer occurs shall (a) be prorated between the transferor and transferee as of the date of the transfer, or (b) be prorated between the portion of the Fiscal Year prior to the change in percentage interest and the portion of the Fiscal Year after the change, using any method that the Partnership determines in good faith reasonably and fairly represents the portion of the Net Profits, Net Losses or items of income, gain, loss and deduction properly allocable to the Partners.

3.11    <u>Tax Items</u>.  Except as otherwise provided herein, any allocation to a Partner of a portion of the Net Profits, Net Losses or items of income, gain, loss or deduction for a Fiscal Year shall be deemed to be an allocation to that Partner of the same proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Partnership for Federal income tax purposes.  In addition, all items of gain or loss recognized from the sale, exchange or other disposition of Tax Liens (including closing a position or determining a lien or property worthless) or Securities in any tax period will generally be allocated among the Partners, so that to the extent possible, consistent with a fair allocation of such items of gain or loss among all of the Partners, each Partner's gain or loss for tax purposes is equal to the amount of gain or loss allocated to his Capital Account in respect of such transactions.

3.12    <u>Stuffing Provision</u>.  As of the close of each Fiscal Year, the capital gains and capital losses of the Partnership shall be allocated to the Partner's Capital Account so as to

minimize, to the extent possible, any disparity between the "book" Capital Account and the "tax" Capital Account, consistent with the principles set forth in section 704 of the Code. To the extent permitted by the Treasury Regulations (or successor regulations) in effect under Code Sections 704(b) and 704(c), allocations of capital gain that have been realized up to the time a Capital Account was completely withdrawn may be allocated first to each Capital Account that was completely withdrawn during the applicable Fiscal Year to the extent that the "book" Capital Account as of the Withdrawal Date exceeds the "tax" Capital Account at that time, and allocations of capital loss that have been realized up to the time a Capital Account is completely withdrawn may be allocated first to each Capital Account that was completely withdrawn during the applicable Fiscal Year to the extent that the "tax" Capital Account as of the Withdrawal Date exceeded the "book" Capital Account of such Capital Account at that time. Notwithstanding anything herein to the contrary, capital gain or capital loss recognized with respect to Tax Liens or Securities contributed to the Partnership, if any, shall be specifically allocated to the contributing Partner in the amount and manner required by Code Section 704(c) and the regulations thereunder, and, to the extent so allocated, shall be excluded from the computation of the Partnership's capital gain or capital loss, as applicable, for the relevant fiscal year.

## ARTICLE IV – DISTRIBUTIONS OF CASH FLOWS; WITHDRAWALS

4.01    <u>Withdrawals of Limited Partners' Capital Account</u>.

(a)    Beginning one year from the date a Capital Account is established for a Limited Partner (such period, the "***Lock-Up Period***"), a Limited Partner will be generally permitted to make withdrawals from its Capital Account as of the last business day of any calendar quarter, or such other date as the General Partner may determine, in its sole discretion (each such date, a "***Withdrawal Date***") subject to the provisions of this *Section 4.01*, by delivering to the General Partner a request in writing for withdrawal in the form of *Appendix A* to the Subscription Agreement *provided that* the Partnership receives notice of such withdrawal not less than 90 days prior to the applicable Withdrawal Date. Solely for purposes of determining the Lock-Up Period, there shall be established a separate Capital Account for each capital contribution made by a Limited Partner. Withdrawals may be permitted prior to the expiration of the Lock-Up Period applicable to a Limited Partner in the sole and absolute discretion of the General Partner, in which case the Limited Partner requesting such withdrawal shall be subject to an early withdrawal penalty equal to 5% of the withdrawal proceeds to which such Limited Partner would otherwise be entitled (the "***Early Withdrawal Penalty***"). The Early Withdrawal Penalty may be reduced by the General Partner in its sole discretion. Any amount paid as an Early Withdrawal Penalty shall be an asset of the Partnership. In the event of a partial withdrawal, a Limited Partner must withdraw a minimum of $25,000, and shall maintain a minimum Capital Account balance, after giving effect to the withdrawal, of not less than $100,000. A Limited Partner failing to maintain the minimum Capital Account balance may be required to withdraw the balance of its Capital Account at any time without notice. The General Partner, in its sole discretion, may waive these minimum amounts.

(b)     Payments for withdrawals are generally made within 10 days of the applicable Withdrawal Date; *provided, however*, in the event a Partner withdraws 90% or more of the balance of such Partner's Capital Account (or if a withdrawal, when combined by all other withdrawals effected by such Partner during the preceding 12 months, would result in such Partner having withdrawn 90% or more of the sum of (i) the aggregate amount of all prior withdrawals during such 12 month period, and (ii) such Partner's Capital Account balance as of the date of the most recent withdrawal request), a portion (generally not to exceed 5%) of the withdrawal payment will be retained in the General Partner's discretion pending completion of the audit of the Partnership's annual financial statements for the Fiscal Year in which the applicable Withdrawal Date occurs. Payment of any amounts in respect of a withdrawal pursuant to this *Section 4.01(b)* shall be net of any accrued but unpaid Management Fee and, if applicable, any earned Performance Allocation on the withdrawn portion of the applicable Limited Partner's Capital Account.

(c)     The General Partner may in its sole discretion require or permit any Partner, for any reason or no reason and at any time, with or without notice, to effect a complete or partial withdrawal of amounts contained in his Capital Account in accordance with the procedures outlined in this *Section 4.01* except that in such case (i) any dollar limitations may be waived by the General Partner and (ii) the General Partner may, in its sole and absolute discretion, distribute to such Partner up to 100% of his Capital Account at any time prior to the date on which that Partner would have been entitled to receive such a distribution had the Partner properly requested such a complete withdrawal.  The undistributed remainder, if any, of such a Capital Account shall be distributed pursuant to the provisions of *Section 4.01(b)*.

(c)     Any Partner who effects a withdrawal during a Fiscal Year shall be obligated upon notice by the General Partner to reimburse the Partnership in Cash or immediately available funds for any overpayment made pursuant to such withdrawal, as determined after completion of the annual accounting of the Partnership's books for that Fiscal Year and after any adjustments to the Capital Accounts of the Partners as are necessary in light of accounting; *provided, however*, that such reimbursement shall be required only to the extent that the overpayment exceeded the aggregate of any amount retained by the Partnership and any balance remaining in such Partner's Capital Account at the time of such determination.  Any obligation of a Partner arising under the provisions of this section to reimburse the Partnership for an overpayment shall terminate unless notice of the amount of the overpayment and a reasonable explanation of the calculation of such overpayment amount has been given on or before the 30th day following completion of the audit of the Partnership's annual financial statements for the Fiscal Year in which the subject withdrawal was made.

(d)     At the discretion of the General Partner, any withdrawal by a Limited Partner may be subject to a charge, as the General Partner may reasonably require, in order to defray the costs and expenses of the Partnership in connection with such withdrawal including, without limitation, any charges or fees imposed by any Partnership investment in connection with a corresponding withdrawal or redemption by the

Partnership from such investment or any other costs associated with the sale of any of the Partnership's portfolio investments.

(e)    If aggregate withdrawal requests are received for a particular Withdrawal Date for more than 25% of the Net Asset Value of the Partnership or any Class of such Withdrawal Date, the General Partner may, in its discretion, reduce all withdrawal requests for the Partnership or any Class for such Withdrawal Date *pro rata* in proportion to the amount sought to be withdrawn by each withdrawing Partner so that only 25% of the Net Asset Value of the Partnership or any Class as of such Withdrawal Date is withdrawn (the "*Gate*").    The Gate may be waived with respect to certain Limited Partners whose remaining Capital Account would otherwise be less than the minimum Capital Account required by the Partnership.    To the extent that any Partner's request has been reduced by the Gate, such request shall be satisfied as of the end of the next Withdrawal Date (and if not fully satisfied as of that date because of the Gate, then as of the next Withdrawal Date and, if necessary, successive Withdrawal Dates), each time subject to the Gate.    Any deferred withdrawal requests shall be treated in priority to withdrawal requests received for Withdrawal Dates subsequent to the initial Withdrawal Date at which the deferred request would have been effected in the absence of the Gate. Any unsatisfied portion of any such withdrawal requests shall continue to be at risk in the Partnership's business until the effective date of the withdrawal.

4.02    <u>Withdrawals of General Partner's Capital Account</u>.

(a)    Except as set forth elsewhere in this *Section 4.02*, the General Partner shall have the same withdrawal rights as a Limited Partner.

(b)    If the General Partner provides not less than 90 days prior notice to each Limited Partner of its intent to resign as general partner of the Partnership or is disqualified pursuant to *Section 4.06* hereof, the Partnership shall dissolve and thereafter conduct only those activities necessary to wind up its affairs in accordance with the provisions of *Article IX* hereof, unless within 90 days after receipt of notice of such resignation or disqualification Limited Partners representing a majority of the Allocation Percentages of all Limited Partners vote to continue the Partnership and in connection therewith appoint a successor general partner.    For the avoidance of doubt, if no successor general partner is appointed and the Partnership dissolves, all unsatisfied withdrawal requests and pending distributions shall be postponed until the completion of the winding up of the Partnership and a final accounting pursuant to *Article IX*.

(c)    If the Limited Partners appoint a successor general partner in accordance with paragraph (b) above, the Partnership shall pay to the General Partner or its legal representatives the General Partner's ending Capital Account balance (after computation of any applicable Performance Allocation) within 30 days of the appointment of such successor general partner (and the date of such appointment shall be deemed the end of an Accounting Period for all purposes under this Agreement); *provided however*, that a portion (generally not to exceed 5%) of the withdrawal payment will be retained pending

completion of the audit of the Partnership's annual financial statements for the Fiscal Year in which the appointment of such successor general partner occurs.

(d)    Notwithstanding the foregoing, this *Section 4.02* shall not apply in the event that, after a withdrawal of the General Partner pursuant to paragraph (a) above or the disqualification of the General Partner pursuant to *Section 4.06*, the General Partner is succeeded by an affiliate of the General Partner pursuant to *Section 2.01(b)* or its Interest is transferred in a transaction that does not require the consent of the Limited Partners pursuant to *Section 8.05* hereof.

4.03    Limitations on Withdrawals.    The General Partner may suspend the right of withdrawal or postpone the date of payment for any period during which (i) there exists a state of affairs that constitutes a state of emergency, as a result of which disposal of the Tax Liens owned by the Partnership is not reasonably practicable or it is not reasonably practicable to determine fairly the value of its assets, (ii) a breakdown occurs in any of the means normally employed in ascertaining the value of a substantial part of the assets of the Partnership or when for any other reason the value of such assets cannot reasonably be ascertained, or (iii) a delay is reasonably necessary, as determined in the reasonable discretion of the General Partner, in order to effectuate an orderly liquidation of the Partnership's investments in a manner that does not have a material adverse impact on the Partnership or the non-withdrawing Limited Partners.    The General Partner shall provide notice of such suspension of the right of withdrawal to each Limited Partner within 5 days of the occurrence of such suspension. At the conclusion of such period, the General Partner shall resume permitting withdrawals otherwise permitted pursuant to this *Article IV* and shall resume any payments pursuant to such withdrawals as soon as reasonably practicable.

4.04    Distributions.    Except as otherwise set forth in this *Article IV*, a Partner who has satisfied the applicable notice requirements set forth herein with respect to withdrawal requests shall receive a distribution (or distributions) in Cash in accordance with the provisions of *Section 4.01(b)*.

4.05    Withholding from Distributions.    The General Partner may establish reserves for expenses, liabilities or contingencies (including those not addressed by GAAP) arising from events occurring during the period of time during which a withdrawing Limited Partner was a Limited Partner of the Partnership including, without limitation, contingent liabilities relating to pending or anticipated litigation, IRS audits or other governmental proceedings, which could reduce the amount of a distribution upon withdrawal.    All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Partnership or to the Partners shall be treated as amounts distributed to the Partners pursuant to this *Article IV* for all purposes of the Agreement.    The Partnership is authorized to withhold from distributions, or with respect to allocations, to the Partners and to pay over to any federal, state or local government any amount required to be withheld pursuant to the Code or any provisions of any other federal, state or local law and may allocate any such amounts among the Partners in any manner that is in accordance with applicable law.    If there are any assets that, in the judgment of the General Partner, cannot be valued properly until sold or realized or cannot be sold without sacrificing a substantial portion of the value thereof, such

assets may be excluded from the valuation of assets for purposes of computing the amount available for distribution to a Limited Partner upon withdrawal of any portion of its Capital Account pursuant to this *Article IV*. Any Partner's *pro rata* interest in such assets shall not be paid until such time as the General Partner, in its sole and absolute discretion, determines that circumstances no longer require such assets to be so excluded (in whole or in part). If there is any contingent liability of the Partnership or any pending transaction or claim by the Partnership as to which the withdrawing Partner's share of such liability or claim cannot, in the judgment of the General Partner, then be determined, the probable loss or liability, or value of the claim, as the case may be, may be excluded from the valuation of assets or liabilities for purposes of computing the amount owing to any Partner upon its withdrawal pursuant to this *Article IV*. No amount shall be paid or charged to any such Partner's Capital Account on account of any such contingency, transaction or claim until its final settlement or such earlier time as the General Partner shall determine. The Partnership may retain from sums otherwise due such Partner an amount that the General Partner estimates to be sufficient to cover the share of such Partner of any probable loss or liability on account of such contingency, or the probable value of the transaction or claim. Any amount so withheld from a Partner shall be held in a segregated interest-bearing account (which may be commingled with similar accounts of other Partners). Any unused portion of such reserve shall be distributed with interest accrued thereon once the General Partner has determined that the need therefor has ceased. Upon determination by the General Partner that circumstances no longer require the exclusion of assets or retention of sums as provided in this *Section 4.05*, the General Partner shall, at the earliest practicable time, pay such sums or the proceeds realized from the sale of such assets to each Partner from whom such sums or assets have been withheld.

4.06    Disqualification.

(a)    For the purposes of this Agreement, a Partner shall be deemed to be "disqualified" upon the occurrence of any of the following events:

(i)    If the Partner is a natural person, upon his death, his adjudication as an incompetent, his becoming bankrupt or adjudicated insolvent, or his making an assignment for the benefit of creditors, or solely with respect to the General Partner, if a Key Man Event occurs; or

(ii)    If the Partner is not a natural person, upon its voluntary dissolution or liquidation, its bankruptcy or adjudication of insolvency, its making an assignment for the benefit of creditors, or its becoming subject to involuntary reorganization or liquidation proceedings and such proceedings not being dismissed within 90 days after filing.

(b)    Neither the withdrawal nor the disqualification of a Limited Partner shall dissolve the Partnership. Upon the disqualification of a Limited Partner, the successor-in-interest of the Limited Partner shall become a transferee of the Limited Partner and be credited or paid, or charged with, as the case may be, all further allocations and distributions on account of the Interest of the disqualified Limited Partner; *provided*, no

such successor-in-interest shall become a substituted Limited Partner without first obtaining the written consent of the General Partner, whose consent may be withheld for any or no reason, and without complying with the provisions of *Section 8.02* hereof.

(c)     The disqualification of the General Partner shall cause the dissolution of the Partnership unless a successor general partner is appointed in accordance with the terms of *Section 4.02* hereof. For purposes of this *Section 4.06(c)*, if the Principal becomes disqualified within the meaning of *Section 4.06(a)* above, the General Partner will be deemed to be disqualified as well.

4.07    Status of Withdrawn Partner. From and after the effective Withdrawal Date applicable to a Partner who has withdrawn all or any portion of its Capital Account, such Partner shall be deemed a creditor of the Partnership with respect to the withdrawn portion after all adjustments to such Capital Account pursuant to *Article III* and any applicable limitations set forth in this *Article IV* to the extent that such withdrawn portion has not been distributed to such Partner pursuant to *Section 4.04* hereof. Such Partner shall thereafter be deemed a Partner only to the extent that such Partner withdraws less than all of its Capital Account.

## ARTICLE V – POWERS, DUTIES AND RIGHTS OF GENERAL PARTNER

5.01    Management of the Partnership. The assets, affairs and operations of the Partnership shall be managed by the General Partner.

5.02    Powers of General Partner. All references herein to any action to be taken by the Partnership shall mean action taken in the name of the Partnership and on its behalf by the General Partner. Except as otherwise provided in this Agreement, the General Partner will have exclusive management and control of the business of the Partnership and will (except as otherwise provided in any other agreements) make all decisions affecting the Partnership and the Partnership's assets. Notwithstanding any other provision of this Agreement, the General Partner will not change the investment strategy of the Partnership from that described in the Partnership's confidential private placement memorandum accompanying this Agreement without the consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time. In addition to the rights, powers, and authority granted elsewhere in this Agreement and by law, the General Partner will have the right, power, and authority to obligate and bind the Partnership and, on behalf of and in the name of the Partnership, to take any action of any kind and to do anything it deems necessary or advisable in pursuit of the Partnership's purposes, including, without limitation, the following:

(a)     To purchase, hold, sell, sell short, lend, borrow or otherwise deal in Tax Liens (through financing or otherwise) or Securities (including to "write" put and call options), and in furtherance of the foregoing, to:

(i)     Exercise all rights, powers, privileges and other incidents of ownership with respect thereto;

(ii)    Acquire a long or short position with respect to any Security and to make purchases or sales increasing, decreasing or liquidating such position, without any limitations as to the frequency of the

fluctuation in such positions or as to the frequency of the changes in the nature of such positions;

(iii)    Enter into contracts for or in connection with investments in Tax Liens;

(iv)    Liquidate Tax Liens that have been distributed to the Partnership

(v)    Delegate the authority to engage in such activities as to some or all of the Partnership's assets to one or more investment managers, and to pursue such activities through investment in one or more pooled investment vehicles;

(b)    To borrow funds on behalf of the Partnership and to pledge and hypothecate Tax Liens, Securities and other assets of the Partnership for such loans, and to lend (with or without security) any Tax Liens, Securities or other assets of the Partnership;

(c)    To open, maintain, conduct, and close accounts, including margin accounts with broker-dealers, and with banks or other custodians for Partnership assets, each as selected by the General Partner, and to draw checks or other orders for the payment of money by the Partnership, and in furtherance of the foregoing, to:

(i)    Issue instructions and authorizations to broker-dealers or custodians regarding Tax Liens and/or money held in accounts of the Partnership with such broker-dealers or custodians;

(ii)    Enter into prime broker agreements, clearing agreements, custodial agreements, margin account agreements and agreements with executing brokers;

(iii)    Combine purchases or sales of Tax Liens on behalf of the Partnership and Classes with purchases and sales for the Other Accounts and allocate Tax Liens or other assets so purchased or sold, on an average-price basis or by any other method of fair allocation, among such accounts; and

(iv)    Enter into arrangements with broker-dealers and custodians to open average price accounts wherein orders placed during a trading day are placed on behalf of the Partnership and Other Accounts and are allocated among such accounts using an average price;

(d)    To employ from time to time, at the expense of the Partnership, persons required for the Partnership's business, accountants, attorneys, financial consultants, and others (who may be affiliated with the General Partner) on such terms and for such compensation as the General Partner determines to be reasonable; and to give receipts, releases, indemnities, and discharges with respect to all of the foregoing and any matter incident thereto as the General Partner may deem advisable or appropriate;

(e)    To engage in any transaction with the General Partner's affiliates to the extent permitted by applicable securities laws (including, without limitation, the ability to effect on behalf of the Partnership any "agency cross transaction" (as contemplated in Rule 206(3)-2 under the Investment Advisers Act of 1940, as amended) through the General Partner or any affiliate of the General Partner that is registered as a broker or dealer);

(f)    To purchase, from or through others, contracts of liability, casualty and other insurance which the General Partner deems advisable, appropriate or convenient for the protection of the Tax Liens acquired by the Partnership or other assets or affairs of the Partnership or for any purpose convenient or beneficial to the Partnership, including policies of insurance insuring the General Partner and/or the Partnership against liabilities that may arise out of the General Partner's management of the Partnership;

(g)    To make all tax elections required or permitted to be made by the Partnership, including elections under Section 754 of the Code;

(h)    To file, conduct and defend legal proceedings of any form, including proceedings against Partners, and to compromise and settle any such proceedings, or any claims against any person, including claims against Partners, on whatever terms deemed appropriate by the General Partner;

(i)    To admit Limited Partners or additional or successor General Partners to the Partnership and to remove Limited Partners;

(j)    To waive or reduce, in whole or in part, any notice period, minimum amount requirement, or other limitation or restriction imposed on capital contributions or withdrawals of capital; waive, reduce or, by agreement with any Limited Partner, otherwise vary any fee or special allocation to the General Partner, and/or any requirement imposed on that Limited Partner by this Agreement.  The General Partner will have such right, power and authority regardless of whether such notice period, minimum amount, limitation, restriction, fee, or special allocation, or the waiver or reduction thereof, operates for the benefit of the Partnership, the General Partner or fewer than all the Limited Partners;

(k)    To retain persons, firms or entities, including without limitation affiliates of the General Partner, selected by the General Partner to provide certain management and administrative services to the Partnership and to cause the Partnership to compensate such Persons for such services in accordance with the terms of investment management agreements pursuant to which such investment manager will have discretionary investment authority over the Partnership's assets;

(k) To amend this Agreement in accordance with *Section 11.05*;

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 119
RECEIVED NYSCEF: 01/11/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 630 of 2230

(l)     To authorize any member, officer, employee or other agent of the General Partner to act for and on behalf of the Partnership in all matters incidental to the foregoing;

(m)     To do any and all acts on behalf of the Partnership as it may deem necessary or advisable in connection with, or incidental to the accomplishment of, the purposes of the Partnership or the maintenance and administration thereof; and

(n)     To issues additional classes of interests

5.03    <u>Consent of the Partners</u>.  Notwithstanding *Section 5.02* to the contrary, without the consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time, in no event shall the General Partner take any action outside the scope of the purposes of the Partnership.

5.04    <u>Duties of General Partner</u>.  Subject to the limitations in *Section 5.03*, the General Partner shall be charged with the full responsibility for managing and promoting the Partnership's purpose and business.  The General Partner shall devote its diligent efforts to the business and affairs of the Partnership, including such time as shall be required, in the reasonable opinion of the General Partner, for the proper conduct of the business of the Partnership.  The General Partner shall not assign its duties under this Agreement except pursuant to the terms of *Section 8.05* hereof.  The General Partner shall have authority in its sole discretion to delegate any responsibilities hereunder to third parties with whom it contracts to provide services on behalf of the Partnership.  No such delegation shall relieve the General Partner from its duties or obligations hereunder.

5.05    <u>Other Activities of the General Partner</u>.  The General Partner and its affiliates, shareholders, members, partners, managers, directors, officers and employees (collectively, the "***Affiliated Persons***") will only devote so much time to the affairs of the Partnership as is reasonably required in the judgment of the General Partner.  The Affiliated Persons will not be precluded from engaging directly or indirectly in any other business or other activity, including exercising investment advisory and management responsibility and buying, selling or otherwise dealing with Tax Liens and other investments for their own accounts, for the accounts of family members, for the accounts of other funds and for the accounts of individual and institutional clients (collectively, "***Other Accounts***").  Such Other Accounts may have investment objectives or may implement investment strategies similar to those of the Partnership.  The Affiliated Persons may also have investments in certain of the Other Accounts.  Each of the Affiliated Persons may give advice and take action in the performance of their duties to their Other Accounts that could differ from the timing and nature of action taken with respect to the Partnership. The Affiliated Persons will have no obligation to purchase or sell for the Partnership any investment that the Affiliated Persons purchase or sell, or recommend for purchase or sale, for their own accounts or for any of the Other Accounts.  The Partnership will not have any rights of first refusal, co-investment or other rights in respect of the investments made by Affiliated Persons for the Other Accounts, or in any fees, profits or other income earned or otherwise derived from them.  If a determination is made that the Partnership and one or more Other Accounts should purchase or sell the same investments at the same time, the Affiliated Persons will allocate these purchases

and sales as is considered equitable to each. No Limited Partner will, by reason of being a Limited Partner of the Partnership, have any right to participate in any manner in any profits or income earned or derived by or accruing to the Affiliated Persons from the conduct of any business or from any transaction in investments effected by the Affiliated Persons for any account other than that of the Partnership.

5.06    Compensation and Reimbursement.

(a)    A management fee (the "**Management Fee**") is paid quarterly in arrears to the General Partner. The Management Fee is equal to 0.25% (1% *per annum*) of the closing Capital Account balance of each Limited Partner for such calendar quarter. The Management Fee will be appropriately prorated to reflect any capital contributions which occur during a calendar quarter. The Capital Account of a Limited Partner making a withdrawal other than the last day of a calendar quarter (whether pursuant to ordinary withdrawal rights or where the special consent of the General Partner is required and, in its discretion, granted, in either case under *Article IV* of this Agreement) will be charged a *pro rata* portion of the Management Fee immediately prior to such withdrawal based on the number of days elapsed during such quarter and the portion withdrawn from such Capital Account. The General Partner may, in its sole discretion, enter into arrangements with Limited Partners under which the Management Fee is reduced, waived or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make a substantial investment or otherwise are determined by the General Partner in its sole discretion to represent a strategic relationship.

(b)    All expenses of the Offering and organization of the Partnership (including legal and other expenses) ("**Organizational Expenses**") will be paid by the Partnership and/or reimbursed by the Partnership to the extent paid by the General Partner. Beginning when the Partnership commences operation, the Organizational Expenses will be amortized and charged to the Partners' Capital Accounts on a monthly basis over a period of five years. The General Partner believes that the impact on the Partnership's results from this departure from GAAP will result in a fairer apportionment of such expenses among Limited Partners. This departure from GAAP may also result in a qualified audit opinion from the Partnership's auditors. If the Partnership is terminated within five years of the commencement of investment activities, any unamortized expenses will be recognized.

(c)    The Partnership shall pay for all ordinary operating and other expenses, including, but not limited to, investment-related expenses (*e.g.*, brokerage commissions, clearing and settlement charges, custodial fees, interest expenses, expenses relating to consultants, brokers or other professionals or advisors who provide research, advice or due diligence services with regard to investments, appraisal fees and expenses, and investment banking expenses); research costs and expenses (including fees for news, quotation and similar information and pricing services); legal expenses (including, without limitation, the costs of on-going legal advice and services, blue sky filings and all

costs and expenses related to or incurred in connection with the General Partner's compliance obligations under applicable federal and/or state securities and investment adviser laws arising out of its relationship to the Partnership, as well as extraordinary legal expenses, such as those related to litigation or regulatory investigations or proceedings); the Management Fee; accounting fees and audit expenses; administrative fees; tax preparation expenses and any applicable tax liabilities (including transfer taxes and withholding taxes); other governmental charges or fees payable by the Partnership; director and officer and/or errors and omissions liability insurance premiums or fiduciary liability insurance premiums for directors, officers and personnel of the General Partner; costs of printing and mailing reports and notices; and other similar expenses related to the Partnership, as the General Partner determines in its sole discretion. As an investor in the Partnership, the Offshore Fund (and therefore each investor in the Offshore Fund) bears its proportionate share of the expenses of the Partnership, as calculated at the Partnership level. The expenses of the Offshore Fund shall be paid by the Partnership. Each Class will be charged for its proportionate share of all Partnership expenses.

5.07   <u>Reliance on Authority of General Partner</u>.  No Person dealing with the General Partner or the Partnership shall be required to determine the authority of the General Partner to make any undertaking on behalf of the Partnership or to determine any fact or circumstance bearing upon the existence of such authority.  No purchaser of any property or interest owned by the Partnership shall be required to determine the sole and exclusive authority of the General Partner to execute and deliver, on behalf of the Partnership, any and all documents and instruments in connection therewith or to see to the application or distribution of revenues or proceeds paid or credited in connection therewith.

5.08   <u>Limitation of Liability; Indemnification</u>.

(a)   The General Partner and each Affiliated Person shall not be liable, responsible nor accountable in damages or otherwise to the Partnership or any Partner, or to any successor, assignee or transferee of the Partnership or of any Partner, for (i) any acts performed or the omission to perform any acts, within the scope of the authority conferred on the General Partner by this Agreement, except by reason of acts or omissions found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence; (ii) performance by the General Partner of, or the omission to perform, any acts on advice of legal counsel, accountants, or other professional advisors to the Partnership; (iii) the negligence, dishonesty, bad faith, or other misconduct of any consultant, employee, or agent of the Partnership, including, without limitation, an Affiliated Person of the General Partner, selected or engaged by the General Partner with reasonable care and in good faith; or (iv) the negligence, dishonesty, bad faith, or other misconduct of any Person in which the Partnership invests or with which the Partnership participates as a partner, joint venturer, or in another capacity, which was selected by the General Partner with reasonable care and in good faith.  The General Partner and each Affiliated Person shall not be liable to the Partnership or to any Partner, or any successors, assignees, or transferees of the Partnership or any Partner, for any loss, damage, expense, or other liability due to any cause beyond its reasonable control,

including, but not limited to, strikes, labor troubles, riots, fires, blowouts, tornadoes, floods, bank moratoria, trading suspensions on any exchange, acts of a public enemy, insurrections, acts of God, acts of terrorism, failures to carry out the provisions hereof due to prohibitions imposed by law, rules, or regulations promulgated by any governmental agency, or any demand or requisition by any government authority. Nothing the Partnership Agreement or this Offering Memorandum may be interpreted to limit or modify the General Partner's fiduciary duty to the Limited Partners not waive any right or remedy a Limited Partner may have under federal or state securities laws. Federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith.

(b)     To the fullest extent permitted by law, the Partnership, in the General Partner's sole discretion, shall indemnify and hold harmless the General Partner and each Affiliated Person and the legal representatives of any of them (an "***Indemnified Party***"), from and against any loss, liability, damage, cost or expense suffered or sustained by an Indemnified Party by reason of (i) any acts, omissions or alleged acts or omissions arising out of or in connection with the Partnership, this Agreement or any investment made or held by the Partnership (including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim), *provided that* such acts, omissions or alleged acts or omission upon which such actual or threatened action, proceeding or claim are based are not found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct, or gross negligence by such Indemnified Party, or (ii) any acts or omissions, or alleged acts or omissions, of any broker or agent of any Indemnified Party, *provided that* such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with reasonable care.

(c)     The Partnership shall, in the sole discretion of the General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct.  In the event that such an advance is made by the Partnership, the Indemnified Party shall agree to reimburse the Partnership for such fees, costs and expenses to the extent that it shall be determined that it was not entitled to indemnification under this Section.

(l)     Notwithstanding any of the foregoing to the contrary, the provisions of this Section 5.08 shall not be construed so as to provide for the indemnification of the General Partner or any Affiliated Person for any liability (including liability under federal or state securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 5.08 to the fullest extent permitted by law.

## ARTICLE VI – POWERS, RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

6.01    <u>Powers and Rights</u>.  Except as expressly set forth herein, the Limited Partners shall not take part in, or interfere in any manner with, the conduct or control of the Partnership business, or have any right or authority to act or sign for, or to obligate the Partnership.  The Limited Partners shall not at any time be entitled to withdraw all or any part of their contribution to the capital of the Partnership except to the extent they are entitled to withdrawals pursuant to the provisions of *Article IV* hereof.  Except as expressly set forth herein, the Limited Partners shall have no right to amend or terminate the Partnership, or to appoint, select, vote for or remove the General Partner or its agents, or to otherwise participate in the business decisions of the Partnership.  The Limited Partners shall have no right to demand and receive any property other than Cash in return for their contributions, and, prior to the dissolution and liquidation of the Partnership pursuant to *Article IX* hereof, their right to Cash shall be limited to the rights set forth in *Article IV* hereof.

6.02    <u>BHCA Subject Persons</u> Notwithstanding any other provision of this Agreement to the contrary, solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the Partnership a written notice to the General Partner of its election not to be treated as a BHCA Subject Person, and shall not thereafter have given the Partnership a notice of revocation of such election, and that at any time has an Allocation Percentage in excess of 4.9% of the aggregate Allocation Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold an Allocation Percentage of only four and nine-tenths percent of the aggregate Allocation Percentages of the Limited Partners (after giving effect to the limitations imposed by this *Article VI* on all such Limited Partners), and such Allocation Percentage in excess of said four and nine-tenths percent shall be deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Allocation Percentages; *provided that* this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of the Agreement up to the full amount of its Allocation Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the affected Interest.  The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; *provided, however*, that the foregoing voting restriction shall not continue to apply if the Interest is transferred: (i) to the Partnership; (ii) to the public in an offering registered under the Securities Act of 1933, as amended (the "***Securities Act***"); (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no person acquires more than 2% of the aggregate Capital Account balances of the Limited Partners; or (iv) in a single transaction to a third party who acquires at least a majority of the aggregate Capital Account balances of the Limited Partners without regard to the transfer of Interests to which such Capital Accounts relate.

## ARTICLE VII – ACCOUNTING, BOOKS AND RECORDS; REPORTS TO PARTNERS

7.01    <u>Accounting Methods</u>.    The General Partner shall prepare the accounting statements for the Partnership on an accrual basis in accordance with GAAP and shall be empowered to make any changes of accounting method that it shall deem advisable.

7.02    <u>Books and Records</u>.  The General Partner shall keep or cause to be kept, at the Partnership's expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts, Net Profits and Net Losses for each Class, the respective Capital Accounts of the Partners and such other matters required by the Act.  Such books of account shall be the property of the Partnership, shall be kept in accordance with sound accounting principles and procedures consistently applied, and shall be open to the reasonable inspection and examination of the Partners or their duly authorized representatives upon notice to the General Partner.  The books of account shall be maintained at the principal office of the General Partner or at the office of the Partnership's accounting or administrative firm, as determined by the General Partner in its sole discretion. Notwithstanding the foregoing, however, the General Partner is not obligated to show any Partners records detailing the actual Tax Liens purchased or sold by the Partnership. Information regarding the Partnership's trading and specific investments is proprietary

7.03    <u>Tax Matters Partner</u>.  The General Partner is hereby designated as the "tax matters partner," pursuant to Code Section 6231 and the Regulations thereunder.  The tax matters partner shall represent the Partnership in all Federal income tax matters, and shall hire attorneys, accountants and other professionals at Partnership expense, as it deems necessary to defend the positions taken by the Partnership for Federal income tax purposes.

7.04    <u>Reports to Partners</u>.  The General Partner will furnish audited financial statements to all Limited Partners within 120 days, or as soon thereafter as is reasonably practicable, following the conclusion of each Fiscal Year, although the General Partner may elect to postpone the first audit of the Partnership's annual financial statements until the completion of the Fiscal Year after the Fiscal Year in which the Partnership commenced investment activities, in which case the initial audit will cover the applicable Fiscal Year as well as the partial "stub" year in which the Partnership commenced operations.  Financial statements will include a balance sheet or statement of financial condition, an income statement or statement of operations, and a cash flow statement.  In addition, all Limited Partners will receive the information necessary to prepare federal and state income tax returns following the conclusion of such Fiscal Year as soon thereafter as is reasonably practical.

All Limited Partners will also receive unaudited performance reports and such other information as the General Partner determines on a monthly basis.  With regard to these reports, the General Partner is not required to provide information about specific investment transactions of the Partnership.

7.05    <u>Preparation of Reports</u>.  In the preparation of any reports required to be delivered pursuant to *Section 7.04*, Tax Liens shall be valued at their Fair Market Value, and any change in such Fair Market Value shall be treated as an item of Net Profit or Net Loss.

7.06    <u>Adjustment of Tax Basis</u>.  In the event of a transfer of an Interest in accordance with the terms of this Agreement, upon the request of any Partner, the General Partner shall cause the Partnership to elect, pursuant to Section 754 of the Code ("***Section 754 Election***"), to adjust the basis of the Partnership property if (a) the effect of such adjustment is to increase the adjusted basis of Partnership property and (b) such requesting Partner agrees to bear any additional expense attributable to accounting and recordkeeping required as a result of the Partnership's Section 754 Election.

## ARTICLE VIII – TRANSFER AND ASSIGNMENT OF PARTNERSHIP INTERESTS

8.01    <u>General Prohibition</u>.  No Limited Partner shall assign, convey, sell, transfer, encumber or in any way alienate all or any part of his Interest without the prior written consent of the General Partner, which consent may be withheld in the General Partner's sole and absolute discretion.

8.02    <u>Requirements upon Transfer</u>.  Any transfer of an Interest permitted under *Section 8.01* hereof or any other provision of this Agreement shall be subject to the following:

(a)    The permitted transferee shall have executed a written agreement, in form and substance reasonably satisfactory to the General Partner, to assume all of the duties and obligations of the transferor Limited Partner under this Agreement and to be bound by and subject to all of the terms and conditions of this Agreement;

(b)    The transferor Partner and the transferee shall have executed a written agreement, in form and substance reasonably satisfactory to the General Partner, to indemnify and hold the Partnership and the Partners harmless from and against any liabilities, losses, costs and expenses arising out of the transfer, including, without limitation, any liability arising by reason of the violation of any securities laws of the United States, any State of the United States, or any foreign country;

(c)    The transferor Partner has delivered to the General Partner an opinion of counsel reasonably acceptable to the General Partner that such transfer would not violate the Securities Act, as amended, or any blue sky laws (including any investor suitability standards);

(d)    The transferor Partner demonstrates that such transfer, when added to the total of all other sales or exchanges of Interests within the preceding 12 months, would not result in the Partnership being considered to have terminated within the meaning of Section 708 of the Code and that such transfer will not result in the Partnership being treated as a publicly-traded partnership within the meaning of Section 7704 of the Code;

(e)    The transferor Partner has demonstrated that such transfer will not cause the assets of the Partnership to be "plan assets" for purposes of ERISA;

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 119
RECEIVED NYSCEF: 01/11/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 637 of 2230

(f)     The transferee shall have executed a power of attorney substantially identical to that contained in *Article X* hereof, and shall execute and swear to such other documents and instruments as the General Partner may deem necessary to effect the admission of the transferee as a Partner;

(g)     The transferee shall have executed, in favor of the Partnership and the General Partner, an instrument containing representations by such transferee substantially identical to the representations and investment qualifications of the Limited Partner set forth in the Subscription Agreement;

(h)     The transferee shall have paid the reasonable expenses incurred by the Partnership in connection with the admission of the transferee to the Partnership; and

(i)     The transferee shall only effect a transfer on the first business day of any calendar month.

8.03   Unauthorized Transfer.   Any purported transfer of an Interest not expressly permitted by this *Article VIII* or consented to by the General Partner shall be null and void and of no effect whatsoever.

8.04   Interest of the Transferee.   In the event that a Limited Partner shall have obtained the consent of the General Partner to a transfer of all or a portion of its Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that the Capital Account relates to the transferred Interest.

8.05   General Partner Transfers.   Without the approval of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners on the relevant date of determination, the General Partner may not transfer its Interest as General Partner in the Partnership; *provided however*, that the General Partner may transfer its Interest as General Partner without the consent of any Limited Partner (i) to any entity controlled by, controlling or under common control with it or the Principal, or (ii) pursuant to a transaction not deemed to involve an "assignment" of this Agreement within the meaning of the Investment Advisers Act of 1940, as amended.   In the case of any transfer pursuant to the preceding clauses (i) and (ii), the transferee shall be admitted to the Partnership as a substitute General Partner, all references herein to the General Partner shall thereafter be deemed references to the transferee General Partner, and the General Partner will promptly notify the Limited Partners of any such transfer of its Interest.

## ARTICLE IX – DISSOLUTION OF PARTNERSHIP

9.01   Dissolution.   The Partnership shall be dissolved upon the expiration of the term of the Partnership as set forth in *Section 1.04* hereof.   In the event that the Partnership is dissolved on a date other than the last day of a Fiscal Year, the date of such dissolution shall be deemed to be the last day of an Accounting Period and a Fiscal Year for purposes of adjusting the Capital Accounts of the Partners. For purposes of distributing the assets of the Partnership upon dissolution, the General Partner shall be entitled to a return, on a *pari passu* basis with the

Limited Partners, of the amount standing to its credit in its Capital Account and, with respect to its share of profits, based upon its Allocation Percentage.

9.02    Winding Up and Distribution of Assets.

(a)    Upon the dissolution of the Partnership, the Partnership shall continue in existence for a reasonable period of time for the purpose of winding up its affairs, and the General Partner (or any Liquidating Agent appointed pursuant to *Section 9.02(c)* below) shall wind up the Partnership's affairs and cause the sale of the Partnership's assets (except those to be distributed in kind or retained pursuant to *Section 9.03* below) as expediently as is practicable and prudent and in such manner as the General Partner or Liquidating Agent, in its sole discretion, determines appropriate to obtain the best prices. Nothing herein shall preclude a sale of any asset of the Partnership to any Partner or affiliate of a Partner. Any property distributed in kind in the liquidation shall be valued at Fair Market Value in determining the amount distributed to Partners. Whether any assets of the Partnership shall be liquidated through sale or shall be distributed to the Partners in kind shall be a matter left to the sole discretion of the General Partner or Liquidating Agent. The General Partner or Liquidating Agent shall conduct (or cause to be conducted) a full accounting of the assets and liabilities of the Partnership and cause a balance sheet of the Partnership to be prepared as of the date of dissolution and a profit and loss statement for the period commencing after the end of the preceding Accounting Period and ending on the date of dissolution, and such financial statements shall be furnished to all of the Partners.

(b)    The proceeds of the sale of the Partnership's property and assets, plus any unsold assets to be distributed in-kind, shall be distributed in the following order of priority:

(i)    Payment of the debts and liabilities of the Partnership incurred in accordance with the terms of this Agreement, and payment of the expenses of liquidation;

(ii)    Setting up of reserves as set forth in *Section 9.03* below, as the General Partner or Liquidating Agent may deem reasonably necessary, for any contingent or unforeseen liabilities or obligations of the Partnership or any obligation or liability not then due and payable; *provided*, any unspent balance of the reserves shall be distributed in the manner hereinafter provided when deemed reasonably prudent by the General Partner or Liquidating Agent;

(iii)    Payment, on a *pro rata* basis, of any loans from or debts incurred in accordance with the terms of this Agreement owed to Partners; and

(iv)  Payment to the Partners, on a *pro rata* basis, of the remaining positive balances of their Capital Accounts, adjusted to the date of payment as set forth in *Article III*.

(c)  The Partnership may, from time to time, enter into (and modify and terminate) agreements with a liquidating agent or trustee selected by the General Partner if the General Partner is unwilling to manage the winding up process or, in the event the General Partner is disqualified pursuant to *Section 4.06* or otherwise is unable to manage the winding up process, such person as may be designated by Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time (in either such case, a "***Liquidating Agent***"), authorizing the Liquidating Agent to wind up the Partnership's affairs; *provided that* the total compensation the Partnership may become obligated to pay to such Liquidating Agent(s) during such winding up period will not exceed the aggregate amount of the Management Fee the Partnership would otherwise pay the General Partner pursuant to *Section 5.06(a)* hereof during such winding up period.

(d)  In the event that the Partnership is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), the distributions made pursuant to this *Section 9.02* shall be made in compliance with 1.704-1(b)(2)(ii)(b)(2).  In the event that the Partnership is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), but the Partnership has not dissolved pursuant to *Section 9.01* above, the Partnership shall be deemed to distribute the Partnership's property to the Partners, who shall be deemed to assume and take such property subject to the Partnership's liabilities, all in accordance with the balances of their respective Capital Accounts.  Immediately thereafter, the Partners shall be deemed to recontribute such property in kind to the Partnership, who shall be deemed to assume and take such property subject to all such liabilities.  Notwithstanding anything in this Agreement to the contrary, no Partner shall have any obligation to restore any negative or deficit balance in its Capital Account upon dissolution or liquidation of the Partnership, or otherwise.

9.03    <u>Reserves</u>

(a)  If there are any assets that, in the judgment of the General Partner or Liquidating Agent, cannot be valued properly until sold or realized or cannot be distributed properly in kind or cannot be sold without sacrificing a substantial portion of the value thereof, such assets may be excluded from the valuation of assets for purposes of computing the amount available for distribution upon dissolution and termination of the Partnership pursuant to this *Article IX*.  Any Partner's *pro rata* interest in such assets shall not be paid or distributed in kind to it until such time as the General Partner or Liquidating Agent, in its sole and absolute discretion, determines that circumstances no longer require such assets to be so excluded (in whole or in part).

(b)  If there is any contingent liability of the Partnership or any pending transaction or claim by the Partnership the remaining value of which cannot, in the judgment of the General Partner or Liquidating Agent, then be determined, the probable

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 640 of 2230

loss or liability, or value of the claim, as the case may be, may be excluded from the valuation of assets or liabilities for purposes of computing the amount available for distribution upon dissolution and termination of the Partnership pursuant to this *Article IX*. No amount shall be paid or charged to any such Partner's Capital Account on account of any such contingency, transaction or claim until its final settlement or such earlier time as the General Partner or Liquidating Agent shall determine. The Partnership may retain from sums otherwise due each Partner an amount that the General Partner or Liquidating Agent estimates to be sufficient to cover the share of such Partner of any probable loss or liability on account of such contingency, or the probable value of the transaction or claim. Any amount so withheld from a Partner shall be held in a segregated interest-bearing account (which may be commingled with similar accounts of other Partners). Any unused portion of such reserve shall be distributed with interest accrued thereon once the General Partner or Liquidating Agent has determined that the need therefor has ceased.

(c)     Upon determination by the General Partner or Liquidating Agent that circumstances no longer require the exclusion of assets or retention of sums as provided in subsections (a) and (b) hereof, the General Partner or Liquidating Agent shall, at the earliest practicable time, pay such sums or distribute such assets or the proceeds realized from the sale of such assets to each Partner from whom such sums or assets have been withheld.

9.04    <u>No Action for Dissolution</u>. The Partners acknowledge that irreparable damage will be done to the Partnership (on account of a premature liquidation of the Partnership's assets, loss of goodwill and reputation, and other factors) if any Partner seeks to dissolve, terminate or liquidate the Partnership by litigation or otherwise. The Partners further acknowledge that this Agreement has been drawn carefully to provide fair treatment of all parties and equitable payments in liquidation of the Interests of all Partners, and that the Partners entered into this Agreement with the intention that the Partnership continue until dissolved and liquidated in accordance with the terms of this Agreement. Accordingly, each Partner hereby waives and renounces any right to dissolve, terminate or liquidate the Partnership, or to obtain the appointment of a receiver or trustee to liquidate the Partnership, except as specifically set forth in this Agreement.

9.05    <u>No Further Claim</u>. Each Partner shall look solely to the assets of the Partnership for the return of its investment in the Partnership (including capital contributions and loans from a Partner to the Partnership), and no Partner shall have any liability or obligation to the Partnership or to any other Partner to repay any unreturned capital contributions or loans made by any Partner to the Partnership.

## ARTICLE X – POWER OF ATTORNEY

10.01    <u>Grant and Scope of Power</u>. Each Partner hereby irrevocably constitutes and appoints the General Partner as its true and lawful agent and attorney-in-fact, with full power of substitution, in its name, place and stead, to make, execute and acknowledge, swear to, record, publish and file:

(a)     Any agreement, document or instrument pertaining to the sale, transfer, conveyance or encumbrance of all or any portion of the property of the Partnership in accordance with the terms of this Agreement;

(b)     Any document or instrument with respect to the Partnership that may be required or permitted to be filed under the laws of any state or of the United States, or which the General Partner shall deem necessary, desirable or advisable to file; and

(c)     Any document that might be required to effectuate the dissolution, termination and liquidation of the Partnership.

The foregoing power of attorney is coupled with an interest, shall be irrevocable and shall survive the death, incompetency, dissolution, merger, consolidation, bankruptcy or insolvency of each of the Partners. The Partners shall execute and deliver to the General Partner, within five days after receipt of the General Partner's request therefor, such further designations, powers of attorney and other instruments as the General Partner reasonably deems necessary to carry out the purposes of this Agreement.

## ARTICLE XI – MISCELLANEOUS

11.01  Additional Documents.  At any time and from time to time after the date of this Agreement, upon the request of the General Partner, the Partners shall do and perform, or cause to be done and performed, all such additional acts and deeds, and shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such additional instruments and documents, as may be required to best effectuate the purposes and intent of this Agreement.

11.02  Applicable Law.  This Agreement shall be governed by, construed under, and enforced and interpreted in accordance with, the laws of the State of Delaware.

11.03  Jurisdiction.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Delaware, and each of the parties consents to the jurisdiction of such courts in any such action or proceeding and waives any objection to venue laid therein.

11.04  Notices.  Any notices required by this Agreement shall be in writing and shall be deemed to have been duly given if (i) delivered in person, (ii) if mailed postage prepaid, by certified or registered mail with return receipt requested, (iii) if transmitted by electronic mail or facsimile, (iv) if sent by second day service by Federal Express or any other nationally recognized courier service, postage prepaid or (v) if sent by Federal Express or any other nationally recognized overnight courier service or overnight express U.S. Mail, postage prepaid, to the Partner at the address set forth below in its execution of this Agreement, or to such other address of which the General Partner subsequently shall have been notified in writing by such Partner.  Notices personally delivered or transmitted by electronic mail or facsimile shall be deemed to have been given on the date so delivered or transmitted.  Notices mailed shall be deemed to have been given on the date three business days after the date posted, notices sent in accordance with (iv) above shall be deemed to have been given on the date two business days

after the date posted, and notices sent in accordance with (v) above shall be deemed to have been given the next business day after delivery to the courier service or U.S. Mail (in time for next day delivery).

11.05   <u>Agreement; Amendments</u>.   This Agreement constitutes the entire agreement between the parties and supersedes any prior understanding or agreement among them respecting the subject matter hereof.   There are no representations, arrangements, understandings or agreements, oral or written, among the parties hereto relating to the subject matter of this agreement, except those fully expressed herein.   No change or modification of this Agreement or waiver of any provision hereof shall be valid or binding on the parties hereto, unless such change, modification or waiver shall be in writing and signed by or on behalf of the parties hereto, and no waiver on one occasion shall be deemed to be a waiver of the same or any other provision hereof in the future.   Notwithstanding the foregoing sentence, amendments can be effected pursuant to the following conditions:

(a)   Except as set forth elsewhere in this *Section 11.05,* this Agreement may be amended from time to time, in whole or in part, with the written consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time (and the affirmative vote of the General Partner).

(b)   The General Partner may, without the consent of the other Limited Partners, issue side letters to investors providing a materially different fee schedule and liquidity structure and may also amend this Agreement (i) to change the Partnership's name, registered office or business office, (ii) to make a change that is necessary or, in the General Partner's opinion advisable, to qualify the Partnership as a partnership (or other entity in which the Limited Partners have limited liability) under the laws of any state and/or to preserve the Partnership's classification for federal tax purposes as a partnership that is not a "publicly traded partnership" treated as a corporation under Code Section 7704, (iii) to make any amendment hereof as long as such amendment does not adversely affect the Limited Partners in any material respect, (iv) to make any change that is necessary or desirable to satisfy any requirements, conditions, or guidelines contained in any opinion, directive, order, statute, ruling, or regulation of any federal or state entity applicable to the Partnership or the General Partner, so long as such change is made in a manner that minimizes any adverse effect on the Limited Partners, (v) to prevent the Partnership from, in any manner, being deemed an investment company subject to registration under the Investment Company Act, (vi) if the Partnership is advised that any allocations of income, gain, loss or deduction provided herein are unlikely to be respected for Federal income tax purposes, to amend the allocation provisions hereof, on advice of legal counsel, to the minimum extent necessary to effect the plan of allocations and distributions provided herein, (vii) to create a new class or series of Interests, which shall have such rights (including voting rights), powers, duties and obligations, including the payment of fees and performance allocations, as the General Partner may specify, (viii) to cure any ambiguity or to correct or supplement any provision contained herein which may be defective or inconsistent with any other provisions contained herein, or (ix) to take such actions as may be necessary or appropriate to avoid the assets of the Partnership being treated for any purpose of ERISA or Code Section 4975 as assets of any "employee benefit

plan" as defined in and subject to ERISA or of any plan or account subject to Code Section 4975 (or any corresponding provisions of succeeding law) or to avoid the General Partner's engaging in a "prohibited transaction" as defined in Section 406 of ERISA or Code Section 4975(c).

(c)     Nothing contained herein shall permit the amendment of this Agreement to reduce a Limited Partner's Capital Account or Allocation Percentage, permit assessments on the Limited Partners or to increase the Management Fees or Performance Allocations chargeable with respect to a Limited Partner without the prior consent of the affected Limited Partner(s); nor shall the following provisions hereof be amended without the consent of each of the Limited Partners adversely affected thereby and the General Partner:  *Sections 2.06, 4.01, 5.08, 9.01* and this *Section 11.05*.

(d)     Copies of each amendment of this Agreement (other than an amendment pursuant to paragraph (b)) shall be delivered to each Limited Partner at least ten days prior to the effective date thereof; *provided that* any amendment that the General Partner determines is necessary or appropriate to prevent the Partnership from being a publicly traded partnership treated as a corporation under Code Section 7704 shall be effective on the date provided in the instrument containing such amendment.  Amendments approved in accordance with this *Section 11.05* shall be binding on all Limited Partners, including any that did not vote to approve the same, except as set forth in *Section 11.05(c)*.

(e)     Limited Partners shall have no right (i) to amend (except to the extent provided in *Section 11.05(a)*) or terminate this Agreement, (ii) to appoint, select, vote for, or remove the General Partner or its agents, or (iii) to exercise voting rights or otherwise participate in the Partnership's management or business decisions or otherwise in connection with the Partnership property.

11.06    Severability.  If any portion of this Agreement is held illegal or unenforceable, the Partners hereby covenant and agree that such portion or portions are absolutely and completely severable from all other provisions of this Agreement and such other provisions shall constitute the agreement of the Partners with respect to the subject matter hereof.

11.07    Successors.  Subject to the provisions hereof imposing limitations and conditions upon the transfer, sale or other disposition of the Interests of the Partners in the Partnership, all the provisions hereof shall inure to the benefit of and be binding upon the heirs, successors, legal representatives and assigns of the parties hereto.

11.08    Counterparts.  This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.

11.09    Section Headings.  Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to define, interpret, describe or limit the scope, extent or intent of this Agreement or any provision hereof.

24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State
Court Records Pg 644 of 2230

11.10  Time.  Time is of the essence in this Agreement.

11.11  Pronouns.  All pronouns used in this Agreement in reference to any Partner shall include the neuter, masculine and feminine genders and the singular and the plural, as the context requires.

[Signatures on following page.]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**GENERAL PARTNER:**

Ebury Street Capital, LLC

By: _____
    John Hanratty
    Manager

**LIMITED PARTNERS:**

Each person who shall sign an Investor Signature Page in the form attached in the Subscription Agreement and is accepted to the Partnership as a Limited Partner

<u>Appendix A</u>

### *Definitions*

"***Accounting Period***" shall initially mean the period beginning on the effective date of the first capital contribution to the Partnership and ending on the first to occur of the events set forth in (a) through (e) of this definition.  Each subsequent Accounting Period shall commence immediately after the close of the preceding Accounting Period and will continue until the close of business on the earlier to occur of (a) the last business day of each calendar month, (b) the first business day immediately preceding the effective date of a capital contribution by a new or existing Partner, (c) a date on which one or more Partners effects a withdrawal from their Capital Accounts, (d) the date of the dissolution of the Partnership, or (e) such other dates as the General Partner determines, in its sole discretion.

"***Act***" shall mean the Delaware Revised Uniform Limited Partnership Act (6 Del. C. 17-101 et. seq.), including amendments from time to time.

"***Affiliated Persons***" shall have the meaning set forth in *Section 5.05*.

"***Allocation Percentage***" shall mean with respect to any Partner for any Accounting Period the quotient obtained by dividing (i) the Capital Account balance for such Partner as of the beginning of such Accounting Period (as determined pursuant to *Section 3.01*) by (ii) the Capital Account balance for all Partners of the same Class as of the beginning of such Accounting Period (as determined pursuant to *Section 3.01*).

"***BHCA***" means the Bank Holding Company Act of 1956, as amended.

"***BHCA Subject Person***" shall mean any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

"***Capital Account***" shall mean, with respect to any Partner, the account established and maintained on the books of the Partnership for such Partner, which shall be credited with the amount of such Partner's capital contributions, and increased, or decreased, from time to time as provided in this Agreement.

"***Cash***" shall mean, with reference to the payment in cash of all or any part of a capital contribution or distribution, payment by check or by wire transfer of funds between banks or other financial institutions.

"***Class***" shall have the meaning set forth in *Section 2.01*.

"***Class A Interests***" shall mean the Class of Interests of the Partnership designated as "Class A" by the General Partner.

"*__Class B Interests__*" shall mean the Class of Interests of the Partnership designated as "Class B" by the General Partner.

"*__Code__*" shall mean the Internal Revenue Code of 1986, as amended.

"*__Cumulative Loss Account__*" refers to a memorandum account to be recorded on the books and records of the Partnership for each Limited Partner that shall have an initial balance of zero and that shall be adjusted at the end of each Performance Allocation Period, after all tentative allocations of Net Profits or Net Losses have been made for the period, as follows: the balance of the Cumulative Loss Account shall be increased by the amount if any by which (A) the sum of Net Losses allocated to the Capital Account of a Limited Partner during the Performance Allocation Period exceeds (B) the sum of Net Profits allocated to the Capital Account of the Limited Partner for the same period, and shall be reduced by the amount if any by which (X) the sum of Net Profits allocated to the Capital Account of the Limited Partner during the Performance Allocation Period exceed (Y) the sum of Net Losses allocated to the Capital Account of the Limited Partner for the same period, *provided that* the cumulative amount of such adjustment for any period shall not reduce the balance of the Cumulative Loss Account below zero.  In the event that there is a positive balance in the Limited Partner's Cumulative Loss Account at the time the Limited Partner makes a withdrawal from its Capital Account, such positive balance shall be reduced (effective as of the date of such withdrawal) in the proportion which the amount of the withdrawal bears to the balance of the Limited Partner's Capital Account immediately prior to giving effect to such withdrawal.

"*__ERISA__*" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"*__Fair Market Value__*" shall be determined by using the following method:

(a)    Non-publically traded Securities, Tax Liens, Real Estate or instruments for which reliable market quotations are not available, Securities, Tax Liens or instruments for which the General Partner determines in its sole discretion that the foregoing valuation methods do not represent the fair value of such Tax Liens, Securities or instruments and other private investments may be initially valued at the acquisition price as the best indicator of fair value. Valuations will depend on facts and circumstances known as of the valuation date and the application of certain valuation methodologies, pursuant to which the General Partner will generally seek to establish the market value of the portfolio investment using one or a combination of income capitalization and sales comparison approaches. These approaches take into account specific financial measures (such as EBITA, adjusted EBITA, free cash flow, net income, book value or net asset value) believed to be the most relevant for the given investment. Consideration may also be given to such factors as the acquisition price of the security, discounted cash flow valuations, historical and projected operational and financial results for the portfolio company, the strengths and weaknesses of the portfolio company relative to market comparables, valuations of comparable companies, sales of comparable investments, industry trends, general economic and market conditions and other factors deemed relevant.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 648 of 2230

(b)     Securities which are listed on one or more United States or foreign Securities exchanges or are traded on a recognized over-the-counter market (including the NASDAQ), or for which market quotations are available shall be valued at their last reported sales price on the date of determination on the primary exchange or market on which such Securities are traded or, if no sale occurred on the valuation date, the value for long positions shall be the "last bid" and the value for short positions shall be the "last ask" (or, if on such date Securities markets were closed, then the last preceding business day on which they were open).

(c)     Securities in the form of options listed on a Securities exchange will be valued at the last reported sales price on the date of determination on the primary exchange or market on which such Securities are traded or, if the last sales price does not fall between the "last bid" and "last ask" price for such options on such date, such options will be valued at the mean between "last bid" and "last ask" prices on the date of determination.

(d)     Securities generally traded on an established Securities market but for which no recorded sales information or quotations of bid and ask prices are available on such date (or, if applicable, the last preceding business day) shall be valued by the General Partner in good faith with reference to (i) the most recently reported bid and ask prices (in that order), (ii) bid and ask price information as of such date not generally reported but secured from a reputable broker or investment banker, and (iii) such other information as the General Partner believes in good faith is relevant.

(e)     Securities not listed or traded on any exchange or on the over-the-counter market shall be valued based upon quotations obtained from independent market makers, dealers or pricing services, and if no such quotations are available, shall be considered as having no ascertainable market value and shall be valued at cost or fair value based on information available to the General Partner regarding the value or worthlessness of such Securities.

(f)     For purposes of this definition, sales and bid and ask prices reported in newspapers of general circulation, or in electronic quotation systems or in standard financial periodicals or in the records of Securities exchanges or other markets, any one or more of which may be selected by the General Partner, shall be accepted as evidence of the price of a Security.

(f)     A Security purchased, and awaiting payment against delivery, shall be included for valuation purposes as a security held, and the cash account shall be adjusted by the deduction of the purchase price, including brokers' commissions or other expenses of the purchase.

(g)     A Security sold but not delivered pending receipt of proceeds shall be valued at the net sales price.

(h)     The General Partner may make adjustments to the value of Tax Liens to best reflect Fair Market Value.  All matters concerning the valuation of Tax Liens, the allocation of profits, gains, and losses among the Partners, and accounting procedures not specifically and expressly provided for by the terms of this Agreement, shall be determined by the General Partner and shall be final and conclusive as to all of the Partners.

"***Fiscal Year***" of the Partnership shall be the calendar year; *provided, however*, that the first Fiscal Year shall commence on the date of this Agreement and shall end on the December 31 next following the date of this Agreement.

"***GAAP***" means generally accepted accounting principles, consistently applied.

"***General Partner***" shall mean Ebury Street Capital LLC and shall also mean any Person who becomes General Partner pursuant to the provisions of *Section 4.02* and any Person who succeeds to all or a portion of the General Partner's Interest pursuant to *Section 8.05* of this Agreement.

"***Interest***" shall mean, for each Partner, all rights and interests of that Partner in the Partnership in its capacity as a Partner together with any and all obligations imposed on it hereunder or under the Act, and shall include Class A Interests and/or Class B Interests, as appropriate.

"***Key Man Event***" shall have the meaning set forth in *Section 1.04*.

"***Limited Partners***" shall mean those persons whose Subscription Agreements to become a limited partner shall have been accepted by the General Partner on behalf of the Partnership, or anyone subsequently admitted as a Limited Partner, but excluding any Limited Partner who has withdrawn from the Partnership or been removed from the Partnership under *Article IV* hereof. Reference to a "Limited Partner" shall mean any one of the Limited Partners.

"***Lock-Up Period***" shall have the meaning set forth in *Section 4.01(a)*.

"***Management Fee***" shall have the meaning set forth in *Section 5.06(a)*.

"***Net Asset Value***" means the combined Class Net Asset Value of all Classes of the Partnership.

"***Class Net Asset Value***" means the net asset value of the assets of each Class determined on the last day of an Accounting Period by:

(a)     Adding:

(i)     the aggregate Fair Market Value of the Class' investments;

(ii)     the aggregate uninvested cash balances of the Partnership proportionally allocated to such Class (such cash balances being adjusted as required under the sub-sections (g) and (h) of the definition of "*Fair Market Value*"),

(iii)     the aggregate Fair Market Value of such assets as would generally be considered pre-payments of expenses proportionally allocated to such Class to be amortized over future periods;

(iv)     the aggregate Fair Market Value of all dividends and distributions payable in cash, stock or other property received by the Partnership and the face value of all notes and other receivables related to the Class' investments; and

(v)     the aggregate Fair Market Value of such other assets of the Partnership proportionally allocated to such Class as should be considered assets in accordance with GAAP (*provided that* the name and goodwill of the Partnership shall not be included in calculating the Net Asset Value of the Partnership).

(b)     Deducting from the total sum obtained pursuant to sub-Section (a) above any liabilities and expenses due (including Management Fees payable for the current calendar month) in accordance with GAAP proportionally allocated to such Class.

All amounts under sub-sections (a) and (b) above shall be stated in United States Dollars, with assets and liabilities denominated in currencies other than United States Dollars to be converted to United States Dollars at published exchange rates in effect on the last day of such Accounting Period.  The resulting Class Net Asset Value at the end of such Accounting Period shall constitute the initial Class Net Asset Value for the subsequent Accounting Period after adjustment to reflect withdrawals pursuant to *Article IV* and additional capital contributions by Partners and the admission of new Partners pursuant to *Article II*.   Whenever ratios or percentages are to be calculated based upon or relating to Partners' Capital Accounts, they shall be calculated to four decimal places with any adjustments resulting from rounding charged or credited to all of the Partners' Capital Accounts proportionally.

"***Net Profit***" or "***Net Loss***" shall mean, with regard to any Accounting Period, the difference between the Class Net Asset Value of any Class at the beginning of the Accounting Period (after giving effect to withdrawals for the preceding Accounting Period and capital contributions for the current Accounting Period) and the Class Net Asset Value of such Class at the close of the same Accounting Period (before giving effect to withdrawals for such Accounting Period).  Any increase in Class Net Asset Value shall be deemed a Net Profit and any decrease in Class Net Asset Value shall be deemed a Net Loss.

"***Other Accounts***" shall have the meaning set forth in *Section 5.05*.

"***Partners***" shall mean, collectively, the General Partner and the Limited Partners, and reference to a "***Partner***" shall mean any one of the Partners.

"***Performance Allocation***" shall have the meaning set forth in *Section 3.02(b)*.

"***Performance Allocation Period***" shall mean each performance period over which the allocations provided for in *Section 3.02(b) and (c)* are measured.

"***Person***" shall mean an individual, partnership, joint venture, association, corporation, trust or any other legal entity.

"***Principal***" shall mean John Hanratty.

"***Regulations***" shall mean Treasury Regulations promulgated under the Code as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations).

"***Tax Liens***" shall mean a legal claim on real property created by a property owner's failure to satisfy its real estate tax obligations or other municipal charges on such property. Tax Liens includes financial instruments of states or municipalities, including, without limitation, tax certificates, tax lien receivables, tax loans, tax deeds, and related interests in real estate and real estate related assets; bonds, notes and debentures (whether subordinated, convertible or otherwise).

"***Securities***" shall mean securities and other financial instruments of United States and foreign entities, including, without limitation, capital stock; exchange traded funds, shares of beneficial interest; bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; money market funds; obligations of the United States or any state thereof, commercial paper; certificates of deposit; and any other obligations and instruments or evidences of indebtedness of whatever kind or nature; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable.

"***Subscription Agreement***" means any subscription booklet, including a subscription agreement containing appropriate representations, warranties, acknowledgments, agreements, indemnifications, confirmations and reciting and evidencing such qualifications as are deemed necessary or appropriate in the General Partner's discretion, prescribed by the General Partner as a condition precedent to becoming a Limited Partner.

"***Withdrawal Date***" shall have the meaning set forth in *Section 3.02(b)*.

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM
NYSCEF DOC. NO. 119

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/11/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 652 of 2230

## EXHIBIT A – LIMITED PARTNERSHIP AGREEMENT

LIMITED PARTNERSHIP AGREEMENT

OF

EBURY FUND 2, LP

Dated as of January 15, 2015

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM
NYSCEF DOC. NO. 119

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/11/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 653 of 2230

# TABLE OF CONTENTS

Page

ARTICLE I – FORMATION AND PURPOSE ............................................................1

ARTICLE II – ADMISSION OF PARTNERS; CAPITALIZATION ............................2

ARTICLE III – CAPITAL ACCOUNTS; PROFITS AND LOSSES ............................4

ARTICLE IV – DISTRIBUTIONS OF CASH FLOWS; WITHDRAWALS ...............8

ARTICLE V – POWERS, DUTIES AND RIGHTS OF GENERAL PARTNER .......................13

ARTICLE VI – POWERS, RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS ..........20

ARTICLE VII – ACCOUNTING, BOOKS AND RECORDS; REPORTS TO PARTNERS .....21

ARTICLE VIII –TRANSFER AND ASSIGNMENT OF PARTNERSHIP INTERESTS...........22

ARTICLE IX – DISSOLUTION OF PARTNERSHIP .................................................23

ARTICLE X – POWER OF ATTORNEY ......................................................................26

ARTICLE XI – MISCELLANEOUS ..............................................................................27

APPENDIX A – DEFINITIONS ....................................................................................

This LIMITED PARTNERSHIP AGREEMENT (the "*Agreement*") of Ebury Fund 2, LP, a Delaware limited partnership (the "*Partnership*"), is made and entered into as of this 1st day of January, 2015, by and among Ebury Street Capital, LLC, a New York limited liability company, as the General Partner, and the Limited Partners.

## WITNESSETH

**WHEREAS**, the parties hereto desire to form a limited partnership for the purposes hereinafter provided.

**NOW, THEREFORE**, for and in consideration of the foregoing premises, the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

## ARTICLE I – FORMATION AND PURPOSE

1.01    Formation.  The parties hereby form a limited partnership and agree to conduct the Partnership as a limited partnership pursuant to the terms hereof.  The General Partner has executed the Certificate of Limited Partnership and caused it to be filed as required by the Act, and shall from time to time execute and file elsewhere a similar certificate when required by applicable law or permitted by applicable law and advisable for the Partnership to do so.

1.02    Name.  The name of the Partnership shall be Ebury Fund 2, LP, and the business of the Partnership shall be conducted under such name.

1.03    Offices.  The registered office of the Partnership is at 3500 S. Dupont Hwy, Dover DE 19901. The Partnership's initial registered agent for service of process at such address shall be Interstate Agent Services, LLC.  The business office of the Partnership is at 56 Locust Ave, 2nd Floor, Rye, New York 10580. The Partnership may have such additional offices at such other places as the General Partner shall deem advisable.

1.04    Term. The Partnership shall continue until the earlier of (i) the termination, bankruptcy, insolvency or dissolution of the General Partner, (ii) the complete withdrawal of the General Partner from the Partnership, unless a successor general partner is appointed pursuant to *Section 4.02(b)* hereof, (iii) entry of a decree of judicial dissolution under Section 17-802 of the Act, (iv) either (a) the death of the Principal or (b) an adjudication in a final non-appealable decision on the merits of a court of competent jurisdiction that the Principal is physically or mentally incapable of making investment decisions on behalf of the General Partner (either such event, a "*Key Man Event*"), unless the Limited Partners elect to continue the Partnership pursuant to *Section 4.02* hereof, or (v) a determination by the General Partner that the Partnership should be dissolved.

1.05    Purpose of Partnership.

    (a)    The Partnership is organized for the purpose of investing in Tax Liens and Securities and engaging in all activities and transactions as the General Partner may deem necessary or advisable in connection therewith and doing such other lawful acts as the General Partner may deem necessary or advisable in connection with the maintenance and administration of the Partnership.

    (b)    The Partnership may engage in other activities and businesses incidental to the purpose of the Partnership as may be necessary or desirable, in the opinion of the General Partner, to promote and carry out the principal purposes of the Partnership, as set forth above; *provided, however*, that, without the written consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time, (i) the purpose of the Partnership shall not be changed, and (ii) the Partnership shall not engage in any substantial business endeavor other than those consistent with the purpose of the Partnership, or incidental thereto.

1.06    Investment Management Techniques Proprietary.    The investment management systems, techniques and methods employed by the General Partner in the management of the Partnership's investments shall be the sole property of the General Partner, and neither the Partnership nor any Limited Partner shall have any interest in or right or claim with respect to such investment management systems, techniques or methods or in any of the research products or recommendations generated through their use.

1.07    Definitions.    Capitalized terms used and not defined herein shall have the meaning attributed to such terms in the definitions set forth in Appendix A hereto, or in the relevant section of this Agreement listed on Appendix A.

1.08    Offshore Fund. Substantially all of the assets of Ebury Fund 1, Ltd., a British Virgin Islands business company (the "Offshore Fund") will place all or substantially all of its assets in, and conduct its trading activities primarily through, the Partnership, utilizing a "Mini-Master-Feeder" structure.  The establishment of the Offshore Fund was sponsored by the General Partner.  The General Partner will serve as the investment manager to the Offshore Fund and the Partnership and will conduct the investment activities of the Partnership, managing its day-to-day activities.  The Offshore Fund will participate on a *pro rata* basis in the profits and losses of the Partnership and bear a *pro rata* portion of all expenses of the Partnership based on the net asset value of its respective interests in the Partnership.

## ARTICLE II – ADMISSION OF PARTNERS; CAPITALIZATION

2.01    Admission of Partners.  The General Partner may admit one or more new Partners to one of the classes (each, a "***Class***") at such times and on such terms as the General Partner deems appropriate, subject only to the conditions that:

    (a)    Each new Partner shall execute a Subscription Agreement pursuant to which it agrees to be bound by the terms and provisions hereof;

(b)    In the case of admission of a general partner other than the General Partner, such new general partner controls, is controlled by, or is under common control with the General Partner;

(c)    The total number of Limited Partners may not at any time exceed 100 (as interpreted under Section 3 of the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder, *provided however*, that the General Partner may further limit the number of Limited Partners such that the combined number of Limited Partners and beneficial owners of any feeder fund investing in the Partnership who are U.S. persons (as determined by the General Partner) shall not exceed 100; and

(d)    The General Partner reasonably believes that any new Partner satisfies the minimum investor suitability standards established by the General Partner.

2.02    <u>Capital Contributions of Limited Partners</u>. Upon admission to the Partnership, each Limited Partner shall contribute Cash in the amount set forth in such Partner's Subscription Agreement.  The minimum initial capital contribution to the Partnership by a Limited Partner is generally $100,000, subject to the General Partner's sole discretion to accept subscriptions for lesser amounts or, upon giving notice to the Limited Partners, to require a higher minimum. Limited Partners may be admitted on the first business day of any calendar month, or at any other time the General Partner chooses to accept initial capital contributions.  The General Partner may, in its sole discretion, reject any initial subscription request.

2.03    <u>Additional Capital Contributions</u>.  A Partner may make additional contributions in Cash to the Partnership in amounts of not less than $25,000, with the consent of the General Partner and subject to its sole and absolute discretion to accept lesser amounts. Additional capital contributions may be accepted from existing Limited Partners on the first business day of any calendar month, or at any other time the General Partner chooses to accept such additional capital contributions.  The General Partner may, in its sole discretion, reject any additional subscription request.

2.04    <u>No Interest on Contributions</u>.  No Partner shall be entitled to receive interest on its capital contributions.

2.05    <u>No Right to Return of Capital Contribution</u>.  No Partner shall have the right to withdraw from the Partnership or to demand a return of all or any part of his capital contribution during the term of the Partnership except as provided in *Article IV* hereof.

2.06    <u>Liability of Limited Partners</u>.  Notwithstanding any other term or provision of this Agreement to the contrary, in no event shall any Limited Partner be liable for (i) any debts, obligations, liabilities or indemnifications of the Partnership in an amount that exceeds the capital contribution of such Limited Partner or for (ii) any debts, obligations, liabilities or indemnifications of any other Partner, nor shall the Limited Partners have any personal liability for contributing any capital to the Partnership.

2.07    <u>Classes</u>.  Initially the Partnership has two Classes of Interests: Class A Interests and Class B Interests..The General Partner has the authority to issue additional classes at its discretion.

## ARTICLE III – CAPITAL ACCOUNTS; PROFITS AND LOSSES

3.01    <u>Capital Accounts</u>.

(a)    One or more Capital Accounts shall be established and maintained on the books of the Partnership for each Partner, with multiple such accounts being maintained for a single Partner solely for the purpose of tracking the Lock-Up Period applicable to each capital contribution made by such Partner.  The amount of each Partner's initial capital contribution shall be credited to its Capital Account at the beginning of the Accounting Period in which such capital contribution is accepted.  At the end of such Accounting Period (and each Accounting Period thereafter), the Capital Account of each Partner shall be (i) increased or decreased by the amount credited or debited to the Capital Account of such Partner pursuant to *Section 3.02(a) through (c)*.  At the beginning of each Accounting Period thereafter, the Capital Account of each Partner shall be increased by the amount of any additional capital contributions made by such Partner on the first day of such Accounting Period, and decreased by (i) the amount of any withdrawals made by such Partner pursuant to *Article IV* as of the end of the immediately preceding Accounting Period.  At the end of each Accounting Period, each Limited Partner's Capital Account shall be decreased by the amount of the Management Fee then due pursuant to *Section 5.06(a)*.

(b)    Capital Account balances and the value of any capital contributed to the Partnership shall be determined by application of the capital accounting rules in Regulations Section 1.704-1(b)(2)(iv).

3.02    <u>Interests in Profits and Losses; Performance Allocation</u>.

(a)    The Net Profit or Net Loss as to each Class for each Accounting Period shall be tentatively allocated as of the last day of such Accounting Period to each Partner's respective Capital Account in proportion to the Partner's Allocation Percentage for such Accounting Period, subject only to reduction pursuant to *Section 3.02(b) and (c)*.  For purposes of calculating Net Profit or Net Loss, the Partnership will include both realized and unrealized gains and losses on its investments.  In the case of the General Partner, the entire amount initially allocated to its Capital Account pursuant to the first sentence of this *Section 3.02(a)* shall be finally allocated to its Capital Account at the close of the Accounting Period.

(b)    Subject to the limitations set forth in *Section 3.03 through 3.07*, at the end of each Fiscal Year, the aggregate Net Profit as to each Class, if any, allocated to each Limited Partner for such Fiscal Year shall be finally allocated as follows:

(i)    <u>High Water Mark</u>.  First, to such Limited Partner until such time as the balance, if any, in such Limited Partner's Cumulative Loss

Account has been eliminated (but in no event more than the balance existing in such account); and

(ii)    85/15 Split.  Thereafter, 85% to such Limited Partner and 15% to the General Partner (such amount allocated to the General Partner, will hereafter be referred to as the "*Performance Allocation*").

The final allocations set forth in this *Section 3.02(b)* (and *3.02(c)* below) may be computed at the end of an Accounting Period, in the sole discretion of the General Partner, for a Limited Partner who effects a partial or complete withdrawal from its Capital Account at the end of such Accounting Period as if the applicable Withdrawal Date were the last day of a Performance Allocation Period, by multiplying (i) the portion of the Net Profits allocable to the withdrawing Limited Partner pursuant to this *Section 3.02* in excess of the balance, if any, existing in such Limited Partner's Cumulative Loss Account, by (ii) the ratio obtained by dividing the amount being withdrawn by the balance in such Limited Partner's Capital Account immediately prior to the withdrawal. If such Limited Partner is making a partial withdrawal of its Capital Account, the allocations set forth in this *Section 3.02* for the remainder of the Performance Allocation Period in which such Accounting Period occurs shall be based on such Limited Partner's Allocation Percentage and Cumulative Loss Account immediately following such withdrawal.  The General Partner may, in its sole discretion, enter into arrangements with Limited Partners under which the Performance Allocation is reduced, waived or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make a substantial investment or otherwise are determined by the General Partner in its sole discretion to represent a strategic relationship.

(c)    Subject to the limitations set forth in *Section 3.03 through 3.07*, at the end of each Fiscal Year, the aggregate Net Loss, if any, allocated to each Limited Partner for such Fiscal Year shall be finally allocated to such Limited Partner (and such Limited Partner's Cumulative Loss Account shall be adjusted accordingly).

3.03    Limitation on Allocations.  Any Net Losses or items of loss or deduction allocated to a Limited Partner pursuant to this *Article III* shall not exceed the maximum amount of such items that can be allocated without causing the Partner to have a negative Capital Account balance, after giving effect to the following adjustments:  (a) debit to such Capital Account balance the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6), and (b) credit to such Capital Account balance the sum of (i) the amount that the Partner is obligated to restore to the capital of the Partnership, and (ii) the amount that the Partner is deemed to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(c)(1) and (2).  The Partnership shall allocate all Net Losses or items of loss or deduction in excess of the limitations set forth in this *Section 3.03* first to any Limited Partners to whom the limitation in the preceding sentence does not apply, in proportion to their respective Allocation Percentages.  Any Net Losses that the Partnership

5

cannot allocate to any Limited Partner as a result of the limitation set forth in the first sentence of this *Section 3.03* shall be allocated to the General Partner.

3.04   Qualified Income Offset.  In the event that any Partner unexpectedly receives any adjustments, allocations or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that cause a deficit balance in such Partner's Capital Account, the Partnership shall allocate items of Partnership income and gain to that Partner in an amount and manner sufficient to eliminate the deficit balance as quickly as possible, *provided that* the Partnership shall make an allocation pursuant to this *Section 3.04* only if and to the extent that a Partner would have a deficit Capital Account balance after the Partnership makes all other allocations provided for in this *Article III* as if this *Section 3.04* were not in the Agreement.  For purposes of any allocation pursuant to the preceding sentence, in determining any deficit balance in a Partner's Capital Account, the Partnership shall (a) reduce the Partner's Capital Account by expected adjustments, allocations or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), and (b) increase the Partner's Capital Account by any amount that the Partner must restore to the deficit balance of his Capital Account or that Regulations Section 1.704-1(b)(2)(ii)(c) deems the Partner to restore to the deficit balance of his Capital Account.

3.05   Gross Income.  In the event that any Partner has a deficit balance in its Capital Account as of the end of any Fiscal Year in excess of the sum of the amount such Partner is obligated to restore to the capital of the Partnership pursuant to any provision of this Agreement, or that such Partner is deemed to be obligated to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(c)(1) and (2), then the Partnership shall allocate to each such Partner items of income and gain for such Fiscal Year and subsequent Fiscal Years, if necessary, in an amount and manner sufficient to eliminate as quickly as possible such Capital Account deficit.  The Partnership shall make an allocation pursuant to this *Section 3.05* if and only to the extent that such Partner would have such an excess deficit balance in its Capital Account after the Partnership tentatively has made all other allocations pursuant to this *Article III* as if *Section 3.04* and this *Section 3.05* were not in this Agreement.

3.06   Section 754 Adjustments.  To the extent that the Partnership makes an election pursuant to Code Section 754 and *Section 7.06* hereof, the amount of any adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or 743(b) that is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and the gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Regulations section.

3.07   Curative Allocations.  The Partnership intends that any allocations made pursuant to the last sentence of *Section 3.03* or pursuant to *Section 3.04, Section 3.05 or Section 3.06* (collectively, "***Regulatory Allocations***") comply with certain requirements of the Regulations.  The Partnership also intends that, to the extent possible, the Partnership offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations pursuant to this *Section 3.07*.  Therefore, notwithstanding any other provisions of this *Article III* (other than the Regulatory Allocations), the Partnership shall make such offsetting special allocations in

whatever manner it determines appropriate so that, after it makes the offsetting allocations, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance the Partner would have had if the Regulatory Allocations were not part of the Agreement and the Partnership allocated all items pursuant to the remaining Sections of this *Article III*.

3.08    <u>Priority of Allocations</u>.    The Partnership shall make the allocations pursuant to *Section 3.02* through *Section 3.07* in the following order and priority: (a) first, the Partnership shall make the Regulatory Allocations in the order and priority in which they appear in this Agreement; and (b) next, the Partnership shall make the allocations pursuant to *Section 3.02*.

3.09    <u>Contributed and Revalued Property</u>.    For Federal income tax purposes, any income, gain, loss or deduction with respect to property contributed by a Partner to the Partnership that has a fair market value different from its adjusted basis for Federal income tax purposes shall be allocated among the Partners in accordance with Code Section 704(c) and the Regulations Section 1.704-3, using any method prescribed in Regulations Section 1.704-3 determined by the General Partner.    With respect to any Partnership asset that is revalued pursuant to the terms hereof, subsequent allocations of income, gain, loss and deduction with respect to the asset shall take into account any variation between the adjusted basis of such asset for Federal income tax purposes and its fair market value at the time of revaluation in the same manner as under Code Section 704(c) and Regulations Section 1.704-3, using any method prescribed therein as determined by the General Partner.

3.10    <u>Varying Interest</u>.    In the event of the transfer of an Interest during a Fiscal Year, or in the event that a Partner's percentage interest changes during a Fiscal Year, the Net Profits, Net Losses or items of income, gain, loss or deduction allocated for the Fiscal Year during which the transfer occurs shall (a) be prorated between the transferor and transferee as of the date of the transfer, or (b) be prorated between the portion of the Fiscal Year prior to the change in percentage interest and the portion of the Fiscal Year after the change, using any method that the Partnership determines in good faith reasonably and fairly represents the portion of the Net Profits, Net Losses or items of income, gain, loss and deduction properly allocable to the Partners.

3.11    <u>Tax Items</u>.    Except as otherwise provided herein, any allocation to a Partner of a portion of the Net Profits, Net Losses or items of income, gain, loss or deduction for a Fiscal Year shall be deemed to be an allocation to that Partner of the same proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Partnership for Federal income tax purposes.    In addition, all items of gain or loss recognized from the sale, exchange or other disposition of Tax Liens (including closing a position or determining a lien or property worthless) or Securities in any tax period will generally be allocated among the Partners, so that to the extent possible, consistent with a fair allocation of such items of gain or loss among all of the Partners, each Partner's gain or loss for tax purposes is equal to the amount of gain or loss allocated to his Capital Account in respect of such transactions.

3.12    <u>Stuffing Provision</u>.    As of the close of each Fiscal Year, the capital gains and capital losses of the Partnership shall be allocated to the Partner's Capital Account so as to

minimize, to the extent possible, any disparity between the "book" Capital Account and the "tax" Capital Account, consistent with the principles set forth in section 704 of the Code. To the extent permitted by the Treasury Regulations (or successor regulations) in effect under Code Sections 704(b) and 704(c), allocations of capital gain that have been realized up to the time a Capital Account was completely withdrawn may be allocated first to each Capital Account that was completely withdrawn during the applicable Fiscal Year to the extent that the "book" Capital Account as of the Withdrawal Date exceeds the "tax" Capital Account at that time, and allocations of capital loss that have been realized up to the time a Capital Account is completely withdrawn may be allocated first to each Capital Account that was completely withdrawn during the applicable Fiscal Year to the extent that the "tax" Capital Account as of the Withdrawal Date exceeded the "book" Capital Account of such Capital Account at that time. Notwithstanding anything herein to the contrary, capital gain or capital loss recognized with respect to Tax Liens or Securities contributed to the Partnership, if any, shall be specifically allocated to the contributing Partner in the amount and manner required by Code Section 704(c) and the regulations thereunder, and, to the extent so allocated, shall be excluded from the computation of the Partnership's capital gain or capital loss, as applicable, for the relevant fiscal year.

## ARTICLE IV – DISTRIBUTIONS OF CASH FLOWS; WITHDRAWALS

    4.01    <u>Withdrawals of Limited Partners' Capital Account</u>.

    (a)    Beginning one year from the date a Capital Account is established for a Limited Partner (such period, the "***Lock-Up Period***"), a Limited Partner will be generally permitted to make withdrawals from its Capital Account as of the last business day of any calendar quarter, or such other date as the General Partner may determine, in its sole discretion (each such date, a "***Withdrawal Date***") subject to the provisions of this *Section 4.01*, by delivering to the General Partner a request in writing for withdrawal in the form of *Appendix A* to the Subscription Agreement *provided that* the Partnership receives notice of such withdrawal not less than 90 days prior to the applicable Withdrawal Date. Solely for purposes of determining the Lock-Up Period, there shall be established a separate Capital Account for each capital contribution made by a Limited Partner. Withdrawals may be permitted prior to the expiration of the Lock-Up Period applicable to a Limited Partner in the sole and absolute discretion of the General Partner, in which case the Limited Partner requesting such withdrawal shall be subject to an early withdrawal penalty equal to 5% of the withdrawal proceeds to which such Limited Partner would otherwise be entitled (the "***Early Withdrawal Penalty***"). The Early Withdrawal Penalty may be reduced by the General Partner in its sole discretion. Any amount paid as an Early Withdrawal Penalty shall be an asset of the Partnership. In the event of a partial withdrawal, a Limited Partner must withdraw a minimum of $25,000, and shall maintain a minimum Capital Account balance, after giving effect to the withdrawal, of not less than $100,000. A Limited Partner failing to maintain the minimum Capital Account balance may be required to withdraw the balance of its Capital Account at any time without notice. The General Partner, in its sole discretion, may waive these minimum amounts.

(b)    Payments for withdrawals are generally made within 10 days of the applicable Withdrawal Date; *provided, however*, in the event a Partner withdraws 90% or more of the balance of such Partner's Capital Account (or if a withdrawal, when combined by all other withdrawals effected by such Partner during the preceding 12 months, would result in such Partner having withdrawn 90% or more of the sum of (i) the aggregate amount of all prior withdrawals during such 12 month period, and (ii) such Partner's Capital Account balance as of the date of the most recent withdrawal request), a portion (generally not to exceed 5%) of the withdrawal payment will be retained in the General Partner's discretion pending completion of the audit of the Partnership's annual financial statements for the Fiscal Year in which the applicable Withdrawal Date occurs. Payment of any amounts in respect of a withdrawal pursuant to this *Section 4.01(b)* shall be net of any accrued but unpaid Management Fee and, if applicable, any earned Performance Allocation on the withdrawn portion of the applicable Limited Partner's Capital Account.

(c)    The General Partner may in its sole discretion require or permit any Partner, for any reason or no reason and at any time, with or without notice, to effect a complete or partial withdrawal of amounts contained in his Capital Account in accordance with the procedures outlined in this *Section 4.01* except that in such case (i) any dollar limitations may be waived by the General Partner and (ii) the General Partner may, in its sole and absolute discretion, distribute to such Partner up to 100% of his Capital Account at any time prior to the date on which that Partner would have been entitled to receive such a distribution had the Partner properly requested such a complete withdrawal. The undistributed remainder, if any, of such a Capital Account shall be distributed pursuant to the provisions of *Section 4.01(b)*.

(c)    Any Partner who effects a withdrawal during a Fiscal Year shall be obligated upon notice by the General Partner to reimburse the Partnership in Cash or immediately available funds for any overpayment made pursuant to such withdrawal, as determined after completion of the annual accounting of the Partnership's books for that Fiscal Year and after any adjustments to the Capital Accounts of the Partners as are necessary in light of accounting; *provided, however*, that such reimbursement shall be required only to the extent that the overpayment exceeded the aggregate of any amount retained by the Partnership and any balance remaining in such Partner's Capital Account at the time of such determination. Any obligation of a Partner arising under the provisions of this section to reimburse the Partnership for an overpayment shall terminate unless notice of the amount of the overpayment and a reasonable explanation of the calculation of such overpayment amount has been given on or before the 30th day following completion of the audit of the Partnership's annual financial statements for the Fiscal Year in which the subject withdrawal was made.

(d)    At the discretion of the General Partner, any withdrawal by a Limited Partner may be subject to a charge, as the General Partner may reasonably require, in order to defray the costs and expenses of the Partnership in connection with such withdrawal including, without limitation, any charges or fees imposed by any Partnership investment in connection with a corresponding withdrawal or redemption by the

Partnership from such investment or any other costs associated with the sale of any of the Partnership's portfolio investments.

(e)    If aggregate withdrawal requests are received for a particular Withdrawal Date for more than 25% of the Net Asset Value of the Partnership or any Class of such Withdrawal Date, the General Partner may, in its discretion, reduce all withdrawal requests for the Partnership or any Class for such Withdrawal Date *pro rata* in proportion to the amount sought to be withdrawn by each withdrawing Partner so that only 25% of the Net Asset Value of the Partnership or any Class as of such Withdrawal Date is withdrawn (the "***Gate***").    The Gate may be waived with respect to certain Limited Partners whose remaining Capital Account would otherwise be less than the minimum Capital Account required by the Partnership.    To the extent that any Partner's request has been reduced by the Gate, such request shall be satisfied as of the end of the next Withdrawal Date (and if not fully satisfied as of that date because of the Gate, then as of the next Withdrawal Date and, if necessary, successive Withdrawal Dates), each time subject to the Gate.    Any deferred withdrawal requests shall be treated in priority to withdrawal requests received for Withdrawal Dates subsequent to the initial Withdrawal Date at which the deferred request would have been effected in the absence of the Gate. Any unsatisfied portion of any such withdrawal requests shall continue to be at risk in the Partnership's business until the effective date of the withdrawal.

4.02    <u>Withdrawals of General Partner's Capital Account</u>.

(a)    Except as set forth elsewhere in this *Section 4.02*, the General Partner shall have the same withdrawal rights as a Limited Partner.

(b)    If the General Partner provides not less than 90 days prior notice to each Limited Partner of its intent to resign as general partner of the Partnership or is disqualified pursuant to *Section 4.06* hereof, the Partnership shall dissolve and thereafter conduct only those activities necessary to wind up its affairs in accordance with the provisions of *Article IX* hereof, unless within 90 days after receipt of notice of such resignation or disqualification Limited Partners representing a majority of the Allocation Percentages of all Limited Partners vote to continue the Partnership and in connection therewith appoint a successor general partner.    For the avoidance of doubt, if no successor general partner is appointed and the Partnership dissolves, all unsatisfied withdrawal requests and pending distributions shall be postponed until the completion of the winding up of the Partnership and a final accounting pursuant to *Article IX*.

(c)    If the Limited Partners appoint a successor general partner in accordance with paragraph (b) above, the Partnership shall pay to the General Partner or its legal representatives the General Partner's ending Capital Account balance (after computation of any applicable Performance Allocation) within 30 days of the appointment of such successor general partner (and the date of such appointment shall be deemed the end of an Accounting Period for all purposes under this Agreement); *provided however*, that a portion (generally not to exceed 5%) of the withdrawal payment will be retained pending

completion of the audit of the Partnership's annual financial statements for the Fiscal Year in which the appointment of such successor general partner occurs.

(d)     Notwithstanding the foregoing, this *Section 4.02* shall not apply in the event that, after a withdrawal of the General Partner pursuant to paragraph (a) above or the disqualification of the General Partner pursuant to *Section 4.06*, the General Partner is succeeded by an affiliate of the General Partner pursuant to *Section 2.01(b)* or its Interest is transferred in a transaction that does not require the consent of the Limited Partners pursuant to *Section 8.05* hereof.

4.03     <u>Limitations on Withdrawals</u>.  The General Partner may suspend the right of withdrawal or postpone the date of payment for any period during which (i) there exists a state of affairs that constitutes a state of emergency, as a result of which disposal of the Tax Liens owned by the Partnership is not reasonably practicable or it is not reasonably practicable to determine fairly the value of its assets, (ii) a breakdown occurs in any of the means normally employed in ascertaining the value of a substantial part of the assets of the Partnership or when for any other reason the value of such assets cannot reasonably be ascertained, or (iii) a delay is reasonably necessary, as determined in the reasonable discretion of the General Partner, in order to effectuate an orderly liquidation of the Partnership's investments in a manner that does not have a material adverse impact on the Partnership or the non-withdrawing Limited Partners.  The General Partner shall provide notice of such suspension of the right of withdrawal to each Limited Partner within 5 days of the occurrence of such suspension. At the conclusion of such period, the General Partner shall resume permitting withdrawals otherwise permitted pursuant to this *Article IV* and shall resume any payments pursuant to such withdrawals as soon as reasonably practicable.

4.04     <u>Distributions</u>.  Except as otherwise set forth in this *Article IV*, a Partner who has satisfied the applicable notice requirements set forth herein with respect to withdrawal requests shall receive a distribution (or distributions) in Cash in accordance with the provisions of *Section 4.01(b)*.

4.05     <u>Withholding from Distributions</u>.  The General Partner may establish reserves for expenses, liabilities or contingencies (including those not addressed by GAAP) arising from events occurring during the period of time during which a withdrawing Limited Partner was a Limited Partner of the Partnership including, without limitation, contingent liabilities relating to pending or anticipated litigation, IRS audits or other governmental proceedings, which could reduce the amount of a distribution upon withdrawal.  All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Partnership or to the Partners shall be treated as amounts distributed to the Partners pursuant to this *Article IV* for all purposes of the Agreement.  The Partnership is authorized to withhold from distributions, or with respect to allocations, to the Partners and to pay over to any federal, state or local government any amount required to be withheld pursuant to the Code or any provisions of any other federal, state or local law and may allocate any such amounts among the Partners in any manner that is in accordance with applicable law.  If there are any assets that, in the judgment of the General Partner, cannot be valued properly until sold or realized or cannot be sold without sacrificing a substantial portion of the value thereof, such

assets may be excluded from the valuation of assets for purposes of computing the amount available for distribution to a Limited Partner upon withdrawal of any portion of its Capital Account pursuant to this *Article IV*. Any Partner's *pro rata* interest in such assets shall not be paid until such time as the General Partner, in its sole and absolute discretion, determines that circumstances no longer require such assets to be so excluded (in whole or in part). If there is any contingent liability of the Partnership or any pending transaction or claim by the Partnership as to which the withdrawing Partner's share of such liability or claim cannot, in the judgment of the General Partner, then be determined, the probable loss or liability, or value of the claim, as the case may be, may be excluded from the valuation of assets or liabilities for purposes of computing the amount owing to any Partner upon its withdrawal pursuant to this *Article IV*. No amount shall be paid or charged to any such Partner's Capital Account on account of any such contingency, transaction or claim until its final settlement or such earlier time as the General Partner shall determine. The Partnership may retain from sums otherwise due such Partner an amount that the General Partner estimates to be sufficient to cover the share of such Partner of any probable loss or liability on account of such contingency, or the probable value of the transaction or claim. Any amount so withheld from a Partner shall be held in a segregated interest-bearing account (which may be commingled with similar accounts of other Partners). Any unused portion of such reserve shall be distributed with interest accrued thereon once the General Partner has determined that the need therefor has ceased. Upon determination by the General Partner that circumstances no longer require the exclusion of assets or retention of sums as provided in this *Section 4.05*, the General Partner shall, at the earliest practicable time, pay such sums or the proceeds realized from the sale of such assets to each Partner from whom such sums or assets have been withheld.

4.06    Disqualification.

(a)    For the purposes of this Agreement, a Partner shall be deemed to be "disqualified" upon the occurrence of any of the following events:

(i)    If the Partner is a natural person, upon his death, his adjudication as an incompetent, his becoming bankrupt or adjudicated insolvent, or his making an assignment for the benefit of creditors, or solely with respect to the General Partner, if a Key Man Event occurs; or

(ii)    If the Partner is not a natural person, upon its voluntary dissolution or liquidation, its bankruptcy or adjudication of insolvency, its making an assignment for the benefit of creditors, or its becoming subject to involuntary reorganization or liquidation proceedings and such proceedings not being dismissed within 90 days after filing.

(b)    Neither the withdrawal nor the disqualification of a Limited Partner shall dissolve the Partnership. Upon the disqualification of a Limited Partner, the successor-in-interest of the Limited Partner shall become a transferee of the Limited Partner and be credited or paid, or charged with, as the case may be, all further allocations and distributions on account of the Interest of the disqualified Limited Partner; *provided*, no

such successor-in-interest shall become a substituted Limited Partner without first obtaining the written consent of the General Partner, whose consent may be withheld for any or no reason, and without complying with the provisions of *Section 8.02* hereof.

(c)     The disqualification of the General Partner shall cause the dissolution of the Partnership unless a successor general partner is appointed in accordance with the terms of *Section 4.02* hereof.  For purposes of this *Section 4.06(c)*, if the Principal becomes disqualified within the meaning of *Section 4.06(a)* above, the General Partner will be deemed to be disqualified as well.

4.07     Status of Withdrawn Partner.  From and after the effective Withdrawal Date applicable to a Partner who has withdrawn all or any portion of its Capital Account, such Partner shall be deemed a creditor of the Partnership with respect to the withdrawn portion after all adjustments to such Capital Account pursuant to *Article III* and any applicable limitations set forth in this *Article IV* to the extent that such withdrawn portion has not been distributed to such Partner pursuant to *Section 4.04* hereof.  Such Partner shall thereafter be deemed a Partner only to the extent that such Partner withdraws less than all of its Capital Account.

## ARTICLE V – POWERS, DUTIES AND RIGHTS OF GENERAL PARTNER

5.01     Management of the Partnership.  The assets, affairs and operations of the Partnership shall be managed by the General Partner.

5.02     Powers of General Partner.  All references herein to any action to be taken by the Partnership shall mean action taken in the name of the Partnership and on its behalf by the General Partner.  Except as otherwise provided in this Agreement, the General Partner will have exclusive management and control of the business of the Partnership and will (except as otherwise provided in any other agreements) make all decisions affecting the Partnership and the Partnership's assets.  Notwithstanding any other provision of this Agreement, the General Partner will not change the investment strategy of the Partnership from that described in the Partnership's confidential private placement memorandum accompanying this Agreement without the consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time.  In addition to the rights, powers, and authority granted elsewhere in this Agreement and by law, the General Partner will have the right, power, and authority to obligate and bind the Partnership and, on behalf of and in the name of the Partnership, to take any action of any kind and to do anything it deems necessary or advisable in pursuit of the Partnership's purposes, including, without limitation, the following:

(a)     To purchase, hold, sell, sell short, lend, borrow or otherwise deal in Tax Liens (through financing or otherwise) or Securities (including to "write" put and call options), and in furtherance of the foregoing, to:

(i)     Exercise all rights, powers, privileges and other incidents of ownership with respect thereto;

(ii)     Acquire a long or short position with respect to any Security and to make purchases or sales increasing, decreasing or liquidating such position, without any limitations as to the frequency of the

fluctuation in such positions or as to the frequency of the changes in the nature of such positions;

(iii)   Enter into contracts for or in connection with investments in Tax Liens;

(iv)   Liquidate Tax Liens that have been distributed to the Partnership

(v)   Delegate the authority to engage in such activities as to some or all of the Partnership's assets to one or more investment managers, and to pursue such activities through investment in one or more pooled investment vehicles;

(b)   To borrow funds on behalf of the Partnership and to pledge and hypothecate Tax Liens, Securities and other assets of the Partnership for such loans, and to lend (with or without security) any Tax Liens, Securities or other assets of the Partnership;

(c)   To open, maintain, conduct, and close accounts, including margin accounts with broker-dealers, and with banks or other custodians for Partnership assets, each as selected by the General Partner, and to draw checks or other orders for the payment of money by the Partnership, and in furtherance of the foregoing, to:

(i)   Issue instructions and authorizations to broker-dealers or custodians regarding Tax Liens and/or money held in accounts of the Partnership with such broker-dealers or custodians;

(ii)   Enter into prime broker agreements, clearing agreements, custodial agreements, margin account agreements and agreements with executing brokers;

(iii)   Combine purchases or sales of Tax Liens on behalf of the Partnership and Classes with purchases and sales for the Other Accounts and allocate Tax Liens or other assets so purchased or sold, on an average-price basis or by any other method of fair allocation, among such accounts; and

(iv)   Enter into arrangements with broker-dealers and custodians to open average price accounts wherein orders placed during a trading day are placed on behalf of the Partnership and Other Accounts and are allocated among such accounts using an average price;

(d)   To employ from time to time, at the expense of the Partnership, persons required for the Partnership's business, accountants, attorneys, financial consultants, and others (who may be affiliated with the General Partner) on such terms and for such compensation as the General Partner determines to be reasonable; and to give receipts, releases, indemnities, and discharges with respect to all of the foregoing and any matter incident thereto as the General Partner may deem advisable or appropriate;

(e)    To engage in any transaction with the General Partner's affiliates to the extent permitted by applicable securities laws (including, without limitation, the ability to effect on behalf of the Partnership any "agency cross transaction" (as contemplated in Rule 206(3)-2 under the Investment Advisers Act of 1940, as amended) through the General Partner or any affiliate of the General Partner that is registered as a broker or dealer);

(f)    To purchase, from or through others, contracts of liability, casualty and other insurance which the General Partner deems advisable, appropriate or convenient for the protection of the Tax Liens acquired by the Partnership or other assets or affairs of the Partnership or for any purpose convenient or beneficial to the Partnership, including policies of insurance insuring the General Partner and/or the Partnership against liabilities that may arise out of the General Partner's management of the Partnership;

(g)    To make all tax elections required or permitted to be made by the Partnership, including elections under Section 754 of the Code;

(h)    To file, conduct and defend legal proceedings of any form, including proceedings against Partners, and to compromise and settle any such proceedings, or any claims against any person, including claims against Partners, on whatever terms deemed appropriate by the General Partner;

(i)    To admit Limited Partners or additional or successor General Partners to the Partnership and to remove Limited Partners;

(j)    To waive or reduce, in whole or in part, any notice period, minimum amount requirement, or other limitation or restriction imposed on capital contributions or withdrawals of capital; waive, reduce or, by agreement with any Limited Partner, otherwise vary any fee or special allocation to the General Partner, and/or any requirement imposed on that Limited Partner by this Agreement.  The General Partner will have such right, power and authority regardless of whether such notice period, minimum amount, limitation, restriction, fee, or special allocation, or the waiver or reduction thereof, operates for the benefit of the Partnership, the General Partner or fewer than all the Limited Partners;

(k)    To retain persons, firms or entities, including without limitation affiliates of the General Partner, selected by the General Partner to provide certain management and administrative services to the Partnership and to cause the Partnership to compensate such Persons for such services in accordance with the terms of investment management agreements pursuant to which such investment manager will have discretionary investment authority over the Partnership's assets;

(k) To amend this Agreement in accordance with *Section 11.05*;

(l)    To authorize any member, officer, employee or other agent of the General Partner to act for and on behalf of the Partnership in all matters incidental to the foregoing;

(m)    To do any and all acts on behalf of the Partnership as it may deem necessary or advisable in connection with, or incidental to the accomplishment of, the purposes of the Partnership or the maintenance and administration thereof; and

(n)    To issues additional classes of interests

5.03    <u>Consent of the Partners</u>.  Notwithstanding *Section 5.02* to the contrary, without the consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time, in no event shall the General Partner take any action outside the scope of the purposes of the Partnership.

5.04    <u>Duties of General Partner</u>.  Subject to the limitations in *Section 5.03*, the General Partner shall be charged with the full responsibility for managing and promoting the Partnership's purpose and business.  The General Partner shall devote its diligent efforts to the business and affairs of the Partnership, including such time as shall be required, in the reasonable opinion of the General Partner, for the proper conduct of the business of the Partnership.  The General Partner shall not assign its duties under this Agreement except pursuant to the terms of *Section 8.05* hereof.  The General Partner shall have authority in its sole discretion to delegate any responsibilities hereunder to third parties with whom it contracts to provide services on behalf of the Partnership.  No such delegation shall relieve the General Partner from its duties or obligations hereunder.

5.05    <u>Other Activities of the General Partner</u>.  The General Partner and its affiliates, shareholders, members, partners, managers, directors, officers and employees (collectively, the "***Affiliated Persons***") will only devote so much time to the affairs of the Partnership as is reasonably required in the judgment of the General Partner.  The Affiliated Persons will not be precluded from engaging directly or indirectly in any other business or other activity, including exercising investment advisory and management responsibility and buying, selling or otherwise dealing with Tax Liens and other investments for their own accounts, for the accounts of family members, for the accounts of other funds and for the accounts of individual and institutional clients (collectively, "***Other Accounts***").  Such Other Accounts may have investment objectives or may implement investment strategies similar to those of the Partnership.  The Affiliated Persons may also have investments in certain of the Other Accounts.  Each of the Affiliated Persons may give advice and take action in the performance of their duties to their Other Accounts that could differ from the timing and nature of action taken with respect to the Partnership.  The Affiliated Persons will have no obligation to purchase or sell for the Partnership any investment that the Affiliated Persons purchase or sell, or recommend for purchase or sale, for their own accounts or for any of the Other Accounts.  The Partnership will not have any rights of first refusal, co-investment or other rights in respect of the investments made by Affiliated Persons for the Other Accounts, or in any fees, profits or other income earned or otherwise derived from them.  If a determination is made that the Partnership and one or more Other Accounts should purchase or sell the same investments at the same time, the Affiliated Persons will allocate these purchases

and sales as is considered equitable to each. No Limited Partner will, by reason of being a Limited Partner of the Partnership, have any right to participate in any manner in any profits or income earned or derived by or accruing to the Affiliated Persons from the conduct of any business or from any transaction in investments effected by the Affiliated Persons for any account other than that of the Partnership.

     5.06   <u>Compensation and Reimbursement</u>.

     (a)    A management fee (the "***Management Fee***") is paid quarterly in arrears to the General Partner. The Management Fee is equal to 0.25% (1% *per annum*) of the closing Capital Account balance of each Limited Partner for such calendar quarter. The Management Fee will be appropriately prorated to reflect any capital contributions which occur during a calendar quarter. The Capital Account of a Limited Partner making a withdrawal other than the last day of a calendar quarter (whether pursuant to ordinary withdrawal rights or where the special consent of the General Partner is required and, in its discretion, granted, in either case under *Article IV* of this Agreement) will be charged a *pro rata* portion of the Management Fee immediately prior to such withdrawal based on the number of days elapsed during such quarter and the portion withdrawn from such Capital Account. The General Partner may, in its sole discretion, enter into arrangements with Limited Partners under which the Management Fee is reduced, waived or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make a substantial investment or otherwise are determined by the General Partner in its sole discretion to represent a strategic relationship.

     (b)    All expenses of the Offering and organization of the Partnership (including legal and other expenses) ("***Organizational Expenses***") will be paid by the Partnership and/or reimbursed by the Partnership to the extent paid by the General Partner. Beginning when the Partnership commences operation, the Organizational Expenses will be amortized and charged to the Partners' Capital Accounts on a monthly basis over a period of five years. The General Partner believes that the impact on the Partnership's results from this departure from GAAP will result in a fairer apportionment of such expenses among Limited Partners. This departure from GAAP may also result in a qualified audit opinion from the Partnership's auditors. If the Partnership is terminated within five years of the commencement of investment activities, any unamortized expenses will be recognized.

     (c)    The Partnership shall pay for all ordinary operating and other expenses, including, but not limited to, investment-related expenses (*e.g.*, brokerage commissions, clearing and settlement charges, custodial fees, interest expenses, expenses relating to consultants, brokers or other professionals or advisors who provide research, advice or due diligence services with regard to investments, appraisal fees and expenses, and investment banking expenses); research costs and expenses (including fees for news, quotation and similar information and pricing services); legal expenses (including, without limitation, the costs of on-going legal advice and services, blue sky filings and all

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 119
RECEIVED NYSCEF: 01/11/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 671 of 2230

costs and expenses related to or incurred in connection with the General Partner's compliance obligations under applicable federal and/or state securities and investment adviser laws arising out of its relationship to the Partnership, as well as extraordinary legal expenses, such as those related to litigation or regulatory investigations or proceedings); the Management Fee; accounting fees and audit expenses; administrative fees; tax preparation expenses and any applicable tax liabilities (including transfer taxes and withholding taxes); other governmental charges or fees payable by the Partnership; director and officer and/or errors and omissions liability insurance premiums or fiduciary liability insurance premiums for directors, officers and personnel of the General Partner; costs of printing and mailing reports and notices; and other similar expenses related to the Partnership, as the General Partner determines in its sole discretion. As an investor in the Partnership, the Offshore Fund (and therefore each investor in the Offshore Fund) bears its proportionate share of the expenses of the Partnership, as calculated at the Partnership level. The expenses of the Offshore Fund shall be paid by the Partnership. Each Class will be charged for its proportionate share of all Partnership expenses.

5.07    <u>Reliance on Authority of General Partner</u>. No Person dealing with the General Partner or the Partnership shall be required to determine the authority of the General Partner to make any undertaking on behalf of the Partnership or to determine any fact or circumstance bearing upon the existence of such authority. No purchaser of any property or interest owned by the Partnership shall be required to determine the sole and exclusive authority of the General Partner to execute and deliver, on behalf of the Partnership, any and all documents and instruments in connection therewith or to see to the application or distribution of revenues or proceeds paid or credited in connection therewith.

5.08    <u>Limitation of Liability; Indemnification</u>.

(a)    The General Partner and each Affiliated Person shall not be liable, responsible nor accountable in damages or otherwise to the Partnership or any Partner, or to any successor, assignee or transferee of the Partnership or of any Partner, for (i) any acts performed or the omission to perform any acts, within the scope of the authority conferred on the General Partner by this Agreement, except by reason of acts or omissions found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence; (ii) performance by the General Partner of, or the omission to perform, any acts on advice of legal counsel, accountants, or other professional advisors to the Partnership; (iii) the negligence, dishonesty, bad faith, or other misconduct of any consultant, employee, or agent of the Partnership, including, without limitation, an Affiliated Person of the General Partner, selected or engaged by the General Partner with reasonable care and in good faith; or (iv) the negligence, dishonesty, bad faith, or other misconduct of any Person in which the Partnership invests or with which the Partnership participates as a partner, joint venturer, or in another capacity, which was selected by the General Partner with reasonable care and in good faith. The General Partner and each Affiliated Person shall not be liable to the Partnership or to any Partner, or any successors, assignees, or transferees of the Partnership or any Partner, for any loss, damage, expense, or other liability due to any cause beyond its reasonable control,

including, but not limited to, strikes, labor troubles, riots, fires, blowouts, tornadoes, floods, bank moratoria, trading suspensions on any exchange, acts of a public enemy, insurrections, acts of God, acts of terrorism, failures to carry out the provisions hereof due to prohibitions imposed by law, rules, or regulations promulgated by any governmental agency, or any demand or requisition by any government authority. Nothing the Partnership Agreement or this Offering Memorandum may be interpreted to limit or modify the General Partner's fiduciary duty to the Limited Partners not waive any right or remedy a Limited Partner may have under federal or state securities laws. Federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith.

(b)     To the fullest extent permitted by law, the Partnership, in the General Partner's sole discretion, shall indemnify and hold harmless the General Partner and each Affiliated Person and the legal representatives of any of them (an "*Indemnified Party*"), from and against any loss, liability, damage, cost or expense suffered or sustained by an Indemnified Party by reason of (i) any acts, omissions or alleged acts or omissions arising out of or in connection with the Partnership, this Agreement or any investment made or held by the Partnership (including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim), *provided that* such acts, omissions or alleged acts or omission upon which such actual or threatened action, proceeding or claim are based are not found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct, or gross negligence by such Indemnified Party, or (ii) any acts or omissions, or alleged acts or omissions, of any broker or agent of any Indemnified Party, *provided that* such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with reasonable care.

(c)     The Partnership shall, in the sole discretion of the General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct.   In the event that such an advance is made by the Partnership, the Indemnified Party shall agree to reimburse the Partnership for such fees, costs and expenses to the extent that it shall be determined that it was not entitled to indemnification under this Section.

(l)     Notwithstanding any of the foregoing to the contrary, the provisions of this Section 5.08 shall not be construed so as to provide for the indemnification of the General Partner or any Affiliated Person for any liability (including liability under federal or state securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 5.08 to the fullest extent permitted by law.

## ARTICLE VI – POWERS, RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

6.01    <u>Powers and Rights</u>.  Except as expressly set forth herein, the Limited Partners shall not take part in, or interfere in any manner with, the conduct or control of the Partnership business, or have any right or authority to act or sign for, or to obligate the Partnership.  The Limited Partners shall not at any time be entitled to withdraw all or any part of their contribution to the capital of the Partnership except to the extent they are entitled to withdrawals pursuant to the provisions of *Article IV* hereof.  Except as expressly set forth herein, the Limited Partners shall have no right to amend or terminate the Partnership, or to appoint, select, vote for or remove the General Partner or its agents, or to otherwise participate in the business decisions of the Partnership.  The Limited Partners shall have no right to demand and receive any property other than Cash in return for their contributions, and, prior to the dissolution and liquidation of the Partnership pursuant to *Article IX* hereof, their right to Cash shall be limited to the rights set forth in *Article IV* hereof.

6.02    <u>BHCA Subject Persons</u> Notwithstanding any other provision of this Agreement to the contrary, solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the Partnership a written notice to the General Partner of its election not to be treated as a BHCA Subject Person, and shall not thereafter have given the Partnership a notice of revocation of such election, and that at any time has an Allocation Percentage in excess of 4.9% of the aggregate Allocation Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold an Allocation Percentage of only four and nine-tenths percent of the aggregate Allocation Percentages of the Limited Partners (after giving effect to the limitations imposed by this *Article VI* on all such Limited Partners), and such Allocation Percentage in excess of said four and nine-tenths percent shall be deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Allocation Percentages; *provided that* this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of the Agreement up to the full amount of its Allocation Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the affected Interest.  The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; *provided, however*, that the foregoing voting restriction shall not continue to apply if the Interest is transferred: (i) to the Partnership; (ii) to the public in an offering registered under the Securities Act of 1933, as amended (the "***Securities Act***"); (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no person acquires more than 2% of the aggregate Capital Account balances of the Limited Partners; or (iv) in a single transaction to a third party who acquires at least a majority of the aggregate Capital Account balances of the Limited Partners without regard to the transfer of Interests to which such Capital Accounts relate.

## ARTICLE VII – ACCOUNTING, BOOKS AND RECORDS; REPORTS TO PARTNERS

7.01   <u>Accounting Methods</u>.   The General Partner shall prepare the accounting statements for the Partnership on an accrual basis in accordance with GAAP and shall be empowered to make any changes of accounting method that it shall deem advisable.

7.02   <u>Books and Records</u>.  The General Partner shall keep or cause to be kept, at the Partnership's expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts, Net Profits and Net Losses for each Class, the respective Capital Accounts of the Partners and such other matters required by the Act.  Such books of account shall be the property of the Partnership, shall be kept in accordance with sound accounting principles and procedures consistently applied, and shall be open to the reasonable inspection and examination of the Partners or their duly authorized representatives upon notice to the General Partner.  The books of account shall be maintained at the principal office of the General Partner or at the office of the Partnership's accounting or administrative firm, as determined by the General Partner in its sole discretion. Notwithstanding the foregoing, however, the General Partner is not obligated to show any Partners records detailing the actual Tax Liens purchased or sold by the Partnership. Information regarding the Partnership's trading and specific investments is proprietary

7.03   <u>Tax Matters Partner</u>.  The General Partner is hereby designated as the "tax matters partner," pursuant to Code Section 6231 and the Regulations thereunder.  The tax matters partner shall represent the Partnership in all Federal income tax matters, and shall hire attorneys, accountants and other professionals at Partnership expense, as it deems necessary to defend the positions taken by the Partnership for Federal income tax purposes.

7.04   <u>Reports to Partners</u>.  The General Partner will furnish audited financial statements to all Limited Partners within 120 days, or as soon thereafter as is reasonably practicable, following the conclusion of each Fiscal Year, although the General Partner may elect to postpone the first audit of the Partnership's annual financial statements until the completion of the Fiscal Year after the Fiscal Year in which the Partnership commenced investment activities, in which case the initial audit will cover the applicable Fiscal Year as well as the partial "stub" year in which the Partnership commenced operations.  Financial statements will include a balance sheet or statement of financial condition, an income statement or statement of operations, and a cash flow statement.  In addition, all Limited Partners will receive the information necessary to prepare federal and state income tax returns following the conclusion of such Fiscal Year as soon thereafter as is reasonably practical.

All Limited Partners will also receive unaudited performance reports and such other information as the General Partner determines on a monthly basis.  With regard to these reports, the General Partner is not required to provide information about specific investment transactions of the Partnership.

7.05   <u>Preparation of Reports</u>.  In the preparation of any reports required to be delivered pursuant to *Section 7.04*, Tax Liens shall be valued at their Fair Market Value, and any change in such Fair Market Value shall be treated as an item of Net Profit or Net Loss.

7.06    Adjustment of Tax Basis.  In the event of a transfer of an Interest in accordance with the terms of this Agreement, upon the request of any Partner, the General Partner shall cause the Partnership to elect, pursuant to Section 754 of the Code ("**Section 754 Election**"), to adjust the basis of the Partnership property if (a) the effect of such adjustment is to increase the adjusted basis of Partnership property and (b) such requesting Partner agrees to bear any additional expense attributable to accounting and recordkeeping required as a result of the Partnership's Section 754 Election.

## ARTICLE VIII –TRANSFER AND ASSIGNMENT OF PARTNERSHIP INTERESTS

8.01    General Prohibition.  No Limited Partner shall assign, convey, sell, transfer, encumber or in any way alienate all or any part of his Interest without the prior written consent of the General Partner, which consent may be withheld in the General Partner's sole and absolute discretion.

8.02    Requirements upon Transfer.  Any transfer of an Interest permitted under *Section 8.01* hereof or any other provision of this Agreement shall be subject to the following:

(a)    The permitted transferee shall have executed a written agreement, in form and substance reasonably satisfactory to the General Partner, to assume all of the duties and obligations of the transferor Limited Partner under this Agreement and to be bound by and subject to all of the terms and conditions of this Agreement;

(b)    The transferor Partner and the transferee shall have executed a written agreement, in form and substance reasonably satisfactory to the General Partner, to indemnify and hold the Partnership and the Partners harmless from and against any liabilities, losses, costs and expenses arising out of the transfer, including, without limitation, any liability arising by reason of the violation of any securities laws of the United States, any State of the United States, or any foreign country;

(c)    The transferor Partner has delivered to the General Partner an opinion of counsel reasonably acceptable to the General Partner that such transfer would not violate the Securities Act, as amended, or any blue sky laws (including any investor suitability standards);

(d)    The transferor Partner demonstrates that such transfer, when added to the total of all other sales or exchanges of Interests within the preceding 12 months, would not result in the Partnership being considered to have terminated within the meaning of Section 708 of the Code and that such transfer will not result in the Partnership being treated as a publicly-traded partnership within the meaning of Section 7704 of the Code;

(e)    The transferor Partner has demonstrated that such transfer will not cause the assets of the Partnership to be "plan assets" for purposes of ERISA;

(f) The transferee shall have executed a power of attorney substantially identical to that contained in *Article X* hereof, and shall execute and swear to such other documents and instruments as the General Partner may deem necessary to effect the admission of the transferee as a Partner;

(g) The transferee shall have executed, in favor of the Partnership and the General Partner, an instrument containing representations by such transferee substantially identical to the representations and investment qualifications of the Limited Partner set forth in the Subscription Agreement;

(h) The transferee shall have paid the reasonable expenses incurred by the Partnership in connection with the admission of the transferee to the Partnership; and

(i) The transferee shall only effect a transfer on the first business day of any calendar month.

8.03  Unauthorized Transfer.  Any purported transfer of an Interest not expressly permitted by this *Article VIII* or consented to by the General Partner shall be null and void and of no effect whatsoever.

8.04  Interest of the Transferee.  In the event that a Limited Partner shall have obtained the consent of the General Partner to a transfer of all or a portion of its Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that the Capital Account relates to the transferred Interest.

8.05  General Partner Transfers.  Without the approval of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners on the relevant date of determination, the General Partner may not transfer its Interest as General Partner in the Partnership; *provided however*, that the General Partner may transfer its Interest as General Partner without the consent of any Limited Partner (i) to any entity controlled by, controlling or under common control with it or the Principal, or (ii) pursuant to a transaction not deemed to involve an "assignment" of this Agreement within the meaning of the Investment Advisers Act of 1940, as amended.  In the case of any transfer pursuant to the preceding clauses (i) and (ii), the transferee shall be admitted to the Partnership as a substitute General Partner, all references herein to the General Partner shall thereafter be deemed references to the transferee General Partner, and the General Partner will promptly notify the Limited Partners of any such transfer of its Interest.

## ARTICLE IX – DISSOLUTION OF PARTNERSHIP

9.01  Dissolution.  The Partnership shall be dissolved upon the expiration of the term of the Partnership as set forth in *Section 1.04* hereof.  In the event that the Partnership is dissolved on a date other than the last day of a Fiscal Year, the date of such dissolution shall be deemed to be the last day of an Accounting Period and a Fiscal Year for purposes of adjusting the Capital Accounts of the Partners. For purposes of distributing the assets of the Partnership upon dissolution, the General Partner shall be entitled to a return, on a *pari passu* basis with the

Limited Partners, of the amount standing to its credit in its Capital Account and, with respect to its share of profits, based upon its Allocation Percentage.

9.02    Winding Up and Distribution of Assets.

(a)    Upon the dissolution of the Partnership, the Partnership shall continue in existence for a reasonable period of time for the purpose of winding up its affairs, and the General Partner (or any Liquidating Agent appointed pursuant to *Section 9.02(c)* below) shall wind up the Partnership's affairs and cause the sale of the Partnership's assets (except those to be distributed in kind or retained pursuant to *Section 9.03* below) as expediently as is practicable and prudent and in such manner as the General Partner or Liquidating Agent, in its sole discretion, determines appropriate to obtain the best prices. Nothing herein shall preclude a sale of any asset of the Partnership to any Partner or affiliate of a Partner. Any property distributed in kind in the liquidation shall be valued at Fair Market Value in determining the amount distributed to Partners. Whether any assets of the Partnership shall be liquidated through sale or shall be distributed to the Partners in kind shall be a matter left to the sole discretion of the General Partner or Liquidating Agent. The General Partner or Liquidating Agent shall conduct (or cause to be conducted) a full accounting of the assets and liabilities of the Partnership and cause a balance sheet of the Partnership to be prepared as of the date of dissolution and a profit and loss statement for the period commencing after the end of the preceding Accounting Period and ending on the date of dissolution, and such financial statements shall be furnished to all of the Partners.

(b)    The proceeds of the sale of the Partnership's property and assets, plus any unsold assets to be distributed in-kind, shall be distributed in the following order of priority:

(i)    Payment of the debts and liabilities of the Partnership incurred in accordance with the terms of this Agreement, and payment of the expenses of liquidation;

(ii)    Setting up of reserves as set forth in *Section 9.03* below, as the General Partner or Liquidating Agent may deem reasonably necessary, for any contingent or unforeseen liabilities or obligations of the Partnership or any obligation or liability not then due and payable; *provided*, any unspent balance of the reserves shall be distributed in the manner hereinafter provided when deemed reasonably prudent by the General Partner or Liquidating Agent;

(iii)    Payment, on a *pro rata* basis, of any loans from or debts incurred in accordance with the terms of this Agreement owed to Partners; and

(iv)    Payment to the Partners, on a *pro rata* basis, of the remaining positive balances of their Capital Accounts, adjusted to the date of payment as set forth in *Article III*.

(c)    The Partnership may, from time to time, enter into (and modify and terminate) agreements with a liquidating agent or trustee selected by the General Partner if the General Partner is unwilling to manage the winding up process or, in the event the General Partner is disqualified pursuant to *Section 4.06* or otherwise is unable to manage the winding up process, such person as may be designated by Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time (in either such case, a "***Liquidating Agent***"), authorizing the Liquidating Agent to wind up the Partnership's affairs; *provided that* the total compensation the Partnership may become obligated to pay to such Liquidating Agent(s) during such winding up period will not exceed the aggregate amount of the Management Fee the Partnership would otherwise pay the General Partner pursuant to *Section 5.06(a)* hereof during such winding up period.

(d)    In the event that the Partnership is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), the distributions made pursuant to this *Section 9.02* shall be made in compliance with 1.704-1(b)(2)(ii)(b)(2). In the event that the Partnership is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), but the Partnership has not dissolved pursuant to *Section 9.01* above, the Partnership shall be deemed to distribute the Partnership's property to the Partners, who shall be deemed to assume and take such property subject to the Partnership's liabilities, all in accordance with the balances of their respective Capital Accounts. Immediately thereafter, the Partners shall be deemed to recontribute such property in kind to the Partnership, who shall be deemed to assume and take such property subject to all such liabilities. Notwithstanding anything in this Agreement to the contrary, no Partner shall have any obligation to restore any negative or deficit balance in its Capital Account upon dissolution or liquidation of the Partnership, or otherwise.

9.03    <u>Reserves</u>

(a)    If there are any assets that, in the judgment of the General Partner or Liquidating Agent, cannot be valued properly until sold or realized or cannot be distributed properly in kind or cannot be sold without sacrificing a substantial portion of the value thereof, such assets may be excluded from the valuation of assets for purposes of computing the amount available for distribution upon dissolution and termination of the Partnership pursuant to this *Article IX*. Any Partner's *pro rata* interest in such assets shall not be paid or distributed in kind to it until such time as the General Partner or Liquidating Agent, in its sole and absolute discretion, determines that circumstances no longer require such assets to be so excluded (in whole or in part).

(b)    If there is any contingent liability of the Partnership or any pending transaction or claim by the Partnership the remaining value of which cannot, in the judgment of the General Partner or Liquidating Agent, then be determined, the probable

loss or liability, or value of the claim, as the case may be, may be excluded from the valuation of assets or liabilities for purposes of computing the amount available for distribution upon dissolution and termination of the Partnership pursuant to this *Article IX*. No amount shall be paid or charged to any such Partner's Capital Account on account of any such contingency, transaction or claim until its final settlement or such earlier time as the General Partner or Liquidating Agent shall determine. The Partnership may retain from sums otherwise due each Partner an amount that the General Partner or Liquidating Agent estimates to be sufficient to cover the share of such Partner of any probable loss or liability on account of such contingency, or the probable value of the transaction or claim. Any amount so withheld from a Partner shall be held in a segregated interest-bearing account (which may be commingled with similar accounts of other Partners). Any unused portion of such reserve shall be distributed with interest accrued thereon once the General Partner or Liquidating Agent has determined that the need therefor has ceased.

(c)    Upon determination by the General Partner or Liquidating Agent that circumstances no longer require the exclusion of assets or retention of sums as provided in subsections (a) and (b) hereof, the General Partner or Liquidating Agent shall, at the earliest practicable time, pay such sums or distribute such assets or the proceeds realized from the sale of such assets to each Partner from whom such sums or assets have been withheld.

9.04    No Action for Dissolution. The Partners acknowledge that irreparable damage will be done to the Partnership (on account of a premature liquidation of the Partnership's assets, loss of goodwill and reputation, and other factors) if any Partner seeks to dissolve, terminate or liquidate the Partnership by litigation or otherwise. The Partners further acknowledge that this Agreement has been drawn carefully to provide fair treatment of all parties and equitable payments in liquidation of the Interests of all Partners, and that the Partners entered into this Agreement with the intention that the Partnership continue until dissolved and liquidated in accordance with the terms of this Agreement. Accordingly, each Partner hereby waives and renounces any right to dissolve, terminate or liquidate the Partnership, or to obtain the appointment of a receiver or trustee to liquidate the Partnership, except as specifically set forth in this Agreement.

9.05    No Further Claim. Each Partner shall look solely to the assets of the Partnership for the return of its investment in the Partnership (including capital contributions and loans from a Partner to the Partnership), and no Partner shall have any liability or obligation to the Partnership or to any other Partner to repay any unreturned capital contributions or loans made by any Partner to the Partnership.

## ARTICLE X – POWER OF ATTORNEY

10.01    Grant and Scope of Power. Each Partner hereby irrevocably constitutes and appoints the General Partner as its true and lawful agent and attorney-in-fact, with full power of substitution, in its name, place and stead, to make, execute and acknowledge, swear to, record, publish and file:

(a)    Any agreement, document or instrument pertaining to the sale, transfer, conveyance or encumbrance of all or any portion of the property of the Partnership in accordance with the terms of this Agreement;

(b)    Any document or instrument with respect to the Partnership that may be required or permitted to be filed under the laws of any state or of the United States, or which the General Partner shall deem necessary, desirable or advisable to file; and

(c)    Any document that might be required to effectuate the dissolution, termination and liquidation of the Partnership.

The foregoing power of attorney is coupled with an interest, shall be irrevocable and shall survive the death, incompetency, dissolution, merger, consolidation, bankruptcy or insolvency of each of the Partners. The Partners shall execute and deliver to the General Partner, within five days after receipt of the General Partner's request therefor, such further designations, powers of attorney and other instruments as the General Partner reasonably deems necessary to carry out the purposes of this Agreement.

## ARTICLE XI – MISCELLANEOUS

11.01    Additional Documents.    At any time and from time to time after the date of this Agreement, upon the request of the General Partner, the Partners shall do and perform, or cause to be done and performed, all such additional acts and deeds, and shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such additional instruments and documents, as may be required to best effectuate the purposes and intent of this Agreement.

11.02    Applicable Law.    This Agreement shall be governed by, construed under, and enforced and interpreted in accordance with, the laws of the State of Delaware.

11.03    Jurisdiction.    Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Delaware, and each of the parties consents to the jurisdiction of such courts in any such action or proceeding and waives any objection to venue laid therein.

11.04    Notices.    Any notices required by this Agreement shall be in writing and shall be deemed to have been duly given if (i) delivered in person, (ii) if mailed postage prepaid, by certified or registered mail with return receipt requested, (iii) if transmitted by electronic mail or facsimile, (iv) if sent by second day service by Federal Express or any other nationally recognized courier service, postage prepaid or (v) if sent by Federal Express or any other nationally recognized overnight courier service or overnight express U.S. Mail, postage prepaid, to the Partner at the address set forth below in its execution of this Agreement, or to such other address of which the General Partner subsequently shall have been notified in writing by such Partner. Notices personally delivered or transmitted by electronic mail or facsimile shall be deemed to have been given on the date so delivered or transmitted. Notices mailed shall be deemed to have been given on the date three business days after the date posted, notices sent in accordance with (iv) above shall be deemed to have been given on the date two business days

after the date posted, and notices sent in accordance with (v) above shall be deemed to have been given the next business day after delivery to the courier service or U.S. Mail (in time for next day delivery).

11.05  <u>Agreement; Amendments</u>.   This Agreement constitutes the entire agreement between the parties and supersedes any prior understanding or agreement among them respecting the subject matter hereof.   There are no representations, arrangements, understandings or agreements, oral or written, among the parties hereto relating to the subject matter of this agreement, except those fully expressed herein.  No change or modification of this Agreement or waiver of any provision hereof shall be valid or binding on the parties hereto, unless such change, modification or waiver shall be in writing and signed by or on behalf of the parties hereto, and no waiver on one occasion shall be deemed to be a waiver of the same or any other provision hereof in the future.   Notwithstanding the foregoing sentence, amendments can be effected pursuant to the following conditions:

(a)   Except as set forth elsewhere in this *Section 11.05,* this Agreement may be amended from time to time, in whole or in part, with the written consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time (and the affirmative vote of the General Partner).

(b)   The General Partner may, without the consent of the other Limited Partners, issue side letters to investors providing a materially different fee schedule and liquidity structure and may also amend this Agreement (i) to change the Partnership's name, registered office or business office, (ii) to make a change that is necessary or, in the General Partner's opinion advisable, to qualify the Partnership as a partnership (or other entity in which the Limited Partners have limited liability) under the laws of any state and/or to preserve the Partnership's classification for federal tax purposes as a partnership that is not a "publicly traded partnership" treated as a corporation under Code Section 7704, (iii) to make any amendment hereof as long as such amendment does not adversely affect the Limited Partners in any material respect, (iv) to make any change that is necessary or desirable to satisfy any requirements, conditions, or guidelines contained in any opinion, directive, order, statute, ruling, or regulation of any federal or state entity applicable to the Partnership or the General Partner, so long as such change is made in a manner that minimizes any adverse effect on the Limited Partners, (v) to prevent the Partnership from, in any manner, being deemed an investment company subject to registration under the Investment Company Act, (vi) if the Partnership is advised that any allocations of income, gain, loss or deduction provided herein are unlikely to be respected for Federal income tax purposes, to amend the allocation provisions hereof, on advice of legal counsel, to the minimum extent necessary to effect the plan of allocations and distributions provided herein, (vii) to create a new class or series of Interests, which shall have such rights (including voting rights), powers, duties and obligations, including the payment of fees and performance allocations, as the General Partner may specify, (viii) to cure any ambiguity or to correct or supplement any provision contained herein which may be defective or inconsistent with any other provisions contained herein, or (ix) to take such actions as may be necessary or appropriate to avoid the assets of the Partnership being treated for any purpose of ERISA or Code Section 4975 as assets of any "employee benefit

plan" as defined in and subject to ERISA or of any plan or account subject to Code Section 4975 (or any corresponding provisions of succeeding law) or to avoid the General Partner's engaging in a "prohibited transaction" as defined in Section 406 of ERISA or Code Section 4975(c).

(c)    Nothing contained herein shall permit the amendment of this Agreement to reduce a Limited Partner's Capital Account or Allocation Percentage, permit assessments on the Limited Partners or to increase the Management Fees or Performance Allocations chargeable with respect to a Limited Partner without the prior consent of the affected Limited Partner(s); nor shall the following provisions hereof be amended without the consent of each of the Limited Partners adversely affected thereby and the General Partner:  *Sections 2.06, 4.01, 5.08, 9.01* and this *Section 11.05*.

(d)    Copies of each amendment of this Agreement (other than an amendment pursuant to paragraph (b)) shall be delivered to each Limited Partner at least ten days prior to the effective date thereof; *provided that* any amendment that the General Partner determines is necessary or appropriate to prevent the Partnership from being a publicly traded partnership treated as a corporation under Code Section 7704 shall be effective on the date provided in the instrument containing such amendment.  Amendments approved in accordance with this *Section 11.05* shall be binding on all Limited Partners, including any that did not vote to approve the same, except as set forth in *Section 11.05(c)*.

(e)    Limited Partners shall have no right (i) to amend (except to the extent provided in *Section 11.05(a)*) or terminate this Agreement, (ii) to appoint, select, vote for, or remove the General Partner or its agents, or (iii) to exercise voting rights or otherwise participate in the Partnership's management or business decisions or otherwise in connection with the Partnership property.

11.06    Severability.  If any portion of this Agreement is held illegal or unenforceable, the Partners hereby covenant and agree that such portion or portions are absolutely and completely severable from all other provisions of this Agreement and such other provisions shall constitute the agreement of the Partners with respect to the subject matter hereof.

11.07    Successors.  Subject to the provisions hereof imposing limitations and conditions upon the transfer, sale or other disposition of the Interests of the Partners in the Partnership, all the provisions hereof shall inure to the benefit of and be binding upon the heirs, successors, legal representatives and assigns of the parties hereto.

11.08    Counterparts.  This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.

11.09    Section Headings.  Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to define, interpret, describe or limit the scope, extent or intent of this Agreement or any provision hereof.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 683 of 2230

11.10   <u>Time</u>.  Time is of the essence in this Agreement.

11.11   <u>Pronouns</u>.  All pronouns used in this Agreement in reference to any Partner shall include the neuter, masculine and feminine genders and the singular and the plural, as the context requires.

[Signatures on following page.]

FILED: NEW YORK COUNTY CLERK 01/11/2024 09:38 PM
NYSCEF DOC. NO. 119

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/11/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 684 of 2230

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**GENERAL PARTNER:**

Ebury Street Capital, LLC

By: _____
      John Hanratty
      Manager

**LIMITED PARTNERS:**

Each person who shall sign an Investor Signature Page in the form attached in the Subscription Agreement and is accepted to the Partnership as a Limited Partner

<u>Appendix A</u>

*Definitions*

"***Accounting Period***" shall initially mean the period beginning on the effective date of the first capital contribution to the Partnership and ending on the first to occur of the events set forth in (a) through (e) of this definition.  Each subsequent Accounting Period shall commence immediately after the close of the preceding Accounting Period and will continue until the close of business on the earlier to occur of (a) the last business day of each calendar month, (b) the first business day immediately preceding the effective date of a capital contribution by a new or existing Partner, (c) a date on which one or more Partners effects a withdrawal from their Capital Accounts, (d) the date of the dissolution of the Partnership, or (e) such other dates as the General Partner determines, in its sole discretion.

"***Act***" shall mean the Delaware Revised Uniform Limited Partnership Act (6 Del. C. 17-101 et. seq.), including amendments from time to time.

"***Affiliated Persons***" shall have the meaning set forth in *Section 5.05*.

"***Allocation Percentage***" shall mean with respect to any Partner for any Accounting Period the quotient obtained by dividing (i) the Capital Account balance for such Partner as of the beginning of such Accounting Period (as determined pursuant to *Section 3.01*) by (ii) the Capital Account balance for all Partners of the same Class as of the beginning of such Accounting Period (as determined pursuant to *Section 3.01*).

"***BHCA***" means the Bank Holding Company Act of 1956, as amended.

"***BHCA Subject Person***" shall mean any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

"***Capital Account***" shall mean, with respect to any Partner, the account established and maintained on the books of the Partnership for such Partner, which shall be credited with the amount of such Partner's capital contributions, and increased, or decreased, from time to time as provided in this Agreement.

"***Cash***" shall mean, with reference to the payment in cash of all or any part of a capital contribution or distribution, payment by check or by wire transfer of funds between banks or other financial institutions.

"***Class***" shall have the meaning set forth in *Section 2.01*.

"***Class A Interests***" shall mean the Class of Interests of the Partnership designated as "Class A" by the General Partner.

"*__Class B Interests__*" shall mean the Class of Interests of the Partnership designated as "Class B" by the General Partner.

"*__Code__*" shall mean the Internal Revenue Code of 1986, as amended.

"*__Cumulative Loss Account__*" refers to a memorandum account to be recorded on the books and records of the Partnership for each Limited Partner that shall have an initial balance of zero and that shall be adjusted at the end of each Performance Allocation Period, after all tentative allocations of Net Profits or Net Losses have been made for the period, as follows: the balance of the Cumulative Loss Account shall be increased by the amount if any by which (A) the sum of Net Losses allocated to the Capital Account of a Limited Partner during the Performance Allocation Period exceeds (B) the sum of Net Profits allocated to the Capital Account of the Limited Partner for the same period, and shall be reduced by the amount if any by which (X) the sum of Net Profits allocated to the Capital Account of the Limited Partner during the Performance Allocation Period exceed (Y) the sum of Net Losses allocated to the Capital Account of the Limited Partner for the same period, *provided that* the cumulative amount of such adjustment for any period shall not reduce the balance of the Cumulative Loss Account below zero. In the event that there is a positive balance in the Limited Partner's Cumulative Loss Account at the time the Limited Partner makes a withdrawal from its Capital Account, such positive balance shall be reduced (effective as of the date of such withdrawal) in the proportion which the amount of the withdrawal bears to the balance of the Limited Partner's Capital Account immediately prior to giving effect to such withdrawal.

"*__ERISA__*" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"*__Fair Market Value__*" shall be determined by using the following method:

(a)    Non-publically traded Securities, Tax Liens, Real Estate or instruments for which reliable market quotations are not available, Securities, Tax Liens or instruments for which the General Partner determines in its sole discretion that the foregoing valuation methods do not represent the fair value of such Tax Liens, Securities or instruments and other private investments may be initially valued at the acquisition price as the best indicator of fair value. Valuations will depend on facts and circumstances known as of the valuation date and the application of certain valuation methodologies, pursuant to which the General Partner will generally seek to establish the market value of the portfolio investment using one or a combination of income capitalization and sales comparison approaches. These approaches take into account specific financial measures (such as EBITA, adjusted EBITA, free cash flow, net income, book value or net asset value) believed to be the most relevant for the given investment. Consideration may also be given to such factors as the acquisition price of the security, discounted cash flow valuations, historical and projected operational and financial results for the portfolio company, the strengths and weaknesses of the portfolio company relative to market comparables, valuations of comparable companies, sales of comparable investments, industry trends, general economic and market conditions and other factors deemed relevant.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 687 of 2230

(b)    Securities which are listed on one or more United States or foreign Securities exchanges or are traded on a recognized over-the-counter market (including the NASDAQ), or for which market quotations are available shall be valued at their last reported sales price on the date of determination on the primary exchange or market on which such Securities are traded or, if no sale occurred on the valuation date, the value for long positions shall be the "last bid" and the value for short positions shall be the "last ask" (or, if on such date Securities markets were closed, then the last preceding business day on which they were open).

(c)    Securities in the form of options listed on a Securities exchange will be valued at the last reported sales price on the date of determination on the primary exchange or market on which such Securities are traded or, if the last sales price does not fall between the "last bid" and "last ask" price for such options on such date, such options will be valued at the mean between "last bid" and "last ask" prices on the date of determination.

(d)    Securities generally traded on an established Securities market but for which no recorded sales information or quotations of bid and ask prices are available on such date (or, if applicable, the last preceding business day) shall be valued by the General Partner in good faith with reference to (i) the most recently reported bid and ask prices (in that order), (ii) bid and ask price information as of such date not generally reported but secured from a reputable broker or investment banker, and (iii) such other information as the General Partner believes in good faith is relevant.

(e)    Securities not listed or traded on any exchange or on the over-the-counter market shall be valued based upon quotations obtained from independent market makers, dealers or pricing services, and if no such quotations are available, shall be considered as having no ascertainable market value and shall be valued at cost or fair value based on information available to the General Partner regarding the value or worthlessness of such Securities.

(f)    For purposes of this definition, sales and bid and ask prices reported in newspapers of general circulation, or in electronic quotation systems or in standard financial periodicals or in the records of Securities exchanges or other markets, any one or more of which may be selected by the General Partner, shall be accepted as evidence of the price of a Security.

(f)    A Security purchased, and awaiting payment against delivery, shall be included for valuation purposes as a security held, and the cash account shall be adjusted by the deduction of the purchase price, including brokers' commissions or other expenses of the purchase.

(g)    A Security sold but not delivered pending receipt of proceeds shall be valued at the net sales price.

(h)    The General Partner may make adjustments to the value of Tax Liens to best reflect Fair Market Value.  All matters concerning the valuation of Tax Liens, the allocation of profits, gains, and losses among the Partners, and accounting procedures not specifically and expressly provided for by the terms of this Agreement, shall be determined by the General Partner and shall be final and conclusive as to all of the Partners.

"***Fiscal Year***" of the Partnership shall be the calendar year; *provided, however*, that the first Fiscal Year shall commence on the date of this Agreement and shall end on the December 31 next following the date of this Agreement.

"***GAAP***" means generally accepted accounting principles, consistently applied.

"***General Partner***" shall mean Ebury Street Capital LLC and shall also mean any Person who becomes General Partner pursuant to the provisions of *Section 4.02* and any Person who succeeds to all or a portion of the General Partner's Interest pursuant to *Section 8.05* of this Agreement.

"***Interest***" shall mean, for each Partner, all rights and interests of that Partner in the Partnership in its capacity as a Partner together with any and all obligations imposed on it hereunder or under the Act, and shall include Class A Interests and/or Class B Interests, as appropriate.

"***Key Man Event***" shall have the meaning set forth in *Section 1.04*.

"***Limited Partners***" shall mean those persons whose Subscription Agreements to become a limited partner shall have been accepted by the General Partner on behalf of the Partnership, or anyone subsequently admitted as a Limited Partner, but excluding any Limited Partner who has withdrawn from the Partnership or been removed from the Partnership under *Article IV* hereof. Reference to a "Limited Partner" shall mean any one of the Limited Partners.

"***Lock-Up Period***" shall have the meaning set forth in *Section 4.01(a)*.

"***Management Fee***" shall have the meaning set forth in *Section 5.06(a)*.

"***Net Asset Value***" means the combined Class Net Asset Value of all Classes of the Partnership.

"***Class Net Asset Value***" means the net asset value of the assets of each Class determined on the last day of an Accounting Period by:

(a)    Adding:

(i)    the aggregate Fair Market Value of the Class' investments;

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
Court Records     Pg 689 of 2230

(ii)     the aggregate uninvested cash balances of the Partnership proportionally allocated to such Class (such cash balances being adjusted as required under the sub-sections (g) and (h) of the definition of "*Fair Market Value*"),

(iii)     the aggregate Fair Market Value of such assets as would generally be considered pre-payments of expenses proportionally allocated to such Class to be amortized over future periods;

(iv)     the aggregate Fair Market Value of all dividends and distributions payable in cash, stock or other property received by the Partnership and the face value of all notes and other receivables related to the Class' investments; and

(v)     the aggregate Fair Market Value of such other assets of the Partnership proportionally allocated to such Class as should be considered assets in accordance with GAAP (*provided that* the name and goodwill of the Partnership shall not be included in calculating the Net Asset Value of the Partnership).

(b)     Deducting from the total sum obtained pursuant to sub-Section (a) above any liabilities and expenses due (including Management Fees payable for the current calendar month) in accordance with GAAP proportionally allocated to such Class.

All amounts under sub-sections (a) and (b) above shall be stated in United States Dollars, with assets and liabilities denominated in currencies other than United States Dollars to be converted to United States Dollars at published exchange rates in effect on the last day of such Accounting Period.  The resulting Class Net Asset Value at the end of such Accounting Period shall constitute the initial Class Net Asset Value for the subsequent Accounting Period after adjustment to reflect withdrawals pursuant to *Article IV* and additional capital contributions by Partners and the admission of new Partners pursuant to *Article II*.  Whenever ratios or percentages are to be calculated based upon or relating to Partners' Capital Accounts, they shall be calculated to four decimal places with any adjustments resulting from rounding charged or credited to all of the Partners' Capital Accounts proportionally.

"***Net Profit***" or "***Net Loss***" shall mean, with regard to any Accounting Period, the difference between the Class Net Asset Value of any Class at the beginning of the Accounting Period (after giving effect to withdrawals for the preceding Accounting Period and capital contributions for the current Accounting Period) and the Class Net Asset Value of such Class at the close of the same Accounting Period (before giving effect to withdrawals for such Accounting Period).  Any increase in Class Net Asset Value shall be deemed a Net Profit and any decrease in Class Net Asset Value shall be deemed a Net Loss.

"***Other Accounts***" shall have the meaning set forth in *Section 5.05*.

"***Partners***" shall mean, collectively, the General Partner and the Limited Partners, and reference to a "***Partner***" shall mean any one of the Partners.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 690 of 2230

"***Performance Allocation***" shall have the meaning set forth in *Section 3.02(b)*.

"***Performance Allocation Period***" shall mean each performance period over which the allocations provided for in *Section 3.02(b) and (c)* are measured.

"***Person***" shall mean an individual, partnership, joint venture, association, corporation, trust or any other legal entity.

"***Principal***" shall mean John Hanratty.

"***Regulations***" shall mean Treasury Regulations promulgated under the Code as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations).

"***Tax Liens***" shall mean a legal claim on real property created by a property owner's failure to satisfy its real estate tax obligations or other municipal charges on such property. Tax Liens includes financial instruments of states or municipalities, including, without limitation, tax certificates, tax lien receivables, tax loans, tax deeds, and related interests in real estate and real estate related assets; bonds, notes and debentures (whether subordinated, convertible or otherwise).

"***Securities***" shall mean securities and other financial instruments of United States and foreign entities, including, without limitation, capital stock; exchange traded funds, shares of beneficial interest; bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; money market funds; obligations of the United States or any state thereof, commercial paper; certificates of deposit; and any other obligations and instruments or evidences of indebtedness of whatever kind or nature; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable.

"***Subscription Agreement***" means any subscription booklet, including a subscription agreement containing appropriate representations, warranties, acknowledgments, agreements, indemnifications, confirmations and reciting and evidencing such qualifications as are deemed necessary or appropriate in the General Partner's discretion, prescribed by the General Partner as a condition precedent to becoming a Limited Partner.

"***Withdrawal Date***" shall have the meaning set forth in *Section 3.02(b)*.

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
                        Court Records      Pg 691 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                Plaintiff,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ
CORPS. 1-10,

                Defendants.

---------------------------------------------------------------- x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 006**

**NOTICE OF EBCC'S MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

      **PLEASE TAKE NOTICE** that, upon the annexed Memorandum of Law; the Affirmation of Alexander J. Willscher, dated January 12, 2024, and the exhibits annexed thereto; and all other pleadings and papers filed herein, Plaintiff Emigrant Business Credit Corporation will move this Court at the Motions Submissions Part, Room 130, at the Courthouse located at 60 Centre Street, New York, New York 10007, on February 26, 2024, at 9:30 a.m., or as soon thereafter as counsel may be heard, for an order pursuant to CPLR 3212, granting Plaintiff summary judgment regarding its breach of contract claims, and for such additional and further relief as may be just and proper.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR 2214(b) and the Parties'
so-ordered stipulation (Dkt. 112), Defendants' opposition papers, if any, must be served by
February 2, 2024; and Plaintiff's reply papers, if any, must be served by February 23, 2024.

Dated:  January 12, 2024      Respectfully submitted,
         New York, New York

                              */s/ Alexander J. Willscher*

                              Alexander J. Willscher
                              Austin P. Mayron
                              Erin Savoie
                              SULLIVAN & CROMWELL LLP
                              125 Broad Street
                              New York, New York  10004
                              Telephone: (212) 558-4000
                              Fax: (212) 558-3588

                              *Attorneys for Plaintiff Emigrant Business
                              Credit Corporation*

-2-

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                          Plaintiff,

         v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ
CORPS. 1-10,

                      Defendants.

---------------------------------------------------------- x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 006**

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF EBCC'S MOTION**
**FOR SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIMS**

Alexander J. Willscher
Austin P. Mayron
Erin L. Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business Credit
Corporation*

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................................ 1

**THE MATERIAL AND UNDISPUTED FACTS** ................................................. 2

    A.    The Credit Agreements, Guaranties, and Validity Guaranties .............................. 2

    B.    The Structure of the Credit Facilities ...................................................... 3

    C.    Relevant Provisions of the Credit Agreements ......................................... 4

    D.    Defendants' Breaches of the Credit Agreements ...................................... 5

**LEGAL STANDARDS** ........................................................................................ 9

**ARGUMENT** ...................................................................................................... 10

    A.    The Borrowers Breached Their Obligations Under the Credit Agreements ......... 11

    B.    The Guarantors Are Liable for Defendants' Breaches of the Credit
        Agreements .................................................................................... 11

    C.    Hanratty Also Is Liable for Defendants' Breaches of the Credit Agreements ..... 11

        1.    Hanratty Is Liable Under the Validity Guaranties ................................... 12

        2.    Hanratty Also Is Liable as an Alter Ego of the Borrowers and
            Guarantors ................................................................................ 16

    D.    EBCC Is Entitled to a Judgment of $20,213,473.65 Plus Prejudgment Interest
        and Attorneys' Fees ......................................................................... 20

**CONCLUSION** .................................................................................................. 22

-i-

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*301 E. 60th St. LLC* v. *Competitive Sols. LLC*,
   217 A.D.3d 79 (1st Dep't 2023) ............................................... 9

*Azte Inc.* v. *The Auto Collection, Inc.*,
   2012 WL 3887671 (Sup. Ct. Kings Cnty. 2012) ................................ 18

*Baby Phat Holding Co., LLC* v. *Kellwood Co.*,
   123 A.D.3d 405 (1st Dep't 2014) ......................................... 18, 19

*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund* v. *Allure Metal Works, Inc.*,
   209 A.D.3d 712 (2d Dep't 2022) ............................................ 16

*Biotronik A.G.* v. *Conor Medsystems Ireland, Ltd.*,
   22 N.Y.3d 799 (2014) ..................................................... 20

*Canter* v. *Canter*,
   91 A.D.2d 1180 (4th Dep't 1983) .......................................... 14

*CC Ming (USA) Ltd. P'ship* v. *Champagne Video, Inc.*,
   232 A.D.2d 202 (1st Dep't 1996) .......................................... 20

*Coffey* v. *Tretola*,
   179 A.D.3d 889 (2d Dep't 2020) ........................................... 21

*Credit Suisse First Bos.* v. *Utrecht-Am. Fin. Co.*,
   84 A.D.3d 579 (1st Dep't 2011) ...................................... 4, 13, 20

*Daiichi Seihan USA* v. *Infinity USA, Inc.*,
   214 A.D.2d 487 (1st Dep't 1995) ........................................... 9

*EAC of N.Y., Inc.* v. *Capri 400, Inc.*,
   49 A.D.3d 1006 (3d Dep't 2008) ........................................... 20

*ED & F Man Sugar Inc.* v. *ZZY Distribs., Inc.*,
   122 N.Y.S.3d 266 (1st Dep't 2020) ........................................ 20

*Ell-Dorer Contracting Co.* v. *P. T. & L. Const. Co.*,
   85 A.D.2d 866 (3d Dep't 1981) ............................................ 12

*Harris* v. *Seward Park Hous. Corp.*,
   79 A.D.3d 425 (1st Dep't 2010) ......................................... 9, 11

-ii-

*Indeck Energy Servs., Inc.* v. *Merced Cap., L.P.*,
    200 A.D.3d 455 (1st Dep't 2021) .......................................................21

*Kashi v. Gratsos*,
    790 F.2d 1050 (2d Cir. 1986).............................................................17

*Kassab* v. *Kasab*,
    195 A.D.3d 832 (2d Dep't 2021) .......................................................21

*M. Lopez Contracting Corp.* v. *HFZ 344 72nd St. Owner, LLC*,
    2021 WL 1696722 (Sup. Ct. N.Y. Cnty. Apr. 27, 2021) .........................9

*Morris* v. *N.Y.S. Dept. of Tax'n & Fin.*,
    82 N.Y.2d 135 (1993) ....................................................................16

*Newbank* v. *Seventh Ave. Fine Foods Corp.*,
    2020 WL 118720 (Sup. Ct. N.Y. Cnty. Jan. 10, 2020)..........................9

*NML Cap.* v. *Republic of Argentina*,
    17 N.Y.3d 250 (2011) ....................................................................21

*Noryb Ventures, Inc.* v. *Mankovsky*,
    47 Misc. 3d 1220(A), (Sup. Ct. N.Y. Cnty. 2015)................................10

*Orr* v. *Miner*,
    220 A.D.2d 567 (2d Dep't 1995) .......................................................14

*Palmerone* v. *Staples*,
    195 A.D.3d 736 (2d Dep't 2021) .......................................................20

*Perez* v. *Long Island Concrete Inc.*,
    203 A.D.3d 552 (1st Dep't 2022) .......................................................16

*Rockefeller* v. *Statement Servs., Corp.*,
    204 A.D.3d 922 (2d Dep't 2022)........................................................16

*Rosenblum* v. *Rosenblum*,
    214 A.D.3d 440 (1st Dep't 2023) .......................................................21

*Shisgal* v. *Brown*,
    21 A.D.3d 845 (1st Dep't 2005) ................................................9, 16, 17

*Sutton* v. *E. River Sav. Bank*,
    55 N.Y.2d 550 (1982) ....................................................................14

*Suttongate Holdings Ltd.* v. *Laconm Mgmt. N.V.*,
    193 A.D.3d 489 (1st Dep't 2021) .......................................................21

*Tap Holdings, LLC v. Orix Fin. Corp.*,
109 A.D.3d 167 (1st Dep't 2013) ........................................................................10

*UBS Secs. LLC v. Highland Cap. Mgmt., L.P.*,
93 A.D.3d 489 (1st Dep't 2012) ...........................................................................16

*Ventresca Realty Corp v. Houlihan*,
41 A.D.3d 707 (2d Dep't 2007) ............................................................................20

*Webmd, LLC v. Media Banner Ad Sales Inc.*,
2016 WL 4245388 (Sup. Ct. N.Y. Cnty. Aug. 11, 2016) ....................................10

*Webmediabrands, Inc. v. Latinvision, Inc.*,
46 Misc. 3d 929 (Sup. Ct. N.Y. Cnty. 2014) .......................................................10

**STATUTES AND RULES**

CPLR 3212...................................................................................................................9

CPLR 5001.................................................................................................................21

CPLR 5004.................................................................................................................21

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.: 121    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Court Records    Pg 698 of 2230

## PRELIMINARY STATEMENT

Over two years after Defendants defaulted on their contractual obligations to repay almost $20 million to Plaintiff Emigrant Business Credit Corporation ("**EBCC**"), there remains no prospect of any repayment. From March 2017 to November 2021, Defendant John Arthur Hanratty ("**Hanratty**") induced EBCC to loan him and his Ebury Companies tens of millions of dollars purportedly to invest in tax lien certificates. Those certificates, which Hanratty said were worth millions more than the amount of EBCC's loans—including valuations of $26.5 million in January 2021, $30 million in May 2021, and $27.8 million in September 2021—were supposed to serve as EBCC's collateral and provide security to EBCC in the event of default. But Hanratty's valuations were grossly overinflated—he now admits that the Ebury Companies own, at most, only $14.5 million in tax lien certificates, and he cannot offer any explanation of what happened to the other $12-16 million in supposed tax lien collateral (Ex. 1 (Hanratty Dep. Tr.) at 270:19-271:24)— which was the product of inflated valuations and double-counting.

The truth is that Hanratty impermissibly used tens of millions of dollars of advances from EBCC to pay distributions to his investors rather than purchase tax lien collateral. (*Id.* at 404:5-10.) Between 2018 and 2019, Hanratty borrowed more than $10 million from EBCC and used those advances to make approximately $21 million in distributions to his investors. (*Id.* at 404:11-15, 405:2-7.) Those distributions were in excess of the limits set by the Credit Agreements and were not permitted in light of undisclosed events of default. By Hanratty's own admission, had he not made the $21 million in distributions, he would have been able to repay EBCC at maturity, as promised. (*Id.* at 314:8-315:5.)

The Credit Agreements required complete repayment of the loans by November 10, 2021, and there is no dispute that Defendants have failed to repay EBCC. As Hanratty unequivocally admitted at his deposition: "**I am currently in default and owe money to**

**Emigrant, yes**," and "<u>**I acknowledge that I owe them money and I want to pay them**</u>." (Ex. 1 at 405:8-12 (emphasis added), 674:9-10 (emphasis added).) EBCC respectfully requests the Court enter summary judgment against all Defendants for breach of contract, in accordance with Hanratty's admissions and the unambiguous terms of the loan documents. EBCC will establish Defendants' liability for its fraud claims at trial, which will require the resolution of disputed issues of intent.[1]

## THE MATERIAL AND UNDISPUTED FACTS

### A.    The Credit Agreements, Guaranties, and Validity Guaranties

In 2017, EBCC extended lines of credit to companies controlled by Hanratty, backed by guaranties from over a dozen other Hanratty-controlled companies, as well as from Hanratty himself. Specifically, EBCC executed agreements (the "**Credit Agreements**") extending a $10 million credit facility to Ebury 1EMI LLC and a $5 million credit facility to Ebury 2EMI LLC (together, the "**Borrowers**"). (*See* <u>Dkt. No. 6</u> at 3, 80) EBCC later agreed to increase the Ebury 1EMI LLC facility to $15 million. (*Id*. at 61)

The Borrowers are wholly-owned subsidiaries of Ebury Fund 1, LP and Ebury Fund 2, LP (together, the "**Funds**"). (*See* Ex. 25 (EBCC_000016681).) Hanratty manages the Funds through Ebury Street Capital, LLC ("**ESC**"), which is the general partner of the Funds. Hanratty is the sole member of ESC. (Ex. 1 at 22:25-23:3.) The Borrowers themselves own a litany of special purpose entities (the "**Ebury SPEs**") that also are Defendants in this action. (*See* Ex. 25.) These entities purchase, own, and sell tax lien certificates or real estate in various states, and are wholly owned by the Borrowers.

---

[1]    On December 18, 2023, Hanratty was arrested and charged by the U.S. Attorney's Office for the Southern District of New York with bank and wire fraud in connection with his scheme to defraud EBCC.

-2-

The Ebury SPEs, along with ESC and Red Clover 1, LLC (another wholly-owned subsidiary of the Funds), are guarantors to the Credit Agreements (the "**Guarantors**"). (*See* Dkt. No. 8.) Each of the Guarantors executed a Guaranty Agreement promising to EBCC "the due, prompt and punctual payment and satisfaction" of the Credit Agreements and agreeing to "'solidary' or 'joint and several'" liability with the Borrowers. (*See, e.g.*, *id.* at 2.)

The Credit Agreements also required that Hanratty execute validity guaranty agreements in favor of EBCC (the "**Validity Guaranties**"). These agreements provide that Hanratty is personally liable for any damages resulting from incorrect information provided to EBCC about the eligibility of collateral under the Credit Agreements. (Dkt. No. 11 at 2.) Specifically, Hanratty guaranteed that "all Information from time to time delivered to Lender will be true and correct in all material respects as of the Calculation Date applicable to such Information." (*Id.*) If any Information is not "true and correct, in all material respects as of a Calculation Date," Hanratty personally must "pay the aggregate amount of all Damages incurred by Lender." (*Id.*) Hanratty's obligation to pay damages under the Validity Guaranties is "on a 'solidary' and 'joint and several' basis" with the Borrowers. (*Id.*)

### B.  The Structure of the Credit Facilities

The Credit Facilities were structured as asset-based loans. (*See* Dkt. No. 5 ¶ 5.) Any lending by EBCC had to be supported by the acquisition of tax lien certificates by Defendants. (*Id.* ¶ 7.) Any tax lien that Defendants purchased using funds advanced by EBCC was EBCC's collateral and Defendants were not allowed to transfer any of the collateral, with limited exceptions. (*See id.* ¶ 10.)

The Credit Agreements were structured so that EBCC would be fully secured at all times. EBCC was to lend money to the Borrowers to finance their purchases of tax liens and then be secured by those tax liens and their proceeds. (*Id.* ¶¶ 5-7.) The tax liens themselves would be

secured by the value of the underlying real estate, which would provide EBCC with an additional layer of protection.

The notes underlying the Credit Agreements required that the Borrowers "repay all principal, interest, costs and expenses outstanding hereunder on March 9, 2021." (*E.g.*, Dkt. No. 7 at 8.) The parties agreed to three maturity date extensions, with the final maturity date set for November 10, 2021. (*E.g.*, Dkt. No. 6 at 76.) On November 10, 2021, the Borrowers and the Guarantors were required to repay EBCC, but failed to do so. (*See* Dkt. No. 12.) On November 29, 2021, EBCC sent the Borrowers and Guarantors notices of default and demands for payment. (*Id.*) Defendants since have failed to repay EBCC the amounts owed under the Credit Agreements.

**C.    Relevant Provisions of the Credit Agreements**

The Credit Agreements impose a variety of restrictions on the Borrowers:

*First*, the Borrowers were required to deliver any tax lien certificates that they purchased to an independent third-party custodian and servicer (which, after November 2017, was MTAG Services, LLC ("**MTAG**")). Under Section 5.10 of the Credit Agreements, the Borrowers represented and warranted as of the date of each Advance that they had delivered to the Custodian "all required Tax Lien Documents." (Dkt. No. 6 § 5.10.) Likewise, under Section 1.1(y) of the Credit Agreements, "[a]ny Tax Lien whose Basic Tax Lien Documents are not delivered to Lender, or to the Custodian, by no later than the effective date of the most recent Borrowing Base Certificate furnished to the Lender," was not eligible to be included in the Borrowing Bases. (*Id.* § 1.1(y).)

This requirement was essential to the parties' agreements. As former EBCC employee Jack Grady explained, the requirement of a third-party custodian and servicer was vital to the structure of the Credit Facilities. (Ex. 2 (EBCC_000008844) at -8869 ("We want to have a

-4-

third party verification of [the v]alue of our collateral.").)  Grady further testified that he was "[u]ncomfortable" with any self-servicing by Ebury because EBCC's "understanding when we went into the deal was that at all times there would be a third party."  (Ex. 3 (Grady Dep. Tr.) at 180:5-22; *see id*. (describing the importance of a third-party custodian and servicer to "valuing the portfolio and administering the portfolio").)

>              *Second*, the Borrowers were permitted to use advances under the Credit Facilities only to purchase eligible tax liens and for ordinary and necessary expenses of business operations incurred in the normal course of business.  (<u>Dkt. No. 6</u> §§ 2.1, 6.26, 9.1.)  All proceeds from EBCC's collateral were to be deposited into an EBCC lockbox account "within one (1) Business Day after receipt."  (*Id*. § 3.7)  The use of proceeds from the sale of EBCC's Collateral for any purpose other than the repayment of indebtedness to EBCC was an event of default.  (*Id*. § 9.1(b).)

>              *Finally*, the Borrowers were not to distribute any money if an event of default had occurred and each Borrower was prohibited from distributing in excess of $5 million in a calendar year.  (*Id*. § 8.8.)

### D.    Defendants' Breaches of the Credit Agreements

>              Defendants breached each of the above-listed restrictions—Defendants distributed funds in excess of the contractual limits, used advanced funds and the proceeds of EBCC's collateral to make distributions to investors; misled and lied to EBCC about multiple events of default; and impermissibly self-serviced EBCC's collateral.

>              In 2018, the Funds made approximately $15.6 million in distributions to Defendants' investors, well in excess of the limits imposed under the Credit Agreements.  (Ex. 4 (EBCC_000010586) at -0611, -0631; *see also* Ex. 1 at 138:6-14 ("**Q.**  And so on page EBCC 10611, it lists approximately 9.2 million in capital withdrawals by the limited partners in 2018,

-5-

correct?  **A.** It does.  **Q.** And that's in excess of the 5 million limitation in the credit agreements, correct?  **A.** It is.").)

On November 9, 2018, Defendants used advances under the Credit Facilities to pay a $288,810.67 distribution to an investor. (Ex. 1 at 401:3-8.)  Hanratty admits that under the Credit Agreements he was not "allowed to use money advanced under the Emigrant Credit facilities to pay distributions to investors" (*Id*. at 401:9-15 ("**Q.** You weren't allowed to use money advanced under the Emigrant Credit facilities to pay distributions to investors, correct? . . . **A.** That is what the Credit Agreement reads, yes.  Correct.")).  Yet that same day, Hanratty signed a borrowing base certificate certifying that there had been no events of default. (Ex. 5 (EBCC_000004964).) Similarly, in 2018, an investor threatened Hanratty with litigation and Hanratty failed to notify EBCC as required under the Credit Agreements.  (Ex. 1 at 124:25-127:3; Dkt. No. 6 § 6.1.) Instead, Hanratty sold EBCC collateral and used the proceeds to pay the investor directly, in violation of the Credit Agreements.  (Ex. 1 at 603:4-606:15.)  Hanratty has since admitted that each subsequent time he certified that there had been no events of default, that was a false certification.  (*Id*. ("**Q.** You were in default of the credit agreements when you made this distribution . . . ? . . . **A.** Yes. . . . **Q.** And you continued to submit signed certifications to Emigrant that there were no outstanding events of default? . . . **A.** In a normal course of reporting, yes, I would have signed documents reflecting such, yes.").)

In January 2019, Ebury Fund 1, LP was sued by the several investors in New York Supreme Court.  Five months later, Hanratty impermissibly used funds that had been advanced under the Credit Facilities to settle the lawsuit by making a $1.2 million settlement payment. (Ex. 1 at 418:3-419:3.)  Yet Hanratty continued to submit signed borrowing base certificates stating that there had been no events of default.  (*See, e.g*., Ex. 6 (EBCC_000005219).)  Further,

-6-

on September 13, 2019, Hanratty again impermissibly signed a borrowing base certificate attesting

that there had been no events of default.  (Ex. 7 (EBCC_000005615).)  A few days later, on

September 20, 2019, Hanratty again impermissibly used EBCC funds to make a $750,000

distribution to an investor.  (Ex. 1 at 424:14-425:20.)

Throughout Hanratty's relationship with EBCC, he repeatedly lied to and misled

EBCC employees to hide Defendants' breaches.  For example, Hanratty did not send Defendants'

2019 audited financial statements to EBCC until July 2021.  (Ex. 1 at 501:19-23.)  According to

the 2019 audited financial statements, the value of Defendants' tax lien portfolio was only

approximately $17 million (Ex. 8 (EBCC_000010663) at -0667; Ex. 9 (EBCC_000010701)

at -0705; Ex. 1 at 495:5-496:24.)  However, Hanratty falsely told Grady that EBCC actually was

overcollateralized and secured by $30 million in lien collateral.  (Ex. 10 (EBCC_000008797)

at -8808; Ex. 1 at 188:3-17.)

Additionally, Hanratty hid the fact that Ebury was impermissibly self-servicing the

vast majority of its lien portfolio.  In 2021, Grady developed concerns that Defendants had not

submitted all of EBCC's collateral to MTAG, the EBCC-approved and required third-party

custodian and servicer.  (*See* Ex. 11 (EBURY_00012283).)  On March 5, Hanratty told Grady,

"[w]e will have upload of liens to be boarded to them Monday."  (Ex. 12 (EBCC_000008667)

at -8687.)  A few days later, he told Grady that the delay in providing an MTAG custodial report

was just a "timing issue."  (*Id*. at -8690.)  On March 16, Hanratty told Grady, "Mtag should be

wrapped up tomorrow."  (*Id*. at -8692.)  Grady replied on March 16 and 17, asking why MTAG

did not already have the liens in their system and for updates.  (*Id*. at -8693.)  Hanratty responded

on March 17 to say that MTAG would "be done . . . today."  (*Id*.)

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.: 121

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 705 of 2230

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

The back-and-forth continued for several months, without any notice from Hanratty that he was, in fact, self-servicing EBCC's collateral. On April 16, Grady requested an update from Hanratty, who replied that MTAG was still "reconciling" the data. (Ex. 13 (EBCC_000007648).) On April 22, Grady again asked Hanratty: "Can you also send the latest draft of the audit/MTAG reports?" (*Id.*) Grady requested further updates on July 20 and September 2, 3, 14, 17, and 20. (Ex. 1 at 253:9-259:8; Ex. 2; Ex. 21 (EBCC_000008905).)

Finally, on September 22, 2021, Hanratty purported to send Grady a custodial report from MTAG, but actually sent Grady a fraudulent lien tape with MTAG's logo affixed to it. (Exs. 14 (EBCC_000008420), 15 (EBCC_000008421).) At his deposition, Hanratty agreed that he had represented to Grady that the lien tape was a list of the liens of which MTAG had custody; however, he conceded during his deposition that it consisted mostly of self-serviced liens. (Ex. 1 at 264:8-267:25.) According to the fake lien tape, MTAG had custody of 6,782 tax lien certificates worth $27.8 million in redemptive value ("**RV**"). In actuality, however, MTAG only had custody of 518 tax lien certificates worth $1.3 million RV. (*Compare* Ex. 15 (EBCC_000008421), *with* Ex. 16 (EBCC_000010281).)

Following Defendants' default at maturity, Hanratty sent EBCC another lien tape purporting to represent the status of EBCC's collateral as of December 1, 2021. According to that lien tape, MTAG had custody of only 497 liens worth $1.4 million RV, and Defendants admitted to self-servicing 1,047 liens, purportedly worth $17.8 million RV. (Dkt. No. 5 ¶ 16.) This lien tape was missing over 5,000 tax liens that were included in the prior fraudulent lien tape, supposedly worth over $14 million RV.

By means of his self-servicing of EBCC's collateral, misuse of EBCC funds, persistent misrepresentations to EBCC, and various other breaches of the Credit Agreement,

-8-

Hanratty and all Defendants committed wrongs against EBCC that can only be rectified by the Court granting EBCC summary judgment as to its breach of contract claim.

## **LEGAL STANDARDS**

Summary judgment is properly granted under CPLR 3212 where a party fails to make required payments under an unambiguous contract. *See*, *e.g.*, *Daiichi Seihan USA* v. *Infinity USA, Inc.*, 214 A.D.2d 487, 488 (1st Dep't 1995).[2]  The elements of a breach of contract claim are "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris* v. *Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010) (citation omitted); *see Newbank* v. *Seventh Ave. Fine Foods Corp.*, 2020 WL 118720, at *2 (Sup. Ct. N.Y. Cnty. Jan. 10, 2020) (same).  Once a plaintiff has established those elements, "[t]he burden . . . shifts to defendants to controvert this showing and raise a triable issue of fact." *M. Lopez Contracting Corp.* v. *HFZ 344 72nd St. Owner, LLC*, 2021 WL 1696722, at *4 (Sup. Ct. N.Y. Cnty. Apr. 27, 2021).

In deciding whether to impose alter ego liability, the Court may consider factors such as:  (i) the disregard of corporate formalities; (ii) inadequate capitalization; (iii) intermingling of funds; (iv) overlap in ownership, officers, directors, and personnel; (v) common office space, address, and telephone numbers of corporate entities; (vi) the amount of business discretion displayed by the related entities; (vii) whether the related entities deal with one another at arm's length; (viii) whether the entities are treated as independent profit centers; (ix) the payment or guarantee of debts by the related entities; and (x) whether the entities used one another's properties as if the properties were their own.  *See Shisgal* v. *Brown*, 21 A.D.3d 845, 848 (1st Dep't 2005).

---

[2]        "When sophisticated parties enter into a contract, the contract should be enforced according to its terms." *301 E. 60th St. LLC* v. *Competitive Sols. LLC*, 217 A.D.3d 79, 84 (1st Dep't 2023).

-9-

"[N]o one factor is dispositive." *Tap Holdings, LLC v. Orix Fin. Corp.*, 109 A.D.3d 167, 174 (1st Dep't 2013) (citation omitted).

Although alter ego liability generally is not imposed at the summary judgment stage, the Court may do so where, as here, "the record [is] replete with sufficient indicia to pierce the corporate veil." *Noryb Ventures, Inc.* v. *Mankovsky*, 47 Misc. 3d 1220(A), at *19 (Sup. Ct. N.Y. Cnty. 2015). The imposition of alter ego liability is appropriate where the undisputed facts establish, for example, that "[the defendants] had overlapping owners and directors," "commingled assets," "used corporate funds for personal purposes," or "held no corporate meetings and kept no corporate records." *See Webmediabrands, Inc.* v. *Latinvision, Inc.*, 46 Misc. 3d 929, 933-34 (Sup. Ct. N.Y. Cnty. 2014) (imposing alter ego liability "as a matter of law"); *see Webmd, LLC* v. *Media Banner Ad Sales Inc.*, 2016 WL 4245388, at *4 (Sup. Ct. N.Y. Cnty. Aug. 11, 2016) (same).

## **ARGUMENT**

There is no dispute that Defendants breached their obligations under the Credit Agreements and must repay the amounts outstanding under the Credit Facilities. Each of the Borrowers was required—but failed—to "repay all principal, interest, costs and expenses outstanding" on November 10, 2021.[3]  (*See* Dkt. No. 7 at 8; Dkt. No. 6 at 76.) Each of the Guarantors is liable for those breaches "on a 'solidary' or 'joint and several' basis" with the Borrowers. (Dkt. No. 8 § 7.) Finally, Hanratty is personally liable for those amounts both under the Validity Guaranties, "on a 'solidary' and 'joint and several' basis" with the Borrowers, and as an alter ego of the Borrowers and Guarantors. (*See* Dkt. No. 11 § 3.) As Hanratty unequivocally admitted at his deposition: "**I am currently in default and owe money to Emigrant, yes**," and

---

[3]    It is an Event of Default under the Credit Agreements if "any event of default occurs or exists . . . under any Transaction Document," including the Promissory Notes. (*See* Dkt. No. 6 §§ 6.25, 9.1(d).)

"**I acknowledge that I owe them money and I want to pay them**." (Ex. 1 at 405:8-12 (emphasis added), 674:9-10 (emphasis added).)

A.   **The Borrowers Breached Their Obligations Under the Credit Agreements**

To obtain summary judgment against the Borrowers, EBCC need only show the "existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." _Harris_, 79 A.D.3d at 426. EBCC has clearly established each of these elements. The Credit Agreements are valid contracts. (_See_ Dkt. No. 6.) EBCC fully performed under those contracts, including by lending Defendants tens of millions of dollars. (_See_ Dkt. No. 12.) Defendants failed to repay those amounts at maturity. (_See id_.) And EBCC has suffered tens of millions of dollars in damages. (_See id_.) Accordingly, EBCC is entitled to judgment against the Borrowers in an amount of $20,213,473.65, plus prejudgment interest and attorneys' fees. _See_ pp. 20-22, _infra_.

B.   **The Guarantors Are Liable for Defendants' Breaches of the Credit Agreements**

EBCC also has clearly established each element necessary to obtain judgment against the Guarantors. _See Harris_, 79 A.D.3d at 426. The Guaranties are valid contracts. (_See_ Dkt. No. 8.) EBCC fully performed under those contracts, including by lending Defendants tens of millions of dollars. (_See_ Dkt. No. 12.) Defendants failed to repay those amounts at maturity. (_See id._) And EBCC has suffered tens of millions of dollars in damages. (_See id._) Thus, the Guarantors are liable for Defendants' breaches of the Credit Agreements "on a 'solidary' or 'joint and several' basis" with the Borrowers. (Dkt. No. 8 § 7.)

C.   **Hanratty Also Is Liable for Defendants' Breaches of the Credit Agreements**

Finally, there can be no dispute that EBCC is entitled to judgment against Hanratty in his individual capacity. Again, Hanratty has unambiguously conceded his liability, stating:

"**I am currently in default and owe money to Emigrant, yes**," and "**I acknowledge that I owe them money and I want to pay them**." (Ex. 1 at 405:8-12 (emphasis added), 674:9-10 (emphasis added).) The Court need look no further than these clear and unequivocal admissions to impose individual liability on Hanratty. *See Ell-Dorer Contracting Co.* v. *P. T. & L. Const. Co.*, 85 A.D.2d 866, 866 (3d Dep't 1981) ("Inasmuch as defendant admits complete performance and does not dispute the amounts owed, summary judgment on plaintiff's two causes of action was properly granted."). Even absent Hanratty's clear admissions, however, imposing personal liability on Hanratty is consistent with both Hanratty's obligations under the Validity Guaranties and his status as an alter ego of the Borrowers and Guarantors.

> 1.      <u>Hanratty Is Liable Under the Validity Guaranties.</u>

The first grounds for imposing individual liability on Hanratty are his obligations under the Validity Guaranties. There is no dispute that Hanratty is a validity guarantor to the Credit Agreements. (<u>Dkt. No. 54</u> at 1 (admitting that "Mr. Hanratty is a party to the 'Validity Guaranties.'"); *see also* <u>Dkt. No. 11</u> (Hanratty's signatures).) Under the Validity Guaranties, Hanratty promised EBCC that "all Information from time to time delivered to Lender will be true and correct in all material respects as of the Calculation Date applicable to such Information."[4] (<u>Dkt. No. 11</u> § 2.) If Hanratty provided any Information to EBCC that was not "true and correct, in all material respects as of a Calculation Date"—regardless of his knowledge or intent—he is liable personally for "the aggregate amount of all Damages incurred by Lender." (*Id.*) This obligation to pay damages under the Validity Guaranties is "on a 'solidary' and 'joint and several' basis" with the Borrowers. (*Id.* § 3.)

---

[4]      "Information" includes "all written information relating to the eligibility of Collateral . . . including, without limitation, all Borrowing Base Certificates and any schedules of Collateral." (<u>Dkt. No. 11</u> § 1.)

Throughout his relationship with EBCC, Hanratty repeatedly provided false information to EBCC in order to receive advances, obtain maturity date extensions, and delay EBCC from demanding repayment. Indeed, as Hanratty admitted to this Court, "it is entirely possible—indeed likely—that there have occasionally been inaccuracies in documents that" he submitted to EBCC. (Dkt. No. 24 at 2.) EBCC's damages from Defendants' breaches of the Credit Agreements resulted from Hanratty's false statements and Hanratty is liable for those damages on a solidary and joint and several basis with the Borrowers.

The false information Hanratty provided to EBCC, for purposes of the Validity Guaranties, can be grouped into two buckets: (i) false statements about the eligibility of collateral; and (ii) false statements about the value of the collateral.

*First*, Hanratty repeatedly provided EBCC with false information about the eligibility of collateral. As previously discussed, any tax lien certificates that were not delivered to the independent third-party custodian and servicer were not eligible to serve as collateral. *See* pp. 4-5, *supra*. Nevertheless, as Hanratty now admits, Defendants impermissibly included self-serviced collateral in the borrowing bases. (Ex. 1 at 101:11-15, 102:21-105:9.) In fact, Hanratty repeatedly "represented to Emigrant that each Ebury company had complied in all respects with its obligations under the custodial agreement with respect to each tax lien including delivery to [the] custodian of all required tax lien documents"—but now admits those representations "w[ere] not true." (*Id*. at 107:25-108:11.)

In an attempt to avoid summary judgment, Hanratty testified that he "believe[d]" that EBCC employee Jack Grady generally "was aware" that Defendants were self-servicing some tax lien certificates. (*Id*. at 101:11-15, 102:21-105:9.) But that would not excuse Defendants' misconduct. Regardless of whether Grady "was aware" that some Defendants were self-servicing

-13-

*some* tax lien certificates, Defendants were forbidden from including self-serviced collateral in the borrowing bases.[5]  (*See* Dkt. No. 6 § 1.1(y).)  That requirement could not be waived or altered except in a signed writing (*see id.*), and there was never any such writing.  (Ex. 1 at 101:24-102:2 ("I do not recall a written approval or a contract.").)

        Further, Grady testified that he was *not* aware that Defendants were self-servicing EBCC's collateral, and Hanratty cannot create a dispute of material fact by offering conclusory, self-serving statements to rebut the evidentiary record.  *See*, *e.g.*, Sutton v. E. River Sav. Bank, 55 N.Y.2d 550, 553-54 (1982); Orr v. Miner, 220 A.D.2d 567, 567 (2d Dep't 1995); Canter v. Canter, 91 A.D.2d 1180, 1181 (4th Dep't 1983).  The record is devoid of any evidence that EBCC was aware that Defendants were servicing EBCC's collateral, and Hanratty's self-serving statements that he "believe[d]" to the contrary are insufficient to create a dispute of material fact.

        Instead, the record establishes that, at least as of September 2019, EBCC was *not* aware that Ebury was self-servicing EBCC's portfolio, including in an email where Grady wrote:

> *I haven't had any discussions with John about Ebury self-servicing the book.*  Our understanding has always been that the servicer provides a backstop if the principals of the company can no longer provide their duties.  Happy to talk to John why he wants to eliminate the servicer.  But we should hold off on working on documents until we get comfortable with this from an operational standpoint.

(Ex. 24 (EBCC_000005627) (emphasis added).)  Similarly, from March 2021 until September 2021, Grady repeatedly requested that Defendants provide MTAG custodial reports; reflecting his belief that EBCC's collateral was being serviced by MTAG, the independent third-party custodian and servicer, not by Defendants.  (*See* Exs. 12, 17-21.)

---

[5]     As Grady testified, while he understood that Defendants self-serviced "collateral that [Hanratty] had separately financed with equity," he did not understand or consent to Defendants self-servicing "collateral that was financed by Emigrant."  (Ex. 3 at 353:22-354:12.)

-14-

After much delay, on September 21, 2021, Hanratty sent Grady a purported custodial report from MTAG, bearing a header with the MTAG logo and falsely representing that MTAG had custody of 6,782 tax liens, worth $27.8 million in RV. (*See* Exs. 14-15; *see also* Ex. 1 at 264:24-265:4.) This spreadsheet was fake—MTAG had custody of only 518 tax lien certificates, worth $1.3 million RV. (Ex. 16)—but there would have been no need for Defendants to create and submit a fake custodial report had Grady known, as Defendants self-servingly claim, that he was aware that Defendants were self-servicing EBCC's collateral. The undisputed record thus establishes that Hanratty provided incorrect information to EBCC by repeatedly including ineligible, self-serviced collateral in the borrowing bases.

*Second*, Hanratty repeatedly provided incorrect information about the value of the collateral. According to Defendants' 2019 audited financial statements, the value of their tax lien portfolios was only approximately $17 million (*See* Ex. 1 at 496:5-499:11; *see also* Exs. 8-9.) Hanratty now concedes that Defendants' tax lien portfolio is worth less than $14.5 million. (Ex. 1 at 270:19-271:24.) Yet throughout 2021, Hanratty persistently told EBCC that it was overcollateralized and secured by nearly $30 million in tax lien collateral. (Ex. 1 at 175:14-183:11.) Hanratty also provided a fake custodial report to EBCC, as described above, indicating that EBCC's tax lien portfolio contained 6,782 tax lien certificates, purportedly worth $27.8 million RV. (Exs. 14-15.) These valuations were vastly overinflated; again Defendants admitted in December 2021 that their tax lien portfolios contained, at most, 1,544 liens, purportedly worth $19.1 million RV (Ex. 16), and have since admitted that their tax lien portfolios are worth less than $14.5 million (Ex. 1 at 270:19-271:24).

In sum, there can be no dispute that Hanratty provided false information to EBCC, causing damage to EBCC when Defendants unexpectedly were unable to repay the amounts

-15-

outstanding under the Credit Facilities at maturity. Hanratty thus is personally liable for EBCC's damages under the Validity Guaranties.

2.    Hanratty Also Is Liable as an Alter Ego of the Borrowers and Guarantors.

The second grounds for imposing individual liability on Hanratty is his status as an alter ego of the Borrowers and Guarantors.[6] Under New York law, alter ego liability is appropriate where the defendant: (i) "exercised complete domination of the corporation in respect to the transaction attacked" and (ii) used that domination "to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." _Morris_ v. _N.Y.S. Dept. of Tax'n & Fin._, 82 N.Y.2d 135, 141 (1993); _Rockefeller_ v. _Statement Servs., Corp._, 204 A.D.3d 922, 924 (2d Dep't 2022) ("Equity will intervene to 'pierce the corporate veil' and permit the assertion of claims against the individuals who control the corporation in order to avoid fraud or injustice." (citation omitted)). Every Defendant to this lawsuit is nothing more than an alter ego of Hanratty, who personally directed every action, and therefore every breach, of the Credit Agreements.

As to the first factor, the record is replete with uncontroverted evidence that Hanratty dominated the Ebury Companies. To determine whether sufficient domination exists, the Court may consider factors such as the overlap in ownership, officers, directors and personnel; common office space; and whether the corporate entities were adequately capitalized. _See Shisgal_, 21 A.D.3d at 848.[7]

---

[6]    Defendant Ebury RE LLC and the other Ebury Companies also are alter egos of one another and of Hanratty, for the same reasons discussed in this section.

[7]    _See also Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund_ v. _Allure Metal Works, Inc._, 209 A.D.3d 712, 714 (2d Dep't 2022) (defendants shared personnel, office space, and equipment, and engaged in the same business); _Perez_ v. _Long Island Concrete Inc._, 203 A.D.3d 552, 554 (1st Dep't 2022) (defendants shared personnel, equipment, and payroll); _UBS Secs. LLC_ v. _Highland Cap. Mgmt., L.P._, 93 A.D.3d 489, 490 (1st Dep't 2012) (defendants were operated "as a single economic entity").

-16-

There can be no dispute that Hanratty dominated the Ebury Companies. Hanratty is the manager and only member of Ebury Street Capital. (Ex. 1 at 22:14-24:2.) Ebury Street Capital, in turn, is the general partner of Ebury Fund 1, LP, and Ebury Fund 2, LP, which collectively own and control all of the other Ebury Companies. (*Id*.) Further, none of the Ebury Companies has its own employees. (*Id.* at 28:16-20; *see also* Ex. 22 (Mendez Dep. Tr.) at 55:8-14.) Instead, as explained by Dennisse Mendez, Ebury's Director of Operations, Defendants' few employees are employed by "Greater Flamingo LLC"—a subsidiary of the Funds—although they call themselves Ebury employees. (Ex. 22 at 23:9-16; *see id*. at 41:8-11 ("**Q.** With respect to Greater Flamingo, John controls that company as well? . . . **A.** That's correct.").) All Defendants share the same office space. (*Id.* at 56:12-24.) And Hanratty moves funds between the Defendants without regard for their separate corporate forms. (*See*, *e.g.*, Ex. 23 (Xie Dep. Tr.) at 44:19-45:4.)

The consistent testimony from each and every Ebury employee—current and former—was that Hanratty made every important decision at the Ebury Companies. Ping Xie, Ebury's former financial controller, admitted that "John [Hanratty] is our decision maker" and "made all decisions related to how to use funds." (Ex. 23 at 46:5-8, 132:8-13.) Mendez further agreed that Hanratty was "in charge," made "all of the decisions," and was the "ultimate decision maker."[8] (Ex. 22 at 40:19-41:4.) Hanratty thus was the "central figure in the scheme" and the imposition of alter ego liability is entirely proper. *See*, *e.g.*, <u>Kashi v. Gratsos</u>, 790 F.2d 1050, 1055-56 (2d Cir. 1986).

---

[8]    EBCC witnesses provided similar testimony. (*See*, *e.g.*, Ex. 3 at 288:19-289-8 ("[Hanratty] was a one-man band. So anything that happened in Ebury, I mean, John [Hanratty] was well-aware.").)

Not only did Hanratty dominate the Ebury Companies, but also he used that domination to commit a wrong against EBCC. "Wrongdoing in this context does not necessarily require allegations of actual fraud. While fraud certainly satisfies the wrongdoing requirement, other claims of inequity or malfeasance will also suffice." *Baby Phat Holding Co., LLC* v. *Kellwood Co.*, 123 A.D.3d 405, 407 (1st Dep't 2014) (citation omitted); *accord Azte Inc.* v. *The Auto Collection, Inc.*, 2012 WL 3887671, at *9 (Sup. Ct. Kings Cnty. 2012) (imposing alter ego liability "[e]ven where outright fraud is not established"). Notably, Hanratty stands accused of fraud not only by EBCC, his primary lender (*see* Dkt. No. 1); but also by:

- ***his investors***, Complaint, *Brinker-Cohen Family Tr.* v. *Ebury Fund I, LP*, Index No. 50611/2019 (Sup. Ct. West. Cnty., filed Jan. 9, 2019), Dkt. No. 1;

- ***his business partners*** (Dkt. No. 14);

- ***his transaction counterparties***, Complaint, *Jefferson St NW JZ, LLC* v. *Red Clover 1, LLC*, Index No. 64292/2023 (Sup. Ct. West. Cnty., filed July 27, 2023), Dkt. No. 1; and

- ***the United States Department of Justice***, which has charged him with bank and wire fraud in connection with his scheme to defraud EBCC, *see United States* v. *John Arthur Hanratty*, No. 1:23-mj-07566 (filed Dec. 15, 2023), ECF No. 1.

The imposition of alter ego liability here is warranted because of Hanratty's pervasive wrongdoing. For example, around September 2018, Hanratty sold a portfolio of liens that were EBCC's collateral and remitted the proceeds directly to an investor. (*See* Ex. 1 at 603:4-606:15.) Hanratty admits that doing so was an event of default under the Credit Agreements and that he failed to provide the required notice to EBCC. (*Id.* ("**Q.** You were in default of the credit agreements when you made this distribution to Mr. Leventhal? . . . **A.** Yes. The normal course for that cash would have been to go to the [EBCC] lockbox. **Q.** And you did not notify Emigrant of this default, correct? . . . **A.** I don't believe I did.").) Even worse, Hanratty

-18-

"continued to submit signed certifications to Emigrant that there were no outstanding events of default." (*Id.* ("**A.** In a normal course of reporting, yes, I would have signed documents reflecting such, yes.").) Those certifications were false, and Hanratty providing dozens of false certifications to EBCC more than establishes sufficient wrongdoing to impose alter ego liability. *See Baby Phat*, 123 A.D.3d at 407.

But Hanratty's misconduct was not isolated to those false certifications. Hanratty repeatedly misused advances under the Credit Agreements and provided false information to EBCC. Under the Credit Agreements, Defendants were allowed to use "[a]dvances . . . solely for the purpose of acquiring Eligible Tax Liens" or "to finance ordinary and necessary expenses of the business operations of the Ebury Companies incurred in the ordinary course of the business." (Dkt No. 6 § 6.26.) Despite these restrictions, Defendants repeatedly used advances to make distributions to investors and for settlement payments for actual and threatened litigation. (*See* Ex. 23 at 131:13-15; Ex. 1 at 603:4-608:14.) For example:

- On September 7, 2018, Defendants used a $3.8 million advance to distribute $3.3 million to an investor, rather than to purchase tax liens. (*See* Dkt. No. 5 ¶ 20.)

- On November 9, 2018, Defendants used a $220,000 advance to make a $288,810.67 distribution to an investor, rather than to purchase tax liens. (*See* Ex. 1 at 400-02.)

- On May 17, 2019, Defendants used an $860,000 advance—combined with proceeds from selling Emigrant's collateral—to make a $1.2 million settlement payment to disgruntled investors. (*See* Ex. 22 at 182-84.)

- On September 13, 2019, Defendants used a $850,000 advance to distribute $749,000 to investors who had threatened to sue Hanratty. (*See* Ex. 22 at 187.)

In total, between 2018 and 2019, Hanratty paid his investors approximately $21 million, in violation of the limits imposed by the Credit Agreements. (Ex. 1 at 404:11-15.) These actions

-19-

were events of default under the Credit Agreement and constitute wrongdoing sufficient to impose alter ego liability.

In sum, Hanratty dominated each Ebury Company and he used that domination in the transactions at issue—the advances and extensions granted by EBCC—to abuse the corporate form and damage EBCC. Hanratty thus is individually liable for Defendants' breaches of the Credit Agreements. *See* *Palmerone* v. *Staples*, 195 A.D.3d 736, 739 (2d Dep't 2021) (piercing the corporate veil where defendant solely owned corporate defendant, conveyed property to avoid debt, and defaulted on mortgages); *ED & F Man Sugar Inc.* v. *ZZY Distribs., Inc.*, 122 N.Y.S.3d 266, 268 (1st Dep't 2020) (piercing the corporate veil where defendant moved funds between multiple companies and third parties, leaving corporate entity unable to pay its outstanding debt to plaintiff).[9]

### D.    EBCC Is Entitled to a Judgment of $20,213,473.65 Plus Prejudgment Interest and Attorneys' Fees

"[A] party seeking recovery for breach of contract is entitled 'to be made whole.'" *Credit Suisse First Bos.* v. *Utrecht-Am. Fin. Co.*, 84 A.D.3d 579, 580 (1st Dep't 2011) (citation omitted). That includes compensation for "money that the breaching party agreed to pay under the contract." *Biotronik A.G.* v. *Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 805 (2014) (citation omitted). At the point that Defendants breached their obligations under the Credit

---

[9]    *See also* *CC Ming (USA) Ltd. P'ship* v. *Champagne Video, Inc.*, 232 A.D.2d 202, 202 (1st Dep't 1996) (piercing the corporate veil where the shareholder dominated debtor, commingled funds, kept debtor undercapitalized and had the same officers, directors and shareholders); *EAC of N.Y., Inc.* v. *Capri 400, Inc.*, 49 A.D.3d 1006, 1007-08 (3d Dep't 2008) (piercing the corporate veil where shareholder commingled funds, dominated the corporation, and frustrated judgment collection); *Ventresca Realty Corp* v. *Houlihan*, 41 A.D.3d 707, 708 (2d Dep't 2007) (piercing the corporate veil where the corporation owned no assets, had no employees, held no regular meetings, maintained no corporate records or minutes, was inadequately capitalized, and held no regular elections of directors and officers).

Agreements—forcing EBCC to declare defaults—EBCC would have been entitled to repayment in the amount of $18,375,885.14, plus a 10% late payment fee.[10] (*See* Dkt. No. 12; Dkt. No. 7 at 4.) That amount ($20,213,473.65) is the base amount of damages.

In addition, an award of prejudgment interest "is *mandatory* in the breach of contract context." *Rosenblum* v. *Rosenblum*, 214 A.D.3d 440, 442 (1st Dep't 2023) (emphasis added); *see* CPLR 5001. While the statutory rate of interest is only 9%, CPLR 5004, "[a] loan agreement may provide for a higher rate of interest to apply in the event of a borrower's default," *Coffey* v. *Tretola*, 179 A.D.3d 889, 890 (2d Dep't 2020) (citation omitted); *see NML Cap.* v. *Republic of Argentina*, 17 N.Y.3d 250, 262 (2011) (same). Here, the Parties agreed to a default interest rate "two percentage points in excess of the per annum interest rate then in effect under" the promissory notes (Dkt. No. 7 at 4)—the defined Index Rate plus 8.25% (*id*; *see*, *e.g*., Dkt. No. 6 at 138).[11] Thus, Defendants must pay pre-judgment interest at the Index Rate plus 10.25%, from November 29, 2021 until judgment is entered. *See*, *e.g*., *Kassab* v. *Kasab*, 195 A.D.3d 832, 838 (2d Dep't 2021) (applying 14% rate of default interest).

Finally, a contract "may provide for the payment of attorney's fees incurred to enforce the agreement." *Coffey*, 179 A.D.3d at 890; *see Suttongate Holdings Ltd.* v. *Laconm Mgmt. N.V.*, 193 A.D.3d 489, 490 (1st Dep't 2021) ("[P]laintiff was properly awarded attorneys' fees pursuant to the loan agreement and his guarantee"). Here, Defendants explicitly agreed to "pay all of the Lender's reasonable attorneys' fees, court costs and legal expenses." (Dkt. No. 6 § 11.7.) Plaintiff has accrued approximately $2 million in attorneys' fees in connection with "the

---

[10]    "[D]amages for breach of contract are calculated at the time of the breach." *Indeck Energy Servs., Inc.* v. *Merced Cap., L.P.*, 200 A.D.3d 455, 457 (1st Dep't 2021).

[11]    The Index Rate is defined as "the greater of: (a) 0.50% per annum; and (b) [LIBOR]." (Dkt. No. 7 at 3.) The promissory notes provide for the replacement of LIBOR with a "substantially similar index rate" in the event "LIBOR becomes unavailable." (*Id*.)

-21-

enforcement, protection, defense and collection" of the Credit Agreements, which must be added to the amounts Defendants must pay to make EBCC whole.

## **CONCLUSION**

EBCC respectfully requests that the Court grant EBCC summary judgment against all Defendants—including John Arthur Hanratty—as to EBCC's claims for breach of contract, and award EBCC its damages plus prejudgment interest and attorneys' fees.

Dated:   January 12, 2024
       New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*

Alexander J. Willscher
Austin P. Mayron
Erin L. Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business Credit Corporation*

-22-

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with the word-count limit of Commercial Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer, as modified by the Court (*see* Dkt. 112), because it contains 6,784 words.

Dated:    January 12, 2024                    Respectfully submitted,
          New York, New York

                                             */s/ Alexander J. Willscher*

                                             Alexander J. Willscher
                                             Austin P. Mayron
                                             Erin Savoie
                                             SULLIVAN & CROMWELL LLP
                                             125 Broad Street
                                             New York, New York  10004
                                             Telephone: (212) 558-4000
                                             Fax: (212) 558-3588

                                             *Attorneys for Plaintiff Emigrant Business
                                             Credit Corporation*

-23-

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 721 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| ———————————————— x | |
| EMIGRANT BUSINESS CREDIT CORPORATION, | : |
| | : |
| Plaintiff, | Index No. 158207/2022 |
| v. | (Hon. Margaret Chan) |
| JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1-10, | **MOTION SEQUENCE NO. 006** **AFFIRMATION OF ALEXANDER J. WILLSCHER** |
| Defendants. | : |
| ———————————————— x | |

**ALEXANDER J. WILLSCHER**, an attorney duly admitted to practice law in the Courts of the State of New York, affirms the truth of the following statements, under the penalties of perjury:

1.  I am a partner at the law firm of Sullivan & Cromwell LLP, counsel for Plaintiff Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned matter. I am familiar with the matters set forth below. I submit this affirmation in support of EBCC's Motion for Summary Judgment.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.: 122
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 722 of 2230

2.       Attached hereto as Exhibit 1 is a true and correct copy of the transcript of the deposition of John Hanratty, dated June 20, 2023 and June 21, 2023.

3.       Attached hereto as Exhibit 2 is a true and correct copy of text messages between Jack Grady and John Hanratty, dated July 1, 2021 to July 30, 2021, that were produced by Plaintiff in this action bearing production numbers EBCC_000008844 – EBCC_000008878.  This document was marked as Exhibit 14 during the deposition of John Hanratty.

4.       Attached hereto as Exhibit 3 is a true and correct copy of the transcript of the deposition of Jack Grady, dated June 6, 2023.

5.       Attached hereto as Exhibit 4 is a true and correct copy of the audited financial statements for Ebury Fund 1 and Ebury Fund 2 for the year ending December 31, 2018, that were produced by Plaintiff in this action bearing production numbers EBCC_000010586 – EBCC_000010643.  This document was marked as Exhibit 8 during the deposition of John Hanratty.

6.       Attached hereto as Exhibit 5 is a true and correct copy of the summary page of a borrowing base report, dated November 9, 2018, that was produced by Plaintiff in this action bearing production number EBCC_000004964.  This document was marked as Exhibit 4 during the deposition of John Hanratty.

7.       Attached hereto as Exhibit 6 is a true and correct copy of the summary page of a borrowing base report, dated May 17, 2019, that was produced by Plaintiff in this action bearing production number EBCC_000005218.  This document was marked as Exhibit 5 during the deposition of John Hanratty.

8.       Attached hereto as Exhibit 7 is a true and correct copy of the summary page of a borrowing base report, dated September 13, 2019, that was produced by Plaintiff in this action

-2-

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 122

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 723 of 2230

bearing production number EBCC_000005615. This document was marked as Exhibit 6 during the deposition of John Hanratty.

9.      Attached hereto as Exhibit 8 is a true and correct copy of the audited financial statements for Ebury Fund 1 for the year ending December 31, 2019, that was produced by Plaintiff in this action bearing production numbers EBCC_000010663 – EBCC_000010682. This document was marked as Exhibit 50 during the deposition of John Hanratty.

10.     Attached hereto as Exhibit 9 is a true and correct copy of the audited financial statements for Ebury Fund 2 for the year ending December 31, 2019, that was produced by Plaintiff in this action bearing production numbers EBCC_000010701 – EBCC_000010720. This document was marked as Exhibit 51 during the deposition of John Hanratty.

11.     Attached hereto as Exhibit 10 is a true and correct copy of text messages between Jack Grady and John Hanratty, dated May 1, 2021 to May 28, 2021, that were produced by Plaintiff in this action bearing production numbers EBCC_000008797 to EBCC_000008834. This document was marked as Exhibit 13 during the deposition of John Hanratty.

12.     Attached hereto as Exhibit 11 is a true and correct copy of emails between Jack Grady and John Hanratty, dated March 11, 2021 to March 18, 2021, that were produced by Defendants in this action bearing production numbers EBURY_00012283 – EBURY_00012285. This document was marked as Exhibit 35 during the deposition of Jack Grady.

13.     Attached hereto as Exhibit 12 is a true and correct copy of text messages between Jack Grady and John Hanratty, dated March 1, 2021 to March 30, 2021, that were produced by Plaintiff in this action bearing production number EBCC_000008667 – EBCC_000008711. This document was marked as Exhibit 18 during the deposition of John Hanratty.

-3-

14.     Attached hereto as Exhibit 13 is a true and correct copy of emails between Jack
Grady and John Hanratty, dated April 21, 2021 to April 22, 2021, that were produced by Plaintiff
in this action bearing production numbers EBCC_000007648 – EBCC_000007649.   This
document was marked as Exhibit 22 during the deposition of John Hanratty.

15.     Attached hereto as Exhibit 14 is a true and correct copy of an email from John
Hanratty to Jack Grady, dated August 31, 2021, that was produced by Plaintiff in this action
bearing production number EBCC_000008420.  This document was marked as Exhibit 25 during
the deposition of John Hanratty.

16.     Attached hereto as Exhibit 15 is a true and correct copy of excerpts from the
attachment to Exhibit 14, an Excel spreadsheet titled "MTAG Active Lien Detail 8.31.2021.xlsx,"
that was produced by Plaintiff in this action bearing production number EBCC_000008421.

17.     Attached hereto as Exhibit 16 is a true and correct copy of excerpts from an Excel
spreadsheet entitled "Active Lien Detail," that was produced by Plaintiff in this action bearing
production number EBCC_000010281.

18.     Attached hereto as Exhibit 17 is a true and correct copy of text messages between
Jack Grady and John Hanratty, dated April 1, 2021 to April 30, 2021, that were produced by
Plaintiff in this action bearing production numbers EBCC_000008712 – EBCC_000008796.  This
document was marked as Exhibit 19 during the deposition of John Hanratty.

19.     Attached hereto as Exhibit 18 is a true and correct copy of emails between Jack
Grady and John Hanratty, dated April 7, 2021 to April 8, 2021, that were produced by Plaintiff in
this action bearing production numbers EBCC_000007620 – EBCC_000007621.  This document
was marked as Exhibit 20 during the deposition of John Hanratty.

-4-

20.     Attached hereto as Exhibit 19 is a true and correct copy of emails between John Hanratty and Jack Grady, dated April 12, 2021 to April 13, 2021, that were produced by Plaintiff in this action bearing production numbers EBCC_000017846 – EBCC_000017847.   This document was marked as Exhibit 21 during the deposition of John Hanratty.

21.     Attached hereto as Exhibit 20 is a true and correct copy of emails between John Hanratty and Jack Grady, dated April 24, 2021, that were produced by Plaintiff in this action bearing production number EBCC_000017855 – EBCC_000017856.  This document was marked as Exhibit 23 during the deposition of John Hanratty.

22.     Attached hereto as Exhibit 21 is a true and correct copy of text messages between John Hanratty and Jack Grady, dated September 1, 2021 to September 30, 2021, that were produced by Plaintiff in this action bearing production numbers EBCC_000008905 – EBCC_000008924.  This document was marked as Exhibit 24 during the deposition of John Hanratty.

23.     Attached hereto as Exhibit 22 is a true and correct copy of the transcript of the deposition of Dennisse Mendez Baez, dated June 2, 2023.

24.     Attached hereto as Exhibit 23 is a true and correct copy of the transcript of the deposition of Ping Xie, dated August 2, 2023.

25.     Attached hereto as Exhibit 24 is a true and correct copy of emails between Barbara Ilsen, Patrick Seymour, and Jack Grady, dated September 20, 2019, that were produced by Plaintiff in this action bearing production numbers EBCC_000005627 – EBCC_000005628.   This document was marked as Exhibit 26 during the deposition of Jack Grady.

26.     Attached hereto as Exhibit 25 is a true and correct copy of organizational charts that were produced by Plaintiff in this action bearing production numbers EBCC_000016681 –

EBCC_000016685.  This document was marked as Exhibit 2 during the deposition of John

Hanratty.


Dated:    January 12, 2024              /s/ Alexander J. Willscher
          New York, New York           **ALEXANDER J. WILLSCHER**

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this affirmation complies with the word count limit of Commercial

Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because

it contains 1,259 words.


Dated:   January 12, 2024                    */s/ Alexander J. Willscher*
         New York, New York                  Alexander J. Willscher

# EXHIBIT 1

### In the Matter Of:

*EMIGRANT BUSINESS CREDIT vs*

*JOHN ARTHUR HANRATTY*

---

## *JOHN HANRATTY*

### *June 20, 2023*

---



24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 730 of 2230

1

1

2      SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF NEW YORK
3

4      EMIGRANT BUSINESS CREDIT          Index No.
       CORPORATION,
5                                        158207/2002
                   Plaintiffs
6
            v.
7
       JOHN ARTHUR HANRATTY,
8      EBURY STREET CAPITAL, LLC,
       EBURY FUND 1, LP,
9      EBURY FUND 2, LP,
       EBURY 1EMI LLC,
10     EBURY 2EMI LLC,
       EB 1EMIALA LLC,
11     EB 2EMIALA LLC,
       EB 1EMIFL, LLC,
12     EB 2EMIFL, LLC,
       EB 1EMIIN, LLC,
13     EB2EMIIN, LLC,
       EB 1EMIMD, LLC,
14     EB 2EMIMD, LLC,

15                 Defendants.
       _____/
16     (Continuation on next page)

17                 VOLUME I

18          VIDEOTAPED DEPOSITION

19                   OF

20          JOHN A. HANRATTY

21          NEW YORK, NEW YORK

22       TUESDAY, JUNE 20, 2023

23

24     Reported Stenographically by:
       ANNETTE ARLEQUIN, CCR/CSR, RPR, CRR, RSA
25     JOB NO. 2023-899116

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 731 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                      June 20, 2023

2

1

2    (Continued caption.)

3    EB 1EMINJ, LLC,
     EB2EMINJ, LLC,
4    EB 1EMINY, LLC,
     EB 2EMINY, LLC,
5    EB 1EMISC, LLC,
     EB 2EMISC, LLC,
6    RE 1EMI LLC,
     RE 2EMI LLC,
7    EB 1EMIDC, LLC,
     ARQUE TAX RECEIVABLE
8    FUND (MARYLAND), LLC,
     EBURY FUND 1FL, LLC,
9    EBURY FUND 2FL, LLC,
     EBURY FUND 1NJ, LLC,
10   EBURY FUND 2NJ, LLC,
     RED CLOVER 1, LLC,
11   EBURY RE LLC, and
     XYZ CORPS,

12
                 Defendants.
13   ----------------------------X

14                   June 20, 2023

15                   11:00 a.m.

16        Videotaped deposition of JOHN

17        HANRATTY, VOLUME I, held at the offices

18        of SULLIVAN & CROMWELL, 125 Broad

19        Street, New York, New York, pursuant to

20        Notice, before Annette Arlequin, a

21        Certified Court Reporter, a Registered

22        Professional Reporter, a Certified

23        Realtime Reporter, and a Realtime

24        Systems Administrator and a Notary

25        Public of the State of New York.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO. 4                                        RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 732 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                      June 20, 2023

3

 1

 2    A P P E A R A N C E S :

 3    SULLIVAN & CROMWELL, LLP

 4    Attorneys for Plaintiff Emigrant Business

 5    Credit Corporation

 6        125 Broad Street

 7        New York, New York 10004

 8    BY: AUSTIN P. MAYRON, ESQ.

 9    BY: ALEXANDER J. WILLSCHER, ESQ.

10        Telephone: (212) 558-4000

11        Fax: (212) 558-3588

12

13    GUSRAE KAPLAN NUSBAUM PLLC

14    Attorneys for Defendants

15        120 Wall Street

16        New York, New York  10005

17    BY: KARI PARKS, ESQ.

18        VICTOR WANG, (Not yet admitted)

19

20    ALSO PRESENT:

21    DECLAN BUTVICK, In-house, Emigrant Bank

22    EMMA BURKE, Summer Associate - Sullivan

23    FARRAH KALACH, Summer Associate -Sullivan

24    DANNY ORTEGA, Legal Videographer, Lexitas

25            - o0o -

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 185 RECEIVED NYSCEF: 01/12/2024

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | THE VIDEOGRAPHER:  We are now on |
| 3 | the record.  My name is Danny Ortega |
| 4 | and I am the legal videographer for |
| 5 | Lexitas Reporting. |
| 6 | Today's date is June 20th, 2023, |
| 7 | and the time is 11:13 a.m. |
| 8 | This video deposition is being |
| 9 | held at 125 Broad Street, New York, New |
| 10 | York, in the matter of Emigrant |
| 11 | Business Credit Corporation versus John |
| 12 | Hanratty, et. al.  The deponent today |
| 13 | is John Hanratty. |
| 14 | Counsel, please identify |
| 15 | yourselves for the record. |
| 16 | MR. MAYRON:  Austin Mayron of |
| 17 | Sullivan & Cromwell on behalf of |
| 18 | plaintiff Emigrant Business Credit |
| 19 | Corporation.  With me today are Alex |
| 20 | Willscher, also of Sullivan & Cromwell, |
| 21 | Emma Burke, who is a summer associate |
| 22 | at Sullivan & Cromwell, and Declan |
| 23 | Butvick, who is the deputy general |
| 24 | counsel of Emigrant Bank. |
| 25 | MS. PARKS:  Good morning.  Kari |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 60
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

5

```
 1            J. Hanratty
 2        Parks for the Ebury defendants.  With
 3        me is my client, of course, John
 4        Hanratty, and our law clerk, Victor
 5        Wang.
 6            THE VIDEOGRAPHER:  Court reporter
 7        today is Annette Arlequin and will now
 8        swear in the witness.
 9
10         J O H N   A.   H A N R A T T Y,
11    called as a witness, having been duly sworn
12            testified as follows:
13            - - - - - - - -
14            THE WITNESS:  I affirm.
15    EXAMINATION BY
16    MR. MAYRON:
17        Q.   Thank you for joining us today,
18    Mr. Hanratty.  For the next two days, I am
19    going to be asking you questions about your
20    relationship with Emigrant Bank.  Unless
21    Ms. Parks instructs you not to answer a
22    question, you must answer my questions.
23            If you do not understand one of
24    my questions, you can ask, and I will
25    repeat or rephrase the question.  And if
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 735 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

6

          1                     J. Hanratty

          2     you don't ask me to clarify a question, I

          3     will assume that you understand it.

          4             Is that okay?

          5        A.    That's okay.

          6        Q.    Is there any reason why you

          7     cannot provide truthful testimony today?

          8        A.    No.

          9        Q.    Have you been deposed before?

         10        A.    I have.

         11        Q.    How many times?

         12        A.    Four.

         13        Q.    Can you tell me about each of

         14     those times?

         15        A.    Yes.  Two times.  It was at my

         16     old employment with a broker-dealer called

         17     OTA.  In my capacity as chief compliance

         18     officer, I had to give testimony in a

         19     matter in front of the SEC, two times

         20     FINRA, one time in the -- I believe the

         21     State of New York one time.

         22        Q.    And what was the context of the

         23     State of New York case?

         24        A.    It was a registration case.  I

         25     had an investment advisory business as

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 736 of 2230
RECEIVED NYSCEF: 01/12/2024
John Hanratty
June 20, 2023

7

|     | J. Hanratty |
| --- | --- |

1              J. Hanratty

2   well.

3        Q.   And what were the FINRA cases?

4        A.   FINRA cases were related to the

5   broker-dealer disseminated research.  It

6   was an investigation related to the

7   research product and how it interacted with

8   the investment advisor.

9        Q.   So now I'd like to just go

10  through a little bit about your background.

11             So you obtained a Bachelor of

12  Arts degree from Fordham?

13       A.   I did.

14       Q.   What was your major at Fordham?

15       A.   Public administration.

16       Q.   And then you obtained a juris

17  doctor from Brooklyn Law School?

18       A.   I did.

19       Q.   What year did you graduate from

20  Brooklyn Law School?

21       A.   2001.

22       Q.   And you were admitted to the New

23  Jersey bar in 2001?

24       A.   No.  I think it was -- I don't

25  recall offhand.  But I think I graduated

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 3
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

1           J. Hanratty

2   midyear, so I think I had like a lag of the

3   next bar test is what I kind of recall.  So

4   it might have been '02.

5        Q.   And currently you're

6   administratively ineligible to practice law

7   in New Jersey?

8        A.   Yes.

9        Q.   Do you know why that is?

10        A.   Not offhand.  I think it's -- not

11   supposed to guess, but CLE, continuing

12   legal education.

13        Q.   And then you were admitted to the

14   New York bar in 2002?

15        A.   Yes.

16        Q.   And you're currently an active

17   member of the New York bar?

18        A.   I am.

19        Q.   What was your first job out of

20   law school?

21        A.   I worked in the compliance

22   department -- sorry, I apologize.  I worked

23   in the compliance department for Bear

24   Stearns.  Out in Whippany, New Jersey.

25        Q.   And what was your role at Bear

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

9

```
 1                  J. Hanratty

 2    Stearns?

 3         A.   Junior.  It was a junior function

 4    of compliance, day-to-day oversight,

 5    reviewing reports, and just interacting

 6    with senior people.

 7         Q.   When you say "compliance," what

 8    do you mean?

 9         A.   So our role out in Whippany was

10    to oversee their retail brokerage

11    operation.  Bear Stearns had, at that time,

12    offices in like San Francisco, New York,

13    Boston, Atlanta.  I would say, off the top

14    of my head, six or seven offices.

15              Our job in that unit was to

16    monitor the activity, communications and

17    trading activity, recommendations.  And

18    look for aberrant behavior and also deal

19    with any complaints or cases or interaction

20    with regulators.

21         Q.   What was your next job after Bear

22    Stearns?

23         A.   After Bear Stearns, I went to a

24    company by the name of Herzog Heine Geduld.

25         Q.   I have no idea how to pronounce
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
24-04020-dsj
RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records   Pg 739 of 2230
John Hanratty
JOHN ARTHUR HANRATTY
June 20, 2023

10

J. Hanratty

1          it, so thank you.

2              A.    It's okay.  It's an old company.

3              Q.    What was your role at Herzog

4       Heine Geduld?

5              A.    Similar function to Bear Stearns.

6       Compliance analyst.  Specifically Herzog

7       Heine Geduld was under a settlement with

8       the Department of Justice which required

9       Herzog to have a phone monitoring on every

10      day of their roughly 300 traders.

11             Q.    Yeah.

12             A.    And so half my day was that.

13      They wanted attorneys for that role.  I

14      think that was part of the settlement.

15             And then doing, I would say,

16      generic compliance and legal function.

17             Q.    And what do you mean by "generic

18      compliance and legal function"?

19             A.    It's similar to the activity at

20      Bear Stearns.  A compliance department.  A

21      broker-dealer generates a bunch of

22      monitoring reports, trading communications,

23      on-boarding of clients.  And so from what I

24      recall, I would be involved with reports

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 65

RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 740 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

11

J. Hanratty

1

2  on -- back then, front running of trades

3  was a very big topic, and so that was one

4  of my roles that I did on a daily basis was

5  go through trading runs and see where

6  Herzog on the principal account may have

7  purchased the head of an order that was

8  protected for a client.

9       Q.   And then, shot in the dark, next

10  you worked at Merrill Lynch?

11       A.   Yes.  But I didn't change roles.

12  Merrill Lynch, after the dot-com -- no,

13  before that.  Merrill Lynch purchased

14  Herzog and then they -- the initial plans

15  were to keep it separate, but once 9/11

16  happened, Merrill Lynch moved in onto

17  Herzog's trading operation, and so they

18  ended up merging the broker-dealers,

19  absorbing it.

20       Q.   Was your position within the

21  compliance department, the legal

22  department, or neither?

23       A.   With Herzog, it was a smaller

24  shop.  And so multifunctions with Merrill

25  Lynch.  It was strictly compliance.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 741 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

12

|       | J. Hanratty |
|-------|-------------|
| 1     | J. Hanratty |
| 2     | Q.   Okay.  And when did you stop |
| 3     | working at Merrill Lynch? |
| 4     | A.   I would have to guess, but my |
| 5     | next job was with OTA, and I would estimate |
| 6     | around '07 and '08. |
| 7     | Q.   So around 2007, 2008, you started |
| 8     | working with OTA? |
| 9     | A.   Yes. |
| 10    | Q.   What is OTA? |
| 11    | A.   OTA is a registered broker-dealer |
| 12    | with the SEC and FINRA. |
| 13    | Q.   And what was your role at OTA? |
| 14    | A.   Initially, I was a senior |
| 15    | compliance officer. |
| 16    | Q.   And what was your responsibility |
| 17    | as senior compliance officer? |
| 18    | A.   Similarly to the other jobs. |
| 19    | It's just executing on creating and |
| 20    | maintaining a framework to make sure that |
| 21    | the broker-dealer complies with all |
| 22    | applicable regulations.  OTA's business was |
| 23    | two prong.  They had a technological |
| 24    | proprietary broker-dealer trading their own |
| 25    | money.  And then in addition to that, at |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

13

1           J. Hanratty

2    that time, they had an institutional sales

3    desk.  And so what that means is, they

4    would execute orders for large equity hedge

5    funds.

6        Q.   Was your role more internal

7    facing, sort of what was going on within

8    the bank, or looking at clients at the

9    bank?

10        A.   It wasn't a bank.  It was just a

11    broker-dealer.  I would know 95 percent

12    internal.  Any external interaction would

13    be with regulators.  Or in the event that a

14    client wanted to talk about how OTA

15    operated.

16        Q.   And how long did you work at OTA?

17        A.   I was there for some time.  I

18    would -- not having looked at it prior to

19    coming here, I would estimate 12, 13 years.

20    I probably left 2016, so -- but I think I

21    was there for ten years.  I did leave in

22    '16.

23        Q.   And at some point you worked at

24    Prudential Financial?

25        A.   It was during law school, before

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022
NYSCEF DOC. NO.                                          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 743 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                          June 20, 2023

14

```
1              J. Hanratty

2    I was an attorney.

3         Q.   And what was your role at

4    Prudential?

5         A.   I worked in -- it was a

6    dual-prong unit of litigation support and

7    the group that would execute liens and

8    levies on accounts.  So people would have a

9    brokerage account or an insurance account.

10   They would have whatever lien comes up in

11   day-to-day life.  It would be -- come in,

12   that unit would make sure that that lien

13   was enforced.

14        Q.   And so what was your title when

15   you started at OTA?

16        A.   I don't recall.

17        Q.   Do you recall any of your titles

18   at OTA?

19        A.   Yes.  Initially, I started -- I

20   had a boss, his name was Rick Jaffe.  He

21   was the chief compliance officer.  And I

22   worked directly under him.  Rick retired

23   three or four years after I got there, and

24   so my title after that was chief compliance

25   officer.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 744 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

15

```
 1                    J. Hanratty

 2        Q.    And do you know how many years

 3   you were the chief compliance officer of

 4   OTA?

 5        A.    For the rest of my employment,

 6   which I'm estimating ended in 2016.

 7        Q.    You also at some point served on

 8   the board of advisors of OTR Global?

 9        A.    I did.

10        Q.    What is OTR Global?

11        A.    OTR Global is a -- was also a

12   broker-dealer.  When I first started

13   working with OTA, before when I referenced

14   they had two businesses.  They had a

15   proprietary trading business and they had a

16   institutional sales business.

17              Along with that sales business,

18   they had a research product called Off The

19   Record Research.  That was rebanded --

20   rebranded into something called OTR Global.

21   That research and the sales trading desk

22   were put into a different broker-dealer and

23   effectively spun off.

24        Q.    And what was your role at OTR?

25        A.    I think when the spinoff first
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1-2
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

16

```
 1              J. Hanratty
 2   occurred, I was the chief compliance
 3   officer of that broker-dealer as well.
 4        Q.   And are you still affiliated with
 5   OTR?
 6        A.   No.
 7        Q.   When did you stop being
 8   affiliated with OTR?
 9        A.   Prior to ending my affiliation
10   with OTA.
11             The spinoff was a business one at
12   first, and then because the business was
13   embedded within OTA, there was many units
14   that provided support for it.  And OTR
15   slowly backfilled and hired people
16   themselves.  So they hired a chief
17   compliance officer.
18        Q.   Just for the record, Burke Gursoy
19   and the summer associate at Sullivan &
20   Cromwell just brought in a document.
21             So at one point, you were a
22   registered FINRA broker?
23        A.   I had licenses, yes.  A series,
24   if you mean by Series 7?
25        Q.   Well, let's start with -- you did
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 177

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 746 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

17

1                     J. Hanratty

2    the Series 63?

3         A.    Yes.

4         Q.    The Series 7?

5         A.    Yes.

6         Q.    The Series 24?

7         A.    Yes.

8         Q.    The Series 14?

9         A.    I don't recall what that one is.

10   I don't remember that one.  That might be

11   options principal, but I'm guessing.

12        Q.    I think it's related to

13   compliance.

14        A.    Okay.

15        Q.    Does it jog your memory?

16        A.    It was a while ago.

17        Q.    I think it was 2007.

18              And then you passed the

19   Securities Industry Essentials examination

20   in 2018?

21        A.    I do not recall.

22        Q.    Do you recall passing the

23   Securities Industry Essentials examination?

24        A.    No.

25              MS. PARKS:   Austin, is that the

18

         J. Hanratty

SIE?

     Does that ring a bell?

     THE WITNESS:  No.

     MS. PARKS:  Okay.  I tried.

BY MR. MAYRON:

   Q.   Approximately how much time did
you spend preparing for this deposition?

   A.   Approximately, approximately 30
minutes.

   Q.   And who did you speak with to
prepare?

   A.   My attorneys, Kari Parks and
Victor.

   Q.   And when was this prep?

   A.   I spoke with Kari yesterday
afternoon and this morning.

   Q.   And then other than your counsel,
have you spoken to anyone about this
litigation?

   A.   The litigation, this litigation?
I made my family aware.

   Q.   You said and that's it?

   A.   Yes.

   Q.   Okay.  What did you tell your

19

```
 1                  J. Hanratty

 2   family about this litigation?

 3        A.   That I am in litigation with

 4   Emigrant Bank.

 5        Q.   Did you tell them anything else?

 6        A.   Nothing specific, no.

 7        Q.   Anything generally?

 8        A.   Not beyond we're in litigation

 9   with Emigrant Bank.

10        Q.   Can you tell me about the origin

11   of the Ebury companies?

12        A.   Sure.

13             The Ebury companies started from

14   a company by the name of Rose Hill.  And so

15   the real beginning, back in '2008-'9, I

16   began purchasing tax liens with my own --

17   with my own money.  And it was a smallish

18   investment; it wasn't big.  It wasn't that

19   time consuming.

20             The partners at OTA in

21   conversations with them, took an interest

22   into potentially investing in it.  They put

23   some investment money into an LLC by the

24   name of Rose Hill.  That LLC grew probably

25   for a couple of years.  And then around
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    EMIGRANT BUSINESS CREDIT    Court Records    Pg 749 of 2230    RECEIVED NYSCEF: 01/12/2024
JOHN ARTHUR HANRATTY

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
John Hanratty
June 20, 2023

20

```
 1              J. Hanratty

 2   2012, it had gotten to the point of size

 3   where -- 2012, 2013 generally -- where I

 4   either had to shut it down or decide if it

 5   was a business or not.  And so from there,

 6   I decided to make it a business.  And from

 7   there, Rose Hill became the Ebury

 8   companies.

 9        Q.   How did you get exposed to tax

10   lien investing?

11           MS. PARKS:  Objection to form.

12           Go ahead.  You can answer.

13           THE WITNESS:  Oh, okay.

14           MS. PARKS:  Unless I tell you --

15       I will tell you do not answer that.

16       Otherwise, go ahead.

17           THE WITNESS:  Okay.

18           MS. PARKS:  I'm going to object a

19       lot.  It's just part of the process.

20           THE WITNESS:  Yeah.  Good thing.

21        A.   I got exposed through -- I was

22   speaking -- it was -- I saw a -- an

23   advertisement in the Asbury Park Press, a

24   New Jersey newspaper, about a tax sale

25   coming up in Asbury Park.  And this was
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 133 RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
John Hanratty
June 20, 2023

21

J. Hanratty

1
2  after the real estate bubble.  And so I

3  asked my brother, who is a local attorney,

4  if he knew anything about them.  And he

5  does a lot of real estate closing.

6         He's like, yeah, it's an

7  investment.

8         And generally speaking, people

9  typically get paid at closings.  And

10  they're, you know, just effectively a

11  receivable.

12         So I went to an auction and

13  bought a couple.

14     Q.   And your first tax liens, what

15  was the exit?  Did they redeem?  Did you

16  sell them?  Did you foreclose?

17         MS. PARKS:  Objection.

18         Go ahead.

19     A.   They redeemed.

20     Q.   I am going to hand you -- this is

21  your affidavit from this litigation, Docket

22  Number 24.

23         MR. MAYRON:  And could the court

24      reporter please mark it as Hanratty

25      Deposition Exhibit 1.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 8 RECEIVED NYSCEF: 01/12/2024

22

```
 1                  J. Hanratty

 2              (Hanratty Exhibit 1, Affidavit of

 3          John Hanratty, marked for

 4          identification, as of this date.)

 5  BY MR. MAYRON:

 6      Q.   I'm just going to direct your

 7  attention to the very first page, the

 8  caption.

 9              You'll understand me if I refer

10  to the entities listed as defendants on the

11  first page other than you and XYZ Corps as

12  the Ebury companies?

13      A.   Yes.

14      Q.   And you are the founder and

15  managing partner of the Ebury companies?

16      A.   Yes.

17      Q.   You founded Ebury Street Capital

18  LLC in 2013?

19      A.    I founded Ebury Street Capital.

20  I don't recall the year; but generally

21  speaking, that sounds accurate.

22      Q.   And you were the manager of Ebury

23  Street Capital?

24      A.   Yes.

25      Q.   And you're also the only member
```

23

             J. Hanratty

 1

 2   of Ebury Street Capital?

 3        A.   Yes.

 4        Q.   You founded Ebury Fund 1 in 2015?

 5        A.   Yeah, I founded it.  Yes, same

 6   thing, the year sounds relatively accurate,

 7   but...

 8        Q.   And Ebury Street Capital is the

 9   general partner of Ebury Fund 1?

10        A.   Yes.

11        Q.   And you effectively managed Ebury

12   Fund 1?

13           MS. PARKS:  Objection to form.

14           Go ahead.

15        A.   Yes.

16        Q.   And then you founded Ebury Fund 2

17   in 2015?

18           MS. PARKS:  Objection.

19        A.   Yes.

20        Q.   Ebury Street Capital is the

21   general partner of Ebury Fund 2?

22        A.   Yes.

23        Q.   And you effectively managed Ebury

24   Fund 2?

25           MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 16
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT                                    John Hanratty
JOHN ARTHUR HANRATTY                                        June 20, 2023

                                                              24

 1                    J. Hanratty

 2        A.   Yes.

 3        Q.   Just to go back to one thing

 4   quickly.

 5             You said that the partners at OTA

 6   were interested in tax lien investing.

 7             Who were those partners?

 8        A.   The first one was a gentleman by

 9   the name of Kevin Heneghan.  And then Ira

10   Leventhal.

11        Q.   Any other investors?

12        A.   At the beginning, it was those

13   two.

14        Q.   What about when you founded Ebury

15   Fund 1?

16        A.   Fund 1, there were two other OTA

17   people who invested.  Their name is Jim

18   Santori and Stephan Skinner.

19        Q.   And then who were the initial

20   investors in Ebury Fund 2?

21        A.   It was Ira Leventhal.

22        Q.   What's the difference between

23   Ebury Fund 1 and Ebury Fund 2?

24             MS. PARKS:  Objection.

25             You can answer.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 12-2   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

25

|    |    |
|----|----|
| 1  | J. Hanratty |
| 2  | A.   The investors. |
| 3  | Q.   Why did you make two different |
| 4  | funds? |
| 5  | A.   At the request of Ira Leventhal. |
| 6  | Q.   Why did Ira Leventhal request |
| 7  | that you make a different fund? |
| 8  | A.   He wanted his own fund as opposed |
| 9  | to a co-mingled asset like co-mingled with |
| 10 | other investors. |
| 11 | Q.   Did Ira Leventhal tell you why he |
| 12 | wanted his own fund? |
| 13 | A.   Not that I can recall other than |
| 14 | that, not to be co-mingled with investors. |
| 15 | MR. MAYRON:   Would you hand me |
| 16 | 1681. |
| 17 | This is a document labeled EBCC |
| 18 | 16681, and could the court reporter |
| 19 | please mark it as Hanratty Deposition |
| 20 | Exhibit Number 2. |
| 21 | (Hanratty Exhibit 2, |
| 22 | Organizational chart for the Ebury |
| 23 | companies, Bates-stamped EBCC_16681 |
| 24 | through 6685, marked for |
| 25 | identification, as of this date.) |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022

NYSCEF DOC. NO.     EMIGRANT BUSINESS CREDIT Court Records     Pg 755 of 2230     RECEIVED NYSCEF: 01/12/2024
JOHN ARTHUR HANRATTY

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
John Hanratty
June 20, 2023

26

```
 1                    J. Hanratty

 2    BY MR. MAYRON:

 3         Q.   This is an organizational chart

 4    for the Ebury companies from 2021, correct?

 5              (Document review.)

 6         A.   I don't see it dated, but it

 7    looks to me this is our structure, in which

 8    it has not changed in many years.  So I'm

 9    -- I would estimate, guess that it is in

10    2021.

11         Q.   Is this organizational chart

12    accurate?

13              MS. PARKS:  Objection to form.

14              (Document review.)

15         A.   The only inaccuracy I could see

16    it would be inactive LLCs.

17         Q.   Which LLCs are inactive, to your

18    knowledge?

19         A.   Well, none here, but, for

20    example, the Legacy Capital One borrower

21    is, I believe, an LLC that is still

22    technically active but isn't reflected on

23    this, but holds no assets.

24         Q.   Each of the Ebury companies is

25    managed by Ebury Street Capital, correct?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022

NYSCEF DOC. NO. ...     Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
Court Records     Pg 756 of 2230
JOHN ARTHUR HANRATTY                          John Hanratty
                                              June 20, 2023

27

 1                    J. Hanratty

 2          MS. PARKS:  Objection.

 3     A.    Yes.

 4     Q.    And the principal place of

 5   business in each of the Ebury companies is

 6   644 Avenida Fernandez Juncos, District View

 7   Office Center, Suite 203, San Juan, Puerto

 8   Rico 00907?

 9          MS. PARKS:  Objection.

10     A.    Yes.

11     Q.    The Ebury companies all share an

12   office space?

13          MS. PARKS:  Objection.

14     A.    Yes, with the exception of -- so

15   you have companies -- clarify that for me.

16   So --

17     Q.    Well, none of the Ebury companies

18   has its own employees, correct?

19          MS. PARKS:  Objection.

20     A.    That's not true.  The employee --

21   so there are employees based in Puerto

22   Rico.  There are employees based in the

23   Philippines.

24     Q.    And what entity employs those

25   individuals?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 5
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

28

J. Hanratty

1

2      A.    The Puerto Rico people are

3  employed by the Greater Flamingo LLC.  And

4  the folks in the Philippines are employed

5  by a local LLC.  It's acronyms of the

6  employees.  I don't remember it offhand.

7      Q.    So just turning back to Hanratty

8  Deposition Exhibit 1, this is the

9  affidavit.

10      A.    Sure.

11      Q.    When I say "Ebury companies," I

12  am referring to the entities listed from

13  Ebury Street Capital down through Ebury RE,

14  LLC?

15      A.    Understood.

16      Q.    So none of the Ebury companies,

17  as I have defined it, has its own

18  employees?

19      A.    No, none of those companies have

20  employees.

21      Q.    Do the Ebury companies use the

22  same phone numbers?

23          MS. PARKS:  Objection.

24      A.    No.

25      Q.    Which Ebury companies use

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 206                                                RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT Court Records    Pg 758 of 2230

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
JOHN ARTHUR HANRATTY                                               John Hanratty
                                                                  June 20, 2023

29

                         J. Hanratty

1

2   different phone numbers?

3        A.    Generally we have a different

4   phone number for -- it's not company based;

5   it's function based.  So liens is a

6   different phone number from real estate.

7   Real estate sales is a different phone

8   number from real estate servicing.  And I

9   think that's -- that's generally how we

10  break it out.

11       Q.    So do the Ebury companies provide

12  services to each other?

13           MS. PARKS:  Objection.

14       A.    No.

15       Q.    Do the Ebury companies use the

16  same email domain?

17           MS. PARKS:  Objection.

18       A.    No.

19       Q.    What different email domains do

20  the Ebury companies use?

21       A.    There's Ebury Cap for Ebury

22  Street Capital and generally lien servicing

23  employees.  And then there is an Ebury RE

24  domain for employees who are solely on the

25  real estate side.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CRED Court Records    Pg 759 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                    June 20, 2023

30

1                    J. Hanratty

2          Q.   Do the same functions use the

3     same phone numbers across the Ebury

4     companies?

5              MS. PARKS:   Objection.

6          A.   I don't know.  Can you clarify?

7          Q.   For instance, does lien servicing

8     have the same phone number regardless of

9     which Ebury entity owns the lien?

10         A.    No.  I believe we have a

11    different phone number, for example, for

12    when we -- at the time when we had Kentucky

13    liens, I believe there was a Kentucky phone

14    number.

15             I believe that we have a

16    different phone number for the New York

17    liens than our general, kind of, I'll call

18    it 1-800 numbers for lien servicing.

19         Q.   Do those phone numbers go to the

20    same group of employees?

21         A.   They go to the -- it rings to the

22    specific person who is the -- assigned to

23    that function first.  And if they don't

24    pick up, we have a auto ring around.  And

25    so it will try one employee who is the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 105 RECEIVED NYSCEF: 01/12/2024

31

```
 1                  J. Hanratty
 2   primary on a given state, and if they're
 3   not there or off work, the system will
 4   rotate it to somebody in the same relative
 5   function but from a different state.
 6        Q.   And when you refer to employees,
 7   these are employees of Greater Flamingo or
 8   in the Philippines?
 9        A.   It depends on what they're doing,
10   but we would rotate phones from -- if
11   somebody in the Philippines is not at work
12   and they don't pick up, then it would ring
13   in Puerto Rico.
14        Q.   So at some point, you list -- the
15   Ebury companies established a borrowing
16   relationship with Capital One?
17        A.   Yeah.
18             MS. PARKS:  Objection.
19             THE WITNESS:  Sorry.
20             MS. PARKS:  It's okay.
21        A.   Yes.
22        Q.   Can you tell me the background
23   for that?
24             MS. PARKS:  Objection.
25        A.   The background was, as I referred
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 761 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                            June 20, 2023

32

        1              J. Hanratty

        2    to earlier, of -- deciding whether it was

        3    real business or not, it became apparent to

        4    me that this is an investment strategy

        5    where borrowing money made sense.  And at

        6    that time, Capital One was the largest

        7    lender in the space by far.  And so I got

        8    introduced to a person by the name of Troy

        9    Ritter, who worked at Capital One at the

       10    time, by a person by the name of Vince

       11    Sarullo, who worked for Tower Fund

       12    Services.

       13         Q.   What is Tower Fund Services?

       14         A.   They were a hedge fund

       15    administrator.  They would provide

       16    accounting, financials.  And then also

       17    ultimately for me, for -- they would

       18    provide lien servicing.  And that was

       19    generally it.

       20         Q.   What is lien servicing?

       21         A.   Tax lien servicing.

       22         Q.   What is tax lien servicing?

       23         A.   Sure.

       24              It a lien is similar to a

       25    mortgage in a few ways.  It's a -- it is an

J. Hanratty

2   obligation that gets attached to the deed

3   of a property.  And to ensure that you are

4   getting repaid back what you are owed,

5   there is a -- it requires somebody to

6   interact with the municipality who was the

7   originator of the lien.

8            And so the basic function of the

9   servicer would be to track the liens that

10   you own, compute interest that you are

11   owed.

12           And the main difference between

13   the lien and a mortgage is that these are

14   effectively on demand in that a mortgage,

15   you owe a payment every month and your

16   servicing is just making sure those

17   payments come in.  A lien you are not owed

18   anything until it's paid.  And the process

19   for getting paid is the homeowner or the

20   person who owes the money calls up the

21   town, generally speaking, not you.  There

22   are exceptions to that.  The town calls

23   you, confirms the amount.  You say we

24   agree.  And then the lien may or may not

25   get paid off.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT Court Records    Pg 763 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

34

```
 1                J. Hanratty

 2          So those are the functions of

 3    servicing.

 4       Q.   And so ultimately, you began a

 5    borrowing relationship with Capital One?

 6          MS. PARKS:  Objection.

 7       A.   Yes.

 8       Q.   Were you involved in negotiating

 9    the contracts with Capital One that

10    governed that relationship?

11          MS. PARKS:  Objection.

12       A.   Yes.

13       Q.   What were the key provisions of

14    the contracts with Capital One?

15          MS. PARKS:  Objection.

16       A.   There were many provisions.

17       Q.   Did Capital One require you to

18    use a third-party custodian?

19       A.   Yes.

20       Q.   Did Capital One require you to

21    use a third-party servicer?

22       A.   Yes.

23       Q.   Did Capital One have eligibility

24    requirements for tax liens?

25          MS. PARKS:  Objection.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj

EMIGRANT BUSINESS CREDIT Court Records    Pg 764 of 2230
JOHN ARTHUR HANRATTY                                      John Hanratty
                                                          June 20, 2023

35

J. Hanratty

1

2    A.   Yes.

3    Q.   Do you recall what those

4    requirements were?

5    A.   Not specifically.

6    Q.   Were some of those requirements

7    related to the age of the lien?

8         MS. PARKS:   Objection.

9    A.   I don't recall specifically.

10   Q.   Did Capital One restrict the

11   Ebury companies' ability to pay

12   distributions?

13        MS. PARKS:   Objection.

14   A.   I don't recall.

15   Q.   Did Capital One take a security

16   interest in Ebury companies' assets?

17        MS. PARKS:   Objection.

18   A.   Yes.

19   Q.   Were those assets collateral for

20   the Capital One credit facility?

21        MS. PARKS:   Objection.

22   A.   Yes.

23   Q.   Were the Ebury companies allowed

24   to transfer the collateral while there was

25   indebtedness outstanding?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 84                                              RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 765 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                              June 20, 2023

36

J. Hanratty

2          MS. PARKS:  Objection.

3     A.    No.

4     Q.    Did the Ebury companies have

5  reporting requirements to Capital One?

6          MS. PARKS:  Objection.

7     A.    Yes.

8     Q.    What sort of reporting

9  requirements?

10     A.    Monthly reporting requirements on

11  your financials, your collateral.

12          I believe offhand, they wanted a

13  report of what anticipated activity would

14  be as well.

15     Q.    What do you mean by that?

16     A.    Where, like, are you going to go

17  purchase more liens.  What are your

18  anticipation for -- they like to understand

19  how much you would be spending.

20     Q.    Did Capital One lend against

21  REOs?

22          MS. PARKS:  Objection.

23     A.    Can you clarify that?

24     Q.    Under the Capital One credit

25  agreements, were you allowed to include

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

37

```
 1              J. Hanratty
 2  REOs and the borrowing risks?
 3          MS. PARKS:  Objection.
 4      A.   It was not eligible collateral,
 5  if that's what you mean.
 6      Q.   Were tax liens that were in
 7  foreclosure eligible collateral with
 8  Capital One?
 9      A.   Yes.
10          MS. PARKS:  Objection.
11  BY MR. MAYRON:
12      Q.   When did you first approach
13  Emigrant about obtaining credit?
14          MS. PARKS:  Objection.
15      A.   I think roughly 2016.  That is
16  not -- yeah.
17      Q.   And when did you first obtain a
18  line of credit with Capital One?
19          MS. PARKS:  Objection.
20      A.   Oh, 2013?  I'm just -- my pause
21  is just the timing.  I feel like I was with
22  Capital One a little bit longer.  So I'm
23  not clear on the dates.
24      Q.   Why did you start looking for a
25  second lender?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 12 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 767 of 2230
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

```
 1                     J. Hanratty

 2               MS. PARKS:  Objection.

 3         A.    I looked for a second lender

 4   because the business was heavily leveraged

 5   -- not myself, but the other participants

 6   -- in that on a daily basis, competing with

 7   places that are much larger, much more well

 8   financed.  And for us to compete in a

 9   business and be profitable, I thought that

10   you could make more money on aged liens,

11   older product.

12               And so I started looking for

13   second lines of credit related to

14   specifically older liens.

15         Q.    What do you mean when you say

16   older liens?

17         A.    Any liens that were issued and

18   were older than a year.

19         Q.    So by aged tax liens, you mean

20   tax liens older than one year?

21               MS. PARKS:  Objection.

22         A.    Yes.

23         Q.    And you weren't allowed to

24   purchase those tax liens under the Capital

25   One facilities?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT                Court Records   Pg 768 of 2230        John Hanratty
JOHN ARTHUR HANRATTY                                                          June 20, 2023

39

```
 1                  J. Hanratty

 2            MS. PARKS:  Objection.

 3       A.   I was.

 4       Q.   So then why bring in a second

 5  lender?

 6       A.    For -- Capital One's -- Capital

 7  One would drive you towards buying directly

 8  from the municipality.  And so to purchase

 9  older liens, generally you're buying them

10  from other market participants.

11            And with Capital One I had to

12  bring a transaction to them to approve.

13  And so for me, I wanted to find another

14  lender who would lend to collateral that,

15  from my perspective, behave relatively

16  similarly to primary product.

17       Q.   And how would Capital One drive

18  you to purchase directly from the

19  municipality?

20            MS. PARKS:  Objection.

21       A.   They would -- I'd have any

22  secondary market transactions submitted and

23  approved by them directly.

24       Q.   They drove you to purchasing

25  directly from municipality by having them
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022

NYSCEF DOC. NO. 8        RECEIVED NYSCEF: 01/12/2024

                              J. Hanratty

1
2    -- having you submit secondary market

3    transactions to them directly?

4         A.   So I identify a portfolio on the

5    -- a secondary market portfolio that I

6    would like to purchase.  I bring it to

7    them.

8              I just -- I generally recall

9    conversations about starting one-off lines

10   of credit with them related to individual

11   purchases.  It just -- it was just a lot of

12   conversation without moving forward.

13             So inherently I would just do

14   what I always did, which was go buy product

15   from municipalities directly.

16        Q.   In your view, how old is too old

17   to buy tax liens on a secondary market?

18             MS. PARKS:  Objection.

19        A.   I don't have a view.  For me,

20   it's about enforceability and the

21   underlying collateral.  Age to me is -- if

22   you're protected by the law and you're

23   collateralized, the age is not as

24   important.  It's not as relevant.

25        Q.   Do you buy tax liens more than

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 770 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

41

```
1                   J. Hanratty

2    three years old?

3         A.   Yes.

4              MS. PARKS:  Objection.

5              THE WITNESS:  Sorry.

6              MS. PARKS:  It's okay.

7         A.   Yes.

8         Q.   Do you buy tax liens more than

9    five years old?

10             MS. PARKS:  Objection.

11        A.   I have, yes.

12        Q.   Did you buy tax liens more than

13   three years old using funds advanced under

14   the Emigrant credit facilities?

15        A.   Yes.

16        Q.   Did you buy tax liens more than

17   five years old using funds advanced under

18   the Emigrant credit facilities?

19             MS. PARKS:  Objection.

20        A.   Yes.

21        Q.   How did you get introduced to

22   Emigrant?

23             MS. PARKS:  Objection.

24        A.   I got introduced to Emigrant

25   through my father-in-law, who is neighbors
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2
RECEIVED NYSCEF: 01/12/2024

42

```
 1              J. Hanratty

 2   with a gentleman by the name of Bill Stout.

 3           And I think they -- I don't

 4   recall offhand how we started talking about

 5   work, but I think just generally in

 6   passing, I talked about work with Bill.

 7   Bill didn't work for the bank, I don't

 8   believe, but was with Emigrant.  Introduced

 9   me to Jack Grady at Emigrant.

10       Q.   What sort of conversations did

11   you have with Jack Grady?

12           MS. PARKS:  Objection.

13       A.   Initially, just -- I don't recall

14   the specific conversations, but generally,

15   you know, he's a -- it was

16   getting-to-know-you conversations of, you

17   know, what's my background, how long I've

18   been doing this and whether it was a fit

19   for Emigrant as lender.

20       Q.   Was Jack Grady experienced in tax

21   lien investing?

22           MS. PARKS:  Objection.

23       A.   I don't know offhand.

24       Q.   Did you get an impression of

25   whether he was experienced in tax lien
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM       INDEX NO. 158207/2022
NYSCEF DOC. NO. 155                                    RECEIVED NYSCEF: 01/12/2024

43

```
 1                  J. Hanratty

 2   investing?

 3          MS. PARKS:  Objection.

 4      A.   I got an impression that he was

 5   educated and good at what he did.  I don't

 6   recall asking him specifically about tax

 7   lien investing.

 8      Q.   During your initial

 9   conversations, were you familiar with the

10   mechanics of tax investing?

11          MS. PARKS:  Objection.

12      A.   I don't remember.

13      Q.   Did -- during your initial

14   conversations, did you have to explain ever

15   the mechanics of tax lien investing to Jack

16   Grady?

17          MS. PARKS:  Objection.

18      A.   I recall explaining the mechanics

19   to many people at Emigrant.  I believe the

20   process of getting a loan approved was over

21   -- over nine -- nine, ten, eleven months of

22   which we had many conversations.

23      Q.   So during your initial

24   conversations, did you have to explain the

25   mechanics of tax lien investing to Jack
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO. 661   RECEIVED NYSCEF: 01/12/2024

44

```
 1                    J. Hanratty

 2   Grady?

 3             MS. PARKS:  Objection.

 4        A.   I don't recall doing that

 5   specifically with Jack Grady.  I recall

 6   conversations that are very typical to when

 7   you're applying to a bank for a line of

 8   credit.

 9        Q.   Who do you recall explaining the

10   mechanics of tax investing to?

11        A.   I don't recall explaining.  I

12   recall giving background information as to

13   how the industry works and how my business

14   worked.  The initial sales, conversations

15   of which I cannot specifically recall, with

16   Jack and Karen.  I believe they had a

17   credit person who was involved as well.  I

18   don't remember the name of that person.

19        Q.   What were the terms of the credit

20   facility you were looking for from

21   Emigrant?

22             MS. PARKS:  Objection.

23        A.   The terms were relatively similar

24   to what I had with Capital One with the

25   exception that we were going to initially
```

45

J. Hanratty

1

2    purchase a portfolio of tax liens from a

3    company that was shutting down based in

4    Rochester, New York.

5        Q.    What was that company's name?

6        A.    American Tax Funding.   ATFS is

7    what they're known as.

8        Q.    And so in 2017, Emigrant extended

9    a line of credit to the Ebury companies?

10            MS. PARKS:   Objection.

11       A.    Yes.  Yes.

12       Q.    The transaction documents were

13   based on the transaction documents you used

14   for the Capital One facilities?

15            MS. PARKS:   Objection.

16       A.    Based -- I don't -- they were

17   very similar.  And I had given my documents

18   to, I don't recall who, but probably their

19   attorneys.  And -- but their attorneys put

20   in -- there were things very specific to

21   Emigrant as well.  It was a process.   It

22   was a ten-month process and it was legal

23   and credit approval.

24       Q.    What things specific to Emigrant

25   were put into the credit agreements?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 775 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

46

1                   J. Hanratty

2          MS. PARKS:  Objection.

3       A.   That I could purchase initially

4    the Rochester portfolio.

5       Q.   Anything else?

6       A.   I don't recall anything

7    specifically -- specific differences

8    comparatively to the two.

9       Q.   I'm handing you a document

10   labeled EBCC 9578.

11          MR. MAYRON:  And could the court

12          reporter please mark the document as

13          Hanratty Deposition Exhibit 3.

14              (Hanratty Exhibit 3, Credit

15          agreement between Ebury 1EMI LLC and

16          Emigrant Business Credit Corporation,

17          Bates-stamped EBCC_9578 through 9629,

18          marked for identification, as of this

19          date.)

20   BY MR. MAYRON:

21      Q.   This is the credit agreement

22   between Ebury 1EMI LLC and Emigrant

23   Business Credit Corporation, correct?

24          MS. PARKS:  Objection.

25              (Document review.)

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

47

J. Hanratty

1

2      A.   Yes.

3      Q.   Have you seen this document

4  before?

5      A.   Yes.  I signed it.

6      Q.   Are you familiar with its terms?

7           MS. PARKS:  Objection.

8      A.   Yes.

9      Q.   So the Ebury 1EMI credit facility

10  is structured as a revolving line of

11  credit, correct?

12          MS. PARKS:  Objection.

13     A.   Yes.

14     Q.   And advances under the credit

15  agreement shall be used solely for the

16  purpose of acquiring eligible tax liens,

17  correct?

18          MS. PARKS:  Objection.

19     A.   I would have to review the

20  document.

21     Q.   What was your understanding of

22  the uses -- the Ebury companies -- the uses

23  to which the Ebury companies could use the

24  funds advanced by Emigrant?

25          MS. PARKS:  Objection.

48

```
 1              J. Hanratty

 2      A.   My understanding was that you

 3   bring them a tax lien of which they fund.

 4   And so it's -- the actual mechanics of it

 5   were inverted from the way you just said

 6   it.

 7           My understanding was that we

 8   could use the funds to operate and acquire

 9   tax liens.

10      Q.   What do you mean by "you bring

11   them a tax lien of which they fund"?

12      A.   So the -- I'm not advanced money

13   without collateral.  Like I don't...

14      Q.   Can you explain --

15      A.   Sure.

16           So the funding occurs after I

17   already have an asset.  So I -- the idea

18   that I -- the funding is solely to acquire

19   assets.  For me to get funding, I have

20   already have acquired the asset.

21      Q.   So let me direct your attention

22   to the page labeled EBCC 9591.  And I am

23   going to direct you to the last sentence of

24   Section 2.1 which says, "Advances shall be

25   used solely for the purpose of acquiring
```

49

```
 1                    J. Hanratty

 2   eligible tax liens including subsequent tax

 3   liens."

 4           Did I read that correctly?

 5       A.    You did.

 6       Q.    Is it your understanding that

 7   advances could be used for other purposes?

 8           MS. PARKS:  Objection.

 9           You can answer.

10       A.    My understanding was that

11   advances could be used for operations but

12   also to acquire liens and subsequent liens.

13       Q.    And what's the basis of your

14   understanding?

15       A.    My six years of interacting with

16   Emigrant Bank and prior to that, Capital

17   One.

18       Q.    And why would interacting with

19   Capital One shed light on the meaning of

20   this credit agreement?

21       A.    Because they were similar in many

22   ways.

23       Q.    Is there any contractual language

24   that supports your understanding?

25           MS. PARKS:  Objection.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 779 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

50

1                  J. Hanratty

2          A.    Not that I can recall.

3          Q.    Let me direct your attention to

4    the page labeled EBCC 9602. And I am going

5    to read from Section 6.26 which is titled

6    Use of Proceeds and states, "Unless

7    specifically consented to the contrary by

8    the lender in writing, the borrower shall

9    use advances solely to fund the acquisition

10   of eligible tax liens in the ordinary

11   course of the business of Ebury companies

12   and to finance ordinary and necessary

13   expenses of the business operations of the

14   Ebury companies incurred in the ordinary

15   course of business."

16              Did I read that correctly?

17         A.    I'm sorry, which number are you

18   on?

19         Q.    6.26.

20         A.    Got it.

21              (Document review.)

22         A.    Yes, you read that correctly.

23         Q.    So is it your understanding that

24   the Ebury companies could use advances

25   solely to fund the acquisition of eligible

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 123 RECEIVED NYSCEF: 01/12/2024
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 780 of 2230

```
 1                     J. Hanratty

 2     tax liens in the ordinary course of the

 3     business of the Ebury companies or to

 4     finance ordinary and necessary expenses of

 5     the business operations of the Ebury

 6     companies incurred in the ordinary course

 7     of business?

 8              MS. PARKS:  Objection.

 9         A.   Sorry, could you say that one

10     more time?

11         Q.   Yes.

12              Is it your understanding that the

13     Ebury companies could use advances solely

14     to fund the acquisition of eligible tax

15     liens in the ordinary course of the

16     business of the Ebury companies or to

17     finance ordinary and necessary expenses of

18     the business operations of the Ebury

19     companies incurred in the ordinary course

20     of the business?

21              MS. PARKS:  Objection.

22              (Document review.)

23         A.   That's what the document

24     reflects.  And so as I said before, my

25     understanding was that we could use
```

52

                              J. Hanratty

1

2    advances to operate and run the business.

3        Q.    What do you mean by "operate and

4    run the business"?

5        A.    Pay expenses that come, legal

6    expenses, servicing expenses, real estate

7    brokers, brokerage.  You know, there's

8    plenty of expenses related to the business.

9        Q.    Was it your understanding that

10   you could use advances to pay distributions

11   to investors?

12            MS. PARKS:  Objection.

13            And I caution you to the extent

14        that you have an understanding that's

15        based off of attorney-client

16        communications in the course of the

17        litigation, you wouldn't want to reveal

18        that.  But anything else is fair game.

19       A.    Sorry, can you repeat the

20   question?

21       Q.    Sure.

22            Without revealing the substance

23   of any attorney-client communications, was

24   it your understanding that you could use

25   advances to pay distributions to investors?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 782 of 2230
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

53

1              J. Hanratty

2       A.    Using -- my understanding is that

3    it was a limit of distributions per year.

4    I don't know where it is in the document.

5       Q.    And when you say you had a limit

6    of distributions per year, again, without

7    revealing the substance of any

8    attorney-client communications, was it your

9    understanding that you could use advances

10   under the Emigrant lines of credit to pay

11   distributions to investors?

12          MS. PARKS:   Objection.

13      A.    Yeah, it was my understanding

14   that we had a limit on the amount of

15   distributions that we could do.

16          My understanding on advances was

17   it was to be used to acquire liens and run

18   the business and operating expenses.

19          (Reporter clarification.)

20      A.    Run the business with expenses.

21      Q.    So just so I understand, and

22   again, without revealing the substance of

23   any attorney-client communications, was it

24   your understanding that the Emigrant lines

25   of credit could be used to pay

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 640    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 783 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

54

```
 1                    J. Hanratty
 2    distributions to investors?
 3            MS. PARKS:  Objection.
 4            You can answer.
 5        A.   I never thought about it in that
 6    context.  From my perspective, my
 7    understanding is that the advances were to
 8    run my business from an expense perspective
 9    and acquiring new assets.
10        Q.   So do you think you were
11    permitted to use advances under that
12    Emigrant lines of credit to pay
13    distributions to investors?
14            MS. PARKS:  Objection.
15        A.   My thought was that I had a limit
16    on the amount that I had to -- had was -- I
17    was limited in the amount that I was able
18    to distribute.  And I believe above that
19    number, I had to get permission.
20        Q.   So as long as you hadn't exceeded
21    that limit, your understanding was you
22    could use advances on the Emigrant lines of
23    credit to pay distributions to investors?
24            MS. PARKS:  Objection.
25        A.   I didn't think it about it from
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022

NYSCEF DOC. NO.     24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State     RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT     Court Records     Pg 784 of 2230     John Hanratty
JOHN ARTHUR HANRATTY     June 20, 2023

55

1                    J. Hanratty

2     the perspective of advances.

3          Q.   Did you ever use advances under

4     the Emigrant lines of credit to pay

5     distributions to investors?

6                MS. PARKS:   Objection.

7          A.   Not that I can specifically

8     recall.

9          Q.   Do you generally recall using

10    advances under the Emigrant line of credit

11    to pay distributions to investors?

12         A.   No, I don't generally recall that

13    either.

14         Q.   Did you ever use the proceeds of

15    Emigrant's collateral to pay distributions

16    to investors?

17               MS. PARKS:   Objection.

18         A.   I don't recall.  I don't recall

19    specifically.

20         Q.   Again, do you generally recall

21    using the proceeds of Emigrant's collateral

22    to pay distributions to investors?

23               MS. PARKS:   Objection.

24         A.   Can you clarify what you mean?

25         Q.   Do you have any recollection of

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 785 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                          June 20, 2023

56

J. Hanratty

1

2    the Ebury companies using the proceeds of

3    Emigrant's collateral to pay distributions

4    to investors?

5              MS. PARKS:  Objection.

6         A.    I recall doing distributions.  I

7    don't specifically recall the sources of

8    those distributions.

9         Q.    Did the Ebury companies have any

10   controls to ensure that advances under the

11   Emigrant lines of credit were used to pay

12   distributions to investors?

13             MS. PARKS:  Objection.

14        A.    I do not recall any specific from

15   Ebury, no.

16        Q.    Is your testimony that such

17   controls could have existed but you don't

18   recall or is that such controls did not

19   exist?

20             MS. PARKS:  Objection.

21        A.    That, I do not recall.

22        Q.    Did Ebury companies have any

23   controls to ensure that the proceeds of

24   Emigrant's collateral were not used to pay

25   distributions to investors?

57

1                    J. Hanratty

2              MS. PARKS:  Objection.

3         A.    Not that I can recall.

4         Q.    And, again, is your testimony

5    that such controls could have existed but

6    you don't recall or that such controls did

7    not exist?

8         A.    That they could have but I do not

9    recall.

10        Q.    Okay.  Who at Ebury would know if

11   there were controls to ensure that advances

12   or the proceeds of Emigrant's collateral

13   were not used to pay distributions to

14   investors?

15        A.    It would be a function initially

16   through the administrator back -- Tower

17   Fund Services.  We replaced Tower Fund

18   Services with a company that I cannot

19   recall.  I'll get that name with you.

20        Q.    Opus?

21        A.    Opus.

22             And that would have occurred in

23   conjunction with Ping Xie, who was my

24   controller, in '18, '19.  We have -- our

25   current controller is a different woman.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1042 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 787 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

58

J. Hanratty

And back in -- pre-Ping's employment, which
was 2018, it was Tower Fund Services.

Q.   So earlier I asked you if it was
your understanding that you could use
advances under the Emigrant lines of credit
to pay distributions to investors and
Ms. Parks instructed you not to answer to
the extent it reveals the substance of any
attorney-client communications.

Have you had conversations with
attorneys about whether the Ebury companies
could use advances under the Emigrant lines
of credit to pay distributions to
investors?

MS. PARKS:  Objection.

A.   Specific -- no.

Q.   So to confirm, you have not had
conversations with attorneys about whether
Ebury companies could use advances under
the Emigrant lines of credit to pay
distributions to investors?

MS. PARKS:  Objection.

A.   None that I can recall.

Q.   So looking back at the page

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 788    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Court Records    Pg 788 of 2230

EMIGRANT BUSINESS CREDIT                                John Hanratty
JOHN ARTHUR HANRATTY                                    June 20, 2023

59

|   |   |
|---|---|
| 1 | J. Hanratty |
| 2 | labeled EBCC 9602, in Section 6.26, it |
| 3 | refers to the ordinary course of the |
| 4 | business of the Ebury companies. |
| 5 | What was the business of the |
| 6 | Ebury companies? |
| 7 | MS. PARKS:  Objection. |
| 8 | A.   The business of the Ebury |
| 9 | companies was the acquisition and |
| 10 | management of tax liens.  And then from |
| 11 | there, in the event that we would acquire |
| 12 | or convert a lien into a property or REO, |
| 13 | as it's known, the management and |
| 14 | disposition of that asset. |
| 15 | Q.   What was your understanding of |
| 16 | what the ordinary course of the business of |
| 17 | the Ebury companies was? |
| 18 | MS. PARKS:  Objection. |
| 19 | A.   Well, they're separate, the |
| 20 | companies, and you referred to as |
| 21 | defendants, have different -- different |
| 22 | functions. |
| 23 | Q.   You would agree, though, that a |
| 24 | company that is in liquidation is not |
| 25 | acting in the ordinary course? |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1 RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

60

```
 1                  J. Hanratty

 2           MS. PARKS:  Objection.

 3      A.   No.

 4      Q.   You think a company that is in

 5  liquidation could be acting in the ordinary

 6  course?

 7           MS. PARKS:  Objection.

 8      A.   Yes.

 9      Q.   Can you explain?

10      A.   My -- are you referring to Ebury

11  as a liquidating company?  Is that -- just

12  to make it specific.

13      Q.   Sure.

14           If Ebury was liquidating --

15      A.   Yeah?

16      Q.   -- would it be acting in the

17  ordinary course?

18           MS. PARKS:  Objection.

19      A.   Yes.

20      Q.   What is the basis of your

21  understanding?

22      A.   I do the exact same thing every

23  day when I'm liquidating as when I wasn't

24  liquidating.

25           MS. PARKS:  We've been going for
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 218
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 790 of 2230
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
John Hanratty
June 20, 2023

61

                        J. Hanratty

1        an hour.

2             Are you good on comfort?

3             THE WITNESS:  Yes, I'm fine.

4             MS. PARKS:  Okay.

5    BY MR. MAYRON:

6        Q.   And what do you mean by you do

7    the same exact thing when you're

8    liquidating and as when you are not

9    liquidating?

10            MS. PARKS:  Objection.

11            You can answer.

12       A.   Generally speaking, without

13   getting into the specific assets or

14   specific roles and functions of people, our

15   job is to recover the money that's been put

16   out.  And so to that end, we move liens

17   towards foreclosure that need to be.

18            When we foreclose on a property,

19   we do the same exact thing that we would do

20   if we weren't liquidating and try and sell

21   it.

22       Q.   Do you agree that when a company

23   is liquidating in a short time, its

24   transactions may not be orderly traded?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records    Pg 791 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                June 20, 2023

62

```
 1              J. Hanratty

 2         MS. PARKS:  Objection.

 3    A.    No.

 4    Q.    When Ebury was liquidating, it

 5  made bulk lien and REO sales, correct?

 6    A.    It did.

 7    Q.    Did it make bulk lien and REO

 8  sales prior to going into liquidation?

 9         MS. PARKS:  Objection.

10    A.    It had.

11    Q.    So as security for the credit

12  facility, Ebury 1EMI pledged collateral to

13  Emigrant?

14         MS. PARKS:  Objection.

15    A.    Yes.

16    Q.    What was the collateral for the

17  credit facility?

18    A.    Eligible tax liens.

19    Q.    Were ineligible tax liens

20  Emigrant's collateral?

21    A.    Yeah.  I believe Emigrant

22  generally had a call on all the collateral

23  on a -- I don't know if they -- yeah, it's

24  their -- it's effectively their collateral,

25  but they didn't lend to ineligible
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 792 of 2230
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj
John Hanratty
June 20, 2023

J. Hanratty

1

2  collateral.

3      Q.   So let me direct your attention

4  to the page labeled EBCC 9581.  This is the

5  definition of collateral.

6          And I'll read starting in the

7  right column about two-thirds of the way

8  down.  It says, "Collateral includes,

9  without limitation, all the equity interest

10  in each Ebury company, other than the

11  borrower; all funds in the lockbox account;

12  and any and all rights and interests in or

13  to each tax lien in which any Ebury company

14  has an interest, whether now owned or

15  hereafter created or acquired, pledged from

16  time to time as security for the

17  indebtedness."

18          Did I read that correctly?

19      A.   You did.

20      Q.   Was that your understanding of

21  what the collateral was for the credit

22  facility?

23          MS. PARKS:  Objection.

24      A.   Yes.

25      Q.   And then I'll look at what's

64

J. Hanratty

1    marked romanette XX or 20 on page 9582

2    which lists "the accessions to and

3    substitutions for and all replacements,

4    products and proceeds" -- I'll skip a

5    little -- "whether cash or non-cash of all

6    the foregoing property and interests in

7    property."

8    Correct?

9    A.    Yes, you read that correctly.

10    Q.    So the collateral for Emigrant's

11    credit facility included any tax lien owned

12    by Ebury company as well as any proceeds

13    from those tax liens?

14    MS. PARKS:  Objection.

15    A.    Yes.

16    Q.    So an REO that resulted from

17    Emigrant's collateral was also Emigrant's

18    collateral?

19    MS. PARKS:  Objection.

20    A.    There is a nuance, I believe,

21    from an equity perspective.  Yes, Emigrant

22    is owed the money it's owed until it gets

23    repaid.

24    Q.    Turning to page EBCC 9593.

65

```
 1                  J. Hanratty

 2          So Section 3.2 are the collateral

 3   representations and warranties.  And this

 4   says that "Each Ebury company agrees and

 5   represents and warrants to the lender

 6   that" -- skipping to B -- "each tax lien

 7   represented to be an eligible tax lien

 8   included in the borrowing base conforms to

 9   the requirements of the definition of

10   eligible tax liens included in the

11   borrowing base."

12          Correct?

13      A.   Yes, you read that correctly.

14      Q.   So your understanding is that you

15   had pledged to Emigrant that each tax lien

16   represented to be an eligible tax lien in

17   the borrowing base conformed the definition

18   of eligible tax liens in the credit

19   agreement?

20          MS. PARKS:  Objection.

21      A.   So can you repeat that?

22      Q.   Sure.

23          Your understanding is that you

24   had pledged to Emigrant that each tax lien

25   represented to be an eligible tax lien in
```

66

                    J. Hanratty

1
the borrowing base conforms to the

2
definition of eligible tax liens in the

3
4
credit agreement?

5           MS. PARKS:  Objection.

6      A.   I understand that I would -- we

7
would, as a company, produce a borrowing

8
base.  There would be a process to

9
determine eligibility of what was

10
submitted.  And then once approved, those

11
are the assets that were eligible liens.

12     Q.   Who was involved in producing a

13
borrowing base?

14          MS. PARKS:  Objection.

15     A.   So going back forever, initially

16
it was Tower Fund Services.  They would do

17
Capital One and Emigrant.

18          Then when they transitioned out,

19
it was -- we took that over in-house, and

20
it was done by Ping Xie, a young guy by the

21
name of Frank Gandol.  And then both those

22
guys no longer worked there and then it

23
was --

24          (Reporter clarification.)

25     A.   No longer work for Ebury.  And

67

```
 1                    J. Hanratty

 2    then it was myself.

 3         Q.   Were you involved in the

 4    preparation of the borrowing base when Ping

 5    Xie and Franklin Gandol were responsible

 6    for it?

 7              MS. PARKS:  Objection.

 8         A.   Yeah, I think the process was --

 9    I was involved.  I don't know if I was

10    involved with every -- like, the monthlies.

11    I think they would do them on their own

12    from time to time.

13         Q.   What was the nature of your

14    involvement?

15              MS. PARKS:  Objection.

16         A.   I think they would produce a

17    borrowing base and send it to me.  From

18    time to time, I would look at it; and from

19    time to time, I wouldn't.

20         Q.   And what would you look for when

21    you would look at the borrowing base?

22              MS. PARKS:  Objection.

23         A.   I would look at -- what I would

24    look at when I saw borrowing base would be

25    how much is outstanding.  Like, whether
```

68

```
 1                   J. Hanratty

 2    we're undercollateralized or

 3    overcollateralized.  Paydowns.  Things of

 4    those nature.

 5         Q.   And why would you sometimes not

 6    look at the borrowing base?

 7              MS. PARKS:  Objection.

 8         A.   We weren't busy, just day-to-day

 9    work.  Sometimes I didn't have to.  There

10    was no reason to.

11         Q.   Did the borrowing -- did the

12    borrowing bases that were sent to Emigrant

13    make it clear that Ebury was preparing the

14    borrowing base as opposed to Tower or MTAG?

15              MS. PARKS:  Objection.

16         A.   Yeah, I don't recall

17    specifically.  I haven't looked at one in a

18    while.  But generally I think my

19    certification from the company is on it.

20         Q.   You would sign the borrowing

21    bases for Emigrant, correct?

22              MS. PARKS:  Objection.

23         A.   No.

24         Q.   Who would sign the borrowing

25    bases that were submitted to Emigrant?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 798 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                                                June 20, 2023

69

```
 1                    J. Hanratty

 2        A.   I don't know if they were ever

 3    actually -- I don't recall ever signing

 4    one.

 5        Q.   Did you ever sign a borrowing

 6    base certificate?

 7        A.   Not that I can recall.  It's

 8    electronic work.

 9            MR. MAYRON:  Could you pull out

10        4964.

11        Q.   I'm going to share with you a

12    document with you labeled EBCC 4964.

13            MR. MAYRON:  Could the court

14        reporter please mark -- it's probably

15        in the other room.  Would the court

16        reporter please mark it as Hanratty

17        Deposition Exhibit 4.

18            (Hanratty Exhibit 4, Summary page

19        of a borrowing base from 2018,

20        Bates-stamped EBCC_4964, marked for

21        identification, as of this date.)

22            MR. MAYRON:  We can take a break

23        now if you guys want.  I don't know if

24        we want to go off the record.

25            THE VIDEOGRAPHER:  The time right
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 799 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

70

J. Hanratty

1

2    now is 12:34 p.m.  We are off the

3    record.

4           (Recess is taken.)

5           THE VIDEOGRAPHER:  The time right

6    now is 12:42 p.m.  We are back on the

7    record.

8  BY MR. MAYRON:

9       Q.   Thank you for indulging while we

10  got Hanratty Exhibit 4, which I am going to

11  hand out.

12           Have you seen this document

13  before?

14       A.   I do not recall it.

15       Q.   Do you know what it is?

16       A.   It is a -- I do.

17           MS. PARKS:  Good job.

18  BY MR. MAYRON:

19       Q.   What is it?

20       A.   It is a -- the summary page of a

21  borrowing base from 2018.

22       Q.   And at the bottom, it says,

23  "Pursuant to the credit and security

24  agreements dated March 9th, 2017, the

25  undersigned does hereby certify that the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO....    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
24-04020-dsj    Court Records    Pg 800 of 2230    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT                                              John Hanratty
JOHN ARTHUR HANRATTY                                                  June 20, 2023

71

                    J. Hanratty

 1

 2    above is a true and correct account of all

 3    accounts receivable assigned to you which

 4    remain unpaid.

 5            "You are asked to rely upon the

 6    truthfulness of the foregoing

 7    representations made herein in order to

 8    advance or lend money to the undersigned.

 9    And the undersigned so represents that the

10    above-described accounts are free and clear

11    of any and all liens or claims whatsoever

12    except the one in your favor."

13            Correct?

14        A.    Yes, you read that correctly.

15        Q.    And then in the bottom right,

16    there is a signature?

17        A.    Yes.

18        Q.    And that's your signature?

19        A.    That looks like my signature,

20    yes.

21        Q.    Is it your signature?

22        A.    Yes.

23        Q.    And do you recall signing this

24    document?

25        A.    No.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 116 RECEIVED NYSCEF: 01/12/2024

72

J. Hanratty

1

2      Q.   Do you recall signing any

3   borrowing base certificate?

4          MS. PARKS:   Objection.

5      A.   No.

6      Q.   What would you do when you

7   received a borrowing base like this to

8   verify it before signing?

9          MS. PARKS:   Objection.

10     A.   I don't recall signing them.  But

11  what I would do, it would be emailed to me

12  from Frank or Ping and then submitted to

13  Emigrant, which was typically Jack and

14  Sahil Arora.

15     Q.   And what would you do to verify

16  the borrowing base that Ping or Frank sent

17  you?

18         MS. PARKS:   Objection.

19     A.   Sometimes nothing.  I would say

20  generally I look at -- would look at the

21  summary page.

22     Q.   And so you --

23     A.   And if --

24     Q.   You would sign and make all of

25  these representations after just looking at

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 802 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

73

                         J. Hanratty

1

2   the summary page?

3              MS. PARKS:  Objection.

4       A.   I don't recall signing them.  But

5   process-wise, they would get sent to me.

6   Sometimes I would review them and sometimes

7   I wouldn't.  And then they would get

8   submitted when they needed to be submitted

9   to the bank.

10      Q.   Was anyone else at the Ebury

11  companies allowed to sign for you?

12             MS. PARKS:  Objection.

13      A.   Yes.  We -- people do sign -- or

14  people stamp my signature.

15      Q.   Is this a stamped signature?

16      A.   I can't --

17             MS. PARKS:  Objection.

18      A.   I can't tell.

19      Q.   And you would permit employees at

20  the Ebury companies to sign a document like

21  this on your behalf without verifying the

22  representations being made?

23      A.   I don't --

24             MS. PARKS:  Objection.

25      A.   I don't specifically recall

74

                              J. Hanratty

1    giving anyone the ability to stamp or sign

2    on my behalf.  I don't specifically recall

3    signing them.  The process that I recall

4    was more of an electronically-based one.

5           MR. MAYRON:  Can you give me the

6        next one.

7        Q.   So I'm handing you a document

8    labeled EBCC 5219.

9           MR. MAYRON:  And could the court

10       reporter please mark it as Hanratty

11       Deposition Exhibit 5.

12          (Hanratty Exhibit 5, Summary page

13       of a borrowing base dated May 17th,

14       2019, Bates-stamped EBCC_5219, marked

15       for identification, as of this date.)

16   BY MR. MAYRON:

17       Q.   Have you seen this document

18   before?

19       A.   I do not remember it.

20       Q.   What is the document?

21       A.   The document is a summary page of

22   a borrowing base dated May 17th, 2019.

23       Q.   And you signed it?

24       A.   There is a signature under my

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 43    RECEIVED NYSCEF: 01/12/2024

75

J. Hanratty

1

2    name, yes.

3         Q.    Do you recall whether you signed

4    it?

5         A.    I do not.

6         Q.    And, again, in the bottom left,

7    it says, "Pursuant to the credit and

8    security agreements dated March 9, 2017,

9    the undersigned does hereby certify that

10    the above is a true and correct account of

11    all accounts receivable assigned to you

12    which remain unpaid.

13              "You are asked to rely upon the

14    truthfulness of the foregoing

15    representations made herein in order to

16    advance or lend money to the undersigned.

17    And the undersigned so represents the

18    above-described accounts are free and clear

19    of any and all liens or claims whatsoever

20    except the one in your favor."

21              Did I read that right?

22         A.    Yes, you did.

23         Q.    Who at Ebury would be responsible

24    for making those representations?

25              MS. PARKS:    Objection.

76

|     | J. Hanratty |
| --- | --- |
| 1   | J. Hanratty |
| 2   | A.    That would be -- I would. |
| 3   | Q.    And do you recall doing anything |
| 4   | to verify that those representations were |
| 5   | true before submitting documents to |
| 6   | Emigrant Bank? |
| 7   | MS. PARKS:  Objection. |
| 8   | A.    I don't recall -- I don't recall |
| 9   | verifying this document. |
| 10  | Q.    Did you have a practice of |
| 11  | signing documents like this without |
| 12  | actually reviewing them? |
| 13  | MS. PARKS:  Objection. |
| 14  | A.    I don't recall signing these |
| 15  | documents. |
| 16  | Q.    I'm going to hand you a document |
| 17  | labeled EBCC 5615. |
| 18  | MR. MAYRON:  Would the court |
| 19  | reporter please mark it as Hanratty |
| 20  | Deposition Exhibit 6. |
| 21  | (Hanratty Exhibit 6, Summary of |
| 22  | borrowing base, dated September 13th, |
| 23  | 2019, EBCC_5615, marked for |
| 24  | identification, as of this date.) |
| 25  | BY MR. MAYRON: |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 806 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

77

J. Hanratty

Q.   Have you seen this document
before?

A.   I do not recall it.

Q.   What is the document?

A.   The document is a summary page
for a borrowing base dated September 13th,
2019.

Q.   And the bottom right is your
signature?

A.   Yes, it appears to be my
signature.

Q.   Did you sign this document?

A.   I don't recall.

Q.   Who else at Ebury could have
signed this document?

MS. PARKS:  Objection.

A.   I don't recall.  I do not recall
giving anybody the ability to sign my
signature on borrowing base.

Q.   Did anyone else at Ebury have the
ability to sign your signature on borrowing
bases?

MS. PARKS:  Objection.

A.   Not that I can recall.

78

1                       J. Hanratty

2          Q.    And, again, in the bottom left,

3     it says, "Pursuant to the credit and

4     security agreements dated March 9th, 2017,

5     the undersigned does hereby certify that

6     the above is a true and correct count of

7     all accounts receivable assigned to you

8     which remain unpaid.

9                   "You are asked to rely upon the

10    truthfulness of the foregoing

11    representations made herein in order to

12    advance or lend money to the undersigned.

13    And the undersigned also represents that

14    the above-described amounts are free and

15    clear of any and all liens or claims

16    whatsoever, except the one in your favor."

17              Did I read that right?

18         A.    Yeah, you did.

19         Q.    You were in charge of the Ebury

20    companies back in 2019, correct?

21         A.    Yes.

22              MS. PARKS:  Objection.

23              THE WITNESS:  Sorry.

24              MS. PARKS:  It's okay.

25    BY MR. MAYRON:

79

J. Hanratty

1

2    Q.   And so if an employee had

3    received authorization to apply your

4    signature to this document, that

5    authorization would have had to come from

6    you?

7         MS. PARKS:   Objection.

8    A.   If an employee had the -- been it

9    was told it was okay to stamp my signature

10   on something, it would have come from me,

11   yes.

12   Q.   And so it's your testimony that

13   either you signed this or you authorized

14   one of your employees to sign on your

15   behalf?

16        MS. PARKS:   Objection.

17   A.   No, that's not my testimony.

18   Q.   Are you saying that one of your

19   employees may have signed this without your

20   permission?

21        MS. PARKS:   Objection.

22   A.   No, I'm saying I don't recall

23   signing it.

24   Q.   But if you didn't sign it and one

25   of your employees didn't sign it on your

80

J. Hanratty

1

2   behalf, who could have signed it?

3           MS. PARKS:  Objection.

4       A.   I'm saying I don't recall signing

5   it.

6       Q.   But that is your signature?

7           MS. PARKS:  Objection.

8       A.   That -- it appears to be my

9   signature, yes.

10       Q.   And earlier I think you said this

11   document is a borrowing base?

12           MS. PARKS:  Objection.

13       A.   Yes.  One of the tabs within the

14   borrowing base.

15       Q.   What is a borrowing base?

16       A.   The borrowing base is the report

17   that's used to determine eligible

18   collateral and then from there, the amount

19   of availability under the line of credit

20   from Emigrant.

21       Q.   The Ebury companies would submit

22   borrowing bases to support draws on

23   Emigrant credit facilities?

24           MS. PARKS:  Objection.

25       A.   That is the purpose of them yes.

81

J. Hanratty

2    Q.    And those draws would often be in

3    the hundreds of thousands of dollars?

4         MS. PARKS:  Objection.

5    A.    Yeah, at that time.  Yes.

6    Q.    Would you be involved in putting

7    together these borrowing bases?

8         MS. PARKS:  Objection.

9    A.    I would generally be involved or

10   aware.  Typically I would get the -- what

11   would be the final product.

12   Q.    You would agree these borrowing

13   bases were important because Emigrant

14   relied on them to advance you sometimes

15   hundreds of thousands of dollars?

16        MS. PARKS:  Objection.

17   A.    Yes, they're important.

18   Q.    And the borrowing bases were also

19   important to the Ebury companies because

20   you were required to submit them to obtain

21   hundreds of thousands of dollars under the

22   credit facilities?

23        MS. PARKS:  Objection.

24   A.    Yes.

25   Q.    But you don't recall doing

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. ...
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 811 of 2230

RECEIVED NYSCEF: 01/12/2024
John Hanratty
June 20, 2023

82

J. Hanratty

2  anything specific to verify the accuracy of

3  the borrowing bases that you submitted to

4  Emigrant?

5          MS. PARKS:  Objection.

6      A.    No.  No, I'm not saying that.

7  I'm saying I don't recall these three

8  specific borrowing bases.  I would say -- I

9  mean, I had a five or six-year

10  relationship.  I haven't submitted a

11  borrowing base in a while process-wise.

12  They would come in.  We would get them.  At

13  times, I would review them.  At times,

14  there would be questions.  And generally

15  speaking, that would be my interaction.

16      Q.    When you say at times you would

17  review them, does that mean at times you

18  would not review them?

19          MS. PARKS:  Objection.

20      A.    Yes, there would be times I would

21  not review them.

22      Q.    So I'm going to turn your

23  attention back to the credit agreement

24  which is labeled Hanratty Deposition

25  Exhibit 3.  And can I direct your attention

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 661
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 812 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

J. Hanratty

1    to page labeled EBCC 9593.

2            So as we discussed earlier,

3    Section 3.2 states that "Each Ebury company

4    agrees and represents and warrants to the

5    lender that...(b) each tax lien represented

6    to be an eligible tax lien included in the

7    borrowing base conforms to the requirements

8    of the definition of eligible tax liens

9    included in the borrowing base."

10           How would you verify that each

11   tax lien represented to be an eligibility

12   tax lien in the borrowing base conforms to

13   the requirements of the definition of

14   eligible tax liens included in the

15   borrowing base?

16           MS. PARKS:  Objection.

17       A.   I believe it was a formula that

18   we agreed to with Emigrant in the borrowing

19   base itself.

20       Q.   And what would you do to verify

21   that the borrowing base satisfied those

22   formulas?

23           MS. PARKS:  Objection.

24       A.   From time to time, I would review

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM  INDEX NO. 158207/2022
NYSCEF DOC. NO. 1275  RECEIVED NYSCEF: 01/12/2024
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 813 of 2230
JOHN ARTHUR HANRATTY
John Hanratty
June 20, 2023

84

J. Hanratty

2  them; and other times, I would not.

3      Q.   So is it your testimony that

4  there would be times that the Ebury

5  companies would submit a borrowing base to

6  Emigrant and you would not review whether

7  each tax lien in the borrowing base

8  conformed to the requirements of the

9  definition of eligible tax liens included

10  in the borrowing base?

11          MS. PARKS:   Objection.

12      A.   Well, we would submit a borrowing

13  base that had eligible tax liens and

14  ineligible tax liens.  So first off.  And

15  so they would have a view of everything we

16  had regardless of eligibility.

17          Operationally and on day-to-day

18  perspective, if there was an issue with the

19  borrowing base, we would hear about it from

20  Emigrant.

21      Q.   Sure.

22          But is it your testimony that

23  there would be times that the Ebury

24  companies would submit a borrowing base to

25  Emigrant and you personally would not

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 164    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 814 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

85

J. Hanratty

1  review whether each tax lien in the

2  borrowing base conformed to the

3  requirements of the definition of eligible

4  tax liens included in the borrowing base?

5          MS. PARKS:   Objection.

6      A.   Yes, there would be times I would

7  not review personally whether those liens

8  met -- the formulas in the borrowing base

9  computed properly everything that was

10  eligible.

11          My employees more than likely

12  would have reviewed those instances.

13      Q.   Which employees?

14      A.   Whoever was responsible for the

15  borrowing base at that time.  As we

16  discussed earlier, it was Tower Fund

17  Services for, I think, the initial period

18  of time.  Ping Xie and then Frank Gandol

19  for a period of time.

20          (Reporter clarification.)

21      A.   Tower Fund Services.  And then

22  Ping, P-i-n-g, Xie, X-i-e.  And then Frank

23  Gandol.  And then from those times, it was

24  myself.

86

1                   J. Hanratty

2        Q.    And so I'm going to direct your

3    attention to the page labeled EBCC 9584.

4    And this is in the definition of eligible

5    tax lien.  And excluded from the definition

6    of eligible tax lien, this is romanette 4,

7    is "any tax lien whose basic tax lien

8    documents are not delivered to the lender

9    or to the custodian by no later than the

10   effective date of the most recent borrowing

11   base certificate furnished to the lender."

12            Did I read that correctly?

13       A.    Which number was it?  I

14   apologize.

15       Q.    Romanette 4, IV.

16       A.    Yep, you read that correctly.

17       Q.    Was your understanding that if

18   Ebury had custody of a tax lien, it was

19   ineligible for the borrowing base?

20            MS. PARKS:  Objection.

21       A.    My understanding operationally

22   was different from the perspective that the

23   Rochester tax liens, which was my initial

24   purchase with Emigrant, there are no liens.

25   Nobody owns them.  There is no custodian.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 816 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

87

J. Hanratty

And you can go through many instances where
that's the case.

And so I think functionally, the
understanding is -- my understanding was
different than the language here.

Q.   Do you agree that the language
here states that a tax lien that Ebury
retained custody of was ineligible for the
borrowing base?

MS. PARKS:  Objection.

A.   Well, it reads here that if you
deliver basic lien documents to the lender,
I don't know what -- or the custodian.

And so, for example, with the
Rochester liens, it's a contract.  I don't
recall offhand if we show the contract to
Emigrant.  But a scenario like that, our --
that entire book would be ineligible.

Q.   Just so I understand, you agree
that if Ebury retained custody of a tax
lien, it was ineligible to be included in
the borrowing base per the terms of the
credit agreement?

MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO. 180          RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT v. Court Records          Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
JOHN ARTHUR HANRATTY                                                                          John Hanratty
                                                                                              June 20, 2023

24-04020-dsj                                          Pg 817 of 2230

88

                      J. Hanratty

1

2          A.    There are a whole host of

3    scenarios where there are liens that,

4    whether Ebury had them or somebody else,

5    that was not with a custodian, such as the

6    initial reason I was at Emigrant, the

7    Rochester tax liens.

8          Q.    Where in the credit agreement

9    does it say that a tax lien that Ebury

10   retained custody of was eligible to be

11   included in the borrowing base?

12              MS. PARKS:   Objection.

13         A.    I don't think it does, but I do

14   not know for sure.

15         Q.    And then let me direct your

16   attention to the page labeled EBCC 9612.

17   This is Section 11.1 titled Amendments.

18              (Document review.)

19         Q.    It states, "No alteration of or

20   amendment to this agreement shall be

21   effective unless given in writing and

22   signed by the party or parties sought to be

23   charged or bound by the alteration or

24   amendment."

25              To your knowledge, is there any

89

J. Hanratty

1

2    written amendment to the credit agreement

3    that provides that a tax lien that Ebury

4    retained custody of is eligible to be

5    included in the borrowing base?

6              MS. PARKS:  Objection.

7         A.   Other than the day-to-day

8    operations of how we interacted together

9    for five years, I don't -- I am not aware

10   of a written, a written agreement or

11   modification.

12        Q.   And then the Capital One credit

13   facility had the same requirement that a

14   tax lien that Ebury retain custody of was

15   not eligible to be included in the

16   borrowing base, correct?

17             MS. PARKS:  Objection.

18        A.   I don't recall offhand.

19        Q.   Earlier you said "the day-to-day

20   operations of how we interacted together

21   for five years."

22             What did you mean by that?

23             MS. PARKS:  Objection.

24        A.   That Emigrant was aware that

25   there were liens that no one had custody of

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 303
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
John Hanratty
June 20, 2023

90

J. Hanratty

2  and that liens that -- that's what I meant.

3      Q.   How do you know that Emigrant was

4  aware that there were liens that no one had

5  custody of?

6          MS. PARKS:  Objection.

7      A.   Well, my assumption would be

8  that -- I take that back.  I was not aware

9  other than the way that we had interacted

10  for many, many years.

11     Q.   What do you mean by "the way that

12  we had interacted for many, many years"?

13     A.   That, as an example, Rochester,

14  which is the basis of my relationship with

15  Emigrant, had no liens.  It was a contract.

16  There was no custodian.  And that was all

17  eligible collateral.

18          MR. MAYRON:  Can you give me

19      12283.  It's towards the end.

20     Q.   I'm going to hand you a document

21  labeled Ebury 1283.

22          MR. MAYRON:  And could the court

23      reporter please mark it as Hanratty

24      Deposition Exhibit 7.

25          (Hanratty Exhibit 7, Email chain

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

```
 1                J. Hanratty

 2        beginning with email dated 3/18/2021

 3        from J. Grady to J. Hanratty and

 4        others, Bates-stamped EBURY_12283

 5        through 12285, marked for

 6        identification, as of this date.)

 7   BY MR. MAYRON:

 8        Q.   Looking at the top email, have

 9   you seen this email before?

10           MS. PARKS:  Are you asking him

11        has he seen just the top one before or

12        the whole --

13           MR. MAYRON:  Just the top email.

14        A.   I don't recall it, but my name is

15   on there.

16        Q.   Who is Jack Grady?

17        A.   Jack Grady was -- is the -- was

18   my -- I guess my main contact at Emigrant.

19   I don't know if they have accounts or

20   whatever with it is.

21        Q.   And so the second sentence in his

22   email, Mr. Grady says, "I thought that,

23   that MTAG uploaded the liens in their

24   system shortly after the purchase date,

25   with the process from there largely
```

92

```
 1                      J. Hanratty
 2     automated."
 3              Did I read that right?
 4              MS. PARKS:  Objection.  And it
 5         says, "I had" --
 6              (Document review.)
 7         A.   You didn't read that right.
 8         Q.   So earlier you said that you
 9     thought Emigrant was aware that there were
10     liens that no one had custody of, correct?
11              MS. PARKS:  Objection.
12         A.   Yes.
13         Q.   But here, Mr. Grady is saying
14     that he thought MTAG uploaded the liens
15     shortly after the purchase date, with the
16     process from there largely automated?
17              MS. PARKS:  Objection.
18         A.   Yes.
19         Q.   So it appears Emigrant had a
20     different understanding?
21              MS. PARKS:  Objection.
22         A.   Well, I don't know what he's
23     talking about.
24         Q.   Do you recall this email?
25         A.   No, not specifically.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 192    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT  Court Records    Pg 822 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

93

```
 1                    J. Hanratty

 2        Q.   What does "I had thought that

 3   MTAG uploaded the liens in their system

 4   shortly after the purchase date with the

 5   process from there largely automated" mean

 6   to you?

 7             MS. PARKS:  Objection.

 8        A.   It means what it reads, that Jack

 9   thought that the MTAG upload was shortly

10   after the purchase date and the process was

11   largely automated.

12        Q.   So Mr. Grady is saying that his

13   understanding is that after the Ebury

14   companies purchase a lien, MTAG uploaded

15   the liens in their system shortly after?

16             MS. PARKS:  Objection.

17        A.   That's what he wrote, yeah.

18        Q.   Do you have any reason to doubt

19   that's what he genuinely believed on

20   March 18th, 2021?

21             MS. PARKS:  Objection.

22        A.   I just don't know what he's

23   talking about as far as there's many liens

24   from many different places and all are

25   different, which impact uploads.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1162 RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT                                          John Hanratty
JOHN ARTHUR HANRATTY                                              June 20, 2023

94

J. Hanratty

Q.   Given that the credit agreement

states that tax liens that have not been

delivered to the custodian or lender are

not eligible to be included in the

borrowing base, is the most reasonable

reading of this that his understanding is

that there was an automated process by

which the Ebury companies uploaded their

tax liens to MTAG?

MS. PARKS:   Objection.

A.   I think he writes that MTAG

uploads it.

Q.   How would MTAG get the tax lien

information?

MS. PARKS:   Objection.

A.   That was through -- there's a --

I don't remember the name of a file, a

purchase file that when you purchase a lien

or two or three, whatever your number is,

go into the file.  But then they have to

reconcile it to cash and the lien itself.

Q.   Did Jack Grady ever say anything

to you to indicate that he understood that

not all of Emigrant's collateral was in the

24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 824 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

95

J. Hanratty

1

2    custody of MTAG?

3         MS. PARKS:  Objection.

4    A.    Not that I can recall.

5    Q.    Turning back to Hanratty

6    Deposition Exhibit 3, the credit agreement,

7    turning to the page labeled EBCC 9585, this

8    is romanette XVIII, so 18.

9    A.    9585?

10    Q.    9585 and romanette 18.

11         And this section of the credit

12    agreement excludes from the definition of

13    eligible tax lien "any other tax lien

14    excluded from the definition of eligible

15    tax lien for a state defined as an eligible

16    jurisdiction herein as set forth on

17    Schedule 1.1X hereto."

18         Correct?

19         MS. PARKS:  Objection.

20    A.    Yes, you read that correctly.

21    Q.    And are you familiar with the

22    restrictions set out in Schedule 1.1X?

23         MS. PARKS:  Objection.

24    A.    No, not -- not specifically.

25    Q.    Are you aware that the credit

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records    Pg 825 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

1                    J. Hanratty

2    agreement contains state-by-state

3    restrictions on the age of tax liens?

4        A.    Yes, I am generally aware.

5        Q.    And generally, those restrictions

6    require that the tax lien have been sold by

7    the taxing authority less than three years,

8    right?

9            MS. PARKS:  Objection.

10       A.    I think it varies by state and

11   the legal status related to those liens.

12       Q.    Let's turn to Schedule 1.1X.

13       A.    Okay.

14       Q.    And so this is page 9619.  This

15   is the Alabama -- exclusions for Alabama.

16           "Any tax lien with respect to

17   which more than 36 months have elapsed

18   since such tax lien was sold by the taxing

19   authority is ineligible."

20           Correct?

21           MS. PARKS:  Sorry.  Are you

22       looking at a particular part of that?

23           MR. MAYRON:  Yes.  It's A,

24       subparagraph A, additional --

25           MS. PARKS:  Oh, I see.  Thank

97

1                    J. Hanratty

2        you.   Thank you.

3              (Document review.)

4        A.   Yes, "any tax lien with respect

5    to more than..."

6              Yes, you read that correctly.

7        Q.   And if you flip to the next page,

8    Florida, this is now in subparagraph B.  It

9    says, "Any tax lien with respect to which

10   more than 36 months have elapsed and such

11   tax lien was sold by the taxing authority."

12             Is that correct?

13       A.   In B, correct?

14       Q.   Yes.

15       A.   Yes.

16       Q.   And turning to the next page,

17   Indiana, this is subparagraph A, it says,

18   "Any tax lien with respect to which more

19   than 18 months have elapsed since such tax

20   lien was sold by the taxing authority"?

21       A.   Yes.

22       Q.   And then turning to the next

23   page, Maryland, "Excluded from the

24   definition of eligible tax liens is any tax

25   lien with respect to more than 36 months

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

Doc #3 State
John Hanratty
June 20, 2023

98

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | have elapsed since such tax lien was sold |
| 3 | by the taxing authority"? |
| 4 | A.   Yes, you read that correctly. |
| 5 | Q.   Turning to the next schedule for |
| 6 | New Jersey, this is subparagraph A.  I |
| 7 | apologize, it's -- |
| 8 | MS. PARKS:  D. |
| 9 | BY MR. MAYRON: |
| 10 | Q.   It's paragraph D. "The aggregate |
| 11 | amount of all tax liens included in the |
| 12 | collateral secured by property where, with |
| 13 | respect to at least one tax lien secured by |
| 14 | the property, more than 36 months has |
| 15 | elapsed and such tax lien was sold unless |
| 16 | foreclosure process has been initiated |
| 17 | against such property before the 36 |
| 18 | month-period elapses"? |
| 19 | A.   Yes, you read that correctly. |
| 20 | Q.   Turning to the next one, New |
| 21 | York, and this is A. "Any tax lien with |
| 22 | respect to which more than 96 months have |
| 23 | elapsed since such tax lien was sold by the |
| 24 | taxing authority." |
| 25 | Did I read that right? |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                           RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 828 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                       June 20, 2023

99

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | A.    The beginning, yes. |
| 3 | Q.    And then turning to the last |
| 4 | schedule, South Carolina, "Any tax lien |
| 5 | with respect to which more than 18 months |
| 6 | have elapsed since such tax lien was sold |
| 7 | by the taxing authority and excluded from |
| 8 | the definition of eligible tax lien"? |
| 9 | MS. PARKS:  Objection. |
| 10 | A.    Yes, you read that correctly. |
| 11 | Q.    Before the Ebury companies |
| 12 | submitted borrowing bases to Emigrant, |
| 13 | would you review to make sure that |
| 14 | ineligible tax liens per the terms of |
| 15 | Schedule 1.1X were excluded from the |
| 16 | borrowing base? |
| 17 | MS. PARKS:  Objection. |
| 18 | A.    I believe that we had a formula |
| 19 | which computed such things. |
| 20 | Q.    What do you mean a formula? |
| 21 | A.    In the borrowing base itself. |
| 22 | Q.    And would the formula check to |
| 23 | see if a tax lien had been sold a certain |
| 24 | number of months prior, and, if so, remove |
| 25 | it from the borrowing base? |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO. 118   RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT   Court Records   Pg 829 of 2230   John Hanratty
JOHN ARTHUR HANRATTY                                June 20, 2023

100

J. Hanratty

1

2      A.   I think all liens remain in the

3  borrowing base.  And it would make it

4  ineligible, formulaic.  And then you can

5  see the amount of ineligibles and eligible.

6      Q.   If a tax lien had been sold by

7  the taxing authority more than the period

8  prescribed by Schedule 1.1X, would the

9  entire tax lien be ineligible?

10          MS. PARKS:  Objection.

11     A.   Yes.  And so if it was outside

12  the parameters of each state with the

13  conditions, it would be ineligible

14  collateral.

15     Q.   Now I'm going to turn to page

16  9593.  This is going to be Section 3.5

17  which talks about a servicing agreement.

18  And it says, "To the extent required by

19  this agreement, the borrower has entered

20  into a service agreement approved as to

21  form by the lender with a servicer

22  acceptable to the lender and a fully

23  executed copy of which has been provided to

24  the lender."

25          Did the Ebury companies execute a

101

```
 1                    J. Hanratty

 2    servicing agreement?

 3         A.    Yes.

 4         Q.    And who was the servicer?

 5         A.    We had multiple servicers

 6    throughout the years.  The first one was

 7    Tower Fund Services, MTAG, American Tax --

 8    ATFS, American Tax Funding was a servicer.

 9    And that's all I can recall off the top of

10    my head.

11         Q.    Were there any other servicers

12    for Ebury's tax liens?

13         A.    Yes.

14         Q.    Who were the other servicers?

15         A.    Ebury.

16         Q.    Did Emigrant ever approve Ebury

17    as a servicer for Emigrant's collateral?

18              MS. PARKS:  Objection.

19         A.    When AT -- I think, yes, when

20    American Tax Funding shut business, there

21    was no one who could service New York.  And

22    we had a conversation about servicing New

23    York, and that's when Ebury started

24    servicing that portion of its portfolio.  I

25    do not recall a written approval or a
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. ___    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT    Court Records    Pg 831 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

102

```
 1                      J. Hanratty

 2    contract.

 3         Q.   When was this conversation?

 4         A.   I recall American Tax Funding

 5    shutting down probably like a year after we

 6    bought that, maybe like 18, 2018, '19,

 7    something around that time frame.

 8         Q.   And who participated in that

 9    conversation from American?

10         A.   I don't recall specifically.

11         Q.   Is it your understanding that

12    neither Tower nor MTAG serviced the New

13    York liens?

14              MS. PARKS:   Objection.

15         A.   They -- Tower could not.  They

16    didn't have the capacity.

17              MTAG, MTAG would say they could.

18         Q.   Did you ask MTAG if they would be

19    willing to service the New York liens?

20         A.   I don't recall.

21         Q.   Did Ebury service liens in any

22    other states?

23         A.   Yes.

24         Q.   Which other states?

25         A.   New Jersey, Ohio, Kentucky.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO.                                    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 832 of 2230         John Hanratty
JOHN ARTHUR HANRATTY                                            June 20, 2023

103

```
 1                    J. Hanratty

 2      Currently Maryland.

 3           Q.   Any other states?

 4           A.   Not off the top of my head.

 5      Those are the main.

 6           Q.   Did Emigrant ever approve Ebury

 7      as a servicer in those states?

 8                MS. PARKS:   Objection.

 9           A.   I don't recall specific approval,

10      but I recall their awareness that we were

11      servicing portions of our portfolio.

12           Q.   What's the basis for your

13      understanding that Emigrant was aware that

14      Ebury was self-servicing in those states?

15                MS. PARKS:   Objection.

16           A.   Well, the Ohio was not a -- Ohio

17      wasn't, like, part of the credit agreement,

18      nor was Kentucky.  And I recall trying to

19      get them approved.  And we just -- we did

20      not do that process or I don't recall if a

21      process actually occurred.  And from those

22      conversations, we made them aware that we

23      were doing those.

24                The New Jersey, I recall general

25      discussions about late-stage New Jersey
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 111
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

104

J. Hanratty

1  liens, which --

3      Q.   Who at -- go ahead.

4      A.   Which were effective REO.  So

5  you're managing more of a property process

6  versus a lien process.

7      Q.   Who at Emigrant was aware that

8  Ebury was self-servicing in those states?

9          MS. PARKS:  Objection.

10     A.   I mainly interacted with just

11  Jack.  Jack Grady.

12     Q.   So it's your testimony Jack Grady

13  was aware that Ebury was self-servicing in

14  those states?

15     A.   It's my testimony that I believe

16  he was aware.  I don't know.  I can't speak

17  to what he was aware of.

18     Q.   And the basis of that

19  understanding is what?

20     A.   That we had conversations about

21  extending the eligibility of our liens on

22  late stage and other ineligible states of

23  which we were currently doing.

24     Q.   And did Emigrant extend the

25  eligibility of your liens in late stage and

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 131 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 834 of 2230

JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

105

1                   J. Hanratty

2    other ineligible states?

3              MS. PARKS:  Objection.

4         A.   The -- well, any new state, I

5    think -- well, we had changed -- I want to

6    say there are multiple versions of this

7    agreement, and I think eligibility was

8    changed probably on each generation.  I

9    can't recall specifically.

10        Q.   You understand that the

11   third-party servicer was an important

12   protection for Emigrant in the credit

13   agreements, correct?

14             MS. PARKS:  Objection.

15        A.   I understand that it's in the

16   credit agreement, yes.

17        Q.   Do you understand that it was an

18   important protection for Emigrant in the

19   credit agreement?

20             MS. PARKS:  Objection.

21        A.   I understand that it's in the

22   credit agreement.

23        Q.   But do you understand that it's

24   an important protection for Emigrant in the

25   credit agreement?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 116 RECEIVED NYSCEF: 01/12/2024

106

         J. Hanratty

1
2          MS. PARKS:  Objection.

3          A.    I don't -- I don't -- no, I don't

4     know what Emigrant thinks is important.  I

5     would presume the entire document is

6     important.

7          Q.    Did other lenders you worked with

8     request that Ebury use a third-party

9     servicer?

10         MS. PARKS:  Objection.

11         A.    Capital One requested it.

12         AloStar approved us to be

13    self-servicers to service our entire

14    portfolio.

15         Bank of Montreal and the term

16    sheet approved us to self-service our

17    entire portfolio.

18         And I think, generally speaking,

19    the entire industry has moved to

20    self-servicing.

21         Q.    And so you never committed

22    anything related to self-servicing in

23    writing in an amendment to the credit

24    agreements?

25         MS. PARKS:  Objection.

EMIGRANT BUSINESS CREDIT                                          John Hanratty
JOHN ARTHUR HANRATTY                                              June 20, 2023

107

                        J. Hanratty

1

2       A.    I don't recall.  Not that I can

3    recall for me submitting something.  I

4    don't recall a draft from their attorneys

5    either.

6       Q.    Did you ever send Jack Grady an

7    email confirming that you were

8    self-servicing?

9            MS. PARKS:  Objection.

10      A.    Not that I can recall.

11      Q.    How about a text message?

12           MS. PARKS:  Objection.

13      A.    I can't.  None that I can recall.

14      Q.    So now let's turn to page 9597 in

15   the credit agreement.

16           And so this is Section 5.10.  And

17   in it, the Ebury companies represent that

18   "Each company has complied with all

19   respects with its obligations under the

20   custodial agreement with respect to each

21   tax lien, including delivery to custodian

22   of all required tax lien documents."

23           Did I read that right?

24      A.    Yes, you did.

25      Q.    So you represented to Emigrant

|    | J. Hanratty |
|----|-------------|
| 1  |  |
| 2  | that each Ebury company had complied in all |
| 3  | respects with its obligations under the |
| 4  | custodial agreement with respect to each |
| 5  | tax lien including delivery to custodian of |
| 6  | all required tax lien documents? |
| 7  | MS. PARKS:  Objection. |
| 8  | A.    Yes, I did. |
| 9  | Q.    And that was not true? |
| 10 | MS. PARKS:  Objection. |
| 11 | A.    Yes, it was not true. |
| 12 | Q.    Turning back to page 9595, this |
| 13 | is right under Article 5, Representations |
| 14 | and Warranties, it says, "Each Ebury |
| 15 | company jointly and separately represents |
| 16 | and warrants to the lender that as of the |
| 17 | date of this agreement and as of the date |
| 18 | of each advance, the following shall be |
| 19 | true and correct and shall be deemed to |
| 20 | have certified that after giving effect to |
| 21 | the proposed advance and pledged tax |
| 22 | liens." |
| 23 | Did I read that right? |
| 24 | A.    I'm sorry, I got a little lost. |
| 25 | Are you -- which one are you in? |

109

```
 1              J. Hanratty

 2      Q.   Just under Representations and

 3  Warranties.

 4      A.   So 4.1.  Got it.

 5           (Document review.)

 6           MS. PARKS:  4.9?

 7  BY MR. MAYRON:

 8      Q.   No, it's under Article 5, above

 9  the --

10      A.   I apologize.  Ah.

11           (Document review.)

12      Q.   So to the extent that

13  representation was untrue, you made an

14  untrue representation as of the date of

15  each advance?

16           MS. PARKS:  Objection.

17      A.   Assuming that there was eligible

18  collateral in the borrowing bases that you

19  are talking about.  Or I'm unclear.

20           Is your question that it negates

21  the entirety of the collateral?

22      Q.   So earlier we discussed this

23  representation in Section 5.10 of the

24  credit agreements in which you represented

25  that "Each Ebury company had complied in
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 126    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 839 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

110

```
 1                    J. Hanratty

 2    all respects with its obligations under the

 3    custodial agreement with respect to each

 4    tax lien, including delivery to custodian

 5    of all required tax lien documents."

 6              And you agreed that that was not

 7    a true representation because Ebury failed

 8    to deliver custody of all of its tax liens

 9    to the custodian?

10              MS. PARKS:  Objection.

11        A.   No, not all of them.  There were

12    some that we could not deliver, which we

13    discussed.  There were some that we had in

14    our possession while we were looking to

15    move our entire book to U.S. Bank, which

16    Emigrant was aware of.  That was in

17    preparation for the refinancing of taking

18    Emigrant out.

19              But my lack of clarity comes from

20    this clause as written appears to negate

21    even eligible collateral.

22        Q.   Why do you say that?

23        A.   "Because in all respects...

24              (Document review.)

25        A.   Okay.  I misread it.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    RECEIVED NYSCEF: 01/12/2024

111

```
 1                   J. Hanratty

 2        Q.   Okay.  So turning to page 9598,

 3   this is Section 5.21 titled Information and

 4   it states, "All information heretofore or

 5   contemporaneously herewith furnished by

 6   each Ebury company and each validity

 7   guarantor to the lender for the purposes of

 8   or in connection with the transaction

 9   documents or any transaction contemplated

10   thereby is," and then it skips a little,

11   "true and accurate and every material

12   respect on the day as of which such

13   information is dated and certified, and

14   none of such information is or will be

15   incomplete by omitting to state any

16   material fact necessary to make such

17   information not misleading."

18             Correct?

19             MS. PARKS:  Objection.

20        A.   That reads correct.

21        Q.   And so to the extent that Ebury

22   included tax liens in the borrowing base

23   that had not been delivered to the

24   custodian, Ebury made an untrue

25   representation?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 11 RECEIVED NYSCEF: 01/12/2024

112

| | J. Hanratty |
|---|---|
| 1 | |
| 2 | MS. PARKS:  Objection. |
| 3 | A.   Within our borrowing base, there |
| 4 | are liens that we -- no one could deliver |
| 5 | to a custodian, but there were liens that |
| 6 | were in the -- our possession and for the |
| 7 | period of time when we were looking to |
| 8 | transition our custodian from MTAG to U.S. |
| 9 | Bank. |
| 10 | Q.   So that was the only period |
| 11 | during which Ebury had tax liens that it |
| 12 | was required to deliver to the custodian |
| 13 | under the credit agreements in its |
| 14 | possession? |
| 15 | MS. PARKS:  Objection. |
| 16 | A.   That period, yes, we still have |
| 17 | those liens in our possession. |
| 18 | Q.   So after the Ebury companies |
| 19 | failed to transition the custodian from |
| 20 | MTAG to U.S. Bank, the Ebury companies did |
| 21 | not deliver custody of the tax liens to |
| 22 | MTAG? |
| 23 | MS. PARKS:  Objection. |
| 24 | A.   Not -- I think a portion of them |
| 25 | we did, but there are some that are in our |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO. 172

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 842 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

113

                    J. Hanratty

1    possession now of which we made the bank

2    aware of.

3        Q.    When did you make the bank aware

4    of them?

5        A.    We made the bank aware of that

6    multiple times during our daily

7    conversations a year-and-a-half ago, a year

8    ago, prior to the legal matter here.

9        Q.    After the default, the maturity?

10       A.    Yes.  And I don't recall whether

11   we made them aware prior to that.

12       Q.    Then also on 9598, this is

13   Section 6.1, it says that "Each Ebury

14   company shall promptly inform the lender in

15   writing of any and all adverse changes

16   caused by a material" -- sorry -- "causing

17   material adverse effect on an Ebury

18   companies' or any validity guarantor's

19   financial condition and all litigation

20   investigation claims and all threatened

21   litigation and claims affecting an Ebury

22   company or a validity guarantor that could

23   reasonably be expected to result in a

24   material adverse effect."

114

                    J. Hanratty

1

2       A.    Yes, you read that correctly.

3       Q.    Just going back to my earlier

4   question, to the extent that Ebury included

5   tax liens and borrowing base that had not

6   been delivered to the custodian, Ebury made

7   an untrue representation in Section 5.21 of

8   the credit agreements?

9           MS. PARKS:  Objection.

10      A.    If Ebury submitted a borrowing

11  base that had a lien that was not in the

12  possession of a custodian, then it was

13  ineligible collateral, yes.

14      Q.    And it would have been an untrue

15  statement to make the representation set

16  out in Section 5.21 of the credit

17  agreements?

18          MS. PARKS:  Objection.

19      A.    Well, Ebury still owned the lien

20  and so it was ineligible collateral on the

21  borrowing base.  But not in the custodian,

22  in the possession of the custodian.

23      Q.    And so if it was not in the

24  possession of the custodian and Ebury

25  didn't provide that information to

115

                           J. Hanratty

2    Emigrant, Ebury made an untrue statement by

3    representing that Section 5.21 is true?

4            MS. PARKS:  Objection.

5        A.    If it was eligible collateral.

6        Q.    Do you mean that if it was

7    ineligible and Ebury represented that it

8    was eligible?

9        A.    If I represented it was

10   ineligible, what...

11       Q.    My question is if you represented

12   that a tax lien was eligible and it was

13   actually ineligible because the Ebury

14   companies had failed to deliver the tax

15   lien documents to the custodian, then Ebury

16   -- then you made a false statement under

17   Section 5.21?

18           MS. PARKS:  Objection.

19       A.    Which -- from the borrowing base.

20   It's meaning that it's ineligible parameter

21   for the borrowing base.

22       Q.    To the extent that the Ebury

23   companies identified a tax lien for which

24   the Ebury companies had failed to deliver

25   the tax liens to the custodian but

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 845 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

116

1                J. Hanratty

2    represented to Emigrant that it was

3    eligible collateral, you agree that Ebury

4    companies would have made an untrue

5    statement under Section 5.21?

6            MS. PARKS:  Objection.

7        A.   Yes, with the caveat that that

8    happens with liens that are not in Ebury's

9    custody.  From the perspective of New

10   Jersey liens get delivered 90 to 180 days

11   later from recordings.  I don't have them

12   in my possession nor does the custodian and

13   they're eligible collateral.

14           Rochester doesn't have liens.

15   Florida has electronic liens.  So there's

16   scenarios where I -- we would have

17   submitted those liens as eligible

18   collateral and no custodian would have it,

19   let alone Ebury.

20       Q.   But if Ebury received the Ebury

21   companies received custody of that tax lien

22   and failed to deliver it to the custodian

23   and then represented to Emigrant that the

24   tax lien was eligible, you would agree that

25   would be a false statement under Section

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO... 24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
EMIGRANT BUSINESS CREDIT Court Records    Pg 846 of 2230    RECEIVED NYSCEF:
JOHN ARTHUR HANRATTY    John Hanratty
June 20, 2023

117

1                    J. Hanratty

2    5.21?

3        A.    It would be ineligible --

4            MS. PARKS:  Objection.

5            THE WITNESS:  I'm sorry.

6            MS. PARKS:  That's okay.

7        A.    The lien would be ineligible,

8    yes.

9        Q.    And it would be a false statement

10   to represent that an ineligible lien is

11   eligible under the credit facilities?

12           MS. PARKS:  Objection.

13       A.    I think similar to all the other

14   eligibility requirements of states,

15   loan-to-value, et cetera, it is -- it would

16   be a violation of the credit agreement.

17       Q.    Would it be a false statement for

18   the Ebury companies to represent that an

19   ineligible lien is eligible under the

20   credit facilities?

21           MS. PARKS:  Objection.

22       A.    What is a false statement?  It

23   would be incorrect.

24           Is that a false statement?

25       Q.    That is the question.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 177    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 847 of 2230    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT                                John Hanratty
JOHN ARTHUR HANRATTY                                    June 20, 2023

118

```
 1                  J. Hanratty

 2                  Would it be a false statement for

 3       the Ebury companies to represent that an

 4       ineligible lien is eligible under the

 5       credit facilities?

 6                  MS. PARKS:  Objection.

 7                  Go ahead.

 8           A.   I think the process of approving

 9       liens as eligible or ineligible is very

10       granular.  And I don't view, personally, if

11       I have a -- the portfolio is 25 percent

12       commercial versus 10 percent commercial,

13       which was the level, and we make the

14       mistake where it's eligible, then I'm doing

15       a false statement, so no.

16           Q.   So it is your testimony that it

17       would not be a false statement if the Ebury

18       companies represented that an ineligible

19       lien is eligible under the credit

20       facilities?

21           A.   It was a mistake --

22                  MS. PARKS:  Objection.

23           A.   It was a mistake on the

24       operational borrowing base.

25           Q.   And so as I think, as you said,
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 92 RECEIVED NYSCEF: 01/12/2024

119

```
 1                    J. Hanratty

 2     that you viewed the process of approving

 3     liens as eligible or ineligible as a

 4     granular process.

 5              And you don't view personally if

 6     the portfolio is 25 percent commercial

 7     versus 10 percent commercial, which was the

 8     level when you make a mistake where it's

 9     legible and then I'm making a false

10     statement.

11              Did you share that view with the

12     bank?

13              MS. PARKS:  Objection.

14     BY MR. MAYRON:

15         Q.   Did you share that view with

16     Emigrant?

17              MS. PARKS:  Objection.

18         A.   That when we made a mistake, we

19     made a mistake?

20         Q.   That you viewed the eligibility

21     determination as a granular process and

22     that if there was a mistake, you didn't

23     view it as a false statement?

24              MS. PARKS:  Objection.

25         A.   The borrowing base process, you
```

120

J. Hanratty

2  submit a document.  They review it and flag

3  -- we have things get kicked out of

4  eligibility all of the time.  It's part of

5  the process.  It's not -- it's not

6  something -- we don't blindly submit it and

7  they accept it.

8      Q.   You intentionally failed to tell

9  Emigrant that certain collateral listed on

10  the borrowing base was being self-serviced

11  by Ebury, correct?

12          MS. PARKS:  Objection.

13      A.   No.

14      Q.   In your view, it was just a

15  mistake?

16          MS. PARKS:  Objection.

17      A.   In my view, Emigrant was aware

18  that we were self-servicing significant

19  portions of our company.

20      Q.   What is the basis for that view?

21      A.   Conversations with Emigrant.

22      Q.   Conversations with who?

23      A.   Conversations around the

24  negotiations of extending eligibility

25  parameters on the credit agreement which we

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 100    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 850 of 2230    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

121

                    J. Hanratty

1

2    did several times.  Those conversations,

3    though I don't recall them specifically,

4    would have been with Jack Grady,

5    potentially Karen Walt, potentially Sahil

6    Arora.

7        Q.    But Ebury and Emigrant never

8    executed an amendment to the credit

9    agreements to allow the Ebury companies to

10   self-service?

11           MS. PARKS:  Objection.

12       A.    We never got that far.  By the

13   time the -- by the time of me going and

14   trying to refinance Emigrant with AloStar,

15   you know, my -- the business was getting to

16   a self-servicing point of view and it was

17   either retire Emigrant or they were ready

18   to move on from the relationship.

19           I think Jack had gotten a lot of

20   nos or -- for extensions and it was not

21   worth pushing.  And so that's where we

22   were.

23       Q.    You said it was not worth

24   pushing.  By "it," you mean getting a

25   formal written amendment to the credit

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. ...    Court Records    Pg 851 of 2230    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT                                     John Hanratty
JOHN ARTHUR HANRATTY                                         June 20, 2023

122

                          J. Hanratty

1    agreements to allow Ebury to self-service?

2        A.   I spent the majority of my time

3    looking for avenues to retire Emigrant.

4        Q.   You said you viewed it was not

5    worth pushing.

6             Is that a reference to pushing

7    getting a formal written amendment to the

8    credit agreements to allow Ebury to

9    self-service?

10            MS. PARKS:   Objection.

11       A.   Emigrant was aware that I was

12   self-servicing and I was moving to a

13   self-servicing with an additional bank that

14   was going to pay them off.  Once that

15   transaction fell through, I moved towards

16   finding solutions for Emigrant.

17       Q.   I just want to get back to what

18   you said.  You said it was not worth

19   pushing.

20            You were saying it was not worth

21   pushing getting a formal written amendment

22   to the credit agreements to allow Ebury to

23   self-service, correct?

24            MS. PARKS:   Objection.

123

                          J. Hanratty

1

2        A.    That in conjunction with other --

3   other parameters.  For example, we had

4   discussed getting tax deeds/REO eligible or

5   finding a way to lend to that, which was

6   exactly the deal that I had with AloStar.

7             Other things we had discussed off

8   and on throughout that time period was the

9   percentages of eligibility, time frame of

10  ownership.  And self-servicing was just a

11  topic amongst all those.

12       Q.    So you thought it wasn't worth

13  pushing getting a formal written amendment

14  to the credit agreements to allow Ebury to

15  self-service and so you just went ahead and

16  self-serviced without a formal written

17  amendment to the credit agreements?

18            MS. PARKS:  Objection.

19       A.    No. I didn't -- self -- pushing

20  from the perspective of Emigrant getting

21  approval done on a bunch of different

22  topics of which I just said.

23            So to me, that's not my

24  perspective of, hey, look, let's go pay for

25  this.  My mindset at the time was getting a

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1-2
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

124

                    J. Hanratty

1

2    deal done to retire them.  And that is --

3    they were fully aware of what we were

4    doing.  And the goal was to retire them.

5        Q.   So you hadn't gotten an amendment

6    done, but you went ahead and self-serviced?

7            MS. PARKS:  Objection.

8        A.   We were self-servicing the

9    ineligible collateral.  They were aware of

10   the Rochester collateral.  They were aware

11   of the late-stage New Jersey collateral.

12   They were aware of the Ohio collateral.

13   They were aware of the Kentucky collateral.

14   And I do not recall that we memorialized

15   it.  And clearly there is no amendment on

16   the credit agreement relating to it.

17       Q.   When did you make Emigrant aware

18   that you were self-servicing?

19           MS. PARKS:  Objection.

20       A.   We had multiple conversations on

21   it throughout the time frame of -- prior to

22   the AloStar process, which was also nine,

23   ten months long.  So you're talking 2017,

24   '18.

25       Q.   So turning again to Section 6.1,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 854 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

125

```
 1              J. Hanratty

 2   which is on page 9598, you covenanted to

 3   promptly inform Emigrant in writing of

 4   several things, but one of them is all

 5   threatened litigation; is that correct?

 6          MS. PARKS:  Objection.

 7      A.   Yes, that's what it reads here.

 8      Q.   You failed to comply with that

 9   covenant, correct?

10          MS. PARKS:  Objection.

11      A.   No.

12      Q.   Ira Leventhal threatened

13   litigation against you and you did not

14   notify Emigrant?

15          MS. PARKS:  Objection.

16      A.   I'm trying to remember the

17   context.

18      Q.   Did Ira Leventhal threaten you

19   with litigation in 2018?

20          MS. PARKS:  2018, you said?

21          THE WITNESS:  Yes.

22      A.   Ira Leventhal was looking to be

23   retired, and I don't recall if he wrote a

24   letter from an attorney or texted or

25   threatened, but, yeah, it was -- did he
```

126

| | J. Hanratty |
|---|---|
| 1 | |

1    J. Hanratty

2    threaten litigation?  I think to me the --

3    what I recall was conversations that --

4    yeah, just that I'm going to sue you, which

5    is a guess of threat of litigation.  So,

6    yeah, Ira Leventhal threatened me with

7    litigation.

8        Q.   And you did not notify Emigrant

9    in writing?

10           MS. PARKS:  Objection.

11       A.   In writing, no.

12       Q.   Did you notify Emigrant in

13   another manner?

14       A.   I don't -- no, I don't recall.  I

15   don't recall speaking about it with

16   Emigrant.  I don't recall that at all.

17       Q.   So you violated this covenant?

18           MS. PARKS:  Objection.

19       A.   I don't -- I don't know that.  I

20   don't recall whether we discussed it.  You

21   know, I discussed investors generally, with

22   Jack mainly, but I don't recall

23   specifically being like this guy --

24           (Reporter clarification.)

25       A.   I don't recall specifically

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

127

```
 1              J. Hanratty

 2   saying that I was threatened by Ira

 3   Leventhal to Jack.

 4        Q.   You also were threatened with

 5   litigation and sued by a group of investors

 6   led by Michael Salerno?

 7        A.   Yes.

 8        Q.   And you didn't notify Emigrant of

 9   that litigation either?

10             MS. PARKS:   Objection.

11        A.   I don't recall.  I do not recall

12   speaking to Jack about it, no.

13        Q.   Do you recall speaking to anyone

14   else at Emigrant about it?

15        A.   No, I would have -- my daily or

16   most interaction would have been with Jack.

17        Q.   I'm going to turn the page to

18   EBCC 9599.  And I'm going to look at

19   Section 6.6 Annual Financial Statements.

20   And it says, "Each Ebury company and Ebury

21   Fund 1 LP shall, without demand or request

22   by the lender and not later than 90 days

23   after the end of each fiscal year,

24   furnished the lender with fiscal year-end

25   consolidated financial statements,"
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records    Pg 857 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

128

                    J. Hanratty

1   skipping a little, "audited by a certified

2   public accountant acceptable to the

3   lender."

4           Correct?

5       A.   Yes, you read that correctly.

6       Q.   So you agreed to provide Emigrant

7   with audited financial statements not later

8   than 90 days after the end of each fiscal

9   year?

10          MS. PARKS:  Objection.

11      A.   Yes.

12      Q.   When was the end of the fiscal

13  year?

14      A.   Which -- it would be December,

15  December 31st.

16      Q.   December 31st?

17          So Ebury's audited financial

18  statements would be due sometime in April

19  the following year?

20      A.   Yes.

21          MS. PARKS:  Objection.

22      A.   Yes, 90 days after.

23  BY MR. MAYRON:

24      Q.   Turning the page to page 9600,

129

```
 1                  J. Hanratty

 2    Section 6.13, and I'm going to look at

 3    Section B.  And it says, "At such time as

 4    the advance is outstanding, together with

 5    all advances outstanding under the credit

 6    agreement by and between the lender and

 7    Ebury 2EMI LLC dated as of the date hereof,

 8    are collectively in excess of $2 million.

 9    Borrowing base certificates shall be

10    furnished without demand or request by the

11    lender no later than 15 days after the end

12    of each month with information for the

13    month just ended."

14            Did I read that correct?

15        A.   You did.

16        Q.   Ebury failed to deliver monthly

17    borrowing base certificates to Emigrant for

18    most of 2020 and 2021, correct?

19            MS. PARKS:  Objection.

20        A.   I don't recall the specific -- I

21    don't recall that.

22        Q.   Did Ebury provide Emigrant with

23    monthly borrowing base certificates in 2020

24    and 2021?

25            MS. PARKS:  Objection.
```

130

```
 1                    J. Hanratty

 2         A.   I don't recall offhand.  Our

 3    typical process is if we don't -- didn't

 4    turn in something monthly, we would get a

 5    request for one.

 6         Q.   But you agree the credit

 7    agreement provides that the Ebury companies

 8    were required to provide borrowing base

 9    certificates without demand or request --

10              MS. PARKS:  Objection.

11         Q.   -- if the advance is outstanding

12    or in excess of 2 million?

13              MS. PARKS:  Objection.

14         A.   Yes.

15         Q.   And then at the bottom section,

16    6.14, you agreed that each month-end

17    borrowing base certificate shall be

18    accompanied by a monthly tax lien report.

19              Correct?

20              MS. PARKS:  Objection.

21              Look through it.

22         A.   I'm sorry, where is that?

23         Q.   Section 6.14.

24              MS. PARKS:  It's the bottom page.

25              THE WITNESS:  Okay.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 166 RECEIVED NYSCEF: 01/12/2024

131

```
 1                    J. Hanratty

 2         A.    Yes, you read that correctly.

 3         Q.    Okay.  And then turning to page

 4    9602, this is Section 6.22, you agreed to

 5    provide a validity guarantee in your

 6    personal capacity in favor of Emigrant

 7    Bank?

 8         A.    Yes.

 9         Q.    And I'm going to turn to page

10    9606.  This is Section 8.2.

11              You agreed to enter into

12    agreements with Tower fund Services as

13    servicer and custodian, correct?

14         A.    Yes.

15         Q.    And you agreed not to change the

16    servicer custodian without the prior

17    written consent of Emigrant, correct?

18              MS. PARKS:  Objection.

19         A.    Yes.

20         Q.    Okay.  Now I'm going to look at

21    Section 8.5.

22              You agreed not to sell, transfer

23    or otherwise alienate any of the

24    collateral, correct?

25              MS. PARKS:  Objection.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. [illegible]    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 861 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

132

                        J. Hanratty

1

2      A.    As written here, yes.

3      Q.    Did you agree not to sell,

4    transfer or otherwise alienate any of

5    Emigrant's collateral?

6            MS. PARKS:  Objection.

7      A.    Yes, that's read correctly.

8      Q.    Did you also agree not to sell,

9    transfer otherwise alienate any of the

10   Ebury companies' other assets except in the

11   ordinary course of business?

12           MS. PARKS:  Objection.

13     A.    Yes.

14     Q.    And this is Section 8.6.  You

15   agreed not to, and this is Section C, cease

16   operations, liquidate or merge or

17   consolidate with any other entity, correct?

18           MS. PARKS:  Objection.

19     A.    Yes.

20     Q.    What does it mean to liquidate?

21           MS. PARKS:  Objection.

22     A.    To shut down.

23     Q.    Section 8.8, you agreed not to

24   make any distributions if an event of

25   default has occurred, correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1297
RECEIVED NYSCEF: 01/12/2024

133

1                    J. Hanratty

2            MS. PARKS:  Objection.

3        A.   Yes.

4        Q.   You also agreed not to make any

5    distributions if an event has occurred that

6    with notice, the lapse of time, or

7    otherwise could constitute an event of

8    default?

9            MS. PARKS:  Objection.

10       A.   Yes.

11       Q.   You also agreed not to make any

12   distributions if the distribution made or

13   to be made will cause the borrower to

14   violate or fail to comply fully with any of

15   the terms and conditions of or to default

16   under this agreement or any other

17   transaction document, correct?

18           MS. PARKS:  Objection.

19       A.   Yes.

20       Q.   Ebury defaulted on its obligation

21   to repay the credit facilities at maturity,

22   correct?

23           MS. PARKS:  Objection.

24       A.   At maturity, yes.

25       Q.   And between 2018 and 2019, the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022
NYSCEF DOC. NO.                                       RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 863 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                      June 20, 2023

                                                                    134

```
 1                    J. Hanratty

 2     Ebury companies distributed $25 million to

 3     their investors, correct?

 4              MS. PARKS:  Objection.

 5         A.    What years?

 6         Q.    2018 and 2019.

 7         A.    That number -- no.

 8         Q.    Approximately how much did the

 9     Ebury companies distribute to their

10     investors between 2018 and 2019?

11         A.    I want to say around 20.5 to 21.

12         Q.    So had the Ebury companies not

13     made those distributions, it would have

14     been able to repay Emigrant Bank at

15     maturity, correct?

16              MS. PARKS:  Objection.

17         A.    Well, the default was two-and-a-

18     half years later.  I don't know.

19         Q.    How much did Emigrant --

20     approximately how much did Ebury owe

21     Emigrant at maturity?

22              MS. PARKS:  Objection.

23         A.    Roughly 18 million.

24         Q.    So if the Ebury companies had not

25     made around 20.5 to 21 million in
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1-2
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

135

1                     J. Hanratty

2    distributions in 2018 and 2019, they would

3    have been able to repay Emigrant Bank at

4    maturity?

5              MS. PARKS:  Objection.

6         A.   I don't know.  It's

7    two-and-a-half years later.  We also would

8    have paid Emigrant off if AloStar went

9    through on its obligations.

10        Q.   If the Ebury companies had not

11   paid out 20.5 to 21 million in

12   distributions to its investors, it would

13   have been able to use that money to pay off

14   Emigrant Bank at maturity?

15             MS. PARKS:  Objection.

16        A.   Other use of cash would have been

17   to go purchase more tax liens.  I don't --

18   I can't say what would have occurred with

19   that asset.

20        Q.   You also agreed in Section 8.8 in

21   addition to the previous limitations, not

22   to make any distributions in excess of $5

23   million in any calendar year, correct?

24             MS. PARKS:  Objection.

25        A.   Per fund, yes.

136

```
 1                    J. Hanratty

 2         Q.   You violated that provision,

 3    correct?

 4             MS. PARKS:  Objection.

 5         A.   I don't have the distributions in

 6    front of me, but -- I don't have the data.

 7    I have to review it to look.

 8         Q.   In 2018, you distributed $9

 9    million to the investors in Fund 1,

10    correct?

11             MS. PARKS:  Objection to form.

12    BY MR. MAYRON:

13         Q.   In 2018, you distributed 9

14    million to the investors in Fund 1,

15    correct?

16         A.   I don't have that in front of me.

17    I don't recall.

18             MS. PARKS:  Do you want to take a

19         break?

20             MR. MAYRON:  Why don't we take a

21         break.

22             MS. PARKS:  Okay.

23             MR. MAYRON:  Yeah.

24             MS. PARKS:  Off the record.

25             THE VIDEOGRAPHER:  The time right
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 66
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

137

                         J. Hanratty

1      now is 2:02 p.m.  We are off the

2      record.

3            (Recess is taken.)

4            (Ms. Farrah Kalach joining now.)

5            THE VIDEOGRAPHER:  The time right

6      now is 2:15 p.m.  We are back on the

7      record.

8   BY MR. MAYRON:

9      Q.   Okay. I'd like to show you a

10  document labeled EBCC 10586.

11           MR. MAYRON:  Could the court

12      reporter please mark it as Hanratty

13      Deposition Exhibit 8.

14           (Hanratty Exhibit 8, Ebury Fund 1

15      LTD. Financial Statements and

16      Independent Auditors' Report year ended

17      December 31, 2018 prepared by Richey

18      May & Co., Bates-stamped EBCC_10586

19      through 6690, marked for

20      identification, as of this date.)

21  BY MR. MAYRON:

22      Q.   And could I direct your attention

23  to the page labeled EBCC 10611.

24           Before I ask you the question,

138

J. Hanratty

1

2    have you seen this document before?

3        A.    I do not recall seeing it, but --

4        Q.    What is it?

5        A.    It's our audit from 2018.

6        Q.    And so on page EBCC 10611, it

7    lists approximately 9.2 million in capital

8    withdrawals by the limited partners in

9    2018, correct?

10        A.    It does.

11        Q.    And that's in excess of the

12    5 million limitation in the credit

13    agreements, correct?

14        A.    It is.

15        Q.    Turning back to the credit

16    agreement which is Hanratty Deposition

17    Exhibit 3, EBCC 9578, and could you please

18    turn to page 9607.

19            And I'm looking at paragraph B

20    under Section 9.1 which says that "It's an

21    event of default if any Ebury company

22    diverts or uses any portion of any amount

23    received on account of the collateral while

24    any of the indebtedness remains outstanding

25    other than for the repayment of the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 167                                        RECEIVED NYSCEF: 01/12/2024

139

```
 1              J. Hanratty

 2   indebtedness deposit into the lockbox

 3   account."

 4         Correct?

 5   A.    I'm sorry, which --

 6   Q.    Section 9.1, subparagraph B.

 7   A.    B.  Sorry.

 8         Yes.  You read that correctly.

 9   Q.    So it would be an event of

10   default for the Ebury companies to use an

11   advance to pay a distribution to an

12   investor because that is not for repayment

13   of the indebtedness or deposit into the

14   lockbox account?

15         MS. PARKS:  Objection.  Calls for

16     a legal conclusion.

17   A.    Where's the -- so where is the

18   advance?

19   Q.    An advance is an amount received

20   on the account of the collateral, correct?

21   A.    Yes, but I don't see where you're

22   reading, I guess.  I see B.

23   Q.    No, I'm paraphrasing.

24   A.    Oh, I apologize.

25   Q.    That's fine.
```

140

J. Hanratty

2       You agree it would be an event of

3       default for the Ebury companies to use an

4       advance to pay a distribution to an

5       investor because that is not for repayment

6       of the indebtedness or repayment of the

7       lockbox account?

8       MS. PARKS:  Objection.  Calls for

9       a legal conclusion.

10       A.  Say that one more time.

11       Q.  You agree that it would be an

12       event of default for the Ebury companies to

13       use an advance to pay a distribution to an

14       investor because that is not for repayment

15       of the indebtedness or deposit into the

16       lockbox account?

17       MS. PARKS:  Objection.

18       A.  No, I don't know if that's an

19       event of default.

20       Q.  Why not?

21       A.  Because I don't know.

22       Q.  So you agree, though,

23       Section 9.1B says that "It's an event of

24       default if any Ebury company diverts or

25       uses any portion of any amount received on

141

J. Hanratty

2  account of the collateral while any of the

3  indebtedness remains outstanding other than

4  for repayment of the indebtedness or

5  deposit into the lockbox account"?

6      A.  What about -- I can pay for

7  expenses, correct?  Like, I'm just confused

8  how this interacts with the other clause.

9      Q.  Which other clause?

10      A.  The one that reads what you're

11  eligible to use an advance for.

12      Q.  So Section 2.1 on page 9591 says,

13  "Advances shall be used solely for the

14  purposes of acquiring eligible tax liens

15  including subsequent tax liens."

16      Correct?

17      A.  I think so, yes.

18      MS. PARKS:  I'm sorry, what page

19      was that, Austin?

20      MR. MAYRON:  9591.

21      MS. PARKS:  And which section did

22      you say?

23      MR. MAYRON:  Section 2.1.

24      MS. PARKS:  2.1, that first top

25      part.

142

                        J. Hanratty

1

2                   (Document review.)

3    BY MR. MAYRON:

4        A.   I'm just not understanding this

5    one specific to advances and this one is

6    specific to using funds.  The other one --

7    and then I think you're paraphrasing them

8    together.  So I don't know.

9        Q.   Okay.  Turning to page 9608, this

10   is subparagraph K.  It says, "It's an event

11   of default if any representation or

12   warranty of any Ebury company or any

13   validity guarantor made in connection with

14   the indebtedness or in this agreement or

15   any of the other transaction documents

16   proves to be incorrect or misleading in any

17   material respect."

18                   Correct?

19                   MS. PARKS:  Objection.

20       A.   Yes, you read that correctly.

21       Q.   Finally, turning to page 9612,

22   this is Section 11.1, the credit agreement

23   states, "No alteration of or amendment to

24   this agreement shall be effective unless

25   given in writing and signed by the party or

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022
NYSCEF DOC. NO. 1233    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
        EMIGRANT BUSINESS CREDIT    Court Records    Pg 872 of 2230        John Hanratty
        JOHN ARTHUR HANRATTY        June 20, 2023

143

                    J. Hanratty

1

2    parties sought to be charged or bound by

3    the alteration or amendment."

4            Correct?

5        A.   Yes.

6        Q.   You agree that the Ebury 2 EMI

7    LLC credit agreement contains the same

8    material provisions as the Ebury 1 EMI LLC

9    credit agreement?

10           MS. PARKS:   Objection.

11       A.   I think -- no.  I think some

12   amount's different in states and

13   eligibility.  There's things that are

14   different.

15       Q.   Does the Ebury 2 EMI LLC

16   agreement have different reporting

17   requirements?

18           MS. PARKS:   Objection.

19       A.   I don't -- I don't know.  I don't

20   remember, more correctly.

21           MR. MAYRON:   I'm handing you the

22       document labeled EBCC 9563.

23           Could the court reporter please

24       mark it as Hanratty Deposition

25       Exhibit 9.

144

```
 1                    J. Hanratty

 2              (Hanratty Exhibit 9, Document

 3          titled "Waiver and Eighth Amendment to

 4          Loan Documents, Ebury 1, March 18,

 5          2021," Bates-stamped EBCC_9563 through

 6          9568, marked for identification, as of

 7          this date.)

 8   BY MR. MAYRON:

 9        Q.    This is the eighth amendment to

10   the Ebury 1 EMI LLC credit agreement,

11   correct?

12              MS. PARKS:   Look through the

13          document.

14              (Document review.)

15        A.    Yes, correct.

16        Q.    And I'm looking at page 9564 in

17   this agreement.

18              Ebury and Emigrant agree to

19   extend the maturity date of the note to

20   May 8th, 2021, correct?

21        A.    What page are you on?

22        Q.    9564, this is Section 2A in the

23   middle of the page.

24        A.    Got it.

25              (Document review.)
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM	INDEX NO. 158207/2022
NYSCEF DOC. NO.	Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
24-04020-dsj                    Court Records    Pg 874 of 2230	RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY	John Hanratty
June 20, 2023

```
 1                    J. Hanratty

 2       A.   Yes, correct.

 3       Q.   And then section 4 down at the

 4  bottom, it says, "The borrower and each

 5  guarantor hereby certifies that all of its

 6  representations and warranties in the loan

 7  document as amended by this amendment are

 8  accepted and they otherwise be stated in

 9  this agreement true and as correct as of

10  the date of this amendment."

11            Correct?

12       A.   Yes, you read that correctly.

13       Q.   You also certified that no event

14  of default or event which would the passage

15  of time or the giving of notice or both

16  would constitute an event of default exists

17  under any loan document, correct?

18            MS. PARKS:  Objection.

19       A.   Yes, you read that correctly.

20       Q.   That was not true when you so

21  certified, correct?

22            MS. PARKS:  Objection.

23       A.   No, I don't know what an event --

24  I think you're referring back to your other

25  event of default, and I don't know what
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records   Pg 875 of 2230
John Hanratty
JOHN ARTHUR HANRATTY
June 20, 2023

146

J. Hanratty

1
2     that is.
3          Q.   Ebury was self-servicing tax
4     liens in violation of the credit agreement,
5     correct?
6               MS. PARKS:   Objection.
7          A.   It was self-servicing tax liens
8     that Emigrant was aware of.
9          Q.   But the credit agreement did not
10    permit Ebury to self-service those liens?
11              MS. PARKS:   Objection.
12         A.   We didn't have anything in
13    writing related to that.
14         Q.   Well, that's not true, is it?
15              The credit agreement excludes
16    from eligible tax lien a tax lien whose
17    basic tax lien documents have not been
18    delivered to the custodian, correct?
19         A.   That is correct.
20         Q.   So you had something in writing?
21         A.   Yes.   And we submitted on our
22    borrowing base a lot of self-servicing
23    liens as ineligible.
24         Q.   And did you submit self-service
25    liens as eligible?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                           RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 876 of 2230         John Hanratty
JOHN ARTHUR HANRATTY                                             June 20, 2023

                                                                    147

J. Hanratty

1

2        A.    The Rochester New York which were

3   -- Emigrant was aware of.

4        Q.    Did you submit any other tax

5   liens on a borrowing base that were

6   self-servicing eligible?

7        A.    I would say generally New Jersey

8   tax liens.

9        Q.    And so the certification in the

10  eighth amendment to the loan documents is

11  false?

12            MS. PARKS:    Objection.

13       A.    Emigrant was aware of the

14  self-servicing.  I don't know what an event

15  of default is.  That's a judgment not for

16  me.

17       Q.    So you're saying you certified

18  that no event of default occurred, but you

19  have -- you are not able to judge what an

20  event of default is?

21            MS. PARKS:    Objection.

22       A.    I'm saying Emigrant was aware of

23  the self-servicing.  That's what I'm

24  saying.

25       Q.    When you say that Emigrant was

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 877    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

EMIGRANT BUSINESS CREDIT

Court Records

JOHN ARTHUR HANRATTY

Pg 877 of 2230

John Hanratty

June 20, 2023

148

                    J. Hanratty

1

2   aware of the self-servicing, you're

3   referring back to supposed conversations

4   that you had with Jack Grady?

5       A.   Yes.

6       Q.   But don't recall when those

7   conversations took place?

8            MS. PARKS:   Objection.

9       A.   I recall generally they took

10  place multiple times in the context of when

11  we were refinancing or attempting to

12  refinance at Emigrant.

13      Q.   And you didn't memorialize those

14  conversations in writing?

15           MS. PARKS:   Objection.

16      A.   Not that I can recall, no.

17      Q.   And you never attempted to

18  execute a written amendment to the credit

19  agreements to allow the Ebury companies to

20  self-service Emigrant's collateral?

21           MS. PARKS:   Objection to form.

22      A.   No.   It was an oversight on my

23  part, but Emigrant was aware.

24      Q.   I'm going to hand you a document

25  labeled EBCC 9569.

149

J. Hanratty

          (Hanratty Exhibit 10, Document

          titled "Ninth Amendment to Loan

          Documents Ebury 1," dated 5/18/201,

          marked for identification, as of this

          date.)

          MR. MAYRON:  Will the court

          reporter please mark this as Hanratty

          Deposition Exhibit 10.

BY MR. MAYRON:

     Q.   This is the ninth amendment to

the Ebury 1EMI LLC credit agreement,

correct?

          (Document review.)

     Q.   This is the ninth amendment to

the Ebury 1EMI LLC credit agreement,

correct?

     A.   I'm reading it.

     Q.   And so if I can direct your

attention to the page marked 9570, this is

Section 1C.  And it states, "The borrower

will be paid all principal, interest, cost

and expenses outstanding hereunder on

August 10, 2021."

          Correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 30
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

150

```
 1                     J. Hanratty

 2        A.   Yes, it reads that.

 3        Q.   So Emigrant and Ebury agreed to

 4   extend the maturity date of the Ebury 1 EMI

 5   LLC credit facility until August 10, 2021,

 6   in this document?

 7        A.   Yes.

 8             MS. PARKS:  Objection.

 9             THE WITNESS:  Sorry.

10             MS. PARKS:  That's okay.

11   BY MR. MAYRON:

12        Q.   And then looking down at the

13   Section 3, Certification, it says, "The

14   borrower and each guarantor hereby

15   certifies that, A, all of its

16   representations and warranties in the loan

17   documents as amended by this amendment are,

18   except as may otherwise stated in this

19   amendment, true and correct as of the date

20   of this amendment."

21             Correct?

22             MS. PARKS:  Objection.

23        A.   Yes, you read that correctly.

24        Q.   And then it also says, "In no

25   event of default or event which with the
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 25
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 880 of 2230
RECEIVED NYSCEF: 01/12/2024
JOHN ARTHUR HANRATTY
John Hanratty
June 20, 2023

151

                    J. Hanratty

1

2    passage of time or the giving of notice or

3    both would constitute an event of default

4    exists under any loan document."

5           Correct?

6           MS. PARKS:  Objection.

7    A.    Yes, you read that correctly.

8    Q.    These representations were

9    untrue?

10          MS. PARKS:  Objection.

11   A.    No.  Again, an event of default

12   is not my judgment.  If it -- as it relates

13   to self-servicing, Emigrant was aware.

14   Q.    So turning to the last page,

15   9572, that's your signature, correct?

16   A.    Yes, that's my signature.

17   Q.    So you certified that no event of

18   default or event which with the passage of

19   time or giving of notice or both would

20   constitute an event of default exists under

21   any loan document, correct?

22          MS. PARKS:  Objection.

23   A.    Yes.

24   Q.    How can you certify that an event

25   of default has not occurred if declaring an

John Hanratty
June 20, 2023

152

                    J. Hanratty

1   event of default is not in your judgment?

2   A.   Because Emigrant is aware of

3   self-servicing.

4   Q.   What were you certifying when you

5   certified no event of default had occurred?

6          MS. PARKS:   Objection.

7   A.   I was certifying that Emigrant

8   was aware of the self-servicing and because

9   they are aware, no event of default

10  occurred.

11  Q.   What does it mean for no event of

12  default to have occurred?

13  A.   That Emigrant -- in this context,

14  that Emigrant was aware of self-servicing.

15  Q.   And when we looked at the Ebury

16  1EMI LLC audited financial statements of

17  2018, we saw that Ebury Fund 1 distributed

18  more than 5 million in distributions in

19  2018, correct?

20  A.   Yes.

21  Q.   And that is a violation of the

22  representations in the credit agreement,

23  correct?

24          MS. PARKS:   Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records    Pg 882 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

153

J. Hanratty

2    A.    Of the clause of the credit

3    agreement, yes.

4    Q.    And that is an event of default,

5    correct?

6         MS. PARKS:  Objection.

7    A.    Again, that's somebody -- that is

8    a judgment that is a document they had in

9    their hands for years and there's an

10   awareness related to it.

11   Q.    In your judgment, is a violation

12   of the representations in the credit

13   agreement an event of default?

14        MS. PARKS:  Objection.

15   A.    When the party has notice, it's

16   not my judgment.  It's not my decision.

17   Q.    What do you mean it's not your

18   decision?

19   A.    From my perspective signing this

20   document, I was not in default because they

21   had awareness.

22   Q.    An awareness of what?

23   A.    Self-servicing.

24   Q.    I was referring to the fact that

25   Ebury Fund 1 distributed more than 5

154

1                    J. Hanratty

2      million in distributions in 2018, which you

3      agree is a violation of the representations

4      in the credit agreement, correct?

5               MS. PARKS:  Objection.  I don't

6           think he did agree to that but...

7           A.   Well, this is a document -- when

8      was this document signed?  May 18th, 2021?

9      Did Karen Walt sign this as well?

10              (Reporter clarification.)

11              THE WITNESS:  I just asked if

12          Emigrant signed it as well.

13     BY MR. MAYRON:

14          Q.   My question is, Emigrant Fund 1

15     distributed more than 5 million in

16     distributions in 2018, correct?

17          A.   Yes, that's what appears to be

18     what the audit says.

19          Q.   And that is a violation of the

20     representations in the credit agreement,

21     correct?

22              MS. PARKS:  Objection.

23          A.   It is a violation of the reading

24     of the credit agreement of which it appears

25     Emigrant had notice of.  And we

155

1                    J. Hanratty

2    collectively signed this document on

3    May 18th, 2021, where we all agreed there

4    is no event of default.

5         Q.    How did you come to the

6    conclusion that there was no event of

7    default?

8         A.    We signed this document.

9         Q.    How did you come to the

10   determination that there was no event of

11   default on Ebury Fund 1's distribution of

12   more than 5 million in distributions in

13   2018?

14              MS. PARKS:    Objection.

15        A.    Because they were aware and we

16   signed it.    If there was an issue, we

17   wouldn't be signing this.

18        Q.    How do you know that Emigrant was

19   aware that Ebury Fund 1 had distributed

20   more than 5 million in distributions in

21   2018?

22        A.    I am making an assumption.

23        Q.    So you signed this document and

24   certified that no event of default had

25   occurred based on an assumption?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 12-2 Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024
Court Records Pg 885 of 2230
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
John Hanratty
June 20, 2023

156

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | MS. PARKS:  Objection. |
| 3 | A.   I am unaware of the timing of |
| 4 | when documents were delivered.  And as I |
| 5 | sit here in 2023, I am reverse-engineering |
| 6 | why we signed this document. |
| 7 | Q.   Did you ever speak to Mr. Grady |
| 8 | about the fact that the Ebury companies |
| 9 | distributed more than $5 million in 2018? |
| 10 | A.   I don't recall specifically doing |
| 11 | that. |
| 12 | Q.   Did you ever send an email |
| 13 | notifying Emigrant on the full amount of |
| 14 | distributions in 2018? |
| 15 | A.   I don't recall doing that. |
| 16 | Q.   So how can you say that Emigrant |
| 17 | was aware that Ebury companies had |
| 18 | distributed more than 5 million in |
| 19 | distributions in 2018? |
| 20 | MS. PARKS:  Objection. |
| 21 | A.   As it relates to this document |
| 22 | signed in 2021, my assumption is they have |
| 23 | the audit before that. |
| 24 | Q.   So you're speculating that |
| 25 | Emigrant was aware that the Ebury companies |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Court Records    Pg 886 of 2230

EMIGRANT BUSINESS CREDIT                                          John Hanratty
JOHN ARTHUR HANRATTY                                             June 20, 2023

157

```
 1              J. Hanratty

 2   had distributed more than $5 million in

 3   distributions in 2018?

 4              MS. PARKS:  Objection.

 5        A.   I said assumption.  I also -- I

 6   believe there were financial reports that

 7   we give quarterly or whatever as well which

 8   would reflect distributions.

 9        Q.   You didn't provide notice

10   yourself to Emigrant?

11              MS. PARKS:  Objection.

12        A.   I don't recall doing that, no.

13        Q.   I'm going to show you a document

14   labeled EBCC 9523.

15              MR. MAYRON:  Could the court

16         reporter please mark it as Hanratty

17         Deposition Exhibit 11.

18              (Hanratty Exhibit 11, Document

19         titled "Tenth Amendment to Loan

20         Documents Ebury 1," dated 8/12/2021,

21         Bates-stamped EBCC_9523 through 9528,

22         marked for identification, as of this

23         date.)

24   BY MR. MAYRON:

25        Q.   This is the tenth amendment to
```

158

1                    J. Hanratty

2    the loan documents for Ebury 1, correct?

3         A.    Yes.

4         Q.    And turning to the page ending in

5    9525, looking at Section 2C, this amendment

6    extended the maturity date of the note for

7    the Ebury 1 credit facility to November 10,

8    2021, correct?

9         A.    Yes.

10        Q.    And like the other amendments we

11   looked at, Section 4, it says, "The

12   borrower in each guarantor hereby certifies

13   that all of its representations and

14   warranties in the loan documents as amended

15   by this amendment are, except as may

16   otherwise be stated in this amendment, true

17   and correct as of the date of this

18   amendment."

19             Correct?

20        A.    Yes, you read that correctly.

21        Q.    It also says, "No event of

22   default or event which with the passage of

23   time with the giving of notice or both

24   would constitute an event of default exists

25   under any loan document."

159

```
 1                    J. Hanratty

 2           Correct?

 3      A.   I'm sorry, where are you?

 4      Q.   Section 4, subparagraph B.

 5      A.   Yes, you read that correctly.

 6      Q.   As we discussed earlier, you

 7  failed to notify Emigrant that Ira

 8  Leventhal threatened you with litigation,

 9  correct?

10           MS. PARKS:  Objection.

11      A.   I don't recall doing that, yes.

12      Q.   And as we discussed earlier, you

13  failed to notify Emigrant that a group of

14  investors led by Michael Salerno had

15  threatened litigation and brought

16  litigation against you in New York State

17  Court?

18           MS. PARKS:  Objection.

19      A.   I don't recall making Emigrant

20  aware, no.

21      Q.   And your failure to notify

22  Emigrant of that litigation and threatened

23  litigation in writing was a violation of

24  the covenants of the credit agreement,

25  correct?
```

1              J. Hanratty

2          MS. PARKS:  Objection.

3      A.   I don't know.  I can't judge just

4  based on the materiality of it.

5      Q.   What do you mean you can't judge

6  based on the materiality of it?

7      A.   I think it's -- there is a

8  material component.  I think Michael

9  Salerno was owed $800,000.  Ira Leventhal,

10 I had a personal relationship with him for

11 over ten years, and I have heard him

12 threaten things like that many, many times.

13 And from my perspective, related to those

14 two events, those are my -- those are my

15 thoughts on materiality.

16          As far as it gets to notice, I

17 don't recall discussing it with Jack or

18 not.

19     Q.   How many times did Ira Leventhal

20 threaten you with litigation?

21     A.   I don't recall.

22     Q.   More than two?

23     A.   I don't recall.

24     Q.   More than five?

25     A.   I don't recall.

24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 890 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

161

1                    J. Hanratty

2        Q.    Did Ira Leventhal ever accuse you

3    of running a Ponzi scheme?

4            MS. PARKS:  Objection.

5        A.    I don't recall that.

6        Q.    Has anyone ever accused you of

7    running a Ponzi scheme?

8        A.    Not that I can recall.

9        Q.    Did Tom McCoster accuse you of

10   running a Ponzi scheme?

11       A.    I don't -- no.  He has accused me

12   of other things.

13       Q.    RICO conspiracy, right?

14       A.    Yes.

15       Q.    Approximately how much in tax

16   liens do the Ebury companies own?

17       A.    Right now?

18       Q.    Yes.

19       A.    Roughly -- just tax liens?

20       Q.    Yes.

21       A.    Roughly probably 14-and-a-half

22   million dollars of tax liens.

23       Q.    Approximately how much REO

24   properties do the Ebury companies have?

25           MS. PARKS:  Objection to form.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. 1205   RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 891 of 2230

EMIGRANT BUSINESS CREDIT   John Hanratty
JOHN ARTHUR HANRATTY   June 20, 2023

162

```
 1                  J. Hanratty

 2          Go ahead.

 3      A.    On a market value basis, roughly

 4  -- roughly $9 million of REO.

 5      Q.    What is market value basis?

 6          MS. PARKS:  Objection.

 7          You can answer.

 8          THE WITNESS:  Oh, sure.

 9      A.    What the properties are worth.

10      Q.    How do you ascertain market value

11  basis?

12      A.    Through either appraisals, best

13  price opinions, list price, and/or under

14  contract.  And then if we don't have any of

15  those determinations, we leave them marked

16  at our book value, which is the lien value.

17      Q.    Have you obtained an independent

18  valuation of the Ebury's company assets?

19          MS. PARKS:  Objection.

20      A.    Like an appraisal of -- is that

21  what you mean?  I don't know what you mean.

22      Q.    Any third-party valuation of the

23  Ebury company's assets in the past year?

24      A.    As to the value of them, no.

25  Other than best price opinions, appraisals,
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO. 58

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

163

|    | J. Hanratty |
|----|-------------|
| 1  | J. Hanratty |
| 2  | list prices and what -- a contract for REO. |
| 3  | Q.   Who gives your best price |
| 4  | opinions? |
| 5  | A.   Oh, it depends on the state and |
| 6  | where they are.  It would -- all different |
| 7  | people.  Typically a broker.  An appraisal |
| 8  | would be an appraiser. |
| 9  | I'm going to hand you a document |
| 10 | labeled EBCC 6689. |
| 11 | MR. MAYRON:  Could the court |
| 12 | reporter please mark this document as |
| 13 | Hanratty Deposition Exhibit 12. |
| 14 | (Hanratty Exhibit 12, Email dated |
| 15 | 1/13/2021 from J. Hanratty to J. Grady, |
| 16 | Bates-stamped EBCC_6689 through 6690, |
| 17 | marked for identification, as of this |
| 18 | date.) |
| 19 | BY MR. MAYRON: |
| 20 | Q.   So this is an email from you to |
| 21 | Jack Grady from January 13th, 2021, |
| 22 | correct? |
| 23 | A.   Yes. |
| 24 | Q.   Halfway down the page, you write, |
| 25 | "We have roughly 26.5 million RV in liens |

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 893 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

164

```
 1              J. Hanratty

 2    collateralized by 275 million of real

 3    estate."

 4         Correct?

 5    A.   Yes.

 6    Q.   So in January of 2021, you

 7    represented to Mr. Grady you had

 8    26-and-a-half million redemptive value in

 9    liens, and now you have approximately

10    14-and-a-half million dollars of tax liens,

11    correct?

12    A.   Yes.

13    Q.   Where did the 12 million in tax

14    liens go?

15         MS. PARKS:  Objection to form.

16    A.   Into foreclosures, into

17    write-offs, into sales, into seller finance

18    loans of $3.2 million which you didn't ask

19    about.

20    Q.   Well, let's take those one at a

21    time.

22    A.   Sure.

23    Q.   The first thing you said was

24    foreclosures.  If you turn over the page to

25    page 6690, you write, "We have 15.366
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
                   EMIGRANT BUSINESS CREDIT    Court Records    Pg 894 of 2230    John Hanratty
                   JOHN ARTHUR HANRATTY                                           June 20, 2023

165

```
 1              J. Hanratty

 2    million of REO."

 3         Correct?

 4    A.   Where?  Okay.  There you go.

 5         (Document review.)

 6    A.   Yes.

 7    Q.   Today your testimony is the Ebury

 8    companies have approximately 9 million of

 9    REO, correct?

10    A.   Yes.

11    Q.   So since January 2021, your

12    portfolio has decreased by approximately

13    $12 million in liens and $6 million in REO?

14    A.   The REO is overstated on this by

15    the last paragraph.

16    Q.   What do you mean by "overstated"?

17    A.   So the joint venture with Kautz

18    Creek where we managed -- I included that

19    in the total number there.

20    Q.   So what is the --

21    A.   That's just a management

22    agreement I have with -- it was just to

23    give Jack a feel where we have an upside if

24    we sell a property.

25    Q.   So what approximately was the
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT Court Records Pg 895 of 2230

JOHN ARTHUR HANRATTY

INDEX NO. 158207/2022

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State

RECEIVED NYSCEF: 01/12/2024

John Hanratty

June 20, 2023

166

J. Hanratty

state, the value of Ebury company's REO

portfolio in January of 2021?

A.   It would be -- ballpark, the REO

was probably in our, in my name, but, you

know, Kautz Creek we have an economic

interest in.  This is -- I don't know what

this document was for.  This was about

liquidity, just off the context of this.

So it's giving him an idea of other

additional liquidity, right?

Because the context of 2021 was,

I had no liquidity.  We were -- ballpark,

Kautz Creek was 4.5ish of REOs, so probably

10ish, more or less, 11.

Q.   So in 2021, your testimony is the

Ebury companies owned 26.5 million RV in

liens and approximately 10 million in REO?

A.   Um-hmm.

Q.   And today the Ebury companies own

14-and-a-half million in tax liens and

approximately 9 million in REO?

A.   And three-and-a-half of seller

financing loans.

Q.   Those are broken out separately

167

                          J. Hanratty

 1

 2     in this document, correct, at the top of

 3     page 6690?

 4          A.   Yes.   There you go.

 5          Q.   So it's your testimony that

 6     between January 2021 and today, the Ebury

 7     companies' lien portfolio decreased by

 8     approximately $12 million and its REO

 9     portfolio decreased approximately $1

10     million?

11          A.   Yes.

12          Q.   Where did $13 million worth of

13     assets go in the past two years?

14          A.   I think the lien book had

15     significant write-downs on the Kentucky

16     portfolio.   They don't have portfolios.

17     We --

18             (Document review.)

19          A.   So a bunch of those New Jersey

20     old ones, recently.   And so I think again

21     it's a combination of into REO, into the

22     uptick of the loans, and into just the

23     expenses of keeping this thing going as far

24     as foreclosures, et cetera.

25          Q.   When did you take the write-down

168

                    J. Hanratty

1    on the Kentucky portfolio?

2        A.    I'd have to look.  I don't recall

3    offhand.  I think at this point in time, we

4    still owned it.

5        Q.    So between 2021 and the present,

6    your portfolio took almost a 30, 40 percent

7    write-down?

8        A.    Through the natural -- these

9    turned into houses, right?

10           And so you have the book, a

11   write-down of 3 million, I believe, just to

12   get rid of it.  But I would have to check.

13   If you want to get granular, I'm happy to

14   do it.

15       Q.    Just so -- you say these turned

16   into houses.

17           But my understanding, right, you

18   have tax liens and you have REOs?

19       A.    Yep.

20       Q.    And so if the 12 million in tax

21   liens turns into REOs, you would expect the

22   REO bucket to be larger; but you said here

23   in January of 2021, you think you had

24   approximately 10 million in REOs, and now

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 175
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 898 of 2230
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

169

                    J. Hanratty

1

2   you have 9 million in REOs, right?

3       A.   Yes.

4       Q.   So the explanation that the $12

5   million in tax liens turned into REOs

6   doesn't hold water.

7           MS. PARKS:  Objection.

8       A.   Well, look, easiest thing for me

9   to do would be to compare these two

10  portfolios of what we're basing these off

11  of.  We took hits.  This is the time of --

12  when I was looking to sell things at a much

13  lower price than probably where we were,

14  and that's what we did.

15          And so the Kentucky was a big

16  loss.  New York we got rid of a huge chunk

17  of -- oh, that's right.  So New York we

18  sold 100 single-family houses, which we

19  took a hit on those.  I'd have to itemize

20  it for you, but, yeah.

21      Q.   How much did you sell the

22  Kentucky portfolio for?

23      A.   That was three separate sales.  I

24  think we were -- I have to look.  I think

25  we probably got -- I sold it to, what's his

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 899 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                      June 20, 2023

170

```
 1                    J. Hanratty
 2    name, David Prader.  I think all of them
 3    for 500 grand.  Something like that.
 4         Q.   How much did you sell the New
 5    Jersey portfolio for?
 6         A.   The recent ones?  Roughly a
 7    million.
 8         Q.   And how much did you sell the New
 9    York portfolios for?
10         A.   The houses, I have to look that
11    one up.  That was done in three different
12    tranches.  It was basically 25,000 a unit,
13    I think, roughly.
14         Q.   2.5 million?
15         A.   Yeah, roughly, but it was on our
16    books for significantly higher.
17         Q.   So all in, those four portfolios,
18    about 4 million in sale proceeds?
19         A.   Roughly, yep.
20         Q.   Where did that money go?
21         A.   It was due in other liens into
22    servicing, paying taxes on REO, day-to-day
23    expenses, lawyers, litigations.  Potential
24    bankruptcies.
25         Q.   So were these representations
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1145    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 900 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

171

```
 1                  J. Hanratty

 2    about the value of the Ebury company's

 3    portfolios, were they correct when you

 4    wrote them?

 5              MS. PARKS:  Objection.

 6         A.   With the -- were they correct?

 7    In hindsight, Kentucky is wrong, but my

 8    mindset was different.  Here, I'm trying to

 9    get a facility up and running.  And I'm

10    thinking that my assets -- I'm not going to

11    be a forced seller, which I was.

12         Q.   Did you know that you would have

13    to take a writedown on the Kentucky

14    portfolio when you wrote this email?

15         A.   No.  Not as big as I -- not as

16    big as I thought.  When we first bought

17    that, it cash-flowed fine for us.  We...

18         Q.   So you thought there was going to

19    be a writedown, though?

20              MS. PARKS:  Objection.

21         A.   Yes.  But to me, what I wrote to

22    Jack is that I got 26 million of redemptive

23    value in liens.

24         Q.   You overestimated the Kentucky

25    portfolio by $3 million, but you wrote the
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. ...
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 901 of 2230
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
John Hanratty
JOHN ARTHUR HANRATTY
June 20, 2023

172

J. Hanratty

2    check?

3           MS. PARKS:  Objection.

4      A.   In hindsight, that's -- that is

5    it.  But at this point, we're discussing

6    getting him funds, right?  And so the

7    purpose of this email was how do we move

8    forward to get these guys paid down.  And

9    this is -- I think this was the CoreVest

10    loan, correct?

11      Q.   Wasn't the purpose of this email

12    to get a maturity extension on the Ebury

13    credit facilities?

14           MS. PARKS:  Objection.

15      A.   I think it was dual prong.  It

16    was -- by this time, the REO was the path

17    the book was going to take to mature, if

18    you will, whatever you want to call it,

19    needed financing around it.  And this is

20    around the time roughly -- this is

21    pre-COVID, correct?  We got the line credit

22    with CoreVest.

23      Q.   This is post-COVID, right?

24           MS. PARKS:  January '21.

25      A.   When did COVID start?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

173

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | Q.   March 2020, I think. |
| 3 | A.   Got it. |
| 4 | Q.   And this -- |
| 5 | A.   Okay.  I see.  They pulled the |
| 6 | line.  I got it. |
| 7 | So I think what this email was, |
| 8 | at this point in time, my line of credit |
| 9 | was pulled for the REO business.  They had |
| 10 | shut down, like, foreclosures.  They had |
| 11 | shut down evictions.  No one was paying and |
| 12 | that's what we were discussing. |
| 13 | And so it might have been in the |
| 14 | -- I don't know why I wrote the email, if |
| 15 | it was -- he asked for it related to the |
| 16 | extension. |
| 17 | Q.   You were trying to get Emigrant |
| 18 | to give you a loan extension, I imagine? |
| 19 | MS. PARKS:  Objection. |
| 20 | A.   I don't know why I was writing |
| 21 | this email, but it was given the state of |
| 22 | play of what was happening with the |
| 23 | business. |
| 24 | Q.   And to confirm, it's your |
| 25 | testimony that the Ebury companies owned |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. ...    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Court Records    Pg 903 of 2230

EMIGRANT BUSINESS CREDIT    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

174

```
 1                    J. Hanratty

 2   26-and-half-million dollars redemptive

 3   value in liens in January of 2021?

 4            MS. PARKS:  Objection.

 5       A.   Yes.  Or that's what I wrote in

 6   an email to Jack Grady.

 7       Q.   But the Ebury companies didn't

 8   own 26-and-a-half million redemptive value

 9   in liens in January of 2021, correct?

10            MS. PARKS:  Objection.

11       A.   Oh, sorry.  I wrote an email that

12   we owned 26 million of redemptive value in

13   liens.  I would have to go back in 2021 to

14   verify.  I don't know off the top -- I

15   don't know what we owned in January of

16   2021.

17       Q.   I'm handing you a document

18   labeled EBCC 8797.

19            MR. MAYRON:  Could the court

20       reporter please mark the document as

21       Hanratty Deposition Exhibit 13.

22            (Hanratty Exhibit 13, Summary of

23       conversations via Instant Messaging,

24       Bates-stamped EBCC_8797 through 8834,

25       marked for identification, as of this
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 163 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 904 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

175

J. Hanratty

2      date.)

3   BY MR. MAYRON:

4      Q.   Can you please turn to the page

5   ending with Bates number 8808.  These are

6   text messages exchanged between you and

7   Jack Grady in May of 2021, correct?

8           MS. PARKS:  You can look through

9      the document.

10          THE WITNESS:  Got it.  Seeing it.

11          (Document review.)

12     A.   Yes, this appears to be our

13  texts.

14     Q.   Mr. Grady writes, "I'm

15  representing to our committee meeting that

16  we are secured by 30 million in lien

17  collateral, which is my understanding where

18  the portfolio is right now."

19          And you respond, "It is."

20          Correct?

21     A.   What date?

22     Q.   May 5th, 2021.

23     A.   Got it.

24     Q.   Page 8808.

25     A.   Well, I don't know what he meant

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 123    Court Records    Pg 905 of 2230    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT                                              John Hanratty
JOHN ARTHUR HANRATTY                                                  June 20, 2023

176

                        J. Hanratty

1

2    by portfolio, the whole company?

3        Q.   I'm representing to our committee

4    meeting that we are secured by 30 million

5    in lien collateral.

6            Correct?

7        A.   Which is where my understanding

8    where the portfolio is right now.

9        Q.   That's what he writes, right?

10       A.   That is what he writes.

11       Q.   And you respond, "It is."

12           Correct?

13       A.   That is what I responded, yes.

14       Q.   The Ebury companies did not have

15   30 million in lien collateral in May of

16   2021, correct?

17           MS. PARKS:   Objection.

18       A.   We had 30 million of asset value

19   of the portfolio.

20       Q.   What do you mean "asset value of

21   the portfolio"?

22       A.   I mean liens, REO loans.

23       Q.   Jack said, "We are secured by 30

24   million in lien collateral."

25           Correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 195                                  RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 906 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                           June 20, 2023

177

1                      J. Hanratty

2       A.    What's that?

3       Q.    Jack said, "We are secured by 30

4    million in lien collateral."

5             Correct?

6       A.    He did.

7       Q.    Not REO collateral, but loan

8    collateral, correct?

9       A.    That's what he wrote, yes.

10      Q.    And he said, "Which is my

11   understanding of where the portfolio is

12   right now."

13      A.    Okay.

14      Q.    And you respond, "It is."

15      A.    Yeah.  I did respond to that,

16   yes.

17      Q.    And the Ebury companies did not

18   have 30 million in lien collateral in May

19   of 2021, correct?

20      A.    I don't -- without having it in

21   front of me, I do not know.  But from the

22   perspective of... yeah, I mean those are

23   the communications.

24      Q.    So could the Ebury companies have

25   more than 30 million in lien collateral in

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

178

```
 1                    J. Hanratty

 2     May of 2021?

 3          A.    Lien collateral?

 4               (Document review.)

 5          A.    As I read this, to me, I am

 6     reading this at a portfolio level, by

 7     portfolio level to me as the guy who runs

 8     the liens and the REO and the loans, this

 9     is all the stuff that Emigrant has.

10          Q.    But Jack's texted, "30 million in

11     lien collateral."

12               Are you saying you understood

13     that to refer to REO and loan collateral as

14     well?

15               MS. PARKS:   Objection.

16          A.    I think it was two separate

17     texts, and so I don't... I don't know what

18     I was thinking when I responded to it.

19               But I do recall around that time,

20     I don't know if that amendment went

21     through, was the -- there was issues

22     related to the REO company pledging,

23     tightening up the security related to that,

24     and I don't know if that's what I was

25     thinking of.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 2254-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT Court Records Pg 908 of 2230 John Hanratty

JOHN ARTHUR HANRATTY June 20, 2023

179

                        J. Hanratty

  1

  2        Q.    You understood that Jack was

  3    going to share this information with the

  4    people at the bank making a decision about

  5    whether to give the Ebury companies an

  6    extension on the credit facilities,

  7    correct?

  8            MS. PARKS:   Objection.

  9        A.    That's what he wrote, yes.

 10        Q.    And you understood that Jack was

 11    going to share this information with the

 12    people at the bank making the decision

 13    about whether to give the Ebury companies

 14    an extension?

 15            MS. PARKS:   Objection.

 16        A.    That's what he wrote, yes.

 17        Q.    Did you understand, though, that

 18    he was going to communicate this

 19    information to the people at the bank

 20    making a decision about whether to give you

 21    an extension?

 22            MS. PARKS:   Objection.

 23        A.    I don't recall what I understood.

 24    I see what I wrote back and I don't recall

 25    what I was thinking he was talking about,

180

                    J. Hanratty

1

2    other than, you know, what I referred to as

3    the portfolio, it's everything.  Like, so

4    the language here is the only thing that is

5    giving me pause.

6            I called the whole thing my

7    portfolio.

8        Q.   Okay.  So let's go back to --

9    let's go back to Hanratty Deposition

10   Exhibit 12, which is -- ends in 6689.

11           So this is January 2021, four

12   months earlier.  And you write that you

13   have 26-and-a-half million RV in liens.

14   You write you have 3.1 million in loans and

15   land contracts, and you write you have

16   15.366 million in REO, correct?

17       A.   Yes.

18       Q.   So the portfolio value decreased

19   from about 45 million to 30 million between

20   January and May of 2021?

21           MS. PARKS:  Objection.

22       A.   I would have to look at what

23   caused it.  I don't know.  But we are going

24   through a pandemic which impacted us

25   severely, and I was getting rid of assets

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT     Court Records     Pg 910 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                      June 20, 2023

181

                           J. Hanratty

1

2    to survive.

3         Q.    So it's your testimony that in

4    January of 2021 the portfolio value was

5    approximately 45 million and by May 2021

6    the portfolio was valued at approximately

7    30 million?

8         A.    Redemptive value --

9              MS. PARKS:  Objection.

10         A.    Redemptive value is not value.

11   Redemptive value is what we are owed in

12   liens.

13         Q.    Are you saying that these two

14   valuation numbers were using different

15   valuation metrics?

16         A.    No.  You said value, and I said

17   redemptive value.

18         Q.    So it's your testimony in January

19   of 2021 the redemptive value of the Ebury

20   companies' portfolio was approximately 45

21   million, and by May 2021 the redemptive

22   value of the portfolio was approximately 30

23   million?

24              MS. PARKS:  Objection.

25         A.    Those are what the communications

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 911 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                      June 20, 2023

182

J. Hanratty

1    

2    reflect.  I don't have the information to

3    bridge the gaps or the basis of what I was

4    responding to.

5    Q.  Did the Ebury portfolio lose

6    approximately $15 million in redemptive

7    value between January of 2021 and May of

8    2021?

9    MS. PARKS:  Objection.

10    A.  No.  I would have to go back and

11    look at the basis here.

12    Q.  Did you sell $15 million

13    redemptive value in assets between January

14    and May of 2021?

15    A.  No.

16    Q.  Would you notice if the value of

17    a portfolio decreased from $45 million in

18    January to $30 million in May?

19    A.  I would notice.

20    Q.  That is a sizeable difference?

21    MS. PARKS:  Objection.

22    A.  It is, yes.

23    Q.  So is it still your testimony

24    that your reference in the text message on

25    May 5th saying "it is," is a reference to

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO. 1-2

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 912 of 2230
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

183

J. Hanratty

2    the entire portfolio value and not the

3    value of the lien collateral?

4         MS. PARKS:  Objection.

5         A.    I don't know.  To me the context

6    of my response -- I do not recall writing

7    this.  I do not recall this interchange and

8    I don't know.  I don't recall it.

9         Q.    But you admit you wrote this

10    text?

11        A.    Yes.

12        Q.    Quickly turning to page EBCC

13    8815, the third text on the page, Mr. Grady

14    says, "Still haven't sent Howard -- sent to

15    Howard but likely later today."

16         Who do you understand Howard to

17    be referring to?

18        A.    Howard Milstein.

19        Q.    Who is Howard Milstein?

20        A.    He's the owner of Emigrant Bank.

21        Q.    You understood that Mr. Grady was

22    requesting financial information from the

23    Ebury companies to share with Mr. Milstein,

24    correct?

25         MS. PARKS:  Objection.

184

                        J. Hanratty

 1

 2                  (Document review.)

 3       A.    I don't recall seeing it.  I'm

 4    just looking for my response.

 5       Q.    Turning back to page EBCC 8803,

 6    this is on May 4th, the day before,

 7    Mr. Grady texted you about the size of the

 8    lien collateral portfolio and he writes,

 9    "Any update on audit would be great for

10    both of us to have this in hand before we

11    meet with Howard."

12                  Correct?

13       A.    Yes, he did write that.

14       Q.    And so you understand that he was

15    asking you about the size of the lien

16    portfolio because he was going to share

17    that information with Mr. Milstein,

18    correct?

19                  MS. PARKS:  Objection.

20       A.    I just -- I don't recall this

21    interchange.

22       Q.    And turning back to Hanratty

23    Deposition Exhibit 10, the one ending in

24    9569, this is the ninth amendment to loan

25    documents for Ebury 1 executed May 18th,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022
NYSCEF DOC. NO.                                            RECEIVED NYSCEF: 01/12/2024

185

                           J. Hanratty

1

2      2021, correct?

3          A.   Yes.

4          Q.   So after you responded "it is" to

5      Mr. Grady's question about the size of the

6      lien portfolio, approximately two weeks

7      later Emigrant agreed to give you a

8      maturity date extension on the credit

9      facilities, correct?

10             MS. PARKS:   Objection.

11         A.   That appears to be the timeline

12     of the text and the extension.

13         Q.   So you agree that Emigrant Bank,

14     at the time of that May 5th extension, was

15     making a decision about whether to grant

16     you an extension?

17             MS. PARKS:   Objection.

18         A.   Yes.

19         Q.   And it was important to be

20     truthful when providing information that

21     Emigrant would rely on when deciding to

22     grant you an extension?

23             MS. PARKS:   Objection.

24         A.   Yes.

25         Q.   So I'm going to hand you a

186

```
 1                  J. Hanratty

 2    document labeled EBCC 8844.

 3              MR. MAYRON:  Could the court

 4         reporter please mark this as Hanratty

 5         Deposition Exhibit 14.

 6              (Hanratty Exhibit 14, Summary of

 7         conversations via Instant Messaging,

 8         Bates-stamped EBCC_8844 through 8878,

 9         marked for identification, as of this

10         date.)

11    BY MR. MAYRON:

12         Q.   And can you please turn to the

13    page Bates number ending 8861.  I

14    apologize, 8862.

15              These are text messages exchanged

16    between you and Jack Grady in July of 2021?

17              MS. PARKS:  Take your time to

18         look through it if you need to.

19              (Document review.)

20         A.   Yes, in 2021, in July.

21         Q.   And Mr. Grady again writes, "What

22    I'm really more focused is the lien

23    shortfall in the audit.  You don't even

24    have one-to-one coverage on an accrued

25    basis.  It's going to raise a ton of
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 50
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 916 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

187

            J. Hanratty

1   questions when I've been saying the whole

2   time we're covered by a 30-million-dollar

3   lien portfolio."

4           Correct?

5       A.   Yes, that's what he wrote.

6       Q.   So Mr. Grady is clearly speaking

7   about the size of the lien portfolio, not

8   the Ebury companies' overall portfolio?

9       A.   Yes.

10          MS. PARKS:  Objection.

11          THE WITNESS:  I'm sorry.

12          MS. PARKS:  It's okay.

13  BY MR. MAYRON:

14      Q.   Is it still your testimony that

15  the May text we looked at was referring to

16  a 30-million-dollar total portfolio value?

17          MS. PARKS:  Objection.

18      A.   I don't... because of... my

19  testimony was that I was unclear as to what

20  the basis of what I was responding to.

21          But from my perspective, the

22  portfolio -- to me, I would have answered

23  that as total -- total assets, which feels

24  a little light without having the

EMIGRANT BUSINESS CREDIT         Court Records      Pg 917 of 2230      John Hanratty
JOHN ARTHUR HANRATTY                                                    June 20, 2023

188

```
 1                    J. Hanratty

 2    information in front of me.

 3         Q.   So on page 8863 you respond to

 4    Mr. Grady and you say, "I don't see your

 5    lack of one-to-one.  End of 2019 we were

 6    32W receivable, 3 million loan book, and 10

 7    million in REO.  I couldn't get guy off of

 8    market price and that in interest of

 9    getting it done, I printed it."

10              Correct?

11         A.   Yes, that's what I wrote.

12         Q.   And so you were telling Mr. Grady

13    that Emigrant was collateralized by 32

14    million in loan receivables, correct?

15              MS. PARKS:  Objection.

16         A.   Yes.  That's -- that is what --

17    yes.  It's what I wrote.

18         Q.   The Ebury companies did not have

19    32 million in lien collateral in July of

20    2021, correct?

21              MS. PARKS:  Objection.

22         A.   Isn't this '19?

23              MS. PARKS:  '21.

24         A.   That is a text, but we're talking

25    about '19.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1273                         RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT                          John Hanratty
JOHN ARTHUR HANRATTY                              June 20, 2023

189

```
 1                    J. Hanratty

 2            MS. PARKS:  Oh, yes.

 3   BY MR. MAYRON:

 4       Q.   The Ebury companies did not have

 5   32 million in lien collateral in December

 6   of 2019?

 7       A.   I don't know the context of the

 8   communication.  I have to look it up.  I

 9   don't have the information.

10       Q.   Did the Ebury companies have 32

11   million in tax lien collateral in December

12   of 2019?

13       A.   I don't know offhand, other than

14   this communication here.

15       Q.   So going back to page 8859, this

16   is a July 21st, 2021, text from Mr. Grady

17   to you.  And Mr. Grady writes, "We don't

18   lend against REO.  Never have."

19            Correct?

20       A.   Yes, he wrote that.

21       Q.   So what -- would you agree that

22   Emigrant did not lend against REO as

23   collateral, correct?

24            MS. PARKS:  Objection.

25       A.   Yes.
```

24-04020-djs   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 919 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
INDEX NO. 158207/2022
Doc #3 State
John Hanratty
June 20, 2023

190

J. Hanratty

1

2     Q.    So turning back to Hanratty

3   Deposition Exhibit 13, the May text

4   messages, and this is page 8808,

5   Mr. Hanratty -- Mr. Grady says, "We are

6   secured by 30 million in lien collateral."

7          Correct?

8     A.    Yes.  He wrote that.

9     Q.    And so for purposes of this

10   discussion, what Mr. Grady cares about is

11   lien collateral, not REO collateral?

12          MS. PARKS:  Objection to form,

13          specifically the "this" discussion.

14     A.    That's what he wrote, yes.

15     Q.    And so when you responded, "It

16   is," you were falsely conveying to him that

17   Emigrant Bank was secured by 30 million in

18   lien collateral?

19          MS. PARKS:  Objection.

20     A.    Other than I don't know exactly

21   what a lien collateral is at this time, as

22   I sit right now.  But everything, as we

23   discussed this morning, is the collateral

24   of Emigrant.  They may not lend to the REO,

25   but it's theirs.

191

                    J. Hanratty

 1

 2              MR. MAYRON:  I'm going to hand

 3         you a document labeled EBCC 10068, and

 4         could the court reporter please mark it

 5         as Hanratty Deposition Exhibit 15.

 6              (Hanratty Exhibit 15, Ebury 1 EMI

 7         LLC Custodial Agreement with MTAG

 8         Services, Bates-stamped EBCC_10068

 9         through 10078, marked for

10         identification, as of this date.)

11    BY MR. MAYRON:

12         Q.   This is the Ebury 1 EMI LLC

13    custodial agreement with MTAG Services,

14    correct?

15         A.   Yes.

16         Q.   Let me direct your attention to

17    page 10070.  And this is Section 2.3 at the

18    bottom of the page.

19              You agreed that, "Within five

20    business days of each acquisition date the

21    grantor shall deliver or cause to be

22    delivered to custodian and lender a copy of

23    any receipt, document, notice, form, or

24    other item evidencing ownership of each tax

25    lien with all material information

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

EMIGRANT BUSINESS CREDIT    Court Records    Pg 921 of 2230    John Hanratty

JOHN ARTHUR HANRATTY    June 20, 2023

192

J. Hanratty

2    concerning the purchase of such tax lien,

3    and information about the property securing

4    the tax lien and each debtor."

5        And then it goes on and lists

6    additional information, correct?

7        A.    Yes, you read that correctly.

8        Q.    The Ebury companies failed to

9    deliver the required documents to MTAG for

10    the self-serviced liens, correct?

11        MS. PARKS:    Objection.

12        A.    I don't know what we sent

13    Emigrant or MTAG related to those liens.

14        Q.    Who would know what you sent to

15    MTAG related to those liens?

16        A.    During that time, Ping would

17    know.  He was the main person with

18    Emigrant -- not Emigrant.  Sorry.  MTAG.

19    Ping Xie, he would do all monthly, kind of

20    month-end reports.

21        Q.    I'm going to hand you a document

22    labeled EBCC 10022.

23        MR. MAYRON:    Could the court

24        reporter please mark this document as

25        Hanratty Deposition Exhibit 16.

193

                    J. Hanratty

1

2              (Hanratty Exhibit 16, Servicing

3        Agreement between the Ebury Fund 1 LP

4        and Ebury Fund 2 LP and their

5        affiliates and MTAG Services, dated

6        8/1/2017, marked for identification, as

7        of this date.)

8    BY MR. MAYRON:

9        Q.    This is the servicing agreement

10   between the Ebury companies and MTAG,

11   correct?

12       A.    Yes.

13       Q.    And so turning to the page ending

14   in 10038, this is Section 2.04, Maintenance

15   and Release of Tax Lien Documentation.

16            Under subparagraph A it says,

17   "Within five business days after each

18   acquisition date, the owner shall

19   electronically deliver to the servicer

20   information on all new tax liens purchased

21   by completing the required information

22   fields in the electronic form attached

23   hereto?"

24            The Ebury companies failed to

25   comply with this requirement for the liens

194

                        J. Hanratty

 1

 2    they serviced in-house, correct?

 3            MS. PARKS:  Objection.

 4        A.   I don't know if it was sent to --

 5    to MTAG.

 6        Q.   You don't know if MTAG was

 7    servicing the Ebury's tax liens?

 8        A.   No.  I don't know what was the

 9    extent of it or what was required to be

10    sent.  I'm saying I don't -- I never -- I

11    don't send things to MTAG.

12        Q.   Who was responsible for sending

13    things to MTAG?

14        A.   That would have been -- that

15    would be Ping Xie at the time frame we are

16    talking about.  It would be Ping Xie or

17    Frank Gandol, would do the new purchases at

18    that time.

19        Q.   After Ping left, you took over

20    reporting to Emigrant, correct?

21        A.   Borrowing base items, yeah.

22        Q.   Who took over reporting to MTAG?

23        A.   That was -- Dennisse is the --

24    she interacts with him the most.

25        Q.   You said Dennisse interacts with

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 924 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

195

```
  1                    J. Hanratty

  2    him the most or with them the most?

  3         A.    MTAG.

  4         Q.    MTAG?

  5         A.    Yes.

  6         Q.    How often did Dennisse interact

  7    with MTAG?

  8         A.    Not much.  We don't buy anything

  9    now.

 10              MS. PARKS:  How are you doing.

 11         Are you good?  Do you need a break?

 12              THE WITNESS:  If everyone else is

 13         okay.

 14    BY MR. MAYRON:

 15         Q.    I'm going to hand you a document

 16    labeled EBCC 16726.

 17              MR. MAYRON:  Could the court

 18         reporter please mark this document as

 19         Hanratty Deposition Exhibit 17.

 20              (Hanratty Exhibit 17, Sound Shore

 21         Financial Memorandum dated 3/10/2021 to

 22         EBCC, Bates-stamped EBCC_16726 through

 23         16739, marked for identification, as of

 24         this date.)

 25              MR. MAYRON:  You want to go off
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1272 24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024
Court Records Pg 925 of 2230
EMIGRANT BUSINESS CREDIT          Doc #3 State
JOHN ARTHUR HANRATTY                    John Hanratty
                                                                  June 20, 2023

J. Hanratty

1

2     the record?

3          MS. PARKS:  Sure.

4          THE VIDEOGRAPHER:  The time right

5     now is 3:36 p.m.  We are off the

6     record.

7          (Recess is taken.)

8          THE VIDEOGRAPHER:  The time right

9     now is 3:49 p.m.  We are back on the

10     record.

11  BY MR. MAYRON:

12     Q.   So I'm going to hand the court

13  reporter the document labeled EBCC 16726

14  and the court reporter please mark it as

15  Hanratty Deposition Exhibit 17.

16          This is a March 10, 2021 report

17  from Sound Shore Financial to Emigrant

18  Business Credit Corp.

19          What is Sound Shore Financial?

20     A.   Oh, they are -- not an auditor,

21  like a consultant group that Emigrant uses.

22     Q.   So can you turn to the page with

23  the Bates number ending in 16727?

24     A.   Yep.

25     Q.   And if you look in the first

EMIGRANT BUSINESS CREDIT Court Records    Pg 926 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                        June 20, 2023

197

```
 1                   J. Hanratty

 2   paragraph, it says, "On Friday, March 5th,

 3   2021, a conference call was held with MTAG.

 4   Present on the call were Karen Wold and

 5   Jack Grady of EBC," skipping, "Dennisse

 6   Mendez of Ebury.

 7             "Mr. Michaud advised that they

 8   maintain and service only the liens Ebury

 9   has uploaded unto their system.  They also

10   advised that the company has not assigned

11   all liens within given states; however,

12   Ebury is in the process of uploading

13   additional liens in the states that are

14   serviced by MTAG."

15             Did I read that right?

16        A.   Yes.

17        Q.   In March of 2021, was Ebury in

18   the process of uploading additional liens

19   to MTAG?

20        A.   Yes.  I think that was -- I think

21   Dennisse Méndez and Pat Seymour were doing

22   that.

23        Q.   And so in the third paragraph, it

24   says, "MTAG has provided a listing of liens

25   as of January 31st, 2021.  This indicates
```

198

                         J. Hanratty

 1

 2   which liens in the borrowing base

 3   certificate in the MTAG system.  From the

 4   list supplied by MTAG, the total amount

 5   they serviced at January 31st, 2021, is

 6   2.465 million or 13 percent of liens in the

 7   January 31st, '21, borrowing base

 8   certificate."

 9            Is that correct?

10       A.   That's what it reads.

11       Q.   And then the last sentence at the

12   bottom of the table, it says, "The company

13   has maintenance in control of other liens."

14            Correct?

15       A.   Yes, that's what it reads, yes.

16       Q.   So in January of 2021, MTAG had

17   custody of only 13 percent of the liens in

18   Emigrant's borrowing base?

19            MS. PARKS:  Objection to form.

20       A.   Yeah, that's what it reads.

21       Q.   So the company, meaning the Ebury

22   companies, were self-servicing 87 percent

23   of the liens in Emigrant's borrowing base?

24            MS. PARKS:  Objection.

25       A.   That's -- that's what it reads.

199

J. Hanratty

2    Q.   Is it true that the Ebury

3  companies were self-serving --

4  self-servicing 87 percent of the liens in

5  Emigrant's borrowing base?

6          MS. PARKS:  Objection.

7    A.   I don't know the exact

8  percentage.

9    Q.   Was Ebury self-servicing more

10  than 80 percent of the liens in Emigrant's

11  borrowing base?

12          MS. PARKS:  Objection.

13    A.   I don't know the exact

14  percentages.

15    Q.   Was Ebury self-servicing more

16  than 50 percent of the liens in Emigrant's

17  borrowing base?

18          MS. PARKS:  Objection.

19    A.   I don't know what the exact

20  percentage is.

21    Q.   Do you have any reason to believe

22  that this percentage is incorrect?

23          MS. PARKS:  Objection.

24    A.   No.  I don't think I've ever seen

25  this report.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Court Records    Pg 929 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

200

J. Hanratty

1

2      Q.   Is MTAG servicing only 13 percent

3   of the liens in Emigrant's borrowing base

4   consistent with your understanding of the

5   division of servicing between the Ebury

6   companies and MTAG?

7           MS. PARKS:   Objection.

8      A.   By... that we had self-serviced a

9   chunk of the New York, the Ohios, and New

10  Jerseys.   It's consistent that we both did

11  it.

12     Q.   Did you understand that Ebury

13  self-serviced the vast majority of the

14  liens in Emigrant's borrowing base?

15          MS. PARKS:   Objection.

16     A.   In the -- of the total liens or

17  in the borrowing base?

18     Q.   Did you understand that Ebury

19  self-serviced the vast majority of the

20  liens in Emigrant's borrowing base?

21          MS. PARKS:   Objection.

22     A.   No, the borrowing base and

23  comparisons, I'm just not certain on the

24  percentages.

25     Q.   Sitting here today, you have no

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 930 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

201

```
 1                    J. Hanratty

 2    understanding of whether it was a majority

 3    or not?

 4           MS. PARKS:  Objection.

 5        A.   I will say we served the majority

 6    of our liens.  I don't know the context of

 7    eligible and ineligible on borrowing base.

 8    An example being like New York was

 9    ineligible at this time, I think.  Places

10    like -- that's what I mean.  So I don't

11    know if he's looking at total eligible

12    collateral is 18 or a total liens.  Like

13    does total liens means eligible liens and

14    eligible -- like, you know, so it's...

15        Q.   Who prepared the January 31st,

16    2021, borrowing base certificate?

17        A.   I don't know.

18        Q.   At the bottom, second paragraph

19    from the bottom, it says, "The Fund 1,

20    January 31st, '21, borrowing base

21    certificate as submitted by the company."

22           Correct?

23        A.   Oh, the company, yes.  So the

24    company submitted.

25        Q.   By the company, you mean the
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 157                                          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 931 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                          June 20, 2023

202

```
 1                    J. Hanratty

 2   Ebury companies?

 3        A.   Yes.

 4        Q.   So the Ebury companies submitted

 5   a borrowing base certificate and only

 6   four -- only 13 percent of the liens in

 7   that borrowing base certificate were

 8   serviced by MTAG?

 9             MS. PARKS:  Objection.

10        A.   That's what it reads.  I've never

11   seen this.

12        Q.   Was that the status of the Ebury

13   companies' portfolio in March of 2021?

14             MS. PARKS:  Objection.

15        A.   The status was that we

16   self-serviced a portion, and MTAG did a

17   portion.

18        Q.   And your understanding is that

19   the self-serviced portion was larger than

20   MTAG's portion?

21             MS. PARKS:  Objection.

22        A.   Of the total liens or the liens

23   in the borrowing base?

24        Q.   Your understanding that the

25   self-serviced portion of the liens in
```

203

                    J. Hanratty

1

2     Emigrant's borrowing base was larger than

3     MTAG's portion?

4             MS. PARKS:  Objection.

5         A.   No.  I'm not -- I'm not certain,

6     but that's what this reads.

7         Q.   How does MTAG charge for its

8     services?  Does it invoice per lien?

9         A.   They charge based off of -- yeah,

10    there is, like, a lien computation, a work

11    computation.  It depends on what they do.

12        Q.   Who is responsible at the Ebury

13    companies for reviewing the invoices from

14    MTAG?

15            MS. PARKS:  Objection.

16        A.   That would be the accounting

17    group.

18        Q.   Did you review the invoices that

19    the Ebury companies received from MTAG?

20        A.   No.  Not at this time, no.

21        Q.   I am going to hand you a document

22    labeled EBCC 8867.

23            MR. MAYRON:  Could the court

24        reporter please mark the document as

25        Hanratty Deposition Exhibit 18.

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State

EMIGRANT BUSINESS CREDIT Court Records     Pg 933 of 2230     John Hanratty

JOHN ARTHUR HANRATTY     June 20, 2023

204

1                    J. Hanratty

2                    (Hanratty Exhibit 18, Summary of

3               conversations via Instant Messaging,

4               Bates-stamped EBCC_8667 through 8711,

5               marked for identification, as of this

6               date.)

7     BY MR. MAYRON:

8          Q.   Could you please turn to the page

9     with Bates number ending in 8690.

10                   (Witness complies.)

11         Q.   These are text messages exchanged

12    between you and Mr. Grady in March of 2021,

13    correct?

14         A.   Yes.  March 20th -- yes.

15         Q.   Mr. Grady writes, "You might want

16    to call Caveny/at least ask Dennisse about

17    missing MTAG liens?"

18                   Correct?

19         A.   Yes, that's what he wrote.

20         Q.   What do you understand "missing

21    MTAG liens" to mean?

22         A.   I would understand that to mean,

23    liens that should be at MTAG.

24         Q.   This text was sent on March 10th,

25    2021, the same day as the Sound Shore

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1-2

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

205

                    J. Hanratty

1

2    Financial report, correct?

3              MS. PARKS:  Objection.

4         A.   Yes, looks like it.

5         Q.   And the Sound Shore Financial

6    report was prepared by Jack Caveny,

7    correct?

8              MS. PARKS:  Objection.

9         Foundation.

10        A.   It reads that it was prepared by

11   Jack Caveny.  117.

12        Q.   And Mr. Grady's text says, "You

13   might want to call Caveny/at least ask

14   Dennisse about missing MTAG liens"?

15        A.   Yes.

16        Q.   You said you understood "missing

17   MTAG liens" to mean liens that should be at

18   MTAG, correct?

19             MS. PARKS:  Objection.  Go ahead.

20        A.   Yeah, that's -- reading this here

21   now today, yes.

22        Q.   And so you understand that to be

23   a reference to the 87 percent of liens in

24   the January 31st, 2021, borrowing base

25   certificate that MTAG did not have custody

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 935 of 2230
John Hanratty
June 20, 2023

206

J. Hanratty

```
 1         of?

 2               MS. PARKS:   Objection.

 3         A.    No.

 4         Q.    What do you understand missing

 5   MTAG liens to mean, then?

 6         A.    Jack Grady's statement, "missing

 7   MTAG liens."

 8         Q.    And what do you understand

 9   Mr. Grady to mean by "missing MTAG liens"?

10         A.    Liens that should be in custodian

11   at MTAG.

12         Q.    The liens in Emigrant's borrowing

13   base that weren't at MTAG should have been

14   at MTAG, correct?

15         A.    Yes, that's what I -- that's what

16   I take him to mean in his text.

17         Q.    But you agree that the liens in

18   Emigrant's borrowing base that weren't at

19   MTAG should have been at MTAG, correct?

20         A.    Yes, I think we discussed that

21   earlier today.  I think there is -- again,

22   there is a portion that we can't put

23   anywhere and then there is a portion of

24   liens that we had.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 123    Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 936 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

207

```
 1                    J. Hanratty

 2        Q.   And Mr. Grady thought, as well,

 3   that the liens in Emigrant's borrowing base

 4   that weren't at MTAG should have been at

 5   MTAG, correct?

 6             MS. PARKS:   Objection.

 7        A.   I assume that's what he thought.

 8        Q.   Based on this text message, is

 9   your understanding that Mr. Grady was

10   asking why the liens in Emigrant's

11   borrowing base that weren't at MTAG weren't

12   there?

13             MS. PARKS:   Objection.

14        A.   No, I take this to be, that they

15   were -- we were -- we had discussed the

16   matter, frankly, and he's following up on

17   it because it looks like it's an issue for

18   Caveny.

19        Q.   When did you discuss the matter

20   with Mr. Grady?

21        A.   I don't recall specifically, but

22   we talked about it in the context of

23   servicing.

24        Q.   What did you tell Mr. Grady about

25   why 87 percent of the liens in the
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 105

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 937 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

208

J. Hanratty

1

2  January 13th, 2021, borrowing base weren't

3  with MTAG?

4      A.   I didn't know that 87 percent was

5  the number.  I had never seen this report.

6  I don't think they sent it to me.

7      Q.   What did you tell Mr. Grady about

8  why liens in the January 13th, 2021,

9  borrowing base weren't with MTAG?

10          MS. PARKS:   Objection.  Go ahead.

11      A.   Well, I think I wrote that it was

12  already in -- down below I wrote that it's

13  a timing issue and we were in the process

14  of getting it -- getting it done, and I

15  needed to verify that it was a project that

16  I think I presumed Dennisse was running

17  with Pat.

18      Q.   So Mr. Grady was asking you about

19  the custodial and servicing status of these

20  liens in connection with a field

21  examination, correct?

22      A.   Yes.  I think that's what Jack

23  Caveny and Sound Shore does.

24      Q.   And he also was asking you about

25  the custodial and servicing status in

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 1 24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT Court Records Pg 938 of 2230 John Hanratty

JOHN ARTHUR HANRATTY June 20, 2023

209

```
 1                  J. Hanratty
 2    connection with a potential maturity
 3    extension for the Ebury credit facilities,
 4    correct?
 5         A.   I think that's the timing of it,
 6    and that's why they were doing that, I
 7    believe, yes.
 8         Q.   And so you understood that
 9    Mr. Grady was asking these questions to
10    understand whether to grant an extension on
11    the credit facilities to the Ebury
12    companies?
13              MS. PARKS:  Objection.
14         A.   Yeah, I think that he was -- one
15    of these conversations that occurred
16    previously, and I read this to be that he's
17    following up on why they're not an impact,
18    the liens that Caveny cited in his report.
19         Q.   So Mr. Grady is concerned because
20    there are liens in the January 13th, 2021,
21    borrowing base certificate that are not
22    with MTAG, correct?
23              MS. PARKS:  Objection.
24         A.   I think that that's why he's
25    asking the question.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 126 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 939 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

210

                         J. Hanratty

1

2       Q.   And you respond that, "It is a

3   timing issue.  We have to record, done,

4   upload and process and verify."  And you

5   say you'll clean it up and understand?

6       A.   That was the process of -- that

7   my employees were supposed to undertake.

8       Q.   So you effectively represented

9   that the reason MTAG did not have custody

10  of the missing MTAG liens was due to a

11  timing issue?

12          MS. PARKS:  Objection.

13          THE VIDEOGRAPHER:  The time is

14      now 4:07 p.m.  We are off the record.

15          (Discussion off the record.)

16          THE VIDEOGRAPHER:  The time right

17      now is 4:07 p.m.  We are back on the

18      record.

19  BY MR. MAYRON:

20      Q.   So you represented that the

21  reason MTAG did not have custody of the

22  missing MTAG liens was due to a timing

23  issue, correct?

24          MS. PARKS:  Objection.

25      A.   No, I -- I represented that the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

211

1                    J. Hanratty

2    reason that they didn't have a position of

3    the liens is because we were in the process

4    of a potential transitioning that business

5    to U.S. Bank.  This goes back probably six,

6    nine, ten months prior to these texts.

7                    And so once that AloStar

8    transaction failed, we had to undertake the

9    process of rerecording everything in the

10   name of MTAG.  So the timing issue is, when

11   you send things out, like -- it's like a

12   deed, you have to record them with the

13   local recording offices, which takes months

14   at times.

15        Q.   So you are saying that you

16   represented to Mr. Grady that the reason

17   that MTAG did not have custody of the

18   missing MTAG liens was due to a timing

19   issue?

20             MS. PARKS:   Objection.

21        A.   I am writing that it's the time

22   of the -- it's a work in progress.  We have

23   to get it recorded, uploaded, and then

24   verify it.  And then that's time.

25        Q.   And so you're saying that the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2
RECEIVED NYSCEF: 01/12/2024

212

```
 1              J. Hanratty

 2    reason MTAG does not have custody of the

 3    missing MTAG liens is due to a timing

 4    issue?

 5         A.   The timing issue --

 6              MS. PARKS:  Objection.

 7         A.   The timing issue of recording,

 8    uploading, and verifying it all, yes.

 9         Q.   Okay.  Can you turn to page 8692.

10    This is March 16th, 2021.  On March 15th

11    Jack texts you, "Hey, can you clear

12    remaining items for Sound Shore."

13              And you respond, "On it.  MTAG

14    should be wrapped up tomorrow."

15              What do you mean by "MTAG should

16    be wrapped up tomorrow"?

17         A.   I don't know.

18         Q.   You mean to say that the missing

19    MTAG liens would be uploaded to MTAG by

20    tomorrow, I guess March 17th?

21         A.   I don't know.  I don't know if

22    there was other MTAG things outstanding.

23         Q.   So then turning to the next page,

24    8693, Mr. Grady texts you, "Do you know why

25    MTAG didn't have these liens already
```

213

                        J. Hanratty

1    uploaded in their system?"

2            You did not answer his question,

3    correct?

4        A.    It looks like I didn't get back

5    for a while.

6        Q.    And so from Mr. Grady's text,

7    it's apparent that he believed that MTAG

8    should have already had the missing MTAG

9    liens uploaded in their system, correct?

10            MS. PARKS:    Objection.

11        A.    I don't know if that is in

12   relation to big picture, they should

13   already be uploaded, or from March 16th to

14   when this audit thing started on the 10th.

15       Q.    I mean, he uses -- he says -- he

16   doesn't say, Do you know why MTAG doesn't

17   have these liens already uploaded.  He

18   said, "Do you know why MTAG didn't have

19   these things already uploaded in their

20   system."

21            Correct?

22            MS. PARKS:    Objection.

23       A.    Yeah, that's what he wrote.

24       Q.    So he's expressing an opinion

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 943 of 2230

EMIGRANT BUSINESS CREDIT                                       John Hanratty
JOHN ARTHUR HANRATTY                                           June 20, 2023

214

                          J. Hanratty

1

2      that MTAG should have already uploaded

3      these missing MTAG liens, correct?

4              MS. PARKS:  Objection.

5          A.    That -- that's his opinion.

6          Q.    And you understood that he had

7      that opinion back in March of 2021?

8              MS. PARKS:  Objection.

9          A.    I didn't respond.  I don't know

10     if I read it.  I don't recall if we even

11     discussed it, but I said that we were going

12     to do it.

13         Q.    When you said, "We were going to

14     do it," what do you mean?

15         A.    That Dennisse was going to get

16     the liens recorded and moved, where they're

17     supposed to go.

18         Q.    So these are the 87 percent of

19     the liens in the January 13th, 2021,

20     borrowing base certificate that MTAG didn't

21     service?

22             MS. PARKS:  Objection.

23         A.    I don't -- I never saw that

24     report and I don't know what the percentage

25     is, but that's the percentage of -- I don't

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
                                                                    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj
EMIGRANT BUSINESS CREDIT
Court Records    Pg 944 of 2230                    John Hanratty
JOHN ARTHUR HANRATTY                               June 20, 2023

215

J. Hanratty

1   know.

2

3       Q.   Can you turn to the next page,

4   ending in 8694.  Mr. Grady writes, "Hey,

5   can you send over the MTAG report/borrowing

6   base today?  We need to put this report to

7   bed."

8            And you said, "Yes.  Dennisse on

9   with them now.  This will put to bed."

10           You were telling Mr. Grady that

11  the missing MTAG liens were going to be

12  uploaded to MTAG, correct?

13      A.   That appears to be what I was

14  being told, yeah.

15      Q.   What do you mean it appears to be

16  what you were being told?

17      A.   Well, I don't know.  I said

18  Dennisse is on with them -- on them now or

19  on with -- sorry.  On with them now.

20      Q.   You told Jack, "This will put to

21  bed"?

22      A.   I did.

23      Q.   You were of the opinion that what

24  Dennisse was doing would satisfy

25  Mr. Grady's concerns?

EMIGRANT BUSINESS CREDIT                                        John Hanratty
JOHN ARTHUR HANRATTY                                            June 20, 2023

216

                            J. Hanratty

1

2        A.    That's what I wrote.

3        Q.    And your understanding of

4   Mr. Grady's concerns is that he was

5   concerned that there were liens missing

6   from MTAG that were listed on the

7   January 3rd, 2021, borrowing base

8   certificate?

9              MS. PARKS:   Objection.

10       A.    Yes.   My -- my understanding was

11  that Jack was having to have the liens

12  uploaded to MTAG that should be there.

13       Q.    And you wrote, "This will put to

14  bed."

15       A.    Um-hmm.

16       Q.    Was that correct at the time,

17  that it was going to put Mr. Grady's

18  concerns to bed?

19             MS. PARKS:   Objection.

20       A.    Was it correct at the time?   I

21  don't know.

22       Q.    You may have lied to him?

23             MS. PARKS:   Objection.

24       A.    No.   I may have been incorrect,

25  but my presumption is my understanding

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2 RECEIVED NYSCEF: 01/12/2024

217

```
 1                    J. Hanratty

 2    probably was that Dennisse was on, working

 3    with MTAG, and that would take care of the

 4    issues.

 5         Q.   Mr. Grady thought 100 percent of

 6    the liens in the January 13, 2021,

 7    borrowing base certificate were supposed to

 8    be at MTAG already, correct?

 9              MS. PARKS:  Objection.

10         A.   I don't know.

11         Q.   Your understanding is that

12    Mr. Grady expected the liens in the

13    January 13, 2021, borrowing base to be

14    serviced by MTAG, correct?

15              MS. PARKS:  Objection.

16         A.   Sorry.  No.  I made Mr. Grady

17    aware that we were servicing large portions

18    of the portfolio ourselves.

19         Q.   When did you make Mr. Grady aware

20    that you were servicing large portions of

21    the portfolio yourself?

22         A.   Through the whole AloStar process

23    where we were going to be approved for

24    self-servicing.

25         Q.   But then you told Mr. Grady that
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

218

1              J. Hanratty

2    it's a timing issue, correct?

3        A.    Yes.

4        Q.    And you said MTAG should be

5    wrapped up tomorrow, correct?

6        A.    I did.  That's what I wrote.

7        Q.    You were telling Mr. Grady that

8    even though you were self-servicing large

9    portions of the portfolio yourself, that

10   you were going to upload that collateral to

11   MTAG?

12       A.    Yes, after the AloStar deal

13   failed, which I believe this is kind of

14   timeline-wise where this is, to move

15   forward and get everyone happy.  That's

16   where we were going to do.

17       Q.    Mr. Grady expected MTAG to

18   service all of Emigrant's collateral,

19   correct?

20            MS. PARKS:  Objection.

21       Foundation.

22       A.    Other than he was aware that we

23   weren't, I don't know what his expectations

24   were.

25       Q.    When Mr. Grady found out that

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. [...]    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

EMIGRANT BUSINESS CREDIT Court Records    Pg 948 of 2230    John Hanratty

JOHN ARTHUR HANRATTY    June 20, 2023

219

J. Hanratty

2  MTAG was not servicing all of Emigrant's

3  collateral, he requested that you upload

4  the collateral to MTAG, correct?

5         MS. PARKS:  Objection.

6     A.   That appears -- I think the ones

7  that are cited here.  I don't know if he

8  meant all, some, ineligibles, eligibles.

9  These were texts that were pretty quick.

10     Q.   So just so I understand the play

11  by play, Mr. Grady discover that MTAG is

12  not servicing all of Emigrant's collateral,

13  and then he requests that you upload

14  Emigrant's collateral to MTAG, correct?

15         MS. PARKS:  Objection.

16     A.   Mr. Grady was aware, from my

17  perspective, that we were -- that MTAG was

18  not servicing all of our collateral.

19  Eligible, some -- a portion of which were

20  probably eligible liens, and he would like

21  those uploaded into MTAG.

22     Q.   Mr. Grady isn't drawing a

23  distinction between eligible and ineligible

24  because he expects all of the collateral to

25  be with MTAG, correct?

220

J. Hanratty

2    MS. PARKS:  Objection.

3    A.   Yes.  I don't know that, but I

4    think that he's probably writing -- I'm not

5    going to surmise what he's doing.  That is

6    an impossibility for the New York

7    portfolio, the Ohio portfolio, and all the

8    portfolios that we don't have liens on.

9    Q.   You never moved all of Emigrant's

10    collateral to MTAG, correct?

11    MS. PARKS:  Objection.

12    A.   No.

13    Q.   And you never intended to move

14    all of Emigrant's collateral to MTAG at the

15    time you wrote these texts, correct?

16    MS. PARKS:  Objection.

17    A.   I never intended to move the

18    Rochester ones, the ones that Emigrant

19    wasn't -- that were not eligible

20    collateral, regardless of where they were

21    housed.

22    Q.   You didn't intend to move the

23    eligible collateral to MTAG?

24    MS. PARKS:  Objection.

25    A.   I did.  Dennisse was working on

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 950 of 2230      John Hanratty
JOHN ARTHUR HANRATTY                                         June 20, 2023

221

                      J. Hanratty

 1

 2     it.

 3          Q.   Why didn't the collateral get

 4     moved, then?

 5               MS. PARKS:  Objection.

 6          A.   I don't recall.  It wasn't -- I

 7     don't -- I don't know what got moved and

 8     what did not get moved.  I don't -- from my

 9     day-to-day life, where it is housed is of

10     -- doesn't roll up to me.  I have a lien

11     that has to be dealt with, and MTAG isn't

12     going to do it, we are going to do it

13     regardless of what's on the piece of paper.

14               And so I don't know -- I don't

15     recall what issue led to some of them or

16     all of them or what the whole number is

17     that is out there.  You'd have to ask

18     Dennisse.

19          Q.   But you're making representations

20     to a bank.  You don't think it's important

21     to be accurate in what you tell Mr. Grady

22     about what you're doing with respect to

23     MTAG?

24               MS. PARKS:  Objection.

25          A.   I told Mr. Grady that it was a

222

```
  1                    J. Hanratty

  2     work in progress and that we were working

  3     on it.  And I think if you look at the

  4     texts at the same time, also working on

  5     getting a refi done for him for with a

  6     hotel and also updating him on that, I'm

  7     focusing on that.  Dennisse is handling

  8     servicing components.

  9              And so a lot going on.

 10        Q.   You told Mr. Grady that the issue

 11     would be put to bed, correct?

 12        A.   I wrote that, yeah.

 13        Q.   But you didn't intend -- strike

 14     that.

 15              Can you turn to the page ending

 16     in 8703.  I apologize, 8709.

 17              Mr. Grady on March 29th texted

 18     you, "Please send out MTAG info by EOD.  If

 19     it is further delayed, I think we will need

 20     another call to discuss, which is not good

 21     use of anyone's time."

 22              Correct?

 23              MS. PARKS:  Austin, you said

 24        8709?

 25              MR. MAYRON:  Yes.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 115 RECEIVED NYSCEF: 01/12/2024

223

1          J. Hanratty

2          MS. PARKS:  Okay.  Thanks.

3     A.   So sorry, the middle text?

4     Q.   Mr. Grady, on March 29th, texts

5  you, "Please send out MTAG info by EOD.  If

6  it is further delayed, I think we will need

7  another call to discuss, which is not a

8  good use of anyone's time."

9          Correct?

10    A.   I guess that's what he wrote.

11    Q.   And then turning the page to

12 8710, Mr. Grady texts you on March 30th,

13 "Any word on what the holdup with MTAG is?"

14         Correct?

15    A.   What is the second page?

16    Q.   8710.

17         (Document review.)

18    A.   I don't -- I don't recall.  I'm

19 just going to watch ^ ck the prior page.

20    Q.   So Mr. Grady texted you on

21 March 30th, "Any word on what the holdup

22 with MTAG is?"

23         Correct?

24    A.   Yeah.

25    Q.   And then turning the page to

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT
Court Records    Pg 953 of 2230
John Hanratty
JOHN ARTHUR HANRATTY
June 20, 2023

1              J. Hanratty

2      8711, you respond to Mr. Grady and you say,

3      "Just paper assignments, should be done

4      today as well.  Had to rerecord a chunk."

5              Correct?

6         A.   Yes, that's what I wrote.

7         Q.   So you told Mr. Grady that the

8      MTAG situation "should be done today."

9              Correct?

10        A.   That's what I wrote, yes.

11        Q.   And at the time you didn't

12     actually intend to move Emigrant's

13     collateral to MTAG, correct?

14             MS. PARKS:  Objection.

15        A.   No.  I -- Dennisse is working

16     on -- my presumption is she's working on

17     this and, as reflected in earlier texts,

18     I'm working on a potential refinance for

19     the Emigrant debt.

20        Q.   And so then Mr. Hanratty ^ [sic]

21     responds to you.  He says on March 30th,

22     "Can you get MTAG over to us?  This is

23     almost two weeks overdue."

24             Correct?

25             MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 954 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

225

1                          J. Hanratty

2          A.    That's on 8710.

3          Q.    8711.

4          A.    Yes.  So I wrote, "Paper

5     assignments" -- I don't remember the

6     context of that.  "Had to rerecord a

7     chunk."

8                That is not -- yeah, this is -- I

9     don't recall all of this or any of it.  But

10    it's not atypical for recordings to go out

11    and get rejected and have to go back out.

12    That's -- that's life.

13         Q.    You were representing to

14    Mr. Grady that the tax liens on the

15    January 13th, 2021, borrowing base that

16    MTAG did not have custody of would be done

17    with their assignments at MTAG that day?

18               MS. PARKS:  Objection.

19         A.    You're talking about on my -- the

20    just -- should be done today?

21         Q.    Yes.

22         A.    I said "should be done today."

23         Q.    Yes.

24         A.    Should be.

25         Q.    So you were representing to

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM  INDEX NO. 158207/2022
NYSCEF DOC. NO. 1191                                RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 955 of 2230   John Hanratty
JOHN ARTHUR HANRATTY                                          June 20, 2023

226

J. Hanratty

1
2  Mr. Grady that the tax liens on the

3  January 13th, 2021, borrowing base that

4  MTAG did not have custody, should have been

5  assigned to MTAG that day?

6         MS. PARKS:  Objection.

7      A.    That is what I wrote.  I wasn't

8  the one doing the work, but that's the

9  communication that I gave him.

10     Q.    You understood that Ebury

11 companies were assigning liens to MTAG,

12 correct?

13        MS. PARKS:  Objection.

14     A.    That was what I understood.

15     Q.    And what was the basis of that

16 understanding?

17     A.    The -- my interacting with the

18 people that I work with.

19     Q.    Which people?

20     A.    Dennisse's name -- I don't recall

21 this at all, but Dennisse's name is in

22 several texts.

23     Q.    I'm going to hand you a document

24 labeled EBCC 8712.

25        MR. MAYRON:  And could the court

24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 956 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

227

                    J. Hanratty

1    reporter please mark it as Emigrant --

2    sorry -- Hanratty Deposition

3    Exhibit 19.

4         (Hanratty Exhibit 19, Summary of

5    conversations via Instant Messaging,

6    Bates-stamped EBCC_8712 through 8796,

7    marked for identification, as of this

8    date.)

9    BY MR. MAYRON:

10        Q.   So the very first page, these are

11   text messages exchanged between you and

12   Mr. Grady in April of 2021, correct?

13        A.   Yes.

14        Q.   Mr. Grady asks again, "Is there

15   anything you can send today, MTAG or

16   audit?"

17        Correct?

18        A.   Yes.

19        Q.   And "MTAG" is a reference to the

20   assignment of the missing MTAG liens to

21   MTAG?

22        MS. PARKS:   Objection.

23        A.   Yes.

24        Q.   And so turning to page 8714,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO.                                          RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT                                              John Hanratty
JOHN ARTHUR HANRATTY                                                  June 20, 2023

228

1                    J. Hanratty

2    Mr. Grady asks, "Any deliverables coming

3    today"?

4            And you say, "Yup, audit draft

5    today, they turning them now."

6            Mr. Grady responds, "What about

7    MTAG?  Why is that taking so long?"

8            Correct?

9            MS. PARKS:  Objection.

10       A.   Yes, he did write that.

11       Q.   And Mr. Grady is asking why it's

12   taking so long because you told him the

13   issue was just paper assignments, just a

14   timing issue, and was going to be put to

15   bed?

16           MS. PARKS:  Objection.

17       A.   That's what I texted.

18       Q.   And you texted Mr. Grady that the

19   issue with MTAG was just paper assignments,

20   just a timing issue, and was going to be

21   put to bed back in March --

22           MS. PARKS:  Objection.

23   BY MR. MAYRON:

24       Q.   -- 2021?

25       A.   Yes, I did.

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
                EMIGRANT BUSINESS CREDIT                                      John Hanratty
                Court Records   Pg 958 of 2230
                JOHN ARTHUR HANRATTY                                          June 20, 2023

229

J. Hanratty

1

2    Q.   Where in all of these texts do

3    you say to Mr. Grady, What's the big deal?

4    You knew for years that I was

5    self-servicing this collateral?

6         MS. PARKS:  Objection.  Are you

7         asking him to look through everything

8         and give you an example?

9    BY MR. MAYRON:

10        Q.   Did you tell Jack:  What's the

11   big deal?  You knew for years that I was

12   self-servicing the collateral?

13        A.   I never said:  What's the big

14   deal.

15        Q.   Why not?

16        A.   Why would I?

17        Q.   It's your testimony today that

18   Mr. Grady knew that you were self-servicing

19   the collateral, right?

20        A.   Yes.

21        Q.   The issue of MTAG having custody

22   of these liens clearly mattered to Jack,

23   correct?

24        MS. PARKS:  Objection.

25        A.   Yes.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1-2

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT   Court Records   Pg 959 of 2230
JOHN ARTHUR HANRATTY
John Hanratty
June 20, 2023

230

J. Hanratty

2   Q.   If Jack had given you permission

3   to self-service the liens, you would have

4   responded to him and said:  You already

5   gave me permission?

6       MS. PARKS:  Objection.

7   A.   He -- the context of these texts

8   are related to an audit.  He's making a

9   request.  I was going to try and comply.

10   Q.   So Ebury company did not have

11   permission to self-service Emigrant's

12   collateral?

13       MS. PARKS:  Objection.

14   A.   I think we talked about this

15   earlier.  We never had written permission,

16   but we made people at Emigrant aware.

17   Q.   Mr. Grady is responding to the

18   Sound Shore Financial audit that 87 percent

19   of the liens in the Emigrant borrowing base

20   are self-serviced, correct?

21       MS. PARKS:  Objection.

22   Foundation.

23   A.   That's what the report reads,

24   yes.

25   Q.   And Mr. Grady clearly did not

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 271
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

Doc #3 State
John Hanratty
June 20, 2023

231

J. Hanratty

1  know that 87 percent of the liens in

2

3  Emigrant's borrowing base were

4  self-service, correct?

5          MS. PARKS:  Objection.

6      A.   I can't tell what he knows from

7  the texts here.  I can't tell if he's

8  responding to a report, responding to a

9  boss.  It has nothing to do with -- I don't

10  think it's related to his awareness.

11     Q.   Did he start asking the Ebury

12  companies to upload the missing tax liens

13  to MTAG before March 10th?

14          MS. PARKS:  Objection.

15     A.   Not that I can recall.

16     Q.   So it was only after Sound Shore

17  sent a memo stating that MTAG only had

18  custody of 13 -- or 18 percent -- sorry --

19  13 percent of Emigrant's collateral that

20  Mr. Grady started asking you to transfer

21  the collateral to MTAG?

22          MS. PARKS:  Objection.

23     A.   I don't recall, other than the

24  texts you have in front of me here.

25     Q.   And you never reminded Mr. Grady

232

J. Hanratty

2  that he had known for some time that Ebury

3  was self-servicing Emigrant's collateral?

4          MS. PARKS:  Objection.

5      A.   I don't recall the conversations,

6  if we had any, around these texts.  But

7  that would have been the venue it happened,

8  but I don't think I would have done that.

9      Q.   You didn't remind him -- you

10  didn't remind Mr. Grady that he knew Ebury

11  was self-servicing Emigrant's collateral

12  because you never told Mr. Grady before

13  that Ebury was self-servicing Emigrant's

14  collateral?

15          MS. PARKS:  Objection.

16      A.   No.  That's not correct.

17      Q.   So it's your testimony that you

18  previously told Mr. Grady that Ebury was

19  self-servicing Emigrant's collateral?

20          MS. PARKS:  Objection.

21      A.   That they were aware that I was

22  self-servicing New York, Ohio, Kentucky,

23  and a portion of the later stage all the

24  New Jersey stuff.

25      Q.   When you refer to New York, Ohio,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1-2
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 962 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

233

J. Hanratty

1    Kentucky, and a portion of the later stage

2    of New Jersey stuff, are you speaking about

3    Emigrant's collateral?

4        A.    It's all Emigrant's collateral.

5        Q.    So your testimony is that

6    Emigrant was aware you were self-servicing

7    their collateral?

8        A.    Yes.

9        Q.    Who at Emigrant was aware that

10   you were -- who at Emigrant was aware that

11   Ebury companies were self-servicing

12   Emigrant's collateral?

13       A.    Jack Grady.

14       Q.    Is that it?

15       A.    I can't recall.  I'm trying to

16   think back to the conversations in 2019,

17   and I can't specifically recall.

18       Q.    So earlier when you said, "They

19   were aware that I was self-servicing,"

20   you're referring only to Mr. Grady?

21           MS. PARKS:  Objection.

22       A.    I don't -- the -- what gives me

23   pause is the self-servicing started upon

24   the shutdown of American Tax Funding.  And

234

J. Hanratty

1

2    there were no other options to -- for us to

3    do it, so we just took it over, and that

4    was the first time that that came up as a

5    concept of us doing it.

6        Q.   So when you said "They were aware

7    that Ebury companies were self-servicing,"

8    who else at Emigrant are you referring to

9    as being aware?

10       A.   I don't know specifically.  I

11   don't know.  They, meaning, I made Jack

12   aware.  My assumption is I don't know what

13   Jack does with information.

14       Q.   So then can you please turn to

15   page 8715.  This is April 5th, 2021.

16           Mr. Grady texts you, "Can you

17   provide an update on two fronts?  A, when

18   you expect to send the reports, and B, why

19   there was such a long delay in getting them

20   over."

21           And then he writes, "On Fund 1,

22   there is a pretty significant discrepancy

23   between tax lien book and our loan

24   facility.  Do you know why?"

25           And you respond, "Yes.  Liens

235

```
1              J. Hanratty

2    were booked into Fund 2 and part of what is

3    payable gets cleaned up with MTAG

4    assignments and/or merging the two."

5              Correct?

6         A.   Yes.  That's what I wrote.

7         Q.   You were representing to

8    Mr. Grady that a shortfall in the

9    collateral will be cleaned up with the MTAG

10   assignments that you had Dennisse working

11   on?

12              MS. PARKS:  Objection.

13        A.   Yes.  We were -- we had

14   historical issues related to liens getting

15   booked and uploaded into the wrong fund,

16   and that's what happened here.  And once

17   it's assigned, you have to reassign it.

18   And so that's more than likely what I meant

19   by cleaning up MTAG assignments.

20              I also think that this issue here

21   was part of the reason for that amendment

22   about the funds cross collateralizing each

23   other.

24        Q.   And so you're saying --

25        A.   And the plan here, too, was to
```

236

J. Hanratty

merge them both.  Just due to the -- I
mean, due to the complexities of having the
two funds.

Q.   And so you communicated to
Mr. Grady that there were historical issues
relating to liens getting booked and
uploaded into the wrong fund, and that
could be the explanation for a discrepancy
between the tax lien book and the Emigrant
loan facility?

MS. PARKS:   Objection.

A.   Well, I interpret that to mean
the facility of the one fund led to the tax
lien book.  I think that's how I read that.

Q.   So if you turn to page 8716,
Mr. Grady responds, "Okay, but it's still 6
to 7 million short if you look on a
consolidated basis.  It looks like they are
missing a whole chunk of the book, ten
short if you remove New York."

Correct?

A.   Yes, that's what he wrote.

Q.   And when he says, "It looks like
they are missing a whole chunk of the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                    EMIGRANT BUSINESS CREDIT Court Records    Pg 966 of 2230    RECEIVED NYSCEF: 01/12/2024
                    JOHN ARTHUR HANRATTY    John Hanratty
                                                              June 20, 2023

237

                              J. Hanratty

1

2    book," who are "they"?

3         A.   I don't know.

4         Q.   Isn't it MTAG?

5         A.   It might be.  I don't know.

6    Financial folks.

7         Q.   Who else could be missing a whole

8    chunk of the book?

9         A.   The people that prepared the --

10   got the data through the borrowing base

11   that he's talking about.  I don't know what

12   he means.

13        Q.   So can you turn to page 8729?  So

14   this is now April 16th.  Mr. Grady writes

15   to you, "What happened with the MTAG stuff?

16   Anyway you can send over today."

17             And on the next page you respond,

18   "They are reconciling some still.  They

19   suck and it is why we have to move on.  We

20   do all the work, they check the work and

21   then charge us."

22             Correct?

23             MS. PARKS:  Objection.

24        A.   Yes, that's what I wrote.

25        Q.   You were dissatisfied with MTAG's

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1-2

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

Doc #3 State
John Hanratty
June 20, 2023

238

1                    J. Hanratty

2    services, correct?

3         A.    I don't know the context of --

4    well, I wrote a frustrated text.

5         Q.    You were dissatisfied with MTAG's

6    services, right?

7              MS. PARKS:   Objection.

8         A.    I don't recall how I felt, but

9    this is an emotional text, and it might

10   just be out of frustration for the day.

11        Q.    You said "they suck."

12             Right?

13        A.    I did write that, yes.

14        Q.    And by "they" you meant MTAG.  So

15   you were saying MTAG sucks?

16        A.    That day, yeah.

17        Q.    And you're saying that reading

18   that text you don't know if you were

19   dissatisfied with MTAG's services?

20        A.    No.  I'm saying I don't know if

21   this is -- I generally don't feel that they

22   suck.  When in an emotive state, I might

23   write "they suck."  I think they're

24   competent in what they do.  I think they're

25   expensive.  But suck --

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1209    RECEIVED NYSCEF: 01/12/2024

24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 968 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

239

J. Hanratty

1

2      Q.    What do you mean you think

3    they're expensive?

4      A.    For the work that they do.

5      Q.    What do you mean for the work

6    that they do?

7      A.    The servicing.

8      Q.    They charge higher rates than

9    other servicers?

10      A.    They do.

11      Q.    Was it cheaper for Ebury to do

12    the servicing in-house?

13      A.    Yes.

14      Q.    Is that why you self-serviced

15    Emigrant's collateral and didn't transmit

16    it to MTAG?

17      A.    No.

18      Q.    Did the fact that it was cheaper

19    for Ebury to self-service against liens

20    play a role in Ebury's decision to

21    self-service Emigrant's collateral?

22      A.    A small role, but not -- but,

23    again, we were servicing the majority of

24    ineligible, older states.

25      Q.    And you were self-servicing the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 901    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 969 of 2230

EMIGRANT BUSINESS CREDIT                                  John Hanratty
JOHN ARTHUR HANRATTY                                      June 20, 2023

240

```
 1                    J. Hanratty

 2   majority of Emigrant's collateral, at least

 3   as of March of 2021, correct?

 4            MS. PARKS:  Objection.

 5       A.   It's all Emigrant's collateral.

 6       Q.   All of the tax liens that the

 7   Ebury companies owned in March of 2021 are

 8   Emigrant's collateral?

 9       A.   And REO and loans.

10       Q.   So all of the assets of Ebury

11   companies were Emigrant's collateral at the

12   time?

13            MS. PARKS:  Objection.

14       A.   On one level or another, secured

15   or unsecured, yes.

16       Q.   What do you mean "unsecured"?

17       A.   I think they have a secured --

18   like a security pledged directly on the

19   liens and then an equity pledge on the

20   remaining assets of the companies.  And so

21   I meant from an equity perspective of

22   unsecured.

23       Q.   I'm going to show you a document

24   labeled EBCC 7620.

25            MR. MAYRON:  Could the court
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. [illegible]    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY    Court Records    Pg 970 of 2230    John Hanratty
June 20, 2023

241

```
 1                   J. Hanratty

 2        reporter please mark this document as

 3        Hanratty Deposition Exhibit 20.

 4             (Hanratty Exhibit 20, Email chain

 5        beginning with email dated 4/08/2021

 6        from J. Grady to J. Hanratty and

 7        others, Bates-stamped EBCC_7620, marked

 8        for identification, as of this date.)

 9   BY MR. MAYRON:

10        Q.   This is an email from -- the top

11   email is an email from Mr. Grady to you

12   from April 2021, correct?

13             MS. PARKS:  Objection.

14        A.   Yes.

15        Q.   And Mr. Grady writes, "In terms

16   of other open items, any sense on when MTAG

17   will be finished with the lien assignments

18   so we sent to Sound Shore."

19             Correct?

20             (Document review.)

21        A.   Yes.  That's what he wrote.

22        Q.   So you understood Mr. Grady was

23   under the impression that Ebury was

24   assigning liens to MTAG, correct?

25             MS. PARKS:  Objection.
```

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT        Court Records      Pg 971 of 2230        John Hanratty
JOHN ARTHUR HANRATTY        June 20, 2023

242

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | A.   Yes.   That's what he -- yes, |
| 3 | that's what he wrote. |
| 4 | Q.   And the liens that were being |
| 5 | assigned were the missing MTAG liens that |
| 6 | Sound Shore identified during its field |
| 7 | exam, correct? |
| 8 | MS. PARKS:   Objection. |
| 9 | A.   Yes. |
| 10 | Q.   I'm going to hand you a document |
| 11 | labeled EBCC 7620. |
| 12 | MR. MAYRON:   Will the court |
| 13 | reporter please mark this as Hanratty |
| 14 | Deposition Exhibit 21. |
| 15 | (Hanratty Exhibit 21, Email chain |
| 16 | beginning with email dated 4/13/2021 |
| 17 | from J. Grady to J. Hanratty and |
| 18 | others, Bates-stamped EBCC_17846, |
| 19 | marked for identification, as of this |
| 20 | date.) |
| 21 | BY MR. MAYRON: |
| 22 | Q.   This is an April 8th, '20 -- I'm |
| 23 | sorry. |
| 24 | This is an April 13th, 2021, |
| 25 | email from Mr. Grady to you, correct? |

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 972 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                              June 20, 2023

243

J. Hanratty

1

2      A.    Yes.

3      Q.    Mr. Grady writes, "Were you able

4  to finish the audit/MTAG like you had

5  planned yesterday"?

6      A.    Yes.

7      Q.    Do you know why Mr. Grady would

8  think that you had planned to finish MTAG

9  the day before?

10         MS. PARKS:   Objection.

11     A.    No, I don't know.

12     Q.    Did you tell Mr. Grady that the

13  MTAG assignments were going to be complete?

14     A.    I do not know.  I think this --

15  this email sort of crosses topics.  I don't

16  know why he's asking, if that's what you're

17  asking.

18     Q.    Mr. Grady has now asked you

19  several times about the status of the MTAG

20  assignments, correct?

21         MS. PARKS:   Objection.

22     A.    Yes.

23     Q.    It was obviously important to him

24  that the missing MTAG liens were assigned

25  to MTAG, correct?

244

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | MS. PARKS:  Objection. |
| 3 | A.   Yes. |
| 4 | Q.   I'm going to share with you a |
| 5 | document labeled EBCC 7648. |
| 6 | MR. MAYRON:  Could the court |
| 7 | reporter please mark it as Hanratty |
| 8 | Deposition Exhibit 22. |
| 9 | (Hanratty Exhibit 22, Email chain |
| 10 | beginning with email dated 4/22/2021 |
| 11 | from J. Grady to J. Hanratty and |
| 12 | others, Bates-stamped EBCC_7648, marked |
| 13 | for identification, as of this date.) |
| 14 | BY MR. MAYRON: |
| 15 | Q.   This is an April 22nd, 2021, |
| 16 | email from Mr. Grady to you, correct? |
| 17 | A.   Yes. |
| 18 | Q.   Mr. Grady asked, "Can you also |
| 19 | send the latest draft of the audit/MTAG |
| 20 | reports?" |
| 21 | Correct? |
| 22 | A.   Yes. |
| 23 | Q.   So Mr. Grady is again asking |
| 24 | about the status of the assignment of the |
| 25 | missing MTAG liens to MTAG, correct? |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 625    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT - Court Records    Pg 974 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

245

1          J. Hanratty

2          MS. PARKS:  Objection.

3     A.   Yes, he is asking for the status.

4     Q.   Why don't you respond to him:

5  You previously authorized this as

6  self-service?

7          MS. PARKS:  Objection.

8     Foundation.

9          You can try to answer it.

10          THE WITNESS:  Oh, I'm sorry.  Say

11     it again.  I apologize.

12  BY MR. MAYRON:

13     Q.   Why didn't you respond to

14  Mr. Grady:  You previously authorized us to

15  self-service?

16          MS. PARKS:  Objection.

17     Foundation.

18     A.   Because we're, you know, going

19  through a process.  This is emails related

20  to financing out the real estate book, mid

21  COVID, the deal with accrediting items.

22  Jack hits a couple things.  I don't know

23  why I did not respond to that, but he's

24  looking for a draft of our audit and

25  reports.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

246

J. Hanratty

1

2    Q.    Mr. Grady has now been asking you

3    for over a month about the status of the

4    assignment of the missing MTAG liens,

5    correct?

6            MS. PARKS:    Objection.

7    A.    Yes, as reflected in the text and

8    emails.

9    Q.    And even though in March you told

10   him that it was going to be put to bed, you

11   still hadn't effectuated the assignments?

12           MS. PARKS:    Objection.

13   A.    The Ebury companies had not, no.

14   I don't recall offhand what the issue was,

15   but that was something that other people

16   were working on while I was working on the

17   things that I was working on.

18   Q.    Did you ask any of your employees

19   what was taking so long?

20   A.    I typically -- I don't recall

21   doing it, offhand.  I, typically, that

22   would be something that I would do.

23   Q.    Did you respond to Mr. Grady and

24   tell him why it was taking so long?

25           MS. PARKS:    Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1345    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 976 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

247

J. Hanratty

1

2    A.   Other than the responses that are

3   reflected in there, not to this email, 22,

4   but I don't see it.  I don't recall writing

5   another email.

6         MR. MAYRON:  I'm going to hand

7      you a document labeled EBCC 17855.

8         (Hanratty Exhibit 23, Email chain

9      beginning with email dated 4/24/2021

10     from J. Grady to J. Hanratty and

11     others, Bates-stamped EBCC_17855,

12     marked for identification, as of this

13     date.)

14   BY MR. MAYRON:

15     Q.   And the bottom email is from you

16   to Mr. Grady on April 24th, 2021, correct?

17     A.   Yes.

18     Q.   And you say, "I will send update

19   on MTAG, audit, and old fill later today"?

20     A.   Yes.  I also say here's -- at

21   this time I think what we were doing was

22   tracking -- no -- oh, so getting liquidity

23   around REO and sales.

24     Q.   So the Ebury companies still had

25   not yet assigned the missing MTAG liens to

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

248

| | J. Hanratty |
|---|---|

1              J. Hanratty

2    MTAG, correct?

3          MS. PARKS:  Objection.

4      A.   I wrote that I would send an

5    update, but it looks like I am working on

6    different -- a lot of different things.

7      Q.   Right.

8          But at this point the Ebury

9    companies still had not yet assigned the

10   missing MTAG liens to MTAG, correct?

11         MS. PARKS:  Objection.

12     A.   At this point, no.  I was writing

13   and send an update.  I presume not.  I

14   don't know, offhand.

15     Q.   And you can say with confidence

16   that the Ebury companies still had not yet

17   assigned the missing MTAG liens to MTAG

18   because Ebury companies never assigned the

19   missing MTAG liens to MTAG, correct?

20         MS. PARKS:  Objection.

21     A.   Yeah, I think there's a portion

22   that still needs to be assigned.

23     Q.   At this point in time, who else

24   works at Ebury?

25     A.   Sure.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT Court Records   Pg 978 of 2230   John Hanratty

JOHN ARTHUR HANRATTY   June 20, 2023

249

```
 1                J. Hanratty

 2           MS. PARKS:  Objection to form.

 3      A.   Dennisse Méndez, Clarissa

 4  D'Angel, Jessica Soto.  We have Angeline

 5  Umali, Bebegen Umali, B-e-b-e-g-e-n, last

 6  name is Umali, U-m-a-l-i, and then Cherry

 7  May.

 8      Q.   Can we look back at Hanratty

 9  Deposition Exhibit 13, which ends in 8797.

10           And can you turn to page labeled

11  EBCC 8825.

12      A.   8725?

13      Q.   8825.

14           Mr. Grady on May 12, 2021, asks

15  you, "Who was custodian for the Kentucky,

16  Ohio liens?"

17           Later that day, he texts you,

18  "Hey, can you get back to me on this?  Need

19  to execute this amendment as we're past

20  term."

21           And you respond, "Yes.  Sorry.

22  All at MTAG as CST."

23           Correct?

24      A.   Yes.

25      Q.   And CST means custodian, correct?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1116                                   RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 979 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                          June 20, 2023

250

                    J. Hanratty

1

2        A.    Yes.

3        Q.    So on May 12, 2021, all of the

4    Kentucky and Ohio liens that the Ebury

5    companies owned were at MTAG as custodian,

6    correct?

7        A.    No.   That's incorrect.

8        Q.    But you say here "all at MTAG as

9    custodian."

10            Correct?

11       A.    I did write that.

12       Q.    So what you said to Mr. Grady was

13    not true?

14       A.    It was incorrect.   I don't

15    know...

16            (Document review.)

17       A.    I don't know what I was -- I

18    don't know what I was thinking, but it's

19    definitely incorrect, and he knows that

20    Kentucky and Ohio are not at MTAG.   And

21    there was no reason.   It's ineligible

22    collateral and not something they ever lend

23    against.

24       Q.    How does Mr. Grady know that the

25    Kentucky and Ohio liens are not at MTAG

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 17    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 980 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

251

                    J. Hanratty

1

2    when you texted him on May 12, 2021, that

3    all are at MTAG as custodian?

4        A.   Yeah, it's just -- that's not

5    correct.  I don't know if I'm answering the

6    same question.

7             What does Kentucky and Ohio have

8    to do with the amendment?  Those states

9    aren't eligible.

10       Q.   Mr. Grady asks you, "Who is the

11   custodian for the Kentucky, Ohio liens?"

12            And you respond, "All at MTAG as

13   custodian."

14            And sitting here today, you can

15   confirm that what you said was not true?

16            MS. PARKS:  Objection.

17       A.   Not correct.  I'm confused by the

18   context.

19       Q.   Were all of the Kentucky and Ohio

20   liens at MTAG as custodian?

21       A.   No.

22       Q.   So this statement that you sent

23   on March -- May 12, 2021, is false?

24            MS. PARKS:  Objection.

25       A.    Incorrect.  Yeah, it's not

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 981 of 2230
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
John Hanratty
JOHN ARTHUR HANRATTY
June 20, 2023

252

J. Hanratty

1         correct.

2           Q.   It's not correct.

3           A.   Yeah.  I don't know -- I'm just

4         reviewing back through the other texts, and

5         I don't know if I'm responding to the

6         question on Kentucky, Ohio, or the only

7         reason I think that is just -- the

8         amendment has nothing to do with Kentucky

9         and Ohio.

10           Q.   Well, Mr. Grady is asking you for

11        information that he needs to execute the

12        amendment, correct?

13            MS. PARKS:  Objection.

14           A.   Yes, but Kentucky and Ohio have

15        nothing to do with the amendment.

16           Q.   And the amendment refers to an

17        extension of the maturity date of the notes

18        underlying the credit facilities, correct?

19            MS. PARKS:  Objection.

20           A.   I think that's the timing as it

21        relates to what you have shown me.  Was

22        that May?

23            MS. PARKS:  May 12th.

24            (Document review.)

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. ...                                 RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
                      Court Records   Pg 982 of 2230

                                                   John Hanratty
                                                   June 20, 2023

253

                            J. Hanratty

1

2   BY MR. MAYRON:

3        Q.   Can you turn to Hanratty

4   Deposition Exhibit 14, which ends in 8844?

5   And can you turn to the page with the Bates

6   number ending in 8856?

7             (Document review.)

8   BY MR. MAYRON:

9        Q.   On July 20th, 2021, Mr. Grady was

10  still asking for the audit and custodial

11  report, correct?

12            MS. PARKS:   Objection.

13       A.   Yes.

14       Q.   The custodian report is a report

15  showing that MTAG had custody of the liens

16  that Emigrant -- that Ebury was

17  self-servicing, correct?

18            MS. PARKS:   Objection.

19       A.   Yeah, the custodial report would

20  show the liens at MTAG.

21       Q.   And so if you turn to page 8866,

22  Mr. Grady writes to you, "Just send me the

23  custodian report so I can match it up.   I

24  think this is the hundredth time I've asked

25  for it."

254

```
 1                  J. Hanratty

 2           Correct?

 3      A.   Yes.

 4      Q.   Mr. Grady had been asking for the

 5  custodial report since March of 2021,

 6  correct?

 7           MS. PARKS:  Objection.

 8      A.   Yes.

 9      Q.   And if you go to page 8869, this

10  is a text message from Mr. Grady to you and

11  he says, "We want to have a third-party

12  verification of value of our collateral."

13           Correct?

14      A.   Yes.

15      Q.   And so the reason why Mr. Grady

16  wanted a custodian report showing that the

17  missing MTAG liens had been assigned to

18  MTAG was because he wanted a third-party

19  verification of the value of Emigrant's

20  collateral, correct?

21           MS. PARKS:  Objection.

22      Foundation.

23      A.   I don't know if that's why -- I

24  don't know if they're conjoined, but that's

25  what he wrote.
```

255

                    J. Hanratty

1

2            THE WITNESS:  Can I go to the

3        bathroom?  Is that all right?

4            THE VIDEOGRAPHER:  The time is

5        4:59 p.m.  We are off the record.

6            (Recess is taken.)

7            THE VIDEOGRAPHER:  The time right

8        now is 5:09 p.m.  We are back on the

9        record.

10   BY MR. MAYRON:

11       Q.   Okay.  I'm going to hand you a

12   document labeled EBCC 8905.

13           MR. MAYRON:  Could the court

14       reporter please mark this document as

15       Hanratty Deposition Exhibit.

16           (Hanratty Exhibit 24, Summary of

17       conversations via Instant Messaging,

18       Bates-stamped EBCC_ 8905 through 8924,

19       marked for identification, as of this

20       date.)

21   BY MR. MAYRON:

22       Q.   Could you please turn to page,

23   the Bates number ending in 8907.  On

24   September 2nd, 2021, Mr. Grady texts you,

25   "Can you send the lien report?"

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 119
RECEIVED NYSCEF: 01/12/2024

256

J. Hanratty

```
 1                    J. Hanratty

 2          Correct?

 3     A.   Yes.

 4     Q.   He's asking for a report showing

 5  that MTAG has custody of the missing MTAG

 6  liens, correct?

 7          MS. PARKS:  Objection.

 8     A.   Yes, that appears what he's

 9  asking for.

10     Q.   And then if you flip the page on

11  the page 8908, September 3rd, 2021,

12  Mr. Grady texts you, "John, can you send

13  the lien tape"?

14     A.   I'm sorry, which one was that?

15     Q.   Page 8908.  He says, "John, can

16  you send the lien tape."

17          Correct?

18     A.   Yes, it's what he wrote.

19     Q.   He's asking for a report showing

20  that MTAG has custody of the missing MTAG

21  liens, correct?

22          MS. PARKS:  Objection.

23  Foundation.

24     A.   Yes, that's what he wrote.

25     Q.   And then can you please turn to
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO. 1-2

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

257

|    |                                                          |
|----|----------------------------------------------------------|
| 1  | J. Hanratty                                              |
| 2  | page 8914.  This is September 14th, 2021.               |
| 3  | Mr. Grady texts you, "Can you also send the             |
| 4  | custodial report.  I really need that for               |
| 5  | audit purposes."                                         |
| 6  | Correct?                                                 |
| 7  | A.    He did write that, yes.                            |
| 8  | Q.    And he's asking for a custodial                    |
| 9  | report that shows that MTAG has custody of              |
| 10 | the missing MTAG liens, correct?                        |
| 11 | MS. PARKS:  Objection.                                  |
| 12 | Foundation.                                              |
| 13 | A.    The -- yes, I would presume based                  |
| 14 | off the previous text, that's what it is.               |
| 15 | Q.    And then turning to page 8916,                     |
| 16 | this is September 17th, 2021, Mr. Grady                 |
| 17 | texts you, "You need to send the signed                 |
| 18 | audit and the custodial report."                        |
| 19 | You understand the custodial                            |
| 20 | report to be a reference to a report                    |
| 21 | showing that MTAG has custody of the                    |
| 22 | missing MTAG liens, correct?                            |
| 23 | A.    Yes.                                                |
| 24 | Q.    And then turning to page 8917,                     |
| 25 | Mr. Grady writes to you on September 20th,              |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022

NYSCEF DOC. NO.        RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 987 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                    June 20, 2023

258

```
 1                    J. Hanratty

 2    2021, "Just following up on custodial

 3    report."

 4            Correct?

 5        A.   Yes.

 6        Q.   And, again, that's a reference to

 7    a custodial report showing that MTAG has

 8    custody of the missing MTAG liens, correct?

 9            MS. PARKS:  Objection.

10        Foundation.

11        A.   Yes.  That's what he wrote.

12        Q.   And then you respond on September

13    21st, 2021, and you say, "Custody is the

14    first thing when I get in.  It is cleaned

15    up as of last night in 2020 end of day.

16    Update REO as well."

17            Correct?

18        A.   That's what I wrote.

19        Q.   You're telling him you're going

20    to send a custodial report showing that

21    MTAG has custody of the missing MTAG liens,

22    correct?

23            MS. PARKS:  Objection.

24        A.   Yeah, me or somebody else, but

25    yes, that's what I'm meaning.
```

259

```
 1                  J. Hanratty

 2      Q.   And you say, "It is cleaned up as

 3   of last night."

 4           By "it" you mean the MTAG custody

 5   for the missing MTAG liens, correct?

 6           MS. PARKS:  Objection.

 7      A.   That is most likely what I mean.

 8   Yep.  Yes.

 9      Q.   Okay.  I'm going to show you a

10   document labeled EBCC 8420.

11           MR. MAYRON:  Would the court

12        reporter please mark this as Hanratty

13        Deposition Exhibit 25.

14           (Hanratty Exhibit 25, Email dated

15        9/22/2021 from J. Hanratty to J. Grady,

16        Bates-stamped EBCC_8420, marked for

17        identification, as of this date.)

18   BY MR. MAYRON:

19      Q.   This is an email from you to

20   Mr. Grady on Wednesday, September 22nd,

21   2021 at 7:53 a.m., correct?

22      A.   Yes.

23      Q.   The subject line of the email is

24   "custody," correct?

25      A.   Yes.
```

260

                    J. Hanratty

 1

 2       Q.   And "custody" is a reference to

 3   Mr. Grady's request for a report showing

 4   that MTAG has custody of the missing MTAG

 5   liens, correct?

 6       A.   Yes.

 7       Q.   And the attachment listed here,

 8   it says, "MTAG active lien detail,

 9   8/31/2021.xlsx."

10            Correct?

11       A.   Yes.

12       Q.   This attachment is a lien tape

13   from MTAG, correct?

14            MS. PARKS:   Objection.

15       Foundation.

16       A.   I don't -- I presume so.

17       Q.   Why do you presume so?

18       A.   Well, it has the word "MTAG" on

19   it.  I don't know if it's the uploaded

20   liens that we're doing or the ones that

21   were there, but yeah.

22       Q.   So just going back to Hanratty

23   Deposition Exhibit 24, the page ending in

24   8917, on September 21st, 2021, you wrote to

25   Mr. Grady saying, "Custody is the first

261

J. Hanratty

1

2    thing when I get in."

3            The next day, September 22nd,

4    2021, you sent him an email with the

5    subject:  Custody, attaching a lien tape

6    that you presumed came from MTAG, correct?

7            MS. PARKS:  Objection.

8        A.    Presumption, yes.  Or -- I

9    typically get them from Dennisse, but, yes.

10        Q.    I'm going to share some exhibits

11    that are spreadsheets.  So for that

12    purpose, to make it easier to look at, I

13    have them on a laptop for you.  I have a

14    folder with all of the documents in it and

15    I will send you a copy after the deposition

16    and you, unfortunately, Ms. Parks can

17    share?

18        A.    Sure.

19        Q.    So just holding back on Hanratty

20    Deposition Exhibit 25, the attachment is

21    MTAG active lien detail 8/31/21.xlsx.

22            Correct?

23        A.    Yes.

24        Q.    That lien tape was not from MTAG,

25    correct?

262

                    J. Hanratty

 1

 2          MS. PARKS:  Objection.

 3      A.   This lien, this one here?

 4      Q.   Yes.

 5          MS. PARKS:  Objection.

 6      Foundation.  If you want to ask him

 7      about the document, we should look at

 8      the document.  The attachment,

 9      specifically.

10   BY MR. MAYRON:

11      Q.   The document that you attached in

12   your September 22nd, 2021, email called:

13   MTAG active lien detail, August 31st,

14   2021.xlsx, is not from MTAG?

15          MS. PARKS:  Objection.  We're not

16      actually looking at that document.  So

17      how are you supposed to know, unless

18      you happen to know what that document

19      is off the top of your head.

20      A.   No, I don't download documents

21   from MTAG.  So --

22      Q.   Do you know whether the

23   attachment to the email marked Hanratty

24   Deposition Exhibit 25 is a lien tape from

25   MTAG?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2    EMIGRANT BUSINESS CREDIT    Court Records    Pg 992 of 2230    Doc #3 State
JOHN ARTHUR HANRATTY                                                              RECEIVED NYSCEF: 01/12/2024
                                                                                 John Hanratty
                                                                                 June 20, 2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23

263

```
 1                    J. Hanratty

 2            MS. PARKS:  Objection to form.

 3        You can answer.

 4            THE WITNESS:  Oh, sure.

 5        A.   I know that I am sending a report

 6    that should reflect the liens that are at

 7    MTAG.

 8        Q.   What do you mean the report

 9    should reflect the liens that are at MTAG?

10        A.   These should be the uploaded MTAG

11    liens.

12        Q.   The report should reflect the

13    liens that are at MTAG because you're

14    representing to Mr. Grady that the lien

15    tape reflects the liens for which MTAG has

16    custody, correct?

17        A.   Yes.

18            MS. PARKS:  Objection to form.

19            Sorry.

20    BY MR. MAYRON:

21        Q.   Could you open the spreadsheet

22    labeled EBCC 8421.

23            MR. MAYRON:  And could the court

24        reporter mark this document for

25        identification as Hanratty Deposition
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO.                                            RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 993 of 2230   John Hanratty
JOHN ARTHUR HANRATTY                                      June 20, 2023

264

1              J. Hanratty

2       Exhibit 26.

3              (Hanratty Exhibit 26, Electronic

4       Excel Spreadsheet, attachment to

5       Hanratty Deposition Exhibit 25, marked

6       for identification, as of this date.)

7    BY MR. MAYRON:

8       Q.   Have you seen this document

9    before?

10             MS. PARKS:  We're still loading.

11      Give us a second.  You can flip through

12      it and stuff if you want.

13             THE WITNESS:  Sure.

14             (Document review.)

15      A.   I don't know if I've seen this

16   document before.

17      Q.   This is the lien tape you sent

18   Emigrant on September 22nd, 2021, correct?

19             MS. PARKS:  Objection.

20      A.   I don't know.

21      Q.   I'll represent to you that it is

22   the attachment to Hanratty Deposition

23   Exhibit 25.

24             Is this the lien tape from MTAG?

25             MS. PARKS:  Objection to form.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 994 of 2230    RECEIVED NYSCEF: John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

265

1              J. Hanratty

2          (Document review.)

3      A.   No.  I see things in here that

4   should not be in here.

5      Q.   What do you mean you see things

6   in there that should not be in there?

7      A.   The New Yorks.

8      Q.   Why should the New Yorks not be

9   in there?

10     A.   They're not -- there's nothing --

11  because there's no custody.  What was

12  supposed to be uploaded was the New

13  Jerseys.  I see Ohios in here.

14     Q.   The day before you sent this lien

15  tape to Mr. Grady, you texted Mr. Grady,

16  "Custody is first thing when I get in.  It

17  is cleaned up as of last night."

18          Correct?

19     A.   Yes.  This is not cleaned up.

20     Q.   But the New York liens are

21  Emigrant's collateral, correct?

22          MS. PARKS:  Objection.

23     A.   It's all --

24          MS. PARKS:  Go ahead.

25     A.   It's all Emigrant's collateral.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022
NYSCEF DOC. NO.        Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
24-04020-dsj
EMIGRANT BUSINESS CREDIT Court Records    Pg 995 of 2230        John Hanratty
JOHN ARTHUR HANRATTY                                    June 20, 2023

```
 1                    J. Hanratty

 2        Q.   And Mr. Grady was asking for a

 3   report showing that MTAG had custody of

 4   Emigrant's collateral, correct?

 5             MS. PARKS:  Objection.

 6        A.   Yes.  With the caveat that

 7   there's nothing to custody from New York,

 8   Ohio, et cetera.

 9        Q.   Did you tell Mr. Grady that this

10   report was not supposed to have liens from

11   New York or Ohio?

12        A.   Or Kentucky.  No.

13        Q.   You just said Ohio and Kentucky,

14   correct?

15        A.   I did.

16        Q.   Looking back at Hanratty

17   Deposition Exhibit 13, on page 8797 -- I

18   apologize, 8825, Mr. Grady texted you, "Who

19   is the custodian for the Kentucky, Ohio

20   liens?"

21             And you responded, "All at MTAG

22   as custodian."

23             Correct?

24             MS. PARKS:  Objection.

25        A.   That is what I wrote, yes.
```

267

1                     J. Hanratty

2          Q.   So you had told Mr. Grady that

3     MTAG had custody of the Kentucky and Ohio

4     liens?

5               MS. PARKS:   Objection.

6          A.   Yes.   Well, that's what I wrote.

7     I don't know the context of it as we

8     discussed.

9          Q.   Sure.

10         A.   This appears to be an

11    over-inclusive list.

12         Q.   So if Mr. --

13         A.   But --

14         Q.   So if Mr. Grady looked at this

15    lien tape and saw Kentucky and Ohio liens,

16    that would be consistent with what you told

17    him about MTAG having custody of Kentucky

18    and Ohio liens, correct?

19              MS. PARKS:   Objection.

20         A.   Yes, it would be consistent that

21    Kentucky and Ohio are in here, and I had

22    texted a couple days prior, or whatever it

23    was, related to that question.

24              I don't -- from -- having an

25    issue remembering what is occurring.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.     Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
24-04020-dsj    Court Records    Pg 997 of 2230

EMIGRANT BUSINESS CREDIT                    John Hanratty
JOHN ARTHUR HANRATTY                        June 20, 2023

268

```
 1                    J. Hanratty

 2        Q.   So I'm going to scroll over to

 3   column AM, which has the header, "Ending

 4   Balance, Including Fees."

 5             This is the column that I would

 6   look at to determine the redemptive value

 7   of a lien, correct?

 8             MS. PARKS:  Objection.

 9             Did you say AM?

10             MR. MAYRON:  AM.

11        A.   Yes, I think that's what they do.

12        Q.   That's the column I should look

13   at to determine the redemptive value of a

14   lien?

15        A.   Yes.

16        Q.   So now I'm going to select all of

17   the entries in that column by doing control

18   shift down, and if you look at the bottom

19   right of Excel, it says, "Count 6,782 and

20   sum, $27,835,122.57."

21             Correct?

22             MS. PARKS:  You're asking him to

23        sum column AM?

24             MR. MAYRON:  Yes.

25        A.   Oh.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO. 1274                                          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records     Pg 998 of 2230     John Hanratty
JOHN ARTHUR HANRATTY                                                          June 20, 2023

269

                        J. Hanratty

 1

 2              (Document review.)

 3      A.    What is it?

 4      Q.    Dennisse helped me with the

 5   spreadsheets during her deposition.

 6      A.    Sorry.

 7              MS. PARKS:  Finance people are

 8          very good with their specialty.

 9      A.    27,835,122.57.

10      Q.    That is the same number I got.

11              And there are 6,782 liens listed

12   in this report, correct?

13      A.    I see 87 lines.  6787.

14      Q.    The first one shows up at 6.

15      A.    Sure.

16      Q.    So 6,782 liens?

17      A.    Yes.

18      Q.    And just to confirm, this lien

19   tape contains 6,782 liens with a redemptive

20   value total of $27,835,122.57, correct?

21      A.    Yes.

22      Q.    MTAG did not have custody of

23   6,782 liens owned by Ebury on August 31st,

24   2021, correct?

25              MS. PARKS:  Objection.  Go ahead.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsl   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records    Pg 999 of 2230
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
John Hanratty
June 20, 2023

270

```
 1                    J. Hanratty

 2        A.    No, they did not.

 3        Q.    Ebury did not own 6782 liens on

 4  August 31st, 2021?

 5        A.    That I don't know.  These --

 6  there is a difference between liens and

 7  addresses, so this might be -- the counts

 8  could be rolled up into one number on our

 9  speedboat system.  And you can have a --

10  like a 2014, '15, '16 lien.  In MTAG I

11  think it counts for three separate liens,

12  whereas in the other system it counts for

13  one.

14        Q.    Ebury did not own $27,835,122.57

15  in redemptive value of lien collateral on

16  August 31st, 2021, correct?

17             MS. PARKS:  Objection.

18        A.    I don't -- I don't know exactly.

19        Q.    Earlier, I believe you testified

20  that the Ebury companies owned

21  approximately 14 to 14-and-a-half million

22  dollars redemptive value on lien collateral

23  right now?

24        A.    Yes, I testified to that, yes.

25        Q.    And that's $14 million in lien
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 11
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1000 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

271

                    J. Hanratty

1    collateral less than is shown in this tape?

2          MS. PARKS:  Objection to form.

3    Foundation.

4          You can answer.

5          THE WITNESS:  Oh, sure.

6    A.    Yes.

7    Q.    Between conversion to REOs,

8    sales, and write-offs, did the Ebury

9    companies lose $14 million in assets

10   between August 2021 and today?

11         MS. PARKS:  Objection.  Go ahead.

12   A.    No, I don't believe it did.

13   Q.    So do you agree that this lien

14   tape presents an incorrect amount for the

15   value of Ebury's tax lien collateral?

16         MS. PARKS:  Objection.

17   A.    No, I -- no.

18   Q.    So it's your testimony that Ebury

19   may have owned $28 million, approximately,

20   redemptive value in liens in August of

21   2021?

22   A.    I'm saying I don't know, and I

23   would have to verify.

24   Q.    Could you open the document

272

```
 1                    J. Hanratty

 2      labeled EBCC 10281.

 3              MR. MAYRON:  And could the court

 4          reporter please mark that as Hanratty

 5          Deposition Exhibit 27.

 6              (Hanratty Exhibit 27, Electronic

 7          Excel Spreadsheet, dated 8/31/2021,

 8          MTAG Lien Detail Report, marked for

 9          identification, as of this date.)

10              MS. PARKS:  Which one did you

11          say?

12              MR. MAYRON:  10281.

13              MS. PARKS:  281?

14              MR. MAYRON:  Yes.

15      BY MR. MAYRON:

16          Q.   Have you seen this document

17      before?

18          A.   I do not know.

19          Q.   Do you know what this document

20      is?

21          A.   It looks like an MTAG lien detail

22      report, just based off of the header that

23      reads:  Lien detail.

24          Q.   And it's for the period ending

25      August 31st, 2021?
```

273

```
 1                    J. Hanratty

 2        A.   Yes.  It reads:  Period ending

 3   Tuesday, August 31st, 2021.

 4        Q.   And that is the same period

 5   ending date that was given in the lien tape

 6   we just looked at, Hanratty Deposition

 7   Exhibit 26?

 8        A.   Yes.

 9        Q.   And, again, I'm going to go to

10   column AM, which I understand represents

11   the redemptive value of the liens.

12        A.   Yes.

13        Q.   And I am going to select all of

14   the liens that are in this tape, and I get

15   that there are 518 liens with a redemptive

16   value of $1,354,929.98.

17        A.   Yes, I see that.

18        Q.   So I'll represent to you that

19   this is a lien tape that we got directly

20   from MTAG.

21             So is it your understanding that

22   MTAG had custody of only 518 liens for the

23   Ebury companies as of August 31st, 2021?

24             MS. PARKS:  Objection.

25        A.   If that's -- if this is directly
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

274

```
 1                  J. Hanratty

 2   from MTAG, that is most likely the case.

 3        Q.   And that the redemptive value of

 4   the liens that MTAG had custody of, was

 5   only $1,354,929.98?

 6             MS. PARKS:  Objection.

 7        A.   Yes, that is what the spreadsheet

 8   reads.

 9        Q.   So when, on September 22nd, 2021,

10   you sent Mr. Grady a lien tape with the

11   title:  MTAG active lien detail, with 6,782

12   liens with a redemptive value total of

13   $27,835,122.57, you overstated the liens,

14   that MTAG had custody of by over 6,000

15   liens worth more than $26 million, correct?

16             MS. PARKS:  Objection.

17        A.   No, I don't know the source of --

18   to me, I think what was on that other one

19   was what was intended to be uploaded.

20        Q.   What do you mean what was

21   intended to be uploaded?

22        A.   The -- intended to be transferred

23   to MTAG to take over.

24        Q.   So going back to Hanratty

25   Deposition Exhibit 24, and if you can turn
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 41
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT v.
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

275

J. Hanratty

1

2    to page 8917, so this is September 21st,

3    2021, you texted Mr. Grady, "Custody is

4    first thing when I get in.  It is cleaned

5    up as of last night."

6         Correct?

7    A.    Yes.

8         Q.    But MTAG did not have custody of

9    the liens, the vast majority of the liens,

10   included in the lien tape that you sent to

11   Mr. Grady the next day?

12            MS. PARKS:  Objection.

13   A.    Yes, that appears to be the case.

14        Q.    Who was responsible for putting

15   together the lien tape that you sent to

16   Emigrant on September 22nd, 2021?

17            MS. PARKS:  Objection.

18   A.    The data person at the time was a

19   guy by the name of Kevin Clark.

20        Q.    Did you check the lien tape

21   before sending it to Emigrant?

22            MS. PARKS:  Objection.

23            You can answer.

24            THE WITNESS:  Sure.

25   A.    I don't recall.  I think I was

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1162
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1005 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
John Hanratty
June 20, 2023

276

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | feeling the pressure to get it out. |
| 3 | Q.   So Mr. Grady has been asking you |
| 4 | for a lien tape and a custodial report |
| 5 | since March 2021, and it takes you six |
| 6 | months to send him a lien tape, and then |
| 7 | the lien tape you sent him is incorrect? |
| 8 | MS. PARKS:  Objection. |
| 9 | A.   Yes.  I think we were -- yeah, |
| 10 | yes. |
| 11 | Q.   Not only is it incorrect, it |
| 12 | overstates the amount of collateral that |
| 13 | MTAG had custody of by $26 million, |
| 14 | approximately? |
| 15 | MS. PARKS:  Objection. |
| 16 | BY MR. MAYRON: |
| 17 | Q.   Correct? |
| 18 | A.   Yes, it appears to be the |
| 19 | difference. |
| 20 | Q.   And then turning back to the lien |
| 21 | tape that you sent Mr. Grady, it showed |
| 22 | that the Ebury portfolio had a total |
| 23 | redemptive value of $27 million, |
| 24 | approximately, but the Ebury companies did |
| 25 | not own $27 million in tax liens, correct? |

277

                         J. Hanratty

1

2        A.   I don't know that.

3        Q.   They owned much less?

4        A.   In 2021, I don't know that, no.

5        Q.   Then why don't we take a look at

6   the spreadsheet labeled EBCC 10220.

7             MR. MAYRON:  And could the court

8        reporter please mark that spreadsheet

9        as Hanratty Deposition Exhibit 28.

10            (Hanratty Exhibit 28, Electronic

11       Lien Tape Sent, marked for

12       identification, as of this date.)

13            THE WITNESS:  Is that the correct

14       one?

15            MS. PARKS:  Um-hmm.  It's loading

16       still.

17            (Document review.)

18            THE WITNESS:  It looks like it's

19       out of memory.

20            MS. PARKS:  Here we go.  Okay.

21            (Document review.)

22   BY MR. MAYRON:

23       Q.   Have you seen this document

24   before?

25       A.   I don't recall.  Yeah, it looks

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1414                    RECEIVED NYSCEF: 01/12/2024

278

J. Hanratty

1

2     familiar.

3          Q.    What is this lien tape?

4               MS. PARKS:  Objection to form.

5          A.    It looks to be a combined lien

6     tape of Speedboat and MTAG.

7          Q.    This is a lien tape you sent to

8     Emigrant Bank through counsel in December

9     of 2021 listing the value of the Ebury

10    company's tax lien portfolio as of December

11    1st, 2021, correct?

12              MS. PARKS:  Objection.

13         Foundation.

14         A.    Yeah -- yes, if that's the way it

15    got to you, yes.

16         Q.    And so the summary tab lists a

17    total redemptive value for the Ebury

18    companies tax lien portfolio of

19    $19.1 million, approximately?

20         A.    Yes, approximately.

21         Q.    And then if you go to the

22    combined tab, there are 1,544 liens in this

23    lien tape, correct?

24         A.    Yeah, that's the rows.

25         Q.    So the lien tape you sent to

279

1              J. Hanratty

2    Emigrant on September 22nd, 2021, contains

3    6,782 liens with a redemptive value of

4    $27,835,122.57, and then the lien tape you

5    sent to Emigrant in December of 2021, three

6    months later, contains only 1,544 liens

7    with a redemptive value of $19,099,976.59,

8    correct?

9              MS. PARKS:  Objection.

10        A.   Yes, that appears to be the

11   total.

12        Q.   The Ebury companies didn't sell

13   5,000 liens between August and December of

14   2021, correct?

15             MS. PARKS:  Objection.

16        A.   No, but I'd have to look and see

17   the timing of write-offs and things like

18   that.

19        Q.   The Ebury companies did not sell

20   or write off 5,000 liens between August and

21   December of 2021?

22        A.   No, that number seems too large.

23        Q.   The Ebury companies did not sell

24   or write off $8 million in tax lien assets

25   between August and December of 2021?

280

```
 1                    J. Hanratty

 2            MS. PARKS:  Objection to form.

 3            You can answer.

 4       A.   Not that I am aware of.

 5       Q.   To your understanding, is this

 6   lien tape an accurate depiction of the

 7   Ebury companies' tax lien portfolio as of

 8   December 1, 2021?

 9            MS. PARKS:  Objection.

10       A.   I don't -- I don't know.

11       Q.   Having looked at this lien tape

12   now, would you agree that the lien tape

13   that you sent to Emigrant in September of

14   2021 listing 6,782 liens with redemptive

15   value of almost $28 million was incorrect?

16            MS. PARKS:  Objection.

17       A.   The one sent to Emigrant -- I

18   think the one sent to Emigrant, yeah, I

19   believe is probably -- has incorrect data

20   on it, yes.

21       Q.   How does that happen?  How do you

22   get 5,000 -- 5,000 liens wrong?

23            MS. PARKS:  Objection.

24            You can answer.

25            THE WITNESS:  Sure.
```

281

                        J. Hanratty

1        A.   I don't know, but I would say

2   that, generally, and as Emigrant's aware

3   of, we struggled for quite some time with

4   financials and with our data.  And so

5   that's generally -- my response is the

6   specifics of these two spreadsheets, I'd

7   have to do some work on them.

8        Q.   You understand that Emigrant was

9   relying on you to submit correct

10  information?

11           MS. PARKS:  Objection to form.

12       A.   Yes, I am aware.

13       Q.   And based on these two lien

14  tapes, it appears that you were submitting

15  incorrect information to Emigrant?

16           MS. PARKS:  Objection to form.

17       A.   Without verifying it, these

18  sheets both appear to have errors.

19       Q.   They both appear to have errors.

20           What errors do you see in the

21  second lien tape, the one marked Hanratty

22  Deposition Exhibit 28?

23           Do you see any errors in the lien

24  tape marked Hanratty Deposition Exhibit 28?

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1011 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

282

                    J. Hanratty

1

2       A.    That's what I'm looking through.

3       Q.    Based on your review so far, have

4    you seen any errors in the lien tape marked

5    Hanratty Deposition Exhibit 28?

6       A.    I just -- I see several Kentucky

7    liens in Speedboat after a time when they

8    should not be in there.  I see -- I

9    don't -- I'm not certain as to what this

10   combined tab is comparatively to the other

11   two.  I'm not certain what Kevin was doing.

12      Q.    What do you mean you're not

13   certain what Kevin was doing?

14      A.    It looks like he was aggregating

15   two tabs into one and then pulling a

16   summary off of the one tab, I think.  And I

17   just -- yeah, that was all.

18      Q.    So Mr. Grady has been asking for

19   six months for a custodial report and you

20   don't verify that the custodial report

21   you're sending him is accurate, correct?

22          MS. PARKS:  Objection.

23      A.    No.  At that time I'm working on

24   all the other items that Jack has been made

25   aware of.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1012 of 2230    John Hanratty
June 20, 2023

283

J. Hanratty

2  Q.  And then you default in the

3  maturity of the credit facilities and then

4  sends you notices of default and demands

5  more than $18 million in repayment, and you

6  send them another lien tape that you also

7  don't verify?

8          MS. PARKS:  Objection.

9  A.  I work with the data I get.  I

10  don't go and get granular into the systems

11  as far as verification goes.

12  Q.  Even if you don't get granular,

13  you don't notice when you submit

14  information to the bank that indicates the

15  portfolio is worth $8 million more than it

16  actually is?

17          MS. PARKS:  Objection to form.

18  You can answer.

19  A.  I did not notice in this

20  instance.

21  Q.  You did not notice that the lien

22  tape that you submitted in August 2021 --

23  apologies -- in September of 2021,

24  overstated the value of the Ebury

25  companies' tax lien portfolio by at least

284

J. Hanratty

1                    J. Hanratty

2    $8 million?

3            MS. PARKS:  Objection.

4            Go ahead.

5        A.    I don't know what the baseline

6    is.  The baseline is this other sheet, so I

7    don't know the accuracy of this one.

8        Q.    Could you go on the combined tab

9    to row 139 to be 3103 Southern Avenue,

10   Apartment 39?

11           MS. PARKS:  139, you said?

12           MR. MAYRON:  139.

13           MS. PARKS:  Okay.

14   BY MR. MAYRON:

15       Q.    The face value of the lien is

16   $439.24, correct?

17       A.    That's what it shows here.

18       Q.    The accrued interest is $580.04,

19   correct?

20       A.    Yes.

21       Q.    And the fees and subs are

22   $209,330.79?

23       A.    No.  This looks like a mistake.

24   There is something off here.  It's only

25   because we're foreclosing on this one now.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 40 RECEIVED NYSCEF: 01/12/2024

285

```
 1              J. Hanratty

 2   That's the face value, I know, is

 3   incorrect.

 4        Q.   What do you mean the face value

 5   is incorrect?

 6        A.   I think it's like 11,000,

 7   something like that.

 8        Q.   Had the Ebury companies paid

 9   $209,330.79 in fees and subs for the 3103

10   Southern Avenue, Apartment 39 tax lien?

11        A.   No.

12        Q.   If you look at the next row, 4809

13   Church Road, the fees and subs is

14   $258,183.12.

15             Did the Ebury companies pay

16   $258,183.12 in fees and subs for the tax

17   lien on 4809 Church Road?

18        A.   I don't -- I don't think so, no.

19        Q.   And we can say the same about row

20   142, the 21031 Woodfield Road?

21        A.   Which one?

22        Q.   Rows 142, 144, 145, 149.

23        A.   I think we put in for -- we paid

24   premiums on these.  These are all in

25   foreclosure.  Like these are all addresses
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 175    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1015 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

286

J. Hanratty

1    J. Hanratty

2    that I recognize as far as getting deeds,

3    which means that we paid a lump sum which

4    is in excess, like a multiple higher.

5        Q.    Did you pay the lump sum for

6    these liens between August and December of

7    2021?

8            MS. PARKS:   Objection.

9            Austin, when you say "these

10        liens" do you mean specifically rows

11        142, 144, 145, 149 or you mean more --

12            MR. MAYRON:   There's more, but we

13        can start with those for now.

14            MS. PARKS:   Yeah, well, I just

15        want to...

16        A.    The ones I know we've paid that

17    we -- and I don't know when.  I know that

18    row 150.  So that...

19            (Document review.)

20        A.    That's correct.

21        Q.    I can show you tomorrow, but I'll

22    submit to you that compared to Hanratty

23    Deposition Exhibit 26, the lien tape you

24    sent Emigrant on September 22nd, 2021,

25    there are several Maryland liens that the

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1016 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

287

1                     J. Hanratty

2    total redemptive value goes up by over 4

3    million, frequently because of payments in

4    the tens or hundreds of thousands on the

5    fees and subs.

6            And so my question, put simply,

7    is:  Between August 2021 and December of

8    2021, did the Ebury companies pay $4

9    million or approximately $4 million in fees

10   and subs on Maryland liens?

11       A.   I do not know offhand.  But in my

12   experience, the Maryland numbers are high,

13   and I do see the three or four addresses

14   there which we paid a long time ago and

15   have issues related to our foreclosure

16   cases.

17           Like Southern, that one I just

18   mentioned, Metsarat, Crane, those are all

19   ones we paid a long time ago.  Van Brady

20   was one we paid a long time ago.

21           And our attorney, he's from the

22   Maryland book, had a bunch of issues, was

23   getting improperly serviced and so these

24   cases just sat even though we paid.  I

25   don't know offhand the amounts, but the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
                   EMIGRANT BUSINESS CREDIT    Court Records    Pg 1017 of 2230    John Hanratty
                   JOHN ARTHUR HANRATTY    June 20, 2023

```
 1                    J. Hanratty

 2   amounts, like, looking at 96,000,

 3   ninety-two, those are not atypical for

 4   Maryland.

 5        Q.    If Ebury companies had paid $4

 6   million in fees and subs between August and

 7   December of 2021, would you know?

 8        A.    I would have known at the time.

 9        Q.    And to your knowledge, did the

10   Ebury companies pay $4 million in fees and

11   subs for Maryland liens between August and

12   September of 2021?

13        A.    I don't remember the exact

14   number, but I know we paid them a whole

15   bunch.

16        Q.    Between August and December of

17   2021?

18        A.    August and December of '21.

19             I'd have to look, but the number

20   of -- amount.  I'm just looking at some of

21   these addresses I know have been around for

22   a while.  I'm not certain I know.

23        Q.    And by "we paid a whole bunch,"

24   is that more or less than a million

25   dollars?
```

289

J. Hanratty

2   A.   I'm not talking dollars.  I'm

3   talking addresses.

4   Q.   Right.  Between August and

5   December of 2021, did the Ebury companies

6   spend more or less than a million dollars

7   in fees and subs for Maryland liens?

8   A.   You know, I don't know.  I'd have

9   to look up exactly.  But it was -- at that

10  time, it was a priority for us.  The number

11  seems high, but that lien -- there's some

12  lien face issues -- like a couple of lien

13  faces, it's like looking correct, yeah.

14  Q.   So you were able to pretty

15  quickly determine that there were some

16  inaccuracies in this lien tape, correct?

17        MS. PARKS:  Objection.

18        You can answer.

19        THE WITNESS:  Sure.

20  A.   No.  Well, very specifically,

21  just 3103 Southern Avenue, just because

22  that's something we were working on this

23  week.

24  Q.   I thought you said something

25  about a Kentucky lien that shouldn't have

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2 RECEIVED NYSCEF: 01/12/2024

```
 1                    J. Hanratty

 2     been on there.

 3          A.   Oh, I was just kind of perusing

 4     down, I think, Speedboat.

 5               (Document review.)

 6     BY MR. MAYRON:

 7          Q.   So in just a couple minutes of

 8     perusing this document, you identified a

 9     Kentucky lien that should not have been

10     included in this lien tape?

11               MS. PARKS:   Objection to form.

12          A.   I don't know for sure, but it's a

13     little unusual for -- we own a lot of liens

14     in Kentucky than to have just several.  It

15     doesn't make much sense.

16          Q.   Did you review this lien tape

17     before the Ebury companies submitted it to

18     Emigrant Bank?

19               MS. PARKS:   Objection.

20          A.   No.

21          Q.   Why not?

22          A.   I don't know.  No reason.

23          Q.   I'm going to show you a document

24     labeled Ebury 18439.

25               MR. MAYRON:  And could the court
```

291

```
 1                    J. Hanratty

 2         reporter please mark this document as

 3         Hanratty Deposition Exhibit 29.

 4               (Hanratty Exhibit 29, Email dated

 5         9/14/2018 from J. Santori to J.

 6         Hanratty and others, Bates-stamped

 7         EBURY_18439 through 18442, marked for

 8         identification, as of this date.)

 9    BY MR. MAYRON:

10         Q.   You can put the laptop aside for

11    now.

12               This is an email from Jim Santori

13    to you and Mr. Xie, September 14th, 2018,

14    correct?

15         A.   Yes.

16         Q.   Who is Mr. Santori?

17         A.   He is the CFO of OTA and an

18    investor in Fund 1.

19         Q.   Mr. Santori writes, "Ping, we

20    haven't heard from John in over a month.

21    This is a copy of an email we sent to him

22    last night.  He hasn't acknowledged

23    receipt."

24               Correct?

25         A.   Yes, that's what he wrote.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1021 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

292

1             J. Hanratty

2       Q.   Mr. Santori writes, "We have

3   become deeply concerned that that you may

4   be mishandling our Ebury investments and

5   engaging in improprieties."

6           Correct?

7       A.   Yes.

8       Q.   Did Mr. Santori accuse you of

9   engaging in fraud?

10          MS. PARKS:   Objection.

11      A.   In this email?

12      Q.   Did Mr. Santori ever accuse you

13  of engaging in fraud?

14      A.   I don't think -- not that I can

15  recall.  We ended up getting an attorney

16  who was doing our closing for AloStar

17  involved with these guys, and once they

18  became aware of a path to exit and getting

19  everyone taken care of, they relaxed at

20  that time.

21      Q.   What was their path to exit and

22  getting everyone taken care of?

23      A.   Well, the AloStar closing, that

24  transaction was going to first close

25  Emigrant, and then with excess collateral

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. 119   RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1022 of 2230

EMIGRANT BUSINESS CREDIT   John Hanratty
JOHN ARTHUR HANRATTY   June 20, 2023

293

J. Hanratty

1

2  of the portfolio they were going to allow

3  these guys to be retired, the OTA group.

4      Q.   But the AloStar deal didn't

5  close?

6      A.   It did not.

7      Q.   So how did you --

8      A.   They're still invested in the

9  fund.  They haven't gotten any money since

10  those first amounts.

11      Q.   So I'm looking at page 18441.

12  This is the bottom in a section called:

13  Liquidation of Entities.

14          Mr. Santori writes -- on

15  June 28th, 2018, you texted, "I am

16  liquidating and shutting down the whole

17  company."

18          Is that right?

19      A.   Yeah, I guess.  I don't know.

20  Without the text, I presume he's...

21          (Document review.)

22  BY MR. MAYRON:

23      Q.   Did you send that text?

24      A.   I don't recall sending that text.

25      Q.   During the summer of 2018, did

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT                                                   John Hanratty
JOHN ARTHUR HANRATTY                                                       June 20, 2023

294

```
 1                    J. Hanratty

 2   you tell anyone that you were liquidating

 3   and shutting down the whole company?

 4        A.   I don't recall doing that, other

 5   than in this context.

 6        Q.   Do you recall telling investors

 7   in this context that you were liquidating

 8   the whole company?

 9            MS. PARKS:  Objection.

10        A.   We did send a letter out as part

11   of -- and I think it went through Opus --

12   as part of that whole -- the whole AloStar

13   process.

14        Q.   And so during the summer of 2018,

15   you were liquidating and shutting down the

16   whole company?

17            MS. PARKS:  Objection.

18        A.   No.  I think it was anticipated

19   to -- no.  I don't recall the context of

20   this text or sending it, but there was an

21   explanation letter sent to everyone as to

22   what was occurring in the event the AloStar

23   transaction closed, which it did not.

24        Q.   So Mr. Santori writes that on

25   July 31st, 2018, you texted, "I got
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.                                                    INDEX NO. 158207/2022
                                                                  RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

Doc 1-2    Doc #3 State
Court Records    John Hanratty
Pg 1024 of 2230    June 20, 2023

Entered 08/14/24 09:45:23

295

```
 1                 J. Hanratty

 2   approved at Emigrant credit yesterday to

 3   purchase the remaining balance of Fund 2

 4   liens.  Pushing to close it by August 30th

 5   to get Ira very close to liquidated."

 6           MS. PARKS:  Objection.

 7   BY MR. MAYRON:

 8       Q.   Did I read that right?

 9           MS. PARKS:  Objection.

10       A.   Yeah, I think what I'm talking

11   about is merging the two funds.

12       Q.   Why would that get Ira very close

13   to liquidated?

14           MS. PARKS:  Objection.

15       A.   I can't remember.  I don't know.

16       Q.   You were planning on using funds

17   from Emigrant Bank to liquidate Ira's

18   investment in the Ebury funds?

19           MS. PARKS:  Objection.

20       A.   No.  At this time I was we were

21   already rolling with AloStar.

22       Q.   This text says, "I got approved

23   at Emigrant credit yesterday to purchase

24   the remaining balance of Fund 2 liens."

25           Right?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT... Court Records    Pg 1025 of 2230    RECEIVED NYSCEF: 01/12/2024

JOHN ARTHUR HANRATTY                                              John Hanratty
                                                                June 20, 2023

296

```
 1                     J. Hanratty

 2            MS. PARKS:  Objection.

 3       A.    It does read that, yes.  Well, I

 4   don't know if that is ^ ck, but that is

 5   what the email reads.

 6       Q.    Did you send this text?

 7       A.    I don't recall doing it.

 8       Q.    During 2018, did you have

 9   discussions with anyone about getting Ira

10   liquidated?

11       A.    Ira.

12       Q.    During 2018, did you have

13   discussions about getting Ira Leventhal

14   liquidated?

15       A.    Yeah, with Ira.

16       Q.    With Ira?

17       A.    Yeah.

18       Q.    And what is the relationship

19   between Emigrant credit approving you to

20   purchase the remaining balance of Fund 2

21   liens and closing the deal to get Ira

22   liquidated?

23            MS. PARKS:  Objection.

24       A.    I can't recall, other than it

25   was... he was in -- I don't remember.  I
```

297

|   | J. Hanratty |
|---|---|

1          J. Hanratty

2    believe he was invested in both funds.  I

3    can't remember the context of it, other

4    than we had been talking about merging

5    these two partnerships for many, many

6    years.

7          Q.   Isn't the implication of this

8    text that you were going to use funds from

9    Emigrant credit to liquidate Ira's

10   investment?

11             MS. PARKS:  Objection.

12         A.   Well, I don't see how that would

13   work.  I don't know -- I don't know what

14   the implications are.  Fund 2 had already

15   borrowed money against an asset, and

16   Fund 1 -- I don't know the context of what

17   I'm talking about.

18         Q.   I'm going to share with you a

19   document labeled Ebury 4045.

20             MR. MAYRON:  Could the court

21         reporter please mark the document as

22         Hanratty Deposition Exhibit 30.

23             (Hanratty Exhibit 30, Email chain

24         beginning with email dated 1/5/2019

25         from A. Noskow to J. Hanratty and B.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

24-04020-dsj
EMIGRANT BUSINESS CREDIT     Court Records     Pg 1027 of 2230     John Hanratty
JOHN ARTHUR HANRATTY                                              June 20, 2023

298

J. Hanratty

1

2       Ashin, Bates-stamped EBURY_4045 through

3       4049, marked for identification, as of

4       this date.)

5   BY MR. MAYRON:

6       Q.    The top email is from Alan Noskow

7   to you on May 1st, 2019, correct?

8       A.    Yes.

9       Q.    Who is Alan Noskow?

10      A.    He was my lawyer for the AloStar

11  transaction.  And he advised me on the --

12  dealing with the OTA he became the -- he

13  dealt with Theodore Altman at DLA Piper.

14  This would have been privileged.  I don't

15  know who Brian Ashin --

16          (Reporter clarification.)

17      A.    I'm just reading.

18          I don't know who Brian Ashin is.

19  I can't remember.

20      Q.    So can you turn to Ebury 4047.

21  At the very top, it says, "In addition,

22  John received text messages from Ira

23  Leventhal in July and August 2018

24  requesting Ebury incur additional debt to

25  create liquidity and also threatening to

299

J. Hanratty

    2   sue Ebury."

    3           Correct?

    4           MS. PARKS:  Sorry.  Where are you

    5       looking?

    6           MR. MAYRON:  Top of page 4047,

    7       the third full sentence.

    8           MS. PARKS:  Got it.  Thank you.

    9       A.   Yes.  That sounds -- yep, that's

   10   what it reads.

   11       Q.   Did you receive text messages

   12   from Ira Leventhal in July and August 2018

   13   requesting Ebury companies incur additional

   14   debt to create liquidity?

   15       A.   I don't recall specifically, but

   16   I presume I did.

   17       Q.   Do you recall generally receiving

   18   text messages from Ira Leventhal in summer

   19   2018 requesting that the Ebury companies

   20   incur additional debt to create liquidity?

   21       A.   Not specifically related to that.

   22   I recall generally Ira would text.  Some of

   23   them would be normal and interactive and

   24   others a little more hostile.  I don't

   25   recall him saying incur more debt to create

300

```
 1                J. Hanratty

 2   liquidity.

 3        Q.    If he didn't say incur more debt

 4   to create liquidity, what did he say?

 5             MS. PARKS:  Objection.

 6        Foundation.

 7        A.    Oh, I don't recall specifically.

 8   He wanted his investment to be returned.

 9        Q.    He also was threatening to sue

10   Ebury?

11             MS. PARKS:  Objection.

12        A.    That's what Alan wrote, yes.

13        Q.    To your knowledge, was

14   Mr. Leventhal threatening to sue Ebury?

15        A.    Yes, I was generally aware that

16   he had mentioned that he would sue Ebury.

17        Q.    And as we discussed earlier, you

18   did not notify Emigrant of this threatened

19   litigation?

20        A.    Yeah, as discussed earlier, I've

21   seen Mr. Leventhal behave in that fashion

22   several times throughout the years.  And

23   from a materiality perspective, I think he

24   would typically be amenable to a plan.

25        Q.    So turning to page 4046, who do
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
                   EMIGRANT BUSINESS CREDIT    Court Records    Pg 1030 of 2230            John Hanratty
                   JOHN ARTHUR HANRATTY                                                    June 20, 2023

301

                              J. Hanratty

 1    you believe wrote the messages in all caps?

 2           Actually, Mr. Noskow wrote the

 3    responses in caps, correct?

 4           MS. PARKS:  Are you asking about

 5       just page 4046 or that whole --

 6           MR. MAYRON:  4046.

 7       A.   I think he writes there in the

 8    first sentence, all caps.

 9       Q.   Your understanding is that the

10    all caps portion of 4046 was written by

11    Mr. Noskow, your attorney?

12       A.   Yes.

13       Q.   And Mr. Noskow writes, "Ebury

14    believed they had three choices on how to

15    deal with the various redemption requests.

16    First, it could have liquidated the entire

17    asset base for a discount, 70 percent of

18    book value, which the manager chose not to

19    because it would have resulted in

20    substantial loss to LPs.

21           "Second, the manager could have

22    made in-kind distribution to LPs and also

23    introduced them to service providers who

24    might want to buy such assets, which it

302

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | chose not to do, as it would have also |
| 3 | resulted in impairment, among other issues. |
| 4 | "Third, it could take time to |
| 5 | market and sell assets to achieve higher |
| 6 | value than a liquidation, while pursuing |
| 7 | recapitalization and refinancing options? |
| 8 | "The third option is what was |
| 9 | chosen, as it was the best of the three |
| 10 | choices.  While the liquidation has taken |
| 11 | far longer than anticipated, this was the |
| 12 | plan that was communicated to investors and |
| 13 | the plan Ebury has and continues to |
| 14 | pursue." |
| 15 | Did I read that right? |
| 16 | A.    Yes. |
| 17 | Q.    Did you communicate to Emigrant |
| 18 | that the Ebury companies were in |
| 19 | liquidation in May of 2019? |
| 20 | MS. PARKS:  Objection. |
| 21 | A.    Well, we weren't in liquidation. |
| 22 | We were getting smaller in order to retire |
| 23 | Emigrant and move on with the AloStar |
| 24 | refinance. |
| 25 | Q.    So your attorney wrote, "Wow, the |

303

J. Hanratty

1
2   liquidation has taken far longer."
3       Are you saying he's mistaken and
4   that the Ebury companies were not in
5   liquidation?
6       MS. PARKS:  Objection to form.
7       A.   I meant from the perspective of
8   closing.
9       Q.   What do you mean "from the
10  perspective of closing"?
11      A.   That the business wasn't going to
12  be shutting down.  We were pursuing other
13  financings which would allow us to, one,
14  take care of legacy issues of which
15  Emigrant was one, and these guys were
16  another.  And move on from there.
17      Q.   But you didn't tell Mr. Grady or
18  anyone at Emigrant what was going on with
19  the liquidation?
20      MS. PARKS:  Objection to form.
21      A.   I don't think they were -- no,
22  Jack was extremely aware of what was going
23  on with the AloStar component, which was
24  part of what we were doing.
25      Q.   Did you notify Mr. Grady that the

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT       Court Records    Pg 1033 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                June 20, 2023

304

```
 1                  J. Hanratty

 2   Ebury companies were in liquidation?

 3            MS. PARKS:  Objection.

 4       A.   I think -- I mean, Jack

 5   interacted with Alan and we were doing deal

 6   documents.  I mean, we were approved by

 7   credit.  We were moving forward to a close.

 8   And so Emigrant was part of that process.

 9       Q.   Turning back to page 4045 at the

10   very bottom, Mr. Noskow writes, "Please

11   note that, as I mentioned to you on the

12   phone, Ebury does not yet have approval

13   from its lenders to make the Fund 2

14   distributions and redemptions that are

15   contemplated in the chart."

16            Did I read that correct?

17       A.   Yes.

18       Q.   Is it your understanding that the

19   Ebury companies required approval from

20   their lenders to make distributions?

21            MS. PARKS:  Objection.

22       A.   I don't know.  This is his

23   writing.  I don't -- context.  I don't know

24   if he's talking about the potential new

25   invest -- new lenders or Emigrant.  I don't
```

305

                    J. Hanratty

1      know what he's referring to.

2          Q.    What was your understanding of

3      whether the Ebury companies required

4      approval from their lenders to make

5      distributions?

6              MS. PARKS:    Objection.

7          A.    I think what Alan means is

8      approval from -- at the closing where

9      Emigrant would get retired, and do an

10     additional equity takeout.

11         Q.    I'm going to share with you a

12     document titled -- labeled Ebury 22963.

13             MR. MAYRON:    Could the court

14             reporter please mark the document as

15             Hanratty Deposition Exhibit 31.

16             (Hanratty Exhibit 31, Email chain

17             dated 2/11/2022 from J. Santori to J.

18             Hanratty, Bates-stamped EBURY_22963

19             through 22965, marked for

20             identification, as of this date.)

21     BY MR. MAYRON:

22         Q.    Sir, if you can turn to the page

23     labeled Ebury 22964.  This is an email from

24     you to Mr. Santori on September 15th, 2022,

306

J. Hanratty

1    correct?

2           (Document review.)

3       A.   Yes.

4       Q.   And you write, "The liquidation

5    of Ebury is moving forward."

6           Correct?

7       A.   Yes.

8       Q.   What did you mean by "the

9    liquidation of Ebury"?

10      A.   Shutting down.

11      Q.   So when you used liquidation

12   here, you mean something different than you

13   did in the document we were just looking

14   at?

15      A.   Now I mean shutting down, yes.

16      Q.   The next sentence you say, "As

17   you may or may not be aware, we distributed

18   equity while still in debt."

19          Correct?

20      A.   I did write that, yes.

21      Q.   What does that mean?

22      A.   It means that we distributed

23   equity while still owing Emigrant money.

24      Q.   Normally, does equity get paid

24-04020-dsj      Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 1036 of 2230
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

307

```
 1                    J. Hanratty

 2   before debt?

 3           MS. PARKS:  Objection.

 4       A.    Normally, no.  But in my credit

 5   agreement it allowed for distributions.

 6       Q.    What do you mean "it allowed for

 7   distributions"?

 8       A.    We were allowed to do

 9   distributions up to $5 million.

10       Q.    In 2018, you distributed more

11   than $9 million from Fund 1, correct?

12           MS. PARKS:  Objection.

13       A.    That's what's reflected in the

14   audit, yes.

15       Q.    There were also limitations on

16   the Ebury companies' ability to pay

17   distributions, correct?

18           MS. PARKS:  Objection to form.

19       A.    Yes.

20       Q.    So turning back to Hanratty

21   Deposition Exhibit 3, which is the credit

22   agreement, EBCC 9578, if you go to page

23   9606, as I think we discussed, the Ebury

24   companies were allowed to make a

25   distribution if an event of a default had
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1037 of 2230
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

308

```
 1                    J. Hanratty

 2     occurred, correct?

 3              MS. PARKS:  Objection.  Did you

 4          want him to look at a particular part

 5          of this page?

 6              MR. MAYRON:  Yes.  Section 8.8.

 7          A.   Yes.

 8          Q.   And the Ebury companies were not

 9     allowed to make a distribution if an event

10     has occurred that, with notice, the lapse

11     of time or otherwise could constitute an

12     event of default?

13              MS. PARKS:  Objection.

14          A.   Yes, that's what this reads.

15          Q.   And the Ebury companies were not

16     to make a distribution if the distribution

17     made or to be made will cause the borrower

18     to violate or fail to comply fully with any

19     of the terms and conditions of or to

20     default under this agreement or any other

21     transaction document, correct?

22              MS. PARKS:  Objection.

23          A.   Yes, that's the way that reads.

24          Q.   The Ebury companies defaulted

25     under this credit agreement, correct?
```

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records     Pg 1038 of 2230     John Hanratty
JOHN ARTHUR HANRATTY                                               June 20, 2023

309

```
 1                    J. Hanratty

 2            MS. PARKS:   Objection.

 3       A.    Again, that is a judgment that is

 4   not mine.

 5       Q.    The Ebury companies failed to

 6   repay the note at maturity, correct?

 7       A.    At maturity, yes, we are in

 8   default and we owe the amount that is

 9   stated.

10       Q.    So that is a default, correct?

11            MS. PARKS:   Objection.

12       A.    Yes.   It's a default now, but the

13   distributions were done before.

14       Q.    But subparagraph C says, "The

15   Ebury company shall not make any

16   distribution if the distribution made or to

17   be made will cause the borrower to violate

18   or fail to comply fully with any of the

19   terms and conditions of or to default under

20   this agreement."

21            Correct?

22       A.    That's the way it reads, yes.

23       Q.    So the Ebury companies, as I

24   think you acknowledged, distributed equity

25   while still in debt?
```

```
 1                    J. Hanratty

 2          MS. PARKS:  Objection to form.

 3   BY MR. MAYRON:

 4      Q.    Correct?

 5      A.    It did, yes.

 6      Q.    And then the Ebury companies

 7   failed to repay their debt at maturity?

 8          MS. PARKS:  Objection.

 9      A.    The Ebury companies have a

10   matured and defaulted loan, yes.

11      Q.    So under the terms of the credit

12   agreement, the distribution was

13   impermissible?

14          MS. PARKS:  Objection.

15      A.    At the time, we were not -- there

16   was no event of default that I was aware

17   of.  And Emigrant also received a copy of

18   my audit which shows the 9 million we were

19   talking about.  And my understanding is

20   that we owe them money.

21      Q.    The Ebury companies paid out

22   equity while still in debt and then failed

23   to comply with the terms of the credit

24   agreement to repay Emigrant at maturity,

25   correct?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1-2
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

311

```
 1              J. Hanratty

 2         MS. PARKS:  Objection.

 3         You can answer.

 4    A.    We owe the balance of the debt

 5    that's outstanding.

 6    Q.    So under the terms of the credit

 7    agreement, the Ebury companies were not

 8    allowed to make those distributions while

 9    still in debt because the borrowers later

10    failed to comply fully with the terms of

11    the credit agreement, correct?

12         MS. PARKS:  Objection.

13    Foundation.  Form.

14    A.    Sorry, I'm just confused.  Can

15    you say that one more time?

16    Q.    Sure.

17         Under the terms of the credit

18    agreement, the Ebury companies were not

19    allowed to make those distributions while

20    still in debt because the borrowers later

21    failed to comply fully with the terms of

22    the credit agreement?

23         MS. PARKS:  Objection.  Same

24    objections.

25    A.    I just know we have a matured
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 161
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

312

J. Hanratty

1

2   loan that we owe money on.  At the time, we

3   weren't in default, and Emigrant received a

4   copy of the audit which shows the

5   distributions.

6        Q.   I think as you said earlier, the

7   Ebury companies distributed over $20

8   million in equity while still in debt to

9   Emigrant?

10            MS. PARKS:  Objection.

11       A.   Yes, I said that earlier, yes.

12       Q.   And the Ebury companies failed to

13   repay Emigrant approximately 18 million at

14   maturity, correct?

15            MS. PARKS:  Objection.

16       A.   Yes.

17       Q.   And the Ebury companies' failure

18   to repay Emigrant at maturity was a default

19   under the credit agreements?

20            MS. PARKS:  Objection.

21       A.   I don't know about that.

22       Q.   The -- Emigrant mailed the Ebury

23   companies notices of default for their

24   failure to repay the notes at maturity,

25   correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                              RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1042 of 2230                John Hanratty
JOHN ARTHUR HANRATTY                                                     June 20, 2023

313

```
 1                    J. Hanratty

 2        A.    At maturity, yes.

 3        Q.    And had the Ebury companies not

 4   made distributions to their investors while

 5   in debt, they could have used those funds

 6   to repay Emigrant?

 7             MS. PARKS:   Objection.

 8        A.    We could have used those funds to

 9   operate the business and purchase more

10   liens as well.

11        Q.    But just to be clear, the Ebury

12   companies could have taken the 20-plus

13   million that they distributed to equity

14   while still in debt, put it in a bank

15   account, and then use that money to repay

16   Emigrant at maturity?

17             MS. PARKS:   Objection.

18        A.    You know, those distributions

19   were done when we were not in default, and

20   we understand that we owe them money.

21        Q.    But to be clear, Ebury paid out

22   approximately $20 million in distributions

23   to equity while in debt.  The Ebury

24   companies could have put that $20 million

25   in a bank account and then used that money
```

314

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | to repay Emigrant at maturity, correct? |
| 3 | MS. PARKS:  Objection. |
| 4 | A.   Again, we made those |
| 5 | distributions at a time when we were not in |
| 6 | default, and we understand that we owe them |
| 7 | money. |
| 8 | Q.   But that's not my question.  My |
| 9 | question is, could the Ebury companies |
| 10 | instead of paying $20 million in |
| 11 | distributions to equity while in debt, have |
| 12 | put the $20 million in a bank account and |
| 13 | used that money to repay Emigrant at |
| 14 | maturity? |
| 15 | MS. PARKS:  Objection.  Form. |
| 16 | Foundation.  Speculation.  Asked and |
| 17 | answered or just asked at least. |
| 18 | A.   Hypothetically, yes. |
| 19 | Q.   Is there anything that would have |
| 20 | stopped the Ebury companies from putting |
| 21 | the $20 million that they paid out to |
| 22 | equity while in debt in a bank account and |
| 23 | using that money to repay Emigrant at |
| 24 | maturity? |
| 25 | MS. PARKS:  Same objections.  You |

315

```
 1                    J. Hanratty

 2        can answer.

 3        A.   Hypothetically, no.  I cannot

 4   think of anything that would prevent the

 5   Ebury companies from doing that.

 6             MS. PARKS:  Is now a good time to

 7        for a break?

 8             MR. MAYRON:  We can take a break.

 9             THE VIDEOGRAPHER:  The time right

10        now is 6:27 p.m.  We are off the

11        record.

12             (Recess is taken.)

13             THE VIDEOGRAPHER:  The time right

14        now is 6:38 p.m.

15   BY MR. MAYRON:

16        Q.   So just quickly if we can go back

17   to Hanratty Deposition Exhibit 26, which

18   was 8421 on the computer.

19        A.   Ah.

20             (Document review.)

21             MS. PARKS:  That first one.

22        Okay.

23   BY MR. MAYRON:

24        Q.   I think you agreed that this lien

25   tape is incorrect?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 648 RECEIVED NYSCEF: 01/12/2024

316

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | MS. PARKS:  Objection to form. |
| 3 | A.    August 31st, yes. |
| 4 | Q.    This is the one that shows 6,782 |
| 5 | liens with redemptive value of about $28 |
| 6 | million in August -- |
| 7 | A.    Yeah. |
| 8 | Q.    -- 2021? |
| 9 | A.    Yes. |
| 10 | Q.    Why does it have the MTAG logo on |
| 11 | it? |
| 12 | A.    At the top? |
| 13 | Q.    Yes. |
| 14 | A.    I don't know.  So -- I don't |
| 15 | know.  I think that my ^ word guy Clark -- |
| 16 | and so I -- I don't -- I don't know |
| 17 | specifically without speaking to Clark |
| 18 | about what went into this. |
| 19 | Q.    Do you agree that it's misleading |
| 20 | for the MTAG logo to be on here given that |
| 21 | the information is not all from MTAG? |
| 22 | MS. PARKS:  Objection. |
| 23 | A.    Yes, with the caveat that a vast |
| 24 | portion of this -- these liens are supposed |
| 25 | to be in MTAG, but yeah that's not -- it's |

317

```
1                    J. Hanratty

2     not -- yes, I agree.

3          Q.   I'm going to share an email with

4     you.  There's no Bates number and it has a

5     highlight that I left on it, but it

6     shouldn't interfere with your reading.

7               This is a June 14th, 2023, email

8     from -- before I do this document, was the

9     placement of the MTAG header on the

10    spreadsheet labeled EBCC 8421 intentional?

11              MS. PARKS:  Objection.  Form.

12         A.   I don't -- I -- to me, I don't

13    know.  From the perspective of I asked

14    Clark to grab most likely the liens that

15    are in MTAG and that are going there, and

16    it shouldn't have been in this format.

17         Q.   So is it your testimony you had

18    nothing to do with the MTAG heading?

19              MS. PARKS:  Objection.  Heading,

20         is that what you said?

21              MR. MAYRON:  Yep.

22              MS. PARKS:  Thanks.  Objection to

23         form.

24         A.   Not that I can recall, other than

25    I might have instructed Clark to make it to
```

318

J. Hanratty

1

2     the MTAG format for the MTAG format for

3     simplicity's sake.

4         Q.    So just taking it one at a time,

5     you said, "from the perspective of I asked

6     Clark to grab most likely the liens that

7     are in MTAG and that are going there."

8             Do you recall asking Clark to

9     grab the liens that are both in MTAG and

10     that are going there?

11             MS. PARKS:    Objection to form.

12         A.    Not specifically, no.

13         Q.    And if you had asked Clark to

14     grab the liens that are in MTAG and the

15     liens that are going there, and he returned

16     this lien tape, would you have been

17     concerned because it looks like it came

18     from MTAG exclusively?

19             MS. PARKS:    Objection.

20         A.    The -- I should have qualified it

21     in the email.    That was my mistake.

22         Q.    But just to clarify, my question

23     was:    If you had asked Clark to grab the

24     liens that are in MTAG as well as the liens

25     that are going there, and he returned this

319

```
 1                    J. Hanratty

 2    lien tape, would you have been concerned

 3    because it looks like it came from MTAG

 4    exclusively?

 5              MS. PARKS:  Objection.

 6        A.   I should have qualified it that

 7    there's -- the portion of these liens, one,

 8    I should have done a much more deeper dive

 9    of review of the data.  A portion of these

10    liens were not uploaded, and I made that

11    clear to Jack.

12        Q.   Do you recall whether you

13    instructed Clark to make it look like the

14    MTAG format?

15              MS. PARKS:  Objection.

16        A.   I don't recall, but clearly we

17    did.

18        Q.   When you say "clearly we did,"

19    were you involved in formatting this

20    document?

21              MS. PARKS:  Objection.

22        A.   Not that I can recall.

23        Q.   And earlier you said you should

24    have qualified your email to Mr. Grady.

25              Is that because the document, as
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT      Court Records    Pg 1049 of 2230     RECEIVED NYSCEF: 01/12/2024
JOHN ARTHUR HANRATTY                                              John Hanratty
                                                                 June 20, 2023

320

J. Hanratty

it stands, is misleading?

        MS. PARKS:  Objection.

    A.    It's because clearly the work

wasn't finished by my group.

    Q.    Do you agree that the document

would give someone the impression that the

lien tape came from MTAG?

        MS. PARKS:  Objection.

    A.    Yes, I can see that that would be

the impression.

    Q.    So you were trying to attempt to

make Mr. Grady assume that all of the

collateral was in MTAG's custody, correct?

        MS. PARKS:  Objection.

    A.    No.  I was trying to get an idea

of the liens that were heading to MTAG and

what was going on at a time when I'm not

directly involved in that process.  And,

clearly, we were having issues getting that

stuff over there.

    Q.    Have you sold REOs that were

Emigrant's collateral and used the proceeds

for personal expenses?

        MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1050 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

321

1          J. Hanratty

2          Are you still asking about this

3     document?

4          MR. MAYRON:  No.

5     A.   Not that I'm aware of.

6          Q.   Earlier you said you were trying

7     to get an idea of the liens that were

8     heading to MTAG and what was going on at

9     the time when I'm not directly involved in

10    that process.

11         Who was directly involved in the

12    process?

13         MS. PARKS:  Objection.

14    A.   That would be Dennisse and Pat at

15    that time.

16    Q.   And what were you doing that was

17    more important than ensuring that this was

18    correct?

19         MS. PARKS:  Objection.

20    A.   I was -- just based off of the

21    texts and all the things going back and

22    forth, to Jack I was working on other

23    finances to get Emigrant taken out with a

24    company called Old Hill and a couple of

25    other folks.

322

J. Hanratty

1

2     Q.   Okay.  Now I'm going to share

3  with you this document.  It's an email from

4  Scott Williams to me, June 14th, 2023.

5          MR. MAYRON:  It's not labeled

6       with a Bates stamp, but could the court

7       reporter please mark it as Hanratty

8       Deposition Exhibit 32 and there is some

9       highlighting on it, which I'll

10      represent to you was my highlighting

11      and it's not the original highlighting.

12          MS. PARKS:  Austin, is this a

13      document that was produced?

14          MR. MAYRON:  No.

15          (Hanratty Exhibit 32, Email dated

16      6/14/2023 from S. Williams to A.

17      Mayron, not Bates-stamped, marked for

18      identification, as of this date.)

19  BY MR. MAYRON:

20     Q.   Are you familiar with the

21  settlement proposal discussed in this

22  email?

23     A.   Yes.

24     Q.   Mr. Williams wrote, "The

25  settlement would be in the form of initial

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 74 RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT                                     John Hanratty
JOHN ARTHUR HANRATTY                                         June 20, 2023

323

```
 1              J. Hanratty

 2    4 million dollar payment to be followed

 3    with quarterly $2.75 million payments."

 4         Correct?

 5    A.   Yes.

 6    Q.   What was the intended source of

 7    the initial $4 million payment?

 8         MS. PARKS:   Objection.

 9    A.   The intended sort, like where is

10    the 4 million coming from?

11    Q.   Yes.

12    A.   We had made a DIP loan in

13    2018-'19, in a bankrupt oil producer called

14    Triumph Energy which has gone -- emerged

15    from bankruptcy and I sold -- the fund sold

16    its shares, and I haven't received the

17    funds yet.  They are sitting with the

18    company and can be distributed.

19    Q.   And I assume it's Red Clover that

20    made the loan?

21    A.   Yes.

22    Q.   And Red Clover is a guarantor for

23    the Emigrant facilities?

24    A.   Yes.

25    Q.   And Red Clover's assets are
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 60    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1053 of 2230

EMIGRANT BUSINESS CREDIT                                John Hanratty
JOHN ARTHUR HANRATTY                                    June 20, 2023

324

J. Hanratty

```
 1                     J. Hanratty

 2   collateral for the credit facilities?

 3       A.   Yes.

 4       Q.   What is the total amount of the

 5   proceeds from the shares in Triumph Energy?

 6            MS. PARKS:  Objection.

 7       A.   Roughly three million, just a

 8   little bit under, and then the rest is

 9   going to be additional cash, and I'm

10   probably going to borrow some funds to make

11   the rest work.

12       Q.   It's important for a borrower to

13   provide accurate information to their bank,

14   correct?

15       A.   Yes.

16       Q.   You've admitted to providing

17   Emigrant with false information, correct?

18            MS. PARKS:  Objection.

19       A.   No.

20       Q.   Could I direct your attention to

21   Hanratty Deposition Exhibit 1, which is the

22   affidavit you submitted in this litigation.

23            MS. PARKS:  You can just look at

24       this one.

25            THE WITNESS:  Thanks.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1052
EMIGRANT BUSINESS CREDIT Courts Records    Pg 1054 of 2230
JOHN ARTHUR HANRATTY
Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
John Hanratty
June 20, 2023

325

J. Hanratty

      MS. PARKS:  Sure.

      (Document review.)

BY MR. MAYRON:

    Q.   This is an affidavit you submitted in this litigation, correct?

    A.   Yes.

    Q.   Paragraph 3 you write, "While it is entirely possible, indeed likely, that there have occasionally been inaccuracies in documents that I, the Ebury entities, and EBCC all relied upon."

      Correct?

    A.   Yes.  That's how it reads.

    Q.   So based on this statement, you have admitted to providing Emigrant Bank with false information, correct?

      MS. PARKS:  Objection.  Misstates the document.

    A.   No.

    Q.   What was the basis for you saying that it is entirely possible, indeed likely, that there have been occasionally inaccuracies in documents that the EBCC relied upon?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO.

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

Court Records    Pg 1055 of 2230

John Hanratty
June 20, 2023

326

| 1  | J. Hanratty |
|----|-------------|

2        A.    The basis is issues with

3    borrowing bases, issues with financials,

4    issues with day-to-day reporting, which for

5    my group of people is just something that

6    over the last several years we have not

7    been able to execute properly on.

8        Q.    What do you mean by "issues with

9    borrowing bases"?

10       A.    Just data.

11       Q.    So you're aware that the Ebury

12   companies have had issues with the accuracy

13   of the data and borrowing bases?

14       A.    I am aware of that we've had

15   issues with accuracy of data on many

16   things, yes.

17       Q.    Well, let's go one by one.  You

18   are aware that the Ebury companies had

19   issues with the accuracy of data and

20   borrowing bases?

21            MS. PARKS:  Objection.

22            You can answer.

23            THE WITNESS:  Sure.

24       A.    Yes, I think throughout the

25   process of borrowing bases, we had them

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT v. Court Records    Pg 1056 of 2230
JOHN ARTHUR HANRATTY
                                                                                John Hanratty
                                                                                June 20, 2023

327

J. Hanratty

1    returned to us to fix them, and when I have

2    reviewed them I find things that have to be

3    fixed.  And so, yes.

4         Q.   The next thing you said, you're

5    aware that the Ebury companies had issues

6    with the accuracy of the data in their

7    financials?

8              MS. PARKS:  Objection.  Go ahead.

9              THE WITNESS:  Sure.

10        A.   Yes, and it's just based off of

11   interactions with the accounting group and

12   people like that.

13        Q.   Next, you're aware that the Ebury

14   companies have had issues with the accuracy

15   of the data in their day-to-day reporting?

16             MS. PARKS:  Objection.

17        A.   Yes, I am aware that we have had

18   those issues.

19        Q.   And you're aware that your group

20   of people is just something that over the

21   last several years you have not been able

22   to execute properly in providing accurate

23   information?

24             MS. PARKS:  Objection.

328

J. Hanratty

1

2    A.    Yes, and I think this is

3    something that I communicated to Emigrant.

4    I think Karen and Jack nicely introduced me

5    to a couple of consultants to help us a

6    couple years back and, yeah.  So, yes, I am

7    aware.

8    Q.    When you submitted documents to

9    Emigrant Bank that you knew Emigrant was

10   going to rely on, did you take extra care,

11   given that you had these problems with

12   reporting accurate information?

13        MS. PARKS:   Objection.

14   A.    I did the best that we could

15   under the circumstances of what we had

16   going.

17   Q.    And what do you mean you did the

18   best you could?

19   A.    I provided the level of care that

20   we had the capacity to do.

21   Q.    And I think as we discussed

22   earlier, that means that sometimes you

23   wouldn't even look at the borrowing base

24   before the Ebury company sent it to

25   Emigrant?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT/Court Records    Pg 1058 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                          June 20, 2023

329

```
 1                    J. Hanratty

 2          MS. PARKS:  Objection.

 3      A.   Yes, sometimes I would not even

 4  look at the borrowing base, yes.

 5      Q.   Even though you were aware that

 6  the Ebury companies were having issues with

 7  the accuracy of borrowing bases?

 8      A.   I think -- I don't remember the

 9  context of what we talked about, but from,

10  you know, '15, '16, '17, '18, I would say

11  our operational issues started for us right

12  around probably '18, is when we started

13  having our main issues.

14      Q.   What do you mean by "we started

15  having our main issues"?

16      A.   Just issues of this type.  I

17  would say inconsistencies with executing on

18  data components, lags of timely reporting,

19  lags of reporting that was inaccurate and

20  had mistakes.

21      Q.   So you knew as of 2018 that Ebury

22  had operational issues?

23          MS. PARKS:  Objection.

24      A.   Go back to 2018?  I would say

25  that every -- let's -- we were attempting
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1059 of 2230
RECEIVED NYSCEF: 01/12/2024
John Hanratty
June 20, 2023
JOHN ARTHUR HANRATTY

330

1               J. Hanratty

2    very hard to get those, to get the results

3    of the work fixed.

4         Q.   And so despite that, you didn't

5    take additional steps in the following

6    years to ensure that the documents you

7    submitted to Emigrant Bank were correct?

8               MS. PARKS:  Objection.

9         A.   Well, we took the steps of hiring

10   multiple accounting back office groups.

11   When those people didn't work out, we fired

12   them; hired new people.  I've said the

13   people we have in the seats now are

14   probably the most competent we've had in a

15   while.

16              As far as the steps that go, you

17   know, that is -- those are the steps we

18   generally took, try to find better quality

19   people.

20        Q.   And so you didn't take additional

21   steps to ensure that the information you

22   submitted to Emigrant was correct, even

23   though you knew that the information was

24   being given to a bank that was making

25   decisions about your loan?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT Court Records    Pg 1060 of 2230    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
JOHN ARTHUR HANRATTY

John Hanratty
June 20, 2023

331

1          J. Hanratty

2          MS. PARKS:  Objection.

3      A.    I think day-to-day we took -- we

4  took many steps.  I would say historically,

5  it's a business that we just had a lot of

6  things going on with personnel and it just

7  impacted the way we performed.

8      Q.    Now, I'm going to share a

9  document with you.  This is docket number

10  27 from this litigation.  It is the brief

11  that defendants filed in opposition to

12  plaintiffs Order to Show Cause.

13          MR. MAYRON:  Could the court

14      reporter please mark this document as

15      Hanratty Deposition Exhibit 33.

16          (Hanratty Exhibit 33, the Ebury

17      Parties' Opposition to Order to Show

18      Cause, marked for identification, as of

19      this date.)

20  BY MR. MAYRON:

21      Q.    This is a brief that was filed on

22  your behalf in this litigation, correct?

23          MS. PARKS:  Objection to form.

24      You can answer.

25      A.    Yes.

332

1                  J. Hanratty

2        Q.   Could you turn to page 23 of 34,

3    which is also page 18.

4              Your counsel wrote, "The Ebury

5    parties' occasional financial

6    misstatements, investor redemptions, and

7    supposed disclosure failures do not clearly

8    breach the credit agreements."

9              What are the Ebury parties'

10   occasional financial misstatements?

11             MS. PARKS:  Are you asking him to

12        go back to the statement of facts or is

13        this more of a jumping off for general

14        discussion?

15             MR. MAYRON:  I don't know what

16        the...

17             MS. PARKS:  As the person who

18        wrote the brief.  Curious.

19        A.   Can you ask that again?

20        Q.   Yeah.

21             Your counsel filed a brief that

22   said the Ebury parties occasionally made

23   financial misstatements.

24             What were those misstatements?

25             MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
                   EMIGRANT BUSINESS CREDIT    Court Records    Pg 1062 of 2230    John Hanratty
                   JOHN ARTHUR HANRATTY    June 20, 2023

333

                        J. Hanratty

 1

 2      Mischaracterizes my brief.

 3      A.    Well, off the top of my head, a

 4   legacy issue that's been forever, it's just

 5   the interactions between Fund 1 and Fund 2,

 6   booking things properly, appropriately.

 7   And that's, you know, impacted, you know,

 8   through the servicing chain up through the

 9   financial chain.

10           That's part of the reason we

11   talked so much, seen emails about merging

12   these two.  That simplified -- simplify the

13   reporting and simplify the workload.  And

14   that's one thing.

15           And then what we just discussed

16   related to the data components, underlying

17   reporting, reporting to the bank.

18      Q.    And by reporting to the bank, you

19   mean reporting to Emigrant?

20      A.    Yes.

21      Q.    And when you say "related to the

22   data components," you're saying that the

23   Ebury parties occasionally made financial

24   misstatements to Emigrant Bank?

25           MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 123 RECEIVED NYSCEF: 01/12/2024

334

```
 1                    J. Hanratty

 2        A.   I don't call them mistakes.

 3   Misstatements.

 4        Q.   I think that's it for today.  We

 5   can -- we're going to ask you more

 6   questions tomorrow.

 7        A.   Sure.

 8             MS. PARKS:  Okay.

 9   EXAMINATION BY

10   MS. PARKS:

11        Q.   Mr. Hanratty, are you ready?

12             Did you ever intentionally lie to

13   anybody at Emigrant Bank?

14        A.   No.

15        Q.   Did you ever instruct any of your

16   employees to lie to anybody at Emigrant

17   Bank?

18        A.   No.

19             MS. PARKS:  That's all I got for

20        today.  Thank you.

21             MR. MAYRON:  Okay.  That's it.

22        Thank you.

23             (Continued on following page to

24        include jurat.)

25
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM  INDEX NO. 158207/2022
NYSCEF DOC. NO.   RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT   Court Records   Pg 1064 of 2230   John Hanratty
JOHN ARTHUR HANRATTY   June 20, 2023

335

```
 1              J. Hanratty

 2          MS. PARKS:  Do you want your last

 3      four minutes tomorrow or no?

 4          THE VIDEOGRAPHER:  The time now

 5      is 7:04 p.m.  We are off the record.

 6          (Time noted:  7:03 p.m.)

 7

 8

 9              _____.

10              JOHN HANRATTY

11

12

13  Subscribed and sworn to before me

14  this    day of          2023.

15

16  _____

17

18

19

20

21

22

23

24

25
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1065 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 20, 2023

336

```
 1

 2                    C E R T I F I C A T E

 3

 4    STATE OF NEW YORK          )

 5                            : ss.

 6    COUNTY OF NEW YORK          )

 7

 8         I, ANNETTE ARLEQUIN, a Notary

 9    Public within and for the State of New

10    York, do hereby certify:

11         That JOHN HANRATTY, whose

12    deposition is hereinbefore set forth,

13    was duly sworn by me, and that the

14    transcript of such depositions is a

15    true record of the testimony given by

16    such witness.

17         I further certify that I am not

18    related to any of the parties to this

19    action by blood or marriage; and that I

20    am in no way interested in the outcome

21    of this matter.

22         IN WITNESS WHEREOF, I have hereunto

23    set my hand this 22nd day of June 2023.

24    _____

25       ANNETTE ARLEQUIN, CCR #30XI00145000
```

337

```
1

2                    I N D E X

3

4       WITNESS                         PAGE

5

6       JOHN HANRATTY

7         BY MR. MAYRON                    5

8

9         I N D E X   O F   E X H I B I T S

10       DESCRIPTION                     PAGE

11
        Hanratty Exhibit 1, Affidavit of      22
12      John Hanratty

13
        Hanratty Exhibit 2,                   25
14      Organizational chart for the
        Ebury companies, Bates-stamped
15      EBCC_16681 through 6685

16
        Hanratty Exhibit 3, Credit            46
17      agreement between Ebury 1EMI LLC
        and Emigrant Business Credit
18      Corporation, Bates-stamped
        EBCC_9578 through 9629,
19

20      Hanratty Exhibit 4, Summary page      69
        of a borrowing base from 2018,
21      Bates-stamped EBCC_4964

22
        Hanratty Exhibit 5, Summary page      74
23      of a borrowing base dated
        May 17th, 2019, Bates-stamped
24      EBCC_5219

25
```

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1067 of 2230

EMIGRANT BUSINESS CREDIT                                  John Hanratty
JOHN ARTHUR HANRATTY                                      June 20, 2023

338

1

2        I N D E X   O F   E X H I B I T S(Cont'd.)

3    DESCRIPTION                              PAGE

4    Hanratty Exhibit 6, Summary of          76
     borrowing base, dated
5    September 13th, 2019, EBCC_5615

6

7    Hanratty Exhibit 7, Email chain         90
     beginning with email dated
     3/18/2021 from J. Grady to J.
8    Hanratty and others,
     Bates-stamped EBURY_12283 through
9    12285

10

11   Hanratty Exhibit 8, Ebury Fund 1        137
     LTD. Financial Statements and
     Independent Auditors' Report year
12   ended December 31, 2018 prepared
     by Richey May & Co.,
13   Bates-stamped EBCC_10586 through
     6690

14

15   Hanratty Exhibit 9, Document            144
     titled "Waiver and Eighth
16   Amendment to Loan Documents,
     Ebury 1, March 18, 2021,"
17   Bates-stamped EBCC_9563 through
     9568

18

19   Hanratty Exhibit 10, Document           149
     titled "Ninth Amendment to Loan
20   Documents Ebury 1," dated
     5/18/201

21

22   Hanratty Exhibit 11, Document           157
     titled "Tenth Amendment to Loan
23   Documents Ebury 1," dated
     8/12/2021, Bates-stamped
24   EBCC_9523 through 9528

25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO. 9                                          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Courts Records    Pg 1068 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                        June 20, 2023

339

 2        I N D E X   O F   E X H I B I T S(Cont'd.)

 3     DESCRIPTION                              PAGE

 4     Hanratty Exhibit 12, Email dated         163
       1/13/2021 from J. Hanratty to J.
 5     Grady, Bates-stamped EBCC_6689
       through 6690
 6

 7     Hanratty Exhibit 13, Summary of          174
       conversations via Instant
 8     Messaging, Bates-stamped
       EBCC_8797 through 8834
 9

10     Hanratty Exhibit 14, Summary of          186
       conversations via Instant
11     Messaging, Bates-stamped
       EBCC_8844 through 8878
12

13     Hanratty Exhibit 15, Ebury 1 EMI         191
       LLC Custodial Agreement with MTAG
14     Services, Bates-stamped
       EBCC_10068 through 10078,
15

16     Hanratty Exhibit 16, Servicing           193
       Agreement between the Ebury Fund
17     1 LP and Ebury Fund 2 LP and
       their affiliates and MTAG
18     Services, dated 8/1/2017

19

20     Hanratty Exhibit 17, Sound Shore         195
       Financial Memorandum dated
21     3/10/2021 to EBCC, Bates-stamped
       EBCC_16726 through 16739

22

23     Hanratty Exhibit 18, Summary of          204
       conversations via Instant
24     Messaging, Bates-stamped
       EBCC_8667 through 8711

25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM      INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2      Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State   RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT                        Court Records      Pg 1069 of 2230                John Hanratty
JOHN ARTHUR HANRATTY                                                                              June 20, 2023

340

1

2        I N D E X   O F   E X H I B I T S(Cont'd.)

3     DESCRIPTION                              PAGE

4     Hanratty Exhibit 19, Summary of          227
      conversations via Instant
5     Messaging, Bates-stamped
      EBCC_8712 through 8796
6

7     Hanratty Exhibit 20, Email chain         241
      beginning with email dated
8     4/08/2021 from J. Grady to J.
      Hanratty and others,
9     Bates-stamped EBCC_7620

10

      Hanratty Exhibit 21, Email chain         242
11    beginning with email dated
      4/13/2021 from J. Grady to J.
12    Hanratty and others,
      Bates-stamped EBCC_17846
13

14    Hanratty Exhibit 22, Email chain         244
      beginning with email dated
15    4/22/2021 from J. Grady to J.
      Hanratty and others,
16    Bates-stamped EBCC_7648

17

      Hanratty Exhibit 23, Email chain         247
18    beginning with email dated
      4/24/2021 from J. Grady to J.
19    Hanratty and others,
      Bates-stamped EBCC_17855
20

21    Plaintiff's Exhibit 24, Summary          255
      of conversations via Instant
22    Messaging, Bates-stamped EBCC_
      8905 through 8924
23

24    Hanratty Exhibit 25, Email dated         259
      9/22/2021 from J. Hanratty to J.
25    Grady, Bates-stamped EBCC_8420

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT... Court Records    Pg 1070 of 2230    RECEIVED NYSCEF: 01/12/2024

JOHN ARTHUR HANRATTY    John Hanratty
June 20, 2023

341

1

2      I N D E X   O F   E X H I B I T S(Cont'd.)

3    DESCRIPTION                          PAGE

4

5    Hanratty Exhibit 26, Electronic       264
     Excel Spreadsheet, attachment to
     Hanratty Deposition Exhibit 25

6

7    Hanratty Exhibit 27, Electronic       272
     Excel Spreadsheet, dated
8    8/31/2021, MTAG Lien Detail
     Report

9

10   Hanratty Exhibit 28, Electronic       277
     Lien Tape Sent

11

12   Hanratty Exhibit 29, Email dated      291
     9/14/2018 from J. Santori to J.
13   Hanratty and others,
     Bates-stamped EBURY_18439 through
14   18442

15

16   Hanratty Exhibit 30, Email chain      297
     beginning with email dated
     1/5/2019 from A. Noskow to J.
17   Hanratty and B. Ashin,
     Bates-stamped EBURY_4045 through
18   4049

19

20   Hanratty Exhibit 31, Email chain      305
     dated 2/11/2022 from J. Santori
     to J.  Hanratty, Bates-stamped
21   EBURY_22963 through 22965

22

23   Hanratty Exhibit 32, Email dated      322
     6/14/2023 from S. Williams to A.
     Mayron, not Bates-stamped

24

25

342

1

2    I N D E X   O F   E X H I B I T S(Cont'd.)

3    DESCRIPTION                        PAGE

4    Hanratty Exhibit 33, the Ebury        331
     Parties' Opposition to Order to
5    Show Cause

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

343

```
 1

 2                 * * ERRATA SHEET * *

 3   OUR ASSIGNMENT No. 2023-899116

 4   CASE CAPTION: EBCC v. JOHN HANRATTY, ET AL.

 5    * DECLARATION UNDER PENALTY OF PERJURY *

 6        I declare under penalty of perjury

 7   that I have read the entire transcript of

 8   my deposition taken in the above-captioned

 9   matter or the same has been read

10   to me, and the same is true and accurate,

11   save and except for changes and/or

12   corrections, if any, as indicated by me on

13   the ERRATA SHEET hereof, with the

14   understanding that I offer these

15   changes as if still under oath.

16           Signed on the _____ day of

17   _____ 2023

18   _____
                 JOHN HANRATTY
19

20           Subscribed and sworn to on the

21   _____ day of _____ 2023 before me.

22

23   _____

24   Notary Public, in and for the State of

25   _____.
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT's    Court Records    Pg 1073 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                              June 20, 2023

344

```
 1

 2        * * DEPOSITION ERRATA PAGE * *

 3

 4    Page No._____ Line No. _____ Change

 5    to:_____

 6    _____Reason for

 7    change:_____

 8

 9    Page No._____ Line No. _____ Change

10    to:_____

11    _____Reason for

12    change:_____

13

14    Page No._____ Line No. _____ Change

15    to:_____

16    _____Reason for

17    change:_____

18

19    Page No._____ Line No. _____ Change

20    to:_____

21    _____Reason for

22    change:_____

23

24

25
```

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1074 of 2230             John Hanratty
JOHN ARTHUR HANRATTY                                                  June 20, 2023

345

```
1

2          * * DEPOSITION ERRATA PAGE(Cont'd.) * *

3     Page No._____ Line No. _____ Change

4     to:_____

5     _____Reason for

6     change: _____

7

8     Page No._____ Line No. _____ Change

9     to:_____

10    _____Reason for

11    change:_____

12

13    Page No._____ Line No. _____ Change

14    to:_____

15    _____Reason for

16    change:_____

17

18    Page No._____ Line No. _____ Change

19    to:_____

20    _____Reason for

21    change:_____

22

23    SIGNATURE:_____DATE:_____

24              JOHN HANRATTY

25
```

## #

**#30XI00145000** 336:25

## $

**$1** 167:9

**$1,354,929.98** 273:16 274:5

**$12** 165:13 167:8 169:4

**$13** 167:12

**$14** 270:25 271:10

**$15** 182:6,12

**$18** 283:5

**$19,099,976.59** 279:7

**$19.1** 278:19

**$2** 129:8

**$2.75** 323:3

**$20** 312:7 313:22,24 314:10,12,21

**$209,330.79** 284:22 285:9

**$25** 134:2

**$258,183.12** 285:14,16

**$26** 274:15 276:13

**$27** 276:23,25

**$27,835,122.57** 268:20 269:20 270:14 274:13 279:4

**$28** 271:20 280:15 316:5

**$3** 171:25

**$3.2** 164:18

**$30** 182:18

**$4** 287:8,9 288:5,10 323:7

**$439.24** 284:16

**$45** 182:17

**$5** 135:22 156:9 157:2 307:9

**$580.04** 284:18

**$6** 165:13

**$8** 279:24 283:15 284:2

**$800,000** 160:9

**$9** 136:8 162:4 307:11

## 0

**00907** 27:8

**02** 8:4

**07** 12:6

**08** 12:6

## 1

**1** 21:25 22:2 23:4,9,12 24:15,16,23 28:8 127:21 136:9,14 137:15 143:8 144:4,10 149:4 150:4 152:18 153:25 154:14 155:19 157:20 158:2,7 184:25 191:6,12 193:3 201:19 234:21 280:8 291:18 297:16 307:11 324:21 333:5 337:11 338:10,16,20,23 339:13,17

**1's** 155:11

**1,544** 278:22 279:6

**1-800** 30:18

**1.1X** 95:17,22 96:12 99:15 100:8

**1/13/2021** 163:15

**1/5/2019** 297:24

**10** 118:12 119:7 149:2,9,24 150:5 158:7 166:18 168:25 184:23 188:6 196:16 338:19

**100** 169:18 217:5

**10022** 192:22

**10038** 193:14

**10068** 191:3

**10070** 191:17

**10078** 191:9 339:14

**10220** 277:6

**10281** 272:2,12

**10586** 137:11

**10611** 137:24 138:6

**10ish** 166:15

**10th** 204:24 213:15 231:13

**11** 157:17,18 166:15 338:22

**11,000** 285:6

**11.1** 88:17 142:22

**117** 205:11

**11:13** 4:7

**12** 13:19 163:13,14 164:13 168:21 180:10 249:14 250:3 251:2,23 339:4

**12283** 90:19

**12285** 91:5 338:9

**125** 4:9

**1283** 90:21

**12:34** 70:2

**12:42** 70:6

**12th** 252:24

**13** 13:19 174:21,22 190:3 198:6,17 200:2 202:6 217:6,13 231:18,19 249:9 266:17 339:7

**137** 338:10

**139** 284:9,11,12

**13th** 76:22 77:7 163:21 208:2,8 209:20 214:19 225:15 226:3 242:24 338:5

**14** 17:8 186:5,6 253:4 270:21 339:10

**14-and-a-half** 161:21 164:10 166:21 270:21

**142** 285:20,22 286:11

**144** 285:22 286:11 338:15

**145** 285:22 286:11

**149** 285:22 286:11 338:19

**14th** 257:2 291:13 317:7 322:4

**15** 129:11 191:5,6 270:10 329:10 339:13

**15.366** 164:25 180:16

**150** 286:18

**157** 338:22

**15th** 212:10 305:25

**16** 13:22 192:25 193:2 270:10 329:10 339:16

**163** 339:4

**16681** 25:18

**16726** 195:16 196:13

**16727** 196:23

**16739** 195:23 339:21

**1681** 25:16

**16th** 212:10 213:14 237:14

**17** 195:19,20 196:15 329:10 339:19

**174** 339:7

**17855** 247:7

**17th** 74:14,23 212:20 257:16 337:23

**18** 57:24 95:8,10 97:19 99:5 102:6 124:24 134:23 144:4 201:12 203:25 204:2 231:18 312:13 329:10,12 332:3 338:16 339:22

**180** 116:10

**18439** 290:24

**18441** 293:11

**18442** 291:7 341:14

**186** 339:10

**18th** 93:20 154:8 155:3 184:25

**19** 57:24 102:6 188:22,25 227:4,5 340:4

**191** 339:13

**193** 339:16

**195** 339:19

**1C** 149:21

**1EMI** 46:15,22 47:9 62:12 149:12,16 152:17 337:17

**1st** 278:11 298:7

---

**2**

**2** 23:16,21,24 24:20,23 25:20,21 130:12 143:6,15 193:4 235:2 295:3, 24 296:20 297:14 304:13 333:5 337:13 339:17

**2.04** 193:14

**2.1** 48:24 141:12,23,24

**2.3** 191:17

**2.465** 198:6

**2.5** 170:14

**2/11/2022** 305:18 341:20

**20** 64:2 241:3,4 242:22 340:7

**20-plus** 313:12

**20.5** 134:11,25 135:11

**2001** 7:21,23

**2002** 8:14

**2007** 12:7 17:17

**2008** 12:7

**2008-'9** 19:15

**2012** 20:2,3

**2013** 20:3 22:18 37:20

**2014** 270:10

**2015** 23:4,17

**2016** 13:20 15:6 37:15

**2017** 45:8 70:24 75:8 78:4 124:23

**2018** 17:20 58:3 69:19 70:21 102:6 125:19,20 133:25 134:6,10 135:2 136:8,13 137:18 138:5,9 152:18,20 154:2,16 155:13,21 156:9,14,19 157:3 291:13 293:15,25 294:14,25 296:8,12 298:23 299:12,19 307:10 329:21,24 337:20 338:12

**2018-'19** 323:13

**2019** 74:15,23 76:23 77:8 78:20 133:25 134:6,10 135:2 188:5 189:6, 12 233:17 298:7 302:19 337:23 338:5

**2020** 129:18,23 173:2 258:15

**2021** 26:4,10 93:20 129:18,24 144:5, 20 149:24 150:5 154:8 155:3 156:22 158:8 163:21 164:6 165:11 166:3,12, 16 167:6 168:6,24 174:3,9,13,16 175:7,22 176:16 177:19 178:2 180:11,20 181:4,5,19,21 182:7,8,14 185:2 186:16,20 188:20 189:16 196:16 197:3,17,25 198:5,16 201:16 202:13 204:12,25 205:24 208:2,8 209:20 212:10 214:7,19 216:7 217:6, 13 225:15 226:3 227:13 228:24 234:15 240:3,7 241:12 242:24 244:15 247:16 249:14 250:3 251:2,23 253:9 254:5 255:24 256:11 257:2,16 258:2, 13 259:21 260:24 261:4 262:12 264:18 269:24 270:4,16 271:11,22 272:25 273:3,23 274:9 275:3,16 276:5 277:4 278:9,11 279:2,5,14,21, 25 280:8,14 283:22,23 286:7,24 287:7,8 288:7,12,17 289:5 316:8 338:16

**2021.xlsx** 262:14

**2022** 305:25

**2023** 4:6 156:5 317:7 322:4 335:14 336:23 343:17,21

**2023-899116** 343:3

**203** 27:7

**204** 339:22

**20th** 4:6 204:14 253:9 257:25

**21** 134:11,25 135:11 172:24 188:23 198:7 201:20 242:14,15 288:18 340:10

**21031** 285:20

**21st** 189:16 258:13 260:24 275:2

**22** 244:8,9 247:3 337:11 340:14

**227** 340:4

**22963** 305:13

**22964** 305:24

**22965** 305:20 341:21

**22nd** 244:15 259:20 261:3 262:12 264:18 274:9 275:16 279:2 286:24 336:23

**23** 247:8 332:2 340:17

**24** 17:6 21:22 255:16 260:23 274:25 340:21

**241** 340:7

**242** 340:10

**244** 340:14

**247** 340:17

**24th** 247:16

**25** 118:11 119:6 259:13,14 261:20 262:24 264:5,23 337:13 340:24 341:5

**25,000** 170:12

**255** 340:21

**259** 340:24

**26** 171:22 174:12 264:2,3 273:7 286:23 315:17 341:4

**26-and-a-half** 164:8 174:8 180:13

**26-and-half-million** 174:2

**26.5** 163:25 166:17

**264** 341:4

**27** 272:5,6 331:10 341:7

**27,835,122.57** 269:9

**272** 341:7

**275** 164:2

**277** 341:10

**28** 277:9,10 281:23,25 282:5 341:10

**281** 272:13

**28th** 293:15

**29** 291:3,4 341:12

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 404    RECEIVED NYSCEF: 01/12/2024
EMBATTLED BUSINESS CREDIT
JOHN ARTHUR HANRATTY
Court Records
Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Pg 1077 of 2230
John Hanratty
June 20, 2023

**291** 341:12

**297** 341:15

**29th** 222:17 223:4

**2:02** 137:2

**2:15** 137:7

**2A** 144:22

**2C** 158:5

**2EMI** 129:7

**2nd** 255:24

---

### 3

**3** 46:13,14 82:25 95:6 138:17 150:13 168:12 188:6 307:21 325:8 337:16

**3.1** 180:14

**3.2** 65:2 83:4

**3.5** 100:16

**3/10/2021** 195:21

**3/18/2021** 91:2

**30** 18:9 168:7 175:16 176:4,15,18,23 177:3,18,25 178:10 180:19 181:7,22 190:6,17 297:22,23 341:15

**30-million-dollar** 187:3,17

**300** 10:11

**305** 341:19

**30th** 223:12,21 224:21 295:4

**31** 137:18 305:16,17 338:12 341:19

**3103** 284:9 285:9 289:21

**31st** 128:16,17 197:25 198:5,7 201:15,20 205:24 262:13 269:23 270:4,16 272:25 273:3,23 294:25 316:3

**32** 188:13,19 189:5,10 322:8,15 341:22

**322** 341:22

**32W** 188:6

**33** 331:15,16 342:4

**331** 342:4

**34** 332:2

**36** 96:17 97:10,25 98:14,17

**39** 284:10 285:10

**3:36** 196:5

**3:49** 196:9

**3rd** 216:7 256:11

---

### 4

**4** 69:17,18 70:10 86:6,15 145:3 158:11 159:4 170:18 287:2 323:2,10 337:20

**4.1** 109:4

**4.5ish** 166:14

**4.9** 109:6

**4/08/2021** 241:5 340:8

**4/13/2021** 242:16

**4/22/2021** 244:10 340:15

**4/24/2021** 247:9

**40** 168:7

**4045** 297:19 304:9

**4046** 300:25 301:6,7,11

**4047** 298:20 299:6

**4049** 298:3 341:18

**45** 180:19 181:5,20

**46** 337:16

**4809** 285:12,17

**4964** 69:10,12

**4:07** 210:14,17

**4:59** 255:5

**4th** 184:6

---

### 5

**5** 74:12,13 108:13 109:8 138:12 152:19 153:25 154:15 155:12,20 156:18 337:7,22

**5,000** 279:13,20 280:22

**5.10** 107:16 109:23

**5.21** 111:3 114:7,16 115:3,17 116:5 117:2

**5/18/201** 149:4

**50** 199:16

**500** 170:3

**518** 273:15,22

**5219** 74:9

**5615** 76:17

**5:09** 255:8

**5th** 175:22 182:25 185:14 197:2 234:15

---

### 6

**6** 76:20,21 236:17 269:14 338:4

**6,000** 274:14

**6,782** 268:19 269:11,16,19,23 274:11 279:3 280:14 316:4

**6.1** 113:14 124:25

**6.13** 129:2

**6.14** 130:16,23

**6.22** 131:4

**6.26** 50:5,19 59:2

**6.6** 127:19

**6/14/2023** 322:16 341:23

**63** 17:2

**644** 27:6

**6685** 25:24 337:15

**6689** 163:10 180:10

**6690** 137:20 163:16 164:25 167:3 339:5

**6782** 270:3

**6787** 269:13

**69** 337:20

**6:27** 315:10

**6:38** 315:14

---

### 7

**7** 16:24 17:4 90:24,25 236:18 338:6

**70** 301:18

**74** 337:22

**76** 338:4

**7620** 240:24 242:11

**7648** 244:5

**7:03** 335:6

**7:04** 335:5

**7:53** 259:21

EMBODODO Business Credit Filed 08/14/24  Entered 08/14/24 09:45:23  Doc #3 Stateof John Hanratty
JOHN ARTHUR HANRATTY                                                    June 20, 2023
Pg 1078 of 2230

## 8

**8** 137:14,15 338:10

**8.2** 131:10

**8.5** 131:21

**8.6** 132:14

**8.8** 132:23 135:20 308:6

**8/1/2017** 193:6 339:18

**8/12/2021** 157:20

**8/31/2021** 272:7 341:8

**8/31/2021.xlsx** 260:9

**8/31/21.xlsx** 261:21

**80** 199:10

**8420** 259:10

**8421** 263:22 315:18 317:10

**8690** 204:9

**8692** 212:9

**8693** 212:24

**8694** 215:4

**87** 198:22 199:4 205:23 207:25 208:4 214:18 230:18 231:2 269:13

**8703** 222:16

**8709** 222:16,24

**8710** 223:12,16 225:2

**8711** 204:4 224:2 225:3 339:24

**8712** 226:24

**8714** 227:25

**8715** 234:15

**8716** 236:16

**8725** 249:12

**8729** 237:13

**8796** 227:7 340:5

**8797** 174:18 249:9 266:17

**8803** 184:5

**8808** 175:5,24 190:4

**8815** 183:13

**8825** 249:11,13 266:18

**8834** 174:24 339:8

**8844** 186:2 253:4

**8856** 253:6

**8859** 189:15

**8861** 186:13

**8862** 186:14

**8863** 188:3

**8866** 253:21

**8867** 203:22

**8869** 254:9

**8878** 186:8 339:11

**8905** 255:12,18

**8907** 255:23

**8908** 256:11,15

**8914** 257:2

**8916** 257:15

**8917** 257:24 260:24 275:2

**8924** 255:18 340:22

**8th** 144:20 242:22

## 9

**9** 75:8 136:13 143:25 144:2 165:8 166:22 169:2 310:18 338:15

**9.1** 138:20 139:6

**9.1B** 140:23

**9.2** 138:7

**9/11** 11:15

**9/14/2018** 291:5

**9/22/2021** 259:15

**90** 116:10 127:22 128:9,23 338:6

**95** 13:11

**9523** 157:14

**9525** 158:5

**9528** 157:21 338:24

**9563** 143:22

**9564** 144:16,22

**9568** 144:6

**9569** 148:25 184:24

**9570** 149:20

**9572** 151:15

**9578** 46:10 138:17 307:22

**9581** 63:4

**9582** 64:2

**9584** 86:3

**9585** 95:7,9,10

**9591** 48:22 141:12,20

**9593** 64:25 83:2 100:16

**9595** 108:12

**9597** 107:14

**9598** 111:2 113:13 125:2

**9599** 127:18

**96** 98:22

**96,000** 288:2

**9600** 128:25

**9602** 50:4 59:2 131:4

**9606** 131:10 307:23

**9607** 138:18

**9608** 142:9

**9612** 88:16 142:21

**9619** 96:14

**9629** 46:17 337:18

**9th** 70:24 78:4

## A

**a.m.** 4:7 259:21

**aberrant** 9:18

**ability** 35:11 74:2 77:19,22 307:16

**above-captioned** 343:8

**above-described** 71:10 75:18 78:14

**absorbing** 11:19

**accept** 120:7

**acceptable** 100:22 128:3

**accepted** 145:8

**accessions** 64:3

**accompanied** 130:18

**account** 11:6 14:9 63:11 71:2 75:10 138:23 139:3,14,20 140:7,16 141:2,5 313:15,25 314:12,22

**accountant** 128:3

**accounting** 32:16 203:16 327:12 330:10

**accounts** 14:8 71:3,10 75:11,18 78:7 91:19

**accrediting** 245:21

**accrued** 186:24 284:18

**accuracy** 82:2 284:7 326:12,15,19 327:7,15 329:7

**accurate** 22:21 23:6 26:12 111:11 221:21 280:6 282:21 324:13 327:23 328:12 343:10

**accuse** 161:2,9 292:8,12

**accused** 161:6,11

**achieve** 302:5

**acknowledged** 291:22 309:24

**acquire** 48:8,18 49:12 53:17 59:11

**acquired** 48:20 63:15

**acquiring** 47:16 48:25 54:9 141:14

**acquisition** 50:9,25 51:14 59:9 191:20 193:18

**acronyms** 28:5

**acting** 59:25 60:5,16

**action** 336:19

**active** 8:16 26:22 260:8 261:21 262:13 274:11

**activity** 9:16,17 10:20 36:13

**actual** 48:4

**addition** 12:25 135:21 298:21

**additional** 96:24 122:14 166:11 192:6 197:13,18 298:24 299:13,20 305:11 324:9 330:5,20

**addresses** 270:7 285:25 287:13 288:21 289:3

**administration** 7:15

**administratively** 8:6

**administrator** 32:15 57:16

**admit** 183:9

**admitted** 7:22 8:13 324:16 325:16

**advance** 71:8 75:16 78:12 81:14 108:18,21 109:15 129:4 130:11 139:11,18,19 140:4,13 141:11

**advanced** 41:13,17 47:24 48:12

**advances** 47:14 48:24 49:7,11 50:9,

24 51:13 52:2,10,25 53:9,16 54:7,11, 22 55:2,3,10 56:10 57:11 58:6,13,20 129:5 141:13 142:5

**adverse** 113:16,18,25

**advertisement** 20:23

**advised** 197:7,10 298:11

**advisor** 7:8

**advisors** 15:8

**advisory** 6:25

**affecting** 113:22

**affidavit** 21:21 22:2 28:9 324:22 325:5 337:11

**affiliated** 16:4,8

**affiliates** 193:5 339:17

**affiliation** 16:9

**affirm** 5:14

**afternoon** 18:17

**age** 35:7 40:21,23 96:3

**aged** 38:10,19

**aggregate** 98:10

**aggregating** 282:14

**agree** 33:24 59:23 61:23 81:12 87:7, 20 116:3,24 130:6 132:3,8 140:2,11, 22 143:6 144:18 154:3,6 185:13 189:21 206:18 271:14 280:12 316:19 317:2 320:6

**agreed** 83:19 110:6 128:7 130:16 131:4,11,15,22 132:15,23 133:4,11 135:20 150:3 155:3 185:7 191:19 315:24

**agreement** 46:15,21 47:15 49:20 65:19 66:4 82:23 87:24 88:8,20 89:2, 10 94:2 95:6,12 96:2 100:17,19,20 101:2 103:17 105:7,16,19,22,25 107:15,20 108:4,17 110:3 117:16 120:25 124:16 129:6 130:7 133:16 138:16 142:14,22,24 143:7,9,16 144:10,17 145:9 146:4,9,15 149:12, 16 152:23 153:3,13 154:4,20,24 159:24 165:22 191:7,13 193:3,9 307:5,22 308:20,25 309:20 310:12,24 311:7,11,18,22 337:17 339:13,16

**agreements** 36:25 45:25 70:24 75:8 78:4 105:13 106:24 109:24 112:13 114:8,17 121:9 122:2,9,23 123:14,17 131:12 138:13 148:19 312:19 332:8

**agrees** 65:4 83:5

**ahead** 20:12,16 21:18 23:14 104:3 118:7 123:15 124:6 162:2 205:19 208:10 265:24 269:25 271:12 284:4 327:9

**Alabama** 96:15

**Alan** 298:6,9 300:12 304:5 305:8

**Alex** 4:19

**alienate** 131:23 132:4,9

**allowed** 35:23 36:25 38:23 73:11 307:5,6,8,24 308:9 311:8,19

**Alostar** 106:12 121:14 123:6 124:22 135:8 211:7 217:22 218:12 292:16,23 293:4 294:12,22 295:21 298:10 302:23 303:23

**alteration** 88:19,23 142:23 143:3

**Altman** 298:13

**amenable** 300:24

**amended** 145:7 150:17 158:14

**amendment** 88:20,24 89:2 106:23 121:8,25 122:8,22 123:13,17 124:5, 15 142:23 143:3 144:3,9 145:7,10 147:10 148:18 149:3,11,15 150:17, 19,20 157:19,25 158:5,15,16,18 178:20 184:24 235:21 249:19 251:8 252:9,13,16,17 338:16,19,22

**amendments** 88:17 158:10

**American** 45:6 101:7,8,20 102:4,9 233:25

**amount** 33:23 53:14 54:16,17 80:18 98:11 100:5 138:22 139:19 140:25 156:13 198:4 271:15 276:12 288:20 309:8 324:4

**amount's** 143:12

**amounts** 78:14 287:25 288:2 293:10

**analyst** 10:7

**and/or** 162:13 235:4 343:11

**Angeline** 249:4

**Annette** 5:7 336:8,25

**Annual** 127:19

**answering** 251:5

**anticipated** 36:13 294:18 302:11

**anticipation** 36:18

**anyone's** 222:21 223:8

**Apartment** 284:10 285:10

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO. 198-2   EMG 36 400 BUSINESS CREDIT Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State John Hanratty   RECEIVED NYSCEF: 01/12/2024

JOHN ARTHUR HANRATTY          Court Records          Pg 1080 of 2230

John Hanratty
June 20, 2023

**apologies** 283:23

**apologize** 8:22 86:14 98:7 109:10 139:24 186:14 222:16 245:11 266:18

**apparent** 32:3 213:8

**appears** 77:11 80:8 92:19 110:20 154:17,24 175:12 185:11 215:13,15 219:6 256:8 267:10 275:13 276:18 279:10 281:15

**applicable** 12:22

**apply** 79:3

**applying** 44:7

**appraisal** 162:20 163:7

**appraisals** 162:12,25

**appraiser** 163:8

**approach** 37:12

**appropriately** 333:6

**approval** 45:23 101:25 103:9 123:21 304:12,19 305:5,9

**approve** 39:12 101:16 103:6

**approved** 39:23 43:20 66:10 100:20 103:19 106:12,16 217:23 295:2,22 304:6

**approving** 118:8 119:2 296:19

**approximately** 18:7,9 134:8,20 138:7 161:15,23 164:9 165:8,12,25 166:18,22 167:8,9 168:25 181:5,6,20, 22 182:6 185:6 270:21 271:20 276:14,24 278:19,20 287:9 312:13 313:22

**April** 128:19 227:13 234:15 237:14 241:12 242:22,24 244:15 247:16

**Arlequin** 5:7 336:8,25

**Arora** 72:14 121:6

**Article** 108:13 109:8

**Arts** 7:12

**Asbury** 20:23,25

**ascertain** 162:10

**Ashin** 298:2,15,18 341:17

**asks** 227:15 228:2 249:14 251:10

**asset** 25:9 48:17,20 59:14 135:19 176:18,20 297:15 301:18

**assets** 26:23 35:16,19 48:19 54:9 61:14 66:11 132:10 162:18,23 167:13 171:10 180:25 182:13 187:24 240:10, 20 271:10 279:24 301:25 302:5

323:25

**assigned** 30:22 71:3 75:11 78:7 197:10 226:5 235:17 242:5 243:24 247:25 248:9,17,18,22 254:17

**assigning** 226:11 241:24

**assignment** 227:21 244:24 246:4 343:3

**assignments** 224:3 225:5,17 228:13,19 235:4,10,19 241:17 243:13,20 246:11

**associate** 4:21 16:19

**assume** 6:3 207:7 320:13 323:19

**Assuming** 109:17

**assumption** 90:7 155:22,25 156:22 157:5 234:12

**ATFS** 45:6 101:8

**Atlanta** 9:13

**attached** 33:2 193:22 262:11

**attaching** 261:5

**attachment** 260:7,12 261:20 262:8, 23 264:4,22 341:5

**attempt** 320:12

**attempted** 148:17

**attempting** 148:11 329:25

**attention** 22:7 48:21 50:3 63:3 82:23,25 86:3 88:16 137:23 149:20 191:16 324:20

**attorney** 14:2 21:3 125:24 287:21 292:15 301:12 302:25

**attorney-client** 52:15,23 53:8,23 58:10

**attorneys** 10:14 18:13 45:19 58:12, 19 107:4

**atypical** 225:10 288:3

**auction** 21:12

**audit** 138:5 154:18 156:23 184:9 186:23 213:15 227:17 228:4 230:8,18 245:24 247:19 253:10 257:5,18 307:14 310:18 312:4

**audit/mtag** 243:4 244:19

**audited** 128:2,8,18 152:17

**auditor** 196:20

**Auditors'** 137:17 338:11

**August** 149:24 150:5 262:13 269:23

270:4,16 271:11,21 272:25 273:3,23 279:13,20,25 283:22 286:6 287:7 288:6,11,16,18 289:4 295:4 298:23 299:12 316:3,6

**Austin** 4:16 17:25 141:19 222:23 286:9 322:12

**authority** 96:7,19 97:11,20 98:3,24 99:7 100:7

**authorization** 79:3,5

**authorized** 79:13 245:5,14

**auto** 30:24

**automated** 92:2,16 93:5,11 94:8

**availability** 80:19

**Avenida** 27:6

**Avenue** 284:9 285:10 289:21

**avenues** 122:4

**aware** 18:22 81:10 89:9,24 90:4,8 92:9 95:25 96:4 103:13,22 104:7,13, 16,17 110:16 113:3,4,6,12 120:17 122:12 124:3,9,10,12,13,17 146:8 147:3,13,22 148:2,23 151:13 152:3,9, 10,15 155:15,19 156:17,25 159:20 217:17,19 218:22 219:16 230:16 232:21 233:7,10,11,20 234:6,9,12 280:4 281:3,13 282:25 292:18 300:15 303:22 306:18 310:16 321:5 326:11, 14,18 327:6,14,18,20 328:7 329:5

**awareness** 103:10 153:10,21,22 231:10

**B**

**B-E-B-E-G-E-N** 249:5

**Bachelor** 7:11

**back** 11:2 19:15 24:3 28:7 33:4 57:16 58:2,25 66:15 70:6 78:20 82:23 90:8 95:5 108:12 114:3 122:18 137:7 138:15 145:24 148:3 174:13 179:24 180:8,9 182:10 184:5,22 189:15 190:2 196:9 210:17 211:5 213:5 214:7 225:11 228:21 233:17 249:8,18 252:5 255:8 260:22 261:19 266:16 274:24 276:20 304:9 307:20 315:16 321:21 328:6 329:24 330:10 332:12

**backfilled** 16:15

**background** 7:10 31:22,25 42:17 44:12

**balance** 268:4 295:3,24 296:20 311:4

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 2070    EMBARGOED BUSINESS CREDIT HEARING    RECEIVED NYSCEF: 01/12/2024

People of the State of New York v. Donald Trump, et al.
JOHN ARTHUR HANRATTY
Court Records    Pg 1081 of 2230

John Hanratty
June 20, 2023

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
Entered 08/14/24 09:45:23    Doc #3 State

Doc 463 Filed 08/14/24

**ballpark** 166:4,13

**bank** 4:24 5:20 13:8,9,10 19:4,9 42:7 44:7 49:16 73:9 76:6 106:15 110:15 112:9,20 113:2,4,6 119:12 122:14 131:7 134:14 135:3,14 179:4,12,19 183:20 185:13 190:17 211:5 221:20 278:8 283:14 290:18 295:17 313:14, 25 314:12,22 324:13 325:16 328:9 330:7,24 333:17,18,24 334:13,17

**bankrupt** 323:13

**bankruptcies** 170:24

**bankruptcy** 323:15

**bar** 7:23 8:3,14,17

**base** 65:8,11,17 66:2,8,13 67:4,17, 21,24 68:6,14 69:6,19 70:21 72:3,7, 16 74:14,23 76:22 77:7,20 80:11,14, 15,16 82:11 83:8,10,13,16,20,22 84:5,7,10,13,19,24 85:3,5,9,16 86:11, 19 87:10,23 88:11 89:5,16 94:6 99:16,21,25 100:3 111:22 112:3 114:5,11,21 115:19,21 118:24 119:25 120:10 129:9,17,23 130:8,17 146:22 147:5 194:21 198:2,7,18,23 199:5,11, 17 200:3,14,17,20,22 201:7,16,20 202:5,7,23 203:2 205:24 206:14,19 207:3,11 208:2,9 209:21 214:20 215:6 216:7 217:7,13 225:15 226:3 230:19 231:3 237:10 301:18 328:23 329:4,7 337:20,23 338:4

**based** 27:21,22 29:4,5 45:3,13,16 52:15 155:25 160:4,6 203:9 207:8 257:13 272:22 281:14 282:3 321:20 325:15 327:11

**baseline** 284:5,6

**bases** 68:12,21,25 77:23 80:22 81:7, 13,18 82:3,8 99:12 109:18 326:3,9, 13,20,25 329:7

**basic** 33:8 86:7 87:13 146:17

**basically** 170:12

**basing** 169:10

**basis** 11:4 38:6 49:13 60:20 90:14 103:12 104:18 120:20 162:3,5,11 182:3,11 186:25 187:21 226:15 236:19 325:21 326:2

**Bates** 175:5 186:13 196:23 204:9 253:5 255:23 317:4 322:6

**Bates-stamped** 25:23 46:17 69:20 74:15 91:4 137:19 144:5 157:21 163:16 174:24 186:8 191:8 195:22 204:4 227:7 241:7 242:18 244:12 247:11 255:18 259:16 291:6 298:2

305:19 322:17 337:14,18,21,23 338:8,13,17,23 339:5,8,11,14,20,23 340:5,9,12,16,19,22,25 341:13,17,20, 23

**bathroom** 255:3

**Bear** 8:23,25 9:11,21,23 10:6,21

**Bebegen** 249:5

**bed** 215:7,9,21 216:14,18 222:11 228:15,21 246:10

**began** 19:16 34:4

**beginning** 19:15 24:12 91:2 99:2 241:5 242:16 244:10 247:9 297:24 338:7 340:7,11,14,18 341:16

**behalf** 4:17 73:21 74:3 79:15 80:2 331:22

**behave** 39:15 300:21

**behavior** 9:18

**believed** 93:19 213:8 301:15

**bell** 18:3

**big** 11:3 19:18 169:15 171:15,16 213:13 229:3,11,13

**Bill** 42:2,6,7

**bit** 7:10 37:22 324:8

**blindly** 120:6

**blood** 336:19

**board** 15:8

**book** 87:19 110:15 162:16 167:14 168:11 172:17 188:6 234:23 236:10, 15,20 237:2,8 245:20 287:22 301:19

**booked** 235:2,15 236:7

**booking** 333:6

**books** 170:16

**borrow** 324:10

**borrowed** 297:15

**borrower** 26:20 50:8 63:11 100:19 133:13 145:4 149:21 150:14 158:12 308:17 309:17 324:12

**borrowers** 311:9,20

**borrowing** 31:15 32:5 34:5 37:2 65:8,11,17 66:2,7,13 67:4,17,21,24 68:6,11,12,14,20,24 69:5,19 70:21 72:3,7,16 74:14,23 76:22 77:7,20,22 80:11,14,15,16,22 81:7,12,18 82:3,8, 11 83:8,10,13,16,19,22 84:5,7,10,12, 19,24 85:3,5,9,16 86:10,19 87:10,23

88:11 89:5,16 94:6 99:12,16,21,25 100:3 109:18 111:22 112:3 114:5,10, 21 115:19,21 118:24 119:25 120:10 129:9,17,23 130:8,17 146:22 147:5 194:21 198:2,7,18,23 199:5,11,17 200:3,14,17,20,22 201:7,16,20 202:5, 7,23 203:2 205:24 206:13,19 207:3, 11 208:2,9 209:21 214:20 216:7 217:7,13 225:15 226:3 230:19 231:3 237:10 326:3,9,13,20,25 328:23 329:4,7 337:20,23 338:4

**boss** 14:20 231:9

**Boston** 9:13

**bottom** 70:22 71:15 75:6 77:9 78:2 130:15,24 145:4 191:18 198:12 201:18,19 247:15 268:18 293:12 304:10

**bought** 21:13 102:6 171:16

**bound** 88:23 143:2

**Brady** 287:19

**breach** 332:8

**break** 29:10 69:22 136:19,21 195:11 315:7,8

**Brian** 298:15,18

**bridge** 182:3

**bring** 39:4,12 40:6 48:3,10

**Broad** 4:9

**broken** 166:25

**broker** 16:22 163:7

**broker-dealer** 6:16 7:5 10:22 12:11, 21,24 13:11 15:12,22 16:3

**broker-dealers** 11:18

**brokerage** 9:10 14:9 52:7

**brokers** 52:7

**Brooklyn** 7:17,20

**brother** 21:3

**brought** 16:20 159:15

**bubble** 21:2

**bucket** 168:23

**bulk** 62:5,7

**bunch** 10:22 123:21 167:19 287:22 288:15,23

**Burke** 4:21 16:18

**business** 4:11,18 6:25 12:22 15:15, 16,17 16:11,12 20:5,6 27:5 32:3 38:4,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 405 EMBARGOED BUSINESS CREDIT Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 Staley RECEIVED NYSCEF: 01/12/2024

JOHN ARTHUR HANRATTY Court Records Pg 1082 of 2230

John Hanratty
June 20, 2023

9 44:13 46:16,23 50:11,13,15 51:3,5,
7,16,18,20 52:2,4,8 53:18,20 54:8
59:4,5,8,16 101:20 121:15 132:11
173:9,23 191:20 193:17 196:18 211:4
303:11 313:9 331:5 337:17

**businesses** 15:14

**busy** 68:8

**Butvick** 4:23

**buy** 40:14,17,25 41:8,12,16 195:8
301:25

**buying** 39:7,9

## C

**calendar** 135:23

**call** 30:17 62:22 172:18 197:3,4
204:16 205:13 222:20 223:7 334:2

**called** 5:11 6:16 15:18,20 180:6
262:12 293:12 321:24 323:13

**calls** 33:20,22 139:15 140:8

**Cap** 29:21

**capacity** 6:17 102:16 131:6 328:20

**capital** 22:17,19,23 23:2,8,20 26:20,
25 28:13 29:22 31:16 32:6,9 34:5,9,
14,17,20,23 35:10,15,20 36:5,20,24
37:8,18,22 38:24 39:6,11,17 44:24
45:14 49:16,19 66:17 89:12 106:11
138:7

**caps** 301:2,4,9,11

**caption** 22:8 343:4

**care** 217:3 292:19,22 303:14 328:10,
19

**cares** 190:10

**Carolina** 99:4

**case** 6:23,24 87:3 274:2 275:13
343:4

**cases** 7:3,4 9:19 287:16,24

**cash** 64:6 94:22 135:16 324:9

**cash-flowed** 171:17

**caused** 113:17 180:23

**causing** 113:17

**caution** 52:13

**caveat** 116:7 266:6 316:23

**Caveny** 205:6,11 207:18 208:23
209:18

**Caveny/at** 204:16 205:13

**CCR** 336:25

**cease** 132:15

**Center** 27:7

**certificate** 69:6 72:3 86:11 130:17
198:3,8 201:16,21 202:5,7 205:25
209:21 214:20 216:8 217:7

**certificates** 129:9,17,23 130:9

**certification** 68:19 147:9 150:13

**certified** 108:20 111:13 128:2
145:13,21 147:17 151:17 152:6
155:24

**certifies** 145:5 150:15 158:12

**certify** 70:25 75:9 78:5 151:24
336:10,17

**certifying** 152:5,8

**cetera** 117:15 167:24 266:8

**CFO** 291:17

**chain** 90:25 241:4 242:15 244:9
247:8 297:23 305:17 333:8,9 338:6
340:7,10,14,17 341:15,19

**change** 11:11 131:15 344:4,7,9,12,
14,17,19,22 345:3,6,8,11,13,16,18,21

**changed** 26:8 105:5,8

**charge** 78:19 203:7,9 237:21 239:8

**charged** 88:23 143:2

**chart** 25:22 26:3,11 304:15 337:14

**cheaper** 239:11,18

**check** 99:22 168:13 172:2 237:20
275:20

**Cherry** 249:6

**chief** 6:17 14:21,24 15:3 16:2,16

**choices** 301:15 302:10

**chose** 301:19 302:2

**chosen** 302:9

**chunk** 169:16 200:9 224:4 225:7
236:20,25 237:8

**Church** 285:13,17

**circumstances** 328:15

**cited** 209:18 219:7

**ck** 223:19 296:4

**claims** 71:11 75:19 78:15 113:21,22

**clarification** 53:19 66:24 85:21
126:24 154:10 298:16

**clarify** 6:2 27:15 30:6 36:23 55:24
318:22

**Clarissa** 249:3

**clarity** 110:19

**Clark** 275:19 316:15,17 317:14,25
318:6,8,13,23 319:13

**clause** 110:20 141:8,9 153:2

**CLE** 8:11

**clean** 210:5

**cleaned** 235:3,9 258:14 259:2
265:17,19 275:4

**cleaning** 235:19

**clear** 37:23 68:13 71:10 75:18 78:15
212:11 313:11,21 319:11

**clerk** 5:4

**client** 5:3 11:8 13:14

**clients** 10:24 13:8

**close** 292:24 293:5 295:4,5,12 304:7

**closed** 294:23

**closing** 21:5 292:16,23 296:21
303:8,10 305:9

**closings** 21:9

**Clover** 323:19,22

**Clover's** 323:25

**co-mingled** 25:9,14

**collateral** 35:19,24 36:11 37:4,7
39:14 40:21 48:13 55:15,21 56:3,24
57:12 62:12,16,20,22,24 63:2,5,8,21
64:11,18,19 65:2 80:18 90:17 94:25
98:12 100:14 101:17 109:18,21
110:21 114:13,20 115:5 116:3,13,18
120:9 124:9,10,11,12,13 131:24
132:5 138:23 139:20 141:2 148:20
175:17 176:5,15,24 177:4,7,8,18,25
178:3,11,13 183:3 184:8 188:19
189:5,11,23 190:6,11,18,21,23
201:12 218:10,18 219:3,4,12,14,18,
24 220:10,14,20,23 221:3 224:13
229:5,12,19 230:12 231:19,21 232:3,
11,14,19 233:4,5,8,13 235:9 239:15,
21 240:2,5,8,11 250:22 254:12,20
265:21,25 266:4 270:15,22 271:2,16
276:12 292:25 320:14,23 324:2

**collateralized** 40:23 164:2 188:13

EMB%040%20BUSINESS%20CREDIT  Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State  John Hanratty
JOHN ARTHUR HANRATTY    Court Records    Pg 1083 of 2230    June 20, 2023

**collateralizing** 235:22

**collectively** 129:8 155:2

**column** 63:7 268:3,5,12,17,23 273:10

**combination** 167:21

**combined** 278:5,22 282:10 284:8

**comfort** 61:3

**commercial** 118:12 119:6,7

**committed** 106:21

**committee** 175:15 176:3

**communicate** 179:18 302:17

**communicated** 236:5 302:12 328:3

**communication** 189:8,14 226:9

**communications** 9:16 10:23 52:16, 23 53:8,23 58:10 177:23 181:25

**companies** 19:11,13 20:8 22:12,15 25:23 26:4,24 27:5,11,15,17 28:11, 16,19,21,25 29:11,15,20 30:4 31:15 35:23 36:4 45:9 47:22,23 50:11,14,24 51:3,6,13,16,19 56:2,9,22 58:12,20 59:4,6,9,17,20 73:11,20 78:20 80:21 81:19 84:5,24 93:14 94:9 99:11 100:25 107:17 112:18,20 115:14,23, 24 116:4,21 117:18 118:3,18 121:9 130:7 134:2,9,12,24 135:10 139:10 140:3,12 148:19 156:8,17,25 161:16, 24 165:8 166:17,20 173:25 174:7 176:14 177:17,24 179:5,13 183:23 188:18 189:4,10 192:8 193:10,24 198:22 199:3 200:6 202:2,4 203:13, 19 209:12 226:11 231:12 233:12 234:7 240:7,11,20 246:13 247:24 248:9,16,18 250:5 270:20 271:10 273:23 276:24 278:18 279:12,19,23 285:8,15 287:8 288:5,10 289:5 290:17 299:13,19 302:18 303:4 304:2,19 305:4 307:24 308:8,15,24 309:5,23 310:6,9,21 311:7,18 312:7, 12,23 313:3,12,24 314:9,20 315:5 326:12,18 327:6,15 329:6 337:14

**companies'** 35:11,16 113:19 132:10 167:7 181:20 187:9 202:13 280:7 283:25 307:16 312:17

**company** 9:24 10:3 19:14 29:4 45:3 57:18 59:24 60:4,11 61:23 63:10,13 64:13 65:4 66:7 68:19 83:4 107:18 108:2,15 109:25 111:6 113:15,23 120:19 127:20 138:21 140:24 142:12 162:18 176:2 178:22 197:10 198:12, 21 201:21,23,24,25 230:10 293:17 294:3,8,16 309:15 321:24 323:18

328:24

**company's** 45:5 162:23 166:2 171:2 278:10

**comparatively** 46:8 282:10

**compare** 169:9

**compared** 286:22

**comparisons** 200:23

**compete** 38:8

**competent** 238:24 330:14

**competing** 38:6

**complaints** 9:19

**complete** 243:13

**completing** 193:21

**complexities** 236:3

**compliance** 6:17 8:21,23 9:4,7 10:7, 17,19,21 11:21,25 12:15,17 14:21,24 15:3 16:2,17 17:13

**complied** 107:18 108:2 109:25

**complies** 12:21 204:10

**comply** 125:8 133:14 193:25 230:9 308:18 309:18 310:23 311:10,21

**component** 160:8 303:23

**components** 222:8 329:18 333:16, 22

**computation** 203:10,11

**compute** 33:10

**computed** 85:10 99:19

**computer** 315:18

**concept** 234:5

**concerned** 209:19 216:5 292:3 318:17 319:2

**concerns** 215:25 216:4,18

**conclusion** 139:16 140:9 155:6

**condition** 113:20

**conditions** 100:13 133:15 308:19 309:19

**conference** 197:3

**confidence** 248:15

**confirm** 58:18 173:24 251:15 269:18

**confirming** 107:7

**confirms** 33:23

**conformed** 65:17 84:8 85:3

**conforms** 65:8 66:2 83:8,13

**confused** 141:7 251:17 311:14

**conjoined** 254:24

**conjunction** 57:23 123:2

**connection** 111:8 142:13 208:20 209:2

**consent** 131:17

**consented** 50:7

**consistent** 200:4,10 267:16,20

**consolidate** 132:17

**consolidated** 127:25 236:19

**conspiracy** 161:13

**constitute** 133:7 145:16 151:3,20 158:24 308:11

**consultant** 196:21

**consultants** 328:5

**consuming** 19:19

**contact** 91:18

**contemplated** 111:9 304:15

**contemporaneously** 111:5

**context** 6:22 54:6 125:17 148:10 152:14 166:9,12 183:5 189:7 201:6 207:22 225:6 230:7 238:3 251:18 267:7 294:5,7,19 297:3,16 304:23 329:9

**continued** 334:23

**continues** 302:13

**continuing** 8:11

**contract** 87:16,17 90:15 102:2 162:14 163:2

**contracts** 34:9,14 180:15

**contractual** 49:23

**contrary** 50:7

**control** 198:13 268:17

**controller** 57:24,25

**controls** 56:10,17,18,23 57:5,6,11

**conversation** 40:12 101:22 102:3,9

**conversations** 19:21 40:9 42:10,14, 16 43:9,14,22,24 44:6,14 58:11,19 103:22 104:20 113:8 120:21,22,23 121:2 124:20 126:3 148:3,7,14 174:23 186:7 204:3 209:15 227:6

232:5 233:17 255:17 339:7,10,23
340:4,21

**conversion** 271:8

**convert** 59:12

**conveying** 190:16

**copy** 100:23 191:22 261:15 291:21
310:17 312:4

**Corevest** 172:9,22

**Corp** 196:18

**Corporation** 4:11,19 46:16,23
337:18

**Corps** 22:11

**correct** 26:4,25 27:18 46:23 47:11,
17 62:5 64:9 65:12 68:21 71:2,13
75:10 78:6,20 89:16 92:10 95:18
96:20 97:12,13 105:13 108:19
111:18,20 120:11 122:24 125:5,9
128:5 129:14,18 130:19 131:13,17,24
132:17,25 133:17,22 134:3,15 135:23
136:3,10,15 138:9,13 139:4,20 141:7,
16 142:18 143:4 144:11,15,20 145:2,
9,11,17,21 146:5,18,19 149:13,17,25
150:19,21 151:5,15,21 152:20,24
153:5 154:4,16,21 158:2,8,17,19
159:2,9,25 163:22 164:4,11 165:3,9
167:2 171:3,6 172:10,21 174:9 175:7,
20 176:6,12,16,25 177:5,8,19 179:7
180:16 183:24 184:12,18 185:2,9
187:5 188:10,14,20 189:19,23 190:7
191:14 192:6,10 193:11 194:2,20
198:9,14 201:22 204:13,18 205:2,7,
18 206:15,20 207:5 208:21 209:4,22
210:23 213:4,10,22 214:3 215:12
216:16,20 217:8,14 218:2,5,19 219:4,
14,25 220:10,15 222:11,22 223:9,14,
23 224:5,9,13,24 226:12 227:13,18
228:8 229:23 230:20 231:4 232:16
235:5 236:22 237:22 238:2 240:3
241:12,19,24 242:7,25 243:20,25
244:16,21,25 246:5 247:16 248:2,10,
19 249:23,25 250:6,10 251:5,17
252:2,3,13,19 253:11,17 254:2,6,13,
20 256:2,6,17,21 257:6,10,22 258:4,
8,17,22 259:5,21,24 260:5,10,13
261:6,22,25 263:16 264:18 265:18,21
266:4,14,23 267:18 268:7,21 269:12,
20,24 270:16 274:15 275:6 276:17,25
277:13 278:11,23 279:8,14 281:10
282:21 284:16,19 286:20 289:13,16
291:14,24 292:6 298:7 299:3 301:4
304:16 306:2,7,20 307:11,17 308:2,
21,25 309:6,10,21 310:4,25 311:11
312:14,25 314:2 320:14 321:18 323:4
324:14,17 325:6,13,17 330:7,22

331:22

**corrections** 343:12

**correctly** 49:4 50:16,22 63:18 64:10
65:13 71:14 86:12,16 95:20 97:6
98:4,19 99:10 114:2 128:6 131:2
132:7 139:8 142:20 143:20 145:12,19
150:23 151:7 158:20 159:5 192:7

**cost** 149:22

**counsel** 4:14,24 18:18 278:8 332:4,
21

**count** 78:6 268:19

**counts** 270:7,11,12

**COUNTY** 336:6

**couple** 19:25 21:13 245:22 267:22
289:12 290:7 321:24 328:5,6

**court** 5:6 21:23 25:18 46:11 69:13,15
74:10 76:18 90:22 137:12 143:23
149:7 157:15 159:17 163:11 174:19
186:3 191:4 192:23 195:17 196:12,14
203:23 226:25 240:25 242:12 244:6
255:13 259:11 263:23 272:3 277:7
290:25 297:20 305:14 322:6 331:13

**covenant** 125:9 126:17

**covenanted** 125:2

**covenants** 159:24

**coverage** 186:24

**covered** 187:3

**COVID** 172:25 245:21

**Crane** 287:18

**create** 298:25 299:14,20,25 300:4

**created** 63:15

**creating** 12:19

**credit** 4:11,18 35:20 36:24 37:13,18
38:13 40:10 41:14,18 44:8,17,19
45:9,23,25 46:14,16,21,23 47:9,11,14
49:20 53:10,25 54:12,23 55:4,10
56:11 58:6,14,21 62:11,17 63:21
64:12 65:18 66:4 70:23 75:7 78:3
80:19,23 81:22 82:23 87:24 88:8
89:2,12 94:2 95:6,11,25 103:17
105:12,16,19,22,25 106:23 107:15
109:24 112:13 114:8,16 117:11,16,20
118:5,19 120:25 121:8,25 122:9,23
123:14,17 124:16 129:5 130:6 133:21
138:12,15 142:22 143:7,9 144:10
146:4,9,15 148:18 149:12,16 150:5
152:23 153:2,12 154:4,20,24 158:7
159:24 172:13,21 173:8 179:6 185:8

196:18 209:3,11 252:19 283:3 295:2,
23 296:19 297:9 304:7 307:4,21
308:25 310:11,23 311:6,11,17,22
312:19 324:2 332:8 337:16,17

**Creek** 165:18 166:6,14

**Cromwell** 4:17,20,22 16:20

**cross** 235:22

**crosses** 243:15

**CST** 249:22,25

**Curious** 332:18

**current** 57:25

**custodial** 107:20 108:4 110:3 191:7,
13 208:19,25 253:10,19 254:5 257:4,
8,18,19 258:2,7,20 276:4 282:19,20
339:13

**custodian** 34:18 86:9,25 87:14 88:5
90:16 94:4 107:21 108:5 110:4,9
111:24 112:5,8,12,19 114:6,12,21,22,
24 115:15,25 116:12,18,22 131:13,16
146:18 191:22 206:11 249:15,25
250:5,9 251:3,11,13,20 253:14,23
254:16 266:19,22

**custody** 86:18 87:9,21 88:10 89:4,
14,25 90:5 92:10 95:2 110:8 112:21
116:9,21 198:17 205:25 210:9,21
211:17 212:2 225:16 226:4 229:21
231:18 253:15 256:5,20 257:9,21
258:8,13,21 259:4,24 260:2,4,25
261:5 263:16 265:11,16 266:3,7
267:3,17 269:22 273:22 274:4,14
275:3,8 276:13 320:14

**D**

**D'ANGEL** 249:4

**daily** 11:4 38:6 113:7 127:15

**Danny** 4:3

**dark** 11:9

**data** 136:6 237:10 275:18 280:19
281:5 283:9 319:9 326:10,13,15,19
327:7,16 329:18 333:16,22

**date** 4:6 22:4 25:25 46:19 69:21
74:16 76:24 86:10 91:6,24 92:15
93:4,10 108:17 109:14 129:7 137:21
144:7,19 145:10 149:6 150:4,19
157:23 158:6,17 163:18 175:2,21
185:8 186:10 191:10,20 193:7,18
195:24 204:6 227:9 241:8 242:20
244:13 247:13 252:18 255:20 259:17
264:6 272:9 273:5 277:12 291:8

298:4 305:21 322:18 331:19

**dated** 26:6 70:24 74:14,23 75:8
76:22 77:7 78:4 91:2 111:13 129:7
149:4 157:20 163:14 193:5 195:21
241:5 242:16 244:10 247:9 259:14
272:7 291:4 297:24 305:18 322:15
337:23 338:4,7,20,23 339:4,18,20
340:7,11,14,18,24 341:7,12,16,20,22

**dates** 37:23

**David** 170:2

**day** 10:11,13 60:23 111:12 184:6
204:25 225:17 226:5 238:10,16 243:9
249:17 258:15 261:3 265:14 275:11
335:14 336:23 343:16,21

**day-to-day** 9:4 14:11 68:8 84:17
89:7,19 170:22 221:9 326:4 327:16
331:3

**days** 5:18 116:10 127:22 128:9,23
129:11 191:20 193:17 267:22

**deal** 9:18 123:6 124:2 218:12 229:3,
11,14 245:21 293:4 296:21 301:16
304:5

**dealing** 298:12

**dealt** 221:11 298:13

**debt** 224:19 298:24 299:14,20,25
300:3 306:19 307:2 309:25 310:7,22
311:4,9,20 312:8 313:5,14,23 314:11,
22

**debtor** 192:4

**December** 128:15,16,17 137:18
189:5,11 278:8,10 279:5,13,21,25
280:8 286:6 287:7 288:7,16,18 289:5
338:12

**decide** 20:4

**decided** 20:6

**deciding** 32:2 185:21

**decision** 153:16,18 179:4,12,20
185:15 239:20

**decisions** 330:25

**Declan** 4:22

**DECLARATION** 343:5

**declare** 343:6

**declaring** 151:25

**decreased** 165:12 167:7,9 180:18
182:17

**deed** 33:2 211:12

**deeds** 286:2

**deeds/reo** 123:4

**deemed** 108:19

**deeper** 319:8

**deeply** 292:3

**default** 113:10 132:25 133:8,15
134:17 138:21 139:10 140:3,12,19,24
142:11 145:14,16,25 147:15,18,20
150:25 151:3,11,18,20,25 152:2,6,10,
13 153:4,13,20 155:4,7,11,24 158:22,
24 283:2,4 307:25 308:12,20 309:8,
10,12,19 310:16 312:3,18,23 313:19
314:6

**defaulted** 133:20 308:24 310:10

**defendants** 5:2 22:10 59:21 331:11

**defined** 28:17 95:15

**definition** 63:5 65:9,17 66:3 83:9,14
84:9 85:4 86:4,5 95:12,14 97:24 99:8

**degree** 7:12

**delay** 234:19

**delayed** 222:19 223:6

**deliver** 87:13 110:8,12 112:4,12,21
115:14,24 116:22 129:16 191:21
192:9 193:19

**deliverables** 228:2

**delivered** 86:8 94:4 111:23 114:6
116:10 146:18 156:4 191:22

**delivery** 107:21 108:5 110:4

**demand** 33:14 127:21 129:10 130:9

**demands** 283:4

**Dennisse** 194:23,25 195:6 197:5,21
204:16 205:14 208:16 214:15 215:8,
18,24 217:2 220:25 221:18 222:7
224:15 235:10 249:3 261:9 269:4
321:14

**Dennisse's** 226:20,21

**department** 8:22,23 10:9,21 11:21,
22

**depends** 31:9 163:5 203:11

**depiction** 280:6

**deponent** 4:12

**deposed** 6:9

**deposit** 139:2,13 140:15 141:5

**deposition** 4:8 18:8 21:25 25:19
28:8 46:13 69:17 74:12 76:20 82:24

**depositions** 336:14

**deputy** 4:23

**DESCRIPTION** 337:10 338:3 339:3
340:3 341:3 342:3

**desk** 13:3 15:21

**detail** 260:8 261:21 262:13 272:8,21,
23 274:11 341:8

**determination** 119:21 155:10

**determinations** 162:15

**determine** 66:9 80:17 268:6,13
289:15

**difference** 24:22 33:12 182:20 270:6
276:19

**differences** 46:7

**DIP** 323:12

**direct** 22:6 48:21,23 50:3 63:3 82:25
86:2 88:15 137:23 149:19 191:16
324:20

**directly** 14:22 39:7,18,23,25 40:3,15
240:18 273:19,25 320:19 321:9,11

**disclosure** 332:7

**discount** 301:18

**discover** 219:11

**discrepancy** 234:22 236:9

**discuss** 207:19 222:20 223:7

**discussed** 83:3 85:17 109:22
110:13 123:4,7 126:20,21 159:6,12
190:23 206:21 207:15 214:11 267:8
300:17,20 307:23 322:21 328:21
333:15

**discussing** 160:17 172:5 173:12

**discussion** 190:10,13 210:15
332:14

**discussions** 103:25 296:9,13

**disposition** 59:14

90:24 95:6 137:14 138:16 143:24
149:9 157:17 163:13 174:21 180:9
184:23 186:5 190:3 191:5 192:25
195:19 196:15 203:25 227:3 241:3
242:14 244:8 249:9 253:4 255:15
259:13 260:23 261:15,20 262:24
263:25 264:5,22 266:17 269:5 272:5
273:6 274:25 277:9 281:23,25 282:5
286:23 291:3 297:22 305:16 307:21
315:17 322:8 324:21 331:15 336:12
341:5 343:8 344:2 345:2

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 6400BUSINESS CREDIT FILE Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024
JOHN ARTHUR HANRATTY Court Records Pg 1086 of 2230
INDEX NO. 158207/2022
Doc #3 State John Hanratty
June 20, 2023

**dissatisfied** 237:25 238:5,19

**disseminated** 7:5

**distinction** 219:23

**distribute** 54:18 134:9

**distributed** 134:2 136:8,13 152:18 153:25 154:15 155:19 156:9,18 157:2 306:18,23 307:10 309:24 312:7 313:13 323:18

**distribution** 133:12 139:11 140:4,13 155:11 301:23 307:25 308:9,16 309:16 310:12

**distributions** 35:12 52:10,25 53:3,6, 11,15 54:2,13,23 55:5,11,15,22 56:3, 6,8,12,25 57:13 58:7,14,22 132:24 133:5,12 134:13 135:2,12,22 136:5 152:19 154:2,16 155:12,20 156:14,19 157:3,8 304:14,20 305:6 307:5,7,9,17 309:13 311:8,19 312:5 313:4,18,22 314:5,11

**District** 27:6

**dive** 319:8

**diverts** 138:22 140:24

**division** 200:5

**DLA** 298:13

**docket** 21:21 331:9

**doctor** 7:17

**document** 16:20 25:17 26:5,14 46:9, 12,25 47:3,20 50:21 51:22,23 53:4 69:12 70:12 71:24 73:20 74:8,18,21, 22 76:9,16 77:2,5,6,13,16 79:4 80:11 88:18 90:20 92:6 97:3 106:5 109:5,11 110:24 120:2 133:17 137:11 138:2 142:2 143:22 144:2,13,14,25 145:7, 17 148:24 149:2,14 150:6 151:4,21 153:8,20 154:7,8 155:2,8,23 156:6,21 157:13,18 158:25 163:9,12 165:5 166:8 167:2,18 174:17,20 175:9,11 178:4 184:2 186:2,19 191:3,23 192:21,24 195:15,18 196:13 203:21, 24 223:17 226:23 240:23 241:2,20 242:10 244:5 247:7 250:16 252:25 253:7 255:12,14 259:10 262:7,8,11, 16,18 263:24 264:8,14,16 265:2 269:2 271:25 272:16,19 277:17,21,23 286:19 290:5,8,23 291:2 293:21 297:19,21 305:13,15 306:3,14 308:21 315:20 317:8 319:20,25 320:6 321:3 322:3,13 325:3,19 331:9,14 338:15, 19,22

**Documentation** 193:15

**documents** 45:12,13,17 76:5,11,15 86:8 87:13 107:22 108:6 110:5 111:9 115:15 142:15 144:4 146:17 147:10 149:4 150:17 156:4 157:20 158:2,14 184:25 192:9 261:14 262:20 304:6 325:11,24 328:8 330:6 338:16,20,23

**dollar** 323:2

**dollars** 81:3,15,21 161:22 164:10 174:2 270:22 288:25 289:2,6

**domain** 29:16,24

**domains** 29:19

**dot-com** 11:12

**doubt** 93:18

**download** 262:20

**draft** 107:4 228:4 244:19 245:24

**drawing** 219:22

**draws** 80:22 81:2

**drive** 39:7,17

**drove** 39:24

**dual** 172:15

**dual-prong** 14:6

**due** 128:19 170:21 210:10,22 211:18 212:3 236:2,3

**duly** 5:11 336:13

## E

**earlier** 32:2 58:4 80:10 83:3 85:17 89:19 92:8 109:22 114:3 159:6,12 180:12 206:22 224:17 230:15 233:19 270:19 300:17,20 312:6,11 319:23 321:6 328:22

**easier** 261:12

**easiest** 169:8

**EBC** 197:5

**EBCC** 25:17 46:10 48:22 50:4 59:2 63:4 64:25 69:12 74:9 76:17 83:2 86:3 88:16 95:7 127:18 137:11,24 138:6,17 143:22 148:25 157:14 163:10 174:18 183:12 184:5 186:2 191:3 192:22 195:16,22 196:13 203:22 226:24 240:24 242:11 244:5 247:7 249:11 255:12,18 259:10 263:22 272:2 277:6 307:22 317:10 325:12,24 339:20 340:22 343:4

**EBCC_10068** 191:8 339:14

**EBCC_10586** 137:19 338:13

**EBCC_16681** 25:23 337:15

**EBCC_16726** 195:22 339:21

**EBCC_17846** 242:18 340:12

**EBCC_17855** 247:11 340:19

**EBCC_4964** 69:20 337:21

**EBCC_5219** 74:15 337:24

**EBCC_5615** 76:23 338:5

**EBCC_6689** 163:16 339:5

**EBCC_7620** 241:7 340:9

**EBCC_7648** 244:12 340:16

**EBCC_8420** 259:16 340:25

**EBCC_8667** 204:4 339:24

**EBCC_8712** 227:7 340:5

**EBCC_8797** 174:24 339:9

**EBCC_8844** 186:8 339:11

**EBCC_9523** 157:21 338:24

**EBCC_9563** 144:5 338:17

**EBCC_9578** 46:17 337:18

**Ebury** 5:2 19:11,13 20:7 22:12,15,17, 19,22 23:2,4,8,9,11,16,20,21,23 24:14,20,23 25:22 26:4,24,25 27:5, 11,17 28:11,13,16,21,25 29:11,15,20, 21,23 30:3,9 31:15 35:11,16,23 36:4 45:9 46:15,22 47:9,22,23 50:11,14,24 51:3,5,13,16,18 56:2,9,15,22 57:10 58:12,20 59:4,6,8,17 60:10,14 62:4, 12 63:10,13 64:13 65:4 66:25 68:13 73:10,20 75:23 77:15,21 78:19 80:21 81:19 83:4 84:4,23 86:18 87:8,21 88:4,9 89:3,14 90:21 93:13 94:9 99:11 100:25 101:15,16,23 102:21 103:6,14 104:8,13 106:8 107:17 108:2,14 109:25 110:7 111:6,21,24 112:11,18,20 113:14,18,22 114:4,6, 10,19,24 115:2,7,13,15,22,24 116:3, 19,20 117:18 118:3,17 120:11 121:7, 9 122:2,9,23 123:14 127:20 129:7,16, 22 130:7 132:10 133:20 134:2,9,12, 20,24 135:10 137:15 138:21 139:10 140:3,12,24 142:12 143:6,8,15 144:4, 10,18 146:3,10 148:19 149:4,12,16 150:3,4 152:16,18 153:25 155:11,19 156:8,17,25 157:20 158:2,7 161:16, 24 162:23 165:7 166:2,17,20 167:6 171:2 172:12 173:25 174:7 176:14 177:17,24 179:5,13 181:19 182:5 183:23 184:25 187:9 188:18 189:4,10 191:6,12 192:8 193:3,4,10,24 197:6,

8,12,17 198:21 199:2,9,15 200:5,12, 18 202:2,4,12 203:12,19 209:3,11 226:10 230:10 231:11 232:2,10,13,18 233:12 234:7 239:11,19 240:7,10 241:23 246:13 247:24 248:8,16,18,24 250:4 253:16 269:23 270:3,14,20 271:9,19 273:23 276:22,24 278:9,17 279:12,19,23 280:7 283:24 285:8,15 287:8 288:5,10 289:5 290:17,24 292:4 295:18 297:19 298:20,24 299:2,13,19 300:10,14,16 301:14 302:13,18 303:4 304:2,12,19 305:4, 13,24 306:6,10 307:16,23 308:8,15, 24 309:5,15,23 310:6,9,21 311:7,18 312:7,12,17,22 313:3,11,21,23 314:9, 20 315:5 325:11 326:11,18 327:6,14 328:24 329:6,21 331:16 332:4,9,22 333:23 337:14,17 338:10,16,20,23 339:13,16,17 342:4

**Ebury's** 101:12 116:8 128:18 162:18 194:7 239:20 271:16

**EBURY_12283** 91:4 338:8

**EBURY_18439** 291:7 341:13

**EBURY_22963** 305:19 341:21

**EBURY_4045** 298:2 341:17

**economic** 166:6

**educated** 43:5

**education** 8:12

**effect** 108:20 113:18,25

**effective** 86:10 88:21 104:4 142:24

**effectively** 15:23 21:10 23:11,23 33:14 62:24 210:8

**effectuated** 246:11

**eighth** 144:3,9 147:10 338:15

**elapsed** 96:17 97:10,19 98:2,15,23 99:6

**elapses** 98:18

**electronic** 69:8 116:15 193:22 264:3 272:6 277:10 341:4,7,10

**electronically** 193:19

**electronically-based** 74:5

**eleven** 43:21

**eligibility** 34:23 66:9 83:12 84:16 104:21,25 105:7 117:14 119:20 120:4,24 123:9 143:13

**eligible** 37:4,7 47:16 49:2 50:10,25 51:14 62:18 65:7,10,16,18,25 66:3,11 80:17 83:7,9,15 84:9,13 85:4,11 86:4,

6 88:10 89:4,15 90:17 94:5 95:13,14, 15 97:24 99:8 100:5 109:17 110:21 115:5,8,12 116:3,13,17,24 117:11,19 118:4,9,14,19 119:3 123:4 141:11,14 146:16,25 147:6 201:7,11,13,14 219:19,20,23 220:19,23 251:9

**eligibles** 219:8

**email** 29:16,19 90:25 91:2,8,9,13,22 92:24 107:7 156:12 163:14,20 171:14 172:7,11 173:7,14,21 174:6,11 241:4, 5,10,11 242:15,16,25 243:15 244:9, 10,16 247:3,5,8,9,15 259:14,19,23 261:4 262:12,23 291:4,12,21 292:11 296:5 297:23,24 298:6 305:17,24 317:3,7 318:21 319:24 322:3,15,22 338:6,7 339:4 340:7,10,11,14,17,18, 24 341:12,15,16,19,22

**emailed** 72:11

**emails** 245:19 246:8 333:11

**embedded** 16:13

**emerged** 323:14

**EMI** 143:6,8,15 144:10 150:4 191:6, 12 339:13

**Emigrant** 4:10,18,24 5:20 19:4,9 37:13 41:14,18,22,24 42:8,9,19 43:19 44:21 45:8,21,24 46:16,22 47:24 49:16 53:10,24 54:12,22 55:4,10 56:11 58:6,13,21 62:13,21 64:22 65:15,24 66:17 68:12,21,25 72:13 76:6 80:20,23 81:13 82:4 83:19 84:6, 20,25 86:24 87:18 88:6 89:24 90:3,15 91:18 92:9,19 99:12 101:16 103:6,13 104:7,24 105:12,18,24 106:4 107:25 110:16,18 115:2 116:2,23 119:16 120:9,17,21 121:7,14,17 122:4,12,17 123:20 124:17 125:3,14 126:8,12,16 127:8,14 128:7 129:17,22 131:6,17 134:14,19,21 135:3,8,14 144:18 146:8 147:3,13,22,25 148:12,23 150:3 151:13 152:3,8,14,15 154:12, 14,25 155:18 156:13,16,25 157:10 159:7,13,19,22 173:17 178:9 183:20 185:7,13,21 188:13 189:22 190:17,24 192:13,18 194:20 196:17,21 220:18 224:19 227:2 230:16,19 233:7,10,11 234:8 236:10 253:16 264:18 275:16, 21 278:8 279:2,5 280:13,17,18 281:9, 16 286:24 290:18 292:25 295:2,17,23 296:19 297:9 300:18 302:17,23 303:15,18 304:8,25 305:10 306:24 310:17,24 312:3,9,13,18,22 313:6,16 314:2,13,23 321:23 323:23 324:17 325:16 328:3,9,25 330:7,22 333:19, 24 334:13,16 337:17

**Emigrant's** 55:15,21 56:3,24 57:12 62:20 64:11,18 94:25 101:17 132:5 148:20 198:18,23 199:5,10,16 200:3, 14,20 203:2 206:13,19 207:3,10 218:18 219:2,12,14 220:9,14 224:12 230:11 231:3,19 232:3,11,13,19 233:4,5,13 239:15,21 240:2,5,8,11 254:19 265:21,25 266:4 281:3 320:23

**Emma** 4:21

**emotional** 238:9

**emotive** 238:22

**employed** 28:3,4

**employee** 27:20 30:25 79:2,8

**employees** 27:18,21,22 28:6,18,20 29:23,24 30:20 31:6,7 73:19 79:14, 19,25 85:12,14 210:7 246:18 334:16

**employment** 6:16 15:5 58:2

**employs** 27:24

**end** 61:17 90:19 127:23 128:9,13 129:11 188:5 258:15

**ended** 11:18 15:6 129:13 137:17 292:15 338:12

**ending** 16:9 158:4 175:5 184:23 186:13 193:13 196:23 204:9 215:4 222:15 253:6 255:23 260:23 268:3 272:24 273:2,5

**ends** 180:10 249:9 253:4

**Energy** 323:14 324:5

**enforceability** 40:20

**enforced** 14:13

**engaging** 292:5,9,13

**ensure** 33:3 56:10,23 57:11 330:6,21

**ensuring** 321:17

**enter** 131:11

**entered** 100:19

**entire** 87:19 100:9 106:5,13,17,19 110:15 183:2 301:17 343:7

**entirety** 109:21

**entities** 22:10 28:12 293:13 325:11

**entity** 27:24 30:9 132:17

**entries** 268:17

**EOD** 222:18 223:5

**equity** 13:4 63:9 64:22 240:19,21 305:11 306:19,24,25 309:24 310:22 312:8 313:13,23 314:11,22

**ERRATA** 343:2,13 344:2 345:2

**errors** 281:19,20,21,24 282:4

**Essentials** 17:19,23

**established** 31:15

**estate** 21:2,5 29:6,7,8,25 52:6 164:3 245:20

**estimate** 12:5 13:19 26:9

**estimating** 15:6

**event** 13:13 59:11 132:24 133:5,7 138:21 139:9 140:2,12,19,23 142:10 145:13,14,16,23,25 147:14,18,20 150:25 151:3,11,17,18,20,24 152:2,6, 10,12 153:4,13 155:4,6,10,24 158:21, 22,24 294:22 307:25 308:9,12 310:16

**events** 160:14

**evictions** 173:11

**evidencing** 191:24

**exact** 60:22 61:8,20 199:7,13,19 288:13

**exam** 242:7

**examination** 5:15 17:19,23 208:21 334:9

**exceeded** 54:20

**Excel** 264:4 268:19 272:7 341:5,7

**exception** 27:14 44:25

**exceptions** 33:22

**excess** 129:8 130:12 135:22 138:11 286:4 292:25

**exchanged** 175:6 186:15 204:11 227:12

**excluded** 86:5 95:14 97:23 99:7,15

**excludes** 95:12 146:15

**exclusions** 96:15

**exclusively** 318:18 319:4

**execute** 13:4 14:7 100:25 148:18 249:19 252:12 326:7 327:23

**executed** 100:23 121:8 184:25

**executing** 12:19 329:17

**Exhibit** 21:25 22:2 25:20,21 28:8 46:13,14 69:17,18 70:10 74:12,13 76:20,21 82:25 90:24,25 95:6 137:14, 15 138:17 143:25 144:2 149:2,9 157:17,18 163:13,14 174:21,22 180:10 184:23 186:5,6 190:3 191:5,6 192:25 193:2 195:19,20 196:15

203:25 204:2 227:4,5 241:3,4 242:14, 15 244:8,9 247:8 249:9 253:4 255:15, 16 259:13,14 260:23 261:20 262:24 264:2,3,5,23 266:17 272:5,6 273:7 274:25 277:9,10 281:23,25 282:5 286:23 291:3,4 297:22,23 305:16,17 307:21 315:17 322:8,15 324:21 331:15,16 337:11,13,16,20,22 338:4, 6,10,15,19,22 339:4,7,10,13,16,19,22 340:4,7,10,14,17,21,24 341:4,5,7,10, 12,15,19,22 342:4

**exhibits** 261:10

**exist** 56:19 57:7

**existed** 56:17 57:5

**exists** 145:16 151:4,20 158:24

**exit** 21:15 292:18,21

**expect** 168:22 234:18

**expectations** 218:23

**expected** 113:24 217:12 218:17

**expects** 219:24

**expense** 54:8

**expenses** 50:13 51:4,17 52:5,6,8 53:18,20 141:7 149:23 167:23 170:23 320:24

**expensive** 238:25 239:3

**experience** 287:12

**experienced** 42:20,25

**explain** 43:14,24 48:14 60:9

**explaining** 43:18 44:9,11

**explanation** 169:4 236:9 294:21

**exposed** 20:9,21

**expressing** 213:25

**extend** 104:24 144:19 150:4

**extended** 45:8 158:6

**extending** 104:21 120:24

**extension** 172:12 173:16,18 179:6, 14,21 185:8,12,14,16,22 209:3,10 252:18

**extensions** 121:20

**extent** 52:13 58:9 100:18 109:12 111:21 114:4 115:22 194:9

**external** 13:12

**extra** 328:10

**extremely** 303:22

**F**

**face** 284:15 285:2,4 289:12

**faces** 289:13

**facilities** 38:25 41:14,18 45:14 80:23 81:22 117:11,20 118:5,20 133:21 172:13 179:6 185:9 209:3,11 252:19 283:3 323:23 324:2

**facility** 35:20 44:20 47:9 62:12,17 63:22 64:12 89:13 150:5 158:7 171:9 234:24 236:11,14

**facing** 13:7

**fact** 111:16 153:24 156:8 239:18

**facts** 332:12

**fail** 133:14 308:18 309:18

**failed** 110:7 112:19 115:14,24 116:22 120:8 125:8 129:16 159:7,13 192:8 193:24 211:8 218:13 309:5 310:7,22 311:10,21 312:12

**failure** 159:21 312:17,24

**failures** 332:7

**fair** 52:18

**false** 115:16 116:25 117:9,17,22,24 118:2,15,17 119:9,23 147:11 251:23 324:17 325:17

**falsely** 190:16

**familiar** 43:9 47:6 95:21 278:2 322:20

**family** 18:22 19:2

**Farrah** 137:5

**fashion** 300:21

**father-in-law** 41:25

**favor** 71:12 75:20 78:16 131:6

**feel** 37:21 165:23 238:21

**feeling** 276:2

**feels** 187:24

**fees** 268:4 284:21 285:9,13,16 287:5, 9 288:6,10 289:7

**fell** 122:16

**felt** 238:8

**Fernandez** 27:6

**field** 208:20 242:6

**fields** 193:22

**file** 94:18,19,21

**filed** 331:11,21 332:21

**fill** 247:19

**final** 81:11

**Finally** 142:21

**finance** 50:12 51:4,17 164:17 269:7

**financed** 38:8

**finances** 321:23

**financial** 13:24 113:20 127:19,25
128:8,18 137:16 152:17 157:6 183:22
195:21 196:17,19 205:2,5 230:18
237:6 332:5,10,23 333:9,23 338:11
339:20

**financials** 32:16 36:11 281:5 326:3
327:8

**financing** 166:24 172:19 245:20

**financings** 303:13

**find** 39:13 327:3 330:18

**finding** 122:17 123:5

**fine** 61:4 139:25 171:17

**finish** 243:4,8

**finished** 241:17 320:5

**FINRA** 6:20 7:3,4 12:12 16:22

**fired** 330:11

**fiscal** 127:23,24 128:9,13

**fit** 42:18

**fix** 327:2

**fixed** 327:4 330:3

**flag** 120:2

**Flamingo** 28:3 31:7

**flip** 97:7 256:10 264:11

**Florida** 97:8 116:15

**focused** 186:22

**focusing** 222:7

**folder** 261:14

**folks** 28:4 237:6 321:25

**forced** 171:11

**Fordham** 7:12,14

**foreclose** 21:16 61:19

**foreclosing** 284:25

**foreclosure** 37:7 61:18 98:16
285:25 287:15

**foreclosures** 164:16,24 167:24
173:10

**foregoing** 64:7 71:6 75:14 78:10

**forever** 66:15 333:4

**form** 20:11 23:13 26:13 100:21
136:11 148:21 161:25 164:15 190:12
191:23 193:22 198:19 249:2 263:2,18
264:25 271:3 278:4 280:2 281:12,17
283:17 290:11 303:6,20 307:18 310:2
311:13 314:15 316:2 317:11,23
318:11 322:25 331:23

**formal** 121:25 122:8,22 123:13,16

**format** 317:16 318:2 319:14

**formatting** 319:19

**formula** 83:18 99:18,20,22

**formulaic** 100:4

**formulas** 83:23 85:9

**forward** 40:12 172:8 218:15 304:7
306:6

**found** 218:25

**Foundation** 205:9 218:21 230:22
245:8,17 254:22 256:23 257:12
258:10 260:15 262:6 271:4 278:13
300:6 311:13 314:16

**founded** 22:17,19 23:4,5,16 24:14

**founder** 22:14

**frame** 102:7 123:9 124:21 194:15

**framework** 12:20

**Francisco** 9:12

**Frank** 66:21 72:12,16 85:19,23
194:17

**Franklin** 67:5

**frankly** 207:16

**fraud** 292:9,13

**free** 71:10 75:18 78:14

**frequently** 287:3

**Friday** 197:2

**front** 6:19 11:2 136:6,16 177:21
188:2 231:24

**fronts** 234:17

**frustrated** 238:4

**frustration** 238:10

**full** 156:13 299:7

**fully** 100:22 124:3 133:14 308:18
309:18 311:10,21

**function** 9:3 10:6,17,19 29:5 30:23
31:5 33:8 57:15

**functionally** 87:4

**functions** 30:2 34:2 59:22 61:15

**fund** 23:4,9,12,16,21,24 24:15,16,20,
23 25:7,8,12 32:11,13,14 48:3,11
50:9,25 51:14 57:17 58:3 66:16
85:17,22 101:7 127:21 131:12 135:25
136:9,14 137:15 152:18 153:25
154:14 155:11,19 193:3,4 201:19
234:21 235:2,15 236:8,14 291:18
293:9 295:3,24 296:20 297:14,16
304:13 307:11 323:15 333:5 338:10
339:16,17

**funding** 45:6 48:16,18,19 101:8,20
102:4 233:25

**funds** 13:5 25:4 41:13,17 47:24 48:8
63:11 142:6 172:6 235:22 236:4
295:11,16,18 297:2,8 313:5,8 323:17
324:10

**furnished** 86:11 111:5 127:24
129:10

## G

**game** 52:18

**Gandol** 66:21 67:5 85:19,24 194:17

**gaps** 182:3

**gave** 226:9 230:5

**Geduld** 9:24 10:5,8

**general** 4:23 23:9,21 30:17 103:24
332:13

**generally** 19:7 20:3 21:8 22:20 29:3,
9,22 32:19 33:21 39:9 40:8 42:5,14
55:9,12,20 61:13 62:22 68:18 72:20
81:9 82:14 96:4,5 106:18 126:21
147:7 148:9 238:21 281:3,6 299:17,
22 300:15 330:18

**generates** 10:22

**generation** 105:8

**generic** 10:17,18

**gentleman** 24:8 42:2

EMBC64000BUSINESSCREDIT.txt    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
JOHN ARTHUR HANRATTY    Court Records    Pg 1090 of 2230    John Hanratty
June 20, 2023

**genuinely** 93:19

**getting-to-know-you** 42:16

**give** 6:18 74:6 90:18 157:7 165:23
173:18 179:5,13,20 185:7 229:8
264:11 320:7

**giving** 44:12 74:2 77:19 108:20
145:15 151:2,19 158:23 166:10 180:5

**Global** 15:8,10,11,20

**goal** 124:4

**good** 4:25 20:20 43:5 61:3 70:17
195:11 222:20 223:8 269:8 315:6

**governed** 34:10

**grab** 317:14 318:6,9,14,23

**graduate** 7:19

**graduated** 7:25

**Grady** 42:9,11,20 43:16 44:2,5 91:3,
16,17,22 92:13 93:12 94:23 104:11,
12 107:6 121:4 148:4 156:7 163:15,
21 164:7 174:6 175:7,14 183:13,21
184:7 186:16,21 187:7 188:4,12
189:16,17 190:5,10 197:5 204:12,15
206:10 207:2,9,20,24 208:7,18 209:9,
19 211:16 212:24 215:4,10 217:5,12,
16,19,25 218:7,17,25 219:11,16,22
221:21,25 222:10,17 223:4,12,20
224:2,7 225:14 226:2 227:13,15
228:2,6,11,18 229:3,18 230:17,25
231:20,25 232:10,12,18 233:14,21
234:16 235:8 236:6,17 237:14 241:6,
11,15,22 242:17,25 243:3,7,12,18
244:11,16,18,23 245:14 246:2,23
247:10,16 249:14 250:12,24 251:10
252:11 253:9,22 254:4,10,15 255:24
256:12 257:3,16,25 259:15,20 260:25
263:14 265:15 266:2,9,18 267:2,14
274:10 275:3,11 276:3,21 282:18
303:17,25 319:24 320:13 338:7 339:5
340:8,11,15,18,25

**Grady's** 185:5 205:12 206:7 213:7
215:25 216:4,17 260:3

**grand** 170:3

**grant** 185:15,22 209:10

**grantor** 191:21

**granular** 118:10 119:4,21 168:14
283:10,12

**great** 184:9

**Greater** 28:3 31:7

**grew** 19:24

**group** 14:7 30:20 127:5 159:13
196:21 203:17 293:3 320:5 326:5
327:12,20

**groups** 330:10

**guarantee** 131:5

**guarantor** 111:7 113:23 142:13
145:5 150:14 158:12 323:22

**guarantor's** 113:19

**guess** 8:11 12:4 26:9 91:18 126:5
139:22 212:20 223:10 293:19

**guessing** 17:11

**Gursoy** 16:18

**guy** 66:20 126:23 178:7 188:7 275:19
316:15

**guys** 66:22 69:23 172:8 292:17 293:3
303:15

### H

**half** 10:13 134:18

**Halfway** 163:24

**hand** 21:20 25:15 70:11 76:16 90:20
148:24 163:9 184:10 185:25 191:2
192:21 195:15 196:12 203:21 226:23
242:10 247:6 255:11 336:23

**handing** 46:9 74:8 143:21 174:17

**handling** 222:7

**hands** 153:9

**hanratty** 4:1,12,13 5:1,4,18 6:1 7:1
8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1 20:1 21:1,24
22:1,2,3 23:1 24:1 25:1,19,21 26:1
27:1 28:1,7 29:1 30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1 45:1 46:1,13,14
47:1 48:1 49:1 50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1 65:1 66:1 67:1
68:1 69:1,16,18 70:1,10 71:1 72:1
73:1 74:1,11,13 75:1 76:1,19,21 77:1
78:1 79:1 80:1 81:1 82:1,24 83:1 84:1
85:1 86:1 87:1 88:1 89:1 90:1,23,25
91:1,3 92:1 93:1 94:1 95:1,5 96:1
97:1 98:1 99:1 100:1 101:1 102:1
103:1 104:1 105:1 106:1 107:1 108:1
109:1 110:1 111:1 112:1 113:1 114:1
115:1 116:1 117:1 118:1 119:1 120:1
121:1 122:1 123:1 124:1 125:1 126:1
127:1 128:1 129:1 130:1 131:1 132:1
133:1 134:1 135:1 136:1 137:1,13,15

**half** (H column)

138:1,16 139:1 140:1 141:1 142:1
143:1,24 144:1,2 145:1 146:1 147:1
148:1 149:1,2,8 150:1 151:1 152:1
153:1 154:1 155:1 156:1 157:1,16,18
158:1 159:1 160:1 161:1 162:1 163:1,
13,14,15 164:1 165:1 166:1 167:1
168:1 169:1 170:1 171:1 172:1 173:1
174:1,21,22 175:1 176:1 177:1 178:1
179:1 180:1,9 181:1 182:1 183:1
184:1,22 185:1 186:1,4,6 187:1 188:1
189:1 190:1,2,5 191:1,5,6 192:1,25
193:1,2 194:1 195:1,19,20 196:1,15
197:1 198:1 199:1 200:1 201:1 202:1
203:1,25 204:1,2 205:1 206:1 207:1
208:1 209:1 210:1 211:1 212:1 213:1
214:1 215:1 216:1 217:1 218:1 219:1
220:1 221:1 222:1 223:1 224:1,20
225:1 226:1 227:1,3,5 228:1 229:1
230:1 231:1 232:1 233:1 234:1 235:1
236:1 237:1 238:1 239:1 240:1 241:1,
3,4,6 242:1,13,15,17 243:1 244:1,7,9,
11 245:1 246:1 247:1,8,10 248:1
249:1,8 250:1 251:1 252:1 253:1,3
254:1 255:1,15,16 256:1 257:1 258:1
259:1,12,14,15 260:1,22 261:1,19
262:1,23 263:1,25 264:1,3,5,22 265:1
266:1,16 267:1 268:1 269:1 270:1
271:1 272:1,4,6 273:1,6 274:1,24
275:1 276:1 277:1,9,10 278:1 279:1
280:1 281:1,22,25 282:1,5 283:1
284:1 285:1 286:1,22 287:1 288:1
289:1 290:1 291:1,3,4,6 292:1 293:1
294:1 295:1 296:1 297:1,22,23,25
298:1 299:1 300:1 301:1 302:1 303:1
304:1 305:1,16,17,19 306:1 307:1,20
308:1 309:1 310:1 311:1 312:1 313:1
314:1 315:1,17 316:1 317:1 318:1
319:1 320:1 321:1 322:1,7,15 323:1
324:1,21 325:1 326:1 327:1 328:1
329:1 330:1 331:1,15,16 332:1 333:1
334:1,11 335:1,10 336:11 337:6,11,
12,13,16,20,22 338:4,6,8,10,15,19,22
339:4,7,10,13,16,19,22 340:4,7,8,10,
12,14,15,17,19,24 341:4,5,7,10,12,
13,15,17,19,20,22 342:4 343:4,18
345:24

**happen** 262:18 280:21

**happened** 11:16 232:7 235:16
237:15

**happening** 173:22

**happy** 168:14 218:15

**hard** 330:2

**head** 9:14 11:7 101:10 103:4 262:19
333:3

**header** 268:3 272:22 317:9

**heading** 317:18,19 320:17 321:8

**hear** 84:19

**heard** 160:11 291:20

**heavily** 38:4

**hedge** 13:4 32:14

**Heine** 9:24 10:5,8

**held** 4:9 197:3

**helped** 269:4

**Heneghan** 24:9

**hereinbefore** 336:12

**hereof** 129:7 343:13

**hereto** 95:17 193:23

**heretofore** 111:4

**hereunder** 149:23

**hereunto** 336:22

**herewith** 111:5

**Herzog** 9:24 10:4,7,10 11:6,14,23

**Herzog's** 11:17

**hey** 123:24 212:11 215:4 249:18

**high** 287:12 289:11

**higher** 170:16 239:8 286:4 302:5

**highlight** 317:5

**highlighting** 322:9,10,11

**Hill** 19:14,24 20:7 321:24

**hindsight** 171:7 172:4

**hired** 16:15,16 330:12

**hiring** 330:9

**historical** 235:14 236:6

**historically** 331:4

**hit** 169:19

**hits** 169:11 245:22

**hold** 169:6

**holding** 261:19

**holds** 26:23

**holdup** 223:13,21

**homeowner** 33:19

**host** 88:2

**hostile** 299:24

**hotel** 222:6

**hour** 61:2

**housed** 220:21 221:9

**houses** 168:10,17 169:18 170:10

**Howard** 183:14,15,16,18,19 184:11

**huge** 169:16

**hundreds** 81:3,15,21 287:4

**hundredth** 253:24

**Hypothetically** 314:18 315:3

**I**

**idea** 9:25 48:17 166:10 320:16 321:7

**identification** 22:4 25:25 46:18 69:21 74:16 76:24 91:6 137:21 144:6 149:5 157:22 163:17 174:25 186:9 191:10 193:6 195:23 204:5 227:8 241:8 242:19 244:13 247:12 255:19 259:17 263:25 264:6 272:9 277:12 291:8 298:3 305:21 322:18 331:18

**identified** 115:23 242:6 290:8

**identify** 4:14 40:4

**imagine** 173:18

**impact** 93:25 209:17

**impacted** 180:24 331:7 333:7

**impairment** 302:3

**impermissible** 310:13

**implication** 297:7

**implications** 297:14

**important** 40:24 81:13,17,19 105:11, 18,24 106:4,6 185:19 221:20 243:23 321:17 324:12

**impossibility** 220:6

**impression** 42:24 43:4 241:23 320:7,11

**improperly** 287:23

**improprieties** 292:5

**in-house** 66:19 194:2 239:12

**in-kind** 301:23

**inaccuracies** 289:16 325:10,24

**inaccuracy** 26:15

**inaccurate** 329:19

**inactive** 26:16,17

**include** 36:25 334:24

**included** 64:12 65:8,10 83:7,10,15 84:9 85:5 87:22 88:11 89:5,15 94:5 98:11 111:22 114:4 165:18 275:10 290:10

**includes** 63:8

**including** 49:2 107:21 108:5 110:4 141:15 268:4

**incomplete** 111:15

**inconsistencies** 329:17

**incorrect** 117:23 142:16 199:22 216:24 250:7,14,19 251:25 271:15 276:7,11 280:15,19 281:16 285:3,5 315:25

**incur** 298:24 299:13,20,25 300:3

**incurred** 50:14 51:6,19

**indebtedness** 35:25 63:17 138:24 139:2,13 140:6,15 141:3,4 142:14

**independent** 137:17 162:17 338:11

**Indiana** 97:17

**individual** 40:10

**individuals** 27:25

**indulging** 70:9

**industry** 17:19,23 44:13 106:19

**ineligible** 8:6 62:19,25 84:14 86:19 87:9,19,22 96:19 99:14 100:4,9,13 104:22 105:2 114:13,20 115:7,10,13, 20 117:3,7,10,19 118:4,9,18 119:3 124:9 146:23 201:7,9 219:23 239:24 250:21

**ineligibles** 100:5 219:8

**info** 222:18 223:5

**inform** 113:15 125:3

**information** 44:12 94:15 111:3,4,13, 14,17 114:25 129:12 179:3,11,19 182:2 183:22 184:17 185:20 188:2 189:9 191:25 192:3,6 193:20,21 234:13 252:12 281:11,16 283:14 316:21 324:13,17 325:17 327:24 328:12 330:21,23

**inherently** 40:13

**initial** 11:14 24:19 43:8,13,23 44:14 85:18 86:23 88:6 322:25 323:7

**initially** 12:14 14:19 42:13 44:25 46:3 57:15 66:15

**initiated** 98:16

**instance** 30:7 283:20

**instances** 85:13 87:2

**Instant** 174:23 186:7 204:3 227:6 255:17 339:7,10,23 340:4,21

**institutional** 13:2 15:16

**instruct** 334:15

**instructed** 58:8 317:25 319:13

**instructs** 5:21

**insurance** 14:9

**intend** 220:22 222:13 224:12

**intended** 220:13,17 274:19,21,22 323:6,9

**intentional** 317:10

**intentionally** 120:8 334:12

**interact** 33:6 195:6

**interacted** 7:7 89:8,20 90:9,12 104:10 304:5

**interacting** 9:5 49:15,18 226:17

**interaction** 9:19 13:12 82:15 127:16

**interactions** 327:12 333:5

**interactive** 299:23

**interacts** 141:8 194:24,25

**interchange** 183:7 184:21

**interest** 19:21 33:10 35:16 63:9,14 149:22 166:7 188:8 284:18

**interested** 24:6 336:20

**interests** 63:12 64:7

**interfere** 317:6

**internal** 13:6,12

**interpret** 236:13

**introduced** 32:8 41:21,24 42:8 301:24 328:4

**inverted** 48:5

**invest** 304:25

**invested** 24:17 293:8 297:2

**investigation** 7:6 113:21

**investing** 19:22 20:10 24:6 42:21 43:2,7,10,15,25 44:10

**investment** 6:25 7:8 19:18,23 21:7 32:4 295:18 297:10 300:8

**investments** 292:4

**investor** 139:12 140:5,14 291:18 332:6

**investors** 24:11,20 25:2,10,14 52:11,25 53:11 54:2,13,23 55:5,11, 16,22 56:4,12,25 57:14 58:7,15,22 126:21 127:5 134:3,10 135:12 136:9, 14 159:14 294:6 302:12 313:4

**invoice** 203:8

**invoices** 203:13,18

**involved** 10:25 34:8 44:17 66:12 67:3,9,10 81:6,9 292:17 319:19 320:19 321:9,11

**involvement** 67:14

**Ira** 24:9,21 25:5,6,11 125:12,18,22 126:6 127:2 159:7 160:9,19 161:2 295:5,12 296:9,11,13,15,16,21 298:22 299:12,18,22

**Ira's** 295:17 297:9

**issue** 84:18 155:16 207:17 208:13 210:3,11,23 211:10,19 212:4,5,7 218:2 221:15 222:10 228:13,14,19,20 229:21 235:20 246:14 267:25 333:4

**issued** 38:17

**issues** 178:21 217:4 235:14 236:6 287:15,22 289:12 302:3 303:14 320:20 326:2,3,4,8,12,15,19 327:6, 15,19 329:6,11,13,15,16,22

**item** 191:24

**itemize** 169:19

**items** 194:21 212:12 241:16 245:21 282:24

**IV** 86:15

**J**

**Jack** 42:9,11,20 43:15,25 44:5,16 72:13 91:16,17 93:8 94:23 104:11,12 107:6 121:4,19 126:22 127:3,12,16 148:4 160:17 163:21 165:23 171:22 174:6 175:7 176:23 177:3 179:2,10 186:16 197:5 205:6,11 206:7 208:22 212:11 215:20 216:11 229:10,22 230:2 233:14 234:11,13 245:22 282:24 303:22 304:4 319:11 321:22 328:4

**Jack's** 178:10

**Jaffe** 14:20

**January** 163:21 164:6 165:11 166:3 167:6 168:24 172:24 174:3,9,15 180:11,20 181:4,18 182:7,13,18 197:25 198:5,7,16 201:15,20 205:24 208:2,8 209:20 214:19 216:7 217:6, 13 225:15 226:3

**Jersey** 7:23 8:7,24 20:24 98:6 102:25 103:24,25 116:10 124:11 147:7 167:19 170:5 232:24 233:3

**Jerseys** 200:10 265:13

**Jessica** 249:4

**Jim** 24:17 291:12

**job** 8:19 9:15,21 12:5 61:16 70:17

**jobs** 12:18

**jog** 17:15

**John** 4:11,13 5:3 22:3 256:12,15 291:20 298:22 335:10 336:11 337:6, 12 343:4,18 345:24

**joining** 5:17 137:5

**joint** 165:17

**jointly** 108:15

**Juan** 27:7

**judge** 147:19 160:3,5

**judgment** 147:15 151:12 152:2 153:8,11,16 309:3

**July** 186:16,20 188:19 189:16 253:9 294:25 298:23 299:12

**jumping** 332:13

**Juncos** 27:6

**June** 4:6 293:15 317:7 322:4 336:23

**junior** 9:3

**jurat** 334:24

**juris** 7:16

**jurisdiction** 95:16

**Justice** 10:9

**K**

**Kalach** 137:5

**Karen** 44:16 121:5 154:9 197:4 328:4

**Kari** 4:25 18:13,16

**Kautz** 165:17 166:6,14

**keeping** 167:23

**Kentucky** 30:12,13 102:25 103:18
124:13 167:15 168:2 169:15,22
171:7,13,24 232:22 233:2 249:15
250:4,20,25 251:7,11,19 252:7,9,15
266:12,13,19 267:3,15,17,21 282:6
289:25 290:9,14

**Kevin** 24:9 275:19 282:11,13

**key** 34:13

**kicked** 120:3

**kind** 8:3 30:17 192:19 218:13 290:3

**knew** 21:4 229:4,11,18 232:10 328:9
329:21 330:23

**knowledge** 26:18 88:25 288:9
300:13

L

**labeled** 25:17 46:10 48:22 50:4 59:2
63:4 69:12 74:9 76:17 82:24 83:2
86:3 88:16 90:21 95:7 137:11,24
143:22 148:25 157:14 163:10 174:18
186:2 191:3 192:22 195:16 196:13
203:22 226:24 240:24 242:11 244:5
247:7 249:10 255:12 259:10 263:22
272:2 277:6 290:24 297:19 305:13,24
317:10 322:5

**lack** 110:19 188:5

**lag** 8:2

**lags** 329:18,19

**land** 180:15

**language** 49:23 87:6,7 180:4

**lapse** 133:6 308:10

**laptop** 261:13 291:10

**large** 13:4 217:17,20 218:8 279:22

**largely** 91:25 92:16 93:5,11

**larger** 38:7 168:23 202:19 203:2

**largest** 32:6

**late** 104:22,25

**late-stage** 103:25 124:11

**latest** 244:19

**law** 5:4 7:17,20 8:6,20 13:25 40:22

**lawyer** 298:10

**lawyers** 170:23

**leave** 13:21 162:15

**led** 127:6 159:14 221:15 236:14

**left** 13:20 75:6 78:2 194:19 317:5

**legacy** 26:20 303:14 333:4

**legal** 4:4 8:12 10:17,19 11:21 45:22
52:5 96:11 113:9 139:16 140:9

**legible** 119:9

**lend** 36:20 39:14 62:25 71:8 75:16
78:12 123:5 189:18,22 190:24 250:22

**lender** 32:7 37:25 38:3 39:5,14 42:19
50:8 65:5 83:6 86:8,11 87:13 94:4
100:21,22,24 108:16 111:7 113:15
127:22,24 128:4 129:6,11 191:22

**lenders** 106:7 304:13,20,25 305:5

**let alone** 116:19

**letter** 125:24 294:10,21

**level** 118:13 119:8 178:6,7 240:14
328:19

**Leventhal** 24:10,21 25:5,6,11
125:12,18,22 126:6 127:3 159:8
160:9,19 161:2 296:13 298:23
299:12,18 300:14,21

**leveraged** 38:4

**levies** 14:8

**Lexitas** 4:5

**licenses** 16:23

**lie** 334:12,16

**lied** 216:22

**lien** 14:10,12 20:10 24:6 29:22 30:7,
9,18 32:18,20,21,22,24 33:7,13,17,24
35:7 42:21,25 43:7,15,25 48:3,11
59:12 62:5,7 63:13 64:12 65:6,7,15,
16,24,25 83:6,7,12,13 84:7 85:2 86:5,
6,7,18 87:8,13,22 88:9 89:3,14 93:14
94:14,19,22 95:13,15 96:6,16,18
97:4,9,11,18,20,25 98:2,13,15,21,23
99:4,6,8,23 100:6,9 104:6 107:21,22
108:5,6 110:4,5 114:11,19 115:12,15,
23 116:21,24 117:7,10,19 118:4,19
130:18 146:16,17 162:16 167:7,14
175:16 176:5,15,24 177:4,18,25
178:3,11 183:3 184:8,15 185:6
186:22 187:4,8 188:19 189:5,11
190:6,11,18,21 191:25 192:2,4
193:15 203:8,10 221:10 234:23
236:10,15 241:17 255:25 256:13,16
260:8,12 261:5,21,24 262:3,13,24
263:14 264:17,24 265:14 267:15
268:7,14 269:18 270:10,15,22,25
271:14,16 272:8,21,23 273:5,19
274:10,11 275:10,15,20 276:4,6,7,20
277:11 278:3,5,7,10,18,23,25 279:4,

24 280:6,7,11,12 281:14,22,24 282:4
283:6,21,25 284:15 285:10,17 286:23
289:11,12,16,25 290:9,10,16 315:24
318:16 319:2 320:8 341:8,10

**liens** 14:7 19:16 21:14 29:5 30:13,17
33:9 34:24 36:17 37:6 38:10,14,16,
17,19,20,24 39:9 40:17,25 41:8,12,16
45:2 47:16 48:9 49:2,3,12 50:10 51:2,
15 53:17 59:10 61:17 62:18,19 64:14
65:10,18 66:3,11 71:11 75:19 78:15
83:9,15 84:9,13,14 85:5,8 86:23,24
87:16 88:3,7 89:25 90:2,4,15 91:23
92:10,14 93:3,15,23 94:3,10 96:3,11
97:24 98:11 99:14 100:2 101:12
102:13,19,21 104:2,21,25 108:22
110:8 111:22 112:4,5,11,17,21 114:5
115:25 116:8,10,14,15,17 118:9
119:3 135:17 141:14,15 146:4,7,10,
23,25 147:5,8 161:16,19,22 163:25
164:9,10,14 165:13 166:18,21
168:19,22 169:5 170:21 171:23
174:3,9,13 176:22 178:8 180:13
181:12 192:10,13,15 193:20,25 194:7
197:8,11,13,18,24 198:2,6,13,17,23
199:4,10,16 200:3,14,16,20 201:6,12,
13 202:6,22,25 204:17,21,23 205:14,
17,23 206:6,8,10,11,13,18,25 207:3,
10,25 208:8,20 209:18,20 210:10,22
211:3,18 212:3,19,25 213:10,18
214:3,16,19 215:11 216:5,11 217:6,
12 219:20 220:8 225:14 226:2,11
227:21 229:22 230:3,19 231:2,12
234:25 235:14 236:7 239:19 240:6,19
241:24 242:4,5 243:24 244:25 246:4
247:25 248:10,17,19 249:16 250:4,25
251:11,20 253:15,20 254:17 256:6,21
257:10,22 258:8,21 259:5 260:5,20
263:6,9,11,13,15 265:20 266:10,20
267:4,15,18 269:11,16,19,23 270:3,6,
11 271:21 273:11,14,15,22 274:4,12,
13,15 275:9 276:25 278:22 279:3,6,
13,20 280:14,22 282:7 286:6,10,25
287:10 288:11 289:7 290:13 295:4,24
296:21 313:10 316:5,24 317:14
318:6,9,14,15,24 319:7,10 320:17
321:7

**life** 14:11 221:9 225:12

**light** 49:19 187:25

**limit** 53:3,5,14 54:15,21

**limitation** 63:9 138:12

**limitations** 135:21 307:15

**limited** 54:17 138:8

**lines** 38:13 40:9 53:10,24 54:12,22
55:4 56:11 58:6,13,21 269:13

**liquidate** 132:16,20 295:17 297:9

**liquidated** 295:5,13 296:10,14,22 301:17

**liquidating** 60:11,14,23,24 61:9,10, 21,24 62:4 293:16 294:2,7,15

**liquidation** 59:24 60:5 62:8 293:13 302:6,10,19,21 303:2,5,19 304:2 306:5,10,12

**liquidity** 166:9,11,13 247:22 298:25 299:14,20 300:2,4

**list** 31:14 162:13 163:2 198:4 267:11

**listed** 22:10 28:12 120:9 216:6 260:7 269:11

**listing** 197:24 278:9 280:14

**lists** 64:3 138:7 192:5 278:16

**litigation** 14:6 18:20,21 19:2,3,8 21:21 52:17 113:20,22 125:5,13,19 126:2,5,7 127:5,9 159:8,15,16,22,23 160:20 300:19 324:22 325:6 331:10, 22

**litigations** 170:23

**LLC** 19:23,24 22:18 26:21 28:3,5,14 46:15,22 129:7 143:7,8,15 144:10 149:12,16 150:5 152:17 191:7,12 337:17 339:13

**LLCS** 26:16,17

**loading** 264:10 277:15

**loan** 43:20 144:4 145:6,17 147:10 149:3 150:16 151:4,21 157:19 158:2, 14,25 172:10 173:18 177:7 178:13 184:24 188:6,14 234:23 236:11 310:10 312:2 323:12,20 330:25 338:16,19,22

**loan-to-value** 117:15

**loans** 164:18 166:24 167:22 176:22 178:8 180:14 240:9

**local** 21:3 28:5 211:13

**lockbox** 63:11 139:2,14 140:7,16 141:5

**logo** 316:10,20

**long** 13:16 42:17 54:20 124:23 228:7, 12 234:19 246:19,24 287:14,19,20

**longer** 37:22 66:22,25 302:11 303:2

**looked** 13:18 38:3 68:17 152:16 158:11 187:16 267:14 273:6 280:11

**lose** 182:5 271:10

**loss** 169:16 301:21

**lost** 108:24

**lot** 20:19 21:5 40:11 121:19 146:22 222:9 248:6 290:13 331:5

**lower** 169:13

**LP** 127:21 193:3,4 339:17

**LPS** 301:21,23

**lump** 286:3,5

**Lynch** 11:10,12,13,16,25 12:3

**M**

**made** 18:22 32:5 62:5 71:7 73:22 75:15 78:11 103:22 109:13 111:24 113:2,6,12 114:6 115:2,16 116:4 119:18,19 133:12,13 134:13,25 142:13 217:16 230:16 234:11 282:24 301:23 308:17 309:16,17 313:4 314:4 319:10 323:12,20 332:22 333:23

**mailed** 312:22

**main** 33:12 91:18 103:5 192:17 329:13,15

**maintain** 197:8

**maintaining** 12:20

**maintenance** 193:14 198:13

**major** 7:14

**majority** 122:3 200:13,19 201:2,5 239:23 240:2 275:9

**make** 12:20 14:12 20:6 25:3,7 38:10 60:12 62:7 68:13 72:24 99:13 100:3 111:16 113:4 114:15 118:13 119:8 124:17 132:24 133:4,11 135:22 217:19 261:12 290:15 304:13,20 305:5 307:24 308:9,16 309:15 311:8, 19 317:25 319:13 320:13 324:10

**making** 33:16 75:24 119:9 155:22 159:19 179:4,12,20 185:15 221:19 230:8 330:24

**managed** 23:11,23 26:25 165:18

**management** 59:10,13 165:21

**manager** 22:22 301:19,22

**managing** 22:15 104:5

**manner** 126:13

**March** 70:24 75:8 78:4 93:20 144:4 173:2 196:16 197:2,17 202:13 204:12,14,24 212:10,20 213:14 214:7 222:17 223:4,12,21 224:21 228:21

**mark** 21:24 25:19 46:12 69:14,16 74:11 76:19 90:23 137:13 143:24 149:8 157:16 163:12 174:20 186:4 191:4 192:24 195:18 196:14 203:24 227:2 241:2 242:13 244:7 255:14 259:12 263:24 272:4 277:8 291:2 297:21 305:15 322:7 331:14

**marked** 22:3 25:24 46:18 64:2 69:20 74:15 76:23 91:5 137:20 144:6 149:5, 20 157:22 162:15 163:17 174:25 186:9 191:9 193:6 195:23 204:5 227:8 241:7 242:19 244:12 247:12 255:19 259:16 262:23 264:5 272:8 277:11 281:22,25 282:4 291:7 298:3 305:20 322:17 331:18

**market** 39:10,22 40:2,5,17 162:3,5, 10 188:8 302:5

**marriage** 336:19

**Maryland** 97:23 103:2 286:25 287:10,12,22 288:4,11 289:7

**match** 253:23

**material** 111:11,16 113:17,18,25 142:17 143:8 160:8 191:25

**materiality** 160:4,6,15 300:23

**matter** 4:10 6:19 113:9 207:16,19 336:21 343:9

**mattered** 229:22

**mature** 172:17

**matured** 310:10 311:25

**maturity** 113:10 133:21,24 134:15, 21 135:4,14 144:19 150:4 158:6 172:12 185:8 209:2 252:18 283:3 309:6,7 310:7,24 312:14,18,24 313:2, 16 314:2,14,24

**Mayron** 4:16 5:16 18:6 21:23 22:5 25:15 26:2 37:11 46:11,20 61:6 69:9, 13,22 70:8,18 74:6,10,17 76:18,25 78:25 90:18,22 91:7,13 96:23 98:9 109:7 119:14 128:24 136:12,20,23 137:9,12,22 141:20,23 142:3 143:21 144:8 149:7,10 150:11 154:13 157:15,24 163:11,19 174:19 175:3 186:3,11 187:14 189:3 191:2,11 192:23 193:8 195:14,17,25 196:11 203:23 204:7 210:19 222:25 226:25 227:10 228:23 229:9 240:25 241:9 242:12,21 244:6,14 245:12 247:6,14 253:2,8 255:10,13,21 259:11,18 262:10 263:20,23 264:7 268:10,24 272:3,12,14,15 276:16 277:7,22

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 119
RECEIVED NYSCEF: 01/12/2024

EMPLOYMENT BUSINESS RECORDS
JOHN ARTHUR HANRATTY
Court Records

INDEX NO. 158207/2022
John Hanratty
June 20, 2023

Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Pg 1095 of 2230

284:12,14 286:12 290:6,25 291:9
293:22 295:7 297:20 298:5 299:6
301:7 305:14,22 308:6 310:3 315:8,
15,23 317:21 321:4 322:5,14,17,19
325:4 331:13,20 332:15 334:21 337:7
341:23

**Mccoster** 161:9

**meaning** 49:19 115:20 198:21
234:11 258:25

**means** 13:3 93:8 201:13 237:12
249:25 286:3 305:8 306:23 328:22

**meant** 90:2 175:25 219:8 235:18
238:14 240:21 303:7

**mechanics** 43:10,15,18,25 44:10
48:4

**meet** 184:11

**meeting** 175:15 176:4

**member** 8:17 22:25

**memo** 231:17

**Memorandum** 195:21 339:20

**memorialize** 148:13

**memorialized** 124:14

**memory** 17:15 277:19

**Mendez** 197:6

**mentioned** 287:18 300:16 304:11

**merge** 132:16 236:2

**merging** 11:18 235:4 295:11 297:4
333:11

**Merrill** 11:10,12,13,16,24 12:3

**message** 107:11 182:24 207:8
254:10

**messages** 175:6 186:15 190:4
204:11 227:12 298:22 299:11,18
301:2

**Messaging** 174:23 186:7 204:3
227:6 255:17 339:8,11,23 340:5,22

**met** 85:9

**metrics** 181:15

**Metsarat** 287:18

**Michael** 127:6 159:14 160:8

**Michaud** 197:7

**mid** 245:20

**middle** 144:23 223:3

**midyear** 8:2

**million** 129:8 130:12 134:2,23,25
135:11,23 136:9,14 138:7,12 152:19
154:2,15 155:12,20 156:9,18 157:2
161:22 162:4 163:25 164:2,8,10,13,
18 165:2,8,13 166:17,18,21,22 167:8,
10,12 168:12,21,25 169:2,5 170:7,14,
18 171:22,25 174:8,12 175:16 176:4,
15,18,24 177:4,18,25 178:10 180:13,
14,16,19 181:5,7,21,23 182:6,12,17,
18 188:6,7,14,19 189:5,11 190:6,17
198:6 236:18 270:21,25 271:10,20
274:15 276:13,23,25 278:19 279:24
280:15 283:5,15 284:2 287:3,9 288:6,
10,24 289:6 307:9,11 310:18 312:8,
13 313:13,22,24 314:10,12,21 316:6
323:2,3,7,10 324:7

**Milstein** 183:18,19,23 184:17

**mindset** 123:25 171:8

**mine** 309:4

**minutes** 18:10 290:7 335:3

**Mischaracterizes** 333:2

**mishandling** 292:4

**misleading** 111:17 142:16 316:19
320:2

**misread** 110:25

**missing** 204:17,20 205:14,16 206:5,
7,10 210:10,22 211:18 212:3,18
213:9 214:3 215:11 216:5 227:21
231:12 236:20,25 237:7 242:5 243:24
244:25 246:4 247:25 248:10,17,19
254:17 256:5,20 257:10,22 258:8,21
259:5 260:4

**misstatements** 332:6,10,23,24
333:24 334:3

**Misstates** 325:18

**mistake** 118:14,21,23 119:8,18,19,
22 120:15 284:23 318:21

**mistaken** 303:3

**mistakes** 329:20 334:2

**modification** 89:11

**money** 12:25 19:17,23 32:5 33:20
38:10 48:12 61:16 64:23 71:8 75:16
78:12 135:13 170:20 293:9 297:15
306:24 310:20 312:2 313:15,20,25
314:7,13,23

**monitor** 9:16

**monitoring** 10:10,23

**month** 33:15 129:12,13 246:3 291:20

**month-end** 130:16 192:20

**month-period** 98:18

**monthlies** 67:10

**monthly** 36:10 129:16,23 130:4,18
192:19

**months** 43:21 96:17 97:10,19,25
98:14,22 99:5,24 124:23 180:12
211:6,13 276:6 279:6 282:19

**Montreal** 106:15

**morning** 4:25 18:17 190:23

**mortgage** 32:25 33:13,14

**move** 61:17 110:15 121:18 172:7
218:14 220:13,17,22 224:12 237:19
302:23 303:16

**moved** 11:16 106:19 122:16 214:16
220:9 221:4,7,8

**moving** 40:12 122:13 304:7 306:6

**MTAG** 68:14 91:23 92:14 93:3,9,14
94:10,12,14 95:2 101:7 102:12,17,18
112:8,20,22 191:7,13 192:9,13,15,18
193:5,10 194:5,6,11,13,22 195:3,4,7
197:3,14,19,24 198:3,4,16 200:2,6
202:8,16 203:7,14,19 204:17,21,23
205:14,17,18,25 206:6,8,10,12,14,15,
20 207:4,5,11 208:3,9 209:22 210:9,
10,21,22 211:10,17,18 212:2,3,13,15,
19,22,25 213:8,9,17,19 214:2,3,20
215:5,11,12 216:6,12 217:3,8,14
218:4,11,17 219:2,4,11,14,17,21,25
220:10,14,23 221:11,23 222:18
223:5,13,22 224:8,13,22 225:16,17
226:4,5,11 227:16,20,21,22 228:7,19
229:21 231:13,17,21 235:3,9,19
237:4,15 238:14,15 239:16 241:16,24
242:5 243:8,13,19,24,25 244:25
246:4 247:19,25 248:2,10,17,19
249:22 250:5,8,20,25 251:3,12,20
253:15,20 254:17,18 256:5,20 257:9,
10,21,22 258:7,8,21 259:4,5 260:4,8,
13,18 261:6,21,24 262:13,14,21,25
263:7,9,10,13,15 264:24 266:3,21
267:3,17 269:22 270:10 272:8,21
273:20,22 274:2,4,11,14,23 275:8
276:13 278:6 316:10,20,21,25 317:9,
15,18 318:2,7,9,14,18,24 319:3,14
320:8,17 321:8 339:13,17 341:8

**MTAG's** 202:20 203:3 237:25 238:5,
19 320:14

**multifunctions** 11:24

**multiple** 101:5 105:6 113:7 124:20

148:10 286:4 330:10

**municipalities** 40:15

**municipality** 33:6 39:8,19,25

**Méndez** 197:21 249:3

---

## N

**natural** 168:9

**nature** 67:13 68:4

**needed** 73:8 172:19 208:15

**negate** 110:20

**negates** 109:20

**negotiating** 34:8

**negotiations** 120:24

**neighbors** 41:25

**newspaper** 20:24

**nicely** 328:4

**night** 258:15 259:3 265:17 275:5
291:22

**ninety-two** 288:3

**ninth** 149:3,11,15 184:24 338:19

**non-cash** 64:6

**normal** 299:23

**nos** 121:20

**Noskow** 297:25 298:6,9 301:3,12,14
304:10 341:16

**Notary** 336:8 343:24

**note** 144:19 158:6 304:11 309:6

**noted** 335:6

**notes** 252:18 312:24

**notice** 133:6 145:15 151:2,19 153:15
154:25 157:9 158:23 160:16 182:16,
19 191:23 283:13,19,21 308:10

**notices** 283:4 312:23

**notify** 125:14 126:8,12 127:8 159:7,
13,21 300:18 303:25

**notifying** 156:13

**November** 158:7

**nuance** 64:21

**number** 21:22 25:20 29:4,6,8 30:8,
11,14,16 50:17 54:19 86:13 94:20
99:24 134:7 165:19 175:5 186:13

196:23 204:9 208:5 221:16 253:6
255:23 269:10 270:8 279:22 288:14,
19 289:10 317:4 331:9

**numbers** 28:22 29:2 30:3,18,19
181:14 287:12

---

## O

**oath** 343:15

**object** 20:18

**Objection** 20:11 21:17 23:13,18,25
24:24 26:13 27:2,9,13,19 28:23
29:13,17 30:5 31:18,24 34:6,11,15,25
35:8,13,17,21 36:2,6,22 37:3,10,14,
19 38:2,21 39:2,20 40:18 41:4,10,19,
23 42:12,22 43:3,11,17 44:3,22
45:10,15 46:2,24 47:7,12,18,25 49:8,
25 51:8,21 52:12 53:12 54:3,14,24
55:6,17,23 56:5,13,20 57:2 58:16,23
59:7,18 60:2,7,18 61:11 62:2,9,14
63:23 64:15,20 65:20 66:5,14 67:7,
15,22 68:7,15,22 72:4,9,18 73:3,12,
17,24 75:25 76:7,13 77:17,24 78:22
79:7,16,21 80:3,7,12,24 81:4,8,16,23
82:5,19 83:17,24 84:11 85:6 86:20
87:11,25 88:12 89:6,17,23 90:6 92:4,
11,17,21 93:7,16,21 94:11,16 95:3,
19,23 96:9 99:9,17 100:10 101:18
102:14 103:8,15 104:9 105:3,14,20
106:2,10,25 107:9,12 108:7,10
109:16 110:10 111:19 112:2,15,23
114:9,18 115:4,18 116:6 117:4,12,21
118:6,22 119:13,17,24 120:12,16
121:11 122:11,25 123:18 124:7,19
125:6,10,15 126:10,18 127:10
128:11,22 129:19,25 130:10,13,20
131:18,25 132:6,12,18,21 133:2,9,18,
23 134:4,16,22 135:5,15,24 136:4,11
139:15 140:8,17 142:19 143:10,18
145:18,22 146:6,11 147:12,21 148:8,
15,21 150:8,22 151:6,10,22 152:7,25
153:6,14 154:5,22 155:14 156:2,20
157:4,11 159:10,18 160:2 161:4,25
162:6,19 164:15 169:7 171:5,20
172:3,14 173:19 174:4,10 176:17
178:15 179:8,15,22 180:21 181:9,24
182:9,21 183:4,25 184:19 185:10,17,
23 187:11,18 188:15,21 189:24
190:12,19 192:11 194:3 198:19,24
199:6,12,18,23 200:7,15,21 201:4
202:9,14,21 203:4,15 205:3,8,19
206:3 207:6,13 208:10 209:13,23
210:12,24 211:20 212:6 213:11,23
214:4,8,22 216:9,19,23 217:9,15
218:20 219:5,15 220:2,11,16,24
221:5,24 224:14,25 225:18 226:6,13
227:23 228:9,16,22 229:6,24 230:6,

13,21 231:5,14,22 232:4,15,20
233:22 235:12 236:12 237:23 238:7
240:4,13 241:13,25 242:8 243:10,21
244:2 245:2,7,16 246:6,12,25 248:3,
11,20 249:2 251:16,24 252:14,20
253:12,18 254:7,21 256:7,22 257:11
258:9,23 259:6 260:14 261:7 262:2,5,
15 263:2,18 264:19,25 265:22 266:5,
24 267:5,19 268:8 269:25 270:17
271:3,12,17 273:24 274:6,16 275:12,
17,22 276:8,15 278:4,12 279:9,15
280:2,9,16,23 281:12,17 282:22
283:8,17 284:3 286:8 289:17 290:11,
19 292:10 294:9,17 295:6,9,14,19
296:2,23 297:11 300:5,11 302:20
303:6,20 304:3,21 305:7 307:3,12,18
308:3,13,22 309:2,11 310:2,8,14
311:2,12,23 312:10,15,20 313:7,17
314:3,15 316:2,22 317:11,19,22
318:11,19 319:5,15,21 320:3,9,15,25
321:13,19 323:8 324:6,18 325:18
326:21 327:9,17,25 328:13 329:2,23
330:8 331:2,23 332:25 333:25

**objections** 311:24 314:25

**obligation** 33:2 133:20

**obligations** 107:19 108:3 110:2
135:9

**obtain** 37:17 81:20

**obtained** 7:11,16 162:17

**obtaining** 37:13

**occasional** 332:5,10

**occasionally** 325:10,23 332:22
333:23

**occurred** 16:2 57:22 103:21 132:25
133:5 135:18 147:18 151:25 152:6,
11,13 155:25 209:15 308:2,10

**occurring** 267:25 294:22

**occurs** 48:16

**offer** 343:14

**offhand** 7:25 8:10 28:6 36:12 42:4,
23 87:17 89:18 130:2 168:4 189:13
246:14,21 248:14 287:11,25

**office** 27:7,12 330:10

**officer** 6:18 12:15,17 14:21,25 15:3
16:3,17

**offices** 9:12,14 211:13

**Ohio** 102:25 103:16 124:12 220:7
232:22,25 249:16 250:4,20,25 251:7,
11,19 252:7,10,15 266:8,11,13,19
267:3,15,18,21

**Ohios** 200:9 265:13

**oil** 323:13

**older** 38:11,14,16,18,20 39:9 239:24

**omitting** 111:15

**on-boarding** 10:24

**One's** 39:6

**one-off** 40:9

**one-to-one** 186:24 188:5

**open** 241:16 263:21 271:25

**operate** 48:8 52:2,3 313:9

**operated** 13:15

**operating** 53:18

**operation** 9:11 11:17

**operational** 118:24 329:11,22

**operationally** 84:17 86:21

**operations** 49:11 50:13 51:5,18 89:8,20 132:16

**opinion** 213:25 214:5,7 215:23

**opinions** 162:13,25 163:4

**opposed** 25:8 68:14

**opposition** 331:11,17 342:4

**option** 302:8

**options** 17:11 234:2 302:7

**Opus** 57:20,21 294:11

**order** 11:7 71:7 75:15 78:11 302:22 331:12,17 342:4

**orderly** 61:25

**orders** 13:4

**ordinary** 50:10,12,14 51:2,4,6,15,17, 19 59:3,16,25 60:5,17 132:11

**organizational** 25:22 26:3,11 337:14

**origin** 19:10

**original** 322:11

**originator** 33:7

**Ortega** 4:3

**OTA** 6:17 12:5,8,10,11,13 13:14,16 14:15,18 15:4,13 16:10,13 19:20 24:5,16 291:17 293:3 298:12

**OTA's** 12:22

**OTR** 15:8,10,11,20,24 16:5,8,14

**outcome** 336:20

**outstanding** 35:25 67:25 129:4,5 130:11 138:24 141:3 149:23 212:22 311:5

**over-inclusive** 267:11

**overcollateralized** 68:3

**overdue** 224:23

**overestimated** 171:24

**oversee** 9:10

**oversight** 9:4 148:22

**overstated** 165:14,16 274:13 283:24

**overstates** 276:12

**owe** 33:15 134:20 309:8 310:20 311:4 312:2 313:20 314:6

**owed** 33:4,11,17 64:23 160:9 181:11

**owes** 33:20

**owing** 306:24

**owned** 63:14 64:12 114:19 166:17 168:5 173:25 174:12,15 240:7 250:5 269:23 270:20 271:20 277:3

**owner** 183:20 193:18

**ownership** 123:10 191:24

**owns** 30:9 86:25

---

**P**

**P-I-N-G** 85:23

**p.m.** 70:2,6 137:2,7 196:5,9 210:14, 17 255:5,8 315:10,14 335:5,6

**PAGE(CONT'D.)** 345:2

**paid** 21:9 33:18,19,25 135:8,11 149:22 172:8 285:8,23 286:3,16 287:14,19,20,24 288:5,14,23 306:25 310:21 313:21 314:21

**pandemic** 180:24

**paper** 221:13 224:3 225:4 228:13,19

**paragraph** 98:10 138:19 165:15 197:2,23 201:18 325:8

**parameter** 115:20

**parameters** 100:12 120:25 123:3

**paraphrasing** 139:23 142:7

**Park** 20:23,25

**Parks** 4:25 5:2,21 17:25 18:5,13

20:11,14,18 21:17 23:13,18,25 24:24 26:13 27:2,9,13,19 28:23 29:13,17 30:5 31:18,20,24 34:6,11,15,25 35:8, 13,17,21 36:2,6,22 37:3,10,14,19 38:2,21 39:2,20 40:18 41:4,6,10,19, 23 42:12,22 43:3,11,17 44:3,22 45:10,15 46:2,24 47:7,12,18,25 49:8, 25 51:8,21 52:12 53:12 54:3,14,24 55:6,17,23 56:5,13,20 57:2 58:8,16, 23 59:7,18 60:2,7,18,25 61:5,11 62:2, 9,14 63:23 64:15,20 65:20 66:5,14 67:7,15,22 68:7,15,22 70:17 72:4,9, 18 73:3,12,17,24 75:25 76:7,13 77:17,24 78:22,24 79:7,16,21 80:3,7, 12,24 81:4,8,16,23 82:5,19 83:17,24 84:11 85:6 86:20 87:11,25 88:12 89:6,17,23 90:6 91:10 92:4,11,17,21 93:7,16,21 94:11,16 95:3,19,23 96:9, 21,25 98:8 99:9,17 100:10 101:18 102:14 103:8,15 104:9 105:3,14,20 106:2,10,25 107:9,12 108:7,10 109:6, 16 110:10 111:19 112:2,15,23 114:9, 18 115:4,18 116:6 117:4,6,12,21 118:6,22 119:13,17,24 120:12,16 121:11 122:11,25 123:18 124:7,19 125:6,10,15,20 126:10,18 127:10 128:11,22 129:19,25 130:10,13,20,24 131:18,25 132:6,12,18,21 133:2,9,18, 23 134:4,16,22 135:5,15,24 136:4,11, 18,22,24 139:15 140:8,17 141:18,21, 24 142:19 143:10,18 144:12 145:18, 22 146:6,11 147:12,21 148:8,15,21 150:8,10,22 151:6,10,22 152:7,25 153:6,14 154:5,22 155:14 156:2,20 157:4,11 159:10,18 160:2 161:4,25 162:6,19 164:15 169:7 171:5,20 172:3,14,24 173:19 174:4,10 175:8 176:17 178:15 179:8,15,22 180:21 181:9,24 182:9,21 183:4,25 184:19 185:10,17,23 186:17 187:11,13,18 188:15,21,23 189:2,24 190:12,19 192:11 194:3 195:10 196:3 198:19,24 199:6,12,18,23 200:7,15,21 201:4 202:9,14,21 203:4,15 205:3,8,19 206:3 207:6,13 208:10 209:13,23 210:12,24 211:20 212:6 213:11,23 214:4,8,22 216:9,19,23 217:9,15 218:20 219:5,15 220:2,11,16,24 221:5,24 222:23 223:2 224:14,25 225:18 226:6,13 227:23 228:9,16,22 229:6,24 230:6,13,21 231:5,14,22 232:4,15,20 233:22 235:12 236:12 237:23 238:7 240:4,13 241:5,15,25 242:8 243:10,21 244:2 245:2,7,16 246:6,12,25 248:3,11,20 249:2 251:16,24 252:14,20,24 253:12,18 254:7,21 256:7,22 257:11 258:9,23 259:6 260:14 261:7,16 262:2,5,15 263:2,18 264:10,19,25 265:22,24

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSEF DOC. NO. 1462049040 BUSINESS CREDIT Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State  John Hanratty
                    JOHN ARTHUR HANRATTY          Court Records     Pg 1098 of 2230        RECEIVED NYSCEF: 06/20/2023
                                                                                              June 20, 2023

266:5,24 267:5,19 268:8,22 269:7,25
270:17 271:3,12,17 272:10,13 273:24
274:6,16 275:12,17,22 276:8,15
277:15,20 278:4,12 279:9,15 280:2,9,
16,23 281:12,17 282:22 283:8,17
284:3,11,13 286:8,14 289:17 290:11,
19 292:10 294:9,17 295:6,9,14,19
296:2,23 297:11 299:4,8 300:5,11
301:5 302:20 303:6,20 304:3,21
305:7 307:3,12,18 308:3,13,22 309:2,
11 310:2,8,14 311:2,12,23 312:10,15,
20 313:7,17 314:3,15,25 315:6,21
316:2,22 317:11,19,22 318:11,19
319:5,15,21 320:3,9,15,25 321:13,19
322:12 323:8 324:6,18,23 325:2,18
326:21 327:9,17,25 328:13 329:2,23
330:8 331:2,23 332:11,17,25 333:25
334:8,10,19 335:2

**part** 10:15 20:19 96:22 103:17 120:4
141:25 148:23 235:2,21 294:10,12
303:24 304:8 308:4 333:10

**participants** 38:5 39:10

**participated** 102:8

**parties** 88:22 143:2 332:22 333:23
336:18

**parties'** 331:17 332:5,9 342:4

**partner** 22:15 23:9,21

**partners** 19:20 24:5,7 138:8

**partnerships** 297:5

**party** 88:22 142:25 153:15

**passage** 145:14 151:2,18 158:22

**passed** 17:18

**passing** 17:22 42:6

**past** 162:23 167:13 249:19

**Pat** 197:21 208:17 321:14

**path** 172:16 292:18,21

**pause** 37:20 180:5 233:24

**pay** 35:11 52:5,10,25 53:10,25 54:12,
23 55:4,11,15,22 56:3,11,24 57:13
58:7,14,21 122:15 123:24 135:13
139:11 140:4,13 141:6 285:15 286:5
287:8 288:10 307:16

**payable** 235:3

**Paydowns** 68:3

**paying** 170:22 173:11 314:10

**payment** 33:15 323:2,7

**payments** 33:17 287:3 323:3

**penalty** 343:5,6

**people** 9:6 14:8 16:15 21:8 24:17
28:2 43:19 61:15 73:13,14 163:7
179:4,12,19 226:18,19 230:16 237:9
246:15 269:7 326:5 327:13,21
330:11,12,13,19

**percent** 13:11 118:11,12 119:6,7
168:7 198:6,17,22 199:4,10,16 200:2
202:6 205:23 207:25 208:4 214:18
217:5 230:18 231:2,18,19 301:18

**percentage** 199:8,20,22 214:24,25

**percentages** 123:9 199:14 200:24

**performed** 331:7

**period** 85:18,20 100:7 112:7,10,16
123:8 272:24 273:2,4

**perjury** 343:5,6

**permission** 54:19 79:20 230:2,5,11,
15

**permit** 73:19 146:10

**permitted** 54:11

**person** 30:22 32:8,10 33:20 44:17,18
192:17 275:18 332:17

**personal** 131:6 160:10 320:24

**personally** 84:25 85:8 118:10 119:5

**personnel** 331:6

**perspective** 39:15 54:6,8 55:2 64:22
84:18 86:22 116:9 123:20,24 153:19
160:13 177:22 187:22 219:17 240:21
300:23 303:7,10 317:13 318:5

**perusing** 290:3,8

**Philippines** 27:23 28:4 31:8,11

**phone** 10:10 28:22 29:2,4,6,7 30:3,8,
11,13,16,19 304:12

**phones** 31:10

**pick** 30:24 31:12

**picture** 213:13

**piece** 221:13

**Ping** 57:23 66:20 67:4 72:12,16
85:19,23 192:16,19 194:15,16,19
291:19

**Piper** 298:13

**place** 27:4 148:7,10

**placement** 317:9

**places** 38:7 93:24 201:9

**plaintiff** 4:18

**Plaintiff's** 340:21

**plaintiffs** 331:12

**plan** 235:25 300:24 302:12,13

**planned** 243:5,8

**planning** 295:16

**plans** 11:14

**play** 173:22 219:10,11 239:20

**pledge** 240:19

**pledged** 62:12 63:15 65:15,24
108:21 240:18

**pledging** 178:22

**plenty** 52:8

**point** 13:23 15:7 16:21 20:2 31:14
121:16 168:4 172:5 173:8 248:8,12,
23

**Ponzi** 161:3,7,10

**portfolio** 40:4,5 45:2 46:4 101:24
103:11 106:14,17 118:11 119:6
165:12 166:3 167:7,9,16 168:2,7
169:22 170:5 171:14,25 175:18
176:2,8,19,21 177:11 178:6,7 180:3,
7,18 181:4,6,20,22 182:5,17 183:2
184:8,16 185:6 187:4,8,9,17,23
202:13 217:18,21 218:9 220:7 276:22
278:10,18 280:7 283:15,25 293:2

**portfolios** 167:16 169:10 170:9,17
171:3 220:8

**portion** 101:24 112:24 138:22
140:25 202:16,17,19,20,25 203:3
206:23,24 219:19 232:23 233:2
248:21 301:11 316:24 319:7,9

**portions** 103:11 120:19 217:17,20
218:9

**position** 11:20 211:2

**possession** 110:14 112:6,14,17
113:2 114:12,22,24 116:12

**post-covid** 172:23

**potential** 170:23 209:2 211:4 224:18
304:24

**potentially** 19:22 121:5

**practice** 8:6 76:10

**Prader** 170:2

**pre-covid** 172:21

**pre-ping's** 58:2

premiums 285:24

prep 18:15

preparation 67:4 110:17

prepare 18:12

prepared 137:18 201:15 205:6,10 237:9 338:12

preparing 18:8 68:13

prescribed 100:8

present 168:6 197:4

presents 271:15

Press 20:23

pressure 276:2

presume 106:5 248:13 257:13 260:16,17 293:20 299:16

presumed 208:16 261:6

presumption 216:25 224:16 261:8

pretty 219:9 234:22 289:14

prevent 315:4

previous 135:21 257:14

previously 209:16 232:18 245:5,14

price 162:13,25 163:3 169:13 188:8

prices 163:2

primary 31:2 39:16

principal 11:6 17:11 27:4 149:22

printed 188:9

prior 13:18 16:9 49:16 62:8 99:24 113:9,12 124:21 131:16 211:6 223:19 267:22

priority 289:10

privileged 298:14

problems 328:11

proceeds 50:6 55:14,21 56:2,23 57:12 64:5,13 170:18 320:23 324:5

process 20:19 33:18 43:20 45:21,22 66:8 67:8 74:4 91:25 92:16 93:5,10 94:8 98:16 103:20,21 104:5,6 118:8 119:2,4,21,25 120:5 124:22 130:3 197:12,18 208:13 210:4,6 211:3,9 217:22 245:19 294:13 304:8 320:19 321:10,12 326:25

process-wise 73:5 82:11

produce 66:7 67:16

produced 322:13

producer 323:13

producing 66:12

product 7:7 15:18 38:11 39:16 40:14 81:11

products 64:5

profitable 38:9

progress 211:22 222:2

project 208:15

promptly 113:15 125:3

prong 12:23 172:15

pronounce 9:25

properly 85:10 326:7 327:23 333:6

properties 161:24 162:9

property 33:3 59:12 61:19 64:7,8 98:12,14,17 104:5 165:24 192:3

proposal 322:21

proposed 108:21

proprietary 12:24 15:15

protected 11:8 40:22

protection 105:12,18,24

proves 142:16

provide 6:7 29:11 32:15,18 114:25 128:7 129:22 130:8 131:5 157:9 234:17 324:13

provided 16:14 100:23 197:24 328:19

providers 301:24

providing 185:20 324:16 325:16 327:23

provision 136:2

provisions 34:13,16 143:8

Prudential 13:24 14:4

public 7:15 128:3 336:9 343:24

Puerto 27:7,21 28:2 31:13

pull 69:9

pulled 173:5,9

pulling 282:15

purchase 36:17 38:24 39:8,18 40:6 45:2 46:3 86:24 91:24 92:15 93:4,10, 14 94:19 135:17 192:2 295:3,23 296:20 313:9

purchased 11:7,13 193:20

purchases 40:11 194:17

purchasing 19:16 39:24

purpose 47:16 48:25 80:25 172:7,11 261:12

purposes 49:7 111:7 141:14 190:9 257:5

Pursuant 70:23 75:7 78:3

pursue 302:14

pursuing 302:6 303:12

pushing 121:21,24 122:6,7,20,22 123:13,19 295:4

put 15:22 19:22 45:19,25 61:16 206:23 215:6,9,20 216:13,17 222:11 228:14,21 246:10 285:23 287:6 291:10 313:14,24 314:12

putting 81:6 275:14 314:20

## Q

qualified 318:20 319:6,24

quality 330:18

quarterly 157:7 323:3

question 5:22,25 6:2 52:20 109:20 114:4 115:11 117:25 137:25 154:14 185:5 209:25 213:3 251:6 252:7 267:23 287:6 314:8,9 318:22

questions 5:19,22,24 82:14 187:2 209:9 334:6

quick 219:9

quickly 24:4 183:12 289:15 315:16

## R

raise 186:25

rates 239:8

read 49:4 50:5,16,22 63:6,18 64:10 65:13 71:14 75:21 78:17 86:12,16 92:3,7 95:20 97:6 98:4,19,25 99:10 107:23 108:23 114:2 128:6 129:14 131:2 132:7 139:8 142:20 145:12,19 150:23 151:7 158:20 159:5 178:5 192:7 197:15 209:16 214:10 236:15 295:8 296:3 302:15 304:16 343:7,9

reading 94:7 139:22 149:18 154:23 178:6 205:20 238:17 298:17 317:6

**reads** 87:12 93:8 111:20 125:7 141:10 150:2 198:10,15,20,25 202:10 203:6 205:10 230:23 272:23 273:2 274:8 296:5 299:10 308:14,23 309:22 325:14

**ready** 121:17 334:11

**real** 19:15 21:2,5 29:6,7,8,25 32:3 52:6 164:2 245:20

**reason** 6:6 68:10 88:6 93:18 199:21 210:9,21 211:2,16 212:2 235:21 250:21 252:8 254:15 290:22 333:10 344:6,11,16,21 345:5,10,15,20

**reasonable** 94:6

**reassign** 235:17

**rebanded** 15:19

**rebranded** 15:20

**recall** 7:25 8:3 10:25 14:16,17 17:9, 21,22 22:20 25:13 35:3,9,14 40:8 42:4,13 43:6,18 44:4,5,9,11,12,15 45:18 46:6 50:2 55:8,9,12,18,20 56:6, 7,14,18,21 57:3,6,9,19 58:24 68:16 69:3,7 70:14 71:23 72:2,10 73:4,25 74:3,4 75:3 76:3,8,14 77:4,14,18,25 79:22 80:4 81:25 82:7 87:17 89:18 91:14 92:24 95:4 101:9,25 102:4,10, 20 103:9,10,18,20,24 105:9 107:2,3, 4,10,13 113:11 121:3 124:14 125:23 126:3,14,15,16,20,22,25 127:11,13 129:20,21 130:2 136:17 138:3 148:6, 9,16 156:10,15 157:12 159:11,19 160:17,21,23,25 161:5,8 168:3 178:19 179:23,24 183:6,7,8 184:3,20 207:21 214:10 221:6,15 223:18 225:9 226:20 231:15,23 232:5 233:16,18 238:8 246:14,20 247:4 275:25 277:25 292:15 293:24 294:4,6,19 296:7,24 299:15,17,22,25 300:7 317:24 318:8 319:12,16,22

**recapitalization** 302:7

**receipt** 191:23 291:23

**receivable** 21:11 71:3 75:11 78:7 188:6

**receivables** 188:14

**receive** 299:11

**received** 72:7 79:3 116:20,21 138:23 139:19 140:25 203:19 298:22 310:17 312:3 323:16

**receiving** 299:17

**recent** 86:10 170:6

**recently** 167:20

**recess** 70:4 137:4 196:7 255:6 315:12

**recognize** 286:2

**recollection** 55:25

**recommendations** 9:17

**reconcile** 94:22

**reconciling** 237:18

**record** 4:3,15 15:19 16:18 69:24 70:3,7 136:24 137:3,8 196:2,6,10 210:3,14,15,18 211:12 255:5,9 315:11 335:5 336:15

**recorded** 211:23 214:16

**recording** 211:13 212:7

**recordings** 116:11 225:10

**recover** 61:16

**Red** 323:19,22,25

**redeem** 21:15

**redeemed** 21:19

**redemption** 301:16

**redemptions** 304:14 332:6

**redemptive** 164:8 171:22 174:2,8,12 181:8,10,11,17,19,21 182:6,13 268:6, 13 269:19 270:15,22 271:21 273:11, 15 274:3,12 276:23 278:17 279:3,7 280:14 287:2 316:5

**refer** 22:9 31:6 178:13 232:25

**reference** 122:7 182:24,25 205:23 227:20 257:20 258:6 260:2

**referenced** 15:13

**referred** 31:25 59:20 180:2

**referring** 28:12 60:10 145:24 148:3 153:24 183:17 187:16 233:21 234:8 305:2

**refers** 59:3 252:17

**refi** 222:5

**refinance** 121:14 148:12 224:18 302:24

**refinancing** 110:17 148:11 302:7

**reflect** 157:8 182:2 263:6,9,12

**reflected** 26:22 224:17 246:7 247:3 307:13

**reflects** 51:24 263:15

**registered** 12:11 16:22

**registration** 6:24

**regulations** 12:22

**regulators** 9:20 13:13

**rejected** 225:11

**related** 7:4,6 17:12 35:7 38:13 40:10 52:8 96:11 106:22 146:13 153:10 160:13 173:15 178:22,23 192:13,15 230:8 231:10 235:14 245:19 267:23 287:15 299:21 333:16,21 336:18

**relates** 151:12 156:21 252:22

**relating** 124:16 236:7

**relation** 213:13

**relationship** 5:20 31:16 34:5,10 82:10 90:14 121:18 160:10 296:18

**relative** 31:4

**relaxed** 292:19

**Release** 193:15

**relevant** 40:24

**relied** 81:14 325:12,25

**rely** 71:5 75:13 78:9 185:21 328:10

**relying** 281:10

**remain** 71:4 75:12 78:8 100:2

**remaining** 212:12 240:20 295:3,24 296:20

**remains** 138:24 141:3

**remember** 17:10 28:6 43:12 44:18 74:20 94:18 125:16 143:20 225:5 288:13 295:15 296:25 297:3 298:19 329:8

**remembering** 267:25

**remind** 232:9,10

**reminded** 231:25

**remove** 99:24 236:21

**REO** 59:12 62:5,7 64:17 104:4 161:23 162:4 163:2 165:2,9,13,14 166:2,4,18,22 167:8,21 168:23 170:22 172:16 173:9 176:2 177:7 178:8,13,22 180:16 188:7 189:18,22 190:11,24 240:9 247:23 258:16

**REOS** 36:21 37:2 166:14 168:19,22, 25 169:2,5 271:8 320:22

**repaid** 33:4 64:24

**repay** 133:21 134:14 135:3 309:6

310:7,24 312:13,18,24 313:6,15
314:2,13,23

**repayment** 138:25 139:12 140:5,6,
14 141:4 283:5

**repeat** 5:25 52:19 65:21

**rephrase** 5:25

**replaced** 57:17

**replacements** 64:4

**report** 36:13 80:16 130:18 137:17
196:16 199:25 205:2,6 208:5 209:18
214:24 215:6 230:23 231:8 253:11,
14,19,23 254:5,16 255:25 256:4,19
257:4,9,18,20 258:3,7,20 260:3
263:5,8,12 266:3,10 269:12 272:8,22
276:4 282:19,20 338:11 341:8

**report/borrowing** 215:5

**reporter** 5:6 21:24 25:18 46:12 53:19
66:24 69:14,16 74:11 76:19 85:21
90:23 126:24 137:13 143:23 149:8
154:10 157:16 163:12 174:20 186:4
191:4 192:24 195:18 196:13,14
203:24 227:2 241:2 242:13 244:7
255:14 259:12 263:24 272:4 277:8
291:2 297:21 298:16 305:15 322:7
331:14

**reporting** 4:5 36:5,8,10 143:16
194:20,22 326:4 327:16 328:12
329:18,19 333:13,17,18,19

**reports** 9:5 10:23,25 157:6 192:20
234:18 244:20 245:25

**represent** 107:17 117:10,18 118:3
264:21 273:18 322:10

**representation** 109:13,14,23 110:7
111:25 114:7,15 142:11

**representations** 65:3 71:7 72:25
73:22 75:15,24 76:4 78:11 108:13
109:2 145:6 150:16 151:8 152:23
153:12 154:3,20 158:13 170:25
221:19

**represented** 65:7,16,25 83:6,12
107:25 109:24 115:7,9,11 116:2,23
118:18 164:7 210:8,20,25 211:16

**representing** 115:3 175:15 176:3
225:13,25 235:7 263:14

**represents** 65:5 71:9 75:17 78:13
83:5 108:15 273:10

**request** 25:5,6 106:8 127:21 129:10
130:5,9 230:9 260:3

**requested** 106:11 219:3

**requesting** 183:22 298:24 299:13,19

**requests** 219:13 301:16

**require** 34:17,20 96:6

**required** 10:9 81:20 100:18 107:22
108:6 110:5 112:12 130:8 192:9
193:21 194:9 304:19 305:4

**requirement** 89:13 193:25

**requirements** 34:24 35:4,6 36:5,9,
10 65:9 83:8,14 84:8 85:4 117:14
143:17

**requires** 33:5

**rerecord** 224:4 225:6

**rerecording** 211:9

**research** 7:5,7 15:18,19,21

**respect** 96:16 97:4,9,18,25 98:13,22
99:5 107:20 108:4 110:3 111:12
142:17 221:22

**respects** 107:19 108:3 110:2,23

**respond** 175:19 176:11 177:14,15
188:3 210:2 212:13 214:9 224:2
234:25 237:17 245:4,13,23 246:23
249:21 251:12 258:12

**responded** 176:13 178:18 185:4
190:15 230:4 266:21

**responding** 182:4 187:21 230:17
231:8 252:6

**responds** 224:21 228:6 236:17

**response** 183:6 184:4 281:6

**responses** 247:2 301:4

**responsibility** 12:16

**responsible** 67:5 75:23 85:15
194:12 203:12 275:14

**rest** 15:5 324:8,11

**restrict** 35:10

**restrictions** 95:22 96:3,5

**result** 113:24

**resulted** 64:17 301:20 302:3

**results** 330:2

**retail** 9:10

**retain** 89:14

**retained** 87:9,21 88:10 89:4

**retire** 121:17 122:4 124:2,4 302:22

**retired** 14:22 125:23 293:3 305:10

**returned** 300:8 318:15,25 327:2

**reveal** 52:17

**revealing** 52:22 53:7,22

**reveals** 58:9

**reverse-engineering** 156:5

**review** 26:5,14 46:25 47:19 50:21
51:22 73:6 82:13,17,18,21 83:25 84:6
85:2,8 88:18 92:6 97:3 99:13 109:5,
11 110:24 120:2 136:7 142:2 144:14,
25 149:14 165:5 167:18 175:11 178:4
184:2 186:19 203:18 223:17 241:20
250:16 252:25 253:7 264:14 265:2
269:2 277:17,21 282:3 286:19 290:5,
16 293:21 306:3 315:20 319:9 325:3

**reviewed** 85:13 327:3

**reviewing** 9:5 76:12 203:13 252:5

**revolving** 47:10

**Richey** 137:18 338:12

**Rick** 14:20,22

**Rico** 27:8,22 28:2 31:13 161:13

**rid** 168:13 169:16 180:25

**rights** 63:12

**ring** 18:3 30:24 31:12

**rings** 30:21

**risks** 37:2

**Ritter** 32:9

**Road** 285:13,17,20

**Rochester** 45:4 46:4 86:23 87:16
88:7 90:13 116:14 124:10 147:2
220:18

**role** 8:25 9:9 10:4,14 12:13 13:6 14:3
15:24 239:20,22

**roles** 11:4,11 61:15

**roll** 221:10

**rolled** 270:8

**rolling** 295:21

**romanette** 64:2 86:6,15 95:8,10

**room** 69:15

**Rose** 19:14,24 20:7

**rotate** 31:4,10

**roughly** 10:11 37:15 134:23 161:19,
21 162:3,4 163:25 170:6,13,15,19
172:20 324:7

**row** 284:9 285:12,19 286:18

**rows** 278:24 285:22 286:10

**run** 52:2,4 53:17,20 54:8

**running** 11:2 161:3,7,10 171:9 208:16

**runs** 11:5 178:7

**RV** 163:25 166:17 180:13

---

**S**

**S(cont'd.)** 338:2 339:2 340:2 341:2 342:2

**Sahil** 72:14 121:5

**sake** 318:3

**sale** 20:24 170:18

**Salerno** 127:6 159:14 160:9

**sales** 13:2 15:16,17,21 29:7 44:14 62:5,8 164:17 169:23 247:23 271:9

**San** 9:12 27:7

**Santori** 24:18 291:5,12,16,19 292:2, 8,12 293:14 294:24 305:18,25 341:12,20

**Sarullo** 32:11

**sat** 287:24

**satisfied** 83:22

**satisfy** 215:24

**save** 343:11

**scenario** 87:18

**scenarios** 88:3 116:16

**schedule** 95:17,22 96:12 98:5 99:4, 15 100:8

**scheme** 161:3,7,10

**school** 7:17,20 8:20 13:25

**Scott** 322:4

**scroll** 268:2

**seats** 330:13

**SEC** 6:19 12:12

**secondary** 39:22 40:2,5,17

**section** 48:24 50:5 59:2 65:2 83:4 88:17 95:11 100:16 107:16 109:23 111:3 113:14 114:7,16 115:3,17 116:5,25 124:25 127:19 129:2,3 130:15,23 131:4,10,21 132:14,15,23

135:20 138:20 139:6 140:23 141:12, 21,23 142:22 144:22 145:3 149:21 150:13 158:5,11 159:4 191:17 193:14 293:12 308:6

**secured** 98:12,13 175:16 176:4,23 177:3 190:6,17 240:14,17

**securing** 192:3

**Securities** 17:19,23

**security** 35:15 62:11 63:16 70:23 75:8 78:4 178:23 240:18

**select** 268:16 273:13

**self-service** 106:16 121:10 122:2, 10,24 123:15 146:10,24 148:20 230:3,11 231:4 239:19,21 245:6,15

**self-serviced** 120:10 123:16 124:6 192:10 200:8,13,19 202:16,19,25 230:20 239:14

**self-servicers** 106:13

**self-servicing** 103:14 104:8,13 106:20,22 107:8 120:18 121:16 122:13,14 123:10 124:8,18 146:3,7, 22 147:6,14,23 148:2 151:13 152:4,9, 15 153:23 198:22 199:4,9,15 217:24 218:8 229:5,12,18 232:3,11,13,19,22 233:7,12,20,24 234:7 239:25 253:17

**self-serving** 199:3

**sell** 21:16 61:21 131:22 132:3,8 165:24 169:12,21 170:4,8 182:12 279:12,19,23 302:5

**seller** 164:17 166:23 171:11

**send** 67:17 107:6 156:12 194:11 211:11 215:5 222:18 223:5 227:16 234:18 237:16 244:19 247:18 248:4, 13 253:22 255:25 256:12,16 257:3,17 258:20 261:15 276:6 283:6 293:23 294:10 296:6

**sending** 194:12 263:5 275:21 282:21 293:24 294:20

**sends** 283:4

**senior** 9:6 12:14,17

**sense** 32:5 241:16 290:15

**sentence** 48:23 91:21 198:11 299:7 301:9 306:17

**separate** 11:15 59:19 169:23 178:16 270:11

**separately** 108:15 166:25

**September** 76:22 77:7 255:24 256:11 257:2,16,25 258:12 259:20

260:24 261:3 262:12 264:18 274:9 275:2,16 279:2 280:13 283:23 286:24 288:12 291:13 305:25 338:5

**series** 16:23,24 17:2,4,6,8

**served** 15:7 201:5

**service** 100:20 101:21 102:19,21 106:13 197:8 214:21 218:18 301:24

**serviced** 102:12 194:2 197:14 198:5 202:8 217:14 287:23

**servicer** 33:9 34:21 100:21 101:4,8, 17 103:7 105:11 106:9 131:13,16 193:19

**servicers** 101:5,11,14 239:9

**services** 29:12 32:12,13 57:17,18 58:3 66:16 85:18,22 101:7 131:12 191:8,13 193:5 203:8 238:2,6,19 339:14,18

**servicing** 29:8,22 30:7,18 32:18,20, 21,22 33:16 34:3 52:6 100:17 101:2, 22,24 103:11 170:22 193:2,9 194:7 200:2,5 207:23 208:19,25 217:17,20 219:2,12,18 222:8 239:7,12,23 333:8 339:16

**set** 95:16,22 114:15 336:12,23

**settlement** 10:8,15 322:21,25

**severely** 180:25

**Seymour** 197:21

**share** 27:11 69:11 119:11,15 179:3, 11 183:23 184:16 244:4 261:10,17 297:18 305:12 317:3 322:2 331:8

**shares** 323:16 324:5

**shed** 49:19

**sheet** 106:16 284:6 343:2,13

**sheets** 281:19

**shift** 268:18

**shop** 11:24

**Shore** 195:20 196:17,19 204:25 205:5 208:23 212:12 230:18 231:16 241:18 242:6 339:19

**short** 61:24 236:18,21

**shortfall** 186:23 235:8

**shortly** 91:24 92:15 93:4,9,15

**shot** 11:9

**show** 87:17 137:10 157:13 240:23 253:20 259:9 286:21 290:23 331:12, 17 342:5

**showed** 276:21

**showing** 253:15 254:16 256:4,19 257:21 258:7,20 260:3 266:3

**shown** 252:22 271:2

**shows** 257:9 269:14 284:17 310:18 312:4 316:4

**shut** 20:4 101:20 132:22 173:10,11

**shutdown** 233:25

**shutting** 45:3 102:5 293:16 294:3,15 303:12 306:11,16

**sic** 224:20

**side** 29:25

**SIE** 18:2

**sign** 68:20,24 69:5 72:24 73:11,13,20 74:2 77:13,19,22 79:14,24,25 154:9

**signature** 71:16,18,19,21 73:14,15 74:25 77:10,12,20,22 79:4,9 80:6,9 151:15,16

**SIGNATURE:_____
_____DATE** 345:23

**signed** 47:5 74:24 75:3 77:16 79:13, 19 80:2 88:22 142:25 154:8,12 155:2, 8,16,23 156:6,22 257:17 343:16

**significant** 120:18 167:15 234:22

**significantly** 170:16

**signing** 69:3 71:23 72:2,8,10 73:4 74:4 76:11,14 79:23 80:4 153:19 155:17

**similar** 10:6,20 32:24 44:23 45:17 49:21 117:13

**similarly** 12:18 39:16

**simplicity's** 318:3

**simplified** 333:12

**simplify** 333:12,13

**simply** 287:6

**single-family** 169:18

**Sir** 305:23

**sit** 156:5 190:22

**sitting** 200:25 251:14 323:17

**situation** 224:8

**six-year** 82:9

**size** 20:2 184:7,15 185:5 187:8

**sizeable** 182:20

**Skinner** 24:18

**skip** 64:5

**skipping** 65:6 128:2 197:5

**skips** 111:10

**slowly** 16:15

**small** 239:22

**smaller** 11:23 302:22

**smallish** 19:17

**sold** 96:6,18 97:11,20 98:2,15,23 99:6,23 100:6 169:18,25 320:22 323:15

**solely** 29:24 47:15 48:18,25 50:9,25 51:13 141:13

**solutions** 122:17

**sort** 13:7 36:8 42:10 243:15 323:9

**Soto** 249:4

**sought** 88:22 143:2

**Sound** 195:20 196:17,19 204:25 205:5 208:23 212:12 230:18 231:16 241:18 242:6 339:19

**sounds** 22:21 23:6 299:9

**source** 274:17 323:6

**sources** 56:7

**South** 99:4

**Southern** 284:9 285:10 287:17 289:21

**space** 27:12 32:7

**speak** 18:11 104:16 156:7

**speaking** 20:22 21:8 22:21 33:21 61:13 82:15 106:18 126:15 127:12,13 187:7 233:3 316:17

**specialty** 269:8

**specific** 19:6 30:22 42:14 45:20,24 46:7 56:14 58:17 60:12 61:14,15 82:2,8 103:9 129:20 142:5,6

**specifically** 10:7 35:5,9 38:14 43:6 44:5,15 46:7 50:7 55:7,19 56:7 68:17 73:25 74:3 92:25 95:24 102:10 105:9 121:3 126:23,25 156:10 190:13 207:21 233:18 234:10 262:9 286:10 289:20 299:15,21 300:7 316:17 318:12

**specifics** 281:7

**speculating** 156:24

**Speculation** 314:16

**speedboat** 270:9 278:6 282:7 290:4

**spend** 18:8 289:6

**spending** 36:19

**spent** 122:3

**spinoff** 15:25 16:11

**spoke** 18:16

**spoken** 18:19

**spreadsheet** 263:21 264:4 272:7 274:7 277:6,8 317:10 341:5,7

**spreadsheets** 261:11 269:5 281:7

**spun** 15:23

**ss** 336:5

**stage** 104:22,25 232:23 233:2

**stamp** 73:14 74:2 79:9 322:6

**stamped** 73:15

**stands** 320:2

**start** 16:25 37:24 172:25 231:11 286:13

**started** 12:7 14:15,19 15:12 19:13 38:12 42:4 101:23 213:15 231:20 233:24 329:11,12,14

**starting** 40:9 63:6

**state** 6:21,23 31:2,5 95:15 96:10 100:12 105:4 111:15 159:16 163:5 166:2 173:21 238:22 336:4,9 343:24

**state-by-state** 96:2

**stated** 145:8 150:18 158:16 309:9

**statement** 114:15 115:2,16 116:5,25 117:9,17,22,24 118:2,15,17 119:10, 23 206:7 251:22 325:15 332:12

**statements** 127:19,25 128:8,19 137:16 152:17 338:11

**states** 50:6 83:4 87:8 88:19 94:3 102:22,24 103:3,7,14 104:8,14,22 105:2 111:4 117:14 142:23 143:12 149:21 197:11,13 239:24 251:8

**stating** 231:17

**status** 96:11 202:12,15 208:19,25 243:19 244:24 245:3 246:3

**Stearns** 8:24 9:2,11,22,23 10:6,21

**Stephan** 24:18

**steps** 330:5,9,16,17,21 331:4

**stop** 12:2 16:7

**stopped** 314:20

**Stout** 42:2

**strategy** 32:4

**Street** 4:9 22:17,19,23 23:2,8,20 26:25 28:13 29:22

**strictly** 11:25

**strike** 222:13

**structure** 26:7

**structured** 47:10

**struggled** 281:4

**stuff** 178:9 232:24 233:3 237:15 264:12 320:21

**subject** 259:23 261:5

**submit** 40:2 80:21 81:20 84:5,12,24 120:2,6 146:24 147:4 281:10 283:13 286:22

**submitted** 39:22 66:10 68:25 72:12 73:8 82:3,10 99:12 114:10 116:17 146:21 201:21,24 202:4 283:22 290:17 324:22 325:6 328:8 330:7,22

**submitting** 76:5 107:3 281:15

**subparagraph** 96:24 97:8,17 98:6 139:6 142:10 159:4 193:16 309:14

**subs** 284:21 285:9,13,16 287:5,10 288:6,11 289:7

**Subscribed** 335:13 343:20

**subsequent** 49:2,12 141:15

**substance** 52:22 53:7,22 58:9

**substantial** 301:21

**substitutions** 64:4

**suck** 237:19 238:11,22,23,25

**sucks** 238:15

**sue** 126:4 299:2 300:9,14,16

**sued** 127:5

**Suite** 27:7

**Sullivan** 4:17,20,22 16:19

**sum** 268:20,23 286:3,5

**summary** 69:18 70:20 72:21 73:2 74:13,22 76:21 77:6 174:22 186:6 204:2 227:5 255:16 278:16 282:16 337:20,22 338:4 339:7,10,22 340:4, 21

**summer** 4:21 16:19 293:25 294:14 299:18

**supplied** 198:4

**support** 14:6 16:14 80:22

**supports** 49:24

**supposed** 8:11 148:3 210:7 214:17 217:7 262:17 265:12 266:10 316:24 332:7

**surmise** 220:5

**survive** 181:2

**swear** 5:8

**sworn** 5:11 335:13 336:13 343:20

**system** 31:3 91:24 93:3,15 197:9 198:3 213:2,10,21 270:9,12

**systems** 283:10

### T

**tab** 278:16,22 282:10,16 284:8

**table** 198:12

**tabs** 80:13 282:15

**takeout** 305:11

**takes** 211:13 276:5

**taking** 110:17 228:7,12 246:19,24 318:4

**talk** 13:14

**talked** 42:6 207:22 230:14 329:9 333:11

**talking** 42:4 92:23 93:23 109:19 124:23 179:25 188:24 194:16 225:19 237:11 289:2,3 295:10 297:4,17 304:24 310:19

**talks** 100:17

**tape** 256:13,16 260:12 261:5,24 262:24 263:15 264:17,24 265:15 267:15 269:19 271:2,15 273:5,14,19 274:10 275:10,15,20 276:4,6,7,21 277:11 278:3,6,7,23,25 279:4 280:6, 11,12 281:22,25 282:4 283:6,22 286:23 289:16 290:10,16 315:25 318:16 319:2 320:8 341:10

**tapes** 281:15

**tax** 19:16 20:9,24 21:14 24:6 32:21, 22 34:24 37:6 38:19,20,24 40:17,25 41:8,12,16 42:20,25 43:6,10,15,25 44:10 45:2,6 47:16 48:3,9,11 49:2 50:10 51:2,14 59:10 62:18,19 63:13

64:12,14 65:6,7,10,15,16,18,24,25 66:3 83:6,7,9,12,13,15 84:7,9,13,14 85:2,5 86:5,6,7,18,23 87:8,21 88:7,9 89:3,14 94:3,10,14 95:13,15 96:3,6, 16,18 97:4,9,11,18,19,24 98:2,11,13, 15,21,23 99:4,6,8,14,23 100:6,9 101:7,8,12,20 102:4 107:21,22 108:5, 6,21 110:4,5,8 111:22 112:11,21 114:5 115:12,14,23,25 116:21,24 123:4 130:18 135:17 141:14,15 146:3,7,16,17 147:4,8 161:15,19,22 164:10,13 166:21 168:19,21 169:5 189:11 191:24 192:2,4 193:15,20 194:7 225:14 226:2 231:12 233:25 234:23 236:10,14 240:6 271:16 276:25 278:10,18 279:24 280:7 283:25 285:10,16

**taxes** 170:22

**taxing** 96:7,18 97:11,20 98:3,24 99:7 100:7

**technically** 26:22

**technological** 12:23

**telling** 188:12 215:10 218:7 258:19 294:6

**ten** 13:21 43:21 124:23 160:11 211:6 236:20

**ten-month** 45:22

**tens** 287:4

**tenth** 157:19,25 338:22

**term** 106:15 249:20

**terms** 44:19,23 47:6 87:23 99:14 133:15 241:15 308:19 309:19 310:11, 23 311:6,10,17,21

**test** 8:3

**testified** 5:12 270:19,24

**testimony** 6:7,18 56:16 57:4 79:12, 17 84:3,22 104:12,15 118:16 165:7 166:16 167:5 173:25 181:3,18 182:23 187:15,20 229:17 232:17 233:6 271:19 317:17 336:15

**text** 107:11 175:6 182:24 183:10,13 185:12 186:15 187:16 188:24 189:16 190:3 204:11,24 205:12 206:17 207:8 213:7 223:3 227:12 238:4,9,18 246:7 254:10 257:14 293:20,23,24 294:20 295:22 296:6 297:8 298:22 299:11, 18,22

**texted** 125:24 178:10 184:7 222:17 223:20 228:17,18 251:2 265:15 266:18 267:22 275:3 293:15 294:25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 420    EMB040120BUSINESS CC EDTH Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

JOHN ARTHUR HANRATTY    Court Records    Pg 1105 of 2230    John Hanratty
June 20, 2023

**texts** 175:13 178:17 211:6 212:11,24 219:9 220:15 222:4 223:4,12 224:17 226:22 229:2 230:7 231:7,24 232:6 234:16 249:17 252:5 255:24 256:12 257:3,17 321:21

**that...(b)** 83:6

**Theodore** 298:13

**thing** 20:20 23:6 24:3 60:22 61:8,20 164:23 167:23 169:8 180:4,6 213:15 258:14 261:2 265:16 275:4 327:5 333:14

**things** 45:20,24 68:3 99:19 120:3 123:7 125:4 143:13 160:12 161:12 169:12 194:11,13 211:11 212:22 213:20 245:22 246:17 248:6 265:3,5 279:17 321:21 326:16 327:3 331:6 333:6

**thinking** 171:10 178:18,25 179:25 250:18

**thinks** 106:4

**third-party** 34:18,21 105:11 106:8 162:22 254:11,18

**thought** 38:9 54:5,15 91:22 92:9,14 93:2,9 123:12 171:16,18 207:2,7 217:5 289:24

**thoughts** 160:15

**thousands** 81:3,15,21 287:4

**threat** 126:5

**threaten** 125:18 126:2 160:12,20

**threatened** 113:21 125:5,12,25 126:6 127:2,4 159:8,15,22 300:18

**threatening** 298:25 300:9,14

**three-and-a-half** 166:23

**tightening** 178:23

**time** 4:7 6:20,21 9:11 13:2,17 18:7 19:19 30:12 32:6,10 51:6 61:24 63:16 67:12,18,19 69:25 70:5 81:5 83:25 85:16,19,20 102:7 112:7 120:4 121:13 122:3 123:8,9,25 124:21 129:3 133:6 136:25 137:6 140:10 145:15 151:2,19 158:23 164:21 168:4 169:11 172:16,20 173:8 178:19 185:14 186:17 187:3 190:21 192:16 194:15,18 196:4,8 201:9 203:20 210:13,16 211:21,24 216:16,20 220:15 222:4,21 223:8 224:11 232:2 234:4 240:12 247:21 248:23 253:24 255:4,7 275:18 281:4 282:7,23 287:14,19,20 288:8 289:10 292:20 295:20 302:4 308:11 310:15 311:15

312:2 314:5 315:6,9,13 318:4 320:18 321:9,15 335:4,6

**timeline** 185:11

**timeline-wise** 218:14

**timely** 329:18

**times** 6:11,14,15,19 82:13,16,17,20 84:2,4,23 85:7,24 113:7 121:2 148:10 160:12,19 211:14 243:19 300:22

**timing** 37:21 156:3 208:13 209:5 210:3,11,22 211:10,18 212:3,5,7 218:2 228:14,20 252:21 279:17

**title** 14:14,24 274:11

**titled** 50:5 88:17 111:3 144:3 149:3 157:19 305:13 338:15,19,22

**titles** 14:17

**today** 4:12,19 5:7,17 6:7 165:7 166:20 167:6 183:15 200:25 205:21 206:22 215:6 224:4,8 225:20,22 227:16 228:3,5 229:17 237:16 247:19 251:14 271:11 334:4,20

**Today's** 4:6

**told** 79:9 215:14,16,20 217:25 221:25 222:10 224:7 228:12 232:12,18 246:9 267:2,16

**Tom** 161:9

**tomorrow** 212:14,16,20 218:5 286:21 334:6 335:3

**ton** 186:25

**top** 9:13 91:8,11,13 101:9 103:4 141:24 167:2 174:14 241:10 262:19 298:6,21 299:6 316:12 333:3

**topic** 11:3 123:11

**topics** 123:22 243:15

**total** 165:19 187:17,24 198:4 200:16 201:11,12,13 202:22 269:20 274:12 276:22 278:17 279:11 287:2 324:4

**Tower** 32:11,13 57:16,17 58:3 66:16 68:14 85:17,22 101:7 102:12,15 131:12

**town** 33:21,22

**track** 33:9

**tracking** 247:22

**traded** 61:25

**traders** 10:11

**trades** 11:2

**trading** 9:17 10:23 11:5,17 12:24 15:15,21

**tranches** 170:12

**transaction** 39:12 45:12,13 111:8,9 122:16 133:17 142:15 211:8 292:24 294:23 298:11 308:21

**transactions** 39:22 40:3 61:25

**transcript** 336:14 343:7

**transfer** 35:24 131:22 132:4,9 231:20

**transferred** 274:22

**transition** 112:8,19

**transitioned** 66:18

**transitioning** 211:4

**transmit** 239:15

**Triumph** 323:14 324:5

**Troy** 32:8

**true** 27:20 71:2 75:10 76:5 78:6 108:9,11,19 110:7 111:11 115:3 145:9,20 146:14 150:19 158:16 199:2 250:13 251:15 336:15 343:10

**truthful** 6:7 185:20

**truthfulness** 71:6 75:14 78:10

**Tuesday** 273:3

**turn** 82:22 96:12 100:15 107:14 127:17 130:4 131:9 138:18 164:24 175:4 186:12 196:22 204:8 212:9 215:3 222:15 234:14 236:16 237:13 249:10 253:3,5,21 255:22 256:25 274:25 298:20 305:23 332:2

**turned** 168:10,16 169:5

**turning** 28:7 64:25 95:5,7 97:16,22 98:5,20 99:3 108:12 111:2 124:25 128:25 131:3 138:15 142:9,21 151:14 158:4 183:12 184:5,22 190:2 193:13 212:23 223:11,25 227:25 228:5 257:15,24 276:20 300:25 304:9 307:20

**turns** 168:22

**two-and-a-** 134:17

**two-and-a-half** 135:7

**two-thirds** 63:7

**type** 329:16

**typical** 44:6 130:3

**typically** 21:9 72:13 81:10 163:7

246:20,21 261:9 300:24

---

**U**

**U-M-A-L-I** 249:6

**U.S.** 110:15 112:8,20 211:5

**ultimately** 32:17 34:4

**Um-hmm** 166:19 216:15 277:15

**Umali** 249:5,6

**unaware** 156:3

**unclear** 109:19 187:20

**undercollateralized** 68:2

**underlying** 40:21 252:19 333:16

**undersigned** 70:25 71:8,9 75:9,16, 17 78:5,12,13

**understand** 5:23 6:3 22:9 36:18 53:21 66:6 87:20 105:10,15,17,21,23 179:17 183:16 184:14 200:12,18 204:20,22 205:22 206:5,9 209:10 210:5 219:10 257:19 273:10 281:9 313:20 314:6

**understanding** 47:21 48:2,7 49:6, 10,14,24 50:23 51:12,25 52:9,14,24 53:2,9,13,16,24 54:7,21 58:5 59:15 60:21 63:20 65:14,23 86:17,21 87:5 92:20 93:13 94:7 102:11 103:13 104:19 142:4 168:18 175:17 176:7 177:11 200:4 201:2 202:18,24 207:9 216:3,10,25 217:11 226:16 273:21 280:5 301:10 304:18 305:3 310:19 343:14

**understood** 28:15 94:24 178:12 179:2,10,23 183:21 205:16 209:8 214:6 226:10,14 241:22

**undertake** 210:7 211:8

**unit** 9:15 14:6,12 170:12

**units** 16:13

**unpaid** 71:4 75:12 78:8

**unsecured** 240:15,16,22

**untrue** 109:13,14 111:24 114:7,14 115:2 116:4 151:9

**unusual** 290:13

**update** 184:9 234:17 247:18 248:5, 13 258:16

**updating** 222:6

**upload** 93:9 210:4 218:10 219:3,13 231:12

**uploaded** 91:23 92:14 93:3,14 94:9 197:9 211:23 212:19 213:2,10,14,18, 20 214:2 215:12 216:12 219:21 235:15 236:8 260:19 263:10 265:12 274:19,21 319:10

**uploading** 197:12,18 212:8

**uploads** 93:25 94:13

**upside** 165:23

**uptick** 167:22

---

**V**

**validity** 111:6 113:19,23 131:5 142:13

**valuation** 162:18,22 181:14,15

**valued** 181:6

**Van** 287:19

**varies** 96:10

**vast** 200:13,19 275:9 316:23

**venture** 165:17

**venue** 232:7

**verification** 254:12,19 283:11

**verify** 72:8,15 76:4 82:2 83:11,21 174:14 208:15 210:4 211:24 271:24 282:20 283:7

**verifying** 73:21 76:9 212:8 281:18

**versions** 105:6

**versus** 4:11 104:6 118:12 119:7

**Victor** 5:4 18:14

**video** 4:8

**view** 27:6 40:16,19 84:15 118:10 119:5,11,15,23 120:14,17,20 121:16

**viewed** 119:2,20 122:5

**Vince** 32:10

**violate** 133:14 308:18 309:17

**violated** 126:17 136:2

**violation** 117:16 146:4 152:22 153:11 154:3,19,23 159:23

---

**W**

**Waiver** 144:3 338:15

**Walt** 121:5 154:9

**Wang** 5:5

**wanted** 10:14 13:14 25:8,12 36:12 39:13 254:16,18 300:8

**warranties** 65:3 108:14 109:3 145:6 150:16 158:14

**warrants** 65:5 83:5 108:16

**warranty** 142:12

**watch** 223:19

**water** 169:6

**ways** 32:25 49:22

**Wednesday** 259:20

**week** 289:23

**weeks** 185:6 224:23

**whatsoever** 71:11 75:19 78:16

**WHEREOF** 336:22

**Whippany** 8:24 9:9

**Williams** 322:4,16,24 341:23

**Willscher** 4:20

**withdrawals** 138:8

**Wold** 197:4

**woman** 57:25

**Woodfield** 285:20

**word** 223:13,21 260:18 316:15

**work** 13:16 31:3,11 42:5,6,7 66:25 68:9 69:8 203:10 211:22 222:2 226:8, 18 237:20 239:4,5 281:8 283:9 297:13 320:4 324:11 330:3,11

**worked** 8:21,22 11:10 13:23 14:5,22 32:9,11 44:14 66:22 106:7

**working** 12:3,8 15:13 217:2 220:25 222:2,4 224:15,16,18 235:10 246:16, 17 248:5 282:23 289:22 321:22

**workload** 333:13

**works** 44:13 248:24

**worth** 121:21,23 122:6,19,21 123:12 162:9 167:12 274:15 283:15

**Wow** 302:25

**wrapped** 212:14,16 218:5

**write** 163:24 164:25 180:12,14,15 184:13 228:10 238:13,23 250:11 257:7 279:20,24 306:5,21 325:8

**write-down** 167:25 168:8,12

**write-downs** 167:15

**write-offs** 164:17 271:9 279:17

**writedown** 171:13,19

**writes** 94:12 175:14 176:9,10 184:8 186:21 189:17 204:15 215:4 234:21 237:14 241:15 243:3 253:22 257:25 291:19 292:2 293:14 294:24 301:8,14 304:10

**writing** 50:8 88:21 106:23 113:16 125:3 126:9,11 142:25 146:13,20 148:14 159:23 173:20 183:6 211:21 220:4 247:4 248:12 304:23

**written** 89:2,10 101:25 110:20 121:25 122:8,22 123:13,16 131:17 132:2 148:18 230:15 301:11

**wrong** 171:7 235:15 236:8 280:22

**wrote** 93:17 125:23 171:4,14,21,25 173:14 174:5,11 177:9 179:9,16,24 183:9 187:6 188:11,17 189:20 190:8, 14 204:19 208:11,12 213:24 216:2,13 218:6 220:15 222:12 223:10 224:6,10 225:4 226:7 235:6 236:23 237:24 238:4 241:21 242:3 248:4 254:25 256:18,24 258:11,18 260:24 266:25 267:6 291:25 300:12 301:2,3 302:25 322:24 332:4,18

---

### X

**X-I-E** 85:23

**Xie** 57:23 66:20 67:5 85:19,23 192:19 194:15,16 291:13

**XVIII** 95:8

**XX** 64:2

**XYZ** 22:11

---

### Y

**year** 7:19 22:20 23:6 38:18,20 53:3,6 102:5 113:8 127:23 128:10,14,20 135:23 137:17 162:23 338:11

**year-and-a-half** 113:8

**year-end** 127:24

**years** 13:19,21 14:23 15:2 19:25 26:8 41:2,9,13,17 49:15 89:9,21 90:10,12 96:7 101:6 134:5,18 135:7 153:9 160:11 167:13 229:4,11 297:6 300:22 326:6 327:22 328:6 330:6

**yesterday** 18:16 243:5 295:2,23

**York** 4:9,10 6:21,23 8:14,17 9:12 30:16 45:4 98:21 101:21,23 102:13, 19 147:2 159:16 169:16,17 170:9 200:9 201:8 220:6 232:22,25 236:21 265:20 266:7,11 336:4,6,10

**Yorks** 265:7,8

**young** 66:20

**Yup** 228:4

---

**In the Matter Of:**

*EMIGRANT BUSINESS CREDIT vs*

*JOHN ARTHUR HANRATTY*

---

*JOHN HANRATTY*

*June 21, 2023*

---



346

```
 1

 2   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
 3

 4   EMIGRANT BUSINESS CREDIT        Index No.
     CORPORATION,
 5                                   158207/2002
              Plaintiffs
 6
          v.
 7
     JOHN ARTHUR HANRATTY,
 8   EBURY STREET CAPITAL, LLC,
     EBURY FUND 1, LP,
 9   EBURY FUND 2, LP,
     EBURY 1EMI LLC,
10   EBURY 2EMI LLC,
     EB 1EMIALA LLC,
11   EB 2EMIALA LLC,
     EB 1EMIFL, LLC,
12   EB 2EMIFL, LLC,
     EB 1EMIIN, LLC,
13   EB2EMIIN, LLC,
     EB 1EMIMD, LLC,
14   EB 2EMIMD, LLC,

15            Defendants.
     _____/
16   (Continuation on next page)

17              VOLUME II

18        VIDEOTAPED DEPOSITION

19              OF

20        JOHN A. HANRATTY

21        NEW YORK, NEW YORK

22      WEDNESDAY, JUNE 21, 2023

23

24   Reported Stenographically by:
     ANNETTE ARLEQUIN, CCR/CSR, RPR, CRR, RSA
25   JOB NO. 2023-899117
```

347

1

2      (Continued caption.)

3      EB 1EMINJ, LLC,
       EB2EMINJ, LLC,
4      EB 1EMINY, LLC,
       EB 2EMINY, LLC,
5      EB 1EMISC, LLC,
       EB 2EMISC, LLC,
6      RE 1EMI LLC,
       RE 2EMI LLC,
7      EB 1EMIDC, LLC,
       ARQUE TAX RECEIVABLE
8      FUND (MARYLAND), LLC,
       EBURY FUND 1FL, LLC,
9      EBURY FUND 2FL, LLC,
       EBURY FUND 1NJ, LLC,
10     EBURY FUND 2NJ, LLC,
       RED CLOVER 1, LLC,
11     EBURY RE LLC, and
       XYZ CORPS,

12
                     Defendants.
13     ----------------------------X

14                    June 20, 2023

15                    11:00 a.m.

16          Videotaped deposition of JOHN

17       HANRATTY, VOLUME I, held at the offices

18       of SULLIVAN & CROMWELL, 125 Broad

19       Street, New York, New York, pursuant to

20       Notice, before Annette Arlequin, a

21       Certified Court Reporter, a Registered

22       Professional Reporter, a Certified

23       Realtime Reporter, and a Realtime

24       Systems Administrator and a Notary

25       Public of the State of New York.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. ...    EMIGRANT BUSINESS CREDIT ...    Court Records    Pg 1111 of 2230    RECEIVED NYSCEF: 01/12/2024

JOHN ARTHUR HANRATTY

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
John Hanratty
June 21, 2023

348

```
 1
 2    A P P E A R A N C E S :
 3    SULLIVAN & CROMWELL, LLP
 4    Attorneys for Plaintiff Emigrant Business
 5    Credit Corporation
 6         125 Broad Street
 7         New York, New York 10004
 8    BY: AUSTIN P. MAYRON, ESQ.
 9    BY: ALEXANDER J. WILLSCHER, ESQ.
10         Telephone: (212) 558-4000
11         Fax: (212) 558-3588
12
13    GUSRAE KAPLAN NUSBAUM PLLC
14    Attorneys for Defendants
15         120 Wall Street
16          New York, New York  10005
17    BY: KARI PARKS, ESQ.
18         VICTOR WANG, (Not yet admitted)
19
20    ALSO PRESENT:
21    BURKE GURSOY, Summer Associate
22    JEANINE MCHUGH, General Counsel Emigrant Bank
23    RICHARD MORALES, Legal Videographer, Lexitas
24
25                 - o0o -
```

349

1          J. Hanratty

2          THE VIDEOGRAPHER:  We are now on

3    the record.  My name is Richard

4    Morales.  I am the videographer

5    retained by Lexitas.  Today's date is

6    June 21st, 2023, and the time on the

7    video is 10:14 a.m.

8          This deposition is being held at

9    Sullivan & Cromwell, 125 Broad Street,

10   37th floor, Room F, New York, New York

11   10021, in the matter of Emigrant

12   Business Credit Corporation versus John

13   Arthur Hanratty, et al.  The deponent

14   is John Hanratty.

15         Will counsel please identify

16   themselves.

17         MR. MAYRON:  Good morning.

18   Austin Mayron, Sullivan & Cromwell, on

19   behalf of the plaintiff Emigrant

20   Business Credit Corporation.

21         With me today are Alex Willscher,

22   also of Sullivan & Cromwell, and Burke

23   Gursoy, a summer associate.

24         MS. PARKS:  Good morning.  Kari

25   Parks of Gusrae Kaplan Nusbaum PLLC for

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
24-04020-dsj
EMIGRANT BUSINESS CREDIT/Court Records    Pg 1113 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                               June 21, 2023

1              J. Hanratty

2        the Ebury parties, defendants, and

3        Mr. John Hanratty, our client who is

4        here with us this morning.

5              In about an hour or so, we will

6        be joined by our law clerk, Victor

7        Wang.

8              THE VIDEOGRAPHER:  The court

9        reporter is Annette Arlequin, and will

10       now swear in the witness.

11             *         *         *

12   J O H N   H A N R A T T Y ,   resumed as a

13        witness, having been previously sworn

14        by the Notary Public, was examined and

15        testified further as follows:

16   EXAMINATION BY

17   MR. MAYRON:

18       Q.   Mr. Hanratty, you have never

19   worked at MTAG Services LLC, correct?

20             MS. PARKS:  Objection to form.

21             Go ahead.

22       A.   No.

23       Q.   I'm handing you an assignment of

24   tax sale from Burlington County, New

25   Jersey, bearing instrument number 5392866.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1104    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1114 of 2230    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT:    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

351

J. Hanratty

2          MR. MAYRON:  And could the court

3      reporter please mark this as Hanratty

4      Deposition Exhibit 34.

5          (Hanratty Exhibit 34, Assignment

6      of Tax Sale, not Bates-stamped, marked

7      for identification, as of this date.)

8  BY MR. MAYRON:

9      Q.   Have you seen this document

10  before?

11     A.   Not that I can recall, but I have

12  seen many similar to it.

13     Q.   What is this document?

14     A.   It's an assignment of a tax lien

15  certificate or assignment of tax sale.

16     Q.   What does that mean?

17     A.   It is when a party purchases a

18  tax lien from another party, you record an

19  assignment.

20     Q.   And so if you turn to the -- I

21  guess it's the second full page, that's

22  your signature at the bottom?

23     A.   Yes, that looks like my

24  signature.  Yes.

25     Q.   Did you sign this document?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1115 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                June 21, 2023

24-04020-dsj

352

```
 1                  J. Hanratty

 2       A.   My signature is on it, but I

 3  don't recall the document.

 4       Q.   Could anyone else apply your

 5  signature to a document like this?

 6            (Document review.)

 7       A.   I don't recall.  It would be

 8  possible that I would let somebody stamp a

 9  document if it was processed with a bunch

10  of other documents in normal course.

11       Q.   If you turn to the back of the

12  second full page, the document is

13  notarized, correct?

14       A.   It is.

15       Q.   And the document says, "John

16  Hanratty personally came before me."

17            Correct?

18       A.   Yes.

19       Q.   So do you agree that you

20  personally signed this document?

21            MS. PARKS:  Objection.

22            Go ahead.

23            THE WITNESS:  Sure.

24       A.   Yes, I would assume I personally

25  signed that document.
```

353

```
 1                   J. Hanratty

 2        Q.   Okay.  And so what is the purpose

 3   of this particular document?

 4        A.   It transfers over a tax lien

 5   to -- from Millennium Trust to Ebury, Ebury

 6   Fund 2NJ LLC.

 7        Q.   You said it transfers a tax lien

 8   from Millennium Trust to Ebury Fund 2NJ

 9   LLC?

10             Let me direct your attention to

11   the second full page.  It says, "MTAG as

12   custodian for Ebury Fund 2, New Jersey" --

13   it continues on.  It says, "does buy these

14   presents assign to Millennium Trust

15   Company."  And then it says, "See attached

16   Schedule A."

17             Correct?

18        A.   Oh, I see.  So it's from Ebury to

19   Millennium.

20        Q.   So this document is assigning a

21   tax lien from Ebury to Millennium Trust

22   Company LLC as custodian and securities

23   intermediary for TLLA of New Jersey and its

24   secured creditor?

25        A.   Yes, that's what it reads.
```

EMIGRANT BUSINESS CREDIT                                     John Hanratty
JOHN ARTHUR HANRATTY                                         June 21, 2023

354

1                         J. Hanratty

2        Q.   And the tax liens that are being

3    assigned, are those listed on Schedule A?

4    And so it looks to me, 12 tax liens?

5        A.   Yes.  Relatively.

6        Q.   Why are the tax liens being

7    transferred in consideration of the sum of

8    one dollar?

9        A.   I think this was part of a larger

10   transaction that was executed through

11   BloxTrade, and they would have handled the

12   clearing and assignments.

13       Q.   Did you transfer the tax liens

14   listed in Schedule A for one dollar in

15   consideration?

16       A.   No.

17       Q.   How much did you transfer those

18   tax liens for?

19       A.   Oh, I don't recall.  But I think

20   it was part of a larger transaction.

21       Q.   And when you say that BloxTrade

22   would have handled the clearing and

23   assignments, you agree, though, that you

24   personally signed this document?

25       A.   I don't recall signing it, but

355

                    J. Hanratty

1

2    that's what the notary says.

3        Q.    And do you have any basis to

4    believe that the notary is not telling the

5    truth?

6            MS. PARKS:   Objection to form.

7        A.    Not off the top of my head.   It

8    was 2018.

9        Q.    Who is Sarah Wells?

10       A.    Sarah Wells worked for me at the

11   time.  She was an office manager.

12       Q.    Would Sarah Wells falsely

13   notarize documents for you?

14           MS. PARKS:   Objection.

15       A.    I don't believe so.

16           MS. PARKS:   Quick question on the

17       document.  No Bates number?  Was this

18       produced in discovery?

19           MR. MAYRON:   It was not produced

20       in discovery.

21           MS. PARKS:   Okay.   Thanks.

22   BY MR. MAYRON:

23       Q.    Would Sarah Wells notarize a

24   document that states you personally

25   appeared before her if you did not

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT Court Records    Pg 1119 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

356

```
 1                  J. Hanratty

 2    personally appear before her?

 3         A.   Not that I can recall.  I mean,

 4    at that time, in May of 2018, I lived in

 5    Rye, New York, where the office was.

 6         Q.   And so at the bottom, you signed

 7    the document?

 8              MS. PARKS:   Objection.

 9    BY MR. MAYRON:

10         Q.   Correct?

11         A.   That's my signature, yes.

12         Q.   And then on the next page you

13    have a notarial statement, and Ms. Wells

14    certifies that on May 9th, 2018, John

15    Hanratty personally came before her and

16    stated under oath to her satisfaction

17    that -- the first is, "A, this person is

18    the director of MTAG as custodian for Ebury

19    Fund 2NJ LLC, the entity named in this

20    instrument."

21              You were not a director at MTAG,

22    correct?

23         A.   No.

24              MS. PARKS:   Objection.

25    BY MR. MAYRON:
```

357

```
 1                    J. Hanratty

 2         Q.   What position do you say you

 3    hold?

 4         A.   I held no position at MTAG.

 5         Q.   Did you state under oath to

 6    Ms. Wells that you were a director of MTAG?

 7              MS. PARKS:   Objection.

 8         A.   No, I don't -- I don't know the

 9    context of why we would be executing these

10    documents.  This transaction was a part of

11    a larger transaction through BloxTrade and

12    typically they handle what they call

13    settlement.

14         Q.   So did you state under oath to

15    Ms. Wells that you were a director of MTAG

16    as custodian for Ebury Fund 2NJ LLC?

17              MS. PARKS:   Objection.

18         A.   I don't recall signing this or

19    stating anything.

20         Q.   Were you authorized to execute

21    this instrument on behalf of MTAG?

22              MS. PARKS:   Objection.

23         A.   No.

24         Q.   Did you execute this instrument

25    on behalf of MTAG?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1146                              RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1121 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                      June 21, 2023

358

| | J. Hanratty |
|---|---|
| 1 | |

1           J. Hanratty

2       A.   I -- no.  In my mind, if -- I

3  don't recall signing this.  As I said, this

4  was part of a larger transaction which

5  typically would be handled by BloxTrade,

6  and they would have sent the documents for

7  signature to MTAG.

8       Q.   So is it your testimony that MTAG

9  signed this document?

10       A.   No.

11          MS. PARKS:  Objection.

12          Just give me a chance.

13          THE WITNESS:  Sure.

14  BY MR. MAYRON:

15       Q.   Is it your testimony that

16  Ms. Wells placed your signature on this

17  document?

18       A.   No.

19       Q.   So you agree that you signed this

20  document?

21          MS. PARKS:  Objection.

22       A.   My signature is on the document.

23  I was in -- living where that office was at

24  the time, and Sarah Wells notarized it.

25       Q.   And this document transferred tax

359

1                    J. Hanratty

2    liens from MTAG as custodian for Ebury Fund

3    2NJ LLC to Millennium Trust Company?

4         A.    That's the purpose of the

5    document, yes.

6         Q.    And so you executed this document

7    by signing it on behalf of MTAG?

8              MS. PARKS:   Objection.

9         A.    I don't recall the context of

10   what this document was.  I know it was a

11   part of a larger transaction involving

12   other counties as well, so I don't know if

13   this is one-off or other counties.  But the

14   intent -- my intent would not be to sign as

15   MTAG, but my signature is on the document.

16        Q.    So you agree you did sign for

17   MTAG?

18             MS. PARKS:   Objection.

19        A.    My -- my signature is on this

20   document.  I do not recall the context of

21   why this transaction settled like this.

22             Typically, when you use the

23   broker that we were using at the time, they

24   handle all settlement and send things

25   appropriately to where they have to go.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1348    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records    Pg 1123 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

360

1                    J. Hanratty

2          Q.    Is there a signature from an

3    employee of MTAG on this document?

4               MS. PARKS:   Objection.

5          A.    I don't see one.

6          Q.    Is there a signature -- strike

7    that.

8               Did MTAG ever authorize you to

9    sign things on their behalf?

10              MS. PARKS:   Objection.

11         A.    Not that I am aware.

12         Q.    And you understood that this

13   document would be filed with Burlington

14   County, New Jersey?

15              MS. PARKS:   Objection.

16         A.    I don't recall signing the

17   document, but typically these documents, if

18   I had one in front of me, there would be an

19   assignment that would -- for the intent or

20   purpose of recording it.

21              In addition to that, there is the

22   actual certificate itself, which was, I

23   would assume, at MTAG, and they would have

24   to send it to where it would have to go in

25   addition to this document.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

```
 1                    J. Hanratty

 2          So I don't know the context of

 3     why this was settled in this manner.

 4          Q.   So to be clear, you don't recall

 5     signing the document, but you don't dispute

 6     that you did sign the document?

 7              MS. PARKS:   Objection.

 8          A.   My signature appears to be on it,

 9     in front of a notary at the time I was in

10     Rye, New York.   And so I do not recall

11     signing it, but it appears to be that is my

12     signature.

13          Q.   So do you dispute that you signed

14     this document?

15              MS. PARKS:   Objection.

16          A.   No.   I'm saying I don't recall

17     signing it and that it looks like my

18     signature.   And it was at a time when I was

19     in Rye, New York, and Sarah Wells was our

20     office manager.

21          Q.   And at the time you were a

22     practicing attorney?

23              MS. PARKS:   Objection.

24          A.   I wasn't practicing.   I was a

25     registered attorney.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT Court Records Pg 1125 of 2230 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

362

                        J. Hanratty

1

2       Q.   Did you own an entity called the

3  Law Offices of John Hanratty?

4           MS. PARKS:  Objection.

5       A.   At that time?  Yeah, yes.

6       Q.   Were you admitted to the New

7  Jersey bar?

8       A.   Yes.

9       Q.   Were you admitted to the New York

10  bar?

11           MS. PARKS:  Objection.

12       A.   Yes.

13       Q.   Were you active in both of the

14  New York and New Jersey bars?

15           MS. PARKS:  Objection.

16       A.   I don't recall.  Yes, I believe I

17  was.

18       Q.   What are the consequences for

19  signing a false affidavit?

20           MS. PARKS:  Objection.

21       A.   I don't know.

22       Q.   I'm going to hand you a document.

23  This is Penal Law Section 210.35.

24           MR. MAYRON:  Could the court

25       reporter please mark this document as

363

1                     J. Hanratty

2          Hanratty Deposition Exhibit 35.

3               (Hanratty Exhibit 35, Document

4          titled "Making an Apparently Sworn

5          False Statement in the Second Degree,"

6          not Bates-stamped, marked for

7          identification, as of this date.)

8    BY MR. MAYRON:

9          Q.    Are you aware that under New York

10   law, a person is guilty of making an

11   apparently sworn false statement in the

12   second degree when that person subscribes a

13   written instrument knowing that it contains

14   a statement which is, in fact, false and

15   which he or she does not believe to be

16   true, and he or she intends or believes

17   that such instrument will be uttered or

18   delivered with a jurat affixed hereto, and

19   such instrument is uttered or delivery with

20   a jurat affixed thereto?

21               MS. PARKS:   Objection.

22               Are you asking him to read this

23          document or are you asking him in

24          general is he aware of that statement?

25          A.    That is what it reads, yes.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. ...
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 1127 of 2230
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

364

```
 1              J. Hanratty

 2       Q.   And this document contains a

 3   notarial jurat at the end?

 4             MS. PARKS:   Objection.

 5             Which document?

 6             MR. MAYRON:   I apologize.

 7   BY MR. MAYRON:

 8       Q.   Hanratty Deposition Exhibit 34

 9   contains a notarial jurat?

10             MS. PARKS:   Objection.

11       A.   It does.

12       Q.   And Hanratty Deposition Exhibit

13   34 lists you as a director of MTAG as

14   custodian for Ebury Fund 2NJ LLC, even

15   though you were not a director of MTAG,

16   correct?

17             MS. PARKS:   Objection.

18       A.   Yeah, I was not a director of

19   MTAG.  Yes.

20       Q.   And you did not believe you were

21   a director of MTAG at the time?

22             MS. PARKS:   Objection.

23       A.   No, I have never believed I was a

24   director of MTAG.

25       Q.   And when you signed this
```

365

J. Hanratty

1

2    document, you understood that it would be

3    notarized?

4            MS. PARKS:   Objection.

5        A.   I don't recall signing the

6    document, but I do know that when you're

7    doing assignment of tax sales, that they

8    are notarized.

9        Q.   And so when you signed this

10   document, you would have appeared before

11   Ms. Wells for her to notarize the document?

12           MS. PARKS:   Objection.

13       A.   That would be standard process,

14   yes.

15       Q.   And so you would have understood

16   that this document would have a jurat

17   affixed to it?

18           MS. PARKS:   Objection.

19       A.   Yes.

20       Q.   You've never worked at Tower Fund

21   Services, correct?

22       A.   No.

23       Q.   I am going to hand you a

24   document.  It is an assignment of tax sale

25   from Burlington County, New Jersey, bearing

366

```
 1              J. Hanratty

 2    Instrument Number 5349716.

 3              MR. MAYRON:  And could the court

 4        reporter please mark it as Hanratty

 5        Deposition Exhibit Number 36.

 6              (Hanratty Exhibit 36, Assignment

 7        of Tax Sale, not Bates-stamped, marked

 8        for identification, as of this date.)

 9    BY MR. MAYRON:

10        Q.   Have you seen this document

11    before?

12        A.   Not that I can recall.

13        Q.   What is the document?

14        A.   It's an assignment of tax sale.

15        Q.   And who are the parties involved

16    in the assignment of the tax sale?

17        A.   They would be the Ebury Fund 2NJ,

18    and a company called Community Capital

19    Investments 2656 LLC.

20        Q.   So on the second full page in the

21    middle of the page, it lists the assigner

22    as Tower as custodian for Ebury Fund 2NJ

23    LLC, correct?

24        A.   Tower is -- sorry.  Tower is

25    custodian for Ebury Fund 2NJ LLC.
```

367

J. Hanratty

1

2    Q.   And so in this document, Tower as

3    custodian for Ebury Fund 2NJ LLC was

4    assigning tax liens to Community Capital

5    Investments, correct?

6         MS. PARKS:  Objection.

7    A.   Yes.  The tax liens that were

8    owned by Ebury Fund 2NJ, yes.

9    Q.   And the middle of the page there

10   is a signature line.  It says, "By John

11   Hanratty."  Is that your signature?

12        MS. PARKS:  Objection.

13   A.   Yes, it looks like my signature.

14   Q.   Did you sign this document?

15   A.   My signature is on it.  I don't

16   recall signing it.

17   Q.   Do you have any reason to believe

18   someone else signed the document for you?

19   A.   I don't recall the context of

20   the -- none that I can think of.

21   Q.   Does anyone else have authority

22   to apply your signature to an assignment of

23   tax sale?

24        MS. PARKS:  Objection.

25   A.   Generally, people -- I do allow

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1131 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                  June 21, 2023

368

J. Hanratty

1  people to stamp my signature on documents

2  that are produced kind of in bulk and in

3  normal process of which I would consider a

4  sales process to be.  But in this context I

5  don't recall whether this is a stamp or my

6  signatures, but either way, this is my

7  signature.

8       Q.   And at the bottom, we have a

9  notarial statement that states that you

10  came before the notary in person, correct?

11            MS. PARKS:  Objection.

12       A.   Yes.

13       Q.   And it says that you stated to

14  the notary's satisfaction under oath that

15  you were the subscribing witness to the

16  signing of the attached instrument,

17  correct?

18            MS. PARKS:  Objection.

19       A.   Yes.

20       Q.   And it states that the instrument

21  was signed by John Hanratty, who is a

22  manager of Tower as custodian for Ebury

23  Fund 2NJ LLC, correct?

24       A.   Yes.  I think the intention is

369

J. Hanratty

1    Ebury Fund 2NJ, but yes.

2        Q.   You were not a manager of Tower?

3        A.   Not of Tower, no.

4        Q.   And you were not authorized to

5    execute this document on behalf of Tower?

6        A.   Not on behalf of Tower, no.

7        Q.   And Tower didn't authorize you to

8    execute this document on its behalf?

9            MS. PARKS:  Objection.

10       A.   I don't -- I don't recall the

11   context of the transaction, nor do I recall

12   it, but upon finishing the assignment there

13   is an additional document which would have

14   to be released from Tower.  So Tower would

15   have received this document in addition in

16   order to have sent the copy of the signed

17   documents to the attorney on the

18   transaction is typically -- I don't recall

19   it, but that's typically how the process

20   works.

21       Q.   Has Tower ever given you

22   authorization to sign legal documents on

23   their behalf?

24           MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 372 RECEIVED NYSCEF: 01/12/2024

370

```
 1                    J. Hanratty

 2        A.    Not that I can recall.

 3        Q.    So based on the fact that you

 4   signed this document, you did execute this

 5   instrument on behalf of Tower?

 6              MS. PARKS:   Objection.

 7        A.    I don't recall signing it.   But

 8   the words Tower as custodian for Ebury Fund

 9   2NJ -- TWR as CST for Ebury Fund 2NJ is

10   what's on the document.

11        Q.    Who executed this document?

12        A.    John Hanratty.

13        Q.    You're John Hanratty?

14        A.    I am.

15        Q.    So you executed this document?

16        A.    My signature is on the document.

17        Q.    You said John Hanratty executed

18   this document?

19        A.    I said -- it appears that my

20   signature is on this document.

21        Q.    Who executed this document?

22              MS. PARKS:   Objection.

23        A.    Assuming that executing is the

24   same thing as signing, my signature is on

25   there.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO. ___

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT

JOHN ARTHUR HANRATTY

John Hanratty

June 21, 2023

371

```
 1                    J. Hanratty

 2        Q.   So you executed this document?

 3        A.   I don't recall executing the

 4   document.  My signature is on there.  Which

 5   reflects the execution of the document.

 6        Q.   But you don't dispute that you

 7   did execute the document?

 8             MS. PARKS:  Objection.

 9        A.   I am not disputing anything other

10   than that my signature is on the document

11   reflecting that it was executed by me.

12        Q.   And has Tower ever authorized you

13   to claim that you are a manager of Tower?

14             MS. PARKS:  Objection.

15        A.   Not that I can recall, no.

16        Q.   Who is Stella Altzman?

17        A.   Stella Altzman...

18             (Document review.)

19        A.   Oh, Stella.  Oh, Stella worked at

20   TD Bank, which was in Rye, New York, in

21   2017.

22        Q.   Did you tell Ms. Altzman that you

23   were a manager of Tower?

24             MS. PARKS:  Objection.

25        A.   I don't recall.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT Court Records    Pg 1135 of 2230    RECEIVED NYSCEF: 01/12/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
John Hanratty
JOHN ARTHUR HANRATTY
June 21, 2023

372

```
 1                    J. Hanratty

 2        Q.   Did you tell Ms. Altzman that you

 3   were authorized to sign this document on

 4   behalf of Tower?

 5             MS. PARKS:  Objection.

 6        A.   I don't recall.

 7        Q.   What is the connection of TD Bank

 8   to this transaction?

 9        A.   Nothing, that I can recall.  I

10   don't know if we -- I -- other than --

11   Stella Altzman worked at TD Bank.  They

12   provided notary services at that time.  And

13   other than that, I can think of no

14   connection between TD Bank and this

15   transaction.

16        Q.   So on October 23rd, 2017, you

17   knew that you were not a manager of Tower,

18   correct?

19             MS. PARKS:  Objection.

20        A.   I've never been a manager of

21   Tower.

22        Q.   And you didn't believe yourself

23   to be a manager at Tower back in 2017?

24             MS. PARKS:  Objection.

25        A.   I don't recall what I thought
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.      Court Records      Pg 1136 of 2230
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT
John Hanratty
JOHN ARTHUR HANRATTY
June 21, 2023

373

```
 1                J. Hanratty

 2   back in 2017, but I know I was never a

 3   manager of Tower.  I was a manager of Ebury

 4   Fund 2NJ LLC.

 5        Q.   And so you approached Ms. Altzman

 6   to notarize this document, correct?

 7             MS. PARKS:  Objection.

 8        A.   Yes.  That would have been a

 9   typical process, but I don't recall

10   October 23rd, 2017.

11        Q.   And so you understood that

12   Ms. Altzman would notarize this document

13   for you?

14             MS. PARKS:  Objection.

15        A.   Yes, Ms. Altzman and others at

16   the bank provided notary services.

17        Q.   Do you have an account at TD

18   Bank?

19             MS. PARKS:  Objection.

20        A.   Not currently, no.  I apologize.

21   I think we have a credit card.

22        Q.   Why would TD provide notary

23   services to you if you weren't a customer?

24        A.   In 2017, we had accounts.  We

25   moved our accounts to M&T and Capital One.
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1137 of 2230
JOHN ARTHUR HANRATTY
John Hanratty
June 21, 2023

374

                        J. Hanratty

1      I don't recall the exact date.  But back in

2      2017, estimating, '18 -- probably from the

3      beginning.  So '14, '15, '16, '17, we

4      banked at TD Bank.

5           Q.   Who is "we"?

6           A.   Ebury companies.

7               MS. PARKS:  As defined yesterday,

8           Ebury companies?  That case caption.

9               THE WITNESS:  Not all.  Like

10          Ebury fund, the Ebury -- what would it

11          be?

12              Ebury Fund 1 LP, Ebury RE had

13          accounts -- not all -- not all the

14          defendants had accounts.

15     BY MR. MAYRON:

16          Q.   How many personal bank accounts

17     do you have?

18              MS. PARKS:  Objection.

19          A.   I have one.

20          Q.   With USAA?

21          A.   Yes.

22          Q.   You've never worked at U.S. Bank,

23     correct?

24              MS. PARKS:  Objection.

375

                    J. Hanratty

1

2      A.   No.

3      Q.   I'm going to hand you a Monmouth

4  County assignment of tax sales, certificate

5  bearing Instrument Number 2015049245.

6          MR. MAYRON:  Could the court

7       reporter please mark this document as

8       Hanratty Deposition Exhibit 37.

9          (Hanratty Exhibit 37, Assignment

10      of Tax Sale Certificate, marked for

11      identification, as of this date.)

12  BY MR. MAYRON:

13     Q.   What is this document?

14     A.   This is an assignment of a tax

15  sale certificate from May 1st, 2015.

16     Q.   And what are the parties to this

17  assignment?

18          MS. PARKS:  Objection.

19     A.   The parties to this assignment

20  are U.S. Bank as custodian for ATR Fund NJ

21  and Ebury RE LLC.

22     Q.   What is ATR Fund NJ?

23     A.   ATR Fund NJ was an LLC that we

24  purchased back in 2000 and -- probably '15,

25  probably right around the time of this

376

J. Hanratty

2   assignment.  It was a company that was

3   shutting down operations.

4        Q.   And you were assigning its assets

5   to Ebury RE LLC?

6            MS. PARKS:  Objection.

7        A.   Yes.  So they -- U.S. Bank --

8   what did we do?

9            They used -- ATR used U.S. Bank

10   as a custodian.

11       Q.   So the assignor on this

12   assignment of tax sale certificate is U.S.

13   Bank, cust for ATR Fund NJ?

14           MS. PARKS:  Objection.

15       A.   Yes.  I'm just trying to recall

16   the context of what occurred in 2015.

17       Q.   And below the listed assignor is

18   your signature, correct?

19       A.   Yes.

20       Q.   And you signed this document?

21           MS. PARKS:  Objection.

22       A.   I don't recall signing this

23   document, but that appears to be my

24   signature.

25       Q.   Do you have any reason to believe

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT'S Court Records    Pg 1140 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

377

1                    J. Hanratty

2    that you did not sign this document?

3          A.    I do not.  Not that I can recall.

4    I recall nothing as to why -- I don't

5    recall anything that would make me think

6    that is not me that sent this document.

7          Q.    And at the bottom is a notarial

8    certification that states that you appeared

9    in person before Mr. Steven Rogers and

10   stated under oath that you were continuing

11   the director of U.S. Bank cust for ATR Fund

12   NJ, correct?

13          MS. PARKS:  Objection.

14         A.    Yes.  As U.S. Bank cust for ATR

15   Fund NJ, which is an LLC that we owned at

16   the time.

17         Q.    You owned U.S. Bank?

18         A.    This lien and ATR Fund NJ,

19   although that appears to be incorrectly

20   titled.  That's not the name of the LLC.

21         Q.    What do you mean that's not the

22   name of the LLC?

23         A.    ATR Fund NJ, I don't know if that

24   was the name of the LLC we purchased, but I

25   recall when we did this transaction, ATR

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1141 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

1          J. Hanratty

2    had a bunch of -- like they had some assets

3    kind of all over the place.

4        Q.   So just to be clear, you said

5    U.S. Bank, cust for ATR Fund NJ, is an LLC

6    that we owned at the time.  That's not

7    correct?

8            MS. PARKS:  Objection.

9        A.   I purchased the entirety of the

10    assets of ATR Fund.

11        Q.   But you didn't --

12        A.   Ebury, not I.

13        Q.   You didn't own U.S. Bank?

14            MS. PARKS:  Objection.

15        A.   No, I don't own U.S. Bank.

16        Q.   And you told the notary,

17    Mr. Rogers, that you were a director of

18    U.S. Bank, correct?

19            MS. PARKS:  Objection.

20        A.   I don't recall what I told

21    Mr. Rogers.  I don't recall signing this.

22    But this is a tax certificate assignment

23    from an entity we owned to another entity

24    we own.

25        Q.   And you were not authorized by

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 131                                  RECEIVED NYSCEF: 01/12/2024

379

J. Hanratty

1

2    U.S. Bank to sign on its behalf, correct?

3         MS. PARKS:  Objection.

4    A.   I don't recall -- no.  I was not

5    authorized by U.S. Bank to sign on its

6    behalf.

7    Q.   But you did sign this document on

8    its behalf?

9         MS. PARKS:  Objection.

10   A.   I don't recall signing this

11   document or the context related to this

12   document.

13   Q.   Who executed this document?

14        MS. PARKS:  Objection.

15   A.   John Hanratty.

16   Q.   So you executed this document on

17   U.S. Bank's behalf?

18        MS. PARKS:  Objection.

19   A.   I signed this document.  I don't

20   recall doing it or the context related to

21   it.

22   Q.   So you signed this document on

23   U.S. Bank's behalf?

24        MS. PARKS:  Objection.

25   A.   I signed -- I don't recall

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1143 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                              June 21, 2023

380

                    J. Hanratty

1

2    signing this document.

3        Q.    Just a second ago, I asked, "So

4    you executed this document on U.S. Bank's

5    behalf?"

6            And you answered, "I signed this

7    document.  I don't recall doing it or the

8    context related to it."

9        A.    Right.  Then I just said I don't

10   recall signing this document.

11       Q.    But you don't dispute that you

12   did sign it?

13           MS. PARKS:  Objection.

14       A.    I'm not disputing anything other

15   than that appears to be my signature on the

16   document, and I don't recall the context or

17   signing it.

18       Q.    So this was an assignment between

19   two companies you controlled?

20           MS. PARKS:  Objection.

21       A.    Yes.

22       Q.    Does that make it okay to lie?

23           MS. PARKS:  Objection.

24       A.    No, it does not make it okay to

25   lie.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1144
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1144 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
John Hanratty
June 21, 2023

381

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | Q.   In your view, is it ever okay to |
| 3 | make false statements under oath? |
| 4 | MS. PARKS:  Objection. |
| 5 | A.   No, it is not okay. |
| 6 | Q.   And you agree it would be a false |
| 7 | statement that you're a director of U.S. |
| 8 | Bank? |
| 9 | MS. PARKS:  Objection. |
| 10 | A.   I agree that that on its self is |
| 11 | not an accurate or correct statement.  It |
| 12 | is false.  I don't recall the context of |
| 13 | this transaction.  I recall that ATR was a |
| 14 | bit of a paper mess.  The principals of ATR |
| 15 | had disappeared and we -- I can recall |
| 16 | vaguely having issues getting people to |
| 17 | move to do what we needed to get done to |
| 18 | organize this sale. |
| 19 | Q.   Why didn't you ask an employee of |
| 20 | U.S. Bank who was authorized to sign on its |
| 21 | behalf to execute this document? |
| 22 | MS. PARKS:  Objection. |
| 23 | A.   I don't -- because I wasn't the |
| 24 | client of U.S. Bank, I don't think, at that |
| 25 | time.  I cannot recall.  We purchased the |

22-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1145 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                  June 21, 2023

382

1                    J. Hanratty

2    ATR liens.  It was Capital One who

3    effectively brokered the transaction.  And

4    I don't recall if I became a client of U.S.

5    Bank for a limited period of time related

6    to these liens or if we needed -- what's

7    the name -- I don't recall the name of the

8    guy -- the principals of ATR to execute as

9    needed.

10            But effectively ATR was shutting

11    down.  Capital One got in touch with us to

12    see if we would be interested in purchasing

13    the legacy assets.  That's what we did.

14        Q.    Did ATR authorize you to sign

15    this document?

16            MS. PARKS:  Objection.

17        A.    I don't -- I don't recall, but I

18    believe I purchased the LLCs that owned the

19    asset of 512 -- 512 Dell Road is the asset

20    referred to in the document.

21        Q.    And you agree in 2017 it would be

22    a false statement to say you were manager

23    of Tower, correct?

24            MS. PARKS:  Objection.  2017?

25            Are we still talking about this one?

383

```
 1                 J. Hanratty

 2           MR. MAYRON:  We can turn back to

 3      Hanratty Deposition Exhibit 36.

 4           MS. PARKS:  You are not asking

 5      about this one?  I just want to be

 6      clear.  Okay.  Got it.

 7   BY MR. MAYRON:

 8      Q.   You agree it would be a false

 9   statement to say you were a manager of

10   Tower in 2017?

11           MS. PARKS:  Objection.

12      A.   I was never a manager of Tower.

13   I don't recall the context of the signature

14   that we are talking about or the

15   transaction that it related to.

16      Q.   If someone said in 2017 that you

17   were a manager of Tower, that would be a

18   false statement?

19           MS. PARKS:  Objection.

20      A.   Alone, yes.  But this is a sales

21   contract where the underlying actual asset

22   is with Tower, and I don't know the context

23   of why I'm executing it versus them, when

24   they have the actual thing that the buyer

25   would want.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1147 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

384

| | J. Hanratty |
|---|---|
| 1 | J. Hanratty |

1                      J. Hanratty

2      Q.   Why didn't you ask Tower to

3  execute this document?

4         MS. PARKS:  Objection.

5      Foundation.

6      A.   I don't recall.

7      Q.   And then looking back at Hanratty

8  Deposition Exhibit 34, you would agree that

9  it was a false statement in 2018 for

10  someone to say you were a director at MTAG,

11  correct?

12         MS. PARKS:  Objection.

13      A.   On its own, yes, it's inaccurate

14  and a false statement.  I don't recall the

15  context of the sale related to the MTAG,

16  other than it was a part of a larger sale

17  that we were not doing the settlement of.

18      Q.   Why didn't you ask MTAG to

19  execute this document?

20      A.   I wasn't involved with the

21  settlement of the transaction.

22      Q.   You were involved in signing this

23  assignment of tax sale, correct?

24         MS. PARKS:  Objection.

25      A.   That appears to be my signature

385

                        J. Hanratty

1

2    on the document, yes.  I would be involved

3    with the sale, yes.  I don't recall the

4    context of why I'm signing it when there's

5    other people that are supposed to be doing

6    the settlement process.

7        Q.   Even if MTAG had authorized you

8    to execute this document on its behalf,

9    would it had made it okay for you to swear

10   under oath that you were a director of

11   MTAG?

12           MS. PARKS:  Objection.

13           This document?

14   BY MR. MAYRON:

15       Q.   Even if MTAG had authorized you

16   to execute the assignment of tax sale that

17   I've labeled as Hanratty Deposition Exhibit

18   34 on its behalf, would it have made it

19   okay for you to swear under oath that you

20   were a director of MTAG?

21           MS. PARKS:  Objection.

22       A.   I don't know hypothetically what

23   agreement I would have with MTAG or what

24   they would empower me to do.  But I do know

25   these documents are all relatively

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                   RECEIVED NYSCEF: 01/12/2024

386

J. Hanratty

1

2  boilerplate.  I don't know why I'm signing

3  this one compared to other ones when it's

4  part of a larger transaction that there is

5  a settlement agent.

6      Q.   If these documents are relatively

7  boilerplate, why didn't you get the actual

8  parties to sign the documents?

9          MS. PARKS:  Objection.

10     A.   I don't remember the context of

11 any of these transactions.

12     Q.   If these documents are relatively

13 boilerplate, why didn't you ask one of your

14 employees to reach out to MTAG or Tower, or

15 U.S. Bank to execute the documents?

16         MS. PARKS:  Objection.

17     A.   I don't recall the context around

18 these sales.  The one that I do recall, the

19 TLOA MTAG one, was part of a bigger sale

20 with an actual settlement agent where it

21 was being paid to coordinate paperwork and

22 do those things.

23     Q.   Who is the settlement agent?

24     A.   It was BloxTrade.

25     Q.   How many employees worked for you

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT - Court Records    Pg 1150 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                     June 21, 2023

387

```
 1                 J. Hanratty

 2   at the time?

 3          MS. PARKS:  Objection.

 4      A.    In 2000 and -- what's the date?

 5      Q.    On the MTAG Millennium Trust

 6   assignment?

 7      A.    Yes.

 8      Q.    2018.  May, 2018.

 9          MS. PARKS:  How many employees

10       worked for him personally or --

11      A.    You said Ebury.

12          MS. PARKS:  At all the Ebury

13       companies?  Is that what you mean?

14   BY MR. MAYRON:

15      Q.    How many employees worked for you

16   in May of 2018?

17          MS. PARKS:  Objection.

18          THE WITNESS:  Sure.

19      A.    In Rye, New York, Sarah Wells was

20   a part-time office manager.

21          John Bronzo was an in-house

22   attorney.  Andrew Adler was sales.  Ping

23   Xie was controller.  That was in Rye.

24          And then in the Philippines, at

25   that time, we had roughly four -- four
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT County Records   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   Pg 1151 of 2230   RECEIVED NYSCEF: 01/12/2024

JOHN ARTHUR HANRATTY   John Hanratty   June 21, 2023

388

```
 1                    J. Hanratty

 2    employees.

 3         Q.   You could have asked one of your

 4    employees to get MTAG to execute this

 5    document, correct?

 6              MS. PARKS:  Objection.

 7         A.   Hypothetically, of course, yes.

 8         Q.   If these documents are

 9    boilerplate, do you commonly swear under

10    oath that you represent parties when, in

11    fact, you do not?

12              MS. PARKS:  Objection.

13         A.   I don't recall the context of why

14    these documents ended up where they did or

15    why we're signing them, but the MTAG one

16    was part of a larger transaction with a

17    settlement agent.

18              The ATR document was around the

19    time when the original seller had

20    effectively gone out of business.  It was

21    no longer functioning.

22              And I don't recall the context of

23    the other one.

24         Q.   Have you ever sworn under oath

25    that you represent a party when, in fact,
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022

NYSCEF DOC. NO...     24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State     RECEIVED NYSCEF: 01/12/2024
                    EMIGRANT BUSINESS CREDIT     Court's Records     Pg 1152 of 2230                     John Hanratty
                    JOHN ARTHUR HANRATTY                                                               June 21, 2023

389

                        J. Hanratty

1

2    you do not?

3            MS. PARKS:  Objection.

4        A.   Other than these documents that

5    we have here, I don't recall.

6        Q.   So yesterday you testified that

7    under the Emigrant Ebury credit facilities

8    an event of default is not your judgment?

9            MS. PARKS:  Objection.

10       A.   I don't -- it's a legal status,

11   in my mind.

12       Q.   What do you mean it's a legal

13   status?

14       A.   It's a conclusion of what an

15   event of default is.

16       Q.   And in your view, an event of

17   default is not something you can decide?

18           MS. PARKS:  Objection.

19       A.   Well, I think under the construct

20   of that document it's for Emigrant to

21   decide.

22       Q.   You're saying under the construct

23   of the credit agreements, only Emigrant

24   could decide an event of default?

25           MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1153 of 2230

EMIGRANT BUSINESS CREDIT                                          Doc #3 State
JOHN ARTHUR HANRATTY                                              John Hanratty
                                                                 June 21, 2023

390

1                        J. Hanratty

2          A.    Enforce an event of default, yes.

3          Q.    Under the credit agreements, you

4    had an obligation to alert Emigrant to

5    potential defaults, correct?

6          A.    Yes.  I think there are several

7    that I recall that I had an obligation to

8    make Emigrant aware of.

9          Q.    And you did not make Emigrant

10   aware of defaults under the Credit

11   Agreement?

12              MS. PARKS:  Objection.

13         A.    The ones that we discussed

14   yesterday or --

15         Q.    You were aware of defaults under

16   the credit agreements that you did not

17   provide notice to Emigrant of?

18              MS. PARKS:  Objection.

19         A.    I don't recall the -- I don't

20   recall thinking of anything related to

21   events of default that I would have had to

22   have given notice of at the time based off

23   of what we talked about in yesterday's

24   testimony.

25         Q.    But if you were aware of an event

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1154 of 2230    RECEIVED NYSCEF: 01/12/2024
                                                                                John Hanratty
JOHN ARTHUR HANRATTY                                                            June 21, 2023

391

```
 1                    J. Hanratty

 2   of default, you were required to provide

 3   notice to Emigrant?

 4          MS. PARKS:  Objection.

 5      A.   I believe, yes, that's what the

 6   document reads.

 7      Q.   And so it's your testimony that

 8   you were not aware of any defaults by Ebury

 9   under the credit agreements before October

10   of 2021?

11          MS. PARKS:  Objection.

12      A.   Outside of what we discussed

13   yesterday, nothing specific, no, unless it

14   was covered yesterday.

15      Q.   Okay.  I'm handing you a document

16   labeled EBCC 4965.

17          MR. MAYRON:  Could the court

18          reporter please mark this document as

19          Hanratty Deposition Exhibit 38.

20            (Hanratty Exhibit 38, Notice of

21          Borrowing Ebury 1EMI LLC, dated

22          11/9/2018, Bates-stamped EBCC_4965,

23          marked for identification, as of this

24          date.)

25   BY MR. MAYRON:
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT Court Records
Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Pg 1155 of 2230
RECEIVED NYSCEF: 01/12/2024
JOHN ARTHUR HANRATTY
John Hanratty
June 21, 2023

392

1                    J. Hanratty

2          Q.    Have you seen this document

3     before?

4          A.    I don't recall it.

5          Q.    What is this document?

6          A.    It's a -- it reads, "A Notice of

7     Borrowing."

8          Q.    And the Ebury companies are

9     proposing borrowing $220,000 under the

10    Ebury 1 EMI LLC Credit Agreement?

11         A.    Yes.

12         Q.    And at the bottom, that's your

13    signature, correct?

14         A.    Yes.  That appears to be my

15    signature, yes.

16         Q.    And the paragraph starting with

17    "In accordance," you certify that "All

18    representations and warranties of the

19    borrower contained in the Credit Agreement

20    are true and correct on the date hereof,"

21    which is November 9th, 2018, correct?

22              MS. PARKS:  Objection.

23         A.    Yes, that appears to be what this

24    document does.

25         Q.    And you certify that "No event of

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1156 of 2230                             John Hanratty
                                                            June 21, 2023

393

J. Hanratty

1

2    default has occurred and is continuing

3    beyond any applicable notice and grace

4    periods or would result from the proposed

5    borrowing," correct?

6        A.   Yes.   That appears what this

7    document does, yes.

8        Q.   And you also certified that

9    "There has been no material adverse change

10   or disclosure regarding the financial or

11   business condition of the borrower since

12   the closing date," correct?

13           MS. PARKS:   Objection.

14       A.   Yes, that's what this document

15   reads.

16       Q.   And you also told Emigrant that

17   they may rely on the fact that such

18   statements are true and correct on the day

19   of the proposed borrowing, correct?

20           MS. PARKS:   Objection.

21       A.   Yes.

22       Q.   And then you also certified

23   "There has been no material adverse change

24   in the borrowing base since the most recent

25   borrowing base certificate or in the

394

```
 1              J. Hanratty

 2    business operations, properties, prospects,

 3    or condition, financial or otherwise, of

 4    any borrowers since the closing date"?

 5              MS. PARKS:  Objection.

 6        A.   Yes.

 7        Q.   And you further certified and

 8    warranted that, "No default or event of

 9    default is existing as of the date of the

10    certificate," correct?

11              MS. PARKS:  Objection.

12        A.   Yes.

13        Q.   And unless you notified Emigrant

14    in writing as of the day of the proposed

15    borrowing, which here is November 9th,

16    2018, correct?

17              MS. PARKS:  Objection.

18        A.   2018, yes.

19        Q.   So you had an obligation between

20    the notice of borrowing and the day of the

21    proposed borrowing to monitor for default

22    or event of default and to notify Emigrant

23    in writing?

24              MS. PARKS:  Objection.

25        A.   Yes, that there was no defaults
```

395

```
 1              J. Hanratty

 2    or event of default.

 3         Q.   And why did the Ebury companies

 4    request $220,000 on November 9th, 2018?

 5              MS. PARKS:  Objection.

 6         A.   I don't recall.

 7         Q.   Why don't we go off the record.

 8              MS. PARKS:  Okay.

 9              THE VIDEOGRAPHER:  The time is

10         11:13 a.m.  We are going off the

11         record.

12              (Recess is taken.)

13              THE VIDEOGRAPHER:  The time is

14         11:23 a.m.  We are back on the record.

15              MR. MAYRON:  During the break,

16         Jeanine McHugh, the general counsel of

17         Emigrant Bank, came and joined and she

18         is now here at the deposition.

19    BY MR. MAYRON:

20         Q.   Could I direct your attention to

21    Hanratty Deposition Exhibit 6.

22              MS. PARKS:  6?

23              MR. MAYRON:  Yes.

24    BY MR. MAYRON:

25         Q.   This is a signed borrowing base
```

EMIGRANT BUSINESS CREDIT                                           John Hanratty
JOHN ARTHUR HANRATTY                                               June 21, 2023

396

```
 1                    J. Hanratty

 2    certificate from November 9th, 2018,

 3    correct?

 4         A.   Yes.

 5         Q.   And you signed this document,

 6    correct?

 7              MS. PARKS:  Object.

 8         A.   The dates --

 9              MS. PARKS:  November 9th?

10         A.   I see September, right?

11              MS. PARKS:  Ours says

12         September 13th.

13              MR. MAYRON:  I apologize.  I must

14         have the numbers mixed up.

15              MS. PARKS:  Do you want the

16         November one?

17              MR. MAYRON:  Yeah.

18         A.   Which is 4.

19         Q.   Which is Number 4.

20              MS. PARKS:  Okay.

21    BY MR. MAYRON:

22         Q.   Hanratty Deposition Exhibit 4,

23    this is a borrowing base certificate from

24    November 9th, 2018, correct?

25         A.   Yes.  It's a borrowing base from
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1194                                    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT            Court Records    Pg 1160 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                    June 21, 2023

397

```
 1                    J. Hanratty

 2    November 9th, 2018.

 3         Q.    And you signed it, correct?

 4         A.    Yes.   That looks to be my

 5    signature.

 6         Q.    And in the section marked, "Two

 7    Additions," you state that the Ebury

 8    companies acquired $40,515.12 in tax liens,

 9    correct?

10         A.    Yes, that's what's on the

11    document.

12         Q.    And the Ebury company -- you also

13    state that the Ebury companies acquired

14    $195,917.66 in overbids and premiums?

15              MS. PARKS:   Objection.

16         A.    Yes.

17         Q.    And you state that the total

18    additions to the borrowing base are

19    $236,432.78?

20              MS. PARKS:   Objection.

21         A.    The additions -- yes, 236 -- yes.

22         Q.    And based on those additions to

23    the borrowing base, you calculated at line

24    14 an availability of $222,373.53?

25              MS. PARKS:   Objection.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT            Court Records    Pg 1161 of 2230                John Hanratty
JOHN ARTHUR HANRATTY                                                                June 21, 2023

398

                    J. Hanratty

1

2       A.   Yeah, line 14.  Availability of

3   223,3 -- 373.

4       Q.   And based on that $222,373.53 in

5   availability, you requested a proposed

6   borrowing of $220,000?

7            MS. PARKS:  Objection.

8       A.   Is that what this other...

9       Q.   Hanratty Deposition Exhibit 38?

10      A.   Got it.

11           (Document review.)

12      A.   Yes.

13      Q.   And so the funds for that

14  proposed borrowing were to be used to

15  acquire tax liens, correct?

16           MS. PARKS:  Objection.

17      A.   I think would acquire tax liens

18  and run the business.

19      Q.   What did you use the $220,000

20  that were advanced on the credit agreements

21  for?

22           MS. PARKS:  Objection.

23      A.   I don't know.  I don't recall

24  offhand.

25      Q.   So I'm going to share, because

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State RECEIVED NYSCEF: 01/12/2024
Court Records      Pg 1162 of 2230      John Hanratty
EMIGRANT BUSINESS CREDIT                                    June 21, 2023
JOHN ARTHUR HANRATTY

399

J. Hanratty

1   it's a spreadsheet, the laptop with you, a

2   document labeled EBCC 11877.

3          MR. MAYRON:  And could the court

4       reporter please mark the document as

5       Hanratty Deposition Exhibit 39.

6          I will provide a copy to you and

7       to Ms. Parks after the deposition.

8          (Hanratty Exhibit 39, Transaction

9       Report for the Capital One account for

10      Ebury Fund 1 ending in 0698, marked for

11      identification, as of this date.)

12  BY MR. MAYRON:

13      Q.   This is a transaction report for

14  the Capital One account for Ebury Fund 1

15  ending in 0698, correct?

16         MS. PARKS:  Objection.

17      A.   That's -- yes, that's -- yes.

18      Q.   And if you scroll to line -- to

19  row 1,491 --

20         MS. PARKS:  1,491, you said?

21         MR. MAYRON:  Yes.

22         (Document review.)

23  BY MR. MAYRON:

24      Q.   I apologize.  1,494.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 41
RECEIVED NYSCEF: 01/12/2024

400

```
 1                   J. Hanratty

 2              (Document review.)

 3    BY MR. MAYRON:

 4         Q.   There is an entry for a new

 5    Emigrant loan for $220,000, correct?

 6         A.   Yes.  Yes.

 7         Q.   And on November 9th, 2018, the

 8    Ebury companies did not purchase any tax

 9    liens, correct?

10              MS. PARKS:   Objection.

11         A.   Ebury Fund 1 does not look like

12    it did, no.

13         Q.   And Ebury 1 EMI LLC was the

14    entity that requested the borrowing of

15    $220,000 on November 9th, 2018, correct?

16         A.   Yes.

17         Q.   I direct your attention to row

18    1,491.  This is the same day as Emigrant

19    sent the Ebury companies 220,000.  There is

20    an entry, "Investor withdrew Tiffany Egan,

21    $288,810.67," correct?

22              MS. PARKS:   You said 1491?

23              MR. MAYRON:   Yes.

24         A.   Sorry.

25              (Document review.)
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. [illegible]    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

EMIGRANT BUSINESS CREDIT

JOHN ARTHUR HANRATTY

Court Records    Pg 1164 of 2230

John Hanratty

June 21, 2023

401

```
 1                    J. Hanratty

 2        A.    Yes, I see that.

 3        Q.    You used the funds advanced by

 4   Emigrant to pay $288,810.67 to Tiffany

 5   Egan?

 6             MS. PARKS:   Objection.

 7        A.    That appears to be what occurred,

 8   yes.

 9        Q.    You weren't allowed to use money

10   advanced under the Emigrant Credit

11   facilities to pay distributions to

12   investors, correct?

13             MS. PARKS:   Objection.

14        A.    That is what the Credit Agreement

15   reads, yes.  Correct.

16        Q.    And you told Emigrant that you

17   were requesting the funds to purchase tax

18   lien collateral?

19             MS. PARKS:   Objection.

20        A.    We told --

21        Q.    According to this borrowing base

22   certificate, the Ebury companies were

23   adding $236,432.78 of tax lien collateral

24   to the borrowing base, correct?

25        A.    Um-hmm.  Yes.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 17
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

402

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | Q.   And so Emigrant thought that the |
| 3 | money it was advancing was to purchase tax |
| 4 | lien collateral? |
| 5 | A.   No. |
| 6 | MS. PARKS:   Objection. |
| 7 | A.   Those would have been already |
| 8 | owned. |
| 9 | Q.   When did you acquire the |
| 10 | $236,432.78 of tax lien collateral? |
| 11 | A.   I don't know. |
| 12 | Q.   What funds did you use to acquire |
| 13 | the $236,432.78 of tax lien collateral? |
| 14 | A.   I don't know which -- those |
| 15 | liens -- like what it is specifically. |
| 16 | Q.   Who is Tiffany Egan? |
| 17 | A.   Tiffany Egan was an investor in |
| 18 | Fund 1. |
| 19 | Q.   She threatened to sue you, |
| 20 | correct? |
| 21 | A.   I believe she did -- |
| 22 | MS. PARKS:   Objection. |
| 23 | A.   I believe she did sue me. |
| 24 | Q.   And you didn't notify Emigrant of |
| 25 | that litigation? |

403

J. Hanratty

1    
2    A.   I don't recall whether I did or

3    not, but no.

4    Q.   And you didn't notify Emigrant

5    that you used the advanced funds to pay

6    Ms. Egan?

7    MS. PARKS:  Objection.

8    A.   I don't recall, no.

9    Q.   Did you ever notify Emigrant that

10   you used funds that Emigrant had advanced

11   under the credit agreements to pay

12   distributions to investors?

13   MS. PARKS:  Objection.

14   A.   I don't -- I don't recall.  I do

15   recall generally that Emigrant was aware

16   that I was retiring equity investors, and

17   my understanding the Credit Agreement was

18   we had a limit of $5 million per fund.

19   Q.   Did you make Emigrant aware,

20   though, that you were using advances to pay

21   distributions to investors?

22   A.   I don't recall --

23   MS. PARKS:  Objection.

24   A.   I don't recall specifically doing

25   it with Tiffany Egan, no.

404

```
 1                    J. Hanratty

 2        Q.   Do you recall doing it with

 3   respect to other investors?

 4        A.   I do not.

 5        Q.   And you were, in fact, using

 6   advances under the Emigrant credit

 7   facilities to pay distributions to

 8   investors?

 9        A.   In the case of Tiffany, it

10   appears that way, yes.

11        Q.   As we discussed yesterday,

12   between 2018 and 2019, you paid investors

13   approximately $21 million, correct?

14             MS. PARKS:   Objection.

15        A.   Yes, as we discussed yesterday.

16        Q.   And during that same time period,

17   you borrowed roughly $19 million from

18   Emigrant?

19             MS. PARKS:   Objection to form.

20        A.   I don't recall the exact amount,

21   no.

22        Q.   Did you borrow more than 10

23   million from Emigrant between 2018 and

24   2019?

25        A.   I would assume.
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1168 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

405

```
 1                    J. Hanratty

 2        Q.    So during the same time period,

 3   you paid investors approximately $20

 4   million, you borrowed more than $10 million

 5   from Emigrant?

 6            MS. PARKS:   Objection.

 7        A.    I assume, yes.

 8        Q.    And you haven't paid Emigrant

 9   back any of the principal?

10            MS. PARKS:   Objection.

11        A.    In 2023, I am currently in

12   default and owe money to Emigrant, yes.

13        Q.    When is the last time you made a

14   principal payment to Emigrant Bank?

15        A.    I believe Emigrant Bank has

16   received $150,000 in the last four months

17   in the lockbox account.

18        Q.    And before that, when is the last

19   time you paid back Emigrant's principal?

20        A.    It would be whatever auto swept

21   to Emigrant in -- upon notice of default we

22   engaged in conversations where we made

23   several offers to get on a payment plan

24   while we were working on a longer term

25   solution, and those agreements were never
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 111                                    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1169 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                            June 21, 2023

406

```
 1              J. Hanratty

 2   met.  So under my advice, I didn't make any

 3   payments.

 4        Q.   What do you mean, "under my

 5   advice"?

 6        A.   From my attorneys.

 7        Q.   Your attorneys advised you not to

 8   make any additional payments to Emigrant?

 9            MS. PARKS:  Do be careful about

10        attorney-client privilege, but beyond

11        that --

12            (Reporter clarification.)

13            MS. PARKS:  Beyond that, I think

14        everybody already knew all that stuff,

15        so we didn't really open the door to

16        anything.

17            THE WITNESS:  Sure.

18        A.   Generally, we were looking for an

19   agreement in order to begin paying.

20        Q.   Have your attorneys advised you

21   not to deposit funds into the escrow

22   account set up for this litigation?

23            MS. PARKS:  Objection.  Calls for

24        privileged communications.

25            You don't -- you're not going to
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 17
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Court Records    Pg 1170 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
John Hanratty
June 21, 2023

407

```
 1              J. Hanratty

 2       answer that question.  That's just

 3       asking him what I told him about

 4       content wise or some other lawyer, so

 5       that's not happening.

 6   BY MR. MAYRON:

 7       Q.   Your lawsuit with Tiffany Egan

 8   settled, correct?

 9       A.   Yes.

10       Q.   And that's because you made a

11   payment to her, correct?

12            MS. PARKS:  Objection.

13       A.   Yes.

14       Q.   And you made that payment by

15   borrowing money from Emigrant?

16            MS. PARKS:  Objection.

17       A.   I don't know if that's the

18   November -- I don't recall when it settled.

19       Q.   Can I direct your attention to

20   the document labeled EBCC 5219, which I

21   believe is Hanratty Deposition Exhibit

22   Number 5.

23            MS. PARKS:  Austin, are you done

24       with this for now?

25            MR. MAYRON:  No.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. ...    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT    Court Records    Pg 1171 of 2230    John Hanratty

JOHN ARTHUR HANRATTY    June 21, 2023

408

```
 1              J. Hanratty

 2         MS. PARKS:  Okay.

 3  BY MR. MAYRON:

 4      Q.   And as we discussed yesterday,

 5  this is a borrowing base certificate that

 6  the Ebury companies submitted to Emigrant

 7  Bank on May 17th, 2019, correct?

 8      A.   Yes.

 9      Q.   And you signed this document?

10      A.   Yes, that appears to be my

11  signature.

12      Q.   And you asked Emigrant to rely on

13  the truthfulness of the foregoing

14  representations made in the document?

15         MS. PARKS:  Objection.

16      A.   Yes, that's the language in the

17  document.

18      Q.   And under the addition section,

19  the Ebury companies represented that they

20  had acquired approximately 1.7 million in

21  tax liens?

22         MS. PARKS:  Objection.

23      A.   Yes.

24      Q.   And they represented that they

25  were acquiring or had acquired 470,0000 --
```

EMIGRANT BUSINESS CREDIT Court Records   Pg 1172 of 2230   John Hanratty
JOHN ARTHUR HANRATTY                                       June 21, 2023

409

J. Hanratty

1

2    I apologize.  They had paid 470,000 in

3    overbids or premiums?

4         A.   Yes.

5         Q.   And the Ebury companies

6    represented that they had acquired or would

7    acquire approximately 1.3 million in

8    subsequent tax liens?

9         A.   Yes, that's the number.

10        Q.   And the total additions to

11   Emigrant's borrowing base listed in this

12   borrowing base certificate is approximately

13   $3.5 million?

14        MS. PARKS:  Objection.

15        A.   Yes.

16        Q.   And based on those additions to

17   the Emigrant borrowing base, the Ebury

18   companies had an availability of

19   $931,669.03?

20        MS. PARKS:  Objection.

21        A.   Yes.  When you factor in the cash

22   received, ineligibles, the availability was

23   931, yes.  So the cash received was

24   3.2 million.  It acquired 3.4 million.

25        Q.   I'm going to hand you a document

410

```
 1                    J. Hanratty

 2      labeled EBCC 5218.

 3              MR. MAYRON:  And could the court

 4          reporter please mark it as Hanratty

 5          Deposition Exhibit 40.

 6              (Hanratty Exhibit 40, Notice of

 7          Borrowing Ebury 1EMI LLC, dated

 8          5/17/2019, marked for identification,

 9          as of this date.)

10      BY MR. MAYRON:

11          Q.   Have you seen this document

12      before?

13          A.   I do not recall it.

14          Q.   What is it?

15          A.   It's a notice of borrowing.

16          Q.   And the proposed borrowing is

17      $900,000, correct?

18          A.   Yes.  The proposed borrowing is

19      $900,000.

20          Q.   And you signed this notice of

21      borrowing?

22          A.   That appears to be my signature.

23      These are stamped.

24              MS. PARKS:  Stamped?

25              THE WITNESS:  Yes.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

411

```
 1                    J. Hanratty

 2   BY MR. MAYRON:

 3        Q.   What do you mean by "stamped"?

 4        A.   I was just comparing the

 5   signatures on Exhibit 5 to Exhibit 40.  It

 6   just looks identical.  I don't recall if

 7   this is an electronic process or a wet

 8   papers process.

 9        Q.   You understood that as part of

10   your relationship with Emigrant Bank, you

11   had to submit signed notices of borrowing

12   to receive funds?

13             MS. PARKS:  Objection.

14        A.   Yes.  That's part of the process.

15        Q.   And so either you signed it or

16   authorized one of your employees to sign on

17   your behalf?

18        A.   Yes.

19        Q.   And by signing it or having your

20   employee sign it on your behalf, you

21   certified that all representations and

22   warranties of the Ebury companies and the

23   Credit Agreement are true and correct as of

24   the date of the notice of borrowing, which

25   here is May 17th, 2019?
```

412

              J. Hanratty

 1

 2          MS. PARKS:  Objection.

 3     A.   Yes, that would be the process.

 4     Q.   And by signing the document --

 5  and by signing the notice of borrowing or

 6  having your employee apply your signature,

 7  you certified to Emigrant Bank that no

 8  event of default had occurred and is

 9  continuing beyond any applicable notice and

10  grace periods or would result from the

11  proposed borrowing, correct?

12          MS. PARKS:  Objection.

13     A.   Yes, that's what the document

14  reads.

15     Q.   And by signing the notice of

16  borrowing or having your employee apply

17  your signature, you certified to Emigrant

18  Bank that there has been no material

19  adverse change or disclosure regarding the

20  financial or business condition of the

21  borrower since the closing date?

22          MS. PARKS:  Objection.

23     A.   Yes.

24     Q.   And the certifications were

25  false, correct?

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1176 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                June 21, 2023

413

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | A.   No. |
| 3 | Q.   The certifications were all true? |
| 4 | MS. PARKS:  Objection. |
| 5 | A.   I am not aware.  At this time, I |
| 6 | don't recall what my mindset was in 2019. |
| 7 | Q.   In 2018, Ebury Fund 1 distributed |
| 8 | more than $5 million to equity investors, |
| 9 | correct? |
| 10 | MS. PARKS:  Objection. |
| 11 | A.   That is what the audit reflected. |
| 12 | Yes. |
| 13 | Q.   And that's a violation of the |
| 14 | credit agreements, correct? |
| 15 | MS. PARKS:  Objection. |
| 16 | A.   Yes.  It would be over the 5 |
| 17 | million dollar number. |
| 18 | Q.   Yet, you certified on May 17, |
| 19 | 2019, that no event of default has |
| 20 | occurred? |
| 21 | MS. PARKS:  Objection. |
| 22 | A.   Yes, I signed this.  I believe at |
| 23 | that time my impression was the |
| 24 | distributions were out of Fund 2, because |
| 25 | at that time Ira Leventhal was in Fund 1 |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Court Records   Pg 1177 of 2230
EMIGRANT BUSINESS CREDIT
John Hanratty
JOHN ARTHUR HANRATTY
June 21, 2023

414

                    J. Hanratty

1

2    and Fund 2, and my understanding was that I

3    believe that Fund 2 was going to get

4    smaller, but the distributions went out of

5    Fund 1.

6         Q.   You paid 9 million in

7    distributions from Fund 1 in 2018, correct?

8              MS. PARKS:   Objection.

9         A.   That is what the audit reflects.

10   Yes.

11        Q.   And you paid 6 million in

12   distributions from Fund 2 in 2018, correct?

13             MS. PARKS:   Objection.

14        A.   2018?  I don't recall offhand.

15        Q.   Could you look back at Hanratty

16   Deposition Exhibit 8?

17             This is the Ebury Fund 1 and 2

18   audited financial statements for 2018.  And

19   could you turn to page labeled EBCC 10632.

20             MS. PARKS:   32?

21             (Document review.)

22   BY MR. MAYRON:

23        Q.   Ebury Fund 2 paid 6.6

24   approximately million in distributions to

25   investors in 2018, correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1178 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

415

```
 1                     J. Hanratty

 2        A.   Yes.

 3        Q.   So both Ebury funds had

 4   distributed more than $5 million to their

 5   investors, correct?

 6             MS. PARKS:  Objection.

 7   BY MR. MAYRON:

 8        Q.   In 2018?

 9        A.   Yes, that's what the audit

10   reflects.

11        Q.   And so by certifying that no

12   event of default had occurred on May 17th,

13   2019, you were making a false

14   certification?

15             MS. PARKS:  Objection.

16        A.   Yes.  The amounts are above the 5

17   million.  The 5 million number in the

18   Credit Agreement.

19        Q.   So if I could turn your attention

20   again to Hanratty Deposition Exhibit 39,

21   this is the Capital One spreadsheet.

22             MS. PARKS:  That's 11877?

23             MR. MAYRON:  Yes.

24   BY MR. MAYRON:

25        Q.   And so can I turn your attention
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
                   EMIGRANT BUSINESS CREDIT Court Records    Pg 1179 of 2230    John Hanratty
                   JOHN ARTHUR HANRATTY                                                June 21, 2023

416

```
 1                    J. Hanratty

 2    to row 1729.

 3             (Document review.)

 4    BY MR. MAYRON:

 5         Q.    1729 is -- has a memo, "New Loan"

 6    and it's $860,000 that Emigrant advanced

 7    you under the credit agreements, correct?

 8         A.    Yes.  It appears to match up.

 9         Q.    And you used that 860,000, along

10    with 350,000 transferred from Fund 2 as

11    shown in row 1730, to make a $1.2 million

12    payment to investors which is shown in row

13    1732, correct?

14             MS. PARKS:  Objection.

15         A.    Yes, that's what it reflects.

16         Q.    And row 1732 has the notation,

17    "Settlement with the investor," correct?

18         A.    Yes.

19         Q.    What was that payment?

20         A.    I assume -- my assumption is

21    related to the Michael Salerno investors.

22         Q.    So this payment shown in row 1732

23    was a settlement with the plaintiffs in the

24    Brinker-Cohen litigation?

25             MS. PARKS:  Objection.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1180                                RECEIVED NYSCEF: 01/12/2024

417

                          J. Hanratty

1

2        A.   I don't know exactly, but --

3    other than language that says "settlement

4    with investor."

5        Q.   Do you remember the termination

6    of the Brinker-Cohen litigation?

7             MS. PARKS:   Objection.

8        A.   Generally.

9        Q.   You settled the litigation with

10   the plaintiffs?

11       A.   Yes.

12            MS. PARKS:   Objection.

13   BY MR. MAYRON:

14       Q.   And as part of that settlement,

15   you agreed to make an approximately $1.2

16   million settlement payment?

17            MS. PARKS:   Objection.

18       A.   Generally, yes.

19       Q.   And this payment on row 1732 is

20   the settlement payment that were paid to

21   the Brinker-Cohen plaintiffs?

22            MS. PARKS:   Objection.

23       A.   Generally, it lines up with the

24   timeline when that occurred, and it reads

25   settlement with the investor and the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1181    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1181 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

418

                      J. Hanratty

 1

 2   amounts are what the amounts.

 3       Q.   So just to recap, you borrowed

 4   $860,000 from Emigrant.  Instead of using

 5   that money to fund new lien purchases, you

 6   used the funds to pay a $1.2 million

 7   settlement to disgruntled limited partners

 8   of Ebury Fund 1?

 9           MS. PARKS:  Objection to form.

10       A.   Yes.  Assuming that that is what

11   the settlement with the investor is, we

12   borrowed those amounts and used it as a

13   portion of the settlement.

14       Q.   Did you tell Emigrant that you

15   were using the advanced funds to pay a

16   settlement to the plaintiffs in the

17   Brinker-Cohen litigation instead of

18   purchasing new tax lien collateral?

19           MS. PARKS:  Objection.

20       A.   I don't -- I don't recall.

21       Q.   In fact, you didn't even provide

22   Emigrant notice of the Brinker-Cohen

23   litigation, correct?

24           MS. PARKS:  Objection.

25       A.   I don't recall speaking to them

419

J. Hanratty

1  about it.  I don't recall doing it in

3  writing either.

4      Q.   Can I direct your attention to

5  the document labeled Hanratty Deposition

6  Exhibit 6, which ends in 5615.

7      A.   Yes.

8      Q.   This is a borrowing base

9  certificate that you submitted to Emigrant

10  Bank on September 13th, 2019, correct?

11     A.   Yes, the date is September 13th,

12  2019.

13     Q.   And in it you list $432,000 in

14  tax liens acquired?

15     A.   Yes.

16     Q.   And then approximately 685,000

17  overbid in premiums paid?

18          MS. PARKS:  Objection.

19     A.   Yes.

20     Q.   And 110,000 approximately in

21  subsequent tax liens acquired?

22     A.   Yes.

23          MS. PARKS:  Objection.

24  BY MR. MAYRON:

25     Q.   And so the total additions in

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1183 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

420

```
 1                  J. Hanratty

 2    this borrowing base certificate are

 3    approximately $1.2 million?

 4        A.   Yes.

 5        Q.   And based on those additions to

 6    the borrowing base, there was an

 7    availability of $864,213.42 under the Ebury

 8    2 EMI LLC credit facility?

 9            MS. PARKS:  Objection.

10        A.   Yes.  When you factor in they

11    received 873,000 in paydown and the

12    ineligible amounts, which I can't see, the

13    availability appears to be 864.

14        Q.   I'm going to hand you a document

15    labeled EBCC 5614.

16            MR. MAYRON:  And could the court

17            reporter please mark this document as

18            Hanratty Deposition Exhibit 41.

19            (Hanratty Exhibit 41, Notice of

20            Borrowing Ebury 2EMI LLC, dated

21            9/13/2019, marked for identification,

22            as of this date.)

23    BY MR. MAYRON:

24        Q.   Have you seen this document

25    before?
```

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT       Court Records   Pg 1184 of 2230       John Hanratty
JOHN ARTHUR HANRATTY                                                  June 21, 2023

421

1                      J. Hanratty

2          A.    I don't recall seeing it.

3          Q.    What is it?

4          A.    It is a notice of borrowing.

5          Q.    So this is a notice of borrowing

6     for Ebury 2 EMI LLC for September 13th,

7     2019, that bears your signature?

8                MS. PARKS:   Objection.

9          A.    Yes, it is a September 13th,

10    2019, notice of borrowing for Ebury 2 EMI.

11         Q.    Did you sign this document?

12               MS. PARKS:   Objection.

13         A.    It appears to be my signature on

14    the document.

15         Q.    Did you sign it?

16         A.    I don't recall signing it.

17         Q.    If you didn't sign it, how could

18    your signature get on this document?

19               MS. PARKS:   Objection.

20         A.    It's either through me signing

21    it, and I just don't recall whether I

22    signed it or not, or through a stamp of an

23    approved employee.

24         Q.    Which employees were approved to

25    apply your signature to documents?

422

J. Hanratty

1

2    A.    In 2019, it would have been -- it

3    would have been John Bronzo could do it.

4    Frank Gandol.  I don't know.  I can't think

5    of anyone else who would have stamped.

6    Q.    So is it your testimony that you

7    either signed this document or authorized

8    an employee to sign it on your behalf?

9    A.    I don't recall doing either one

10   of those, but that's my signature on the

11   document.

12   Q.    And so by signing the document or

13   having your employee apply your signature,

14   you certified that all representations and

15   warranties with the borrower contained in

16   the Credit Agreement were true and correct

17   as of September 13, 2019?

18   A.    That's what the document reads,

19   yes.

20   Q.    And you certified that no event

21   of default had occurred or was continuing

22   beyond any applicable notice and grace

23   periods or would result from proposed

24   borrowing?

25        MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

423

1                    J. Hanratty

2        A.    That is what it reads, yes.

3        Q.    And you certified that there have

4   been no material adverse change or

5   disclosure regarding the financial or

6   business condition of Ebury 2 EMI LLC since

7   the closing date?

8             MS. PARKS:  Objection.

9        A.    Yes.

10        Q.    And you certified that no default

11   or event of default was existing as of the

12   date of the notice of borrowing?

13             MS. PARKS:  Objection.

14        A.    Yes.

15        Q.    But as we discussed, that wasn't

16   true, correct?

17             MS. PARKS:  Objection.

18        A.    As discussed, we exceeded the

19   5-million-dollar limit.

20        Q.    And so let me direct your

21   attention to the spreadsheet labeled EBCC

22   11878.

23             MR. MAYRON:  And could the court

24        reporter please mark it as Hanratty

25        Deposition Exhibit 42.

424

```
 1              J. Hanratty

 2              (Hanratty Exhibit 42, Electronic

 3         Transaction Report for Ebury Fund 2

 4         LP's Capital One account ending in

 5         0744, marked for identification, as of

 6         this date.)

 7              MS. PARKS:  11878?

 8              MR. MAYRON:  Yes.

 9              MS. PARKS:  Okay.

10    BY MR. MAYRON:

11         Q.   This is a transaction report for

12    Ebury Fund 2 LP's Capital One account

13    ending in 0744, correct?

14         A.   Yes.

15         Q.   Could you go to row 638?  This is

16    an entry with memo "New loan for $850,000,"

17    correct?

18              MS. PARKS:  Objection.

19              (Document review.)

20         A.   Yes.

21         Q.   You didn't use these funds to

22    purchase new tax liens, correct?

23              MS. PARKS:  Objection.

24         A.   I don't recall.

25         Q.   Would you look at rows 641 and
```

425

J. Hanratty

1   642.  You made approximately $750,000 in

2   distributions to Beth and Ira Leventhal,

3   correct?

4           MS. PARKS:  Objection.

5       A.   Yes, that's what the document

6   reflects.

7       Q.   So instead of purchasing tax

8   liens with the $850,000 Emigrant advanced

9   you under the credit facilities, you made a

10  distribution to the Leventhals?

11          MS. PARKS:  Objection.

12      A.   Yes, that's what the document

13  reflects, that we paid them on the 20th.

14      Q.   Did you tell Emigrant Bank that

15  you were requesting advances to pay

16  distributions to your investors?

17          MS. PARKS:  Objection.  Form.

18          Go ahead.

19      A.   I don't recall telling them.

20      Q.   I'm going to hand you the first

21  amended verified complaint from the -- what

22  I'll refer to you as the Brinker Cohen

23  litigation.

24          MR. MAYRON:  Could the court

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. ...
RECEIVED NYSCEF: 01/12/2024

426

J. Hanratty

1    reporter please mark the document as

2    Hanratty Deposition Exhibit 43.

3        (Plaintiff's Exhibit 43, First

4    Amended Verified Complaint, marked for

5    identification, as of this date.)

6    BY MR. MAYRON:

7        Q.   You will understand what I'm

8    saying if I refer to the entities listed as

9    plaintiffs here as the Brinker Cohen

10   plaintiffs?

11        MS. PARKS:   Objection.

12        A.   Yes.

13        Q.   Why did the Brinker Cohen

14   plaintiffs sue you?

15        A.   They sued me because they were

16   looking for distributions of their equity.

17   Had received a substantial portion.  And

18   the last portion that they would receive,

19   we had informed them that the funds

20   weren't -- we didn't have the capacity to

21   make them as of yet.

22        Michael Leventhal -- or Salerno,

23   sorry, showed up at our -- my office.  I

24   was not there that day.  Would not let Ping

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 681

RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
Court Records    Pg 1190 of 2230

John Hanratty
June 21, 2023

427

J. Hanratty

1
2    Xie leave the office, occupied the space.

3    In efforts to getting him to relax and move

4    on, we signed checks to him and told him he

5    was not to cash them until instructed.

6            He went and tried to cash them

7    the very next day, which obviously resulted

8    in checks not clearing, and so he sued us

9    based off of that.

10            Ping Xie executed an affidavit,

11    and I can't recall if he submitted it to

12    the police related to those events.  But,

13    generally, that is what occurred.

14        Q.   And as we discussed earlier, you

15    ultimately settled the litigation with the

16    Brinker Cohen plaintiffs using funds

17    advanced under that Emigrant credit

18    facility?

19            MS. PARKS:   Objection.

20        A.   That's what it appears the timing

21    of the documents and the notations reflect,

22    assuming that the notation is related to

23    this.

24        Q.   So a group of investors -- well,

25    so Michael Salerno shows up at your office,

428

| | J. Hanratty |
|---|---|
| 1 | J. Hanratty |
| 2 | threatens Ping Xie, demands checks, sues |
| 3 | you, and then you pay him a settlement |
| 4 | using funds advanced under the credit |
| 5 | facilities? |
| 6 | MS. PARKS:  Objection to form. |
| 7 | A.   We -- Michael Salerno's investors |
| 8 | were getting redeemed out in a relatively |
| 9 | organized fashion. |
| 10 | Michael had in his mind a |
| 11 | specific date and time which he needed to |
| 12 | be paid.  I think he communicated that to |
| 13 | his investors, who were giving him |
| 14 | pressure. |
| 15 | Michael then showed up at our |
| 16 | office where we had our incident with Ping, |
| 17 | and in an attempt to pacify him, we gave |
| 18 | him checks, of which he deposited and did |
| 19 | not clear, and then he sued. |
| 20 | Q.   So, again, tax lien investing is |
| 21 | an illiquid business, correct? |
| 22 | MS. PARKS:  Objection to form. |
| 23 | A.   From the perspective that you |
| 24 | don't control when you get -- when you get |
| 25 | the redemptions related to liens or |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 121    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT       Court Records    Pg 1192 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

429

```
 1              J. Hanratty

 2   anything like that, it can be illiquid,

 3   yes.

 4       Q.  So I imagine, you know, if you

 5   have equity investors and they want to

 6   withdraw their investments, it's difficult

 7   because if you're invested in tax liens,

 8   you either have to wait for them to redeem,

 9   you have to sell the liens, potentially at

10   loss, or you have to convert them to REOs

11   and then sell the REOs to come up with the

12   money to pay the withdrawal?

13           MS. PARKS:  Objection.

14       A.  Yes.  The avenues for disposition

15   for a lien from day one is either redeems

16   or you can sell it to somebody else or you

17   can go through the legal process and

18   convert it to the underlying asset and then

19   you have to monetize that.

20       Q.  So, you know, if an investor

21   shows up in your office and says, "I want

22   to pull my money out now," your only option

23   is really to sell tax liens?

24           MS. PARKS:  Objection.

25   BY MR. MAYRON:
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1193 of 2230
RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT
John Hanratty
JOHN ARTHUR HANRATTY
June 21, 2023

430

                    J. Hanratty

1

2      Q.    Sell assets?

3            MS. PARKS:   Objection.

4      A.    Well, I didn't communicate that

5    he was going to get the money that day.  I

6    said, would you wait until there's adequate

7    liquidity to do it.  And that was a

8    mistake.

9      Q.    I guess what I'm driving at is,

10   it seems like you run a business where

11   you're investing in tax liens using

12   investor money, and if an investor wants to

13   abruptly pull out, it's difficult to come

14   up with the funds to pay an investor out

15   unless you sell tax liens which could

16   potentially be at a loss?

17           MS. PARKS:   Objection.

18     A.    Generally, the -- what you're

19   saying is correct, in that to get liquidity

20   out in a pinch, like any other business,

21   you have to come up, you have to sell an

22   asset, and you're in distress or not.

23           The -- Michael's issue was really

24   more personal.  It was I shouldn't have --

25   I shouldn't have relied upon the

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT, Court Records   Pg 1194 of 2230   John Hanratty
JOHN ARTHUR HANRATTY                                              June 21, 2023

431

J. Hanratty

1    documentation in our investor agreements

2    more than I did.

3        Q.   But if you have an REO portfolio

4    and you need liquidity in a pinch, you can

5    get a mortgage on the real estate property?

6            MS. PARKS:  Objection.

7        A.   Yes, you can.  And that was -- if

8    you recall, that was an avenue of liquidity

9    for us with the CoreVest loan, which was

10   cancelled during COVID, and then the loans

11   that we ended up taking out -- I forget the

12   year.  But that is something you can do.

13           For us, generally, to get a loan,

14   you have issues related to foreclosure

15   properties, title.  And then you have to

16   control the assets, which is -- comes into

17   play with evictions.

18           And then also there's two kind of

19   markets for REO.  There's the

20   wholesale-type folks which are -- do all

21   that work, if you want to do it, or you fix

22   it up and you make a little more money.

23       Q.   Correct me if I'm wrong, but I

24   would just like to mark for the record that

432

```
 1                    J. Hanratty

 2    Victor Wang, Esquire, has joined the

 3    deposition.

 4              MS. PARKS:  High five for the

 5         record.  Thanks, Austin.

 6              THE WITNESS:  Did it just get

 7         more expensive?

 8              MS. PARKS:  Yes, it did.  No,

 9         just kidding.  Maybe tomorrow.

10              THE WITNESS:  That was a joke.

11    BY MR. MAYRON:

12         Q.   So an REO business has more

13    opportunities for liquidity than a tax lien

14    only business?

15              MS. PARKS:  Objection.

16              Go ahead.

17         A.   I don't know if that's accurate.

18    A lien business with -- if you look at just

19    redemption patterns of liens, generally

20    speaking, the -- a newer lien has a higher

21    probability of paying back quicker than an

22    older lien.

23              And so if you have much of the

24    liens that are new, generally your

25    liquidity will be better than someone, like
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1196 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

433

                        J. Hanratty

 1

 2      the liens that we currently have, that are

 3      older.

 4              But from a -- the liquidity on

 5      real estate, it just matters with those

 6      factors that I said before.  How long have

 7      you had it?  As far as title goes, like,

 8      you know, part of the struggles you get a

 9      property today, it doesn't mean you can

10      sell it tomorrow because you may not have

11      clean title.  The title has to settle.

12      That means that other people can't insure

13      title and all that good stuff.

14              But when you have a pipeline of

15      them, generally speaking, you can have

16      sales every month, and it is a -- I find

17      it's easier to sell real estate than it is

18      to sell liens in a pinch, which is what you

19      said before.

20      Q.   When you first -- sorry.  Back in

21      2016 and 2017 when you were establishing

22      the credit facilities with Emigrant, you

23      told Emigrant that the Ebury companies'

24      focus was on new liens, correct?

25              MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1197 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

434

                    J. Hanratty

1

2        A.    With the exception that we were

3    buying a very old book of Rochester liens

4    as the first transaction with Emigrant.

5              So the -- I think the -- my

6    conversations with Emigrant was that we

7    were going to do both.  We were going to

8    do -- continue to do purchasing directly on

9    new liens with municipalities, but would

10   like to grow out older purchases.

11             And so -- and I think the

12   Rochester book with Emigrant was just as

13   challenging to get underwritten.  It was --

14   just due to its age and the manner in which

15   it sold, it was just very different than

16   other -- other states.

17       Q.    A large proportion of the liens

18   in the Rochester book had payment plans in

19   place, correct?

20             MS. PARKS:  Objection.

21             Go ahead.

22       A.    They did, but there was a large

23   churn.  I say proportion, probably I

24   wouldn't say it was above 20 percent.

25             But what that portfolio was, was

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1198 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                      June 21, 2023

435

J. Hanratty

2  a -- and we were purchasing 100 percent of

3  American Tax Funding's assets and they had

4  been the buyer for Rochester for -- for

5  forever.

6           So it was their lien sales from,

7  I don't know, like 2012, which was our

8  initial one.

9           So the City of Rochester sold

10  everything that they had on their books to

11  them in 2012 --

12           (Reporter clarification.)

13           THE WITNESS:  Had on their books

14  to American Tax Funding, which included a

15  lot of older ones.  But then as far as the

16  payment plans, it was probably roughly 20

17  percent, but we did have a lot more plans

18  than that.  The problem with plans is you

19  get a lot of churn in that someone would be

20  on a plan for a couple of months, they fall

21  off, and then you have to reset the clock.

22  And so that's what happens with payment

23  plans.

24  BY MR. MAYRON:

25      Q.   Part of the underwriting process

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1199 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

436

```
 1                    J. Hanratty

 2   was explaining to Emigrant the payment

 3   plans that existed on the Rochester liens?

 4          MS. PARKS:  Objection.

 5      A.    Yes.  They would have wanted to

 6   understood that, as I did.  For us, that

 7   was my -- I only had been buying lien

 8   states where you could receive payment, I

 9   call it, on demand.  Like 100 percent of

10   it.  You couldn't -- you

11   couldn't interact -- legally, you weren't

12   allowed to interact with the title holder

13   in places like New Jersey and Maryland.

14   Rochester was just -- for us, that was new.

15          But, yes, they -- Emigrant did a

16   ton of work on understanding what that

17   portfolio was, how it was to be exited

18   through redemptions and payment plans.

19      Q.   The exit plan for the Rochester

20   portfolio, even though it was aged

21   collateral, was redemptions and payment

22   plans?

23          MS. PARKS:  Objection.

24      A.    I think I had anticipated -- I

25   would assume I communicated it or made an
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022
NYSCEF DOC. NO.                                          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT/Court Records    Pg 1200 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                         June 21, 2023

437

J. Hanratty

2    understanding just based off of the track

3    record of American Tax Funding with

4    foreclosures that there would be a higher

5    than normal, comparatively, to my

6    experience at the time, number of REOs as

7    well.  As American Tax Funding, they had a

8    decent bit of properties in New York, in

9    Rochester.

10       Q.   I'm handing you a document

11   labeled EBCC 16740, which is the Emigrant

12   internal approval memo for the Ebury credit

13   facilities.

14          MR. MAYRON:  Could the court

15       reporter please mark this document as

16       Hanratty Deposition Exhibit 44.

17          (Plaintiff's Exhibit 44, Final

18       Approval Memo for Ebury Street Capital,

19       Bates-stamped EBCC_16740 through 16767,

20       marked for identification, as of this

21       date.)

22   BY MR. MAYRON:

23       Q.   Have you seen this document

24   before?

25          MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
Court Records        Pg 1201 of 2230

EMIGRANT BUSINESS CREDIT                                  John Hanratty
JOHN ARTHUR HANRATTY                                      June 21, 2023

438

```
 1                    J. Hanratty

 2        A.   I don't -- I don't recall this

 3   document.

 4        Q.   Could you turn to the page

 5   labeled EBCC 16742.

 6             It says, "Ebury is seeking to

 7   raise a new 15 million dollar senior credit

 8   facility to finance the purchase of new tax

 9   receivables in both existing and in new

10   market Rochester, New York."

11             Is that correct?

12        A.   I apologize.  Where exactly are

13   you on the page?

14        Q.   The very first sentence.

15        A.   Ah.

16             (Document review.)

17        A.   Yes, that's what it reads.

18        Q.   Was Ebury seeking to raise a new

19   15-million-dollar senior credit facility at

20   the time?

21        A.   I don't recall -- just the word

22   new in relation to Capital One.  Okay.

23             So yes -- okay.  So, yes, we were

24   looking to raise a new credit facility

25   which was next to Capital One.
```

439

```
 1              J. Hanratty

 2      Q.   Can you turn to the page labeled

 3   16746.

 4           The middle of the page indented,

 5   it says, "Although Ebury occasionally

 6   invests in liens to gain control of the

 7   underlying property, it largely focuses on

 8   liens that have a high probability of

 9   redemption.  95 percent of Ebury's closed

10   liens have been redeemed by the property

11   owner, ultimately translating into a steady

12   income stream across the portfolio."

13           Did I read that right?

14      A.   Yes.

15      Q.   You represented to Emigrant Bank

16   that the Ebury companies' focus back in

17   2017 was liens that have a high probability

18   of redemption, correct?

19           MS. PARKS:  Objection.

20      A.   With the exception of -- I think

21   that was more of -- what you read was more

22   of a historical statement.  The reason I

23   was talking to Emigrant was the Rochester,

24   New York, portfolio.

25      Q.   Can you turn to the page ending
```

440

J. Hanratty

1    in 16749.

2        And I'm looking at the second

3    bullet point under the table.  It says,

4    "The eligibility criterion and the proposed

5    EBCC facility are materially consistent

6    with the Capital One transaction with

7    almost identical aging criteria and similar

8    LTV restrictions.

9        Did I read that right?

10       MS. PARKS:  Objection.

11   A.    Yes.

12   Q.    Do you agree that the eligibility

13   criteria in the EBCC facility is consistent

14   with the Capital One facility with almost

15   identical aging criteria and similar LTV

16   restrictions?

17       MS. PARKS:  Objection.

18   A.    With the exception that the

19   Capital One would not lend to Rochester at

20   all.  The structure of them looked very

21   similar.  I would agree the remainder are

22   similar.

23   Q.    Can you turn to page 16755.  The

24   second bullet says, "While Rochester is an

441

J. Hanratty

2   older lien portfolio compared to the rest

3   of Ebury's portfolio, unlike other states,

4   Rochester permits lienholders to negotiate

5   payment plans with the property owner

6   rather than paying the off the outstanding

7   amount in a single lump sum.  This allows

8   for steady repayment of liens, as well as

9   active cash flow stream for the investor

10  and lender."

11          Did I read that right?

12      A.    You did.

13      Q.    You understand that it was

14  important to Emigrant that there were

15  payment plans for the Rochester portfolio,

16  correct?

17          MS. PARKS:  Objection.

18      A.    Yeah, I do.  I mean, whenever we

19  would discuss, you know, generally

20  speaking, when we would go through the

21  portfolio over the years, Rochester, we

22  would always talk about the redemptions,

23  how it was going.  Payment plans, how they

24  were going.  And, you know, process towards

25  REO.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1205 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1205 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

442

1              J. Hanratty

2        Q.   Can you turn to page 16760.

3              Earlier you said that the

4    representation to Emigrant Bank that

5    Ebury's focus was liens that have a high

6    probability of redemption was more of a

7    historical statement, correct?

8              MS. PARKS:   Objection.

9        A.   Just that statement that you read

10   and this.   But I think historically that

11   was our focus and we ended up talking to

12   Emigrant because we had an opportunity to

13   buy the aged portfolio of Rochester.

14             And then what we had discussed

15   with Rochester was that we would continue

16   operating the other businesses we had done.

17       Q.   And so the bullet point under

18   "Fast Redemption Cycle" reads, "Ebury liens

19   are typically repaid in less than one year

20   due to Ebury's investment strategy of

21   purchasing liens that are likely to be

22   redeemed by the property owner versus

23   purchasing certificates to gain control of

24   the property."

25             Did I read that right?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 194                                      RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT...Courts Records    Pg 1206 of 2230
JOHN ARTHUR HANRATTY

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
John Hanratty
June 21, 2023

443

J. Hanratty

2    A.   Yes, that's -- you did read that

3    right.

4    Q.   You represented to Emigrant that

5    apart from the Ebury portfolio --

6    apologies.

7         You represented to Emigrant that

8    apart from the Rochester portfolio, Ebury's

9    investment strategy was purchasing liens

10    that are likely to be redeemed by the

11    owner.

12         MS. PARKS:   Objection.

13    A.   I think that historically that is

14    what has happened with the entirety of our

15    book.  I think the vast majority of our

16    liens have all redeemed.  I think when we

17    were first becoming a client, we were going

18    to operate our business the way we had

19    always done, but we were going to do it

20    with Capital One and Emigrant's line.  I

21    think the majority of Emigrant's line went

22    to Rochester initially.

23    Q.   Just to be clear, you represented

24    that the Ebury companies had an investment

25    strategy of purchasing liens that are

444

J. Hanratty

1

2    likely to be redeemed by the property owner

3    back in 2017?

4          MS. PARKS:  Objection.

5      A.   Yes.  And I think that we

6    redeemed out the majority of Rochester

7    liens and all those -- that generally would

8    reflect our history at the time and it was

9    what I assumed would happen with the

10   Rochester portfolio as well.

11         MR. MAYRON:  Why don't we go off

12       the record.

13         MS. PARKS:  Sure.

14         THE VIDEOGRAPHER:  The time is

15       12:30 p.m.  We are going off the

16       record.

17         (Recess is taken.)

18

19

20

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1208
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

445

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | A F T E R N O O N   S E S S I O N |
| 3 | (Time noted:  1:23 p.m.) |
| 4 | *       *       * |
| 5 | J O H N   H A N R A T T Y ,   resumed and |
| 6 | testified as follows: |
| 7 | |
| 8 | THE VIDEOGRAPHER:  The time is |
| 9 | 1:24 -- I'm sorry.  The time is |
| 10 | 1:23 p.m.  We are back on the record. |
| 11 | EXAMINATION BY (Cont'd) |
| 12 | BY MR. MAYRON: |
| 13 | Q.  Okay.  I'm going to show you a |
| 14 | document labeled EBCC 16645. |
| 15 | MR. MAYRON:  And could the court |
| 16 | reporter please mark the document as |
| 17 | Hanratty Deposition Exhibit 45. |
| 18 | (Hanratty Exhibit 45, Ebury |
| 19 | Street Capital, LLC Informational |
| 20 | Materials, Bates-stamped EBCC_16645 |
| 21 | through 16659, marked for |
| 22 | identification, as of this date.) |
| 23 | BY MR. MAYRON: |
| 24 | Q.  Have you seen this document |
| 25 | before? |

446

1              J. Hanratty

2        A.    Yes, I've seen this document.

3        Q.    What is it?

4        A.    It is background information,

5    materials on Ebury and the Ebury companies'

6    business.  I believe historically.

7        Q.    What do you mean, "historically"?

8        A.    What it operated as historically.

9        Q.    And so back in 2016, the Ebury

10   companies' investment strategy was to

11   target tax liens with a high redemption

12   rate, correct?

13           MS. PARKS:  Objection.

14           Go ahead.

15           THE WITNESS:  Sure.

16       A.    Yes, with the exceptions of

17   several portfolios that we had purchased

18   with older assets, older liens.  Like, for

19   example, the -- we discussed this morning

20   the ATR or Arque transaction that was under

21   Capital One.

22           But generally speaking, we would

23   purchase directly from the municipalities

24   and target liens that would redeem quicker

25   than not.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 661    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1210 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

447

J. Hanratty

1

2    Q.   I'm going to hand you a document

3    labeled Ebury 3279.

4         MR. MAYRON:   Could the court

5         reporter please mark this document as

6         Hanratty Deposition Exhibit 46.

7              (Hanratty Exhibit 46, Capital

8         History Timeline, Bates-stamped

9         EBURY_3279, marked for identification,

10        as of this date.)

11   BY MR. MAYRON:

12   Q.   Have you seen this document

13   before?

14   A.   I don't recall this one

15   specifically.  I recall generally creating

16   a timeline like this.  I don't recall

17   making a -- actually, no, I don't recall

18   doing one for Capital, but I recall one for

19   kind of the history of Ebury, which I

20   thought was in this Document 45.

21   Q.   Is this timeline correct?

22   A.   I'm having trouble seeing the

23   dates.  Do you mind if I use my phone to

24   make them bigger?

25   Q.   No, not at all.

448

J. Hanratty

1

2          (Document review.)

3     A.    Thanks.

4          The timeline looks -- I didn't

5     see anything that looked inaccurate.

6     Q.    So in 2017, the Ebury companies

7     opened a relationship with Emigrant with

8     initial 15 million in line of credit which

9     is used for the Rochester purchase,

10    correct?

11         MS. PARKS:   Objection.

12    A.    Yes.

13    Q.    And then in years 2018, 2019, the

14    Ebury companies made transition to focus on

15    tail purchases and property, correct?

16    A.    Yes, that's what that reads.

17    Q.    What are tail purchases?

18    A.    Tail purchases are what I

19    referred to before as secondary market

20    purchases, a tail specifically meaning in

21    our industry you have either larger people

22    who would go and securitize their

23    portfolios and there would be certain

24    assets which they couldn't securitize.  Or

25    like in the scenario of the Rochester

449

J. Hanratty

2 portfolio, where a company was shutting

3 down, we would seek to purchase them.

4 Tail is probably not the right

5 word. I would have used secondary market

6 purchase just because in our -- my

7 experience when we purchased other people's

8 originations, it's kind of a mixed bag of

9 old and new.

10 Q. And so tail purchases refer to

11 aged tax liens?

12 A. Yeah, generally.

13 Q. And then what is property in this

14 context?

15 A. That would be -- tail purchases.

16 (Document review.)

17 A. Just generally, based off of the

18 business, I would -- it's most likely REO

19 based off of the way this is written.

20 Meaning the underlying assets.

21 Q. Why did the Ebury companies

22 transition their focus to REOs and aged tax

23 liens?

24 A. I think generally the scenario

25 that we -- you could -- based off of our

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1213 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

450

```
 1                    J. Hanratty

 2    experience with the -- frankly, the

 3    Rochester portfolio and how our initial

 4    purchase of the Arque portfolio performed

 5    comparatively to purchasing the new liens.

 6         Q.   Did the Ebury companies

 7    transition the focus to REOs and aged tax

 8    liens because REOs and aged tax liens were

 9    more profitable?

10              MS. PARKS:   Objection.

11         A.   Yes, but that is one of the

12    driving factors.

13              Secondly, and a big one is the

14    origination process is one you can control

15    a little better and not have a lot of

16    waste.

17         Q.   What do you mean the origination

18    process is one you can control a little

19    better?

20         A.   An example is -- so if I go to --

21    just based off of originating liens

22    directly from the municipality versus

23    buying from a counterpart.  When I go to a

24    municipality, there is a list of liens that

25    are for sale.  It's a competitive bidding
```

                    J. Hanratty

1

2    process.  You don't know if you're going to

3    buy 100 liens or two liens, but you have to

4    do work, diligence, and background and the

5    underlying collateral, pair of funds, et

6    cetera, for every lien in the portfolio --

7    or every lien that's for sale, and you

8    still might come away with nothing.

9              When you're purchasing on the

10   secondary market, it's -- you know what

11   you're potentially buying.  And you can use

12   your origination resources specific to

13   those and hopefully price it properly.

14        Q.   And before the Ebury companies

15   made their transition to focusing on aged

16   tax liens and REOs, part of the origination

17   process was identifying liens with a high

18   chance of redemption?

19             MS. PARKS:  Objection.

20        A.   Well, I would even -- regardless

21   of the process, you're still looking for

22   liens that have a high chance of

23   redemption.  The difference is time.

24        Q.   What do you mean by that?

25        A.    I mean that statistically, liens

24-04020-djs    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1215 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                              June 21, 2023

452

1                    J. Hanratty

2    that are sold initially can redeem at a

3    faster pace.  But over time, generally

4    speaking, here redemptions, just because

5    it's older doesn't mean it won't be repaid.

6         Q.   Isn't it true that the older the

7    tax lien is, the more likely you'll have to

8    foreclose?

9              MS. PARKS:  Objection.

10        A.   Yes, which means that -- but part

11   of that foreclosure process is promoting

12   redemption.  So it's just -- whereas, I

13   think the difference between new or

14   younger, is probably a better word, versus

15   older, and with the understanding that in

16   each state that definition of whatever that

17   defining line is different, is the work

18   that you have to do.

19        Q.   And so is another reason that the

20   Ebury companies transitioned from -- is

21   another reason that the Ebury companies

22   transitioned to purchasing aged tax liens

23   and REOs is that such portfolios provide

24   greater liquidity?

25             MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 1413 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1216 of 2230

EMIGRANT BUSINESS CREDIT    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

453

1                    J. Hanratty

2        A.    Sorry.  Could you repeat that.

3        Q.    Yes.

4              Is another reason that the Ebury

5    companies transitioned to purchasing aged

6    tax liens and REOs is that such portfolios

7    provide greater liquidity?

8        A.    Greater in that the -- do you

9    mean like the ultimate amount that will be

10   recovered?

11       Q.    No.  I mean, in terms of that

12   REOs you can get a mortgage on in a way

13   that you can't necessarily obtain financing

14   on a tax lien?

15       A.    As I said, to me, in my

16   experience and my company that are in

17   Ebury's experience, the benefit of the REO

18   is your ability to monetize a single asset.

19   And also that it more appealing to a

20   greater group of people in that there are

21   not a ton of people out there who you can

22   sell one-off tax liens to and have them sit

23   there waiting to either get repaid or be

24   like, hey, look, you have to go hire an

25   attorney and foreclose on this.

454

1                    J. Hanratty

2              With REO, your chances of selling

3         a distressed home or, you know, if it's not

4         distressed, it's just better because people

5         understand real estate a little bit better.

6              Q.   So, in general, it's easier to

7         monetize in the REO portfolio than a tax

8         lien portfolio?

9                    MS. PARKS:   Objection.

10             A.   It is easier when you are the one

11        who has to do the pushing and selling from

12        the perspective of -- with tax liens,

13        you're -- if you don't do anything, you can

14        still get paid through a natural redemption

15        process.

16             With REO, you control -- you

17        control your process obviously more.

18        You're the owner of the asset.

19             Q.   So, for example, if an investor

20        comes to the Ebury companies and asks to

21        withdraw their investment, it's easier to

22        obtain the funds to pay out the investor if

23        you have an REO portfolio because it's

24        easier to monetize?

25             A.   From the perspective that you

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT          Court Records    Pg 1218 of 2230          RECEIVED NYSCEF: 01/12/2024
                                                                                            John Hanratty
JOHN ARTHUR HANRATTY                                                                         June 21, 2023

455

```
 1                 J. Hanratty

 2    control the individual assets, yes.

 3         Q.   And so having an REO portfolio

 4    provided more flexibility in dealing with

 5    disgruntled investors?

 6              MS. PARKS:  Objection.

 7         A.   Yeah, it's a source -- you know,

 8    end of day, liquidity has to come from

 9    somewhere to make people whole.

10         Q.   And then in 2018, Capital One

11    became more demanding about receiving

12    payments under their facilities?

13              MS. PARKS:  Objection.

14         A.   I'm not certain I recall -- I

15    don't recall that context.  Simply as that.

16         Q.   Did you ever pay an overadvance

17    to Capital One?

18         A.   An over...

19              MS. PARKS:  Objection.

20    BY MR. MAYRON:

21         Q.   Did you ever have to repay

22    Capital One because tax liens had aged out

23    of the borrowing base?

24              MS. PARKS:  Objection.

25         A.   I don't recall specifically.  I
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                            RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1219 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                        June 21, 2023

456

J. Hanratty

1    don't recall specifically.

2        Q.    Remind me why you decided to

3    transition away from Capital One?

4        A.    They were -- two things were

5    occurring.

6            With Capital One in particular,

7    they were -- they had gone from when I

8    first became a client, I think they had a

9    tax lien specific staff of seven or eight

10   people.  My main liaison was a fellow by

11   the name of Troy Ritter.  Troy was the

12   person who wrote the term sheet that we had

13   given to Emigrant as potential takeout

14   financing here, which did not move forward.

15           Troy left.  The main other boss,

16   I forget her name, left.  And the tax lien

17   group at Capital One was getting smaller.

18           And so then in addition to that,

19   it was around the time where I was looking

20   to do more later-stage purchases.  And so

21   that was -- so, to me, the writing was

22   somewhat on the wall that it was time to

23   move on from Capital One versus Emigrant,

24   where Capital One there's just no -- there

457

J. Hanratty

1
2  was no -- there's no different terms that
3  would be coming.
4      Like it was you could maybe
5  improve your -- you know, your advance rate
6  a little bit, but the cost was the cost.
7  This is what we do.  And so it just wasn't
8  going to move to where my business -- where
9  I envisioned my business going.
10     Q.   Was Capital One beginning to
11  require more repayments?
12          MS. PARKS:   Objection.
13     A.   I don't -- I don't recall.  I
14  mean, I had -- we had -- I mean, we had, I
15  think, seven lines of credit in total with
16  them, and I don't recall the specific
17  requirements of repaying in the manner in
18  which you're asking.  That's just not what
19  I recall.
20     Q.   So looking back at Hanratty
21  Deposition Exhibit 46, the next item is,
22  "Years 2018 to 2019, return roughly 25
23  million of equity to retire smaller
24  investors and return to core investor
25  group."

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT Court Records Pg 1221 of 2230 RECEIVED NYSCEF: 01/12/2024
24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State
JOHN ARTHUR HANRATTY John Hanratty
June 21, 2023

458

```
 1              J. Hanratty

 2         Did I read that correct?

 3    A.    Yes, that's what read.

 4    Q.    And Ebury companies did return

 5    roughly 25 million of equity to its

 6    investors?

 7         MS. PARKS:  Objection.

 8    A.    Yes.  I think -- well, I don't

 9    remember the number being that high.  We

10    had gone through audited financials earlier

11    yesterday and today.

12         And so the audit reflects the

13    numbers that was returned.

14    Q.    And so did the Ebury companies

15    transition to focus on aged tax liens and

16    REOs because they needed to fund these

17    distributions to their investors?

18    A.    No.

19    Q.    Did the Ebury companies

20    transition to focusing on aged tax liens

21    and REOs because they had paid out

22    significant amounts of funds to equity

23    investors and needed more profitable

24    investments to repay Emigrant?

25         MS. PARKS:  Objection.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.     Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT    Court Records    Pg 1222 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                      June 21, 2023

459

J. Hanratty

2    A.    No.   At this time, we are in the

3    process of working with AloStar, of

4    attempting to make the business smaller, to

5    focus on these types of secondary market

6    purchases in REO from one thing which the

7    AloStar line -- and this is the same thing

8    that we had spoken to Emigrant about -- was

9    the funding gap of how do you manage your

10    REO real estate portfolio without

11    financing.

12        And what we needed was a line of

13    credit which would accomplish a couple of

14    different things.  Those things were to

15    fund secondary market transactions.  This

16    is what the credit group at AloStar had

17    approved.

18        The additional thing we needed

19    funded was this middle ground of, like,

20    deed purchases.  It's that area that we

21    spoke about before where you don't have

22    good title, you can't get a mortgage and

23    you can't really sell it, but it's still an

24    asset that you can't finance under a lien

25    book and lastly in REO.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1223 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

460

1                    J. Hanratty

2               And so AloStar was going to

3    retire Emigrant, but also lend to two of

4    those buckets, but not the -- not fully the

5    REO.  But they would lend to the -- like

6    once you have title, all the way up until

7    it has good title.

8          Q.   I'm going to hand you a document

9    labeled Ebury 71440.

10               MR. MAYRON:  Could the court

11          reporter please mark this document as

12          Hanratty Deposition Exhibit 47.

13               (Hanratty Exhibit 47, Email chain

14          beginning with email dated 5/14/2019

15          from J. Hanratty to Chee-How and

16          others, Bates-stamped EBURY_71440

17          through 71445, marked for

18          identification, as of this date.)

19   BY MR. MAYRON:

20          Q.   I'm going to direct your

21   attention to the email.  The first line is

22   at the very end of the first page and it

23   carries onto the second page.

24               This is an email from you to

25   Johnny Chee-How at AloStar Bank in May

461

1                    J. Hanratty

2    2019, correct?

3                MS. PARKS:  Objection.

4         A.    Yes.  I think amongst -- there

5    were a bunch of people on there, right?

6    You're talking about the first email?

7         Q.    The email that begins at the very

8    end of the page marked 71440 and spills

9    over onto --

10        A.    Oh, at the end.

11        Q.    -- 71441.

12        A.    I see.  Yes.  So me to Johnny,

13   Ping, Dennisse, who works with me.  Dave

14   Turco, who was the -- Dave is like the

15   salesperson for AloStar Bank.  And Neil

16   was -- Neil Mulford is Johnny Chee-How's

17   boss.

18        Q.    And you wrote, "On age, I haven't

19   bought a primary market tax lien in over

20   ten months"; is that correct?

21        A.    That is what I wrote, yes.

22        Q.    And you acknowledge that

23   typically the quickest redeemers are the

24   younger ones?

25        A.    Yes.

462

1                    J. Hanratty

2        Q.    And the implication of this

3    statement is that the secondary market tax

4    liens you're purchasing are older and

5    slower redeeming?

6        A.    Yes.  Well, that would be the

7    inverse of what I wrote, but yes.

8        Q.    And the secondary market tax lien

9    that you're purchasing were potentially

10   more profitable than primary market tax

11   liens?

12            MS. PARKS:   Objection.

13       A.    I'm sorry, can you repeat that?

14       Q.    The secondary market tax liens

15   that you were purchasing were potentially

16   more profitable than primary market tax

17   liens?

18       A.    Yes.  So they were potentially

19   more profitable because they would have

20   higher interest rates.  The other component

21   to younger ones is the rates are smaller in

22   that there is a bunch of payments.  So the

23   weighted average coupon of younger tax

24   liens is pretty slim.

25            And so older ones typically bear

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1226 of 2230
RECEIVED NYSCEF: 01/12/2024
John Hanratty
June 21, 2023

463

```
 1                    J. Hanratty

 2    more interest and then there is the REO

 3    components that we had discussed.

 4         Q.   You're not saying that the tax

 5    lien has a different interest rate based on

 6    its age, right?

 7              MS. PARKS:  Objection to form.

 8         A.   No, I'm not saying that.

 9         Q.   You're just saying that when you

10    take into account the fees that are

11    associated with newer tax liens, that you

12    get a greater return from an older tax

13    lien?

14         A.   I think fees and also some cost

15    of premiums and things like that.  You're

16    weighted average coupon typically is higher

17    for older liens because you will have made

18    subsequent payments and things like that.

19         Q.   But as we discussed earlier, an

20    older tax lien, you're more likely to have

21    to foreclose on it to recover your

22    investment?

23              MS. PARKS:  Objection.

24         A.   Not necessarily the case.  I

25    think you are -- I would say, generally
```

464

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | speaking, redemption is driven by -- more |
| 3 | by collateral value and the personal |
| 4 | circumstances of the titleholder than by |
| 5 | age of the lien. |
| 6 | But with the age of the lien |
| 7 | comes you're more than likely to have to |
| 8 | initiate a foreclosure component. |
| 9 | Q.   Beginning in 2018, the Ebury |
| 10 | companies started purchasing tax liens that |
| 11 | were in active foreclosure, correct? |
| 12 | MS. PARKS:   Objection. |
| 13 | A.   That they were in -- that they |
| 14 | were actively being foreclosed? |
| 15 | Q.   Yes. |
| 16 | A.   Yes, but I think before I |
| 17 | purchased in 2015, Arque portfolio, which |
| 18 | had a lot of active foreclosures, the |
| 19 | Rochester portfolio was a ton of act -- I |
| 20 | don't know -- I'm sorry, not to quantify |
| 21 | what a ton is, but had a lot of active |
| 22 | foreclosures.  So, no, it didn't -- we did |
| 23 | not begin just in 2018. |
| 24 | Q.   Did you buy active foreclosures |
| 25 | from the Capital One facility?  With any of |

465

                    J. Hanratty

1

2    the Capital One facilities?

3        A.   Yes.

4        Q.   Did Emigrant lend against active

5    foreclosures?

6            MS. PARKS:   Objection.

7        A.   The -- yes.  Yes.

8        Q.   I'm going to hand you a document

9    labeled Ebury 23926.

10           MR. MAYRON:   Could the court

11           reporter please mark this as Hanratty

12           Deposition Exhibit 48.

13           (Plaintiff's Exhibit 48, Email

14           chain beginning with email dated

15           7/30/2018 from J. Hanratty to F. Gandol

16           and P. Xie, Bates-stamped EBURY_23926

17           through 23928, marked for

18           identification, as of this date.)

19   BY MR. MAYRON:

20       Q.   So, again, at the bottom of the

21   first page, continuing over to the second

22   page is an email from Mr. Chi to you from

23   July of 2018, correct?

24       A.   Yes.

25       Q.   Mr. Chi says, "Frank, please do a

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
    EMIGRANT BUSINESS CREDIT    Court Records    Pg 1229 of 2230    John Hanratty
    JOHN ARTHUR HANRATTY    June 21, 2023

466

```
 1                    J. Hanratty

 2    new borrowing base to see if we still owe

 3    Capital One funds.  If we do, we may have

 4    to borrow from Emigrant to pay Capital

 5    One."

 6              Correct?

 7        A.    Yes, that's what it reads.

 8        Q.    What does this email mean?

 9        A.    This email...

10              (Document review.)

11    BY MR. MAYRON:

12        Q.    What did Mr. Chi mean by, "If we

13    still owe Capital One funds, we may have to

14    borrow from Emigrant to pay Capital One"?

15        A.    I don't know.  I'm reading the

16    context of the other emails.

17        Q.    When you're done reading those

18    emails, let me know.

19        A.    Sure.

20              (Document review.)

21        A.    So it reads that we were -- what

22    Ping is writing is that...

23              (Document review.)

24        A.    I made an overadvance based off

25    of a...
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1230 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

467

```
 1                    J. Hanratty

 2           (Document review.)

 3      A.   Based off of some overadvance

 4  related to a sale.

 5      Q.   An overadvance on the Capital One

 6  facility?

 7      A.   I think he's -- yes.  So that's

 8  what it reads like to me that he's writing

 9  about.

10      Q.   So during the summer of 2018, you

11  had an overadvance at the Capital One

12  facility?

13           MS. PARKS:  Objection.

14      A.   I don't recall specifically other

15  than this email.  But, yeah.

16      Q.   Apart from your obligations to

17  pay principal at maturity and interest, did

18  you owe Capital One funds in 2018?

19      A.   What do you mean apart from?  I

20  don't understand that.

21      Q.   Did you make payments to Capital

22  One for overadvances in 2018?

23      A.   Not that I can recall.

24      Q.   Did you transfer your business

25  from Capital One to Emigrant because
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. 1265   RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT   Court Records   Pg 1231 of 2230   John Hanratty
JOHN ARTHUR HANRATTY                                    June 21, 2023

468

                        J. Hanratty

1

2  Capital One was requesting payments for

3  overadvances?

4          MS. PARKS:  Objection.

5      A.   No.

6      Q.   Did you transition the funds to

7  investing in aged tax liens and REOs to

8  have more liquidity for when your investors

9  requested repayments?

10         MS. PARKS:  Objection.

11     A.   No.  I began investing in aged

12 tax liens, as it started in 2015, and the

13 initial purchase or initial transaction we

14 had with Emigrant was, as we discussed, the

15 Rochester portfolio.

16         Our transition coincided with the

17 AloStar process, frankly.  And as

18 discussed, the reasons for leaving Capital

19 One were two prong.  They were not -- tax

20 liens were not a growth space for them

21 anymore.

22     Q.   Did the Ebury companies ever

23 borrow funds from Emigrant to pay Capital

24 One?

25         MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

EMIGRANT BUSINESS CREDIT Court Records    Pg 1232 of 2230    John Hanratty

JOHN ARTHUR HANRATTY    June 21, 2023

469

            J. Hanratty

1

2    A.    Yes.

3    Q.    When?

4    A.    I only recall -- I don't recall

5    the timing.  It was when we transitioned

6    the collateral at Capital One to Emigrant.

7    Q.    And how is that transition

8    structured?

9            MS. PARKS:  Objection.

10    A.    I don't... I believe we assigned

11    the borrower to Emigrant.  I don't

12    recall -- I don't recall signing the actual

13    collateral, but it would either -- it would

14    happen in one of those two ways.

15    Q.    And did Emigrant advance the

16    funds to pay off the Capital One

17    facilities?

18    A.    I don't recall specifically, but,

19    yeah, they must have, I suppose.  The

20    collateral, I think, ended up with

21    Emigrant.

22    Q.    And was there surplus collateral

23    that was assigned from Capital One to

24    Emigrant?

25            MS. PARKS:  Objection.

470

```
 1                    J. Hanratty

 2        A.    What do you mean by "surplus"?

 3        Q.    After accounting for the advances

 4   that Emigrant made to pay off the Capital

 5   One facilities, was there collateral that

 6   created additional availability on the

 7   Emigrant facilities after the assignment?

 8             MS. PARKS:   Objection.

 9        A.    Oh, so you mean was there -- so

10   just so I'm clear, if an asset is moved

11   from Capital One to Emigrant, did it create

12   excess availability comparatively to what

13   Capital One was lending?  Is that what you

14   mean?

15        Q.    To what was outstanding.

16             I guess another way to do an

17   example is, if you had, for instance,

18   $5 million in tax and collateral with

19   Capital One, but you only owed a million,

20   and Emigrant then advanced you a million --

21        A.    Oh, I see, i see.

22        Q.    -- and got the benefit of 5

23   million in tax lien collateral, was that

24   the situation?  Or did Emigrant basically

25   advance what was required to -- based on
```

471

J. Hanratty

2   the entirety of the collateral that was

3   assigned to Emigrant was used to create the

4   availability to pay off Capital One?

5          MS. PARKS:  Objection to form.

6          You can answer.

7      A.   Yeah.  I don't recall

8   specifically.

9      Q.   And so other than when you

10  transitioned collateral at Capital One to

11  Emigrant, did the Ebury companies ever

12  borrow from Emigrant to pay Capital One?

13         MS. PARKS:  Objection.

14     A.   Not that I can remember

15  specifically.

16     Q.   And so this email is from

17  July 2018, correct?

18     A.   From Ping?

19         MS. PARKS:  We are talking about

20     Exhibit 48?

21         MR. MAYRON:  Yes.

22         MS. PARKS:  Okay.

23     A.   Yes, July 20th.

24     Q.   And so at this time you were not

25  transitioning the Capital One collateral to

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022
NYSCEF DOC. NO. 1202     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records     Pg 1235 of 2230     John Hanratty
JOHN ARTHUR HANRATTY                                              June 21, 2023

472

J. Hanratty

 1
 2   Emigrant, correct?
 3            MS. PARKS:  Objection.
 4        A.   I don't recall the timing of when
 5   that all occurred, but I don't read
 6   anything in Exhibit 48 that references it.
 7        Q.   So the next email from
 8   Ms. Fetterman writes, "When can we expect
 9   to receive the May financial statements and
10   June borrowing base," correct?
11        A.   Yes.  She sent that to Ping.
12        Q.   So you were still operating under
13   the Capital One facility, correct?
14            MS. PARKS:  Objection.
15        A.   Yeah, that's what the -- but I
16   think -- I don't know the context of what
17   was occurring or anticipated to occur.  I
18   don't know, is what I'm saying.
19        Q.   So what did Ping mean when he was
20   saying -- when he was proposing to borrow
21   from Emigrant to pay Capital One?
22            MS. PARKS:  Objection.
23        A.   I think that -- I think that Ping
24   wrote that we have to see if we can borrow
25   to pay the -- what was apparently an

473

1                  J. Hanratty

2    overadvance based off of some sale.

3         Q.    And was your understanding that

4    the Ebury companies could borrow from

5    Emigrant to pay an overadvance to Capital

6    One?

7              MS. PARKS:   Objection.

8         A.    My understanding was, I would

9    presume at this time we were -- without

10   having a timeline of the -- when collateral

11   moved, that we talked about retiring the

12   remaining amounts on Capital One with

13   transitioning collateral, and that I could

14   borrow for what is required for the

15   business.

16        Q.    So your understanding in July of

17   2018 was that it was permissible for you to

18   borrow from Emigrant to pay an overadvance

19   to Capital One?

20             MS. PARKS:   Objection.

21        A.    I don't recall this event.   So

22   what my mind set was, I don't remember.

23   But generally, as we discussed several

24   times, it was my understanding that I could

25   borrow to fund expenses of the business.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO. 1240   RECEIVED NYSCEF: 01/12/2024

474

```
 1                  J. Hanratty

 2        Q.   And would paying an overadvance

 3   to another lender be an ordinary expense of

 4   the business?

 5             MS. PARKS:  Objection.

 6        A.   It's an expensive -- it's the

 7   cost of the business, which I don't recall

 8   how many times this had occurred throughout

 9   my five-year relationship with Capital One.

10        Q.   Did you have to pay overadvances

11   to Capital One more than three times during

12   your five-year relationship?

13             MS. PARKS:  Objection to form.

14        A.   I don't recall -- I don't recall

15   specifically.

16        Q.   More than five times?

17        A.   I don't -- I don't remember.

18             MS. PARKS:  Objection.

19   BY MR. MAYRON:

20        Q.   Less than three times?

21             MS. PARKS:  Objection.

22        A.   I don't -- I don't remember.

23        Q.   And your understanding of the

24   Emigrant facility was that you were allowed

25   to borrow funds under the Emigrant facility
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO.

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT - Court Records    Pg 1238 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                    June 21, 2023

475

```
 1                    J. Hanratty

 2    to pay overadvances at Capital One?

 3              MS. PARKS:  Objection.

 4         A.   My understanding was that

 5    generally we could borrow against the

 6    availability for cost and expenses of the

 7    business.

 8         Q.   Did you tell Emigrant that you

 9    were borrowing against the Emigrant

10    facility to pay the overadvances to Capital

11    One?

12              MS. PARKS:  Objection.

13         A.   Multiple advances or this one?

14         Q.   Did you tell Emigrant that you

15    were borrowing against the Emigrant

16    facility to pay an overadvance to Capital

17    One?

18              MS. PARKS:  Objection.

19         A.   I don't remember.

20         Q.   I'm going to hand you a document

21    labeled Ebury 43029.

22              MR. MAYRON:  Could the court

23         reporter please mark it as Hanratty

24         Deposition Exhibit 49.

25              MS. PARKS:  49.
```

476

```
 1                    J. Hanratty

 2              (Plaintiff's Exhibit 49, Email

 3         chain beginning with email dated 8/3/22

 4         from J. Hanratty to M. Colon and D.

 5         Mendez, Bates-stamped EBURY_43029

 6         through 43030, marked for

 7         identification, as of this date.)

 8   BY MR. MAYRON:

 9         Q.    This is an August 3rd, 2022,

10   email from you to Marcos Colon Cuebas, who

11   was your auditor in 2021, correct?

12              MS. PARKS:   Objection.

13         A.    Yes.

14         Q.    And you write, "Can you give an

15   update to Dennisse on 2020?  Bank is

16   getting a little overemotional."

17              Correct?

18         A.    Yes, that's what I wrote.

19         Q.    What did you mean by "bank is

20   getting a little overemotional"?

21         A.    Rightly so, the bank was looking

22   for an update on 2020, and I wanted to stop

23   them from being emotional.

24         Q.    What do you mean by the bank was

25   looking for an update on 2020?
```

477

```
 1                   J. Hanratty
 2        A.    Just what I wrote here.
 3        Q.    So as of August 3rd, 2022, you
 4   had not provided Emigrant with 2020 audited
 5   financial statements?
 6        A.    No.
 7        Q.    And I think you said the bank
 8   rightly was looking for an update on those
 9   audited financial statements?
10        A.    Yes.
11        Q.    And it was your view that the
12   bank was getting a little overemotional?
13        A.    I wrote that I wanted to stop
14   them -- I meant what was intended by what
15   was wrote, I presume, is that I wanted to
16   stop them from being emotional.
17        Q.    "Bank is getting a little
18   overemotional."
19              Did I read that correctly?
20        A.    You did.
21        Q.    And your testimony is what you
22   meant to say was you wanted to stop the
23   bank from getting overemotional?
24              MS. PARKS:  Objection to form.
25              You can answer.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. ... Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024
24-04020-dsj Court Records Pg 1241 of 2230
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
John Hanratty
June 21, 2023

478

J. Hanratty

2    A.   I wanted to impart my -- I don't

3    remember writing this email.  But I could

4    see myself wanting to impart upon Marcos

5    that it's an emotional -- that it's not a

6    good situation and we need to get to work

7    because we are way late.  We hadn't

8    delivered what we were supposed to.

9        Q.   You told Mr. Colon that the bank

10   was getting a little overemotional,

11   correct?

12       A.   Yes.

13            MS. PARKS:  Objection.

14   BY MR. MAYRON:

15       Q.   What did you mean by

16   "overemotional"?

17            MS. PARKS:  Asked and answered.

18       Objection.

19            But go ahead.

20            THE WITNESS:  Sure.

21       A.   I meant that we needed to provide

22   the update for 2020 because they were late

23   and the bank was getting emotional related

24   to it.

25       Q.   What do you mean the bank was

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. RECEIVED NYSCEF: 01/12/2024

479

J. Hanratty

1    getting emotional?

2        A.   Rightly so, I presume what I mean

3    by emotion is they were upset.

4        Q.   And you said "overemotional,"

5    correct?

6        A.   Yes, that's what I wrote.

7        Q.   And so what you were saying is

8    the bank was more upset than it should have

9    been?

10           MS. PARKS:  Objection.  Form.

11       Foundation.

12           Go ahead, John.

13       A.   I wrote, "overemotional."  What

14   was -- I don't remember writing this email.

15   But Marcos was a new auditor and wanted to

16   impart that it was an emotional situation.

17       Q.   What do you mean, "an emotional

18   situation"?

19       A.   They were -- the bank was --

20   wanted its documents and was upset.

21       Q.   And so what did you mean to

22   convey by saying overemotional rather than

23   just emotional?

24       A.   The bank was upset.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 1-2

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1243 of 2230

JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

480

```
 1                      J. Hanratty

 2        Q.   So there is no difference between

 3   the bank getting emotional and the bank

 4   getting overemotional?

 5             MS. PARKS:  Objection.

 6        A.   I don't know, but I wrote they're

 7   getting overemotional.

 8        Q.   Is it your view that the bank was

 9   more upset than it should have been that

10   you hadn't provided audited financial

11   statements for 2020 by August 3rd, 2022?

12        A.   No.

13             MS. PARKS:  Objection.

14             THE WITNESS:  Sorry.

15             MS. PARKS:  It's okay.

16   BY MR. MAYRON:

17        Q.   Did you view that the bank was

18   upset a proper amount that the Ebury

19   companies had failed to provide audited

20   financial statements for 2020 by

21   August 3rd, 2022?

22             MS. PARKS:  Objection.

23        A.   I don't have a view towards the

24   properness of their -- where they're at.

25   We had to deliver audited financials.
```

EMIGRANT BUSINESS CREDIT Court Records    Pg 1244 of 2230                John Hanratty
JOHN ARTHUR HANRATTY                                                    June 21, 2023

481

1                    J. Hanratty

2        Q.   At this point, the audited

3    financials were over a year-and-a-half

4    late?

5        A.   Yes.

6        Q.   And you were aware that the

7    audited financials were over a

8    year-and-a-half late?

9            MS. PARKS:  Objection.

10       A.   Yes.

11       Q.   What did you do -- once you

12   became aware that the audited financials

13   were late, what did you do to ensure that

14   they were delivered to the bank?

15       A.   We fired all of our accounting

16   staff in Puerto Rico.

17       Q.   Have you completed your audited

18   financials for 2020?

19           MS. PARKS:  Did you say "had" or

20       "have"?

21           MR. MAYRON:  Have you.

22           MS. PARKS:  Have.  Thanks.

23       A.   No.  We've moved on to another

24   firm.

25       Q.   Why did you move on to another

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1245 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                      June 21, 2023

482

                        J. Hanratty

1    firm?

2        A.    Marcos resigned because he did

3    not want to work for a bankruptcy.

4        Q.    So prior to Colon Cuebas, your

5    auditors were Richey May?

6        A.    Yes.

7        Q.    And why did you move from Richey

8    May to Colon Cuebas?

9        A.    Because Richey May, we were --

10   due to the staffing issues that we were

11   having in Puerto Rico, we were very delayed

12   in getting financials to Richey May.  And

13   Richey May, the time we were in a position

14   to move forward, they had already began all

15   their audit and tax work and were not going

16   to be able to produce documents for an

17   extended period of time.  I forget what the

18   estimate was.

19          And so we thought the best thing

20   to do was to hire a local competent person

21   to move forward and we could also have

22   somebody close by where they can -- like

23   Dennisse can work directly with them, in

24   light of the other accountants not

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO. 1243                                RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT                                John Hanratty
JOHN ARTHUR HANRATTY                                    June 21, 2023

                                                              483

 1                J. Hanratty

 2    performing at a level which -- to get that

 3    done.

 4         Q.   Didn't Richey May refuse to do

 5    your 2019 audited financial statements

 6    because you were two years delinquent in

 7    your audited financial statements?

 8              MS. PARKS:  Objection.

 9         A.   I don't recall that.  What I

10    recall was the decision around this I spoke

11    with a partner at Richey May, I forget if

12    it was Sean, once -- I think if that was

13    what the issue was, once that was work was

14    done, once we got a real timeline.  That's

15    what I recall.

16         Q.   And so then Colon Cuebas decided

17    to no longer work with you?

18              MS. PARKS:  Objection.

19         A.   Yeah, when we apprised him --

20    because he was -- the one he got up to the

21    point of issuing a -- finalizing the 2020

22    audit and writing an opinion, and getting

23    it all done, that was roughly around the

24    time of the default.  And he said he did

25    not want to get involved with the

EMIGRANT BUSINESS CREDIT                                    John Hanratty
JOHN ARTHUR HANRATTY                                        June 21, 2023

484

1                    J. Hanratty

2    bankruptcy, and quit.  I had a conversation

3    that that wasn't appropriate.  It's your

4    obligation.  That's what the status of the

5    business was --

6              (Reporter clarification.)

7         A.   That it wasn't an appropriate

8    result and it did not move him.

9         Q.   So you're onto your third auditor

10   in five years?

11             MS. PARKS:  Objection.

12        A.   Yes.

13        Q.   And when did you start with your

14   current auditor?

15        A.   I don't know exactly.  Dennisse

16   is in charge of all of that, and she -- I

17   don't know exactly when the start date was.

18        Q.   Who is your current auditor?

19        A.   I don't know the name exactly.  I

20   don't deal with them at all.

21        Q.   And you said that Mr. Colon fired

22   you around the time of the default.  So

23   have you been working with your current

24   auditor for over a year now?

25             MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 177    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT-Court Records    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
JOHN ARTHUR HANRATTY                                                                                    John Hanratty
Pg 1248 of 2230                                                                                          June 21, 2023

485

```
 1                    J. Hanratty

 2         Mischaracterizes his testimony.

 3              You can answer.

 4              THE WITNESS:  Sure.

 5         A.   I don't know how long we've been

 6    work, but it's been some time.

 7         Q.   More than six months?

 8         A.   I don't -- I don't know when we

 9    signed an engagement letter.

10         Q.   And --

11         A.   But I think it took us -- there

12    is a search function, and so I think we had

13    to find somebody new.

14              And also I recall Dennisse

15    talking about the difficulties of calendar

16    getting on people's schedules and -- et

17    cetera.  And also I think we had some

18    difficulty related to the same issues with

19    Mr. Colon.  The potential litigation around

20    the company.

21         Q.   So we are sitting here in June of

22    2023 and the Ebury companies have not

23    produced audited financials for 2020, 2021,

24    or 2022, correct?

25              MS. PARKS:  Objection.
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT                 Court Records    Pg 1249 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                       June 21, 2023

486

```
 1                    J. Hanratty

 2        A.   Yes.  We had our auditor resign

 3   prior to issuing an opinion in 2020.  And

 4   then due to the complexities of the

 5   litigations and potential bankruptcies,

 6   it's been difficult to hire additional

 7   auditors.  We have hired another auditor,

 8   and they are currently working on it.

 9        Q.   I'm going to hand you a document

10   labeled EBCC 57 --

11             MR. MAYRON:  Actually, Burke, I'm

12        sorry.  I'm actually 10663.

13   BY MR. MAYRON:

14        Q.   I'm going to hand you a document

15   labeled EBCC 10663.

16             MR. MAYRON:  Could the court

17        reporter please mark the document as

18        Hanratty Deposition Exhibit 50.

19             (Hanratty Exhibit 50, Ebury Fund

20        1, L.P. and Subsidiaries Consolidated

21        Financial Statements and Independent

22        Auditor's Report for year ended

23        12/31/2019, Bates-stamped EBCC_10663

24        through 10682, marked for

25        identification, as of this date.)
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                      Court Records    Pg 1250 of 2230    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT                                      John Hanratty
JOHN ARTHUR HANRATTY                                         June 21, 2023

487

                        J. Hanratty

1

2   BY MR. MAYRON:

3       Q.   Have you seen this document

4   before?

5       A.   I don't recall seeing it, but

6   it's our audit.  But yes.  Yes, I have seen

7   this before.

8       Q.   This is the Ebury Fund 1 audited

9   financial statements for 2019, correct?

10      A.   Yes.

11      Q.   And if you turn to the page

12  labeled EBCC 10666, your auditor expressed

13  substantial doubt about the partnership's

14  ability to continue as a going concern,

15  correct?

16      A.   Yes.

17      Q.   And your auditor expressed

18  concern whether the partnership will be

19  able to repay all amounts outstanding under

20  the Emigrant line of credit at maturity,

21  correct?

22      A.   Yes.

23      Q.   Can you turn to the page labeled

24  EBCC 10670.

25      A.   Yes.

488

J. Hanratty

1

2      Q.    In 2019, you distributed

3   3.1 million in distributions to the limited

4   partners, correct?

5           MS. PARKS:  Objection.

6      A.    Yes, that's what this looks like.

7      Q.    And at the time you made those

8   distributions, there was doubt whether the

9   Ebury companies would be able to repay

10  their obligations to Emigrant Bank at

11  maturity?

12          MS. PARKS:  Objection.

13     A.    No.  I think if -- what I recall,

14  if you look at the date of when this was

15  issued, the companies -- I think it was

16  done in '21, correct?

17          And so I recall conversations

18  with Marcos about the go-forward plan which

19  was causing the issue.

20          And so those are his opinion, but

21  I think the context and the timing of them

22  are a little bit different.

23     Q.    I'm going to hand you a document

24  labeled EBCC 1070.

25          MS. PARKS:  Sorry, I just don't

489

```
 1              J. Hanratty

 2      know.  It's not my house.

 3           MR. MAYRON:  Can we go off the

 4      record.

 5           MS. PARKS:  Sure.

 6           THE VIDEOGRAPHER:  The time is

 7      2:21 p.m.  We are going off the record.

 8           (Recess is taken.)

 9           THE VIDEOGRAPHER:  The time is

10      2:31 p.m.  We are back on the record.

11  BY MR. MAYRON:

12      Q.   Just before we left, I was about

13  to hand you a document.  So here is EBCC

14  10701.

15           MR. MAYRON:  And could the court

16      reporter please mark this as Hanratty

17      Deposition Exhibit 51.

18           (Hanratty Exhibit 51, Ebury Fund

19      2, L.P. and Subsidiaries Consolidated

20      Financial Statements and Independent

21      Auditor's Report for the year ended

22      12/31/2019, Bates-stamped EBCC_10701

23      through 10720, marked for

24      identification, as of this date.)

25  BY MR. MAYRON:
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records    Pg 1253 of 2230    John Hanratty
24-04020-dsj

JOHN ARTHUR HANRATTY                                              June 21, 2023

490

1                    J. Hanratty

2        Q.   Have you seen this document

3    before?

4        A.   Yes.

5        Q.   What is it?

6        A.    It is Ebury Fund 2 LP and its

7    subsidiaries, financial audit.

8        Q.   For 2019, correct?

9        A.   Yes.

10       Q.   So if you turn to the page

11   labeled 10704, your auditor expresses

12   substantial data about Fund 2's ability to

13   continue as a going concern, correct?

14       A.   Yes, he does.

15       Q.   And your auditor states that,

16   "It's uncertain whether Fund 2 will be able

17   to repay all amounts outstanding under the

18   line -- under the Emigrant line of credit

19   at maturity"?

20          MS. PARKS:   Objection.  It looks

21      like partnership is defined Fund 2 LP

22      and subsidiaries.

23   BY MR. MAYRON:

24       Q.   Mr. Hanratty?

25       A.   Oh, sorry.  Yes, that is what

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. Court Records Pg 1254 of 2230 RECEIVED NYSCEF: 01/12/2024

491

J. Hanratty

1
2  Marcos wrote.  The work was being done in
3  2021 and by that point in time he was
4  concerned.  He put his opinion in this
5  document.
6      Q.   And then there is an emphasis of
7  other matter there, which says, "The
8  consolidated financial statements include
9  investments and tax lien receivables and
10 Ebury RE LLC, whose fair values have been
11 estimated by the general partner of the
12 partnership in the absence of readily
13 ascertainable market values."
14          Did I read that right?
15     A.   Yes.
16     Q.   Who is the general partner of the
17 partnership?
18     A.   Ebury Street Capital.
19     Q.   And who is the manager of Ebury
20 Street Capital?
21     A.   John Hanratty.
22     Q.   And so you provided the estimated
23 valuations of the tax lien receivables and
24 investments in Ebury RE that were used in
25 these audited financial statements?

492

1                         J. Hanratty

2               MS. PARKS:  Objection.

3          A.    That's what he wrote, yes.

4          Q.    Did you provide the valuations of

5     the tax lien receivables and investments in

6     Ebury RE that were used in these audited

7     financial statements?

8          A.    Did I -- say that one more time?

9          Q.    Did you provide the valuations of

10    the tax lien receivables and investments in

11    Ebury RE that were used in the 2019 audited

12    financial statements for the Ebury

13    companies?

14              MS. PARKS:  Objection.

15              Go ahead.

16         A.    I don't recall sending the

17    schedules, what the receivables were.

18    That's what he wrote as far as an estimated

19    valuation.

20         Q.    I'm confused.

21              Did you provide the valuations of

22    the tax lien receivables and investments in

23    Ebury RE that were used in the 2019 audited

24    financial statements for the Ebury

25    companies or not?

493

J. Hanratty

2    MS. PARKS:  Objection.

3    A.   I didn't, if you're asking John

4    Hanratty.  It would have come from our

5    accounting group.  For -- he writes, tax

6    lien investment, receivables, and Ebury RE.

7         So Ebury RE, I think we discussed

8    this, we get valuations done by appraisers,

9    brokers, things like that.

10        And so we would have provided

11   those.

12   Q.   Did you direct your accounting

13   group to provide the valuations of the tax

14   lien receivables and investments in Ebury

15   RE that were used in the 2019 audited

16   financial statements for the Ebury

17   companies?

18        MS. PARKS:  Objection.

19   A.   Not specifically.  I would

20   have -- if the auditor requested

21   valuations, we would have provided them, if

22   we had them.

23        So if we had a valuation on

24   property value for Ebury RE or an

25   appraisal, we would have sent that along.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj
EMIGRANT BUSINESS CREDIT Court Records   Pg 1257 of 2230
John Hanratty
JOHN ARTHUR HANRATTY
June 21, 2023

494

|  | J. Hanratty |
|---|---|

1          J. Hanratty

2          For the liens, we don't get them

3    valued.

4        Q.   So who provided the value of the

5    tax lien receivables that were used in the

6    2019 audited financial statements for the

7    Ebury companies?

8          MS. PARKS:  Objection.

9        A.   I presume the normal course

10   our -- our accounting group.  At this time

11   in 2021, I think it's Dennisse.  I don't

12   recall if Clarissa was working with us

13   then.

14       Q.   And so the valuations for the

15   Ebury companies' investments and tax lien

16   receivables in Ebury RE LLC were provided

17   by the Ebury companies?

18          MS. PARKS:  Objection.

19       A.   Yes.  Like a request would have

20   been made from Marcos, we would have given

21   him the documentation that he needs.

22       Q.   Turning to the page labeled EBCC

23   10708.  Ebury Fund 2 and its subsidiaries

24   paid 2.8 million in distributions to

25   investors in 2019, correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1258 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

495

          J. Hanratty

1

2          MS. PARKS:  Objection.

3          A.   Yes, I think that's what this

4     reflects.

5          Q.   Turning back a page or two,

6     actually, to page labeled 10705, your

7     auditors -- sorry, the 2019 audited

8     financial statements for Ebury Fund 2 lists

9     the total investments and tax lien

10    receivable as $10,770,836, correct?

11          MS. PARKS:  Objection.

12          A.   Yes, that's what it reads.

13          Q.   And that number is as of

14    December 31st, 2019, correct?

15          MS. PARKS:  Objection.

16          A.   Yes, it's what it reads.

17          Q.   And then turning back to Hanratty

18    Deposition Exhibit 50, which is the Ebury

19    Fund 1 audited financial statement for

20    2019, could I direct you, please, to the

21    page labeled 10667?

22          A.   Yes.

23          Q.   And the audited financial

24    statement lists that Ebury Fund 1's total

25    investment and tax lien receivable as of

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1259    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1259 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY                                                    John Hanratty
                                                                       June 21, 2023

496

J. Hanratty

1    December 31st, 2019, is $6,466,903,

3    correct?

4         A.    That's what it reads, yes.

5         Q.    So between the two funds, as of

6    December 31st, 2019, the Ebury companies

7    had investments in tax liens receivable of

8    approximately $17 million?

9              MS. PARKS:   Objection.

10        A.    That's what it reads, yes.

11        Q.    Did the Ebury -- strike that.

12             Did the Ebury companies have

13   investments in tax lien receivables on

14   December 31st, 2019, of approximately

15   $17 million?

16             MS. PARKS:   Objection.

17        A.    I generally recall a conversation

18   with Jack around this number of being some

19   component of them, including like our

20   write-offs or like a reserve.  Something

21   related to the principal component.  So

22   what the audit reflects is 17, but I can

23   recall conversations related to what fair

24   value is.

25        Q.    Are you saying that the audited

497

                      J. Hanratty

1

2      financial statements for 2019 for the Ebury

3      companies have an incorrect valuation of

4      the Ebury companies' investments in tax

5      lien receivables?

6              MS. PARKS:  Objection.

7          A.    No.  I recall having a

8      conversation, probably multiple, with Jack

9      about this number and its relation to the

10     redemptive value.  And I can't recall the

11     outcome of that.

12         Q.    So the 2019 audited financial

13     statements are correct, the Ebury

14     companies' total -- the Ebury companies'

15     total investments in tax liens receivable

16     as of December 31st, 2019, are worth

17     approximately $17 million?

18             MS. PARKS:  Objection.

19         A.    That's what the audit reads, yes.

20         Q.    Are the numbers in the audit

21     correct?

22         A.    It's our audited financials.

23         Q.    And are the numbers correct?

24             MS. PARKS:  Objection.

25             Go ahead.

498

                          J. Hanratty

1

2      A.    This is our audited financials.

3   The reflection for what we perceived to be

4   the fair value of the liens.

5      Q.    And so as of December 31st, 2019,

6   you perceived the fair value of the Ebury

7   companies' investments in tax lien

8   receivable to be approximately $17 million?

9           MS. PARKS:   Objection.

10     A.    That's what the audit reads, yes.

11     Q.    That wasn't my question.  My

12  question was:  As of December 31st, 2019,

13  you perceived the fair value of the Ebury

14  companies' investments in tax liens

15  receivable to be approximately $17 million?

16          MS. PARKS:   Objection.  Form.

17     Foundation.

18     A.    The -- I would presume the fair

19  value reflects the conversations we had

20  with Marcos related to the value of the

21  liens.

22     Q.    Earlier you said, "This is our

23  audited financials, the reflection of what

24  we perceived to be the fair value of the

25  liens," correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 23    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1262 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

499

```
 1                    J. Hanratty

 2           MS. PARKS:  Objection.

 3      A.    If that's what I said, that's

 4  what I said.

 5      Q.    So you perceived the fair value

 6  of the Ebury companies' investments in tax

 7  liens receivable as of December 31st, 2019,

 8  to be approximately $17 million?

 9           MS. PARKS:  Objection.

10           You can answer.

11           THE WITNESS:  Sure.

12      A.    Our audited financials reflect

13  17.  I know there is a process to get to

14  that number, and that number might not be

15  reflective of the redemptive value of that

16  number.  But that's 17 on the outs.

17      Q.    What is the difference between

18  the redemptive value of the lien and what

19  the fair value of the Ebury companies'

20  investment in that lien is?

21      A.    The fair value might not reflect

22  the entire redemptive value.

23      Q.    Under what circumstances would

24  the fair value not reflect the entire

25  redemptive value?
```

500

1                    J. Hanratty

2        A.   If we had presumed -- not

3    presume.

4             If we have a reserve against it

5    of a potential write-down.

6        Q.   What do you mean "a reserve

7    against it"?

8        A.   If we have -- if we're owed, you

9    know, a 2 million of redemptive value and

10   we put a reserve of $500,000 against that

11   as a loss, a protection of loss.  So net

12   would be .5 for a fair value.

13       Q.   Why would you put a reserve

14   against a tax lien investment?

15       A.   We've done that historically

16   for -- potentially for like in the example

17   of Rochester, I forget the purchase price,

18   but it's roughly, I think, 70, 70 cents,

19   something along those lines.  We would put

20   a reserve against the -- I don't know if it

21   was perfect as to the 30 percent, but we

22   would put up a loss reserve against the

23   asset to make up the difference.

24       Q.   Can I turn your attention back to

25   Hanratty Deposition Exhibit 14, which is

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

501

J. Hanratty

EBCC 8844.

A.   Yes.

Q.   And could you please turn to the
page ending in 8861.

Mr. Grady sends you a text,
saying, "This audit paints a really bad
picture.  I am not sure how I would even be
able to defend you."

Did I read that correctly?

A.   Yes.  Down below, yes.

Q.   And by "this audit," Mr. Grady is
referring to the audited financial
statements that we were looking at,
Hanratty Deposition Exhibits 50 and 51?

MS. PARKS:  Objection.

A.   Yes.  The timing of it appears to
line up.

Q.   And you did not send Emigrant
Bank the 2019 audited financial statements
for the Ebury companies until July 2021?

MS. PARKS:  Objection.

A.   Yes.

Q.   And so Mr. Grady receives the
audited financial statements and sends you

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1287 RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT                                                    John Hanratty
JOHN ARTHUR HANRATTY                                                        June 21, 2023

502

J. Hanratty

1

2      a text message, saying, "This audit paints

3      a really bad picture"?

4              MS. PARKS:  Objection.

5          A.   Yes.

6          Q.   And so then turning to page 8862,

7      we spoke about this text message yesterday,

8      Mr. Grady writes, "What I'm really more

9      focused on is the lien shortfall in the

10     audit.  You don't even have one-to-one

11     coverage on an accrued basis.  It's going

12     to raise a ton of questions when I've been

13     saying this whole time we are covered by a

14     30-million-dollar lien portfolio."

15             Correct?

16             MS. PARKS:  Objection.

17         A.   Yes, that is what he wrote.

18         Q.   What does one-to-one coverage on

19     an accrued basis mean?

20         A.   I presume he means a dollar, a

21     dollar for a dollar.

22         Q.   On an accrued basis means

23     according to the redemptive value of the

24     investments and tax liens?

25         A.   Yes, I presume that's what he

503

```
 1                        J. Hanratty

 2     means.

 3          Q.    And you respond to Mr. Grady on

 4     the next page, 8863, "I don't see your lack

 5     of one-to-one.  End of 2019, we were 32W

 6     receivable."

 7               Correct?

 8               MS. PARKS:  Objection.

 9               (Document review.)

10     BY MR. MAYRON:

11          Q.    Did I read that correctly?

12          A.    Yes.

13          Q.    And so what was the basis for you

14     telling Mr. Grady that you had 32 million

15     in investments in tax lien receivables?

16               MS. PARKS:  Objection.

17          A.    Got it off the market price.

18     That the fair value of the book was

19     understated in the audit, is what I think

20     I'm getting at by market price.

21          Q.    Is it your understanding that the

22     total investments and tax liens receivable

23     reported in the audited financial

24     statements for the Ebury companies in 2019

25     are incorrect?
```

504

```
 1                    J. Hanratty

 2            MS. PARKS:  Objection.

 3       A.    No.  I think I'm writing here

 4  that I didn't agree with -- well --

 5       Q.    You can go ahead.

 6       A.    That I couldn't get guy off the

 7  market price and that interest of getting

 8  it done -- not interest.

 9       Q.    And just to be clear, according

10  to the independent auditor's reports in the

11  2019 audited financial statements, the fair

12  values of the investments and tax lien

13  receivables were provided by the general

14  partner of the partnership, meaning Ebury

15  Street Capital, which is you?

16            MS. PARKS:  Objection.

17            Are you asking about what the

18       document says or are you asking him

19       what happened?

20            You said, just to be clear,

21       according to, et cetera, et cetera, et

22       cetera.  Meaning Ebury Street Capital,

23       which is you.

24            So my question is, are you asking

25       him what the document says or are you
```

505

J. Hanratty

1

2      asking him about his recollection of

3      what happened?

4   BY MR. MAYRON:

5      Q.    To repeat the question:

6   According to the independent auditor's

7   reports and the 2019 audited financial

8   statements, the fair values of the

9   investments and tax lien receivables were

10  provided by the general partner of the

11  partnership, meaning Ebury Street Capital,

12  which is you?

13         MS. PARKS:  Same objection.

14     A.    Well, I'm not Ebury Street

15  Capital, but Ebury Street Capital is a

16  general partner of the funds.  It provided

17  the documentation related to the request

18  from the auditor.

19     Q.    And Ebury Street Capital provided

20  the fair values of the tax lien, the

21  investments in tax lien receivables that

22  your auditor reported in the 2019 audited

23  financial statements?

24         MS. PARKS:  Objection.

25     A.    Other than, as I mentioned in my

506

J. Hanratty

2  text, I believe there were conversations

3  around what fair value was.  But, yes, the

4  documentation came from Ebury Street

5  Capital.

6      Q.   So the numbers that Ebury Street

7  Capital submitted to your auditors in 2019

8  were not the fair market value of the

9  investments and tax lien receivables?

10         MS. PARKS:   Objection.

11     A.   I think there were conversations

12  around what the fair value -- I don't

13  recall them -- of what fair value was for

14  liens.

15     Q.   Did you believe that the numbers

16  that you submitted to your auditors for the

17  fair value of the Ebury companies' total

18  investments and tax lien receivable were

19  correct?

20         MS. PARKS:   Objection.

21         You can answer.

22     A.   We finalized the report based off

23  of the fair value as perceived by the

24  documentation that we gave them and there

25  is the opinion.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 138                                 RECEIVED NYSCEF: 01/12/2024

507

```
 1                    J. Hanratty

 2        Q.   Your auditor said that the fair

 3   values have been estimated by the general

 4   partner, correct?

 5             MS. PARKS:  Objection.

 6             If you need to look back.

 7             THE WITNESS:  Yeah, sure.

 8        A.   No, it does read that, yes.

 9        Q.   And so when you say, "We

10   finalized the report based off the fair

11   value as perceived by the documentation

12   that we gave them," you're saying that in

13   Ebury -- you're saying that in 2019 --

14   sorry.  Let me start over.

15             When you said "We finalized the

16   report based off the fair value as

17   perceived by the documentation we gave

18   them," you are saying that these numbers

19   reflect your view of the fair market value

20   of the Ebury companies' investments and tax

21   liens?

22             MS. PARKS:  Objection to form.

23             You can answer.

24             THE WITNESS:  Sure.

25        A.   I recall generally a process
```

508

 1                   J. Hanratty

 2    around how to value tax liens, which was

 3    different than the redemptive value

 4    component, which I believe I'm referring to

 5    here.  Those conversations I believe

 6    generally took place with Dennisse and

 7    Marcos, and ultimately he issued an opinion

 8    of what is reflected here.

 9         Q.   So the fair market value that you

10    estimated for the audited financial

11    statements is approximately half of the

12    redemptive value that you reported to

13    Emigrant?

14              MS. PARKS:  Objection.

15         A.   I think the fair value is less

16    than the redemptive value.

17         Q.   Right.

18              Is the fair market value that you

19    estimated for the audited financial

20    statements approximately half of the

21    redemptive value that you reported to

22    Emigrant?

23              MS. PARKS:  Objection.

24         A.   Well, there -- so in reports to

25    Emigrant, I think we're just putting out

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1272 RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

509

1          J. Hanratty

2    what we -- the liens we have just on the --

3    is what we have on a redemptive value

4    basis.  This, I think, reflects a value --

5    an attempt of valuing them for what they

6    are.

7          Q.   So the fair market value that you

8    reported to your auditor in 2019 was

9    approximately 17 million for the Ebury

10   companies' investments and tax lien

11   receivable?

12          MS. PARKS:  Objection.

13          A.   I think that -- yes, that's what

14   the audit reflects.

15          Q.   And then the redemptive value

16   that you reported to Mr. Grady on

17   July 21st, 2021, was approximately 32

18   million in investments and tax lien

19   receivable?

20          MS. PARKS:  Objection to form.

21          A.   That's what I texted in response,

22   yes.

23          Q.   So the fair market value that you

24   estimated for the audited financial

25   statements is approximately half of the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 45
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1273 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

510

J. Hanratty

2    redemptive value that you reported to

3    Emigrant?

4         MS. PARKS:   Objection.  Form.

5    A.    I recall a process where certain

6    components of the redemptive value weren't

7    taken into -- where it's a different number

8    than what the fair value is, and I don't

9    recall the process in which we agreed with

10   Marcos to value them.

11   Q.    We can get into that process.

12         My question is, I think, a little

13   simpler.  It's the fair market value that

14   you estimated for the audited financial

15   statements, roughly $17 million, is

16   approximately half of the redemptive value

17   that you reported to Emigrant, $32 million,

18   correct?

19        MS. PARKS:   Objection.

20   A.    In a text, yes.  I texted the --

21   that we had 32 with receivable, a

22   3-million-dollar loan book and then

23   $10 million in REO.

24        MS. PARKS:   Just remember when

25        you read, you tend to go too fast --

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                    Court Records          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT                                                    John Hanratty
JOHN ARTHUR HANRATTY                                                        June 21, 2023

511

J. Hanratty

1          THE WITNESS:  Oh, sorry.

2

3          MS. PARKS:  -- so just slow it

4   down.

5  BY MR. MAYRON:

6     Q.   And that's a pretty significant

7  difference between the redemptive value and

8  the fair market value, correct?

9          MS. PARKS:  Objection.

10     A.   It is.

11     Q.   Why is the fair market value of

12  the Ebury companies' investments and tax

13  lien receivables, in your view, so much

14  lower than the redemptive value?

15          MS. PARKS:  Objection.

16     A.   I don't recall the process that

17  Marcos used to do this, other than

18  potentially valuing it at cost.

19     Q.   You say you don't recall the

20  process that Marcos used to do this.

21         And by "Marcos," you mean

22  Mr. Colon?

23     A.   Yes.

24     Q.   And in the audited financial

25  statements, Mr. Colon says that the fair

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT
Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1275 of 2230
RECEIVED NYSCEF: 01/12/2024
JOHN ARTHUR HANRATTY
John Hanratty
June 21, 2023

512

1                    J. Hanratty

2    values have been estimated by the general

3    partner, not by him, correct?

4              MS. PARKS:  Objection.

5        A.    Yes.  I meant -- what I meant was

6    the process of getting to that fair value

7    number.

8              One follow-up, I do also believe

9    that there was differences with Richey May

10   as well.  Like I think this was -- I recall

11   this being a constant theme going back to

12   '17, '18.

13       Q.    That tax liens are difficult to

14   value?

15       A.    Difficult to value, but also

16   having a difference between fair value and

17   overall redemptive value.

18       Q.    I am going to hand you a document

19   labeled EBCC 5705.  And could the court

20   reporter please mark it as Hanratty

21   Deposition Exhibit 52.

22             (Hanratty Exhibit 52, Email dated

23        9/30/2019 from J. Hanratty to J. Grady,

24        Bates-stamped EBCC_5705, marked for

25        identification, as of this date.)

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2                                  RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1276 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                        June 21, 2023

513

J. Hanratty

1
2    BY MR. MAYRON:
3         Q.    This is an email from you to
4    Mr. Grady from September 30th, 2019,
5    correct?
6         A.    Yes.
7         Q.    And in the email, you say, "Hey,
8    sorry for the delay."  And you attach a
9    document called, "2018 Ebury Full
10   Secure.pdf," correct?
11        A.    Yes.  It reads, "Ebury Full
12   Secure."
13        Q.    Do you know what Ebury Full
14   Secure is?
15        A.    No.
16        Q.    I'll represent to you that it is
17   the 2018 audited financial statements for
18   the Ebury companies, which we marked as
19   Hanratty Deposition Exhibit 8.
20              You didn't provide Emigrant with
21   the 2018 audited financial statements for
22   the Ebury companies until September 30th,
23   2019, correct?
24              MS. PARKS:  Objection.
25        A.    Assuming that -- yeah.  If Ebury

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 67

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT            Court Records    Pg 1277 of 2230            John Hanratty
JOHN ARTHUR HANRATTY                                                            June 21, 2023

514

                      J. Hanratty

1

2    Full Secure is our audit, this is -- I

3    don't know if there is another email that

4    is earlier, but this appears to be

5    providing it on September 30th, 2019.

6        Q.   Do you recall sending Emigrant

7    the 2018 audited financial statements for

8    the Ebury companies prior to

9    September 30th, 2019?

10       A.   I do not.

11           MS. PARKS:  I'll state for the

12       record, Austin Mayron is a gentleman

13       and a scholar.  Thank you.

14   BY MR. MAYRON:

15       Q.   And as we discussed before,

16   according to Ebury companies' audited

17   financial statements, the Ebury companies

18   distributed approximately 15 million to

19   equity investors in 2018?

20       A.   Yes.  In our prior review of the

21   '18 audit, yes.

22       Q.   And then in 2019, the Ebury

23   companies distributed approximately 6 or 7

24   million in distributions to equity

25   investors?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 110    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1278 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                June 21, 2023

515

J. Hanratty

2    A.   Yes.  I recall that's what the

3  audit reflected for 2019.

4    Q.   So by the time you sent Emigrant

5  the audited financial statements for the

6  Ebury companies for 2018, you had already

7  distributed approximately 20 million

8  distributions to equity investors?

9       MS. PARKS:  Objection.  Form.

10    A.   Yes.

11    Q.   And then after you sent Emigrant

12  the audited financial statements for the

13  Ebury companies for 2018, did you continue

14  to make equity distributions to investors?

15       MS. PARKS:  Objection.

16    A.   I don't... I don't recall the

17  exact timing of the 2019.  So you mean from

18  September 30th, 2019, did I continue to do

19  it, or Ebury?

20    Q.   Yes.

21       Well, did you make equity -- did

22  you make distributions to equity investors

23  in 2020?

24       MS. PARKS:  Objection to form.

25    A.   I don't think so.  I can't

516

```
 1              J. Hanratty

 2   recall.

 3      Q.   Are you aware of any

 4   distributions to equity investors that the

 5   Ebury companies made in 2020?

 6          MS. PARKS:  Objection.

 7      A.   Not that I can recall, no.

 8      Q.   I am going to hand you a document

 9   labeled EBCC 22650.

10          MR. MAYRON:  Could the court

11          reporter please mark the document as

12          Hanratty Deposition Exhibit 53.

13          (Hanratty Exhibit 53, Validity

14          Guaranty Agreement, Bates-stamped

15          EBCC_22650 through 22657, marked for

16          identification, as of this date.)

17   BY MR. MAYRON:

18      Q.   Have you seen this document

19   before?

20      A.   Yes.

21      Q.   And what is it?

22      A.   It's a validity guarantee.

23      Q.   What is a validity guarantee?

24      A.   A validity guarantee is -- this

25   one in particular was part of the closing
```

517

                    J. Hanratty

1   documents for the line of credit with

2

3   Emigrant Bank where I would agree that

4   everything I gave them was valid.

5        Q.   What do you mean you agreed that

6   everything you gave them was valid?

7             MS. PARKS:   Objection.

8        A.   That all the information that I

9   give them is valid.

10        Q.   I direct your attention to the

11   page labeled 22651.  Section 2 reads,

12   "Validity guarantor..." which is you,

13   "...hereby guarantees that, to the

14   knowledge of validity guarantor, all

15   information from time to time delivered to

16   lender will be true and correct in all

17   material respects as of the calculation

18   date applicable to such information."

19        Correct?

20        A.   Yes.

21        Q.   So you agreed that all of the

22   information that you provided Emigrant

23   would be true and correct in all material

24   respects?

25             MS. PARKS:   Objection.

518

    1              J. Hanratty

    2       A.   Yes, that's what that reads.

    3       Q.   And you further agreed to pay the

    4  aggregate amount of all damages incurred by

    5  the lender, which is Emigrant, where

    6  damages are any damages, costs, or losses

    7  caused to Emigrant as a result of any

    8  information not being true and correct in

    9  all material respects.

   10            This is back earlier on page

   11  22650.

   12            MS. PARKS:   Objection.

   13       A.   Sorry, where was that?

   14       Q.   Damages, definition.  I'll just

   15  repeat the question.

   16            You further agreed to pay the

   17  aggregate amount of all damages incurred by

   18  the lender, which is Emigrant, where

   19  damages are any damages, costs, or losses

   20  caused to Emigrant as a result of any

   21  information not being true and correct in

   22  all material respects, correct?

   23       A.   Yes, that's what that reads.

   24       Q.   And you executed a validity

   25  guarantee for the Fund 2 credit facility as

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records     Pg 1282 of 2230     John Hanratty
JOHN ARTHUR HANRATTY                                            June 21, 2023

519

```
 1                     J. Hanratty
 2   well?
 3              MS. PARKS:  Objection.
 4      A.   Yes.  I would have executed the
 5   same document two times.
 6      Q.   So to confirm, you are personally
 7   liable if the Ebury companies delivered
 8   inaccurate information to the bank?
 9              MS. PARKS:  Objection.  Legal
10         conclusion.
11      A.   Do I answer?
12      Q.   I'll rephrase.
13              So to confirm, you agreed to be
14   personally liable if the Ebury companies
15   delivered inaccurate information to the
16   bank?
17              MS. PARKS:  Objection.
18      A.   That appears what this reads,
19   yes.
20      Q.   Did you agree to be personally
21   liable if the Ebury companies delivered
22   inaccurate information to the bank?
23              MS. PARKS:  Objection.
24      A.   I agreed to the entirety of this
25   document, which I haven't read in a while,
```

520

                         J. Hanratty

1

2    not just the clause that we are reading.

3              And so I agreed to the clause

4    that you read, yes.

5         Q.   Was it your understanding that by

6    executing this document, you would be

7    personally liable if the Ebury companies

8    delivered inaccurate information to the

9    bank?

10             MS. PARKS:   Objection.

11        A.   Yes, I agreed with the caveat of

12   all material respects and all that

13   qualifying language, yes, I did agree that

14   there would be -- would have to be

15   accurate.

16        Q.   Given that you would be

17   personally liable, what did you do to

18   ensure that the information that the Ebury

19   companies delivered to Emigrant Bank was

20   accurate in all material respects?

21             MS. PARKS:   Objection.

22             Go ahead.

23             THE WITNESS:   Sure.

24        A.   We tried our best to hire

25   competent individuals to help with all the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 14 RECEIVED NYSCEF: 01/12/2024

521

                           J. Hanratty

1

2   reporting requirements to Emigrant Bank.  I

3   think where some of the staffing fell

4   short, we made decisions to move on and

5   improve ourselves.

6           And so I would say, generally

7   speaking, trying to build a team to be as

8   accurate as possible.

9       Q.   So after you hired employees to

10  help with reporting to Emigrant Bank, what

11  did you do to supervise the performance of

12  their duties?

13          MS. PARKS:  Objection.

14          Go ahead.

15          THE WITNESS:  Sure.

16      A.   Well, so back in 2017, we were

17  using Tower Fund Services, who used

18  basically the entirety of our books and

19  servicing.  As we grew, I had thought that

20  the interactions of, putting employees in

21  direct contact --

22          (Reporter clarification.)

23      A.   Putting employees to work

24  directly with the service providers that we

25  had for a few years would be more of a

522

J. Hanratty

2    seamless process than what it was.

3           As far as supervision, I worked

4    with the same office with these people for

5    many years and we made changes when it had

6    to happen.

7           Q.   To be clear, you understood that

8    you would be personally liable if the Ebury

9    companies delivered information to Emigrant

10   Bank that was not accurate in all material

11   respects, and all you did to ensure that

12   the Ebury companies delivered accurate

13   information to Emigrant in all material

14   respects was hire employees to help with

15   the reporting, putting employees to work

16   directly with the service providers, and

17   then working with these people for many

18   years, and making changes when it had to

19   happen?

20           MS. PARKS:   Objection.

21           A.   No.  I interacted with them all

22   on a daily basis and provided as much

23   oversight and questions and et cetera and

24   advice when possible.

25           We built out a financial group

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1284                              RECEIVED NYSCEF: 01/12/2024

523

1                    J. Hanratty

2     which operated independently under Ping for

3     many years, and then transitioned to the

4     people in Puerto Rico.  We built out a lien

5     management group, servicing group, and that

6     still is around today.  And built out an

7     REO group as well.

8              Everybody's work processes is

9     different based off of their functions.

10    And I'm involved with all of them.

11         Q.   So to be clear, you interact with

12    the employees that you hired to assist with

13    the reporting to Emigrant Bank on a daily

14    basis and provide them with oversight?

15         A.   I interact with the employees on

16    a daily basis as it relates to reporting to

17    Emigrant where needed and as discussed

18    throughout the past couple of days on all

19    the documents that we have.  I would review

20    them from time to time.  Would not review

21    everything that came through my email box

22    or my desk.  And that's what we did.

23         Q.   You said, "where needed."  Where

24    was it needed for you to provide your

25    employees oversight with respect to the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 67    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1287 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

524

J. Hanratty

1
2  reporting to Emigrant Bank?

3          MS. PARKS:  Objection.

4      A.    In the context if there were

5  specific questions that they had.

6      Q.    So you would only provide

7  oversight to your employees who worked on

8  reporting to Emigrant Bank if they had

9  specific questions?

10          MS. PARKS:  Objection.

11      A.    No.  No.  I was referring to

12  interaction.

13      Q.    So what sort of oversight did you

14  provide to your employees who assisted you

15  with the reporting to Emigrant Bank?

16          MS. PARKS:  Objection.

17          Go ahead.

18      A.    We were a small business, and so

19  the oversight is interaction --

20      Q.    What do you mean?

21      A.    -- on a daily basis.

22      Q.    What do you mean by "interaction

23  on a daily basis"?

24      A.    I mean that we collectively

25  worked in the same place.  We're not a

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO. [illegible]   RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1288 of 2230

EMIGRANT BUSINESS CREDIT                                    John Hanratty
JOHN ARTHUR HANRATTY                                        June 21, 2023

525

```
 1                  J. Hanratty

 2    company of -- with the exceptions of people

 3    in the Philippines, where we're not around

 4    each other.  And with the exception of

 5    COVID time.

 6         Q.   So you would regularly review the

 7    work of the employees who assisted you with

 8    the reporting to Emigrant Bank?

 9              MS. PARKS:  Objection.

10         A.   Generally speaking, yes.

11         Q.   I am going to hand you a document

12    labeled Ebury 24340.

13              MR. MAYRON:  And could the court

14         reporter please mark this document as

15         Hanratty Deposition Exhibit 54.

16              (Hanratty Exhibit 54, Email chain

17         beginning with email dated 9/20/2019

18         from J. Grady to P. Seymour and B.

19         Ilsen, Bates-stamped 24340 through

20         24341, marked for identification, as of

21         this date.)

22    BY MR. MAYRON:

23         Q.   And I'll start at the very last

24    email, which is on the back of the page.

25    This is an email from Patrick Seymour to
```

526

```
 1              J. Hanratty

 2   Barbara Ilsen from September 20th, 2019.

 3          Who is Mr. Seymour?

 4      A.   Mr. Seymour was the general

 5   counsel of Ebury.

 6      Q.   And he wrote to Ms. Ilsen, "I

 7   want to confirm you received the ESC

 8   servicing agreement that I sent earlier

 9   this week," correct?

10      A.   Yes.

11      Q.   And that is a reference to the

12   Ebury Street Capital servicing agreement

13   for servicing collateral?

14          MS. PARKS:   Objection.

15          THE REPORTER:   Sorry, I need to

16      go off the record.

17          (Technical issues.)

18          THE VIDEOGRAPHER:   The time is

19      3:19 p.m.  We are going off the record.

20          (Recess is taken.)

21          THE VIDEOGRAPHER:   The time is

22      3:30 p.m.  We are back on the record.

23   BY MR. MAYRON:

24      Q.   Before the break, we were

25   discussing the email from Mr. Seymour to
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO. 1 EMIGRANT BUSINESS CREDIT Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

JOHN ARTHUR HANRATTY Court Records Pg 1290 of 2230

John Hanratty

June 21, 2023

527

```
 1                    J. Hanratty

 2    Ms. Ilsen, referring to the ESC servicing

 3    agreement.

 4             And my question is:  This is a

 5    reference to the Ebury Street Capital

 6    servicing agreement for servicing tax

 7    liens?

 8             MS. PARKS:  Are you talking about

 9        Exhibit 54?

10             MR. MAYRON:  Yes.

11        A.   Yes, which I have.

12             So the whole -- all emails?

13        Q.   I'm just referring to Mr. Seymour

14    referred to the ESC servicing agreement,

15    and that is a reference to the Ebury Street

16    Capital servicing agreement for servicing

17    tax liens, correct?

18        A.   Yes.  It looks like in

19    September 2019, Patrick sent an email to

20    Barbara Ilsen confirming she received -- so

21    this isn't what he sent, but -- yeah.

22    So ESC would be -- I presume he means Ebury

23    Street Capital servicing agreement.

24        Q.   Your understanding is that the

25    Ebury companies needed Emigrant's
```

528

J. Hanratty

2  permission to change the servicer for

3  Emigrant's collateral?

4          MS. PARKS:  Objection.

5      A.   I'm trying to recall the context

6  of why this was occurring.

7          I think what this agreement was

8  to take over the entirety of the servicing

9  of the portfolio, is what I think the

10  context of.

11          The question of, did it require

12  an agreement with Emigrant?  Yes.

13      Q.   And so you're saying it required

14  Emigrant's permission to change the

15  servicer for Emigrant's collateral to ESC?

16          MS. PARKS:  Objection.

17      A.   For Ebury to become the servicer

18  for the remaining portions of the

19  portfolio, that it wasn't servicing, such

20  as I think we discussed a bunch yesterday,

21  the Rochester portfolio, the ineligible

22  books that were not on the -- even though

23  the collateral is Emigrant's, it was not

24  eligible collateral.  I think what was

25  intended here was an agreement related to

529

1                    J. Hanratty

2    the remaining.

3        Q.    And you said you agreed that it

4    required Ebury's permission to change the

5    servicer for the remaining portions of the

6    portfolio?

7            MS. PARKS:   Objection.

8        A.    I think this agreement is -- the

9    servicing agreement for the entirety of the

10   Ebury assets.

11       Q.    My question was:  You understand

12   that the Ebury companies required

13   Emigrant's permission to change the

14   servicer for Emigrant's collateral?

15           MS. PARKS:   Objection.

16       A.    Yes.  I think that's why Patrick

17   had sent the document.

18       Q.    And at this time, the Ebury

19   companies wanted to self-service Emigrant's

20   collateral?

21           MS. PARKS:   Objection.

22       A.    I believe, at this time, it is

23   post the AloStar refinancing falling

24   through.  We had been approved -- I think

25   this document is just the servicing

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
                   EMIGRANT BUSINESS CREDIT                   Court Records    Pg 1293 of 2230                   John Hanratty
                   JOHN ARTHUR HANRATTY                                                                         June 21, 2023

530

J. Hanratty

1

2  agreement that we had been approved for

3  AloStar.  We were looking for a similar

4  agreement with Emigrant.

5       Q.   So by "we were looking for a

6  similar agreement with Emigrant," you mean

7  that the Ebury companies wanted to

8  self-service Emigrant's collateral?

9            MS. PARKS:  Objection.

10      A.   That is the purpose of this

11 agreement, yes.

12      Q.   And Emigrant never gave the Ebury

13 companies permission to self-service

14 Emigrant's collateral?

15           MS. PARKS:  Objection.

16      A.   Other than making them aware that

17 we were self-servicing the portions of the

18 book that were not -- even though all the

19 collateral and assets of the company are

20 Emigrant's collateral, the portion of the

21 book that was -- let's call it eligible

22 collateral, even though we discussed that

23 many times throughout the years, we were

24 looking to memorialize it in a similar

25 fashion to what we had agreed to with the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1040
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT... Court Records    Pg 1294 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

531

                        J. Hanratty

1

2    AloStar transaction.

3        Q.    And when did you make Emigrant

4    aware that the Ebury companies were

5    self-servicing portions of Emigrant's

6    collateral?

7            MS. PARKS:    Objection.

8        A.    The first time generally would

9    have been when I think American Tax Funding

10   decided to close -- close their business.

11       Q.    When was that, approximately?

12       A.    I think it was sometime -- it was

13   probably a year or so after --

14   approximately a year or so after their

15   sale.  So I think that would put it mid to

16   early '18, if not before that.  I think

17   before that, frankly.

18            And then off and on we've had

19   discussions about doing the work on the

20   other portfolios, the Kentucky, the Ohio,

21   the portions of the collateral, it's all

22   Emigrant's collateral, that was not the

23   eligible collateral.

24       Q.    So the top email here is from

25   Mr. Grady to Mr. Seymour, and Mr. Grady

532

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | writes, "I haven't had any discussions with |
| 3 | John about Ebury self-servicing the book." |
| 4 | Did I read that right? |
| 5 | A.   Yes. |
| 6 | Q.   So according to Mr. Grady, the |
| 7 | two of you had not had any discussions |
| 8 | about Ebury's self-servicing Emigrant's |
| 9 | collateral? |
| 10 | MS. PARKS:   Objection. |
| 11 | A.   That's what he wrote. |
| 12 | Q.   As of September 20th, 2019, had |
| 13 | you had a conversation with Mr. Grady about |
| 14 | Ebury's self-servicing Emigrant's |
| 15 | collateral? |
| 16 | A.   I had conversations about |
| 17 | self-servicing the ineligible portions of |
| 18 | collateral of Emigrant's book with the |
| 19 | caveat that it is all Emigrant's |
| 20 | collateral.  There is a portion of it which |
| 21 | is not to be lent to, but it's ineligible. |
| 22 | And that's what we discussed. |
| 23 | Q.   And who did you have those |
| 24 | conversations with? |
| 25 | A.   With Jack Grady. |

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

533

J. Hanratty

1

2    Q.    And when were those

3    conversations?

4    A.    They would have occurred around

5    the time of American Tax Funding going out

6    of business because that was the first

7    thing that we in-housed because we were in

8    a pinch.

9    Q.    Were there any other

10   conversations with Mr. Grady about the

11   Ebury companies self-servicing Emigrant's

12   collateral?

13   A.    I recall specifically discussing

14   the Ohio and Kentucky and the servicing

15   components related to those.  Just because

16   they were serviced similarly to the New

17   York.

18        And then generally I recall

19   making him aware that we were going to be

20   self-servicing on AloStar, and I believe

21   that was -- and that -- the context I'm not

22   clear on here is why Patrick would send an

23   agreement over if we didn't discuss

24   anything.  So I think -- so I don't know

25   the context of what Jack is writing

EMIGRANT BUSINESS CREDIT    Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
JOHN ARTHUR HANRATTY        Court Records    Pg 1297 of 2230              John Hanratty
                                                                        June 21, 2023

534

1                    J. Hanratty

2    comparatively to us producing a contract.

3        Q.   When -- when did you pledge the

4    Ohio and Kentucky portfolios as collateral

5    for the Emigrant Credit facilities?

6            MS. PARKS:  Objection.

7        A.   Well, they're pledged from the

8    second we own them regardless of

9    eligibility.

10       Q.   When did you acquire the Ohio,

11   Kentucky portfolios?

12       A.   I think 19, 2019.  Maybe 2000 --

13   a think a portion in -- I think it was in

14   '19.  When did I move to Puerto Rico?

15           MS. PARKS:  I'm not testifying.

16   I think you moved in '19.

17       A.   A year after Maria.

18           Generally, I don't specifically

19   recall, but I think some of them were

20   purchased in '18 and some were purchased in

21   '19.

22       Q.   When did Kentucky and Ohio become

23   eligible states under the Emigrant Credit

24   facility?

25           MS. PARKS:  Objection.

EMIGRANT BUSINESS CREDIT...    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    Court Records    Pg 1298 of 2230    John Hanratty    June 21, 2023

JOHN ARTHUR HANRATTY

535

J. Hanratty

1

2    A.   I don't think ever.  I don't

3   know.  I'm not certain if we did an

4   amendment related to the -- I think we

5   discussed them off and on.  I can't

6   remember if we -- I can't recall.

7        Q.   And which Ebury entity owned the

8   Kentucky and Ohio portfolios?

9        A.   Generally, I think both owned a

10  portion.

11       Q.   Which specific Ebury company

12  owned the portfolios?

13       A.   I can't recall which ones.  Just

14  because it's typically easier with eligible

15  collateral because you have the LLC that

16  mirrors the name of the state.  I don't

17  think we had that with Kentucky.

18            And we might have, in preparation

19  for the AloStar close where they were going

20  to be eligible collateral, might have had

21  Red Clover own them.

22       Q.   Did Ebury 1 EMI LLC or any of its

23  subsidiaries own the Kentucky or Ohio

24  portfolios?

25       A.   I believe some Kentucky was owned

536

```
 1                    J. Hanratty

 2    by Red Clover.

 3         Q.   Red Clover is not a subsidiary of

 4    Ebury 1 EMI LLC, correct?

 5              MS. PARKS:  Objection to form.

 6         A.   No.  It's a subsidiary of Ebury

 7    Fund 1 LLP.

 8         Q.   And did Ebury 2 EMI LLC or any of

 9    its subsidiaries own the Kentucky or Ohio

10    portfolios?

11              MS. PARKS:  Objection.

12         A.   Ebury 2 EMI?  Is that what you

13    asked?

14         Q.   Yes.

15         A.   I'm sorry.

16              Ebury 2 EMI wouldn't own liens

17    directly.  They would own a membership

18    interest in an LLC.

19         Q.   Did Ebury 2 EMI LLC or any of its

20    subsidiaries own the Kentucky or Ohio

21    portfolios?

22              MS. PARKS:  Objection.

23         A.   I don't recall offhand.

24         Q.   Red Clover wasn't added as a

25    guarantor to the credit agreements until
```

537

J. Hanratty

1

2    2021, correct?

3        A.    I think that was an amendment.  I

4    think it was part of the amendment where we

5    cross-collateralized the funds.  But I

6    don't recall the year.  I think it was -- I

7    don't recall.

8        Q.    Do you recall adding Red Clover

9    as a guarantor to the Ebury 2 credit

10   agreements in 2021 in connection with the

11   maturity date extension?

12           MS. PARKS:  Objection.

13       A.    I don't specifically, but if it

14   wasn't a covered LLC, that would be a

15   normal course.

16       Q.    So at the time -- so back in 2019

17   when you discussed the Ebury companies

18   self-servicing Kentucky and Ohio, those

19   weren't portfolios that were part of the

20   Emigrant's collateral, correct?

21           MS. PARKS:  Objection.

22       A.    Well, similarly to the REO, they

23   would have a call on all of it.  I view it

24   as their collateral, personally.  It's not

25   specific collateral that I can borrow

538

```
 1                    J. Hanratty

 2    against, but from the perspective that

 3    it's, like, REO and things like that,

 4    it's -- it's Emigrant collateral.

 5         Q.   But back in 2019, the entities

 6    that owned the Kentucky and Ohio portfolios

 7    were not borrowers or guarantors to the

 8    credit agreements, correct?

 9              MS. PARKS:  Objection.

10         A.   I don't -- I don't recall.  My

11    presumption, no.  I -- if that's what

12    you -- if you say that the amendment did

13    not happen in 2021, then it didn't.

14              But from the perspective of

15    Ebury, then the agreements that it signed,

16    the assets of those entities, regardless of

17    whether it was eligible or not are

18    collateral for Emigrant.

19         Q.   So why would Emigrant be aware in

20    2019 that Ebury companies were

21    self-servicing Emigrant's collateral if the

22    Kentucky and Ohio portfolios were not

23    Emigrant's collateral at the time?

24              MS. PARKS:  Objection.

25         A.   Because around the context of the
```

539

1                   J. Hanratty

2    AloStar transaction where those were the

3    eligible states.  I can recall talking to

4    Jack about potentially getting them to be

5    eligible states and whether that was

6    something that Emigrant wanted to do.

7              And so for me, the conversations

8    would occur around state eligibility versus

9    LLCs, as part of the borrower.

10        Q.   Why would a conversation with

11   Mr. Grady about getting Kentucky and Ohio

12   to be eligible states inform Mr. Grady that

13   the Ebury companies were self-servicing

14   Emigrant's collateral?

15             MS. PARKS:  Objection.

16        A.   Because we were self-servicing

17   the Rochester -- like the New York liens.

18   The Ohio, the Kentucky liens.  And while

19   they are not named as borrowers, as

20   eligible collateral to be borrowed against,

21   Emigrant would have an equity pledge

22   related to those assets.  And the

23   conversations were around eligibility and

24   servicing in that I was looking to -- and

25   Ebury was looking to get -- when the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

540

J. Hanratty

1

2    AloStar transaction fell through, I still

3    had -- we still had still had collectively

4    the same issues.  Assets that were going to

5    foreclosure, states that were not eligible.

6    And so we had a bunch of things that --

7    assets that -- states that I was looking to

8    get approved to see if they're lendable.

9        Q.   If Red Clover was neither a

10   borrower nor a guarantor, how did Emigrant

11   have an equity pledge related to its

12   assets?

13            MS. PARKS:  Objection.

14       A.   I presume the fund or the

15   borrower... I would presume that, generally

16   speaking, in the agreement, the assets of

17   the limited partnership are also covered in

18   some way.  So that was -- that's what I

19   meant.  I understand -- I think you're

20   speaking -- I wasn't understanding clearly

21   what you were saying -- in that you had the

22   borrower or you have the lender, which was

23   Ebury 2 EMI and 1 EMI, and my presumption

24   was that -- sorry.

25       Q.   But the credit agreements didn't

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO.                                    RECEIVED NYSCEF: 01/12/2024

541

J. Hanratty

 1              J. Hanratty

 2      impose restrictions on the Ebury company's

 3      ability to self-service assets of the

 4      limited partnership that were not owned by

 5      borrowers or guarantors, correct?

 6              MS. PARKS:  Objection.

 7          A.   I don't know offhand, and I guess

 8      at this point I don't know legally whether

 9      the funds are guarantors of the Credit

10      Agreement or the note, the amount that

11      Ebury currently owes.  So I'm confused.

12              But I think the big picture, we

13      would have conversations around the asset

14      that was owned by the limited partnerships,

15      and one of those topics related to that

16      asset was that we were self-servicing it

17      similar to the New York portfolio.

18          Q.   And so when Mr. Grady wrote, "I

19      haven't had any discussions with John about

20      Ebury self-servicing the book," he was

21      mistaken?

22              MS. PARKS:  Objection.

23          A.   I don't -- I don't know if he was

24      mistaken.

25          Q.   Had you had conversations with

542

                    J. Hanratty

1

2    Mr. Grady about Ebury self-servicing

3    Emigrant's collateral?

4              MS. PARKS:  Objection.

5        A.   I had conversations with Jack

6    Grady about servicing Ebury or Emigrant's

7    ineligible collateral of what they were

8    doing.  I can't speak for Jack, but the

9    context of this email appears to be that we

10   sent an agreement over to be reviewed by an

11   attorney.  I don't know why we would do

12   that, you know, we're not going to burn

13   money, if we hadn't generally discussed it.

14       Q.   So you are assuming that you had

15   discussed self-servicing Emigrant's

16   collateral with Mr. Grady because

17   Mr. Seymour sent the first or the last

18   email in this document, Hanratty Deposition

19   Exhibit 54?

20             MS. PARKS:  Objection.

21       A.   I'm not assuming.  I'm saying I

22   don't understand the context of these

23   interchanges.

24       Q.   You understand from Mr. Grady's

25   email to Mr. Seymour that he was not aware

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

EMIGRANT BUSINESS CREDIT Court Records    Pg 1306 of 2230    John Hanratty

JOHN ARTHUR HANRATTY    June 21, 2023

543

J. Hanratty

2    that the Ebury companies were

3    self-servicing Emigrant's collateral,

4    correct?

5          MS. PARKS:  Objection.

6       A.  No.

7       Q.  Why not?

8       A.  Based off the prior conversations

9    that I had had with Jack Grady.

10       Q.  Why would Mr. Grady say, "I

11    haven't had any discussions with John about

12    Ebury self-servicing the book," if he was

13    aware that Ebury was self-servicing

14    Emigrant's collateral?

15          MS. PARKS:  Objection.

16       Speculation.

17       A.  I would speculate that he is

18    talking about the entirety.

19       Q.  What do you mean by that?

20       A.  All of the collateral of

21    Emigrant.

22       Q.  And so your understanding is he's

23    saying, I haven't had any discussions with

24    John about Ebury self-servicing all of the

25    collateral of Emigrant?

544

1             J. Hanratty

2             MS. PARKS:  Objection.

3        A.   Well, I'm not on this email, for

4   one thing.  So this is the first time I'm

5   seeing this.

6             And so all I can tell you is the

7   conversations that I know we had and the

8   confusion -- not confusion.

9             In multiple times with Jack, he

10  referred to not being concerned about us

11  servicing the -- for lack of a better word,

12  the ineligible portions of the book, even

13  though it was all Emigrant's collateral.

14  And I don't know --

15       Q.   What do you mean by "ineligible

16  portions of the book"?  Are you referring

17  to the Kentucky and Ohio liens?

18       A.   And legacy Rochester.  I believe

19  we paid off -- Rochester, New York, was an

20  approved state to borrow, but I believe

21  the -- I don't know what year.  I believe

22  we made it its own line of credit at a

23  certain point in time.  And I believe it

24  got paid off, but I was not allowed to

25  borrow anymore.  And so that would be -- it

545

                         J. Hanratty

 1

 2    was ineligible.

 3        Q.    Mr. Grady writes, "Happy to talk

 4    to John about why he wants to eliminate the

 5    servicer, but we should hold off on working

 6    on any documents until we get more

 7    comfortable with this from an operational

 8    standpoint."

 9             Did I read that right?

10        A.    You did, yes.

11        Q.    Did you speak to Mr. Grady after

12    September 20th, 2019, about why you wanted

13    to eliminate the servicer?

14             MS. PARKS:  Objection to form.

15             Go ahead.

16        A.    Yeah, I don't recall -- I don't

17    recall doing that, but that last sentence

18    there would lead me to believe the first

19    portion is, as I'm thinking of it, in that

20    what this document does is eliminate the

21    entire servicer, although we would have --

22    the typical format in this industry now is

23    for a self-servicer to have a backup

24    servicer.

25             And so I think this is why Jack

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1   24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
Court Records   Pg 1309 of 2230
John Arthur Hanratty
June 21, 2023

JOHN ARTHUR HANRATTY

546

```
 1              J. Hanratty
 2   is writing this from the perspective of
 3   getting rid of a servicer completely, as
 4   opposed to the way we were operating, where
 5   I was -- Ebury was servicing a portion of
 6   the ineligible or -- ineligible collateral,
 7   which was Emigrant's collateral.
 8        Q.   I think I understand the
 9   distinction.
10        A.   Yes.
11        Q.   So Mr. Grady is saying he hasn't
12   had any discussions with you about Ebury
13   self-servicing Emigrant's eligible
14   collateral?
15           MS. PARKS:  Objection.
16        A.   You know, I wasn't on this email.
17   Reading it now, that seems to me the
18   meaning that I would take from it.
19        Q.   And had you had conversations
20   with Mr. Grady about Ebury's self-servicing
21   Emigrant's eligible collateral?
22           MS. PARKS:  Objection.
23   BY MR. MAYRON:
24        Q.   Prior to September 20th, 2019?
25        A.   I would -- generally speaking,
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT   Court Records   Pg 1310 of 2230   John Hanratty
JOHN ARTHUR HANRATTY   June 21, 2023

547

J. Hanratty

2  yes.  And the context of this email, you

3  know, that sent an agreement which in a way

4  which appears to just be a one-off -- we

5  don't have the email that was sent, but --

6  seems like he sent an email to an attorney.

7  I don't know.

8            And so the context just seems a

9  little funny that he would just throw it

10  out there without having me spoken to Jack

11  or anybody.

12     Q.   When did you speak with Mr. Grady

13  about the Ebury companies self-servicing

14  Emigrant's eligible collateral?

15     A.   I would say generally it occurred

16  probably within -- it would have been

17  several times, within that -- this time

18  period after post AloStar of -- I think

19  that deal fell through in June or July of

20  that year.

21     Q.   So as of September 20th, 2019,

22  the Ebury companies were not allowed to

23  self-service Emigrant's eligible

24  collateral?

25            MS. PARKS:  Objection.

548

J. Hanratty

1

2    A.    I think we were -- as of

3    September 20th, we were looking to get

4    approval to become the servicer of the

5    eligible collateral.

6    Q.    And so as of September 20th,

7    2019, the Ebury companies were not allowed

8    to self-service Emigrant's eligible

9    collateral?

10    MS. PARKS:    Objection.

11    A.    We were not the written agreed-to

12    servicer, no.

13    Q.    Was -- were the Ebury companies

14    as of September 20th, 2019, allowed to

15    self-service Emigrant's eligible

16    collateral?

17    MS. PARKS:    Objection.

18    A.    We were not the servicer that we

19    had agreed to.

20    Q.    But the Ebury companies were

21    self-servicing Emigrant's eligible

22    collateral as of September 20th, 2019,

23    correct?

24    MS. PARKS:    Objection.

25    A.    A portion of it, yes.

549

1                      J. Hanratty

2        Q.    And you did not inform Emigrant

3     that the Ebury companies were

4     self-servicing Emigrant's eligible

5     collateral as of September 20th, 2019?

6              MS. PARKS:   Objection.

7        A.    I believe I discussed the

8     later-stage eligible collateral, just due

9     to the proximity of foreclosure.  But the

10    entire portfolio -- entire book, no, it

11    would have been a concept that came out of

12    the failed AloStar refinance of Emigrant.

13       Q.    I'm going to share with you a

14    document labeled Ebury 50514.

15             MR. MAYRON:   Could the court

16             reporter please mark this as Hanratty

17             Deposition Exhibit Number 55.

18             (Plaintiff's Exhibit 55, Email

19             voicemail dated 9/20/2019 from

20             RingCentral to P. Seymour,

21             Bates-stamped EBURY_505514, marked for

22             identification, as of this date.)

23    BY MR. MAYRON:

24       Q.    This is a Ring Central voicemail

25    preview emailed to Mr. Seymour from later

550

J. Hanratty

1    on September 20th, 2019, correct?

2    A.   Yes.  That's what this looks to

3    be.  On September 20th, 2019, yes.

4    Q.   And given that the voicemail

5    preview is not accurate, I will play the

6    recording which was attached to this email

7    for us all to listen to together, and I'll

8    ask the court reporter to designate this

9    MP3 file, which is labeled Ebury 50515, as

10   Hanratty Deposition Exhibit 56.

11           (Plaintiff's Exhibit 56, Audio

12       file, marked for identification, as of

13       this date.)

14           (Audio file marked.)

15           (Audio playing.)

16   BY MR. MAYRON:

17       Q.   So Mr. Grady said, "Allowing

18   Ebury to self-service the book would really

19   represent a bit of a change to the business

20   deal," correct?

21           MS. PARKS:  Are you asking about

22       55 or 56?

23           MR. MAYRON:  The audio we just

24       listened to.

551

J. Hanratty

1

2          MS. PARKS:  Okay.

3    BY MR. MAYRON:

4          Q.   Mr. Grady said, "Allowing Ebury

5    to self-service the book would really

6    represent a bit of a change to the business

7    deal."

8          A.   Yeah, that's the words he used.

9          Q.   Was it your understanding that

10   allowing Ebury to self-service Emigrant's

11   eligible collateral would represent a

12   change to the business deal between

13   Emigrant and the Ebury companies?

14          MS. PARKS:  Objection.

15          A.   My understanding that we were not

16   the -- we did not have the servicing

17   agreement.  It was my understanding in

18   conversations with Jack that -- that

19   this -- it would be a change.

20          Q.   It would be a change because the

21   business deal at that time did not allow

22   the Ebury companies to self-service

23   Emigrant's collateral?

24          MS. PARKS:  Objection.

25          A.   No.  I think -- I don't know.  My

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 1315 of 2230
JOHN ARTHUR HANRATTY
John Hanratty
June 21, 2023

552

1              J. Hanratty

2    interpretation of his message, which wasn't

3    to me, was that he wanted to have a

4    business call related to how we can

5    properly approach the Credit Committee with

6    this concept and a typical concept, which

7    is now an industry-wide practice, is to

8    appoint a backup servicer.

9              And so, to me, the -- that's what

10   I took from that message.

11        Q.   I asked you, "Was is it your

12   understanding that allowing Ebury to

13   self-service Emigrant's eligible collateral

14   would represent a change to the business

15   deal between Emigrant and the Ebury

16   companies?"

17              You responded, "My understanding

18   that we were not the -- we did not have the

19   servicing agreement, it was my

20   understanding in conversations with Jack

21   that it would be a change."

22              And then I'm going to repeat my

23   question was:  It would be a change because

24   the business deal at that time did not

25   allow the Ebury companies to self-service

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT
Court Records    Pg 1316 of 2230
John Hanratty
JOHN ARTHUR HANRATTY
June 21, 2023

553

J. Hanratty

1

2      Emigrant's collateral, correct?

3              MS. PARKS:  Objection to form.

4          A.   Yes.  We were not the -- we were

5      not the named servicer.  We did not have

6      the agreement to be the servicer.

7          Q.   And Mr. Grady says he'd like to

8      have a conversation with you before you had

9      a legal call.

10             Did you have a conversation with

11     Mr. Grady after September 20th, 2019, about

12     the Ebury companies self-servicing

13     Emigrant's eligible collateral?

14         A.   I don't recall what we -- I don't

15     recall connecting with that, to be honest

16     with you.

17         Q.   And Mr. Grady said he wanted to

18     have a business call with John before we

19     have a call with the attorneys.

20             Did you have a call with the

21     attorneys about the Ebury companies

22     self-servicing Emigrant's eligible

23     collateral?

24             MS. PARKS:  Objection.

25         A.   I don't recall being on a call

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 96
RECEIVED NYSCEF: 01/12/2024

554

|    | J. Hanratty |
|----|-------------|
| 1  | J. Hanratty |
| 2  | with Barbara, who I think was the attorney |
| 3  | that Patrick sent that to. |
| 4  | Q.  Do you recall being on a call |
| 5  | with other attorneys from -- representing |
| 6  | Emigrant about the Ebury companies |
| 7  | self-servicing Emigrant's collateral? |
| 8  | MS. PARKS:  Objection. |
| 9  | A.  No, I do not -- I don't recall a |
| 10 | phone call. |
| 11 | Q.  Do you recall either the Ebury |
| 12 | companies or Emigrant drafting an amendment |
| 13 | to the credit agreements to permit the |
| 14 | Ebury companies to self-service Emigrant's |
| 15 | eligible collateral? |
| 16 | MS. PARKS:  Objection. |
| 17 | A.  No.  I -- no, I don't recall |
| 18 | that. |
| 19 | Q.  And you agree that the Ebury |
| 20 | companies and Emigrant never executed an |
| 21 | amendment to the credit agreements that |
| 22 | would have permitted the Ebury companies to |
| 23 | self-service eligible collateral? |
| 24 | MS. PARKS:  Objection. |
| 25 | A.  Yes.  I do not think we ever got |

555

                    J. Hanratty

 1

 2   that done.

 3       Q.   Now I am going to hand you a

 4   document labeled EBCC 59765.

 5           MR. MAYRON:  And could the court

 6           reporter please mark the document for

 7           identification as Hanratty Deposition

 8           Exhibit 57.

 9           (Hanratty Exhibit 57, Email chain

10           beginning with email dated 8/12/2019

11           from J. Hanratty to P. Xie and others,

12           Bates-stamped EBURY_59765 through

13           59775, marked for identification, as of

14           this date.)

15   BY MR. MAYRON:

16       Q.   The top email is an email from

17   you to Mr. Chi from August 12th, 2019,

18   correct?

19           MS. PARKS:  Objection to form.

20       A.   Yes.  I apologize.  I was just...

21   so this is an email from John to -- John

22   Hanratty, me, to Ping Xie and Dennisse and

23   Frank Gandol.

24       Q.   And so two emails down is an

25   email from Travis Thomason at Richey May to

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO. 1142                                RECEIVED NYSCEF: 01/12/2024

556

```
 1                J. Hanratty

 2   Mr. Chi, and he writes, "We need to confirm

 3   all the certs held by the fund at year end.

 4   For physical certs, does MTAG hold all of

 5   those?"

 6            Correct?

 7       A.   Yes.

 8       Q.   And in your email, you write to

 9   Mr. Chi, "2018 certificates were held by

10   MTAG," correct?

11       A.   Yes, that's what I wrote.

12       Q.   You write, "Kentucky, Ohio certs

13   were Rye, and now PR, pending the closing

14   of the U.S. Bank as custodian contract."

15       A.   Yes, that's what I wrote.

16       Q.   And then you say, "No one lent to

17   the collateral.  We were under no

18   obligation to deposit certs with

19   custodian."

20            Correct?

21       A.   The Kentucky -- yes.

22       Q.   And so when you say "no one lent

23   to the collateral," you're referring to the

24   Kentucky and Ohio collateral?

25       A.   Yes.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1331                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1320 of 2230

EMIGRANT BUSINESS CREDIT                                      John Hanratty
JOHN ARTHUR HANRATTY                                         June 21, 2023

557

                          J. Hanratty

1

2        Q.   And so it was your understanding

3    that the Kentucky and Ohio collateral did

4    not have to be deposited with the custodian

5    because no one lent to that collateral?

6             MS. PARKS:   Objection.

7        A.   Yes, it was my understanding.

8    But I think the intention was to deposit it

9    with U.S. Bank.

10       Q.   And so when you say "No one lent

11   to the collateral, we were under no

12   obligation to deposit certs with

13   custodian," that implies that if a lender

14   did lend against collateral, the Ebury

15   companies were under an obligation to

16   deposit the certificates with the

17   custodian, correct?

18            MS. PARKS:   Objection.

19       A.   Yes.

20       Q.   Next I'm going to hand you a

21   document labeled EBCC 43022.

22            MR. MAYRON:   Could the court

23        reporter please mark this document as

24        Hanratty Deposition Exhibit 58.

25            (Hanratty Exhibit 58, Email chain

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records   Pg 1321 of 2230           John Hanratty
JOHN ARTHUR HANRATTY                                               June 21, 2023

558

```
 1              J. Hanratty

 2         beginning with email dated 7/29/2022

 3         from A. Berman to D. Mendez and others,

 4         Bates-stamped EBURY_43022 through

 5         40325, marked for identification, as of

 6         this date.)

 7    BY MR. MAYRON:

 8         Q.   So on the page labeled Ebury

 9    43024 is an email from Dennisse Méndez to

10    Heather Adkins of MTAG, Kevin Clark of

11    Ebury, and Anna Zyra Mendoza of Ebury,

12    correct?

13              MS. PARKS:  Objection.

14         A.   I'm sorry, Austin.  Where is it?

15    On the top one or the...

16         Q.   Yes, the top email on page 43024.

17         A.   On 24.  Sorry.

18              (Document review.)

19         A.   From Dennisse, yes, to Heather

20    Adkins of MTAG and Kevin Clark of Ebury,

21    Anna Zyra Mendoza of Ebury, Gilles, Anna

22    Berman, and Tim Clayton.  Yes.

23         Q.   And Ms. Méndez writes, "The

24    import of all the liens was supposed to be

25    put on hold months ago," correct?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1322 of 2230    John Hanratty
June 21, 2023

559

```
 1                    J. Hanratty

 2        A.   Yes.

 3        Q.   Did you instruct Ms. Méndez to

 4   send this email to MTAG?

 5             MS. PARKS:  Objection.

 6        A.   I don't recall the specific

 7   components of this.  No, I don't recall

 8   instructing her to send this email.  Am I

 9   on this email?

10        Q.   So Ms. Méndez writes, "The import

11   of all the liens."

12             What is she referring to when she

13   says, "The import of all the liens"?

14             MS. PARKS:  Objection.

15             Go ahead.

16        A.   Yeah.  I'm not on the email, but

17   generally it was getting all the liens to

18   MTAG.

19        Q.   And by "all the liens," you mean

20   Emigrant's lien collateral that was not

21   with MTAG?

22        A.   I think everything is what we

23   were looking to do.  We just -- yes.

24        Q.   And everything includes

25   Emigrant's lien collateral?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                   EMIGRANT BUSINESS CREDIT      Court Records    Pg 1323 of 2230    RECEIVED NYSCEF: 01/12/2024
                   JOHN ARTHUR HANRATTY                                                John Hanratty
                                                                                      June 21, 2023

560

```
 1                    J. Hanratty

 2        A.   Yes.

 3        Q.   Did you instruct MTAG to put the

 4   import of Emigrant's lien collateral on

 5   hold?

 6        A.   I think in this email, yes, Ebury

 7   did in July of '22?  Is that when this

 8   happened?

 9        Q.   Did you instruct MTAG to put the

10   import of Emigrant's lien collateral on

11   hold?

12        A.   I don't... I don't recall, but I

13   do like the context of this email.  We may

14   have had interactions with counsel related

15   to it.

16        Q.   Did you instruct one of your

17   employees to put the import of Emigrant's

18   lien collateral on hold?

19             MS. PARKS:  Objection.

20        A.   I don't recall specifically

21   instructing her to do that.

22             By "employees," I'm assuming you

23   mean Dennisse?

24        Q.   Ms. Méndez writes, "The import of

25   all the liens was supposed to be put on
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO.                                    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT                                    John Hanratty
JOHN ARTHUR HANRATTY                                        June 21, 2023

561

1                     J. Hanratty

2    hold months ago."

3             Who made the decision to put the

4    import of all the liens on hold?

5             MS. PARKS:  Objection.

6         A.   That would typically be a

7    decision of mine, but I don't recall making

8    it.

9         Q.   Did Ms. Méndez have the authority

10   at the Ebury companies to make the decision

11   to put on hold the import of the tax liens

12   to MTAG?

13            MS. PARKS:  Objection.

14        A.   Generally speaking, I would trust

15   her with the decision.  I don't know

16   whether she made me aware of this, but I'm

17   assuming -- I don't recall.  I don't recall

18   this specific time or these interactions.

19   But I generally know that they imported

20   those liens on hold.

21        Q.   Why did the Ebury companies

22   instruct MTAG to put on hold the import of

23   the liens?

24            MS. PARKS:  Objection.

25            THE WITNESS:  Can I go off the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 12
24-04020-dsl   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records   Pg 1325 of 2230                John Hanratty
JOHN ARTHUR HANRATTY                                                   June 21, 2023

562

```
 1              J. Hanratty

 2      record for a second?  I just have a

 3      question related to...

 4          MS. PARKS:  You can't because he

 5      just asked a question.

 6          MR. MAYRON:  If it's related to

 7      privilege --

 8          MS. PARKS:  If it's something we

 9      talked about content-wise, you don't

10      want to say that.

11          So if your answer is, "I can't

12      talk about that," then that's your

13      answer.

14          THE WITNESS:  Well, it's

15      interactions with Scott.

16          MS. PARKS:  Why don't you say

17      that, interactions with your counsel.

18      Is there anything not privileged you

19      would have -- you could answer Austin's

20      question.

21      A.   Yeah, through interactions with

22   counsel, the result of which the liens were

23   put on pause.

24          MS. PARKS:  When you say "Scott,"

25      you mean Scott Williams?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022
NYSCEF DOC. NO. 51                                    RECEIVED NYSCEF: 01/12/2024

563

J. Hanratty

1

2          THE WITNESS:  Scott Williams from

3      the law firm by the name of Rumberger.

4          MS. PARKS:  Rumberger.

5          THE WITNESS:  R-u-m --

6          MR. MAYRON:  It could be French,

7      Rumberger.

8          THE WITNESS:  R-u-m-b-e-r-g-e-r.

9  BY MR. MAYRON:

10     Q.   So just to be clear, you don't

11  recall making the decision to put the

12  import of all the liens on hold, but the

13  reason why the Ebury companies instructed

14  MTAG to put the imported liens on hold was

15  based on interactions with counsel?

16         MS. PARKS:  Objection.

17     A.   I don't specifically recall these

18  interactions.  I generally recall pausing

19  the process to upload these liens pending

20  ongoing negotiations with MTAG and under

21  interactions with counsel.  Or not MTAG,

22  apologies, Emigrant.

23     Q.   Did you make the decision to

24  pause the process of uploading those liens?

25         MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1327 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                       June 21, 2023

564

1                   J. Hanratty

2        A.    Generally, that would have been

3    my decision.  I don't recall this time

4    frame doing it.

5        Q.    Ms. Méndez writes, "You are not

6    supposed to be servicing those liens."

7               Did I read that right?

8        A.    Yes.

9        Q.    That's not true.  Under the

10   credit agreements, MTAG was supposed to be

11   servicing those liens, correct?

12              MS. PARKS:   Objection.

13       A.    I don't -- I don't know what lien

14   she's talking about.

15       Q.    Earlier you said, "I generally

16   recall pausing the process to upload these

17   liens pending ongoing negotiations with

18   MTAG and under interactions with counsel,"

19   correct?

20       A.    Yes.

21       Q.    So you understand generally what

22   liens were being imported, correct?

23              MS. PARKS:   Objection.  Form.

24       A.    Generally, I believe it was -- it

25   is or was going to be all liens.  And so

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT          Court Records    Pg 1328 of 2230          John Hanratty
JOHN ARTHUR HANRATTY                                                        June 21, 2023

565

```
 1                  J. Hanratty
 2    I'm saying, I don't understand what
 3    Dennisse means by ones they're supposed to
 4    be servicing.  Or -- and so are they just
 5    supposed to be a custodian on them?  Are
 6    they supposed to be a servicer and a
 7    custodian on them?  Are they supposed to be
 8    a servicer, a custodian, and an REO person
 9    on them?  That's different by the type of
10    lien.
11                  And so I don't know what she is
12    writing.
13         Q.   Under the credit agreements, MTAG
14    was supposed to be the servicer for
15    Emigrant's lien collateral, correct?
16         A.   Yes.
17         Q.   And you said you generally
18    believe that it is or was going to be all
19    liens, and at the time, all liens were
20    Emigrant's lien collateral, correct?
21                  MS. PARKS:  Objection.
22         A.   Yes.  With the caveat of the
23    ineligible liens, which Emigrant was --
24    that Jack and I discussed that we were
25    self-servicing.  We were -- I don't
```

566

J. Hanratty

1    recall -- I think, generally speaking,

2    going to deposit every single thing.

3            And so I don't know if this means

4    you're not supposed to be servicing, like,

5    the Rochester liens, the Ohio.  Like, I

6    don't know the context of what she's

7    writing about.

8        Q.   So just to be clear, you recall

9    conversations with counsel relating to

10   whether to upload these liens to MTAG, but

11   you don't remember what the liens actually

12   were?

13       A.   No, that's not what I said.  I'm

14   saying I don't know what liens Dennisse is

15   referring to about you are not supposed to

16   be servicing those liens.  I don't know

17   what those liens are.

18           What I recall is that we imported

19   all of -- I believe everything.

20       Q.   So Ms. Méndez writes, "The import

21   of all the liens was supposed to be put on

22   hold months ago.  You are not supposed to

23   be servicing those liens."

24           Correct?

*(Note: line numbering above follows the printed transcript lines.)*

24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1330 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                June 21, 2023

567

                          J. Hanratty

1

2      A.    Yes, she writes that.

3      Q.    And "those liens" refers to the

4    liens that were being imported, correct?

5          MS. PARKS:  Objection.

6      A.    I don't know other than -- I

7    don't know.  Just because there is a subset

8    of the product that was being uploaded or

9    imported that they weren't going to

10   service.  And so I don't...

11         (Document review.)

12     A.    I'm sorry.  Can we repeat --

13     Q.    We're good.

14     A.    Sorry.

15         MS. PARKS:  Austin, when it's a

16   good time for a break, can we take one?

17         MR. MAYRON:  Yeah, we can take a

18   break.

19         MS. PARKS:  If you're in the

20   middle of something --

21         MR. MAYRON:  We can take a break.

22         THE VIDEOGRAPHER:  The time is

23   4:27 p.m.  We are going off the record.

24         (Recess is taken.)

25         THE VIDEOGRAPHER:  The time is

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1331 of 2230
EMIGRANT BUSINESS CREDIT                                          John Hanratty
JOHN ARTHUR HANRATTY                                              June 21, 2023

568

1                    J. Hanratty

2         5:06 p.m.  We are back on the record.

3    BY MR. MAYRON:

4         Q.   I'm going to hand you a document

5    labeled Ebury 53185.

6              MR. MAYRON:  Could the court

7         reporter please mark this document as

8         Hanratty Deposition Exhibit 59.

9              (Hanratty Exhibit 59, Email dated

10        5/7/2020 from T. Thomason to J.

11        Hanratty, Bates-stamped EBURY_53185,

12        marked for identification, as of this

13        date.)

14   BY MR. MAYRON:

15        Q.   This is an email from Travis

16   Thomason to you from May 2020, correct?

17        A.   Yes.

18        Q.   Who is Travis Thomason?

19        A.   Travis.  So Travis was the --

20   kind of the main audit, like the

21   relationship, if you will, with Richey May,

22   at least that's how I know him.  But I

23   think he worked on the audits, but I don't

24   think he did the main work.

25        Q.   And he says he wanted to have a

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                    Court Records      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT                                         John Hanratty
JOHN ARTHUR HANRATTY                                             June 21, 2023

569

J. Hanratty

1    follow-up call regarding the liquidation of

2    Fund 1, correct?

3        A.   Yes.

4        Q.   So in May 2020, Fund 1 was in

5    liquidation?

6        A.   May 2020.  So this is post

7    AloStar where we were going to merge

8    everything into one.

9            I don't... I think we -- at this

10   time I don't think we had purchased much

11   anymore.  I can't -- generally speaking,

12   but I think we -- I remember long-term goal

13   for many years was to make the corporate

14   structure -- filling a lot of our reporting

15   and operations issues related to our

16   capital structure.

17           And I think that I had

18   conversations with Jack, and I think Sahil,

19   Sahil Arora, I apologize, about merging the

20   two funds.  So I don't know if that's

21   what -- that's what he means.

22           But generally speaking, we

23   were -- I was looking to get down to one --

24   one entity.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT'v Records    Pg 1333 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                       June 21, 2023

570

J. Hanratty

1

2    Q.   When did you begin the

3    liquidation of Ebury Fund 1?

4         MS. PARKS:  Objection.

5    A.   Well, it was -- we had been

6    making it smaller back in the lead-up to

7    the AloStar transaction.  So it goes back

8    as part of that process, which I think we

9    discussed -- discussed yesterday.

10   Q.   What do you mean by "we had been

11   making it smaller"?

12   A.   I think we were in the process of

13   getting the asset level smaller to focus

14   and to change the pivot of the business

15   into older, like more REO and

16   foreclosure-based, more seasoned liens.

17   And part of that was getting it smaller.

18        I think in this context we were

19   looking to merge the -- just put everybody

20   in one -- one bucket.

21   Q.   What do you mean you were getting

22   the asset level smaller?

23   A.   I think we were letting the fund

24   generally get smaller as opposed to add

25   new -- adding new product at this time.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT — Court Records    Pg 1334 of 2230
JOHN ARTHUR HANRATTY

571

```
 1                    J. Hanratty

 2       Q.    What do you mean "letting the

 3  fund generally get smaller"?

 4       A.    Sorry, I'm just looking at the

 5  time frame.

 6             (Document review.)

 7       A.    Generally speaking, we were

 8  looking to put the funds together and have

 9  them be smaller from a historical

10  perspective.

11       Q.    And so you had said, "We had been

12  making it smaller back in the lead-up to

13  the AloStar transaction."

14             So approximately when did you

15  begin the liquidation of Ebury Fund 1?

16             MS. PARKS:  Objection.

17       A.    Liquidation isn't a word I would

18  use.  We were still acquiring leads in --

19  we were I think -- I mean, generally

20  speaking, it was a smaller company at the

21  time of this email.

22             But I think really the context

23  that he's calling about is just what's

24  happening with the business, and is it one

25  fund going away.
```

572

1          J. Hanratty

2          And for the AloStar transaction,

3    it was going to be Fund 1 that would

4    disappear.

5          Q.   I'm going to share with you a

6    document labeled EBCC 29017.

7          MR. MAYRON:  Could the court

8          reporter please mark this as Hanratty

9          Deposition Exhibit 60.

10          (Hanratty Exhibit 60, Email chain

11          beginning with email dated 9/13/2019

12          from T. Thomason to J. Hanratty and

13          others, Bates-stamped EBURY_29017

14          through 29022, marked for

15          identification, as of this date.)

16    BY MR. MAYRON:

17          Q.   The top email in this chain is an

18    email from Travis Thomason to you and

19    Mr. Chi from September 2019, correct?

20          A.   Yes.

21          Q.   So looking to the second page,

22    the page marked 29018, Mr. Thomason emails

23    Franklin Gandol from Ebury, Matthew Cherry

24    at Richey May, and Ping Xie at Ebury, and

25    asked, "Ping, is there a reason the sales

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022

NYSCEF DOC. NO. XXX                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1336 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                     June 21, 2023

573

```
 1                      J. Hanratty

 2      prices are consistently much lower than the

 3      value you have them marked at for

 4      12/31/18," correct?

 5           A.   Yes.

 6           Q.   And he says, "Consistent sales

 7      prices that do not correlate with your

 8      year-end market value would lead us to

 9      believe your fair market values are

10      overstated," correct?

11           A.   Yes, that's what he wrote.

12           Q.   And Mr. Chi responds, "For

13      accounting purpose, the fair value is the

14      exit price in an orderly traded market.

15      The distress sale is not fair market value,

16      and accounting should not report not

17      orderly traded transaction as fair market

18      value."

19                Correct?

20           A.   Yes, that's what he wrote.

21           Q.   Prior to September 2019, had the

22      Ebury companies engaged in a distress sale

23      of real estate at below fair market value?

24                MS. PARKS:   Objection.

25           A.   I don't recall specifically what
```

574

1                    J. Hanratty

2    properties he's talking about, but he

3    writes here that we had sold REO below

4    where they were marked.

5        Q.    Prior to September '19, had the

6    Ebury companies engaged in distress sale of

7    real estate at below fair market value?

8              MS. PARKS:  Objection.

9        A.    I don't recall specifically, but

10   that's what Travis and Ping are talking

11   about here.

12       Q.    Generally, do you recall whether

13   prior to September 2019 the Ebury companies

14   had engaged in distress sale of real estate

15   at below fair market value?

16             MS. PARKS:  Objection.

17       A.    Generally, I don't -- I don't

18   know what they're -- which ones they are

19   talking about.  I think if I knew if there

20   was like a bulk and new at the addresses or

21   the properties where I would be able to

22   remember it.

23       Q.    So without looking at a list of

24   addresses or properties, you cannot recall

25   whether prior to September 2019 the Ebury

575

                    J. Hanratty

 1

 2    companies had ever engaged in distress sale

 3    of real estate at below fair market value?

 4            MS. PARKS:   Objection.

 5        A.    I don't...

 6            (Document review.)

 7        A.    I don't recall what the context

 8    of this is, and Ping uses the word

 9    "distress."  Travis references below fair

10    market value.

11            I don't know if we are exiting a

12    state, which I recall at this time exiting

13    Indiana.  But what goes into that, I think

14    we had a pretty terrible time operating

15    there, too, and just wanted to get out.

16        Q.    What is a distress sale?

17        A.    A distress sale is selling for

18    your -- a distress sale means that you are

19    selling an asset that's under distress.

20        Q.    What does it mean for an asset to

21    be under distress?

22        A.    That in order to sell it, you

23    value having liquidity more than having the

24    asset.

25        Q.    Would you agree that a distress

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 142-3                                RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1339 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                            June 21, 2023

576

J. Hanratty

1      sale occurs when an asset must be sold

2      quickly?

3            MS. PARKS:  Objection.

4        A.   Yes, I would agree with that.

5        Q.   And what is fair market value?

6        A.   Fair market value is, to me, what

7      a buyer would pay in a normal operating

8      environment, a normal market environment,

9      if you will.

10       Q.   So this email aside, without

11     looking at a list of addresses or

12     properties, you cannot recall whether prior

13     to September 2019 the Ebury companies had

14     ever engaged in a distress sale of real

15     estate at below fair market value?

16           MS. PARKS:  Objection.

17       A.   I generally recall selling the

18     entirety of our Indiana portfolio of

19     properties.  I don't know if that was '18

20     or '19.  That was a -- driven as much by

21     our lack of operational capacity there, as

22     price.  Sometimes when you can't execute,

23     it doesn't matter what it's worth.  You're

24     kind of dormy.

577

1                    J. Hanratty

2              We also sold -- I don't know if

3      that was in '19 or '20 -- a large portion

4      of our Rochester single-family homes.

5              I don't -- it was also -- from my

6      perspective, that was a market that was

7      difficult to get, like, rehabs done for us

8      in a way where you can justify that cost

9      and rent those properties.

10             And so it was a bit of -- a bit

11     of us minimizing our exposure to single

12     families there.  Those are the only -- I

13     think -- we're talking about bulk sales,

14     large bulk sales that I can recall.

15        Q.   What made those sales distressed

16     sales?

17        A.   From my perspective, if I were to

18     say now, it would be the combination of

19     valuing the capital of liquidity more than

20     the asset.

21             And then, secondly, our inability

22     to have people locally who can either

23     enhance the value of that asset or maximize

24     monetizing that asset.

25        Q.   So Mr. Chi writes, "Many Ebury

578

```
 1                   J. Hanratty

 2      investor requests withdraw in 2018 to 2019

 3      which resulted in Ebury to make bulk lien

 4      and REO sales."

 5              Did I read that right?

 6         A.    Yes.

 7         Q.    And you understand that Mr. Chi

 8      is referring to those bulk lien and REO

 9      sales as distress sales, correct?

10              MS. PARKS:   Objection.

11         A.    I think he's -- I think he's

12      referring to the -- specifically the 2019

13      REO, right?  That is the subject of --

14         Q.    Mr. Chi writes, "Many Ebury

15      investor requested withdrawing in 2018 to

16      2019, which resulted in Ebury to make bulk

17      lien and REO sales," correct?

18         A.    He did write that, yes.

19         Q.    And then he writes, "The effort

20      to liquidate the property is a short time

21      to satisfy the investors' withdraw may not

22      be an orderly trade," correct?

23         A.    That's what he wrote, yes.

24         Q.    And so Mr. Chi is saying that

25      Ebury made bulk lien and REO sales in
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 0101                                RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
                    Court Records    Pg 1342 of 2230

EMIGRANT BUSINESS CREDIT                                       John Hanratty
JOHN ARTHUR HANRATTY                                           June 21, 2023

579

```
 1                    J. Hanratty

 2   distress to satisfy investor requests to

 3   withdraw?

 4           MS. PARKS:  Objection.

 5       A.    That is what he wrote, yes.

 6       Q.    Did Ebury make bulk lien and REO

 7   sales in distress in 2018 and 2019 to

 8   satisfy investor requests to withdraw?

 9           MS. PARKS:  Objection.

10   BY MR. MAYRON:

11       Q.    Let me rephrase that.

12           Did Ebury make bulk lien and REO

13   sales in distress in 2018 or 2019 to

14   satisfy investor requests to withdraw?

15           MS. PARKS:  Objection.

16       A.    No.  The context of -- there was

17   more reasons for it than just the

18   redemption requests which were initiated by

19   us telling investors that we would be

20   getting smaller in conjunction with the

21   AloStar financing.

22       Q.    So I'm speaking with Mr. Chi next

23   Tuesday, and I'm going to ask him the same

24   question about whether Ebury made bulk lien

25   and REO sales in distress in 2018 or 2019
```

580

```
 1              J. Hanratty

 2   to satisfy investor requests to withdraw.

 3          Do you have anything to add

 4   today?

 5      A.   Sure.  That there are the

 6   additional context would be that we were

 7   exiting REO markets that we could not

 8   operate in.

 9          And that the bulk lien prices

10   of -- that we -- the lien sales that we

11   did, I don't think that Travis's objecting

12   to as far as being distressed.  He's

13   asking -- Travis here is asking us a

14   specific question about the variance of REO

15   sales.

16          Ping responds to something that

17   Travis is flagging as an issue between

18   having market values overstated.  But from

19   the perspective of what Travis is flagging,

20   I -- we did sell REO sales at less than

21   fair market values in certain markets.  I

22   can't recall specifically the timing of us

23   exiting those two, Indiana and the

24   Rochester single family.  But I believe

25   that those are probably what he's referring
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT Court Records    Pg 1344 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                        June 21, 2023

581

J. Hanratty

1

2  to in 2019.

3      Q.   Did you sell REOs at less than

4  fair market values to satisfy Ebury

5  investor requests to withdraw in 2018 to

6  2019?

7          MS. PARKS:  Objection.

8      A.   No.  From my perspective, those

9  markets that we exited, we would have

10  exited regardless of investor redemptions.

11      Q.   So when Mr. Chi says, "Many

12  invest -- either investor requested

13  withdrawing 2018 to 2019, which resulted in

14  Ebury to make bulk lien and REO sales," he

15  is incorrect?

16      A.   I think that that is a -- that

17  might be his view.  My view is that those

18  sales would have occurred because we

19  couldn't operate there.

20      Q.   So when he says, "The investor

21  requests to withdraw resulted in Ebury to

22  make bulk lien and REO sales," he is

23  incorrect?

24          MS. PARKS:  Objection.

25      A.   I don't think he is considering

24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1345 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                    June 21, 2023

582

J. Hanratty

1

2   the total reasons for them.  I don't think

3   he has exposure to where we were struggling

4   as a company.  He has exposure to financial

5   components, which is investors and prices

6   and what the fair market value of those

7   things are.

8       I don't recall discussing with

9   him, "Hey, look, Ping, we're selling these

10  because of the stink or struggling."  But a

11  real significant issue for us was our

12  ability to operate single families in

13  Rochester and also to rehab those houses in

14  a way that wouldn't ultimately end up in

15  just getting roughed up and destroyed.  It

16  was just a challenge for us there.

17      Indiana in particular was just a

18  combination of similar issues.  We had very

19  dispersed houses and not a lot of bandwidth

20  for people to work for us.

21      Q.   So the Ebury investor request

22  withdraw in 2018 to 2019 were not a reason

23  that Ebury made bulk lien and REO sales?

24      MS. PARKS:  Objection.

25      A.   I didn't say that.  I said it is

```
 1                    J. Hanratty

 2    a portion of it.  I would say that, to

 3    your -- it's in addition to the operation

 4    of capacity for the REO and the fact that

 5    we were losing money on certain markets, in

 6    addition to investors' requests for

 7    withdrawals.  It made a lot of sense in a

 8    bunch of different buckets to liquidate and

 9    sell.

10         Q.   Ebury investor requests to

11    withdraw in 2018 to 2019 were a reason that

12    Ebury made bulk lien and REO sales?

13              MS. PARKS:  Objection.

14         A.   Yes, they were.  It was a reason.

15         Q.   And these bulk lien and REO sales

16    prices were consistently much lower than

17    the value Ebury had the assets marked at as

18    of December 31st, 2018, correct?

19              MS. PARKS:  Objection.

20         A.   No, that's not correct.

21         Q.   Is Mr. Thomason wrong when he

22    says, "Is there a reason the sales prices

23    are consistently much lower than the value

24    you have them marked at for December 31st,

25    2018?"
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1347 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

584

```
 1              J. Hanratty

 2        MS. PARKS:  Objection.

 3     A.   He is talking solely about the

 4  properties sold in 2000 and -- what year,

 5  2019.

 6     Q.   So --

 7     A.   I think that the sales are

 8  related to two specific markets.  And I

 9  recall tracking our sales for the CoreVest

10  line of credit, which we were -- that's

11  another reason why this doesn't make a ton

12  of sense.

13     Q.   Why do you say this doesn't make

14  a ton of sense?

15     A.   Because we were in the process at

16  this time of doing diligence.  I think --

17  when did we close the CoreVest -- it was

18  later on.  So we would have -- the CoreVest

19  underwriting was similar to, you know, what

20  a bank would do.  It took many months.  You

21  go through property sales and things like

22  that.  We would give them our fair market

23  values.  They would see our tape from '17,

24  '18, '19.  I think we did that loan in '20.

25  So I think we were talking to them in '19.
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT                                            John Hanratty
JOHN ARTHUR HANRATTY                                                June 21, 2023
Court Records

585

J. Hanratty

2  And they would have seen those things.  And

3  I don't think I would have gotten a

4  10-million-dollar line of credit if our

5  fair market values were consistently

6  overstated, because they went and appraised

7  every property that we had.

8         But that's just another context.

9         But Travis here is talking about

10  and writes the words that you read.  I

11  think that he is referring to a couple of

12  specific transactions in a couple of

13  specific markets.

14    Q.   So to be clear, in 2019, the

15  Ebury companies made bulk sales of REOs at

16  prices much lower than the value the Ebury

17  companies had marked the properties at for

18  December 31st, 2018?

19         MS. PARKS:  Objection.

20    A.   Based off of -- I do not recall

21  the markings from 2018 and the sale prices

22  in 2019, which Travis is referencing.  But

23  generally I believe in '19 we sold in a

24  couple of markets, Indiana and Rochester,

25  which we discussed, which would impact the

586

1                    J. Hanratty

2    overall comparison of sales versus a fair

3    market value.

4         Q.   And one of the reason the Ebury

5    companies made the bulk sales of REOs at

6    prices much lower than the value of the

7    Ebury companies had marked the properties

8    at for December 31st, 2018, was because

9    many Ebury investors requested to withdraw

10   in 2018 to 2019?

11             MS. PARKS:   Objection.

12        A.   Again, in those markets that I

13   think that we're discussing -- and, again,

14   I am not certain that that is what he is

15   referring to -- and also to his language,

16   "consistent sale prices do not correlate

17   with your year-end market would lead us to

18   believe," I think that, to me, he is

19   referring to 60 -- I think we sold 75

20   houses in one transaction in Rochester.

21             And so think that roughly our

22   sales price, that would impact a large

23   portion of them.  And so the optics of

24   looking at your total sales, not total

25   dollar amount, would show a proportion

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT
Court Records    Pg 1350 of 2230
John Hanratty
JOHN ARTHUR HANRATTY
June 21, 2023

587

1          J. Hanratty

2    larger with a lower amount.

3         Q.   So you respond to Mr. Chi -- and

4    this is page 29017 -- I apologize.  You

5    respond to Mr. Thomason, "Hey, Travis.  I

6    think it was a result of bulk transactions.

7    Those sales were done together.  My view

8    was we saved on ongoing expense and

9    management by selling in bulk."

10          Did I read that right?

11         A.   Yes.

12         Q.   You didn't respond to

13    Mr. Thomason that the difference between

14    sales prices and fair market value was

15    because you were exiting markets in Indiana

16    and Rochester, correct?

17         A.   Do you mean respond to his first

18    email or the email on Friday the 13th?

19         Q.   So on Friday the 13th, at

20    11:57 a.m., Mr. Thomason asks Ping if there

21    is a reason why the sale prices are

22    consistently much lower than the value you

23    have the properties marked at for

24    December 31st, 2018.

25         A.   Um-hmm.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    RECEIVED NYSCEF: 01/12/2024

588

J. Hanratty

2   Q.   Ping then responds and says, "I

3   have copied John here for him to explain."

4        And you respond to Mr. Thomason,

5   "I think it was a result of bulk

6   transactions.  Those sales were done

7   together.  My view is we saved on ongoing

8   expense and management by selling in bulk."

9        Did I read that correctly?

10   A.   You did.  I'm just confused by

11   the times of the emails and the question

12   that I didn't respond.  Like it looks like

13   this email is before the other two.  I

14   might be --

15   Q.   I'll have to speculate, and

16   Ms. Parks can say if she disagrees, but

17   this is how the email was produced to us.

18        It looks as though from

19   Mr. Thomason's signature block, he is

20   located in Colorado?

21   A.   Yeah, I agree.  I gotcha.

22   Q.   And so it probably reflects the

23   time zone that was local.

24   A.   Okay.  Very good.

25        Yes, he was Colorado.  I see.  So

589

J. Hanratty

1    my time --

2    MS. PARKS:  Well, that really

3    wouldn't explain.  But it is a document

4    we produced.  It is what it looks like.

5    Maybe you were traveling or something.

6    Maybe you were on the West Coast.

7    THE WITNESS:  I don't know.

8    MS. PARKS:  But we know now.  A

9    mystery.

10    A.   Yes, I did not respond to his

11    initial email, but I did respond the same

12    day, I think, right?

13    Q.   So on Friday, the 13th,

14    Mr. Thomason asks Mr. Chi if there is a

15    reason why the sales prices are

16    consistently much lower than the value the

17    Ebury companies had the properties marked

18    at for December 31st, 2018.

19    Mr. Chi then responds and says,

20    "I have copied John here for him to

21    explain."

22    And then you respond to

23    Mr. Thomason, "I think it was a result of

24    bulk transactions.  Those sales were done

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2 RECEIVED NYSCEF: 01/12/2024

590

                    J. Hanratty

1          together.  My view was we saved on ongoing

2          expense and management by selling in bulk."

3              A.   Yes.  So I couldn't respond to

4          his first email because I wasn't on it.  I

5          see.

6              Q.   What do you mean you couldn't

7          respond to his first email?

8              A.   Well, Travis's first email was to

9          Frank, Matt Cherry, and Ping.

10                 And then Ping added me, right?

11         So at the bottom of Ping's email, he says

12         he copied me to further explain.

13             Q.   Yes.

14                 So you agree that your email on

15         the bottom of the page marked 29017, is a

16         response to Mr. Thomason's question in his

17         email on the bottom of the page marked

18         29018?

19                 MS. PARKS:  Objection.

20             A.   Yes.

21                 THE WITNESS:  Sorry.

22                 MS. PARKS:  That's okay.

23             A.   Yes.  I just -- I didn't -- I

24         thought you were asking why I didn't

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1354 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                          June 21, 2023

591

J. Hanratty

2  respond to him directly as opposed to Ping.

3      Q.   No.

4          And so you didn't respond to

5  Mr. Thomason that the difference between

6  the sales prices and the fair market value

7  of the properties that the Ebury companies

8  sold was because you were exiting markets

9  in Indiana and Rochester, correct?

10         MS. PARKS:   Objection.

11         (Document review.)

12     A.   I responded... so what I wrote

13 that they were bulk transactions, which

14 they were.  And I think what I'm attempting

15 to do is, was sales done together, just

16 explained to him what a bulk transaction

17 is.  So like it would be one price for ten

18 houses.

19         And then I think what I'm writing

20 here is -- refers to what I mentioned

21 before, that we, as a company, were going

22 to save money on -- like our ongoing

23 expenses and management of the properties

24 which was a struggle for us by selling in

25 bulk.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1239 RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
Court Records    Pg 1355 of 2230

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
JOHN ARTHUR HANRATTY                                              John Hanratty
                                                                 June 21, 2023

592

J. Hanratty

1

2      Q.   So your response to

3  Mr. Thomason's question about the

4  discrepancy between the sales prices and

5  the fair market values as of December 31st,

6  2018, was that the discrepancy, quote, was

7  a result of bulk transactions, close quote?

8           MS. PARKS:   Objection.

9      A.   I think -- well, if you go down

10  to Travis's question, is there a reason for

11  the sale prices being consistently lower

12  than the value that they were marked?  So

13  he was asking for a reason.

14           A reason is -- well, what I

15  wrote, like, we were selling in bulk,

16  typically in foreclosure world or whatever

17  you want to call it, if you sell in bulk,

18  the prices are going to be less regardless

19  of distress or whatever it is because

20  you're moving multiple assets in one

21  transaction.

22      Q.   So you told Mr. Thomason the

23  reason the sales prices were lower than the

24  fair market value as of December 31st,

25  2018, was, quote, a result of bulk

593

```
 1                    J. Hanratty
 2    transactions, close quote?
 3           MS. PARKS:  Objection.
 4      A.   No.  I wrote I think it was a
 5    result of bulk transactions.
 6      Q.   Did you believe that the
 7    discrepancy between the sales price and the
 8    fair market value was a result of the bulk
 9    transactions?
10           MS. PARKS:  Objection.
11    BY MR. MAYRON:
12      Q.   At the time?
13           MS. PARKS:  Objection.
14      A.   I think I believed that our sale
15    price -- the difference between our sale
16    price and fair market value price would be
17    offset by our savings of the ongoing
18    expense and not having to manage those
19    properties.
20      Q.   But did you believe that the
21    discrepancy between the sales price and the
22    fair market value was a result of the bulk
23    transactions?
24           MS. PARKS:  Objection.
25      A.   It appears to me, knowing what
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
          EMIGRANT BUSINESS CREDIT    Court Records    Pg 1357 of 2230    John Hanratty
          JOHN ARTHUR HANRATTY    June 21, 2023

                                                          594

 1                    J. Hanratty

 2    I -- I don't recall typing this email, but

 3    when I'm -- typically when we sell in bulk,

 4    I think about and factor in how much am I

 5    losing holding these assets to the sale

 6    price.

 7              And so from my perspective, and I

 8    think what I'm trying to communicate to

 9    Travis here, is that I think they were the

10    result of selling in bulk and that those

11    sales, when compared to the fair market

12    value, which he's talking about, have to

13    take into consideration our ongoing

14    expenses.  And when I write "management," I

15    think I'm referring to the quality of our

16    management.

17        Q.    Putting aside the savings on

18    ongoing expense management, you responded

19    to Mr. Thomason that the discrepancy

20    between the fair market value of these

21    properties and the sales prices was the

22    result of bulk transactions, correct?

23              MS. PARKS:  Objection.

24        A.    I wrote to Travis and Ping, and a

25    couple others, that I thought the -- going

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 12    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1358 of 2230    RECEIVED NYSCEF: 01/12/2024
JOHN ARTHUR HANRATTY    John Hanratty
June 21, 2023

595

```
 1                  J. Hanratty

 2   to what Travis wrote of the difference of

 3   the sale price as related to the 2018 fair

 4   market value price being -- having the

 5   difference, and he calls it consistent, I

 6   presume what Travis gets is just a list of

 7   all our sales.  And so he's not going to

 8   know that they were all sold at the same

 9   time.

10           And so he's going to see a

11   hundred sales with different prices, and

12   he's going to see if you sell 40 houses, 40

13   houses with -- that are probably booked at

14   the average price of what a bulk sale is,

15   and some of them are going to be lower than

16   fair market because we spread that sale

17   price across every property.

18           And so I was explaining to him

19   that I think that the difference is due to

20   selling in bulk and explaining further that

21   they're sales that were done together, but

22   that it was offset, or my view, that was we

23   were going to save money on having to deal

24   with it.

25       Q.   And the Ebury companies -- let me
```

596

J. Hanratty

1    start again.

2         One of the reasons the Ebury

3    companies made bulk sales in 2019 was to

4    satisfy investor requests to withdraw,

5    correct?

6         MS. PARKS:  Objection.

7    A.    I don't have a list of all the

8    bulk sales, but I think, you know, Ping

9    wrote in his email that it was -- it was a

10   factor related to it.

11        But, again, the bulk sale

12   specific to what he's talking about that

13   we're losing on comparatively or marketed

14   at, my response was that we're losing

15   because we're selling them in bulk.

16        And for me, like, you know, I

17   didn't -- I don't recall writing this

18   email, but the thing I did write was that

19   we're going to save because we don't have

20   to manage this, and I know specifically we

21   struggled very much in Indiana and in

22   Rochester, Rochester specifically

23   single-family homes.

24        Q.    Let me ask that again, because I

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1 Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records Pg 1360 of 2230 John Hanratty
JOHN ARTHUR HANRATTY June 21, 2023

J. Hanratty

1

2  feel your answer was a little muddled.  And

3  if you don't understand the question, you

4  can feel free to ask me to clarify.

5          My question is:  One of the

6  reasons the Ebury companies made bulk sales

7  in 2019 was to satisfy investor requests to

8  withdraw, correct?

9          MS. PARKS:  Objection.

10      A.    The -- one of -- so bulk sales

11  that we're referring to in these emails are

12  distressed -- are the ones that we are

13  talking about, the distressed fair market

14  value ones, correct?  The ones referenced

15  by Travis?

16      Q.    I'm looking at the same email you

17  are.  Mr. Thomason asks, "Is there a reason

18  the sales prices are consistently much

19  lower than the value you have them marked

20  at for 12/31/18?"

21          Mr. Chi responds, "I have copied

22  John here for him to explain."

23          And you respond to Mr. Thomason,

24  and you say, "I think it was a result of

25  bulk transactions."

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 137
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1361 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                June 21, 2023

598

J. Hanratty

2      A.   Yes.  And for me, the reason I

3    give is that we're going to save on the

4    ongoing expense and management.

5      Q.   Sure.

6      A.   Yes.

7      Q.   And I understand that point and I

8    see where you wrote that.

9           But my question is:  One of the

10   reasons the Ebury companies made bulk sales

11   in 2019 was to satisfy investor requests to

12   withdraw, correct?

13          MS. PARKS:  Objection.

14     A.   Yes.  I would say that is based

15   off of Ping's email and what we were

16   experiencing and had discussed in other

17   times today, that's a factor.

18          But specifically, I don't view

19   these -- my response is related to price,

20   and I'm not viewing these as distressed

21   sales.

22     Q.   And so then Mr. Thomason responds

23   to you and says, "We will likely just need

24   to document an explanation in the files

25   since there is a fairly significant

599

1                      J. Hanratty

2    variance between year-end values and final

3    sale prices," correct?

4         A.   Yes.

5         Q.   So because of the bulk -- because

6    the Ebury companies sold the properties in

7    bulk, there was a fairly significant

8    variance between the final sale price and

9    the fair market value that had been marked

10   as of December 31, 2018, correct?

11             MS. PARKS:  Objection.

12        A.   That's what Travis -- that's what

13   Travis wrote, yes.

14        Q.   Do you recall if there was a

15   fairly significant variance between the

16   fair market values you assigned to the

17   properties and the price at which you sold

18   them?

19             MS. PARKS:  Objection.

20        A.   Specifically, no, I don't know --

21   I do not recall what the variance amount

22   was.

23        Q.   Would you recall if you sold a

24   group of properties in a bulk sale at a

25   fairly significant amount less than the

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT  Court Records    Pg 1363 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                          June 21, 2023

600

```
 1              J. Hanratty

 2  fair market value?

 3          MS. PARKS:  Objection.

 4      A.   I recall, as I have given two

 5  examples of what I know to be bulk sales,

 6  where we sold it less than what the

 7  values -- the values on those houses are.

 8          And also, just when it gets to

 9  valuation of REO, we -- the fair market

10  value price that is in our books is the

11  foreclosure price until we have an

12  independent verification of price.

13  Meaning, if we had an appraisal or if we

14  put something out for sale.

15          And so what possibly could have

16  occurred here is we just kept the lien

17  amount and then sold the properties at what

18  we thought they would be.

19      Q.   I'm now going to show you a

20  document labeled Ebury 9590.

21          MR. MAYRON:  Could the court

22      reporter please mark the document as

23      Hanratty Deposition Exhibit 61.

24          (Hanratty Exhibit 61, Email chain

25      beginning with email dated 2/12/2021
```

601

```
 1              J. Hanratty

 2       from J. Hanratty to R. Bedford,

 3       Bates-stamped EBURY_9590 through 9599,

 4       marked for identification, as of this

 5       date.)

 6   BY MR. MAYRON:

 7       Q.   So turn to the very last page,

 8   9599.  This is an email that you wrote to

 9   Robin Bedford of Opus Fund Services on

10   January 22nd, 2021, correct?

11       A.   On 9599?

12       Q.   Yes.

13       A.   Yes.  The last --

14       Q.   Who is Robin Bedford?

15       A.   Robin Bedford is -- was -- I

16   think he was the director of Opus Funds.

17       Q.   What is Opus Funds?

18       A.   Opus Funds was the administrator

19   we attempted to -- that we had hired to

20   replace Tower Fund Services.

21       Q.   What is an administrator?

22       A.   A fund administrator, they --

23   they are a repository for financial

24   reporting, investor communications, and

25   reporting.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 28
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1365 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

602

1                    J. Hanratty

2       Q.   And you write, "As previously

3   offered in the event you would seek to take

4   a distribution on encumbered assets in lieu

5   of a cash distribution, please contact us

6   directly."

7            Did I read that correctly?

8       A.   In 9599?

9       Q.   Yes.

10      A.   Yes, this is what I wrote.

11      Q.   Did you offer investors in Ebury

12  funds distributions on encumbered assets in

13  lieu of cash distributions?

14      A.   I don't know if this letter ever

15  went out.

16      Q.   A distribution on encumbered

17  assets, does that refer to a distribution

18  in kind to your investors?

19      A.   It does, but I don't think the

20  wording is accurate.

21      Q.   And here a distribution in kind

22  would be, for example, assigning tax liens

23  to an investor in lieu of paying a cash

24  distribution?

25      A.   I don't think that's what was

603

```
 1                    J. Hanratty

 2    anticipated.  Potentially none of my

 3    investors would have taken any tax liens.

 4         Q.   Have you ever sold tax liens and

 5    directed the broker to distribute the

 6    proceeds directly to an investor?

 7              MS. PARKS:  Objection.

 8         A.   I believe a Leventhal

 9    distribution went out in that manner.

10         Q.   And when was that distribution?

11         A.   I think it might have been in the

12    2018 distributions that we discussed.

13         Q.   If I'm not mistaken, you sold a

14    portfolio of liens called the New Jersey

15    551B liens through BloxTrade, correct?

16              MS. PARKS:  Objection.

17         A.   Yes.

18         Q.   And you directed BloxTrade to

19    send the proceeds of those sales directly

20    to Mr. Leventhal, correct?

21              MS. PARKS:  Objection.

22         A.   Yeah, I believe -- yes, I believe

23    that's what occurred.

24         Q.   And the liens that were included

25    in the New Jersey 551B portfolio were
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. EMIGRANT BUSINESS CREDIT Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024
Court Records        Pg 1367 of 2230

JOHN ARTHUR HANRATTY                                John Hanratty
                                                    June 21, 2023

604

```
 1                 J. Hanratty

 2   Emigrant's collateral?

 3            MS. PARKS:  Objection.

 4       A.   Yeah, without seeing the

 5   collateral -- yes, I believe it was

 6   Emigrant's collateral.

 7       Q.   So just to understand, you sold

 8   Emigrant's collateral through BloxTrade and

 9   directed BloxTrade to remit the proceeds

10   directly to Mr. Leventhal?

11            MS. PARKS:  Objection.

12       A.   Yes, that is what occurred.

13       Q.   Did you tell Emigrant you were

14   selling its collateral through BloxTrade

15   and that you had directed BloxTrade to

16   remit the proceeds directly to

17   Mr. Leventhal?

18            MS. PARKS:  Objection.

19       A.   I don't think -- I don't recall

20   doing -- I don't recall communicating that

21   with them other than potentially normal

22   course reporting or something of that

23   nature.

24       Q.   Were you allowed under the credit

25   agreements to sell Emigrant's collateral
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 686-2    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT...Court Records    Pg 1368 of 2230
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

605

```
 1              J. Hanratty

 2   and direct the broker for the sale to remit

 3   the proceeds directly to an equity

 4   investor?

 5         MS. PARKS:  Objection.

 6      A.   No.  The normal course of that

 7   transaction would have been to have the

 8   funds sweep in the normal function.

 9      Q.   You were required to deposit the

10   proceeds from sales of Emigrant's

11   collateral into the PNC lockbox account,

12   correct?

13         MS. PARKS:  Objection.

14      A.   Yes, it's the Credit Agreement

15   requires that.

16      Q.   And so you were in default of the

17   credit agreements when you made this

18   in-kind distribution to Mr. Leventhal?

19         MS. PARKS:  Objection.

20      A.   Not an in-kind distribution.

21      Q.   You were in default of the credit

22   agreements when you made this distribution

23   to Mr. Leventhal?

24         MS. PARKS:  Objection.

25      A.   Yes.  The normal course for that
```

606

```
 1              J. Hanratty

 2   cash would have been to go to the PNC

 3   lockbox.

 4        Q.   And you did not notify Emigrant

 5   of this default, correct?

 6             MS. PARKS:  Objection.

 7        A.   I don't believe I did.

 8        Q.   And you continued to submit

 9   signed certifications to Emigrant that

10   there were no outstanding events of

11   default?

12             MS. PARKS:  Objection.

13        A.   In a normal course of reporting,

14   yes, I would have signed documents

15   reflecting such, yes.

16        Q.   And the distribution to

17   Mr. Leventhal occurred in 2018 or 2019?

18             MS. PARKS:  Objection.

19        A.   I don't recall the specific

20   dates.

21        Q.   Was it before 2021?

22             MS. PARKS:  Objection.

23        A.   I think it's before 2021, yes.

24        Q.   So when you executed the three

25   maturity date extensions in 2021, there was
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1370 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                      June 21, 2023

607

                            J. Hanratty

1

2    an event of default for which you did not

3    provide notice to Emigrant?

4              MS. PARKS:  Objection.

5         A.   I had distributed funds.  I had

6    ordered the broker to distribute funds in a

7    fashion where the capital or cash should

8    have swept to the PNC lockbox.

9         Q.   I think we discussed that was an

10   event of default, so when you executed the

11   three maturity date extensions in 2021,

12   there was an event of default for which you

13   did not provide notice to Emigrant?

14             MS. PARKS:  Objection.

15        A.   Yeah, I did not provide -- I

16   don't recall providing notice of default to

17   Emigrant.

18        Q.   And when you executed the three

19   maturity date extensions in 2021, you

20   falsely certified that there were no

21   outstanding events of default?

22             MS. PARKS:  Objection.

23        A.    I had -- I had incorrectly

24   ordered the broker to sweep those funds

25   directly to Ira Leventhal, and they should

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. ...    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT    Court Records    Pg 1371 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

608

```
 1                    J. Hanratty

 2    have gone to the PNC lockbox.  And I signed

 3    the certifications.

 4         Q.   What do you mean by you had

 5    incorrectly ordered the broker to sweep

 6    those funds directly to Ira Leventhal?

 7         A.   The funds should have gone to the

 8    PNC lockbox.

 9         Q.   But you intended to direct the

10    broker to sweep the funds directly to Ira

11    Leventhal?

12              MS. PARKS:  Objection.

13         A.   That was the net result of what

14    occurred, yes.

15         Q.   Let's turn to page 9593.

16              This is an email from you to

17    Robin Bedford on January 25th, 2021, and

18    you again say, "I have been in

19    liquidation," correct?

20         A.   Yes.

21              MS. PARKS:  Objection.

22    BY MR. MAYRON:

23         Q.   And what does "I have been in

24    liquidation" mean?

25              MS. PARKS:  Objection.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.                                                          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1372 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                                June 21, 2023

609

```
 1                   J. Hanratty

 2          Go ahead.

 3      A.   We had been generally getting

 4  smaller and not taking on -- at the time of

 5  this email, not adding new liens.

 6      Q.   And you say, "I first told

 7  Emigrant about the suit in a meeting in New

 8  York City in 2019."

 9          Did I read that right?

10      A.   I don't know -- the AloStar

11  lawsuit?

12          MS. PARKS:  You can look through

13      the document if it helps you answer the

14      question.

15          (Document review.)

16      A.   I don't know what lawsuit I'm

17  referring to.

18      Q.   Later you say, "The liens have

19  been removed from my asset borrowing base."

20          Could this be a reference to the

21  lawsuit with Thomas McOsker?

22          MS. PARKS:  Objection.  Form.

23      Speculation.

24  BY MR. MAYRON:

25      Q.   Let me direct you to the page
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. 1379   24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
Court Records   Pg 1373 of 2230
EMIGRANT BUSINESS CREDIT   John Hanratty
JOHN ARTHUR HANRATTY   June 21, 2023

610

J. Hanratty

 1    labeled 9594 in the first full paragraph,

 2

 3    three lines down, it says, "I have been

 4    stolen from."

 5            What does that mean?

 6            MS. PARKS:  Objection to form.

 7            Go ahead.

 8            THE WITNESS:  Sure.

 9       A.   I think I am referring to Thomas

10    McOsker.

11       Q.   And you're referring to Thomas

12    McOsker not remitting to you over

13    $3 million of sales proceeds in liens that

14    you sold through BloxTrade?

15            MS. PARKS:  Take the time to look

16        through the document in case it helps

17        you.

18       A.   I think that dollar amount

19    factors in interest and other costs, but,

20    yes, roughly, that is what I am referring

21    to.

22       Q.   Did you agree to let Mr. McOsker

23    retain the sale proceeds from those sales

24    as a provisional credit line?

25       A.   No.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1374 of 2230    RECEIVED NYSCEF: 01/12/2024    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

611

                    J. Hanratty

1

2          MS. PARKS:  Objection.

3          THE WITNESS:  Sure.

4          MS. PARKS:  It's okay.  Go ahead.

5      A.   No, I did not.

6      Q.   And the liens that were sold

7   through BloxTrade to which Mr. McOsker did

8   not remit the proceeds, those liens were

9   Emigrant's collateral, correct?

10         MS. PARKS:  Objection.

11     A.   A portion, yes.  The -- I think

12  we're talking about the closing of the New

13  Jersey sale and the Alabama sale or two.

14         But, again, all the collateral is

15  Emigrant's collateral regardless of

16  eligibility or ineligibility.

17     Q.   So the liens that the Ebury

18  companies sold through BloxTrade to which

19  Mr. McOsker did not remit the proceeds,

20  those liens were Emigrant's collateral,

21  correct?

22         MS. PARKS:  Objection.

23     A.   All -- all the assets of Ebury

24  are Emigrant's collateral and we owe money

25  on.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 136 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records Pg 1375 of 2230 John Hanratty
JOHN ARTHUR HANRATTY June 21, 2023

612

J. Hanratty

1

2      Q.   And you say, "I first told

3  Emigrant about the suit in a meeting in New

4  York City in 2019."

5           Is that a reference to your

6  lawsuit against Mr. McOsker related to the

7  sales of liens?

8           MS. PARKS:  Can you tell him what

9       page you are looking at, Austin?

10           THE WITNESS:  No, I see what

11       pages he's looking at.

12      A.   I think the AloStar litigation

13  was in 2020.

14      Q.   Would you have included a

15  receivable on the pro forma financials for

16  the AloStar litigation?

17           MS. PARKS:  Objection.  And to

18       the extent that that -- answering that

19       question would require you to reveal

20       privileged communications, I caution

21       you not to do so.

22      A.   No.  I'm reasonably certain I am

23  referring to the McOsker litigation when I

24  told Emigrant.

25      Q.   And just for ease of reference,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. 38                                    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT's Records   Pg 1376 of 2230   John Hanratty
JOHN ARTHUR HANRATTY                                   June 21, 2023

613

J. Hanratty

1

2  you'll understand when I refer to the

3  McOsker litigation, I'm speaking about the

4  litigation you initiated against Thomas

5  McOsker for his failure to remit to you the

6  proceeds of certain tax sales through

7  BloxTrade?

8          MS. PARKS:  Objection.

9      A.   Yes.

10     Q.   And you say you first told

11 Emigrant about the suit, which is a

12 reference to the McOsker litigation, in a

13 meeting in New York City in 2019?

14         MS. PARKS:  Objection.

15     A.   We -- yes, I think that's when I

16 sued him.

17     Q.   You didn't inform Emigrant about

18 the McOsker litigation in 2019, correct?

19         MS. PARKS:  Objection.

20     A.   No.  I believe I -- I discussed

21 the litigation with them in 2000 -- in

22 2019.

23     Q.   Who did you discuss the

24 litigation with?

25     A.   I recall discussing it multiple

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. Court Records Pg 1377 of 2230
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT                                                   John Hanratty
JOHN ARTHUR HANRATTY                                                       June 21, 2023

614

J. Hanratty

1
2    times with Jack.  I don't recall if Karen

3    was there.  Actually, I recall that meeting

4    was downstairs and Karen was there.  But

5    I've discussed this not just in 2019, but a

6    couple of times, generally, over the years.

7         Q.   So your recollection is that you

8    discussed the McOsker litigation with Jack

9    and Karen in 2019?

10        A.   I wrote that I discussed it with

11   them in 2019.  I recall having a live

12   meeting with them in 2019 where I went to

13   their offices.

14        Q.   Do you recall speaking to Jack

15   and Karen about the McOsker litigation

16   during that live meeting with Jack and

17   Karen in 2019?

18        A.   I don't recall that, other than I

19   wrote it here.  And I know I had a meeting

20   because I can remember meeting with them.

21        Q.   You say, "You included the

22   receivable on the pro forma financials we

23   have submitted since that time."

24             What pro forma financials are you

25   referring to?

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT       Court Records    Pg 1378 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                              June 21, 2023

615

                    J. Hanratty

1

2        A.   I think we, on our books, the

3    financials of the company kept open the

4    receivable and the amounts of what was owed

5    for the sales.

6        Q.   So in your email, you say, "On

7    the pro forma financials we have submitted

8    since that time."

9             What pro forma financials did you

10   submit to Emigrant between 2019 and

11   January 25th, 2021?

12       A.   I don't -- I didn't submit any

13   personally.  But whatever financials our

14   reporting would have required.

15       Q.   Do you know whether the Ebury

16   companies included a receivable on a

17   financial that was submitted to Emigrant

18   between 2019 and January 25th, 2021?

19       A.   Not specifically, but I believe

20   it's accounted for on our -- in our audit,

21   and so I presume that means it's in our

22   financials.

23       Q.   And your 2019 audit wasn't

24   delivered to Emigrant until July 2021,

25   correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 111                                 RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1379 of 2230
JOHN ARTHUR HANRATTY                                                    John Hanratty
                                                                       June 21, 2023

616

                    J. Hanratty

 1

 2          MS. PARKS:  Objection.

 3      A.    That sounds correct, based off of

 4  the exhibit that we reviewed before.

 5      Q.    Turning to page 9594, you wrote

 6  "We have distributed a significant chunk of

 7  equity in last two-plus years and also paid

 8  off significant amount of debt."

 9          Did I read that correctly?

10      A.    Yes.

11      Q.    Is that a true statement?

12          MS. PARKS:  Objection.

13  BY MR. MAYRON:

14      Q.    Let me rephrase that.

15          Did the Ebury companies

16  distribute a significant chunk of equity in

17  the two-plus years prior to January 25th,

18  2021, and also paid off significant amount

19  of debt?

20          MS. PARKS:  Objection.

21      A.    As we had discussed at various

22  times, we distributed equity in '18 and

23  '19.  I don't know what debt I'm referring

24  to here.  I don't recall the timing of

25  Capital One retirement.  I don't think at

617

J. Hanratty

1    that time we had significant debt with the

2    real estate.  And obviously we are still

3    indebted to Emigrant.

4    

5    Q.   So your understanding is that the

6    reference to paying off a significant

7    amount of debt refers to paying off the

8    Capital One facilities?

9            MS. PARKS:  Objection.

10   A.   I don't know the context of what

11   I'm referring to.

12   Q.   Did the Ebury companies pay off a

13   significant amount of debt in the two-plus

14   years prior to January 25th, 2021?

15           MS. PARKS:  Objection.

16   A.   The two-plus years being '19 and

17   '20?

18           (Document review.)

19   A.   I'm not certain what I'm

20   referring to here.

21   Q.   And then you say, "I have six

22   equity investors remaining in a bank."

23           Did I read that right?

24   A.   Yes.

25   Q.   Who are the six equity investors?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT        Court Records        Pg 1381 of 2230        John Hanratty
JOHN ARTHUR HANRATTY                                                        June 21, 2023

618

```
 1                   J. Hanratty

 2        A.    The six equity investors are

 3   Leventhal, St. D.Angelo, Stephan Skinner,

 4   Jim Santori, and Sebastian -- there's a

 5   fellow in Germany.  I can't remember.

 6   Sebastian something.

 7        Q.    And the bank refers to Emigrant

 8   Bank?

 9        A.    Yes.

10        Q.    How many investors -- equity

11   investors are there remaining in the Ebury

12   funds today?

13        A.    The same.

14        Q.    And how many other creditors are

15   there of the Ebury companies?

16             MS. PARKS:  Objection to form.

17             THE WITNESS:  Sure.

18        A.    The -- we owe nothing on liens.

19   It's just Emigrant.  Nothing on loans.

20             On REO, we owe, roughly,

21   estimating here, around $700,000.  One loan

22   is onto Precision Capital and that's

23   roughly 300,000ish on a property in New

24   Jersey.

25             Then an additional -- I think
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT...    Court Records    Pg 1382 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

619

1                    J. Hanratty

2    there's three loans to a company called

3    Velocity of roughly -- when you add it all

4    up, it's roughly $400,000.  So I think

5    there's two other -- two other lenders on

6    those.  But only on -- they're direct

7    lenders to specific addresses.

8         Q.   Do you have merchant cash advance

9    agreements with Epic Advance or Orange

10   Advance?

11        A.   Yes, I do.  We're paying off our

12   last fund.  My apologies.  I forgot.

13        Q.   What do you mean "we're paying

14   off our last fund"?

15        A.   We have I think the balance

16   outstanding of -- I don't think it's very

17   much -- maybe it's like $20,000.  I think

18   it's less than that right now.

19        Q.   What was the purpose of these

20   loans from Epic Advance and Orange Advance?

21        A.   Day-to-day operations for the

22   real estate company.

23        Q.   What was the interest rate on the

24   Epic Advance loan?

25        A.   Very high.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1065                                    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1383 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                       June 21, 2023

620

1                      J. Hanratty

2       Q.   And was the interest rate on the

3    Orange Advance loan very high as well?

4       A.   Yes.

5       Q.   Why did you agree to take out a

6    loan at very high interest rates?

7       A.   I have no access to liquidity or

8    loans, and so it's just this is overall the

9    portfolio.  In fact, I think the Orange --

10   those last two loans probably went to the

11   lien book in order to continue to push

12   these liens through to monetizing them, we

13   have to spend money.

14      Q.   What was the collateral for the

15   Epic Advance and Orange Advance loans?

16      A.   It's technically unsecured.  It's

17   the real estate bank account.  It withdraws

18   $700 a day and a personal guaranty by me.

19   But no specific collateral.

20      Q.   So turning to page 9592,

21   Mr. Bedford on January 26th, 2021, sends

22   you an email and sends you a list of steps

23   to get the funds up to date, and in his

24   summary of the key points that should

25   happen immediately, he requests a mutually

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
JOHN ARTHUR HANRATTY    Court Records    Pg 1384 of 2230    John Hanratty
June 21, 2023

621

J. Hanratty

2   agreeable lawyer to be engaged to review

3   and provide written assurances to Opus that

4   the Ebury entities are meeting investor and

5   Emigrant Bank requirements, correct?

6       A.   Yes.

7       Q.   You did not engage a lawyer to

8   review and provide written assurances to

9   Opus that the Ebury entities were meeting

10  investor and Emigrant Bank requirements?

11          MS. PARKS:  Objection.  And

12      specifically caution you to the extent

13      that answering would require revealing

14      attorney-client privilege, please do

15      not do that.

16      A.   I spoke to the -- Simon Riveles,

17  the attorney who had done our corporate

18  setup and done all of our documents related

19  to our formation.  And I believe Ian and

20  Pat started the process of drafting written

21  assurances.

22          MS. PARKS:  I think we've been

23      going a little over an hour.  Is this a

24      good time for a quick break?

25          MR. MAYRON:  Yes.  Let's go off

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1385 of 2230
JOHN ARTHUR HANRATTY    John Hanratty
June 21, 2023

622

J. Hanratty

1    the record.

2        MS. PARKS:  Off the record.

3        THE VIDEOGRAPHER:  The time is

4    6:17 p.m.  We are going off the record.

5        (Recess is taken.)

6        THE VIDEOGRAPHER:  The time is

7    6:28 p.m.  We are back on the record.

8  BY MR. MAYRON:

9    Q.   I'm going to hand you a document

10  which is Document Number 14 in the docket

11  on this case, and it's a copy of the

12  counterclaim filed by Thomas McOsker in the

13  District of Delaware in your ongoing

14  litigation with him.

15        MR. MAYRON:  Could the court

16        reporter please mark this as Hanratty

17        Deposition Exhibit 62.

18        (Hanratty Exhibit 62, Electronic

19        file consisting of spreadsheet listing

20        investor balances as of April 2019,

21        marked for identification, as of this

22        date.)

23        MS. PARKS:  Is this the original

24        counterclaim or amended?  I guess I

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 105    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Court Records    Pg 1386 of 2230

EMIGRANT BUSINESS CREDIT    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

623

|    |    |
|----|----|
| 1  | J. Hanratty |
| 2  | will find out in two seconds. |
| 3  | (Document review.) |
| 4  | BY MR. MAYRON: |
| 5  | Q.   What is Carry Trade LLC? |
| 6  | A.   Carry Trade LLC is an LLC that is |
| 7  | owned and controlled by Tom McOsker. |
| 8  | Q.   And so turning to -- if you look |
| 9  | at the page numbers at the very top of the |
| 10 | page, I'm going to refer to page 49 of 100. |
| 11 | A.   So I should look -- I gotcha. |
| 12 | (Document review.) |
| 13 | BY MR. MAYRON: |
| 14 | Q.   In paragraph 46, Mr. McOsker says |
| 15 | that, "On more than one occasion in 2017, |
| 16 | Hanratty through Ebury Street purchased tax |
| 17 | encumbrances directly from Carry Trade LLC |
| 18 | then owned by McOsker." |
| 19 | Is that correct? |
| 20 | MS. PARKS:  Objection to form. |
| 21 | You can answer. |
| 22 | THE WITNESS:  Sure. |
| 23 | A.   I don't think this was one |
| 24 | occasion.  I recall specifically buying a |
| 25 | portfolio of Florida liens from him.  And |

624

J. Hanratty

1  
2  we diligenced that as any other trade that

3  we did.  Andrew Adler -- basically I gave

4  the book to him and I had him go review it,

5  kick the tires on it, and I think we bought

6  it at a pretty fair price.  And I'm

7  entirely certain that we've recovered far

8  in excess of what we bought it for.

9       Q.   Turning to page 51 of 100.  This

10  is paragraph 56.  Mr. McOsker alleges that

11  Carry Trade LLC was assigned to Ebury Fund

12  2, correct?

13          MS. PARKS:  51, you said?  Page

14      51, rather?

15          MR. MAYRON:  Yes.

16          MS. PARKS:  Objection to form.

17      The document speaks for itself.

18      A.   I don't think that that occurred.

19      Q.   So Carry Trade LLC was not

20  assigned to Ebury Fund 2?

21      A.   We had taken over managing those

22  liens for him.  The thought process was to

23  sign that document into -- contribute into

24  the fund when AloStar closed, and the whole

25  point of the AloStar transaction before I

625

```
 1                     J. Hanratty

 2    removed Tom from the transaction was to

 3    allow him to get liquidity on his Boxtrade

 4    business, which I had nothing to do.

 5              And so in order to do that, he

 6    would have to contribute his liens to the

 7    remaining partnership, but that never

 8    happened.

 9         Q.   Now page 52 of 100, and this is

10    paragraph 60, Mr. McOsker alleges that

11    Carry Trade LLC, along with another LLC,

12    had tax encumbrance assets whose redemption

13    value was estimated to be approximately

14    $5,325,290.85 at the time of transfer.

15              Did I read that correctly?

16              MS. PARKS:  Objection.

17         A.   Yes, you read that correctly.

18         Q.   Were tax lien assets owned by

19    Carry Trade assigned to Ebury Fund 2?

20              MS. PARKS:  Objection.

21         A.   I believe the -- several of the

22    assets were, and then they were unassigned

23    back to Carry Trade, reassigned back at a

24    later date.

25         Q.   Why were assets assigned from
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
EMIGRANT BUSINESS CREDIT Court Records    Pg 1389 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                   June 21, 2023
24-04020-dsj
RECEIVED NYSCEF:

626

| | J. Hanratty |
|---|---|

1            J. Hanratty

2    Carry Trade to Ebury Fund 2?

3            MS. PARKS:   Objection.

4        A.   I think it was in anticipation of

5    the AloStar transaction closing prior to me

6    removing Tom from that transaction.

7        Q.   Why did you remove Mr. McOsker

8    from that transaction?

9        A.   I had over a six-month period

10   discovered that in addition to the original

11   escrow theft that he did without my

12   knowledge, their attempt to recover those

13   funds, through additional issues and lies

14   from him relating to the personal expenses,

15   where that money was going.

16            And then, lastly, when we were in

17   the process of raising outside capital for

18   the proposed CRIM transaction, I discovered

19   he was, in my opinion, engaged in a tax

20   credit fraud on the government of Puerto

21   Rico.

22       Q.   What do you mean by "a tax credit

23   fraud"?

24       A.   I mean that Puerto Rico has a

25   bunch of what are called tax decrees in

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1275    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1390 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

627

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | that for local residents you can apply for |
| 3 | decree personally or through your business. |
| 4 | Tom had a technology business called -- |
| 5 | well, he had several, but one of them -- he |
| 6 | had a decree for BCMG Services, and with |
| 7 | BCMG Services, he was allowed to put in for |
| 8 | a tax decree for the acquisition of |
| 9 | intellectual property, and that |
| 10 | acquisition, he would be basically |
| 11 | reimbursed a tax credit for 50 percent of |
| 12 | the cost of acquiring intellectual |
| 13 | property. |
| 14 | I became aware that Mr. McOsker |
| 15 | had put in for a tax credit of $2 million |
| 16 | on an asset by the name of Lien Log.  I |
| 17 | know that Tom's purchase price of Lien Log |
| 18 | was $160,000.  And so I know that in order |
| 19 | for that transaction to have been approved |
| 20 | by the government of Puerto Rico, he had to |
| 21 | use escrow funds to fictitiously create an |
| 22 | installment purchase for $2 million |
| 23 | between an entity he controlled in New York |
| 24 | and an entity he controlled in Puerto Rico. |
| 25 | Around the time that we were |

628

| | |
|---|---|
| 1 | J. Hanratty |
| 2 | looking to settle our issues, prior to me |
| 3 | suing him, he told me that he was going to |
| 4 | be getting a bigger tax credit payment of |
| 5 | roughly 8-and-a-half million dollars, and I |
| 6 | became aware that he had put in for a |
| 7 | 60-million-dollar tax credit based off of a |
| 8 | business named Lien Cloud.  The Lien Cloud |
| 9 | is not a business that exists.  It is |
| 10 | effectively the Lien Log application with a |
| 11 | change of colors. |
| 12 | He took my escrow transactions |
| 13 | and moved them, prior to me even being in |
| 14 | Puerto Rico, up to a company in New York to |
| 15 | fictitiously create a 16-million-dollar |
| 16 | transaction, and then applied for the |
| 17 | credit of $8 million for which he would go |
| 18 | to repay me. |
| 19 | I went to talk to the government |
| 20 | of Puerto Rico about this, solely because I |
| 21 | didn't understand what was occurring, and |
| 22 | to get a lien potentially on the asset |
| 23 | because I knew that once he cashed it out, |
| 24 | he was not going to repay me |
| 25 | three-and-a-half million dollars. |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                        RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1392 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

629

```
 1                J. Hanratty

 2             And from there I sued him.  I

 3   have had discussions with the FBI and the

 4   tax authorities of both Puerto Rico,

 5   multiple times in the last three or four

 6   years.

 7             So generally that is why I

 8   removed Tom from the AloStar transaction.

 9   I did that with -- when I visited Atlanta,

10   I want to say, probably a month before that

11   was scheduled to close.

12       Q.   I'm going to share with you a

13   document labeled Ebury 18741, which is a

14   spreadsheet.  So I'm going to show it to

15   you on the computer and send to court

16   reporter and Ms. Parks afterwards.

17             MR. MAYRON:  Could the court

18        reporter please mark that as Hanratty

19        Deposition Exhibit 63.

20             (Hanratty Exhibit 63, Electronic

21        file consisting of spreadsheet listing

22        investor balances as of April 2019,

23        marked for identification, as of this

24        date.)

25             (Electronic file).
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records    Pg 1393 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

                                            630

 1                       J. Hanratty

 2    BY MR. MAYRON:

 3         Q.    This is a spreadsheet listing

 4    investor balances as of April 2019?

 5         A.    Yes.

 6         Q.    And in the tenth row is Carry

 7    Trade?

 8         A.    Yes.

 9         Q.    Is that a reference to Carry

10    Trade LLC?

11         A.    I would assume so, yes.

12         Q.    Was Carry Trade an investor in

13    Fund 1?

14         A.    Not at these levels, no.

15         Q.    What do you mean "not at these

16    levels"?

17         A.    I don't think -- ultimately, I

18    don't think this is correct.  I don't know

19    when this document is from.

20         Q.    I'll represent to you that it's

21    from April 22, 2019.

22              What was the value of Carry

23    Trade's investment in Fund 1 LTV in

24    April 2019?

25         A.    I don't know offhand, but I do

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

Court Records     Pg 1394 of 2230

John Hanratty
June 21, 2023

631

J. Hanratty

1

2  know that on -- I don't know if it was in

3  '19 or '20 -- I think it was working on the

4  '20 audit.  We had reversed a much, much

5  smaller amount of I think -- of what were

6  effectively the redemptive value of the

7  liens versus what the actual value is.

8      Q.   What was the nature of Carry

9  Trade's investment in Fund 1 LTD?

10     A.   Just whatever the lien value was.

11  In preparation for the AloStar closing, we

12  had started papering and assigning or

13  effectively getting everything ready to

14  close because we were doing closing

15  documents and all of such.  And this is

16  prior to the culmination of everything we

17  just discussed related to what I think Tom

18  is engaged in.

19          And so it remained on here until

20  we dealt with it from a paper perspective.

21     Q.   Did you return the investment

22  Carry Trade LLC made in Ebury Fund 1 LTD?

23     A.   I informed Eduardo Vazquez, the

24  controller and CFO of BCMG companies, that

25  100 percent of Carry Trade liens were not

632

J. Hanratty

1

2  mine, not ours, and they were going -- they

3  were returned, and you guys should go

4  forward and do such.  In an affidavit that

5  we have taken from -- sorry, not an

6  affidavit -- a proposed affidavit, from

7  Eduardo and also in an interview with

8  counsel -- prior counsel from Kari, Eduardo

9  had referenced that this, in fact, I

10  believe occurred, in addition to confirming

11  all the other items related to what Tom had

12  going on.

13  Q.  Without disclosing the substance

14  of any privileged communications, what is

15  the status of your litigation with

16  Mr. McOsker?

17  A.  I have two litigations ongoing.

18  I am suing him in Puerto Rico.  He is suing

19  me in Puerto Rico.  Down there, we are in

20  interrogatory stage in discovery.  The

21  courts down there move slow.  COVID was not

22  great.  He's had five different attorneys.

23  Four attorneys have resigned.  He's now has

24  the last attorney who he is working with

25  and appears to be moving forward.  So

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                         RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1396 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                         June 21, 2023

633

|    | J. Hanratty |
|----|-------------|
| 1  | |
| 2  | nothing substantive on either front there. |
| 3  | The case here, we sued him, as |
| 4  | you're aware, under the -- a civil RICO |
| 5  | claim related to my additional discoveries |
| 6  | that he had been messing -- playing with |
| 7  | escrow funds well in advance of my time. |
| 8  | And a portion of our funds were used to |
| 9  | repay his escrow funds from prior years. |
| 10 | And it allowed us to qualify for |
| 11 | the escrow component. We survived the |
| 12 | Motion to Dismiss and are in discovery with |
| 13 | him, which he has not responded and is past |
| 14 | deadlines. |
| 15 | We have filed a Motion to Dismiss |
| 16 | on his counterclaim against us. I think |
| 17 | Kari's opinion was that the -- our chances |
| 18 | are pretty good that it will be dismissed. |
| 19 | MS. PARKS: I am biased. I'll |
| 20 | put that. |
| 21 | And a slight correction. It's |
| 22 | the amended counterclaim. |
| 23 | THE WITNESS: Sorry. |
| 24 | MS. PARKS: No, no, it's fine. |
| 25 | So just while we are on the |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO.
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT    Court Records    Pg 1397 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

634

| | J. Hanratty |
|---|---|
| 1 | |
| 2 | record, this document you have for us, |
| 3 | because the original counterclaim, we |
| 4 | moved to dismiss that.  He, you know, |
| 5 | by the normal course, filed an amended |
| 6 | counterclaim instead of opposing our |
| 7 | Motion to Dismiss.  That's all Delaware |
| 8 | fed, so it's all in the document. |
| 9 | A.   One last matter.  I'm reasonably |
| 10 | certain that Hacienda -- the tax authority |
| 11 | locally has opened up an investigation and |
| 12 | are moving forward. |
| 13 | Q.   So just to run through |
| 14 | Mr. McOsker's allegations. |
| 15 | A.   Sure. |
| 16 | Q.   Turning to page 60 of 100, |
| 17 | Mr. McOsker alleges that, "Hanratty, over |
| 18 | the course of 2018, it is believed in 2019 |
| 19 | and to this day, altered data on Excel |
| 20 | documents sent to his banks, including |
| 21 | Emigrant's Bank, regarding the borrowing |
| 22 | base for Ebury fund certificates, |
| 23 | specifically origination dates for hundreds |
| 24 | of certificates and other relative |
| 25 | financial data." |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 115
RECEIVED NYSCEF: 01/12/2024

635

                           J. Hanratty

1

2          Did I read that correctly?

3          MS. PARKS:  Which -- can you tell

4     us which paragraph you're looking at?

5          MR. MAYRON:  19, paragraph 90D as

6     in delta.

7          MS. PARKS:  90D.  Thank you.

8     A.   So, I'm sorry, page --

9          MS. PARKS:  It's page 60 of 100,

10     if you look in the file stamping thing.

11     And it's paragraph 90D.

12          THE WITNESS:  Got it.  Super.  I

13     got it.

14     A.   So this is the portion in order

15 to cover his own cash and redemption

16 shortfalls?

17     Q.   Yes.

18     A.   Caused by his own...

19          (Document review.)

20     A.   Yes, that's what it reads.

21     Q.   Have you ever altered data in

22 Excel documents sent to Emigrant Bank

23 regarding the borrowing base for Ebury

24 certificates?

25          MS. PARKS:  Objection.

636

```
 1                    J. Hanratty

 2    BY MR. MAYRON:

 3        Q.   And by "alter," I mean submit

 4    inaccurate data.

 5             MS. PARKS:  Objection.

 6    BY MR. MAYRON:

 7        Q.   Let me take the question back.

 8             Have you ever submitted --

 9    intentionally submitted incorrect data on

10    Excel documents sent to Emigrant Bank

11    regarding the borrowing base?

12        A.   Ebury -- has the Ebury companies

13    ever submitted incorrect data on our

14    borrowing base, effectively?

15        Q.   Have you ever altered data on

16    Excel documents sent to Emigrant Bank

17    regarding the borrowing base for Ebury fund

18    certificates?

19             MS. PARKS:  Objection.

20        A.   I don't recall specifically

21    altering data with the caveat that if there

22    was an issue I was working on with Frank or

23    Ping and corrections had to be made, we

24    would make corrections and submit.  I don't

25    know if that's what is considered
```

637

```
 1                 J. Hanratty

 2    alterations.

 3        Q.   Have you ever intentionally

 4    submitted incorrect origination dates for

 5    certificates in the Ebury borrowing base?

 6            MS. PARKS:  Objection.

 7        A.   Not -- no, not that I can recall.

 8        Q.   In paragraph 90F, Mr. Hanratty

 9    alleges -- apologies.  Mr. McOsker alleges

10    that in one instance in August of 2018, you

11    approached Misters Vazquez and Kernan to

12    request a wire of approximately 2 million

13    owed to the Ebury funds directly to Ira

14    Leventhal, correct?

15            MS. PARKS:  Objection.

16        A.   Yes.  As we discussed before, the

17    wire ended up -- the wire went directly to

18    Ira Leventhal.

19        Q.   So you did instruct Misters

20    Vazquez and Kernan to wire the proceeds to

21    directly to Ira Leventhal?

22            MS. PARKS:  Objection.

23        A.   I don't recall -- I don't recall

24    specifically doing that.  I think it was

25    just Edguardo.  But, you know, as we
```

638

J. Hanratty

1    discussed previously, yes, I asked the

2    broker on those transactions to send the

3    funds directly to Ira Leventhal.

4        Q.   Mr. Hanratty -- Mr. McOsker

5    alleges, "When questioned as to why this

6    money would go directly to an investor

7    instead of to the fund to pay the bank

8    first, Hanratty became irate."

9        Did I read that correctly?

10        MS. PARKS:  Objection.

11        A.   That did not occur from my

12    perspective.  I do not recall it.  I don't

13    know who questioned me.

14        Q.   Did anyone question you?

15        MS. PARKS:  Objection.

16        A.   No.

17        Q.   Turning to page 63 of 100, this

18    is paragraph 93.  Mr. McOsker alleges,

19    "Wells would notarize documents on

20    Hanratty's behalf while Hanratty was

21    neither present nor in the same state when

22    said notarizations occurred."

23        Did I read that correctly?

24        MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1402 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

639

J. Hanratty

1

2      A.    Oh, 93?

3            (Document review.)

4      A.    Yes, you read that correctly.

5      Q.    Would Ms. Wells notarize

6   documents on your behalf while you were

7   neither present nor in the same state when

8   said notarizations occurred?

9            MS. PARKS:  Objection.

10     A.    No.

11     Q.    So turning to page 75 of 100,

12  Mr. McOsker alleges that you told him your

13  investors were aware that you were

14  leapfrogging.

15           Did I read that correctly?

16           MS. PARKS:  Which paragraph are

17     you looking at?

18           MR. MAYRON:  Paragraph 148.

19           MS. PARKS:  Thanks.

20           Objection to form.

21     A.    I don't -- yes, you read that

22  correctly.

23     Q.    Did you -- have you ever told

24  anyone that you were leapfrogging?

25           MS. PARKS:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 601 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 1403 of 2230
JOHN ARTHUR HANRATTY
John Hanratty
June 21, 2023

640

                        J. Hanratty

1
2      A.   No.  That's not a term I use.  I
3  don't know if -- what the reference is to a
4  text message either.
5      Q.   Are you familiar with the term
6  "lily-padding"?
7           MS. PARKS:  Objection.
8      A.   I am familiar with that term,
9  yes.
10     Q.   What does lily-padding meaning?
11     A.   Jumping from one pad to another.
12     Q.   What does lily-padding mean in
13  the context of your business?
14          MS. PARKS:  Objection.
15     A.   Nothing.
16     Q.   Have you ever told anyone in the
17  context of the Ebury company business that
18  you were lily-padding?
19          MS. PARKS:  Objection.
20     A.   We -- generally speaking, at this
21  time, Tom and I were -- I had known him for
22  ten-plus years.  We were close personally.
23  The investment banker who we had hired to
24  get Tom the loans that we -- he's saying I
25  gave him, for example, he met with Emigrant

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 641 RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1404 of 2230

John Hanratty
June 21, 2023

641

|    |                                             |
|----|---------------------------------------------|
| 1  | J. Hanratty                                 |
| 2  | to potentially get a loan on his BloxTrade  |
| 3  | and his technology business.                |
| 4  | That banker would use the term              |
| 5  | "lily-padding," and the context that we     |
| 6  | would all jokingly use it on was that, hey, |
| 7  | you're staying alive and doing -- pushing   |
| 8  | the ball forward on your current businesses |
| 9  | to try and get to something larger.         |
| 10 | At that time, we were all                   |
| 11 | collectively working towards potential      |
| 12 | transaction with the government. Tom had    |
| 13 | his technology business which -- you know,  |
| 14 | there were people that worked there. It     |
| 15 | was his thing. It was operating. But it     |
| 16 | was a grind at that point in life. So that  |
| 17 | was the context I recall using lily-padding |
| 18 | in. I don't recall using it directly as it  |
| 19 | relates to Ebury, other than it was part of |
| 20 | the process for how we were going to move   |
| 21 | it forward and hopefully become successful, |
| 22 | which ultimately didn't occur.              |
| 23 | Q.   Going back to page 74 of 100,          |
| 24 | paragraph 145, Mr. McOsker alleges that you |
| 25 | stated, "Jack Grady has no idea what he's   |

642

```
 1              J. Hanratty

 2    doing and won't notice."

 3         Did I read that correctly?

 4         MS. PARKS:  Objection.

 5    A.    Yes, you read that correctly.

 6    Q.    Have you ever stated that Jack

 7    Grady has no idea what he's doing?

 8         MS. PARKS:  Objection.

 9    A.    No -- I -- that is not -- I do

10    not recall saying that.  Also in addition

11    to that, I would not -- speaking with Tom

12    McOsker even at that point in time when he

13    was my friend, it's just -- he worked -- we

14    didn't interact on my things.

15    Q.    Did Mr. Grady know what he was

16    doing with respect to the Ebury credit

17    agreements?

18         MS. PARKS:  Objection.

19         You can answer.

20         THE WITNESS:  Sure.

21    A.    I think the record reflects that

22    Jack knew the business intimately.  Knew

23    what he was doing intimately.  Knew me

24    intimately.  And was a very capable and

25    qualified employee for Emigrant.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj

EMIGRANT BUSINESS CREDIT

Court Records    Pg 1406 of 2230

John Hanratty

JOHN ARTHUR HANRATTY    June 21, 2023

643

1                    J. Hanratty

2        Q.   So Mr. McOsker next alleges that

3    you falsified the borrowing base you

4    submitted to Emigrant and you did this so

5    that certain assets that were no longer

6    eligible for financing purposes would not

7    expire so that he could gain more time to

8    put additional assets on the borrowing base

9    to cover these shortfalls.

10            Did I read that correctly?

11       A.   Yes, you did.

12       Q.   Can I turn your attention to the

13   spreadsheet marked Ebury 9343.

14            MR. MAYRON:  And could the court

15       reporter please mark this document as

16       Hanratty Deposition Exhibit 64.

17            (Hanratty Exhibit 64, Electronic

18       file, marked for identification, as of

19       this date.)

20   BY MR. MAYRON:

21       Q.   And I am going direct you to the

22   final tab -- not the final tab.  I'm going

23   direct you to the tab called NJ Additions

24   2.

25            (Electronic file).

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM                    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                                RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1407 of 2230                                    John Hanratty
                                                                    June 21, 2023

644

```
 1                      J. Hanratty

 2          A.    Um-hmm.

 3                (Document review.)

 4    BY MR. MAYRON:

 5          Q.    Actually, before we do that, what

 6    is this document?

 7          A.    It's a borrowing base for

 8    Emigrant Bank.

 9          Q.    And it is dated September 13,

10    2019, correct?

11          A.    September 2019.

12          Q.    If you look at the very first

13    tab, combined tab, cell G4?

14          A.    I'm just looking at the dates.

15    So it was created -- yeah, very good.

16          Q.    So going back to the Tab ND

17    additions 2 --

18                MS. PARKS:    Sorry.    We are not in

19          G4 yet.    Just give us a sec.

20          A.    G4?

21          Q.    That lists the date in the very

22    first tab.

23          A.    Yes.

24          Q.    And it lists the date as

25    September 13th, 2019?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 2 24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT Court Records    Pg 1408 of 2230    John Hanratty

JOHN ARTHUR HANRATTY    June 21, 2023

645

```
 1                   J. Hanratty

 2        A.   Yes.

 3        Q.   Okay.  Turning to the NJ

 4   additions 2 tab.  So the very first lien,

 5   this is row 2 --

 6        A.   Yes.

 7        Q.   -- if you go to Column AC, it

 8   lists the acquired date as September 16th,

 9   2011, correct?

10        A.   Yes.

11        Q.   And it lists the lien amount as

12   $3,425.72, correct?

13        A.   Yes.

14             MS. PARKS:  Sorry.  Which row are

15        we looking at?

16             THE WITNESS:  One.

17             MS. PARKS:  One.  Okay.

18   BY MR. MAYRON:

19        Q.   And then let's go to Column CQ.

20   The header of this column is, "In

21   Foreclosure," correct?

22        A.   Yes.

23        Q.   It actually says "In

24   Foreclose" -- no, that's correct.

25             No, that's now how --
```

646

```
 1                    J. Hanratty

 2              MS. PARKS:  In foreclosisure.

 3         A.    I think that's Frank's --

 4         Q.    And in Cell CQ2, it has a value

 5    of 1, which means this lien is in

 6    foreclosure, correct?

 7         A.    So it's 10 -- well, I see the

 8    status there in CS.

 9         Q.    So if you look at CS, the header

10    for that is, "INS Status For Three Years

11    Above," correct?

12         A.    Yes.

13         Q.    And so that means the lien had

14    been in foreclosure for more than three

15    years, correct?

16         A.    Yes.

17         Q.    And the total amount eligible for

18    this lien is listed as $34,017.62?

19         A.    Yes.

20         Q.    But this lien was ineligible to

21    be included in the borrowing base because

22    it had been in foreclosure for more than

23    three years?

24              MS. PARKS:  Objection.

25         A.    What was the foreclosure start
```

647

J. Hanratty

1      date?

2           Oh, I actually own this property

3      now.  I apologize.  332 River Road, we own.

4         Q.   So we don't have the foreclosure

5      date on here.  What we do have is the

6      acquired date, which is Column AC?

7         A.   Yes.

8         Q.   And the acquired date is

9      September 16th, 2011, correct?

10        A.   That is the date -- I don't know

11     if that means I acquired it in September of

12     2011 or that's the date it was originated.

13     But, I mean, the column says, "acquired."

14        Q.   Is that the date the tax lien was

15     sold by the taxing authority?

16        MS. PARKS:  Objection.

17        A.   It has to be -- or -- from the

18     perspective of I didn't exist in 2011 as a

19     company.

20        Q.   So looking back at the --

21        MR. MAYRON:  Could we go off the

22          record for a minute.

23        THE VIDEOGRAPHER:  The time is

24          7:02 p.m.  We are going off the record.

648

J. Hanratty

1

2          (Recess is taken.)

3          THE VIDEOGRAPHER:   The time is

4    7:09 p.m.  We are back on the record.

5          MR. MAYRON:   Could the court

6    reporter please mark the document I'm

7    going to hand to you, which is labeled

8    EBCC 9834, as Hanratty Deposition

9    Exhibit 64 [sic].

10          (Hanratty Exhibit 65, Credit

11    Agreement between Emigrant business

12    Credit Corporation and Ebury 2 EMI LLC,

13    marked for identification, as of this

14    date.)

15  BY MR. MAYRON:

16          Q.   Have you seen this document

17  before?

18          A.   Yes, I have.

19          Q.   It is the Credit Agreement

20  between Emigrant Business Credit

21  Corporation and Ebury 2 EMI LLC, correct?

22          A.   Yes.  It's the Credit Agreement

23  to Ebury 2 and Emigrant.

24          Q.   So turning to the very end, page

25  9879, this is the schedule of eligible

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1412 of 2230                John Hanratty
JOHN ARTHUR HANRATTY                                                    June 21, 2023

649

```
 1                    J. Hanratty

 2    property and tax lien exclusions for New

 3    Jersey liens, correct?

 4         A.   Yes.

 5         Q.   And in the section entitled

 6    "Additional Eligible Tax Lien Exclusions,"

 7    it sets out itemized exclusions from the

 8    definition of eligible tax liens, correct?

 9         A.   Yes, it does.

10         Q.   And Exclusion F, as in Franklin

11    Gandol, is, "The aggregate amount of all

12    tax liens included in the collateral

13    secured by a property to which more than 24

14    months after a foreclosure process has been

15    initiated, no later than 36 after such tax

16    lien was sold."

17         A.   Yes, that's what it reads.

18         Q.   And so adding up the 24 and 36,

19    you get, I guess, 60 months or 5 years?

20         A.   This is one that always confuses

21    me.

22              (Document review.)

23         A.   24 months after a foreclosure

24    process has been initiated and no later

25    than 36 -- oh, I see.  No later than 36
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1266
RECEIVED NYSCEF: 01/12/2024

650

                        J. Hanratty

1

2    after the tax lien was sold.

3        Q.   So the way I understand this is a

4    tax lien is sold on January 1st, 2011.  The

5    foreclosure process must be initiated no

6    later than 36 months after.  So that would

7    be three years, or January 1st, 2014.

8            And then no more than 24 months

9    may elapse since the foreclosure process

10   has been initiated.  So that would be

11   January 1st, 2016, or five years after this

12   tax lien was sold.

13       A.   Sorry, just rereading it.

14           (Document review.)

15       A.   So no later -- I see.  So 36

16   months after the lien was sold.  I'm

17   assuming sold means the municipality?

18       Q.   That's my understanding.

19           Do you understand that to mean

20   sold by the municipality?

21       A.   It's not capitalized.  And 24

22   months after -- so you have two years to

23   complete a foreclosure process that can't

24   begin more than 36 months after.

25           So, yes.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsl   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1414 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

651

1                    J. Hanratty

2        Q.   And you understand that "after

3   such tax lien was sold" refers to the sale

4   of the tax lien by the tax authority?

5            (Reporter clarification.)

6   BY MR. MAYRON:

7        Q.   And you understand that "after

8   such tax lien was sold" refers to the sale

9   of the tax lien by the taxing authority?

10       A.   That's the -- I understand that

11  is the meaning of the word "sale" in this

12  agreement.  Is that what you're...

13       Q.   Yes.

14            So the lien we were just looking

15  at in the spreadsheet, EBCC 9343, was sold,

16  according to Column AC, on September 16th,

17  2011, correct?

18       A.   Yeah.  The document has

19  September 16th, 2011, as an acquired date.

20       Q.   And this document is dated

21  September 13th, 2019, correct?

22       A.   September 13th, 2019.

23  September -- yeah, last printed on

24  September -- yes, it's dated the 13th.

25       Q.   So roughly eight years after the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT Court Records    Pg 1415 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

652

```
 1              J. Hanratty
 2    acquired date of this tax lien?
 3         A.   Yes.
 4         Q.   So this tax lien was ineligible
 5    per Schedule 1.1X to the Credit Agreement,
 6    correct?
 7         A.   Just based off of the five years,
 8    my only thought is whether -- I just
 9    remember in later iterations with --
10    definitely with AloStar, and I thought that
11    we had discussed the main potential change
12    was that the acquisition date would go off
13    of my date of acquisition versus the date
14    of when it was sold.  I can't recall
15    whether it was definitely a term that was
16    important to me on the AloStar component,
17    and I don't recall if we ever made a
18    modification for that in later credit
19    agreements.
20              But by the 2017 credit report,
21    this is -- this is older than 5 years --
22    older than 36 months and the 24 months in
23    the New Jersey tab of the Credit Agreement.
24    But it was in foreclosure.
25         Q.   So if there is not an amendment
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
INDEX NO. 158207/2022
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1416 of 2230
RECEIVED NYSCEF: 01/12/2024
John Hanratty
June 21, 2023

653

J. Hanratty

1   to the credit agreements that changes the

2   definition of "after such tax lien was

3   sold," you agree that the tax lien in Row 2

4   of EBCC 9343 and the tab New Jersey

5   Additions 2 was not eligible with the

6   Credit Agreement?

7        A.   Yes.  Assuming the word "sale"

8   means sale from the municipality and that

9   we didn't do an amendment, which at a later

10  date under the readings of the Credit

11  Agreement in Exhibit 64 that this appears

12  to be ineligible.

13       Q.   Despite that fact, according to

14  Column CT, there is an eligible amount of

15  34,17.62 -- $34,017.62?

16       A.   Yes, that's what's in CT.

17       Q.   And so if the Credit Agreement

18  was not amended to change the meaning of

19  when a tax lien is sold, this tax lien was

20  ineligible under the credit agreements and

21  including in the borrowing base that the

22  total amount eligible was $34,000 and --

23  sorry, $34,017.62 was false?

24       A.   Yes.  I think we would have

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                            RECEIVED NYSCEF: 01/12/2024

654

                        J. Hanratty

1    submitted the borrowing base to Emigrant.

2    I think just by looking at the document

3    timeline, I think Frank more than likely

4    was the last author on this.  It looks like

5    we included that in Column CT, submitted

6    it, and we approved it and then we signed,

7    is what I am assuming happened.

8        Q.   And in this tab, if you go back

9    to Column AC, there are -- are you able to

10   sort Column AC from oldest to newest?

11       A.   Yeah.  Or I can filter.  I don't

12   want to mess up...

13           Yes.

14       Q.   And so 5 years before

15   September 13th, 2019, is September 13th,

16   2014?

17           MS. PARKS:  Give us a minute.

18           THE WITNESS:  Yeah.

19       A.   So yes.

20           MS. PARKS:  Do the sorting first

21       before we say it.

22           THE WITNESS:  Well, he asked

23       about a specific date.  Let's just do

24       that.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1418 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

655

1          J. Hanratty

2          (Document review.)

3    BY MR. MAYRON:

4          Q.   And so this lien tape contains 69

5    tax liens where the acquired date was prior

6    to September 13th, 2014?

7          A.   I count 49 -- oh, 14, I

8    apologize.

9          Q.   Maybe it will be easiest if we

10   all just --

11         A.   I got it.   69 is your number

12   based off of September.   There is a bunch

13   after.

14         Q.   Okay.   So this lien -- this tab

15   contains 69 liens where the acquired date

16   was prior to September 13th, 2019?

17         A.   Yes, that appears to be the case.

18         Q.   And then looking at Column CT for

19   these liens, 63 are listed as having

20   eligible amounts.

21         A.   Yes.   The ones that are not as

22   eligible are ones that are not in

23   foreclosure, like the three years above not

24   in FC, right?   Okay.

25         Q.   And if you sum the value of the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 656

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1419 of 2230

RECEIVED NYSCEF: 01/12/2024

656

```
 1              J. Hanratty

 2   eligible amount of the 63 liens that were

 3   sold by the taxing authority prior to

 4   September 13th, 2014, the amount

 5   represented as eligible is $746,648.07,

 6   correct?

 7          MS. PARKS:  Objection.

 8      A.   Yes, that is -- that appears to

 9   be the amount.

10      Q.   And as we discussed, if after

11   such tax lien was sold in the Credit

12   Agreement means after the tax lien was sold

13   by the taxing authority and was not amended

14   by a later amendment, these amounts were

15   ineligible?

16          MS. PARKS:  Objection.

17      A.   Yes.  As -- again, assuming we

18   did not make an amendment related to the

19   acquisition date of -- the acquisition date

20   from another party.

21          The -- it appears that

22   anything -- it appears that what we're

23   doing is anything in foreclosure we're

24   marking as eligible, is what it looks like

25   to me.
```

657

                      J. Hanratty

1

2    Q.   And then just going back to the

3    combined tab, and I'll direct your

4    attention again to Hanratty Deposition

5    Exhibit 6, Hanratty Deposition Exhibit 6 --

6    A.   Do you want me to be on the

7    combined tab on this or this?

8    Q.   The combined tab on the

9    spreadsheet, and as well as looking at

10   Hanratty Deposition Exhibit 6.

11   A.   Oh, got it.

12   Q.   Hanratty Deposition Exhibit 6 is

13   the signed borrowing base certificate from

14   September 13th, 2019?

15   A.   Yes.

16   Q.   And it matches the combined tab

17   in the spreadsheet which is marked as

18   Hanratty Deposition Exhibit 64?

19   A.   I was confused in the redeemed

20   number for the ineligible.

21        Yes, it matches.  Exhibit 6

22   matches the -- Exhibit 64.

23   Q.   So if Ebury did not make an

24   amendment related to the acquisition date

25   from another party, you would agree that

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 110    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
                      EMIGRANT BUSINESS CREDIT    Court Records    Pg 1421 of 2230                John Hanratty
                      JOHN ARTHUR HANRATTY                                                         June 21, 2023

658

J. Hanratty

1          J. Hanratty

2    this borrowing base certificate was

3    incorrect because it falsely represented

4    $746,648.07 of ineligible collateral as

5    eligible?

6          MS. PARKS:  Objection.

7    A.    Yes.  I think it looks to me

8    formulaically that we were including as

9    eligible anything in foreclosure and then

10   sending it to Emigrant for approval.  I

11   assume after getting approval, we would

12   sign and submit.

13   Q.    You can put that document away.

14         MS. PARKS:  The spreadsheet or

15   the Exhibit 6?

16         MR. MAYRON:  You can put both

17   documents away.

18         MS. PARKS:  Okay.

19         THE WITNESS:  Close?

20         MR. MAYRON:  Yeah.  We're done

21   with it.

22   BY MR. MAYRON:

23   Q.    What is SJ Marina?

24   A.    It's a -- it's related to the

25   Triumph loan.  It's an asset owned by a --

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 120    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1422 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

659

                          J. Hanratty

1

2    a fellow by the Sharon Geninteri

3    (phonetically) at Fortress related to

4    the -- and they use SJ Marina as a

5    launching point for all their vessels.  And

6    that's the Triumph loan we discussed, which

7    was yesterday.

8         Q.    And what is the Triumph loan?

9              MS. PARKS:   Objection.

10         A.    That was a debtor-in-possession

11   loan from 2019.  We had done a non-related

12   to Emigrant collateral, just a loan related

13   to a fellow by the name of Sean Daugherty,

14   the banker I mentioned before, was looking

15   for capital and we provided a

16   debtor-in-possession loan.

17         Q.    And what is the status of the

18   Triumph loan?

19         A.    We are -- we emerged from

20   bankruptcy and I'm liquidating my equity

21   position in it to provide the capital for

22   this.

23         Q.    So as part of the loan, you

24   obtained equity in Triumph?

25         A.    Yes.

EMIGRANT BUSINESS CREDIT         Court Records     Pg 1423 of 2230          John Hanratty
JOHN ARTHUR HANRATTY                                                        June 21, 2023

660

                              J. Hanratty

1

2      Q.    And which Ebury entity holds the

3   equity in Triumph?

4           MS. PARKS:   Objection.

5      A.    It would be Red Clover, which is

6   an asset -- a borrower of the collateral

7   that belongs to Emigrant, the long and

8   short of it.

9      Q.    And when you say liquidating your

10  equity position, how would you liquidate

11  your equity position?

12          MS. PARKS:   Objection.

13     A.    Selling it.

14     Q.    Is it -- are your shares in

15  Triumph, is it a publicly traded stock?

16     A.    No.  It's a privately-held

17  company.  Emerged from bankruptcy.  Red

18  Clover owns roughly 40 percent of the

19  asset.  I am selling it to my portion to

20  the gentleman, you don't know this yet, who

21  is providing the hard money loan on the --

22  the total package.  So his name is William

23  Tropp, Bill Tropp.

24          MS. PARKS:   T-R-O-P-P.

25  BY MR. MAYRON:

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1424 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

661

```
 1                    J. Hanratty

 2        Q.   And you said Mr. Tropp is

 3   providing you the hard money loan on the

 4   total package?

 5             MS. PARKS:  Objection.

 6             Go ahead.

 7        A.   We had made an offer yesterday

 8   for 11 million.  We got countered for a

 9   14-million-dollar settlement and we

10   countered -- I asked Bill if I could borrow

11   an additional couple million dollars, and

12   he approved.  So that's where we are

13   borrowing the money to make an offer on the

14   12-and-a-half million.

15        Q.   Is Mr. Tropp aware of the

16   litigation between Emigrant and the Ebury

17   companies?

18        A.   Yes.

19        Q.   Is he aware that Emigrant has

20   accused the Ebury companies and you

21   personally of engaging in fraud?

22        A.   Yes.

23        Q.   And he's still willing to loan

24   you $11 million?

25        A.   Yes.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. ...
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 1425 of 2230
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

662

1                J. Hanratty

2           MS. PARKS:  Did you say 11?

3           THE WITNESS:  That is the term

4      sheet.

5           MS. PARKS:  You said you made an

6      offer for 11, so I think his question

7      was has Bill offered to loan you 11,

8      just to be clear on that.

9       A.   His offer is to loan me the 10

10 and then the portion of cash related to

11 the -- me exiting the Triumph shares.

12      Q.   And how much cash has he offered

13 you for your Triumph shares?

14      A.   Three million.

15      Q.   Okay.  What is Kirkland Income

16 Fund?

17      A.   Kirkland Income Fund -- oh, they

18 provided a loan on a -- the property in

19 Rochester, New York.  619 Portland Avenue

20 in Rochester, New York.

21      Q.   And have you sold that property?

22      A.   Yes.

23      Q.   And did you continue making

24 payments to Kirkland Income Fund after you

25 sold the property?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 
24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1426 of 2230
RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT
John Hanratty
JOHN ARTHUR HANRATTY
June 21, 2023

663

J. Hanratty

1

2      A.   Yes.  What happened, it sounds a

3   little atypical, in that sale process, they

4   didn't record their mortgage.  And so the

5   title company did not assume that there was

6   debt on the property, and so I dissatisfied

7   the debt.  And so the property sold.  They

8   had an unrecorded mortgage -- a mortgage,

9   like an enforceable note, but they let me

10   pay it off over time.

11      Q.   Why didn't the sale of the

12   property extinguish the mortgage?

13      A.   It -- they never recorded it on

14   the title so the title company could

15   insure.

16           MR. MAYRON:  Give me one minute

17      to make sure I don't have any other

18      questions.

19           THE WITNESS:  That's fine.

20           (Pause.)

21           MR. MAYRON:  Kari, I think that's

22      it.  Your witness.

23           MS. PARKS:  Thanks, Austin.

24   EXAMINATION BY

25   MS. PARKS:

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022

NYSCEF DOC. NO.     Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
                                    Court Records    Pg 1427 of 2230    RECEIVED NYSCEF:

24-04020-dsj

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

664

```
 1                    J. Hanratty

 2        Q.    John, have you ever intended to

 3    trick Emigrant Business Credit Corporation?

 4        A.    No.

 5        Q.    Have you ever intended to trick

 6    Emigrant Bank?

 7        A.    No.

 8        Q.    Have you ever intended to trick

 9    any human being associated with, employed

10    by, et cetera, Emigrant Bank and its

11    subsidiaries?

12        A.    No.

13             MR. MAYRON:  Object to form.

14    BY MS. PARKS:

15        Q.    Have you ever lied to Emigrant

16    Business Credit Corporation?

17             MR. MAYRON:  Object to form.

18        A.    No.

19        Q.    Have you ever lied to Emigrant

20    Bank?

21             MR. MAYRON:  Object to form.

22        A.    No.

23        Q.    Have you ever lied to any human

24    acting -- who was acting as a

25    representative of Emigrant Bank or its
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT    Court Records    Pg 1428 of 2230    John Hanratty

24-04020-dsj

JOHN ARTHUR HANRATTY    June 21, 2023

665

```
 1                   J. Hanratty

 2   subsidiaries?

 3          MR. MAYRON:  Object to form.

 4       A.   No.

 5       Q.   Have you ever instructed any

 6   person who works for the Ebury companies to

 7   lie to Emigrant Business Credit

 8   Corporation?

 9          MR. MAYRON:  Object to form.

10       A.   No.

11       Q.   Have you ever instructed any what

12   I'll call Ebury personnel to lie to anybody

13   who works for Emigrant Bank?

14          MR. MAYRON:  Object to form.

15       A.   No.

16       Q.   Have you ever wanted any of your

17   employees to lie to Emigrant Business

18   Credit Corporation?

19          MR. MAYRON:  Object to form.

20       A.   No.

21       Q.   Have you ever wanted any of your

22   employees to lie to Emigrant Bank?

23          MR. MAYRON:  Object to form.

24       A.   No.

25       Q.   Have you ever pressured anybody
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 655    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1429 of 2230
EMIGRANT BUSINESS CREDIT    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

666

```
 1              J. Hanratty

 2    to lie to Emigrant Business Credit

 3    Corporation?

 4              MR. MAYRON:  Object to form.

 5         A.   No.

 6         Q.   Have you ever pressured anybody

 7    to lie to Emigrant Bank?

 8              MR. MAYRON:  Object to form.

 9         A.   No.

10         Q.   Have you ever pressured anybody

11    to lie to any Emigrant Bank subsidiary or

12    affiliate?

13              MR. MAYRON:  Object to form.

14         A.   No.

15         Q.   Switching topics.  You, meaning

16    you personally, John Hanratty, admit that

17    the Ebury companies owe millions of dollars

18    to Emigrant Business Credit Corporation; is

19    that right?

20         A.   Yes.

21         Q.   We'll refer to a shorthand we've

22    been using.  So Ebury companies have had

23    some sort of business relationship with

24    Emigrant Business Credit Corporation since

25    2017 formally, meaning, by contract; is
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 173                                 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1430 of 2230    John Hanratty
JOHN ARTHUR HANRATTY                                        June 21, 2023

667

```
 1                    J. Hanratty

 2    that right?

 3            MR. MAYRON:  Object to form.

 4        A.   Yes.

 5            Oh, sorry.

 6        Q.   It's okay.  It's a terrible

 7    question.

 8            And in 2017, did the Ebury

 9    companies pay any money to Emigrant?

10        A.   Yes.

11        Q.   How much money, ballpark, in

12    2017?

13            MR. MAYRON:  Object.

14        A.   I don't -- I don't recall.

15        Q.   More than a million dollars?

16        A.   Yes.

17        Q.   More than $2 million?

18        A.   Yes.

19        Q.   More than $5 million?  In 2017?

20        A.   I just don't recall when we

21    started our relationship in 2017.

22        Q.   And it goes to around September?

23        A.   I would -- not 5 million then.

24        Q.   Okay.  How about in 2018, did the

25    Ebury parties pay any money to Emigrant?
```

668

```
1                     J. Hanratty

2         A.   Yes.

3         Q.   How much, approximately?

4         A.   I would think greater than 5

5    million.

6         Q.   In 2018?

7         A.   Yes.

8         Q.   Okay.  More than $10 million in

9    2018?

10        A.   I don't know offhand.

11   Potentially.

12        Q.   Okay.  More than $7 million in

13   2018?

14        A.   I would say yes.

15        Q.   Okay.  In 2019, did the Ebury

16   parties pay any money to Emigrant?

17        A.   Yes.

18             MR. MAYRON:  Object to form.

19             THE WITNESS:  Sorry.

20   BY MS. PARKS:

21        Q.   More than $5 million in 2019?

22             MR. MAYRON:  Object to form.

23        A.   Yes.

24        Q.   More than 10 million in 2019?

25        A.   I don't know offhand.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj
EMIGRANT BUSINESS CREDIT
Court Records   Pg 1432 of 2230
John Hanratty
JOHN ARTHUR HANRATTY
June 21, 2023

669

                        J. Hanratty

1

2    Q.   More than 7 million in 2019?

3    A.   I would -- generally, yes.

4    Q.   To the best of your memory.  It's

5    not a memory test.

6         Okay.  In 2020, did the Ebury

7    companies pay any money to Emigrant?

8    A.   Yes.

9    Q.   Approximately how much money?

10   A.   I would say greater than 5

11   million.

12   Q.   Okay.  And the COVID-19 pandemic

13   began in March of 2020 officially in New

14   York City?

15   A.   Possibly less -- I would

16   downgrade 5 -- that would be ballpark.  We

17   probably did 5.

18   Q.   Okay.  So your estimation is that

19   with the impact of COVID-19 in 2020, the

20   Ebury companies still paid Emigrant

21   approximately $5 million that year?

22   A.   For us, the COVID impact started

23   a few months after March -- a few months

24   after the official start of the pandemic.

25   Q.   Got it.

670

```
 1                    J. Hanratty

 2              Did the Ebury companies pay

 3      Emigrant any money in 2021?

 4          A.   Yes.

 5          Q.   How much?

 6          A.   I would say probably an estimate

 7      of 2 million.

 8          Q.   Okay.

 9          A.   Probably less.

10          Q.   Did the Ebury companies pay

11      Emigrant any money in 2022?

12          A.   Yes -- no.

13          Q.   What about the lockbox, were

14      there any lockbox sweeps?

15          A.   Yes, there were lockbox sweeps in

16      2022, but minimal.

17          Q.   What do you mean by minimal?

18          A.   Probably a few hundred thousand

19      dollars, give or take.

20          Q.   Okay.   In 2023, have the Ebury

21      companies paid any money to Emigrant Bank?

22          A.   Just the money that I referenced

23      earlier, about 150,000.

24          Q.   That's that lockbox payment?

25          A.   Yeah.
```

671

```
 1                      J. Hanratty

 2          Q.   Okay.

 3          A.   I think 2 million in 2022 is too

 4     high.  Did I say that for --

 5          Q.   You said for 2022 you said a few

 6     hundred thousand dollars, give or take.

 7          A.   That's fine.

 8          Q.   So in 2022 and 2023 combined,

 9     approximately how much have the Ebury

10     companies paid Emigrant via the lockbox

11     sweeps?

12          A.   I would say, in total, maybe

13     400,000.

14          Q.   So have the Ebury companies paid

15     Emigrant over $21 million since 2017?

16          A.   Yeah, I would say I borrowed

17     probably in total from them roughly 40, 45

18     million, I would assume.  This is best

19     guess, where we paid back.  That sounds

20     about right to me, without looking at it

21     specifically.

22          Q.   Right.

23               That's just to the best of your

24     memory.  We know you're not looking at any

25     documents right now.
```

672

```
 1                  J. Hanratty

 2           So did the COVID-19 pandemic

 3      affect your ability to repay Emigrant's

 4      loans?

 5           A.   Yes, it did.

 6           Q.   How so?

 7           A.   It completely -- well, for our

 8      ability to -- as we discussed many times,

 9      my testimony last couple of days, we had

10      pivoted to later-stage liens and REO and

11      also stopped acquiring newer liens.

12               And so during the COVID pandemic,

13      the tools that we would have to promote the

14      payment effectively went away.  And so for

15      us we couldn't foreclose, couldn't enforce

16      judgments.  Any final judgment we had, we

17      couldn't enforce.  We couldn't evict.

18               And then so later on in the COVID

19      pandemic, the asset value started to rise,

20      which is a good --

21               (Reporter clarification.)

22           A.   The asset value started to rise,

23      the underlying assets.  We still had the

24      people problem, and so we weren't able to

25      generally access and unlock the value of
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1436
RECEIVED NYSCEF: 01/12/2024

673

J. Hanratty

1  those assets due to our other issues.

2  Q.   What do you mean by we still had

3  the people problem?

4  A.   Of moving forward court cases, of

5  evicting holdover people -- holdover

6  occupants when you foreclose.

7  And so in the past, a good tool

8  for us would be, even if you had a judgment

9  and you had somebody there, who you could

10  go and evict.  We found we didn't have to

11  because he'd cut a deal.

12  And he'd be like, look, we'll pay

13  you to go on or we cut a deal where you can

14  stay for 90 days, but people just stopped

15  interacting with him completely.

16  Q.   So speaking of cutting a deal,

17  one of the last topics you discussed with

18  Mr. Mayron was Bill Tropp, and a potential

19  loan that he would make available to you;

20  is that right?

21  A.   Yes.

22  Q.   Are you interested in settling

23  this litigation with Emigrant?

24  A.   Yes.

674

                    J. Hanratty

1

2        Q.    Why?

3        A.    Because the options on the table

4    for this business is bankruptcy or a

5    settlement.  And I've never -- I don't

6    think that the process of going through

7    bankruptcy is in the best interest of the

8    business or -- I can't speak for Emigrant,

9    but I acknowledge that I owe them money and

10   I want to pay them.

11            And from my perspective, we've

12   put a lot of time and energy into making

13   offers to them since November of 2021,

14   which were not pursued, responded to.  And

15   when we did come to an agreement, that

16   agreement was pulled.

17       Q.    And when you say which were not

18   pursued, responded to, what do you mean by

19   that?

20       A.    We had a couple of outside

21   investors who were willing to effectively

22   do -- we had a couple of outside investors

23   that were potentially looking to push

24   forward an agreement.  One of them being a

25   guy I mentioned earlier, Troy Ritter from

675

J. Hanratty

```
 1              J. Hanratty

 2   Capital One, worked for a fund who knew me,

 3   knew what I was doing.  So it was a very

 4   good fit.  But that didn't go anywhere.

 5           And then -- but ultimately we did

 6   strike a deal with them, which is a good

 7   thing.

 8       Q.   Who is "them" when you say you

 9   did strike a deal with them?

10       A.   We ultimately came to an

11   agreement, but that agreement fell through.

12       Q.   Can you give us more color on

13   that, specifically the agreement that fell

14   through?

15       A.   Yes.  We had come to an agreement

16   to repay I believe $18 million over a

17   30-month period.

18       Q.   And by "we," when you said

19   "we" --

20       A.   Ebury companies.

21       Q.   Had come to an agreement with

22   whom?

23       A.   Emigrant Bank.

24       Q.   And when had you come to that

25   agreement to repay the $18 million over a
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 74    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT...    Court Records    Pg 1439 of 2230    RECEIVED NYSCEF: 01/12/2024
JOHN ARTHUR HANRATTY                                      John Hanratty
                                                          June 21, 2023

676

 1                    J. Hanratty

 2     30-month period, approximately?

 3          A.    Approximately six months ago,

 4     seven months ago?  It all kind of blends.

 5          Q.    Was it before this litigation

 6     began?

 7          A.    Yes.  So the agreement fell

 8     through and this litigation commenced.

 9          Q.    I see.

10                And I think -- I think you had

11     told Mr. Mayron that your current

12     settlement offer to resolve this case is to

13     pay Emigrant $12.5 million cash in a

14     one-time payment; is that right?

15          A.    Yes.  That is currently -- we've

16     asked if a 12.5 million payment would

17     settle all -- settle this litigation.

18          Q.    And what is the source of that

19     12.5 million?

20          A.    Tiger Financial -- not the famous

21     Tiger Financial, but William Tropp of

22     Tiger -- a combination company, Tiger

23     Petro, which is how I met him through the

24     oil transaction, and he has a real estate

25     business which lends money and does

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1284
RECEIVED NYSCEF: 01/12/2024

J. Hanratty

1   property development.

2       Q.   I see.

3           And is your intention -- strike

4   that.  Please strike that.

5           If Emigrant accepted your

6   settlement offer and the Ebury companies,

7   Ebury parties, and Emigrant Business Credit

8   Corp. resolved this litigation entirely, is

9   it your intention to work again with

10  Emigrant in the future?

11      A.   I don't -- day one, no.  I don't

12  think they would work with me.  So I don't

13  have an intention related to Emigrant other

14  than settling this case.

15      Q.   And so once you settle this case,

16  your relationship with Emigrant will be

17  done?

18      A.   My assumption would be, yes.  I

19  don't think that -- yes.

20      Q.   Okay.

21          MS. PARKS:  Anything else?  First

22      day one, Esquire?

23          MR. WANG:  I am not an esquire

24      yet.

678

|   | J. Hanratty |
|---|---|
| 1 | |
| 2 | MS. PARKS:  Oh, yeah.  Okay. |
| 3 | That's all we got.  Thank you. |
| 4 | Austin, you have anything? |
| 5 | MR. MAYRON:  Yeah, just a few |
| 6 | things. |
| 7 | EXAMINATION BY |
| 8 | MR. MAYRON: |
| 9 | Q.   Ms. Parks was asking you about |
| 10 | various payments the Ebury companies made |
| 11 | to Emigrant, correct? |
| 12 | A.   Yes. |
| 13 | Q.   And you answered with ballpark |
| 14 | numbers, correct? |
| 15 | A.   Yes.  I did not review our |
| 16 | payment data prior to -- prior to these |
| 17 | things, and so they're all ballpark |
| 18 | estimates, to the best of my knowledge. |
| 19 | Q.   So you don't know if any of the |
| 20 | numbers you provided is actually correct? |
| 21 | MS. PARKS:  Objection. |
| 22 | A.   Again, I cannot say that they are |
| 23 | 100 percent correct, but they are my best |
| 24 | guess in estimates. |
| 25 | Q.   And all of the payments that you |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1400
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1442 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

679

```
 1              J. Hanratty

 2    discussed were payments to Emigrant Bank of

 3    either interest or principal that the Ebury

 4    companies owed Emigrant Bank?

 5              MS. PARKS:  Objection.

 6         A.   Yes.

 7         Q.   And the Ebury companies

 8    advanced -- apologies -- Emigrant Bank

 9    advanced the Ebury companies approximately

10    $35.7 million between 2017 and 2020,

11    correct?

12              MS. PARKS:  Objection.

13         A.   Yes, that sounds about right.

14         Q.   And the -- in 2017, the Ebury

15    companies made 3.7 million in principal

16    payments and approximately 220,000 in

17    interest payments?

18              MS. PARKS:  Objection.

19              Answer if you can.

20              THE WITNESS:  Sure.

21         A.   I think that is -- yeah, that is

22    why I said we were less than 5 is because

23    we were only around for four months that

24    year.  And so that -- I think that was

25    consistent with my guess.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Courts Records   Pg 1443 of 2230
JOHN ARTHUR HANRATTY
RECEIVED NYSCEF: 01/12/2024
John Hanratty
June 21, 2023

680

J. Hanratty

1

2    Q.   So you told Ms. Parks that you

3  would say, yes, that the Ebury companies

4  paid Emigrant more than 7 million in 2018,

5  but, in fact, the Ebury companies only paid

6  Emigrant about 6.4 million in 2018,

7  correct?

8         MS. PARKS:   Objection.

9    A.   Yes.   I did make a best guess of

10  7 and it ended up being 6.4, if that is the

11  accurate number you have there, which I

12  acknowledge you probably have an accurate

13  number.

14    Q.   And then in 2020, Ms. Parks asked

15  you how much approximately the Ebury

16  companies paid to Emigrant in 2020, and you

17  said greater than 5 million, when, in fact,

18  the Ebury companies paid Emigrant only

19  about $1.8 million in 2020?

20         MS. PARKS:   Objection.

21    A.   That's fair.   I think the part

22  that I couldn't get my -- that I was

23  struggling with in answering that generally

24  was the impacts of COVID and when that

25  started for us.   So yes, I overestimated.

```
 1                     J. Hanratty

 2        Q.    And so how does COVID -- let me

 3   rephrase that.

 4        A.    Sure.

 5        Q.    During a pandemic, even if there

 6   is a foreclosure moratorium, tax liens

 7   continue to accrue interest, correct?

 8        A.    Yes.

 9        Q.    So COVID would affect the Ebury

10   company's ability to monetize their

11   portfolio, but not the value of their

12   portfolio?

13             MS. PARKS:  Objection to form.

14        A.    Yeah, your book would continue to

15   accrue accrete interest.

16        Q.    And then when the foreclosure

17   moratorium was lifted or courts reopened,

18   the Ebury companies would be able to

19   monetize their assets at the new accreted

20   value?

21             MS. PARKS:  Objection.

22        A.    Yeah.  That's fair.

23        Q.    You told Ms. Parks that you are

24   interested in settling this litigation with

25   Emigrant?
```

682

J. Hanratty

1

2      A.    Yes.

3      Q.    Why didn't you make a settlement

4  proposal earlier?

5           MS. PARKS:   Objection.

6      A.    We did.  And so our day one --

7  from day one, we offered a couple of

8  things.

9           We were looking to pay them.

10  Said that multiple times on phone calls

11  with the bank.  And get a -- whatever you

12  call it -- a stay or a timeline so you

13  could work out -- get a plan.  And so that

14  wasn't approved, which is fine.

15           And then from there we started a

16  process where I would go out and look for

17  external sources to take on the bank, refi

18  the bank, and we got a couple of term

19  sheets in.

20           The term sheet that was

21  ultimately agreed to, you know, 14, 15 -- I

22  think we were on the phone for, I don't

23  know, 13 months, 14 months.  That was a

24  plan that we had put forward, generally

25  speaking, maybe a month, like three or

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1466    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Court Records    Pg 1446 of 2230    John Hanratty
June 21, 2023

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

683

```
 1                   J. Hanratty

 2   four, from a budgeting perspective.

 3           And so it just took a while to

 4   get there.  And that's -- that is the

 5   process, as I recollect -- remember it.

 6           I think the focus, generally, was

 7   get us out completely, which they knew I

 8   couldn't do.  And so I spent a lot of time

 9   trying to get them out completely.

10       Q.   So earlier you said we had a

11   couple of outside investors who were

12   willing to push forward; is that correct?

13           MS. PARKS:  Objection.

14   BY MR. MAYRON:

15       Q.   Maybe I'll rephrase it.

16           Beginning in November of 2021,

17   you spoke with outside investors to

18   refinance the Ebury companies' debt?

19       A.   Yes.

20       Q.   Who are those investors?

21       A.   We got -- we had a pool of

22   roughly 13, and it was in a document that

23   we would -- that I would submit weekly to

24   the bank, and the bank had a -- kind of a

25   workout group.  I forget their -- I forget
```

684

J. Hanratty

2     the name of their company.

3              Ultimately, the two best options

4     would have been Sheridan Capital

5     Management, and they were going to do a

6     loan jointly with a company called Ovation,

7     which is a company that two ex-Capital One

8     guys work for.  And one is Troy Ritter.

9     And then a fellow by the name of Josh.  I

10    think his last name is Bullock.  He was a

11    Capital One person who left before I got

12    there.

13             We also talked to the company

14    called Summit and who was -- I don't --

15    they were -- they had called Karen a couple

16    of times, but I don't know how that -- that

17    would have been tough to get done.

18             The last viable option was of a

19    person who put in a lot of time was -- oh,

20    what the heck is his name?

21        Q.   Sachin --

22        A.   Sachin Sarnobat, who I had

23    dealings with at his prior company, which

24    is also blanking.  I apologize.  And I

25    think his --

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
24-04020-dsj                                                                          RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY    Court Records    Pg 1448 of 2230    John Hanratty
                                                                                       June 21, 2023

1              J. Hanratty

2        Q.   Is it 400 Capital?

3        A.   400 Capital.  Thank you.

4             And so we had a lot of back and

5    forth.

6             He ended up having to pull out

7    because I think right around the time when

8    it was kind of term sheet time and to push

9    forward, like the interest rates all went

10   kind of wonky.  So he was like I got to

11   reprise -- he was like, bandwidth-wise, he

12   had to reprice all of his deals.  And so it

13   just didn't work out from that perspective.

14            Another group was called Old

15   Hill, which I had gone out to prior to

16   anything prior to the default.  That guy,

17   Peter -- Peter -- last name is escaping me,

18   but he had -- he was in the process of

19   selling his business.  We circled back to

20   him a little bit too late in the game, and

21   he was picking up where he left off when

22   things kind of went -- actually, I think

23   right when Emigrant decided to do the term

24   sheet that I signed.

25       Q.   Had any of these lenders

686

J. Hanratty

1    completed due diligence?

2         MS. PARKS:  Objection to form.

3         THE WITNESS:  Sure.

4         MS. PARKS:  Go ahead.

5    A.    Sheridan.  Sheridan had

6    engaged -- I forget the name of their

7    diligence company -- and taken -- you know,

8    had done -- I forget the process they were

9    doing.  But they were looking at it first

10   that the REO -- and then from there they

11   worked on smaller assets, which are like

12   the liens.

13        Q.    So Sheridan hadn't completed

14   their due diligence?

15        MS. PARKS:  Objection.

16   A.    They had -- I don't know if they

17   were finished, but they had engaged a third

18   party.  We had gotten the name at one point

19   in time.  I can't remember what that is.

20   But I think they had written -- it wasn't a

21   term sheet.  It was like a Letter of Intent

22   or something along those lines.

23        Q.    Why did the Sheridan deal fall

24   through?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1234
RECEIVED NYSCEF: 01/12/2024

687

J. Hanratty

2    A.    I don't think it fell through

3    inasmuch as I think kind of -- at the kind

4    of end -- well, something happened which

5    I'm not privy to.  We were -- we had made

6    an offer of the term sheet that we

7    ultimately signed many months I think

8    before us getting term sheets in from the

9    outside investors.

10         And then Karen, Karen Wold, kind

11    of disappeared from the phone calls.  We

12    took a week or two-week break I think while

13    Emigrant dealt with whatever was happening

14    internally.

15         We came back online with Chris

16    Stout, and then within a week, we had a

17    term sheet kind of banged out and ready to

18    go.  And so I think they opted to not push

19    forward with any of the outside capital.

20         And so I think that's the process

21    that I recall.

22    Q.    And why did the Summit deal fall

23    through?

24         MS. PARKS:  Objection.

25    A.    The Summit deal fell through,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1451 of 2230
RECEIVED NYSCEF: 01/12/2024
John Hanratty
June 21, 2023

688

J. Hanratty

2   they weren't really -- I don't think --

3   they weren't really -- they were like a

4   deal, like, aggregator, and they bring all

5   their deals to Fortress.  And so Fortress

6   is a large tax lien group.  I had spoken to

7   that tax lien group about -- I think Andrew

8   Adler had shown them my portfolio in like

9   '18 as a potential just sell this whole

10  thing and, you know, reboot.  And they were

11  like -- they're not going to bid -- they're

12  not -- a price wouldn't have worked.

13          And then when you factor in

14  having to pay Summit, pay Fortress.  So I

15  think I ended up talking to the principal

16  of Avenue and be like we can circle back if

17  we get kind of super desperate --

18          (Reporter clarification.)

19      A.   Kind of circle back if we had

20  gotten to a point where there are no other

21  options, because I didn't want them to do a

22  ton of work when I knew what the results

23  would be.

24      Q.   And then why did the 400 Capital

25  deal fall through?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1327
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1452 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

689

                    J. Hanratty

1

2       A.   I think as we chatted, I think

3   /SAURB -- I think the interest rates

4   started going against -- or started

5   escalating pretty high at that time, and so

6   I think /SAURB, from what I recall, every

7   portfolio manager had to kind of reprice

8   their current deal flow, and I think he

9   wasn't even -- you know, he had never -- I

10  didn't get a term sheet from him, but he

11  was definitely -- he does a ton of work

12  himself.  He's a pretty bright guy.

13          And so I think he gets it to a

14  point in order to propose a deal, so his

15  credit folks -- but I think he was like,

16  look, I got to reprice a bunch of deals and

17  yours is end of the line.

18      Q.   And then why did the Old Hill

19  deal fall through?

20          MS. PARKS:  Objection.

21      A.   I think when Peter got backed up

22  after his sale, I think he -- I recall him

23  saying, at least to this guy named Skip

24  Pierce, who was the banker on it, I think

25  he said, "Look, this has been out there for

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
EMIGRANT BUSINESS CREDIT    Court Records    Pg 1453 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

24-04020-dsj

690

```
 1                     J. Hanratty

 2    a while."  He took that to be an indication

 3    of it being a bad, a bad credit.  I don't

 4    know if he wrote that or said that or if

 5    Skip said it, but that's kind of what I

 6    recall.

 7              There was one other group out of

 8    Boston that I can't -- I don't remember the

 9    name of.

10         Q.   Do you know why that group's deal

11    fell through?

12              MS. PARKS:   Objection.

13         A.   That one fell through -- that was

14    really just I think the -- they were big

15    lenders to REO and a bunch of -- actually,

16    one of the companies that I did a loan with

17    that I don't have any debt with anymore

18    that they were a backer of, and I think for

19    them they are like just, generally

20    speaking, when you bring a lien book to

21    credit groups, it's a lot of work and a lot

22    of low dollar amount things.  And so I

23    think they were like, putting in the work

24    to take out -- refi somebody -- and at that

25    time I wasn't going to commit to doing more
```

691

J. Hanratty

1

2    lien -- they wanted like an ongoing thing

3    is what I recall.  And I was like -- at

4    that point, I'm like, I kind of just want

5    to cap this and call it a day.

6        Q.   So you told Ms. Parks that you

7    ultimately came to an agreement with

8    Emigrant, that agreement fell through?

9           MS. PARKS:   Objection.

10       A.   Yes.

11       Q.   And by "agreement," you're

12   referring to a term sheet?

13          MS. PARKS:   Objection.

14       A.   Yes.  Yes.

15       Q.   And the term sheet was a

16   nonbinding term sheet that did not impose

17   any obligations on Emigrant?

18          MS. PARKS:   Objection.

19       A.   Yes.  It was 100 percent non- --

20   well, they didn't even execute it.  So even

21   if it was binding, they didn't sign.

22       Q.   So to confirm, Emigrant never

23   executed the term sheet?

24       A.   Not that I saw, no.

25       Q.   And even then the term sheet

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. 117   24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
Court Records   Pg 1455 of 2230

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
John Hanratty
June 21, 2023

692

```
 1                    J. Hanratty

 2   represented only a summary of the proposed

 3   amendment to the credit agreements?

 4           MS. PARKS:  Objection.

 5       A.   Yes.  It was in term sheet form.

 6           MS. PARKS:  You may be done, but

 7   I'll just state for the record here that I

 8   think you've gone a bit over 7 hours

 9   probably at this point.  If you think you

10   have pretty limited follow-up --

11           MR. MAYRON:  I just have one

12       more.

13           MS. PARKS:  Okay.

14           MR. MAYRON:  That's fine if it's

15       fine for Ms. Arlequin, who has had a

16       long day.

17   BY MR. MAYRON:

18       Q.   You said Mr. Tropp is willing to

19   loan you $11 million?

20       A.   Yes.

21       Q.   And in addition, he's willing to

22   pay you approximately $3 million for your

23   shares in Triumph Energy?

24       A.   Yes.

25       Q.   That's it for me.
```

693

J. Hanratty

1      A.    Not the total amount -- back it

2    up.  He's going to lend $10 million.  So

3    for the current offer, the 12-and-a-half

4    portioned from my sale, and a portion is a

5    loan against the -- to replace Emigrant as

6    a senior secured on all the assets for a

7    total dollar amount of 12-and-a-half.

8      Q.    Did Mr. Tropp ever communicate a

9    willingness to loan you $11 million?

10          MS. PARKS:  Objection.

11     A.    He's communicated a willingness

12   to loan me $10 million.

13     Q.    And in addition to that loan of

14   $10 million, he's communicated a

15   willingness to pay you $3 million for your

16   shares of Triumph Energy?

17     A.    Yes.

18          MR. MAYRON:  That's it.

19          (Continued on following page to

20          include jurat.)

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 113
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records   Pg 1457 of 2230
JOHN ARTHUR HANRATTY

John Hanratty
June 21, 2023

694

1              J. Hanratty

2          MS. PARKS:  Okay.  Cool.  We're

3      done.

4          THE VIDEOGRAPHER:  The time is

5      8:10 p.m.  We are off the record.

6

7

8          _____.

9              JOHN HANRATTY

10

11

12   Subscribed and sworn to before me

13   this   day of         2023.

14

15   _____

16

17

18

19

20

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT — Court Records   Pg 1458 of 2230   John Hanratty
JOHN ARTHUR HANRATTY   June 21, 2023

695

```
 1

 2                    C E R T I F I C A T E

 3

 4    STATE OF NEW YORK         )

 5                        : ss.

 6    COUNTY OF NEW YORK        )

 7

 8            I, ANNETTE ARLEQUIN, a Notary

 9       Public within and for the State of New

10       York, do hereby certify:

11            That JOHN HANRATTY, whose

12       deposition is hereinbefore set forth,

13       was duly sworn by me, and that the

14       transcript of such depositions is a

15       true record of the testimony given by

16       such witness.

17            I further certify that I am not

18       related to any of the parties to this

19       action by blood or marriage; and that I

20       am in no way interested in the outcome

21       of this matter.

22            IN WITNESS WHEREOF, I have hereunto

23       set my hand this 22nd day of June 2023.

24       _____

25          ANNETTE ARLEQUIN, CCR #30XI00145000
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO. ___          Courts Records    Pg 1459 of 2230          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT                                              John Hanratty
JOHN ARTHUR HANRATTY                                                  June 21, 2023

696

```
 1

 2                    I N D E X

 3     WITNESS                         PAGE

 4

 5     JOHN HANRATTY

 6        BY MR. MAYRON              350,678

 7        BY MS. PARKS              663

 8

 9        I N D E X   O F   E X H I B I T S

10     DESCRIPTION                     PAGE

11
       Hanratty Exhibit 34, Assignment      351
12     of Tax Sale, not Bates-stamped

13
       Hanratty Exhibit 35, Document         363
14     titled "Making an Apparently
       Sworn False Statement in the
15     Second Degree," not Bates-stamped

16
       Hanratty Exhibit 36, Assignment      366
17     of Tax Sale, not Bates-stamped

18
       Hanratty Exhibit 37, Assignment      375
19     of Tax Sale Certificate

20
       Hanratty Exhibit 38, Notice of       391
21     Borrowing Ebury 1EMI LLC, dated
       11/9/2018, Bates-stamped
22     EBCC_4965

23

24

25     I N D E X   O F   E X H I B I T S(Cont'd.)
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                    Court Records    Pg 1460 of 2230          RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                                                                          John Hanratty
                                                                          June 21, 2023

697

DESCRIPTION                                    PAGE

Hanratty Exhibit 39, Transaction         399
Report for the Capital One
account for Ebury Fund 1 ending
in 0698

Hanratty Exhibit 40, Notice of           410
Borrowing Ebury 1EMI LLC, dated
5/17/2019

Hanratty Exhibit 41, Notice of           420
Borrowing Ebury 2EMI LLC, dated
9/13/2019

Hanratty Exhibit 42, Electronic          424
Transaction Report for Ebury Fund
2 LP's Capital One account ending
in 0744

Hanratty Exhibit 43, First               426
Amended Verified Complaint

Hanratty Exhibit 44, Final               437
Approval Memo for Ebury Street
Capital, Bates-stamped EBCC_16740
through 16767

Hanratty Exhibit 45, Ebury Street        445
Capital, LLC Informational
Materials, Bates-stamped
EBCC_16645 through 16659

Hanratty Exhibit 46, Capital             447
History Timeline, Bates-stamped
EBURY_3279

   I N D E X   O F   E X H I B I T S(Cont'd.)

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
EMIGRANT BUSINESS CREDIT Court Records    Pg 1461 of 2230    John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023
RECEIVED NYSCEF: 01/12/2024

698

```
 1

 2     DESCRIPTION                          PAGE

 3     Hanratty Exhibit 47, Email chain      460
       beginning with email dated
 4     5/14/2019 from J. Hanratty to
       Chee-How and others,
 5     Bates-stamped EBURY_71440 through
       71445
 6

 7     Hanratty Exhibit 48, Email chain      465
       beginning with email dated
 8     7/30/2018 from J. Hanratty to F.
       Gandol and P. Xie, Bates-stamped
 9     EBURY_23926 through 23928

10

       Hanratty Exhibit 49, Email chain      476
11     beginning with email dated 8/3/22
       from J. Hanratty to M. Colon and
12     D. Mendez, Bates-stamped
       EBURY_43029 through 43030
13

14     Hanratty Exhibit 50, Ebury Fund       486
       1, L.P. and Subsidiaries
15     Consolidated Financial Statements
       and Independent Auditor's Report
16     for year ended 12/31/2019,
       Bates-stamped EBCC_10663 through
17     10682

18

       Hanratty Exhibit 51, Ebury Fund       489
19     2, L.P. and Subsidiaries
       Consolidated Financial Statements
20     and Independent Auditor's Report
       for the year ended 12/31/2019,
21     Bates-stamped EBCC_10701 through
       10720
22

23     Hanratty Exhibit 52, Email dated      512
       9/30/2019 from J. Hanratty to J.
24     Grady, Bates-stamped EBCC_5705

25        I N D E X   O F   E X H I B I T S(Cont'd.)
```

EMIGRANT BUSINESS CREDIT                Court Records    Pg 1462 of 2230                John Hanratty
JOHN ARTHUR HANRATTY                                                                    June 21, 2023

699

```
 1

 2    DESCRIPTION                          PAGE

 3    Hanratty Exhibit 53, Validity        516
      Guaranty Agreement, Bates-stamped
 4    EBCC_22650 through 22657

 5
      Hanratty Exhibit 54, Email chain     525
 6    beginning with email dated
      9/20/2019 from J. Grady to P.
 7    Seymour and B. Ilsen,
      Bates-stamped 24340 through 24341
 8

 9    Hanratty Exhibit 55, Email           549
      voicemail dated 9/20/2019 from
10    RingCentral to P. Seymour,
      Bates-stamped EBURY_505514
11

12    Hanratty Exhibit 56, Audio file      550

13
      Hanratty Exhibit 57, Email chain     555
14    beginning with email dated
      8/12/2019 from J. Hanratty to P.
15    Xie and others, Bates-stamped
      EBURY_59765 through 59775
16

17    Hanratty Exhibit 58, Email chain     557
      beginning with email dated
18    7/29/2022 from A. Berman to D.
      Mendez and others, Bates-stamped
19    EBURY_43022 through 40325

20
      Hanratty Exhibit 59, Email dated     568
21    5/7/2020 from T. Thomason to J.
      Hanratty, Bates-stamped
22    EBURY_53185

23

24

25       I N D E X   O F   E X H I B I T S(Cont'd.)
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024
EMIGRANT BUSINESS CREDIT
JOHN ARTHUR HANRATTY
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Courts Records    Pg 1463 of 2230
John Hanratty
June 21, 2023

700

| | DESCRIPTION | PAGE |
|---|---|---|
| | Hanratty Exhibit 60, Email chain beginning with email dated 9/13/2019 from T. Thomason to J. Hanratty and others, Bates-stamped EBURY_29017 through 29022 | 572 |
| | Hanratty Exhibit 61, Email chain beginning with email dated 2/12/2021 from J. Hanratty to R. Bedford, Bates-stamped EBURY_9590 through 9599 | 600 |
| | Hanratty Exhibit 62, Electronic file consisting of spreadsheet listing investor balances as of April 2019 | 622 |
| | Hanratty Exhibit 63, Electronic file consisting of spreadsheet listing investor balances as of April 2019 | 629 |
| | Hanratty Exhibit 64, Electronic file | 643 |
| | Hanratty Exhibit 65, Credit Agreement between Emigrant business Credit Corporation and Ebury 2 EMI LLC | 648 |

701

```
1

2              * * ERRATA SHEET * *

3    OUR ASSIGNMENT No. 2023-899116

4    CASE CAPTION: EBCC v. JOHN HANRATTY, ET AL.

5      * DECLARATION UNDER PENALTY OF PERJURY *

6          I declare under penalty of perjury

7    that I have read the entire transcript of

8    my deposition taken in the above-captioned

9    matter or the same has been read

10   to me, and the same is true and accurate,

11   save and except for changes and/or

12   corrections, if any, as indicated by me on

13   the ERRATA SHEET hereof, with the

14   understanding that I offer these

15   changes as if still under oath.

16             Signed on the _____ day of

17   _____ 2023

18   _____
              JOHN HANRATTY
19

20             Subscribed and sworn to on the

21   _____ day of _____ 2023 before me.

22

23   _____

24   Notary Public, in and for the State of

25   _____.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.          Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

EMIGRANT BUSINESS CREDIT Court Records     Pg 1465 of 2230                    John Hanratty
JOHN ARTHUR HANRATTY                                                         June 21, 2023

702

1

2          * * DEPOSITION ERRATA PAGE * *

3

4    Page No._____ Line No. _____ Change

5    to:_____

6    _____Reason for

7    change:_____

8

9    Page No._____ Line No. _____ Change

10   to:_____

11   _____Reason for

12   change:_____

13

14   Page No._____ Line No. _____ Change

15   to:_____

16   _____Reason for

17   change:_____

18

19   Page No._____ Line No. _____ Change

20   to:_____

21   _____Reason for

22   change:_____

23

24

25

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

EMIGRANT BUSINESS CREDIT Court Records    Pg 1466 of 2230    John Hanratty

JOHN ARTHUR HANRATTY    June 21, 2023

703

```
 1
 2       * * DEPOSITION ERRATA PAGE(Cont'd.) * *
 3   Page No._____ Line No. _____ Change
 4   to:_____
 5   _____Reason for
 6   change: _____
 7
 8   Page No._____ Line No. _____ Change
 9   to:_____
10   _____Reason for
11   change:_____
12
13   Page No._____ Line No. _____ Change
14   to:_____
15   _____Reason for
16   change:_____
17
18   Page No._____ Line No. _____ Change
19   to:_____
20   _____Reason for
21   change:_____
22
23   SIGNATURE:_____DATE:_____
24            JOHN HANRATTY
25
```

## #

**#30XI00145000** 695:25

## $

**$1.2** 416:11 417:15 418:6 420:3

**$1.8** 680:19

**$10** 405:4 510:23 668:8 693:3,13,15

**$10,770,836** 495:10

**$11** 661:24 692:19 693:10

**$12.5** 676:13

**$150,000** 405:16

**$160,000** 627:18

**$17** 496:8,15 497:17 498:8,15 499:8 510:15

**$18** 675:16,25

**$19** 404:17

**$195,917.66** 397:14

**$2** 627:15,22 667:17

**$20** 405:3

**$20,000** 619:17

**$21** 404:13 671:15

**$220,000** 392:9 395:4 398:6,19 400:5,15

**$222,373.53** 397:24 398:4

**$236,432.78** 397:19 401:23 402:10, 13

**$288,810.67** 400:21 401:4

**$3** 610:13 692:22 693:16

**$3,425.72** 645:12

**$3.5** 409:13

**$32** 510:17

**$34,000** 653:23

**$34,017.62** 646:18 653:16,24

**$35.7** 679:10

**$40,515.12** 397:8

**$400,000** 619:4

**$432,000** 419:13

**$5** 403:18 413:8 415:4 470:18 667:19 668:21 669:21

**$5,325,290.85** 625:14

**$500,000** 500:10

**$6,466,903** 496:2

**$7** 668:12

**$700** 620:18

**$700,000** 618:21

**$746,648.07** 656:5 658:4

**$750,000** 425:2

**$8** 628:17

**$850,000** 424:16 425:9

**$860,000** 416:6 418:4

**$864,213.42** 420:7

**$900,000** 410:17,19

**$931,669.03** 409:19

## 0

**0698** 399:11,16 697:4

**0744** 424:5,13 697:12

## 1

**1** 374:13 392:10 399:11,15 400:11,13 402:18 413:7,25 414:5,7,17 418:8 486:20 487:8 495:19 535:22 536:4,7 540:23 569:3,5 570:3 571:15 572:3 630:13,23 631:9,22 646:5 697:4

**1's** 495:24

**1,491** 399:20,21 400:18

**1,494** 399:25

**1.1X** 652:5

**1.3** 409:7

**1.7** 408:20

**10** 404:22 646:7 662:9 668:24

**10-million-dollar** 585:4

**100** 435:2 436:9 451:3 623:10 624:9 625:9 631:25 634:16 635:9 638:18 639:11 641:23 678:23 691:19

**10021** 349:11

**10632** 414:19

**10663** 486:12,15

**10666** 487:12

**10667** 495:21

**10670** 487:24

**10682** 486:24 698:17

**1070** 488:24

**10701** 489:14

**10704** 490:11

**10705** 495:6

**10708** 494:23

**10720** 489:23

**10:14** 349:7

**11** 661:8 662:2,6,7

**11/9/2018** 391:22

**110,000** 419:20

**11877** 399:3 415:22

**11878** 423:22 424:7

**11:13** 395:10

**11:23** 395:14

**11:57** 587:20

**12** 354:4

**12-and-a-half** 661:14 693:4,8

**12.5** 676:16,19

**12/31/18** 573:4 597:20

**12/31/2019** 486:23 489:22 698:16,20

**125** 349:9

**12:30** 444:15

**12th** 555:17

**13** 422:17 644:9 682:23 683:22

**13th** 396:12 419:10,11 421:6,9 587:18,19 589:14 644:25 651:21,22, 24 654:16 655:6,16 656:4 657:14

**14** 374:4 397:24 398:2 500:25 622:11 655:7 682:21,23

**14-million-dollar** 661:9

**145** 641:24

**148** 639:18

**1491** 400:22

**15** 374:4 375:24 438:7 448:8 514:18 682:21

**15-million-dollar** 438:19

**150,000** 670:23

**16** 374:4

**16-million-dollar** 628:15

**16645** 445:14

**16659** 445:21 697:20

**16740** 437:11

**16742** 438:5

**16746** 439:3

**16749** 440:2

**16755** 440:24

**16760** 442:2

**16767** 437:19 697:17

**16th** 645:8 647:10 651:16,19

**17** 374:4 413:18 496:22 499:13,16 509:9 512:12 584:23

**1729** 416:2,5

**1730** 416:11

**1732** 416:13,16,22 417:19

**17th** 408:7 411:25 415:12

**18** 374:3 512:12 514:21 531:16 534:20 576:20 584:24 616:22 688:9

**18741** 629:13

**19** 534:12,14,16,21 574:5 576:21 577:3 584:24,25 585:23 616:23 617:16 631:3 635:5

**1:23** 445:3,10

**1:24** 445:9

**1EMI** 391:21 410:7 696:21 697:6

**1st** 375:15 650:4,7,11

---

**2**

**2** 353:12 413:24 414:2,3,12,17,23 416:10 420:8 421:6,10 423:6 424:3, 12 489:19 490:6,16,21 494:23 495:8 500:9 517:11 518:25 536:8,12,16,19 537:9 540:23 624:12,20 625:19 626:2 637:12 643:24 644:17 645:4,5 648:12,21,23 653:4,6 670:7 671:3 697:12 698:19 700:20

**2's** 490:12

**2.8** 494:24

**2/12/2021** 600:25 700:8

**20** 434:24 435:16 515:7 577:3 584:24 617:17 631:3,4

**2000** 375:24 387:4 534:12 584:4 613:21

**2011** 645:9 647:10,13,19 650:4 651:17,19

**2012** 435:7,11

**2014** 650:7 654:17 655:6 656:4

**2015** 375:15 376:16 464:17 468:12

**2015049245** 375:5

**2016** 433:21 446:9 650:11

**2017** 371:21 372:16,23 373:2,10,24 374:3 382:21,24 383:10,16 433:21 439:17 444:3 448:6 521:16 623:15 652:20 666:25 667:8,12,19,21 671:15 679:10,14

**2018** 355:8 356:4,14 384:9 387:8,16 392:21 394:16,18 395:4 396:2,24 397:2 400:7,15 404:12,23 413:7 414:7,12,14,18,25 415:8 448:13 455:10 457:22 464:9,23 465:23 467:10,18,22 471:17 473:17 513:9, 17,21 514:7,19 515:6,13 556:9 578:2, 15 579:7,13,25 581:5,13 582:22 583:11,18,25 585:18,21 586:8,10 587:24 589:19 592:6,25 595:3 599:10 603:12 606:17 634:18 637:10 667:24 668:6,9,13 680:4,6

**2019** 404:12,24 408:7 411:25 413:6, 19 415:13 419:10,12 421:7,10 422:2, 17 448:13 457:22 461:2 483:5 487:9 488:2 490:8 492:11,23 493:15 494:6, 25 495:7,14,20 496:2,6,14 497:2,12, 16 498:5,12 499:7 501:20 503:5,24 504:11 505:7,22 506:7 507:13 509:8 513:4,23 514:5,9,22 515:3,17,18 526:2 527:19 532:12 534:12 537:16 538:5,20 545:12 546:24 547:21 548:7,14,22 549:5 550:2,4 553:11 555:17 572:19 573:21 574:13,25 576:14 578:2,12,16 579:7,13,25 581:2,6,13 582:22 583:11 584:5 585:14,22 586:10 596:4 597:7 598:11 606:17 609:8 612:4 613:13,18,22 614:5,9,11,12,17 615:10,18,23 622:21 629:22 630:4,21,24 634:18 644:10,11,25 651:21,22 654:16 655:16 657:14 659:11 668:15,21,24 669:2 700:12,15

**2020** 476:15,22,25 477:4 478:22 480:11,20 481:18 483:21 485:23 486:3 515:23 516:5 568:16 569:5,7 612:13 669:6,13,19 679:10 680:14, 16,19

**2021** 391:10 476:11 485:23 491:3

**494:11** 501:21 509:17 537:2,10 538:13 601:10 606:21,23,25 607:11, 19 608:17 615:11,18,24 616:18 617:14 620:21 670:3 674:13 683:16

**2022** 476:9 477:3 480:11,21 485:24 670:11,16 671:3,5,8

**2023** 349:6 405:11 485:22 670:20 671:8 694:13 695:23 701:17,21

**2023-899116** 701:3

**20th** 425:14 471:23 526:2 532:12 545:12 546:24 547:21 548:3,6,14,22 549:5 550:2,4 553:11

**21** 488:16

**210.35** 362:23

**21st** 349:6 509:17

**22** 560:7 630:21

**220,000** 400:19 679:16

**223,3** 398:3

**22650** 516:9 518:11

**22651** 517:11

**22657** 516:15 699:4

**22nd** 601:10 695:23

**236** 397:21

**23926** 465:9

**23928** 465:17 698:9

**23rd** 372:16 373:10

**24** 558:17 649:13,18,23 650:8,21 652:22

**24340** 525:12,19 699:7

**24341** 525:20 699:7

**25** 457:22 458:5

**25th** 608:17 615:11,18 616:17 617:14

**2656** 366:19

**26th** 620:21

**29017** 572:6 587:4 590:16

**29018** 572:22 590:19

**29022** 572:14

**2:21** 489:7

**2:31** 489:10

**2EMI** 420:20 697:9

**2NJ** 353:6,8 356:19 357:16 359:3 364:14 366:17,22,25 367:3,8 368:24

---

369:2 370:9 373:4

---

### 3

**3-million-dollar** 510:22

**3.1** 488:3

**3.2** 409:24

**3.4** 409:24

**3.7** 679:15

**30** 500:21

**30-million-dollar** 502:14

**30-month** 675:17 676:2

**300,000ish** 618:23

**30th** 513:4,22 514:5,9 515:18

**31** 599:10

**31st** 495:14 496:2,6,14 497:16 498:5, 12 499:7 583:18,24 585:18 586:8 587:24 589:19 592:5,24

**32** 414:20 503:14 509:17 510:21

**3279** 447:3

**32W** 503:5

**332** 647:4

**34** 351:4,5 364:8,13 384:8 385:18 696:11

**34,17.62** 653:16

**35** 363:2,3 696:13

**350,000** 416:10

**350,678** 696:6

**351** 696:11

**36** 366:5,6 383:3 649:15,18,25 650:6, 15,24 652:22 696:16

**363** 696:13

**366** 696:16

**37** 375:8,9 696:18

**373** 398:3

**375** 696:18

**37th** 349:10

**38** 391:19,20 398:9 696:20

**39** 399:6,9 415:20 697:3

**391** 696:20

**399** 697:3

**3:19** 526:19

**3:30** 526:22

**3rd** 476:9 477:3 480:11,21

---

### 4

**4** 396:18,19,22

**40** 410:5,6 411:5 595:12 660:18 671:17 697:6

**400** 685:2,3 688:24

**400,000** 671:13

**40325** 558:5 699:19

**41** 420:18,19 697:8

**410** 697:6

**42** 423:25 424:2 697:11

**420** 697:8

**424** 697:11

**426** 697:14

**43** 426:3,4 697:14

**43022** 557:21

**43024** 558:9,16

**43029** 475:21

**43030** 476:6 698:12

**437** 697:16

**44** 437:16,17 697:16

**445** 697:19

**447** 697:22

**45** 445:17,18 447:20 671:17 697:19

**46** 447:6,7 457:21 623:14 697:22

**460** 698:3

**465** 698:7

**47** 460:12,13 698:3

**470,000** 409:2

**470,0000** 408:25

**476** 698:10

**48** 465:12,13 471:20 472:6 698:7

**486** 698:14

**489** 698:18

**49** 475:24,25 476:2 623:10 655:7 698:10

**4965** 391:16

**4:27** 567:23

---

### 5

**5** 407:22 411:5 413:16 415:16,17 470:22 500:12 649:19 652:21 654:15 667:23 668:4 669:10,16,17 679:22 680:17

**5-million-dollar** 423:19

**5/14/2019** 460:14 698:4

**5/17/2019** 410:8 697:7

**5/7/2020** 568:10 699:21

**50** 486:18,19 495:18 501:15 627:11 698:14

**50514** 549:14

**50515** 550:10

**51** 489:17,18 501:15 624:9,13,14 698:18

**512** 382:19 698:23

**516** 699:3

**52** 512:21,22 625:9 698:23

**5218** 410:2

**5219** 407:20

**525** 699:5

**53** 516:12,13 699:3

**53185** 568:5

**5349716** 366:2

**5392866** 350:25

**54** 525:15,16 527:9 542:19 699:5

**549** 699:9

**55** 549:17,18 550:23 699:9

**550** 699:12

**551B** 603:15,25

**555** 699:13

**557** 699:17

**56** 550:11,12,23 624:10 699:12

**5614** 420:15

**5615** 419:6

**568** 699:20

**57** 486:10 555:8,9 699:13

**5705** 512:19

**572** 700:3

**58** 557:24,25 699:17

**59** 568:8,9 699:20

**59765** 555:4

**59775** 555:13 699:15

**5:06** 568:2

---

**6**

**6** 395:21,22 414:11 419:6 514:23 657:5,10,12,21 658:15

**6.4** 680:6,10

**6.6** 414:23

**60** 572:9,10 586:19 625:10 634:16 635:9 649:19 700:3

**60-million-dollar** 628:7

**600** 700:7

**61** 600:23,24 700:7

**619** 662:19

**62** 622:18,19 700:10

**622** 700:10

**629** 700:13

**63** 629:19,20 638:18 655:19 656:2 700:13

**638** 424:15

**64** 643:16,17 648:9 653:12 657:18,22 700:16

**641** 424:25

**642** 425:2

**643** 700:16

**648** 700:18

**65** 648:10 700:18

**663** 696:7

**685,000** 419:16

**69** 655:4,11,15

**6:17** 622:5

**6:28** 622:8

---

**7**

**7** 514:23 669:2 680:4,10 692:8

**7/29/2022** 558:2 699:18

**7/30/2018** 465:15 698:8

**70** 500:18

**71440** 460:9 461:8

**71441** 461:11

**71445** 460:17

**74** 641:23

**75** 586:19 639:11

**7:02** 647:25

**7:09** 648:4

---

**8**

**8** 414:16 513:19

**8-and-a-half** 628:5

**8/12/2019** 555:10

**8/3/22** 476:3 698:11

**860,000** 416:9

**864** 420:13

**873,000** 420:11

**8844** 501:2

**8861** 501:5

**8862** 502:6

**8863** 503:4

**8:10** 694:5

---

**9**

**9** 414:6

**9/13/2019** 420:21 572:11 700:4

**9/20/2019** 525:17 549:19 699:9

**9/30/2019** 512:23

**90** 673:15

**90D** 635:5,7,11

**90F** 637:8

**93** 638:19 639:2

**931** 409:23

**9343** 643:13 651:15 653:5

**95** 439:9

**9590** 600:20

**9592** 620:20

**9593** 608:15

**9594** 610:2 616:5

**9599** 601:3,8,11 602:8 700:9

**9834** 648:8

**9879** 648:25

**9th** 356:14 392:21 394:15 395:4 396:2,9,24 397:2 400:7,15

---

**A**

**a.m.** 349:7 395:10,14 587:20

**ability** 453:18 487:14 490:12 541:3 582:12 672:3,8 681:10

**above-captioned** 701:8

**abruptly** 430:13

**absence** 491:12

**AC** 645:7 647:7 651:16 654:10,11

**accepted** 677:6

**access** 620:7 672:25

**accomplish** 459:13

**accordance** 392:17

**account** 373:17 399:10,15 405:17 406:22 424:4,12 463:10 605:11 620:17 697:4,12

**accountants** 482:25

**accounted** 615:20

**accounting** 470:3 481:15 493:5,12 494:10 573:13,16

**accounts** 373:24,25 374:14,15,17

**accrete** 681:15

**accreted** 681:19

**accrue** 681:7,15

**accrued** 502:11,19,22

**accurate** 381:11 432:17 520:15,20 521:8 522:10,12 550:6 602:20 680:11,12 701:10

**accused** 661:20

**acknowledge** 461:22 674:9 680:12

**acquire** 398:15,17 402:9,12 409:7 534:10

**acquired** 397:8,13 408:20,25 409:6, 24 419:14,21 645:8 647:7,9,12,14

---

INDEX NO. 158207/2022
NYSCEF DOC. NO. 218 RECEIVED NYSCEF: 06/21/2024
FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
ENGAGEMENT/BUSINESS Certified 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State
JOHN ARTHUR HANRATTY Court Records Pg 1471 of 2230 John Hanratty
June 21, 2023

651:19 652:2 655:5,15

**acquiring** 408:25 571:18 627:12 672:11

**acquisition** 627:8,10 652:12,13 656:19 657:24

**act** 464:19

**acting** 664:24

**action** 695:19

**active** 362:13 441:9 464:11,18,21,24 465:4

**actively** 464:14

**actual** 360:22 383:21,24 386:7,20 469:12 631:7

**add** 570:24 580:3 619:3

**added** 536:24 590:11

**adding** 401:23 537:8 570:25 609:5 649:18

**addition** 360:21,25 369:16 408:18 456:19 583:3,6 626:10 632:10 642:10 692:21 693:14

**additional** 369:14 406:8 459:18 470:6 486:6 580:6 618:25 626:13 633:5 643:8 649:6 661:11

**additions** 397:7,18,21,22 409:10,16 419:25 420:5 643:23 644:17 645:4 653:6

**addresses** 574:20,24 576:12 619:7

**adequate** 430:6

**Adkins** 558:10,20

**Adler** 387:22 624:3 688:8

**administrator** 601:18,21,22

**admit** 666:16

**admitted** 362:6,9

**advance** 457:5 469:15 470:25 619:8, 9,10,20,24 620:3,15 633:7

**advanced** 398:20 401:3,10 403:5,10 416:6 418:15 425:9 427:17 428:4 470:20 679:8,9

**advances** 403:20 404:6 425:16 470:3 475:13

**advancing** 402:3

**adverse** 393:9,23 412:19 423:4

**advice** 406:2,5 522:24

**advised** 406:7,20

**affect** 672:3 681:9

**affidavit** 362:19 427:10 632:4,6

**affiliate** 666:12

**affixed** 363:18,20 365:17

**age** 434:14 461:18 463:6 464:5,6

**aged** 436:20 442:13 449:11,22 450:7, 8 451:15 452:22 453:5 455:22 458:15,20 468:7,11

**agent** 386:5,20,23 388:17

**aggregate** 518:4,17 649:11

**aggregator** 688:4

**aging** 440:8,16

**agree** 352:19 354:23 358:19 359:16 381:6,10 382:21 383:8 384:8 440:13, 22 504:4 517:3 519:20 520:13 554:19 575:25 576:5 588:21 590:15 610:22 620:5 653:4 657:25

**agreeable** 621:2

**agreed** 417:15 510:9 517:5,21 518:3, 16 519:13,24 520:3,11 529:3 530:25 548:19 682:21

**agreed-to** 548:11

**agreement** 385:23 390:1,19 392:10,19 401:14 403:17 406:19 411:23 415:18 422:16 516:14 526:8,12 527:3,6,14, 16,23 528:7,12,25 529:8,9 530:2,4,6, 11 533:23 540:16 541:10 542:10 547:3 551:17 552:19 553:6 605:14 648:11,19,22 651:12 652:5,23 653:7, 12,18 656:12 674:15,16,24 675:11, 13,15,21,25 676:7 691:7,8,11 699:3 700:19

**agreements** 389:23 390:3,16 391:9 398:20 403:11 405:25 413:14 416:7 431:2 536:25 537:10 538:8,15 540:25 554:13,21 564:10 565:13 604:25 605:17,22 619:9 642:17 652:19 653:2,21 692:3

**ahead** 350:21 352:22 425:19 432:16 434:21 446:14 478:19 479:13 492:15 497:25 504:5 520:22 521:14 524:17 545:15 559:15 609:2 610:7 611:4 661:6 686:5

**Alabama** 611:13

**alert** 390:4

**Alex** 349:21

**alive** 641:7

**allegations** 634:14

**alleges** 624:10 625:10 634:17 637:9 638:6,19 639:12 641:24 643:2

**allowed** 401:9 436:12 474:24 544:24 547:22 548:7,14 604:24 627:7 633:10

**allowing** 550:18 551:4,10 552:12

**Alostar** 459:3,7,16 460:2,25 461:15 468:17 529:23 530:3 531:2 533:20 535:19 539:2 540:2 547:18 549:12 569:8 570:7 571:13 572:2 579:21 609:10 612:12,16 624:24,25 626:5 629:8 631:11 652:10,16

**alter** 636:3

**alterations** 637:2

**altered** 634:19 635:21 636:15

**altering** 636:21

**Altzman** 371:16,17,22 372:2,11 373:5,12,15

**amended** 425:22 426:5 622:25 633:22 634:5 653:19 656:13 697:14

**amendment** 535:4 537:3,4 538:12 554:12,21 652:25 653:10 656:14,18 657:24 692:3

**American** 435:3,14 437:3,7 531:9 533:5

**amount** 404:20 441:7 453:9 480:18 518:4,17 541:10 586:25 587:2 599:21,25 600:17 610:18 616:8,18 617:7,13 631:5 645:11 646:17 649:11 653:15,23 656:2,4,9 690:22 693:2,8

**amounts** 415:16 418:2,12 420:12 458:22 473:12 487:19 490:17 615:4 655:20 656:14

**and/or** 701:11

**Andrew** 387:22 624:3 688:7

**Anna** 558:11,21

**Annette** 350:9 695:8,25

**answering** 612:18 621:13 680:23

**anticipated** 436:24 472:17 603:2

**anticipation** 626:4

**anymore** 468:21 544:25 569:12 690:17

**apologies** 443:6 563:22 619:12 637:9 679:8

**apologize** 364:6 373:20 396:13 399:25 409:2 438:12 555:20 569:20

587:4 647:4 655:8 684:24

**apparently** 363:4,11 472:25 696:14

**appealing** 453:19

**appeared** 355:25 365:10 377:8

**appears** 361:8,11 370:19 376:23
377:19 380:15 384:25 392:14,23
393:6 401:7 404:10 408:10 410:22
416:8 420:13 421:13 427:20 501:17
514:4 519:18 542:9 547:4 593:25
632:25 653:12 655:17 656:8,21,22

**applicable** 393:3 412:9 422:22
517:18

**application** 628:10

**applied** 628:16

**apply** 352:4 367:22 412:6,16 421:25
422:13 627:2

**appoint** 552:8

**appraisal** 493:25 600:13

**appraised** 585:6

**appraisers** 493:8

**apprised** 483:19

**approach** 552:5

**approached** 373:5 637:11

**appropriately** 359:25

**approval** 437:12,18 548:4 658:10,11
697:16

**approved** 421:23,24 459:17 529:24
530:2 540:8 544:20 627:19 654:7
661:12 682:14

**approximately** 404:13 405:3 408:20
409:7,12 414:24 417:15 419:16,20
420:3 425:2 496:8,14 497:17 498:8,
15 499:8 508:11,20 509:9,17,25
510:16 514:18,23 515:7 531:11,14
571:14 625:13 637:12 668:3 669:9,21
671:9 676:2,3 679:9,16 680:15
692:22

**April** 622:21 629:22 630:4,21,24
700:12,15

**area** 459:20

**Arlequin** 350:9 692:15 695:8,25

**Arora** 569:20

**Arque** 446:20 450:4 464:17

**Arthur** 349:13

**ascertainable** 491:13

**asks** 454:20 587:20 589:15 597:17

**asset** 382:19 383:21 429:18 430:22
453:18 454:18 459:24 470:10 500:23
541:13,16 570:13,22 575:19,20,24
576:2 577:20,23,24 609:19 627:16
628:22 658:25 660:6,19 672:19,22

**assets** 376:4 378:2,10 382:13 430:2
431:17 435:3 446:18 448:24 449:20
455:2 529:10 530:19 538:16 539:22
540:4,7,12,16 541:3 583:17 592:20
594:5 602:4,12,17 611:23 625:12,18,
22,25 643:5,8 672:23 673:2 681:19
686:12 693:7

**assign** 353:14

**assigned** 354:3 469:10,23 471:3
599:16 624:11,20 625:19,25

**assigner** 366:21

**assigning** 353:20 367:4 376:4
602:22 631:12

**assignment** 350:23 351:5,14,15,19
360:19 365:7,24 366:6,14,16 367:22
369:13 375:4,9,14,17,19 376:2,12
378:22 380:18 384:23 385:16 387:6
470:7 696:11,16,18 701:3

**assignments** 354:12,23

**assignor** 366:11,17

**assist** 523:12

**assisted** 524:14 525:7

**associate** 349:23

**assume** 352:24 360:23 404:25 405:7
416:20 436:25 630:11 658:11 663:5
671:18

**assumed** 444:9

**assuming** 370:23 418:10 427:22
513:25 542:14,21 560:22 561:17
650:17 653:8 654:8 656:17

**assumption** 416:20 677:19

**assurances** 621:3,8,21

**Atlanta** 629:9

**ATR** 375:20,22,23 376:9,13 377:11,
14,18,23,25 378:5,10 381:13,14
382:2,8,10,14 388:18 446:20

**attach** 513:8

**attached** 353:15 368:17 550:7

**attempt** 428:17 509:5 626:12

**attempted** 601:19

**attempting** 459:4 591:14

**attention** 353:10 395:20 400:17
407:19 415:19,25 419:4 423:21
460:21 500:24 517:10 643:12 657:4

**attorney** 361:22,25 369:18 387:22
453:25 542:11 547:6 554:2 621:17
632:24

**attorney-client** 406:10 621:14

**attorneys** 406:6,7,20 553:19,21
554:5 632:22,23

**atypical** 663:3

**audio** 550:12,15,16,24 699:12

**audit** 413:11 414:9 415:9 458:12
482:16 483:22 487:6 490:7 496:22
497:19,20 498:10 501:7,12 502:2,10
503:19 509:14 514:2,21 515:3 568:20
615:20,23 631:4

**audited** 414:18 458:10 477:4,9
480:10,19,25 481:2,7,12,17 483:5,7
485:23 487:8 491:25 492:6,11,23
493:15 494:6 495:7,19,23 496:25
497:12,22 498:2,23 499:12 501:13,
20,25 503:23 504:11 505:7,22
508:10,19 509:24 510:14 511:24
513:17,21 514:7,16 515:5,12

**auditor** 476:11 479:16 484:9,14,18,
24 486:2,7 487:12,17 490:11,15
493:20 505:18,22 507:2 509:8

**auditor's** 486:22 489:21 504:10
505:6 698:15,20

**auditors** 482:6 486:7 495:7 506:7,16

**audits** 568:23

**August** 476:9 477:3 480:11,21
555:17 637:10

**Austin** 349:18 407:23 432:5 514:12
558:14 567:15 612:9 663:23 678:4

**Austin's** 562:19

**author** 654:5

**authorities** 629:4

**authority** 367:21 561:9 634:10
647:16 651:4,9 656:3,13

**authorization** 369:23

**authorize** 360:8 369:8 382:14

**authorized** 357:20 369:5 371:12
372:3 378:25 379:5 381:20 385:7,15
411:16 422:7

**auto** 405:20

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 203    RECEIVED NYSCEF: 01/12/2024

EMG040002BUSINESSCREDIT    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
JOHN ARTHUR HANRATTY    Court Records    Pg 1473 of 2230    John Hanratty
June 21, 2023

**availability** 397:24 398:2,5 409:18, 22 420:7,13 470:6,12 471:4 475:6

**avenue** 431:9 662:19 688:16

**avenues** 429:14

**average** 462:23 463:16 595:14

**aware** 360:11 363:9,24 390:8,10,15, 25 391:8 403:15,19 413:5 481:6,12 516:3 530:16 531:4 533:19 538:19 542:25 543:13 561:16 627:14 628:6 633:4 639:13 661:15,19

**B**

**back** 352:11 372:23 373:2 374:2 375:24 383:2 384:7 395:14 405:9,19 414:15 432:21 433:20 439:16 444:3 445:10 446:9 457:20 489:10 495:5,17 500:24 507:6 512:11 518:10 521:16 525:24 526:22 537:16 538:5 568:2 570:6,7 571:12 622:8 625:23 636:7 641:23 644:16 647:21 648:4 654:9 657:2 671:19 685:4,19 687:15 688:16,19 693:2

**backed** 689:21

**backer** 690:18

**background** 446:4 451:4

**backup** 545:23 552:8

**bad** 501:7 502:3 690:3

**bag** 449:8

**balance** 619:15

**balances** 622:21 629:22 630:4 700:11,14

**ball** 641:8

**ballpark** 667:11 669:16 678:13,17

**bandwidth** 582:19

**bandwidth-wise** 685:11

**banged** 687:17

**bank** 371:20 372:7,11,14 373:16,18 374:5,17,23 375:20 376:7,9,13 377:11,14,17 378:5,13,15,18 379:2,5 381:8,20,24 382:5 386:15 395:17 405:14,15 408:7 411:10 412:7,18 419:10 425:15 439:15 442:4 460:25 461:15 476:15,19,21,24 477:7,12,17, 23 478:9,23,25 479:9,20,25 480:3,8, 17 481:14 488:10 501:20 517:3 519:8,16,22 520:9,19 521:2,10 522:10 523:13 524:2,8,15 525:8 556:14 557:9 584:20 617:22 618:7,8

**Bank's** 379:17,23 380:4

**banked** 374:5

**banker** 640:23 641:4 659:14 689:24

**bankruptcies** 486:5

**bankruptcy** 482:4 484:2 659:20 660:17 674:4,7

**banks** 634:20

**bar** 362:7,10

**Barbara** 526:2 527:20 554:2

**bars** 362:14

**base** 393:24,25 395:25 396:23,25 397:18,23 401:21,24 408:5 409:11, 12,17 419:8 420:2,6 455:23 466:2 472:10 609:19 634:22 635:23 636:11, 14,17 637:5 643:3,8 644:7 646:21 653:22 654:2 657:13 658:2

**based** 370:3 390:22 397:22 398:4 409:16 420:5 427:9 437:2 449:17,19, 25 450:21 463:5 466:24 467:3 470:25 473:2 506:22 507:10,16 523:9 543:8 563:15 585:20 598:14 616:3 628:7 652:7 655:12

**basically** 470:24 521:18 624:3 627:10

**basis** 355:3 502:11,19,22 503:13 509:4 522:22 523:14,16 524:21,23

**Bates** 355:17

**Bates-stamped** 351:6 363:6 366:7 391:22 437:19 445:20 447:8 460:16 465:16 476:5 486:23 489:22 512:24 516:14 525:19 549:21 555:12 558:4 568:11 572:13 601:3 696:12,15,17,21 697:17,20,22 698:5,8,12,16,21,24 699:3,7,10,15,18,21 700:5,8

**BCMG** 627:6,7 631:24

**bear** 462:25

**bearing** 350:25 365:25 375:5

**bears** 421:7

**Bedford** 601:2,9,14,15 608:17 620:21 700:8

**began** 468:11 482:15 669:13 676:6

**begin** 406:19 464:23 570:2 571:15 650:24

**beginning** 374:4 457:10 460:14 464:9 465:14 476:3 525:17 555:10 558:2 572:11 600:25 683:16 698:3,7, 11 699:6,14,17 700:3,7

**begins** 461:7

**behalf** 349:19 357:21,25 359:7 360:9 369:6,7,9,24 370:5 372:4 379:2,6,8, 17,23 380:5 381:21 385:8,18 411:17, 20 422:8 638:21 639:6

**believed** 364:23 593:14 634:18

**believes** 363:16

**belongs** 660:7

**benefit** 453:17 470:22

**Berman** 558:3,22 699:18

**Beth** 425:3

**biased** 633:19

**bid** 688:11

**bidding** 450:25

**big** 450:13 541:12 690:14

**bigger** 386:19 447:24 628:4

**Bill** 660:23 661:10 662:7 673:19

**binding** 691:21

**bit** 381:14 437:8 454:5 457:6 488:22 550:20 551:6 577:10 685:20 692:8

**blanking** 684:24

**blends** 676:4

**block** 588:19

**blood** 695:19

**Bloxtrade** 354:11,21 357:11 358:5 386:24 603:15,18 604:8,9,14,15 610:14 611:7,18 613:7 641:2

**boilerplate** 386:2,7,13 388:9

**book** 434:3,12,18 443:15 459:25 503:18 510:22 530:18,21 532:3,18 541:20 543:12 544:12,16 549:10 550:19 551:5 620:11 624:4 681:14 690:20

**booked** 595:13

**books** 435:10,13 521:18 528:22 600:10 615:2

**borrow** 404:22 466:4,14 468:23 471:12 472:20,24 473:4,14,18,25 474:25 475:5 537:25 544:20,25 661:10

**borrowed** 404:17 405:4 418:3,12 539:20 671:16

**borrower** 392:19 393:11 412:21 422:15 469:11 539:9 540:10,15,22 660:6

**borrowers** 394:4 538:7 539:19 541:5

**borrowing** 391:21 392:7,9 393:5,19, 24,25 394:15,20,21 395:25 396:23,25 397:18,23 398:6,14 400:14 401:21,24 407:15 408:5 409:11,12,17 410:7,15, 16,18,21 411:11,24 412:5,11,16 419:8 420:2,6,20 421:4,5,10 422:24 423:12 455:23 466:2 472:10 475:9,15 609:19 634:21 635:23 636:11,14,17 637:5 643:3,8 644:7 646:21 653:22 654:2 657:13 658:2 661:13 696:21 697:6,9

**boss** 456:16 461:17

**Boston** 690:8

**bottom** 351:22 356:6 368:9 377:7 392:12 465:20 590:12,16,18

**bought** 461:19 624:5,8

**box** 523:21

**Boxtrade** 625:3

**break** 395:15 526:24 567:16,18,21 621:24 687:12

**bright** 689:12

**bring** 688:4 690:20

**Brinker** 425:23 426:10,14 427:16

**Brinker-cohen** 416:24 417:6,21 418:17,22

**Broad** 349:9

**broker** 359:23 603:5 605:2 607:6,24 608:5,10 638:3

**brokered** 382:3

**brokers** 493:9

**Bronzo** 387:21 422:3

**bucket** 570:20

**buckets** 460:4 583:8

**budgeting** 683:2

**build** 521:7

**built** 522:25 523:4,6

**bulk** 368:3 574:20 577:13,14 578:3,8, 16,25 579:6,12,24 580:9 581:14,22 582:23 583:12,15 585:15 586:5

587:6,9 588:5,8 589:25 590:3 591:13, 16,25 592:7,15,17,25 593:5,8,22 594:3,10,22 595:14,20 596:4,9,12,16 597:6,10,25 598:10 599:5,7,24 600:5

**bullet** 440:4,25 442:17

**Bullock** 684:10

**bunch** 352:9 378:2 461:5 462:22 528:20 540:6 583:8 626:25 655:12 689:16 690:15

**Burke** 349:22 486:11

**Burlington** 350:24 360:13 365:25

**burn** 542:12

**business** 349:12,20 388:20 393:11 394:2 398:18 412:20 423:6 428:21 430:10,20 432:12,14,18 443:18 446:6 449:18 457:8,9 459:4 467:24 473:15, 25 474:4,7 475:7 484:5 524:18 531:10 533:6 550:20 551:6,12,21 552:4,14,24 553:18 570:14 571:24 625:4 627:3,4 628:8,9 640:13,17 641:3,13 642:22 648:11,20 664:3,16 665:7,17 666:2,18,23,24 674:4,8 676:25 677:8 685:19 700:19

**businesses** 442:16 641:8

**buy** 353:13 442:13 451:3 464:24

**buyer** 383:24 435:4 576:8

**buying** 434:3 436:7 450:23 451:11 623:24

## C

**calculated** 397:23

**calculation** 517:17

**calendar** 485:15

**call** 357:12 436:9 530:21 537:23 552:4 553:9,18,19,20,25 554:4,10 569:2 592:17 665:12 682:12 691:5

**called** 362:2 366:18 513:9 603:14 619:2 626:25 627:4 643:23 684:6,14, 15 685:14

**calling** 571:23

**calls** 406:23 595:5 682:10 687:11

**cancelled** 431:11

**cap** 691:5

**capable** 642:24

**capacity** 426:21 576:22 583:4

**capital** 366:18 367:4 373:25 382:2, 11 399:10,15 415:21 424:4,12 437:18 438:22,25 440:7,15,20 443:20 445:19 446:21 447:7,18 455:10,17,22 456:4, 7,18,24,25 457:10 464:25 465:2 466:3,4,13,14 467:5,11,18,21,25 468:2,18,23 469:6,16,23 470:4,11,13, 19 471:4,10,12,25 472:13,21 473:5, 12,19 474:9,11 475:2,10,16 491:18, 20 504:15,22 505:11,15,19 506:5,7 526:12 527:5,16,23 569:17 577:19 607:7 616:25 617:8 618:22 626:17 659:15,21 675:2 684:4,11 685:2,3 687:19 688:24 697:3,12,17,19,22

**capitalized** 650:21

**caption** 374:9 701:4

**card** 373:21

**careful** 406:9

**carries** 460:23

**Carry** 623:5,6,17 624:11,19 625:11, 19,23 626:2 630:6,9,12,22 631:8,22, 25

**case** 374:9 404:9 463:24 610:16 622:12 633:3 655:17 676:12 677:15, 16 701:4

**cases** 673:5

**cash** 409:21,23 427:5,6 441:9 602:5, 13,23 606:2 607:7 619:8 635:15 662:10,12 676:13

**cashed** 628:23

**caused** 518:7,20 635:18

**causing** 488:19

**caution** 612:20 621:12

**caveat** 520:11 532:19 565:22 636:21

**CCR** 695:25

**cell** 644:13 646:4

**Central** 549:24

**cents** 500:18

**certificate** 351:15 360:22 375:4,10, 15 376:12 378:22 393:25 394:10 396:2,23 401:22 408:5 409:12 419:9 420:2 657:13 658:2 696:19

**certificates** 442:23 556:9 557:16 634:22,24 635:24 636:18 637:5

**certification** 377:8 415:14

**certifications** 412:24 413:3 606:9 608:3

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 65    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3    RECEIVED NYSCEF: 01/12/2024
EMG0400 BUSINESS CREDIT LLC    Pg 1475 of 2230
JOHN ARTHUR HANRATTY    Court Records
John Hanratty
June 21, 2023

**certified** 393:8,22 394:7 411:21 412:7,17 413:18 422:14,20 423:3,10 607:20

**certifies** 356:14

**certify** 392:17,25 695:10,17

**certifying** 415:11

**certs** 556:3,4,12,18 557:12

**cetera** 451:6 485:17 504:21,22 522:23 664:10

**CFO** 631:24

**chain** 460:13 465:14 476:3 525:16 555:9 557:25 572:10,17 600:24 698:3,7,10 699:5,13,17 700:3,7

**challenge** 582:16

**challenging** 434:13

**chance** 358:12 451:18,22

**chances** 454:2 633:17

**change** 393:9,23 412:19 423:4 528:2,14 529:4,13 550:20 551:6,12, 19,20 552:14,21,23 570:14 628:11 652:11 653:19 702:4,7,9,12,14,17,19, 22 703:3,6,8,11,13,16,18,21

**charge** 484:16

**chatted** 689:2

**checks** 427:4,8 428:2,18

**Chee-how** 460:15,25 698:4

**Chee-how's** 461:16

**Cherry** 572:23 590:10

**Chi** 465:22,25 466:12 555:17 556:2,9 572:19 573:12 577:25 578:7,14,24 579:22 581:11 587:3 589:15,20 597:21

**Chris** 687:15

**chunk** 616:6,16

**churn** 434:23 435:19

**circle** 688:16,19

**circled** 685:19

**circumstances** 464:4 499:23

**City** 435:9 609:8 612:4 613:13 669:14

**civil** 633:4

**claim** 371:13 633:5

**clarification** 406:12 435:12 484:6 521:22 651:5 672:21 688:18

**clarify** 597:4

**Clarissa** 494:12

**Clark** 558:10,20

**clause** 520:2,3

**Clayton** 558:22

**clean** 433:11

**clear** 361:4 378:4 383:6 428:19 443:23 470:10 504:9,20 522:7 523:11 533:22 563:10 566:9 585:14 662:8

**clearing** 354:12,22 427:8

**clerk** 350:6

**client** 350:3 381:24 382:4 443:17 456:9

**clock** 435:21

**close** 482:23 531:10 535:19 584:17 592:7 593:2 629:11 631:14 640:22 658:19

**closed** 439:9 624:24

**closing** 393:12 394:4 412:21 423:7 516:25 556:13 611:12 626:5 631:11, 14

**Cloud** 628:8

**Clover** 535:21 536:2,3,24 537:8 540:9 660:5,18

**Coast** 589:7

**Cohen** 425:23 426:10,14 427:16

**coincided** 468:16

**collateral** 401:18,23 402:4,10,13 418:18 436:21 451:5 464:3 469:6,13, 20,22 470:5,18,23 471:2,10,25 473:10,13 526:13 528:3,15,23,24 529:14,20 530:8,14,19,20,22 531:6, 21,22,23 532:9,15,18,20 533:12 534:4 535:15,20 537:20,24,25 538:4, 18,21,23 539:14,20 542:3,7,16 543:3, 14,20,25 544:13 546:6,7,14,21 547:14,24 548:5,9,16,22 549:5,8 551:11,23 552:13 553:2,13,23 554:7, 15,23 556:17,23,24 557:3,5,11,14 559:20,25 560:4,10,18 565:15,20 604:2,5,6,8,14,25 605:11 611:9,14, 15,20,24 620:14,19 649:12 658:4 659:12 660:6

**collectively** 524:24 540:3 641:11

**Colon** 476:4,10 478:9 482:5,9 483:16 484:21 485:19 511:22,25 698:11

**color** 675:12

**Colorado** 588:20,25

**colors** 628:11

**column** 645:7,19,20 647:7,14 651:16 653:15 654:6,10,11 655:18

**combination** 577:18 582:18 676:22

**combined** 644:13 657:3,7,8,16 671:8

**comfortable** 545:7

**commenced** 676:8

**commit** 690:25

**Committee** 552:5

**commonly** 388:9

**communicate** 430:4 594:8 693:9

**communicated** 428:12 436:25 693:12,15

**communicating** 604:20

**communications** 406:24 601:24 612:20 632:14

**Community** 366:18 367:4

**companies** 374:7,9 380:19 387:13 392:8 395:3 397:8,13 400:8,19 401:22 408:6,19 409:5,18 411:22 443:24 448:6,14 449:21 450:6 451:14 452:20,21 453:5 454:20 458:4,14,19 464:10 468:22 471:11 473:4 480:19 485:22 488:9,15 492:13,25 493:17 494:7,17 496:6,12 497:3 501:21 503:24 513:18,22 514:8,17,23 515:6, 13 516:5 519:7,14,21 520:7,19 522:9, 12 527:25 529:12,19 530:7,13 531:4 533:11 537:17 538:20 539:13 543:2 547:13,22 548:7,13,20 549:3 551:13, 22 552:16,25 553:12,21 554:6,12,14, 20,22 557:15 561:10,21 563:13 573:22 574:6,13 575:2 576:14 585:15,17 586:5,7 589:18 591:7 595:25 596:4 597:6 598:10 599:6 611:18 615:16 616:15 617:12 618:15 631:24 636:12 661:17,20 665:6 666:17,22 667:9 669:7,20 670:2,10, 21 671:10,14 675:20 677:7 678:10 679:4,7,9,15 680:3,5,16,18 681:18 690:16

**companies'** 433:23 439:16 446:5,10 494:15 497:4,14 498:7,14 499:6,19 506:17 507:20 509:10 511:12 514:16 683:18

**company** 353:15,22 359:3 366:18 376:2 397:12 449:2 453:16 485:20 525:2 530:19 535:11 571:20 582:4

591:21 615:3 619:2,22 628:14 640:17
647:20 660:17 663:5,14 676:22
684:2,6,7,13,23 686:8

**company's** 541:2 681:10

**comparatively** 437:5 450:5 470:12
534:2 596:14

**compared** 386:3 441:2 594:11

**comparing** 411:4

**comparison** 586:2

**competent** 482:21 520:25

**competitive** 450:25

**complaint** 425:22 426:5 697:14

**complete** 650:23

**completed** 481:17 686:2,14

**completely** 546:3 672:7 673:16
683:7,9

**complexities** 486:4

**component** 462:20 464:8 496:19,21
508:4 633:11 652:16

**components** 463:3 510:6 533:15
559:7 582:5

**computer** 629:15

**concept** 549:11 552:6

**concern** 487:14,18 490:13

**concerned** 491:4 544:10

**conclusion** 389:14 519:10

**condition** 393:11 394:3 412:20
423:6

**confirm** 519:6,13 526:7 556:2
691:22

**confirming** 527:20 632:10

**confused** 492:20 541:11 588:10
657:19

**confuses** 649:20

**confusion** 544:8

**conjunction** 579:20

**connecting** 553:15

**connection** 372:7,14 537:10

**consequences** 362:18

**consideration** 354:7,15 594:13

**considered** 636:25

**consistent** 440:6,14 573:6 586:16

595:5 679:25

**consistently** 573:2 583:16,23 585:5
587:22 589:17 592:11 597:18

**consisting** 622:20 629:21 700:11,14

**consolidated** 486:20 489:19 491:8
698:15,19

**constant** 512:11

**construct** 389:19,22

**Cont'd** 445:11

**contact** 521:21 602:5

**contained** 392:19 422:15

**content** 407:4

**content-wise** 562:9

**context** 357:9 359:9,20 361:2 367:19
368:5 369:12 376:16 379:11,20
380:8,16 381:12 383:13,22 384:15
385:4 386:10,17 388:13,22 449:14
455:15 466:16 472:16 488:21 524:4
528:5,10 533:21,25 538:25 542:9,22
547:2,8 560:13 566:7 570:18 571:22
575:7 579:16 580:6 585:8 617:10
640:13,17 641:5,17

**continue** 434:8 442:15 487:14
490:13 515:13,18 620:11 662:23
681:7,14

**continued** 606:8 693:20

**continues** 353:13

**continuing** 377:10 393:2 412:9
422:21 465:21

**contract** 383:21 534:2 556:14
666:25

**contribute** 624:23 625:6

**control** 428:24 431:17 439:6 442:23
450:14,18 454:16,17 455:2

**controlled** 380:19 623:7 627:23,24

**controller** 387:23 631:24

**conversation** 484:2 496:17 497:8
532:13 539:10 553:8,10

**conversations** 405:22 434:6 488:17
496:23 498:19 506:2,11 508:5
532:16,24 533:3,10 539:7,23 541:13,
25 542:5 543:8 544:7 546:19 551:18
552:20 566:10 569:19

**convert** 429:10,18

**convey** 479:23

**Cool** 694:2

**coordinate** 386:21

**copied** 588:3 589:21 590:13 597:21

**copy** 369:17 399:7 622:12

**core** 457:24

**Corevest** 431:10 584:9,17,18

**Corp** 677:9

**corporate** 569:14 621:17

**Corporation** 349:12,20 648:12,21
664:3,16 665:8,18 666:3,18,24
700:19

**correct** 350:19 352:13,17 353:17
356:10,22 364:16 365:21 366:23
367:5 368:11,18,24 372:18 373:6
374:24 376:18 377:12 378:7,18 379:2
381:11 382:23 384:11,23 388:5 390:5
392:13,20,21 393:5,12,18,19 394:10,
16 396:3,6,24 397:3,9 398:15 399:16
400:5,9,15,21 401:12,15,24 402:20
404:13 407:8,11 408:7 410:17 411:23
412:11,25 413:9,14 414:7,12,25
415:5 416:7,13,17 418:23 419:10
422:16 423:16 424:13,17,22 425:4
428:21 430:19 431:24 433:24 434:19
438:11 439:18 441:16 442:7 446:12
447:21 448:10,15 458:2 461:2,20
464:11 465:23 466:6 471:17 472:2,
10,13 476:11,17 478:11 479:6 485:24
487:9,15,21 488:4,16 490:8,13
494:25 495:10,14 496:3 497:13,21,23
498:25 502:15 503:7 506:19 507:4
510:18 511:8 512:3 513:5,10,23
517:16,19,23 518:8,21,22 526:9
527:17 536:4 537:2,20 538:8 541:5
543:4 548:23 550:2,21 553:2 555:18
556:6,10,20 557:17 558:12,25
564:11,19,22 565:15,20 566:25 567:4
568:16 569:3 572:19 573:4,10,19
578:9,17,22 583:18,20 587:16 591:9
594:22 596:6 597:8,14 598:12 599:3,
10 601:10 603:15,20 605:12 606:5
608:19 611:9,21 613:18 615:25 616:3
621:5 623:19 624:12 630:18 637:14
644:10 645:9,12,21,24 646:6,11,15
647:10 648:21 649:3,8 651:17,21
652:6 656:6 678:11,14,20,23 679:11
680:7 681:7 683:12

**correction** 633:21

**corrections** 636:23,24 701:12

**correctly** 477:19 501:10 503:11
588:9 602:7 616:9 625:15,17 635:2
638:10,24 639:4,15,22 642:3,5
643:10

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022
NYSCEF DOC. NO. 1542                                  RECEIVED NYSCEF: 01/12/2024

EMBASSADOR BUSINESS CREDIT, LLC v.     Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State     John Hanratty
JOHN ARTHUR HANRATTY          Court Records        Pg 1477 of 2230                          June 21, 2023

**correlate** 573:7 586:16

**cost** 457:6 463:14 474:7 475:6 511:18 577:8 627:12

**costs** 518:6,19 610:19

**counsel** 349:15 395:16 526:5 560:14 562:17,22 563:15,21 564:18 566:10 632:8

**count** 655:7

**counterclaim** 622:13,25 633:16,22 634:3,6

**countered** 661:8,10

**counterpart** 450:23

**counties** 359:12,13

**County** 350:24 360:14 365:25 375:4 695:6

**couple** 435:20 459:13 523:18 585:11,12,24 594:25 614:6 661:11 672:9 674:20,22 682:7,18 683:11 684:15

**coupon** 462:23 463:16

**court** 350:8 351:2 362:24 366:3 375:6 391:17 399:4 410:3 420:16 423:23 425:25 437:14 445:15 447:4 460:10 465:10 475:22 486:16 489:15 512:19 516:10 525:13 549:15 550:9 555:5 557:22 568:6 572:7 600:21 622:16 629:15,17 643:14 648:5 673:5

**courts** 632:21 681:17

**cover** 635:15 643:9

**coverage** 502:11,18

**covered** 391:14 502:13 537:14 540:17

**COVID** 431:11 525:5 632:21 669:22 672:12,18 680:24 681:2,9

**COVID-19** 669:12,19 672:2

**CQ** 645:19

**CQ2** 646:4

**create** 470:11 471:3 627:21 628:15

**created** 470:6 644:15

**creating** 447:15

**credit** 349:12,20 373:21 389:7,23 390:3,10,16 391:9 392:10,19 398:20 401:10,14 403:11,17 404:6 411:23 413:14 415:18 416:7 420:8 422:16 425:10 427:17 428:4 433:22 437:12 438:7,19,24 448:8 457:15 459:13,16

487:20 490:18 517:2 518:25 534:5,23 536:25 537:9 538:8 540:25 541:9 544:22 552:5 554:13,21 564:10 565:13 584:10 585:4 604:24 605:14, 17,21 610:24 626:20,22 627:11,15 628:4,7,17 642:16 648:10,12,19,20, 22 652:5,18,20,23 653:2,7,11,18,21 656:11 664:3,16 665:7,18 666:2,18, 24 677:8 689:15 690:3,21 692:3 700:18,19

**creditor** 353:24

**creditors** 618:14

**CRIM** 626:18

**criteria** 440:8,14,16

**criterion** 440:5

**Cromwell** 349:9,18,22

**cross-collateralized** 537:5

**CS** 646:8,9

**CST** 370:9

**CT** 653:15,17 654:6 655:18

**Cuebas** 476:10 482:5,9 483:16

**culmination** 631:16

**current** 484:14,18,23 641:8 676:11 689:8 693:4

**cust** 376:13 377:11,14 378:5

**custodian** 353:12,22 356:18 357:16 359:2 364:14 366:22,25 367:3 368:23 370:8 375:20 376:10 556:14,19 557:4,13,17 565:5,7,8

**customer** 373:23

**cut** 673:12,14

**cutting** 673:17

**Cycle** 442:18

---

## D

**D.angelo** 618:3

**daily** 522:22 523:13,16 524:21,23

**damages** 518:4,6,14,17,19

**data** 490:12 634:19,25 635:21 636:4, 9,13,15,21 678:16

**date** 349:5 351:7 363:7 366:8 374:2 375:11 387:4 391:24 392:20 393:12 394:4,9 399:12 410:9 411:24 412:21 419:11 420:22 423:7,12 424:6 426:6 428:11 437:21 445:22 447:10 460:18

465:18 476:7 484:17 486:25 488:14 489:24 512:25 516:16 517:18 525:21 537:11 549:22 550:14 555:14 558:6 568:13 572:15 601:5 606:25 607:11, 19 620:23 622:23 625:24 629:24 643:19 644:21,24 645:8 647:2,6,7,9, 11,13,15 648:14 651:19 652:2,12,13 653:11 654:24 655:5,15 656:19 657:24

**dated** 391:21 410:7 420:20 460:14 465:14 476:3 512:22 525:17 549:19 555:10 558:2 568:9 572:11 600:25 644:9 651:20,24 696:21 697:6,9 698:3,7,11,23 699:6,9,14,17,20 700:3,7

**dates** 396:8 447:23 606:20 634:23 637:4 644:14

**Daugherty** 659:13

**Dave** 461:13,14

**day** 393:18 394:14,20 400:18 426:25 427:7 429:15 430:5 455:8 589:13 620:18 634:19 677:12,23 682:6,7 691:5 692:16 694:13 695:23 701:16, 21

**Day-to-day** 619:21

**days** 523:18 672:9 673:15

**deadlines** 633:14

**deal** 484:20 547:19 550:21 551:7,12, 21 552:15,24 595:23 673:12,14,17 675:6,9 686:24 687:22,25 688:4,25 689:8,14,19 690:10

**dealing** 455:4

**dealings** 684:23

**deals** 685:12 688:5 689:16

**dealt** 631:20 687:13

**debt** 616:8,19,23 617:2,7,13 663:6,7 683:18 690:17

**debtor-in-possession** 659:10,16

**December** 495:14 496:2,6,14 497:16 498:5,12 499:7 583:18,24 585:18 586:8 587:24 589:19 592:5,24 599:10

**decent** 437:8

**decide** 389:17,21,24

**decided** 456:3 483:16 531:10 685:23

**decision** 483:10 561:3,7,10,15 563:11,23 564:3

**decisions** 521:4

**DECLARATION** 701:5

**declare** 701:6

**decree** 627:3,6,8

**decrees** 626:25

**deed** 459:20

**default** 389:8,15,17,24 390:2,21
391:2 393:2 394:8,9,21,22 395:2
405:12,21 412:8 413:19 415:12
422:21 423:10,11 483:24 484:22
605:16,21 606:5,11 607:2,10,12,16,
21 685:16

**defaults** 390:5,10,15 391:8 394:25

**defend** 501:9

**defendants** 350:2 374:15

**defined** 374:8 490:21

**defining** 452:17

**definition** 452:16 518:14 649:8
653:3

**degree** 363:5,12 696:15

**Delaware** 622:14 634:7

**delay** 513:8

**delayed** 482:12

**delinquent** 483:6

**deliver** 480:25

**delivered** 363:18 478:8 481:14
517:15 519:7,15,21 520:8,19 522:9,
12 615:24

**delivery** 363:19

**Dell** 382:19

**delta** 635:6

**demand** 436:9

**demanding** 455:11

**demands** 428:2

**Dennisse** 461:13 476:15 482:24
484:15 485:14 494:11 508:6 555:22
558:9,19 560:23 565:3 566:15

**deponent** 349:13

**deposit** 406:21 556:18 557:8,12,16
566:3 605:9

**deposited** 428:18 557:4

**deposition** 349:8 351:4 363:2 364:8,
12 366:5 375:8 383:3 384:8 385:17
391:19 395:18,21 396:22 398:9
399:6,8 407:21 410:5 414:16 415:20
419:5 420:18 423:25 426:3 432:3
437:16 445:17 447:6 457:21 460:12
465:12 475:24 486:18 489:17 495:18
500:25 501:15 512:21 513:19 516:12
525:15 542:18 549:17 550:11 555:7
557:24 568:8 572:9 600:23 622:18
629:19 643:16 648:8 657:4,5,10,12,
18 695:12 701:8 702:2 703:2

**depositions** 695:14

**DESCRIPTION** 696:10 697:2 698:2
699:2 700:2

**designate** 550:9

**desk** 523:22

**desperate** 688:17

**destroyed** 582:15

**development** 677:2

**difference** 451:23 452:13 480:2
499:17 500:23 511:7 512:16 587:13
591:5 593:15 595:2,5,19

**differences** 512:9

**difficult** 429:6 430:13 486:6 512:13,
15 577:7

**difficulties** 485:15

**difficulty** 485:18

**diligence** 451:4 584:16 686:2,8,15

**diligenced** 624:2

**direct** 353:10 395:20 400:17 407:19
419:4 423:20 460:20 493:12 495:20
517:10 521:21 605:2 608:9 609:25
619:6 643:21,23 657:3

**directed** 603:5,18 604:9,15

**directly** 434:8 446:23 450:22 482:24
521:24 522:16 536:17 591:2 602:6
603:6,19 604:10,16 605:3 607:25
608:6,10 623:17 637:13,17,21 638:4,
7 641:18

**director** 356:18,21 357:6,15 364:13,
15,18,21,24 377:11 378:17 381:7
384:10 385:10,20 601:16

**disagrees** 588:16

**disappear** 572:4

**disappeared** 381:15 687:11

**disclosing** 632:13

**disclosure** 393:10 412:19 423:5

**discovered** 626:10,18

**discoveries** 633:5

**discovery** 355:18,20 632:20 633:12

**discrepancy** 592:4,6 593:7,21
594:19

**discuss** 441:19 533:23 613:23

**discussed** 390:13 391:12 404:11,15
408:4 423:15,18 427:14 442:14
446:19 463:3,19 468:14,18 473:23
493:7 514:15 523:17 528:20 530:22
532:22 535:5 537:17 542:13,15 549:7
565:24 570:9 585:25 598:16 603:12
607:9 613:20 614:5,8,10 616:21
631:17 637:16 638:2 652:11 656:10
659:6 672:8 673:18 679:2

**discussing** 526:25 533:13 582:8
586:13 613:25

**discussions** 531:19 532:2,7 541:19
543:11,23 546:12 629:3

**disgruntled** 418:7 455:5

**dismiss** 633:12,15 634:4,7

**dismissed** 633:18

**dispersed** 582:19

**disposition** 429:14

**dispute** 361:5,13 371:6 380:11

**disputing** 371:9 380:14

**dissatisfied** 663:6

**distinction** 546:9

**distress** 430:22 573:15,22 574:6,14
575:2,9,16,17,18,19,21,25 576:15
578:9 579:2,7,13,25 592:19

**distressed** 454:3,4 577:15 580:12
597:12,13 598:20

**distribute** 603:5 607:6 616:16

**distributed** 413:7 415:4 488:2
514:18,23 515:7 607:5 616:6,22

**distribution** 425:11 602:4,5,16,17,
21,24 603:9,10 605:18,20,22 606:16

**distributions** 401:11 403:12,21
404:7 413:24 414:4,7,12,24 425:3,17
426:17 458:17 488:3,8 494:24 514:24
515:8,14,22 516:4 602:12,13 603:12

**District** 622:14

**docket** 622:11

**document** 351:9,13,25 352:3,5,6,9,
12,15,20,25 353:3,20 354:24 355:17,
24 356:7 358:9,17,20,22,25 359:5,6,

10,15,20 360:3,13,17,25 361:5,6,14
362:22,25 363:3,23 364:2,5 365:2,6,
10,11,16,24 366:10,13 367:2,14,18
369:6,9,14,16 370:4,10,11,15,16,18,
20,21 371:2,4,5,7,10,18 372:3 373:6,
12 375:7,13 376:20,23 377:2,6 379:7,
11,12,13,16,19,22 380:2,4,7,10,16
381:21 382:15,20 384:3,19 385:2,8,
13 388:5,18 389:20 391:6,15,18
392:2,5,24 393:7,14 396:5 397:11
398:11 399:3,5,23 400:2,25 407:20
408:9,14,17 409:25 410:11 412:4,13
414:21 416:3 419:5 420:14,17,24
421:11,14,18 422:7,11,12,18 424:19
425:6,13 426:2 437:10,15,23 438:3,
16 445:14,16,24 446:2 447:2,5,12,20
448:2 449:16 460:8,11 465:8 466:10,
20,23 467:2 475:20 486:9,14,17
487:3 488:23 489:13 490:2 491:5
503:9 504:18,25 512:18 513:9 516:8,
11,18 519:5,25 520:6 525:11,14
529:17,25 542:18 545:20 549:14
555:4,6 557:21,23 558:18 567:11
568:4,7 571:6 572:6 575:6 589:4
591:11 598:24 600:20,22 609:13,15
610:16 617:18 622:10,11 623:3,12
624:17,23 629:13 630:19 634:2,8
635:19 639:3 643:15 644:3,6 648:6,
16 649:22 650:14 651:18,20 654:3
655:2 658:13 683:22 696:13

**documentation** 431:2 494:21
505:17 506:4,24 507:11,17

**documents** 352:10 355:13 357:10
358:6 360:17 368:2 369:18,23 385:25
386:6,8,12,15 388:8,14 389:4 421:25
427:21 479:21 482:17 517:2 523:19
545:6 606:14 621:18 631:15 634:20
635:22 636:10,16 638:20 639:6
658:17 671:25

**dollar** 354:8,14 413:17 438:7 502:20,
21 586:25 610:18 690:22 693:8

**dollars** 628:5,25 661:11 666:17
667:15 670:19 671:6

**door** 406:15

**dormy** 576:25

**doubt** 487:13 488:8

**downgrade** 669:16

**downstairs** 614:4

**drafting** 554:12 621:20

**driven** 464:2 576:21

**driving** 430:9 450:12

**due** 434:14 442:20 482:11 486:4

549:8 595:19 673:2 686:2,15

**duly** 695:13

**duties** 521:12

## E

**earlier** 427:14 442:3 458:10 463:19
498:22 514:4 518:10 526:8 564:15
670:23 674:25 682:4 683:10

**early** 531:16

**ease** 612:25

**easier** 433:17 454:6,10,21,24 535:14

**easiest** 655:9

**EBCC** 391:16 399:3 407:20 410:2
414:19 420:15 423:21 437:11 438:5
440:6,14 445:14 486:10,15 487:12,24
488:24 489:13 494:22 501:2 512:19
516:9 555:4 557:21 572:6 648:8
651:15 653:5 701:4

**EBCC_10663** 486:23 698:16

**EBCC_10701** 489:22 698:21

**EBCC_16645** 445:20 697:20

**EBCC_16740** 437:19 697:17

**EBCC_22650** 516:15 699:4

**EBCC_4965** 391:22 696:22

**EBCC_5705** 512:24 698:24

**Ebury** 350:2 353:5,8,12,18,21 356:18
357:16 359:2 364:14 366:17,22,25
367:3,8 368:23 369:2 370:8,9 373:3
374:7,9,11,13 375:21 376:5 378:12
387:11,12 389:7 391:8,21 392:8,10
395:3 397:7,12,13 399:11,15 400:8,
11,13,19 401:22 408:6,19 409:5,17
410:7 411:22 413:7 414:17,23 415:3
418:8 420:7,20 421:6,10 423:6 424:3,
12 433:23 437:12,18 438:6,18 439:5,
16 442:18 443:5,24 445:18 446:5,9
447:3,19 448:6,14 449:21 450:6
451:14 452:20,21 453:4 454:20
458:4,14,19 460:9 464:9 465:9
468:22 471:11 473:4 475:21 480:18
485:22 486:19 487:8 488:9 489:18
490:6 491:10,18,19,24 492:6,11,12,
23,24 493:6,7,14,16,24 494:7,15,16,
17,23 495:8,18,24 496:6,11,12 497:2,
4,13,14 498:6,13 499:6,19 501:21
503:24 504:14,22 505:11,14,15,19
506:4,6,17 507:13,20 509:9 511:12
513:9,11,13,18,22,25 514:8,16,17,22
515:6,13,19 516:5 519:7,14,21 520:7,

18 522:8,12 525:12 526:5,12 527:5,
15,22,25 528:17 529:10,12,18 530:7,
12 531:4 532:3 533:11 535:7,11,22
536:4,6,8,12,16,19 537:9,17 538:15,
20 539:13,25 540:23 541:2,11,20
542:2,6 543:2,12,13,24 546:5,12
547:13,22 548:7,13,20 549:3,14
550:10,19 551:4,10,13,22 552:12,15,
25 553:12,21 554:6,11,14,19,22
557:14 558:8,11,20,21 560:6 561:10,
21 563:13 568:5 570:3 571:15
572:23,24 573:22 574:6,13,25 576:14
577:25 578:3,14,16,25 579:6,12,24
581:4,14,21 582:21,23 583:10,12,17
585:15,16 586:4,7,9 589:18 591:7
595:25 596:3 597:6 598:10 599:6
600:20 602:11 611:17,23 615:15
616:15 617:12 618:11,15 621:4,9
623:16 624:11,20 625:19 626:2
629:13 631:22 634:22 635:23 636:12,
17 637:5,13 640:17 641:19 642:16
643:13 648:12,21,23 657:23 660:2
661:16,20 665:6,12 666:17,22 667:8,
25 668:15 669:6,20 670:2,10,20
671:9,14 675:20 677:7,8 678:10
679:3,7,9,14 680:3,5,15,18 681:9,18
683:18 696:21 697:4,6,9,11,16,19
698:14,18 700:20

**Ebury's** 439:9 441:3 442:5,20 443:8
453:17 529:4 532:8,14 546:20

**EBURY_23926** 465:16 698:9

**EBURY_29017** 572:13 700:5

**EBURY_3279** 447:9 697:23

**EBURY_43022** 558:4 699:19

**EBURY_43029** 476:5 698:12

**EBURY_505514** 549:21 699:10

**EBURY_53185** 568:11 699:22

**EBURY_59765** 555:12 699:15

**EBURY_71440** 460:16 698:5

**EBURY_9590** 601:3 700:8

**Edguardo** 637:25

**Eduardo** 631:23 632:7,8

**effectively** 382:3,10 388:20 628:10
631:6,13 636:14 672:14 674:21

**effort** 578:19

**efforts** 427:3

**Egan** 400:20 401:5 402:16,17 403:6,
25 407:7

**elapse** 650:9

**electronic** 411:7 424:2 622:19 629:20,25 643:17,25 697:11 700:10, 13,16

**eligibility** 440:5,13 534:9 539:8,23 611:16

**eligible** 528:24 530:21 531:23 534:23 535:14,20 538:17 539:3,5,12, 20 540:5 546:13,21 547:14,23 548:5, 8,15,21 549:4,8 551:11 552:13 553:13,22 554:15,23 643:6 646:17 648:25 649:6,8 653:6,15,23 655:20, 22 656:2,5,24 658:5,9

**eliminate** 545:4,13,20

**email** 460:13,14,21,24 461:6,7 465:13,14,22 466:8,9 467:15 471:16 472:7 476:2,3,10 478:3 479:15 512:22 513:3,7 514:3 523:21 525:16, 17,24,25 526:25 527:19 531:24 542:9,18,25 544:3 546:16 547:2,5,6 549:18 550:7 555:9,10,16,21,25 556:8 557:25 558:2,9,16 559:4,8,9,16 560:6,13 568:9,15 571:21 572:10,11, 17,18 576:11 587:18 588:13,17 589:12 590:5,8,9,12,15,18 594:2 596:10,19 597:16 598:15 600:24,25 601:8 608:16 609:5 615:6 620:22 698:3,7,10,11,23 699:5,6,9,13,14,17, 20 700:3,7

**emailed** 549:25

**emails** 466:16,18 527:12 555:24 572:22 588:11 597:11

**emerged** 659:19 660:17

**EMI** 392:10 400:13 420:8 421:6,10 423:6 535:22 536:4,8,12,16,19 540:23 648:12,21 700:20

**Emigrant** 349:11,19 389:7,20,23 390:4,8,9,17 391:3 393:16 394:13,22 395:17 400:5,18 401:4,10,16 402:2, 24 403:4,9,10,15,19 404:6,18,23 405:5,8,12,14,15,21 406:8 407:15 408:6,12 409:17 411:10 412:7,17 416:6 418:4,14,22 419:9 425:9,15 427:17 433:22,23 434:4,6,12 436:2, 15 437:11 439:15,23 441:14 442:4,12 443:4,7 448:7 456:14,24 458:24 459:8 460:3 465:4 466:4,14 467:25 468:14,23 469:6,11,15,21,24 470:4,7, 11,20,24 471:3,11,12 472:2,21 473:5, 18 474:24,25 475:8,9,14,15 477:4 487:20 488:10 490:18 501:19 508:13, 22,25 510:3,17 513:20 514:6 515:4, 11 517:3,22 518:5,7,18,20 520:19 521:2,10 522:9,13 523:13,17 524:2,8, 15 525:8 528:12 530:4,6,12 531:3

534:5,23 538:4,18,19 539:6,21 540:10 543:21,25 549:2,12 551:13 552:15 554:6,12,20 563:22 565:23 604:13 606:4,9 607:3,13,17 609:7 612:3,24 613:11,17 615:10,17,24 617:4 618:7,19 621:5,10 635:22 636:10,16 640:25 642:25 643:4 644:8 648:11,20,23 654:2 658:10 659:12 660:7 661:16,19 664:3,6,10,15,19,25 665:7,13,17,22 666:2,7,11,18,24 667:9,25 668:16 669:7,20 670:3,11, 21 671:10,15 673:24 674:8 675:23 676:13 677:6,8,11,14,17 678:11 679:2,4,8 680:4,6,16,18 681:25 685:23 687:13 691:8,17,22 693:6 700:19

**Emigrant's** 405:19 409:11 443:20, 21 527:25 528:3,14,15,23 529:13,14, 19 530:8,14,20 531:5,22 532:8,14,18, 19 533:11 537:20 538:21,23 539:14 542:3,6,15 543:3,14 544:13 546:7,13, 21 547:14,23 548:8,15,21 549:4 551:10,23 552:13 553:2,13,22 554:7, 14 559:20,25 560:4,10,17 565:15,20 604:2,6,8,25 605:10 611:9,15,20,24 634:21 672:3

**emotion** 479:4

**emotional** 476:23 477:16 478:5,23 479:2,17,18,24 480:3

**emphasis** 491:6

**employed** 664:9

**employee** 360:3 381:19 411:20 412:6,16 421:23 422:8,13 642:25

**employees** 386:14,25 387:9,15 388:2,4 411:16 421:24 521:9,20,23 522:14,15 523:12,15,25 524:7,14 525:7 560:17,22 665:17,22

**empower** 385:24

**encumbered** 602:4,12,16

**encumbrance** 625:12

**encumbrances** 623:17

**end** 364:3 455:8 460:22 461:8,10 503:5 556:3 582:14 648:24 687:4 689:17

**ended** 388:14 431:12 442:11 469:20 486:22 489:21 637:17 680:10 685:6 688:15 698:16,20

**ending** 399:11,16 424:4,13 439:25 501:5 697:4,12

**ends** 419:6

**energy** 674:12 692:23 693:17

**enforce** 390:2 672:15,17

**enforceable** 663:9

**engage** 621:7

**engaged** 405:22 573:22 574:6,14 575:2 576:15 621:2 626:19 631:18 686:7,18

**engagement** 485:9

**engaging** 661:21

**enhance** 577:23

**ensure** 481:13 520:18 522:11

**entire** 499:22,24 545:21 549:10 701:7

**entirety** 378:9 443:14 471:2 519:24 521:18 528:8 529:9 543:18 576:19

**entities** 426:9 538:5,16 621:4,9

**entitled** 649:5

**entity** 356:19 362:2 378:23 400:14 535:7 569:25 627:23,24 660:2

**entry** 400:4,20 424:16

**environment** 576:9

**envisioned** 457:9

**Epic** 619:9,20,24 620:15

**equity** 403:16 413:8 426:17 429:5 457:23 458:5,22 514:19,24 515:8,14, 21,22 516:4 539:21 540:11 605:3 616:7,16,22 617:22,25 618:2,10 659:20,24 660:3,10,11

**ERRATA** 701:2,13 702:2 703:2

**ESC** 526:7 527:2,14,22 528:15

**escalating** 689:5

**escaping** 685:17

**escrow** 406:21 626:11 627:21 628:12 633:7,9,11

**esquire** 432:2 677:23,24

**establishing** 433:21

**estate** 431:6 433:5,17 454:5 459:10 573:23 574:7,14 575:3 576:16 617:3 619:22 620:17 676:24

**estimate** 482:19 670:6

**estimated** 491:11,22 492:18 507:3 508:10,19 509:24 510:14 512:2 625:13

**estimates** 678:18,24

**estimating** 374:3 618:21

**estimation** 669:18

**et al** 349:13

**event** 389:8,15,16,24 390:2,25
392:25 394:8,22 395:2 412:8 413:19
415:12 422:20 423:11 473:21 602:3
607:2,10,12

**events** 390:21 427:12 606:10 607:21

**Everybody's** 523:8

**evict** 672:17 673:11

**evicting** 673:6

**evictions** 431:18

**ex-capital** 684:7

**exact** 374:2 404:20 515:17

**EXAMINATION** 350:16 445:11
663:24 678:7

**examined** 350:14

**examples** 600:5

**exceeded** 423:18

**Excel** 634:19 635:22 636:10,16

**exception** 434:2 439:20 440:19
525:4

**exceptions** 446:16 525:2

**excess** 470:12 624:8

**Exclusion** 649:10

**exclusions** 649:2,6,7

**execute** 357:20,24 369:6,9 370:4
371:7 381:21 382:8 384:3,19 385:8,
16 386:15 388:4 576:23 691:20

**executed** 354:10 359:6 370:11,15,
17,21 371:2,11 379:13,16 380:4
427:10 518:24 519:4 554:20 606:24
607:10,18 691:23

**executing** 357:9 370:23 371:3
383:23 520:6

**execution** 371:5

**exhibit** 351:4,5 363:2,3 364:8,12
366:5,6 375:8,9 383:3 384:8 385:17
391:19,20 395:21 396:22 398:9
399:6,9 407:21 410:5,6 411:5 414:16
415:20 419:6 420:18,19 423:25 424:2
426:3,4 437:16,17 445:17,18 447:6,7
457:21 460:12,13 465:12,13 471:20
472:6 475:24 476:2 486:18,19

489:17,18 495:18 500:25 512:21,22
513:19 516:12,13 525:15,16 527:9
542:19 549:17,18 550:11,12 555:8,9
557:24,25 568:8,9 572:9,10 600:23,
24 616:4 622:18,19 629:19,20
643:16,17 648:9,10 653:12 657:5,10,
12,18,21,22 658:15 696:11,13,16,18,
20 697:3,6,8,11,14,16,19,22 698:3,7,
10,14,18,23 699:3,5,9,12,13,17,20
700:3,7,10,13,16,18

**Exhibits** 501:15

**exist** 647:19

**existed** 436:3

**existing** 394:9 423:11 438:9

**exists** 628:9

**exit** 436:19 573:14

**exited** 436:17 581:9,10

**exiting** 575:11,12 580:7,23 587:15
591:8 662:11

**expect** 472:8

**expense** 474:3 587:8 588:8 590:3
593:18 594:18 598:4

**expenses** 473:25 475:6 591:23
594:14 626:14

**expensive** 432:7 474:6

**experience** 437:6 449:7 450:2
453:16,17

**experiencing** 598:16

**expire** 643:7

**explain** 588:3 589:4,22 590:13
597:22

**explained** 591:16

**explaining** 436:2 595:18,20

**explanation** 598:24

**exposure** 577:11 582:3,4

**expressed** 487:12,17

**expresses** 490:11

**extended** 482:18

**extension** 537:11

**extensions** 606:25 607:11,19

**extent** 612:18 621:12

**external** 682:17

**extinguish** 663:12

---

## F

**facilities** 389:7 401:11 404:7 425:10
428:5 433:22 437:13 455:12 465:2
469:17 470:5,7 534:5 617:8

**facility** 420:8 427:18 438:8,19,24
440:6,14,15 464:25 467:6,12 472:13
474:24,25 475:10,16 518:25 534:24

**fact** 363:14 370:3 388:11,25 393:17
404:5 418:21 583:4 620:9 632:9
653:14 680:5,17

**factor** 409:21 420:10 594:4 596:11
598:17 688:13

**factors** 433:6 450:12 610:19

**failed** 480:19 549:12

**failure** 613:5

**fair** 491:10 496:23 498:4,6,13,18,24
499:5,19,21,24 500:12 503:18 504:11
505:8,20 506:3,8,12,13,17,23 507:2,
10,16,19 508:9,15,18 509:7,23 510:8,
13 511:8,11,25 512:6,16 513:9,13,15,
17,23 574:7,15 575:3,9 576:6,7,16
580:21 581:4 582:6 584:22 585:5
586:2 587:14 591:6 592:5,24 593:8,
16,22 594:11,20 595:3,16 597:13
599:9,16 600:2,9 624:6 680:21
681:22

**fairly** 598:25 599:7,15,25

**fall** 435:20 686:24 687:22 688:25
689:19

**falling** 529:23

**false** 362:19 363:5,11,14 381:3,6,12
382:22 383:8,18 384:9,14 412:25
415:13 653:24 696:14

**falsely** 355:12 607:20 658:3

**falsified** 643:3

**familiar** 640:5,8

**families** 577:12 582:12

**family** 580:24

**famous** 676:20

**fashion** 428:9 530:25 607:7

**fast** 442:18 510:25

**faster** 452:3

**FBI** 629:3

**FC** 655:24

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 420    RECEIVED NYSCEF: 01/12/2024

EMB)56420 BUSINESS CREDIT    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    John Hanratty
JOHN ARTHUR HANRATTY    Court Records    Pg 1482 of 2230    June 21, 2023

**fed** 634:8

**feel** 597:2,4

**fees** 463:10,14

**fell** 521:3 540:2 547:19 675:11,13 676:7 687:2,25 690:11,13 691:8

**fellow** 456:11 618:5 659:2,13 684:9

**Fetterman** 472:8

**fictitiously** 627:21 628:15

**file** 550:10,13,15 622:20 629:21,25 635:10 643:18,25 699:12 700:11,14, 17

**filed** 360:13 622:13 633:15 634:5

**files** 598:24

**filling** 569:15

**filter** 654:12

**final** 437:17 599:2,8 643:22 672:16 697:16

**finalized** 506:22 507:10,15

**finalizing** 483:21

**finance** 438:8 459:24

**financial** 393:10 394:3 412:20 414:18 423:5 472:9 477:5,9 480:10, 20 483:5,7 486:21 487:9 489:20 490:7 491:8,25 492:7,12,24 493:16 494:6 495:8,19,23 497:2,12 501:13, 20,25 503:23 504:11 505:7,23 508:10,19 509:24 510:14 511:24 513:17,21 514:7,17 515:5,12 522:25 582:4 601:23 615:17 634:25 676:20, 21 698:15,19

**financials** 458:10 480:25 481:3,7,12, 18 482:13 485:23 497:22 498:2,23 499:12 612:15 614:22,24 615:3,7,9, 13,22

**financing** 453:13 456:15 459:11 579:21 643:6

**find** 433:16 485:13 623:2

**fine** 633:24 663:19 671:7 682:14 692:14,15

**finished** 686:18

**finishing** 369:13

**fired** 481:15 484:21

**firm** 481:24 482:2 563:3

**fit** 675:4

**five-year** 474:9,12

**fix** 431:22

**flagging** 580:17,19

**flexibility** 455:4

**floor** 349:10

**Florida** 623:25

**flow** 441:9 689:8

**focus** 433:24 439:16 442:5,11 448:14 449:22 450:7 458:15 459:5 570:13 683:6

**focused** 502:9

**focuses** 439:7

**focusing** 451:15 458:20

**folks** 431:21 689:15

**follow-up** 512:8 569:2 692:10

**foreclose** 452:8 453:25 463:21 645:24 672:15 673:7

**foreclosed** 464:14

**foreclosisure** 646:2

**foreclosure** 431:15 452:11 464:8,11 540:5 549:9 592:16 600:11 645:21 646:6,14,22,25 647:5 649:14,23 650:5,9,23 652:24 655:23 656:23 658:9 681:6,16

**foreclosure-based** 570:16

**foreclosures** 437:4 464:18,22,24 465:5

**foregoing** 408:13

**forever** 435:5

**forget** 431:12 456:17 482:18 483:11 500:17 683:25 686:7,9

**forgot** 619:12

**form** 350:20 355:6 404:19 418:9 425:18 428:6,22 463:7 471:5 474:13 477:24 479:11 498:16 507:22 509:20 510:4 515:9,24 536:5 545:14 553:3 555:19 564:23 609:22 610:6 618:16 623:20 624:16 639:20 664:13,17,21 665:3,9,14,19,23 666:4,8,13 667:3 668:18,22 681:13 686:3 692:5

**forma** 612:15 614:22,24 615:7,9

**formally** 666:25

**format** 545:22

**formation** 621:19

**formulaically** 658:8

**Fortress** 659:3 688:5,14

**forward** 456:15 482:15,22 632:4,25 634:12 641:8,21 673:5 674:24 682:24 683:12 685:9 687:19

**found** 673:11

**Foundation** 384:5 479:12 498:17

**frame** 564:4 571:5

**Frank** 422:4 465:25 555:23 590:10 636:22 654:4

**Frank's** 646:3

**Franklin** 572:23 649:10

**frankly** 450:2 468:17 531:17

**fraud** 626:20,23 661:21

**free** 597:4

**French** 563:6

**Friday** 587:18,19 589:14

**friend** 642:13

**front** 360:18 361:9 633:2

**full** 351:21 352:12 353:11 366:20 513:9,11,13 514:2 610:2

**fully** 460:4

**function** 485:12 605:8

**functioning** 388:21

**functions** 523:9

**fund** 353:6,8,12 356:19 357:16 359:2 364:14 365:20 366:17,22,25 367:3,8 368:24 369:2 370:8,9 373:4 374:11, 13 375:20,22,23 376:13 377:11,15, 18,23 378:5,10 399:11,15 400:11 402:18 403:18 413:7,24,25 414:2,3,5, 7,12,17,23 416:10 418:5,8 424:3,12 458:16 459:15 473:25 486:19 487:8 489:18 490:6,12,16,21 494:23 495:8, 19,24 518:25 521:17 536:7 540:14 556:3 569:3,5 570:3,23 571:3,15,25 572:3 601:9,20,22 619:12,14 624:11, 20,24 625:19 626:2 630:13,23 631:9, 22 634:22 636:17 638:8 662:16,17,24 675:2 697:4,11 698:14,18

**funded** 459:19

**funding** 435:14 437:3,7 459:9 531:9 533:5

**Funding's** 435:3

**funds** 398:13 401:3,17 402:12 403:5, 10 406:21 411:12 415:3 418:6,15 424:21 426:20 427:16 428:4 430:14

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

INDEX NO. 158207/2022

NYSCEF DOC. NO. 1 EMBQ6400 BUSINESS CREDIT Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024

John Hanratty

JOHN ARTHUR HANRATTY

Court Records

Pg 1483 of 2230

June 21, 2023

451:5 454:22 458:22 466:3,13 467:18 468:6,23 469:16 474:25 496:5 505:16 537:5 541:9 569:21 571:8 601:16,17, 18 602:12 605:8 607:5,6,24 608:6,7, 10 618:12 620:23 626:13 627:21 633:7,8,9 637:13 638:4

**funny** 547:9

**future** 677:11

---

**G**

**G4** 644:13,19,20

**gain** 439:6 442:23 643:7

**game** 685:20

**Gandol** 422:4 465:15 555:23 572:23 649:11 698:8

**gap** 459:9

**gave** 428:17 506:24 507:12,17 517:4, 6 530:12 624:3 640:25

**general** 363:24 395:16 454:6 491:11, 16 504:13 505:10,16 507:3 512:2 526:4

**generally** 367:25 403:15 406:18 417:8,18,23 427:13 430:18 431:14 432:19,24 433:15 441:19 444:7 446:22 447:15 449:12,17,24 452:3 463:25 473:23 475:5 496:17 507:25 508:6 521:6 525:10 531:8 533:18 534:18 535:9 540:15 542:13 546:25 547:15 559:17 561:14,19 563:18 564:2,15,21,24 565:17 566:2 569:12, 23 570:24 571:3,7,19 574:12,17 576:18 585:23 609:3 614:6 629:7 640:20 669:3 672:25 680:23 682:24 683:6 690:19

**Geninteri** 659:2

**gentleman** 514:12 660:20

**Germany** 618:5

**Gilles** 558:21

**give** 358:12 476:14 517:9 584:22 598:3 644:19 654:18 663:16 670:19 671:6 675:12

**giving** 428:13

**go-forward** 488:18

**goal** 569:13

**good** 349:17,24 433:13 459:22 460:7 478:6 567:13,16 588:24 621:24 633:18 644:15 672:20 673:8 675:4,6

**gotcha** 588:21 623:11

**government** 626:20 627:20 628:19 641:12

**grace** 393:3 412:10 422:22

**Grady** 501:6,12,24 502:8 503:3,14 509:16 512:23 513:4 525:18 531:25 532:6,13,25 533:10 539:11,12 541:18 542:2,6,16 543:9,10 545:3,11 546:11, 20 547:12 550:18 551:4 553:7,11,17 641:25 642:7,15 698:24 699:6

**Grady's** 542:15

**great** 632:22

**greater** 452:24 453:7,8,20 463:12 668:4 669:10 680:17

**grew** 521:19

**grind** 641:16

**ground** 459:19

**group** 427:24 453:20 456:18 457:25 459:16 493:5,13 494:10 522:25 523:5,7 599:24 683:25 685:14 688:6, 7 690:7

**group's** 690:10

**groups** 690:21

**grow** 434:10

**growth** 468:20

**guarantee** 516:22,23,24 518:25

**guarantees** 517:13

**guarantor** 517:12,14 536:25 537:9 540:10

**guarantors** 538:7 541:5,9

**guaranty** 516:14 620:18 699:3

**guess** 351:21 430:9 470:16 541:7 622:25 649:19 671:19 678:24 679:25 680:9

**guilty** 363:10

**Gursoy** 349:23

**Gusrae** 349:25

**guy** 382:8 504:6 674:25 685:16 689:12,23

**guys** 632:3 684:8

---

**H**

**Hacienda** 634:10

**half** 508:11,20 509:25 510:16

**hand** 362:22 365:23 375:3 409:25 420:14 425:21 447:2 460:8 465:8 475:20 486:9,14 488:23 489:13 512:18 516:8 525:11 555:3 557:20 568:4 622:10 648:7 695:23

**handing** 350:23 391:15 437:10

**handle** 357:12 359:24

**handled** 354:11,22 358:5

**hanratty** 349:1,13,14 350:1,3,18 351:1,3,5 352:1,16 353:1 354:1 355:1 356:1,15 357:1 358:1 359:1 360:1 361:1 362:1,3 363:1,2,3 364:1,8,12 365:1 366:1,4,6 367:1,11 368:1,22 369:1 370:1,12,13,17 371:1 372:1 373:1 374:1 375:1,8,9 376:1 377:1 378:1 379:1,15 380:1 381:1 382:1 383:1,3 384:1,7 385:1,17 386:1 387:1 388:1 389:1 390:1 391:1,19,20 392:1 393:1 394:1 395:1,21 396:1,22 397:1 398:1,9 399:1,6,9 400:1 401:1 402:1 403:1 404:1 405:1 406:1 407:1,21 408:1 409:1 410:1,4,6 411:1 412:1 413:1 414:1,15 415:1,20 416:1 417:1 418:1 419:1,5 420:1,18,19 421:1 422:1 423:1,24 424:1,2 425:1 426:1,3 427:1 428:1 429:1 430:1 431:1 432:1 433:1 434:1 435:1 436:1 437:1,16 438:1 439:1 440:1 441:1 442:1 443:1 444:1 445:1,17,18 446:1 447:1,6,7 448:1 449:1 450:1 451:1 452:1 453:1 454:1 455:1 456:1 457:1,20 458:1 459:1 460:1,12,13,15 461:1 462:1 463:1 464:1 465:1,11,15 466:1 467:1 468:1 469:1 470:1 471:1 472:1 473:1 474:1 475:1,23 476:1,4 477:1 478:1 479:1 480:1 481:1 482:1 483:1 484:1 485:1 486:1,18,19 487:1 488:1 489:1, 16,18 490:1,24 491:1,21 492:1 493:1, 4 494:1 495:1,17 496:1 497:1 498:1 499:1 500:1,25 501:1,15 502:1 503:1 504:1 505:1 506:1 507:1 508:1 509:1 510:1 511:1 512:1,20,22,23 513:1,19 514:1 515:1 516:1,12,13 517:1 518:1 519:1 520:1 521:1 522:1 523:1 524:1 525:1,15,16 526:1 527:1 528:1 529:1 530:1 531:1 532:1 533:1 534:1 535:1 536:1 537:1 538:1 539:1 540:1 541:1 542:1,18 543:1 544:1 545:1 546:1 547:1 548:1 549:1,16 550:1,11 551:1 552:1 553:1 554:1 555:1,7,9,11,22 556:1 557:1,24,25 558:1 559:1 560:1 561:1 562:1 563:1 564:1 565:1 566:1 567:1 568:1,8,9,11 569:1 570:1 571:1 572:1,8,10,12 573:1 574:1 575:1 576:1 577:1 578:1 579:1 580:1 581:1

582:1 583:1 584:1 585:1 586:1 587:1 588:1 589:1 590:1 591:1 592:1 593:1 594:1 595:1 596:1 597:1 598:1 599:1 600:1,23,24 601:1,2 602:1 603:1 604:1 605:1 606:1 607:1 608:1 609:1 610:1 611:1 612:1 613:1 614:1 615:1 616:1 617:1 618:1 619:1 620:1 621:1 622:1,17,19 623:1,16 624:1 625:1 626:1 627:1 628:1 629:1,18,20 630:1 631:1 632:1 633:1 634:1,17 635:1 636:1 637:1,8 638:1,5,9,21 639:1 640:1 641:1 642:1 643:1,16,17 644:1 645:1 646:1 647:1 648:1,8,10 649:1 650:1 651:1 652:1 653:1 654:1 655:1 656:1 657:1,4,5,10,12,18 658:1 659:1 660:1 661:1 662:1 663:1 664:1 665:1 666:1,16 667:1 668:1 669:1 670:1 671:1 672:1 673:1 674:1 675:1 676:1 677:1 678:1 679:1 680:1 681:1 682:1 683:1 684:1 685:1 686:1 687:1 688:1 689:1 690:1 691:1 692:1 693:1 694:1, 9 695:11 696:5,11,13,16,18,20 697:3, 6,8,11,14,16,19,22 698:3,4,7,8,10,11, 14,18,23 699:3,5,9,12,13,14,17,20,21 700:3,4,7,8,10,13,16,18 701:4,18 703:24

**Hanratty's** 638:21

**happen** 444:9 469:14 522:6,19 538:13 620:25

**happened** 443:14 504:19 505:3 560:8 625:8 654:8 663:2 687:4

**happening** 407:5 571:24 687:13

**Happy** 545:3

**hard** 660:21 661:3

**head** 355:7

**header** 645:20 646:9

**Heather** 558:10,19

**heck** 684:20

**held** 349:8 357:4 556:3,9

**helps** 609:13 610:16

**hereinbefore** 695:12

**hereof** 392:20 701:13

**hereto** 363:18

**hereunto** 695:22

**hey** 453:24 513:7 582:9 587:5 641:6

**high** 432:4 439:8,17 442:5 446:11 451:17,22 458:9 619:25 620:3,6 671:4 689:5

**higher** 432:20 437:4 462:20 463:16

**Hill** 685:15 689:18

**hire** 453:24 482:21 486:6 520:24 522:14

**hired** 486:7 521:9 523:12 601:19 640:23

**historical** 439:22 442:7 571:9

**historically** 442:10 443:13 446:6,7,8 500:15

**history** 444:8 447:8,19 697:22

**hold** 357:3 545:5 556:4 558:25 560:5, 11,18 561:2,4,11,20,22 563:12,14 566:23

**holder** 436:12

**holding** 594:5

**holdover** 673:6

**holds** 660:2

**home** 454:3

**homes** 577:4 596:24

**honest** 553:15

**hour** 350:5 621:23

**hours** 692:8

**house** 489:2

**houses** 582:13,19 586:20 591:18 595:12,13 600:7

**human** 664:9,23

**hundred** 595:11 670:18 671:6

**hundreds** 634:23

**hypothetically** 385:22 388:7

---

**I**

**Ian** 621:19

**idea** 641:25 642:7

**identical** 411:6 440:8,16

**identification** 351:7 363:7 366:8 375:11 391:23 399:12 410:8 420:21 424:5 426:6 437:20 445:22 447:9 460:18 465:18 476:7 486:25 489:24 512:25 516:16 525:20 549:22 550:13 555:7,13 558:5 568:12 572:15 601:4 622:22 629:23 643:18 648:13

**identify** 349:15

**identifying** 451:17

**illiquid** 428:21 429:2

**Ilsen** 525:19 526:2,6 527:2,20 699:7

**imagine** 429:4

**immediately** 620:25

**impact** 585:25 586:22 669:19,22

**impacts** 680:24

**impart** 478:2,4 479:17

**implication** 462:2

**implies** 557:13

**import** 558:24 559:10,13 560:4,10, 17,24 561:4,11,22 563:12 566:21

**important** 441:14 652:16

**imported** 561:19 563:14 564:22 566:19 567:4,9

**impose** 541:2 691:16

**impression** 413:23

**improve** 457:5 521:5

**in-house** 387:21

**in-housed** 533:7

**in-kind** 605:18,20

**inability** 577:21

**inaccurate** 384:13 448:5 519:8,15, 22 520:8 636:4

**incident** 428:16

**include** 491:8 693:21

**included** 435:14 603:24 612:14 614:21 615:16 646:21 649:12 654:6

**includes** 559:24

**including** 496:19 634:20 653:22 658:8

**income** 439:12 662:15,17,24

**incorrect** 497:3 503:25 581:15,23 636:9,13 637:4 658:3

**incorrectly** 377:19 607:23 608:5

**incurred** 518:4,17

**indebted** 617:4

**indented** 439:4

**independent** 486:21 489:20 504:10 505:6 600:12 698:15,20

**independently** 523:2

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 3    EMB000400 BUSINESS CREDITPl-led 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State RECEIVED NYSCEF: 01/12/2024
John Hanratty

JOHN ARTHUR HANRATTY    Court Records    Pg 1485 of 2230    June 21, 2023

**Indiana** 575:13 576:19 580:23
582:17 585:24 587:15 591:9 596:22

**indication** 690:2

**individual** 455:2

**individuals** 520:25

**industry** 448:21 545:22

**industry-wide** 552:7

**ineligibility** 611:16

**ineligible** 420:12 528:21 532:17,21
542:7 544:12,15 545:2 546:6 565:23
646:20 652:4 653:13,21 656:15
657:20 658:4

**ineligibles** 409:22

**inform** 539:12 549:2 613:17

**information** 446:4 517:8,15,18,22
518:8,21 519:8,15,22 520:8,18 522:9,
13

**Informational** 445:19 697:19

**informed** 426:20 631:23

**initial** 435:8 448:8 450:3 468:13
589:12

**initially** 443:22 452:2

**initiate** 464:8

**initiated** 579:18 613:4 649:15,24
650:5,10

**INS** 646:10

**installment** 627:22

**instance** 470:17 637:10

**instruct** 559:3 560:3,9,16 561:22
637:19

**instructed** 427:5 563:13 665:5,11

**instructing** 559:8 560:21

**instrument** 350:25 356:20 357:21,
24 363:13,17,19 366:2 368:17,21
370:5 375:5

**insure** 433:12 663:15

**intellectual** 627:9,12

**intended** 477:14 528:25 608:9
664:2,5,8

**intends** 363:16

**intent** 359:14 360:19 686:22

**intention** 368:25 557:8 677:4,10,14

**intentionally** 636:9 637:3

**interact** 436:11,12 523:11,15 642:14

**interacted** 522:21

**interacting** 673:16

**interaction** 524:12,19,22

**interactions** 521:20 560:14 561:18
562:15,17,21 563:15,18,21 564:18

**interchanges** 542:23

**interest** 462:20 463:2,5 467:17
504:7,8 536:18 610:19 619:23 620:2,
6 674:7 679:3,17 681:7,15 685:9
689:3

**interested** 382:12 673:23 681:24
695:20

**intermediary** 353:23

**internal** 437:12

**internally** 687:14

**interpretation** 552:2

**interrogatory** 632:20

**interview** 632:7

**intimately** 642:22,23,24

**inverse** 462:7

**invest** 581:12

**invested** 429:7

**investigation** 634:11

**investing** 428:20 430:11 468:7,11

**investment** 442:20 443:9,24 446:10
454:21 463:22 493:6 495:25 499:20
500:14 630:23 631:9,21 640:23

**investments** 366:19 367:5 429:6
458:24 491:9,24 492:5,10,22 493:14
494:15 495:9 496:7,13 497:4,15
498:7,14 499:6 502:24 503:15,22
504:12 505:9,21 506:9,18 507:20
509:10,18 511:12

**investor** 400:20 402:17 416:17
417:4,25 418:11 429:20 430:12,14
431:2 441:9 454:19,22 457:24 578:2,
15 579:2,8,14 580:2 581:5,10,12,20
582:21 583:10 596:5 597:7 598:11
601:24 602:23 603:6 605:4 621:4,10
622:21 629:22 630:4,12 638:7
700:11,14

**investors** 401:12 403:12,16,21
404:3,8,12 405:3 413:8 414:25 415:5
416:12,21 425:17 427:24 428:7,13
429:5 455:5 457:24 458:6,17,23
468:8 494:25 514:19,25 515:8,14,22

516:4 579:19 582:5 586:9 602:11,18
603:3 617:22,25 618:2,10,11 639:13
674:21,22 683:11,17,20 687:9

**investors'** 578:21 583:6

**invests** 439:6

**involved** 366:15 384:20,22 385:2
483:25 523:10

**involving** 359:11

**Ira** 413:25 425:3 607:25 608:6,10
637:13,18,21 638:4

**irate** 638:9

**issue** 430:23 483:13 488:19 580:17
582:11 636:22

**issued** 488:15 508:7

**issues** 381:16 431:15 482:11 485:18
526:17 540:4 569:16 582:18 626:13
628:2 673:2

**issuing** 483:21 486:3

**item** 457:21

**itemized** 649:7

**items** 632:11

**iterations** 652:9

---

**J**

**Jack** 496:18 497:8 532:25 533:25
539:4 542:5,8 543:9 544:9 545:25
547:10 551:18 552:20 565:24 569:19
614:2,8,14,16 641:25 642:6,22

**January** 601:10 608:17 615:11,18
616:17 617:14 620:21 650:4,7,11

**Jeanine** 395:16

**Jersey** 350:25 353:12,23 360:14
362:7,14 365:25 436:13 603:14,25
611:13 618:24 649:3 652:23 653:5

**Jim** 618:4

**John** 349:12,14 350:3 352:15 356:14
362:3 367:10 368:22 370:12,13,17
379:15 387:21 422:3 479:13 491:21
493:3 532:3 541:19 543:11,24 545:4
553:18 555:21 588:3 589:21 597:22
664:2 666:16 694:9 695:11 696:5
701:4,18 703:24

**Johnny** 460:25 461:12,16

**joined** 350:6 395:17 432:2

**jointly** 684:6

**joke** 432:10

**jokingly** 641:6

**Josh** 684:9

**judgment** 389:8 672:16 673:9

**judgments** 672:16

**July** 465:23 471:17,23 473:16 501:21
509:17 547:19 560:7 615:24

**Jumping** 640:11

**June** 349:6 472:10 485:21 547:19
695:23

**jurat** 363:18,20 364:3,9 365:16
693:21

**justify** 577:8

## K

**Kaplan** 349:25

**Karen** 614:2,4,9,15,17 684:15 687:10

**Kari** 349:24 632:8 663:21

**Kari's** 633:17

**Kentucky** 531:20 533:14 534:4,11,
22 535:8,17,23,25 536:9,20 537:18
538:6,22 539:11,18 544:17 556:12,
21,24 557:3

**Kernan** 637:11,20

**Kevin** 558:10,20

**key** 620:24

**kick** 624:5

**kidding** 432:9

**kind** 368:3 378:3 431:19 447:19
449:8 568:20 576:25 602:18,21 676:4
683:24 685:8,10,22 687:3,10,17
688:17,19 689:7 690:5 691:4

**Kirkland** 662:15,17,24

**knew** 372:17 406:14 574:19 628:23
642:22,23 675:2,3 683:7 688:22

**knowing** 363:13 593:25

**knowledge** 517:14 626:12 678:18

## L

**L.P.** 486:20 489:19 698:14,19

**labeled** 385:17 391:16 399:3 407:20
410:2 414:19 419:5 420:15 423:21
437:11 438:5 439:2 445:14 447:3

**460**:9 465:9 475:21 486:10,15
487:12,23 488:24 490:11 494:22
495:6,21 512:19 516:9 517:11 525:12
549:14 550:10 555:4 557:21 558:8
568:5 572:6 600:20 610:2 629:13
648:7

**lack** 503:4 544:11 576:22

**language** 408:16 417:3 520:13
586:15

**laptop** 399:2

**large** 434:17,22 577:3,14 586:22
688:6

**largely** 439:7

**larger** 354:9,20 357:11 358:4 359:11
384:16 386:4 388:16 448:21 587:2
641:9

**lastly** 459:25 626:16

**late** 478:7,22 481:4,8,13 685:20

**later-stage** 456:21 549:8 672:10

**launching** 659:5

**law** 350:6 362:3,23 363:10 563:3

**lawsuit** 407:7 609:11,16,21 612:6

**lawyer** 407:4 621:2,7

**lead** 545:18 573:8 586:17

**lead-up** 570:6 571:12

**leads** 571:18

**leapfrogging** 639:14,24

**leave** 427:2

**leaving** 468:18

**left** 456:16,17 489:12 684:11 685:21

**legacy** 382:13 544:18

**legal** 369:23 389:10,12 429:17 519:9
553:9

**legally** 436:11 541:8

**lend** 440:20 460:3,5 465:4 557:14
693:3

**lendable** 540:8

**lender** 441:10 474:3 517:16 518:5,18
540:22 557:13

**lenders** 619:5,7 685:25 690:15

**lending** 470:13

**lends** 676:25

**lent** 532:21 556:16,22 557:5,10

**letter** 485:9 602:14 686:22

**letting** 570:23 571:2

**level** 483:2 570:13,22

**levels** 630:14,16

**Leventhal** 413:25 425:3 426:23
603:8,20 604:10,17 605:18,23 606:17
607:25 608:6,11 618:3 637:14,18,21
638:4

**Leventhals** 425:11

**Lexitas** 349:5

**liable** 519:7,14,21 520:7,17 522:8

**liaison** 456:11

**lie** 380:22,25 665:7,12,17,22 666:2,7,
11

**lied** 664:15,19,23

**lien** 351:14,18 353:4,7,21 377:18
401:18,23 402:4,10,13 418:5,18
428:20 429:15 432:13,18,20,22 435:6
436:7 441:2 451:6,7 452:7 453:14
454:8 456:10,17 459:24 461:19 462:8
463:5,13,20 464:5,6 470:23 491:9,23
492:5,10,22 493:6,14 494:5,15 495:9,
25 496:13 497:5 498:7 499:18,20
500:14 502:9,14 503:15 504:12
505:9,20,21 506:9,18 509:10,18
511:13 523:4 559:20,25 560:4,10,18
564:13 565:10,15,20 578:3,8,17,25
579:6,12,24 580:9,10 581:14,22
582:23 583:12,15 600:16 620:11
625:18 627:16,17 628:8,10,22 631:10
645:4,11 646:5,13,18,20 647:15
649:2,6,16 650:2,4,12,16 651:3,4,8,9,
14 652:2,4 653:3,4,20 655:4,14
656:11,12 688:6,7 690:20 691:2

**lienholders** 441:4

**liens** 354:2,4,6,13,18 359:2 367:4,7
382:2,6 397:8 398:15,17 400:9
402:15 408:21 409:8 419:14,21
424:22 425:9 428:25 429:7,9,23
430:11,15 432:19,24 433:12,18,24
434:3,9,17 436:3 439:6,8,10,17 441:8
442:5,18,21 443:9,16,25 444:7
446:11,18,24 449:11,23 450:5,8,21,
24 451:3,16,17,22,25 452:22 453:6,
22 454:12 455:22 458:15,20 462:4,
11,14,17,24 463:11,17 464:10 468:7,
12,20 494:2 496:7 497:15 498:4,14,
21,25 499:7 502:24 503:22 506:14
507:21 508:2 509:2 512:13 527:7,17
536:16 539:17,18 544:17 558:24
559:11,13,17,19 560:25 561:4,11,20,
23 562:22 563:12,14,19,24 564:6,11,

17,22,25 565:19,23 566:6,11,12,15,
17,18,22,24 567:3,4 570:16 602:22
603:3,4,14,15,24 609:5,18 610:13
611:6,8,17,20 612:7 618:18 620:12
623:25 624:22 625:6 631:7,25 649:3,
8,12 655:5,15,19 656:2 672:10,11
681:6 686:13

**lies** 626:13

**lieu** 602:4,13,23

**life** 641:16

**lifted** 681:17

**light** 482:25

**lily-padding** 640:6,10,12,18 641:5,
17

**limit** 403:18 423:19

**limited** 382:5 418:7 488:3 540:17
541:4,14 692:10

**lines** 417:23 457:15 500:19 610:3
686:23

**liquidate** 578:20 583:8 660:10

**liquidating** 659:20 660:9

**liquidation** 569:2,6 570:3 571:15,17
608:19,24

**liquidity** 430:7,19 431:5,9 432:13,25
433:4 452:24 453:7 455:8 468:8
575:23 577:19 620:7 625:3

**list** 419:13 450:24 574:23 576:12
595:6 596:8 620:22

**listed** 354:3,14 376:17 409:11 426:9
646:18 655:19

**listen** 550:8

**listened** 550:25

**listing** 622:20 629:21 630:3 700:11,
14

**lists** 364:13 366:21 495:8,24 644:21,
24 645:8,11

**litigation** 402:25 406:22 416:24
417:6,9 418:17,23 425:24 427:15
485:19 612:12,16,23 613:3,4,12,18,
21,24 614:8,15 622:15 632:15 661:16
673:24 676:5,8,17 677:9 681:24

**litigations** 486:5 632:17

**live** 614:11,16

**lived** 356:4

**living** 358:23

**LLC** 350:19 353:6,9,22 356:19
357:16 359:3 364:14 366:19,23,25
367:3 368:24 373:4 375:21,23 376:5
377:15,20,22,24 378:5 391:21 392:10
400:13 410:7 420:8,20 421:6 423:6
445:19 491:10 494:16 535:15,22
536:4,8,18,19 537:14 623:5,6,17
624:11,19 625:11 630:10 631:22
648:12,21 696:21 697:6,9,19 700:20

**LLCS** 382:18 539:9

**LLP** 536:7

**loan** 400:5 416:5 424:16 431:10,14
510:22 584:24 618:21 619:24 620:3,6
641:2 658:25 659:6,8,11,12,16,18,23
660:21 661:3,23 662:7,9,18 673:20
684:6 690:16 692:19 693:6,10,13,14

**loans** 431:11 618:19 619:2,20 620:8,
10,15 640:24 672:4

**local** 482:21 588:23 627:2

**locally** 577:22 634:11

**located** 588:20

**lockbox** 405:17 605:11 606:3 607:8
608:2,8 670:13,14,15,24 671:10

**Log** 627:16,17 628:10

**long** 433:6 485:5 660:7 692:16

**long-term** 569:13

**longer** 388:21 405:24 483:17 643:5

**looked** 440:21 448:5

**losing** 583:5 594:5 596:14,15

**loss** 429:10 430:16 500:11,22

**losses** 518:6,19

**lot** 435:15,17,19 450:15 464:18,21
569:15 582:19 583:7 674:12 683:8
684:19 685:4 690:21

**low** 690:22

**lower** 511:14 573:2 583:16,23 585:16
586:6 587:2,22 589:17 592:11,23
595:15 597:19

**LP** 374:13 490:6,21

**LP's** 424:4,12 697:12

**LTV** 440:9,16 630:23

**lump** 441:7

---

**M**

**M&t** 373:25

**made** 385:9,18 405:13,22 407:10,14
408:14 425:2,10 436:25 448:14
451:15 463:17 466:24 470:4 488:7
494:20 516:5 521:4 522:5 544:22
561:3,16 577:15 578:25 579:24
582:23 583:7,12 585:15 586:5 596:4
597:6 598:10 605:17,22 631:22
636:23 652:17 661:7 662:5 678:10
679:15 687:5

**main** 456:11,16 568:20,24 652:11

**majority** 443:15,21 444:6

**make** 377:5 380:22,24 381:3 390:8,9
403:19 406:2,8 416:11 417:15 426:22
431:23 447:24 455:9 459:4 467:21
500:23 515:14,21,22 531:3 561:10
563:23 569:14 578:3,16 579:6,12
581:14,22 584:11,13 636:24 656:18
657:23 661:13 663:17 673:20 680:9
682:3

**making** 363:4,10 415:13 447:17
522:18 530:16 533:19 561:7 563:11
570:6,11 571:12 662:23 674:12
696:14

**manage** 459:9 593:18 596:21

**management** 523:5 587:9 588:8
590:3 591:23 594:14,16,18 598:4
684:5

**manager** 355:11 361:20 368:23
369:3 371:13,23 372:17,20,23 373:3
382:22 383:9,12,17 387:20 491:19
689:7

**managing** 624:21

**manner** 361:3 434:14 457:17 603:9

**March** 669:13,23

**Marcos** 476:10 478:4 479:16 482:3
488:18 491:2 494:20 498:20 508:7
510:10 511:17,20,21

**Maria** 534:17

**Marina** 658:23 659:4

**mark** 351:3 362:25 366:4 375:7
391:18 399:5 410:4 420:17 423:24
426:2 431:25 437:15 445:16 447:5
460:11 465:11 475:23 486:17 489:16
512:20 516:11 525:14 549:16 555:6
557:23 568:7 572:8 600:22 622:17
629:18 643:15 648:6

**marked** 351:6 363:6 366:7 375:10
391:23 397:6 399:11 410:8 420:21
424:5 426:5 437:20 445:21 447:9
460:17 461:8 465:17 476:6 486:24
489:23 512:24 513:18 516:15 525:20

**market** 438:10 448:19 449:5 451:10
459:5,15 461:19 462:3,8,10,14,16
491:13 503:17,20 504:7 506:8 507:19
508:9,18 509:7,23 510:13 511:8,11
573:8,9,14,15,17,23 574:7,15 575:3,
10 576:6,7,9,16 577:6 580:18,21
581:4 582:6 584:22 585:5 586:3,17
587:14 591:6 592:5,24 593:8,16,22
594:11,20 595:4,16 597:13 599:9,16
600:2,9

**marketed** 596:14

**markets** 431:20 580:7,21 581:9
583:5 584:8 585:13,24 586:12 587:15
591:8

**marking** 656:24

**markings** 585:21

**marriage** 695:19

**Maryland** 436:13

**match** 416:8

**matches** 657:16,21,22

**material** 393:9,23 412:18 423:4
517:17,23 518:9,22 520:12,20
522:10,13

**materially** 440:6

**materials** 445:20 446:5 697:20

**Matt** 590:10

**matter** 349:11 491:7 576:24 634:9
695:21 701:9

**matters** 433:5

**Matthew** 572:23

**maturity** 467:17 487:20 488:11
490:19 537:11 606:25 607:11,19

**maximize** 577:23

**Mayron** 349:17,18 350:17 351:2,8
355:19,22 356:9,25 358:14 362:24
363:8 364:6,7 366:3,9 374:16 375:6,
12 383:2,7 385:14 387:14 391:17,25
395:15,19,23,24 396:13,17,21 399:4,
13,22,24 400:3,23 407:6,25 408:3
410:3,10 411:2 414:22 415:7,23,24
416:4 417:13 419:24 420:16,23
423:23 424:8,10 425:25 426:7 429:25
432:11 435:24 437:14,22 444:11

445:12,15,23 447:4,11 455:20
460:10,19 465:10,19 466:11 471:21
474:19 475:22 476:8 478:14 480:16
481:21 486:11,13,16 487:2 489:3,11,
15,25 490:23 503:10 505:4 511:5
513:2 514:12,14 516:10,17 525:13,22
526:23 527:10 546:23 549:15,23
550:17,24 551:3 555:5,15 557:22
558:7 562:6 563:6,9 567:17,21 568:3,
6,14 572:7,16 579:10 593:11 600:21
601:6 608:22 609:24 616:13 621:25
622:9,16 623:4,13 624:15 629:17
630:2 635:5 636:2,6 639:18 643:14,
20 644:4 645:18 647:22 648:5,15
651:6 655:3 658:16,20,22 660:25
663:16,21 664:13,17,21 665:3,9,14,
19,23 666:4,8,13 667:3,13 668:18,22
673:19 676:11 678:5,8 683:14
692:11,14,17 693:19 696:6

**Mchugh** 395:16

**Mcosker** 609:21 610:10,12,22 611:7,
19 612:6,23 613:3,5,12,18 614:8,15
622:13 623:7,14,18 624:10 625:10
626:7 627:14 632:16 634:17 637:9
638:5,19 639:12 641:24 642:12 643:2

**Mcosker's** 634:14

**meaning** 448:20 449:20 504:14,22
505:11 546:18 600:13 640:10 651:11
653:19 666:15,25

**means** 433:12 452:10 502:20,22
503:2 527:22 565:3 566:4 569:22
575:18 615:21 646:5,13 647:12
650:17 653:9 656:12

**meant** 477:14,22 478:21 512:5
540:19

**meeting** 609:7 612:3 613:13 614:3,
12,16,19,20 621:4,9

**membership** 536:17

**memo** 416:5 424:16 437:12,18
697:16

**memorialize** 530:24

**memory** 669:4,5 671:24

**Mendez** 476:5 558:3 698:12 699:18

**Mendoza** 558:11,21

**mentioned** 505:25 591:20 659:14
674:25

**merchant** 619:8

**merge** 569:8 570:19

**merging** 569:20

**mess** 381:14 654:13

**message** 502:2,7 552:2,10 640:4

**messing** 633:6

**met** 406:2 640:25 676:23

**Michael** 416:21 426:23 427:25
428:7,10,15

**Michael's** 430:23

**mid** 531:15

**middle** 366:21 367:9 439:4 459:19
567:20

**Millennium** 353:5,8,14,19,21 359:3
387:5

**million** 403:18 404:13,17,23 405:4
408:20 409:7,13,24 413:8,17 414:6,
11,24 415:4,17 416:11 417:16 418:6
420:3 438:7 448:8 457:23 458:5
470:18,19,20,23 488:3 494:24 496:8,
15 497:17 498:8,15 499:8 500:9
503:14 509:9,18 510:15,17,23
514:18,24 515:7 610:13 627:15,22
628:5,17,25 637:12 661:8,11,14,24
662:14 667:15,17,19,23 668:5,8,12,
21,24 669:2,11,21 670:7 671:3,15,18
675:16,25 676:13,16,19 679:10,15
680:4,6,17,19 692:19,22 693:3,10,13,
15,16

**millions** 666:17

**mind** 358:2 389:11 428:10 447:23
473:22

**mindset** 413:6

**mine** 561:7 632:2

**minimal** 670:16,17

**minimizing** 577:11

**minute** 647:23 654:18 663:16

**mirrors** 535:16

**Mischaracterizes** 485:2

**mistake** 430:8

**mistaken** 541:21,24 603:13

**Misters** 637:11,19

**mixed** 396:14 449:8

**modification** 652:18

**monetize** 429:19 453:18 454:7,24
681:10,19

**monetizing** 577:24 620:12

**money** 401:9 402:3 405:12 407:15

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 408 BUSINESS CORP Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
JOHN ARTHUR HANRATTY        Court Records    Pg 1489 of 2230
John Hanratty
June 21, 2023

418:5 429:12,22 430:5,12 431:23
542:13 583:5 591:22 595:23 611:24
620:13 626:15 638:7 660:21 661:3,13
667:9,11,25 668:16 669:7,9 670:3,11,
21,22 674:9 676:25

**monitor** 394:21

**Monmouth** 375:3

**month** 433:16 629:10 682:25

**months** 405:16 435:20 461:20 485:7
558:25 561:2 566:23 584:20 649:14,
19,23 650:6,8,16,22,24 652:22
669:23 676:3,4 679:23 682:23 687:7

**Morales** 349:4

**moratorium** 681:6,17

**morning** 349:17,24 350:4 446:19

**mortgage** 431:6 453:12 459:22
663:4,8,12

**Motion** 633:12,15 634:7

**move** 381:17 427:3 456:15,24 457:8
481:25 482:8,15,22 484:8 521:4
534:14 632:21 641:20

**moved** 373:25 470:10 473:11 481:23
534:16 628:13 634:4

**moving** 592:20 632:25 634:12 673:5

**MP3** 550:10

**MTAG** 350:19 353:11 356:18,21
357:4,6,15,21,25 358:7,8 359:2,7,15,
17 360:3,8,23 364:13,15,19,21,24
384:10,15,18 385:7,11,15,20,23
386:14,19 387:5 388:4,15 556:4,10
558:10,20 559:4,18,21 560:3,9
561:12,22 563:14,20,21 564:10,18
565:13 566:11

**muddled** 597:2

**Mulford** 461:16

**multiple** 475:13 497:8 544:9 592:20
613:25 629:5 682:10

**municipalities** 434:9 446:23

**municipality** 450:22,24 650:17,20
653:9

**mutually** 620:25

**mystery** 589:10

**Méndez** 558:9,23 559:3,10 560:24
561:9 564:5 566:21

## N

**named** 356:19 539:19 553:5 628:8
689:23

**natural** 454:14

**nature** 604:23 631:8

**necessarily** 453:13 463:24

**needed** 381:17 382:6,9 428:11
458:16,23 459:12,18 478:21 523:17,
23,24 527:25

**negotiate** 441:4

**negotiations** 563:20 564:17

**Neil** 461:15,16

**net** 500:11 608:13

**newer** 432:20 463:11 672:11

**newest** 654:11

**NJ** 375:20,22,23 376:13 377:12,15,
18,23 378:5 643:23 645:3

**non-** 691:19

**non-related** 659:11

**nonbinding** 691:16

**normal** 352:10 368:4 437:5 494:9
537:15 576:8,9 604:21 605:6,8,25
606:13 634:5

**notarial** 356:13 364:3,9 368:10 377:7

**notarizations** 638:23 639:8

**notarize** 355:13,23 365:11 373:6,12
638:20 639:5

**notarized** 352:13 358:24 365:3,8

**notary** 350:14 355:2,4 361:9 368:11
372:12 373:16,22 378:16 695:8
701:24

**notary's** 368:15

**notation** 416:16 427:22

**notations** 427:21

**note** 541:10 663:9

**noted** 445:3

**notice** 390:17,22 391:3,20 392:6
393:3 394:20 405:21 410:6,15,20
411:24 412:5,9,15 418:22 420:19
421:4,5,10 422:22 423:12 607:3,13,
16 642:2 696:20 697:6,8

**notices** 411:11

**notified** 394:13

**notify** 394:22 402:24 403:4,9 606:4

**November** 392:21 394:15 395:4
396:2,9,16,24 397:2 400:7,15 407:18
674:13 683:16

**number** 350:25 355:17 366:2,5
375:5 396:19 407:22 409:9 413:17
415:17 437:6 458:9 495:13 496:18
497:9 499:14,16 510:7 512:7 549:17
622:11 655:11 657:20 680:11,13

**numbers** 396:14 458:13 497:20,23
506:6,15 507:18 623:9 678:14,20

**Nusbaum** 349:25

## O

**oath** 356:16 357:5,14 368:15 377:10
381:3 385:10,19 388:10,24 701:15

**Object** 396:7 664:13,17,21 665:3,9,
14,19,23 666:4,8,13 667:3,13 668:18,
22

**objecting** 580:11

**objection** 350:20 352:21 355:6,14
356:8,24 357:7,17,22 358:11,21
359:8,18 360:4,10,15 361:7,15,23
362:4,11,15,20 363:21 364:4,10,17,
22 365:4,12,18 367:6,12,24 368:12,
19 369:10,25 370:6,22 371:8,14,24
372:5,19,24 373:7,14,19 374:19,25
375:18 376:6,14,21 377:13 378:8,14,
19 379:3,9,14,18,24 380:13,20,23
381:4,9,22 382:16,24 383:11,19
384:4,12,24 385:12,21 386:9,16
387:3,17 388:6,12 389:3,9,18,25
390:12,18 391:4,11 392:22 393:13,20
394:5,11,17,24 395:5 397:15,20,25
398:7,16,22 399:17 400:10 401:6,13,
19 402:6,22 403:7,13,23 404:14,19
405:6,10 406:23 407:12,16 408:15,22
409:14,20 411:13 412:2,12,22 413:4,
10,15,21 414:8,13 415:6,15 416:14,
25 417:7,12,17,22 418:9,19,24
419:18,23 420:9 421:8,12,19 422:25
423:8,13,17 424:18,23 425:5,12,18
426:12 427:19 428:6,22 429:13,24
430:3,17 431:7 432:15 433:25 434:20
436:4,23 437:25 439:19 440:11,18
441:17 442:8 443:12 444:4 446:13
448:11 450:10 451:19 452:9,25 454:9
455:6,13,19,24 457:12 458:7,25
461:3 462:12 463:7,23 464:12 465:6
467:13 468:4,10,25 469:9,25 470:8
471:5,13 472:3,14,22 473:7,20 474:5,
13,18,21 475:3,12,18 476:12 477:24

478:13,18 479:11 480:5,13,22 481:9
483:8,18 484:11,25 485:25 488:5,12
490:20 492:2,14 493:2,18 494:8,18
495:2,11,15 496:9,16 497:6,18,24
498:9,16 499:2,9 501:16,22 502:4,16
503:8,16 504:2,16 505:13,24 506:10,
20 507:5,22 508:14,23 509:12,20
510:4,19 511:9,15 512:4 513:24
515:9,15,24 516:6 517:7,25 518:12
519:3,9,17,23 520:10,21 521:13
522:20 524:3,10,16 525:9 526:14
528:4,16 529:7,15,21 530:9,15 531:7
532:10 534:6,25 536:5,11,22 537:12,
21 538:9,24 539:15 540:13 541:6,22
542:4,20 543:5,15 544:2 545:14
546:15,22 547:25 548:10,17,24 549:6
551:14,24 553:3,24 554:8,16,24
555:19 557:6,18 558:13 559:5,14
560:19 561:5,13,24 563:16,25
564:12,23 565:21 567:5 570:4 571:16
573:24 574:8,16 575:4 576:4,17
578:10 579:4,9,15 581:7,24 582:24
583:13,19 584:2 585:19 586:11
590:20 591:10 592:8 593:3,10,13,24
594:23 596:7 597:9 598:13 599:11,19
600:3 603:7,16,21 604:3,11,18 605:5,
13,19,24 606:6,12,18,22 607:4,14,22
608:12,21,25 609:22 610:6 611:2,10,
22 612:17 613:8,14,19 616:2,12,20
617:9,15 618:16 621:11 623:20
624:16 625:16,20 626:3 635:25
636:5,19 637:6,15,22 638:11,16,25
639:9,20,25 640:7,14,19 642:4,8,18
646:24 647:17 656:7,16 658:6 659:9
660:4,12 661:5 678:21 679:5,12,18
680:8,20 681:13,21 682:5 683:13
686:3,16 687:24 689:20 690:12
691:9,13,18 692:4 693:11

**obligation** 390:4,7 394:19 484:4
556:18 557:12,15

**obligations** 467:16 488:10 691:17

**obtain** 453:13 454:22

**obtained** 659:24

**occasion** 623:15,24

**occasionally** 439:5

**occupants** 673:7

**occupied** 427:2

**occur** 472:17 539:8 638:12 641:22

**occurred** 376:16 393:2 401:7 412:8
413:20 415:12 417:24 422:21 427:13
472:5 474:8 533:4 547:15 581:18
600:16 603:23 604:12 606:17 608:14
624:18 632:10 638:23 639:8

**occurring** 456:6 472:17 528:6
628:21

**occurs** 576:2

**October** 372:16 373:10 391:9

**offer** 602:11 661:7,13 662:6,9 676:12
677:7 687:6 693:4 701:14

**offered** 602:3 662:7,12 682:7

**offers** 405:23 674:13

**offhand** 398:24 414:14 536:23 541:7
630:25 668:10,25

**office** 355:11 356:5 358:23 361:20
387:20 426:24 427:2,25 428:16
429:21 522:4

**offices** 362:3 614:13

**official** 669:24

**officially** 669:13

**offset** 593:17 595:22

**Ohio** 531:20 533:14 534:4,10,22
535:8,23 536:9,20 537:18 538:6,22
539:11,18 544:17 556:12,24 557:3
566:6

**oil** 676:24

**older** 432:22 433:3 434:10 435:15
441:2 446:18 452:5,6,15 462:4,25
463:12,17,20 570:15 652:21,22

**oldest** 654:11

**one-off** 359:13 453:22 547:4

**one-time** 676:14

**one-to-one** 502:10,18 503:5

**ongoing** 563:20 564:17 587:8 588:7
590:2 591:22 593:17 594:13,18 598:4
622:14 632:17 691:2

**online** 687:15

**open** 406:15 615:3

**opened** 448:7 634:11

**operate** 443:18 580:8 581:19 582:12

**operated** 446:8 523:2

**operating** 442:16 472:12 546:4
575:14 576:8 641:15

**operation** 583:3

**operational** 545:7 576:22

**operations** 376:3 394:2 569:16
619:21

**opinion** 483:22 486:3 488:20 491:4
506:25 508:7 626:19 633:17

**opportunities** 432:13

**opportunity** 442:12

**opposed** 546:4 570:24 591:2

**opposing** 634:6

**opted** 687:18

**optics** 586:23

**option** 429:22 684:18

**options** 674:3 684:3 688:21

**Opus** 601:9,16,17,18 621:3,9

**Orange** 619:9,20 620:3,9,15

**order** 369:17 406:19 575:22 620:11
625:5 627:18 635:14 689:14

**ordered** 607:6,24 608:5

**orderly** 573:14,17 578:22

**ordinary** 474:3

**organize** 381:18

**organized** 428:9

**original** 388:19 622:24 626:10 634:3

**originated** 647:13

**originating** 450:21

**origination** 450:14,17 451:12,16
634:23 637:4

**originations** 449:8

**outcome** 497:11 695:20

**outs** 499:16

**outstanding** 441:6 470:15 487:19
490:17 606:10 607:21 619:16

**Ovation** 684:6

**overadvance** 455:16 466:24 467:3,
5,11 473:2,5,18 474:2 475:16

**overadvances** 467:22 468:3 474:10
475:2,10

**overbid** 419:17

**overbids** 397:14 409:3

**overemotional** 476:16,20 477:12,
18,23 478:10,16 479:5,14,23 480:4,7

**overestimated** 680:25

**oversight** 522:23 523:14,25 524:7,
13,19

**overstated** 573:10 580:18 585:6

**owe** 405:12 466:2,13 467:18 611:24
618:18,20 666:17 674:9

**owed** 470:19 500:8 615:4 637:13
679:4

**owes** 541:11

**owned** 367:8 377:15,17 378:6,23
382:18 402:8 535:7,9,12,25 538:6
541:4,14 623:7,18 625:18 658:25

**owner** 439:11 441:5 442:22 443:11
444:2 454:18

**owns** 660:18

---

**P**

**p.m.** 444:15 445:3,10 489:7,10
526:19,22 567:23 568:2 622:5,8
647:25 648:4 694:5

**pace** 452:3

**pacify** 428:17

**package** 660:22 661:4

**pad** 640:11

**PAGE(CONT'D.)** 703:2

**pages** 612:11

**paid** 386:21 404:12 405:3,8,19 409:2
414:6,11,23 417:20 419:17 425:14
428:12 454:14 458:21 494:24 544:19,
24 616:7,18 669:20 670:21 671:10,
14,19 680:4,5,16,18

**paints** 501:7 502:2

**pair** 451:5

**pandemic** 669:12,24 672:2,12,19
681:5

**paper** 381:14 631:20

**papering** 631:12

**papers** 411:8

**paperwork** 386:21

**paragraph** 392:16 610:2 623:14
624:10 625:10 635:4,5,11 637:8
638:19 639:16,18 641:24

**Parks** 349:24,25 350:20 352:21
355:6,14,16,21 356:8,24 357:7,17,22
358:11,21 359:8,18 360:4,10,15
361:7,15,23 362:4,11,15,20 363:21
364:4,10,17,22 365:4,12,18 367:6,12,
24 368:12,19 369:10,25 370:6,22
371:8,14,24 372:5,19,24 373:7,14,19

374:8,19,25 375:18 376:6,14,21
377:13 378:8,14,19 379:3,9,14,18,24
380:13,20,23 381:4,9,22 382:16,24
383:4,11,19 384:4,12,24 385:12,21
386:9,16 387:3,9,12,17 388:6,12
389:3,9,18,25 390:12,18 391:4,11
392:22 393:13,20 394:5,11,17,24
395:5,8,22 396:7,9,11,15,20 397:15,
20,25 398:7,16,22 399:8,17,21
400:10,22 401:6,13,19 402:6,22
403:7,13,23 404:14,19 405:6,10
406:9,13,23 407:12,16,23 408:2,15,
22 409:14,20 410:24 411:13 412:2,
12,22 413:4,10,15,21 414:8,13,20
415:6,15,22 416:14,25 417:7,12,17,
22 418:9,19,24 419:18,23 420:9
421:8,12,19 422:25 423:8,13,17
424:7,9,18,23 425:5,12,18 426:12
427:19 428:6,22 429:13,24 430:3,17
431:7 432:4,8,15 433:25 434:20
436:4,23 437:25 439:19 440:11,18
441:17 442:8 443:12 444:4,13 446:13
448:11 450:10 451:19 452:9,25 454:9
455:6,13,19,24 457:12 458:7,25
461:3 462:12 463:7,23 464:12 465:6
467:13 468:4,10,25 469:9,25 470:8
471:5,13,19,22 472:3,14,22 473:7,20
474:5,13,18,21 475:3,12,18,25
476:12 477:24 478:13,17 479:11
480:5,13,15,22 481:9,19,22 483:8,18
484:11,25 485:25 488:5,12,25 489:5
490:20 492:2,14 493:2,18 494:8,18
495:2,11,15 496:9,16 497:6,18,24
498:9,16 499:2,9 501:16,22 502:4,16
503:8,16 504:2,16 505:13,24 506:10,
20 507:5,22 508:14,23 509:12,20
510:4,19,24 511:3,9,15 512:4 513:24
514:11 515:9,15,24 516:6 517:7,25
518:12 519:3,9,17,23 520:10,21
521:13 522:20 524:3,10,16 525:9
526:14 527:8 528:4,16 529:7,15,21
530:9,15 531:7 532:10 534:6,15,25
536:5,11,22 537:12,21 538:9,24
539:15 540:13 541:6,22 542:4,20
543:5,15 544:2 545:14 546:15,22
547:25 548:10,17,24 549:6 550:22
551:2,14,24 553:3,24 554:8,16,24
555:19 557:6,18 558:13 559:5,14
560:19 561:5,13,24 562:4,8,16,24
563:4,16,25 564:12,23 565:21 567:5,
15,19 570:4 571:16 573:24 574:8,16
575:4 576:4,17 578:10 579:4,9,15
581:7,24 582:24 583:13,19 584:2
585:19 586:11 588:16 589:3,9
590:20,23 591:10 592:8 593:3,10,13,
24 594:23 596:7 597:9 598:13
599:11,19 600:3 603:7,16,21 604:3,
11,18 605:5,13,19,24 606:6,12,18,22
607:4,14,22 608:12,21,25 609:12,22

610:6,15 611:2,4,10,22 612:8,17
613:8,14,19 616:2,12,20 617:9,15
618:16 621:11,22 622:3,24 623:20
624:13,16 625:16,20 626:3 629:16
633:19,24 635:3,7,9,25 636:5,19
637:6,15,22 638:11,16,25 639:9,16,
19,25 640:7,14,19 642:4,8,18 644:18
645:14,17 646:2,24 647:17 654:18,21
656:7,16 658:6,14,18 659:9 660:4,12,
24 661:5 662:2,5 663:23,25 664:14
668:20 677:22 678:2,9,21 679:5,12,
18 680:2,8,14,20 681:13,21,23 682:5
683:13 686:3,5,16 687:24 689:20
690:12 691:6,9,13,18 692:4,6,13
693:11 694:2 696:7

**part** 354:9,20 357:10 358:4 359:11
384:16 386:4,19 388:16 411:9,14
417:14 433:8 435:25 451:16 452:10
516:25 537:4,19 539:9 570:8,17
641:19 659:23 680:21

**part-time** 387:20

**parties** 350:2 366:15 375:16,19
386:8 388:10 667:25 668:16 677:8
695:18

**partner** 483:11 491:11,16 504:14
505:10,16 507:4 512:3

**partners** 418:7 488:4

**partnership** 487:18 490:21 491:12,
17 504:14 505:11 540:17 541:4 625:7

**partnership's** 487:13

**partnerships** 541:14

**party** 351:17,18 388:25 656:20
657:25 686:19

**past** 523:18 633:13 673:8

**Pat** 621:20

**Patrick** 525:25 527:19 529:16 533:22
554:3

**patterns** 432:19

**pause** 562:23 563:24 663:20

**pausing** 563:18 564:16

**pay** 401:4,11 403:5,11,20 404:7
418:6,15 425:16 428:3 429:12 430:14
454:22 455:16 466:4,14 467:17
468:23 469:16 470:4 471:4,12
472:21,25 473:5,18 474:10 475:2,10,
16 518:3,16 576:8 617:12 638:8
663:10 667:9,25 668:16 669:7 670:2,
10 673:13 674:10 676:13 682:9
688:14 692:22 693:16

**paydown** 420:11

**paying** 406:19 432:21 441:6 474:2 602:23 617:6,7 619:11,13

**payment** 405:14,23 407:11,14 416:12,19,22 417:16,19,20 434:18 435:16,22 436:2,8,18,21 441:5,15,23 628:4 670:24 672:14 676:14,16 678:16

**payments** 406:3,8 455:12 462:22 463:18 467:21 468:2 662:24 678:10, 25 679:2,16,17

**Penal** 362:23

**penalty** 701:5,6

**pending** 556:13 563:19 564:17

**people** 367:25 368:2 381:16 385:5 433:12 448:21 453:20,21 454:4 455:9 456:11 461:5 522:4,17 523:4 525:2 577:22 582:20 641:14 672:24 673:4, 6,15

**people's** 449:7 485:16

**perceived** 498:3,6,13,24 499:5 506:23 507:11,17

**percent** 434:24 435:2,17 436:9 439:9 500:21 627:11 631:25 660:18 678:23 691:19

**perfect** 500:21

**performance** 521:11

**performed** 450:4

**performing** 483:2

**period** 382:5 404:16 405:2 482:18 547:18 626:9 675:17 676:2

**periods** 393:4 412:10 422:23

**perjury** 701:5,6

**permissible** 473:17

**permission** 528:2,14 529:4,13 530:13

**permit** 554:13

**permits** 441:4

**permitted** 554:22

**person** 356:17 363:10,12 368:11 377:9 456:13 482:21 565:8 665:6 684:11,19

**personal** 374:17 430:24 464:3 620:18 626:14

**personally** 352:16,20,24 354:24 355:24 356:2,15 387:10 519:6,14,20

**personnel** 665:12

520:7,17 522:8 537:24 615:13 627:3 640:22 661:21 666:16

**perspective** 428:23 454:12,25 538:2,14 546:2 571:10 577:6,17 580:19 581:8 594:7 631:20 638:13 647:19 674:11 683:2 685:13

**Peter** 685:17 689:21

**Petro** 676:23

**Philippines** 387:24 525:3

**phone** 447:23 554:10 682:10,22 687:11

**phonetically** 659:3

**physical** 556:4

**picking** 685:21

**picture** 501:8 502:3 541:12

**Pierce** 689:24

**pinch** 430:20 431:5 433:18 533:8

**Ping** 387:22 426:25 427:10 428:2,16 461:13 466:22 471:18 472:11,19,23 523:2 555:22 572:24,25 574:10 575:8 580:16 582:9 587:20 588:2 590:10,11 591:2 594:24 596:9 636:23

**Ping's** 590:12 598:15

**pipeline** 433:14

**pivot** 570:14

**pivoted** 672:10

**place** 378:3 434:19 508:6 524:25

**places** 436:13

**plaintiff** 349:19

**plaintiff's** 426:4 437:17 465:17 476:2 549:18 550:12

**plaintiffs** 416:23 417:10,21 418:16 426:10,11,15 427:16

**plan** 405:23 435:20 436:19 488:18 682:13,24

**plans** 434:18 435:16,17,18,23 436:3, 18,22 441:5,15,23

**play** 431:18 550:6

**playing** 550:16 633:6

**pledge** 534:3 539:21 540:11

**pledged** 534:7

**PLLC** 349:25

**PNC** 605:11 606:2 607:8 608:2,8

**point** 440:4 442:17 481:2 483:21 491:3 541:8 544:23 598:7 624:25 641:16 642:12 659:5 686:19 688:20 689:14 691:4 692:9

**points** 620:24

**police** 427:12

**pool** 683:21

**portfolio** 431:4 434:25 436:17,20 439:12,24 441:2,3,15,21 442:13 443:5,8 444:10 449:2 450:3,4 451:6 454:7,8,23 455:3 459:10 464:17,19 468:15 502:14 528:9,19,21 529:6 541:17 549:10 576:19 603:14,25 620:9 623:25 681:11,12 688:8 689:7

**portfolios** 446:17 448:23 452:23 453:6 531:20 534:4,11 535:8,12,24 536:10,21 537:19 538:6,22

**portion** 418:13 426:18,19 530:20 532:20 534:13 535:10 545:19 546:5 548:25 577:3 583:2 586:23 611:11 633:8 635:14 660:19 662:10 693:5

**portioned** 693:5

**portions** 528:18 529:5 530:17 531:5, 21 532:17 544:12,16

**Portland** 662:19

**position** 357:2,4 482:14 659:21 660:10,11

**possibly** 600:15 669:15

**post** 529:23 547:18 569:7

**potential** 390:5 456:14 485:19 486:5 500:5 641:11 652:11 673:19 688:9

**potentially** 429:9 430:16 451:11 462:9,15,18 500:16 511:18 539:4 603:2 604:21 628:22 641:2 668:11 674:23

**PR** 556:13

**practice** 552:7

**practicing** 361:22,24

**Precision** 618:22

**premiums** 397:14 409:3 419:17 463:15

**preparation** 535:18 631:11

**present** 638:22 639:7

**presents** 353:14

**pressure** 428:14

**pressured** 665:25 666:6,10

**presume** 473:9 477:15 479:3 494:9 498:18 500:3 502:20,25 527:22 540:14,15 595:6 615:21

**presumed** 500:2

**presumption** 538:11 540:23

**pretty** 462:24 511:6 575:14 624:6 633:18 689:5,12 692:10

**preview** 549:25 550:6

**previously** 350:13 602:2 638:2

**price** 451:13 500:17 503:17,20 504:7 573:14 576:23 586:22 591:17 593:7, 15,16,21 594:6 595:3,4,14,17 598:19 599:8,17 600:10,11,12 624:6 627:17 688:12

**prices** 573:2,7 580:9 582:5 583:16, 22 585:16,21 586:6,16 587:14,21 589:16 591:6 592:4,11,18,23 594:21 595:11 597:18 599:3

**primary** 461:19 462:10,16

**principal** 405:9,14,19 467:17 496:21 679:3,15 688:15

**principals** 381:14 382:8

**printed** 651:23

**prior** 482:5 486:3 514:8,20 543:8 546:24 573:21 574:5,13,25 576:13 616:17 617:14 626:5 628:2,13 631:16 632:8 633:9 655:5,16 656:3 678:16 684:23 685:15,16

**privately-held** 660:16

**privilege** 406:10 562:7 621:14

**privileged** 406:24 562:18 612:20 632:14

**privy** 687:5

**pro** 612:15 614:22,24 615:7,9

**probability** 432:21 439:8,17 442:6

**problem** 435:18 672:24 673:4

**proceeds** 603:6,19 604:9,16 605:3, 10 610:13,23 611:8,19 613:6 637:20

**process** 365:13 368:4,5 369:20 373:9 385:6 411:7,8,14 412:3 429:17 435:25 441:24 450:14,18 451:2,17,21 452:11 454:15,17 459:3 468:17 499:13 507:25 510:5,9,11 511:16,20 512:6 522:2 563:19,24 564:16 570:8, 12 584:15 621:20 624:22 626:17 641:20 649:14,24 650:5,9,23 663:3

674:6 682:16 683:5 685:18 686:9 687:20

**processed** 352:9

**processes** 523:8

**produce** 482:17

**produced** 355:18,19 368:3 485:23 588:17 589:5

**producing** 534:2

**product** 567:8 570:25

**profitable** 450:9 458:23 462:10,16, 19

**promote** 672:13

**promoting** 452:11

**prong** 468:19

**proper** 480:18

**properly** 451:13 552:5

**properness** 480:24

**properties** 394:2 431:16 437:8 574:2,21,24 576:13,20 577:9 584:4 585:17 586:7 587:23 589:18 591:7,23 593:19 594:21 599:6,17,24 600:17

**property** 431:6 433:9 439:7,10 441:5 442:22,24 444:2 448:15 449:13 493:24 578:20 584:21 585:7 595:17 618:23 627:9,13 647:3 649:2,13 662:18,21,25 663:6,7,12 677:2

**proportion** 434:17,23 586:25

**proposal** 682:4

**propose** 689:14

**proposed** 393:4,19 394:14,21 398:5, 14 410:16,18 412:11 422:23 440:5 626:18 632:6 692:2

**proposing** 392:9 472:20

**prospects** 394:2

**protection** 500:11

**provide** 373:22 390:17 391:2 399:7 418:21 452:23 453:7 478:21 480:19 492:4,9,21 493:13 513:20 523:14,24 524:6,14 607:3,13,15 621:3,8 659:21

**provided** 372:12 373:16 455:4 477:4 480:10 491:22 493:10,21 494:4,16 504:13 505:10,16,19 517:22 522:22 659:15 662:18 678:20

**providers** 521:24 522:16

**providing** 514:5 607:16 660:21

661:3

**provisional** 610:24

**proximity** 549:9

**Public** 350:14 695:9 701:24

**publicly** 660:15

**Puerto** 481:16 482:12 523:4 534:14 626:20,24 627:20,24 628:14,20 629:4 632:18,19

**pull** 429:22 430:13 685:6

**pulled** 674:16

**purchase** 400:8 401:17 402:3 424:22 438:8 446:23 448:9 449:3,6 450:4 468:13 500:17 627:17,22

**purchased** 375:24 377:24 378:9 381:25 382:18 446:17 449:7 464:17 534:20 569:11 623:16

**purchases** 351:17 418:5 434:10 448:15,17,18,20 449:10,15 456:21 459:6,20

**purchasing** 382:12 418:18 425:8 434:8 435:2 442:21,23 443:9,25 450:5 451:9 452:22 453:5 462:4,9,15 464:10

**purpose** 353:2 359:4 360:20 530:10 573:13 619:19

**purposes** 643:6

**pursued** 674:14,18

**push** 620:11 674:23 683:12 685:8 687:18

**pushing** 454:11 641:7

**put** 491:4 500:10,13,19,22 531:15 558:25 560:3,9,17,25 561:3,11,22 562:23 563:11,14 566:22 570:19 571:8 600:14 627:7,15 628:6 633:20 643:8 658:13,16 674:12 682:24 684:19

**putting** 508:25 521:20,23 522:15 594:17 690:23

---

## Q

**qualified** 642:25

**qualify** 633:10

**qualifying** 520:13

**quality** 594:15

**quantify** 464:20

**question** 355:16 407:2 498:11,12 504:24 505:5 510:12 518:15 527:4 528:11 529:11 552:23 562:3,5,20 579:24 580:14 588:11 590:17 592:3, 10 597:3,5 598:9 609:14 612:19 636:7 638:15 662:6 667:7

**questioned** 638:6,14

**questions** 502:12 522:23 524:5,9 663:18

**quick** 355:16 621:24

**quicker** 432:21 446:24

**quickest** 461:23

**quickly** 576:3

**quit** 484:2

**quote** 592:6,7,25 593:2

---

### R

**R-U-M** 563:5

**R-U-M-B-E-R-G-E-R** 563:8

**raise** 438:7,18,24 502:12

**raising** 626:17

**rate** 446:12 457:5 463:5 619:23 620:2

**rates** 462:20,21 620:6 685:9 689:3

**reach** 386:14

**read** 363:22 439:13,21 440:10 441:11 442:9,25 443:2 458:2,3 472:5 477:19 491:14 501:10 503:11 507:8 510:25 519:25 520:4 532:4 545:9 564:7 578:5 585:10 587:10 588:9 602:7 609:9 616:9 617:23 625:15,17 635:2 638:10,24 639:4,15,21 642:3,5 643:10 701:7,9

**readily** 491:12

**reading** 466:15,17 520:2 546:17

**readings** 653:11

**reads** 353:25 363:25 391:6 392:6 393:15 401:15 412:14 417:24 422:18 423:2 438:17 442:18 448:16 466:7,21 467:8 495:12,16 496:4,10 497:19 498:10 513:11 517:11 518:2,23 519:18 635:20 649:17

**ready** 631:13 687:17

**real** 431:6 433:5,17 454:5 459:10 483:14 573:23 574:7,14 575:3 576:15 582:11 617:3 619:22 620:17 676:24

**reason** 367:17 376:25 439:22 452:19,21 453:4 563:13 572:25 582:22 583:11,14,22 584:11 586:4 587:21 589:16 592:10,13,14,23 597:17 598:2 702:6,11,16,21 703:5, 10,15,20

**reasons** 468:18 579:17 582:2 596:3 597:6 598:10

**reassigned** 625:23

**reboot** 688:10

**recall** 351:11 352:3,7 354:19,25 356:3 357:18 358:3 359:9,20 360:16 361:4,10,16 362:16 365:5 366:12 367:16,19 368:6 369:11,12,19 370:2, 7 371:3,15,25 372:6,9,25 373:9 374:2 376:15,22 377:3,4,5,25 378:20,21 379:4,10,20,25 380:7,10,16 381:12, 13,15,25 382:4,7,17 383:13 384:6,14 385:3 386:17,18 388:13,22 389:5 390:7,19,20 392:4 395:6 398:23 403:2,8,14,15,22,24 404:2,20 407:18 410:13 411:6 413:6 414:14 418:20,25 419:2 421:2,16,21 422:9 424:24 425:20 427:11 431:9 438:2,21 447:14,15,16,17,18 455:14,15,25 456:2 457:13,16,19 467:14,23 469:4, 12,18 471:7 472:4 473:21 474:7,14 483:9,10,15 485:14 487:5 488:13,17 492:16 494:12 496:17,23 497:7,10 506:13 507:25 510:5,9 511:16,19 512:10 514:6 515:2,16 516:2,7 528:5 533:13,18 534:19 535:6,13 536:23 537:6,7,8 538:10 539:3 545:16,17 553:14,15,25 554:4,9,11,17 559:6,7 560:12,20 561:7,17 563:11,17,18 564:3,16 566:2,9,19 573:25 574:9,12, 24 575:7,12 576:13,18 577:14 580:22 582:8 584:9 585:20 594:2 596:18 599:14,21,23 600:4 604:19,20 606:19 607:16 613:25 614:2,3,11,14,18 616:24 623:24 636:20 637:7,23 638:13 641:17,18 642:10 652:14,17 667:14,20 687:21 689:6,22 690:6 691:3

**recap** 418:3

**receivable** 495:10,25 496:7 497:15 498:8,15 499:7 503:6,22 506:18 509:11,19 510:21 612:15 614:22 615:4,16

**receivables** 438:9 491:9,23 492:5, 10,17,22 493:6,14 494:5,16 496:13 497:5 503:15 504:13 505:9,21 506:9 511:13

**receive** 411:12 426:19 436:8 472:9

**received** 369:16 405:16 409:22,23 420:11 426:18 526:7 527:20

**receives** 501:24

**receiving** 455:11

**recent** 393:24

**recess** 395:12 444:17 489:8 526:20 567:24 622:6 648:2

**recollect** 683:5

**recollection** 505:2 614:7

**record** 349:3 351:18 395:7,11,14 431:25 432:5 437:3 444:12,16 445:10 489:4,7,10 514:12 526:16,19,22 562:2 567:23 568:2 622:2,3,5,8 634:2 642:21 647:23,25 648:4 663:4 692:7 694:5 695:15

**recorded** 663:13

**recording** 360:20 550:7

**recover** 463:21 626:12

**recovered** 453:10 624:7

**Red** 535:21 536:2,3,24 537:8 540:9 660:5,17

**redeem** 429:8 446:24 452:2

**redeemed** 428:8 439:10 442:22 443:10,16 444:2,6 657:19

**redeemers** 461:23

**redeeming** 462:5

**redeems** 429:15

**redemption** 432:19 439:9,18 442:6, 18 446:11 451:18,23 452:12 454:14 464:2 579:18 625:12 635:15

**redemptions** 428:25 436:18,21 441:22 452:4 581:10

**redemptive** 497:10 499:15,18,22,25 500:9 502:23 508:3,12,16,21 509:3, 15 510:2,6,16 511:7,14 512:17 631:6

**refer** 425:23 426:9 449:10 602:17 613:2 623:10 666:21

**reference** 526:11 527:5,15 609:20 612:5,25 613:12 617:6 630:9 640:3

**referenced** 597:14 632:9 670:22

**references** 472:6 575:9

**referencing** 585:22

**referred** 382:20 448:19 527:14 544:10

**referring** 501:13 508:4 524:11 527:2, 13 544:16 556:23 559:12 566:16 578:8,12 580:25 585:11 586:15,19 594:15 597:11 609:17 610:9,11,20 612:23 614:25 616:23 617:11,20 691:12

**refers** 567:3 591:20 617:7 618:7 651:3,8

**refi** 682:17 690:24

**refinance** 549:12 683:18

**refinancing** 529:23

**reflect** 427:21 444:8 499:12,21,24 507:19

**reflected** 413:11 508:8 515:3

**reflecting** 371:11 606:15

**reflection** 498:3,23

**reflective** 499:15

**reflects** 371:5 414:9 415:10 416:15 425:7,14 458:12 495:4 496:22 498:19 509:4,14 588:22 642:21

**refuse** 483:4

**registered** 361:25

**regularly** 525:6

**rehab** 582:13

**rehabs** 577:7

**reimbursed** 627:11

**related** 379:11,20 380:8 382:5 383:15 384:15 390:20 416:21 427:12, 22 428:25 431:15 467:4 478:23 485:18 496:21,23 498:20 505:17 528:25 533:15 535:4 539:22 540:11 541:15 552:4 560:14 562:3,6 569:16 584:8 595:3 596:11 598:19 612:6 621:18 631:17 632:11 633:5 656:18 657:24 658:24 659:3,12 662:10 677:14 695:18

**relates** 523:16 641:19

**relating** 566:10 626:14

**relation** 438:22 497:9

**relationship** 411:10 448:7 474:9,12 568:21 666:23 667:21 677:17

**relative** 634:24

**relax** 427:3

**released** 369:15

**relied** 430:25

**rely** 393:17 408:12

**remainder** 440:22

**remained** 631:19

**remaining** 473:12 528:18 529:2,5 617:22 618:11 625:7

**remember** 386:10 417:5 458:9 471:14 473:22 474:17,22 475:19 478:3 479:15 510:24 535:6 566:12 569:13 574:22 614:20 618:5 652:9 683:5 686:20 690:8

**Remind** 456:3

**remit** 604:9,16 605:2 611:8,19 613:5

**remitting** 610:12

**remove** 626:7

**removed** 609:19 625:2 629:8

**removing** 626:6

**rent** 577:9

**REO** 431:4,20 432:12 441:25 449:18 453:17 454:2,7,16,23 455:3 459:6,10, 25 460:5 463:2 510:23 523:7 537:22 538:3 565:8 570:15 574:3 578:4,8,13, 17,25 579:6,12,25 580:7,14,20 581:14,22 582:23 583:4,12,15 600:9 618:20 672:10 686:11 690:15

**reopened** 681:17

**REOS** 429:10,11 437:6 449:22 450:7, 8 451:16 452:23 453:6,12 458:16,21 468:7 581:3 585:15 586:5

**repaid** 442:19 452:5 453:23

**repay** 455:21 458:24 487:19 488:9 490:17 628:18,24 633:9 672:3 675:16,25

**repaying** 457:17

**repayment** 441:8

**repayments** 457:11 468:9

**repeat** 453:2 462:13 505:5 518:15 552:22 567:12

**rephrase** 519:12 579:11 616:14 681:3 683:15

**replace** 601:20 693:6

**report** 399:10,14 424:3,11 486:22 489:21 506:22 507:10,16 573:16 652:20 697:3,11 698:15,20

**reported** 503:23 505:22 508:12,21 509:8,16 510:2,17

**reporter** 350:9 351:3 362:25 366:4 375:7 391:18 399:5 406:12 410:4 420:17 423:24 426:2 435:12 437:15 445:16 447:5 460:11 465:11 475:23 484:6 486:17 489:16 512:20 516:11 521:22 525:14 526:15 549:16 550:9 555:6 557:23 568:7 572:8 600:22 622:17 629:16,18 643:15 648:6 651:5 672:21 688:18

**reporting** 521:2,10 522:15 523:13, 16 524:2,8,15 525:8 569:15 601:24, 25 604:22 606:13 615:14

**reports** 504:10 505:7 508:24

**repository** 601:23

**represent** 388:10,25 513:16 550:20 551:6,11 552:14 630:20

**representation** 442:4

**representations** 392:18 408:14 411:21 422:14

**representative** 664:25

**represented** 408:19,24 409:6 439:15 443:4,7,23 656:5 658:3 692:2

**representing** 554:5

**reprice** 685:12 689:7,16

**reprise** 685:11

**request** 395:4 494:19 505:17 582:21 637:12

**requested** 398:5 400:14 468:9 493:20 578:15 581:12 586:9

**requesting** 401:17 425:16 468:2

**requests** 578:2 579:2,8,14,18 580:2 581:5,21 583:6,10 596:5 597:7 598:11 620:25

**require** 457:11 528:11 612:19 621:13

**required** 391:2 470:25 473:14 528:13 529:4,12 605:9 615:14

**requirements** 457:17 521:2 621:5, 10

**requires** 605:15

**rereading** 650:13

**reserve** 496:20 500:4,6,10,13,20,22

**reset** 435:21

**residents** 627:2

**resign** 486:2

**resigned** 482:3 632:23

**resolve** 676:12

**resolved** 677:9

**resources** 451:12

**respect** 404:3 523:25 642:16

**respects** 517:17,24 518:9,22 520:12, 20 522:11,14

**respond** 503:3 587:3,5,12,17 588:4, 12 589:11,12,23 590:4,8 591:2,4 597:23

**responded** 552:17 591:12 594:18 633:13 674:14,18

**responds** 573:12 580:16 588:2 589:20 597:21 598:22

**response** 509:21 590:17 592:2 596:15 598:19

**rest** 441:2

**restrictions** 440:9,17 541:2

**result** 393:4 412:10 422:23 484:8 518:7,20 562:22 587:6 588:5 589:24 592:7,25 593:5,8,22 594:10,22 597:24 608:13

**resulted** 427:7 578:3,16 581:13,21

**results** 688:22

**resumed** 350:12 445:5

**retain** 610:23

**retained** 349:5

**retire** 457:23 460:3

**retirement** 616:25

**retiring** 403:16 473:11

**return** 457:22,24 458:4 463:12 631:21

**returned** 458:13 632:3

**reveal** 612:19

**revealing** 621:13

**reversed** 631:4

**review** 352:6 371:18 398:11 399:23 400:2,25 414:21 416:3 424:19 438:16 448:2 449:16 466:10,20,23 467:2 503:9 514:20 523:19,20 525:6 558:18 567:11 571:6 575:6 591:11 609:15 617:18 621:2,8 623:3,12 624:4 635:19 639:3 644:3 649:22 650:14 655:2 678:15

**reviewed** 542:10 616:4

**Richard** 349:3

**Richey** 482:6,8,10,13,14 483:4,11 512:9 555:25 568:21 572:24

**Rico** 481:16 482:12 523:4 534:14 626:21,24 627:20,24 628:14,20 629:4 632:18,19 633:4

**rid** 546:3

**rightly** 476:21 477:8 479:3

**Ring** 549:24

**Ringcentral** 549:20 699:10

**rise** 672:19,22

**Ritter** 456:12 674:25 684:8

**Riveles** 621:16

**River** 647:4

**Road** 382:19 647:4

**Robin** 601:9,14,15 608:17

**Rochester** 434:3,12,18 435:4,9 436:3,14,19 437:9 438:10 439:23 440:20,25 441:4,15,21 442:13,15 443:8,22 444:6,10 448:9,25 450:3 464:19 468:15 500:17 528:21 539:17 544:18,19 566:6 577:4 580:24 582:13 585:24 586:20 587:16 591:9 596:23 662:19,20

**Rogers** 377:9 378:17,21

**Room** 349:10

**roughed** 582:15

**roughly** 387:25 404:17 435:16 457:22 458:5 483:23 500:18 510:15 586:21 610:20 618:20,23 619:3,4 628:5 651:25 660:18 671:17 683:22

**row** 399:20 400:17 416:2,11,12,16,22 417:19 424:15 630:6 645:5,14 653:4

**rows** 424:25

**Rumberger** 563:3,4,7

**run** 398:18 430:10 634:13

**Rye** 356:5 361:10,19 371:20 387:19, 23 556:13

---

## S

**S(cont'd.)** 696:25 697:25 698:25 699:25

**Sachin** 684:21,22

**Sahil** 569:19,20

**sale** 350:24 351:6,15 365:24 366:7, 14,16 367:23 375:10,15 376:12 381:18 384:15,16,23 385:3,16 386:19 450:25 451:7 467:4 473:2 531:15 573:15,22 574:6,14 575:2,16,17,18 576:2,15 585:21 586:16 587:21 592:11 593:14,15 594:5 595:3,14,16 596:12 599:3,8,24 600:14 605:2 610:23 611:13 651:3,8,11 653:8,9 663:3,11 689:22 693:5 696:12,17,19

**Salerno** 416:21 426:23 427:25

**Salerno's** 428:7

**sales** 365:7 368:5 375:4 383:20 386:18 387:22 433:16 435:6 572:25 573:6 577:13,14,15,16 578:4,9,17,25 579:7,13,25 580:10,15,20 581:14,18, 22 582:23 583:12,15,22 584:7,9,21 585:15 586:2,5,22,24 587:7,14 588:6 589:16,25 591:6,15 592:4,23 593:7, 21 594:11,21 595:7,11,21 596:4,9 597:6,10,18 598:10,21 600:5 603:19 605:10 610:13,23 612:7 613:6 615:5

**salesperson** 461:15

**Santori** 618:4

**Sarah** 355:9,10,12,23 358:24 361:19 387:19

**Sarnobat** 684:22

**satisfaction** 356:16 368:15

**satisfy** 578:21 579:2,8,14 580:2 581:4 596:5 597:7 598:11

**SAURB** 689:3,6

**save** 591:22 595:23 596:20 598:3 701:11

**saved** 587:8 588:7 590:2

**savings** 593:17 594:17

**scenario** 448:25 449:24

**schedule** 353:16 354:3,14 648:25 652:5

**scheduled** 629:11

**schedules** 485:16 492:17

**scholar** 514:13

**Scott** 562:15,24,25 563:2

**scroll** 399:19

**seamless** 522:2

**Sean** 483:12 659:13

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 404    Court Records    Pg 1497 of 2230    RECEIVED NYSCEF: 01/12/2024

EMBASSADOR BUSINESS CREDIT - Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 Stalen John Hanratty
JOHN ARTHUR HANRATTY    June 21, 2023

**search** 485:12

**seasoned** 570:16

**Sebastian** 618:4,6

**sec** 644:19

**secondary** 448:19 449:5 451:10 459:5,15 462:3,8,14

**seconds** 623:2

**section** 362:23 397:6 408:18 517:11 649:5

**Secure** 513:12,14 514:2

**Secure.pdf** 513:10

**secured** 353:24 649:13 693:7

**securities** 353:22

**securitize** 448:22,24

**seek** 449:3 602:3

**seeking** 438:6,18

**self-service** 529:19 530:8,13 541:3 547:23 548:8,15 550:19 551:5,10,22 552:13,25 554:14,23

**self-servicer** 545:23

**self-servicing** 530:17 531:5 532:3, 8,14,17 533:11,20 537:18 538:21 539:13,16 541:16,20 542:2,15 543:3, 12,13,24 546:13,20 547:13 548:21 549:4 553:12,22 554:7 565:25

**sell** 429:9,11,16,23 430:2,15,21 433:10,17,18 453:22 459:23 575:22 580:20 581:3 583:9 592:17 594:3 595:12 604:25 688:9

**seller** 388:19

**selling** 454:2,11 575:17,19 576:18 582:9 587:9 588:8 590:3 591:24 592:15 594:10 595:20 596:16 604:14 660:13,19 685:19

**send** 359:24 360:24 501:19 533:22 559:4,8 603:19 629:15 638:3

**sending** 492:16 514:6 658:10

**sends** 501:6,25 620:21,22

**senior** 438:7,19 693:7

**sense** 583:7 584:12,14

**sentence** 438:14 545:17

**September** 396:10,12 419:10,11 421:6,9 422:17 513:4,22 514:5,9 515:18 526:2 527:19 532:12 545:12 546:24 547:21 548:3,6,14,22 549:5

550:2,4 553:11 572:19 573:21 574:5, 13,25 576:14 644:9,11,25 645:8 647:10,12 651:16,19,21,22,23,24 654:16 655:6,12,16 656:4 657:14 667:22

**service** 521:24 522:16 567:10

**serviced** 533:16

**servicer** 528:2,15,17 529:5,14 545:5, 13,21,24 546:3 548:4,12,18 552:8 553:5,6 565:6,8,14

**services** 350:19 365:21 372:12 373:16,23 521:17 601:9,20 607:6,7

**servicing** 521:19 523:5 526:8,12,13 527:2,6,14,16,23 528:8,19 529:9,25 533:14 539:24 542:6 544:11 546:5 551:16 552:19 564:6,11 565:4 566:5, 17,24

**set** 406:22 473:22 695:12,23

**sets** 649:7

**settle** 433:11 628:2 676:17 677:16

**settled** 359:21 361:3 407:8,18 417:9 427:15

**settlement** 357:13 359:24 384:17,21 385:6 386:5,20,23 388:17 416:17,23 417:3,14,16,20,25 418:7,11,13,16 428:3 661:9 674:5 676:12 677:7 682:3

**settling** 673:23 677:15 681:24

**setup** 621:18

**Seymour** 525:18,25 526:3,4,25 527:13 531:25 542:17,25 549:20,25 699:7,10

**share** 398:25 549:13 572:5 629:12

**shares** 660:14 662:11,13 692:23 693:17

**Sharon** 659:2

**sheet** 456:13 662:4 682:20 685:8,24 686:22 687:6,17 689:10 691:12,15, 16,23,25 692:5 701:2,13

**sheets** 682:19 687:8

**Sheridan** 684:4 686:6,14,24

**short** 521:4 578:20 660:8

**shortfall** 502:9

**shortfalls** 635:16 643:9

**shorthand** 666:21

**show** 445:13 586:25 600:19 629:14

**showed** 426:24 428:15

**shown** 416:11,12,22 688:8

**shows** 427:25 429:21

**shutting** 376:3 382:10 449:2

**sic** 648:9

**sign** 351:25 359:14,16 360:9 361:6 367:14 369:23 372:3 377:2 379:2,5,7 380:12 381:20 382:14 386:8 411:16, 20 421:11,15,17 422:8 624:23 658:12 691:21

**signature** 351:22,24 352:2,5 356:11 358:7,16,22 359:15,19 360:2,6 361:8, 12,18 367:10,11,13,15,22 368:2,8 370:16,20,24 371:4,10 376:18,24 380:15 383:13 384:25 392:13,15 397:5 408:11 410:22 412:6,17 421:7, 13,18,25 422:10,13 588:19

**SIGNATURE:_____**
**_____DATE** 703:23

**signatures** 368:7 411:5

**signed** 352:20,25 354:24 356:6 358:9,19 361:13 364:25 365:9 367:18 368:22 369:17 370:4 376:20 379:19, 22,25 380:6 395:25 396:5 397:3 408:9 410:20 411:11,15 413:22 421:22 422:7 427:4 485:9 538:15 606:9,14 608:2 654:7 657:13 685:24 687:7 701:16

**significant** 458:22 511:6 582:11 598:25 599:7,15,25 616:6,8,16,18 617:2,6,13

**signing** 354:25 357:18 358:3 359:7 360:16 361:5,11,17 362:19 365:5 367:16 368:17 370:7,24 376:22 378:21 379:10 380:2,10,17 384:22 385:4 386:2 388:15 411:19 412:4,5, 15 421:16,20 422:12 469:12

**similar** 351:12 440:8,16,22,23 530:3, 6,24 541:17 582:18 584:19

**similarly** 533:16 537:22

**Simon** 621:16

**simpler** 510:13

**Simply** 455:15

**single** 441:7 453:18 566:3 577:11 580:24 582:12

**single-family** 577:4 596:24

**sit** 453:22

**sitting** 485:21

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 282

RECEIVED NYSCEF: 01/12/2024

EMC340002BUSINESSCREDITFiled 08/14/24    Entered 08/14/24 09:45:23    Doc #3 Stat
JOHN ARTHUR HANRATTY        Court Records        Pg 1498 of 2230

John Hanratty
June 21, 2023

**situation** 470:24 478:6 479:17,19

**six-month** 626:9

**SJ** 658:23 659:4

**Skinner** 618:3

**Skip** 689:23 690:5

**slight** 633:21

**slim** 462:24

**slow** 511:3 632:21

**slower** 462:5

**small** 524:18

**smaller** 414:4 456:18 457:23 459:4 462:21 570:6,11,13,17,22,24 571:3,9, 12,20 579:20 609:4 631:5 686:12

**sold** 434:15 435:9 452:2 574:3 576:2 577:2 584:4 585:23 586:19 591:8 595:8 599:6,17,23 600:6,17 603:4,13 604:7 610:14 611:6,18 647:16 649:16 650:2,4,12,16,17,20 651:3,8,15 652:14 653:4,20 656:3,11,12 662:21, 25 663:7

**solely** 584:3 628:20

**solution** 405:25

**sort** 524:13 654:11 666:23

**sorting** 654:21

**sounds** 616:9 663:2 671:19 679:13

**source** 455:7 676:18

**sources** 682:17

**space** 427:2 468:20

**speak** 542:8 545:11 547:12 674:8

**speaking** 418:25 432:20 433:15 441:20 446:22 452:4 462:4 521:7 525:10 540:16,20 546:25 561:14 566:2 569:12,23 571:7,20 579:22 613:3 614:14 640:20 642:11 673:17 682:25 690:20

**speaks** 624:17

**specific** 391:13 428:11 451:12 456:10 457:16 524:5,9 535:11 537:25 559:6 561:18 580:14 584:8 585:12,13 596:13 606:19 619:7 620:19 654:24

**specifically** 402:15 403:24 447:15 448:20 455:25 456:2 467:14 469:18 471:8,15 474:15 493:19 533:13 534:18 537:13 560:20 563:17 573:25 574:9 578:12 580:22 596:21,23 598:18 599:20 615:19 621:12 623:24

634:23 636:20 637:24 671:21 675:13

**speculate** 543:17 588:15

**Speculation** 543:16 609:23

**spend** 620:13

**spent** 683:8

**spills** 461:8

**spoke** 459:21 483:10 502:7 621:16 683:17

**spoken** 459:8 547:10 688:6

**spread** 595:16

**spreadsheet** 399:2 415:21 423:21 622:20 629:14,21 630:3 643:13 651:15 657:9,17 658:14 700:11,14

**ss** 695:5

**St** 618:3

**staff** 456:10 481:16

**staffing** 482:11 521:3

**stage** 632:20

**stamp** 352:8 368:2,6 421:22

**stamped** 410:23,24 411:3 422:5

**stamping** 635:10

**standard** 365:13

**standpoint** 545:8

**start** 484:13,17 507:14 525:23 596:2 646:25 669:24

**started** 464:10 468:12 621:20 631:12 667:21 669:22 672:19,22 680:25 682:15 689:4

**starting** 392:16

**state** 357:5,14 397:7,13,17 452:16 514:11 535:16 539:8 544:20 575:12 638:22 639:7 692:7 695:4,9 701:24

**stated** 356:16 368:14 377:10 641:25 642:6

**statement** 356:13 363:5,11,14,24 368:10 381:7,11 382:22 383:9,18 384:9,14 439:22 442:7,9 462:3 495:19,24 616:11 696:14

**statements** 381:3 393:18 414:18 472:9 477:5,9 480:11,20 483:5,7 486:21 487:9 489:20 491:8,25 492:7, 12,24 493:16 494:6 495:8 497:2,13 501:14,20,25 503:24 504:11 505:8,23 508:11,20 509:25 510:15 511:25 513:17,21 514:7,17 515:5,12 698:15,

19

**states** 355:24 368:10,21 377:8 434:16 436:8 441:3 490:15 534:23 539:3,5,12 540:5,7

**stating** 357:19

**statistically** 451:25

**status** 389:10,13 484:4 632:15 646:8,10 659:17

**stay** 673:15 682:12

**staying** 641:7

**steady** 439:11 441:8

**Stella** 371:16,17,19 372:11

**Stephan** 618:3

**steps** 620:22

**Steven** 377:9

**stink** 582:10

**stock** 660:15

**stolen** 610:4

**stop** 476:22 477:13,16,22

**stopped** 672:11 673:15

**Stout** 687:16

**strategy** 442:20 443:9,25 446:10

**stream** 439:12 441:9

**Street** 349:9 437:18 445:19 491:18, 20 504:15,22 505:11,14,15,19 506:4, 6 526:12 527:5,15,23 623:16 697:16, 19

**strike** 360:6 496:11 675:6,9 677:4,5

**structure** 440:21 569:15,17

**structured** 469:8

**struggle** 591:24

**struggled** 596:22

**struggles** 433:8

**struggling** 582:3,10 680:23

**stuff** 406:14 433:13

**subject** 578:13

**submit** 411:11 606:8 615:10,12 636:3,24 658:12 683:23

**submitted** 408:6 419:9 427:11 506:7,16 614:23 615:7,17 636:8,9,13 637:4 643:4 654:2,6

**Subscribed** 694:12 701:20

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSEF DOC. NO. 1036  EM36040 BUSINESS CREDIT Filed 08/14/24  Entered 08/14/24 09:45:23  Doc #3 Stalen RECEIVED NYSCEF: 01/12/2024  John Hanratty

JOHN ARTHUR HANRATTY   Court Records   Pg 1499 of 2230   June 21, 2023

subscribes 363:12

subscribing 368:16

subsequent 409:8 419:21 463:18

subset 567:7

subsidiaries 486:20 489:19 490:7,
22 494:23 535:23 536:9,20 664:11
665:2 698:14,19

subsidiary 536:3,6 666:11

substance 632:13

substantial 426:18 487:13 490:12

substantive 633:2

successful 641:21

sue 402:19,23 426:15

sued 426:16 427:8 428:19 613:16
629:2 633:3

sues 428:2

suing 628:3 632:18

suit 609:7 612:3 613:11

Sullivan 349:9,18,22

sum 354:7 441:7 655:25

summary 620:24 692:2

summer 349:23 467:10

Summit 684:14 687:22,25 688:14

super 635:12 688:17

supervise 521:11

supervision 522:3

suppose 469:19

supposed 385:5 478:8 558:24
560:25 564:6,10 565:3,5,6,7,14
566:5,16,22,23

surplus 469:22 470:2

survived 633:11

swear 350:10 385:9,19 388:9

sweep 605:8 607:24 608:5,10

sweeps 670:14,15 671:11

swept 405:20 607:8

Switching 666:15

sworn 350:13 363:4,11 388:24
694:12 695:13 696:14 701:20

---

**T**

T-R-O-P-P 660:24

tab 643:22,23 644:13,16,22 645:4
652:23 653:5 654:9 655:14 657:3,7,8,
16

table 440:4 674:3

tail 448:15,17,18,20 449:4,10,15

takeout 456:14

taking 431:12 609:4

talk 441:22 545:3 562:12 628:19

talked 390:23 473:11 562:9 684:13

talking 382:25 383:14 439:23 442:11
461:6 471:19 485:15 527:8 539:3
543:18 564:14 574:2,10,19 577:13
584:3,25 585:9 594:12 596:13 597:13
611:12 688:15

tape 584:23 655:4

target 446:11,24

tax 350:24 351:6,14,15,18 353:4,7,21
354:2,4,6,13,18 358:25 365:7,24
366:7,14,16 367:4,7,23 375:4,10,14
376:12 378:22 384:23 385:16 397:8
398:15,17 400:8 401:17,23 402:3,10,
13 408:21 409:8 418:18 419:14,21
424:22 425:8 428:20 429:7,23
430:11,15 432:13 435:3,14 437:3,7
438:8 446:11 449:11,22 450:7,8
451:16 452:7,22 453:6,14,22 454:7,
12 455:22 456:10,17 458:15,20
461:19 462:3,8,10,14,16,23 463:4,11,
12,20 464:10 468:7,12,19 470:18,23
482:16 491:9,23 492:5,10,22 493:5,
13 494:5,15 495:9,25 496:7,13 497:4,
15 498:7,14 499:6 500:14 502:24
503:15,22 504:12 505:9,20,21 506:9,
18 507:20 508:2 509:10,18 511:12
512:13 527:6,17 531:9 533:5 561:11
602:22 603:3,4 613:6 623:16 625:12,
18 626:19,22,25 627:8,11,15 628:4,7
629:4 634:10 647:15 649:2,6,8,12,15
650:2,4,12 651:3,4,8,9 652:2,4 653:3,
4,20 655:5 656:11,12 681:6 688:6,7
696:12,17,19

taxing 647:16 651:9 656:3,13

TD 371:20 372:7,11,14 373:17,22
374:5

team 521:7

technical 526:17

---

technically 620:16

technology 627:4 641:3,13

telling 355:4 425:20 503:14 579:19

ten 461:20 591:17

ten-plus 640:22

tend 510:25

tenth 630:6

term 405:24 456:13 640:2,5,8 641:4
652:15 662:3 682:18,20 685:8,23
686:22 687:6,8,17 689:10 691:12,15,
16,23,25 692:5

termination 417:5

terms 453:11 457:2

terrible 575:14 667:6

test 669:5

testified 350:15 389:6 445:6

testifying 534:15

testimony 358:8,15 390:24 391:7
422:6 477:21 485:2 672:9 695:15

text 501:6 502:2,7 506:2 510:20
640:4

texted 509:21 510:20

theft 626:11

theme 512:11

thereto 363:20

thing 370:24 383:24 459:6,7,18
482:20 533:7 544:4 566:3 596:19
635:10 641:15 675:7 688:10 691:2

things 359:24 360:9 386:22 456:5
459:14 463:15,18 493:9 538:3 540:6
582:7 584:21 585:2 642:14 678:6,17
682:8 685:22 690:22

thinking 390:20 545:19

Thomas 609:21 610:9,11 613:4
622:13

Thomason 555:25 568:10,16,18
572:12,18,22 583:21 587:5,13,20
588:4 589:15,24 591:5 592:22 594:19
597:17,23 598:22 699:21 700:4

Thomason's 588:19 590:17 592:3

thought 372:25 402:2 447:20 482:20
521:19 590:25 594:25 600:18 624:22
652:8,10

thousand 670:18 671:6

**threatened** 402:19

**threatens** 428:2

**three-and-a-half** 628:25

**throw** 547:9

**Tiffany** 400:20 401:4 402:16,17 403:25 404:9 407:7

**Tiger** 676:20,21,22

**Tim** 558:22

**time** 349:6 355:11 356:4 358:24 359:23 361:9,18,21 362:5 364:21 372:12 375:25 377:16 378:6 381:25 382:5 387:2,25 388:19 390:22 395:9, 13 404:16 405:2,13,19 413:5,23,25 428:11 437:6 438:20 444:8,14 445:3, 8,9 451:23 452:3 456:20,23 459:2 471:24 473:9 482:14,18 483:24 484:22 485:6 488:7 489:6,9 491:3 492:8 494:10 502:13 515:4 517:15 523:20 525:5 526:18,21 529:18,22 531:8 533:5 537:16 538:23 544:4,23 547:17 551:21 552:24 561:18 564:3 565:19 567:16,22,25 569:11 570:25 571:5,21 575:12,14 578:20 584:16 588:23 589:2 593:12 595:9 609:4 610:15 614:23 615:8 617:2 621:24 622:4,7 625:14 627:25 633:7 640:21 641:10 642:12 643:7 647:24 648:3 663:10 674:12 683:8 684:19 685:7,8 686:20 689:5 690:25 694:4

**timeline** 417:24 447:8,16,21 448:4 473:10 483:14 654:4 682:12 697:22

**times** 473:24 474:8,11,16,20 519:5 530:23 544:9 547:17 588:11 598:17 614:2,6 616:22 629:5 672:8 682:10 684:16

**timing** 427:20 469:5 472:4 488:21 501:17 515:17 580:22 616:24

**tires** 624:5

**title** 431:16 433:7,11,13 436:12 459:22 460:6,7 663:5,14

**titled** 363:4 377:20 696:14

**titleholder** 464:4

**TLLA** 353:23

**TLOA** 386:19

**today** 349:21 433:9 458:11 523:6 580:4 598:17 618:12

**Today's** 349:5

**told** 378:16,20 393:16 401:16,20 407:3 427:4 433:23 478:9 592:22

**Tom** 623:7 625:2 626:6 627:4 629:8 631:17 632:11 640:21,24 641:12 642:11

**Tom's** 627:17

**tomorrow** 432:9 433:10

**ton** 436:16 453:21 464:19,21 502:12 584:11,14 688:22 689:11

**tool** 673:8

**tools** 672:13

**top** 355:7 531:24 555:16 558:15,16 572:17 623:9

**topics** 541:15 666:15 673:18

**total** 397:17 409:10 419:25 457:15 495:9,24 497:14,15 503:22 506:17 582:2 586:24 646:17 653:23 660:22 661:4 671:12,17 693:2,8

**touch** 382:11

**tough** 684:17

**Tower** 365:20 366:22,24 367:2 368:23 369:3,4,6,7,8,15,22 370:5,8 371:12,13,23 372:4,17,21,23 373:3 382:23 383:10,12,17,22 384:2 386:14 521:17 601:20

**track** 437:2

**tracking** 584:9

**trade** 578:22 623:5,6,17 624:2,11,19 625:11,19,23 626:2 630:7,10,12 631:22,25

**Trade's** 630:23 631:9

**traded** 573:14,17 660:15

**transaction** 354:10,20 357:10,11 358:4 359:11,21 369:12,19 372:8,15 377:25 381:13 382:3 383:15 384:21 386:4 388:16 399:9,14 424:3,11 434:4 440:7 446:20 468:13 531:2 539:2 540:2 570:7 571:13 572:2 573:17 586:20 591:16 592:21 605:7 624:25 625:2 626:5,6,8,18 627:19 628:16 629:8 641:12 676:24 697:3,11

**transactions** 386:11 459:15 585:12 587:6 588:6 589:25 591:13 592:7 593:2,5,9,23 594:22 597:25 628:12 638:3

**transcript** 695:14 701:7

**transfer** 354:13,17 467:24 625:14

**transferred** 354:7 358:25 416:10

**transfers** 353:4,7

**transition** 448:14 449:22 450:7 451:15 456:4 458:15,20 468:6,16 469:7

**transitioned** 452:20,22 453:5 469:5 471:10 523:3

**transitioning** 471:25 473:13

**translating** 439:11

**traveling** 589:6

**Travis** 555:25 568:15,18,19 572:18 574:10 575:9 580:13,17,19 585:9,22 587:5 594:9,24 595:2,6 597:15 599:12,13

**Travis's** 580:11 590:9 592:10

**trick** 664:3,5,8

**Triumph** 658:25 659:6,8,18,24 660:3,15 662:11,13 692:23 693:17

**Tropp** 660:23 661:2,15 673:19 676:21 692:18 693:9

**trouble** 447:22

**Troy** 456:12,16 674:25 684:8

**true** 363:16 392:20 393:18 411:23 413:3 422:16 423:16 452:6 517:16,23 518:8,21 564:9 616:11 695:15 701:10

**trust** 353:5,8,14,21 359:3 387:5 561:14

**truth** 355:5

**truthfulness** 408:13

**Tuesday** 579:23

**Turco** 461:14

**turn** 351:20 352:11 383:2 414:19 415:19,25 438:4 439:2,25 440:24 442:2 487:11,23 490:10 500:24 501:4 601:7 608:15 643:12

**turning** 494:22 495:5,17 502:6 616:5 620:20 623:8 624:9 634:16 638:18 639:11 645:3 648:24

**two-plus** 616:7,17 617:13,16

**two-week** 687:12

**TWR** 370:9

**type** 565:9

**types** 459:5

**typical** 373:9 545:22 552:6

**typically**  357:12 358:5 359:22
360:17 369:19,20 442:19 461:23
462:25 463:16 535:14 561:6 592:16
594:3

**typing**  594:2

**U**

**U.S.**  374:23 375:20 376:7,9,12
377:11,14,17 378:5,13,15,18 379:2,5,
17,23 380:4 381:7,20,24 382:4
386:15 556:14 557:9

**ultimate**  453:9

**ultimately**  427:15 439:11 508:7
582:14 630:17 641:22 675:5,10
682:21 684:3 687:7 691:7

**Um-hmm**  401:25 587:25 644:2

**unassigned**  625:22

**uncertain**  490:16

**underlying**  383:21 429:18 439:7
449:20 451:5 672:23

**understand**  426:8 441:13 454:5
467:20 529:11 540:19 542:22,24
546:8 564:21 565:2 578:7 597:3
598:7 604:7 613:2 628:21 650:3,19
651:2,7,10

**understanding**  403:17 414:2
436:16 437:2 452:15 473:3,8,16,24
474:23 475:4 503:21 520:5 527:24
540:20 543:22 551:9,15,17 552:12,
17,20 557:2,7 617:5 650:18 701:14

**understated**  503:19

**understood**  360:12 365:2,15 373:11
411:9 436:6 522:7

**underwriting**  435:25 584:19

**underwritten**  434:13

**unlike**  441:3

**unlock**  672:25

**unrecorded**  663:8

**unsecured**  620:16

**update**  476:15,22,25 477:8 478:22

**upload**  563:19 564:16 566:11

**uploaded**  567:8

**uploading**  563:24

**upset**  479:4,9,21,25 480:9,18

**USAA**  374:21

**uttered**  363:17,19

**V**

**vaguely**  381:16

**valid**  517:4,6,9

**validity**  516:13,22,23,24 517:12,14
518:24 699:3

**valuation**  492:19 493:23 497:3
600:9

**valuations**  491:23 492:4,9,21 493:8,
13,21 494:14

**valued**  494:3

**values**  491:10,13 504:12 505:8,20
507:3 512:2 573:9 580:18,21 581:4
584:23 585:5 592:5 599:2,16 600:7

**valuing**  509:5 511:18 577:19

**variance**  580:14 599:2,8,15,21

**vast**  443:15

**Vazquez**  631:23 637:11,20

**Velocity**  619:3

**verification**  600:12

**verified**  425:22 426:5 697:14

**versus**  349:12 383:23 442:22 450:22
452:14 456:24 539:8 586:2 631:7
652:13

**vessels**  659:5

**viable**  684:18

**Victor**  350:6 432:2

**video**  349:7

**view**  381:2 389:16 477:11 480:8,17,
23 507:19 511:13 537:23 581:17
587:7 588:7 590:2 595:22 598:18

**viewing**  598:20

**violation**  413:13

**visited**  629:9

**voicemail**  549:19,24 550:5 699:9

**W**

**wait**  429:8 430:6

**waiting**  453:23

**wall**  456:23

**Wang**  350:7 432:2 677:24

**wanted**  436:5 476:22 477:13,15,22
478:2 479:16,21 529:19 530:7 539:6
545:12 552:3 553:17 568:25 575:15
665:16,21 691:2

**wanting**  478:4

**warranted**  394:8

**warranties**  392:18 411:22 422:15

**waste**  450:16

**ways**  469:14

**week**  526:9 687:12,16

**weekly**  683:23

**weighted**  462:23 463:16

**Wells**  355:9,10,12,23 356:13 357:6,
15 358:16,24 361:19 365:11 387:19
638:20 639:5

**West**  589:7

**wet**  411:7

**WHEREOF**  695:22

**wholesale-type**  431:21

**William**  660:22 676:21

**Williams**  562:25 563:2

**willingness**  693:10,12,16

**Willscher**  349:21

**wire**  637:12,17,20

**wise**  407:4

**withdraw**  429:6 454:21 578:2,21
579:3,8,14 580:2 581:5,21 582:22
583:11 586:9 596:5 597:8 598:12

**withdrawal**  429:12

**withdrawals**  583:7

**withdrawing**  578:15 581:13

**withdraws**  620:17

**withdrew**  400:20

**Wold**  687:10

**wonky**  685:10

**word**  438:21 449:5 452:14 544:11
571:17 575:8 651:11 653:8

**wording**  602:20

**words**  370:8 551:8 585:10

**work**  431:22 436:16 451:4 452:17
478:6 482:4,16,24 483:13,17 485:6

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 405
RECEIVED NYSCEF: 01/12/2024
EMPLOYMENT DISCRIMINATION Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State
JOHN ARTHUR HANRATTY
John Hanratty
June 21, 2023
Court Records
Pg 1502 of 2230

491:2 521:23 522:15 523:8 525:7 531:19 568:24 582:20 677:10,13 682:13 684:8 685:13 688:22 689:11 690:21,23

**worked** 350:19 355:10 365:20 371:19 372:11 374:23 386:25 387:10, 15 522:3 524:7,25 568:23 641:14 642:13 675:2 686:12 688:12

**working** 405:24 459:3 484:23 486:8 494:12 522:17 545:5 631:3 632:24 636:22 641:11

**workout** 683:25

**works** 369:21 461:13 665:6,13

**world** 592:16

**worth** 497:16 576:24

**write** 476:14 556:8,12 578:18 594:14 596:19 602:2

**write-down** 500:5

**write-offs** 496:20

**writes** 472:8 493:5 502:8 532:2 545:3 556:2 558:23 559:10 560:24 564:5 566:21 567:2 574:3 577:25 578:14,19 585:10

**writing** 394:14,23 419:3 456:22 466:22 467:8 478:3 479:15 483:22 504:3 533:25 546:2 565:12 566:8 591:19 596:18

**written** 363:13 449:19 548:11 621:3, 8,20 686:21

**wrong** 431:24 583:21

**wrote** 456:13 461:18,21 462:7 472:24 476:18 477:2,13,15 479:7,14 480:6 491:2 492:3,18 502:17 526:6 532:11 541:18 556:11,15 573:11,20 578:23 579:5 591:12 592:15 593:4 594:24 595:2 596:10 598:8 599:13 601:8 602:10 614:10,19 616:5 690:4

---

### X

**Xie** 387:23 427:2,10 428:2 465:16 555:11,22 572:24 698:8 699:15

---

### Y

**year** 431:13 442:19 484:24 486:22 489:21 531:13,14 534:17 537:6 544:21 547:20 556:3 584:4 669:21 679:24 698:16,20

**year-and-a-half** 481:3,8

**year-end** 573:8 586:17 599:2

**years** 441:21 448:13 457:22 483:6 484:10 521:25 522:5,18 523:3 530:23 569:14 614:6 616:7,17 617:14,16 629:6 633:9 640:22 646:10,15,23 649:19 650:7,11,22 651:25 652:7,21 654:15 655:23

**yesterday** 374:8 389:6 390:14 391:13,14 404:11,15 408:4 458:11 502:7 528:20 570:9 659:7 661:7

**yesterday's** 390:23

**York** 349:10 356:5 361:10,19 362:9, 14 363:9 371:20 387:19 437:8 438:10 439:24 533:17 539:17 541:17 544:19 609:8 612:4 613:13 627:23 628:14 662:19,20 669:14 695:4,6,10

**younger** 452:14 461:24 462:21,23

---

### Z

**zone** 588:23

**Zyra** 558:11,21

---

# FILED: NEW YORK COUNTY CLERK

# NYSCEF DOC. NO. 124

# EXHIBIT(S) - REQUEST TO SEAL

## July 2021 Text Messages

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 125

EXHIBIT(S) - REQUEST TO SEAL

Grady Deposition Transcript

# FILED: NEW YORK COUNTY CLERK

# NYSCEF DOC. NO. 126

# EXHIBIT(S) - REQUEST TO SEAL

## 2018 Audited Financial Statements

# FILED: NEW YORK COUNTY CLERK

# NYSCEF DOC. NO. 127

# EXHIBIT(S) - REQUEST TO SEAL

November 9, 2018 Borrowing Base
Summary Page

# FILED: NEW YORK COUNTY CLERK

# NYSCEF DOC. NO. 128

# EXHIBIT(S) - REQUEST TO SEAL

May 17, 2019 Borrowing Base Summary
Page

# FILED: NEW YORK COUNTY CLERK

## NYSCEF DOC. NO. 129

## EXHIBIT(S) - REQUEST TO SEAL

September 13, 2019 Borrowing Base
Summary Page

# FILED: NEW YORK COUNTY CLERK

## NYSCEF DOC. NO. 130

## EXHIBIT(S) - REQUEST TO SEAL

2019 Fund 1 Audited Financial Statements

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 131

EXHIBIT(S) - REQUEST TO SEAL

2019 Fund 2 Audited Financial Statements

# FILED: NEW YORK COUNTY CLERK

# NYSCEF DOC. NO. 132

# EXHIBIT(S) - REQUEST TO SEAL

## May 2021 Text Messages

# FILED: NEW YORK COUNTY CLERK

# NYSCEF DOC. NO. 133

# EXHIBIT(S) - REQUEST TO SEAL

# March 2021 Email Correspondence

# FILED: NEW YORK COUNTY CLERK

# NYSCEF DOC. NO. 134

# EXHIBIT(S) - REQUEST TO SEAL

# March 2021 Text Messages

# FILED: NEW YORK COUNTY CLERK

## NYSCEF DOC. NO. 135

## EXHIBIT(S) - REQUEST TO SEAL

April 21-22, 2021 Email Correspondence

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 136

EXHIBIT(S) - REQUEST TO SEAL

August 2021 Email Correspondence

# FILED: NEW YORK COUNTY CLERK

# NYSCEF DOC. NO. 137

# EXHIBIT(S) - REQUEST TO SEAL

## August 31, 2021 Lien Tape (Ebury)

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 138

EXHIBIT(S) - REQUEST TO SEAL

August 31, 2021 Lien Tape (MTAG)

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 139

EXHIBIT(S) - REQUEST TO SEAL

April 2021 Text Messages

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 140

EXHIBIT(S) - REQUEST TO SEAL

April 7-8, 2021 Email Correspondence

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 141

EXHIBIT(S) - REQUEST TO SEAL

April 12-13, 2021 Email Correspondence

# FILED: NEW YORK COUNTY CLERK

# NYSCEF DOC. NO. 142

# EXHIBIT(S) - REQUEST TO SEAL

April 24, 2021 Email Correspondence

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 143

EXHIBIT(S) - REQUEST TO SEAL

September 2021 Text Messages

# EXHIBIT 22

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 144

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1524 of 2230

### In the Matter Of:

*Emigrant Business Credit vs*

*Hanratty*

---

## *DENNISSE BAEZ*

## *June 02, 2023*

---



1                                                          1

2    SUPREME COURT OF THE STATE OF NEW YORK

3    COUNTY OF NEW YORK

4    --------------------------------------

5    EMIGRANT BUSINESS CREDIT

6    CORPORATION,

7            Plaintiff,              Index No.

8      vs.                          158207/2022

9    JOHN ARTHUR HANRATTY, et al.,

10           Defendants.

11   --------------------------------------

12

13

14

15       REMOTE VIDEOTAPED DEPOSITION OF

16            DENNISSE MENDEZ BAEZ

17

18            Friday, June 2, 2023

19            10:00 a.m. (EDT)

20

21

22

23   Reported By:

24   Joan Ferrara, RMR, FCRR

25   Job No. 2023-899113

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 161                                                    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.    Court Records    Pg 1526 of 2230    Doc #3 State
Hanratty                                                             Dennisse Baez
                                                                     June 02, 2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23

2

```
 1

 2

 3

 4                    June 2, 2023

 5                    10:00 a.m. (EDT)

 6

 7

 8

 9          Videotaped Deposition of DENNISSE

10    MENDEZ BAEZ, held remotely via Zoom, before

11    Joan Ferrara, a Registered Merit Reporter,

12    Federal Certified Realtime Reporter and

13    Notary Public.

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1

 2   REMOTE APPEARANCES:

 3

 4   ON BEHALF OF EMIGRANT BUSINESS CREDIT

 5   CORPORATION:

 6   SULLIVAN & CROMWELL LLP

 7            125 Broad Street

 8            New York, New York 10004-2498

 9   BY:      AUSTIN MAYRON, ESQ.

10            ALEX WILLSCHER, ESQ.

11

12

13   ON BEHALF OF EBURY PARTIES:

14   GUSRAE KAPLAN NUSBAUM PLLC

15            120 Wall Street

16            New York, New York 10005

17   BY:      KARI PARKS, ESQ.

18

19

20   ALSO PRESENT:

21            BRIAN SMITH, Videographer

22            VICTOR WANG, Law Clerk

23

24

25
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
                   Emigrant Business Credit vs    Court Records    Pg 1528 of 2230    RECEIVED NYSCEF:    Dennisse Baez
                   Hanratty                                                                          June 02, 2023

4

```
 1

 2    --------------- I N D E X ---------------

 3    WITNESS            EXAMINATION BY        PAGE

 4    DENNISSE MENDEZ BAEZ

 5                      MR. MAYRON           8

 6                      MS. PARKS           219

 7

 8

 9    --------------- EXHIBITS ----------------

10    MENDEZ                           FOR ID.

11       (PROVIDED ELECTRONICALLY TO REPORTER)

12    Exhibit 1   E-mail chain, Bates EBURY

13                611                      14

14    Exhibit 2   Resignation of Shirley Vega,

15                Bates EBURY 15977        16

16    Exhibit 3   Summons and Complaint    19

17    Exhibit 4   Document, Bates EBURY 58356   22

18    Exhibit 5   Document, Bates EBURY 5548   74

19    Exhibit 6   E-mail, Bates EBURY 59765   78

20    Exhibit 7   E-mail chain, Bates EBURY

21                73415                    85

22    Exhibit 8   E-mail, Bates EBURY 12978   91

23    Exhibit 9   E-mail, Bates EBURY 71497   98

24

25                      (Continued)
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1529 of 2230    Dennisse Baez
Hanratty    June 02, 2023

```
                                                            5

 1

 2     --------------- EXHIBITS ---------------

 3    MENDEZ                              FOR ID.

 4       (PROVIDED ELECTRONICALLY TO REPORTER)

 5    Exhibit 10  Procedures memo, Bates EBURY

 6                71498                      99

 7    Exhibit 11  E-mail, Bates EBURY 58332   109

 8    Exhibit 12  E-mail attachment, Bates

 9                EBURY 58333                110

10    Exhibit 13  Document, Bates EBCC-7532    120

11    Exhibit 14  Sound Shore Financial

12                Memorandum, Bates EBCC-16726  120

13    Exhibit 15  E-mail, Bates EBCC-7955     127

14    Exhibit 16  E-mail chain, Bates EBCC-8371 130

15    Exhibit 17  Document, Bates EBCC-8879   131

16    Exhibit 18  E-mail, Bates EBCC-17776    135

17    Exhibit 19  Spreadsheet, Bates EBCC-27564 143

18    Exhibit 20  Lien Tape, Bates EBCC-10220  149

19    Exhibit 21  QuickBooks report, Bates

20                EBCC-11877                 173

21    Exhibit 22  QuickBooks report, Bates

22                EBCC-11878                 184

23    Exhibit 23  E-mail, Bates EBURY-666     191

24

25                        (Continued)
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1530 of 2230    Dennisse Baez
Hanratty    June 02, 2023

6

```
1

2     ---------------- EXHIBITS ----------------

3    MENDEZ                                    FOR ID.

4        (PROVIDED ELECTRONICALLY TO REPORTER)

5    Exhibit 24  E-mail, Bates EBURY-35508      194

6    Exhibit 25  E-mail, Bates EBURY-54761      200

7    Exhibit 26  E-mail chain, Bates

8                EBURY-59638                    202

9    Exhibit 27  Audited financial statements

10               from Richey May for the

11               year-ended 12/31/18, Bates

12               EBCC-10586                     205

13

14

15

16

17

18

19

20

21

22

23

24

25
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1073                                          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1531 of 2230    Dennisse Baez
Hanratty                                                           June 02, 2023

7

          1

          2          THE VIDEOGRAPHER:  Good morning.

          3    We are now on the record.  Today's

          4    date is June 2, 2023 and the video

          5    time is 10:04 a.m. Eastern.

          6          This is the video deposition of

          7    Dennisse Mendez Baez in the matter of

          8    Emigrant Business Credit Corporation

          9    versus John Arthur Hanratty, et al.,

         10    filed in the Supreme Court of the

         11    State of New York, County of New York.

         12          This deposition is taking place

         13    via web videoconference with all

         14    participants attending remotely.

         15          My name is Brian Smith.  I am the

         16    videographer representing Lexitas.

         17          Would all counsel on the

         18    conference, please, identify

         19    yourselves and state whom you

         20    represent, beginning with the

         21    questioning attorney.

         22          MR. MAYRON:  Austin Mayron, of

         23    Sullivan & Cromwell, representing

         24    Plaintiff Emigrant Business Credit

         25    Corporation.  With me today is Alex

8

```
 1              D. MENDEZ

 2       Willscher, also of Sullivan &

 3       Cromwell, on behalf of Emigrant.

 4            MS. PARKS:  Good morning.  My

 5       name is Kari Parks.  I represent the

 6       Ebury parties in this action who are

 7       all of the named Defendants, and I'll

 8       be attending today's deposition.  With

 9       me on the line is Victor Wang, our law

10       clerk here.  Thank you.

11            THE VIDEOGRAPHER:  The court

12       reporter is Joan Ferrara and will now

13       swear in the witness.

14  DENNISSE MENDEZ BAEZ,

15       called as a witness, having been duly

16       sworn by a Notary Public, was examined

17       and testified as follows:

18  EXAMINATION BY

19  MR. MAYRON:

20       Q.   Hi, Ms. Mendez.  Could you please

21  state and spell your name for the record?

22       A.   Yes.  My name is Dennisse Mendez

23  and it's D-E-N-N-I-S-S-E.  Since I'm Puerto

24  Rican I use Mendez Baez, my two last names.

25  So Mendez is not my middle name, it's my
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. ___ RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.
Hanratty

Dennisse Baez
June 02, 2023

9

                    D. MENDEZ

1    first last name.  Mendez is spelled M-E-N

2    as in Nancy, D as in David, E-Z.  And Baez

3    B-A-E-Z.

4         Q.    Would you prefer Ms. Mendez Baez

5    to Ms. Mendez?

6         A.    No, you can call me Ms. Mendez.

7         Q.    Okay.  You understand that you're

8    under oath, correct?

9         A.    Yes.

10        Q.    Is there any reason you cannot

11   provide complete and truthful answers to my

12   questions today?

13        A.    No.

14        Q.    Do you agree to provide complete

15   and truthful answers to my questions just

16   the same as if you were testifying before a

17   judge and jury in New York City?

18        A.    Yes.

19        Q.    And do you understand that if you

20   testify at the trial in this case, your

21   responses to my questions in this

22   deposition may be used when you testify at

23   trial?

24        A.    Yes.

10

D. MENDEZ

2      Q.    Is anyone else in the room with

3   you?

4      A.    No.

5      Q.    Do you agree to tell me if

6   someone joins you during a break or during

7   the deposition?

8      A.    Yes.

9      Q.    Do you have any other

10   applications other than Zoom or your PDF

11   viewer open on your computer?

12      A.    Let me check.  Sorry, I was -- I

13   do.  So let me close everything that I have

14   open on my computer.

15      Q.    Thank you.

16      A.    I apologize for that.

17      Q.    It's okay.

18      A.    I was --

19      Q.    Can you confirm when you've

20   closed all the other applications?

21      A.    Give me one second.  I'll confirm

22   you in a minute.  I was trying to do some

23   work before this started.  So I apologize

24   for that.  And I think one more.

25           Okay.  Almost there.  Everything

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022

NYSCEF DOC. NO.        24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   01/12/2024
                       Emigrant Business Credit vs   Court Records   Pg 1535 of 2230        Dennisse Baez
                       Hanratty                                                             June 02, 2023

11

                        D. MENDEZ

1

2    is closed on my computer now except Zoom.

3        Q.      Thank you.

4            If you access any applications

5    other than Zoom or your PDF viewer during a

6    break or during the deposition, do you

7    agree to tell me?

8        A.      Yes.

9        Q.      And do you agree not to access

10   the internet during this deposition or

11   during a break unless I ask you to do so?

12       A.      I agree.

13       Q.      Okay.  A few more.

14           During this deposition, please do

15   not communicate with anyone by chat, text,

16   or otherwise, including Ms. Parks.

17           Do you agree not to do that?

18           MS. PARKS:  Well, what about

19       during breaks and stuff, Austin, I

20       mean --

21           MR. MAYRON:  Presumably not about

22       the content of the testimony, but, you

23       know, sort of "how are you doing" I

24       think is okay.

25           MS. PARKS:  Okay.  Just checking.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. Emigrant Business Credit vs. Court Records    Pg 1536 of 2230    RECEIVED NYSCEF: 01/12/2024
Hanratty

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Dennisse Baez
June 02, 2023

12

D. MENDEZ

1

2      A.     Okay.  If it's not related to

3    this, I'm okay with it.  But if the school

4    calls or someone related to my kids calls,

5    I am going to stop everything and just

6    answer the call.

7      Q.     I understand.

8      A.     Sorry about that, but that's not

9    negotiable.

10     Q.     I understand.

11            Do you have any hard copy

12   documents related to this case within

13   reach?

14     A.     No.

15     Q.     Okay.

16     A.     I just have water with me and

17   napkins because I have a runny nose.

18   That's it.

19     Q.     Do you have any electronic

20   documents on your computer related to the

21   case?

22     A.     I have access to everything if I

23   log into different platforms, but I'm

24   logged out of everything.

25     Q.     Okay.  During the duration of

Emigrant Business Credit vs
Hanratty
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1537 of 2230   Dennisse Baez
June 02, 2023

13

                    D. MENDEZ

1    this deposition and any breaks, do you

2    agree not to look at any electronic

3    documents unless I provide them to you as

4    an exhibit or unless you identify them

5    first?

6        A.    I agree.

7        Q.    Okay.  Approximately how much

8    time did you spend preparing for this

9    deposition?

10       A.    Not much time really.

11       Q.    Less than five hours?

12       A.    Yes.

13       Q.    Who did you speak with to

14   prepare?

15       A.    To my attorney and that was it.

16       Q.    You didn't speak with

17   Mr. Hanratty?

18       A.    No, I did not.

19       Q.    Okay.  So to confirm, you didn't

20   speak to anyone from Ebury or any its

21   affiliates to prepare for this deposition?

22           MS. PARKS:  Objection to form.

23       You can answer.

24       A.    I did not.

14

```
 1                    D. MENDEZ

 2           THE WITNESS:  I'm sorry.

 3           MS. PARKS:  It's okay.  It's a

 4      weird exercise, the deposition.  Don't

 5      worry.

 6  BY MR. MAYRON:

 7      Q.    Have you seen the Complaint in

 8  this action?

 9      A.    I'm sorry, can you repeat the

10  question again?

11      Q.    Have you see the Complaint in

12  this action?

13      A.    I have not.

14           MR. MAYRON:  I'm sharing in the

15      chat now a document with Bates stamp

16      EBURY 611.  Could the court reporter,

17      please, mark it as Mendez Deposition

18      Exhibit 1.

19           (Mendez Exhibit 1, E-mail chain,

20      Bates EBURY 611, remotely introduced

21      and provided electronically to the

22      reporter.)

23  BY MR. MAYRON:

24      Q.    And could you please open the

25  document and let me know when you have it
```

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 1539 of 2230   Dennisse Baez
Hanratty   June 02, 2023

15

                    D. MENDEZ

1   open?

2       A.    Okay.  I have it open.

3       Q.    Do you recognize this document?

4       A.    I do.

5       Q.    What is it?

6       A.    This is an e-mail that I sent to

7   Ms. Shirley Vega and it was an e-mail that

8   I thought it was related to the -- to

9   another case that we have that Ms. Vega and

10  myself are a part of, and that's why I

11  responded to this e-mail.  You didn't read

12  it right.  Because I was referring to the

13  other lawsuit until we saw the document

14  that was sent to us was a different one.

15      Q.    So, Ms. Vega, and my Spanish

16  isn't the best, says:  There's no mention

17  of me stealing anything?

18      A.    Uh-huh.

19      Q.    And you said:  You did not read

20  it well?

21      A.    Uh-huh.

22      Q.    What does it refer to?

23      A.    To that other lawsuit that we are

24  mentioning.  Because in that lawsuit, it's

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
Emigrant Business Credit vs Court Records    Pg 1540 of 2230    RECEIVED NYSCEF:    Dennisse Baez
Hanratty    June 02, 2023

16

                        D. MENDEZ

 1

 2    mentioned that she stole some documents and

 3    that's the document I thought it was shared

 4    with us.  I didn't read the subject of it.

 5    So that's why I responded to her:  You

 6    didn't read it right.

 7         Q.    And you didn't review the

 8    document that was referred to in this

 9    e-mail chain?

10         A.    I did not.  That's why my

11    response on it, that you didn't write it

12    well, because I was referring to that other

13    lawsuit.

14              MR. MAYRON:  So I'm sharing in

15         the chat now a document marked EBURY

16         15977.  Could the court reporter,

17         please, mark that as Mendez Deposition

18         Exhibit 2.

19              (Mendez Exhibit 2, Resignation of

20         Shirley Vega, Bates EBURY 15977,

21         remotely introduced and provided

22         electronically to the reporter.)

23    BY MR. MAYRON:

24         Q.    And could you, please, open it up

25    and let me know when you have it open?

17

D. MENDEZ

2    A.    Uh-huh.

3    Q.    Do you recognize this document?

4    A.    Yes.

5    Q.    What is this?

6    A.    This is Ms. Vega's resignation.

7    Q.    And so Ms. Vega has resigned from

8  Ebury?

9    A.    Yes, she did.

10    Q.    Did she tell you why she

11  resigned?

12    A.    Yes.  She had a new job.

13    Q.    Her resignation wasn't related to

14  the lawsuit?

15    A.    Un-huh.

16        MS. PARKS:  Objection to form.

17    Just give me a second.  And remember,

18    you should use verbal answers because

19    it's hard for the court reporter to

20    take down like shakes or nods, that

21    kind of thing.

22    A.    I'm sorry.  I'm sorry about that.

23        MS. PARKS:  No, it's okay.

24  BY MR. MAYRON:

25    Q.    Her resignation was not related

18

1              D. MENDEZ

2    to the Emigrant lawsuit?

3              MS. PARKS:  Objection to form.

4              You can answer.

5        A.    No.

6        Q.    Was it related to the lawsuit

7    from Thomas McClosky?

8              MS. PARKS:  Objection to form.

9              You can answer.

10       A.    No.

11       Q.    So you're currently employed by

12   Ebury?

13             MS. PARKS:  Objection to form.

14             You can answer.

15       A.    I am not employed by -- well,

16   which entity are you referring to?

17       Q.    So which -- so where do you work?

18       A.    I work for Greater Flamingo.

19       Q.    And what is Greater Flamingo?

20       A.    That's the employer.

21       Q.    What is Greater Flamingo?

22       A.    Greater Flamingo, it's a peer

23   entity that manages the Ebury assets.

24       Q.    What do you mean by "peer

25   entity"?

Emigrant Business Credit vs
Hanratty

Court Records    Pg 1543 of 2230

Dennisse Baez
June 02, 2023

19

D. MENDEZ

2    A.    I mean -- I'm sorry.  Puerto Rico

3    entity.

4    Q.    And what do you mean by manages

5    the Ebury assets?

6    A.    Greater Flamingo, it's the entity

7    that has the employees that work with the

8    Ebury assets, the servicing and the real

9    estate and the management.

10    Q.    The other Ebury companies don't

11    have employees to perform those functions?

12    A.    Which Ebury entities are you

13    referring to?

14        MR. MAYRON:  So I'm going to

15        share in the chat a document titled

16        Summons and Complaint.  Could the

17        court reporter, please, mark it as

18        Mendez Deposition Exhibit 3.

19            (Mendez Exhibit 3, Summons and

20        Complaint, remotely introduced and

21        provided electronically to the

22        reporter.)

23    BY MR. MAYRON:

24    Q.    Do you have it open?

25    A.    Yes, I do.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs Court Records   Pg 1544 of 2230   Dennisse Baez
Hanratty                                                     June 02, 2023

20

D. MENDEZ

1

2    Q.    On the first page, beneath the V,

3    it says John Arthur Hanratty.

4    A.    Uh-huh.

5    Q.    And then it lists, I think, 28

6    companies, and then at the bottom it says

7    XYZ Corps 1 through 10.

8          I'm going to refer to those

9    companies, Ebury Street Capital LLC through

10   Ebury Re LLC as the Ebury companies.

11   A.    Okay.

12   Q.    Will you understand what I'm

13   referring to if I say "Ebury companies"?

14   A.    I do.

15   Q.    So do the Ebury companies have

16   employees to perform the servicing of the

17   Ebury assets?

18   A.    No.

19   Q.    In your view, do the Ebury

20   companies all function as a single entity?

21         MS. PARKS:  Objection to form.

22         You can answer.

23   A.    No.

24   Q.    Why not?

25   A.    All of the entities have

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                            RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs    Court Records      Pg 1545 of 2230      Dennisse Baez
Hanratty                                                              June 02, 2023

21

                         D. MENDEZ

1
2    different assets, different -- it's mostly

3    different assets and different purpose.  So

4    for me they're not all the same.

5         Q.    They're all subsidiaries of Ebury

6    Fund I or Ebury Fund II?

7         A.    I would have to verify our

8    organizational chart and see which one is

9    affiliated to which, because I don't know

10   it from the top of my mind.  There are many

11   entities.

12        Q.    And the Ebury companies are all

13   managed by Ebury Street Capital?

14             MS. PARKS:  Objection to form.

15             You can answer.

16        A.    Ebury Street Capital is a manager

17   of these entities, that's correct.

18        Q.    And John Hanratty runs Ebury

19   Street Capital?

20             MS. PARKS:  Objection to form.

21             You can answer.

22        A.    What do you mean by "run"?

23        Q.    He's in charge?

24        A.    He is.

25        Q.    He makes all of the decisions?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1546 of 2230    Dennisse Baez
Hanratty    June 02, 2023

22

D. MENDEZ

2      MS. PARKS:  Objection to form.

3      You can answer.

4    A.    Yes.

5    Q.    So you are director of operations

6  at Greater Flamingo?

7    A.    That's correct.

8    Q.    You've also used the title

9  servicing director?

10   A.    I might have, yes.

11     MS. PARKS:  Just a reminder,

12   Dennisse, if you remember, answer.  If

13   you're not sure, you know, you can say

14   that, too.

15   A.    I'm sorry, I'm not sure.

16     MR. MAYRON:  Kari, let's keep

17   objections succinct and

18   non-suggestive.

19     I'm going to share in the chat a

20   document labeled EBURY 58356.  Could

21   the court reporter, please, mark it as

22   Mendez Deposition Exhibit 4.

23     (Mendez Exhibit 4, Document,

24   Bates EBURY 58356, remotely introduced

25   and provided electronically to the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO.    Emigrant Business Credit vs    Court Records    Pg 1547 of 2230    RECEIVED NYSCEF: 01/12/2024
Hanratty                                                                    Doc #3 State
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Dennisse Baez
June 02, 2023

23

```
 1                 D. MENDEZ

 2        reporter.)

 3   BY MR. MAYRON:

 4        Q.     Do you recognize this document?

 5        A.     Yes.

 6        Q.     Johnny Chee-How asks:  What is

 7   your official title with Ebury?

 8        A.     Uh-huh.

 9        Q.     You answer:  I'm Ebury's

10   servicing director.

11        A.     That's correct.

12        Q.     You didn't say:  I'm Greater

13   Flamingo's servicing director?

14        A.     I did not.

15        Q.     Why not?

16        A.     Because at the time, I was not.

17        Q.     So then let's talk about your

18   roles.

19               So your current job is director

20   of operations?

21        A.     That's correct.

22        Q.     How long have you been director

23   of operations?

24        A.     Since August of 2019.

25        Q.     And before August of 2019, what
```

24

```
 1                      D. MENDEZ

 2    was your title?

 3         A.     Before August of 2019, I was not

 4    an employee of the Ebury group, but I was

 5    doing the jobs as the servicing director

 6    for John at the time.

 7         Q.     So where did you work prior to

 8    August of 2019?

 9         A.     I was employed by, I think the

10    name of the entity was BCMG Services or one

11    of their entities.

12         Q.     And how long did you work at BCMG

13    Services?

14         A.     I started in August of 2018 until

15    I started my maternity leave in May of

16    2019.

17         Q.     And where did you work prior to

18    BCMG Services?

19         A.     Prior to August 2018?

20         Q.     Yes, prior.  Where did you work

21    prior to August 2018?

22         A.     I worked for a company that it's

23    not related to John or the BCMG group, and

24    their name was -- I can't remember the name

25    of the entity.  It was a group, I remember
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1549 of 2230    Dennisse Baez
Hanratty    June 02, 2023

25

                    D. MENDEZ

1

2    they had a company name Southern Tax

3    Capital, which is the one that held up

4    assets, but I can't remember the name of

5    the entity in Puerto Rico.

6         Q.    Was the entity related to

7    Mr. McCosker?

8         A.    No.

9         Q.    So before that job, would the

10   company that may be named Southern Tax

11   Capital, where did you work?

12        A.    Before Southern Tax Capital?

13        Q.    Yes.

14        A.    I worked for a telecom company

15   that it's called QMC Telecom.

16        Q.    So approximately when did you

17   work for QMC Telecom?

18        A.    I started working for QMC Telecom

19   from 2010 to 2014, if I'm not mistaken.

20        Q.    And then prior to QMC Telecom,

21   where did you work?

22        A.    I work for a CPA firm.

23   Originally, their name was Scherrer

24   Hernandez and then they changed their name

25   to BDO while I was working for them.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs   Court Records   Pg 1550 of 2230   Dennisse Baez
Hanratty
June 02, 2023

26

```
 1                    D. MENDEZ

 2       Q.    And then before that job?

 3       A.    Before that -- oh boy -- I was

 4   working for the Grant Thornton branch in

 5   PR, which was Kevane Grant Thornton.

 6       Q.    And then the next job before

 7   that?

 8       A.    Before that, I was in college.  I

 9   did some work while I was in college, but I

10   was a teacher to old people, teaching them

11   how to read and write.

12            Now, that was with the Department

13   of Education here in the island, and I

14   tutor kids in math and Spanish and stuff

15   like that while I was in college.

16       Q.    What was your college degree in?

17       A.    I have a major in accounting, a

18   bachelor's degree in business

19   administration, with a major in accounting.

20       Q.    And you're also a CPA?

21       A.    I do not have an active license.

22   But yes, I passed the test and I had a

23   valid CPA license while I was in the CPA

24   firms.

25       Q.    When did you become a CPA?
```

27

                         D. MENDEZ

1

2        A.      I think it was 2013.

3        Q.      And when did you let your license

4    lapse?

5        A.      I do not remember.

6        Q.      When did you first start working

7    with tax liens?

8             MS. PARKS:   Objection to form.

9        You can answer.

10       A.      I started working with tax liens

11   in 2014.

12       Q.      And this was at Southern Tax

13   Capital?

14       A.      Yes.

15       Q.      And what sort of work did you do

16   with tax liens at the time?

17       A.      Originally, I was supervising the

18   servicing team that we had in Atlanta and

19   then shortly after I left, I was servicing

20   the link portfolio myself.

21       Q.      When you say after you left, are

22   you referring to your job at BCMG Services?

23       A.      Before I left to start my job at

24   BCMG Services, yes.

25       Q.      So this was between when you

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.    Court Records    Pg 1552 of 2230    Dennisse Baez
Hanratty    June 02, 2023

28

D. MENDEZ

1

2    worked at Southern Tax Capital and when you

3    started working at BCMG Services?

4        A.    No.   When I was at Southern Tax

5    Capital or whatever the name of the Puerto

6    Rico entity was, I started there as like

7    supervisor for the servicing group.   And

8    then as that portfolio started to wind down

9    and we were liquidating the portfolio, I

10   started servicing that portfolio myself.

11       Q.    What does it mean to service a

12   tax lien portfolio?

13       A.    At the time, I was the one

14   interacting with the taxpayers, tax

15   collectors, attending auctions, managing

16   the legal work with the attorneys that were

17   representing us in foreclosures, that type

18   of work.

19       Q.    And why does a tax lien portfolio

20   need a servicer?

21           MS. PARKS:   Objection to form.

22           You can answer.

23       A.    Tax liens are similar to

24   mortgages.   They need someone to interact

25   with whoever owes the debt and do

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM  INDEX NO. 158207/2022

NYSCEF DOC. NO.     Doc 1-2  Filed 08/14/24  Entered 08/14/24 09:45:23  Doc #3 State  RECEIVED NYSCEF: 01/12/2024

24-04020-dsj

Emigrant Business Credit vs
Hanratty                        Court Records     Pg 1553 of 2230           Dennisse Baez
                                                                            June 02, 2023

29

D. MENDEZ

2   collection efforts and talk to tax

3   collectors.  So someone has to be in

4   contact with all the parties involved in

5   the tax lien.

6       Q.    And so when you first were

7   working at Southern Tax Capital, you were

8   servicing another entity's lien portfolio?

9           MS. PARKS:  Objection.

10          You can answer.

11      A.    What do you mean, other entities?

12  Other entities besides Southern Tax Capital

13  or --

14      Q.    Was it a situation where there

15  was an entity that owned the tax liens and

16  they hired Southern Tax Capital to service

17  their portfolio?

18      A.    No.

19      Q.    Southern Tax Capital had its own

20  portfolio of liens and you managed the

21  servicing?

22      A.    That's correct.

23      Q.    Do the owners of tax lien

24  portfolios ever hire third parties to

25  service their portfolios?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO.                                                    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

Emigrant Business Credit vs    Court Records    Pg 1554 of 2230    Dennisse Baez
Hanratty                                                            June 02, 2023

30

1                    D. MENDEZ

2          MS. PARKS:  Objection.

3          You can answer.

4     A.    While I was there, no.  I don't

5     remember doing that.

6     Q.    More generally, based on your

7     knowledge of the industry, do owners of tax

8     liens sometimes hire third-party entities

9     to service their portfolios?

10         MS. PARKS:  Objection.

11         You can answer.

12    A.    Yes.

13    Q.    So after Southern Tax Capital,

14    you were at BCMG Services?

15         MS. PARKS:  Object to form.

16         You can answer.

17    A.    Yes, I was hired by one of BCMG

18    entities.  I can't remember if it was BCMG

19    Services, but it was one of the BCMG

20    entities.

21    Q.    What was your role at the BCMG

22    entity?

23    A.    Originally, I was hired by

24    Mr. McCosker to do the -- it was the

25    operations of a financial entity he was

31

```
 1                    D. MENDEZ

 2   forming, an international financial entity,

 3   and he wanted me to help him basically put

 4   together the entity and the compliance of

 5   that entity.

 6            And he also asked me to get

 7   involved with the lien portfolio, the lien

 8   portfolios that John had at the time as

 9   well as some lien portfolios that at the

10   time Mr. Tom McCosker owned.

11       Q.    So this was beginning in 2014?

12            MS. PARKS:  Objection.

13            You can answer.

14       A.    No.  With Mr. McCosker, that was

15   2018.

16       Q.    And at the time you were working

17   for a BCMG entity helping to service

18   Mr. Hanratty's lien portfolios?

19            MS. PARKS:  Objection.

20            You can answer.

21       A.    No.

22       Q.    So earlier you said "and he also

23   asked me to get involved with the lien

24   portfolio, the lien portfolios that John

25   had at the same time."
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   01/12/2024
                Emigrant Business Credit vs.   Court Records   Pg 1556 of 2230   RECEIVED NYSCEF:   Dennisse Baez
                Hanratty                                                                           June 02, 2023

32

```
 1                    D. MENDEZ

 2           What did you mean by that?

 3     A.     John had a servicing group and at

 4  the time they were -- there were

 5  conversations or it was my understanding at

 6  the time there were conversations between

 7  the two of them to get together and have

 8  portfolios together.

 9           So Tom McCosker asked me to

10  understand the lien business or the

11  servicing business that Mr. Hanratty had

12  with his team and see how it could be

13  basically describe all the processes, see

14  what they were doing and establish like a

15  standard operating procedure of the

16  servicing process so it could be translated

17  into a platform that Mr. McCosker had

18  purchased and was trying to get back on,

19  which was LienLog, which was a lien

20  servicing platform.  So that was my

21  involvement.

22     Q.     So you weren't helping service

23  Mr. Hanratty's portfolios at the time?

24           MS. PARKS:  Objection to form.

25           You can answer.
```

33

                        D. MENDEZ

1

2      A.    Not that I remember at that time.

3      Q.    So why did you leave BCMG?

4      A.    When -- while I was on my

5  maternity leave, John and Tom separated.

6  That was back in May of 2019, and I

7  received a call from Mr. McCosker while I

8  was on maternity leave saying that he and

9  John had agreed that I was going to go and

10 work with John instead of staying with the

11 BCMG entities.

12     Q.    So I understand, if you were

13 working for Mr. McCosker helping to set up

14 LienLog, why would you then go work for

15 Mr. Hanratty who wasn't, I assume, creating

16 LienLog?

17         MS. PARKS:  Objection to form.

18         You can answer.

19     A.    Can you repeat the question

20 again?  I didn't hear the last part of it.

21 Do you mind if I increase the volume here?

22 I'm sorry.

23     Q.    Not at all.

24         If your role for Mr. McCosker was

25 to help set up LienLog, why would it make

34

D. MENDEZ

2  sense for you to go work for Mr. Hanratty?

3      A.    Well, at the time LienLog was

4  stopped.  It was not moving forward.  That

5  was not the only task that I was assigned

6  while working with Mr. McCosker.

7          And from all the back and forth

8  between them at the time, I believed

9  Mr. McCosker didn't have the workload or

10  the income to keep me employed there.  And

11  I had started working more closely with

12  John Hanratty and his team.  So, for me, it

13  was a better decision just to accept the

14  move and move with John.

15     Q.   What do you mean by you had

16  started working more closely with John

17  Hanratty and his team?

18     A.    When I started working at BCMG, I

19  was only working as I previously explained

20  to you trying to document the processes of

21  the servicing part.

22          And then after a few months, I

23  started understanding better his business,

24  or at least the servicing part.  His

25  portfolio was growing and I know he needed

35

                    D. MENDEZ

1    the help in that area and that I thought I

2    could help him with that.

3         MS. PARKS:  Sorry, Dennisse, when

4      you say he, you're talking about John

5      right now?

6         THE WITNESS:  I'm sorry, John,

7      yes.

8         MR. MAYRON:  Kari, if I need to

9      clear up the record, I'll ask a

10     follow-up.  Thank you.

11   BY MR. MAYRON:

12        Q.    You said you started

13   understanding his business better.  What

14   did you understand about his business?

15        A.    Well, I started seeing the

16   portfolio that he had and he was incurring

17   new assets.  And I started -- before I

18   started working with John and his

19   portfolio, I had worked with a portfolio in

20   the State of Georgia and Missouri.  John

21   had other states he had liens on, so I

22   started to get involved in those states and

23   starting to understand the process in those

24   states, which was completely different to

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1560 of 2230    Dennisse Baez
Hanratty                                                          June 02, 2023

36

```
 1                    D. MENDEZ

 2    what I was used to.  That's what I meant.

 3        Q.    And just more generally, what was

 4    John's business?  What was his business

 5    model?

 6              MS. PARKS:  Objection to form.

 7              You can answer.

 8        A.    At the time, my understanding of

 9    John's business was he had different lien

10    portfolios in different states.  He had a

11    group that was helping him with the

12    foreclosures and onboarding of real estate

13    after the foreclosure process was

14    completed.  He was buying and selling real

15    estate.

16        Q.    Do you know if he had investors?

17              MS. PARKS:  Objection to form.

18              You can answer.

19        A.    Not at that time.

20        Q.    Did you know if he had

21    relationships with banks?

22        A.    What kind of relationships?

23              MS. PARKS:  Objection to form.

24              Go ahead.

25        A.    What kind of relationships?
```

37

```
 1                    D. MENDEZ

 2      Q.     Lending relationships.

 3      A.     Yes.

 4      Q.     How do you know that?

 5      A.     Because I've heard him talking

 6   about preparing the borrowing base for

 7   Emigrant and also because he was trying to

 8   get his line refinanced at the time.  And

 9   this is one of the e-mails that you sent to

10   me with Johnny Chee-How.  It's that person

11   that he was trying to -- or he was in

12   contact with in Alister Bank for the

13   refinance.

14      Q.     And so at the time what had he

15   told you about preparing the borrowing base

16   for Emigrant?

17      A.     What do you mean what he told me

18   about preparing the borrowing base?

19      Q.     You said, "I've heard him talking

20   about preparing the borrowing base for

21   Emigrant"?

22      A.     Yeah, I remember him requesting

23   information from his team, from the

24   accounting team that he had at the time,

25   requesting information for the borrowing
```

38

D. MENDEZ

1

2    base.  He had someone that was extracting

3    the data so he can provide the borrowing

4    base to Emigrant.

5        Q.    Anything else?

6        A.    No.

7        Q.    Did he ever say anything about

8    Emigrant's review of the borrowing base?

9        A.    Not that I remember.

10       Q.    Did he ever say anything about

11   making alterations to the borrowing base?

12       A.    No.

13       Q.    And so then after your maternity

14   leave, you joined Greater Flamingo?

15       A.    After my maternity leave, I

16   joined -- I don't remember if it was

17   straight to Greater Flamingo or was another

18   entity at the time, but yes, I joined the

19   group.

20       Q.    What do you mean you joined the

21   group?

22       A.    I started working at John's

23   office.  It's -- I don't remember if

24   Greater Flamingo existed at the time.  So

25   that's why I'm not saying yes, it was

39

D. MENDEZ

2   Greater Flamingo.  It could have been

3   another entity.  And then I started working

4   as an employee for Greater Flamingo.

5       Q.    By the group, did you mean the

6   Ebury companies?

7       A.    The Ebury companies, uh-huh.

8       Q.    And do you view them sort of as a

9   single entity, operationally?

10          MS. PARKS:  Objection to form.

11          You can answer.

12      A.    What do you mean as a single

13  entity, operationally?

14      Q.    Do you view them as operating

15  effectively as a single entity?

16          MS. PARKS:  Objection.

17          You can answer.

18      A.    No, I don't.

19      Q.    Which Ebury companies operate

20  independently of each other?

21          MS. PARKS:  Objection.  Dennisse,

22      when I object, you can still answer.

23      I was just trying to cut it down.

24          THE WITNESS:  Okay, I'm sorry.

25          MS. PARKS:  Unless I tell you

40

                    D. MENDEZ

 1     don't answer.

 2              THE WITNESS:  Okay, I'm sorry.

 3              MS. PARKS:  No, you're good.

 4        A.    Okay.  Well, you have -- let me

 5     look at the list again.  Sorry, I have to

 6     look at list all the time just to -- okay.

 7              From this list, I have Ebury RE,

 8     which operates independently from -- it's

 9     owned by the funds, but it operates

10     independently because that only helps REO.

11     So its operation is different from the

12     operation of the funds that hold liens.

13        Q.    John controls all of the Ebury

14     companies, though.

15              MS. PARKS:  Objection to form.

16     It's not a question also.

17     BY MR. MAYRON:

18        Q.    Does John control all of the

19     Ebury companies?

20              MS. PARKS:  Objection to form.

21        A.    What do you mean by "control"?

22     He's the manager.

23        Q.    Is he the ultimate

24     decision-maker?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM       INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   01/12/2024
             Emigrant Business Credit vs   Court Records   Pg 1565 of 2230          Dennisse Baez
             Hanratty                                                               June 02, 2023

41

```
 1                    D. MENDEZ

 2          MS. PARKS:  Objection.

 3          Go ahead.

 4     A.   Yes, he is.

 5     Q.   Does anyone other than

 6  Mr. Hanratty make decisions -- strike that.

 7  Apologies.

 8          With respect to Greater Flamingo,

 9  John controls that company as well?

10          MS. PARKS:  Objection.

11     A.   That's correct.

12     Q.   So your first title at the Ebury

13  companies was director of servicing?

14          MS. PARKS:  Objection.

15     A.   Yes, it was.

16     Q.   What were your responsibilities

17  in that role?

18     A.   I was in charge of the servicing

19  team.  I was -- I started to get in contact

20  with the attorneys doing foreclosures for

21  us.  I started to get involved in the real

22  estate side, too.  Yeah, that was it.

23     Q.   Did Ebury service its tax lien

24  portfolio in-house?

25          MS. PARKS:  Objection.
```

42

```
 1                    D. MENDEZ

 2        A.    Not all the portfolio, but some

 3   of the assets.

 4        Q.    For the assets that it did not

 5   service in-house, who serviced them?

 6              MS. PARKS:  Objection.

 7        A.    When I joined the company, it was

 8   MTAG Services.

 9        Q.    Which of the assets were serviced

10   by MTAG Services?

11        A.    I'm sorry, but I don't have a

12   list of assets.

13        Q.    Why did MTAG Services service

14   some of the assets?

15        A.    I wasn't here when that servicing

16   agreement started.  All I know, it's before

17   MTAG.  John was using Tower Fund Servicing

18   and it's my understanding that it didn't go

19   well with Tower.  So it was changed to

20   MTAG.

21        Q.    Has there been a servicer other

22   than MTAG or Tower during your time at the

23   company?

24              MS. PARKS:  Objection to form.

25        A.    No.  I know there were talks with
```

43

```
 1                      D. MENDEZ

 2    another servicing -- was it servicing --

 3    no, there hasn't.

 4        Q.    Why didn't things go well with

 5    Tower?

 6        A.    I don't know.  I cannot

 7    speculate.  I wasn't here.

 8        Q.    How do you know things didn't go

 9    well with Tower?

10        A.    Because John told me things

11    didn't go well with Tower.

12        Q.    Did he tell you what happened?

13        A.    If he did, I do not remember.

14        Q.    So you don't know whether he told

15    you what happened?

16            MS. PARKS:  Objection.

17            You can answer.

18        A.    I do not remember.

19        Q.    Because you don't remember

20    whether he told you what happened with

21    Tower?

22        A.    Exactly.  I do not remember if he

23    told me what happened with Tower.  I do

24    remember him saying it didn't go well, but

25    I do not remember if he told me what was
```

44

D. MENDEZ

1
2    the exact issue with them.  I'm sorry, that
3    was 2018.  A lot has happened to me in 5
4    years.
5        Q.    Do you know why Ebury was using a
6    third-party servicer?
7            MS. PARKS:  Objection to form.
8        A.    No.
9        Q.    Do you know if MTAG was servicing
10   liens that were financed by Emigrant Bank?
11           MS. PARKS:  Object to the form.
12       A.    Yes.
13           MS. PARKS:  Go ahead.
14       A.    Yes.
15       Q.    Do you know if that was a
16   requirement of the agreement with Emigrant
17   Bank?
18           MS. PARKS:  Objection to form.
19       A.    I do not if it was a requirement
20   to use MTAG.
21       Q.    Do you know if it was a
22   requirement to use a third-party servicer?
23           MS. PARKS:  Objection to form.
24           You can answer.
25       A.    I don't think so.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1569 of 2230    Dennisse Baez
Hanratty    June 02, 2023

45

D. MENDEZ

1

2      Q.     Was Ebury servicing any of

3   Emigrant's portfolio in 2018?

4           MS. PARKS:  Objection to form.

5           You can answer.

6      A.     I don't have a list of the assets

7   that were under Emigrant in 2018 to confirm

8   if some of the assets were being serviced

9   in-house.

10     Q.     Would you agree that most of the

11  assets that were under the Emigrant

12  facility were being serviced by MTAG?

13          MS. PARKS:  Objection.

14     A.     Again, I don't have a list of the

15  assets to answer that question.

16     Q.     To confirm, you're not able to

17  answer without seeing a list of the

18  specific assets?

19     A.     I'm sorry?

20     Q.     To confirm, you cannot answer

21  whether most of the assets that were under

22  the Emigrant facility were being serviced

23  by MTAG without seeing a list?

24     A.     Confirm -- I would have to see a

25  list and to see to which portfolio those

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.    Court Records    Pg 1570 of 2230    Dennisse Baez

Hanratty    June 02, 2023

46

D. MENDEZ

1

2    assets pertain to to be able to tell you

3    which assets were serviced by MTAG and

4    which assets were serviced in-house.

5    Q.    Did you have a general

6    understanding of which assets MTAG

7    serviced?

8    MS. PARKS:  Objection.

9    A.    I -- it's -- do you mean now or

10    do you mean back then?

11    Q.    Back in 2018.

12    A.    I would have to get an MTAG

13    report of the assets they were managing in

14    2018.

15    Q.    To the extent Ebury was servicing

16    assets in the Emigrant portfolio, you would

17    have been the person responsible for that,

18    correct?

19    MS. PARKS:  Objection.

20    A.    For the servicing?  For the

21    servicing of the assets?

22    Q.    Yes.

23    A.    I would have been the person

24    involved in the servicing of the assets

25    from 2019.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO.  Emigrant Business Credit vs  Court Records  Pg 1571 of 2230  RECEIVED NYSCEF: 01/12/2024
Hanratty

24-04020-dsj  Doc 1-2  Filed 08/14/24  Entered 08/14/24 09:45:23  Doc #3 State
Dennisse Baez
June 02, 2023

47

```
 1              D. MENDEZ

 2      Q.   So you would have known if Ebury

 3   was servicing assets in the Emigrant

 4   portfolio?

 5           MS. PARKS:  Objection.

 6      A.    Again, if there are assets that

 7   we serviced that were in the Emigrant

 8   portfolio, I would have to see a list of

 9   the assets we were servicing.

10      Q.   My question was at the time, if

11   Ebury was servicing assets in the Emigrant

12   portfolio, you would have known, correct?

13           MS. PARKS:  Objection.

14   Speculation.

15      A.   I would have known there were

16   Emigrant's collateral -- is that what

17   you're saying?

18      Q.   My question was, if there were

19   assets that -- my question was at the time,

20   if Ebury was servicing assets in the

21   Emigrant portfolio, you would have known,

22   correct?

23           MS. PARKS:  Objection.

24           You can answer.

25      A.    The -- if you're referring to the
```

48

D. MENDEZ

1    in-house servicing, the servicing of the

2    in-house liens didn't say anywhere that it

3    was Emigrant's collateral or not.

4          So if there was a lien that is

5    serviced in-house that was Emigrant, I

6    wouldn't have known exactly which asset was

7    Emigrant's collateral at the time.

8       Q.    Ebury didn't keep records of what

9    collateral belongs to Emigrant?

10          MS. PARKS:  Objection.

11       A.    That's not what I'm saying.  I'm

12    saying in terms of the servicing side,

13    in-house, the servicing team I don't

14    remember having a detail of this assets are

15    Emigrant's collateral or not.

16       Q.    So Ebury did have records of what

17    collateral belonged to Emigrant?

18          MS. PARKS:  Objection.

19          You can answer.

20       A.    John, on the accounting time, at

21    the time they had it, because they were

22    preparing the borrowing base, so... they

23    had a list of the assets that were

24    collateral for Emigrant.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.    Court Records    Pg 1573 of 2230    Dennisse Baez
Hanratty    June 02, 2023

49

```
 1                    D. MENDEZ

 2        Q.    But you didn't look at that list?

 3               MS. PARKS:   Objection.

 4        A.    I did not work with the borrowing

 5   base.

 6        Q.    But did you look at the list that

 7   were collateral for Emigrant?

 8        A.    I did not.

 9        Q.    Did you have any other

10   responsibilities as director of servicing?

11               MS. PARKS:   Objection to form.

12               You can answer.

13        A.    No.

14        Q.    And later you became director of

15   operations?

16        A.    That's correct.

17        Q.    When did you become director of

18   operations?

19        A.    That's when I started with John

20   in 2019 -- August, I think it was when I

21   came back from my maternity leave.

22        Q.    What were your responsibilities

23   as director of operations?

24        A.    I was mostly in charge of the

25   August in our Puerto Rico office and
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1574 of 2230    Dennisse Baez
Hanratty    June 02, 2023

50

D. MENDEZ

1

2  setting up our office here and recruiting

3  an accounting team here in Puerto Rico to

4  help the accounting team that we had in New

5  York.

6       I was in charge of basically

7  managing the personnel down here as well as

8  the servicing team and the REO team.

9       Q.    Did you have any responsibilities

10 with respect to the borrowing base?

11          MS. PARKS:  Objection to form.

12      A.    No.  Sorry, I did not.

13      Q.    Did you communicate with

14 employees from Emigrant Bank?

15      A.    I think I did at some point.

16 Yes, I definitely did at some point.

17      Q.    Who was responsible for the

18 borrowing base?

19          MS. PARKS:  Objection to form.

20          You can answer.

21      A.    When you mean who was

22 responsible, on our end?

23      Q.    Yes.

24      A.    It was John, the one that always

25 work with the borrowing base.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                     RECEIVED NYSCEF: 01/12/2024

51

D. MENDEZ

1

2      Q.    Anyone else from the accounting

3   team or otherwise?

4      A.    The accounting team I know was

5   the one sending him information.

6      Q.    Who on the accounting team?

7      A.    At the time when I started --

8   what was his name -- I can't remember his

9   name, but he was the one that assisted

10  Mr. Ping Xie who was a controller.  I can't

11  remember the guy's name, sorry.

12     Q.    Was it Franklin Gandall?

13     A.    Yes, that's him.

14     Q.    And then after the time when you

15  started, who else assisted with the

16  borrowing base?

17     A.    I don't think -- I think after

18  Frank left, Kevin Clark would pull the data

19  from the systems and provide it to John.

20  But Kevin had no accounting background or

21  anything.  He was just pulling data and

22  sending it to John.

23     Q.    What did the accounting team send

24  to Mr. Hanratty with respect to the

25  borrowing base?

52

D. MENDEZ

1

2     A.     I don't know.  I don't remember

3  being copied on the e-mails from the

4  accounting team.

5     Q.     After the accounting team sent

6  information to Mr. Hanratty, what did he do

7  with the borrowing base?

8          MS. PARKS:  Objection.

9     A.     Again, I don't know.  I'm not

10  Mr. John Hanratty.  So I don't know what he

11  did or he didn't do with the information

12  provided.

13     Q.     Did he submit the borrowing base

14  to Emigrant Bank?

15          MS. PARKS:  Objection.

16     A.     Yes.  He was the one submitting

17  the borrowing base to Emigrant.

18     Q.     And he was the person responsible

19  at Ebury for submitting the borrowing base

20  to Emigrant?

21          MS. PARKS:  Objection.

22     A.     I would say yes, because no one

23  else was doing it.

24     Q.     And you had nothing to do with

25  preparing the borrowing base for Emigrant?

53

D. MENDEZ

2    MS. PARKS:  Objection to form.

3    A.    No.  Maybe providing information,

4    if he requested information and I didn't

5    know it was strictly for the borrowing

6    base, because he could make information

7    requests.  But I was not in charge of

8    putting together anything for the borrowing

9    base.

10    Q.    What sort of information would

11    Mr. Hanratty request from you?

12    A.    He would request asset data,

13    active assets, redemptive values, lien

14    portfolio reports.

15    Q.    What are lien portfolio reports?

16    A.    Lien portfolio reports are

17    reports that are generated either from MTAG

18    system or from the in-house servicing

19    platform that contains all the assets per

20    state with their face values, interest,

21    redemptive value, addresses and status of

22    the lien.

23    Q.    So if a lien was sold or charged

24    off, you were responsible for removing them

25    from the reports?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
                   Emigrant Business Credit vs    Court Records    Pg 1578 of 2230    Dennisse Baez
                   Hanratty    June 02, 2023

54

```
 1                    D. MENDEZ

 2      A.     Not me personally, because that

 3   would be something that the servicing team

 4   would do.  But since I was in charge of the

 5   servicing team, then it becomes my

 6   responsibility.  But it was not -- it's not

 7   me personally that removes or adds assets

 8   into the system.

 9      Q.     Who was on the servicing team?

10      A.     At the time in 2018 or now?

11      Q.     We'll do 2018 first.

12      A.     We had Anna Yang, which was

13   basically the manager of the entire team.

14             We had Ryan Yang, which was

15   helping with the reporting and all that of

16   the servicing platform.

17             We had Jericho Carrigo who was

18   managing the Kentucky portfolio at the

19   time.

20             Cherry Mae Posados who was

21   managing the Rochester portfolio at the

22   time.

23             Frank was accounting.  I think

24   those were the ones in 2018.

25      Q.     And how about now?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
                   Emigrant Business Credit vs    Court Records    Pg 1579 of 2230    Dennisse Baez
                   Hanratty                                                           June 02, 2023

55

D. MENDEZ

1

2      A.     Now -- well, Cherry Mae is on

3   maternity leave.  She just gave birth to a

4   baby boy last week, so she's out.

5             We have Babogen Numali (ph).  And

6   that's it.  Because the portfolio, it's a

7   small portfolio now.  Plus the MTAG team.

8      Q.     How many employees presently work

9   for the Ebury companies?

10            MS. PARKS:  Objection to form.

11            You can answer.

12     A.     Employees, we have -- for the

13  Ebury team, let me see -- none of the

14  entities here have employees.

15     Q.     And by "here," you mean listed --

16     A.     I'm sorry, in the ones listed in

17  the Summons and Complaint that you sent me.

18     Q.     Greater Flamingo still has

19  employees?

20     A.     Greater Flamingo has employees,

21  uh-huh.

22     Q.     And how many employees does

23  Greater Flamingo have?

24     A.     Just three.

25     Q.     Who are the employees?

56

D. MENDEZ

1

2      A.      Myself, and the two accountants,

Clarissa and Jessica.  Clarissa Anhil (ph)

and Jessica -- what's Jessica's last name?

5            MS. PARKS:  Soto?

6      A.      Jessica Soto, yes.  Thank you.

7      Q.      Ismael Rodriguez no longer works

8  at Ebury?

9      A.      No.  Ismael left in 2021, I think

10  it was.  I think it was June of 2021, or

11  May 2021, around that time.

12      Q.      Besides the three people who work

13  at Greater Flamingo, do the Ebury companies

14  not have any other employees?

15      A.      No.

16      Q.      Where is the office for Greater

17  Flamingo?

18      A.      It's located in Puerto Rico.

19      Q.      And do all three work in the same

20  office?

21      A.      Yes, we do.

22      Q.      Are there any other employees of

23  any other Ebury companies?

24      A.      No.

25      Q.      Who is in charge of the Ebury

57

```
 1                    D. MENDEZ

 2    companies right now?

 3         A.    When you say --

 4               MS. PARKS:  Object to form.

 5               Go ahead.

 6         A.    When you say who is in charge of

 7    the Ebury companies, again, what do you

 8    mean by being in charge?

 9         Q.    Who is the ultimate

10    decision-maker?

11         A.    It's John Hanratty.

12         Q.    What is Ebury's relationship with

13    Emigrant Bank?

14               MS. PARKS:  Objection to form.

15               You can answer.

16         A.    To my knowledge, Emigrant is a

17    lender for the funds and -- and that's it,

18    besides that the loan is in default since

19    2021.

20         Q.    What do you mean by it's a lender

21    to the funds?

22         A.    There is a loan or a line of

23    credit where there was cash provided to

24    Ebury.  I'm not sure which entity exactly,

25    but I understand it's Ebury -- I think it's
```

58

```
 1              D. MENDEZ

 2   Ebury Fund I -- I'm sorry, I don't know all

 3   the entities from the top of my mind and

 4   there are so many entities that I don't

 5   know exactly which one is the borrower.

 6          I know there are two that are

 7   borrowers because of the interest invoices

 8   that we used to get to -- from Emigrant.

 9      Q.   Do you know the purpose of the

10   loan?

11      A.   To my understanding, it was to

12   buy tax liens.

13          MS. PARKS:  I'll just pause.

14      We've been going about an hour and 15.

15      I just want to see if Dennisse needed

16      a break or you guys need a break or

17      anything?

18          THE WITNESS:  I'm okay for now.

19      Thank you.

20          MS. PARKS:  Sure.

21   BY MR. MAYRON:

22      Q.   What did Ebury use the money for

23   from Emigrant?

24      A.   I -- my understanding was to buy

25   liens.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022

NYSCEF DOC. NO.     24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   01/12/2024
Emigrant Business Credit vs   Court Records      Pg 1583 of 2230                    Dennisse Baez
Hanratty                                                                June 02, 2023

59

                        D. MENDEZ

1

2    Q.    Did Ebury use money from Emigrant

3    for any other purposes?

4         MS. PARKS:  Objection to form.

5         You can answer.

6    A.    Not that I know.

7    Q.    Was Ebury allowed to use the

8    money from Emigrant for other purposes?

9         MS. PARKS:  Objection.

10   A.    I have not read the agreement

11   between Emigrant and the Ebury entities.

12   So I don't know.

13   Q.    Do you have an understanding

14   whether Ebury was allowed to use the money

15   from Emigrant for other purposes?

16        MS. PARKS:  Objection to form:

17        You can answer.

18   A.    My understanding, it was just to

19   buy liens and subs on those liens and to

20   protect the assets.

21   Q.    And by sub, you mean subsequent

22   tax payments?

23   A.    Yes, you're correct.  I'm sorry.

24   Subsequent taxes.

25   Q.    Would you be surprised if Ebury

60

```
 1                   D. MENDEZ

 2    was using the money from Emigrant to pay

 3    distributions to investors in the funds?

 4            MS. PARKS:  Objection to form.

 5            You can answer.

 6        A.    I will have to verify the

 7    accounting records back then to see if cash

 8    that pertains to Emigrant went to

 9    investors, but I don't know.

10        Q.    Would you find that surprising if

11    money from Emigrant was used to pay

12    investors?

13            MS. PARKS:  Objection.

14            You can answer.

15        A.    I don't know.  If it was used for

16    that purpose, I would think it was because

17    it could be done or because John would have

18    gotten some sort of approval.  But I don't

19    know.

20        Q.    So your understanding was that

21    money from Emigrant would be used to pay

22    investors only if it was something that

23    could be done or because John got some sort

24    of approval?

25            MS. PARKS:  Objection.  You can
```

61

                    D. MENDEZ

2       answer.

3       A.    That's not what I said.  I'm

4  saying if it was done.  It was because of

5  that.

6       Q.    So what you're saying is you

7  assume that if it was done, it was

8  something that was permissible or that

9  Mr. Hanratty had received approval for?

10            MS. PARKS:  Objection to form.

11            You can answer.

12       A.    I would think so.

13       Q.    So using money from Emigrant to

14  pay investors would be something that would

15  require Emigrant's approval?

16            MS. PARKS:  Objection.

17       A.    I don't know if that's the case

18  because I have not read the agreement, as I

19  said previously.

20       Q.    But you assume that if it was

21  done, it was done with Emigrant's approval?

22            MS. PARKS:  Objection.

23       A.    I don't want to --

24            MS. PARKS:  Hypothetical.

25       A.    Yeah, I don't want to assume

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1586 of 2230    Dennisse Baez
Hanratty                                                           June 02, 2023

62

1                    D. MENDEZ

2    anything.

3        Q.    Did you ever -- did Ebury use

4    money from Emigrant to pay investors in the

5    Ebury companies?

6            MS. PARKS:  Objection to form.

7            You can answer.

8    A.    I don't know.

9        Q.    Did you ever speak to

10   Mr. Hanratty about whether money from

11   Emigrant was being used to pay investors in

12   the funds?

13           MS. PARKS:  Objection to form.

14       You can answer.

15   A.    I don't think so.

16       Q.    Did any other person ever tell

17   you that money from Emigrant was being used

18   to pay investors in the funds?

19           MS. PARKS:  Objection.

20           You can answer.

21   A.    Not that I remember.

22       Q.    You have no knowledge about money

23   from Emigrant being used to pay investors?

24           MS. PARKS:  Objection to form.

25           You can answer.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs    Court Records    Pg 1587 of 2230    Dennisse Baez
Hanratty                                    June 02, 2023

63

D. MENDEZ

1

2      A.    No, not that I remember, no.

3      Q.    Do you know who Ira Leventhal is?

4      A.    I've seen the name and I know

5   it's one of the investors, but I don't know

6   the person personally.

7      Q.    Do you know, has Ebury made

8   payments to Ira Leventhal?

9          MS. PARKS:  Objection to form.

10      A.    What sort of payments?  You're

11   talking about distributions or other kind

12   of payments?

13      Q.    Has Ebury made distributions to

14   Mr. Leventhal?

15      A.    Yes.

16      Q.    Do you know, what funds did Ebury

17   use to make those distributions to

18   Mr. Leventhal?

19          MS. PARKS:  Object to the form.

20          You can answer.

21      A.    I'm sorry, I don't know.  I would

22   have to go to our bank accounts, see where

23   cash came in and when it went out to answer

24   you that.

25      Q.    When were these distributions

64

D. MENDEZ

1

2    made to Mr. Leventhal?

3    A.    I don't have the dates.  Again, I

4    would have to look at accounting records

5    and bank records to see when the payments

6    went out.

7    Q.    Would it have been in 2018?

8    A.    Again, I don't know without

9    looking at records just to see the dates on

10    them.

11    Q.    Ebury ultimately paid

12    Mr. Leventhal the amount he was owed,

13    correct?

14    MS. PARKS:  Objection.

15    A.    Again, I would have to look at

16    the records to see if what he was owed was

17    paid.

18    Q.    Ebury used money from Emigrant to

19    make payments to Mr. Leventhal.

20    MS. PARKS:  Objection.

21    Q.    Right?

22    A.    Again, as I told you before, I

23    don't know.

24    Q.    Mr. Leventhal was threatening to

25    sue Ebury over his investment, correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 145    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit v.    Court Records    Pg 1589 of 2230    Dennisse Baez
Hanratty                                                            June 02, 2023

65

                         D. MENDEZ

1

2       A.    I'm sorry, can you repeat the

3    question?

4       Q.    Mr. Leventhal was threatening to

5    sue Ebury over his investment, correct?

6            MS. PARKS:  Objection.

7            You can answer.

8       A.    I think he did, yes.

9       Q.    What's the basis for that

10   understanding?

11      A.    Conversations with John, and I

12   remember an e-mail or something on it about

13   the Leventhal issue.

14      Q.    What was the Leventhal issue?

15      A.    I'm sorry, what you just

16   mentioned, that there was a claim that they

17   wanted their money out.  That's it.

18      Q.    What did Mr. Hanratty tell you

19   about the Leventhal issue?

20      A.    I don't remember exactly what he

21   would have said at the time.  It was

22   probably more or less that we have to pay

23   Leventhal X amount of money by X date.  But

24   I don't have any of the communications in

25   front of me to tell you exactly what was

66

                    D. MENDEZ

 1    told.

 2        Q.    What do you remember

 3    Mr. Leventhal told you about the Leventhal

 4    issue -- apologies.

 5            What do you remember Mr. Hanratty

 6    told you about the Leventhal issue?

 7        A.    I'm sorry, what I just told you.

 8    If he mentioned anything to me at the time

 9    besides that we needed to pay them because

10    they wanted to get out.  If he said

11    something else, I do not remember exactly

12    what else he could have told me.

13        Q.    Do you remember how much time

14    Mr. Hanratty said he had to pay

15    Mr. Leventhal?

16            MS. PARKS:  Objection to form.

17        A.    No.

18            MS. PARKS:  Go ahead.

19        A.    No, I don't.

20        Q.    Was it urgent?

21            MS. PARKS:  Objection.

22            You can answer.

23        A.    I do not remember if it was

24    urgent or not.

67

                        D. MENDEZ

1

2      Q.    Did Ebury make payments to

3   Mr. Leventhal?

4           MS. PARKS:  Objection to form.

5           You can answer.

6      A.    Again, if you mean by payment

7   distributions, yes.

8      Q.    So earlier I asked what funds

9   Ebury used to make distributions and you

10  said you'd have to go to the bank accounts.

11          Do you have no other ability to

12  answer my questions about payments to

13  Mr. Leventhal without looking at the bank

14  records?

15          MS. PARKS:  Objection.

16          You can answer.

17     A.    I would have to go to our

18  accounting records and see what cash came

19  in right before distributions to

20  Mr. Leventhal went out, what comes to my

21  mind, the way I would know where the funds

22  came from.

23     Q.    So the way you would know the

24  funds -- where the funds came from is by

25  looking at accounting records to see where

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.    Court Records    Pg 1592 of 2230    Dennisse Baez
Hanratty    June 02, 2023

68

```
 1                    D. MENDEZ

 2    the cash came in right before the

 3    distributions went out?

 4            MS. PARKS:  Objection to form.

 5            You can answer.

 6       A.    That's what comes to mind.  Just

 7    to pinpoint the exact funds that were used

 8    to make the distribution.

 9       Q.    What has Mr. Hanratty told you

10    about Emigrant?

11            MS. PARKS:  Objection.

12            You can answer.

13       A.    That -- well, the loan is

14    currently in default, that we were being

15    sued, and that's -- that he was in

16    negotiations just to try to get the matter

17    resolved, that negotiations didn't seem to

18    move forward.  Just that.

19       Q.    Anything else?

20       A.    Not that I can remember right

21    now.

22       Q.    How much was the Emigrant loan?

23            MS. PARKS:  Objection to form.

24            You can answer.

25       A.    I'm sorry, I don't have the
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022

NYSCEF DOC. NO.                                       RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1593 of 2230         Dennisse Baez
Hanratty                                                                June 02, 2023

69

D. MENDEZ

1    amount from the top of my mind.

2         Q.    More than $10 million?

3         A.    From the last statement that I

4    remember looking at, between the two

5    entities, my recollection is yes.

6         Q.    Did Mr. Hanratty tell you what

7    happened to the money Emigrant lent to

8    Ebury?

9              MS. PARKS:  Objection to form.

10             You can answer.

11        A.    No.

12        Q.    Do you know what happened to the

13   money that Emigrant lent to Ebury?

14             MS. PARKS:  Objection.

15        A.    It was used to buy liens.

16        Q.    Was it used for any other

17   purposes?

18        A.    Not that I'm aware of.

19        Q.    You were not involved in

20   negotiating the credit agreements with

21   Emigrant?

22        A.    No.

23        Q.    And you've never read the credit

24   agreements?

70

                        D. MENDEZ

1

2      A.      Un-huh.

3      Q.      You're not aware of any of the

4  requirements in the credit agreemms?

5      A.      I would have to look in my

6  e-mails or -- and see if I have anything on

7  it.

8      Q.      Sitting here today, do you know

9  any of the requirements of the Emigrant

10  credit agreement?

11      A.      No.  Unfortunately, no.

12      Q.      Has Mr. Hanratty ever spoken to

13  you about credit agreements?

14          MS. PARKS:  Objection to form.

15          You can answer.

16      A.      Not that I remember.

17      Q.      Under the credit agreements, the

18  tax liens that Ebury purchased using the

19  credit facilities were Emigrant's

20  collateral, correct?

21          MS. PARKS:  Objection.

22      A.      I haven't read the agreement.  So

23  again, I don't know which assets were

24  supposed to or supposed to be under the

25  Emigrant -- were supposed to be Emigrant's

71

```
 1                 D. MENDEZ

 2    collateral.

 3        Q.    You understand, however, that the

 4    tax liens that Ebury purchased using the

 5    credit facilities were supposed to be

 6    Emigrant's collateral?

 7            MS. PARKS:  Objection.  She's not

 8        a lawyer.

 9        A.    I'm sorry, can you repeat the

10    question?

11        Q.    Sure.

12            You were aware, however, that the

13    tax liens that Ebury purchased using the

14    credit facilities were supposed to be

15    Emigrant's collateral, correct?

16            MS. PARKS:  Objection.

17        A.    As I told you before, I did

18    not -- I have not read the credit

19    agreement.  So I am not aware of which

20    assets are supposed to be Emigrant's

21    collateral.

22        Q.    So you had no understanding of

23    what Emigrant's collateral was?

24            MS. PARKS:  Objection.

25        A.    Again, I would have to look at
```

72

                        D. MENDEZ

1

2    the records and look at the inventory of

3    assets at the time to see what was supposed

4    to be the Emigrant's collateral, but...

5        Q.    But do you have an understanding

6    that the tax liens that Ebury purchased

7    using the credit facilities were Emigrant's

8    collateral?

9            MS. PARKS:  Objection.

10            You can answer.

11        A.    Yes.

12        Q.    And do you also have an

13    understanding that the proceeds from the

14    sale of any of Emigrant's collateral is

15    also Emigrant's collateral?

16            MS. PARKS:  Objection.

17        A.    Again, can you repeat that?

18        Q.    You understand that the proceeds

19    from the sale of any of Emigrant's

20    collateral are also Emigrant's collateral?

21            MS. PARKS:  Objection.

22            You can answer.

23        A.    I would have to say yes.

24        Q.    You understand that if Ebury sold

25    a tax lien that was Emigrant's collateral,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1597 of 2230    Dennisse Baez
Hanratty    June 02, 2023

73

                    D. MENDEZ

1    Ebury should send the money to Emigrant?

2          MS. PARKS:  Objection.

3      A.    I don't want to assume because I

4    don't know what the agreement says, again.

5      Q.    Do you have an understanding,

6    however, that if Ebury sold the tax lien

7    that was Emigrant's collateral, that Ebury

8    was required to send the money to Emigrant?

9          MS. PARKS:  Objection.

10     A.    No, I don't have that

11   understanding.

12         MS. PARKS:  Austin, would this be

13      a good time for like a five-minute

14      comfort break or --

15         MR. MAYRON:  Let me finish this

16      line of questioning.

17         MS. PARKS:  Sure.  If it's okay

18      with Dennisse.  You good?

19         THE WITNESS:  Okay.

20         MS. PARKS:  Okay.

21         MR. MAYRON:  I'm sharing in the

22      chat a document marked EBURY 5548.

23      Could the court reporter, please, mark

24      this document as Mendez Deposition

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. Emigrant Business Credit vs Court Records Pg 1598 of 2230 Dennisse Baez 01/12/2024
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Hanratty                                                               June 02, 2023

74

1              D. MENDEZ

2       Exhibit No. 5.

3              (Mendez Exhibit 5, Document,

4       Bates EBURY 5548, remotely introduced

5       and provided electronically to the

6       reporter.)

7   BY MR. MAYRON:

8       Q.    What is this document?

9       A.    Give me one second.  Let me read

10  it.

11      Q.    So Adam Berman says:  Going

12  forward, if you receive funds for a lien

13  that we were servicing under the Emigrant

14  line of credit, please forward the payment

15  or otherwise transfer the funds to the PNC

16  lockbox, correct?

17      A.    Give me one second.  Let me

18  finish.

19             MS. PARKS:  Austin, you might

20      want to direct her to where you're

21      looking since it's a multipage

22      document.

23             THE WITNESS:  I'm reading the

24      last thing.

25             MS. PARKS:  Okay.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   01/12/2024
Emigrant Business Credit vs   Court Records   Pg 1599 of 2230   Dennisse Baez
Hanratty                                                          June 02, 2023

75

1                    D. MENDEZ

2       A.    Yes.  This is about collections.

3  You were asking me about sales.

4       Q.    So you understand -- so you have

5  a different understanding for collections

6  and sales with respect to what Ebury was

7  required to do with the proceeds?

8            MS. PARKS:  Objection to form.

9       A.    Again, I was telling you, I have

10  not read the agreement.  I know from this

11  e-mail that Adam sent that the collections

12  from the -- this was a redemption -- was

13  supposed to be moved there, but I don't

14  know if there is anything different in

15  terms of sales because I have not read the

16  agreement.

17       Q.    Do you have any reason to believe

18  that a different standard was applied to

19  sales than to redemptions?

20            MS. PARKS:  Objection.

21       A.    I don't know what was agreed or

22  not.  And at this point, which -- and that

23  e-mail is 2022, which it was my

24  understanding that there's things going on

25  between Ebury and Emigrant and I'm not sure

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. RECEIVED NYSCEF: 01/12/2024

76

                        D. MENDEZ

1    whatever is in the credit agreement still

2    applies or not.  Like, I don't know what to

3    say to that.

4              MR. MAYRON:  How about we take a

5         break now?  How long do you think you

6         need, Kari?

7              MS. PARKS:  Well, you want to go

8         off the record?

9              THE VIDEOGRAPHER:  The time is

10        11:35 a.m.  We are now off the record.

11             (Recess taken from 11:35 a.m. to

12        11:45 a.m.)

13             THE VIDEOGRAPHER:  The time is

14        11:45 a.m.  We are now back on the

15        record.

16   BY MR. MAYRON:

17        Q.    Ms. Mendez, did you speak with

18   anyone during the break?

19        A.    When I was going to the bathroom,

20   the girls in the office asked me how's

21   everything going and I did this

22   (indicating) and then I come back and sit

23   here.

24        Q.    Ebury was required to deliver

77

```
 1                    D. MENDEZ

 2    Emigrant's collateral to a third-party

 3    custodian and servicer, correct?

 4            MS. PARKS:  Objection to form.

 5       A.    You asked me that before and I

 6    don't know.  I have not read the agreement.

 7    So I'm not sure if that's a requirement or

 8    not.

 9       Q.    Did Ebury deliver Emigrant's

10    collateral to a third-party custodian

11    servicer?

12            MS. PARKS:  Objection to form.

13            You can answer.

14       A.    I know we have MTAG, but there

15    are liens that were serviced in-house that

16    apparently are a part of that collateral,

17    too.  So if the in-house servicing is part

18    of your collateral, then...

19       Q.    So you said there were liens that

20    were part of Emigrant's collateral that

21    were serviced in-house?

22            MS. PARKS:  Objection.

23            Go ahead, Dennisse.

24       A.    No, I'm not saying that.  I'm

25    saying if there are, because I don't know,
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 174    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1602 of 2230    Dennisse Baez
Hanratty    June 02, 2023

78

1                    D. MENDEZ

2    I don't have a list in front of me of the

3    assets that are collateral to Emigrant, if

4    there are assets that are Emigrant's

5    collateral that were serviced in-house,

6    then the answer is no.  But I don't have a

7    list of those assets.

8        Q.    Why did Ebury retain MTAG?

9             MS. PARKS:  Objection.

10            You can answer.

11       A.    Again, I do not know.  I was not

12   in the company when Ebury retained

13   Emigrant -- I'm sorry, MTAG.

14            MR. MAYRON:  I'm going to share

15       in the chat a document labeled EBURY

16       59765.  Could the court reporter

17       please mark it as Mendez Deposition

18       Exhibit No. 6.

19            (Mendez Exhibit 6, E-mail, Bates

20       EBURY 59765, remotely introduced and

21       provided electronically to the

22       reporter.)

23   BY MR. MAYRON:

24       Q.    This is an e-mail from

25   Mr. Hanratty to Mr. Xie.  Mr. Hanratty

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1603 of 2230    Dennisse Baez
Hanratty                                                         June 02, 2023

79

```
 1                   D. MENDEZ

 2   says:  No one lent the collateral.  We were

 3   under no obligations to deposit certs with

 4   custodian?

 5           MS. PARKS:  Austin, can you tell

 6       us where you're looking?  It's an

 7       11-page exhibit, it looks like.

 8           MR. MAYRON:  Very first page, top

 9       e-mail.

10           MS. PARKS:  So are you asking

11       letter to confirm that that's what

12       that says?

13       A.   I'm sorry, can you repeat the

14   question?

15       Q.   Mr. Hanratty says:  No one lent

16   to the collateral.  We were under no

17   obligation to deposit certs with the

18   custodian.

19           MS. PARKS:  Was that a question?

20       Q.   Mr. Mendez?

21       A.   Yes, I'm here.

22       Q.   Mr. Hanratty says:  No one lent

23   the collateral.  We were under no

24   obligations to deposit certs with the

25   custodian.
```

80

                        D. MENDEZ

1

2        A.    That's what I'm reading here.

3    This is an e-mail from John to Mr. Ping

4    Xie.

5        Q.    And so if someone had lent to the

6    collateral, this would mean that Ebury did

7    have an obligation to deposit certs with

8    the custodian.

9            MS. PARKS:  Objection.  Come on.

10        She's already said she hasn't read the

11        contracts.  We've let you do this for

12        a while.  Now you're asking her to do

13        a hypothetical and she hasn't read the

14        contracts.  It's too much, Austin.

15        Let's ask her what she knows or

16        doesn't know, please.

17            MR. MAYRON:  Kari, that's a

18        completely improper speaking

19        objection.

20            MS. PARKS:  Well, your last 40

21        minutes of questioning asking her

22        about her interpretations of a

23        contract she hasn't read have been

24        entirely improper.  So --

25            MR. MAYRON:  Kari, I'm entitled

81

                    D. MENDEZ

1    to ask my questions.

2          MS. PARKS:  Yes, and I'm entitled

3    to object.  So --

4          MR. MAYRON:  Your objections are

5    not supposed to be suggestive or

6    argumentative.  It's a violation of

7    Part 221, the Uniform Rules for the

8    Conduct of Depositions.

9          MS. PARKS:  And you're not

10   supposed to badger a witness about a

11   contract she's never read for 45

12   minutes.  So we're all here and we can

13   just move on.  But I'd ask you to

14   please, you know, try to focus on what

15   she actually knows and she could be

16   helpful with.

17         MR. MAYRON:  I'll ask my

18   questions and you can object.

19         MS. PARKS:  Yes, I can.  Go

20   ahead.  What was the -- is there a

21   question?  I'm not even sure anymore.

22 BY MR. MAYRON:

23   Q.   This statement means that if

24 someone had lent to the collateral, Ebury

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1606 of 2230    Dennisse Baez
Hanratty    June 02, 2023

82

D. MENDEZ

1    had an obligation to deposit the

2    certificates with the custodian?

3    

4         MS. PARKS:  Objection.

5         Dennisse, you can try to answer

6         the question.

7    A.    I'm sorry, I didn't understand

8    that was a question.  I thought he was

9    saying that it is.

10   Q.    I'll repeat my question.

11   A.    I'm sorry.

12   Q.    This statement means that if

13   someone had lent to the collateral, Ebury

14   would have an obligation to deposit the

15   certificates with the custodian.

16        MS. PARKS:  Objection.  It's a

17        sentence, not a question.  But if it's

18        a question, Dennisse, try to answer

19        whatever question it might be.

20   A.    That would be an assumption of

21   it.

22   Q.    Is that how you would interpret

23   that sentence?

24        MS. PARKS:  Objection to form.

25        You can answer.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1607 of 2230    Dennisse Baez
Hanratty                                                          June 02, 2023

83

D. MENDEZ

1

2    A.    I would have to say yes based

3    on --

4    Q.    Just to confirm, you would

5    interpret this sentence, "No one lent to

6    the collateral, we were under no obligation

7    to deposit certs with the custodian" to

8    mean that if someone had lent to the

9    collateral, Ebury would have an obligation

10    to deposit certificates with the custodian.

11            MS. PARKS:  Objection to form.

12    A.    I don't want to make assumptions.

13    I'm sorry.

14    Q.    I'm not asking you to assume.

15    I'm asking how you interpret that sentence.

16            Again, would you interpret the

17    sentence, "No one lent to the collateral,

18    we were under no obligation to deposit

19    certs with the custodian" to mean --

20    A.    When you're reading it now, I

21    would have to interpret it like that now.

22    I'm not sure how I would have interpreted

23    it back in 2019.

24    Q.    Just so that I can have a clean

25    record, I'm going to ask the question again

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1608 of 2230    Dennisse Baez
Hanratty                                                        June 02, 2023

84

                        D. MENDEZ

1    and you can give your answer.

2            You would interpret the sentence,

3    "No one lent to the collateral, we were

4    under no obligation to deposit certs with

5    the custodian" to mean that if someone had

6    lent to the collateral, Ebury would have

7    had an obligation to deposit certificates

8    with the custodian, correct?

9        MS. PARKS:  Objection to form.

10       And Dennisse -- well, I'll say that

11       for now.  Objection to form.

12   A.    Correct.

13   Q.    Ebury had reporting requirements

14   to Emigrant, correct?

15       MS. PARKS:  Objection to form.

16   A.    I know there were some reporting

17   requirements.  I don't know exactly which

18   reporting requirements were there.

19   Q.    Ebury was required to provide

20   Emigrant with borrowing base certificates.

21       MS. PARKS:  Objection.  Same

22       objection.

23   A.    I know we were providing

24   borrowing bases.  But again, since I have

85

D. MENDEZ

1

2    not read the credit agreement, I am not --

3    I don't know if it's because it was a

4    requirement there that asked us to do so.

5    But I know we were submitting borrowing

6    base reports.

7        Q.    So sitting here today, you don't

8    know if that was a requirement for --

9            MS. PARKS:   Objection.

10            You can answer.

11       A.    If it was informed to me in an

12   e-mail a few years ago, I honestly do not

13   remember it.

14            MR. MAYRON:   I'm going to share

15       in the chat a document labeled EBURY

16       73415.  Could the court reporter,

17       please, mark it as Mendez Deposition

18       Exhibit 7.

19            (Mendez Exhibit 7, E-mail chain,

20       Bates EBURY 73415, remotely introduced

21       and provided electronically to the

22       reporter.)

23       A.    Have you uploaded it already?

24       Q.    Yes.  It should be in the chat.

25   73415.

Emigrant Business Credit vs Court Records   Pg 1610 of 2230   Doc #3 State
Hanratty                                                      Dennisse Baez
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23
June 02, 2023

86

```
 1                    D. MENDEZ

 2         A.    Uh-huh.

 3         Q.    The bottom e-mail is from

 4   Mr. Hanratty to Mr. Arora and yourself and

 5   others and it says:  Sorry for delay on

 6   introduction.  Here is Ismael Rodriguez and

 7   Dennisse Mendez.  They will be finance and

 8   operation points of contact going forward.

 9         A.    Uh-huh.

10         Q.    And then it goes on to say:  We

11   owe you following, lien macro breakdown

12   with redemption analysis, first quarter

13   reporting.  We will have this to you

14   Monday.

15         A.    Uh-huh.

16         Q.    You respond and say:  What is

17   this?

18         A.    Uh-huh.

19         Q.    Mr. Hanratty responds to you and

20   says:  It is bank that funds our liens.

21               And says:  We owe them a whole

22   bunch of regular reporting that, to date, I

23   have been managing by myself because of all

24   the issues you are aware of.  I want them

25   to be plugged into you both.
```

87

```
 1                     D. MENDEZ

 2       A.     Uh-huh.

 3       Q.     Having seen this e-mail, do you

 4   have an understanding that Ebury was

 5   required to provide Emigrant with borrowing

 6   base certificates?

 7            MS. PARKS:  Objection.

 8       A.     That's not what it says in the

 9   e-mail.

10       Q.     What do you understand the

11   regular reporting to be?

12       A.      If you see my question what is

13   this, it's because I didn't know what it

14   was, what is the reporting that was

15   required.  And from Mr. Hanratty's e-mail,

16   he says:  I've been doing this myself

17   because of all the issues you are aware of,

18   I want them to be plugged into you both.

19   So I didn't know what the reporting was.

20       Q.     So Mr. Hanratty had been managing

21   the reporting to Emigrant?

22            MS. PARKS:  Objection to form.

23            You can answer.

24       A.     Yes.

25       Q.     What are the issues you are aware
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1612 of 2230    Dennisse Baez
Hanratty                                                          June 02, 2023

88

D. MENDEZ

2  of that he's referring to?

3      A.    At this point, I don't know.

4  This was from 2020.  We've had a lot or

5  turnover issues.  So I would have to assume

6  it was that, that there was no one else

7  that could do the reporting.

8          MS. PARKS:  I'll remind you,

9      Dennisse, don't assume, right.  Answer

10      what you can.

11          MR. MAYRON:  Kari, that's

12      coaching the witness.  Please refrain.

13          MS. PARKS:  It's appropriate,

14      mild coaching to try to make a clean

15      record.  We want facts, not

16      speculation.  That's more useful for

17      everybody, including for you.

18      A.    Again, at this point, I'm not

19  sure what exactly was at the time.

20      Q.    Did you assume responsibility for

21  reporting to Emigrant after this e-mail?

22          MS. PARKS:  Objection to form.

23          Go ahead, Dennisse.

24      A.    No.

25      Q.    Did Ismael Rodriguez take

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1613 of 2230    Dennisse Baez
Hanratty                                                          June 02, 2023

89

                        D. MENDEZ

1
2    responsibility for regular reporting after
3    this e-mail?
4            MS. PARKS:  Objection to form.
5            You can answer.
6    A.    I don't know.
7    Q.    Did you have any responsibilities
8    with respect to the Emigrant loan?
9            MS. PARKS:  Objection.
10   A.    What do you mean -- I'm sorry --
11   by responsibilities?
12   Q.    I mean the ordinary meaning.  Do
13   you have any responsibilities, work
14   responsibilities, with respect to the
15   Emigrant loan?
16           MS. PARKS:  Objection.
17   A.    No.
18   Q.    Did you ever interact with anyone
19   at Emigrant?
20           MS. PARKS:  Objection.
21   A.    As I previously mentioned, yes, I
22   know I was in a few e-mails probably.  I
23   don't know exactly how many e-mails or
24   exactly the interaction because I don't
25   remember.  It was a long time ago.  But

90

D. MENDEZ

1    yes, I would have to say yes.

2       Q.    What about phone calls?

3       A.    What about what, I'm sorry?

4       Q.    Phone calls.  Did you ever have

5    phone calls with Emigrant employees?

6       A.    I remember being in one or two

7    calls maybe.

8       Q.    We'll come back to that.

9             Did you help prepare reports that

10   were sent to Emigrant?

11            MS. PARKS:  Objection.

12            Go ahead.

13      A.    I don't know.  I know I provided

14   information requested by John since he was

15   the one providing reports to Emigrant.  I'm

16   not sure I provided the information to him

17   qualified as preparing the reports.  I was

18   not copied on the final reports sent to

19   Emigrant.

20      Q.    Did you speak with Mr. Hanratty

21   about MTAG's role with respect to servicing

22   Emigrant's collateral?

23            MS. PARKS:  Objection.

24      A.    I do not remember.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO.      24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.      Court Records      Pg 1615 of 2230      Dennisse Baez
Hanratty                                                                                            June 02, 2023

91

                              D. MENDEZ

1

2      Q.    Did Mr. Hanratty ever tell you

3    that MTAG was supposed to be servicing

4    Emigrant's collateral?

5            MS. PARKS:  Objection.

6      A.    I'm thinking.  But if he did, I

7    do not remember.

8      Q.    Did Mr. Hanratty tell you that,

9    in fact, Ebury was self-servicing

10   Emigrant's collateral?

11           MS. PARKS:  Objection.

12     A.    Can you repeat your question

13   again?

14     Q.    Did Mr. Hanratty tell you that,

15   in fact, Ebury was self-servicing

16   Emigrant's collateral?

17           MS. PARKS:  Objection.

18     A.    I don't remember.

19           MR. MAYRON:  I'm going to share

20       in the chat a document labeled EBURY

21       12978.  Could the court reporter,

22       please, mark it as Mendez Deposition

23       Exhibit No. 8.

24           (Mendez Exhibit 8, E-mail, Bates

25       EBURY 12978, remotely introduced and

92

 1               D. MENDEZ

 2        provided electronically to the

 3        reporter.)

 4   BY MR. MAYRON:

 5        Q.    So this document is the same

 6   e-mail from Mr. Hanratty to Mr. Arora and

 7   yourself?

 8        A.    Uh-huh.

 9        Q.    Mr. Rodriguez sends you an e-mail

10   and I believe it says:  I need to know what

11   this is.  Is this what we discussed on

12   Tuesday?

13             And then he says:  And now we're

14   promising something for Monday.

15        A.    Uh-huh.

16        Q.    So Mr. Rodriguez was asking you

17   what this e-mail was about?

18        A.    Uh-huh.  Yes.  I'm sorry.

19        Q.    Why would he expect you to know

20   what this e-mail was about?

21             MS. PARKS:  Objection.

22        A.    I am the person that is being in

23   the company the most.  So a lot of people

24   here assume I know everything in here.

25        Q.    Mr. Rodriguez asks if this is

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1617 of 2230
Hanratty                                                                    RECEIVED NYSCEF: 01/12/2024
Dennisse Baez
June 02, 2023

93

D. MENDEZ

1

2  what you had discussed on Tuesday.  What

3  had you discussed on Tuesday?

4      A.    This is June 26, 2020.  I can

5  barely recall what I discussed last week.

6  I don't know what I discussed with him that

7  Tuesday, I'm sorry.

8      Q.    So you have no recollection what

9  Mr. Rodriguez is referring to here?

10     A.    In asking me if that's what we

11 discussed on Tuesday, I have no

12 recollection of what he meant.

13     Q.    Do you know at this time if Ebury

14 was paying its interest to Emigrant?

15         MS. PARKS:  Objection.

16     A.    This is June 26, 2020.  I would

17 have to look in our records.

18     Q.    So without looking at the

19 records, you can't say whether Ebury was

20 paying --

21     A.    I would be assuming if I say yes

22 because I don't have a record in front of

23 me on when was the last time we sent

24 payments out to Emigrant.

25     Q.    Did you speak to Mr. Hanratty did

94

```
 1                    D. MENDEZ

 2   yes stopped paying interest to Emigrant?

 3            MS. PARKS:  Objection.

 4       A.    I don't remember us talking about

 5   it or me asking him why he stopped making

 6   the payments.

 7       Q.    But you know Ebury stopped making

 8   payments?

 9            MS. PARKS:  Objection.

10       A.    I do know Ebury stopped making

11   payments.

12       Q.    Do you know when Ebury stopped

13   making payments?

14       A.    I do not have the exact date, but

15   I -- somewhere around 2022.

16       Q.    How do you know that payments

17   stopped?

18       A.    Because I ask for the accounting

19   team, we were working on getting our

20   accounting records up to date and I ask

21   when the payments, if the payments to

22   Emigrant has stopped.

23       Q.    Did anyone tell you that payments

24   had stopped?

25            MS. PARKS:  Objection.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1619 of 2230
Emigrant Business Credit vs
Hanratty
Dennisse Baez
June 02, 2023

95

                    D. MENDEZ

1

2     A.    Yes.

3     Q.    Who told you that payments had

4  stopped?

5     A.    The accounting department, when I

6  asked.

7     Q.    Who in the accounting department?

8     A.    Clarissa Anhil.

9     Q.    What did Clarissa tell you about

10  the stopped payments?

11     A.    When I asked, she said we stopped

12  receiving invoices, and we were paying

13  based on the invoices we were receiving.

14     Q.    Looking at Exhibit 8 again,

15  Mr. Hanratty says:  Shooting to have this

16  to you Monday.

17          The e-mail was sent on Friday.

18  And you said you didn't know what the

19  e-mail was about.  Correct?

20          MS. PARKS:  You're asking her as

21     of right now she didn't know or at the

22     time she didn't know what the e-mail

23     was about, or which are you asking?

24          MR. MAYRON:  At the time.

25          MS. PARKS:  Thank you.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1620 of 2230    Dennisse Baez
Hanratty    June 02, 2023

96

                    D. MENDEZ

1

2        A.     At the time, I didn't know what

3   he was asking and I think the e-mail of the

4   exhibit before that shows when I asked what

5   is this.

6        Q.     Do you find that's a short amount

7   of time to tell someone they have to put

8   together reporting to a bank?

9              MS. PARKS:   Objection.

10       A.     If you ask me, yes, it is a short

11  period of time, if I don't know what I have

12  to put together.   If I have known exactly

13  what it was, maybe it was enough time.   But

14  not knowing exactly what I was supposed to

15  provide, it was -- no.

16       Q.     Do you think it's important to

17  provide accurate information to a bank?

18             MS. PARKS:   Objection.

19       A.     Yes, I try to provide accurate

20  information.

21       Q.     Did Ebury try to provide accurate

22  information to the bank?

23             MS. PARKS:   Objection.

24             You can answer.

25       A.     I can answer for me.  I would try

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1621 of 2230    Dennisse Baez
Hanratty    June 02, 2023

97

1                    D. MENDEZ

2    to provide accurate information to the

3    bank.  Sometimes it's not perfect, but I

4    would try to provide the accurate

5    information that we have.

6        Q.    Are you aware of whether Ebury

7    ever provided information to Emigrant that

8    was not accurate?

9            MS. PARKS:  Objection to form.

10       A.    I am not aware.

11       Q.    So a little earlier we were

12   discussing the use of a third-party

13   servicer and you said you weren't aware

14   whether Ebury was required to use a

15   third-party servicer for Emigrant's

16   collateral?

17       A.    I'm sorry, what was the question

18   again?

19       Q.    A little earlier we were

20   discussing the use of third-party servicer

21   and you said you weren't aware whether

22   Ebury was required to use a third-party

23   servicer for Emigrant's collateral.

24       A.    Yes.

25            MR. MAYRON:  I'd like to share

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO.          Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
                24-04020-dsj
          Emigrant Business Credit vs                                             Dennisse Baez
          Hanratty            Court Records    Pg 1622 of 2230                    June 02, 2023

98

1              D. MENDEZ

2      another document with you marked EBURY

3      71497.

4              Court reporter, please, mark this

5      as Mendez Deposition Exhibit No. 9.

6              (Mendez Exhibit 9, E-mail, Bates

7      EBURY 71497, remotely introduced and

8      provided electronically to the

9      reporter.)

10             MS. PARKS:  Is it 71497?

11             MR. MAYRON:  Yes.

12             MS. PARKS:  Thanks.

13  BY MR. MAYRON:

14      Q.    This is an e-mail from Mr. Xie to

15  you and Mr. Hanratty, correct?

16      A.    Uh-huh.

17      Q.    And it says it's attaching

18  updated Ebury tax lien procedures for the

19  December 2019 audit, correct?

20      A.    Yes, uh-huh -- yes, that's

21  correct, I'm sorry.  Yes, that's correct.

22             MR. MAYRON:  I'm going to share

23      in the chat a document labeled EBURY

24      71498.

25             Could the court reporter, please,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1623 of 2230    Dennisse Baez
Hanratty    June 02, 2023

99

1              D. MENDEZ

2       mark that as Mendez Deposition Exhibit

3       10.

4              (Mendez Exhibit 10, Procedures

5       memo, Bates EBURY 71498, remotely

6       introduced and provided electronically

7       to the reporter.)

8   BY MR. MAYRON:

9       Q.    So this is the attached

10  procedures memo?

11             MS. PARKS:  Is that a

12      representation you're making to her or

13      a question?

14             MR. MAYRON:  Yes.

15             MS. PARKS:  Okay.

16  BY MR. MAYRON:

17      Q.    This is the attached procedures

18  memo.  And it says the funds purchased tax

19  liens from various sources and send the

20  lien purchase information to one MTAG lien

21  service provider since November 1, 2017 if

22  the liens are not Rochester, New York

23  liens?

24      A.    I'm sorry, where are you reading?

25      Q.    The very first sentence.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs
Court Records      Pg 1624 of 2230
Dennisse Baez
Hanratty
June 02, 2023

100

D. MENDEZ

1

2     A.     Okay, I'm sorry.

3     Q.     So the procedures memo says the

4  funds purchase tax liens from various

5  sources and send the lien purchase

6  information to, 1, MTAG lien service

7  provider since November 1, 2017 if the

8  liens are not Rochester lien.

9          And then it continues and says:

10  2, AFTS if the liens are Rochester lien.

11  Is that correct?

12     A.     Uh-huh, that's correct.

13     Q.     Was this the Ebury's -- strike

14  that.

15          This was the Ebury company's

16  servicing procedures at the time, correct?

17          MS. PARKS:  Objection to form.

18     A.     Um --

19     Q.     This was the Ebury party's

20  servicing procedures in December 2018.

21          MS. PARKS:  Objection.

22     A.     I don't know.

23     Q.     You were director of servicing at

24  the time?

25     A.     Yes.  I had returned from my

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit v. Court Records      Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Hanratty                                                                    Dennisse Baez
24-04020-dsj                     Pg 1625 of 2230                            June 02, 2023

101

                        D. MENDEZ

1   maternity leave at this point.

2   

3        Q.    And you don't know if this was

4   Ebury company's procedure for servicing

5   liens?

6        A.    I did not prepare this document.

7   So I would have to read it all and try to

8   remember if this is what has been done back

9   in 2018.

10       Q.    So you don't know whether Ebury

11  was complying with its procedures memo for

12  servicing liens in December 2018?

13           MS. PARKS:   Objection.  Come on,

14       that was a lot of jumps.

15       A.    I will have to read through the

16  memo and see what I remember of this memo

17  back in 2018.

18       Q.    So let's just talk about the

19  first paragraph.  It says that the funds

20  purchase tax liens, and I'm paraphrasing,

21  they send the lien information to MTAG if

22  the liens are not Rochester liens or AFTS

23  if they are Rochester liens.  Correct?

24       A.    That's what it says here,

25  correct.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

102

1                D. MENDEZ

2      Q.    Was that Ebury's practice in

3   December 2018?

4      A.    I would have to verify if there

5   was any other portfolios back in 2018.

6   Back in December 2018 I was still with the

7   BCMG entity.  So I have to validate that.

8   I don't remember.

9      Q.    Let me turn back to Mendez

10   Deposition Exhibit 9.  This was the e-mail

11   from Mr. Xie to you.

12           You have an @eburycap.com e-mail,

13   correct?

14      A.    This e-mail is from August of

15   2019 and you're asking me about a memo of

16   December 31, 2018, nine months prior to

17   that e-mail.

18      Q.    So you're not aware whether Ebury

19   was complying with the procedures memo in

20   December 2018?

21           MS. PARKS:  Objection to the

22      form.  Go ahead.

23      A.    I am not aware.

24      Q.    And so then in August of 2019,

25   was Ebury complying with this procedures

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.          Court Records    Pg 1627 of 2230          Dennisse Baez
Hanratty                                                                       June 02, 2023

103

                    D. MENDEZ

 1    memo?

 2          MS. PARKS:  Objection to form.

 3      A.    It was four years ago.  I don't

 4    know exactly if we were compliant or not at

 5    the time.

 6      Q.    Were any liens that were not

 7    Rochester liens self-serviced or sent to a

 8    servicer other than MTAG?

 9          MS. PARKS:  At what time period,

10      Austin?

11          MR. MAYRON:  In 2019.

12          MS. PARKS:  Thank you.

13      A.    Can you repeat your question, if

14    there were --

15      Q.    I'll ask first, in December 2018,

16    were there liens that were not Rochester

17    liens that were being serviced by an entity

18    other than MTAG?

19      A.    I don't know.  I would have to

20    look at the portfolios that we had at the

21    time.

22      Q.    And then in August of 2019, were

23    there any liens that were not Rochester

24    liens that were being serviced by an entity

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 32
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1628 of 2230    Dennisse Baez
Hanratty    June 02, 2023

104

```
 1                   D. MENDEZ

 2   other than MTAG?

 3        A.     In August of 2019 -- other than

 4   Rochester?

 5        Q.     Other than Rochester.

 6        A.     Yes, we had liens that we were

 7   servicing in-house.

 8        Q.     What liens were you servicing

 9   in-house?

10        A.     On August of 2019, we had New

11   Jersey liens that we were servicing

12   in-house, and if I'm not mistaken Kentucky

13   liens that we were servicing in-house, too.

14        Q.     So Mr. Xie says:  Would you

15   please review the attached updated Ebury

16   tax lien procedures for December 2018

17   audit, correct?

18             MS. PARKS:  Are you back in

19        Exhibit 9?

20             MR. MAYRON:  Yes.

21             MS. PARKS:  Okay.

22        A.     Yes, that's correct.

23        Q.     And so you understand from this

24   that the procedures memo was being gathered

25   in connection with the 2018 audit, correct?
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. [illegible]    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1629 of 2230    Dennisse Baez
Hanratty    June 02, 2023

105

```
 1              D. MENDEZ

 2         MS. PARKS:  Objection.

 3    A.    That's correct.

 4    Q.    And you understand that it's

 5    important to be truthful with auditors?

 6         MS. PARKS:  Objection, but you

 7    can answer.

 8    A.    Yes.  I was an auditor for eight

 9    years.

10    Q.    Just for a clean record, you

11    understand that it's important to be

12    truthful with auditors?

13    A.    Yes.

14    Q.    And so you just said that at the

15    time of this e-mail, Ebury had New Jersey

16    liens that it was servicing in-house as

17    well as Kentucky liens that it was

18    servicing in-house?

19    A.    That's correct, in 2019.

20    Q.    Do you know -- strike that.

21         Did you tell Mr. Xie at the time

22    that this procedures memo was incorrect?

23         MS. PARKS:  Objection.

24    A.    I do not remember.

25    Q.    Did you check whether the
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit v.    Court Records    Pg 1630 of 2230    Dennisse Baez
Hanratty    June 02, 2023

106

1              D. MENDEZ

2    Kentucky and New Jersey servicing was also

3    happening in 2018?

4              MS. PARKS:  Objection.

5         A.    I do not remember if I checked,

6    but the New Jersey portfolio is a 2019

7    portfolio.  I'm sure of that.

8              The Kentucky lien, I would have

9    to look because I did not remember when

10   that portfolio was purchased.

11        Q.    So back in Exhibit 10, at the

12   very end, the last page, it says Ebury

13   acquired Kentucky, Maryland and Ohio liens

14   in September, October and December via

15   partner contribution, correct?

16        A.    I'm sorry, which one are you

17   looking at?

18        Q.    Exhibit 10, which ends in 71498.

19             MS. PARKS:  As a reminder,

20        Dennisse, you should look at the whole

21        document when he's asking about

22        documents.

23             MR. MAYRON:  Kari, I can give you

24        a copy of Part 221, but that's an

25        improper speaking instruction.

107

         D. MENDEZ

1              MS. PARKS:  It's not, Austin.

2         What's improper is to throw documents

3         at her, give her no time to review

4         them and then ask her questions about

5         isolated sentences.  That's what's

6         improper.  Depositions aren't intended

7         to trick people --

8              MR. MAYRON:  Kari, Kari, you've

9         said your piece already.

10             MS. PARKS:  You're right.

11    BY MR. MAYRON:

12        Q.   So on page 3 it says Ebury

13    acquired Kentucky, Maryland and Ohio liens

14    in September, October, and November via

15    partner contributions, correct?

16        A.   Yes.  That's in the other lien

17    section at the end.

18        Q.   What does it mean, via partner

19    contribution?

20             MS. PARKS:  Objection.

21        A.   I didn't write this memo, so...

22        Q.   What do you understand "via

23    partner contribution" to mean?

24             MS. PARKS:  Austin, you means

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. ... 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs Court Records   Pg 1632 of 2230   Dennisse Baez
Hanratty   June 02, 2023

108

|    |                                           |
|----|-------------------------------------------|
| 1  | D. MENDEZ                                 |
| 2  | sitting here today what does she          |
| 3  | understand or back at the time she got    |
| 4  | this e-mail?                              |
| 5  | BY MR. MAYRON:                            |
| 6  | Q.   Ms. Mendez, what do you              |
| 7  | understand "via partner contribution" to  |
| 8  | mean?                                     |
| 9  | A.   I understand that it's               |
| 10 | something -- there were assets that were  |
| 11 | purchased by one of the partners and the  |
| 12 | partners contributed those funds to -- or |
| 13 | those assets to the entity.               |
| 14 | Q.   Who purchased -- or who              |
| 15 | contributed these liens?                  |
| 16 | MS. PARKS:  Objection to form.            |
| 17 | A.   I would have to look who made the    |
| 18 | contribution, which entity made the       |
| 19 | contribution.                             |
| 20 | Q.   Was it an entity controlled by       |
| 21 | Thomas McCosker?                          |
| 22 | MS. PARKS:  Objection.                    |
| 23 | A.   No.  It would not be by Thomas       |
| 24 | McCosker because the assets of Thomas     |
| 25 | McCosker, he was not a partner.           |

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs   Court Records    Pg 1633 of 2230              Dennisse Baez
Hanratty                                                                    June 02, 2023

109

                        D. MENDEZ

1
2      Q.    Was it an entity controlled by

3    Mr. Hanratty?

4           MS. PARKS:  Objection.

5           You can answer.

6      A.    I'm not sure which entity it is

7    to be able to answer that question with a

8    yes or no.  I would have to look which

9    entity contributed the assets as a partner

10   contribution to say yes or no.

11     Q.    And you were responsible for

12   servicing these assets?

13     A.    Yes.

14          MR. MAYRON:  Now I'm going to

15       share with you a document labeled

16       EBURY 58332.

17          Could the court reporter, please,

18       mark this as Mendez Deposition Exhibit

19       11.

20          (Mendez Exhibit 11, E-mail, Bates

21       EBURY 58332, remotely introduced and

22       provided electronically to the

23       reporter.)

24          MR. MAYRON:  And I'm also going

25       to share a document labeled EBURY

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj
Emigrant Business Credit vs
Hanratty
Court Records
Pg 1634 of 2230
Dennisse Baez
June 02, 2023

110

```
 1                    D. MENDEZ

 2        58333, which the court reporter can

 3        mark as Mendez Deposition Exhibit 12.

 4             (Mendez Exhibit 12, E-mail

 5        attachment, Bates EBURY 58333,

 6        remotely introduced and provided

 7        electronically to the reporter.)

 8        A.    Okay.  Are you sending the

 9   attachment, too?

10        Q.    Yes, the attachment is EBURY

11   58333 and the e-mail is EBURY 58332.

12             So 58332 is an e-mail from you to

13   Mr. Colon, who is an auditor, correct?

14        A.    Uh-huh, that's correct.

15        Q.    And you're attaching an internal

16   control memo, correct?

17        A.    That's correct.

18        Q.    And the attachment, which I'll

19   represent is the document labeled EBURY

20   58333, is an updated procedures memo as of

21   December 31, 2020?

22        A.    Yes.

23        Q.    And it says from January through

24   October 2018 the funds purchased tax liens

25   from various sources and sent purchase
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2 RECEIVED NYSCEF: 01/12/2024

111

```
 1              D. MENDEZ

 2   information -- and I'm paraphrasing --

 3   either to MTAG if the liens were not from

 4   Rochester -- and then it says there's

 5   in-house service portfolios, which were

 6   transferred to a platform called VADAR?

 7        A.    Yes.

 8        Q.    And then it's in, another change

 9   in the in-house servicing platform took

10   place in June of 2020 when all liens,

11   except those serviced by MTAG, were

12   transferred to Speedboat?

13        A.    Yes.

14        Q.    So Ebury has self-serviced all

15   the liens that weren't sent to MTAG prior

16   to October 2018?

17             MS. PARKS:  Objection.

18        A.    I have to look at that.

19        Q.    When Ebury purchased liens, who

20   was responsible for sending them to MTAG?

21             MS. PARKS:  Objection.

22        A.    I don't remember who was

23   responsible at the time.

24        Q.    Was it you as the director of

25   servicing?
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1636 of 2230    Dennisse Baez
Hanratty    June 02, 2023

112

                        D. MENDEZ

1

2       A.    Since I've been here in the

3   servicing, I do not remember any onboarding

4   with MTAG of new liens except when we were

5   trying to migrate the in-house servicing to

6   MTAG.

7       Q.    So just to confirm, since you've

8   been at the Ebury companies, you don't

9   remember onboarding any new liens with

10  MTAG?

11          MS. PARKS:   Objection.

12      A.    I do not remember onboarding any

13  new liens with MTAG.

14      Q.    Did you onboard any new liens

15  with MTAG?

16          MS. PARKS:   Objection.

17      A.    I did not.

18      Q.    And then you mentioned migrating

19  the in-house servicing to MTAG.  What did

20  you mean by that?

21      A.    At some point, we were going to

22  move all the in-house servicing to MTAG.

23      Q.    Why were you going to do that?

24      A.    I was -- John requested us to do

25  so.  My understanding is that he was having

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1637 of 2230    Dennisse Baez
Hanratty    June 02, 2023

113

D. MENDEZ

1

2   some conversations with the lender about

3   moving all the assets to MTAG.

4       Q.    And by the lender, you mean

5   Emigrant?

6       A.    I am not sure if it was because

7   of conversations with Emigrant or if it was

8   conversations with other lenders when he

9   was trying to refinance the line of credit.

10      Q.    When did you have these

11  conversations with Mr. Hanratty?

12      A.    I do not remember the dates.

13      Q.    And what did he tell you about

14  moving the assets to MTAG?

15      A.    What I just mentioned, to start

16  preparing the assets to do the onboarding

17  into MTAG.

18      Q.    Did you onboard the assets into

19  MTAG?

20          MS. PARKS:  Objection.

21          You can answer.

22      A.    We put the onboarding on hold.

23      Q.    Who put the onboarding on hold?

24      A.    I gave the instruction to MTAG

25  after John asked me to put the onboarding

114

|   |   |
|---|---|
| 1 | D. MENDEZ |
| 2 | on hold. |
| 3 | Q.    When did Mr. Hanratty ask you to |
| 4 | put the onboarding on hold? |
| 5 | A.    I do not remember the date. |
| 6 | Q.    Was it during 2021? |
| 7 | A.    I honestly do not remember the |
| 8 | date. |
| 9 | Q.    Was it before the maturity date |
| 10 | of the Emigrant loan? |
| 11 | MS. PARKS:  Objection to form. |
| 12 | Do you want to tell her what that date |
| 13 | is?  Maybe that would help. |
| 14 | BY MR. MAYRON: |
| 15 | Q.    Before November 10, 2021. |
| 16 | A.    I do not remember.  I would have |
| 17 | to look at my e-mails or communications to |
| 18 | see when was it. |
| 19 | Q.    Did he tell you why he gave that |
| 20 | instruction? |
| 21 | A.    I don't remember if he did. |
| 22 | Q.    Was it due to cost? |
| 23 | A.    No.  Cost was not an issue |
| 24 | because he approved the cost of the |
| 25 | migration or the onboarding into MTAG.  So |

115

D. MENDEZ

1    I'm sure it was not cost.

2        Q.    Is it cheaper to self-service

3    than it is to have MTAG service liens?

4        A.    I would have to compare what it

5    cost monthly the servicing agreement that

6    we have with MTAG with the costs associated

7    with it internally.

8        Q.    Do you have an understanding of

9    whether self-service something generally

10   cheaper than MTAG?

11       A.    I don't.

12       Q.    Why would Ebury self-service if

13   MTAG was cheaper?

14           MS. PARKS:  Objection to form.

15       A.    I don't know.  I know John has

16   never been happy with MTAG and it's hard to

17   get things from them or sometimes it gets

18   delayed or --

19       Q.    How do you know that Mr. Hanratty

20   wasn't happy with MTAG?

21       A.    Because he has expressly said

22   that he was not happy with the servicing

23   from MTAG as well as Mr. Pingciere before

24   who was not happy with MTAG.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Emigrant Business Credit vs Court Records
Hanratty
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Pg 1640 of 2230
RECEIVED NYSCEF: 01/12/2024
Dennisse Baez
June 02, 2023

116

1            D. MENDEZ

2       Q.    What did he tell you about why he

3   was not happy with MTAG?

4       A.    What I just mentioned, that MTAG,

5   the servicing was not great and it was not

6   as quick to get things from them or the

7   reporting for the account.  I remember Ping

8   Xie wasn't very happy with it, I think

9   because the reporting he was used to

10  before -- so it was changed.  He was still

11  getting used to the new reporting.

12      Q.    So just to confirm, Mr. Hanratty

13  told you that MTAG's servicing was not

14  great and it was not as quick to get things

15  from them?

16            MS. PARKS:  Object to the form.

17            Go ahead.

18      A.    I do not remember the exact

19  words.  I'm not quoting him.  It's a

20  generality of what I remember from that

21  conversation.

22      Q.    Do you remember Mr. Hanratty

23  telling you anything he is about MTAG?

24      A.    About what exactly?

25      Q.    What does he talk to you about --

117

                    D. MENDEZ

1   what has he told but MTAG?

2       A.    We don't talk about MTAG much

3   besides they're -- I mean, they're just a

4   servicer and how many assets they have left

5   servicing, but we don't talk much about

6   MTAG.

7       Q.    So what has he told you about

8   MTAG?

9       A.    Nothing much more than in terms

10  of how satisfied he was with MTAG's

11  services.

12      Q.    So Mr. Hanratty intended to stop

13  using MTAG Services?

14          MS. PARKS:  Objection to form.

15      A.    At some point we explore other

16  servicers, but I remember at some point

17  getting a quote.  So the answer is yes, at

18  some point we were exploring changing

19  Emigrant to another servicer -- I mean MTAG

20  to another servicer.

21      Q.    Did you consider servicing the

22  MTAG liens in-house?

23          MS. PARKS:  Objection to form.

24          You can answer.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.                                    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1642 of 2230    Dennisse Baez
Hanratty                                        June 02, 2023

118

```
 1                   D. MENDEZ

 2        A.    I don't think we did, no.

 3        Q.    Why not?

 4        A.    I don't know why it was not an

 5   option.  We never discussed to do it

 6   in-house.

 7        Q.    For the liens that Ebury serviced

 8   in-house, what platform did Ebury use for

 9   the servicing?

10             MS. PARKS:  Object to form.

11             Go ahead, sorry.

12        A.    You asking now or are you asking

13   2018?

14        Q.    Let's start when you first

15   started at Ebury.

16             When you first started at Ebury,

17   what platform did Ebury use?

18        A.    Well, if you read the memo that

19   you just presented in Exhibit -- the one

20   that ends in 8333, it was mentioned there

21   that originally the in-house liens were

22   serviced manually in Excel spreadsheets.

23        Q.    And then at some point you

24   started using VADAR?

25        A.    Then at some point we started
```

119

1                   D. MENDEZ

2    using VADAR.  I'm sorry.

3         Q.    It's okay.

4         A.    We started using VADAR.  We

5    didn't like VADAR much.  It didn't have,

6    like, reporting capability, dealing with

7    the programmers was not -- it was not very

8    easy.  So we migrated again to Speedboat.

9              When I started with John, we were

10   trying to use LienLog, which was a platform

11   that Mr. McCosker had and we were trying to

12   get it up and running, but the platform was

13   dated.  It didn't have the capability -- it

14   wasn't in working condition by when

15   Mr. McCosker had it.  So we abort that

16   mission and that's why the VADAR onboard

17   was done.

18        Q.    So in March 2021, you

19   participated in a call with MTAG and an

20   entity called Sound Shore Financial,

21   correct?

22        A.    I'm sorry, I don't remember.

23             MR. MAYRON:  I'm going to share

24        with you a document marked EBCC-7532.

25        Could the court reporter, please, mark

120

                    D. MENDEZ

 1

 2        it as Emigrant -- Mendez Deposition

 3        Exhibit 13.

 4              (Mendez Exhibit 13, Document,

 5        Bates EBCC-7532, remotely introduced

 6        and provided electronically to the

 7        reporter.)

 8        A.    The one that ends in 7532,

 9    correct?

10        Q.    Yes.

11        A.    Okay.  Yes, I was on that call,

12    or at least it says there I was required to

13    be on that call.

14        Q.    What was discussed during that

15    call?

16        A.    I do not remember exactly what

17    this call was about.

18        Q.    I'm going to share with you a

19    document EBCC-16726.

20        A.    Okay.

21              MR. MAYRON:  Could the court

22        reporter please mark it as Mendez

23        Deposition Exhibit 14.

24              (Mendez Exhibit 14, Sound Shore

25        Financial memorandum, Bates

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1645 of 2230    Dennisse Baez
Hanratty    June 02, 2023

121

1              D. MENDEZ

2        EBCC-16726, remotely introduced and

3        provided electronically to the

4        reporter.)

5    BY MR. MAYRON:

6        Q.    And I'm going to direct your

7    attention to the second page.

8        A.    Okay.

9        Q.    So I'll represent to you this is

10   a memorandum from Sound Shore Financial,

11   which is an auditor, to Emigrant regarding

12   the Ebury companies?

13       A.    Okay.

14       Q.    And on the second page, it says:

15   The first item on the request list was an

16   introduction to MTAG.

17           It says:  This was delayed and

18   finally a conference call was accomplished.

19           It says:  On Friday, March 5,

20   2021, a conference call was held with MTAG

21   who was represented by Gilles Michaud.

22   Present on the call was, for Ebury,

23   Dennisse Mendez.  Correct?

24       A.    Yes.  That's what it says there.

25       Q.    And it says:  Mr. Michaud advised

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO.          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State

Emigrant Business Credit vs.   Court Records   Pg 1646 of 2230   Dennisse Baez
Hanratty                                                          June 02, 2023

122

                    D. MENDEZ

1

2    that they maintain and service only the

3    liens Ebury has uploaded onto their system.

4         A.    Uh-huh.

5         Q.    So they also advised that the

6    company, referring to Ebury, has not

7    assigned all liens within given states.

8    However, Ebury is in the process of

9    uploading additional liens in the states

10   through are certs by MTAG?

11        A.    That's correct.  That's what it

12   says there.

13        Q.    Did you say during the call that

14   Ebury was in the process of uploading

15   additional liens to MTAG?

16             MS. PARKS:  Objection.

17             You can answer.

18        A.    I don't remember if I said it.

19   MTAG person was there.  So if the memo says

20   I said it and the MTAG personnel didn't say

21   I was lying -- I don't recall the exact

22   conversation or that call.  I remember

23   having a call with Gilles and someone else

24   and it has to be this conversation.

25        Q.    So the third paragraph says:

123

1              D. MENDEZ

2   There remains a significant amount of liens

3   that remain in the upload process to MTAG.

4              Did you say that there was a

5   significant amount of liens that were in

6   the upload process to MTAG?

7              MS. PARKS:  Objection to form.

8              You can answer.

9      A.    I don't remember saying there was

10  a significant amount of liens.

11     Q.    Were there liens that were in the

12  upload process to MTAG in March 2021?

13     A.    Yes, there were.

14     Q.    Were those liens ultimately

15  uploaded to MTAG?

16     A.    No.  Those were not.

17     Q.    Did --

18     A.    I'm sorry, let me go back.

19             MTAG added all of the liens into

20  the system and then the servicing of those

21  liens was put on hold.

22     Q.    When you say MTAG added all the

23  liens into the system, what do you mean?

24     A.    They completed the onboarding

25  process of the in-house service liens at

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 11
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

124

D. MENDEZ

1  some point.  I don't remember the exact

3  date.

4    Q.    So at some point, MTAG had

5  onboarded all of the liens that Ebury was

6  self-servicing?

7    A.    Yes.

8    Q.    And then the last thing here,

9  right above the table on the middle of that

10  page, it says:  This indicates which liens

11  in the BBC, the borrowing base certificate,

12  are in the MTAG system.  From the list

13  supplied by MTAG, the total amount they

14  serviced at January 31, 2021 is 13 percent

15  of the liens in the borrowing base

16  certificate.  Correct?

17    A.    That's what it says there.  I'm

18  not sure if that information is correct or

19  not.

20    Q.    At this time in 2021, you were

21  still the director of servicing?

22    A.    Yes.  I was director of

23  operations in 2021.

24    Q.    And you don't know whether --

25  independent of this memo, do you know

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
                   Emigrant Business Credit vs    Court Records    Pg 1649 of 2230    RECEIVED NYSCEF:    Dennisse Baez
                   Hanratty                                                                 June 02, 2023

125

D. MENDEZ

2    whether Ebury was servicing liens that were

3    included in Emigrant's borrowing base?

4        A.    Independent of this memo?

5        Q.    Yes.

6        A.    Now I know, I do know that there

7    were liens that we were servicing in-house

8    that were -- but I don't know which liens

9    they were.

10       Q.    Do you know if Ebury was

11   self-servicing the majority of Emigrant's

12   collateral?

13           MS. PARKS:  Objection to form.

14       A.    I don't know that.  I would have

15   to go to the list of assets and verify

16   that.

17       Q.    Did you ever instruct MTAG to

18   suspend the onboarding of the self-service

19   liens?

20           MS. PARKS:  Objection.

21       A.    Yes, I mention it before, that I

22   asked them to stop.

23       Q.    So just to be clear, did MTAG

24   complete the onboarding of the

25   self-servicing liens or did you instruct

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. RECEIVED NYSCEF: 01/12/2024

126

```
 1              D. MENDEZ

 2   them to stop?

 3       A.    I instructed them to stop.  They

 4   complete the onboarding anyways.

 5       Q.    Why did you instruct them to

 6   stop?

 7       A.    I receive instructions from

 8   Mr. John Hanratty to stop the onboarding.

 9       Q.    I'm going to share with you --

10            MR. MAYRON:  Actually, do we want

11       to do lunch?

12            MS. PARKS:  You want to go off

13       the record?

14            MR. MAYRON:  Yeah, we can go off

15       the record.

16            THE VIDEOGRAPHER:  The time is

17       12:46 p.m.  We are now off the record.

18            (Recess taken from 12:46 a.m. to

19       1:11 p.m.)

20            THE VIDEOGRAPHER:  The time is

21       1:11 p.m.  We are now back on the

22       record.

23   BY MR. MAYRON:

24       Q.    Ms. Mendez, did you speak to

25   anyone during the break about the substance
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1651 of 2230    Dennisse Baez
Hanratty                                                           June 02, 2023

127

1                   D. MENDEZ

2    of your testimony?

3        A.    No.  We talk about pizza and

4    kids.  And I gave the thumbs up when they

5    ask if everything was okay.

6             MR. MAYRON:  Okay.  I'm going to

7        share with you a document labeled

8        EBCC-7955.  Could the court reporter,

9        please, mark this as Mendez Deposition

10       Exhibit 15.

11            (Mendez Exhibit 15, E-mail, Bates

12       EBCC-7955, remotely introduced and

13       provided electronically to the

14       reporter.)

15   BY MR. MAYRON:

16       Q.    This is an e-mail from Jack Grady

17   at Emigrant to Mr. Hanratty and yourself?

18       A.    Uh-huh.

19       Q.    Asking for an update on the

20   servicer.  And he asks:  Can you send the

21   latest report you've received from MTAG

22   updated for the collateral you recently

23   uploaded with them.

24            Is that correct?

25       A.    Yes, that's correct.

128

D. MENDEZ

2   Q.    And so, earlier you said you were

3   in the process of uploading or you had

4   uploaded collateral to MTAG at this point?

5   A.    As of today?

6   Q.    As of May 11, 2021.

7   A.    I don't know.  I'm sorry, I do

8   not have the exact date.  We initiated the

9   onboarding process.  We told MTAG to stop

10   it, but they completed the onboarding, but

11   I don't have the dates and I didn't want to

12   look for the dates because you told me not

13   to access any documents.

14   Q.    Do you understand from this

15   e-mail that Emigrant Bank, Ebury's lender,

16   was asking for an updated report from MTAG

17   with the in-house liens uploaded?

18        MS. PARKS:  Objection to form.

19        You can answer.

20   A.    Yes.

21   Q.    Did you or anyone from Ebury tell

22   Emigrant that the self-service collateral

23   was being uploaded to MTAG?

24   A.    I'm sorry, what was your question

25   again?

129

D. MENDEZ

1
2    Q.    Did you or anyone at Ebury tell

3    Emigrant that the self-serviced collateral

4    was being uploaded for MTAG?

5    A.    I don't think it was me that told

6    them, but in the memo that you have, that

7    you show earlier, it shows that we have

8    told them we were going to onboard the

9    liens to MTAG in that memo from the

10   external accountant or -- I can't remember

11   which exhibit it was.  Let me see.  One

12   that ends in 6726.

13   Q.    So you don't know if you were the

14   one who told them that Ebury was uploading

15   liens to MTAG?

16   A.    I don't remember me being the one

17   telling Emigrant we were doing it.

18   Q.    Who else could have told Emigrant

19   that you were doing it?

20   A.    The only other person could have

21   been Mr. John Hanratty.

22        MR. MAYRON:  I'm going to share

23        with you a document labeled EBCC-8371,

24        which the court reporter can mark as

25        Mendez Deposition Exhibit 16.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs
Hanratty                    Court Records    Pg 1654 of 2230            Dennisse Baez
                                                                       June 02, 2023

130

```
 1                    D. MENDEZ

 2              (Mendez Exhibit 16, E-mail chain,

 3         Bates EBCC-8371, remotely introduced

 4         and provided electronically to the

 5         reporter.)

 6    BY MR. MAYRON:

 7         Q.    This is an e-mail from September

 8    from Jack Grady at Emigrant to Mr. Hanratty

 9    and you are cc'd.

10         A.    Uh-huh.

11         Q.    Actually, let's scroll down.

12    Let's go to the last e-mail, which is an

13    August 25, 2021 e-mail from Mr. Arora at

14    Emigrant and it says:  Hi Dennisse.  Could

15    you please send us following.

16              And the second item is custodial

17    report for liens.  Correct?

18         A.    Yes.

19         Q.    Mr. Arora was asking for an

20    updated report from MTAG with the

21    self-service collateral uploaded, correct?

22              MS. PARKS:  Objection.

23              You can answer.

24         A.    Well, it says custodial report

25    for the liens.  It doesn't say for the
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs.   Court Records   Pg 1655 of 2230   Dennisse Baez
Hanratty                                                        June 02, 2023

131

                    D. MENDEZ

 1

 2    self-service liens.

 3        Q.     Did you understand that Emigrant

 4    was asking for an updated custodial report

 5    from MTAG that included the self-service

 6    liens?

 7             MS. PARKS:  Objection.

 8             You can answer.

 9        A.     At the time or now?

10        Q.     Now.

11        A.     For the way you're questioning

12    about it, I would say yes, but it's not

13    what it says there.  It's not how it reads.

14    So at the time -- and I don't -- this was

15    almost two years ago -- it doesn't say

16    anything about what the new onboarding is.

17             MR. MAYRON:  So I'm going to

18        share with you a document labeled

19        EBCC-8879 and could the court

20        reporter, please, mark it as Mendez

21        Deposition Exhibit 17.

22             (Mendez Exhibit 17, Document,

23        Bates EBCC-8879, remotely introduced

24        and provided electronically to the

25        reporter.)

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   01/12/2024
Emigrant Business Credit vs.            Court Records          Pg 1656 of 2230          Dennisse Baez
Hanratty                                                                                June 02, 2023

132

              D. MENDEZ

1
2    BY MR. MAYRON:

3        Q.    If you could scroll to page 16,

4    Jack Grady sends Mr. Hanratty a text

5    saying:  While you're waiting for these

6    deals to close, can you knock out our punch

7    list of outstanding items, financials,

8    custodial report, et cetera --

9            MS. PARKS:  I'm sorry, you said

10       page 16?

11       Q.    Yes.

12       A.    Okay, it's the third green

13   bubble?

14       Q.    Yes.

15       A.    Okay.

16       Q.    And Mr. Hanratty responds:  Yes.

17   Dennisse and I doing today and tomorrow.

18           You look surprised by that.

19       A.    I'm trying to read.

20       Q.    Are you surprised that Mr. --

21       A.    Oh, I'm sorry, you're going into

22   the next bubble, the blue one.

23       Q.    Yep.  Are you surprised that

24   Mr. Hanratty told Mr. Grady that you were

25   working on the financials, custodial

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs   Court Records    Pg 1657 of 2230    Dennisse Baez
Hanratty                                                                     June 02, 2023

133

D. MENDEZ

2  report, et cetera?

3          MS. PARKS:  Objection to form.

4          Go ahead, Dennisse.

5      A.    Well, this e-mail mentioned I was

6  on bedrest -- I mean the text.  So I'm not

7  sure if this -- I don't remember this was

8  something I was working with John at the

9  time.

10      Q.    So you weren't -- it says August

11  24, 2021 -- you weren't working on

12  providing financials and a custodial report

13  to Emigrant?

14          MS. PARKS:  Objection.

15          Go ahead, Dennisse.  Just give me

16      a second.

17          THE WITNESS:  I'm so sorry.

18          MS. PARKS:  It's okay.

19      A.    I've been trying to do a catch-up

20  in our accounting records for a while now.

21  So for him to tell that I'm working on

22  getting documents out, I am always trying

23  to get caught up so we can send whatever we

24  need to send out.

25      Q.    And which documents were you

134

D. MENDEZ

1       working on at this time?

2           A.     I'm sorry?

3           Q.     What documents were you working

4       on at this time it?

5           A.     Was 2021.  I don't remember what

6       I was working on at the time.  I do know I

7       was out, as he said on those e-mails,

8       because of my second pregnancy.  I needed

9       to go on bedrest since like June or July.

10          Q.     So Mr. Hanratty said, though,

11      Dennisse and I doing today and tomorrow.

12      So what was he saying you were doing?

13              MS. PARKS:  Objection.

14          A.     I don't know.  You will have to

15      ask him.  He was the one that send the

16      text.

17          Q.     And so are you saying you weren't

18      doing the financials and the custodial

19      report on August 24, 2021?

20              MS. PARKS:  Objection.

21          A.     No, that's not what I'm saying.

22      I'm saying I do not know what I was doing

23      on August 27th of 2021.

24              MR. MAYRON:  I'm going to share

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 1659 of 2230   Dennisse Baez
Hanratty   June 02, 2023

135

1          D. MENDEZ

2     with you a document labeled

3     EBCC-17776.  Could the court reporter,

4     please, mark it as Mendez Deposition

5     Exhibit 18.

6          (Mendez Exhibit 18, E-mail, Bates

7     EBCC-17776, remotely introduced and

8     provided electronically to the

9     reporter.)

10          MS. PARKS:  18, you said, Austin?

11          MR. MAYRON:  Yes.

12          MS. PARKS:  Thank you.

13     Q.    So this is a March 1, 2021 e-mail

14  from Mr. Hanratty to Anna Middleton of MTAG

15  Services and yourself.

16          Mr. Hanratty says:  As Dennisse

17  made you aware, we are correcting

18  registration and will be uploading New

19  Jersey and Maryland liens once we correct

20  it.

21          Correct?

22     A.    That's what it says there.

23     Q.    Did you make Ms. Middleton aware

24  that Ebury was "correcting registration and

25  will be uploading New Jersey and Maryland

136

                         D. MENDEZ

1

2    liens once corrected"?

3        A.    I do not remember that's what I

4    asked MTAG to do.  I asked them to do the

5    onboarding of the liens.  I didn't -- my

6    recollection is nothing about fixing

7    anything.  Sorry.

8        Q.    Could you repeat that?

9        A.    I'm sorry.  My recollection of

10   it, I ask, I think it was Kimberly Clayton

11   or whoever I was in contact with MTAG at

12   the time, to do the onboarding, but I

13   didn't say anything about correcting

14   anything.

15       Q.    What do you understand

16   Mr. Hanratty to mean when he says

17   correcting registration?

18       A.    I don't know what he means by

19   that.

20       Q.    If Ebury was correcting

21   registrations, does that mean the

22   registrations were incorrect?

23           MS. PARKS:  Objection.

24       A.    You will have to ask Mr. Hanratty

25   what he meant by it.

137

D. MENDEZ

1

2      Q.    What do you understand it to

3   mean -- let me say that again.

4            Do you understand this to mean

5   that the registrations were incorrect?

6      A.    My understanding is when you

7   correct something, it's because something

8   needs to be changed because it previously

9   wasn't right.

10     Q.    So do you understand this to mean

11  that the registrations were incorrect?

12           MS. PARKS:  Objection.

13           You can answer.

14     A.    It could be interpreted that way,

15  yes.

16     Q.    Do you understand this to mean,

17  however, that the registrations were

18  incorrect?

19     A.    Reading it now, yes.

20     Q.    Let's go back to Exhibit 16,

21  which is EBCC-8371.

22     A.    Okay, here.

23     Q.    Mr. Arora requests a custodial

24  report for the liens.

25           Do you understand this to be a

138

                            D. MENDEZ

1

2    request for the corrected registrations for

3    the self-service liens to be with MTAG?

4              MS. PARKS:  Objection.

5         A.    I'm sorry, again, as I'm reading

6    it now, that's not what it says there.

7         Q.    What is a custodial report?

8         A.    The custodial report includes all

9    of the assets that it's servicing.

10        Q.    Does it list who is the entity

11   that has custody for the liens?

12        A.    Yes.

13        Q.    And do you understand Mr. Arora's

14   request for a custodial report to be

15   because Emigrant understood you were

16   uploading liens to MTAG?

17             MS. PARKS:  Objection.

18        A.    That will be an assumption of it,

19   but that's not what it says here.

20        Q.    So sitting here today, you don't

21   know?

22        A.    I don't know.

23        Q.    Okay.  And so then the next

24   e-mail above it, Mr. Hanratty responds,

25   copies you, and he says:  We will get out

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022
NYSCEF DOC. NO.                                        RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 1663 of 2230   Dennisse Baez
Hanratty                                                        June 02, 2023

139

                        D. MENDEZ

 1

 2    the door tomorrow.

 3             And then the top e-mail is from

 4    Mr. Grady to Mr. Hanratty saying:

 5    Following up on the financials and the

 6    current lien custodial report.

 7             Correct?

 8        A.    I'm sorry, which one are you

 9    looking at now?

10        Q.    This is 8371, Exhibit No. 18.

11        A.    8371, I'm sorry.

12        Q.    It's okay.

13        A.    I have like a bunch of them open,

14    so.  I'm sorry about that.

15             Can you repeat the question

16    again, I'm sorry?

17        Q.    Actually, can we look at 7955

18    again, which is Mendez Deposition Exhibit

19    15.

20        A.    7955, I'm back to it.

21        Q.    So Mr. Grady requests a report

22    from MTAG update for the collateral you

23    recently uploaded, correct?

24        A.    That's correct.

25        Q.    Would you understand that to be

140

                        D. MENDEZ

1

2    custodial report?

3              MS. PARKS:   Objection.

4              You can answer.

5        A.    Well, it doesn't say custodial

6    report.  When I see this, I would assume

7    it's a lien portfolio report.

8        Q.    What's the difference between a

9    lien portfolio report and a custodial

10   report?

11       A.    The lien portfolio will include

12   the detail of all the assets, like every

13   detail on the asset.  The custodial report,

14   if I'm not mistaken, would only include the

15   list of the assets, not written values and

16   information like that.

17       Q.    So a lien -- a lien portfolio

18   report would contain more information than

19   a custodial report?

20       A.    I would understand so.

21       Q.    And so in May of 2021, Mr. Grady

22   is requesting an updated report from MTAG,

23   but you don't know if it was a lien

24   portfolio report or a custodial report?

25             MS. PARKS:   Objection to form.

141

                         D. MENDEZ

1                You can answer.

2        A.    We're talking about 7955?

3        Q.    Yes.

4        A.    When I read this, I would have

5   interpreted it now and probably then as

6   what I call a lien portfolio report.  It's

7   how we call it with Speedboat -- or a lien

8   detail.  Everyone calls it different, so...

9        Q.    So back to 8371, which is Exhibit

10  16, Mr. Arora requests a custodial report

11  for the liens.

12               Mr. Hanratty says:  We will get

13  it out the door tomorrow.  And then

14  Mr. Grady sends an e-mail saying you had

15  mentioned these items were imminent a few

16  weeks ago, but we never received.

17               Is that right?

18       A.    That's what the e-mail says.

19       Q.    So you understand that even

20  though Mr. Hanratty said we will get out

21  the door tomorrow on August 25th, he still

22  hadn't sent it by September 13th?

23               MS. PARKS:  Objection.

24               You can answer.

142

D. MENDEZ

2    A.    That's what the e-mail says.

3    Q.    And if MTAG had uploaded the

4    self-service liens, that information would

5    show up on a lien custodial report?

6        MS. PARKS:  Objection.

7        You can answer.

8    A.    Yes, it would have shown in a

9    lien custodial report.

10   Q.    So Emigrant could use a lien

11   custodial report to see if MTAG had custody

12   of their collateral?

13       MS. PARKS:  Objection.

14   A.    Yes.

15       MR. MAYRON:  Do you mind if we

16   take a five-minute break?

17       MS. PARKS:  Sure, yeah.  No

18   problem.  Is that okay with you guys?

19       THE WITNESS:  Yes, no problem.

20       THE VIDEOGRAPHER:  The time is

21   1:30 p.m.  We are now off the record.

22       (Recess taken from 1:30 p.m. to

23   1:36 p.m.)

24       THE VIDEOGRAPHER:  The time is

25   1:36 p.m.  We are now back on the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024

```
 1              D. MENDEZ

 2        record.

 3              MR. MAYRON:  I'm going to share a

 4        document with you labeled EBCC-27564

 5        and could the court reporter, please,

 6        mark it as Mendez Deposition Exhibit

 7        19.

 8              (Mendez Exhibit 19, Spreadsheet,

 9        Bates EBCC-27564, remotely introduced

10        and provided electronically to the

11        reporter.)

12   BY MR. MAYRON:

13        Q.   It's a spreadsheet, so it might

14   take a second to open up.

15              Can you tell me what this

16   document is?

17        A.   It's an active lien detail from

18   MTAG.

19        Q.   How do you know it's from MTAG?

20        A.   Well, it has the MTAG logo and

21   the MTAG format.

22        Q.   Okay.

23        A.   And it looks just like an MTAG

24   report I would download from -- I'm

25   sorry -- that I would download from their
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO.                                           RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs Court Records   Pg 1668 of 2230   Dennisse Baez
Hanratty                                                      June 02, 2023

144

```
 1                 D. MENDEZ

 2    platform.

 3        Q.    So you've seen MTAG reports

 4    before?

 5        A.    Yes.

 6        Q.    And this looks to you like an

 7    MTAG report?

 8        A.    Yes.

 9        Q.    Okay.  So maybe I'll share my

10    screen so we can see.

11             So I've scrolled over to column

12    AM, which is the purchase balance and fees,

13    and I'm going to scroll all the way through

14    to the bottom.

15        A.    Counsel, shift down and you will

16    get to the bottom.

17             MS. PARKS:  Oh, you finance

18        people and your Excel hacks.

19             MR. MAYRON:  Thank you.

20    BY MR. MAYRON:

21        Q.    So it might be tiny, but in the

22    bottom right-hand corner of Excel, it sums

23    up the selected cells?

24             Can you see that?

25        A.    Yes.
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 52

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

Emigrant Business Credit vs    Court Records    Pg 1669 of 2230    RECEIVED NYSCEF: 01/12/2024

Hanratty    Dennisse Baez

June 02, 2023

145

```
 1                    D. MENDEZ

 2       Q.    And it says 27.8 million.

 3       A.    Yes, it does.

 4       Q.    And so would you understand that

 5  the redemptive value of the liens in this

 6  report is approximately $27.8 million?

 7            MS. PARKS:  Objection to form.

 8            You can answer.

 9       A.    Can you scroll to your left to

10  see the other columns on the report?

11       Q.    Just let me know if you want me

12  to keep scrolling.

13       A.    It could be the redemptive value

14  and I have to look -- the MTAG report is

15  not something I work with them every day.

16  It could be the redemptive value or -- I'm

17  sorry if you hear noise in the background,

18  I have noise around.

19            It could be the redemptive value

20  or it could be the -- is that principal,

21  interest -- or it could be the value of the

22  liens prior to any redemptions.  Can you

23  scroll completely to the left, I'm sorry.

24       Q.    What about this column AE, total

25  due?  Would you understand that to be the
```

146

1              D. MENDEZ

2    redemptive value?

3         A.    Total due excluding fees.  Can

4    you add up that column?

5         Q.    Yep.  Thanks.  Thanks for the

6    help there.  It says $27.7 million.

7         A.    Scroll up again.  As of when is

8    that report?  August 31, 2021.  I would

9    have to download an MTAG report from their

10   system and make sure it's same report

11   you're showing me, because this one looks

12   like it and validate the columns basically.

13        Q.    What do you mean you have to

14   validate the columns?

15        A.    Validate that the report that I

16   am downloading from MTAG is the same one

17   that you're showing me.

18        Q.    Do you have reason to think that

19   there wasn't $27.7 million in redemptive

20   value in August 2021?

21        A.    I would have to verify our

22   records.  I don't remember.

23        Q.    Could there have been more -- do

24   you think there could have been more in

25   redemptive value?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
Emigrant Business Credit vs.    Court Records    Pg 1671 of 2230    Dennisse Baez
Hanratty    June 02, 2023

147

```
 1                    D. MENDEZ

 2        A.    Again, I don't want to speculate.

 3   I would have to look at the reports.

 4             MS. PARKS:  Austin, I don't know

 5        if this helps.  Maybe if we want to

 6        focus on this document and what the

 7        columns mean in this document we could

 8        do it that way, or are you trying to

 9        ask her if she has like an independent

10        recollection of whether these numbers

11        are the right numbers?  Do you know

12        what I mean?

13             MR. MAYRON:  Yeah.  I'm asking

14        both.

15   BY MR. MAYRON:

16        Q.    So the first is, do you have any

17   independent recollection of the amount of

18   redemptive value in the lien portfolio?

19        A.    No, I'm sorry, I do not have a

20   recollection of the balance of the

21   portfolio in 2021.

22        Q.    Then just looking at this report,

23   do you agree that it shows a redemptive

24   value of liens of about $27.7 million, the

25   column we just summed up?
```

148

                          D. MENDEZ

1

2       A.    Well, the column doesn't say

3   redemptive value.  It says -- move to the

4   right again, I'm sorry.

5       Q.    Total due?

6       A.    No, the other are one.  The

7   ending balance.

8       Q.    Is there any column here that you

9   would understand to be the redemptive

10  value?

11      A.    It could be the ending balance,

12  including fees.  But honestly I would have

13  to confirm that because as I was telling

14  you, I don't look at MTAG reports

15  regularly.

16      Q.    Would the redemptive value

17  include the principal balance and the

18  interest balance?

19      A.    It would include interest,

20  penalties and fees.  The thing is, here it

21  says principal balance, I'm not sure if

22  it's a principal balance at the beginning

23  because some of the reports include the

24  principal balance at the beginning of the

25  asset.  Is there a status column on those?

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 1673 of 2230   Dennisse Baez
Hanratty                                                          June 02, 2023

149

D. MENDEZ

1

2    Q.    The one called status code?  Is

3    that what you're talking about?

4    A.    No, that's not it.

5    Q.    I'll ask another question.

6         In this spreadsheet, there are,

7    looks like over 6,700 rows.  Correct?

8    A.    Yes.  That's what you're showing

9    me there.

10   Q.    And each row represents a tax

11   lien?

12   A.    Each row represents a

13   certificate, that's correct.

14   Q.    So this report means MTAG has

15   6,780-something certificates?

16        MS. PARKS:  Objection to form.

17        You can answer.

18   A.    That's what it appears from that

19   report.

20        MR. MAYRON:  Okay.  I'm going to

21        share with you another document.  This

22        one is marked EBCC-10220.  And could

23        the court reporter, please, mark it as

24        Mendez Deposition Exhibit 20.

25        (Mendez Exhibit 20, Lien Tape,

150

D. MENDEZ

1

2      Bates EBCC-10220, remotely introduced

3      and provided electronically to the

4      reporter.)

5      A.    Okay.

6      Q.    And I'll share my screen again.

7            I'll represent to you that this

8   is a lien tape that Emigrant received from

9   Ebury in December of 2021.

10      A.    Okay.

11      Q.    And if you look in cell F13, it

12  lists the grand total redemptive value as

13  $19 million.

14      A.    That's correct.  I'm seeing that.

15      Q.    Do you have a recollection of

16  whether this is an accurate amount of liens

17  that you owned as of December 2021?

18      A.    I'm sorry, I don't.

19      Q.    Were you involved in the

20  preparation of this document?

21      A.    I don't remember me preparing

22  that document.  No.  The only other person

23  that could have pulled that data and

24  formatted that way could have been

25  Mr. Kevin Clark, which he would pull data

151

```
 1                     D. MENDEZ

 2    and prepare spreadsheets for John.

 3         Q.    Have you seen this document

 4    before?

 5         A.    Yes, I've seen that document

 6    before -- well, I'm not sure if that's the

 7    exact document, but I've seen a similar

 8    document before.

 9         Q.    And do you know why this document

10    was made?

11         A.    No.  Well, you just told me it

12    was sent to Emigrant, so...

13         Q.    Is Kevin Clark still employed at

14    Ebury?

15         A.    Kevin Clark was a contractor.  So

16    he's not.

17         Q.    And why --

18         A.    He stopped being a contractor a

19    while ago.

20         Q.    Why did he leave?

21         A.    He had another job.

22         Q.    When did he leave?

23         A.    I think he's gone now for over a

24    year, or a year maybe.  I don't remember

25    the exact date he left, I'm sorry.
```

152

D. MENDEZ

1

2    Q.    And so looking back at this

3    exhibit, there's a tab called Summary and

4    then there's a tab called Combined.  And in

5    Combined there is 1,545 rows.  So would you

6    read this to mean that Ebury owned only

7    1,545 tax lien certificates?

8              MS. PARKS:  Objection to form.

9    A.    Can you scroll to that report up?

10   Is there a status column on that report?

11   Can you go back to the summary?

12             The thing is, I don't see in the

13   summary that it says this is a summary of

14   our active lien portfolio.  And in the

15   combined, I don't see a status or other

16   tabs saying that that is an active lien

17   detail.

18   Q.    Are you saying this may include

19   inactive liens?

20   A.    I'm saying that --

21             MS. PARKS:  Objection.

22             Go ahead.

23             THE WITNESS:  Sorry.

24             MS. PARKS:  That's okay.

25             Go ahead.

153

D. MENDEZ

2    A.    What I'm saying is I don't know

3    if what you're showing me is an active lien

4    summary.  If it's a summary of the sold

5    liens or redeemed liens, and you're showing

6    me the redemptive value at -- I mean the

7    redemptive value that we've collected.

8         So without seeing the status of

9    the liens or the summary, I'm not sure if

10   you're showing me an active lien detail or

11   you're showing me something else.

12   Q.    You said earlier that you've seen

13   this document before, correct?

14   A.    I've seen -- I didn't say -- I

15   specifically said I haven't seen this one

16   in particular.  I've seen similar

17   spreadsheets to this and we've done

18   spreadsheets like this or I've seen

19   spreadsheets like this done by Clark or by

20   myself that there were for the entire

21   universe of our portfolio from the day we

22   started until the end or only redeemed

23   liens or only active liens.

24        So looking at that one, it looks

25   like a report that would be generated from

154

D. MENDEZ

2   Kevin who was the one putting together

3   data, but I didn't see the status and the

4   spreadsheet doesn't have a tab that says

5   active liens or anything for me to confirm

6   those are the active liens as of that date.

7       Q.    Did you prepare this spreadsheet?

8       A.    I don't remember preparing that

9   spreadsheet.

10       Q.    And I'll put it back up on the

11   screen.  Column I is headed with Remaining

12   Lien Payoff.

13            Does that suggest to you that

14   this is a list of active liens?

15            MS. PARKS:  Objection to form.

16            You can answer.  It's okay.

17       A.    It could be an active lien

18   detail.

19       Q.    What else could it be?

20       A.    It says remaining lien payoff, so

21   it has to be an active lien detail.

22       Q.    And the spreadsheet that we

23   looked at earlier with the MTAG logo on it,

24   which I think was marked as Deposition

25   Exhibit 19, that was also an active lien

155

                    D. MENDEZ

1

2    detail, correct?

3         A.    The one that you showed me there

4    is an active lien detail, correct.

5              MS. PARKS:  Pause.  Are you

6         saying an active lien or inactive,

7         like not active?

8              MR. MAYRON:  An -- space --

9         active.

10             MS. PARKS:  Thank you.

11   BY MR. MAYRON:

12        Q.    So if I understand correct, in

13   August of 2021 I think creates an active

14   lien detail that lists 6,700 liens.  And

15   then in December of 2021 it puts together

16   an active lien detail that has only about

17   1500 liens, correct?

18             MS. PARKS:  Object to the form.

19             You can answer.

20        A.    You showed me those two reports.

21   I don't know who produced that or who sent

22   that to who.  So I'm just looking at the

23   reports that you're showing me.

24        Q.    So just looking at those two

25   reports, 5,000 liens disappeared.

156

D. MENDEZ

 1          MS. PARKS:  Objection.

 2     A.    I don't know.

 3     Q.    If the August tape had over 6,700

 4   liens and the December tape had only 1,500

 5   liens, that means 5,000 liens are no longer

 6   there?

 7          MS. PARKS:  Objection.

 8     A.    Can we pull back the active lien

 9   detail report that you have from MTAG?

10     Q.    Sure.

11     A.    Can you go back to the column

12   with the balance?  Does the column ending

13   balance has a balance higher than zero on

14   every single line?

15     Q.    I'm going to scroll through

16   quickly and we can look as they fly by.

17   Actually, I could probably sort -- that

18   might be the quickest way to do this.  So

19   let's select everything and now we're going

20   to sort the data on ending balance from

21   smallest to largest.  So it looks like

22   there are --

23     A.    Some miscellaneous and zero

24   balances, those are not active liens.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                          RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs          Court Records          Doc #3 State
Hanratty                                                     Dennisse Baez
                                     Pg 1681 of 2230        June 02, 2023

24-04020-dsj    Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23

157

                    D. MENDEZ

1

2       Q.     Okay.  How do you know which

3   liens are active and which ones are not?

4       A.     Well, if you go up and you have

5   liens with zero balances.

6       Q.     So there's nine liens with zero

7   balances.  Should I understand the other

8   6,700 to be --

9       A.     I have to look at the status code

10  because the status code you have WRD, you

11  have PDC, WRDs -- I have to look at like

12  the legend of what each status means.  That

13  looks to me like write-offs, so it has zero

14  balance.  And I would have to look at the

15  other status codes to confirm all of those

16  liens.  Maybe they were active in their

17  platform and that's why they've been shown

18  on an active lien detail.

19          But they are not necessarily

20  active liens because they have zero balance

21  or they were written off or the balance

22  that it's very small, it's just a rounding

23  thing.  So that's why I have to look at the

24  status of each lien to confirm that's

25  really all the active liens.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
Emigrant Business Credit vs.    Court Records    Pg 1682 of 2230    RECEIVED NYSCEF:    Dennisse Baez
Hanratty                                                                      June 02, 2023

158

D. MENDEZ

2    Q.    Just to confirm, there's only, it

3  looks like nine liens that have ending

4  balances of zero.

5    A.    Yes, but you have -- not at

6  25 cents, $1, $2.42, $3, $7, $9.  So that's

7  why I said I would look at the status code.

8    Q.    But you agree that the December

9  21st lien tape has 5,000 fewer certificates

10 listed than the August lien tape?

11         MS. PARKS:  Objection.

12         You can answer.

13    A.    I agree that in the two reports

14 that you're showing me, which you have one

15 dated May and one dated December of 2021,

16 the amount of liens is different.  It's

17 different by 5,000 liens.

18    Q.    Just to have a clean record, you

19 agree that the December tape has 5,000

20 fewer certificates than the August tape?

21         MS. PARKS:  Objection to form.

22         You can answer.

23    A.    Again, I'm agreeing that from the

24 two reports that you're showing me, which I

25 don't know the status of all the ones that

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 1683 of 2230   Dennisse Baez
Hanratty                                                        June 02, 2023

159

```
 1              D. MENDEZ

 2   are in MTAG, it's an actual active lien,

 3   there is a difference of 5,000 liens

 4   approximately from what you showed me.

 5        Q.    And then the, as we discussed,

 6   the August tape had a total redemptive

 7   value of about $27 million and the December

 8   tape has a redemptive value of about $19

 9   million.  So that's a discrepancy of about

10   $8 million, correct?

11        A.    That's correct, from what you

12   showed me.

13        Q.    Did anyone tell you there is a

14   5,000 lien or $8 million discrepancy

15   between the August and December lien tapes?

16             MS. PARKS:  Objection to form.

17        A.    What do you mean if anyone told

18   me there was?

19        Q.    Did anyone tell you that there

20   was a 5,000 lien discrepancy or an $8

21   million discrepancy between the August lien

22   tape and the December lien tape?

23             MS. PARKS:  Objection to form.

24        A.    Not that I remember.

25        Q.    You were responsible for lien
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Hanratty                        Court Records    Pg 1684 of 2230                                          Dennisse Baez
                                                                                                         June 02, 2023

160

                        D. MENDEZ

1    servicing in the second half of 2021,

2    correct?

3    correct?

4       A.    Yes.

5       Q.    That that role you would have

6    insight into the number of liens either was

7    servicing, right?

8       A.    Yes.

9       Q.    And you would know if Ebury

10   somehow had 5,000 fewer liens over the

11   course of five months, correct?

12           MS. PARKS:    Objection.

13      A.    I would think so.

14      Q.    Did you speak to anyone about the

15   August MTAG lien tape?

16           MS. PARKS:    Objection.

17      A.    No.

18           MS. PARKS:    When you say the

19      August lien tape, are you referring to

20      Exhibit 19, I guess.

21           MR. MAYRON:    Yes.

22      Q.    Did you speak to anyone about the

23   lien tape reflected in Exhibit 19?

24      A.    I don't remember.

25      Q.    Did anyone ever tell you that it

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.   Court Records       Pg 1685 of 2230       Dennisse Baez
Hanratty                                                                 June 02, 2023

161

```
 1                    D. MENDEZ

 2    was provided or a copy of it was provided

 3    to Emigrant?

 4            MS. PARKS:  Objection.

 5        A.    Not that I remember.

 6        Q.    What happened to those 5,000

 7    liens?

 8            MS. PARKS:  Objection.

 9        A.    Assuming what the two reports

10    you're showing to me are MTAG reports with

11    all the information, I would have to look

12    and see if there was a sale of liens, if

13    there was a write-off of liens, if to begin

14    with the list that you show me is, in fact,

15    active liens as of that date.

16        Q.    As the director of servicing, you

17    would know if 5,000 liens were sold or

18    written off over a five-month period,

19    correct?

20            MS. PARKS:  Objection.

21            You can answer.

22        A.    Yes.

23        Q.    Were 5,000 liens sold or written

24    off in the second half of 2021?

25            MS. PARKS:  Objection.
```

Emigrant Business Credit vs Court Records    Pg 1686 of 2230
Hanratty

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Dennisse Baez
June 02, 2023

162

D. MENDEZ

2      You can answer.

3      A.      I would have to look and see what

4  we sold during that period and what was

5  written off.

6      Q.      So sitting here today, you can't

7  recall whether Ebury between sales and

8  write-offs got rid of 5,000 liens in the

9  second half of 2021?

10     A.      I cannot recall that.

11     Q.      Is that because it didn't happen?

12             MS. PARKS:  Objection to form.

13     A.      That's not what I'm saying.  I

14 would have to go see what we sold, what was

15 redeemed, what was foreclosed on to verify

16 what happened to those liens if, in fact,

17 those liens were active liens in August.

18     Q.      So in your view, it's possible

19 for 5,000 liens to have redeemed, within

20 written off or sold in the five-month

21 period in the second half of 2021 and you

22 wouldn't remember it?

23             MS. PARKS:  Objection to form.

24     A.      I don't remember every exact

25 transaction that we did.  I don't remember

163

D. MENDEZ

2  every redemption and I would have look at

3  our records and see what happens to those.

4  I do not know that from the top of my mind.

5      Q.    So the August lien tape had about

6  6,700 certificates on it listed, correct?

7      A.    That's what you showed me on the

8  report.

9      Q.    5,000 is a significant chunk of

10  the 6,700, correct?

11          MS. PARKS:  Objection.

12      A.    It is a significant chunk.

13      Q.    So even if you didn't keep track

14  of every lien that was sold or redeemed or

15  charged off, you don't think you'd notice

16  5,000 liens, which I think is about 80

17  percent of the portfolio disappearing over

18  five months?

19          MS. PARKS:  Objection.

20      A.    Yes.

21      Q.    Do you recall a cash inflow of

22  approximately 8 million in the second half

23  of 2021?

24      A.    No.  I would have to look at our

25  accounting records and bank records to see

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs Court Records   Pg 1688 of 2230   Dennisse Baez
Hanratty
June 02, 2023

164

D. MENDEZ

2  what we got in.

3      Q.    I'm going to share my screen

4  again and this is going to be Exhibit 19

5  which is the August active lien detail.

6          I want to direct your attention

7  to row 5671, which is a certificate for

8  3103 Southern Ave, apartment 39, and it has

9  a face value, if we go over to column Q of

10  $439.24.  Is that correct?

11      A.    I'm sorry, where are we looking

12  at?

13      Q.    Do you mind if I hide rows 1

14  through 5,670 so you can see the column

15  headers?

16      A.    I don't mind.  You can also do a

17  split at the top.

18      Q.    I'm not that fancy.

19      A.    Okay, no problem.  Hide whatever

20  you need to hide.

21      Q.    So I'll do -- so this is row

22  5,671, the property address is 3103

23  Southern Avenue, apartment 39, and the

24  tax -- the tax lien has a face value of

25  $439.24, is that correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1689 of 2230    Dennisse Baez
Hanratty                                          June 02, 2023

165

```
 1                  D. MENDEZ

 2        A.    Of how much, I'm sorry?

 3        Q.    This is -- this is cell Q-5671

 4   lists the tax as $439.24.

 5        A.    Okay.

 6        Q.    Or you can look at cell W-5671

 7   which also lists the principal of the

 8   certificate at $439.24, correct?

 9        A.    Uh-huh.

10        Q.    And let's continue to scroll

11   over, we see the ending balance including

12   fees.  This is cell AM-5671, is $5,610.

13        A.    Yes.

14        Q.    Now I'm going to go to Exhibit

15   20.  This is the spreadsheet that ends

16   in -- sorry, Exhibit 20, which ends in 0220

17   and I'm in the tab called Speedboat, row

18   139.

19        A.    That's a Speedboat lien.  That's

20   an in-house service lien then.

21        Q.    Let me make sure that it's being

22   showed properly.

23             MS. PARKS:  Austin, are you

24        pulling it up?

25             MR. MAYRON:  I'm pulling it up.
```

Emigrant Business Credit vs
Hanratty

Dennisse Baez
June 02, 2023

166

                    D. MENDEZ

1

2   BY MR. MAYRON:

3        Q.    I'm going to hide rows 2

4   through -- so now we're in the tab called

5   Speedboat.

6        A.    Uh-huh.

7        Q.    7139 and we have 3103 Southern

8   Avenue, apartment 339 and the face value of

9   the lien is $439.24.

10       A.    Yes.

11       Q.    Do you understand this to be the

12  same lien we were just looking at?

13       A.    Yes.

14       Q.    And I think as you said earlier,

15  this means that the lien was self-serviced?

16       A.    Yes.

17       Q.    And if we go to the column called

18  Fees and Subs, it says $209,000?

19       A.    Correct.

20       Q.    And the remaining lien payoff is

21  $210,000.

22       A.    Correct.

23       Q.    And so would you understand the

24  redemptive value of this lien is $210,000?

25       A.    Yes.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
                            Emigrant Business Credit vs Court Records   Pg 1691 of 2230   RECEIVED NYSCEF: 01/12/2024
                            Hanratty                                    Dennisse Baez
                                                                        June 02, 2023

```
 1                      D. MENDEZ

 2      Q.    Can you explain that to me?

 3      A.    What I'm thinking happened here,

 4   the report that you have from MTAG had all

 5   the self-service liens included in it, too.

 6   And as I talked to you previously, MTAG did

 7   complete the onboarding of the assets into

 8   their platform.  I don't recall exactly the

 9   date that that August report that you're

10   showing me seems to show that all the

11   self-service assets were shown on that

12   report from MTAG.

13           And when we told MTAG that they

14   didn't have to service those liens because

15   they completed the onboarding, even though

16   we asked them to stop, those liens were

17   shown on that report.

18      Q.    So going back to the August

19   report, the ending balance including fees

20   of this lien in August of 2021 is listed as

21   $5,610.

22           And then in December, the

23   remaining lien payoff, which I understand

24   to represent the same thing as listed as

25   $210,000 --
```

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs   Court Records    Pg 1692 of 2230    Dennisse Baez
Hanratty                                                         June 02, 2023

168

D. MENDEZ

1

2      A.     That's entirely possible and it

3   happens a lot with Maryland liens, you will

4   have that huge difference and it could

5   probably be because on the column that you

6   have fees and subs, in order for us to

7   complete the foreclosure process we have to

8   payout standing taxes, premiums and --

9   Maryland business is expensive to get the

10  deeds on.

11     Q.     You're referring to the bid

12  amount on the lien?

13     A.     Yes.

14     Q.     Does the property owner have to

15  pay the bid amount to obtain the deed?

16     A.     Yes.  So just looking at this,

17  just looking at report without having the

18  numbers right in front of me and seeing

19  what we said to go the deed, like you will

20  see that big difference.  It has to be

21  Maryland, the ones that you have shown that

22  huge difference, if we paid the subsequent

23  taxes and the premiums and the bid amount

24  between August and December.

25     Q.     To make sure I understand, this

169

                        D. MENDEZ

1

2    would be possible, this huge increase, if

3    Ebury paid the bid amount for this

4    certificate?

5            MS. PARKS:  Objection.

6            Go ahead.

7        A.    Yes.

8        Q.    If Ebury had paid the bid amount,

9    wouldn't it have received the deed?

10       A.    Yes, they take a bid and I think

11   in 3301 Southern, the address rings a bell,

12   I'm not sure if we already had the deed on

13   that one, the -- the other thing I could

14   think of, it should not be -- the only

15   other thing I could think of, for the

16   Maryland, at some point the premiums were

17   added into our system, but they were added

18   as non-redeemable, and that for some reason

19   some were not flagged as non-redeemable and

20   they're showing in the remaining link

21   payoff but I have to look at each

22   individual case.

23       Q.    So if Ebury had not paid the bid

24   amount, this remaining lien payoff number

25   would not be the correct redemptive value

Emigrant Business Credit vs. Court Records    Pg 1694 of 2230    Dennisse Baez
Hanratty    June 02, 2023

170

                    D. MENDEZ

1    of the lien, correct?

2              MS. PARKS:  Objection to form.

3              You can answer.  Go ahead,

4         Dennisse.  Sorry.

5         A.    That's correct.

6         Q.    Just to make sure the record is

7    clear, I'm going to pull up the document

8    that has been marked as Mendez Deposition

9    Exhibit 20 and I'm going to go to the tab

10   called Speedboat.  I'm going to row 139,

11   which is the certificate for 3103 Southern

12   Avenue, apartment 39 and the fifth column

13   called Remaining Lien Payoff, which is cell

14   I-139, it lists the remaining lien payoff

15   as $210,350.037, correct?

16        A.    Uh-huh.

17        Q.    And the same lien in the August

18   lien tape, which was marked EBCC-27564, had

19   a -- it had a -- so this is row 3,162, cell

20   AM-3162.  It had an ending balance,

21   including fees of only $5,610, correct?

22        A.    I cannot see if that's the same

23   line.  I'm sorry.

24        Q.    Yeah, it's --

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO.       24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
                      Emigrant Business Credit vs    Court Records    Pg 1695 of 2230    Dennisse Baez
                      Hanratty                                                           June 02, 2023

171

1                      D. MENDEZ

2        A.    Yes, it does.

3        Q.    And so you're saying the reason

4    the redemptive value of the lien could have

5    increased from $5,610 to $210,350 is if

6    Ebury paid the bid amount for the lien?

7        A.    Yes, or mistakenly did not flag

8    it as non-redeemable in the system when the

9    bid amount or premium amount was added.

10       Q.    And then the amount in -- back to

11   the lien tape from December, this is Mendez

12   Deposition Exhibit 20 -- the amount that's

13   listed as the remaining lien payoff is

14   listed as the redemptive value of the

15   certificate on 3103 Southern Avenue.

16            MS. PARKS:  Objection to form.

17            You can answer.

18       A.    I'm sorry, can you repeat the

19   question?

20       Q.    Yeah.

21            In Mendez Deposition Exhibit 20,

22   this is cell I-139, it lists the redemptive

23   value certificate on 3103 Southern Avenue

24   as $210,350 -- or $210,350, correct?

25       A.    That's correct.

172

D. MENDEZ

1

2      Q.    And it uses that number to come

3    up with a total RV, redemptive value, of

4    the portfolio of $19 million?

5           MS. PARKS:  Object to the form.

6           Go ahead.

7      A.    If that's a payment table adding

8    what you have there or -- where is that

9    pulling it from, the Combined tab?

10      Q.    Go to Design at the top.  I'm

11    sorry, Analyze, go to Analyze.  Change Data

12    Source, in the middle, Data.

13           So it's coming from Combined --

14      A.    It is coming from the Combined.

15    Or the tab that you were showing me before

16    was the Combined, too, and the Combined has

17    2910.

18      Q.    No, I was showing you the

19    Speedboat.  So let's go to the Combined

20    tab.

21           So now I'm in the Combined tab

22    and this is row 139 and we see, again, 3103

23    Southern Avenue, apartment 39, and we see a

24    remaining lien payoff of $210,000, correct?

25      A.    Yeah.  So it seems like the pivot

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. ... 24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs Court Records    Pg 1697 of 2230    Dennisse Baez
Hanratty    June 02, 2023

173

D. MENDEZ

2  table summary is adding the 210 in the

3  value.

4      Q.    And that would be incorrect if

5  Ebury had not paid the bid amount for that

6  lien?

7      A.    That's correct.

8      Q.    And do you know if Ebury paid

9  approximately $3 million in bid amounts for

10  Maryland liens between August and December

11  of 2021?

12          MS. PARKS:  Objection to form.

13          You can answer.

14      A.    I don't know from the top of my

15  mind.

16      Q.    Now I want to show you another

17  spreadsheet you labeled -- or actually --

18  yes, another spreadsheet.  This one is

19  labeled EBCC-11877.

20          MR. MAYRON:  And could the court

21      reporter, please, mark it as are

22      Mendez Deposition Exhibit 21.

23          (Mendez Exhibit 21, QuickBooks

24      report, Bates EBCC-11877, remotely

25      introduced and provided electronically

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1698 of 2230    Dennisse Baez
Hanratty    June 02, 2023

174

D. MENDEZ

1

2          to the reporter.)

3          A.    Okay.

4          Q.    I'll share it up on screen.

5                Do you know what this document

6     is?

7          A.    This looks like a QuickBooks

8     report.

9          Q.    What is a QuickBooks report?

10         A.    It looks like a report that was

11    obtained from our accounting system.

12         Q.    Okay.  And in cell A6, it says

13    cap 0698.  That's one of the bank accounts

14    for Ebury Fund I, correct?

15         A.    That's correct.

16         Q.    I'm going to adjust the columns

17    just so that we can see more and I'm going

18    to go to row -- I'm going to go to row

19    1491.

20                So if we look at rows 149 -- 1

21    through 1495, these are transactions that

22    took place on November 9, 2018, correct?

23         A.    Yes.

24         Q.    And in row 1494, there's an entry

25    and the memo is new Emigrant loan, correct?

175

                          D. MENDEZ

1

2        A.    Yes.

3        Q.    And then in cell I-1494, it says

4    $220,000.

5              So do you understand that to be

6    an advance from Emigrant of $220,000?

7              MS. PARKS:  Objection.

8              You can answer.

9        A.    From the description, it appears

10   to be so.

11       Q.    Okay.  On -- so it looks like

12   there are five transactions on November 9,

13   2018, correct?

14       A.    On that account, it seems so.

15       Q.    Is any of these -- does any of

16   these transactions -- is any of these

17   transactions a purchase of tax liens for

18   more than $100,000 -- actually, let me

19   rephrase that, I'm sorry.

20             Is any of these a purchase of tax

21   liens or payment of premiums for

22   $236,432.78?

23       A.    I'm sorry, can you repeat that?

24       Q.    Is any of the transactions listed

25   for November 9, 2018 a purchase of tax

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 62    24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs. Court Records    Pg 1700 of 2230    Dennisse Baez
Hanratty    June 02, 2023

176

D. MENDEZ

2  liens where the acquisition of -- or the

3  payment of premiums for $236,432.78?

4           MS. PARKS:  Objection to form.

5           You can answer.

6     A.    I cannot say that from the

7  description of those transactions in there.

8     Q.    So at row 1491, the memo is

9  investor withdrew Tiffany Egan.  And in

10  cell I-1491, it shows a disbursement of

11  $288,810.  Correct?

12    A.    Correct.

13    Q.    So this means that on November 9,

14  2018, Ebury made a distribution to an

15  investor of almost $300,000?

16           MS. PARKS:  Objection to form.

17           You can answer.

18    A.    From the accounting records

19  you're showing me, it shows like yes.

20    Q.    And then let me -- so column I is

21  the amount, column J is the balance.  So

22  going back down are, if you see the balance

23  after the transaction in row 1491, the

24  distribution to Tiffany Egan, is negative.

25  But the ending balance at the end of

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. [illegible]    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs    Court Records    Pg 1701 of 2230    Dennisse Baez
Hanratty    June 02, 2023

177

D. MENDEZ

1

2  November 9, 2018 is positive, correct?

3      A.    Correct.

4      Q.    Do you interpret this to mean

5  that without the new Emigrant loan in row

6  1494 that Ebury could not have made the

7  distribution in row 1491?

8          MS. PARKS:  Objection to form.

9          You can answer.

10     A.    Well, I cannot say that just from

11  looking at the 0698 account.  I would have

12  to look at all the other bank accounts.

13     Q.    So looking at just this account,

14  was the 220,000 from the Emigrant loan used

15  to pay a disbursement to Tiffany Egan?

16         MS. PARKS:  Objection to form.

17         You can answer.

18     A.    If you're looking at just this

19  account without verifying if the other

20  accounts for that group had cash, it's what

21  it shows.  But I cannot say that with

22  certainty without looking at the other bank

23  account and seeing what kind of cash was

24  there.

25     Q.    Just to confirm my understanding

178

                    D. MENDEZ

1

2   of column J, without the $220,000 advance

3   from Emigrant, there would have been a

4   negative value in the account, correct?

5       A.    Yes, that's correct.

6       Q.    So without that advance, Ebury

7   would not have been able to pay the

8   disbursement to Tiffany Egan from that

9   account?

10          MS. PARKS:   Objection.

11          You can answer.

12      A.    From that account only, the

13  answer is yes.  But I cannot say yes

14  definitely without looking at the other

15  bank accounts for the fund to see if there

16  was other cash that could have been

17  transferred to this account.

18      Q.    Did Mr. Hanratty ever tell you

19  that he used an advancement from Emigrant

20  to pay off the investor Tiffany Egan?

21      A.    No.  I don't remember him saying

22  that to me.

23      Q.    If you go to row 1732.  So we're

24  now looking at May 17, 2019.  There are

25  five transactions listed on May 17, 2019,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO. INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs
Hanratty
Court Records    Pg 1703 of 2230    Dennisse Baez
June 02, 2023

179

D. MENDEZ

2  correct?

3      A.    I'm sorry, again?

4      Q.    There are five transactions

5  listed on May 17, 2019, correct?

6      A.    Yes.

7      Q.    And in row 1729, this is column

8  I, it list as new loan of $860,000,

9  correct?

10      A.    Yes.

11          MS. PARKS:  Sorry, Austin, which

12      cell are you looking at -- oh, I see

13      it, I see it, go ahead.

14  BY MR. MAYRON:

15      Q.    We see a new loan.  Are and then

16  in row 1732, we see settlement with the

17  investor for $1.2 million, correct?

18      A.    Correct.

19      Q.    And the only two cash -- sorry.

20          There were three cash outflows on

21  May 17, 2019 from this account, one for

22  $3,000, one for $2,700 and then one for

23  $1.2 million.  Correct?

24      A.    Correct.

25      Q.    So Ebury did not purchase tax

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

INDEX NO. 158207/2022

NYSCEF DOC. NO.

Emigrant Business Credit vs
Hanratty

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1704 of 2230

RECEIVED NYSCEF: 01/12/2024
Dennisse Baez
June 02, 2023

180

D. MENDEZ

2  liens worth more than $3,000 -- strike

3  that.

4          Ebury did not make a purchase

5  greater than $10,000 of tax liens from this

6  account on May 17th, correct?

7          MS. PARKS:  Objection to form.

8          You can answer.

9      A.    From the cash outflows from this

10  account and the description of those

11  transactions on those days, no.

12      Q.    And as we discussed with the

13  earlier example, based on the balance in

14  the account, Ebury used the cash from the

15  new loan on 1729 to pay the disbursement to

16  the investor that's listed on row 1732,

17  correct?

18          MS. PARKS:  Objection.

19          You can answer.

20      A.    Again, as with the previous one,

21  looking at just this account, without

22  looking at the other bank accounts for the

23  fund had cash, yes.

24      Q.    Okay.  My question is based on

25  the balance and the transaction report,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                                                                          Dennisse Baez
Emigrant Business Credit vs Court Records    Pg 1705 of 2230
Hanratty                                                                  June 02, 2023

181

D. MENDEZ

1

2    Ebury used the cash from the advance to pay

3    the distribution, correct?

4         MS. PARKS:  Objection to form.

5         You can answer.

6    A.    Looking at just this transactions

7    on this bank account, it seems like it, but

8    I cannot say definitely yes if I am not

9    looking at the other accounts to see what

10   movement was there.  I cannot see if there

11   was a purchase that it's reflected as a

12   partner contribution and I'm not seeing it

13   there, because it's not --

14   Q.    So in row 1730 there is an entry

15   called transfer.

16   A.    Uh-huh.

17   Q.    Do you understand that if there

18   was a transfer from another bank account

19   into this bank account, it would show up in

20   this transaction report?

21   A.    If there was a transfer from one

22   of our accounts to another, it should be

23   reflected here, if it was deposited into in

24   account.

25   Q.    And, in fact, in row 1730, we see

182

1              D. MENDEZ

2    a transfer of $350,000, correct?

3        A.    Yes.

4        Q.    But then based on all of the

5    transactions on May 17, 2019, this document

6    shows that Ebury used the $860,000 cash

7    from Emigrant to pay a $1.2 million

8    distribution to an investor.

9              MS. PARKS:  Objection to form.

10             You can answer.

11       A.    Where it says new loan, you're

12   telling me it's an Emigrant.  I haven't

13   looked at the detail.  I just see there new

14   loan.

15             So from this, I don't know if

16   those funds are Emigrant's.

17       Q.    Okay.

18       A.    And just by looking at this

19   account, without looking at everything

20   else, yes, the funds that are shown as new

21   loan appear to be used to the settlement

22   with the investor of 1.2, but I don't know

23   if there was additional cash in the other

24   accounts and it was just not transferred

25   completely.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 1707 of 2230   Dennisse Baez
Hanratty                                                        June 02, 2023

183

D. MENDEZ

1

2    Q.    So if the other cash wasn't

3    transferred, that would mean the cash

4    that's designated as new loan is the cash

5    that was used to pay the distribution?

6         MS. PARKS:  Objection.

7         You can answer.

8    A.    Well, if there is other cash in

9    other bank accounts and it was the other

10   bank accounts that were used to pay the

11   subs or to buy the liens or -- which I

12   don't know because I will have to look at

13   the transactions -- then the answer is no

14   because there was cash in the other

15   accounts.

16        So it was, instead of moving all

17   the funds into this account, there were

18   already funds there that were used to pay

19   the investor.  But I don't know the answer

20   to that unless I look at everything else

21   and see what was the cash available for the

22   company at the time, you know, of the

23   accounts.

24   Q.    Just so we're on the same page,

25   what you're saying is that Ebury may have

184

```
 1                    D. MENDEZ

 2   used cash in another account to purchase

 3   liens, but that it used the cash from

 4   Emigrant in this account to pay a

 5   distribution?

 6              MS. PARKS:  Objection.

 7       A.    From the account movement that

 8   you're showing me, yes.

 9              MR. MAYRON:  Okay.  Let's look at

10        one more of these.  I'm going to share

11        a document with you with Bates No.

12        EBCC-11878, which if the court

13        reporter could, please, mark as Mendez

14        Deposition Exhibit 22.

15              (Mendez Exhibit 22, QuickBooks

16        report, Bates EBCC-11878, remotely

17        introduced and provided electronically

18        to the reporter.)

19   BY MR. MAYRON:

20       Q.    I'm going to share it on the

21   screen.

22              Do you know what this is?

23       A.    This looks like a QuickBooks

24   report, an accounting report from our

25   accounting system for account ending in
```

185

1          D. MENDEZ

2    0744.

3          Q.    And let's go to rows 641 to 642.

4    So now this is September 20, 2019.  Also,

5    let's look at the transactions from the

6    prior week as well.

7               So row 641, it says Beth

8    Leventhal withdraw, $71,000.  And row 642

9    says Ira Leventhal withdraw $678,000.

10   Correct?

11         A.    Uh-huh.

12         Q.    Row 637 -- I apologize.  Row 638

13   says new loan $850,000.  Correct?

14         A.    Correct.

15         Q.    And to confirm, do you see -- let

16   me scroll a little -- for any of the

17   transactions in September, do you see the

18   purchase of $1.2 million in new tax liens?

19              MS. PARKS:  Objection to form.

20              You can answer.

21         A.    September of 2019?

22         Q.    Yes.

23         A.    Not in this account movement, but

24   I think it was September of 2019 when we

25   bought the PROCAP II portfolio, and I don't

186

```
 1               D. MENDEZ

 2    see that transaction here in this bank

 3    account.

 4         Q.    Do you know which bank account

 5    was used for the PROCAP II transaction?

 6         A.    This is September of 2019.  No.

 7    But for some reason, maybe I'm wrong, but

 8    for some reason I have September 2019 like

 9    in my head for the PROCAP II portfolio

10    purchase.

11         Q.    So as with the two previous ones

12    we've discussed, Ebury used at least a part

13    of the $850,000 it was loaned to pay the

14    distributions to Beth and Ira Leventhal,

15    correct?

16              MS. PARKS:  Objection.

17              You can answer.

18         A.    Again, looking at just this, is

19    that I see the full sale transaction to

20    auction for 600 in September and it was

21    transferred to other account, at least a

22    portion of it.

23              So again, I would have to look at

24    the other bank accounts for the same month

25    and see what happened with the cash in the
```

187

                        D. MENDEZ

1

2    other bank accounts for the same month to

3    say definitely yes that the funds from that

4    section flagged as new loan were used to

5    pay the Leventhal people.

6         Q.    Even if there were funds in other

7    bank accounts that were used, for instance,

8    to purchase liens, the cash that was

9    deposited to this account was used to pay

10   this distribution, correct?

11              MS. PARKS:  Objection.

12              You can answer.

13        A.    Yes.  The cash deposited in this

14   account, it was used to -- from this

15   account movement, a portion of it was used

16   to pay the Leventhals.

17        Q.    Okay.  Thank you.

18              MS. PARKS:  Austin, I don't know

19         if this is a good time, but maybe a

20         brief comfort break in the near

21         future.

22              MR. MAYRON:  Yeah, why don't we

23         take a five-minute break or however

24         long the court reporter --

25              MS. PARKS:  Okay.  Is five

188

```
 1              D. MENDEZ

 2      minutes okay with you guys?

 3              THE WITNESS:  Yes.

 4              MS. PARKS:  Thank you.

 5              THE VIDEOGRAPHER:  The time is

 6      2:35 p.m.  We are now off the record.

 7              (Recess taken from 2:35 p.m. to

 8      2:40 p.m.)

 9              THE VIDEOGRAPHER:  The time is

10      2:40 p.m.  We are now back on the

11      record.

12  BY MR. MAYRON:

13      Q.    During the break, did you speak

14  to anyone about the substance of your

15  testimony?

16      A.    No, just about stretching.

17      Q.    Who at the company would know if

18  Emigrant's money was used to pay

19  distributions to advances?

20              MS. PARKS:  Sorry, Austin, by

21      "the company," you mean?

22  BY MR. MAYRON:

23      Q.    Who at Ebury would know if

24  advances from Emigrant were used to pay

25  distributions to investors?
```

INDEX NO. 158207/2022

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs    Court Records    Pg 1713 of 2230    Dennisse Baez
Hanratty                                                            June 02, 2023

189

```
 1                    D. MENDEZ

 2        A.     John Hanratty.

 3        Q.     Anyone else?

 4        A.     The only other person that I can

 5   think of, it could be me if I was notified

 6   of anything.

 7        Q.     Do you know if advances from

 8   Emigrant were used to pay distributions to

 9   investors?

10             MS. PARKS:  Objection.

11             Go ahead.

12        A.     I don't have a recollection of

13   being informed of that.

14        Q.     Would you be surprised if

15   advances from Emigrant were used to pay

16   distributions to investors?

17             MS. PARKS:  Objection to form.

18             You can answer.

19        A.     Well, I was not involved in the

20   accounting or disbursements at the time, so

21   everything will be a surprise to me because

22   I didn't know.  Because I was never looking

23   at the accounting records, not until like

24   more recently.

25        Q.     What did you look at more
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                         RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1714 of 2230    Dennisse Baez
Hanratty                                                June 02, 2023

190

D. MENDEZ

1    recently?

2        A.    In terms of the accounting

3    records because since we had to change

4    accountants or we had accountant turnover

5    really badly, then I had to start trying to

6    get involved what was going on, where one

7    left, where the other one will take over,

8    and so on and so on.  But I was not -- I

9    was not the person looking at the

10   financials or looking at the accounting

11   records.

12        MS. PARKS:  Did you say back then

13        you weren't, Dennisse?  I just

14        didn't --

15        THE WITNESS:  Yes, back in 2018,

16        2019, up to the point that Ping left

17        in 2020.

18        MS. PARKS:  Thanks.  I just

19        didn't hear you.

20        MR. MAYRON:  So I'm going to

21        share with you a document labeled

22        EBURY-666.

23        THE WITNESS:  Oh God.

24        MR. MAYRON:  Would the court

191

1           D. MENDEZ

2       reporter, please, mark it as Mendez

3       Deposition Exhibit 23.

4               (Mendez Exhibit 23, E-mail, Bates

5       EBURY-666, remotely introduced and

6       provided electronically to the

7       reporter.)

8   BY MR. MAYRON:

9       Q.    At the bottom of the first page,

10  it's an e-mail from you to Marcos Colón

11  Cuebas and you mentioned switching

12  auditors, tax preparers from Richey May to

13  Colón Cuebas & Lagos?

14      A.    Laguna.

15      Q.    Laguna?

16      A.    Uh-huh.

17      Q.    Why did you change auditors?

18      A.    As I stated on this e-mail, we

19  change auditors because Richey May fired

20  us.  Richey May inform us that they had a

21  policy of -- that they will not take

22  clients that were two years or more behind

23  in their audits.  So even though they

24  started a 2019 audit, they kicked us, they

25  fired us.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                           RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1716 of 2230    Dennisse Baez
Hanratty                                                       June 02, 2023

192

1                    D. MENDEZ

2       Q.    Why was Ebury two years behind on

3    its audits?

4       A.    The audits were originally been

5    handled by Ping Xie.  Ping left in January

6    of 2020, which would have been around the

7    time of those first months of the year that

8    the 2019 audit would have started, or at

9    least the information would have been

10   started gathering.

11          When Ping left, we had an

12   accountant here, but she was just more of a

13   junior accountant.  So she didn't know the

14   entire accounting cycle.

15          When -- 2020 was a bad year for

16   us.  In 2020, in January, the island was

17   hit by earthquakes that really destroyed

18   part of the south side of the island and

19   affected the metro area.  So in January we

20   were closed for a little bit.  And then in

21   March we were hit by COVID.

22          So trying to hire someone after

23   Ping left to do the accounting -- to be the

24   controller of the company, it took us

25   almost six months until we finally were

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj
Emigrant Business Credit vs
Hanratty
Court Records   Pg 1717 of 2230
Dennisse Baez
June 02, 2023

193

D. MENDEZ

1    able to get someone, which was Ismael, and

2    he started as a contractor, then he became

3    an employee.

4            When Ismael started, he -- it was

5    mid 2020 and he started to learn the

6    business.  Ismael had no previous

7    accounting experience with tax liens

8    industry.  And I don't think anyone in

9    Puerto Rico or -- it was just a handful

10   that knew about tax liens because that's

11   not a business that we have in PR, I mean

12   in Puerto Rico.

13           So while he was learning the

14   process, the accounting and everything and

15   he started to get into our accounting

16   records, he found out that even though Ping

17   left in January of 2020, he had only closed

18   books until June of 2019.

19      Q.   Did anyone ever complain to you

20   about Mr. Xie's job performance?

21      A.   I complain about him and some of

22   the servicing team complained about him.

23      Q.   What did you complain about?

24      A.   That he was not very cooperative,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO.   24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.   Court Records   Pg 1718 of 2230   Dennisse Baez

Hanratty   June 02, 2023

194

1               D. MENDEZ

2    he was very, I think combative with

3    everyone.  Both of the work was being done

4    by a junior accountant that he had, was his

5    assistant, which I don't think he was

6    supervising his work.  Things along those

7    lines.

8         Q.    Was Mr. Xie good at his job?

9         A.    From what we've seen after he

10   left, it seemed like he was not -- or he

11   was not very good at communicating stuff.

12   I think there was a language barrier there,

13   too, so...

14              MR. MAYRON:  I'm going to share a

15         document with you labeled EBURY-35508.

16              Could the court reporter, please,

17         mark it as Mendez Deposition Exhibit

18         24.

19              (Mendez Exhibit 24, E-mail, Bates

20         EBURY-35508, remotely introduced and

21         provided electronically to the

22         reporter.)

23         A.    I knew this was the e-mail that

24   you were going to show me.  I'm sorry.  I'm

25   sorry, I knew this was e-mail that was

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs Court Records Pg 1719 of 2230 Dennisse Baez
Hanratty June 02, 2023

D. MENDEZ

1

2   coming.

3       Q.    How did you know this is the

4   e-mail that was coming?

5       A.    Because that e-mail was epic.

6   I'm sorry.

7       Q.    So can you tell me about this

8   e-mail?

9       A.    Yes.  So I was asking him -- let

10  me see if this is the one.

11          MS. PARKS:  Yeah, double-check

12      first if this is the epic --

13          THE WITNESS:  Yeah, let me go

14      through it.  Is this about the

15      interest rate?  Yes, this is the

16      e-mail about the interest rate.

17  BY MR. MAYRON:

18      Q.    So why was this e-mail memorable?

19          MS. PARKS:  Object to the form,

20      but go right ahead.

21      A.    Yeah, I'm not going to go through

22  e-mail because I remember this situation

23  very clearly in my mind.  Because he cited

24  me the code of conduct like I was moron and

25  I wanted just to -- I'm sorry for my

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1720 of 2230    Dennisse Baez
Hanratty    June 02, 2023

196

D. MENDEZ

1

2    language, but -- when we started servicing

3    the Ohio portfolio, we were not very clear

4    in terms of the -- on how to calculate the

5    interest on Ohio liens.

6            So we call on Ohio attorney that

7    she -- I think it was Maureen Zink.  I

8    think I even put it in my e-mail -- I think

9    it was he.  I called her and I had a call

10   -- I think John was on that call, too, John

11   Hanratty, and we started asking the process

12   on how was the interest on the liens been

13   calculated and how we were supposed to do

14   the calculations so we knew how to do --

15   how to tell our programmer and to do the

16   onboarding on the system on how to

17   calculate interest on Ohio liens.

18            So after the conversation, I

19   think on this e-mail James sends -- Babogen

20   sends to Ping the calculation, and he comes

21   back and says this calculation is wrong,

22   you're calculating this wrong.  And I go

23   back to him and say, no, this is the way

24   that the attorneys told us to calculate it.

25            And it's just not me, that

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Doc #3 State
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 1721 of 2230
Hanratty
Dennisse Baez
June 02, 2023

197

                        D. MENDEZ

1
2    English is not my first language and I
3    understood someone incorrectly.  It was not
4    me the only person on that call.  So this
5    is how we discuss with the attorneys that
6    we should be calculating the interest.
7            And then he came back, if I'm not
8    mistaken, with like a print screen or
9    something or something that he has read
10   somewhere else.  And I -- let me go to the
11   e-mail --
12       Q.    Yeah, it's on page 3.  So
13   ultimately, he says to you, and this is the
14   top of page 3, he say:  I will not report
15   any interest until it is the calculation on
16   VADAR and you would have to provide the
17   support for Ohio interest calculation for
18   auditor.
19           Correct?
20       A.    Yes.
21       Q.    And then --
22       A.    And I think he wanted a legal
23   memo.  I think at some point in that e-mail
24   exchange he wanted a legal memo.
25       Q.    And then you respond to him and

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs
Hanratty
Court Records    Pg 1722 of 2230
Dennisse Baez
June 02, 2023

198

                    D. MENDEZ

1    said:  No problem.  Please let JH -- Mr.

2    Hanratty -- know so he knows the financials

3    are understated.

4            Right?

5        A.    Uh-huh.

6        Q.    Mr. Xie responds:  I will let him

7    know.  As a CPA, I can't book anything

8    without support and I must tell the auditor

9    about it, too.

10           Correct?

11       A.    Uh-huh.

12       Q.    And you respond I'm a CPA, too,

13   and I was an auditor.  And then he

14   responds:  Well, then we all know the CPA

15   code of conduct and last statement must be

16   made to the auditors.  I am just following

17   the code of conduct that need support for

18   the accounting entries.  Right?

19       A.    Uh-huh.

20       Q.    And so how did you react when

21   Ping sent this e-mail?

22       A.    I think I started laughing.

23           MS. PARKS:  When you ask how did

24       she react, you mean what she typed or

199

D. MENDEZ

 2    what she was thinking outside the

 3    document?

 4  BY MR. MAYRON:

 5    Q.    Did you understand Ping to be

 6  insinuating you were violating the code of

 7  conduct or asking him to violate the code

 8  of conduct?

 9    A.    I would never ask anyone to

10  violate the code of conduct.  He was saying

11  I was violating it because he wanted me to

12  obtain a legal memo when I had already had

13  a conversation that we could have

14  documented from the date and everything

15  that we had discussed so he could book it

16  accordingly.

17    MR. MAYRON:  I'm going to share

18    with you a document labeled

19    EBURY-54761.

20    Could the court reporter, please,

21    mark this as Mendez Deposition Exhibit

22    25.

23    This is a July 17, 2020 e-mail

24    from Mr. Hanratty to Mr. Sawey at

25    Richey May.  You're copied.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 142    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1724 of 2230    Dennisse Baez
Hanratty    June 02, 2023

200

```
 1              D. MENDEZ

 2              (Mendez Exhibit 25, E-mail, Bates

 3         EBURY-54761, remotely introduced and

 4         provided electronically to the

 5         reporter.)

 6         Q.    And Mr. Hanratty said:  We had

 7    some failure to launch hires that have

 8    impacted us.

 9              Do you know who he's referring

10    to?

11         A.    I'm sorry, I'm sorry, go ahead

12    again?

13         Q.    Mr. Hanratty says:  We had some

14    failure to launch hires that have impacted

15    us.

16              Do you know what he's referring

17    to?

18              MS. PARKS:  Sorry, Austin, where

19         are you looking?  I just had trouble

20         downloading it.  Which page are you

21         on?

22              MR. MAYRON:  The very top.

23              MS. PARKS:  Okay, thank you.  I

24         see it.  Okay, thanks.

25         A.    The first page, and it was on
```

201

                    D. MENDEZ

1    July 17th.  The hires that we were having

2    big failures hiring, it was accounting

3    team, to have an accounting group that we

4    could finish the accounting records so we

5    could finish the audit.

6        Q.    This wasn't a reference to

7    Mr. Xie?

8        A.    Mr. Xie was no longer with us at

9    the time.

10       Q.    So you understood this to refer

11   to accounting employees that were hired

12   after Mr. Xie departed?

13       A.    We were having trouble hiring

14   after Mr. Xie had departed.  So that's what

15   this e-mail is referencing to.

16       Q.    Did Ebury hire replacements that

17   didn't work out?

18           MS. PARKS:  Objection.

19           Go ahead, Dennisse.

20       A.    Well, we hired Ismael and he

21   left, too, and he left us in the middle of

22   the audit.  So that didn't work out.

23       Q.    When did Mr. Rodriguez leave?

24   Was it before July 2020?

202

                              D. MENDEZ

1

2        A.    No, no, that's when he started.

3        Q.    So what do you understand --

4        A.    He started around that time,

5    around mid -- I have to verify, but it

6    was -- I think it was between -- it was

7    somewhere around June of 2020 that we hired

8    him.

9        Q.    So who did Ebury hire who failed

10   to launch?

11            MS. PARKS:  Objection to form.

12            You can answer.

13       A.    What I understand from this is we

14   had some failure to launch hires.  It's we

15   had trouble hiring new people to onboarding

16   them quickly enough to be able to turn

17   around the audit.  That's how I read that

18   e-mail, I'm sorry.

19            MR. MAYRON:  Okay.  I'm going to

20       share with you a document labeled

21       EBURY-59638.

22            Could the court reporter, please,

23       mark it as Mendez Deposition Exhibit

24       26.

25            (Mendez Exhibit 26, E-mail chain,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
Emigrant Business Credit vs.    Court Records    Pg 1727 of 2230    Dennisse Baez
Hanratty    June 02, 2023

203

D. MENDEZ

1

2          Bates EBURY-59638, remotely introduced

3          and provided electronically to the

4          reporter.)

5    BY MR. MAYRON:

6          Q.    And I'm just going to refer to

7    the very top e-mail.  This is an April 22,

8    2019 e-mail from Mr. Hanratty to you.

9              And Mr. Hanratty says LienLog --

10   and I'll paraphrase -- messed up the whole

11   thing.  At least I get to blame that

12   shithead in your office.

13             Who is that shithead in your

14   office?

15             MS. PARKS:  And Dennisse, scroll

16        down if you need to figure out.

17        A.    Let me scroll down because that

18   was April of 2019.

19             Honestly, I don't know if at the

20   time -- he's referring to LienLog, messing

21   the whole thing up.

22        Q.    How many people worked in your

23   office around April 2019?

24        A.    April 2019, that was before my

25   first maternity leave.  I was at the BCMG

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1728 of 2230    Dennisse Baez
Hanratty    June 02, 2023

204

                        D. MENDEZ

1

2    office.  So it could be Mr. McCosker

3    because he's referring to LienLog and

4    LienLog was not moving forward because of

5    all the issues on the BCMG side.

6            But, I mean, that was 2019.  To

7    tell you exactly who it was referring to, I

8    don't remember.  From the e-mail, it seems

9    like he's referring to Tom McCosker because

10   he's mentioning LienLog on the same

11   sentence.  Back then, in the office, it was

12   from Ebury was John, and I was not Ebury at

13   the time.  I was a BCMG employee.  I was

14   doing work for John, but -- and the other

15   people that were in that office had nothing

16   to do with Ebury.

17       Q.    Okay.

18       A.    Because at the time -- no, there

19   was -- there was no New York office at the

20   time either, I think.  2019, I'm sorry,

21   2019 -- yeah, I think we closed that office

22   in February.

23            So either it was either Mr. Tom

24   McCosker, or honestly, I don't know who he

25   was referencing to.  And I'm saying that

205

1              D. MENDEZ

2     because of the LienLog sentence.

3              MR. MAYRON:  Okay.  I'm going to

4        share another document with you,

5        EBCC-10586.

6              Could the court reporter mark it

7        as Mendez Deposition Exhibit 27.

8              (Mendez Exhibit 27, Audited

9        financial statements from Richey May

10       for the year-ended 12/31/18, Bates

11       EBCC-10586, remotely introduced and

12       provided electronically to the

13       reporter.)

14       A.    Is it already there?

15       Q.    Not yet, no.

16       A.    Okay.  I just wanted to make sure

17    there was nothing wrong on my end.

18       Q.    Okay.

19             MS. PARKS:  Ending in 586?

20             MR. MAYRON:  Yes.

21       A.    I see it now.

22       Q.    So this is the audited financial

23    statements from Richey May for the

24    year-ended December 31, 2018.

25       A.    Okay.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. ...    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Hanratty                                       Court Records    Pg 1730 of 2230    Dennisse Baez
                                                                                  June 02, 2023

206

D. MENDEZ

1

2     Q.    And if we go to page 26, and I'll

3   share it on the screen, it lists for Ebury

4   Fund I LP and subsidiaries, the

5   consolidated statement of changes in

6   partner capital.  Then we see capital

7   withdraws by the limited partners of $9.1

8   million, correct?

9     A.    Uh-huh.

10     Q.    So this means Ebury paid $9.1

11  million in distributions from Fund I in

12  2018?

13     A.    That's what it seems here.

14     Q.    And if we go to page 47.

15         MS. PARKS:  47 you said?

16         MR. MAYRON:  Yep.

17  BY MR. MAYRON:

18     Q.    We see for Ebury Fund II and

19  subsidiaries, $6.6 million in capital

20  withdraws in 2018, is that correct?

21     A.    Yes.

22     Q.    Were you aware that Ebury had

23  paid approximately $16 million in

24  distributions to partners in 2018?

25         MS. PARKS:  Object to the form.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 74    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1731 of 2230    Dennisse Baez
Hanratty    June 02, 2023

207

```
 1                    D. MENDEZ

 2          You can answer.

 3     A.    No, I wasn't aware back in

 4   2018-'19, I didn't have anything to do with

 5   the accounting records.

 6     Q.    Since 2018, did you become aware

 7   that Ebury paid out distributions to

 8   investors in 2018?

 9     A.    Yes.

10     Q.    When did you become aware of

11   that?

12     A.    I don't know the exact date, but

13   it has to be around when we started working

14   the 2019 audit because I had to get

15   involved with the financials.

16     Q.    Do you know if Ebury was allowed

17   to pay close to $15 million in

18   distributions to investors?

19          MS. PARKS:  Object to the form.

20          Go ahead.

21     A.    If Ebury was allowed, I mean --

22   can you ask the question again because I'm

23   not sure I'm following your question?

24     Q.    Under the terms of Ebury's

25   agreement with Emigrant, was Ebury allowed
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs Court Records   Pg 1732 of 2230   Dennisse Baez
Hanratty                                                      June 02, 2023

208

                    D. MENDEZ

1

2   to pay $15 million in distributions to its

3   partners in 2018?

4       A.    I don't know because I haven't

5   read it.  So I don't know the answer to

6   that.

7       Q.    Have you ever spoken with anyone

8   about these distributions?

9           MS. PARKS:  Objection to form.

10          You can answer.

11      A.    Talk about the distributions?

12  Yes, I definitely have done so because I

13  talked to auditors and because at some

14  point I was gathering information on the

15  distributions that were paid to have like a

16  detail of everything that was paid at some

17  point.

18      Q.    Did you speak with Mr. Hanratty

19  about these distributions ever?

20          MS. PARKS:  Objection to form.

21          You can answer.

22      A.    Yeah, Mr. Hanratty asked for the

23  detail.  So I had to provide the detail to

24  him.

25      Q.    Did he ever tell that you he was

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022

NYSCEF DOC. NO.     24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State     01/12/2024
                    Emigrant Business Credit vs     Court Records     Pg 1733 of 2230     RECEIVED NYSCEF:     Dennisse Baez
                    Hanratty                                                                                     June 02, 2023

209

                        D. MENDEZ

1

2     trying to liquidate the investors in Fund

3     I?

4               MS. PARKS:   Objection to form.

5               You can answer.

6     A.     Yes.

7     Q.     When did he tell you that?

8     A.     I don't have an exact date.

9     Q.     And what did he tell you?

10    A.     He told me that he was trying to

11    liquidate -- get the investors from out --

12    that he didn't want to have to deal with

13    investors ever again.

14    Q.     Was he having problems with

15    investors?

16    A.     He always managed the investors.

17    I don't think I have ever -- and if I did,

18    I don't remember -- I don't think I've ever

19    talked to them -- or maybe, I maybe had

20    communication, but I do not recall like me

21    interacting with them.

22            I know because I've heard him

23    talking that he was receiving pressure from

24    investors to get their money and I, at some

25    point, I know there was some legal action,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO. ...   RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs.   Court Records   Pg 1734 of 2230   Dennisse Baez
Hanratty   June 02, 2023

210

D. MENDEZ

1  I don't know the details of it, of some

2  investors trying to get their money.

3        Again, I do not know the entire

4  details of it on how the conversations or

5  how the legal action initiated or what went

6  back and forth.

7        I know there was a settlement

8  with some of the investors that I've been

9  trying to piece together the settlement and

10 the agreement so we make sure whatever was

11 settled and agreed, the accounting team can

12 reflect it accurately in our accounting

13 records.

14    Q.   Do you know if Ebury used an

15 advance from Emigrant to pay the settlement

16 to the investors?

17        MS. PARKS:  Objection to form.

18    A.   No.  I don't know.

19    Q.   Would you be surprised if Ebury

20 used an advance from Emigrant to settle

21 with the investors?

22        MS. PARKS:  Objection to form.

23    A.   Again, everything will surprise

24 me if it happened before I was involved in

211

D. MENDEZ

1
2  it because I was not involved in the
3  accounting, so...
4      Q.    Would you find it unusual if
5  Ebury used an advance from Emigrant to
6  settle with its investors?
7          MS. PARKS:  Objection.
8      A.    I don't know, because I don't
9  know what we were -- since I didn't read
10  the agreement, I don't know if it was
11  allowed or not to do so.
12     Q.    Who would know if Ebury was
13  allowed to use an advance from Emigrant to
14  settle with investors?
15     A.    That would be John.
16     Q.    And to be fair, that's
17  Mr. Hanratty?
18     A.    Yeah, sorry.  I think John
19  Hanratty or Mr. Patrick Zimmer who at some
20  point was working with a credit agreement.
21     Q.    And you said that Mr. Hanratty
22  was receiving pressure from investors to
23  get their money.  When was he receiving
24  pressure from investors?
25     A.    I don't have an exact date.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs.   Court Records   Pg 1736 of 2230   Dennisse Baez
Hanratty                                        June 02, 2023

212

```
 1                 D. MENDEZ

 2      Q.    Was it 2018?

 3      A.    I wasn't around for much of 2018.

 4   I started working with the BCMG team at the

 5   time.  So the investors that John had for

 6   his entities, I was not involved in any

 7   communications or anything that I can

 8   remember of until 2019 when I joined the

 9   Ebury.

10      Q.    How did you learn that

11   Mr. Hanratty was receiving pressure from

12   investors to get their money out?

13      A.    Well, because he had mentioned

14   it.

15      Q.    Approximately when did he mention

16   it to you?

17      A.    I remember talking about it

18   around the 2019 audit because he was

19   putting pressure on us to get accounting

20   records finalized and we were trying to

21   explain to him what we have found and that

22   we needed to figure out how to complete the

23   financials with the info that we had and

24   piecing together between e-mails and

25   communications of other people because we
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. ...
Emigrant Business Credit vs. Hanratty
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1737 of 2230
RECEIVED NYSCEF: 01/12/2024
Dennisse Baez
June 02, 2023

213

                          D. MENDEZ

1    were not involved in those communications

2    from the get-go.

3          And I remember him like saying

4    that he was having pressure, he needed to

5    get financials out, he needed to provide

6    financials to Emigrant and he had his

7    investors like breathing down his neck --

8    maybe not those words -- but they were

9    putting pressure on him.

10         So it had to be somewhere around

11   2020, 2019.

12       Q.    Do you know what funds

13   Mr. Hanratty used to pay off his investors?

14       A.    Un-huh.

15       Q.    Is it possible that he used --

16       A.    No.  I'm sorry.  I moved my head

17   no.

18       Q.    Is it possible that he used funds

19   advanced from Emigrant to pay off his

20   investors?

21         MS. PARKS:  Objection to form.

22       A.    I mean, everything is possible.

23   But I don't know that he did.

24       Q.    Approximately how much RV in tax

214

D. MENDEZ

1 liens does Ebury own right now?

2   MS. PARKS:  Austin, did you say

3  RV?

4   MR. MAYRON:  Yea, sorry.

5 BY MR. MAYRON:

6  Q.    Approximately how much in

7 redemptive value in tax liens does Ebury

8 own right now?

9  A.    I don't know the number from the

10 top of my mind and I don't want to say

11 anything that is is totally wrong.

12  Q.    More than $10 million?

13  A.    In tax liens?

14  Q.    Yep.

15  A.    No, I don't think we have more

16 than 10 million.

17  Q.    And then do you know

18 approximately how much Ebury owns in real

19 estate-owned properties?

20  A.    At this point, it's hard because

21 there was a lot of things going in and out

22 our real estate portfolio.

23  Q.    You think it's more than $10

24 million?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. 40   Emigrant Business Credit vs Court Records   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
Hanratty   Pg 1739 of 2230   Dennisse Baez
June 02, 2023

215

```
 1                    D. MENDEZ

 2       A.    I don't think we have more than

 3    $10 million in real estate right now.

 4       Q.    So if Ebury has less than $10

 5    million in tax liens and less than $10

 6    million in real estate, is it your

 7    understanding that Ebury has less than $20

 8    million in assets?

 9            MS. PARKS:  Objection to form.

10            You can answer.

11       A.    It's only tax liens and -- yeah,

12    around that number.

13       Q.    So is it your understanding that

14    Ebury has less than $20 million in assets?

15            MS. PARKS:  Objection to form.

16            Go ahead, Dennisse.

17       A.    Yes, probably.

18       Q.    And you understand that Ebury

19    owes Emigrant more than $20 million in

20    outstanding principal and interest?

21            MS. PARKS:  Objection.

22       A.    No.  I don't know the balance.

23    We have not received a statement from

24    Emigrant in, I don't know, or at least I

25    have not seen a statement from Emigrant in
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1740 of 2230    Dennisse Baez
Hanratty    June 02, 2023

216

                        D. MENDEZ

1

2    I don't know how long.

3        Q.    Has anyone ever told you that

4    they thought Mr. Hanratty was dishonest?

5        A.    No.

6                MS. PARKS:   Objection.

7                Go ahead.

8        A.    No.

9        Q.    Has anyone ever told you that

10   they thought Mr. Hanratty had not been

11   fully truthful?

12                MS. PARKS:   Objection.

13                You can answer.

14        A.    I'm trying to think, because I

15   know someone but he's not saying that he's

16   lying, he just says that he changes what he

17   says to him all the time.

18        Q.    What do you mean?

19        A.    But not accusing him of lying.

20   It's a contractor that we have issues with

21   him and he always says something and then

22   it changes, but not lying.

23        Q.    Who is the contractor?

24        A.    His name is Brandon Rayam.

25        Q.    Can you spell his last name?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs Court Records    Pg 1741 of 2230    Dennisse Baez
Hanratty    June 02, 2023

217

1              D. MENDEZ

2        A.    R-A-Y-A-M.

3        Q.    And what does he allege about

4   Mr. Hanratty?

5        A.    That they agree numbers on a deal

6   and then John changes the numbers.  But I

7   don't trust the guy.  I don't like him,

8   so...

9        Q.    Changes them how?

10       A.    Like they agree on a price on a

11  property and then he says John changes the

12  numbers and it's not the number that they

13  originally agreed to.

14       Q.    How often does this happen?

15       A.    I don't know.  I don't pay much

16  attention to Mr. Rayam.

17       Q.    Has it happened more than twice?

18       A.    Yes.

19       Q.    Has it happened more than five

20  times?

21       A.    No, I don't think so.

22       Q.    What about Mr. McCosker?  He has

23  alleged, I believe, that Mr. Hanratty isn't

24  truthful.

25       A.    Uh-huh.  But you asked if someone

218

D. MENDEZ

1  had told me that.  Mr. McCosker has not

2

3  told me that.

4      Q.    Have you ever heard of

5  allegations that Mr. Hanratty has not been

6  fully truthful?

7      A.    Yeah, from Mr. McCosker's

8  lawsuit.

9      Q.    Any other instances?

10     A.    Not that it comes to my mind now.

11     Q.    And Mr. McCosker has alleged that

12 Mr. Hanratty is not fully truthful.

13     A.    Uh-huh, yes.

14     Q.    Are you aware?

15     A.    Yes, I'm aware.

16     Q.    Are you aware of his allegations?

17          MS. PARKS:  Objection to form.

18 His, you mean McCosker's?

19     Q.    Are you aware of Mr. McCosker's

20 allegations?

21     A.    Yes, I am to some extent because

22 I am part of that lawsuit.

23     Q.    So who at Ebury deals with

24 Emigrant, other than Mr. Hanratty?

25          MS. PARKS:  Objection to form.

219

D. MENDEZ

1

2      A.    You mean who has talked to

3   Emigrant people?

4      Q.    Who at Ebury is responsible for

5   working with Emigrant?

6      A.    That's John, John Hanratty.

7          MR. MAYRON:  I think that's it

8      for what I have.  Kari, if you have

9      questions.

10         MS. PARKS:  Yeah, just a couple

11     of follow-up questions and -- well,

12     they always tell us don't say it will

13     be short because it won't, but here

14     I'm going to say it anyway.

15         THE WITNESS:  You're never short,

16     Kari.

17         MS. PARKS:  I know, I know.

18   EXAMINATION BY

19   MS. PARKS:

20     Q.    I just wanted to get a little

21   more information on the last two gentlemen

22   we discussed.  So you just mentioned

23   Brandon Rayam and you said he was a

24   contractor of Ebury, is that right?

25     A.    Uh-huh.

220

D. MENDEZ

1

2    Q.    Can you tell us a little bit more

3    about that, like what kind of contractor, I

4    guess what kind of services does he do for

5    Ebury?

6    A.    He was -- he was doing property

7    management at some point for us and he was

8    doing rehab work for us for the real estate

9    portfolio.

10    Q.    So rehab, do you mean like

11    physical construction, like remodeling

12    type?

13    A.    Right, clean-outs, physical

14    remodeling of some of the properties and

15    stuff like that.  And he, at some point he

16    wanted to play with the big boys and wanted

17    to start buying properties for himself.

18    Q.    I see.  Where is he based or

19    where does he live, do you know?

20    A.    He lives in Ohio.

21    Q.    Okay.  And earlier when you were

22    speaking with Mr. Mayron, you said "I don't

23    trust him."  I know you weren't talking

24    about Mr. Mayron.  You're saying you don't

25    trust Mr. Brandon Rayam?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs. Court Records   Pg 1745 of 2230   Dennisse Baez
Hanratty                                                    June 02, 2023

221

```
 1              D. MENDEZ

 2      A.    I do not trust him at all.

 3      Q.    Why not?

 4      A.    Because the interactions that we

 5   have, he's the one that says something and

 6   then goes and send a text or e-mail with a

 7   completely different conversation from what

 8   we've had, and that's what he's done to me

 9   and he's done to multiple people in the

10   office.

11           And at some point, we told John

12   we're not going to deal with him anymore

13   because he lies all the time.  And if you

14   want to keep dealing with him, I'm sorry,

15   but you will have to deal with him and it's

16   going to be your problem.  You deal with

17   his lies and his -- he's always lying.

18      Q.    And what kind of stuff is he

19   lying about?  Could you just give us a

20   couple of examples?

21      A.    Like he was renting one of our

22   properties and then he stopped paying rent.

23   And then he's like:  I want to buy the

24   house.

25           I'm like:  How are you going to
```

Emigrant Business Credit vs. Court Records    Pg 1746 of 2230    Dennisse Baez
Hanratty    June 02, 2023

222

D. MENDEZ

1

2    buy a house if you can barely afford paying

3    the rent on it?

4         And then he wanted to -- he said

5    he had other investors that would help him

6    with that.  We find some property for him

7    where he defaulted on the mortgage on that

8    property that we finance to him.  And now

9    he keeps coming back saying he wants to buy

10   more properties.  I'm like uh-oh two

11   already.  You don't pay rent.  You owe one.

12         And apparently -- or he says, or

13   what he mentioned was like a purchase price

14   was agreed in one of those properties.  And

15   when he came back, John told him like if

16   you cannot pay everything that you owe me,

17   then if you want to buy another property

18   and you are financing that property with

19   someone else then all that you owe me will

20   roll into that new transaction and that's

21   when the numbers change.

22   Q.   Okay.  And then I want to -- the

23   only other topic of questions I have is

24   just Mr. McCosker a little more generally.

25         So earlier you testified -- well,

INDEX NO. 158207/2022

223

D. MENDEZ

2  you know, to be very clear, right, he has

3  sued you, correct?

4       A.    Uh-huh.

5       Q.    So you probably don't have the

6  best friendliest feelings toward him right

7  now?

8       A.    I don't have a grudge against him

9  at all.

10       Q.    Why not?

11       A.    Because I think this lawsuit is a

12  way to try to get to John.  It has nothing

13  to do with me.  And he's just trying to

14  drag this thing and get more people

15  involved on John's side.

16            But I'm not -- if I would see him

17  on the streets, I would say hi to him.  I

18  have -- because for me it's not personal.

19  I was there at the beginning when John and

20  him started doing business.  I -- at the

21  beginning, it sounded like John was working

22  for McCosker instead of being a partner.

23            Then I went to maternity leave

24  and all hell broke loose.  When I came

25  back, I came back to a different office, a

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1748 of 2230    Dennisse Baez
Hanratty    June 02, 2023

224

D. MENDEZ

2  different employer, different everything.

3  And staying with John, it was kind of my

4  decision to stay with John.  I knew

5  McCosker before I knew John.  And Puerto

6  Rico is a very small island and the circle

7  where they move, it's obviously not the

8  same circle I'm at, but I have access to

9  it.

10       So I have heard from people from

11  the banking industry saying a lot of bad

12  stuff about McCosker.  So when I decided to

13  join them, it was because John was there,

14  because there was going to be someone

15  different that it was not McCosker the only

16  one.

17       And when they decided to

18  separate, I talked to John and I said, if

19  you separate and this happens and if there

20  is anything I can do for you and you want

21  me working with you, I would appreciate if

22  you could take me with you instead of

23  leaving me here because I knew I was going

24  to be without a job within a month or two.

25  And I just had a baby, I couldn't be

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Emigrant Business Credit vs
Hanratty
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1749 of 2230
RECEIVED NYSCEF: 01/12/2024
Dennisse Baez
June 02, 2023

225

                    D. MENDEZ

1   without a job.

2       Q.    Got it.

3           MS. PARKS:  Okay.  Well, that is

4       all I've got.  So thanks, Ms. Mendez.

5       I don't know if Mr. Mayron might have

6       some follow-up.

7           MR. MAYRON:  We're good.  Thank

8       you.

9           MS. PARKS:  Okay, great.

10          THE VIDEOGRAPHER:  This concludes

11      today's deposition.  The time is 3:26

12      p.m.  We are now off the record.

13          THE COURT REPORTER:  Would any

14      counsel like a rough draft?

15          MS. PARKS:  We'd love a rough,

16      actually.  I'll put my e-mail address

17      in the chat box.  Thank you so much.

18          (Time noted:  3:26 p.m.)

19

20

21                    _____

22

23                  DENNISSE MENDEZ BAEZ

24

25  Subscribed and sworn to before me

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 1750

RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1750 of 2230    Dennisse Baez
Hanratty    June 02, 2023

226

1          D. MENDEZ

2     this ___ day of _____, 2023.

3

4     _____

5

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 42
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

Emigrant Business Credit vs Court Records    Pg 1751 of 2230    Dennisse Baez

Hanratty    June 02, 2023

227

1

2           REPORTER CERTIFICATE

3

4           I, JOAN FERRARA, do hereby

5    certify:

6           That said proceedings were taken

7    at the time and place herein named;

8    and that the transcript is a true

9    record of the testimony as reported by

10   me, a disinterested person, and was

11   thereafter transcribed.

12          I further certify that I am not

13   interested in the outcome of the said

14   action, nor connected with, nor

15   related to any of the parties in said

16   action, nor to their respective

17   counsel.

18          IN WITNESS WHEREOF, I have

19   hereunto set my hand this 13th day of

20   June, 2023.

21

22                  _Joan Ferrara_

23           _____

24           JOAN FERRARA, RMR, FCRR

25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 117    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1752 of 2230    Dennisse Baez
Hanratty    June 02, 2023

228

1

2              DEPOSITION ERRATA SHEET

3    Case Caption:  Emigrant v. Hanratty

4

5      DECLARATION UNDER PENALTY OF PERJURY

6              I declare under penalty of perjury

7    that I have read the entire transcript of my

8    Deposition taken in the captioned matter or

9    the same has been read to me, and the same is

10   true and accurate, save and except for

11   changes and/or corrections, if any, as

12   indicated by me on the DEPOSITION ERRATA

13   SHEET hereof, with the understanding that I

14   offer these changes as if still under oath.

15

16

17   _____

18      DENNISSE MENDEZ BAEZ

19

20   Subscribed and sworn to on the _____ day of

21   _____, 2023, before me,

22   _____

23   Notary Public,in and for the State of

24   _____

25

Emigrant Business Credit vs.
Hanratty
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1753 of 2230

Dennisse Baez
June 02, 2023

229

DEPOSITION ERRATA SHEET

Page No. ____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. _____ Change to: _____

_____

Reason for change: _____

SIGNATURE:_____DATE:_____

DENNISSE MENDEZ BAEZ

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs. Court Records    Pg 1754 of 2230    Dennisse Baez
Hanratty    June 02, 2023

230

1

2                DEPOSITION ERRATA SHEET

3    Page No. ____ Line No. _____ Change to: _____

4    _____

5    Reason for change: _____

6    Page No. ____ Line No. _____ Change to: _____

7    _____

8    Reason for change: _____

9    Page No. ____ Line No. _____ Change to: _____

10   _____

11   Reason for change: _____

12   Page No. ____ Line No. _____ Change to: _____

13   _____

14   Reason for change: _____

15   Page No. ____ Line No. _____ Change to: _____

16   _____

17   Reason for change: _____

18   Page No. ____ Line No. _____ Change to: _____

19   _____

20   Reason for change: _____

21   Page No. ____ Line No. _____ Change to: _____

22   _____

23   Reason for change: _____

24   SIGNATURE:_____DATE:_____

25              DENNISSE MENDEZ BAEZ

## $

**$1**  158:6

**$1.2**  179:17,23 182:7 185:18

**$10**  69:3 214:13,24 215:3,4,5

**$10,000**  180:5

**$100,000**  175:18

**$15**  207:17 208:2

**$16**  206:23

**$19**  150:13 159:8 172:4

**$2,700**  179:22

**$2.42**  158:6

**$20**  215:7,14,19

**$209,000**  166:18

**$210,000**  166:21,24 167:25 172:24

**$210,350**  171:5,24

**$210,350.037**  170:16

**$220,000**  175:4,6 178:2

**$236,432.78**  175:22 176:3

**$27**  159:7

**$27.7**  146:6,19 147:24

**$27.8**  145:6

**$288,810**  176:11

**$3**  158:6 173:9

**$3,000**  179:22 180:2

**$300,000**  176:15

**$350,000**  182:2

**$439.24**  164:10,25 165:4,8 166:9

**$5,610**  165:12 167:21 170:22 171:5

**$6.6**  206:19

**$678,000**  185:9

**$7**  158:6

**$71,000**  185:8

**$8**  159:10,14,20

**$850,000**  185:13 186:13

**$860,000**  179:8 182:6

**$9**  158:6

**$9.1**  206:7,10

## 0

**0220**  165:16

**0698**  174:13 177:11

**0744**  185:2

## 1

**1**  14:18,19 20:7 99:21 100:6,7 135:13 164:13 174:20

**1,500**  156:5

**1,545**  152:5,7

**1.2**  182:22

**10**  20:7 99:3,4 106:11,18 114:15 214:17

**10:04**  7:5

**11**  109:19,20 128:6

**11-page**  79:7

**11:35**  76:11,12

**11:45**  76:13,15

**12**  110:3,4

**12/31/18**  205:10

**12978**  91:21,25

**12:46**  126:17,18

**13**  120:3,4 124:14

**139**  165:18 170:11 172:22

**13th**  141:23

**14**  120:23,24

**149**  174:20

**1491**  174:19 176:8,23 177:7

**1494**  174:24 177:6

**1495**  174:21

**15**  58:14 127:10,11 139:19

**1500**  155:17

**15977**  16:16,20

**16**  129:25 130:2 132:3,10 137:20 141:11

**17**  131:21,22 178:24,25 179:5,21 182:5 199:23

**1729**  179:7 180:15

**1730**  181:14,25

**1732**  178:23 179:16 180:16

**17th**  180:6 201:2

**18**  135:5,6,10 139:10

**19**  143:7,8 154:25 160:20,23 164:4

**1:11**  126:19,21

**1:30**  142:21,22

**1:36**  142:23,25

## 2

**2**  7:4 16:18,19 100:10 166:3

**20**  149:24,25 165:15,16 170:10 171:12,21 185:4

**2010**  25:19

**2013**  27:2

**2014**  25:19 27:11 31:11

**2017**  99:21 100:7

**2018**  24:14,19,21 31:15 44:3 45:3,7 46:11,14 54:10,11,24 64:7 100:20 101:9,12,17 102:3,5,6,16,20 103:16 104:16,25 106:3 110:24 111:16 118:13 174:22 175:13,25 176:14 177:2 190:16 205:24 206:12,20,24 207:6,8 208:3 212:2,3

**2018-'19**  207:4

**2019**  23:24,25 24:3,8,16 33:6 46:25 49:20 83:23 98:19 102:15,24 103:12, 23 104:3,10 105:19 106:6 178:24,25 179:5,21 182:5 185:4,21,24 186:6,8 190:17 191:24 192:8 193:19 203:8, 18,23,24 204:6,20,21 207:14 212:8, 18 213:12

**2020**  88:4 93:4,16 110:21 111:10 190:18 192:6,15,16 193:6,18 199:23 201:25 202:7 213:12

**2021**  56:9,10,11 57:19 114:6,15 119:18 121:20 123:12 124:14,20,23 128:6 130:13 133:11 134:6,20,24 135:13 140:21 146:8,20 147:21 150:9,17 155:13,15 158:15 160:2 161:24 162:9,21 163:23 167:20 173:11

**2022**  75:23 94:15

**2023**  7:4

**21**  173:22,23

**210**  173:2

**21st**  158:9

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 44    RECEIVED NYSCEF: 01/12/2024

Edward Donus Deposits Corp Y 2    Doc #3 Sta    Dennisse Baez
Hanratty 44    June 02, 2023
Filed 08/14/24 09:45:23    Entered 08/14/24 09:45:23
Court Records    Pg 1756 of 2230

**22** 184:14,15 203:7

**220,000** 177:14

**221** 81:8 106:24

**23** 191:3,4

**24** 133:11 134:20 194:18,19

**25** 130:13 158:6 199:22 200:2

**25th** 141:22

**26** 93:4,16 202:24,25 206:2

**27** 205:7,8

**27.8** 145:2

**27th** 134:24

**28** 20:5

**2910** 172:17

**2:35** 188:6,7

**2:40** 188:8,10

---

**3**

**3** 19:18,19 107:13 197:12,14

**3,162** 170:20

**31** 102:16 110:21 124:14 146:8 205:24

**3103** 164:8,22 166:7 170:12 171:15, 23 172:22

**3301** 169:11

**339** 166:8

**39** 164:8,23 170:13 172:23

**3:26** 225:12,19

---

**4**

**4** 22:22,23

**40** 80:20

**45** 81:12

**47** 206:14,15

---

**5**

**5** 44:3 74:2,3 121:19

**5,000** 155:25 156:6 158:9,17,19 159:3,14,20 160:10 161:6,17,23 162:8,19 163:9,16

**5,670** 164:14

**5,671** 164:22

**5548** 73:23 74:4

**5671** 164:7

**58332** 109:16,21 110:11,12

**58333** 110:2,5,11,20

**58356** 22:20,24

**586** 205:19

**59765** 78:16,20

---

**6**

**6** 78:18,19

**6,700** 149:7 155:14 156:4 157:8 163:6,10

**6,780-something** 149:15

**600** 186:20

**611** 14:16,20

**637** 185:12

**638** 185:12

**641** 185:3,7

**642** 185:3,8

**6726** 129:12

---

**7**

**7** 85:18,19

**7139** 166:7

**71497** 98:3,7,10

**71498** 98:24 99:5 106:18

**73415** 85:16,20,25

**7532** 120:8

**7955** 139:17,20 141:3

---

**8**

**8** 91:23,24 95:14 163:22

**80** 163:16

**8333** 118:20

**8371** 139:10,11 141:10

---

**9**

**9** 98:5,6 102:10 104:19 174:22 175:12,25 176:13 177:2

---

**@**

**@eburycap.com** 102:12

---

**A**

**a.m.** 7:5 76:11,12,13,15 126:18

**A6** 174:12

**ability** 67:11

**abort** 119:15

**accept** 34:13

**access** 11:4,9 12:22 128:13 224:8

**accomplished** 121:18

**account** 116:7 175:14 177:11,13,19, 23 178:4,9,12,17 179:21 180:6,10,14, 21 181:7,18,19,24 182:19 183:17 184:2,4,7,25 185:23 186:3,4,21 187:9,14,15

**accountant** 129:10 190:5 192:12,13 194:4

**accountants** 56:2 190:5

**accounting** 26:17,19 37:24 48:21 50:3,4 51:2,4,6,20,23 52:4,5 54:23 60:7 64:4 67:18,25 94:18,20 95:5,7 133:20 163:25 174:11 176:18 184:24, 25 189:20,23 190:3,11 192:14,23 193:8,15,16 198:19 201:3,4,5,12 207:5 210:12,13 211:3 212:19

**accounts** 63:22 67:10 174:13 177:12,20 178:15 180:22 181:9,22 182:24 183:9,10,15,23 186:24 187:2, 7

**accurate** 96:17,19,21 97:2,4,8 150:16

**accurately** 210:13

**accusing** 216:19

**acquired** 106:13 107:14

**acquisition** 176:2

**action** 8:6 14:8,12 209:25 210:6

**active** 26:21 53:13 143:17 152:14,16 153:3,10,23 154:5,6,14,17,21,25 155:4,6,7,9,13,16 156:9,25 157:3,16,

18,20,25 159:2 161:15 162:17 164:5

**actual** 159:2

**Adam** 74:11 75:11

**add** 146:4

**added** 123:19,22 169:17 171:9

**adding** 172:7 173:2

**additional** 122:9,15 182:23

**address** 164:22 169:11 225:17

**addresses** 53:21

**adds** 54:7

**adjust** 174:16

**administration** 26:19

**advance** 175:6 178:2,6 181:2 210:16,21 211:5,13

**advanced** 213:20

**advancement** 178:19

**advances** 188:19,24 189:7,15

**advised** 121:25 122:5

**AE** 145:24

**affected** 192:19

**affiliated** 21:9

**affiliates** 13:22

**afford** 222:2

**AFTS** 100:10 101:22

**agree** 9:15 10:5 11:7,9,12,17 13:3,7 45:10 147:23 158:8,13,19 217:5,10

**agreed** 33:9 75:21 210:12 217:13 222:14

**agreeing** 158:23

**agreement** 42:16 44:16 59:10 61:18 70:10,22 71:19 73:5 75:10,16 76:2 77:6 85:2 115:6 207:25 210:11 211:10,20

**agreements** 69:21,25 70:4,13,17

**ahead** 36:24 41:3 44:13 57:5 66:19 77:23 81:21 88:23 90:13 102:22 116:17 118:11 133:4,15 152:22,25 169:6 170:4 172:6 179:13 189:11 195:20 200:11 201:20 207:20 215:16 216:7

**Alex** 7:25

**Alister** 37:12

**allegations** 218:5,16,20

**allege** 217:3

**alleged** 217:23 218:11

**allowed** 59:7,14 207:16,21,25 211:11,13

**alterations** 38:11

**AM-3162** 170:21

**AM-5671** 165:12

**amount** 64:12 65:23 69:2 96:6 123:2, 5,10 124:13 147:17 150:16 158:16 168:12,15,23 169:3,8,24 171:6,9,10, 12 173:5 176:21

**amounts** 173:9

**analysis** 86:12

**Analyze** 172:11

**Anhil** 56:3 95:8

**Anna** 54:12 135:14

**answers** 9:12,16 17:18

**anymore** 81:22 221:12

**apartment** 164:8,23 166:8 170:13 172:23

**apologies** 41:7 66:5

**apologize** 10:16,23 185:12

**apparently** 77:16 222:12

**appears** 149:18 175:9

**applications** 10:10,20 11:4

**applied** 75:18

**applies** 76:3

**approval** 60:18,24 61:9,15,21

**approved** 114:24

**approximately** 13:8 25:16 145:6 159:4 163:22 173:9 206:23 212:15 213:25 214:7,19

**April** 203:7,18,23,24

**area** 35:2 192:19

**argumentative** 81:7

**Arora** 86:4 92:6 130:13,19 137:23 141:11

**Arora's** 138:13

**Arthur** 7:9 20:3

**asks** 23:6 92:25 127:20

**asset** 48:7 53:12 140:13 148:25

**assets** 18:23 19:5,8 20:17 21:2,3 25:4 35:18 42:3,4,9,12,14 45:6,8,11, 15,18,21 46:2,3,4,6,13,16,21,24 47:3, 6,9,11,19,20 48:15,24 53:13,19 54:7 59:20 70:23 71:20 72:3 78:3,4,7 108:10,13,24 109:9,12 113:3,14,16, 18 117:5 125:15 138:9 140:12,15 167:7,11 215:8,14

**assigned** 34:5 122:7

**assistant** 194:5

**assisted** 51:9,15

**assume** 33:15 61:7,20,25 73:4 83:14 88:5,9,20 92:24 140:6

**assuming** 93:21 161:9

**assumption** 82:20 138:18

**assumptions** 83:12

**Atlanta** 27:18

**attached** 99:9,17 104:15

**attaching** 98:17 110:15

**attachment** 110:5,9,10,18

**attending** 7:14 8:8 28:15

**attention** 121:7 164:6 217:16

**attorney** 7:21 13:16 196:6

**attorneys** 28:16 41:20 196:24 197:5

**auction** 186:20

**auctions** 28:15

**audit** 98:19 104:17,25 191:24 192:8 201:6,23 202:17 207:14 212:18

**audited** 205:8,22

**auditor** 105:8 110:13 121:11 197:18 198:9,14

**auditors** 105:5,12 191:12,17,19 198:17 208:13

**audits** 191:23 192:3,4

**August** 23:24,25 24:3,8,14,19,21 49:20,25 102:14,24 103:23 104:3,10 130:13 133:10 134:20,24 141:22 146:8,20 155:13 156:4 158:10,20 159:6,15,21 160:15,19 162:17 163:5 164:5 167:9,18,20 168:24 170:18 173:10

**Austin** 7:22 11:19 73:13 74:19 79:5 80:14 103:11 107:2,25 135:10 147:4 165:23 179:11 187:18 188:20 200:18 214:3

Ave 164:8

Avenue 164:23 166:8 170:13 171:15, 23 172:23

aware 69:19 70:3 71:12,19 86:24 87:17,25 97:6,10,13,21 102:18,23 135:17,23 206:22 207:3,6,10 218:14, 15,16,19

## B

B-A-E-Z 9:4

Babogen 55:5 196:19

baby 55:4 224:25

bachelor's 26:18

back 32:18 33:6 34:7 46:10,11 49:21 60:7 76:15,23 83:23 90:9 101:8,17 102:5,6,9 104:18 106:11 108:3 123:18 126:21 137:20 139:20 141:10 142:25 152:2,11 154:10 156:9,12 167:18 171:10 176:22 188:10 190:13, 16 196:21,23 197:7 204:11 207:3 210:7 222:9,15 223:25

background 51:20 145:17

bad 192:15 224:11

badger 81:11

badly 190:6

Baez 7:7 8:14,24 9:3,5 225:23

balance 144:12 147:20 148:7,11,17, 18,21,22,24 156:13,14,21 157:14,20, 21 165:11 167:19 170:21 176:21,22, 25 180:13,25 215:22

balances 156:25 157:5,7 158:4

bank 37:12 44:10,17 50:14 52:14 57:13 63:22 64:5 67:10,13 86:20 96:8,17,22 97:3 128:15 163:25 174:13 177:12,22 178:15 180:22 181:7,18,19 183:9,10 186:2,4,24 187:2,7

banking 224:11

banks 36:21

barely 93:5 222:2

barrier 194:12

base 37:6,15,18,20 38:2,4,8,11 48:23 49:5 50:10,18,25 51:16,25 52:7,13, 17,19,25 53:6,9 84:21 85:6 87:6 124:11,15 125:3

based 30:6 83:2 95:13 180:13,24 182:4 220:18

bases 84:25

basically 31:3 32:13 50:6 54:13 146:12

basis 65:9

Bates 14:15,20 16:20 22:24 74:4 78:19 85:20 91:24 98:6 99:5 109:20 110:5 120:5,25 127:11 130:3 131:23 135:6 143:9 150:2 173:24 184:11,16 191:4 194:19 200:2 203:2 205:10

bathroom 76:20

BBC 124:11

BCMG 24:10,12,18,23 27:22,24 28:3 30:14,17,18,19,21 31:17 33:3,11 34:18 102:7 203:25 204:5,13 212:4

BDO 25:25

bedrest 133:6 134:10

begin 161:13

beginning 7:20 31:11 148:22,24 223:19,21

behalf 8:3

believed 34:8

bell 169:11

belonged 48:18

belongs 48:10

beneath 20:2

Berman 74:11

Beth 185:7 186:14

bid 168:11,15,23 169:3,8,10,23 171:6,9 173:5,9

big 168:20 201:3 220:16

birth 55:3

bit 192:20 220:2

blame 203:11

blue 132:22

book 198:8 199:15

books 193:19

borrower 58:5

borrowers 58:7

borrowing 37:6,15,18,20,25 38:3,8, 11 48:23 49:4 50:10,18,25 51:16,25 52:7,13,17,19,25 53:5,8 84:21,25 85:5 87:5 124:11,15 125:3

bottom 20:6 86:3 144:14,16,22

191:9

bought 185:25

box 225:18

boy 26:3 55:4

boys 220:16

branch 26:4

Brandon 216:24 219:23 220:25

break 10:6 11:6,11 58:16 73:15 76:6, 19 126:25 142:16 187:20,23 188:13

breakdown 86:11

breaks 11:19 13:2

breathing 213:8

Brian 7:15

broke 223:24

bubble 132:13,22

bunch 86:22 139:13

business 7:8,24 26:18 32:10,11 34:23 35:14,15 36:4,9 168:9 193:7,12 223:20

buy 58:12,24 59:19 69:16 183:11 221:23 222:2,9,17

buying 36:14 220:17

## C

calculate 196:4,17,24

calculated 196:13

calculating 196:22 197:6

calculation 196:20,21 197:15,17

calculations 196:14

call 9:7 12:6 33:7 119:19 120:11,13, 15,17 121:18,20,22 122:13,22,23 141:7,8 196:6,9,10 197:4

called 8:15 25:15 111:6 119:20 149:2 152:3,4 165:17 166:4,17 170:11,14 181:15 196:9

calls 12:4 90:3,5,6,8 141:9

cap 174:13

capability 119:6,13

capital 20:9 21:13,16,19 25:3,11,12 27:13 28:2,5 29:7,12,16,19 30:13 206:6,19

Carrigo 54:17

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 144 RECEIVED NYSCEF: 01/12/2024

Edward Dowd vs. Doug Ivey - Dennisse Baez Hanratty

Court Records Pg 1759 of 2230

Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 Stb

June 02, 2023

**case** 9:21 12:12,21 15:10 61:17 169:22

**cash** 57:23 60:7 63:23 67:18 68:2 163:21 177:20,23 178:16 179:19,20 180:9,14,23 181:2 182:6,23 183:2,3, 4,8,14,21 184:2,3 186:25 187:8,13

**catch-up** 133:19

**caught** 133:23

**cc'd** 130:9

**cell** 150:11 165:3,6,12 170:14,20 171:22 174:12 175:3 176:10 179:12

**cells** 144:23

**cents** 158:6

**certainty** 177:22

**certificate** 124:11,16 149:13 164:7 165:8 169:4 170:12 171:15,23

**certificates** 82:3,15 83:10 84:8,21 87:6 149:15 152:7 158:9,20 163:6

**certs** 79:3,17,24 80:7 83:7,19 84:5 122:10

**cetera** 132:8 133:2

**chain** 14:19 16:9 85:19 130:2 202:25

**change** 111:8 172:11 190:4 191:17, 19 222:21

**changed** 25:24 42:19 116:10 137:8

**changing** 117:19

**charge** 21:23 41:18 49:24 50:6 53:7 54:4 56:25 57:6,8

**charged** 53:23 163:15

**chart** 21:8

**chat** 11:15 14:15 16:15 19:15 22:19 73:23 78:15 85:15,24 91:20 98:23 225:18

**cheaper** 115:3,11,14

**check** 10:12 105:25

**checked** 106:5

**checking** 11:25

**Chee-how** 23:6 37:10

**Cherry** 54:20 55:2

**chunk** 163:9,12

**circle** 224:6,8

**cited** 195:23

**City** 9:18

**claim** 65:16

**Clarissa** 56:3 95:8,9

**Clark** 51:18 150:25 151:13,15 153:19

**Clayton** 136:10

**clean** 83:24 88:14 105:10 158:18

**clean-outs** 220:13

**clear** 35:10 125:23 170:8 196:3 223:2

**clerk** 8:10

**clients** 191:22

**close** 10:13 132:6 207:17

**closed** 10:20 11:2 192:20 193:18 204:21

**closely** 34:11,16

**coaching** 88:12,14

**code** 149:2 157:9,10 158:7 195:24 198:16,18 199:6,7,10

**codes** 157:15

**collateral** 47:16 48:4,8,10,16,18,25 49:7 70:20 71:2,6,15,21,23 72:4,8,14, 15,20,25 73:8 77:2,10,16,18,20 78:3, 5 79:2,16,23 80:6 81:25 82:13 83:6,9, 17 84:4,7 90:23 91:4,10,16 97:16,23 125:12 127:22 128:4,22 129:3 130:21 139:22 142:12

**collected** 153:7

**collection** 29:2

**collections** 75:2,5,11

**collectors** 28:15 29:3

**college** 26:8,9,15,16

**Colon** 110:13

**column** 144:11 145:24 146:4 147:25 148:2,8,25 152:10 154:11 156:12,13 164:9,14 166:17 168:5 170:13 176:20,21 178:2 179:7

**columns** 145:10 146:12,14 147:7 174:16

**Colón** 191:10,13

**combative** 194:2

**combined** 152:4,5,15 172:9,13,14, 16,19,21

**comfort** 73:15 187:20

**communicate** 11:15 50:13

**communicating** 194:11

**communication** 209:20

**communications** 65:24 114:17 212:7,25 213:2

**companies** 19:10 20:6,9,10,13,15, 20 21:12 39:6,7,19 40:15,20 41:13 55:9 56:13,23 57:2,7 62:5 112:8 121:12

**company** 24:22 25:2,10,14 41:9 42:7,23 78:12 92:23 122:6 183:22 188:17,21 192:24

**company's** 100:15 101:4

**compare** 115:5

**complain** 193:20,22,24

**complained** 193:23

**Complaint** 14:7,11 19:16,20 55:17

**complete** 9:12,15 125:24 126:4 167:7 168:7 212:22

**completed** 36:14 123:24 128:10 167:15

**completely** 35:25 80:18 145:23 182:25 221:7

**compliance** 31:4

**compliant** 103:5

**complying** 101:11 102:19,25

**computer** 10:11,14 11:2 12:20

**concludes** 225:11

**condition** 119:14

**conduct** 81:9 195:24 198:16,18 199:7,8,10

**conference** 7:18 121:18,20

**confirm** 10:19,21 13:20 45:7,16,20, 24 79:11 83:4 112:7 116:12 148:13 154:5 157:15,24 158:2 177:25 185:15

**connection** 104:25

**consolidated** 206:5

**construction** 220:11

**contact** 29:4 37:12 41:19 86:8 136:11

**content** 11:22

**continue** 165:10

**continues** 100:9

**contract** 80:23 81:12

**contractor** 151:15,18 193:3 216:20, 23 219:24 220:3

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSEF DOC. NO. 144    Edward Dowdy vs. Dr. Y  Ziaud Din  Filed 08/14/24  Entered 08/14/24 09:45:23  Doc #3  State  Dennisse Baez  Hanratty  Court Records  Pg 1760 of 2230  RECEIVED NYSCEF: 01/12/2024  June 02, 2023

**contracts** 80:11,14

**contributed** 108:12,15 109:9

**contribution** 106:15 107:20,24 108:7,18,19 109:10 181:12

**contributions** 107:16

**control** 40:19,22 110:16

**controlled** 108:20 109:2

**controller** 51:10 192:24

**controls** 40:14 41:9

**conversation** 116:21 122:22,24 196:18 199:13 221:7

**conversations** 32:5,6 65:11 113:2, 7,8,11 210:5

**cooperative** 193:25

**copied** 52:3 90:19 199:25

**copies** 138:25

**copy** 12:11 106:24 161:2

**corner** 144:22

**Corporation** 7:8,25

**Corps** 20:7

**correct** 9:9 21:17 22:7 23:11,21 29:22 41:11 46:18 47:12,22 49:16 59:23 64:13,25 65:5 70:20 71:15 74:16 77:3 84:9,13,15 95:19 98:15, 19,21 100:11,12,16 101:23,25 102:13 104:17,22,25 105:3,19 106:15 107:16 110:13,14,16,17 119:21 120:9 121:23 122:11 124:16,18 127:24,25 130:17, 21 135:19,21 137:7 139:7,23,24 149:7,13 150:14 153:13 155:2,4,12, 17 159:10,11 160:3,11 161:19 163:6, 10 164:10,25 165:8 166:19,22 169:25 170:2,6,16,22 171:24,25 172:24 173:7 174:14,15,22,25 175:13 176:11,12 177:2,3 178:4,5 179:2,5,9, 17,18,23,24 180:6,17 181:3 182:2 185:10,13,14 186:15 187:10 197:19 198:11 206:8,20 223:3

**corrected** 136:2 138:2

**correcting** 135:17,24 136:13,17,20

**cost** 114:22,23,24 115:2,6

**costs** 115:7

**counsel** 7:17 144:15 225:15

**County** 7:11

**couple** 219:10 221:20

**court** 7:10 8:11 14:16 16:16 17:19 19:17 22:21 73:24 78:16 85:16 91:21 98:4,25 109:17 110:2 119:25 120:21 127:8 129:24 131:19 135:3 143:5 149:23 173:20 184:12 187:24 190:25 194:16 199:20 202:22 205:6 225:14

**COVID** 192:21

**CPA** 25:22 26:20,23,25 198:8,13,15

**creates** 155:13

**creating** 33:15

**credit** 7:8,24 57:23 69:21,24 70:4,10, 13,17,19 71:5,14,18 72:7 74:14 76:2 85:2 113:9 211:20

**Cromwell** 7:23 8:3

**Cuebas** 191:11,13

**current** 23:19 139:6

**custodial** 130:16,24 131:4 132:8,25 133:12 134:19 137:23 138:7,8,14 139:6 140:2,5,9,13,19,24 141:11 142:5,9,11

**custodian** 77:3,10 79:4,18,25 80:8 82:3,15 83:7,10,19 84:6,9

**custody** 138:11 142:11

**cut** 39:23

**cycle** 192:14

## D

**D-E-N-N-I-S-S-E** 8:23

**data** 38:3 51:18,21 53:12 150:23,25 154:3 156:21 172:11,12

**date** 7:4 65:23 86:22 94:14,20 114:5, 8,9,12 124:3 128:8 151:25 154:6 161:15 167:9 199:14 207:12 209:8 211:25

**dated** 119:13 158:15

**dates** 64:3,9 113:12 128:11,12

**David** 9:3

**day** 145:15 153:21

**days** 180:11

**deal** 209:12 217:5 221:12,15,16

**dealing** 119:6 221:14

**deals** 132:6 218:23

**debt** 28:25

**December** 98:19 100:20 101:12

102:3,6,16,20 103:16 104:16 106:14 110:21 150:9,17 155:15 156:5 158:8, 15,19 159:7,15,22 167:22 168:24 171:11 173:10 205:24

**decided** 224:12,17

**decision** 34:13 224:4

**decision-maker** 40:25 57:10

**decisions** 21:25 41:6

**deed** 168:15,19 169:9,12

**deeds** 168:10

**default** 57:18 68:14

**defaulted** 222:7

**Defendants** 8:7

**degree** 26:16,18

**delay** 86:5

**delayed** 115:19 121:17

**deliver** 76:25 77:9

**Dennisse** 7:7 8:14,22 22:12 35:4 39:21 58:15 73:19 77:23 82:5,18 84:11 86:7 88:9,23 106:20 121:23 130:14 132:17 133:4,15 134:12 135:16 170:5 190:14 201:20 203:15 215:16 225:23

**departed** 201:13,15

**department** 26:12 95:5,7

**deposit** 79:3,17,24 80:7 82:2,14 83:7,10,18 84:5,8

**deposited** 181:23 187:9,13

**deposition** 7:6,12 8:8 9:23 10:7 11:6,10,14 13:2,10,22 14:4,17 16:17 19:18 22:22 73:25 78:17 85:17 91:22 98:5 99:2 102:10 109:18 110:3 120:2, 23 127:9 129:25 131:21 135:4 139:18 143:6 149:24 154:24 170:9 171:12,21 173:22 184:14 191:3 194:17 199:21 202:23 205:7 225:12

**Depositions** 81:9 107:7

**describe** 32:13

**description** 175:9 176:7 180:10

**Design** 172:10

**designated** 183:4

**destroyed** 192:17

**detail** 48:15 140:12,13 141:9 143:17 152:17 153:10 154:18,21 155:2,4,14, 16 156:10 157:18 164:5 182:13

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 144    RECEIVED NYSCEF: 01/12/2024

Emily Roberts Court Ys2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 St Dennisse Baez
Hanratty    Court Records    Pg 1761 of 2230    June 02, 2023

208:16,23

**details** 210:2,5

**difference** 140:8 159:3 168:4,20,22

**direct** 74:20 121:6 164:6

**director** 22:5,9 23:10,13,19,22 24:5
41:13 49:10,14,17,23 100:23 111:24
124:21,22 161:16

**disappeared** 155:25

**disappearing** 163:17

**disbursement** 176:10 177:15 178:8
180:15

**disbursements** 189:20

**discrepancy** 159:9,14,20,21

**discuss** 197:5

**discussed** 92:11 93:2,3,5,6,11
118:5 120:14 159:5 180:12 186:12
199:15 219:22

**discussing** 97:12,20

**dishonest** 216:4

**distribution** 68:8 176:14,24 177:7
181:3 182:8 183:5 184:5 187:10

**distributions** 60:3 63:11,13,17,25
67:7,9,19 68:3 186:14 188:19,25
189:8,16 206:11,24 207:7,18 208:2,8,
11,15,19

**document** 14:15,25 15:4,14 16:3,8,
15 17:3 19:15 22:20,23 23:4 34:20
73:23,25 74:3,8,22 78:15 85:15 91:20
92:5 98:2,23 101:6 106:21 109:15,25
110:19 119:24 120:4,19 127:7 129:23
131:18,22 135:2 143:4,16 147:6,7
149:21 150:20,22 151:3,5,7,8,9
153:13 170:8 174:5 182:5 184:11
190:22 194:15 199:3,18 202:20 205:4

**documented** 199:14

**documents** 12:12,20 13:4 16:2
106:22 107:3 128:13 133:22,25 134:4

**door** 139:2 141:14,22

**double-check** 195:11

**download** 143:24,25 146:9

**downloading** 146:16 200:20

**draft** 225:15

**drag** 223:14

**due** 114:22 145:25 146:3 148:5

**duly** 8:15

**duration** 12:25

**E**

**e-mail** 14:19 15:7,8,12 16:9 65:12
75:11,23 78:19,24 79:9 80:3 85:12,19
86:3 87:3,9,15 88:21 89:3 91:24 92:6,
9,17,20 95:17,19,22 96:3 98:6,14
102:10,12,14,17 105:15 108:4 109:20
110:4,11,12 127:11,16 128:15 130:2,
7,12,13 133:5 135:6,13 138:24 139:3
141:15,19 142:2 191:4,10,18 194:19,
23,25 195:4,5,8,16,18,22 196:8,19
197:11,23 198:22 199:23 200:2
201:16 202:18,25 203:7,8 204:8
221:6 225:17

**e-mails** 37:9 52:3 70:6 89:22,23
114:17 134:8 212:24

**E-Z** 9:3

**earlier** 31:22 67:8 97:11,19 128:2
129:7 153:12 154:23 166:14 180:13
220:21 222:25

**earthquakes** 192:17

**Eastern** 7:5

**easy** 119:8

**EBCC-10220** 149:22 150:2

**EBCC-10586** 205:5,11

**EBCC-11877** 173:19,24

**EBCC-11878** 184:12,16

**EBCC-16726** 120:19 121:2

**EBCC-17776** 135:3,7

**EBCC-27564** 143:4,9 170:19

**EBCC-7532** 119:24 120:5

**EBCC-7955** 127:8,12

**EBCC-8371** 129:23 130:3 137:21

**EBCC-8879** 131:19,23

**Ebury** 8:6 13:21 14:16,20 16:15,20
17:8 18:12,23 19:5,8,10,12 20:9,10,
13,15,17,19 21:5,6,12,13,16,18
22:20,24 23:7 24:4 39:6,7,19 40:8,14,
20 41:12,23 44:5 45:2 46:15 47:2,11,
20 48:9,17 52:19 55:9,13 56:8,13,23,
25 57:7,24,25 58:2,22 59:2,7,11,14,
25 62:3,5 63:7,13,16 64:11,18,25
65:5 67:2,9 69:9,14 70:18 71:4,13
72:6,24 73:2,7,8,23 74:4 75:6,25
76:25 77:9 78:8,12,15,20 80:6 81:25
82:13 83:9 84:7,14,20 85:15,20 87:4
91:9,15,20,25 93:13,19 94:7,10,12

96:21 97:6,14,22 98:2,7,18,23 99:5
100:15,19 101:4,10 102:18,25 104:15
105:15 106:12 107:13 109:16,21,25
110:5,10,11,19 111:14,19 112:8
115:13 118:7,8,15,16,17 121:12,22
122:3,6,8,14 124:5 125:2,10 128:21
129:2,14 135:24 136:20 150:9 151:14
152:6 160:9 162:7 169:3,8,23 171:6
173:5,8 174:14 176:14 177:6 178:6
179:25 180:4,14 181:2 182:6 183:25
186:12 188:23 192:2 201:17 202:9
204:12,16 206:3,10,18,22 207:7,16,
21,25 210:15,20 211:5,12 212:9
214:2,8,19 215:4,7,14,18 218:23
219:4,24 220:5

**Ebury's** 23:9 57:12 100:13 102:2
128:15 207:24

**EBURY-35508** 194:15,20

**EBURY-54761** 199:19 200:3

**EBURY-59638** 202:21 203:2

**EBURY-666** 190:23 191:5

**Education** 26:13

**effectively** 39:15

**efforts** 29:2

**Egan** 176:9,24 177:15 178:8,20

**electronic** 12:19 13:3

**electronically** 14:21 16:22 19:21
22:25 74:5 78:21 85:21 92:2 98:8
99:6 109:22 110:7 120:6 121:3
127:13 130:4 131:24 135:8 143:10
150:3 173:25 184:17 191:6 194:21
200:4 203:3 205:12

**Emigrant** 7:8,24 8:3 18:2 37:7,16,21
38:4 44:10,16 45:7,11,22 46:16 47:3,
7,11,21 48:6,10,18,25 49:7 50:14
52:14,17,20,25 57:13,16 58:8,23
59:2,8,11,15 60:2,8,11,21 61:13 62:4,
11,17,23 64:18 68:10,22 69:8,14,22
70:9,25 73:2,9 74:13 75:25 78:3,13
84:15,21 87:5,21 88:21 89:8,15,19
90:6,11,16,20 93:14,24 94:2,22 97:7
113:5,7 114:10 117:20 120:2 121:11
127:17 128:15,22 129:3,17,18 130:8,
14 131:3 133:13 138:15 142:10 150:8
151:12 161:3 174:25 175:6 177:5,14
178:3,19 182:7,12 184:4 188:24
189:8,15 207:25 210:16,21 211:5,13
213:7,20 215:19,24,25 218:24 219:3,
5

**Emigrant's** 38:8 45:3 47:16 48:4,8,
16 61:15,21 70:19,25 71:6,15,20,23
72:4,7,14,15,19,20,25 73:8 77:2,9,20

Edward Berjuan uses Court...    Doc #3 St... Dennisse Baez
Hanratty    Filed 08/14/24    Entered 08/14/24 09:45:23
Court Records    Pg 1762 of 2230    June 02, 2023

78:4 90:23 91:4,10,16 97:15,23
125:3,11 182:16 188:18

**employed** 18:11,15 24:9 34:10
151:13

**employee** 24:4 39:4 193:4 204:13

**employees** 19:7,11 20:16 50:14
55:8,12,14,19,20,22,25 56:14,22 90:6
201:12

**employer** 18:20 224:2

**end** 50:22 106:12 107:18 153:22
176:25 205:17

**ending** 148:7,11 156:13,21 158:3
165:11 167:19 170:21 176:25 184:25
205:19

**ends** 106:18 118:20 120:8 129:12
165:15,16

**English** 197:2

**entire** 54:13 153:20 192:14 210:4

**entities** 19:12 20:25 21:11,17 24:11
29:11,12 30:8,18,20 33:11 55:14
58:3,4 59:11 69:6 212:6

**entitled** 80:25 81:3

**entity** 18:16,23,25 19:3,6 20:20
24:10,25 25:5,6 28:6 29:15 30:22,25
31:2,4,5,17 38:18 39:3,9,13,15 57:24
102:7 103:18,25 108:13,18,20 109:2,
6,9 119:20 138:10

**entity's** 29:8

**entries** 198:19

**entry** 174:24 181:14

**epic** 195:5,12

**establish** 32:14

**estate** 19:9 36:12,15 41:22 214:23
215:3,6 220:8

**estate-owned** 214:20

**et al** 7:9

**exact** 44:2 68:7 94:14 116:18 122:21
124:2 128:8 151:7,25 162:24 207:12
209:8 211:25

**EXAMINATION** 8:18 219:18

**examined** 8:16

**examples** 221:20

**Excel** 118:22 144:18,22

**exchange** 197:24

**excluding** 146:3

**exercise** 14:4

**exhibit** 13:5 14:18,19 16:18,19
19:18,19 22:22,23 74:2,3 78:18,19
79:7 85:18,19 91:23,24 95:14 96:4
98:5,6 99:2,4 102:10 104:19 106:11,
18 109:18,20 110:3,4 118:19 120:3,4,
23,24 127:10,11 129:11,25 130:2
131:21,22 135:5,6 137:20 139:10,18
141:10 143:6,8 149:24,25 152:3
154:25 160:20,23 164:4 165:14,16
170:10 171:12,21 173:22,23 184:14,
15 191:3,4 194:17,19 199:21 200:2
202:23,25 205:7,8

**existed** 38:24

**expect** 92:19

**expensive** 168:9

**experience** 193:8

**explain** 167:2 212:21

**explained** 34:19

**explore** 117:16

**exploring** 117:19

**expressly** 115:22

**extent** 46:15 218:21

**external** 129:10

**extracting** 38:2

---

## F

**F13** 150:11

**face** 53:20 164:9,24 166:8

**facilities** 70:19 71:5,14 72:7

**facility** 45:12,22

**fact** 91:9,15 161:14 162:16 181:25

**facts** 88:15

**failed** 202:9

**failure** 200:7,14 202:14

**failures** 201:3

**fair** 211:16

**fancy** 164:18

**February** 204:22

**feelings** 223:6

**fees** 144:12 146:3 148:12,20 165:12
166:18 167:19 168:6 170:22

**Ferrara** 8:12

**fewer** 158:9,20 160:10

**figure** 203:16 212:22

**filed** 7:10

**final** 90:19

**finalized** 212:20

**finally** 121:18 192:25

**finance** 86:7 144:17 222:8

**financed** 44:10

**financial** 30:25 31:2 119:20 120:25
121:10 205:9,22

**financials** 132:7,25 133:12 134:19
139:5 190:11 198:3 207:15 212:23
213:6,7

**financing** 222:18

**find** 60:10 96:6 211:4 222:6

**finish** 73:16 74:18 201:5,6

**fired** 191:19,25

**firm** 25:22

**firms** 26:24

**five-minute** 73:14 142:16 187:23

**five-month** 161:18 162:20

**fixing** 136:6

**flag** 171:7

**flagged** 169:19 187:4

**Flamingo** 18:18,19,21,22 19:6 22:6
38:14,17,24 39:2,4 41:8 55:18,20,23
56:13,17

**Flamingo's** 23:13

**fly** 156:17

**focus** 81:15 147:6

**follow-up** 35:11 219:11 225:7

**foreclosed** 162:15

**foreclosure** 36:13 168:7

**foreclosures** 28:17 36:12 41:20

**form** 13:23 17:16 18:3,8,13 20:21
21:14,20 22:2 27:8 28:21 30:15 32:24
33:17 36:6,17,23 39:10 40:16,21
42:24 44:7,11,18,23 45:4 49:11
50:11,19 53:2 55:10 57:4,14 59:4,16
60:4 61:10 62:6,13,24 63:9,19 66:17
67:4 68:4,23 69:10 70:14 75:8 77:4,
12 82:24 83:11 84:10,12,16 87:22

Engagement Versus Court 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 Stip Dennisse Baez
Hanratty    Court Records    Pg 1763 of 2230    June 02, 2023

88:22 89:4 97:9 100:17 102:22 103:3 108:16 114:11 115:15 116:16 117:15, 24 118:10 123:7 125:13 128:18 133:3 140:25 145:7 149:16 152:8 154:15 155:18 158:21 159:16,23 162:12,23 170:3 171:16 172:5 173:12 176:4,16 177:8,16 180:7 181:4 182:9 185:19 189:17 195:19 202:11 206:25 207:19 208:9,20 209:4 210:18,23 213:22 215:9,15 218:17,25

**format** 143:21

**formatted** 150:24

**forming** 31:2

**forward** 34:4 68:18 74:12,14 86:8 204:4

**found** 193:17 212:21

**Frank** 51:18 54:23

**Franklin** 51:12

**Friday** 95:17 121:19

**friendliest** 223:6

**front** 65:25 78:2 93:22 168:18

**full** 186:19

**fully** 216:11 218:6,12

**function** 20:20

**functions** 19:11

**fund** 21:6 42:17 58:2 174:14 178:15 180:23 206:4,11,18 209:2

**funds** 40:10,13 57:17,21 60:3 62:12, 18 63:16 67:8,21,24 68:7 74:12,15 86:20 99:18 100:4 101:19 108:12 110:24 182:16,20 183:17,18 187:3,6 213:13,19

**future** 187:21

### G

**Gandall** 51:12

**gathered** 104:24

**gathering** 192:10 208:14

**gave** 55:3 113:24 114:19 127:4

**general** 46:5

**generality** 116:20

**generally** 30:6 36:3 115:10 222:24

**generated** 53:17 153:25

**gentlemen** 219:21

**Georgia** 35:21

**get-go** 213:3

**Gilles** 121:21 122:23

**girls** 76:21

**give** 10:21 17:17 74:9,17 84:2 106:23 107:4 133:15 221:19

**God** 190:24

**good** 7:2 8:4 40:4 73:14,19 187:19 194:8,11 225:8

**Grady** 127:16 130:8 132:4,24 139:4, 21 140:21 141:15

**grand** 150:12

**Grant** 26:4,5

**great** 116:5,14 225:10

**greater** 18:18,19,21,22 19:6 22:6 23:12 38:14,17,24 39:2,4 41:8 55:18, 20,23 56:13,16 180:5

**green** 132:12

**group** 24:4,23,25 28:7 32:3 36:11 38:19,21 39:5 177:20 201:4

**growing** 34:25

**grudge** 223:8

**guess** 160:20 220:4

**guy** 217:7

**guy's** 51:11

**guys** 58:16 142:18 188:2

### H

**hacks** 144:18

**half** 160:2 161:24 162:9,21 163:22

**handful** 193:10

**handled** 192:5

**Hanratty** 7:9 13:18 20:3 21:18 32:11 33:15 34:2,12,17 41:6 51:24 52:6,10 53:11 57:11 61:9 62:10 65:18 66:6,15 68:9 69:7 70:12 78:25 79:15,22 86:4, 19 87:20 90:21 91:2,8,14 92:6 93:25 95:15 98:15 109:3 113:11 114:3 115:20 116:12,22 117:13 126:8 127:17 129:21 130:8 132:4,16,24 134:11 135:14,16 136:16,24 138:24 139:4 141:13,21 178:18 189:2 196:11 198:3 199:24 200:6,13 203:8,9 208:18,22 211:17,19,21 212:11 213:14 216:4,10 217:4,23 218:5,12,

24 219:6

**Hanratty's** 31:18 32:23 87:15

**happen** 162:11 217:14

**happened** 43:12,15,20,23 44:3 69:8, 13 161:6 162:16 167:3 186:25 210:25 217:17,19

**happening** 106:3

**happy** 115:17,21,23,25 116:3,8

**hard** 12:11 17:19 115:17 214:21

**head** 186:9 213:17

**headed** 154:11

**headers** 164:15

**hear** 33:20 145:17 190:20

**heard** 37:5,19 209:22 218:4 224:10

**held** 25:3 121:20

**hell** 223:24

**helpful** 81:17

**helping** 31:17 32:22 33:13 36:11 54:15

**helps** 40:11 147:5

**Hernandez** 25:24

**hide** 164:13,19,20 166:3

**higher** 156:14

**hire** 29:24 30:8 192:22 201:17 202:9

**hired** 29:16 30:17,23 201:12,21 202:7

**hires** 200:7,14 201:2 202:14

**hiring** 201:3,14 202:15

**hit** 192:17,21

**hold** 40:13 113:22,23 114:2,4 123:21

**honestly** 85:12 114:7 148:12 203:19 204:24

**hour** 58:14

**hours** 13:12

**house** 221:24 222:2

**how's** 76:21

**huge** 168:4,22 169:2

**hypothetical** 61:24 80:13

## I

**I-139** 170:15 171:22

**I-1491** 176:10

**I-1494** 175:3

**identify** 7:18 13:5

**II** 21:6 185:25 186:5,9 206:18

**imminent** 141:16

**impacted** 200:8,14

**important** 96:16 105:5,11

**improper** 80:18,24 106:25 107:3,7

**in-house** 41:24 42:5 45:9 46:4 48:2,
3,6,14 53:18 77:15,17,21 78:5 104:7,
9,12,13 105:16,18 111:5,9 112:5,19,
22 117:23 118:6,8,21 123:25 125:7
128:17 165:20

**inactive** 152:19 155:6

**include** 140:11,14 148:17,19,23
152:18

**included** 125:3 131:5 167:5

**includes** 138:8

**including** 11:16 88:17 148:12
165:11 167:19 170:22

**income** 34:10

**incorrect** 105:22 136:22 137:5,11,18
173:4

**incorrectly** 197:3

**increase** 33:21 169:2

**increased** 171:5

**incurring** 35:17

**independent** 124:25 125:4 147:9,17

**independently** 39:20 40:9,11

**indicating** 76:23

**individual** 169:22

**industry** 30:7 193:9 224:11

**inflow** 163:21

**info** 212:23

**inform** 191:20

**information** 37:23,25 51:5 52:6,11
53:3,4,6,10 90:15,17 96:17,20,22
97:2,5,7 99:20 100:6 101:21 111:2
124:18 140:16,18 142:4 161:11 192:9

208:14 219:21

**informed** 85:11 189:13

**initiated** 128:8 210:6

**insight** 160:6

**insinuating** 199:6

**instance** 187:7

**instances** 218:9

**instruct** 125:17,25 126:5

**instructed** 126:3

**instruction** 106:25 113:24 114:20

**instructions** 126:7

**intended** 107:7 117:13

**interact** 28:24 89:18

**interacting** 28:14 209:21

**interaction** 89:24

**interactions** 221:4

**interest** 53:20 58:7 93:14 94:2
145:21 148:18,19 195:15,16 196:5,
12,17 197:6,15,17 215:20

**internal** 110:15

**internally** 115:8

**international** 31:2

**internet** 11:10

**interpret** 82:22 83:5,15,16,21 84:3
177:4

**interpretations** 80:22

**interpreted** 83:22 137:14 141:6

**introduced** 14:20 16:21 19:20 22:24
74:4 78:20 85:20 91:25 98:7 99:6
109:21 110:6 120:5 121:2 127:12
130:3 131:23 135:7 143:9 150:2
173:25 184:17 191:5 194:20 200:3
203:2 205:11

**introduction** 86:6 121:16

**inventory** 72:2

**investment** 64:25 65:5

**investor** 176:9,15 178:20 179:17
180:16 182:8,22 183:19

**investors** 36:16 60:3,9,12,22 61:14
62:4,11,18,23 63:5 188:25 189:9,16
207:8,18 209:2,11,13,15,16,24 210:3,
9,17,22 211:6,14,22,24 212:5,12
213:8,14,21 222:5

**invoices** 58:7 95:12,13

**involved** 29:4 31:7,23 35:23 41:21
46:24 69:20 150:19 189:19 190:7
207:15 210:25 211:2 212:6 213:2
223:15

**involvement** 32:21

**Ira** 63:3,8 185:9 186:14

**island** 26:13 192:16,18 224:6

**Ismael** 56:7,9 86:6 88:25 193:2,5,7
201:21

**isolated** 107:6

**issue** 44:2 65:13,14,19 66:5,7 114:23

**issues** 86:24 87:17,25 88:5 204:5
216:20

**item** 121:15 130:16

**items** 132:7 141:16

## J

**Jack** 127:16 130:8 132:4

**James** 196:19

**January** 110:23 124:14 192:5,16,19
193:18

**Jericho** 54:17

**Jersey** 104:11 105:15 106:2,6
135:19,25

**Jessica** 56:3,4,6

**Jessica's** 56:4

**JH** 198:2

**Joan** 8:12

**job** 17:12 23:19 25:9 26:2,6 27:22,23
151:21 193:21 194:8 224:24 225:2

**jobs** 24:5

**John** 7:9 20:3 21:18 24:6,23 31:8,24
32:3 33:5,9,10 34:12,14,16 35:5,7,19,
21 40:14,19 41:9 42:17 43:10 48:21
49:19 50:24 51:19,22 52:10 57:11
60:17,23 65:11 80:3 90:15 112:24
113:25 115:16 119:9 126:8 129:21
133:8 151:2 189:2 196:10 204:12,14
211:15,18 212:5 217:6,11 219:6
221:11 222:15 223:12,19,21 224:3,4,
5,13,18

**John's** 36:4,9 38:22 223:15

**Johnny** 23:6 37:10

Emineth 020-usps Court Ys2     Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 StateHannisse Baez
Hanratty 444                    Court Records    Pg 1765 of 2230                    June 02, 2023

**join** 224:13

**joined** 38:14,16,18,20 42:7 212:8

**joins** 10:6

**judge** 9:18

**July** 134:10 199:23 201:2,25

**jumps** 101:14

**June** 7:4 56:10 93:4,16 111:10
134:10 193:19 202:7

**junior** 192:13 194:4

**jury** 9:18

**K**

**Kari** 8:5 22:16 35:9 76:7 80:17,25
88:11 106:23 107:9 219:8,16

**Kentucky** 54:18 104:12 105:17
106:2,8,13 107:14

**Kevane** 26:5

**Kevin** 51:18,20 150:25 151:13,15
154:2

**kicked** 191:24

**kids** 12:4 26:14 127:4

**Kimberly** 136:10

**kind** 17:21 36:22,25 63:11 177:23
220:3,4 221:18 224:3

**knew** 193:11 194:23,25 196:14
224:4,5,23

**knock** 132:6

**knowing** 96:14

**knowledge** 30:7 57:16 62:22

**L**

**labeled** 22:20 78:15 85:15 91:20
98:23 109:15,25 110:19 127:7 129:23
131:18 135:2 143:4 173:17,19 190:22
194:15 199:18 202:20

**Lagos** 191:13

**Laguna** 191:14,15

**language** 194:12 196:2 197:2

**lapse** 27:4

**largest** 156:22

**latest** 127:21

**laughing** 198:23

**launch** 200:7,14 202:10,14

**law** 8:9

**lawsuit** 15:14,24,25 16:13 17:14
18:2,6 218:8,22 223:11

**lawyer** 71:8

**learn** 193:6 212:10

**learning** 193:14

**leave** 24:15 33:3,5,8 38:14,15 49:21
55:3 101:2 151:20,22 201:24 203:25
223:23

**leaving** 224:23

**left** 27:19,21,23 51:18 56:9 117:5
145:9,23 151:25 190:8,17 192:5,11,
23 193:18 194:10 201:22

**legal** 28:16 197:22,24 199:12 209:25
210:6

**legend** 157:12

**lender** 57:17,20 113:2,4 128:15

**lenders** 113:8

**Lending** 37:2

**lent** 69:8,14 79:2,15,22 80:5 81:25
82:13 83:5,8,17 84:4,7

**letter** 79:11

**Leventhal** 63:3,8,14,18 64:2,12,19,
24 65:4,13,14,19,23 66:4,7,16 67:3,
13,20 185:8,9 186:14 187:5

**Leventhals** 187:16

**Lexitas** 7:16

**license** 26:21,23 27:3

**lien** 28:12,19 29:5,8,23 31:7,9,18,23,
24 32:10,19 36:9 41:23 48:5 53:13,
15,16,22,23 72:25 73:7 74:12 86:11
98:18 99:20 100:5,6,8,10 101:21
104:16 106:8 107:17 139:6 140:7,9,
11,17,23 141:7,8 142:5,9,10 143:17
147:18 149:11,25 150:8 152:7,14,16
153:3,10 154:12,17,20,21,25 155:4,6,
14,16 156:9 157:18,24 158:9,10
159:2,14,15,20,21,22,25 160:15,19,
23 163:5,14 164:5,24 165:19,20
166:9,12,15,20,24 167:20,23 168:12
169:24 170:2,14,15,18,19 171:4,6,11,
13 172:24 173:6

**Lienlog** 32:19 33:14,16,25 34:3
119:10 203:9,20 204:3,4,10 205:2

**liens** 27:7,10,16 28:23 29:15,20 30:8
35:22 40:13 44:10 48:3 58:12,25
59:19 69:16 70:18 71:4,13 72:6
77:15,19 86:20 99:19,22,23 100:4,8,
10 101:5,12,20,22,23 103:7,8,17,18,
24,25 104:6,8,11,13 105:16,17
106:13 107:14 108:15 110:24 111:3,
10,15,19 112:4,9,13,14 115:4 117:23
118:7,21 122:3,7,9,15 123:2,5,10,11,
14,19,21,23,25 124:5,10,15 125:2,7,
8,19,25 128:17 129:9,15 130:17,25
131:2,6 135:19 136:2,5 137:24 138:3,
11,16 141:12 142:4 145:5,22 147:24
150:16 152:19 153:5,9,23 154:5,6,14
155:14,17,25 156:5,6,25 157:3,5,6,
16,20,25 158:3,16,17 159:3 160:6,10
161:7,12,13,15,17,23 162:8,16,17,19
163:16 167:5,14,16 168:3 173:10
175:17,21 176:2 180:2,5 183:11
184:3 185:18 187:8 193:8,11 196:5,
12,17 214:2,8,14 215:5,11

**lies** 221:13,17

**limited** 206:7

**lines** 194:7

**link** 27:20 169:20

**liquidate** 209:2,11

**liquidating** 28:9

**list** 40:6,7,8 42:12 45:6,14,17,23,25
47:8 48:24 49:2,6 78:2,7 121:15
124:12 125:15 132:7 138:10 140:15
154:14 161:14 179:8

**listed** 55:15,16 158:10 163:6 167:20,
24 171:13,14 175:24 178:25 179:5
180:16

**lists** 20:5 150:12 155:14 165:4,7
170:15 171:22 206:3

**live** 220:19

**lives** 220:20

**LLC** 20:9,10

**loan** 57:18,22 58:10 68:13,22 89:8,15
114:10 174:25 177:5,14 179:8,15
180:15 182:11,14,21 183:4 185:13
187:4

**loaned** 186:13

**located** 56:18

**lockbox** 74:16

**log** 12:23

**logged** 12:24

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO. 444                                RECEIVED NYSCEF: 06/02/2023

Emma Hanratty vs Doe #1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 St Dennisse Baez
Court Records   Pg 1766 of 2230   June 02, 2023

**logo** 143:20 154:23

**long** 23:22 24:12 76:6 89:25 187:24 216:2

**longer** 56:7 156:6 201:9

**looked** 154:23 182:13

**loose** 223:24

**lot** 44:3 88:4 92:23 101:14 168:3 214:22 224:11

**love** 225:16

**LP** 206:4

**lunch** 126:11

**lying** 122:21 216:16,19,22 221:17,19

---

**M**

**M-E-N** 9:2

**macro** 86:11

**made** 63:7,13 64:2 108:17,18 135:17 151:10 176:14 177:6 198:17

**Mae** 54:20 55:2

**maintain** 122:2

**major** 26:17,19

**majority** 125:11

**make** 33:25 41:6 53:6 63:17 64:19 67:2,9 68:8 83:12 88:14 135:23 146:10 165:21 168:25 170:7 180:4 205:16 210:11

**makes** 21:25

**making** 38:11 94:5,7,10,13 99:12

**managed** 21:13 29:20 209:16

**management** 19:9 220:7

**manager** 21:16 40:23 54:13

**manages** 18:23 19:4

**managing** 28:15 46:13 50:7 54:18, 21 86:23 87:20

**manually** 118:22

**March** 119:18 121:19 123:12 135:13 192:21

**Marcos** 191:10

**mark** 14:17 16:17 19:17 22:21 73:24 78:17 85:17 91:22 98:4 99:2 109:18 110:3 119:25 120:22 127:9 129:24 131:20 135:4 143:6 149:23 173:21 184:13 191:2 194:17 199:21 202:23 205:6

**marked** 16:15 73:23 98:2 119:24 149:22 154:24 170:9,19

**Maryland** 106:13 107:14 135:19,25 168:3,9,21 169:16 173:10

**maternity** 24:15 33:5,8 38:13,15 49:21 55:3 101:2 203:25 223:23

**math** 26:14

**matter** 7:7 68:16

**maturity** 114:9

**Maureen** 196:7

**Mayron** 7:22 8:19 11:21 14:6,14,23 16:14,23 17:24 19:14,23 22:16 23:3 35:9,12 40:18 58:21 73:16,22 74:7 76:5,17 78:14,23 79:8 80:17,25 81:5, 18,23 85:14 88:11 91:19 92:4 95:24 97:25 98:11,13,22 99:8,14,16 103:12 104:20 106:23 107:9,12 108:5 109:14,24 114:14 119:23 120:21 121:5 126:10,14,23 127:6,15 129:22 130:6 131:17 132:2 134:25 135:11 142:15 143:3,12 144:19,20 147:13,15 149:20 155:8,11 160:21 165:25 166:2 173:20 179:14 184:9,19 187:22 188:12,22 190:21,25 191:8 194:14 195:17 199:4,17 200:22 202:19 203:5 205:3,20 206:16,17 214:5,6 219:7 220:22,24 225:6,8

**Mcclosky** 18:7

**Mccosker** 25:7 30:24 31:10,14 32:9, 17 33:7,13,24 34:6,9 108:21,24,25 119:11,15 204:2,9,24 217:22 218:2, 11 222:24 223:22 224:5,12,15

**Mccosker's** 218:7,18,19

**meaning** 89:12

**means** 81:24 82:12 107:25 136:18 149:14 156:6 157:12 166:15 176:13 206:10

**meant** 36:2 93:12 136:25

**memo** 99:5,10,18 100:3 101:11,16 102:15,19 103:2 104:24 105:22 107:22 110:16,20 118:18 122:19 124:25 125:4 129:6,9 174:25 176:8 197:23,24 199:12

**memorable** 195:18

**memorandum** 120:25 121:10

**mendez** 7:7 8:1,14,20,22,24,25 9:1, 2,5,6,7 10:1 11:1 12:1 13:1 14:1,17, 19 15:1 16:1,17,19 17:1 18:1 19:1,18,

19 20:1 21:1 22:1,22,23 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1,25 74:1,3 75:1 76:1,18 77:1 78:1,17,19 79:1,20 80:1 81:1 82:1 83:1 84:1 85:1,17,19 86:1,7 87:1 88:1 89:1 90:1 91:1,22,24 92:1 93:1 94:1 95:1 96:1 97:1 98:1,5,6 99:1,2,4 100:1 101:1 102:1,9 103:1 104:1 105:1 106:1 107:1 108:1,6 109:1,18,20 110:1,3,4 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1,2,4,22,24 121:1,23 122:1 123:1 124:1 125:1 126:1,24 127:1,9,11 128:1 129:1,25 130:1,2 131:1,20,22 132:1 133:1 134:1 135:1,4,6 136:1 137:1 138:1 139:1,18 140:1 141:1 142:1 143:1,6,8 144:1 145:1 146:1 147:1 148:1 149:1, 24,25 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1,9 171:1,11, 21 172:1 173:1,22,23 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1,13,15 185:1 186:1 187:1 188:1 189:1 190:1 191:1,2,4 192:1 193:1 194:1,17,19 195:1 196:1 197:1 198:1 199:1,21 200:1,2 201:1 202:1,23,25 203:1 204:1 205:1,7,8 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,5,23

**mention** 15:17 125:21 212:15

**mentioned** 16:2 65:16 66:9 89:21 112:18 113:15 116:4 118:20 133:5 141:16 191:11 212:13 219:22 222:13

**mentioning** 15:25 204:10

**messed** 203:10

**messing** 203:20

**metro** 192:19

**Michaud** 121:21,25

**mid** 193:6 202:5

**middle** 8:25 124:9 172:12 201:22

**Middleton** 135:14,23

**migrate** 112:5

**migrated** 119:8

**migrating**  112:18

**migration**  114:25

**mild**  88:14

**million**  69:3 145:2,6 146:6,19 147:24
150:13 159:7,9,10,14,21 163:22
172:4 173:9 179:17,23 182:7 185:18
206:8,11,19,23 207:17 208:2 214:13,
17,25 215:3,5,6,8,14,19

**mind**  21:10 33:21 58:3 67:21 68:6
69:2 142:15 163:4 164:13,16 173:15
195:23 214:11 218:10

**minute**  10:22

**minutes**  80:21 81:13 188:2

**miscellaneous**  156:24

**mission**  119:16

**Missouri**  35:21

**mistaken**  25:19 104:12 140:14 197:8

**mistakenly**  171:7

**model**  36:5

**Monday**  86:14 92:14 95:16

**money**  58:22 59:2,8,14 60:2,11,21
61:13 62:4,10,17,22 64:18 65:17,23
69:8,14 73:2,9 188:18 209:24 210:3
211:23 212:12

**month**  186:24 187:2 224:24

**monthly**  115:6

**months**  34:22 102:16 160:11 163:18
192:7,25

**morning**  7:2 8:4

**moron**  195:24

**mortgage**  222:7

**mortgages**  28:24

**move**  34:14 68:18 81:14 112:22
148:3 224:7

**moved**  75:13 213:17

**movement**  181:10 184:7 185:23
187:15

**moving**  34:4 113:3,14 183:16 204:4

**MTAG**  42:8,10,13,17,20,22 44:9,20
45:12,23 46:3,6,12 53:17 55:7 77:14
78:8,13 91:3 99:20 100:6 101:21
103:9,19 104:2 111:3,11,15,20 112:4,
6,10,13,15,19,22 113:3,14,17,19,24
114:25 115:4,7,11,14,17,21,24,25
116:3,4,23 117:2,3,7,9,14,20,23

119:19 121:16,20 122:10,15,19,20
123:3,6,12,15,19,22 124:4,12,13
125:17,23 127:21 128:4,9,16,23
129:4,9,15 130:20 131:5 135:14
136:4,11 138:3,16 139:22 140:22
142:3,11 143:18,19,20,21,23 144:3,7
145:14 146:9,16 148:14 149:14
154:23 156:10 159:2 160:15 161:10
167:4,6,12,13

**MTAG's**  90:22 116:13 117:11

**multipage**  74:21

**multiple**  221:9

**N**

**named**  8:7 25:10

**names**  8:24

**Nancy**  9:3

**napkins**  12:17

**necessarily**  157:19

**neck**  213:8

**needed**  34:25 58:15 66:10 134:9
212:22 213:5,6

**negative**  176:24 178:4

**negotiable**  12:9

**negotiating**  69:21

**negotiations**  68:16,17

**nods**  17:20

**noise**  145:17,18

**non-redeemable**  169:18,19 171:8

**non-suggestive**  22:18

**nose**  12:17

**Notary**  8:16

**noted**  225:19

**notice**  163:15

**notified**  189:5

**November**  99:21 100:7 107:15
114:15 174:22 175:12,25 176:13
177:2

**Numali**  55:5

**number**  160:6 169:24 172:2 214:10
215:12 217:12

**numbers**  147:10,11 168:18 217:5,6,
12 222:21

**O**

**oath**  9:9

**object**  30:15 39:22 44:11 57:4 63:19
81:4,19 116:16 118:10 155:18 172:5
195:19 206:25 207:19

**objection**  13:23 17:16 18:3,8,13
20:21 21:14,20 22:2 27:8 28:21 29:9
30:2,10 31:12,19 32:24 33:17 36:6,
17,23 39:10,16,21 40:16,21 41:2,10,
14,25 42:6,24 43:16 44:7,18,23 45:4,
13 46:8,19 47:5,13,23 48:11,19 49:3,
11 50:11,19 52:8,15,21 53:2 55:10
57:14 59:4,9,16 60:4,13,25 61:10,16,
22 62:6,13,19,24 63:9 64:14,20 65:6
66:17,22 67:4,15 68:4,11,23 69:10,15
70:14,21 71:7,16,24 72:9,16,21 73:3,
10 75:8,20 77:4,12,22 78:9 80:9,19
82:4,16,24 83:11 84:10,12,16,22,23
85:9 87:7,22 88:22 89:4,9,16,20
90:12,24 91:5,11,17 92:21 93:15
94:3,9,25 96:9,18,23 97:9 100:17,21
101:13 102:21 103:3 105:2,6,23
106:4 107:21 108:16,22 109:4
111:17,21 112:11,16 113:20 114:11
115:15 117:15,24 122:16 123:7
125:13,20 128:18 130:22 131:7
133:3,14 134:14,21 136:23 137:12
138:4,17 140:3,25 141:24 142:6,13
145:7 149:16 152:8,21 154:15 156:2,
8 158:11,21 159:16,23 160:12,16
161:4,8,20,25 162:12,23 163:11,19
169:5 170:3 171:16 173:12 175:7
176:4,16 177:8,16 178:10 180:7,18
181:4 182:9 183:6 184:6 185:19
186:16 187:11 189:10,17 201:19
202:11 208:9,20 209:4 210:18,23
211:7 213:22 215:9,15,21 216:6,12
218:17,25

**objections**  22:17 81:5

**obligation**  79:17 80:7 82:2,14 83:6,
9,18 84:5,8

**obligations**  79:3,24

**obtain**  168:15 199:12

**obtained**  174:11

**October**  106:14 107:15 110:24
111:16

**office**  38:23 49:25 50:2 56:16,20
76:21 203:12,14,23 204:2,11,15,19,
21 221:10 223:25

**official**  23:7

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 144    RECEIVED NYSCEF: 01/12/2024

Edward Bosies Deux y-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 Stephanie Baez
Hanratty    Court Records    Pg 1768 of 2230    June 02, 2023

**Ohio** 106:13 107:14 196:3,5,6,17 197:17 220:20

**onboard** 112:14 113:18 119:16 129:8

**onboarded** 124:5

**onboarding** 36:12 112:3,9,12 113:16,22,23,25 114:4,25 123:24 125:18,24 126:4,8 128:9,10 131:16 136:5,12 167:7,15 196:16 202:15

**open** 10:11,14 14:24 15:2,3 16:24,25 19:24 139:13 143:14

**operate** 39:19

**operates** 40:9,10

**operating** 32:15 39:14

**operation** 40:12,13 86:8

**operationally** 39:9,13

**operations** 22:5 23:20,23 30:25 49:15,18,23 124:23

**option** 118:5

**order** 168:6

**ordinary** 89:12

**organizational** 21:8

**originally** 25:23 27:17 30:23 118:21 192:4 217:13

**outflows** 179:20 180:9

**outstanding** 132:7 215:20

**owe** 86:11,21 222:11,16,19

**owed** 64:12,16

**owes** 28:25 215:19

**owned** 29:15 31:10 40:10 150:17 152:6

**owner** 168:14

**owners** 29:23 30:7

**owns** 214:19

**P**

**p.m.** 126:17,19,21 142:21,22,23,25 188:6,7,8,10 225:13,19

**paid** 64:11,17 168:22 169:3,8,23 171:6 173:5,8 206:10,23 207:7 208:15,16

**paragraph** 101:19 122:25

**paraphrase** 203:10

**paraphrasing** 101:20 111:2

**Parks** 8:4,5 11:16,18,25 13:23 14:3 17:16,23 18:3,8,13 20:21 21:14,20 22:2,11 27:8 28:21 29:9 30:2,10,15 31:12,19 32:24 33:17 35:4 36:6,17,23 39:10,16,21,25 40:4,16,21 41:2,10, 14,25 42:6,24 43:16 44:7,11,13,18,23 45:4,13 46:8,19 47:5,13,23 48:11,19 49:3,11 50:11,19 52:8,15,21 53:2 55:10 56:5 57:4,14 58:13,20 59:4,9, 16 60:4,13,25 61:10,16,22,24 62:6, 13,19,24 63:9,19 64:14,20 65:6 66:17,19,22 67:4,15 68:4,11,23 69:10,15 70:14,21 71:7,16,24 72:9, 16,21 73:3,10,13,18,21 74:19,25 75:8,20 76:8 77:4,12,22 78:9 79:5,10, 19 80:9,20 81:3,10,20 82:4,16,24 83:11 84:10,16,22 85:9 87:7,22 88:8, 13,22 89:4,9,16,20 90:12,24 91:5,11, 17 92:21 93:15 94:3,9,25 95:20,25 96:9,18,23 97:9 98:10,12 99:11,15 100:17,21 101:13 102:21 103:3,10,13 104:18,21 105:2,6,23 106:4,19 107:2, 11,21,25 108:16,22 109:4 111:17,21 112:11,16 113:20 114:11 115:15 116:16 117:15,24 118:10 122:16 123:7 125:13,20 126:12 128:18 130:22 131:7 132:9 133:3,14,18 134:14,21 135:10,12 136:23 137:12 138:4,17 140:3,25 141:24 142:6,13, 17 144:17 145:7 147:4 149:16 152:8, 21,24 154:15 155:5,10,18 156:2,8 158:11,21 159:16,23 160:12,16,18 161:4,8,20,25 162:12,23 163:11,19 165:23 169:5 170:3 171:16 172:5 173:12 175:7 176:4,16 177:8,16 178:10 179:11 180:7,18 181:4 182:9 183:6 184:6 185:19 186:16 187:11, 18,25 188:4,20 189:10,17 190:13,19 195:11,19 198:24 200:18,23 201:19 202:11 203:15 205:19 206:15,25 207:19 208:9,20 209:4 210:18,23 211:7 213:22 214:3 215:9,15,21 216:6,12 218:17,25 219:10,17,19 225:4,10,16

**part** 15:11 33:20 34:21,24 77:16,17, 20 81:8 106:24 186:12 192:18 218:22

**participants** 7:14

**participated** 119:19

**parties** 8:6 29:4,24

**partner** 106:15 107:16,19,24 108:7, 25 109:9 181:12 206:6 223:22

**partners** 108:11,12 206:7,24 208:3

**party's** 100:19

**passed** 26:22

**Patrick** 211:19

**pause** 58:13 155:5

**pay** 60:2,11,21 61:14 62:4,11,18,23 65:22 66:10,15 168:15 177:15 178:7, 20 180:15 181:2 182:7 183:5,10,18 184:4 186:13 187:5,9,16 188:18,24 189:8,15 207:17 208:2 210:16 213:14,20 217:15 222:11,16

**paying** 93:14,20 94:2 95:12 221:22 222:2

**payment** 67:6 74:14 172:7 175:21 176:3

**payments** 59:22 63:8,10,12 64:5,19 67:2,12 93:24 94:6,8,11,13,16,21,23 95:3,10

**payoff** 154:12,20 166:20 167:23 169:21,24 170:14,15 171:13 172:24

**payout** 168:8

**PDC** 157:11

**PDF** 10:10 11:5

**peer** 18:22,24

**penalties** 148:20

**people** 26:10 56:12 92:23 107:8 144:18 187:5 202:15 203:22 204:15 212:25 219:3 221:9 223:14 224:10

**percent** 124:14 163:17

**perfect** 97:3

**perform** 19:11 20:16

**performance** 193:21

**period** 96:11 103:10 161:18 162:4,21

**permissible** 61:8

**person** 37:10 46:17,23 52:18 62:16 63:6 92:22 122:19 129:20 150:22 189:4 190:10 197:4

**personal** 223:18

**personally** 54:2,7 63:6

**personnel** 50:7 122:20

**pertain** 46:2

**pertains** 60:8

**ph** 55:5 56:3

**phone** 90:3,5,6

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 144 RECEIVED NYSCEF: 01/12/2024

Edward Posada Deut Y 2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 St Dennisse Baez
Hanratty 144 Court Records Pg 1769 of 2230 June 02, 2023

**physical** 220:11,13

**piece** 107:10 210:10

**piecing** 212:24

**Ping** 51:10 80:3 116:7 190:17 192:5, 11,23 193:17 196:20 198:22 199:5

**Pingciere** 115:24

**pinpoint** 68:7

**pivot** 172:25

**pizza** 127:3

**place** 7:12 111:10 174:22

**Plaintiff** 7:24

**platform** 32:17,20 53:19 54:16 111:6,9 118:8,17 119:10,12 144:2 157:17 167:8

**platforms** 12:23

**play** 220:16

**plugged** 86:25 87:18

**PNC** 74:15

**point** 50:15,16 75:22 88:3,18 101:2 112:21 117:16,17,19 118:23,25 124:2,4 128:4 169:16 190:17 197:23 208:14,17 209:25 211:20 214:21 220:7,15 221:11

**points** 86:8

**policy** 191:21

**portfolio** 27:20 28:8,9,10,12,19 29:8, 17,20 31:7,24 34:25 35:17,20 41:24 42:2 45:3,25 46:16 47:4,8,12,21 53:14,15,16 54:18,21 55:6,7 106:6,7, 10 140:7,9,11,17,24 141:7 147:18,21 152:14 153:21 163:17 172:4 185:25 186:9 196:3 214:23 220:9

**portfolios** 29:24,25 30:9 31:8,9,18, 24 32:8,23 36:10 102:5 103:21 111:5

**portion** 186:22 187:15

**Posados** 54:20

**positive** 177:2

**PR** 26:5 193:12

**practice** 102:2

**prefer** 9:5

**pregnancy** 134:9

**premium** 171:9

**premiums** 168:8,23 169:16 175:21 176:3

**preparation** 150:20

**prepare** 13:15,22 90:10 101:6 151:2 154:7

**preparers** 191:12

**preparing** 13:9 37:6,15,18,20 48:23 52:25 90:18 113:16 150:21 154:8

**Present** 121:22

**presented** 118:19

**presently** 55:8

**pressure** 209:23 211:22,24 212:11, 19 213:5,10

**previous** 180:20 186:11 193:7

**previously** 34:19 61:19 89:21 137:8 167:6

**price** 217:10 222:13

**principal** 145:20 148:17,21,22,24 165:7 215:20

**print** 197:8

**prior** 24:7,17,19,20,21 25:20 102:16 111:15 145:22 185:6

**problem** 142:18,19 164:19 198:2 221:16

**problems** 209:14

**PROCAP** 185:25 186:5,9

**procedure** 32:15 101:4

**procedures** 98:18 99:4,10,17 100:3, 16,20 101:11 102:19,25 104:16,24 105:22 110:20

**proceeds** 72:13,18 75:7

**process** 32:16 35:24 36:13 122:8,14 123:3,6,12,25 128:3,9 168:7 193:15 196:11

**processes** 32:13 34:20

**produced** 155:21

**programmer** 196:15

**programmers** 119:7

**promising** 92:14

**properly** 165:22

**properties** 214:20 220:14,17 221:22 222:10,14

**property** 164:22 168:14 217:11 220:6 222:6,8,17,18

**protect** 59:20

**provide** 9:12,15 13:4 38:3 51:19 84:20 87:5 96:15,17,19,21 97:2,4 197:16 208:23 213:6

**provided** 14:21 16:21 19:21 22:25 52:12 57:23 74:5 78:21 85:21 90:14, 17 92:2 97:7 98:8 99:6 109:22 110:6 120:6 121:3 127:13 130:4 131:24 135:8 143:10 150:3 161:2 173:25 184:17 191:6 194:21 200:4 203:3 205:12

**provider** 99:21 100:7

**providing** 53:3 84:24 90:16 133:12

**Public** 8:16

**Puerto** 8:23 19:2 25:5 28:5 49:25 50:3 56:18 193:10,13 224:5

**pull** 51:18 150:25 156:9 170:8

**pulled** 150:23

**pulling** 51:21 165:24,25 172:9

**punch** 132:6

**purchase** 99:20 100:4,5 101:20 110:25 144:12 175:17,20,25 179:25 180:4 181:11 184:2 185:18 186:10 187:8 222:13

**purchased** 32:18 70:18 71:4,13 72:6 99:18 106:10 108:11,14 110:24 111:19

**purpose** 21:3 58:9 60:16

**purposes** 59:3,8,15 69:18

**put** 31:3 96:7,12 113:22,23,25 114:4 123:21 154:10 196:8 225:17

**puts** 155:15

**putting** 53:8 154:2 212:19 213:10

---

**Q**

**Q-5671** 165:3

**QMC** 25:15,17,18,20

**qualified** 90:18

**quarter** 86:12

**question** 14:10 33:19 40:17 45:15 47:10,18,19 65:3 71:10 79:14,19 81:22 82:6,8,10,17,18,19 83:25 87:12 91:12 97:17 99:13 103:14 109:7 128:24 139:15 149:5 171:19 180:24 207:22,23

**questioning** 7:21 73:17 80:21 131:11

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 144    RECEIVED NYSCEF: 01/12/2024

Edward Jones Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 Ster...
Hanratty    Court Records    Pg 1770 of 2230    Dennisse Baez
June 02, 2023

**questions** 9:13,16,22 67:12 81:2,19
107:5 219:9,11 222:23

**quick** 116:6,14

**Quickbooks** 173:23 174:7,9 184:15,
23

**quickest** 156:19

**quickly** 156:17 202:16

**quote** 117:18

**quoting** 116:19

**R**

**R-A-Y-A-M** 217:2

**rate** 195:15,16

**Rayam** 216:24 217:16 219:23 220:25

**reach** 12:13

**react** 198:21,25

**read** 15:12,20 16:4,6 26:11 59:10
61:18 69:24 70:22 71:18 74:9 75:10,
15 77:6 80:10,13,23 81:12 85:2
101:7,15 118:18 132:19 141:5 152:6
197:9 202:17 208:5 211:9

**reading** 74:23 80:2 83:20 99:24
137:19 138:5

**reads** 131:13

**real** 19:8 36:12,14 41:21 214:19,23
215:3,6 220:8

**reason** 9:11 75:17 146:18 169:18
171:3 186:7,8

**recall** 93:5 122:21 162:7,10 163:21
167:8 209:20

**receive** 74:12 126:7

**received** 33:7 61:9 127:21 141:17
150:8 169:9 215:23

**receiving** 95:12,13 209:23 211:22,
23 212:11

**recently** 127:22 139:23 189:24 190:2

**recess** 76:12 126:18 142:22 188:7

**recognize** 15:4 17:3 23:4

**recollection** 69:6 93:8,12 136:6,9
147:10,17,20 150:15 189:12

**record** 7:3 8:21 35:10 76:9,11,16
83:25 88:15 93:22 105:10 126:13,15,
17,22 142:21 143:2 158:18 170:7
188:6,11 225:13

**records** 48:9,17 60:7 64:4,5,9,16
67:14,18,25 72:2 93:17,19 94:20
133:20 146:22 163:3,25 176:18
189:23 190:4,12 193:17 201:5 207:5
210:14 212:20

**recruiting** 50:2

**redeemed** 153:5,22 162:15,19
163:14

**redemption** 75:12 86:12 163:2

**redemptions** 75:19 145:22

**redemptive** 53:13,21 145:5,13,16,19
146:2,19,25 147:18,23 148:3,9,16
150:12 153:6,7 159:6,8 166:24
169:25 171:4,14,22 172:3 214:8

**refer** 15:23 20:8 201:11 203:6

**reference** 201:7

**referencing** 201:16 204:25

**referred** 16:8

**referring** 15:13 16:12 18:16 19:13
20:13 27:22 47:25 88:2 93:9 122:6
160:19 168:11 200:9,16 203:20
204:3,7,9

**refinance** 37:13 113:9

**refinanced** 37:8

**reflect** 210:13

**reflected** 160:23 181:11,23

**refrain** 88:12

**registration** 135:18,24 136:17

**registrations** 136:21,22 137:5,11,17
138:2

**regular** 86:22 87:11 89:2

**regularly** 148:15

**rehab** 220:8,10

**related** 12:2,4,12,20 15:9 17:13,25
18:6 24:23 25:6

**relationship** 57:12

**relationships** 36:21,22,25 37:2

**remain** 123:3

**remaining** 154:11,20 166:20 167:23
169:20,24 170:14,15 171:13 172:24

**remains** 123:2

**remember** 17:17 22:12 24:24,25
25:4 27:5 30:5,18 33:2 37:22 38:9,16,
23 43:13,18,19,22,24,25 48:15 51:8,
11 52:2 62:21 63:2 65:12,20 66:3,6,

12,14,24 68:20 69:5 70:16 85:13
89:25 90:7,25 91:7,18 94:4 101:8,16
102:8 105:24 106:5,9 111:22 112:3,9,
12 113:12 114:5,7,16,21 116:7,18,20,
22 117:17 119:22 120:16 122:18,22
123:9 124:2 129:10,16 133:7 134:6
136:3 146:22 150:21 151:24 154:8
159:24 160:24 161:5 162:22,24,25
178:21 195:22 204:8 209:18 212:8,17
213:4

**remind** 88:8

**reminder** 22:11 106:19

**remodeling** 220:11,14

**remotely** 7:14 14:20 16:21 19:20
22:24 74:4 78:20 85:20 91:25 98:7
99:5 109:21 110:6 120:5 121:2
127:12 130:3 131:23 135:7 143:9
150:2 173:24 184:16 191:5 194:20
200:3 203:2 205:11

**removes** 54:7

**removing** 53:24

**rent** 221:22 222:3,11

**renting** 221:21

**REO** 40:11 50:8

**repeat** 14:9 33:19 65:2 71:9 72:17
79:13 82:10 91:12 103:14 136:8
139:15 171:18 175:23

**rephrase** 175:19

**replacements** 201:17

**report** 46:13 127:21 128:16 130:17,
20,24 131:4 132:8 133:2,12 134:20
137:24 138:7,8,14 139:6,21 140:2,6,
7,9,10,13,18,19,22,24 141:7,11
142:5,9,11 143:24 144:7 145:6,10,14
146:8,9,10,15 147:22 149:14,19
152:9,10 153:25 156:10 163:8 167:4,
9,12,17,19 168:17 173:24 174:8,9,10
180:25 181:20 184:16,24 197:14

**reporter** 8:12 14:16,22 16:16,22
17:19 19:17,22 22:21 23:2 73:24 74:6
78:16,22 85:16,22 91:21 92:3 98:4,9,
25 99:7 109:17,23 110:2,7 119:25
120:7,22 121:4 127:8,14 129:24
130:5 131:20,25 135:3,9 143:5,11
149:23 150:4 173:21 174:2 184:13,18
187:24 191:2,7 194:16,22 199:20
200:5 202:22 203:4 205:6,13 225:14

**reporting** 54:15 84:14,17,19 86:13,
22 87:11,14,19,21 88:7,21 89:2 96:8
116:7,9,11 119:6

**reports** 53:14,15,16,17,25 85:6 90:10,16,18,19 144:3 147:3 148:14, 23 155:20,23,25 158:13,24 161:9,10

**represent** 7:20 8:5 110:19 121:9 150:7 167:24

**representation** 99:12

**represented** 121:21

**representing** 7:16,23 28:17

**represents** 149:10,12

**request** 53:11,12 121:15 138:2,14

**requested** 53:4 90:15 112:24

**requesting** 37:22,25 140:22

**requests** 53:7 137:23 139:21 141:11

**require** 61:15

**required** 73:9 75:7 76:25 84:20 87:5, 15 97:14,22 120:12

**requirement** 44:16,19,22 77:7 85:4, 8

**requirements** 70:4,9 84:14,18,19

**resignation** 16:19 17:6,13,25

**resigned** 17:7,11

**resolved** 68:17

**respect** 41:8 50:10 51:24 75:6 89:8, 14 90:22

**respond** 86:16 197:25 198:13

**responded** 15:12 16:5

**responds** 86:19 132:16 138:24 198:7,15

**response** 16:11

**responses** 9:22

**responsibilities** 41:16 49:10,22 50:9 89:7,11,13,14

**responsibility** 54:6 88:20 89:2

**responsible** 46:17 50:17,22 52:18 53:24 109:11 111:20,23 159:25 219:4

**retain** 78:8

**retained** 78:12

**returned** 100:25

**review** 16:7 38:8 104:15 107:4

**Rican** 8:24

**Richey** 191:12,19,20 199:25 205:9, 23

**Rico** 19:2 25:5 28:6 49:25 50:3 56:18 193:10,13 224:6

**rid** 162:8

**right-hand** 144:22

**rings** 169:11

**Rochester** 54:21 99:22 100:8,10 101:22,23 103:8,17,24 104:4,5 111:4

**Rodriguez** 56:7 86:6 88:25 92:9,16, 25 93:9 201:24

**role** 30:21 33:24 41:17 90:22 160:5

**roles** 23:18

**roll** 222:20

**room** 10:2

**rough** 225:15,16

**rounding** 157:22

**row** 149:10,12 164:7,21 165:17 170:11,20 172:22 174:18,24 176:8,23 177:5,7 178:23 179:7,16 180:16 181:14,25 185:7,8,12

**rows** 149:7 152:5 164:13 166:3 174:20 185:3

**Rules** 81:8

**run** 21:22

**running** 119:12

**runny** 12:17

**runs** 21:18

**RV** 172:3 213:25 214:4

**Ryan** 54:14

## S

**sale** 72:14,19 161:12 186:19

**sales** 75:3,6,15,19 162:7

**satisfied** 117:11

**Sawey** 199:24

**Scherrer** 25:23

**school** 12:3

**screen** 144:10 150:6 154:11 164:3 174:4 184:21 197:8 206:3

**scroll** 130:11 132:3 144:13 145:9,23 146:7 152:9 156:16 165:10 185:16 203:15,17

**scrolled** 144:11

**scrolling** 145:12

**section** 107:18 187:4

**select** 156:20

**selected** 144:23

**self-service** 115:3,10,13 125:18 128:22 130:21 131:2,5 138:3 142:4 167:5,11

**self-serviced** 103:8 111:14 129:3 166:15

**self-servicing** 91:9,15 124:6 125:11,25

**selling** 36:14

**send** 51:23 73:2,9 99:19 100:5 101:21 127:20 130:15 133:23,24 134:16 221:6

**sending** 51:5,22 110:8 111:20

**sends** 92:9 132:4 141:15 196:19,20

**sense** 34:2

**sentence** 82:17,23 83:5,15,17 84:3 99:25 204:11 205:2

**sentences** 107:6

**separate** 224:18,19

**separated** 33:5

**September** 106:14 107:15 130:7 141:23 185:4,17,21,24 186:6,8,20

**service** 28:11 29:16,25 30:9 31:17 32:22 41:23 42:5,13 99:21 100:6 111:5 115:4 122:2 123:25 165:20 167:14

**serviced** 42:5,9 45:8,12,22 46:3,4,7 47:7 48:6 77:15,21 78:5 103:18,25 111:11 118:7,22 124:14

**servicer** 28:20 42:21 44:6,22 77:3,11 97:13,15,20,23 103:9 117:5,20,21 127:20

**servicers** 117:17

**services** 24:10,13,18 27:22,24 28:3 30:14,19 42:8,10,13 117:12,14 135:15 220:4

**servicing** 19:8 20:16 22:9 23:10,13 24:5 27:18,19 28:7,10 29:8,21 32:3, 11,16,20 34:21,24 41:13,18 42:15,17 43:2 44:9 45:2 46:15,20,21,24 47:3,9, 11,20 48:2,13,14 49:10 50:8 53:18 54:3,5,9,16 74:13 77:17 90:22 91:3 100:16,20,23 101:4,12 104:7,8,11,13 105:16,18 106:2 109:12 111:9,25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 444

Edward Barton Oct. V. 2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 Str Dennisse Baez
Hanratty                 Court Records        Pg 1772 of 2230     RECEIVED NYSCEF: 01/12/2024
                                                                          June 02, 2023

112:3,5,19,22 115:6,23 116:5,13
117:6,22 118:9 123:20 124:21 125:2,
7 138:9 160:2,7 161:16 193:23 196:2

**set** 33:13,25

**setting** 50:2

**settle** 210:21 211:6,14

**settled** 210:12

**settlement** 179:16 182:21 210:8,10,
16

**shakes** 17:20

**share** 19:15 22:19 78:14 85:14 91:19
97:25 98:22 109:15,25 119:23 120:18
126:9 127:7 129:22 131:18 134:25
143:3 144:9 149:21 150:6 164:3
174:4 184:10,20 190:22 194:14
199:17 202:20 205:4 206:3

**shared** 16:3

**sharing** 14:14 16:14 73:22

**shift** 144:15

**Shirley** 15:8 16:20

**shithead** 203:12,13

**Shooting** 95:15

**Shore** 119:20 120:24 121:10

**short** 96:6,10 219:13,15

**shortly** 27:19

**show** 129:7 142:5 161:14 167:10
173:16 181:19 194:24

**showed** 155:3,20 159:4,12 163:7
165:22

**showing** 146:11,17 149:8 153:3,5,
10,11 155:23 158:14,24 161:10
167:10 169:20 172:15,18 176:19
184:8

**shown** 142:8 157:17 167:11,17
168:21 182:20

**shows** 96:4 129:7 147:23 176:10,19
177:21 182:6

**side** 41:22 48:13 192:18 204:5
223:15

**significant** 123:2,5,10 163:9,12

**similar** 28:23 151:7 153:16

**single** 20:20 39:9,12,15 156:15

**sit** 76:23

**sitting** 70:8 85:7 108:2 138:20 162:6

**situation** 29:14 195:22

**small** 55:7 157:22 224:6

**smallest** 156:22

**Smith** 7:15

**sold** 53:23 72:24 73:7 153:4 161:17,
23 162:4,14,20 163:14

**sort** 11:23 27:15 39:8 53:10 60:18,23
63:10 156:18,21

**Soto** 56:5,6

**Sound** 119:20 120:24 121:10

**sounded** 223:21

**Source** 72:12

**sources** 99:19 100:5 110:25

**south** 192:18

**Southern** 25:2,10,12 27:12 28:2,4
29:7,12,16,19 30:13 164:8,23 166:7
169:11 170:12 171:15,23 172:23

**space** 155:8

**Spanish** 15:16 26:14

**speak** 13:14,17,21 62:9 76:18 90:21
93:25 126:24 160:14,22 188:13
208:18

**speaking** 80:18 106:25 220:22

**specific** 45:18

**specifically** 153:15

**speculate** 43:7 147:2

**speculation** 47:14 88:16

**Speedboat** 111:12 119:8 141:8
165:17,19 166:5 170:11 172:19

**spell** 8:21 216:25

**spelled** 9:2

**spend** 13:9

**split** 164:17

**spoken** 70:12 208:7

**spreadsheet** 143:8,13 149:6 154:4,
7,9,22 165:15 173:17,18

**spreadsheets** 118:22 151:2 153:17,
18,19

**stamp** 14:15

**standard** 32:15 75:18

**standing** 168:8

**start** 27:6,23 113:15 118:14 190:6

220:17

**started** 10:23 24:14,15 25:18 27:10
28:3,6,8,10 34:11,16,18,23 35:13,16,
18,19,23 38:22 39:3 41:19,21 42:16
49:19 51:7,15 118:15,16,24,25 119:4,
9 153:22 191:24 192:8,10 193:3,5,6,
16 196:2,11 198:23 202:2,4 207:13
212:4 223:20

**starting** 35:24

**state** 7:11,19 8:21 35:21 53:20

**stated** 191:18

**statement** 69:4 81:24 82:12 198:16
206:5 215:23,25

**statements** 205:9,23

**states** 35:22,23,25 36:10 122:7,9

**status** 53:21 148:25 149:2 152:10,15
153:8 154:3 157:9,10,12,15,24 158:7,
25

**stay** 224:4

**staying** 33:10 224:3

**stealing** 15:18

**stole** 16:2

**stop** 12:5 117:13 125:22 126:2,3,6,8
128:9 167:16

**stopped** 34:4 94:2,5,7,10,12,17,22,
24 95:4,10,11 151:18 221:22

**straight** 38:17

**Street** 20:9 21:13,16,19

**streets** 223:17

**stretching** 188:16

**strictly** 53:5

**strike** 41:6 100:13 105:20 180:2

**stuff** 11:19 26:14 194:11 220:15
221:18 224:12

**subject** 16:4

**submit** 52:13

**submitting** 52:16,19 85:5

**subs** 59:19 166:18 168:6 183:11

**Subscribed** 225:25

**subsequent** 59:21,24 168:22

**subsidiaries** 21:5 206:4,19

**substance** 126:25 188:14

**succinct** 22:17

**sue** 64:25 65:5

**sued** 68:15 223:3

**suggest** 154:13

**suggestive** 81:6

**Sullivan** 7:23 8:2

**summary** 152:3,11,13 153:4,9 173:2

**summed** 147:25

**Summons** 19:16,19 55:17

**sums** 144:22

**supervising** 27:17 194:6

**supervisor** 28:7

**supplied** 124:13

**support** 197:17 198:9,18

**supposed** 70:24,25 71:5,14,20 72:3 75:13 81:6,11 91:3 96:14 196:13

**Supreme** 7:10

**surprise** 189:21 210:24

**surprised** 59:25 132:18,20,23 189:14 210:20

**surprising** 60:10

**suspend** 125:18

**swear** 8:13

**switching** 191:11

**sworn** 8:16 225:25

**system** 53:18 54:8 122:3 123:20,23 124:12 146:10 169:17 171:8 174:11 184:25 196:16

**systems** 51:19

---

**T**

**tab** 152:3,4 154:4 165:17 166:4 170:10 172:9,15,20,21

**table** 124:9 172:7 173:2

**tabs** 152:16

**taking** 7:12

**talk** 23:17 29:2 101:18 116:25 117:3, 6 127:3 208:11

**talked** 167:6 208:13 209:19 219:2 224:18

**talking** 35:5 37:5,19 63:11 94:4 141:3 149:3 209:23 212:17 220:23

**talks** 42:25

**tape** 149:25 150:8 156:4,5 158:9,10, 19,20 159:6,8,22 160:15,19,23 163:5 170:19 171:11

**tapes** 159:15

**task** 34:5

**tax** 25:2,10,12 27:7,10,12,16 28:2,4, 12,14,19,23 29:2,5,7,12,15,16,19,23 30:7,13 41:23 58:12 59:22 70:18 71:4,13 72:6,25 73:7 98:18 99:18 100:4 101:20 104:16 110:24 149:10 152:7 164:24 165:4 175:17,20,25 179:25 180:5 185:18 191:12 193:8,11 213:25 214:8,14 215:5,11

**taxes** 59:24 168:8,23

**taxpayers** 28:14

**teacher** 26:10

**teaching** 26:10

**team** 27:18 32:12 34:12,17 37:23,24 41:19 48:14 50:3,4,8 51:3,4,6,23 52:4,5 54:3,5,9,13 55:7,13 94:19 193:23 201:4 210:12 212:4

**telecom** 25:14,15,17,18,20

**telling** 75:9 116:23 129:17 148:13 182:12

**terms** 48:13 75:15 117:10 190:3 196:4 207:24

**test** 26:22

**testified** 8:17 222:25

**testify** 9:21,23

**testifying** 9:17

**testimony** 11:22 127:2 188:15

**text** 11:15 132:4 133:6 134:17 221:6

**thing** 17:21 74:24 124:8 148:20 152:12 157:23 167:24 169:13,15 203:11,21 223:14

**things** 43:4,8,10 75:24 115:18 116:6, 14 194:6 214:22

**thinking** 91:6 167:3 199:2

**third-party** 30:8 44:6,22 77:2,10 97:12,15,20,22

**Thomas** 18:7 108:21,23,24

**Thornton** 26:4,5

**thought** 15:9 16:3 35:2 82:8 216:4, 10

**threatening** 64:24 65:4

**throw** 107:3

**thumbs** 127:4

**Tiffany** 176:9,24 177:15 178:8,20

**time** 7:5 13:9,11 23:16 24:6 27:16 28:13 31:8,10,16,25 32:4,6,23 33:2 34:3,8 36:8,19 37:8,14,24 38:18,24 40:7 42:22 47:10,19 48:8,21,22 51:7, 14 54:10,19,22 56:11 65:21 66:9,14 72:3 73:14 76:10,14 88:19 89:25 93:13,23 95:22,24 96:2,7,11,13 100:16,24 103:6,10,22 105:15,21 107:4 108:3 111:23 124:20 126:16,20 131:9,14 133:9 134:2,5,7 136:12 142:20,24 183:22 187:19 188:5,9 189:20 192:7 201:10 202:4 203:20 204:13,18,20 212:5 216:17 221:13 225:12,19

**times** 217:20

**tiny** 144:21

**title** 22:8 23:7 24:2 41:12

**titled** 19:15

**today** 7:25 9:13 70:8 85:7 108:2 128:5 132:17 134:12 138:20 162:6

**today's** 7:3 8:8 225:12

**told** 37:15,17 43:10,14,20,23,25 64:22 66:2,4,7,8,13 68:9 71:17 95:3 116:13 117:2,8 128:9,12 129:5,8,14, 18 132:24 151:11 159:17 167:13 196:24 209:10 216:3,9 218:2,3 221:11 222:15

**Tom** 31:10 32:9 33:5 204:9,23

**tomorrow** 132:17 134:12 139:2 141:14,22

**top** 21:10 58:3 69:2 79:8 139:3 163:4 164:17 172:10 173:14 197:14 200:22 203:7 214:11

**topic** 222:23

**total** 124:13 145:24 146:3 148:5 150:12 159:6 172:3

**totally** 214:12

**Tower** 42:17,19,22 43:5,9,11,21,23

**track** 163:13

**transaction** 162:25 176:23 180:25 181:20 186:2,5,19 222:20

**transactions** 174:21 175:12,16,17, 24 176:7 178:25 179:4 180:11 181:6 182:5 183:13 185:5,17

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 144    RECEIVED NYSCEF: 01/12/2024

Edward Bonilla vs. Court 2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 Stephen Dennisse Baez
Hanratty    Court Records    Pg 1774 of 2230    June 02, 2023

**transfer** 74:15 181:15,18,21 182:2

**transferred** 111:6,12 178:17 182:24 183:3 186:21

**translated** 32:16

**trial** 9:21,24

**trick** 107:8

**trouble** 200:19 201:14 202:15

**trust** 217:7 220:23,25 221:2

**truthful** 9:12,16 105:5,12 216:11 217:24 218:6,12

**Tuesday** 92:12 93:2,3,7,11

**turn** 102:9 202:16

**turnover** 88:5 190:5

**tutor** 26:14

**type** 28:17 220:12

**typed** 198:25

### U

**uh-huh** 15:19,22 17:2 20:4 23:8 39:7 55:21 86:2,9,15,18 87:2 92:8,15,18 98:16,20 100:12 110:14 122:4 127:18 130:10 165:9 166:6 170:17 181:16 185:11 191:16 198:6,12,20 206:9 217:25 218:13 219:25 223:4

**uh-oh** 222:10

**ultimate** 40:24 57:9

**ultimately** 64:11 123:14 197:13

**Un-huh** 17:15 70:2 213:15

**understand** 9:8,20 12:7,10 20:12 32:10 33:12 35:15,24 57:25 71:3 72:18,24 75:4 82:7 87:10 104:23 105:4,11 107:23 108:3,7,9 128:14 131:3 136:15 137:2,4,10,16,25 138:13 139:25 140:20 141:20 145:4, 25 148:9 155:12 157:7 166:11,23 167:23 168:25 175:5 181:17 199:5 202:3,13 215:18

**understanding** 32:5 34:23 35:14 36:8 42:18 46:6 58:11,24 59:13,18 60:20 65:10 71:22 72:5,13 73:6,12 75:5,24 87:4 112:25 115:9 137:6 177:25 215:7,13

**understated** 198:4

**understood** 138:15 197:3 201:11

**Uniform** 81:8

**universe** 153:21

**unusual** 211:4

**update** 127:19 139:22

**updated** 98:18 104:15 110:20 127:22 128:16 130:20 131:4 140:22

**upload** 123:3,6,12

**uploaded** 85:23 122:3 123:15 127:23 128:4,17,23 129:4 130:21 139:23 142:3

**uploading** 122:9,14 128:3 129:14 135:18,25 138:16

**urgent** 66:21,25

### V

**VADAR** 111:6 118:24 119:2,4,5,16 197:16

**valid** 26:23

**validate** 102:7 146:12,14,15

**values** 53:13,20 140:15

**Vega** 15:8,10,16 16:20 17:7

**Vega's** 17:6

**verbal** 17:18

**verify** 21:7 60:6 102:4 125:15 146:21 162:15 202:5

**verifying** 177:19

**versus** 7:9

**Victor** 8:9

**video** 7:4,6

**videoconference** 7:13

**view** 20:19 39:8,14 162:18

**viewer** 10:11 11:5

**violate** 199:7,10

**violating** 199:6,11

**violation** 81:7

**volume** 33:21

### W

**W-5671** 165:6

**waiting** 132:5

**Wang** 8:9

**wanted** 31:3 65:17 66:11 195:25 197:22,24 199:11 205:16 219:20 220:16 222:4

**water** 12:16

**web** 7:13

**week** 55:4 93:5 185:6

**weeks** 141:17

**weird** 14:4

**Willscher** 8:2

**wind** 28:8

**withdraw** 185:8,9

**withdraws** 206:7,20

**withdrew** 176:9

**words** 116:19 213:9

**work** 10:23 18:17,18 19:7 24:7,12,17, 20 25:11,17,21,22 26:9 27:15 28:16, 18 33:10,14 34:2 49:4 50:25 55:8 56:12,19 89:13 145:15 194:3,6 201:18,23 204:14 220:8

**worked** 24:22 25:14 28:2 35:20 203:22

**working** 25:18,25 26:4 27:6,10 28:3 29:7 31:16 33:13 34:6,11,16,18,19 35:19 38:22 39:3 94:19 119:14 132:25 133:8,11,21 134:2,4,7 207:13 211:20 212:4 219:5 223:21 224:21

**workload** 34:9

**works** 56:7

**worry** 14:5

**worth** 180:2

**WRD** 157:10

**WRDS** 157:11

**write** 16:11 26:11 107:22

**write-off** 161:13

**write-offs** 157:13 162:8

**written** 140:15 157:21 161:18,23 162:5,20

**wrong** 186:7 196:21,22 205:17 214:12

### X

**Xie** 51:10 78:25 80:4 98:14 102:11 104:14 105:21 116:8 192:5 194:8 198:7 201:8,9,13,15

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 44
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

Empaneled Jury - 2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 Stipa
Hanratty              Court Records   Pg 1775 of 2230

Dennisse Baez
June 02, 2023

**Xie's** 193:21

**XYZ** 20:7

---

**Y**

---

**Yang** 54:12,14

**Yea** 214:5

**year** 151:24 192:7,15

**year-ended** 205:10,24

**years** 44:4 85:12 103:4 105:9 131:15
  191:22 192:2

**York** 7:11 9:18 50:5 99:22 204:19

---

**Z**

---

**Zimmer** 211:19

**Zink** 196:7

**Zoom** 10:10 11:2,5

# EXHIBIT 23

**In the Matter Of:**

*Emigrant Business Credit vs*

*Hanratty*

*PING XIE*

*August 02, 2023*

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1778 of 2230

1

1     SUPREME COURT OF THE STATE OF NEW YORK

2          COUNTY OF NEW YORK

3

4   EMIGRANT BUSINESS CREDIT          )
    CORPORATION,                      )
5        Plaintiff,                   )
6        -vs-                         )  Index No.
7                                     )  158207/2022
    JOHN ARTHUR HANRATTY,             )
8   EBURY STREET CAPITAL, LLC, ET     )
    AL,                               )
9        Defendants.                  )

10

11

12        VIDEO RECORDED EXAMINATION OF

13             PING XIE

14     _____

15          TAKEN ON

16

17     WEDNESDAY, AUGUST 2, 2023

18

19

20

21

22
    CERTIFIED STENOGRAPHER:
23   JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
    CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24   CCR-WA (No. 21007264), CSR-CA (No. 14420),
    REALTIME SYSTEMS ADMINISTRATOR
25   JOB NO.:  906011

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                          Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs Court Records    Pg 1779 of 2230    Ping Xie
Hanratty                                                         August 02, 2023

2

1

2

3          VIDEO RECORDED EXAMINATION of

4    PING XIE, taken before JESSICA R. WAACK,

5    Registered Professional Reporter, Registered

6    Merit Reporter, Certified Realtime Reporter,

7    Registered Diplomate Reporter, California

8    Certified Realtime Reporter, New Jersey

9    Certified Court Reporter (License No.

10   30XI008238700); Texas Certified Shorthand

11   Reporter (License No. 11958); Washington State

12   Certified Court Reporter (License No.

13   21007264); California Certified Shorthand

14   Reporter (License No. 14420); New York

15   Association Certified Reporter, New York

16   Realtime Court Reporter and Notary Public of

17   Washington, D.C. and the States of New York,

18   Pennsylvania, Delaware, Maryland and Virginia,

19   at Sullivan & Cromwell, LLP, 125 Broad Street,

20   New York, New York, on Wednesday,

21   August 2, 2023, commencing at 9:34 a.m. and

22   concluding at 3:38 p.m.

23

24

25

3

1          A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF:

4        SULLIVAN & CROMWELL LLP

5        BY:  AUSTIN P. MAYRON, ESQ.

6        BY:  ALEX WILLSCHER, ESQ.

7        125 Broad Street

8        New York, New York  10004-2498

9        PHONE:  212-558-4000

10        EMAIL:  Mayrona@sullcrom.com

11

12    ON BEHALF OF THE DEFENDANTS:

13        GUSRAE KAPLAN NUSBAUM PLLC

14        BY:  VICTOR WANG, ESQ.

15        BY:  KARI PARKS, ESQ.

16        120 Wall Street

17        New York, New York  10005

18        PHONE:  212-269-1400

19        EMAIL:  Vwang@gusraekaplan.com

20        EMAIL:  Kparks@gusraekaplan.com

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1781 of 2230    Ping Xie
Hanratty                                             August 02, 2023

4

1          A P P E A R A N C E S

2

3    ON BEHALF OF THE WITNESS:

4       LAW OFFICES OF MARK A. BEDEROW, P.C.

5       BY:  MARK A. BEDEROW, ESQ.

6       152 West 57th Street

7       New York, New York  10019

8       PHONE:  212-256-9491

9

10         A L S O   P R E S E N T

11   DMITRY ZVONKOV, videographer

12   LENNY YANG, interpreter

13   HUTCHINSON FANN, summer associate

14

15          --o0o--

16

17

18

19

20

21

22

23

24

25

Emigrant Business Credit vs
Hanratty

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1782 of 2230

Ping Xie
August 02, 2023

5

1           INDEX TO EXAMINATION

2            WITNESS:  PING XIE

3

4           EXAMINATION            PAGE

5    BY MR. MAYRON                12

6

7           INDEXED PAGES

8                        PAGE

9    PING XIE, sworn             11

10   REPORTER CERTIFICATE            225

11   INSTRUCTIONS TO WITNESS         226

12   DECLARATION UNDER PENALTY OF PERJURY   227

13   ERRATA SHEET              228

14

15           INFORMATION REQUESTED

16                None

17

18

19

20

21

22

23

24

25

6

 1   WITNESS INSTRUCTED NOT TO ANSWER

 2

 3          Page    Line

 4           18     14

 5           18     20

 6           23     12

 7           24     22

 8           25      5

 9           86     22

10          110     12

11          110     18

12          114      6

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022

NYSCEF DOC. NO.        24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.        Court Records        Pg 1784 of 2230        Ping Xie
Hanratty                                                                              August 02, 2023

7

1        INDEX TO EXHIBITS

2        WITNESS: PING XIE

3        Wednesday, August 2, 2023

4    MARKED        DESCRIPTION        PAGE

5    Exhibit 1  Complaint                78

6    Exhibit 2  Affidavit of John Hanratty      80

7    Exhibit 3  Email dated March 4, 2020;

8        EBCC_38991                87

9    Exhibit 4  Deposition transcript of

10        Dennissee Baez            90

11    Exhibit 5  Email chain ending on

12        August 6, 2019; EBURY_35508    109

13    Exhibit 6  Volume 1 of John Hanratty's

14        deposition                137

15    Exhibit 7  Email dated August 12, 2019;

16        EBURY_71497                152

17    Exhibit 8  Attachment to Exhibit 7;

18        EBURY_71498                152

19    Exhibit 9  Email chain ending on

20        August 12, 2019; EBURY_59765   162

21    Exhibit 10 Email chain ending on July 24,

22        2017; EBCC_34790            165

23    Exhibit 11 Email chain ending on

24        September 18, 2017; EBCC_1778  166

25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1785 of 2230    Ping Xie
Hanratty

August 02, 2023

8

1          INDEX TO EXHIBITS

2          WITNESS:  PING XIE

3          Wednesday, August 2, 2023

4    MARKED          DESCRIPTION          PAGE

5    Exhibit 12 Email chain ending on

6          February 14, 2018; EBURY_2932  169

7    Exhibit 13 Consolidated financial

8          statements for Ebury Fund 1;

9          EBCC_10586                177

10    Exhibit 14 Ebury Fund 1 consolidated

11          financial statements dated

12          December 31, 2019; EBCC_10663  177

13    Exhibit 15 Ebury Fund 2 consolidated

14          financial statements dated

15          December 31, 2019; EBCC_10701  177

16    Exhibit 16 Email chain ending on

17          September 11, 2019;

18          EBURY_53064                183

19    Exhibit 17 Email chain ending on

20          September 13, 2019;

21          EBURY_29017                189

22    Exhibit 18 Email chain ending on July 30,

23          2018; EBURY_23926          196

24    Exhibit 19 Email chain ending on July 25,

25          2019; EBCC_5399            198

9

1          INDEX TO EXHIBITS

2          WITNESS:  PING XIE

3        Wednesday, August 2, 2023

4    MARKED          DESCRIPTION          PAGE

5    Exhibit 20 Email dated April 12, 2018;

6          EBCC_3152                201

7    Exhibit 21 Email dated August 24, 2018;

8          EBURY_3523               206

9    Exhibit 22 Email dated October 12, 2018;

10          EBURY_18474               210

11   Exhibit 23 Email chain ending on

12          October 10, 2019; EBURY_27135  212

13

14    ** All exhibits were attached to the

15          original transcript **

16

17          --o0o--

18

19

20

21

22

23

24

25

10

1    PING XIE - 08/02/2023

2        ******

3        PROCEEDINGS

4    August 2, 2023, 9:34 a.m.

5      New York, New York

6        ******

7      THE VIDEOGRAPHER:  We are on the

8   record.

9      Today's date is August 2, 2023.

10  The time on the video is 9:34 a.m.

11      This is video 1 in the deposition

12  of Ping Xie in the matter of Emigrant

13  Business Credit Corporation vs. John

14  Arthur Hanratty, et al., in the Supreme

15  Court of New York, County of New York,

16  Case Number 158207/2022.

17      This deposition is taking place

18  at 125 Broad Street, New York,

19  New York.

20      The videographer is Dmitry

21  Zvonkov, the court reporter is Jessie

22  Waack, both with Lexitas.

23      Will counsel please identify

24  themselves for the record.

25      MR. MAYRON:  Good morning.

1        PING XIE - 08/02/2023

2    Austin Mayron of Sullivan & Cromwell on

3    behalf of Plaintiff Emigrant Business

4    Credit Corporation.  With me today is

5    Alex Willscher, also of Sullivan &

6    Cromwell, and Hutchinson Fann, a summer

7    associate here.

8        MR. BEDEROW:  On behalf of the

9    witness, Mark Bederow, B-e-d-e-r-o-w.

10        MR. WANG:  On behalf of the

11    defendant, Victor Wang, from Gusrae

12    Kaplan Nusbaum, and with me is the

13    senior associate, Kari Parks.

14        THE VIDEOGRAPHER:  Would the

15    reporter please swear in the

16    interpreter and the witness.

17        (Whereupon, the interpreter was

18        sworn on oath.)

19            *****

20        PING XIE, sworn

21    on oath and/or affirmed, called as a

22    witness herein, was examined and testified

23        as follows:

24            *****

25        MR. BEDEROW:  Wait for the

Emigrant Business Credit vs.
Hanratty
Court Records    Pg 1789 of 2230    Ping Xie
August 02, 2023

12

1        PING XIE - 08/02/2023

2    interpreter even if you understand.

3          EXAMINATION

4    BY MR. MAYRON:

5      Q.   Good morning, Mr. Xie.  And thank

6    you for joining us.  I'll be asking you

7    questions today.  Unless your counsel

8    instructs you to answer [sic], you need to

9    answer my questions truthfully and fully.

10         Do you understand?

11     A.   Yes, I understand.

12     Q.   The court reporter will be taking

13   down everything that we say today, so for

14   that reason, it's very important that we

15   both not talk over each other and we let

16   each other complete our questions and

17   answers before proceeding.

18         Is that okay?

19     A.   I agree.

20     Q.   All of your answers must be

21   verbal, so please make sure that you answer

22   verbally instead of shaking or nodding your

23   head.

24     A.   I got it.

25     Q.   Your counsel or defendant's

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1790 of 2230    Ping Xie
Hanratty    August 02, 2023

13

1        PING XIE - 08/02/2023

2   counsel might make objections to some of my

3   questions.  These objections may become

4   relevant at later stages of the case, but

5   the objections should not have any effect

6   at all on your answers unless your counsel

7   specifically instructs you not to answer a

8   question.

9        Does that make sense?

10    A.  I got it.

11    Q.  You've asked today to conduct the

12  deposition with a Mandarin-English

13  interpreter; is that correct?

14    A.  Yes.

15    Q.  Mandarin is your native language,

16  correct?

17    A.  Yes.

18    Q.  You also understand English

19  fluently, correct?

20    A.  Yes.

21    Q.  And how many years have you been

22  speaking English?

23    A.  Since 1997 when I came to the

24  United States.

25    Q.  And so why do you ask to conduct

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1791 of 2230    Ping Xie
Hanratty                                              August 02, 2023

14

1          PING XIE - 08/02/2023

2   the deposition today through a

3   Mandarin-English interpreter?

4       A.   Mainly to avoid some grammar

5   mistakes and misunderstanding.

6       Q.   Are you confident in your English

7   communication abilities?

8       A.   Yes, it should be.

9       Q.   Have you ever had trouble

10  understanding John Hanratty?

11      A.   Basically not.

12      Q.   Have you ever had trouble

13  communicating with John Hanratty?

14      A.   I don't think so.

15      Q.   Did the fact that English is your

16  second language ever impact your ability to

17  perform your job at Ebury?

18      A.   No substantial impact.

19      Q.   And to be clear, when you worked

20  at Ebury, you communicated with the other

21  employees in English?

22      A.   Yes.

23      Q.   And when you communicated with

24  Emigrant Bank, you also communicated in

25  English, correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
Emigrant Business Credit vs Court Records
Hanratty

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Pg 1792 of 2230

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/12/2024
Ping Xie

August 02, 2023

15

1       PING XIE - 08/02/2023

2       A.  Yes.

3       Q.  Did you ever have trouble

4    understanding what Emigrant employees were

5    saying to you?

6           MR. WANG:  Objection.

7           MR. BEDEROW:  You can answer.

8           THE WITNESS:  I don't -- I didn't

9    feel that.

10   BY MR. MAYRON:

11      Q.  You could understand Jack Grady

12   when you communicated with him?

13      A.  Yes.

14      Q.  And you could understand Sahil

15   Arora when you communicated with him?

16      A.  I don't remember this name, but

17   if I had worked with this person, it

18   shouldn't be a problem.

19      Q.  Thank you.

20          If you need a break at any point

21   today, please let me know.  The only thing

22   I ask is that if there's a question

23   pending, you answer the pending question

24   before we take a break.

25          Is that okay?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO.                                           RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1793 of 2230    Ping Xie
Hanratty                                                          August 02, 2023

16

PING XIE - 08/02/2023

1

2     A.  No problem.

3     Q.  And if you don't understand my

4  question, please let me know and I'll

5  rephrase it.

6         If you answer a question, I'll

7  assume that you understood the question; is

8  that fair?

9     A.  I understand.

10     Q.  Do you have any questions about

11  any of these ground rules before we

12  continue?

13     A.  No question.

14     Q.  Have you ever given testimony

15  under oath before?

16     A.  No.

17     Q.  When did you first become aware

18  that Emigrant was seeking your deposition

19  testimony in this matter?

20     A.  I don't remember the exact time.

21  It's about one or two weeks earlier, about

22  the beginning of July.

23     Q.  Are you aware that on March 29,

24  Emigrant served a subpoena for your

25  testimony?

17

1       PING XIE - 08/02/2023

2    A.  I have no idea.

3    Q.  Are you aware that Defendant's

4  counsel originally scheduled your

5  deposition for June 7, 2023?

6       MR. BEDEROW:  I'm going to

7    object.  And just remind the witness

8    not to discuss any conversations you

9    had with your lawyers at the time.

10       Other than that, you can answer

11    the question.  No conversations with

12    lawyers.

13       THE WITNESS:  I don't remember

14    the exact date, but in June, I have no

15    idea about this until July I learned

16    about it.

17  BY MR. MAYRON:

18    Q.  So were you aware that on June 2,

19  Ebury's counsel sent Emigrant an email

20  saying that a family emergency had come up

21  and that you were no longer available on

22  June 7, but that you were available on

23  June 20?

24       MR. BEDEROW:  Objection.

25       Again, if it calls for

18

1        PING XIE - 08/02/2023

2    conversations between him and his

3    then-counsel.

4        THE WITNESS:  I have no idea

5    about that.  And I didn't have that

6    family emergency.

7  BY MR. MAYRON:

8    Q.  Mr. Bederow referred to

9  Defendant's counsel, I believe, as your

10  then-counsel.

11       Did Defendant's counsel -- let

12  me -- did you ever engage Defendant's

13  counsel to represent you?

14       MR. BEDEROW:  Objection.  Don't

15    answer that.

16  BY MR. MAYRON:

17    Q.  Are you going to answer that

18  question, Mr. Xie?

19       MR. BEDEROW:  No.  No.  Don't

20    answer.  We're not talking about hiring

21    lawyers or who represents you.

22       Don't answer.

23  BY MR. MAYRON:

24    Q.  Are you following counsel's

25  instruction not to answer?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1796 of 2230    Ping Xie
Hanratty    August 02, 2023

19

1    PING XIE - 08/02/2023

2    A.  Yes.

3    Q.  Are you aware that your

4    deposition was rescheduled from June 7 to

5    June 27, 2023?

6    A.  I have no idea.

7    Q.  Are you aware that Defendant's

8    counsel told Emigrant on June 22 that you

9    were no longer available on June 27 but

10    that you were available the week of July 3?

11    MR. WANG:  Objection.

12    MR. BEDEROW:  Objection.

13    Let me begin, if I can.

14    Objection to the extent it calls for

15    any conversations between you and

16    counsel for the defendant.

17    Beyond that, I don't have an

18    objection.

19    Counsel for Ebury, excuse me.

20    Too many Es.

21    THE WITNESS:  Other than the last

22    cancelation, I have no idea about any

23    prior arrangement.

24    BY MR. MAYRON:

25    Q.  Thank you.

20

1    PING XIE - 08/02/2023

2        And I'm just going to go through

3    all of the scheduling that occurred just so

4    we understand what happened.

5        Are you aware that Ebury's

6    counsel told Emigrant that you were not

7    available on June 27 because you were

8    attending a piano tournament?

9        MR. BEDEROW:  Objection to the

10        extent it calls for conversations

11        between the witness and counsel for

12        Ebury.

13        THE WITNESS:  I have no idea.  I

14        don't play piano.

15    BY MR. MAYRON:

16    Q.  Did your son participate in a

17    piano tournament on or around June 27?

18    A.  No.  My son is attending

19    University of Chicago as a sophomore.  He's

20    not playing.

21    Q.  Does your son play piano?

22    A.  Yes.

23    Q.  And when did you first become

24    aware that your deposition was rescheduled

25    for July 11, 2023?

21

1          PING XIE - 08/02/2023

2              MR. BEDEROW:  Objection to the

3      extent it calls for communications

4      between the witness and counsel for

5      Ebury.

6              If you can answer without that,

7      fine.

8              THE WITNESS:  It's about a day or

9      two days before the date of last

10      cancelation of the deposition.

11    BY MR. MAYRON:

12        Q.   I think you sent me an email were

13    you said that you were not aware of the

14    subpoena until July 10 at 11:00 a.m. via a

15    text message from John Hanratty.

16            Is that roughly correct?

17      A.   Yes.

18      Q.   Are you aware that Ebury's

19    counsel told Emigrant that you were

20    refusing to appear --

21            MS. PARKS:  Objection.

22    BY MR. MAYRON:

23      Q.   -- for the July 11, 2023,

24    deposition?

25            MR. BEDEROW:  Objection to the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1799 of 2230   RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs   Ping Xie
Hanratty

August 02, 2023

22

1          PING XIE - 08/02/2023

2     extent it calls for communications

3     between the witness and counsel for

4     Ebury.

5          MS. PARKS:  Objection.  Because

6     it also misrepresents [indiscernible].

7          THE STENOGRAPHER:

8     Misrepresents...  excuse me?

9          MS. PARKS:  I'm sorry.  Our

10     previous conversation.

11          THE WITNESS:  Yes, I do.

12   BY MR. MAYRON:

13     Q.   Were you, in fact, refusing to

14   appear for your deposition on July 11 --

15          MR. WANG:  Objection.

16   BY MR. MAYRON:

17     Q.   -- 2023?

18          MR. WANG:  Objection.

19          MR. BEDEROW:  I object to the

20     form, actually.

21          You can...

22          THE WITNESS:  I didn't have a

23     attorney at that time so I feel like I

24     don't know anything.  I couldn't appear

25     at the -- this deposition.

23

1        PING XIE - 08/02/2023

2   BY MR. MAYRON:

3        Q.   So, Mr. Bederow several times has

4   objected to my questions to the extent it

5   calls for privileged information and

6   instructed you not to disclosure privileged

7   information.

8            Have you withheld information

9   related to communications with Ebury's

10  counsel in June 2023 on the basis of

11  Mr. Bederow's instruction?

12           MR. BEDEROW:  Objection.  Don't

13   answer that.

14           Don't answer.

15           You don't have to answer that.

16  Don't answer.  That means, don't speak,

17   okay?

18  BY MR. MAYRON:

19       Q.   Mr. Xie, are you willing to

20  answer that question?

21   A.   No.

22       Q.   Are you following counsel's

23  instruction?

24   A.   Yes.

25           MR. MAYRON:  Mr. Bederow, what's

24

1        PING XIE - 08/02/2023

2    the basis of your objection?

3        MR. BEDEROW:  You're asking him

4    about conversations and information

5    exchanged or materially withheld

6    between him and counsel.

7        And, in my view, that's not the

8    subject of a proper question, so the

9    witness is being advised not to answer.

10        MR. MAYRON:  Well, to be clear, I

11    think it's an improper instruction

12    because he just said he didn't have an

13    attorney at the time.  And, also, I'm

14    not asking him about the substance.

15        MR. BEDEROW:  Well, any

16    information that was theoretically

17    exchanged between attorneys, whether

18    retained or in contemplation of

19    retention, are otherwise privileged, in

20    my view, would still be subject to

21    attorney-client privilege.  And the

22    witness is being advised not to answer

23    it.

24    BY MR. MAYRON:

25    Q.   Mr. Xie, were you contemplating

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1802 of 2230    Ping Xie
Hanratty    August 02, 2023

25

1          PING XIE - 08/02/2023

2    retaining counsel for the defendants in

3    June 2023?

4          MR. BEDEROW:  Objection.

5          I'm advising you not to answer.

6    BY MR. MAYRON:

7      Q.  Mr. Xie, are you willing to

8    answer that question?

9      A.  No.

10      Q.  Are you aware that on July 11,

11    Ebury's counsel informed Emigrant that you

12    appeared committed to not appearing at your

13    deposition on July 11?

14          MR. WANG:  Objection.

15          MS. PARKS:  Objection.

16          MR. BEDEROW:  Objection to the

17    extent -- from the witness's attorney's

18    perspective, to the extent it calls for

19    conversations between the witness and

20    lawyers for Ebury.

21          You can answer to the extent it

22    doesn't reveal communications between

23    you and Ebury -- lawyers for Ebury,

24    excuse me.

25          THE WITNESS:  Can you repeat the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. Emigrant Business Credit vs
Hanratty
Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records       Pg 1803 of 2230
24-04020-dsj
RECEIVED NYSCEF: 01/12/2024
Ping Xie
August 02, 2023

26

1        PING XIE - 08/02/2023

2     question?

3  BY MR. MAYRON:

4        Q.  Sure.

5          Are you aware that on July 11,

6  Ebury's counsel informed Emigrant that you

7  appeared committed to not appearing to your

8  deposition on July 11?

9     A.  Yes, I know that.

10        Q.  And are you aware that on

11  July 11, Ebury's counsel informed Emigrant

12  that it would not oppose a motion to compel

13  you to attend a deposition?

14          MR. BEDEROW:  Objection to the

15     extent it calls for communications

16     between the witness and counsel for

17     Ebury.

18          THE WITNESS:  I don't remember

19     that.

20  BY MR. MAYRON:

21     Q.  Without revealing the substance

22  of the communications, when was the first

23  you spoke with Ms. Parks?

24        Let me ask you again.

25          Without revealing the substance

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022

NYSCEF DOC. NO.   24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.   Court Records   Pg 1804 of 2230   Ping Xie
Hanratty                                                       August 02, 2023

27

1          PING XIE - 08/02/2023

2   of the communications, when was the first

3   time that you communicated with Ms. Parks?

4          MR. WANG:  Objection.  Objection

5     to form.

6          THE WITNESS:  It should be the

7     same day as I received that email.  It

8     should be the same day as I mentioned

9     in my email to Austin.

10  BY MR. MAYRON:

11    Q.   And without revealing the

12  substance of the communications, when was

13  the first time that you communicated with

14  Mr. Wang?

15    A.   The same day.

16    Q.   When you say "the same day," you

17  mean July 11?

18    A.   Yes.

19    Q.   So to confirm, you have never

20  spoken to Ms. Parks or Mr. Wang before

21  July 11?

22    A.   I confirm.

23    Q.   Had you spoken to anyone else

24  from Ms. Parks' or Mr. Wang's law firm

25  before July 11?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.    Court Records    Pg 1805 of 2230    Ping Xie
Hanratty    August 02, 2023

28

1      PING XIE - 08/02/2023

2    A.  No.

3    Q.  Did you speak to John Hanratty

4   about the scheduling of your deposition?

5    A.  No.

6    Q.  Did you text with Mr. Hanratty

7   about the scheduling of your deposition?

8        MR. BEDEROW:  I'm going to object

9    to the form.

10        You can answer.

11        I'm sorry.

12        THE WITNESS:  No.

13   BY MR. MAYRON:

14    Q.  On July 11, you sent me an email

15   that stated you weren't aware of the

16   subpoena until Monday morning, July 10 at

17   11:00 a.m. via a text message from John

18   Hanratty.

19        Was that not correct?

20        MR. BEDEROW:  Object to the form.

21        THE WITNESS:  If I remember

22    correctly, in the text message, I

23    communicated with his counsel and then

24    his counsel called.

25        The text message is from John,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO.                                            RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1806 of 2230    Ping Xie
Hanratty                                                  August 02, 2023

29

1        PING XIE - 08/02/2023

2    and he told me to have a phone call

3    with his counsel.  And his counsel

4    called me.  Victor told me that there

5    is a schedule.

6  BY MR. MAYRON:

7     Q.  Can I see the text message from

8  Mr. Hanratty?

9        MR. BEDEROW:  I don't know that

10   he literally has anything with him.

11       THE WITNESS:  Let me check.

12       (Pause in testimony.)

13       MR. BEDEROW:  Let me see it

14   first.  I don't have my reading

15   glasses.  Bear with me.

16       I'm going to show this to you.

17   I'm just going to ask that you not

18   scroll beyond starting, I guess,

19   July 6.

20  BY MR. MAYRON:

21    Q.  So on July 6 at 11:50 a.m.,

22  Mr. Hanratty texted you, "Ping.  This is

23  John Hanratty.  Do you have time to speak

24  today or tomorrow?  Hope you are doing

25  well."

30

1      PING XIE - 08/02/2023

2          Did I read that correctly?

3      A.   Yes.

4      Q.   Is that the first time you had

5  communicated with John Hanratty about this

6  lawsuit by Emigrant against Ebury?

7          MR. BEDEROW:  Objection.  I'm

8      going to object to the form.  He didn't

9      communicate.  Your question asked if he

10     was communicating with.

11          You can answer.

12          THE WITNESS:  In his text

13     message, he didn't mention this case.

14     And at that time, I thought that was

15     another John, so I said you can call

16     me.  I'm available.  I'm here.  But I

17     didn't receive any phone call until the

18     next --

19          (Interpretation occurs.)

20          THE WITNESS:  Let me correct.

21          It's not I didn't receive any

22     phone call.  Just because I was busy I

23     didn't pick up the phone call.  Then

24     it's until July the 10th or 11th, I

25     received another message.

31

1          PING XIE - 08/02/2023

2    BY MR. MAYRON:

3        Q.   So, again, prior to July 6 at

4    11:50 a.m., had you communicated with John

5    Hanratty about this lawsuit by Emigrant

6    against Ebury?

7          MR. BEDEROW:  I object to the

8    form.

9          But he can answer.

10          THE WITNESS:  No.

11    BY MR. MAYRON:

12        Q.   Prior to July 6, had anyone

13    approached you about this lawsuit?

14        A.   No.

15        Q.   Do you mind if I see the rest of

16    the text messages?

17        A.   (In English.)  Yeah, yeah.

18        Q.   To make this more -- easier, I'm

19    just going to read the rest of the text

20    messages into the record.

21          On July 10 at 9:26 a.m.,

22    Mr. Hanratty texted you, "Ping, can we

23    speak today?  TY.  And let me know a good

24    time."

25          And then on July 10 at

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.    Court Records    Pg 1809 of 2230
Hanratty

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Ping Xie

August 02, 2023

32

1        PING XIE - 08/02/2023

2   11:00 a.m., Mr. Hanratty texted you, "Ping,

3   I am in litigation with Emigrant.  They

4   want to depose you.  I assume it will last

5   two to three hours.  They have time

6   tomorrow morning or Friday morning.  There

7   is nothing to prep, but you need to speak

8   to Kari Parks, my lawyer.  Please give me a

9   call.  This has nothing to do with you

10  personally."

11        Did I read that correctly?

12     A.  Yes, correct.

13     Q.  Have you communicated with

14  Mr. Hanratty since July 10 at 11:00 a.m.?

15     A.  No.

16     Q.  Without revealing the substance

17  of your communications, have you spoken

18  with Ebury's counsel since July 10 at

19  11:00 a.m.?

20     A.  It should be.  I don't remember

21  the exact time, but it should be.  We have

22  scheduled this deposition with this matter.

23     Q.  Approximately how much time did

24  you spend preparing for this deposition?

25     A.  Several hours.

33

1        PING XIE - 08/02/2023

2        Q.   Who did you speak with to prepare

3    for the deposition?

4            MR. BEDEROW:  Well, objection.

5    If -- not including lawyers.

6            THE WITNESS:  Other than my

7    lawyer, no one else.

8            MR. BEDEROW:  When you say "other

9    than lawyers," it means -- leave the

10    lawyers out.

11           THE WITNESS:  (In English.)

12    Okay.  Okay.

13           MR. BEDEROW:  Just go ahead.

14   BY MR. MAYRON:

15       Q.   Did you review any documents to

16   prepare for this deposition?

17       A.   Yes.

18       Q.   Did you speak to anyone from

19   Ebury or any of its affiliates to prepare

20   for this deposition?

21           MR. BEDEROW:  Objection.  Other

22    than lawyers for Ebury.

23           THE WITNESS:  No.

24   BY MR. MAYRON:

25       Q.   Without revealing the substance

34

1           PING XIE - 08/02/2023

2   of your communications, did you speak with

3   Ebury's counsel to prepare for this

4   deposition?

5     A.  No.

6     Q.  Have you seen the complaint that

7   was filed in this action?

8     A.  Yes.

9     Q.  What was your reaction when you

10  saw the complaint?

11          MR. BEDEROW:  Objection.

12          MR. WANG:  Objection.

13          MR. BEDEROW:  You can answer.

14          THE WITNESS:  (In English.)  Not

15   very surprised -- sorry.

16          (Interpretation occurs.)

17          THE WITNESS:  But I was aware

18   about this.

19  BY MR. MAYRON:

20    Q.  What do you mean by "not very

21  surprised"?

22    A.  When I decided to leave Ebury and

23  there are some -- their financial condition

24  was not that good.  Their problem with --

25  along with Capital One, and for me, the

35

PING XIE - 08/02/2023

1

2 financial condition of them was not good.

3 So I was not surprised to see such kind of

4 bad loans.

5    Q.  Let's just break them down, some

6 of your answers.

7       The first answer you said you

8 were not very surprised, but you were aware

9 about this.

10       What did you mean by you were

11 aware about this?

12    A.  When I say I was aware about

13 this, that means that at the end of my

14 career working at Ebury, I can predict that

15 such bad debt will -- and condition may

16 happen.

17       It's not like kind of predict,

18 but there were possibilities.

19    Q.  So going back an answer again,

20 you said when you left Ebury, their

21 financial condition was not that good.

22       What do you mean by that?

23    A.  I don't remember the terms of the

24 Capital One loan.  It says the EBITDA have

25 to be more than the cost of the interest.

36

1       PING XIE - 08/02/2023

2   But at that time, Ebury have a lot of loss

3   and it can -- their EBITDA cannot afford

4   the payment of interest.

5           So at that time, their financial

6   condition was not that good and their

7   ability to pay back a loan is very weak --

8   was very weak.

9       Q.   Are you aware that Emigrant's

10  lawsuit accuses John Hanratty of defrauding

11  Emigrant Bank?

12      A.   I was aware of that after I saw

13  that complaint.

14      Q.   What is your reaction to those

15  allegations?

16          MR. WANG:  Objection.

17          MR. BEDEROW:  Objection.

18          You can answer.

19          THE WITNESS:  I was not very

20      clear whether he was -- his defrauding,

21      but I was not surprised about he

22      couldn't pay back the Capital One loan.

23  BY MR. MAYRON:

24      Q.   Were you surprised that he

25  couldn't pay back the Emigrant loan?

37

1    PING XIE - 08/02/2023

2    A.  No.  What I said was I was not

3    surprised.

4    Q.  You understand that the Ebury

5    companies had a line of credit with Capital

6    One, correct?

7    A.  Yes.  If I remember that

8    correctly, before I left Ebury, it was

9    required to pay back the whole loan.

10    Q.  You also understand that the

11    Ebury companies had a separate line of

12    credit with Emigrant Bank, correct?

13    A.  Yes.

14    Q.  And so earlier when you said, I

15    was not surprised that he couldn't pay back

16    the Capital One loan, did you mean to say

17    you were surprised he couldn't pay back the

18    Emigrant loan?

19    A.  At that time, based on the

20    business condition of Ebury, I was not

21    surprised about he -- about them not being

22    able to pay back the relevant loans or the

23    interest of the investors, because their

24    financial condition and business condition

25    was not very well at that time.

38

PING XIE - 08/02/2023

1

2    Q.   By "the relevant loans," do you

3    mean the Emigrant loan?

4        A.   It included the loan of the

5    Capital One loan, because they requested to

6    pay this back a little bit earlier.  And

7    Emigrant had requested later.  But for me,

8    any -- any of the loans cannot be paid

9    back, I was not surprised about that.

10       Q.   Are you aware that the Ebury

11   companies paid off the Capital One

12   facilities?

13       A.   It has been a long time.  I'm

14   not -- I may not remember clearly.  But if

15   my memory was correct, because Capital One

16   asked that urgently and I think it was paid

17   back in full.

18       Q.   Is your understanding that

19   Capital One requested repayment of its

20   credit facilities in 2018?

21       A.   I don't remember the exact years,

22   but every quarter we have to prepare those

23   financial reports.  And based on the terms,

24   the financial ratios, for example, EBITDA

25   has -- was less than the interest that need

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.    Court Records    Pg 1816 of 2230
Hanratty
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                                                                          Ping Xie
                                                                          August 02, 2023

39

PING XIE - 08/02/2023

1

2    to be paid to Capital One.

3        And also, like, the balance sheet

4    ratio was not good.  So Capital One

5    mentioned that Ebury has to pay back all

6    these facilities.  But I don't remember

7    that was in 2018 or '19.

8        Q.   Just so that the record is clear,

9    would it be possible for you to speak one

10    sentence at a time and let the interpreter

11    translate that sentence before proceeding?

12        A.   Okay.

13        Q.   So you said that Capital One

14    asked that it be repaid urgently.

15        What makes you say that Capital

16    One's request was urgent?

17        A.   If I remember correctly, they do

18    have a due date.

19        Q.   Are there any other reasons that

20    you said Capital One's request was urgent?

21        A.   Because we always provide the

22    financial information to Capital One in a

23    delayed manner, so Capital One was pushed

24    really hard.

25        Q.   Ebury companies used funds

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO.

Emigrant Business Credit vs.
Hanratty

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

Court Records    Pg 1817 of 2230

RECEIVED NYSCEF: 01/12/2024

Ping Xie
August 02, 2023

40

1          PING XIE - 08/02/2023

2    advanced by Emigrant Bank to repay Capital

3    One, correct?

4          MR. WANG:  Objection.

5          THE WITNESS:  At Ebury, the fund

6      was not clearly separated like where

7      did it come from or where it goes to.

8      So it's from John's direction on where

9      to send the money to.

10          I was not sure the money paid

11      back to Capital One was from Emigrant

12      Bank.  It has to be examined for those

13      things -- transactions.  I can't just

14      say it while I'm sitting here.

15    BY MR. MAYRON:

16      Q.   What do you mean by, at Ebury,

17    the fund was not clearly separated?

18      A.   For example, at Ebury, there are

19    Fund 1 and Fund 2, but sometimes the fund

20    in these funds are mixed.

21      Q.   Did Ebury have controls in place

22    to ensure that funds from Ebury's lenders

23    were not used to pay distributions to

24    investors?

25          MR. WANG:  Objection.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1818 of 2230    Ping Xie
Hanratty                                                        August 02, 2023

41

1    PING XIE - 08/02/2023

2    THE WITNESS:  Okay.  Repeat this

3  question.  I didn't catch the last

4  part.

5    MR. MAYRON:  Can you just re-read

6  it from the realtime?

7    THE INTERPRETER:  Oh, yes.  Sure.

8    (Interpretation occurs.)

9    THE WITNESS:  I don't know if

10  there is any control about Ebury that

11  they cannot use the loan to pay

12  investors.  I have never seen this kind

13  of contracts or any kind of terms.  I

14  was not aware of that.

15    At Ebury, everything, all the

16  distribution of the large amount of

17  money are under John's directions.  I

18  have never seen such kind of controls,

19  so I understand there it was no such

20  kind of a control; so...

21    May I make a clarification of the

22  first part of the sentence?  I have --

23  I was not aware of there is or not any

24  controls at Ebury that they cannot use

25  any loans to pay back the investors.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs                Court Records    Pg 1819 of 2230    Ping Xie
Hanratty                                                             August 02, 2023

42

1        PING XIE - 08/02/2023

2        THE WITNESS:  (In English.)  Can

3    I speak English for this?  I mean, I

4    was not aware there is such term in the

5    loan agreement that the funds from

6    Ebury's loan cannot be used as a

7    distribution to the -- for the

8    investors' redemptions.

9        I was not shared for the

10   documentation, therefore -- since I

11   don't know.  I do not believe there is

12   such a control to see cannot be used

13   for the distribution for investor

14   redemptions.

15       MR. BEDEROW:  Can you just

16   explain for the record why you just

17   reverted to English?  Was there a

18   communication issue?

19       THE WITNESS:  (In English.)

20   Yeah, because the translation was

21   continue to use "control."  My first

22   part is nothing to do with control.

23   It's just I'm not aware of there is

24   such a loan term at all.  So just want

25   to clarify this.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1820 of 2230    Ping Xie
Hanratty                                                     August 02, 2023

43

1       PING XIE - 08/02/2023

2   BY MR. MAYRON:

3       Q.  Would it be easier if we

4   proceeded in English and then if you don't

5   understand my question or are having

6   trouble formulating an answer in English,

7   you confer with our translator?

8       A.  (In English.)  Okay.

9       Q.  And I'll try to speak slowly.

10      A.  (In English.)  Okay.

11          (Whereupon, unless otherwise

12          noted, all answers are spoken in

13          English by the witness without

14          the interpreter's assistance.)

15  BY MR. BEDEROW:

16      Q.  Are you aware that the Ebury

17  companies used funds advanced by Emigrant

18  to pay distributions to investors?

19          MR. WANG:  Objection.

20          THE WITNESS:  I cannot remember

21      exactly, but there is a possibility

22      there.

23  BY MR. MAYRON:

24      Q.  Are you aware that the Ebury

25  companies used funds advanced by Emigrant

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1821 of 2230    Ping Xie
Hanratty    August 02, 2023

44

1          PING XIE - 08/02/2023

2    to repay Capital One?

3          MR. WANG:  Objection.

4          THE WITNESS:  As mentioned

5    earlier, it's very harder for me to sit

6    here to say that.  Because the -- I

7    have -- each transaction has to be

8    examined to make sure the funds was

9    used to pay their investor was -- came

10     -- was from the Emigrant Bank loan.

11   BY MR. MAYRON:

12     Q.   Is that because the Ebury funds

13   mingled their money?

14          MR. WANG:  Objection.

15          THE WITNESS:  Yes.  It's a --

16     it's a have a -- yes.  Sometime is

17      commingled together; so...

18   BY MR. MAYRON:

19     Q.   And just to clarify my question,

20   is that because the Ebury funds mingled

21   investor and lender money?

22          MR. WANG:  Objection.

23          THE WITNESS:  I would see we have

24    two loan from Capital One and from

25    Ebury, not from Emigrant.  The loan

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. Emigrant Business Credit vs Court Records    Doc #3 State
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   RECEIVED NYSCEF: 01/12/2024
Hanratty                Pg 1822 of 2230                           Ping Xie
                                                          August 02, 2023

45

PING XIE - 08/02/2023

1

2    from both was not clearly separately

3    used for each entity.  They may mix the

4    yields.

5  BY MR. MAYRON:

6        Q.  And you said all of the

7    distributions of the large amount of money

8    are under John's directions.

9         What do you mean by that?

10       A.  Yeah.  Because the payment

11   process usually is John gave instruction to

12   Frank and then to see how they use funds or

13   the funds to use.

14        So all the large money, major

15   use, all from John's direction.

16       Q.  And what do you mean by "large

17   money, major use"?

18       A.  You mean except the small one,

19   for example, office expenses.  These kind

20   of stuff are made just directly paid,

21   instruct to paid.

22        All other, including lien

23   purchases, investor distributions, funds

24   transfer between accounts are under John's

25   instruction.

46

1          PING XIE - 08/02/2023

2      Q.   Who is Frank?

3      A.   Frank Gandol is our accountant in

4    Philippines.

5      Q.   And to be clear, John Hanratty

6    made all decisions related to how to use

7    funds?

8      A.   Yes.

9      Q.   Did you have the authority to

10   decide how to use the Ebury company's

11   funds?

12     A.   I was authorized signor of bank

13   account, but in reality, I never really the

14   decision-maker of how to use the funds.

15         MR. WANG:  Austin, do you mind if

16      we go off the record just real quick?

17      I just want to see if Mr. Xie wants to

18      take a break because it's been a little

19      over an hour.  Or --

20         MR. MAYRON:  I've just got a

21      couple more questions, I think, on this

22      line of questions.

23   BY MR. MAYRON:

24     Q.   Are you aware that between 2018

25   and 2019, the Ebury companies paid almost

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs                                              Ping Xie
Hanratty            Court Recrods    Pg 1824 of 2230    August 02, 2023

47

1         PING XIE - 08/02/2023

2     $20 million in distributions to investors?

3        A.  I can't remember specific.  I

4     can't.

5        Q.   Generally, are you aware that

6     between 2018 and 2019, the Ebury companies

7     paid almost 20 million in distributions to

8     investors?

9        A.  Yeah, I couldn't remember the --

10    like, you mention the 20 million.  But I

11    understand, yes, a large amount of

12    distribution to investor between 2028 [sic]

13    and 2019.

14       Q.   By "large amount," do you mean

15    more than 10 million?

16       A.  Yes.

17       Q.   More than 15 million?

18       A.  I do not -- I can't tell if over

19    fifth -- yes, I cannot remember.  Sorry.

20       Q.   That's okay.

21           And earlier you said that when

22    you left the Ebury companies, the financial

23    condition was not good, correct?

24       A.  Yes.

25       Q.   Before you left the Ebury

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.     Doc #3 State    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1825 of 2230    Ping Xie
Hanratty    August 02, 2023

48

1        PING XIE - 08/02/2023

2    companies, did you ever speak with

3    Mr. Hanratty about the financial condition

4    of the Ebury companies?

5        A.   He received financial reports so

6    I think he knows.  Also, he know their --

7    their violation of loan term with Capital

8    One.

9        So we didn't specifically talk

10    about how bad a performer he is, but I'm

11    assuming he was aware at that time the

12    financial condition wasn't good.

13        Q.   And you said the violation of

14    loan terms with Capital One.

15        What were those violations?

16        A.   I mean there -- I mentioned the

17    two -- two have -- for example, the loan

18    requirement and specific financial ratio.

19    I gave example.  It's EBITDA must be able

20    to cover their interest expenses.

21        So when those term are -- when

22    Ebury cannot meet that term, it's consider

23    is a violation of the loan term.

24        Q.   And so when Ebury was unable to

25    meet those terms, it switched from using

49

1    PING XIE - 08/02/2023

2    Capital One as its main lender to using

3    Emigrant Bank?

4        A.   I cannot give such a judgment

5    because those are John's arrangement, how

6    to get a loan.  So I don't know how it --

7    what his source was.  But so I can't tell

8    why he switch to the Emigrant.

9        But I understand the company need

10    the funds to survive or to continue

11    operations.

12        Q.   And so after the Ebury companies

13    began to have problems with the Capital One

14    facility, it -- they switched from using

15    Capital One as their main lender to using

16    Emigrant Bank?

17        MR. WANG:  Objection.

18        THE WITNESS:  I cannot remember

19        exactly of the order, but I understand

20        that John was talking to the different

21        lender including Alostar and Emigrant;

22        so... Yeah.

23    BY MR. MAYRON:

24        Q.   So did Mr. Hanratty ever

25    communicate to you that the Ebury companies

50

1          PING XIE - 08/02/2023

2    might not be able to repay the Emigrant

3    facility at maturity?

4          MR. WANG:  Objection.

5          THE WITNESS:  No, no, he didn't.

6    BY MR. MAYRON:

7      Q.   Did you ever tell Mr. Hanratty

8    that the Ebury companies might not be able

9    to repay the Emigrant facility at maturity?

10     A.   Not specifically.  But I -- I

11   probably mentioned the financial report was

12   not good.

13     Q.   Which financial report are you

14   referring to?

15     A.   I mean, these are --

16          (Stenographer asks for

17          clarification.)

18          THE WITNESS:  These are financial

19   reports.  For example, the financial

20   report of some meeting to the Capital

21   One.  So I would tell him the ratio

22   is -- it's not going to be able to meet

23   the loan require- -- the terms

24   stipulated in the loan terms.

25   ///

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 178    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

Emigrant Business Credit vs.    Court Records    Pg 1828 of 2230    Ping Xie

Hanratty    August 02, 2023

51

1          PING XIE - 08/02/2023

2    BY MR. MAYRON:

3        Q.  Do you believe Mr. Hanratty is an

4    honest person?

5        A.  Oh, my God.  This is a personal

6    judgment.  I don't know.  I don't know how

7    to say -- because I only have a working

8    relationship with him, so I really cannot

9    tell his -- like, at this level if he's

10    honest or dishonest.  Sorry.

11        Q.  So you laughed when I asked that

12    question.

13          Is there a reason you laughed?

14        A.  Because it hard, right?  So it's

15    hard to answer.

16        Q.  Based on your working

17    relationship, do you believe he's an honest

18    person?

19          MR. WANG:  Objection.

20          THE WITNESS:  I -- sometime he

21      may -- his statement -- statement may

22      not be 100 percent truth.  That's

23      all -- only I can say it, yeah.

24    BY MR. MAYRON:

25        Q.  Is there anything else you can

52

1        PING XIE - 08/02/2023

2    say about your view on whether he's an

3    honest person?

4        A.  I would say from a business

5    perspective or a personal perspective.  So

6    I don't know his personal perspective.  But

7    a business perspectively, sometime his

8    statement may not be 100 percent truth for

9    business purpose.  I would say that.

10       Q.  Can you give examples of

11   statements he made that were not

12   100 percent true for business purposes?

13       A.  For example, one investor

14   requested redeem.  He would give a date he

15   will repay, but those days often failed,

16   make investor very angry.  And he repeating

17   gave other dates was not be accomplished.

18        So, for example, he would say,

19   okay, I will return your funds by 15th, but

20   on the 15th, he won't be able to return.

21   Therefore, he'll say at the next month 15th

22   and it wasn't.

23        So I -- from this perspective, I

24   mean, that he didn't give a realistic

25   picture of the company cash flow to the

53

1           PING XIE - 08/02/2023

2    investor and the timing he can -- he can

3    have investor withdraw their investment.

4        Q.   Do you have reason to believe

5    that Mr. Hanratty knew he would be unable

6    to return the funds by the dates he was

7    providing to investors?

8           MR. WANG:  Objection.

9           THE WITNESS:  I do not believe

10       I'm in a position to speculate.

11   BY MR. MAYRON:

12       Q.   Did Mr. Hanratty ever communicate

13   to you that he was providing dates to

14   investors that he was not able to make --

15          MR. WANG:  Objection --

16   BY MR. MAYRON:

17       Q.   -- those distributions by?

18          MR. WANG:  Objection.

19          THE WITNESS:  He did not.  But

20       because it's sometime an email coming

21       to me, the dates, I know the initial

22       date wasn't fulfilled.  Or when

23       investor call me, I know his prom- --

24       previous promise wasn't met.

25   ///

54

1       PING XIE - 08/02/2023

2    BY MR. MAYRON:

3       Q.   Can you think of any other

4    examples where Mr. Hanratty made statements

5    that were not 100 percent true for business

6    purposes?

7       A.   It's too long, so, sorry, I

8    can't -- how many years, five years?  Yeah.

9       Q.   Did you ever observe Mr. Hanratty

10    speak to the Ebury company's auditors in a

11    way that was not 100 percent true?

12       A.   No.

13       Q.   Did you ever observe Mr. Hanratty

14    speak to Capital One in a way that was not

15    100 percent true?

16       A.   I do not recall any.

17       Q.   Did you ever observe Mr. Hanratty

18    speak to Emigrant in a way that was not

19    100 percent true?

20       A.   I was not --

21          (Stenographer asks for

22          clarification.)

23          THE WITNESS:  I was not aware of

24    any of that.

25    ///

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.    Court Records    Pg 1832 of 2230    Ping Xie
Hanratty    August 02, 2023

55

1    PING XIE - 08/02/2023

2    BY MR. MAYRON:

3    Q.   Would Mr. Hanratty provide

4    unrealistic dates for submitting financial

5    reporting to Emigrant Bank?

6    MR. WANG:  Objection.

7    THE WITNESS:  I -- I cannot

8    recall any on purpose doing that.  So I

9    do not believe at that time and any on

10    purpose giving their end release the

11    date of financial statement date to the

12    Emigrant Bank.  It's a -- it's kind of

13    a truthful estimation at that time.

14    BY MR. MAYRON:

15    Q.   Did Mr. Hanratty ever promise

16    payment to an investor or creditor when you

17    knew that Ebury did not have the money to

18    make the payment?

19    A.   Yes.

20    MR. WANG:  Objection.

21    BY MR. MAYRON:

22    Q.   Can you give examples?

23    A.   I cannot remember which year, but

24    during summer, he promised one investor to

25    pick up a check in my office -- in the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM                    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                      RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs Court Records     Entered 08/14/24 09:45:23    Doc #3 State
Hanratty                                      Pg 1833 of 2230                     Ping Xie
24-04020-dsj    Doc 1-2    Filed 08/14/24                              August 02, 2023

56

1       PING XIE - 08/02/2023

2   office at a specific date.  But that time,

3   our bank account doesn't have such money.

4          And one investor came to my

5   office basically demanding check from me.

6   I wasn't able to write anything to them.

7   And the investor basically did not allow me

8   to leave the office so until -- until I

9   write a check to them.

10          Later was one of check -- was

11  basically bounced, not be able to cash out,

12  cash.

13      Q.   Was the investor Michael Salerno?

14      A.   Yes.

15      Q.   And this was in 2018?

16      A.   As I mentioned, I couldn't recall

17  exactly.

18      Q.   Have you ever observed

19  Mr. Hanratty act dishonestly other than

20  what we've discussed so far?

21          MR. WANG:  Objection.

22          THE WITNESS:  You mean honestly?

23          MR. BEDEROW:  Dis, dishonestly.

24          THE WITNESS:  Oh, dishonestly.

25          I couldn't recall anything except

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM                    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                     RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.
Hanratty

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1834 of 2230                                  Ping Xie

August 02, 2023

57

1          PING XIE - 08/02/2023

2          I already told you.

3    BY MR. MAYRON:

4          Q.  Has Mr. Hanratty ever been

5    dishonest with you?

6          MR. WANG:  Objection.

7          THE WITNESS:  Yeah, it's a

8    smaller stuff.  One time I was supposed

9    to be paid annual bonus for certain

10   amount.  The bonus wasn't paid the

11   second the year.

12         And the first year was not -- was

13   reduced, prorated.  But it wasn't based

14   on -- the contract is a full -- full

15   bonus, but it was paid only partial,

16   not a full amount.

17   BY MR. MAYRON:

18         Q.  So, to be clear, Mr. Hanratty

19   promised you in a written contract to pay

20   you a bonus and then did not pay you the

21   bonus you were entitled to?

22         A.  Didn't pay in full in the first

23   year and the second year didn't pay.  And I

24   didn't ask, yeah.

25         Q.  What are other examples of him

58

1        PING XIE - 08/02/2023

2    being dishonest with you?

3      A.  I cannot think of one at this

4    moment.

5      Q.   Are you aware of any times when

6    Mr. Hanratty was dishonest with others?

7          MR. WANG:  Objection.

8          THE WITNESS:  I'm not aware of.

9      Except that I mentioned about a

10      investor the dates of communication

11      with investor.  But those are judgment

12      also.

13          MR. MAYRON:  Okay.  Off the

14      record.

15          THE VIDEOGRAPHER:  This ends

16      unit 1.

17          We are off the record at 10:56.

18          (Whereupon, a recess was taken at

19          10:56 a.m.)

20          THE VIDEOGRAPHER:  This begins

21      unit 2.

22          We're on the record at 11:09.

23    BY MR. MAYRON:

24      Q.   So I just want to clean up the

25    record on a few things we discussed

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.    Court Records    Pg 1836 of 2230    Ping Xie
Hanratty
August 02, 2023

59

PING XIE - 08/02/2023

1

2   earlier.

3      A.   Uh-huh.

4      Q.   So your deposition was originally

5   scheduled for June 7, and then on June 2,

6   we were informed that you had a family

7   emergency come up.

8         Did a family emergency occur -- I

9   apologize.  Let me restart.

10        Did you have a family emergency

11   come up the first week of June 2023?

12      A.   No.

13      Q.   Did you tell anyone that you had

14   a family emergency come up the first week

15   of June 2023?

16      A.   No.

17      Q.   On June 25, we were informed that

18   you would not be available on Tuesday,

19   June 27 because your son was in a piano

20   tournament and you would not be back in

21   time.

22        Was your son in a piano

23   tournament around June 25?

24      A.   No.

25      Q.   Did you tell anyone your son was

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs                                          State
Hanratty                                                            Ping Xie
                                                              August 02, 2023

22-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3
Court Records    Pg 1837 of 2230

60

1        PING XIE - 08/02/2023

2   in a piano tournament around June 25?

3        A.   No.

4        Q.   You graduated from the Zhongnan

5   University of Finance in Economics,

6   correct?

7        A.   A bachelor, yes.

8        Q.   What was your bachelor's in?

9        A.   A bachelor of finance economics.

10        Q.   When did you move to the United

11   States?

12        A.   1990 -- 1997.  I can't -- sorry.

13   1997, yes.

14        Q.   You next attended the University

15   of Bridgeport in Connecticut?

16        A.   Yes.

17        Q.   For an MBA?

18        A.   Yes.

19        Q.   Did you work between your

20   bachelor's and MBA?

21        A.   I did.

22        Q.   Where did you work?

23        A.   I work for several company in

24   China, a manufacturer, also a

25   importer-exporter corporations.

61

1        PING XIE - 08/02/2023

2        Q.  How long did you work between

3    your bachelor's and MBA?

4        A.  About 10 years, yeah.

5        Q.  Did you receive any other formal

6    education or training?

7        A.  No.  Except those two.

8        Q.  You are a licensed CPA, correct?

9        A.  Yes.

10        Q.  When did you obtain your CPA

11    license?

12        A.  I can't remember exactly.  If I

13    guess, around 2013.

14        Q.  Do you have any other

15    professional licenses?

16        A.  No.

17        Q.  After your MBA, you started

18    working as a controller at Louis Dreyfus

19    Commodities, correct?

20        A.  No.  This my third job in U.S.

21    My first job was with North Sails as a cash

22    accountant.  Then the second job was

23    Internet.com.  Louis Dreyfus my third job

24    in the U.S.

25        Q.  When did you receive your MBA?

62

1          PING XIE - 08/02/2023

2       A.   Two thousand -- I think 2000,

3    yeah.  But before -- before my graduation,

4    I work at another sale Internet.com of the

5    internship and practical training.

6       Q.   Was Louis Dreyfus your first job

7    after your MBA?

8       A.   I can't remember exactly timing.

9    Looks like, yeah.  I think I graduated

10   May 2020, yes.  So, yes.

11      Q.   May 2000?

12      A.   May 2000 -- 2000, yes.

13      Q.   What were your responsibilities

14   at Louis Dreyfus Commodities?

15      A.   I been Dreyfus about 10 years.

16   So I started with a senior accountant.

17   Then gradually become a global controller

18   for one of the major platform.  Oversee

19   North America, Europe and Asian certain

20   regions, global operation, financial

21   operations.

22      Q.   Why did you leave Louis Dreyfus?

23      A.   Louis Dreyfus had reorganization.

24   Basically my boss I reported directly

25   retired.  So I had a disagreement and

63

1        PING XIE - 08/02/2023

2    conflict with new boss; so...

3        Q.   What was the nature of your

4    disagreement and conflict with your new

5    boss?

6        A.   It's kind of work related about

7    how to manage my team, how to basically

8    divide up each functions, yeah.

9        Q.   Next, you worked at a product --

10   as a product controller at Traxys North

11   America?

12       A.   Yes.

13       Q.   What were your responsibilities

14   at Traxys?

15       A.   Yeah, I was responsible for --

16            (Stenographer asks for

17            clarification.)

18            THE WITNESS:  A couple metal

19   products.  Metal -- because Traxys is a

20   commodity trading company, so they

21   traded metals.  So coupled metals.

22            I would say product lines, the

23   profit and loss and the financial

24   reporting, yeah.

25   ///

64

1         PING XIE - 08/02/2023

2    BY MR. MAYRON:

3         Q.   And why did you leave Traxys?

4         A.   Left Louis Dreyfus set back for

5    me for career, so I restarted -- restarted

6    and trying to go back to the level I used

7    to be.

8         Q.   Why would you leave Louis Dreyfus

9    if it would set you back in your career?

10         A.   Yeah.  Because as mentioned, I

11    have disagreement and hard to continue.  So

12    I left for another company but I take a

13    lower-level job.  So I was global

14    controller.  So become a product

15    controller.  So a setback career for me,

16    yeah.

17         Q.   Next, you worked as an accounting

18    manager and consultant at Crius Energy?

19         A.   Yes.

20         Q.   What were your responsibilities

21    at Crius Energy?

22         A.   Crius Energy is a publicly traded

23    at Canadian exchange.  So I was majorly in

24    charge of financial reporting.  So part of

25    those Canadian SEC filing and mostly close,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.   Court Records   Pg 1842 of 2230   Ping Xie
Hanratty                                                          August 02, 2023

65

1      PING XIE - 08/02/2023

2   yes.

3      Q.   Why did you leave Crius Energy?

4      A.   Same.  So I was trying to go back

5   to the -- like a controller or CFO roles,

6   yeah.

7      Q.   And, next, you worked as a

8   financial controller at College of Mount

9   Saint Vincent?

10      A.   Yes.

11      Q.   What were your roles at the

12   College of Mount Saint Vincent?

13      A.   I was a controller there.

14      Q.   And why did you leave?

15      A.   Yeah, why I interviewed the job,

16   the CFO of a college supposed to be

17   retiring a few months and the position want

18   to be filled basically.

19         But later on, around October or

20   something, he decided not to retire.  So

21   that's what I was expecting so I moved to

22   another company.

23      Q.   And next you worked as the CFO at

24   AFG Trading Inc.?

25      A.   Yeah.  Trader, trader and the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
Emigrant Business Credit vs.     Court Records     Pg 1843 of 2230     Ping Xie
Hanratty     August 02, 2023

66

1          PING XIE - 08/02/2023

2     CFO, yeah.

3          Q.   And what is AFG Trading?

4          A.   AFG is a -- agricultural

5     commodity trading company.  Mainly doing

6     the soy beans, import-export.

7          Q.   What were your responsibilities

8     at AFG Trading?

9          A.   I was responsible for their

10    entire financial reporting, mostly closing,

11    accounting, day-to-day operations.

12         Q.   Approximately when did you begin

13    working at AFG Trading?

14         A.   My memory correct, that would be

15    November 15, 2015, around that time.

16         Q.   And approximately when did you

17    leave AFG Trading?

18         A.   I leave there -- I believe the

19    last year working day May 2017.

20         Q.   What were your responsibilities

21    at AFG Trading?

22         A.   I was a trader and a financial

23    controller able -- basically responsible

24    for company's financial reporting, banking

25    and day-to-day accounting operation.

67

1        PING XIE - 08/02/2023

2        Q.   And next you worked as a

3    financial controller at Ebury Street

4    Capital?

5        A.   Yes.

6        Q.   And you began working at Ebury

7    Street Capital in June 2017?

8        A.   I believe so.

9        Q.   And you left Ebury Street Capital

10   in January 2020?

11       A.   Yeah.  January 13, 2020, yeah.

12       Q.   You remember the exact date?

13       A.   Yeah.  Because I specifically

14   gave a four week's notice.  I supposed to

15   start in December.  I know they don't have

16   a controller there so I gave the four

17   weeks.

18       Q.   Why did you leave Ebury?

19       A.   The Ebury financial condition

20   become very bad for me.  And also, the --

21   some goal I believe was strategically maybe

22   not realistic.  I do not see the company

23   continue survival, so that's the reason I

24   left.

25            Also, the many practice sometime

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO.
Emigrant Business Credit vs
Hanratty
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 1845 of 2230
RECEIVED NYSCEF: 01/12/2024
Ping Xie
August 02, 2023

68

1        PING XIE - 08/02/2023

2   concern me; so...

3      Q.   The what practices concerned you?

4      A.   Yeah, I specifically worry about

5   a wire account which is due to manager

6   account.  So it's -- the loan a very large

7   amount.  So I was worried how to -- this

8   account settlement between -- basically

9   between John and the funds.

10         I worry that John won't be able

11   to really be able to pay back to the funds.

12      Q.   And just as someone who's not

13   trained as a CPA, what do you mean by that

14   John wouldn't be --

15      A.   So, yeah --

16         (Simultaneous unreportable

17         crosstalk occurs among parties.)

18         (Stenographer requests one

19         speaker at a time.)

20   BY MR. MAYRON:

21      Q.   -- be able to pay back to the

22   funds?

23      A.   Yeah, because the fund structure

24   is here, John is -- John's company, the

25   Ebury LLC -- LLC hire others, our

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 1-2    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1846 of 2230    Ping Xie
Hanratty    August 02, 2023

69

1          PING XIE - 08/02/2023

2    employees, Ebury LLC, we are not employee

3    of any of the funds, Fund 1 or Fund 2.

4          And John's Ebury LLC, the income

5    from the funds, the management fee,

6    whatever the bonus funds would pay him

7    will -- then this fund supposed to pay each

8    employee of ours, right?

9          So when the funds would transfer

10    from Ebury Fund 1 or Fund 2 to the Ebury

11    LLC recorder's due from fund manager, then

12    when we settle his management fee and the

13    bonuses, basically.

14          For example, if we -- he entitle

15    for all those management fee and the bonus,

16    then the company would become zero because

17    it settle, right, then pay to him.

18          But that account balance become

19    very large literally.  And his management

20    fee not be able to cover those expenses.

21    So this worry me very much to see if he be

22    able to repay those funds back to the funds

23    because the funds of -- the funds were

24    funds to the money belong to investors.

25          Q.   So Mr. Hanratty was taking money

70

1          PING XIE - 08/02/2023

2   from the funds to pay the expenses of Ebury

3   Street Capital?

4          MR. WANG:  Objection.

5          THE WITNESS:  Yeah, I would not

6     say that.  But from accounting

7     perspective, we recorded those one.

8     But I recall I mentioned he may get a

9     performance bonus, which possibly

10     settled those one.  So I -- I couldn't

11     never tell he just take.

12          But the reality is the balance

13     become large and not settled.

14   BY MR. MAYRON:

15     Q.   And so you were employed by Ebury

16   Street Capital LLC?

17     A.   Yes.

18     Q.   When you joined Ebury back in

19   2017 --

20     A.   Uh-huh.

21     Q.   -- were there other employees at

22   Ebury?

23     A.   Yeah.  Yes.

24     Q.   Who were the other employees of

25   Ebury back when you joined in 2017?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs
Hanratty

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1848 of 2230

Ping Xie
August 02, 2023

71

PING XIE - 08/02/2023

1

2    A.  We have Sarah, who is HR, and

3  also Andrew Adler, who is a salesperson.

4  Then other person was in the Philippines.

5        At that time, why John there --

6  they hired one accountant before me.  I

7  seen his name is Mohammed, if I recall

8  correctly.  But if he was let go two weeks

9  or one weeks after I arrived.

10    Q.  Do you know why he was let go?

11    A.  I wasn't gave a specific reason.

12  If I say that, it would be speculation.  So

13  I think that here I don't want to

14  speculate.

15    Q.  Okay.  Were there any other

16  employees of Ebury when you joined in 2017?

17    A.  In my memory only those, plus the

18  people in Philippines.

19    Q.  And when you left Ebury in 2020,

20  were there other employees?

21    A.  Yes.  I think everybody still

22  there plus John Gandol -- I cannot

23  pronounce his last name.  Anyway, his name

24  is John.  Also he's a lawyer with company.

25    Q.  What about Dennissee Mendez?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1849 of 2230    Ping Xie
Hanratty    August 02, 2023

72

PING XIE - 08/02/2023

1

2     A.  Dennissee, he -- I cannot recall

3   when she joined.  She was there.  She

4   joined because John move to the Puerto

5   Rico, want do their business with -- I

6   can't remember the -- who owned the -- I

7   think he had a lawsuit with him too.  I

8   can't remember his name.

9        He wanted do business together

10  with him, and Dennissee work for that

11  person.  So he moved to -- basically

12  Dennissee joined Ebury from that firm.  I

13  can't remember exact time, but, yeah.

14    Q.   What about Franklin Gandol?

15    A.   Frank Gandol, yeah, he was still

16  there until he was fired because he -- he

17  basically took company's money in the

18  Philippines, supposed to pay employee

19  Social Security tax.  He -- instead, he

20  pocket the money himself.

21        And later when employee claim

22  unemployment or Social Security benefits

23  from Philippines government, the company

24  found out he never paid those to

25  government.  So he was dismissed before I

73

1        PING XIE - 08/02/2023

2    left Ebury.

3       Q.   Do you know when Franklin Gandol

4    was dismissed?

5       A.   I cannot recall.  I don't know.

6    I cannot recall exact time.

7       Q.   How would you rate the quality of

8    Franklin Gandol's work product?

9        MR. WANG:  Objection.

10        THE WITNESS:  From an accounting

11     perspective, I give a pass, like 75.

12    BY MR. MAYRON:

13       Q.   Did you ever speak with

14    Mr. Hanratty about Mr. Gandol's job

15    performance?

16       A.   We didn't specific because he had

17    not many accountant, so he's only one;

18    so...

19       Q.   What do you mean?

20       A.   We only have two accountant at

21    the time, myself and John -- and the Frank.

22       Q.   And so you never spoke with

23    Mr. Hanratty about Mr. Gandol's job

24    performance?

25       A.   I think 75 percent is acceptable

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.        Court Records        Pg 1851 of 2230              Ping Xie
Hanratty                                                                        August 02, 2023

74

1          PING XIE - 08/02/2023

2     level.  So not a reason to say, okay, like,

3     a separate level.  So, no, I didn't.

4          Q.   And what about Kevin Clark?

5          A.   I cannot recall this name.  I

6     don't -- I cannot recall this name.

7          Q.   After you left Ebury, you worked

8     as a controller at Apifiny?

9          A.   Yes.

10          Q.   And why did you leave Apifiny?

11          A.   Oh, I was offered a much better

12     compensation from other company.  Was,

13     like, twice the compensation than Apifiny

14     offered me.

15          Q.   And what was your role at

16     Apifiny?

17          A.   I was a global financial

18     controller.  Also the CFO of for Singapore

19     subsidiaries.

20          Q.   And so now you work as a senior

21     financial controller at AscendEX?

22          A.   Yes.

23          Q.   What is your role at AscendEX?

24          A.   I'm also the financial

25     controller.

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
Emigrant Business Credit vs          Court Records          Pg 1852 of 2230          Ping Xie
Hanratty          August 02, 2023

75

1          PING XIE - 08/02/2023

2          Q.   And what is your role -- I'm

3     sorry, what --

4          A.   What I'm doing?

5          Q.   Yeah.

6          A.   Yeah.  Actually, I prepare

7     basically management report because

8     AscendEX a private company.

9          So basically do the monthly

10    closing for the management team and related

11    required regulatory funding, for example,

12    overseas tax returns, financial reporting

13    requirement.

14         Q.   You also own and operate Ping Xie

15    CPA?

16         A.   Yes, I do.

17         Q.   You've operated Ping Xie CPA

18    since February 2015?

19         A.   I cannot remember what date it

20    was established.  I think that's after I

21    got my CPA license, yeah.  But it wasn't

22    active until later, yeah.

23         Q.   By "it wasn't active," you're

24    referring to your company?

25         A.   Yeah.  I cannot remember when

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022
NYSCEF DOC. NO.     RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs       Court Records       Ping Xie
Hanratty                                              August 02, 2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                          Court Records    Pg 1853 of 2230

76

1      PING XIE - 08/02/2023

2    start with it really.  Oh, I know why.

3    Because when I left the Crius Energy, they

4    needed me -- still needed me badly for the

5    financial reporting.  So they ask me

6    continue as a consultant.

7         So that's why I starting using

8    that firm, still doing the accounting, help

9    them do the financial accounting until they

10   find another person be able to take over my

11   job.

12      Q.   Did you do work for Ping Xie CPA

13   while working at any of the prior

14   employers --

15      A.   Yes.

16      Q.   -- we discussed?

17      A.   Yes.

18      Q.   Did you do work for Ping Xie CPA

19   while you were working at Ebury Street

20   Capital?

21      A.   Yes, I did.

22      Q.   Approximately how many hours a

23   week would you spend doing consulting work

24   for Ping Xie CPA while you were working at

25   Ebury Street Capital?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                        RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs   Court Records   Pg 1854 of 2230   State
Hanratty                                                        Ping Xie
                                                               August 02, 2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3

77

1        PING XIE - 08/02/2023

2        A.  I cannot recall.  I only work at

3    night so I -- I work very late night, yeah.

4        Q.  Did you inform Mr. Hanratty or

5    anyone at Ebury that you were doing work

6    through Ping Xie CPA?

7        A.  No.  Because my contract does not

8    ask me to do so.

9        Q.  Has anyone ever complained to you

10   about your job performance?

11        MR. WANG:  Objection.

12        THE WITNESS:  I'm not aware of.

13   BY MR. MAYRON:

14        Q.  You're not aware of any times

15   someone has spoken negatively about your

16   job performance?

17        A.  No, I'm not aware.

18        Q.  So you worked for Ebury Street

19   Capital from June 2017 to January 2020?

20        A.  Yes.

21        Q.  I'm going to show you the

22   complaint in this action just for

23   identification purposes.

24        MR. MAYRON:  And could the court

25        reporter please mark it as Xie

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. Emigrant Business Credit vs. Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024

Hanratty Court Records Pg 1855 of 2230 Ping Xie

August 02, 2023

78

1    PING XIE - 08/02/2023

2   Exhibit 1.

3        (Whereupon, Exhibit 1 is marked

4        for identification.)

5  BY MR. MAYRON:

6        Q.   So on the first page is the

7  caption, and it says:  Emigrant Business

8  Credit Corporation, Plaintiff, versus a

9  list of entities as defendants.

10       A.   Uh-huh.

11       Q.   The third and fourth listed

12 entities are Ebury Fund 1 and Ebury Fund 2.

13       A.   Yes.

14       Q.   Will you understand me if I refer

15 to those as the Ebury funds?

16       A.   Yeah.

17       Q.   What are Ebury Fund 1 and Ebury

18 Fund 2?

19       A.   It been while.  I can't remember.

20 But I understand one funds was specifically

21 set out for Leventhal.  And other funds are

22 for other company.

23        So as mentioned earlier, yeah,

24 the funds -- the funds between two, maybe

25 mixed use, yeah.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 292
RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs Court Records    Pg 1856 of 2230    Ping Xie
Hanratty    August 02, 2023

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

79

PING XIE - 08/02/2023

1

2    Q.  By Leventhal, you mean Ira

3    Leventhal?

4    A.  And his wife, I believe.

5    Q.  And then beneath Fund 1 and

6    Fund 2 are Ebury 1EMI, LLC and Ebury 2EMI,

7    LLC.

8    A.  Uh-huh.

9    Q.  What are those entities?

10    A.  I cannot recall exactly, but if

11    my memory is correct, I believe -- there's

12    also that relate to New York.

13    Anyway, all other funds are SPV,

14    special purpose vehicles.  So those are

15    just under Fund 1 or Fund 2.

16    Q.  Okay.  And all of the entities

17    between Ebury Street Capital LLC and Ebury

18    RE LLC at the bottom are controlled by John

19    Hanratty?

20    A.  I -- some name I'm not very

21    familiar with.  For example, XYZ and

22    Maryland, LLC.  But others, my

23    understanding, yes, was controlled by John

24    Hanratty.

25    Q.  So apart from XYZ Corps and

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 124-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.    Court Records    Pg 1857 of 2230    Ping Xie
Hanratty                                                                August 02, 2023

80

1          PING XIE - 08/02/2023

2    Arque Tax Receivable Fund (Maryland), your

3    understanding is that all of these entities

4    are controlled by John Hanratty?

5        A.  Yes.

6        Q.  And if I refer to all of these

7    entities as the Ebury companies, you'll

8    understand what I'm saying?

9        A.  Yes.

10       Q.  I'm now going to hand you the

11   affidavit John Hanratty submitted in this

12   case as docket Number 24.

13           MR. MAYRON:  And could the court

14       reporter please mark this as Xie

15       Deposition Exhibit 2.

16           (Whereupon, Exhibit 2 is marked

17           for identification.)

18   BY MR. MAYRON:

19       Q.  Could I direct your attention to

20   paragraph 11, which is on the third page.

21           Mr. Hanratty wrote, "Shortly

22   before the credit lines closed in

23   March 2017, the Ebury entities hired

24   'Controller 1.'"

25           Do you understand Controller 1 to

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs.
Court Records   Pg 1858 of 2230   Ping Xie
Hanratty

August 02, 2023

81

PING XIE - 08/02/2023

1

2 be you?

3       MR. WANG:  Objection.

4       THE WITNESS:  I don't know.  But

5   I was hired on June 2017.

6 BY MR. MAYRON:

7   Q.  So let me direct your attention

8 to paragraph 21 -- apologies, 20 and 21.

9       Mr. Hanratty wrote, "Controller 1

10 appeared to get the Ebury's Entities'

11 financials in shape and work well with

12 MTAG, but the entities had to retain the

13 services of Opus Fund Services for fund

14 administration."

15       And then in paragraph 21,

16 Mr. Hanratty wrote, "The Puerto Rico

17 bookkeepers discovered that Controller 1

18 had not been keeping proper books,

19 financials, or accounting records, and

20 Controller 1 resigned."

21       Did I read that correctly?

22   A.  First there about the 20, the

23 truth, I want to want to get the Ebury

24 entity financial in shape, that's true.

25       However, to have MTAG or hire

82

1        PING XIE - 08/02/2023

2   Opus Fund Service is entirely John's

3   decision, not myself.  I was just informed

4   that they want to move to MTAG and Opus

5   Fund Services and I just have to execute

6   the plan.

7      Q.   Based on paragraphs 20 and 21, do

8   you understand Controller 1 to refer to

9   you?

10     A.   Yes, it looks like.

11     Q.   And Mr. Hanratty wrote that, "the

12  Puerto Rico bookkeepers discovered that

13  Controller 1 had not been keeping proper

14  books, financials, or accounting records."

15       Is that true?

16     A.   That's not true.  I think 2018

17  financial was audited.  The bigger issue is

18  when we moved to the M -- from -- I can't

19  remember the previous admins.  Sort of

20  fund --

21     Q.   Could it be Tower Fund Services?

22     A.   Yeah, Tower Fund Services moved

23  to MTAG.  The entire transition was very

24  bad.  A lot of work needed reconcile.

25       I think I spend many, many hour,

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 1860 of 2230   Ping Xie
Hanratty                                                      August 02, 2023

83

PING XIE - 08/02/2023

1

2   a lot of time to reconcile the book.  And

3   lot of records transfer from office to MTAG

4   was kept delaying.  The records was not a

5   match.

6         The two records, one you have a

7   money transfer, the two records have to be

8   fully reconciled before you can producing

9   the financial statement.  And I have no

10  idea Dennissee even know accounting at all,

11  to be honestly.

12        Entire financial 2018 audit

13  was -- I was the major contact the company.

14        So the financial delays because

15  of migration, but in order to both

16  keeping -- my financial on the bank

17  reconciliation every time is reconciled to

18  the pennies.  That's my requirement for the

19  standard of professionalism; so...

20    Q.   So you disagree with

21  Mr. Hanratty's assertion that you had not

22  been keeping proper books, financials or

23  accounting records?

24    A.   That's not true.  Think about it.

25  After I left, 2019 financial report, one

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO.                                    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs                                          Ping Xie
Hanratty               Court Records   Pg 1861 of 2230   August 02, 2023

84

PING XIE - 08/02/2023

1
2  was prepared.  Was it audit?  Was it
3  finished?
4         So if I -- if the person who
5  believe I didn't do the proper work, she
6  should already finish 2019 financial
7  statement.
8         So I obviously disagree with.  I
9  -- because of me, the huge migration will
10  be able to produce 2018 financials.
11  Without my efforts, there is no possibility
12  to have 2018 financials.  I can confidently
13  say that.
14     Q.   Are you saying without your
15  efforts, there's no possibility to have
16  2018 financials or 2019 financials?
17     A.   2018 financials.  Because 2019, I
18  only created partial quarterly and I left.
19  The financial closing would be -- have to
20  be done in 2020.
21     Q.   Okay.  And Mr. Hanratty wrote
22  that Controller 1 resigned.
23         Did you resign?
24     A.   I did resign.
25         But the reason I gave is not

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs
Court Records    Pg 1862 of 2230
Ping Xie
Hanratty
August 02, 2023

85

1          PING XIE - 08/02/2023

2    because of my job performance.  Because I

3    worry about the survival of the company and

4    worry about the account, below account I

5    believe is over several million.

6          I do not believe it can be -- I

7    think it's a -- it's a -- it's hard for me

8    to understand how that will be repaid.

9          MR. MAYRON:  And, Mr. Bederow,

10          you're more than welcome to object if

11          you'd like.

12    BY MR. MAYRON:

13      Q.  But were you aware that

14    Mr. Hanratty was alleging that you had not

15    been keeping proper books, financials or

16    accounting records?

17      A.  No.

18          MR. BEDEROW:  As long as it

19          doesn't relate to conversations with

20          lawyers, you can answer, if you know.

21          THE WITNESS:  No, I was not

22          aware.

23    BY MR. MAYRON:

24      Q.  And in your communications with

25    Ebury's counsel, did they inform you that

86

1        PING XIE - 08/02/2023

2   in this litigation they were alleging that

3   you were the person who was not keeping

4   proper books --

5           (Simultaneous unreportable

6           crosstalk occurs among parties.)

7           (Stenographer requests one

8           speaker at a time.)

9   BY MR. MAYRON:

10      Q.   -- were the person who was not

11  keeping proper books, financials or

12  accounting records?

13          MR. BEDEROW:  Objection.

14          MR. WANG:  Objection.

15          MS. PARKS:  Objection.

16          THE WITNESS:  No.

17          MR. BEDEROW:  I will instruct the

18  witness not to answer about the

19  substance of communications with

20  Ebury's attorney.

21          THE WITNESS:  I had no --

22          MR. BEDEROW:  Don't answer.

23          MS. PARKS:  Sorry.  Mr. Mayron is

24  specifically asking you about what

25  Ebury's counsel told you, so that's the

87

1          PING XIE - 08/02/2023

2     content.

3          THE WITNESS:  Okay.

4          MS. PARKS:  And that's not

5     appropriate.

6          MR. MAYRON:  Mr. Bederow, during

7     the next break, I'd like to talk to you

8     about that, but --

9          MR. BEDEROW:  Sure.

10   BY MR. MAYRON:

11      Q.   I'm going to show you a document

12   labeled EBCC_38991.

13          MR. MAYRON:  Would the court

14      reporter please mark it as Xie

15      Deposition Exhibit 3.

16          (Whereupon, Exhibit 3 is marked

17          for identification.)

18   BY MR. MAYRON:

19      Q.   This is an email from John

20   Hanratty to Jack Grady from March 4, 2020;

21   is that correct?

22      A.   Yes.

23          You mean the content of this

24   email, I think it was -- obviously is a --

25   it's not true.

88

PING XIE - 08/02/2023

1

2     Q.  So before we get into that, who

3  is Jack Grady?

4     A.  Jack Grady is the -- I believe is

5  Ebury's contact with Emigrant Bank.

6     Q.  And Mr. Hanratty wrote, "Ping

7  left without completing REO business and

8  basically booked everything as expense and

9  didn't allocate several months."

10        Did I read that correctly?

11     A.  I --

12        MR. BEDEROW:  Did he read that

13  correctly?

14        THE WITNESS:  Yes, I read it

15  correctly.

16  BY MR. MAYRON:

17     Q.  Do you agree with Mr. Hanratty's

18  statement?

19     A.  I cannot recall right now, but I

20  think it was wrong, incorrect, because the

21  RE -- because myself, usually the Frank

22  doing the bulking.  I only do the monthly

23  review and the monthly close.

24        I don't know what happened that

25  time.  But if -- if I was there, at least

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1866 of 2230    Ping Xie
Hanratty    August 02, 2023

89

1          PING XIE - 08/02/2023

2    the Q3 information would be there.  If

3    left, it's Q4 monthly close --

4          (Stenographer asks for

5          clarification.)

6          THE WITNESS:  Q4,

7     Q4 traditionally close book has to be

8     in the next year, means next one or two

9     months, right?  Means you wouldn't

10     close the Q4 2029's [sic] book in

11     February -- January or February of

12     2020, right?

13          So if we're saying the Q4 records

14     was not 100 percent booked, yeah,

15     that's possible because, you know,

16     that's the new accountant job, not my

17     job.

18    BY MR. MAYRON:

19          Q.   Now I'm going to share with you a

20    big one, the transcript from the deposition

21    of Dennissee Mendez in this case from

22    June 2, 2023.

23          MR. MAYRON:  Could the court

24     reporter please mark this as Xie

25     Deposition Exhibit 4.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State
Emigrant Business Credit vs Court Records Pg 1867 of 2230 Ping Xie
Hanratty August 02, 2023

90

1        PING XIE - 08/02/2023

2        (Whereupon, Exhibit 4 is marked

3        for identification.)

4  BY MR. MAYRON:

5    Q.  I'm going to direct your

6  attention to page 193.

7        Page 193, Ms. Mendez -- well, I

8  asked:

9        "QUESTION:  Did anyone ever

10  complain to you about Mr. Xie's job

11  performance?"

12        Ms. Mendez responded:

13        "ANSWER:  I complain about him

14  and some of the servicing team complained

15  about him."

16        I then asked:

17        "QUESTION:  What did you complain

18        about?"

19        Ms. Mendez said:

20        "ANSWER:  That he was not very

21        cooperative, he was very, I think

22        combative with everyone.  Both of

23        the work was being done by a

24        junior accountant that he had,

25        was his assistant, which I don't

91

1    PING XIE - 08/02/2023

2    think he was supervising his

3    work.  Things along those lines."

4    Did I read that correctly?

5    A.  Yes.

6    Q.  Were you aware that Ms. Mendez

7  and the servicing team complained about

8  you?

9    A.  I was not aware while I was in

10  the company.

11    Q.  Were you aware after you left the

12  company?

13    A.  I never had any communication or

14  contact with them after I left the company.

15    Q.  But to be clear, were you aware

16  that Ms. Mendez and the servicing team

17  complained about you?

18    A.  I'm not aware of them.

19    Q.  Do you agree with Ms. Mendez,

20  that you were not very cooperative?

21    (Stenographer asks for

22    clarification.)

23    THE WITNESS:  If in term of

24  cooperative, I mean in term of their

25  practice, I may disagree.

92

1    PING XIE - 08/02/2023

2        For example, on the lien

3    information need to be timely transfer,

4    deliver to MTAG, those are under her

5    supervision and also service team.

6    Those were never timely done.

7        The -- at month-end for the

8    accounting records for the -- for the

9    cash reconciliation, every counsel and

10    they see a lot of liens, information

11    would not timely deliver to the MTAG,

12    therefore, so it's not a properly

13    recorded.

14        So it's very hard -- made the

15    monthly closing very hard.  Even she

16    mention that those not cooperative, I

17    wouldn't think so.  Because I wanted

18    all the information timely recorded or

19    transferred.

20        But that -- that's also -- I can

21    recall one of the reasons also I want

22    to leave too because -- because the

23    accounting system on the recording of

24    the bank reconciliation become so hard

25    on the records with third party as well

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 1870 of 2230

Emigrant Business Credit vs.
Hanratty
Ping Xie
August 02, 2023

93

1        PING XIE - 08/02/2023

2        as internally as well.

3              Nothing -- I couldn't get the

4        information I needed for accounting.

5    BY MR. MAYRON:

6          Q.   So you said that you disagreed

7    with some of Ebury's practices, correct?

8          A.   Yeah, for the how they handle

9    their lien.

10             For example, like, see if they

11   purchase a lien, they give a lease -- say,

12   what lien they purchase, how much they

13   received, right?

14             But the actual physical evidence

15   never be able to deliver it to myself or

16   deliver to the third-party accountant --

17   third-party service.

18             So I constantly chase them.

19   Okay, last month you gave me, say, your

20   purchase lien.  Where is the physical

21   evidence, right?  I needed those both for

22   accounting purpose.  So those often not be

23   answered.

24             Another one, for example, the

25   RE -- REO for the rent, for the renovation,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 121    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1871 of 2230    Ping Xie
Hanratty    August 02, 2023

94

1          PING XIE - 08/02/2023

2     for their fix-up.  We gave all to -- money

3     to the person to do their work, but we

4     never receive actual expense report, how

5     much actually it was paid, used.

6            And, therefore, I don't know this

7     money was -- how it was spending, how much

8     left and how to book those accounting

9     records.

10            Those are my conflict with her

11    team, operation team.  Because we're

12    accounting, I'm constantly needing physical

13    evidence, documentation to book them.  And

14    I like office apart from them.  So those

15    are conflict.

16            If he believe that's not

17    cooperative, yeah, I agree.

18      Q.  You said you often lacked support

19    from the operations team?

20      A.  Yeah.  For example, I mentioned

21    this.  The expense report from the -- they

22    hired a person who do the renovation of

23    REOs.  Reports never timely come back to

24    me.

25            I couldn't -- I paid out for

95

1    PING XIE - 08/02/2023

2    $50,000 advance payment.  I never knew how

3    those $50,000 were spent so I cannot book

4    those -- those information at all.

5        So -- and also for the lien, the

6    purchase lien.  If you purchase a lien, the

7    lien certification have to deliver to the

8    service provider.  Therefore, they record

9    it in their system.  And those payment

10   eventually have to match accounting --

11   accounting records.

12       Such efforts I try to make --

13   make those documentation and match them.

14   It's very difficult because the lack of

15   cooperation and with -- from the operation

16   teams.

17     Q.   Were there ever times that

18   Ms. Mendez or another employee told you

19   that the Ebury companies had purchased

20   liens and then never provided you with

21   physical evidence of those purchases?

22     A.   They usually do not tell me

23   directly.  They go to -- for example, when

24   you do the borrowing basis -- right? --

25   they would give those information Frank,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1873 of 2230    Ping Xie
Hanratty    August 02, 2023

96

1         PING XIE - 08/02/2023

2    which Frank put in, right?

3         And also, the money come out the

4    bank.  I only aware at end of month when I

5    match the bank reconciliation.

6         For example, I paid bank C, have

7    $500,000 left.  I have to match those

8    $500,000 to each lien purchase show up

9    under whatever service product records,

10   right?

11        At that time you will find them

12   -- these matches.  So I would ask them --

13   where -- how you reconcile that.  And

14   not -- they not going to specifically tell

15   me, oh, with a lien book.  I only find out

16   at months later end of close, monthly close

17   procedures.

18   Q.   Would the Ebury companies provide

19   you with documentary proof that they were

20   making the lien purchases they claimed?

21        MR. WANG:  Objection.

22        THE WITNESS:  They -- they

23   supposed to provide this to their

24   service provider, right?  Service

25   provider will be able to match the bank

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.   Court Records   Pg 1874 of 2230   Ping Xie
Hanratty
August 02, 2023

97

1          PING XIE - 08/02/2023

2          reconciliation.  But I often found at

3          month end that we have difficulties.

4    BY MR. MAYRON:

5          Q.   What do you -- what type of

6    difficulties?

7          A.   Means at monthly end you need to

8    reconcile bank reconciliation, right?  If

9    you pay out $500, $500 have to match each

10   of lien's detail purchase, what time,

11   right?

12          We often -- often find the

13   difficulty to match them perfectly.  And I

14   regularly heard the service provider say we

15   didn't receive a physical certificate.

16          So I go to the service provider,

17   include Dennissee, where is certification,

18   when you going to send to them.

19          I often get answer, say, yeah,

20   I'm going to upload it, like, tomorrow, a

21   few days, but it never happens.  So it's

22   records -- I often have to chase them, say,

23   where are the records, when did you upload,

24   when the MTAG will update their

25   information.

98

1        PING XIE - 08/02/2023

2        So this was a conflict between me

3    and them.

4        So before Dennissee, before

5    Dennissee, I will be able to effectively

6    communicate with the Philippine team, like,

7    Anna and her husband, he will be very

8    cooperative.

9        After Dennissee, because she

10    become the chief operating officers, the

11    practice very hard now.  At that time

12    become very hard.

13        The timing become -- if, say, I

14    cannot book my records, that's true,

15    because I have nothing to book.  I do not

16    have records to book, right?

17        So it's -- so that's why I take a

18    very long time to do the -- like, audit

19    stuff.  Because a lot of reconciliation to

20    true up stuff, yeah.

21    Q.   Thank you.  That's all very

22    helpful.

23        So you mentioned MTAG?

24    A.   Yeah.

25    Q.   What is MTAG?

99

1        PING XIE - 08/02/2023

2        A.   MTAG is lien service provider.  I

3    think that John want to switch from --

4        Q.   Tower?

5        A.   -- from Tower, Tower Fund Service

6    to them.  So I visit that company once,

7    basically go through their systems to

8    understand.  Their system quite different

9    from Towers -- Tower Fund Services.

10            So take a long time to do the

11   reconciliation and initial make records

12   correct.

13       Q.   Did John Hanratty ever tell you

14   why he wanted to switch from Tower Fund

15   Services to MTAG?

16       A.   I think he mentioned -- if I --

17   obviously so many years.  If I recall it

18   correctly, he probably mentioned the cost

19   saving as one of the reason.

20       Q.   So your understanding is that

21   MTAG was cheaper than Tower Fund Services?

22       A.   I believe -- I believe so, but

23   obviously so many years, I cannot have the

24   cost analysis in front of me, yeah.

25       Q.   What is self-servicing?

100

PING XIE - 08/02/2023

1

2     A.   Self-service meaning the Ebury do

3     the service themself rather than through

4     their third party, yeah.

5     Q.   Did the Ebury companies

6     self-service tax liens?

7     A.   I believe what -- when John talk

8     to Alostar, he mentioned the possibility he

9     wanted to have a self-servicing in order to

10    save the cost.

11         So basically mentioned like MTAG

12    also very expensive.  So he also -- I think

13    he -- I can't remember -- mention he had a

14    lawsuit, another part -- I think that

15    person also have a lien system software.

16    He wanted to use their software to do their

17    service instead of MTAG as he had that plan

18    to.

19    Q.   Did Mr. Hanratty ever tell you

20    that MTAG was very expensive?

21    A.   He mentioned once that's why he

22    wanted to do their -- bring something

23    in-house also go to work with the Puerto

24    Rico guy, which Dennissee work for using a

25    lien service software.

101

PING XIE - 08/02/2023

1

2    Q.  Was the Puerto Rico guy Tom

3    McCosker?

4    A.  I think so, yes, Tom McCosker.

5    Yeah.

6    Q.  So you said, I believe, that the

7    Ebury companies were supposed to deliver

8    physical evidence of lien purchases to the

9    third-party servicer?

10    A.  Yes.

11    Q.  Do you know what the basis of

12    that requirement was?

13    A.  I think that this all required by

14    their third-party services, right?  They

15    cannot recall a lien just by verbally tell

16    them you purchase.  So they need to match

17    their each city and the town's records.

18    So the only way for you match

19    them, you have a copy of a certificate to

20    they can go to the town's data center to

21    match one by one.

22    Q.  Do you know why the Ebury

23    companies used a third-party servicer?

24    A.  I -- actually, I don't know until

25    I -- until -- until I knew -- until this

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO.          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1879 of 2230    Ping Xie
Hanratty                                                                August 02, 2023

102

PING XIE - 08/02/2023

1

2   case I read.

3       I didn't know it was required by

4   the loan agreement.  I was just thinking

5   they may not have a team so they using

6   them, yeah.

7    Q.   And now that you know that the

8   Ebury companies were required to use a

9   third-party servicer, are you surprised

10   that the Ebury companies were not doing

11   what they were required to do?

12       MR. WANG:  Objection.

13       THE WITNESS:  Yes.  I wasn't

14    aware.  I thought it was, like, cost

15    savings good for the business, so I

16    thought it was just wiser account of

17    the business operation strategies.

18   BY MR. MAYRON:

19    Q.   And we may have covered this

20   earlier, but you said you would constantly

21   be in contact with the operation team about

22   getting physical evidence and documentation

23   to book liens.

24    A.   Yeah.

25    Q.   Would her team ultimately provide

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs. Court Records                Pg 1880 of 2230                Ping Xie
Hanratty                                                                                 August 02, 2023

103

1        PING XIE - 08/02/2023

2   that documentation, or were there times

3   where her team never provided that

4   information?

5       A.   I could not recall if never

6   reply, but usually it's not timely.  Where

7   I have to ask many times every month, like,

8   not only for those, also for the -- as I

9   mentioned, for the REO operation as well.

10      Q.   And so you would rely on

11  documentation from the operations team in

12  performing your duties?

13      A.   Yes.  Yes.

14      Q.   And Mr. Gandol would rely on the

15  information from the operations team to

16  perform his job duties?

17          MR. WANG:  Objection.

18          THE WITNESS:  I believe -- I

19      believe so, yeah.

20  BY MR. MAYRON:

21      Q.   Did Mr. Gandol have his -- did

22  Mr. Gandol have access to an independent

23  source of information to value the tax

24  liens?

25      A.   I'm not aware of.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                     RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs   Court Records    Pg 1881 of 2230    Ping Xie
Hanratty                                                           August 02, 2023

104

1        PING XIE - 08/02/2023

2      Q.  So looking back at the Mendez

3   deposition transcript, Ms. Mendez said:

4        "ANSWER:  He was very, I think

5   combative with everyone.  Both of the work

6   was being done by a junior accountant that

7   he had, was his assistant, which I don't

8   think he was supervising his work.  Things

9   along those lines."

10        Do you agree with Ms. Mendez's

11   statement that you were not supervising the

12   junior accountant's work?

13      A.  That's not true.  I think the REO

14   was using the John selected REO software.

15   I can't remember the name.  You know, those

16   are entirely new system.

17        From the Tower -- Tower Fund

18   Service, using their -- I'm sorry.  Give me

19   one second.  I'm thinking about the name of

20   software.

21      Q.  Lien servicing software?

22      A.  No, no.  The accounting is

23   a Microsoft accounting.

24      Q.  Could it be any of QuickBooks?

25      A.  Yeah, QuickBooks, sorry.  Yeah,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs Court Records    Pg 1882 of 2230    Ping Xie
Hanratty    August 02, 2023

105

1       PING XIE - 08/02/2023

2   QuickBooks.

3       Using QuickBook and John selected

4   another software.  So we have to migrate

5   all the data to the new software.  That's

6   extremely difficult work.

7       So Frank couldn't finish.  And

8   then because Dennissee say, oh.  She want

9   to supervise her and John said, Let

10  Dennissee do it.

11      I think that two or three month

12  there is no progress.  So I have to hand in

13  hand with John Gandol tell him exactly how

14  to reconcile, how to make it Excel file to

15  migrate the data to there.

16      I -- if I didn't supervise him,

17  there is no data migration at all.  Because

18  Dennissee and her -- Dennissee and Frank

19  work for two months, I basically -- John

20  said, Let Dennissee handle it.

21      I say, Okay, that's fine.  But

22  they couldn't.  There is no financial -- no

23  REO -- the accounting at all.

24      So I have to basically work line

25  by line with Frank to get it done.  So I

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO.

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/12/2024

106

1        PING XIE - 08/02/2023

2   believe I did supervise her -- him.  If I

3   didn't, there is no REO this new accounting

4   system at all.

5        Q.   What was the software -- what

6   accounting software did the Ebury companies

7   use during your time there?

8        A.   We use QuickBook for all the

9   lien, but the REO using the different

10   because John want to treat -- he select, he

11   then see many real company use that

12   software.  I can't remember exactly name.

13        Q.   Could it be Zoho --

14        A.   No.

15        Q.   -- or AppFolio?

16        A.   No.

17            Oh, I think of -- sort of like

18   voyage or something.  I can't remember.

19   Sorry.  So many years.

20            Oh, Yardi.

21        Q.   Yardi?

22        A.   Yardi, Yardi.  I recall.  Yeah,

23   use Yardi.

24        Q.   Yardi?

25        A.   Yeah.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1884 of 2230    Ping Xie
Hanratty                                                            August 02, 2023

107

1         PING XIE - 08/02/2023

2     Q.  Okay.  Thank you.

3         And so the financials for the REO

4    business were not in QuickBooks but instead

5    in Yardi?

6     A.  Yes.

7         Then the Yardi -- Yardi's result

8    was you actually measured putting to the

9    QuickBook as one line item in the Fund 1,

10   Fund 2.

11    Q.  Okay.  Got it.

12        Next, I asked Ms. Mendez:

13        "QUESTION:  Was Mr. Xie good at

14   his job?"

15        And Ms. Mendez responded:

16        "ANSWER:  From what we've seen

17   after he left, it seemed like he was not --

18   or he was not very good at communicating

19   stuff.  I think there was a language

20   barrier there, too."

21        Do you agree with Ms. Mendez's

22   assessment of your job performance?

23        MR. WANG:  Objection.

24        THE WITNESS:  No.  It's her

25    opinion, right?  So I have no comment.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. Emigrant Business Credit vs  Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
                Hanratty              Court Records   Pg 1885 of 2230                      Ping Xie   01/12/2024
                                                                              RECEIVED NYSCEF:
                                                                                                    August 02, 2023

108

1     PING XIE - 08/02/2023

2     Sorry.  Her opinion.

3         So obviously, as I mentioned, my

4     conflict with her about how to handle

5     the lien, how to basically make the REO

6     software works.  So if he believe so,

7     I'm not surprised.

8     BY MR. MAYRON:

9       Q.  Do you agree with her statement

10    that you were not very good at

11    communicating stuff?

12        MR. WANG:  Objection.

13        THE WITNESS:  No, I disagree,

14     yeah.

15    BY MR. MAYRON:

16      Q.  Do you agree that there was a

17    language barrier?

18      A.  Not a major one.  Maybe a little

19    bit, I would say, because my English my --

20    not native language for me, yeah.

21      Q.  Did Ms. Mendez ever tell you that

22    she was having difficulty understanding

23    you?

24      A.  I do not recall.

25      Q.  You don't recall whether she ever

Emigrant Business Credit vs    Court Records    Pg 1886 of 2230    Ping Xie
Hanratty    August 02, 2023

109

1    PING XIE - 08/02/2023

2    told you that or she never told you that

3    she had difficulty understanding you?

4    A.  I do not recall any such

5    communications.

6    Q.  Okay.

7    A.  Yeah.

8    MR. MAYRON:  Off the record.

9    THE VIDEOGRAPHER:  This ends

10    unit 2.

11    We are off the record at 12:07.

12    (Whereupon, a break for lunch was

13    taken from 12:07 p.m. to

14    12:48 p.m.)

15    THE VIDEOGRAPHER:  This begins

16    unit 3.

17    We're on the record at 12:48.

18    BY MR. MAYRON:

19    Q.  I'm going to hand you an email

20    chain labeled EBURY_35508.

21    MR. MAYRON:  Could the court

22    reporter please mark this as Xie

23    Deposition Exhibit 5.

24    (Whereupon, Exhibit 5 is marked

25    for identification.)

110

1        PING XIE - 08/02/2023

2    BY MR. MAYRON:

3        Q.   Could you take a second just to

4    read the whole email chain.

5        A.   Okay.

6            (Pause for reading/reviewing.)

7        Q.   So, actually before we dive into

8    this document, I have two quick questions.

9            First question:  Are you paying

10   for Mr. Bederow to represent you today?

11           MR. BEDEROW:  Objection.

12           Don't answer that.

13   BY MR. MAYRON:

14       Q.   Who is paying for you to

15   represent -- for Mr. Bederow to represent

16   you today?

17           MR. BEDEROW:  Objection.

18           You don't have to answer that.

19           MR. MAYRON:  It goes to bias.  It

20       goes to many potential issues.

21           What's the basis of your

22       objection?

23           MR. BEDEROW:  I don't think that

24       he needs to indicate who's paying his

25       legal fees.  And that would go to bias,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022

NYSCEF DOC. NO. 22-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.    Court Records    Pg 1888 of 2230    Ping Xie
Hanratty                                                          August 02, 2023

111

1     PING XIE - 08/02/2023

2   I don't know, what bias would that go

3   to?

4        MR. MAYRON:  Is your instruction

5   on the basis of privilege?

6        MR. BEDEROW:  In terms of who is

7   paying his legal fees?

8        MR. MAYRON:  Yeah.

9        MR. BEDEROW:  Yeah.

10       MR. MAYRON:  That it's the

11  attorney-client privilege --

12       MR. BEDEROW:  It's under the

13  rubric of the privilege, but I don't

14  know what the basis for questioning him

15  about bias would be if somebody other

16  than himself is paying his legal fees.

17       MR. MAYRON:  If the defendant is

18  paying his legal fees, it's plainly

19  relevant and proper for discovery.

20       And so I'm just asking, you're

21  instructing him not to answer, what the

22  basis for that instruction is.

23       MR. BEDEROW:  You can ask him has

24  anyone paid -- any third party paid his

25  legal fees.  I suppose you can ask him

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs    Court Records    Pg 1889 of 2230    Ping Xie
Hanratty

August 02, 2023

112

1          PING XIE - 08/02/2023

2      that.

3          And you can answer that.

4    BY MR. MAYRON:

5      Q.   Is any third party paying your

6    legal fees?

7      A.   As of today, no.

8      Q.   Has any third party agreed to pay

9    your legal fees?

10      A.   Yes.

11      Q.   Who has agreed to pay your legal

12    fees?

13      A.   Ebury's attorney.

14      Q.   Ebury's attorney has agreed to

15    pay your legal fees?

16      A.   Yeah.  We didn't have a

17    agreement, but it was offered.

18      Q.   Was it offered by John Hanratty?

19      A.   I learned it from Mark.

20          MR. BEDEROW:  Well, don't

21    discuss --

22          THE WITNESS:  Oh, sorry.

23          MR. BEDEROW:  No, it's okay.

24    Anything you and I talk about you

25    should not answer.

113

1          PING XIE - 08/02/2023

2     BY MR. MAYRON:

3        Q.  So your understanding is that

4     John Hanratty will be paying your legal

5     fees for appearing at this deposition?

6          MR. WANG:  Objection.  I don't

7        think that's what he said.

8     BY MR. MAYRON:

9        Q.  You can go ahead.

10       A.  I can answer it.

11          Yeah, not -- to be determined.

12       Q.  So your understanding is that

13    John Hanratty may pay your legal fees for

14    appearing at this deposition?

15       A.  Yes.

16       Q.  And what is his payment

17    contingent on?

18          MR. WANG:  Objection.

19          THE WITNESS:  I'm not aware any

20       contingency.  I'm only -- yeah, I'm not

21       aware of any.

22    BY MR. MAYRON:

23       Q.  So Mr. Hanratty communicated

24    through counsel to you that he may pay your

25    attorneys' fees, but he may not?

114

1    PING XIE - 08/02/2023

2        MR. WANG:  Objection.

3        MR. BEDEROW:  I object.  That's

4    not -- don't answer that.

5        Don't answer anything

6    communicated --

7        THE WITNESS:  I'm not going to

8    answer it.

9        MR. BEDEROW:  -- to lawyers and

10   then lawyers talking to you.

11       MR. MAYRON:  And what's the basis

12   of that objection?

13       MR. BEDEROW:  You're asking him

14   whether attorneys for Ebury

15   communicated to him or someone else, I

16   suppose me, and those conversations are

17   not appropriate for this.

18       MR. MAYRON:  Okay.  We'll come

19   back to this.

20       MR. BEDEROW:  Okay.

21   BY MR. MAYRON:

22   Q.  Also earlier, I believe you said

23   that you would sometimes have to chase

24   Ms. Mendez for evidence of lien purchases;

25   is that correct?

Emigrant Business Credit vs
Hanratty                        Court Records        Pg 1892 of 2230                        Ping Xie
                                                                                            August 02, 2023

115

1          PING XIE - 08/02/2023

2      A.   Yes.  More -- for clarification,

3    Dennissee and her team.

4      Q.   Would these communications with

5    Dennissee and her team have been by email,

6    by phone?

7      A.   Both.

8      Q.   Both.

9          Would you contact MTAG with

10   questions about lien purchases?

11     A.   I believe so.  If my memory

12   correct, yeah.

13     Q.   Would those communications have

14   been by email?

15     A.   I believe so.

16     Q.   Would those communications have

17   been by phone?

18     A.   Most are by email but are

19   possible by phone, yeah.

20     Q.   Approximately how many times did

21   you contact MTAG about Ebury's lien

22   portfolio?

23     A.   I cannot put a estimation, but at

24   a month end of close, would have a lot of

25   communications for the monthly closing

116

1           PING XIE - 08/02/2023

2    because the individual each lien has to tie

3    so I would have had a lot of communication.

4        Q.   Would you -- during your tenure

5    at Ebury, would you have sent more than 100

6    emails to MTAG?

7        A.   I don't know.

8        Q.   More than 50?

9        A.   Probably, probably.

10       Q.   And who at MTAG would you

11   contact?

12       A.   Unfortunately, I can't remember

13   the name anymore.

14       Q.   So turning to Xie Deposition

15   Exhibit 5, it appears that you and

16   Ms. Mendez are discussing interest

17   calculations for Ohio liens; is that

18   correct?

19       A.   Yes.

20       Q.   And you tell Ms. Mendez on

21   August 6, 2019, "I will not report any

22   interest until it is the calculation on

23   Vadar and you would have to provide the

24   support for OH interest calculation for

25   auditor."

117

1    PING XIE - 08/02/2023

2    Did I read that correctly?

3    A.  Yes.

4    Q.  And then she responds, "No

5    problem.  Please let J.H. know so he knows

6    the financials are understated."

7    Did I read that correctly?

8    A.  Yes.

9    Q.  J.H., she means John Hanratty,

10    correct?

11    A.  Yes.

12    Q.  And she's telling you that

13    because you're not agreeing with her

14    interpretation of the interest calculation,

15    that she wants you to tell Mr. Hanratty

16    that the financials for the Ebury companies

17    are understated?

18    MR. WANG:  Objection.

19    THE WITNESS:  Yes, that's what

20    she means.

21    BY MR. MAYRON:

22    Q.  And you respond, "As a CPA, I

23    can't book anything without support and I

24    must tell the auditor about it too."

25    Did I read that correctly?

118

PING XIE - 08/02/2023

1

2    A.  Yes.

3    Q.  You respond [sic], "I'm a CPA too

4    and I was an auditor."

5        And then you respond, "Well, then

6    we all know the CPA code of conduct and

7    last statement must be made to the

8    auditors.  I'm just following the code of

9    conduct and need support for the accounting

10   entries."

11       Did I read that correctly?

12   A.  Yes.

13   Q.  So what was going on in this

14   chain?

15   A.  It's too long.  I couldn't recall

16   this conversation anymore.  I believe it's

17   more related to -- about the revenue.

18       So you have impact under

19   financial statement on the income

20   statement, especially the profitability of

21   the company.

22       So it looks like there is a

23   disagreement how to calculate the interest.

24   Because also interest are accrued, not paid

25   by cash, therefore, involving accounting

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    01/12/2024
Emigrant Business Credit vs.    Court Records    Pg 1896 of 2230    RECEIVED NYSCEF    Ping Xie
Hanratty    August 02, 2023

119

1          PING XIE - 08/02/2023

2    estimation and judgmental judgment.

3          So I believe, based on my

4    experience and my understanding of

5    accounting principle, I believe the

6    schedule she provided about her interest

7    income for that period, especially for this

8    one, was incorrect.  Therefore, I tried to

9    communicate with her to see what's correct

10   calculation would be.

11       Q.   Why did you cite the CPA code of

12   conduct to her?

13       A.   Because that means -- I have a

14   obligation, even management tell me

15   otherwise, I have a obligation.  CPA must

16   perform my work according to the accounting

17   principle and the CPA code of conduct.

18          For this case, meaning if John

19   and her insist on booking that interest,

20   which for me, a CPA, I cannot -- I would

21   not accept this one and must report it to

22   the auditor for auditor make their

23   decision, because they may have different

24   opinion for me.

25          So whatever the auditor's

120

1        PING XIE - 08/02/2023

2    resolved and consideration is what would be

3    the final one.

4        Q.  Apart from this email chain, did

5    anyone at Ebury ever ask you to perform

6    your work in ways that you felt were

7    inappropriate?

8        MR. WANG:  Objection.

9        THE WITNESS:  I even couldn't

10       recall this one so I'm -- in my memory,

11       I was not aware of.

12   BY MR. MAYRON:

13       Q.  Okay.  And so turning back to

14   Mendez -- the Mendez deposition, which is

15   Xie Deposition Exhibit 4, turning to

16   page 194, I showed Ms. Mendez this email

17   and she started laughing and said:

18       "ANSWER:  I knew this was the

19   email that you were going to show me.  I'm

20   sorry.  I'm sorry.  I knew this was the

21   email that was coming."

22       And I asked:

23       "QUESTION:  How did you know this

24   is the email that was coming?"

25       And Ms. Mendez said:

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1898 of 2230    Ping Xie
Hanratty    August 02, 2023

121

PING XIE - 08/02/2023

1

2    "ANSWER:  Because that email was

3   epic."

4    And then later I asked:

5    "QUESTION:  Why was this email

6   memorable?"

7    And Ms. Mendez said:

8    "ANSWER:  Yeah, I'm not going to

9   go through the email because I remember

10   this situation very clearly in my mind.

11   Because he cited me the code of conduct

12   like I was a moron and I just wanted to..."

13    And then she trails off.

14   A.  Okay.

15   Q.  Did I read that roughly

16   correctly?

17   A.  Yes.

18   Q.  What do you think of Ms. Mendez's

19   reaction to this email?

20   A.  Okay.  For me, I -- I didn't -- I

21   was not able to recall this one until they

22   show me.

23    So for me, it's, like, regular

24   work for me.  I -- as a CPA, I just perform

25   what I supposed to be which is anything I

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM        INDEX NO. 158207/2022
NYSCEF DOC. NO.        RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1899 of 2230    Ping Xie
Hanratty                                                    August 02, 2023

122

1          PING XIE - 08/02/2023

2    don't believe is right.  So it's normal for

3    me.  It's not something I -- like she said

4    she would remember.  I didn't remember at

5    all; so...

6        Q.   Do you believe Ms. Mendez

7    followed the CPA code of conduct in

8    performing her duties at Ebury?

9        MR. WANG:  Objection.

10        THE WITNESS:  I think -- at that

11        time, I feel she work very close with

12        John.

13            Also, at that time, John want to

14        form our -- work together with Tom, I

15        think Tom.  And she was Tom's former --

16        basically employee.  And using Tom's

17        office together.

18            So -- and considering their

19        Alostar's loan application failed and

20        the difficult company, I do feel little

21        bit not comfortable for her practice on

22        accounting and her instruction to the

23        employees.

24            But having said that, I -- I do

25        not feel something especially very,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM     INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs                  Court Records    Pg 1900 of 2230    Ping Xie
Hanratty                                                      August 02, 2023

123

1          PING XIE - 08/02/2023

2     very comfortable obviously wrong; so...

3   BY MR. MAYRON:

4       Q.   What accounting practices of hers

5   did you not feel comfortable about?

6       A.   Like the lack of support of

7   documentation for company transactions.

8   Like a lot of time is folks -- obviously,

9   John said, I have this one, John said, I

10   have that one.  But there is no third-party

11   evidence to support this kind of --

12   obviously it's a long time.

13          I just still from memory.  This I

14   feel is a documentation of what accounting

15   become lesser and lesser available.

16   Meaning that I have lesser, lesser

17   confident on the accounting datas.

18       Q.   So you're saying Ms. Mendez would

19   tell you that transactions had occurred and

20   would not provide you evidence to support

21   those transactions?

22       A.   I mean, when I ask for support, I

23   not always get the support.

24       Q.   And so for some transactions,

25   Ms. Mendez would tell you the transactions

124

1       PING XIE - 08/02/2023

2   had occurred and would not provide you with

3   evidence to support those transactions?

4       A.  Yes.  Many times, even many

5   months later, for example, some accounting

6   transaction had a quarterly close, we

7   really needed documentation, then -- then

8   something I never heard of would come up.

9       So, yes, I -- I do feel the

10  accounting documentation -- we started to

11  have a much weaker accounting

12  documentations.

13      Q.  And you also said, I believe,

14  that Ms. Mendez would refer you to

15  Mr. Hanratty for the documentation?

16      A.  Yes.  He some -- okay.  I speak

17  from memory because it's so long so I'm not

18  sure.

19      Yeah, he does mention sometimes

20  he jumps at a -- I give you example, not a

21  very specific.  To the general example.

22      He would say, John said if he

23  purchased sort of lien, I just state, What

24  dollar amount, right?  But there is no

25  physical evidence that were provided me to

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs.                Court Records      Pg 1902 of 2230      Ping Xie
Hanratty                                                                 August 02, 2023

125

1           PING XIE - 08/02/2023

2    specifically basically support such story

3    or accounting interest, yeah.

4        Q.   Is it your understanding that

5    Ms. Mendez performed her job duties subject

6    to Mr. Hanratty's direction?

7           MR. WANG:  Objection.

8           THE WITNESS:  It's judgmental.

9       So for me, she also stay in the Puerto

10       Rico.  I'm in New York.  So I don't

11       know.

12          But as I mentioned, her

13       relationship with John, with John's

14       business partner and her -- the way she

15       want to treat accounting, operation,

16       documentation, data worries me a lot.

17          I'm worried accounting

18       documentation and accuracy of datas,

19       yeah.

20   BY MR. MAYRON:

21       Q.   And is it your understanding that

22   John Hanratty was her boss?

23       A.   Yeah.

24       Q.   And Mr. Hanratty was in charge of

25   all of the employees at the Ebury

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1903 of 2230    Ping Xie
Hanratty                                                            August 02, 2023

126

1        PING XIE - 08/02/2023

2    companies?

3        MR. WANG:  Objection.

4        THE WITNESS:  Yes.

5    BY MR. MAYRON:

6        Q.  And what were your job

7    responsibilities as controller at the Ebury

8    companies?

9        A.  Okay.  Before -- before Dennissee

10   join, I basically responsible for the

11   accounting data through operation, like,

12   deposit, payment and the month-end close

13   and help under borrowing basis.

14        Because when the transfer from

15   Tower Funds other formula, I have to

16   understand and transfer my knowledge to

17   John [sic] Gandol.

18        And Dennissee actually --

19   Dennissee joined.  She was -- her title was

20   COO.  She also want to take over

21   accounting, so she started direct a lot

22   over accounting.

23        And that time, accounting records

24   less -- less available.  Also, as mentioned

25   already, which I -- the transfer, she want

127

1        PING XIE - 08/02/2023

2    to take a different approach but after two

3    months, I feel I have to go back to make

4    that work.

5        But such a practice really

6    worried me if we going to have accuracy,

7    the accounting documentation for the lien,

8    for the REO operations.

9    Q.   Did you have concerns that the

10    Ebury companies were not maintaining proper

11    documentation for accounting for the liens

12    and REOs?

13        MR. WANG:  Objection.

14        THE WITNESS:  Yes.  For some --

15    for, yeah, at some degree.  I give

16    example about the REOs.  It's a prepaid

17    funds.

18        The actual usage and the final

19    report, most time it won't be able to

20    obtain.  And the lien documentation,

21    not timely delivered to the third

22    party.

23        And records, it's very difficult

24    to reconcile the records in the Excel

25    to the third-party documentation, also

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                            RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1905 of 2230    Ping Xie
Hanratty                                                          August 02, 2023

128

1          PING XIE - 08/02/2023

2      final statement.

3   BY MR. MAYRON:

4      Q.   Did you ever communicate to

5   Mr. Hanratty that the Ebury Companies were

6   not maintaining proper documentation for

7   accounting for the liens and REOs?

8      A.   Not directly.  But did see

9   accounting couldn't get a proper

10  documentations.  So -- so, yeah, I did

11  communicate such, but I couldn't recall

12  what the respond, yeah.

13     Q.   When did you communicate that

14  information to Mr. Hanratty?

15     A.   I speak from memory.  I couldn't

16  recall exactly date or time.  But in my

17  memory, I did communicate.

18     Q.   What is Ebury's relationship with

19  Emigrant?

20     A.   I believe when I started Ebury

21  only have very small loan with Emigrant,

22  especially for their Rochester lien, which

23  is especially putting in the spreadsheets

24  rather than Capital One even migrated to

25  the MTAG.

129

1        PING XIE - 08/02/2023

2        Like -- like the MTAG's borrowing

3   basis deposit directly from MTAG.  They go

4   copy that report to Frank and Ira -- Frank

5   -- at the bank.  Then Frank prepare

6   borrowing basis based on the report.

7        For the Ebury is based on the

8   spreadsheets.  So rather than their

9   system -- not Ebury, I meant Emigrant loan,

10  yeah.

11      Q.   You understand that the Ebury

12  companies had two lines of credit with

13  Emigrant Bank?

14      A.   I cannot recall.  And at least I

15  know it's one.  I cannot recall the two.  I

16  knew there is a renewal because John

17  mentioned a renewal.  I don't know if the

18  second one or is a continuation of the

19  first one.

20      Q.   And are you aware that the lines

21  of credit that Ebury had with Emigrant Bank

22  were governed by written contracts?

23      A.   I know the contract, but I

24  believe the contract initially was not

25  shared with me.  I think I may -- I might

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                    Emigrant Business Credit vs    Court Records    Pg 1907 of 2230    RECEIVED NYSCEF: 01/12/2024
Hanratty
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Ping Xie
August 02, 2023

130

1          PING XIE - 08/02/2023

2    saw a copy, but only for the purpose to see

3    the ratio.  Because borrowing base have a

4    ratio, just wanted to make sure Frank use

5    the right ratio for the availability.

6          But I -- I do not recall I read a

7    whole contract at all entirely.

8       Q.   Who at the Ebury companies would

9    have read those contracts?

10      A.   I don't know who.

11      Q.   And are you aware what the

12   purpose of the Emigrant credit facilities

13   was?

14         MR. WANG:  Objection.

15         THE WITNESS:  Yes.

16   BY MR. MAYRON:

17      Q.   What was the purpose of the

18   Emigrant credit facilities?

19      A.   My understanding, the purpose of

20   this for use -- use consistently of

21   collateral, to borrow money to fund the

22   regular operation and also the new purchase

23   of lien.

24      Q.   And what is the basis of that

25   understanding?

131

1       PING XIE - 08/02/2023

2    A.  That's basically a practice,

3 after I joined the company how the funds

4 would be used, so that's what I formed in

5 my understanding.

6    Q.  So you said the funds were used

7 to --

8    A.  For the new --

9    Q.  Oh, to fund the regular

10 operations of the Ebury companies and also

11 for new purchase of liens?

12    A.  Yes.

13    Q.  Were the funds used to pay

14 distributions to investors?

15    A.  Yes.

16    Q.  Do you know how much -- how much

17 funds from Emigrant was used to pay

18 distributions to investors?

19       MR. WANG:  Objection.

20       THE WITNESS:  I don't know

21  because -- because, I mention, it's not

22  a specific track, no.

23 BY MR. MAYRON:

24    Q.  Who would know whether funds were

25 used to pay distributions to investors?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs                    Court Records    Pg 1909 of 2230                    Ping Xie
Hanratty                                                                              August 02, 2023

132

1    PING XIE - 08/02/2023

2        MR. WANG:  Objection.

3        THE WITNESS:  I think John

4    because he had arranged those one.  He

5    would know -- he would know where the

6    funds from.

7  BY MR. MAYRON:

8        Q.   Who had the authority at the

9  Ebury companies to decide how to use funds

10  advanced by Emigrant?

11        MR. WANG:  Objection.

12        THE WITNESS:  John is our

13    decision-maker.

14  BY MR. MAYRON:

15        Q.   Did anyone else at the Ebury

16  companies have the authority to decide how

17  to used funds advanced by Emigrant?

18        MR. WANG:  Objection.

19        THE WITNESS:  I'm a signer of the

20    bank account, but I -- I am the person

21    actually executing the instruction.

22    But I do not have -- or I never

23    exercised any right to direct the funds

24    to the distribution or whatever, yeah.

25  ///

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1910 of 2230    Ping Xie
Hanratty    August 02, 2023

133

1      PING XIE - 08/02/2023

2    BY MR. MAYRON:

3      Q.  Are you aware that the tax liens

4    that the Ebury companies purchased using

5    advances under the Emigrant credit

6    facilities were Emigrant's collateral?

7         MR. WANG:  Objection.

8         THE WITNESS:  Yes, I understand

9     that.

10   BY MR. MAYRON:

11     Q.  Are you aware that the Ebury

12   companies sold Emigrant's collateral to pay

13   distributions to investors?

14        MR. WANG:  Objection.

15        THE WITNESS:  I'm not aware.  I

16     understand that there is one

17     transaction with a company Tom owned,

18     but I don't know if that's -- I didn't

19     exam -- or I -- as I said, I have not a

20     single of where the -- which lien those

21     belonged to, yeah.

22   BY MR. MAYRON:

23     Q.  How do you know that there was a

24   transaction with a company Tom owned?

25     A.  Yeah.  Because, you know, when

134

PING XIE - 08/02/2023

1

2    you're distributing to investor, you will

3    have money, right?

4        Also, you have a lien with dues

5    in the -- from the beginning -- beginning

6    balance.  I would have asked where those

7    lien goes to and why -- so how -- what you

8    exchange it for.

9        At the time I would thought or my

10    trader or John will tell me -- the trader

11    means handler -- this operation -- they

12    will tell me what a lien was sold, how much

13    money we get.  So I record it in the

14    accounting book.

15    Q.   So did Mr. Hanratty ever tell you

16    that he sold liens to fund distributions to

17    investors?

18        MR. WANG:  Objection.

19        THE WITNESS:  He didn't tell me

20    it was fund to -- but I understand he

21    told me the lien was sold.

22        Because there was outstanding

23    receivable from Tom for very long time.

24    I was worried -- I was constantly

25    asking for collectability of those

135

1         PING XIE - 08/02/2023

2     accounts receivable how to reflect in

3     the accounting book.

4   BY MR. MAYRON:

5       Q.  Are you aware that the Ebury

6   companies' contracts with Emigrant required

7   the Ebury companies to deliver the tax

8   liens they purchased using the Emigrant

9   credit facilities to independent

10  third-party custodian and servicer?

11        MR. WANG:  Objection.

12        THE WITNESS:  I -- I'm not aware

13    such a term.  I'm not -- I was not

14    aware such term.

15  BY MR. MAYRON:

16      Q.   Are you aware that the Ebury

17  companies were self-servicing Emigrant's

18  collateral?

19        MR. WANG:  Objection.

20        THE WITNESS:  I cannot recall,

21    but I don't know.  I knew there is

22    self-servicing for a certain state, but

23    I don't know if it was a lien or a

24    collateral from the -- from Emigrant

25    Bank.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.
Hanratty
Court Records   Pg 1913 of 2230
Ping Xie
August 02, 2023

136

1    PING XIE - 08/02/2023

2  BY MR. MAYRON:

3    Q.   Who at the Ebury companies would

4  have the authority to decide whether to

5  self-service Emigrant's collateral?

6    MR. WANG:  Objection.

7    THE WITNESS:  John.

8  BY MR. MAYRON:

9    Q.   Anyone else?

10   A.   No.

11   Q.   So only John would have the

12  authority to decide whether to self-service

13  Emigrant's collateral?

14   A.   Yeah.

15   Q.   Are you aware that under the

16  contracts governing the Emigrant credit

17  facilities, the Ebury companies were only

18  allowed to use advances to purchase new tax

19  liens or for ordinary and necessary

20  business expenses?

21     MR. WANG:  Objection.

22     THE WITNESS:  I didn't know the

23   -- this term at all, this contract

24   term.  However, in the practice, my

25   understanding the loan from Ebury was

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    Emigrant Business Credit vs Court Records    Pg 1914 of 2230    RECEIVED NYSCEF: 01/12/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Hanratty    Ping Xie
August 02, 2023

137

1          PING XIE - 08/02/2023

2     used for the business operation and to

3     purchase new liens.

4   BY MR. MAYRON:

5      Q.   The Ebury companies also used

6   funds advanced by Emigrant, however, to

7   fund distributions to investors, correct?

8          MR. WANG:  Objection.

9          THE WITNESS:  As I mentioned, I

10    do not -- I cannot recall specific, but

11    it's possibility, yes.

12  BY MR. MAYRON:

13     Q.   I am going to share with you

14  Volume 1 of Mr. Hanratty's deposition.

15         MR. MAYRON:  And could the court

16    reporter please mark this as Xie

17    Deposition Exhibit 6.

18         (Whereupon, Exhibit 6 is marked

19         for identification.)

20  BY MR. MAYRON:

21     Q.   So could I direct your attention

22  to page 57.

23         I asked Mr. Hanratty:

24         "QUESTION:  Who at Ebury would

25  know if there were controls to ensure that

138

1         PING XIE - 08/02/2023

2    advances or the proceeds of Emigrant's

3    collateral were not used to pay

4    distributions to investors?"

5         And Mr. Hanratty said:

6         "ANSWER:  Opus.  And that would

7    have occurred in conjunction with Ping Xie,

8    who was our controller in '18, '19."

9         Did I read that correctly?

10    A.   Yes.

11    Q.   Were you responsible to ensure

12    that advances or the proceeds of Ebury's

13    collateral was not used to pay

14    distributions to investors?

15    A.   No.  I was not aware of such a

16    contract term at all.

17    Q.   Who at the Ebury companies was

18    responsibile --

19         (Stenographer asks for

20         clarification.)

21    BY MR. MAYRON:

22    Q.   Who at Ebury was responsible for

23    the controls to ensure that advances or the

24    proceeds of Emigrant's collateral were not

25    used to pay distributions to investors?

139

1        PING XIE - 08/02/2023

2        MR. WANG:  Objection.

3        THE WITNESS:  I don't think Ebury

4    have such a control, to my knowledge.

5    However, I would assume when the funds

6    arrived, if John arrange, he will think

7    about this.

8        But there is no actual control in

9    Ebury to check and see how much

10    distribution from which, no.  I'm not

11    aware of such control at all.

12   BY MR. MAYRON:

13       Q.   Who at the Ebury companies was

14   responsible for ensuring that advances or

15   the proceeds of Emigrant's collateral were

16   not used to pay distributions to investors?

17       MR. WANG:  Objection.

18       THE WITNESS:  I'm not aware

19    anyone.

20   BY MR. MAYRON:

21       Q.   Would John Hanratty have been

22   responsible for ensuring?

23       A.   In the principal, yes.  Because

24   he's the one direct all the distributions,

25   yeah.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1917 of 2230    Ping Xie
Hanratty                                              August 02, 2023

140

1        PING XIE - 08/02/2023

2     Q.  So as the person directing all

3    the distributions, John Hanratty was

4    responsible for ensuring that advances of

5    the proceeds of Emigrant's collateral were

6    not used to pay distributions to investors?

7        MR. WANG:  Objection.

8        THE WITNESS:  Principally, my

9     understanding, yes.

10   BY MR. MAYRON:

11    Q.  Can I direct your attention to

12   page 66.

13       I asked Mr. Hanratty:

14       "QUESTION:  Who was involved in

15   producing a borrowing base?"

16       And Mr. Hanratty said:

17       "ANSWER:  Going back forever,

18   initially it was Tower Fund Services.  They

19   would do Capital One and Emigrant.

20       "Then when they transitioned out,

21   it was -- we took that over in-house, and

22   it was done by Ping Xie, a young guy by the

23   name of Frank Gandol.  And then both those

24   guys no longer worked there."

25       Did I read that correctly?

141

1       PING XIE - 08/02/2023

2       A.  Yes.

3       Q.   Were you responsible for

4    producing borrowing basis for Emigrant?

5       A.  No.  I think during the

6    transition part from the Tower Fund was

7    surveys, I did it in the design of Excel,

8    how to put the data, how the formula

9    reflecting the requirement of funds

10   manager.

11        But those knowledge were

12   transferred from -- from the -- Frank -- I

13   believe Frank is person actually doing the

14   borrowing basis.

15        I couldn't recall if I ever, as a

16   backup, doing this one.  But I'm certain

17   because the -- any borrowing basis, when

18   approved, would have our certification,

19   either John's signature.

20        I do not have his digital

21   signature.  Only -- at my time, only two

22   person in the company has that digital

23   signature, it is Frank and Anna.  Anna is

24   also his person in the Philippine.

25        Myself, I don't have what --

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs
Hanratty                    Court Records    Pg 1919 of 2230              Ping Xie
                                                                         August 02, 2023

142

1        PING XIE - 08/02/2023

2   John's digital signature.  So that's making

3   me impossible to submit the certification

4   to the Emigrant's bank.

5        Q.   Who at the Ebury companies was

6   responsible for producing borrowing basis

7   for Emigrant?

8        A.   Frank.  I would probably -- maybe

9   he have question, come to me, do certain

10  review of, answer a question about the

11  formula about the numbers, yeah.

12       Q.   Mr. Hanratty also was involved in

13  providing borrowing basis for Emigrant,

14  correct?

15       A.   He -- in the common practice,

16  after Frank done, he would have send to

17  John for approval before send to the bank.

18  So I believe that's his im- -- involvement.

19       Q.   So it's your understanding that

20  Frank would send borrowing basis to John

21  for approval before sending them to the

22  bank?

23       A.   Yeah.  Because I believe only

24  after he agreed, Frank will put his digital

25  signature to the certificate.

143

PING XIE - 08/02/2023

1

2    Q.   You understand that Frank could

3    not put Mr. Hanratty's digital signature on

4    the certificate without Mr. Hanratty's

5    consent?

6        MR. WANG:  Objection.

7        THE WITNESS:  That's my

8    understanding.  But I'm not -- I'm

9    not -- I don't know if Frank will do

10    that without John's authorization.

11        But in the practice what I saw is

12    Frank send borrowing basis to John for

13    his approval.  After he send, yes, he

14    will submit together with digital

15    signatures.

16    BY MR. MAYRON:

17    Q.   During your time at the Ebury

18    companies, did the Ebury companies submit

19    any borrowing basis to Emigrant that

20    weren't approved by Mr. Hanratty?

21        MR. WANG:  Objection.

22        THE WITNESS:  I cannot recall any

23    of them.

24    BY MR. MAYRON:

25    Q.   So you're not aware of any

144

1          PING XIE - 08/02/2023

2    borrowing basis that the Ebury companies

3    submitted to Emigrant without

4    Mr. Hanratty's approval?

5        A.  Yes.  Based on memory, yeah.

6        Q.  Do you know what Mr. Hanratty

7    would do to review the borrowing basis that

8    had been prepared by Mr. Gandol?

9          MR. WANG:  Objection.

10          THE WITNESS:  Yes.  I mentioned

11       Frank will send the borrowing basis for

12       him to approval before send out and the

13       communicating availability to him.

14   BY MR. MAYRON:

15       Q.  Do you know whether Mr. Hanratty

16   would review the borrowing basis for --

17   before it was sent to Emigrant?

18       A.  I don't know because -- yeah, I

19   don't know.  I can't tell.

20       Q.  And do you know where Mr. Gandol

21   obtained the financial information that he

22   included in the borrowing basis?

23          MR. WANG:  Objection.

24          THE WITNESS:  Should be in his

25       computer.

145

1   PING XIE - 08/02/2023

2 BY MR. MAYRON:

3  Q. Would the information have come

4 from MTAG?

5  A. As mentioned, Emigrant, I cannot

6 recall.  You mentioned a second loan --

7 only for -- for the Rochester, New York

8 loan, no, it's not from MTAG.

9   Because it's by another company.

10 I think it was -- I cannot remember, TF --

11 whatever the name.  Not from -- not from

12 the MTAG.

13  Q. So apart from the Rochester --

14  A. Yeah.

15  Q. -- liens, the information in the

16 borrowing base was supposed to come from

17 MTAG?

18  A. No.  Rochester lien wasn't from

19 MTAG.

20  Q. Other than the Rochester liens --

21  A. Yes.

22  Q. -- the information in the

23 borrowing base for Emigrant was supposed to

24 come from MTAG?

25  A. I believe so.

PING XIE - 08/02/2023

1

2    Q.  Are you aware that the contracts

3    between Ebury and Emigrant had eligibility

4    requirements for liens that could be

5    included in the borrowing base?

6        MR. WANG:  Objection.

7        THE WITNESS:  Yes, I believe so.

8    BY MR. MAYRON:

9    Q.  How did you become aware that --

10    A.  Because -- because the formula

11    was building into the system, not only for

12    Emigrant, also Capital One.  The

13    calculation and the availability was

14    building into Excel.

15        I work with MTAG and try to make

16    MTAG automated system.  So I started all

17    those one, including its eligibility,

18    percentage, recommendations.  Also, build

19    the formula for -- for Frank to use.

20    Q.  So if I can turn your attention

21    to page 85.  Apologies.  84.  I asked

22    Mr. Hanratty:

23        "QUESTION:  But is it your

24    testimony that there would be times that

25    the Ebury companies would submit a

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. Emigrant Business Credit vs Court Records  Doc 1-2  Filed 08/14/24  Entered 08/14/24 09:45:23  Doc #3 State  RECEIVED NYSCEF: 01/12/2024
Hanratty  Pg 1924 of 2230  Ping Xie
August 02, 2023

147

PING XIE - 08/02/2023

2  borrowing base to Emigrant and you

3  personally would not review whether each

4  tax lien in the borrowing base conformed to

5  the requirements of the definition of

6  eligible tax liens included in the

7  borrowing base?"

8      And Mr. Hanratty responded:

9      "ANSWER:  My employees more than

10  likely would have reviewed those

11  instances."

12      I asked:

13      "QUESTION:  Which employees?"

14      And he responded:

15      "ANSWER:  Ping Xie and then Frank

16  Gandol for A period of time."

17      Did I read that correctly?

18  A.  Yes.

19  Q.  Were you responsible for ensuring

20  that each tax lien in the borrowing base

21  conformed with the requirements of the

22  definition of eligible tax liens included

23  in the borrowing base?

24  A.  For to some -- yeah, to the --

25  for the review purpose, yeah, make sure the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1925 of 2230    Ping Xie
Hanratty    August 02, 2023

148

PING XIE - 08/02/2023

1

2    eligibility, we do a review to see for

3    amount are reasonable, our information are

4    correct.

5       Q.   And how would you verify that the

6    information contained in the spreadsheet

7    itself was correct?

8       A.   If I recall correctly, most times

9    the information were from a third party.

10   And in addition to that, maybe for the new

11   purchase lien, which not recorded, John --

12   or he will ask operation team tell us

13   amount and the lien amount to put it into

14   the spreadsheet manually.

15        So from review purpose, because

16   this borrowing base is not monthly closing

17   process, so I could not guarantee there is

18   no errors.

19        For example, third-party service

20   could have the error as well.  That's why

21   they have a service audit to make sure

22   there is no control.

23        But from the process perspective,

24   we do review those formulas to -- to make

25   sure eligibility are correct.

149

1    PING XIE - 08/02/2023

2        The better example for the

3    Capital One, Capital One receive a copy

4    from third party, so they were comparing

5    the certified documentation to the final

6    submitted documentation to see the

7    consistent of -- consistency of the two

8    file.

9        For the Emigrant, because -- my

10    understanding mostly involve only for the

11    Rochester is very small amount.  My

12    understanding at that time.  I don't know

13    getting bigger later.  Is very small

14    amount.

15        And the service of Rochester

16    lien, they only -- only do update at month

17    end, therefore, we will lack all for

18    intermediate information to verify or to

19    really do the, like, the middle of month or

20    sometimes borrowing basis.

21    Q.   So other than Rochester liens and

22    newly purchased liens, your understanding

23    is that the information in the borrowing

24    base came from the third-party servicer?

25    A.   Yes.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State RECEIVED NYSCEF: 01/12/2024
                   Emigrant Business Credit vs    Court Records    Pg 1927 of 2230    Ping Xie
                   Hanratty

August 02, 2023

150

1        PING XIE - 08/02/2023

2        Q.   I'm going to direct your

3    attention to page 192.  I asked

4    Mr. Hanratty:

5        "QUESTION:  The Ebury companies

6    failed to deliver the required documents to

7    MTAG for the self-service liens, correct?"

8        And he responded:

9        "ANSWER:  I don't know what we

10   sent Emigrant or MTAG related to those

11   liens."

12       Then I asked:

13       "QUESTION:  Who would know what

14   you sent to MTAG related to those liens?"

15       And Mr. Hanratty responded:

16       "ANSWER:  During that time, Ping

17   would know.  He was the main person with

18   Emigrant -- not Emigrant.  Sorry.  MTAG.

19   Ping Xie, he would do all monthly, kind of

20   month-end reports."

21       Did I read that correctly?

22   A.   Yes.

23       Q.   Were you the main person at Ebury

24   in connection with MTAG?

25   A.   For the monthly closing part,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1928 of 2230    Ping Xie
Hanratty    August 02, 2023

151

1        PING XIE - 08/02/2023

2    yes.  Because monthly closing, I needed to

3    tie out the financial statement, the

4    balance of each lien.

5        But in order on the day-to-day,

6    like, as mentioned, the operation is a

7    direct connect.  Any new purchased lien,

8    you're supposed to provide the information

9    to the MTAG.  The MTAG record it.  You only

10    need upload the documentation to the MTAG

11    systems.

12        But I'm not the day-to-day of

13    connection to make sure those lien -- no, I

14    only do the monthly close.

15    Q.   So who at the Ebury companies was

16    required -- apology.

17        Who at the Ebury companies was

18    responsible for delivering the required

19    documents to MTAG for tax liens --

20    A.   Yeah --

21        MR. WANG:  Objection.

22        THE WITNESS:  -- it's Dennissee

23    and her team.

24    BY MR. MAYRON:

25    Q.   I'm going to hand you a document

152

1        PING XIE - 08/02/2023

2   labeled EBURY_71497.

3        MR. MAYRON:  Could the court

4   reporter please mark it as Xie

5   Deposition Exhibit 7.

6        (Whereupon, Exhibit 7 is marked

7        for identification.)

8   BY MR. MAYRON:

9    Q.   And then I'm also going to

10   provide you the attachment, which is

11   labeled EBURY_71498.

12        MR. MAYRON:  And could the court

13   reporter please mark that document as

14   Xie Deposition Exhibit 8.

15        (Whereupon, Exhibit 8 is marked

16        for identification.)

17   BY MR. MAYRON:

18    Q.   So Xie Deposition Exhibit 7 is an

19   email from you to Mr. Hanratty and

20   Ms. Mendez from August 2019, Subject:

21   Ebury tax lien procedures; is that right?

22    A.   Uh-huh.  Yes.

23    Q.   Do you remember sending this

24   email?

25    A.   No, I couldn't remember.  But my

153

PING XIE - 08/02/2023

1

2   name is there.

3      Q.   So you ask, "Would you please

4   review the attached updated Ebury tax lien

5   procedures for December 2018 audit,"

6   correct?

7      A.   Yeah.

8      Q.   And so if you turn to Xie

9   Deposition Exhibit 8, I'll represent to you

10   that this is the attachment to your email.

11      A.   Uh-huh.

12      Q.   It says, "The funds purchase tax

13   liens from various sources and send the

14   lien purchase information to, 1, MTAG if

15   the liens are not Rochester liens," and

16   then it continues on "2, AFTS if the liens

17   are Rochester liens."

18         Did I read that correctly?

19      A.   Let me read it again.  [Reading

20   sotto voce].

21         (Pause for reading/reviewing.)

22      A.   Yes.

23      Q.   So is it your understanding that

24   the Ebury companies would send the lien

25   purchase information for all lien purchases

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.
Court Records   Pg 1931 of 2230
Ping Xie
Hanratty
August 02, 2023

154

1          PING XIE - 08/02/2023

2     other than Rochester liens to MTAG?

3       A.   Yes.

4          MR. WANG:  Objection.

5          THE WITNESS:  Yes.  I cannot

6     recall, but if I read it correctly,

7     it's my -- the write-up for the

8     auditors, yes.  That's my

9     understanding.

10    BY MR. MAYRON:

11      Q.   But the Ebury companies were

12    self-servicing liens, correct?

13      A.   I was not aware -- at least that

14    -- no, December.  I'm not aware there is a

15    self-servicing December to -- I cannot

16    recall.  I'm not aware.  At least --

17          (Stenographer asks for

18          clarification.)

19          THE WITNESS:  I was not aware we

20    are self-servicing, at least when I

21    wrote this one, if memory correctly.

22    BY MR. MAYRON:

23      Q.   When did you become aware that

24    the Ebury companies were self-servicing tax

25    liens?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1932 of 2230    Ping Xie
Hanratty                                                          August 02, 2023

155

1    PING XIE - 08/02/2023

2        MR. WANG:  Objection.

3        THE WITNESS:  Actually, I only

4    heard this one, but I cannot recall I

5    actually see anyone -- rather than, I

6    understand several state, like, Ohio,

7    those kind of lien were directly send

8    to our mailing office instead of a

9    regular lock box.  If I -- I -- I speak

10    from memory.

11        So it means that if we -- if it's

12    not a lock box and if I don't deposit

13    lock box, it looks like it's not

14    third-party servicing lien.  But it's

15    so many year, I could not exactly

16    remember; so...

17  BY MR. MAYRON:

18    Q.  When did you first become aware

19  that the Ebury companies were

20  self-servicing tax liens?

21        MR. WANG:  Objection.

22        THE WITNESS:  Actually, I'm

23    not -- I was not aware of all --

24    especially confirmed we are

25    self-servicing.  But I only -- I cannot

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2
Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj
Emigrant Business Credit vs. Court Records   Pg 1933 of 2230   Ping Xie
Hanratty
August 02, 2023

156

1    PING XIE - 08/02/2023

2    exactly remember one, but I just heard

3    we have a team -- we have a team called

4    a lien service team.

5        They may handling the tax lien

6    related directly instead of a third

7    party because they have a person --

8    have a team doing that.

9        But my personally, not

10    specifically -- at least in my mind,

11    I -- for accounting purpose, I actually

12    not aware actual any self-service at

13    all.

14   BY MR. MAYRON:

15    Q.   Are you aware that the Ebury

16   companies were not allowed to self-service

17   Emigrant's collateral?

18    A.   No.

19    Q.   Who at the Ebury companies had

20   the authority to decide the servicer for

21   tax liens?

22        MR. WANG:  Objection.

23        THE WITNESS:  John was manager.

24   BY MR. MAYRON:

25    Q.   Did anyone else at the Ebury

157

1        PING XIE - 08/02/2023

2    companies have the authority beside the

3    servicer for the Ebury companies' tax

4    liens?

5        A.  No.

6        Q.  So MTAG as servicer ensured that

7    proper accounting records were kept for the

8    Ebury companies' tax liens, correct?

9        MR. WANG:  Objection.

10        THE WITNESS:  Yeah, there is a

11        lots of time during the transition

12        period when the tax lien service

13        transfer from the Tower Fund Service to

14        the MTAG.

15        There is a very rough time to get

16        the records correctly.  I believe I

17        spend a lot of time for that transition

18        to reconcile each in -- into the

19        original Tower Fund Service file.

20        Sometime it's because the Tower

21        service -- Tower Fund Service records

22        were incorrect.  Sometimes because MTAG

23        didn't record it properly.

24        So after this transition period

25        finish, I think then we face the issue

158

PING XIE - 08/02/2023

1

2    about timely make the information

3    available to the MTAG because I heard

4    a --

5    (Stenographer asks for

6    clarification.)

7    THE WITNESS:  Available to MTAG,

8    yeah.  MTAG.

9    BY MR. MAYRON:

10    Q.  You heard a complaint, I believe

11    you said?

12    A.  Yes.

13    Q.  What was the complaint?

14    A.  Because, from my memory, if I ask

15    MTAG why this bank deposit or payment not

16    recorded in your system, for example, if I

17    paid one of -- city the tax, right, it's

18    not a recording in their system.  It will

19    come back to say they didn't receive their

20    records from the town.

21    Like, the -- you have to have

22    records to see you paid a tax and this --

23    this tax lien was additional payment belong

24    to you.

25    That's a timing meaning my money

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs
Court Records    Pg 1936 of 2230    Ping Xie
Hanratty
August 02, 2023

159

1          PING XIE - 08/02/2023

2    out of the bank but not recorded in the

3    MTAG tax lien book.  So I was -- at that

4    time, I mentioned early, I would push

5    Dennissee, their team, say -- I mention,

6    when you going to upload the information to

7    MTAG system, right?  Often -- often it's

8    not timely, so I struggling how to

9    reconcile those ones.

10          So it's struggle -- very struggle

11   accounting for -- because of this

12   information not timely delivered or

13   recorded.

14      Q.   So you relied on MTAG's records

15   to perform your accounting functions?

16      A.   I do.  But as accountant, I have

17   to reconcile their records to our bank --

18   bank records.  So it's taking time because

19   different.  So -- different so it take a

20   longer time to perform our accounting

21   functions.

22      Q.   I guess my question is:  By using

23   a third-party servicer --

24      A.   Uh-huh.

25      Q.   -- the Ebury companies were able

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1937 of 2230    Ping Xie
Hanratty    August 02, 2023

160

1          PING XIE - 08/02/2023

2     to obtain more reliable information about

3     the tax liens that they owned?

4          MR. WANG:  Objection.

5          THE WITNESS:  I mean, the -- if a

6     third party have all the information in

7     a system, yes.  But if their system not

8     have complete records -- right? -- it

9     would be difficult.

10          We often call system is garbage

11     in, garbage out.  So you only have a

12     good input if you have a good output.

13     So if you are garbage in, you're going

14     to have garbage out.

15          There is a issue, see.  I have a

16     garbage other result I cannot use for

17     account -- it's difficult for me to use

18     for accounting.

19     BY MR. MAYRON:

20     Q.  Were the Ebury companies

21     providing garbage information to MTAG?

22          MR. WANG:  Objection.

23          THE WITNESS:  I mean, the garbage

24     in just sort of -- I wouldn't know --

25     see, I mean, the information supposedly

161

1        PING XIE - 08/02/2023

2        upload through this lien, they mention

3        this lien.  It was not done timely.  So

4        often delayed.

5            Lot of time when we do the

6        monthly closing we not able to -- you

7        know, we chasing these records to

8        reflect in the MTAG reports.

9    BY MR. MAYRON:

10       Q.   During your time at the Ebury

11   companies, a majority of the funds the

12   Ebury companies requested from Emigrant

13   were used to pay distributions to

14   investors, correct?

15           MR. WANG:  Objection.

16           THE WITNESS:  I can't tell

17       because I cannot examine or recall each

18       individually transactions.  So I don't

19       know.

20   BY MR. MAYRON:

21       Q.   Do you recall the Ebury companies

22   using advances from the Emigrant credit

23   facilities to purchase tax liens?

24       A.   Yes.  I -- I believe so, yeah.

25       Q.   Do you recall the Ebury companies

162

1           PING XIE - 08/02/2023

2    using advances from the Emigrant credit

3    facilities to purchase more than

4    $10 million in tax liens?

5        A.   No.  I don't know the number,

6    yeah.

7        Q.   More than 5 million in tax liens?

8        A.   Basically, no, I have no idea

9    to -- I cannot estimate.

10        Q.   Can you estimate approximately

11    how much in tax liens the Ebury companies

12    purchased during your tenure?

13        A.   No, I can't.

14        Q.   I'm going to share with you a

15    document labeled EBURY_59765.

16           MR. MAYRON:  Could the court

17       reporter please mark the document as

18       Xie Deposition Exhibit 9.

19           (Whereupon, Exhibit 9 is marked

20           for identification.)

21    BY MR. MAYRON:

22        Q.   So I'll just direct your

23    attention to the very first page.

24           Who is Travis Thomason?

25        A.   I believe that he is a -- the

163

1        PING XIE - 08/02/2023

2    auditors.  Yes, he's the auditors.

3        Q.   He worked for Richey May?

4        A.   Yeah.

5        Q.   And Richey May was the Ebury

6    companies' auditor back in 2019?

7        A.   Yes.

8        Q.   And Mr. Thomason on August 12,

9    2019, wrote to you, "We need to confirm all

10    the certs held by the fund at year-end.

11    For physical certs does MTAG hold all of

12    those?"

13        Did I read that correctly?

14        A.   Yes.

15        Q.   And then Mr. Hanratty writes to

16    you on August 12, 2019, "2018 certificates

17    were held by MTAG.  Kentucky, Ohio certs

18    were Rye and now Puerto Rico pending the

19    closing of the U.S. Bank as custodian

20    contract.  No one lent to the collateral,

21    we were under no obligation to deposit

22    certs with custodian."

23        Did I read that correctly?

24        A.   Yes.

25        Q.   By saying "no one lent to the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs Court Records   Pg 1941 of 2230   Ping Xie
Hanratty   August 02, 2023

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State

164

1          PING XIE - 08/02/2023

2   collateral, we were under no obligation to

3   deposit certs with custodian," he means

4   that if Emigrant had lent to the

5   collateral, the Ebury companies were

6   obligated to deposit the certificates with

7   the custodian, correct?

8          MR. WANG:  Objection.

9          THE WITNESS:  I don't know

10      because I don't know the contract

11      terms, so.

12   BY MR. MAYRON:

13      Q.   Was it your understanding that if

14   Emigrant lent to tax lien collateral, the

15   Ebury companies were required to deposit

16   the certificates with a third-party

17   custodian?

18          MR. WANG:  Objection.

19          THE WITNESS:  No, because I -- I

20      was not aware of the contract term.

21   BY MR. MAYRON:

22      Q.   Who at the Ebury companies would

23   have been aware of the contract terms?

24      A.   I'm assuming John because he's

25   the one sign the contract, negotiate the

165

PING XIE - 08/02/2023

1

2   contract.

3    Q.   So now I'm going to share with

4   you a document labeled EBCC_34790.

5        MR. MAYRON:  And could the court

6   reporter please mark it as Xie

7   Deposition Exhibit 10.

8        (Whereupon, Exhibit 10 is marked

9        for identification.)

10  BY MR. MAYRON:

11   Q.   This is an email from you to

12  Mr. Grady from July 2017, correct?

13   A.   Yes.

14   Q.   And you write, "Jack, please see

15  attached loan document.  Please release

16  fund today if possible."

17       Correct?

18   A.   Yes.

19   Q.   Do you recall what was happening

20  when you sent this email?

21   A.   No.  I don't know it's a loan.

22  Was that -- okay, I cannot recall, yeah.  I

23  don't know.

24   Q.   We'll come back to this one.

25       Now I'm going to share with you a

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM   INDEX NO. 158207/2022
NYSCEF DOC. NO. 1-2   RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs.   Court Records   Pg 1943 of 2230   Ping Xie
Hanratty   August 02, 2023

166

1          PING XIE - 08/02/2023

2   document labeled EBCC_1778.

3          MR. MAYRON:  Could the court

4   reporter please mark it as Xie

5   Deposition Exhibit 11.

6          (Whereupon, Exhibit 11 is marked

7          for identification.)

8   BY MR. MAYRON:

9      Q.   This is an email from

10  Mr. Hanratty to Mr. Grady regarding the

11  Emigrant borrowing base.  And Mr. Hanratty

12  writes, "We are buying a 500,000 pool of

13  Florida liens aged from 2013 to 2017.  We

14  will be looking to do a wire tomorrow.

15          "We will provide you the

16  transaction docs, they are not assigned in

17  our name yet.  BCMG holds in escrow until

18  such time as assignment is received and

19  then funds are released.  Typically Cap 1

20  lends to assignments under the caveat that

21  the assignment goes through within 30

22  days."

23          Correct -- did I read that

24  correctly?

25     A.   Yes.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

INDEX NO. 158207/2022

NYSCEF DOC. NO. Emigrant Business Credit vs Court Records Pg 1944 of 2230    RECEIVED NYSCEF: 01/12/2024
Hanratty

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                                                                          Ping Xie

August 02, 2023

167

```
 1        PING XIE - 08/02/2023

 2      Q.  Is it your understanding that the

 3   Ebury companies would use the Emigrant

 4   credit facilities to purchase new tax

 5   liens?

 6        MR. WANG:  Objection.

 7        THE WITNESS:  From this email,

 8    yes.

 9   BY MR. MAYRON:

10      Q.  Do you have any other reason to

11   believe that the Ebury companies would use

12   the Emigrant credit facilities to purchase

13   new tax liens?

14      A.  I'm sorry, can you repeat?

15      Q.  Do you have any other reason to

16   believe that the Ebury companies would use

17   the Emigrant credit facilities to purchase

18   new tax liens?

19      A.  My understanding, yes, the Ebury

20   using the funds to purchase the -- the

21   funds -- the loan -- of the funds from

22   Emigrant to purchase the new tax liens.

23      Q.  And so the Ebury companies would

24   come to the bank with a tax lien portfolio

25   that they intended to purchase or had
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs                Court Records   Pg 1945 of 2230                        Ping Xie
Hanratty                                                                                     August 02, 2023

168

1        PING XIE - 08/02/2023

2    recently purchased and then request an

3    advance to fund or reimburse that purchase?

4        MR. WANG:  Objection.

5        THE WITNESS:  Yeah, for some

6      time, yes.

7    BY MR. MAYRON:

8      Q.   What do you mean for some time?

9      A.   As I mentioned, my understanding

10   is sometime you do the borrowing basis and

11   maybe just get the funds for operation.  So

12   in that case you're going to have a new

13   purchases.  That's my understanding from my

14   memory, yeah.

15        So in this case, specific

16   mentioned purchasing new funds rather than

17   existing loan availability to withdraw,

18   yeah.

19   BY MR. MAYRON:

20     Q.   Okay.  I'm going to share with

21   you a document labeled EBURY_2932.

22        MR. MAYRON:  Could the court

23      reporter please mark it as Xie

24      Deposition Exhibit 12.

25   ///

169

1          PING XIE - 08/02/2023

2          (Whereupon, Exhibit 12 is marked

3          for identification.)

4    BY MR. MAYRON:

5      Q.   This is an email from Jim Santori

6    to you and Mr. Hanratty from February 2018,

7    correct?

8      A.   Uh-huh.

9      Q.   Do you remember receiving this

10   email?

11     A.   Yeah -- no, no recall.  But I see

12   this -- I see right now, yeah.  I'm seeing

13   this right now.

14     Q.   Mr. Santori writes, "None of the

15   data that you guys are sending me is

16   consistent."

17          Did I read that correctly?

18     A.   Yes.

19     Q.   Do you know why the data you were

20   sending Mr. Santori was not consistent?

21          MR. WANG:  Objection.

22          MR. BEDEROW:  I object to the

23   form.

24          THE WITNESS:  I cannot recall.

25   Let me -- can I read this briefly so --

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 1947 of 2230   Ping Xie
Hanratty   August 02, 2023

170

1      PING XIE - 08/02/2023

2   BY MR. MAYRON:

3      Q.  Yeah.

4      A.  -- to see if I can remember

5   anything?

6      Q.  Sure.

7         (Pause for reading/reviewing.)

8      A.  Yes.  So I think I can recall the

9   discussion a little bit, yeah.  Yeah; so...

10      Q.  So why was the data that you were

11   sending Mr. Santori not consistent?

12         MR. BEDEROW:  Object to the form.

13         THE WITNESS:  I do not believe

14      it's inconsistent in recalling.  I

15      believe I would later explain the

16      difference to see why -- I think at

17      that time I constantly receive email

18      from Jim and sometime from Leventhal to

19      question about our financial

20      information.

21         At that time, actually, I think

22      it's some question just their

23      understanding of the data rather than

24      actual errors in the financial.  That's

25      my understanding.

171

1    PING XIE - 08/02/2023

2       So I usually explain the

3    difference in the -- in another email.

4    But I do not recall there would any

5    actual significant errors in the -- in

6    those -- in those number at that time

7    based on available information.

8    BY MR. MAYRON:

9       Q.  So I direct your attention to the

10   page labeled EBURY_2394.  And in it there's

11   a February 14, 2018, email from you to

12   Mr. Santori listing the loan balances for,

13   it appears, five different credit

14   facilities; is that correct?

15      A.  Page --

16      Q.  2394.

17         MR. BEDEROW:  At the bottom where

18   it's Bates stamped.

19         THE WITNESS:  Oh, okay.

20         Yeah, four different, yeah.

21   BY MR. MAYRON:

22      Q.  What are the different credit

23   facilities you discuss in this email?

24      A.  It's basically with Capital One

25   and with Emigrant.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs.    Court Records    Pg 1949 of 2230    Ping Xie
Hanratty    August 02, 2023

172

1        PING XIE - 08/02/2023

2        Q.   And so in February 2018, the

3    Ebury companies had a loan balance of

4    approximately 18 million with Capital One

5    and then a loan balance with Emigrant of

6    approximately 3.5 million?

7        A.   Yes.   Based on the borrowing

8    basis data at that time, yes.

9        Q.   And by the end of 2018, the Ebury

10    companies had paid off the Capital One

11    facilities and increased their exposure on

12    the Emigrant facilities?

13        MR. WANG:   Objection.

14        THE WITNESS:   I cannot recall the

15        timing, as I mentioned, and the loan

16        amount with Emigrant, yeah.

17    BY MR. MAYRON:

18        Q.   From where did the Ebury

19    companies obtain funds to pay off the

20    Capital One credit facilities?

21        A.   If remember -- you mean, I do not

22    have a detail information for -- in front

23    of me, but from a financial perspective, I

24    understand probably because the funds from

25    Emigrant because the -- John was looking

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. 123 RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs Court Records    Pg 1950 of 2230    Ping Xie
Hanratty    August 02, 2023

173

1          PING XIE - 08/02/2023

2    for refinancing with Alostar basically to

3    pay off all the loan so -- and to pay off

4    investor so he basically can operate with a

5    loan himself.

6          So in that case -- and the dollar

7    amount, obviously, be impossible to sell

8    and to repay all the loans.  So I would

9    assuming possibly from Emigrant, but

10    obviously without the data information, I

11    cannot a -- be certain for that.

12    Q.   Why was John looking to pay off

13    his investors?

14          MR. WANG:  Objection.

15          THE WITNESS:  Because, like,

16    major investor Leventhal, you mention

17    in this Jim's email, he was on the --

18          (Stenographer asks for

19          clarification.)

20          THE WITNESS:  He want to exit the

21    investment.  Basically he want to

22    redeem his investment from the funds at

23    that time already.  And later on, the

24    investor want to redeem.

25          So the Leventhal is the biggest

174

1          PING XIE - 08/02/2023

2    investor, so if he gone, there is not

3    much business left.  So it has been

4    continuously receive the email from Ira

5    Leventhal asking, where my money is.

6          So I probably that's why they

7    want to refinance entirely with Alostar

8    so he could repay all investor and

9    continue operation this investment --

10     investment company.

11  BY MR. MAYRON:

12     Q.   Did Mr. Hanratty communicate to

13  you that he wanted to pay off the Ebury

14  fund investors?

15          MR. WANG:  Objection.

16          THE WITNESS:  I believe so.  He

17     mentioned that he want to retire all

18     the current bank loan, also investor.

19     And Alostar -- after Alostar, the one

20     other purpose he work together with Tom

21     is a similar situation.  He want to be

22     able to just pay off all the current

23     loan with a new one to handle his

24     investment.

25  ///

175

1          PING XIE - 08/02/2023

2    BY MR. MAYRON:

3        Q.   But the Alostar deal fell

4    through?

5        A.   Yeah.  It didn't -- it didn't --

6    well, at last step, it was voted by the

7    head of Alostar so it didn't go through.

8        Q.   And so instead of using funds

9    from Alostar to pay off Capital One and

10   investors such as Ira Leventhal,

11   Mr. Hanratty used funds from Emigrant to do

12   so?

13         MR. WANG:  Objection.

14         THE WITNESS:  I don't know

15      because that's a John's question.  I

16      cannot answer for him what was his

17      intention, what he want do.

18   BY MR. MAYRON:

19       Q.   Well, apart from his intention,

20   isn't that what happened just as a matter

21   of accounting, is the Ebury companies used

22   funds from Emigrant to pay off Capital One

23   and investors such as Ira Leventhal?

24         MR. WANG:  Objection.

25         THE WITNESS:  Yes, I cannot

176

1    PING XIE - 08/02/2023

2    recall the -- recall the financials --

3    the balance sheet or the loan balance

4    right now for that one.

5    But apparently, yes, if for -- if

6    Capital One's loan was paid off and the

7    investment size wasn't reduced and no

8    new investor coming in, then, yes, then

9    the funds have to come from a new loan

10    from Emigrant logically, yeah.

11    MS. PARKS:  Austin, is this a

12    good time for a break?  It's been an

13    hour 20.

14    MR. MAYRON:  Yeah, we can go take

15    a break.

16    THE VIDEOGRAPHER:  This ends

17    unit 3.

18    We are off the record at 2:07.

19    (Whereupon, a recess was taken at

20    2:07 p.m.)

21    THE VIDEOGRAPHER:  This begins

22    unit 4.

23    We're on the record at 2:17.

24    BY MR. MAYRON:

25    Q.  Mr. Xie, I'm going to share three

177

1        PING XIE - 08/02/2023

2    documents with you.  The first document is

3    labeled EBCC_10586.

4        MR. MAYRON:  Could the court

5    reporter please mark this as Xie

6    Deposition Exhibit 13.

7        (Whereupon, Exhibit 13 is marked

8        for identification.)

9        MR. MAYRON:  The next document is

10   EBCC_10663.

11       Could the court reporter please

12   mark this as Xie Deposition Exhibit 14.

13       (Whereupon, Exhibit 14 is marked

14       for identification.)

15       MR. MAYRON:  And the last

16   document is EBCC_10701.

17       And could the court reporter

18   please mark this as Xie Deposition

19   Exhibit 15.

20       (Whereupon, Exhibit 15 is marked

21       for identification.)

22   BY MR. MAYRON:

23       Q.  So Xie Deposition Exhibit 13 is

24   the 2018 audited financial statements for

25   Ebury Fund 1 and Fund 2, correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsl Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs. Court Records Pg 1955 of 2230 Ping Xie
Hanratty August 02, 2023

178

PING XIE - 08/02/2023

2    A.  Yes.

3    Q.  So if you'd turn to the page

4  labeled EBCC_10611, the Ebury Fund 1

5  audited financial statements for 2018 list

6  approximately 9 million in distributions to

7  limited partners, correct?

8    A.  Yes.

9    Q.  Turning to page labeled

10  EBCC_10632, the Ebury Fund 2 audited

11  financial statements for 2018 lists

12  approximately 6.7 million in distributions

13  to limited partners, correct?

14    A.  Uh-huh.

15    Q.  Is that a "yes"?

16    A.  Yes, yes.  Sorry.

17    Q.  So in 2018, the Ebury companies

18  distributed approximately 15.7 million in

19  distributions to limited partners?

20    A.  Yes.

21    Q.  The only person at the Ebury

22  companies with the authority to direct the

23  company to make those distributions was

24  John Hanratty, correct?

25      MR. WANG:  Objection.

179

1          PING XIE - 08/02/2023

2          THE WITNESS:  Yes.

3     BY MR. MAYRON:

4          Q.   Are you aware whether the Ebury

5     companies used funds advanced by Emigrant

6     to make those distributions?

7          MR. WANG:  Objection.

8          THE WITNESS:  As I mentioned, I

9      couldn't tell without any detailed

10      transactions.

11     BY MR. MAYRON:

12          Q.   So Xie Deposition Exhibit 14 is

13     the Ebury Fund 1 audited financial

14     statement for 2019, correct?

15      A.   Yes.

16          Q.   Have you seen this document

17     before?

18      A.   No.

19          Q.   This audit was completed after

20     you left the Ebury companies, correct?

21      A.   Yes.

22          Q.   If you turn to page EBCC_10670,

23     the Ebury Fund 1 audited financial

24     statements for 2019 lists approximately

25     3.2 million in distributions to limited

180

1    PING XIE - 08/02/2023

2    partners, correct?

3    A.  Which page?  I'm sorry.  10669?

4    Q.  10670.

5    A.  Oh, 7.  Yes.

6    Q.  And then in Xie Deposition

7    Exhibit 15, this is the Ebury Fund 2

8    audited financial statement for 2019,

9    correct?

10    A.  Yes.

11    Q.  Have you seen this document

12    before?

13    A.  No.

14    Q.  And this audit was completed

15    after you left the Ebury companies,

16    correct?

17    A.  Yes.

18    Q.  And if you turn to the page

19    labeled EBCC_10708, the Ebury Fund 2

20    audited financial statements for 2019 lists

21    approximately 2.8 million in distributions

22    to limited partners, correct?

23    A.  Yes, yes.  Sorry.  Yes.

24    Q.  So in 2019, the Ebury companies

25    distributed approximately $6 million in

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs
Court Records    Pg 1958 of 2230
Ping Xie
Hanratty
August 02, 2023

181

PING XIE - 08/02/2023

1

2    distributions to limited partners, correct?

3        MR. WANG:  Objection.

4        THE WITNESS:  You mean 2029

5    [sic]?

6    BY MR. MAYRON:

7        Q.  I apologize.

8        A.  Yes, yes.

9        Q.  So in -- yeah, in 2019, the Ebury

10    companies distributed approximately

11    6 million in distributions --

12        A.  Yes.

13        Q.  -- to limited partners?

14        A.  Yes.

15        Q.  So between 2018 and 2019, the

16    Ebury companies distributed approximately

17    $21.7 million in distributions to limited

18    partners?

19        A.  Yes.

20        Q.  And during the same 2018-2019

21    time frame, the Ebury companies repaid

22    Capital One approximately $18 million?

23        MR. WANG:  Objection.

24        THE WITNESS:  I do not

25    remember...

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.                                           RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs     24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Hanratty                        Court Records   Pg 1959 of 2230                                       Ping Xie
                                                                                                     August 02, 2023

182

1       PING XIE - 08/02/2023

2    BY MR. MAYRON:

3       Q.  So going back to Xie Deposition

4    Exhibit 12.

5       A.  12, yes.

6       Q.  This is the page labeled

7    EBURY_2394.

8       A.  Oh.  18.

9          Yeah.  Based on this information,

10   about the 18 million, yes.

11      Q.   And at the beginning of 2018, the

12   Ebury companies had only drawn

13   approximately 3.5 million on the Emigrant

14   credit facilities?

15      A.  Yes.

16      Q.   And by the time you left the

17   Ebury companies, they had drawn

18   approximately $20 million on the Emigrant

19   credit facilities?

20         MR. WANG:  Objection.

21         THE WITNESS:  I don't know the

22      number in my mind -- in my head, yeah.

23   BY MR. MAYRON:

24      Q.   At the time you left the Ebury

25   companies, they had drawn almost the

183

1        PING XIE - 08/02/2023

2    maximum amount available under the Emigrant

3    credit facilities, correct?

4           MR. WANG:  Objection.

5           THE WITNESS:  I cannot recall.

6    BY MR. MAYRON:

7       Q.   I'm going to share with you a

8    document labeled EBURY_53064.

9           MR. MAYRON:  Could the court

10          reporter please mark this document as

11          Xie Deposition Exhibit 16.

12             (Whereupon, Exhibit 16 is marked

13             for identification.)

14   BY MR. MAYRON:

15      Q.   You write to Mr. Hanratty on

16   September 11, 2019, "John, would you please

17   give Frank authorization to digitally sign

18   the attached after adding the letterheader

19   for you?"

20      A.   Uh-huh.

21      Q.   Did I read that correctly?

22      A.   Yes.

23      Q.   And then you again write to

24   Mr. Hanratty, it looks like seven hours

25   later, "John, do you authorize Frank to

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM          INDEX NO. 158207/2022
NYSCEF DOC. NO.          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs          Court Records          Pg 1961 of 2230          Ping Xie
Hanratty          August 02, 2023

184

```
1          PING XIE - 08/02/2023

2    digitally sign those files by using your

3    digital signature?"

4          Correct?

5    A.  Yes.

6    Q.  Why did you ask Mr. Hanratty for

7    his authorization for Frank to digitally

8    sign the files?

9    A.  Yeah, because those are audited

10   confirmation, needed John's signature.

11   He's representing the -- the funds that had

12   been audited.

13   Q.  Is it your understanding that

14   Mr. Gandol required Mr. Hanratty's

15   authorization to apply Mr. Hanratty's

16   digital signal?

17   A.  Yes.

18          MR. WANG:  Objection.

19   BY MR. MAYRON:

20   Q.  Do you have any reason to believe

21   that Mr. Gandol ever applied Mr. Hanratty's

22   digital signature without Mr. Hanratty's

23   authorization?

24   A.  No.

25   Q.  Turning back to Hanratty -- or
```

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM                    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                                          RECEIVED NYSCEF: 01/12/2024

24-04020-dsj     Doc 1-2     Filed 08/14/24     Entered 08/14/24 09:45:23     Doc #3 State
Emigrant Business Credit vs          Court Records     Pg 1962 of 2230                    Ping Xie
Hanratty                                                                     August 02, 2023

185

1          PING XIE - 08/02/2023

2    not Hanratty, I apologize -- Xie Deposition

3    Exhibits 14 and 15.

4          Xie Deposition Exhibit 14 on

5    page 10667 lists Ebury Fund 1's investments

6    and tax lien receivable at a fair value of

7    approximately $6.5 million; is that

8    correct?

9     A.  I'm sorry?

10          MR. BEDEROW:  667 at the bottom.

11   BY MR. MAYRON:

12    Q.  This is Xie Deposition

13   Exhibit 14, which is the --

14    A.  Oh, 14.  Back one, sorry.

15    Q.  -- which is the Fund 1 audited

16   statement.

17    A.  I'm trying to organize this.

18          Okay.  I'm sorry.  Which page are

19   you referring to?

20    Q.  10667.

21    A.  667.  Yes.

22    Q.  The audit lists Ebury Fund 1's

23   investments in tax lien receivable at a

24   fair value of approximately $6.5 million,

25   correct?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs                                              Ping Xie
Hanratty                    Court Records    Pg 1963 of 2230

August 02, 2023

186

 1          PING XIE - 08/02/2023

 2      A.  Yes.

 3      Q.  Do you have any reason to believe

 4   that that number is incorrect?

 5      A.  No.

 6      Q.  Do you have any reason to believe

 7   that the Ebury companies -- apologies --

 8   Ebury Fund 1 owned -- had a larger

 9   investment in tax liens receivables than

10   that?

11      A.  No.

12      Q.  And then turning to Xie

13   Deposition Exhibit 15, this is

14   page EBCC_10705, the audit lists Ebury

15   Fund 2's investment in tax lien receivables

16   at a fair value of approximately

17   $10.1 million, correct?

18      A.  Uh-huh.

19      Q.  Do you have reason -- is that a

20   "yes"?

21      A.  Yes.  Yes, sorry.

22      Q.  Do you have any reason to believe

23   that Ebury Fund 2 had a larger investment

24   in tax lien receivables than that?

25      A.  Oh, oh, these audited financial

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022
NYSCEF DOC. NO. RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1964 of 2230    Ping Xie
Hanratty    August 02, 2023

187

1        PING XIE - 08/02/2023

2   statement, that's -- I was not involved so

3   I cannot give any answer to.

4      Q.   So as the -- you were financial

5   controller of the Ebury companies as of

6   December 31, 2019, correct?

7      A.   That's right.

8      Q.   Do you have any reason to believe

9   that the Ebury companies had more --

10  apologies -- that Ebury Fund 2 owned more

11  than $10.7 million in tax liens receivable?

12     A.   Yeah, I -- I couldn't recall that

13  time --

14         (Stenographer asks for

15         clarification.)

16         THE WITNESS:  I could not -- at

17      the time the fair value of those tax

18      liens, therefore, I do not have a -- I

19      cannot access my judgment, especially

20      the audited financial statement very

21      few pages.

22         So I cannot give any

23      reasonable -- I mean -- I mean, I

24      cannot make any judgment on that.

25  ///

188

1      PING XIE - 08/02/2023

2   BY MR. MAYRON:

3      Q.   So between the Fund 1 and Fund 2

4   audited financial statements, it appears

5   that the Ebury companies had investments in

6   tax liens receivable of approximately

7   $17.1 million as of December 31, 2019,

8   correct?

9      A.   I'm sorry.  I lost.  Can you

10  repeat that?

11     Q.   Yeah.

12        So I think as we covered, the

13  Ebury Fund 1 had investments in tax lien

14  receivable valued at approximately

15  $6.5 million --

16     A.   Yeah.

17     Q.   -- and Ebury Fund 2 has

18  investments in tax lien receivable valued

19  at about $10.8 million, so that would mean

20  between the two funds, the Ebury companies

21  had investments in tax lien receivable as

22  of December 31, 2019, with a fair value of

23  approximately $17.3 million?

24     A.   If audited financial are correct,

25  yes.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.   Court Records   Pg 1966 of 2230   Ping Xie
Hanratty   August 02, 2023

189

PING XIE - 08/02/2023

1

2    Q.   Okay.  Do you have reason to

3    believe that the Ebury companies owned

4    substantially more in tax lien receivables

5    as of December 31, 2019?

6         MR. WANG:  Objection.

7         THE WITNESS:  I don't know.  But

8    from the audited financial statement,

9    it looks like not likely.

10   BY MR. MAYRON:

11    Q.   I'm going to share with you a

12   document labeled EBURY_29017.

13        MR. MAYRON:  And could the court

14   reporter please mark it as Xie

15   Deposition Exhibit 17.

16        (Whereupon, Exhibit 17 is marked

17        for identification.)

18   BY MR. MAYRON:

19    Q.   Could you take a second to review

20   the email chain.

21        (Pause for reading/reviewing.)

22    Q.   So why don't I direct your

23   attention to the bottom email on the page

24   labeled EBURY_29018.

25        Mr. Thomason from Richey May asks

190

1          PING XIE - 08/02/2023

2    you, "Is there a reason the sales prices

3    are consistently much lower than the value

4    you have them marked at for 12/31/2018,"

5    correct?

6        A.  Yes.

7        Q.  So he's saying that the sale

8    prices for certain REOs are lower than the

9    value that the Ebury companies had the REOs

10   marked for at the end of the year of 2018?

11          MR. WANG:  Objection.

12          THE WITNESS:  Yes.

13   BY MR. MAYRON:

14       Q.  And you respond, "For accounting

15   purpose, the fair value is the exit price

16   in an orderly traded market.  The distress

17   sale is not fair market value and

18   accounting should not report not orderly

19   traded transaction as fair market value.

20          "Many Ebury investor requested

21   withdraw in 2018 to 2019 which resulted in

22   Ebury to make bulk lien and REO sales.  The

23   effort to liquidate the property in a short

24   time to satisfy the investors' withdrawal

25   may not be an orderly trade."

Emigrant Business Credit vs   Court Records
Hanratty                                          Ping Xie
                                                  August 02, 2023

191

1        PING XIE - 08/02/2023

2        Did I read that correctly?

3    A.   Yes.

4    Q.   Did the Ebury companies engage in

5    distressed sales in 2018 and 2019?

6    A.   That's my observation, yes.

7    Q.   And why do you characterize the

8    sales as distressed sales?

9    A.   Because at that time in the

10   financial condition of the Ebury indicated

11   that first there is a cash flow.  The cash

12   balance in the bank is not enough to cover

13   the operation.

14        Secondly, a large redemption

15   investment done from the investor amount is

16   too large.  We don't have any liquidity

17   assets to meet those requirement.

18        The third one is a lot of REO

19   become REO and subsequently subject to tax

20   lien itself because you have to pay the

21   annual release tax and the company does not

22   have enough cash to make those payment;

23   therefore, we are -- Ebury subject to be

24   foreclosed by other people who paying those

25   REO tax for us.

192

1        PING XIE - 08/02/2023

2            So those all add together,

3    require a huge cash flows.  And Ebury

4    doesn't have.  The only option is selling

5    available assets.

6            The REO selling is one of the

7    option.  Bulk sale is one of -- first to

8    save their cost, their operating cost, you

9    have to pay the tax, avoid being disclosed

10    by other person.

11            Secondly, you need a cash flow

12    operation for the investor.

13            So from this financial

14    perspective, all those sale have to be

15    contemplated in a very short period of

16    time.  And REO is not a liquid market.  You

17    cannot sell also -- right away like stock

18    market.

19            Therefore, that it's my

20    observation all these sale is distressed

21    because you need a market quickly and

22    couldn't wait for favorable of a market

23    value for that.

24      Q.  Thank you.

25            And so you next write, "Many

193

1        PING XIE - 08/02/2023

2    Ebury investor requested withdraw in 2018

3    to 2019," correct?

4        A.   Yes.  Including, I mentioned the

5    Leventhal and Mike -- I think his name is

6    Michael, yeah.

7        Q.   Michael Salerno?

8        A.   Yes, right.  He wants the money,

9    yeah.

10           Plus other I think also.  Jim

11    Santos and his colleague as well, they also

12    investors.  I constantly receive the email

13    ask the moneys, yeah.

14        Q.   And so as we just discussed, from

15    the Ebury companies' audited financial

16    statements, it appears they distributed

17    approximately 21.7 million in distributions

18    to limited partners from 2018 to 2019?

19        A.   Yes.  If you cited a number from

20    audited financials, yes.

21        Q.   And is that 21.7 million what

22    you're referring to when you wrote "Many

23    Ebury investors requested to withdraw in

24    2018 to 2019"?

25        A.   Not specifically, but most like

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 1971 of 2230    Ping Xie
Hanratty    August 02, 2023

194

1      PING XIE - 08/02/2023

2  at least a part of them, yes.

3      Q.   And so you tie the investor

4  request to withdraw to Ebury's decision to

5  make bulk lien and REO sales.

6          So first, did the Ebury companies

7  make bulk lien and REO sales --

8      A.   Yeah.

9      Q.   -- in 2018 and 2019?

10     A.   Yes.

11     Q.   And did they make those bulk

12  sales to satisfy investor redemption

13  requests?

14          MR. WANG:  Objection.

15          THE WITNESS:  As mentioned in the

16  email, I just gave a one other reason.

17  But a possible I have other reason as I

18  mentioned, other two reasons as well.

19          But the largest cash requirement

20  is from the investor so it would be a

21  major driver of the -- those

22  liquidations.

23  BY MR. MAYRON:

24     Q.   And you talk about the effort to

25  liquidate the property in a short time may

195

PING XIE - 08/02/2023

1

2  not be an orderly trade?

3      A.  Uh-huh.

4      Q.  Why did the Ebury companies have

5  to liquidate property in a short time?

6      A.  For instance, for the Michael's

7  issue, Ebury promise to pay them on certain

8  days, always late.  Therefore, you know,

9  also to meet those new days, you need --

10  you need to borrow money or borrow more

11  money or you sell the assets, right?

12      Otherwise, you don't have money

13  to meet the promise you already -- we

14  already -- Ebury already gave to the

15  investors.  And the time frame is very

16  short.

17      Q.  Why was the time frame very

18  short?

19      A.  As I mentioned, you miss the due

20  date, the new date -- new due date is

21  very -- I believe is in very short period

22  of time, a one month, two month max.

23  And -- yeah.

24      Q.  I'm going to show you an email

25  labeled EBURY_23926.

196

1    PING XIE - 08/02/2023

2         MR. MAYRON:  Could the court

3    reporter please mark it as Xie

4    Deposition Exhibit 18.

5         (Whereupon, Exhibit 18 is marked

6         for identification.)

7    BY MR. MAYRON:

8         Q.  I'm going to direct your

9    attention to the email beginning at the

10   very bottom of the first page spilling over

11   on to the second page.  This is an email

12   from you to Mr. Hanratty copying Mr. Gandol

13   from July 20, 2018.

14        You write, "Frank, please do a

15   new borrowing base to see if we still owe

16   Capital One funds.  If we do, we may have

17   to borrow from Emigrant to pay Capital

18   One."

19        A.  Oh, my gosh.  Okay.  Yes, yes.

20        Q.  Did Mr. Hanratty communicate to

21   you that the Ebury companies were allowed

22   to borrow from Emigrant to pay Capital One?

23        A.  No.  But I was not aware we

24   cannot -- as I mentioned, my understanding

25   is the funds borrow from Emigrant is used

197

1        PING XIE - 08/02/2023

2    for the regular operation and the tax lien,

3    in my mind, is also a regular operation for

4    the -- for meet the operation requirement.

5        Q.   To borrow from Emigrant to pay

6    Capital One?

7        A.   Yeah, because working capital.

8    Why I say the regular operation means the

9    necessary working capital.  The loan is a

10   part of working capital we can use.  That's

11   my -- that's my understanding before

12   knowing those terms, right?  So, like, a

13   distribution.

14        But I still -- in my mind, I

15   still retain the Capital One's loan in my

16   mind is still regular operation.  Because

17   the regular -- regular working capitals,

18   yeah.

19        Q.   Do you know whether the Ebury

20   companies did borrow from Emigrant to pay

21   Capital One?

22        MR. WANG:  Objection.

23        THE WITNESS:  From here, I

24   mention -- earlier I mention I do not

25   recall.  But from this email, the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs    Court Records    Pg 1975 of 2230    Doc #3 State
Hanratty                                                                    Ping Xie

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23

August 02, 2023

198

1       PING XIE - 08/02/2023

2       evidence looks like it, yes.

3   BY MR. MAYRON:

4       Q.   Did Mr. Hanratty ever ask you to

5   work on requests for advances from Emigrant

6   to be used to pay Capital One?

7       A.   I believe those are common

8   practice why John the company -- as

9   mentioned, the funds from Emigrant or from

10  Capital One is not strictly separate,

11  Fund 1, Fund 2.

12       So it is -- in other part is

13  possible also the loan from Capital One was

14  used to return to the Emigrants based on

15  the borrowing basis availabilities.

16       So my understanding is a regular

17  operation, it's not sort of an out of

18  ordinary.

19       Q.   I'm going to share with you a

20  document labeled EBCC_5399.

21       MR. MAYRON:  Could the court

22  reporter please mark it as Xie

23  Deposition Exhibit 19.

24       (Whereupon, Exhibit 19 is marked

25       for identification.)

1          PING XIE - 08/02/2023

2    BY MR. MAYRON:

3        Q.   So the second email on the first

4    page is an email from Sahil Arora to you on

5    July 25, 2019.

6            Who is Mr. Arora?

7        A.   I think I can recall.  I think

8    she -- she or him, I don't know.  It's one

9    of a people work with Jack.  That's

10   correct?  Yes.  He's a colleague of Jack.

11       Q.   And Mr. Arora writes, "Ping,

12   could you please provide the covenant

13   compliance."

14           And then Mr. Grady writes to

15   Mr. Hanratty, "You really need to get this

16   guy a copy of our loan agreement."

17           Did Mr. Hanratty, after July 25,

18   2019, provide you with a copy of the

19   Emigrant loan agreement?

20       A.   I can't recall, sorry.  I don't

21   know.

22       Q.   Did Mr. Hanratty ever discuss

23   with you the requirements of the Emigrant

24   credit facilities?

25       A.   No.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs   Court Records   Pg 1977 of 2230   Ping Xie
Hanratty

August 02, 2023

200

1        PING XIE - 08/02/2023

2        Q.  Did Mr. Hanratty ever provide you

3    with any instructions on how to comply with

4    the requirements --

5        A.  No --

6        Q.  -- of the Emigrant credit

7    facilities?

8        A.  -- no.

9        Q.  And I may have asked this

10   earlier, but who at the Ebury companies was

11   responsible for ensuring that the companies

12   were complying with the requirements of the

13   Emigrant credit facilities?

14       MR. WANG:  Objection.

15       THE WITNESS:  Yeah, because as

16    far as know, I don't have the -- or I

17    don't know any specific loan term

18    needed to be required, rather than

19    Capital One, which because I need to

20    calculate the financial ratio.

21       And the -- also, the eligibility

22    percentage and the term for the loans.

23    Besides those two, I was not aware

24    anything.  So reasonable assume --

25    assumption is that John would know and

201

1        PING XIE - 08/02/2023

2      he would be the person to do this

3      control or advise us whether we

4      should look out to make sure in

5      compliance.

6    BY MR. MAYRON:

7      Q.   Did Mr. Hanratty ever speak to

8    you about compliance with the requirements

9    of Emigrant credit facilities?

10          MR. WANG:  Objection.

11          THE WITNESS:  Except about the

12      balance of availability, I -- I do not

13      believe so.  At least in my memory.

14    BY MR. MAYRON:

15      Q.   I'm going to share with you a

16    document labeled EBCC_3152.

17          MR. MAYRON:  Could the court

18      reporter please mark it as Xie

19      Deposition Exhibit 20.

20          (Whereupon, Exhibit 20 is marked

21          for identification.)

22    BY MR. MAYRON:

23      Q.   This is an email from Jack Grady

24    to you from April 12, 2018.

25      A.   Uh-huh.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
24-04020-dsj
Emigrant Business Credit vs.
Court Records    Pg 1979 of 2230
Hanratty

Ping Xie
August 02, 2023

202

1        PING XIE - 08/02/2023

2        Q.   Mr. Grady writes, "Ping, here are

3    the credit agreements."

4            And the email lists attachments

5    Ebury 1 Credit Agreement Executed and

6    Ebury 2 Credit Agreement, correct?

7        A.   Uh-huh.  Uh-huh, yes.

8        Q.   Do you recall why Mr. Grady sent

9    you the credit agreements?

10        A.   I don't recall.  Also, I -- I

11    don't know is the old one, new one.  Most

12    likely -- the credit agreement I use most

13    likely is a folder availability for the

14    percentage checking, which loan, how much

15    it can be borrowed.

16            I cannot recall if for any

17    requirement ask me for the financial

18    statement, specifically calculate the

19    certain ratio stipulated in the contract

20    with Emigrant.

21            I knew we have those for the

22    Capital One, but I cannot recall -- in my

23    memory I do not -- so I cannot recall why

24    Jack send me this.

25        Q.   So when you would check the

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsl    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1980 of 2230    Ping Xie
Hanratty    August 02, 2023

203

1        PING XIE - 08/02/2023

2    availability under the Emigrant credit

3    facilities, you would rely on the

4    information contained in the borrowing base

5    you were provided?

6     A.   Yes --

7          MR. WANG:  Objection.

8          THE WITNESS:  Yes.  Because the

9     borrowing basis have formula for

10     each -- it's many liens, right, 2,000

11     lien.  It's nearly -- not a possible to

12     check line by line by self.  So you go

13     through the formulas to make sure the

14     reasonableness of numbers.

15      So my focus, because the Excel

16     formula, as mentioned earlier, I have

17     develop, so I'm more focus on the

18     formula to identify eligibility and the

19     percentage.

20    BY MR. MAYRON:

21     Q.   And your understanding is the

22    information in the borrowing base

23    spreadsheets you received was coming from

24    the independent third-party custodian and

25    servicer?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.    Court Records    Pg 1981 of 2230    Ping Xie
Hanratty    August 02, 2023

204

PING XIE - 08/02/2023

1

2     A.  Capital One, yes, for the

3  Emigrants.  I cannot recall because you

4  mention I have two loan.

5         For the Rochester loan,

6  definitely it was from the -- the tax -- I

7  think the tax lien service is older, but

8  TFX.  And they only produce monthly, not in

9  the middle.

10        I cannot recall others for the

11  Emigrants where the data cells come from.

12  I cannot recall for the new loan.  You

13  mentioned another Rochester loan.

14     Q.   Other than the Rochester loans,

15  was it your understanding that the data in

16  the borrowing base spreadsheets you

17  received came from MTAG?

18     A.   If those are MTAG liens.

19  Assuming for the lien if not MTAG, it would

20  have given by John or the trader, say what

21  they purchase it; so...

22     Q.   So the data for non-MTAG liens in

23  the borrowing base was provided by

24  Mr. Hanratty?

25     A.   Or the -- or the trader means

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State RECEIVED NYSCEF: 01/12/2024
Court Records   Pg 1982 of 2230

Emigrant Business Credit vs
Hanratty

Ping Xie
August 02, 2023

205

1         PING XIE - 08/02/2023

2   like Adler, Andrew Adler, or some -- or

3   Dennissee team.  So that's my assumption.

4   Not -- I'm not stating the facts.  Just

5   memory, see, what I saw over there, yeah.

6        Q.   So your understanding is if it

7   was a non-MTAG lien, the data in the

8   borrowing base was provided by Mr. Hanratty

9   or another Ebury employee?

10       A.   Yes.

11            MR. MAYRON:  Off the record.

12            THE VIDEOGRAPHER:  This ends

13   unit 4.

14            We're off the record at 2:55.

15            (Whereupon, a recess was taken at

16            2:55 p.m.)

17            THE VIDEOGRAPHER:  This begins

18   unit 5.

19            We're on the record at 3:11.

20   BY MR. MAYRON:

21       Q.   We're going to wrap up with a few

22   miscellaneous documents.  First I'm going

23   to share with you a document labeled

24   EBURY_3523.

25            MR. MAYRON:  Could the court

1          PING XIE - 08/02/2023

2     reporter please mark it as Xie

3     Deposition Exhibit 21.

4          (Whereupon, Exhibit 21 is marked

5          for identification.)

6   BY MR. MAYRON:

7     Q.   This is an email from Jim Santori

8   to you from August 24, 2018.

9          Who is Jim Santori?

10     A.   He's one of investor, also the

11   former colleague of John.

12     Q.   Mr. Santori writes, "Hi Ping,

13   When we last spoke, you impressed upon me

14   the fact that John is very busy and working

15   hard to get Fund 2 liquidated."

16          Did I read that correctly?

17     A.   Yes.

18     Q.   Did you tell Mr. Santori that

19   Mr. Hanratty was working to get Fund 2

20   liquidated?

21          MS. PARKS:  Objection.

22          THE WITNESS:  I believe so if I

23     wrote that one.  Yeah, at that time

24     maybe they -- yes, I believe so.

25   ///

207

1        PING XIE - 08/02/2023

2    BY MR. MAYRON:

3        Q.   Was Ebury Fund 2 in liquidation

4    in August 2018?

5          MR. WANG:  Objection.

6          THE WITNESS:  I cannot recall,

7      but at least that time I was told the

8      Ebury would liquidate the Fund 2 and

9      return the investment to the investors.

10   BY MR. MAYRON:

11       Q.   Who told you that Ebury was going

12   to liquidate Fund 2 and return the

13   investment to investors?

14       A.   Yeah, only possible John would

15   tell me.

16       Q.   So Mr. Hanratty told you in

17   August 2018 that he was going to liquidate

18   Fund 2?

19       A.   Not specifically.  Probably

20   before August 24.  Because in the email

21   mention the last -- last time spoke, so it

22   must be earlier than that.

23       Q.   So prior to August 24, 2018,

24   Mr. Hanratty told you that he was going to

25   liquidate Ebury Fund 2?

208

1        PING XIE - 08/02/2023

2        A.  I -- I mean, I speak from memory.

3    I do not recall this.  But logically,

4    either the liquidation means Alostar loan

5    agreement go through, therefore, it's

6    considered liquidation because John would

7    have bought those lien and gave money to

8    the -- to the Leventhal.  Or indicated it

9    actually liquidated the tax lien.  I cannot

10   recall which one but probably one of them.

11       Q.  Okay.

12       A.  Can go back to that question?

13          Because from the email looks like

14   liquidation mean the -- first the bullet

15   point, because it mention we'll get a loan

16   from Emigrant and then basically John will

17   purchase balance of Fund 2.

18          I -- from this email, I would

19   believe my liquidation means John will

20   purchase from the Leventhal using the loan

21   from Emigrant.  Just a change of ownership,

22   but tax lien itself doesn't change.

23       Q.  And at what value did the Ebury

24   companies purchase the Fund 2 liens from

25   the Capital One line to the Emigrant line?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs.    Court Records    Pg 1986 of 2230    Ping Xie
Hanratty
August 02, 2023

209

PING XIE - 08/02/2023

1

2     A.  I'm sorry.  Can you repeat that

3  again?  Sorry.

4     Q.  So my understanding is that the

5  Ebury companies used the Emigrant line of

6  credit to purchase Fund 2 liens that were

7  being financed through Capital One; is that

8  correct?

9     A.  I read the -- okay.  It's been

10  long.  So I read the email means John will

11  get the Emigrant loan to purchase remaining

12  balance of Fund 2 lien from Leventhal.

13       Because Leventhal is probably the

14  only -- and his wife the only investor for

15  Fund 2, therefore, I read that is mean John

16  will purchase from Leventhal if he got the

17  loan from Emigrant.

18       Therefore, Leventhal will be

19  totally out and be repaid and John will

20  assuming the ownership of Fund 2, become

21  the only investor.

22       That's how I read, but, yeah.

23     Q.  Okay.  Now I'm going to share

24  with you a document labeled EBURY_18474.

25       MR. MAYRON:  And could the court

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
NYSCEF DOC. NO. 24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs.    Court Records    Pg 1987 of 2230    RECEIVED NYSCEF: 01/12/2024
Hanratty
INDEX NO. 158207/2022
Ping Xie
August 02, 2023

210

1    PING XIE - 08/02/2023

2    reporter please mark the document as

3    Xie Deposition Exhibit 22.

4        (Whereupon, Exhibit 22 is marked

5        for identification.)

6    BY MR. MAYRON:

7        Q.   This is an email from you to John

8    Bronzo and Mr. Hanratty from October 12,

9    2018, correct?

10        A.   Yeah.

11        Q.   And you write, "I called MTAG.

12    They will assign the Fund 2 Cap One lien to

13    Fund 2 Emigrant lien today."

14        Did I read that correct?

15        A.   Yes.

16        Q.   What do you mean by "they will

17    assign the fund to Cap One lien to fund to

18    Emigrant credit lien today"?

19        A.   I mean the -- I don't know at

20    that time if Capital One lien was already

21    fully repaid or --

22        (Stenographer asks for

23        clarification.)

24        THE WITNESS:  Repaid.  Repaid,

25    yeah.

211

1          PING XIE - 08/02/2023

2          I can't recall, but from this

3     email, I assuming Capital One lien will

4     be fully repaid and, therefore, become

5     the Emigrant collateral and, therefore,

6     going to recorded under Emigrant credit

7     line.

8   BY MR. MAYRON:

9          Q.   And the Ebury companies used the

10   availability generated by assigning the

11   Capital One lien collateral to Emigrant to

12   pay off the Capital One credit facilities,

13   correct?

14          MR. WANG:  Objection.

15          (Stenographer asks for

16          clarification.)

17          THE WITNESS:  I cannot recall

18    exactly, but from the email, I just

19    assume that Capital One lien was paid

20    in full, therefore, it's a free to be

21    transferred and used as collateral for

22    their Emigrant's loan.

23   BY MR. MAYRON:

24          Q.   I'm going to share with you a

25   document labeled EBURY_27135.

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/12/2024
Emigrant Business Credit vs    Court Records    Pg 1989 of 2230    Ping Xie
Hanratty    August 02, 2023

212

1        PING XIE - 08/02/2023

2            MR. MAYRON:  Could the court

3    reporter please mark this as Xie

4    Deposition Exhibit 23.

5            (Whereupon, Exhibit 23 is marked

6            for identification.)

7    BY MR. MAYRON:

8        Q.   The very first email is an email

9    from you to Mr. Hanratty on October 10,

10   2019.

11           And you write, "I just spoke to

12   Clark.  I do not have the same access as he

13   has.  He runs the lien from lien app.  I

14   was only given lien app report access."

15       A.   I'm sorry.  I'm trying to locate

16   it.

17       Q.   The very first email.

18       A.   You mean the first page?

19       Q.   Yes.

20       A.   Oh, from me.  Okay.  I'm sorry.

21           (Pause for reading/reviewing.)

22       A.   Yes.

23       Q.   Who is Clark?

24       A.   I have no recollection.  Sorry.

25   I don't know.  He's in our email.  I don't

213

1        PING XIE - 08/02/2023

2    know, I'm sorry.  I cannot recall.

3       Q.  Is he -- was he an Ebury

4    employee?

5       A.  I don't know.  Because after

6    Dennissee joined, a lot of people in the

7    Puerto Rico, they also have accountant in

8    there.  So I don't know if Clark is one of

9    them.  They have a service accountant.

10        Like, earlier you may have

11    mentioned, the REO.  Because -- so they

12    have accountant supposedly in that or after

13    Frank left.  And they -- I believe in

14    Puerto Rico had at least one or two

15    accountant.

16        So I can't recall if Clark is one

17    of them or is a person from the MTAG.  I

18    don't know.

19       Q.  And you write, "I do not have the

20    same access as he has.  He runs the lien

21    from lien app."

22        What did you mean by, "I do not

23    have the same access as he has"?

24       A.  I mean, I couldn't tell exactly

25    how those number come from.  For example,

214

1    PING XIE - 08/02/2023

2    let's say if you had -- if the reporter see

3    the fair value of liens is $1 million, I

4    don't know how those $1 million consist of,

5    for example, initial payment, subsequent,

6    and accrued interest.

7        I believe that -- that's what it

8    mean, but I -- obviously I'm not sure just

9    by reading those email.  I cannot recall

10   this one; so...

11       Q.   Did you have access to the data

12   necessary to ascertain the value of

13   individual liens?

14       MR. WANG:  Objection.

15       THE WITNESS:  I cannot recall.

16   Sorry.  I don't know.  I cannot recall

17   anymore.  I cannot recall, no.  I don't

18   know.

19   BY MR. MAYRON:

20       Q.   Did you rely on other Ebury

21   employees to provide the data necessary to

22   ascertain the value of individual liens?

23       A.   Yes.

24       MR. WANG:  Objection.

25       THE WITNESS:  Ebury, MTAG, yeah.

215

1          PING XIE - 08/02/2023

2    BY MR. MAYRON:

3       Q.   Which Ebury employees did you

4    rely upon to provide the data necessary to

5    ascertain the value of individual liens?

6          MR. WANG:  Objection.

7          THE WITNESS:  So accounting is

8      kind of like a place where all number

9      go to.  So accounting interface with

10     all the department sales, services and

11     IT.

12        So that means that I was looking

13     for information from everyone,

14     including the trader, tech services,

15     MTAG and the Philippine and Puerto Rico

16     employee, almost everyone; so...

17   BY MR. MAYRON:

18      Q.   So it wasn't your responsibility

19   to independently verify the value of

20   individual liens?

21      A.   I do basically looking for their

22   history of the lien to tie over with the

23   bank statement for additional payment and

24   also calculation of accrued interest.

25        But I won't be able to physically

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs. Court Records   Pg 1993 of 2230   RECEIVED NYSCEF: 01/12/2024
Hanratty
Ping Xie
August 02, 2023

216

1          PING XIE - 08/02/2023

2    verify existence of lien.  Because

3    that's -- you have to go to the -- each

4    town, city, looking specific, and I don't

5    have that will be rely on the employee and

6    the service provider.

7        Q.   And by service provider, you mean

8    MTAG?

9        A.   MTAG.  And also TFX.  Means

10   the -- who service the Rochester lien.

11       Q.   Tower Fund Services?

12       A.   Tower Fund Service is in the

13   2017.  Yes, all of -- basically they are

14   performing everything at that time.  But

15   after -- yeah, after them would be, as I

16   mentioned, MTAG.

17       Q.   So putting the documents aside,

18   and apologies if we've covered some of this

19   before, your understanding is that

20   Mr. Hanratty was in charge of the Ebury

21   companies?

22       A.   Yes.

23       Q.   And Mr. Hanratty had sole

24   authority to decide how the Ebury companies

25   used funds advanced by Emigrant Bank?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

Emigrant Business Credit vs Court Records    Pg 1994 of 2230    Doc #3 State Ping Xie
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23
Hanratty                                                        August 02, 2023

217

1          PING XIE - 08/02/2023

2              MR. WANG:  Objection.

3              THE WITNESS:  Yes.

4    BY MR. MAYRON:

5        Q.  Mr. Hanratty had sole authority

6    to decide whether to sell tax lien or REO

7    collateral?

8              MR. WANG:  Objection.

9              THE WITNESS:  Yes.

10   BY MR. MAYRON:

11       Q.  Mr. Hanratty had sole authority

12   to decide whether to make distributions to

13   investors?

14             MR. WANG:  Objection.

15             THE WITNESS:  Yes.

16   BY MR. MAYRON:

17       Q.  Mr. Hanratty was responsible for

18   ensuring the Ebury companies complied with

19   the Emigrant credit agreements?

20             MR. WANG:  Objection.

21             THE WITNESS:  Principally, yes.

22   BY MR. MAYRON:

23       Q.  Let me re-ask it then.

24             Mr. Hanratty was principally

25   responsible for ensuring the Ebury

218

1          PING XIE - 08/02/2023

2    companies complied with the Emigrant credit

3    agreements?

4    A.  Yes.

5          MR. WANG:  Objection.

6    BY MR. MAYRON:

7    Q.  Mr. Hanratty was principally

8    responsible for ensuring that the Ebury

9    companies delivered tax liens to the

10   third-party custodian and servicer?

11         MR. WANG:  Objection.

12         THE WITNESS:  And person who

13    assigned the -- John assigned the task

14    of -- for example, Dennissee would be

15    the major person responsible for

16    providing information timely to the

17    MTAG under --

18         (Stenographer asks for

19         clarification.)

20         THE WITNESS:  John Hanratty

21    supervision.

22   BY MR. MAYRON:

23   Q.  And you relied on information

24   from MTAG and other employees to perform

25   your job duties?

219

1        PING XIE - 08/02/2023

2        A.  Yes.

3        Q.   And I think, as you said earlier,

4    only two employees had the ability to apply

5    Mr. Hanratty's signature to documents?

6        A.   At that time, I'm not sure if

7    Dennissee has it later on.  Before

8    Dennissee join the company, yes, only -- my

9    understanding, only two person has a

10   digital signature of John's.

11       Q.   And your understanding is that

12   the employees who had Mr. Hanratty's

13   digital signature were not allowed to apply

14   it without his authorization?

15       A.   That's common understanding,

16   yeah, common sense.

17       Q.   And you're not aware of any

18   instances where the employees who had

19   Mr. Hanratty's digital signature applied it

20   without his authorization?

21       A.   I'm not aware.

22       Q.   And I think, as we covered, in

23   the 2018-2019 time frame, the Ebury

24   companies paid approximately 21.7 million

25   in distributions to investors?

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.                                      RECEIVED NYSCEF: 01/12/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 1997 of 2230          Ping Xie
Hanratty                                                               August 02, 2023

220

1        PING XIE - 08/02/2023

2      A.  Uh-huh.  Yes.  Yes, sorry.

3      Q.   And during that same time period,

4   Michael Salerno came to Ebury's offices and

5   demanded a check from you?

6      A.  Yes.

7      Q.   And during that same time period,

8   Capital One requested repayment of its

9   loans?

10     A.   I cannot recall the timing, so I

11  don't know if the same period of time.

12     Q.   Do you recall approximately when

13  Capital One requested repayment of its

14  loans?

15     A.   It's so many years ago so I don't

16  know.  I can't recall.

17     Q.   So you left the Ebury companies

18  in January 2020?

19     A.  Yes.

20     Q.   Would you agree that the Capital

21  One -- let me start over.

22        Capital One requested repayment

23  of its loans prior to January 2020?

24     A.  Yes.

25     Q.   And during the time in which the

24-04020-dsj
Emigrant Business Credit vs Court Records    Pg 1998 of 2230
Hanratty                                                          Ping Xie
                                                                 August 02, 2023

221

1        PING XIE - 08/02/2023

2   Ebury companies were distributing tens of

3   millions of dollars to investors, repaying

4   Capital One and writing checks to investors

5   such as Michael Salerno, they were in debt

6   to Emigrant Bank, correct?

7      A.  Yes.

8          MR. WANG:  Objection.

9   BY MR. MAYRON:

10     Q.  And Mr. Hanratty never spoke to

11  you about the requirements of the Emigrant

12  credit facilities, correct?

13     A.  No, he didn't.

14     Q.  Mr. Hanratty never trained you on

15  the requirements of the Emigrant credit

16  facilities?

17     A.  No, he didn't.

18     Q.  Mr. Hanratty ever tell you he

19  wasn't satisfied with your job performance?

20     A.  I was not aware of.

21     Q.  And earlier you said you believe

22  Mr. Hanratty was dishonest with investors

23  when he promised them payments with

24  unrealistic payment dates?

25         MR. WANG:  Objection.

222

1      PING XIE - 08/02/2023

2          THE WITNESS:  For the date, yeah,

3      yes.  He was not giving realistic

4      timing, yeah.

5  BY MR. MAYRON:

6          Q.  And sitting here today, can you

7      think of any other times Mr. Hanratty was

8      dishonest?

9          A.  Oh.  No.  Maybe -- maybe in this

10     evidence his -- he -- his statement about

11     me I disagree, so I don't know if that

12     consider.  But, no.  No, other than that, I

13     cannot recall any.

14         Q.  And having reviewed the complaint

15     and these documents today, would you agree

16     that Mr. Hanratty used the Emigrant credit

17     lines to pay distributions to his investors

18     and repay his other lenders?

19         MR. WANG:  Objection.

20         THE WITNESS:  Sorry.

21         I believe it's possible, but

22     without the detail of the transaction,

23     I cannot tell for sure, 100 percent --

24     with 100 percent confident.

25         MR. MAYRON:  Okay.  Thank you

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO.    RECEIVED NYSCEF: 01/12/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 2000 of 2230    Ping Xie
Hanratty    August 02, 2023

223

1    PING XIE - 08/02/2023

2    very much.

3    THE WITNESS:  You're welcome.

4    Thank you.

5    MS. PARKS:  Can we take five and

6    we'll just double-check if we need to

7    cover anything?

8    MR. MAYRON:  Sure.  Off the

9    record.

10    THE VIDEOGRAPHER:  This ends

11    unit 5.

12    We're off the record at 3:33.

13    (Whereupon, a recess was taken at

14    3:33 p.m.)

15    THE VIDEOGRAPHER:  This begins

16    unit 6.

17    We're on the record at 3:38.

18    MR. WANG:  So, for the record, we

19    have no further questions to Mr. Xie.

20    And that's it.

21    MR. MAYRON:  Thank you, everyone.

22    THE WITNESS:  Thank you.

23    THE VIDEOGRAPHER:  This concludes

24    today's proceeding.  Today number of

25    videos used was six.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Emigrant Business Credit vs    Court Records    Pg 2001 of 2230
Hanratty

Ping Xie
August 02, 2023

224

1    PING XIE - 08/02/2023

2    We're off the record at 3:38.

3    (Time noted: 3:38 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

225

1        REPORTER CERTIFICATE

2     I, the undersigned, do hereby certify:

3      That PING XIE was by me duly sworn in the

4   within-entitled cause; that said deposition

5   was taken at the time and place herein

6   named; and that the deposition is a true

7   record of the witness's testimony as

8   reported by me, a disinterested person, and

9   was thereafter transcribed.

10      I further certify that I am not

11   interested in the outcome of the said

12   action, nor connected with, nor related to

13   any of the parties in said action, nor to

14   their respective counsel.

15      IN WITNESS WHEREOF, I have hereunto set

16   my hand this 13th day of August, 2023.

17

18

19

20     _____

21        JESSICA R. WAACK

         Registered Diplomate Reporter

22        Certified Realtime Reporter

      California Certified Realtime Reporter

23      New York Realtime Court Reporter

      New York Association Court Reporter

24      Notary Public, State of New York

   CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)

25   CCR-WA (No. 21007264), CSR-CA (No. 14420)

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Emigrant Business Credit vs   Court Records   Pg 2003 of 2230   Ping Xie
Hanratty                                                August 02, 2023

226

1        INSTRUCTIONS TO WITNESS

2

3        Please read your deposition over

4   carefully and make any necessary

5   corrections.  You should state the reason

6   in the appropriate space on the errata

7   sheet for any corrections that are made.

8        After doing so, please sign the

9   errata sheet and date it.

10        You are signing same subject to

11   the changes you have noted on the errata

12   sheet, which will be attached to your

13   deposition.

14        It is imperative that you return

15   the original errata sheet to the deposing

16   attorney within thirty (30) days of

17   receipt of the deposition transcript by

18   you.  If you fail to do so, the deposition

19   transcript may be deemed to be accurate

20   and may be used in court.

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. Emigrant Business Credit vs Court Records    Pg 2004 of 2230    RECEIVED NYSCEF: 01/12/2024
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Hanratty                                                              Ping Xie
                                                                      August 02, 2023

                                                                                 227

1   DECLARATION UNDER PENALTY OF PERJURY

2   EMIGRANT BUSINESS V. JOHN ARTHUR HANRATTY

3   Date of Deposition:  August 2, 2023

4

5

6          I, PING XIE, hereby certify

7   under penalty of perjury under the laws of

8   the State of _____ that the

9   foregoing is true and correct.

10

11    Executed this_____ day of    , 2023,

12  at _____.

13

14

15       _____

16          PING XIE

17

18  SUBSCRIBED AND SWORN BEFORE ME

19  THIS __ DAY OF _____, 20

20  _____

        NOTARY PUBLIC

21

22  MY COMMISSION EXPIRES:_____

23

24

25

228

1          ERRATA SHEET

2     EMIGRANT BUSINESS V. JOHN ARTHUR HANRATTY

3     WITNESS:  PING XIE

4     Date of Deposition:  August 2, 2023

5

6     Reason Codes: 1. Clarify the record
                    2. Conform to the facts

7                   3. Correct transcription errors

8
      Page        Line       Reason
9     From                   To
      Page        Line       Reason
10    Page                   To
      Page        Line       Reason
11    From                   To
      Page        Line       Reason
12    From                   To
      Page        Line       Reason
13    From                   To
      Page        Line       Reason
14    From                   To
      Page        Line       Reason
15    From                   To
      Page        Line       Reason
16    From                   To
      Page        Line       Reason
17    From                   To
      Page        Line       Reason
18    From                   To
      Page        Line       Reason
19    From                   To
      Page        Line       Reason
20    From                   To
      Page        Line       Reason
21    From                   To
      Page        Line       Reason
22    From                   To
      Page        Line       Reason
23    From                   To

24

25     _____
              PING XIE

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 45    Hanratty
Emma Robinson Docket - 2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    Ping Xie
Court Records    Pg 2006 of 2230    RECEIVED NYSCEF: 01/12/2024
August 02, 2023

## $

**$1** 214:3,4

**$10** 162:4

**$10.1** 186:17

**$10.7** 187:11

**$10.8** 188:19

**$17.1** 188:7

**$17.3** 188:23

**$18** 181:22

**$20** 47:2 182:18

**$21.7** 181:17

**$50,000** 95:2,3

**$500** 97:9

**$500,000** 96:7,8

**$6** 180:25

**$6.5** 185:7,24 188:15

## 0

**08/02/2023** 10:1 11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1 96:1 97:1 98:1
99:1 100:1 101:1 102:1 103:1 104:1
105:1 106:1 107:1 108:1 109:1 110:1
111:1 112:1 113:1 114:1 115:1 116:1
117:1 118:1 119:1 120:1 121:1 122:1
123:1 124:1 125:1 126:1 127:1 128:1
129:1 130:1 131:1 132:1 133:1 134:1
135:1 136:1 137:1 138:1 139:1 140:1
141:1 142:1 143:1 144:1 145:1 146:1
147:1 148:1 149:1 150:1 151:1 152:1
153:1 154:1 155:1 156:1 157:1 158:1
159:1 160:1 161:1 162:1 163:1 164:1
165:1 166:1 167:1 168:1 169:1 170:1
171:1 172:1 173:1 174:1 175:1 176:1
177:1 178:1 179:1 180:1 181:1 182:1
183:1 184:1 185:1 186:1 187:1 188:1
189:1 190:1 191:1 192:1 193:1 194:1
195:1 196:1 197:1 198:1 199:1 200:1

201:1 202:1 203:1 204:1 205:1 206:1
207:1 208:1 209:1 210:1 211:1 212:1
213:1 214:1 215:1 216:1 217:1 218:1
219:1 220:1 221:1 222:1 223:1 224:1

## 1

**1** 10:11 40:19 58:16 69:3,10 78:2,3,
12,17 79:5,15 80:25 81:9,17,20 82:8,
13 84:22 107:9 137:14 153:14 166:19
177:25 178:4 179:13,23 185:15 186:8
188:3,13 198:11 202:5

**1's** 185:5,22

**1.'"** 80:24

**10** 21:14 28:16 31:21,25 32:14,18
47:15 61:4 62:15 165:7,8 212:9

**100** 51:22 52:8,12 54:5,11,15,19
89:14 116:5 222:23,24

**10667** 185:5,20

**10669** 180:3

**10670** 180:4

**10:56** 58:17,19

**10th** 30:24

**11** 20:25 21:23 22:14 25:10,13 26:5,8,
11 27:17,21,25 28:14 80:20 166:5,6
183:16

**11:00** 21:14 28:17 32:2,14,19

**11:09** 58:22

**11:50** 29:21 31:4

**11th** 30:24

**12** 163:8,16 168:24 169:2 182:4,5
201:24 210:8

**12/31/2018** 190:4

**125** 10:18

**12:07** 109:11,13

**12:48** 109:14,17

**13** 67:11 177:6,7,23

**14** 171:11 177:12,13 179:12 185:3,4,
13,14

**15** 47:17 66:15 177:19,20 180:7 185:3
186:13

**15.7** 178:18

**158207/2022** 10:16

**15th** 52:19,20,21

**16** 183:11,12

**17** 189:15,16

**18** 138:8 172:4 182:8,10 196:4,5

**19** 39:7 138:8 198:23,24

**192** 150:3

**193** 90:6,7

**194** 120:16

**1990** 60:12

**1997** 13:23 60:12,13

**1EMI** 79:6

## 2

**2** 10:4,9 17:18 40:19 58:21 59:5 69:3,
10 78:12,18 79:6,15 80:15,16 89:22
107:10 109:10 153:16 177:25 178:10
180:7,19 186:23 187:10 188:3,17
198:11 202:6 206:15,19 207:3,8,12,
18,25 208:17,24 209:6,12,15,20
210:12,13

**2's** 186:15

**2,000** 203:10

**2.8** 180:21

**20** 17:23 47:7,10 81:8,22 82:7 176:13
196:13 201:19,20

**2000** 62:2,11,12

**2013** 61:13 166:13

**2015** 66:15 75:18

**2017** 66:19 67:7 70:19,25 71:16
77:19 80:23 81:5 165:12 166:13
216:13

**2018** 38:20 39:7 46:24 47:6 56:15
82:16 83:12 84:10,12,16,17 153:5
163:16 169:6 171:11 172:2,9 177:24
178:5,11,17 181:15 182:11 190:10,21
191:5 193:2,18,24 194:9 196:13
201:24 206:8 207:4,17,23 210:9

**2018-2019** 181:20 219:23

**2019** 46:25 47:6,13 83:25 84:6,16,17
116:21 152:20 163:6,9,16 179:14,24
180:8,20,24 181:9,15 183:16 187:6
188:7,22 189:5 190:21 191:5 193:3,
18,24 194:9 199:5,18 212:10

**2020** 62:10 67:10,11 71:19 77:19
84:20 87:20 89:12 220:18,23

**2023** 10:4,9 17:5 19:5 20:25 21:23
22:17 23:10 25:3 59:11,15 89:22

**2028** 47:12

**2029** 181:4

**2029's** 89:10

**21** 81:8,15 82:7 206:3,4

**21.7** 193:17,21 219:24

**22** 19:8 210:3,4

**23** 212:4,5

**2394** 171:16

**24** 80:12 206:8 207:20,23

**25** 59:17,23 60:2 199:5,17

**27** 19:5,9 20:7,17 59:19

**29** 16:23

**2:07** 176:18,20

**2:17** 176:23

**2:55** 205:14,16

**2EMI** 79:6

---

**3**

**3** 19:10 87:15,16 109:16 176:17

**3.2** 179:25

**3.5** 172:6 182:13

**30** 166:21

**31** 187:6 188:7,22 189:5

**3:11** 205:19

**3:33** 223:12,14

**3:38** 223:17 224:2,3

---

**4**

**4** 87:20 89:25 90:2 120:15 176:22
205:13

---

**5**

**5** 109:23,24 116:15 162:7 205:18
223:11

**50** 116:8

**500,000** 166:12

**57** 137:22

---

**6**

**6** 29:19,21 31:3,12 116:21 137:17,18
181:11 223:16

**6.7** 178:12

**66** 140:12

**667** 185:10,21

---

**7**

**7** 17:5,22 19:4 59:5 152:5,6,18 180:5

**75** 73:11,25

---

**8**

**8** 152:14,15 153:9

**84** 146:21

**85** 146:21

---

**9**

**9** 162:18,19 178:6

**9:26** 31:21

**9:34** 10:4,10

---

**A**

**a.m.** 10:4,10 21:14 28:17 29:21 31:4,
21 32:2,14,19 58:19

**abilities** 14:7

**ability** 14:16 36:7 219:4

**accept** 119:21

**acceptable** 73:25

**access** 103:22 187:19 212:12,14
213:20,23 214:11

**accomplished** 52:17

**account** 46:13 56:3 68:5,6,8 69:18
85:4 102:16 132:20 160:17

**accountant** 46:3 61:22 62:16 71:6
73:17,20 89:16 90:24 93:16 104:6
159:16 213:7,9,12,15

**accountant's** 104:12

**accounting** 64:17 66:11,25 70:6
73:10 76:8,9 81:19 82:14 83:10,23
85:16 86:12 92:8,23 93:4,22 94:8,12

**95**:10,11 104:22,23 105:23 106:3,6
118:9,25 119:5,16 122:22 123:4,14,
17 124:5,10,11 125:3,15,17 126:11,
21,22,23 127:7,11 128:7,9 134:14
135:3 156:11 157:7 159:11,15,20
160:18 175:21 190:14,18 215:7,9

**accounts** 45:24 135:2

**accrued** 118:24 214:6 215:24

**accuracy** 125:18 127:6

**accuses** 36:10

**act** 56:19

**action** 34:7 77:22

**active** 75:22,23

**actual** 93:14 94:4 127:18 139:8
156:12 170:24 171:5

**add** 192:2

**adding** 183:18

**addition** 148:10

**additional** 158:23 215:23

**Adler** 71:3 205:2

**administration** 81:14

**admins** 82:19

**advance** 95:2 168:3

**advanced** 40:2 43:17,25 132:10,17
137:6 179:5 216:25

**advances** 133:5 136:18 138:2,12,23
139:14 140:4 161:22 162:2 198:5

**advise** 201:3

**advised** 24:9,22

**advising** 25:5

**affidavit** 80:11

**affiliates** 33:19

**affirmed** 11:21

**afford** 36:3

**AFG** 65:24 66:3,4,8,13,17,21

**AFTS** 153:16

**aged** 166:13

**agree** 12:19 88:17 91:19 94:17
104:10 107:21 108:9,16 220:20
222:15

**agreed** 112:8,11,14 142:24

**agreeing** 117:13

INDEX NO. 158207/2022

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

NYSCEF DOC. NO. 45    RECEIVED NYSCEF: 01/12/2024

Emad Dabbah Dec. 2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    Ping Xie
Hanratty    45    Court Records    Pg 2008 of 2230    August 02, 2023

**agreement** 42:5 102:4 112:17 199:16,19 202:5,6,12 208:5

**agreements** 202:3,9 217:19 218:3

**agricultural** 66:4

**ahead** 33:13 113:9

**Alex** 11:5

**allegations** 36:15

**alleging** 85:14 86:2

**allocate** 88:9

**allowed** 136:18 156:16 196:21 219:13

**Alostar** 49:21 100:8 173:2 174:7,19 175:3,7,9 208:4

**Alostar's** 122:19

**America** 62:19 63:11

**amount** 41:16 45:7 47:11,14 57:10, 16 68:7 124:24 148:3,13 149:11,14 172:16 173:7 183:2 191:15

**analysis** 99:24

**and/or** 11:21

**Andrew** 71:3 205:2

**angry** 52:16

**Anna** 98:7 141:23

**annual** 57:9 191:21

**answers** 12:17,20 13:6 35:6 43:12

**anymore** 116:13 118:16 214:17

**Apifiny** 74:8,10,13,16

**apologies** 81:8 146:21 186:7 187:10 216:18

**apologize** 59:9 181:7 185:2

**apology** 151:16

**app** 212:13,14 213:21

**apparently** 176:5

**appeared** 25:12 26:7 81:10

**appearing** 25:12 26:7 113:5,14

**appears** 116:15 171:13 188:4 193:16

**Appfolio** 106:15

**application** 122:19

**applied** 184:21 219:19

**apply** 184:15 219:4,13

**approach** 127:2

**approached** 31:13

**approval** 142:17,21 143:13 144:4,12

**approved** 141:18 143:20

**approximately** 32:23 66:12,16 76:22 115:20 162:10 172:4,6 178:6, 12,18 179:24 180:21,25 181:10,16,22 182:13,18 185:7,24 186:16 188:6,14, 23 193:17 219:24 220:12

**April** 201:24

**Arora** 15:15 199:4,6,11

**Arque** 80:2

**arrange** 139:6

**arranged** 132:4

**arrangement** 19:23 49:5

**arrived** 71:9 139:6

**Arthur** 10:14

**Ascendex** 74:21,23 75:8

**ascertain** 214:12,22 215:5

**Asian** 62:19

**asks** 50:16 54:21 63:16 89:4 91:21 138:19 154:17 158:5 173:18 187:14 189:25 210:22 211:15 218:18

**assertion** 83:21

**assessment** 107:22

**assets** 191:17 192:5 195:11

**assign** 210:12,17

**assigned** 166:16 218:13

**assigning** 211:10

**assignment** 166:18,21

**assignments** 166:20

**assistance** 43:14

**assistant** 90:25 104:7

**associate** 11:7,13

**assume** 16:7 32:4 139:5 200:24 211:19

**assuming** 48:11 164:24 173:9 204:19 209:20 211:3

**assumption** 200:25 205:3

**attached** 153:4 165:15 183:18

**attachment** 152:10 153:10

**attachments** 202:4

**attend** 26:13

**attended** 60:14

**attending** 20:8,18

**attention** 80:19 81:7 90:6 137:21 140:11 146:20 150:3 162:23 171:9 189:23 196:9

**attorney** 22:23 24:13 86:20 112:13, 14

**attorney's** 25:17

**attorney-client** 24:21 111:11

**attorneys** 24:17 114:14

**attorneys'** 113:25

**audit** 83:12 84:2 98:18 148:21 153:5 179:19 180:14 185:22 186:14

**audited** 82:17 177:24 178:5,10 179:13,23 180:8,20 184:9,12 185:15 186:25 187:20 188:4,24 189:8 193:15,20

**auditor** 116:25 117:24 118:4 119:22 163:6

**auditor's** 119:25

**auditors** 54:10 118:8 154:8 163:2

**August** 10:4,9 116:21 152:20 163:8, 16 206:8 207:4,17,20,23

**Austin** 11:2 27:9 46:15 176:11

**authority** 46:9 132:8,16 136:4,12 156:20 157:2 178:22 216:24 217:5,11

**authorization** 143:10 183:17 184:7, 15,23 219:14,20

**authorize** 183:25

**authorized** 46:12

**automated** 146:16

**availabilities** 198:15

**availability** 130:5 144:13 146:13 168:17 201:12 202:13 203:2 211:10

**avoid** 14:4 192:9

**aware** 16:17,23 17:3,18 19:3,7 20:5, 24 21:13,18 25:10 26:5,10 28:15 34:17 35:8,11,12 36:9,12 38:10 41:14,23 42:4,23 43:16,24 46:24 47:5 48:11 54:23 58:5,8 77:12,14,17 85:13,22 91:6,9,11,15,18 96:4 102:14 103:25 113:19,21 120:11 129:20 130:11 133:3,11,15 135:5,12,14,16 136:15 138:15 139:11,18 143:25 146:2,9 154:13,14,16,19,23 155:18,

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 145    RECEIVED NYSCEF: 01/12/2024

Edgardo Roos v Donald J    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    Ping Xie
Hanratty    Pg 2009 of 2230    Court Records    August 02, 2023

23 156:12,15 164:20,23 179:4 196:23
200:23 219:17,21 221:20

## B

**B-E-D-E-R-O-W** 11:9

**bachelor** 60:7,9

**bachelor's** 60:8,20 61:3

**back** 35:19 36:7,22,25 37:9,15,17,22
38:6,9,17 39:5 40:11 41:25 59:20
64:4,6,9 65:4 68:11,21 69:22 70:18,
25 94:23 104:2 114:19 120:13 127:3
140:17 158:19 163:6 165:24 182:3
184:25 185:14 208:12

**backup** 141:16

**bad** 35:4,15 48:10 67:20 82:24

**badly** 76:4

**balance** 39:3 69:18 70:12 134:6
151:4 172:3,5 176:3 191:12 201:12
208:17 209:12

**balances** 171:12

**bank** 14:24 36:11 37:12 40:2,12
44:10 46:12 49:3,16 55:5,12 56:3
83:16 88:5 92:24 96:4,5,6,25 97:8
129:5,13,21 132:20 135:25 142:4,17,
22 158:15 159:2,17,18 163:19 167:24
174:18 191:12 215:23 216:25 221:6

**banking** 66:24

**barrier** 107:20 108:17

**base** 130:3 140:15 145:16,23 146:5
147:2,4,7,20,23 148:16 149:24
166:11 196:15 203:4,22 204:16,23
205:8

**based** 37:19 38:23 51:16 57:13 82:7
119:3 129:6,7 144:5 171:7 172:7
182:9 198:14

**basically** 14:11 56:5,7,11 62:24 63:7
65:18 66:23 68:8 69:13 72:11,17
75:7,9 88:8 99:7 100:11 105:19,24
108:5 122:16 125:2 126:10 131:2
162:8 171:24 173:2,4,21 208:16
215:21 216:13

**basis** 23:10 24:2 95:24 101:11
110:21 111:5,14,22 114:11 126:13
129:3,6 130:24 141:4,14,17 142:6,13,
20 143:12,19 144:2,7,11,16,22
149:20 168:10 172:8 198:15 203:9

**Bates** 171:18

**BCMG** 166:17

**beans** 66:6

**Bear** 29:15

**Bederow** 11:8,9,25 15:7 17:6,24
18:8,14,19 19:12 20:9 21:2,25 22:19
23:3,12,25 24:3,15 25:4,16 26:14
28:8,20 29:9,13 30:7 31:7 33:4,8,13,
21 34:11,13 36:17 42:15 43:15 56:23
85:9,18 86:13,17,22 87:6,9 88:12
110:10,11,15,17,23 111:6,9,12,23
112:20,23 114:3,9,13,20 169:22
170:12 171:17 185:10

**Bederow's** 23:11

**began** 49:13 67:6

**begin** 19:13 66:12

**beginning** 16:22 134:5 182:11 196:9

**begins** 58:20 109:15 176:21 205:17
223:15

**behalf** 11:3,8,10

**belong** 69:24 158:23

**belonged** 133:21

**beneath** 79:5

**benefits** 72:22

**bias** 110:19,25 111:2,15

**big** 89:20

**bigger** 82:17 149:13

**biggest** 173:25

**bit** 38:6 108:19 122:21 170:9

**bonus** 57:9,10,15,20,21 69:6,15 70:9

**bonuses** 69:13

**book** 83:2 89:7,10 94:8,13 95:3
96:15 98:14,15,16 102:23 117:23
134:14 135:3 159:3

**booked** 88:8 89:14

**booking** 119:19

**bookkeepers** 81:17 82:12

**books** 81:18 82:14 83:22 85:15 86:4,
11

**borrow** 130:21 195:10 196:17,22,25
197:5,20

**borrowed** 202:15

**borrowing** 95:24 126:13 129:2,6
130:3 140:15 141:4,14,17 142:6,13,
20 143:12,19 144:2,7,11,16,22
145:16,23 146:5 147:2,4,7,20,23
148:16 149:20,23 166:11 168:10

172:7 196:15 198:15 203:4,9,22
204:16,23 205:8

**boss** 62:24 63:2,5 125:22

**bottom** 79:18 171:17 185:10 189:23
196:10

**bought** 208:7

**bounced** 56:11

**box** 155:9,12,13

**break** 15:20,24 35:5 46:18 87:7
109:12 176:12,15

**Bridgeport** 60:15

**briefly** 169:25

**bring** 100:22

**Broad** 10:18

**Bronzo** 210:8

**build** 146:18

**building** 146:11,14

**bulk** 190:22 192:7 194:5,7,11

**bulking** 88:22

**bullet** 208:14

**business** 10:13 11:3 37:20,24 52:4,
7,9,12 54:5 72:5,9 78:7 88:7 102:15,
17 107:4 125:14 136:20 137:2 174:3

**busy** 30:22 206:14

**buying** 166:12

## C

**calculate** 118:23 200:20 202:18

**calculation** 116:22,24 117:14
119:10 146:13 215:24

**calculations** 116:17

**call** 29:2 30:15,17,22,23 32:9 53:23
160:10

**called** 11:21 28:24 29:4 156:3 210:11

**calls** 17:25 19:14 20:10 21:3 22:2
23:5 25:18 26:15

**Canadian** 64:23,25

**cancelation** 19:22 21:10

**Cap** 166:19 210:12,17

**capital** 34:25 35:24 36:22 37:5,16
38:5,11,15,19 39:2,4,13,15,20,22,23
40:2,11 44:2,24 48:7,14 49:2,13,15

Engquist & Co. v. Doyt Y2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    Ping Xie
Hanratty    45    Court Records    Pg 2010 of 2230    August 02, 2023

50:20 54:14 67:4,7,9 70:3,16 76:20,
   25 77:19 79:17 128:24 140:19 146:12
   149:3 171:24 172:4,10,20 175:9,22
   176:6 181:22 196:16,17,22 197:6,7,9,
   10,15,21 198:6,10,13 200:19 202:22
   204:2 208:25 209:7 210:20 211:3,11,
   12,19 220:8,13,20,22 221:4

**capitals** 197:17

**caption** 78:7

**career** 35:14 64:5,9,15

**case** 10:16 13:4 30:13 80:12 89:21
   102:2 119:18 168:12,15 173:6

**cash** 52:25 56:11,12 61:21 92:9
   118:25 191:11,22 192:3,11 194:19

**catch** 41:3

**caveat** 166:20

**cells** 204:11

**center** 101:20

**certificate** 97:15 101:19 142:25
   143:4

**certificates** 163:16 164:6,16

**certification** 95:7 97:17 141:18
   142:3

**certified** 149:5

**certs** 163:10,11,17,22 164:3

**CFO** 65:5,16,23 66:2 74:18

**chain** 109:20 110:4 118:14 120:4
   189:20

**change** 208:21,22

**characterize** 191:7

**charge** 64:24 125:24 216:20

**chase** 93:18 97:22 114:23

**chasing** 161:7

**cheaper** 99:21

**check** 29:11 55:25 56:5,9,10 139:9
   202:25 203:12 220:5

**checking** 202:14

**checks** 221:4

**Chicago** 20:19

**chief** 98:10

**China** 60:24

**cite** 119:11

**cited** 121:11 193:19

**city** 101:17 158:17 216:4

**claim** 72:21

**claimed** 96:20

**clarification** 41:21 50:17 54:22
   63:17 89:5 91:22 115:2 138:20
   154:18 158:6 173:19 187:15 210:23
   211:16 218:19

**clarify** 42:25 44:19

**Clark** 74:4 212:12,23 213:8,16

**clean** 58:24

**clear** 14:19 24:10 36:20 39:8 46:5
   57:18 91:15

**close** 64:25 88:23 89:3,7,10 96:16
   115:24 122:11 124:6 126:12 151:14

**closed** 80:22

**closing** 66:10 75:10 84:19 92:15
   115:25 148:16 150:25 151:2 161:6
   163:19

**code** 118:6,8 119:11,17 121:11 122:7

**collateral** 130:21 133:6,12 135:18,
   24 136:5,13 138:3,13,24 139:15
   140:5 156:17 163:20 164:2,5,14
   211:5,11,21 217:7

**colleague** 193:11 199:10 206:11

**collectability** 134:25

**college** 65:8,12,16

**combative** 90:22 104:5

**comfortable** 122:21 123:2,5

**comment** 107:25

**commingled** 44:17

**committed** 25:12 26:7

**Commodities** 61:19 62:14

**commodity** 63:20 66:5

**common** 142:15 198:7 219:15,16

**communicate** 30:9 49:25 53:12
   98:6 119:9 128:4,11,13,17 174:12
   196:20

**communicated** 14:20,23,24 15:12,
   15 27:3,13 28:23 30:5 31:4 32:13
   113:23 114:6,15

**communicating** 14:13 30:10
   107:18 108:11 144:13

**communication** 14:7 42:18 58:10
   91:13 116:3

**communications** 21:3 22:2 23:9
   25:22 26:15,22 27:2,12 32:17 34:2
   85:24 86:19 109:5 115:4,13,16,25

**companies** 37:5,11 38:11 39:25
   43:17,25 46:25 47:6,22 48:2,4 49:12,
   25 50:8 80:7 95:19 96:18 100:5
   101:7,23 102:8,10 106:6 117:16
   126:2,8 127:10 128:5 129:12 130:8
   131:10 132:9,16 133:4,12 135:7,17
   136:3,17 137:5 138:17 139:13 142:5
   143:18 144:2 146:25 150:5 151:15,17
   153:24 154:11,24 155:19 156:16,19
   157:2 159:25 160:20 161:11,12,21,25
   162:11 164:5,15,22 167:3,11,16,23
   172:3,10,19 175:21 178:17,22 179:5,
   20 180:15,24 181:10,16,21 182:12,
   17,25 186:7 187:5,9 188:5,20 189:3
   190:9 191:4 194:6 195:4 196:21
   197:20 200:10,11 208:24 209:5 211:9
   216:21,24 217:18 218:2,9 219:24
   220:17 221:2

**companies'** 135:6 157:3,8 163:6
   193:15

**company** 49:9 52:25 60:23 63:20
   64:12 65:22 66:5 67:22 68:24 69:16
   71:24 72:23 74:12 75:8,24 78:22
   83:13 85:3 91:10,12,14 99:6 106:11
   118:21 122:20 123:7 131:3 133:17,24
   141:22 145:9 174:10 178:23 191:21
   198:8 219:8

**company's** 46:10 54:10 66:24 72:17

**comparing** 149:4

**compel** 26:12

**compensation** 74:12,13

**complain** 90:10,13,17

**complained** 77:9 90:14 91:7,17

**complaint** 34:6,10 36:13 77:22
   158:10,13 222:14

**complete** 12:16 160:8

**completed** 179:19 180:14

**completing** 88:7

**compliance** 199:13 201:5,8

**complied** 217:18 218:2

**comply** 200:3

**complying** 200:12

**computer** 144:25

**concern** 68:2

**concerned** 68:3

**concerns** 127:9

**concludes** 223:23

**condition** 34:23 35:2,15,21 36:6 37:20,24 47:23 48:3,12 67:19 191:10

**conduct** 13:11,25 118:6,9 119:12,17 121:11 122:7

**confer** 43:7

**confident** 14:6 123:17 222:24

**confidently** 84:12

**confirm** 27:19,22 163:9

**confirmation** 184:10

**confirmed** 155:24

**conflict** 63:2,4 94:10,15 98:2 108:4

**conformed** 147:4,21

**conjunction** 138:7

**connect** 151:7

**Connecticut** 60:15

**connection** 150:24 151:13

**consent** 143:5

**consideration** 120:2

**considered** 208:6

**consist** 214:4

**consistency** 149:7

**consistent** 149:7 169:16,20 170:11

**consistently** 130:20 190:3

**constantly** 93:18 94:12 102:20 134:24 170:17 193:12

**consultant** 64:18 76:6

**consulting** 76:23

**contact** 83:13 88:5 91:14 102:21 115:9,21 116:11

**contained** 148:6 203:4

**contemplated** 192:15

**contemplating** 24:25

**contemplation** 24:18

**content** 87:2,23

**contingency** 113:20

**contingent** 113:17

**continuation** 129:18

**continue** 16:12 42:21 49:10 64:11 67:23 76:6 174:9

**continues** 153:16

**continuously** 174:4

**contract** 57:14,19 77:7 129:23,24 130:7 136:23 138:16 163:20 164:10, 20,23,25 165:2 202:19

**contracts** 41:13 129:22 130:9 135:6 136:16 146:2

**control** 41:10,20 42:12,21,22 139:4, 8,11 148:22 201:3

**controlled** 79:18,23 80:4

**controller** 61:18 62:17 63:10 64:14, 15 65:5,8,13 66:23 67:3,16 74:8,18, 21,25 80:24,25 81:9,17,20 82:8,13 84:22 126:7 138:8 187:5

**controls** 40:21 41:18,24 137:25 138:23

**conversation** 22:10 118:16

**conversations** 17:8,11 18:2 19:15 20:10 24:4 25:19 85:19 114:16

**COO** 126:20

**cooperation** 95:15

**cooperative** 90:21 91:20,24 92:16 94:17 98:8

**copy** 101:19 129:4 130:2 149:3 199:16,18

**copying** 196:12

**Corporation** 10:13 11:4 78:8

**corporations** 60:25

**Corps** 79:25

**correct** 13:13,16,19 14:25 21:16 28:19 30:20 32:12 37:6,12 38:15 40:3 47:23 60:6 61:8,19 66:14 79:11 87:21 93:7 99:12 114:25 115:12 116:18 117:10 119:9 137:7 142:14 148:4,7, 25 150:7 153:6 154:12 157:8 161:14 164:7 165:12,17 166:23 169:7 171:14 177:25 178:7,13,24 179:14,20 180:2, 9,16,22 181:2 183:3 184:4 185:8,25 186:17 187:6 188:8,24 190:5 193:3 199:10 202:6 209:8 210:9,14 211:13 221:6,12

**correctly** 28:22 30:2 32:11 37:8 39:17 71:8 81:21 88:10,13,15 91:4 99:18 117:2,7,25 118:11 121:16 138:9 140:25 147:17 148:8 150:21 153:18 154:6,21 157:16 163:13,23 166:24 169:17 183:21 191:2 206:16

**cost** 35:25 99:18,24 100:10 102:14

**192:8**

**counsel** 10:23 12:7,25 13:2,6 17:4, 19 18:9,11,13 19:8,16,19 20:6,11 21:4,19 22:3 23:10 24:6 25:2,11 26:6, 11,16 28:23,24 29:3 32:18 34:3 85:25 86:25 92:9 113:24

**counsel's** 18:24 23:22

**County** 10:15

**couple** 46:21 63:18

**coupled** 63:21

**court** 10:15,21 12:12 77:24 80:13 87:13 89:23 109:21 137:15 152:3,12 162:16 165:5 166:3 168:22 177:4,11, 17 183:9 189:13 196:2 198:21 201:17 205:25 209:25 212:2

**covenant** 199:12

**cover** 48:20 69:20 191:12 223:7

**covered** 102:19 188:12 216:18 219:22

**CPA** 61:8,10 68:13 75:15,17,21 76:12,18,24 77:6 117:22 118:3,6 119:11,15,17,20 121:24 122:7

**created** 84:18

**credit** 10:13 11:4 37:5,12 38:20 78:8 80:22 129:12,21 130:12,18 133:5 135:9 136:16 161:22 162:2 167:4,12, 17 171:13,22 172:20 182:14,19 183:3 199:24 200:6,13 201:9 202:3,5,6,9,12 203:2 209:6 210:18 211:6,12 217:19 218:2 221:12,15 222:16

**creditor** 55:16

**Crius** 64:18,21,22 65:3 76:3

**Cromwell** 11:2,6

**crosstalk** 68:17 86:6

**current** 174:18,22

**custodian** 135:10 163:19,22 164:3, 7,17 203:24 218:10

**D**

**data** 101:20 105:5,15,17 125:16 126:11 141:8 169:15,19 170:10,23 172:8 173:10 204:11,15,22 205:7 214:11,21 215:4

**datas** 123:17 125:18

**date** 10:9 17:14 21:9 39:18 52:14 53:22 55:11 56:2 67:12 75:19 128:16 195:20 222:2

**dates** 52:17 53:6,13,21 55:4 58:10 221:24

**day** 21:8 27:7,8,15,16 66:19

**day-to-day** 66:11,25 151:5,12

**days** 21:9 52:15 97:21 166:22 195:8,9

**deal** 175:3

**debt** 35:15 221:5

**December** 67:15 153:5 154:14,15 187:6 188:7,22 189:5

**decide** 46:10 132:9,16 136:4,12 156:20 216:24 217:6,12

**decided** 34:22 65:20

**decision** 82:3 119:23 194:4

**decision-maker** 46:14 132:13

**decisions** 46:6

**defendant** 11:11 19:16 111:17

**defendant's** 12:25 17:3 18:9,11,12 19:7

**defendants** 25:2 78:9

**definition** 147:5,22

**defrauding** 36:10,20

**degree** 127:15

**delayed** 39:23 161:4

**delaying** 83:4

**delays** 83:14

**deliver** 92:4,11 93:15,16 95:7 101:7 135:7 150:6

**delivered** 127:21 159:12 218:9

**delivering** 151:18

**demanded** 220:5

**demanding** 56:5

**Dennissee** 71:25 72:2,10,12 83:10 89:21 97:17 98:4,5,9 100:24 105:8, 10,18,20 115:3,5 126:9,18,19 151:22 159:5 205:3 213:6 218:14 219:7,8

**department** 215:10

**depose** 32:4

**deposit** 126:12 129:3 155:12 158:15 163:21 164:3,6,15

**deposition** 10:11,17 13:12 14:2 16:18 17:5 19:4 20:24 21:10,24 22:14,25 25:13 26:8,13 28:4,7 32:22, 24 33:3,16,20 34:4 59:4 80:15 87:15 89:20,25 104:3 109:23 113:5,14 116:14 120:14,15 137:14,17 152:5, 14,18 153:9 162:18 165:7 166:5 168:24 177:6,12,18,23 179:12 180:6 182:3 183:11 185:2,4,12 186:13 189:15 196:4 198:23 201:19 206:3 210:3 212:4

**design** 141:7

**detail** 97:10 172:22 222:22

**detailed** 179:9

**determined** 113:11

**develop** 203:17

**difference** 170:16 171:3

**difficult** 95:14 105:6 122:20 127:23 160:9,17

**difficulties** 97:3,6

**difficulty** 97:13 108:22 109:3

**digital** 141:20,22 142:2,24 143:3,14 184:3,16,22 219:10,13,19

**digitally** 183:17 184:2,7

**direct** 80:19 81:7 90:5 126:21 132:23 137:21 139:24 140:11 150:2 151:7 162:22 171:9 178:22 189:22 196:8

**directing** 140:2

**direction** 40:8 45:15 125:6

**directions** 41:17 45:8

**directly** 45:20 62:24 95:23 128:8 129:3 155:7 156:6

**Dis** 56:23

**disagree** 83:20 84:8 91:25 108:13 222:11

**disagreed** 93:6

**disagreement** 62:25 63:4 64:11 118:23

**disclosed** 192:9

**disclosure** 23:6

**discovered** 81:17 82:12

**discovery** 111:19

**discuss** 17:8 112:21 171:23 199:22

**discussed** 56:20 58:25 76:16 193:14

**discussing** 116:16

**discussion** 170:9

**dishonest** 51:10 57:5 58:2,6 221:22 222:8

**dishonestly** 56:19,23,24

**dismissed** 72:25 73:4

**distress** 190:16

**distressed** 191:5,8 192:20

**distributed** 178:18 180:25 181:10, 16 193:16

**distributing** 134:2 221:2

**distribution** 41:16 42:7,13 47:12 132:24 139:10 197:13

**distributions** 40:23 43:18 45:7,23 47:2,7 53:17 131:14,18,25 133:13 134:16 137:7 138:4,14,25 139:16,24 140:3,6 161:13 178:6,12,19,23 179:6, 25 180:21 181:2,11,17 193:17 217:12 219:25 222:17

**dive** 110:7

**divide** 63:8

**Dmitry** 10:20

**docket** 80:12

**docs** 166:16

**document** 87:11 110:8 151:25 152:13 162:15,17 165:4,15 166:2 168:21 177:2,9,16 179:16 180:11 183:8,10 189:12 198:20 201:14 205:23 209:24 210:2 211:25

**documentary** 96:19

**documentation** 42:10 94:13 95:13 102:22 103:2,11 123:7,14 124:7,10, 15 125:16,18 127:7,11,20,25 128:6 149:5,6 151:10

**documentations** 124:12 128:10

**documents** 33:15 150:6 151:19 177:2 205:22 216:17 219:5 222:15

**dollar** 124:24 173:6

**dollars** 221:3

**double-check** 223:6

**drawn** 182:12,17,25

**Dreyfus** 61:18,23 62:6,14,15,22,23 64:4,8

**driver** 194:21

**due** 39:18 68:5 69:11 195:19,20

**dues** 134:4

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 145
RECEIVED NYSCEF: 01/12/2024

Emmanuel Josue v. Uber
Hanratty
Doc. 2
Filed 08/14/24
Entered 08/14/24 09:45:23
Court Records
Pg 2013 of 2230
Doc #3 State
Ping Xie
August 02, 2023

**duties** 103:12,16 122:8 125:5 218:25

---

## E

**earlier** 16:21 37:14 38:6 44:5 47:21 59:2 78:23 102:20 114:22 197:24 200:10 203:16 207:22 213:10 219:3 221:21

**early** 159:4

**easier** 31:18 43:3

**EBCC_10586** 177:3

**EBCC_10611** 178:4

**EBCC_10632** 178:10

**EBCC_10663** 177:10

**EBCC_10670** 179:22

**EBCC_10701** 177:16

**EBCC_10705** 186:14

**EBCC_10708** 180:19

**EBCC_1778** 166:2

**EBCC_3152** 201:16

**EBCC_34790** 165:4

**EBCC_38991** 87:12

**EBCC_5399** 198:20

**EBITDA** 35:24 36:3 38:24 48:19

**Ebury** 14:17,20 19:19 20:12 21:5 22:4 25:20,23 26:17 30:6 31:6 33:19, 22 34:22 35:14,20 36:2 37:4,8,11,20 38:10 39:5,25 40:5,16,18,21 41:10, 15,24 43:16,24 44:12,20,25 46:10,25 47:6,22,25 48:4,22,24 49:12,25 50:8 54:10 55:17 67:3,6,9,18,19 68:25 69:2,4,10 70:2,15,18,22,25 71:16,19 72:12 73:2 74:7 76:19,25 77:5,18 78:12,15,17 79:6,17 80:7,23 81:23 95:19 96:18 100:2,5 101:7,22 102:8, 10 106:6 114:14 116:5 117:16 120:5 122:8 125:25 126:7 127:10 128:5,20 129:7,9,11,21 130:8 131:10 132:9,15 133:4,11 135:5,7,16 136:3,17,25 137:5,24 138:17,22 139:3,9,13 142:5 143:17,18 144:2 146:3,25 150:5,23 151:15,17 152:21 153:4,24 154:11,24 155:19 156:15,19,25 157:3,8 159:25 160:20 161:10,12,21,25 162:11 163:5 164:5,15,22 167:3,11,16,19,23 172:3, 9,18 174:13 175:21 177:25 178:4,10, 17,21 179:4,13,20,23 180:7,15,19,24 181:9,16,21 182:12,17,24 185:5,22 186:7,8,14,23 187:5,9,10 188:5,13,

17,20 189:3 190:9,20,22 191:4,10,23 192:3 193:2,15,23 194:6 195:4,7,14 196:21 197:19 200:10 202:5,6 205:9 207:3,8,11,25 208:23 209:5 211:9 213:3 214:20,25 215:3 216:20,24 217:18,25 218:8 219:23 220:17 221:2

**Ebury's** 17:19 20:5 21:18 23:9 25:11 26:6,11 32:18 34:3 40:22 42:6 81:10 85:25 86:20,25 88:5 93:7 112:13,14 115:21 128:18 138:12 194:4 220:4

**EBURY_18474** 209:24

**EBURY_23926** 195:25

**EBURY_2394** 171:10 182:7

**EBURY_27135** 211:25

**EBURY_29017** 189:12

**EBURY_29018** 189:24

**EBURY_2932** 168:21

**EBURY_3523** 205:24

**EBURY_35508** 109:20

**EBURY_53064** 183:8

**EBURY_59765** 162:15

**EBURY_71497** 152:2

**EBURY_71498** 152:11

**economics** 60:5,9

**education** 61:6

**effect** 13:5

**effectively** 98:5

**effort** 190:23 194:24

**efforts** 84:11,15 95:12

**eligibility** 146:3,17 148:2,25 200:21 203:18

**eligible** 147:6,22

**email** 17:19 21:12 27:7,9 28:14 53:20 87:19,24 109:19 110:4 115:5,14,18 120:4,16,19,21,24 121:2,5,9,19 152:19,24 153:10 165:11,20 166:9 167:7 169:5,10 170:17 171:3,11,23 173:17 174:4 189:20,23 193:12 194:16 195:24 196:9,11 197:25 199:3,4 201:23 202:4 206:7 207:20 208:13,18 209:10 210:7 211:3,18 212:8,17,25 214:9

**emails** 116:6

**emergency** 17:20 18:6 59:7,8,10,14

**Emigrant** 10:12 11:3 14:24 15:4

16:18,24 17:19 19:8 20:6 21:19 25:11 26:6,11 30:6 31:5 32:3 36:11,25 37:12,18 38:3,7 40:2,11 43:17,25 44:10,25 49:3,8,16,21 50:2,9 54:18 55:5,12 78:7 88:5 128:19,21 129:9, 13,21 130:12,18 131:17 132:10,17 133:5 135:6,8,24 136:16 137:6 140:19 141:4 142:7,13 143:19 144:3, 17 145:5,23 146:3,12 147:2 149:9 150:10,18 161:12,22 162:2 164:4,14 166:11 167:3,12,17,22 171:25 172:5, 12,16,25 173:9 175:11,22 176:10 179:5 182:13,18 183:2 196:17,22,25 197:5,20 198:5,9 199:19,23 200:6,13 201:9 202:20 203:2 208:16,21,25 209:5,11,17 210:13,18 211:5,6,11 216:25 217:19 218:2 221:6,11,15 222:16

**Emigrant's** 36:9 133:6,12 135:17 136:5,13 138:2,24 139:15 140:5 142:4 156:17 211:22

**Emigrants** 198:14 204:3,11

**employed** 70:15

**employee** 69:2,8 72:18,21 95:18 122:16 205:9 213:4 215:16 216:5

**employees** 14:21 15:4 69:2 70:21, 24 71:16,20 122:23 125:25 147:9,13 214:21 215:3 218:24 219:4,12,18

**employers** 76:14

**end** 35:13 55:10 96:4,16 97:3,7 115:24 149:17 172:9 190:10

**ends** 58:15 109:9 176:16 205:12 223:10

**Energy** 64:18,21,22 65:3 76:3

**engage** 18:12 191:4

**English** 13:18,22 14:6,15,21,25 31:17 33:11 34:14 42:2,3,17,19 43:4, 6,8,10,13 108:19

**ensure** 40:22 137:25 138:11,23

**ensured** 157:6

**ensuring** 139:14,22 140:4 147:19 200:11 217:18,25 218:8

**entire** 66:10 82:23 83:12

**entities** 78:9,12 79:9,16 80:3,7,23 81:12

**Entities'** 81:10

**entitle** 69:14

**entitled** 57:21

www.LexitasLegal.com/Premier
Lexitas
888-267-1200  Index: duties–entitled

Emanuel Posner Deel Y-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   Ping Xie
Hanratty   Court Records   Pg 2014 of 2230   August 02, 2023

**entity** 45:3 81:24

**entries** 118:10

**epic** 121:3

**error** 148:20

**errors** 148:18 170:24 171:5

**Es** 19:20

**escrow** 166:17

**established** 75:20

**estimate** 162:9,10

**estimation** 55:13 115:23 119:2

**et al** 10:14

**Europe** 62:19

**eventually** 95:10

**evidence** 93:14,21 94:13 95:21
101:8 102:22 114:24 123:11,20
124:3,25 198:2 222:10

**exact** 16:20 17:14 32:21 38:21 67:12
72:13 73:6

**exam** 133:19

**EXAMINATION** 12:3

**examine** 161:17

**examined** 11:22 40:12 44:8

**examples** 52:10 54:4 55:22 57:25

**Excel** 105:14 127:24 141:7 146:14
203:15

**exchange** 64:23 134:8

**exchanged** 24:5,17

**excuse** 19:19 22:8 25:24

**execute** 82:5

**Executed** 202:5

**executing** 132:21

**exercised** 132:23

**Exhibit** 78:2,3 80:15,16 87:15,16
89:25 90:2 109:23,24 116:15 120:15
137:17,18 152:5,6,14,15,18 153:9
162:18,19 165:7,8 166:5,6 168:24
169:2 177:6,7,12,13,19,20,23 179:12
180:7 182:4 183:11,12 185:4,13
186:13 189:15,16 196:4,5 198:23,24
201:19,20 206:3,4 210:3,4 212:4,5

**Exhibits** 185:3

**existence** 216:2

**existing** 168:17

**exit** 173:20 190:15

**expecting** 65:21

**expense** 88:8 94:4,21

**expenses** 45:19 48:20 69:20 70:2
136:20

**expensive** 100:12,20

**experience** 119:4

**explain** 42:16 170:15 171:2

**exposure** 172:11

**extent** 19:14 20:10 21:3 22:2 23:4
25:17,18,21 26:15

**extremely** 105:6

**F**

**face** 157:25

**facilities** 38:12,20 39:6 130:12,18
133:6 135:9 136:17 161:23 162:3
167:4,12,17 171:14,23 172:11,12,20
182:14,19 183:3 199:24 200:7,13
201:9 203:3 211:12 221:12,16

**facility** 49:14 50:3,9

**fact** 14:15 22:13 206:14

**facts** 205:4

**failed** 52:15 122:19 150:6

**fair** 16:8 185:6,24 186:16 187:17
188:22 190:15,17,19 214:3

**familiar** 79:21

**family** 17:20 18:6 59:6,8,10,14

**Fann** 11:6

**favorable** 192:22

**February** 75:18 89:11 169:6 171:11
172:2

**fee** 69:5,12,15,20

**feel** 15:9 22:23 122:11,20,25 123:5,
14 124:9 127:3

**fees** 110:25 111:7,16,18,25 112:6,9,
12,15 113:5,13,25

**fell** 175:3

**felt** 120:6

**file** 105:14 149:8 157:19

**filed** 34:7

**files** 184:2,8

**filing** 64:25

**filled** 65:18

**final** 120:3 127:18 128:2 149:5

**finance** 60:5,9

**financed** 209:7

**financial** 34:23 35:2,21 36:5 37:24
38:23,24 39:22 47:22 48:3,5,12,18
50:11,13,18,19 55:4,11 62:20 63:23
64:24 65:8 66:10,22,24 67:3,19
74:17,21,24 75:12 76:5,9 81:24 82:17
83:9,12,14,16,25 84:6,19 105:22
118:19 144:21 151:3 170:19,24
172:23 177:24 178:5,11 179:13,23
180:8,20 186:25 187:4,20 188:4,24
189:8 191:10 192:13 193:15 200:20
202:17

**financials** 81:11,19 82:14 83:22
84:10,12,16,17 85:15 86:11 107:3
117:6,16 176:2 193:20

**find** 76:10 96:11,15 97:12

**fine** 21:7 105:21

**finish** 84:6 105:7 157:25

**finished** 84:3

**fired** 72:16

**firm** 27:24 72:12 76:8

**fix-up** 94:2

**Florida** 166:13

**flow** 52:25 191:11 192:11

**flows** 192:3

**fluently** 13:19

**focus** 203:15,17

**folder** 202:13

**folks** 123:8

**foreclosed** 191:24

**forever** 140:17

**form** 22:20 27:5 28:9,20 30:8 31:8
122:14 169:23 170:12

**formal** 61:5

**formed** 131:4

**formula** 126:15 141:8 142:11
146:10,19 203:9,16,18

**formulas** 148:24 203:13

Edward D. Conlon et al v. Hanratty - 45

Doc #3 State    Ping Xie
Filed 08/14/24    Entered 08/14/24 09:45:23
Court Records    Pg 2015 of 2230    August 02, 2023

**formulating** 43:6

**found** 72:24 97:2

**fourth** 78:11

**frame** 181:21 195:15,17 219:23

**Frank** 45:12 46:2,3 72:15 73:21
88:21 95:25 96:2 105:7,18,25 129:4,5
130:4 140:23 141:12,13,23 142:8,16,
20,24 143:2,9,12 144:11 146:19
147:15 183:17,25 184:7 196:14
213:13

**Franklin** 72:14 73:3,8

**free** 211:20

**Friday** 32:6

**front** 99:24 172:22

**fulfilled** 53:22

**full** 38:17 57:14,16,22 211:20

**fully** 12:9 83:8 210:21 211:4

**functions** 63:8 159:15,21

**fund** 40:5,17,19 68:23 69:3,7,10,11
78:12,17,18 79:5,6,15 80:2 81:13
82:2,5,20,21,22 99:5,9,14,21 104:17
107:9,10 130:21 131:9 134:16,20
137:7 140:18 141:6 157:13,19,21
163:10 165:16 168:3 174:14 177:25
178:4,10 179:13,23 180:7,19 185:5,
15,22 186:8,15,23 187:10 188:3,13,
17 198:11 206:15,19 207:3,8,12,18,
25 208:17,24 209:6,12,15,20 210:12,
13,17 216:11,12

**funding** 75:11

**funds** 39:25 40:20,22 42:5 43:17,25
44:8,12,20 45:12,13,23 46:7,11,14
49:10 52:19 53:6 68:9,11,22 69:3,5,6,
9,22,23,24 70:2 78:15,20,21,24 79:13
126:15 127:17 131:3,6,13,17,24
132:6,9,17,23 137:6 139:5 141:9
153:12 161:11 166:19 167:20,21
168:11,16 172:19,24 173:22 175:8,
11,22 176:9 179:5 184:11 188:20
196:16,25 198:9 216:25

### G

**Gandol** 46:3 71:22 72:14,15 73:3
103:14,21,22 105:13 126:17 140:23
144:8,20 147:16 184:14,21 196:12

**Gandol's** 73:8,14,23

**garbage** 160:10,11,13,14,16,21,23

**gave** 45:11 48:19 52:17 67:14,16
71:11 84:25 93:19 94:2 194:16
195:14 208:7

**general** 124:21

**Generally** 47:5

**generated** 211:10

**give** 32:8 49:4 52:10,14,24 55:22
73:11 93:11 95:25 104:18 124:20
127:15 183:17 187:3,22

**giving** 55:10 222:3

**glasses** 29:15

**global** 62:17,20 64:13 74:17

**goal** 67:21

**God** 51:5

**good** 10:25 12:5 31:23 34:24 35:2,21
36:6 39:4 47:23 48:12 50:12 102:15
107:13,18 108:10 160:12 176:12

**gosh** 196:19

**governed** 129:22

**governing** 136:16

**government** 72:23,25

**gradually** 62:17

**graduated** 60:4 62:9

**graduation** 62:3

**Grady** 15:11 87:20 88:3,4 165:12
166:10 199:14 201:23 202:2,8

**grammar** 14:4

**ground** 16:11

**guarantee** 148:17

**guess** 29:18 61:13 159:22

**Gusrae** 11:11

**guy** 100:24 101:2 140:22 199:16

**guys** 140:24 169:15

### H

**hand** 80:10 105:12,13 109:19 151:25

**handle** 93:8 105:20 108:4 174:23

**handler** 134:11

**handling** 156:5

**Hanratty** 10:14 14:10,13 21:15 28:3,
6,18 29:8,22,23 30:5 31:5,22 32:2,14
36:10 46:5 48:3 49:24 50:7 51:3 53:5,
12 54:4,9,13,17 55:3,15 56:19 57:4,
18 58:6 69:25 73:14,23 77:4 79:19,24
80:4,11,21 81:9,16 82:11 84:21 85:14
87:20 88:6 99:13 100:19 112:18
113:4,13,23 117:9,15 124:15 125:22,
24 128:5,14 134:15 137:23 138:5
139:21 140:3,13,16 142:12 143:20
144:6,15 146:22 147:8 150:4,15
152:19 163:15 166:10,11 169:6
174:12 175:11 178:24 183:15,24
184:6,25 185:2 196:12,20 198:4
199:15,17,22 200:2 201:7 204:24
205:8 206:19 207:16,24 210:8 212:9
216:20,23 217:5,11,17,24 218:7,20
221:10,14,18,22 222:7,16

**Hanratty's** 83:21 88:17 125:6
137:14 143:3,4 144:4 184:14,15,21,
22 219:5,12,19

**happen** 35:16

**happened** 20:4 88:24 175:20

**happening** 165:19

**hard** 39:24 51:14,15 64:11 85:7
92:14,15,24 98:11,12 206:15

**harder** 44:5

**he'll** 52:21

**head** 12:23 175:7 182:22

**heard** 97:14 124:8 155:4 156:2
158:3,10

**held** 163:10,17

**helpful** 98:22

**hire** 68:25 81:25

**hired** 71:6 80:23 81:5 94:22

**hiring** 18:20

**history** 215:22

**hold** 163:11

**holds** 166:17

**honest** 51:4,10,17 52:3

**honestly** 56:22 83:11

**Hope** 29:24

**hour** 46:19 82:25 176:13

**hours** 32:5,25 76:22 183:24

**HR** 71:2

**huge** 84:9 192:3

**husband** 98:7

**Hutchinson** 11:6

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. [illegible]    RECEIVED NYSCEF: 01/12/2024

Emmanuel Dokus Obou Ys    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    Ping Xie
Hanratty 45    Court Records    Pg 2016 of 2230    August 02, 2023

## I

**idea** 17:2,15 18:4 19:6,22 20:13 83:10 162:8

**identification** 77:23 78:4 80:17 87:17 90:3 109:25 137:19 152:7,16 162:20 165:9 166:7 169:3 177:8,14, 21 183:13 189:17 196:6 198:25 201:21 206:5 210:5 212:6

**identify** 10:23 203:18

**im-** 142:18

**impact** 14:16,18 118:18

**import-export** 66:6

**important** 12:14

**importer-exporter** 60:25

**impossible** 142:3 173:7

**impressed** 206:13

**improper** 24:11

**in-house** 100:23 140:21

**inappropriate** 120:7

**include** 97:17

**included** 38:4 144:22 146:5 147:6,22

**including** 33:5 45:22 49:21 146:17 193:4 215:14

**income** 69:4 118:19 119:7

**inconsistent** 170:14

**incorrect** 88:20 119:8 157:22 186:4

**increased** 172:11

**independent** 103:22 135:9 203:24

**independently** 215:19

**indiscernible** 22:6

**individual** 116:2 214:13,22 215:5,20

**individually** 161:18

**inform** 77:4 85:25

**information** 23:5,7,8 24:4,16 39:22 89:2 92:3,10,18 93:4 95:4,25 97:25 103:4,15,23 128:14 144:21 145:3,15, 22 148:3,6,9 149:18,23 151:8 153:14, 25 158:2 159:6,12 160:2,6,21,25 170:20 171:7 172:22 173:10 182:9 203:4,22 215:13 218:16,23

**informed** 25:11 26:6,11 59:6,17 82:3

**initial** 53:21 99:11 214:5

**initially** 129:24 140:18

**input** 160:12

**insist** 119:19

**instance** 195:6

**instances** 147:11 219:18

**instruct** 45:21 86:17

**instructed** 23:6

**instructing** 111:21

**instruction** 18:25 23:11,23 24:11 45:11,25 111:4,22 122:22 132:21

**instructions** 200:3

**instructs** 12:8 13:7

**intended** 167:25

**intention** 175:17,19

**interest** 35:25 36:4 37:23 38:25 48:20 116:16,22,24 117:14 118:23,24 119:6,19 125:3 214:6 215:24

**interface** 215:9

**intermediate** 149:18

**internally** 93:2

**Internet.com** 62:4

**Internet.com.** 61:23

**internship** 62:5

**interpretation** 30:19 34:16 41:8 117:14

**interpreter** 11:16,17 12:2 13:13 14:3 39:10 41:7

**interpreter's** 43:14

**interviewed** 65:15

**investment** 53:3 173:21,22 174:9, 10,24 176:7 186:9,15,23 191:15 207:9,13

**investments** 185:5,23 188:5,13,18, 21

**investor** 42:13 44:9,21 45:23 47:12 52:13,16 53:2,3,23 55:16,24 56:4,7, 13 58:10,11 134:2 173:4,16,24 174:2, 8,18 176:8 190:20 191:15 192:12 193:2 194:3,12,20 206:10 209:14,21

**investors** 37:23 40:24 41:12,25 43:18 47:2,8 53:7,14 69:24 131:14, 18,25 133:13 134:17 137:7 138:4,14, 25 139:16 140:6 161:14 173:13

174:14 175:10,23 193:12,23 195:15 207:9,13 217:13 219:25 221:3,4,22 222:17

**investors'** 42:8 190:24

**involve** 149:10

**involved** 140:14 142:12 187:2

**involvement** 142:18

**involving** 118:25

**Ira** 79:2 129:4 174:4 175:10,23

**issue** 42:18 82:17 157:25 160:15 195:7

**issues** 110:20

**item** 107:9

## J

**J.H.** 117:5,9

**Jack** 15:11 87:20 88:3,4 165:14 199:9,10 201:23 202:24

**January** 67:10,11 77:19 89:11 220:18,23

**Jessie** 10:21

**Jim** 169:5 170:18 193:10 206:7,9

**Jim's** 173:17

**job** 14:17 61:20,21,22,23 62:6 64:13 65:15 73:14,23 76:11 77:10,16 85:2 89:16,17 90:10 103:16 107:14,22 125:5 126:6 218:25 221:19

**John** 10:13 14:10,13 21:15 28:3,17, 25 29:23 30:5,15 31:4 36:10 45:11 46:5 49:20 68:9,10,14,24 71:5,22,24 72:4 73:21 79:18,23 80:4,11 87:19 99:3,13 100:7 104:14 105:3,9,13,19 106:10 112:18 113:4,13 117:9 119:18 122:12,13 123:9 124:22 125:13,22 126:17 129:16 132:3,12 134:10 136:7,11 139:6,21 140:3 142:17,20 143:12 148:11 156:23 164:24 172:25 173:12 178:24 183:16,25 198:8 200:25 204:20 206:11,14 207:14 208:6,16,19 209:10,15,19 210:7 218:13,20

**John's** 40:8 41:17 45:8,15,24 49:5 68:24 69:4 82:2 125:13 141:19 142:2 143:10 175:15 184:10 219:10

**join** 126:10 219:8

**joined** 70:18,25 71:16 72:3,4,12 126:19 131:3 213:6

INDEX NO. 158207/2022
NYSCEF DOC. NO. 143
RECEIVED NYSCEF: 01/12/2024

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM

Edward Droste vs. Doug's 2
Hanratty

Doc #3 State Ping Xie
August 02, 2023

Filed 08/14/24    Entered 08/14/24 09:45:23
Court Records    Pg 2017 of 2230

**joining** 12:6

**judgment** 49:4 51:6 58:11 119:2 187:19,24

**judgmental** 119:2 125:8

**July** 16:22 17:15 19:10 20:25 21:14, 23 22:14 25:10,13 26:5,8,11 27:17, 21,25 28:14,16 29:19,21 30:24 31:3, 12,21,25 32:14,18 165:12 196:13 199:5,17

**jumps** 124:20

**June** 17:5,14,18,22,23 19:4,5,8,9 20:7,17 23:10 25:3 59:5,11,15,17,19, 23 60:2 67:7 77:19 81:5 89:22

**junior** 90:24 104:6,12

---

**K**

**Kaplan** 11:12

**Kari** 11:13 32:8

**keeping** 81:18 82:13 83:16,22 85:15 86:3,11

**Kentucky** 163:17

**Kevin** 74:4

**kind** 35:3,17 41:12,13,18,20 45:19 55:12 63:6 123:11 150:19 155:7 215:8

**knew** 53:5 55:17 95:2 101:25 120:18, 20 129:16 135:21 202:21

**knowing** 197:12

**knowledge** 126:16 139:4 141:11

---

**L**

**labeled** 87:12 109:20 152:2,11 162:15 165:4 166:2 168:21 171:10 177:3 178:4,9 180:19 182:6 183:8 189:12,24 195:25 198:20 201:16 205:23 209:24 211:25

**lack** 95:14 123:6 149:17

**lacked** 94:18

**language** 13:15 14:16 107:19 108:17,20

**large** 41:16 45:7,14,16 47:11,14 68:6 69:19 70:13 191:14,16

**larger** 186:8,23

**largest** 194:19

**late** 77:3 195:8

**laughed** 51:11,13

**laughing** 120:17

**law** 27:24

**lawsuit** 30:6 31:5,13 36:10 72:7 100:14

**lawyer** 32:8 33:7 71:24

**lawyers** 17:9,12 18:21 25:20,23 33:5,9,10,22 85:20 114:9,10

**learned** 17:15 112:19

**lease** 93:11

**leave** 33:9 34:22 56:8 62:22 64:3,8 65:3,14 66:17,18 67:18 74:10 92:22

**left** 35:20 37:8 47:22,25 64:4,12 67:9, 24 71:19 73:2 74:7 76:3 83:25 84:18 88:7 89:3 91:11,14 94:8 96:7 107:17 174:3 179:20 180:15 182:16,24 213:13 220:17

**legal** 110:25 111:7,16,18,25 112:6,9, 11,15 113:4,13

**lender** 44:21 49:2,15,21

**lenders** 40:22 222:18

**lends** 166:20

**lent** 163:20,25 164:4,14

**lesser** 123:15,16

**letterheader** 183:18

**level** 51:9 64:6 74:2,3

**Leventhal** 78:21 79:2,3 170:18 173:16,25 174:5 175:10,23 193:5 208:8,20 209:12,13,16,18

**Lexitas** 10:22

**license** 61:11 75:21

**licensed** 61:8

**licenses** 61:15

**lien** 45:22 92:2 93:9,11,12,20 95:5,6, 7 96:8,15,20 99:2 100:15,25 101:8,15 104:21 106:9 108:5 114:24 115:10,21 116:2 124:23 127:7,20 128:22 130:23 133:20 134:4,7,12,21 135:23 145:18 147:4,20 148:11,13 149:16 151:4,7, 13 152:21 153:4,14,24,25 155:7,14 156:4,5 157:12 158:23 159:3 161:2,3 164:14 167:24 185:6,23 186:15,24 188:13,18,21 189:4 190:22 191:20 194:5,7 197:2 203:11 204:7,19 205:7 208:7,9,22 209:12 210:12,13,17,18,

**late** (continued)
20 211:3,11,19 212:13,14 213:20,21 215:22 216:2,10 217:6

**lien's** 97:10

**liens** 92:10 95:20 100:6 102:23 103:24 116:17 127:11 128:7 131:11 133:3 134:16 135:8 136:19 137:3 145:15,20 146:4 147:6,22 149:21,22 150:7,11,14 151:19 153:13,15,16,17 154:2,12,25 155:20 156:21 157:4,8 160:3 161:23 162:4,7,11 166:13 167:5,13,18,22 186:9 187:11,18 188:6 203:10 204:18,22 208:24 209:6 214:3,13,22 215:5,20 218:9

**limited** 178:7,13,19 179:25 180:22 181:2,13,17 193:18

**lines** 63:22 80:22 91:3 104:9 129:12, 20 222:17

**liquid** 192:16

**liquidate** 190:23 194:25 195:5 207:8, 12,17,25

**liquidated** 206:15,20 208:9

**liquidation** 207:3 208:4,6,14,19

**liquidations** 194:22

**liquidity** 191:16

**list** 78:9 178:5

**listed** 78:11

**listing** 171:12

**lists** 178:11 179:24 180:20 185:5,22 186:14 202:4

**literally** 29:10 69:19

**litigation** 32:3 86:2

**LLC** 68:25 69:2,4,11 70:16 79:6,7,17, 18,22

**loan** 35:24 36:7,22,25 37:9,16,18 38:3,4,5 41:11 42:5,6,24 44:10,24,25 48:7,14,17,23 49:6 50:23,24 68:6 102:4 122:19 128:21 129:9 136:25 145:6,8 165:15,21 167:21 168:17 171:12 172:3,5,15 173:3,5 174:18,23 176:3,6,9 197:9,15 198:13 199:16,19 200:17 202:14 204:4,5,12,13 208:4, 15,20 209:11,17 211:22

**loans** 35:4 37:22 38:2,8 41:25 173:8 200:22 204:14 220:9,14,23

**locate** 212:15

**lock** 155:9,12,13

**logically** 176:10 208:3

FILED: NEW YORK COUNTY CLERK 01/12/2024 10:51 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 145    RECEIVED NYSCEF: 01/12/2024

Edmund D. dos Santos v. 2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    Ping Xie
Hanratty    Court Records    Pg 2018 of 2230    August 02, 2023

**long** 38:13 54:7 61:2 85:18 98:18
99:10 118:15 123:12 124:17 134:23
209:10

**longer** 17:21 19:9 140:24 159:20

**loss** 36:2 63:23

**lost** 188:9

**lot** 36:2 82:24 83:2,3 92:10 98:19
115:24 116:3 123:8 125:16 126:21
157:17 161:5 191:18 213:6

**lots** 157:11

**Louis** 61:18,23 62:6,14,22,23 64:4,8

**lower** 190:3,8

**lower-level** 64:13

**lunch** 109:12

---

**M**

**made** 45:20 46:6 52:11 54:4 92:14
118:7

**mailing** 155:8

**main** 49:2,15 150:17,23

**maintaining** 127:10 128:6

**major** 45:14,17 62:18 83:13 108:18
173:16 194:21 218:15

**majority** 161:11

**majorly** 64:23

**make** 12:21 13:2,9 31:18 41:21 44:8
52:16 53:14 55:18 95:12,13 99:11
105:14 108:5 119:22 127:3 130:4
146:15 147:25 148:21,24 151:13
158:2 178:23 179:6 187:24 190:22
191:22 194:5,7,11 201:4 203:13
217:12

**makes** 39:15

**making** 96:20 142:2

**manage** 63:7

**management** 69:5,12,15,19 75:7,10
119:14

**manager** 64:18 68:5 69:11 141:10
156:23

**Mandarin** 13:15

**Mandarin-english** 13:12 14:3

**manner** 39:23

**manually** 148:14

**manufacturer** 60:24

**March** 16:23 80:23 87:20

**mark** 11:9 77:25 80:14 87:14 89:24
109:22 112:19 137:16 152:4,13
162:17 165:6 166:4 168:23 177:5,12,
18 183:10 189:14 196:3 198:22
201:18 206:2 210:2 212:3

**marked** 78:3 80:16 87:16 90:2
109:24 137:18 152:6,15 162:19 165:8
166:6 169:2 177:7,13,20 183:12
189:16 190:4,10 196:5 198:24 201:20
206:4 210:4 212:5

**market** 190:16,17,19 192:16,18,21,
22

**Maryland** 79:22 80:2

**match** 83:5 95:10,13 96:5,7,25 97:9,
13 101:16,18,21

**matches** 96:12

**materially** 24:5

**matter** 10:12 16:19 32:22 175:20

**maturity** 50:3,9

**max** 195:22

**maximum** 183:2

**Mayron** 10:25 11:2 12:4 15:10 17:17
18:7,16,23 19:24 20:15 21:11,22
22:12,16 23:2,18,25 24:10,24 25:6
26:3,20 27:10 28:13 29:6,20 31:2,11
33:14,24 34:19 36:23 40:15 41:5
43:2,23 44:11,18 45:5 46:20,23 49:23
50:6 51:2,24 53:11,16 54:2 55:2,14,
21 57:3,17 58:13,23 64:2 68:20 70:14
73:12 77:13,24 78:5 80:13,18 81:6
85:9,12,23 86:9,23 87:6,10,13,18
88:16 89:18,23 90:4 93:5 97:4 102:18
103:20 108:8,15 109:8,18,21 110:2,
13,19 111:4,8,10,17 112:4 113:2,8,22
114:11,18,21 117:21 120:12 123:3
125:20 126:5 128:3 130:16 131:23
132:7,14 133:2,10,22 135:4,15 136:2,
8 137:4,12,15,20 138:21 139:12,20
140:10 143:16,24 144:14 145:2 146:8
151:24 152:3,8,12,17 154:10,22
155:17 156:14,24 158:9 160:19
161:9,20 162:16,21 164:12,21 165:5,
10 166:3,8 167:9 168:7,19,22 169:4
170:2 171:8,21 172:17 174:11 175:2,
18 176:14,24 177:4,9,15,22 179:3,11
181:6 182:2,23 183:6,9,14 184:19
185:11 188:2 189:10,13,18 190:13
194:23 196:2,7 198:3,21 199:2 201:6,
14,17,22 203:20 205:11,20,25 206:6
207:2,10 209:25 210:6 211:8,23

212:2,7 214:19 215:2,17 217:4,10,16,
22 218:6,22 221:9 222:5,25 223:8,21

**MBA** 60:17,20 61:3,17,25 62:7

**Mccosker** 101:3,4

**meaning** 100:2 119:18 123:16
158:25

**means** 23:16 33:9 35:13 89:8,9 97:7
117:9,20 119:13 134:11 155:11 164:3
197:8 204:25 208:4,19 209:10 215:12
216:9

**meant** 129:9

**measured** 107:8

**meet** 48:22,25 50:22 191:17 195:9,13
197:4

**meeting** 50:20

**memorable** 121:6

**memory** 38:15 66:14 71:17 79:11
115:11 120:10 123:13 124:17 128:15,
17 144:5 154:21 155:10 158:14
168:14 201:13 202:23 205:5 208:2

**Mendez** 71:25 89:21 90:7,12,19
91:6,16,19 95:18 104:2,3 107:12,15
108:21 114:24 116:16,20 120:14,16,
25 121:7 122:6 123:18,25 124:14
125:5 152:20

**Mendez's** 104:10 107:21 121:18

**mention** 30:13 47:10 92:16 100:13
124:19 131:21 159:5 161:2 173:16
197:24 204:4 207:21 208:15

**mentioned** 27:8 39:5 44:4 48:16
50:11 56:16 58:9 64:10 70:8 78:23
94:20 98:23 99:16,18 100:8,11,21
103:9 108:3 125:12 126:24 129:17
137:9 144:10 145:5,6 151:6 159:4
168:9,16 172:15 174:17 179:8 193:4
194:15,18 195:19 196:24 198:9
203:16 204:13 213:11 216:16

**message** 21:15 28:17,22,25 29:7
30:13,25

**messages** 31:16,20

**met** 53:24

**metal** 63:18,19

**metals** 63:21

**Michael** 56:13 193:6,7 220:4 221:5

**Michael's** 195:6

**Microsoft** 104:23

Emma Goodson Doc Y-2    Filed 08/14/24 09:45:23    Doc #3 State    Ping Xie
Hanratty 45    Filed 08/14/24    Entered 08/14/24 09:45:23    August 02, 2023
Court Records    Pg 2019 of 2230

**middle** 149:19 204:9

**migrate** 105:4,15

**migrated** 128:24

**migration** 83:15 84:9 105:17

**Mike** 193:5

**million** 47:2,7,10,15,17 85:5 162:4,7
172:4,6 178:6,12,18 179:25 180:21,
25 181:11,17,22 182:10,13,18 185:7,
24 186:17 187:11 188:7,15,19,23
193:17,21 214:3,4 219:24

**millions** 221:3

**mind** 31:15 46:15 121:10 156:10
182:22 197:3,14,16

**mingled** 44:13,20

**miscellaneous** 205:22

**misrepresents** 22:6,8

**mistakes** 14:5

**misunderstanding** 14:5

**mix** 45:3

**mixed** 40:20 78:25

**Mohammed** 71:7

**moment** 58:4

**Monday** 28:16

**money** 40:9,10 41:17 44:13,21 45:7,
14,17 55:11 56:3 69:24,25 72:17,20
83:7 94:2,7 96:3 130:21 134:3,13
158:25 174:5 193:8 195:10,11,12
208:7

**moneys** 193:13

**month** 52:21 93:19 96:4 97:3 103:7
105:11 115:24 149:16,19 195:22

**month-end** 92:7 126:12 150:20

**monthly** 75:9 88:22,23 89:3 92:15
96:16 97:7 115:25 148:16 150:19,25
151:2,14 161:6 204:8

**months** 65:17 88:9 89:9 96:16
105:19 124:5 127:3

**morning** 10:25 12:5 28:16 32:6

**moron** 121:12

**motion** 26:12

**Mount** 65:8,12

**move** 60:10 72:4 82:4

**moved** 65:21 72:11 82:18,22

**MTAG** 81:12,25 82:4,23 83:3 92:4,11
97:24 98:23,25 99:2,15,21 100:11,17,
20 115:9,21 116:6,10 128:25 129:3
145:4,8,12,17,19,24 146:15,16 150:7,
10,14,18,24 151:9,10,19 153:14
154:2 157:6,14,22 158:3,7,8,15
159:3,7 160:21 161:8 163:11,17
204:17,18,19 210:11 213:17 214:25
215:15 216:8,9,16 218:17,24

**MTAG's** 129:2 159:14

**N**

**native** 13:15 108:20

**nature** 63:3

**needed** 76:4 82:24 93:4,21 124:7
151:2 184:10 200:18

**needing** 94:12

**negatively** 77:15

**negotiate** 164:25

**newly** 149:22

**night** 77:3

**nodding** 12:22

**non-mtag** 204:22 205:7

**normal** 122:2

**North** 61:21 62:19 63:10

**noted** 43:12 224:3

**notice** 67:14

**November** 66:15

**number** 10:16 80:12 162:5 171:6
182:22 186:4 193:19 213:25 215:8
223:24

**numbers** 142:11 203:14

**Nusbaum** 11:12

**O**

**oath** 11:18,21 16:15

**object** 17:7 22:19 28:8,20 30:8 31:7
85:10 114:3 169:22 170:12

**objected** 23:4

**objection** 15:6 17:24 18:14 19:11,
12,14,18 20:9 21:2,21,25 22:5,15,18
23:12 24:2 25:4,14,15,16 26:14 27:4
30:7 33:4,21 34:11,12 36:16,17 40:4,
25 43:19 44:3,14,22 49:17 50:4 51:19

53:8,15,18 55:6,20 56:21 57:6 58:7
70:4 73:9 77:11 81:3 86:13,14,15
96:21 102:12 103:17 107:23 108:12
110:11,17,22 113:6,18 114:2,12
117:18 120:8 122:9 125:7 126:3
127:13 130:14 131:19 132:2,11,18
133:7,14 134:18 135:11,19 136:6,21
137:8 139:2,17 140:7 143:6,21 144:9,
23 146:6 151:21 154:4 155:2,21
156:22 157:9 160:4,22 161:15 164:8,
18 167:6 168:4 169:21 172:13 173:14
174:15 175:13,24 178:25 179:7
181:3,23 182:20 183:4 184:18 189:6
190:11 194:14 197:22 200:14 201:10
203:7 206:21 207:5 211:14 214:14,24
215:6 217:2,8,14,20 218:5,11 221:8,
25 222:19

**objections** 13:2,3,5

**obligated** 164:6

**obligation** 119:14,15 163:21 164:2

**observation** 191:6 192:20

**observe** 54:9,13,17

**observed** 56:18

**obtain** 61:10 127:20 160:2 172:19

**obtained** 144:21

**occur** 59:8

**occurred** 20:3 123:19 124:2 138:7

**occurs** 30:19 34:16 41:8 68:17 86:6

**October** 65:19 210:8 212:9

**offered** 74:11,14 112:17,18

**office** 45:19 55:25 56:2,5,8 83:3
94:14 122:17 155:8

**officers** 98:10

**offices** 220:4

**Ohio** 116:17 155:6 163:17

**older** 204:7

**One's** 39:16,20 176:6 197:15

**operate** 75:14 173:4

**operated** 75:17

**operating** 98:10 192:8

**operation** 62:20 66:25 94:11 95:15
102:17,21 103:9 125:15 126:11
130:22 134:11 137:2 148:12 151:6
168:11 174:9 191:13 192:12 197:2,3,
4,8,16 198:17

**operations** 49:11 62:21 66:11 94:19

103:11,15 127:8 131:10

**opinion** 107:25 108:2 119:24

**oppose** 26:12

**option** 192:4,7

**Opus** 81:13 82:2,4 138:6

**order** 49:19 83:15 100:9 151:5

**orderly** 190:16,18,25 195:2

**ordinary** 136:19 198:18

**organize** 185:17

**original** 157:19

**originally** 17:4 59:4

**output** 160:12

**outstanding** 134:22

**overseas** 75:12

**Oversee** 62:18

**owe** 196:15

**owned** 72:6 133:17,24 160:3 186:8
187:10 189:3

**ownership** 208:21 209:20

---

**P**

**p.m.** 109:13,14 176:20 205:16 223:14
224:3

**pages** 187:21

**paid** 38:8,11,16 39:2 40:10 45:20,21
46:25 47:7 57:9,10,15 72:24 94:5,25
96:6 111:24 118:24 158:17,22 172:10
176:6 211:19 219:24

**paragraph** 80:20 81:8,15

**paragraphs** 82:7

**Parks** 11:13 21:21 22:5,9 25:15
26:23 27:3,20 32:8 86:15,23 87:4
176:11 206:21 223:5

**Parks'** 27:24

**part** 41:4,22 42:22 64:24 100:14
141:6 150:25 194:2 197:10 198:12

**partial** 57:15 84:18

**participate** 20:16

**parties** 68:17 86:6

**partner** 125:14

**partners** 178:7,13,19 180:2,22
181:2,13,18 193:18

**party** 92:25 100:4 111:24 112:5,8
127:22 148:9 149:4 156:7 160:6

**pass** 73:11

**pause** 29:12 110:6 153:21 170:7
189:21 212:21

**pay** 36:7,22,25 37:9,15,17,22 38:6
39:5 40:23 41:11,25 43:18 44:9
57:19,20,22,23 68:11,21 69:6,7,17
70:2 72:18 97:9 112:8,11,15 113:13,
24 131:13,17,25 133:12 138:3,13,25
139:16 140:6 161:13 172:19 173:3,12
174:13,22 175:9,22 191:20 192:9
195:7 196:17,22 197:5,20 198:6
211:12 222:17

**paying** 110:9,14,24 111:7,16,18
112:5 113:4 191:24

**payment** 36:4 45:10 55:16,18 95:2,9
113:16 126:12 158:15,23 191:22
214:5 215:23 221:24

**payments** 221:23

**pending** 15:23 163:18

**pennies** 83:18

**people** 71:18 191:24 199:9 213:6

**percent** 51:22 52:8,12 54:5,11,15,19
73:25 89:14 222:23,24

**percentage** 146:18 200:22 202:14
203:19

**perfectly** 97:13

**perform** 14:17 103:16 119:16 120:5
121:24 159:15,20 218:24

**performance** 70:9 73:15,24 77:10,
16 85:2 90:11 107:22 221:19

**performed** 125:5

**performer** 48:10

**performing** 103:12 122:8 216:14

**period** 119:7 147:16 157:12,24
192:15 195:21 220:3,7,11

**person** 15:17 51:4,18 52:3 71:4
72:11 76:10 84:4 86:3,10 94:3,22
100:15 132:20 140:2 141:13,22,24
150:17,23 156:7 178:21 192:10 201:2
213:17 218:12,15 219:9

**personal** 51:5 52:5,6

**personally** 32:10 147:3 156:9

**perspective** 25:18 52:5,6,23 70:7
73:11 148:23 172:23 192:14

**perspectively** 52:7

**Philippine** 98:6 141:24 215:15

**Philippines** 46:4 71:4,18 72:18,23

**phone** 29:2 30:17,22,23 115:6,17,19

**physical** 93:14,20 94:12 95:21 97:15
101:8 102:22 124:25 163:11

**physically** 215:25

**piano** 20:8,14,17,21 59:19,22 60:2

**pick** 30:23 55:25

**picture** 52:25

**Ping** 10:1,12 11:1,20 12:1 13:1 14:1
15:1 16:1 17:1 18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1 26:1 27:1 28:1
29:1,22 30:1 31:1,22 32:1,2 33:1 34:1
35:1 36:1 37:1 38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1 74:1 75:1,14,17
76:1,12,18,24 77:1,6 78:1 79:1 80:1
81:1 82:1 83:1 84:1 85:1 86:1 87:1
88:1,6 89:1 90:1 91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1 99:1 100:1 101:1
102:1 103:1 104:1 105:1 106:1 107:1
108:1 109:1 110:1 111:1 112:1 113:1
114:1 115:1 116:1 117:1 118:1 119:1
120:1 121:1 122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1 130:1 131:1
132:1 133:1 134:1 135:1 136:1 137:1
138:1,7 139:1 140:1,22 141:1 142:1
143:1 144:1 145:1 146:1 147:1,15
148:1 149:1 150:1,16,19 151:1 152:1
153:1 154:1 155:1 156:1 157:1 158:1
159:1 160:1 161:1 162:1 163:1 164:1
165:1 166:1 167:1 168:1 169:1 170:1
171:1 172:1 173:1 174:1 175:1 176:1
177:1 178:1 179:1 180:1 181:1 182:1
183:1 184:1 185:1 186:1 187:1 188:1
189:1 190:1 191:1 192:1 193:1 194:1
195:1 196:1 197:1 198:1 199:1,11
200:1 201:1 202:1,2 203:1 204:1
205:1 206:1,12 207:1 208:1 209:1
210:1 211:1 212:1 213:1 214:1 215:1
216:1 217:1 218:1 219:1 220:1 221:1
222:1 223:1 224:1

**place** 10:17 40:21 215:8

**plainly** 111:18

**Plaintiff** 11:3 78:8

**plan** 82:6 100:17

**platform** 62:18

Edgar Rosenberg, Don Ys2
Hanratty  45
Ping Xie
August 02, 2023
Court Records    Pg 2021 of 2230
Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

play 20:14,21

playing 20:20

pocket 72:20

point 15:20 208:15

pool 166:12

portfolio 115:22 167:24

position 53:10 65:17

possibilities 35:18

possibility 43:21 84:11,15 100:8
137:11

possibly 70:9 173:9

potential 110:20

practical 62:5

practice 67:25 91:25 98:11 122:21
127:5 131:2 136:24 142:15 143:11
198:8

practices 68:3 93:7 123:4

predict 35:14,17

prep 32:7

prepaid 127:16

prepare 33:2,16,19 34:3 38:22 75:6
129:5

prepared 84:2 144:8

preparing 32:24

previous 22:10 53:24 82:19

price 190:15

prices 190:2,8

principal 139:23

principally 140:8 217:21,24 218:7

principle 119:5,17

prior 19:23 31:3,12 76:13 207:23
220:23

private 75:8

privilege 24:21 111:5,11,13

privileged 23:5,6 24:19

problem 15:18 16:2 34:24 117:5

problems 49:13

procedures 96:17 152:21 153:5

proceeded 43:4

proceeding 12:17 39:11 223:24

PROCEEDINGS 10:3

proceeds 138:2,12,24 139:15 140:5

process 45:11 148:17,23

produce 84:10 204:8

producing 83:8 140:15 141:4 142:6

product 63:9,10,22 64:14 73:8 96:9

products 63:19

professional 61:15

professionalism 83:19

profit 63:23

profitability 118:20

progress 105:12

prom- 53:23

promise 53:24 55:15 195:7,13

promised 55:24 57:19 221:23

pronounce 71:23

proof 96:19

proper 24:8 81:18 82:13 83:22 84:5
85:15 86:4,11 111:19 127:10 128:6,9
157:7

properly 92:12 157:23

property 190:23 194:25 195:5

prorated 57:13

provide 39:21 55:3 96:18,23 102:25
116:23 123:20 124:2 151:8 152:10
166:15 199:12,18 200:2 214:21 215:4

provided 95:20 103:3 119:6 124:25
203:5 204:23 205:8

provider 95:8 96:24,25 97:14,16
99:2 216:6,7

providing 53:7,13 142:13 160:21
218:16

publicly 64:22

Puerto 72:4 81:16 82:12 100:23
101:2 125:9 163:18 213:7,14 215:15

purchase 93:11,12,20 95:6 96:8
97:10 101:16 130:22 131:11 136:18
137:3 148:11 153:12,14,25 161:23
162:3 167:4,12,17,20,22,25 168:3
204:21 208:17,20,24 209:6,11,16

purchased 95:19 124:23 133:4
135:8 149:22 151:7 162:12 168:2

purchases 45:23 95:21 96:20 101:8
114:24 115:10 153:25 168:13

purchasing 168:16

purpose 52:9 55:8,10 79:14 93:22
130:2,12,17,19 147:25 148:15 156:11
174:20 190:15

purposes 52:12 54:6 77:23

push 159:4

pushed 39:23

put 96:2 115:23 141:8 142:24 143:3
148:13

putting 107:8 128:23 216:17

### Q

Q3 89:2

Q4 89:3,6,7,10,13

quality 73:7

quarter 38:22

quarterly 84:18 124:6

question 13:8 15:22,23 16:4,6,7,13
17:11 18:18 23:20 24:8 25:8 26:2
30:9 41:3 43:5 44:19 51:12 90:9,17
107:13 110:9 120:23 121:5 137:24
140:14 142:9,10 146:23 147:13
150:5,13 159:22 170:19,22 175:15
208:12

questioning 111:14

questions 12:7,9,16 13:3 16:10 23:4
46:21,22 110:8 115:10 223:19

quick 46:16 110:8

Quickbook 105:3 106:8 107:9

Quickbooks 104:24,25 105:2 107:4

quickly 192:21

### R

rate 73:7

ratio 39:4 48:18 50:21 130:3,4,5
200:20 202:19

ratios 38:24

re-ask 217:23

re-read 41:5

reaction 34:9 36:14 121:19

read 30:2 31:19 32:11 81:21 88:10,
12,14 91:4 102:2 110:4 117:2,7,25
118:11 121:15 130:6,9 138:9 140:25

147:17 150:21 153:18,19 154:6
163:13,23 166:23 169:17,25 183:21
191:2 206:16 209:9,10,15,22 210:14

**reading** 29:14 153:19 214:9

**reading/reviewing** 110:6 153:21
170:7 189:21 212:21

**real** 46:16 106:11

**realistic** 52:24 67:22 222:3

**reality** 46:13 70:12

**realtime** 41:6

**reason** 12:14 51:13 53:4 67:23 71:11
74:2 84:25 99:19 167:10,15 184:20
186:3,6,19,22 187:8 189:2 190:2
194:16,17

**reasonable** 148:3 187:23 200:24

**reasonableness** 203:14

**reasons** 39:19 92:21 194:18

**recall** 54:16 55:8 56:16,25 70:8 71:7
72:2 73:5,6 74:5,6 77:2 79:10 88:19
92:21 99:17 101:15 103:5 106:22
108:24,25 109:4 118:15 120:10
121:21 128:11,16 129:14,15 130:6
135:20 137:10 141:15 143:22 145:6
148:8 154:6,16 155:4 161:17,21,25
165:19,22 169:11,24 170:8 171:4
172:14 176:2 183:5 187:12 197:25
199:7,20 202:8,10,16,22,23 204:3,10,
12 207:6 208:3,10 211:2,17 213:2,16
214:9,15,16,17 220:10,12,16 222:13

**recalling** 170:14

**receivable** 80:2 134:23 135:2 185:6,
23 187:11 188:6,14,18,21

**receivables** 186:9,15,24 189:4

**receive** 30:17,21 61:5,25 94:4 97:15
149:3 158:19 170:17 174:4 193:12

**received** 27:7 30:25 48:5 93:13
166:18 203:23 204:17

**receiving** 169:9

**recently** 168:2

**recess** 58:18 176:19 205:15 223:13

**recollection** 212:24

**recommendations** 146:18

**reconcile** 82:24 83:2 96:13 97:8
105:14 127:24 157:18 159:9,17

**reconciled** 83:8,17

**reconciliation** 83:17 92:9,24 96:5

97:2,8 98:19 99:11

**record** 10:8,24 31:20 39:8 42:16
46:16 58:14,17,22,25 95:8 109:8,11,
17 134:13 151:9 157:23 176:18,23
205:11,14,19 223:9,12,17,18 224:2

**recorded** 70:7 92:13,18 148:11
158:16 159:2,13 211:6

**recorder's** 69:11

**recording** 92:23 158:18

**records** 81:19 82:14 83:3,4,6,7,23
85:16 86:12 89:13 92:8,25 94:9 95:11
96:9 97:22,23 98:14,16 99:11 101:17
126:23 127:23,24 157:7,16,21
158:20,22 159:14,17,18 160:8 161:7

**redeem** 52:14 173:22,24

**redemption** 191:14 194:12

**redemptions** 42:8,14

**reduced** 57:13 176:7

**refer** 78:14 80:6 82:8 124:14

**referred** 18:8

**referring** 50:14 75:24 185:19 193:22

**refinance** 174:7

**refinancing** 173:2

**reflect** 135:2 161:8

**reflecting** 141:9

**refusing** 21:20 22:13

**regions** 62:20

**regular** 121:23 130:22 131:9 155:9
197:2,3,8,16,17 198:16

**regularly** 97:14

**regulatory** 75:11

**reimburse** 168:3

**relate** 79:12 85:19

**related** 23:9 46:6 63:6 75:10 118:17
150:10,14 156:6

**relationship** 51:8,17 125:13 128:18

**release** 55:10 165:15 191:21

**released** 166:19

**relevant** 13:4 37:22 38:2 111:19

**reliable** 160:2

**relied** 159:14 218:23

**rely** 103:10,14 203:3 214:20 215:4
216:5

**remaining** 209:11

**remember** 15:16 16:20 17:13 26:18
28:21 32:20 35:23 37:7 38:14,21
39:6,17 43:20 47:3,9,19 49:18 55:23
61:12 62:8 67:12 72:6,8,13 75:19,25
78:19 82:19 100:13 104:15 106:12,18
116:12 121:9 122:4 145:10 152:23,25
155:16 156:2 169:9 170:4 172:21
181:25

**remind** 17:7

**renewal** 129:16,17

**renovation** 93:25 94:22

**rent** 93:25

**REO** 88:7 93:25 103:9 104:13,14
105:23 106:3,9 107:3 108:5 127:8
190:22 191:18,19,25 192:6,16 194:5,
7 213:11 217:6

**reorganization** 62:23

**REOS** 94:23 127:12,16 128:7 190:8,9

**repaid** 39:14 85:8 181:21 209:19
210:21,24 211:4

**repay** 40:2 44:2 50:2,9 52:15 69:22
173:8 174:8 222:18

**repaying** 221:3

**repayment** 38:19 220:8,13,22

**repeat** 25:25 41:2 167:14 188:10
209:2

**repeating** 52:16

**rephrase** 16:5

**reply** 103:6

**report** 50:11,13,20 75:7 83:25 94:4,
21 116:21 119:21 127:19 129:4,6
190:18 212:14

**reported** 62:24

**reporter** 10:21 11:15 12:12 77:25
80:14 87:14 89:24 109:22 137:16
152:4,13 162:17 165:6 166:4 168:23
177:5,11,17 183:10 189:14 196:3
198:22 201:18 206:2 210:2 212:3
214:2

**reporting** 55:5 63:24 64:24 66:10,24
75:12 76:5

**reports** 38:23 48:5 50:19 94:23
150:20 161:8

**represent** 18:13 110:10,15 153:9

**representing** 184:11

represents 18:21

request 39:16,20 168:2 194:4

requested 38:5,7,19 52:14 161:12
190:20 193:2,23 220:8,13,22

requests 68:18 86:7 194:13 198:5

require 192:3

require- 50:23

required 37:9 75:11 101:13 102:3,8,
11 135:6 150:6 151:16,18 164:15
184:14 200:18

requirement 48:18 75:13 83:18
101:12 141:9 191:17 194:19 197:4
202:17

requirements 146:4 147:5,21
199:23 200:4,12 201:8 221:11,15

rescheduled 19:4 20:24

resign 84:23,24

resigned 81:20 84:22

resolved 120:2

respond 117:22 118:3,5 128:12
190:14

responded 90:12 107:15 147:8,14
150:8,15

responds 117:4

responsibile 138:18

responsibilities 62:13 63:13 64:20
66:7,20 126:7

responsibility 215:18

responsible 63:15 66:9,23 126:10
138:11,22 139:14,22 140:4 141:3
142:6 147:19 151:18 200:11 217:17,
25 218:8,15

rest 31:15,19

restart 59:9

restarted 64:5

result 107:7 160:16

resulted 190:21

retain 81:12 197:15

retained 24:18

retaining 25:2

retention 24:19

retire 65:20 174:17

retired 62:25

retiring 65:17

return 52:19,20 53:6 198:14 207:9,
12

returns 75:12

reveal 25:22

revealing 26:21,25 27:11 32:16
33:25

revenue 118:17

reverted 42:17

review 33:15 88:23 142:10 144:7,16
147:3,25 148:2,15,24 153:4 189:19

reviewed 147:10 222:14

Richey 163:3,5 189:25

Rico 72:5 81:16 82:12 100:24 101:2
125:10 163:18 213:7,14 215:15

Rochester 128:22 145:7,13,18,20
149:11,15,21 153:15,17 154:2 204:5,
13,14 216:10

role 74:15,23 75:2

roles 65:5,11

rough 157:15

roughly 21:16 121:15

rubric 111:13

rules 16:11

runs 212:13 213:20

Rye 163:18

## S

Sahil 15:14 199:4

Sails 61:21

Saint 65:9,12

sale 62:4 190:7,17 192:7,14,20

Salerno 56:13 193:7 220:4 221:5

sales 190:2,22 191:5,8 194:5,7,12
215:10

salesperson 71:3

Santori 169:5,14,20 170:11 171:12
206:7,9,12,18

Santos 193:11

Sarah 71:2

satisfied 221:19

satisfy 190:24 194:12

save 100:10 192:8

saving 99:19

savings 102:15

schedule 29:5 119:6

scheduled 17:4 32:22 59:5

scheduling 20:3 28:4,7

scroll 29:18

SEC 64:25

Security 72:19,22

seeking 16:18

select 106:10

selected 104:14 105:3

self-service 100:2,6 136:5,12 150:7
156:12,16

self-servicing 99:25 100:9 135:17,
22 154:12,15,20,24 155:20,25

sell 173:7 192:17 195:11 217:6

selling 192:4,6

send 40:9 97:18 142:16,17,20
143:12,13 144:11,12 153:13,24 155:7
202:24

sending 142:21 152:23 169:15,20
170:11

senior 11:13 62:16 74:20

sense 13:9 219:16

sentence 39:10,11 41:22

separate 37:11 74:3 198:10

separated 40:6,17

separately 45:2

September 183:16

served 16:24

service 82:2 92:5 93:17 95:8 96:9,24
97:14,16 99:2,5 100:3,17,25 104:18
148:19,21 149:15 156:4 157:12,13,
19,21 204:7 213:9 216:6,7,10,12

servicer 101:9,23 102:9 135:10
149:24 156:20 157:3,6 159:23 203:25
218:10

services 81:13 82:5,21,22 99:9,15,
21 101:14 140:18 215:10,14 216:11

servicing 90:14 91:7,16 104:21
155:14

Efran0020 usps Coupt Is2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   Ping Xie
Hanratty  45
Court Records   Pg 2024 of 2230   August 02, 2023

**set** 64:4,9 78:21

**setback** 64:15

**settle** 69:12,17

**settled** 70:10,13

**settlement** 68:8

**shaking** 12:22

**shape** 81:11,24

**share** 89:19 137:13 162:14 165:3,25
168:20 176:25 183:7 189:11 198:19
201:15 205:23 209:23 211:24

**shared** 42:9 129:25

**sheet** 39:3 176:3

**short** 190:23 192:15 194:25 195:5,
16,18,21

**Shortly** 80:21

**show** 29:16 77:21 87:11 96:8 120:19
121:22 195:24

**showed** 120:16

**sic** 12:8 47:12 89:10 118:3 126:17
181:5

**sign** 164:25 183:17 184:2,8

**signal** 184:16

**signature** 141:19,21,23 142:2,25
143:3 184:3,10,22 219:5,10,13,19

**signatures** 143:15

**signer** 132:19

**significant** 171:5

**signor** 46:12

**similar** 174:21

**simultaneous** 68:16 86:5

**Singapore** 74:18

**single** 133:20

**sit** 44:5

**sitting** 40:14 222:6

**situation** 121:10 174:21

**size** 176:7

**slowly** 43:9

**small** 45:18 128:21 149:11,13

**smaller** 57:8

**Social** 72:19,22

**software** 100:15,16,25 104:14,20,21

105:4,5 106:5,6,12 108:6

**sold** 133:12 134:12,16,21

**sole** 216:23 217:5,11

**son** 20:16,18,21 59:19,22,25

**sophomore** 20:19

**sort** 82:19 106:17 124:23 160:24
198:17

**sotto** 153:20

**source** 49:7 103:23

**sources** 153:13

**soy** 66:6

**speak** 23:16 28:3 29:23 31:23 32:7
33:2,18 34:2 39:9 42:3 43:9 48:2
54:10,14,18 73:13 124:16 128:15
155:9 201:7 208:2

**speaker** 68:19 86:8

**speaking** 13:22

**special** 79:14

**specific** 47:3 48:18 56:2 71:11 73:16
124:21 131:22 137:10 168:15 200:17
216:4

**specifically** 13:7 48:9 50:10 67:13
68:4 78:20 86:24 96:14 125:2 156:10
193:25 202:18 207:19

**speculate** 53:10 71:14

**speculation** 71:12

**spend** 32:24 76:23 82:25 157:17

**spending** 94:7

**spent** 95:3

**spilling** 196:10

**spoke** 26:23 73:22 206:13 207:21
212:11 221:10

**spoken** 27:20,23 32:17 43:12 77:15

**spreadsheet** 148:6,14

**spreadsheets** 128:23 129:8 203:23
204:16

**SPV** 79:13

**stages** 13:4

**stamped** 171:18

**standard** 83:19

**start** 67:15 76:2 220:21

**started** 61:17 62:16 120:17 124:10
126:21 128:20 146:16

**starting** 29:18 76:7

**state** 124:23 135:22 155:6

**stated** 28:15

**statement** 51:21 52:8 55:11 83:9
84:7 88:18 104:11 108:9 118:7,19,20
128:2 151:3 179:14 180:8 185:16
187:2,20 189:8 202:18 215:23 222:10

**statements** 52:11 54:4 177:24
178:5,11 179:24 180:20 188:4 193:16

**States** 13:24 60:11

**stating** 205:4

**stay** 125:9

**stenographer** 22:7 50:16 54:21
63:16 68:18 86:7 89:4 91:21 138:19
154:17 158:5 173:18 187:14 210:22
211:15 218:18

**step** 175:6

**stipulated** 50:24 202:19

**stock** 192:17

**story** 125:2

**strategically** 67:21

**strategies** 102:17

**Street** 10:18 67:3,7,9 70:3,16 76:19,
25 77:18 79:17

**strictly** 198:10

**structure** 68:23

**struggle** 159:10

**struggling** 159:8

**stuff** 45:20 57:8 98:19,20 107:19
108:11

**subject** 24:8,20 125:5 152:20
191:19,23

**submit** 142:3 143:14,18 146:25

**submitted** 80:11 144:3 149:6

**submitting** 55:4

**subpoena** 16:24 21:14 28:16

**subsequent** 214:5

**subsequently** 191:19

**subsidiaries** 74:19

**substance** 24:14 26:21,25 27:12
32:16 33:25 86:19

**substantial** 14:18

**substantially** 189:4

**Sullivan** 11:2,5

**summer** 11:6 55:24

**supervise** 105:9,16 106:2

**supervising** 91:2 104:8,11

**supervision** 92:5 218:21

**support** 94:18 116:24 117:23 118:9 123:6,11,20,22,23 124:3 125:2

**suppose** 111:25 114:16

**supposed** 57:8 65:16 67:14 69:7 72:18 96:23 101:7 121:25 145:16,23 151:8

**supposedly** 160:25 213:12

**Supreme** 10:14

**surprised** 34:15,21 35:3,8 36:21,24 37:3,15,17,21 38:9 102:9 108:7

**surveys** 141:7

**survival** 67:23 85:3

**survive** 49:10

**swear** 11:15

**switch** 49:8 99:3,14

**switched** 48:25 49:14

**sworn** 11:18,20

**system** 92:23 95:9 99:8 100:15 104:16 106:4 129:9 146:11,16 158:16,18 159:7 160:7,10

**systems** 99:7 151:11

---

**T**

**taking** 10:17 12:12 69:25 159:18

**talk** 12:15 48:9 87:7 100:7 112:24 194:24

**talking** 18:20 49:20 114:10

**task** 218:13

**tax** 72:19 75:12 80:2 100:6 103:23 133:3 135:7 136:18 147:4,6,20,22 151:19 152:21 153:4,12 154:24 155:20 156:5,21 157:3,8,12 158:17, 22,23 159:3 160:3 161:23 162:4,7,11 164:14 167:4,13,18,22,24 185:6,23 186:9,15,24 187:11,17 188:6,13,18, 21 189:4 191:19,21,25 192:9 197:2 204:6,7 208:9,22 217:6 218:9

**team** 63:7 75:10 90:14 91:7,16 92:5

94:11,19 98:6 102:5,21,25 103:3,11, 15 115:3,5 148:12 151:23 156:3,4,8 159:5 205:3

**teams** 95:16

**tech** 215:14

**telling** 117:12

**tens** 221:2

**tenure** 116:4 162:12

**term** 42:4,24 48:7,21,22,23 91:23,24 135:13,14 136:23,24 138:16 164:20 200:17,22

**terms** 35:23 38:23 41:13 48:14,25 50:23,24 111:6 164:11,23 197:12

**testified** 11:22

**testimony** 16:14,19,25 29:12 146:24

**text** 21:15 28:6,17,22,25 29:7 30:12 31:16,19

**texted** 29:22 31:22 32:2

**TF** 145:10

**TFX** 204:8 216:9

**themself** 100:3

**then-counsel** 18:3,10

**theoretically** 24:16

**thing** 15:21

**things** 40:13 58:25 91:3 104:8

**thinking** 102:4 104:19

**third-party** 93:16,17 101:9,14,23 102:9 123:10 127:25 135:10 148:19 149:24 155:14 159:23 164:16 203:24 218:10

**Thomason** 162:24 163:8 189:25

**thought** 30:14 102:14,16 134:9

**thousand** 62:2

**tie** 116:2 151:3 194:3 215:22

**time** 10:10 16:20 17:9 22:23 24:13 27:3,13 29:23 30:4,14 31:24 32:5,21, 23 36:2,5 37:19,25 38:13 39:10 48:11 55:9,13 56:2 57:8 59:21 66:15 68:19 71:5 72:13 73:6,21 83:2,17 86:8 88:25 96:11 97:10 98:11,18 99:10 106:7 122:11,13 123:8,12 126:23 127:19 128:16 134:9,23 141:21 143:17 147:16 149:12 150:16 157:11, 15,17 159:4,18,20 161:5,10 166:18 168:6,8 170:17,21 171:6 172:8 173:23 176:12 181:21 182:16,24

187:13,17 190:24 191:9 192:16 194:25 195:5,15,17,22 206:23 207:7, 21 210:20 216:14 219:6,23 220:3,7, 11,25 224:3

**timely** 92:3,6,11,18 94:23 103:6 127:21 158:2 159:8,12 161:3 218:16

**times** 23:3 58:5 77:14 95:17 103:2,7 115:20 124:4 146:24 148:8 222:7

**timing** 53:2 62:8 98:13 158:25 172:15 220:10 222:4

**title** 126:19

**today** 11:4 12:7,13 13:11 14:2 15:21 29:24 31:23 110:10,16 112:7 165:16 210:13,18 222:6,15 223:24

**today's** 10:9 223:24

**told** 19:8 20:6 21:19 29:2,4 57:2 86:25 95:18 109:2 134:21 207:7,11, 16,24

**Tom** 101:2,4 122:14,15 133:17,24 134:23 174:20

**Tom's** 122:15,16

**tomorrow** 29:24 32:6 97:20 166:14

**totally** 209:19

**tournament** 20:8,17 59:20,23 60:2

**Tower** 82:21,22 99:4,5,9,14,21 104:17 126:15 140:18 141:6 157:13, 19,20,21 216:11,12

**Towers** 99:9

**town** 158:20 216:4

**town's** 101:17,20

**track** 131:22

**trade** 190:25 195:2

**traded** 63:21 64:22 190:16,19

**trader** 65:25 66:22 134:10 204:20,25 215:14

**trading** 63:20 65:24 66:3,5,8,13,17, 21

**traditionally** 89:7

**trails** 121:13

**trained** 68:13 221:14

**training** 61:6 62:5

**transaction** 44:7 124:6 133:17,24 166:16 190:19 222:22

**transactions** 40:13 123:7,19,21,24, 25 124:3 161:18 179:10

Edward Dowd vs. Doe 1-2
Hanratty
Court Records
Entered 08/14/24 09:45:23    Doc #3 State    Ping Xie
Filed 08/14/24
Pg 2026 of 2230
August 02, 2023

**transcript** 89:20 104:3

**transfer** 45:24 69:9 83:3,7 92:3 126:14,16,25 157:13

**transferred** 92:19 141:12 211:21

**transition** 82:23 141:6 157:11,17,24

**transitioned** 140:20

**translate** 39:11

**translation** 42:20

**translator** 43:7

**Travis** 162:24

**Traxys** 63:10,14,19 64:3

**treat** 106:10 125:15

**trouble** 14:9,12 15:3 43:6

**true** 52:12 54:5,11,15,19 81:24 82:15,16 83:24 87:25 98:14,20 104:13

**truth** 51:22 52:8 81:23

**truthful** 55:13

**truthfully** 12:9

**Tuesday** 59:18

**turn** 146:20 153:8 178:3 179:22 180:18

**turning** 116:14 120:13,15 178:9 184:25 186:12

**TY** 31:23

**type** 97:5

**Typically** 166:19

---

**U**

**U.S.** 61:20,24 163:19

**Uh-huh** 59:3 70:20 78:10 79:8 152:22 153:11 159:24 169:8 178:14 183:20 186:18 195:3 201:25 202:7 220:2

**ultimately** 102:25

**unable** 48:24 53:5

**understand** 12:2,10,11 13:18 15:11, 14 16:3,9 20:4 37:4,10 41:19 43:5 47:11 49:9,19 78:14,20 80:8,25 82:8 85:8 99:8 126:16 129:11 133:8,16 134:20 143:2 155:6 172:24

**understanding** 14:10 15:4 38:18 79:23 80:3 99:20 108:22 109:3 113:3,

12 119:4 125:4,21 130:19,25 131:5 136:25 140:9 142:19 143:8 149:10, 12,22 153:23 154:9 164:13 167:2,19 168:9,13 170:23,25 184:13 196:24 197:11 198:16 203:21 204:15 205:6 209:4 216:19 219:9,11,15

**understated** 117:6,17

**understood** 16:7

**unemployment** 72:22

**unit** 58:16,21 109:10,16 176:17,22 205:13,18 223:11,16

**United** 13:24 60:10

**University** 20:19 60:5,14

**unrealistic** 55:4 221:24

**unreportable** 68:16 86:5

**update** 97:24 149:16

**updated** 153:4

**upload** 97:20,23 151:10 159:6 161:2

**urgent** 39:16,20

**urgently** 38:16 39:14

**usage** 127:18

---

**V**

**Vadar** 116:23

**valued** 188:14,18

**vehicles** 79:14

**verbal** 12:21

**verbally** 12:22 101:15

**verify** 148:5 149:18 215:19 216:2

**versus** 78:8

**Victor** 11:11 29:4

**video** 10:10,11

**videos** 223:25

**view** 24:7,20 52:2

**Vincent** 65:9,12

**violation** 48:7,13,23

**violations** 48:15

**visit** 99:6

**voce** 153:20

**Volume** 137:14

**voted** 175:6

**voyage** 106:18

---

**W**

**Waack** 10:22

**wait** 11:25 192:22

**Wang** 11:10,11 15:6 19:11 22:15,18 25:14 27:4,14,20 34:12 36:16 40:4,25 43:19 44:3,14,22 46:15 49:17 50:4 51:19 53:8,15,18 55:6,20 56:21 57:6 58:7 70:4 73:9 77:11 81:3 86:14 96:21 102:12 103:17 107:23 108:12 113:6,18 114:2 117:18 120:8 122:9 125:7 126:3 127:13 130:14 131:19 132:2,11,18 133:7,14 134:18 135:11, 19 136:6,21 137:8 139:2,17 140:7 143:6,21 144:9,23 146:6 151:21 154:4 155:2,21 156:22 157:9 160:4, 22 161:15 164:8,18 167:6 168:4 169:21 172:13 173:14 174:15 175:13, 24 178:25 179:7 181:3,23 182:20 183:4 184:18 189:6 190:11 194:14 197:22 200:14 201:10 203:7 207:5 211:14 214:14,24 215:6 217:2,8,14, 20 218:5,11 221:8,25 222:19 223:18

**Wang's** 27:24

**wanted** 72:9 92:17 99:14 100:9,16, 22 121:12 130:4 174:13

**ways** 120:6

**weak** 36:7,8

**weaker** 124:11

**week** 19:10 59:11,14 76:23

**week's** 67:14

**weeks** 16:21 67:17 71:8,9

**wife** 79:4 209:14

**Willscher** 11:5

**wire** 68:5 166:14

**wiser** 102:16

**withdraw** 53:3 168:17 190:21 193:2, 23 194:4

**withdrawal** 190:24

**withheld** 23:8 24:5

**witness's** 25:17

**work** 60:19,22,23 61:2 62:4 63:6 72:10 73:8 74:20 76:12,18,23 77:2,3, 5 81:11 82:24 84:5 90:23 91:3 94:3 100:23,24 104:5,8,12 105:6,19,24

Engagement Uses Deputy-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    Ping Xie
Hanratty 145                Court Records      Pg 2027 of 2230                             August 02, 2023

119:16 120:6 121:24 122:11,14 127:4
146:15 174:20 198:5 199:9

**worked** 14:19 15:17 63:9 64:17 65:7,
23 67:2 74:7 77:18 140:24 163:3

**working** 35:14 51:7,16 61:18 66:13,
19 67:6 76:13,19,24 197:7,9,10,17
206:14,19

**works** 108:6

**worried** 68:7 125:17 127:6 134:24

**worries** 125:16

**worry** 68:4,10 69:21 85:3,4

**wrap** 205:21

**write** 56:6,9 165:14 183:15,23 192:25
196:14 210:11 212:11 213:19

**write-up** 154:7

**writes** 163:15 166:12 169:14 199:11,
14 202:2 206:12

**writing** 221:4

**written** 57:19 129:22

**wrong** 88:20 123:2

**wrote** 80:21 81:9,16 82:11 84:21
88:6 154:21 163:9 193:22 206:23

---

### X

**Xie** 10:1,12 11:1,20 12:1,5 13:1 14:1
15:1 16:1 17:1 18:1,18 19:1 20:1 21:1
22:1 23:1,19 24:1,25 25:1,7 26:1 27:1
28:1 29:1 30:1 31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1 46:1,17 47:1 48:1
49:1 50:1 51:1 52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1 74:1 75:1,14,17
76:1,12,18,24 77:1,6,25 78:1 79:1
80:1,14 81:1 82:1 83:1 84:1 85:1 86:1
87:1,14 88:1 89:1,24 90:1 91:1 92:1
93:1 94:1 95:1 96:1 97:1 98:1 99:1
100:1 101:1 102:1 103:1 104:1 105:1
106:1 107:1,13 108:1 109:1,22 110:1
111:1 112:1 113:1 114:1 115:1 116:1,
14 117:1 118:1 119:1 120:1,15 121:1
122:1 123:1 124:1 125:1 126:1 127:1
128:1 129:1 130:1 131:1 132:1 133:1
134:1 135:1 136:1 137:1,16 138:1,7
139:1 140:1,22 141:1 142:1 143:1
144:1 145:1 146:1 147:1,15 148:1
149:1 150:1,19 151:1 152:1,4,14,18
153:1,8 154:1 155:1 156:1 157:1
158:1 159:1 160:1 161:1 162:1,18

163:1 164:1 165:1,6 166:1,4 167:1
168:1,23 169:1 170:1 171:1 172:1
173:1 174:1 175:1 176:1,25 177:1,5,
12,18,23 178:1 179:1,12 180:1,6
181:1 182:1,3 183:1,11 184:1 185:1,
2,4,12 186:1,12 187:1 188:1 189:1,14
190:1 191:1 192:1 193:1 194:1 195:1
196:1,3 197:1 198:1,22 199:1 200:1
201:1,18 202:1 203:1 204:1 205:1
206:1,2 207:1 208:1 209:1 210:1,3
211:1 212:1,3 213:1 214:1 215:1
216:1 217:1 218:1 219:1 220:1 221:1
222:1 223:1,19 224:1

**Xie's** 90:10

**XYZ** 79:21,25

---

### Y

**Yardi** 106:20,21,22,23,24 107:5,7

**Yardi's** 107:7

**year** 55:23 57:11,12,23 66:19 89:8
155:15 190:10

**year-end** 163:10

**years** 13:21 38:21 54:8 61:4 62:15
99:17,23 106:19 220:15

**yields** 45:4

**York** 10:5,15,18,19 79:12 125:10
145:7

**young** 140:22

---

### Z

**Zhongnan** 60:4

**Zoho** 106:13

**Zvonkov** 10:21

# FILED: NEW YORK COUNTY CLERK

# NYSCEF DOC. NO. 146

## EXHIBIT(S) - REQUEST TO SEAL

September 20, 2019 Email Correspondence

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 147

EXHIBIT(S) - REQUEST TO SEAL

Ebury Organizational Charts

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

|  |  |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | : |
| Plaintiff, | : |
| v. | : |
| JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1-10, | : |
| Defendants. | : |

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 006**

**STATEMENT OF MATERIAL FACTS**

---

Pursuant to Rule 19-a of the Rules of the Commercial Division of the Supreme Court of the State of New York, Plaintiff Emigrant Business Credit Corporation ("**EBCC**") respectfully submits this Statement of Material Facts in support of EBCC's Motion for Summary Judgment.

1.      Defendant, John Hanratty ("**Hanratty**") is the founder, manager, and only member of Ebury Street Capital, LLC ("**ESC**"). (Hanratty Dep. Tr. at 22:22-23:3.)

2.      ESC manages both Ebury Fund 1, LP and Ebury Fund 2, LP (together, the "**Funds**"). (EBCC_000016681 at -6681.)

3.     The Funds, in turn, wholly-own Ebury 1EMI LLC and Ebury 2EMI LLC (together, the "**Borrowers**"), Red Clover 1, LLC, and Ebury RE LLC. (EBCC_000016681 at -6681.)

4.     Each Borrower owns special purpose entities (the "**Ebury SPEs**") that purchase, own, and sell tax lien certificates or real estate in various states. These include EB 1EMIALA LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; and Ebury Fund 2NJ, LLC. (EBCC_000016681 at -6682-6683.)

5.     The Ebury SPEs, ESC, and Red Clover 1, LLC are guarantors to the Credit Agreements (the "**Guarantors**"). (Dkt. No. 8.)

6.     The Borrowers, Guarantors, and Ebury RE LLC (the "**Ebury Companies**") share the same address at 664 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907. (Hanratty Dep. Tr. at 27:4-10.)

7.     All of the Ebury Companies are managed by ESC. (Hanratty Dep. Tr. at 26:24-27:3; EBCC_000016681.)

8.     None of the Ebury Companies have any employees. (Hanratty Dep. Tr. at 28:16-20; Mendez Dep. Tr. at 55:8-14.)

9.     Hanratty is the ultimate decision maker for all transactions and distributions made by the Defendants. (Mendez Dep. Tr. at 40:24-41:4.)

10.     Hanratty moves funds between the Ebury Companies without regard for their separate corporate forms.  (Xie Dep. Tr. at 44:19-45:4.)

11.     In 2017, EBCC extended a $10 million credit facility to Ebury 1EMI LLC and a $5 million credit facility to Ebury 2EMI LLC.  (*See* <u>Dkt. No. 6</u>; <u>Dkt. No. 5</u> ¶ 4.)

12.     The notes underlying the Credit Agreements provided that the Borrowers would "repay all principal, interest, costs and expenses outstanding hereunder on March 9, 2021." (<u>Dkt. No. 7</u> at 8; <u>Dkt. No. 5</u> ¶ 8.)

13.     The parties agreed to three maturity date extensions, with the final maturity date set for November 10, 2021.  (<u>Dkt. No. 6</u> at 76; <u>Dkt. No. 5</u> ¶ 8.)

14.     The Credit Agreements required that Hanratty execute validity guaranty agreements in favor of EBCC (the "**Validity Guaranties**").  (<u>Dkt. No. 6</u> at 27.)

15.     Under the Validity Guaranties, Hanratty agreed to be personally liable for any damages resulting from incorrect information provided to EBCC about the eligibility of collateral under the Credit Agreements.  (<u>Dkt. No. 11</u> ¶ 3.)

16.     Hanratty guaranteed to EBCC that "all Information from time to time delivered to Lender will be true and correct in all material respects as of the Calculation Date applicable to such Information."  (<u>Dkt. No. 11</u> ¶ 2.)

17.     If any Information was not "true and correct, in all material respects as of a Calculation Date," Hanratty agreed personally to "pay the aggregate amount of all Damages incurred by Lender."  (<u>Dkt. No. 11</u> ¶ 2.)

18.     Hanratty's obligation to pay damages under the Validity Guaranties is "on a 'solidary' and 'joint and several' basis" with the Borrowers.  (<u>Dkt. No. 11</u> ¶ 3; <u>Dkt. No. 5</u> ¶ 9.)

-3-

19.     As of the date of each advance, the Borrowers represented and warranted that they had delivered to the designated third-party custodian and servicer "all required Tax Lien Documents." (Dkt. No. 6 § 5.10.)

20.     "Any Tax Lien whose Basic Tax Lien Documents are not delivered to Lender, or to the Custodian, by no later than the effective date of the most recent Borrowing Base Certificate furnished to the Lender," was not eligible to be included in the Borrowing Bases. (Dkt. No. 6 § 1.1(y).)

21.     This requirement could not be waived or altered except in a signed writing, and there was never any such writing. (Hanratty Dep. Tr. at 101:24-102:2.)

22.     The Borrowers were permitted to use advances under the Credit Facilities only to purchase eligible tax liens and for ordinary and necessary expenses of business operations incurred in the normal course of business. (Dkt. No. 6 §§ 2.1, 6.26, 9.1.)

23.     All proceeds from EBCC's collateral were to be deposited into an EBCC lockbox account "within one (1) Business Day after receipt." (Dkt. No. 6 § 3.7.)

24.     An event of default occurred when "any Ebury Company fail[ed] to deposit (or cause to be deposited) into the Lockbox Account any Collections received by it within one (1) Business Day of the date required hereunder." (Dkt. No. 6 § 9.1(q).)

25.     The use of proceeds from the sale of EBCC's collateral for any purpose other than the repayment of indebtedness to EBCC was an event of default. (See Dkt. No. 6 § 9.1(b).)

26.     The Borrowers were not allowed to distribute any money if an event of default had occurred. (Dkt. No. 6 § 8.8.)

-4-

27.     Each Borrower was prohibited from distributing in excess of $5 million in a calendar year.  (<u>Dkt. No. 6</u> § 8.8.)

28.     On November 10, 2021, the Borrowers and the Guarantors were required, but failed, to repay EBCC, including over $18 million in outstanding principal and interest.  (*See* <u>Dkt. No. 12</u>.)

29.     Defendants breached the Credit Agreements when they failed to repay EBCC at maturity and are currently in default.  (Hanratty Dep. Tr. at 405:8-12, 674:9-10.)

30.     Defendants impermissibly included self-serviced collateral in the borrowing bases.  (Hanratty Dep. Tr. at 101:11-15, 102:21-105:9.)

31.     Hanratty falsely represented to Emigrant that each Ebury Company had complied in all respects with its obligations under the custodial agreement with respect to each tax lien, which included the delivery to the designated third-party custodian and servicer of all required tax lien documents.  (Hanratty Dep. Tr. at 107:25-108:11.)

32.     In 2018, the Funds made approximately $15.6 million in distributions to Defendants' investors, in excess of the limits imposed under the Credit Agreements.  (EBCC_000010586 at -10611 and -10632; *see also* Hanratty Dep. Tr.at 138:6-14.)

33.     Had Defendants not made almost $21 million in distributions to investors, they would have been able to repay EBCC at maturity.  (Hanratty Dep. Tr. at 314:8-315:5.)

34.     On September 7, 2018, EBCC advanced Defendants $3.8 million purportedly to fund their assignment to EBCC of $5.2 million in tax lien collateral, which Defendants instead used to pay a $3.3 million distribution to an investor.  (<u>Dkt. No. 5</u> ¶ 20; EBCC_000011878 at rows 276-77.)

-5-

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2035 of 2230

35.  Around September 2018, Hanratty sold a portfolio of liens that were EBCC's collateral and remitted the proceeds directly to an investor.  (*See* Hanratty Dep. Tr. at 603:4-606:15.)

36.  Doing so was an event of default under the Credit Agreements and Hanratty failed to provide the required notice to EBCC.  (*See* Hanratty Dep. Tr. at 603:4-606:15.)

37.  On November 9, 2018, Defendants used advances under the Credit Facilities to pay a $288,810.67 distribution to an investor.  (Hanratty Dep. Tr. at 401:3-8; Dkt No. 5 ¶ 20; EBCC_000011877 at rows 1491 and 1494.)

38.  Hanratty was not "allowed to use money advanced under the Emigrant Credit facilities to pay distributions to investors" (Hanratty Dep. Tr. at 401:9-15), yet the same day—November 9, 2018—Hanratty signed a borrowing base certificate stating that there had been no events of default (EBCC_000004964).

39.  On May 17, 2019, EBCC advanced Defendants $860,000 to finance the purchase of $3,492,881 in tax lien certificates, which Defendants instead used to pay $1,208,772 to various investors.  (Dkt No. 5 ¶ 20; EBCC_000011877 at rows 1729, 1731-32.)

40.  On September 13, 2019, Hanratty signed a borrowing base certificate attesting that there had been no events of default, and EBCC advanced Defendants $850,000.  (EBCC_000011878 at row 638.)

41.  One week later, on September 20, 2019, Hanratty used Emigrant funds to make a $750,000 distribution to an investor.  (Hanratty Dep. Tr. 424:14-425:20; *see also* EBCC_000011878 at rows 641-42.)

42.  Hanratty did not send Defendants' 2019 audited financial statements to EBCC until July 2021.  (Hanratty Dep. Tr. at 501:19-23.)

-6-

43.     According to the 2019 audited financial statements, the value of Defendants' tax lien portfolio was only approximately $17 million (EBCC_000010663 at -0667; EBCC_000010701 at -0705; Hanratty Dep. Tr. at 495:5-496:24.)

44.     Even after receiving the 2019 audited financial statements, Hanratty told Grady that EBCC was overcollateralized and secured by $30 million in lien collateral. (EBCC_000008797 at -8808; Hanratty Dep. Tr. at 188:3-17.)

45.     On September 22, 2021, Hanratty purported to send Grady a custodial report from the designated custodian and servicer, MTAG, but actually sent Grady a lien tape that was not from MTAG but that had MTAG's logo affixed to it.   (EBURY_000008420; EBURY_000008421.)

46.     Hanratty represented to Grady that the lien tape was a list of the liens of which MTAG had custody; however, the lien tape was mostly comprised of self-serviced liens. (Hanratty Dep. Tr. at 264:8-267:25.)

47.     According to the lien tape, MTAG had custody of 6,782 tax lien certificates worth $27.8 million in redemptive value ("**RV**"), but in actuality, MTAG had custody of only 518 tax lien certificates worth $1.3 million RV.   (*Compare* EBCC_000008421, *with* EBCC_000010281.)

48.     Following Defendants' default at maturity, Hanratty sent EBCC another lien tape purporting to represent the status of EBCC's collateral as of December 1, 2021. According to this lien tape, MTAG had custody of only 497 liens worth $1.4 million RV, and Defendants admitted to self-servicing 1,047 liens, purportedly worth $17.8 million RV. (Dkt No. 5 ¶ 6; EBCC_000010220.)

Dated:   January 12, 2024
         New York, New York

Respectfully submitted,

/s/ Alexander J. Willscher

Alexander J. Willscher
Austin P. Mayron
Erin Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business
Credit Corporation*

-8-

At Commercial Division Part 49, of the
Supreme Court of the State of New
York, held in and for the County of New
York, at the Courthouse located at 60
Centre Street, New    York,    NY,    on
the    ____    day    of
_____, 2024.

PRESENT:
Hon. Margaret Chan, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT
CORPORATION,
　　　Plaintiff,


　　　　　v.


JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB
1EMIALA LLC, EB 2EMIALA LLC, EB
1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB
1EMIMD, LLC, EB 2EMIMD, LLC, EB
1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB
1EMISC, LLC, EB 2EMISC, LLC, RE
1EMI LLC,
RE 2EMI LLC, EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC, EBURY FUND 1FL,
LLC, EBURY FUND 2FL, LLC, EBURY
FUND 1NJ, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, and EBURY
RE LLC,
　　　Defendants,


　　　　　v.


XYZ CORPS. 1-10,
　　　Defendants.

Index No. 158207/2022

The Honorable Margaret A. Chan

Mot. Seq. 8

**[PROPOSED]
<u>ORDER TO SHOW CAUSE</u>**

**UPON READING** the annexed Memorandum of Law; the Affirmation of Kari Parks and the exhibits annexed thereto; and all other papers and pleadings filed herein; it is

**ORDERED** that Plaintiff Emigrant Business Credit Corporation appear before this Court, located at 60 Centre Street, New York, New York, on the _____ day of _____ 2024, at _____ o'clock a.m. / p.m., or as soon thereafter as counsel can be heard, and show cause why an Order should not be issued:

a.    Pursuant to CPLR § 2201, staying this civil action until the related criminal action, currently captioned <u>USA v. Hanratty</u>, 23-mj-7566 (S.D.N.Y. 2023), reaches final judgment or is dismissed; and

b.    Granting Defendants  such other and further relief as the Court deems just and proper.

Sufficient reason having been alleged, and pending a hearing and further Order of this Court, it is

**ORDERED** that service of a copy of this Order, together with a copy of the papers in support  thereof,  made  upon Plaintiff by _____, on or before  the  _____ day  of _____ 2024, be deemed good and sufficient service; and it is

**ORDERED**, that any opposition to this motion be served by _____, 2024; and any reply be served by _____, 2024.

ENTER:

_____

Hon. Margaret Chan, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

      Plaintiff,

          v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB
1EMIALA LLC, EB 2EMIALA LLC, EB
1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB
1EMIMD, LLC, EB 2EMIMD, LLC, EB
1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB
1EMISC, LLC, EB 2EMISC, LLC, RE
1EMI LLC, RE 2EMI LLC, EB 1EMIDC,
LLC, ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC, EBURY FUND 1FL,
LLC, EBURY FUND 2FL, LLC, EBURY
FUND 1NJ, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, and EBURY
RE LLC,

      Defendants,

          v.

XYZ CORPS. 1-10,

      Defendants.

---

Index No. 158207/2022

The Honorable Margaret A. Chan

Mot. Seq. 8

**MEMORANDUM OF LAW IN
SUPPORT OF
ORDER TO SHOW CAUSE**

Defendants respectfully submit this memorandum in support of their motion to stay all proceedings in the above-captioned civil "**Action**" until the related "**Criminal Action**" reaches final judgment or is dismissed.

## BACKGROUND

On September 25, 2022, Plaintiff Emigrant Business Credit Corporation ("**EBCC**") filed a "**Civil Complaint**" initiating this Action. See generally Dkt. 1 (Sep. 25, 2022). The Civil Complaint's opening paragraph summarized EBCC's claims:

> This is an action for fraudulent inducement, fraudulent transfer, and breach of contract that stems from Defendants' fraudulent conversion of tens of millions of dollars' worth of EBCC's collateral. Defendants brazenly violated the terms of [ . . . ] "**Credit Agreements**"[] governing two ["**C]redit [F]acilities**["] that EBCC extended to Defendants beginning in 2017[], and later fraudulently induced EBCC to amend the Credit Agreements, including to obtain increases to Defendants' lines of credit. Defendants misappropriated advances under the Credit Facilities as well as EBCC's collateral to pay tens of millions of dollars in distributions to company insiders—including Defendant John Hanratty—as well as other investors. Defendants' actions violated strict contractual limitations in the Credit Agreements that required them to maintain the loan proceeds as EBCC's collateral. To facilitate the scheme, Defendants regularly falsified borrowing base certificates and other documents that they submitted to EBCC as the basis for receiving advances under the Credit Facilities. Defendants further used a web of sham corporate transactions—among companies controlled by Hanratty—to loot EBCC's collateral and loan proceeds. Indeed, according to a federal counterclaim filed by one of his former business partners[, Thomas McOsker], Hanratty openly bragged about the fact that he was defrauding EBCC.

Civil Compl. ¶ 1. EBCC's Civil Complaint also alleges that all 29 of the Ebury Entity Defendants are alter egos of Mr. Hanratty and of each other. Id. ¶¶ 18, 109, 116, 124.

On January 4, 2024, EBCC moved via order to show cause for civil and contempt findings, due to Defendants' alleged failure to comply with the Court's

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2042 of 2230

December 12, 2022 Preliminary Conference order. See Dkt. 97 (Jan. 4, 2024). The
Court has ordered that Defendants file opposition papers no later than today,
January 16, and that the parties appear on Friday, January 19. Dkt. 113 at 2, 4 (Jan.
10, 2024).

On Friday, EBCC moved for summary judgment on its breach-of-contract
claim. See Dkt. 120 (Jan. 12, 2024). Per the Parties' stipulation, Defendants'
opposition and cross-motion—in which Defendants had planned to move for summary
judgment dismissal of EBCC's fraudulent inducement and fraudulent transfer
claims—is due on February 2; EBCC's reply and cross-motion opposition are due on
February 23; and Defendants' reply is due on March 8. Dkt. 112 (Jan. 8, 2024).

On December 18, 2023, federal agents arrested Mr. Hanratty in connection
with a "**Criminal Complaint**," which was unsealed that same day. Affirmation of
Kari Parks ¶ 3 (Jan. 16, 2024) ("**Parks Aff.**"); id. Exhibit A, USA v. Hanratty
Criminal Complaint ("**Crim. Compl.**"). To craft the federal charges, a Federal
Bureau of Investigation ("**FBI**") agent had "conversations with representatives of"
and reviewed "records from [EBCC]" and had "conversations with" and reviewed
"records obtained from [Broker-1]," whom federal prosecutors have confirmed is
Thomas McOsker. Crim. Compl. ¶¶ 5, 7; Parks Aff. ¶ 6.

In the Criminal Complaint, which is being prosecuted by the United States
Attorney's Office ("**USAO**") for the Southern District of New York, federal authorities
have accused Mr. Hanratty of victimizing EBCC, and charged Mr. Hanratty with wire

fraud in violation of 18 U.S.C. § 1343 and bank fraud in violation of 18 U.S.C. § 1344.

Crim. Compl. ¶¶ 1–2.

The Criminal Complaint's first substantive paragraph largely repeats EBCC's

Civil Complaint summary:

> Hanratty, the defendant, was the Founder and Managing Director of Ebury Street Capital, LLC ("**ESC**"), an investment firm with a portfolio primarily comprised of municipal tax liens. Between in or around 2017 and in or around 2021, Hanratty participated in a fraudulent scheme to steal money from Victim Bank-1 [EBCC] by drawing down on approximately $20 million in commercial lines of credit that had been extended to [ESC]. Specifically, as further detailed below, Hanratty made materially false statements on spreadsheets (known as "borrowing base certificates") submitted by email to [EBCC] summarizing the value of the municipal tax liens that [ESC] was offering as collateral for its commercial line of credit. As a result of these false statements on [ESC's] borrowing base certificates, [EBCC] paid [ESC] large sums of money to which it was not entitled. The false statements on [ESC's] borrowing base certificates included, among other things: (1) listing large quantities of municipal tax liens on the borrowing base certificates that [ESC] did not own; and (2) double-counting municipal tax liens by listing the same liens on multiple borrowing base certificates. Additionally, although [ESC] was contractually required to use the money from [EBCC] either to purchase municipal tax liens or for ordinary business expenses, Hanratty actually used portions of the money obtained from [EBCC] to pay off [ESC's] investors—who themselves were threatening to sue and who, in fact, sued [ESC] and Hanratty after [ESC] was unable to pay investors who were seeking to pull out their investments from the fund. [ESC's] commercial line of credit has now been completely exhausted, and [ESC] owes over $20 million in principal and interest to [EBCC].

Crim. Compl. ¶ 4.

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:36 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 150    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/16/2024

Court Records    Pg 2044 of 2230

## LEGAL STANDARD

This Court "may grant a stay of proceedings in a proper case, upon such terms as may be just." CPLR § 2201; <u>Britt v. Int'l Bus Servs., Inc.</u>, 255 A.D.2d 143, 144 (1st Dep't 1998) (holding that Supreme Court abused its discretion when it denied motion to stay civil case while related criminal case was pending).

"Although the pendency of a criminal proceeding does not give rise to an absolute right under the United States or New York State Constitutions to a stay of a related civil proceeding [ . . . ] there is no question but that the court may exercise its discretion to stay proceedings in a civil action until a related criminal dispute is resolved." <u>DeSiervi v. Liverzani</u>, 136 A.D.2d 527, 527 (2d Dep't 1988) (citations omitted).

A "compelling factor" favoring a stay is present when the party's Fifth Amendment rights are at stake. <u>Britt</u>, 255 A.D.2d at 144. Other relevant factors include "avoiding the risk of inconsistent adjudicators, [duplication] of proof[,] and potential waste of judicial resources." <u>Id.</u>

New York courts routinely stay civil actions in which a party is simultaneously defending himself against parallel criminal cases arising out of the same underlying facts. <u>See, e.g.</u>, <u>Britt</u>, 255 A.D.2d at 144; <u>Mook v. Homesafe Am. Inc.</u>, 144 A.D.3d 1116, 1117 (2d Dep't 2016) (affirming stay of civil proceeding pending the resolution of a related criminal proceeding); <u>Cornier v. Massanova</u>, 35 A.D.3d 3431, 341 (2d Dep't 2006) (reversing Supreme Court's refusal to stay civil action pending resolution of related criminal prosecution); <u>Zonghetti v. Jeromack</u>, 150 A.D.2d 561, 562 (2d Dep't

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:36 PM INDEX NO. 158207/2022

NYSCEF DOC. NO.: 150    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/16/2024
Court Records    Pg 2045 of 2230

1989) (affirming trial court's grant of motion to stay civil action pending completion of related criminal action); <u>Peralta-Mera v. Streep</u>, No. 157258/2020, 2021 WL 1213451, at *5 (Sup. Ct. Mar. 31, 2021) (Jaffe, J.) (<u>inter alia</u>, granting motion to stay pending resolution of related criminal action); <u>Thomas v. Zuniga</u>, No. 500931/22, 2023 WL 2131358, at *1 (Sup. Ct. Feb. 16, 2023) (Rothenberg, J.) (granting two defendants' motion to stay civil proceeding that "arise[s] from the same facts" as pending criminal proceedings against them); <u>Garden City Irrigation, Inc. v. Salamanca</u>, 801 N.Y.S.2d 234 (Sup. Ct. 2005) (Austin, J.) (staying civil action to enjoin a former employee from transferring property pending a criminal prosecution for grand larceny, reasoning that "the resolution of the criminal action may result in this case either not requiring discovery or a trial, or significantly simplify and streamline discovery and trial"); <u>Budget Mortgage Bankers, Ltd. v. Maza</u>, 799 N.Y.S.2d 159 (Sup. Ct. 2004) (Austin, J.) (staying civil action pending disposition of criminal grand larceny charges in order to conserve judicial resources and potentially avoid liability trial, as well as to avoid inconsistent verdicts).

That is because a criminal defendant's constitutional right against self-incrimination is more important than a plaintiff's interest in a swift civil resolution. <u>Accord, e.g.</u>, <u>Britt</u>, 255 A.D.2d at 144 (citing, 136 A.D.2d at 528 (2d Dep't 1988)) ("A compelling factor is a situation where a defendant will invoke his or her constitutional right against self-incrimination."); <u>DeSiervi</u>, 136 A.D.2d at 527 (citing <u>Dienstag v. Bronsen</u>, 49 F.R.D. 327, 329 (S.D.N.Y. 1970)) ("While the stay of the instant action pending the resolution of the criminal prosecution may cause inconvenience and

6

delay to the plaintiff, the protection of Mr. Cavalier's constitutional right against self-incrimination is the more important consideration.").

Moreover, allowing the criminal case to go forward can significantly streamline the work left in the parallel civil case, as a criminal conviction must be proven beyond a reasonable doubt and therefore has the effect of collateral estoppel, simplifying or even eliminating any remaining issues that must be determined via summary judgment or trial. Id. (citing Merchants Mut. Ins. Co. v. Arzillo, 98 A.D.2d 495, 501–04 (2d Dep't 1984); Texaco, Inc. v. Borda, 383 F.2d 607, 609 (3d Cir. 1967); Clark v. United States, 624 F.2d 3, 3 (2d Cir. 1980)); see also Merchants, 98 A.2d at 501 ("a guilty plea is equivalent to a conviction after trial for issue preclusion purposes and [ . . . ] precludes relitigation in a subsequent civil action of all issues necessarily determined by the conviction"); El-Dehdan v. El-Dehdan, 26 N.Y.3d 19, 38 (2015) (inter alia, affirming Supreme Court's decision to draw a negative inference against a respondent who invoked the Fifth Amendment in opposition to a contempt motion).

For example, in the seminal case of Britt, the plaintiff was seriously injured when a bus, driven by one of the defendants, overturned on the parkway during a snowstorm. 255 A.D.2d at 144. After criminal authorities pressed charges against the bus driver, all of the civil defendants moved to stay the civil action. Id. While the trial court denied defendants' stay motion, the First Department reversed, recognizing that the indicted defendant intended to assert his Fifth Amendment rights in the civil action and that without him, the remaining plaintiffs would be unable to assert competent defenses. Id.

7

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:36 PM
NYSCEF DOC. NO. 150
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/16/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2047 of 2230

In <u>DeSiervi</u>, meanwhile, the Second Department affirmed the grant of a stay, finding that the criminal action's resolution could collaterally estop and simplify any remaining related civil proceedings. 136 A.D.2d at 528. In <u>Mook</u>, the Second Department again affirmed the trial court's grant of the defendant's motion to stay because the civil and criminal proceedings arose from the same facts, and failing to grant the stay would cause defendant the "severe prejudice of being deprived of a defense." 144 A.D.3d at 1117 (quoting <u>Matter of Astor</u>, 62 A.D.3d 867, 869 (2d Dep't 2009); citing <u>Britt</u>, 255 A.D.2d at 144).

And in <u>Burgdof</u>, the Fourth Department affirmed the grant of a stay where the trial court had found that the civil and criminal proceedings were "sufficiently similar such that the goals of preserving judicial resources and preventing an inequitable result are properly served." <u>Burgdorf v. Kasper</u>, 83 A.D.3d 1553, 1556 (4th Dep't 2011) (quoting <u>Finger Lakes Racing Ass'n v. New York Racing Ass'n</u>, 28 A.D.3d 1208, 1209 (4th Dep't 2006)).

## ARGUMENT

Because EBCC's Civil Complaint arises out of exactly the same facts as the Criminal Complaint, the Court should exercise its discretion to stay this civil Action.

Both the Civil Complaint and Criminal Complaint allege that Mr. Hanratty (1) used falsified borrowing bases to trick EBCC into extending credit lines to the Entity Defendants, (2) wrongfully included assets that actually were owned by Mr. McOsker, not Defendants, (3) used EBCC's loans to redeem Entity Defendants' investors, and therefore (4) caused EBCC over $20 million in damages. In fact, in moving for

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2048 of 2230

contempt sanctions against Defendants, EBCC's counsel, himself, affirmed that the Criminal Complaint's allegations are nearly identical to those pursued by EBCC in this civil Action. See Dkt. 99, Affirmation of Alexander J. Willscher ¶ 4 (Jan. 4, 2024).

Moreover, it appears that in prosecuting their respective Complaints, EBCC and the USAO even rely on the same witnesses and the same facts: EBCC personnel had multiple conversations with the USAO, and both EBCC's and the USAO's Complaints rely on the same documents, including borrowing base certificates and public filings in Defendants' litigations against former Entity Defendant investors and Mr. McOsker.

Therefore, granting this Motion would serve all of the reasons why New York courts stay parallel civil litigations. Staying this action would promote judicial economy and preserve this Court's and the parties' resources, since a final criminal judgment adverse to Mr. Hanratty would estop his defenses to all three of EBCC's Civil Complaint claims, including its fact-intensive fraudulent transfer and fraudulent inducement claims. Given the USAO's standard practices of seeking forfeiture and restitution, final judgment in the Criminal Action would even eliminate this Court's need to determine damages.

Staying this Civil Action also would protect Mr. Hanratty's Fifth Amendment rights: although discovery is complete in this case, Mr. Hanratty and the other Defendants must file their combined summary judgment papers in less than three weeks. Accord Mook, 144 A.D.3d at 1117 (citations omitted) (failing to stay would cause defendant the "severe prejudice of being deprived of a defense" in the civil case);

see also Indigo v. Finkelstein, 23 N.Y.2d 728, 729 (1968) (parties opposing summary judgment must submit "evidentiary facts or materials, by affidavit or otherwise [ . . . ] demonstrating the existence of a triable issue of ultimate fact.").

Furthermore, while only Mr. Hanratty currently is facing criminal charges, the Court should stay this Civil Action against all of the Entity Defendants, particularly since EBCC has alleged that all of the Entity Defendants are alter egos of each other and Mr. Hanratty. Compl. ¶¶ 18, 109, 116, 124. It would be highly prejudicial to force the Entity Defendants to keep litigating this case while Mr. Hanratty faces related federal felony charges: he is their ultimate managing member; served as the corporate witness for all of the Entity Defendants; and, as a practical matter, is the only human with the ability to produce information and speak on behalf of the Entity Defendants. Accord Britt, 255 A.D.2d at 144 (reversing denial of motion to stay, holding that all defendants were entitled to stay even though only one of them was facing criminal charges, since defendants "would be unable to assert a competent defense" unless the criminally-charged defendant fully participated in the civil case, despite the fact that discovery already had closed).

Finally, Mr. Hanratty's Fifth Amendment rights, as well as interests in judicial efficiency, economy, and consistency, outweigh any potential prejudice to EBCC. Accord id. ("[W]hile there may be prejudice to plaintiff by the delay, his prejudice is not as severe as defendants would suffer without a stay."). Even then, it not clear that a stay would truly prejudice EBCC: particularly given Speedy Trial Constraints, it is

not a given that final judgment in this Civil Action would issue before final judgment in the Criminal Action.

Moreover, if Mr. Hanratty were found guilty in the Criminal Action, EBCC would not need to spend further time, energy, and money to prove its contract damages, let alone meet its "clear and convincing" burden to prove fraudulent conveyance or fraudulent inducement. See Gaidon v. Guardian Life Ins. Co., 94 N.Y.2d 330, 350 (1999) (plaintiff must prove fraudulent inducement by "clear and convincing evidence"); Symbax, Inc. v. Bingaman, 219 A.D.2d 552, 553 (1st Dep't 1995) (fraudulent conveyance).

## CONCLUSION

There is complete overlap between EBCC's civil allegations against Defendants and the USAO's criminal charges against Mr. Hanratty. Therefore, Defendants respectfully request that the Court exercise its discretion to stay this Civil Action until the related Criminal Action reaches final judgment or is dismissed.

Dated: January 16, 2024
         New York, New York

                              Respectfully submitted,

                              **GUSRAE KAPLAN NUSBAUM PLLC**

                              /s/ Kari Parks
                              Kari Parks
                              120 Wall Street, 25th Floor
                              New York, New York 10005
                              (212) 269-1400
                              kparks@gusraekaplan.com

                              Counsel for Defendants

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:36 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 150 RECEIVED NYSCEF: 01/16/2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with Commercial

Division Rule 17, 22 NYCRR § 202.70(g), because it contains 2,628 words, as

calculated by Microsoft Word's Word Count function.

Dated: January 16, 2024
        New York, New York

/s/ Kari Parks
Kari Parks

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

Plaintiff,

v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

Defendants.

The Honorable Margaret A. Chan
Index No. 158207/2022

Mot. Seq. 8

## AFFIDAVIT OF KARI PARKS PURSUANT TO CPLR 2217(b)

STATE OF NEW YORK            )
                             ) ss.:
COUNTY OF NEW YORK           )

Kari Parks, being duly sworn, deposes and says under the penalties of perjury:

1.      I am a partner of the law firm Gusrae Kaplan Nusbaum PLLC, counsel for

the Ebury Parties in the above-captioned matter and I submit this affidavit to replace

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:36 PM
NYSCEF DOC. NO. 151

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/19/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2053 of 2230

the affirmation in support of the Ebury Parties' proposed order to show cause, Motion Sequence 8, that I filed on January 16, 2024.

2.     The Ebury Parties have moved, pursuant to Civil Practice Law and Rules §2201, for an order (the "**Motion**") requiring EBCC to show cause why the Court should not be issued granting a stay of the current proceeding due to the related criminal action pending in the federal district court for the Southern District of New York.

3.     Pursuant to CPLR 2217(b), the Ebury Parties have not previously moved for the relief sought by this Motion, brought by order to show cause.

4.     The above-entitled action was brought against the Ebury Parties for fraudulent inducement, fraudulent transfer, and breach of contract.

5.     The above-entitled action was commenced by service of the summons and complaint upon the Ebury Parties on the 25th day of September, 2022.

6.     On December 18, 2023, Federal Bureau of Investigation agents arrested Defendant John Hanratty in connection with a "**Criminal Complaint**" that was unsealed the same day.

7.     Annexed as Exhibit A is a true and correct copy of the Criminal Complaint in the action captioned United States of America v. John Arthur Hanratty, 23-mj-7566 (S.D.N.Y.) (the "**Criminal Action**").

8.     I represent Mr. Hanratty in the Criminal Action.

9.     Assistant United States Attorneys have confirmed that Plaintiff Emigrant Business Credit Corporation is "Victim Bank-1" identified in the Criminal Complaint, and that Thomas McOsker is "Broker-1" identified in the Criminal Complaint.

2

WHEREFORE, the Ebury Parties respectfully request for an order, pursuant to Civil Practice Law and Rules §2201, requiring EBCC to show cause before the Court why an order should not be issued granting a stay of this action during the pendency of the related federal criminal case.

Dated: January 19, 2024
    New York, New York

                        Respectfully submitted,

                        Kari Parks

**STATE OF NEW YORK**       )
                        ) ss.:
**COUNTY OF NEW YORK**    )

On this day, before me personally appeared Kari Parks, to me known, who, being by me duly sworn, personally known to me or proved to me on the basis of satisfactory evidence to be the individual who in my presence executed the foregoing, in her individual capacity, and in my presence duly acknowledged to me that he executed the same.

Notary Public

WENDY RABINER
NOTARY PUBLIC, STATE OF NEW YORK
REGISTRATION NO. 01RA6311420
QUALIFIED IN RICHMOND COUNTY
COMMISSION EXPIRES _____

3

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:36 PM

NYSCEF DOC. NO. 152

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/16/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2055 of 2230

# EXHIBIT A

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2056 of 2230

AUSAs: Andrew K. Chan and Nicholas Chiuchiolo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JOHN ARTHUR HANRATTY,

Defendant.

# 23 MAG 7566

## SEALED COMPLAINT

Violations of 18 U.S.C. §§ 1343, 1344

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

LAUREN COLLINS, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Wire Fraud)

1.      From at least in or about 2017 through at least in or about 2021, in the Southern District of New York and elsewhere, JOHN ARTHUR HANRATTY, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, HANRATTY engaged in scheme to make false statements to a bank ("Victim Bank-1") insured by the Federal Deposit Insurance Corporation (the "FDIC") in order to fraudulently obtain money from HANRATTY's line of credit with Victim Bank-1, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
### (Bank Fraud)

2.      From at least in or about 2017 through at least in or about 2021, in the Southern District of New York and elsewhere, JOHN ARTHUR HANRATTY, the defendant, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:36 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO. 152     24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/16/2024
                                       Court Records          Pg 2057 of 2230

wit, HANRATTY engaged in scheme to make false statements to Victim Bank-1 in order to obtain money from HANRATTY's line of credit with Victim Bank-1.

(Title 18, United States Code, Sections 1344 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.      I am a Special Agent with the FBI and am currently assigned to a squad that primarily investigates securities fraud and other complex white-collar frauds. I have received training and have participated in investigations of financial crimes, including crimes involving financial institutions. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## OVERVIEW

4.      As detailed below, JOHN ARTHUR HANRATTY, the defendant, was the Founder and Managing Director of Ebury Street Capital, LLC ("Ebury Street Capital"), an investment firm with a portfolio primarily comprised of municipal tax liens. Between in or around 2017 and in or around 2021, HANRATTY participated in a fraudulent scheme to steal money from Victim Bank-1 by drawing down on approximately $20 million in commercial lines of credit that had been extended to Ebury Street Capital. Specifically, as further detailed below, HANRATTY made materially false statements on spreadsheets (known as "borrowing base certificates") submitted by email to Victim Bank-1 summarizing the value of the municipal tax liens that Ebury Street Capital was offering as collateral for its commercial line of credit. As a result of these false statements on Ebury Street Capital's borrowing base certificates, Victim Bank-1 paid Ebury Street Capital large sums of money to which it was not entitled. The false statements on Ebury Street Capital's borrowing base certificates included, among other things: (1) listing large quantities of municipal tax liens on the borrowing base certificates that Ebury Street Capital did not own; and (2) double-counting municipal tax liens by listing the same liens on multiple borrowing base certificates. Additionally, although Ebury Street Capital was contractually required to use money from Victim Bank-1 either to purchase municipal tax liens or for ordinary business expenses, HANRATTY actually used portions of the money obtained from Victim Bank-1 to pay off Ebury Street Capital's investors—who themselves were threatening to sue and who, in fact, sued Ebury Street Capital and HANRATTY after Ebury Street Capital was unable to pay investors who were seeking to pull out their investments from the fund. Ebury Street Capital's commercial line of credit has now been completely exhausted, and Ebury Street Capital owes over $20 million in principal and interest to Victim Bank-1.

## BACKGROUND ON EBURY STREET CAPITAL

5.      Based on my training and experience, my conversations with representatives of Victim Bank-1, my review of publicly available information regarding Ebury Street Capital, and

my personal involvement in this investigation, I have learned the following, in substance and in part, regarding Ebury Street Capital and its commercial line of credit with Victim Bank-1:

    a.  Ebury Street Capital is an investment firm that was founded by JOHN ARTHUR HANRATTY, the defendant, in or around 2010.  At all relevant times, HANRATTY served as the Managing Director and Principal for Ebury Street Capital, which manages two different funds known as Ebury Fund 1 and Ebury Fund 2.  HANRATTY has been an attorney licensed to practice law in the State of New York since in or around 2002 and has previously held legal and compliance positions at well-known investment firms and financial institutions, including serving as the Chief Compliance Officer and General Counsel for a trading broker dealer.  HANRATTY resided in Rye, New York until in or around 2019, when he relocated to San Juan, Puerto Rico.

    b.  Ebury Street Capital primarily invests in municipal tax liens, which are liens placed on real property by municipal governments for delinquent property taxes and other fees owed by property owners.  Municipal governments typically sell municipal tax lien certificates to the highest bidder at public auctions.  Investors frequently purchase tax lien certificates because: (1) municipal tax liens earn a high rate of interest (frequently between 10% to 36% annually) until the underlying taxes are repaid (and the lien is "redeemed") by the property owner; and (2) municipal tax liens frequently provide a path for investors to foreclose on the underlying property and potentially gain ownership of the underlying real estate.  Within the municipal tax lien investment industry, municipal tax liens are typically valued by: (a) the amount of outstanding taxes or fees owed to the municipality (known as the "face value"); (b) the amount of taxes and fees owed plus all accrued interest required to redeem a property and satisfy the lien (known as the "redemptive value"); or (c) the fair market value of the underlying real estate.

    c.  Victim Bank-1 is headquartered in Manhattan and operates a commercial lending business through which it provides loans to various businesses, including investment firms.  In or around 2016, HANRATTY approached Victim Bank-1 to apply for a commercial line of credit for Ebury Street Capital.  HANRATTY represented to representatives of Victim Bank-1 that the purpose of Ebury Street Capital's commercial line of credit would be for HANRATTY to invest in municipal tax liens earning a high rate of interest—an interest rate that would exceed the interest charged by Victim Bank-1 on the line of credit.  HANRATTY claimed to have significant experience in purchasing municipal tax liens and to have been investing in tax liens since 2009.

    d.  In or around March 2017, Victim Bank-1 agreed to extend a $10 million commercial line of credit to Ebury Fund 1 and a $5 million commercial line of credit to Ebury Fund 2.  In or around October 2018, Victim Bank-1 agreed to expand these commercial lines of credit by an additional $3.5 million.  In or around September 2019, Victim Bank-1 agreed to expand these commercial lines of credit by an additional $1.5 million, for a total of $20 million.  To memorialize these commercial lines of credit, HANRATTY signed credit agreements on behalf of Ebury Fund 1 and Ebury Fund 2.  The credit agreements restricted Ebury Street Capital's use of the funds from the line of credit to the purchase of tax liens and ordinary and necessary business expenses.  Prior to obtaining any money from Victim Bank-1, Ebury Street Capital was required to submit a spreadsheet known as a "borrowing base certificate" that summarized the unencumbered municipal tax liens being offered as collateral for the line of credit.  The borrowing bases used a formula allowing Ebury Street Capital to borrow a certain percentage (typically between 80% to 90%, depending on the municipality) of the redemptive value of the municipal tax lien.  So, for example, if Ebury Street Capital placed new municipal tax liens into a borrowing

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:36 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO.: 152
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records      Pg 2059 of 2230
RECEIVED NYSCEF: 01/16/2024

base certificate, their potential borrowing ability increased. Similarly, if batches of municipal tax liens were redeemed or sold, then Ebury Street Capital's borrowing base decreased. Because of the importance of the accuracy and truthfulness of these borrowing base spreadsheets, HANRATTY was required to sign each borrowing base certificate and certify as to its accuracy.

e.   The total loan balance on Ebury Fund 1's and Ebury Fund 2's lines of credit with Victim Bank-1 generally hovered below approximately $5 million until in or around the Summer of 2018, when Ebury Street Capital began to borrow heavily from the lines of credit with Victim Bank-1.  By in or around September 2018, Ebury Street Capital had borrowed approximately $15 million from its lines of credit, and by in or around December 2019, Ebury Street Capital had nearly exhausted the $20 million available through its lines of credit with Victim Bank-1.

f.   In or around March 2021, Ebury Street Capital failed to pay off its outstanding loan to Victim Bank-1 by the original maturity date, which was then extended several additional times until in or around November 2021, by which time Ebury Street Capital owed over $18 million in outstanding principal and interest.  Since in or around October 2021, Ebury Street Capital has failed to make any principal or interest payments to Victim Bank-1.

### FALSE STATEMENTS IN EBURY STREET CAPITAL'S BORROWING BASE CERTIFICATES

6.   As further discussed below, the FBI has identified numerous false statements in Ebury Street Capital's borrowing base certificates that were submitted by JOHN ARTHUR HANRATTY, the defendant, to Victim Bank-1 to obtain additional funds to which Ebury Street Capital was not entitled.  These false statements include (1) listing large quantities of municipal tax liens on borrowing base certificates that Ebury Street Capital did not actually own; and (2) double-counting municipal tax liens by listing the same liens on multiple borrowing base certificates.  Some examples of these false statements are described below.

7.   Based on my review of records from Victim Bank-1, my conversations with representatives of Victim Bank-1, my conversations with the CEO and owner of a brokerage firm for municipal tax liens that did business with Ebury Street Capital ("Broker-1"),[1] and my review of bank records, records obtained from Broker-1, and other records obtained during the course of the investigation, I have learned the following, in substance and in part:

*Ebury Fund 2 - October 15, 2018 Borrowing Base Certificate and*
*January 9, 2020 Borrowing Base Certificate*

a.   On or about October 15, 2018, an Ebury Street Capital employee located outside of the United States submitted by email to Victim Bank-1, located in Manhattan, a borrowing base certificate signed by JOHN ARTHUR HANRATTY, the defendant, containing a spreadsheet titled "NJ Additions" with a purported value of approximately $85,000.  The spreadsheet contained

---

[1] Based on my review of publicly available court records, I know that in or around February 2021, Ebury Street Capital filed a lawsuit against Broker-1 in the United States District Court for the District of Delaware alleging, among other things, violations of the racketeering laws, fraudulent inducement to contract, breach of contract, and unjust enrichment.  Broker-1 has filed counterclaims in the litigation alleging similar claims against Ebury Street Capital.

information regarding approximately 44 tax liens from various municipalities in New Jersey. The "NJ Additions" sheet in the borrowing base certificate contains the name of Broker-1 and contained information typically held by Broker-1 for each of the liens, including a unique identification number for each lien used by Broker-1. Based on my conversations with the CEO of Broker-1, HANRATTY inquired with Broker-1 about purchasing the book of liens described in the "NJ Additions" spreadsheet on behalf of Ebury Street Capital, but the transaction did not occur. Based on this information from Broker-1 and my review of Ebury Street Capital's bank records and internal accounting records, I believe that HANRATTY falsely represented to Victim Bank-1 that Ebury Street Capital owned the tax liens in the "NJ Additions" spreadsheet and offered the liens as collateral.

        b.      As a result of the inclusion of the "NJ Additions" spreadsheet in the borrowing base certificate, HANRATTY falsely certified to Victim Bank-1 that the value of Ebury Fund 2's collateral was approximately $4.65 million. Based on this collateral valuation and the previous loan balance of approximately $4.56 million, HANRATTY falsely certified that Ebury Street Capital was entitled to borrow an additional $85,500 from Ebury Fund 2's line of credit.

        c.      Based on my review of bank records, I know that on or about October 15, 2018, Victim Bank-1 transferred approximately $75,000 to Ebury Fund 2 in reliance on the false borrowing base certificate. The money was then transferred from Ebury Fund 2 to Ebury Fund 1, shortly after Ebury Fund 1 had disbursed on or about October 11, 2018 approximately $340,000 to two individuals that, based on the names of the individuals and publicly available information, appear to be investors in Ebury Street Capital.

        d.      On or about January 9, 2020, Ebury Street Capital submitted to Victim Bank-1 a borrowing base certificate signed by HANRATTY containing a spreadsheet titled "NJ Additions" that contained approximately 44 tax liens from various municipalities in New Jersey. The "NJ Additions" spreadsheet in the borrowing base certificate contains the name of Broker-1 and appears to be nearly identical in all material respects to the "NJ Additions" spreadsheet in the October 15, 2018 borrowing base certificate. In connection with the submission of this borrowing base certificate, HANRATTY wrote in the subject line of the email sent to Victim Bank-1: "Fund 2 – we bought some subs." Based on my training, experience, and participation in this investigation, I believe that "subs" frequently refer to subsequent tax liens that are placed on a particular property for additional years where taxes are owed by a property owner to a municipality. As a result, in this borrowing base certificate, I believe that HANRATTY was representing that Ebury Fund 2 had purchased tax liens for additional years on the same liens that were listed in the "NJ Additions" sheet in the October 15, 2018 borrowing base certificate—a batch of tax liens and subsequent tax liens that Ebury Street Capital did not actually own.

        e.      As a result of the inclusion of the "NJ Additions" spreadsheet in the January 9, 2020 borrowing base certificate, HANRATTY falsely certified to Victim Bank-1 that the value of Ebury Fund 2's collateral was approximately $4.85 million. Based on this collateral valuation and the previous loan balance of approximately $4.73 million, HANRATTY falsely certified that Ebury Street Capital was entitled to borrow an additional approximately $132,000 from Ebury Fund 2's line of credit.

        f.      Based on my review of bank records, I know that on or about January 10, 2020, Victim Bank-1 transferred approximately $125,000 to Ebury Fund 2 in reliance on the false

borrowing base certificate. Those funds, in turn, were distributed to various Ebury bank accounts, including $10,000 that was quickly transferred through multiple Ebury accounts and then to HANRATTY's American Express account.

*Ebury Fund 1 – November 9, 2018 Borrowing Base Certificate and*
*February 8, 2019 Borrowing Base Certificate*

g.   On or about November 9, 2018, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY containing a spreadsheet titled "FL Additions" that contained approximately 60 tax liens from various municipalities in Florida.  The "FL Additions" spreadsheet in the borrowing base certificate did not contain the name of Broker-1, but contained information typically held by Broker-1 for each of the liens, including, for example, a unique identification number for each lien used by Broker-1.  Based on my conversations with the CEO of Broker-1, HANRATTY inquired about purchasing the book of liens described in the "FL Additions" spreadsheet on behalf of Ebury Street Capital in or around October 2018, but the transaction did not occur.

h.   Based on my personal involvement in this investigation, I know that an external contractor was hired to conduct an analysis on a random sample of approximately 15 percent of the 60 tax liens listed in the "FL Additions" spreadsheet.  Based on this analysis of the publicly-available records for these randomly-selected tax liens, it did not appear that Ebury Street Capital ever became the registered owner of the tax liens in the "FL Additions" spreadsheet.

i.   As a result of the inclusion of the "FL Additions" spreadsheet in the November 9, 2018 borrowing base certificate, HANRATTY falsely certified to Victim Bank-1 that the value of Ebury Fund 1's collateral was approximately $9.55 million.  Based on this collateral valuation and the previous loan balance of approximately $9.33 million, HANRATTY falsely certified that Ebury Street Capital was entitled to borrow an additional approximately $220,000 from Ebury Fund 1's line of credit.

j.   Based on my review of bank records, I know that on or about November 9, 2018, Victim Bank-1 transferred approximately $220,000 to Ebury Fund 1 in reliance on the false borrowing base certificate.  Later that day, Ebury Fund 1 disbursed approximately $288,000 to an individual who, according to Victim Bank-1 and publicly available information, was a representative of an investor in Ebury Street Capital.

k.   Approximately three months later, on or about February 8, 2019, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY attaching a spreadsheet titled "FL Additions," which appeared to be identical in all material respects to the false "FL Additions" spreadsheet included in the November 9, 2018 borrowing base certificate described above in paragraph 7(g).  In other words, HANRATTY on two separate occasions fraudulently offered the same batch of tax liens as collateral to Victim Bank-1.  Based on my conversations with the CEO of Broker-1, the analysis by the external contractor described above, and my review of Ebury Street Capital's bank records and internal accounting records, I believe that HANRATTY falsely represented to Victim Bank-1 that Ebury Street Capital owned the batch of liens listed in the "FL Additions" spreadsheet at the time when they were listed in the November 9, 2018 and February 8, 2019 borrowing base certificates.

l.    As a result of the inclusion of the "FL Additions" spreadsheet in the February 8, 2019 borrowing base certificate, HANRATTY falsely certified to Victim Bank-1 that the value of Ebury Fund 1's collateral was approximately $9 million. Based on this collateral valuation and the previous loan balance of approximately $8.52 million, HANRATTY falsely certified that Ebury Street Capital was entitled to borrow an additional $482,000 from Ebury Fund 1's line of credit.

m.    Based on my review of bank records, I know that on or about February 8, 2019, Victim Bank-1 transferred approximately $460,000 to Ebury Fund 1 in reliance on the false borrowing base certificate.

*Ebury Fund 1 – March 21, 2019 Borrowing Base Certificate and*
*May 17, 2019 Borrowing Base Certificate*

n.    On or about March 21, 2019, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY containing a spreadsheet titled "NJ Additions #2" that contained approximately 385 tax liens from various municipalities in New Jersey. As a result of the inclusion of this sheet, HANRATTY falsely certified to Victim Bank-1 that there was approximately $2.1 million of available money to be borrowed under Ebury Fund 1's line of credit. Based on my review of bank records, I know that on or about March 22, 2019, Victim Bank-1 transferred approximately $1.675 million to Ebury Fund 1 on or about March 22, 2019.

o.    On or about May 17, 2019, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY containing a spreadsheet titled "NJ Additions #3" that contained approximately 344 tax liens from various municipalities in New Jersey. As a result of the inclusion of this sheet, HANRATTY falsely certified to Victim Bank-1 that there was approximately $860,000 of available money to be borrowed under Ebury Fund 1's line of credit. Based on my review of bank records, I know that on or about May 17, 2019: (1) approximately $860,000 was transferred from Victim Bank-1 to Ebury Fund 1; (2) approximately $350,000 was transferred from Ebury Fund 2 to Ebury Fund 1; and (3) approximately $1.2 million was transferred from Ebury Fund 1 to a business entity that, based on publicly available information and according to Victim Bank-1, was an investor in Ebury Street Capital. Based on my review of Ebury Street Capital's internal accounting records, I know that the $1.2 million payment was described in Ebury Street Capital's records as a "Settlement with the investor."

p.    Based on my comparison of the "NJ Additions #2" spreadsheet in the March 21, 2019 borrowing base certificate and the "NJ Additions #3" spreadsheet in the May 17, 2019 borrowing base certificate, it appears that approximately 70 percent of the liens in the "NJ Additions #2" spreadsheet reappeared on the "NJ Additions #3" spreadsheet. In other words, it appears that HANRATTY fraudulently obtained money from Victim Bank-1 by double-counting over 200 municipal tax liens.

## MISAPPROPRIATION OF FUNDS FROM VICTIM BANK-1 TO PAY INVESTORS

8.    Based on my review of publicly available court records, I know that in or around January 2019, Ebury Street Capital was sued by a group of investors (the "Plaintiff Investors") in Westchester County Supreme Court, who alleged, in substance and in part, that in or around June

2018, the Plaintiff Investors notified Ebury Street Capital of their intent to withdraw their investments in the company. However, as of the time the lawsuit was filed, Ebury Street Capital had not been able to pay the Plaintiff Investors. *See Brinker-Cohen Family Trust et al. v. Ebury Fund I, LP et al.*, No. 50611/2019 (Sup. Ct. Westchester Cnty. Jan. 9. 2019). Based on my conversations with a representative of Victim Bank-1, I know that JOHN ARTHUR HANRATTY, the defendant, did not inform Victim Bank-1 of this lawsuit, in violation of the credit agreements signed by HANRATTY. As further described below, on various dates that Ebury Street Capital submitted borrowing base certificates requesting funds from Victim Bank-1 to purchase municipal tax liens, it appears that Ebury Street Capital instead used the funds to pay investor distributions—in violation of the credit agreements signed by JOHN ARTHUR HANRATTY, the defendant. Based on my review of bank records, Ebury Street Capital's accounting records, and records from Victim Bank-1, I have learned the following, among other things:

a. On or about November 9, 2018, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY, which resulted in Victim Bank-1 providing approximately $220,000 to Ebury Fund 1 for the purpose of purchasing municipal tax liens and ordinary business expenses. Ebury Street Capital's accounting records do not record any purchases of liens on or about that day; however, the records indicate a transfer of approximately $280,000 as an "Investor withdrew." The records additionally indicate the name of an attorney who serves as a representative for one of the Plaintiff Investors. As a result, it appears that HANRATTY misappropriated funds provided by Victim Bank-1 to pay one of the Plaintiff Investors.

b. On or about May 17, 2019, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY, which resulted in Victim Bank-1 providing approximately $860,000 to Ebury Fund 1 for the purpose of purchasing municipal tax liens, as described above in ¶ 7(o). Ebury Street Capital's internal accounting records do not include records of any purchases of liens on or about that day; however, the records indicate a transfer of approximately $1.2 million as a "Settlement with the investor." Based on my review of bank records, it appears that this transfer was sent to one of the Plaintiff Investors.

c. On or about September 13, 2019, Ebury Street Capital submitted by email to Victim Bank-1 a borrowing base certificate signed by HANRATTY, which resulted in Victim Bank-1 providing approximately $850,000 to Ebury Fund 2 for the purpose of purchasing municipal tax liens. Ebury Street Capital's accounting records do not record any purchases of liens on or about that day; however, the records indicate two transfers totaling approximately $750,000 to two individuals ("Investor-1" and "Investor-2"). Based on my conversations with Investor-1, I know that Investor-1 had been seeking to withdraw Investor-1's investments in Ebury Street Capital around the time of this transfer.

9.    Based on my conversations with representatives of Victim Bank-1, Ebury Street Capital and JOHN ARTHUR HANRATTY, the defendant, have not made any principal or interest payments on its commercial lines of credit since in or around October 2021. Ebury Street Capital currently owes Victim Bank-1 over $20 million in outstanding principal and interest.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2064 of 2230

WHEREFORE, I respectfully request that a warrant be issued for the arrest of JOHN ARTHUR HANRATTY, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

_s/ Lauren Collins /otw_____
Lauren Collins
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 15th day of December, 2023.

_____
THE HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2065 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

      Plaintiff,

         v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB
1EMIALA LLC, EB 2EMIALA LLC, EB
1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB
1EMIMD, LLC, EB 2EMIMD, LLC, EB
1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB
1EMISC, LLC, EB 2EMISC, LLC, RE
1EMI LLC,
RE 2EMI LLC, EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC, EBURY FUND 1FL,
LLC, EBURY FUND 2FL, LLC, EBURY
FUND 1NJ, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, and EBURY
RE LLC,

      Defendants,

         v.

XYZ CORPS. 1-10,

      Defendants.

---

Index No. 158207/2022

The Honorable Margaret A. Chan

Mot. Seq. 5

**MEMORANDUM OF LAW IN
OPPOSITION TO
<u>ORDER TO SHOW CAUSE</u>**

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:56 PM
NYSCEF DOC. NO. 153

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/16/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2066 of 2230

Defendants respectfully submit this memorandum in opposition to Plaintiff Emigrant Business Credit Corp.'s ("**EBCC**") contempt "**Motion**." <u>See</u> <u>Dkt. 113</u> (Jan. 10, 2024). Defendants respectfully request that the Court deny EBCC's Motion or, in light of Defendants' pending motion to stay this Civil Action while the parallel Criminal Action is pending, adjourn this Motion *sine die*.

## BACKGROUND

In September 2022, Plaintiff Emigrant Business Credit Corporation ("**EBCC**" and with the Ebury Parties, the "**Parties**") initiated the above-captioned "**Action**," suing the Ebury Parties for breach of contract, fraudulent inducement, and fraudulent transfer. <u>See generally</u> <u>Dkt. 1</u> (Sep. 25, 2022). Three weeks later, EBCC filed an order to show cause seeking temporary injunctive relief while this Action is pending. <u>Dkt. 2</u> (Oct. 17, 2022). Over the Ebury Parties' opposition, this Court granted EBCC's injunctive relief motion. <u>Dkt. 47</u> (Nov. 29, 2022) (the "**Preliminary Injunction Order**").

Among other terms, the Preliminary Injunction Order "temporarily restrain[s] and enjoin[s]" the Ebury Parties, (1) prohibiting them from transferring "any of their assets, aside from ordinary and necessary disbursements related to [the Ebury Parties'] tax lien or real estate business or living expenses;" (2) requiring them to escrow tax lien certificate or resulting real estate property proceeds, if those proceeds are not intended for "ordinary and necessary disbursements related to the [Ebury Parties'] tax lien or real estate businesses," and (3) requiring them to notify EBCC at least 24 hours before transferring any assets "exceeding $50,000." <u>Id.</u> at 8–9.

In the year since the Court issued the Preliminary Injunction Order, the Parties have cooperated fully in litigating this Action, from motion practice to exchanging hundreds of thousands of pages of documents to weeks of depositions, including EBCC's two-day, in-person deposition of Defendant John Hanratty, who is the Ebury Entities' managing member. Affirmation of Kari Parks ¶ 3 (Jan. 16, 2024) ("**Parks Aff.**").

Before this Motion, the only motions filed by the Parties were dispositive motions or stipulated briefing schedules; the Parties never once sought the Court's intervention or assistance to ensure that discovery moved forward. See generally Dkt. Indeed, EBCC's moving papers admit that while it initially "had serious concerns about" what it characterizes as "Defendants' repeated violations of the Preliminary Injunction Order, Defendants appeared to have come into compliance with the Court's order by the beginning of December 2023 (with [] one exception[]), so EBCC did not pursue the issue further with the Court." Dkt. 109 at 5 (Jan. 4, 2024) ("**Contempt Motion Brief**").

However, Mr. Hanratty was arrested, and a federal "**Criminal Complaint**" against him was unsealed, on January 18, 2024. See generally Dkt. 100, Affirmation of Alexander J. Willscher Exhibit A (Jan. 4, 2024) ("**Willscher Aff.**"). As EBCC's counsel has affirmed, that Criminal Complaint's allegations are nearly identical to those pursued by EBCC in this civil Action, and accuse Mr. Hanratty of fraudulently inducing EBCC's extension of credit to the Ebury Entities. See Dkt. 99, Willscher Aff. ¶ 4; see generally id. Exhibit A. The Criminal Complaint, which takes the form of a

sworn affidavit from a Federal Bureau of Investigations ("**FBI**") agent, is largely based on records provided by and conversations with EBCC. See, e.g., id. ¶¶ 5, 7, 8(a), 9. Mr. Hanratty's conditions of release require, inter alia, a $2 million bond secured by $400,000 in assets. Dkt. 101, Willscher Aff. Exhibit B.

Approximately two weeks later, EBCC filed this Motion, arguing that Defendants violated the Preliminary Injunction Order because, without prior notice to EBCC, (a) on December 11, 2023, Mr. Hanratty personally "made a bulk sale" of collateral with a "book value of $1.1 million" for $256,946.30," and (b) on December 20, 2023, Mr. Hanratty "transferred $75,000 to himself." Contempt Motion Brief at 2.

EBCC's Motion argues that Defendants concealed these and other allegedly-violative transactions from EBCC. Id. ("After further investigation, EBCC has discovered that its fears [that Defendants are violating the Preliminary Injunction Order) were well placed"); id. ("EBCC has discovered that, on December 11, 2023, Hanratty made a bulk sale of EBCC's tax lien collateral [ . . . ]"); id. at 2–3 ("EBCC's preliminary review has discovered additional violations" dated October 13, 2023; November 16 and 17, 2022; December 1, 6, and 19, 2022; and August 17, 2023); id. at 4 ("After the preliminary injunction issued, EBCC discovered that Defendants had repeatedly violated the temporary restraining order"); id. at 5 (EBCC's "belief [that Defendants had been complying with the Preliminary Injunction Order] was shattered yesterday when EBCC discovered new and very serious violations [ . . . ] dating back to October 2023"); see also generally id. (using the word "discovered" eight times in twelve-page brief).

However, EBCC also admits that Defendants, themselves, alerted EBCC to the allegedly-violative transactions. See id. at 5 ("Defendants' first monthly reporting [ . . . ] revealed" four allegedly-violative transactions); id. ("Subsequently monthly reporting [made by Defendants] revealed further violations"

Furthermore, Defendants gave EBCC continuous, open access to the Ebury Entities' live financial and operational records, including contracts for unconsummated transactions and records of actual transactions, no later than early 2022—approximately nine months before EBCC filed this lawsuit. Dkt. 24, Affidavit of John Hanratty ¶¶ 51–53 (Oct. 26, 2022). Indeed, at the outset of the case, Mr. Hanratty swore:

> To facilitate the [settlement] process, in January 2022, [Defendants] gave EBCC full access to all of their financial and operational records. The Ebury Parties use Quicbooks for financials of the Ebury Entities, Appfolio for the Financials of its real estate owned property ("**REO**"), ZOHO for managing the sales process and property oversight, and Speedboat for servicing the lien portfolios; the Ebury Entities track their seller-financed loan portfolio internally. For the last ten months, EBCC has had the login credentials to directly access these systems and acquire all information related to [Defendants'] assets. However, the software's audit trails show[] that EBCC did not bother to view the Ebury Entities' (1) Quickbooks account between June 2022 and October 24, 2022; (2) Appfolio between March 2022 and October 24, 2022; (3) Speedboat since August 16, 2022; and (4) ZOHO between June 2022 and October 24, 2022. [ . . . ] On October 24, 2022, the Ebury Parties' counsel reminded EBCC's counsel that EBCC "continues to have full access to all of [the Ebury Parties'] financials, including their Quickbooks and other accounting software."

Id.

Yet EBCC only bothered to look at the Ebury Entities' records on 13 dates between January 1, 2023 and January 7, 2024: February 3, March 22, June 1, August

16, August 17, October 19, December 7, December 8, December 13, December 14, January 3, January 4, and January 5. Dkt. 118, Quickbooks Audit Log (Jan. 11, 2024).

In claiming that it just "discovered" Defendants' allegedly-wrongful transactions, EBCC actually annexes excerpts that it extracted from the Ebury Entities' Quickbooks software. Willscher Aff. ¶ 20. Those Quickbooks excerpts show that 27 separate transactions, whose proceeds ranged from $2,500 to $167,132.75, comprise the "bulk sale." Dkt. 108, id. Exhibit I at 1–2. On at least one occasion, EBCC inquired about certain transactions disclosed by the Ebury Parties in their monthly report; received the answer that those transactions were part of a "bulk sale;" and raised no objection or complaint to those transactions. Dkt. 117, Emails re: Bulk Sale (Jan. 11, 2024).

The most recent transaction in EBCC's Quickbooks extract—which EBCC created on January 3, 2024—is a $75,000 transfer to Mr. Hanratty. Willscher Aff. Exhibit I at 4. EBCC's Motion is predicated on its purported concern that Mr. Hanratty will "misappropriate proceeds from the sale of EBCC's collateral in order to post his bond." Contempt Brief at 1–2; see also Willscher Aff. ¶ 4 (EBCC's counsel avers that he "believe[s] that [Mr.] Hanratty intends to use that $75,000 [ . . . ] to fund his bail package and the costs of his defense.").

But the limited partnership agreements of both Ebury Fund 1 and Ebury Fund 2 provide that the entities "shall, in the sole discretion of the General Partner [Mr. Hanratty], advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or

proceeding that arises out of" "any acts, omissions or alleged acts or omissions arising out of or in connection with the Partnership, this Agreement or any investment made or held by the Partnership [ . . . if] such acts, omissions or alleged acts or omission [ . . . ] are not found by a court of competent jurisdiction **upon entry of a final non-appealable judgment** to have been made in bad faith or to constitute fraud, willful misconduct, or gross negligence." <u>Dkt. 119</u>, Partnership Agreements at 19, 58 (Jan. 11, 2024) (emphasis added).

Moreover, EBCC has never challenged the Ebury Parties' retention of or payments to undersigned counsel in connection with litigating this Action or certain Ebury Parties' pre-existing Delaware federal litigation, which Defendants ESC, EB 1EMIALA, EB 2EMIALA, Ebury Fund 1 NJ, and Ebury Fund 2 NJ initiated in February 2021, and to which Mr. Hanratty, Ebury Fund 1, Ebury Fund 2, EB 1EMIDC, Red Clover 1, and Ebury RE have been parties since September 2023. <u>See generally</u> Contempt Brief; <u>see also generally</u> <u>Dkt.</u>

### LEGAL STANDARD

"It is well established that contempt is a drastic remedy which should not be granted absent a clear right to the relief." <u>Usina Costa Pinto, S.A. v. Sanco Sav. Co. Ltd.</u>, 174 A.D.2d 487, 488 (1st Dep't 1991). Accordingly, the Court's contempt power "is discretionary and is to be exercised in the light of the facts and circumstances in each particular case." <u>Matter of Storm</u>, 28 A.D.2d 290, 292 (1st Dep't 1967); <u>see also</u> <u>id.</u> at 293 (quoting 21 Carmody–Wait, New York Practice, § 157, p. 310) ("There is a

large degree of discretion lodged in the matter of punishing for a civil contempt, and as to conditions on which contempt may be purged.").

The movant bears the burden of proving civil contempt "with reasonable certainty" and criminal contempt "beyond a reasonable doubt." Usina Costa, 174 A.D.2d at 488. Where there are factual disputes, including regarding the alleged contemnors' willfulness in disobeying the prior order, the Court must hold a hearing before it can issue the contempt order. Pinto v. Pinto, 120 A.D.2d 337, 338 (1st Dep't 1986) (unanimously reversing and vacating Supreme Court finding of contempt and remanding for hearing).

To establish civil contempt, EBCC must prove, by clear and convincing evidence, that (1) "a lawful order of the court was in effect, clearly expressing an unequivocal mandate;" (2) Defendants disobeyed the order; (3) Defendants had knowledge of the order; and (4) Defendants' allegedly-wrongful acts prejudiced EBCC. El-Dehdan v. El-Dehdan, 26 N.Y.3d 19, 29 (2015) (citing McCormick v. Axelrod, 59 N.Y.2d 574, 583 (1983)); see also B&M Kingstone, LLC v. Mega Int'l Comm. Bank Ltd., 214 A.D.3d 473, 473 (1st Dep't 2023) (quoting El-Dehdan, 26 N.Y.3d at 29) (unanimously affirming Justice Cohen's denial of motion to hold respondent in contempt and holding that to find someone in civil contempt, the Court must "determine[] that a lawful order of the court, clearly expressing an unequivocal mandate, was in effect.").

EBCC may prove prejudice by showing that Defendants' "actions 'were calculated to or actually did defeat, impair, impede, or prejudice [EBCC's] rights or

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:56 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 153
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2073 of 2230
RECEIVED NYSCEF: 01/16/2024

remedies." <u>Tedesco v. Elio</u>, 211 A.D.3d 153, 157 (2d Dep't 2022) (citations omitted) (reversing Supreme Court order of civil contempt where, <u>inter alia</u>, plaintiffs identified no specific prejudice, "such as an impairment of use of their property or any pecuniary loss"). However, EBCC must actually prove that a violation caused EBCC prejudice; violative conduct, without more, cannot show civil contempt. <u>Theroux v. Rescinow</u>, 200 A.D.3d 481, 431 (1st Dep't 2021) (citations omitted) (holding that "Supreme Court providently exercised its discretion in denying plaintiff's [contempt] motion" where he "failed to demonstrate that his rights were prejudiced").

To prove criminal contempt beyond a reasonable doubt, EBCC must show that Defendants' misconduct was willful, <u>i.e.</u>, that they "ha[d] a consciousness that reflects an awareness of the act that is other than 'unwitting conduct.'" <u>El-Dehdan</u>, 26 N.Y.3d at 35 (quoting <u>Bryan v. United States</u>, 425 U.S. 184, 191 (1998)); <u>see also</u> Black's Law Dictionary 1834 (10th ed. 2014) (defining "willful" as "[v]oluntary and intentional").

Regardless of whether a party moves for civil or criminal contempt, "[t]here is no reasonable justification for a rule" requiring the court to issue contempt orders against a respondent who is simply unable "to comply with the court mandate." <u>Id.</u> at 294.

## ARGUMENT

### I.    There is No "Unequivocal Mandate" Prohibiting the Entity Defendants from Advancing Mr. Hanratty's Criminal Action Defense Fees

Most of the allegedly-wrongful transactions that EBCC claims to have just "discovered" do not violate an "unequivocal mandate." See El-Dehdan, 26 N.Y.3d at 29.

As a threshold matter, Defendants have understood the Preliminary Injunction Order's prohibiting against transferring "any of their assets, aside from ordinary and necessary disbursements related to [the Ebury Parties'] tax lien or real estate business or living expenses" to allow Defendants to transfer those assets among each other, including to Mr. Hanratty. EBCC has alleged that all of the Entity Defendants are Mr. Hanratty's alter egos, and claims that all Defendants are jointly and severally liable; moreover, as Mr. Hanratty is the only natural Defendant, there would have been no need to include "living expenses" unless the Defendants were allowed to transfer those costs to him personally.

Regardless, EBCC's conjecture about **why** Defendants engaged in the allegedly-violative December 2023 transactions does not prove any violation of an "unequivocal mandate." Any advancement of Mr. Hanratty's criminal defense costs is an "ordinary" and "necessary" business expense—particularly since he is the Entity Defendants' principal and functionally sole businessperson; certainly a necessary "living expense[];" and is explicitly contemplated in Ebury Fund 1 and Ebury Fund 2's partnership agreements. Compare Preliminary Injunction with, e.g., Sierra

<u>Rutile Ltd. v. Katz</u>, No. 90 Civ. 4913, 1997 WL 43119, at *1–2 (S.D.N.Y. July 31, 1997) ("[T]he Court may order [a] corporation to advance litigation expenses, notwithstanding the corporation's allegations that the director or officer engaged in wrongdoing against the corporation."); <u>Blackmer v. Comm'r of Internal Revenue</u>, 70 F.2d 255, 256 (2d Cir. 1934) ("Expenses incurred in the defense of a criminal charge growing out the business of the taxpayer are 'ordinary' expenses").

Moreover, EBCC has never complained about the six figures in legal fees that the Ebury Parties have paid to undersigned counsel's law firm in connection with this Action or the Delaware litigation, despite the fact that both EBCC and the Delaware adverse party have accused Mr. Hanratty of fraud. <u>See generally</u> Dkt. Nor has EBCC complained about previous transactions that were characterized as "bulk sales."

And despite EBCC's purported concern that Mr. Hanratty would use company funds to post bond, and EBCC's years of continuous, live access to the Ebury Parties' accounting records, EBCC does not complain of any transfers made after the December 20, 2023 $75,000 transfer. <u>See generally</u> Dkt. 110, Memorandum in Support of Proposed OSC (Jan. 4, 2024).

Particularly considering that EBCC has never before complained about intra-Defendant transfers or Defendants' payment of legal fees, EBCC fails to prove that the $75,000 transfer violated an "unequivocal mandate."

## II.  EBCC Does Not Prove Prejudice by "Clear and Convincing Evidence," Let Alone "Beyond a Reasonable Doubt"

While Defendants did not email EBCC specific advance notice of the individual December 11 transactions that "exceeded $50,000," EBCC did continue to have live access to Defendants' deal pipeline and anticipated transactions, and apparently chose not to use it. Parks Aff. ¶ 4. That said, despite EBCC's access to Defendants' deal pipeline, Defendants historically did email EBCC advance notice of relevant transactions. Id. ¶ 5.

Defendants' failure to follow its usual notification practices was inadvertent. Moreover, EBCC's continued access to Defendants' live financial and operational systems, including Quickbooks—the very tool that EBCC relied on to "discover" Defendants' alleged violations—shows that Defendants' omissions were neither willful nor intended to prejudice EBCC.

Finally, EBCC has not proven, by "clear and convincing evidence," how either the December 11 or December 20 transactions actually prejudiced EBCC, let alone Defendants' intent to prejudice EBCC: EBCC has not argued or otherwise shown why selling assets for less than "book value" is per se prejudicial, let alone in the highly illiquid tax lien market.

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:56 PM
NYSCEF DOC. NO. 153

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/16/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2077 of 2230

## CONCLUSION

Defendants respectfully request that the Court deny EBCC's Motion or, in light of Defendants' pending motion to stay this Civil Action while the parallel Criminal Action is pending, adjourn this Motion **sine die**.

Dated: January 16, 2024
      New York, New York

Respectfully submitted,

**GUSRAE KAPLAN NUSBAUM PLLC**

/s/ Kari Parks
Kari Parks
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com

Counsel for Defendants

13

FILED: NEW YORK COUNTY CLERK 01/16/2024 09:56 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 153    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/16/2024
Court Records    Pg 2078 of 2230

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with Commercial Division Rule 17, 22 NYCRR § 202.70(g), because it contains 2,749 words, as calculated by Microsoft Word's Word Count function.

Dated: January 16, 2024
New York, New York

/s/ Kari Parks_____
Kari Parks

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

                Plaintiff,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY
FUND 1, LP, EBURY FUND 2, LP,
EBURY 1EMI LLC, EBURY 2EMI
LLC, EB 1EMIALA LLC, EB 2EMIALA
LLC, EB 1 EMIFL, LLC, EB 2EMIFL,
LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC,
EB 2EMIMD, LLC, EB 1EMINJ, LLC,
EB 1EMINJ, LLC, EB 1EMINY, LLC,
EB 2MINY, LLC, EB 1EMISC, LLC,
EB 2EMISC, LLC, RE 1EMI LLC, RE
2EMI LLC, EB 1EMIDC, LLC, ARQUE
TAX RECEIVABLE FUND
(MARYLAND), LLC, EBURY FUND
1FL, LLC, EBURY FUND 2FL, LLC,
EBURY FUND 2NJ, LLC, RED
CLOVER 1, LLC, EBURY RE LLC, and
XYZ CORPS. 1–10,

                Defendants.

The Honorable Margaret A. Chan
Index No. 158207/2022

Mot. Seq. 5

---

## AFFIRMATION OF KARI PARKS

Under the penalties of perjury, I, Kari Parks, affirm as follows:

1.      I am a partner of the law firm Gusrae Kaplan Nusbaum PLLC, counsel

for Defendants in the above-captioned matter.

2.      I submit this affirmation in opposition to Plaintiff's contempt motion,

Motion Sequence 5.

24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State
Court Records Pg 2080 of 2230

3. In the year since the Court issued the Preliminary Injunction Order, the Parties have cooperated fully in litigating this Action, from motion practice to exchanging hundreds of thousands of pages of documents to weeks of depositions, including EBCC's two-day, in-person deposition of Defendant John Hanratty, who is the Ebury Entities' managing member.

4. While Defendants did not email EBCC specific advance notice of the individual December 11 transactions that "exceeded $50,000," I understand that EBCC did continue to have live access to Defendants' deal pipeline and anticipated transactions, but generally has not been accessing those platforms.

5. On multiple occasions, Defendants emailed EBCC advance notice of relevant transactions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 16, 2024
New York, New York

Respectfully submitted,

/s/ Kari Parks
Kari Parks

2

# EXHIBIT D

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2082 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT CORPORATION,

        Plaintiff,

        v.

JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, and EBURY RE LLC,

        Defendants,

        v.

XYZ CORPS. 1-10,

        Defendants.

---

Index No. 158207/2022

The Honorable Margaret A. Chan

Mot. Seq. 6

**MEMORANDUM OF LAW IN SUPPORT OF
ORDER TO SHOW CAUSE**

Defendants respectfully submit this memorandum in support of Order to Show Cause ("**OSC**"), which moves the Court to vacate or allow reargument on and modify the portion of its January 9, 2024 "**Order**" that ordered the Ebury Parties[1] to "deposit $306,946.30 into the Parties' joint escrow account no later than the 11th day of January, 2024." See Dkt. 113 at 3 (Jan. 10, 2024).

## BACKGROUND

In September 2022, Plaintiff Emigrant Business Credit Corporation ("**EBCC**" and with the Ebury Parties, the "**Parties**") initiated the above-captioned "**Action**," suing the Ebury Parties for breach of contract, fraudulent inducement, and fraudulent transfer. See generally Dkt. 1 (Sep. 25, 2022). Three weeks later, EBCC filed an order to show cause seeking temporary injunctive relief while this Action is pending. Dkt. 2 (Oct. 17, 2022). Over the Ebury Parties' opposition, this Court granted EBCC's injunctive relief motion. Dkt. 47 (Nov. 29, 2022) (the "**Preliminary Injunction**").

Among other terms, the Preliminary Injunction "temporarily restrain[s] and enjoin[s]" the Ebury Parties, (1) prohibiting them from transferring "any of their assets, aside from ordinary and necessary disbursements related to [the Ebury Parties'] tax lien

---

[1] Defendants Ebury Street Capital ("**ESC**"), LLC, "**Ebury Fund 1**," LP, "**Ebury Fund 2**," LP, Ebury 1EMI LLC, Ebury 2 EMI LLC, "**EB 1EMIALA**" LLC, "**EB 2EMIALA**" LLC, Eb 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, Arque Tax Receivable Fund (Maryland), LLC, Ebury Fund 1 FL, LLC, Ebury Fund 2 FL, LLC, "**Ebury Fund 1NJ**," LLC, "**Ebury Fund 2NJ**," LLC, Red Clover 1, LLC, and "**Ebury RE**," LLC (together, the "**Ebury Entities**") and John Hanratty (with the Ebury Entities, the "**Ebury Parties**").

or real estate business or living expenses;" (2) requiring them to escrow tax lien certificate or resulting real estate property proceeds, if those proceeds are not intended for "ordinary and necessary disbursements related to the [Ebury Parties'] tax lien or real state businesses," and (3) requiring them to notify EBCC at least 24 hours before transferring any assets "exceeding $50,000." Dkt. 47 at 8–9.

In the year since the Court issued the Preliminary Injunction, the Parties have cooperated fully in litigating this Action, from motion practice to exchanging hundreds of thousands of pages of documents to weeks of depositions, including EBCC's two-day, in-person deposition of Defendant John Hanratty, who is the Ebury Entities' managing member. Indeed, before last week, the only motions filed by the Parties were dispositive motions or stipulated briefing schedules; the Parties never once sought the Court's intervention or assistance to ensure that discovery moved forward. See generally Dkt.

Moreover, EBCC has never challenged the Ebury Parties' retention of or payments to undersigned counsel in connection with litigating this Action or certain Ebury Parties' pre-existing Delaware federal litigation, which Defendants ESC, EB 1EMIALA, EB 2EMIALA, Ebury Fund 1 NJ, and Ebury Fund 2 NJ initiated in February 2021, and to which Mr. Hanratty, Ebury Fund 1, Ebury Fund 2, EB 1EMIDC, Red Clover 1, and Ebury RE have been parties since September 2023. See generally id.

However, Mr. Hanratty was arrested, and a federal "**Criminal Complaint**" against him was unsealed, on January 18, 2024. See generally Dkt. 100 (Jan. 4, 2024). As EBCC's counsel has affirmed, that Criminal Complaint's allegations are nearly identical to those pursued by EBCC in this civil Action, and accuse Mr. Hanratty of fraudulently inducing

3

24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State
Court Records Pg 2085 of 2230

EBCC's extension of credit to the Ebury Entities. See Affirmation of Alexander J. Willscher ¶ 4, Dkt. 99 (Jan. 4, 2024) ("**Willscher Aff.**"); see generally id. Exhibit A. The Criminal Complaint, which takes the form of a sworn affidavit from a Federal Bureau of Investigations ("**FBI**") agent, is largely based on records provided by and conversations with EBCC. See, e.g., id. ¶¶ 5, 7, 8(a), 9. Mr. Hanratty's conditions of release require, inter alia, a $2 million bond secured by $400,000 in assets. Id. Ex. B.

Approximately two weeks later, EBCC filed the proposed OSC. Dkt. 97 (Jan. 4, 2024). EBCC argued that without prior notice to EBCC, (a) on December 11, 2023, Mr. Hanratty personally "made a bulk sale" of collateral with a "book value of $1.1 million" for $256,946.30," and (b) on December 20, 2023, Mr. Hanratty "transferred $75,000 to himself." Dkt. 109 at 2 (Jan. 4, 2024).

To support its motion, EBCC annexes excerpts that it extracted from the Ebury Entities' Quickbooks software. Willscher Aff. ¶ 20. Those Quickbooks excerpts show that the "bulk sale" was actually 27 separate transactions, whose proceeds ranged from $2,500 to $167,132.75. Willscher Exhibit I at 1–2. And on at least one occasion, EBCC inquired about certain transactions disclosed by the Ebury Parties in their monthly report; received the answer that those transactions were part of a "bulk sale;" and raised no objection or complaint to those transactions. Affidavit of Kari Parks Exhibit A (Jan. 18, 2024) ("**Parks Aff.**").

EBCC has had continuous, open access to the Ebury Entities' live accounting records, including Quickbooks, since at least early 2022. Id. ¶ 3. However—and despite the Preliminary Injunction's terms—in 2023, EBCC has only bothered to look at the Ebury

4

**Deleted:** Affirmation

**Deleted:** 1

Entities' records on 13 dates: February 3, March 22, June 1, August 16, August 17, October 19, December 7, December 8, December 13, December 14, January 3, January 4, and January 5. Id. Exhibit B. The most recent transaction in EBCC's Quickbooks extract—which EBCC created on January 3, 2024—is a $75,000 transfer to Mr. Hanratty. Willscher Aff. Exhibit I at 4.

 To further support EBCC's motion, its counsel avers that he "believe[s] that [Mr.] Hanratty intends to use that $75,000 [ . . . ] to fund his bail package and the costs of his defense." Id. The limited partnership agreements of both Ebury Fund 1 and Ebury Fund 2 provide that the entities "shall, in the sole discretion of the General Partner [Mr. Hanratty], advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of" "any acts, omissions or alleged acts or omissions arising out of or in connection with the Partnership, this Agreement or any investment made or held by the Partnership [ . . . if] such acts, omissions or alleged acts or omission [ . . . ] are not found by a court of competent jurisdiction **upon entry of a final non-appealable judgment** to have been made in bad faith or to constitute fraud, willful misconduct, or gross negligence." Parks Aff. Exhibit C at 19, 58 (emphasis added).

 EBCC does not acknowledge that pursuant to this Action's governing Credit Agreements, and separate from any deposits made into the escrow account ordered by this Court, the Ebury Parties paid EBCC $169,074.49 in 2023. See Parks Aff. ¶ 4.

The Court's ensuing OSC orders the Ebury Parties to serve any opposition papers by January 16, but to deposit $306,946.30 — the total amount of fine demanded by EBCC — into the escrow account "no later than" January 11, 2024. OSC at 3.

> **Deleted:** Since the Court's order, the Ebury Parties have transferred at least $169,074.49 to the Parties' escrow account. Parks Aff. ¶ 4.

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2088 of 2230

**LEGAL STANDARD**

The Court may vacate an order on the grounds of, <u>inter alia</u>, "newly-discovered evidence" or "misrepresentation[] or other misconduct of an adverse party." CPLR § 5015(a). The Court may grant leave to reargue and vacate a prior order if it finds that "matters of fact or law allegedly overlooked or misapprehended" should change its decision. CPLR § 2221.

While not binding on this Commercial Division Court, Second Circuit federal courts apply a "heightened 'substantial likelihood' standard" when a "requested injunction (a) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." <u>Citigroup Glob. Mkts. V. VCG Special Opp. Master Fund Ltd.</u>, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (citations omitted). New York federal courts apply this standard if "the issuance of an injunction will render a trial on the merits largely or partly meaningless, either because of temporal concerns, say, a case involving the live televising of an event scheduled for the day on which preliminary relief is granted, or because of the nature of the subject of the litigation, say, a case involving the disclosure of confidential information." <u>Id.</u> at 35.

Second Circuit courts apply this heightened standard if a plaintiff seeks a "mandatory" preliminary injunction—<u>i.e.</u>, one that "command[s] some positive act," as opposed to a "prohibitory" injunction that merely asks the party to refrain from acting. <u>Id.</u> at 35 n.4.

7

## ARGUMENT

The Ebury Parties respectfully request that the Court either (a) vacate the OSC's order that the Ebury Parties deposit $306,946.30 into the escrow account no later than January 11, 2024 or (b) modify the order by adjourning the deadline by no less than one week and / or lessening the amount that the Ebury Parties must escrow.

As a threshold matter, it simply is not clear that EBCC must succeed on its contempt motion. The Ebury Parties will brief the issue more comprehensively when they file their January 16 opposition. But historically, EBCC has neither objected to nor demanded advance notice of bulk sales. See, e.g., Parks Aff. Exhibit A. EBCC has never complained about the six figures in legal fees that the Ebury Parties have paid to undersigned counsel's law firm in connection with this Action or the Delaware litigation, despite the fact that both EBCC and the Delaware adverse party have accused Mr. Hanratty of fraud. See generally Dkt. Any advancement of criminal defense costs is an "ordinary" and "necessary" business expense, certainly a necessary "living expense[]," and is explicitly contemplated in Ebury Fund 1 and Ebury Fund 2's partnership agreements. Compare Preliminary Injunction with, e.g., Sierra Rutile Ltd. v. Katz, No. 90 Civ. 4913, 1997 WL 43119, at *1–2 (S.D.N.Y. July 31, 1997) ("[T]he Court may order [a] corporation to advance litigation expenses, notwithstanding the corporation's allegations that the director or officer engaged in wrongdoing against the corporation."); Blackmer v. Comm'r of Internal Revenue, 70 F.2d 255, 256 (2d Cir. 1934) ("Expenses incurred in the defense of a criminal charge growing out the business of the taxpayer are 'ordinary' expenses"). And despite EBCC's purported concern that Mr. Hanratty would use

8

company funds to post bond, and EBCC's years of continuous, live access to the Ebury

Parties' accounting records, EBCC does not complain of any transfers made after the

December 20, 2023 $75,000 transfer. See generally Dkt. 110, Memorandum in Support of

Proposed OSC (Jan. 4, 2024).

Moreover, as a practical matter—and assuming the truth of EBCC's claims that the

Ebury Entities are highly illiquid—it is no small feat for the Ebury Parties to conjure up

$306,946.30 cash on 36 hours' notice. While the Ebury Parties paid EBCC no less than

$169,047.49 in 2023, it is unrealistic and unjust to require—and punish—them if they fail

to find and deposit the **entirety** of the fine that EBCC seeks, let alone to do so five days

before the Ebury Parties even are required to serve their opposition papers, and an

unknown period of time before the Court rules on the motion's merits.

> **Deleted:** have been able to identify

> **Deleted:** and deposit

9

FILED: NEW YORK COUNTY CLERK 01/18/2024 05:24 PM
NYSCEF DOC. NO. 155

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/18/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2091 of 2230

**CONCLUSION**

The OSC's order that the Ebury Parties deposit the entire fine sought by EBCC, on two days' notice, is unwarranted and unjust. The Ebury Parties respectfully request that the Court vacate this portion of the OSC in its entirety or modify it to allow the Ebury Parties to fulfill the Court's order on a longer timeline and / or with less money.

Dated: January 18, 2024
      New York, New York

> **Deleted:** 1

              Respectfully submitted,

              **GUSRAE KAPLAN NUSBAUM PLLC**

              /s/ Kari Parks
              Kari Parks
              Victor Wang
              120 Wall Street, 25th Floor
              New York, New York 10005
              (212) 269-1400
              kparks@gusraekaplan.com
              vwang@gusraekaplan.com

              *Counsel for the Ebury Parties*

24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State
Court Records Pg 2092 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                 Plaintiff,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ
CORPS. 1-10,

                Defendants.

---------------------------------------------------------- x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 007**

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' STAY MOTION

Alexander J. Willscher
Austin P. Mayron
Erin L. Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business Credit
Corporation*

## TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................................................ 1

**FACTUAL BACKGROUND** ................................................................................................... 2

**LEGAL STANDARD** ............................................................................................................ 4

**ARGUMENT** ....................................................................................................................... 5

    A.    The Criminal Charges Against Hanratty Do Not Require a Stay ............................ 5

    B.    Granting Defendants' Request for a Stay Would Not Be Just ................................ 7

**CONCLUSION** .................................................................................................................... 10

# **TABLE OF AUTHORITIES**

*Page(s)*

CASES

*54 West 16th St. Apt. Corp.* v. *Dawson*,
    684 N.Y.S.2d 400 (N.Y.C. Civ. Ct. 1998)....................................................................5

*Access Capital, Inc.* v. *DeCicco*,
    302 A.D.2d 48 (1st Dep't 2002) ..........................................................................4, 5

*Barbarito* v. *Zahavi*,
    2012 WL 8881152 (Sup. Ct. N.Y. Cnty. June 18, 2012).....................................4, 7

*Britt* v. *Int'l Bus Servs., Inc.*,
    255 A.D.2d 143 (1st Dep't 1998) .........................................................................5, 6

*Budget Mortg. Bankers, Ltd.* v. *Maza*,
    5 Misc. 3d 1031(A) (Sup. Ct. Nassau Cnty. 2004) ................................................6

*Cornier* v. *Massanova*,
    35 A.D.3d 341 (2d Dep't 2006) ..............................................................................6

*DeSiervi* v. *Liverzani*,
    136 A.D.2d 527 (2d Dep't 1988) ............................................................................9

*El-Dehdan* v. *El-Dehdan*,
    114 A.D.3d 4 (2d Dep't 2013) ................................................................................5

*Ferber* v. *Fairfield Greenwich Grp.*,
    28 Misc. 3d 1214(A) (Sup. Ct. N.Y. Cnty. 2010)..................................................4

*Galper* v. *Burkes*,
    44 A.D.3d 451 (1st Dep't 2007) .............................................................................7

*Garden City Irr., Inc.* v. *Salamanca*,
    7 Misc. 3d 1014(A) (Sup. Ct. Nassau Cnty. 2005) ................................................6

*Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984, Y., M.D., P.C.* v.
    *Kuriansky*,
    69 N.Y.2d 232 (1987) ...........................................................................................10

*Middlebury Off. Park Ltd. P'ship* v. *Gen. Datacomm Indus., Inc.*,
    248 A.D.2d 313 (1st Dep't 1998) .........................................................................10

FILED: NEW YORK COUNTY CLERK 01/23/2024 12:32 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 156
RECEIVED NYSCEF: 01/23/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2095 of 2230

*Mook* v. *Homesafe Am., Inc.*,
  144 A.D.3d 1116 (2d Dep't 2016) ...........................................................................6

*Peralta-Mera* v. *Streep*,
  2021 WL 1213451 (Sup. Ct. N.Y. Cnty. Mar. 31, 2021) ...........................................6

*Phan* v. *City of New York*,
  2012 WL 781048 (Sup. Ct. N.Y. Cnty. Mar. 2, 2012) ...............................................4

*Phillips* v. *Bronx Lebanon Hosp.*,
  268 A.D.2d 318 (1st Dep't 2000) .............................................................................7

*Spencers* v. *City of Buffalo*,
  172 A.D.3d 1916 (4th Dep't 2019)............................................................................5

*Stolowski* v. *234 E. 178th St. LLC*,
  12 Misc. 3d 1159(A) (Sup. Ct. Bronx Cnty. 2006).................................................4, 5

*Thomas Jr.* v. *Zuniga*,
  2023 WL 2131358 (Sup. Ct. Kings Cnty. Feb. 16, 2023) ..........................................6

*Visual Arts Found., Inc.* v. *Egnasko*,
  2009 WL 2440305 (Sup. Ct. N.Y. Cnty. July 24, 2009) ............................................6

*Zonghetti* v. *Jeromack*,
  150 A.D.2d 561 (2d Dep't 1989) ..............................................................................6

## STATUTES AND RULES

CPLR 2201.......................................................................................................................4

-iii-

## PRELIMINARY STATEMENT

For nearly three years, Defendant John Arthur Hanratty ("**Hanratty**") has evaded responsibility for defrauding Plaintiff Emigrant Business Credit Corporation ("**EBCC**"). Hanratty was contractually required to repay EBCC tens of millions of dollars in March 2021, but he fraudulently induced EBCC into agreeing to three maturity date extensions. At final maturity, in November 2021, Hanratty failed to repay EBCC the amounts owed under the contracts, and he has since failed to comply with his contractual repayment obligations.

EBCC recently filed summary judgment papers that conclusively establish Defendants' liability for breach of contract. (Dkt. 121 at 10-20.) The U.S. Attorney's Office for the Southern District of New York has charged Hanratty with bank and wire fraud in connection with his scheme to defraud EBCC. Sealed Complaint, *United States* v. *John Arthur Hanratty*, No. 1:23-mj-07566 (filed Dec. 15, 2023), ECF No. 1. And EBCC has brought to the Court's attention evidence of Hanratty's repeated and willful violations of the Preliminary Injunction Order and Preliminary Conference Order. (Dkt. 110 at 5-7.)

Hanratty's stay motion would only further delay justice for EBCC. Hanratty claims that a stay is needed to protect his Fifth Amendment rights, but that respectfully makes no sense. Fact discovery in this litigation is complete. Indeed, Hanratty provided two days of deposition testimony, including answers to nearly 2,000 questions from EBCC's counsel. Further, the Ebury Companies themselves have no Fifth Amendment rights. Summary judgment for Defendants' breach of contract can be granted based on the undisputed factual record and there is no need for any further testimony from Hanratty.

Even if there were a need for further testimony from Hanratty (and there is not), the equities still would weigh against granting a stay. Defendants owe EBCC tens of millions of

-1-

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2097 of 2230

dollars and each passing day only increases the risk that Defendants will not be able to satisfy a judgment against them, as well as the risk that Defendants will continue to violate the Credit Agreements and this Court's orders, as detailed in EBCC's contempt motion. (Dkt. 110 at 5-7.)

Moreover, granting a stay would reward Defendants' apparent gamesmanship. On December 20, 2023—two days *after* Hanratty was arrested—Defendants agreed to a briefing schedule that required EBCC to file its motion for summary judgment on January 12, 2024. EBCC fully complied with the parties' agreement, without any indication from Defendants that they would seek a stay. One business day after EBCC filed its motion, Defendants jettisoned the agreed-upon schedule and moved for a stay of the entire action. That timing suggests that Defendants waited to seek a stay until after EBCC filed its motion for summary judgment. Defendants should not be rewarded for this tactic and should be held to the agreed-upon and Court-ordered deadline of February 2, 2024 for their opposition papers.

## **FACTUAL BACKGROUND**

Between 2017 and 2021, EBCC loaned companies controlled by Hanratty tens of millions of dollars to invest in tax liens. (Dkt. 121 at 2.) Defendants were due to repay EBCC at maturity in March 2021. However, Hanratty convinced EBCC to agree to three maturity date extensions based on misrepresentations that EBCC was "overcollateralized" and secured by nearly $30 million in tax lien collateral. (*Id.* at 7.) At final maturity in November 2021, Defendants failed to repay EBCC over $18 million in outstanding principal and interest and EBCC issued notices of default. (Dkt. 12 at 3, 5.) Defendants still have not repaid the amounts outstanding under the Credit Facilities and now owe EBCC more than $24 million in principal and interest. (Dkt. 121 at 20-21.)

-2-

EBCC has expended substantial resources to recover the amounts it is owed. In September 2022, EBCC filed this action and has since briefed a preliminary injunction motion, two motions to dismiss, and filed opening summary judgment papers. (Dkt. 4; Dkt. 48; Dkt. 81; Dkt. 121.) During discovery, the parties conducted twelve depositions and exchanged hundreds of thousands of pages of documents. (*See* Dkt. 153 at 3.) In total, EBCC has accrued approximately $2 million in attorneys' fees prosecuting this action. (Dkt. 121 at 21.)

Over the course of a two-day deposition in June, Hanratty never once invoked the Fifth Amendment. Instead, he made a number of damaging and dispositive admissions. Hanratty admitted:

- "I acknowledge that I owe them money and I want to pay them" (Dkt. 123 at 405:8-12);

- "I am currently in default and owe money to Emigrant, yes" (*id.* at 674:9-10);

- That he repeatedly provided false certified statements to EBCC (*id.* at 605:21-606:15); and

- That he used advances from EBCC to fund distributions to investors (*id.* at 604:7-12).

On December 18, 2023, Hanratty was arrested and charged by the U.S. Attorney's Office for the Southern District of New York with bank and wire fraud in connection with his scheme to defraud EBCC. Sealed Complaint, *United States* v. *John Arthur Hanratty*, No. 1:23-mj-07566 (filed Dec. 15, 2023), ECF No. 1. Yet two days *after* Hanratty's arrest, Defendants agreed to a briefing schedule, which required EBCC to file its summary judgment motion by January 12, 2024 and Defendants to file their opposition papers by February 2, 2024.[1]

---

[1]    Although the stipulated schedule was made "without prejudice to the Ebury Parties' ability to request additional extensions, as necessary" (Ex. A to Willscher Affirm.), EBCC did not forfeit its right to object to improper extension requests. In any event, Defendants do not seek an extension of the briefing deadlines; they seek a stay of the entire action.

(*See* Ex. A to Willscher Affirm.)  The parties submitted a joint proposal regarding the stipulated briefing schedule to the Court on December 28, 2023 (Dkt. 95), which the Court so-ordered on January 8, 2024 (Dkt. 112).  Defendants never once disclosed that they intended to move for a stay of this action.

On January 12, 2024, EBCC filed its motion for summary judgment.  (*See* Dkt. 121.)  One business day later, Defendants gave notice and filed an order to show cause requesting a stay of this action pending resolution of Hanratty's criminal proceedings.  (Dkt. 149.)

## LEGAL STANDARD

The Court may grant a stay of proceedings "in a proper case" and "upon such terms as may be just."  CPLR 2201.  The decision whether to grant a stay is committed to the Court's sound discretion and may not be disturbed absent an abuse of discretion.  *See Stolowski* v. *234 E. 178th St. LLC*, 12 Misc. 3d 1159(A), at *4 (Sup. Ct. Bronx Cnty. 2006).  "A stay of an action can easily be a drastic remedy, on the simple basis that justice delayed is justice denied.  It should therefore be refused unless the proponent shows good cause for granting it."  *Barbarito* v. *Zahavi*, 2012 WL 8881152, at *2 (Sup. Ct. N.Y. Cnty. June 18, 2012) (citation omitted).  "Some excellent reason would have to be demonstrated before a judge is asked to bring to a halt a litigant's quest for a day in court."  *Ferber* v. *Fairfield Greenwich Grp.*, 28 Misc. 3d 1214(A) at *3 (Sup. Ct. N.Y. Cnty. 2010).

It is well-settled that "invoking the privilege against self-incrimination is generally an insufficient basis for precluding discovery in a civil matter."  *Access Capital, Inc.* v. *DeCicco*, 302 A.D.2d 48, 52 (1st Dep't 2002); *accord Phan* v. *City of New York*, 2012 WL 781048, at *2 (Sup. Ct. N.Y. Cnty. Mar. 2, 2012).  Moreover, a court is under no obligation to stay a civil action "until a pending criminal prosecution has been terminated."  *Access Capital, Inc.*, 302 A.D.2d at

-4-

FILED: NEW YORK COUNTY CLERK 01/23/2024 12:32 PM INDEX NO. 158207/2022

NYSCEF DOC. NO.: 156    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 01/23/2024

Court Records    Pg 2100 of 2230

53. As such, courts regularly deny stay motions premised on related criminal proceedings. *See, e.g.*, <u>*Spencers*</u> v. *City of Buffalo*, 172 A.D.3d 1916, 1916-17 (4th Dep't 2019); <u>*El-Dehdan* v. *El-Dehdan*</u>, 114 A.D.3d 4, 19-22 (2d Dep't 2013); <u>*54 West 16th St. Apt. Corp.* v. *Dawson*</u>, 684 N.Y.S.2d 400, 403-05 (N.Y.C. Civ. Ct. 1998).

In deciding whether to grant a stay, the Court may consider the likelihood that an invocation of the Fifth Amendment will adversely impact a party's rights. <u>*Britt* v. *Int'l Bus Servs., Inc.*</u>, 255 A.D.2d 143, 144 (1st Dep't 1998) (granting stay where defendant had not given deposition testimony); <u>*Stolowski*</u>, 12 Misc. 3d 1159(A), at *7-8 (granting stay where essential witnesses would invoke their Fifth Amendment rights at their depositions). The Court also may consider the risk of inconsistent adjudications and potential waste of judicial resources. *See* <u>*Access Capital, Inc.*</u>, 302 A.D.2d at 51.

## **ARGUMENT**

Fact discovery has been complete for nearly six months. Both parties have vigorously and fully litigated all of the issues presented in the case, which is now ripe for a summary judgment ruling on EBCC's breach of contract claims. At this late juncture, a multi-year delay to EBCC in obtaining what can only be an inevitable judgment in its favor would be extremely prejudicial. There is no valid reason to grant Defendants' request for a stay. After more than six years of lies designed by Hanratty to delay a final reckoning, Defendants now must face the consequences of their wrongdoing.

### A.    **The Criminal Charges Against Hanratty Do Not Require a Stay**

Ongoing criminal proceedings, standing alone, are an "insufficient basis" to stay a case. <u>*Access Capital, Inc.*</u>, 302 A.D.2d at 52. Defendants disagree and assert that granting a stay here would be "routine[]" (<u>Dkt. 150</u> at 5-6), but every case Defendants cite involves a request for

a stay made **prior** to the deposition of the criminal defendant, where an invocation of the Fifth

Amendment would adversely impact a party's rights. *See Britt*, 255 A.D.2d at 144 (stay granted

before defendant had given any deposition testimony); *Cornier* v. *Massanova*, 35 A.D.3d 341, 341

(2d Dep't 2006) (same); *Thomas Jr.* v. *Zuniga*, 2023 WL 2131358, at *1 (Sup. Ct. Kings Cnty.

Feb. 16, 2023) (same); *Budget Mortg. Bankers, Ltd.* v. *Maza*, 5 Misc. 3d 1031(A), at *4 (Sup. Ct.

Nassau Cnty. 2004) (same); *Mook* v. *Homesafe Am., Inc.*, 144 A.D.3d 1116, 1116-17 (2d Dep't

2016) (staying all discovery); *Zonghetti* v. *Jeromack*, 150 A.D.2d 561, 561, 563 (2d Dep't 1989)

(same); *Peralta-Mera* v. *Streep*, 2021 WL 1213451, at *3-5 (Sup. Ct. N.Y. Cnty. Mar. 31, 2021)

(same); *Garden City Irr., Inc.* v. *Salamanca*, 7 Misc. 3d 1014(A), at *3-4 (Sup. Ct. Nassau Cnty.

2005) (same).

        Here, by contrast, fact discovery is complete and Hanratty has already testified

extensively. Hanratty sat for two days of depositions in June 2023—over fifteen hours on the

record—and answered almost 2,000 questions from EBCC's counsel without once invoking of his

Fifth Amendment rights. He even admitted to making apparently sworn false statements in the

second degree, in violation of New Jersey Penal Law § 210.35, in connection with certain sales of

tax lien certificates to third parties. (*See* Dkt. 123 at 362:22-371:11, 377:7-380:17.) The fact that

Hanratty already has been deposed weighs conclusively against granting Defendants' request for

a stay, as there is no risk that an invocation of the Fifth Amendment will adversely impact his

rights. *See Visual Arts Found., Inc.* v. *Egnasko*, 2009 WL 2440305 (Sup. Ct. N.Y. Cnty. July 24,

2009) (denying a stay where the criminal defendant had "already been subject to six days of

deposition").

        Moreover, Defendants fail to articulate how Hanratty's Fifth Amendment rights

will be implicated by further proceedings in this case, stating only that Defendants "must file their

combined summary judgment papers in less than three weeks." (Dkt. 150 at 9.) This rationale is conclusory and does not merit granting a stay. EBCC moved for summary judgment on its contractual claims (*see* Dkt. 121 at 1-2), and those claims can be resolved on the basis of the undisputed factual record. At his deposition, Hanratty freely admitted: "**I am currently in default and owe money to Emigrant, yes**," and "**I acknowledge that I owe them money and I want to pay them**." (Dkt. 123 at 405:8-12 (emphasis added), 674:9-10 (emphasis added).) He also admitted to repeatedly providing false certifications to EBCC and committing other violations of the Credit Agreements. (*Id.* at 107:25-108:11, 603:4-606:15.) Summary judgment is proper based on these admissions alone and Hanratty cannot retract them. *See Phillips* v. *Bronx Lebanon Hosp.*, 268 A.D.2d 318, 320 (1st Dep't 2000) ("self-serving affidavits" that "contradict [a party's] own deposition testimony" are insufficient to defeat a motion for summary judgment).[2]

### B.    Granting Defendants' Request for a Stay Would Not Be Just

Defendants cannot establish good cause for a stay. *First*, "justice delayed is justice denied." *See Barbarito*, 2012 WL 8881152, at *2. The original maturity date of the Credit Agreements was March 9, 2021—nearly three years ago. (Dkt. 121 at 4.) Even accounting for the three maturity date extensions, Defendants have been in default of their repayment obligations since November 10, 2021. (*Id.*) It is now January 2024, and Hanratty has openly admitted that he is "in default and owe[s] money to Emigrant." (Dkt. 123 at 405:8-12.) A stay will only further delay repayment to EBCC—something Hanratty supposedly "want[s]" to do now. (*Id.* at 674:9-10.)

---

[2]    If the Court determines that a stay is warranted, the stay should not apply to the contractual claims on which EBCC has moved for summary judgment. Although EBCC's contractual claims are related to the criminal charges against Hanratty for wire and bank fraud, they are fundamentally different claims. *Cf. Galper* v. *Burkes*, 44 A.D.3d 451, 452 (1st Dep't 2007) (affirming denial of stay in a negligence action against a dentist based on related criminal charges).

-7-

*Second*, under the Credit Agreements, Defendants agreed to pay default interest, which is continuing to accrue. (Dkt. 121 at 20-21.) Each additional month that passes increases the amount Defendants will owe, as well as the likelihood that Defendants will not be able to satisfy the judgment. (*See* Dkt. 4 at 13-14 (establishing that Defendants are insolvent); Dkt. 115 at 8 (conceding that Defendants are, at a minimum, "highly illiquid").) Further, Defendants continue to sell EBCC's collateral at substantial discounts and misuse the proceeds of that collateral, including to fund Hanratty's criminal defense expenses. (*See* Dkt. 110 at 5-7; Dkt. 115 at 5, 7.) Defendants should not be permitted to continue dissipating EBCC's collateral and diminishing EBCC's potential recovery.

*Third*, Defendants cannot promise a speedy resolution to Hanratty's criminal proceedings. As of January 17, 2024, the only development in the criminal proceedings is a thirty-day continuance, *i.e.*, further delay tactics. *See* Order of Continuance, *United States* v. *John Arthur Hanratty*, No. 1:23-mj-07566 (filed Jan. 17, 2023), ECF No. 9. By the time that continuance elapses, summary judgment briefing in this case will be nearly complete. (Dkt. 112.) And the longer this case takes to resolve, the more resources EBCC will be forced to expend to be made whole—in addition to the attorneys' fees it has spent to date. (*See* Dkt. 121 at 21-22.)

*Fourth*, Defendants claim that allowing the criminal case to proceed will "significantly streamline the work left in the parallel civil case." (Dkt. 150 at 7.) But that is not true given the procedural posture of this case. Again, discovery has been complete for months and EBCC has already filed its motion for summary judgment, which conclusively establishes Defendants' liability for breach of contract for $20,213,473.65 in damages plus prejudgment interest and attorneys' fees. (Dkt. 121 at 20-22.) The cases on which Defendants rely are distinguishable because, in each, discovery was ongoing and "determination of the criminal action

-8-

. . . could well serve to reduce the scope of discovery." *See, e.g.*, *DeSiervi* v. *Liverzani*, 136 A.D.2d 527, 527 (2d Dep't 1988).

*Fifth*, the timing of Defendants' motion is concerning. Hanratty was arrested on December 18, 2023. *See* Order of Continuance, *United States* v. *John Arthur Hanratty*, No. 1:23-mj-07566 (filed Jan. 17, 2023), ECF No. 9. Yet two days later, Defendants agreed to the summary judgment briefing schedule, without any mention of a potential stay. (Ex. A to Willscher Affirm.) EBCC waited until December 28, 2023 to file the stipulated summary judgment briefing schedule; and even then, Defendants remained silent about their desire for a stay. (Dkt. 95.) It was only on January 16, 2024—one business day after EBCC filed its motion for summary judgment—that Defendants first mentioned their intention to seek a stay. (Ex. B to Willscher Affirm.) The most logical inference from the circumstances is that Defendants waited to seek a stay until *after* EBCC filed its motion for summary judgment. In essence, Defendants orchestrated an opportunity to review EBCC's motion and now seek practically unlimited time to formulate their response. This tactic should not be rewarded. Defendants should be held to the agreement they made on December 20—well after Hanratty was arrested—to submit their summary judgment papers on February 2. (Ex. A to Willscher Affirm.)

*Sixth*, Defendants made their request for a stay only after being exposed for having committed repeated, willful violations of this Court's orders. (*See* Dkt. 110 at 1-3.) Despite the plain language of the Court's Preliminary Injunction Order and Preliminary Conference Order, Defendants repeatedly failed to provide EBCC with advance notice of large transactions and have refused to deposit the proceeds of those transactions into the parties' joint escrow account. Moreover, Defendants continue to violate the Credit Agreements, including by self-servicing the vast majority of EBCC's collateral and selling it at substantial discounts without depositing the

-9-

proceeds into the parties' lockbox account. Defendants' stay motion effectively requests more time for Defendants to continue violating this Court's orders and the Credit Agreements, and for that reason, should be denied.

Seventh, the Ebury Companies do not have any Fifth Amendment rights, and hence no basis to seek a stay. "It is settled that a corporation has no Fifth Amendment privilege." _Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984, Y., M.D., P.C._ v. _Kuriansky_, 69 N.Y.2d 232, 242 (1987). Moreover, when it has suited Hanratty, he has argued strenuously that the Ebury Entities are not his alter egos. (_See_ Dkt. 42 at 8-10.) Yet now that he has been indicted for bank and wire fraud, he argues that a stay of this action against _all_ Defendants is required because he "is the only human with the ability to produce information and speak on behalf of the Entity Defendants." (Dkt. 150 at 10.) Hanratty offers no reasons why this case cannot proceed against the Ebury Companies even if it is stayed as to him personally. _Cf._, _Middlebury Off. Park Ltd. P'ship_ v. _Gen. Datacomm Indus., Inc._, 248 A.D.2d 313, 314 (1st Dep't 1998) (examining whether two cases "involve[] complete identity with the parties, claims and relief sought").

## **CONCLUSION**

For the foregoing reasons, EBCC respectfully requests the Court deny Defendants' stay motion.

Dated:   January 23, 2024
         New York, New York

Respectfully submitted,

_/s/ Alexander J. Willscher_

Alexander J. Willscher
Austin P. Mayron
Erin L. Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004

-10-

Telephone:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Plaintiff Emigrant Business
Credit Corporation*

-11-

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with the word-count limit of Commercial Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because it contains 3,073 words.

Dated:   January 23, 2024                     */s/ Alexander J. Willscher*
        New York, New York                Alexander J. Willscher

-12-

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records        Pg 2108 of 2230

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

              Plaintiff,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ
CORPS. 1-10,

              Defendants.

---------------------------------------------------------------- x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 007**

**AFFIRMATION OF ALEXANDER J.
WILLSCHER**

      **ALEXANDER J. WILLSCHER**, an attorney duly admitted to practice law in the Courts

of the State of New York, affirms the truth of the following statements, under the penalties of

perjury:

      1.      I am a partner at the law firm of Sullivan & Cromwell LLP, counsel for Plaintiff

Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned matter.  I am familiar

with the matters set forth below.  I submit this affirmation in opposition to Defendants' Proposed

Order to Show Cause, seeking a stay of this action.  (Dkt. 149.)

2.      Attached hereto as Exhibit A is a true and correct copy of email correspondence between EBCC's counsel and Defendants' counsel, dated November 20, 2023 to December 20, 2023.

3.      Attached hereto as Exhibit B is a true and correct copy of email correspondence EBCC's counsel and Defendants' counsel, dated January 16, 2024.

Dated:   January 23, 2024                    */s/ Alexander J. Willscher*
         New York, New York              **ALEXANDER J. WILLSCHER**

-2-

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this affirmation complies with the word count limit of Commercial

Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because

it contains 140 words.


Dated:   January 23, 2024            */s/ Alexander J. Willscher*
       New York, New York              Alexander J. Willscher

# EXHIBIT A

| From: | Kari Parks <kparks@gusraekaplan.com> |
|---|---|
| Sent: | Wednesday, December 20, 2023 4:36 AM |
| To: | Mayron, Austin P.; Victor Wang |
| Cc: | Willscher, Alexander J. |
| Subject: | [EXTERNAL] Re: Emigrant v. Hanratty |

Hi Austin - OK with us. Please send us the drafts when you're ready. Thank you

**Kari Parks, Senior Associate** | **Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T:
(212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Monday, December 18, 2023 3:55 PM
**To:** Kari Parks <kparks@gusraekaplan.com>; Victor Wang <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Emigrant v. Hanratty

Hi Kari,

We would like to revise our proposed schedule for summary judgment briefing to the following:

| Brief | Original Proposal | Revised Proposal |
|---|---|---|
| Emigrant's Motion for Summary Judgment | December 22 | January 12 |
| Ebury's Combined Cross-Motion for Summary Judgment and Opposition | January 12 | February 2 |
| Emigrant's Combined Opposition and Reply | February 2 | February 23 |
| Ebury's Reply | February 16 | March 8 |

FILED: NEW YORK COUNTY CLERK 01/23/2024 12:32 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 158

RECEIVED NYSCEF: 01/23/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2113 of 2230

Please let us know if this revised proposal is agreeable, without prejudice to the Ebury Parties' ability to request additional extensions, as necessary.  In addition, to streamline summary judgment briefing, we would like to propose a stipulation to the Court to the effect that each party need only file a single motion to seal information designated under the Protective Order in connection with the summary judgment briefing (rather than one motion per brief).  Please let us know if this is agreeable—if so, we can prepare a draft stipulation and proposed order.

Best,

Austin P. Mayron
+1 212 558 3733 (T) | +1 518 577 1643 (M)

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Tuesday, November 21, 2023 1:02 PM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>; Victor Wang <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** [EXTERNAL] RE: Emigrant v. Hanratty

Works for me. Thanks!

**Kari Parks, Senior Associate | Gusrae Kaplan Nusbaum PLLC |** 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication.  Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission.  Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Tuesday, November 21, 2023 13:00
**To:** Kari Parks <kparks@gusraekaplan.com>; Victor Wang <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Emigrant v. Hanratty

Hi Kari,

As discussed, here is a proposed summary judgment briefing schedule.  Please let us know if it is acceptable.

| Brief | Deadline | Word Limit |
|---|---|---|

| | | |
|---|---|---|
| Emigrant's Motion for Summary Judgment | December 22 | 7,000 words |
| Ebury's Combined Cross-Motion for Summary Judgment and Opposition | January 12 | 14,000 words |
| Emigrant's Combined Opposition and Reply | February 2 | 11,200 words |
| Ebury's Reply | February 16 | 4,200 words |

Best,

Austin P. Mayron
+1 212 558 3733 (T) | +1 518 577 1643 (M)

---

**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Monday, November 20, 2023 11:06 AM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>
**Subject:** [EXTERNAL] RE: Emigrant v. Hanratty

Hi – Sure. I can do anytime before 4pm. Just call my office when you want to chat: (212) 269-1400.

**Kari Parks, Senior Associate** | **Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Monday, November 20, 2023 10:33
**To:** Kari Parks <kparks@gusraekaplan.com>
**Subject:** Re: Emigrant v. Hanratty

Hi Kari,

Are you available today to touch base regarding the case schedule?

Best,

**Austin P. Mayron**
Sullivan & Cromwell LLP
125 Broad Street | New York, NY 10004-2498

+1 212 558 3733 (T) | +1 518 577 1643 (M)
mayrona@sullcrom.com | www.sullcrom.com

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

---

**This is an external message from:** kparks@gusraekaplan.com **

# EXHIBIT B

| | |
|---|---|
| **From:** | Kari Parks <kparks@gusraekaplan.com> |
| **Sent:** | Tuesday, January 16, 2024 1:01 PM |
| **To:** | Mayron, Austin P.; Victor Wang |
| **Cc:** | Willscher, Alexander J.; Savoie, Erin L. |
| **Subject:** | [EXTERNAL] Re: Emigrant v. Hanratty |

Hi Austin,

Hope you had a great holiday weekend. I'll look into that and get back to you as soon as I have the confirmation number.

Also, pursuant to Rule 202.7(f), and as I'm sure your seasoned team has been expecting, please take notice that later today, Defendants intend to move to stay this civil litigation while the related federal criminal action is pending. Please let me know if your client has a position on that anticipated motion. Thanks.

Best,
Kari


**Kari Parks, Partner** | **Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

---

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Tuesday, January 16, 2024 11:04 AM
**To:** Kari Parks <kparks@gusraekaplan.com>; Victor Wang <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>; Savoie, Erin L. <savoiee@sullcrom.com>
**Subject:** Re: Emigrant v. Hanratty

FILED: NEW YORK COUNTY CLERK 01/23/2024 12:32 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 159
RECEIVED NYSCEF: 01/23/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2118 of 2230

Kari,

Your January 11 affidavit states that Defendants transferred at least $169,074.49 into the Parties' joint escrow account.  As of 10:54 AM today, Citi has no record of any such deposits.  Please provide the reference numbers for the deposits.

Best,

**Austin P. Mayron**
Sullivan & Cromwell LLP
125 Broad Street | New York, NY 10004-2498
+1 212 558 3733 (T) | +1 518 577 1643 (M)
mayrona@sullcrom.com | www.sullcrom.com

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

---

**This is an external message from: kparks@gusraekaplan.com **

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | : | Index No. 158207/2022 |
| Plaintiff, | : | (Hon. Margaret Chan) |
| v. | : | **MOTION SEQUENCE NO. 006** |
| JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1-10, | : | **ORAL ARGUMENT REQUESTED** |
| Defendants. | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE THE COURT'S JANUARY 9, 2024 ORDER (DKT. 113)**

Alexander J. Willscher
Austin P. Mayron
Erin L. Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business Credit Corporation*

FILED: NEW YORK COUNTY CLERK 01/23/2024 02:00 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 160
RECEIVED NYSCEF: 01/23/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2120 of 2230

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND.................................................................................... 3

LEGAL STANDARD .............................................................................................. 6

ARGUMENT........................................................................................................... 6

CONCLUSION ...................................................................................................... 10

## **TABLE OF AUTHORITIES**

*Page(s)*

### CASES

*A.V. by Versace, Inc.* v. *Gianni Versace S.p.A.*,
     87 F. Supp. 2d 281 (S.D.N.Y. 2000) ...................................................10

*Citigroup Glob. Markets, Inc.* v. *VCG Special Opportunities Master Fund Ltd.*,
     598 F.3d 30 (2d Cir. 2010) ...................................................................6

*Delijani* v. *Delijani*,
     107 A.D.3d 930 (2d Dep't 2013) .........................................................10

*Ficus Invs., Inc.* v. *Priv. Cap. Mgmt., L.L.C.*,
     66 A.D.3d 557 (1st Dep't 2009) ............................................................7

*Kaley* v. *United States*,
     571 U.S. 320 (2014) .............................................................................8

*Matter of People* v. *Hooks*,
     64 A.D.3d 1075 (3d Dep't 2009) .........................................................10

*Nat'l Rsch. Bureau, Inc.* v. *Kucker*,
     481 F. Supp. 612 (S.D.N.Y. 1979) ........................................................9

*In re Restraint of Bowman Gaskins Fin. Grp. Accts.*,
     345 F. Supp. 2d 613 (E.D. Va. 2004) ....................................................8

*Richardson* v. *Gray*,
     272 A.D.2d 142 (1st Dep't 2000) ..........................................................7

*United States* v. *Kam*,
     2011 WL 3039589 (E.D.N.Y. Mar. 18, 2011) .......................................8

*United States* v. *Monsanto*,
     491 U.S. 600 (1989) .............................................................................8

### STATUTES AND RULES

CPLR 2221 ....................................................................................................6

CPLR 5015(a) ...............................................................................................6

## PRELIMINARY STATEMENT

Defendant John Arthur Hanratty ("**Hanratty**") repeatedly has disregarded this Court's orders and should be held in contempt. The Court's November 30, 2022 Preliminary Injunction Order (Dkt. 47) required Hanratty to provide EBCC with twenty-four hours advance notice before transferring "assets in an amount exceeding $50,000." But Hanratty failed to provide notice for large transactions on October 13, 2023, December 11, 2023, and December 20, 2023— the last of which involved Hanratty transferring $75,000 to himself just days after he was arrested for bank and wire fraud. Hanratty also failed to escrow the proceeds of either the October 13, 2023 or December 11, 2023 sales, again in violation of the Preliminary Injunction Order (Dkt. 47), as well as the plain and unambiguous terms of the Credit Agreements (Dkt. 6 § 8.5). Finally, although the Preliminary Conference Order (Dkt. 53) required Hanratty to disclose large transactions to EBCC in monthly financial reporting, Hanratty failed to disclose the October 13, 2023 transaction, which is conspicuously missing from Defendants' October monthly financial reporting.

After EBCC discovered these transactions, it immediately sought clarification from Defendants. (*See* Ex. A to Willscher Affirm.) When Defendants failed to provide an adequate explanation for any of these transactions, EBCC filed an Order to Show Cause on January 4, 2024. (Dkt. 110.) EBCC requested, as interim relief, that the Court order Defendants to deposit the proceeds from the October 13, 2023 and December 11, 2023 sales into an escrow account, pending further order of the Court. The Court agreed and, on January 9, 2024, entered the Order to Show Cause, directing Defendants to escrow $306,946.30 by January 11, 2024. (Dkt. 113.) Notably, the Order to Show Cause required only that Defendants comply with conditions *to which they*

-1-

*already had agreed* in the Credit Agreements, which the Court reinforced with its Preliminary Injunction Order.

In the ensuing two weeks since the Court issued its Order to Show Cause, Defendants have utterly failed to comply. Indeed, Defendants have not escrowed a single dollar. Defendants instead, on January 11, 2024, filed a motion to vacate or modify the Order to Show Cause. (Dkt. 115.)

Defendants freely admit that "Defendants did not email EBCC specific advance notice of the individual December 11 transactions that 'exceeded $50,000,'" in violation of the Preliminary Injunction Order. (*See* Dkt. 154 ¶ 4.) Defendants nevertheless advance a litany of arguments about why they should be permitted to divert and further waste the proceeds of EBCC's collateral, including:

- EBCC should have monitored Defendants' accounting records more closely, even though the Court's Preliminary Conference Order required Defendants to provide detailed monthly reporting (*id.* at 4-5);

- EBCC has waived any contempt arguments by not moving for such relief sooner, based on an incident of noncompliance by Defendants over the summer (*id.* at 4);

- Hanratty should be permitted to divert the proceeds of EBCC's collateral to pay the costs of defending himself against federal criminal charges pending in the Southern District of New York (*id.* at 5); and

- Defendants' bulk sale of over $1.1 million in tax liens for $256,946.30 somehow is not a "transfer of any assets in an amount exceeding $50,000," as defined by the Preliminary Injunction Order (*id.* at 4).

None of these responses comes remotely close to justifying Defendants' blatant and repeated disregard of the Court's orders.

FILED: NEW YORK COUNTY CLERK 01/23/2024 02:00 PM | INDEX NO. 158207/2022
NYSCEF DOC. NO.: 160 | RECEIVED NYSCEF: 01/23/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2124 of 2230

Moreover, Defendants provide no explanation for their refusal to escrow the proceeds of the two at-issue sales, as required by the Order to Show Cause. Instead, Defendants state: "as a practical matter—**and assuming the truth of EBCC's claims that the Ebury Entities are highly illiquid**—it is no small feat for the Ebury Parties to conjure up $306,946.30 on 36 hours' notice." (Dkt. 115 at 8 (emphasis added).) For starters, Defendants have now had two full weeks to escrow the at-issue funds but have failed to do so. More importantly, Defendants do not argue that they *cannot* escrow the proceeds. Indeed, Defendants' own books and records prove that Defendants received $306,946.30 in liquid cash as a result of Defendants' improper distress sales of EBCC's collateral on October 13, 2023 and December 11, 2023. In the face of that evidence, Defendants have not proffered any evidence about what Hanratty did with that money or why he will not return it, as required by the Court's Order to Show Cause.

Accordingly, and as set forth more fully below, EBCC respectfully requests that the Court deny Defendants' motion and hold Hanratty in contempt.

## FACTUAL BACKGROUND

In 2017, Defendants executed the Credit Agreements with EBCC, which unequivocally restrict Defendants' ability to "sell, transfer or otherwise alienate any of the Collateral" unless "all proceeds of any such sales are deposited into the Lockbox Account within one (1) Business Day after receipt." (Dkt. 6 § 8.5.)

Shortly after EBCC filed this action in September 2022, EBCC moved, by order to show cause, for a temporary restraining order and preliminary injunction to restrict Defendants' ability to transfer *any* assets—including the Collateral—to provide an opportunity for the parties

-3-

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2125 of 2230

to resolve which assets were EBCC's Collateral.[1]  (*See* Dkt. 2.)  Specifically, EBCC sought a robust preliminary injunction containing the following provisions:

- <u>Transfer Restriction</u>:  Enjoining Defendants "from transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, [or] permitting the transfer of any of their assets, aside from ordinary and necessary disbursements related to the defendants' tax lien or real estate businesses or living expenses";

- <u>Escrow Requirement</u>:  Ordering Defendants to "deposit any proceeds" from the sale of "any tax lien certificate or real estate property resulting from the foreclosure on a tax lien certificate . . . into an escrow account, to be established by the parties"; and

- <u>Notice Requirement</u>:  Ordering Defendants to provide EBCC with notice "at least twenty-four (24) hours [before] transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, or permitting the transfer of any of their assets in an amount exceeding $50,000."

(Dkt. 2 at 2-3.)

On October 19, 2022, the Court issued a temporary restraining order that imposed the Escrow and Notice Requirements.  (Dkt. 23 at 3-4.)  Then, on November 30, 2022, the Court entered a preliminary injunction that imposed all three Requirements.  (Dkt. 47 at 8-9.)

During the Preliminary Conference on December 9, 2022, EBCC requested additional mechanisms to verify Defendants' compliance with the Preliminary Injunction Order. EBCC requested, and the Court ordered, that "defendants shall provide to plaintiff documentation showing the source of any proceeds in excess of $5,000 and any disbursements from the defendants in excess of $10,000 . . . as an ongoing obligation" each month.  (Dkt. 53 at 1.)

---

[1]    Defendants have since admitted that all of the Ebury Companies' assets are EBCC's Collateral.  (*See* Dkt. 123 at 232:25-233:5 ("**A**. It's all Emigrant's collateral."); *id.* at 240:4 ("**A**. It's all Emigrant's collateral."); *id.* at 240:6-15 ("**Q**. All of the tax liens that the Ebury companies owned in March of 2021 are Emigrant's collateral?  **A**. And REO and loans.").)

A year later, on December 18, 2023, Hanratty was arrested and charged by the U.S.

Attorney's Office for the Southern District of New York with bank and wire fraud in connection

with his scheme to defraud EBCC.  Two days later, Hanratty transferred $75,000 to himself out of

the Ebury Companies' bank accounts.  EBCC later discovered that Hanratty had made a distress

sale of $1.1 million of EBCC's collateral for only $256,946.30 in December 2023.  Hanratty did

so without providing the required notice to EBCC, in violation of both the Preliminary Injunction

Order and the Credit Agreements.  Out of concern that Hanratty was misusing the proceeds of

EBCC's collateral, including to pay his criminal defense expenses, EBCC moved on January 4,

2024, for the Court to hold Hanratty in civil and criminal contempt and to order him to  deposit

$306,946.30—representing the proceeds from the October and December 2023 asset sales—into

the Parties' joint escrow account, pending further order of the Court.  (*See* Dkt. 97.)  On January 9,

2024,  the  Court  entered  EBCC's  Order  to  Show  Cause,  ordering  Defendants  to  deposit

$306,946.30 into the Parties' joint escrow account no later than January 11, 2024.  (*See* Dkt. 113.)

Rather than comply with the escrow requirement, Defendants filed this motion to

vacate or modify the Court's Order.  In support of the motion, Defendants initially asserted, falsely,

that "on January 11, 2024, the Ebury Parties transferred at least $169,074.49 to the Parties' escrow

account."  (*See* Ex. B. to Willscher Affirm. ¶ 4.)  That representation was obviously untrue and

Defendants ultimately were forced to submit corrected motion papers and affirmations. (*See*

Dkt. 116 ¶¶ 2-4.) [2]

---

[2]    In fact, the $169,074.49 represents proceeds deposited into EBCC's lockbox account in 2023 by MTAG, the independent third-party custodian and servicer, which has custody of only a small fraction of EBCC's purported collateral.  EBCC understands that Hanratty and the other Defendants do not have control over that money and played no part in remitting it to EBCC.

## LEGAL STANDARD

CPLR 5015(a) lists only five grounds for vacating a Court order:  (i) "excusable default"; (ii) "newly-discovered evidence"; (iii) "fraud, misrepresentation, or other misconduct of an adverse party"; (iv) "lack of jurisdiction to render the judgment or order"; or (v) "reversal, modification or vacatur of a prior judgment or order."  *See* CPLR 5015(a).  CPLR 2221 similarly allows for reargument only "based upon matters of fact or law allegedly misapprehended by the court in determining the prior motion."  *See* CPLR 2221(d), (e).

## ARGUMENT

Defendants have not identified any circumstances, newly-discovered evidence, or misrepresentation or other misconduct of an adverse party to justify vacating the Order to Show Cause under CPLR 5015(a).  EBCC accurately represented the facts to the Court, and Defendants do not argue to the contrary.[3]

Moreover, Defendants have failed to contradict a single element of EBCC's argument that Hanratty should be found in contempt.  Defendants do not dispute that they:

- made withdrawals of $65,000 and $56,843.28, on November 16 and 17, 2022, respectively. without advance notice to EBCC (Dkt. 99 ¶¶ 10-11);

- made withdrawals of $148,735.81 and $93,000 on December 1, 2022; a withdrawal of $58,725.54 on December 6, 2022; and a

---

[3]    Defendants suggest that the relief requested by EBCC's Order to Show Cause should be evaluated under a "heightened 'substantial likelihood' standard." (Dkt. 115 at 6 (citing *Citigroup Glob. Markets, Inc.* v. *VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010)).) But *Citigroup* does not apply by Defendants' own admission. (*Id.*)  Further, the Second Circuit applies this standard only where "the requested injunction (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Citigroup*, 598 F.3d at 35 n.4. Defendants have not established either factor—Defendants depositing funds into an escrow account would not provide EBCC "all the relief that is sought," and it also could easily be undone, simply by directing the escrow agent to return the funds.

transfer of $50,000.00 on December 7, 2022, all without advance notice to EBCC (*id*. ¶¶ 12-13);

- made a withdrawal of $64,637.21 on December 19, 2022, without advance notice to EBCC (*id*. ¶¶ 14-15.);

- made a bulk sale of liens for $90,000 on August 17, 2023, without advance notice to EBCC or escrowing the proceeds (*id*. ¶¶ 16-17);

- sold a tax lien worth $87,414.74 for $50,000 on October 13, 2023, without advance notice to EBCC, without escrowing the proceeds, and without disclosing the transaction in their monthly financial reporting (*id*. ¶ 22); and

- made a bulk sale of tax liens worth $1,124,483.96 for only $256,946.30 on December 11, 2023; and transferred $75,000 directly to Hanratty on December 20, 2023, without providing advance notice to EBCC or escrowing any proceeds (*id*. ¶¶ 20-21).

Defendants' failure to comply with the Court's orders has deprived EBCC (and the Court) of the ability to review the propriety and fairness of the at-issue transactions in advance and has prejudiced EBCC's ability to recover the transferred assets. *See Ficus Invs., Inc.* v. *Priv. Cap. Mgmt., L.L.C.*, 66 A.D.3d 557, 558 (1st Dep't 2009) (finding prejudice where the defendant impermissibly "negotiat[ed] the conveyance of certain mortgages without providing notice to plaintiffs"); *Richardson* v. *Gray*, 272 A.D.2d 142, 142 (1st Dep't 2000) (affirming finding of civil contempt where defendant transferred funds other than "in the ordinary course of business").

Defendants first respond that their failure to comply with the Preliminary Injunction Order by providing notice to EBCC regarding the December 11, 2023 bulk sale was merely "inadvertent." (Dkt. 153 at 12.) That assertion is conclusory, unsupported by any proffered affidavit from Hanratty, and frankly not credible given Hanratty's long history of evasive and deceptive practices.

Defendants then argue that any transfers made directly to Hanratty are "ordinary and necessary disbursements" under the terms of the Preliminary Injunction Order because he, in

FILED: NEW YORK COUNTY CLERK 01/23/2024 02:00 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 160    24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 01/23/2024

Court Records          Pg 2129 of 2230

fact, will be using them to pay criminal defense expenses. (*Id.* at 10.) Defendants argue that "[a]ny advancement of criminal defense costs is an 'ordinary' and 'necessary' business expense, certainly a necessary 'living expense[],'" and is explicitly contemplated in Ebury Fund 1 and Ebury Fund 2's partnership agreements." (*Id.* at 12.) This argument fails for at least four reasons.

*First*, it is inequitable and contrary to federal law to allow Hanratty to use the proceeds of his fraud against Emigrant to defend against federal criminal charges related to that fraud. Indeed, it is well-established practice in federal criminal law for courts to issue pre-trial orders that prevent defendants from using fraud proceeds to fund their defense. *See Kaley* v. *United States*, 571 U.S. 320, 322 (2014) (federal courts are authorized to issue orders to prevent defendants from spending or transferring forfeitable property, including to pay an attorney for legal services); *United States* v. *Monsanto*, 491 U.S. 600 (1989) (affirming pre-trial restraint of criminal proceeds with no exemption for attorney's fees); *United States* v. *Kam*, 2011 WL 3039589, *7 (E.D.N.Y. Mar. 18, 2011) (restraining criminal proceeds already deposited in attorney's escrow account); *In re Restraint of Bowman Gaskins Fin. Grp. Accts.*, 345 F. Supp. 2d 613, 627-28 (E.D. Va. 2004) (*Monsanto* applies equally to preindictment orders; that the target of the grand jury investigation wants to use the money to hire counsel is no reason to object to a restraining order if there is probable cause to believe the property is forfeitable).

*Second*, it is inequitable to force EBCC to continue expending resources to recover what it is owed, while Hanratty is permitted to freely use EBCC's collateral for his own personal purposes, including funding his criminal defense expenses. EBCC disagrees that these are "ordinary and necessary disbursements related to defendants' tax lien or real estate businesses or living expenses," as defined by the Preliminary Injunction Order. But, to the extent there can be

-8-

any dispute, EBCC requests that the Court amend that order to make clear that funding Hanratty's

criminal defense is not an authorized exception to the escrow requirement.[4]

   *Third*, even if Hanratty were to be permitted to use the proceeds of his fraud to

defend himself against criminal fraud charges, Defendants have not provided any evidence that

the $75,000 transfer to Hanratty was, in fact, related to such expenses.  On the contrary, Defendants

previously have paid legal expenses to Defendants' civil counsel—who is representing him in the

criminal proceedings—directly from the Ebury Companies' bank accounts, including in December

2023 and January 2024.  (*See, e.g.*, Ex. C to Willscher Affirm.)

   *Fourth*, separate and apart from the Preliminary Injunction Order, Defendants

entirely ignore the fact that they agreed to escrow any proceeds from the sale of Emigrant's

Collateral as a condition of the Credit Agreements.  (Dkt. 6 § 8.5.)  Exceedingly generous

indemnification provisions contained in Defendants' Limited Partnership Agreements simply

cannot overrule the express restrictions on Defendants' use of EBCC's Collateral contained in the

Credit Agreements.  By arguing otherwise, Defendants ask this Court to condone further breaches

of the Credit Agreements.

   Defendants alternatively argue that, because EBCC did not file a contempt motion

after a single incident of noncompliance last summer, Defendants are free to do as they please with

EBCC's collateral.  But it is Defendants' responsibility to comply with the Preliminary Injunction

Order, not EBCC's responsibility constantly to police them.  EBCC's decision not to "object[] to"

---

[4] To the extent Defendants argue that the Preliminary Injunction Order is ambiguous, they should have requested a clarification before taking action.  *Nat'l Rsch. Bureau, Inc.* v. *Kucker*, 481 F. Supp. 612, 615 (S.D.N.Y. 1979) ("If an order is ambiguous, which this one does not appear to be, then a clarification should be sought before acts are performed in the ambiguous area. . . . Nor can contempt be avoided by some literal or hypertechnical reading of an order.  It is the spirit and purpose of an injunction, not merely its precise words, that must be obeyed.").

or "complain[]" about Ebury's violation last summer does not excuse Defendants' failure to comply with the Court's orders. *See* <u>Delijani</u> v. <u>Delijani</u>, 107 A.D.3d 930 (2d Dep't 2013) (holding that "repeated violation[s]" demonstrated willfulness sufficient for criminal contempt); *Matter of People* v. *Hooks*, 64 A.D.3d 1075, 1075-76 (3d Dep't 2009) (affirming finding of contempt where petitioner "ultimately applied in 2004 to have [respondent] again held in contempt," despite receiving notice of noncompliance "[s]oon" after respondent was imprisoned in 2001); *see also A.V. by Versace, Inc.* v. *Gianni Versace S.p.A.*, 87 F. Supp. 2d 281 (S.D.N.Y. 2000) (finding defendant in contempt despite seven-month gap between issuance of order and plaintiff seeking defendant to be held in contempt).

## **CONCLUSION**

For the foregoing reasons, EBCC respectfully requests the Court deny Defendants' proposed order to show cause.

Dated:  January 23, 2024
       New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*

Alexander J. Willscher
Austin P. Mayron
Erin L. Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Plaintiff Emigrant Business Credit Corporation*

-10-

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this memorandum of law complies with the word-count limit of Commercial Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because it contains 2,928 words.

Dated:   January 23, 2024                         */s/ Alexander J. Willscher*
              New York, New York                      Alexander J. Willscher

-11-

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                Plaintiff,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ
CORPS. 1-10,

                Defendants.

---------------------------------------------------------------- x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. 006**

**AFFIRMATION OF ALEXANDER J.
WILLSCHER**

      **ALEXANDER J. WILLSCHER**, an attorney duly admitted to practice law in the Courts

of the State of New York, affirms the truth of the following statements, under the penalties of

perjury:

      1.      I am a partner at the law firm of Sullivan & Cromwell LLP, counsel for Plaintiff

Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned matter.  I am familiar

with the matters set forth below.  I submit this affirmation in opposition to Defendants' Proposed

Order to Show Cause, seeking to vacate or modify the Court's January 9, 2024 Order.  (Dkt. 114.)

2.      Attached hereto as Exhibit A is a true and correct copy of email correspondence between EBCC's counsel and Defendants' counsel, dated January 4, 2024, and the corresponding attachment containing excerpts from a journal report exported from Defendants' QuickBooks accounting software on January 3, 2024, including transactions from Defendants' bank accounts from October 12, 2023 through December 20, 2023.

3.      Attached hereto as Exhibit B is a true and correct copy of the Affirmation of Kari Parks, dated January 11, 2024; originally docketed as NYSCEF No. 116.

4.      Attached hereto as Exhibit C is a true and correct copy of excerpts from a spreadsheet produced by Defendants in this action, bearing Bates numbers EBURY_00081329 to EBURY_00081330 and purportedly listing transactions from Defendants' bank accounts, including transactions from December 6, 2023 through January 5, 2024.

Dated:   January 23, 2024
         New York, New York

*/s/ Alexander J. Willscher*
**ALEXANDER J. WILLSCHER**

-2-

FILED: NEW YORK COUNTY CLERK 01/23/2024 02:00 PM
NYSCEF DOC. NO. 161

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/23/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2135 of 2230

## CERTIFICATE OF COMPLIANCE

I hereby certify that this affirmation complies with the word count limit of Commercial

Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because

it contains 226 words.


Dated:    January 23, 2024                    */s/ Alexander J. Willscher*
          New York, New York                 Alexander J. Willscher

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 162

EXHIBIT(S) - REQUEST TO SEAL

January 4, 2024 Email Correspondence

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

<div align="center">Plaintiff,</div>

<div align="center">v.</div>

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1 EMIFL,
LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC,
EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
1EMINJ, LLC, EB 1EMINY, LLC, EB
2MINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND),
LLC, EBURY FUND 1FL, LLC, EBURY
FUND 2FL, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, EBURY RE
LLC, and XYZ CORPS. 1–10,

<div align="right">Defendants.</div>

The Honorable Margaret A. Chan
Index No. 158207/2022

Mot. Seq. 6

---

## AFFIRMATION OF KARI PARKS

Under the penalties of perjury, I, Kari Parks, affirm as follows:

1.      I am a partner of the law firm Gusrae Kaplan Nusbaum PLLC, counsel for the "Ebury Parties" in the above-captioned matter.

2.      I submit this affirmation in support of the Ebury Parties' proposed order to show cause, Motion Sequence 6.

3.      EBCC has had continuous, open access to the Ebury Entities' live accounting records, including Quickbooks, since at least early 2022.

4.      I understand that on January 11, 2024, the Ebury Parties transferred at least $169,074.49 to the Parties' escrow account.

5.      A true and correct copy of the September 15, 2023 emails between our law firm and Plaintiff's counsel is annexed as Exhibit A.

6.      A true and correct copy of Quickbooks login time stamps is annexed as Exhibit B.

7.      True and correct copies of Ebury Fund 1, LP and Ebury Fund 2, LP's Limited Partnership Agreements are annexed as Exhibit C to this Affirmation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 11, 2022
         New York, New York

Respectfully submitted,

/s/ Kari Parks

Kari Parks

FILED: NEW YORK COUNTY CLERK

NYSCEF DOC. NO. 164

EXHIBIT(S) - REQUEST TO SEAL

EBURY_00081329 to EBURY_00081330

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2141 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

--------------------------------------------------------------------------------X

EMIGRANT BUSINESS CREDIT CORPORATION,

Plaintiff,

- v -

JOHN ARTHUR HANRATTY, EBURY STREET
CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2,
LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB
1EMIALA LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC,
EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ,
LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE
1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE
TAX RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC, EBURY RE LLC, and XYZ
CORPS.

Defendants.

------------------------------------------:-------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 158207/2022 |
| **MOTION DATE** | 01/04/2024, 01/22/2024, 01/22/2024 |
| **MOTION SEQ. NO.** | 005 006 007 |

**DECISION + ORDER ON MOTION**

HON. MARGARET A. CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 005) 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 113, 153, 154

were read on this motion to/for _____ CONTEMPT _____.

The following e-filed documents, listed by NYSCEF document number (Motion 006) 114, 115, 116, 117, 118, 119, 155, 160, 161, 162, 163, 164

were read on this motion to/for _____ VACATE - DECISION/ORDER/JUDGMENT/AWARD _____.

The following e-filed documents, listed by NYSCEF document number (Motion 007) 149, 150, 151, 152, 156, 157, 158, 159

were read on this motion to/for _____ STAY _____.

Presently before the court are three motions in this action by plaintiff
Emigrant Business Credit Corporation alleging claims for breach of contract,
fraudulent inducement, and fraudulent transfer. In Motion Sequence (MS) 005,
plaintiff moves, by order to show cause, for an order pursuant to Judiciary Law §§
753, 773, and 774 holding defendants in civil contempt and an order pursuant to
Judiciary Law §§ 750(3) and 751(1) holding defendant John Arthur Hanratty

**158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL**
**Motion No. 005 006 007**    Page 1 of 4

1 of 4

FILED: NEW YORK COUNTY CLERK 01/26/2024 04:58 PM
NYSCEF DOC. NO. 165
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/25/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2142 of 2230

(Hanratty) in criminal contempt (NYSCEF # 113). In MS 006, defendants move, by order to show cause, for an order pursuant to CPLR 5015 and/or 2221 vacating and/or modifying that portion of this court's January 9, 2024, order requiring defendants to deposit $306,946.30 into the parties' joint escrow account no later than January 11, 2024 (NYSCEF # 114). And in MS 007, defendants move pursuant to CPLR 2201 for a stay of this civil action pending final resolution of the criminal action against Hanratty, captioned *United States of America v John Arthur Hanratty*, 23-mj-7566 (SDNY 2023). All three motions are opposed.

Oral arguments on all three motions were held on January 24, 2024. This Decision and Order resolves all three motions and/or pending orders to show cause.

Turning to MS 005, to establish civil contempt based on an alleged violation of a court order, the movant must establish, by clear and convincing evidence, that a lawful order of the court expressing an unequivocal mandate was in effect, and that the order was disobeyed with reasonable certainty (*Department of Envtl. Protection of City of New York v Dept. of Envtl. Conserv. of State of N.Y.*, 70 NY2d 233, 240 [1987]). "Intent or willfulness is not required to hold a party in contempt for disobeying a court order or subpoena" (*Yalkowsky v Yalkowskv*, 93 AD2d 834, 835 [2d Dept 1983]). Instead, the movant must establish that the party to be held in contempt had knowledge of a clear and unequivocal order, failed to comply with its terms, and prejudiced the right of another party through its disobedience (*McCain v Dinkins*, 84 NY2d 216, 226 [1994]; *Garcia v Great Atl. & Pac. Tea Co.*, 231 AD2d 401, 401-402 [1st Dept 1996]). Once this showing is made, "the burden shifts to the alleged contemnor to refute the movant's showing, or to offer evidence of a defense, such as an inability to comply with the order" (*El-Dehdan v El-Dehdan*, 114 AD3d 4, 17-18 [2d Dept 2013], *aff'd* 26 NY3d 19 [2015]).

Here, for the reasons set forth during oral arguments and upon consideration of defendants' concessions set forth on the record, the court finds Hanratty in civil contempt and imposes a civil fine of $306,946.30 for failure to comply with the terms and restrictions set forth in the court's preliminary injunction order (NYSCEF # 47 at 8-9) and its preliminary conference order (NYSCEF # 53). Hanratty is directed to pay or cause to be paid $306,946.30 into the parties' joint escrow account by no later than February 7, 2024.

Given this determination, the court declines to sign defendants' proposed order to show cause submitted in connection with MS 006 because that issue has been mooted by the court's resolution of MS 007. Meanwhile, the remainder of MS 005 is denied, without prejudice, to extent it seeks to hold Hanratty in criminal contempt. Plaintiff, however, is granted leave to renew if plaintiff learns of additional breaches of the court's preliminary injunction order or preliminary conference order.

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL
Motion No. 005 006 007

Page 2 of 4

2 of 4

Regarding defendants' application for a stay in MS 007, it is well settled that a motion pursuant to CPLR 2201 seeking a stay of a civil action pending resolution of a related criminal action is directed to the sound discretion of the court (*see Britt v International Bus Servs., Inc.*, 255 AD2d 143, 144 [1st Dept 1998]). Factors for the court to consider include, among others, the risk of inconsistent adjudications, potential waste of judicial resources, and whether "defendant will invoke his or her constitutional right against self incrimination" (*see id.*, citing *Zonghetti v Jeromack*, 150 AD2d 561, 563 [2d Dept 1989] and *DeSiervi v Liverzani*, 136 AD 527, 528 [2d Dept 1988]).

Here, after considering the parties' written and oral arguments, the court concludes that a stay of this action pending resolution of the ongoing criminal proceedings against Hanratty is warranted. As defendants note, the criminal action against Hanratty and this civil action arise out of identical facts (*compare* NYSCEF # 1 *with* NYSCEF # 152). Accordingly, a stay will avoid the possibility inconsistent results, save scarce judicial resources, and result in a potential streamlining and simplifying of the issues to be resolved in this proceeding, either by summary judgment or trial (*see Mook v Homesafe Am., Inc.*, 144 AD3d 1116, 1117 [2d Dept 2016] ["a prior determination in the criminal proceeding could have collateral estoppel effect in this action, thereby simplifying the issues"]). Furthermore, although discovery in this action is complete, briefing on plaintiff's motion for summary judgment on its breach of contract claim remains ongoing—including a forthcoming opposition and cross-motion by defendants—and a trial on plaintiff's remaining claims is also on the horizon. Hanratty's concerns regarding his constitutional right against self-incrimination are therefore not entirely obviated by the current procedural posture of this civil action. For these reasons, defendants' motion to stay pursuant to CPLR 2201 is granted.

In conclusion, it is hereby

ORDERED that plaintiff's motion to hold defendant John Arthur Hanratty in civil contempt (MS 005) is granted; and it is further

ORDERED and ADJUDGED that defendant John Arthur Hanratty is guilty of civil contempt for his failure to comply with the court's November 30, 2022, preliminary injunction order and its December 12, 2022, preliminary conference order; and it is further

ORDERED that a fine of $306,946.30 is imposed on defendant John Arthur Hanratty, plus legal costs and expenses incurred by plaintiff in connection with its contempt motion; and it is further

ORDERED that defendant John Arthur Hanratty will be purged of the contempt by providing proof of payment of the $306,943.30 into the parties' joint escrow account by February 7, 2024; and it is further

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL    Page 3 of 4
Motion No. 005 006 007

3 of 4

ORDERED that if defendant John Arthur Hanratty fails to comply with the immediately preceding paragraph, plaintiff may apply for further relief including a fine or other appropriate penalty or an adjudication of criminal contempt; and it is further

ORDERED that defendants' request for a stay pursuant to CPLR 2201 pending final resolution of the criminal action against defendant John Arthur Hanratty, captioned *United States of America v John Arthur Hanratty*, 23-mj-7566 (SDNY 2023) is granted, thereby resolving the proposed order to show cause submitted in connection with MS 007.

The court otherwise declines to sign the order to show cause in MS006 for the reasons set forth above.

| 01/25/2024 | | | MARGARET A. CHAN, J.S.C. |
| DATE | | | |

| CHECK ONE: | | CASE DISPOSED | [X] NON-FINAL DISPOSITION |
| | | [ ] GRANTED [ ] DENIED | [ ] GRANTED IN PART [X] OTHER |
| APPLICATION: | | [ ] SETTLE ORDER | [ ] SUBMIT ORDER |
| CHECK IF APPROPRIATE: | | [ ] INCLUDES TRANSFER/REASSIGN | [ ] FIDUCIARY APPOINTMENT [ ] REFERENCE |

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL        Page 4 of 4
Motion No. 005 006 007

FILED: NEW YORK COUNTY CLERK 01/26/2024 04:58 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 166
RECEIVED NYSCEF: 01/25/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2145 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

---------------------------------------------------------------------------------X

| | |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | **INDEX NO.** _____158207/2022_____ |
| Plaintiff, | 01/04/2024, 01/22/2024, |
| - v - | **MOTION DATE** _____01/22/2024_____ |
| JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC,EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC,EB 1EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB 2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC,RE 2EMI LLC,EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. | **MOTION SEQ. NO.** ___005 006 007___  **DECISION + ORDER ON MOTION** |
| Defendants. | |

---------------------------------------------------------------------------------X

HON. MARGARET A. CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 005) 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 113, 153, 154
were read on this motion to/for _____CONTEMPT_____.

The following e-filed documents, listed by NYSCEF document number (Motion 006) 114, 115, 116, 117, 118, 119, 155, 160, 161, 162, 163, 164
were read on this motion to/for _____VACATE - DECISION/ORDER/JUDGMENT/AWARD_____.

The following e-filed documents, listed by NYSCEF document number (Motion 007) 149, 150, 151, 152, 156, 157, 158, 159
were read on this motion to/for _____STAY_____.

     Presently before the court are three motions in this action by plaintiff Emigrant Business Credit Corporation alleging claims for breach of contract, fraudulent inducement, and fraudulent transfer. In Motion Sequence (MS) 005, plaintiff moves, by order to show cause, for an order pursuant to Judiciary Law §§ 753, 773, and 774 holding defendants in civil contempt and an order pursuant to Judiciary Law §§ 750(3) and 751(1) holding defendant John Arthur Hanratty

**158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL**
**Motion No. 005 006 007**
Page 1 of 4

1 of 4

FILED: NEW YORK COUNTY CLERK 01/26/2024 04:58 PM
NYSCEF DOC. NO. 166

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2146 of 2230

INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/25/2024

(Hanratty) in criminal contempt (NYSCEF # 113). In MS 006, defendants move, by order to show cause, for an order pursuant to CPLR 5015 and/or 2221 vacating and/or modifying that portion of this court's January 9, 2024, order requiring defendants to deposit $306,946.30 into the parties' joint escrow account no later than January 11, 2024 (NYSCEF # 114). And in MS 007, defendants move pursuant to CPLR 2201 for a stay of this civil action pending final resolution of the criminal action against Hanratty, captioned *United States of America v John Arthur Hanratty*, 23-mj-7566 (SDNY 2023). All three motions are opposed.

Oral arguments on all three motions were held on January 24, 2024. This Decision and Order resolves all three motions and/or pending orders to show cause.

Turning to MS 005, to establish civil contempt based on an alleged violation of a court order, the movant must establish, by clear and convincing evidence, that a lawful order of the court expressing an unequivocal mandate was in effect, and that the order was disobeyed with reasonable certainty (*Department of Envtl. Protection of City of New York v Dept. of Envtl. Conserv. of State of N.Y.*, 70 NY2d 233, 240 [1987]). "Intent or willfulness is not required to hold a party in contempt for disobeying a court order or subpoena" (*Yalkowsky v Yalkowsky*, 93 AD2d 834, 835 [2d Dept 1983]). Instead, the movant must establish that the party to be held in contempt had knowledge of a clear and unequivocal order, failed to comply with its terms, and prejudiced the right of another party through its disobedience (*McCain v Dinkins*, 84 NY2d 216, 226 [1994]; *Garcia v Great Atl. & Pac. Tea Co.*, 231 AD2d 401, 401-402 [1st Dept 1996]). Once this showing is made, "the burden shifts to the alleged contemnor to refute the movant's showing, or to offer evidence of a defense, such as an inability to comply with the order" (*El-Dehdan v El-Dehdan*, 114 AD3d 4, 17-18 [2d Dept 2013], *aff'd* 26 NY3d 19 [2015]).

Here, for the reasons set forth during oral arguments and upon consideration of defendants' concessions set forth on the record, the court finds Hanratty in civil contempt and imposes a civil fine of $306,946.30 for failure to comply with the terms and restrictions set forth in the court's preliminary injunction order (NYSCEF # 47 at 8-9) and its preliminary conference order (NYSCEF # 53). Hanratty is directed to pay or cause to be paid $306,946.30 into the parties' joint escrow account by no later than February 7, 2024.

Given this determination, the court declines to sign defendants' proposed order to show cause submitted in connection with MS 006 because that issue has been mooted by the court's resolution of MS 007. Meanwhile, the remainder of MS 005 is denied, without prejudice, to extent it seeks to hold Hanratty in criminal contempt. Plaintiff, however, is granted leave to renew if plaintiff learns of additional breaches of the court's preliminary injunction order or preliminary conference order.

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL
Motion No. 005 006 007

Page 2 of 4

2 of 4

Regarding defendants' application for a stay in MS 007, it is well settled that a motion pursuant to CPLR 2201 seeking a stay of a civil action pending resolution of a related criminal action is directed to the sound discretion of the court (*see Britt v International Bus Servs., Inc.*, 255 AD2d 143, 144 [1st Dept 1998]). Factors for the court to consider include, among others, the risk of inconsistent adjudications, potential waste of judicial resources, and whether "defendant will invoke his or her constitutional right against self incrimination" (*see id.*, citing *Zonghetti v Jeromack*, 150 AD2d 561, 563 [2d Dept 1989] and *DeSiervi v Liverzani*, 136 AD 527, 528 [2d Dept 1988]).

Here, after considering the parties' written and oral arguments, the court concludes that a stay of this action pending resolution of the ongoing criminal proceedings against Hanratty is warranted. As defendants note, the criminal action against Hanratty and this civil action arise out of identical facts (*compare* NYSCEF # 1 *with* NYSCEF # 152). Accordingly, a stay will avoid the possibility inconsistent results, save scarce judicial resources, and result in a potential streamlining and simplifying of the issues to be resolved in this proceeding, either by summary judgment or trial (*see Mook v Homesafe Am., Inc.*, 144 AD3d 1116, 1117 [2d Dept 2016] ["a prior determination in the criminal proceeding could have collateral estoppel effect in this action, thereby simplifying the issues"]). Furthermore, although discovery in this action is complete, briefing on plaintiff's motion for summary judgment on its breach of contract claim remains ongoing—including a forthcoming opposition and cross-motion by defendants—and a trial on plaintiff's remaining claims is also on the horizon. Hanratty's concerns regarding his constitutional right against self-incrimination are therefore not entirely obviated by the current procedural posture of this civil action. For these reasons, defendants' motion to stay pursuant to CPLR 2201 is granted.

In conclusion, it is hereby

ORDERED that plaintiff's motion to hold defendant John Arthur Hanratty in civil contempt (MS 005) is granted; and it is further

ORDERED and ADJUDGED that defendant John Arthur Hanratty is guilty of civil contempt for his failure to comply with the court's November 30, 2022, preliminary injunction order and its December 12, 2022, preliminary conference order; and it is further

ORDERED that a fine of $306,946.30 is imposed on defendant John Arthur Hanratty, plus legal costs and expenses incurred by plaintiff in connection with its contempt motion; and it is further

ORDERED that defendant John Arthur Hanratty will be purged of the contempt by providing proof of payment of the $306,943.30 into the parties' joint escrow account by February 7, 2024; and it is further

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2148 of 2230

ORDERED that if defendant John Arthur Hanratty fails to comply with the immediately preceding paragraph, plaintiff may apply for further relief including a fine or other appropriate penalty or an adjudication of criminal contempt; and it is further

ORDERED that defendants' request for a stay pursuant to CPLR 2201 pending final resolution of the criminal action against defendant John Arthur Hanratty, captioned *United States of America v John Arthur Hanratty*, 23-mj-7566 (SDNY 2023) is granted, thereby resolving the proposed order to show cause submitted in connection with MS 007.

The court otherwise declines to sign the order to show cause in MS006 for the reasons set forth above.

01/25/2024
DATE                                                    MARGARET A. CHAN, J.S.C.

CHECK ONE:                    [ ] CASE DISPOSED       [X] NON-FINAL DISPOSITION
                              [ ] GRANTED   [ ] DENIED [ ] GRANTED IN PART   [X] OTHER
APPLICATION:                  [ ] SETTLE ORDER        [ ] SUBMIT ORDER
CHECK IF APPROPRIATE:         [ ] INCLUDES TRANSFER/REASSIGN  [ ] FIDUCIARY APPOINTMENT  [ ] REFERENCE

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL          Page 4 of 4
Motion No. 005 006 007

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49M

------------------------------------------------------------------------------X

| | |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, | **INDEX NO.**    158207/2022 |
| Plaintiff, | 01/04/2024, |
| | 01/22/2024, |
| - v - | **MOTION DATE**    01/22/2024 |
| JOHN ARTHUR HANRATTY, EBURY STREET | **MOTION SEQ. NO.**    005 006 007 |
| CAPITAL, LLC,EBURY FUND 1, LP, EBURY FUND 2, | |
| LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB | **DECISION + ORDER ON** |
| 1EMIALA LLC, EB 2EMIALA LLC,EB 1EMIFL, LLC, | **MOTION** |

JOHN ARTHUR HANRATTY, EBURY STREET
CAPITAL, LLC,EBURY FUND 1, LP, EBURY FUND 2,
LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB
1EMIALA LLC, EB 2EMIALA LLC,EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC,
EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ,
LLC, EB 2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE
1EMI LLC,RE 2EMI LLC,EB 1EMIDC, LLC, ARQUE
TAX RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC,
EBURY FUND 1NJ, LLC, EBURY FUND 2NJ, LLC,
RED CLOVER 1, LLC, EBURY RE LLC, and XYZ
CORPS.

Defendants.

------------------------------------------------------------------------------X

HON. MARGARET A. CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 005) 97, 98, 99, 100, 101, 102,
103, 104, 105, 106, 107, 108, 109, 110, 113, 153, 154
were read on this motion to/for _____ CONTEMPT _____ .

The following e-filed documents, listed by NYSCEF document number (Motion 006) 114, 115, 116, 117, 118,
119, 155, 160, 161, 162, 163, 164
were read on this motion to/for _____ VACATE - DECISION/ORDER/JUDGMENT/AWARD _____ .

The following e-filed documents, listed by NYSCEF document number (Motion 007) 149, 150, 151, 152, 156,
157, 158, 159
were read on this motion to/for _____ STAY _____ .

Presently before the court are three motions in this action by plaintiff
Emigrant Business Credit Corporation alleging claims for breach of contract,
fraudulent inducement, and fraudulent transfer. In Motion Sequence (MS) 005,
plaintiff moves, by order to show cause, for an order pursuant to Judiciary Law §§
753, 773, and 774 holding defendants in civil contempt and an order pursuant to
Judiciary Law §§ 750(3) and 751(1) holding defendant John Arthur Hanratty

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL    Page 1 of 4
Motion No. 005 006 007

1 of 4

(Hanratty) in criminal contempt (NYSCEF # 113). In MS 006, defendants move, by order to show cause, for an order pursuant to CPLR 5015 and/or 2221 vacating and/or modifying that portion of this court's January 9, 2024, order requiring defendants to deposit $306,946.30 into the parties' joint escrow account no later than January 11, 2024 (NYSCEF # 114). And in MS 007, defendants move pursuant to CPLR 2201 for a stay of this civil action pending final resolution of the criminal action against Hanratty, captioned *United States of America v John Arthur Hanratty*, 23-mj-7566 (SDNY 2023). All three motions are opposed.

Oral arguments on all three motions were held on January 24, 2024. This Decision and Order resolves all three motions and/or pending orders to show cause.

Turning to MS 005, to establish civil contempt based on an alleged violation of a court order, the movant must establish, by clear and convincing evidence, that a lawful order of the court expressing an unequivocal mandate was in effect, and that the order was disobeyed with reasonable certainty (*Department of Envtl. Protection of City of New York v Dept. of Envtl. Conserv. of State of N.Y.*, 70 NY2d 233, 240 [1987]). "Intent or willfulness is not required to hold a party in contempt for disobeying a court order or subpoena" (*Yalkowsky v Yalkowsky*, 93 AD2d 834, 835 [2d Dept 1983]). Instead, the movant must establish that the party to be held in contempt had knowledge of a clear and unequivocal order, failed to comply with its terms, and prejudiced the right of another party through its disobedience (*McCain v Dinkins*, 84 NY2d 216, 226 [1994]; *Garcia v Great Atl. & Pac. Tea Co.*, 231 AD2d 401, 401-402 [1st Dept 1996]). Once this showing is made, "the burden shifts to the alleged contemnor to refute the movant's showing, or to offer evidence of a defense, such as an inability to comply with the order" (*El-Dehdan v El-Dehdan*, 114 AD3d 4, 17-18 [2d Dept 2013], *aff'd* 26 NY3d 19 [2015]).

Here, for the reasons set forth during oral arguments and upon consideration of defendants' concessions set forth on the record, the court finds Hanratty in civil contempt and imposes a civil fine of $306,946.30 for failure to comply with the terms and restrictions set forth in the court's preliminary injunction order (NYSCEF # 47 at 8-9) and its preliminary conference order (NYSCEF # 53). Hanratty is directed to pay or cause to be paid $306,946.30 into the parties' joint escrow account by no later than February 7, 2024.

Given this determination, the court declines to sign defendants' proposed order to show cause submitted in connection with MS 006 because that issue has been mooted by the court's resolution of MS 007. Meanwhile, the remainder of MS 005 is denied, without prejudice, to extent it seeks to hold Hanratty in criminal contempt. Plaintiff, however, is granted leave to renew if plaintiff learns of additional breaches of the court's preliminary injunction order or preliminary conference order.

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL          Page 2 of 4
Motion No. 005 006 007

2 of 4

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records    Pg 2151 of 2230

Regarding defendants' application for a stay in MS 007, it is well settled that a motion pursuant to CPLR 2201 seeking a stay of a civil action pending resolution of a related criminal action is directed to the sound discretion of the court (*see Britt v International Bus Servs., Inc.*, 255 AD2d 143, 144 [1st Dept 1998]). Factors for the court to consider include, among others, the risk of inconsistent adjudications, potential waste of judicial resources, and whether "defendant will invoke his or her constitutional right against self incrimination" (*see id.*, citing *Zonghetti v Jeromack*, 150 AD2d 561, 563 [2d Dept 1989] and *DeSiervi v Liverzani*, 136 AD 527, 528 [2d Dept 1988]).

Here, after considering the parties' written and oral arguments, the court concludes that a stay of this action pending resolution of the ongoing criminal proceedings against Hanratty is warranted. As defendants note, the criminal action against Hanratty and this civil action arise out of identical facts (*compare* NYSCEF # 1 *with* NYSCEF # 152). Accordingly, a stay will avoid the possibility inconsistent results, save scarce judicial resources, and result in a potential streamlining and simplifying of the issues to be resolved in this proceeding, either by summary judgment or trial (*see Mook v Homesafe Am., Inc.*, 144 AD3d 1116, 1117 [2d Dept 2016] ["a prior determination in the criminal proceeding could have collateral estoppel effect in this action, thereby simplifying the issues"]). Furthermore, although discovery in this action is complete, briefing on plaintiff's motion for summary judgment on its breach of contract claim remains ongoing—including a forthcoming opposition and cross-motion by defendants—and a trial on plaintiff's remaining claims is also on the horizon. Hanratty's concerns regarding his constitutional right against self-incrimination are therefore not entirely obviated by the current procedural posture of this civil action. For these reasons, defendants' motion to stay pursuant to CPLR 2201 is granted.

In conclusion, it is hereby

ORDERED that plaintiff's motion to hold defendant John Arthur Hanratty in civil contempt (MS 005) is granted; and it is further

ORDERED and ADJUDGED that defendant John Arthur Hanratty is guilty of civil contempt for his failure to comply with the court's November 30, 2022, preliminary injunction order and its December 12, 2022, preliminary conference order; and it is further

ORDERED that a fine of $306,946.30 is imposed on defendant John Arthur Hanratty, plus legal costs and expenses incurred by plaintiff in connection with its contempt motion; and it is further

ORDERED that defendant John Arthur Hanratty will be purged of the contempt by providing proof of payment of the $306,943.30 into the parties' joint escrow account by February 7, 2024; and it is further

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL
Motion No. 005 006 007

Page 3 of 4

3 of 4

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2152 of 2230

ORDERED that if defendant John Arthur Hanratty fails to comply with the immediately preceding paragraph, plaintiff may apply for further relief including a fine or other appropriate penalty or an adjudication of criminal contempt; and it is further

ORDERED that defendants' request for a stay pursuant to CPLR 2201 pending final resolution of the criminal action against defendant John Arthur Hanratty, captioned *United States of America v John Arthur Hanratty*, 23-mj-7566 (SDNY 2023) is granted, thereby resolving the proposed order to show cause submitted in connection with MS 007.

The court otherwise declines to sign the order to show cause in MS006 for the reasons set forth above.

| 01/25/2024 | | | MARGARET A. CHAN, J.S.C. |
| DATE | | | |

| CHECK ONE: | | CASE DISPOSED | [ X ] NON-FINAL DISPOSITION |
| | | [ ] GRANTED  [ ] DENIED | [ ] GRANTED IN PART  [ X ] OTHER |
| APPLICATION: | | [ ] SETTLE ORDER | [ ] SUBMIT ORDER |
| CHECK IF APPROPRIATE: | | [ ] INCLUDES TRANSFER/REASSIGN | [ ] FIDUCIARY APPOINTMENT  [ ] REFERENCE |

158207/2022 EMIGRANT BUSINESS CREDIT CORPORATION vs. HANRATTY ET AL          Page 4 of 4
Motion No. 005 006 007

At Commercial Division Part 49, of the
Supreme Court of the State of New York,
held in and for the County of New York, at
the Courthouse located at 60 Centre Street,
New York, NY, on the ___ day of
_____, 2024.

PRESENT:
Hon. Margaret Chan, J.S.C.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

——————————————————— x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                Plaintiff,

      v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ
CORPS. 1-10,

            Defendants.

——————————————————— x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. ___**

**[PROPOSED] ORDER TO SHOW
CAUSE**

      **UPON READING** the annexed Memorandum of Law; the Affirmation of Alexander J.

Willscher and the exhibits annexed thereto; and all other papers and pleadings filed herein; it is

**ORDERED** that Defendants John Arthur Hanratty; Ebury Street Capital, LLC; Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1, LLC; and Ebury RE LLC appear before this Court, located at 60 Centre Street, New York, NY, on the ___ day of _____ 2024, at ____ o'clock a.m./p.m., or as soon thereafter as counsel can be heard, and show cause why an Order should not be issued:

  a. Granting Plaintiff Emigrant Business Credit Corporation leave to renew its opposition to Defendants' motion for a stay (Mot. Seq. No. 7) pursuant to CPLR 2221(e);

  b. On renewal, denying Defendants' motion for a stay; and

  c. Granting such other and further relief as the Court deems just and proper.

Sufficient reason having been alleged, and pending a hearing and further Order of this Court, it is

**ORDERED** that service of a copy of this Order, together with a copy of the papers in support thereof, made upon Defendants by NYSCEF, on or before the ___ day of _____, 2024, be deemed good and sufficient service; and it is

**ORDERED**, that any opposition to this motion be served by _____, 2024.


ENTER:

_____
Hon. Margaret Chan, J.S.C.

-2-

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

EMIGRANT BUSINESS CREDIT
CORPORATION,

    Plaintiff,

  v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ
CORPS. 1-10,

    Defendants.

---

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. ___**

**MEMORANDUM OF LAW IN SUPPORT OF EBCC'S MOTION FOR LEAVE TO RENEW**

Defendants' stay motion was premised on the argument that "Mr. Hanratty's Fifth Amendment rights, as well as interests in judicial efficiency, economy, and consistency, outweigh any potential prejudice to EBCC." (Dkt. 150 at 10.) Defendants went as far as to claim that "it is not clear that a stay would truly prejudice EBCC" at all "given Speedy Trial Constraints." (*Id*.) But those claims were inaccurate and EBCC has discovered new facts—which Defendants failed to disclose to EBCC or the Court—that establish a significant risk of prejudice to EBCC from a stay.

Specifically, on September 13, 2023, a $4.2 million final default judgment was entered against Defendants John Arthur Hanratty ("**Hanratty**") and Ebury RE LLC in the District Court for the 116th Judicial District in Dallas County, Texas, on claims that Hanratty defrauded an investor in a joint venture. (*See* Ex. A to Willscher Affirm.) The plaintiff in that action now seeks to enforce the $4.2 million judgment in New York Supreme Court and has filed a motion for summary judgment with a return date of February 28, 2024. (*See* Ex. B to Willscher Affirm.)

EBCC discovered the judgment only last night, as Defendants failed to disclose its existence either to EBCC or the Court. Hanratty's failure to disclose the judgment to EBCC constitutes yet another wrongful act, in violation of Hanratty's unequivocal obligation to keep EBCC "informed of any facts, events or circumstances that might in any way affect" his financial circumstances as a validity guarantor. (Dkt. 11 § 12(a).)* It also calls into question Hanratty's representations to the Court that "it is not clear that a stay would truly prejudice EBCC." On the contrary, EBCC will suffer significant prejudice if EYZC Investments Holdings, LLC is allowed to cut ahead of EBCC and recover from Hanratty's limited assets, while EBCC—a *secured* creditor, which has been diligently litigating this case for over sixteen months—is forced to wait. A further stay would effectively push EBCC to the back of the line of an apparently growing list of victims from Defendants' fraudulent misconduct.

The Court may grant leave to renew where a party introduces "new facts not offered on the prior motion that would change the prior determination . . . [and] reasonable justification

---

* Similarly, Defendants repeatedly failed to uphold their obligations under the Credit Agreements to inform EBCC of actual or threatened litigation against the Ebury Companies. (*Compare* Dkt. 6 § 6.1, *with* Dkt. 123 at 159:6-20 ("**Q.** [Y]ou failed to notify Emigrant that Ira Leventhal threatened you with litigation correct? **A.** I don't recall doing that, yes. **Q.** And . . . you failed to notify Emigrant that a group of investors led by Michael Salerno had threatened you with litigation and brought litigation against you in New York State Court? **A.** I don't recall making Emigrant aware, no.") (objections omitted).)

for the failure to present such facts on the prior motion." CPLR 2221(e); *see Adzer* v. *Rudin Mgmt. Co.*, 50 A.D.3d 1070, 1072 (2d Dep't 2008) (holding that the Court's "broad discretion in granting renewal" should be guided "to advance the interests of justice").  Here, renewal is proper because EBCC seeks to "draw the court's attention to new or additional facts which, although in existence at the time of the original motion, were unknown to the party seeking renewal." *William P. Pahl Equip. Corp.* v. *Kassis*, 182 A.D.2d 22, 27 (1st Dept 1992).  Specifically, EBCC discovered the judgment against Hanratty only last night (*see* Willscher Affirm. ¶ 3), and Hanratty effectively concealed the judgment from both EBCC and the Court, despite its obvious relevance to the arguments Hanratty made in his motion for a stay.

EBCC respectfully requests that the Court grant EBCC leave to renew its opposition to Defendants' motion for a stay and, upon renewal, deny Defendants' motion.

Dated:  January 26, 2024
        New York, New York

Respectfully submitted,

*/s/ Alexander J. Willscher*
_____

Alexander J. Willscher
Austin P. Mayron
Erin L. Savoie
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Plaintiff Emigrant Business Credit Corporation*

FILED: NEW YORK COUNTY CLERK 01/26/2024 05:06 PM
NYSCEF DOC. NO. 169

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/26/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2158 of 2230

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with the word-count limit of Commercial Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer, because it contains 634 words.

Dated:   January 26, 2024           Respectfully submitted,
         New York, New York

                                    */s/ Alexander J. Willscher*

                                    Alexander J. Willscher
                                    Austin P. Mayron
                                    Erin Savoie
                                    SULLIVAN & CROMWELL LLP
                                    125 Broad Street
                                    New York, New York  10004
                                    Telephone: (212) 558-4000
                                    Fax: (212) 558-3588

                                    *Attorneys for Plaintiff Emigrant Business
                                    Credit Corporation*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------- x

EMIGRANT BUSINESS CREDIT
CORPORATION,

                       Plaintiff,

        v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ
CORPS. 1-10,

                    Defendants.

---------------------------------------------------- x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. ___**

**AFFIRMATION OF ALEXANDER J. WILLSCHER**

      **ALEXANDER J. WILLSCHER**, an attorney duly admitted to practice law in the Courts of the State of New York, affirms the truth of the following statements, under the penalties of perjury:

      1.     I am a partner at the law firm of Sullivan & Cromwell LLP, counsel for Plaintiff Emigrant Business Credit Corporation ("**EBCC**") in the above-captioned matter. I am familiar with the matters set forth below.

      2.     I make this affirmation in support of EBCC's motion, by order to show cause, respectfully requesting that the Court grant Plaintiff leave to renew its opposition to Defendants'

motion for a stay (Mot. Seq. No. 7), pursuant to CPLR 2221(e).

3.      On January 25, 2024, EBCC discovered that a final judgment was entered in District Court in Dallas County, Texas against Defendants John Arthur Hanratty ("**Hanratty**") and Ebury RE LLC on September 13, 2023.  The final judgment adjudges Hanratty and Ebury RE LLC jointly and severally liable for approximately $4.2 million in damages.

4.      EBCC also has discovered that the plaintiff in the Texas action, EYZC Investment Holdings, LLC, presently seeks to enforce its judgment in New York Supreme Court.

5.      Attached hereto as Exhibit A is a true and correct copy of the final judgment entered against Hanratty and Ebury RE, LLC in the District Court of Dallas County, Texas on September 13, 2023.

6.      Attached hereto as Exhibit B is EYZC Investment Holdings, LLC's notice of motion for summary judgment in lieu of a complaint filed in the Supreme Court, New York County on December 19, 2023 (Index No. 656313/2023).

7.      There is a real and imminent risk that enforcing a stay of this action will result in the further depletion of Defendants' assets which will cause EBCC immediate and irreparable harm and frustrate any recovery by EBCC in this action.

8.      No prior application has been made for the relief sought by this order to show cause.

Dated:   January 26, 2024              */s/ Alexander J. Willscher*
         New York, New York            **ALEXANDER J. WILLSCHER**

-2-

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this affirmation complies with the word-count limit of Commercial

Division Rule 17, 22 NYCRR § 202.70(g), for documents prepared by use of a computer because

it contains 317 words.


Dated:  January 26, 2024                    _/s/ Alexander J. Willscher_____
          New York, New York                    Alexander J. Willscher

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 01/26/2024 05:06 PM
NYSCEF DOC. NO. 171
INDEX NO. 158207/2022
RECEIVED NYSCEF: 01/26/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2163 of 2230

## CAUSE NO. DC-23-06256

| | | |
|---|---|---|
| EYZC INVESTMENT HOLDINGS, LLC, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | 116th JUDICIAL DISTRICT |
| EBURY RE LIMITED LIABILITY COMPANY and JOHN HANRATTY, | § § § § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## FINAL JUDGMENT

Plaintiff's motion for interlocutory default judgment against Defendant Ebury RE Limited Liability Company ("Ebury") and the hearing on Plaintiff's damages against Ebury and Defendant John Hanratty ("Hanratty") came before the Court this day. Having considered the motion, the record in this case, and the arguments of counsel, the Court makes the following determinations which are incorporated as part of the Court's judgment:

1.    The findings in the Court's Interlocutory Default Judgment against Hanratty entered on August 4, 2023 are incorporated herein;

2.    Ebury was duly served with process and notice of this action in accordance with the Texas Rules of Civil Procedure. Citation was issued in accordance with Texas Rule of Evidence 99 and the officer's return has been on file for at least ten days exclusive of the date of filing and the date of judgment in accordance with Texas Rule of Civil Procedure 107;

3.     That Ebury has wholly failed to answer or otherwise appear prior to the rendition of judgment by default;

4.     That this Court has jurisdiction over the subject matter, the parties, and that the record indicates that this case is ripe for judgment by default;

5.     That Plaintiff's motion for interlocutory default judgment against Ebury is well taken; and

6.     That Plaintiff has introduced evidence of its damages against Ebury and Hanratty sufficient to support the Court's awards of damages.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Ebury has admitted the material facts alleged in Plaintiff's Original Petition, except as to damages. It is the judgment of this Court that:

1.     Ebury is liable for damages on account of breach of contract and Hanratty is liable for damages on account of civil theft/conversion, tortious interference with contract, and fraud.

2.     Plaintiff recover its actual damages of $3,219,753.00 from Ebury and Hanratty, jointly and severally.

3.     Plaintiff recover exemplary damages of $ 1,000,000 _____ from Hanratty.

4.     Plaintiff recover its reasonable attorneys' fees of $ 39,585.00 _____ from Ebury.

5.     Plaintiff recover its taxable costs of court from Ebury and Hanratty, jointly and severally.

6.    Plaintiff recover post-judgment interest on the foregoing monetary awards at the rate of five percent (5%) per annum, compounded annually, from the date this judgment is entered until all amounts are paid in full.

7.    This judgment finally disposes of all claims and all parties and is a final and appealable judgment.

8.    The Court orders writs of execution to issue for this judgment in accordance with Texas law.

Judgment is signed this 13th day of September 2023.

TONYA PARKER
PRESIDING JUDGE

FILED: NEW YORK COUNTY CLERK 01/26/2024 05:06 PM

NYSCEF DOC. NO: 172

INDEX NO. 158207/2022

RECEIVED NYSCEF: 01/26/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2166 of 2230

# EXHIBIT B

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

EYZC INVESTMENT HOLDINGS, LLC,

          Plaintiff,

v.

EBURY RE LIMITED LIABILITY COMPANY and JOHN
HANRATTY,

          Defendants.

INDEX NO.

NOTICE OF MOTION FOR
SUMMARY JUDGMENT IN LIEU
OF A COMPLAINT

TO THE ABOVE NAMED DEFENDANTS:
Ebury RE Limited Liability Company
644 Avenida Fernandez Juncos, Suite 203, District View Plaza
San Juan, Puerto Rico 00907

John Hanratty
644 Avenida Fernandez Juncos, Suite 203, District View Plaza
San Juan, Puerto Rico 00907

      PLEASE TAKE NOTICE, that upon the annexed Affidavit of Eric Nichols, sworn to on

November 13, 2023, the Affirmation of William Brewer IV, counsel for Plaintiff herein, and all the

proceedings heretofore had herein, the Plaintiff, EYZC Investment Holdings, LLC, will move this Court

in the Motion Support Office Courtroom – Submission Part, Room 130, at the New York County

Courthouse at 60 Centre Street, New York, NY 10007 on the 28th day of February, 2024 at 9:30 AM, or

as soon thereafter as counsel can be heard, for summary judgment pursuant to CPLR §§ 3213 & 5406 in

favor of Plaintiff and against Defendants, jointly and severally, in the amount of $3,220,199, against

Defendant Hanratty in the amount of $1,000,000, against Defendant Ebury in the amount of $39,585, plus

accrued interest from September 13, 2023, on the grounds that there is a final judgement entered against

Defendants, and proof of the final judgement is established as required under CPLR § 3213; together with

the costs and disbursements and such other and further relief as this Court deems just and proper.

      PLEASE TAKE FURTHER NOTICE that pursuant to CPLR § 3213 answering papers, if any,

shall be served in order to be received by the undersigned at least seven days prior to the return date.

DATED: New York, New York
December 12, 2023

                      By: /s/ William Brewer IV
                      William Brewer IV
                      wbb@brewerattorneys.com

FILED: NEW YORK COUNTY CLERK 02/26/2024 05:06 PM

INDEX NO. 656207/2022

NYSCEF DOC. NO. 172

RECEIVED NYSCEF: 02/26/2024

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2168 of 2230

**BREWER, ATTORNEYS & COUNSELORS**
750 Lexington Avenue, 14th Floor New York,
New York 10022
Telephone: 212.527.3024

**COUNSEL FOR EYZC INVESTMENT
HOLDINGS, LLC**

At Commercial Division Part 49, of the
Supreme Court of the State of New York,
held in and for the County of New York, at
the Courthouse located at 60 Centre Street,
New York, NY, on the _30_ day of
_January_, 2024.

PRESENT:
Hon. Margaret Chan, J.S.C.

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

——————————————————— x
:
EMIGRANT BUSINESS CREDIT
CORPORATION,
:
              Plaintiff,
:
      v.
:
JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND 1,
LP, EBURY FUND 2, LP, EBURY 1EMI
LLC, EBURY 2EMI LLC, EB 1EMIALA
LLC, EB 2EMIALA LLC, EB 1EMIFL, LLC,
EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB
2EMIIN, LLC, EB 1EMIMD, LLC, EB
2EMIMD, LLC, EB 1EMINJ, LLC, EB
2EMINJ, LLC, EB 1EMINY, LLC, EB
2EMINY, LLC, EB 1EMISC, LLC, EB
2EMISC, LLC, RE 1EMI LLC, RE 2EMI
LLC, EB 1EMIDC, LLC, ARQUE TAX
RECEIVABLE FUND (MARYLAND), LLC,
EBURY FUND 1FL, LLC, EBURY FUND
2FL, LLC, EBURY FUND 1NJ, LLC,
EBURY FUND 2NJ, LLC, RED CLOVER 1,
LLC, EBURY RE LLC, and XYZ
CORPS. 1-10,
:
         Defendants.
:
——————————————————— x

Index No. 158207/2022

(Hon. Margaret Chan)

**MOTION SEQUENCE NO. _008_**

~~[PROPOSED]~~ **ORDER TO SHOW
CAUSE**

      **UPON READING** the annexed Memorandum of Law; the Affirmation of Alexander J.

Willscher and the exhibits annexed thereto; and all other papers and pleadings filed herein; ~~it is~~

FILED: NEW YORK COUNTY CLERK 01/31/2024 12:25 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 173    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2170 of 2230    RECEIVED NYSCEF: 01/30/2024

LET

~~ORDERED that~~ Defendants John Arthur Hanratty; Ebury Street Capital, LLC; Ebury Fund 1, LP; Ebury Fund 2, LP; Ebury 1EMI LLC; Ebury 2EMI LLC; EB 1EMIALA LLC; EB 2EMIALA LLC; EB 1EMIFL, LLC; EB 2EMIFL, LLC; EB 1EMIIN, LLC; EB 2EMIIN, LLC; EB 1EMIMD, LLC; EB 2EMIMD, LLC; EB 1EMINJ, LLC; EB 2EMINJ, LLC; EB 1EMINY, LLC; EB 2EMINY, LLC; EB 1EMISC, LLC; EB 2EMISC, LLC; RE 1EMI LLC; RE 2EMI LLC; EB 1EMIDC, LLC; Arque Tax Receivable Fund (Maryland), LLC; Ebury Fund 1FL, LLC; Ebury Fund 2FL, LLC; Ebury Fund 1NJ, LLC; Ebury Fund 2NJ, LLC; Red Clover 1, LLC; and Ebury RE LLC appear before this Court, located at 60 Centre Street, New York, NY, on the 8 day of February 2024, at 11:30 ~~o'clock~~ (a.m.)/p.m., or as soon thereafter as counsel can be heard, and show cause why an Order should not be issued:

    a.    Granting Plaintiff Emigrant Business Credit Corporation leave to renew its opposition to Defendants' motion for a stay (Mot. Seq. No. 7) pursuant to CPLR 2221(e);

    b.    On renewal, denying Defendants' motion for a stay; and

    c.    Granting such other and further relief as the Court deems just and proper.

Sufficient reason having been alleged, and pending a hearing and further Order of this Court, it is

**ORDERED** that service of a copy of this Order, together with a copy of the papers in support thereof, made upon Defendants by NYSCEF, on or before the 31 day of January, 2024, be deemed good and sufficient service; and it is

**ORDERED**, that any opposition to this motion be served by February 7, 2024.

ENTER:

_____

Hon. Margaret Chan, J.S.C.

-2-

# GUSRAE KAPLAN NUSBAUM PLLC

### ATTORNEYS AT LAW

| | | |
|---|---|---|
| RICHARD DEVITA | 120 WALL STREET – 25TH FLOOR | OF COUNSEL |
| TIMOTHY FEIL | NEW YORK, NEW YORK 10005 | ROBERT L. BLESSEY |
| SCOTT H. GOLDSTEIN | | |
| MARTIN H. KAPLAN | | SENIOR COUNSEL |
| LAWRENCE G. NUSBAUM | 425 BROADHOLLOW ROAD | ERIC M. LEANDER |
| KARI PARKS | SUITE 300 | |
| | MELVILLE, NEW YORK 11747 | |

TEL. (212) 269-1400
FAX  (212) 809-4147

www.gusraekaplan.com

February 7, 2024

**VIA NYSCEF**
The Honorable Margaret Chan
Supreme Court of the State of New York
60 Centre Street, Courtroom 252
New York, New York 10007

RE: Emigrant Business Credit Corp. v. Hanratty et al., No. 158207/2022

Dear Justice Chan:

I represent Defendants in the above-captioned matter and write to provide an update on Defendant John Hanratty's attempts to comply with Your Honor's January 25, 2024 ordrt that, inter alia, Mr. Hanratty would be purged of the Court's finding of civil contempt if he provided proof of payment of paying a $306,943.30 fine into the Parties' joint escrow account by February 7, 2024. See Dkt. 167 at 3 (Jan. 26, 2024) (the "**Order**").

Mr. Hanratty has struggled to find the funds necessary to satisfy the Order but has been attempting to collect amounts due to him from various third parties to satisfy the fine. So far, Mr. Hanratty has paid $120,000 into the escrow account in accordance with the Order, and has provided an unredacted version of the annexed wire confirmation to the plaintiff. See Exhibit A. Mr. Hanratty will continue to attempt to secure the funds necessary to satisfy the Court's Order and will alert the Court and request relief if he finds that, despite his best efforts, he will not be able to deposit the remainder in a timely fashion.

Respectfully submitted,

/s/ Kari Parks
Kari Parks

cc: All Counsel of Record (via NYSCEF)

Enclosure

# EXHIBIT A

## Payment Details



**LAW OFFICE OF JOHN HANRATTY -** ██████

### PAYMENT ID: ██

| | |
|---|---|
| Payment Type | Wire - Domestic |
| Status | Bank Confirmed |
| Entry Method | Freeform |
| Value Date | 02/07/2024 |
| Tran Date | 02/07/2024 |
| Credit Amount | 120,000.00 USD |
| Debit Amount | 120,000.00 USD |
| Exchange Rate | 1 |
| Tnum | ██████ |
| Charges | OUR |
| 1st Confirmation | |
| 2nd Confirmation | WIRE |
| | REF ████████ |
| | FED████ |
| | REF ██████████ |
| | ██ |

### DEBIT ACCOUNT

| | |
|---|---|
| Number | ████████ |
| Name | ██████████ |
| Type | Checking |
| Bank | MNTBANK |

### ORIGINATOR INFORMATION

| | |
|---|---|
| Name | ██████████ |
| ID | ████████ |
| Type | DDA |
| Country | US |

### BENEFICIARY

| | |
|---|---|
| Name | PBG Concentration Account |
| Country | US |
| Account | ██████ |

### BENEFICIARY BANK

| | |
|---|---|
| Account Type | Other |
| Bank Code | ██████ |
| Bank | CITIBANK NA |
| Address 1 | 176 WATER STREET |
| City | NEW YORK |
| Country | US |

### PAYMENT DETAILS

Instructions to Beneficiary:
Further Credit to Account Number
██████████

Account Name Ebury/Emigrant

### BANK-TO-BANK INFORMATION

Instructions to Beneficiary:
Further Credit to Account Number
██████████.

Account Name Ebury/Emigrant
Attn Anabelle Roz (212) 783-7021

### AUDIT INFORMATION

| | Timestamp | User ID | Company |
|---|---|---|---|
| APPROVED | 02/07/2024 03:10:56 PM | JHANRATTY | ██████ |
| MODIFIED | 02/07/2024 03:00:45 PM | CDEANGEL | ██████ |
| ENTERED | 02/07/2024 09:15:45 AM | CDEANGEL | ██████ |

### SETTLEMENT INFORMATION

| | Timestamp |
|---|---|
| Extracted | 02/07/2024 03:11:14 PM |
| Bank Confirmed | 02/07/2024 03:11:28 PM |

**Continued**

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:20 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 137 24-04020-dsj Doc 1-2 Filed 08/14/24 Entered 08/14/24 09:45:23 Doc #3 State RECEIVED NYSCEF: 02/07/2024

Court Records Pg 2174 of 2230

## Payment Details

**M&T** Bank

**LAW OFFICE OF JOHN HANRATTY -** ███████

**REPORT TOTALS**

| Wires | | Total Debit Amount | Payments | Total Credit Amount | Payments |
|-------|--|--------------------|----------|---------------------|----------|
| Wires | (USD to USD) | 120,000.00 USD | 1 | | |

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2175 of 2230

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

EMIGRANT BUSINESS CREDIT
CORPORATION,

      Plaintiff,

        v.

JOHN ARTHUR HANRATTY, EBURY
STREET CAPITAL, LLC, EBURY FUND
1, LP, EBURY FUND 2, LP, EBURY
1EMI LLC, EBURY 2EMI LLC, EB
1EMIALA LLC, EB 2EMIALA LLC, EB
1EMIFL, LLC, EB 2EMIFL, LLC, EB
1EMIIN, LLC, EB 2EMIIN, LLC, EB
1EMIMD, LLC, EB 2EMIMD, LLC, EB
1EMINJ, LLC, EB 2EMINJ, LLC, EB
1EMINY, LLC, EB 2EMINY, LLC, EB
1EMISC, LLC, EB 2EMISC, LLC, RE
1EMI LLC,
RE 2EMI LLC, EB 1EMIDC, LLC,
ARQUE TAX RECEIVABLE FUND
(MARYLAND), LLC, EBURY FUND 1FL,
LLC, EBURY FUND 2FL, LLC, EBURY
FUND 1NJ, LLC, EBURY FUND 2NJ,
LLC, RED CLOVER 1, LLC, and EBURY
RE LLC,

      Defendants,

        v.

XYZ CORPS. 1-10,

      Defendants.

Index No. 158207/2022

The Honorable Margaret A. Chan

Mot. Seq. 8

**MEMORANDUM OF LAW IN
OPPOSITION TO
MOTION FOR LEAVE TO RENEW**

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 176
RECEIVED NYSCEF: 02/07/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2176 of 2230

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES .................................................................... iii

PRELIMINARY STATEMENT ................................................................ 1

ARGUMENT ............................................................................................ 10

    I.   EBCC Does Not Even Try to Offer a "Reasonable Justification" for Failing to Mention the September 2023 Court Filing In Its January 2024 Papers and Oral Argument, Let Alone Why It Neglects to Mention that Mr. Hanratty and Ebury RE Have Now Appeared in that Case ............................................................ 10

        A.   The "New Evidence" is Nothing But Months-Old Public Records Available to the Whole World ........................................................................ 11

    II.   The Texas Case is Immaterial to the Reasons for the Stay ............. 14

        A.   The Unfixed Texas Judgment has No Bearing on the Efficiency, Public Resources, and Fifth Amendment Reasons for the Stay ..................... 14

        B.   EBCC's Continual Efforts to Prolong this Dispute Belie Its Claim that the Stay's Delay Prejudices EBCC ...................................................... 16

WORD COUNT CERTIFICATION .......................................................... 19

# TABLE OF AUTHORITIES

**Cases**

Barbarito v. Zahavi, 2012 WL 8881152 (Sup. Ct. June 18, 2012) (Singh, J.)    5

Britt v. Int'l Bus Servs., Inc., 255 A.D.2d 143 (1st Dep't 1998)    15

Chris Grant Brohawk Films v. Digital Seven LLC, 210 A.D.3d 552 (1st Dep't 2022)    10, 11

Demas v. E&R Quilting Corp., 111 A.D.2d 898 (2d Dep't 1985)    11

Elder v. Elder, 21 A.D.3d 1055 (2d Dep't 2005)    8

Federated Conservationists v. County of Westchester, 4 A.D.3d 326 (2d Dep't 2004)    9, 11, 13

Foley v. Roche, 68 A.D.2d 558 (1st Dep't 1979)    13

Graham v. Beermunder, 93 A.D.2d 254 (2d Dep't 1983)    11

LFR Collections LLC v. Blan Law Offices, 117 A.D.3d 486 (1st Dep't 2014)    13

Matter of Chatham Towers, Inc. v. Bloomberg, 39 A.D.3d 308 (1st Dep't 2007)    8

Mook v. Homesafe Am., Inc., 144 A.D.3d 1116 (2d Dep't 2006)    5

Mully v. Drayn, 51 A.D.2d 660 (4th Dep't 1976)    11

NRZ Pass-Through Trust IV v. Rouge, 199 A.D. 3d 466 (1st Dep't 2021)    8, 9

People v. Adams, 219 A.d.3d 1178 (1st Dep't 2023)    9

Rowe v. NYCP, 85 A.D.3d 1001 (2d Dep't 2011)    9

Welch Foods, Inc. v. Wilson, 247 A.D.2d 830 (4th Dep't 1998)    11

**Statutes**

CPLR 2221    8

CPLR 4547    17

**Treatises**

Patrick M. Connors, 2020 Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 2221    8

iii

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM          INDEX NO. 158207/2022

NYSCEF DOC. NO. 176          24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 02/07/2024

Court Records       Pg 2178 of 2230

The Ebury Parties[1] respectfully submit this memorandum in opposition to Plaintiff Emigrant Business Credit Corporation's ("**EBCC**" and with the Ebury Parties, the "**Parties**") "**Motion**" for leave to renew, which argues that the Court should lift the "**Stay**" it imposed due to the "identical fact[ual]" overlap between this "**Civil Action**" and the "**Criminal Action**[2]" because one day after the Court issued the Stay, EBCC "discovered" a September 23, 2023 final default judgment entered against two of this Action's 30 defendants. See Dkt. 169 at 2–3 (Jan. 26, 2024); but see CPLR 2221(e)(2), (3) (movant must prove that "new facts [ . . . ] would change the prior determination" and "reasonable justification for [its] failure to present" on the prior motion).

## PRELIMINARY STATEMENT

The Court should deny this Motion because EBCC's "new facts" were in publicly-available court filings that EBCC could have "discovered" at any time, and are immaterial to the economy, efficiency, and and constitutional concerns that caused the Court to grant the Stay.

The September 2023 default judgment against two of the Ebury Parties is a five-month-old public record and, as the fast timing of EBCC's Motion itself proves, an easy Google. Unable to find any excuse for its own lack of diligence, EBCC instead relies on adjectives and mischaracterizations to try to muster up a reason

---

[1] The "**Ebury Parties**" are all of the named defendants who have appeared in this case.
[2] The "**Criminal Action**" is the federal criminal prosecution pending in the Southern District of New York that is captioned United States of America v. Hanratty, 23-mj-7566.

1

why that Texas default running to an unsecured creditor could, and of itself, trump the Court's holding that "the possibility [of] inconsistent results, [] scarce judicial resources, [] potential streamlining and simplifying of the issues to be resolved in this proceeding," and Mr. Hanratty's "constitutional right against self-incrimination" all justify staying this Civil Action until the "identical" Criminal Action is resolved. See Dkt. 167 at 3 (Jan. 25, 2024) ("**Stay Order**").

In short, any "prejudice" caused by the Stay is prejudice of EBCC's own making. The Court should reject EBCC's Motion to renew, preserve the Stay of this Civil Action, and save the judiciary, the public, and the Ebury Parties of the burden to simultaneously litigate two "identical" cases. See Stay Order at 3 (finding that the Civil and Criminal Actions "arise out of identical facts").

## BACKGROUND

On September 25, 2022, EBCC filed a "**Civil Complaint**" initiating this Civil Action, suing the Ebury Parties for breach of contract, fraudulent inducement, and fraudulent transfer, and alleging that all 29 of the Ebury Entities are alter egos of Mr. Hanratty and each other. See generally Dkt. 1 (Sep. 25, 2022). The Civil Complaint alleged that the Ebury Parties' failure to repay amounts due pursuant to two "**Credit Agreements**" (the "**Loan**") entitled EBCC to loan contract damages of $21.8 million and counting. Id. ¶ 104. While the Civil Complaint does not specify damages sought on its two fraud claims, both of those claims arise out of the Ebury Parties' failure to pay off the Loan. Id. ¶¶ 110–24.

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 176    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 02/07/2024

Court Records    Pg 2180 of 2230

Even before EBCC initiated this suit, the Ebury Parties had admitted that they have failed to repay the Loan: besides months of negotiations, in September 2022, the Ebury Parties executed a non-binding term sheet drafted by EBCC in which the Ebury Parties acknowledged their "failure to pay all outstanding principal, interest, and other obligations owed under the [Credit Agreements] when due on November 10, 2021." Dkt. 74 at 1 (Aug. 9, 2023) (Sep. 14, 2022 Term Sheet). In their answer to the Civil Complaint, the Ebury Parties admitted that they have not fully repaid the Loan. Dkt. 69 ¶¶ 103–04 (July 20, 2023). Indeed, EBCC's motion for summary judgment repeatedly invokes Mr. Hanratty's free, unqualified admissions that the relevant Ebury Parties have failed to repay EBCC's Loan. See generally Dkt. 121 (Jan. 12, 2024).

While the Ebury Parties have never denied that the relevant Ebury Entities failed to timely repay EBCC's Loan, they have fiercely contested EBCC's fraud allegations. See, e.g., Dkt. 27 (Oct. 26, 2022) (opposition to preliminary injunction motion); Dkt. 42 (Nov. 16, 2022) (memorandum in support of motion to dismiss fraudulent inducement and transfer claims); Dkt. 54 (Dec. 15, 2022) (reply memorandum in support of motion to dismiss fraudulent inducement and transfer claims). Accordingly, the Parties exchanged over 130,000 pages of documents and deposed 11 witnesses. Affirmation of Kari Parks ¶ 3 (Feb. 7, 2024 ("**Parks Aff.**") While the Ebury Parties were content to conduct all depositions via videoconferencing, EBCC insisted that Mr. Hanratty fly up from Puerto Rico to sit

for two days of depositions at Sullivan & Cromwell's Manhattan office—which he did. Id. ¶ 4.

At the same time, the Ebury Parties consistently have attempted to settle this Civil Case. Besides pre-litigation settlement attempts, the Parties participated in the First Department's new mediation program from January through July 2023; the Ebury Parties continued to privately pursue settlement during and after that mediation program; EBCC deposed Mr. Hanratty about the settlement's funding source during his June 2023 depositions; and on November 22, 2023, EBCC agreed to accept an eight-figure settlement amount, "subject to [its] requested proof of funds and the execution of appropriate documentation." Id. ¶¶ 5–8. Although the Ebury Parties have continually provided information that they believe should satisfy EBCC's documentation requests, the Parties have not finalized a settlement. Id. ¶ 9.

Nevertheless, on December 18, 2024, federal authorities unsealed their Criminal Complaint and arrested Mr. Hanratty at home in Puerto Rico. Dkt. 151 ¶¶ 6–7 (Jan. 19, 2024). Two days later, EBCC requested the Ebury Parties' consent to push back all summary judgment deadlines, including by moving EBCC's first deadline from December 22, 2023 to January 12, 2024. Parks Aff. Exhibit A, Emails Between Counsel (Dec. 20, 2023).

Despite previously claiming that its fraud claims were so strong that they warranted preliminary injunctive relief, EBCC only moved for summary judgment on its contract claim. Compare Dkt. 4 (Oct. 17, 2022) with Dkt. 121 (Jan. 12, 2024)

(summary judgment brief). At the January 24, 2024 hearing in this case, EBCC

claimed that it did not move for summary judgment on its fraud claims because of

their fact-intensive nature.[3]

On the Ebury Parties' motion—and over EBCC's opposition that "justice

delayed is justice denied" and "[e]ach additional month that passes increases the

amount Defendants will owe, as well as the likelihood that Defendants will not be

able to satisfy the judgment[4]"—this Court found that this Civil Action and the

Criminal Action "arise out of identical facts" and stayed this case. See Stay Order at

3–4 (Jan. 26, 2024). In issuing the Stay, this Court reasoned:

> Factors for the court to consider include, among others, the risk of
> inconsistent adjudications, potential waste of judicial resources, and
> whether "defendant will invoke his or her constitutional right against
> self incrimination." [Citations omitted.]
>
> Here, after considering the parties' written and oral arguments, the
> court concludes that a stay of this action pending resolution of the
> ongoing criminal proceedings against Hanratty is warranted. As
> defendants note, the criminal action against Hanratty and this civil
> action arise out of identical facts. Accordingly, a stay will avoid the
> possibility [of] inconsistent results, save scarce judicial resources, and
> result in a potential streamlining and simplifying of the issues to be
> resolved in this proceeding, either by summary judgment or trial (see
> Mook v. Homesafe Am., Inc., 144 A.D.3d 1116, 1117 (2d Dep't 2006) ("a
> prior determination in the criminal proceeding could have collateral
> estoppel effect in this action, thereby simplifying the issues")).
> Furthermore, although discovery in this action is complete, briefing on
> plaintiff's motion for summary judgment on its breach of contract claim
> remains ongoing—including a forthcoming opposition and cross-motion

---

[3] The Ebury Parties have not yet received the transcript from this hearing.

[4] Dkt. 156 at 7–8 (Jan. 23, 2024) (citing Barbarito v. Zahavi, 2012 WL 8881152, at
*2 (Sup. Ct. June 18, 2012) (Singh, J.)); but see Barbarito, 2012 WL 8881152, at *2
(denying motion for stay because, inter alia, movant had not "demonstrated how
proceeding with discovery and a trial in the civil action will result in inconsistent
adjudications, duplication of proof, or a potential waste of judicial resources").

by defendants—and a trial on plaintiff's remaining claims is also on the horizon. Hanratty's concerns regarding his constitutional right against self-incrimination are therefore not entirely obviated by the current procedural posture of this civil action. For these reasons, defendants' motion to stay pursuant to CPLR 2201 is granted.

Id. at 3.

The next morning, EBCC filed this Motion, claiming that just hours after the Court imposed the Stay, EBCC "discovered" that "on September 13, 2023, a $4.2 million final default judgment was entered against Defendants John Arthur Hanratty [] and Ebury RE LLC in the District Court for the 116th Judicial District in Dallas County, Texas, on claims that Hanratty defrauded an investor in a joint venture" (the "**Texas Case**"), and that the Texas Case's plaintiff had initiated a collection action in New York Supreme Court. Mot. at 2. On February 6, 2024, undersigned counsel Googled "ebury hanratty;" a link to the Texas Case's July 18, 2023 interlocutory default judgment was the 19th search result. Affirmation of Kari Parks ("**Parks Aff.**") Exhibit B at 3 (Feb. 6, 2024).

While EBCC's Motion claims that Mr. "Hanratty's failure to disclose the [default] judgment to EBCC constitutes yet another wrongful act, in violation of [Mr.] Hanratty's unequivocal obligation" that violates Section 12(a) of the Validity Guaranties Mr. Hanratty executed in March 2017, EBCC cites no fact or law explaining why Mr. Hanratty has an obligation to tell his litigation adversary about a default judgment awarded against two of this Action's defendants, to an unsecured creditor, over six years after Mr. Hanratty executed the Validity Guaranties; three years after any Ebury Party last obtained funding from EBCC;

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records        Pg 2184 of 2230

two years after the Credit Agreements matured; and one year after EBCC initiated

this Civil Action. See id.

Besides ignoring the fact that Section 12(a) only required Mr. Hanratty to

provide information while those Guaranties were "in effect"—and only about "risks"

to EBCC, which, unlike the plaintiff in the Texas Case, is a secured creditor—EBCC

also neglects to mention that after the default judgment was entered, Ebury RE and

Mr. Hanratty appeared in the Texas Case, and that on January 31, 2024, the Texas

court post-judgment discovery to determine the proper quantum of damages,

including interrogatories, document requests, and a deposition of Mr. Hanratty.

Compare id. with Texas Case Docket Sheet, Parks Aff. Exhibit C at 6–13 (Feb. 7,

2024); Texas Case Discovery Order, Parks Aff. Exhibit D at 1–2 (Feb. 7, 2024).

Similarly, while EBCC represents that the Texas Case plaintiff brought an

enforcement action in New York Supreme Court, EBCC does not say when that case

was filed: December 12, 2023, or over a month before EBCC filed its opposition to

the Ebury Parties' stay motion. Compare Mot. at 2 with Collection Action Docket

Sheet, Parks Aff. Exhibit E (Feb. 7, 2024). On January 31, 2024, that plaintiff filed

affidavits of service claiming service dates of January 29, 2024. See id. Dkt. 11 (Nov.

25, 2024).

7

## LEGAL STANDARD

"A motion for leave to renew is not a second chance freely given to parties who have not exercised due diligence in making their first factual presentation." Elder v. Elder, 21 A.D.3d 1055, 1055 (2d Dep't 2005) (citations omitted) (affirming denial of motion for leave to renew; "to the extent that the new materials were matters of public record available before the court issued the decision[,] they could not serve as a proper basis for a motion to renew.").

Accordingly, the Court may grant this Motion only if EBCC meets its burden to prove (1) "new facts not offered on the prior motion that would change the prior determination" and (2) "reasonable justification for [its] failure to present" those facts on the prior motion. CPLR 2221(e)(2), (3); see also Patrick M. Connors, 2020 Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 2221 ("CPLR 2221(e)(3) now explicitly requires that the motion to renew contain 'reasonable justification for the failure to present such facts on the prior motion.' The caselaw indicates that this requirement [is] applied strictly.").

However, "[m]atters of public record are 'generally not deemed new evidence.'" NRZ Pass-Through Trust IV v. Rouge, 199 A.D. 3d 466, 466 (1st Dep't 2021) (quoting Matter of Chatham Towers, Inc. v. Bloomberg, 39 A.D.3d 308, 309 (1st Dep't 2007)) (affirming denial of leave to renew; movant "offered no reasonable justification for why it failed to find and timely present [a court filing made by its adversary], which was a matter of public record in the court file"); see also Chatham Towers, 39 A.D.3d at 309 (quoting Federated Conservationists v. County of

8

<u>Westchester</u>, 4 A.D.3d 326, 327 (2d Dep't 2004)) (in CPLR 5015(a)(2) context of motions for relief from judgment or order, a matter of public record "is generally not deemed new evidence which could not have been discovered with due diligence").

Therefore, while this Court "has discretion to determine what constitutes a reasonable justification and to relax [CPLR 2221(e)'s requirements] in the interest of justice," the First Department has denied renewal motions predicated on "new facts" contained in public records, including in court filings. <u>NRZ</u>, 199 A.D. 3d at 466 (affirming denial of leave to renew; movant "offered no reasonable justification for why it failed to find and timely present [a court filing made by its adversary], which was a matter of public record in the court file").

Similarly, the First Department has rejected renewal motions where the movant had access to the supposedly-new information and were aware of and had the opportunity to respond to the adversary's arguments. <u>People v. Adams</u>, 219 A.d.3d 1178, 1182–83 (1st Dep't 2023) (citing <u>Rowe v. NYCP</u>, 85 A.D.3d 1001, 1003 (2d Dep't 2011)) (affirming denial of renewal motion where movant "had the information in their possession before the hearing, were aware if defendant's argument, and the motion court gave the [movant] ample time to respond").

9

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 176    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 02/07/2024

Court Records        Pg 2187 of 2230

## ARGUMENT

**I.    EBCC Does Not Even Try to Offer a "Reasonable Justification" for Failing to Mention the September 2023 Court Filing In Its January 2024 Papers and Oral Argument, Let Alone Why It Neglects to Mention that Mr. Hanratty and Ebury RE Have Now Appeared in that Case**

The closest that EBCC comes to discussing its own "reasonable justification" burden is its argument that Validity Guaranties Section 12(a) required Mr. Hanratty to notify EBCC of the Texas Case. See Mot. at 2; but see Chris Grant Brohawk Films v. Digital Seven LLC, 210 A.D.3d 552, 552 (1st Dep't 2022) (reversing grant of renewal motion where movant "did not provide in the renewal motion a 'reasonable justification for the failure to present such facts on the prior motion'").

Even assuming that those contracts still require Mr. Hanratty to affirmatively notify his litigation adversary of other potentially-related litigations— a dubious proposition, given that its covenants only are binding as long as those contracts "remain[] in effect," the Ebury Parties have not received funding from EBCC for several years, EBCC called the Loan contracts in November 2021, EBCC sued the Ebury Parties under those contracts approximately one year before the Texas Case default issued, and EBCC is a secured creditor while the Texas Case plaintiff is not—they would not excuse EBCC's failure to exercise even cursory diligence and raise the Texas Case default during the original motion's arguments.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2188 of 2230

## A.    The "New Evidence" is Nothing But Months-Old Public Records Available to the Whole World

In motions to renew, for judgment and new trial, and for relief from judgment or order, New York courts consistently hold that "public records," including litigation filings, are not "new evidence which could not have been discovered with due diligence." Federated Conservationists, 4 A.D.3d at 327 (citing Demas v. E&R Quilting Corp., 111 A.D.2d 898, 899 (2d Dep't 1985); Graham v. Beermunder, 93 A.D.2d 254, 259 (2d Dep't 1983); Mully v. Drayn, 51 A.D.2d 660, (4th Dep't 1976)) (CPLR 5015).

All of EBCC's purportedly "new evidence" are court filings that *per se* cannot justify this Motion. See, e.g., Chris Grant, 210 A.D. at 552 (reversing CPLR 2221 grant of renewal where movant's "new evidence" was "court filings [ . . . ] which are matters of public record [and] existed at the time" movant briefed the underlying motion); Welch Foods, Inc. v. Wilson, 247 A.D.2d 830, 830 (4th Dep't 1998) (reversing grant of CPLR 2221 motion to renew; "To the extent that the new materials were matters of public record available before the court issued its decision [ . . . ] they could not serve as a proper basis for motion to renew"); Demas, 111 A.D.2d at 899 (affirming denial of CPLR 4404 motion; movant "failed to establish that the documents which it discovered a few days after the trial could not have been timely obtained by the exercise of due diligence, since most of the documents (corporate records on file with the Secretary of State) were a matter of public record."); Mully, 51 A.D.2d (affirming denial of CPLR 5015 motion "based upon a

1923 state map, a public record which existed at the time of trial, was discoverable by ordinary diligence and was subject to subpoena").

### B. EBCC Offers No "Reasonable Justification" for Its Previous Omissions

Moreover, the sheer speed with which EBCC briefed the original stay motion, then "discovered" and filed the "new evidence," reveals EBCC's own lack of diligence. Initially, EBCC filed its stay opposition papers before the Court had even issued the Ebury Parties' requested Order to Show Cause. Compare Dkt. 149 (Jan. 16, 2024) (proposed OSC, never entered) with Dkt. 156 (Jan. 23, 2024) (EBCC's opposition brief). Then, just one day after the Court issued the Stay Order, EBCC filed this Motion, claiming that it had discovered the "new evidence" within hours of the Court uploading the Order. Compare Dkts. 165–67 Confirmation Notice at 1 (Jan. 25, 2024) (Decision and Order uploaded and emailed at 3:57 PM) with Dkt. 169 at 2 (Jan. 26, 2024) (EBCC claims that it "discovered the judgement only last night").

The Ebury Parties tested just how easy it is to "discover" that the Texas Case exists: on February 6, 2024, undersigned counsel's 19th Google hit for "ebury hanratty" was a July 2023 interlocutory default judgment issued in the Texas Case. Parks Aff. Exhibit B at 3.

The ease with which even a cursory search reveals the Texas Case shows exactly why EBCC—which has had three attorneys sign each recent brief, all affiliated with a firm that boasts the services of "875 lawyers who serve clients around the world through a network of 13 offices" and who "work as a single

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2190 of 2230

partnership without geographic division"—fails to address its burden to prove its own "reasonable justification" for failing to raise the Texas Case while the stay motion was pending. Compare Mot. at 3–4 (quoting "reasonable justification" standard without explaining why EBCC could not have learned of the Texas Case while the stay motion was pending) with Sullivan & Cromwell, LLP, About (Feb. 7, 2024); accord LFR Collections LLC v. Blan Law Offices, 117 A.D.3d 486, 497 (1st Dep't 2014) (affirming denial of renewal motion where, inter alia, movants "failed to provide any justification for failing to present the motion court with these facts which were available at the time the original motion was made.").

Because EBCC falls far short of its burden to prove its own "reasonable justification" for only raising the Texas Case now, the Court should deny the Motion. Accord Foley v. Roche, 68 A.D.2d 558, 568 (1st Dep't 1979) (citation omitted) ("Renewal should be denied where the party fails to offer a valid excuse for not submitting the additional facts upon the original application. Nor should the remedy be available where a party has proceeded on one legal theory on the assumption that what has been submitted is sufficient, and thereafter sought to move again on a different legal argument merely because he was unsuccessful upon the original application."); cf. Federated Conservationists, 4 A.D.3d at 327 (affirming denial of CPLR 5015 motion; "[I]t is clear from the record that the [movant] did not diligently look for the documents before the trial because it had 'expected to prevail' at the trial. The plaintiff began a comprehensive search for the documents only after it lost at trial.").

## II.   The Texas Case is Immaterial to the Reasons for the Stay

### A.   The Unfixed Texas Judgment has No Bearing on the Efficiency, Public Resources, and Fifth Amendment Reasons for the Stay

Regardless of EBCC's diligence or lack thereof, the Court should deny the Motion because the Texas Case is immaterial to the reasons why the Court granted the Stay. Compare generally Stay Order at 3 with Mot. at 1–3.

The Court held that the Stay is warranted because the Criminal and Civil Actions "arise out of identical facts" and therefore the Stay "will avoid the possibility [of] inconsistent results, save scarce judicial resources, and result in a potential streamlining and simplifying of the issues to be resolved in the proceeding, either by summary judgment or trial." Stay Order at 3.

Notwithstanding the Parties' agreement that the typical stay decision has arisen before the civil case has completed discovery, the Court held that Mr. Hanratty's Fifth Amendment protections are still relevant: there are at least three more summary judgment briefs to be filed, including the Ebury Parties' cross-motion for dismissal of the fraud claims, and it is entirely possible that even summary judgment practice will leave some issues that must be adjudicated at trial. Id. at 3 (finding that "Hanratty's concerns regarding his constitutional right against self-incrimination are therefore not entirely obviated by the current procedural posture of this civil action.").

Instead of even attempting to claim that the Texas Case is relevant to the Court's stated reasons for granting the Stay, EBCC again argues that its interest in a faster civil judgment, standing alone, is enough to trump "compelling" judicial

14

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2192 of 2230

economy and self-incrimination concerns. See Mot. at 2; EBCC Opposition to
Defendants' Stay Motion, Dkt. 156 at 8 (Jan. 23, 2024) (arguing that stay would not
be just because "[e]ach additional month that passes increases the amount
Defendants will owe, as well as the likelihood that Defendants will not be able to
satisfy the judgment."); but see Britt v. Int'l Bus Servs., Inc., 255 A.D.2d 143, 144
(1st Dep't 1998) (holding that Supreme Court abused its discretion when it denied
motion to stay civil case while related criminal case was pending; "A compelling
factor is a situation where a defendant will invoke his or her constitutional right
against self-incrimination," and other factors include "avoiding the risk of
inconsistent adjudicators, [duplication] of proof[,] and potential waste of judicial
resources.").

Even then, EBCC does not explain why the mere existence of the Texas Case
default judgment threatens any recovery it may achieve in this Civil Action. See
generally Mot. And in sounding the alarm over what it characterized as the
September 2023 "final [default] judgment" in the Texas Case, EBCC neglected to
mention any of the subsequent (and mitigating) docket entries, including Mr.
Hanratty and Ebury RE's appearances and the plaintiff's motion for post-judgment
discovery on the appropriate quantum of damages. Compare generally Mot. with
Texas Case Docket Sheet. Nor did EBCC mention that the New York Collection
Action seeks to enforce a final judgment that appears to not yet exist, given the
Texas motion to compel discovery. Compare generally Mot. with Texas Order
Compelling Discovery. And EBCC ignores that the courts in both of those case may

15

stay those cases for the same reason this Court stayed this Civil Action. <u>See</u> <u>generally</u> Mot.

The existence of the Texas Case, its default judgment, and the related New York Collection Action simply have nothing to do with the efficiency, judicial resources, and constitutional reasons why the Court issued the Stay.

### B. EBCC's Continual Efforts to Prolong this Dispute Belie Its Claim that the Stay's Delay Prejudices EBCC

Finally, the Court should reject EBCC's attempts to use "delay" as both a sword and a shield to complicate and prolong this commercial dispute instead of accepting the Ebury Parties' long-offered admissions of contractual liability.

As detailed above, this could have been a simple breach-of-contract case that likely would have been resolved by now, with significantly less discovery, fewer motions, and less strain on the Court's and the Ebury Parties' limited resources. <u>See</u> <u>supra</u> at 2–4. Instead of taking any number of measures to focus on collecting money that the Ebury Parties have freely admitted to owing, EBCC pursued scorched-earth fraud claims, participated in (and likely instigated) the federal criminal prosecution, and—just two days after Mr. Hanratty was arrested, and two days before EBCC's opening brief was due—asked the Ebury Parties and the Court to postpone all summary judgment deadlines by three weeks. <u>Id.</u>

Then—despite claiming from this action's inception that its fraud cause was so strong that it merited preliminary injunctive relief and federal prosecution— EBCC declined to move for summary judgment on its fraud claims, now claiming that they were too fact-intensive to be resolved before trial. <u>Id.</u>; <u>id.</u> n.3. All the

16

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records        Pg 2194 of 2230

while, the Ebury Parties have continually tried to settle this case, including by obtaining a third party's commitment to provide an eight-figure sum to which EBCC has agreed, pending further documentation. Id. 4

If delay alone truly did prejudice EBCC, it could have accepted the Ebury Parties' yearslong admissions to breaching the Loan contracts, limited any litigation to determine the proper amount of damages, and likely resolved the dispute long ago. And if—as EBCC has repeatedly argued—any dollar out of the Ebury Parties' pockets also is a dollar out of EBCC's own eventual recovery, EBCC's insistence that the Ebury Parties defend this dispute on multiple fronts makes even less sense. See Mot. at 2 (arguing that "EBCC will suffer significant prejudice if EYZC Investment Holdings, LLC is allowed to cut ahead of EBCC and recover from Ebury's limited assets [ . . . a] further stay would effectively push EBCC to the back of the line of an apparently growing list of victims").

Instead, EBCC has dragged out this fight and wolfed down the scarce resources of this Court, federal prosecutors, and the federal district court for the Southern District of New York, not to mention those of the Ebury Parties. Cf. CPLR 4547 (evidence of settlement discussions and offers is admissible to, inter alia, prove negat[e] a contention of undue delay").

Particularly considering EBCC's history of complicating this dispute, the Court should reject its argument that a "newly-discovered" and unfixed default judgment is enough to trump the efficiency, estoppel, and constitutional justifications for the Court's Stay.

17

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 176

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State

Court Records    Pg 2195 of 2230

RECEIVED NYSCEF: 02/07/2024

## CONCLUSION

EBCC articulates no good reason why it failed to previously present the Texas Case, let alone why that case's unfixed default judgment to an unsecured creditor outweighs the economy and constitutional concerns that the Court invoked in issuing the Stay in this first-filed Civil Action initiated by a secured creditor.

Because EBCC falls short of proving either of CPLR 2221's conjunctive prongs, the Ebury Parties respectfully request that the Court deny EBCC's Motion.

Dated: February 7, 2024
    New York, New York

        Respectfully submitted,

        **GUSRAE KAPLAN NUSBAUM PLLC**

        /s/ Kari Parks
        Kari Parks
        120 Wall Street, 25th Floor
        New York, New York 10005
        (212) 269-1400
        kparks@gusraekaplan.com

        *Counsel for the Ebury Parties*

18

24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2196 of 2230

## WORD COUNT CERTIFICATION

I certify that this memorandum of law complies with the word count limit of

N.Y.C.R.R. 202.8-b for documents prepared by computer. Microsoft Word's word

count tool represents that this memorandum, excluding the caption, tables of

contents and authorities, and signature block, totals 4,560 words.


Dated: February 7, 2024
       New York, New York

                                    /s/ Kari Parks
                                    Kari Parks

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| EMIGRANT BUSINESS CREDIT CORPORATION, <br><br>         Plaintiff, <br><br>     v. <br><br> JOHN ARTHUR HANRATTY, EBURY STREET CAPITAL, LLC, EBURY FUND 1, LP, EBURY FUND 2, LP, EBURY 1EMI LLC, EBURY 2EMI LLC, EB 1EMIALA LLC, EB 2EMIALA LLC, EB 1 EMIFL, LLC, EB 2EMIFL, LLC, EB 1EMIIN, LLC, EB 2EMIIN, LLC, EB 1EMIMD, LLC, EB 2EMIMD, LLC, EB 1EMINJ, LLC, EB 1EMINJ, LLC, EB 1EMINY, LLC, EB 2MINY, LLC, EB 1EMISC, LLC, EB 2EMISC, LLC, RE 1EMI LLC, RE 2EMI LLC, EB 1EMIDC, LLC, ARQUE TAX RECEIVABLE FUND (MARYLAND), LLC, EBURY FUND 1FL, LLC, EBURY FUND 2FL, LLC, EBURY FUND 2NJ, LLC, RED CLOVER 1, LLC, EBURY RE LLC, and XYZ CORPS. 1–10, <br><br>         Defendants. | Index No. 158207/2022 <br><br> Mot. Seq. 8 |

## **AFFIRMATION OF KARI PARKS**

Under the penalties of perjury, I, Kari Parks, affirm as follows:

1.     I am a partner of the law firm Gusrae Kaplan Nusbaum PLLC, counsel for the "**Ebury Parties**" in the above-captioned matter.

2.     I submit this affirmation in opposition to Plaintiff Emigrant Business Credit Corporation's ("**EBCC**" and with the Ebury Parties, the "**Parties**") order to show cause, Mot. #008.

3.     During discovery in the above-captioned case, the Parties exchanged over 130,000 pages of documents and deposed 11 witnesses.

4.     While the Ebury Parties were content to conduct all depositions via videoconferencing, EBCC insisted that Mr. Hanratty fly up from Puerto Rico to sit for two days of depositions at Sullivan & Cromwell's Manhattan office—which he did.

5.     The Parties have engaged in post-litigation settlement discussions for at least eight months, both privately and through the First Department's mediation program.

6.     By June 2023, the Ebury Parties had identified a third party who was willing to lend millions to the Ebury Parties to facilitate their settlement with EBCC.

7.     During Mr. Hanratty's June 2023 deposition, EBCC asked Mr. Hanratty a series of questions about that third party and his willingness and ability to fund the settlement.

8.     On November 22, 2023, EBCC agreed to accept a particular eight-figure settlement amount, "subject to [its] requested proof of funds and the execution of appropriate documentation."

9.     Although the Ebury Parties have continually provided information that they believe should satisfy EBCC's documentation requests, the Parties have not finalized a settlement.

2

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM
NYSCEF DOC. NO. 177

INDEX NO. 158207/2022

RECEIVED NYSCEF: 02/07/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2199 of 2230

11.      Annexed as Exhibit A is a true and correct copy of emails between counsel agreeing to summary judgment briefing dates.

12.      Annexed as Exhibit B is a true and correct copy of the results of my February 6, 2024 Google of "ebury hanratty."

13.      Annexed as Exhibit C is a true and correct copy of the Texas Case Docket Sheet as of approximately 12:54pm EST on February 7, 2024.

14.      Annexed as Exhibit D is a true and correct copy of the Texas Case order compelling post-judgment discovery dated January 31, 2024.

15.      Annexed as Exhibit E is a true and correct copy of the New York Collection Action docket as of approximately 7:48pm EST on February 7, 2024.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 7, 2024
        New York, New York

Respectfully submitted,

/s/ Kari Parks
Kari Parks

# EXHIBIT A

| From: | Kari Parks |
|---|---|
| To: | Mayron, Austin P.; Victor Wang |
| Cc: | Willscher, Alexander J. |
| Subject: | Re: Emigrant v. Hanratty |
| Date: | Wednesday, December 20, 2023 4:36:31 |

Hi Austin - OK with us. Please send us the drafts when you're ready. Thank you

**Kari Parks, Senior Associate** | **Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 | www.gusraekaplan.com

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication.  Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost. Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission.  Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Monday, December 18, 2023 3:55 PM
**To:** Kari Parks <kparks@gusraekaplan.com>; Victor Wang <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Emigrant v. Hanratty

Hi Kari,

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2202 of 2230

We would like to revise our proposed schedule for summary judgment briefing to the following:

| Brief | Original Proposal | Revised Proposal |
|---|---|---|
| Emigrant's Motion for Summary Judgment | December 22 | January 12 |
| Ebury's Combined Cross-Motion for Summary Judgment and Opposition | January 12 | February 2 |
| Emigrant's Combined Opposition and Reply | February 2 | February 23 |
| Ebury's Reply | February 16 | March 8 |

Please let us know if this revised proposal is agreeable, without prejudice to the Ebury Parties' ability to request additional extensions, as necessary. In addition, to streamline summary judgment briefing, we would like to propose a stipulation to the Court to the effect that each party need only file a single motion to seal information designated under the Protective Order in connection with the summary judgment briefing (rather than one motion per brief). Please let us know if this is agreeable—if so, we can prepare a draft stipulation and proposed order.

Best,

**Austin P. Mayron**
+1 212 558 3733 (T) | +1 518 577 1643 (M)

**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Tuesday, November 21, 2023 1:02 PM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>; Victor Wang <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** [EXTERNAL] RE: Emigrant v. Hanratty

Works for me. Thanks!

**Kari Parks, Senior Associate** | **Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 | www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication. Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records        Pg 2203 of 2230

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission.  Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Tuesday, November 21, 2023 13:00
**To:** Kari Parks <kparks@gusraekaplan.com>; Victor Wang <vwang@gusraekaplan.com>
**Cc:** Willscher, Alexander J. <willschera@sullcrom.com>
**Subject:** RE: Emigrant v. Hanratty

Hi Kari,

As discussed, here is a proposed summary judgment briefing schedule.  Please let us know if it is acceptable.

| Brief | Deadline | Word Limit |
|---|---|---|
| Emigrant's Motion for Summary Judgment | December 22 | 7,000 words |
| Ebury's Combined Cross-Motion for Summary Judgment and Opposition | January 12 | 14,000 words |
| Emigrant's Combined Opposition and Reply | February 2 | 11,200 words |
| Ebury's Reply | February 16 | 4,200 words |

Best,


**Austin P. Mayron**
+1 212 558 3733 (T) | +1 518 577 1643 (M)


**From:** Kari Parks <kparks@gusraekaplan.com>
**Sent:** Monday, November 20, 2023 11:06 AM
**To:** Mayron, Austin P. <mayrona@sullcrom.com>
**Subject:** [EXTERNAL] RE: Emigrant v. Hanratty

Hi – Sure. I can do anytime before 4pm. Just call my office when you want to chat: (212) 269-1400.

**Kari Parks, Senior Associate | Gusrae Kaplan Nusbaum PLLC** | 120 Wall Street | New York, NY 10005 | T: (212) 269-1400 |www.gusraekaplan.com [gusraekaplan.com]

This transmission may contain information that is confidential, privileged, and/or exempt from disclosure under law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance

thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, including all electronic and hard copies.

This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication.  Gusrae Kaplan Nusbaum PLLC is not rendering tax advice, and nothing in this email should be construed as such.

Internet communications cannot be guaranteed to be secure or error-free inasmuch as information may arrive late, contain viruses, or be intercepted, corrupted, or lost.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any errors or omissions in the content of this message which arise as a result of internet transmission.  Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received, it is the responsibility of the recipient to ensure that it is virus free.  Gusrae Kaplan Nusbaum PLLC does not accept responsibility for any loss or damage arising in any way from its use.

**From:** Mayron, Austin P. <mayrona@sullcrom.com>
**Sent:** Monday, November 20, 2023 10:33
**To:** Kari Parks <kparks@gusraekaplan.com>
**Subject:** Re: Emigrant v. Hanratty

Hi Kari,

Are you available today to touch base regarding the case schedule?

Best,

**Austin P. Mayron**
**Sᴜʟʟɪᴠᴀɴ & Cʀᴏᴍᴡᴇʟʟ LLP**
125 Broad Street | New York, NY 10004-2498
+1 212 558 3733 (T) | +1 518 577 1643 (M)
mayrona@sullcrom.com | www.sullcrom.com

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

---

**\*\*This is an external message from:** kparks@gusraekaplan.com **\*\***

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM
INDEX NO. 158207/2022

NYSCEF DOC. NO. 179

RECEIVED NYSCEF: 02/07/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2205 of 2230

# EXHIBIT B

Google          ebury hanratty                              ⚙ ⦂⦂⦂    Sign in

Images   News   Videos   Perspectives   Shopping   Maps   Books   Flights   Finance      All filters ▾    Tools    SafeSearch ▾

About 5,190 results (0.26 seconds)

 Department of Justice (.gov)
https://www.justice.gov › usao-sdny › founder-and-m... ⦂

## Founder And Managing Director Of Tax Lien Investment ...

Dec 18, 2023 — HANRATTY was the Founder and Managing Director of **Ebury** Street Capital, LLC ("**Ebury** Street Capital"), an investment firm with a portfolio ...

 Westfair Online
https://westfaironline.com › Banking & Finance ⦂

## Founder of Rye investment firm charged in $20M bank ...

Dec 20, 2023 — **Hanratty** was licensed as an attorney in 2002 and served as chief compliance officer for Options Trading Associates, Purchase, from 2002 to 2018.

 Casetext
https://casetext.com › ... › 2022 › November ⦂

## Emigrant Bus. Credit Corp. v. Hanratty

Nov 29, 2022 — Defendant John **Hanratty** is the manager of defendant **Ebury** Street Capital, LLC (ESC), the manager or general partner of all the other corporate ...

 BNN Breaking
https://bnnbreaking.com › Crime › United States ⦂

## CEO of Ebury Street Capital Detained in $20 Million Fraud ...

Dec 20, 2023 — **Ebury** Street Capital's CEO John Arthur **Hanratty** arrested in alleged $20 million fraud scheme. The FBI in New York has charged **Hanratty** with ...

 MoreLaw
https://www.morelaw.com › verdicts › case ⦂

## Re: United States of America v. John Arthur Hanratty

Jan 1, 2024 — John Arthur **Hanratty** was the Founder and Managing Director of **Ebury** Street Capital, LLC ("**Ebury** Street Capital"), an investment firm with a ...

 X · News12WC
2 likes · 1 month ago

## FRAUD SCHEME - 💲 - John Hanratty is accused ...

FRAUD SCHEME John **Hanratty** is accused of orchestrating a plan to unlawfully obtain funds from an FDIC-insured bank ... **Ebury** Street Capital.

 Bloomberg Law News
https://news.bloomberglaw.com › tax-lien-investment-... ⦂

## Tax Lien Investment Firm Founder Faces Charges in Credit ...

Dec 20, 2023 — John Arthur **Hanratty**, a New York-licensed attorney, has been arrested for charges in connection with a fraudulent scheme that involved $20 ...

 Department of Justice (.gov)
https://www.justice.gov › u.s_v_hanratty_com... PDF ⦂

## 23 MAG 7566

**Ebury** Street Capital is an investment firm that was founded by JOHN ARTHUR. **HANRATTY**, the defendant, in or around 2010. At all relevant times, **HANRATTY** served ...

Rye Record
https://ryerecord.com › Police Blotter ⦂

## Former Rye Resident Charged with Bank and Wire Fraud

https://www.google.com/search?q=ebury+hanratty&sca_esv=891f019e1683b014&rlz=1C1ONGR_enUS979US979&ei=drnCZYHoDMn-ptQP_qG-0A0...    1/8

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM    INDEX NO. 158207/2022
NYSCEF DOC. NO. 179                                 RECEIVED NYSCEF: 02/07/2024

2/6/24, 6:03 PM    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                                  Court Records    Pg 2207 of 2230

 Google

dailyvoice.com
https://dailyvoice.com › Rye Daily Voice › News

### $20M Scheme: Former Rye Resident Steals Funds From Bank ...

Dec 28, 2023 — According to federal officials, **Hanratty** was the founder and managing director of Rye-based **Ebury** Street Capital, LLC, an investment firm ...

Related searches

**john arthur** hanratty                    **ebury street capital**

 X · News12WC
1 like · 1 month ago

### News12WC

FRAUD SCHEME John **Hanratty** ... **Ebury** Street Capital. westchester.news12.com. Rye investment firm founder charged in $20 million fraud scheme.

 WHEC.com
https://www.whec.com › investigations

### News10NBC Investigates: Rats, roaches and leaks. Slum ...

Mar 1, 2022 — I reached out to **Ebury**, and John **Hanratty**, the firm's managing director, objects to being called a slumlord. He insists it's unfair to ...

 News 12 · Long Island
https://longisland.news12.com › rye-investment-firm-f...

### Rye investment firm founder charged in $20 million fraud scheme

... **Ebury** Street Capital. Prosecutors claim that **Hanratty** made false statements on spreadsheets submitted to the bank, receiving significant sums of money and ...

 Trellis.Law
https://trellis.law › doc › summons-complaint

### summons-complaint

Access the Complaint,Petition in the Emigrant Business Credit Corporation v. John Arthur **Hanratty**, **Ebury** Street Capital, Llc, **Ebury** Fund 1, Lp, **Ebury** Fund 2 ...

 Law360
https://www.law360.com › pulse › courts › articles › atty...

### Atty Who Led Tax Lien Investment Firm Charged With Fraud

Dec 19, 2023 — According to a complaint unsealed Monday in Manhattan federal court, **Hanratty** was the founder and managing director of **Ebury** Street Capital ...

 Reg-Track
https://reg-track.com › ...

### DoJ Tax Lien Investment Head Fraud

Dec 18, 2023 — DoJ reported that John Arthur **Hanratty**, founder and managing director of tax lien investment firm **Ebury** Street Capital, was charged with ...

 Facebook · Ebury RE
900+ followers

### Ebury RE | San Juan

**Ebury** RE. 863 likes. . 907 followers. Is a diversified Real Estate company focused on ... Emma Uehlein **Hanratty** · 1 · · 2. **Ebury**. Feb 7, 2022 ...

 ZoomInfo
https://www.zoominfo.com › John-Hanratty

### John Hanratty Email & Phone Number - OTA Management

John **Hanratty** , Senior Managing Director **Ebury** Street Capital LLC , Rye, New York. riveleslawgroup.com. news feed 4. Client Praise - Riveles Wahab LLP ...

Google

EYZC INVESTMENT HOLDINGS, LLC. VS. EBURY RE ...

On May 11, 2023 a Judgment was filed involving a dispute between Eyzc Investment Holdings, Llc, and **Ebury** Re Limited Liability Company, Hanratty, John, for ...

## Images

| | | |
|---|---|---|
| CEO of Ebury Street Capital ... | Ebury RE - "Buy land, they are... | Founder of Rye Investment Fi... |
| BNN Breaking | Facebook | MyRye.com |

6 more images ⌄

Feedback

Dun & Bradstreet
https://www.dnb.com › ... › NEW YORK › RYE

**Ebury Street Capital, LLC Company Profile | Rye, NY**

Who is **Ebury** Street Capital, LLC's key principal? **Ebury** Street Capital, LLC's key principal is John **Hanratty**. What year was **Ebury** Street Capital, LLC started?

SEC.gov
https://www.sec.gov › xslFormDX01 › primary_doc

**FORM D**

**Ebury** Fund 1, LP, John **Hanratty**, John **Hanratty**, Manager of General Partner, 2013-08-20. Persons who respond to the collection of information contained in ...

Justia
https://dockets.justia.com › ... › District Court

**Ebury Street Capital, LLC et al v. McOsker et al**

Feb 12, 2021 — ... **EBURY FUND 2CI**, LLC, **EBURY FUND IC1**, LLC and John **Hanratty**. Case ... **Ebury** Fund 2 NJ, LLC, **Ebury** Street Capital, LLC. (Miller, Kathleen).

My State MLS
https://www.mystatemls.com › profiles › john-hanratty

**John Hanratty Of HANRATTY JOHN A In SAN JUAN PR**

John **Hanratty** HANRATTY JOHN A. Generic placeholder image. About Mr. John **Hanratty** ... marketing@eburycap.com. Visit Website. 1357 ASHFORD AVE STE 2. SAN JUAN, PR ...

Law.com
https://www.law.com › almID

**Emigrant Bus. Credit Corp. v. Hanratty**

Defendant John **Hanratty** is the manager of defendant **Ebury** Street Capital ... **Ebury** Entities' liens" (NYSCEF # 24 — **Hanratty** Aff, 45). As for evidence of ...

New Jersey (.gov)
https://www.nj.gov › golddel_consent_order  PDF

**IN THE MATTER OF THE GOLDDEL OF MIDLAND PARK ...**

**Ebury** RE 2, LLC ("**Ebury**") is a corporation with a business address of 41 ... Printed Name: John **Hanratty**. Printed Title:

vLex
https://case-law.vlex.com › Case Law › New York

Emigrant Bus. Credit Corp. v. Hanratty Index No. 158207/2022



**Google**

LinkedIn · John Hanratty
570+ followers

**John Hanratty**

John **Hanratty**. Cambridge, Massachusetts, United States. 570 followers 500+ ... Accountant at **Ebury** Street Capital. Wichita, Kansas Metropolitan Area · Connect ...

PacerMonitor
https://www.pacermonitor.com › public › case › Ebur...

**Ebury Street Capital, LLC et al v. McOsker et al**

Feb 12, 2021 — **Ebury** Street Capital, LLC et al v. McOsker et al (1:21-cv-00203), Delaware District Court, Filed: 02/12/2021 - PacerMonitor Mobile Federal ...

Facebook · Ebury RE
1 reaction · 1 year ago

**Ebury RE - "Buy land, they aren't making it anymore." BUY**

**Ebury** RE's post. **Ebury** RE. Feb 28, 2022 . . "Buy land ... #andersonsc. Emma Uehlein **Hanratty** · 1 · 2. Recent Posts.

Riveles Wahab LLP
https://randwlawfirm.com › testimonials

**Private Fund, Securities, Corporate and Technology Lawyers**

I would highly recommend Simon and his firm to new and established asset managers. John **Hanratty**. Senior Managing Director, **Ebury** Street Capital LLC. We ...

Wall Township (.gov)
https://www.wallnj.gov › View › 22-0225-Dupl...   **PDF**

**authorization to issue a duplicate tax sale certificate ...**

John **Hanratty** - MTAG cst **Ebury** Fund 2 NJ LLC (assignee). I, Roberta Lang, Municipal Clerk of the Township of Wall in the County of Monmouth and the State of ...

Leagle
https://www.leagle.com › innyco20221205226

**EMIGRANT BUS. CREDIT CORP. v. HANRATTY**

Oct 18, 2022 — EMIGRANT BUSINESS CREDIT CORPORATION, Plaintiff, v. JOHN ARTHUR **HANRATTY**, **EBURY** STREET CAPITAL, LLC, **EBURY** FUND 1, LP, **EBURY** FUND 2, LP, ...

Kumneger Media
https://kumnegermedia.com › the-fbi-arrests-an-invest...

**The FBI arrests an investor in Puerto Rico accused of a ...**

Dec 20, 2023 — ... **Ebury** Street Capital an investment firm with a portfolio composed ... **Hanratty's** arrest last Monday, when he appeared before a magistrate in ...

Law360
https://www.law360.com › cases

**Ebury Street Capital, LLC et al v. McOsker et al**

Feb 12, 2021 — Parties, docket activity and news coverage of federal case **Ebury** Street Capital, LLC et al v. McOsker et al, case number 1:21-cv-00203, ...

LinkedIn
https://www.linkedin.com › franklin-gandol-284746176

**Franklin Gandol - Accountant - Ebury Street Capital**

Wichita, Kansas Metropolitan Area · Accountant · Ebury Street Capital
Accountant at **Ebury** Street Capital. **Ebury** Street Capital. Wichita, Kansas ... John **Hanratty**. Consultant Oral Maxillofacial Surgery Western Health Trust.

NY State MLS
https://www.nystatemls.com › property › 396_Orange...

**396 Orange, Rochester, NY 14611 (Sold ...**

2024-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records        Pg 2210 of 2230

Google



PL  Pluma Libre News
https://www.plumalibrenews.com › ...    Translate this page

**Abogado de Rye acusado de millonario fraude financiero**

Dec 18, 2023 — ... **Ebury** Street Capital, que administra dos fondos diferentes conocidos como **Ebury** Fund 1 y **Ebury** Fund 2. **HANRATTY** ha sido un abogado con ...

🌐  Riveles Law Group
https://www.rivelestlawgroup.com › testimonials

**Client Testimonials on RLG's Hedge Fund Services in New ...**

I would highly recommend Simon and his firm to new and established asset managers." John **Hanratty**, Senior Managing Director **Ebury** Street Capital LLC, Rye, New ...

OPRAmachine
https://opramachine.com › response › attach    PDF

**December 30, 2022**

Dec 30, 2023 — TOWER FUND SERVICES/CUST **EBURY**. JOHN **HANRATTY**. (212)634-9097. TWR AS CSTFOREBURYFUND1 NJ LLC. 46-3245126 admin@eburycap.com. PO BOX 37695. Page ...



Corporation Wiki
https://www.corporationwiki.com › ... › Rye

**John Hanratty - Previous Manager for Ebury Fund Flz LLC**

View John **Hanratty's** profile for company associations, background information, and partnerships. Search our database of over 100 million company and ...

ClustrMaps
https://clustrmaps.com › ... › Rye › Halsted Place

**26 Halsted Pl, Rye, NY - Ebury Re LLC Public Records**

Oct 5, 2023 — **Ebury** Street Capital, LLC ( Alternate Name: John **Hanratty**) Domestic Limited Liability Company, Domestic Limited Liability Company. Date ...

SlideShare
https://www.slideshare.net › weavenyce › ebury-profe...

**Ebury Professional Services Solutions | PDF**

Jun 5, 2016 — John **Hanratty** MR. **HANRATTY** IS AN EXPERIENCED ENTREPRENEUR AND REAL ESTATE INVESTOR WHO CURRENTLY SERVES AS THE GENERAL PARTNER OF **EBURY** ...



True People Search
https://www.truepeoplesearch.com › ... › PR › San Juan

**John Arthur Hanratty, Age 49 - San Juan**

Get the TruePeopleSearch app! install · Home / H / **Hanratty** / John **Hanratty** / PR / San Juan ... **Ebury** Street Capital LLC 26 Halsted Pl Rye Ny 10580-3410. Rosehill ...

P  Pace University
https://www.pace.edu › profile › kier-hanratty

**Kier Hanratty | Pace University New York**

Kier **Hanratty**. Assistant Professor, Dyson College of Arts and Sciences. Economics. (212) 346-1452 · khanratty@pace.edu. NYC. 1127. 41 Park Row. On This ...



Poder Judicial de Puerto Rico
https://dts.poderjudicial.pr › KLCE202100430-...    PDF

**KLCE202100430**

En San Juan, Puerto Rico, a 13 de mayo de 2021. Comparece ante este tribunal apelativo, el Sr. John **Hanratty**;. **Ebury** Street Capital, LLC; **Ebury** Fund 1 NJ, ...



Prensa Latina
https://www.prensa-latina.cu › ... › 20    Translate this page

**FBI arresta en Puerto Rico a inversionista por fraude de 20 ...**

Dec 20, 2023 — San Juan, 20 dic (Prensa Latina) El abogado estadounidense John Arthur **Hanratty**, fundador de **Ebury** Street Capital, fue arrestado por agentes ...

2024 Court Records 24-04020-dsj    Doc 1-2    Filed 08/14/24 Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2211 of 2230

Google

John Hanratty | Real Estate Agent in San Juan, PR

Real Estate Agent John **Hanratty** of San Juan, PR. Read reviews, see agent listings, and contact for all your real estate needs.

MoreLaw
https://www.morelaw.com › newhampshire › false_pre...

**New Hampshire False Pretense Law**

John Arthur **Hanratty** was the Founder and Managing Director of **Ebury** Street Capital, LLC ("**Ebury** Street Capital"), an investment firm with a portfolio ...

YouTube · Rangers Football Club (Official)
22.7K+ views · 8 years ago

**Queen of the South 1-5 Rangers | 30 Aug 2015 - YouTube**

INTERVIEW | **Ebury** Partnership Launch | 18 Jan 2024. Rangers Football ... Gordon **Hanratty**•5.7K views · 5:04. Go to channel · Rangers players songs.

1:47

NY State MLS
https://www.nystatemls.com › property › 13-wood-st-r...

**13 Wood St, Rochester, NY 14626**

Buyer's Agent: **Ebury** RE; Company: **Ebury** RE. Previously Listed By. Mr. John **Hanratty**. **HANRATTY** JOHN A. Request More Information. Request More Information. I am ...

garage-rochat-ventes.fr
https://garage-rochat-ventes.fr › cojvz

**Arkadaşlık ll Hanratty Cobbetts John gelin çevrimiçi poker**

... **Hanratty**. Address & Phone Number Defendant John **Hanratty** is the manager of defendant **Ebury** Street Capital, LLC (ESC), the manager or John Arthur **Hanratty** ...

StrikeFans.com
https://strikefans.com › kinvara-hanratty

**Kinvara Hanratty**

Oct 24, 2023 — Kinvara **Hanratty**. Kinvara **Hanratty** is the second wife of Jasper ... **Ebury** Street. Foreign Office. Harley Street. Franco's. Lancaster House.

Midland Park NJ |
https://www.midlandparknj.org › files › agendas  PDF

**PB PACKET 1-21**

Jan 25, 2021 — John **Hanratty**; **EBURY** RE 2UC. SIGNATURE: ADDRESS OF OWNER: 41 Purdy Avenue, P.O. Box 281 Rye, by 10580. #yol. CERTIFICATION THAT ALL CONDITIONS ...

Poder Judicial de Puerto Rico
https://dts.poderjudicial.pr › KLCE202100266-...  PDF

**KLCE202100266**

John **Hanratty**; **Ebury** Street. Capital, LLC.; EB 1Emiala, LLC; EB 2Emiala, LLC; **Ebury** Fund 1 NJ,. LLC y **Ebury** Fund 2 NJ, LLC (recurridos) presentaron una Demanda.

OPRAmachine
https://opramachine.com › response › attach  PDF

**August 5, 2022**

**EBURY**. MTAG cst **EBURY** FUND 1 NJ LLC. JOHN **HANRATTY**. (212)634-9097. PO BOX 37695. 46-3245126. BALTIMORE. MD 21297-3695. **EBURY**-2. MTAG cst **Ebury** Fund 2 NJ LLC. PO ...

ClustrMaps
https://clustrmaps.com › US Persons › H

**Emma U Hanratty, (914) 305-4083, Rye — Public Records ...**

Mar 5, 2022 — Quick Facts. She is in her forties. Her age is 47. Emma is a resident of 26 Halsted Pl, Rye, NY. **Ebury** Street Capital, LLC has been linked to ...

2/6/24, 6:00 PM 24-04020-dsj Doc 1-2 ebury+hanratty - Google Search Doc #3 State
Court Records Pg 2212 of 2230



**Behind the Seams**

... Hanratty, Robert Behar, Stacia Lang, Stacie Huckeba, Steve Summers, Timothy ... **Ebury** Publishing. SIZE. 230.7. MB. Listeners Also Bought. Run Rose Run. 2022 · All ...

£9.99 · Free delivery · Free 14-day returns



NotiUno.com
https://www.notiuno.com › noticias · Translate this page

**FBI arresta inversionista acusado por fraude**

Dec 20, 2023 — ... **Hanratty**, fundador y director ejecutivo de **Ebury** Street Capital, una firma de inversión con una cartera compuesta principalmente por ...



Ebury
https://ebury.com › e-blog › blog › ebury_post › ebur...

**Ebury Women's Event in London**

Nov 7, 2017 — On the 10th October, over 20 female employees from all departments attended a dinner for the **Ebury** UK Women's Initiative, held at the Rail ...



GOV.UK
https://assets.publishing.service.gov.uk › media

**2010 to 2013**

... **Ebury** Press,",2010,,"SOUTHBY-TAILYOUR, EWEN", The 9/11 wars,"Allen Lane ... **Hanratty**: report of Mr. C. Lewis Hawser, QC of his assessment of the ...



xigxag
https://xigxag.co.uk › behind-the-seams-9781529915617

**Behind the Seams**

**Ebury** Publishing; Run Time 4 hours and 21 minutes; Format Audio; Genre ... **Hanratty**, Robert Behar, Stacia Lang, Stacie Huckeba, Steve Summers, Timothy White ...

£7.99 · 14-day returns · In stock



JSTOR
https://www.jstor.org › stable

**CURRENT JJ CHECKLIST (120)**

by WS Brockman · 2013 — **EBURY**, Katherine. "Joycean Cosmologies." Modernism and Cosmology: Absurd ... " Human Destinies: Philosophical Essays in Memory of Gerald **Hanratty** ...



British Newspaper Archive
https://www.britishnewspaperarchive.co.uk › search

**Results for 'murder'**

James **Hanratty**. aged 61. whose son was hanged for the A 6 murder, said last ... Flats , **Ebury** Bridge, London. A week ago at Arundel he was treated at Charing ...



Player FM
https://player.fm › podcasts › danny-wallace

**Best Danny Wallace Podcasts (2024)**

Scott Wallace, Gordon **Hanratty**. Subscribe ... **Ebury** Goes Live Podcast. **Ebury** Publishing. Subscribe. Unsubscribe. 18 years ago 18y. Subscribe. Unsubscribe. Monthly.



Amazon.com
https://www.amazon.com › Call-Me-Red-shepherds-jo...

**Call Me Red: Jackson, Hannah**

**Ebury** Press (March 4, 2021). Language, English. Hardcover, 320 pages. ISBN-10 ... **Hanratty**. 5.0 out of 5 stars. Call Me Red: A Shepard's Journey. Reviewed in ...

Rating: 4.7 · 387 reviews · $28.46 · 30-day returns



Dallas County
https://www.dallascounty.org › courts-livestream › proba...

**Probate Court No. 3 Docket Information**



Google


Haystack News
https://www.haystack.tv › ...

**Rye investment firm founder charged in $20 million fraud ...**

Dec 28, 2023 — **Hanratty** is accused of orchestrating a plan to unlawfully obtain ... **Ebury** Street Capital.

Robert Smith Literary agency
https://www.robertsmithliteraryagency.com › year

**2021**

**Ebury** Press (January 2021). Houchin The Guv'nor and Me Don't cross The Neck ... **Hanratty**, 60 years ago in the notorious 'A6 Murder'. After a 5-hour ordeal ...


Google Play
https://play.google.com › store › audiobooks › details

**Behind the Seams: My Life in Rhinestones by Dolly Parton**

Brought to you by Penguin. A beautiful celebration of Dolly Parton's iconic sense of style through entertaining personal stories, interviews with friends ...

¥2,599

More results ⌄

11201, New York, NY - From your IP address - Update location

More options in **Quick settings (⚙)**

# EXHIBIT C

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 180

RECEIVED NYSCEF: 02/07/2024

2/7/24, 12:54 PM 24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2215 of 2230

## Case Information

DC-23-06256 | EYZC INVESTMENT HOLDINGS, LLC. vs. EBURY RE LIMITED LIABILITY COMPANY, et al

| | | |
|---|---|---|
| Case Number | Court | Judicial Officer |
| DC-23-06256 | 116th District Court | PARKER, TONYA |
| File Date | Case Type | Case Status |
| 05/11/2023 | OTHER (CIVIL) | CLOSED |

## Party

PLAINTIFF
EYZC INVESTMENT HOLDINGS, LLC.

Active Attorneys ▾

Attorney
ARNETT, JAMES ROBERT, II
Retained

Attorney
SOPUCH III, JOHN
Retained

Lead Attorney
ARNETT, JAMES ROBERT
Retained

Attorney
GOFF, MONICA LITTLE
Retained

DEFENDANT
EBURY RE LIMITED LIABILITY COMPANY

Active Attorneys ▾

Pro Se

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 180    2/7/24, 12:54 PM    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 02/07/2024
Court Records    Pg 2216 of 2230

Inactive Attorneys ▾

Attorney
BEARD, ALEXANDER N
Retained

Work Phone
214-919-3555

Fax Phone
214-644-2050

---

DEFENDANT
HANRATTY, JOHN

---

## Disposition Events

09/13/2023 Judgment ▾

DEFAULT JUDGMENT

Judicial Officer
PARKER, TONYA

Judgment Type
DEFAULT JUDGMENT

---

Judgment

Total Judgment: of $0.00

Awarded To: EYZC INVESTMENT HOLDINGS, LLC.

Awarded Against: EBURY RE LIMITED LIABILITY COMPANY, et al

---

## Events and Hearings

05/11/2023 NEW CASE FILED (OCA) - CIVIL

05/11/2023 ORIGINAL PETITION ▾

ORIGINAL PETITION

05/17/2023 REQUEST FOR SERVICE ▾

RQST LETTER

05/17/2023 ISSUE CITATION ▾

ISSUE CITATION-EBURY RE LIMITED LIABILITY COMPANY

ISSUE CITATION-JOHN HANRATTY

05/24/2023 CITATION ▾

Served
07/19/2023

Anticipated Server
ESERVE

Anticipated Method
Actual Server
OUT OF STATE

Returned
07/25/2023
Comment
EBURY RE LIMITED LIABILITY COMPANY

05/24/2023 CITATION ▾

Served
06/23/2023

Anticipated Server
ESERVE

Anticipated Method

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM    INDEX NO. 158207/2022

NYSCEF DOC. NO. 180    RECEIVED NYSCEF: 02/07/2024

2/7/24, 12:51 PM    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2218 of 2230

Actual Server
OUT OF COUNTY

Returned
06/26/2023
Comment
JOHN HANRATTY

---

06/07/2023 MOTION-SUBSTITUTE SERVICE ▾

MOTION SUBSTITUTE SERVICE

---

06/07/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED ORDER SUBSTITUTE SERVICE

Comment
PROPOSED ORDER SUBSTITUTE SERVICE

---

06/21/2023 ORDER - SUBSTITUTE SERVICE ▾

ORDER - SUBSTITUTE SERVICE

---

06/26/2023 RETURN OF SERVICE ▾

EXECUTED CITATION - JOHN HANRATTY

Comment
EXECUTED CITATION - JOHN HANRATTY

---

07/18/2023 MOTION - DEFAULT JUDGMENT ▾

Comment
INTERLOCUTORY

---

07/18/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED ORDER OF INTERLOCUTORY DEFAULT JUDGMENT

Comment
PROPOSED ORDER OF INTERLOCUTORY DEFAULT JUDGMENT

---

07/24/2023 AFFIDAVIT ▾

SERVICEMEMBER'S CIVIL RELIEF ACT AFFIDAVIT

Comment
SERVICEMEMEBER'S CIVIL RELIEF ACT AFFIDAVIT

---

07/25/2023 RETURN OF SERVICE ▾

EXECUTED CITATION - EBURY RE LIMITED LIABILITY COMPANY

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 180        2/7/24, 12:54 PM  24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State   RECEIVED NYSCEF: 02/07/2024

Court Records      Pg 2219 of 2230

EXECUTED CITATION - EBURY RE LIMITED LIABILITY COMPANY

07/26/2023 VACATION LETTER

08/02/2023 AFFIDAVIT ▾

AMENDED SERVICEMEMBERS CIVIL RELIEF ACT AFFIDAVIT

Comment
AMENDED SERVICEMEMBERS CIVIL RELIEF ACT

08/04/2023 ORDER - INTERLOCUTORY JUDGMENT ▾

ORDER - INTERLOCUTORY JUDGMENT

Comment
AGAINST JOHN HANRATTY

08/08/2023 NOTICE OF JUDGMENT MAILED ▾

FP NOTICE OF DEFAULT JUDGMENT RULE 239(a)

FP NOTICE OF DEFAULT JUDGMENT RULE 239(a)

08/15/2023 DISMISSAL FOR WANT OF PROSECUTION ▾

dism letter (116th)

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
3:00 PM

Cancel Reason
BY COURT ADMINISTRATOR

08/15/2023 MOTION - DEFAULT JUDGMENT ▾

MOTION FOR INTERLOCUTORY DEFAULT JUDGMENT AS TO EBURY RE LIMITED LIABILITY COMPANY

Comment
AS TO EBURY RE LIMITED LIABILITY COMPANY

08/15/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED DEFAULT JUDGMENT

Comment
PROPOSED DEFAULT JUDGMENT

09/13/2023 Default Prove-Up ▾

MOTION FOR INTERLOCUTORY DEFAULT JUDGMENT AS TO EBURY RE LIMITED LIABILITY
COMPANY

PROPOSED DEFAULT JUDGMENT

Judicial Officer
PARKER, TONYA

Hearing Time
9:15 AM

Comment
Set with Interlocutory Default Judgment signed August 4, 2023. IN PERSON. HEARING CAN ONLY BE
CANCELLED BY JUDGE OR ADMIN

---

09/13/2023 ORDER - INTERLOCUTORY JUDGMENT ▾

ORDER - INTERLOCUTORY JUDGMENT

Comment
EBURY RE LIMIT LIABILITY COMPANY

---

09/13/2023 NOTICE OF JUDGMENT MAILED ▾

FP NOTICE OF DEFAULT JUDGMENT RULE 239(a)

---

09/15/2023 MISCELLANOUS EVENT ▾

E-SERVE COVER LETTER ORDER FINAL JUDGMENT & ORDER INTERLOCUTORY JUDGMENT

E-SERVE ORDER FINAL JUDGMENT

E-SERVE ORDER INTERLOCUTORY JUDGMENT

Comment
E-SERVE COVER LETTER ORDER FINAL JUDGMENT & ORDER INTERLOCUTORY JUDGMENT

---

10/13/2023 MOTION - NEW TRIAL ▾

DEF'S MOTION FOR NEW TRIAL AND TO VACATE DEFAULT JUDGMENT

Comment
AND TO VACATE DEFAULT JUDGMENT

---

10/17/2023 NOTICE OF HEARING / FIAT ▾

MOTION FOR NEW TRIAL AND TO VACATE DEFAULT JUDGMENT

Comment
MOTION FOR NEW TRIAL AND TO VACATE DEFAULT JUDGMENT

---

10/23/2023 NOTE - CLERKS ▾

Comment
CC COPY NOTEBOOK RECEIVED HEARING D/M/NEW TRIAL 19/26 @ 10:00 A.M

---

10/23/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM INDEX NO. 158207/2022

NYSCEF DOC. NO. 180    2/7/24, 12:54 PM    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State    RECEIVED NYSCEF: 02/07/2024

Court Records    Pg 2221 of 2230

PROPOSED ORDER FOR NEW TRIAL AND TO SET ASIDE DEFAULT JUDGMENT

Comment
PROPOSED ORDER FOR NEW TRIAL AND TO SET ASIDE DEFAULT JUDGMENT

---

10/23/2023 RESPONSE ▾

IN OPPOSITION TO MOTION FOR NEW TRIAL

Comment
IN OPPOSITION TO MOTION FOR NEW TRIAL

---

10/23/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED DENYING MOTION FOR NEW TRIAL

Comment
PROPOSED DENYING MOTION FOR NEW TRIAL

---

10/25/2023 NOTE - CLERKS ▾

Comment
CC COPY NOTEBOOK RECEIVED HEARING D/M/NEW TRIAL 10/26 @ 10:00 A.M

---

10/25/2023 AFFIDAVIT ▾

AFFIDAVIT IN SUPPORT OF MOTION FOR A NEW TRIAL & TO VACATE DEFAULT JUDGMENT - JOHN HANRATTY

Comment
IN SUPPORT OF MOTION FOR A NEW TRIAL & TO VACATE DEFAULT JUDGMENT

---

10/26/2023 Motion - New Trial ▾

DEF'S MOTION FOR NEW TRIAL AND TO VACATE DEFAULT JUDGMENT

MOTION FOR NEW TRIAL AND TO VACATE DEFAULT JUDGMENT

AFFIDAVIT IN SUPPORT OF MOTION FOR A NEW TRIAL & TO VACATE DEFAULT JUDGMENT - JOHN HANRATTY

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
10:00 AM

Comment
& TO VACATE - SET BY LIZ 214-919-3555 - 30M - IN PERSON - C.C REQ. CC RECEIVED

---

10/26/2023 ORDER - DENY ▾

ORDER - DENY MOTION FOR NEW TRIAL AND VACATE DEFAULT JUDGMENT

Comment
MOTION FOR NEW TRIAL AND TO VACATE DEFAULT JUDGMENT

2/7/24, 12:54 PM
24-04020-dsj   Doc 1-2   Filed 08/14/24   Entered 08/14/24 09:45:23   Doc #3 State
Court Records   Pg 2222 of 2230

10/31/2023 MISCELLANOUS EVENT ▾

E-SERVE COVER LETTER

E-SERVE ORDER DENY MOTION FOR NEW TRIAL

Comment
ESERVE COVER LETTER - ORDER DENY MOTION FOR NEW TRIAL

11/07/2023 MOTION - WITHDRAW ATTORNEY ▾

MOTION TO WITHDRAW OF COUNSEL

11/07/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED ORDER WITHDRAW OF COUNSEL

Comment
PROPOSED TO WITHDRAW ATTORNEY

11/08/2023 CERTIFICATE OF CONFERENCE ▾

ON MOTION FOR WITHDRAWAL OF COUNSEL

Comment
ON MOTION FOR WITHDRAWAL OF COUNSEL

11/08/2023 DISCOVERY ▾

NOTICE OF DEPOSITION UPON ORAL EXAMINATION OF JOHN HANRATTY

Comment
NOTICE OF DEPOSITION UPON ORAL EXAMINATION OF JOHN HANRATTY

11/09/2023 NOTICE OF HEARING / FIAT ▾

NOH-MOTION TO WITHDRAW COUNSEL

Comment
MOTION TO WITHDRAW COUNSEL

11/14/2023 NOTICE OF APPEARANCE ▾

NOTICE OF APPEARANCE

11/14/2023 RESPONSE ▾

RESPONSE TO MOTION FOR WITHDRAWAL OF COUNSEL

Comment
TO MOTION FOR WITHDRAWAL OF COUNSEL

11/14/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO. 180
RECEIVED NYSCEF: 02/07/2024
2/7/24, 12:54 PM
DC-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2223 of 2230

PROPOSED ORDER MOTION TO WITHDRAW COUNSEL

Comment
PROPOSED ORDER MOTION TO WITHDRAW COUNSEL

---

11/17/2023 Motion - Withdraw ▾

PROPOSED ORDER WITHDRAW OF COUNSEL

MOTION TO WITHDRAW OF COUNSEL

NOH-MOTION TO WITHDRAW COUNSEL

RESPONSE TO MOTION FOR WITHDRAWAL OF COUNSEL

PROPOSED ORDER MOTION TO WITHDRAW COUNSEL

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
10:15 AM

Comment
Set with Alex Beard 214-919-3555. IN PERSON.

---

11/17/2023 ORDER - WITHDRAW ATTORNEY ▾

ORDER - WITHDRAW ATTORNEY

---

11/20/2023 NOTE - CLERKS ▾

MAILED TO EBURY RE LIMITED LIABILITY COMPANY

MAILED TO JOHN HANDRATTY

Comment
COPY OF MOTION TO WITHDRAW COUNSEL MAILED TO DEFS

---

11/21/2023 MISCELLANOUS EVENT ▾

E-SERVE COVER LETTER

E-SERVE ORDER WITHDRAW COUNSE

Comment
ESERVE COVER LETTER - ORDER WITHDRAW COUNSEL

---

11/22/2023 CORRESPONDENCE - LETTER TO FILE ▾

LETTER TO JOHN HANRATTY REGARDING ORDER TO WITHDRAW COUNSEL

Comment
LETTER TO JOHN HANRATTY REGARDING ORDER TO WITHDRAW COUNSEL

---

01/03/2024 MOTION - COMPEL ▾

PLAINTIFF'S MOTION TO COMPEL POST-JUDGMENT DISCOVERY

2/7/24, 12:54 PM    3:24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2224 of 2230

Comment
PLAINTIFF'S RE: POST-JUDGMENT DISCOVERY

---

01/03/2024 NON-SIGNED PROPOSED ORDER/JUDGMENT ▼

PROPOSED ORDER GRANTING MOTION TO COMPEL POST-JUDGMENT DISCOVERY

Comment
PROPOSED ORDER GRANTING MOTION TO COMPEL POST-JUDGMENT DISCOVERY

---

01/03/2024 NOTICE OF HEARING / FIAT ▼

NOTICE OF HEARING ON PLTF'S MOTION TO COMPEL POST-JUDGMENT DISCOVERY

Comment
ON PLTF'S MOTION TO COMPEL POST-JUDGMENT DISCOVERY

---

01/05/2024 CERTIFICATE OF DEPOSITION ▼

CERTIFICATE OF DEPOSITION - NON-APPEARANCE RE: JOHN HANRATTY

Comment
NON-APPEARANCE RE: JOHN HANRATTY

---

01/31/2024 Motion - Compel ▼

PLAINTIFF'S MOTION TO COMPEL POST-JUDGMENT DISCOVERY

PROPOSED ORDER GRANTING MOTION TO COMPEL POST-JUDGMENT DISCOVERY

NOTICE OF HEARING ON PLTF'S MOTION TO COMPEL POST-JUDGMENT DISCOVERY

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
1:15 PM

Comment
BOB ARNETT 214-550-8209; CC REQ'D; IN-PERSON

---

01/31/2024 ORDER - COMPEL ▼

ORDER - COMPEL

---

02/05/2024 NOTE - CLERKS ▼

Comment
COPY OF ORDER TO COMPEL MALED TO DEF

---

02/05/2024 MISCELLANOUS EVENT ▼

Comment
ESERVE COVER LETTER - ORDER COMPEL

2/7/24, 12:54 PM    24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
                                               Court Records    Pg 2225 of 2230

## Financial

EYZC INVESTMENT HOLDINGS, LLC.

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | $366.00 |
| | Total Payments and Credits | | | $366.00 |
| 5/11/2023 | Transaction Assessment | | | $350.00 |
| 5/11/2023 | CREDIT CARD - TEXFILE (DC) | Receipt # 31061-2023-DCLK | EYZC INVESTMENT HOLDINGS, LLC. | ($213.00) |
| 5/11/2023 | STATE CREDIT | | | ($137.00) |
| 5/22/2023 | Transaction Assessment | | | $16.00 |
| 5/22/2023 | CREDIT CARD - TEXFILE (DC) | Receipt # 33130-2023-DCLK | EYZC INVESTMENT HOLDINGS, LLC. | ($16.00) |

## Documents

ORIGINAL PETITION

RQST LETTER

ISSUE CITATION-EBURY RE LIMITED LIABILITY COMPANY

ISSUE CITATION-JOHN HANRATTY

MOTION SUBSTITUTE SERVICE

PROPOSED ORDER SUBSTITUTE SERVICE

dism letter (116th)

ORDER - SUBSTITUTE SERVICE

EXECUTED CITATION - JOHN HANRATTY

PROPOSED ORDER OF INTERLOCUTORY DEFAULT JUDGMENT

DC-21-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2226 of 2230

SERVICEMEMBER'S CIVIL RELIEF ACT AFFIDAVIT

EXECUTED CITATION - EBURY RE LIMITED LIABILITY COMPANY

AMENDED SERVICEMEMBERS CIVIL RELIEF ACT AFFIDAVIT

FP NOTICE OF DEFAULT JUDGMENT RULE 239(a)

FP NOTICE OF DEFAULT JUDGMENT RULE 239(a)

ORDER - INTERLOCUTORY JUDGMENT

MOTION FOR INTERLOCUTORY DEFAULT JUDGMENT AS TO EBURY RE LIMITED LIABILITY COMPANY

PROPOSED DEFAULT JUDGMENT

FP NOTICE OF DEFAULT JUDGMENT RULE 239(a)

ORDER - INTERLOCUTORY JUDGMENT

DEFAULT JUDGMENT

E-SERVE COVER LETTER ORDER FINAL JUDGMENT & ORDER INTERLOCUTORY JUDGMENT

E-SERVE ORDER FINAL JUDGMENT

E-SERVE ORDER INTERLOCUTORY JUDGMENT

DEF'S MOTION FOR NEW TRIAL AND TO VACATE DEFAULT JUDGMENT

MOTION FOR NEW TRIAL AND TO VACATE DEFAULT JUDGMENT

AFFIDAVIT IN SUPPORT OF MOTION FOR A NEW TRIAL & TO VACATE DEFAULT JUDGMENT - JOHN HANRATTY

PROPOSED ORDER FOR NEW TRIAL AND TO SET ASIDE DEFAULT JUDGMENT

IN OPPOSITION TO MOTION FOR NEW TRIAL

PROPOSED DENYING MOTION FOR NEW TRIAL

ORDER - DENY MOTION FOR NEW TRIAL AND VACATE DEFAULT JUDGMENT

E-SERVE COVER LETTER

E-SERVE ORDER DENY MOTION FOR NEW TRIAL

PROPOSED ORDER WITHDRAW OF COUNSEL

MOTION TO WITHDRAW OF COUNSEL

ON MOTION FOR WITHDRAWAL OF COUNSEL

NOTICE OF DEPOSITION UPON ORAL EXAMINATION OF JOHN HANRATTY

NOH-MOTION TO WITHDRAW COUNSEL

NOTICE OF APPEARANCE

RESPONSE TO MOTION FOR WITHDRAWAL OF COUNSEL

PROPOSED ORDER MOTION TO WITHDRAW COUNSEL

MAILED TO EBURY RE LIMITED LIABILITY COMPANY

MAILED TO JOHN HANDRATTY

ORDER - WITHDRAW ATTORNEY

E-SERVE COVER LETTER

E-SERVE ORDER WITHDRAW COUNSE

LETTER TO JOHN HANRATTY REGARDING ORDER TO WITHDRAW COUNSEL

PLAINTIFF'S MOTION TO COMPEL POST-JUDGMENT DISCOVERY

PROPOSED ORDER GRANTING MOTION TO COMPEL POST-JUDGMENT DISCOVERY

NOTICE OF HEARING ON PLTF'S MOTION TO COMPEL POST-JUDGMENT DISCOVERY

CERTIFICATE OF DEPOSITION IN NON-APPEARANCE DEPOSITION/PARTY

ORDER - COMPEL

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO: 181
RECEIVED NYSCEF: 02/07/2024

24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2228 of 2230

# EXHIBIT D

CAUSE NO. DC-23-06256

| | | |
|---|---|---|
| EYZC INVESTMENT HOLDINGS, LLC, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| v. | § § | 116th JUDICIAL DISTRICT |
| EBURY RE LIMITED LIABILITY COMPANY and JOHN HANRATTY, | § § § § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## ORDER GRANTING MOTION TO COMPEL POST-JUDGMENT DISCOVERY

Plaintiff EYZC Investment Holdings, LLC's motion to compel post-judgment discovery from Defendants Ebury RE Limited Liability Company ("Ebury") and John Hanratty ("Hanratty"), came before the Court this day. Having considered the motion and the response (if any), and having heard the arguments of counsel, the Court finds and concludes that the motion should be granted. Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the motion to compel post-judgment discovery is GRANTED, as follows:

1. Ebury is ordered to fully and completely answer Judgment Creditor EYZC's Interrogatories to Judgment Debtor Ebury RE Limited Liability Company within fourteen days from the date of this order.

2. Ebury is ordered to produce all documents responsive to Judgment Creditor's Request for Production to Judgment Debtor within fourteen days from the date of this order.

FILED: NEW YORK COUNTY CLERK 02/07/2024 08:25 PM
INDEX NO. 158207/2022
NYSCEF DOC. NO: 181
RECEIVED NYSCEF: 02/07/2024
24-04020-dsj    Doc 1-2    Filed 08/14/24    Entered 08/14/24 09:45:23    Doc #3 State
Court Records    Pg 2230 of 2230

3.    Hanratty is ordered to fully and completely answer Judgment Creditor EYZC's Interrogatories to Judgment Debtor John Hanratty within fourteen days from the date of this order.

4.    Hanratty is ordered to produce all documents responsive to Judgment Creditor's Request for Production to Judgment Debtor within fourteen days from the date of this order.

5.    Hanratty is ordered to appear ~~in person~~ *Via Zoom* for deposition examination in Dallas, Texas, within thirty days from the date of the order and on a date selected by EYZC's counsel, *unless otherwise agreed to by the parties.*

6.    Hanratty and Ebury are jointly and severally ordered to pay EYZC $6,500.00 for its reasonable and necessary attorneys' fees incurred in bringing the motion within fourteen days from the date of this order.

Signed this 31st day of January, 2024.

TONYA PARKER
PRESIDING JUDGE